Eugene Licker (EL 0334)
KIRKPATRICK & LOCKHART LLP
599 Lexington Avenue
New York, New York 10022-6030
(212) 536-3900 (phone)
(212) 536-3901 (fax)

Jerry S. McDevitt
Curtis B. Krasik
Amy L. Barrette
KIRKPATRICK & LOCKHART LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, Pennsylvania 15222
(412) 355-8608 (phone)
(412) 355-6501 (fax)

Attorneys for Plaintiff, World Wrestling Entertainment, Inc.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X    :
                                                                 :
WORLD WRESTLING ENTERTAINMENT, INC.,                             :
                                                                 :    04  CV 8223
                                          Plaintiff,             :
                                                                 :
                       - against -                               :
                                                                 :    **JURY TRIAL DEMANDED**
JAKKS PACIFIC, INC.; JAKKS PACIFIC (H.K.)                        :
LIMITED; ROAD CHAMPS LIMITED; THQ, INC.;                        :
THQ/JAKKS PACIFIC LLC, THE JOINT VENTURE                        :
OF THQ, INC. and JAKKS PACIFIC, INC.;                           :
STANLEY SHENKER AND ASSOCIATES, INC.;                           :
STANLEY SHENKER; BELL LICENSING, LLC;                           :
JAMES BELL; JACK FRIEDMAN; STEPHEN                              :
BERMAN and JOEL BENNETT,                                        :
                                                                 :
                                          Defendants.           :
                                                                 :
------------------------------------------------------------X


**COMPLAINT**

## Nature of the Action

1.      This action is brought to (a) recover damages caused to WWE by the pattern of multifaceted racketeering activities set forth herein in connection with a commercial bribery scheme to obtain a lucrative videogame license, and amendments to toy licenses, issued by World Wrestling Entertainment, Inc. ("WWE"); (b) obtain a declaratory judgment that the videogame license between WWE and THQ/Jakks, LLC ("THQ/Jakks") and amendments to toy licenses between WWE and Jakks Pacific, Inc. ("Jakks") are void as a result of the illegal activities of Defendants taken to secure the videogame license and amendments of the toy licenses; (c) recover as damages the financial losses which will be associated with voiding the licenses; (d) obtain disgorgement of all profits earned by Defendants as a result of the commercial bribery scheme and licensing rights obtained by their conduct; and (e) recover punitive and other damages for the conduct set forth herein.

2.      The two licenses at issue herein were and are extremely lucrative licenses which were expected to and did produce millions of dollars in profits to the licensees.  THQ, Inc. ("THQ") and Jakks are two publicly traded companies whose stock valuation was expected to increase if the revenues from the videogame license and amendments to the toy licenses could be secured.

3.      At all times relevant hereto, Defendants Jack Friedman, Stephen Berman and Joel Bennett were the highest ranking executives of Jakks.  Individually and collectively, they were and are in a position to control the affairs of Jakks and foreign subsidiaries owned by Jakks which were used to both implement and conceal the commercial bribery scheme set forth herein.

4.      Additionally, Friedman, Berman and Bennett were all agents of a joint venture between THQ and Jakks formed for the purpose of obtaining the videogame license ("the Joint

Venture"). All acts of Friedman, Berman, Bennett and Jakks set forth herein were committed in furtherance of the Joint Venture, which has also ratified and accepted the benefits of the videogame license.

5. At all times relevant hereto, Defendants Friedman, Berman and Bennett realized they would recognize several million dollars in personal profits as a result of stock ownership and options in Jakks if the videogame license and the amendments to the toy licenses were secured.

6. The Defendants have acted through the years in concert to conceal the unlawful scheme and commercial bribes set forth herein by a variety of tactics, including laundering the bribes through foreign corporations and bank accounts, falsification of corporate accounting records, collusive and serial perjury by certain of the Defendants in a state court proceeding, destruction of physical evidence, falsification of physical evidence, incomplete and knowingly false responses to subpoenas duces tecum and false denials that the payments were made when requested by WWE to disclose such payments.

<u>The Parties</u>

7. Plaintiff, World Wrestling Entertainment, Inc. ("WWE"), is a Delaware corporation having its principal place of business at 1241 East Main Street, Stamford, Connecticut 06902. WWE is an integrated media and entertainment company principally engaged in the development, promotion and marketing of television programming, pay-per-view programming and live arena events. In the process, WWE creates colorful characters and personas whose names and likenesses can be licensed to third parties, such as Jakks and THQ.

8. Defendant Jakks Pacific, Inc. ("Jakks") is a Delaware corporation with its principal place of business at 22619 Pacific Coast Highway, Suite 250, Malibu, California

90265. Jakks is in the business of action figures and toys. In connection with the unlawful scheme, Jakks acted on its own behalf and then on behalf of the Joint Venture, and has benefited greatly from the scheme. Jakks owns and/or controls Road Champs, Ltd. and Jakks Pacific, H.K., two entities utilized by Jakks to effectuate the commercial bribes set forth herein.

9.     Defendant Jakks Pacific (H.K.) Limited ("Jakks Pacific (H.K.))" is a corporation organized under the laws of Hong Kong. The owners of Jakks Pacific (H.K.) are Defendants Friedman, who owns 1 of 1000 outstanding shares, and Jakks Pacific, Inc., which owns 999 of 1000 outstanding shares. Defendants Friedman and Berman are directors of Jakks Pacific (H.K.).

10.     Road Champs Limited ("Road Champs, Ltd.") is a corporation organized under the laws of Hong Kong. The owners of Road Champs, Ltd. are Defendants Friedman, who owns 1 of 300 outstanding shares, and Road Champs, Inc., which owns 299 of 300 outstanding shares. Road Champs, Inc. is a wholly owned subsidiary of Jakks Pacific, Inc. Defendants Friedman and Berman are directors of Road Champs, Ltd.

11.     Defendant Jack Friedman ("Friedman") is an individual who resides at 6351 Kanan Dume Road, Malibu, California 90265. At all times relevant hereto, Friedman was the highest-ranking executive at Jakks and served, and continues to serve, as Chief Executive Officer and Chairman of the Board of Directors of Jakks. Together with Defendant Berman, Friedman co-founded Jakks in or about January 1995. Prior to co-founding Jakks, Friedman was CEO and a director of THQ.

12.     Defendant Stephen Berman ("Berman") is an individual who resides at 27465 East Winding Way, Malibu, California 90265. During the implementation of the unlawful scheme and bribery payments set forth herein, Berman served as an Executive Vice President of

Jakks.  Since January 1, 1999, Berman has served as President, Secretary, and Chief Operating Officer of Jakks and served, and continues to serve, on the Board of Directors of Jakks.  On information and belief, prior to co-founding Jakks with Friedman, Berman was a Vice President and Managing Director of THQ International, Inc., a subsidiary of THQ.

13.    Defendant Joel Bennett ("Bennett") is an individual who resides at 6791 Trevino Drive, Moorpark, California 93021.  At all times relevant hereto, Bennett was the Chief Financial Officer of Jakks.

14.    Defendant THQ, Inc. ("THQ") is a Delaware corporation with its principal place of business at 27001 Agoura Road, Suite 325, Calabasas Hills, California 91301.  THQ is in the business of videogame marketing and sales.  THQ authorized its Joint Venture partner, Jakks, to act on its behalf and on behalf of the Joint Venture in order to secure the benefits of a videogame license with WWE and/or has ratified the actions of Jakks set forth herein.  Together with Jakks, THQ jointly obtained the videogame license.  THQ is in day-to-day control of the Joint Venture. THQ has benefited from the scheme set forth herein.

15.    Defendant THQ/Jakks Pacific LLC ("THQ/Jakks") is a Delaware limited liability corporation having its principal place of business at 22761 Pacific Coast Highway, Suite 226, Malibu, California 90265.  THQ/Jakks was formed on June 10, 1998 as part of the scheme set forth herein by Jakks and THQ to be the official licensee for WWE's videogame license. Defendant Berman signed the Certificate of Formation as an authorized person on behalf of the Joint Venture.  The Joint Venture has agreements in place detailing the manner in which revenues from the WWE videogame license will be accounted for and ultimately distributed between THQ and Jakks.

16.    Defendant Stanley Shenker & Associates, Inc. ("SSAI") is a New York corporation with its principal place of business at 25 VanZant Street, Norwalk, Connecticut. SSAI was WWE's licensing agent from in or around April 1995 through June 13, 2000.

17.    Defendant Stanley Shenker ("Shenker") is an individual who resides in New Canaan, Connecticut.  Shenker is, and at all times relevant to this Complaint has been, the President and sole owner of SSAI.  At all times relevant hereto, Shenker was also the sole owner and alter ego of a foreign corporation known as Stanfull Industrial, Ltd. ("Stanfull") in Hong Kong.  Shenker utilized Stanfull for a variety of criminal and fraudulent purposes, including as a money-laundering device to conceal the receipt and payment of bribes and kickbacks, including commercial bribes made by Jakks utilizing foreign subsidiaries that Jakks owned and/or controlled.

18.    Defendant Bell Licensing, LLC ("Bell Licensing") is a limited liability company organized amidst the scheme set forth herein by Bell under the laws of Connecticut with its principal place of business located at 405 Silver Creek Lane, Norwalk, Connecticut 06850.  Bell Licensing was formed to be a receptacle for bribes paid to Bell to influence him while serving as an executive and fiduciary of WWE, including, but not limited to, the bribes paid him in connection with the scheme described herein.  Prior to July 18, 2002, Bell Licensing did business under the name of Bell Consulting, LLC.

19.    Defendant James Bell ("Bell) is an individual who resides in Norwalk, Connecticut.  Bell is, and at all times relevant to this Complaint has been, the President and sole owner of Bell Licensing.  At all times relevant hereto, Bell utilized Bell Licensing as a money-laundering device to conceal the receipt of bribes and kickbacks, including payments from SSAI, Shenker, Stanfull and Jakks.

<u>Jurisdiction and Venue</u>

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. § 1331 and 15 U.S.C. § 15(a) in that WWE has alleged claims arising under the

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 and the Robinson-

Patman Act, 15 U.S.C. § 13 *et seq.*  This Court may exercise supplemental jurisdiction over

WWE's state law claims pursuant to 28 U.S.C. § 1367.

21.     Venue is proper under 28 U.S.C. § 1391(b)(3) because THQ and Jakks and SSAI

all may be found in this district.

<u>The Unlawful Scheme</u>

22.     In or around March 1995, WWE hired Bell as its Director of Domestic Licensing.

In October 1996, Bell became Senior Vice President of Licensing and Merchandising, a position

he held until his termination on March 24, 2000.

23.     As Senior Vice President of Licensing and Merchandising, Bell occupied a

fiduciary position and was responsible for, among other things:  (i) procuring licensees for

WWE; (ii) negotiating license agreements between WWE and potential licensees; (iii) managing

WWE's licensing arrangements with its licensees; and (iv) all other activities necessary and/or

attendant to the development and maintenance of WWE's licensing program.  Pursuant to

WWE's licensing program, licensees were granted the right to utilize WWE intellectual property

in connection with the licensees' own goods and/or services.

24.     Shortly after securing his position, Bell urged WWE to hire SSAI as an outside

licensing agent, touting to WWE Shenker's reported extensive experience and contacts in the

licensing business.  For at least ten years prior to Bell's introduction of Shenker to WWE in

April 1995, Bell and Shenker had maintained both a business and personal relationship.

25.     On Bell's recommendation, WWE retained SSAI in or around April 1995 originally as a non-exclusive outside licensing agent.  As such, SSAI was to procure and negotiate licensing contracts by utilizing Shenker's alleged contacts in the licensing business. Bell was responsible to supervise SSAI in its licensing endeavors and remained responsible to generate licenses for WWE using his own contacts and by negotiating with prospective licensees who contacted WWE directly.

26.     As a result of their respective positions, Bell, Shenker and SSAI occupied positions of trust and of a fiduciary nature to WWE.  During the course of their relationship with WWE, SSAI and Bell both entered into agreements with WWE reflecting and acknowledging their fiduciary roles and unique positions of trust.

27.     On March 2, 1995, Bell executed a Code of Conduct Agreement wherein he agreed, among other things, that he would not:

a.     accept fees, commissions, or property in connection with any transaction on behalf of WWE;

b.     accept or offer unauthorized or illegal payments;

c.     use his position directly or indirectly for personal or financial gain;

d.     personally take advantage of business opportunities which might be of interest to WWE; and

e.     serve as an officer, director, employee, consultant or promoter of for profit organizations without WWE's prior approval.

28.     After SSAI agreed to be WWE's nonexclusive licensing agent, Friedman approached both Bell and Shenker at a toy fair inquiring whether Jakks could obtain a toy license from WWE.  Bell and Shenker subsequently presented a deal memo to WWE indicating SSAI

had procured and negotiated the terms of a toy license with Jakks.  On or about October 24,

1995, WWE and Jakks entered into a domestic toy license with Jakks.  The term of the original

domestic license was to end on December 31, 1997 with a one-year right to renew if Jakks

achieved certain financial requirements.

29.    Prior to becoming the Chairman of the Board of Jakks, Defendant Friedman had

worked in the videogame business.  At points in time prior to becoming Chairman of Jakks,

Friedman had an ownership interest in, and was employed by, Defendant THQ.

30.    Unknown to WWE, and undisclosed by SSAI, Shenker, and Jakks, Shenker

entered into financial transactions with Jakks after the domestic toy license was entered into

wherein he agreed to represent Jakks' interests at the same time he was acting as WWE's agent.

31.    The first such transaction now known to have occurred, despite years of

concealment, occurred in early 1996 when Berman entered into an agreement on behalf of Jakks

with Shenker to act as their agent with respect to a toy product of perfumed dolls.

32.    Unknown to WWE, Jakks was paying Shenker as their agent at the same time

they were ostensibly negotiating amendments to the WWE toy license with Shenker as WWE's

agent.

33.    After Jakks and Shenker entered into a contract for Shenker to be Jakks' agent on

the perfume doll toy, Friedman, Berman and Shenker discussed having Shenker serve as Jakks'

agent with respect to other matters, including acting as Jakks' agent specifically on WWE

matters notwithstanding that he was known to be an agent of WWE.

34.    The conversation discussing Jakks' desire to retain Shenker to act as their agent

on WWE matters occurred at the New York Toy Fair in 1996.

35.    During the conversation regarding Shenker serving as Jakks' agent on WWE matters at the same time he was a WWE agent, a call was placed by Friedman, Berman and Shenker to Mr. Murray Skala, Jakks' outside legal counsel and a member of the Board of Directors of Jakks, regarding the proposed arrangement.  Mr. Skala advised all participants in the call that it would be a conflict of interest for Shenker to serve as Jakks' agent on WWE matters at the same time Shenker was acting as WWE's agent and that such an arrangement could not be done without first making full disclosure to WWE and obtaining their consent.

36.    Following the conversation with Jakks' corporate counsel, neither Friedman, Berman, Shenker, nor Jakks disclosed the conversation to WWE nor sought their consent.  On information and belief, all three men did not disclose the conversation because they knew WWE would not agree to such an obvious conflict of interest and because disclosure might also cause it to be revealed that Shenker was already acting as Jakks' agent.  Instead, all three men kept the conversation secret and eventually implemented, in or around 1998, a plan whereby Shenker would accept and split bribes from Jakks with Bell to secure the videogame license and related amendments to the domestic toy license and an international toy license secured by Jakks following the aforementioned conversation.  The plan devised and implemented by Jakks and its three highest executives utilized monies laundered through foreign corporations controlled by Jakks and bank accounts of those foreign corporations in Hong Kong.  An essential part of the scheme was that the monies paid as commercial bribes were not recorded anywhere on the financial books and records of Jakks situated in America at the headquarters of the parent corporation.

37.    On or about February 10, 1997, WWE and Jakks entered into an international toy license having a term which was to end on December 31, 1999.  At no time prior to entering into

this license did SSAI, Shenker or Jakks disclose that Shenker had performed services for Jakks. Likewise, none of the aforementioned parties disclosed to WWE the conversation about Shenker serving as Jakks' agent on WWE matters.

38.    On March 7, 1997, WWE and SSAI entered into an agreement (the "Agency Agreement") pursuant to which SSAI became WWE's exclusive outside licensing agent.  The Agency Agreement provided that the services thereunder would be performed specifically and primarily by Shenker personally.  At the time it entered into the March 7, 1997 Agency Agreement with SSAI, WWE did not know that Shenker had been serving as Jakks' agent or of the discussions between Jakks' executives and Shenker aimed at having him be Jakks' agent at the same time Jakks knew he was WWE's agent.

39.    Under the contract to be WWE's exclusive outside licensing agent, SSAI was responsible for, *inter alia*, procuring potential licensees and negotiating the terms of prospective licenses.  SSAI was not, however, granted any right to accept licensing proposals or to execute particular agreements on behalf of WWE.  Instead, SSAI was to present all licensing proposals it procured and negotiated in deal memo format to Bell, who in turn would recommend to WWE whether to accept the proposal.

40.    In consideration of the services rendered under the Agency Agreement, SSAI was to receive a commission of eleven percent (11%) of royalties and other consideration paid to WWE with respect to licensing deals specifically negotiated and procured by SSAI which were accepted by WWE.  SSAI was not to receive commissions on licensing deals procured and negotiated by Bell, who remained responsible to generate licensing deals using his own contacts and with prospective licensees who contacted WWE.

41.     Under the March 7, 1997 contract, SSAI also was not entitled to commissions on royalties paid to WWE with respect to, *inter alia*, licenses granted by WWE prior to the commencement of the Agency Agreement.  The licenses on which SSAI was not entitled to receive commissions were listed on an Exhibit A to the Agency Agreement.  One such license on which SSAI was not entitled to receive commissions was WWE's preexisting videogame license with Acclaim.  At the time SSAI entered into the March 7, 1997 Agency Agreement, Acclaim was WWE's exclusive licensee for the manufacture and sale of videogames utilizing WWE intellectual property.

42.     As an existing licensee of WWE, Acclaim was to and did conduct negotiations regarding a renewal of its videogame license with Bell, not SSAI.  If the Acclaim license were renewed, SSAI would not receive any commission.

43.     In addition to Acclaim and Jakks, other companies desired to secure the WWE videogame license including THQ and Activision.

44.     In order to place Jakks in control of the videogame license, and with the intent to cause SSAI and Bell to breach their fiduciary duties, Defendants Friedman and/or Berman and/or Bennett devised and implemented a corrupt scheme to foreclose competition for the videogame license and to obtain it by the commercial bribery of Shenker and Bell.  Pursuant to the scheme, Jakks agreed to pay monies to Shenker's alter ego—Stanfull—by a series of payments to Stanfull's foreign bank account with the understanding that Shenker would then serve as a conduit for the payment of bribes directly to Bell.

45.     An essential part of the corrupt scheme involved concealment of the payments, both as a necessary corollary of a commercial bribery scheme and as a result of the prior

conversation with Jakks' corporate counsel advising that Shenker could not serve as the agent of Jakks on WWE matters while at the same time acting as WWE's agent.

46.     The scheme was implemented in early 1998, while negotiations were ongoing regarding the videogame license.  At the direction of Defendants Friedman and/or Berman, Shenker caused to be delivered a handwritten invoice from his foreign corporation, Stanfull, to Jakks' corporate headquarters in California for $80,000.  The cursory description contained on the invoice stated it was "For Development of Possible Latex Based Soft Toys with Special Coating" and was dated January 2, 1998.  On the invoice, Shenker directed that the payment be made to Stanfull's account at the Hang Seng Bank in Hong Kong.  A true and correct copy of the invoice is attached hereto as Exhibit 1.

47.     The January 2, 1998 invoice was a false and fraudulent invoice, known to be by all concerned, and was merely a conduit to secure corporate funds to pay commercial bribes.  No contract existed between Jakks and Stanfull or Shenker for the development of latex based soft toys and neither Shenker nor Stanfull ever developed or delivered such toys to Jakks pursuant to the January 2, 1998 invoice.

48.     Upon receipt of the January 2, 1998 invoice, Jakks did not record the invoice, nor any of the ensuing steps it took to pay the invoice, on the financial books and records of the American parent company to which the invoice had been delivered even though the invoice purported to be, and was, payable by Jakks and not one of its foreign subsidiaries.

49.     In January of 1998, the internal financial controls of Jakks known to and implemented by Defendant Bennett as the CFO required the corporate official authorizing payment of an invoice to sign and approve the invoice.

50.     The January 2, 1998 invoice of Stanfull was not signed by the corporate official authorizing payment in the first of many steps designed to conceal the involvement of Friedman and/or Berman in the scheme.

51.     In violation of Jakks' own internal financial controls requiring a corporate official to sign an invoice approving payment, Defendant Bennett, upon receipt of the January 2, 1998 invoice from Defendant Friedman and/or Berman, took steps to have the invoice paid. Rather than pay the invoice on available funds of the American parent corporation, Defendant Bennett sent it by facsimile to Mr. Will Hons, a foreign agent of Jakks, in Hong Kong and instructed Hons to make arrangements to pay $40,000 of the invoice to Stanfull.

52.     On or about January 14, 1998, acting upon the direction of Defendant Bennett, $40,000 was, in fact, paid to Stanfull via a series of transactions undertaken with the intent to conceal the transactions and bury them in fraudulent accounting of foreign corporations owned by Jakks and bank accounts of those foreign subsidiaries.

53.     On January 14, 1998, $40,000 was withdrawn from an account at the Hang Seng Bank in Hong Kong of Road Champs, Ltd. ("Road Champs"), a foreign subsidiary owned and/or controlled by Jakks. The $40,000 was deposited that same day into Stanfull's bank account at the Hang Seng Bank.

54.     On January 14, 1998, the same day as the Jakks' monies were deposited into Stanfull's account, Shenker, acting in concert with Jakks to conceal the disposition of the monies, and with the intent of inducing Bell to violate his fiduciary duties, obtained a demand draft for $20,000 payable to James Bell from the Hang Seng Bank, which he subsequently gave to Bell upon returning to the United States, thereby splitting the money equally with Bell.

55.    At or around the same time Road Champs paid the $40,000, another foreign subsidiary owned and/or controlled by Jakks known as Jakks Pacific, H.K. sent $40,000 by wire transfer to Road Champs to reimburse Road Champs for the $40,000 paid to Stanfull.

56.    The general ledgers of Road Champs were then falsified to conceal completely the payment to Stanfull.  Instead of recording the payment to Stanfull on the general ledger of Road Champs, the accounting entries made it appear as if the transaction was simply the intercorporate transfer of monies from Jakks Pacific, H.K. to Road Champs, with no mention made on the ledger of the payment to Stanfull.

57.    Shortly after receiving his share of the $40,000 bribe, and without WWE's knowledge or consent or prior approval, Bell formed Bell Consulting, now known as Bell Licensing, as a for-profit organization and served as its President.  At no time during his employment with WWE did Bell ever disclose to WWE either the formation or existence of Bell Licensing or Bell's own role as Bell Licensing's President.

58.    Bell formed Bell Licensing in order to serve as a vehicle for the receipt of illegal bribes and kickbacks he had received and expected to receive from Shenker, the first of which was the $20,000 in monies originating with Jakks laundered through the Hang Seng Bank on January 14, 1998.

59.    Upon receipt of the $20,000 from Stanfull on or about January 14, 1998 of monies originating with Jakks' foreign subsidiaries in the aforementioned series of transactions, Bell utilized his influence to steer WWE away from even considering the renewal of Acclaim as the videogame licensee.  Prior to the payment of the aforementioned bribe, Bell had advised Acclaim that there would be no problem with the renewal of the existing license.

60.     On March 25, 1998, Bell advised Acclaim that he would not even listen to any proposal that Acclaim would make for the renewal of their license.  After Acclaim complained to senior management at WWE that it was not being permitted to submit a renewal proposal, Acclaim was told it could do so.

61.     Before Acclaim's formal proposal was ever received, however, Bell initialed a deal memo on March 30, 1998 recommending to senior management at WWE that the videogame license be awarded to "Jakks Pacific-Electronic Game Division."  The deal memo listed SSAI as the agent who had negotiated and procured the deal.

62.     As of March 30, 1998, Jakks did not even have a videogame division and had no ability to perform a videogame license.

63.     On March 31, 1998, the day after Bell had initialed the deal memo recommending that the videogame license be awarded to Jakks, Defendant Bennett again directed Will Hons to use Jakks' foreign subsidiaries to pay another $40,000 to Stanfull.  Bennett advised Hons on the day after Bell had recommended to WWE management that it grant the videogame license to Jakks that it was "imperative" that the funds be available to Stanfull not later than April 2, 1998.

64.     On or about April 2, 1998, Jakks Pacific, H.K., a foreign subsidiary of Jakks acting on Bennett's direction, wire transferred another $40,000 into Stanfull's account at the Hang Seng Bank in Hong Kong.

65.     On or about April 7, 1998, as he had done following the first $40,000 payment from Jakks, Shenker once again split the money with Bell by obtaining a demand draft from the Hang Seng Bank for $20,000 payable to Bell Consulting, LLC.

66.    On April 8, 1998, WWE management approved the deal memo submitted by Bell and SSAI to grant the videogame license to Jakks.  At that time, WWE was not aware of any of the aforementioned payments to its agents by Jakks.

67.    On or about April 15, 1998, principally based on Bell's influence, direction and advice, WWE advised Acclaim that it did not intend to renew Acclaim's videogame license.

68.    The actions of SSAI and Bell were in violation of their fiduciary duties, and were in direct response to being paid commercial bribes.  Both SSAI and Bell recommended to WWE management that the videogame license be given to Jakks before even obtaining proposals from other videogame companies interested in independently securing the license.

69.    Following Bell's and SSAI's recommendation that the videogame license be given to Jakks, a series of events occurred which threatened to expose the illegal scheme.

70.    On April 16, 1998, representatives of THQ met with Bell and Shenker.  On information and belief, both Bell and Shenker initially tried to steer THQ away from seeking the videogame license or making a proposal for it, telling THQ that it should consider making a proposal for arcade games and personal computers.

71.    On April 23, 1998, THQ directed a letter to both Bell and Shenker indicating its desire to obtain the videogame license.  THQ indicated it would be willing to do a non-exclusive multi-year license with guarantees of several million dollars, competitive royalty rates, significant marketing commitments, and stock purchase warrants.  THQ's proposal was clearly superior to the deal with Jakks which Bell and SSAI had already recommended to WWE management and which had been approved based on their recommendation.

72.    On April 27, 1998, after the aforementioned scheme was effectuated by Defendants, Activision also sent its initial informal proposal to SSAI for the videogame license

with WWE.  The Activision offer was also clearly superior to the terms offered by Jakks and which had already been recommended by Bell and approved by WWE.  Activision's offer included a higher guaranteed royalty than the Jakks proposal and included stock options in Activision.

73.      On information and belief, the receipt of the THQ and Activision proposals jeopardized the existing bribery scheme then in place since questions would be raised if WWE went forward with the Jakks proposed license and later learned that WWE agents, SSAI and Bell, had received clearly superior offers from THQ and Activision.

74.      In order to conceal the scheme and see it to fruition, SSAI and Bell did not provide WWE management with copies of the April 23, 1998 letter from THQ or the April 27, 1998 Activision informal proposal.

75.      On information and belief, Shenker and/or Bell advised Jakks of the terms of Activision's offer and of THQ's interest and the need to increase their offer so as to avoid detection of their scheme.

76.      Having obtained WWE's agreement to grant the videogame license to Jakks via the aforementioned scheme, and in order to get a cut of the anticipated revenues from the anticipated revenues associated with the videogame license, Jakks then solicited THQ to become a Joint Venture partner instead of submitting an independent proposal on behalf of THQ.  THQ agreed to become a Joint Venture partner with Jakks on the videogame license instead of making its own formal and independent proposal, and agreed to pay Jakks monies which otherwise would have, and should have, been promised to WWE in an independent proposal.  THQ did so as consideration for Jakks' role in securing the license.  For all intents and purposes, Jakks and

THQ both knew that the videogame license would be performed by THQ as Jakks had no ability to perform a videogame license.

77.     The Joint Venture of THQ and Jakks then submitted a proposal designed to be competitive with the Activision proposal, including stock options in both Jakks and THQ.

78.     As additional inducement to Bell, Shenker, individually, as a corporate officer of SSAI, and/or while acting as an undisclosed agent of Jakks, promised Bell that SSAI would split equally with Bell all commissions and other considerations he would receive if Bell recommended the videogame license be given to the Joint Venture between THQ and Jakks.

79.     SSAI, Shenker and Bell agreed to the corrupt scheme of the joint venture knowing that Jakks would receive monies which otherwise would have went to their principal in a true competitive bidding situation, and agreed to take all action necessary to recommend to WWE management that the videogame license be awarded to the joint venture instead of the only remaining candidate for the license, Activision.

80.     As a result of the unlawful scheme, the joint venture proposed and SSAI, Shenker and Bell agreed to recommend to WWE that the videogame license be of the extraordinary length of ten years with a five-year right of renewal to be vested in the joint venture.

81.     By recommending a license of extraordinary length, SSAI, Shenker and Bell stood personally to make millions in illegal profits at the expense of their principal, WWE, as a result of the bribery scheme to give Jakks control of the license and to thereby generate a commission stream to SSAI to split equally with Bell for at least ten and potentially fifteen years.

82.     On May 12, 1998, Bell submitted a deal memorandum setting forth the revised proposal for a videogame license between WWE and the Joint Venture between THQ and Jakks. The deal memo listed SSAI as the procuring agent.

83.    Bell submitted the May 12, 1998 deal memo to WWE management before even receiving the more formal proposal of Activision, which was sent to Bell late in the day of May 12, 1998.  Consistent with their scheme, neither Bell nor SSAI ever sent the formal Activision proposal of May 12, 1998 to WWE management.

84.    On June 10, 1998, the Joint Venture of THQ and Jakks caused to be filed a Certificate of Formation in Delaware forming THQ & Jakks Pacific LLC and on that same date executed a videogame license agreement with WWE.

85.    On June 23, 1998, WWE executed a videogame license agreement with THQ/Jakks effective as of June 10, 1998 (the "videogame license").  The term of the license was to end on December 31, 2009, subject to the right to renew for an additional five years in favor of THQ/Jakks.

86.    As another central aspect of the corrupt influence of SSAI, Shenker and Bell, which Jakks had obtained as a result of the aforementioned scheme, Jakks requested, and SSAI and Bell agreed to recommend, a lengthy extension to the toy licenses to make the term of the licenses coincide with the term of the videogame license.  By Agreements dated June 24, 1998, the domestic and international toy licenses between WWE and Jakks were amended to make the toy licenses coterminous with the videogame license as a necessary and essential part of the commercial bribery scheme.

87.    On July 15, 1998, as a final payment of the bribery scheme, Shenker caused another phony invoice to be delivered to Jakks' corporate headquarters in Malibu, California for $20,000 with a false and fraudulent description for the charges.  The fraudulent invoice dated July 15, 1998 was sent to the attention of Berman.  As he had done before, Bennett directed an overseas agent of a Jakks' foreign subsidiary to make the payment.

88.     On April 3, 1998, Bennett was advised by overseas agents of a Jakks' subsidiary that the $20,000 had, in fact, been paid to Stanfull.  The payment, once again, was made by Road Champs to Stanfull's account at the Hang Seng Bank.

89.     On October 8, 1998, Bell Licensing invoiced Stanfull for the $20,000.  On October 9, 1998, Shenker caused the invoice to be paid to Bell Licensing on funds drawn from SSAI's account.

90.     At no time during the negotiation of the videogame license with the Joint Venture or the amendment to the toy licenses with Jakks did Defendants disclose the existence of the bribery scheme or the series of payments made by Jakks through foreign subsidiaries to Stanfull and to Bell.

<u>The Coverup</u>

91.     Following the corruption of Shenker and Bell and the inducement to breach their fiduciary duties in connection with the videogame license and amendments to the toy licenses, Shenker and Bell expanded their criminal activity by agreements to split commissions on other licensing deals approved by Bell and/or assigned to SSAI by Bell.  All the illegal activity was affirmatively concealed from WWE by SSAI, Shenker and Bell.

92.     On March 24, 2000, WWE terminated Bell's employment with WWE for reasons unrelated to Bell's receipt of bribes and kickbacks, none of which were known to WWE at the time.

93.     On June 13, 2000, WWE terminated the contract of SSAI pursuant to a provision which entitled it to do so for a change in business direction.

94.     In October of 2000, SSAI brought an action against WWE for breach of contract in Connecticut state court seeking to be paid commissions on licenses SSAI had allegedly procured, including the toy and videogame licenses (the "Shenker litigation").

95.     At various times following the initiation of the Shenker litigation, Shenker, Bell, Friedman, Berman and Bennett, individually and as agents of the corporations they each own and control, as well as Jakks, the Joint Venture, THQ/Jakks, have acted in concert to conceal the unlawful scheme and bribes. All involved first concealed and denied the fact of payments to Stanfull and the use of foreign accounts to do so. After WWE eventually learned about the payments during discovery in the Shenker litigation, the Defendants directly involved in the payments gave false and inconsistent explanations for the payments, none of which are corroborated by any evidence.

96.     In an early attempt to make sure the payments were never discovered in the Shenker litigation, Defendant Friedman telephoned Linda McMahon, the CEO of WWE, and made an unsolicited offer during the early phase of the Shenker litigation to use his good graces with Shenker to broker a settlement of the Shenker litigation. WWE declined his offer.

97.     In the early phases of the Shenker litigation, Bell and Shenker acted in concert and destroyed invoices Bell had sent to Shenker for the bribes he had been promised, including invoices related to the bribes promised him in connection with the unlawful scheme set forth herein. Bell and Shenker also destroyed contracts they had related to the bribery scheme at issue herein.

98.     As a further part of the conspiracy, Shenker committed perjury and failed to disclose the existence of Stanfull when asked if he owned any corporations other than SSAI.

Shenker committed perjury in order to conceal the payments originating with Jakks made to Stanfull's foreign bank account.

99.     To further the coverup and conceal their criminal conduct, Shenker and Bell both perjured themselves in the Shenker litigation and testified that neither SSAI nor Shenker had made any payments to Bell relating to WWE licenses.  In actual fact, Shenker had made directly, or via money laundered through foreign accounts he controlled, payments in excess of $1,000,000 to Bell and/or Bell Licensing as commercial bribes, including payments of hundreds of thousands of dollars of bribes paid in connection with the scheme surrounding the videogame license and amendments to the toy licenses.

100.     During the same time Shenker and Bell were obstructing justice as set forth above, THQ and Jakks both represented that no payments had been made to Stanfull, SSAI, Shenker and/or Bell.  In response to repeated requests by WWE, pursuant to (i) subpoenas duces tecum served in connection with the Shenker litigation; (ii) audits of both THQ and Jakks' books and records; and (iii) communications from their legal counsel, all uniformly denied making any payments to Stanfull, SSAI, Shenker and/or Bell.

101.     By subpoena dated June 11, 2002, Jakks was ordered to produce a variety of records relating to its dealings with Shenker and Bell, including all documents relating to any agreements between Jakks and Shenker and/or SSAI and all documents relating to any payments made to SSAI and/or Shenker.

102.     Jakks' production of records in response to the subpoena was done by letter dated October 30, 2002.  Jakks concealed and did not produce either the $80,000 or the $20,000 invoice it paid to Stanfull in 1998 or any other documentation indicating such payments had been made.  Jakks also concealed, and did not produce, documents which demonstrated Shenker had

acted as their agent. Jakks' response to the subpoena gave no indication that monies had, in fact, been paid to Shenker.

103.    In order to police Jakks' compliance with the license, WWE exercised its right to audit the books and records of Jakks in early 2003.

104.    On January 14, 2003, WWE's auditors formally requested, in writing, that Jakks provide the auditors with a complete listing of all payments made by Jakks to Shenker, SSAI, Bell and/or Stanfull.

105.    On January 17, 2003, Jakks provided yet another false and misleading response to the auditors request of January 14, 2003 by stating that they had already "provided any documents that may exist" in response to the June 11, 2002 subpoena. As Jakks knew, it had not produced any documents evidencing payments to Shenker, SSAI or Stanfull in response to the June 11, 2002 subpoena even though such records existed. Joel Bennett received a copy of Jakks' false response to WWE's auditors and did nothing to correct it despite his knowledge of the payments at issue, all of which he had personally directed and orchestrated.

106.    By email dated February 25, 2003, WWE's auditors responded to Jakks' January 17, 2003 misleading response by pointing out that Jakks had not provided any documents related to payments to Shenker, SSAI or Stanfull in response to the June 11, 2002 subpoena and again asked for copies of all invoices or a description of each transaction whereby payments were made by Jakks to Shenker, SSAI and/or Stanfull.

107.    On February 25, 2003, in an email response from employees working under the direct supervision of Joel Bennett, Jakks did not respond and disclose the payments but instead advised that the request had been forwarded to their attorney who would advise shortly.

108.    By March 14, 2003, no response had been received from Jakks' attorneys to the request for disclosure of payments to SSAI, Shenker and Stanfull.  By letter dated March 14, 2003 sent to Jakks' corporate counsel, Mr. Murray Skala, WWE again requested an answer to the question of whether payments had been made to Shenker, SSAI and Stanfull.

109.    On March 19, 2003, Jakks, through its counsel, continued the practice of providing false and misleading information.  By letter of that date, Jakks' counsel reiterated the false theme that "the specific information requested was provided months ago" in response to the subpoena.  Such statements were false and known by Jakks to be false, as Jakks had not provided any information on the payments made to Shenker via Stanfull in 1998.

110.    On March 25, 2003, WWE once again informed Jakks, through its counsel, that the specific information requested had not been provided and again requested specific disclosure.

111.    On March 26, 2003, Jakks' counsel acknowledged that the documents provided in response to the June 2002 subpoena did not include documents reflecting payments to Shenker, SSAI or Stanfull, and then represented "there simply is no additional information of the type you seek."  Like all previous statements by Jakks, that statement was false.  Jakks had numerous documents evidencing the payments to Stanfull buried in the records of foreign subsidiaries of the payments.

112.    The repeated refusals to disclose the payments to Stanfull in 1998 were deliberate, in bad faith, and part of a plan to fraudulently conceal the unlawful scheme and commercial bribery set forth herein at all costs.  The payments were known to and orchestrated by the highest-ranking executives of Jakks, who also serve in executive capacities for the Joint Venture.  Instead of disclosing the payments, Jakks repeatedly provided false and misleading information to the effect that no such payments had been made.

113.    In the Shenker litigation, SSAI, Shenker and Bell also acted in concert to conceal both the existence and extent of the unlawful scheme and bribes and did so during the same time that Jakks, THQ, the Joint Venture, and Jakks/THQ were concealing the payments to Stanfull which Jakks had made via foreign subsidiaries.  Bell and Shenker both initially denied that any payments had been made to Bell, and SSAI denied receiving any money from licensees of WWE.  When discovery indicated that payments had been made to Bell by Shenker, both falsely claimed the payments were for "development projects" unrelated to WWE.  As part of their scheme to conceal their illegal conduct, Bell and Shenker created and then produced in discovery numerous fabricated invoices relating to payments from SSAI and/or Shenker to Bell, and destroyed the true invoices reflecting their bribery scheme.  The fabricated invoices were designed to make it appear as if the payments made to Bell were for "developmental projects" unrelated to WWE.  In or around September 2002, however, SSAI inadvertently produced to WWE two authentic Bell Licensing invoices it had neglected to destroy and which revealed that Bell Licensing had in fact invoiced SSAI for what was described as "consulting services" with respect to specifically listed WWE licenses.  Neither invoice produced at that time listed the videogame license as one of the licenses for which Bell was invoicing SSAI.

114.    In late December 2002, both Shenker and Bell committed serial perjury by testifying that the invoices they had fabricated were the actual and true invoices for the payments SSAI had made to Bell.  Their serial perjury became manifest at the end of their respective depositions when the true invoices which had been inadvertently produced were shown to them.

115.    Evidence also surfaced at Bell's deposition in December 2002 that Shenker had paid Bell $20,000 in monies originating with Jakks.  Bell falsely claimed at that time that the

payment was a "finder's fee" for a deal between Jakks and a company called Playmates, which was also a WWE licensee at one point in time.

116.     Following being caught in manifest perjury, SSAI, through its counsel, advised the Court that Shenker would be recanting his prior testimony.  Shenker thereafter spent two months devising what in reality turned out to be just another round of perjury in which he continued to conceal the full extent and purpose of the payments he had received from Jakks.

117.     On March 3, 2003, Shenker served WWE with alleged formal recantations covering every material aspect of his testimony.  The alleged recantations made clear that for months, Shenker had willfully perjured himself in deposition testimony and interrogatory answers.  Throughout four days of post-recantation deposition testimony, Shenker repeatedly admitted to giving false and misleading testimony.

118.     In his post-recantation testimony, however, Shenker continued to provide false and incomplete evidence on the payments he had received from Jakks and split with Bell.  He adopted the same story told by Bell in December of 2002 about the only payment known at that time, namely that a $40,000 payment from Jakks and split with Bell was for brokering a deal in which Playmates sold its inventory and equipment to Jakks.  He did not, however, disclose or admit to receiving any additional monies from Jakks, and continued to conceal both that he had been paid another $60,000 in 1998 by Jakks and the details of when the payments were made.

119.     WWE presented the evidence of the foregoing and other dishonest and abusive discovery conduct to the Court in the Shenker Litigation in a motion for sanctions.  The Court wrote an opinion dated October 16, 2003 detailing Shenker and Bell's perjurious and corrupt scheme, and substantively finding they committed fraud upon the court which warranted the dismissal with prejudice of SSAI's claims against WWE.

120.    The Court's opinion explicitly noted that Jakks was one of the WWE licensees that had paid Shenker and that Shenker perjured himself to conceal Stanfull's existence specifically to cover up its role as a conduit for payments to Shenker and Bell from WWE licensees, including specifically from Jakks.

121.    As of the time the Court issued its opinion dated October 16, 2003, which noted that Shenker had perjured himself about Stanfull in order to conceal payments from Jakks, neither THQ or Jakks had disclosed any payments to Stanfull or Shenker despite prior repeated requests that they do so.  Similarly, Jakks had not corrected the false information provided through its counsel on March 26, 2003 that there was no such information to provide.

122.    Jakks' failure to disclose such information by October 16, 2003, and correct its prior misrepresentations, was calculated, deliberate and part of a continuation of its plan to conceal the scheme at all costs.  Unknown to WWE as of October 16, 2003, Jakks, through Bennett, had retrieved specific documentary evidence of the payments to Stanfull from its foreign subsidiaries and had provided it to Jakks' outside counsel not later than the first week of September 2003.  Despite their certain knowledge by that time that both Jakks and its counsel had previously provided false and incorrect information to WWE, neither Jakks nor its counsel disclosed the information to WWE in September or October of 2003.

123.    After the court issued its October 16, 2003 opinion in the Shenker Litigation, and in violation of specific court orders of compulsion and his promise to do so, Shenker refused to obtain and produce the records of Stanfull's account at the Hang Seng Bank which were needed to determine the full extent of payments to Stanfull by Jakks.  As a result, WWE was compelled to incur considerable trouble and expense to go to Hong Kong in October 2003 to depose the records custodian of the Hang Seng Bank.

124.    In the course of that deposition, WWE confirmed that one $40,000 payment had been made to Stanfull's account by Jakks H.K. in April 1998—the very time that WWE was

28

considering to whom to award its videogame license.  Records further confirmed that the $40,000 payment was then split equally by a demand draft to Bell a few days later.  Based on other incomplete records produced in that deposition, it appeared Jakks had paid Stanfull another $40,000 in January 1998 and $20,000 in August 1998.

125.    Immediately following those discoveries, on November 5, 2003, WWE's counsel directed a letter to Jakks' counsel transmitting the Court's opinion in the Shenker Litigation on WWE's sanction motion and again requested that complete information regarding payments to SSAI, Shenker and/or Stanfull be provided to WWE.  By reading the Court's opinion, Jakks would have known that, despite its consistent prior denials of such payments, WWE was in possession of evidence indicating that payments had been made to Stanfull by Jakks.

126.    On November 11, 2003, Defendant Friedman telephoned WWE's Chief Executive Officer, Linda McMahon, and told her that, in response to WWE's counsel's letter, Jakks had searched their files and found evidence of payments to Stanfull—the fundamental fact Jakks previously had outright denied.  Defendant Friedman told Mrs. McMahon that the payments were for a perfume deal and $80,000 for "project development" for a mechanical dinosaur project, both of which supposedly were unrelated to WWE.

127.    Friedman's statements to Linda McMahon were neither accurate nor complete.  Jakks had unquestionably forwarded the payment information to its outside counsel not later than the first week of September and had that information for two months before WWE's counsel's letter of November 5, 2003 and had not disclosed it.  Additionally, the $80,000 in payments made in January and April of 1998 were not for project development, and Friedman completely failed to disclose the $20,000 payment made to Stanfull in August of 1998 after the videogame license and amendments to the toy licenses had been secured.

128.    On November 14, 2003, despite its previous repeated denials, Jakks' counsel wrote to WWE's counsel reaffirming Defendant Friedman's statements to Mrs. McMahon and

produced for the first time any records relating to the payments made by Jakks to Stanfull. Among other things, Jakks produced for the first time the January 2, 1998 $80,000 invoice from Stanfull in Shenker's own handwriting, which Shenker had never produced in the Shenker litigation. Jakks, through its counsel, did not disclose the $20,000 payment made in August 1998 or the phony invoice behind that payment.

129.    Jakks alleged explanation for the $80,000 in payments to Stanfull—a "project development" for a mechanical dinosaur project unrelated to WWE—was completely inconsistent with the purported explanation for those payments offered by Shenker and Bell that the payments were a finder's fee for a deal involving WWE licensees, Jakks and Playmates.

130.    The January 2, 1998 invoice in Shenker's own handwriting did not bill Jakks for a finder's fee on Playmates as he and Bell had claimed under oath, but rather for the "development of possible latex based soft toys with special coatings." On information and belief, Jakks concealed this invoice for as long as it could because they knew it was inconsistent with the testimonial positions taken by Shenker and Bell for the payments and because they knew Shenker would have no reason to split the monies with Bell, as he did, if in fact the payments were for a mechanical dinosaur project unrelated to WWE.

131.    Jakks produced the invoice only after it knew WWE was aware of the payments and because, as a publicly traded company, it would reasonably be expected to have some form of documentation for such payments.

132.    In January 2004, WWE again deposed representatives of the Hang Seng Bank and confirmed for the first time that in fact three payments had been made to Shenker's Stanfull account in 1998 totaling $100,000.

133.    Defendants have colluded during their coverup on several different occasions. On one occasion during the period he was planning his supposed recantation after being caught in

perjury, Shenker directed his legal counsel for SSAI to contact Jakks' counsel to advise that he would be disclosing that Jakks paid him money.  SSAI's legal counsel did so.  Thereafter, Shenker disclosed only what he knew WWE was already aware of – a single $40,000 payment – and, like Jakks, did not disclose the full range and dates of payments.  On another occasion, he directed his counsel to notify Jakks' counsel that Shenker had provided information regarding statements made by Friedman reflecting Friedman's knowledge that SSAI was splitting his commissions with Bell.

134.    The fraudulent concealment of facts related to the payments continues to this date. Friedman, Berman and Bennett were all deposed in the Shenker litigation and none identified the person who negotiated the payments to Stanfull or authorized the payments.  Jakks failed to produce a properly prepared corporate representative to testify on that and related subjects and refused to produce certain records, all of which required WWE to seek and obtain compulsion orders from the Court in the Shenker litigation.

**COUNT I**
**VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT**
**ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1962(c)**
**(Against All Defendants)**

135.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

**RICO Persons**

136.    The Joint Venture of THQ and Jakks, THQ/Jakks, Jakks, Jakks H.K., Road Champs, THQ, SSAI, Shenker, Bell Licensing, Bell, Friedman, Berman and Bennett are each a "person" within the meaning of 18 U.S.C. § 1961(3).

**RICO Enterprise**

137.     For the purpose of 18 U.S.C. § 1962(c), the Joint Venture of THQ and Jakks, THQ/Jakks, Jakks, Jakks H.K., Road Champs, THQ, SSAI, Shenker, Bell Licensing, Bell, Friedman, Berman and Bennett, acting in concert, comprised an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) through a pattern of racketeering activity as set forth below for the purpose of conducting the unlawful activities described herein.

138.     For the purpose of 18 U.S.C. § 1962(c), the Joint Venture of THQ and Jakks, THQ/Jakks, Jakks, Jakks H.K., Road Champs, THQ, SSAI, Shenker, Bell Licensing, Bell, Friedman, Berman and Bennett each had authority within the enterprise or enterprises described above and/or conducted or participated in the unlawful conduct set forth herein through the enterprise described above.

**Effect on Interstate Commerce**

139.     The association-in-fact of the Joint Venture of THQ and Jakks, THQ/Jakks, Jakks, Jakks H.K., Road Champs, THQ, SSAI, Shenker, Bell Licensing, Bell, Friedman, Berman and Bennett is an entity that engages in and affects interstate commerce by maintaining contacts and conducting economic and other activities throughout the United States and around the world.

**Predicate Acts of Racketeering Activity**

140.     Defendants conducted, engaged in and/or participated in a pattern of predicate acts through the enterprise described above, including the commission of numerous violations of the Federal Mail Fraud Statute, 18 U.S.C. § 1341, the Federal Wire Fraud Statute, 18 U.S.C. § 1343, the Federal Money Laundering Statute, 18 U.S.C. §§ 1956 and 1957, the Federal Travel Act, 18 U.S.C. § 1952, the National Stolen Property Act, 18 U.S.C. § 2314 and New York Penal Law § 180.03 concerning commercial bribery.  Such violations are "predicate acts" under 18 U.S.C. § 1961(1)(A) and (B).

141. Specifically, Defendants' predicate acts included, but are not limited to, the following:

    a.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, Defendants knowingly used or caused to be used the mails or wire communications in violation of 18 U.S.C. § 1341 and/or 18 U.S.C. § 1343 to fraudulently secure the videogame license and the 1998 amendments to the toy licenses through the payment of unlawful bribes, and the use of phony and/or fraudulent invoices and documents to conceal the true nature of the bribes. Defendants' specific acts of mail and/or wire fraud include at least the following:

        i.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on January 2, 1998, Defendant Bennett, individually and on behalf of Jakks, and upon authorization of Defendants Friedman and/or Berman, transmitted by facsimile Stanfull's January 2, 1998 invoice in the amount of $80,000 to Salina of Defendant Jakks H.K., with direction that she pay the invoice.

        ii.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on January 12, 1998, Defendant Bennett, individually and on behalf of Jakks, and upon authorization of Defendants Friedman and/or Berman, transmitted by facsimile a direction to Will Hons of Defendant Jakks H.K. to make payment arrangements for Stanfull's January 2, 1998 invoice.

        iii.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on January 14, 1998, pursuant to Defendant

Bennett's direction made on behalf of Defendants Jakks and which was authorized by Defendants Friedman and/or Berman, Defendant Road Champs wire-transferred $40,000 from its account at the Hang Seng Bank in Hong Kong in an intra-bank transfer to Stanfull's account at the Hang Seng Bank.

iv.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on January 14, 1998, pursuant to Defendant Bennett's direction made on behalf of Jakks and authorized by Defendants Friedman and/or Berman, Defendant Jakks H.K. transmitted by facsimile a request to Norwest Bank Minnesota, N.A. ("Norwest Bank") in Hong Kong for telegraphic transfer of $40,000 to Defendant Road Champs' account at the Hang Seng Bank.

v.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on January 14, 1998, pursuant to Defendant Bennett's direction made on behalf of Jakks and authorized by Defendants Friedman and/or Berman, Defendant Jakks H.K. wire-transferred $40,000 from Defendant Jakks H.K.'s account at Norwest Bank to Defendant Road Champs' account at the Hang Seng Bank.

vi.    As a reasonably foreseeable result of Defendants' fraudulent scheme, Norwest Bank transmitted by facsimile a letter to Defendant Jakks H.K. confirming that the $40,000 wire-transfer to Defendant Road Champs had been completed.

vii.    As a reasonably foreseeable result of Defendants' fraudulent scheme, Hang Seng Bank transmitted by facsimile a letter to Defendant Road Champs confirming that Defendant Road Champs' account at the Hang Seng Bank had been credited for $40,000 by order of Defendant Jakks H.K.

viii.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, Defendant Road Champs falsified its corporate books and records to conceal its $40,000 payment to Stanfull by making it appear as an inter-company transfer between Defendant Jakks H.K. and Defendant Road Champs.

ix.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, Defendant Bennett, individually and on behalf of Jakks, falsified Defendant Jakks' corporate books and records by failing to record the $40,000 payment to Stanfull.

x.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on March 31, 1998, Defendant Bennett, individually and on behalf of Jakks and upon authorization of Defendants Friedman and/or Berman, transmitted by facsimile a direction to Will Hons of Defendant Jakks H.K. to make payment arrangements for the second installment payment of Stanfull's January 2, 1998 invoice, specifically instructing Mr. Hon that it was "imperative" that the payment be made effective April 1, 1998.

xi.    As a reasonably foreseeable result of Defendants' fraudulent scheme, Norwest Bank transmitted by facsimile a letter to

Defendant Jakks H.K. confirming that Defendant Jakks H.K.'s account had been debited in the amount of $40,000.

xii.   In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on April 2, 1998, pursuant to Defendant Bennett's direction made on behalf of Jakks and authorized by Defendants Friedman and/or Berman, Defendant Jakks H.K. wire-transferred $40,000 from its account at Norwest Bank to Stanfull's account at the Hang Seng Bank.

xiii.   In furtherance of Defendants' scheme or artifice to defraud, and with specific intent to defraud, on May 7, 1998, Defendant Berman, on behalf of Jakks, THQ and the Joint Venture, transmitted by facsimile a letter to Defendant Bell regarding toy company strength in marketing vs. videogame strength in marketing, which Defendant Bell subsequently forwarded to Linda McMahon as part of an effort to deceive her that Jakks and THQ's Joint Venture was "right on target."

xiv.   As a reasonably foreseeable result of Defendants' fraudulent scheme, on May 28, 1998, Edward L. Kaufman, Esq., General Counsel of WWE ("Kaufman"), transmitted by Federal Express a letter to Murray Skala, Esq., counsel to Jakks, regarding a draft of the proposed videogame license agreement and attaching a copy of the videogame license deal memo.

xv.   As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, and with specific intent to defraud, on June 2, 1998,

Defendant Berman, individually and on behalf of Defendants Jakks, THQ and the Joint Venture, upon authorization of Defendant Friedman, transmitted by facsimile a letter to Defendant Shenker regarding, among other things, (i) comments regarding the proposed videogame license agreement, which was to be forwarded to Defendants Bell and Shenker on June 3, 1998; (ii) the third amendment to Jakks' domestic toy license with WWE; and (iii) the fifth amendment to Jakks' international toy license with WWE.

xvi.     As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, on June 3, 1998, Defendant Berman, individually and on behalf of Defendants Jakks, THQ and the Joint Venture transmitted by facsimile a letter to Defendants Bell and Shenker, and to Kaufman, enclosing comments regarding the proposed videogame license agreement.

xvii.    As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, on June 3, 1998, Defendant Berman, individually and on behalf of Defendants Jakks, THQ and the Joint Venture transmitted by facsimile a letter to Defendants Bell and Shenker, and to Kaufman, enclosing revised comments regarding the proposed videogame license agreement.

xviii.   As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to

defraud, on June 4, 1998, Daniel Offner, counsel to THQ, on behalf of THQ and the Joint Venture, transmitted by facsimile a letter to Kaufman, Geoffrey Bass, Esq., counsel for Jakks, Brian Farrell, President and CEO of THQ, and Defendant Berman enclosing revisions to the proposed videogame license agreement.

xix.   As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, on June 5, 1998, Defendant Berman, individually and on behalf of Defendants Jakks, THQ and the Joint Venture transmitted by facsimile a letter to Defendant Bell enclosing revisions to the proposed videogame license agreement.

xx.   As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, on June 9, 1998, Geoffrey Bass, Esq., counsel for Jakks, on behalf of Defendants Jakks and the Joint Venture, upon authorization of Defendants Friedman and/or Berman, transmitted by facsimile a letter to Kaufman enclosing comments to the revised proposed videogame license agreement.

xxi.   As a reasonably foreseeable result of Defendants' fraudulent scheme, on June 10, 1998, Kaufman transmitted by facsimile a redlined version of the proposed videogame license agreement to Geoffrey Bass, Esq., counsel to Jakks.

xxii.   As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, on June 17, 1998, Geoffrey Bass, Esq., counsel for Jakks,

on behalf of Defendants Jakks, THQ, the Joint Venture and THQ/Jakks, transmitted by facsimile a letter to Kaufman requesting copies of the videogame license agreement executed by WWE for Mr. Bass to provide to Defendants THQ and Jakks, and attaching a copy of the videogame license agreement executed by Brian Farrell, President and CEO of THQ.

xxiii.   As a reasonably foreseeable result of Defendants' fraudulent scheme, on June 24, 1998, Kaufman transmitted by Federal Express to Defendant Friedman, on behalf of Defendant Jakks, an unexecuted copy of the fifth amendment to Jakks' domestic toy license agreement with WWE.

xxiv.   As a reasonably foreseeable result of Defendants' fraudulent scheme, on June 24, 1998, Kaufman transmitted by Federal Express to Defendant Friedman, on behalf of Defendant Jakks, an unexecuted copy of the third amendment to Jakks' international toy license agreement with WWE.

xxv.   As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, on July 1, 1998, Defendant Berman, individually and on behalf of Defendant Jakks, upon authorization of Defendant Friedman, transmitted to WWE a copy of the fifth amendment to Jakks' domestic toy license with WWE executed by Defendant Berman.

xxvi.   As a reasonably foreseeable result of Defendants' fraudulent scheme, on June 24, 1998, Kaufman transmitted by Federal

Express to Defendant Bennett a fully executed copy of the fifth amendment to Jakks' domestic toy license agreement with WWE.

xxvii.  In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on July 27, 1998, Defendant SSAI transmitted by facsimile to Defendant Berman, a phony invoice directed to Jakks from Stanfull dated July 15, 1998 in the amount of $20,000 falsely purporting to invoice Defendant Jakks for alleged product development.

xxviii. In furtherance of a scheme or artifice to defraud and with specific intent to defraud, on July 30, 1998, Defendant Bennett, individually and on behalf of or for the benefit of Defendants Jakks, THQ, the Joint Venture and THQ/Jakks, upon authorization of Defendants Friedman and/or Berman, transmitted by facsimile to Elmen Lai of Defendant Road Champs a copy of Stanfull's July 15, 1998 invoice, directing that payment be made.

xxix.   In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on August 3, 1998, pursuant to Defendant Bennett's direction made on behalf of and for the benefit of Defendants Jakks, THQ, the Joint Venture and THQ/Jakks, Elmen Lai of Defendant Road Champs transmitted an email communication to Defendant Bennett confirming that $20,000 was paid to Stanfull.

xxx.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on August 4, 1998, pursuant to Defendant Bennett's direction made on behalf of and for the benefit of

40

Defendants Jakks, THQ, the Joint Venture and THQ/Jakks, Defendant Road Champs wire-transferred $20,000 from its account at the Hang Seng Bank in an intra-bank transfer to Stanfull's account at the Hang Seng Bank.

xxxi.    As a reasonably foreseeable result of Defendants' fraudulent acts and in furtherance of Defendants' scheme or artifice to defraud, on June 9, 1998, Brian Farrell, President and CEO of THQ, on behalf of Defendants Jakks, THQ, the Joint Venture and THQ/Jakks, transmitted by facsimile a letter to Defendant Bell regarding his recent meeting with Bell in Stamford, Connecticut, and meetings between Defendants THQ and Jakks to discuss the Joint Venture.

xxxii.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on December 21, 1998, Defendant Shenker caused Defendant SSAI to wire-transfer $280,616 from Defendant SSAI's checking account at Fleet Bank, headquartered in Fort Lee, New Jersey, to Stanfull's account at the Hang Seng Bank, consisting of $165,000 of commissions Defendant SSAI was paid by WWE on the videogame license.

xxxiii.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on January 11, 1999, Defendant Shenker wire-transferred $280,601 from Stanfull's account at the Hang Seng Bank to Defendant Bell Licensing's money market account at Hudson Bank, consisting of $165,000 in commissions Defendant SSAI was paid by WWE on the videogame license.

b.      In violation of the Federal Money Laundering Statutes, 18 U.S.C. §§ 1956 & 1957, Defendants' payment and/or receipt of unlawful bribes and payments to secure the videogame license and the 1998 amendments to the toy licenses, and subsequent receipt of benefits as a result of the unlawful bribes, involved the proceeds of commercial bribery, an enumerated unlawful activity under 18 U.S.C. § 1956, and were designed to conceal the nature of the source of such unlawful activity.  In addition and/or in the alternative, Defendants' payment and receipt of unlawful bribes and payments to secure the videogame license and the 1998 amendments to the toy licenses, and subsequent receipt of benefits as a result of the unlawful bribes, involved the deposit, withdrawal, transfer or exchange of funds through or to a financial institution of a value in excess of $10,000 and represented the proceeds from commercial bribery, an enumerated unlawful activity under 18 U.S.C. § 1957.  Defendants' specific acts of money laundering in violation of 18 U.S.C. §§ 1956 & 1557 include at least the following:

i.      In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on January 14, 1998, pursuant to Defendant Bennett's direction made on behalf of Jakks and which was authorized by Defendants Friedman and/or Berman, Defendant Road Champs wire-transferred $40,000 from its account at the Hang Seng Bank in Hong Kong in an intra-bank transfer to Stanfull's account at the Hang Seng Bank.

ii.     In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on January 14, 1998, pursuant to Defendant Bennett's direction made on behalf of Jakks and

authorized by Defendants Friedman and/or Berman, Defendant Jakks H.K. wire-transferred $40,000 from Defendant Jakks H.K.'s account at Norwest Bank to Defendant Road Champs' account at the Hang Seng Bank.

iii.　In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by demand draft dated January 14, 1998 drawn on Stanfull's account at the Hang Seng Bank, Defendant Shenker paid Defendant Bell $20,000 of the $40,000 paid to Stanfull from Defendant Road Champs.

iv.　In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, pursuant to Defendant Bennett's direction made on behalf of Jakks and authorized by Defendants Friedman and/or Berman, Defendant Jakks H.K. wire-transferred $40,000 from its account at Norwest Bank to Stanfull's account at the Hang Seng Bank.

v.　In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by demand draft dated April 2, 1998 drawn on Stanfull's account at the Hang Seng Bank, Defendant Shenker paid Defendant Bell Licensing $20,000 of the $40,000 paid to Stanfull from Defendant Jakks H.K.

vi.　In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on April 7, 1998, Defendant Bell deposited the Stanfull demand draft paid to Defendant Bell Licensing into a MBNA money market account owned by

Defendant Bell, which cleared through Citibank located in New York.

vii.    In furtherance of Defendants' commercial bribery scheme, on July 3, 1998, Defendant Shenker deposited a check, dated July 3, 1998, from WWE in the amount of $301,751.54 into SSAI's Fleet Bank account, consisting of commissions related to the advance on the videogame license, which represented proceeds derived from Defendants' commercial bribery scheme.  The total of SSAI's commission related to the videogame license was $330,000; however, due to an overpayment of commissions in a prior month, WWE deducted $28,248.46 from that amount, thereby SSAI only received $301,751.54 on July 3, 1998.

viii.   In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on August 4, 1998, pursuant to Defendant Bennett's direction made on behalf of and for the benefit of Defendants Jakks, THQ, the Joint Venture and THQ/Jakks, Defendant Road Champs wire-transferred $20,000 from its account at the Hang Seng Bank in an intra-bank transfer to Stanfull's account at the Hang Seng Bank.

ix.     In furtherance of, and with the intent to conceal proceeds of Defendants' commercial bribery scheme, by check no. 1881, dated October 8, 1998, Defendant Shenker caused Defendant SSAI to pay Defendant Bell Licensing $20,000, drawn on SSAI's checking account at Fleet Bank, headquartered in Fort Lee, New Jersey.

x.      In furtherance of, and with the intent to conceal proceeds of
Defendants' commercial bribery scheme, on October 9, 1998,
Defendant Bell deposited the October 8, 1998 check from
Defendant SSAI into Defendant Bell Licensing's Hudson Bank
money market account located in Darien, Connecticut, thereby
causing the check to clear at Hudson Bank's main office located in
Mahwah, New Jersey.

xi.      In furtherance of, and with the intent to conceal proceeds of the
commercial bribery scheme, on December 21, 1998, Defendant
Shenker caused Defendant SSAI to wire transfer $280,616 from
Defendant SSAI's checking account at Fleet Bank, headquartered
in Fort Lee, New Jersey, to Stanfull's account at the Hang Seng
Bank, consisting in part of $165,000 which was exactly 50% of the
advance Defendant SSAI was paid by WWE on the videogame
license.  Defendant SSAI's transfer to Stanfull was the precursor to
Defendant Bell Licensing's receipt of the unlawful proceeds, as
Defendant Shenker elected to run the transaction through a foreign
bank account in order to conceal the nature and source of the
payments.

xii.     In furtherance of, and with the intent to conceal proceeds of the
commercial bribery scheme, on January 11, 1999, Defendant
Shenker wire-transferred $280,601 from Stanfull's account at the
Hang Seng Bank to Defendant Bell Licensing's money market
account at Hudson Bank, consisting of $165,000, exactly 50% of
the advance Defendant SSAI was paid by WWE on the videogame
license.

xiii. In furtherance of Defendants' commercial bribery scheme, on February 7, 2000 Defendant Shenker deposited a check dated February 4, 2000 from WWE in the amount of $663,037.70 into SSAI's Fleet Bank account, consisting of $165,000 in commissions related to the videogame license, which represented proceeds derived from Defendants' commercial bribery scheme.

xiv. In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 2595 dated February 22, 2000, drawn on SSAI's bank account at Fleet Bank, headquartered in Fort Lee, New Jersey, Defendant SSAI paid $95,396.90 to Defendant Bell Licensing, consisting of $82,500, exactly 50% of the commissions paid to Defendant SSAI by WWE on the videogame license.

xv. In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on February 23, 2000, Defendant Bell deposited the February 22, 2000 check from Defendant SSAI into Defendant Bell Licensing's Hudson Bank money market account located in Darien, Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey.

xvi. In furtherance of Defendants' commercial bribery scheme, on June 12, 2000, Defendant SSAI deposited a check, dated June 9, 2000, from WWE, in the amount of $312,788.55 into SSAI's Fleet Bank account, consisting of $247,180.90 of commissions related to the videogame license, which represented proceeds derived from Defendants' commercial bribery scheme.

xvii.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 2832 dated June 16, 2000 drawn on Defendant SSAI's bank account at Fleet Bank, headquartered in Fort Lee, New Jersey, Defendant SSAI paid $124,454 to Defendant Bell Licensing, consisting of $123,590.45, exactly 50% of commissions paid to Defendant SSAI by WWE on the videogame license.

xviii.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on June 19, 2000, Defendant Bell deposited Defendant SSAI's June 16, 2000 check into Defendant Bell Licensing's Hudson Bank money market account located in Darien, Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey.

xix.    In furtherance of Defendants' commercial bribery scheme, on August 25, 2000, Defendant Shenker deposited a check, dated August 18, 2000, in the amount of $324,540.66 into SSAI's Fleet Bank account, consisting of $132,735.44 of commissions related to the videogame license, which represented proceeds derived from Defendants' commercial bribery scheme.

xx.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 3016 dated September 10, 2000 drawn on Defendant SSAI's bank account at Fleet Bank, headquartered in Fort Lee, New Jersey, Defendant SSAI paid $84,525.29 to Defendant Bell Licensing, consisting of

$66,367.72, exactly 50% of commissions paid to Defendant SSAI by WWE on the videogame license.

xxi.  In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on September 12, 2000, Defendant Bell deposited Defendant SSAI's September 10, 2000 check into Defendant Bell Licensing's Hudson Bank money market account located in Darien, Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey.

xxii.  In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 1846 dated September 14, 2001 drawn on Defendant Shenker's account at Fleet Bank headquartered in Fort Lee, New Jersey, Defendant Shenker paid Defendant Bell $52,948, representing a split of the proceeds from Defendant Shenker's sale of THQ and Jakks stock acquired pursuant to the videogame license.

xxiii.  In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on September 24, 2001, Defendant Bell deposited Defendant Shenker's September 14, 2001 check into Defendant Bell's Citibank preferred money market account, account no. 47507343, thereby causing the check to clear at Citibank in New York.

xxiv.  In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 1869 dated October 12, 2001 drawn on Defendant Shenker's account at Fleet Bank headquartered in Fort Lee, New Jersey, Defendant Shenker paid

Defendant Bell $26,994, representing a split of the proceeds of Defendant Shenker's sale of THQ and Jakks stock acquired pursuant to the videogame license.

xxv.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on October 13, 2001, Defendant Bell deposited Defendant Shenker's October 12, 2001 check into Defendant Bell's branch account at Hudson Bank located in Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey.

xxvi.   In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 1894 dated December 11, 2001 drawn on Defendant Shenker's account at Fleet Bank headquartered in Fort Lee, New Jersey, Defendant Shenker paid Defendant Bell $26,944, representing a split of the proceeds of Defendant Shenker's sale of THQ and Jakks stock acquired pursuant to the videogame license.

xxvii.  In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on December 13, 2001, Defendant Bell deposited Defendant Shenker's December 11, 2001 check into Defendant Bell's branch account at Hudson Bank located in Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey.

c.    In violation of the National Stolen Property Act, 18 U.S.C. § 2314, Defendants' payment and/or receipt of unlawful bribes and payments to secure the videogame license and the 1998 amendments to the toy licenses

involved the transmittal and/or transfer in interstate commerce of money having a value of at least $5,000 knowing such proceeds were obtained by fraud against WWE. Defendants' specific acts in violation of the National Stolen Property Act include at least the following:

i.    As a result of Defendants' commercial bribery scheme to secure the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on July 3, 1998, Defendant Shenker deposited a check, dated July 3, 1998, from WWE, in the amount of $301,751.54 into SSAI's Fleet Bank account, consisting of commissions related to the advance on the videogame license which Defendants SSAI and Shenker knew had been acquired by fraud.

ii.   As a result of Defendants' commercial bribery scheme to secure the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on December 21, 1998, Defendant Shenker caused Defendant SSAI to wire transfer $280,616 from Defendant SSAI's checking account at Fleet Bank, headquartered in Fort Lee, New Jersey, to Stanfull's account at the Hang Seng Bank, consisting of $165,000, exactly 50% of the advance Defendant SSAI was paid by WWE on the videogame license which Defendants SSAI and Shenker knew had been acquired by fraud. Defendant SSAI's transfer of this money was the precursor to Defendant Bell Licensing's receipt of the unlawful proceeds as Defendant Shenker elected to run the transaction through a foreign bank account in order to conceal the nature and source of the payment.

iii.    As a result of Defendants' commercial bribery scheme to secure the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on January 11, 1999, Defendant Shenker wire-transferred $280,601 from Stanfull's account at the Hang Seng Bank to Defendant Bell Licensing's money market account at Hudson Bank, consisting of $165,000, exactly 50% of the advance Defendant SSAI was paid by WWE on the videogame license which Defendants SSAI, Shenker, Bell and Bell Licensing knew had been acquired by fraud.

iv.    As a result of Defendants' commercial bribery scheme to secure the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on February 7, 2000 Defendant Shenker deposited a check, dated February 4, 2000, from WWE, in the amount of $663,037.70 into SSAI's Fleet Bank account, consisting of $165,000 in commissions related to the videogame license, which Defendants SSAI and Shenker knew had been acquired by fraud.

v.    As a result of Defendants' commercial bribery scheme to secure the videogame license and the 1998 amendments to the toy licenses by fraudulent means, by check no. 2595 dated February 22, 2000, drawn on SSAI's bank account at Fleet Bank headquartered in Fort Lee, New Jersey, Defendant SSAI paid $95,396.90 to Defendant Bell Licensing, consisting of $82,500, exactly 50% of the commissions paid to Defendant SSAI on the videogame license which Defendants SSAI, Shenker, Bell and Bell Licensing knew had been acquired by fraud.

vi.    As a result of Defendants' commercial bribery scheme to secure the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on February 23, 2000, Defendant Bell deposited the February 22, 2000 check from Defendant SSAI into Defendant Bell Licensing's Hudson Bank money market account located in Darien, Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey.  Defendants SSAI, Shenker, Bell and Bell Licensing knew the proceeds of said check had been acquired by fraud.

vii.    As a result of Defendants' commercial bribery scheme to secure the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on June 12, 2000, Defendant SSAI deposited a check, dated June 9, 2000, from WWE, in the amount of $312,788.55 into SSAI's Fleet Bank account, consisting of $247,180.90 of commissions related to the videogame license which Defendants SSAI and Shenker knew had been acquired by fraud.

viii.    As a result of Defendants' commercial bribery scheme to secure the videogame license and the 1998 amendments to the toy licenses by fraudulent means, by check no. 2832 dated June 16, 2000 drawn on Defendant SSAI's bank account at Fleet Bank, headquartered in Fort Lee, New Jersey, Defendant SSAI paid $124,454 to Defendant Bell Licensing, consisting of $123,590.45, exactly 50% of the commissions Defendant SSAI was paid on the videogame license which Defendants SSAI, Shenker, Bell and Bell Licensing knew had been acquired by fraud.

ix.    As a result of Defendants' commercial bribery scheme to secure the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on June 19, 2000, Defendant Bell deposited Defendant SSAI's June 16, 2000 check into Defendant Bell Licensing's Hudson Bank money market account located in Darien, Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey.  Defendants SSAI, Shenker, Bell and Bell Licensing knew the proceeds of said check had been acquired by fraud.

x.    As a result of Defendants' commercial bribery scheme to secure the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on August 25, 2000, Defendant Shenker deposited a check, dated August 18, 2000, in the amount of $324,540.66 into SSAI's Fleet Bank account, consisting of $132,735.44 of commissions Defendant SSAI was paid on the videogame license which Defendants SSAI and Shenker knew had been acquired by fraud.

xi.    As a result of Defendants' commercial bribery scheme to secure the videogame license and the 1998 amendments to the toy licenses by fraudulent means, by check no. 3016 dated September 10, 2000 drawn on Defendant SSAI's bank account at Fleet Bank, headquartered in Fort Lee, New Jersey, Defendant SSAI paid $84,525.29 to Defendant Bell Licensing, consisting of $66,367.72, exactly 50% of the commissions Defendant SSAI was paid on the videogame license which Defendants SSAI, Shenker, Bell and Bell Licensing knew had been acquired by fraud.

xii.     As a result of Defendants' commercial bribery scheme to secure the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on September 12, 2000, Defendant Bell deposited Defendant SSAI's September 10, 2000 check into Defendant Bell Licensing's Hudson Bank money market account located in Darien, Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey. Defendants SSAI, Shenker, Bell and Bell Licensing knew the proceeds of said check had been acquired by fraud.

xiii.    As a result of Defendants' commercial bribery scheme to secure the videogame license and the 1998 amendments to the toy licenses by fraudulent means, by check no. 1846 dated September 14, 2001 drawn on Defendant Shenker's account at Fleet Bank headquartered in Fort Lee, New Jersey, Defendant Shenker paid Defendant Bell $52,948, representing a split of the proceeds from Defendant Shenker's sale of THQ and Jakks stock acquired pursuant to the videogame license which Defendants Shenker and Bell knew had been acquired by fraud.

xiv.     As a result of Defendants' commercial bribery scheme to secure the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on September 24, 2001, Defendant Bell deposited Defendant Shenker's September 14, 2001 check into Defendant Bell's Citibank preferred money market account, account no. 47507343, thereby causing the check to clear at Citibank in New York.  Defendants Shenker and Bell knew the proceeds of said check had been acquired by fraud.

xv.     As a result of Defendants' commercial bribery scheme to secure
the videogame license and the 1998 amendments to the toy
licenses by fraudulent means, by check no. 1869 dated October 12,
2001 drawn on Defendant Shenker's account at Fleet Bank
headquartered in Fort Lee, New Jersey, Defendant Shenker paid
Defendant Bell $26,994, representing a split of the proceeds of
Defendant Shenker's sale of THQ and Jakks stock acquired
pursuant to the videogame license which Defendants Shenker and
Bell knew had been acquired by fraud.

xvi.    As a result of Defendants' commercial bribery scheme to secure
the videogame license and the 1998 amendments to the toy
licenses by fraudulent means, on October 13, 2001, Defendant Bell
deposited Defendant Shenker's October 12, 2001 check into
Defendant Bell's branch account at Hudson Bank located in
Connecticut, thereby causing the check to clear at Hudson Bank's
main office located in Mahwah, New Jersey.  Defendants Shenker
and Bell knew the proceeds of said check had been acquired by
fraud.

xvii.   As a result of Defendants' commercial bribery scheme to secure
the videogame license and the 1998 amendments to the toy
licenses by fraudulent means, by check no. 1894 dated
December 11, 2001 drawn on Defendant Shenker's account at
Fleet Bank headquartered in Fort Lee, New Jersey, Defendant
Shenker paid Defendant Bell $26,944, representing a split of the
proceeds of Defendant Shenker's sale of THQ and Jakks stock

acquired pursuant to the videogame license which Defendants Shenker and Bell knew had been acquired by fraud.

xviii.   As a result of Defendants' commercial bribery scheme to secure the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on December 13, 2001, Defendant Bell deposited Defendant Shenker's December 11, 2001 check into Defendant Bell's branch account at Hudson Bank located in Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey.  Defendants Shenker and Bell knew the proceeds of said check had been acquired by fraud.

d.   In violation of the Federal Travel Act, 18 U.S.C. § 1952, Defendants' scheme to fraudulently secure the videogame license and the 1998 amendments to the toy licenses through the payment of unlawful bribes and payments and to the use of fraudulent conduct to conceal the true nature of the bribes and payments involved the unlawful use of the mail or a facility of interstate commerce with the intent to distribute the proceeds of, and/or facilitate the carrying on of, commercial bribery, an enumerated unlawful act under 18 U.S.C. § 1952 and, thereafter, the commission of an additional act in furtherance of such commercial bribery scheme.  Each of the specific acts identified above in violation of the Federal Mail and Wire Fraud Statutes, 18 U.S.C. §§ 1341 & 1343, the Federal Money Laundering Statutes, 18 U.S.C. §§ 1956 & 1957, and the National Stolen Property Act, 18 U.S.C. § 2314, also constitutes separate violations of the Federal Travel Act, and therefore such allegations are incorporated herein by reference and reasserted as though fully set forth at length.

e.     In violation of New York Penal Law § 180.03, as described herein, certain Defendants made, authorized and/or participated in the payment of or agreement to pay unlawful bribes and payments in excess of one thousand dollars to SSAI, Shenker and/or Bell, who at all relevant times were employees, agents or fiduciaries of WWE, without WWE's consent, with the intent to influence their conduct in relation to WWE's affairs to secure the videogame license and the 1998 amendments to the toy licenses, and said acts inured to the benefit of and/or were ratified by the Joint Venture and THQ/Jakks.  Pursuant to 18 U.S.C. § 1961(1)(A), Defendants' violations of New York Penal Law § 180.03, as described herein, constitutes separate predicate acts under RICO.

**Pattern of Racketeering Activity**

142.     Defendants knowingly and repeatedly committed the above criminal acts in furtherance of and for the purpose of executing a fraudulent scheme to harm WWE's business.

143.     The predicate acts described herein were related to one another as part of a common scheme or plan.

144.     The unlawful conduct described herein constitutes a continuous pattern of racketeering activity.  Such unlawful conduct, which began in or around 1998, continues through this date.

**Injury to WWE**

145.     As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(c) as described herein, WWE has been injured in its business and property.

**COUNT II**
**CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(d)**
**(Against All Defendants)**

146.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

147.    THQ/Jakks, the Joint Venture, Jakks, THQ, SSAI, Shenker, Bell Licensing, Bell, Friedman, Berman and Bennett formed a conspiracy for the purpose of achieving and profiting from the racketeering activities described herein in violation of 18 U.S.C. § 1962(c).

148.    As described herein, each of the Defendants knowingly and intentionally agreed and conspired to commit at least two of the predicate acts set forth above and they did so with the knowledge and intent that such acts were in furtherance of the foregoing pattern of racketeering.

149.    As described herein, Defendants' conspiracy substantially affected interstate commerce as much of the conduct that formed the overt acts of the conspiracy involved interstate commerce and the damage caused by the conspiracy has harmed a corporation that itself substantially affects interstate commerce.

150.    As a direct and proximate result of the conspiracy in violation of 18 U.S.C. § 1962(d) as described herein, WWE has been injured in its business and property.

**COUNT III**
**DECLARATORY JUDGMENT**
**(Against THQ, THQ/Jakks, Jakks and the Joint Venture)**

151.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

152.    As described herein, the videogame license was formed or induced as a result of commercial bribery and/or illegal conduct in violation of New York law.

153.    As described herein, the 1998 amendments to the toy licenses were formed or induced as a result of commercial bribery and/or illegal conduct in violation of New York law.

154.    As described herein, the commercial bribery and/or illegal conduct was and remains central to the performance of the videogame license.

155.    As described herein, the commercial bribery and/or illegal conduct was and remains central to the performance of the 1998 amendments to the toy licenses.

156.    Under New York law a contract formed or induced as a result of commercial bribery is void.

157.    Thus, an actual dispute and controversy exists with respect to whether the videogame license and the 1998 amendments to the toy licenses are void as a result of the commercial bribery.

158.    A judicial declaration is, therefore, necessary pursuant to 28 U.S.C. § 2201 *et seq.* to determine the parties' rights and obligations under the videogame license and the 1998 amendments to the toy licenses.

**COUNT IV**
**DECLARATORY JUDGMENT**
**(Against Defendants THQ, THQ/Jakks, Jakks and the Joint Venture)**

159.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

160.    Prior to and during the time the videogame license and the 1998 amendments to the toy license were negotiated, Jakks knew of and created an undisclosed conflict of interest between SSAI and its principal, Stanley Shenker, and WWE.

161.    During the time Jakks knew SSAI was WWE's agent, Jakks began the practice of paying Shenker and using him as their agent, none of which was disclosed to WWE.

162.    At various times during their undisclosed relationship with Shenker, Jakks personnel would, in writing, direct and inquire of Shenker regarding matters being performed by Shenker on Jakks' behalf and at the same time request he secure modifications and/or amendments to the WWE toy licenses.

163.    Jakks personnel were acutely aware of the impropriety of doing so, and in particular were aware of the impropriety of doing so after being advised by corporate counsel that Jakks could not do so without WWE consent.

164.    With knowledge of the impropriety involved, Jakks continued to find ways to corrupt Shenker's loyalties by the payment of monies and/or promises of more contracts, including during and after the time Shenker and SSAI were negotiating with Jakks regarding the videogame license and amendments to the toy licenses.

165.    At all times relevant hereto, Jakks knew that it was dealing with a corrupt agent capable of, and actually engaging in, unethical conduct in violation of his fiduciary duties to WWE.  Jakks not only concealed such conduct from WWE but also directly fostered it.

166.    The payment made at Jakks' direction to Stanfull in January 1998, which was subsequently split with Bell, was the first time Shenker paid Bell monies in what evolved into a corrupt, illegal and wide-ranging bribery and kickback scheme between SSAI, Shenker and Bell during the time both SSAI and Bell were agents and fiduciaries of WWE.

167.    In order to induce Bell to favor the issuance of the videogame license to the Joint Venture between THQ and Jakks over other prospective licensees, Shenker promised that he would split equally all commissions SSAI was paid, as well as profits from the sale of stock SSAI would also receive as compensation if Bell recommended that the videogame license be awarded to the Joint Venture between THQ and Jakks.

168.    Bell did recommend the license be granted to the Joint Venture between THQ and Jakks and further recommended amendments to the toy licenses at the same time.  Thereafter, SSAI and Shenker did split commissions and profits from stock sales with Bell in amounts exceeding several hundred thousand dollars.

169.    As a direct result of and during the foregoing conduct, the videogame license issued to THQ/Jakks and the amendments to the toy licenses were executed.

170.    The issuance of the videogame license, and the 1998 amendments to the toy licenses executed in the same time frame, were tainted by the illegality of WWE's agents and the conflicts of interest which were known to and facilitated by Jakks for its own benefit, and for the benefit of the Joint Venture between THQ and Jakks.

171.    An actual dispute and controversy exists with respect to whether the videogame license and the 1998 amendments to the toy licenses are void for such illegality.

172.    A judicial declaration is, therefore, a necessary point to 28 U.S.C. §2201, et seq. to determine the parties rights and obligations under the videogame license and the 1998 amendments to the toy licenses.

**COUNT V**
**VIOLATION OF THE ROBINSON-PATMAN ACT, 15 U.S.C. § 13(c)**
**(Against THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman, and Bennett)**

173.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth herein.

174.    Defendants THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and Bennett are engaged in interstate commerce and, in the course of such commerce, engaged in the course of commercial bribery described above.

175.    As described herein, Jakks, Friedman, Berman and/or Bennett paid unlawful bribes and/or payments, through Stanfull, to SSAI, Shenker, Bell Licensing and/or Bell of at least $100,000 to secure the WWE videogame license for the Joint Venture and the 1998 amendments to the toy licenses.  Defendants acted with the intent corruptly to influence the conduct of Shenker, SSAI and Bell in the performance of their duties for WWE, including inducing WWE to enter into the videogame license and amendments despite the fact that other competing opportunities were, or could be negotiated to be, more favorable for WWE.

176.    At all relevant times, SSAI, Shenker, and Bell were agents or employees of WWE and thus owed WWE fiduciary duties and obligations.

177.    The payment of unlawful bribes, through Stanfull, to SSAI, Shenker, Bell Licensing and/or Bell of at least $100,000 to secure the videogame license and the 1998 amendments to the toy licenses, as described herein, constitutes commercial bribery in violation of 15 U.S.C. § 13(c).

178.    By that aspect of the scheme related to the toy licenses, Jakks was able to foreclose competition for the rights covered by the toy licenses during and in the period those licenses would otherwise have expired but for the extended term granted by the amendments.

179.    As a direct and proximate result of Defendants' unlawful conduct described herein, WWE was deprived of the benefit of competition between and among Acclaim, Activision, THQ and the Joint Venture THQ/Jakks and Jakks, for the purchase of a videogame license for its intellectual property.  Defendants the Joint Venture and THQ/Jakks, as a consequence of the commercial bribery alleged herein, obtained the videogame license from WWE upon terms less favorable to WWE than the terms which would have been available to WWE but for Defendants' foreclosure of such competition through the bribery of WWE's fiduciaries and the associated fraudulent withholding by those agents of material information regarding Defendants' offers and the competing offers available in a competitive market.  WWE was thereby injured in its business and property and was deprived of a fair and competitive return on the innovation and creativity which gave rise to WWE's intellectual property.

## COUNT VI
## VIOLATION OF NEW YORK COMMERCIAL BRIBERY LAW
### (Against THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and Bennett)

180.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

181.    As described herein, Jakks, Friedman, Berman and/or Bennett paid unlawful bribes and/or payments, through Stanfull, to SSAI, Shenker, Bell Licensing and/or Bell of at least $100,000 to secure the WWE videogame license and the 1998 amendments to the toy licenses.

182.    At all times relevant to the payment of such bribes and/or payments, as described herein, SSAI, Shenker, and Bell were agents or employees of WWE and thus owed WWE fiduciary duties and obligations.

183.    Jakks, Friedman, Berman and/or Bennett's payment of unlawful bribes and/or payments, through Stanfull, to SSAI, Shenker, Bell Licensing and/or Bell of at least $100,000 to secure the WWE videogame license and the 1998 amendments to the toy license, constitutes commercial bribery in violation of New York law.

184.    The bribery scheme inured not only to the benefit of Jakks, but also to the benefit of THQ, the Joint Venture, and THQ/Jakks, all of whom accepted the benefits and/or ratified the acts and/or are legally liable as joint ventures in any event.

185.    As a direct and proximate result of Defendants' unlawful conduct described herein, WWE has been injured in its business and property.

186.    In addition, because the videogame license and the 1998 amendments to the toy licenses were obtained by bribery, they should be declared void *ab initio*.

## COUNT VII
## FRAUDULENT INDUCEMENT
### (Against THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and Bennett)

187.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

188.    As detailed herein, in connection with the discussions leading to execution of the videogame license and the 1998 amendments to the toy licenses and during the performance of those licenses, THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and/or Bennett knowingly or recklessly made false and misleading statements to, and also knowingly or recklessly concealed information from and did not disclose information to, WWE regarding (1) the payment of bribes, through Stanfull, to SSAI, Shenker, Bell Licensing and/or Bell of at least $100,000 to secure the WWE videogame license and the 1998 amendments to the toy licenses,

and/or (2) their use of SSAI or Shenker as its undisclosed agent to secure the videogame license and the 1998 amendments to the toy licenses.

189.    Under the circumstances, THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and/or Bennett had a duty not to make such false and misleading statements, a duty to disclose the concealed and omitted information, and a duty not to induce or otherwise aid and abet SSAI's, Shenker's and Bell's violation of fiduciary duties.

190.    As described herein, THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and/or Bennett engaged in such conduct with the intent and purpose of inducing reliance thereon by WWE and inducing WWE to enter into the videogame license and the 1998 amendments to the toy licenses.

191.    The false and misleading statements, and concealed information, were material to WWE's decision to enter into, induced WWE to enter into, and were reasonably and justifiably relied upon by WWE in entering into, the videogame license and the 1998 amendments to the toy licenses.  As THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and/or Bennett knew, WWE would never have entered into the videogame license or the 1998 amendments to the toy licenses had WWE known the true state of affairs regarding the payment of bribes, through Stanfull, to SSAI, Shenker, Bell Licensing and/or Bell and/or the use of SSAI or Shenker as an undisclosed agent.

192.    In fraudulently inducing WWE to enter into the videogame license and the 1998 amendments to the toy licenses, as described herein, THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and/or Bennett acted with malicious purpose and/or dishonest, unfair or improper means to harm WWE.

193.    As a direct and proximate result of Defendants' fraudulent conduct, WWE has been injured in its business and property.

194.    In addition, because the videogame license and the 1998 amendments to the toy licenses were obtained on the basis of fraud, the videogame license and the 1998 amendments to the toy licenses should be declared void *ab initio*.

## COUNT VIII
## UNJUST ENRICHMENT
### (Against THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and Bennett Only)

195.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

196.    As described herein, THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and/or Bennett have derived substantial benefits from the videogame license and the 1998 amendments to the toy license, to which they were not properly entitled.

197.    Accordingly, THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and/or Bennett have unfairly and unjustly enjoyed the benefits of monies to which they were not properly entitled.

198.    It would be unfair and unjust for THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and/or Bennett to retain the benefits of such monies, to which they were not properly entitled.

## COUNT IX
## INDUCING BREACH OF FIDUCIARY DUTY
### (Against THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and Bennett Only)

199.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

200.    As described herein, Bell, SSAI and/or Shenker breached their fiduciary duties owed to WWE by, *inter alia,* accepting bribes of at least $100,000 to secure the WWE videogame license and the 1998 amendments to the toy licenses.

201.    As described herein, Defendants herein knowingly induced or participated in Bell, SSAI and/or Shenker's breach of their fiduciary duties by making bribes of at least $100,000, through Stanfull, to secure the WWE videogame license and the 1998 amendments to the toy licenses and by failing to disclose that Shenker was secretly acting as their agent.

202.    In seeking to induce SSAI, Shenker and/or Bell to breach their fiduciary duties owed to WWE, Defendants herein acted with malicious purpose and/or dishonest, unfair or improper means to harm WWE.

203.    As a direct and proximate result of Defendants' unlawful conduct, WWE has been injured in its business and property, including, but not limited to, by the corruption of the fair and honest services of its agents and fiduciaries.

## COUNT X
## INDUCING BREACH OF FIDUCIARY DUTY
### (Against THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and Bennett Only)

204.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

205.    At all relevant times, SSAI and/or Shenker were agents of WWE and thus owed WWE fiduciary duties and obligations.

206.    As described herein, during the time SSAI and/or Shenker were agents of WWE, including, but not limited to, during the time the video game license and the 1998 amendments to

the toy licenses were negotiated, Jakks knew of and created an undisclosed conflict of interest between SSAI and/or Shenker, and WWE.

207.    As described herein, during the time Jakks knew SSAI and/or Shenker was WWE's agent, Jakks began the practice of paying Shenker and using him as their agent, none of which was disclosed to WWE.

208.    As described herein, at various times during their undisclosed agency relationship with Shenker, Jakks personnel would, in writing, direct and inquire of Shenker regarding matters being performed by Shenker on Jakks' behalf and at the same time request that he secure modifications and/or amendments to Jakks' toy license with WWE.

209.    As described herein, Jakks personnel were acutely aware of the impropriety of such conduct, and in particular were aware of the impropriety of such conduct after being advised by corporate counsel that Jakks could not do so without WWE's knowledge and consent.

210.    Jakks never disclosed to WWE its agency relationship with Shenker.

211.    As described herein, SSAI and/or Shenker breached its fiduciary duties to WWE through Shenker's undisclosed conflict of interest by virtue of his undisclosed agency relationship with Jakks.

212.    As described herein, Defendants herein knowingly induced or participated in SSAI and/or Shenker's breach of fiduciary duty by Jakks maintaining an agency relationship with Shenker despite knowing of Shenker and/or SSAI's agency relationship with WWE, and Jakks failing to disclose such agency relationship and conflict of interest to WWE at the same time that Jakks was conducing business with WWE, including, but not limited to, the negotiation of the videogame license and 1998 amendments to the toy licenses.

213.     In seeking to induce SSAI and/or Shenker to breach their fiduciary duties owed to WWE, Defendants herein acted with malicious purpose and/or dishonest, unfair or improper means to harm WWE.

214.     As a direct and proximate result of Defendants' unlawful conduct, WWE has been injured in its business and property, including, but not limited to, by the corruption of the fair and honest services of its agents and fiduciaries.

## COUNT XI
## CONSTRUCTIVE TRUST
### (Against Defendants THQ/Jakks, Jakks, the Joint Venture, Friedman, Berman and Bennett Only)

215.     Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

216.     As described herein, Bell, SSAI and/or Shenker breached their fiduciary duties owed to WWE by, *inter alia,* accepting bribes of at least $100,000 to secure the WWE videogame license and the 1998 amendments to the toy license.

217.     As described herein, in violation of their fiduciary duties owed to WWE, Bell, SSAI and/or Shenker caused WWE to enter into the videogame license and the 1998 amendments to the toy licenses.

218.     As described herein, Defendants herein had notice or knowledge of Bell, SSAI and/or Shenker's breach of their fiduciary duties owed to WWE in causing WWE to enter into the videogame license and the 1998 amendments to the toy licenses.

219.     Accordingly, the videogame license and the 1998 amendments to the toy license, and all revenues and profits therefrom, are held by THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and/or Bennett in constructive trust for WWE.

69

**COUNT XII**
**TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**
**(Against THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and Bennett**
**Only)**

220.    Each and every one of the foregoing allegations is incorporated herein by reference as though fully set forth at length.

221.    At all times relevant to the payment of unlawful bribes and/or payments, WWE maintained valid contracts with SSAI, Shenker and/or Bell.

222.    Defendants herein had knowledge of WWE's valid contracts with SSAI, Shenker and/or Bell.

223.    As described herein, Defendants herein intentionally sought to induce SSAI, Shenker and/or Bell to breach their contracts with WWE by making bribes, through Stanfull, to secure the WWE videogame license and the 1998 amendments to the toy licenses.

224.    In seeking to induce SSAI, Shenker and/or Bell to breach their contracts with Defendants acted with malicious purpose and/or dishonest, unfair or improper means to harm WWE.

225.    As a direct and proximate result of Defendants' unlawful conduct, WWE has been injured in its business and property.

**COUNT XIII**
**PIERCING THE CORPORATE VEIL/ALTER EGO**
**(Against THQ, Jakks, the Joint Venture and THQ/Jakks)**

226.    Each and every one of the foregoing allegations is incorporated herein by reference as though fully set forth at length.

227.    THQ and Jakks exercised complete domination of THQ/Jakks Pacific LLC with respect to the formation and operation of THQ/Jakks Pacific, LLC.

228.    THQ/Jakks Pacific LLC was used to perpetrate and implement a fraud, specifically to be the formal signatory to the videogame license procured by the fraudulent and criminal schemes set forth herein.

229.    As a result, any and all liability of THQ/Jakks LLC to WWE should be imposed upon THQ and Jakks, jointly and severally.

## COUNT XIV
## CONSPIRACY TO COMMIT COMMERCIAL BRIBERY; FRAUDULENT INDUCEMENT; INDUCING BREACH OF FIDUCIARY DUTY; AND TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
## (Against THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and Bennett Only)

230.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

231.    Defendants entered into an agreement to, *inter alia,* (i) commit commercial bribery; (ii) fraudulently induce WWE to execute the videogame license and the 1998 amendments to the toy licenses without knowledge of Defendants' unlawful bribes to SSAI, Shenker, Bell and/or Bell Licensing of at least $100,000 and Defendants' use of SSAI and/or Shenker as their undisclosed agent ; (iii) induce SSAI, Shenker and/or Bell to breach their fiduciary duties owed to WWE; and (iv) tortiously interefere with WWE's contractual relations with SSAI, Shenker and/or Bell, as described in the foregoing substantive Counts of this Complaint.

232.    Each of the Defendants committed one or more overt acts pursuant to and in furtherance of Defendants' conspiracy to unlawfully harm WWE by the unlawful conduct described herein.

233.     Pursuant to and in furtherance of Defendants' conspiracy, Defendants have, among other things, committed the acts described in Count I above, which are overt acts in furtherance of the goals of the conspiracy and which are specifically incorporated herein by reference and made a part hereof.

234.     As a direct and proximate result of Defendants' unlawful conspiracy, WWE has been injured in its business and property.

## **PRAYER FOR RELIEF**

WHEREFORE, WWE respectfully requests that this Honorable Court enter judgment in favor of WWE and order the following relief:

(1)     All damages proven pursuant to RICO and Robinson-Patman Act, trebled as permitted by law;

(2)     A declaration that the videogame license and the 1998 amendments to the toy licenses, as well as all other amendments executed during the fraudulently-obtained term extension of the toy licenses, are void;

(3)     An accounting of all revenues and profits obtained pursuant to the videogame license and the 1998 amendments to the toy licenses;

(4)     Restitution and/or disgorgement of all revenues and profits obtained pursuant to the videogame license and the 1998 amendments to the toy licenses to which THQ/Jakks, Jakks, THQ, the Joint Venture, Friedman, Berman and/or Bennett were not properly entitled;

(5)     Restitution and/or disgorgement of all bribes and/or payments paid or received by Defendants;

(6)     All other actual damages sustained by WWE;

(7)    Punitive damages;

(8)    Attorneys' fees and costs; and

(9)    Such other and further relief as this Court deems just and appropriate.

**JURY TRIAL DEMANDED**

Respectfully submitted,

KIRKPATRICK & LOCKHART LLP

_____/S_____
By: Eugene Licker (EL 0334)

KIRKPATRICK & LOCKHART LLP
599 Lexington Avenue
New York, New York 10022-6030
(212) 536-3900 (phone)
(212) 536-3901 (fax)

and

Jerry S. McDevitt
Curtis B. Krasik
Amy L. Barrette

KIRKPATRICK & LOCKHART LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, Pennsylvania 15222
(412) 355-8608 (phone)
(412) 355-6501 (fax)

Dated:  October 19, 2004                Attorneys for Plaintiff, World Wrestling
Entertainment, Inc.