

**Kirkpatrick & Lockhart Nicholson Graham LLP**

Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA  15222-2312
412.355.6500
Fax 412.355.6501
www.klng.com

Jerry S. McDevitt
412.355.8608
jmcdevitt@klng.com

February 10, 2005

**VIA ELECTRONIC FILING AND FIRST CLASS MAIL**

Honorable Kenneth M. Karas
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street, Room 920
New York, NY 10007

> Re:   **World Wrestling Entertainment, Inc. v. JAKKS Pacific, Inc., et al.**
> **1:04-CV-08223-KMK**

Dear Judge Karas:

We submit this response to the fifteen pages submitted to the Court by various defendants to stay discovery. Consistent with the spirit of the Court's ruling on page limits for the briefing on motions to dismiss, our response to the cumulative efforts of Defendants to avoid all discovery will not exceed the cumulative length of their submissions.

## I.      INTRODUCTION

Without even knowing the type or breadth of discovery sought by WWE, various defendants ask this Court to stay all discovery pending resolution of their motions to dismiss on the grounds that such unknown discovery will be burdensome and prejudicial to them. However, the discovery sought by WWE at this time is limited to discovery related to any challenges to personal jurisdiction, any motions to transfer on convenience grounds, and documentary discovery from certain Defendants regarding six discrete topics specific as to time and scope. Because the discovery WWE desires to undertake is limited in scope, and it is not inevitable that the motions to dismiss will be granted, Defendants' request for a stay of discovery should be denied.

Honorable Kenneth M. Karas
February 10, 2005
Page 2

## II.    ANALYSIS

### A.    STAYS OF DISCOVERY ARE NOT ROUTINELY GRANTED PENDING DISPOSITION OF MOTIONS TO DISMISS

The decision as to whether good cause exists to stay discovery due to the pendency of motions to dismiss is a matter vested in the sound discretion of the Court. See Fed. R. Civ. P. 26(c). A stay of discovery is not, however, routinely granted simply because a motion to dismiss has been filed. In re Chase Manhattan Corp. Sec. Litig., No. 90 Civ. 6092 (LMM), 1991 WL 79432, at *1 (S.D.N.Y. May 7, 1991). When courts have found that it was not "inevitable" that the motion to dismiss would be granted, a stay is denied. Id. It is also appropriate to consider the breadth of discovery being sought, the burden of responding to it, and the unfair prejudice to the party opposing the stay.[1] In re Currency Conversion Fee Antitrust Litig., No. MDL 1409, M21-95, 2002 WL 88278, at *1 (S.D.N.Y. Jan. 22, 2002). Finally, attacks on the factual sufficiency of a complaint do not warrant stays of discovery since such issues are curable by amended pleadings. See Moore v. Painewebber, Inc., No. 96 Civ. 6820 (JFK), 1997 WL 12805, at *1 (S.D.N.Y. Jan. 14, 1997); Howard v. Galesi, 107 F.R.D. 348, 351 (S.D.N.Y. 1985).

### B.    IT IS NOT INEVITABLE THAT THIS ACTION WILL BE DISMISSED AND IT WOULD BE ERROR TO DO SO

Dismissal of the federal claims would require this Court to find that, taking as true all factual allegations in the Complaint, as well as all inferences from those allegations, WWE could

---

[1]    Although the primary case relied on by the Jakks Defendants in support of their request for a stay, Spencer Trask Software & Info. Servs., LLC v. RPost Int'l Ltd., 206 F.R.D. 367, 368 (S.D.N.Y. 2002), also identifies the breadth of discovery being sought and the burden of responding to it as relevant factors for a court to consider when deciding a motion for a stay of discovery, the Jakks Defendants conveniently fail to mention these factors to the Court, and all of the Defendants fail to address these factors whatsoever. Notably, in granting the stay in Spencer, the Court found that the breadth of discovery sought, which included depositions of third parties, was broad, the burden of responding to it was substantial, and the expense and possible injury to the success of defendants' current contractual negotiations was great. Spencer, 206 F.R.D. at 368. Because none of those concerns exist in this case, Spencer is completely inapplicable.

Honorable Kenneth M. Karas
February 10, 2005
Page 3

prove no set of facts entitling WWE to relief.  See H.J. Inc. v. Northwestern Bell Tel. Co., 492

U.S. 229, 249-50 (1989).  The RICO counts in the Complaint rely upon over 156 specifically

plead predicate acts and incorporate by reference others set forth in the Complaint.  The

Complaint more than satisfies the pleading requirements applicable to all aspects of RICO

claims.  See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young, No. 91 Civ. 2923 (CSH),

1994 WL 88129, at *8 (S.D.N.Y. Mar. 15, 1994) (stating that Rule 9(b) specificity requirement

only applies to RICO predicate acts of fraud, and all others are assessed under Rule 8(a)).

Moreover, a defrauded plaintiff framing a RICO complaint will not have access to factual

information regarding the inner workings of a RICO enterprise, which courts recognize is the

purpose of discovery. Friedman v. Hartmann, No. 91 Civ. 1523 (PKL), 1994 WL 376058, at *2

(S.D.N.Y. July 15, 1994).

    The Complaint contains a detailed description of the fraudulent scheme and, therefore,

discovery should proceed.  Ahead By A Length, Inc. v. Feiner, 100 B.R. 157, 167 (Bankr.

S.D.N.Y. 1989) (when a plaintiff has "established the basic framework of the fraud, she should

be permitted to flesh out the allegations in the complaint through discovery").  The facts plead

with specificity were developed despite a massive criminal obstruction of justice scheme

designed to conceal the payments Jakks made to foreign bank accounts of WWE's licensing

agent, defendant Stanley Shenker.  In uncommonly specific factual details for a RICO case at

this stage, the Complaint establishes actionable wrongdoing involving the corruption and bribery

of WWE fiduciaries orchestrated by the highest ranking officers and directors of Jakks, on behalf

of Jakks and on behalf of their joint venture partner, THQ.  The racketeering activity resulted in

improperly securing three valuable licenses involving hundreds of millions of dollars and, on

another view of the evidence alleged in the Complaint, potentially a fourth licensing right

obtained by Jakks for which it separately bribed WWE's agents.[2]

_____

[2]    Although the Jakks Defendants pronounce that this Court would not grant leave to amend
and therefore there should be no discovery, the reality is that the Defendants primarily attack the
factual sufficiency of the RICO allegations.  Under the foregoing authorities, that is precisely the
situation where discovery should not be stayed, particularly for narrow requests as are made
herein by WWE.

Honorable Kenneth M. Karas
February 10, 2005
Page 4

As to THQ, its argument is best described as "we didn't know about it, didn't do it, but want to continue to collect hundreds of millions of dollars from a license procured by our joint venture partner, Jakks, via improper means."[3]  Indeed, in its letter requesting a stay, THQ states, after self-serving denials of knowledge of wrongdoing by Jakks, that if the allegations are true against their partner, then THQ is "as much a victim of the alleged misconduct as WWE claims it is."  THQ is no "victim."  The scienter of THQ is inferred upon proof of motive to commit fraud and a clear opportunity to do so.  See Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 241 (2d Cir. 1999).  The benefits received by a defendant can be proof of a compelling motive to engage in fraud.  Id.  Additionally, circumstances showing a conscious behavior may be sufficient and atypicality or unusual circumstances alone are sufficient to show conscious behavior.  See Powers v. British Vita, P.L.C., 57 F.3d 176, 185 (2d Cir. 1995); 131 Main Street Assocs. v. Manko, 897 F. Supp. 1507, 1529 (S.D.N.Y. 1995).  Additionally, the Complaint alleges that THQ was the joint venture partner of Jakks.  As such, THQ's liability is determined by the law governing joint ventures, which is essentially partnership law.  See Gramercy Equities Corp. v. Dumont, 531 N.E.2d 629, 632 (N.Y. 1988); In re Wedtech Corp., 88 B.R. 619, 623 (Bankr. S.D.N.Y. 1988).[4]  Finally, the allegations regarding high level management involvement are more than adequate to impose vicarious RICO liability upon THQ.  See USA Certified Merchs., LLC v. Koebel, 262 F. Supp. 2d 319, 327-30 (S.D.N.Y. 2003).  In sum, for the above reasons as well as for the reasons contained in our letter to the Court dated December 8, 2004 in response to Defendants' pre-motion letters, we respectfully submit that it is hardly "inevitable"

---

[3]    Due to space limitations associated with our response to the Defendants' pre-motion letters requesting leave to move to dismiss, WWE could not respond to THQ's arguments. WWE will, of course, fully brief the theories of liability against THQ at the appropriate time but has briefly reviewed the law herein because it demonstrates the relevance of the limited discovery sought by WWE discussed below.

[4]    See also Young v. New York State Elec. & Gas Corp., 55 N.Y.S.2d 150, 153-54 (N.Y. Sup. Ct. 1945) ("[A] principal cannot receive the fruits of a bargain without adopting the instrumentalities employed by his agent in bringing it to consummation, and so is bound by false representations of his agent, although ignorant thereof and intending no fraud"), aff'd, 60 N.Y.S.2d 303 (N.Y. App. Div. 1946).

Honorable Kenneth M. Karas
February 10, 2005
Page 5

that the case will be dismissed after motion practice. Without such a finding, discovery should not be stayed.[5]

## C.  THE DISCOVERY SOUGHT BY WWE IS LIMITED AND THUS NOT BURDENSOME OR OVERREACHING

Another factor that a court should consider in deciding whether to grant a stay of discovery pending a motion to dismiss is the breadth of discovery being sought and the burden of responding to it. Amazingly, despite this relevant consideration, Defendants oppose all discovery without knowing or even asking what discovery WWE desires to take. As evident from the requests set forth below, the discovery that WWE desires to undertake is limited and thus not burdensome or overreaching.

At this time, WWE does not propose any discovery against the Shenker or Bell Defendants, the only parties to the Connecticut state court action. Rather, WWE desires to take the following limited discovery from the other Defendants now. Notably, no discovery has been conducted in Connecticut against THQ or the joint venture. The individual Jakks Defendants were not asked to produce documents. Moreover, the discovery requested here was neither sought nor obtained from Jakks in the Connecticut action.

1.  **Personal Jurisdiction Discovery.** Three individual Jakks Defendants and the two Hong Kong subsidiaries of Jakks intend to contest personal jurisdiction. We believe that the foreign subsidiaries conduct extensive business in the United States and will be amenable to both general and specific jurisdiction on a proper factual record. We believe that the three individual Jakks Defendants have extensive and ongoing contacts with New York which can only be developed on a factual record. Such discovery is appropriate if jurisdictional issues are raised. See Daventree Ltd. v. Republic of Azerbaijan, 349 F. Supp. 2d 736, 761 (S.D.N.Y. 2004) ("A

---

[5]    As noted by WWE at the recent conference, even if the Court were to dismiss the federal claims, WWE would either amend or refile its state law claims in state court. Such factors have led courts to deny discovery stays pending motions to dismiss. See, e.g., Wolf v. United States, 157 F.R.D. 494, 495 (D. Kan. 1994).

Honorable Kenneth M. Karas
February 10, 2005
Page 6

plaintiff should be provided with "'ample opportunity to secure and present evidence relevant to
the existence of jurisdiction'" through jurisdictional discovery.") (citations omitted).

    2.    **Discovery Related to Any Motion to Transfer on Convenience Grounds**.  It
will be Defendants' burden to convince the Court to transfer the case.  <u>Linzer v. Blackwood
Music, Inc.</u>, 904 F. Supp. 207, 216 (S.D.N.Y. 1995).  To the extent affidavits are submitted
which WWE believes embellishes the number of key witnesses or the amount of records outside
of New York, it is appropriate to depose the affiants for a proper record to be created.  <u>See</u>
<u>McDonnell Douglas Corp. v. Polin</u>, 429 F.2d 30, 31 (3d Cir. 1970) (court did not stay discovery
related to transfer motions), <u>remanded to</u> <u>Polin v. Conductron Corp.</u>, 340 F. Supp. 602, 606-07
(E.D. Pa. 1972) (on remand, trial court bemoaned ability to make principled decision without
plenary factual record).

    3.    **Documentary Discovery on Selected Issues from THQ, the Joint Venture of
THQ and Jakks, Jakks, and Defendants Friedman, Berman and Bennett**.  There has been no
documentary discovery whatsoever from the aforementioned Defendants on the matters for
which WWE now seeks documentary evidence.  Items (a)-(d) set forth below are directly
relevant to THQ's knowledge and scienter.  Item (e) seeks disclosure of payments made by the
individual Jakks Defendants to Shenker or Bell.  Item (f) seeks information relevant to a fourth
licensing right obtained by Jakks by potential bribery of Shenker and Bell.  The narrow requests
are for the following limited documents:

    (a)    documents concerning communications between Jakks and THQ in 1998
relating to WWE's video game license,

    (b)    documents concerning communications between Jakks and THQ in 1998
relating to the formation of the joint venture to pursue the WWE video game license,

    (c)    documents concerning operational agreements relating to the joint venture
between THQ and Jakks,

    (d)    documents concerning the receipt of THQ stock by Friedman in 1998,

    (e)    documents concerning payments of monies or other consideration to
Shenker or Bell, directly or indirectly, by Defendants Friedman, Berman and/or Bennett, and

Honorable Kenneth M. Karas
February 10, 2005
Page 7

        (f)     documents concerning Jakks' acquisition of licensing rights from WWE formerly held by Playmates.

        WWE believes that this limited discovery is appropriate and is certainly not burdensome. The requests are specific as to time and narrow in scope, and it would therefore not be burdensome to produce documents in response to such limited requests. See Howard v. Galesi, 107 F.R.D. 348, 350-51 (S.D.N.Y. 1985). Indeed, it is probable that the able defense counsel in this case have already obtained the documents requested for their own review, thus further negating any claim of burden. Also, no issue could seriously be raised as to the relevance of the requested records or whether, as suggested in the blind by Defendants, such directly relevant evidence would be discoverable in a state court proceeding if the Court did dismiss the federal claims. All requests relate to information exclusively in the possession of Defendants and will provide a basis for amending the Complaint if deemed necessary.[6] As a result, Defendants' request for a stay of such limited discovery should be denied.

## D.    WWE WILL BE PREJUDICED BY FURTHER DELAY

        The Jakks Defendants, THQ, and the joint venture between Jakks and THQ are currently exploiting intellectual property licenses obtained by improper means. Bankers Trust Co. v. Litton Sys., Inc., 599 F.2d 488, 492 (2d Cir. 1979) (bribery induced contracts are illegal and void). WWE is in the wholly undesirable position of having to do business with entities it believes hold bribery induced licenses which will ultimately be declared void. Further delay will effectively deny WWE meaningful relief, as two of the licenses in question will expire at the end of December 2009.

        Additionally, evidence in this case has already been lost and in some cases affirmatively destroyed. Written agreements between Bell and Shenker related to the video game license bribery scheme were destroyed by them while obstructing justice in Connecticut. Jakks'

---

[6]     Indeed, Defendants' arguments that WWE can obtain such records in the Connecticut proceeding are self-defeating. If true, why object to producing the records here? In reality, if WWE did seek those records in Connecticut, all would complain that WWE was conducting discovery there for use in this case.

Honorable Kenneth M. Karas
February 10, 2005
Page 8

corporate representative has testified that files relating to Jakks' dealings with Shenker are mysteriously missing. Under such circumstances, the highly relevant evidence in the sole possession of the Defendants should be secured as soon as possible to prevent further prejudice. Indeed, it is precisely for that reason why WWE believes all parties should be permitted to serve document requests immediately so that there can be no question about what evidence should be preserved.

Finally, although WWE believes jurisdiction and venue are proper and that the federal claims are viable, further delay jeopardizes WWE's ability to refile state claims in the appropriate forum with the strongest case possible in the face of the obstruction of the facts by those who have exclusive possession and complete control of the relevant evidence. Defendants have a decided interest in concealing the facts and then arguing that limitations have run against the WWE. Therefore, because WWE will be prejudiced by further delay, the limited discovery sought by WWE should not be stayed.

E.    **DEFENDANTS' NUMEROUS RED HERRINGS ARE NOT ONLY IRRELEVANT TO THE ISSUES BEFORE THE COURT BUT ALSO UNSUPPORTED BY THE FACTS**

To buttress their argument that no discovery should occur, some Defendants suggest that discovery has already occurred in the Connecticut action and, in amazing statements under the circumstances, actually suggest that WWE employed improper discovery tactics in the Connecticut action. Shenker, an adjudicated "serial perjurer," states "judging by the discovery tactics employed by WWE's counsel in the Connecticut action, it is reasonable to assume that . . . plaintiff's discovery will be expansive." For their part, while professing to have only "limited information" of the Connecticut litigation,[7] the Jakks Defendants predict "there is ample reason to believe that the discovery process will be contentious and require significant Court oversight;" which is a not-too-subtle attempt to precondition the Court to expect that the Jakks

---

[7]    In reality, Jakks has been monitoring the Connecticut litigation for some time now, a fact specifically noted by the Connecticut court on the record during compulsion proceedings against Jakks in that Court.

Honorable Kenneth M. Karas
February 10, 2005
Page 9

Defendants will not produce evidence without compulsion orders. The Jakks Defendants also suggest that WWE has been conducting discovery against the Jakks Defendants for years in Connecticut.

Lastly, THQ argues that it has been denied access to evidence in the Connecticut case because they were "told" a protective order exists in the case. The implication is that THQ was so told by WWE counsel. Given the incorrect impressions those arguments are designed to create, it is necessary to squarely rebut those red herrings so the Court has a clear picture of the situation.

1.    **WWE Has Not Told THQ Or Any Other Party That It Cannot Have
      Access To Evidence Generated In Connecticut**

THQ has not asked WWE to provide evidence from the Connecticut action because they do not want to undercut their no-discovery position. WWE would prefer that all parties engage in plenary documentary discovery now in order to be prepared to commence depositions as soon as possible after the Court rules on their motions.[8] The only discussion WWE's counsel had with THQ's counsel regarding the evidence from the Connecticut action was to inquire if THQ's counsel had read the depositions of the three Jakks individual defendants described below. The response was that Jakks' counsel, Mr. Skala, would not provide those depositions to THQ's counsel even though Mr. Skala had the transcripts in his possession. For the record, WWE has no objection to those transcripts being shared with THQ.

---

[8]    This action was commenced on October 19, 2004 with service made shortly thereafter. The current briefing schedule has the last brief due on April 14, 2005. Thus, by engaging in motion practice in lieu of litigating the merits, Defendants will have delayed the adjudication of the case by five months plus however long it takes the Court to wade through the barrage of paper contemplated by Defendants. If the Court denies the motions, as WWE respectfully submits should be the case, documentary discovery will then be initiated and take at least thirty days to occur. If the Jakks Defendants follow through on their announced intentions to litigate discovery requests, even further delay is injected and depositions cannot commence until resolved. WWE respectfully submits this is exactly the kind of delay which will be the hallmark of Defendants' strategy here and WWE is duty bound to contest it as inconsistent with the command of Fed. R. Civ. P. 1 (rules "shall be construed and administered to secure the just, speedy, and inexpensive determination of every action").

Honorable Kenneth M. Karas
February 10, 2005
Page 10

### 2.    Shenker's Comments About The Manner Discovery Was Conducted In Connecticut Are Absurd Under The Circumstances

Shenker's innuendo about the "discovery tactics employed by WWE's counsel in the Connecticut action" is inane. No discovery "tactics" by WWE would have been necessary had Shenker not engaged in criminal obstruction of justice. Instead, Shenker (with Bell) engaged in a now admitted plan to commit serial perjury, destroy evidence, fabricate documentary evidence, and ignore Court orders. Shenker's tactics required WWE to obtain at least twelve compulsion orders and endure four discovery extensions. This is not rhetoric of counsel. So the Court need not rely on polemics of counsel, we enclose herewith the Opinion of the Connecticut Court detailing some, but not all, of the now adjudicated criminal activity WWE had to overcome. In Section B and B3 of the Opinion, the Court reviewed the deception employed by Shenker to prevent disclosure of the payments from Jakks. In Section B, the Court specifically found that Shenker perjured himself to conceal his ownership of a Hong Kong corporation in order to prevent discovery of "the significant, additional, improper payments Shenker received from WWE licensees." Jakks was specifically noted to have been one of those licensees. In Section B3, the Court notes three different lies Shenker told about payments received from licensees and how he changed his answer only when he knew WWE was aware of a $40,000 payment from Jakks.[9] In sum, Shenker complaining about WWE's litigation tactics is more than strange.[10]

---

[9]    In fact, even the response given by Shenker that he had received $40,000 from Jakks noted by the Court, given during the period Shenker was supposedly coming clean, was false. After the Court issued its rulings, WWE learned via discovery of a Hong Kong bank that at least $100,000 was paid to Shenker by Jakks.

[10]    In any event, WWE does not for the moment seek to conduct discovery against the Shenker or Bell Defendants pending motions to dismiss.

Honorable Kenneth M. Karas
February 10, 2005
Page 11

3.     **The Discovery Against The Jakks Defendants In Connecticut Was Both Limited And Problematical**

The Jakks Defendants suggest WWE has already had ample discovery of the Jakks Defendants in Connecticut. Reading the Jakks Defendants' submission, one would think they cooperated fully with that process. Indeed, at the January 25, 2005 hearing, when the Court suggested it was not WWE's fault for the problems with discovery in Connecticut due to discovery misconduct, Jakks Defendants' counsel responded, "Not my clients, your Honor." Well, not exactly.

As set forth in the Complaint, the Jakks Defendants at all times acted in conscious parallelism with Shenker to conceal the payments and indeed any economic relationship to Shenker at all. Despite a subpoena and letters to its counsel, Jakks never produced evidence of payments to Shenker until after WWE had obtained such evidence from third parties. After WWE obtained foreign banking records proving that, in fact, at least $100,000 had been paid to Shenker by Jakks, WWE sought deposition discovery against the Jakks Defendants aimed at answering the most basic questions about what Jakks had previously denied—why did it pay Shenker monies, who authorized the payments, and why was it "imperative" to pay Shenker $40,000 literally at the same time he and Bell were recommending the video game license be given to Jakks.[11] Exactly three depositions were scheduled, and none lasted more than a day. All were narrowly focused. First to testify, on June 9, 2004, was defendant Berman, who categorically denied being involved in the payments to Shenker or knowing who had authorized them:

Q:     Well, the record shows the payments were made in January and April of '98. That's the time period the video game license was being negotiated, wasn't it?

A:     Yes, but I don't recall the payments.

---

[11]     CFO and defendant Bennett gave the "imperative" direction.

Honorable Kenneth M. Karas
February 10, 2005
Page 12

> Q:    Understood.  I want to make sure I understand.  Your testimony, then, is
> that you did not know at the time the video game license was being
> negotiated that somebody else in your company had made arrangements to
> pay Mr. Shenker $80,000?
>
> Q:    That's your testimony, correct?
>
> A:    Correct, I believe so.

The next day, defendant Bennett was designated by Jakks as the corporate official who
would testify on behalf of the company about the payments.  After admitting he did absolutely
nothing to prepare, Bennett systematically claimed amnesia about who had authorized the
payment of the $80,000 invoice Bennett had sent overseas to be paid, exemplified by the
following exchange:

> Q:    Did you ever deal with Stephen Berman with respect to any issues related
> to this $80,000 invoice?
>
> A:    Not that I recall.
>
> Q:    Did you ever deal with Jack Friedman related to any issues on these
> $80,000?
>
> A:    Not that I recall.
>
> Q:    What executive within the company did you deal with that you recall
> regarding that invoice?
>
> A:    I don't recall.
>
> Q:    None?
>
> A:    No.[12]

---

[12]    CFO Bennett also testified that certain files evidencing contractual relationships between
Jakks and Shenker had, of course, inexplicably disappeared!

Honorable Kenneth M. Karas
February 10, 2005
Page 13

Defendant Friedman's deposition was scheduled to occur on July 28, 2004. The day before his deposition, Jakks filed a frivolous protective order motion seeking to postpone his deposition and said he would not show up due to the filing of the motion. That day, the Connecticut court ordered him to appear and testify as scheduled. Friedman, the Chairman of the Board of Jakks, categorically denied being involved in the payments or even being aware the payments were made in 1998:

> Q:      You're aware of two $40,000 payments made by Hong Kong affiliates of Jakks Pacific to Stanful Industrial in 1998, aren't you?
>
> A:      I was made aware of them, yes.
>
> Q:      When were you made aware of them?
>
> A:      Sometime in the last – less than a year, I believe less than a year ago.
>
> Q:      Is it your testimony that you didn't know about those payments prior to then?
>
> A:      Correct.

As a result of this charade, the top management of Jakks avoided identifying the persons who authorized the payments. Thus, WWE had to seek a compulsion order directing Jakks to do so. The Court entered a second compulsion order against Jakks requiring it to adequately prepare and produce a corporate witness.

On October 15, 2004, Mr. Bennett returned as Jakks' corporate witness under specific order of the Court. As the official corporate representative testifying under Court order, and after admitting he had discussed their testimony with both Friedman and Berman, Bennett then admitted that, under any circumstances then existing, the payments in question had to have been authorized by Mr. Berman, Mr. Friedman, or both. Effectively, Jakks' corporate representative, while under a compulsion order, indicated that one or both of its highest ranking officers had not been truthful about their involvement in the payments to Shenker. The net effect, of course, was that Friedman and Berman have both escaped examination to date on their precise roles in the payments since both denied being involved under oath. In sum, the Jakks Defendants'

Honorable Kenneth M. Karas
February 10, 2005
Page 14

suggestion that discovery be stayed here because they provided discovery in the Connecticut
action is not persuasive. The Jakks Defendants, like their co-conspirators, obstructed discovery
at every turn.

### III.    CONCLUSION

Therefore, for the foregoing reasons, we respectfully request that the Court deny the
motions to stay and order the discovery specified herein to occur, with the documents being
produced within thirty days, and the depositions to await disclosure of the alleged jurisdictional
defects and reasons for seeking a transfer of venue.

Very truly yours,

Jerry S. McDevitt

JSM/emw