Not Reported in F.Supp.2d  
(Cite as: 2000 WL 1692844 (E.D.N.Y.))  
<KeyCite Citations>

Page 16

Only the Westlaw citation is currently available.

United States District Court, E.D. New York.

**Todd BANK, Plaintiff,**
v.
**BROOKLYN LAW SCHOOL, Defendant.**

No. 97-CV-7470(JG).

Oct. 6, 2000.

Todd C. Bank, Kew Gardens, NY, Plaintiff, pro se.

Mark R. Heller, Bryan Dunlap, Winthrop, Stimpson, Putnam & Roberts, New York, NY, for Defendant.

MEMORANDUM AND ORDER

GLEESON, J.

*1 In March 1993, plaintiff Todd Bank read in U.S. News & World Report that the class of 1992 graduates of defendant Brooklyn Law School working in the private sector earned an average of $60,328. Based in part on that information, plaintiff decided to attend Brooklyn Law School and decided not to transfer to another law school a year later. He graduated in 1996. He claims that the $60,328 figure was false and misleading.

Plaintiff, who is representing himself in this case, has converted that straightforward allegation into a 65-page, 225-paragraph complaint that charges, among many other things, that Brooklyn Law School violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., in association with various other entities and thousands of individuals. It is exactly this sort of complaint that has given the private right of action under RICO a bad name.

Brooklyn Law School has moved to dismiss the case. For the reasons set forth below, the motion is granted.

BACKGROUND

A. The Facts

The following factual background is based on the allegations contained in plaintiff's second amended complaint.

In December 1992, defendant mailed questionnaires to the 469 graduates of its class of 1992, seeking to obtain information concerning, among other things, their starting salaries upon graduation. (Second Am. Compl. ¶¶ 4, 5.) Defendant determined that the average starting salary of these graduates who were employed in the private sector and who responded to the questionnaire was $60,328. (Second Am. Compl. ¶ 5.) In February 1993, defendant sent the results of the survey, including the aforementioned salary figure, to U.S. News & World Report, Inc. ("U.S. News"). (Second Am. Compl. ¶ 8.) A representative of defendant then verified the accuracy of the information and expressly authorized the results of the survey to be published by U.S. News as part of its annual law school survey. (Second Am. Compl. ¶ 9.) The results of the survey appeared in the March 22, 1993, issue of U.S. News & World Report magazine. (Id.).

According to plaintiff, defendant authorized the publication of the salary information despite its knowledge that the information was false. (Second Am. Compl. ¶ 12.) Plaintiff alleges that the true results of the survey indicated a starting salary "materially lower" than the $60,328 figure published in the U.S. News report. (Second Am. Compl. ¶ 11.) He bases this allegation on (1) "Plaintiff's conversations ... with students who graduated in 1992;" (2) statements by the defendant's "own career advisors" comparing the average salary of the class of 1995 with that of the class of 1992; (3) a comparison of average class of 1992 salary figures submitted to U.S. News by both Brooklyn Law School and Cardozo Law School, which "conformed so closely" with one another as to "defy any reasonable belief;" (4) more detailed salary figures published by the defendant in its own publication materials; and (5) a memorandum from Joan G. Wexler, the dean of Brooklyn Law School, concerning the average salary figures for the class of 1995 published by U.S. News in its 1996 annual law school survey. (Second Am. Compl. ¶ 11.) Plaintiff further alleges that defendant was motivated to publish the false salary information to enlarge its applicant pool, to attract more selective students,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2000 WL 1692844, *1 (E.D.N.Y.))

Page 17

and to induce prospective students to accept their offers of admission. (Second Am. Compl. ¶ 13.)

*2 In March 1993, plaintiff purchased the March 22, 1993, issue of U.S. News & World Report for the sole purpose of reading the law school survey. (Second Am. Compl. ¶ 15.) Plaintiff alleges that he reasonably relied on the average salary information published by U.S. News and was persuaded by the false salary information to attend Brooklyn Law School. (Second Am. Compl. ¶ 16.)

According to plaintiff, he was damaged by the misleading salary information, which allegedly induced him to pay tuition and fees to defendant, as well as related living expenses. (Second Am. Compl. ¶ 17.) Furthermore, he alleges damages in that his law degree is "worth substantially less" than it would have been had the salary information reported by U.S. News been correct. (Second Am. Compl. ¶ 18.) Finally, plaintiff alleges that the false salary information caused him to reject an offer to transfer to the law school at the State University of New York at Buffalo ("SUNY Buffalo") after he completed his first year of law school. [FN1] (Second Am. Compl. ¶ 19.)

> FN1. Plaintiff asserts that "the difference in [Brooklyn Law School's] salary figure, and the salary figure of $41,074 submitted by SUNY Buffalo to U.S. News and published in the March 21, 1994 issue of U.S. News ... was a substantial factor, and the proximate and direct cause, for plaintiff's rejection of [SUNY Buffalo's] offer of admission." (Second Am. Compl. ¶ 19). Moreover, the tuition and living expenses for two years at SUNY Buffalo were, at a minimum, $30,000 lower than the same costs associated with Brooklyn Law School. (Id.)

Plaintiff alleges that the conduct complained of was "neither sporadic nor isolated." (Second Am. Compl. ¶ 41.) Rather, "Defendant and its agents, associates, and representatives also committed similar acts ... in the years 1991, 1992, 1993, 1994, 1995, 1996, 1997, and 1998." (Id.) Moreover, plaintiff alleges that defendant conducted a second survey of each of its graduating classes for the years 1990 through 1996. (Second Am. Compl. ¶¶ 43, 60, 69, 77, 87, 97, 128.) The "purported results" of these surveys were published each year in the Brooklyn Law School Bulletin (the "Annual Bulletin"). (Second Am. Compl. ¶¶ 44, 62, 71, 78, 88, 112, 129.) The Annual Bulletin was mailed to "more than one thousand prospective students" each year. (Second Am. Compl. ¶¶ 45, 61, 70, 79, 89, 113, 130.) According to plaintiff, the results of these surveys "were false and materially misleading." (Second Am. Compl. ¶¶ 46, 62, 71, 80, 90, 114, 131.)

B. The Procedural History

The initial complaint was filed on December 19, 1997. Defendant then moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiff submitted an amended complaint, and defendant again moved to dismiss. In a memorandum and order dated March 27, 2000 ("March 27 M & O"), Judge Sifton granted defendant's motion to dismiss the amended complaint on several grounds. First, he dismissed on proximate cause grounds, see Holmes v. Securities Investor Protection Corp., 503 U.S. 258 (1992), plaintiff's § 1962(c) claim "in as much as it relates to receiving a law degree with a lower value than it would have had had the salary information been accurate." (March 27 M & O at 10.) However, to the extent plaintiff alleges injury in the form of remaining at Brooklyn Law School instead of transferring to SUNY Buffalo, Judge Sifton held that his pleading satisfies the proximate cause requirement. (Id. at 9.)

*3 Judge Sifton then dismissed the RICO claims in their entirety on two separate grounds. He held that plaintiff had failed to allege that any of the nineteen association-in-fact enterprises alleged in the amended complaint had the structural characteristics of such an enterprise, such as a common purpose, an ongoing structure, and an organization that functions as a continuing unit. (Id. at 11-12.) In addition, Judge Sifton dismissed the RICO claims on the ground that plaintiff had failed to plead the racketeering acts of mail and wire fraud with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. (Id. at 12-13.) In this regard, Judge Sifton concluded that plaintiff had failed to "allege a factual basis for his conclusion that the salary information reported in U .S. News was not representative of the survey results." (Id. at 13 .)

Judge Sifton granted plaintiff leave to amend the

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



complaint. He stated that "[a]ny amendment seeking to set forth a claim for the diminished value of plaintiff's law degree or loss of earnings following graduation would be futile, and accordingly leave to amend to allege such a claim is denied." (Id. at 15-16.) However, he observed that "[p]laintiff's allegations indicate that there may be a possibility that plaintiff may cure the deficiencies of his pleading with respect to the enterprise and fraud and thereby provide a jurisdictional basis for his state law claims." (Id. at 16.) The case was reassigned to me the day after Judge Sifton signed the March 27, 2000, memorandum and order.

The second amended complaint is plaintiff's attempt to cure the deficiencies cited in that order. In its motion to dismiss, Brooklyn Law School claims, inter alia, that he has failed.

DISCUSSION

A. The Standard for Dismissal Under Rule 12(b)(6)

Under Rule 12(b)(6), a court must not dismiss a complaint unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College, 128 F.3d 59, 62-63 (2d Cir.1997). In applying this standard, a district court must "read the facts alleged in the complaint in the light most favorable" to the plaintiff, and accept these allegations as true. H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 249 (1989). In addition, the Supreme Court has instructed that where the plaintiff is proceeding pro se, as in the instant case, the district court must liberally construe the complaint's allegations. See Haines v. Kerner, 404 U.S. 519, 520 (1972).

B. The RICO Claims

The complaint seeks recovery pursuant to 18 U.S.C. § 1964(c), which provides that "Any person injured in his business or property by reason of a violation of § 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." Plaintiff alleges that Brooklyn Law School violated both 18 U.S.C. § 1962(c), which makes it unlawful to conduct the affairs of an enterprise through a pattern of racketeering activity, [FN2] and 18 U.S.C. § 1962(d), which prohibits, among other things, conspiracy to violate § 1962(c) . [FN3] Plaintiff specifies mail and wire fraud, indictable under 18 U .S.C. §§ 1341 and 1343, respectively, as the acts of racketeering activity.

> FN2. Specifically, section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." 18 U.S.C. § 1962(c). To establish a civil RICO claim for violation of § 1962(c), a plaintiff must plead "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Azrielli v. Cohen Law Offices, 21 F.3d 512, 520 (2d Cir.1994) (citations omitted).

> FN3. Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of [Section 1962]." 18 U.S.C. § 1962(d).

1. Failure to Plead a RICO Enterprise (The "Association-in-Fact" Enterprises)

*4 In his second amended complaint, plaintiff alleges twenty-two different enterprises. Nineteen of them are the "association-in-fact" enterprises that plaintiff alleged in the first amended complaint, [FN4] and plaintiff has not even attempted to cure the pleading deficiencies identified by Judge Sifton in his memorandum and order dismissing that complaint. Arguably, nothing more need be said about this aspect of plaintiff's claims, but I write briefly to explain my agreement with Judge Sifton's reasoning and result.

> FN4. These nineteen enterprises are: (1) Defendant, Cardozo Law School, U.S. News, the National Association for Law Placement ("NALP"), graduates of Brooklyn Law School, and graduates of Cardozo Law School; (2) Defendant, Cardozo Laws School, U.S. News, and NALP; (3) Defendant, Cardozo Law School, U.S. News, graduates of Brooklyn Law School, and graduates of Cardozo Law School; (4) Defendant, Cardozo Law School, and U.S. News; (5) Defendant, Cardozo Law School, and NALP; (6) Defendant,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Cardozo Law School, NALP, graduates of Brooklyn Law School, and graduates of Cardozo Law School; (7) Defendant, U.S. News, NALP, graduates of Brooklyn Law School, and graduates of Cardozo Law School; (8) Defendant, U.S. News, and NALP; (9) Defendant, U.S. News, and graduates of Brooklyn Law School; (10) Defendant and U.S. News; (11) Defendant and Cardozo Law School; (12) Defendant and NALP; (13) Defendant and graduates of Brooklyn Law School; (14) Defendant, NALP, and graduates of Brooklyn Law School; (15) Defendant, Cardozo Law School, graduates of Brooklyn Law School; (16) U.S. News, NALP, and graduates of Brooklyn Law School; (17) U.S. News and NALP; (18) U.S. News and graduates of Brooklyn Law School; and (19) NALP and graduates of Brooklyn Law School. (Compare Sifton Op. at 5, with Second Am. Compl. ¶ 22.)

A racketeering "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Supreme Court has explained that an association-in-fact enterprise is a "group of persons associated together for a common purpose of engaging in a course of conduct," and is "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." United States v. Turkette, 452 U.S. 576, 583 (1981). The RICO enterprise must have an ascertainable structure distinct from the pattern of racketeering activity in which its members engage. Id. As the Supreme Court stated in Turkette, "[t]he enterprise is not the 'pattern of racketeering;' it is an entity separate and apart from the pattern of activity in which it engages." Id. When applying Turkette, the Second Circuit has looked for evidence of an enterprise's "hierarchy, organization, and activities," as well as whether its "members functioned as a unit." United States v. Coonan, 938 F.2d 1553, 1560-61 (2d Cir.1991), cert. denied, 503 U.S. 941 (1992); see also Moy v. Terranova, 1999 WL 118773, at *5 (E.D.N.Y.1999) (dismissing a complaint for failure "to offer any allegations regarding the continuity or structure of the group or how the entities joined together").

Thus, an association-in-fact enterprise is not alleged every time a specified combination of individuals (or entities) is alleged to have acted in concert to commit multiple acts that qualify as racketeering acts. A private right of action alleging a violation of § 1962(c) is not a civil conspiracy claim, and the criminal prohibition in § 1962(c) is not a mere super-conspiracy statute. While the proof of the alleged criminal acts (and the pattern they comprise) and the proof of the enterprise "may in particular cases coalesce," Turkette, 452 U.S. at 583, that is far more likely to occur when the charged association-in-fact is wholly illegitimate, as in Turkette. Moreover, it does not alter the fact that proof of the pattern "does not necessarily establish" the enterprise. Id.

The second amended complaint fails to allege that any of the nineteen associations-in-fact existed as an entity separate and apart from the commission of the alleged acts of mail and wire fraud. These failures are not surprising. It is difficult to fathom how plaintiff could allege in good faith that, for example, Brooklyn Law School, U.S. News, the National Association for Law Placement, and several years of graduates of Brooklyn Law School and Cardozo Law School constituted an ongoing organization that functioned together as a continuing unit separate and apart from Brooklyn Law School's provision of salary information to U.S. News. Nor are there any allegations that even suggest that this or any of the various other alleged enterprises would exist " 'were the predicate acts removed from the equation." ' Schmidt v. Fleet Bank, 16 F.Supp.2d 340, 349 (S.D.N.Y.1998) (quoting Handeen v. Lemaire, 112 F.3d 1339, 1352 (8th Cir.1997)); see also Amsterdam Tobacco Inc., v. Philip Morris Inc., 107 F.Supp.2d 210, 215 (S.D.N.Y.2000). Finally, "[t]here is no allegation of any kind of chain of command or functional integration, as is typical of classic RICO enterprises ." Schmidt, 16 F.Supp.2d at 350. Accordingly, to the extent they are based on Brooklyn Law School's conduct of the affairs of the nineteen alleged associations-in-fact, plaintiff's RICO claims are again dismissed for failure to adequately plead a RICO enterprise.

2. The Failure to Plead Participation in the "Operation or Management" of the Enterprises (The Legal Entity and Individual Enterprises)

*5 The remaining three enterprises, alleged for the first time in the second amended complaint, are as follows: (1) U.S. News & World Report, Inc., (2)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



the National Association for Law Placement ("NALP"), and (3) each graduate of Brooklyn Law School and Cardozo Law School to whom questionnaires were mailed by the law schools. [FN5] (Second Am. Compl. ¶ 22.) With respect to these alleged enterprises, plaintiff's RICO claims are again deficient.

> FN5. This latter group, which is quite large, is not alleged to constitute an association-in-fact. Rather, plaintiff alleges that each of the thousands of individual graduates of these two law schools was an independent enterprise, whose affairs were conducted by Brooklyn Law School through a pattern of racketeering activity. (See Pl. Mem. at 2.)

A plaintiff in a § 1962(c) case must prove, inter alia, that the defendant conducted or participated in the conduct of the enterprise's affairs. See 18 U.S.C. § 1962(c). In Reves v. Ernst & Young, 507 U.S. 170, 183 (1993), the Supreme Court held that this element of the claim requires proof that the defendant "participate[d] in the operation or management of the enterprise itself." Id. [FN6] The remainder of plaintiff's § 1962(c) claim fails because he does not even attempt to allege that Brooklyn Law School participated in the operation or management of U.S. News, NALP, or each graduate of Brooklyn Law School and Cardozo Law School to whom questionnaires were sent.

> FN6. This test is difficult to satisfy, and claims are often dismissed for failure to meet the Second Circuit's "stringent standards." See, e.g., Azrielli, 21 F.3d at 521-22 (dismissing RICO claim on ground that provision of legal services related to fraudulent real estate transaction was not management of the RICO enterprise); Schmidt, 16 F.Supp.2d at 347 (dismissing RICO claim on grounds that "allowing Schick access to the escrow accounts, approving Schick's overdrafts on 500 separate occasions, failing to notify the relevant authorities of the irregularities in the Schick accounts, misrepresenting to investors the status of the account and helping Schick to conceal the scheme generally ... are really allegations of assistance to the alleged RICO enterprise, not direction of it"); Redtail Leasing, Inc. v. Bellezza, 1997 WL 603496, at *5 (S.D.N.Y. Sept. 30, 1997) (dismissing RICO claim where amended complaint alleged facts tending to show that defendants participated in the enterprise's affairs but was "devoid of allegations suggesting that [they] had some part in directing the enterprise's affairs"); Sundial Int'l Fund Ltd. v. Delta Consultants, Inc., 923 F.Supp. 38, 41 (S.D.N.Y.1996) (dismissing RICO claims against individual bank officer and banks who held investors' deposits in fraud scheme because the banks did not solicit the investments or direct the affairs of the operation); Amalgamated Bank of New York v. Marsh, 823 F.Supp. 209, 221 (S.D.N.Y.1993) (dismissing RICO claim where amended complaint failed to suggest that defendant "exerted control" over RICO enterprise"); Morin v. Trupin, 832 F.Supp. 93, 97-98 (S.D.N.Y.1993) (dismissing RICO claim upon finding that lawyer's provision of allegedly fraudulent tax opinions and information included in PPM for partnership offering insufficient to establish participation in operation and management of enterprise); Strong & Fisher Ltd. v. Maxima Leather, Inc., 1993 WL 277205, at *1 (S.D.N.Y. July 22, 1993) (dismissing RICO claim despite defendant's "substantial persuasive power" to influence the enterprise, which was not enough to demonstrate an ability to conduct the affairs of the enterprise).

The most that can be gleaned from the complaint in this respect is that Brooklyn Law School provided U.S. News with information (including starting salary data) concerning its graduates, (Second Am. Compl. ¶¶ 7-9, 30-35), used a questionnaire designed by NALP to obtain the information from its graduates, (Second Am. Compl. ¶ 36), and mailed the questionnaire to its graduates, some of whom chose to respond by filling out and returning the form, (Second Am. Compl. ¶¶ 38--153). These allegations are not enough to survive a motion to dismiss. See, e.g., LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co., 951 F.Supp. 1071, 1090 (S.D.N.Y.1996) (" 'Simply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result." ') (quoting University of Md. v. Peat Marwick, Main & Co., 996 F.2d 1534, 1539 (3d Cir.1993)); see also Department of Econ. Dev. v. Arthur Anderson & Co., 924 F.Supp. 449, 468 (S.D.N.Y.1996) ( "[T]he provision of services-- even essential services--to a RICO enterprise is not the same as controlling the enterprise's affairs.").

Plaintiff's argument in opposition to this aspect of defendant's motion reflects a fundamental

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



misunderstanding of the § 1962(c) claim. Plaintiff asserts that Reves cannot bar his claim because Brooklyn Law School is "the primary actor in the fraudulent scheme." (Pl. Mem. at 2.) However, because plaintiff has elected to bring his substantive RICO claim under § 1962(c), the issue raised by Reves is not Brooklyn Law School's role in the scheme, but its role in the enterprise. See Reves, 507 U.S. at 185 (observing that § 1962(c) has a "more limited reach" in this respect than §§ 1962(a) and 1962(b)). Specifically, the issue is whether Brooklyn Law School participated in the operation or management of the affairs of the particular enterprises plaintiff chose to allege. In the absence of such an allegation regarding U.S. News, NALP or any of the numerous individual graduates who received the questionnaires, Brooklyn Law School's "primary" role in the alleged fraudulent scheme does not save plaintiff's claim.

3. The Failure to Plead Fraud with Particularity

*6 Plaintiff's RICO claim must also be dismissed because the allegations of fraud that constitute the alleged acts of racketeering once again fail to plead fraud with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. See Wasserman v. Maimonides Medical Center, 970 F.Supp. 183, 197 (E.D.N.Y.1997) ("Where the predicate racketeering acts of a RICO claim sound in fraud, as here, the pleading of those predicate acts must satisfy the particularity requirement of Fed.R.Civ.P. 9(b).").

Rule 9(b) provides, in pertinent part, that "in all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). The rule is designed to "provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from 'improvident charges of wrongdoing,' and to protect a defendant against the institution of a strike suit." Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir.1995) (quoting O'Brien v. National Property Analysts Partners, 936 F.2d 674, 676 (2d Cir.1991)).

Under Rule 9(b), a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir.1993). Furthermore, the Second Circuit has cautioned that "we must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a 'license to base claims of fraud on speculation and conclusory allegations." ' Acito, 47 F.3d at 52 (quoting Wexner v. First Manhattan Co., 902 F.2d 169, 172 (2d Cir.1990)). Accordingly, the complaint must plead "facts that give rise to a strong inference of fraudulent intent." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir.1994); accord Mills, 12 F.3d at 1176; O'Brien, 936 F.2d at 676; Ouaknine v. MacFarlane, 897 F.2d 75, 80 (2d Cir.1990). This inference may be established "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Shields, 25 F.3d at 1128. Measured against these standards, plaintiff's allegations of fraud are inadequate.

a. Circumstances Constituting Fraud

The complaint alleges that Brooklyn Law School knew that the salary figure it reported to U.S. News was false and materially misleading, or was recklessly indifferent to that fact. (See Second Am. Compl. ¶ 12.) However, the complaint is devoid of any facts supporting an inference that Brooklyn Law School knowingly or recklessly misstated the information received in response to the survey questionnaires when it reported the average salary figures to U.S. News. Plaintiff points to a memorandum dated April 8, 1996, from Dean Joan G. Wexler to the student body at Brooklyn Law School, in which she stated that U.S. News's method of reporting the salary information of law school graduates is "misleading." (Second Am. Compl. Ex. C.) But Dean Wexler explained in the memorandum that it was misleading because the data reported by U.S. News was gathered only from those graduates who entered the private sector and chose to return the survey. (Id.) The letter expressly states that Brooklyn Law School provided U.S. News with accurate information in response to U.S. News's request. (Id.)

*7 The only other purported basis for plaintiff's allegations of fraud stems from his tortured calculation of the average salaries of the 1992 class,

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



which he concludes "reveals the literal impossibility that the $60,328 figure was correct." (See Pl.'s Mem. at 6). Plaintiff's calculations, which are set forth in the margin, [FN7] reveal no such thing. Moreover, even if they supported an inference that the figures provided to U.S. News were incorrect, plaintiff's allegations that the figures were provided with fraudulent intent are insufficient.

> FN7. Plaintiff's analysis is based on a comparison of the 99 questionnaire responses that served as the basis for the data used in the March 22, 1993, U.S. News & World Report survey with the 174 questionnaire responses that served as the basis for various data reported in the 1993-1994 Annual Bulletin. This analysis, which purportedly supports plaintiff's allegation that the $60,328 salary figure was "knowingly or recklessly" miscalculated is, in part, as follows: If 99 graduates had an salary of $60,328, then the total salary of this group would be $5,972,472. The 174 graduates, on the other hand, with an average salary of $44,042, had a total salary of $7,663,264. Therefore, the 75 graduates whose responses were not part of that 99 but were part of the responses which comprised the figures in the Bulletin must have made the difference between the 99 graduates' total salary of $5,972,472 and the 174 graduates' total salary of $7,663,134. Thus, the 75 graduates would have had to account for a total salary of $1,690,662. Dividing that figure by 75 shows that this group must have averaged a salary of $22, 542! However, such a figure is lower than the lowest average of the five categories of firms listed in the Bulletin. Thus, even if these 75 graduates were maximally skewed toward the low end of the salary spectrum--that is, if they all were positioned with firms of 2-10 attorneys, the figures of $22,542 still could not have been their salary average. This is because they would have comprised virtually the entire group employed in that bracket--that is, 75 of 77 graduates--yet the group itself averaged $29,900 (and clearly, two additional students in a group of 77 could not have accounted for the average changing from $22,542 to $29,900). Given that the figure of $22,542 was derived from the supposed average of $60,328 of the previously mentioned 99 graduates, it simply cannot be true that the 99 graduates's responses revealed an average salary of $60,328. (Pl. Mem. at 7-8.)

b. Fraudulent Intent

As noted above, plaintiff may satisfy the burden under Rule 9(b) to plead circumstances that "give rise to a strong inference of fraudulent intent" by alleging either motive and opportunity to commit fraud or facts that constitute strong circumstantial evidence of fraudulent behavior or recklessness. Shields, 25 F.3d at 1128-30. Here, plaintiff fails to do either.

In an effort to establish motive and opportunity, plaintiff alleges that the salary figures were intended by defendant to induce students into applying to Brooklyn Law School, to enlarge its pool of applicants, to enable it to be more selective and less dependant on scholarships and grants to attract high-caliber students, and to raise the prestige of the institution. (Second Am. Compl. ¶ 51). Defendant argues, and I agree, that if the desire to attract first-rate students and enhance an institution's reputation were sufficient to give rise to a strong inference of an intent to deceive, colleges and professional schools could face countless meritless suits based on statements made in the information they disseminate. Cf. Acito, 47 F.3d at 54 ("Plaintiffs' allegations that defendants were motivated to defraud the public because an inflated stock price would increase their compensation is without merit. If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."); Shields, 25 F.3d at 1130 ("If motive could be pleaded by alleging the defendant's desire for continued employment, and opportunity by alleging the defendant's authority to speak for the company, the required showing of motive and opportunity would be no realistic check on aspersions of fraud....").

Alternatively, plaintiff argues that defendant's conduct rises to the level of conscious fraudulent behavior. Yet the complaint contains no particularized allegations that suggest conscious misbehavior. Instead, plaintiff observes that the second amended complaint "sets forth a scheme involving thirteen episodes over a period of approximately seven years, each involving hundreds of mailings as well as the uses of interstate telephone wire" (Pl. Mem. at 19), and then asserts that the sheer number of alleged misstatements eliminates any doubt that he has pleaded conscious behavior. (Id.) These conclusory allegations fail to establish any conscious behavior giving rise to an inference of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d  
(Cite as: 2000 WL 1692844, *7 (E.D.N.Y.))

Page 23

fraudulent intent on the part of defendant.

4. The RICO Conspiracy Claim

*8 Plaintiff has also alleged a violation of 18 U.S.C. § 1962(d), RICO's conspiracy provision. This claim must be dismissed as well. The Supreme Court has held that in order to establish a violation of § 1962(d), a "conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense...." Salinas v. United States, 522 U.S. 52, 65 (1997); see also Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 244-45 (2d Cir.1999). In this case, for the reasons stated above, the plaintiff has failed to adequately allege the enterprise element of his § 1962(c) claim. Therefore, the allegations against Brooklyn Law School, if proven, would not suffice to show that a RICO conspiracy existed. Black Radio Network, Inc. v. NYNEX Corp., 44 F.Supp.2d 565, 581 (S.D.N.Y.1999) ("A RICO conspiracy claim must fail, however, if the substantive claims themselves are deficient"); Schmidt, 16 F.Supp.2d at 353-54 ("[T]he Second Circuit has held that there can be no RICO conspiracy without a substantive RICO violation) (collecting cases).

C. The Supplemental State Law Claims

Under 28 U.S.C. § 1367(a), "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Subsection (c)(3) provides that the district court may decline to exercise supplemental jurisdiction over a claim under subsection (a) if "the district court has dismissed all claims over which it has original jurisdiction." Such supplemental jurisdiction is discretionary, and if the federal claims are dismissed before trial, the state claims generally should be dismissed as well. See United Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966).

Here, there is no independent basis for retaining jurisdiction over the remaining state law claims of fraud, deceit, intentional misrepresentation, negligence, and unjust enrichment. At this early stage of the litigation, it would not serve the interest of judicial economy to retain jurisdiction over these claims. Accordingly, the state law claims are dismissed.

CONCLUSION

For the reasons set forth above, defendant's motion to dismiss is granted. The Clerk of the Court is advised that this order closes the case.

2000 WL 1692844 (E.D.N.Y.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

