Not Reported in F.Supp.2d
RICO Bus.Disp.Guide 9891
(Cite as: 2000 WL 420546 (S.D.N.Y.))
&lt;KeyCite Citations&gt;

Page 62

United States District Court, S.D. New York.

COUGAR AUDIO, INC., Plaintiff,
v.
Ephraim REICH, Chana Reich, Reich Family Foundation, Inc. Wolf Mayer Family Foundation, Inc. and Supersonic Electronics, Ltd., Defendants.

No. 99 Civ. 4498 LBS.

April 18, 2000.

MEMORANDUM AND ORDER

SAND, J.

*1 Plaintiff, Cougar Audio, Inc., is a seller of merchandise that claims it was defrauded by a buyer. Presently before the Court is Defendant Ephraim Reich's motion to dismiss, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1). Because we believe that the Complaint fails to allege fraud with the degree of particularity required by Federal Rule of Civil Procedure 9(b), we dismiss the three fraud-based causes of action from the Complaint pursuant to that rule. [FN1] However, because we also find that Plaintiff may be able to amend its allegations in such a way as to state a valid claim against Defendant Reich, the Court grants Plaintiff leave to amend its Complaint within the next thirty days. We reserve decision on Defendant's 12(b)(6) motion until such time as Plaintiff files an amended complaint, should it decide to do so.

> FN1. Defendant Reich's Notice of Motion indicates that he is seeking an order dismissing the Complaint pursuant only to Rules 12(b)(6) and (b)(1). Nevertheless, a court may dismiss a complaint on 9(b) grounds sua sponte. See Bonnie & Co. Fashions, Inc. v. Bankers Trust Co., 945 F.Supp. 693, 719 (S.D.N.Y.1996) (citing Schreiber Distributing Co. v. Serv-Well Furniture Co., Inc., 806 F.2d 1393, 1395-96 (9th Cir.1986)). Moreover, we note that although Defendant Reich has not formally moved to dismiss on Rule 9(b) grounds, he argues for such a dismissal in his supporting memorandum, and Plaintiff responded to those arguments both in its memorandum and at oral argument.

I. BACKGROUND

The following facts are taken from Plaintiff's Complaint and, given the nature of the motion, are assumed to be true. See SEC v. Cassano, 61 F.Supp.2d 31, 32 (S.D.N.Y.1999).

A. The 1991 Meeting

The events underlying the complex fraud alleged by Plaintiff are rooted in the activities of two individuals who are not parties to this lawsuit--Dan Mosche Reich ("Dan Reich") and Solomon Mayer. Dan Reich and Mayer owned and operated a company, called Pinros & Gar Corp. ("P & G"), that was in the business of importing audio equipment into Brazil. By the beginning of 1991, P & G had accumulated over 12 million dollars of debt which it owed to the Bank Leumi Trust Company of New York. When, later that year, P & G was no longer able to satisfy its debt obligations, and Bank Leumi commenced collection actions against it in state court, P & G was forced to cease operations. Around the same time, Dan Reich's brother, Defendant Ephraim Reich ("Reich"), and Herman Markovits formed a new company, which they called National Olimpia, Inc. ("National"), with which they planned to engage in the same business that P & G was abandoning--importing audio products into Brazil.

Plaintiff, Cougar Audio, Inc. ("Cougar"), is a New York corporation owned and operated by an individual named Zigmond Brach. At all times relevant to this Complaint, Mr. Brach was engaged in the business of selling a particular brand of audio equipment, Cougar audio equipment. In August 1991, while Mr. Brach was conducting his business through an entity called Sound Around, Inc ("Sound Around"), Brach met with the Defendant, Ephraim Reich, along with Dan Reich, Mayer, and Markovits. At that meeting the parties discussed a proposed business relationship between Sound Around and the newly-formed National. Defendant Reich and his associates proposed (1) that Sound Around sell Cougar audio products to National; (2) that Sound Around purchase those products from a particular manufacturer, Defendant Supersonic, Ltd.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2000 WL 420546, *1 (S.D.N.Y.))

Page 63

("Supersonic"); and (3) that Sound Around hire Dan Reich and Mayer to act as "sales representatives"-- under the aegis of a new company they would form called CE Electronic Sales, Inc. ("CE Sales")--to manage all of the transactions between Supersonic, Sound Around, and National. Reich and his associates told Brach that the reason they insisted that Supersonic manufacture the goods that National would buy from Cougar was that "they had a prior working relationship with Supersonic and because Supersonic was familiar with, and able to produce, the Cougar audio products." (Complaint at ¶ 51.) Brach was not told, however, that Dan Reich and Mayer had an arrangement with Defendant Supersonic, of which Defendant Reich was aware, which provided that in exchange for Reich's and Mayer's efforts on Supersonic's behalf, Supersonic would make payments into bank accounts listed under the names of Defendants Chana Reich, the Reich Family Foundation, Inc. and the Wolf Mayer Family Foundation, Inc., but which were actually controlled by Dan Reich and Mayer ("the Supersonic payments"). Brach accepted the proposal and business between Sound Around and National commenced.

*2 The transactions between National and Sound Around were structured as follows: Reich would fax purchase orders to Sound Around requesting a particular quantity of Cougar products. Sound Around would respond by shipping the requested products to National on credit. National would subsequently send payments back to Cougar, which were credited against the earliest outstanding invoice. In 1992, Sound Around sold $5,737,872 worth of Cougar audio products to National. In 1993, that figure rose to $23,266,316, and in 1994, it rose to $28,682,103. As of September 30, 1994, National was $2,259,205.59 in debt to Cougar for products it had received, but for which it had not yet paid. In addition, throughout this period, CE Sales operated as sales representatives for Cougar and worked out of Brach's office in Brooklyn. CE Sales received a commission from Cougar on all goods sold to National. The total amount of commissions paid to CE Sales, from 1992 to 1995, was $1,034,710.21.

B. The 1994 Summer Meeting

In July or August of 1994, Brach met with Markovits and Reich. At that meeting, Markovits and Reich "told Brach that National Olimpia was in desperate need of additional goods on open credit to meet existing demand from customers, and ... that they had customers waiting for delivery of goods which National Olimpia could not deliver due to the lack of goods." (Complaint at ¶ 71.) Brach agreed to extend National's line of credit with Cougar to approximately $10 million. To accommodate the expansion of his business with National, Brach decided to form a new corporation, Plaintiff Cougar Audio, Inc. ("Cougar"). At that time, Sound Around assigned all of its business with National to Cougar, and all future business between Brach and National would be conducted through Cougar.

In the following months, National faxed purchase orders to Cougar for increased quantities of goods, and Cougar shipped the audio products to National in response. Between September 30, 1994 and November 30, 1994, National's indebtedness to Cougar for goods it had received but for which it had not yet paid increased to approximately $11.4 million. Over the next three years, National continued to make payments to Cougar and to order more goods, which Cougar continued to ship. Cougar made its last shipment to National on December 11, 1996 and National sent its last payment on August 12, 1997. To date, however, National's indebtedness to Cougar has never dropped below $10 million.

According to the Plaintiff, Reich and Markovits's representation at the summer 1994 meeting that National had existing demand for an increased quantity of goods was false. Plaintiff claims that Reich and Markovits made that false representation to persuade Brach to extend them more credit, without having any intention of meeting their ensuing obligations. Moreover, during roughly the same period that National was increasing the quantity of goods it ordered on credit, 1994-1995, secret payments were being made by Supersonic via wire transfer into the bank accounts of Defendants Ephraim Reich, Chana Reich, the Wolf Mayer Family Foundation, and the Reich Family Foundation. Plaintiff cannot determine the total amount of those secret payments, but alleges that it is no less than $1,771,119.00.

C. Procedural History

*3 Cougar filed a diversity action in this Court on

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2000 WL 420546, *3 (S.D.N.Y.))

Page 64

March 23, 1998 against Markovits, Ephraim Reich, and National Olimpia, alleging breach of contract and seeking judgment in the amount of $12,984,384, representing the total amount of National's outstanding indebtedness to Cougar. See Cougar Audio, Inc. v. Markovits, No. 98 Civ.2070(LBS). On May 5, 1998, Cougar amended its complaint to include claims against Abraham Reich and Nechama Reich. Default judgments were entered against Ephraim and Nechama Reich when they failed to appear, but those judgments were eventually vacated with the Plaintiff's consent.

Meanwhile, the case was placed on this Court's suspense docket to permit the dispute between Cougar and Markovits to be submitted to arbitration conducted by the Beth Din Tzedek of the Central Rabbinical Congress, a well-known rabbinical court. On November 17, 1998, the rabbinical court awarded judgment to Plaintiff in the amount of $7,280,000. Plaintiff then moved this Court for an order confirming that arbitral award, but before that motion could be decided, Plaintiff settled all outstanding disputes with Mr. Markovits for $1,500,000 and withdrew its motion. Plaintiff subsequently decided to voluntarily discontinue its claims against Nechama Reich and Abraham Reich.

Subsequently, Plaintiff moved the Court for leave to file another amended complaint, adding Supersonic Electronics, Ltd. as a Defendant. Leave was denied, but the Court suggested that Plaintiff begin anew by filing a fresh complaint. (See Transcript 5/27/99.) The Complaint currently before the Court is the result. It alleges 13 causes of action. The first charges Ephraim Reich with a RICO violation predicated upon numerous alleged acts of wire fraud. The second and third causes of action charge Reich with conspiring to violate RICO with Dan Reich, Mayer, and Markovits (count two) and with Supersonic (count three). The fourth, fifth, and twelfth causes of action allege state law violations by Ephraim Reich, and the remaining causes of action (6-11, 13) all allege state law causes of action against Supersonic, the Reich Family Foundation, and the Wolf Mayer Family Foundation. Ephraim Reich now moves this Court for an order, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1), dismissing the Complaint against him.

## II. DISCUSSION

The first three causes of action charge Defendant Reich with violating and conspiring to violate the Racketeer Influenced Corrupt Organizations ("RICO") chapter of the Organized Crime Control Act of 1970, Pub.L. 91-452, Title IX, 84 Stat. 941, codified as amended at 18 U.S.C. §§ 1961-68 (West 2000), by conducting and conspiring to conduct the affairs of an enterprise, National, through a pattern of racketeering activity. (See Complaint at ¶¶ 113, 118, 124; Pl.'s Civil RICO Statement at ¶ 2-6); see also 18 U.S.C. § 1962(c); Moss v. Morgan Stanley, 719 F.2d 5, 17 (2d Cir.1983). The alleged pattern of racketeering activity consisted of numerous acts of wire fraud. (See Pl.'s Civil RICO Statement at ¶ 5.) Plaintiff's theory is that Ephraim Reich and the others were engaged in a "dual scheme" to defraud Cougar of money and property consisting of two components: (1) the failure to disclose the Supersonic payments to Brach; and (2) Reich's false representation that National had an existing demand for increased goods. Each purchase order that Reich, or those acting at his direction, faxed to Cougar on behalf of National was, therefore, an international wire communication made in furtherance of the alleged dual scheme to defraud. (See Complaint at ¶ 111; Pl.'s Civil RICO Statement at ¶ 5); see also 18 U.S.C. § 1343; United States v. Walker, 191 F.3d 326, 334 (2d Cir.1999) (citing United States v.. Dinome, 86 F.3d 277, 283 (2d Cir.1996)), cert. denied, --- S.Ct. ---- (April 17, 2000).

*4 For the reasons set forth below, we believe that both components of the alleged dual scheme rely crucially on assumptions and speculation that stretch far beyond the reasonable inferences that can be drawn from the facts alleged in the Complaint. Because a civil RICO complaint alleging predicate acts of wire fraud must set forth "the circumstances constituting fraud ... with particularity," Fed.R.Civ.P. 9(b); see Schmidt v. Fleet Bank, No. 96 Civ. 5030, 1998 WL 47827, at *5 (S.D.N.Y. Feb. 4, 1998) ("Rule 9(b)'s particularity requirements have 'even greater urgency' in civil RICO actions.") (quoting Morin v. Trupin, 778 F.Supp. 711, 716 (S.D.N.Y.1991)), we dismiss the Complaint's RICO causes of action pursuant to Rule 9(b).

### A. The Supersonic Payments

When alleging a predicate act of wire fraud, in addition to setting forth with particularity the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



statement or omission that was allegedly fraudulent, the individual who made that statement or omission, and the time and place in which the statement or omission was made, the complaint must "explain why the statements [or omissions] were fraudulent." Acito v. IMCERA Group, 47 F.3d 47, 51 (2d Cir.1995) (citing Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir.1993)); see also Koehler v. Bank of Bermuda, 209 F.3d 130, 2000 WL 364993, at *4 (2d Cir. April 10, 2000). Cougar's Complaint in this case clearly identifies the omission that was allegedly fraudulent as well as the person who made that omission and the time and place in which it was made. The Complaint explains that Defendant Ephraim Reich knew of the Supersonic payments and fraudulently failed to disclose them to Brach at the August 1991 meeting. [FN2] But the Complaint never adequately explains why that omission was fraudulent. In particular, it does not allege either that Plaintiff detrimentally relied on the omission or that Reich acted with a fraudulent intent when he failed to disclose the existence of the Supersonic payments.

> FN2. A duty to disclose material information in the course of business negotiations exists when one party has superior knowledge about particular information that is not readily available to another party and is aware that the other party is "acting on the basis of mistaken knowledge." Banque Arabe et Internationale D'Investissement v. Maryland National Bank, 57 F.3d 146, 155 (2d Cir.1995) (citing Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir.1993); Young v. Keith, 112 A.D.2d 625, 627, 492 N.Y.S.2d 489 (1985)). Because Reich was aware that Brach did not know of his arrangement with Supersonic and, in agreeing to the business terms proposed by Reich, was acting on the basis of mistaken knowledge, we believe he had a duty to disclose that information. Moreover, a duty to disclose also exists when disclosure would clarify or complete an earlier partial or ambiguous statement. Id. Because Reich had earlier told Brach that the reason he wanted Cougar to purchase the equipment it would export from Supersonic was that Supersonic was familiar with the business, he had a duty to disclose the payment scheme so as to complete his earlier, partial statement.

1. Detrimental Reliance

Congress's prohibition of particular acts in furtherance of a scheme to defraud, rather than a completed fraud, in the mail and wire fraud statute, typically makes it unnecessary to allege reliance and damages. See Neder v. United States, 527 U.S. 1, ----, 119 S.Ct. 1827, 1841, 144 L.Ed.2d 35 (1999); United States v. Rowe, 56 F.2d 747, 749 (2d Cir.1932). When a civil plaintiff alleges wire fraud as a predicate act of racketeering activity in a RICO claim, however, he must show that he suffered an injury "in his business or property" and that the injury occurred "by reason of" the alleged RICO violation. 18 U.S.C. § 1964(c). In other words, a civil RICO plaintiff alleging predicate acts of wire fraud must allege detrimental reliance on the fraud. See THC Holdings Corp. v. v.. Tishman, TMLC Corp., No. 93 Civ. 5393(KMW), 1996 WL 291881, at *4 (S.D.N.Y. May 31, 1996) (citing Metromedia Co. v. Fugazy, 983 F.2d 350, 368 (2d Cir.1992) (citing County of Suffolk v. Long Island Lighting Co., 907 F.2d 1295, 1311 (2d Cir.1990); Center Cadillac, Inc. v. Bank Leumi Trust Co. of New York, 808 F.Supp. 213, 229 (S.D.N.Y.1992))).

*5 Cougar alleges that it suffered an injury from the concealment of the Supersonic payments because, upon information and belief, the cost of those payments was passed on to it in the form of inflated prices that Supersonic charged for the audio equipment it supplied. (See Complaint at ¶¶ 47, 55.) [FN3] But that argument is not supported by any specific factual allegations. We recognize that notwithstanding Rule 9(b), the allegations in a complaint may be made "upon information and belief," when "facts are peculiarly within the opposing party's knowledge," Schmidt, 1998 WL 47827, at *5 (citing Wexner v. First Manhattan Co., 902 F.2d 169, 172 (2d Cir.1990)), but there are factual allegations necessary to substantiate Plaintiff's claim that are not peculiarly within the Defendants' control. The Complaint does not, for example, identify the unit price that Cougar paid for the audio products it purchased or the price that other suppliers were charging for the same products. It only identifies the overall amount of money ($55 million) that Cougar paid to Supersonic. (See Complaint at ¶ 66.) That number alone, however, does not provide a basis for inferring that Supersonic charged Cougar an inflated price.

> FN3. Although Cougar does not so argue, we recognize that in criminal wire fraud cases, the "

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2000 WL 420546, *5 (S.D.N.Y.))

Page 66

'money or property" ' formulation found in 18 U.S.C. § 1341 has been broadened ..." to include the right to control one's own assets. See Walker, 191 F.3d at 335 (citing United States v. Rossomando, 144 F.3d 197, 201-02 n. 5 (2d Cir.1998); Dinome, 86 F.3d at 283); United States v. Wallach, 935 F.2d 445, 461 (2d Cir.1991). It might be argued that Reich's concealment of the payment scheme deprived Cougar of its right to control its assets and, for that reason, constituted a scheme to defraud. However, "[i]n cases resting upon the so-called 'right to control' theory ... 'the information withheld either must be of some independent value or must bear on the ultimate value of the transaction." ' Rossomando, 144 F.3d at 201 n. 5 (citing Dinome, 86 F.3d at 284). Because Cougar has not alleged that the concealment of the payment scheme had any bearing on the ultimate value of the transaction, he has not alleged sufficient facts for him to proceed pursuant to the right to control theory.

Moreover, the Complaint never specifically alleges that Brach would not have agreed to Reich's business proposal, or that he would have agreed on different terms, if he had known of the Supersonic payments. In short, by not alleging either the specific amount by which Supersonic inflated its price and by not providing any allegation that Cougar would not have struck the same bargain if the payments had been disclosed, the Complaint fails to plead with particularity that Reich's concealment of the Supersonic payments was a basis of the bargain between Cougar and National. It fails, therefore, to explain why the omission in question constitutes a scheme to defraud. See United States v. Starr, 816 F.2d 94, 98 (2d Cir.1987); United States v. Regent Office Supply Co., 421 F.2d 1174, 1182 (2d Cir.1970); Litwin v. American Express Co., 838 F.Supp. 855, 859 (S.D.N.Y.1993).

2. Fraudulent Intent

The essence of a scheme to defraud is a fraudulent intent. See Walker, 191 F.3d at 334; United States v. D'Amato, 39 F.3d 1249, 1257 (2d Cir.1994) (citing Durland v. United States, 161 U.S. 306, 313-14 (1896); United States v. Starr, 816 F.2d 94, 98 (2d Cir.1987); United States v. Regent Office Supply Co., 421 F.2d 1174, 1180 (2d Cir.1970)). Although intent "may be averred generally," Fed.R.Civ.P. 9(b), "plaintiffs are still required to plead the factual basis which gives rise to a 'strong inference' of fraudulent intent." Wexner, 902 F.2d at 172 (citing Beck v. Manufacturers Hanover Trust Co., 820 F.2d 46, 50 (2d Cir.1987); Ouakinine v. MacFarlane, 897 F.2d 75, 79-80 (2d Cir.1990)); see also Acito, 47 F.3d at 52 ("[W]e must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a 'license to base claims of fraud on speculation and conclusory allegations." ') (quoting Wexner, 902 F.2d at 172). Assuming Plaintiff could plead that the cost of the Supersonic payments was passed on to Cougar, it would still need to allege that Reich was aware of that fact. If Reich was unaware of the fact that Supersonic was passing the cost of its payments on to Cougar, then he could not have had an intent to deprive Cougar of that money through the alleged scheme to defraud. Plaintiff has made absolutely no allegation in its Complaint with respect to Reich's awareness of whether the cost of the Supersonic payments was reflected in an inflated price that Supersonic charged Cougar. The total lack of an allegation falls far short of creating a "strong inference" of a fraudulent intent.

B. The Misrepresentation About Existing Demand

*6 Plaintiff claims that at the August, 1994 meeting Reich's representation that National had an existing demand for goods and, therefore, needed an extension of its line of credit, was false. According to the Complaint, no such customers existed and National consequently defaulted on the debt which that misrepresentation induced Cougar to extend. As with the first component of the alleged dual scheme, the Complaint fails to explain with sufficient particularity why that misrepresentation constitutes a scheme to defraud rather than a mere breach of contract, and fails to provide a factual basis for inferring a fraudulent intent.

1. Breach of Contract vs. Fraud

When a plaintiff claims that the defendant breached a contract that he never intended to honor, he may only present that claim as an action sounding in fraud if (1) the defendant owed a legal duty to the plaintiff "separate from the duty to perform under the contract"; (2) the defendant makes a fraudulent misrepresentation that is "collateral or extraneous" to the contract; or (3) the plaintiff seeks special

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



damages unrecoverable as contract damages. See Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc., 98 F.3d 13, 20 (2d Cir.1996). [FN4] Plaintiff argues that Reich's intention not to honor National's contractual obligation to pay for the goods it ordered from Cougar constitutes fraud because the concealment of the Supersonic payments constituted an additional fraudulent misrepresentation that was collateral or extraneous to the contractual promise. We agree with Plaintiff that the concealment of the Supersonic payments was collateral to the sales contract concluded between National and Cougar. But in those rare cases in which a fraud claim has been found to be sustainable because of a collateral or extraneous misrepresentation, that misrepresentation was a promise made specifically to induce the other party to enter into the contract. See Deerfield, 68 N.Y.2d at 955-56, 510 N.Y.S.2d 88, 502 N.E.2d 1003 (buyer agreed to abide by geographical restriction on re-sale of goods which was subsequently violated); Sager v. Friedman, 270 N.Y. 472, 477, 1 N.E.2d 971 (N.Y.1936) (borrower promised lender that collateral was unencumbered when it, in fact, was). For the reasons set forth above, we do not believe that Plaintiff has alleged any facts sufficient to support an inference that the concealment of the Supersonic payments induced Brach to agree to National's business proposal. We do not believe, therefore, that Plaintiff has alleged with the necessary particularity that National's defaulting on the trade debt that it owed to Cougar constitutes a scheme to defraud rather than a mere breach of contract.

> FN4. This rule derives from a very long and very puzzling line of New York cases. On at least four occasions, New York's Court of Appeals has expressly held that "a contractual promise made with the undisclosed intention not to perform it constitutes fraud." Sabo v. Delman, 3 N.Y.2d 155, 164 N.Y.S.2d 714, 143 N.E.2d 906 (N.Y.1957); see also Graubard, Mollen, Dannett, & Horowitz v. Moskovitz, 86 N.Y.2d 112, 122, 629 N.Y.S.2d 1009, 653 N.E.2d 1179 (N.Y.1995); Deerfield Communications Corp. v. Chesbrough-Ponds, Inc., 68 N.Y.2d 954, 510 N.Y.S.2d 88, 502 N.E.2d 1003, 1004-05 (N.Y.1986); Channel Master Corporation v. Aluminum Limited Sales, Inc., 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833 (N.Y.1958). At the same time, however, there are numerous Appellate Division cases that state precisely the opposite rule. See Papa's-June Music, Inc. v. McLean, 921 F.Supp. 1154, 1162 (S.D.N.Y.1996) (collecting cases); Sudul v. Computer Outsourcing Services, 868 F.Supp. 59, 62 (S.D.N.Y.1994) ( "Implicit in the policy sanctioning the formalization of contractual undertakings is precaution against an existing intention not to be bound by the agreement ....") (quoting Briefstein v. P.J. Rotondo Constr. Co., 8 A.D.2d 349, 187 N.Y.S.2d 866, 868 (N.Y.App.Div.1959)). Federal courts confronted with this disjunction between the Appellate Division and the Court of Appeals have consistently followed the Appellate Division rule, although they have done so for different reasons. Compare Best Western International, Inc. v. CSI International Corp., No. 94 0360(LMM), 1994 WL 465905, at *5 (S.D.N.Y. Aug. 23, 1994) (reasoning that the Appellate Division rule was more likely to be applied in state trial courts and that predicting the law in state trial courts was the federal court's role under Erie ) with Rolls-Royce Motor Cars, Inc. v. Schudroff, 929 F.Supp. 117, 123 (S.D.N.Y.1996) (reasoning that Court of Appeals' failure to reverse Appellate Division cases indicates tacit acquiescence); Sudul, 868 F.Supp. at 62 (same); Bower v. Weisman, 650 F.Supp. 1415, 1422-23 (S.D.N.Y.1986) (same); and PI, Inc. v. Quality Products, Inc., 907 F.Supp. 752, 761-62 (S.D.N.Y.1995) (finding Appellate Division cases to be persuasive authority) (citing D.S. America (East), Inc. v. Chromagrafx Imaging Systems, Inc., 873 F.Supp. 786, 796 (E.D.N.Y.1995); GSGSB, Inc. v. New York Yankees, 862 F.Supp. 1160, 1177 (S.D.N.Y.1994); Vista Co. v. Columbia Pictures Indus., Inc., 725 F.Supp. 1286, 1294 (S.D.N.Y.1989)). The Second Circuit's rule which, of course, we follow here seems to be based on the view that the Appellate Division cases state the general principle of law, and that each of the individual Court of Appeals decisions to the contrary should be read as a fact-specific exception to that principle. See Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc., 98 F.3d 13, 19-20 (2d Cir.1996); see also Rolls-Royce, 929 F.Supp. at 123; Papa's-June Music, Inc., 921 F.Supp. at 1162.

2. Fraudulent Intent

Assuming that Reich's conduct--falsely representing that he had an existing demand for goods so as to induce Cougar to send National



Not Reported in F.Supp.2d
(Cite as: 2000 WL 420546, *6 (S.D.N.Y.))

Page 68

goods for which it intended never to pay--constituted a scheme to defraud rather than only a breach of contract, the Complaint would nevertheless be defective because it fails to allege a factual basis for a strong inference that Reich acted with a fraudulent intent. The only fact alleged in support of the allegation that Reich intended for National to default on its debt to Cougar is that it did default. However, National continued to send payments to Cougar for approximately three years after Reich made the misrepresentation about existing customers. (See Complaint Ex. B.) Moreover, we note that the audio products purchased by National would only be valuable to Reich if they could be re-sold. In light of those facts, we do not believe it is reasonable to infer from the fact that National defaulted on the debt it owed to Cougar that, at the time Reich represented to Cougar that National needed additional credit to meet existing demand, he intended never to sell the products and consequently to cause National to default on its debt obligation. The Complaint does not, therefore, allege facts sufficient to establish a strong inference of a fraudulent intent, as required by Rule 9(b).

C. The "Dual Scheme"

*7 Having decided that neither component of the dual scheme set forth in the Complaint is alleged with sufficient particularity to satisfy the requirements of Rule 9(b), we turn now to examine whether the allegation of the two components operating together is sufficiently alleged as to constitute a single, over-arching scheme to defraud. Plaintiff argues that "the two schemes were part of an ongoing, preconcerted scheme to carry out the entire fraud against the plaintiff, not two unrelated schemes that developed over time." (Pl.'s Mem. at 13.) The crucial link in this argument is Plaintiff's contention that "[a]s in all schemes based on 'skimming off,' the legitimate purchases of goods fed the illegal activities and created the stream of commerce from which the illegal payments were derived." (Id. at 16; see also Transcript 11/4/99 at 6.) However, while this argument is set out with some force in Plaintiff's brief and was repeated at oral argument, there is no factual allegation in the Complaint to substantiate an inference that the magnitude of the Supersonic payments was related to the quantity of audio products that Cougar shipped to National. Plaintiff does not even allege a correlation between the two. Instead, Plaintiff merely assumes that the amount of the Supersonic payments must have been tied to the amount of merchandise shipped because that is the nature of such schemes. That allegation is too conclusory and too speculative and, therefore, insufficiently particular to serve as the basis for an allegation of wire fraud.

D. Commercial Bribery

The third cause of action alleges that Reich conspired with Supersonic to conduct National's affairs through a pattern of racketeering activity, but alleges a different set of predicate acts. The Complaint alleges that Reich and Supersonic conspired to make the Supersonic payments and that such payments constitute predicate acts of racketeering because they are indictable under N.Y. Penal Law § 180.03, as acts of commercial bribery. That statute provides that it is unlawful for a person to confer, offer, or agree to confer,
> any benefit upon any employee, agent or fiduciary without the consent of the latter's ... principal, with intent to influence his conduct in relation to his ... principal's affairs, and when the value of the benefit ... exceeds one thousand dollars and causes economic harm to the ... principal in an amount exceeding two hundred fifty dollars.

N.Y. Penal Law § 180.03 (McKinney's 1999).

Because the allegation of predicate acts of commercial bribery is not an allegation of fraud, Rule 9(b) does not apply. See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young, No. 91 Civ. 2923(CSH), 1994 WL 88129, at *12 (S.D.N.Y. Mar. 15, 1994). Nevertheless, to be sustainable, the Complaint must state a claim on which relief can be granted. See Fed.R.Civ.P. 12(b)(6). An allegation that a defendant violated New York's commercial bribery statute must include a claim of "economic harm," although that harm need not be an identifiable form of damage. See People v. Reynolds, 174 Misc.2d 812, 667 N.Y.S.2d 591, 596 (N.Y.Sup.Ct.1997) (citing United States v. Rowe, 56 F.2d 747, 749 (2d Cir.1932)). There is authority for the proposition that the payment of kickbacks from a supplier of merchandise to a buyer's purchasing agent constitutes, in and of itself, an "economic harm" sufficient to establish a claim of commercial bribery. See id.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2000 WL 420546, *8 (S.D.N.Y.))

Page 69

*8 For an allegation of commercial bribery to serve as a civil RICO predicate, however, it must have caused an injury to the plaintiff's "business or property," as that term has been interpreted under federal law. See 18 U.S.C.A. § 1964(c) (West 2000). For the same reasons that we believe the Complaint fails to allege any damage as a result of fraud, we conclude that it fails to allege injury by reason of alleged commercial bribery. The abstract form of harm suffered by one who loses the chance to bargain with all the facts may be sufficient to sustain a bare allegation of commercial bribery under New York law, but it is not sufficient to sustain a RICO allegation with commercial bribery predicates. See United States v. Mittelstaedt, 31 F.3d 1208 (2d Cir.1994). For that reason, we grant Reich's motion to dismiss the third cause of action pursuant to Federal Rule of Civil Procedure 12(b)(6).

E. Leave to Amend

"Complaints dismissed under Rule 9(b) are 'almost always' dismissed with leave to amend." Luce v. Edelstein, 802 F.2d 49, 56 (2d Cir.1986) (quoting 2A J. Moore & J. Lucas, Moore's Federal Practice ¶ 9.03, at 9-34 (2d ed.1986)); see also Fed.R.Civ.P. 15(a) (providing that "leave [to amend] shall be freely given when justice so requires"). Although we believe that the first three causes of action contained in the Complaint presently before the Court must be dismissed because they are all premised on a scheme to defraud that is not pled with sufficient particularity, we are not convinced that the pleading defects described above could not be cured by re-pleading. Accordingly, leave to amend within the next thirty days is granted, but only with respect to the first three causes of action alleging a RICO violation and two conspiracies to violate RICO.

CONCLUSION

Because we find that the Complaint fails to allege any predicate acts of wire fraud with the requisite particularity, we dismiss the three fraud-based causes of action from the Complaint, pursuant to Federal Rule of Civil Procedure 9(b). We grant Defendant's motion to dismiss count three, pursuant to Rule 12(b)(6). With respect to the remainder of the Defendant's motions pursuant to Rules 12(b)(1) and 12(b)(6), we reserve decision until such time as Plaintiff files an amended complaint, should it decide to do so.

SO ORDERED.

2000 WL 420546 (S.D.N.Y.), RICO Bus.Disp.Guide 9891

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo