Not Reported in F.Supp.
1996-1 Trade Cases P 71,438
(Cite as: 1996 WL 257581 (S.D.N.Y.))
<KeyCite History>

Page  94

United States District Court, S.D. New York.

**HYGRADE MILK & CREAM CO., INC.,
Terminal Dairies, Inc., Sunbeam Farms, Inc.,
Hytest Milk Corp., Gold Medal Farms, Inc.,
Queens Farms Dairy, Inc., Babylon
Dairy Co., Inc., and Meadowbrook Farms, Inc.,
Plaintiffs,
v.
TROPICANA PRODUCTS, INC., and Tropicana
Products Sales, Inc., Defendants.**

No. 88 Civ. 2861 (SAS).

May 16, 1996.

OPINION AND ORDER

SCHEINDLIN, District Judge:

**\*1** Plaintiffs are suing Tropicana Products, Inc. and Tropicana Products Sales, Inc. (together, "Tropicana"), alleging that their pricing practices on sales of orange juice violate Sections 2(a), 2(d), and 2(e) of the Clayton Act, amended by the Robinson-Patman Act (the "Act"), 15 U.S.C. §§ 13(a), (d)-(e) (1973). Tropicana moves for summary judgment dismissing the complaint in its entirety or, alternatively, dismissing the claim for damages. Plaintiffs cross-move for partial summary judgment on their claim that Tropicana violated § 2(a) of the Act. For the reasons set forth below, Tropicana's motion is granted in part and denied in part and Plaintiffs' motion is denied.

BACKGROUND

I. Facts

Plaintiffs are milk distributors who purchase Tropicana orange juice for resale to various retailers, mostly bodegas, mom-and-pop grocery stores, chain stores, and cooperatives. [FN1] Of the eight Plaintiffs, Babylon Dairy, Inc. ("Babylon"), Queens Farms Dairy, Inc. ("Queens Farms"), and Gold Medal Farms, Inc. ("Gold Medal") are no longer in business. Plaintiffs Terminal Dairies, Inc., Sunbeam Farms, Inc., and Hytest Milk Corp. are wholly-owned subsidiaries of Hygrade Milk & Cream Co., Inc. ("Hygrade"); they are not and

have never been direct customers of Tropicana. Hygrade, Queens Farms, Babylon, and Gold Medal all sold their own in-house brands of orange juice as well as Tropicana orange juice.

> FN1. There are generally two types of cooperatives. A buying co-op is a group of stores which join together under a common name, make their purchases through a central buying office, and warehouse their product in a jointly owned facility. Buying co-ops purchase directly from Tropicana. An advertising co-op is a group of independent stores which advertise under a common name. These independent stores may purchase product from any distributor and are still eligible for promotional allowances because of the amount of advertising they provide. See Affidavit of Terry Schulke ("Schulke Aff."), Vice-President and Director of Grocery Sales for Tropicana, October 1995, ¶¶ 7-8.

The focus of this lawsuit is Tropicana's promotional programs regarding orange juice sales in the New York metropolitan area, known as the "Citrus Bowl." Plaintiffs allege that Tropicana engages in unlawful price discrimination in violation of the Act. In particular, Plaintiffs allege that wholesale food distributors Royal Foods Distributors, Inc. ("Royal") and White Rose Dairy ("White Rose") (together, "Preferred Wholesalers") as well as direct buying chains Waldbaum's, Inc. ("Waldbaum's") and Supermarkets General Corp. ("Pathmark") (together, "Preferred Chains") receive promotions, discounts, and incentives which are unavailable to Plaintiffs or their customers on proportionally equal terms.

Tropicana sells its orange juice directly to 1) dairies; 2) routemen; [FN2] 3) wholesale food distributors; and 4) direct buying chain retailers. Tropicana has a single list price for its orange juice. Tropicana, however, offers many promotional allowances, discounts, and incentives to some of its purchasers. Tropicana has three promotional programs available to retailers. [FN3]

> FN2. Routemen, or jobbers, are independent truck drivers who sell Tropicana product to various retail customers. In both the original Complaint, filed on April 20, 1988, and the First Amended Complaint,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1996 WL 257581, *1 (S.D.N.Y.))

Page 95

filed on August 1, 1988, Plaintiffs alleged that Tropicana engaged in discriminatory practices in favor of jobbers. In the Second Amended Complaint, filed on February 26, 1993, Plaintiffs acknowledge jobbers as purchasers of Tropicana, but define "Favored Buyers" as "direct buying chains, including Defendants Pathmark and Waldbaum's, and [ ] wholesale food distributors, including Defendants White Rose and Royal Food." Second Amended Complaint ¶ 20. There are no allegations of discriminatory practices involving jobbers in the Second Amended Complaint. On January 23, 1996, this Court denied Plaintiffs' motion to amend the complaint to include jobbers as Favored Buyers. See Transcript of Oral Argument ("Tr."), at 32. Plaintiffs now argue that the words "wholesale food distributor" include jobbers. The Complaint, however, separately defines jobbers and wholesale food distributors. See Second Amended Complaint ¶ 19. Accordingly, any alleged differential treatment of jobbers will not be considered.

FN3. Tropicana claims that these programs are open to all retailers regardless of whether they purchase from Tropicana or a wholesaler. Plaintiffs, however, contend that these programs were not functionally available to their customers.

(1) The Basic Plan. This promotional allowance gives retailers a per case discount on each case of orange juice they purchase. In order to qualify for the allowance, the retailer must (a) notify Tropicana in advance that it intends to participate in the program, (b) engage in some form of advertising (for example, placing a sign in the window advertising the juice at a reduced price or printing a notice in a supermarket flyer), and (c) feature the product at a reduced price to be determined by the retailer. Tropicana's drivers periodically check to ensure that participating retailers are performing. There are approximately seven such promotions during a thirteen week period. Tropicana does not specifically require that any of the allowance be spent for advertising Tropicana products.

**\*2** (2) Case Volume Incentive ("CVI"). This program is only available to "chain" stores, i.e., cooperatives or direct buying chains. Under this program a retailer receives a discount if it runs some sort of promotion for the product and purchases more Tropicana product in a period than it had

purchased in the same period in a previous year.

(3) Tactical Action Fund ("TAF"). Under this program retailers are provided payments for extraordinary advertising performance like a price-reduced coupon or prominent placement of Tropicana product in a circular distributed by the retailer.

Plaintiffs contend that: 1) the Basic Plan is not practically available to their bodega customers or mom-and-pop customers (together, "bodegas" or "bodega customers"); 2) the Basic Plan is administered in a discriminatory fashion; 3) the CVI and TAF programs are not available to bodega customers; 4) "slotting allowances" and "price protection," described below, are given to various retailers but denied to bodega customers; 5) Preferred Wholesalers receive discounts, allowances, and benefits from Tropicana which are not available to them; and 6) Preferred Retailers receive discounts, allowances, and incentives which are not available to them.

## DISCUSSION

### II. Legal Standard

Summary judgment will be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The burden is on the moving party to demonstrate that no material factual dispute exists. See Gallo v. Prudential Residential Services, Ltd., 22 F.3d 1219, 1223 (2d Cir.1994). All ambiguities must be resolved and all inferences must be drawn in favor of the party against whom summary judgment is sought. See id. Additionally, if the party opposing summary judgment sets forth a reasonable interpretation of a material fact that conflicts with the interpretation suggested by the movant, then summary judgment must be denied. See Schering Corp. v. Home Ins. Co., 712 F.2d 4 (2d Cir.1983). However, "where the non-movant will bear the ultimate burden of proof at trial on an issue, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1996 WL 257581, *2 (S.D.N.Y.))

Page 96

on the non-moving party's claim." Brady v. Town of Colchester, 863 F.2d 205, 210-11 (2d Cir.1988).

Once the moving party has come forward with support demonstrating that there is no genuine issue of material fact to be tried, the burden shifts to the non-moving party to provide similar support setting forth specific facts about which a genuine triable issue remains. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). Mere conclusory allegations will not suffice. See Fed.R.Civ.P. 56(e). Affidavits must be based on personal knowledge, not hearsay, and "shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify on the matters stated therein." Id.; see also Beyah v. Coughlin, 789 F.2d 986, 987 (2d Cir.1986); Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 643 (2d Cir.1988). In considering the evidence, the trial court's task is "limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." Gallo, 22 F.3d at 1224.

III. Section 2(a) of the Robinson-Patman Act

*3 In order for Plaintiffs to establish a violation of § 2(a) [FN4] they must show 1) that Tropicana "discriminat[ed] in price between different purchasers"; and 2) that "the effect of such discrimination may be substantially to lessen competition." [FN5] 15 U.S.C. § 13(a). Tropicana asserts that Plaintiffs have failed to establish both of these requirements.

> FN4. Section 2(a) states, in relevant part: It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, ... and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.... 15 U.S.C. § 13(a) (1973).

> FN5. The statute also requires that the sales to the different purchasers occurred in interstate

commerce and were of commodities of like grade and quality. See 15 U.S.C. § 13(a). Neither of these requirements are at issue here.

Price discrimination, for the purposes of the Act, means nothing more than a price differential. See, e.g., Best Brands Beverage, Inc. v. Falstaff Brewing Corp., 842 F.2d 578, 584 (2d Cir.1987). Price discrimination may be either direct or indirect. See 15 U.S.C. § 13(a). Direct price discrimination occurs when a seller charges different purchasers different prices; indirect price discrimination occurs when one buyer receives something of value which is not offered to another buyer. See Robbins Flooring, Inc. v. Federal Floors, Inc., 445 F.Supp. 4, 8 (E.D.Pa.1977). There is no price discrimination, however, where a seller offers different prices to each of its purchasers, provided all competing purchasers have an equal opportunity to purchase the seller's product at the different prices. See FLM Collision Parts, Inc. v. Ford Motor Co., 543 F.2d 1019, 1024 (2d Cir.1976), cert. denied, 429 U.S. 1097 (1977).

A program which grants discounts or allowances to its customers in an unequal or discriminatory manner may constitute price discrimination. See FTC v. Morton Salt Co., 334 U.S. 37, 42 (1948); FLM Collision, 543 F.2d at 1025-26. The Act requires that a seller who provides discounts or allowances must make them functionally (not just theoretically) available to all of its customers. See Morton Salt, 334 U.S. at 42 (volume discounts which were theoretically available to all customers but practically unavailable to smaller customers violated the Act). Functional availability, however, does not require that each customer be able to participate or benefit equally. See L.S. Amster & Co. v. McNeil Labs., Inc., 504 F.Supp. 617, 623, 625 (S.D.N.Y.1980) (promotional allowance program which enabled some customers to profit more than others does not violate the Act as long as it is evenly administered and competing customers are able to participate to a significant degree).

Price discrimination standing alone does not violate the Act. See Best Brands, 842 F.2d at 584. Plaintiffs must also prove that the price discrimination causes competitive injury--"a reasonable possibility that the price difference may harm competition." Falls City Indus. v. Vanco Beverage, Inc., 460 U.S. 428, 435 (1983). Actual



Not Reported in F.Supp.

(Cite as: 1996 WL 257581, *3 (S.D.N.Y.))

**Page 97**

harm to competition is not required. *Id.* Competitive injury is not limited to competition between the favored purchaser and disfavored purchaser; it also encompasses harm to competition between their customers. [FN6] *Id.* at 436.

> FN6. Typically competitive injury may occur at three levels. First, a primary-line injury occurs where the seller's price discrimination harms competition with the seller's competitors. See, e.g., *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209 (1993). Second, a secondary-line injury occurs where a seller's price discrimination harms competition between the favored purchasers and disfavored purchasers. See, e.g., *F.T.C. v. Sun Oil Co.,* 371 U.S. 505 (1963). In order to establish a secondary-line violation the favored purchasers and disfavored purchasers must be in actual competition. See *Best Brands,* 842 F.2d at 584. Third, a tertiary-line violation occurs where the seller's price discrimination harms competition between the customers of the favored purchasers and disfavored purchasers even though the favored purchasers and disfavored purchasers do not compete. See *Falls City,* 460 U.S. at 436.

A prima facie showing of competitive injury may be demonstrated by substantial price differentials to competing purchasers over time. See *Falls City,* 460 U.S. at 435 (citing *Morton Salt,* 334 U.S. at 46, 50-51). Competitive injury may also be shown by proof of lost sales or profits. *Falls City,* 460 U.S. at 434-35. Where competitive injury is inferred from a substantial price difference over time and plaintiffs cannot show evidence of displaced sales, this inference may be overcome by evidence breaking the causal connection between a price differential and lost sales. *Id.* at 435.

**\*4** Thus, in order to support their § 2(a) claim, Plaintiffs must show that as a result of Tropicana's pricing practices: 1) there is a substantial price difference between the favored purchasers and the disfavored purchasers (price discrimination); and 2) there is a reasonable possibility that the price discrimination may harm competition (competitive injury). Plaintiffs claim that Tropicana's promotional programs are discriminatory and harm competition between their customers and Preferred Retailers, between themselves and Preferred Wholesalers, and between themselves and Preferred Retailers.

A. Tropicana's Motion for Summary Judgment

1. Preferred Retailers and Plaintiffs' Customers

Plaintiffs claim that Tropicana's pricing practices harm competition between direct buying chain retailers and Plaintiffs' customers. Plaintiffs contend that the Basic Plan is not functionally available to bodega customers because it is burdensome and economically impractical, and that it is administered in a discriminatory manner. Plaintiffs also claim that allowances, discounts, and incentives that are given to direct buying chains are not available to bodega customers.

a. Availability of Basic Plan

In order to inform retailers about the Basic Plan, Tropicana sent notifications describing the Plan to its wholesale distributors. See Deposition of Terry Schulke ("Schulke Dep."), Vice-President and Director of Grocery Sales for Tropicana, dated March 20, 1995, at 163, 165-66; Deposition of Richard Richer ("Richer Dep."), Director of Finance and Operations of the Eastern Division of Tropicana, dated March 29, 1995, at 142-43; Deposition of Lisa Scanlon ("Scanlon Dep."), Manager of Retail Operations for Tropicana, dated March 22, 1995, at 18; Deposition of William Meyer, Sr. ("Meyer, Sr.Dep."), President of Hygrade, dated April 10, 1995, at 199, 201; Deposition of William Schwartz ("Schwartz Dep."), President of Meadowbrook, dated April 24, 1995, at 222. Tropicana claims that it could not notify bodega customers directly because Plaintiffs would not provide them with customer lists. See Schulke Dep. at 159; Richer Dep. at 142-44. Tropicana also advertised the plan in Spanish and English in a trade journal called Modern Grocer. See Schulke Dep. at 159-60; Richer Dep. at 150; Scanlon Dep. at 18. Plaintiffs admit that their customers were not denied the opportunity to take advantage of the Basic Plan. See Meyer, Sr. Dep. at 241; Deposition of Jules Kotcher ("Kotcher Dep."), President of Babylon and Queens Farms, dated April 18, 1995, at 263-64. In fact, some bodega customers have participated in the Basic Plan. See, e.g., Declaration of Billy Meyer, Jr. ("Meyer, Jr. Decl."), President of Hygrade, dated November 24, 1995, ¶ 25.

Plaintiffs nonetheless contend that the Plan is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1996 WL 257581, *4 (S.D.N.Y.))

Page  98

unworkable and uneconomical for bodegas and Plaintiffs. Plaintiffs had a significant responsibility in implementing the Plan for their bodega customers. Plaintiffs' drivers would solicit bodegas to participate in the promotional program. See Meyer, Sr. Dep. at 770; Kotcher Dep. at 326; Schwartz Dep. at 470. It was difficult for the drivers to do this because many bodega owners spoke Spanish and they did not. See Schwartz Dep. at 469. In order to facilitate this process, Hygrade produced a flyer describing the program in more understandable terms. [FN7] Plaintiffs paid the drivers a commission so that they would take the time to solicit bodegas. See Meyer, Sr. Dep. at 770. After a customer agreed to participate in the promotion, Plaintiffs notified Tropicana. See Meyer, Sr. Dep. at 770; Schwartz Dep. at 472. Plaintiffs would pick up advertising signs from Tropicana and deliver them to the bodegas. See Meyer, Sr. Dep. at 771; Schwartz Dep. at 471. Plaintiffs would check if the bodega was keeping the sign up for the entire week and report to Tropicana during the promotional week. See Schwartz Dep. at 471, 473. Plaintiffs maintained sales records for the bodega during the promotional period for submission to Tropicana. See Meyer, Sr. Dep. at 771. Plaintiffs then handled numerous complaints from bodegas who frequently had to wait for extended periods to receive their checks from Tropicana. Id. at 769; Kotcher Dep. at 325.

> FN7. Tropicana claims that Hygrade's flyer misrepresented the terms and conditions of the promotion.

**\*5** The vast majority of bodega customers did not participate in the Basic Plan. See, e.g., Meyer, Jr. Decl. ¶ 25. Tropicana contends that they chose not to do so because they did not want to comply with the Plan's minimal requirements. See Defendants' Reply Memorandum of Law in Support of Their Motion for Summary Judgment at 5-6. This might be so. However, it is also possible that the Plan was not functionally available to bodega customers. Tropicana's efforts to inform bodega customers of the Plan were limited. While Tropicana informed Plaintiffs of the Plan, Plaintiffs claim that Tropicana never requested a customer list. See Kotcher Dep. at 247-48, 324-25; Schwartz Dep. at 243, 374. Although Plaintiffs helped inform bodega customers of the Plan, they never entered into any agreement with Tropicana to do so. Ultimately, it is

Tropicana's obligation to inform bodega customers about the Plan. See Guides for Advertising Allowances and Other Merchandising Payments and Services ("FTC Guides"), 16 C.F.R. § 240.11. [FN8] It is also questionable whether Tropicana's advertisements in a trade journal, which may not have been seen by bodega customers, provided effective notice. Cf. Exquisite Form Brassiere, Inc. v. FTC, 301 F.2d 499, 501 (D.C.Cir.1961), cert. denied, 369 U.S. 888 (1962) (three advertisements in trade journal was insufficient notice). The inadequacy of the notice is evidenced by the fact that many former bodega customers claim that they were not aware of Tropicana's promotional program. See Bodega Declarations in Support of Plaintiffs' Cross-Motion to Amend the Complaint ("Bodega Declarations") ¶ 5. Additionally, those bodega customers who participated in the Plan faced difficulties obtaining promotional materials and receiving payment from Tropicana.

> FN8. The FTC Guides are designed to help businesses comply with the requirements of §§ 2(d) and (e) of the Act. The Guides are based on the language and legislative history of the Act as well as court decisions construing the Act. See FTC Guides, 16 C.F.R. § 240.1 (1995). They do not have the force of law. Id. Such guidelines, however, have the "power to persuade, if lacking the power to control." General Electric Co. v. Gilbert, 429 U.S. 125, 142 (1976) (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)); EEOC v. Arabian American Oil Co., 499 U.S. 244, 257 (1991). The weight to be given the Guides depends on "the thoroughness evident in [their] consideration, the validity of [their] reasoning, [and their] inconsistency with earlier and later pronouncements." Skidmore, 323 U.S. at 140. Without discussing these factors in detail, I note that the FTC Guides' position on a customer's use of promotional allowances has been substantially the same throughout the period relevant to this lawsuit. See 16 C.F.R. § 240.11 (1984).

Moreover, Tropicana's promotional allowances bear no relationship to the value of services provided by the retailer. Such a program is inconsistent with the FTC Guides which state that sellers should not overpay for services and that the allowance should be spent solely for the purpose for which it was given. See FTC Guides, 16 C.F.R. §

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1996 WL 257581, *5 (S.D.N.Y.))

240.12.    It is true that a legitimate allowance program need not guarantee that all customers participate equally or benefit to the same degree, as long as the program is evenly administered. See L.S. Amster, 504 F.Supp. at 623, 625.    However, the fact that some retailers make thousands of dollars from the Plan while others do not even participate creates an inference that the Plan is not functionally available to all customers.

There is evidence that suggests that bodega customers did not understand the Basic Plan and did not want to comply with its requirements.    See Meyer, Jr. Dep. at 369;  Meyer, Sr. Dep. at 231-32, 240, 819-20.  There is also a question of fact as to whether Tropicana requested customer lists from Plaintiffs. Based on the limited notice provided by Tropicana, the administrative difficulties faced by bodegas participating in the Plan, and the lack of any relationship between the allowance and the value of service provided, a reasonable jury could conclude that the Plan was not functionally available to bodega customers.

### b. Off-Invoice Payments

*6    Tropicana permitted Pathmark and Waldbaum's to receive their allowances directly as a discount on their next bill, or "off-invoice." Bodega customers, in contrast, had to "billback" Tropicana after providing the required documentation.  Bodega customers were required to submit a "verification" form, proof of advertising, and proof of purchase to Tropicana within 30 days of the promotion.    Only after approving the documentation would Tropicana send a check to bodega customers.    Tropicana asserts that the reason bodega customers do not receive off-invoice payments is that they do not purchase directly from Tropicana.    Tropicana cannot deduct bodega customers' promotional allowance from their next bill because it does not bill them in the first place.

In L.S. Amster, 504 F.Supp. at 620, this Court found that the decision to grant allowances off-invoice is similar to the decision to extend credit. The decision not to grant allowances to a customer on an off-invoice basis will not violate the Act if it is based on a valid business consideration.  Id. at 621-22;    see also Bouldis, 711 F.2d at 1325 (discriminatory practices in the extension of credit do not violate § 2(a) where they are based on

legitimate business reasons).    Tropicana grants off-invoice payments to direct buying chains because they promise to perform the required promotional activity and historically have done so.    See Schulke Dep. at 169-73.    Wholesalers, on the other hand, do not have the authority to make such a commitment on behalf of independent retailers. Furthermore, bodegas have a poor record of complying with the required promotional activity. See Meyer, Jr. Dep at 369;  Meyer, Sr. Dep. at 231-32, 240, 819-20.    These considerations, coupled with the logistical difficulty of granting off-invoice allowances to bodega customers, are legitimate reasons for differential treatment.    See L.S. Amster, 504 F.Supp. at 621-22 (granting off-invoice payments based on prior compliance with the requirements of promotional programs does not violate the Act).    Moreover, Plaintiffs have not offered any competent proof that Tropicana's decision to deny off-invoice payments to bodega customers was motivated by anything other than business considerations.

### c. Pre-Pull

Tropicana customers who participate in the promotional program may receive product which is eligible for the promotional allowance prior to the dates of the promotion.    This time period is known as "pre-pull."    This period may be different for different customers.    See Ex. H to Declaration of Carl Person ("Nov. Person Decl."), attorney for Plaintiffs, dated November, 27, 1995.  Pathmark and Waldbaum's, for example, have five days (or one week, as Tropicana does not deliver on the weekends) of pre-pull.  See Deposition of Salvatore Olivito ("Olivito Dep."), Vice-President of Dairy for Pathmark, dated October 21, 1993, at 57-58; Deposition of Alexander Garofalo ("Garofalo Dep."), Chilled Products Sales Manager for Tropicana, dated December 3, 1993, at 11-12.    As there are seven promotions in a thirteen week quarter, all of their purchases are eligible for the allowance.    Plaintiffs, however, only receive one day of pre-pull on behalf of their customers.

*7 Tropicana claims that the purpose of pre-pull is to allow enough time to get the product in the stores for the promotion.    See Defendants' Rule 3(g) Statement ("Def.3(g)") ¶ 61.  Tropicana argues that this is necessary because only juice delivered for the promotion--as opposed to juice already existing in



Not Reported in F.Supp.
(Cite as: 1996 WL 257581, *7 (S.D.N.Y.))

inventory--is eligible for the allowance. Tropicana, however, does not require all product which is eligible for a promotional allowance to be sold at a lower price. Thus, a customer may purchase product during the pre-pull period or the promotional period and sell it at the regular price after the promotion is over. Tropicana asserts that the reason for the discrepancy in pre-pull periods is that different customers have different delivery considerations. See Def. 3(g) ¶¶ 62-63. Bodegas usually receive daily deliveries. Chains and buying co-ops, on the other hand, usually take delivery at a central warehouse and then distribute the product to the several retail outlets. Some retailers only take delivery once a week. Tropicana claims that it adjusts the pre-pull period depending on the needs of the retailer. See Def. 3(g) ¶¶ 65, 87.

Tropicana's pre-pull practices permit all purchases by direct-buying chains to be eligible for promotional payments, but only permit purchases made by bodega customers for 6 out of 10 days to be eligible. This practice raises an inference of price discrimination. The net effect of this differential treatment is that direct buying chains receive lower prices (through promotional allowances) for nearly twice as long as bodega customers. Tropicana's argument that different pre-pull periods were necessary because of delivery considerations is neither relevant to the question whether a price difference and competitive injury resulted nor a defense to price discrimination under the Act. See 15 U.S.C. §§ 13(a)-(b).

### d. TAF Program

Tropicana claims that the TAF program is available to all retailers. See Schulke Aff. ¶ 10. Although some large supermarkets who are customers of Plaintiffs have received TAF money, see Def. 3(g) ¶ 74, Plaintiffs claim that this program was not available to bodega customers, see, e.g., Meyer, Jr. Decl. ¶ 42. Furthermore, Tropicana's documentation describing the promotional program available to independent grocers makes no mention of the TAF program. See Exs. B and C to Declaration of Carl Person ("Oct. Person Decl."), dated October 18, 1995; Tropicana Ex. 20. Consequently, an issue of fact exists as to whether the TAF program was functionally available to bodega customers.

### e. CVI Program

Tropicana admits that CVI funds are unavailable to individual bodegas. See Def. 3(g) ¶ 72. Tropicana claims that bodegas are excluded from this program because Tropicana is unable to track their purchases for the prior year. According to Tropicana, bodegas would be able to participate in this program if they banded together to form advertising co-ops. Tropicana, however, may not structure a promotional program in a manner that prevents a customer from participating. Cf. Morton Salt, 334 U.S. at 42-44 (quantity discounts which were theoretically available to all purchasers but functionally unavailable to small stores violate the Act). Although the CVI program is not available to individual bodegas, Tropicana contends that "[v]iewed in their entirety, promotional payments are available on proportionally equal terms to all competing retailers." Schulke Aff. ¶ 11 (emphasis added). However, a question of fact exists as to whether the exclusion of bodegas from participating in this program caused price discrimination and competitive injury.

### f. Slotting Allowances and Price Protection

**\*8** Slotting allowances are payments traditionally made by a manufacturer to a retailer to obtain or retain shelf space for its products. Slotting allowances are designed to cover the retailer's administrative costs in providing and maintaining shelf space for a manufacturer's products. Tropicana admits to paying slotting allowances when demanded by a retailer. See Def. 3(g) ¶ 96. In fact, Tropicana claims to have paid slotting allowances to some of Plaintiffs' supermarket customers. Id. ¶ 97. Tropicana contends that it has never denied a request for slotting allowances from Plaintiffs' bodega customers--bodega customers have just never asked for one. Id. ¶ 98. Plaintiffs respond that their bodega customers never knew that it was available and under what terms it would be granted. See Plaintiffs' Response Rule 3(g) Statement ("Pls.Res.3(g)") ¶ 98. If the existence of a promotional program is not known by the customers of a seller, then it cannot be considered available to them in any meaningful way. See Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft, 19 F.3d 745, 752 (1st Cir.1994). Consequently, a question of fact exists as to whether slotting allowances were functionally

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1996 WL 257581, *8 (S.D.N.Y.))

available to bodega customers.

"Price protection" is a practice that Tropicana occasionally engaged in when it raised its prices. Where a retailer has a commitment to an advertised promotional price and Tropicana increases its prices prior to the running of the ad, Tropicana will protect the retailer. Pathmark has requested price protection from Tropicana approximately fifteen times in a ten year period. See Olivito Dep. at 146-48. Plaintiffs claim that they did not know that Tropicana had a price protection program available for bodegas. See, e.g., Meyer, Jr. Decl. ¶ 50. Some of Hygrade's customers have also received price protection from Tropicana under the same conditions as other retailers. See Def. 3(g) ¶ 103; Pls.Res. 3(g) ¶ 103. Hygrade claims, however, that this occurred only after it complained to Tropicana, and that it never knew that such a program existed. See, e.g., Meyer, Jr. Decl. ¶ 50. Moreover, there is no indication that Tropicana ever informed Plaintiffs or their customers that price protection might be available. Accordingly, a question of fact also exists as to whether price protection was functionally available to bodega customers.

### g. Summary

Resolving all ambiguities and drawing all inferences in Plaintiffs' favor, the evidence demonstrates that the Basic Plan, the TAF program, slotting allowances, and price protection were not available to bodegas. Additionally, the CVI program and equivalent pre-pull periods were denied to bodega customers. Thus, a rational jury could find that these differences constituted a substantial price discrimination over time between bodegas and direct buying chains. Accordingly, Tropicana's motion is only granted with respect to the use of off-invoice allowances. In all other respects, Tropicana's motion for summary judgment on this aspect of Plaintiffs' § 2(a) claim is denied.

### 2. Preferred Wholesalers and Plaintiffs

*9 Plaintiffs also claim that Tropicana's pricing practices harmed competition between themselves and their competitors Royal and White Rose.

### a. Allowances and Discounts

Tropicana claims that all wholesalers, including Royal and White Rose, purchase product at the same price and that none of them received any discounts or allowances. See Garofalo Dep. at 53; Schulke Dep. at 23, 29; Richer Dep. at 47. Furthermore, Tropicana claims that retailers are equally eligible for promotional allowances regardless of the identity of their wholesaler. See Schulke Aff. ¶ 11; see also Deposition of Robert Price ("Price Dep."), former Vice-President for Sales and Marketing for Red Apple Supermarkets, dated June 16, 1995, at 13 (stating that any allowance that Red Apple received did not depend on which wholesaler supplied the product).

Plaintiffs, however, claim that retailers purchasing from Royal and White Rose are eligible for certain discounts and allowances which would not have been available to them had they purchased from Plaintiffs. In support of this allegation Plaintiffs submit three documents describing promotional allowances made available to Red Apple, a supermarket that purchased Tropicana product from both Hygrade and Royal. See Ex. K to Nov. Person Decl. Each document states on the first page that the allowance only applies to purchases made through Royal. See id. at 7832, 7834, 7845. Robert Price of Red Apple admitted that Red Apple, Tropicana, and Royal entered into an arrangement permitting Red Apple to purchase product from Royal for possibly "well in excess" of a dollar per case cheaper than it could from Hygrade. See Price Dep. at 15-16. Hygrade contends that it lost its Red Apple account to Royal as a result of this discriminatory treatment. A reasonable trier of fact could conclude that Tropicana discriminated against Plaintiffs by providing allowances or discounts to those who purchased from Preferred Wholesalers.

### b. Pre-Pull

Plaintiffs claim that Royal and White Rose received preferential pre-pull periods for their customers. A Tropicana business record reveals that when certain retail customers purchased from Royal and White Rose they were given 100% pre-pull, but were given only one-day of pre-pull when purchasing from Plaintiffs. See Ex. H to Nov. Person Decl. Tropicana's response is that different retailers have different delivery requirements. This does not address the question of why the same retailer might have different pre-pull periods

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1996 WL 257581, *9 (S.D.N.Y.))

depending on the identity of the wholesaler.

### c. Off-Invoice

In the 1980s, Royal decided to advance to certain customers the promotional allowance they would eventually receive. In turn, Tropicana agreed to pay the promotional allowance due to those retailers directly to Royal by deducting it from the invoice. Tropicana only paid the allowance to Royal after proof of performance was submitted. See Schulke Dep. at 131-32; Garofalo Dep. at 54-55. This effectively created an off-invoice arrangement for some of Royal's customers. Plaintiffs claim that Tropicana discriminated against them by refusing to extend such an arrangement to them on behalf of their bodega customers. As was the case for off-invoice payments, such a decision could reasonably be based on an erratic record of performance by bodega customers. See Meyer, Jr. Dep at 369; Meyer, St.Dep. at 231-32, 240, 819-20. In 1992, Tropicana made this arrangement available to all its customers, but Plaintiffs chose not to participate. Hygrade's president testified that Hygrade did not participate in this program because it feared that it would not get the money back from Tropicana. See Meyer, Sr.Dep. at 324. Plaintiffs' decision not to participate undermines their claim that they were damaged by Tropicana's earlier refusal to let them participate.

### d. Summary

*10 As Plaintiffs and Preferred Wholesalers are both direct customers of Tropicana, Plaintiffs are claiming a secondary-line violation. Because Plaintiffs and Preferred Wholesalers are competitors, Plaintiffs must demonstrate a substantial price difference over time in order to establish their § 2(a) claim. See Falls City, 460 U.S. at 435. Drawing all inferences and resolving all ambiguities in Plaintiffs' favor, the evidence supports the conclusion that Tropicana provided allowances or discounts and extended pre-pull periods to retail customers of Preferred Wholesalers, but not to Plaintiffs' customers. Consequently, an issue of material fact has been raised as to whether these actions constitute substantial indirect price discrimination. Thus, summary judgment is denied as to Plaintiffs' claim that Tropicana's pricing practices harmed competition between Plaintiffs and Preferred Wholesalers. On the other hand,

Tropicana's refusal to pay the bodegas' promotional allowances directly to Plaintiffs does not raise an inference of price discrimination resulting in a competitive injury.

### 3. Favored Retailers and Plaintiffs

Finally, Plaintiffs claim that Tropicana's pricing practices harmed competition between themselves and direct buying chains. There is no dispute that direct buying chains (which are retailers) received allowances which were unavailable to Plaintiffs (which are wholesalers). Thus, Tropicana in effect permits direct buying chains to purchase product for less than Plaintiffs. Tropicana claims that this practice does not violate the Act.

Tropicana contends that in order to violate § 2(a) "the favored and disfavored purchasers [must compete] at the same functional level, i.e., all wholesalers or all retailers, and within the same geographical market." Best Brands, 842 F.2d at 585. However, in Texaco, Inc. v. Hasbrouck, 496 U.S. 543, 567 (1990), the Supreme Court rejected the contention that § 2(a) categorically exempts price discrimination between wholesalers and retailers. [FN9] See also Morton Salt, 334 U.S. at 55; J.T. Jones v. Metzger Dairy, 334 F.2d 919, 924-25 (5th Cir.1964), cert. denied, 379 U.S. 965 (1965).

> FN9. While the holding of Best Brands is no longer controlling, it does support the proposition that competitive injury is much less likely to occur as a result of price discrimination between retailers and wholesalers because they generally compete in different markets. See Hasbrouck, 496 U.S. at 580 (Scalia, J., concurring in the judgment).

As Plaintiffs are asserting a secondary-line injury, they must show that they were in actual competition with the direct buying chains in order to establish competitive injury. See Best Brands, 842 F.2d at 584. Plaintiffs must also show that "the probable effect of the discrimination would be to allow the 'favored competitor to draw sales or profits from the unfavored competitor.' " Id. at 584 (quoting J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 569-70 (1981) (Powell, J., dissenting in part)). Although Plaintiffs and direct buying chains primarily sell to different customers, Plaintiffs claim that the direct-buying chains were in effect acting as



Not Reported in F.Supp.
(Cite as: 1996 WL 257581, *10 (S.D.N.Y.))

Page 103

wholesalers in two different respects.

First, Plaintiffs claim that the direct buying chains were acting as wholesalers because they resold ("diverted") Tropicana product to customers other than the ultimate consumer. Tropicana claims that it discourages and consistently tries to stop such activity. Furthermore, Tropicana asserts that neither Waldbaum's nor Pathmark engaged in such diversionary activity within the Citrus Bowl area. See Def. 3(g) ¶¶ 104-06. However, Herbert Whitehead, former president of Dellwood Foods, Inc., testified that Dellwood purchased diverted Tropicana products from Waldbaum's and other direct buying chains. See Deposition of Herbert Whitehead, April 26, 1995, at 17-19. These purchases were $3,000 to $3,500 cheaper per trailer load than purchases from Tropicana and continued for a period of approximately five years. See id. at 19-21. Salvatore Olivito, Pathmark's Dairy Vice President, testified that Pathmark diverted Tropicana product through brokers located in New York or New Jersey, but that it stopped diverting product in January 1991 at the instruction of Tropicana. See Olivito Dep. at 15-16, 20, 26. Furthermore, Olivito claims that any product diverted by Pathmark was sent out of the New York marketing area. See id. at 104-05.

*11 Even assuming that Pathmark and Waldbaum's diverted some product into the New York marketing area, there is no evidence suggesting that any of it reached Plaintiffs' customers or the competitors of Plaintiffs' customers. More importantly, there is no evidence that Tropicana product was diverted to any retailers. Therefore, to the extent that direct buying chains were diverting product to wholesalers in the Citrus Bowl area, they were acting as a manufacturer, not a wholesaler. See Kirby v. P.R. Mallory & Co., 489 F.2d 904, 909 (7th Cir.1973), cert. denied, 417 U.S. 911 (1974) ("the litmus test of a wholesaler is the character of his selling, not his buying"). Thus, if direct buying chains were competing with anybody it was Tropicana or other diverters, not Plaintiffs. Plaintiffs themselves have purchased significant amounts of diverted product. See Meyer, Sr. Dep. at 360; Schwartz Dep. at 341; Deposition of Martin Fromm ("Fromm Dep."), President of Gold Medal, dated April 20, 1995, at 80-81; Kotcher Dep. at 194-97. The fact that there was a less expensive source from which Plaintiffs

could purchase Tropicana product did not harm competition between Plaintiffs and direct buying chains.

Second, Plaintiffs claim that their bodega customers purchased Tropicana from direct buying chains instead of Plaintiffs because it was cheaper. In support of this contention Plaintiffs submit approximately 40 virtually identical declarations from former bodega customers. Each declaration states that "[s]ometimes we would buy Tropicana orange juice from the competing supermarket at these low prices, which was lower than the price which the Dairy was charging us at that time." See Bodega Declarations ¶ 3. The declarations do not state, however, that such purchases were from direct buying chains like Pathmark or Waldbaum's. Moreover, the declarations do not state how much or how often bodegas purchased Tropicana product from the supermarkets. The fact that bodegas also purchased product from a wholesaler at the same time, see id. ¶ 2, suggests that the purchases from supermarkets were not substantial. Accordingly, this evidence does not support the conclusion that Plaintiffs were in actual competition with direct buying chains.

Plaintiffs have offered no credible evidence that they were in competition with direct buying chains. Therefore, Tropicana's motion for summary judgment is granted with respect to Plaintiffs' claim of price discrimination as between Plaintiffs and direct buying chains.

B. Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs and Tropicana disagree on whether Tropicana's promotional programs are available to bodegas. For the purpose of their motion for partial summary judgment, however, Plaintiffs accept that Tropicana's programs are available to bodegas. See Reply Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgment at 3-4. The theory of Plaintiffs' motion is that promotional allowances which bear no relationship to the value of services provided by the customer violate § 2(a) of the Act.

*12 Plaintiffs claim, and Tropicana admits, that: 1) the retailer was not required to spend any portion of the allowance on advertising or promoting

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.                                    **Page 104**
(Cite as: 1996 WL 257581, *12 (S.D.N.Y.))

Tropicana products; 2) the cost to the retailer of promoting Tropicana products was not regulated by Tropicana; 3) there was no relationship between the amount of the allowance and the cost of promotion to the retailer; 4) the effect of the promotional allowance program was to give supermarkets a lower price than Plaintiffs; and 5) supermarkets were able to sell Tropicana product during promotional periods for lower prices than Plaintiffs were able to buy from Tropicana. Plaintiffs argue that these facts establish that the promotional program was a sham and that the allowances should have been given automatically to all customers.

In support of their contention, Plaintiffs cite several cases holding that allowances that were unrelated to the value of the services performed violated the Act. In these cases, however, none of the allowances were available to the plaintiffs. The relationship between the allowance and the value of the services only becomes relevant when the allowance is not available to all customers. Where an allowance is available to all competing customers, there is no discrimination in price and hence no competitive injury. See FLM Collision, 543 F.2d at 1025-26 (where a "lower price is available to all purchasers, not only in theory but in fact … there is no violation"). Thus, a promotional program which provides payments to customers in excess of their costs of promotion does not violate § 2(a) where it is functionally available to competing purchasers on proportionally equal terms. [FN10] Plaintiffs' motion for partial summary judgment is denied as their theory cannot, as a matter of law, state a claim under § 2(a). Plaintiffs may eventually prevail, however, if they prove that Tropicana's promotional programs were not available to bodegas.

> FN10. Plaintiffs also rely on § 240.12 of the FTC Guides, which states that the customer should spend the promotional allowance for the purpose that it was given. This reliance is misplaced. The FTC Guides, which provide guidelines for complying with §§ 2(d) and (e) of the Act, do not alter the fact that price discrimination and competitive injury must be proved in order to establish a violation of § 2(a).

IV. Sections 2(d) and 2(e) of the Robinson Patman Act

Section 2(d) [FN11] of the Act prohibits sellers from providing payments to customers to be used in connection with the resale of goods unless the payments are available to all customers competing in the distribution of such products on proportionally equal terms. See 15 U.S.C. § 13(d); FTC v. Fred Meyer, Inc., 390 U.S. 341, 350-53 (1967). Section 2(e) [FN12] is similar to § 2(d) except that it prohibits a seller from providing services (as opposed to payments for services) to customers to be used in connection with the resale of goods unless the services are available to all competing customers on proportionally equal terms. See 15 U.S.C. § 13(e); FTC v. Simplicity Pattern Co., 360 U.S. 55, 65 (1959). Although the language in these two sections is slightly different, courts have applied the same analysis to both. See World of Sleep, Inc. v. La-Z-Boy Chair Co., 756 F.2d 1467, 1479 n. 6 (10th Cir.), cert. denied, 474 U.S. 823 (1985); Kirby, 489 F.2d at 909.

> FN11. Section 2(d) states: It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities. 15 U.S.C. § 13(d) (1973).

> FN12. Section 2(e) states: It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms. 15 U.S.C. § 13(e) (1973).

*13 In order to establish a violation of §§ 2(d) or (e), Plaintiffs must show that 1) Tropicana provided payments or services to customers in connection with the resale of goods; and 2) such payments or

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1996 WL 257581, *13 (S.D.N.Y.))

services were not available to competing customers on proportionally equal terms. 15 U.S.C. §§ 2(d)-(e); Fred Meyer, 390 U.S. at 355-57; Alan's of Atlanta, Inc. v. Minolta Corp., 903 F.2d 1414, 1423-24 (11th Cir.1990); Bouldis, 711 F.2d at 1327-28; Kirby, 489 F.2d at 908. Sections 2(d) and (e), unlike 2(a), have no competitive injury requirement. See Simplicity Pattern, 360 U.S. at 66. Discrimination under §§ 2(d) and (e) is only unlawful if it reaches competing customers reselling on the same functional level; it does not require proportional equality between direct-buying retailers and wholesalers. See Fred Meyer, 390 U.S. at 348-49. Thus, discrimination between Plaintiffs and direct buying chains is not actionable under §§ 2(d) or (e). See id.

### A. In Connection With the Resale of Goods

Under the Basic Plan, CVI program, and TAF program Tropicana provides payments in return for promotional activity by the retailer for the resale of Tropicana product. Also, the allowances which Plaintiffs allege were given to Preferred Wholesalers were for the purpose of reselling Tropicana product to retailers. Furthermore, price-protection and pre-pull are services provided by Tropicana to retailers to aid in the resale of the product. While slotting allowances are not given for advertising or promotion, they are used primarily to promote the resale of the seller's product by securing shelf space. See FTC Guides, 16 C.F.R. § 240.9 at 36 n. 1 ("The discriminatory purchase of shelf space, whether directly or by means of so-called allowances, may violate the Act...."). Thus, discriminatory treatment regarding these programs and services is within the scope of §§ 2(d) and (e).

As off-invoice payments are usually an advance of funds that must eventually be paid, they are similar to an extension of credit. See L.S. Amster, 504 F.Supp. at 620. Courts have held that discriminatory credit practices are outside the scope of §§ 2(d) and (e) as they generally do not relate to the resale of a supplier's goods. See, e.g., Alan's of Atlanta, 903 F.2d at 1424; Bouldis, 711 F.2d at 1328. Here, however, the off-invoice payments specifically relate to the payment of promotional allowances, not to the original sale of goods. Thus, these off-invoice payments are properly within the scope of §§ 2(d) and (e).

### B. Availability on Proportionally Equal Terms

Sections 2(d) and (e) require that a seller's promotional program be available on proportionally equal terms. The FTC Guides provide guidance as to when a promotional program will satisfy this requirements. FTC Guides, 16 C.F.R. §§ 240.1-240.15.

#### 1. FTC Guides

First, a customer must be informed of the existence of a promotional program. "The seller has an obligation to take steps reasonably designed to provide notice to competing customers of the availability of promotional services and allowances." FTC Guides, 16 C.F.R. § 240.10(b); see also Alterman Foods, Inc. v. FTC, 497 F.2d 993, 1001 (5th Cir.1974). While a seller may contract with its wholesalers to inform indirect purchasing retailers of a promotion, it remains ultimately responsible for providing the required notification. See FTC Guides, 16 C.F.R. § 240.11; see also Fred Meyer, 340 U.S. at 358.

**\*14** Second, a customer must be able to participate in the promotion in a practical sense. See FTC Guides, 16 C.F.R. § 240.10(a)(1). A promotion which, although theoretically available to all, effectively excludes smaller customers from participating violates the Act. In order to make promotional programs functionally available, a seller may have to offer "alternative terms and conditions under which customers can participate." Id. Furthermore, a seller "must take reasonable steps to ensure that the alternatives are proportionally equal, and ... inform all competing customers of the various alternative plans." Id. Where the seller has complied with these requirements, but the customer does not participate because it is reluctant to process the required paperwork to verify performance, the seller is not in violation of the functional availability requirement. See id. example 4.

Third, promotional payments or services must be made available to competing customers on proportionally equal terms. Although there is no single way to do this, basing the payments or services on the dollar volume or the quantity of product purchased will generally suffice. See FTC Guides, 16 C.F.R. § 240.9(a). "Where a seller

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1996 WL 257581, *14 (S.D.N.Y.))

Page 106

offers more than one type of service, or payments for more than one type of service, all the services or payments should be offered on proportionally equal terms." FTC Guides, 16 C.F.R. § 240.9(b).

Finally, the FTC Guides require a seller to take reasonable precautions that it is not overpaying for the services provided. See FTC Guides, 16 C.F.R. § 240.12. "The customer should expend the allowance solely for the purpose for which it was given." Id. If a seller knows or should know that the allowance is not being properly used, it should discontinue the payments or services. Id.

### 2. Tropicana's Programs

Sections 2(d) and (e) are narrower in scope than § 2(a) as they do not reach discrimination between customers competing at different functional levels. However, as the FTC Guides and the statute demonstrate, and as Tropicana recognizes, compliance with §§ 2(d) and (e) is more difficult than compliance with § 2(a) with regard to customers competing at the same functional level. [FN13] Tropicana must make each promotional program functionally available to all competing customers on proportionally equal terms regardless of the effect on price or competition. As discussed above, there are questions of fact concerning the adequacy of notice provided by Tropicana, the bodegas' ability to participate in the promotional programs in a practical sense, and the availability of all of Tropicana's promotional programs to bodegas. Under these circumstances, a reasonable jury could conclude that Tropicana's practices relating to the Basic Plan, TAF program, CVI program, pre-pull, slotting allowances, and price protection were not functionally available to bodegas, as opposed to direct buying chains, on proportionally equal terms. As off-invoice payments were denied to bodegas for a valid business reason, this does not violate the Act. See L.S. Amster, 504 F.Supp. at 621. Thus, Tropicana's motion for summary judgment on Plaintiffs' §§ 2(d) and (e) claims is granted with respect to off-invoice payments. Tropicana's motion is denied in all other respects.

FN13. Michael Malina, counsel for Tropicana, stated: "The suggestion that somehow there might be a violation of Section 2(a) when there's no violation of Section 2(d) turns this statute upside-down, because Sections 2(d) and 2(e) are more

stringent than Section 2(a)...." Tr. at 33.

### V. Meeting-Competition Defense

**\*15** The meeting-competition defense of § 2(b) [FN14] relieves a seller from liability under the Act. Falls City, 460 U.S. at 438. The defense is an absolute defense to violations of §§ 2(a), (d), and (e) of the Act. See Viviano Macaroni Co. v. FTC, 411 F.2d 255 (3d Cir.1969); Exquisite Form Brassiere, 301 F.2d at 504; FTC Guides, 16 C.F.R. § 240.14; see also Standard Oil Co. v. FTC, 340 U.S. 231 (1951). In order to prevail on this defense, the seller must show "the existence of facts which would lead a reasonable prudent person to believe that the granting of a lower price would in fact meet the equally low price of a competitor." Falls City, 460 U.S. at 438 (internal quotation marks omitted). Furthermore, the seller's response must be "offered in good faith to 'meet not beat' the competitor's low price." Id. at 446. The burden of establishing this defense lies with Tropicana. Id. at 451.

FN14. Section 2(b) states, in relevant part: That nothing herein contained shall prevent a seller rebutting the prima facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor. 15 U.S.C. § 13(b) (1973).

Tropicana urges that its promotional pricing scheme was a good faith effort to meet the equally low prices of Minute Maid (a division of The Coca-Cola Company), Citrus Hill (a Proctor & Gamble Company), and other private label brands including Hygrade's 100% Pure Orange Juice. In support of this assertion, executives of several retail chains have testified that Tropicana's competitors provided them with discounts and that they requested discounts from Tropicana. See Olivito Dep. at 92-95 (Minute Maid provided a volume discount program similar to Tropicana's); Deposition of Ira Savoy ("Savoy Dep."), former Vice-President of Merchandising for Waldbaum, dated September 14, 1993, at 116 (Savoy requested promotional allowances from Tropicana); Deposition of Jeffrey Berger ("Berger Dep."), Chief Operating Officer for Food City Markets, Inc., dated June 14, 1995, at



Not Reported in F.Supp.
(Cite as: 1996 WL 257581, *15 (S.D.N.Y.))

26-27, 60-61, 69-70 (slotting allowances were received from Tropicana, Minute Maid, and other orange juice producers). Furthermore, Terry Schulke of Tropicana claims that his staff attempted to obtain documentation verifying a retailer's claim regarding a Tropicana competitor's promotional allowances. [FN15] See Schulke Aff. ¶ 15. Tropicana claims that its allowances are based on the competitive circumstances in the market. Id. ¶¶ 15-16. Finally, Schulke believes that Tropicana will lose sales if it does not maintain its promotional allowances. Id. ¶ 17.

> FN15. Tropicana has submitted documentation of a Minute Maid consumer coupon promotion and various advertisements of Minute Maid orange juice. See Ex. 1 to Schulke Aff. There is also an ambiguous document concerning "off-invoice" and "ad allowance" programs by Minute Maid. Id. Finally, there is a Tropicana inter-office correspondence, dated May 31, 1989, stating that Minute Maid is paying A & P $12,500 per orange juice ad.

This evidence is insufficient to satisfy Tropicana's burden for a number of reasons. First, it is unclear which manufacturer first instituted a promotional allowance program. See Olivito Dep. at 94-95. Tropicana's promotional program has been in effect for many years with little, if any, changes. As of 1988, Tropicana had no information on Minute Maid's promotional programs and no verification of Citrus Hill's promotional programs. See Ex. 1 to Schulke Aff. Tropicana has failed to establish that it reacted in response to a competitor's price, see Garofalo Dep. at 157-59, and therefore is not entitled to judgment based on the meeting competition defense. See Checker Motors Corp. v. Chrysler Corp., 283 F.Supp. 876, 889 (S.D.N.Y.1968), aff'd, 405 F.2d 319 (2d Cir.), cert. denied, 394 U.S. 999 (1969).

*16 Second, there is no competent evidence that executives of retail chains told Tropicana the terms and conditions of their competitors' promotional programs. At best, Tropicana's information consisted of generalized assertions from retailers with an interest in convincing Tropicana that its allowances were too low. The cases cited by Tropicana (where summary judgment was granted) involved circumstances where the seller had particular information about a competitor's prices.

The information allegedly known by Tropicana is not sufficient to establish, as a matter of law, either its good faith or the reasonableness of its promotional programs. Cf. Corn Prods. Ref. Co. v. FTC, 324 U.S. 726, 740-41 (1945) (evidence from witnesses who had no personal knowledge of competitor's transactions and who concluded that price discrimination was necessary was insufficient to establish meeting-competition defense).

Finally, summary judgment under the meeting-competition defense "is rarely, if ever, reachable." Alan's of Atlanta, 903 F.2d at 1425. As Tropicana bears the burden of proof on this defense at trial, it "must remove genuine doubt from the issue altogether" to be entitled to summary judgment. Id. As the defense requires determinations of reasonableness, good faith, and the beliefs of Tropicana executives, it inherently involves credibility issues which are best decided by a jury. See id. This case is no different. Whether the evidence supports the inference that the requirements of the meeting competition defense have been met is a "question for the trier of fact, not this Court." Falls City, 460 U.S. at 451. Tropicana's motion for summary judgment on the meeting-competition defense of § 2(b) is denied.

### VI. Damages

In order to recover damages under § 4 of the Clayton Act Plaintiffs must establish that they suffered actual antitrust injury as a result of Tropicana's violation of the Act. See J. Truett Payne, 451 U.S. at 562; see also World of Sleep, 756 F.2d at 1479-80 (requirement of actual antitrust injury applies whether there was a violation of §§ 2(a), (d), or (e)). Plaintiffs, as wholesalers, have standing to recover damages that they suffered as a result of discrimination between their customers and direct buying chains. [FN16] See Lago & Sons Dairy, Inc. v. H.P. Hood, Inc., 892 F.Supp. 325, 338-44 (D.N.H.1995); Morris Electronics of Syracuse, Inc. v. Mattel, Inc., 595 F.Supp. 56, 57 (N.D.N.Y.1984). Tropicana contends that Plaintiffs have insufficient evidence to support an award of damages.

> FN16. Tropicana did not challenge Plaintiffs' claim of standing in its brief in support of its motion for summary judgment.

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1996 WL 257581, *16 (S.D.N.Y.))

Page 108

Assuming that Plaintiffs establish a violation of the Act, they need not provide "the kind of concrete, detailed proof of injury which is available in [non-antitrust] contexts." J. Truett Payne, 451 U.S. at 565 (quoting Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264 (1946)). This is because the "vagaries of the marketplace" create a "difficulty of ascertaining business damages." J. Truett Payne, 451 U.S. at 566. Moreover, this rule is justified because "it does not come with very good grace for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted." Id. at 566-67. The question is whether the damages are based on a "just and reasonable inference" drawn from the evidence. Id. at 566.

*17 Under this relaxed standard of proof, damages have been awarded where there was limited evidentiary support. Damages have been awarded on the basis of a plaintiff's estimate of sales it could have made absent the violation. See Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100 (1969). Damages have also been awarded based on a comparison of a plaintiff's actual profits with the contemporaneous profits of a competitor who was not the victim of discrimination. See Bigelow, 327 U.S. 251.

In J. Truett Payne, 451 U.S. at 563-63, the plaintiff's evidence of damages consisted of his testimony and the testimony of an expert witness. The plaintiff claimed that he suffered a temporary four percent (4%) loss in sales because of defendant's discriminatory incentive programs. Id. The expert testified that the discrimination would artificially inflate retail prices and that the plaintiff was harmed because the favored retailers made more money per car. Id. at 564. While the Court characterized this evidence as "weak," it was insufficient to foreclose recovery before a determination of liability was made. Id. at 568. It is important to note, however, that this relaxed standard of proof applies to the amount of damages, not to whether the violation caused damage. See, e.g., MCI Communications Corp. v. American Telephone & Telegraph Co., 708 F.2d 1081, 1161 (7th Cir.1982), cert. denied, 464 U.S. 891 (1983) (once causation has been proved "in a reasonable manner," damages may be determined by a just and reasonable estimate).

A. Plaintiffs' Evidence

1. Plaintiff Hygrade

Hygrade claims that its sales of Tropicana product declined approximately 68 percent from 1984 to 1992. See Meyer, Jr. Decl. ¶ 54; Ex. Q to Nov. Person Decl. Some of Hygrade's former bodega customers state that they lost sales to supermarkets and that they left Hygrade because its prices were not competitive. See Bodega Declarations ¶¶ 2-3. Hygrade also contends that it lost its Red Apple account because of Tropicana's discriminatory practices. Red Apple was a chain account which enabled Hygrade to serve several stores. Robert Price of Red Apple testified that Red Apple only left Hygrade because Royal's prices were significantly cheaper. See Price Dep. at 10-12. This evidence of injury is sufficient to support an award of damages under the standards set forth in J. Truett Payne.

Tropicana argues that any sales lost by Hygrade (and other Plaintiffs) were not caused by Tropicana's promotional programs. Tropicana cites many other factors which may have led to a decline in Tropicana sales. See Def. 3(g) ¶ 125. Hygrade counters that while not every lost sale was due to Tropicana's promotional programs, most of them were. See Pls. Res. 3(g) ¶ 125; Meyer, Jr. Decl. ¶ 56. Plaintiffs must establish a causal connection between the injury and the violation of the Act. See J. Truett Payne, 451 U.S. at 562. The evidence presented creates a question of fact as to causation. There is considerable evidence that many aspects of Tropicana's promotional programs were denied to bodegas. Moreover, Hygrade's injury was substantial. A jury could find "as a matter of fact and with a fair degree of certainty" that Tropicana's discriminatory promotional programs were a material cause of Hygrade's injury. Chrysler Credit Corp. v. J. Truett Payne Co., 670 F.2d 575, 581 (5th Cir.), cert. denied, 459 U.S. 908 (1982). A question of fact remains as to what extent the other factors contributed to Hygrade's lost sales. Hygrade is entitled to damages to the extent that Tropicana is responsible for its injury. See Falls City, 460 U.S. at 437. Finally, Hygrade's inability to ascertain which sales of Tropicana were lost because of price discrimination is not fatal to its claim for damages. Once injury has been established, uncertainty as to the extent of damage does not preclude recovery. J. Truett Payne, 451 U.S. at 567 n. 5. Where the evidence of injury is

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.                                                                Page 109
(Cite as: 1996 WL 257581, *17 (S.D.N.Y.))

sufficient, a jury may properly approximate the amount of damages. Id. at 567.

**\*18** Approximately one-third of Hygrade's customers took loans from Hygrade. The loans require that the customer must purchase all milk and juice products "exclusively and solely" from Hygrade. [FN17] Ex. 14 to Meyer, Jr. Dep. Tropicana argues that these loan agreements prevent Hygrade from claiming that it lost these accounts to any of the Preferred Buyers. This argument makes no sense. If Tropicana's illegal conduct caused the customers to breach these contracts, Tropicana remains liable. Thus, Hygrade may maintain its claim for damages.

> FN17. Meadowbrook, Gold Medal, Babylon, and Queens Farms also made similar loans to their customers.

### 2. Other Plaintiffs

The remaining Plaintiffs assert that they have "substantial evidence of lost sales." Schwartz Decl. ¶ 53; Kotcher Decl. ¶ 53; Fromm Decl. ¶ 53. Plaintiffs state that the precise amount of each of their purchases of Tropicana product is contained in the data processing records which were produced by Tropicana. Schwartz Decl. ¶ 57; Kotcher Decl. ¶ 57; Fromm Decl. ¶ 57. Unlike Hygrade, the remaining Plaintiffs make no specific claim that their sales of Tropicana product declined over time. They do not name any significant accounts that they lost. They offer no direct evidence of lost profits. They offer no expert testimony of lost sales. Other than Plaintiffs' generalized assertions, their evidence of injury consists of declarations from former bodega customers.

Former bodega customers claim that they stopped purchasing Tropicana product from Plaintiffs because Plaintiffs' competitors were offering lower prices. See Bodega Declarations ¶ 2; see also Schwartz Decl. ¶¶ 54, 56; Kotcher Decl. ¶¶ 54, 56; Fromm Decl. ¶¶ 54, 56. Plaintiffs must prove, however, that any losses they suffered were caused by Tropicana's alleged discrimination. J. Truett Payne, 451 U.S. at 562. As Plaintiffs do not allege jobbers to be Preferred Buyers, any customers lost to jobbers are not relevant to this lawsuit. Similarly, any customers Plaintiffs lost to other wholesalers, who are not Preferred Buyers, was not

caused by Tropicana's alleged discrimination. Only one of Plaintiffs' former customers claims that it switched to White Rose because of lower prices. Such a limited loss of sales cannot possibly show that Plaintiffs suffered any actual injury. See Allen Pen Co. v. Springfield Photo Mount Co., 653 F.2d 17, 21 (1st Cir.1981) (price difference affecting 1 1/2 % to 2% of sales is insufficient to warrant an inference of actual injury).

The bodega owners believe that they lost sales to supermarkets and that they therefore purchased less product from Plaintiffs. See Bodega Declarations ¶ 3. The bodegas also claim that they "sometimes" purchased Tropicana product from the supermarkets to sell to the public. Id. Thus, Plaintiffs contend that bodegas would have purchased more Tropicana product from them if Tropicana's promotional programs were not discriminatory. These claims by bodegas, however, are vague and speculative. Both of these claims assume that the bodegas would have participated in the promotional program if it were administered legally. In order to recover damages Plaintiffs must show that they actually suffered an injury, not merely that there is a reasonable likelihood of injury. See J. Truett Payne, 451 U.S. at 562. At best, the bodega owners' belief that their sales were affected suggests that Plaintiffs might have suffered an injury. Significantly, bodega owners offer no evidence that they themselves suffered any lost sales as a result of Tropicana's promotional programs.

**\*19** Assuming, arguendo, that Plaintiffs suffered some injury due to lost sales from bodegas, the Bodega Declarations suggest that it was insignificant. The bodegas have not indicated the quantity of sales that they lost to supermarkets. Furthermore, bodegas continued to purchase Tropicana product from a wholesaler at the same time that they purchased Tropicana product from the supermarkets. See Bodega Declarations ¶ 2. This suggests that the amount of orange juice bodegas purchased from supermarkets was insubstantial. Plaintiffs also failed to submit evidence as to the percentage of lost sales.

The Bodega Declarations, by themselves, do not establish that Plaintiffs suffered actual antitrust injury. See Allen Pen, 653 F.2d at 21. At best, they indicate a speculative and insignificant loss of sales. Accordingly, Tropicana's motion dismissing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
**(Cite as: 1996 WL 257581, \*19 (S.D.N.Y.))**

the claim for damages by Plaintiffs other than Hygrade is granted.

## CONCLUSION

For the reasons discussed above:  1) Tropicana's motion for summary judgment on Plaintiffs' § 2(a) claim is granted as to Tropicana's off-invoice program and Plaintiffs' claim that competition was harmed between Plaintiffs and direct-buying chains, but is denied in all other respects;  2) Tropicana's motion for summary judgment on Plaintiffs' §§ 2(d) and (e) claims is granted as to Tropicana's off-invoice program but denied in all other respects;  3) Tropicana's motion for summary judgment on the meeting competition defense is denied;     4) Tropicana's motion dismissing Plaintiffs' claim for damages is denied with respect to Plaintiff Hygrade and granted with respect to the other Plaintiffs;  and 5) Plaintiffs' motion for partial summary judgment on their § 2(a) claim is denied.

SO ORDERED:

1996  WL  257581  (S.D.N.Y.),  1996-1  Trade Cases  P 71,438

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

