Not Reported in F.Supp.
RICO Bus.Disp.Guide 9443
(Cite as: 1998 WL 67545 (E.D.Pa.))
<KeyCite History>

Page 112

United States District Court, E.D. Pennsylvania.

J. PLATER-ZYBERK, Jr. PH.D.
v.
Charles ABRAHAM, Robert Vito, Arthur Werner, Lee Schwartz, Elcom Technologies Corp., and VideoCom, Inc.

Civ. A. No. 97-3322.

Feb. 17, 1998.

MEMORANDUM AND FINAL JUDGMENT

HERBERT J. HUTTON, J.

*1 Presently before the Court are the Motions of Defendants Robert Vito, Arthur Werner, Lee Schwartz, VideoCom, Inc., and Elcom Technologies Corp. to Dismiss Plaintiff's Complaint, Plaintiff J. Plater-Zyberk, Jr.'s Memoranda in Opposition, and the parties' various supplementary memoranda and replies. For the foregoing reasons, the Defendants' Motions are granted.

I. BACKGROUND

In this action, J. Plater-Zyberk ("Plaintiff") claims his former business partner Charles Abraham ("Abraham") and Arthur Werner ("Werner"), Lee Schwartz ("Schwartz") and Robert Vito ("Vito")-- Abraham's lawyers and accountant--conspired to defraud him of a 50% interest in a corporation and its intellectual property. According to the Complaint, the defendants manufactured a fraudulent basis on which to exclude him, and then misappropriated the intellectual property to a corporation they formed among themselves. This conduct, he claims, constitutes a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) & (d) (1994), and gives rise to liability for conversion, breach of contract, and intentional interference with contractual relations under Pennsylvania law.

According to his Complaint, plaintiff is an expert in management and economics, and joined with Abraham to form a start-up company based on Abraham's proprietary technology. At the time of the negotiations, Abraham had several patents and patents pending for technology that would enable communication over local powerlines (the "Powerline Technology"). In April 1992, the parties began working together without a formal agreement to govern their relationship. On August 3, 1992, they entered into a written contract to form a new corporation in which each would have a 50% interest. As consideration, Abraham was to assign the corporation his rights in the Powerline Technology and plaintiff was to provide it with management and fundraising services. On September 7, 1992, the parties entered into a written modification in which they agreed that, instead of forming a new corporation, plaintiff would take a 50% interest and several officer and director positions in Abraham's pre-existing corporation, Abraham Communication, Inc. ("Abcom"). Plaintiff claims he worked diligently to create a business organization capable of reducing Abraham's ideas into a sellable product. Abraham, however, failed to assign the Powerline Technology over to Abcom. The parties also never executed a proposed shareholders agreement.

Abraham first retained lawyers Werner and Schwartz in early 1993. They were friends and associates of accountant Vito. According to the Complaint:
  Beginning in approximately April 1993 and continuing until today, Defendants Abraham, Werner, Schwartz and Vito entered into a scheme, plan, and conspiracy and engaged in a course of conduct to deprive Plaintiff of his rightful ownership of Abcom and the financial benefits flowing from the development of its concepts, technology, trade secrets and business and to divert such ownership and financial rewards to themselves and others affiliated with them.
*2 (Compl. at ¶ 20). Under the alleged scheme, Werner and Schwartz advised Abraham that he could oust plaintiff and form a new and separate business based on the unassigned Powerline Technology. This scheme was carried out between July and December, 1993 in the following manner.

In July 26, 1993, Werner informed plaintiff by letter and fax that Abraham was concerned about plaintiff's inability to raise funds. In the letter Werner imposed an ultimatum: unless plaintiff raised $1,000,000.00 dollars for Abcom by

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.  
(Cite as: 1998 WL 67545, *2 (E.D.Pa.))

Page 113

September 1, 1993, on terms favorable to Abraham, Abraham would terminate his relationship with plaintiff. Plaintiff claims that this was an unfair extra-contractual requirement, designed as a pretext to support his later "termination." In subsequent letters to plaintiff, dated August 2, 3, 6, and 10, Werner restated this position. Finally, according to the Complaint, on September 17, 1993, Abraham "wrote to Plaintiff purporting to relieve Plaintiff of certain of his positions with Abcom based on an alleged special meeting of shareholders and directors on September 17, 1993." (Compl. at ¶ 34). In fact, the letter stated:

> In my capacity as the President of ABCOM, I hereby relieve you of all duties with regard to ABCOM. Effective immediately, your services to ABCOM are no longer desired.
> YOU ARE HEREBY INSTRUCTED THAT YOU ARE TO NO LONGER HOLD YOURSELF OUT TO THE PUBLIC AS BEING ASSOCIATED WITH ABCOM. IF YOU CONTINUE TO DO SO, APPROPRIATE LEGAL ACTION WILL BE TAKEN.
> YOU ARE FURTHER HEREBY INSTRUCTED NOT TO COMMUNICATE WITH ANY INDIVIDUAL OR CORPORATE ENTITY ASSOCIATED WITH ABCOM. IF YOU DO SO, APPROPRIATE LEGAL ACTION WILL BE TAKEN.

(Def. Robert Vito's Mot. to Dismiss at Ex. 8). In his Complaint, plaintiff argues that Abraham lacked authority to "terminate" him under Pennsylvania corporation law, because plaintiff was a 50% shareholder, officer, and director. Nevertheless, this letter gave plaintiff notice of Abraham's intention to do so.

According to the Complaint, two weeks before issuing the termination letter, on September 3, 1993, Abraham entered into a shareholders agreement with Vito under which the parties became joint shareholders of a newly organized entity called Elcom Technologies, Inc. ("Elcom"). According to the Complaint, Vito soon transferred substantial stakes in Elcom to Werner and Schwartz. The defendants never notified plaintiff of Elcom's existence, and plaintiff asserts that they took affirmative steps to keep others with knowledge about the new entity from disclosing it to him. Apparently to avoid contact with plaintiff, Abraham abruptly moved to Virginia without a forwarding address. Finally, pursuant to a December 23, 1993 Employment Contract, Abraham assigned Elcom his "entire interests in all of his patents and all of his patent pendings." Thus, the defendants achieved the aim of the alleged RICO conspiracy--the usurpation of the Powerline Technology--seven to nine months after allegedly hatching the plan in April, 1993.

*3 Since the events of late 1993, the Complaint states, Elcom has obtained financing through private securities offerings, and pursued the development and marketing of products based on the Powerline Technology. According to the Complaint, Elcom solicited private investors through private placement memoranda dated February 22, 1994, December 22, 1994, July 28, 1995, and December 23, 1996. According to these documents, Elcom has acquired all of the assets and liabilities of Abcom. The documents also state that Abcom was in negotiations with a "consultant," and deny that it had any enforceable obligations to him. Finally, Elcom has had some success in its development and marketing of products based on the Powerline Technology. According to Elcom's December 23, 1996 Private Placement Memorandum, the company had a net sales of over $500,000 for the nine month period ending September 10, 1996.

Plaintiff filed his Complaint on May 9, 1997. In it he charges the defendants with violating RICO §§ 1964(c) and (d) (Count I). In addition, he charges the defendants variously with conversion (Count II), breach of contract (Count III), and intentional interference with contractual relationship (Count IV). All of the individual parties are Pennsylvania residents and all of the corporate defendants are Pennsylvania corporations. (Compl. ¶ 3-8). Therefore, the only basis for federal jurisdiction is 28 U.S.C. § 1332 (1994) and 28 U.S.C. § 1367 (1994).

II. DISCUSSION

A. Standard of Review

The defendants move to dismiss plaintiff's Complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The purpose of a motion to dismiss is to test the legal sufficiency of the complaint. See Sturm v. Clark, 835 F.2d 1009, 1011 (3d Cir.1987). When deciding a motion to dismiss, the Court must accept all of the plaintiff's factual allegations as true and

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.  
(Cite as: 1998 WL 67545, *3 (E.D.Pa.))

Page 114

draw all reasonable inferences in its favor. See Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir.1994). This indulgence is not absolute, however, and "legal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness." Government Guarantee Fund v. Hyatt Corp., 955 F.Supp. 441, 448 (D.Vi.1997) (citing Fleming v. Lind-Waldock & Co., 922 F.2d 20, 23 (1st Cir.1990)). The Court may only grant the motion if, after viewing the complaint in the light most favorable to the plaintiff, "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief" under the applicable law. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir.1994).

Because a motion to dismiss is meant to test a complaint's legal sufficiency, as opposed to its basis in fact, courts generally limit their consideration to the complaint, exhibits attached to the complaint, and matters of public record. See Foust v. FMC Corp., 962 F.Supp. 650, 651-52 (E.D.Pa.1997). To prevent abuse of the Rule 12(b)(6) standard, however, the Third Circuit established an exception for certain important documents:

> *4 a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document. Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document on which it relied.

Pension Guaranty Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir.1993), cert. denied, 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994) (citation omitted). It is fair to consider the extrinsic document without converting the motion into one for summary judgment, the Court reasoned, because a plaintiff who has relied on a document in his complaint is on notice that it might be used against him. See id.

Courts have relied on Pension Guaranty in many cases to consider material that a plaintiff has referenced in the complaint but neglected to provide. For example, in Dykes v. South Eastern Pennsylvania Transp. Auth., 68 F.3d 1564, 1567 n. 3 (3d Cir.1995), cert. denied, 116 S.Ct. 1343 (1996), the Third Circuit considered a SEPTA collective bargaining agreement--omitted from the plaintiff's complaint--in determining whether it had reasonable suspicion to support a mandatory body fluids test. Similarly, in Foust, 962 F.Supp. at 652, the Court considered the civil rights plaintiff's right-to-sue letter, noting that she relied on it to prove her case and did not question its authenticity. See also Klein v. Boyd, 1996 WL 230012, *7 (E.D.Pa. May 3, 1996); Johnakin v. City of Philadelphia, 1996 WL 18821, *7 (E.D.Pa. January 18, 1996); J/H Real Estate, Inc. v. Abramson, 901 F.Supp. 952, 954 (E.D.Pa.1995). It is therefore well established that a court may consider omitted documents where their content and meaning are central to the plaintiff's complaint.

In this case, the Complaint refers to, and describes without appending, a number of documents, including: (1) the August 3, 1992 contract between plaintiff and Abraham, (Compl. at ¶ 12), (2) the letters from Werner to Plaintiff dated July 26, 1993, and August 2, 3, 6, and 10, (id. ¶¶ 21-23), and (3) the September 17, 1993 termination letter from Abraham to plaintiff, (id. ¶ 34). Defendants Vito, Werner, and Schwartz have appended these documents as exhibits to their motions, and rely on them in their arguments. Plaintiff has not questioned their authenticity. Also, the content of the documents is integral to PA's claims. As noted above, the August 3, 1992 contract is the very basis of plaintiff's claim to ownership of Abcom and the Powerline Technology. Likewise, plaintiff relies on the August and September 1993 letters noted above to establish predicate acts of mail fraud for his RICO claim. (Id. ¶¶ 21-24, 46). The Court finds that these documents are integral to the Complaint, and therefore fall within the Pension Guaranty exception. See In re Donald Trump Secs. Litig., 7 F.3d 357, 368 n. 9 (3d Cir.1993), cert. denied, 510 U.S. 1178, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994) (finding that the district court properly considered the prospectus that formed the basis of the plaintiffs' complaint). [FN1]

> FN1. In any case, plaintiff assents to the Court's use of these documents for the purpose of the defendants' Motions to Dismiss. (See Pl.'s Mem. in Opp. to Def. Vito's Mot. to Dismiss at 4 n. 5).

B. The RICO Claim

*5 Plaintiff premises federal jurisdiction on Count

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.     Page 115
(Cite as: 1998 WL 67545, *5 (E.D.Pa.))

I of his complaint, the RICO count. Under RICO, "[a]ny person injured in his business or property by reason of a violation of [RICO] section 1962" may bring a civil action for treble damages. Section 1962 sets forth four types of prohibited activities that give rise to RICO liability. Subsection (a) outlaws the use of funds obtained through a pattern of racketeering activity or by the collection of an unlawful debt to acquire an interest in, or operate, a legitimate business enterprise affecting interstate commerce. Subsection (b) outlaws the employment of such racketeering conduct or proceeds to "acquire or maintain, directly or indirectly, any interest in or control of any enterprise" affecting interstate commerce. Id. § 1962(b). Subsection (c) outlaws "any person employed by or associated with any enterprise" affecting interstate commerce from "conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or the collection of an unlawful debt." Finally, subsection (d) makes it unlawful for any person to conspire to violate any of provisions of subsections (a), (b), or (c). See Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1411 (3d Cir.), cert. denied, 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991).

To make out a claim under any of these theories, a plaintiff must also prove that the defendants conducted the affairs of a RICO enterprise through a "pattern of racketeering activity." 18 U.S.C. § 1962. Section 1961(1) enumerates a number of predicate acts that may constitute "racketeering activity" for RICO purposes, including any act indictable as mail or wire fraud under 18 U.S.C. §§ 1341, 1343 (1994). Section 1961(5) states that a pattern of racketeering activity "requires at least two acts of racketeering activity, one of which occurred after the effective date of the chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." But the courts have held that the mere allegation of two predicate acts is not enough. See H.J., Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 236-39, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). To prove a pattern of racketeering activity, a plaintiff "must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." Id. at 239 (emphasis in original); see Tabas v. Tabas, 47 F.3d 1280, 1292 (3d Cir.), cert. denied, 515 U.S. 1118, 115 S.Ct. 2269, 132 L.Ed.2d 275 (1995). Thus, "a short-term scheme threatening no future criminal activity will not suffice." Kehr, 926 F.2d at 1412.

1. Predicate Acts

*6 In determining the sufficiency of a RICO claim, the Court must first look to the predicate acts of racketeering activity. See Kehr, 926 F.2d 1414. In this case, Plaintiff alleges a number of violations of the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343. To prove a violation of the mail fraud statute, a plaintiff must show that the defendant employed the U.S. mails in furtherance of a scheme or artifice to defraud. See Schmuck v. United States, 489 U.S. 705, 715, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989); F/V Robins Nest, Inc. v. Atlantic Marine Diesel, Inc., 1994 WL 5945932, *6 (D.N.J. October 24, 1994). The mailing itself need not be fraudulent. A so-called "innocent mailing" will suffice if "incident to an essential part of the scheme." Schmuck, 489 U.S. at 711. But while the mailing need not be fraudulent itself, the overall scheme "must involve some sort of fraudulent misrepresentation or omission reasonably calculated to deceive persons of ordinary prudence and comprehension." Kehr, 926 F.2d at 1415 (quoting United States v. Pearlstein, 576 F.2d 531, 535 (3d Cir.1978)). The same standards apply to the wire fraud statute, which is essentially identical. See Leonard A. Feinberg, Inc. v. Central Asia Capital, 974 F.Supp. 822, 849 (E.D.Pa.1997).

In his Complaint, plaintiff alleges that the defendants carried out a scheme to deprive him of his interest in Abcom and the Powerline Technology. But nowhere does he allege that the defendants fraudulently induced him to change his position, or that he reasonably relied on any such fraud. Plaintiff alleges that in August-September 1992 he and Abraham contracted that plaintiff would own a 50% share of Abcom and that Abraham would assign his patents to Abcom, in exchange for plaintiff's services. (See Compl. at ¶ 13). He does not allege that Abraham fraudulently misrepresented his intentions at that time to induce plaintiff to perform work for Abcom. Rather, plaintiff alleges that several months later, in April 1993, the defendants developed a scheme to deprive him of his contractual and property rights--essentially to break the contract. (Id. at ¶ 20). Next, plaintiff alleges that various defendants mailed and wired him the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.  
(Cite as: 1998 WL 67545, *6 (E.D.Pa.))

Page 116

series of letters that culminated in his September 17, 1993 "termination." Although the Complaint characterizes these letters as "fraudulent," the Court cannot credit this conclusory allegation as true. See Government Guarantee Fund, 955 F.Supp. at 448. While the letters do demand that plaintiff meet certain requirements to avoid termination, they are not deceptive. Instead they baldly assert an ultimatum: that he would be excluded unless he produced $1 million by September 1st. (See Compl. at ¶ 23). Indeed the entire scheme, while possibly treacherous, lacks fraudulence entirely. Abraham's September 17 letter was the clearest possible statement of his intention to break his relationship with plaintiff. The only deception Plaintiff can point to is the defendants' secret formation of Elcom and assignment of Abraham's patents to it on December 23, 1993, but plaintiff does not claim the defendants had a duty to disclose the formation of Elcom, and the assignment occurred after the defendants had already achieved their goal of forcing plaintiff out of the business.

*7 Finally, even if the alleged scheme and the series of 1993 letters amounted to mail or wire fraud, the subsequent Elcom private placement memoranda would not fall within the scheme because they occurred after the scheme had reached fruition, see United States v. Cross, 128 F.3d 145, 150 (3d Cir.1997) (quoting United States v. Tarnopol, 561 F.2d 466, 471-72 (3d Cir.1977)), and did not operate to lull plaintiff, see United States v. Coyle, 63 F.3d 1239, 1245 (3d Cir.1995). "[M]ailings taking place after the object of the scheme has been accomplished, or before its accomplishment has begun, are not sufficiently closely related to the scheme to support a mail fraud prosecution." Cross, 128 F.3d at 150 (quoting Tarnopol, 561 F.2d at 471). Here, the scheme's object was accomplished when Abraham sent his September 17 letter, or at the very latest when he assigned the Powerline Technology to Elcom on December 23. Abraham's letter gave Plaintiff clear notice of Abraham's intention to exclude him from the business. Plaintiff's harm was the loss of his contractual and property rights in Abcom, which occurred in advance of the first private placement memorandum, issued February 22, 1994. (See Compl. at ¶ 38). Because the defendants had already achieved their object before the private placements, the scheme's completion did not depend on these mailings. See Raymond v. Borken Truckorama, 1990 WL 112103, *2 (E.D.Pa. August 3, 1990) (plaintiff's post sale mailing of checks to defendant not essential to scheme because mailings occurred after fraudulent transaction was consummated).

> In some cases
> Even mailings made after the fruits of the scheme have been received may come within the statute when they are designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place.

Coyle, 63 F.3d at 1244-45 (quoting United States v. Otto, 742 F.2d 104, 108 (3d Cir.1984), cert. denied, 469 U.S. 1196, 105 S.Ct. 978, 83 L.Ed.2d 980 (1985). Plaintiff argues that the private placement memoranda fit this description. But plaintiff also acknowledges that he never received or knew about the offending private placement memoranda. (See Compl. at ¶ 38; Pl.'s Mem. in Opposition at 11-12). Therefore, he cannot possibly maintain that the memoranda lulled him into believing that things were not amiss, as the lulling theory assumes that the plaintiff actually see or know about the letter. See, e.g., Coyle, 63 F.3d at 1245 (defendant executive lulled health care benefits fund by mailing false financial schedules); United States v. Ruuska, 883 F.2d 262, 264-65 (3d Cir.1989) (defendant sent investors explanatory letter to prevent suspicion about his use of their funds). In any case, plaintiff cannot claim that these private placement memoranda made discovery of the alleged scheme less likely than if no mailings had been made at all. If anything the mailings increased the odds that Plaintiff would discover Elcom eventually. [FN2]

> FN2. Plaintiff mistakenly relies on Tabas, 47 F.3d at 1294 n. 18, in support of his argument that the private placements were lulling letters. In Tabas, the mailings were monthly distribution checks paid from Tabas Enterprises to the plaintiffs during the period that the defendants were misappropriating partnership funds. See id. at 1282-83. The Court found that the mailing of the checks was an essential part of the scheme because "[h]ad the defendants failed to mail disbursement checks to plaintiffs, plaintiffs would have immediately been alerted to defendants' alleged scheme." Id. at 1294 n. 18. Plaintiff's case is entirely different. First,

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.  
(Cite as: 1998 WL 67545, *7 (E.D.Pa.))

Page 117

like classic lulling letters, the Tabas checks were mailed to the plaintiffs themselves. In this case, however, Plaintiff never received the mailings and argues that his failure to receive them was somehow lulling. Second, the Tabas mailings occurred on an ongoing basis as the defendants continued to misappropriate funds, and therefore were not even post-fraud mailings. In this case, the private placements are clearly different because they occurred after completion of the claimed fraud.

**\*8** Given the above, the Court finds that plaintiff fails to state any valid predicate acts of mail fraud to support his RICO claim. See Ideal Dairy Farms, Inc. v. John Labatt, LTD., 90 F.3d 737, 747 (3d Cir.1996) (upholding dismissal of RICO claim where alleged predicate acts lacked element of fraudulence).

2. Relatedness

To establish a pattern of racketeering activity, a RICO plaintiff must show that his alleged predicate acts are related. Given RICO's liberal relatedness requirement the Court finds that Plaintiff's alleged predicate acts bear a sufficient relationship to one another.

For RICO purposes, acts are related if they have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." H.J., 492 U.S. at 240; see Banks v. Wolk, 918 F.2d 418, 422 (3d Cir.1990). Although this standard is amorphous, and to some degree unhelpful, predicate acts clearly satisfy the relatedness requirement when they all concern the same participants in a single transactional event. See id. at 422 (mailings and telephone use related to common goal of obtaining artificially low price in real estate deal). Plaintiff's RICO claim meets this minimal standard because, as alleged, all of the mailings concerned the same Defendants and their alleged scheme to usurp ownership of Abcom and the Powerline Technology, or cover it up.

3. Continuity

The final aspect of a pattern of racketeering activity is continuity. A RICO complaint will not survive a motion to dismiss unless the plaintiff can show that the alleged scheme presented the kind of threat of continuing harm that RICO's drafters were concerned with. See H.J., 492 U.S. at 240. [FN3] The offense is something greater than the sum of its predicate acts, it is an intangible underlying criminality manifested by those acts. To constitute a RICO offense, the scheme and acts must not be merely transactional in nature, but must involve ingrained ongoing criminal conduct. See id. at 242; Kehr, 926 F.2d at 1412-13; Marshall-Silver, 894 F.2d at 597 (noting that Congress directed RICO's draconian penalties at a societal threat greater than ordinary "single injury" fraud).

FN3. In response to Plaintiff's suggestion that it is improper to dismiss a RICO claim for lack of sufficient continuity, the Court notes that there is overwhelming authority for dismissing a RICO claim on this ground. In fact, many of the Third Circuit's leading RICO cases, including Hindes v. Castle, 937 F.2d 868, 876 (3d Cir.1991), Kehr, 926 F.2d at 1419, Banks, 918 F.2d at 422-23, and Marshall-Silver Const. Co., Inc. v. Mendel, 894 F.2d 593, 598 (3d Cir.1990), upheld district courts that dismissed RICO complaints on precisely this ground. Plaintiff cites three cases in support of his contention that the "fact-intensive" nature of the continuity inquiry renders dismissal inappropriate. As noted above, the Court in Kehr, the Plaintiff's first case, actually upheld the district court's dismissal of a RICO claim. Kehr Packages, 926 F.2d at 1419. In the Plaintiff's second case, Tabas, 47 F.3d at 1296, the Third Circuit reviewed a grant of summary judgment against the plaintiff, a posture in which the complaint's adequacy was no longer at issue. The Tabas Court reversed summary judgment not because continuity may only be decided by a jury, but because the plaintiff had demonstrated a triable issue of fact on the question. See id. In Plaintiff's third case, United States v. Pelullo, 964 F.2d 193, 210 (3d Cir.1992)--a criminal matter--the Third Circuit granted the defendant a new trial on, inter alia, the ground that the jury instructions did not adequately apprise the jury of the continuity requirement. When the Court noted that "[u]ltimately, continuity is a factual issue for the jury," id., the Court meant not that continuity must always be determined by a jury, but that although it was convinced that the government had made a sufficient showing of continuity, only a jury could find against the defendant on this issue in a criminal case. Finally, the Court notes that a rule precluding dismissal for failure to plead sufficient

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp. Page 118
(Cite as: 1998 WL 67545, *8 (E.D.Pa.))

continuity would be entirely at odds with Rule 12(b)(6)'s purpose of freeing defendants from the burden of litigating a facially meritless claim. In sum, there is ample authority for this Court to grant a motion to dismiss on the pattern of racketeering element, and the Plaintiff has offered no pertinent authority to the contrary.

The Supreme Court established the general framework for analyzing continuity in H.J.:

> Continuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.... A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the threat of continuity is demonstrated.

*9 H.J., 492 U.S. at 241 (emphasis in original) (citations omitted). The Court now turns to a specific application of these concepts to the facts alleged in this case.

The H.J. Court declined to specify what might constitute a "substantial" period of time for purposes of establishing closed-ended continuity. Since then, however, the Third Circuit has developed a durational requirement of at least twelve months. See Tabas, 47 F.3d at 1293. Although this time period is ordinarily measured between the first and last predicate acts alleged, in a case where the predicates are acts of mail or wire fraud "the continuity test requires us to look beyond the mailings and examine the underlying scheme or artifice." See id. (quoting Kehr, 926 F.2d at 1414). One implication of this focus on the underlying scheme, however, is that the Court must not count the period after the scheme has reached fruition towards the durational requirement. See id. But even if the Court looked to the predicate mailings themselves, it could not consider post-scheme innocent mailings or mailings alleged only to have concealed a single transactional fraud. See Kehr, 926 F.2d at 1418 (excluding post-fraud innocent mailings from consideration); Barsam v. Pure Tech Intern., Inc., 864 F.Supp. 1440, 1451 (S.D.N.Y.1994) (excluding consideration of post-fraud SEC filings as predicate mailings). Cf. Davis v. Grusemeyer, 996 F.2d 617, 627 (3d Cir.1993) (finding plaintiff's true injury was the loss of his trucks, and the defendant's subsequent disposition of the trucks within the limitations period was a mere continuation of the same injury).

In his Complaint, plaintiff alleges that the defendant's scheme ran from April 1993 until the present. (See Compl. at 20). However, the Court has already determined that for mail and wire fraud purposes the alleged scheme reached fruition either when Plaintiff received Abraham's September 17 letter or when Abraham assigned the Powerline Technology to Elcom on December 23rd. Therefore, even accepting as true plaintiff's allegation that the scheme began in April, the scheme did not continue for RICO purposes for more than seven to nine months. This duration does not suffice to establish closed-ended continuity under Third Circuit precedent. See Tabas, 47 F.3d at 1293; Hughes v. Consol-Pennsylvania Coal Co., 945 F.2d 594, 610-11 (3d Cir.1991), cert. denied, 504 U.S. 955 (1992) (twelve month scheme insufficient); Hindes, 937 F.2d at 875 (eight months insufficient); Kehr, 926 F.2d at 1413 (same); Banks, 918 F.2d at 422-23 (same); Marshall-Silver, 894 F.2d at 597 (same). Furthermore, plaintiff alleges no more than a single transactional fraud. The alleged continuing nature of his loss--that is, his loss of potential future earnings--cannot extend such a single episodic event into a pattern of racketeering activity. See, e.g., Hughes, 945 F.2d at 611 (finding no closed-ended continuity in short-term, single object fraudulent scheme to acquire real estate, although defendants continued to hold property--and presumably derive income from it-- after it changed hands). Accordingly, plaintiff does not state an adequate claim of closed-ended continuity. [FN4]

> FN4. Computing duration from the predicates themselves produces the same result. Plaintiff alleges a series of mailings spanning between July 26, 1993 and December 23, 1995--a period of almost two and one half years. Upon closer inspection, these fall into two distinct groups. The first group consists of all mailings aimed at forcing Plaintiff out of Abcom. These include Werner's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Case 7:04-cv-08223-KMK  Document 42-12  Filed 02/16/2005  Page 8 of 8

Not Reported in F.Supp.
(Cite as: 1998 WL 67545, *9 (E.D.Pa.))

Page 119

July 26 and August 2, 3, 6, and 10 letters, and Abraham's September 17 letter. The second group of alleged mail frauds consists of the four Elcom private placement memoranda, dated February 22, 1994, December 22, 1994, July 28, 1995, and December 23, 1996. As this second group is alleged to have done no more than conceal the original fraud, it does not count towards the durational requirement. See Barsam, 864 F.Supp. at 1451. Therefore, computing duration from the acts themselves results in a period of less than two months.

**\*10** Likewise, plaintiff fails to allege adequate open-ended continuity. The term open-ended continuity describes conduct that threatens to be a continuous danger to society, but has been intercepted at an earlier stage of its development. See H.J., 492 U.S. at 242. The alleged illegal activity must pose a "threat of additional repeated criminal conduct over a significant period." Banks, 918 F.2d at 423 (quoting Marshall-Silver, 894 F.2d at 597) (emphasis in original). In H.J., the Supreme Court offered the example of a hoodlum selling "insurance" to neighborhood storekeepers against window breakage, and telling his victims he would return each month to collect the "premium" for their "coverage." H.J., 492 U.S. at 242. Such conduct threatens that the defendant will continue a pattern of additional criminal activity. Another method of demonstrating open-ended continuity is to show that committing illegal acts is part of an ongoing entity's way of doing business. See id.

Here, plaintiff argues that open-ended continuity is present because Elcom's ongoing business "is dependent on raising funds to develop the Powerline Products." (Pl.'s Mem. at 12). Essentially, Plaintiff argues that the continuing effects of one transactional fraud may establish open-ended continuity. The Court cannot agree. Once an allegedly fraudulent transaction is complete, a plaintiff may not rely on the defendants' retention or use of his assets to establish open-ended continuity. See Blue Line Coal Co., Inc. v. Equibank, 769 F.Supp. 891, 897 (E.D.Pa.1991). Open-ended continuity is meant to insure RICO liability for conduct like the bribery in H.J., which although intercepted and prosecuted, threatens to meet the closed-ended durational standard. Plaintiff's interpretation of open-ended continuity would permit any plaintiff once defrauded to state a RICO claim if the defendants continued to derive a benefit from the property they obtained. This would be true in nearly every case. Therefore, it must be insufficient to constitute open-ended continuity.

In sum, the Court finds plaintiff has failed to establish that the Defendants engaged in a pattern of racketeering activity. Accordingly, plaintiff has failed to state a claim for RICO liability.

C. State Claims

As noted before, plaintiff's sole basis for federal jurisdiction is his RICO claim in Count I. For the remaining state claims (Counts II through V) he relies on pendant jurisdiction, supplied by 28 U.S.C. § 1367. As the Court has dismissed Plaintiff's RICO claim and lacks any independent basis of jurisdiction over the remaining claims, it declines jurisdiction over them pursuant to § 1367(c)(3). See Mathon v. Marine Midland Bank, N.A., 875 F.Supp. 986, 1002 (E.D.N.Y.1995); Blue Line Coal, 769 F.Supp. at 898.

III. CONCLUSION

**\*11** Because plaintiff has failed to plead an adequate fraudulent scheme or pattern of racketeering activity, plaintiff's RICO claim is dismissed. Without a jurisdictional basis to proceed with plaintiff's pendent state law claims, they are dismissed as well.

FINAL JUDGMENT

AND NOW, this 17th day of February, 1998, upon consideration of the Motion of Defendants Robert Vito, Arthur Werner, Lee Schwartz, VideoCom, Inc., and Elcom Technologies Corp. to Dismiss, Plaintiff J. Plater-Zyberk, Jr.'s Memoranda in Opposition thereto, and the parties' various supplementary memoranda and replies, IT IS HEREBY ORDERED that Defendants' Motions are GRANTED.

IT IS FURTHER ORDERED that Judgment is entered in favor of Defendants and against Plaintiff.

1998 WL 67545 (E.D.Pa.), RICO Bus.Disp.Guide 9443

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

