2004 WL 3015287
--- F.Supp.2d ---
(Cite as: 2004 WL 3015287 (S.D.N.Y.))

Page 152

<KeyCite History>
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.

MADDALONI JEWELERS, INC., Plaintiff,
v.
ROLEX WATCH U.S.A., INC., Allen Brill and Lawrence Mazzeo Defendants.

No. 02 Civ. 6438PKC.

Dec. 29, 2004.

Background: Watch dealer brought action in state court against manufacturer and two of its sales managers, alleging that they violated Racketeer Influenced and Corrupt Organizations Act (RICO) and Robinson Patman Act, and committed torts under state law during the course of their relationship with it. After removal, defendants moved for summary judgment.

Holdings: The District Court, Castel, J., held that: (1) evidence did not establish RICO predicate offense of commercial bribe receiving (2) several attempts at extortion constituted a single RICO predicate of extortion; and (3) dealer failed to establish antitrust injury under Clayton Act as result of manufacturer's alleged Robinson-Patman Act violations.

Motion granted as to federal claims; state law claims remanded.

[1] Release    0
331    0 k.

Under New York law, a release like any contract must be construed to give force and effect to the intention of the parties.

[2] Release    0
331    0 k.

Under New York law, a release that employs general terms will not bar claims outside the parties' contemplation at the time the release was executed.

[3] Federal Civil Procedure    0
170A    0 k.

Genuine issue of material fact existed as to whether parties intended to release manufacturer and its sales managers of liability for the Robinson-Patman Act and common-law tort claims, precluding summary judgment in favor of manufacturer and sales managers on dealer's claims based on conduct alleged to have occurred prior to execution of release. Clayton Act, § 2, as amended by Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13.

[4] Racketeer Influenced and Corrupt Organizations    0
319H    0 k.

A Racketeer Influenced and Corrupt Organizations Act (RICO) conspiracy claim cannot stand where, as here, the elements of the substantive RICO provisions are not met. 18 U.S.C.A. § 1962(d).

[5] Bribery    0
63    0 k.

Evidence that watch manufacturer's sales managers sought under-the-table compensation from dealer in exchange for supplying dealer with certain desirable pieces of manufacturer's inventory did not establish Racketeer Influenced and Corrupt Organizations Act (RICO) predicate offense of commercial bribe receiving in violation of New York law since there was no evidence that manufacturer would suffer a loss if the inventory were directed from one dealer of its products to another. 18 U.S.C.A. § 1962(c); McKinney's Penal Law § 180.08.

[6] Extortion and Threats    0
165    0 k.

If the context of the alleged extortion is outside the realm of labor disputes, then there is extortion under the Hobbs Act whenever property is obtained by inherently wrongful means regardless of whether or not defendant has a lawful claim to the property; extortion through threats of economic loss falls within the Hobbs Act's prohibitions, and extortion may therefore be established on a theory that activities amounted to extortion by wrongful use of fear of economic loss. 18 U.S.C.A. § 1951.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



**[7] Racketeer Influenced and Corrupt Organizations** 0
319H 0 k.

Watch manufacturer's sales managers' solicitation of bribe from dealer constituted Racketeer Influenced and Corrupt Organizations Act (RICO) predicate offense of extortion and/or attempted extortion under the Hobbs Act; sales managers applied economic pressure for not participating in the bribery and extortion scheme by refusing to provide dealer with manufacturer's most desirable products, placing limits on advertising and promotional support, and denial of access to manufacturer's customer service department until dealer finally paid. 18 U.S.C.A. § 1962(c); 18 U.S.C.A. § 1951.

**[8] Racketeer Influenced and Corrupt Organizations** 0
319H 0 k.

For purposes of Racketeer Influenced and Corrupt Organizations Act (RICO), several attempts at extortion constituted a single predicate of extortion in violation of Hobbs Act; conversations between manufacturer's sales managers led dealer to finally realize that he was being shaken down for a bribe, which he then paid. 18 U.S.C.A. § 1962(c); 18 U.S.C.A. § 1951.

**[9] Racketeer Influenced and Corrupt Organizations** 0
319H 0 k.

Although two separate attempts to commit extortion in violation of the Hobbs Act may suffice to establish the pattern under Racketeer Influenced and Corrupt Organizations Act (RICO), and an attempt and a completed act of extortion may constitute the two predicate acts, a completed act of extortion along with the intermediate steps toward completion of that act constitute one predicate act, not multiple distinct attempts. 18 U.S.C.A. § 1962(c); 18 U.S.C.A. § 1951.

**[10] Monopolies** 0
265 0 k.

Robinson-Patman Act does not provide a private cause of action. Clayton Act, § 2, as amended by Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13.

**[11] Monopolies** 0
265 0 k.

To bring suit under the Clayton Act, a private litigant seeking treble damages must show antitrust injury. Clayton Act, § 4, 15 U.S.C.A. § 15(a).

**[12] Monopolies** 0
265 0 k.

A plaintiff alleging Robinson-Patman Act violation must prove more than a violation of the Act, and must make some showing of actual injury; the "actual injury" caused by a violation is different from an injury to competition generally. Clayton Act, § 2, as amended by Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13; Clayton Act, § 4, 15 U.S.C.A. § 15(a).

**[13] Monopolies** 0
265 0 k.

To establish an antitrust injury, a Clayton Act plaintiff must show (1) an injury in fact, (2) that was caused by the violation, and (3) that it is the type of injury contemplated by the statute; third criterion is satisfied if a plaintiff makes some showing of actual injury attributable to something the antitrust laws were designed to prevent. Clayton Act, § 4, 15 U.S.C.A. § 15(a).

**[14] Monopolies** 0
265 0 k.

Watch dealer failed to establish antitrust injury under Clayton Act as result of manufacturer's alleged Robinson-Patman Act violations by showing an estimated differential in promotional support that favored other watch dealers or out-of-pocket cost of replacement advertising. Clayton Act, § 2, as amended by Robinson-Patman Price Discrimination Act, 15 U.S.C.A. § 13; Clayton Act, § 4, 15 U.S.C.A. § 15(a).

**[15] Monopolies** 0
265 0 k.

Sweeping, conclusory statements cannot suffice as evidence of antitrust injury within meaning of Clayton Act. Clayton Act, § 4, 15 U.S.C.A. § 15(a).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



**[16] Monopolies** 0
265 0 k.

Out-of-pocket expenditures for advertising are not in and of themselves antitrust injuries for purposes of Clayton Act. Clayton Act, § 4, 15 U.S.C.A. § 15(a).

**[17] Federal Civil Procedure** 0
170A 0 k.

New York citizenship of plaintiff dealer and defendant manufacturer precluded an assertion of diversity jurisdiction.

**[18] Federal Courts** 0
170B 0 k.

In the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine, judicial economy, convenience, fairness, and comity, will point toward declining to exercise jurisdiction over the remaining state-law claims. 28 U.S.C.A. § 1367(c)(3).

**[19] Removal of Cases** 0
334 0 k.

When a district court declines to exercise jurisdiction over state-law claims in a removed case, the court may either remand or dismiss the state-law claims.

MEMORANDUM AND ORDER

CASTEL, J.

*1 The plaintiff in this action, Maddaloni Jewelers, Inc. ("Maddaloni Jewelers"), is a self-styled "upscale retailer of fine jewelry and watches" located in Huntington, New York. At one time, Maddaloni Jewelers was an official dealer of Rolex-brand watches. It is no longer. This lawsuit asserts that Rolex Watch U.S.A., Inc. ("Rolex") and two of its sales managers violated state and federal law during the course of their relationship with Maddaloni Jewelers, and that federal statutory and state common-law claims arise from those violations.

Maddaloni Jewelers brings claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, and the Robinson Patman Act, 15 U.S.C. §§ 13(d)-(e), as well as state-law causes of action for tortious interference with business relations, and breach of covenant of good faith and fair dealing. The three defendants move for summary judgment pursuant to Rule 56, Fed.R.Civ.P., arguing that there are no triable issues of fact in this case, and that Maddaloni Jewelers's action should be dismissed. For the reasons explained below, the defendants' motion is granted as to plaintiff's claims under RICO and the Robinson-Patman Act, and those claims are dismissed. I decline to exercise supplemental jurisdiction over the remaining state law claims, and they are remanded to Supreme Court, New York County, from which the case was removed.

Background

In describing the facts, I draw every reasonable inference in support of the non-moving party, Maddaloni Jewelers. Rolex is a New York corporation that markets "a premium, high quality brand of watches." (Third Amended Complaint ("3d AC") ¶ 5; Defendants' Answer to the 3d AC ("Answer") ¶ 5) In the time period relevant to this action, Rolex employed defendants Allen Brill and Lawrence Mazzeo, with Brill as its national sales manager, and Mazzeo as area sales manager for accounts on Long Island and New Jersey. (3d AC ¶¶ 6-7, 14-15; Answer ¶¶ 6-7)

Lou Maddaloni is the sole owner of the plaintiff. [FN1] (Deposition of Lou Maddaloni ("Lou Maddaloni Dep.") at Defendants' 56.1 Statement ("Def.56.1") Ex. C at 23) Maddaloni Jewelers became an "Official Rolex Jeweler" in May 1996. (3d AC ¶ 9; Answer ¶ 9) Broadly described, the Official Rolex Jeweler Agreement ("ORJ Agreement") is a fifteen-page contract that sets forth the rights, duties and obligations of an Official Rolex Jeweler. The ORJ Agreement states that "[i]n the event of a breach of this Agreement, or of any Rolex policy or procedure, or for any other just cause, either party may terminate the Agreement effective immediately, upon giving written notice of termination to the other party." (ORJ Agreement ¶ 8.3, at Def. 56.1 Ex. B) The ORJ Agreement also sets forth seven examples of actions that may constitute "just cause." (ORJ Agreement ¶ 8.4)

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



2004 WL 3015287  
(Cite as: 2004 WL 3015287, *1 (S.D.N.Y.))

Page 155

According to the 3d AC, Mazzeo, on Brill's behalf, requested "under the table payments" from Lou Maddaloni. (3d AC ¶¶ 16-17) When Maddaloni declined to make such payments, the 3d AC alleges, he encountered difficulties with Rolex, including delays in receiving products, refusals to supply certain Rolex products, and limited promotional support from Rolex. (3d AC ¶ 18) Simultaneously, the 3d AC alleges that other Rolex retailers who complied with the under-the-table payment requests received more favorable treatment from Brill. (3d AC ¶ 27) Maddaloni Jewelers's treatment worsened with time, according to the 3d AC, and it was terminated as an "Official Rolex Jeweler" on January 29, 2002. (3d AC ¶ 30-36; Letter, Jan. 29, 2002, at Def. 56.1 Ex. D) Rolex indicated that it was terminating plaintiff's status as an "Official Rolex Jeweler" because it violated the terms of four paragraphs set forth in the ORJ Agreement. (Letter, Jan. 29, 2002) Those provisions of the ORJ Agreement required, inter alia, an "Official Rolex Jeweler" to sell Rolex products "in a manner consistent with the high standards, goodwill and prestigious reputation" of Rolex, limit sales to over-the-counter transactions, maintain "ethical business practices" and "good standing in the community," and comply with applicable laws. (ORJ Agreement ¶¶ 1, 3, 7, 8)

*2 This action was filed in Supreme Court, New York County, and removed to this Court on August 13, 2002. The defendants moved to dismiss the Second Amended Complaint pursuant to Rule 12(b)(6), Fed.R.Civ.P. The Honorable Shira A. Scheindlin, U.S.D.J., to whom this case was then assigned, granted in part and denied in part the defendants' motion to dismiss. Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc., 2003 WL 21507529 (S.D.N.Y. June 30, 2003). Judge Scheindlin limited plaintiff's RICO claims to injuries that were discovered or should have been discovered within four years prior to the date on which the original complaint was filed, and limited its tortious interference claims to injuries sustained three years prior to the filing of the original complaint. Id. at *4. Plaintiff's claim under section 2(a) of the Robinson-Patman Act also was dismissed. Id. at *4-5.

On March 10, 2004, I granted plaintiff leave to file the 3d AC, which Maddaloni Jewelers filed on March 24, 2004. Discovery is now closed. Defendants' motion seeks the dismissal of all remaining claims.

Rule 56 Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, demonstrating that he or she is entitled to relief. A fact is material if it "might affect the outcome of the suit under the governing law ..." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence on each material element must be sufficient to entitle the movant to relief in his or her favor as a matter of law. Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir.2004).

When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. Rule 56(e), Fed.R.Civ.P. In raising a triable issue of fact, the nonmovant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial."' Powell v. Nat'l Bd. of Medical Examiners, 364 F.3d 79, 84 (2d Cir.2004) (quoting Aslandis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir.1993)).

An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir.1995)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



2004 WL 3015287  
(Cite as: 2004 WL 3015287, *2 (S.D.N.Y.))

Page 156

(quotations and citations omitted); accord Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In reviewing a motion for summary judgment, the court must scrutinize the record, and grant or deny summary judgment as the record warrants. See Fed.R.Civ.P. 56(c). In the absence of any disputed material fact, summary judgment is appropriate.

Discussion

*3 Before addressing the propriety of summary judgment as to the plaintiff's federal statutory claims, I will address the terms of the general release contained in the ORJ Agreement, which the defendants argue warrants summary judgment dismissing all of plaintiff's causes of action.

1. The Release Provision of the April 2000 Agreement

The ORJ Agreement contains the following provision, which the defendants argue functions as a release as to all of plaintiff's claims:

> Mutual Release. The parties hereby release all claims they might have against each other as of this date. Notwithstanding the foregoing, this release does not apply to any claim by Rolex relating to merchandise purchased by Jeweler for which Jeweler has not yet paid.

(ORJ Agreement ¶ 11) The ORJ Agreement was "made and entered as of April 3, 2000." (ORJ Agreement at 1) Lou Maddaloni signed the Agreement, and in his deposition, stated that he read the contract. (Lou Maddaloni Dep. at 228-29) Maddaloni also testified that he understood the contents of the Agreement, and did not feel any confusion about any topic therein. (Lou Maddaloni Dep. at 233-34) He stated that he consulted in an informal capacity with Richard Lerner, a lawyer who also was a customer of the plaintiff. (Lou Maddaloni Dep. at 234-35) Defendants argue that the mutual release provision bars plaintiff's Robinson-Patman Act claims, which are based on conduct alleged to have occurred in 1999, and limits the damages available for plaintiff's state-law claims.

[1][2] "[A] release like any contract must be construed to give force and effect to the intention of the parties." Pinto v. Allstate Ins. Co., 221 F.3d 394, 404 (2d Cir.2000) (applying New York law). "The instrument of release must be strictly construed," Johnson v. Thruway Speedways, Inc., 63 A.D.2d 204, 205, 407 N.Y.S.2d 81, 83 (3d Dep't 1978). A release that employs general terms will not bar claims outside the parties' contemplation at the time the release was executed. See Estes v. New York State Saddle Horse Ass'n Inc., 188 A.D.2d 857, 859, 591 N.Y.S.2d 271, 274 (3d Dep't 1992). New York law does not construe a general release to bar claims for injuries unknown at the time the release was executed, even when the release contains broad language. See Bushkin, Gaims, Gaines, Jonas & Stream v. Garber, 677 F.Supp. 774, 776 (S.D.N.Y.1988).

[3] Defendants have failed to satisfy their initial burden of demonstrating to the Court that the release language establishes a defense as to any of the claims that remain in this lawsuit. See Vermont Teddy Bear Co., 373 F.3d at 244. The language and context of this release provision are so non-specific that I cannot, on a motion for summary judgment, conclude as a matter of law that the parties intended to release the defendants of liability for the Robinson-Patman Act and common-law tort claims. It is, for instance, unclear whether the plaintiff was aware of the damages it had incurred at the time the April 3, 2000 ORJ Agreement was executed. Neither the text of the release nor defendants' factual submissions demonstrates that the parties intended the release to apply to the claims brought in this litigation.

*4 Defendants' motion is therefore denied as to the ORJ's mutual release provision.

2. Plaintiff Fails to Raise a Triable Issue of Fact as to Two Predicate Acts Under RICO

In the 3d AC, plaintiff claims that Brill and Mazzeo instituted and operated a racketeering enterprise based on bribery and extortion under RICO section 1962(c), and conspired to do the same under section 1962(d). Maddaloni Jewelers alleges that Brill and Mazzeo's racketeering caused it to incur $4.4 million in damages. (3d AC ¶¶ 53, 57) For the reasons explained below, I conclude that plaintiff has failed to raise a triable issue of fact as to whether the defendants committed two or more predicate acts of racketeering activity within ten years of each other, and, accordingly, I grant

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



2004 WL 3015287 \
(Cite as: 2004 WL 3015287, *4 (S.D.N.Y.))

Page 157

summary judgment dismissing plaintiff's RICO claims.

Section 1962(c) of the RICO act states:
It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
18 U.S.C. § 1962(c). As articulated by the Supreme Court, a violation of section 1962(c) "requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.... Conducting an enterprise that affects interstate commerce is obviously not in itself a violation of § 1962, nor is mere commission of the predicate offenses." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985). The RICO statute states that a " 'pattern of racketeering activity' requires at least two acts of racketeering activity ... the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5).

[4] Plaintiff also brings a claim of RICO conspiracy. Section 1962(d) of RICO states: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). Section 1962(d) does not require the commission of an overt act. Salinas v. U.S., 522 U.S. 52, 64, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997). "A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." Id. at 65. The conspirator need not commit or agree to commit the two predicate acts, but rather, must know of and agree to facilitate the racketeering scheme. Id. at 65-66. See also U.S. v. Zichettello, 208 F.3d 72, 99 (2d Cir.2000) ("[W]e need inquire only whether an alleged conspirator knew what the other conspirators 'were up to' or whether the situation would logically lead an alleged conspirator 'to suspect he was part of a larger enterprise.' ") (quoting United States v. Viola, 35 F.3d 37, 44-45 (2d Cir.1994)), cert. denied, 531 U.S. 1143, 121 S.Ct. 1077, 148 L.Ed.2d 954 (2001). As described by Judge Sweet, "in order to establish a violation of § 1962(d), the Supreme Court has held that a conspirator must intend to further an endeavor which, if completed, would satisfy all the elements of a substantive criminal offense.... In other words, a RICO conspiracy claim cannot stand where, as here, the elements of the substantive RICO provisions are not met." Citadel Mgt., Inc. v. Telesis Trust, Inc., 123 F.Supp.2d 133, 156 (S.D.N.Y.2000) (internal citations and quotation marks omitted; ellipses in original).

*5 The 3d AC endeavors to fit the defendants' conduct into two different predicate offenses. The first is commercial bribe receiving in the first degree, a felony defined by New York Penal Law § 180.08. [FN2] (3d AC ¶ 49) Under section 180.08, "[a] person is guilty of first-degree commercial bribe receiving where, without his employer's consent, he agrees to accept a benefit exceeding $1,000 from a third party in exchange for influencing the employer's conduct, and thereby causes the employer to suffer a loss exceeding $250." In re Lulkin, 692 N.Y.S.2d 338, 340, 258 A.D.2d 209, 210 (1st Dep't 1999) (per curiam).

[5] Defendants argue that plaintiff cannot establish the economic harm required to prove first-degree commercial bribery, and contend that it has offered no evidence that Rolex suffered economic harm from the conduct of Mazzeo and Brill. In People v. Wolf, 98 N.Y.2d 105, 110, 772 N.E.2d 1124, 1127, 745 N.Y.S.2d 766, 769 (2002), the New York Court of Appeals stated that "the felony commercial bribery legislation requires proof of concrete economic loss suffered by the bribe receiver's employer, which would not have been incurred in the absence of the corrupt arrangement." (emphasis added).

Plaintiff's theory of the case is that Mazzeo and Brill sought under-the-table compensation in exchange for supplying Maddaloni Jewelers with certain desirable pieces of Rolex inventory. However, it does not necessarily follow that Rolex would suffer a loss if the inventory were directed by Mazzeo from one retailer of Rolex's products to another. In opposition, plaintiff argues, in a wholly conclusory fashion, that "[a]s Rolex's profit from the sale to Maddaloni of a single Rolex watch may be in the thousands of dollars, there is no question that Rolex suffered at least $250 in economic harm as a result of the scheme." [FN3] (Plaintiff's Mem. at 9)

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Plaintiff directs the Court to no facts or expert analysis that supports a loss of at least $250 to Rolex, or to any evidence as fundamental to this argument as Rolex's profits on any given sale by Maddaloni Jewelers. Plaintiff asserts that "[t]he conduct of the individual defendants caused at least $250 in economic harm to Rolex, represented by the lost sales of watches to Maddaloni," and for support, cites generally to "sales documentation produced by Maddaloni and Rolex during discovery." (Plaintiff's Statement of Disputed Facts ¶ 17) This sales documentation was not included as part of the evidence submitted by either party on this motion. Plaintiff is wholly silent as to the contents of this sales documentation, and how it supports a theory of loss by Rolex. This is not the evidence of concrete economic loss required by New York law, and it fails to "set forth specific facts showing that there is a genuine issue for trial." Rule 56(e) (emphasis added). I therefore conclude that plaintiff has raised no triable issues of fact as to any violation of section 180.08.

*6 [6] The plaintiff also argues that the facts can be viewed as constituting the predicate offense of extortion and/or attempted extortion under the Hobbs Act, 18 U.S.C. § 1951. (3d AC ¶ 50) The Hobbs Act states in relevant part:
(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.
(b) As used in this section-
...
(2) the term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.
18 U.S.C. § 1951. Under the Hobbs Act, "if the context of the alleged extortion is outside the realm of labor disputes, then there is extortion under the Hobbs Act whenever property is obtained by 'inherently wrongful means' regardless of whether or not defendant has a lawful claim to the property." Viacom Int'l Inc. v. Icahn, 747 F.Supp. 205, 210 n. 5 (S.D.N.Y.1990). "Extortion through threats of economic loss falls within the Hobbs Act's prohibitions. Extortion may therefore be established on a theory that activities amounted to extortion by wrongful use of fear of economic loss." DeFalco v. Bernas, 244 F.3d 286, 313 (2d Cir.) (internal citations omitted), cert. denied, 534 U.S. 891, 122 S.Ct. 207, 151 L.Ed.2d 147 (2001). For instance, the Second Circuit has found a violation of the Hobbs Act when a defendant inspires fear in a victim, therein prompting the victim to pay $1,000 to remain in competition for a subcontract. See U.S. v. Brecht, 540 F.2d 45, 51-52 (2d Cir.1976).

[7] Based on the record before me, I conclude that the plaintiff makes out a prima facie case that Mazzeo committed a single violation of the Hobbs Act. The plaintiff directs the Court to a series of events that culminated in an alleged payment by Lou Maddaloni to Mazzeo. In January 1999, Rolex hosted a brunch at Tavern on the Green in Central Park, which Lou Maddaloni attended. (Lou Maddaloni Dep. at 350; Maddaloni Affidavit ¶ 26) While there, he was approached by Mazzeo, who gave him "a big hug." (Lou Maddaloni Dep. at 353) At that point in time, although Mazzeo had been relocated to New Jersey and Maddaloni Jewelers was under the oversight of a new regional sales manager, Lou Maddaloni believed that Mazzeo was influential in determining the quantity and selection of Rolex products available to Maddaloni Jewelers. (Maddaloni Affidavit ¶ 26; 3d AC ¶ 28) At his deposition, Maddaloni testified that:
... Larry [Mazzeo] and I went out of that room where all the people were. We went into a small hallway where there was no one.... I said to him that I am not getting any product and the only thing that I knew that I had to do to get the product was to give him an envelope. And when I did, he put it in his pocket, he tapped it and he said to me it feels like 1.3 million. [FN4]
*7 (Lou Maddaloni Dep. at 353) The envelope contained $2,500 in cash. (Mazzeo Dep. at 354)

This "arrangement," according to Lou Maddaloni, had its origins in previous meetings between he and Mazzeo at an establishment called PG Steakhouse, as well as in at least one phone call, possibly made in May 1998. (Lou Maddaloni Dep. at 354-55) Plaintiff states that after Mazzeo become Rolex's regional sales manager, there were "at least four occasions" when Mazzeo and Maddaloni visited PG Steakhouse, at which points Mazzeo uttered statements that Maddaloni interpreted as demands

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



2004 WL 3015287  
(Cite as: 2004 WL 3015287, *7 (S.D.N.Y.))

Page 159

for payment. (Maddaloni Affidavit ¶ 11) At one of the PG Steakhouse meetings, in the spring or summer of 1997, Mazzeo "had started a conversation while we were having our luncheon and it went wrong when he started to indicate that he has the power to direct the product, the Rolex watches, and I have the money, and if I were to take care of him he would take care of me." (Lou Maddaloni Dep. at 287) In a second meeting at PG Steakhouse, Mazzeo said to Maddaloni, " 'you take care of me and I will take care of you. I have the power to get the product. You got the money, I got the product." ' (Lou Maddaloni Dep. at 302) In reaction to Mazzeo's utterances, Maddaloni testified: "I was scared. I was petrified to hear this going on in a business like this." (Lou Maddaloni Dep. at 303)

Plaintiff also points to economic pressure that arose following Mazzeo's solicitation of bribes. After the PG Steakhouse meetings, Maddaloni experienced delays in receiving Rolex products, refusals by Rolex to provide its most desirable products, limits on advertising and promotional support, and denial of access to Rolex's customer service department. (Maddaloni Affidavit ¶ 13) Following a meeting with Brill in 1997, Maddaloni believed that Brill was punishing the plaintiff for not participating "in the bribery and extortion scheme ..." (Maddaloni Affidavit ¶ 18) Plaintiff contends that from 1997 until 2002, Rolex delayed filling Maddaloni Jewelers's orders, leading customers to place Rolex orders through other retailers, presumably those that complied with the defendants' payment scheme. (Maddaloni Affidavit ¶ 20)

Plaintiff also directs the Court to portions of the deposition of Laura Maddaloni. Plaintiff argues that Ms. Maddaloni's testimony provided evidence of "an overall scheme" of extortion. (Transcript, Dec. 10, 2004, at 31) Ms. Maddaloni testified "that Allen Brill wanted to destroy my business in God's honest truth. That's what he did." (Deposition of Laura Maddaloni ("Laura Maddaloni Dep.") at 179) Ms. Maddaloni further testified:
> Destroyed my business. I had customers coming in to purchase watches that I couldn't get, that Tourneau had, that London had, in two days, that I was told six months, two years, three years that I had to wait for. Friends. Friends of mine that I became friendly with couldn't get a watch from me.

(Laura Maddaloni Dep. at 180)

*8 [8] Defendants argue that even if the payment from Maddaloni Jewelers to Mazzeo constitutes a completed act of extortion under 18 U.S.C. § 1951(b)(2), it is a single act insufficient to constitute the pattern of racketeering as defined by 18 U.S.C. § 1961(5), which requires a pattern of at least two acts of racketeering committed within ten years of one another.

[9] In response, plaintiff argues that there were several attempts at extortion and argues that these attempts constitute the multiple predicate acts. Plaintiff asserted at oral argument that it established that each of these conversations constituted a separate predicate act and that together they established a pattern of racketeering activity because "the predicate acts are comprised of the solicitation of a bribe by Mr. Mazzeo on repeated occasions." (Transcript, Dec. 10, 2004, at 7) True, two separate attempts to commit extortion in violation of the Hobbs Act may suffice to establish the pattern, and an attempt and a completed act of extortion may constitute the two predicate acts. However, a completed act of extortion along with the intermediate steps toward completion of that act constitute one predicate act, not multiple distinct attempts. In United States v. York, 578 F.2d 1036 (5th Cir.), cert. denied, 439 U.S. 1005, 99 S.Ct. 619, 58 L.Ed.2d 682 (1978), the Fifth Circuit canvassed the common-law origins of the concept of an attempt to commit a crime as a separate offense and considered whether the government was required to prove failure as a necessary element of an attempt. It concluded that completion of the act was not a defense, and that both the attempt to complete an act and the completed act could not support two separate convictions, because "[t]he attempt is an offense included in the completed crime, and, therefore, cannot support a separate conviction and sentence." Id. at 1040. Here, conversations between Maddaloni and Mazzeo led Maddaloni to finally realize that he was being shaken down for a bribe, which he then paid. Mazzeo's efforts to bring Maddaloni to that realization, which culminated in payment, constituted a single criminal act. See U.S. v. Bicaksiz, 194 F.3d 390, 395 n. 7 (2nd Cir.1999), cert. denied, 588 U.S. 1161 (2000) ( "[T]he [Hobbs Act] Amendments dealt with attempt and substantive offenses in separate paragraphs, even though a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



2004 WL 3015287                                                                                         Page 160
(Cite as: 2004 WL 3015287, *8 (S.D.N.Y.))

defendant cannot be convicted of both attempt and a substantive offense, let alone be punished for both.") (dictum).

Judge Lynch reached a similar conclusion in Linens of Europe, Inc. v. Best Manufacturing, Inc., 2004 WL 2071689, at *16 (S.D.N.Y. Sept.16, 2004). There, the plaintiff brought a RICO conspiracy claim in a complaint that included a "laundry list of incidents" alleged to establish the requisite predicate acts. Id. at *15. Defendants moved to dismiss under Rule 12(b)(6), Fed.R.Civ.P. Id. at *4. Plaintiff cited to several of defendants' actions as evidence of Hobbs Act violations. Id. at *16. Plaintiff alleged that defendants repeatedly threatened one of plaintiff's officers, sent "a group of thugs" to assault him, and threatened plaintiff with further harm if it refused to sell itself. Id. Linens of Europe concluded that the allegations of extortion constituted, "at best, a single act of attempted extortion, not a pattern of two or more such acts." Id. The court observed that "multiple acts in furtherance of a single extortion episode constitute only a single predicate act of attempted extortion, not a pattern of two or more predicate acts." Id. (emphasis in original). As Linens of Europe noted, this approach to attempted extortion under the Hobbs Act--as well as RICO's pattern requirement--is thoroughly grounded in the law of this and other Circuits. Id. at *16 (citing, inter alia, McLaughlin v. Anderson, 962 F.2d 187, 194 (2d Cir.1992) ("several acts" were "[a]t best ... examples of [defendant's] 'making good' on his threat" and support "only a single predicate act of attempted extortion"); Tellis v. United States Fidelity & Guaranty Co., 826 F.2d 477, 478 (7th Cir.1986) ("[M]ultiple acts of mail fraud in furtherance of a single episode of fraud involving one victim and relating to one basic transaction cannot constitute the necessary pattern [under RICO].")).

*9 Similarly, Andrea Doreen Ltd. v. Building Material Local Union 282, 299 F.Supp.2d 129, 154 (E.D.N.Y.2004), held that the defendants' repeated bribery requests as part of a "shakedown" constituted only a single predicate RICO act. In Andrea Doreen, the plaintiff did not respond to the defendants' "first shakedown," after which the defendants revised their bribery demand. Id. The court found that the defendants' repeated shakedown attempts occurred as part of a single scheme and not as multiple predicate acts for RICO purposes. Id.

Linens of Europe and Andrea Doreen are consistent with the Second Circuit's oft-stated admonition that courts should guard against the meritless fragmentation of a single predicate act into multiple acts for the mere purpose of pursuing a RICO claim. See Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 98 (2d Cir.1997) (in context of RICO continuity analysis, noting that "courts must take care to ensure that the plaintiff is not artificially fragmenting a singular act into multiple acts simply to invoke RICO."); U.S. v. Indelicato, 865 F.2d 1370, 1383 (2d Cir .) (en banc) (noting in dictum that the Second Circuit would "disapprove any attempt by the government or a private plaintiff to go beyond Congress's intent and fragment an act that plainly is unitary into multiple acts in order to invoke RICO ..."), cert. denied, 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989).

Defendants have demonstrated that the evidence, when viewed in the light most favorable to the plaintiff, can support only one predicate act, and the plaintiff has failed to raise a triable issue of fact as to the existence of two or more predicate acts within ten years. [FN5] Maddaloni Jewelers attempted to raise a triable issue by inviting the Court to examine all of Lou Maddaloni's 943-page deposition and the Maddaloni Affidavit on the premise that "[t]he record is replete with facts that support acts of extortion and attempted extortion under the Hobbs Act." (Plaintiff's Mem. in Opposition at 11) The Court granted the plaintiff more than ample opportunity--both in its written submissions and at oral argument--to point to specific conduct showing that the defendants committed a separate predicate act, such as a distinct attempt at extortion. Yet plaintiff has failed to come forward with "specific facts showing that there is a genuine issue for trial," Rule 56(e), and offers nothing more than "metaphysical doubt as to the material facts." Powell, 364 F.3d at 84. Fully crediting the truth of the testimony in the depositions of both Laura Maddaloni and Lou Maddaloni, the plaintiff fails to offer evidence of a second predicate act--either of extortion or of criminal bribe receiving--necessary to establish a pattern of racketeering activity. Because a single predicate act cannot constitute a pattern of racketeering activity under RICO, plaintiff's RICO claims are dismissed.

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



### 3. Plaintiff Fails to Offer Facts Supporting Antitrust Injury

**\*10** Maddaloni Jewelers alleges that Rolex violated sections 2(d) and 2(e) of the Robinson-Patman Act. Defendants move for summary judgment, arguing, inter alia, that plaintiff has failed to make out a case that it suffered antitrust injury. For the reasons explained below, I conclude that plaintiff has produced no triable issues of fact as to any antitrust injury, and grant the defendants summary judgment dismissing the Robinson-Patman Act claims.

I begin by considering the language and purpose of these two provisions. The Robinson-Patman Act "requires that each purchaser be given an 'equal opportunity' by the seller to receive the benefit of higher or lower prices," and subsections (d) and (e) "were designed to prohibit indirect price discrimination in the form of advertising and other promotional allowances made available to purchasers on disproportionate terms." George Haug Co. v. Rolls Royce Motor Cars Inc., 148 F.3d 136, 140, 144 (2d Cir.1998). The provisions reach "services or facilities that somehow aid the buyer in reselling the product, such as advertising, packaging, informational brochures, and the like." Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 2363e (2002). The Supreme Court has observed that the Robinson-Patman Act should be "construed liberally." Jefferson County Pharmaceutical Ass'n v. Abbott Labs., 460 U.S. 150, 159, 103 S.Ct. 1011, 74 L.Ed.2d 882 (1983); Abbott Labs. v. Portland Retail Druggists Ass'n, Inc., 425 U.S. 1, 11, 96 S.Ct. 1305, 47 L.Ed.2d 537 (1976).

Section 2(d) of the Robinson-Patman Act states:
It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.
15 U.S.C. § 13(d). In a section 2(d) violation, the purchaser (in this case, Maddaloni Jewelers) supplies the services or facilities, and the seller (in this case, Rolex) repays the purchaser. George Haug Co., 148 F.3d at 144. "Advertising allowances are lawful under Robinson-Patman Act § 2(d) when available on proportionally equal terms to all of a manufacturer's competing dealers." Phillip E. Areeda, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 1639g2B (2002). Section 2(e) of the Robinson-Patman Act states:
It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms.
**\*11** 15 U.S.C. § 13(e). In a section 2(e) violation, the seller directly provides the services and facilities for the use of the purchaser in facilitating product sales to the general public. George Haug Co., 148 F.3d at 144.

[10][11] The Robinson-Patman Act does not provide a private cause of action. Blue Tree Hotels Investment (Canada) Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 218 (2d Cir.2004). Rather, plaintiff's cause of action arises under section 4 of the Clayton Act, 15 U.S.C. § 15(a), which permits "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" to bring suit in federal district court. 15 U.S.C. § 15(a). To bring suit under the Clayton Act, a private litigant seeking treble damages must show antitrust injury. Blue Tree Hotels, 369 F.3d at 220.

[12] The Supreme Court has made clear that a plaintiff "must prove more than a violation" of the Robinson-Patman Act, and "must make some showing of actual injury." J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 562, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981). The "actual injury" caused by a violation is different from an injury to competition generally. See George Haug Co., 148 F.3d at 145. ("[N]o injury to competition

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



need be demonstrated" for claims under sections 2(d) or (e)). "While competitive injury concerns the potential effect certain conduct may have on 'competition generally' or 'on the business opportunities of a defined class of competitors,' the focus of 'antitrust injury' is on whether the challenged conduct has actually caused harm to the plaintiff." Blue Tree Hotels, 369 F.3d at 220 (internal citation omitted). The "actual injury" requirement is a component of the Clayton Act's definition of antitrust injury. J. Truett Payne, 451 U.S. at 557 (an antitrust injury is "an actual injury attributable to something the antitrust laws were designed to prevent."); see also Intimate Bookshop v. Barnes & Noble, Inc., 2003 WL 22251312, at *3 (S.D.N.Y. Sept.30, 2003) ("[I]f it is going to have standing to recover damages as a private plaintiff, [plaintiff must] demonstrate that it suffered actual injury to its business as a result of the price discrimination--the antitrust injury requirement."); Industrial Burner Systems, Inc. v. Maxon Corp., 275 F.Supp.2d 878, 889 (E.D.Mich.2003) (same).

[13] To establish an antitrust injury, a plaintiff must show (1) an injury in fact, (2) that was caused by the violation, and (3) that it is the type of injury contemplated by the statute. Id. The third criterion is satisfied if a plaintiff " 'makes some showing of actual injury attributable to something the antitrust laws were designed to prevent." ' Id. (quoting Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990)); see also George Haug Co., 148 F.3d at 140 ("It is hornbook law as cited hereinafter that anti-competitive injury need not be alleged to sustain a claim for violation of the Robinson-Patman Act; a price differential, direct or indirect, between secondary-line competitors is enough."); Stelwagon Mfg. Co. v. Tarmac Roofing Systems, Inc., 63 F.3d 1267, 1273-74 (3d Cir.1995), (Robinson-Patman plaintiff must show "some direct evidence" illustrating a causal link between discrimination and injury) (emphasis in original), cert. denied, 516 U.S. 1172, 116 S.Ct. 1264, 134 L.Ed.2d 212 (1996); Mathias v. Daily News, L.P., 152 F.Supp.2d 465, 478 (S.D.N.Y.2001) (to establish antitrust injury, "the harm must result from a competition-reducing aspect or effect of defendant's behavior, and it must flow from conduct that the antitrust laws clearly condemn.").

*12 [14] As evidence of antitrust injury, the plaintiff cites to the deposition testimony of Laura Maddaloni. Ms. Maddaloni testified that Maddaloni Jewelers "suffered greatly" as a result of Rolex's allegedly disproportionate promotional practices. (Laura Maddaloni Dep. at 56, attached at Def. 56.1 Ex. M) However, as evidence of antitrust injury, the plaintiff cites to deposition testimony that, generously construed, merely supports a finding of discriminatory conduct:

Q. Can you tell us what damages Maddaloni suffered as the result of disproportional promotional allowances?
A. Disproportional to what? Proportionate to what? Disproportionate to what?
Q. Compared with what your competitors received.
A. I don't know what my competitors received.
Q. Okay, thank you. So the answer is you cannot tell us the damages you suffered as a result of disproportional advertising allowances, is that correct?
A. I wouldn't be able to give you a number, because there is no number. It's severe. Disproportionate to my competitors? My treatment was severe, causing no monetary numbers to be put on it, as far as damages.
Q. When you found that you were not receiving the same type of advertising support as other jewelers, did you do anything to try to maintain your profitability?
A. I spent the money myself, because, you're going to call it disproportionate amount was due to the amount of watches being shipped to my jewelry store, so what you're going to get is a lower budget that Rolex is going to pay. I paid for it out of my pocket. Disproportionate to my competitors was the amount of product gotten, the amount of advertising dollars have to spend. That's disproportionate.
(Laura Maddaloni Dep. at 56-57)

[15][16] While exactitude is not required, sweeping, conclusory statements cannot suffice as evidence of antitrust injury. Moreover, as discussed below, out-of-pocket expenditures for advertising are not in and of themselves antitrust injuries. Plaintiffs other ostensible examples of antitrust injury are similarly unavailing. Ms. Maddaloni testified that Rolex did not allow the plaintiff to advertise a specific Rolex product (Laura Maddaloni Dep. at 10-13), that Rolex refused participation in plaintiff's store catalog (Laura Maddaloni Dep. at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



38-39), that Rolex's advertising staff refused to communicate with Maddaloni Jewelers (Laura Maddaloni Dep. at 39-41), and that she recalled seeing Thanksgiving-themed holiday sales displays set up by other area Rolex vendors. (Laura Maddaloni Dep. at 45-47) Laura Maddaloni's instances of perceived discrimination in Rolex's promotional support do not constitute antitrust injuries flowing from the discriminatory conduct. (Laura Maddaloni Dep. at 44-45) For instance, in regard to the allegedly discriminatory availability of the Rolex Thanksgiving display, Laura Maddaloni was unable to cite to any resulting injury:

> Q. Okay. What was the dollar amount of your damages that Maddaloni suffered as a result of not having the Thanksgiving display unit?
> *13 A. I don't have that information for you.
> Q. Is there anyplace you can get that information?
> A. Not--I would have to ask somebody else to get that information for you, an accountant or somebody. I don't know.
> Q. How many sales did Maddaloni Jewelers lose as a result of not having that display unit?
> A. Couldn't tell you.
> Q. Can anyone tell me?
> A. I'm sure somebody will be able to tell you.
> Q. And who is that?
> A. Maybe an accountant. I don't know.
> Q. What accountant?
> A. I don't know.

(Laura Maddaloni Dep. at 51-52)

Maddaloni Jewelers properly points out that it is not required to set forth " 'the kind of concrete, detailed proof of injury which is available in [non-antitrust] contexts." ' Hygrade Milk & Cream Co. v. Tropicana Products, Inc., 1996 WL 257581, at *16 (alteration in original) (quoting J. Truett Payne., 451 U.S. at 565). Nevertheless, Maddaloni Jewelers must come forth with some evidence of actual injury, as opposed to evidence of an underlying violation. George Haug Co., 148 F.3d at 145. The record before me is insufficient to raise a triable issue of fact as to whether the plaintiff suffered antitrust injury. Antitrust injury--as opposed to the underlying discriminatory conduct--is not measured by the estimated differential in promotional support or the out-of-pocket cost of a replacement, but by showing antitrust injury arising from lost sales, often caused by price differentials between the plaintiff and its competitors. See, e.g., Intimate Bookshop, 2003 WL 22251312, at *3 ("[A] plaintiff who has provided a violation under Section 2(a) or 2(f) must still establish 'antitrust injury' through some evidence of actual injury, usually in the form of lost sales or profits, and 'a causal connection between the price discrimination and the actual damage suffered' to support an award of damages.").

The Tenth Circuit in World of Sleep, Inc. v. La-Z-Boy Chair Co., 756 F.2d 1467, 1480 (10th Cir.), cert. denied, 474 U.S. 823 (1985), held that the plaintiff's Robinson-Patman section 2(e) claim should not have gone to a jury when plaintiff failed to show injury from advertising allotments that disproportionately favored a competitor. The Tenth Circuit found that the plaintiff had not established antitrust injury because it "presented no evidence that the allowance enabled favored competitors to lower their prices and divert sales, or that it had to lower its prices to an unprofitable level in response to such low prices.... Although [plaintiff] presented evidence that it paid more for La-Z-Boy chairs than did competitors who received the advertising allowance, this showing is not enough to establish injury in fact under the analysis of J. Truett Payne." Id. In addition, the court also was persuaded that the plaintiff's self-funded advertising was effective, which militated against finding injury arising out of disproportional promotional support. Id.

*14 In this District, Judge Scheindlin has granted summary judgment dismissing Robinson-Patman Act claims because the plaintiffs' evidence of antitrust injury was vague and speculative. Hygrade Milk, 1996 WL 257581, at *18. In Hygrade Milk, the plaintiffs were milk distributors that purchased the defendant's Tropicana-brand orange juice for resale to retailers. Id. at *1. Tropicana provided payments in return for retailers' Tropicana promotions. Id. at *13. Plaintiffs alleged that these programs were administered in a discriminatory fashion. Id. The court noted the plaintiffs' failure to offer evidence in support of antitrust injury:

> [Plaintiffs] do not name any significant accounts that they lost. They offer no direct evidence of lost profits. They offer no expert testimony of lost sales. Other than Plaintiffs' generalized assertions, their evidence of injury consists of declarations from former bodega customers.... Plaintiffs must prove ... that any losses they suffered were caused by Tropicana's alleged discrimination.... In order to recover damages Plaintiffs must show that they



2004 WL 3015287  
(Cite as: 2004 WL 3015287, *14 (S.D.N.Y.))

Page 164

actually suffered an injury, not merely that there is a reasonable likelihood of injury. At best, the bodega owners' belief that their sales were affected suggests that Plaintiffs might have suffered an injury. Significantly, bodega owners offer no evidence that they themselves suffered any lost sales.

Id. (internal citation omitted). Maddaloni Jewelers's evidence of antitrust injury is no more concrete than the evidence that precipitated the dismissals in Hygrade Milk.

The facts offered by the single successful Hygrade plaintiff included proof of a 68 percent decline in sales, customer declarations showing that the plaintiff lost their business, and evidence from a chain store client showing that the price differences between plaintiff's products and those of the plaintiff's competitor prompted the client not to purchase Tropicana products from the plaintiff. Id. Judge Scheindlin held that the successful plaintiff set forth "considerable evidence" that defendant did not proportionally distribute promotional resources, that plaintiff's injury was "substantial," and that a jury could find that the discriminatory promotional programs were "a material cause" of injury. Id. at *17. While the facts sufficient to defeat a summary judgment motion will necessarily vary from case to case, plaintiff has set forth no comparable evidence, and cites principally to the testimony of Laura Maddaloni, who was unable to describe any injury caused by Rolex's allegedly disproportional implementation of its promotional plans.

While it forms no basis for my ruling in the summary judgment context, I note the tension between plaintiff's RICO theory and its theory on its section (d) and (e) claims. For RICO purposes, plaintiff portrays Rolex watches as a scarce commodity. The clear implication on the RICO claim is that if plaintiff had only received its fair quantity of this scarce merchandise, it would have sold the products to customers who actively sought them. But for Robinson-Patman purposes, plaintiff assumes that it had a supply of product but inadequate (or at least, discriminatory) promotional support, which impeded its ability to make sales. The point is simply that plaintiff cannot supplant evidence of antitrust injury with surmise and supposition.

*15 Maddaloni Jewelers has failed to raise a triable issue of fact as to the existence of antitrust injury caused by a violation of section 2(d) or 2(e). As such, its Robinson-Patman Act claim is dismissed.

4. Supplemental Jurisdiction

In addition to moving for summary judgment on the two federal causes of action, defendants move to dismiss plaintiff's claims for tortious interference with business relations and breach of the covenant of good faith and fair dealing. I do not reach those issues, however, because this Court declines to exercise supplemental jurisdiction over these remaining state-law claims.

[17] The RICO and Robinson-Patman claims, over which this Court had original jurisdiction, are now dismissed. The New York citizenship of plaintiff and Rolex preclude an assertion of diversity jurisdiction. Therefore, the only basis for the Court's continued jurisdiction is supplemental jurisdiction. Section 1367 of Title 28 of the United States Code governs the Court's exercise of supplemental jurisdiction and states in relevant part:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a). Section 1367(c)(3) states that a district court "may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... the district court has dismissed all claims over which it has original jurisdiction ..."

[18] Although section 1367(c)(3) is couched in permissive terms, the Second Circuit has made clear that the Court's discretion "is not boundless." Valencia ex rel. Franco v. Lee, 316 F.3d 299, 302 (2d Cir.2003). In Valencia, the Second Circuit held that the district court abused its discretion by exercising jurisdiction over a state-law claim following summary judgment dismissing the plaintiffs' federal claims. Id. at 307-08. At the time the federal claims were dismissed, "most of the anticipated pretrial discovery had been completed,"

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



2004 WL 3015287
(Cite as: 2004 WL 3015287, *15 (S.D.N.Y.))

Page 165

no judicial opinions had issued, and the case was not yet trial-ready. Id. at 306. "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine--judicial economy, convenience, fairness, and comity--will point toward declining to exercise jurisdiction over the remaining state-law claims." Id. at 305. Instances where the Second Circuit deemed it proper to retain supplemental jurisdiction over state-law claims include actions that implicate preemption issues; state-law claims that remain when federal claims are voluntarily dismissed days before the scheduled start of trial; and state-law claims that remain after the District Court considered three dispositive motions. Id. at 306. See also Arthur Glick Truck Sales, Inc. v. H.O. Penn Machinery Co., 332 F.Supp.2d 584, 586 (S.D.N.Y.2004) (plaintiff's voluntary dismissal of single federal claim warranted remand to state court for lack of supplemental jurisdiction over the remaining state-law claims); Den Hollander v. Flash Dancers Topless Club, 340 F.Supp.2d 453, 463 (S.D.N.Y.2004) (dismissing state law claims following dismissal of RICO claim, and noting that "[w]hile district courts are capable and are bound to apply the state law to claims, '[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring them a surer-footed reading of applicable law." ') (quoting New York v. Niagara Mohawk Power Corp., 263 F.Supp.2d 650, 670 (W.D.N.Y.2003)).

*16 Two state-law claims remain in this action: one alleging that the defendants tortiously interfered with Maddaloni Jewelers's prospective business relations, and one alleging that the defendants breached a covenant of good faith and fair dealing implicit in the ORJ Agreement. I have examined defendants' summary judgment motion on the two claims that turn entirely on interpretation of New York law. While defendants view their arguments as calling for a straightforward application of settled principles, I conclude that plaintiff's opposition may require a court to test the reaches of these common-law claims. For example, while I have found that the plaintiff has failed to raise a triable issue of fact as to RICO's requirement of a pattern of racketeering activity, I have also found that plaintiff has made out a prima facie case of a single act of extortion. Comity dictates that a New York court consider whether these common law theories encompass (or should be stretched to encompass) the facts present here. Accordingly, I decline to exercise supplemental jurisdiction.

[19] Here, another factor--but by no means a determinative one--is that declining to exercise supplemental jurisdiction honors the plaintiff's original choice of forum. Indeed, when a district court declines to exercise jurisdiction over state-law claims in a removed case, the Court may either remand or dismiss the state-law claims. Travelers Ins. Co. v. Keeling, 996 F.2d 1485, 1490 (2d Cir.1993) (affirming remand of state-law claims that remained after dismissal of federal claims); Santiago ex rel. Muniz v. Hernandez, 53 F.Supp.2d 264, 273-74 (E.D.N.Y.1999) (collecting cases). Because this case originated in state court and was removed to federal court, I remand the claims for tortious interference and breach of the covenant of good faith and fair dealing to state court.

Conclusion

Plaintiff's RICO and Robinson-Patman Act claims are dismissed. The case is otherwise remanded to the Supreme Court, New York County.

SO ORDERED.

> FN1. In the submissions before me, Mr. Maddaloni is variously identified as Luigi Maddaloni, Louis Maddaloni, and Lou Maddaloni. I refer to him as Lou Maddaloni based on the prevailing usage in the plaintiff's opposition papers, and the need to distinguish him from both the plaintiff and Laura Maddaloni, whose deposition testimony is cited herein.
>
> FN2. N.Y. Penal L. § 180.08 states: "An employee, agent or fiduciary is guilty of commercial bribe receiving in the first degree when, without the consent of his employer or principal, he solicits, accepts or agrees to accept any benefit from another person upon an agreement or understanding that such benefit will influence his conduct in relation to his employer's or principal's affairs, and when the value of the benefit solicited, accepted or agreed to be accepted exceeds one thousand dollars and causes economic harm to the employer or principal in an amount exceeding two hundred fifty dollars."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



2004 WL 3015287  
(Cite as: 2004 WL 3015287, *16 (S.D.N.Y.))

Page 166

FN3. Plaintiff's counsel speculated at oral argument that its customers sometimes purchased vintage or used Rolexes, therein depriving Rolex of the proceeds it would have received from the sales of new watches. (Transcript, Dec. 10, 2004, at 5-6) The speculation does not address whether the same number of new Rolex watches would have been sold, albeit by different retailers.

FN4. In his affidavit, Mr. Maddaloni states that Mazzeo said, "it [the money] feels like you'll be getting 1.3 million in product this year." (Maddaloni Affidavit ¶ 26) Although not material to the disposition of the summary judgment motion, Mazzeo denies that the encounter took place. (Deposition of Lawrence Mazzeo, Nov. 3, 2003, at 229-30, attached at Def. 56.1 Ex. I)

FN5. Assuming arguendo that Maddaloni Jewelers had proffered evidence that Rolex suffered the requisite monetary loss, and, hence, that the conduct violated N.Y. Penal Law § 180.08, plaintiff nevertheless would have failed to establish two distinct predicate acts. See Polycast Technology Corp. v. Uniroyal, Inc., 728 F.Supp. 926, 945 (S.D.N.Y.1989) (a single misrepresentation that violated two securities laws established only a single predicate act for RICO purposes) (citing U.S. v. Walgren, 885 F.2d 1417 (9th Cir.1989); U.S. v. Kragness, 830 F.2d 842, 861 (8th Cir.1987)).

2004 WL 3015287 (S.D.N.Y.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

