Not Reported in F.Supp.  
1993-1 Trade Cases P 70,145, RICO Bus.Disp.Guide 8238  
(Cite as: 1993 WL 23758 (N.D.Ill.))  
<KeyCite Yellow Flag>

Page 197

United States District Court, N.D. Illinois, Eastern Division.

MIYANO MACHINERY USA, INC., Plaintiff,  
v.  
Dusan ZONAR, L & D Machinery, Inc., Myotec Machinery, Inc., Donald M. Lasser, and William Fischer, Defendants.  
Richard Midland, Cross-defendant.  
William Fischer, Deponent.  
Dusan ZONAR, Cross-claimant,  
v.  
MYOTEC MACHINERY, INC. and Miyano Machinery USA, Inc., Cross-defendants.

No. 92 C 2385.

Jan. 29, 1993.

MEMORANDUM OPINION AND ORDER

HART, District Judge.

*1 Plaintiff, Miyano Machinery USA, Inc. ("Miyano Machinery"), is an Illinois corporation with its principal place of business in Wood Dale, Illinois. Miyano Machinery manufactures machine tools and related products for sale throughout the United States. Miyano Machinery sells its products through a network of distributors appointed by Miyano Machinery. Defendant, William F. Fischer, Jr., was Miyano Machinery's Marketing and Sales Manager until late in 1991.

Richard Midland was the owner/operator of a company called Midland Machinery, Inc., Miyano Machinery's distributor in Wisconsin. According to Miyano Machinery, Fischer became aware of Midland's desire to expand his Miyano Machinery distribution responsibilities. Fischer also learned that Miyano's southern California distributor, L & D Machinery, Inc. ("L & D"), wished to terminate its distributorship. L & D was owned and operated by Dusan Zonar. According to plaintiff, Fischer and Zonar conspired to sell the L & D distributorship for southern California to a newly-formed distribution company called Myotec Machinery, Inc. ("Myotec"), owned by Midland.

In the transaction, L & D relinquished its distributorship for southern California to Myotec. The payoff for Zonar came in the form of "consulting" payments from Myotec to Zonar and Zonar's covenant not to compete. Zonar was to be paid $1.5 million in five installments. Fischer was to receive twenty-five percent of the payments received by Zonar. Fischer and Zonar ensured payment from Myotec by requiring that Myotec pay all amounts owed to Miyano Machinery for machinery purchases through Zonar. Additionally, the transaction provided for Zonar to be appointed distributor by Miyano Machinery in the event of a default and termination of Myotec.

After several payments to Zonar, Myotec had difficulty keeping-up and eventually relinquished the distributorship in April 1992, citing differences with Zonar. Fischer had been fired in December 1991. Zonar then demanded to be reappointed distributor by Miyano and Miyano first learned of the agreements. Miyano Machinery sued Zonar, Zonar's company, L & D, their lawyer, Donald Lasser, [FN1] Myotec and Fischer. Miyano claims violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), as amended, 18 U.S.C. §§ 1961-1968, illegal kickbacks in violation of the Robinson-Patman Antidiscrimination Act, 15 U.S.C. § 13(c), common-law fraud and breach of fiduciary duty. Defendants Fischer, Zonar and L & D move to dismiss plaintiff's amended complaint. On such motions, all well-pleaded allegations of the amended complaint are assumed to be true and all reasonable inferences from the facts alleged are drawn in favor of plaintiff. Gomez v. Illinois State Bd. of Ed., 811 F.2d 1030, 1039 (7th Cir.1987). The motion will be granted only if defendant can demonstrate that the facts alleged cannot support a claim. Id. at 1039-40.

A violation of § 1962(c) of RICO requires conduct of an enterprise through a pattern of racketeering activity. Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496 (1985). Plaintiff's amended complaint alleges that Miyano Machinery, L & D and Myotec each constitute an "enterprise" as defined under RICO, 18 U.S.C. § 1961(4). The allegation that Zonar and Fischer's collusion, and the organizations through which they are alleged to have operated, constituted "enterprises" for RICO purposes is sufficient. See Jennings v. Emry, 910

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.  
(Cite as: 1993 WL 23758, *1 (N.D.Ill.))

Page 198

F.2d 1434, 1440 (7th Cir.1990) (enterprise requires ongoing structure of persons associated through time, joined in purpose, and organized for hierarchial or consensual decision-making). Since defendants do not argue lack of an enterprise as a basis for their motions to dismiss, it is assumed the amended complaint sufficiently pleads the existence of a RICO enterprise.

*2 The more difficult question is whether the activity of defendants constituted "a pattern of racketeering activity." H.J., Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229 (1989); United States Textiles, Inc. v. Anheuser-Busch Cos., Inc., 911 F.2d 1261, 1269 (7th Cir.1990). In H.J., the Supreme Court reaffirmed the validity of its holding in Sedima, that besides showing a number of predicate acts, a plaintiff must show that the acts are related and that they amount to, or threaten continuing criminal activity. H.J., 492 U.S. at 239.

The RICO statute defines the predicate acts of "racketeering activity" as any one of several federal or state offenses, including wire and mail fraud. 18 U.S.C. § 1961(1); Hartz v. Friedman, 919 F.2d 469, 472 (7th Cir.1990). The amended complaint alleges a number of instances of fraud by mail, 18 U.S.C. § 1341, and wire, 18 U.S.C. § 1343, constituting predicate acts. See Midwest Grinding Co., Inc. v. Spitz, 976 F.2d 1016, 1021 (7th Cir.1992) (discussing predicate acts under RICO). Plaintiff alleges these predicate acts were in furtherance of a number of fraudulent schemes.

In the instant case, defendants do not dispute that plaintiff's claim sufficiently alleges a relationship between the alleged racketeering acts and the defendants' fraudulent scheme or schemes. Shields Enterprises, Inc. v. First Chicago Corp., 975 F.2d 1290, 1295 (7th Cir.1992). In fact, defendants argue that all the predicate acts relate to just one scheme that does not constitute a pattern under RICO. As in Shields, and most RICO cases, "[t]he question here is continuity," id., "a rather amorphous concept," Anheuser-Busch, 911 F.2d at 1267.

The Seventh Circuit "does not look favorably on relying on many instances of mail and wire fraud to form a pattern." Hartz, 919 F.2d at 473 (citing Lipin Enterprises, Inc. v. Lee, 803 F.2d 322 (7th Cir.1986)). Mail and wire fraud are "perhaps unique" as predicate acts in that a multiplicity of such acts "may be no indication of the requisite continuity of the underlying fraudulent activity." Id. (quoting Lipin, 803 F.2d at 325 (Cudahy, J., concurring)). However, plaintiff alleges that defendants' fraudulent activities, furthered by the predicate acts of mail and wire fraud, constituted not one, but several distinct schemes satisfying the continuity requirement under RICO. See Shields, 975 F.2d at 1295. Defendants argue that plaintiff has alleged, at most, ordinary business fraud involving one, complex scheme. [FN2]

"Continuity [the threat of continued criminal activity] is 'both a closed-and open-ended concept.' " Midwest Grinding, 976 F.2d at 1022 (quoting H.J.). In a closed-ended situation, a plaintiff must allege a series of related predicates existing over a "substantial period of time" such that "the duration and repetition of the [crime] carries with it an implicit threat of continued criminal activity in the future." Id. at 1022-23.

*3 By contrast, an open-ended period of racketeering, lacking the duration and repetition establishing continuity in itself, may nonetheless satisfy the continuity requirement if that past conduct "by its nature projects into the future with a threat of repetition." Id. at 1023 (quoting H.J., 492 U.S. at 242-43). The Seventh Circuit has summarized the distinction, holding that a plaintiff must either prove "a closed-ended conspiracy that existed for such an extended period of time that a threat of future harm is implicit, or ... an open-ended conspiracy that, while short-lived, shows clear signs of threatening to continue into the future." Id. at 1023. In applying these principles, it must be kept in mind that "Congress was concerned in RICO with long-term criminal conduct." Shields, 975 F.2d at 1295 (citing H.J., 492 U.S. at 242). To that end, Congress intended a natural and common sense approach to RICO's pattern element. Anheuser-Busch, 911 F.2d at 1267 (citing H.J.).

Since H.J., the Seventh Circuit has decided many cases dealing with the continuity requirement under civil RICO. See cases collected in Shields, 975 F.2d at 1295. And until Shields, the Seventh Circuit had not found a RICO pattern in any of those cases. In Shields, a majority stockholder had allegedly tried to dilute the minority shareholders'

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.  
(Cite as: 1993 WL 23758, *3 (N.D.Ill.))

Page 199

position by issuing stock at below market value and forcing an equity infusion. The majority also allegedly prevented one minority shareholder from selling shares to another minority shareholder and then allegedly forced a sale of the company against the wishes of a minority shareholder. The Seventh Circuit, in distinguishing Shields from precedent, noted that two separate schemes were involved: a forced capital contribution and a forced sale of the company. Id. at 1295. These two schemes encompassed three different predicate episodes of alleged extortion. Id. Finding a RICO pattern existed, the court rejected defendant's argument that only one scheme, the extortion and coercion of the minority shareholders, was involved. Id. The Shields court went on to note that the presence of two separate schemes does not invariably mean that a pattern exists. Id. at 1296 (citing Hartz, 919 F.2d at 472-73).

In Hartz, plaintiffs alleged a scheme by their attorneys to conceal an error that resulted in an award of costs and another scheme to demand advance money for expenses the attorneys did not intend to incur. 919 F.2d at 473. The Hartz court applied the four "pattern" factors, originally announced in Morgan v. Bank of Waukegan, 804 F.2d 970, 975 (7th Cir.1986), which the court consistently applied prior to H.J., and has applied since. Hartz, 919 F.2d at 472-74. Those four factors are: (1) the number and variety of predicate acts and the length of time over which they were committed; (2) the number of victims; (3) the presence of separate schemes; and (4) the occurrence of distinct injuries. Id. at 472. After considering the four Morgan factors, the Hartz court determined that neither a relationship nor continuity existed among the predicate acts necessary to form a RICO pattern. Id. at 474.

*4 By contrast, the Seventh Circuit did not expressly mention the four Morgan factors in its analysis in Shields. The Shields court held that two separate schemes could be found by a reasonable jury and rejected defendant's argument that the alleged extortion was not a pattern in that it only occurred three times during a closed, eight-month relationship. 975 F.2d at 1296. The Seventh Circuit particularly noted that whenever the minority shareholders stood in the way of the majority, the majority allegedly "turned to extortion to accomplish its goal." Id. This, the court held, constitutes a RICO pattern, even in "common parlance," in that the predicate acts are a "regular way ... of conducting or participating in an ongoing and legitimate RICO enterprise." Id. (quoting H.J., 492 U.S. at 243).

In the instant case, defendants argue that application of the Morgan factors yields no pattern of racketeering. They argue that the predicate acts of mail and wire fraud lack any variety. Plaintiff relies exclusively on predicate acts of mail and wire fraud which do not indicate continuity. Hartz, 919 F.2d at 473. As in Anheuser-Busch, "each allegation of mail fraud and wire fraud apparently relates back to the [fraud] allegedly achieved by the ... contract. Indeed the economic injury which [the plaintiff] alleges, although it may have been felt over the course of the two years immediately following the contract, stems from and was complete at the time of the [fraudulent transaction]." 911 F.2d at 1268. The Anheuser-Busch court believed that under these circumstances, the raw number of transactions and the length of time over which those transactions occurred was pure happenstance in light of the underlying concern which is the "continuity" of criminal activity. Id. Such is the case here.

The fact that the predicate acts are all mail or wire fraud is not dispositive of continuity. See Liquid Air Corp. v. Rogers, 834 F.2d 1297 (7th Cir.1987) (nineteen acts of mail fraud sufficient); Morgan, 804 F.2d 970 (several acts of mail fraud sufficient); Illinois Dept. of Revenue v. Phillips, 771 F.2d 312 (7th Cir.1985) (nine acts of mail fraud sufficient). Miyano Machinery's amended complaint also relies on what it considers several individual schemes, and the fact that the racketeering activity is alleged to have taken place over more than two years, to satisfy the continuity requirement.

Applying the second factor, defendants argue that the only victim is Miyano Machinery. Defendants argue that the amended complaint fails to allege a fraud on Myotec and, at best, indicates concealment of the agreement between Zonar and Fischer from Myotec. However, plaintiff claims that Myotec was supposed to pay Zonar $1.5 million, in the form of consulting fees and for an agreement not to compete, in exchange for a distributorship that Zonar had no right to sell. Plaintiff's allegation is that Myotec paid more than it should have for the distributorship and that Myotec was induced to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp. **Page 200**
(Cite as: 1993 WL 23758, *4 (N.D.Ill.))

become more deeply indebted to Miyano Machinery than it would have otherwise. Despite the fact that Myotec voluntarily entered the transaction with knowledge of the payment amounts under the consulting agreement, plaintiff alleges that Myotec eventually resigned the distributorship over disputes with Zonar. Therefore, Miyano Machinery has alleged injury to itself, Myotec and Myotec's owner, Midland. [FN3]

**\*5** As to the number of schemes involved, defendants argue that the amended complaint alleges only one scheme: the commercial transaction set forth in the agreements executed February 14, 1990, whereby Myotec received its exclusive distribution rights, Zonar received consultation fees and a reappointment right, Fischer received his finder's fee and Myotec received a fee in consideration for Zonar's right to require termination and be reappointed. [FN4] Defendants argue that this was a single scheme that does not fall within the narrow exception for single-scheme cases recognized in Jones v. Lampe, 845 F.2d 755, 758 (7th Cir.1988).

Even if this scenario is considered a single scheme, the narrow exception recognized by the Seventh Circuit may apply to this case. See Appley v. West, 832 F.2d 1021, 1027-28 (7th Cir.1987); Liquid Air Corp. v. Rogers, 834 F.2d 1297, 1305 (7th Cir.1987). In those exceptional cases where plaintiffs suffered "repeated infliction of economic injury" over time, a pattern has been found despite the existence of only one scheme. Jones v. Lampe, 845 F.2d at 758. In this case, plaintiff suffered economic injury over more than two years as Fischer conspired to and then received five kickbacks from Zonar. Additionally, plaintiff suffered economic injury when Fischer had payments re-routed to Zonar under the consultation agreement instead of paying-down the substantial amounts owing to Miyano Machinery. Finally, plaintiff was forced to defend Zonar's counterclaims under the fraudulent agreements. Therefore, even if considered only one scheme, repeated economic harm is alleged.

Despite individual factors, however, when viewed together, the Morgan factors do not support a pattern of racketeering. It remains the case that plaintiff relies solely on predicate acts which all arise out of garden variety business fraud. Although plaintiff would have this fraud characterized as several schemes, what happened is really several "subschemes," see Jones v. Lampe, 845 F.2d at 759, of one transaction--the attempt to sell the distributorship and to realize the proceeds from that sale. What is alleged becomes apparent as a commercial fraud played out on one party, Miyano Machinery, with perhaps purely collateral injury to a company along for the ride, Myotec.

That this case does not fit the RICO requirements under the Morgan factors is supported by an examination of the real question of implicit continuing threat. Viewed as a closed-ended conspiracy situation, plaintiff must ultimately allege racketeering activity that existed for such an extended period of time that a threat of future harm is implicit. Midwest Grinding, 976 F.2d at 1023. In this case, although plaintiff alleges related predicate acts over more than two years, those acts all relate to one relationship and one transaction, the sale of Miyano Machinery's distributorship. In that sense, it is a "one-shot scheme" that only lasted as long as necessary to realize the benefit of that transaction. See id. at 1024. As such, the fraud had a natural ending in the realization of the sale proceeds. Olive Can Co., Inc. v. Martin, 906 F.2d 1147, 1152 (7th Cir.1990). If viewed as an open-ended scenario, this case does not show clear signs of threatening to continue into the future in that Fischer has been fired, Myotec has resigned, and the agreement relied on by Zonar is allegedly fraudulent. In sum, this case does not represent the sort of long-term criminal activity carrying some quantum of threat to society that RICO is designed to address. Id.; see also Anheuser-Busch, 911 F.2d at 1266 (only party engaged in widespread fraud should be subject to treble damages under RICO). Therefore, plaintiff's RICO claim will be dismissed. [FN5]

**\*6** Defendants have also moved to dismiss Count II of Miyano Machinery's amended complaint ("the § 2(c) Robinson-Patman claim"). 15 U.S.C. § 13(c). Defendants argue that plaintiff failed to allege a violation of § 2(c) of the Robinson-Patman Act.

Section 2(c) of the Robinson-Patman Act prohibits payment of commissions or brokerage except for services rendered in connection with the sale or purchase of "goods, wares, or merchandise." 15 U.S.C. § 13(c). The purpose of § 2(c) was to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Case 7:04-cv-08223-KMK   Document 42-19   Filed 02/16/2005   Page 5 of 7

Not Reported in F.Supp.
(Cite as: 1993 WL 23758, *6 (N.D.Ill.))

Page 201

prevent large buyers from obtaining indirect price discrimination by demanding fees from sellers. FTC v. Henry Broch & Co., 363 U.S. 166 (1960). The Seventh Circuit has held that § 2(c) also applies to cases of "commercial bribery." Grace v. E.J. Kozin Co., 538 F.2d 170, 173 (7th Cir.1976) (following the Sixth and Ninth Circuits). In Grace, the court noted that one of the purposes of § 2 is to "protect the integrity of the principal-agent relationship where a violation has an anticompetitive effect." Id. The Grace decision did not, however, extend § 2 beyond situations involving the sale or purchase of goods. Grace involved commercial bribery of one competitor's sales manager by another competitor through kickbacks in the sale of food. 538 F.2d at 172.

Plaintiff alleges that the kickbacks paid by Zonar to Fischer were "in connection with the sale or purchase of goods." Plaintiff's argument is, in essence, that L & D and Myotec were both buyers and sellers of Miyano Machinery's goods and that therefore "[t]his lawsuit has everything to do with the purchase and sale of goods." However, the transaction was only tangentially about the purchase and sale of Miyano Machinery's goods. As the amended complaint itself explains in Count I, Zonar and Fischer entered into an agreement to encourage Midland to purchase distribution rights, a business opportunity, and Fischer received kickbacks from that sale. [FN6] That the sale of a business opportunity, even the opportunity to sell goods, does not come within the purview of § 2(c) of Robinson-Patman, is bolstered by cases rejecting service-related Robinson-Patman claims. See e.g., Union City Barge Line, Inc. v. Union Carbide Corp., 823 F.2d 129, 140-41 (5th Cir.1987) (commercial bribery involving services); Freeman v. Chicago Title & Trust Co., 505 F.2d 527 (7th Cir.1974) (§ 2(c) of Robinson-Patman does not apply to intangibles); CBS, Inc. v. Amana Refrigeration, Inc., 295 F.2d 375, 378 (7th Cir.1961) (contractual right is not a commodity); LaSalle Street Press, Inc. v. McCormick & Henderson, Inc., 293 F.Supp. 1004 (N.D.Ill.1968), aff'd, 445 F.2d 84 (7th Cir.1971) (patent license not goods). Therefore, plaintiff's Robinson-Patman claim fails to state a claim upon which relief can be granted.

Furthermore, even if the scheme alleged by plaintiff is somehow in connection with the purchase or sale of goods, etc., and is therefore a violation of § 2(c) of the Robinson-Patman Act, the standing requirements of § 4 of the Clayton Act, 15 U.S.C. § 15(a), must be met. The Clayton act provides a private right of action for "any person ... injured by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a). Although the language of § 4 implies a very broad concept of standing, there is no consensus among the circuits on what type of injury must be plead in a private § 2(c) claim. Cf. Federal Paper Bd. Co., Inc. v. Amata, 693 F.Supp. 1376 (D.Conn.1988) (necessary to show antitrust injury); Municipality of Anchorage v. Hitachi Cable, Ltd., 547 F.Supp. 633 (D.Alaska 1982) (only destruction of fiduciary relationship need be shown); NL Indus., Inc. v. Gulf & Western Indus., Inc., 650 F.Supp. 1115 (D.Kan.1986) (applying "target area" analysis).

*7 The Supreme Court has, on a number of occasions, indicated that standing to bring private suit under antitrust laws requires more than simply proof of a violation of a particular substantive antitrust law. See Atlantic Richfield Co. v. USA Petroleum Co., 110 S.Ct. 1884, 1889 (1990); Blue Shield of Virginia v. McCready, 457 U.S. 465 (1982); J. Truett Payne Co., Inc. v. Chrysler Motors Corp., 451 U.S. 557, 562 (1981) (requiring more than proof of violation of § 2(a)); Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 486 (1977) (in addition to substantive violation of § 7 of Clayton Act, petitioner must show antitrust injury of type antitrust laws designed to prevent). In the case of a § 2(c) claim, courts have struggled with exactly what is required for standing. Section 2(c), unlike § 2(a), defines per se violations without reference to antitrust injury. Therefore, no showing of actual antitrust injury is necessary to allege a substantive violation of § 2(c). See FTC v. Simplicity Pattern Co., 360 U.S. 55, 65 (1959).

Although a substantive violation of § 2(c) can be proved by simply showing certain brokerage payments made other than for services rendered, several courts, including this one, have read § 2(c) and standing requirements to include a requirement of antitrust or competitive injury. See Lupia v. Stella D'Oro Biscuit Co., Inc., 586 F.2d 1163 (7th Cir.1978) (no price discrimination, no antitrust injury); Grace v. E.J. Kozin Co., 538 F.2d 170 (7th Cir.1976) (indirect price discrimination found); Goold Electronics Corp. v. Galaxy Electronics,

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.  
(Cite as: 1993 WL 23758, *7 (N.D.Ill.))

Page 202

Inc., No. 91 C 5989, 1991 WL 281744 (N.D.Ill. Dec. 30, 1991) (no standing without antitrust injury); Pete Thoesen Tractor & Engine Repair Co. v. City of Chicago, 101 F.R.D. 734 (N.D.Ill.1984) (competitor of discounter did not claim antitrust injury); Bunker Ramo Corp. v. Cywan, 511 F.Supp. 531, 533-34 (N.D.Ill.1981) (anticompetitive injury necessary); cf. Rehabilitation Inst. of Chicago v. Hicks, No. 89 C 0387, 1991 WL 111212 (N.D.Ill. June 14, 1991) (bribe involving increased cost to plaintiff-buyer, standing not discussed). See also Larry R. George Sales Co. v. Cool Attic Corp., 587 F.2d 266 (5th Cir.1979) (competitive injury required); Federal Paper Bd., 693 F.Supp. at 1385-88 (price discrimination not necessary, however anticompetitive injury implied by plaintiff-competitor); Fitch v. Kentucky-Tennessee Light & Power, 136 F.2d 12, 15 (6th Cir.1943) (competitive injury to buyer); NL Indus., 650 F.Supp. at 1123 (no competitive injury found); Haff v. Jewelmont Corp., 594 F.Supp. 1468, 1471-79 (N.D.Cal.1984) (plaintiff neither consumer nor competitor, no competitive injury). But see Municipality of Anchorage, 547 F.Supp. 633 (breach of fiduciary relationship sufficient injury for § 2(c)); Seaboard Supply Co. v. Congoleum Corp., 770 F.2d 367 (3d Cir.1985) (antitrust injury not required); Metrix Warehouse, Inc. v. Daimler-Benz Aktiengesellschaft, 716 F.2d 245 (4th Cir.1983) (antitrust injury not necessary); Gregoris Motors v. Nissan Motor Corp. in USA, 630 F.Supp. 902 (E.D.N.Y.1986) (antitrust injury not necessary); Computer Statistics Inc. v. Blair, 418 F.Supp. 1339 (S.D.Tex.1976) (same). Cf. Environmental Tectonics v. W.S. Kirkpatrick, Inc., 847 F.2d 1052, 1066 (3d Cir.1988) (price discrimination injury not necessary but must meet "standing requirements," left standing requirements undefined because plaintiff direct competitor in this case, implying some anticompetitive injury requirement); Stephen Jay Photography, Ltd. v. Olan Mills, Inc., 903 F.2d 988, 992 (4th Cir.1990) (looking at target area injury). In a price discrimination case such as Henry Broch & Co, where the illegal brokerage is passed on to the buyer or seller, antitrust injury to a competitor is clear. However, most § 2(c) cases involve commercial bribery. In a commercial bribery case, either the seller or the buyer bribes the other's agent to make the sale. The application of § 2(c) to commercial bribery usually involves either a seller bribing a buyer's agent so that the buyer will pay more for a product, see Grace; Rangen, Inc. v. Sterling Nelson & Sons, Inc., 351 F.2d 851 (9th Cir.1965); Fitch; Environmental Tectonics; Bunker Ramo; Municipality of Anchorage; Metrix; NL Indus.; Federal Paper Bd., or a buyer bribing a seller's agent so that purchases can be made more cheaply, see Goold; Larry R. George Sales. When a buyer purchases goods at a higher price or a seller sells goods at a lower price because of the bribe, there may be price discrimination [FN7] or antitrust injury. But the cases in this circuit indicate that the simple fact of commercial bribery does not make all related injury antitrust injury. See Lupia; Goold; Pete Thoesen; Bunker Ramo. See also Federal Paper Bd.; NL Indus.

*8 In this case, Miyano Machinery alleges injury consisting of lost sales through Myotec, losses attributable to Myotec's inability to pay for purchases, losses from compensation to Fischer, and costs of defending against Zonar's counterclaims. However, this is not the type of injury that flows from the anticompetitive nature of defendants' acts and which is necessary for standing in this case. Miyano Machinery does not allege that it sold machinery to Myotec for less than it would have without the bribe. Although Miyano Machinery alleges reduced sales, the reduction in sales is not directly attributable to the anticompetitive nature defendants' acts, namely preventing other distributors from becoming the distributor through a competitive process and charging Myotec more for the distributorship. See Brunswick, 429 U.S. at 489 (antitrust injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation). The loss in sales was due to Myotec's inability to keep sales high enough to pay the consulting agreement, not from the anticompetitive nature of the bribe. Since Miyano Machinery has failed to allege antitrust injury, Miyano Machinery lacks standing to bring its Robinson-Patman claim.

The remaining claims have been brought under supplemental jurisdiction. 28 U.S.C. § 1367. Since plaintiff's federal claims will be dismissed before trial, this court declines to exercise jurisdiction over the pendent claims and plaintiff's pendent state-law claims will be dismissed without prejudice. Martin-Trigona v. Champion Federal Savings & Loan Ass'n, 892 F.2d 575, 578 (7th Cir.1989); Midwest Grinding, Inc. v. Spitz, 769 F.Supp. 1457, 1470 (N.D.Ill.1991).

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

Not Reported in F.Supp.  
(Cite as: 1993 WL 23758, *8 (N.D.Ill.))

Page 203

IT IS THEREFORE ORDERED that motions of defendants Fischer, Zonar and L & D to dismiss [64, 68] are granted. Plaintiff's RICO and Robinson-Patman claims, Counts I and II of the amended complaint are dismissed with prejudice. Plaintiff's remaining claims are dismissed without prejudice. Defendant Lasser's motion to dismiss [81] is denied as moot. The Clerk of the Court is directed to enter judgment dismissing the federal claims with prejudice (Counts I and II) and the pendent claims (Counts III through VI) without prejudice.

FN1. Plaintiff voluntarily dismissed defendant Lasser.

FN2. The Supreme Court has held that proof of multiple schemes, by itself, is insufficient to show a pattern of racketeering activity. H.J., 429 U.S. at 240-41. However, evidence of multiple schemes is relevant to the determination of whether a pattern has been alleged. Midwest Grinding, 976 F.2d at 1025.

FN3. Although it is unclear why, plaintiff's amended complaint also names Myotec as a defendant.

FN4. Nowhere in the amended complaint is it clear that Myotec received a fee in consideration for Zonar's right to require termination and be reappointed.

FN5. Plaintiff's amended complaint alleged both violation and conspiracy to violate RICO. Since plaintiff has failed to allege a violation of RICO and does not allege an agreement by defendants to do anything more than the alleged violations, plaintiff's RICO conspiracy allegation is also insufficient and will be dismissed as part of the RICO count. See Midwest Grinding, 976 F.2d at 1026.

FN6. The kickbacks received by Fischer were tied to "consulting" payments from Myotec to Zonar. Even though the characterization of those payments as consulting fees belies their purpose, plaintiff does not contend that the payments were in any way tied to the actual purchases and sales of Miyano Machinery's goods by Myotec.

FN7. Several courts have expressly stated that the anticompetitive effect need not be in the form of price discrimination even though that is the primary thrust of § 2. See Environmental Tectonics, 847 F.2d 1052; Larry R. George Sales, 587 F.2d 266; Rangen, Inc., 351 F.2d 851. But see Grace, 538 F.2d 170 (indirect price discrimination found in higher prices charged because of bribe to buyer's agent).

1993 WL 23758 (N.D.Ill.), 1993-1 Trade Cases P 70,145, RICO Bus.Disp.Guide 8238

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

