**Westlaw.**

Not Reported in F.Supp.2d
2001 WL 1530637 (E.D.Pa.)
**(Cite as: 2001 WL 1530637 (E.D.Pa.))**

Page 1

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
STRAIGHT ARROW PRODUCTS
v.
CONVERSION CONCEPTS, INC.; MA, Inc.;
Manufacturers Assortments; All These Brand
Names, Inc., Individually and trading as All These
Brand Names; and Howard
Martin.
**No. 01-221.**

Dec. 3, 2001.

*MEMORANDUM*

WALDMAN, J.

*Introduction*
*1 This case arises out of a Sales Agreement and subsequent Notice of Cancellation & Mutual Release entered into by the parties.

Plaintiff is a New Jersey corporation with its principal place of business in Pennsylvania. It manufactures personal care products. Its primary products are a shampoo and a hair conditioner for use on horses and by humans sold under the name "Mane 'n Tail." Defendants are interrelated companies operated from a joint location in White Plains, New York and their owner-president. They are engaged in direct marketing of consumer products under the name of All These Brand Names ("ATBN").

Plaintiff has asserted claims for breach of contract, fraudulent misrepresentation, an accounting and other equitable relief related to defendants' alleged resale in a prohibited manner of products acquired from plaintiff under the Sales Agreement. Defendants have moved to dismiss plaintiff's action on the grounds that it is subject to a binding general release and covenant not to sue and otherwise fails to set forth cognizable claims.

*Legal Standard*
Dismissal for failure to state a claim is appropriate when it clearly appears that plaintiff can prove no set of facts in support of the claim which would entitle him to relief. *See Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Robb v. City of Philadelphia,* 733 F.2d 286, 290 (3d Cir.1984). Such a motion tests the legal sufficiency of a claim while accepting the veracity of the claimant's allegations. *See Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990); *Sturm v. Clark,* 835 F.2d 1009, 1011 (3d Cir.1987); *Winterberg v. CNA Ins. Co.,* 868 F.Supp. 713, 718 (E.D.Pa.1994), *aff'd, 72 F.3d 318* (3d Cir.1995). A court may also consider any document appended to and referenced in the complaint on which plaintiff's claim is based. *See* Fed.R.Civ.P. 10(c); *In re Burlington Coat Factory Securities Litigation,* 114 F.3d 1426 (3d Cir.1997); *In re Westinghouse Securities Litigation,* 90 F.3d 696, 707 (3d Cir.1996). [FN1] A complaint may be dismissed when the facts alleged and the reasonable inferences therefrom are legally insufficient to support the relief sought. *See Pennsylvania ex rel. Zimmerman v. PepsiCo., Inc.,* 836 F.2d 173, 179 (3d Cir.1988).

> FN1. The Sales Agreement and Notice of Cancellation & Mutual Release are appended to and referenced in plaintiff's complaint, and indeed plaintiff seeks a declaration that the Release is void and its claims are thus viable.

*Factual Background*
The pertinent facts as alleged by plaintiff are as follow.

Straight Arrow Products, Inc. ("SAPI") and All These Brand Names ("ATBN") entered into a Sales Agreement on July 28, 1999 whereby SAPI agreed to sell and ATBN agreed to purchase 300,000 units of Mane 'n Tail Shampoo and 300,000 units of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 1530637 (E.D.Pa.)
**(Cite as: 2001 WL 1530637 (E.D.Pa.))**

Page 2

Mane 'n Tail Conditioner. The products were sold to ATBN for less than 50% of the lowest wholesale price charged to retail stores. [FN2] The shampoo and conditioner were to be shipped to ATBN in twelve equal monthly shipments from August 16, 1999 through July 17, 2000.

> FN2. The shampoo and conditioner were sold to ATBN for $1.44 per unit or $17.28 for a case of twelve units. SAPI's "customary national average retail price" of Mane 'n Tail is $83.88 per case.

ATBN was to sell these items for "consumer trial" as part of an assortment of household products manufactured by other companies. The Sales Agreement prohibited distribution outside of ATBN's sample and marketing program.

*2 In early 1999, SAPI suspected that another corporation with which SAPI had entered into a similar marketing agreement might be diverting products to parties other than the intended consumers in violation of the parties' sales agreement. [FN3] While involved in litigation with this corporation, SAPI "obtained information suggesting that ATBN might also be involved in similar improper diversion activities regarding Mane 'n Tail products."

> FN3. This agreement was with Selective Marketing, Inc. and was entered into on December 4, 1998.

In November 1999 SAPI's vice-president of sales, Edward Kline, sought assurances from the president of ATBN, Howard Martin, that ATBN was not involved in diversion. Mr. Martin assured Mr. Kline that ATBN was not engaged in any type of diversion. Mr. Martin also stated that nearly all units of the product in ATBN's possession had been distributed and that the remaining units were allocated to marketing programs directed to consumers. [FN4]

> FN4. Pursuant to the Sales Agreement, SAPI had shipped to ATBN 50,016 units each of Mane 'n Tail shampoo and conditioner.

On December 14, 1999 SAPI and ATBN executed a "Notice of Cancellation & Mutual Release" by which "all agreements between the parties" were terminated and all claims relating in any way to the now cancelled agreement were mutually released. The parties also expressly agreed not to sue on any claims arising out of the cancelled agreement.

At a time identified by plaintiff only as "more than six months later," SAPI found twenty bottles of Mane 'n Tail shampoo and nineteen bottles of conditioner previously sold to ATBN on retail drug store shelves. [FN5]

> FN5. SAPI identified these as units sold to ATBN from a manufacturer product code on the bottles.

*Discussion*

Plaintiff's breach of contract claim is predicated on ATBN's alleged sales of Mane 'n Tail to individuals outside of its marketing program. Plaintiff's fraud claim is based upon the alleged false assurances of Mr. Martin regarding ATBN's sales activities which SAPI states induced it to permit ATBN to continue distributing Mane 'n Tail. SAPI also alleges it would not have entered into the Release but for these misrepresentations. [FN6]

> FN6. Defendants conclude that Pennsylvania law governs these claims and plaintiff does not contest the issue. It appears that the Sales Agreement and Release were negotiated respectively in both New York and Pennsylvania, and the Sales Agreement was performed respectively in these states. The Sales Agreement contains a Pennsylvania forum selection provision. The court will apply Pennsylvania law.

Release is an affirmative defense. *See* Fed.R.Civ.P. 8(c). It is thus generally asserted by motion for judgment on the pleadings or summary judgment. As plaintiff, however, has incorporated the Release into the complaint and set forth allegations making its invalidity a *sine qua non* for its other claims, it is a matter properly addressed by the instant motion. The court has before it the terms of the pertinent documents and plaintiff's factual allegations, presumed to be true, as to why the Release is ineffective or void.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 1530637 (E.D.Pa.)
(Cite as: 2001 WL 1530637 (E.D.Pa.))

Page 3

Plaintiff asserts that the Release should not bar the present suit because of a lack of identity between the parties who signed the Sales Agreement and those who signed the Release, a lack of consideration and inducement of the Release through fraud.

Plaintiff argues that because the liability clause of the Sales Agreement holds Conversion Concepts, Inc. liable for any monetary damages to SAPI if Mane 'n Tail were sold in an unauthorized way, Conversion Concepts is the true party to the contract. Plaintiff then argues that ATBN and MA, Inc. were the parties to the Release and Conversion Concepts thus was never released from any claims relating to the Sales Agreement.

If plaintiff really means what it argues, that "the Agreement was entered into between [SAPI] on the one hand and Conversion Concepts, Inc. trading as [ATBN] on the other," then plaintiff has no viable claim for breach of contract against the other defendants as they would not have been bound by the Agreement. Yet, they were specifically mentioned in the Release. All invoices regarding shipments of Mane 'n Tail show the products were sold to "All These Brand Names, Inc." and shipped to ATBN warehouses. The Sales Agreement itself is on letterhead with the insignia of ATBN and Conversion Concepts.

*3 Plaintiff does not explain why it would enter an agreement to cancel a contract with entities which were not parties to the contract. Plaintiff does not explain why if SAPI and Conversion Concepts were the only true parties to the Sales Agreement and the latter was not discharged and released under the terms of the Cancellation & Mutual Release, all performance ceased upon execution of that document. Plaintiff also does not explain why entities which were not parties to the Sales Agreement would be released from all obligations and claims relating to the Agreement while the entity which was a party would not be released. Plaintiff's argument in this regard defies reason. It is also inconsistent with its own pleadings. Plaintiff alleges in its complaint that it contracted with ATBN and that the other defendants are interrelated corporations "comprising ATBN" and doing business under the ATBN name, and the owner-president of those corporations who operates them from the same New York business address.

Plaintiff correctly notes that to apply a release to parties not specifically named, the terms of the release must clearly extend to them. *See Crestar Mortgage Corporation v. Shapiro,* 937 F.Supp. 453, 456 (E.D.Pa.1996). The instant Release, however, clearly includes "each party and its subsidiaries, divisions and corporate affiliates and their respective directors, officers, employees, servants, agents" in the covenant not to initiate or maintain any legal action "relating to or in any way connected with" the cancelled agreement. Plaintiff does not cogently explain how Conversion Concepts trading as and in part "comprising" ATBN could be the one true party to the Sales Agreement but not covered by a discharge and release of ATBN. It also appears from the pleadings that Conversion Concepts is at least a corporate affiliate of ATBN, and plaintiff acknowledges that such affiliates are encompassed by the covenant not to sue.

An agreement must be construed as a whole and the various provisions read in context. *See Williams v. Metzler,* 132 F.3d 937, 947 (3d Cir.1997); *Tuthill v. Tuthill,* 763 A.2d 417, 419 (Pa.Super.2000); *Meeting House Lane, Ltd. v. Melso,* 427 Pa.Super. 118, 628 A.2d 854, 857-58 (Pa.Super.1993), *app. denied,* 537 Pa. 633, 642 A.2d 486 (Pa.1994). In so doing, a court must adopt an interpretation which is "most reasonable" in view of the object of the agreement. *Wrenfield Homeowners Ass'n. v. DeYoung,* 410 Pa.Super. 621, 600 A.2d 960, 963 (Pa.Super.1991). The release and covenant not to sue cannot logically be divorced. It defies reason to suggest that the parties would not intend to release from liability on claims an entity which could not sue or be sued on those claims.

Under Pennsylvania law, a contract must be supported by consideration on both sides. *See Peoples Mortgage Co. v. Federal Nat'l Mortgage Ass'n,* 856 F.Supp. 910, 922 (E.D.Pa.1994). Consideration is sufficient when it confers some benefit upon the promisor or causes some detriment to the promisee. *See Eighth North-Val, Inc. v. William L. Parkinson, D.D.S., P.C., Pension Trust,* 773 A.2d 1248, 1253 (Pa.Super.2001); *Pyle v. Department of Pub. Welfare,* 730 A.2d 1046, 1050 n. 5 (Pa.Commw.1999). Valid consideration

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2001 WL 1530637 (E.D.Pa.)
(Cite as: 2001 WL 1530637 (E.D.Pa.))

Page 4

includes any act, forbearance or return promise, bargained for and given in exchange for the original promise. *See Cardamone v. University of Pittsburgh,* 253 Pa.Super. 65, 384 A.2d 1228, 1232 n. 6 (Pa.Super.1978).

**\*4** Plaintiff argues that the only consideration for the Release was payment of $144,046.08 ATBN already owed SAPI for the units of Mane 'n Tail which were shipped. It appears from the face of the Release, however, payment of that money is not the only consideration. The Release provides that it is executed "in consideration of" payment of the sum of $144,046.08 to plaintiff by ATBN *and* the release of commitments under the cancelled Agreement. The Release expressly provides that each party is discharged from all of their respective obligations, agreements and contracts. The mutual agreement to cancel the parties' respective obligations under the Sales Agreement was sufficient consideration for the Release. *See* Restatement 2d, Contracts § 283 ("[c]onsideration is provided by each party's discharge of the duties of the other").

The third paragraph of the Release reads:
"In consideration for this release agreement, each party ... hereby covenants and agrees that it will forever refrain from institut[ing], prosecuting, maintaining, or otherwise participating in any way in any suit, action or proceeding against the other party or its parent or subsidiary companies, their past and present officers, employees, servants, agents and their receptive heirs, successors, administrators, and assigns, concerning all present, past or future debts, obligations, endorsements, bonds, specialties, controversies, disputes, suits, actions, cause of action, trespasses, variances, judgments, extents, executions, damages, claims or demands, in law or in equity, which either party ever had, now has or hereafter can have, relating to or in any way connected with the agreements between the parties which are canceled by this instrument."
The parties' mutual releases also are valid consideration. *See General Mills, Inc. v. Snavely,* 203 Pa.Super. 162, 199 A.2d 540, 543 (Pa.Super.1964) (promise to forbear from prosecuting claim is sufficient consideration).

Plaintiff finally argues that the Release is void because it was fraudulently induced into signing it. [FN7] Plaintiff alleges it would not have signed the Release but for Mr. Martin's fraudulent misrepresention that ATBN had not engaged in diversion and that the few remaining units in its possession were allocated to direct marketing programs aimed at consumers.

> FN7. In a footnote in its brief, plaintiff suggests that the fraudulent misrepresentation may also constitute fraud in the execution because they "presented a false picture that no significant diversion could take place in the future since little inventory remained in ATBN's possession" and "caused the omission of any language concerning diversion by falsely presenting diversion as a moot issue." Plaintiff misperceives the distinction between fraud in the inducement and fraud in the execution. Fraud in the execution occurs when a party executes an the agreement because he was led to believe that the document being signed contained terms that were actually omitted therefrom. *See 1726 Cherry Street Partnership v. Bell Atlantic Properties, Inc.,* 439 Pa.Super. 141, 653 A.2d 663, 666 (Pa.Super.1995). Plaintiff's claim is solely one of fraud in the inducement whereby "the party proffering evidence of additional prior representations does not contend that the parties agreed that the additional representations would be in the written agreement, but rather claims that the representations were fraudulently made and that but for them, he or she never would have entered into the agreement." *Id.*

Defendants assert that it is plain from plaintiff's amended complaint that evidence necessary to show the alleged fraud would be barred by the parol evidence rule.

**\*5** In Pennsylvania, the parol evidence rule bars evidence of a prior misrepresentation to establish fraud in the inducement of a fully integrated written agreement. *See HCB Contractors v. Liberty Place Hotel Assocs.,* 539 Pa. 395, 652 A.2d 1278, 1279 (Pa.1995). This rule applies not only when the alleged misrepresentation contradicts or conflicts

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
2001 WL 1530637 (E.D.Pa.)  
**(Cite as: 2001 WL 1530637 (E.D.Pa.))**

Page 5

with a term of the contract, but also when it would add to, modify or vary the terms of the agreement. *See Resolution Trust Corp. v. Urban Redevelopment Authority,* 536 Pa. 219, 638 A.2d 972, 975 (Pa.1994); *Lenzi v. Hahnemann Univ.,* 445 Pa.Super. 187, 664 A.2d 1375, 1379 (Pa.Super.1995); *1726 Cherry Street,* 653 A.2d at 670; *Iron Worker's S & L v. IWS, Inc.,* 424 Pa.Super. 255, 622 A.2d 367, 373 (Pa.Super.1993).

Although a formal integration clause clearly evinces an integrated understanding, such a clause is not necessary to show that an agreement represents the final and complete expression of the parties' agreement. *See Mellon Bank Corp. v. First Union Real Estate,* 951 F.2d 1399, 1406 n. 6 (3rd Cir.1991) ("[w]hile the effect of an integration clause is to make the parol evidence rule clearly applicable, it is not required"); *Kehr Packages, Inc. v. Fidelity Bank, Nat. Ass'n,* 710 A.2d 1169, 1174 (Pa.Super.1998) (finding contract fully integrated in absence of an integration clause). *See also Sanderson v. H.I.G. P-XI Holding, Inc.,* 2001 WL 238138, *5 (E.D.La. Mar.7, 2001) (finding release agreement fully integrated in absence of integration clause in case governed by Pennsylvania parol evidence rule).

A written contract is integrated if it represents a final and complete expression of the parties' agreement. *Kehr Packages,* 710 A.2d at 1173. No particular form is required for an integrated contract. *See* E. Allan Farnsworth, Contracts § 7.3 (2d ed.2000). In the absence of a formal integration clause, a court "must examine the text [of the agreement] to determine its completeness." *See Kehr Packages,* 710 A.2d at 1173 (quoting *Henry v. First Federal Savings & Loan Assoc.,* 313 Pa.Super. 128, 459 A.2d 772, 776 (Pa.Super.1983)).

A court must look at the writing and "if it appears to be a contract complete within itself 'couched in such terms as [to] import a complete legal obligation without any uncertainty as to the object or extent of the engagement, it is conclusively presumed that the whole engagement of the parties [was] reduced to writing.' " *Gianni v. R. Russell & Co.,* 281 Pa. 320, 126 A. 791, 792 (Pa.1924) (citation omitted).

When the cause of action depends upon an alleged oral understanding concerning a subject dealt with in a written contract, it is presumed that the writing was intended to embody the entire understanding of the parties regarding that subject. *See Kehr Packages,* 710 A.2d at 1174. This is because when a party executes a written agreement in reliance upon an oral representation, it is only natural that he would insist that such representation be incorporated into the writing. *See Coram Healthcare Corp. v. Aetna U.S. Healthcare, Inc.,* 94 F.Supp.2d 589, 592 (E.D.Pa.1999); *Kehr Packages,* 710 A.2d at 1174 ("if the written agreement and the alleged oral agreement 'relate to the same subject-matter and are so interrelated that both would be executed at the same time, and in the same contract, the scope of the [oral] agreement must be taken to be covered by the writing' ") (quoting *Gianni,* 126 A. at 792); *1724 Cherry Street,* 653 A.2d at 670 ("[i]f the [plaintiffs] intended to rely on what they now contend to be a centrally important representation conveyed by [defendant], then the [plaintiffs] should have insisted that the representations be set forth in their integrated written agreement").

*6 The Cancellation & Mutual Release agreement appears to be a contract complete within itself and importing a complete expression of legal rights without any uncertainty as to the object or scope of the engagement. If, as plaintiff alleges, Mr. Martin's representations about diversion and disposition of remaining inventory were critical to its decision to execute a general release, it is only natural that plaintiff would insist on incorporating such representations or warranties in the written release agreement. [FN8]

> FN8. The parties' provision that "[t]his Mutual Release and Covenant Not to Sue may not be altered or Modified in any respect by either party except in writing" also demonstrates their intent to embody all understandings between them regarding the subject matter in writing.

Plaintiff's claims are precluded by the broad general release and concomitant covenant not to sue.

As plaintiff's claims are precluded, the court will not address all of defendants' various contentions regarding plaintiff's failure otherwise to plead

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
2001 WL 1530637 (E.D.Pa.)  
**(Cite as: 2001 WL 1530637 (E.D.Pa.))**

Page 6

substantively cognizable claims. Defendant has forcefully argued that the fraud claim cannot be sustained in view of the economic loss doctrine and gist of the action rule, and that the consequential damages plaintiff seeks for breach of contract are precluded by the express terms of the Sales Agreement. The court notes at least one other deficiency.

Although characterizing it as a misrepresentation, plaintiff does not specifically aver that Mr. Martin's statement that ATBN was not diverting and that only a few units remained in inventory which had been allocated to direct marketing programs was knowingly false when made. Plaintiff acknowledges that it "assumes" from the later discovery of 39 bottles on retail shelves that "all of the bottles of Mane 'n Tail shipped by SAPI to ATBN were improperly diverted."

The supposedly diverted products were found more than six months after the Release was executed and defendants' obligations under the Sales Agreement were discharged. Plaintiff's breach of contract and fraud claims depend upon the assumed diversion of plaintiff's product prior to the execution of the Cancellation & Mutual Release. That a handful of units appeared on retail shelves about six months after Mr. Martin's statement and the cancellation of the contract does not give rise to a reasonable inference that defendants diverted tens of thousands of units in the intervening eleven months since the first shipment in August 1999. To the contrary, it is virtually inconceivable that substantially more units would not have been found in plaintiff's canvass of retail outlets if the assumed mass diversion had occurred. [FN9]

> FN9. In responding to other defense arguments, plaintiff acknowledges that it "saw no evidence of improperly diverted product on store shelves many months after the Release was signed" and that "[n]o diversion appeared to be taking place in the marketplace."

### CONCLUSION

*7 Consistent with the foregoing, plaintiff's motion will be granted. An appropriate order will be entered.

2001 WL 1530637 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

. 2:01CV00221  (Docket)  
(Jan. 16, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.