UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

WORLD WRESTLING ENTERTAINMENT, INC.

                  :

           Plaintiff,                     04 CV 8223 (KMK)

                  :          (ECF CASE)

       v.

                  :

JAKKS PACIFIC, INC.; JAKKS PACIFIC (H.K.)
LIMITED; ROAD CHAMPS LIMITED; THQ,    :
INC.; THQ/JAKKS PACIFIC LLC, THE JOINT
VENTURE OF THQ, INC. and JAKKS PACIFIC,  :
INC.; STANLEY SHENKER AND ASSOCIATES,
INC.; STANLEY SHENKER; BELL LICENSING,  :
LLC; JAMES BELL; JACK FRIEDMAN;
STEPHEN BERMAN and JOEL BENNETT,     :

            Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF THE JAKKS DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

FEDER, KASZOVITZ, ISAACSON, WEBER,
  SKALA, BASS & RHINE LLP
Murray L. Skala (MS 9354)
Jonathan D. Honig (JH 7577)
750 Lexington Avenue
New York, New York 10022
Phone:  (212) 888-8200
Fax:  (212) 888-5968

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Jonathan J. Lerner (JL 7117)
Michael H. Gruenglas (MG 8705)
Maura B. Grinalds (MG 2836)
Marco G. Argentieri (MA 8932)
Four Times Square
New York, New York 10036
Phone:  (212) 735-3000
Fax:  (212) 735-2000

*Attorneys for the JAKKS Defendants*

February 16, 2005

## **TABLE OF CONTENTS**

Page

**TABLE OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

**PRELIMINARY STATEMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    B.    WWE's Licensing Arrangements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    C.    The Alleged RICO Scheme . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    D.    The Connecticut Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    E.    The Subpoena to JAKKS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    F.    WWE's Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**I.**    **WWE FAILS TO STATE A CLAIM
    UNDER THE ROBINSON PATMAN ACT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.    The RPA Targets Unlawful Price Discrimination in the Sale of Goods . . . . . . 10
    B.    The RPA Is Inapplicable to the Intangible Licence Rights at Issue Here . . . . . 11
    C.    WWE's Speculative Allegations of Loss Fail to Allege the Necessary
           Injury for an RPA Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**II.**    **WWE'S RICO CLAIMS FAIL AS A MATTER OF LAW** . . . . . . . . . . . . . . . . . . . 17

    A.    The Complaint Fails to Allege the Requisite Continuous Pattern of
           Racketeering Activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
           1.    The Complaint Fails to Adequately Allege Continuity . . . . . . . . . . . . . 18
           2.    The Single Alleged Bribe Does Not Constitute a Pattern of
                 Racketeering Activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    B.    The Complaint Fails to Allege a Cognizable RICO "Enterprise" . . . . . . . . . . . 27
    C.    WWE's Alleged RICO Injury Is Too Speculative as a Matter of Law . . . . . . . . 29
    D.    WWE'S Prayer for Rescission, Restitution and Disgorgement Renders Its
           RICO Claims Void as a Matter of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    E.    The RICO Predicate Acts Are Defective . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**III.**    **WWE'S CLAIMS ARE BARRED BY THE 2004 RELEASE** . . . . . . . . . . . . . . . . 35

**IV.**    **IN THE ALTERNATIVE, THE ACTION
    SHOULD BE TRANSFERRED TO CALIFORNIA** . . . . . . . . . . . . . . . . . . . . . . . 37

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

i

## TABLE OF AUTHORITIES

CASES                                                                                    PAGE(S)

2660 Woodley Road Joint Venture v. ITT Sheraton Corp., 369 F.3d 732 (3d Cir.
    2004) ................................................................................................ 15

Agency Holding Corp. v. Malley-Duff & Associates, Inc., 483 U.S. 143 (1987) ...................... 24

Allen v. Berenson Pari-Mutuel of New York, No. 95 Civ. 10289, 1998 WL 80168
    (S.D.N.Y. Feb. 25, 1998) ................................................................... 31

Apparel Art International, Inc. v. Jacobson, 967 F.2d 720 (1st Cir. 1992) ................................. 26

Associated Artists Entertainment, Inc. v. Walt Disney Pictures, No. 93 Civ. 3934,
    1994 WL 708142 (S.D.N.Y. Dec. 19, 1954) ................................................... 37

Atlantic Richfield Co.v. USA Petroleum Co., 495 U.S. 328 (1990) ........................................... 16

Bank v. Brooklyn Law School, No. 97 CV 7470 , 2000 WL 1692844 (E.D.N.Y.
    Oct. 6, 2000) ...................................................................................... 28

Banque de Gestion Privee Sib v. Transoptions, Co., No. 91 Civ. 81871992 WL
    190135 (S.D.N.Y. July 29, 1992) ..................................................... 37

Bingham v. Zolt, 683 F. Supp. 965 (S.D.N.Y. 1988) .................................................... 31

Blue Tree Hotels Investment (Canada), Ltd. v. Starwood Hotels & Resorts
    Worldwide, Inc., 369 F.3d 212 (2d Cir. 2004) ................................... 11, 14, 15, 16, 19, 21

Brown v. Dow Corning Corp., No. 93 Civ. 5510, 1996 WL 257614, *3 (S.D.N.Y.
    May 15, 1996) ...................................................................................... 38

Casio Computer Co. v. Sayo, No. 89 Civ. 3772, 2000 WL 1877516
    (S.D.N.Y. Oct. 13, 2000) ................................................................... 34

Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158 (2001) .................................................. 27

Chang v. Chen, 80 F.3d 1293 (9th Cir. 1996) ........................................................... 38

Clapp v. Greene, 743 F. Supp. 273 (S.D.N.Y. 1990), aff'd mem.,
    930 F.2d 912 (2d Cir. 1991) ..................................................................... 23, 30

Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229
    (2d Cir. 1999) ............................................... 2, 17, 18, 19, 20, 22, 35

Coker v. Bank of America, 984 F. Supp. 757, 766 (S.D.N.Y. 1997) ........................................... 38

Continental Realty Corp. v. J.C. Penny Co., 729 F. Supp. 1452 (S.D.N.Y. 1990) ...................... 19

Continental Time Corp. v. Swiss Credit Bank, 543 F. Supp. 408 (S.D.N.Y. 1982) ................... 37

Cougar Audio, Inc. v. Reich, No. 99 Civ. 4498, 2000 WL 420546 (S.D.N.Y. Apr.
    18, 2000) ..................................................................................................................... 30, 34

Daugherty v. Popick, 89 F.R.D. 642 (S.D.N.Y. 1981) ................................................. 37

Dubai Islamic Bank v. Citibank, N.A., 256 F. Supp. 2d 158 (S.D.N.Y. 2003) ..................... 17, 36

Economic Opportunity Commission of Nassau County, Inc. v. County of Nassau,
    Inc., 47 F. Supp.2d 353 (E.D.N.Y. 1999) ................................................................ 22, 29

Elliott v. Foufas, 867 F.2d 877 (5th Cir. 1989) ........................................................... 28

Empire State Pharmaceutical Society Inc. v. Empire Blue Cross
    & Blue Shield of Greater New York, 778 F. Supp. 1253 (S.D.N.Y. 1991) ..................... 12

FD Property Holding, Inc. v. US Traffic Corp., 206 F. Supp. 2d 362
    (E.D.N.Y. 2002) ...................................................................................... 19, 25, 29

Federal Trade Commission v. Henry Broch & Co., 363 U.S. 166 (1960) ............................ 11, 17

Fiore v. Kelly Run Sanitation, Inc., 609 F. Supp. 909 (W.D. Pa. 1985) ....................................... 12

First Capital Asset Management, Inc. v. Satinwood, Inc., 385 F.3d 159
    (2d Cir. 2004) ............................................................... 2, 20, 22, 28, 29, 36, 38

Freeman v. Chicago Title & Trust Co., 505 F.2d 527 (7th Cir. 1974) ...................................... 12

GICC Capital Corp. v. Technology Finance Group, Inc., 67 F.3d 463
    (2d Cir. 1995) ....................................................... 18, 19, 22, 23, 24, 25, 28, 30

Goodloe v. National Wholesale Co., No. 03 C 7176, 2004 WL 1631728 (N.D. Ill.
    July 19, 2004) ................................................................................................... 13

Gordon v. New York Stock Exchange, Inc., 498 F.2d 1303 (2d Cir. 1974), aff'd,
    422 U.S. 659 (1975) ......................................................................................... 11

H.J. Inc. v. Northwestern Bell Telephone Co, 492 U.S. 229 (1989) ..................................... 18, 23

Hecht v. Commerce Clearing House, Inc., 897 F.2d 21 (2d Cir. 1990) ................................. 3, 30

Hygrade Milk & Cream Co. v. Tropicana Productions, Inc., No. 88 Civ. 2861,
        1996 WL 257581 (S.D.N.Y. May 16, 1996) ..................................................... 16

Innomed Labs, LLC v. ALZA Corp., 368 F.3d 148 (2d Cir. 2004) ............................ 12

International Brotherhood of Teamsters v. Carey, 297 F. Supp. 2d 706
        (S.D.N.Y. 2004) ................................................................ 17, 20, 21, 22, 23

J.D. Marshall International, Inc. v. Redstart, Inc., 935 F.2d 815 (7th Cir. 1991) ........................ 26

J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557 (1981) ........................... 15

Jerome M. Sobel & Co. v. Fleck, No. 03 Civ. 1041, 2003 WL 22839799
        (S.D.N.Y. Dec. 1, 2003) ......................................................................... 24

Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406 (3d Cir.1991) ........................... 27

La Salle Street Press, Inc. v. McCormick & Henderson, Inc., 293 F. Supp. 1004
        (N.D. Ill. 1968), aff'd, 445 F.2d 84 (7th Cir. 1971) .......................................... 13

Lesavoy v. Lane 304 F. Supp.2d 520 (S.D.N.Y. 2004) ..................................... 37

Linens of Europe, Inc. v. Best Manufacturing, Inc., No. 03 Civ. 9612, 2004 WL
        2071689 (S.D.N.Y. Sept. 16, 2004) ........................................................ 26

Lighting World, Inc. v. Birchwood Lighting, Inc., No. 01 Civ. 4751(BSJ), 2001
        WL 1242277 (S.D.N.Y. Oct. 16, 2001) ...................................................... 38

Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc., No. 02 Civ. 6438 PKC,
        2004 WL 3015287 (S.D.N.Y. Dec. 29, 2004) ...................................... 2, 15, 16, 25, 26, 27

Marshall Gobuty International USA, Inc. v. Nike, Inc., 04 Civ. 6975, 2004 WL
        2578912 (Nov. 10, 2004) .................................................................... 37

Martinez v. Sanders, No. 02 Civ. 5624 (RCC), 2004 WL 1234041
        (S.D.N.Y. June 3, 2004) ....................................................................... 4

Mason v. America Tobacco Co., 346 F.3d 36 (2d Cir. 2003), cert. denied, 124 S.
        Ct. 2163 (2004) ................................................................................ 4

Mathon v. Marine Midland Bank, N.A., 875 F. Supp. 986 (E.D.N.Y. 1995) ........................ 19, 25

May Department Store v. Graphic Process Co., 637 F.2d 1211 (9th Cir. 1980) ........................ 12

iv

Miyano Machinery USA, Inc. v. Zonar, No. 92 C 2385, 1993 WL 23758
    (N.D. Ill. Jan. 29, 1993) ........................................................................... 14

Moy v. Terranova, 97 CV 1578, 1999 WL 118773 (E.D.N.Y. Mar. 2, 1999) ............................. 28

Mussett v. Baker Material Handling Corp., 844 F.2d 760, 762 (10th Cir. 1988) ........................ 35

Nasik Breeding & Research Farm Ltd. v. Merck & Co., 165 F. Supp. 2d 514
    (S.D.N.Y. 2001) ..................................................................................... 17

New York Transportation, Inc. v. Naples Transportation, Inc., 116 F. Supp. 2d
    382 (E.D.N.Y. 2000) ................................................................................ 33

Old Republic Insurance Co. v. Hansa World Cargo Service, Inc., 170 F.R.D. 361
    (S.D.N.Y. 1997) .......................................................................... 3, 32, 33, 34

Oscar v. University Students Co-Operative Ass'n, 965 F.2d 783 (9th Cir. 1992) ................. 29, 30

Oriska Insurance Co. v. Power P.E.O., Inc., 317 F. Supp. 2d 161, 166
    (N.D.N.Y. 2004) ..................................................................................... 39

Patterson v. Ford Motor Credit Co., No. 98-2774, 2000 WL 123943
    (4th Cir. Feb. 2, 2000) ...................................................................... 11, 13, 18

Plater-Zyberk v. Abraham, No. Civ. 3322, 1998 WL 67545,
    (E.D. Pa. Feb. 17, 1998) ............................................................................ 24

Polycast Technology Corp v. Uniroyal, Inc., 728 F. Supp. 945 (S.D.N.Y. 1989) ........................ 27

Ray Larsen Associates Inc. v. Nikkeo America, Inc., No. 89 Civ 2809, 1996 WL
    442799 (S.D.N.Y. Aug. 6, 1996) ............................................................. 20, 21, 35

Record Club of America, Inc. v. Capitol Records, Inc., No. 70 Civ 3315, 1971
    WL 558 (S.D.N.Y. Sept. 8, 1971) .................................................................... 13

Resnick v. Resnick, 763 F. Supp. 760 (S.D.N.Y. 1991) ................................................ 31

Richard v. Hoechst Celanese Chemical Group Inc., 355 F.3d 345
    (5th Cir. 2003), cert. denied, 125 S.Ct. 46 (2004) ......................................... 3, 32, 42, 43

Roeder v. Alpha Industries, Inc., 814 F.2d 22 (1st Cir. 1987) ....................................... 25

Ruby Development Corp. v. Charrim Development Corp., 742 F. Supp. 1213
    (E.D.N.Y. 1990) ..................................................................................... 21

v

San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris
    Cos., 75 F.3d 801 (2d Cir. 1996) ................................................................. 4

Santana Products, Inc. v. Bobrick Washroom Equipment, Inc., 69 F. Supp.2d 678, 686
    (M.D. Pa. 1999) ........................................................................................ 35

Saminsky v. Occidental Petroleum Corp., 373 F. Supp. 257, 259-60 (S.D.N.Y.
    1974) ......................................................................................................... 38

Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91 (2d Cir. 1997) ..................................... 25

Seaboard Supply Co. v. Congoleum Corp., 770 F.2d 367 (3d Cir. 1985) ................................... 11

Schmidt v. Fleet Bank, 16 F. Supp. 2d 340 (S.D.N.Y. 1998) ................................................. 28, 29

Singh v. Parnes, 199 F. Supp. 2d 152 (S.D.N.Y. 2002) ........................................................... 26, 28

Snyder v. Ply Gem Industries, Inc., 200 F. Supp. 2d 246, 251-52 (S.D.N.Y. 2001) ................... 38

Stanley Shenker & Associates, Inc. v. World Wrestling Entertainment, Inc.,
    844 A.2d 964 (Conn. Super. Ct. 2003) ......................................................... 12

Stephens, Inc. v. Geldermann, Inc., 962 F.2d 808 (8th Cir. 1992) ............................................. 29

Straight Arrow Products v. Conversion Concepts, Inc., No. 01-221, 2001
    WL 1530637 (E.D. Pa., Dec 03, 2001) ........................................................ 35

In re Taxable Municipal Bond Securities Litigation, 51 F.3d 518 (5th Cir. 1995) ..................... 31

Tellis v. United States Fidelity & Guaranty Co., 826 F.2d 477 (7th Cir. 1986) ......................... 27

Thai Airways International Ltd. v. United Aviation Leasing B.V., 842 F. Supp.
    1567 (S.D.N.Y. 1994) ......................................................................... 20, 21, 27

Three Rivers Motors Co. v. Ford Motor Co., 522 F.2d 885, 897 (3d Cir. 1975) ........................ 35

Tsipouras v. W & M Properties, Inc., 9 F. Supp. 2d 365 (S.D.N.Y. 1998) ................................ 31

United States v. Carson, 52 F.3d 1173 (2d Cir. 1995) ........................................................... 3, 31

United States v. Philip Morris USA, Inc., No. 04 Civ. 5252, 2005 WL 267948
    (D.C.Cir. Feb. 4, 2005) ............................................................................... 31

United States v. Turkette, 452 U.S. 576 (1981) ..................................................................... 28

United States v. Kragnes, 830 F.2d 842 (8th Cir. 1987) ................................................................ 27

United States v. Walgren, 885 F.2d 1417 (9th Cir. 1989) ............................................................ 27

United States Fire Insurance Co. v. United Limosine Service, Inc., 303 F. Supp.
    2d 432 (S.D.N.Y. 2004) ......................................................................................................... 18

Vemco, Inc. v. Camardella, 23 F.3d 129 (6th Cir. 1994) ...................................................... 21, 23

Viacom International, Inc. v. Melvin Simon Productions, Inc., 774 F. Supp. 858
    (S.D.N.Y. 1991) ..................................................................................................................... 38

Watral v. Silvernails Farms, LLC, 177 F. Supp. 2d 141 (E.D.N.Y. 2001) ............................ 21, 35

West 79th St. Corp. v. Congregation Kahl Minchas Chinuch, No. 03 Civ. 8606,
    2004 WL 2187069 (S.D.N.Y. Sept. 29, 2004) .................................................... 34, 35, 40

Williams v. Stone, 109 F.3d 890, 892, 896 (3d Cir. 1997) .......................................................... 36

ZPC 2000, Inc. v. The SCA Group, Inc., 86 F. Supp. 2d 274, 279 (S.D.N.Y. 2000) .................. 38

STATUTES                                                                        PAGE(S)

15 U.S.C. § 13 ........................................................................................... 2, 11, 12, 14

18 U.S.C. § 1952 ................................................................................................... 35

18 U.S.C. § 1956 ................................................................................................... 35

18 U.S.C. § 1957 ................................................................................................... 35

18 U.S.C. § 1961 ........................................................................................... 18, 28, 35

18 U.S.C. § 1964 ............................................................................... 3, 28, 29, 30, 32, 34

18 U.S.C. § 2314 ............................................................................................... 3, 34

28 U.S.C. § 1404(a) ..................................................................................... 1, 3, 37

OTHER AUTHORITIES                                   PAGE(S)

S. Rep. No. 91-617 (1969) ........................................................................................ 25

Wright & Miller, 5B Fed. Prac. & Proc. Civ.3d § 1357 ................................................................ 36

Defendants JAKKS Pacific, Inc., JAKKS Pacific (H.K.) Limited, Road Champs Limited, Jack Friedman, Stephen Berman and Joel Bennett (collectively, the "JAKKS Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the complaint (the "Complaint" or "Compl.") of World Wrestling Entertainment, Inc. ("WWE"), pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6) and 9(b), or, in the alternative, to transfer this action pursuant to 28 U.S.C. § 1404(a).

## PRELIMINARY STATEMENT

By filing its action in this Court, which lacks subject matter jurisdiction and has no bona fide relationship to the parties or events that give rise to its claims, WWE has engaged in gamesmanship that is rarely encountered and, we respectfully submit, never should be countenanced. Lacking diversity of citizenship or any other basis of federal jurisdiction, WWE's complaint constitutes an ill-conceived attempt to morph garden-variety state law issues -- which WWE has been litigating in the Connecticut state court for several years against defendants Shenker and Bell -- into a federal case.[1] As a result, this Court's subject matter jurisdiction depends entirely on the validity of WWE's federal claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and Robinson-Patman Act ("RPA"). Not surprisingly, WWE's strained attempt to manufacture federal claims, where none exist, has produced federal claims that are riddled with fatal flaws, and thus cannot sustain the Court's jurisdiction.

---

[1]	In attempting to corral the defendants in this District, WWE has run roughshod over its agency agreement with Stanley Shenker & Associates ("SSAI") that mandates that its disputes be resolved in Connecticut. See accompanying Declaration of Michael H. Gruenglas which contains all exhibits cited herein ("Ex."), at Ex. A at § 14(h). Given the lengthy litigation that has been pending in the Connecticut state court, the naming of defendants Shenker and Bell as defendants in this action is inexplicable.

On their face, WWE's alleged RPA allegations fail to state a claim because they rest solely on alleged payments to procure intellectual property -- a video game license -- and the related extension of a toy licence (the "Licenses"). As a matter of law, the Licenses are intangible rights, not "goods, wares, or merchandise" within the purview of the RPA. 15 U.S.C. § 13(c). As a separate and independent basis for dismissal, WWE fails to allege the requisite "antitrust injury" and, therefore, lacks standing to assert a RPA claim against JAKKS. See Point I, infra.

Of similar ilk are WWE's RICO claims, which suffer from myriad fundamental defects. Stripped of persiflage, WWE's RICO claims against the JAKKS Defendants are based on a single alleged bribery episode to obtain the Licenses from a single victim (WWE) beginning on January 2, 1998 (Compl. ¶ 46), which was completed with a July 15, 1998 invoice representing the "final payment of the bribery scheme." (See Compl. ¶ 87.) In this context, WWE's RICO's claims must be dismissed on the following separate and independent grounds:

- Under controlling legal authority, the Complaint fails to allege the requisite "continuity" necessary to constitute a pattern of racketeering activity. See Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 242 (2d Cir. 1999).

- WWE's artificial attempt to "slice and dice" a single alleged bribery episode into several individual components and then to pass them off as predicate acts violates "the Second Circuit's oft-stated admonition that courts should guard against the meritless fragmentation of a single predicate act into multiple acts for the mere purpose of pursuing a RICO claim." Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc., No. 02 Civ. 6438PKC, 2004 WL 3015287, at *9 (S.D.N.Y. Dec. 29, 2004).

- WWE's attempt to allege a RICO "association-in-fact enterprise" consisting of the JAKKS Defendants and the Connecticut Defendants and their affiliates, (Compl. ¶ 137) fails, as a matter of law, because WWE defines the "enterprise" solely by the alleged predicate acts in the single alleged scheme against WWE, and it has no other structure, ongoing organization or purpose beyond the alleged predicate acts. See, e.g., First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 173-75 (2d Cir. 2004).

- WWE fails to allege the requisite pecuniary injury to its "business or property by reason of a violation of" the RICO statute so as to state a claim under RICO.  18 U.S.C. § 1964(c).  WWE's conclusory claimed loss of the opportunity to entertain other potential offers is a "loss far too speculative to sustain a claim under RICO."  See Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 24 (2d Cir. 1990).

- WWE's allegations of predicate acts fail to comply with Rule 9(b) of the Federal Rules of Civil Procedure or are otherwise subject to fatal defects.  See Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc., 170 F.R.D. 361, 382 (S.D.N.Y. 1997).

- WWE's prayer for rescission of the Licenses and/or restitution or disgorgement of the revenue from the Licenses is barred as a matter of law because such remedies are available under RICO only to "prevent and restrain" future conduct, not to redress past conduct.  See United States v. Carson, 52 F.3d 1173, 1181 (2d Cir. 1995).  See Point II, infra.

Wholly apart from the glaring defects in WWE's federal claims, all of its claims are barred by the Settlement Agreement and General Release of All Claims that WWE provided JAKKS in 2004 (the "Release").  The Release was issued after an audit that, according to the Complaint, targeted precisely those payments that form the basis of the Complaint.  See Point III., infra.

Even if the Court had federal subject matter jurisdiction, which it plainly does not, and even if the Release did not bar this action, and it does, this forum -- which the WWE inexplicably selected for no bona fide reason -- has no conceivable connection to the claims or parties to this action.  It bears emphasis that not a single one of the parties to this case, including WWE, resides in this District.  Indeed, based on the face of WWE's own Complaint, this action should be summarily transferred pursuant to 28 U.S.C. § 1404(a) to the Central District of California, where it could have been brought and where the main events occurred and the vast majority of the Defendants and witnesses reside.  See Point IV, infra.

3

## FACTUAL BACKGROUND[2]

### A.    The Parties

WWE:  Plaintiff WWE is a Delaware corporation whose principal place of business is located in Connecticut. (Compl. ¶ 7.)  WWE is an integrated media and entertainment company principally engaged in events involving professional wrestling. (Id.)

The JAKKS Corporate Defendants:  JAKKS Pacific, Inc. ("JAKKS") is a Delaware corporation whose principal place of business is in California. (Id. ¶ 8.)  JAKKS is a multi-brand company that designs, develops, produces and markets toys, leisure products and writing instruments for children and adults around the world.  JAKKS Pacific (H.K.) Limited ("JAKKS H.K.") and Road Champs Limited ("Road Champs") are Hong Kong corporations that are wholly owned subsidiaries of JAKKS. (Id. ¶¶ 9, 10.)

The JAKKS Individual Defendants:  Jack Friedman ("Friedman") is the Chief Executive Officer and Chairman of the Board of Directors of JAKKS and resides in Malibu, California. (Id. ¶ 11.)  Stephen Berman ("Berman") is the President, Secretary and Chief Operating Officer of JAKKS and serves on JAKKS' Board of Directors and resides in Malibu, California. (Id. ¶12.)  Joel Bennett ("Bennett") is the Chief Financial Officer of JAKKS and resides in Moorpark, California. (Id. ¶ 13.)

---

[2]      Although the Complaint's factual allegations are, solely for purposes of this motion, accepted as true, "'[l]egal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness.'"  Mason v. Am. Tobacco Co., 346 F.3d 36, 39 (2d Cir. 2003) (citations omitted).  On a Rule 12(b)(6) motion to dismiss, the Court may properly consider documents that are "integral" to the complaint, see San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 808-09 (2d Cir. 1996), as well as public papers in the legal proceedings between Plaintiff and other defendants in Connecticut.  See Martinez v. Sanders, No. 02 Civ. 5624, 2004 WL 1234041, at *1 n.2 (S.D.N.Y. June 3, 2004).

<u>THQ</u>:  THQ, Inc. ("THQ"), a developer and publisher of interactive entertainment software (video games), is a Delaware corporation whose principal place of business is in California.  (<u>Id.</u> ¶ 14.)  THQ, along with JAKKS, created Defendant THQ/JAKKS Pacific LLC (the "LLC"), a Delaware limited liability corporation whose principal place of business is in California, to jointly obtain and exploit a videogame license from WWE.  (<u>Id.</u> ¶¶ 14, 15.)

<u>The Connecticut Defendants</u>:  Stanley Shenker ("Shenker") resides in New Canaan, and is the President and sole owner of Stanley Shenker & Associates ("SSAI") and the sole owner of Stanfull Industrial, Ltd. ("Stanfull"), a Hong Kong corporation.  (<u>Id.</u> ¶ 17.)  SSAI is a New York corporation whose principal place of business is in Connecticut.  (<u>Id.</u> ¶ 16.)  WWE has affirmatively pled that SSAI is a New Jersey Corporation.  (<u>See</u> Ex. H, pg. 18, ¶ 3.)  From approximately April 1995 through June 13, 2000, SSAI was WWE's licensing agent.  (Compl. ¶ 16.)  James Bell ("Bell") resides in Norwalk, Connecticut and is the President and sole owner of Bell Licensing, LLC.  (<u>Id.</u> ¶ 19.)  Bell Licensing, LLC ("Bell Licensing") is a Connecticut company whose principal place of business is in Connecticut.  (<u>Id.</u> ¶ 18.)

**B.    WWE's Licensing Arrangements**

Bell was responsible for, among other things, procuring and negotiating license agreements for WWE.  (<u>Id.</u> ¶¶ 22, 23.)  In or around April 1995, on Bell's recommendation, WWE hired SSAI as a non-exclusive outside licensing agent to procure and negotiate licensing agreements for WWE.  (<u>Id.</u> ¶ 25.)  In 1997, WWE entered into an "Agency Agreement" with SSAI pursuant to which SSAI became WWE's exclusive outside licensing agent.  (<u>Id.</u> ¶ 38, Ex. A.)  SSAI received commissions (of 11%) on new licensing deals it procured -- but not on deals procured by WWE or Bell.  (Compl. ¶¶ 40, 41.)  The Agency Agreement did not permit

SSAI to enter into any agreements on behalf of WWE. Rather, it required SSAI to present proposals to Bell, who made recommendations to WWE, which alone made the final decision on licenses. (Id. ¶ 39; Ex. A.) Further, the Agency Agreement did not prohibit SSAI from performing services for other clients; it only precluded SSAI from representing another professional wrestling company in negotiating and servicing licenses. (Ex. A. at § 5.) The Agency Agreement requires that disputes between WWE and SSAI be resolved in Connecticut. (See Ex. A. at § 14(h).) WWE acknowledges that Shenker performed services for JAKKS in 1996 in connection with a perfumed doll toy product. (Compl. ¶ 31.) WWE does not challenge the legitimacy of this transaction or any payments relating to it.

### C.    The Alleged RICO Scheme

The alleged RICO scheme involves a supposed plan by JAKKS to obtain the Licenses by bribing Bell and Shenker and funneling the payments through Stanfull. (Id. ¶ 44.) In early 1998, WWE began negotiating with a number of companies over rights to WWE's videogame license which was then held by Acclaim. (Id. ¶¶ 42, 43, 46.) JAKKS already was an established WWE licensee, having held a domestic toy license from WWE since 1995 (the "Toy License") and an international toy license from WWE since 1997. WWE alleges that "in order to control the videogame license" the JAKKS Defendants "devised and implemented a corrupt scheme to foreclose competition for the videogame license." (Id. ¶ 44.) The only facts alleged by WWE to demonstrate this so-called scheme are payments amounting to $100,000 by JAKKS' affiliates to Stanfull, pursuant to two invoices in the first seven months of 1998 that were described as relating to the development of possible latex based soft toys (Compl. Ex. 1) and the design and development of B.A.S.S. samples (Compl. Ex. 2; Compl. ¶¶ 46, 87.) Relying on the

timing of these payments, WWE characterizes these transactions as "bribes" to obtain the Licences. (Id. ¶¶ 36, 44 et seq., 90.)

Significantly, despite years of discovery, WWE has not identified a single piece of evidence linking the alleged payments to the Licenses. To the contrary, WWE admits that in the Connecticut litigation, despite the Connecticut Defendants' admissions with respect to improprieties in dealings with other licensees, and their extensive recantations of sworn testimony, all defendants have consistently and steadfastly denied that any bribes were paid in connection with the Licenses. (See Compl. ¶¶ 116, 117, 118.)

According to WWE, SSAI split the payments it received from JAKKS with Bell, paying Bell $20,000 of the $40,000 it received on January 14, 1998, (id. ¶ 54), and an additional $20,000 on or about April 7, 1998 from the $40,000 payment received from JAKKS on April 2, 1998. (Id. at ¶ 65.) WWE alleges that Stanfull received the $20,000 "final payment of the bribery scheme," (for B.A.S.S. samples) on August 3, 1998. (Id. ¶¶ 87-88.) WWE also alleges that this same $20,000 payment was transferred to Bell months later in October, 1998, purportedly as part of the same bribery scheme. (Id. at ¶ 89.)

On March 30, 1998, allegedly in consideration for this $100,000 bribe, Bell recommended to WWE that the videogame license be awarded to JAKKS and listed SSAI as the agent that procured the deal. (Id. ¶ 61.) WWE approved the JAKKS deal memorandum on April 8, 1998 and days later "principally based on Bell's influence," informed its current videogame licensee, Acclaim, that it did not intend to renew Acclaim's license. (Id. ¶¶ 66, 67.) WWE admits that the alleged bribe did not preclude further bidding or negotiations, and that

even after Bell supposedly told Acclaim on March 25, 1998, that it could not submit a proposal, Acclaim was told by WWE that "it could do so." (Id. at 60.)

WWE concedes that the alleged bribery scheme did not prevent the submission of "clearly superior" bids from others. (Id. ¶¶ 71, 72.) Indeed, WWE admits that after WWE's management approved Bell's proposal for JAKKS becoming the videogame licensee, THQ and Activision sent proposals to Bell and Shenker for the videogame license that allegedly included terms superior to the JAKKS's proposal. (Id. ¶¶ 71, 72.) Subsequently, THQ decided to partner with JAKKS and create a Joint Venture -- the LLC -- to make a proposal for the videogame license. (Id. ¶ 76.) The LLC then submitted its own proposal to WWE "designed to be competitive with the Activision proposal, including stock options in both JAKKS and THQ." (Id. ¶ 77.) On May 12, 1998, Bell drafted a new deal memorandum reflecting the LLC's proposal, with SSAI as the agent, and submitted it to WWE management. (Id. ¶ 82.) On June 23, 1998, WWE executed the videogame license agreement with the LLC, effective as of June 10, 1998. (Id. ¶ 85.) A day later, WWE and JAKKS amended the Toy License to make it coterminous with the videogame license. (Id. ¶ 86.)

### D.    The Connecticut Litigation

Since 2000, WWE has been furiously litigating with Bell and Shenker in Connecticut state court about whether Shenker made illicit payments to Bell to steer WWE licensees to SSAI so that SSAI could collect the 11% commissions described in Shenker's Agency Agreement with WWE. Nearly five years ago, WWE terminated its business relationship with Shenker and Bell, ending any possibility of continued illicit conduct by them. On March 24, 2000, WWE terminated Bell's employment, purportedly for reasons unrelated to any

8

alleged bribery scheme. (Id. ¶ 92.) On June 13, 2000, WWE also terminated its contract with SSAI, purportedly due to a "change in business direction." (Id. ¶ 93.) In response, in October 2000, SSAI sued WWE in Connecticut state court to recover commissions owed to SSAI on licenses SSAI allegedly procured. (Id. ¶ 94; Ex. B.) WWE asserted counterclaims. (Ex. I.) In February 2003, WWE also asserted claims against Bell, including claims arising under RICO. (Ex. C at ¶¶ 50-64.) The RICO scheme alleged by WWE involved Bell's alleged misrepresentations to WWE that Shenker and/or SSAI had procured or negotiated several licenses, including the licenses with JAKKS, to enable SSAI to obtain commissions from WWE on licenses it had not procured. (See Id. at ¶ 58(a).)

On October 16, 2003, due to Shenker's discovery misconduct, the court dismissed SSAI's claims against WWE with prejudice and entered a default judgment against SSAI on WWE's counterclaims. (Ex. D.) On August 17, 2004, summary judgment also was granted to WWE on seven of its claims against Bell, including breach of contract, breach of fiduciary duty, statutory conversion, fraudulent misrepresentation and civil conspiracy. (Ex. E.) WWE's RICO claim against Bell in Connecticut state court remains sub judice. (WWE 12/8/04 Pre-Motion Letter ("WWE 12/8/04 Letter") at 2.)

### E.    The Subpoena to JAKKS

In the Connecticut litigation, WWE issued a third party subpoena to JAKKS. (Compl. ¶ 100.) On its face, the subpoena only sought information related to payments between JAKKS, Shenker, SSAI and Bell. (Id. ¶ 101; see also Ex. F.) The Subpoena nowhere mentioned Stanfull and only sought documents from JAKKS Pacific, Inc., not any of JAKKS' foreign

9

subsidiaries.  (Ex. F.)  JAKKS's October 30, 2002 response to the Subpoena initially omitted the

two 1998 Stanfull invoices from Stanfull to JAKKS Pacific in Hong Kong.  (Compl. ¶ 102.)

     **F.**     **WWE's Claims**

     In the Complaint, WWE asserts claims against the JAKKS Defendants for:

(1) RICO violations (id. ¶¶ 135-45); (2) RICO conspiracy (id. ¶¶ 146-50); (3) a declaratory

judgment that the videogame and toy licenses are void (id. ¶¶ 151-72); (4) violations of the RPA

(id. ¶¶ 173-79); (5) violations of the New York commercial bribery law (id. ¶¶ 180-86); (6)

fraudulent inducement (id. ¶¶ 187-94); (7) unjust enrichment (id. ¶¶ 195-98); (8) inducing breach

of fiduciary duty (id. ¶¶ 199-14); (8) the imposition of a constructive trust (id. ¶¶ 215-19); (9)

tortious interference with contract (id. ¶¶ 220-25); (10) piercing the corporate veil/alter ego (id.

¶¶ 226-229); and (11) civil conspiracy.  (Id. ¶¶ 230-34.)  Diversity of citizenship between WWE

and all the defendants is absent because WWE, JAKKS, THQ and the LLC are Delaware

Corporations.  Thus, the Court's subject matter jurisdiction depends entirely on the federal RPA

and RICO claims WWE has attempted to plead.  Because both of these claims are fatally

defective, this Court lacks subject matter jurisdiction.

## ARGUMENT

**I.**     **WWE FAILS TO STATE A CLAIM UNDER THE ROBINSON PATMAN ACT**

     **A.**     **The RPA Targets Unlawful Price Discrimination in the Sale of Goods**

     Section 2(c) of the RPA, provides that "[i]t shall be unlawful for any person

engaged in commerce . . . to pay or grant, or to receive or accept, anything of value as a commis-

sion, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for

services rendered in connection with the sale or purchase of goods, wares, or merchandise . . . ."

10

15 U.S.C. § 13(c).  Section 2(c) of the RPA was designed to address a problem far removed from the allegations here -- the use of "dummy" brokerage fees to create price discrimination in the sale of tangible goods and merchandise.  <u>Fed. Trade Comm'n v. Henry Broch & Co.</u>, 363 U.S. 166, 168-69 (1960); <u>see also</u> <u>Blue Tree Hotels Investment (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.</u>, 369 F.3d 12, 221 (S.D.N.Y. 2004).

**B.      The RPA Is Inapplicable to the Intangible Licence Rights at Issue Here**

WWE claims that the JAKKS Defendants committed commercial bribery to procure the Licenses.  Even if commercial bribery were actionable under the RPA, which is doubtful,[3] as a matter of law, WWE fails to state an RPA claim because the Licenses are intangible rights, not  "goods, wares, or merchandise" within the purview of Section 2(c) of the RPA.  <u>See</u> 15 U.S.C. § 13(c).

On its face, the protections of Section 2(c) of the RPA extend only to the purchase or sale of concrete "goods, wares, or merchandise," and do not apply to transactions involving intangible rights or services.  <u>See</u> <u>Gordon v. N.Y. Stock Exch., Inc.</u>, 498 F.2d 1303, 1305 & n.7 (2d Cir. 1974) (holding RPA claim challenging stock exchange rate structure "frivolous" because brokerage services were not "commodities," and noting that brokerage commissions were not

---

[3]      Even if this case involved a sale of tangible goods, it is doubtful that the type of commercial bribery alleged here would be actionable under the RPA.  <u>Seaboard Supply Co. v. Congoleum Corp.</u>, 770 F.2d 367, 372 (3d Cir. 1985) ("There is good reason to question whether Congress intended to sweep commercial bribery within the ambit of section 2(c)."); <u>accord</u> <u>Patterson v. Ford Motor Credit Co.</u>, No 98-2774, 2000 WL 123943, at *2 (4th Cir. Feb. 2, 2000) (unpublished table decision (203 F.3d 821) (noting that "[w]hether commercial bribery comes within the scope of . . . section [2(c)] remains an open question in [the Fourth Circuit]"); <u>see also</u> <u>Blue Tree Hotels</u>, 369 F.3d at 221 ("The Second Circuit has never reached the question of whether -- and under what circumstances -- commercial bribery can form the basis of a claim under § 2(c).  And we find that we need not decide the issue here.").

covered by Section 2(c) of the RPA which "proscribes such practices only 'in connection with the sale or purchase of goods, wares, or merchandise'" (quoting 15 U.S.C. § 13(c))), aff'd, 422 U.S. 659 (1975); Freeman v. Chicago Title & Trust Co., 505 F.2d 527, 529, 534 (7th Cir. 1974) (affirming dismissal of an RPA Section 2(c) claim based on rebates by a title insurance company to buyer's agents because title insurance is an intangible good: "[t]he courts have consistently interpreted the other provisions of the [RPA] as being restricted to transactions involving tangible products."); Fiore v. Kelly Run Sanitation, Inc., 609 F. Supp. 909, 916 (W.D. Pa. 1985) (holding permits similar to "licensing transactions which are not sales for purposes of [Section 2(c) of the RPA]"); see also May Dep't Store v. Graphic Process Co., 637 F.2d 1211, 1214 (9th Cir. 1980) ("It is necessary for an action under section 2(c) of the [RPA] that the transactions between the parties constitute a sale of 'goods, wares, or merchandise' and not merely a contract for services.").

Construing Section 2(a) of the RPA, which is broader than Section 2(c),[4] and proscribes price discrimination in the sale of "commodities," the Second Circuit Court of Appeals recently stated that "contracts that explicitly grant a license to exploit the intellectual property contained in a commodity have been viewed as primarily concerned with intangible rights and are therefore not covered by the [RPA]." Innomed Labs, LLC v. ALZA Corp., 368 F.3d 148, 160 n.4 (2d Cir. 2004).[5] Accord Empire State Pharmaceutical Society, Inc. v. Empire

---

[4]      In Freeman, the court noted that although courts had not attempted to distinguish between the term "commodities" in Section 2(a) and "goods, wares or merchandise" in Section 2(c), Section 2(c) "would have to be considered the more restrictive."  505 F.2d at 530 n.6.

[5]      Unlike in Innomed, which involved a distributor's actual purchase of physical goods (pills) from the manufacturer for distribution and resale, 368 F.3d at 152-53, the Licenses convey only

(continued...)

<u>Blue Cross & Blue Shield of Greater New York</u>, 778 F. Supp. 1253, 1258-60 (S.D.N.Y. 1991)

(dismissing RPA claim because the "abundance of authority establishing that the [RPA] applies

only to goods and commodities and does not apply to services such as insurance," and imposing

Rule 11 sanctions because plaintiff's "claim under the [RPA] was objectively unreasonable.")

       The Licenses at the heart of this action certainly are not tangible "goods, wares, or

merchandise" protected by the RPA.  On the contrary, they are quintessentially intangible rights

that are outside the scope of the RPA.  <u>See, e.g.</u>, <u>Goodloe v. Nat'l Wholesale Co.</u>, No. 03 C 7176,

2004 WL 1631728, at *10 (N.D. Ill. July 19, 2004) (dismissing RPA claims based on sale of

business services and licenses because "licenses and services leased to [plaintiff] do not

constitute 'commodities' under the [RPA]"); <u>see also</u> <u>La Salle St. Press, Inc. v. McCormick &</u>

<u>Henderson, Inc.</u>, 293 F. Supp. 1004, 1006 (N.D. Ill. 1968) (agreement selling license to patented

process is for an intangible right, rather than a commodity), <u>aff'd</u>, 445 F.2d 84 (7th Cir. 1971);

<u>Record Club of Am., Inc. v. Capitol Records, Inc.</u>, No. 70 Civ. 3315, 1971 WL 558, at *3

(S.D.N.Y. Sept. 8, 1971) (agreement granting manufacturing and distribution rights to copy-

righted material involved an intangible right).

       In <u>Patterson</u>, 2000 WL 123943, at *4-5, the Court of Appeals for the Fourth

Circuit affirmed the dismissal of an RPA Section 2(c) claim arising from alleged bribes paid to

obtain the assignment of a sales contract.  Noting that "circuit courts of appeal appear to be in

agreement that section 2(c) covers only transactions that involve the transfer of tangible goods,"

the Fourth Circuit squarely held that plaintiffs failed to state a claim under Section 2(c) because

---

[5]     (...continued)
the intangible right to use WWE's intellectual property and do not transfer any goods, wares or
merchandise to JAKKS or the LLC.  (Ex. G at § 2(a).)

the alleged bribe "was connected only to the purchase and transfer of the installment sales contract, [and therefore] was not a transaction in tangible goods within the reach of section 2(c) of the [RPA]." Id. at *3.

In Miyano Machinery USA, Inc. v. Zonar, No. 92 C 2385, 1993 WL 23758, at *6 (N.D. Ill. Jan. 29, 1993), the court dismissed a Section 2(c) claim based on alleged bribes paid to obtain distribution rights because the transaction was "only tangentially about the purchase and sale of . . . goods."  In language equally applicable here, the court explained that the alleged scheme involved "an agreement to encourage Midland to purchase distribution rights, a business opportunity, and [the plaintiff's sales manager] received kickbacks from that sale.  That sale of a business opportunity, even the opportunity to sell goods, does not come within the purview of § 2(c) of [the RPA]." Id. at *6 (emphasis added) (footnote omitted).  Because WWE's RPA claim, at best, alleges only payments to acquire a business opportunity or to obtain intangible license rights, and not the purchase or sale of tangible goods, it must be dismissed as a matter of law.

### C.    WWE's Speculative Allegations of Loss Fail To Allege the Necessary Injury for an RPA Claim

A private litigant seeking treble damages for a violation of Section 2(c) of the RPA, 15 U.S.C. § 13(c), must also allege an "antitrust injury." Blue Tree Hotels, 369 F.3d at 219-20.  An antitrust injury requires "(1) an injury-in-fact; (2) that has been caused by the violation; and (3) that is the type of injury contemplated by the statute." Id. at 220 (citation omitted).  WWE's RPA claims also fail for the separate and independent reason that it does not allege the requisite "antitrust injury" because its alleged injury is not the type targeted by the

14

statute and is wholly speculative.  WWE therefore lacks standing under the RPA.  See 2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp., 369 F.3d 732, 740-41 (3d Cir. 2004).

WWE simply does not and cannot allege the type of concrete antitrust injury necessary to state a claim under Section 2(c).  As the Supreme Court has held, to bring suit under the RPA, a plaintiff "'must prove more than a violation' of the [RPA], and 'must make some showing of actual injury.'"  Maddaloni Jewelers, Inc., 2004 WL 3015287, at *11 (quoting J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 562 (1981)).  "[T]he focus of 'antitrust injury' is on whether the challenged conduct has actually caused harm to the plaintiff."  Blue Tree Hotels, 369 F.3d at 220 (emphasis added).

Lacking any antitrust or other concrete injury, WWE engages in rank speculation that it was injured because it was "deprived of the benefit of competition between and among [certain other potential licensees] and JAKKS."  (Compl. ¶ 179.)  WWE's own allegations directly contradict its assertion that competition was stifled by the alleged bribe.  Indeed, WWE admits, as it must, that even after Bell's recommendation on March 30, 1998 (which was allegedly procured by the bribe payments), despite Bell's alleged interference, Acclaim obtained permission from WWE to submit a bid.  (Compl. ¶ 61.)  WWE is conspicuously silent about the terms of that bid, which is information in WWE's exclusive possession.  Further, WWE admits that after the March 30, 1998 deal memo, Activision and THQ submitted "clearly superior" bids for the videogame license.  (Id. at ¶¶ 71-72.)  According to WWE, this led to an increased bid from the LLC to be "competitive," (id. at ¶ 77),[6] which was ultimately accepted by WWE.

---

[6]      Tellingly, WWE's Complaint is devoid of any allegation of other contenders for the Toy License, or any facts to show that WWE suffered any injury -- even a speculative one -- from the
(continued...)

15

Given the competition that occurred and which yielded a superior economic deal for WWE from the LLC, WWE speculates baselessly that in forming the LLC, THQ "agreed to pay JAKKS monies which otherwise would have, and should have, been promised to WWE in an independent proposal." (Id. ¶ 76.) It bears emphasis that the Complaint is devoid of any allegation that THQ alone had the wherewithal or desire to make the bid that WWE accepted from the LLC. As a matter of law, such rank speculation fails to amount to an antitrust injury. See Maddaloni Jewelers, Inc., 2004 WL 3015287, at *14 (citing Hygrade Milk & Cream Co. v. Tropicana Prods., Inc., No. 88 Civ. 2861, 1996 WL 257581, at *18 (S.D.N.Y. May 16, 1996); id. at *12 (dismissing RPA claims where injury was speculative: "[S]weeping, conclusory statements cannot suffice as evidence of antitrust injury.") In order to establish an antitrust injury WWE must show that it actually suffered injury -- a mere "reasonable likelihood of injury" is not adequate. Hygrade Milk & Cream Co., 1996 WL 257581, at *18. WWE fails to do so.

Apart from being unduly speculative, WWE's claimed injury also fails to state a RPA claim for the separate and independent reason that it is not the "type of injury contemplated by the statute." Blue Tree Hotels, 369 F. 3d at 220; Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990). Section 2(c) was intended to address improper payments to camouflage unlawful price discrimination. See Henry Broch & Co., 363 U.S. at 168-69; see also Blue Tree Hotels, 369 F.3d at 221. The "injury" alleged by WWE bears no conceivable relation to the harm targeted by the statute. Thus, WWE wholly fails to state a viable claim under the RPA.

---

[6]    (...continued)

extension of the Toy License in 1998. Nor does the Complaint even attempt to allege that WWE has suffered in any way from JAKKS' or the LLC's performance under any of the Licenses.

16

II.    **WWE'S RICO CLAIMS FAIL AS A MATTER OF LAW**

This Court has repeatedly and properly recognized that "'[c]ivil RICO is an unusually potent weapon -- the litigation equivalent of a thermonuclear device.'" Dubai Islamic Bank v. Citibank, N.A., 256 F. Supp. 2d 158, 163 (S.D.N.Y. 2003) (citation omitted).  Because the mere assertion of a civil RICO claim "'has [an] almost inevitable stigmatizing effect on those named as defendants . . . courts should strive to flush out frivolous RICO allegations at an early stage of the litigation.'"  Id. (emphasis supplied) (citation omitted).  To ensure that "'RICO's severe penalties are limited to enterprises consisting of more than simple conspiracies to perpetrate the acts of racketeering . . . courts must always be on the lookout for the putative RICO case that is really nothing more than an ordinary fraud case clothed in the Emperor's trendy garb.'"  Nasik Breeding & Research Farm Ltd. v. Merck & Co., 165 F. Supp. 2d 514, 537 (S.D.N.Y. 2001) (alteration in original) (quoting Schmidt v. Fleet Bank, 16 F. Supp. 2d 340, 346).  In evaluating the sufficiency of a RICO complaint, courts focus on "factual allegations, as distinguished from . . . conclusory recitation of RICO-related legal propositions."  Int'l Bhd. of Teamsters v. Carey, 297 F. Supp. 2d 706, 716 (S.D.N.Y. 2004).

A.    **The Complaint Fails to Allege the Requisite
Continuous Pattern of Racketeering Activity**

WWE's RICO claims against the JAKKS Defendants fail to allege the required "pattern of racketeering activity," which consists of "at least two [predicate] acts of racketeering activity" committed in a ten-year period, 18 U.S.C. § 1961(5), which "'amount to or pose a threat of continued criminal activity,'" Cofacredit, S.A., 187 F.3d at 242 (quoting H.J. Inc. v. N.W. Bell Tel. Co., 492 U.S. 229, 239 (1989)).

17

WWE's RICO claims against the JAKKS Defendants rest on a single alleged bribe to obtain Licences from a single victim (WWE), which allegedly started on January 2, 1998 and ended with a "final payment of the bribery scheme" on July 15, 1998. (See Compl. ¶¶ 46, 87.) Under controlling Second Circuit law, this alleged scheme fails to satisfy either of the two independent essential requirements of the RICO statute: (1) "continuity" and (2) a "pattern" of racketeering.

### 1.    The Complaint Fails to Adequately Allege Continuity

When pleading a pattern of racketeering, a plaintiff must allege facts that would establish "that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." H.J. Inc. v. N.W. Bell Tel. Co., 492 U.S. 229, 239 (1989) (emphasis added). Under H.J. Inc., "[c]ontinuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." 492 U.S. at 241.

To satisfy closed-ended continuity, a plaintiff must allege related predicate acts that extend over "a substantial period of time." Id. at 242. Since the Supreme Court's decision in H.J. Inc., "'the Second Circuit has never held a period of less than two years to constitute a "substantial period of time" for purposes of closed end continuity.'" U.S. Fire Ins. Co. v. United Limousine Serv., Inc., 303 F. Supp. 2d 432, 448 (S.D.N.Y. 2004) (citation omitted); Cofacredit, S.A., 187 F.3d at 242. Although the Second Circuit has acknowledged that this durational requirement "is undoubtedly somewhat mechanistic," it is nonetheless "required to effectuate Congress's intent to target 'long-term criminal conduct.'" GICC Capital Corp. v. Tech. Fin. Group, Inc., 67 F.3d 463, 468 (2d Cir. 1995) (quoting H.J. Inc., 492 U.S. at 242). "Open-ended"

18

continuity does not require the minimum two year duration, but does require a plaintiff to plead

past criminal conduct coupled with a threat of future criminal conduct. Id. at 466.

<strong>a.    WWE Fails to Allege Closed-Ended Continuity</strong>

In its Complaint, WWE alleges, at most, a unitary scheme which lasted less than

one year to defraud a single entity -- WWE -- to procure the Licenses. According to WWE, the

alleged scheme to obtain the Licenses by bribing Shenker lasted barely seven months, from

January 1998 to the "final payment" on an invoice dated July 15, 1998. (See Compl. ¶¶ 46, 44 et

seq., 90.)

As a matter of law, this seven-month time-frame is woefully insufficient to

establish closed-ended continuity. Cofacredit, S.A., 187 F.3d at 242, 244 ("[T]he predicate acts

that the . . . Defendants committed spanned less than one year -- a period of insufficient length to

demonstrate closed-ended continuity under our precedents."); accord GICC, 67 F.3d at 468;

Mathon v. Marine Midland Bank, N.A., 875 F. Supp. 986, 998-99 (E.D.N.Y. 1995) (single real

estate transaction involving two persons and a limited goal lasting approximately fifteen (15)

months was insufficient to establish closed-ended continuity).

This conclusion is fortified by the limited number of perpetrators, victims and

objectives in this case: "[c]ourts in the Second Circuit have generally held that where the conduct

at issue involves a limited number of perpetrators and victims and a limited goal, the conduct is

lacking in closed-ended continuity." FD Prop. Holding, Inc. v. U.S. Traffic Corp., 206 F. Supp.

2d 362, 372 (E.D.N.Y. 2002) (collecting cases); see, e.g., GICC, 67 F.3d at 468 ("a handful of

participants" and no identified victim other than plaintiff); Cont'l Realty Corp. v. J.C. Penny Co.,

729 F. Supp. 1452, 1455 (S.D.N.Y. 1990) (RICO claim will typically fail when it relies on

19

"narrowly directed [actions] toward a single allegedly fraudulent [and limited] goal" lasting for a short period of time); Thai Airways Int'l Ltd. v. United Aviation Leasing B.V., 842 F. Supp 1567, 1572 (S.D.N.Y. 1994) ("courts have found that 'there is insufficient threat of continuity to support a RICO cause of action where the racketeering acts involved a brief period of time, relatively few criminal acts, an uncomplicated scheme, few participants and few victims.'" (citation omitted)); Ray Larsen Assocs., Inc. v. Nikko Am., Inc., No. 89 Civ. 2809, 1996 WL 442799, at *9 (S.D.N.Y. Aug. 6, 1996) (scheme involving single victim and one group of perpetrators spanning seventeen (17) months lacked sufficient continuity). A fortiori, where, as here, WWE alleges one brief scheme lasting only seven months to defraud one victim (WWE), it fails to establish continuity under RICO.

Recognizing its failure to allege in the Complaint any actions, much less predicate acts, by any of the JAKKS Defendants after 1998, WWE attempts to artificially elongate its insufficient RICO scheme by improperly tacking on alleged actions by other defendants. (See, e.g., WWE 12/8/04 Letter at 3 (claiming that "specifically enumerated violations cover a period from January 2, 1998 (Compl. ¶ 141 a.i) to December 13, 2001 (Compl. ¶ 141 b.xxvii), a period of nearly four years").) As a matter of law, the post-1998 actions by other defendants cannot satisfy the continuity requirement as to the JAKKS Defendants because continuity must be assessed as to each defendant solely on the basis of that specific defendant's predicate acts. See First Capital, 385 F.3d at 180 (in analyzing continuity, court must "evaluate the RICO allegations with respect to each defendant individually"); Cofacredit, S.A., 187 F.3d at 242 ("Closed-ended continuity is demonstrated by predicate acts that 'amount to continued criminal activity,' by a particular defendant." (emphasis added)); Int'l Brotherhood of Teamsters v. Carey, 163

F. Supp.2d 271, 280-81 (S.D.N.Y. 2001) ("[i]n determining the duration of a pattern of racketeer-ing activity, <u>courts focus solely on the predicate acts of racketeering each defendants is alleged to have committed</u>.") (emphasis supplied)  Accordingly, actions by other defendants and actions which are not predicate acts cannot extend the legally insufficient alleged RICO pattern as to the JAKKS Defendants.

As a fall-back, WWE also tries to prolong its unduly short RICO pattern by citing actions allegedly "taken by Defendants to cover up the criminal activity."  (WWE 12/8/04 Letter at 3.)  As a legal matter, alleged efforts to "cover up" prior predicate acts cannot satisfy the RICO continuity requirement.  <u>See, e.g.</u>, <u>Vemco, Inc. v. Camardella</u>, 23 F.3d 129, 134 (6th Cir. 1994) (disregarding "actions taken years later by a party to avoid a court judgment on RICO predicate acts," including defiance of court order to produce documents and deeming remaining predicate acts spanning 17 months insufficient to show continuity); <u>accord</u> <u>Carey</u>, 163 F. Supp. 2d at 283-84 (disregarding defendants' alleged "attempts to cover-up their wrongdoing" by, <u>inter alia,</u> submitting false affidavits); <u>Watral v. Silvernails Farms, LLC</u>, 177 F. Supp. 2d 141, 150 (E.D.N.Y. 2001) (rejecting attempt to extend bribery scheme lasting one year to satisfy RICO continuity by "tacking on statements made during the course of [the] litigation as constituting obstruction of justice.").[7]  In sum, WWE has not alleged closed-ended continuity.

_____

[7]    <u>See also</u>, <u>e.g.</u>, <u>Ray Larsen Assocs.</u>, 1996 WL 442799, at *7 n.8 ("acts of obstruction of justice during the pendency of this lawsuit" would not be considered in determining the duration of RICO scheme "because efforts by a defendant to cover up the underlying conduct are inadequate to satisfy the continuity requirement of the RICO statute"); <u>Thai Airways</u>, 842 F. Supp. at 1572-73 (defendants' concealment of previously converted security deposits did not constitute continuing criminal conduct because fraudulent scheme was "essentially accom-plished" upon the conversion of the deposits); <u>Ruby Dev. Corp. v. Charrim Dev. Corp.</u>, 742 F. Supp 1213, 1217 (E.D.N.Y. 1990) ("allegations of concealment on the part of the wrongdoer"
(continued...)

21

b.    **WWE Fails To Allege Open-Ended Continuity**

Nor does WWE's pleading satisfy the "open-ended" continuity requirement.  In this Circuit, Courts have repeatedly held that where criminal acts have a natural ending point, as the Complaint alleges here, the scheme is "inherently terminable," defeating open-ended continuity.  First Capital, 385 F.3d at 180-81 (no continuing threat of racketeering activity because the alleged fraud was "inherently terminable"); Cofacredit, S.A., 187 F.3d at 244 (multiple acts of mail and wire fraud against factoring company and bank over eleven months to obtain cost-free inventory was inherently terminable because, when $1.5 million credit insurance limit was reached, no more fraud could be committed); GICC, 67 F.3d at 466 (alleged scheme to loot company assets was inherently terminable because, once all assets were looted, scheme would necessarily end); Carey, 297 F. Supp. 2d at 715-18 (alleged fraud and embezzlement schemes in connection with union election were inherently terminable because "[o]nce the election occurred, the schemes, and their alleged sponsoring enterprise, necessarily came to an end."); FD Prop. Holding, 206 F. Supp. 2d at 371 (alleged mail, wire and bank fraud to obtain payments of $1.3 million in connection with sale of one product was inherently terminable); Econ. Opportunity Comm'n of Nassau County, Inc. v. County of Nassau, Inc., 47 F. Supp.2d 353, 366-67 (E.D.N.Y. 1999) (alleged scheme to obtain control over bus terminal and real estate properties did not satisfy continuity requirement as the acquisition of control "'even if by fraudulent means, provided a natural end to [their] project'" (alteration in original) (quoting Mathon, 875 F. Supp. at 998-99)).  Here the alleged scheme to defraud WWE in connection with

---

[7]    (...continued)
could not serve as basis for satisfying continuity requirement, "[o]therwise every past act of wrongdoing which a wrongdoer attempts to conceal might be the basis for finding continuity").

the JAKKS Licenses was inherently terminable: once the Licenses were obtained, the alleged scheme was completed as well.

Nor does the Complaint allege that the JAKKS Defendants committed any unlawful acts after the Licenses were procured in 1998.  (See Compl. ¶¶ 46, et seq. 87.)  In fact, the alleged "enterprise" is defined by WWE as an association in fact consisting of the defendants "associat[ed]-in-fact . . . for the purpose of conducting the unlawful conduct alleged herein" (id. ¶137 (emphasis added)), which is confined to the alleged bribery scheme relating to the Licenses. Because the alleged "enterprise's" activity was so circumscribed and discrete, the alleged pattern of racketeering activity was equally limited and inherently terminable.  See Carey, 297 F. Supp. 2d at 716-17 (rejecting argument that association-in-fact criminal enterprise engaged in fraud and embezzlement connected to union election posed threat of continuity, "particularly in the absence of any allegations of non-election-related illicit activity").

WWE strains to satisfy the open-ended continuity requirement by advancing the preposterous and legally discredited suggestion that the alleged scheme should be measured by the terms of the Licenses allegedly procured through bribery.  (WWE 12/8/04 Letter at 3.)  As a matter of law, "continuity" for purposes of RICO is measured only by the criminal predicate acts, not by the subsequent actions, even actions pursuant to agreements allegedly acquired unlaw- fully.  See GICC, 67 F.3d at 467 (for "temporal aspect of plaintiff's [RICO] claim," court looks only at period of actual racketeering activity to measure continuity); Vemco, Inc., 23 F.3d at 134 (billing statements sent in 1991 through 1992 requesting payment "pursuant to an allegedly fraudulent contract cannot be cited by plaintiffs to extend the duration of the fraudulent scheme" which was completed in 1988); Clapp v. Greene, 743 F. Supp. 273, 278 (S.D.N.Y. 1990)

23

(defendant's continued payment of compensation to attorneys allegedly bribed to breach partnership agreement and transfer client accounts to defendant "will not transform a single alleged bribe into a pattern for RICO purposes"), aff'd mem., 930 F.2d 912 (2d Cir. 1991).[8]

WWE also contends that open-ended continuity is established because the alleged scheme would have continued through the length of the Licenses had it not been uncovered. (WWE 12/8/04 Letter at 3.) On its face, this claim is demolished by WWE's own Complaint. By WWE's own admission, the "enterprise" alleged here -- including the JAKKS Defendants, Bell and Shenker -- could not possibly have continued, or posed any continuing threat of criminal activity because WWE terminated both Bell and Shenker in 2000, almost five years ago (Compl. ¶¶ 92, 93), preventing the alleged "enterprise" from committing any further alleged misconduct long before WWE purportedly uncovered the alleged scheme.

### 2.    The Single Alleged Bribe Does Not Constitute a Pattern of Racketeering Activity

The United States Supreme Court has declared that "the heart to any RICO complaint is the allegation of a pattern of racketeering." Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143, 154 (1987).[9] In its Complaint, WWE improperly attempts to

---

[8]    See also Jerome M. Sobel & Co. v. Fleck, No. 03 Civ. 1041, 2003 WL 22839799, at *11 (S.D.N.Y. Dec. 1, 2003) (acts of mail and wire fraud related to fees earned from the performance of "otherwise lawful" accounting services on fraudulently obtained agreements could not be used to extend a RICO scheme); Plater-Zyberk v. Abraham, No. Civ. 3322, 1998 WL 67545, at *10 (E.D. Pa. Feb. 17, 1998) (holding that plaintiff could "not rely on the defendants' retention or use of his assets" derived from the fraudulent misappropriation of plaintiff's interest in two companies and his intellectual property to "establish open-ended continuity"); Bingham v. Zolt, 683 F. Supp. 965, 970 (S.D.N.Y. 1988) (rejecting attempt to "characteriz[e] the defendant's subsequent enjoyment of the proceeds of the scheme as continuous criminal activity").

[9]    See also S. Rep. No. 91-617, at 158 (1969) ("The target of [RICO] is thus not sporadic (continued...)

24

artificially deconstruct a single alleged bribe into three separate invoices and the payments

relating to them and to pass these components off as separate RICO "predicate acts." <u>Schlaifer

Nance & Co. v. Estate of Warhol</u>, 119 F.3d 91, 98 (2d Cir. 1997) ('[C]ourts must take care to

ensure that the plaintiff is not artificially fragmenting a singular act into multiple acts simply to

invoke RICO.")  Indeed, by re-counting each of these fragments of the same bribe under several

statutes, WWE boasts that it has alleged over <u>156 predicate acts</u>!  <u>See</u> WWE 12/8/04 Letter at 3.

In reality, WWE alleges only a single unitary bribe directed at the singular purpose of securing

the Licenses, and its attempt to splinter the single alleged bribe into multiple predicate acts

contravenes "the Second Circuit's oft-stated admonition that courts should guard against the

meritless fragmentation of a single predicate act into multiple acts for the mere purpose of

pursuing a RICO claim." <u>Maddaloni Jewelers, Inc.</u>, 2004 WL 3015287, at *9.

        In holding that the bribery of a company employee to obtain subcontracts, effected

through three payment installments disguised as payments for a marketing study and eleven

phone calls and eight letters constituting wire and mail fraud <u>did not</u> make out a RICO "pattern,"

the court in <u>Roeder v. Alpha Industries, Inc.</u>, 814 F.2d 22, 31 (1st Cir. 1987) held:

> A bribe, which by any realistic appraisal is solitary and isolated, is not trans-
> formed into a threatening 'pattern of racketeering activity' with which Congress
> was concerned simply because the bribe is implemented in several steps and
> involves a number of acts of communication.

Courts in this Circuit consistently have rejected attempts, like the WWE's, to manufacture RICO

patterns by artificially slicing and dicing purported predicate acts.  <u>See, e.g.</u>, <u>Maddaloni Jewelers,</u>

---

[9]     (...continued)

activity.  The infiltration of legitimate business normally requires more than one 'racketeering
activity' and the threat of continuing activity to be effective.  It is this factor of continuity plus
relationship which combines to produce a pattern.").

Inc., 2004 WL 3015287, at *9 (dismissing RICO claims and holding that repeated attempts at extortion resulting in a payment aimed at securing various favorable services amounted to a single predicate act); Linens of Europe, Inc. v. Best Mfg., Inc., No. 03 Civ. 9612, 2004 WL 2071689, *15-16 (S.D.N.Y. Sept. 16, 2004) (dismissing RICO conspiracy claim based on a "laundry list of incidents" because the "multiple acts in furtherance of a single extortion episode constitute only a single predicate act . . . not a pattern of two or more predicate acts."); Singh v. Parnes, 199 F. Supp. 2d 152, 161 (S.D.N.Y. 2002) (dismissing RICO claim because "[w]hatever pattern and continuity of allegedly unlawful conduct [plaintiff] specifies relates to defendants' conduct in connection with the events and transactions pertaining to a single property").

　　　　In this same vein, WWE cannot multiply predicate acts by depicting the single alleged bribery scheme as violations of different federal statutes. (See, e.g., Compl. ¶ 141(d).) Courts have "consistently held that a single episode does not constitute a 'pattern,' even if that single episode involves behavior that amounts to several crimes (for example, several unlawful mailings)." Apparel Art Int'l, Inc. v. Jacobson, 967 F.2d 720, 722, 723 (1st Cir. 1992) (dismissing RICO claim alleging several bribes, subsequent false statements and cover-up, unlawful access to confidential information and fraudulent conduct related to procurement of a government contract because RICO's pattern requirement "does not encompass a single criminal event, a single criminal episode, a single 'crime,'" despite the separate criminal actions that may comprise that crime); J.D. Marshall Int'l, Inc. v. Redstart, Inc., 935 F.2d 815, 820-21 (7th Cir. 1991) (holding that numerous acts of mail and wire fraud related to the sale of a company's assets did not constitute pattern); Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1417-19 (3d Cir.

1991) (finding that numerous alleged acts of mail fraud and wire fraud relating to single

fraudulent scheme to force company into bankruptcy did not constitute a RICO pattern).

        A single set of actions that violates more than one law can only be used to

establish one RICO predicate act. See Maddaloni Jewelers, Inc., 2004 WL 3105287, at *9, n.5

(even if defendant's alleged demand for payments constituted both commercial bribery under the

New York Penal Law and extortion in violation of the Hobbs Act, "plaintiff would nevertheless

have failed to establish two distinct predicate acts"); see also Polycast Tech. Corp. v. Uniroyal,

Inc., 728 F. Supp. 926, 945 (S.D.N.Y. 1989) (a single set of misrepresentations, directed to a

single purpose, constituting multiple securities law violations established only one RICO

predicate act); United States v. Walgren, 885 F.2d 1417, 1426 (9th Cir. 1989) (stating that a

"RICO conviction cannot be based solely upon [a] single act, even though that act may have

violated two separate laws"); United States v. Kragnes, 830 F.2d 842, 861 (8th Cir. 1987) ("[I]t is

not proper under RICO to charge two predicate acts where one action violates two statutes.");

Tellis v. U.S. Fid. & Guar. Co., 826 F.2d 477, 478-79 (7th Cir. 1986) ("[M]ultiple acts of mail

fraud in furtherance of a single episode of fraud involving one victim and relating to one basic

transaction cannot constitute the necessary pattern [under RICO].").

    **B.**    **The Complaint Fails to Allege a Cognizable RICO "Enterprise"**

        WWE's RICO claims also must be dismissed for failure to allege the existence of

a distinct RICO enterprise. Section 1962(c) requires the "person" alleged to have violated RICO

to be distinct from the "enterprise." Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 162

(2001). Although a plaintiff may allege an enterprise that is an association-in-fact, see 18 U.S.C.

§ 1961(4), courts have long recognized that a RICO enterprise must be more than simply a group

of individuals who commit crimes together, it must be an "ongoing organization" whose

constituents "function as a continuing unit." United States v. Turkette, 452 U.S. 576, 583 (1981).

If the enterprise alleged is an "association-in-fact" enterprise, in this Circuit the plaintiff must

allege the existence of an ongoing organization, formal or informal, that functions as a continu-

ing unit and has sufficient hierarchy, organization and activities from which the court can

conclude that its "members functioned as a unit" associated for a "common purpose." See First

Capital, 385 F.3d at 174.[10]  The "plaintiff must plead specific facts which establish that the

association exists for purposes other than simply to commit the predicate acts." Elliott v. Foufas,

867 F.2d 877, 881 (5th Cir. 1989); Bank v. Brooklyn Law School, No. 97 CV 7470, 2000 WL

1692844, at *4 (E.D.N.Y. Oct. 6, 2000) (RICO enterprise not alleged absent allegations that the

enterprise would exist in absence of the racketeering acts).

       The Supreme Court's decision in Turkette underscores the necessity for pleading

facts distinguishing the enterprise from the underlying alleged pattern of racketeering activity:

"The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from

the pattern of activity in which it engages." 452 U.S. at 583 (emphasis added).  In keeping with

Turkette, courts in this Circuit and others have consistently required that the enterprise have an

existence and structure separate and apart from the racketeering acts or the minimal association

necessary to commit the racketeering acts. See, e.g., First Capital, 385 F.3d at 174 (declaring that

allegations showing that enterprise is "separate and distinct from the alleged predicate racketeer-

ing acts themselves" is "a requirement in [the Second] Circuit"); Chang v. Chen, 80 F.3d 1293,

---

[10]     Accord Moy v. Terranova, No. 87 CV 1578, 1999 WL 118773, at *5 (E.D.N.Y. Mar. 2, 1999); Singh, 199 F. Supp. 2d at 162-63; Schmidt v. Fleet Bank, 16 F. Supp. 2d 340, 349 (S.D.N.Y. 1998).

1297-98 (9th Cir. 1996) (Turkette requires that an enterprise have an ascertainable structure apart

from the racketeering activity); Stephens, Inc. v. Geldermann, Inc., 962 F.2d 808, 815 (8th Cir.

1992) ("'[The enterprise] cannot simply be . . . the minimal association which surrounds these

[racketeering] acts.'" (quotation omitted)); Schmidt, 16 F. Supp. 2d at 349 ("[T]he RICO

enterprise must always have an ascertainable structure distinct from that inherent in the conduct

of a 'pattern of racketeering.'" (citation omitted)).

        WWE's Complaint wholly fails to allege a free-standing organization with any

structure or organization.  Indeed, the purported RICO "enterprise" here is defined solely by the

alleged predicate acts in the single alleged scheme against WWE, and has no other structure or

ongoing organization or any other purpose outside of these alleged acts: "[Defendants] acting in

concert, comprised an association-in-fact enterprise" for "the purpose of conducting the unlawful

activities described herein." (Compl. ¶ 137) (emphasis added.)  The only connection between the

thirteen (13) purported members of the alleged enterprise is the single scheme alleged in the

Complaint.  Because the alleged enterprise here is merely the personification of the alleged

predicate acts, it fails as a matter of law.

    **C.**    **WWE's Alleged RICO Injury Is Too Speculative as a Matter of Law**

        WWE's RICO claims must also be dismissed because WWE fails to allege any

pecuniary injury to its "business or property by reason of a violation of" the RICO statute so as to

state a claim under RICO.  See 18 U.S.C. 1964(c).  In Oscar v. Univ. Students Coop. Ass'n, 965

F.2d 783, 785-87 (9th Cir. 1992), the Ninth Circuit Court of Appeals held: "RICO was intended

to combat organized crime, not to provide a federal cause of action and treble damages to every

tort plaintiff."  Given the "'restrictive significance'" of the phrase "injured in his business or

property," under RICO, "a showing of "injury" requires proof of concrete financial loss, and not

mere "injury to a valuable intangible property interest."' Id. at 785-86 (citations omitted).  At

best, WWE alleges, without any particularity, that it has been damaged by losing the opportunity

to entertain other potential offers for the Licenses.  (Compl. ¶ 179.)  WWE's own allegations,

which show that there was active competition, contradict this assertion.  See Factual Background

§ C, supra.  WWE's conclusory allegations that THQ, as part of the LLC, agreed to pay JAKKS

an unquantified amount of money that "otherwise would have, and should have, been promised

to WWE in an independent proposal," (id. ¶ 76), is entirely speculative.  Even though WWE

would have the information within its control, it does not, and cannot describe the hypothetical

THQ offer, or allege that any other potential offer actually exceeded the LLC proposal that WWE

accepted.  Nor does the Complaint allege that any other licensee would have performed as well

as JAKKS and the LLC under the Licenses.

          Courts have routinely held that the kind of speculative loss alleged here fails to

state a claim under RICO.  See, e.g., Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 24

(2d Cir. 1990) (affirming dismissal of employee's RICO claims alleging injury in the form of lost

commissions because such losses were too speculative to support a RICO claim); see also Oscar,

965 F.2d at 785.  In all events, the claimed loss of a potential opportunity to earn unquantified,

and unquantifiable profits that WWE has alleged here has been repeatedly held insufficient to

confer standing under the RICO statute.  See Cougar Audio, Inc. v. Reich, No. 99 Civ. 4498,

2000 WL 420546, at *8 (S.D.N.Y. Apr. 18, 2000) (dismissing RICO claims based on alleged

commercial bribery, holding that "[t]he abstract form of harm suffered by one who loses the

chance to bargain with all the facts . . . is not sufficient to sustain a RICO allegation with

commercial bribery predicates").[11]

### D.    WWE'S Prayer for Rescission, Restitution and Disgorgement Renders Its RICO Claims Void as a Matter of Law

In its RICO claim, WWE seeks a declaration that the Licenses, along with any

amendments to the Licenses executed during the term of the extension of the Toy License, be

declared void, and that WWE be paid restitution and/or disgorgement.  (Compl. pg. 72 ¶¶ (2),

(4), (5).)  These remedies are quintessentially equitable.  See, e.g. Resnick v. Resnick, 763 F.

Supp. 760, 767-68 (S.D.N.Y. 1991).

Because WWE's RICO claims seek equitable relief to redress past conduct -- not

to restrain future conduct -- they are legally flawed under 18 U.S.C. § 1964(a) and controlling

Second Circuit authority.  See United States v. Carson, 52 F.3d 1173, 1181-82 (2d Cir. 1995)

(vacating order on the grounds that the disgorgement of kickbacks must be intended solely to

"prevent and restrain" future conduct); accord U.S. v. Philip Morris USA, Inc., No. 04 Civ. 5252,

2005 WL 267948, *10 (D.C. Cir. Feb 4, 2005) (holding that disgorgement is unavailable under

RICO statute).

---

[11]    Accord In re Taxable Mun. Bond Sec. Litig., 51 F.3d 518, 522-23 (5th Cir. 1995) ("At
best, [plaintiff's] suit shows only a lost opportunity to obtain a . . . loan.  Such a lost opportunity
by itself does not constitute an injury that confers standing to bring a RICO cause of action."
(emphasis added)); see also Tsipouras v. W & M Props., Inc., 9 F. Supp. 2d 365, 368 (S.D.N.Y.
1998) (a bonus was not recoverable under RICO because its accrual was speculative and its
amount unquantified); Allen v. Berenson Pari-Mutuel of N.Y., No. 95 Civ. 10289, 1998 WL
80168, at *3 (S.D.N.Y. Feb. 25, 1998) (manipulation of purses for certain horse races does not
amount to injury within the meaning of RICO where plaintiffs could not "quantify with any
certainty the extent of damages" allegedly suffered).

In <u>Richard v. Hoechst Celanese Chem. Group, Inc.</u>, 355 F.3d 345, 354-55 (5th Cir. 2003), the Fifth Circuit Court of Appeals explicitly adopted the Second Circuit's holding in <u>Carson</u> and held that a RICO plaintiff's claim for disgorgement was not a proper RICO remedy where, as here, the plaintiff sought to redress <u>past</u> conduct, not to restrain future conduct. There, as here, because plaintiff had failed to seek a permissible remedy, its RICO claim was "void." <u>Richard</u>, 355 F.3d at 355. On their face, WWE's RICO claims seek redress exclusively for <u>past conduct</u> -- in 1998 -- and do not identify, or seek to restrain, any future conduct.

### E. The RICO Predicate Acts Are Defective

#### 1. Mail and Wire Fraud

WWE's allegations of mail and wire fraud must be dismissed for failure to satisfy the heightened pleading requirements of Rule 9(b). To satisfy the pleading requirements for predicate acts of mail and wire fraud: "the complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identity those responsible for the statements." <u>Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.</u>, 170 F.R.D. 361, 382 (S.D.N.Y. 1997) (quotation omitted).

WWE fails to allege any statements by JAKKS to WWE that were false or misleading. Its allegations of fraud rest on a conclusory and unsubstantiated charge that certain transactions between JAKKS and Stanfull in 1998 were secretly effected to fraudulently induce WWE to confer license rights on JAKKS. Yet, nowhere in any of the thirty-three paragraphs in the Complaint devoted to identifying communications that were allegedly made "[i]n furtherance of a scheme or artifice to defraud," (Compl. ¶ 141(a)), has WWE identified a <u>single</u> specific

32

statement that was allegedly false or misleading.  Nor does WWE -- despite years of discovery --

allege a single statement or fact to show any complicity or any actual agreement, at any time,

among JAKKS, Shenker and Bell to improperly influence the competition for the Licenses.  On

the contrary, the Complaint admits that even after recanting his prior denials of receiving

payments from other licensees, (Compl. ¶¶ 116, 117), Shenker, like Bell, "continued" to

steadfastly deny that the payments by JAKKS to Shenker were related in any way to the Licenses.

(Id. ¶ 118.)  The Complaint is also devoid of any factual allegations that JAKKS had any

knowledge, at any time, of any agreement between Shenker and Bell to share the proceeds of

transactions between JAKKS and Stanfull, let alone of any agreement between Shenker and Bell

to share Shenker's royalties from WWE.  In short, WWE's attempt to plead mail and wire fraud

wholly fails to meet the requirements of Rule 9(b).  E.g., N.Y. Transp., Inc. v. Naples Transp.,

Inc., 116 F. Supp. 2d 382, 386 (E.D.N.Y. 2000) (in cases involving multiple defendants, Rule

9(b) requires plaintiff to provide particularized allegations of fraud against each defendant).

      Likewise, the Complaint's talismanic incantation that certain communications

were made "[i]n furtherance of a scheme or artifice to defraud," (Compl. ¶ 141(a)), cannot satisfy

the requirement that "'[p]laintiffs asserting mail fraud [or wire fraud] must . . . identify the

purpose of [the mail or wire communication] within the defendant's fraudulent scheme.'"  Old

Republic Ins. Co., 170 F.R.D. at 382 (alterations in original) (citation omitted).

### 2.    National Stolen Property Act

      WWE alleges that the Defendants' violated the National Stolen Property Act

("NSPA"), 18 U.S.C. § 2314.  (Compl. ¶ 141(c).)  WWE's NSPA claims against the JAKKS

Defendants cannot be sustained because none of the specific acts alleged as violations of the

NSPA were committed by any of the JAKKS Defendants.  (Id.)  Further, WWE's fraud-based

NSPA allegations fail to comply with Rule 9(b)'s heightened pleading requirements.  See Casio

Computer Co. v. Sayo, No. 98 Civ. 3772, 2000 WL 1877516, at *18 (S.D.N.Y. Oct. 13, 2000).

### 3.    Commercial Bribery

The act of commercial bribery alleged by WWE does not state a claim for

commercial bribery because it fails to allege the requisite injury to plaintiff's "business or

property" mandated by the RICO statute. 18 U.S.C. § 1964(c); see Cougar Audio, 2000 WL

420546, at *8.  WWE has not, and cannot, specify how, or in what amount, its "business or

property" was damaged by the alleged commercial bribery scheme.  "The abstract form of harm

suffered by one who loses the chance to bargain with all the facts may be sufficient to sustain a

bare allegation of commercial bribery under New York law, but it is not sufficient to sustain a

RICO allegation with commercial bribery predicates."  Cougar Audio, 2000 WL 420546, at *8.

### 4.    Money Laundering

WWE's allegations of violations of the federal money laundering statutes, 18

U.S.C. §§ 1956-57, (Compl. ¶ 141(b)), fail to satisfy the requirement that plaintiff establish that

the property that is the subject of the transactions in question be derived from "specified unlawful

activity." 18 U.S.C. §§ 1956(a), 1957(a).  Here, the "unlawful activity" supporting WWE's

allegations of money laundering, (Compl. ¶ 141(b)), is WWE's commercial bribery allegations,

which are themselves deficient, and therefore cannot constitute the "specified unlawful activity"

required by the money laundering statute.  W. 79th St. Corp. v. Congregation Kahl Minchas

Chinuch, No. 03 Civ. 8606, 2004 WL 2187069, at *9 (S.D.N.Y. Sept. 29, 2004).

34

5.    **The Federal Travel Act**

WWE's allegations that Defendants violated the Federal Travel Act, 18 U.S.C. §

1952, are also deficient. (Compl. ¶ 141(d).)  WWE fails to identify any specific, independent

acts constituting violations of the Federal Travel Act.  Instead, WWE advances the conclusory

claim that each of the acts it characterizes as violations of the Federal Mail and Wire Fraud

Statutes, the Federal Money Laundering Statutes and the NSPA also constitute violations of the

Travel Act.  (Id.)  Because those other alleged predicate acts are fatally defective, they cannot

constitute violations of the Travel Act.  E.g., W. 79th St. Corp., 2004 WL 2187069, at *9.[12]

## III.    WWE'S CLAIMS ARE BARRED BY THE 2004 RELEASE

Dismissal of WWE's Complaint is warranted as a matter of law for the additional

reason that in 2004 WWE executed a General Release and Settlement Agreement that uncondi-

tionally released JAKKS from any liability associated with, and barred WWE from suing JAKKS

on, the very claims alleged in the Complaint.  Federal Courts have upheld dismissals, as a matter

of law, where, as here, the Plaintiff's claims are precluded by a valid release, see Williams v.

Stone, 109 F.3d 890, 892, 896 (3d Cir. 1997); Three Rivers Motors Co. v. Ford Motor Co., 522

F.2d 885, 897 (3d Cir. 1975); Mussett v. Baker Material Handling Corp., 844 F.2d 760, 762

(10th Cir. 1988), or covenant not to sue, Straight Arrow Products v. Conversion Concepts, Inc.,

No. 01-221, 2001 WL 1530637, *6 (E.D. Pa., Dec 03, 2001); Santana Products, Inc. v. Bobrick

---

[12]    Dismissal of WWE's substantive RICO claims mandates dismissal of its RICO conspir-
acy claim.  See Cofacredit, S.A., 187 F.3d at 244.  Further, WWE's wholly conclusory RICO
conspiracy claim fails as a matter of law because WWE fails to plead any factual basis for
finding a "conscious agreement" among the alleged RICO co-conspirators to commit RICO
predicate acts.  Ray Larsen Assocs., Inc., 1996 WL 442799, at *9.  Once WWE's RICO and RPA
claims are dismissed, as they must be, this Court should dismiss WWE's remaining state law
claims.  See, e.g., Watral, 177 F. Supp. 2d at 151.

<u>Washroom Equipment, Inc.</u>, 69 F. Supp. 2d 678, 686 (M.D. Pa. 1999); <u>see</u> <u>also</u> Wright & Miller, 5B Fed. Prac. & Proc. Civ.3d § 1357. Given the strong public policy favoring "flush[ing] out frivolous RICO allegations at an early stage of the litigation," strict enforcement of the Release is particularly appropriate here. <u>Dubai Islamic Bank</u>, 256 F. Supp. 2d at 163.

WWE alleges that in January 2003 it commenced an audit (the "Audit") of JAKKS that, according to WWE specifically targeted "all payments made by JAKKS to Shenker, SSAI, Bell and/or Stanfull." (Compl. ¶ 104.) WWE claims that in response to the auditor's questions in early 2003, JAKKS failed to produce documents that existed evidencing payments to these individuals and entities. (<u>Id.</u> ¶¶ 105, 106-07, 110.) WWE admits that prior to the execution of the 2004 Release, WWE knew about the payments to Stanfull that were sought in the Audit. (Compl. ¶¶ 113-14, 118, 120, 124, 126, 128, 132.)

On January 15, 2004, fully aware of the payments that were allegedly concealed by JAKKS during the Audit -- which form the basis of WWE's entire complaint in this action -- WWE entered into a "Settlement Agreement and General Release of All Claims" with JAKKS (Ex. J), in consideration for which JAKKS paid WWE $200,000. (<u>Id.</u> at 1.) The Release unambiguously operates to bar "any and all claims" of any nature whatsoever "arising from or relating to the Audit," whether "known or unknown," (<u>see</u> <u>id.</u>) and, despite the then pending litigation between WWE and the Connecticut Defendants, expressly includes a "Covenant Not To Sue," which bars WWE from bringing any action against JAKKS "arising out of <u>or relating in any way to the Audit</u> including <u>but not limited to</u> the matters released in [the Release]." (<u>Id.</u>) (emphasis added.) Because WWE is now barred, as a matter of law, from bringing its claims here against JAKKS, which spring from the very payments it admits in the Complaint were

targeted in the Audit, WWE's Complaint must be dismissed. (See e.g., Compl. ¶¶ 104, 106, 108.)

## IV.    IN THE ALTERNATIVE, THE ACTION SHOULD BE TRANSFERRED TO CALIFORNIA

Even if the WWE stated any viable federal claims -- and it has not -- this action should be transferred to the Central District of California pursuant to 28 U.S.C. § 1404(a) for "the convenience of the parties and witnesses, in the interest of justice." See Banque de Gestion Privee Sib, 1992 WL 190135, at *3. In this case, WWE's own complaint overwhelmingly establishes that California -- not New York -- is where the great preponderance of parties and witnesses reside and the substantial events underlying this action arose, while there is virtually no connection to New York. See, e.g., Marshall Gobuty Int'l USA, Inc. v. Nike, Inc., 04 Civ. 6975, 2004 WL 2578912, *1 (Nov. 10, 2004) (J. Scheindlin) (granting transfer on basis of pre-motion letter). WWE does not reside in New York. The moving Defendants all reside in either the Central District of California or in Hong Kong and the remaining defendants reside in Connecticut, with the exception of SSAI, which is incorporated in New York, but which is a closely-held corporation that resides and conducts its business entirely in Connecticut.[13]

---

[13]    The contrived presence of SSAI, nominally incorporated in New York, is of no consequence. WWE's gamesmanship in dragging Shenker and Bell into this case -- when they are already litigating all of their licensing activities with WWE in Connecticut -- should not impede a transfer to California. As we expect will be shown in the motions to be filed by Bell and Shenker, WWE's claims against them are subject to dismissal under the prior pending action doctrine, e.g., Lesavoy v. Lane, 304 F. Supp. 2d 520, 536 (S.D.N.Y. 2004); Cont'l Time Corp. v. Swiss Credit Bank, 543 F. Supp. 408, 410 (S.D.N.Y. 1982); Daugherty v. Popick, 89 F.R.D. 642 (S.D.N.Y. 1981), and then venue should be based on the residence of the remaining defendants. See Associated Artists Entm't, Inc. v. Walt Disney Pictures, No. 93 Civ. 3934, 1994 WL 708142, at *1, *3 (S.D.N.Y. Dec. 19, 1994)  Even if Bell and Shenker are not dismissed (as they should be), transfer to California is still appropriate because none of the material witnesses are alleged to
(continued...)

By filing suit in a District that lacks any bona fide connection to the parties or the purported bribery scheme, WWE has forfeited any right to deference to its choice of forum. Coker v. Bank of America, 984 F. Supp. 757, 766 (S.D.N.Y. 1997) ("[P]laintiff's choice of forum also is entitled to lesser weight because [plaintiff] has chosen a forum that is not his residence."); accord Lighting World, Inc. v. Birchwood Lighting, Inc., No. 01 Civ. 4751(BSJ), 2001 WL 1242277, *4 (S.D.N.Y. Oct. 16, 2001); Brown v. Dow Corning Corp., No. 93 Civ. 5510, 1996 WL 257614, *3 (S.D.N.Y. May 15, 1996).

That none of the parties resides in New York, including WWE, strongly undermines WWE's choice of forum. See, e.g., Snyder v. Ply Gem Industries, Inc., 200 F. Supp. 2d 246, 251-52 (S.D.N.Y. 2001) (in granting motion to transfer to defendants' home forum, court emphasized that "[f]irst and foremost, none of the parties reside in New York."); ZPC 2000, Inc. v. The SCA Group, Inc., 86 F. Supp. 2d 274, 279 (S.D.N.Y. 2000) (deeming transfer "logical" where "none of the parties resides in New York.").

Moreover, because the location of operative events is a "primary factor" in the transfer analysis, courts in this District regularly transfer cases lacking a factual nexus with New York. See ZPC 2000, 86 F. Supp. 2d at 279 (granting transfer motion despite a forum selection clause, where "[n]owhere in plaintiff's pleadings, briefs, or supporting affidavits does it point to any significant events that took place in New York"); Viacom Int'l, Inc. v. Melvin Simon Prods., Inc., 774 F. Supp. 858, 868 (S.D.N.Y. 1991). Here the vast majority of the alleged "predicate

---

[13]    (...continued)
reside in New York and none of the Defendants are located there.

acts" consist of mail and wire transmissions to, or emanating from, California, or made pursuant to instructions from California.  (Compl. ¶ 141(a), (b).)

Finally, the convenience of party and non-party witnesses, one of the most significant of the transfer factors, weighs overwhelmingly in favor or transfer.  Saminsky v. Occidental Petroleum Corp., 373 F. Supp. 257, 259-60 (S.D.N.Y. 1974).  Requiring all of the JAKKS Defendants, THQ and the LLC, and their respective officers and employees to travel 3000 miles to litigate and attend trial in this forum will necessarily pose significant inconvenience and risk of disruption to their businesses (and the individuals' families).

Inescapably recognizing that its Complaint shows no genuine connection to New York, WWE tries to rationalize its bizarre choice of venue by asserting that the "bench in the Southern District has specialized expertise in RICO."  (WWE 12/8/04 Letter at 2) (citing wholly inapposite cases, all merely involving a federal court's refusal to abstain from exercising jurisdiction in favor of a state court under the Colorado River abstention doctrine.)  While this Court undoubtedly has significant expertise and experience in interpreting the RICO statute, there is simply no reason to believe that its sister federal courts in California are not equally qualified to adjudicate WWE's RICO claim.  See generally Oriska Ins. Co. v. Power P.E.O., Inc., 317 F. Supp. 2d 161, 166 (N.D.N.Y. 2004).  Accordingly, this Court should grant the JAKKS Defendants' request to transfer to California.

39

## CONCLUSION

For all the foregoing reasons, the JAKKS Defendants' motion to dismiss the Complaint should be granted in all respects. Further, because the Complaint's defects deprive this Court of subject matter jurisdiction and cannot be cured by amendment, the Complaint should be dismissed with prejudice. W. 79th St. Corp., 2004 WL 2187069, at *17. In the alternative, should the Court conclude that federal subject matter exists, the action should be transferred to the Central District of California.

Respectfully submitted,

FEDER, KASZOVITZ, ISAACSON,
  WEBER, SKALA, BASS & RHINE LLP
Murray L. Skala (MS 9354)
Jonathan D. Honig (JH 7577)
750 Lexington Avenue
New York, New York 10022
Phone: (212) 888-8200
Fax: (212) 888-5968

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

By: _____
    Jonathan J. Lerner (JL 7117)
    Michael H. Gruenglas (MG 8705)
    Maura B. Grinalds (MG 2836)
    Marco G. Argentieri (MA 8932)
    Four Times Square
    New York, New York 10036
    (212) 735-3000

*Attorneys for the JAKKS Defendants*