RETURN DATE: MARCH 11, 2003                    SUPERIOR COURT

WORLD WRESTLING ENTERTAINMENT,                 JUDICIAL DISTRICT OF
INC.,                                          STAMFORD/NORWALK

          Plaintiff,                    AT STAMFORD

vs.

JAMES K. BELL and
BELL LICENSING, LLC, formerly known as         FEBRUARY 14, 2003
BELL CONSULTING, LLC,

          Defendants.


## COMPLAINT

### First Count
### (Breach of Fiduciary Duty against James K. Bell)

1.      World Wrestling Entertainment, Inc. ("WWE"), formerly known as World Wrestling Federation Entertainment, Inc. and Titan Sports, Inc., is a Delaware corporation having its principal place of business at 1241 East Main Street, Stamford, Connecticut 06902.

2.      WWE is an integrated media and entertainment company principally engaged in the development, promotion and marketing of television programming, pay-per-view programming and live arena events, and the licensing and sale of branded consumer products featuring the highly successful World Wrestling Entertainment brand.

3.    James K. Bell ("Bell") is an individual residing at 405 Silver Creek Lane, Norwalk, Connecticut 06850.

4.    Bell Licensing, LLC ("Bell Consulting"), formerly known as Bell Consulting, LLC, is a limited liability company organized under the laws of Connecticut, with its principal place of business located at 405 Silver Creek Lane, Norwalk, Connecticut 06850. On or about July 18, 2002, Bell Consulting, LLC amended its articles of organization to change its name to Bell Licensing, LLC.

5.    Bell is, and at all times relevant to this Complaint has been, the President and sole owner of Bell Consulting.

6.    On or about March 20, 1995, WWE hired Bell as its Director of Domestic Licensing.  As a condition of his employment, on March 2, 1995, Bell signed a Conflict of Interest and Code of Conduct Agreement (the "Code of Conduct Agreement"), a true and correct copy of which is attached hereto and incorporated herein as Exhibit "A."

7.    Pursuant to the Code of Conduct Agreement, Bell agreed, *inter alia*, that during the course of his employment with WWE, he would not "engage in any activities or have any personal or financial interests which impair, or appear to impair, [his] independence or judgment or otherwise conflict, or appear to conflict with [his] responsibilities to [WWE]."

8.    More specifically, the Code of Conduct Agreement expressly prohibited Bell from, among other things:

a.  accepting fees, commissions or property in connection with any transaction on behalf of WWE;

b.  accepting or offering unauthorized or illegal payments;

c.  using his position directly or indirectly for personal or financial gain;

d.  personally taking advantage of business opportunities which might be of interest to WWE; and

e.  serving as an officer, director, employee, consultant or promoter of for-profit organizations without WWE's prior approval.

9.  During his employment with WWE, Bell served in various capacities, including:

a.  Director of Domestic Licensing (from March 20, 1995 until April 30, 1996);

b.  Vice President of Pay-Per-View and Television Marketing from May 1, 1996 until October 27, 1996; and

c.  Senior Vice President of Licensing and Merchandising from October 28, 1996 until March 24, 2000.

10.  As Senior Vice President of Licensing and Merchandising, Bell was responsible for, among other things:

a.  procuring licensees for WWE;

b.  negotiating license agreements between WWE and potential licensees;

c.  WWE's performance pursuant to license agreements; and

d.  all other activities necessary and/or attendant to the development and maintenance of WWE's licensing program.

11.     In or about April 1995, Bell introduced WWE to Stanley Shenker ("Shenker"), who is, and at all times relevant to this Complaint has been, the President and sole owner of Stanley Shenker & Associates, Inc. ("SSAI").

12.     For at least ten years prior to April 1995, when Bell introduced Shenker to WWE, Bell and Shenker had maintained both a business and personal relationship.

13.     SSAI is a New York corporation with its principal place of business located at 25 VanZant Street, Norwalk, Connecticut.

14.     SSAI and Shenker are, and at all times relevant to this Complaint have been, engaged in the business of providing licensing services to various companies.

15.     On March 7, 1997, WWE and SSAI entered into an agreement (the "Agency Agreement") pursuant to which SSAI was to act as WWE's exclusive licensing agent. The Agency Agreement provided that the services to be performed under the Agreement would be specifically and primarily performed by Shenker.

16.     As WWE's exclusive licensing agent, SSAI was responsible for, *inter alia*, seeking out and bringing potential licensees to WWE.

17.     Paragraph 6(a) of the Agency Agreement, entitled "Compensation to Agent," provided that "[i]n full consideration for the services to be rendered under [the Agency] Agreement," SSAI was entitled to receive a commission of eleven percent of royalties received by

4

WWE on licensing deals or agreements "negotiated and procured specifically by [SSAI] pursuant to, and during the term of, [the Agency] Agreement."

18.    Paragraph 6(c) of the Agency Agreement expressly stated that SSAI was not entitled to receive commissions or royalties paid to WWE as a result of WWE's efforts or as a result of activities by parties that had been granted a license by WWE, prior to the commencement of the Agency Agreement, without SSAI's involvement.

19.    Pursuant to paragraph 7(d) of the Agency Agreement, entitled "[WWE] Right to Negotiate Agreements," WWE expressly reserved the right to negotiate its own license agreements with entities "that were not first brought to [WWE's] attention through [SSAI's] efforts."

20.    Due to the tremendous success of the WWE brand, there was a great demand for license agreements with WWE, pursuant to which licensees could utilize WWE intellectual property in connection with sales of the licensees' own goods and/or services.

21.    As a result of this demand, many potential licensees contacted WWE directly seeking licensing opportunities. Indeed, many of these potential licensees contacted Bell personally.

22.    As Senior Vice President of Licensing and Merchandising, Bell's responsibilities included negotiating and procuring license agreements in-house, separate and apart from agreements negotiated and procured externally by SSAI.

23.    Unlike SSAI, which was compensated solely through royalty commissions, Bell, as a WWE employee, was compensated solely by means of an annual salary. Accordingly, Bell neither received, nor was he entitled to receive, additional compensation based upon sales of WWE licensed products pursuant to license agreements obtained as a result of his efforts.

24.    In or about March 1998, while acting as WWE's Senior Vice President of Licensing and Merchandising, and without WWE's knowledge or consent or prior approval, Bell formed Bell Consulting, a for-profit organization, and served as its President. Bell's formation of Bell Consulting was in breach of the Code of Conduct Agreement. At no time during his employment with WWE did Bell ever disclose to WWE either the formation or existence of Bell Consulting, or Bell's own role as Bell Consulting's President.

25.    Upon information and belief, at or around the time that Bell formed Bell Consulting, Bell entered into an agreement with Shenker and/or SSAI whereby Bell would direct licensing opportunities that should have been handled in-house by Bell to SSAI in exchange for a percentage of the commissions that SSAI was to receive from WWE on the passed opportunities.

26.    By passing licensing opportunities to SSAI that should have been handled in-house by Bell, in exchange for a percentage of the commissions SSAI thereby would wrongfully be positioned to receive on such licensing opportunities, Bell deprived WWE of a corporate opportunity for his own financial gain.

27.    More specifically, on more than one occasion, potential WWE licensees contacted Bell directly, or contacted WWE and were referred to Bell, in order to seek merchandise licensing rights. Rather than handling the procurement and negotiation of the license agreement, Bell would direct the licensee to deal directly with Shenker, and Bell and Shenker subsequently would falsely represent that SSAI had procured and negotiated the licensing deal when, in fact, the licensee had approached WWE without any involvement whatsoever on the part of SSAI and/or Shenker.

28.    In addition, on more than one occasion, Bell negotiated and procured license agreements and then misrepresented to WWE that SSAI had negotiated and procured those agreements, thereby resulting in commissions paid to SSAI on license agreements that SSAI did not negotiate and procure.

29.    Bell and SSAI then split SSAI's wrongfully obtained commissions, pursuant to an arrangement whereby within days of receipt of royalty commissions from WWE, SSAI would send checks to Bell Consulting totaling fifty percent of the commissions received by SSAI relating to licensees wrongly diverted to SSAI.

30.    As a result of Bell's and Shenker's deceit, WWE paid SSAI sizable commissions on royalties earned by WWE pursuant to license agreements that SSAI did not specifically negotiate and procure, which commissions SSAI and Bell then split.

31.     Upon information and belief, as a result of Bell's and Shenker's misconduct, WWE paid SSAI over $1,400,000.00 in unearned commissions pursuant to license agreements that SSAI did not negotiate and procure.  SSAI subsequently paid Bell, through Bell Consulting, a percentage of the wrongfully obtained commissions.

32.     Bell used Bell Consulting as a channel to funnel improper payments from SSAI to Bell for Bell's own personal use.

33.     From October 1998 through November 2000, SSAI and/or Shenker made periodic payments to Bell totaling in excess of $780,000.00.  These payments were made at intervals coinciding with SSAI's receipt of commission payments from WWE.

34.     Upon information and belief, the payments from SSAI to Bell Consulting represent a percentage of SSAI's unearned and wrongfully obtained commissions with respect to the following WWE licensees:

        a.      Trinity Products, Inc.;
        b.      Trau & Loevner Imprinted Sportswear, Inc.;
        c.      Comic Images;
        d.      Chaos Comics;
        e.      Ocean Atlantic Textiles, Inc.;
        f.      Zippo Manufacturing, Inc.;
        g.      Carolina Manufacturing, Inc.;
        h.      Game Day Enterprises;
        i.      Advanced Sports Concepts;
        j.      MZ Berger;
        k.      Ralph Marlin;
        l.      Bowie Industries, Inc. a/k/a Changes;
        m.      Toys R Us;

    n.    Kosmakare;

    o.    Bev Key; and

    p.    Jakks/THQ.

35.    In addition to passing licensing opportunities that should have been handled in-house by Bell to SSAI in order to receive a percentage of SSAI's commissions, Bell also entered into an agreement with SSAI and/or Shenker whereby SSAI solicited one or more WWE licensees for improper payments in exchange for favorable terms or treatment, and subsequently split with Bell the payments that SSAI improperly received.

36.    More specifically, in or around January 1998, Shenker, acting on behalf of SSAI, solicited Trinity Products, Inc. ("Trinity"), a WWE licensee, for monetary payments in exchange for granting Trinity a secret exclusive right to sell WWE licensed products to Wal-Mart. In exchange for the exclusive right to sell WWE licensed products to Wal-Mart, Trinity was required to pay two percent of its total Wal-Mart sales of WWE licensed products directly to SSAI.

37.    When Trinity questioned Bell as to the propriety of paying SSAI two percent of Trinity's total sales of WWE licensed products to Wal-Mart, Bell advised Trinity that Trinity was to pay SSAI and/or Shenker directly.

38.    In order to grant Trinity the secret Wal-Mart exclusive, Bell and Shenker also entered into an agreement whereby both Bell and Shenker would use their respective positions with WWE to pressure other WWE licensees to forego contractual rights so that Trinity would be the sole WWE licensee selling t-shirts to Wal-Mart.

39.     Specifically, using his position as Senior Vice President of Licensing and Merchandising, Bell pressured WWE licensee Trau & Loevner Imprinted Sportswear, Inc. ("T&L") to forego its contractual right to sell WWE licensed products to Wal-Mart.

40.     On or about April 30, 1999, Trinity paid SSAI $28,881.68. This check represented two percent of Trinity's sales of WWE licensed products to Wal-Mart for the fourth quarter of 1998. SSAI subsequently split equally this payment from Trinity with Bell in exchange for his participation in the scheme.

41.     In addition to sharing a percentage of SSAI's wrongfully obtained commissions on licensing opportunities that were passed from Bell to SSAI, and splitting improper payments received from Trinity, Bell and Bell Consulting also actively worked to conceal this improper conduct from WWE.

42.     For example, Bell, acting on behalf of Bell Consulting, generated phony invoices to seemingly justify the payments from SSAI to Bell Consulting as being for unrelated projects. The dates and amounts of the phony Bell Consulting invoices correspond to the amounts and approximate dates of the improper payments from SSAI to Bell Consulting. These phony invoices were generated to prevent WWE from discovering the true nature of the payments from SSAI to Bell.

43.     As a result of Bell's superior skill, knowledge and expertise as Senior Vice President of Licensing and Merchandising and the unique degree of trust and confidence WWE placed in Bell, Bell owed a fiduciary duty to WWE.

44.     In addition, because Bell held the position of Senior Vice President of Licensing and Merchandising, Bell owed a fiduciary duty to WWE.

45.     Because Bell owed a fiduciary duty to WWE, Bell had a duty to act with loyalty and honesty toward WWE.  Bell also had a duty not to engage in self-dealing or act with a conflict, or appearance of a conflict, of interest.

46.     By engaging in wrongful conduct, including:

   a.     entering into an agreement with WWE's agent, SSAI, to solicit improper payments from Trinity;

   b.     splitting improper payments solicited from Trinity with WWE's agent, SSAI;

   c.     pressuring WWE licensees to forego contractual rights in order to grant Trinity a secret exclusive merchandising right to sell WWE licensed products to Wal-Mart;

   d.     passing licensing opportunities that should have been handled in-house by Bell to SSAI in order to obtain a portion of SSAI's wrongfully obtained commissions on such opportunities;

   e.     misrepresenting to WWE that SSAI was entitled to commissions on license agreements that Bell knew SSAI did not negotiate and procure;

f.    accepting, through Bell Consulting, a percentage of SSAI's wrongfully obtained commissions;

g.    forming Bell Consulting and acting as its President without the prior consent of WWE; and

h.    actively concealing this conduct from WWE;

Bell engaged in self-dealing and acted with a conflict of interest due to his position as Senior Vice President of Licensing and Merchandising and fiduciary of WWE.

47.    Bell, having signed the Conduct Agreement, was fully aware that WWE would strongly disapprove of this conduct.  As a result, Bell also acted with extreme disloyalty and dishonesty toward WWE.

48.    As a result of Bell's self-dealing, conflict of interest, disloyalty, dishonesty and usurpation of corporate opportunities, Bell breached his fiduciary duty to WWE.

49.    These acts of:

a.    entering into an agreement with WWE's agent, SSAI, to solicit improper payments from Trinity;

b.    splitting improper payments solicited from Trinity with WWE's agent, SSAI;

c.    pressuring WWE licensees to forego contractual rights in order to grant Trinity a secret exclusive merchandising right to sell WWE licensed products to Wal-Mart;

d.    passing licensing opportunities that should have been handled in-house by Bell to SSAI in order to obtain a portion of SSAI's wrongfully obtained commissions on such opportunities;

e.    misrepresenting to WWE that SSAI was entitled to commissions on license agreements that Bell knew SSAI did not negotiate and procure;

f.    accepting, through Bell Consulting, a percentage of SSAI's wrongfully obtained commissions;

g.    forming Bell Consulting and acting as its President without the prior consent of WWE; and

h.    actively concealing this conduct from WWE;

constitute conduct that is outrageous, and that is done with bad motive and reckless indifference to the rights of WWE and its licensees.

50.    As a result of the foregoing breaches by Bell, WWE has been damaged and continues to suffer damages.

## Second Count
### (Fraudulent Misrepresentation against James K. Bell)

1-50.    WWE hereby adopts and incorporates by reference paragraphs 1 through 50 of the first count as if fully stated herein.

51.    Bell has superior skill, knowledge and expertise in the licensing industry. WWE placed a unique degree of trust and confidence in Bell, and relied on Bell's skill, knowledge and expertise when it promoted Bell to Senior Vice President of Licensing and Merchandising.

52.    Because of Bell's superior skill, knowledge and expertise in the licensing industry, and the unique degree of trust and confidence placed in Bell by WWE, Bell owed a fiduciary duty to WWE.

53.  Bell's conduct, including:

    a.  entering into an agreement with WWE's agent, SSAI, to solicit improper payments from Trinity;

    b.  splitting improper payments solicited from Trinity with WWE's agent, SSAI;

    c.  pressuring WWE licensees to forego contractual rights in order to grant Trinity a secret exclusive merchandising right to sell WWE licensed products to Wal-Mart;

    d.  passing licensing opportunities that should have been handled in-house by Bell to SSAI in order to obtain a portion of SSAI's wrongfully obtained commissions on such opportunities;

    e.  misrepresenting to WWE that SSAI was entitled to commissions on license agreements that Bell knew SSAI did not negotiate and procure;

    f.  accepting, through Bell Consulting, a percentage of SSAI's wrongfully obtained commissions;

    g.  forming Bell Consulting and acting as its President without the prior consent of WWE; and

    h.  actively concealing this conduct from WWE;

concerned matters within the scope of Bell's relationship with WWE.

54.  As a result of Bell's fiduciary relationship with WWE, Bell had a duty to disclose to WWE Bell's and Shenker's scheme to solicit improper payments from Trinity in exchange for granting a secret exclusive right to sell WWE licensed products to Wal-Mart.

55.    As a result of Bell's fiduciary relationship with WWE, Bell had a duty to disclose to WWE the fact that Bell took advantage of WWE's corporate opportunities for his own financial gain by passing licensing opportunities that should have been handled in-house by Bell to SSAI in exchange for a percentage of SSAI's wrongfully obtained commissions.

56.    As a result of Bell's fiduciary relationship with WWE, Bell had a duty to disclose to WWE that Bell misrepresented to WWE that SSAI was entitled to receive commissions on license agreements that SSAI did not negotiate and procure.

57.    Bell's concealment was of existing facts.

58.    Bell concealed the aforesaid conduct to prevent WWE from terminating Bell's employment and in order to continue receiving payments from SSAI pursuant to the scheme.

59.    Bell concealed the aforesaid conduct to prevent WWE from terminating the Agency Agreement between SSAI and WWE.

60.    As a result of Bell's concealment, WWE was prevented from discovering Bell's wrongful conduct and terminating Bell's employment and, therefore, was induced to pay Bell his annual salary for the years 1998 through 2000 in addition to severance pay upon Bell's termination in 2000.

61.    Furthermore, WWE was prevented from discovering SSAI's wrongful conduct and terminating the Agency Agreement and, therefore, was induced to pay SSAI commissions under the Agency Agreement to which SSAI would not have been entitled to receive had the contract been terminated pursuant to Paragraph 13(a)(iv), which defines a breach of contract to include acts of fraud, theft, deceit or unethical conduct.

62.    As a further result of the foregoing, WWE was induced to pay SSAI over $1,400,000.00 in commissions on the sale of WWE licensed products sold pursuant to license agreements that SSAI did not negotiate and procure for WWE.

63.    Based of the foregoing fraudulent misrepresentation, WWE has suffered damages and will continue to suffer damages.

### Third Count
### (Civil Conspiracy against James K. Bell)

1-50.    WWE hereby adopts and incorporates by reference paragraphs 1 through 50 of the first count as if fully stated herein.

51.    Bell, Bell Consulting, Shenker and SSAI acted together to deprive WWE of over $1,400,000.00 in royalty revenue.

52.    Pursuant to the Agency Agreement, SSAI was not entitled to receive commissions on license agreements that SSAI did not negotiate and procure for WWE.

53.    Due to the tremendous popularity of the WWE brand, many potential licensees contacted Bell and WWE directly, without SSAI's assistance, for the purpose of obtaining licensing and merchandising rights.

54.    Upon information and belief, Bell passed licensing opportunities that should have been handled in-house by Bell to SSAI in exchange for a percentage of the commissions SSAI would receive on the passed license opportunities.

55.    Upon information and belief, Bell, Shenker and SSAI presented the passed license opportunities to WWE as if SSAI had negotiated and procured the license agreements, thereby deceiving WWE into paying SSAI commissions on license agreements that SSAI was not entitled to receive.

56.    Upon information and belief, on several occasions, Bell represented to WWE that SSAI negotiated and procured certain license agreements when, in fact, Bell negotiated and procured the license agreements, thereby deceiving WWE into paying commissions to SSAI that SSAI was not entitled to receive.

57.    Upon information and belief, SSAI caused a percentage of its wrongfully obtained commissions on license agreements that SSAI did not negotiate and procure to be paid to Bell, through Bell Consulting.

58.    Upon information and belief, in order to conceal the aforesaid conduct, Bell, acting on behalf of Bell Consulting, generated false invoices that correspond to the amounts and approximate dates of the improper payments from SSAI to Bell Consulting.

59.    As a result of Bell's fiduciary relationship with WWE, Bell had a duty to disclose the agreement among Bell, Shenker and SSAI whereby Bell passed licensing opportunities that should have been handled in-house by Bell to SSAI in exchange for a percentage of SSAI's wrongfully obtained commissions on such opportunities.

60.    As WWE's agent, SSAI owed a fiduciary duty to WWE.  As a result of SSAI's fiduciary relationship with WWE, SSAI had a duty to disclose the agreement among Bell, Shenker and SSAI whereby Bell passed licensing opportunities that should have been handled in-house by Bell to SSAI in exchange for a percentage of SSAI's wrongfully obtained commissions on such opportunities.

61.    As a result of Bell's conduct, WWE has suffered damages and will continue to suffer damages.

**Fourth Count**
**(Civil Conspiracy against Bell Consulting, LLC)**

1-50.    WWE hereby adopts and incorporates by reference paragraphs 1 through 50 of the first count as if fully stated herein.

51.    Bell, Bell Consulting, Shenker and SSAI acted together to deprive WWE of over $1,400,000.00 in royalty revenue.

52.     Pursuant to the Agency Agreement, SSAI was not entitled to receive commissions on license agreements that SSAI did not negotiate and procure for WWE.

53.     Due to the tremendous popularity of the WWE brand, many potential licensees contacted Bell and WWE directly, without SSAI's assistance, for the purpose of obtaining licensing and merchandising rights.

54.     Upon information and belief, Bell passed licensing opportunities that should have been handled in-house by Bell to SSAI in exchange for a percentage of the commissions SSAI would receive on such opportunities.

55.     Upon information and belief, Bell, Shenker and SSAI presented the passed licensing opportunities to WWE as if SSAI had negotiated and procured the license agreements, thereby deceiving WWE into paying SSAI commissions on license agreements that SSAI was not entitled to receive.

56.     Upon information and belief, on several occasions, Bell represented to WWE that SSAI negotiated and procured certain license agreements when, in fact, Bell negotiated and procured the license agreements, thereby deceiving WWE into paying commissions to SSAI that SSAI was not entitled to receive.

57.     Upon information and belief, SSAI caused a percentage of its wrongfully obtained commissions on license agreements that SSAI did not negotiate and procure to be paid to Bell, through Bell Consulting.

58.    Upon information and belief, pursuant to an agreement among Bell, Bell Consulting, Shenker and SSAI, Bell Consulting received over $780,000.00 of SSAI's wrongfully obtained commissions on the sale of licensed WWE products, pursuant to license agreements SSAI did not negotiate and procure.

59.    Upon information and belief, in furtherance of, and in order to conceal the aforesaid conduct, Bell, acting on behalf of Bell Consulting, generated false invoices that correspond to the amounts and approximate dates of the improper payments from SSAI to Bell Consulting.

60.    As a result of Bell's fiduciary relationship with WWE, Bell had a duty to disclose the agreement among Bell, Shenker and SSAI whereby Bell passed licensing opportunities that should have been handled in-house by Bell to SSAI in exchange for a percentage of SSAI's wrongfully obtained commissions on such opportunities.

61.    As WWE's agent, SSAI owed a fiduciary duty to WWE. As a result of SSAI's fiduciary relationship with WWE, SSAI had a duty to disclose the agreement among Bell, Shenker and SSAI whereby Bell passed licensing opportunities that should have been handled in-house by Bell to SSAI in exchange for a percentage of SSAI's wrongfully obtained commissions on such opportunities.

62.    As a result of Bell Consulting's conduct, WWE has suffered damages and will continue to suffer damages.

**Fifth Count**
**(Violation of Connecticut General Statutes Section 52-564 against James K. Bell)**

1-50.    WWE hereby adopts and incorporates by reference paragraphs 1 through 50 of the first count as if fully stated herein.

51.    Bell concealed from WWE that:

    a.    Bell entered into an agreement with WWE's agent, SSAI, to solicit improper payments from Trinity;

    b.    Bell split improper payments solicited from Trinity with WWE's agent, SSAI;

    c.    Bell pressured WWE licensees to forego contractual rights in order to grant Trinity a secret exclusive merchandising right to sell WWE licensed products to Wal-Mart;

    d.    Bell passed licensing opportunities that should have been handled in-house by Bell to SSAI in order to obtain a portion of SSAI's wrongfully obtained commissions on such opportunities;

    e.    Bell misrepresented to WWE that SSAI was entitled to commissions on license agreements that Bell knew SSAI did not negotiate and procure;

    f.    Bell, through Bell Consulting, accepted a percentage of SSAI's wrongfully obtained commissions;

    g.    Bell formed Bell Consulting and acted as its President without the prior consent of WWE; and

    h.    Bell actively concealed this conduct from WWE.

52.    Bell's aforesaid conduct was intentional in that Bell committed said acts with the intent to steal funds from WWE in the form of commissions wrongfully received by SSAI

on licensing opportunities passed to SSAI by Bell and on kickbacks paid by licensees to SSAI and split with Bell.

53.    Bell's unauthorized and intentional conduct, as aforesaid, is a violation of Connecticut General Statutes Section 52-564.

54.    Based on the foregoing statutory violation, WWE has suffered damages and will continue to suffer damages.

## Sixth Count
### (Violation of Connecticut General Statutes Section 52-564 against Bell Consulting, LLC)

1-50.    WWE hereby adopts and incorporates by reference paragraphs 1 through 50 of the first count as if fully stated herein.

51.    Bell Consulting concealed from WWE that it received over $780,000.00 of SSAI's wrongfully obtained commissions on license agreements SSAI did not negotiate and procure.

52.    Bell Consulting's aforesaid conduct was intentional in that Bell Consulting committed said acts with the intent to steal funds from WWE in the form of commissions wrongfully received by SSAI on licensing opportunities passed to SSAI by Bell.

53.    Bell Consulting's unauthorized and intentional conduct, as aforesaid, is a violation of Connecticut General Statutes Section 52-564.

54.    Based on the foregoing statutory violation, WWE has suffered damages and will continue to suffer damages.

### Seventh Count
### (Common Law Conversion against James K. Bell)

1-50.    WWE hereby adopts and incorporates by reference paragraphs 1 through 50 of the first count as if fully stated herein.

51.    Bell failed to inform WWE that:

a.    Bell entered into an agreement with WWE's agent, SSAI, to solicit improper payments from Trinity;

b.    Bell split improper payments solicited from Trinity with WWE's agent, SSAI;

c.    Bell pressured WWE licensees to forego contractual rights in order to grant Trinity a secret exclusive merchandising right to sell WWE licensed products to Wal-Mart;

d.    Bell passed licensing opportunities that should have been handled in-house by Bell to SSAI in order to obtain a portion of SSAI's wrongfully obtained commissions on such opportunities;

e.    Bell misrepresented to WWE that SSAI was entitled to commissions on license agreements that Bell knew SSAI did not negotiate and procure;

f.    Bell, through Bell Consulting, accepted a percentage of SSAI's wrongfully obtained commissions;

g.    Bell formed Bell Consulting and acted as its President without the prior consent of WWE; and

h.    Bell actively concealed this conduct from WWE.

52.    Bell's aforesaid conduct was intentional in that Bell committed said acts with the intent to steal funds from WWE in the form of commissions wrongfully received by SSAI on licensing opportunities passed to SSAI by Bell, and on license agreements that SSAI did not negotiate and procure.

53.    As a result of Bell's unauthorized and intentional conduct, WWE has suffered damages and will continue to suffer damages.

## Eighth Count
## (Common Law Conversion against Bell Consulting, LLC)

1-50.    WWE hereby adopts and incorporates by reference paragraphs 1 through 50 of the first count as if fully stated herein.

54.    Bell Consulting concealed from WWE that it received over $780,000.00 of SSAI's wrongfully obtained commissions on licensing opportunities passed by Bell to SSAI and on license agreements that Bell negotiated and procured.

55.    Bell Consulting's aforesaid conduct was intentional in that Bell Consulting committed said acts with the intent to steal funds from WWE in the form of commissions wrongfully received by SSAI on licensing opportunities passed to SSAI by Bell, and on license agreements that SSAI did not negotiate and procure.

56.    As a result of Bell Consulting's unauthorized and intentional conduct, WWE has suffered damages and will continue to suffer damages.

## Ninth Count
### (Breach of Contract against James K. Bell)

1-50.   WWE hereby adopts and incorporates by reference paragraphs 1 through 50 of the first count as if fully stated herein.

51.    The acts of:

    a.    entering into an agreement with WWE's agent, SSAI, to solicit improper payments from Trinity;

    b.    splitting improper payments solicited from Trinity with WWE's agent, SSAI;

    c.    pressuring WWE licensees to forego contractual rights in order to grant Trinity a secret exclusive merchandising right to sell WWE licensed products to Wal-Mart;

    d.    passing licensing opportunities that should have been handled in-house by Bell to SSAI in order to obtain a portion of SSAI's wrongfully obtained commissions on such opportunities;

    e.    misrepresenting to WWE that SSAI was entitled to commissions on license agreements that Bell knew SSAI did not negotiate and procure;

    f.    accepting, through Bell Consulting, a percentage of SSAI's wrongfully obtained commissions;

    g.    forming Bell Consulting and acting as its President without the prior consent of WWE; and

    h.    actively concealing this conduct from WWE;

violate the provisions set forth in the Conduct Agreement.

52.    As a result of the aforesaid conduct, Bell violated the following Paragraphs of the Conduct Agreement: a; c; d; e; f; g; h; and i.

53.    WWE fully performed all of its obligations under the Conduct Agreement.

54.    As a result of the foregoing breaches by Bell, WWE has been damaged and continues to suffer damages.

## Tenth Count
### (Breach of the Implied Covenant of Good Faith and Fair Dealing against James K. Bell)

1-50.    WWE hereby adopts and incorporates by reference paragraphs 1 through 50 of the first count as if fully stated herein.

51.    Based on the Conduct Agreement between Bell and WWE, Bell was under a duty to act in good faith and deal fairly with WWE.

52.    Upon information and belief, Bell breached his duty of good faith and fair dealing by:

a.    entering into an agreement with WWE's agent, SSAI, to solicit improper payments from Trinity;

b.    splitting improper payments solicited from Trinity with WWE's agent, SSAI;

c.    pressuring WWE licensees to forego contractual rights in order to grant Trinity a secret exclusive merchandising right to sell WWE licensed products to Wal-Mart;

d.    passing licensing opportunities that should have been handled in-house by Bell to SSAI in order to obtain a portion of SSAI's wrongfully obtained commissions on such opportunities;

e.    misrepresenting to WWE that SSAI was entitled to commissions on license agreements that Bell knew SSAI did not negotiate and procure;

f.    accepting, through Bell Consulting, a percentage of SSAI's wrongfully obtained commissions;

g.    forming Bell Consulting and acting as its President without the prior consent of WWE; and

h.    actively concealing this conduct from WWE.

53.    As a result, Bell has violated the covenant of good faith and fair dealing that is implied in the Conduct Agreement under Connecticut law.

54.    The aforesaid acts constitute conduct that is outrageous, and that is done with bad motive and reckless indifference to the rights of WWE and its licensees.

55.    As a result of the foregoing breaches by Bell, WWE has been damaged and continues to suffer damages.

### Eleventh Count
### (Tortious Interference with Business Relations against James K. Bell)

1-50.    WWE hereby adopts and incorporates by reference paragraphs 1 through 50 of the first count as if fully stated herein.

51.     At all times relevant hereto, Bell and SSAI were aware that SSAI would not receive commissions on license agreements that were not negotiated and procured by SSAI.

52.     Upon information and belief, Bell passed licensing opportunities that should have been handled in-house by Bell to SSAI in exchange for a percentage of the commissions SSAI would receive on such opportunities.

53.     Upon information and belief, Bell passed to SSAI the names and contact information of potential licensees that approached WWE without SSAI's intervention, and to which WWE had an interest in granting licensing rights.

54.     Upon information and belief, SSAI then contacted the potential licensees and, in limited cases, negotiated the terms of the license agreements.  SSAI then presented the potential licensees to WWE, and along with Bell, represented that the potential licensees' agreements were negotiated and procured by SSAI.  As a result, WWE was deceived and, therefore, paid SSAI commissions on the sale of WWE licensed products, pursuant to license agreements that SSAI did not negotiate and procure.

55.     Upon information and belief, SSAI and Shenker then caused a percentage of SSAI's wrongfully obtained commissions to be paid to Bell, through Bell Consulting.

56.     As a result of Bell's, SSAI's and Shenker's aforesaid conduct, including passing licensing opportunities to SSAI that should have been handled in-house by Bell, WWE was deprived of the opportunity to negotiate more favorable contract terms directly with the

licensees through its Senior Vice President of Licensing and Merchandising, whereby WWE would not have been required to pay SSAI commissions on such license agreements.

57.    In addition, Bell, Shenker and SSAI used their respective positions with WWE to pressure WWE licensees to forego contractual rights in order for Bell, Shenker and SSAI to secretly offer exclusive rights to other WWE licensees.

58.    Specifically, Bell, Shenker and SSAI pressured T&L to not sell WWE licensed products to Wal-Mart in order for Bell, Shenker and SSAI to secretly grant Trinity an exclusive right to sell WWE licensed products to Wal-Mart.

59.    Based on the foregoing interference with business relations, WWE has suffered damages and will continue to suffer damages.

**Twelfth Count**
**(Violation of the Connecticut Unfair Trade Practices Act against Bell Consulting, LLC)**

1-50.    WWE hereby adopts and incorporates by reference paragraphs 1 through 50 of the first count as if fully stated herein.

51.    At all times relevant to this complaint, Bell Consulting was engaged in the conduct of trade or commerce as that term is defined by Connecticut General Statutes Section 42-110a(4).

52.    Bell Consulting's aforesaid conduct, including, but not limited to, receiving a percentage of SSAI's wrongfully obtained commissions on licensing opportunities passed to

29

SSAI that should have been handled in-house by Bell, constitutes unfair methods of competition and/or unfair and deceptive acts and/or practices in the conduct of trade or commerce.

53.    Bell Consulting's aforesaid conduct, including, but not limited to, receiving a percentage of SSAI's wrongfully obtained commissions on licensing opportunities passed to SSAI that should have been handled in-house by Bell, violates the public policy of Connecticut.

54.    Bell Consulting's aforesaid conduct, including, but not limited to, receiving a percentage of SSAI's wrongfully obtained commissions on licensing opportunities passed to SSAI that should have been handled in-house by Bell, is immoral, unethical, oppressive and/or unscrupulous.

55.    Bell Consulting has caused substantial injury to:

a.    consumers in the form of higher prices due to the passed-on costs of paying SSAI over $1,400,000.00 in unearned commissions; and

b.    WWE in the form of, among other things, the loss of over $1,400,000.00 in royalty revenue.

56.    Bell Consulting's aforesaid conduct constitutes a violation of the Connecticut Unfair Trade Practices Act, Connecticut General Statutes Sections 42-110a, *et seq.*;

57.    WWE has suffered and may continue to suffer ascertainable losses and damages as a result of Bell Consulting's violation of the Connecticut Unfair Trade Practices Act.

### Thirteenth Count
### (Violation of RICO, 18 U.S.C. § 1962(c) by James K. Bell)

1-50.    WWE hereby adopts and incorporates by reference paragraphs 1 through 50 of the first count as if fully stated herein.

#### RICO Persons

51.    Bell, Bell Consulting, Shenker and SSAI are each a "person," within the meaning of 18 U.S.C. §1961(3).

#### RICO Enterprise

52.    For the purpose of 18 U.S.C. § 1962(c), Bell Consulting is an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

53.    In the alternative, for the purpose of 18 U.S.C. § 1962(c), Bell operated Bell Consulting as an "enterprise" within the meaning of 18 U.S.C. § 1961(4) through a pattern of racketeering activity as set forth herein.

54.    In the alternative, for the purpose of 18 U.S.C. § 1962(c), Bell, Shenker, Bell Consulting and SSAI, acting in concert, comprised an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) for the purpose of conducting the activities set forth herein.

55.    For the purpose of 18 U.S.C. § 1962(c), Bell had authority within the Enterprise and conducted or participated in the activities set forth herein through the Enterprise or Enterprises described above.

### Effect on Interstate Commerce

56.     Bell Consulting is an entity that engages in and affects interstate commerce by maintaining contacts and conducting economic and other activities throughout the United States.

57.     The association-in-fact of Bell, Shenker, Bell Consulting and SSAI is an enterprise that engages in and effects interstate commerce by maintaining contacts and conducting economic and other activities throughout the United States.

### Predicate Acts of Racketeering Activity

58.     Defendants engaged, conducted and participated in a continuous pattern of predicate acts through the enterprise or enterprises which predicate acts included, but are not limited to the following:

    a.     In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, Bell made the following fraudulent misrepresentations to WWE regarding several licensees: 1) SSAI and/or Shenker's efforts had brought the licensee to the WWE; and/or 2) SSAI and/or Shenker had negotiated and procured the licensing contract of the licensee. Bell made one or both of these misrepresentations to the WWE with regards to the following licensees: Trau & Loevner Imprinted Sportswear, Inc.; Comic Images; Chaos Comics; Ocean Atlantic Textiles, Inc.; Zippo Manufacturing, Inc.; Carolina Manufacturing, Inc.; Game Day Enterprises; Advanced Sports Concepts; MZ Berger; Ralph Marlin; Bowie Industries, Inc. a/k/a Changes; Toys R Us; Kosmakare; Bev Key; and Jakks/THQ. In fact, upon information and belief, many of these licensees approached WWE without any intervention on the part of SSAI or Shenker. Additionally, upon information and belief,

Bell himself had negotiated and procured the licensing agreements with many of these licensees. WWE relied on Bell's fraudulent misrepresentations to its detriment, by paying commissions to SSAI on license agreements that SSAI did not negotiate and procure. Such fraudulent misrepresentations were transmitted by telephone, facsimile, or sent or delivered by United States Mail or private or commercial carrier (or material omissions were made in the course of communications by telephone or sent or delivered by United States mail or by private or commercial interstate carrier) in violation of 18 U.S.C. § 1341 and/or 18 U.S.C. § 1343.

b.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, SSAI and/or Shenker paid Bell or Bell Consulting kickback payments equaling fifty percent of the unearned commissions he received from the following licensees: Trinity Products, Inc.; Trau & Loevner Imprinted Sportswear, Inc.; Comic Images; Chaos Comics; Ocean Atlantic Textiles, Inc.; Zippo Manufacturing, Inc.; Carolina Manufacturing, Inc.; Game Day Enterprises; Advanced Sports Concepts; MZ Berger; Ralph Marlin; Bowie Industries, Inc. a/k/a Changes; Toys R Us; Kosmakare; Bev Key; and Jakks/THQ. Such kickback payments were made or facilitated by mail or wire transfer and Bell knew or should have known that such kickback payments would be made or facilitated by mail or wire transfer in violation of 18 U.S.C. § 1341 and/or 18 U.S.C. § 1343. In addition and/or alternatively, Bell knew or should have known such kickback payments involved the proceeds of some unlawful activity and such kickback payments were made with the intent to promote the carrying on of such unlawful activity in violation of 18 U.S.C. § 1956 and/or 18 U.S.C. § 1957.

c.    In furtherance of their scheme or artifice to defraud, and with specific intent to defraud, Bell entered an agreement with Shenker whereby both Bell and Shenker would pressure other WWE licensees to forego contractual rights so that Trinity would be the sole WWE licensee selling t-shirts to Wal-Mart. Bell used his position at WWE to pressure other WWE licensees to forego contractual rights so that Trinity would be the sole WWE licensee selling t-shirts to Wal-Mart. Bell made misrepresentations to these

WWE licensees, causing them to forego contractual rights to sell WWE licensed products to Wal-Mart. Bell made further misrepresentations to Trinity, causing Trinity to pay SSAI and/or Shenker directly kickback payments equaling two percent of Trinity's total sales of WWE licensed products to Wal-Mart. Such fraudulent misrepresentations were transmitted by telephone, facsimile, or sent or delivered by United States Mail or private or commercial carrier (or material omissions were made in the course of communications by telephone or sent or delivered by United States Mail or by private or commercial interstate carrier), in violation of 18 U.S.C. § 1341 and/or 18 U.S.C. § 1343.

d.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, SSAI and/or Shenker paid Bell or Bell Consulting kickback payments equaling fifty percent of the of the kickback payments Trinity paid to SSAI or Shenker. Such kickback payments were made or facilitated by mail or wire transfer and Bell knew or should have know that such kickback payments would be made or facilitated by mail or wire transfer in violation of 18 U.S.C. § 1341 and/or 18 U.S.C. § 1343. In addition and/or alternatively, Bell knew or should have known such kickback payments involved the proceeds of some unlawful activity and such kickback payments were made with the intent to promote the carrying on of such unlawful activity in violation of 18 U.S.C. § 1956 and/or 18 U.S.C. § 1957.

e.    In furtherance of the scheme or artifice to defraud and with specific intent to defraud, Bell, acting on behalf of Bell Consulting, generated phony invoices to seemingly justify the payments from SSAI to Bell Consulting as being for unrelated projects. The dates and amounts of the phony Bell Consulting invoices correspond to the amounts and approximate dates of the improper payments from SSAI to Bell Consulting. These phony invoices were generated to prevent WWE from discovering the true nature of the payments from SSAI to Bell. Such phony invoices were transmitted by telephone, facsimile, or sent or delivered by United States Mail or private or commercial carrier (or material omissions were made in the course of communications by telephone or sent or delivered by United

States Mail or by private or commercial interstate carrier) in violation of 18 U.S.C. § 1341 and/or 18 U.S.C. § 1343.

## Pattern of Racketeering Activity

59.    By knowingly and repeatedly committing the above criminal acts in furtherance and for the purpose of executing a fraudulent scheme to harm the WWE's business, Bell has committed numerous violations of the Federal Mail Fraud Statute, 18 U.S.C. § 1341, the Federal Wire Fraud Statute, 18 U.S.C. § 1343, the Federal Obstruction of Justice Statute, 18 U.S.C. § 1503, and the Federal Money Laundering Statute, 18 U.S.C. §§ 1956 and 1957.  Such violations are "predicate acts" under 18 U.S.C. § 1961(1)(B).  The numerous criminal acts that have been described herein, beginning in or around 1998 and continuing through the present, constitute a continuous and related pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

## Injury to WWE

60.    By reason of violation of 18 U.S.C. § 1962(c) committed by Bell, the WWE was injured in its business and property.

### Fourteenth Count
### (Conspiracy to Violate RICO, 18 U.S.C. § 1962(d) by James K. Bell)

1-60.    WWE hereby adopts and incorporates by reference paragraphs 1 through 60 of the previous count as if fully stated herein.

61.    Bell, Bell Consulting, Shenker and SSAI formed a conspiracy for the purpose of achieving and profiting from the racketeering activities described herein in violation of 18 U.S.C. § 1962(c).

62.    As described herein, Defendants engaged in one or more overt acts in furtherance of their conspiracy.

63.    As described herein, Defendants' conspiracy substantially affected interstate commerce as much of the conduct that formed the overt acts of the conspiracy involved interstate commerce and the damage caused by the conspiracy has harmed a corporation that itself substantially affects interstate commerce.

64.    As a direct and proximate result of the conspiracy, WWE has been injured in its business and property.

### Prayer for Relief

WHEREFORE, WWE respectfully requests the following relief:

(1)   Actual damages suffered by WWE as a result of the conduct complained of herein;

(2)   Reimbursement/recovery of all commissions and other sums of money paid to SSAI, by or on behalf of WWE as a result of Bell's and Bell Consulting's fraud, theft, deceit and/or the concealment of such conduct by Bell;

(3)   Punitive damages, costs and attorney's fees in accordance with Connecticut General Statutes Section 42-110(g);

(4)   Punitive damages under the common law;

(5)   Treble damages pursuant to Connecticut General Statutes Section 52-564, *et seq.*

(6)   Treble damages, costs and attorney's fees in accordance with 18 U.S.C. § 1964(c).

(7)   Prejudgment and post-judgment interest;

(8)   Costs; and

(9)   Such other and further relief as this Court deems just and appropriate.

PLAINTIFF,
WORLD WRESTLING
ENTERTAINMENT, INC.

By: _____

Stanley A. Twardy, Jr.
Richard P. Colbert
Day, Berry & Howard LLP
One Canterbury Green
Stamford, CT 06901-2047
Telephone:  (203) 977-7300
Facsimile:  (203) 977-7301
Juris No.: 14230

Jerry S. McDevitt
Amy L. Barrette
Kirkpatrick & Lockhart LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, Pennsylvania 15222
Telephone:  (412) 355-6500
Facsimile:   (412) 355-6501

RETURN DATE: MARCH 11, 2003      :    SUPERIOR COURT

                                  :

WORLD WRESTLING ENTERTAINMENT, :    JUDICIAL DISTRICT OF
INC.,                               :    STAMFORD/NORWALK

                                    :

           Plaintiff,            :

                                    :

vs.                                  :

                                  :

JAMES K. BELL and             :
BELL CONSULTING, LLC,        :    FEBRUARY 14, 2003

                                  :

          Defendants.         :

### STATEMENT OF AMOUNT IN DEMAND

The amount in demand, exclusive of interest and costs, exceeds $15,000.

                       PLAINTIFF,
                       WORLD WRESTLING
                       ENTERTAINMENT, INC.,

                       By:                                  

                              Stanley A. Twardy, Jr.
                              Richard P. Colbert
                              Day, Berry & Howard LLP
                              One Canterbury Green
                              Stamford, CT 06901-2047
                              Telephone:  (203) 977-7300
                              Facsimile:  (203) 977-7301
                              Juris No.: 14230

                              Jerry S. McDevitt
                              Amy L. Barrette
                              Kirkpatrick & Lockhart LLP
                              Henry W. Oliver Building
                              535 Smithfield Street
                              Pittsburgh, Pennsylvania 15222
                              Telephone:  (412) 355-6500
                              Facsimile:  (412) 355-6501

**TitanSports, Inc.**
**Conflict of Interest**
**and Code of Conduct Agreement**

I understand, acknowledge and agree that during my employment I may not engage in any activities or have any personal or financial interests which impair, or appear to impair, my independence or judgment or otherwise conflict, or appear to conflict, with my responsibilities to TitanSports, Inc. Such activities include, but are not limited to:

a. accepting fees, commissions or property in connection with any transaction on behalf of Titan;

b. accepting entertainment or gifts of more than nominal value;

c. accepting or offering unauthorized or illegal payments;

d. having a financial interest in customers, suppliers, promoters/co-promoters, or any enterprise which has a business relationship with Titan except where my financial interest is limited to a nominal investment in a publicly-held company;

e. borrowing from or lending to customers, suppliers, promoters/co-promoters except for normal banking transactions with financial institutions;

f. disclosing confidential information which I may create, produce or obtain in the course of my employment to outsiders or using information or my position directly or indirectly for personal or financial gain;

g. personally taking advantage of business opportunities which might be of interest to Titan;

h. engaging in business with, or as, a competitor, customer, promoter/co-promoter, or supplier of Titan without the prior approval of Titan's President or Executive Vice President;

i. serving as an officer, director, employee, consultant or promoter of for-profit organizations without Titan's prior approval.

I understand that this Agreement is not a contract of employment. Employment is at will with TitanSports, Inc. and can be terminated, with or without cause, at any time at the option of either TitanSports, Inc. or the employee.

I represent that, except as noted below, during the past eighteen months neither I nor any member of my immediate family (parents, spouse and children), have engaged in any activity or had any personal or financial interest or any other relationship which conflicts, or might appear to conflict, with my responsibilities to TitanSports, Inc.

This Agreement shall be construed according to the laws of the State of Connecticut applicable to agreements to be wholly performed therein.

JAMES K. BELL
_____
NAME

3/2/95
_____
DATE

EXCEPTIONS  Production Video training Products for Dog owners
& Monster Buster Products design to assist children with Night terrors.

_____
SIGNATURE

WWFE 62434
ATTORNEY CONFIDENTIAL