844 A.2d 964
48 Conn.Supp. 357, 844 A.2d 964
(Cite as: 48 Conn.Supp. 357, 844 A.2d 964)

Page 1

H

Superior Court of Connecticut,
Complex Litigation Docket
at Stamford.
STANLEY SHENKER AND ASSOCIATES, INC., et al.
v.
WORLD WRESTLING FEDERATION ENTERTAINMENT, INC.
No. X05-CV 00-0180933S.

Oct. 16, 2003.

**Background:** In proceedings on civil complaint brought by licensing firm against former client, and on former client's counterclaims against licensing firm, former client brought motion for sanctions based upon admissions by president and sole owner of plaintiff firm of discovery abuse.

**Holdings:** The Superior Court, Complex Litigation Docket at Stamford, Rogers, J., held that:
(1) dismissal with prejudice of licensing firm's action was appropriate sanction for discovery abuse, and
(2) entry of default judgment against plaintiff and in favor of defendant on each of defendant's counterclaims was appropriate sanction for egregious discovery abuse.
Plaintiff's claims dismissed with prejudice; default judgment for defendant.

West Headnotes

[1] Pretrial Procedure 221
307Ak221 Most Cited Cases

[1] Pretrial Procedure 309
307Ak309 Most Cited Cases
For purposes of defendant's motion for sanctions in civil action, based upon admission of corporate plaintiff's president and sole owner to discovery abuse, president and owner's false deposition testimony and interrogatory answers regarding nature and extent of payments to third party clearly concerned material matter, where president and owner's "corrected" explanation of such payments constituted admission of bulk of core allegations comprising defendant's counterclaims and also related to claims contained in operative complaint.

[2] Pretrial Procedure 221
307Ak221 Most Cited Cases
For purposes of defendant's motion for sanctions in civil action, based upon admission of corporate plaintiff's president and sole owner to discovery abuse, president and owner was aware that his deposition testimony concerning nature of payments to third party was false, and that such payments were in fact a split of commissions received from defendant, where president and owner admitted that he substituted fabricated invoices for actual invoices reflecting true nature of payments.

[3] Perjury 1
297k1 Most Cited Cases

[3] Pretrial Procedure 309
307Ak309 Most Cited Cases
Providing false, knowingly incomplete, or misleading interrogatory answers constitutes perjury, as well as fraud on the opposing party and the court.

[4] Perjury 1
297k1 Most Cited Cases

[4] Pretrial Procedure 221
307Ak221 Most Cited Cases

[4] Pretrial Procedure 309
307Ak309 Most Cited Cases
President and sole owner of corporate plaintiff in civil action brought by licensing firm against former client deliberately and repeatedly committed perjury and fraud upon the court, based upon subject matter and scope of his false deposition testimony and provision of false, knowingly incomplete, and misleading interrogatory answers, which perjury and fraud resulted in significant delays in litigation process, expenditure of significant expense to uncover truth, and deliberate disregard for integrity of civil justice system.

[5] Pretrial Procedure 46
307Ak46 Most Cited Cases

[5] Pretrial Procedure 563
307Ak563 Most Cited Cases
Where a litigant's conduct abuses the judicial process, whether through flagrant discovery violations or through other serious litigation misconduct, dismissal is an appropriate sanction.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[6] Pretrial Procedure ⇌226**
307Ak226 Most Cited Cases
Dismissal with prejudice of licensing firm's action against former client was appropriate sanction for plaintiff's abuse of discovery process, where perjury and evidence tampering were undertaken willfully and in bad faith, defendant was severely prejudiced by plaintiff's actions, and granting plaintiff further opportunities to respond to discovery would serve no just purpose; plaintiff's president and owner only recanted perjurious deposition testimony after third party admitted under oath that it had engaged in kickback scheme with him, and after being presented with invoices demonstrating his commission-splitting. Practice Book 1998, 13-14(a, b).

**[7] Pretrial Procedure ⇌226**
307Ak226 Most Cited Cases

**[7] Pretrial Procedure ⇌315**
307Ak315 Most Cited Cases
Sanction of dismissal for discovery violations by president and sole owner of plaintiff licensing firm was appropriate, where rules violated by president and owner, requiring that interrogatories be answered under oath and deponents be placed under oath at deposition, were absolutely clear, president and owner's violations thereof were intentional, and sanction of dismissal was proportional to violation. Practice Book 1998, 13-7, 13-14, 13-30.

**[8] Pretrial Procedure ⇌46**
307Ak46 Most Cited Cases
No separate violation of court order was required in order for sanction of dismissal to be appropriate response to discovery violations by president and sole owner of plaintiff licensing firm, where orders were embodied in Practice Book rules. Practice Book 1998, 13-14.

**[9] Pretrial Procedure ⇌46**
307Ak46 Most Cited Cases
In addition to dismissal, discovery abuse can lead to the sanction of default; similarly, the Practice Book provides that a court may enter a nonsuit or default against the party failing to comply with its discovery obligations. Practice Book 1998, 13-14(b)(1).

**[10] Pretrial Procedure ⇌46**
307Ak46 Most Cited Cases
Entry of default judgment against plaintiff licensing firm and in favor of defendant former client on each of defendant's counterclaims was appropriate sanction for plaintiff's egregious abuse of discovery process.

**[11] Costs ⇌2**
102k2 Most Cited Cases

**[11] Costs ⇌194.44**
102k194.44 Most Cited Cases
Litigant is entitled to a recovery of his attorney's fees and costs where those expenses were incurred as a result of his adversary's litigation misconduct.
**966 Sandak, Hennessey & Greco and Shipman & Goodwin, Stamford, for the named plaintiff.

Richard R. Brown, Hartford, for the plaintiff Margaret Chapman et al.

Day, Berry & Howard, Stamford, for the defendant.

ROGERS, J.

Throughout the course of this litigation, the named plaintiff, Stanley Shenker & Associates, Inc. (associates or the plaintiff), has engaged in serious misconduct during the discovery process.

*358 After more than two years of extensive discovery in the present case, including four discovery extensions, the production of more than 92,000 pages of documents, the taking of more than twenty-five depositions, and the filing of more than 150 motions, briefs and other pleadings, the plaintiff, through its president and sole owner Stanley Shenker (Shenker), now admits to having committed acts throughout the course of this litigation that include deliberately concealing and/or otherwise refusing to produce critical documents and repeatedly committing perjury during his deposition testimony.

I
OVERVIEW OF THE RECORD

Shenker has now admitted a wide range of discovery abuses that include: (1) giving perjured deposition testimony; (2) providing perjured interrogatory answers; (3) fabricating evidence after instituting the present action; (4) facilitating the destruction of evidence after instituting the present action; (5) concealing evidence; and, (6) conspiring with third parties to engage in other litigation misconduct.

Shenker testified in the present action as associates' corporate designee. The defendant, World Wrestling Federation Entertainment, Inc. (federation), began Shenker's deposition on May 30, 2002. The deposition was continued on December 10 and 11,

2002, March 18 and 20, and April 1-2, 2003.

By his own admission, Shenker is a serial perjurer. Examples from his deposition **967 include the following: "When I was giving that [deposition] testimony ... it was false,"; "In ... prior [deposition] testimony, I wasn't truthful and I left out by omission,"; "I didn't tell the whole truth ... [a]nd I knew at the time it was not the whole truth,"; "I wasn't telling the truth, the *359 whole truth and nothing but the truth,"; "I [deliberately] mislead you,"; and, "Did I deliberately give you misinformation [in deposition testimony]? Yes."

Shenker's perjured deposition testimony directly related to a multitude of issues at the heart of both federation's defenses and its counterclaims. Specifically, for over two years federation has maintained, as a defense to associates' claims and through affirmative counterclaims, that Shenker conspired with James Bell (Bell), federation's former senior vice president of licensing and merchandising, to defraud federation and its licensees of money, by: (1) improperly soliciting and splitting a series of kickbacks from at least one federation licensee, Trinity Products (Trinity); and, (2) improperly treating licensing transactions not otherwise commissionable to associates as if such deals had been procured and negotiated by associates, and subsequently splitting the commissions wrongfully obtained by associates as a result.

For well over two years, Shenker consistently and vehemently denied these allegations. Consistent with these denials, Shenker testified throughout the first three days of his deposition that: (1) every payment Shenker made to Bell was for "developmental projects" unrelated to federation; (2) these payments amount to no more than $300,000 to $400,000; (3) associates received payments from Trinity pursuant to a "separate oral consulting agreement" in which Bell was not involved; and (4) Shenker had no ownership interest in any companies other than associates, Creative Craft Company and a real estate venture coowned with his daughter.

Apparently, unbeknownst to Shenker during the first three days of his deposition, associates had inadvertently produced to federation on September 26, 2002, two authentic Bell Consulting invoices, which made *360 clear that Shenker had willfully perjured himself in deposition testimony and interrogatory answers. After being confronted with one of those invoices on the third day of his deposition, Shenker sought to recant much of his prior testimony.

To that end, on March 3, 2003, Shenker served federation with formal recantations (the recantations), consisting of over 400 substantive changes to his deposition testimony. The recantations made clear that for months, Shenker had deliberately lied under oath. Throughout four days of postrecantations deposition testimony, Shenker repeatedly admitted to having given deliberately false and misleading testimony.

A
Shenker's Perjured Testimony Regarding the Nature and Extent of Payments to
Bell and Bell Consulting [FN1]

FN1. The court notes that its findings do not constitute findings regarding the merits of the underlying case but instead are findings regarding unrefuted admissions of misconduct during the discovery process. Accordingly, the basis for the court's decision to grant the motion for sanctions is Shenker's own admissions of misconduct. Additionally, Shenker's affidavit filed October 2, 2003 addresses his alleged motives for lying under oath; specifically because Bell asked him to. Whether Bell asked him to lie may be relevant to the underlying merits of the case but it is irrelevant to the question of whether the plaintiff engaged in acts of discovery abuse.

Through records produced by associates' accountant, federation learned that both **968 during and after the time Shenker was acting as federation's exclusive licensing agent, Shenker made substantial payments to Bell, through Bell Consulting, LLC (Bell Consulting), a company owned and operated by Bell. Shenker repeatedly lied in deposition testimony about the nature and extent of those payments. Specifically, in response to questioning by counsel for federation, Shenker consistently testified on May 30, December 10 and December 11, 2002, that every single payment to Bell was made in *361 connection with "developmental projects" totally unrelated to federation in which Shenker would invest with Bell. Shenker also testified that the amount of payments made to Bell Consulting ranged between $300,000 and $400,000.

After being confronted with an invoice that evidenced the true nature of his payments to Bell, Shenker finally admitted in his recantations and at his March 18 deposition, that rather than being for "developmental

projects," the Bell payments, as alleged in federation's counterclaims, represented a percentage of the commissions that Shenker received from federation on certain federation licenses, as well as a percentage of payments that Shenker received directly from federation licensees such as Trinity. Shenker also admitted that he had deliberately lied under oath to federation about the payments to Bell:

"Q. So that when you testified over the course of three days that the payments to Jim Bell were for developmental projects, is it fair to say that you knew at the time you were giving that testimony that it was false?

"A. I would have to say that when I was giving that testimony, it was not totally true, yes.

"Q. It was false, wasn't it?

"A. I would say it was--it was not true; it was false.

"Q. It was deliberately false, wasn't it?

"A. It was done to try to protect Jim and, therefore, it was also deliberately not--it was deliberately misleading, not true."

[1] Shenker also admitted in his recantations that associates had paid Bell approximately $800,000, twice the amount that Shenker originally had claimed. As a result of multiple compulsion orders obtained by federation, additional records became available revealing that Bell *362 actually had been paid in excess of $900,000. After being confronted with evidence of the additional payments to Bell, Shenker admitted to receipt of the additional $100,000. Shenker's false testimony regarding the nature and extent of payments to Bell clearly concerned a material matter because Shenker's "corrected" explanation constitutes an admission of the bulk of the core allegations comprising federation's counterclaims and also relates to the claims contained in the operative complaint.

B
Shenker's Deliberately False and Misleading
Testimony Concerning Invoices
Submitted to Associates by Bell Consulting

In addition to providing perjured testimony about the nature and extent of associates' payments to Bell and Bell Consulting, Shenker also provided perjured testimony about the supporting documents for those payments. As a result of compulsion orders obtained by federation, associates produced Bell Consulting invoices on July 16, 2002, that purported to reflect monies associates paid for expenses **969 incurred by Bell with respect to the fictitious "developmental projects" Shenker allegedly had invested in with Bell. When questioned about these invoices, Shenker claimed that all invoices from Bell Consulting should have been "around the product development area." In reality, however, the invoices associates produced were fabricated by Bell and Shenker solely for this litigation. The fabricated invoices listed phony "developmental projects"; the authentic invoices, on the other hand, listed the federation licenses on which Shenker and Bell were splitting commissions. In the summer of 2001, during the course of the litigation, Shenker and Bell removed the authentic invoices from associates' files and substituted the fabricated invoices in their stead.

*363 During his December 11, 2002 deposition, Shenker was confronted with one of the authentic invoices. Shenker claimed not to recognize the invoice and testified that he had no idea why two invoices would reflect the same date, amount and check number.

Shenker admitted during his March 18, 2003 deposition that he would use the excuse of a failed memory to avoid disclosing the truth.

"Q. Do you remember in your first three days of deposition using 'I don't remember' to evade disclosing the truth, Mr. Shenker?

"A. I remember sometimes I didn't remember and sometimes I used it not to remember.

"Q. To be evasive; correct?

"A. Yes."

[2] Based on the fact that Shenker now admits that he substituted fabricated invoices, the court finds that Shenker knew that this testimony was false, and that the payments to Bell were in fact a split of commissions Shenker received from federation.

C
Shenker's Deliberately False and Misleading
Testimony Regarding the Trinity
Kickback Scheme

Federation's counterclaims allege that the misconduct in which Shenker engaged while serving as federation's exclusive licensing agent included wrongfully soliciting and/or demanding payments from federation licensees. When questioned about

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

these payments during the first day of his deposition, Shenker claimed that the payments were made in connection with a "separate oral consulting agreement" pursuant to which Shenker was to be paid 2 percent of any increase in Trinity's sales *364 that resulted from Shenker's efforts. Shenker further testified that this agreement with Trinity had nothing to do with Bell, that there would be no reason for Bell to be paid a percentage of Trinity's payments to Shenker, and that Shenker had not paid Bell any money in connection with Shenker's agreement with Trinity. When counsel for federation confronted Shenker with a check reflecting that ten days after receiving a payment from Trinity, associates paid Bell Consulting exactly one half, to the penny, of the amount received from Trinity, Shenker explained this away as "coincidence."

On January 16, 2003, associates deposed Trinity. Trinity's President, Robert Goetz, testified in detail regarding the scheme devised by Shenker, whereby Trinity would be granted an exclusive right to sell federation-licensed products to Wal-Mart if Trinity would pay associates a commission of 2 percent of those sales. Shenker then recanted his prior testimony, and at his March 18, March 20 and April 2, 2003 depositions, Shenker admitted **970 that: (1) he granted Trinity a secret exclusive right to sell federation products to Wal-Mart in exchange for 2 percent of those sales; (2) he sought to conceal his agreement with Trinity from federation's counsel; (3) Bell was a part of the arrangement; and,(4) it was not mere "coincidence" that associates issued checks to Bell in amounts equal to exactly one-half of Trinity's payments to associates; rather, Shenker agreed to split those payments with Bell. Shenker also admitted that he had lied and deliberately misled federation regarding the Trinity arrangement:

"Q. First you denied any payment from Trinity; correct? That was your first position in this case?

"A. The first position I believe is I denied [having] payment from Trinity....

"Q. You did not tell the whole truth?

*365 "A. I did not tell the whole truth.

"Q. You violated that branch of the oath deliberately, didn't you?

"A. I didn't tell the whole truth under those circumstances.

"Q. And you knew at the time you weren't?

"A. And I knew at the time it was not the whole truth."

II
SHENKER'S DELIBERATELY FALSE AND MISLEADING TESTIMONY REGARDING STANFULL
INDUSTRIES LIMITED

Shenker also provided perjured testimony regarding companies in which he had an ownership interest. On May 30, 2002, Shenker testified that other than associates, Creative Craft, and a real estate venture that he coowned with his daughter, he had not owned any other companies, in whole or in part, for the past decade. In his recantations, however, Shenker admitted that he also owned a Hong Kong-based company known as Stanfull Industrial Limited (Stanfull). Shenker subsequently admitted at his March 20, 2003 deposition that he made a deliberate and conscious decision to give perjured testimony regarding his ownership of Stanfull:

"Q. And when I asked you in your first day of deposition whether you owned any other corporations, you lied and said no; correct?

"A. Back in May?

"Q. Yes.

"A. Yes. I mislead you.

"Q. And you did that deliberately, right?

"A. Yes, I did.

*366 "Q. And you didn't want me to know about Stanfull, did you?

"A. That's correct."

The reasons underlying Shenker's attempts to conceal his ownership of Stanfull are now apparent. First, Shenker used Stanfull as a conduit to launder over $300,000 in payments to Bell. Second, Shenker received hundreds of thousands of dollars in payments from additional federation licensees--Toy Island, Ringside and Jakks Pacific Inc. (Jakks)--through Stanfull. Shenker's perjurious failure to disclose the existence of Stanfull obviously was part of his scheme to prevent federation from discovering the existence and scope of his conspiracy with Bell. Similarly, revealing the existence of Stanfull would have led to the discovery of the significant, additional, improper

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

payments Shenker received from federation licensees.

**\*\*971 A**
**Shenker's Admitted Production of Fabricated Documents and Participation in the Destruction and Concealment of Authentic Documents Responsive to Federation's Discovery Requests**

Shenker, as noted previously, also conspired with Bell to conceal their fraudulent fee-splitting arrangement by replacing the original Bell Consulting invoices in Shenker's files with phony invoices created by Bell in order to give the appearance of propriety to the financial transactions between them. Significantly, the original invoices that were removed from Shenker's files revealed that Shenker was paying Bell 50 percent of the commission payments that Shenker received in connection with numerous federation licensees.

Shenker and Bell replaced the original invoices with fraudulent ones during the summer of 2001, before Shenker had produced a single document to federation, \*367 but after the litigation had commenced. Shenker testified on March 18, 2003 that he went through associates' files and gave the original, authentic invoices to Bell. Shenker further testified that by doing so, he knew that those invoices would not resurface. Bell then gave Shenker phony invoices to put in place of the originals. Shenker testified that to ensure that the phony invoices appeared as authentic as possible, he duplicated on them his handwritten notes from the original invoices. When these tasks were completed, Shenker had a file that by all appearances indicated that the payments Shenker had made to Bell were for "developmental projects" unrelated to federation. This is the story to which Shenker adhered throughout this litigation, until the filing of his recantations in March, 2003.

Shenker also facilitated the destruction of other critical evidence in the summer of 2001. Shenker testified that he removed from his files original signed letter agreements between associates and Bell, which set forth the details of their commission-splitting scheme. Shenker gave the letter agreements to Bell with the understanding that, like the invoices, the agreements would be destroyed. Those documents have also not surfaced in this litigation.

Shenker also testified that he and Bell agreed to give false testimony about the nature of the payments and the corresponding invoices; specifically that both men would testify that all payments from associates to Bell were for the so-called "developmental projects unrelated to federation."

**B**
**Associates' Deliberately False and Misleading Responses to Federation's Interrogatories**

[3] Shenker's pattern of deception and denial also included the repeated filing of perjured interrogatory \*368 responses. Providing false, knowingly incomplete and/or misleading interrogatory answers constitutes perjury, as well as fraud on the opposing party and the court. *Dotson v. Bravo,* 202 F.R.D. 559, 567 (N.D.Ill.2001); *In re Amtrak "Sunset Limited" Train Crash,* 136 F.Supp.2d 1251, 1257 (S.D.Ala.2001); *Chiarappi v. Donovan,* Superior Court, judicial district of New Britain, Docket No. CV01-0509589S5, 2002 WL 31991913 (December 30, 2002) (*Bryant, J.*) On November 26, 2001, federation served associates with a set of unambiguous interrogatories seeking information regarding any payment that associates or Shenker ever requested or received from any federation licensee. After initially objecting wholesale and refusing to answer the interrogatories, associates filed four separate sets of interrogatory responses over the course of the next thirteen months, \*\*972 each of which contained now admittedly perjured information.

In its first set of interrogatory responses, dated January 29, 2002, associates disclosed that it had received approximately $35,000 from Trinity, but asserted that the payment was made pursuant to a "separate oral consulting agreement." Associates continued with this response in its first and second amended responses dated May 28, 2002 and May 29, 2002 respectively. Those amendments resulted from associates' need to address a document that federation had produced on March 17, 2002, that directly related Trinity's payment to associates to Trinity's contract with federation. Specifically, this was a check from Trinity made payable to associates in the amount of $28,881.68, on which the words "WWF Royalty" were noted below Shenker's name. Trinity accidentally had sent this check to federation rather than to associates' business address.

The story that associates concocted to address this critical piece of evidence relates to the World Wildlife Fund, an entity with which Shenker knew federation was involved in litigation over the use of the initials \*369 "WWF." In its amended response, associates claimed that Goetz, Trinity's president, had asked Shenker for his assistance "in pursuing possible tee-shirt deals with various companies, other than

[federation,] with which Mr. Shenker had contact," and that Shenker believed "he contacted the World Wildlife fund [and others] on Mr. Goetz's behalf." The amendments thus were tailored to make it appear as if the reference to "WWF Royalty" on the Trinity check was a reference to the World Wildlife Fund rather than to the World Wrestling Federation.

Shenker has now admitted in deposition testimony that the January 29, 2002 and May 29, 2002 verified interrogatory responses were false and that Trinity's payments to associates were not unrelated to federation. Specifically, Shenker admitted that the Trinity payments were directly related to Trinity's contract with federation, specifically representing 2 percent of Trinity's sales of federation-licensed products to Wal-Mart.

On February 18, 2003, associates filed yet another set of amended interrogatory responses to address additional evidence that had come to light making clear that prior verified responses were false. On December 9, 2002, federation produced Trinity accounting records that showed calculations being computed with respect to 2 percent of Trinity's sales to Wal-Mart; handwriting on a check stub produced by federation indicated that payments to Shenker and associates represented 2 percent of Trinity's sales to Wal-Mart. Shenker's third amended interrogatory responses admitted that Shenker had spoken with Goetz about increasing Trinity's business with Wal-Mart, that Trinity was paying 2 percent on the increase, and that Shenker and Bell were to split the money paid by Trinity. Shenker claimed, however, that it was Bell who arranged the deal between Shenker and Trinity.

On April, 2, 2003, Shenker admitted that he, not Bell, made the arrangement with Goetz, that Shenker granted *370 Trinity a secret exclusive right to sell federation-licensed products to Wal-Mart, and that in exchange for that right, Trinity paid associates and Shenker 2 percent of those sales.

C
Associates' Deliberately False and Misleading Responses Relating to Additional Licensees: Toy Island, Jakks and Ringside Supplies

Associates failed to disclose in its January 29, 2002 first responses, May 28, 2002 **973 first amended responses and May 29, 2002 second amended responses that Shenker, and/or companies owned by Shenker, had received payments from any federation licensee other than Trinity. When confronted with the fact that federation was aware, through Bell's deposition testimony, that Shenker had received a payment from federation licensee Jakks, associates filed a third set of amended interrogatory responses to account for this payment. Associates admitted in those responses that Jakks had paid Shenker a $40,000 commission for "broker[ing]" a deal in which another federation licensee, Playmates, sold its inventory and equipment to Jakks. On March 20, 2003, Shenker admitted that he received payments from at least two other federation licensees, Toy Island and Ringside Supplies, and that those payments were directly related to the licensees' contracts with federation.

[4] Given the subject matter and the scope of false testimony by Shenker, the court finds that the plaintiff deliberately and repeatedly committed perjury and a fraud upon this court. [FN2] The court further finds that this misconduct resulted in significant delays in the litigation *371 process, expenditure of significant expense to uncover the truth and a deliberate disregard for the integrity of the civil justice system. [FN3]

> FN2. There has been absolutely no evidence presented and the court does not believe that counsel for the plaintiff had any knowledge of the fraud upon the court being perpetrated by their client. In fact, Shenker states twice in his affidavit that counsel had no knowledge of his misconduct.
>
> FN3. The plaintiff originally argued that the motion for sanctions should be denied because it has not had an opportunity to cross-examine Shenker because the defendant chose not to continue his deposition. The plaintiff has known since March 10, 2003 that fact discovery was to be completed by August 31, 2003. Shenker is the corporate designee, president and sole owner of the plaintiff. The plaintiff, therefore, could have simply submitted an affidavit of Shenker to correct any factual inaccuracies that were not addressed in the deposition. The court provided the plaintiff with an opportunity to submit an affidavit and Shenker has now done so. Counsel for the plaintiff has now conceded on the record that there are no factual disputes regarding the discovery abuses and has withdrawn its objection to the use of Shenker's deposition for this motion only. The plaintiff also argues it did not get an opportunity to examine Bell. With regard to Bell, the plaintiff was given the opportunity to cross-examine Bell and Bell chose to

exercise his fifth amendment rights. The deposition, therefore, did take place.

### III
### DISCUSSION

[5] It is a long and well established principle, both in Connecticut courts and in state and federal courts throughout the country, that where a litigant's conduct abuses the judicial process, whether through flagrant discovery violations or through other serious litigation misconduct, dismissal is an appropriate sanction. See generally *National Hockey League v. Metropolitan Hockey Club*, 427 U.S. 639, 643, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) (dismissal sanction "must be available ... not merely to penalize ... but to deter those who might be tempted to such conduct in the absence of such a deterrent"); *Barnhill v. United States*, 11 F.3d 1360, 1367 (7th Cir.1993) ("[m]isconduct may exhibit such flagrant contempt for the court and its processes that to allow the offending party to continue to invoke the judicial mechanism for its own benefit would raise concerns about the integrity and credibility of the civil justice system that transcend the interests of the parties *372 immediately before the court"); *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir.1989) **974 ("court's processes [should be denied] to one who defiles the judicial system by committing a fraud on the court").

#### A
#### Dismissal of the Plaintiff's Action

[6] Shenker's recantations and his postrecantations deposition testimony provide uncontroverted and irrefutable evidence of conduct so violative of the judicial process that dismissal with prejudice of the present case is the only appropriate sanction. The plaintiff, through its conduct, has intentionally and repeatedly committed a fraud upon this court. *Pappas v. Pappas*, 164 Conn. 242, 245, 320 A.2d 809 (1973) (false testimony given in deposition constitutes fraud on court). For the first two years of this litigation associates, through Shenker, has engaged in perjury and has only attempted to "correct" the record after being caught red-handed. Specifically, Shenker recanted his prior testimony only after a third party, Trinity, admitted under oath that it had engaged in a kickback scheme with Shenker and after Shenker was presented with two authentic Bell Consulting invoices demonstrating that he was splitting commissions with Bell. The plaintiff argues that he should not be sanctioned because he "voluntarily" recanted his prior testimony. This argument is without merit. Instead, the plaintiff, through Shenker, intentionally and repeatedly lied and only recanted this testimony when the scheme began to unravel through third party testimony and production of records.

It is well settled Connecticut policy that courts should "safeguard the proper administration of justice and preserve the public confidence in the purity and efficiency of judicial proceedings." *Usowski v. Jacobson*, Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. (X05) CV 98 0166410S, 2000 WL 1196756 (August 3, 2000) *373 Tierney, J.), aff'd in relevant part, 68 Conn.App. 785, 793 A.2d 268, cert. granted in part, 261 Conn. 901, 802 A.2d 855 (2002). "[C]ourts must be vigilant to preserve the overall integrity of the [judicial] system.... [P]reventing litigants from playing 'fast and loose' with the courts [safeguards the administration of justice]." *Usowski v. Jacobson*, supra, Superior Court, Docket No. (X05) CV98 0166410S.

Connecticut courts, accordingly, have long recognized that they have the power to impose sanctions for litigation misconduct, including, where appropriate, the ultimate sanction of dismissal. See, e.g., *Conway v. Hartford*, 60 Conn.App. 630, 760 A.2d 974 (2000); *Crivell v. Sears, Roebuck & Co.*, Superior Court, judicial district of Waterbury, Docket No. CV97 0139544, 2000 WL 1861841 (November 28, 2000) (Doherty, J.); *Usowski v. Jacobson*, supra, Superior Court, Docket No. (X05) CV98 0166410S; *Asztalos v. Stop & Shop Supermarket*, Superior Court, judicial district of New Haven at Meriden, Docket No. CV99 0263111S (March 14, 2000) (Robinson, J.) (26 Conn. L. Rptr. 598, 2000 WL 327450); see also *Millbrook Owners Assn., Inc. v. Hamilton Standard*, 257 Conn. 1, 9-10, 14, 776 A.2d 1115 (2001); *Mulrooney v. Wambolt*, 215 Conn. 211, 223, 575 A.2d 996 (1990).

Connecticut Practice Book § 13-14 also provides in pertinent part: "(a) If any party has failed to answer interrogatories or to answer them fairly, or has intentionally answered them falsely or in a manner calculated to mislead, or has failed to respond to requests for production ... or has failed to comply with a discovery order made pursuant to Section 13-13 ... or has failed otherwise substantially to comply with any other discovery order made pursuant to Sections 13-6 through 13-11, the **975 judicial authority may, on motion, make such order as the ends of justice require.

"(b) Such orders may include the following: (1) The entry of a nonsuit or default against the party failing *374 to comply ... (5) If the party failing to comply is the plaintiff, the entry of a judgment of dismissal."

[7] Connecticut courts have found it necessary on

occasion to dismiss a plaintiff's lawsuit as a sanction for litigation misconduct. In *Pavlinko v. Yale-New Haven Hospital*, 192 Conn. 138, 139, 470 A.2d 246 (1984), the Supreme Court addressed the issue of whether dismissal was an appropriate sanction where the plaintiff refused to answer questions at a deposition concerning his removal of hospital records on the grounds of a claim of privilege against self-incrimination. [FN4] The court applied the following test in resolving this issue: "(1) the cause of the deponent's failure to respond to the posed questions, that is, whether it is due to inability rather than the willfulness, bad faith or fault of the deponent ... (2) the degree of prejudice suffered by the opposing party, which in turn may depend on the importance of the information requested to that party's case; and (3) which of the available sanctions would, under the particular circumstances, be an appropriate response to the disobedient party's conduct." (Citation omitted.) Id., at 144, 470 A.2d 246. The court in *Pavlinko* found that dismissal was the was the only appropriate sanction. "Suffice it to observe at this point that if the disobedient party's refusal to testify is intentional, if a sufficient need for the information requested is shown by the *375 opposing party, and if it does not appear that the disobedient party, having failed to comply with the order embodied in the rules, is inclined to change his position, then dismissal is an appropriate sanction. In such situations dismissal serves not only to penalize those whose conduct warrants such a sanction but also to deter those who might be tempted to such conduct in the absence of such deterrent." Id., at 145, 470 A.2d 246.

FN4. The court is aware that the test for violation of discovery orders was clarified by the Supreme Court in *Millbrook Owners Assn. v. Hamilton Standard*, 257 Conn. 1, 17, 776 A.2d 1115 (2001). This clarification appears, however, to address violations of separate discovery orders and not the rules of the court contained in the Practice Book, which is what is at issue in the present case. In any event, even if the court were to apply the *Millbrook* test, the sanction of dismissal is appropriate because the rules contained in Practice Book 13-7 (interrogatories shall be answered under oath) Practice Book 13-30 (deponent placed under oath at deposition) and Practice Book 13-14 are absolutely clear. The record reveals that the plaintiff intentionally violated these rules and the sanction of dismissal is proportional to the violation.

*Asztalos*, a case in which the trial court granted the defendant's motion for a sanction of dismissal due to the plaintiff's willful failure to comply with discovery, is also instructive because the trial court's opinion there reflects the attitude of Connecticut courts toward litigants who willfully abuse the discovery process.

The plaintiff in *Asztalos* filed suit alleging that she suffered injuries as a result of a slip and fall caused by the defendant's negligence. In response to interrogatories, the plaintiff denied having been treated for related injuries in the ten years preceding the accident. At her deposition six months later, however, the plaintiff acknowledged that she had sustained new injuries during another fall within the preceding ten years, but denied any other falls or injuries. Subsequent discovery revealed that the plaintiff had sustained other related injuries during that time. In addition, both the plaintiff and her attorney **976 possessed relevant medical records that they had not produced to the defendant.

The defendant moved for sanctions pursuant to Connecticut Practice Book 13-14, requesting a judgment of dismissal because of the plaintiff's continued, intentional and flagrant violations of discovery orders. The plaintiff opposed the motion arguing that the violations of court orders were not intentional, but rather were due to mistake, misunderstanding or misinformation. The plaintiff also argued that because the case had been *376 postponed and no firm trial date had yet been set, there was no real prejudice to the defendant.

The court concluded that the plaintiff's failure to comply with discovery requests and court orders "was either, at worst an intentional act calculated at misleading the defendant, or at best an unfair attempt to gain the advantage of late disclosures" and, therefore, constituted a violation of Practice Book 13-14(a). *Asztalos v. Stop & Shop Supermarket*, supra, 26 Conn. L. Rptr. at 600. The court concluded that the plaintiff's failure to comply was willful and the result of bad faith, and that the defendant had been prejudiced by the plaintiff's actions. In rejecting the plaintiff's argument regarding prejudice, the court stated: "It is true that there is no jury trial date scheduled. However, the trial of this matter was continued because of the plaintiff's failure to completely and honestly comply with discovery requests. Thus, the plaintiff should not benefit. The delay in trial was due to her acts and omissions. Notwithstanding the absence of a jury trial date, this court concludes that the defendant has been severely prejudiced by the failure of the plaintiff to make full,

fair and timely discovery disclosures." Id.

In determining that the plaintiff's conduct warranted the most severe sanction of dismissal, the court also stated: "There is benefit to ordering a judgment of dismissal in this case to deter others who might be tempted to follow in the path of the plaintiff. We have rules of discovery for a purpose. That purpose is completely thwarted when a party lies under oath, withholds discoverable information, intentionally misleads his/her opponent and/or fails to disclose relevant and discoverable information in a timely fashion. In this case, not only did the plaintiff violate our rules of discovery, but she violated direct orders of this court. The plaintiff was given many opportunities to comply. Each time, non-compliance was accompanied with excuses.... *377 Certainly, in the court's view, to continue to grant the plaintiff further opportunities when she has squandered those previously granted to her, would serve no just purpose. Therefore, this court holds that *a judgment of dismissal should enter*." (Emphasis added.) Id., at 600-601.

[8] It is clear that dismissal of associates' claims with prejudice is warranted. [FN5] First, Shenker's commission of perjury, and evidence tampering, were undertaken willfully and in bad faith; indeed, Shenker had admitted that he intended to withhold the truth from federation and its counsel, and that he acted in accordance with this plan. Second, federation has been severely prejudiced by Shenker's scheme to lie and obstruct, regardless of any extension in discovery or the amount of time left before trial. Federation has incurred significant legal fees and costs in the present **977 case, and counsel for federation has put in many hours of work, all of which directly resulted from Shenker's misconduct. Moreover, federation would be further prejudiced if associates' case is not dismissed, as federation and its counsel would be compelled to expend significantly more time and money in a process that Shenker has abused repeatedly and substantially. Finally, the reasoning of the *Asztalos* court is persuasive. As in *Asztalos*, to continue to grant associates and Shenker further opportunities, when they have squandered those previously granted to them, would serve no just purpose here. See also *Crivell v. Sears, Roebuck & Co.*, supra, Superior Court, Docket No. CV97 0139544 (trial court also granted defendant's motion for judgment of dismissal pursuant to Practice Book 13-14 as result of *378 plaintiff's failure to respond fully, fairly, truthfully and timely to interrogatories and request for production of documents).

FN5. The plaintiff appears to argue that there must be a separate violation of a court order in order for the sanction of dismissal to be appropriate. This argument is flawed because it ignores that orders are embodied in the Practice Book rules. *Pavlinko v. Yale-New Haven Hospital*, 192 Conn. 138, 145, 470 A.2d 246 (1984).

In sum, the record before the court necessitates dismissal of the present action. The plaintiff has now admitted that he repeatedly and intentionally engaged in perjury regarding issues central to the case until faced with irrefutable evidence that he had testified falsely. The plaintiff also has admitted that evidence was concealed and even in some cases destroyed. This pattern of egregious conduct has resulted in prejudice to the opposing party both in terms of time and expense. Documents have also disappeared as a result of the plaintiff's conduct that might have a bearing on the outcome of the present case if it was tried on the merits. Additionally, this is not a situation of simply a "discovery violation addressed to another party" as the plaintiff argues in its opposition papers. The plaintiff has deliberately committed a fraud on this court through Shenker's deposition testimony. The court has also expended a significant amount of time deciding discovery motions that would not have been necessary if the plaintiff had not willfully failed to comply with the discovery process.

To allow the present case to continue would be to condone perjury. If the court were not to dismiss the present case based on the record before it, it would be inviting parties in other cases to take a calculated risk of engaging in deliberate misleading conduct with the knowledge that, if caught, they would only be forced to pay attorney's fees. In sum, while this court firmly believes and understands that except under the most unusual circumstances parties should have their day in court, dismissal is the only viable option in the present case.

*379 B
A Default Judgment in Favor of Federation on its Counterclaims Should Enter as
a Result of Associates' Litigation Misconduct

[9] In addition to dismissal, discovery abuse can lead to the sanction of default. Similarly, the Practice Book provides that a court may enter "a nonsuit or default against the party failing to comply" with its discovery obligations. Practice Book 13-14(b)(1).

Connecticut courts routinely enter default judgments against litigants who abuse the discovery process.

See, e.g., *Wren v. MacPherson Interiors, Inc.*, 69 Conn.App. 349, 350-52, 794 A.2d 1043 (2002) (affirming trial court's entry of default judgment against defendant who failed to respond to discovery requests and to comply with court orders); *State v. Ritz Realty Corp.*, 63 Conn.App. 544, 545-46, 776 A.2d 1195 (2001) (affirming trial court's entry of default judgment against defendant who failed to respond to discovery requests); **978*Weldon Business Group v. Schweitzer*, 22 Conn.App. 552-54, 556, 577 A.2d 1126 (1990) (affirming trial court's entry of default judgment against defendant who failed to respond to discovery requests and to comply with court orders); *Zaleski v. Zaleski*, 21 Conn.App. 185, 186-87, 572 A.2d 76 (1990) (same); *Skyler Ltd. Partnership v. S.P. Douthett & Co.*, 18 Conn.App. 245, 248, 557 A.2d 927, cert. denied, 212 Conn. 802, 560 A.2d 984 (1989).

[10] Based on the foregoing authorities, and the record of egregious discovery abuse in the present case, the court hereby enters a default judgment against associates and in favor of federation on each of federation's counterclaims.

*380 C
This Court Will Consider Attorney's Fees and Costs Incurred by Federation in
Connection with and as a Result of Associates' Litigation Misconduct

[11] A litigant is entitled to a recovery of his attorney's fees and costs where those expenses were incurred as a result of his adversary's litigation misconduct. See *Fattibene v. Kealey*, 18 Conn.App. 344, 360, 558 A.2d 677 (1989); see also *Asztalos v. Stop & Shop Supermarket*, supra, 26 Conn. L. Rptr. at 601 (awarding "reasonable costs, including attorneys fees," in addition to dismissing plaintiff's action). At the conclusion of the hearing in damages on the defendant's counterclaims pursuant to Practice Book 17-34, the court will consider an award of attorney's fees for expenses directly incurred as a result of the plaintiff's misconduct if such fees have not already been awarded as damages in the underlying matter.

CONCLUSION

The plaintiff's case is dismissed with prejudice. A default judgment in favor of the defendant on its counterclaims is entered. The parties should contact the Complex Litigation Docket court officer to schedule a hearing in damages pursuant to Practice Book 17-34.

48 Conn.Supp. 357, 844 A.2d 964

END OF DOCUMENT

2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.