Not Reported in A.2d
2004 WL 2039700 (Conn.Super.)
(Cite as: 2004 WL 2039700 (Conn.Super.))

Page 1

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut,
Judicial District of Stamford-Norwalk.
WORLD WRESTLING ENTERTAINMENT
v.
James K. BELL et al.
No. X05CV030193994S.

Aug. 17, 2004.

Day, Berry & Howard, Stamford, for World Wrestling Entertainment Inc.

John Williams, New Haven, for James Bell and Bell Licensing.

Levett, Rockwood, PC, Westport, for Mark C. Durkin, John C. Polera and Durkin & Polera.

William Dow, New Haven, for Witness.

Santos & Seeley, PC, Hartford, for Pepe & Hazard, LLP.

Wofsey Rosen Kweskin & Kuriansky LL, Stamford, for Jakks Pacific Inc-Witness.

CHASE T. ROGERS, Superior Court Judge.

*1 The plaintiff, World Wrestling Entertainment, ("WWE") has moved for summary judgment on counts one, two, three, four, five, six and nine of the Complaint. The plaintiff, WWE, has set forth in great detail the facts it claims support granting summary judgment. "Once the moving party has submitted evidence in support of the motion for summary judgment, the opposing party must present evidence that demonstrates the existence of some disputed factual issue." *Sivek v. Baljevic,* 46 Conn.Sup. 518, 20 (1999), citing *Bartha v. Waterbury House Wrecking Co.,* 190 Conn. 8, 11-12 (1983). "It is not enough for the opposing party merely to assert the existence of such disputed issue. 'Mere assertions of fact ... are insufficient to establish the existence of a material [FN1] fact and, therefore, cannot refute evidence properly presented to the court under Practice Book [17-45].'" *Id.*

> FN1. "A material fact is one that will make a difference in the outcome of the case ..." *Campbell v. Town of Plymouth,* 74 Conn.App. 67, 80 (2002).

"[A] party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue." *Connell v. Calwell,* 214 Conn. 242, 246 (1990). "The existence of a genuine issue of material fact must be demonstrated by counteraffidavits and concrete evidence, and not by '[m]ere assertions of fact.'" *Prucinsky v. Evans,* 47 Conn.Sup. 655, 657, 34 Conn. L. Rptr. 226 (2003), citing *Maffucci v. Royal Park Ltd. Partnership,* 243 Conn. 552, 554 (1998). "The non-existence of an issue of fact is not rebutted by the bald statement that an issue of fact does exist." *Lopez v. United Nurseries, Inc.,* Conn.App. 602, 606 (1985), citing *Burns v. Hartford Hospital,* 192 Conn. 451, 455 (1984).

In order to overcome a motion for summary judgment, it is insufficient as a matter of law for a party to "rely on mere speculation or conjecture as to the true nature of the facts ..." *Buell Industries, Inc. v. Greater New York Mutual Ins. Co.,* 259 Conn. 527, 559 (2002). "Only evidence that would be admissible at trial may be used to support or oppose a motion for summary judgment." *Home Insurance Co. v. Aetna Life and Casualty Co.,* 235 Conn. 185, 202-03 (1995), citing Practice Book § 381, currently Practice Book 17-46.

Bell has submitted an affidavit in support of his opposition to summary judgment. The court has not stricken the affidavit of James Bell despite his refusal to testify during part of the discovery period. WWE has since had an opportunity to conduct discovery regarding the statements he made in the affidavit. Accordingly, the court has reviewed and considered the Bell affidavit as well as the other materials submitted by Bell in making its ruling.

*Breach of Contract*

WWE is entitled to summary judgment with regard to liability on Count Nine of its Complaint because the Bell Defendants have failed to controvert the facts set forth by WWE.

Case 7:04-cv-08223-KMK    Document 44-6    Filed 02/16/2005    Page 2 of 6

Not Reported in A.2d       Page 2
2004 WL 2039700 (Conn.Super.)
(Cite as: 2004 WL 2039700 (Conn.Super.))

The following material facts which support WWE's Motion regarding Bell's liability for breach of contract are undisputed. On or about March 2, 1995, Bell signed a Code of Conduct Agreement in order to be hired by WWE. Pursuant to the Code of Conduct Agreement, Bell agreed that he would not "engage in any activities or have any personal or financial interests which impair, or appear to impair, [his] independence or judgment or otherwise conflict or appear to conflict with [his] responsibilities to [WWE]." The Code of Conduct Agreement *expressly* prohibited Bell from: (a) accepting fees, commissions or property in connection with any transaction on behalf of WWE; (b) accepting or offering unauthorized or illegal payments; (c) using his position directly or indirectly for personal or financial gain; (d) personally taking advantage of business opportunities which might be of interest to WWE; and (e) serving as an officer, director, employee, consultant or promoter of for-profit organizations without WWE's prior approval. As Senior Vice President of Licensing and Merchandise, Bell's responsibilities included procuring licenses for WWE and negotiating license agreements between WWE and potential licensees. Bell was expected to utilize the staff within the consumer products department of WWE to field and screen potential licensees and to develop additional contacts for future licensing opportunities. Bell was also to review any SSAI proposals and recommend action on licensing proposals procured and negotiated by SSAI. As a high level management member, Bell was compensated solely by means of an annual salary. Bell was not entitled to receive any additional compensation based upon sales of WWE-licensed products pursuant to license agreements obtained as a result of his efforts or SSAI's efforts. On or about March 8, 1998, while acting as WWE's Senior Vice President of Licensing and Merchandise, and without WWE's knowledge, consent or prior approval, Bell formed Bell Consulting, a for-profit organization and served as its President. In violation of the Code of Conduct Agreement, Bell never disclosed to WWE either the formation or existence of Bell Consulting, Bell's role as Bell Consulting's President or the payments made to Bell Consulting. Bell referred licensing opportunities to SSAI that Bell should have handled within WWE. Bell split SSAI's commissions on the following WWE licensees: [FN2]

FN2. The Bell Defendants do not deny that every licensee listed was part of a commission splitting scheme between Bell and SSAI. Defendants argue, however, that three of the licensees were not passed to SSAI by Bell, but rather originated with Shenker. As noted above, a material fact is one that will make a difference in the outcome of the case. The fact that several commissions generating licensees may have originated with Shenker, but were still part of the overall commission splitting scheme, which was precluded under the contract, does not constitute a material fact that would result in the denial of WWE's Motion on liability.

Further, the Bell Defendants do not deny that SSAI was not entitled to receive commissions on license agreements that Shenker did not negotiate and procure. The fact that Bell negotiated and procured MZ Berger and Ralph Marlin while SSAI received commissions on these deals that were subsequently split with Bell, is further evidence of breach of contract by Bell and does not create a material issue of fact upon which WWE's Motion should be denied.

WWE also set forth factual allegations regarding Bell's receipt of payments of monies originating from Jakks. There is no dispute that Bell accepted two $20,000 payments from Shenker on January 14 and April 7, 1998, of monies originating from Jakks. There is also no dispute that the payments occurred during the selection of WWE's videogame license. The Bell Defendants allege that the Jakks payments were a "finder's fee" related to a company called Playmates. (Opposition at p. 4 and Bell Affidavit, ¶ 4.) Specifically, the Bell Defendants assert that Shenker's and Bell's testimony that the $40,000 paid to Bell of monies originating from Jakks creates a genuine issue of material fact for which WWE's Motion must be denied. For purposes of summary judgment, however, WWE explicitly stated that it *did not* rely upon the two 1998 $20,000 payments from Shenker to Bell and did not include these payments in WWE's damage calculations.

```
Game Day Enterprises                        $  2,085.38
Alliance Publishing (a/k/a/ Comic Images)     100,056.15
Bowie Industries (a/k/a Changes)              109,319.43
```

Not Reported in A.2d
2004 WL 2039700 (Conn.Super.)
(Cite as: 2004 WL 2039700 (Conn.Super.))

Case 7:04-cv-08223-KMK   Document 44-6   Filed 02/16/2005   Page 3 of 6

Page 3

```
Toys R Us                                          2,278.55
Trau & Loevner Imprinted Sportswear              263,921.52
Chaos Comics                                       4,595.96
Ocean Atlantic Textiles (a/k/a Wild Oats)         15,179.63
MZ Berger                                          2,933.34
Ralph Marlin                                       2,227.68
Kosma Kare International                           1,949.38
Carolina Manufacturing                             2,863.80
Bev Key                                            2,277.14
Advanced Sports Concepts                           2,435.73
Zippo                                              5,787.38
                                                 -----------
                                                 $514,977.73
```

*2 Bell did not disclose to anyone at WWE that he was receiving a percentage of SSAI's commissions. Trinity was a preexisting licensee, on whose license agreement SSAI was not entitled to receive commissions. [FN3] When the Trinity license was assigned to SSAI it created a revenue stream for Bell. Both Bell and Shenker ended up getting 5 1/2 % of the royalties paid to WWE by Trinity. Pursuant to the Trinity "assignment," WWE paid SSAI $302,935.99, which SSAI subsequently split with Bell. WWE fully performed all of its obligations under the Code of Conduct Agreement; and WWE provided Bell with an office and staff and compensated him for his services in the form of an annual salary.

> FN3. With respect to the Trinity assignment, the Bell Defendants argue that "WWE is unable to point to any testimony by Shenker or any admissible evidence to support its claim that Bell 'assigned' the Trinity License to SSAI without WWE's knowledge." (Opposition, p. 13.) This is irrelevant to a finding of liability because Bell does not dispute that he split the commissions on Trinity with SSAI.

The elements of a breach of contract action are "the formation of an agreement performance by one party, breach of the agreement by the other party and damages." *Rosato v. Mascardo,* 82 Conn.App. 396 (2004). Based on the foregoing facts, it is clear that Bell breached his contract with WWE when he accepted money from SSAI in connection with various WWE-related transactions.

Because the Bell Defendants failed to provide evidence to controvert the foregoing facts, summary judgment is granted in favor of WWE with respect to liability on Count Nine of WWE's Complaint.

The court does find, however, that there are genuine issues of material fact as to when Bell initially breached the Code of Conduct contract and specifically when he became aware of the Walmart agreement. This is a material question of fact because the breach date determines when the payment of wages to Bell becomes recoverable by WWE. The court also finds there is an issue of fact as to which transactions were wrongfully passed from Bell to Shenker that should have been handled in-house and that there is an issue of law as to whether all payments made to Bell by Shenker are recoverable or whether only payments for deals that were wrongfully passed on to Shenker by Bell that should have been handled in-house are recoverable under the breach of contract theory.

*Counts Five and Six For Statutory Conversion*
WWE is entitled to summary judgment on Counts Five and Six of its Complaint. The Bell Defendants failed to provide any evidence to refute the material facts set forth by WWE regarding the Bell Defendants' liability with respect to violations of Connecticut General Statutes 52-564.

Conn. Gen.Stat. 52-564 provides:
  Any person who steals property of another, or knowingly receives and conceals stolen property, shall pay the owner treble damages.

The same uncontested facts, as set forth previously demonstrate the Bell Defendants' liability for statutory conversion. These uncontested facts demonstrate that: (1) the Bell Defendants received monies from SSAI which rightfully belonged to WWE; (2) the Bell Defendants intentionally deprived WWE of its funds; and (3) the Bell Defendants' conduct was unauthorized. Because the Bell Defendants set forth no evidence to create a genuine issue of material fact,

Case 7:04-cv-08223-KMK   Document 44-6   Filed 02/16/2005   Page 4 of 6

Not Reported in A.2d
2004 WL 2039700 (Conn.Super.)
(Cite as: 2004 WL 2039700 (Conn.Super.))

Page 4

summary judgment is granted in favor of WWE with regard to liability on Counts Five and Six of WWE's Complaint.

*3 Because issues have been raised as to whether certain licensing agreements originated with WWE or Shenker and there is therefore an issue as to which transactions WWE paid SSAI certain commissions it should not have had to, the court finds there are genuine issues of material fact regarding damages which must be considered by the trier of fact.

*Breach of Fiduciary Duty*

WWE is entitled to summary judgment on Count One of its Complaint because the Bell Defendants have not raised a genuine issue of material fact with respect to Bell's breach of fiduciary duties.

Rather than dispute WWE's factual issues, the Bell Defendants argue that " 'in the absence of a contract specifying whether fiduciary responsibilities have or have not been assumed,' the issue of the existence of a fiduciary is an issue of fact." However, the Code of Conduct Agreement, clearly spells out the fiduciary obligations Bell assumed as a condition of employment with WWE.

Moreover, even if the Code of Conduct Agreement did not exist, WWE has clearly established the existence of a fiduciary relationship and Bell's subsequent breach of that duty.

Under Connecticut law, "a fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill and expertise and is under a duty to represent the interest of the other." *Capitol City Personnel v. Harriet Franklin,* CV 910505367 1997 Conn.Super. Lexis 453, * 6-7, (1997) (staffing coordinator of company that provided placement services for health care professionals held to be a fiduciary), quoting *Dunham v. Dunham,* 204 Conn. 303, 322 (1987). The Connecticut Supreme Court has "specifically refused to define 'a fiduciary relationship in precise detail and in such a manner as to exclude new situations,' choosing instead to leave 'the bars down for situations in which there is a justifiable trust confided on one side and a resulting superiority and influence on the other.' " *Alaimo v. Royer,* 188 Conn. 36, 41 (1982), quoting *Harper v. Adametz,* 142 Conn. 218, 225 (1955). See also Restatement (Second) Agency, 1(1) (1958) (an agency relationship is the "fiduciary relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act"); *Detroit Lions, Inc. v. Argovitz,* 580 F.Sup. 542, 547 (E.D.Mich.1984) ("The fiduciary relationship arises not only from a formal principal-agent contract, but also from informal relationships of trust").

The following facts support Bell's liability for breach of fiduciary duties and are uncontested by the Bell Defendants: On or about March 2, 1995, Bell signed a Code of Conduct Agreement in order to be hired by WWE. Pursuant to the Code of Conduct Agreement, Bell agreed that he would not "engage in any activities or have any personal or financial interests which impair, or appear to impair, [his] independence or judgment or otherwise conflict, or appear to conflict with [his] independence or judgment or otherwise conflict, or appear to conflict with [his] responsibilities to [WWE]." The Code of Conduct Agreement expressly prohibited Bell from: (a) accepting fees, commissions or property in connection with any transaction on behalf of WWE; (b) accepting or offering unauthorized or illegal payments; (c) using his position directly or indirectly for personal or financial gain; (d) personally taking advantage of business opportunities which might be of interest to WWE; and (e) serving as an officer, director, employee, consultant or promoter of for-profit organizations without WWE's prior approval. During his employment with WWE, Bell served in various capacities, including Director of Domestic Licensing (from March 20, 1995 until April 30, 1996); Vice-President of Pay-Per-View and Television Marketing (from May 1, 1996 until October 27, 1996); and Senior Vice-President of Licensing and Merchandise (from October 28, 1996 until March 24, 2000). As Senior Vice-President of Licensing and Merchandise, Bell's responsibilities included procuring licenses for WWE, negotiating license agreements between WWE and potential licensees, and all other activities necessary and/or attendant to the development and maintenance of WWE's licensing program. As a high-level management member, Bell was compensated solely by means of an annual salary. Bell's position was a high-level management position on WWE's organizational chart. Bell had superior knowledge, skill and expertise in the area of licensing and was under a duty to represent the interests of WWE. On or about March 8, 1998, while acting as WWE's Senior Vice-President of Licensing and Merchandise, and without WWE's knowledge, consent or prior approval, Bell formed Bell Consulting, a for-profit organization, and served as its President. In violation of the Code of Conduct Agreement, Bell never disclosed to WWE either the

Not Reported in A.2d
2004 WL 2039700 (Conn.Super.)
(Cite as: 2004 WL 2039700 (Conn.Super.))

Page 5

formation or existence of Bell Consulting, Bell's role as Bell Consulting's President, or the payment of money to Bell Consulting by SSAI. Bell referred licensing opportunities to SSAI that Bell should have handled with WWE internal resources. Bell split SSAI's commissions on the following WWE licensees:

```
Game Day Enterprises                          $   2,085.38
Alliance Publishing (a/k/a Comic Images)      $ 100,056.15
Bowie Industries (a/k/a Changes)              $ 109,319.43
Toys R Us                                     $   2,278.55
Trau & Loevner Imprinted Sportswear           $ 263,921.52
Chaos Comics                                  $   4,595.96
Ocean Atlantic Textiles (a/k/a Wild Oats)     $  15,179.63
MZ Berger                                     $   2,933.34
Ralph Marlin                                  $   2,227.68
Kosma Kare International                      $   1,949.38
Carolina Manufacturing                        $   2,863.80
Bev Key                                       $   2,277.14
Advanced Sports Concepts                      $   2,435.73
Zippo                                         $   5,787.38
```

*4 Bell did not disclose to anyone at WWE that he was receiving a percentage of SSAI's commissions. As Senior Vice-President of Licensing and Merchandise, Bell had the responsibility of signing off on commission checks cut to SSAI from WWE. Before WWE's accounting department would issue SSAI a commission check, Bell would receive a list of all royalties paid by each licensee with a corresponding amount to be paid to SSAI based on the 11% commission rate subject to Bell's approval. Bell knew exactly how much SSAI was to be paid on each specific licensee. Trinity was a preexisting licensee, on whose license agreement SSAI was not entitled to receive commissions. The assignment of the Trinity license created a revenue stream for Shenker and Bell that neither had a right to receive prior to the assignment. Both Bell and Shenker ended up getting 5 1/2% of the royalties paid to WWE by Trinity; and pursuant to the Trinity "assignment," WWE paid SSAI $302,935.99, which SSAI subsequently split with Bell. Finally, Bell admits the fiduciary nature of his job by stating: "in fact, because of a 'purge' of large numbers of important in-house staff, I had been given a tremendous number of other responsibilities, in addition to licensing, which were financially more important to WWE than the licensing."

All of the positions held by Bell at WWE were positions of trust and given to him because of his unique expertise in product licensing. The Code of Conduct Agreement he signed specifically acknowledged his fiduciary obligations, and confirmed that he would not "engage in any activities or have any personal or financial interests which impair, or appear to impair, [his] independence or judgment or otherwise conflict, or appear to conflict with [his] responsibilities to [WWE]." As a matter of contract and law, the Code of Conduct Agreement imposed fiduciary duties upon Bell.

Moreover, Bell was an officer of WWE. An officer and director occupies a fiduciary relationship to the corporation and its stockholders. *Arrigoni v. Adorno,* 129 Conn. 673, 681, 31 A.2d 32. He occupies a position of the highest trust and therefore he is bound to use the utmost good faith and fair dealing in all his relationships with the corporation. General Statutes Sec. 33-323; *Osbourne v. Locke Steel Chain Co.,* 153 Conn. 527, 534, 218 A.2d 526; *Massoth v. Central Bus Corporation,* 104 Conn. 683, 689, 134 A. 236; *Mallory v. Mallory Wheeler Co.,* 61 Conn. 131, 139, 23 A. 708; see Cross, Corporation Law in Connecticut 6.8; 3 Fletcher, Private Corporations (Perm. Ed. Rev.1975) 838, 850.

Based on the foregoing there is no genuine issue of material fact that Bell owed fiduciary responsibilities to WWE.

Because there are no genuine issues of material fact that Bell breached the fiduciary duties he owed WWE by engaging in the aforementioned conduct, summary judgment is granted in favor of WWE with respect to liability on Count One of WWE's Complaint. For the reasons previously stated, there are genuine issues of material fact regarding the amount of damages that WWE is entitled to that must be determined by the trier of fact.

Not Reported in A.2d
2004 WL 2039700 (Conn.Super.)
(Cite as: 2004 WL 2039700 (Conn.Super.))

Case 7:04-cv-08223-KMK   Document 44-6   Filed 02/16/2005   Page 6 of 6

Page 6

*Fraudulent Misrepresentation*

**\*5** WWE is entitled to summary judgment on Count Two of its Complaint because the Bell Defendants failed to demonstrate a material issue of fact regarding Bell's liability for fraudulent concealment. The following facts, on which WWE relies to support its Motion, are uncontested by the Bell Defendants. At no time during his employment did Bell ever disclose to WWE either the formation or existence of Bell Consulting, Bell's role as Bell Consulting's President, or his commission splitting with SSAI and/or Shenker. On March 26, 1998, unaware of SSAI's and Bell's extensive misconduct, WWE extended the term of the Agency Agreement for an additional five years to expire on December 31, 2003. At no time prior to, or after the extension of SSAI's Agency Agreement did Bell disclose to WWE that he had engaged in, and intended to engage in licensing schemes. Finally, if Bell had disclosed his conduct he would have been fired.

"An action will lie for a fraudulent nondisclosure which causes one to continue in a course of action." *Franchey v. Hannes*, 152 Conn. 372, 378 (1965), citing *Bridge-Mile Shoe Corporation v. Liggett Drug Co.*, 142 Conn. 313, 319 (1955). Furthermore, the "nondisclosure must be by a person intending or expecting thereby to cause a mistake by another to exist or to continue, in order to induce the latter to enter into or refrain from entering into a transaction." *Wedig v. Brinster*, 1 Conn.App. 123, 131 (1983). See also *Pacelli Brothers Transportation, Inc. v. Pacelli*, 189 Conn. 401, 407 (1983) ("The intentional withholding of information for the purpose of inducing action has been regarded ... as equivalent to a fraudulent misrepresentation").

Bell's intentional nondisclosure of passing licensees to SSAI and commission splitting with Shenker for the purpose of inducing WWE to continue to work with Shenker and to keep his own job was clearly fraudulent conduct.

Because there are no genuine issues of material fact, summary judgment is granted in favor of WWE with respect to liability on Count Two of the Complaint. For the reasons previously stated, there are genuine issues of material fact regarding damages which must be decided by the trier of fact.

*Civil Conspiracy*

WWE is entitled to summary judgment on Counts Three and Four of its Complaint because the Bell Defendants failed to raise a material issue of fact with respect to the Bell Defendants' liability for civil conspiracy.

The Bell Defendants argue that WWE's Motion should be denied because there is no independent cause of action for civil conspiracy. Defendants are correct that there is no independent claim of civil conspiracy. Rather, "[t]he action is for damages caused *by acts committed pursuant to a formed conspiracy* rather than by the conspiracy itself." (Emphasis added; internal quotation marks omitted.) *Marshak v. Marshak*, 226 Conn. 652, 669, 628 A.2d 964 (1993). Thus, to state a cause of action, a claim of civil conspiracy must be joined with an allegation of a substantive tort. *Creer v. Active Auto Exchange*, 99 Conn. 266, 272 (1923). The court has determined that the Bell defendants engaged in fraud which constitutes a tort. The court has also determined that the defendants engaged in statutory conversion.

**\*6** "The [elements] of a civil action for conspiracy are: (1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff." (Internal quotation marks omitted.) *Marshak v. Marshak*, 226 Conn. 652, 665, 628 A.2d 964 (1993). Here plaintiff has demonstrated all of these elements through the foregoing undisputed facts and summary judgment is granted with respect to liability. For the reasons stated previously, there are genuine issues of material fact regarding damages which must be decided by the trier of fact.

*Conclusion*

Summary judgment is granted on the issue of liability only on Counts One, Two, Three, Four, Five, Six and Nine of the Complaint. Pursuant to Section 17-50 of the Practice Book, a hearing in damages will be scheduled.

The parties should contact the Complex Litigation Docket Court Officer regarding scheduling.

2004 WL 2039700 (Conn.Super.)

END OF DOCUMENT