**TAB 3**

FOCUS - 11 of 83 DOCUMENTS

**NUEVO MUNDO HOLDINGS, et al., Plaintiffs, - against - PRICEWATERHOUSE COOPERS LLP, et al., Defendants.**

**03 Civ. 0613 (GBD)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2004 U.S. Dist. LEXIS 780*

**January 22, 2004, Decided**
**January 22, 2004, Filed**

**SUBSEQUENT HISTORY:** Complaint dismissed at *Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP, 2004 U.S. Dist. LEXIS 24900 (S.D.N.Y., Dec. 8, 2004)*

**DISPOSITION:** [*1] Plaintiffs' motion to dismiss was granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff shareholders and directors of a company filed an action, alleging several claims under common law, breach of contract, and a violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), *18 U.S.C.S. § 1964* et seq. Defendant accounting firms moved to dismiss.

**OVERVIEW:** The shareholders and directors alleged a Peruvian entity that their company did business with was under the control of one firm and was so identified therewith as to make the firm responsible and liable for the actions and conduct of the Peruvian entity. Absent any allegations of direct liability, in order to hold the firms vicariously liable for the actions of the Peruvian entity, the shareholders and directors had to allege facts in support of one of the following three relationships: a principal/agent relationship; an alter-ego relationship; or a partnership. They, however, did not specifically allege facts in support of any one of these relationships in their complaint. The complaint did not support a bald assertion that an agency relationship existed; inter alia, there was no allegation of a manifestation by either firm that the Peruvian entity was to act on their behalf, and

there were no alleged facts suggesting the firms ever participated in the decision as to how audit reports submitted by the Peruvian entity were completed. Having failed to allege vicarious liability, the shareholders and directors did not allege facts sufficient to support tort, contract, or RICO claims.

**OUTCOME:** The motion to dismiss was granted.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN1] Fed. R. Civ. P. 12(b)(6) allows a party to move to dismiss a complaint where the complaint fails to state a claim upon which relief can be granted.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN2] In reviewing a motion to dismiss, the court accepts the allegations in the complaint as true and draws all reasonable inferences in favor of the non-moving party.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN3] A motion to dismiss will only be granted if the plaintiff can prove no set of facts in support of its claim that would entitle it to relief.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

[HN4] In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference.

*Business & Corporate Entities > Agency > Agency Established > Elements of Agency*

[HN5] In order to establish a principal/agent relationship, a party must demonstrate the following elements: (1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) an understanding between the parties that the principal is to be in control of the undertaking.

*Business & Corporate Entities > Agency > Agency Established > Elements of Agency*

[HN6] Actual agency is created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account. Whether such an agency exists depends upon the actual interactions of the putative agent and principal and not on the perception a third party may have of the relationship.

*Business & Corporate Entities > Agency > Agency Established > Elements of Agency*

[HN7] To establish a principal/agent relationship, a party must allege that the agent acts subject to the principal's direction and control. The importance of control by the principal is paramount. There is no agency relationship where the alleged principal has no right of control over the alleged agent. When the elements of an agency relationship have been proven, the corporation acting as principal will be held liable for the torts committed. by the agent while acting within the scope of the agency.

*Business & Corporate Entities > Agency > Authority to Act > Agent Authority*

[HN8] The authority of an agent can only be established by tracing it to its source in some word or act of the alleged principal. The agent cannot confer authority upon himself or make himself an agent merely by saying that he is one.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

[HN9] A complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Fed. R. Civ. P. 12(b)(6).

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Disregard of Corporate Entity*

[HN10] "Alter ego theory" and the doctrine of "piercing the corporate veil" are one and the same under New York law. To pierce the corporate veil under New York law, a plaintiff must prove that: (1) the owner exercised such control that the corporation has become a mere instrumentality of the owner, who is the real actor; (2) the owner used this control to commit a fraud or "other wrong"; and (3) the fraud or wrong results in an unjust loss or injury to the plaintiff. Courts have recognized that the element of control may be predicated upon the concept of equitable ownership. Pursuant to this approach, an individual who exercises considerable authority over the corporation to the point of completely disregarding the corporate form and acting as though its assets are his alone to manage and distribute may be deemed the equitable owner of the corporation and its assets, notwithstanding the fact that the individual is not a shareholder and does not occupy a formal position of authority.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Disregard of Corporate Entity*

[HN11] The element of control is established by factors indicating that the corporation is the mere alter ego of another corporation or an individual, such as: (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e. issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arm's length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
*Business & Corporate Entities > General Partnerships > Formation*

[HN12] Under New York law, the party pleading the existence of a partnership has the burden of proving its existence.

*Business & Corporate Entities > General Partnerships > Formation*

[HN13] The elements of a partnership are (1) the sharing of profits and losses of the enterprise; (2) the joint control and management of the business; (3) the contribution by each party of property, financial resources, effort skill or knowledge; and (4) an intention of the parties to be partners.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*

[HN14] Despite the liberal policy toward amendment embodied in Fed. R. Civ. P. 15(a), leave to amend should not be granted where it is futile. For example, leave to amend is properly denied when the amended complaint would not survive a motion to dismiss.

**COUNSEL:** For Nuevo Mundo Holdings, SA, Jacques Simon Levy Calvo, Vitaly Franco Varon, Herbert Herschkowicz Grosman, ISY Levy Calvo, David Levy Pesso, Jacques Franco Sarfaty, Sassone Franco Sarfaty, Jose Porudominsky Gabel, PLAINTIFFS: Paul S Edelman, Kreindler & Kreindler, Lewis M Smoley, New York, NY USA.

For Pricewaterhousecoopers, LLP, DEFENDANT: Francis P Barron, Cravath, Swaine & Moore, Michael Alan Paskin, Cravath Swaine Et Ano, LLP, New York, NY USA.

For Arthur Andersen, LLP, DEFENDANT: Beth Ann Schultz, Reginald R Goeke, Mayer, Brown, Rowe & Maw, New York, NY USA.

**JUDGES:** GEORGE B. DANIELS, United States District Judge.

**OPINIONBY:** GEORGE B. DANIELS

**OPINION:** GEORGE B. DANIELS, DISTRICT JUDGE:

Plaintiffs bring suit alleging several claims under common law, breach of contract and a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), *18 U.S.C. § 1964 et. seq.* Defendants filed a motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6) and 12(b)(7).* Defendants' motion to dismiss is granted.

I. Background [*2]

Plaintiffs Nuevo Mundo Holdings S.A., Jacques Simon levy Calvo, Vitaly Franco Varon, Herbert Herschkowicz Grosman, Isy Levy Calvo, David Levy Pesso, Jacques Franco Sarfaty, Sassone Franco Sarfaty and Jose Porudominsky Gabel are the Peruvian and Panamanian shareholders and directors of Banco Nuevo Mundo S.A. ("Nuevo Mundo"), a bank organized under Peruvian law that is not a party to this action. Plaintiffs' claims arise from the loss that plaintiffs allegedly suffered when the Peruvian government placed Neuvo Mundo into administration.

The named defendants, PricewaterhouseCoopers LLP ("PWC") and Arthur Andersen LLP ("Andersen")(collectively, "Defendants"), are accounting firms located in New York City. Plaintiffs make no allegations that defendants directly participated in any of the events that led to Nuevo Mundo being placed into administration by the Peruvian government. Rather, plaintiffs' sole allegation against these defendants is that Sociedad de Auditoria Medina, Zalvidary Asociados ("Medina") and Collas Dongo-Soria y Asociados ("CDSA"), the two accounting firms with which Nuevo Mundo conducted business, "operate under the control of" Andersen and PWC and are "so identified [*3] therewith" as to make the defendants liable for the actions of Medina and CDSA. Complaint PP 47, 58.

The events central to plaintiffs' claims all occurred in Peru. There are no allegations that any events that occurred in the United States. On December 5, 2000, the Superintendency of Banking and Insurance of Peru ("SBS") ordered Neuvo Mundo into administration after an inspection conducted by SBS found that Nuevo Mundo was in poor financial condition and presented "the highest risk of liquidity due to withdrawals of" cash deposits. Complaint P 35. Plaintiffs allege that after being ordered into administration, "control of the administration, operations and assets of [Nuevo Mundo] was wrongfully taken from its officers, directors, shareholders, and/or investors." Complaint P 38. Subsequently, the Peruvian government advised plaintiffs that Nuevo Mundo would be sold and that the investors would lose their entire investment. Investment banks were invited to take charge of the sale of Nuevo Mundo, and the government ruled that any transfer of equity in Nuevo Mundo could not benefit the shareholders. n1 Complaint PP 43-45.

n1 Subsequently, on August 19, 2003, the Superior Court of Justice of Lima, Lima's highest court, reversed "the Order of the Superintendent of Banking and Insurance, which declared that Banco Nuevo Mundo had zero capital and, therefore, the shareholders, Plaintiff, [Nuevo

Mundo Holdings] had no further rights or interest in the bank. The decision holds the action of the Superintendent to be illegal and unconstitutional. The decision orders the Superintendent to restore the rights of the shareholders of Plaintiff, NMH, which owns the bank." Furthermore, "the decision of the Supreme Court, of May 2003, orders the Superintendent to stop the liquidation of the bank." Affirmation of Jacques Simon Levy Calvo at 2.

[*4]

CDSA, a Peruvian accounting firm alleged to be affiliated with defendant PricewaterhouseCoopers, was retained by Nuevo Mundo "to be its independent auditor for the calendar year 1999." Complaint P 47. Plaintiffs allege that in April 2001, after CDSA submitted an audit report regarding Neuvo Mundo's financial status, SBS "wrongfully required and demanded that [CDSA] make several changes in the said draft audit report, including devaluing [Nuevo Mundo's] loan portfolio, and make other changes so as to revalue [Neuvo Mundo's] asset balance so that it would become a negative instead of a positive amount." Complaint P 49. Plaintiffs assert that CDSA submitted its allegedly unlawful final audit report in July 2001.

Medina, a Peruvian accounting firm alleged to be affiliated with defendant Arthur Andersen, was retained by SBS in March or April, 2001 to conduct a financial audit of Neuvo Mundo for the year 2000. Plaintiffs allege that SBS "wrongfully, fraudulently and illegally directed [Medina] to revise previous audit reports issued on [Neuvo Mundo's] financial condition ... [and] undervalued [Nuevo Mundo's] loan portfolio by approximately U.S. $ 200,000,000.00 ... in violation [*5] of generally accepted accounting principles, standards and practices." Complaint PP 59-60.

Plaintiffs allege nine causes of action against defendants including common law claims for fraud, tortious interference, negligence, malpractice, prima facie tort and punitive damages. Plaintiffs have also alleged a claim under R.I.C.O, *18 U.S.C. § 1964 et. seq.* against both defendants and a breach of contract claim against PricewaterhouseCoopers LLP.

## II. Discussion

*Federal Rule of Civil Procedure 12(b)(6)* [HN1] allows a party to move to dismiss a complaint where the complaint "fails ... to state a claim upon which relief can be granted[.]" *FED.R.CIV. P. 12(b)(6)*. [HN2] In reviewing a motion to dismiss, this Court accepts the allegations in the complaint as true and draws all reasonable inferences in favor of the non-moving party. See *Patel v. Searles, 305 F.3d 130, 134-35 (2d Cir.*

*2002).* [HN3] A motion to dismiss will only be granted if the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. See *Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1494 (2d Cir. 1992).* [*6] [HN4] In considering a motion to dismiss under *Fed. R. Civ. P. 12(b)(6)*, a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference. *Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991)*; see also *Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 71 (2d Cir. 1998)*(in evaluating motions to dismiss, a court must limit its review to the allegations contained within the four corner's of the complaint).

### A. Defendants' Liability

In their complaint, plaintiffs allege that "[CDSA] operates under the control of defendant PWC, and is so identified therewith, as to make Defendant PWC responsible and liable for the actions and conduct of its Peruvian affiliate." Complaint P 47. Against defendant Andersen, plaintiffs allege that "[Medina] operates under the control of Defendant Andersen, and is so identified therewith as to make Defendant Andersen responsible and liable for the actions and conduct of [Medina]." Complaint P 58. Plaintiffs make no allegations of direct liability on the part of defendants [*7] Andersen or PWC. Rather, plaintiffs' allegations assert a vicarious relationship between the accounting firms in Peru and their respective defendant affiliates in the United States. Other than the allegations contained in paragraphs 47 and 58, plaintiffs proffer no other facts specifically describing the nature of the relationship upon which their claims are based.

Allegations of an affiliate relationship, however, are insufficient to hold defendants liable for the actions of either Medina or CDSA. Member firms in an international accounting association are not part of a single firm and are neither agents nor partners of other member firms simply by virtue of using the same brand name. See e.g., *In re Lernout & Hauspie Sec. Litig., 230 F. Supp.2d 152, 170 (D. Mass. 2002)*. During oral argument, defendants articulated that "the U.S. entities are member firms, and they use the Andersen and Price Waterhouse Coopers name ... And what they have in common is simply that they both use ... the brand name Andersen or PWC in order to provide accounting services in their respective countries." Transcript of Oral Argument dated Sept. 17, 2003 at 34. Defendants maintain that [*8]

> the member firms are all autonomous. U.S. Firms are autonomous from the Peruvian firms and all the other member

firms throughout the world. They have separate capital structure. They have separate management and organization. They are autonomous firms. They have contracts with the worldwide entity, which requires them to follow certain kinds of standards and procedures in order to be able to use the brand name. But that's the only relationship between the U.S. entities and the Peruvian entities.

Id. at 35. Indeed, courts have declined to treat different firms as a single entity, holding them liable for one another's acts, simply because they shared an associational name and/or collaborated on certain aspects of a transaction. See *In re Lernout, 230 F. Supp.2d at 170-71 (D.Mass.2002)* (rejecting theory that KPMG entities should be held jointly and severally liable for each other's acts and statements because they hold themselves out as a single entity); see also *In re AM Int'l Inc. Sec. Litig., 606 F. Supp. 600, 607 (S.D.N.Y. 1985)*(dismissing complaint against Price Waterhouse entities outside the U.S. after rejecting argument that [*9] all Price Waterhouse affiliates worldwide were "in fact one entity, and acted as agents of one another"); see also *Reingold, v. Deloitte, Haskins & Sells, 599 F. Supp. 1241, 1249, 1254 n.10 (S.D.N.Y. 1984)*(holding that existence of DH&S International, "an organization composed of a large number of affiliated accounting firms," did not prove DH&S was "a single worldwide entity" even though some brochures described DH&S as "a single cohesive worldwide organization").

Absent any allegations of direct liability, in order to hold the defendants vicariously liable for the actions of the Peruvian accounting firms, plaintiffs must allege facts in support of one of the following three relationships: a principal/agent relationship; an alter-ego relationship; or a partnership. Plaintiffs, however, have not specifically alleged facts in support of any one of these relationships in their complaint.

Plaintiffs proffer all three relationships in their responsive papers, arguing that the "defendants and the overall companies overseeing the activities of local affiliates are implicated because there is overall training and supervision of all affiliates and peer review meetings held [*10] to assure compliance with the accepted professional standards and ethical requirements of what each affiliate is doing." Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Plaintiffs' Brief") at 3. Plaintiffs also claim that the main purpose of [PricewaterhouseCoopers International Limited] and [Arthur Andersen Worldwide S.C.], separate corporate entities that are not parties to the

litigation, is "to assure that the affiliates act properly and in accordance with their worldwide requirements. This is the essence of our Alter Ego Theory of Liability ... There is ... a common bond requiring that all affiliates act honestly and according to prescribed rules, regulations and accounting standards." Plaintiffs' Brief at 11. Furthermore, plaintiffs argue that "Arthur Andersen may be a partnership of all its affiliates," and that "at one time, ... all [Arthur Andersen] officers were partners." Id. at 7, 11.

During oral argument, plaintiffs' counsel, in response to the Court's query to further explain the basis for vicarious liability, responded: "I think we have already articulated one aspect of this relationship. I think it can be shown that a principal/agent [*11] relationship exists. The nature of the relationship should make the principal liable for the acts of its agent. And I think we can show that in the way in which we describe the relationship between these affiliates and the global and/or New York entities that we've already joined." Transcript of oral argument heard September 17, 2003 at 79.

Lastly, in a subsequent letter to the Court dated October 1, 2003 submitted in support of plaintiffs' proposed Second Amended Complaint, they "allege ... that all principals of [Arthur Andersen], wherever they may be, are, or were, partners. As partners, the actions of any one subjects all to liability." Plaintiff's letter dated October 1, 2003 at 2, P 2. Plaintiffs also reiterated its principal/agent allegation: "in addition, we believe that the Peruvian affiliates cloaked with the names respectively of [Arthur Andersen] and [PricewaterhouseCoopers] and under the aegis of the other accounting firms (present and future defendants), are the 'apparent agents' of those latter accounting firms." Id. Plaintiffs further proffered an alter-ego argument as the basis for vicarious liability: "moreover, we allege that the corporate veil may be [*12] pierced since we have information and so allege that the Peruvian accounting firms are seriously undercapitalized so as to limit liability in an improper manner." Id.

Regardless of which relationship plaintiffs argue, if their claims are to withstand defendants' motion to dismiss, their complaint must clearly and specifically articulate allegations of fact which can support the existence of at least one of these relationships. n2

n2 Plaintiffs also attempt to argue that CDSA and Medina are the subsidiaries of the named defendants. Although their complaint is devoid of any factual allegations of a subsidiary/parent relationship, plaintiffs cite *U.S. v. Bestfoods, Inc., 524 U.S. 51, 118 S. Ct. 1876, 141 L. Ed. 2d 43*

*(1999)* for the proposition that the "defendants, their world wide overseers and the local affiliates are integrated in terms of responsibilities for good accounting practices and there is a symbiosis of the companies." Plaintiffs' Brief at 8. The Supreme Court in Bestfoods, however, rejected that plaintiff's failure to supervise argument; holding that activities that involve a subsidiary's facility but which are consistent with the parent corporation's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct parental liability. *Id., 524 U.S. at 72, 118 S. Ct. 1876.*

[*13]

1. Agency Relationship

[HN5] In order to establish a principal/agent relationship, a party must demonstrate the following elements: (1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) an understanding between the parties that the principal is to be in control of the undertaking. See Restatement (Second) of Agency *§ 1 cmt. b (1958)* ; see also *Rubin Bros. Footwear, Inc. v. Chemical Bank, 119 B.R. 416, 422 (S.D.N.Y.1990).* [HN6] Actual agency is created by "written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." *Itel Containers Int'l Corp. v. Atlanttrafik Express Service Ltd., 909 F.2d 698, 702 (2d Cir. 1990)* (quoting Restatement *§ 26)*). "Whether such an agency exists depends upon the actual interactions of the putative agent and principal and not on the perception a third party may have of the relationship." See *Manchester Equipment Co., Inc. v. American Way and Moving Co., Inc., 60 F. Supp.2d 3, 8 (E.D.N.Y.1999).* [*14]

Furthermore, [HN7] a party must allege that "the agent acts subject to the principal's direction and control." *Shulman Transport Enterprises, Inc. v. Pan American World Airways, Inc., 744 F.2d 293, 295 (2d Cir.1984).* The importance of control by the principal is paramount. "There is no agency relationship where the alleged principal has no right of control over the alleged agent." *Morgan Guar. Trust Co. of N.Y. v. Republic of Palau, 657 F. Supp. 1475, 1481 n. 2 (S.D.N.Y.1987)*; see also *Rubin Bros., 119 B.R. at 422* ("No agency relationship can be established where the alleged principal lacks the essential right of control over the alleged agent.") (citing *Shulman Transport, 744 F.3d at 295*); *Lee v. Kim, 1994 U.S. Dist. LEXIS 15275, No. 93*

*Civ. 8280, 1994 WL 586435, *3 (S.D.N.Y. Oct. 25, 1994)* ("Where the principal does not exercise control over the professed agent, no agency relationship exists."). When the elements of an agency relationship have been proven, the corporation acting as principal will be held liable for the torts committed. by the agent while acting within the scope of the agency. See, e.g., *Fletcher v. Atex, Inc., 861 F. Supp. 242, 247 (S.D.N.Y. 1994)* [*15] ("Principals are liable for the tortious acts of their agents"), aff'd, *68 F.3d 1451 (2d Cir.1995).*

In their complaint, plaintiffs make two allegations regarding defendants Andersen and PWC in support of their claims:

> Plaintiffs BNM and NMH relied on representations made by [CDSA] that it was part of and operated under the control of Defendant PWC, the well-known international accounting firm, and that [CDSA] used the same international accounting standards as are used by Defendant PWC in providing accounting services throughout the world ... [CDSA] operates under the control of defendant PWC, and is so identified therewith, as to make Defendant PWC responsible and liable for the actions and conduct of its Peruvian affiliate.

Complaint P 47. Plaintiffs further allege that:

> Upon information and belief, [Medina] represented itself, directly, indirectly or implicitly, as Defendant Andersen, the well-known international accounting firm, to show its ability and experience as auditor ... [Medina] operates under the control of Defendant Andersen, and is so identified therewith as to make Defendant Andersen responsible and liable for the actions [*16] and conduct of [Medina].

Complaint P 58.

Without any further factual allegations, plaintiffs' complaint fails to support a bald assertion that an agency relationship existed between the defendants and their Peruvian affiliates. Plaintiffs make no allegation of a manifestation by either PWC or Andersen that CDSA or Medina were to act on their behalf. Plaintiffs make no allegation that there was an understanding between PWC and CDSA or between Andersen and Medina that the U.S. entities were to be in control of the Peruvian entities' accounting services. Furthermore, there are no facts alleged which suggest that the defendants ever

participated in the decision as to how the audit reports submitted by CDSA or Medina were completed, and certainly none which would support an inference that the defendants were either aware of, or in fact contributed to, the decision to alter those audit reports.

Plaintiffs solely allege that they "relied on representations made by [CDSA] that it was part of and operated under the control of [PWC]," and that "[Medina] represented itself, directly, indirectly or implicitly, as Defendant Andersen." Complaint P 47, 58. At best, plaintiffs' agency [*17] claim is based on alleged representations not made by the defendants, but made by the defendant's Peruvian affiliates who are not parties to this litigation. The Second Circuit, however, has held that [HN8] the authority of an agent can only be established by tracing it to its source in some word or act of the alleged principal. See *Karavos Compania Naviera S.A. v. Atlantica Export Corp.*, 588 F.2d 1, 10 (2d Cir.1978). The agent cannot confer authority upon himself or make himself an agent merely by saying that he is one. Id.

Plaintiffs' conclusory allegations that Medina and CDSA were "agents" of defendants Andersen and PWC, because they represented themselves as part of defendants, are therefore insufficient to withstand defendants' motion to dismiss. See *DeJesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 70 (2d Cir.1996) [HN9] ("A complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of *Rule 12(b)(6)*.") (internal quotations omitted); *Neubauer v. Eva-Health USA, Inc.*, 158 F.R.D. 281, 285 (S.D.N.Y.1994) (holding that bare allegation of control did not suffice to allege control [*18] person liability "as the Court need not accept as true on a motion to dismiss allegations which amount simply to legal conclusions"); *Coraggio v. Time Inc. Magazine Co.*, 1996 U.S. Dist. LEXIS 3770, No. 94 Civ. 5429, 1995 WL 242047, *3 (S.D.N.Y. April 26, 1995) (allegation that parent "controls" subsidiary held insufficient to allege single employer liability under Title VII; "While a claim should not be dismissed unless it appears plaintiff can prove no set of facts entitling her to relief, some reasonable particularity is required ... The instant complaint contains nothing more than a conclusory and unsupported allegation of control.") (citation omitted).

Construing the factual allegations in the complaint in plaintiffs' favor, those allegations are insufficient as a matter of law to demonstrate the existence of a principal/agent relationship between defendant PWC and CDSA, or between defendant Andersen and Medina.

2. Alter-Ego Claim

[HN10] "Alter ego theory" and the doctrine of "piercing the corporate veil" are one and the same under New York law. See *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 138 (2d Cir. 1991)(finding that the doctrine [*19] of piercing the corporate veil and the "alter ego theory" are indistinguishable and "should be treated as interchangeable"). To pierce the corporate veil under New York law, a plaintiff must prove that: (1) the owner exercised such control that the corporation has become a mere instrumentality of the owner, who is the real actor; (2) the owner used this control to commit a fraud or "other wrong"; and (3) the fraud or wrong results in an unjust loss or injury to the plaintiff. See *Freeman v. Complex Computing Co., Inc.*, 119 F.3d 1044, 1052 (2d Cir. 1997) (citations omitted). Courts have recognized that the element of control may be predicated upon the concept of equitable ownership. See *id. at 1051-53*. Pursuant to this approach, an individual who "exercise[s] considerable authority over [the corporation] ... to the point of completely disregarding the corporate form and acting as though [its] assets [are] his alone to manage and distribute" may be deemed the equitable owner of the corporation and its assets, notwithstanding the fact that the individual is not a shareholder and does not occupy a formal position of authority. *Id. at 1051* [*20] (citation omitted).

[HN11] The element of control is established by factors indicating that the corporation is the mere alter ego of another corporation or an individual, such as:

> 1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e. issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arm's length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10)

whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Passalacqua*, 933 F.2d at 139 (quoted in *Carte Blanche Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 1993 WL 316985, [*21] at *2, 1993 U.S.App. LEXIS 21214, at *4-5).

Plaintiffs make no factual allegations in their complaint that support an alter ego theory for piercing the corporate veil. Their argument arises for the first time in their opposition brief where plaintiffs suggest an "Alter Ego Theory of Liability" premised on the unpleaded assertions that (1) non-parties PWC International and Andersen Worldwide Societe Cooperative "oversaw the activities of the affiliates," and (2) "the supervisory groups and all affiliates were in close contact, with periodic meetings following mandated training." Plaintiffs' Brief at 7 and 11. Outside of their conclusory allegations of control, the complaint is devoid of any factual allegations to support a finding of alter-ego. Without any supportive factual allegations, plaintiffs have failed to allege sufficient facts to avoid dismissal of their alter ego claim.

3. Partnership

[HN12] Under New York law, the party "pleading the existence of a partnership has the burden of proving its existence." *Central Nat'l Bank, Canajoharie v. Purdy*, 249 A.D.2d 825, 826, 671 N.Y.S.2d 866 (N.Y.App.Div.1998). Thus, plaintiffs' claim of vicarious liability on this basis [*22] cannot survive a motion to dismiss unless plaintiff pleads sufficient facts in support of each of the required elements of a partnership. See *US Airways Group v. British Airways PLC*, 989 F. Supp. 482, 493 (S.D.N.Y.1997). [HN13] Those elements are 1) the sharing of profits and losses of the enterprise; 2) the joint control and management of the business; 3) the contribution by each party of property, financial resources, effort skill or knowledge; and 4) an intention of the parties to be partners. See *NYNEX Corp. v. Shared Resources Exch.*, 1990 N.Y. Misc. LEXIS 759, No. 89 Civ. 14577, 1990 WL 605347, at *5 (N.Y.Sup.Ct. Sept. 10, 1990); *Hoskin v. New Grovetown Assoc.*, 129 Misc. 2d 222, 492 N.Y.S.2d 685, 687 (N.Y.Sup.Ct.1985).

As previously noted, the only allegations in plaintiffs' complaint that can support vicarious liability through a partnership are found in P 47 and P 58. In their opposition brief, plaintiffs argue that "in fact, Arthur Andersen *may be* a partnership of all its affiliates." Plaintiffs Memo at 7 (emphasis added). They further argue that "at one time, ... all [Andersen] officers were partners." Plaintiffs Memo at 11. Even accepting these

arguments, [*23] plaintiffs still have not plead facts that would establish all four elements of a partnership. Equally important is plaintiffs own admission in their opposition brief that "defendants may not be partners in the legal sense." Plaintiffs' Brief at 11. Similar to their other attempts to establish vicarious liability, plaintiffs have failed to allege sufficient facts to establish the existence of a partnership.

Having failed to sufficiently allege a theory of vicarious liability either under a theory of agency, alter-ego, or partnership, plaintiffs have not alleged sufficient facts to support any tort or contractual claims against defendants PWC and Andersen, nor any claim under the Racketeer Influenced and Corrupt Organizations Act, *18 U.S.C. § 1964 et. seq.* Defendants' motion to dismiss the complaint in its entirety is therefore granted. n3

> n3 Defendants make three additional arguments: that plaintiffs' complaint must be dismissed for failure to join necessary and indispensable parties; plaintiffs' claims are precluded under the Act of State Doctrine and the Foreign Sovereign Compulsion Defense; and plaintiffs have generally failed to state a claim. As this Court has granted defendants' motions to dismiss on alternative grounds, it will not further address the merits of these arguments.

[*24]

B. Leave to File a Second Amended Complaint

Plaintiffs also moved to again amend their complaint. Defendants' oppose such a motion as untimely and futile. At the time they submitted their motion, plaintiffs failed to submit a proposed second amended complaint. At the time of oral argument, the Court allowed plaintiffs to submit a *proposed* Second Amended Complaint. A review of the Second Amended Complaint shows that despite additional allegations, plaintiffs' complaint still suffers from the deficiencies inherent in their original. Plaintiffs' Second Amended Complaint would similarly fail to withstand motions to dismiss under *Fed. R. Civ. P. 12(b)(6)* for failing to allege vicarious liability.

In their Second Amended Complaint, plaintiffs seek to add two additional defendants: PricewaterhouseCoopers International Limited ("PWC International") and Andersen Worldwide Societe Cooperative ("Andersen Worldwide") and hold them also vicariously liable for the actions of CDSA and Medina. Plaintiffs, however, have added insufficient additional allegations to support their claims against current

defendants PWC and Andersen. Plaintiffs now [*25] attempt to shift their focus toward finding PWC International and Andersen Worldwide vicariously liable for the actions of CDSA and Medina. n4 Their proposed claims against these entities, however, would fail for the same reasons they fail against defendants Andersen and PWC; plaintiffs' conclusory allegations of agency, partnership or alter-ego are unsupported by sufficient factual allegations.

n4 In support of their vicarious liability theory, plaintiffs have added the following further assertions:

Upon information and belief, [CDSA and Medina] were and are undercapitalized at about $ 300,000 each and, as such, Plaintiffs can prove that the accounting firm Defendants herein are liable under the theory of piercing the corporate veil. By use of interchangeable names given to the public and undercapitalized subsidiaries, Defendant accounting firms become liable for the acts of [CDSA and Medina], which were purposefully limiting their liability due to undercapitalization.

Complaint at 24-5, P 74.

Defendant accounting firms act as principals in that they cloaked [CDSA and Medina] with

apparent authority and made them agents. The acts of the Peruvian affiliate are binding on Defendant accounting firms.

Complaint at 25, P 75.

[*26]

[HN14] Despite the liberal policy toward amendment embodied in *Rule 15(a) of the Federal Rules of Civil Procedure*, "leave to amend should not be granted where it is futile." *Bruce v. Martin, 702 F. Supp. 66, 69 (S.D.N.Y.1988)*; see *Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962)*; *Albany Ins. Co. v. Esses, 831 F.2d 41, 45 (2d Cir.1987)*. For example, leave to amend is properly denied when the amended complaint "would not survive a motion to dismiss." *Prudential Ins. Co. of America v. BMC Indus., Inc., 655 F. Supp. 710, 711 (S.D.N.Y.1987)*; see also *S.S. Silberblatt, Inc. v. East Harlem Pilot Block-Building 1 Housing Dev. Fund Co., 608 F.2d 28, 42 (2d Cir.1979)*; *Health-Chem Corp. v. Baker, 915 F.2d 805, 810 (2d Cir. 1990)*("where ... there is not merit to the proposed amendments, leave to amend should be denied") Id. In the absence of additional allegations sufficient to support their claims, plaintiffs' motion to amend is denied as futile.

Dated: January 22, 2004

SO ORDERED:

GEORGE B. DANIELS

United States [*27] District Judge

**TAB 4**



Not Reported in F.Supp.
1992 WL 276565 (S.D.N.Y.), RICO Bus.Disp.Guide 8116
**(Cite as: 1992 WL 276565 (S.D.N.Y.))**

Page 1

⚐

**Motions, Pleadings and Filings**

United States District Court, S.D. New York.
QATAR NATIONAL NAVIGATION &
TRANSPORTATION CO. LTD., Plaintiff,
v.
CITIBANK, N.A., Defendant.
CITIBANK, N.A., Defendant and Third-Party
Plaintiff,
v.
Leonard FLOCCO, Martec Petroleum & Energy
Corp., Surico Inc., and Sanjay Suri,
Third-Party Defendants.
**No. 89 Civ. 0464 (CSH).**

Sept. 29, 1992.

MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

**\*1** Plaintiff Qatar National Navigation &
Transportation Co. Ltd. ("QNNT") objects to the
Report and Recommendation of Magistrate Judge
Francis of November 13, 1991, which recommends
dismissing the fifth and sixth causes of action of the
Second Amended Complaint of July 1, 1991. For
the reasons set forth below, the Magistrate Judge's
recommendations are affirmed.

BACKGROUND
The underlying facts are fully recounted in
Magistrate Judge Francis' opinion. In summary,
the action arises out of a contract for the sale of
marine diesel oil by plaintiff QNNT to third-party
defendant Surico, Inc. ("Surico")

On November 28, 1985, QNNT made an offer to
Heiza Martec AG ("Heiza Martec"), an oil trading
company, to sell 300,000 metric tons of diesel oil.
The terms of the agreement required the purchaser
to pay with an irrevocable letter of credit and
QNNT to post a performance bond of 2% of the

value of the oil, also in the form of an irrevocable
letter of credit. On December 18, 1985, Heiza
Martec notified QNNT that Surico of San Francisco
would purchase the oil. On December 23, 1985, an
agreement was executed between QNNT and Surico
for the sale of the oil for $75 million to be supplied
at 25,000 metric tons per month during 1986.
Surico failed to produce the letter of credit required
under the contract and QNNT declared the contract
void on January 19, 1986. On the same day, Surico
proposed purchasing the oil in partnership with
Martec. H.Z. Mandour, on behalf of QNNT, stated
it would reopen the transaction only if Citibank,
Heiza Martec's bank, would confirm in writing that
it would provide the letter of credit. Second
Amended Complaint ¶¶ 13-26.

On January 21, 1986 Leonard Flocco, an Assistant
Vice-President and Manager of Citibank's branch
office in Bronxville, New York, sent a telex to
QNNT stating,
  On behalf of our client Martec Petroleum and
  Energy Corp., we inform that our client is ready
  for the purchase of the 25,000 metric tons of
  marine diesel per month for one year with
  renewals, as specified in contract between Martec
  Petroleum and Energy Corp. and Surico Inc. on
  January 17, 1986.
  Our client will proceed to issue the necessary
  letter of credit revolving for each shipment, to the
  bank account of your designation....
*Id.* ¶ 27.

During the period January 22-30, 1986, H.Z.
Mandour on behalf of QNNT communicated with
Flocco on numerous occasions concerning the letter
of credit and was assured that Martec was a
customer in good standing with the financial ability
to purchase the oil and that Citibank was in the
process of issuing the letter of credit for Surico and
Martec. The Magistrate Judge concluded that in
these communications, Flocco misrepresented the
financial ability of Surico and Martec to pay for the
oil. *Id.* ¶¶ 27-36; Report at 2-3.

The Letter of Credit Department of Citibank sent a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                     Page 2
1992 WL 276565 (S.D.N.Y.), RICO Bus.Disp.Guide 8116
**(Cite as: 1992 WL 276565 (S.D.N.Y.))**

tested telex on February 14, 1986 to QNNT stating that Citibank's telex of January 21, 1986 quoted above had been "simply informational and conveys absolutely no engagement or responsibility on the part of Citibank N.A." On February 15, 1986 QNNT informed Martec, Surico, and Citibank that it considered the contract breached since Citibank had not conveyed to it the requisite letter of credit. On February 16, 1986 QNNT sold the oil prepared under the contract elsewhere and claims that it sustained losses of $44 million on the sale. Second Amended Complaint ¶¶ 40-42.

**\*2** On February 23, 1986 QNNT attempted to cancel the 2% performance letter of credit held by Citibank. The advising bank, First Chicago International Bank ("First Chicago"), informed QNNT that the beneficiary had not consented to the cancellation. Citibank released the letter of credit to Surico and on May 23, 1986, Sanjay Suri on behalf of Surico presented allegedly false documents which specified that QNNT had not performed under the contract and demanded payment of the performance bond. Suri presented a letter along with the documents requesting First Chicago to transfer the amount due under the performance letter of credit to Surico's account with Citibank "Branch # 165 Bankers name Mr. Leonard Flocco". First Chicago refused to honor the draft. *Id.* ¶¶ 48-62.

QNNT makes the following claims in its second amended complaint concerning the role of Citibank in the alleged scheme to defraud it: first, Citibank breached its contract to issue a letter of credit for the sale of the oil; second, Citibank is estopped from showing "the truth contrary to its agreements to issue said letter of credit" since QNNT had relied upon it; third, Citibank made misrepresentations as part of a scheme to defraud QNNT; fourth, Citibank negligently advised QNNT that Martec and Surico were financially capable of issuing the letters of credit pursuant to the oil purchase contract; fifth, Citibank, Flocco, and others conspired to defraud QNNT through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), the Racketeering Influenced and Corrupt Organizations statute (RICO); sixth, Citibank violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). *Id.* ¶¶ 65-85, 217-21.

DISCUSSION
Defendant Citibank moved to dismiss QNNT's fifth and sixth claims pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). In his Report of November 13, 1991, the Magistrate Judge recommended that the motion be granted and found that QNNT failed to allege facts showing scienter on Citibank's part, a required element of the underlying RICO predicate acts of fraud. Additionally, the Magistrate Judge rejected plaintiff's argument that Citibank could be held liable for RICO violations under a theory of vicarious liability. Report at 8, 11, 13.

Plaintiff filed timely objections to the Report and claims that the Magistrate Judge incorrectly relied on matters outside the second amended complaint in reaching his decision on the Rule 12(b)(6) motion. Additionally, it avers that the Court failed to accept as true pleaded allegations concerning scienter on the part of Citibank to commit fraud, the role of Citibank's letter of credit department in the scheme, Flocco and the letter of credit department's intent to benefit Citibank, and Martec's and Surico's intent to purchase QNNT's oil. Finally, QNNT claims that the Court incorrectly rejected plaintiff's arguments that respondeat superior and apparent authority doctrines apply to RICO actions. Pl.'s Objection to Report at 26-27.

*Consideration of Outside Materials*
**\*3** Plaintiff claims that Magistrate Judge Francis examined materials outside of the second amended complaint in reaching his conclusions. Plaintiff bases his objection on Rule 12(b)(6) which provides that:

> If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

The plaintiff specifically objects to footnote 3 on page 6-7 of the Report in which the Magistrate Judge writes, "Additional documents, most of them not included by QNNT in the Second Amended Complaint, are nonetheless relevant to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

h          e     c     e     h     e        f

Not Reported in F.Supp.                                                                                    Page 3
1992 WL 276565 (S.D.N.Y.), RICO Bus.Disp.Guide 8116
(Cite as: 1992 WL 276565 (S.D.N.Y.))

understanding Mr. Flocco's dealings with QNNT and the scope of Citibank's knowledge of his conduct." In the footnote, the Magistrate Judge cites documents produced earlier in the litigation which concerned additional misrepresentations made by Flocco and the results of a polygraph examination of Flocco. These documents were reviewed *in camera* by Magistrate Judge Francis in early 1990 and eventually produced to the plaintiff. Def.'s Mem. in Answer to Pl.'s Objections at 65; Pl.'s Reply Mem. at 8.

Plaintiff claims that the Court should have treated the motion as arising under Rule 56 since it considered outside materials, relying on *Festa v. Local 3 Intern. Broth. of Elec. Workers,* 905 F.2d 35 (2d Cir.1990).

In *United States v. District Council of New York City and Vicinity of United Broth. of Carpenters and Joiners of America,* 778 F.Supp. 738 (S.D.N.Y.1991), this Court summarized the Second Circuit law on Rule 12(b)(6) motions:

The Second Circuit has held that on a motion to dismiss, the district court should only consider allegations on the face of the complaint. Documents outside of the complaint can be considered if they are attached as exhibits or incorporated by reference, *see Cosmas [v. Hasset],* 886 F.2d [8,] 13 [ (2d Cir.1989) ], but if additional material is considered the motion to dismiss should be converted to a motion for summary judgment. *See Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir.1991). However, the Second Circuit has considered a prospectus that was not attached to the complaint and was only given "limited quotations" in the complaint, because it declined "to create a rule permitting a plaintiff to evade a properly argued motion to dismiss simply because plaintiff has chosen not to attach the prospectus to the complaint or to incorporate it by reference." *I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2d. Cir.1991); *see Kramer,* 937 F.2d at 774 (district court may consider public documents filed with S.E.C.). Since the main problem with considering documents outside the complaint on a motion to dismiss is lack of notice to the plaintiff, "[w]here plaintiff has actual notice of all of the information in the movant's papers and has relied upon these

documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated." *Cortec Industries, Inc. v. Sum Holdings, L.P.,* 949 F.2d 42 at 48 (2d Cir.1991).
*4 *Id.* at 749 n. 3.

The question is whether documents appearing only in a footnote to the Report were relied upon by the Magistrate Judge within the meaning of 12(b)(6) and if so, whether the plaintiff can be considered "on notice" as in *Cortec Industries* with respect to documents with which he was served during earlier litigation.

Magistrate Judge Francis satisfied Rule 12(b)(6) by presenting a version of the facts directly attributed to the amended complaint and by concluding that on the face of the complaint, the plaintiff's allegations are insufficient to defeat dismissal of the RICO allegations. In the offending footnote, the Magistrate Judge makes no argument but appears to mention the outside documents only in passing. Furthermore, this footnote appears in the background section of his Report and not as support for his conclusions. The mere presence of references to outside documents in a footnote to a Magistrate Judge's Report does not render the report invalid where the pleadings are insufficient on their face to defeat a motion to dismiss parts of the complaint. I will therefore consider whether the Magistrate Judge's conclusions are warranted on the basis of the plaintiff's pleadings alone.

*RICO Allegations--Scienter*
The plaintiff attempts to bring a civil action under 18 U.S.C. § 1962(c) which states, "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Plaintiff alleges that Citibank is a "person" within the meaning of the statute and that Martec, Surico or Heiza Martec in combination or individually constitute an "enterprise". Complaint ¶ 82-83.

The Magistrate Judge concluded that plaintiff failed to allege with particularity the required

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1992 WL 276565 (S.D.N.Y.), RICO Bus.Disp.Guide 8116
(Cite as: 1992 WL 276565 (S.D.N.Y.))

element of scienter on the part of Citibank to violate the RICO act. Plaintiff responds that scienter is a "subjective" matter and therefore, need not be plead with the specificity required for fraud. Pl.'s Reply Mem. at 18. In the case relied upon by plaintiff, *Ouaknine v. MacFarlane,* 897 F.2d 75 (2d. Cir.1990), the Second Circuit said, "Allegations of scienter are not subjected to the more exacting consideration applied to the other components of fraud. They are sufficient where ... the allegations lie peculiarly within the opposing parties' knowledge and are accompanied by information that raises a strong inference of fraud." *Id.* at 81.

Plaintiff avers that the second amended complaint satisfies the above standard. However, the general allegations to which the plaintiff refers provide no basis for a "strong inference of fraud" on the part of Citibank. Complaint ¶¶ 75, 84-87, 206-11, 214. The plaintiff alleges that Citibank, Flocco, and others conspired with the enterprise,

> *5 in the conduct of such Enterprise's affairs through a pattern of racketeering activity, to wit:
> a) Multiple instances of mail fraud in violation of 18 U.S.C. Section 1341;
> b) Multiple instances of wire fraud in violation of 18 U.S.C. Section 1343;
> c) Conspiracy to commit larceny in violation of Penal Law Sections 20.00 and 155.05(2)(d); and
> d) Conspiracy to commit forgery in the third degree in violation of Penal Law Section 20.00 and 170.05.

*Id.* ¶ 84.

Plaintiff further attempts to provide a factual basis for its allegations against Citibank by identifying numerous, specific communications which it claims "constitute the RICO 'predicate acts,' " or alleged acts of wire and mail fraud, listed in appendix A to the second amended complaint. *Id.* ¶¶ 96-175, App. A; Pl.'s Reply Mem. at 19-20. Although the plaintiff painstakingly explicates the misleading statements in each telex, they were all generated by Flocco. Plaintiff does not provide any evidence that Citibank in addition to Flocco, bears responsibility for the statements in these telexes. The plaintiff's substitution of "Citibank (Flocco)" for "Flocco" when describing conspiratorial or fraudulent activity does not demonstrate Citibank's culpability. In order to create an strong inference that Citibank was involved, the plaintiff must allege

some higher level of complicity than merely the participation of Flocco and the use of Citibank equipment to perpetrate the scheme.

Plaintiff asserts the conclusory claim that Citibank acted "with reckless tolerance of the illegal activities of Flocco and the Letter of Credit Department and others and with wanton and reckless disregard of the rights of [QNNT] and others." *Id.* ¶ 206. Scienter may include recklessness; *see Breard v. Sacknoff & Weaver, Ltd.,* 941 F.2d 142, 144 (2d Cir.1991). Mere negligence, however, does not satisfy the scienter pleading requirement since the entity held liable under RICO must itself have been actively engaged in a pattern of racketeering. *See Dakis on behalf of Dakis Pension Plan v. Chapman,* 574 F.Supp. 757, 760 (N.D.Cal.1983). Magistrate Judge Francis correctly observed that the facts alleged do no more than support an inference of unwitting corporate participation on the part of Citibank.

Magistrate Judge Francis concluded:
> Here QNNT alleges little to support an inference that Citibank was an active participant in the alleged scheme to defraud QNNT. QNNT has offered no facts that would support an inference that Citibank did more than unwittingly supply the telex machines and other equipment by which Mr. Flocco made the communications of which QNNT complains. No facts support any inference that Citibank learned of Mr. Flocco's misconduct earlier than February 14, 1986, after he had made the alleged misrepresentations to QNNT; therefore Citibank cannot claim that Citibank knowingly participated in the fraudulent scheme to induce it to contract to sell oil to Surico.
> *6 Moreover, as the court below noted, Citibank had no apparent motive to participated in Flocco's fraud.

Magistrate Judge Francis said:
> Similarly, the claim that Citibank conspired with Mr. Flocco to defraud QNNT must fail because QNNT has not alleged facts that would support an inference that Mr. Flocco intended his misrepresentations to benefit Citibank. Citibank would not be benefited if, as QNNT alleges, the scheme required Citibank to renege on its promise to issue a letter of credit in case of a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1992 WL 276565 (S.D.N.Y.), RICO Bus.Disp.Guide 8116
(Cite as: 1992 WL 276565 (S.D.N.Y.))

falling oil market; in such circumstances, there would be no transaction upon which Citibank could charge a commission. Conceivably, had Martec gone forward with the purchase of oil from QNNT, a benefit to Citibank might have occurred that would not have taken place without Mr. Flocco's misrepresentations. However, QNNT alleges no facts to support an inference that Mr. Flocco's intent was to benefit Citibank under these circumstances, either. It is evident that Citibank would not have provided the letter of credit that Mr. Flocco promised to issue on behalf of Martec had Citibank known the true state of Martec's finances [sic] condition. This conclusion is supported by Citibank's 2/14/86 communication to Martec, disclaiming an obligation to issue the letter of credit (Compl. ¶) (sic), and its 12/23/86 and 12/24/86 communications canceling a letter of credit issued in connection with Martec's agreement to purchase oil from Capetown Corporation (Compl. ¶¶ 41, 187-88), as well by as (sic) Citibank's instructions to Mr. Flocco, beginning in March, 1986, that he have no further dealings with Martec. (e.g. Memorandum of 3/21/86 from Arthur Lloyd to Leonard Flocco; see supra at 6 n. 3). Conceivably, if the purchase of oil had gone through and Martec did not have sufficient assets to make good on the credit extended to it, Citibank would have been liable for the amounts due to QNNT or any other seller. Thus, the only reasonable inference to be drawn from the facts pleaded is that Mr. Flocco was putting Citibank in jeopardy rather than intending to benefit it.
Report at 10-12 (footnote omitted).

To satisfy the scienter element, a plaintiff need not allege facts which show a defendant had a motive for committing fraud, so long as plaintiff adequately identifies circumstances indicating "conscious behavior" by the defendant from which an intent to defraud may fairly be inferred. Cosmas v. Hassett, 886 F.2d 8, 13 (2d Cir.1989). However, where a particular defendant's nature to defraud is not apparent, the strength of the circumstantial allegations must be correspondingly greater. Beck v. Manufacturers Hanover Trust Co., 820 F.2d 46, 50 (2d Cir.1987), cert. denied, 484 U.S. 1005 (1988). In the case at bar, the circumstances militate against, not in favor, of an inference of fraudulent intent on Citibank's part.

For the reasons stated above, I concur in Magistrate Judge Francis' determination that the plaintiff has failed to allege scienter adequately.

### Respondeat Superior

*7 Plaintiff alleges that even if Citibank did not directly participate in the fraudulent scheme, it is vicariously liable for the actions of its employee Flocco under the theory of respondeat superior or the common law theory of apparent authority. Plaintiff objects to the Magistrate Judge's conclusion that courts in general and the courts of this district in particular reject vicarious liability in civil RICO actions.

Plaintiff correctly notes that the Second Circuit has not yet spoken on the matter of whether a corporation can be held vicariously liable under the civil RICO statute for the actions of its employees.

Plaintiff in its memorandum describes the multiple approaches of courts to the question of vicarious liability in RICO actions and claims that the facts of this case support holding Citibank liable under four theories of corporate liability. Pl.'s Objection to Report at 51. Specifically, QNNT claims that Citibank can be held liable since: 1) Flocco acted with actual authority in perpetrating the RICO predicate acts; e.g., see Connors v. Lexington Ins. Co., 666 F.Supp. 434, 453 (E.D.N.Y.1987) (a legitimate business may be held liable in the RICO context under respondeat superior); 2) Citibank would have benefited from the letter of credit scheme; see, e.g., D & S Auto Parts, Inc. v. Schwartz, 838 F.2d 964, 967 (7th Cir.1988), cert. denied 486 U.S. 1061 (1988) (employer may be held liable under RICO statute only for action undertaken by employee with the intent of benefiting employer); 3) Flocco was a high level employee; see, e.g. Gruber v. Prudential-Bache Securities, Inc., 679 F.Supp. 165, 181 (D.Conn.1987) (court may find corporation liable for RICO violation, if it determines "an officer or director had knowledge of or was recklessly indifferent to" the violative activity); and 4) Citibank is the RICO "person" but not the RICO "enterprise"; e.g. Bennett v. United States Trust Co. of New York, 770 F.2d 308 (2d Cir.1985), cert. denied, 474 U.S. 1058 (1986) (corporation may not be both the RICO "person" and "enterprise").

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 6
1992 WL 276565 (S.D.N.Y.), RICO Bus.Disp.Guide 8116
**(Cite as: 1992 WL 276565 (S.D.N.Y.))**

Decisions in this district generally hold that corporations may not be held vicariously liable for the actions of their employees in violation of the RICO statute "where the plaintiff has not alleged any facts which portray the company as an active perpetrator of the fraud or a central figure in the criminal scheme." *Philan Ins. Ltd. v. Frank B. Hall & Co., Inc.,* 748 F.Supp. 190, 198 (S.D.N.Y.1990); *see also Metro Furniture Rental Inc. v. Alessi,* 770 F.Supp. 198, 201 (S.D.N.Y.1991); *Kahn v. Chase Manhattan Bank, N.A.,* 760 F.Supp. 369, 373 (S.D.N.Y.1991).

Essentially, vicarious liability has been held to be at odds with Congressional intent in enacting RICO since the statute was designed to protect corporations from criminal infiltration rather than hold them liable. *Kahn,* 760 F.Supp at 373; *Banque Worms v. Luis A. Duque Pena E. Hijos, Ltd.,* 652 F.Supp. 770, 772 (S.D.N.Y.1986). In *Rush v. Oppenheimer & Co. Inc.,* 628 F.Supp. 1188, 1194-95 (S.D.N.Y.1985), Judge Sweet said, "Superimposing vicarious liability doctrines on the RICO criminality requirements would in this context permit the 'enterprise' which is the conduit for these activities, to become the defendant by way of imputation, in a transparent attempt to reach a deeper pocket than the actual violator or perpetrator of the predicate racketeering acts."

*8 Relying on *D & S Auto Parts, Inc. v. Schwartz,* 838 F.2d at 967, plaintiff claims that vicarious liability for RICO violations may be imposed when the employee undertakes the action for the benefit of the employer. Pl.'s Objection at 48, 51-52. Pl.'s Reply Mem. at 20-29. In the Plaintiff's Objection to the Report, plaintiff suggests that Citibank stood to benefit from Flocco's activities in the form of large transaction fees for supplying letters of credit. Pl.'s Objection at 51-52. Plaintiff further alleges that Magistrate Judge Francis failed to treat the allegations that Flocco acted for the benefit of Citibank true as pleaded. But "baldly conclusory" and "groundless" allegations will not defeat dismissal under 12(b)(6), *Duncan v. AT & T Communications, Inc.,* 668 F.Supp. 232, 234 (S.D.N.Y.1987), and the Magistrate Judge was not bound to accept as true conclusory pleadings unsupported by facts.

In its second amended complaint, although plaintiff

does claim that Flocco participated in the fraud to make money for Citibank, it fails to allege facts tending to indicate that Citibank knew of Flocco's misrepresentations before February 14, 1986. Complaint ¶¶ 66, 86, 91, 181, 191, 199. As the Seventh Circuit said in *D & S Auto Parts, Inc. v. Schwartz,* 838 F.2d at 967, "An employee violating RICO without his employer's knowledge is highly unlikely to be acting for his employer's benefit." Thus, the facts alleged by the plaintiff are not sufficient to allow an inference that Flocco acted for Citibank's benefit.

The plaintiff has correctly noted that in many of the cases cited by the defendant in which courts reject vicarious liability, the corporation is the RICO "person" as well as the RICO "enterprise". Pls' Reply Mem. at 37. The identical argument failed to convince the court in *Banque Worms:*

A number of other district courts have similarly rejected vicarious liability and RICO when the employer/corporation is a passive victim of racketeering activity. The plaintiff attempts to distinguish these cases by claiming that they focus on the distinction between the RICO "person" and the RICO "enterprise," finding that an "enterprise" cannot also be liable as a "person" under section 1962(c). *The plaintiff argues that Flota is not the enterprise in this action, but should be responsible for the acts of the "person," its employee Abadia, because the latter acted with the force of the corporation behind him. This yields the absurd result specifically denounced in the above cases, i.e., holding an innocent corporation liable for the unauthorized wrongdoing of a lower level employee.*

652 F.Supp. at 773 (emphasis added) (citations omitted). *Banque Worms* makes it clear that even where the defendant corporation is not the RICO "enterprise", holding a corporation liable for the RICO violations of its employees conflicts with the purpose of the RICO statute. Furthermore, although the plaintiff claims that Flocco was not a "lower level employee", Flocco does not constitute an "officer or director" for whose activity the corporation may be liable, according to *Gruber v. Prudential-Bache,* 679 F.Supp. at 189.

*9 The plaintiff makes a further argument that the Supreme Court's decision in *American Soc. of Mechanical Engineers, Inc. v. Hydrolevel Corp.,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

h           e     c     e     e     h     e     f

Not Reported in F.Supp.                                    Page 7
1992 WL 276565 (S.D.N.Y.), RICO Bus.Disp.Guide 8116
**(Cite as: 1992 WL 276565 (S.D.N.Y.))**

456 U.S. 556 (1982), which held the Society liable for antitrust violations committed by its agents, supports vicarious liability on the part of Citibank in this case. Pl.'s Objection at 53. However, I agree with the analysis of the First Circuit in *Schofield v. First Commodity Corp. of Boston,* 793 F.2d 28, 33 (1st Cir.1986) on *Hydrolevel* 's applicability to the question of vicarious liability in RICO actions:

> Unlike section 1962(c), however, with its precise language of relationship between two entities, the antitrust laws sweep broadly and extend liability to "[e]very person", 15 U.S.C. §§ 1, 2, 3, and define "person" to include corporations and associations, 15 U.S.C. § 7....
>
> In contrast to the antitrust and securities provisions at issue in those cases, the language of section 1962(c) is phrased so as to limit rather than expand the range of potential violators.
>
> Moreover, the legislative history tells us that Congress had a specific target in mind with this statute, the individual wrongdoer, in contrast to the more general purposes behind the antitrust and securities acts.

*Id.* at 33. *See also D & S Auto Parts, Inc. v. Schwartz,* 838 F.2d at 968 (holding *Hydrolevel* rule inapplicable to RICO liability); *Banque Worms,* 652 F.Supp. at 772 (rejecting a similarity between corporate liability in antitrust and RICO actions).

Since the plaintiff failed to allege any factual basis upon which I could infer that Citibank was an active participant in the alleged letter of credit scheme and this district does not recognize RICO liability of a corporation for the acts of its employees, the plaintiff's fifth and sixth causes of action were correctly dismissed by Magistrate Judge Francis. Accordingly, I affirm the Magistrate Judge's Report and Recommendations.

It is SO ORDERED.

1992 WL 276565 (S.D.N.Y.), RICO Bus.Disp.Guide 8116

**Motions, Pleadings and Filings (Back to top)**

. 1:89CV00464 (Docket)
                      (Jan. 20, 1989)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

h        e      c      e      h      e      f

**TAB 5**



Slip Copy
2004 WL 2454120 (S.D.N.Y.)
(Cite as: 2004 WL 2454120 (S.D.N.Y.))

Page 1

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Robert SAVITSKY, Plaintiff,
v.
Louis MAZZELLA, Sr., Anne Mazzella, Louis
Mazzella, Jr., Claude Castro,
Castro & Karten, Timothy Dowd, Louis Mazzella
Irrevocable Qtip Trust, CLM
Properties, Inc., Darby Corporation, and A & L
Properties, Defendants.
**No. 98 Civ.9051 RWS.**

Nov. 1, 2004.
Anthony F. LeCrichia, New York, NY, for Plaintiff.

Castro & Karten, New York, NY, By: Claude
Castro, for Defendants, of counsel.

*OPINION*

SWEET, J.

*1 Defendants Louis Mazzella, Sr. ("Mazzella,
Sr."), Anne Mazzella ("Mrs.Mazzella"), Louis
Mazzella, Jr. ("Mazzella, Jr."), Claude Castro
("Castro"), Castro & Karten, LLP ("C & K"),
Timothy Dowd ("Dowd"), Louis Mazzella
Irrevocable QTIP Trust ("QTIP"), CLM Properties,
Inc. ("CLM"), Darby Corporation ("Darby"), and A
& L Properties ("A & L") (collectively, the
"defendants"), have moved under Rule 56,
Fed.R.Civ.P., for summary judgment dismissing the
amended complaint of Robert Savitsky
("Savitsky"). Savitsky has cross-moved under Rule
15(a), Fed.R.Civ.P., to amend his complaint and
under New York Disciplinary Rules ("DR") 5-101
and 5-102, 22 NYCRR §§ 1200.20 and 1200.21, to
disqualify Castro and C & K and from representing
the defendants. For the reasons set forth below, the

cross-motion is granted to permit the filing of a
second amended complaint ("SAC") and denied as
to disqualification. The motion of the defendants for
summary judgment is denied at this time with leave
granted to renew after the filing of the SAC in
accordance with this opinion.

This action has been prosecuted under difficult
circumstances. Savitsky has been represented by
three successive lawyers and has also participated
*pro se.* The first appearance of his present counsel
was on January 26, 2004. In order to permit new
counsel an opportunity to represent Savitsky, his
cross-motion to file an amended pleading is granted
in accordance with the rulings which follow.

*Facts*

The following facts are not in dispute. The plaintiff
and the defendants have been involved in an
ongoing litigation arising out of a money judgment
entered against the defendant in favor of the
plaintiff on June 27, 1991 in the federal district
court for the Eastern District of Pennsylvania. Over
the past thirteen years, the plaintiff has tried
unsuccessfully to collect on these judgments.

*Prior Proceedings*

The complaint was originally filed in the Central
District of California but was transferred to this
Court pursuant to 28 U.S.C. § 1404(a). On
September 1, 1999, plaintiff filed with this Court
the first amended complaint ("FAC"), which alleged
two causes of action: (1) conspiracy to intentionally,
fraudulently transfer property under New York
Debtor and Creditor Law ("DCL") § 276-a, [FN1]
and (2) conspiracy to commit common law fraud.
The FAC was dismissed by opinion of this Court of
April 23, 2002 (the "April Opinion"), which granted
the defendants' motion for summary judgment.
*Savitsky v. Mazzella,* No. 98 Civ. 9051(RWS), 2002
WL 664060 (S.D.N.Y. April 23, 2002). On appeal,
the April Opinion was vacated for failure to provide
Savitsky with notice of the nature and consequences
of the defendants' motion. *Savitsky v. Mazzella,* 59

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

h       e    c    e    e    h    e    f

Slip Copy                                                                                          Page 2
2004 WL 2454120 (S.D.N.Y.)
**(Cite as: 2004 WL 2454120 (S.D.N.Y.))**

Fed. Appx. 432, 2003 WL 1191180 (2nd Cir.2003).

> FN1. In both the FAC and the SAC, plaintiff asserts his fraudulent conveyance claims pursuant to DCL § 276-a, which governs awards of attorneys' fees in actions and special proceedings to set aside fraudulent conveyances. For the purpose of the FAC, the Court assumes that this citation was in error, and that plaintiff intended to assert his claim pursuant to DCL § 273-a, which provides for the setting aside of certain property transfers by defendants.

On remand, discovery was completed and the defendants again moved for summary judgment. Savitsky cross-moved (1) for leave to file the SAC and (2) to disqualify Castro and C & K from representing the defendants. These motions were heard and marked fully submitted on June 9, 2004.

*Discussion*

1. *Leave is Granted to File the SAC*

*2 Defendants oppose plaintiff's motion to file the SAC on the following grounds: (1) that leave to amend at this stage of an already protracted litigation will cause undue delay and prejudice and (2) that the SAC fails to cure alleged defects of the FAC.

In general, leave to replead is "freely given when justice so requires." Fed.R.Civ.P. 15(a); *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991); *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991). This liberal approach to the amendment of pleadings serves a dual purpose:

> First, the rule's purpose is to provide maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities.... Second, Rule 15 reflects the fact that the federal rules assign the pleadings the limited role of providing the parties with notice of the nature of the pleader's claim or defense and the transaction, event, or occurrence that has been called into question....

6 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1471 (2d ed.1990).

A district court has discretion to deny leave to amend "where the application is made after an inordinate delay, no satisfactory explanation is made for the delay, and the amendment would prejudice the defendant." *BBS Norwalk One, Inc. v. Raccolta, Inc.,* 60 F.Supp.2d 123, 132 (S.D.N.Y.1999) (*citing MacDraw, Inc. v. CIT Group Equip. Fin., Inc.,* 157 F.3d 956, 962 (2d Cir.1998)). The Second Circuit has stated that "[m]ere delay, ... absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *State Teachers Retirement Bd. v. Fluor Corp.,* 654 F.2d 843, 856 (2d Cir.1981).

The defendants argue that Savitsky's cross motion should be denied because undue delay would result if Savitsky is permitted to amend his complaint and that such delay would cause undue prejudice. (Castro Aff. ¶ 13). This conclusory assertion not withstanding, defendants have failed to make any actual showing as to how the filing of the SAC would result in any sort of prejudice to them. Savitsky is therefore granted leave to file the SAC despite the delay which has resulted after the remand.

2. *Claims Identified in the SAC*

The SAC asserts seven causes of action: (1) misrepresentation, (2) fraudulent conveyance, (3) fraudulent conveyance, (4) expenses, [FN2] (5) violation of Section 487 of the New York Judiciary Law ("JL"), (6) unjust enrichment, and (7) conspiracy to commit fraud.

> FN2. Pursuant to his fourth cause of action, Savitsky seeks attorneys' fees and other costs associated with bringing this law suit. As such, this is not a separate cause of action. Rather, it is an assertion of the damages that have resulted from defendants' allegedly improper conduct. It should be noted that under New York law, "[i]n actions for torts, counsel fees and other expenses in conducting the suit cannot be taken into consideration in assessing damages" 36 *N.Y. Jurisprudence* § 93 (2d ed. 2003) (*"N.Y. Jur ."* ) (collecting cases). However, pursuant to DCL 276- a, attorney's fees can be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

h          e       c      e      e      h      e      f

recovered in an action to set aside a fraudulent conveyance if the transfer "is found to have been made by the debtor and received by the transferee with actual intent" to delay, hinder or defraud the creditor.

For ease of analysis, this cumbersome and redundant structure can be collapsed into the following claims: (1) fraud (cause of action 1), (2) fraudulent conveyance (causes of action 2, 3, and 6), (3) violation of JL § 487 (cause of action 5), and (4) conspiracy to commit fraud (cause of action 7).

3. *Choice of Law*

Since this diversity action was transferred from a district court sitting in California, that state's choice-of-law rules are determinative of the substantive law that will govern the above-referenced state law claims. *Ferens v. John Deere Co.,* 494 U.S. 516, 532 (1990). For most tort claims, California courts use a "governmental interest" analysis to determine what law should be applied. *Downing v. Abercrombie & Fitch,* 265 F.3d 994, 1005 (9th Cir.2001). The steps of this test are as follows:

*3 (1) "the court examines the substantive laws of each jurisdiction to determine whether the laws differ as applied to the relevant transaction", (2) "if the laws do differ, the court must determine whether a true conflict' exists in that each of the relevant jurisdictions has an interest in having its law applied", and (3) "if more than one jurisdiction has a legitimate interest ... the court [must] identify and apply the law of the state whose interest would be more impaired if its law were not applied."

*Id.* (quoting *Coufal Abogados v. AT & T, Inc.,* 223 F.3d 932, 934 (9th Cir.2000); *Liew v. Official Receiver & Liquidator,* 685 F.2d 1192, 1196 (9th Cir.1982)).

For claims 1, 3, and 4, the first step of this governmental interest analysis is dispositive: With respect to the transactions at issue and the claims asserted, there are no significant differences [FN3] among the laws of California (the place of the transferor court), New York (the place of the transferee court), and Pennsylvania (the place where the underlying judgments were entered). Moreover,

the parties have both applied New York law to these claims. Therefore, New York law will be applied to claims 1, 3, and 4.

> FN3. It should be noted that in contrast to New York and California, Pennsylvania does not require express agreement between the parties as an element of a civil conspiracy claim. *See, e.g., Ball v. Paramount Pictures, Inc.,* 169 F.2d 317, 320 (3d Cir.1948) (stating that " '[i]t is not necessary to find an express agreement in order to find a conspiracy. It is enough that a concert of action is contemplated and that the defendants conformed to the arrangement .'' ') (quoting *United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 142 (1948)).

Claim 2 is based on the theory that Mazzella, Sr. fraudulently conveyed real property in California and New York to prevent Savitsky from collecting on the 1991 judgment. California law dictates that such "questions affecting title to real property are determined by the law of the jurisdiction where the property is located; if the law of the situs does not differ from that of California, the court will look to California law for guiding principles of decision." 12 Barbara Slotnik, *California Jurisprudence 3d* § 43 (2004) (*"Cal.Jur."* ) (citing *Cummings v. Bullock,* 367 F.2d 182 (9th Cir.1966)). As described below, there are significant differences between New York and California law as it relates to Savitsky's fraudulent conveyance claim. Therefore, California law must govern Savitsky's claim that California real property was fraudulently conveyed, and New York law must govern his claim that an interest in New York property was so conveyed.

4. *The SAC is not Futile as to Claims 1 & 2*

"[I]t is well established that leave to amend a complaint need not be granted when amendment would be futile." *Ellis v. Chao,* 336 F.3d 114, 126 (2d Cir.2003) (citing *Foman v. Davis,* 371 U.S. 178, 182 (1962)). A proposed amendment to a pleading is deemed to be futile if "it could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." *Oneida Indian Nation of New York v. City of Sherrill, New York,* 337 F.3d 139, 168 (2d Cir.2003) (citing *Ricciuti v. N.Y.C. Transit Auth.,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
2004 WL 2454120 (S.D.N.Y.)
(Cite as: 2004 WL 2454120 (S.D.N.Y.))

941 F.2d 119, 123 (2d Cir.1991)).

For the purposes of evaluating futility, the 12(b)(6) standard is applied: All well pleaded allegations are accepted as true, and all inferences are drawn in favor of the pleader. *See Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993).

*A. The Fraud Claim*

**\*4** Plaintiff's fraud claim has been properly plead. Under New York law, the elements of a fraud claim are: (1) that the defendant made a material false representation, (2) that the defendant intended to defraud the plaintiff thereby, (3) that the plaintiff reasonably relied upon the representation, and (4) that the plaintiff suffered damage as a result of such reliance. *Manning v. Utils. Mut. Ins. Co.,* 254 F.3d 387, 400 (2d Cir.2001) (quoting *Bridgestone/Firestone, Inc. v. Recovery Credit Servs.,* 98 F.3d 13, 19 (2d Cir.1996)); *see also Lama Holding Co. v. Smith Barney, Inc.,* 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 80, 668 N.E.2d 1370, 1373 (1996); 60A William H. Danne, Jr., *N.Y. Jur.* § 14.

Pursuant to Fed.R.Civ.P. 9(b), a fraud claim must be stated with particularity. The Second Circuit "has read Rule 9(b) to require that a complaint '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " *Rombach v. Chang,* 355 F.3d 164, 170 (2d Cir.2004) (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)).

Paragraphs 21 through 25 of the SAC, in which Savitsky alleges that Mazzella, Sr. made false statements during the course of a July 13, 1992 deposition, are sufficient to satisfy the first three *Mills* requirements. Paragraphs 26 through 100--alleging, in part, that Mazzella, Sr. held assets at the time of the July 13, 2002 deposition--are sufficient to satisfy the fourth *Mills* requirement. That is, these paragraphs give rise to a "strong inference of fraudulent intent." *Mills,* 12 F.3d at 1176. Based on the foregoing, it is determined that the fraud claim, as stated in the SAC, is not futile.

*B. The Fraudulent Conveyance Claim*

The SAC alleges that Mazzella, Sr. fraudulently conveyed to his wife eight California properties after the June 27, 1991 judgment in favor of Savitsky. Section 3439.04(a) of the California Civil Code provides that "a transfer made or obligation incurred by a debtor is fraudulent as to a creditor ... if the debtor made the transfer or incurred the obligation ... [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." Cal. Civ.Code § 3439.04(a) (2004).

With respect to the California claims, the SAC has plead the elements of fraudulent conveyance with requisite particularity. Savitsky's allegations support an inference that the properties in question were purchased with funds provided by Mazzella, Sr. Furthermore, the intent element is satisfied by Savitsky's allegation that the real property transfers were made from husband to wife. *See In re Kaiser,* 722 F.2d 1574, 1582 (2d Cir.1983) (stating that a family relationship between transferor and transferee is a " 'badge ... of fraud' [that] establish[es] the requisite actual intent to defraud.") (quoting *In re Freudmann,* 362 F.Supp. 429, 433 (S.D.N.Y.1973)).

**\*5** The SAC further alleges that Mazzella, Sr. fraudulently transferred his interest in New York real property after judgment was entered in favor of Savitsky. Section 273-a of the DCL provides that:
Every conveyance made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action *without regard to the actual intent* of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment.
DCL § 273-a (2004) (emphasis added).

Paragraphs 77 and 78 of the SAC state a proper claim under DCL section 273- a. Paragraph 77 alleges that Mazzella, Sr. sold New York real property (located at 249 Waverly Place in New York City) to Richard Blitz, and that Mazzella, Sr. gave Blitz a purchase money mortgage for the purpose of this transfer. Paragraph 78 alleges that Mazzella, Sr. subsequently transferred his interest in this mortgage to QTIP for no consideration.

Based on the foregoing, the fraudulent conveyance

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

h        e        c        e        h        e        f

Slip Copy                                                          Page 5
2004 WL 2454120 (S.D.N.Y.)
(Cite as: 2004 WL 2454120 (S.D.N.Y.))

claim is not futile.

5. *The SAC is Futile as to Claims 3 and 4*

A. *The JL § 487 Claim*

Savitsky has alleged that defendants' counsel,
Castro and C & K, violated JL Section 487(1),
which broadly provides criminal and civil liability
[FN4] for any attorney who "[i]s guilty of any
deceit or collusion, or consents to any deceit or
collusion, with intent to deceive the court or any
party[.]" This statute is " 'little known and seldom
used." ' *Brignoli v. Balch, Hardy & Scheinman, Inc.,*
126 F.R.D. 462, 467 (S.D.N.Y.1989) (quoting
*Wiggin v. Gordon,* 115 Misc.2d 1071, 455
N.Y.S.2d 205, 206 (Civ.Ct.1982)). Moreover, "civil
relief [pursuant to J.L. § 487(1) ] ... is warranted
only where the defendant attorney has engaged in 'a
chronic, extreme pattern of legal delinquency." '
*Schindler v. Issler & Schrage, P.C.,* 692 N.Y.S.2d
361, 362, 262 A.D.2d 226, 228 (1st Dep't 1999)
(quoting *Wiggin,* 115 Misc.2d at 1077, 455
N.Y.S.2d at 209); *see also Senator Linie GmbH &
Co. KG v. Eastern Sunway Line, Inc.,* No. 96 Civ.
0008(MGC), 2004 WL 232143 at *2 n. 1 (S.D.N.Y.
Feb. 06, 2004); *Schweizer v. Mulvehill,* 93
F.Supp.2d 376, 408 (S.D.N.Y.2000).

> FN4. Any attorney who engages in the
> conduct described in JL § 487(1) "is guilty
> of a misdemeanor, and in addition to the
> punishment prescribed therefor by the
> penal law, he forfeits to the party injured
> treble damages, to be recovered in a civil
> action." JL § 487.

In the SAC, Savitsky makes three allegations in
support of his JL § 487(1) claim: (1) that Castro
failed to prevent another attorney from arguing at a
June 23, 1999 TRO hearing that Mazzella, Sr. was
not the mortgagee of 249 Waverly Place (SAC ¶
162-163), (2) that Castro permitted Mazzella, Sr. to
falsely testify at the July 13, 1992 deposition (*Id.* ¶
164), and (3) that Castro and his firm "wilfully
masterminded or participated in the scheme alleged
in this complaint" (*Id.* ¶ 143). The fist of the
above-described allegations is contradicted by other
parts of the SAC, [FN5] and the second and third
allegations are conclusory. Moreover, these
allegations, which identify two isolated incidents

separated by some seven years, are inadequate to
allege the requisite pattern of "chronic, extreme
legal delinquency." Therefore, the JL § 487(1)
claim is futile, and will not be permitted in the SAC.

> FN5. In paragraph 78 of the SAC, plaintiff
> admits that "Mazzella Sr. and Anne
> Mazzella assigned a mortgage on 249
> Waverly Place without consideration to
> [QTIP]." (Compl.¶ 78.) While plaintiff
> may argue that this transaction should be
> set aside as a fraudulent conveyance, he
> does not dispute that such a transfer of
> interest in the mortgage did, in fact, occur.

B. *The Conspiracy to Commit Fraud Claim*

*6 The conspiracy to commit fraud claim is not
adequately pled. In order to state a claim for
conspiracy, a plaintiff must allege an independent
actionable tort and four additional elements: (1) a
corrupt agreement between two or more parties; (2)
an overt act in furtherance of the agreement; (3) a
party's intentional participation in the furtherance of
a plan or purpose; and (4) resulting damage or
injury. *See Best Cellars Inc. v. Grape Finds at
Dupont, Inc.,* 90 F.Supp.2d 431, 446
(S.D.N.Y.2000).

Savitsky's has failed to plead two of these elements.
First, he has failed to allege, as he must, the
existence of a corrupt agreement among the
defendants. *See, e.g., Goldstein v. Siegel,* 19
A.D.2d 489, 493 244 N.Y.S.2d 378, 382 (1st Dep't
1963) (stating that in order to properly allege a
conspiracy claim, plaintiff must "assert adequately
common action for a common purpose by common
agreement or understanding among a group, from
which common responsibility derives. [Citations
omitted]. A bare conclusory allegation of
conspiracy is usually held insufficient.") Second, he
has failed to allege defendants' " 'intentional
participation in the furtherance of the plan or
purpose [.]" ' *Kashi v. Gratsos,* 790 F.2d 1050,
1055 (2d Cir.1986) (quoting *Vom Lehn v. Astor Art
Galleries, Ltd.,* 86 Misc.2d 1, 7, 380 N.Y .S.2d 532,
538 (Sup.Ct.1976); *Newburger, Loeb & Co., Inc. v.
Gross,* 563 F.2d 1057, 1074 (2d Cir.).

Since the agreement and intentional participation
have not been pled, Savitsky's conspiracy claim is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

h      e      c    e    e    h    e      f

2004 WL 2454120 (S.D.N.Y.)
**(Cite as: 2004 WL 2454120 (S.D.N.Y.))**

futile and will not be permitted as part of the SAC.

6. *The Motion to Disqualify Castro and C & K is Denied*

Pursuant to DR 5-101 and DR 5-102, [FN6] 22 NYCRR §§ 1200.20 and 1200.21, Savitsky has sought disqualification of Castro and C & K from the representation of the other defendants on the ground that Castro will be a witness upon trial.

> FN6. Subject to certain exceptions, DR-102 require withdrawal when "a lawyer learns or it is obvious that the lawyer ought to be called as a witness on a significant issue on behalf of the client." DR 5-101, which concerns conflicts between an attorney's interests and those of the client, does not address the issue of an attorney being called as a witness during the course of a representation.

Motions to disqualify counsel have long been disfavored in this Circuit. *See, e.g., Evans v. Artek Sys. Corp.,* 715 F.2d 788, 791-92 (2d Cir.1983) (enumerating the reasons for which disqualification motions are disfavored); *Bennett Silvershein Assoc. v. Furman,* 776 F.Supp. 800, 802 (S.D.N.Y.1991) ("The Second Circuit has indeed been loathe to separate a client from his chosen attorney ....") (collecting cases). "Disqualification motions are often made for tactical reasons, and thereby unduly interfere with a party's right to employ counsel of his choice." *Skidmore v. Warburg Dillon Read LLC,* No. 99 Civ. 10525(NRB), 2001 WL 504876, at *2 (S.D.N.Y. May 11, 2001) (citing *Board of Educ. v. Nyquist,* 590 F.2d 1241, 1246 (2d Cir.1979)). Moreover, disqualification motions, "even when made in the best of faith ... inevitably cause delay." *Evans,* 715 F.2d at 792 (quoting *Nyquist,* 590 F.2d at 1246). A "high standard of proof" is therefore required from one who moves to disqualify counsel. *Id.* at 791 (quoting *Government of India v. Cook Industries, Inc.,* 569 F.2d 737, 739 (2d Cir.1978)). The appearance of impropriety alone does not warrant disqualification. *See Nyquist,* 590 F.2d at 1246-47.

*7 Since leave has been granted to the defendants to renew their summary judgment motion upon the filing of an appropriate SAC, the grounds advanced

are premature. If no such motion is made, or if it proves unsuccessful, leave is granted to Savitsky to renew his effort to disqualify Castro and his firm.

*Conclusion*

Based on the foregoing, the cross-motion is granted to permit the filing of a second amended complaint ("SAC") and denied as to disqualification. The causes of action for violation of JL § 487 and for conspiracy to commit fraud are judged to be futile and will not be included in the SAC. The motion of the defendants for summary judgment is denied at this time with leave granted to renew after the filing of the SAC in accordance with this opinion.

It is so ordered.

2004 WL 2454120 (S.D.N.Y.)

**Motions, Pleadings and Filings** (Back to top)

. 1:98CV09051 (Docket)
                                                (Dec. 22, 1998)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

h          e          c          e          h          e          f