Defendants assert that two enterprise arguments remain viable against the Amended Complaint. First, the Jakks Defendants, and all other Defendants who adopted their argument, argued that sufficient facts must be pleaded establishing that the members of the enterprise functioned as a unit for a common purpose, citing United States v. Turkette, 452 U.S. 576, 583 (1981) and First Capital Asset Mgmt. v. Satinwood, Inc., 385 F.3d 159, 174 (2d Cir. 2004) (Jakks Mem. 27-28). WWE takes no issue with that statement of law. Having done so, however, the Jakks Defendants then cited Elliott v. Foufas, 867 F.2d 877, 881 (5th Cir. 1989) for the proposition that "plaintiff must plead specific facts which establish that the association exists for purposes other than simply to commit the predicate acts" (Jakks Mem. 28) (emphasis added). Defendants never articulate what "other purpose" they contend is required to establish the existence of an enterprise, nor point to any Second Circuit decision embracing some "other purpose" element of an enterprise. In fact, Turkette and numerous Second Circuit cases cited herein have clearly ruled that an enterprise which exists solely for criminal purposes and which has no other purpose is covered by RICO (see, infra, pp. 17-18).

Defendants next argued that the enterprise is an entity separate and apart from the pattern of racketeering activity in which it engages, a point of law also clearly established by Turkette (Jakks Mem. 28). Having done so, however, Defendants then stated that "[i]n keeping with Turkette, courts in this Circuit and others have consistently required that the enterprise have an existence and structure separate and apart from the racketeering acts or the minimal association necessary to commit the racketeering acts" (Jakks Mem. 28). Immediately following this statement Defendants cited First Capital, with a parenthetical doing nothing more than restating Turkette's language that the enterprise element is separate and distinct from the racketeering acts (Jakks Mem. 28). Then, however, Defendants cited two cases from the Eighth and Ninth

Circuits, <u>Chang v. Chen</u>, 80 F.3d 1293 (9th Cir. 1996) and <u>Stephens, Inc. v. Geldermann, Inc.</u>, 962 F.2d 808 (8th Cir. 1992), and a single decision of a court in this district, <u>Schmidt v. Fleet Bank</u>, 16 F. Supp. 2d 340 (S.D.N.Y. 1998), for the proposition that the enterprise must have an "ascertainable structure" apart from the racketeering activity (Jakks Mem. 28-29). The apparent purpose of linking these cases together is to suggest that the Second Circuit approach in <u>First Capital</u> is the same as the "ascertainable structure" requirement of the Eighth and Ninth Circuits. Once again, that is not the law of this circuit. In fact, the Ninth Circuit itself in <u>Chang</u> noted that the "ascertainable structure" requirement of the Eighth and Ninth Circuits has been expressly rejected by the Second Circuit. <u>Chang</u>, 80 F.3d at 1297; <u>see also</u> <u>Hansel 'N Gretel Brand, Inc. v. Savitsky</u>, No. 94 Civ. 4027 (CSH), 1997 WL 543088, at *2-3 (S.D.N.Y. Sept. 3, 1997) (noting that overwhelming authority of Second Circuit has expressly rejected the <u>Chang</u> ascertainable structure requirement that the evidence necessary to establish an enterprise must be distinct from the evidence which proves a pattern of racketeering activity).

Relying on this law that has been specifically rejected by the Second Circuit, Defendants then maintained that the enterprise allegations are defective because the enterprise alleged by WWE is said to be defined solely by the predicate acts and "has no <u>other structure</u> or ongoing organization or any <u>other purpose</u> outside of these alleged acts" and is "merely the personification of the alleged predicate acts" (Jakks Mem. 29) (emphasis added). Defendants' argument, however, is meritless and must be rejected because it is built on legal principles about a RICO enterprise which are not the law of this circuit.

A second enterprise argument was made only by THQ and THQ/Jakks, not the Jakks Defendants or any other Defendant. THQ argued that it arrived on the scene largely after bribes were paid to obtain the videogame license and thus could not be charged with "the

implementation" or "operation and management" of what it classified as a bribery scheme (THQ

Mem. 7-8). THQ further argued that it was not alleged to have taken direction or performed

tasks for the enterprise once THQ became associated with Jakks, and therefore could not be said

to have been involved in the operation and management of the enterprise (id. at 7). THQ/Jakks

similarly argued it could not have participated in the operation and management of the enterprise

because it "did not exist at the time the alleged enterprise was formed" or when the "bribery

scheme was initiated" or "during the bulk of the period when the . . . bribery occurred"

(THQ/Jakks Mem. 6). Ignoring the undisputed fact that THQ/Jakks was formed by Jakks and

THQ to be the official signatory to the videogame license procured by the antecedent pattern of

racketeering activity, THQ/Jakks also argued that it could not have participated in the operation

and management of the enterprise because, according to THQ/Jakks, "the RICO enterprise

initiated and substantially carried out the alleged scheme for the purpose of Jakks—not the

LLC—acquiring a videogame license from WWE" (id.).[10] These arguments are also meritless.

### A.    Standard of Review

The extraordinarily detailed 363-paragraph Amended Complaint more than satisfies the

notice function of federal pleading, which applies here notwithstanding the suggestion of

Defendants that heightened pleading rules apply in RICO cases.[11] As this Court has correctly

---

[10]    Although bribes were noted in the original Complaint, the racketeering activity depicted therein
was plainly not limited to bribes. The Amended Complaint makes clear that the foremost attribute of the
scheme was to deny WWE the honest services of its agents, and that the racketeering <u>additionally</u>
included bribes, Travel Act violations, Stolen Property Act violations and money laundering.

[11]    The Supreme Court has repeatedly struck down any attempt to impose heightened pleading
requirements on federal practice. <u>See, e.g.</u>, <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 512-13 (2002);
<u>Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit</u>, 507 U.S. 163, 168 (1993); <u>see
also</u> <u>Cullen v. Margiotta</u>, 811 F.2d 698, 729 (2d Cir. 1987) (RICO enterprise allegations must be liberally
construed under Rule 8); <u>In re Sumitomo Copper Litig.</u>, 104 F. Supp. 2d 314, 319 (S.D.N.Y. 2000)
(RICO enterprise allegations must meet only "notice pleading" requirements); <u>Spira v. Nick</u>, 876 F. Supp.
553, 561 (S.D.N.Y. 1995) (RICO enterprise allegations are not subject to Rule 9(b)); <u>Morrow v. Black</u>,

noted, the pleading requirements of Rule 8 are "extremely permissive." Braphman-Bines v. N.Y. City Police Dept., No. 03 Civ. 10207(KMK), 2005 WL 22843, at *3 (S.D.N.Y. Jan. 3, 2005).

Courts are not to confuse the requirements for pleading a RICO violation with the ultimate proof requirements and decline to do so even when liberty is at issue. See, e.g., United States v. Triumph Capital Group, Inc., 260 F. Supp. 2d 444, 455 (D. Conn. 2002). Enterprise allegations are sufficient when they "identif[y] the enterprise's members, the roles they played, the objects of the racketeering activity in which they engaged, and describe the manner and means by which the enterprise operated and its activities" and thus provide "sufficient details of who its members were and what it did." Id. Thus, a complaint is sufficient when the allegations show "'a group of persons associated together for a common purpose of engaging in a course of conduct' which functioned then as a 'continuing unit.'" Procter & Gamble Co. v. Big Apple Indus. Bldgs., 879 F.2d 10, 15-18 (2d Cir. 1989). Such allegations are sufficient to infer that an enterprise "exists," which is the ultimate question on a motion to dismiss. Id.

### B. Defendants Fail to Address Several Principles of Second Circuit Law That Are Fatal to Their Enterprise Arguments

In assessing whether the Amended Complaint satisfies the Procter & Gamble standard for pleading the existence of an enterprise, several additional principles of Second Circuit RICO law not addressed by Defendants bear directly on that issue. First, as noted, the argument that WWE must allege some facts to prove an "ascertainable structure" to the enterprise by evidence distinct from that inherent in the evidence used to prove a pattern of racketeering activity is not the law of this circuit and never has been. The Second Circuit long ago rejected a requirement that an enterprise must have an "ascertainable structure" distinct from that inherent in the pattern of

---

742 F. Supp. 1199, 1202 (E.D.N.Y. 1990) (proper standard of review on motion to dismiss does not distinguish between RICO and non-RICO claims).

racketeering activity, a historical fact noted directly in the Chang decision cited by Defendants. Chang, 80 F.3d at 1297; see also United States v. Bagaric, 706 F.2d 42, 56 (2d Cir. 1983) ("[I]t is logical to characterize any associative group in terms of what it does rather than by abstract analysis of its structure."); United States v. Feldman, 853 F.2d 648, 659-60 (9th Cir. 1988) (noting that Second Circuit rejected an "ascertainable structure" requirement). In addition to relying on decisions from the Eighth and Ninth Circuits, even though not the law of this circuit, Defendants also cite a single trial court decision from this district, Schmidt, to support their "ascertainable structure" argument (Jakks Mem. 29). As a court in this district has subsequently and correctly noted, however, Schmidt rests on the "ascertainable structure" standard adopted in the Eighth Circuit that has been expressly rejected in the Second Circuit. Feinberg v. Katz, No. 99 CIV. 45(CSH), 2002 WL 1751135, at *12-13 (S.D.N.Y. July 26, 2002) ("The defendants' reliance on Schmidt and its progeny is as disturbing as it is unavailing.").

Defendants' citation to the Second Circuit's decision in First Capital in the same breath as the Eighth and Ninth Circuit opinions (as well as Schmidt) is fundamentally misleading as to the state of the law in this circuit (Jakks Mem. 28-29). First Capital did not, and could not, depart from long-established Second Circuit precedent regarding the requirements for an enterprise, and did not purport to do so. A panel of the Second Circuit is bound by a decision of a prior panel unless and until its rationale is overruled, implicitly or expressly, by the Supreme Court or the Second Circuit en banc. Leecan v. Lopes, 893 F.2d 1434, 1443 (2d Cir. 1990).

The relevant Second Circuit authorities, which were studiously ignored by Defendants, all derive from Turkette, which held that one element of proof is the existence of an "enterprise," which the Court defined as a "group of persons associated together for a common purpose of engaging in a course of conduct," proven by evidence of an ongoing organization, formal or

informal, and by evidence that the various associates function as a continuing unit. Id. at 583.

Apart from proving the existence of an enterprise, Turkette established that another element of

proof is a "connected 'pattern of racketeering activity,'" proven by evidence of the requisite

number of acts of racketeering committed by the participants in the enterprise. Id. In language

ignored by Defendants, Turkette acknowledged that the actual evidence proving the existence of

the enterprise and the racketeering acts "may in particular cases coalesce." Id. In a long line of

unbroken precedent since Turkette tracking that common sense notion, the Second Circuit

repeatedly has held that the proof of racketeering acts may be relied upon to establish the

existence of the enterprise and that an enterprise need not have independent economic

significance from the pattern of racketeering activity. See, e.g., United States v. Coonan, 938

F.2d 1553, 1560 (2d Cir. 1991) ("proof of various racketeering acts may be relied on to establish

the existence of the charged enterprise"); United States v. Ferguson, 758 F.2d 843, 853 (2d Cir.

1985) ("RICO . . . may be proven even when the enterprise and predicate acts are 'functionally

equivalent'"); Moss v. Morgan Stanley, Inc., 719 F.2d 5, 22 (2d Cir. 1983) (enterprise need not

have independent economic significance from the pattern of racketeering activity); Bagaric, 706

F.2d at 55 ("We have upheld application of RICO to situations where the enterprise was . . . no

more than the sum of the predicate racketeering acts."); United States v. Mazzei, 700 F.2d 85,

89-90 (2d Cir. 1983) (expressly rejecting Eighth Circuit view advanced by defendants that

evidence offered to prove the "enterprise" and "pattern of racketeering" must be distinct).

Defendants categorically ignored this controlling authority and completely failed to even attempt

to demonstrate inadequacy of the enterprise allegations measured against this controlling law.

First Capital, the sole Second Circuit authority cited by Defendants, did not in any way

purport to alter the long-standing law cited herein and even cited Coonan in its enterprise

analysis. First Capital, 385 F.3d at 174. Instead, First Capital applied the standard cited by WWE and determined that the complaint in that case provided no basis "to support the conclusion that the . . . constituent entities of the . . . enterprise were 'associated together for a common purpose of engaging in a course of conduct.'" Id. at 175. Nowhere in First Capital did the Second Circuit purport to adopt an "ascertainable structure" requirement. Simply put, Defendants' arguments contort the requirement that a plaintiff must prove two elements—an enterprise and a connected pattern of racketeering—into an evidentiary limitation on how one does so operative at the pleading phase. No such limitation on the evidence which proves or adequately pleads enterprise exists under Second Circuit law.

Second, the argument that facts must be alleged showing that the enterprise has "some other purpose" other than engaging in racketeering activity in furtherance of a common purpose and goal is again quite simply wrong. Indeed, that precise issue was squarely decided by Turkette. In Turkette, the First Circuit had vacated a criminal conviction of an enterprise engaged solely in criminal activity, finding that RICO did not reach participation in an association which performs only illegal acts. Id. at 580. The Supreme Court reversed, clearly holding that a group of individuals with an "exclusively criminal" purpose is covered. Id. at 581.

Third, the argument that an association-in-fact engaged principally in racketeering activity is somehow exempt from RICO unless it has some "other purpose" or "other structure" also ignores not only the foregoing law, but equally well-established law treating such an enterprise harshly, especially when engaged in "inherently unlawful activities." Where the enterprise is engaged primarily in inherently unlawful activity, Second Circuit law holds that both enterprise and pattern requirements are met. See Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 242-43 (2d Cir. 1999) (emphasis added); GICC Capital Corp. v. Tech.

Fin. Group, Inc., 67 F.3d 463, 466 (2nd Cir. 1995) (["A]n inherently unlawful act performed at

the behest of an enterprise whose business is racketeering activity . . . automatically gives rise to

the requisite threat of continuity."); United States v. Aulicino, 44 F.3d 1102, 1111-12 (2d Cir.

1995). Under this branch of RICO law, bribery and money laundering, both of which are alleged

here (AC ¶ 249(b)(i)-(lxxxviii), (e)(i-xiii)), are regarded as inherently unlawful. See United

States v. Coiro, 922 F.2d 1008, 1017 (2d Cir. 1991); Metro. Transp. Auth. v. Contini, No. 04-

CV-0104 DGTJMA, 2005 WL 1565524, at *4 (E.D.N.Y. July 6, 2005).

Fourth, Defendants' arguments that the Amended Complaint lacks sufficient allegations

about the hierarchy or organization of the enterprise:  (i) ignores the highly specific factual

allegations of the Amended Complaint; and (ii) overstates the function of such evidence at this

stage and what such evidence ultimately is designed to prove.  All notions of hierarchy,

organization and activities are satisfied by information that shows its members functioned as a

unit.  First Capital, 385 F.3d at 173.

### C.    The Amended Complaint Adequately Pleads the Existence of an Enterprise

Judged against the foregoing authorities, the Amended Complaint plainly alleges the sine

qua non of enterprise—facts showing that the Defendants named as members associated together

for a common purpose of engaging in a course of conduct and functioned as a continuing unit.

Indeed, no Defendant has even presented an argument that it does not under controlling Second

Circuit law.  Instead, by reliance on cases decidedly not the law in this circuit, Defendants hoped

to construct enterprise requirements which do not exist, and which have been actually rejected in

this circuit, to attack the sufficiency of the enterprise allegations.  In any event, the Amended

Complaint lays out in chapter and verse detailed specifics of the hierarchy, organization, roles

and highly coordinated actions of each member for the shared purpose of obtaining licensing

rights by criminal acts and the distribution of the proceeds of the crimes. The actions set forth therein were not independent acts of fraud being done by the members for their own individual purposes, as was the case in First Capital, or unrelated activities of persons having no demonstrable connection to each other, as was the case in Bank v. Brooklyn Law School, the two cases cited by the Jakks Defendants that dismiss suits on enterprise grounds. Those cases do no more than implement the Supreme Court's dividing line for enterprise liability—the defendants in those cases were conducting "their own affairs" and not affairs of the enterprise. See Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 163 (2001).

The "means and methods" of the members showing their pursuit of a shared and common purpose are spelled out in exacting detail (AC ¶¶ 29-241, 249). The dates and methods by which Jakks and its high ranking officers initially corrupted Shenker to have him do their bidding on licensing matters is plead (AC ¶¶ 37-56). Their utilization of Shenker to corruptly serve Jakks' interests on various toy licensing matters is set forth in great detail (AC ¶¶ 57-71). Their utilization of Shenker to enlist Bell and pay bribes to Bell to be a dishonest servant is plead (AC ¶¶ 79-82, 91-97). The decision to use Shenker's and Bell's corrupt services to drive a competitor out of the toy business and secure videogame rights is spelled out (AC ¶¶ 100-17, 129-37). The flow of money for doing so, and the manner in which members structured payments to conceal them is spelled out in damning allegations proving the wisdom of both the maxim of "follow the money" and the "common sense" notion that the existence of an enterprise can be, and is, proven by an examination of the predicate acts and how they were committed.[12] Not once, but three times, Jakks and its officers used foreign subsidiaries to launder bribes to Shenker after he

---

[12]    See Coonan, 938 F.2d at 1559 ("[c]ommon sense suggests that the existence of an association-in-fact is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure.") (emphasis added).

delivered phony invoices to Jakks. The payments were all made through foreign bank accounts

in transactions deliberately structured to be undetectable and not recorded on the records of

Jakks, and then all involved lied about it thereafter (AC ¶¶ 94-99, 111-13, 167-69, 197-219).

Once Jakks' foreign subsidiaries put monies into Shenker's foreign accounts, Shenker obtained

undetectable bank checks from his foreign bank to split the money in half with Bell, doing so at

exactly the same time Jakks was seeking favorable treatment on different licensing matters (AC

¶¶ 80-82, 90-97, 107-14). To further his true master's goals, Shenker further promised Bell he

would split, and then did split, commissions with Bell for his assistance in steering the

videogame license in the manner desired by Jakks (AC ¶¶ 81, 249(b)(xi)-(xxvii)).

When THQ initially independently determined to bid on the videogame license, it was

told by Jakks executives that they were in control of that license and that THQ would have to pay

Jakks to get in on the license (AC ¶ 137). THQ, which was in desperate condition at the time,

and with knowledge of or reckless indifference to the illegal activities, joined into the enterprise,

and became an integral part in the fraud (AC ¶¶ 118-26, 140-44, 154-64). It not only agreed to

join in and to perform the license; it paid handsome remuneration to Friedman, the head of Jakks,

for his role in brokering the deal (AC ¶ 166) and agreed to engage in acts constituting money

laundering of the fruits of the crime, including subsequent payments to Jakks of over

$64,000,000 (AC ¶ 184). THQ/Jakks, for its part, takes the knowledge of its incorporators as a

matter of law.[13] THQ/Jakks was clearly an integral part in the racketeering activity, as it

executed the license on behalf of Jakks and THQ, then agreed to several related agreements

regarding the manner in which the license would be performed and the money laundered from

---

[13]    Mallis v. Bankers Trust Co., 717 F.2d 683, 689 n.9 (2d Cir. 1983) ("It is a basic tenet of the law
of agency that the knowledge of an agent, or for that matter a partner or joint venturer, is imputed to the
principal."); 131 Main St. Assocs. v. Manko, 897 F. Supp. 1507, 1533-34 (S.D.N.Y. 1995) (partnership
liability concepts apply in the civil RICO context).

the illegal activity (AC ¶¶ 154, 174-82).

The foregoing, which is but a small glimpse of the coordinated and highly directed actions of the members of the enterprise set forth in exacting detail in the Amended Complaint, is more than sufficient to prove the "existence" of an enterprise under the applicable standard of the Second Circuit. The allegations plainly show the members functioning as a continuing unit to further a common purpose. If such facts are admissible to prove the existence of the enterprise at trial, and the law clearly holds to that effect, then those same facts are plainly also sufficient to plead the existence of an enterprise at this stage.

### D.    The Allegations Against THQ and THQ/Jakks Satisfy the Low Bar for the "Operation and Management" Test

Contrary to THQ's and THQ/Jakks' arguments, the "operation and management" test is not a stringent or heightened pleading requirement, and could not be without running afoul of the Supreme Court's admonition that such requirements do not exist. Indeed, the Second Circuit in First Capital, cited extensively by Defendants for their other enterprise argument, expressly noted that "[i]n this Circuit, the 'operation or management' test typically has proven to be a relatively low hurdle for plaintiff to clear . . . especially at the pleading stage." First Capital, 385 F.3d at 176. The proof required at trial is only that a defendant played "some part in directing [the enterprise's] affairs," id., and the express purpose of the test is not to construct insuperable pleading requirements but to ensure the proof establishes that a defendant had "sufficient connection to the enterprise to warrant imposing liability." Contini, 2005 WL 1565524, at *4. A complaint is sufficient at the pleading phase if it charges a defendant with being in charge of certain aspects of the enterprise, or that a member is a lower rung participant under the direction of upper management, or that a defendant directed at least part of the scheme, such as money laundering. See id. at *4-5. As discussed above, the Amended Complaint plainly makes such

- 22 -

allegations against THQ and THQ/Jakks (AC ¶ 249(b)(xxviii)-(lxviii)).

Furthermore, THQ's and THQ/Jakks' argument that neither were involved in the operation and management of the enterprise because they arrived on the scene after a few of the bribes were paid not only fails to take into account the pleaded circumstances of their involvement; their integral roles in the culmination and implementation of the scheme; and their ensuing money laundering, but is irrelevant under the law in any event. For RICO liability to attach, "participation in a series of transactions does not require participation in each transaction." United States v. Teitler, 802 F.2d 606, 615 (2d Cir. 1986). Thus, all that is required at the pleading phase regarding the operation and management aspect are allegations that the defendant was in charge of certain aspects of the enterprise. Contini, 2005 WL 1565524, at *4-5. There is no requirement that the members of an enterprise must participate throughout the life of the enterprise. United States v. Hewes, 729 F.2d 1302, 1310-11 (11th Cir. 1984), cert. denied, 469 U.S. 110 (1985); Feldman, 853 F.2d at 659; Zito v. Leasecomm Corp., No. 02 Civ.8074 GEL, 2004 WL 2211650, at *9 (S.D.N.Y. Sept. 30, 2004) ("It is common place in RICO enterprises for the members . . . to engage in separate schemes or conspiracies, not all of which involve all of the participants in the enterprise.").

Finally, the Amended Complaint alleges that both THQ and THQ/Jakks knew of or were recklessly indifferent to the prior unlawful activity at the time they joined into it (AC ¶¶ 143, 154). Their denials of knowledge about the antecedent behavior of Jakks is a factual issue which cannot be resolved on a motion to dismiss. The scienter element is satisfied at the pleading phase by facts showing both a motive for committing fraud and a clear opportunity to do so. See, e.g., State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C., 375 F. Supp. 2d 141, 154 (E.D.N.Y. 2005); Nafta v. Feniks Int'l House of Trade (U.S.A.) Inc., 932 F. Supp. 422, 430

(E.D.N.Y. 1996). The Amended Complaint does both (AC ¶¶ 118-26, 137-49, 154-64).[14]

## III.    WWE HAS STATED A CLAIM UNDER THE ROBINSON-PATMAN ACT

Count VI of the Amended Complaint asserts a claim against Defendants THQ/Jakks, Jakks, THQ, Friedman, Berman, and Bennett (the "RPA Defendants") for violation of section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c) (2000) ("RPA"), specifically alleging the payment of at least $100,000 in commercial bribes to WWE's fiduciaries on WWE licensing matters (AC ¶¶ 296-302). WWE has specifically alleged damages exceeding one hundred million dollars caused by the bribes (AC ¶ 163).

The RPA Defendants first assert it is "doubtful" that the RPA prohibits commercial bribery. Second, they contend that the prohibitions of the RPA extend only to payments in connection with "goods, wares, or merchandise" and do not cover bribes paid for intellectual property licenses. Finally, they contend that the injury to WWE is a speculative injury and not the type of "antitrust injury" contemplated by the RPA. The RPA Defendants' arguments are without merit and should be rejected.

### A.    Section 2(c) of the RPA Proscribes Commercial Bribery

The RPA was enacted in 1936 to broaden the scope of section 2 of the Clayton Act and did so by adding sections 2(c), (d), and (e), targeting three additional unfair trade practices. See Oliver Bros. v. Fed. Trade Comm'n, 102 F.2d 763, 767 (4th Cir. 1939). In relevant part, section

---

[14]    All Defendants also seem to think that the RICO conspiracy charge must fail if the substantive RICO count is defective, which it is not. Once again, however, Defendants are wrong. There are legions of cases where people have been even criminally convicted of only a RICO conspiracy. See, e.g., Salinas v. United States, 522 U.S. 52, 63 (1977) (RICO conspiracy conviction upheld where defendant acquitted of substantive RICO violations); State Farm Mut. Auto. Ins. Co., 375 F. Supp. 2d at 50-51. Indeed, First Capital, relied upon by Defendants, explicitly states that the requirements for a RICO conspiracy are even less demanding and points out that all that is required is that the conspirator must intend to further an endeavor which if completed, would satisfy all the elements of a substantive offense, but it suffices that they adopt the goal of furthering or facilitating the endeavor. First Capital, 385 F.3d at 178.

2(c) provides:

> It shall be unlawful for any person . . . to pay . . . anything of value as . . .
> compensation . . ., except for services rendered in connection with the sale
> or purchase of goods, wares, or merchandise, . . . to an agent . . . of any
> party . . . other than the person by whom such compensation is so . . . paid.

15 U.S.C. § 13(c).

The RPA Defendants begin their argument by pointing out that the catalyst for the

enactment of section 2(c) was the price discrimination caused by "dummy" brokerage fees,

thereby suggesting that the statute is limited to that specific abuse. However, statutes written in

broad sweeping language are to be given broad sweeping application, regardless of the alleged

reasons for enacting the statute. See New York v. Fed. Energy Regulatory Comm'n, 535 U.S. 1,

20-21 (2002) (where Congress uses broad language, evidence of a specific catalyzing force for

the enactment does not define the outer limits of the statute's coverage); PGA Tour, Inc. v.

Martin, 532 U.S. 661, 689 (2001) ("[T]he fact that a statute can be applied in situations not

expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth.").

Consistent with these principles, the Supreme Court held in 1959 that: (i) section 2(c)

"unqualifiedly" makes certain business practices other than price discrimination unlawful; (ii)

the "proscription" of section 2(c) is "absolute"; and (iii) section 2(c) has no "built-in defensive

matter." Fed. Trade Comm'n v. Simplicity Pattern Co., 360 U.S. 55, 65 (1959) (emphasis

added). One year later, the Supreme Court further amplified in dicta the types of business

practices other than price discrimination made "unqualifiedly" unlawful, stating that "§ 2(c) was

intended to proscribe . . . the 'bribing' of a seller's broker by the buyer." Fed. Trade Comm'n v.

Henry Broch & Co., 363 U.S. 166, 169 n.6 (1960) (emphasis added). Subsequently, numerous

courts have noted that the broader goal of Congress in enacting the RPA was to protect the

fiduciary relationship of an agent to his or her principal in order to promote fairness and foster

- 25 -

confidence in the marketplace. See. e.g., Stephen Jay Photo., Ltd. v. Olan Mills, Inc., 903 F.2d

988, 992 (4th Cir. 1990); In Town Hotels Ltd. P'ship v. Marriott Int'l, 246 F. Supp. 2d 469, 480

(S.D. W.Va. 2003); Gregoris Motors v. Nissan Motor Corp., 630 F. Supp. 902, 910 (E.D.N.Y.

1986) ("harm to a fiduciary relationship and preferential treatment are recognized bases for a §

2(c) cause of action"). Therefore, because a "major concern of Congress in promulgating section

2(c) was protection of the fiduciary relationship between a broker and his client," Municipality

of Anchorage v. Hitachi Cable, Ltd., 547 F. Supp. 633, 640 (D. Alaska 1982), Congress sought

"to prohibit commercial bribery that tended to undermine the fiduciary relationship." Edison

Elec. Inst. v. Henwood, 832 F. Supp. 413, 418-19 (D.D.C. 1993).

Although stating it is "doubtful" that the RPA prohibits commercial bribery, the RPA

Defendants cite no case from any court actually holding that it does not.[15] It appears that no

court has ever held that commercial bribery is not actionable under the RPA. Although the

Second Circuit has reserved decision on the issue,[16] the Supreme Court, four Courts of Appeals,

and numerous district courts, including this district, have indicated or held that section 2(c)

proscribes commercial bribery. See, e.g., Henry Broch & Co., 363 U.S. at 169 n.6; 2660

Woodley Rd. Joint Venture, 369 F.3d at 737-38; Harris v. Duty Free Shoppers Ltd. P'ship, 940

F.2d 1272, 1274 n.3 (9th Cir. 1991); Grace v. E.J. Kozin Co., 538 F.2d 170, 173 (7th Cir. 1976);

Fitch v. Ky.-Tenn. Light & Power, 136 F.2d 12, 15-16 (6th Cir. 1943); Philip Morris, Inc. v.

---

[15]     The RPA Defendants cite Seaboard Supply, a Third Circuit case from 1985, for the proposition
that it is "doubtful" that commercial bribery is actionable under section 2(c) (Jakks Mem. 11 n.3). But in
2660 Woodley Rd. Joint Venture, which the Jakks Defendants themselves cite (Jakks Mem. 15), the Third
Circuit stated: "Although we once expressed skepticism about 'whether Congress intended to sweep
commercial bribery within the ambit of §2(c),' Seaboard Supply, 770 F.2d at 371, we have since agreed
that 'commercial bribery is actionable under 2(c).' Envtl. Tectonics [v. W.S. Kirkpatrick, Inc.,] 847 F.2d
[1052] at 1066." 2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp., 369 F.3d 732, 738 (3d Cir.
2004).

[16]     See Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d
212, 221 (2d Cir. 2004).

Grinnell Lithographic Co., 67 F. Supp. 2d 126, 130-31 (E.D.N.Y. 1999); Hansel 'N Gretel

Brand, Inc. v. Savitsky, 1997 WL 543088, at *7; Edison Elec. Inst., 832 F. Supp. at 418;

Gregoris Motors, 630 F. Supp. at 910.

### B. The Prohibition of Section 2(c) Is Not Limited to Transactions Involving "Goods, Wares, or Merchandise"

When interpreting a statute, the "first step . . . is to determine whether the language at

issue has a plain and unambiguous meaning." Robinson v. Shell Oil Co., 519 U.S. 337, 340

(1997). The plain meaning of a statute "will typically heed the commands of its punctuation."

United States Nat'l Bank of Or. v. Indep. Ins. Agents of Am., 508 U.S. 439, 454 (1993). When

the statutory language is unambiguous, "judicial inquiry is complete, except in 'rare and

exceptional circumstances'" when there is "only the most extraordinary showing" of "clearly

expressed legislative intent to the contrary." Burlington N. R.R. Co. v. Okla. Tax Comm'n, 481

U.S. 454, 461 (1987); Garcia v. United States, 469 U.S. 70, 75 (1984).

As Judge Roberts, now nominated to be the Chief Justice, observed last year:

> [T]he Supreme Court reiterated as recently as this past Term that
> resort to legislative history is not appropriate in construing plain
> statutory language. "[W]hen the statute's language is plain, the
> sole function of the courts—at least where the disposition required
> by the text is not absurd—is to enforce it according to its terms."
> Lamie v. United States Tr., 540 U.S. 526, 124 S.Ct. 1023, 1030,
> 157 L.Ed.2d 1024 (2004) (quoting Hartford Underwriters Ins. Co.
> v. Union Planters Bank, N.A., 530 U.S. 1, 6, 120 S.Ct. 1942, 1947,
> 147 L.Ed.2d 1 (2000)); see also Ratzlaf v. United States, 510 U.S.
> 135, 147-48, 114 S.Ct. 655, 662-63, 126 L.Ed.2d 615 (1994)
> (courts should "not resort to legislative history to cloud a statutory
> text that is clear"); Davis v. Mich. Dep't of Treasury, 489 U.S.
> 803, 808-09, n.3, 109 S.Ct. 1500, 1504-05 n.3, 103 L.Ed.2d 891
> (1989) ("Legislative history is irrelevant to the interpretation of an
> unambiguous statute.").

United States ex rel. Totten v. Bombardier Corp., 380 F.3d 488, 494 (D.C. Cir. 2004).

Aside from these general canons of construction, the Supreme Court has instructed that

the RPA is remedial legislation to be construed broadly, with its exceptions construed strictly.

Abbott Labs. v. Portland Retail Druggists Ass'n, 425 U.S. 1, 12 (1976).  As discussed more fully

below, the plain language of section 2(c) reveals that the statute is a straightforward, broad

prohibition with a narrow exception contained entirely within a parenthetical clause.  The

exception clause, not the prohibition, contains the "goods, wares, or merchandise" language.

The general prohibition makes it unlawful to "pay . . . anything of value as . . . compensation . . .

to an agent . . . where such intermediary is acting . . . for . . . any party . . . other than the person

by whom such compensation is so . . . paid."  15 U.S.C. § 13(c).

      1.    **The Plain and Unambiguous Meaning of Section 2(c) Establishes That the "Goods, Wares, or Merchandise" Language Does Not Limit the Prohibition of Section 2(c) but Rather Is Part of the "Services Rendered" Exception Only**

The plain language of section 2(c) has been diagrammed by the Second Circuit as

follows:

> It is unlawful for any person to
> (1) pay (or receive)-
> a. anything of value as a commission, brokerage, or
> other compensation, *or*
> b. any allowance or discount in lieu of brokerage,
> *except* for services rendered in connection with a
> sale or purchase of goods,
> (2) when the payment is made to (or by)
> a. the other party to the transaction, or
> b. an agent, representative or other intermediary
> where the intermediary is
> (i) acting for or in behalf of, or
> (ii) subject to the direct or indirect control of
> any party to the transaction other than the person
> by whom the compensation is paid.

See Blue Tree Hotels, 369 F.3d at 218.  As this diagram illustrates, Congress placed the phrase

"in connection with the sale or purchase of goods, wares, or merchandise" immediately

following the phrase "except for services rendered" and did not separate the two phrases by any

punctuation. Given that commands of punctuation are to guide interpretation, as well as the

plain language of the statute, the phrase "in connection with the sale or purchase of goods, wares,

or merchandise" in section 2(c) is part of the "services rendered" exception and is not a

limitation on the broadly worded prohibition of section 2(c).

This interpretation is also consistent with the earliest opinion addressing section 2(c) by

the Second Circuit. In Biddle Purchasing Co. v. Federal Trade Commission, 96 F.2d 687 (2d

Cir. 1938), the Second Circuit described the clear purpose of section 2(c) as follows:

> The report of the House and Senate Conference Committee,
> submitted in referring the bill in its present form, interprets the
> section as having this meaning[:]
>
> 'This subsection permits the payment of compensation by a seller
> to his broker or agent for services actually rendered in his behalf;
> likewise by a buyer to his broker or agent for services in
> connection with the purchase of goods actually rendered in his
> behalf; but it prohibits the direct or indirect payment of brokerage
> except for such services rendered. . . . .' House Rep., 2951, 74th
> Congress, 2d Session.

Id. at 691 & n.1. Thus, in Biddle, the Second Circuit recognized that the phrase "in connection

with the sale or purchase of goods, wares, or merchandise" is only a part of the "services

rendered" exception.

Following Biddle, the Eighth Circuit also recognized that:

> It is also apparent that the terminology 'goods, wares, or
> merchandise' in the statute may merely modify the 'services
> rendered' exception and therefore constitute only an element to be
> determined when a defendant contends that the concession was
> made in exchange for services rendered.

Ideal Plumbing Co. v. Benco, Inc., 529 F.2d 972, 978 n.6 (8th Cir. 1976). More recently, and as

noted, the Second Circuit diagrammed section 2(c) consistently with the readings of Biddle and

Ideal Plumbing. See Blue Tree Hotels, 369 F.3d at 218.[17] Such an interpretation is fully consistent with the Supreme Court's clear instruction that the antitrust laws, and the RPA in particular, are to be construed "liberally" and "broadly" and its exceptions construed "strictly." See Abbott, 425 U.S. at 12. Conversely, if, as the RPA Defendants contend, the limiting clause "in connection with the sale or purchase of goods, wares, or merchandise" is applied to the prohibition of section 2(c) as a whole, rather than just to the "services rendered" exception, the prohibition of section 2(c) would be construed narrowly, not "liberally" and "broadly," as the Supreme Court has stated should be done. In turn, the "services rendered" exception would be construed broadly, in direct defiance of the mandate of Abbott that the exceptions should be construed "strictly." Therefore, the RPA Defendants' proposed interpretation turns the Supreme Court's mandate on its head and should be rejected.

### 2.    The Cases Relied upon by the RPA Defendants Are Not Instructive and Should Not Be Followed

Although the RPA Defendants cite to several non-binding cases to support their argument that the prohibition of section 2(c) is limited to transactions involving "goods, wares, or merchandise," a review of those cases reveals that none is instructive here. First, the only opinion of the Second Circuit which Defendants suggest as "holding" that section 2(c) does not apply to sales of intangible property or services (Jakks Mem. 11) contains only dicta with respect to section 2(c). The plaintiff's complaint in Gordon v. New York Stock Exchange, Inc., 498 F.2d 1303 (2d Cir. 1974), alleged a price discrimination claim under section 2(a) of RPA. Id. at

---

[17]    Although a few of the non-binding cases cited by the RPA Defendants note some references in the legislative history to a "goods, wares, or merchandise" limitation to the prohibition of section 2(c) as a whole, the analysis of the legislative history contained in Biddle and Ideal Plumbing demonstrates that it supports the view that the "goods, wares, or merchandise" language applies only to the "services rendered" exception and not to the prohibition of section 2(c) as a whole. Therefore, this interpretation based on the plain and unambiguous meaning of the language of section 2(c) is conclusive because the required "extraordinary showing" of "clearly expressed legislative intent to the contrary" is absent.

1304. When the plaintiff attempted to raise on appeal a section 2(c) claim, the Court of Appeals "decline[d] to entertain the claim because it was not raised in the district court . . . ." Id. at 1305 n.7.

Second, five of the cases upon which the RPA Defendants rely do not even deal with section 2(c) of the RPA but instead address section 2(a).[18] Because the Supreme Court has stated that section 2(c) should be read independently of section 2(a), these cases are inapplicable. See Henry Broch & Co., 363 U.S. at 170-71; Oliver Bros., 102 F.2d at 767 ("no reason suggests itself why the limitations and provisions relating to one [section] should be read into those relating to the other").

Third, four of the cases cited by the RPA Defendants, including two noted above that do not even address section 2(c), were decided before Abbott and thus predate the Supreme Court mandate that the RPA is to be construed broadly and its exceptions construed strictly. See Freeman v. Chicago Title & Trust Co., 505 F.2d 527, 529-30 (7th Cir. 1974); Gordon, 498 F.2d at 1305 n.7; Record Club, 1971 WL 558; La Salle St. Press, 293 F. Supp. 1004. Although the remaining four cases upon which the RPA Defendants rely, excluding three noted above that do not even address section 2(c), were decided after Abbott, those cases fail to even mention Abbott and thus do not apply the Supreme Court mandate that the RPA is to be construed broadly and its exceptions construed strictly.

Notably, the court in Freeman, a leading case relied upon by the RPA Defendants, admits that it actually had to repunctuate the statute to achieve its interpretation of the statute. Such

---

[18]    See Innomed Labs, LLC v. ALZA Corp., 368 F.3d 148 (2d Cir. 2004); Goodloe v. Nat'l Wholesale Co., No. 03 C 7176, 2004 WL 1631728 (N.D. Ill. July 19, 2004); Empire State Pharm. Soc'y, Inc. v. Empire Blue Cross & Blue Shield, 778 F. Supp. 1253 (S.D.N.Y. 1991); Record Club of Am., Inc. v. Capitol Records, Inc., No. 70 Civ. 3315, 1971 WL 558 (S.D.N.Y. Sept. 8, 1971); La Salle St. Press, Inc. v. McCormick & Henderson, Inc., 293 F. Supp. 1004 (N.D. Ill. 1968).

repunctuation is at odds with traditional canons of statutory construction and the subsequent guidance of the Supreme Court in Abbott. See United States Nat'l Bank of Or., 508 U.S. at 454 (the plain meaning of a statute "will typically heed the commands of its punctuation").

In sum, the cases relied upon by the RPA Defendants to limit the prohibition of section 2(c) to transactions involving "goods, wares, or merchandise" are contrary to the plain and unambiguous meaning of the statutory language, effectively require judicial repunctuation of the statute, and predate or ignore the Supreme Court's mandate that the RPA is to be construed liberally and broadly and its exceptions construed strictly. This Court, therefore, should apply the plain and unambiguous meaning of the language of section 2(c). The only conclusion possible from doing so is that section 2(c) prohibits commercial bribery, period. See Phillip Morris, Inc. v. Grinnell Lithographic Co., 67 F. Supp. 2d at 128 (applying section 2(c) to a case of commercial bribery in the sale of lithographic printing services).

### C.    The Amended Complaint Adequately Alleges an Antitrust Injury

An antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977). To allege an antitrust injury, a plaintiff must show: "(1) an injury-in-fact; (2) that has been caused by the violation; and (3) that is the type of injury contemplated by the statute." Blue Tree Hotels, 369 F.3d at 220. The Amended Complaint's allegations demonstrate that WWE suffered such an antitrust injury.

### 1.    The Amended Complaint Alleges Detailed and Concrete Injuries

The Amended Complaint describes the actual injuries sustained by WWE in extraordinary detail and more than satisfies the notice pleading standards. The Amended Complaint alleges that the commercial bribery corrupted WWE's fiduciary relationships and resulted in preferential treatment being accorded to the RPA Defendants in connection with

- 32 -

WWE licensing matters (See, e.g., AC ¶¶ 81-82, 104, 116, 147). The Amended Complaint

further alleges that, as a direct result of the commercial bribery and the corruption of WWE's

agents, WWE received 50%-66% lower royalty rates for the videogame license than the 19%-

22% it would have received in a competitive situation, a differential projecting to over a hundred

million dollars over the term of the license (AC ¶¶ 160-63). The Amended Complaint also

plainly alleges that the commercial bribery resulted in WWE's agents recommending lengthy

extensions to two toy licenses held by Jakks, as well as steering license rights away from

Playmates and to Jakks, which had the effect of denying WWE $376,391.64, plus royalties over

and above this amount (AC ¶¶ 81-83, 165). Such concrete and detailed allegations of both injury

in fact and quantum of damages are not "rank speculation" and more than satisfy the applicable

liberal notice pleading standard. See, e.g., In Town Hotels, 246 F. Supp. 2d at 480-81 (finding

antitrust injury adequately alleged where plaintiffs alleged that their agency relationship was

corrupted by the defendant's commercial bribery and that they suffered resulting injuries of the

type typically caused by commercial bribery).[19]

### 2. The Corruption of WWE's Fiduciary Relationships and the Substantial Damages WWE Incurred Are Injuries Contemplated by Section 2(c)

As previously established, Congress sought to prevent corruption of the fiduciary

---

[19]    The RPA Defendants rely on three non-binding cases that are patently inapposite. Both
Maddaloni Jewelers and Hygrade Milk address the antitrust injury requirement in the context of a motion
for summary judgment, not a motion to dismiss; additionally, neither involved a section 2(c) claim. See
Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc., 354 F. Supp. 2d 293, 296 (S.D.N.Y. 2004);
Hygrade Milk & Cream Co. v. Tropicana Prods., Inc., No. 88 Civ. 2861 (SAS), 1996 WL 257581, at *1
(S.D.N.Y. May 16, 1996). Furthermore, both cases explicitly recognized that even in the context of a
motion for summary judgment, a plaintiff in an antitrust case faces a relaxed standard of proof when
establishing injury and "need not provide 'the kind of concrete, detailed proof of injury which is available
in [non-antitrust] contexts'"). Hygrade Milk, 1996 WL 257581, at *16-17; Maddaloni Jewelers, 354 F.
Supp. 2d at 308. Further, 2660 Woodley Road Joint Venture involved an appeal from a final judgment
and did not address antitrust injury in the context of a motion to dismiss, as is the case here. See 2660
Woodley Rd. Joint Venture, 369 F.3d at 735. Therefore, these cases are inapposite.

relationship "to protect those who deal in the streams of commerce against breaches of faith in its

relations of trust" and "to foster confidence in its processes and promote its wholesomeness and

volume." See, e.g., Stephen Jay Photo., 903 F.2d at 992. As a result, "the antitrust injury

standing requirement is met when a plaintiff alleges an injury flowing from 'the corruption of an

agency relationship.'" In Town Hotels, 246 F. Supp. 2d at 480. "[N]on-price injuries, including

harm to a fiduciary relationship and preferential treatment, are recognized bases for a § 2(c)

cause of action." Gregoris Motors, 630 F. Supp. at 910; see also Calnetics Corp. v. Volkswagen

of Am., Inc., 532 F.2d 674, 696 (9th Cir. 1976) (claimants who are able to prove that defendants

committed acts of commercial bribery ought to be able to recover any damages proximately

caused thereby); Edison Elec. Inst., 832 F. Supp. at 418-19 (antitrust injury adequately alleged

because Congress sought "to prohibit commercial bribery that tended to undermine the fiduciary

relationship between a buyer and its agent,"); Municipality of Anchorage, 547 F. Supp. at 640

(the scope of standing to sue under RPA must be expanded to include those who are injured by

the destruction of fiduciary obligations). Thus, the allegations of the Amended Complaint

describing the RPA Defendants' corruption of the fiduciary relationship between WWE and its

agents and the resulting preferential treatment also adequately describe an antitrust injury.

    Additionally, damages resulting from the anticompetitive effects of commercial bribery

are clearly the type of injuries that section 2(c) sought to prevent and which flow "from that

which makes the defendants' acts unlawful." Brunswick, 429 U.S. at 489. "Commercial bribery

is by its very nature anticompetitive." Philip Morris, Inc. v. Grinnell Lithographic Co., 67 F.

Supp. 2d at 128 ("the sole purpose of the practice is to circumvent competitive forces in

obtaining a contract"). Because the sale price is insulated from the normal operation of the

marketplace, the seller is prevented from realizing its market rate of profit in the bribery-tainted

transaction, and has suffered an antitrust injury. See Grace, 538 F.2d at 174 ("The presence of

the kickback effectively precluded the realization of [plaintiff's] maximum profit potential, so

the fact of damage was adequately established."); Fitch, 136 F.2d at 16 ("the payment of secret

commissions to [the plaintiff's agent] was an unfair trade practice, and obviously resulted in

lessening competition in the sale of coal to the [plaintiff]").[20]  One of the purposes of the antitrust

laws is to protect sellers, like WWE, from being deprived of a competitive price through a

buyer's anticompetitive conduct. See Mandeville Island Farms v. Am. Crystal Sugar Co., 334

U.S. 219, 235 (1948).

WWE's injury—the loss of a competitive return on its intellectual property used by the

RPA Defendants to sell toys and games—flows directly from the restraint on competition among

potential buyers which was created by the RPA Defendants' corruption of the agency

relationship. Thus, WWE has clearly alleged an injury in fact caused by a violation of the type

which section 2(c) was intended to prevent. Therefore, all of the antitrust injury requirements set

forth in Brunswick and Blue Tree have been satisfied.

## CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss the Amended Complaint on

the grounds addressed herein should be denied in all respects.

---

[20]    See also SmithKline Beecham Corp. v. E. Applicators, Inc., No. CIV.A. 99-CV-6552, 2002 WL
1197763, at *7 (E.D. Pa. May 24, 2002) (antitrust injury in Sherman Act claim sufficiently established
where the plaintiff had alleged that "a lower bid would have been submitted in the absence of the
defendants' concerted action" of bid rigging, and that this was an injury "within the concern of Congress"
under the antitrust statutes); Philip Morris Inc. v. Heinrich, No. 95 CIV. 0328 (LMM), 1996 WL 363156,
at *9 (S.D.N.Y. June 28, 1996) (commercial bribery combined with a bid rigging scheme is "precisely the
type of conduct the Sherman Act prohibits").

Respectfully submitted,

By: Jerry S. McDevitt
Curtis B. Krasik
Amy L. Barrette
535 Smithfield Street
Pittsburgh, Pennsylvania 15222
(412) 355-6500 (phone)
(412) 355-6501 (fax)

William O. Purcell (WP 5001)
599 Lexington Avenue
New York, New York 10022-6030
(212) 536-3900 (phone)
(212) 536-3901 (fax)

KIRKPATRICK & LOCKHART NICHOLSON
GRAHAM LLP

Dated:  September 19, 2005                Attorneys for Plaintiff, World Wrestling
                                          Entertainment, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of World Wrestling Entertainment, Inc.'s

Memorandum of Law in Opposition to Defendants' Motions to Dismiss was served on the

following counsel of record via electronic mail service and first-class U.S. mail, postage prepaid:

this 19th day of September, 2005:

John R. Williams
Williams & Pattis, LLC
51 Elm Street, Suite 409
New Haven, CT 06510

Michael A. Cornman
Schweitzer Cornman Gross & Bondell, LLP
292 Madison Avenue
New York, NY 10017

Steven A. Marenberg
Irell & Manella, LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067-4276

Steven M. Bierman
Sidley Austin Brown & Wood
787 Seventh Avenue
New York, NY 10019

Michael A. Freeman
24 West 40th Street
17th Floor
New York, NY 10018

Jonathan J. Lerner
Skadden, Arps, Slate, Meagher &
    Flom, LLP
Four Times Square
New York, NY 10036-6522

Murray L. Skala
Feder, Kaszovitz, Isaacson, Weber,
    Skala, Bass & Rhine, LLP
750 Lexington Avenue
New York, NY 10022-1200

Richard Schaeffer
Dornbush Schaeffer Stongin &
    Weinstein, LLP
747 Third Avenue
New York, NY 10017

_____
Jerry S. McDevitt