Westlaw.

Not Reported in A.2d  
Not Reported in A.2d, 2003 WL 21977974 (Conn.Super.)  
(Cite as: Not Reported in A.2d)

Page 1

**H**  
Not Reported in A.2d, 2003 WL 21977974 (Conn.Super.)  
Only the Westlaw citation is currently available.  
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.  
Superior Court of Connecticut,Judicial District of New London.  
BENVENUTI OIL COMPANY, INC.,  
v.  
FOSS CONSULTANTS, INC. et al.  
No. 01559862.

Aug. 1, 2003.

Bartinik Gianacoplos Bartinik Barti, Groton, for Benvenuti Oil Company Inc.  
Suisman Shapiro Wool Brennan Gray, New London, for Foss Consultants Inc., John Spinogatti, Felicia Spinogatti and Jon Spinogatti.

CORRADINO, J.  
*1 This matter was tried before the court for several days and testimony was received from over ten witnesses. The court will give a brief summary of the facts which will be referred to in more detail as the legal issues are discussed.

The plaintiff Benvenuti Oil Company sells oil to customers in an area of Eastern Connecticut. Its customers lie in a radius of approximately thirty miles. Mr. Mazzella who runs the company had a real interest in expanding the operations of his company. He had to repay a loan to his relative from whom the business was purchased and family members worked in the business who had to be supported by its operations. One option was to buy another similar company which would have cost three or four hundred thousand dollars in the 1995 time frame involved in this case. At the end of 1995, another option presented itself. Mr. Mazzella was contacted by Marc Trichon, a sales representative of Foss Consultants, Inc. run by John Spinogatti. Leonard Levenberg worked in the Foss office and did various clerical jobs. That company had developed a successful marketing scheme geared to helping oil companies attract new customers. It was Mr. Mazzella's understanding of what was represented to him that if he paid the program fee of $25,500, his company would be guaranteed 250 new customers and he would be given a 25-mile exclusive radius, that is, Foss would not sell the program to other companies in that radius. There was an option to renew the program after the first year. With a down payment, Mr. Mazzella received an invoice which used the term "25 mile exclusive radius." Dates for training were set up for January 12 and 13, 1996. Felicia Spinogatti did the training in the Foss program. The parties dispute when the training actually occurred, Benvenuti claims it occurred January 26 and 27, 1996. At the conclusion of the training, a payment of $6,500 had to be made to Foss. A check to Foss for $6,500 plus Felicia Spinogatti's expenses dated January 27 was offered into evidence. It should also be noted that after the initial contact with the sales representative, Marc Trichon, Mr. Mazzella indicated to Trichon that he wanted a more formal agreement than the invoice. This request was allegedly made soon after the initial contact with the sales representative.

In any event, it came to pass that in the fall of 1996, Mr. Mazzella learned that the Deep River Oil Company was using the Foss program and it was located within the 25-mile radius of Benvenuti. Mr. Mazzella felt this violated his agreement and he contacted Foss to complain speaking to Leonard Levenberg who worked for Foss. Mazzella did not speak to John Spinogatti himself until January 1997. Attempts to work out the dispute were unsuccessful and eventually Benvenuti Oil Company filed suit against Foss. In September 1996, Mr. Spinogatti faxed to his lawyer what purported to be a signed copy of an agreement between Foss and Benvenuti which made no reference to the 25-mile exclusive radius. The faxed copy was dated January 13, 1996 and that date appeared under the signatures of Felicia Spinogatti and Charles Mazzella. The plaintiff claims, and it does not appear to be disputed, that based on this faxed agreement, a trial court granted summary judgment in favor of Foss. The Appellate Court sustained the action of the trial court. While the matter was before the trial court, Levenberg, who had been sued and allegedly threatened by John Spinogotti, told Charles Mazzella that the purported agreement was a forgery. He alleged Jon Spinogotti, the son of John Spinogotti, forged Charles Mazzella's signature and Felicia Spinogatti signed the document when it was otherwise blank, that is, not containing Mazzella's signature.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 2
Not Reported in A.2d, 2003 WL 21977974 (Conn.Super.)
**(Cite as: Not Reported in A.2d)**

*2 None of this information was brought to the attention of the trial court or Appellate Court by the plaintiff. In any event, this suit was filed August 22, 2001, fifteen days after the Appellate Court upheld the trial court's granting of the defendant's motion for summary judgment in the first suit.

An expert could not determine if Mazzella's signature was forged from the fax copy of the agreement Spinogatti gave to his lawyer. But in the fall of 2002, the alleged original suddenly appeared and was delivered to Mazzella by Levenberg. Levenberg claims that he had gotten this document from discarded files of Foss, sent it to Trichon who had also been sued by Spinogatti for illegally using the Foss program and was reminded by Trichon of the document before he called Mazzella. An expert testified at trial that the signature of Mazzella was a trace forgery-someone traced his signature from a document apparently superimposed on the forged document. Levenberg, as noted, testified that he was present when John Spinogatti concocted a scheme to forge this document. Before receiving the forged document back, Spinogatti allegedly bet Trichon lunch that Mazzella would sign the agreement. Trichon could not understand why he would do so but later Spinogatti told Trichon that he owed him lunch.

The three individual defendants adamantly deny forging any document or abetting any forgery. They point to inconsistencies between the trial and deposition testimony of various plaintiff witnesses on such things as the date of the training and the dates certain information was learned by Mazzella in particular. The miraculous appearance of the original January 13, 1996 agreement is pointed to-an expert cannot determine if forgery occurred from a fax. All of this being no less miraculous than Spinogatti's discovery of the fax in September 1998 of what purports to be the January agreement which allowed Foss to prevail in the first suit. What was used to originate the fax sent to Spinogatti's lawyer was never really made clear, at least to the court-was it another fax, the "true" original? All of this provides a taste of the contradictory evidence in this case. The court will discuss these matters in more detail when it deals with the legal issues before it.

Prior to the case being sent to the court for trial on the second complaint, it was bifurcated. The complaint contained several counts (1) fraud, (2) forgery, (3) breach of contract, and (4) violation of Connecticut Unfair Trade Practices Act (CUTPA).

The court has examined the transcript and it appears that the matters to be tried were understood to be the forgery and fraud counts. The court was not to try the breach of contract and CUTPA claim. As indicated, the trial was to be bifurcated, in that liability on the two just mentioned claims was to be determined first and the issue of damages was to be addressed at a later hearing. If liability were to be found on these claims, the court would also hold further hearings on the breach of contract and CUTPA claims.

*3 The fraud and forgery claims are factually and legally tied together. The fraud claim is made in the first count of the complaint and the factual allegations supporting it are set forth in the first 39 paragraphs. The second count is the forgery count, which is made pursuant to § 52-565 of the General Statutes. The second count reads as follows:
  Second Count (General Statutes § 52-565, Forgery as to all Defendants)
  1-39. Paragraphs 1-39 of the plaintiff's First Count are hereby realleged as paragraphs 1-39 of the Second Count.
  40. The defendants are liable for double damages under General Statutes § 52-565 because they forged Charles Mazzella's signature.
The legal theories underlying the fraud and forgery claim are for all intents and purposes interchangeable, given the facts of this case.

The court will first discuss some basic principles of civil fraud and forgery. It will then review the approximately 900 pages of often contradictory and convoluted trial testimony in trying to decide the liability issue. Finally, the court will discuss defenses raised by the defendants regarding the statute of limitations and "collateral estoppel/res judicata."

I. Civil Forgery and Fraud

The pleadings may treat the forgery and fraud claims as interchangeable but what do the cases indicate? What is the standard of proof required for these torts? It is best to first approach these questions by discussing the elements of a civil fraud case.

What must be proven in a fraud action and how must it be proven? Quoting from an earlier case the court in *Harold Cohn & Co. v. Harco International*, 72 Conn.App. 43 (2003), said:
  The essential elements of a cause of action in fraud are: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK     Document 93-3     Filed 09/19/2005     Page 3 of 13

Not Reported in A.2d                                                                                                   Page 3
Not Reported in A.2d, 2003 WL 21977974 (Conn.Super.)
(Cite as: Not Reported in A.2d)

induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury ... All of these ingredients must be found to exist; and the absence of any one of them is fatal to a recovery ... Additionally, [t]he party asserting such a cause of action must prove the existence of the first three of [the] elements by a standard higher than the usual fair preponderance of the evidence, which higher standard we have described as clear and satisfactory or clear, precise and unequivocal.
*Id.*, page 51.

It is true that in *Cook v. Bieluch, 32 Conn.App. 537 (1993)*, the court, at page 549, said: "We need not decide whether a claim of forgery requires proof by clear, precise and unequivocal evidence as do other forms of fraud ... or by some lesser standard above a fair preponderance of the evidence ..." The court noted that the trial court found forgery "by the higher standard."

It is difficult to see why a civil forgery claim would not be subject to the same higher standard of proof as a fraud claim. As noted, *Cook* seems to describe forgery as a subspecies of fraud. This follows from the broad definition given to civil fraud in the case law. Section 1 of the "Fraud and Deceit" article in 37 Am.Jur.2d cites numerous cases in trying to define fraud, see pp. 30-33, and at pages 32-33, it says "Fraud ... is deemed to comprise anything calculated to deceive including all acts, omissions and concealment involving breach of legal or equitable duty, trust or confidence justly reposed, resulting in damage to another, or by which an undue and unconscientious advantage is taken of another. 'Fraud' is malfeasance and, as such, is a positive act resulting from a wilful intent to deceive."

*4 In fact, the court said in *Maturo v. Gerard, 196 Conn. 584, 587 (1985)*: "Fraud and misrepresentation cannot be easily defined because they can be accomplished in so many different ways." Forgery certainly seems to be one of the ways contemplated by these definitions and conducive to being established by the elements necessary to prove other types of fraud. The court will apply the higher standard of proof to the forgery claim in this case which in any event because of the way in which it was pled, is interchangeable with the fraud claim.

II. Was There a Forgery Here?

The question that must first be answered is whether the faxed document submitted to the court in the first suit in support of the defendant Foss Consultants' motion for summary judgment is a forgery or more exactly a copy of a document known to be forged? That is, was the signature of Charles Mazzella on that so-called agreement a forgery?

(A) Motive

The court will first discuss this issue from the perspective of motive-was there a motive for such a forgery? Why would it have been in the interest of Foss Consultants or its prime mover John Spinogatti to fraudulently create this document and use it in court proceedings brought against it by Mazzella?

A somewhat simplistic answer to these inquiries would be yes there was a motive and this is indicated by the fact that when he received the document on the representation it was authentic, the defendant's lawyer felt it was important to include it as one of the summary judgment exhibits filed against the first suit-he was not wrong because the document was instrumental in the trial court's decision granting the defendant's motion for summary judgment in the first suit.

Why was the document instrumental, that is, why was it important to Spinogatti in his dispute with Mazzella? In November 1996, Mazzella learned that Deep River Oil Company, which was located within 25 miles of his company was using the Foss marketing program. Mr. Mazzella thought this violated the terms of the contract he had with Foss Consultants. For him, his contract rights were set forth in the invoice signed by him on December 8, 1995, pursuant to his meeting with Marc Trichon, Foss' sales representative. That document said, "This will confirm and summarize our agreement regarding our new accounts program." The marketing/sales program "cost $25,500 (plus expenses)" and was described as a "one year program 25 mile exclusive radius." In handwriting at the bottom left of the invoice, it says, "Foss guarantees 250 new customers. Benvenuti must perform all functions required by the Foss program. Option to extend exclusive radius at $300 per month after 1st first ."

If this invoice were to be considered the only contract document before the trial court in the first suit, the chances of Foss prevailing on a motion for summary judgment would have been fairly questionable. Restatement (Second) Contracts at § 203 says that "an interpretation which gives a reasonable, lawful

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21977974 (Conn.Super.)
(Cite as: Not Reported in A.2d)

Page 4

and effective meaning to all the terms of an agreement is preferred to an interpretation which leaves a part unreasonable, unlawful or of no effect." Cf., *Hatko Corp. v. Della Pietra*, 195 Conn. 18, 20 (1985); *Judd v. Mutual Bank & Trust Co.*, 114 Conn. 553, 557 (1932). What can the word "exclusive" mean but that the Foss program would not be sold to another oil company within 25 miles of Benvenuti Oil Company? In the invoice, the program could have been described simply as "one year program, 25 mile radius." John Spinogatti's explanation that "25 mile exclusive radius" only meant the 250 new customers would come from within 25 miles of the Benvenuti Company is not very convincing. Benvenuti only serviced customers within 30 miles in any event, what does the word "exclusive" add or even mean under such circumstances?

*5 Also, "in arriving at the intent of the parties to a contract as expressed or implied in the language used by them, it is always admissible to consider the situation of the parties and the circumstances connected with the transaction, and every part of the writing should be considered with the help of that evidence." *Shaw v. Pope*, 80 Conn. 206, 209 (1907); *Foley v. Huntington Co.*, 42 Conn.App. 712, 730 (1996); cf. Restatement (Second) Contracts, § 202, "Rules in Aid of Interpretation," see comment (b). Charles Mazzella testified he had strong financial reasons to expand his business. As noted, he bought it from in-laws and had to repay the debt, and the business not only supported him, but had to provide a living for his son, Michael. The first-year guarantee of 250 customers was important since each new account had an annual value of $451 according to Mazzella. That translates into approximately $112,000 profit for the first year, but the cost was approximately $26,000, not exactly a windfall given Mazzella's goals. If Mazzella was aiming at a higher return than the one "guaranteed," it was important for him to have the exclusive right to use the Foss program within the 25-mile radius. As he noted, his business was located near Long Island Sound, he had only three sides to which the 25-mile radius would apply there being no customers in the Sound.

Thus, Mazzella's reading of the 25-mile exclusive radius clause in the invoice was reasonable and Foss ran the risk of a court or jury agreeing with Mr. Mazzella. According to Mazzella, when the dispute first arose, Spinogatti tried to deflect Mazzella's complaints about Deep River by saying that company was only sold a program that tried to increase their service contracts (i.e. furnace repair business), not their oil customers. This was before the January 13, 1996 document was mentioned let alone discovered and shows Spinogatti understood why Mazzella regarded this issue as important.

Finally, as to motive, the court regards Marc Trichon's testimony of at least some relevance. He was an experienced sales representative for Foss having sold over two hundred oil customer marketing agreements. He testified that to clinch a sale, he would sometimes offer the 25-mile exclusive radius enticement, barring sale of the Foss program to any other competitor in those confines. That is exactly what Mr. Mazzella said was offered to him by Trichon and, lo and behold, the 25-mile exclusive radius language appears in the invoice to corroborate Mazzella's understanding.

But after the Mazzella-Trichon meeting, the latter writes his boss saying Mazzella wants Foss to "send him a letter outlining the agreement between us." In response, on December 9, 1995, a letter goes out from Spinogatti not mentioning any 25-mile exclusive radius. If this language has the innocuous and somewhat irrelevant meaning that Spinogatti gives it why not use it in the December 9th letter? The inference could be drawn that what we have here is a variation of the classic "bait and switch" operation where "a consumer is promised (and pays for) one thing, and is given quite another." *Urich v. Fish*, 28 Conn. L. Rptr. 615 (Blue, J.), citing *National Trade Publications Service Inc. v. F.T.C.*, 300 F.2d 790 (Ca.8, 1962); *Slaney v. Westwood Auto, Inc.*, 322 N.E.2d 768, 778 (Mass., 1975). Foss Consultants, for the foregoing reasons, would certainly have a motive to prepare a document forged and bearing the signature of Charles Mazzella, dated January 13, 1996, when the training was purportedly completed. This "agreement" removes any question about whether Benvenuti was promised a 25-mile exclusive radius in the sense that no competitor would be sold the Foss program in that area. In the January 1996 "agreement," the word exclusive is not mentioned and it neatly supports Spinogatti's interpretation of "25 mile exclusive radius" even as used in the invoice by saying in paragraph 2 that "the new customers will be located within a 25 mile radius of the Benvenuti Oil Company."

*6 But an analysis, based on motive, cannot be conclusive as to whether a certain act was committed by a party, here forgery and fraud. Just because a person has a motive to do something hardly means he/she did it. A person may have moral scruples against doing something or the hard evidence may show that the person could not have done the

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21977974 (Conn.Super.)
(Cite as: Not Reported in A.2d)

Page 5

fraudulent act. Other people may have had just as powerful reasons to do the same act. In fact, a motive analysis can be unfair since it can skewer a factual analysis by creating an ongoing presumption in favor of finding facts against the party sought to be accused of wrongdoing.

The remaining questions then are: (1) Do the facts support by clear and convincing evidence that the signature of Charles Mazzella on the January 13, 1996 agreement was forged? (2) If the answer is yes, who can be shown by clear and convincing evidence as participating in accomplishing or actually doing the forgery?

The court concludes the evidence is clear and convincing that a forgery was perpetrated here and will now give its reasons for so concluding.

(B) The Evidence of Forgery

During cross examination, especially by counsel for the defendants, several inconsistencies were brought out between what a plaintiff's witness said at trial and what the same witness said at a deposition held only two or three months before. These inconsistencies must be kept in mind of course when weighing the credibility of witnesses, but it is also true that inconsistency is often not surprising when, for example, as in the case of Michael and Charles Mazzella and Felicia Spinogatti, their depositions and the trial took place five or six years after the events in question. In fact, absolute consistency in narrating fairly detailed factual events in such a situation might raise the suspicion that the memorized story was a rehearsed fabrication.

In reaching its conclusion, therefore, the court has given great weight to what might be characterized as non-testimonial facts or facts in the record that cannot be altered or questioned.

In determining whether the January 13, 1996 "agreement" was forged, the actual dates that the training took place are of central importance, at least to the court. The parties seemed to have recognized this since much of the trial testimony on direct and cross revolved around answering this question.

After Marc Trichon met with Mr. Mazzella and there was an agreement to have Foss train Benvenuti Oil Company in its program, Trichon prepared an invoice which Mazzella signed. There is no dispute concerning the invoice, its contents or the fact that Charles Mazzella signed it. The invoice states that training was to take place January 12 and 13 of 1996. The January 13, 1996 "agreement" which Spinogatti claims was the controlling contract document between the parties contains what purports to be the signatures of Charles Mazzella and Felicia Spinogatti. Under each signature, the date 1/13/96 appears.

*7 The trial court, which granted the defendant Foss motion for summary judgment and the Appellate Court which upheld it (64 Conn.App. 723 (2001)), based their decision on the fact that the January 13, 1996 document was a complete integration of the parties' agreement. That document only guarantees new customers will come from within that radius and thus precludes any argument that the invoice language guaranteed that Foss would not sell the marketing program to any other oil company within a 25-mile radius (such as Deep River).

Although this critical agreement contains the date 1/13/96 under the signatures of the people that allegedly signed it, the court concludes by clear and convincing evidence the training occurred January 26 and 27, 1996, after the first training dates were cancelled. The court further can conclude the agreement entered as Exhibit 3 in this case and relied upon by trial court and Appellate Court in sustaining judgment for Foss in the first suit was fabricated because of this dated discrepancy. Why does the court conclude that the training took place in 1996 on January 26 and 27 and not January 12 and 13? The court will try to discuss the facts that it has found lead it to that conclusion.

The court will first discuss the previously mentioned invoice which was signed by Mr. Mazzella. Among other things, it contained a payments schedule. The schedule states amounts due Foss on various dates under the program. The following language then appears, "Upon initial Training-$6,000." Felicia Spinogatti did the training and she was also to be reimbursed for her expenses which were $495. Exhibit 5 references another uncontroverted piece of evidence-a check dated "27 Jan 96" signed by Charles Mazzella and cashed by Foss. The invoice Exhibit 1 has the following writing, "6,000 ↙ 495 paid # 1622 1/27." The uncontroverted testimony from Charles Mazzella was that it was the course of business for his secretary to note on an invoice the fact that she has written a check. Felicia Spinogatti testified she certainly brings the invoice to the training sessions-that is what allows her to get paid. She has no specific memory of this training session.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK    Document 93-3    Filed 09/19/2005    Page 6 of 13

Not Reported in A.2d                                                                                      Page 6
Not Reported in A.2d, 2003 WL 21977974 (Conn.Super.)
(Cite as: Not Reported in A.2d)

She has done two or three hundred of them. She speculated the check that was to be delivered after training could have been post-dated. But there is no evidence this $6,495 check was in fact post-dated. Why would that happen-the training was scheduled to occur over a month after Mazzella agreed to use the program. Furthermore, why would the secretary indicate the check was "paid" on January 27th? There is other evidence which leads the court to conclude the training ended on this last mentioned date. A weather expert, Mr. Basian, testified for the plaintiff. The plaintiff's position had been that the training was cancelled for the 12th and 13th and rescheduled because Benvenuti was busy and because of snow conditions. In his examination of Mr. Basian, the defendant brought out that on January 12th, there was only a trace of snow.

*8 But Felicia Spinogatti was coming from New York. Small busy companies do not set aside two full days for training and then look out the window the day training is going to start to see if it should go forward that particular day. Mr. Basian testified that from January 7, 1996 on, there was quite a bit of snow, with the snow pack decreasing five inches on January 11 and 12. This is consistent with a common sense decision by Mazzella to change the training dates at some point before training was to begin. He testified at trial as follows: "Okay. The initial training was set up on here for the 12th and 13th. Because of the inclement weather, okay, about *three, four, maybe five days prior* to the initial training, we had ... it was just unbelievably busy in our office and we're not a big company. I asked Mike to give them a call, okay, and reschedule the date, okay, get a different date. He came back and said to me the 26th and 27th, and I wrote it right there." (Emphasis by court.) The call was made before the snow pack melted five inches and that was the context in which the request was made to continue the training. The court concludes the training took place on January 26 and 27, 1996. Felicia Spinogatti who did the training could offer no help from present memory as to when the training took place when she testified at trial. That is not surprising since she struck the court as a credible witness and would naturally have trouble remembering the date of events that occurred seven years before trial.

What follows from the fact that the training dates did not occur on the originally planned dates? What inferences can clearly and convincingly be drawn as to the authenticity of the January 13, 1996 "agreement"? For one thing, Felicia Spinogatti is a highly intelligent woman with a great deal of business experience-she worked as a trainer for her father's company for years and ran Lady Oil, her own oil company. Charles Mazzella had run his own business for years when these events transpired. These individuals are not the type of people who would sign a document entitled "Agreement between Foss Consultants, Inc. and Benvenuti Oil Company," which contained in the first paragraph wrong dates for the training and then sign their names and place a date under their signatures that was in fact not the date they signed the agreement-1/13/96 as opposed to 1/27/96.

Purportedly, John Spinogatti wrote a note to his daughter in which he said he wanted an agreement signed. He wanted Mazzella to sign the agreement in her presence then she should "also sign same as a witness at same time Mazzella signs"-pretty important. Can one suppose, despite all this demanded formality, she would write in the wrong date as a witness if in fact this was a document signed by these individuals the same day training concluded?

The foregoing observations support the conclusion that the 1/13/1996 "agreement" was in fact an after the fact created document not signed by Mazzella, but produced to aid Foss in the litigation initiated by the plaintiff. Besides the discrepancy of the training dates, there are other factors that lead the court to conclude the purported January 13, 1996 agreement, submitted by way of fax to the trial court in the first suit, was not authentic.

*9 In first talking to Mazzella, could Spinogatti have forgotten about this "agreement" which was to be his trump card in winning litigation brought by the plaintiff? This would appear unlikely if for no other reason that before the training took place he wrote the just mentioned note to his daughter which also said he wanted his daughter to prepare an agreement because he wanted "to be sure there were no problems"-one would think he would remember Benvenuti and the problems requiring a signed agreement. FN1 Indeed, as previously indicated, Mazzella testified that when he first spoke to Spinogatti about the Deep River situation and complained that Foss' oil customer program had been sold to that company, Spinogatti said Deep River only was operating under a program related to serving furnaces in need of repair. It did not purchase a program aimed at acquiring customers interested in purchasing oil.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                Page 7
Not Reported in A.2d, 2003 WL 21977974 (Conn.Super.)
(Cite as: Not Reported in A.2d)

> FN1. What "problems" could Spinogatti have envisaged if as he claims, the invoice's 25 mile radius language did not bar sale of his program to Deep River and if Trichon never represented such a sale could not be made in his pitch to Mazzella? The note we are discussing was prepared after the invoice was signed but before the actual training.

What is also somewhat odd, at least to the court, is that when the purported agreement was discovered, it is unclear from anything presented to the court whether the only thing allegedly found by Spinogatti was a fax, or is the story that he found the original, made a fax from it then lost the original? If, as some testimony indicated, his daughter forgot to bring any documents to the training session and even the training manual was a fax of an original sent from Foss to the Benvenuti office, would there not be an original fax somewhere with names and dates signed in ink on the fax? Felicia Spinogatti testified that although she had no present memory of the signing ceremony in this case, if there was an agreement to be signed, she would have the customer sign the original of any agreement and take that back to Foss. If the customer wanted a copy he/she would have to make one from that original for its own files. Where is the original or even the fax of the original with inked signatures? These are at least some of the reasons why the court concludes the January 13, 1996 "agreement" was an after the fact creation even before the testimony of the plaintiff's handwriting expert is considered. FN2

> FN2. There is a consideration that might be considered as not supporting the conclusion reached by the court. In an affidavit Mr. Mazzella submitted in the first litigation, he said he signed a document on the last day of training which said he was satisfied with the training. At trial, he also said he did sign a document January 27th. It is also true that the first paragraph of the January 1996 "agreement" states training took place on the 12th and 13th of January 1996 and it "has been satisfactory." His son, Michael, was with him throughout the training and says Mazzella signed nothing. Whatever Mazzella signed on January 27th, the court cannot conclude it was this agreement, however. He would have had to have signed a document which by its waiver clause in paragraph 4 and the description of the guarantee in paragraph 2 completely barred any expectation he had that Foss could not sell its program to any other oil company within 25 miles of its company. Supposedly, too, Mazzella would have had to simply overlook language in the "agreement" that gave incorrect dates for the training. The court concludes Mazzella may have signed a receipt to the effect that the training was satisfactory but he did not sign this agreement. Mazzella's assertions that he did not sign this document has the ring of truth to it. In other words, his son said he signed nothing and Felicia Spinogatti brought no papers with her to the training. If this man is dishonest, he chose an odd defense-I signed a document, not this agreement, that had language similar to the first paragraph of the agreement. But for him volunteering this information who could have found it out? People who are lying do not do things quite that way.

But, in addition to the foregoing, the plaintiff presented the testimony of an expert, Streeter, who has impressive educational and professional credentials in the area of signature and handwriting analysis.

He examined what the court concludes is the original of the January 13, 1996 agreement-the source of the Spinogatti fax-and determined Charles Mazzella's signature was a trace forgery. No expert testimony was presented to dispute this conclusion. However, the defendants have raised objection to the basis on which Mr. Streeter reached his conclusion.

First, they point out that in his analysis Streeter relied on an examination of twenty checks purportedly signed by Charles Mazzella. At trial and in their post-trial brief, they point out that the checks were never authenticated; Streeter made no independent investigation as to whether these were checks signed by Mazzella. The court's memory is that the checks came into evidence without objection. In any event, this criticism seems to miss the point of Streeter's analysis. Blowups were made of the purported Mazzella signature on the claimed original of the January 13th document. Mr. Streeter noticed evidence of hesitation or trembling at certain points in this signature. He then examined the checks and could find no evidence of hesitation. But that represented only a portion of his analysis. His conclusion was, in large part, based on aspects of the January 13th signature itself; he concluded that signature was traced based on that analysis and by

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21977974 (Conn.Super.)
(Cite as: Not Reported in A.2d)

Page 8

superimposing a copy of Mazzella's signature on the invoice (Exhibit 1) over that of his purported signature in the "agreement." The main thrust of Streeter's conclusion was not based upon a comparative study between the signature in question and known signatures made around the same time such as represented in the checks. In examining Mazzella's signature on the January 13th "agreement," he noticed "patching" that he described as "where if you had a line and you were tracing it and it didn't come out correctly, you would take your pen and go over it. That would be patching, filling it in." Another element of simulation was lack of feathering. When a person finishes his or her signature, the pen is removed from the paper. "This causes a feathering of the line. It comes in narrow, it gets wider and as you finish it's wide and then it goes to narrow. An element of simulation is the pen is placed directly on to the paper and then traced, which eliminates the feathering aspect of it."

*10 Mr. Streeter also testified that people do not sign their names the same way twice. As noted, the traced Mazzella's signature from the invoice and superimposed it on his purported signature appearing on the January 13th agreement. Mr. Streeter concluded "no one ever duplicates their signature to this degree" (i.e. the degree that he found in doing this just described comparison).

Another line of objection to any reliance on the document which Streeter analyzed and which purports to be the original of the fax Spinogatti sent to his lawyer is the suggestion that it somehow itself is not an authentic document, perhaps created by Levenberg or Trichon to work out their personal vendettas against Spinogatti who sued them both. Great surprise is expressed at the fact that this "original" appeared out of nowhere at some point subsequent to the expert Streeter's disclosure that he could not determine whether Mazzella's signature was forged from a faxed document-all that Spinogatti sent to his lawyer. There was testimony that Levenberg took the document from Foss files he was told to dispose of, sent it to Trichon who eventually returned it to Levenberg. Levenberg then gave the document to the plaintiff. Spinogatti throws doubt on this scenario; he said he took all the Foss-Benvenuti papers with him when he moved to Las Vegas. His response is left somewhere in mid air, however. Spinogatti could argue the court should not consider this document-and the use the expert made of it-because it was stolen and the expert should not be allowed to testify on his findings of forgery made by examining a stolen document. But this would be an unpalatable argument to advance since it could, in effect, be an admission that this document-now said to be a forgery-was, in fact, the "original" of the fax which Spinogatti sent to his lawyer to win his case and which the expert now says is a forgery. In any event, the court does not find it all that surprising that the "original" which Streeter examined only surfaced in the fall of 2002. For at least a while after Mazzella made his complaint to Spinogatti about Deep River, Levenberg and Trichon were still employed by Foss. Trichon and Levenberg were not sued until late 1999. Trichon and Levenberg are people that played it very close to the vest, to coin a phrase.

Trichon at one point told Levenberg not to get involved in the Foss-Benvenuti dispute-he opined that if you do not get involved, you cannot get hurt. The fact that Trichon and/or Levenberg held back on the production of the "original" of the January 13, 1996 agreement, however, does not mean they created it.

The problem with the defendants' argument is that it does not directly address the question of where Spinogatti's fax of the January 13, 1996 agreement came from-the miraculous appearance of that document predates the equally miraculous appearance of the claimed original to the fax which Streeter said contained Mazzella's forged signature.

*11 If the document Streeter examined is in fact the source of the Spinogatti fax, the defense position cannot be sustained as a grounds for ignoring Streeter's testimony.

The court will now address that question. A trier of fact, such as this court, can make comparisons of various sorts without relying on expert testimony. Lay jurors from earliest times have been allowed to make handwriting comparisons. _Tyler v. Todd,_ 36 Conn. 218, 222 (1869). Expert testimony is not needed to instruct a jury whether a composite sketch and a photograph look alike, in fact, such testimony is inadmissible. _State v. Palmer,_ 196 Conn. 157, 166 (1985).

If the purported original of the January 13, 1996 agreement (Exhibit 3 of plaintiff) is compared to the fax of the agreement Spinogatti sent to his lawyer (Ex. 6c), careful observation indicates that the source of the fax is the original which is Exhibit 3. What purports to be Felicia Spinogatti's signature is in exactly the same location on Exhibit 3 as on Exhibit 6c. The "S" of her signature on both documents crosses the typewritten letters "ti" of her typewritten

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK   Document 93-3   Filed 09/19/2005   Page 9 of 13

Not Reported in A.2d                                                                       Page 9
Not Reported in A.2d, 2003 WL 21977974 (Conn.Super.)
(Cite as: Not Reported in A.2d)

signature at exactly the same spot. Under Felicia Spinogatti's signature, the typed word "title" appears and the word "trainer" is printed.

Each of the letters of the word "trainer" appears in exactly the same position above printed letters, punctuation marks, and numbers on the next line and the printed word "trainer" curves in exactly the same way on both documents in that each of the printed letters on both exhibits appears to be at the same relative position vis-a-vis the typed line beneath the letters. The printed date "1/13/96" on both documents appears to be in exactly the same position as to each letter, punctuation mark and number in the printed line above it. The same observation can be made as to the signature of Charles Mazzella relative to his printed name below the signature. In fact, the bottom portion of the "2" of his signature intersects the printed "lla" below the signature at the same point although not quite touching the printed "a." The "C" of his signature on both documents goes beneath the printed signature line in exactly the same way and other letters bear the same relationship to that printed line. The printed word "Title" appears under Mazzella's purported signature and "VP" is printed in. It dissects the printed "la" of Mazzella's name located above it at exactly the same points on both documents. The written date "1/13/96" appears on the last line of the documents. A comparison of these figures on each document shows them to be remarkably similar relative to location above the printed line and the internal characteristics of each number. Below the "3" what appears to be a small circle appears. The "6" on each exhibit has a small dot on its top and there is the same line or smudge mark at the immediate bottom of the number "6" on the left side. It is true that the numeral "3" in the first printed date under Felicia Spinogatti's signature appears to go all the way down to the printed line in Exhibit 6c, but not in Exhibit 3. But this can probably be explained by the nature of a fax copy. The only other explanation would be that although the person creating this fake original paid exquisite attention to detail in every other respect in making the fake original (Exhibit 3) look like the "authentic" fax Spinogatti gave to his lawyer (Ex. 6c), he/she somehow overlooked this aspect of the location of the numeral "3," although in every other respect, the numeral gives the appearance of being the same on both documents. The court concludes that the original submitted by the plaintiff as Exhibit 3 appears to be the source of the fax which is Exhibit 6c or at the very least nothing in the court's examination of these documents indicates otherwise.

*12 The court then, for the foregoing reasons, concludes that the purported January 13, 1996 agreement is a fabricated and forged document. The question remains as to who was responsible for the forgery.

III. Who Was Responsible for the Forgery?

If, in fact, as the court believes, the document representing the purported agreement and examined by Streeter is the original or source on which Spinogatti's fax is based, it would take a speculative invention to conclude Spinogatti was not aware of the forgery and did not try to use it to his advantage. Levenberg would have had to forge the purported "original" (Ex. 3), make a fax of it, and somehow sneak the fax in a file or files Spinogatti retained to delude him into thinking he had a signed agreement with Mazzella. All of this as an act of revenge in 1998 based on Levenberg's fear that Spinogatti might sue him in 1999 and before any trial or appellate court ruled that the faxed agreement dictated the plaintiff's first suit would be dismissed. The argument just does not hold together. The court certainly does not accept all of Levenberg's or Trichon's testimony; some of it is contradictory to earlier deposition testimony. At the time of this trial and long before that-from the time he was sued-Levenberg had a motive to cause harm to Foss and John Spinogatti. But at the time this document was created and falsely signed and submitted to the court, no such motive existed. There was also testimony from Levenberg that he and Spinogatti tried to duplicate Mazzella's signature, in fact, Levenberg was quite proud of his efforts. Whether or not the court accepts this, it is interesting to note, as will be discussed shortly, that Levenberg did not know the actual mechanics of how the forgery was accomplished-a trace forgery as opposed to a freehand signature attempting to mimic Mazzella's.

For the reasons discussed, the court concludes that John Spinogatti's involvement in forgery as to this document has been proven by clear and convincing evidence. The same conclusion must therefore be reached as to Foss Consultants, Inc. Spinogatti was the founder and president of the company and he acted in his behalf. No claim has been made that if John Spinogatti is responsible in forgery and as a result fraud, somehow Foss is not. It should also be noted that fraud can be proven by circumstantial evidence, § 479 of 37 Am.Jur.2d article on "Fraud and Deceit" at pp. 468-69.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK   Document 93-3   Filed 09/19/2005   Page 10 of 13

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21977974 (Conn.Super.)
(Cite as: Not Reported in A.2d)

Page 10

There is one other evidentiary matter that must be discussed. After the litigation in the first suit began, a meeting was held between Spinogatti and Levenberg at a diner in New York State. An investigator hired by Spinogatti sat in a booth behind the two men and recorded their conversation. The plaintiff objected to the court's examination of what purports to be a transcription of that conversation. For the reasons set forth in the footnote, the court agrees with the defendant that it can examine and consider this evidence. FN3 However, that examination does not lead the court to change its opinion as to Spinogatti's involvement. The investigative technique used was highly unusual and frankly somewhat suspect as an appropriate basis for the court to draw conclusions. Mr. Rupolo, the investigator, said he taped the whole conversation, it lasted between 35 to 45 minutes. What was submitted to the court as Exhibit A, which is now a full exhibit, contains approximately one page of conversation, the tape of the conversation was discarded and a full transcript of the tape was not made. In his report, Rupolo said he left out "the unmeaningful things" (sic). Not "meaningful" in what sense-not relevant at all, not helpful to his client; apparently he meant irrelevant matters such as inquiries about Levenberg's diet, how was Spinogatti's wife doing, etc. The report contains the "exact words" used according to Rupolo, but it is not clear to the report that the sentences attributed to Spinogatti or Levenberg are sequential or other conversation intervened between each sentence in the report. Of a conversation lasting 35 to 45 minutes, he could only remember two threats made by Levenberg. At one point, when pressed about the contents of the conversation, he understandably said after all it occurred three years ago. At one point, Rupolo said he only had his daughter transcribe "the important stuff." Concerning Benvenuti Oil, at trial Rupolo remembered it was mentioned, but he could not remember the context it was mentioned in. At first he said he did not remember any portion of the conversation dealing with lawyers, but did remember Levenberg saying he was going to speak with someone at Benvenuti Oil. But he could not remember what he was going to say. The report submitted to this court includes a number of accusations against Levenberg and a series of self-serving protestations of general innocence by Spinogatti who, of course, knew he was being taped. The portion of the report relevant here proceeds as follows:

FN3. Section 52-184a states that: "No evidence obtained illegally by the use of any electronic device is admissible in any court of this state." An electronic device was used to record the conversation and whether the evidence was illegally obtained must be determined by examining § 53a-187 of the General Statutes and § 53a-189. The latter statute makes it a crime when one "unlawfully engages in ... mechanical overhearing of a conversation." Subsection (a)(2) of § 53a-187 states that "mechanical overhearing of a conversation means the intentional overhearing or recording of a conversation or discussion without the consent of at least one party thereto, by a person not present thereat, by means of any instrument, device or equipment. "The conversation between Spinogatti and Levenberg and Spinogatti took place in New York. Section 250.05 of New York's Penal Law makes eavesdropping a crime and defines it as occurring when a person "unlawfully engages in ... mechanical overhearing of a conversation." Subsection (2) of § 250.00 defines "mechanical overhearing of a conversation" in the exact language of § 53a-187(a)(2) (see Vol. 39 of McKinney's Consolidated Laws of New York Annotated). The practice commentary to § 250.05 states at page 483, "Furthermore, it is possible that a person may be present at a conversation or discussion and yet not be a party, in the sense of active participation, to the conversation or discussion. Those who talk in the presence of a nonparticipating 'third party,' can have no expectation of privacy with respect to the statements overheard by the third party." Thus, the definition of 'mechanical overhearing' of a conversation exempts any overhearing or recording by or with the consent of a party to the conversation or discussion as well as by a person present at the conversation, irrespective of whether that person is a party to the conversation or discussion." Here, Spinogatti obviously consented to the recording. How can Levenberg claim a privacy interest-he talked to Spinogatti and the latter could testify as to the contents of that conversation if it is admissible under some exception to the hearsay rule or for impeachment of credibility. The commentary to the New York statute makes clear that it is not illegal in that state for a person to secretly record his/her

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                           Page 11
Not Reported in A.2d, 2003 WL 21977974 (Conn.Super.)
(Cite as: Not Reported in A.2d)

> conversation with another, why is it then illegal if a consenting party arranges for another to secretly record the conversation?

*13 LEVENBERG: I'm telling you, I'll get even.
SPINOGATTI: There's nothing you can do but make up something and lie.
LEVENBERG: Remember that company Benvenuti Oil, first they sued you and appeal talk.
SPINOGATTI: Sure, I did nothing wrong.
LEVENBERG: That's beside the point. Benvenuti Oil is stupid and that crazy money hungry lawyer he's got would love to hear a new story. I could make up a good one (laughs). The lawyer doesn't care. Benvenuti keeps paying him.

Apart from the fact that the court has a real question as to whether it can attach any credibility to this report, the fact remains that the court, for a variety of reasons, found that the faxed document purportedly representing the January agreement was fabricated and appears to find its source in an original on which the court has concluded the forged signature of Mazzella appears. All of this occurring sometime before September 1998 before the court is aware of any dispute developing between Levenberg and Spinogatti. He worked for Spinogatti until September 1999 or thereabouts and, according to the complaint Foss filed in the New York courts, Levenberg's surreptitious removal of Foss files for Trichon's benefit in the latter's new business occurred around September 1999. The conversation was recorded in October of 1999. The court attaches no weight to the implications sought to be garnered from this report; it does not mesh with facts that can be established without relying on the testimony of witnesses that the court did not find credible on all aspects of their testimony in any event.

The court concludes that John Spinogatti was responsible himself or through an agent for perpetrating the forgery. It will discuss at a later point whether the civil tort of forgery and/or fraud with all of their elements have been proven.

Before doing that, however, the court will discuss whether Felicia and Jon Spinogatti can be shown to have been involved in any forgery by clear and convincing evidence.

As to Jon Spinogatti, the court cannot reach that conclusion. He struck the court as a very credible witness. The claim against him relies completely on the testimony and alleged observations Levenberg made into John Spinogatti's office. The court has real questions about Levenberg's credibility and does not believe he could, as will be discussed, see into Spinogatti's office. What is even more disturbing to the court is that Levenberg seems to have committed himself in his November 2000 statement to the notion that the materials sent to the son to forge would have required him to draw Mazzella's signature-that is why the father sent the blank agreement to Jon Spinogatti, the artist, along with a copy of Mazzella's signature. Levenberg even testified he and Spinogatti practiced drawing Mazzella's signature before it was decided to get the artist son's help. But that was before an expert such as Streeter determined the forgery here was not done free hand by a skilled duplicator of someone else's signature. This was a trace forgery for which a Picasso talent is not required. Besides, the son was a graphic designer on computers at the relevant times. He enjoyed drawing as a hobby, but considered himself only a doodler.

*14 The court will now turn to the claim against Felicia Spinogatti. Based on the evidence presented, can the court conclude that Felicia Spinogatti was involved in the forgery or in a fraud on the plaintiff by, in effect, perpetrating a fraud on the court (of which more later)? The court would have trouble reaching this conclusion by a fair preponderance standard let alone a clear and convincing standard evidence standard. The case against this young woman really was based on the testimony of Levenberg. Just as the testimony he delivered to implicate her brother depended in part on his being able to look into John Spinogatti's office and see him take certain actions, so too he said at trial he saw Felicia Spinogatti sign the January 13, 1996 agreement in her father's office. At deposition, he said he was unsure as to whether he saw Felicia Spinogatti sign the document or whether it was signed for her. At trial, only a few months after the deposition and several years after the events in question, he is sure he saw the woman sign it after her father called her in the office to do so. He explains these discrepancies by saying his memory is now "crystal clear," he has thought about it since. The court does not believe his testimony in this regard. Sandra Spinogatti, John's wife, struck the court as a highly credible individual who knew the office layout at Foss Consultants. She testified, given the location of Levenberg's office and the positioning of the desk within the office, Levenberg could not see into John Spinogatti's office. From hearing the testimony, the court concludes Mrs. Spinogatti is to be believed. Furthermore, Felicia Spinogatti had all the hallmarks of an honest witness. Her memory of events called on to be exercised long after the events in question was not tailored to be helpful to the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21977974 (Conn.Super.)
(Cite as: Not Reported in A.2d)

Page 12

defendants' position. She could have easily said, if she chose to participate in the fabrication, that she definitely remembered the training occurred on January 12th and 13th, yes, the check to reimburse her and pay Foss was postdated, she clearly recalls Mazzella signing the contract in her presence, etc. She said none of these things at trial. She did not have a memory of Mr. Mazzella or this specific training or actual events that transpired at the training. She testified only in general terms that if her father wanted a customer to sign an agreement at the conclusion of training and she neglected to have this accomplished, this would have been a "memorable event"-in other words, he would not have been amused. As far as the dates of the training, all she could remember was "snow," but that could have just as well been a reason for canceling the training as well as holding it on the 26th and 27th of January. When looking at her signature on the document, she only could say it looked like her signature, when shown a copy of the agreement which only had her signature on it she reacted with what the court interpreted as honest surprise-why would I put just my signature on an otherwise unsigned and undated document?

*15 Also, it is interesting to note that although an expert, Streeter, was retained by the plaintiff to examine Mazzella's signature on the "original" of the January document, he was not asked to examine Felicia Spinogatti's signature to see if he thought it was genuine.

In any event, the court found Mr. Levenberg's offhand remark in his deposition that he could not remember if he saw Felicia Spinogatti sign the document or whether he signed her name illuminating as well as John Spinogatti's testimony to the effect that his daughter signed her signature in many different ways. Previous Levenberg testimony is also of interest where, as the court noted, Levenberg took some pride in his ability to duplicate signatures freehand apparently and not by tracing. In any event, the court concludes that it has not been proven that Felicia Spinogatti was involved in forging this document or in any way knowingly participating in a fraud adding authenticity to the forged document by adding her signature after the completion of the training and after the dispute between these parties arose. Spinogatti had no need to involve his children in this scheme, Mr. Levenberg was right there to assist him or he could do it himself.

The court will now summarize the conclusions it has reached regarding the factual question of whether there was a forgery of the January 13, 1996 agreement and, if so, who was responsible for the forgery. It will then discuss whether, given that conclusion, all the elements of civil forgery and/or fraud have been proven. That is, even though forgery may have been committed pursuant to the ordinary use of that word, proof of the torts alleged require more than the act of falsely reproducing a signature.

First, as to the question of the false reproduction of a signature, the court finds that the fax copy of the agreement delivered by John Spinogatti to his lawyer which was relied upon by the trial and Appellate Court in ruling in his favor in the first suit contained the forged signature of Charles Mazzella. The court further concludes this fax was copied from an original which is plaintiff's Exhibit 3 and which was examined by Mr. Streeter, a document and handwriting expert. The court reaches this conclusion on the basis of clear and convincing evidence. John Spinogatti was the only person who had a motive to produce such a document in September 1998 and to use it for his own purposes; he had the opportunity and means to do so and the court infers from the evidence presented that he did take these actions. The court cannot find by either a preponderance or clear and convincing evidence standard that Jon or Felicia Spinogatti were participants in the creation of the false signature on a purported January 13, 1996 agreement.

But several issues must still be addressed. The court must discuss whether even if Jon Spinogatti falsely reproduced Mazzella's signature, all the elements of civil forgery and/or fraud have been proven-mere false reproduction of a signature or "forgery" as it is understood in the vernacular will not suffice.

*16 Also, the court must discuss whether, even if all the necessary elements of these torts have been proven by the requisite standard as a result of the evidence introduced at trial and the inferences to be drawn from it, the plaintiff should be precluded from prevailing because (1) the claims cannot be proven under the allegations of the original complaint, and (2) if the latter is the case, it would not be fair to permit the plaintiff to amend the complaint under the guise of conforming it to the evidence.

IV. Were the Civil Torts of Forgery/Fraud Committed?

Given the court's factual conclusion that a forgery was perpetrated here and that John Spinogatti did the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21977974 (Conn.Super.)
(Cite as: Not Reported in A.2d)

Page 13

actual forgery or had Levenberg do it and then submitted a document to the trial court in the first litigation, was civil forgery or fraud proven in this case by clear and convincing evidence? In the *Harold Cohn* case, as previously noted, a civil action in fraud requires four elements be proven:

> (1) a false representation was made as a statement of fact;
> (2) it was untrue and known to be so when made;
> (3) it was made in order to induce the other party to act upon it;
> (4) the other party acted upon the false representation to its injury.

For civil common-law forgery to lie, a person need not have actually done the forgery. This is certainly true in criminal law. The basic criminal law definition of forgery is set forth in § 53a-140.

> (a) A person is guilty of forgery in the third degree when, with intent to defraud, deceive or injure, another he (sic) falsely makes, completes or alters a written instrument or *issues or possesses* any written instrument which he (sic) knows to be forged.

(Emphasis by court.)

Section 52-565 providing civil double damages assumes a person can be liable for civil forgery even if he or she did not actually do the forgery. It reads as follows:

> 52-565. Double Damages for Forgery. Any person who falsely makes, alters, forges or counterfeits any document or *knowingly utters, as true, any document falsely made, altered, forged or counterfeited*, shall pay double damages to any party injured thereby.

(Emphasis by court.)

Whether in this case the forgery claim is regarded as separate from the fraud claim or whether they are duplicitous, it seems clear that to be liable under either claim, where a forged instrument is the device allegedly used to cause injury to another, the party sought to be held responsible need not have created the forged instrument but must have used it to his or her advantage knowing it was in fact forged.

Here, whether the proposed amendment were to be permitted or not, the plaintiff would rely on the same factual allegations to prove civil forgery as it does to prove civil fraud. If the plaintiff does not prevail on the forgery claim, it cannot prevail on the fraud claim. Or to put it another way, insofar as civil forgery is a subspecies of civil fraud, it would seem that in order to prevail on a forgery claim the same elements necessary for fraud must be proven given the facts of this case. The court will now discuss the elements of civil forgery and/or fraud and whether they have been proven.

*17 Here, the first two elements of fraud have been proven. The purported January 13, 1986 was a false representation because it contained the forged signature of Charles Mazzella. The Mazzella signature was forged and known to be so by John Spinogatti. The false representation was made directly to Mazzella when Mr. Spinogatti delivered a document to his lawyer which, in effect, barred Benvenuti's position as to having received a 25-mile exclusive radius for use in legal proceedings. Attorney Lennon who was Spinogatti's agent in the first litigation had no knowledge of the falsity of the document but having been provided with the fax of the purported agreement quite understandably made it the feature piece of the defendant's motion for summary judgment by way of an exhibit-in effect, the representation was made to Benvenuti and its secretary and treasurer, Charles Mazzella, by means of the defendant's motion having been filed in court. Mazzella in his affidavit opposing the motion in the first litigation was obviously aware of the purported agreement submitted by Spinogatti; Mazzella said he did not remember signing it. Cf., *Suffield Development Assoc. v. National Loan Investors,* 260 Conn. 766, 778 (2002) (representation made only to court not plaintiff so common-law fraud could not be found).

The third element of fraud seems also to have been established. The misrepresentation was to induce the other party, Mazzella, to rely upon it in the conduct of ongoing legal proceedings.

The fourth element, as set forth in the *Harold Cohn* case and *Barbara Weisman, Trustee v. Kaspar,* 233 Conn. 531, 539 (1995), might be seen to present the most difficulty on the fraud/forgery count for the plaintiff: "(4) the other party did so act upon that false representation to [the party's] injury." Basically, this is a requirement that the party claiming to be injured was injured because it relied on the misrepresentation to its injury. In *Suffield Development,* reliance could not be found because the false representation was made to the court and the court relied on it to the plaintiff's harm. That case was not prepared to recognize a tort for "fraud on the court" apparently, reasoning that the remedy for such an action is a statutory one for a new trial; the court was not prepared to recognize a damage remedy for such a claim, 260 Conn. at p. 779. Does the plaintiff face the same problem here?

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.