Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21977974 (Conn.Super.)
(Cite as: Not Reported in A.2d)

Page 14

It can be argued here that the answer would appear to be no. This requires an analysis of the reliance factor in a fraud case, and here, under a forgery claim.

In the article on "Fraud and Deception" in 37 Am.Jur.2d, § 239 at pp. 263-64, it says: "The recipient of a fraudulent misrepresentation can recover against its maker for pecuniary loss resulting from it, but only if the recipient relies on the misrepresentation in acting or *refraining from action* and such reliance is justifiable." (Emphasis by court.) *U.P.S. v. Rickert*, 996 S.W.2d 464, 469 (Ky., 1999) (induced inaction because of fraud can satisfy reliance requirement); cf. *Kaufman v. Delafield*, 229 NYS 545 (1928), also see § 243 of Am.Jur. article at p. 268.

*18 Section 537 of Restatement (Second) Torts says that:
> The recipient of a fraudulent misrepresentation can recover against its maker for pecuniary loss resulting from it, but only if (a) he (sic) relies on the misrepresentation in acting or *refraining from action*, and (b) his (sic) reliance is justifiable. (Emphasis by court.)

A review of the file in the first litigation indicates that in opposing the defendant's summary judgment motion, the plaintiff relied on the authenticity of the purported January 13, 1996 agreement to the extent of refraining from directly questioning whether it was actually signed by Charles Mazzella. In his affidavit opposing the motion, Mazzella merely said that he "did not recall ever signing that document," the document is dated January 13th and Mazzella claimed he only signed a document on the 27th stating the training was satisfactory-paralleling the language in the beginning of the January 13, 1996 document submitted to the court. In the plaintiff's brief, the thrust of the argument was not that the January 13, 1996 was not authentic, rather the argument was that this document "is not part of the contract." All of this proved fatal to the plaintiff's case. The trial court reviewed all the so-called "contract documents" and the January 13, 1996 "agreement." It concluded the agreement was controlling. As previously discussed, the "agreement," reading the second and fourth paragraphs together, invalidates any claim by the plaintiff that the 25-mile exclusive radius language in the invoice contractually bound Foss not to sell to competitors within that radius. As the trial court pointed out, (1) "It is axiomatic that a party is entitled to rely upon its written contract as the final integration of its rights and duties," *Zullo v. Smith*, 179 Conn. 596, 601 (1980); and (2) in the absence of a claim of fraud or mistake, a party is bound by his/her signature on a contact document. Cf. *Bashura v. Strategy Plus, Inc.*, Sup.Ct., Milford, Docket No. 050871. The Appellate Court affirmed the trial court's granting of the defendant's summary judgment motion holding in effect that the logic of *Zullo* dictated that the January 13, 1996 was the only "contract document" the trial court should have considered. The agreement in paragraph four contained an unambiguous "merger clause" and the Appellate Court affirmed the trial court's reading of that document as barring the plaintiff's claim regarding the twenty-five mile exclusive radius. See *Benvenuti Oil Co. v. Foss Consultants, Inc.*, 64 Conn.App. 723 (2001).

But assuming the court's construct of reliance is accepted that will, standing alone, not satisfy the fourth and final element of common-law fraud. Two other matters must be discussed.

As § 537 of Restatement (Second) Torts makes clear, any reliance must be shown to be justifiable and the justifiable reliance must be shown to have led to "injury" as that concept is defined in common-law fraud.

*19 First, the court will discuss whether the reliance was justifiable. This is a necessary requirement since without proving its reliance was justifiable how can a plaintiff prove any injury it claims to have suffered flowed from the fraud? The plaintiff's failure to act here was certainly justifiable as of the date of the trial court's decision granting the defendant's summary judgment motion on April 6, 1999. Levenberg's revelation of a fraudulent scheme did not come to Mazzella's attention until the fall of 2000. Was the reliance justifiable after that date? This question is related to the collateral estoppel issue and whether this pending suit is precluded by the fact that there was no attempt to reopen the judgment in the first suit after Mazzella heard Levenberg's story. The court will discuss this issue at a later point in this decision.

The foregoing discussion as to whether any reliance was justifiable leads to a second requirement of the fourth element of common-law fraud. What must now be addressed is whether any justifiable reliance has led to injury to the plaintiff as that concept is defined under this element of fraud. How is injury described in this context? In a common-law fraud action, a claimant must show "substantial pecuniary loss"; without actual damage there is no cause of

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21977974 (Conn.Super.)
(Cite as: Not Reported in A.2d)

Page 15

action in fraud. *Beik v. Thorsen,* 169 Conn. 593, 594-95 (1975), cited with approval in *Kildruff v. Adams, Inc.,* 219 Conn. 314, 329 (1991). Our state appears to follow the general rule to the effect that "proof of damages is an essential element in claims of fraud or misrepresentation and the plaintiff must show that the fraud has come to rest, causing the plaintiff an injury ... In contrast with trespass and other direct injuries for which the complainant may be awarded nominal damages if no actual damages are proven, deceit belongs to that class of tort for which a pecuniary loss generally constitutes a necessary part of the cause of action," 37 Am.Jur.2d "Fraud and Deceit," § 272 at pp. 294-95, also see § 382; *Meader v. Trout Brook Ice & Feed Co.,* 96 Conn. 454, 463 at p. 385 (1921), suggests nominal damages can be awarded but that case has not been cited by any appellate court since it saw the light of day eighty years ago.

Has the evidence presented met the requirements of injury as just defined? The court will first examine the question from the nature of the claims made.

Is one of the claims here some concept of "fraud on the court"? If so, as pointed out in *Suffield Development Assoc. v. National Loan Investors,* 260 Conn. 766 (2002), "fraud on the court" may provide a statutory [§ 52-570] or equitable basis for seeking a new trial but it apparently cannot be framed as a tort claim seeking money damages. *Id.* p. 779. If that is true, then the fourth element of common-law fraud cannot be shown under this complaint since there is no "injury" in the meaning of that term for common-law fraud.

*20 Perhaps the present litigation can be viewed as a renewed attempt to seek damages in fraud for any harm caused by what is now claimed as a violation of the true contractual intent of the parties-that Foss would not sell its program to any other company within an exclusive 25-mile radius from Benvenuti. That is, the claim now is that the fraud deprived the plaintiff of the opportunity to make such a claim in the first suit. But then is not this litigation really an attempt to reopen the judgment in the first suit and must not the various requirements for making such a request be complied with? The court will discuss this matter later in the opinion.

Another interesting question not addressed by the parties but seemingly raised by the "injury" requirement of common-law fraud is the issue of whether the plaintiff would have prevailed in the first suit on its position regarding the meaning of the 25-mile exclusive radius clause if the January 13, 1996 "agreement" was not before the trial and appellate courts in that litigation. That is, if even under the terms the plaintiff wished the court to consider the breach of contract issue, it would not have prevailed, what is the injury? This matter will also be addressed later in the opinion.

The difficulties discussed in proving "injury" perhaps underline the fact that perhaps a common-law fraud claim cannot be as easily bifurcated into a liability phase followed by a damage hearing if a plaintiff prevails on the liability question.

One way out of these difficulties from the perspective of preserving the tool of bifurcation in this type of case is to say injury at least can be shown if the fraud caused added litigation expenses, including attorneys fees. Other damage claims and whether they can be made at all could then be addressed at a damage hearing.

In this case, the problem is that no evidence was presented as to attorneys fees-can the court assume they were incurred with their amount to be determined at the damage portion of this ligation? There is a second problem with this approach. This is so because the general rule seems to be that in an action based on fraud, "a successful party in an action may not recover from his (sic) adversary in that action the attorneys fees incurred in prosecuting or defending against the action." 44 ALR 4th 776, § 3, p. 782; also see § 2, p. 780, article entitled, "Attorneys fees as recoverable in fraud action." Cf. *Beiser v. Evered,* 20 Conn.Sup. 365 (1957), also see 37 Am.Jur.2d § 392, pp. 391-92, "Fraud and Deceit."

It is true that in a fraud action, attorneys fees can be awarded by way of punitive damages. See § 395 of Am.Jur.2d article, § 4(a) of ALR 4th article; cf. *Bennett v. Gibbons,* 55 Conn. 450 (1998). *Hi Ho Tower, Inc. v. Com Tronics,* 255 Conn. 20, 33 (2000), is interesting. The tort discussed there was tortious interference with a business relationship which, like fraud, requires proof of actual loss. In that case, the court went on to note that sometimes damages are hard to calculate but the court is convinced damages have been incurred and goes on to award nominal damages. The count referred to Restatement (Second) Torts § 774(a) comment (c) and went on to say, "That is an award of compensatory damages is not necessary to establish a course of action for tortious interference as long as there is a finding of actual loss and a finding of actual loss may support of punitive damages." *Id.* p. 34. As noted, however, no evidence was offered as to actual loss.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21977974 (Conn.Super.)
(Cite as: Not Reported in A.2d)

Page 16

*21 But, technically speaking, the rule against attorneys fees in a fraud action bars such a claim only when the fees have been incurred in prosecuting or defending against the action. Query whether that would bar such a claim in this action for the attorneys fees incurred in the first action as a direct result of having to confront and somehow try to avert a defense in the trial and appellate case based on fraudulent actions?

The court has tried to set forth these considerations, because it believes they must be addressed in any second phase of this bifurcated trial. What must particularly be dealt with here is the ambit of the *Suffield Development* case which neither of the parties directly addressed. But the court is reluctant to rule here that the fourth element of fraud was not proven because "injury" was not established or that the defendant has waived his right to explore these issues. Both sides could have in good faith concluded they had no obligation to raise this question in a trial that was to be bifurcated between a hearing on liability and followed by a hearing on damages with the notion of damages in such a hearing encompassing the concept of injury under fraud. The court itself did not order the bifurcation and only discovered the problem that proof of injury is an element to be proven to establish liability for common-law fraud as it was wandering through the highways and byways of that ancient tort.

Where does that leave the court as to this so-called liability phrase of this hearing? The court concludes the plaintiff has, by clear and convincing evidence, established the first three elements of civil forgery/fraud against Foss Consultants, Inc. and John Spinogatti from an examination of the evidence that it heard. The court further concludes that the justifiable reliance element of the fourth element of common-law fraud has been established but that the injury aspect of this element must be addressed at a later hearing which could also address other appropriate damage claims.

However, having said this, the court must examine other issues raised by the defendant. One issue is that of amending the pleadings.

Post-trial, the plaintiff has moved to amend its pleadings. This raises various issues. One issue is whether the offered amendments permit the plaintiff to make a claim against Foss and John Spinogatti independently of claims against other defendants. Are they necessary to accomplish this end? If so, would the defendant be now unfairly prejudiced by allowing the amendment since the trial proceeded under a complaint that advanced a theory of liability not only against the previously mentioned defendants but also against Jon and Felicia Spinogatti with all of them acting in concert?

Two other defenses raised by the defendants must also be considered. The defendants argue that the plaintiff's claim is barred by the statute of limitations. They further argue that the plaintiff's action should be dismissed through operation of the doctrines of collateral estoppel/res judicata. The court will now discuss each of these matters.

V. Post-trial Issues and Defenses

(1)

*22 As indicated, the court must address the plaintiff's post-trial attempt to amend the complaint so as to conform with the evidence offered at trial. In the complaint filed in this case, the plaintiff set forth the means by which it claims a forgery and fraud were perpetrated. The problem arises because the court has found that a forgery was committed but not by all the parties declared complicit in the complaint and not pursuant to the method set forth in the complaint as originally filed. The complaint states that the forged document was prepared by the defendants John, Jon and Felicia Spinogatti. It was sent to the son for Spinogatti who allegedly forged Mazzella's signature and Felicia Spinogatti then signed the forged document (par. 28-31). Paragraph 27 states all three individual defendants prepared the document to perpetrate a fraud on the court. The defendant Foss Consultants filed a motion for summary judgment in the first litigation and, relying on the forged document, the trial court granted the Foss summary judgment motion (par. 32-34).

After trial, the plaintiff filed a request to amend the complaint as to the substantive claims by adding the following paragraphs to the first count:

    6a If the individual defendants were not employees or shareholders of Foss Consultants, Inc., they were acting within their scope of authority as agents of either Foss Consultants, Inc. or John Spinogatti or both.

    27a The individual defendant, John Spinogatti, filed with the court an affidavit stating that the document dated January 13, 1996 was a true document:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21977974 (Conn.Super.)
(Cite as: Not Reported in A.2d)

Page 17

a. when he knew the document was false;
b. knew or should have known that the document contained a signature that was not the true signature of Charles Mazzella;
c. claimed the document was authentic when he knew it was false;
d. failed to disclose to the plaintiff that the document was false;
e. signed an affidavit that he knew to be false.
28a The individual defendants were in such a relationship that they aided and abetted each other so that all were acting together or some of them were acting together so as to cause a false and fraudulent document to be filed and represented it as a true document when they knew that the document was false and fraudulent.
40a The defendants violated § 52-505 of the Connecticut General Statutes in that all of them or some of them or one of them made, altered or forged a document which document was dated January 13, 1996 or knowingly uttered as true the document dated January 13, 1996 falsely made, altered or forged.

Permitting the amendment would allow the plaintiff to press the forgery/fraud claim against Foss Consultants and John Spinogatti alone on the theory that he prepared a forged document or in any event knowing that it was false presented it to the court thereby prevailing on a motion for summary judgment in the first litigation. The defendants object. If such an amendment is not permitted, it can be argued that the plaintiff cannot prevail on the forgery/fraud claim since the court has concluded Jon and Felicia Spinogatti did not participate in creating the forgery.

*23 The issue of whether to allow a post-trial amendment to the pleadings so that they conform to the proof can be a difficult one depending on the appellate cases one turns to for guidance.

On the one hand, there seems to be a strict view which is indicated in the language of a case like *Yellow Page Consultants, Inc. v. Omni Home Health Services, Inc.*, 59 Conn.App. 194, which quoting from an earlier case said:

It is fundamental in our law that the right of a [party] to recover is limited to the allegations of the complaint ... A [party] may not allege one cause of action and recover on another.

*Id.*, p. 200.

In a statement following this language at the same page the court approved a statement that, if carried to its logical extreme, takes a very strict view: "Facts found but not averred cannot be made the basis for recovery." *Id.* Also see *Kane v. Kane*, 120 Conn. 184, 189 (1935). A very recent case quoted all this language, *Shapero v. Mercede*, 77 Conn.App. 497, 503 (2003), and quoted the earlier case of *Westfall v. Westfall*, 46 Conn.App. 182 (1997), which said at p. 185: "Judgment cannot be founded on a finding of facts not in issue, although they may have been shown in evidence to which no proper objection was taken."

How does this language square with that of *Voll v. Lafayette Bank & Trust Co.*, 223 Conn. 419, 433 (1992).

A trial court may allow, in its discretion, an amendment to pleadings before, during or, as here, after trial to conform to the proof ... Whether to allow an amendment is a matter left to the sound discretion of the trial court. This court will not disturb a trial court's ruling on a proposed amendment unless there has been a clear abuse of that discretion ...
*Where, as here, there is a variance between allegations in the (original complaint) and the proof at trial, which is corrected by amendment to the (original complaint), a judgment based on the amended complaint will not be set aside unless the variance misled or prejudiced the defendants on the merits of the case.*
(Emphasis added by this court.)

On what may be regarded as the outer reaches of such a liberal view is the language of *Stafford Higgins Industries, Inc. v. Norwalk*, 245 Conn. 551 (1998), where the court said at p. 575:

With respect to the lack of an amendment of the complaint, it is true that ordinarily a court may not grant relief on the basis of an unpleaded claim ... "[a] plaintiff may not allege one cause of action and recover upon another." ... *That does not necessarily mean, however, that the absence of a particular claim from the pleadings automatically precludes a trial court from addressing the claim, because a court may, despite pleading deficiencies, decide a case on the basis on which it was actually litigated and may, in such an instance, permit the amendment of a complaint, even after the trial, to conform to that actuality* ... Indeed, we have recognized that, even in the absence of such an amendment, where the trial court had in fact addressed a technically unpleaded claim that was actually litigated by the parties, it was improper for the Appellate Court to reverse the trial court's judgment for lack of such an amendment ... Whether to grant such a post-trial amendment is

Not Reported in A.2d                                                                  Page 18
Not Reported in A.2d, 2003 WL 21977974 (Conn.Super.)
(Cite as: Not Reported in A.2d)

within the discretion of the trial court ..."[t]he trial court has wide discretion in granting or denying amendments before, during or after trial." ...
*24 (Emphasis added by this court.)

Some basic observations can be garnered from the cases. Where a case is tried to the court, a similar analytical problem is presented as that raised by post-trial motions to amend the pleadings. In other words, where after a court trial a judge enters judgment on a theory of recovery not even alluded to in the pleadings or, for example, rejects a breach of contract claim on a defense not raised by the pleadings or even by argument of counsel, *Yellow Page Consultants*, 59 Conn.App. at p. 200, cf. *Maloney v. Steinberg*, 138 Conn. 718, 721 (1952), a reviewing court is more likely to conclude that there was error. Where a theory of liability is advanced in the original complaint, however, and a post-trial amendment seeks to rest the claim on different basic facts, no ironclad rules exist and the issue of prejudice and whether the amendment or post-trial action by the court can be said to have misled or confound the party opposing the amendment becomes the paramount concern. In this regard, the case of *Antonofsky v. Goldberg*, 144 Conn. 594 (1957), is of some interest. There, the trial court was upheld in granting the defendants' motion for directed verdict because no evidence was offered which would have justified the jury in finding the plaintiff's injuries were caused as alleged in the complaint. The theory of liability was in negligence and the allegations of the complaint were that the combined negligence of the two defendants caused the plaintiff's injuries. At trial, it became clear that the injury was incurred by the sudden braking of only one of the defendants. The court refused to allow an amendment midtrial. It is interesting to note, however, that even in this factual situation, the court did not dismiss the request to amend outright. It pointed to the fact that years had passed since the accident and witnesses and documentary evidence may be lost. The court said of the plaintiff in upholding the denial of the amendment request: "He sought to recover, however, on proof of materially different facts on which he asked that the defendants be found guilty of negligent acts not specified in the complaint. The test was whether the variance misled or prejudiced the defendants on the merits of the case." See 144 Conn. at pp. 598-99. Ultimately, then as the defendants recognize by their reference to *Remington Investments, Inc. v. National Properties*, 49 Conn.App. 789, 803-04 (1998), in the type of situation now before the court the test to apply in deciding whether to permit a post-trial amendment to conform the pleadings to the proof depends on whether doing so would unfairly prejudice the party imposing the amendment.

The gravamen of the original complaint against the defendants was fraud. Paragraph 27 of that complaint reads as follows:

27. During the litigation in September 1998, the defendants produced a document that was a forgery. The document was prepared to perpetrate a fraud upon the plaintiff to deprive it of the right to present its claims in court. Furthermore, the document was prepared to perpetrate a fraud upon the trial court. The document was a fraudulently prepared document that contained a forged signature of Charles Mazzella, the president of plaintiff, Benvenuti Oil Company.

*25 No new theory of liability is being presented through the amendments. They only concern the mechanism of the forgery which allowed one of the defendants, John Spinogatti, to allegedly perpetrate the fraud by submitting a forged document to the court. Would the defendants be prejudiced by this factual change if allowed post-trial?

Once the court permitted the plaintiff's expert to testify that Exhibit 3, the document the court has concluded was the original of the faxed document John Spinogatti sent to his lawyer was a forgery, Spinogatti was certainly on notice that a claim was being made that he knowingly submitted a fraudulent document to the court in the first litigation no matter what the mechanism for accomplishing that forgery was. In the affidavit attached to the Foss summary judgment motion in the first suit Spinogatti averred he was familiar with the faxed version of the document because he created it, had previously seen it, executed it or otherwise made myself familiar with it. He further swore that this document along with others submitted for the motion was "authentic" and "genuine." What is the prejudice-that the defendant could not pursue a line of inquiry with Levenberg to the effect that Levenberg forged the document in September 1998 or before for some reason not operative at the time but which would allow Levenberg to get Spinogatti in trouble in litigation three or four years in the future? Attorney Bartinik argued at trial that a comparison of Exhibit 3 and the faxed document attached to the summary judgment motion indicate the fax's source is the original. That the mechanism of the forgery as alleged in the complaint was not controlling in the understanding of the litigants is further revealed by the fact that the attorney for the defendants did not confine his defense to attacking Levenberg's credibility as to how

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21977974 (Conn.Super.)
(Cite as: Not Reported in A.2d)

Page 19

the forgery took place-the mailing to the son, the return mail, Felicia Spinogatti signing the "agreement," etc. He specifically asked Felicia Spinogatti if her father ever asked her to forge anyone's signature and whether she ever forged anyone's signature. Counsel for the defendants also specifically asked John Spinogatti if he ever asked his son to forge anything and went beyond that and asked him if he ever asked his daughter "to forge or simulate someone else's signature." Counsel also asked Mr. Spinogatti whether he, Mr. Spinogatti, "ever forge(d) Charles Mazzella's signature." In examining Charles Mazzella, counsel for the defendants asked Charles Mazzella whether he had any personal knowledge that Jon or Felicia Spinogatti forged a document or that the father, John Spinogatti, forged a document. Counsel even asked Marc Trichon whether he was "ever asked to forge Charles Mazzella's signature" or whether he was asked to write Felicia Spinogatti's name on a blank document purporting to be an agreement between Foss and Benvenuti Oil Company.

It is difficult to understand what the surprise or prejudice could be to the defendants or what line of inquiry would have been pursued that was not because the amendments had not been made earlier. The defendants claim prejudice but do not articulate what in fact that prejudice was or what trial strategy would have been pursued if it had envisaged the amendments or that only one of the named defendants under the theory of the case could be responsible for the forgery or using a forged document to commit a fraud.

*26 In fact the use of the plural defendants is somewhat ironic in the context of the claim of prejudice. Defense counsel's excellent examination of witnesses and brief convinced the court that it cannot find John and Felicia Spinogatti to have been involved in fraud/forgery by clear and convincing evidence. But success on that score still leaves the court with a document which all counsel knew was claimed to have been a forgery.

There is one other objection to the suggested amendments which the court is perhaps misunderstanding. This concerns the proposed amendment 6A. Insofar as the amendment suggests John Spinogatti was acting within the scope of his authority as an agent of Foss, one could take the objection to mean that the amendment in this regard does not conform to the proof, "nor was it raised during the trial." In fact says the objection, "no evidence was adduced as to John Spinogatti acting within his scope of authority as an agent for Foss Consultants. Nor, on cross examination, was he asked the same."

The record is replete with indications that all sides understood Foss to be the creature of John Spinogatti and that in all his actions relative to its business, he was acting as its agent or in its behalf. Exhibit 11 is the file in the first litigation. The affidavit John Spinogatti filed to secure summary judgment is in that file which is before the court in this case. In paragraph 1, he states he is the president of Foss and as such familiar with all aspects of the pending litigation. Jon Spinogatti testified he worked for a short time in his "father's business" but was not familiar with his "father's contracts." Felicia Spinogatti testified she worked for her "father's company" and leaned her "father's business." Her father's company dissolved some time in 1999. She had no authority to resolve any dispute with Foss customers-that always lied with her father. John Spinogatti on direct testified he created Foss in 1980. He was repeatedly asked about the selling of "your program," whether any client used the program indefinitely. On cross, he said he "created" the invoice for his company. He was asked what the 25-mile exclusive radius gave to "your customers"-i.e., Foss customers. Innumerable questions and answers on direct and cross were to the same effect.

Given the broad allegations of paragraph 27 of the original complaint and the admonition by our courts to read pleadings liberally and broadly, *Cellu Tissue Corp. v. Blake Equipment Co.*, 41 Conn.App. 413, 417 (1996), and in light of the foregoing observations of what transpired at trial, the court believes the suggested post-trial amendments should be permitted. In fact, the problem presented with the interplay between the original pleading and the proposed post-trial amendment is similar to that before the court in *Remington Investments, Inc., v. National Properties*, 49 Conn.App. 789, 802-04 (see §§ III and IV).

(2)

The applicable statute of limitations for an action in fraud and/or forgery if the latter is to be considered separately is three years pursuant to § 52-577 of the General Statutes. *Giuletti et al. v. Giuletti et al.*, 65 Conn.App. 813, 833 (2001). The defense of statute of limitations is an affirmative defense, *Edwards v. Bridgeport Hydraulic Co.*, 152 Conn. 684, 691 (1965), and the burden is on the defendant to establish it. Thus, as the defendant points out, "the

Case 7:04-cv-08223-KMK   Document 93-4   Filed 09/19/2005   Page 7 of 12

Not Reported in A.2d                                                                Page 20
Not Reported in A.2d, 2003 WL 21977974 (Conn.Super.)
(Cite as: Not Reported in A.2d)

alleged acts of fraud or forgery had to have been committed within three (3) years of August 21, 2001, the date of the complaint (in this action) or, not before August 21, 1998."

*27 The statute of limitations defense presents, at least for the court, difficult questions. Section 52-577 reads as follows: "No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of." But the question is what exactly constitutes the act or omission complained of in any tort action. *Protter v. Brown Thompson & Co.,* 25 Conn .App. 360, 364 (1991) (indemnification action). In a negligence case, the answer to this question can appear to be easy. Thus, in the leading case of *Prokolkin v. General Motors Corp.,* 170 Conn. 289, the court said:

> [i]n adopting (the act or omission complained of) language, our legislature distinguished Connecticut's statutes of limitations for torts from those of other jurisdictions, the majority of which begin to run only "after the cause of action has accrued." Id. pp. 294-95.
> The date of the act or omission complained of is the date when the negligent conduct of the defendant occurs and is not the date when the plaintiff first sustains damage. Id. p. 297 ... Because of the distinction created in the Connecticut limitation statute between the injury and the tortious conduct that caused it, it is indeed possible, on occasions, to bar an action before the cause of action accrues. Id. p. 296.

But in some contexts, the "act or omission complained of" language found in § 52-577 is not so easily defined. Thus, the *Prokolkin* court relied heavily on the reasoning of *Dincher v. Marlin Firearms Co.,* 198 F.2d 821 (2d Cir., 1952), which interpreted the same language in a statute which was a predecessor to § 52-584. *Dincher* was a product liability case brought against a gun manufacturer as a result of an injury sustained when a rifle backfired. The federal court said the act or omission language undermined any argument that the period of limitations runs from the date of injury-i.e. from the time at which the injury accrues. The federal court went on to say, "of course, the act or omission complained of took place, at the latest, when the sale of the defective gun took place." Id. pp. 822-23. Why is that so? Why should not the act or omission have taken place when the gun was manufactured? or when it was delivered to the retailer? This, of course, would lead to ludicrous results. Not only would a product liability cause of action be barred before it accrues (damage or injury occurs), but it would be barred before the allegedly defective product came in contact with a particular consumer who might be endangered by the product.

The same analysis could be applied to a forgery civil claim or a fraud case based, for example, on forgery or any other plan or device calculated to take advantage of a particular individual or class of individuals. There is no such thing as forgery in the air. Thus, *Lauder v. Peck,* 11 Conn.App. 161 (1987), recognized the viability of a claim in civil forgery and fraud. In that case, a plaintiff sued her former lawyer. She claimed that he had forged a release of a lis pendens she had filed against property owned by her former husband. The trial court found the defendant committed a forgery in violation of § 53a-137. The first count of the complaint said, "the defendant falsely made and forged a release, acknowledging therein that he was the issuing authority of said Notice of Lis Pendens."

*28 As a result of the defendant's actions, the plaintiff suffered injury when the husband sold the property. Using a § 52-577 *Prokolkin* analysis, it cannot be said that the limitations statute began to run when injury occurred-the sale of the property. On the other hand, would it not be silly to say the act or omission took place when the defendant forged the document not when he issued it and thus released the lien? Certainly, § 52-577 as interpreted can bar an action before it "accrues" but it should not be interpreted in such a way so as to create a gratuitous benefit for persons who allegedly are concocting fraudulent schemes. FN4

> FN4. The difficulties presented by applying a statute like § 52-577, which has been interpreted as a so-called "occurrence" statute, to fraud cases or, for example, forgery cases where forgery is the mechanism to commit fraud on the initially unsuspecting seems to be reflected in *Travelers Indemnity Co. v. Rubin,* 209 Conn. 437 (1988). In that case, the insurance company provided the defendant with coverage on a restaurant. In 1975, Rubin vandalized the restaurant and the company paid his claim under the policy. The company discovered the fraud in 1980 and brought suit. In 1974, Rubin owned property in Manchester. Thereafter, he engaged in an elaborate series of transactions regarding the property; the property was foreclosed on in 1978 and eventually ended up in the possession of his girlfriend whom he

Case 7:04-cv-08223-KMK   Document 93-4   Filed 09/19/2005   Page 8 of 12

Not Reported in A.2d  Page 21
Not Reported in A.2d, 2003 WL 21977974 (Conn.Super.)
(Cite as: Not Reported in A.2d)

married in 1980. The plaintiff insurance company brought an action to set aside the 1978 conveyance of the property claiming it was fraudulent. The trial court found that the latter action was barred by the three-year § 52-577 limitations statute. The Supreme Court affirmed the trial court. The court at pp. 443-44 reasoned as follows:

In the present case, the trial court found that the plaintiff knew that the property had been foreclosed in 1978 when it instituted the action to recover damages from Rubin for the insurance policy fraud on July 30, 1980. The plaintiff had known of Rubin's residence on Birch Mountain Road since 1975. When the plaintiff discovered in September 1979, that Rubin's claim under the restaurant policy was fraudulent, it also became aware that the Birch Mountain Road property owned by Rubin had been foreclosed in 1978. It also became aware that Rubin was living on the same premises in 1980. Page 444.

We can discern no rational reason why a party knowing of a debtor's fraudulent conveyance should not be required to join an action to set aside the fraudulent conveyance with the underlying action against the debtor for damages. Knowledge of the fraud should facilitate the prompt resolution of claims against real property. A claim of fraudulent conveyance should not be like the sword of Damocles hanging over a title of real property to be dropped at the pleasure of the claimant. The trial court properly considered the plaintiff's knowledge of the fraudulent conveyance in determining that the statute of limitations barred its action.

In interpreting an "occurrence" limitation statute, § 52-577, interestingly, the court did not say the limitations period ran from the time the fraudulent conveyance occurred but from the point at which the plaintiff had knowledge of it. On the way to its conclusion, the court cited two cases, Rosenberg v. Rosenberg, 601 P.2d 589 (Ariz., 1979), and Greco v. Pullara, 444 P.2d 383 (Colo., 1968), which in the fraudulent conveyance context held the statute of limitations began to run when moving parties discovered fraud or was chargeable with knowledge of it. Also see Cowart v. Whitley, 251 S.E.2d 627 (N.C., 1979).

In other words, the act or omission complained of here is not the mechanical perpetration of the forgery qua forgery, but (1) the creation of the forged document plus (2) the knowing use of that document as part of a court filing. This approach still preserves the *Prokolkin* reasoning which creates a dichotomy between the act or omission complained of and any resulting injury-here, any injury shown to have resulted from the fraudulent court filing of a document known to be forged.

The court concludes the defendant has not established an affirmative defense under the statute of limitations.

(3)

The defendant also raises the argument that the present action is barred by "the doctrines of res judicata and collateral estoppel." The ambit of the defendants' position is set forth in the brief where it is argued the prerequisites for application of these doctrines are met here: "Benvenuti Oil was the plaintiff in the first matter and it is the plaintiff in the second (present) matter. Foss Consultants, Inc. was the defendant in the first matter and it is the defendant in the second matter. The allegations pertaining to Jon Spinogatti and Felicia Spinogatti are not the same and can be litigated here, but the claims against Foss Consultants, Inc. and its president, John Spinogatti, who was only acting as president in the first have been adjudicated." The court has dismissed the action against Felicia and Jon Spinogatti so the defendants' position on this issue only applies to Foss Consultants and John Spinogatti.

First, the argument must be set in perspective and the purposes of these doctrines and the distinction between them must be set forth. As our court said in *Mazzotti v. Allstate Ins. Co.*, 240 Conn. 799, 812 (1997):

Res judicata, or claim preclusion, is distinguishable from collateral estoppel or issue preclusion. Under the doctrine of res judicata, a final judgment, when rendered on the merits, is an absolute bar to a subsequent action between the same parties or those in privity with them upon the same claim (citations omitted). In contrast, collateral estoppel precludes a party from relitigating issues and facts actually and necessarily determined in an earlier proceeding between the same parties or those in privity with them upon a different claim (citations omitted). Furthermore, "to invoke collateral estoppel the issues sought to be litigated in the new

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d  
Not Reported in A.2d, 2003 WL 21977974 (Conn.Super.)  
(Cite as: Not Reported in A.2d)

Page 22

proceeding must be identical to those considered in the prior proceeding." (Citations omitted.) Both issue and claim preclusion "express no more than the fundamental principle that once a matter has been fully and fairly litigated, and finally decided, it comes to rest." (Citations omitted.)

*29 In this case, the counts now before the court lie in forgery and/or fraud. In the first suit, a breach of contract and violation of the Connecticut Unfair Trade Practices Act (§ 42-110a CGSA) were alleged; the CUTPA claim was based on the same factual allegations as made in the breach of contract count.

The forgery or fraud claims now before the court are not the claims of breach of contract and violation of CUTPA alleged in the first action. On the other hand, the factual allegations surrounding the forgery and fraud could certainly have been used to rebut the defense to the breach of contract claim raised by Foss Consultants and John Spinogatti in their summary judgment motion which relied on Exhibit 3, a forged document purporting to be the agreement between these parties.

One issue presented then by the facts of this case is whether the present forgery and fraud affirmative claims for relief on common-law tort grounds would be barred if the facts on which these claims are based were known in the first litigation and could have been presented at the trial court or Appellate Court level to rebut the defendants' summary judgment motion and/or used as a basis to reopen the judgment in that case. Query whether if the facts were known, whether, while the case was still in the trial court not only could they have been used to counter the summary judgment motion but relied upon not only as a defense in that court but as a basis to seek to amend the complaint in the first suit to make the same forgery and fraud claims now being made? What criteria should be used to determine if the general policy behind res judicata requires that these claims should be precluded? What is the requisite knowledge of a claim not advanced in earlier litigation, the possession of which would prevent the claim being advanced in subsequent litigation? The court will first refer to general language in cases which are not directly on point but which are instructive in at least outlining res judicata policy that should apply to situations such as the one now before the court.

In *Commissioner, Enviro. Prot. v. Conn. Bldg. Wrecking,* 227 Conn. 175 (1993), the court said at page 189:

We have adopted a transactional test as a guide to determining whether an action involves the same claim as an earlier action so as to trigger operation of the doctrine of res judicata. The claim that is extinguished (by the judgment in the first action) includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose. What factual grouping constitutes a 'transaction,' and what grouping constitutes a series, are to be determined pragmatically, giving weight to such considerations as to whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.

*30 The forgery and fraud claim would certainly appear to meet this test under the facts of this case, and what must be kept in mind is not just what was actually litigated under the umbrella of the portion of the transaction advanced in the first litigation, but what could have been litigated. Thus, in *Gagne v. Norton,* 189 Conn. 29, 32 (1983), the court said: "The theory underlying preclusion is merger. The original claim as a result of being merged in the judgment is extinguished and rights upon the judgment are substituted for it ... It follows that ordinarily a plaintiff cannot split his cause of action. He cannot sue for part of his claim in one action and then sue for the balance in another action."

Perhaps the language in *State v. Aillon,* 189 Conn. 416 (1983), is more to the point, at least as regards the issue now before the court. There, the court said at page 423: "Under the doctrine of res judicata or claim preclusion, a former judgment on a claim, if rendered on the merits, is an absolute bar to a subsequent action on the same claim. *A judgment is final not only as to every matter which was offered to sustain the claim, but also as to any other admissible matter which might have been offered for that purpose.*" (Emphasis added by this court.)

At the conclusion of their discussion on the res judicata/collateral estoppel question, the defendants make another argument which is indirectly related to that set of issues. It is that under Practice Book § 17-4 and § 52-212a CGSA, the plaintiff had four months to open the judgment in the first case. The plaintiff should have opened the judgment during the pendency of the appeal when it secured Levenberg's November 2000 statement regarding the alleged forgery and fraud; "the trial court had the inherent authority to grant a new trial if it found the allegation

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 23
Not Reported in A.2d, 2003 WL 21977974 (Conn.Super.)
**(Cite as: Not Reported in A.2d)**

of fraud convincing. Instead, the plaintiff sat on this knowledge, until after the Appellate Court's decision was reached."

First, it should be noted that our court has been quite explicit in saying that "a party clearly cannot utilize res judicata or collateral estoppel when it has committed fraud." *Jackson v. R.G. Whipple, Inc.*, 225 Conn. 705, 721 (1993) ; *Slattery v. Maykut*, 176 Conn. 147, 157 (1978). And it is difficult to see why an independent action cannot be brought in a situation such as this in lieu of a motion to reopen the judgment in the original suit barring, for example, laches or unreasonable delay by the party claiming to be injured after the fraud was discovered-the latter qualification being the same as that imposed on a court's inherent power to reopen a judgment for fraud at any time. Cf. *Billington v. Billington*, 220 Conn. 212, 218 (1991). This observation only has merit if they can be accommodated within the observations of *Suffield Development Associates, see 260 Conn. at p. 777* et seq., which the parties did not directly address and which may have to be examined in later proceedings in this case.

*31 Even leaving aside the observation in *Jackson*, if that can be done, a collateral estoppel/res judicata analysis can run in tandem with the question of whether a motion to reopen should have been filed as to the first litigation. As will be discussed, at least for purposes of this case, one important issue for both questions is whether the forgery matter could or should have been raised in the first litigation.

Or, to put it another way, this second suit can be treated not only as independent litigation subject to collateral estoppel and res judicata analysis, but also viewed as in effect a motion or legal procedure that in effect reopens the judgment in the first suit. As long as the same criteria are applied to test whether that judgment should be vacated, how can the defendants complain? Procedural rules and concepts should not be used as a straight jacket where the substantial rights of the parties and the criteria used to test those rights are not affected by the procedural cubbyhole used for any analysis and where the reason prompting the whole analysis is an allegation of fraud on the court.

Let us then examine the question of the feasibility of reopening the judgment in the first case. The trial court granted the motion for summary judgment in April of 1999. The matter was then appealed to the Appellate Court, which issued its decision, adverse to the plaintiff in August 2001. Levenberg made his revelations about forgery in November 2000. Theoretically, the plaintiff could have moved to reopen the judgment based on the Levenberg statement. But what would the burdens have been and thus the chances of success? In *Varley v. Varley*, 180 Conn. 1 (1980), the standards for reopening a judgment in a marital case were set forth which also apply in the case of a nonmarital judgment. Cf. *Beacon Falls v. Posick*, 17 Conn.App. 13, 17 (1988), which cites *Jucker v. Jucker*, 190 Conn. 674, 677 (1983).

The four criteria set forth in *Varley*, at page 4 of that decision, are the following:
   (1) There must have been no laches or unreasonable delay by the injured party after the fraud was discovered.
   (2) There must have been diligence in the original action, that is, diligence in trying to discover and expose the fraud.
   (3) There must be clear proof of the perjury or fraud.
   (4) There must be a substantial likelihood that the result of the new trial will be different.

In this case, the stumbling block to any motion to reopen would have been the third *Varley* criteria-"clear proof of the perjury or fraud," and this criteria is related to the first and second criteria in this case. It is somewhat ironic that the perpetrator of the fraud should now argue that armed with Levenberg's statement alone, the Benvenuti Oil Company should have approached the trial or Appellate Court and argued for a reopening of the judgment, but also should have moved to amend the original complaint by adding the children of Spinogatti as defendants and new common-law counts of fraud and forgery. Counsel for the defendant was extremely effective in attacking the credibility of Levenberg, so effective that he convinced the court that Felicia and Jon Spinogatti should not be subject to this lawsuit. At the time Levenberg made his November 2000 statement, he had already been sued by Spinogatti, there was obvious ill will between these gentlemen and a motive for Levenberg to fabricate a story. There was no practical way of corroborating Levenberg's story because a handwriting analysis could not be made of the faxed "agreement" of January 13, 1996 attached to the defendant's summary judgment motion. During argument in this case, counsel for the plaintiff himself, referring to the way they dealt with prospective customers, referred to Trichon, John Spinogatti and Levenberg as a group of con artists-yet now, the plaintiff, victim of a forgery, is to be faulted for not moving in the original action to reopen the judgment based on Levenberg's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                    Page 24
Not Reported in A.2d, 2003 WL 21977974 (Conn.Super.)
(Cite as: Not Reported in A.2d)

November 2000 story.

*32 In weighing the plaintiff's action or lack of action when presented with Levenberg's story, the time frame of the first litigation should be kept in mind. Levenberg gave his statement in November. The case was set down for argument February 14, 2001 in the Appellate Court, only three months later. How fair would it be to require the plaintiff to explore the various avenues necessary to corroborate or back up Levenberg's relations while all the time getting ready for an appellate argument which, in large part, entailed creating an argument to rebut a false scenario created by the defendant?

The nature of the fraud here, how it was effectuated by a faxed copy attached to pleadings, the people the plaintiff would have had to rely on, Levenberg and Trichon, all of which was known to Spinogatti, created a dilemma for the plaintiff which, at least in this court's opinion, the defendant should not be able to rely on in criticizing the lack of action by the plaintiff that that dilemma caused.

From the foregoing perspective, it was quite reasonable for the plaintiff to rely on the arguments it made before the Appellate Court, which did not raise the forgery and fraud issue, and having lost that argument, file a second suit wherein it might be hoped that discovery and deposition procedure might lead to corroboration of the fraud and forgery claim based on Levenberg's statement. Applying the *Varley* criteria, the court concludes the first three tests have been met by the plaintiff in its effort to avoid dismissal of this suit. (The third test is established for the court by its earlier discussion of the forgery issue.)

On the continuing assumption that the *Varley* analysis is an appropriate test to determine the viability of this second litigation, the fourth factor in *Varley* must be examined at least on the question on whether the judgment should be opened apart from collateral estoppel/res judicata issues. That test says that "there must be a substantial likelihood that the result of the new trial will be different." 180 Conn. at page 4. If the result will be the same, despite the existence of fraud, there is no reason to reopen the case or allow a new action based on the same allegations. Also, if actual not nominal damages must be shown for common-law fraud, there would be no basis for those counts in any second litigation.

Was there a substantial likelihood that the result would have been different in the first case? Absent the forged January 13, 1996 agreement, the "contract documents" would have arguably included the invoice and the December 9, 1995 letter sent to Mazzella upon his request for a more formal statement of the agreement between the parties.

The invoice dated December 8, 1995 is signed by Mazzella and writing by Trichon, Foss' sales representative, guarantees 250 new customers and a "25 mile exclusive radius." As noted earlier in this decision, the court agrees with the plaintiff's position that this language gave Benvenuti the exclusive right to use the program within the indicated radius of 25-miles. Spinogatti sent a letter on December 9, 1995 in response to Mazzella's request which begins, "As per our recent meeting with you, the following will confirm and summarizes our agreement ..." Mention is made of the 250 new customer guarantee but there is no mention of the 25-mile exclusive radius. Is the December 9th letter controlling?

*33 Issues of the parol evidence rule are raised and the usual rubric attached to the parole evidence rule is that the last written document constitutes the integrated agreement between the parties. Also as Calamari notes at common law, it is often held that a confirmation letter sent to the other party, here Mazzella, is a total integration if the letter is not responded to before performance. *The Law of Contracts*, Calamari and Perillo, 3d ed. § 3-3, page 143. But as Calamari goes on to point out, "It is agreed that any relevant evidence is admissible to show that the writing was not intended to be final." And oddly enough in Spinogatti's affidavit attached to his motion for summary judgment, Spinogatti says not only the January 13, 1996 agreement, but the December 9, 1995 letter *and* the December 8, 1995 invoice "constituted the full agreement between Foss Consultants, Inc. and Benvenuti Oil Company." When Mazzella's company paid Felicia Spinogatti, the secretary made the notation to that effect not on the December 9, 1995 letter, but on the invoice.

More to the point, the policy behind the parole evidence rule gives way when extrinsic evidence is offered to show mistake or fraud including fraud in the inducement of a contract. *Jay Realty, Inc. v. Ahearn Development Corp.*, 189 Conn. 52, 56 (1983); *Colliers, Dow & Condon, Inc. v. Schwartz*, 77 Conn.App. 462, 470 (2003). The court would refer to its earlier discussion regarding Trichon's testimony to the effect that the 25 mile exclusive radius language was resorted to as a way of "clinching" a deal and the specter of bait and switch tactics that this raises. But even leaving that aside, if the intention of the parties

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21977974 (Conn.Super.)
(Cite as: Not Reported in A.2d)

Page 25

was clearly expressed in the December 9, 1995 letter, why was it necessary to create the January 13, 1996 "agreement"? This would seem to create the negative inference that the plaintiff's interpretation of the 25 mile exclusive radius language, which the court agrees with, is the correct understanding of the intention of the parties, at least as evidenced in the "contract documents," especially the December 8th invoice.

For the foregoing reasons, the court does not accept the defense of collateral estoppel and res judicata and the ancillary argument regarding the consequences of the plaintiff's not filing a motion to reopen the judgment.

The court concludes civil forgery and fraud have been proven by clear and convincing evidence against John Spinogatti and Foss Consultants only with the reservation that the "injury" aspect of the fraud claim must still be explored along with the court's reservations about the applicability of *Suffield Development Associates Ltd. Partnership v. National Loan Investors,* to the viability of this action.

Conn.Super.,2003.
Benvenuti Oil Co., Inc. v. Foss Consultants, Inc.
Not Reported in A.2d, 2003 WL 21977974 (Conn.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.