Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1751135 (S.D.N.Y.),  RICO Bus.Disp.Guide 10,316
(Cite as: Not Reported in F.Supp.2d)

occurred well before October 5, 1997. If it does apply, plaintiff may recover for acts of misappropriation by Stephen occurring after January 5, 1995.

Rule 15(c) allows an amended pleading to relate back to the date of the original pleading when "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." In order for a new claim to relate back, "the basic claim must have arisen out of the conduct set forth in the original pleading ...." *Schiavone v. Fortune*, 477 U.S. 21, 29, 106 S.Ct. 2379, 91 L.Ed.2d 18 (1986). The key consideration is "whether the original complaint gave the defendant fair notice of the newly alleged claims." *Wilson v. Fairchild Republic Co.*, 143 F.3d 733, 738 (2d Cir.1998). Plaintiff's position is that the Amended Pleading relates back to the date of the original complaint because the original complaint it sets forth the same core acts of misappropriation as the predicate acts in the RICO claim in the Amended Complaint.

Defendants argue that because RICO claims are of an entirely different species than common law fraud claims and subject the defendants to more severe penalties, the relation-back doctrine cannot extend to claims that convert garden variety fraud into RICO causes of action. Defendants cite two district court cases in support of this position, each holding of which held that a RICO claim could not relate-back to a common law fraud pleading even though both arose out of the same wrongful conduct. *See Burghart v. Landau*, No. 82 Civ. 2181, 1991 WL 82064 (S.D.N.Y. May 9, 1991) ; *Radiology Center, S.C. v. Stife, Nicolaus & Company, Inc.*, No. 86 C 10166, 1992 WL 225568 (N.D.Ill. Sept.8, 1992).

The defendants' position untenable in light of more recent Second Circuit decisions which indicate that RICO claims may permissibly relate back to claims of common law fraud. *Tho Dihn Tran*, 281 F.3d at 35, involved a claim under the Fair Labor Standards Act ("FLSA") to which a RICO claim had been added in an amended complaint. The Second Circuit held that the district court should not have allowed the plaintiff to add the RICO claim as it was untimely and did not relate back to the FLSA claim. In concluding that the RICO claim could not relate back because it was based on illegal conduct "that was not alleged in any form in the original complaint," the court reasoned that:

*11 If the original complaint referred to general acts of fraud or other predicate acts that might

support a RICO claim, then a later amendment adding a RICO claim would "relate back" to the original complaint. *See Benfield v. Mocatta Metals Corp.*, 26 F.3d 19, 23 (2d Cir.1994). Even if the description of such an act of fraud was not fully developed or specifically described as part of a RICO conspiracy, it would put the defendants on notice that the conduct was at issue.

281 F.3d at 36. The court suggested that such a RICO claim could relate back because it would amount to "merely adding a new legal theory based on the same facts as those presented in the original complaint ...." *Id. Benfield*, the case cited by *Tho Dihn Tran*, reversed the lower court's dismissal on limitations grounds of a RICO cause of action in an amended complaint where the initial complaint alleged only commodities fraud. The Second Circuit held that because there was "commonality" between the allegations of commodities fraud in the original complaint and in the RICO claim, the RICO claim was not untimely because it would have related back to the fraud claim. The court found it significant that "[a]lthough RICO requires more in the way of evidence, proof of the RICO cause of action nonetheless involves evidence of the underlying fraudulent acts pleaded [in the original complaint]." 26 F.3d at 23 (citation omitted). With the original fraud allegations the plaintiff was "placed on notice that a RICO claim, based in large part on the fraud already alleged, might be made against it." *Id.*

The court's reasoning in these decisions undercuts the Katzes' position. Although dicta, the *Tho Dihn Tran* court's discussion furnishes an instructive an example of the kind of RICO claim that would relate back which essentially describes the claim at bar-where the predicate acts are the same as the acts of common law fraud in the original complaint. The *Benfield* court earlier came to the same conclusion in its holding. These decisions strongly suggest that defendants are put on notice sufficient to satisfy Rule 15(c) when acts of malfeasance that become RICO predicate acts are first alleged under a different fraud theory. This is so even when the acts of fraud are "not fully developed," *Tho Dihn Tran*, 281 F.3d at 36, and no hint of a future RICO claim is given.

In this case, the allegations of misappropriation that underlay the original fraud claim against Stephen Katz are virtually the same as those constituting the RICO predicate acts. Applying the reasoning of *Tho Dihn Tran* and *Benfield*, Stephen has been on notice that he could be subject to liability for these fraudulent acts under a RICO theory ever since the original complaint was filed. Accordingly, the RICO

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1751135 (S.D.N.Y.), RICO Bus.Disp.Guide 10,316
(Cite as: Not Reported in F.Supp.2d)

claim pleaded in the Amended Complaint relates back to the date of the original complaint. As a result, to the extent that it is otherwise viable, plaintiff may base his RICO claim against Stephen on injuries that occurred on or after January 5, 1995.

### C. RICO Enterprise

*12 Under 18 U.S.C. § 1962(c), it is unlawful "for any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ...." "Enterprise" is defined under the statute as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

The Amended Complaint alleges that Stephen and Norman Katz constituted an association-in-fact enterprise (the "Katz Enterprise"). Amended Complaint at ¶ 16. According to the allegations, "The Katz Enterprise, which also included corporations such as FKG Services, Inc. and individuals such as Bob Gainer engaged in the systematic looting of assets of Alliance for the personal benefit of the Katzes." Id.

In order to demonstrate an "association-in-fact" enterprise, the plaintiff must show that a "group of persons associated together for a common purpose of engaging in a course of conduct which functioned then as a continuing unit." Procter & Gamble Co. v. Big Apple Industrial Buildings, Inc., 879 F.2d 10, 18 (2d Cir.1987) (internal quotations omitted) (citing United States v. Turkette, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981)). The Katzes argue that the RICO claim should be dismissed for two reasons: (1) the allegations do not show that the Katzes functioned as a "continuing unit," and (2) the Amended Complaint does not adequately allege the existence of an enterprise extending beyond the objectives of the racketeering acts charged.

### 1. Sole Purpose to Commit Racketeering Acts

The second argument must be rejected because it rests on a legal standard that has been expressly disavowed by the Second Circuit. The Katzes base their argument on several district court decisions within this circuit which hold that a plaintiff cannot adequately plead a RICO enterprise if it is not distinct from the racketeering acts themselves. See Schmidt v. Fleet Bank, 16 F.Supp.2d 340, 349-50 (S.D.N.Y.1998) ; Goldfine v. Sichenzia, 118 F.Supp.2d 392, 400 (S.D.N.Y.2000) ; Heffernan v. HSBC Bank USA, No. 99 Cv 07981, 2001 WL 803719, *5 (E.D.N.Y. March 29, 2001); Black Radio Network, Inc. v. NYNEX Corp., 44 F.Supp.2d 565, 580 (S.D.N.Y.1999). Defendants correctly cite these cases as standing for the proposition that an enterprise cannot exist if it has no purpose separate and apart from commission of the illegal activity. Goldfine, Heffernan, and Black Radio Network all derive this proposition exclusively from Schmidt. Schmidt, in turn, rests its holding on a series of cases emanating from the Eighth Circuit which hold that if the sole purpose of a purported enterprise is to commit the predicate acts there can be no enterprise under RICO. See Schmidt, 16 F.Supp.2d at 349 (citing cases).

[8] The defendants' reliance on Schmidt and its progeny is as disturbing as it is unavailing. The Second Circuit pointedly disagreed with Schmidt on precisely the point for which defendants cite it months before defendants filed their reply brief on this motion. See Pavlov v. Bank of New York Co., Inc., 25 Fed. Appx. 70, 2002 WL 63576 (2d Cir. Jan.14, 2002) (unpublished decision). FN7 In Pavlov, the Second Circuit reversed the district court's dismissal of a RICO claim on the ground that the complaint did not allege an enterprise because the alleged enterprise constituted merely an aggregation of the predicate racketeering acts. In reversing, the court of appeals noted that the district court relied on Eighth Circuit precedent, as well as Schmidt. Id. 2002 WL 63576, ----1. The Second Circuit disapproved of this reasoning, summarizing its view as follows:

> FN7. Although the Second Circuit rules do not permit citation to unpublished decisions, see CTA2 Rule § 0.23, I believe that it is appropriate for me to consider Pavlov because the case expressly disapproves of the main case cited by the defendants.

*13 Our Circuit has rejected the Eighth Circuit's restrictive approach to the enterprise element.... The enterprise need not necessarily have a continuity extending beyond the performance of the pattern of racketeering acts alleged, or a structural hierarchy, so long as it is in fact an enterprise as defined in the statute.
We have repeatedly found a sufficient enterprise

Not Reported in F.Supp.2d                                                          Page 12
Not Reported in F.Supp.2d, 2002 WL 1751135 (S.D.N.Y.), RICO Bus.Disp.Guide 10,316
(Cite as: Not Reported in F.Supp.2d)

*where the complaint alleges a group without
centralized hierarchy formed for the sole purpose
of carrying out a pattern of racketeering acts.*
*Id.* (citations omitted) (emphasis added).

As the unpublished nature of the decision implies, it
did not break new ground. The reasoning of the
Eighth Circuit on which *Schmidt* stands was
dismissed by the Second Circuit long before *Pavlov*,
as this Court previously recognized. In *Hansel 'n
Gretel Brand, Inc. v. Savitsky*, No. 94 Civ.
4027(CSH), 1997 WL 543088, *2 (S.D.N.Y. Sept.3,
1997), I rejected the defendants' argument that the
enterprise element of a RICO claim had not been met
because the plaintiff failed to allege that the
defendants who comprised the enterprise played roles
distinct from the racketeering activity. I noted that the
defendants derived their argument from a passage in
*Turkette* in which the Supreme Court stated that
"[t]he 'enterprise' is not the 'pattern of racketeering
activity'; it is an entity separate and apart from the
pattern of activity in which it engages." *452 U.S. at
583*. My analysis of the defendants' argument in
*Hansel 'n Gretel* is equally applicable to the Katzes'
argument here and is therefore worth quoting at
length:

> Defendants interpret this passage, not without
> reason, to hold that the evidence necessary to
> establish an enterprise must be distinct from that
> which a plaintiff must adduce to show a pattern of
> racketeering activity. The majority of circuits
> embrace this reading. The Second Circuit,
> however, has not. In *United States v. Mazzei*, *700
> F.2d 85 (2d Cir.1983)* , the Circuit considered the
> impact of *Turkette*, and specifically rejected the
> notion that proof of enterprise and pattern be
> distinct, "so long as the proof offered is sufficient
> to satisfy both elements." *Id.* at 89. The court has
> restated that conclusion on numerous subsequent
> occasions.

1997 WL 543088, *2 (citations omitted). In *Mazzei*,
the court of appeals recognized its disagreement with
the Eighth Circuit's position. *700 F.2d at 89* ("The
appellant correctly notes that the Eighth Circuit's
position on the 'distinctness' issue is at odds with our
analysis.").

Given the Second Circuit's clarity on this issue, it is
puzzling that the *Schmidt* court followed the Eighth
Circuit's approach; and, given the *Pavlov* decision, it
is clear that the defendants cannot rely on *Schmidt*. In
light of the clear Second Circuit precedent which
allows an enterprise to be comprised of a group
formed for the sole purpose of engaging in fraudulent
activity, I cannot accept the Katzes' argument that the

plaintiff has failed to adequately allege an enterprise
because the Katz Enterprise existed purely to commit
the fraud plaintiff alleges.

### 2. *Continuing Unit*

*14 [9] An association-in-fact enterprise, such as the
Katz Enterprise, exists if the plaintiff can show that
its "various associates function as a continuing unit."
*Turkette*, 452 U.S. at 583. "For an association of
individuals to constitute an 'enterprise,' the
individuals must 'share a common purpose to engage
in a particular fraudulent course of conduct and work
together to achieve such purposes." ' *First
Nationwide Bank v. Gelt Funding, Corp.*, 820
F.Supp. 89, 98 (S.D.N.Y.1993) (quoting *Moll v. U.S.
Life Title Ins. Co.*, 654 F.Supp. 1012, 1031
(S.D.N.Y.1987)). Defendants argue that Katz
Enterprise does not qualify as such because the well-
pleaded allegations do not show that the Katzes
worked together as a continuing unit to perpetrate the
fraud on the Company.

Nearly all of the allegations in the Amended
Complaint regarding the misappropriation scheme
detail acts of looting by Stephen, not by Norman. The
Amended Complaint is replete with references to the
"Katzes" ' collective fraud, but all of the examples of
the fraud, save one, involve Stephen alone. The only
specific act by Norman is his alleged use of
"dummy" invoices in 1993 to bill I. Appel for more
than $10,000 worth of purported expenses for
"consultation and repairs" by a company which had
in point of fact provided architectural and
construction services to Norman's synagogue.
Amended Complaint at ¶ 37. In contrast, the
Amended Complaint alleges that for years *Stephen*
maintained a hidden I. Appel bank account into
which he transferred I. Appel funds and converted
them to his personal use, *id.* at ¶ ¶ 20-25; that
*Stephen* prepared countless dummy invoices for
bogus services to I. Appel, ¶ ¶ 26, 29, 34, 35; and
that *Stephen's* wife used I. Appel department stores
for personal items. ¶ ¶ 41-43. *Stephen*, not Norman,
is alleged to be the signatory on the checks in
payment of the dummy invoices. ¶ 39. *Stephen* is
also alleged to have submitted false expense reports
by which he bilked I. Appel out of thousands of
dollars each year, and to have created an entity, FKG
Services Inc. ("FKG"), which he used to create still
more fictitious invoices. ¶ 31.

Apart from the allegation regarding Norman's 1993
synagogue invoices, the only allegations against

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 13
Not Reported in F.Supp.2d, 2002 WL 1751135 (S.D.N.Y.), RICO Bus.Disp.Guide 10,316
(Cite as: Not Reported in F.Supp.2d)

Norman are conclusory, lumping him together with Stephen without supporting facts that show his participation and sometimes with facts that show only *Stephen's* involvement. For example, the Amended Complaint alleges that " 'the Katzes created dummy invoices [from FKG] for nonexistent services denominated as 'Outside Service Appel," ' ¶ 32, and that "the Katzes caused Alliance to pay FKG for phantom services that were never provided," ¶ 33. But the Amended Complaint alleges that *Stephen* set up FKG. ¶ 31. While it also alleges that both Norman and Stephen "controlled" FKG, there are no facts set forth which indicate the manner in which Norman, who apparently did not set up the company, controlled FKG. As a further example, the Amended Complaint alleges that "Stephen and Norman Katz" instructed the Alliance accounts payable department to prepare checks in payment of the invoices ¶ 39, but discloses no facts concerning Norman's instructions and alleges that the checks were only signed by Stephen. Moreover, the Amended Complaint avers that "The Katzes also stole money through the use of corporate or personal accounts at various department stores," ¶ 40, but furnishes examples only of Stephen's wife's use of those accounts.

*15 Apart from failing to demonstrate that Norman himself committed acts of misappropriation (except for the synagogue invoices), the Amended Complaint also fails to set forth factual allegations that show that Norman may have acted in concert with Stephen by directing or benefitting from Stephen's acts. While at its outset the Amended Complaint vaguely alleges that Stephen acted "with the full knowledge and consent of his father," ¶ 22, it does not set forth facts that give rise to an inference of that knowledge or consent. To be sure, Norman and Stephen are alleged to have "worked intimately in managing I. Appel," lived in the same building and generally spent a great deal of time together, ¶ 12, but that legitimate proximity alone does not reasonably suggest Norman's complicity in Stephen's malfeasance. Nor, as plaintiff seems to suggest, does the closeness of the filial relationship indict Norman. Other than the 1993 synagogue invoices, none of the misappropriation is alleged to have benefitted Norman. For example, many of the invoices Stephen shepherded through I. Appel involved services performed on Stephen's private boat, ¶ 34-35, and the department store fraud directly benefitted Stephen's wife.

In short, while the Amended Complaint broadly avers that father and son jointly undertook to loot the Company, it is devoid of facts suggesting that Norman took part in or reaped the benefits of Stephen's acts of misappropriation. Without any facts which might suggest that Norman knew of and participated in Stephen's assorted fraudulent activities, there can be no reasonable suggestion that the two worked together toward the common purpose of looting I. Appel. It is therefore simply not a reasonable inference to be drawn from the factual allegations that the Katzes constituted a "continuing unit" sufficient to comprise a RICO association-in-fact. Accordingly, the RICO claim must be dismissed.

That Norman is alleged to have engaged in instances of synagogue-related false invoicing in 1993 does not compel a different conclusion. These are the only examples of misappropriation by Norman and they do not involve Stephen. The fact that Norman may have engaged in isolated acts of false billing unconnected to Stephen's does not reasonably suggest that the two were *joined together* in an overarching scheme to misappropriate the Company's assets and that they worked in concert to achieve this goal. Instead, in light of the absence of allegations connecting Norman to Stephen's wrongdoing, taking the synagogue allegations in the light most favorable to plaintiff they show at most that Norman separately defrauded the Company, not a synergy between the two men. *Cf. Hansel 'n Gretel, 1997 WL 543088, * 4* (complaint failed to allege single RICO enterprise where it alleged that two groups worked on two similarly structured but entirely separate schemes to bilk the same company).

To the extent that the conclusory allegation that Norman "controlled" FKG suggests his involvement in a fraudulent billing scheme using dummy FKG invoices, that involvement also fails to demonstrate a viable enterprise. All the false FKG invoices are alleged to have been created in 1992 and 1993. Therefore, even assuming Stephen and Norman worked together to bilk the Company through FKG, the timing of that activity does not suggest a unit that "continued" beyond mid-1993. Considered favorably to plaintiff, they might show that Norman and Stephen shared a common purpose to misappropriate Company assets in 1992 and 1993, well before the applicable limitations period, but they do not in any way suggest that the association-in-fact continued beyond that time.

*16 Nor can plaintiff salvage the enterprise element by pointing to the Amended Complaint's conclusory allegations that Norman "conspired" with Stephen

Not Reported in F.Supp.2d                                                    Page 14
Not Reported in F.Supp.2d, 2002 WL 1751135 (S.D.N.Y.),  RICO Bus.Disp.Guide 10,316
(Cite as: Not Reported in F.Supp.2d)

and that they "regularly and systematically misappropriated large sums of money" from the Company. Such generalized allegations, unbacked by facts showing how the defendants acted together, are insufficient to plead a RICO enterprise. Cf. *First Nationwide Bank*, 820 F.Supp. at 98 ("Conclusory allegations that disparate parties were associated in fact by virtue of their involvement in the real estate industry in the 1980s are insufficient to sustain a RICO claim, absent allegations as to how the members were associated together in an 'enterprise.' "); cf. *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir.1995) ("General, conclusory allegations need not be credited ... when they are belied by more specific allegations of the complaint.").

Arguably the conclusion that the Katzes did not function as a continuing unit with respect to the misappropriation scheme does not preclude a finding that Norman, Stephen and Peschard constituted a separate enterprise with the aim of expropriating the Zacatecas plant. The difficulty with this proposition, however, is that the Amended Complaint does not in fact allege two separate enterprises. It alleges a single association-in-fact spearheaded by Norman and Stephen with one broad objective-looting I. Appel-and covering the acts of misappropriation beginning in 1992 through the Mexican Subsidiary fraud in 1996 and 1997. As I have held, because the well-pleaded facts do not allege that Stephen and Norman worked as a continuing unit to misappropriate the assets of the Company, the single enterprise alleged in the Amended Complaint does not properly allege a RICO enterprise. Assuming *arguendo* that I could conclude despite the Amended Complaint's clarity on this element that it properly alleges two separate enterprises and that the one involving the Mexican scheme is adequate, that victory would only be Pyrrhic, since I have held that plaintiff lacks standing to bring a RICO claim arising from that scheme.

### D. *Common Law Claims*

#### 1. *Conversion/Constructive Trust Claims*

[10] Defendants argue that plaintiff's conversion and constructive trust claims must be dismissed because the Amended Complaint does not identify specific segregated property or funds sought to be recovered. FN8 This argument must be rejected. Contrary to defendants' contention, such claims do not require an allegation that specific funds are presently held in a

separate account. Defendants' Brief in Opposition at 24. The cases which defendants cite in support of their argument state the general proposition that in order for money to be subject to conversion or constructive trust it must be "specifically identifiable." *Peters Griffin Woodward, Inc. v. WCSC, Incorporated*, 88 A.D.2d 883, 452 N.Y.S.2d 599, 600 (App. Div. 1st Dep't 1982) (conversion); *In re Weis Securities, Inc.*, 605 F.2d 590, 597 (2d Cir.1978) ( "before a constructive trust may arise[ ] there must be a Res a segregated fund or property to which the trust can attach."). Many of the cited cases involve bank deposits. With respect to bank deposits, given their unique nature, courts have frequently held that funds must be specifically identifiable vis-a-vis the bank's other funds in order for conversion or constructive trust to apply. This translates into a requirement that funds must be held in a segregated, identifiable account in order for such a claim to be viable. As one court in this district explained:

> FN8. The parties assume that New York law governs the common law claims. Since the Court has no reason to believe otherwise, it will apply New York law to those claims for purposes of this motion.

*17 Under law, funds deposited in a bank become the property of the bank, and the bank becomes indebted to the depositor for the amount of the funds deposited. Therefore, a conversion claim, predicated on the unlawful use of funds belonging to another, is not sustainable between a bank and a depositor with a standard debtor-creditor relationship.... [I]n [the situation of special deposits where the bank acts as bailee], a conversion claim could be sustainable due to the depositor's property right to the funds at issue. *Nwachukwu v. Chemical Bank*, No. 96 Civ. 5118, 1997 WL 441941, ----5-6 (S.D.N.Y. Aug.6, 1997) (citation omitted). See *Fundacion Museo de Arte v. CBI-TDB Union Bancaire Privee*, 160 F.3d 146, 148 (2d Cir.1998) ("[F]unds deposited in a bank account are not sufficiently specific and identifiable, in relation to the bank's other funds, to support a claim for conversion against the bank.") (internal quotations omitted); *Citadel Management Inc. v. Telesis Trust, Inc.*, 123 F.Supp.2d 133, 151 (S.D.N.Y.2000) ("[A]lthough the Amended Complaint does allege the existing balance in the Telesis and Hertzog's Chase accounts when the $5 million transfer was made, there is no allegation that the funds were in any manner segregated within the accounts while held there, which is a prerequisite to stating a claim for conversion against the derivative

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1751135 (S.D.N.Y.),  RICO Bus.Disp.Guide 10,316
(Cite as: Not Reported in F.Supp.2d)

defendants.") (footnote omitted).

The case at bar does not involve bank or investment accounts and therefore the special need for a segregated account does not arise. Moreover, many courts have held allowed conversion and constructive trust claims over money that was as identifiable as the funds involved here. *Nissho Iwai American Corporation v. Siedler,* No. 94 Civ. 513, 1995 WL 555699, *3 (S.D.N.Y. Sept. 18, 1995), is representative. In that case plaintiff brought a RICO claim and common law claims alleging that the defendants engaged in a false billing scheme to embezzle nearly $1,000,000 from the plaintiff. The plaintiff submitted evidence of the specific amounts of the 31 checks defendants caused Nissho to issue in their false billing scheme. The court granted the plaintiff's motion for summary judgment on its conversion claim, noting that the plaintiff had demonstrated that it had title to the funds embezzled and that the defendants wrongfully converted them.

The funds at issue in *Nissho,* just as those here, were specific amounts misappropriated through fraudulent billing. Yet the fact that they were not held in any identifiable account was no bar to a successful conversion claim. *See also Utica Mutual Ins. Co. v. Avery,* 261 A.D.2d 802, 690 N.Y.S.2d 760, 761 & n. 1 (App. Div. 3rd Dep't 1999) (noting that claim to recover money embezzled from town "arguably" "fits the definition of conversion"); *United Features Syndicate, Inc. v. Miller Features Syndicate, Inc.,* No. 01 Civ. 2491, 2002 WL 389155, * 18 (S.D.N.Y. March 11, 2002) (funds wrongfully taken by defendants that were held in trust for plaintiff's benefit were " 'specifically identifiable' in the same manner as a chattel so as to be the proper subject of an action in conversion"); *Key Bank of New York v. Grossi,* 227 A.D.2d 841, 642 N.Y.S.2d 403, 405 (App. Div.3d Dep't 1996) (proceeds of auctions of plaintiff's cars and boat which were not alleged to be held in a segregated account were clearly "sufficiently identifiable for the purposes of an action for conversion"). The same is true for constructive trust claims. *See Schmid, Inc. v. Zucker's Gifts, Inc.,* 766 F.Supp. 118, 120 (S.D.N.Y.1991) (allowing a constructive trust claim over funds defendants derived from improper sales of Hummel figurines in circumvention of plaintiff's exclusive contract to sell Hummel figurines in the United States).

*18   [11] The Amended Complaint alleges that specific amounts of money were misappropriated by the Katzes from the Company. These funds are "specifically identifiable" despite the fact that they

are not alleged to be held by the defendants in a segregated account. Accordingly, I deny defendants' motion to dismiss the conversion and constructive trust claims on this ground.  FN9

> FN9. To the extent plaintiff's conversion claim arises from the expropriation of the Zacatecas plant, however, it may not lie. Real property may not be the subject of a conversion claim. *Roemer and Featherstonhaugh P.C. v. Featherstonhaugh,* 267 A.D.2d 697, 699 N.Y.S.2d 603, 604 (App. Div.3d Dep't 1999). In *Roemer,* the Appellate Division affirmed dismissal of a conversion cause of action which was based on the plaintiff's claim that the defendant diverted real property that belonged to the plaintiff. The court held that "whether the property claimed to have been converted is real property, as alleged in the complaint, or an interest or expectancy in a business opportunity, as plaintiff now alleges, conversion will not lie." *Id.* Feinberg's analogous claim that the defendants diverted the Mexican Subsidiary's business opportunity in the Zacatecas plant obviously cannot be sustained. *See also Garelick v. Carmel,* 141 A.D.2d 501, 529 N.Y.S.2d 126, 127 (App. Div.2d Dep't 1988) ("An action sounding in conversion does not lie where the property involved is real property ."). I have already concluded that plaintiff lacks standing to bring claims arising from the Mexican fraud, including common law claims. However, the fact that the subject matter involves real property is an alternative reason for dismissal of the conversion claim arising from that fraud.

### 2. Indemnification

Plaintiff claims that the Katzes are liable to indemnify him for legal fees and settlement payments Alliance incurred in connection with a lawsuit filed in 1997 by Val Mode, a company whose assets Feinberg agreed to purchase in June of 1996. The sellers of Val Mode sued Feinberg and Alliance claiming that the financial statements upon which they relied in agreeing to sell Val Mode were false and misleading. Amended Complaint at ¶ 113. Feinberg claims here that the financial statements were false and misleading as a result of the fraud perpetrated by the Katzes, and seeks "Indemnification" and/or "contribution" from them

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1751135 (S.D.N.Y.), RICO Bus.Disp.Guide 10,316
(Cite as: Not Reported in F.Supp.2d)

for the legal fees and settlement payments incurred in that suit. Defendants move to dismiss the claim arguing that neither contribution nor indemnification is available as a matter of law.

It is unclear whether plaintiff seeks indemnification, contribution or both. The Sixth Claim for Relief contains the heading "Indemnification," but avers that the plaintiff is "entitled to contribution from defendants." ¶ 116. It makes no difference which form of relief the plaintiff intends to seek, however, because both are unavailable.

[12] Plaintiff does not challenge defendants' contention that a claim for contribution is inappropriate because under New York law a party may not obtain contribution for settlement of a claim. *See, e.g., Rosado v. Proctor & Schwartz, Inc.,* 66 N.Y.2d 21, 24, 494 N.Y.S.2d 851, 484 N.E.2d 1354 (1985). Given that the Amended Complaint alleges that Alliance settled the Val Mode lawsuit, plaintiff may not now seek contribution for any part of that settlement payment.

[13] As for indemnification, in New York such a claim must be grounded in contract either express or implied. *McDermott v. City of New York,* 50 N.Y.2d 211, 216, 428 N.Y.S.2d 643, 406 N.E.2d 460 (1980) ("The right to indemnity ... springs from a contract, express or implied, and full, not partial, reimbursement is sought") (internal quotations omitted). The Amended Complaint does not allege that the Katzes had an express contractual obligation to indemnify Alliance or Feinberg for claims arising from the sale of Val Mode. The indemnification claim must therefore derive from implied contract. To find an implied contract for indemnification "a duty must exist between the third-party defendant and the primary plaintiff." *Kemron Environmental Services, Inc. v. Environmental Compliance, Inc.,* 184 A.D.2d 755, 585 N.Y.S.2d 475, 476 (App. Div.2d Dep't 1992). This precept stems from the recognition that "[a] person who, in whole or in part, has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other, is entitled to indemnity." *McDermott,* 50 N.Y.2d at 216, 428 N.Y.S.2d 643, 406 N.E.2d 460 (internal quotations omitted).

*19 For the Katzes to be obligated to indemnify Feinberg, the Katzes must have had an independent legal duty to *Val Mode*-the plaintiff in the underlying claim. But the facts alleged in the Amended Complaint fail reveal no such duty on the part of the Katzes. Accordingly, the indemnification claim must be dismissed. *See Waldorf Steel Fabricators, Inc. v. Trocom Constr. Corp.,* 244 A.D.2d 479, 664 N.Y.S.2d 326, 328 (App. Div.2d Dep't 1997) (rejecting general contractor's claim that prime contractor should be required to indemnify it for any liability to subcontractor because prime contractor did not owe any duty directly to the subcontractor); *Travelers Indemnity Co. v. AMR Services Corp.,* 921 F.Supp. 176, 182 (S.D.N.Y.1996) (dismissing defendant's indemnification claim against third-party defendant because defendant had not alleged that third-party defendant owed plaintiff a duty); *Kemron,* 585 N.Y.S.2d at 476 (same).

### 2. *Statute of Limitations*

Defendants move to partially dismiss most of the common law claims on statute of limitations grounds. Defendants correctly note that under New York law, a six-year statute of limitations applies to the breach of fiduciary duty, unjust enrichment and constructive trust claims, and a three-year statute of limitations applies to the conversion claim. Since the first allegations of misappropriation were lodged against Stephen in the January 5, 1999 complaint, defendants argue that the conversion claim must be dismissed insofar as it is based on conduct occurring prior to January 5, 1996, and the breach of fiduciary duty, unjust enrichment and constructive trust claims must be dismissed to the extent based on conduct occurring before January 5, 1993. With respect to Norman, because the charges of misappropriation were first advanced against him in the Amended Complaint filed on November 5, 2001, defendants contend that the unjust enrichment, breach of fiduciary duty and constructive trust claims may be based only on actions committed after November 5, 1995. Defendants further argue that the conversion claim against him must be dismissed in its entirety because the Amended Complaint does not allege any conduct relevant to that claim occurring after November 5, 1998, within the three-year limitations period for that claim.

Plaintiff does not specifically oppose this aspect of the defendants' motion. In view of the lack of opposition and because the defendants' argument is sound, I grant this aspect of their motion. Accordingly, plaintiff may not recover against Stephen on claims of breach of fiduciary duty, unjust enrichment or constructive trust claims for conduct occurring before January 5, 1993, and may not recover on a conversion theory for conduct before

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1751135 (S.D.N.Y.), RICO Bus.Disp.Guide 10,316
(Cite as: Not Reported in F.Supp.2d)

January 5, 1996. As against Norman, plaintiff may recover on a breach of fiduciary duty, unjust enrichment or constructive trust theory only for conduct of his occurring after November 5, 1995. The conversion claim against Norman must be dismissed in its entirety as the Amended Complaint does not allege any actions constituting conversion by Norman within the three-year limitations period.

### E. *Motion to Strike*

**\*20** [14] The defendants move to strike two paragraphs in the Amended Complaint pursuant to Fed.R.Civ.P. 12(f) as containing irrelevant and prejudicial information. The two paragraphs involved appear under the heading "Allegations Common to All Causes of Action" and primarily involve Stephen's tangles with New York State tax authorities. Paragraph 12 alleges:

12. Prior to July 1, 1996, Stephen Katz and his father, Norman Katz, worked intimately in managing Alliance, had adjoining offices and conferred together many times each day in making all production, financial, sales, and administrative decisions for the corporation, and together were responsible for handling the day-to-day business affairs of Alliance. These activities were carried on from their offices in New York City. In addition, they lived in the same building, had breakfast together on most mornings, traveled together, and jointly engaged in many other personal and business activities, *such as the creation of identical false out-of-state primary residences to evade New York Sate and New York City income taxes.*

(Emphasis added). Although the Katzes do not specify, based on their argument it is the last clause of this paragraph which defendants find objectionable. The other paragraph at issue alleges:

50. Stephen Katz has a documented history of cheating on his taxes. Thus, on March 5, 1998, Stephen Katz pleaded guilty to violation of § 1801(a) of the New York State Tax Law, for failure to file New York State and City Resident Personal Income Tax Returns for the tax year 1996. He simultaneously arranged with the New York State Department of Taxation and Finance to resolve unpaid tax liabilities, based upon his Form W-2 income, for his failure to file personal income tax returns for prior years. The New York County District Attorney's investigation revealed that at all times since 1976, while actually a resident of New York City, Stephen Katz claimed that his place of residence was, variously, in the State of New Jersey, or Connecticut, or Tennessee.

Rule 12(f) allows the Court to "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." It is well-recognized that as a general matter motions to strike are "disfavored and will not be granted unless the matter asserted clearly has no bearing on the issue in dispute." *Smith v. AVSC International, Inc.,* 148 F.Supp.2d 302, 317 (S.D.N.Y.2001) (internal quotations omitted). However, "[w]here the materiality of the alleged matter is highly unlikely, or where its effect would be prejudicial, the Court may order it stricken." *Reiter's Beer Distributors, Ind. v. Christian Schmidt Brewing Co.,* 657 F.Supp. 136, 144 (E.D.N.Y.1987). Defendants argue that the referenced allegations are "gratuitous" as they are unrelated to any of the other factual allegations and are raised merely as a form of "character assassination." Defendants' Brief at p. 28. Plaintiff counters that the allegations are relevant to demonstrate "Stephen's motivation for undertaking the misappropriation scheme, namely increasing his income while evading tax liability for that increase," Plaintiff's Brief at p. 66, and that the allegation concerning his conviction is relevant because it will be admissible to impeach Stephen's credibility if he testifies at trial.

**\*21** I disagree with plaintiff's assessment of the relevancy of these allegations. The purported creation by Stephen and Norman of fictional out-of-state tax residences and Stephen's resulting conviction for failing to pay taxes are wholly irrelevant to the claim that they misappropriated the Company's assets. The fact that they may have sought to decrease their New York State and City tax bills by claiming to be out-of-state residents has no apparent connection to their activities at I. Appel. The creation of fictional residencies and Stephen's conviction may tend to show that the Katzes wanted to increase their income, but only indirectly by decreasing their taxes. Their alleged evasion of income tax liability does not make it more likely that they also increased their income through the very different vehicle of looting I. Appel.

[15] The allegations concerning Stephen's conviction for tax evasion, while not directly relevant to the claims at bar, would nonetheless be admissible at trial to impeach Stephen's credibility under Fed.R.Evid. 609(a)(2) since it is a crime involving dishonesty. For that reason, I will allow only the second sentence of paragraph 50-the one directly involving his conviction-to stand. *Cf. American Arbitration Association, Inc. v. DeFonseca,* No. 93 Civ. 2424(CSH), 1996 WL 363128, \* 12 (S.D.N.Y. June

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1751135 (S.D.N.Y.),   RICO Bus.Disp.Guide 10,316
(Cite as: Not Reported in F.Supp.2d)

28, 1996) (refusing to strike allegation in complaint concerning one defendant's incarceration for bank fraud because "[a]t the very least, that information may be admissible to impeach [the defendant's] credibility, should he testify.") The other information in paragraph 50 concerning the details of his conviction and the last sentence of paragraph 12 have no bearing on the claims in the Amended Complaint and serve merely to inflame the reader against the Katzes. Accordingly, those allegations must be stricken. *Cf. Smith,* 148 F.Supp.2d at 317 (striking allegations of discrimination by defendant toward dissimilar third parties as irrelevant to discrimination claim).

### F. *Other Arguments*

Given the view I take of the sufficiency of the RICO cause of action, I do not reach defendants' arguments that the plaintiff fails to allege a pattern of RICO activity, that the allegations of wire and mail fraud are not pleaded with sufficient particularity under Fed.R.Civ.P. 9(b), and that predicate acts of mail or wire fraud are not sufficiently alleged with respect to the Mexican Subsidiary fraud and certain of the acts of misappropriation.

### G. *Leave to Replead*

[16] Plaintiff requests leave to further amend the complaint in the event the Amended Complaint is found deficient. "When a motion to dismiss is granted the usual practice is to grant leave to amend the complaint." *Hayden v. County of Nassau,* 180 F.3d 42, 53 (2d Cir.1999). Such leave, which is discretionary, may be denied "where the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal." *Id.* In this case it is appropriate to grant the request only in part. It is inconceivable that plaintiff could plead any set of facts that demonstrate standing with respect to injuries arising out of the Mexican Subsidiary fraud. Nor is there reason to believe that plaintiff could transform the facts pleaded into proper indemnification or contribution claims or that he could somehow extend the limitations period of the RICO claims. These infirmities are fundamental and cannot be repaired by more artful pleading. Accordingly, plaintiff may not amend the complaint to cure those deficiencies. However, although I have found that plaintiff failed to sufficiently allege a RICO enterprise on the facts pleaded, I cannot say that it would be impossible for

plaintiff to amend his complaint to repair the faults in the enterprise allegation. Accordingly, I will allow him to replead the enterprise element if he can do so consistent with the obligations imposed by Fed.R.Civ.P. 11.

### CONCLUSION

*22 Defendants' motion to dismiss the Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6) is granted in part and denied in part.

The First Claim under RICO is dismissed in its entirety with leave to replead consistent with this Opinion.

The Sixth Claim for indemnification and/or contribution is dismissed without leave to replead.

The last clause of paragraph 12 of the Amended Complaint and all but the second sentence of paragraph 50 will be stricken as irrelevant and inflammatory.

The Second, Third, Fourth and Fifth claims, for breach of fiduciary duty, conversion, unjust enrichment and constructive trust, respectively, may stand as temporally delimited above.

Plaintiff may file a Second Amended Complaint consistent with this Opinion on or before August 16, 2002. If a Second Amended Complaint is filed, defendants must answer or otherwise move on or before September 9, 2002.

The foregoing is SO ORDERED.

S.D.N.Y.,2002.
Feinberg v. Katz
Not Reported in F.Supp.2d, 2002 WL 1751135 (S.D.N.Y.), RICO Bus.Disp.Guide 10,316

Briefs and Other Related Documents (Back to top)

• 2002 WL 32495916 (Trial Pleading) Answer (May. 13, 2002)
• 2002 WL 32595397 (Trial Pleading) Answer (May. 13, 2002)
• 2002 WL 32496024 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss (Mar. 12, 2002)
• 2002 WL 32595395 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum of Law in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1751135 (S.D.N.Y.),   RICO Bus.Disp.Guide 10,316
**(Cite as: Not Reported in F.Supp.2d)**

Opposition to Defendants' Motion to Dismiss (Mar. 12, 2002)

• 2001 WL 34545616 (Trial Motion, Memorandum and Affidavit) Memorandum of Law of Defendants Norman and Stephen Katz for Dismissal of the Complaint and Alternative Relief (Dec. 13, 2001)

• 2001 WL 34611361 (Trial Motion, Memorandum and Affidavit) Memorandum of Law of Defendants Norman and Stephen Katz for Dismissal of the Complaint and Alternative Relief (Dec. 13, 2001)

• 2001 WL 34611359 (Trial Pleading) Amended Complaint (Nov. 05, 2001)

• 1:99cv00045 (Docket) (Jan. 05, 1999)


END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.