Not Reported in F.Supp.                                                                Page 1
Not Reported in F.Supp., 1997 WL 543088 (S.D.N.Y.), 1997-2 Trade Cases P 71,967, RICO Bus.Disp.Guide 9350
(Cite as: Not Reported in F.Supp.)

▶

Not Reported in F.Supp., 1997 WL 543088 (S.D.N.Y.), 1997-2 Trade Cases P 71,967, RICO Bus.Disp.Guide 9350
Briefs and Other Related Documents

United States District Court, S.D. New York.
HANSEL 'N GRETEL BRAND, INC., Plaintiff,
v.
Stewart SAVITSKY, Renate Savitsky, ABN-INL, Muller's Meat Limited, David Muller, Heritage Corrugated Box Corp., Jeffrey Schatz, Gerald Rebouillat and Jane Doe, Defendants.
No. 94 Civ. 4027(CSH).

Sept. 3, 1997.

MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.
*1 Defendants Heritage Corrugated Box Corporation ("Heritage") and Jeffrey Schatz (collectively "the Heritage defendants") move to dismiss this action, brought under § 1962 of the Racketeering and Corrupt Organizations Act ("RICO"), § 2(c) of the Robinson-Patman Act, and state common law, for failure to state a claim. For reasons set forth below, the motion is denied as to the § 2(c) claim, granted as to the RICO claim, and plaintiff is granted leave to amend its RICO allegations.

BACKGROUND

The complaint and RICO Case Statement filed by plaintiff Hansel 'N Gretel Brand, Inc. ("HNG") allege the following facts, which I must take as true for purposes of this motion. FN1

> FN1. With defendant's consent, HNG filed an amended complaint in this action on November 25, 1996. It contains no changes relevant to the issues now before me.

HNG is a New York Corporation engaged in the manufacture and distribution of meats, cold cuts, and other delicatessen products. During the period at issue, defendant Stewart Savitsky was the company's Senior Vice President, and managed its day-to-day affairs. In this capacity, Savitsky conducted a kickback scheme, in which certain of HNG's suppliers overcharged the company for their products, and then returned the excess profits to Savitsky, his wife defendant Renate Savitsky, and the pseudonymous Gerard Rebouillat, the unknown recipient of some of these funds. By participating in this scheme, the defendant suppliers were permitted to maintain their accounts with HNG.

The complaint specifically charges two suppliers with compliance in Savitsky's plot: Muller's Meats Limited ("Muller's"), which supplied HNG with various beef products, and Heritage, which served as HNG's supplier of corrugated boxes and other packaging and shipping materials. The principals of these companies, defendants David Muller and Schatz, respectively, knew of this scheme, and directed the participation of their companies therein. FN2

> FN2. David Muller and Muller's are referred to subsequently as the "Muller defendants."

Savitsky's improper dealings with Heritage commenced in the late 1980's. At that time, Savitsky and Schatz arranged for Heritage to overcharge HNG for its products, and to reflect this overcharge on fraudulent invoices. Heritage than mailed all or substantially all of this overcharge to Savitsky via Rebouillat and others. The resulting payments totalled over $ 250,000. As a result of this plan, Heritage charged HNG more for its goods than it did other purchasers.

Savitsky's arrangement with Muller's followed the same pattern in all essential respects. FN3 Plaintiff does not contend, however, that Muller's had any relationship with Heritage, that the two companies or their principals were aware that the other was engaged in similar conduct, or that they benefited in any way from each other's actions.

> FN3. In regards to the Muller scheme, plaintiff states that Savitsky created a phony association, defendant ABN-INL, to send out fraudulent invoices and receive kickback

Case 7:04-cv-08223-KMK   Document 93-10   Filed 09/19/2005   Page 2 of 10

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 543088 (S.D.N.Y.), 1997-2 Trade Cases P 71,967, RICO Bus.Disp.Guide 9350
(Cite as: Not Reported in F.Supp.)

Page 2

payments. Amended Complaint ¶¶ 28, 30. ABN-INL is not alleged to have played any role in Savitsky's dealings with the Heritage defendants.

These kickback arrangements continued until February 1994, when HNG and its sole shareholder, Milton Rattner, learned of the scheme, and terminated Savitsky's employment. Several months later, plaintiff commenced the instant action. It seeks, *inter alia,* treble damages under RICO and the Robinson-Patman Act.

The RICO cause of action set forth in plaintiff's complaint alleges that all of the identified defendants in this action, along with HNG itself, constituted a RICO enterprise. The purpose of this enterprise, according to the complaint, was twofold: to "bilk Hansel 'N Gretel out of millions of dollars by overcharging Hansel 'N Gretel for essential supplies," and "to arrogate to one or more of the defendant 'persons' the proceeds of those overcharges through illegal bribes and kickbacks...." Plaintiff asserts that Heritage and Schatz used the mails to send Savitsky the kickbacks, as well as to forward fraudulent invoices. These actions, according to plaintiff, constituted numerous instances of mail fraud in violation of 18 U.S.C. § 1341, purportedly establishing the requisite predicate acts for a RICO claim. FN4

> FN4. The complaint also charges defendants with violating 18 U.S.C. § 1343, the wire fraud statute. In its RICO statement, HNG also states that defendants' conduct constituted commercial bribery in violation of New York Penal Law § 180.03. That assertion is not made in the complaint.

*2 The present movants argue that the RICO claim is defective, as it fails to allege a cognizable enterprise, and does not properly plead a pattern of racketeering activity. Furthermore, they contend that plaintiff's cause of action under the Robinson-Patman Act must be dismissed because it does not set forth the requisite "competitive injury." Finally, movants ask the Court to dismiss all pendent state law claims, in the event their motion is granted as to the federal causes of action.

DISCUSSION

*I. RICO*

To state a cause of action under § 1962, plaintiff must allege: "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affects interstate or foreign commerce." *Moss v. Morgan Stanley,* 719 F.2d 5, 17 (2d Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). I will address, in turn, movants' challenges to the sufficiency of these allegations in the present pleadings.

*A. Enterprise*

Initially, I consider the Heritage defendants' claim that the enterprise element has not been met because plaintiff has failed to "properly plead that an actual enterprise existed in which the defendants played roles separate and apart from the racketeering activity alleged." Heritage Mem. at 11. This contention is based on language contained in *United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), in which the Supreme Court stated the following:

> That a wholly criminal enterprise comes within the ambit of the statute does not mean that a 'pattern of racketeering activity' is an 'enterprise'.... The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages.

*Id.* at 583.

Defendants interpret this passage, not without reason, to hold that the evidence necessary to establish an enterprise must be distinct from that which a plaintiff must adduce to show a pattern of racketeering activity. The majority of circuits have embraced this reading. *See Chang v. Chen,* 80 F.3d 1293, 1297 (9th Cir.1996) ("Six Circuits have interpreted the Supreme Court's decision in *Turkette* to require a

Case 7:04-cv-08223-KMK   Document 93-10   Filed 09/19/2005   Page 3 of 10

Not Reported in F.Supp.
Page 3
Not Reported in F.Supp., 1997 WL 543088 (S.D.N.Y.), 1997-2 Trade Cases P 71,967, RICO Bus.Disp.Guide 9350
(Cite as: Not Reported in F.Supp.)

RICO enterprise to have an ascertainable structure separate and apart from the pattern of racketeering activity in which it engages.") (citations omitted). The Second Circuit, however, has not. In _United States v. Mazzei_, 700 F.2d 85 (2d Cir.), cert. denied, 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983), the Circuit considered the impact of _Turkette_, and specifically rejected the notion that proof of enterprise and pattern be distinct, "so long as the proof offered is sufficient to satisfy both elements." _Id._ at 89. The court has restated that conclusion on numerous subsequent occasions. _See United States v. Coonan_, 938 F.2d 1553, 1560 (2d Cir.1991) ("we have previously indicated that proof of various racketeering acts may be relied on to establish the existence of the charged enterprise"), cert. denied, 503 U.S. 941, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992); _United States v. Ferguson_, 758 F.2d 843, 853 (2d Cir.) ("RICO charges may be proven even when the enterprise and predicate acts are functionally equivalent, and the proof used to establish them coalesced.") (citations and internal quotation marks omitted), cert. denied, 474 U.S. 841 (1985); _Moss_, 719 F.2d at 22 (_Mazzei_ rejected view that "the evidence offered to prove the 'enterprise' and 'pattern of racketeering activity' must be distinct"); _United States v. Bagaric_, 706 F.2d 42, 55 (2d Cir.) ("We have upheld application of RICO to situations where the enterprise was, in effect, no more than the sum of the predicate racketeering acts."), cert. denied, 464 U.S. 840 (1983), abrogated on other grounds, _Nat'l Organization for Women, Inc. v. Scheidler_, 510 U.S. 249, 260, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994). See also _Chang_, 80 F.3d at 1297 (Second Circuit is one of two which "interpret[ ] _Turkette_ to permit the organization constituting the enterprise to be no more than the sum of the predicate racketeering acts.").

*3 In light of this overwhelming authority, defendants' argument must fail as a matter of law. The task for this Court, on the instant motion, is not to determine whether the same evidence was adduced to support the "enterprise" and "pattern" elements; rather, I must decide whether the enterprise pled by plaintiff, viewed on its own terms, is cognizable under RICO.

Movants also argue that HNG may not be both the victim of the racketeering activity and a member of the enterprise. For many years, courts had rejected this argument. _See, e.g., Sun Sav. and Loan Ass'n v. Dierdorff_, 825 F.2d 187, 190 n. 6 (9th Cir.1987); _United States v. Kovic_, 684 F.2d 512, 516-17 (7th Cir.), cert. denied, 459 U.S. 972, 103 S.Ct. 304, 74 L.Ed.2d 284 (1982); _Com-Tech Assocs. v. Computer Assocs. Int'l, Inc._, 753 F.Supp. 1078, 1088 (E.D.N.Y.1990), aff'd, 938 F.2d 1574 (2d Cir.1991); _Temple Univ. v. Salla Bros., Inc._, 656 F.Supp. 97, 102 (E.D.Pa.1986). Then, in _Nat'l Organization for Women, Inc. v. Scheidler_, 510 U.S. 249, 259, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994), the Supreme Court stated: "the enterprise in subsection (c) [of § 1962] connotes generally the vehicle through which the unlawful pattern of racketeering activity is committed, rather than the victim of that activity."

In response to _Scheidler_, courts have divided on whether a victim of racketeering activity may still comprise part of a racketeering enterprise. _Compare Jaguar Cars, Inc. v. Royal Oaks Motor Car Co._, 46 F.3d 258, 267 (3rd Cir.1995) ("a victim corporation drained of its own money by pilfering officers and employees could not reasonably be viewed as the enterprise through which employee persons carried out their racketeering activity") with _LaSalle Bank Lake View v. Seguban_, 937 F.Supp. 1309, 1323 (N.D.Ill.1996) ("this Court does not agree with the leap of logic made by the Third Circuit from the Supreme Court's _Scheidler_ statement that 'enterprises' '_generally_' are not 'victims' to the conclusion that enterprises cannot be 'victims' ") (emphasis in original). I agree with _Lasalle Bank_ that the language in _Scheidler_ was not intended to prescribe a blanket rule. In the present case, however, it makes little sense to say that HNG was a participant in an enterprise whose guiding purpose was to bilk HNG. Any amended complaint, therefore, should not include HNG in the alleged enterprise. In any event, the argument is one of form, not substance. I cannot envision how the exclusion of HNG will have any impact on the further proceedings in this case.

The Heritage defendants also assert generally that the entities and individuals identified in the complaint cannot make up a valid RICO enterprise. In so doing, movants have set a tall order for themselves. The statute defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). As is clear from this language, Congress sought to make the definition "as broad [[[ ] as possible ." _United States v. Indelicato_, 865 F.2d 1370, 1382 (2d Cir.) (en banc), cert. denied, 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989). See also _United States v. Angelilli_, 660 F.2d 23, 31 (2d

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 543088 (S.D.N.Y.), 1997-2 Trade Cases P 71,967, RICO Bus.Disp.Guide 9350
(Cite as: Not Reported in F.Supp.)

Page 4

Cir.1981) ("On its face, the definition of 'enterprise' is quite broad"), cert. denied, 455 U.S. 910, 102 S.Ct. 1258, 71 L.Ed.2d 449 (1982). As the statute defines an enterprise as any entity, legal or non-legal, the definition can be read to include virtually "anything that exists." Angelilli, 660 F.2d at 31.

*4 Nonetheless, the caselaw does place limits on what may constitute an enterprise. The Supreme Court has defined an enterprise as "a group of persons associated together for a common purpose of engaging in a course of conduct." United States v. Turkette, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). Evidence of an "ongoing organization", in which the members "function as a continuing unit," suffices to prove an enterprise. The Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc., 879 F.2d 10, 15 (2d Cir.1989) (citing Turkette, 452 U.S. at 583), cert. denied, 493 U.S. 1022 (1990). An entity is not properly included in the enterprise when it is not "an integral part of the fraudulent scheme." United States v. District Council, 778 F.Supp. 738, 757-58 (S.D.N.Y.1991) (Haight, J.) (citing United States v. Porcelli, 865 F.2d 1352, 1364 (2d Cir.), cert. denied, 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989)).

The complaint before me alleges that all of the identified defendants, along with HNG, formed a RICO enterprise. Movants contend that this group cannot constitute an enterprise, as the Heritage defendants never associated with the Muller defendants, nor were they aware that their conduct was part of a larger scheme. Rather, defendants maintain, HNG has asserted nothing more than that these two groups of defendants engaged in similar conduct, and that they both had dealings with Savitsky. This, they reason, does not suffice to allege a RICO enterprise.

HNG seeks to parry this attack by contending that the Heritage and Muller defendants were united by a common purpose: to "bilk" HNG. In support of this argument, plaintiff cites United States v. Errico, 635 F.2d 152 (2d Cir.1980), cert. denied, 453 U.S. 911, 101 S.Ct. 3142, 69 L.Ed.2d 994 (1981).

Errico was the "linchpin" of a conspiracy to fix horse races. Two other sets of actors participated in the scheme in which he was involved: bettors who used inside information to wager on the fixed races, and jockeys who accepted bribes to hold their horses back. On appeal, Errico argued that this collection of individuals could not be classified as an enterprise, an argument the Second Circuit rejected. The court of appeals found that the "circle of bettors" and "circle of jockeys"-joined through Errico-had the requisite "community of interest" and core of "continuing personnel" to constitute that "group of individuals associated in fact" that is required for a RICO enterprise. Id. at 156.

I decline to accept plaintiff's contention that Errico is analogous to the present case. Although Errico also concerned two sets of individuals that did not have any contact with each other, both groups were integral components of the race-fixing scheme, without whom the plot could not have been executed. Each depended on the other to carry out its role properly, and if the other did not do as expected, no one could have profited from the plan.

In the case at bar, the Muller and Heritage defendants engaged in two unconnected operations, albeit employing similar methodologies. HNG is able to claim that these sets of defendants shared similar goals only by defining those goals at such a level of generality as to deprive them of any meaning. If it is sufficient, under RICO, to allege that two parties are both members of a common enterprise because they sought to "bilk" the same company, then two burglars who sought to rob the same apartment on different nights may constitute an enterprise, as they shared the common aim of depriving the tenants of their valuables.

*5 The instant case is distinguishable from this example only in that both the Heritage and Muller defendants worked in concert with the same cast of characters, and primarily, Stewart Savitsky. I do not think that this fact alone is sufficient to render two groups, at work on two similarly structured but entirely separate schemes, part of a single enterprise. See First Nationwide Bank v. Gelt Funding, Corp., 820 F.Supp. 89, 98 (S.D.N.Y.1993) (where "several borrowers committed a similar but independent fraud with the aid of a particular lender," such a "series of discontinuous independent frauds is no more an enterprise than it is a single conspiracy"), aff'd, 27 F.3d 763 (2d Cir.1994), cert. denied, 513 U.S. 1079, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995). The Muller defendants and the Heritage defendants shared neither a "community of interests", when those interests are defined with any specificity, nor were they part of an ongoing organization. Moreover, to the extent Savitsky and his associates constitute a common core of individuals, that core cannot be transmuted into an association-in-fact enterprise by

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 5
Not Reported in F.Supp., 1997 WL 543088 (S.D.N.Y.), 1997-2 Trade Cases P 71,967, RICO Bus.Disp.Guide 9350
**(Cite as: Not Reported in F.Supp.)**

linking it to two disparate schemes.

This ruling does not end my inquiry. HNG asks, in the event that its RICO cause of action is dismissed, that it be permitted to file an amended complaint alleging "an enterprise involving the Heritage [d]efendants, Savitsky and his affiliates." Defendant's Mem. at 8 n. 6. In essence, plaintiff seeks to divide the enterprise in two: one centered around Savitsky's arrangement with the Muller defendants, the other arising out of his dealings with the Heritage defendants. FN5

> FN5. HNG does not say that it wishes to include the Muller defendants in a separate enterprise. I presume, however, that the footnote seeking leave to amend HNG's complaint was not an invitation to the Court to excise the Muller defendants from the RICO claim. I will not assume that plaintiff sought to surrender its cause of action against these parties without a more direct statement of this intent. Thus, I read plaintiff's application as one directed at alleging two distinct enterprises.

Movants ask the Court, before it permits such amendment, to require plaintiff to explain its theory of this enterprise. FN6 Heritage Reply Mem. at 2 n. 1. I find, on the basis of the present record, that the enterprises HNG seeks to present in an amended complaint fall within the outlines of this element as set forth by statute and caselaw. Savitsky, his affiliates, and the Heritage defendants comprised a common core of persons, who acted in concert in pursuit of a common goal: to carry out the commercial bribery scheme described in detail above. The same can be said for an enterprise involving the Muller defendants.

> FN6. Movants also contend that the amended complaint would not remedy their other objections to plaintiff's RICO claim. Those challenges will be addressed below.

Although leave to amend a complaint should be freely granted, I may deny such leave if the amendment would be futile. FN7 *Foman v.. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). I therefore will consider the remaining challenge to the sufficiency of HNG's RICO allegations. In doing so, I note that the elements of RICO must be pled as to each of the separate RICO enterprises. *See Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co.,* 758 F.Supp. 64, 77 (D.P.R.1991).

> FN7. Although plaintiff has already filed an amended complaint, this should not deter me from permitting the submission of a further revised pleading. The first amended complaint was submitted with defendants' consent, and contained only minor revisions. Moreover, the changes I direct in this opinion are largely formalistic.

*B. Pattern*

Movants contend that plaintiff has failed to plead a sufficient pattern of racketeering activity, because it has alleged only that the Heritage defendants participated in a "single scheme of commercial bribery." Heritage Mem. at 12. While the complaint states that the Heritage defendants engaged in numerous instances of mail fraud, movants contend that that does not suffice to set forth a pattern, as the mailings each related to a "single, limited goal." *Id.*

*6 To plead a pattern under RICO, a plaintiff must establish that the predicate acts are related to one another, and that they pose a threat of continuing racketeering activity. *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 240, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). The relationship prong may be met by a showing of "temporal proximity, or common goals, or similarity of methods, or repetitions." *Indelicato,* 865 F.2d at 1382. There is no requirement, under RICO, that plaintiff allege a pattern of more than one "scheme". In fact, an *en banc* sitting of the Second Circuit specifically rejected that contention. *See id.* at 1383 ("We doubt that Congress meant to exclude from the reach of RICO multiple acts of racketeering simply because ... they further but a single scheme.").

Recently, the court of appeals has qualified the language of *Indelicato,* noting that "courts must take care to ensure that the plaintiff is not artificially fragmenting a singular act into multiple acts simply to invoke RICO." *Schlaifer Nance & Co. v. The Estate of Andy Warhol,* 119 F.3d 91, 1997 WL 378986, at *6 (2d Cir. July 10, 1997) ("*Schlaifer*"). Thus, where the acts complained of are merely "subparts of the singular act, and not a 'pattern' of

Case 7:04-cv-08223-KMK   Document 93-10   Filed 09/19/2005   Page 6 of 10

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 543088 (S.D.N.Y.), 1997-2 Trade Cases P 71,967, RICO Bus.Disp.Guide 9350
(Cite as: Not Reported in F.Supp.)

Page 6

separate acts with an underlying purpose," plaintiff cannot show the requisite continuity to meet the pattern requirement. *Id.*

Although the boundaries established in *Schlaifer* are somewhat hazy, I do not believe the allegations presented by plaintiff herein can be characterized as an artificial subdivision of a single act. In *Schlaifer*, the predicate acts all arose from the process of drawing up a single contractual agreement. Here, each individual act set forth in the complaint was necessary to secure a separate overcharge of HNG, and to kickback a distinct sum of money to Savitsky and his compatriots. The fact that these acts were directed at the same end does not place them outside the reach of RICO; indeed, the allegation that the acts furthered a similar aim may be necessary to meet the "relatedness" prong of the pattern element.

The cases cited by movants do not support their argument. A RICO claim was rejected in *Certilman v. Harcastle, Ltd.*, 754 F.Supp. 974, 980 (E.D.N.Y.1991) because the complaint failed to allege two predicate acts. In *Barsam v. Pure Tech Int'l, Inc.*, 864 F.Supp. 1440 (S.D.N.Y.1994), the court declined to find a pattern directed at a "single fraudulent end," but did so in the context of finding that plaintiff had failed to meet the continuity prong of the pattern element, because the acts had occurred over "a limited period of time." *Id.* at 1450.

Having rejected the Heritage defendants' primary challenge to this element, I find that plaintiff's pleadings sufficiently set forth a RICO pattern. Clearly, the acts charged are related to one another; movants essentially concede as much by stating that they shared a common goal. Moreover, HNG has pleaded the requisite degree of continuity. "Continuity ... is centrally a temporal concept." *H.J. Inc.*, 492 U.S. at 242. In order to demonstrate that defendants' conduct possessed sufficient continuity, a RICO plaintiff must allege either a "closed-ended" pattern, in which the criminal conduct "extended over a substantial period of time," or an "open-ended" pattern, in which the past wrongdoing carried with it the threat of future criminal activity. *GICC Capital Corp. v. Technology Finance Group, Inc.*, 67 F.3d 463, 466 (2d Cir.1995), *cert. denied*, 518 U.S. 1017, 116 S.Ct. 2547, 135 L.Ed.2d 1067 (1996). In the instant case, plaintiff states that the Heritage defendants engaged in commercial bribery, carried out by fraudulent use of the mails, from 1988 to 1994. In an appendix to its Case Statement, plaintiff submits a list of the payments and purportedly fraudulent invoices sent by Heritage to Savitsky, stretching from November 1990 to February 1994. Although there is no bright-line test for finding a closed-ended pattern, *see Metromedia Co. v. Fugazy*, 983 F.2d 350, 369 (2d Cir .1992), *cert. denied*, 508 U.S. 952, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993), a period of over three years is generally of sufficient length to meet this standard. *See id.* (period of at least two years sufficient); *see also Proctor & Gamble Co. v. Big Apple Indus. Bldgs, Inc.*, 879 F.2d 10, 18 (2d Cir.1989) (holding, prior to *H.J.*, that racketeering activities spanning nearly two years were enough to establish pattern), *cert. denied*, 493 U.S. 1022 (1990).

*7 In light of the foregoing, plaintiff's submission of an amended complaint would not be futile. Thus, I dismiss HNG's RICO claims with leave to amend so as to allege two separate RICO enterprises. I leave open the possibility that fairness to the defendants may necessitate a bifurcated trial, so that separate juries may hear evidence of each distinct enterprise.

*II. Robinson-Patman Act*

Plaintiff also charges that the conduct of the Heritage defendants transgressed § 2(c) of the Robinson-Patman Act, and seeks treble damages for this purported violation. The section at issue reads as follows:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

15 U.S.C. § 13(c).

The Robinson-Patman Act was passed in an attempt to curb price discrimination which benefitted certain large chain stores, which were able to use their purchasing power to extract preferential purchasing terms. Section 2(c) was directed at preventing such retailers from using "dummy brokerage fees as a means of securing price rebates." *See FTC v. Harry*

Case 7:04-cv-08223-KMK    Document 93-10    Filed 09/19/2005    Page 7 of 10

Not Reported in F.Supp.                                                                  Page 7
Not Reported in F.Supp., 1997 WL 543088 (S.D.N.Y.), 1997-2 Trade Cases P 71,967, RICO Bus.Disp.Guide 9350
(Cite as: Not Reported in F.Supp.)

Broch & Co., 363 U.S. 166, 169, 80 S.Ct. 1158, 4 L.Ed.2d 1124 (1960); see also Seaboard Supply Co. v. Congoleum Corp., 770 F.2d 367, 371 (3rd Cir.1985). Suppliers would be forced to go through such brokers, who would perform no service and would merely pass on their fees to their employer. As a result of this de facto rebate, large distributors who used such brokers purchased their goods at lower prices, which allowed them to undersell their independent competitors. See Keller W. Allen and Meriwether D. Williams, Commercial Bribery, Antitrust Injury and Section 2(c) of the Robinson-Patman Anti-Discrimination Act, 26 Gonz.L.Rev. 167, 171 (1990/91); 2 The Robinson-Patman Act: Policy and Law, 1983 A.B.A. Sec. Antitrust L. Mon. 4 at ix.

Although this was the primary purpose of § 2(c), "Congress in its wisdom phrased § 2(c) broadly, not only to cover the other methods then in existence but all other means by which brokerage could be used to effect price discrimination." Broch & Co., 363 U.S. at 169. Specifically, the Supreme Court noted that "the debates on the bill show clearly that § 2(c) was intended to proscribe other practices such as the 'bribing' of the seller's broker by the buyer." Id. at 169 n. 6. Cf. California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 513, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) ("bribery of a public official may constitute a violation of § 2(c)"). Thus, commercial bribery falls generally within the ambit of this section.

*8 Movants argue that a claim cannot be maintained under this section unless plaintiff can show some sort of "competitive injury", a term whose meaning will be discussed at greater length infra. Plaintiff denies that such a requirement can be read into this statute, and in any event contends that it has sufficiently pled such an injury.

I agree with HNG that nothing in the language of the Act requires that a § 2(c) plaintiff allege any sort of special damages. However, the genesis of the "competitive injury" requirement is not found in this section, but rather arises from the standing requirements for bringing a private damages suit under the antitrust laws. The Robinson-Patman Act does not provide for a private right of action for treble damages. Such a right is granted by § 4 of the Clayton Act, FN8 codified at 15 U.S.C. § 15(a), which authorizes such suits by "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." See Schwimmer v. Sony Corp., 637 F.2d 41, 46 (2d Cir.1980) (standing to raise claim under § 2(a) of Robinson-Patman Act "is derived from Section 4 of the Clayton Act"); Federal Paper Bd. Co. v. Amata, 693 F.Supp. 1376, 1386 (D.Conn.1988) ("Private plaintiff standing to sue for violations of the Robinson-Patman Act is provided by section 4 of the Clayton Act"); Abernathy v. Bausch & Lomb, Inc., 97 F.R.D. 470, 476 (N.D.Tex.1983) ("Although section 2(c) may state a per se violation for which no showing of anticompetitive effect is required in a government enforcement action, in a private action brought under section 4 of the Clayton Act the requirement of antitrust injury still obtains").

> FN8. The Robinson-Patman Act amended the Clayton Act, and thus § 2(c) is sometimes referred to as part of the latter statute. To avoid confusion, I will refer to § 2(c) of the Robinson-Patman Act, and § 4 of the Clayton Act.

Before a plaintiff may recover treble damages under § 4, it "must make some showing of actual injury attributable to something the antitrust laws were designed to prevent." FN9 J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 562, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981). The Supreme Court has made clear, moreover, that an "antitrust injury" should "reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation" See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). HNG thus must show some injury to competition before it may obtain damages under § 2(c). FN10 As HNG is not seeking any sort of injunctive relief, the fate of its § 2(c) cause of action turns on the sufficiency of such a showing.

> FN9. A number of the cases which rejected the notion that competitive injury must be pled as part of a § 2(c) damages claim have simply looked at the language of this section, and have not considered the requisites of the Clayton Act. See Calnetics Corp. v. Volkswagen of America, Inc., 532 F.2d 674, 696 (9th Cir.), cert. denied, 429 U.S. 940 (1976); Gregoris Motors v. Nisan Motor Corp. in USA, 630 F.Supp. 902, 910 (E.D.N.Y.1986) (anti-competitive injury requirement not "part of the plain language of the statute.").

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK   Document 93-10   Filed 09/19/2005   Page 8 of 10

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 543088 (S.D.N.Y.), 1997-2 Trade Cases P 71,967, RICO Bus.Disp.Guide 9350
(Cite as: Not Reported in F.Supp.)

Page 8

In *Municipality of Anchorage v. Hitachi Cable, Ltd.,* 547 F.Supp. 633 (D.Ak.1982), the Court made reference to § 4, but ultimately found that, in passing § 2(c), Congress sought in part to protect the fiduciary relationship between broker and client. The court held, therefore, that the scope of § 2(c) standing "must be expanded to include those who are injured by the destruction of fiduciary obligations." *Id.* at 640. This reasoning was based entirely on the language and history of § 2(c). It is inconsistent, however, with the requisites of a private damages action brought under § 4 of the Clayton Act, as set forth above.

FN10. HNG places great reliance on *John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.,* 588 F.2d 24 (2d Cir.1978), cert. denied, 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979), which it construes as definitively putting to rest the notion that competitive injury must be alleged to state a damages claim under § 2(c). HNG Mem. at 15. That case, which considered a price discrimination claim brought under § 2(a), stated that "[p]roof of injury to competition is not a jurisdictional prerequisite, but instead is part of a Robinson-Patman plaintiff's substantive burden in demonstrating a violation of the Act." *John B. Hull,* 588 F.2d at 27.
*John B. Hull* did not address the pleading requirements of the Clayton Act discussed above, as plaintiffs therein sought injunctive relief, not damages. Instead the case was addressed to the specific elements of § 2(a) which, unlike § 2(c), requires that the violation "lessen competition." 15 U.S.C. § 13(a). Were I to read that case as applying generally to Robinson-Patman claims brought under other provisions of the Act, it would not be of much aid to plaintiff. Because, under *John B. Hull,* plaintiff must ultimately demonstrate some injury to competition, a complaint would, at very least, need to set forth some basis for such injury. I do not, however, see that decision as addressing anything more than the requirements for an action seeking injunctive relied under § 2(a). To the extent it can be read, as plaintiff wishes, to reject the competitive injury requirement in a treble damages case, it is inconsistent with *J. Truett Payne Co.*

The question of what constitutes an injury to competition in commercial bribery cases brought under § 2(c) is one that has given rise to many conflicting authorities. The most stringent reading of this requirement is that only the competitors of the company that has benefitted from a violation of the antitrust laws have standing to sue under § 2(c). According to this view, although "a company may be injured when a supplier bribes an employee of that company in order to make a sale, the purchaser's injury is not cognizable under the antitrust laws because it is not a 'competitive injury' ". *Bunker Ramo Corp. v. Cywan,* 511 F.Supp. 531, 533 (N.D.Ill.1981). Instead, "it is the supplier's competitors who have suffered competitive injury as a consequence of the bribe and it is they who have standing to sue under the antitrust scheme." *Id.* See also *Larry R. George Sales Co. v. Cool Attic Corp.,* 587 F.2d 266, 272 (5th Cir.1979) (per curiam) ("Only if Plaintiff was in the same business and in competition [with the parties that acted in violation of § 2(c) ] would he have standing under [section 4 of the Clayton act]").

*9 Other courts have sought to articulate different tests. Thus, the Third Circuit has found that claims of commercial bribery under § 2(c) have been allowed only where the bribe passed between the seller and buyer, or vice versa. *See Seaboard Supply Co.,* 770 F.2d at 371. The Fourth Circuit, in contrast, has suggested that all successful claims of this sort involve "the corruption of an agency or employment relationship." *Stephen Jay Photography, Ltd. v. Olan Mills, Inc.,* 903 F.2d 988 (4th Cir.1990).

At least one court has reasoned that, because § 2(c) was intended to apply to commercial bribery, any claim setting forth such misconduct has successfully presented a wrong of the sort that the antitrust laws were designed to prevent. *Edison Elec. Institute v. Henwood,* 832 F.Supp. 413, 418 (D.D.C.1993). While this opinion correctly identified commercial bribery as one of the targets of § 2(c), the antitrust motivation behind the legislation lay in Congress's desire to prevent price discrimination. I do not believe that the "antitrust injury" requirement is met merely by demonstrating that a particular act fell somewhere within the purpose underlying a certain provision generally classified as an antitrust statute. *See J. Truett Payne Co.,* 451 U.S. at 568 ("even if there has been a violation of the Robinson-Patman

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK   Document 93-10   Filed 09/19/2005   Page 9 of 10

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 543088 (S.D.N.Y.), 1997-2 Trade Cases P 71,967, RICO Bus.Disp.Guide 9350
(Cite as: Not Reported in F.Supp.)

Page 9

Act, petitioner is not excused from its burden of proving antitrust injury and damages"). Rather, I must look to whether the goal of the "antitrust laws" in general, the protection of competition, is implicated by the conduct at issue before determining if that conduct supports an action under § 4 of the Clayton Act. Thus, "injury, although causally related to an antitrust violation, nevertheless will not qualify as an antitrust injury unless it is attributable to an anti-competitive aspect of the practice under scrutiny...." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (citing *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 109-10, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986)).

To determine the requisites of such an "injury to competition", I seek guidance from application of antitrust injury principles in other contexts. Specifically, the caselaw governing suits under § 2(a) of the Robinson-Patman Act, is directly relevant to this question.

Section 2(a) sets forth the general prohibition against price discrimination. FN11 As stated above, the primary *antitrust* purpose of § 2(c) was to prevent the use of brokerage arrangements as a mask for such discrimination. See *Amata*, 693 F.Supp. at 1388 ("main purpose" of § 2(c) was to prohibit price discrimination exercised through brokerage payments); *NL Indus., Inc. v. Gulf & Western Indus., Inc.*, 650 F.Supp. 1115, 1123 (D.Kan.1986) ("The general view is that Congress' intent in enacting § 2(c) was to prevent disguised price discrimination"). While the law was also directed at commercial bribery, that practice has no relation to the inhibition of competition, at least as targeted by the Robinson-Patman Act, unless it subjected competitors to discriminatory pricing. See *Amata*, 693 F.Supp. at 1389 (no antitrust injury without showing that bribes permitted competitors to buy supplies at lower cost); Allen and Williams at 179 ("To logically fit into the protection of the antitrust laws in general, and section 2(c) in particular, a buyer must prove that an overcharge resulting from the commercial bribery allowed competitors to illegally undercut the buyer's prices, and thereby increase the competitors' sales volume at the buyer's expense"). Without such an anticompetitive effect, there is no antitrust injury on which plaintiff can base its standing under § 4 of the Clayton Act.

FN11. This section reads in relevant part:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce ... and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with the customers of either of them.
> 15 U.S.C. § 13(a).

*10 When a section 2(a) claim is brought by a buyer who has allegedly been discriminated against directly by the seller, it "must first prove that, as the disfavored purchaser, it was engaged in actual competition with the favored purchaser(s) at the time of the price differential." *Best Brands Beverage, Inc. v. Falstaff Brewing Corp.*, 842 F.2d 578, 584 (2d Cir.1987). Although the present case concerns § 2(c), the same principle must apply. Absent such discrimination against parties engaged in actual competition, I discern no anticompetitive effect arising out of the kickbacks at issue which harmed plaintiff. If such discrimination is shown, however, antitrust concerns would be implicated, and a private action for treble damages may lie. See *FTC v. Morton Salt Co.*, 334 U.S. 37, 50-51, 68 S.Ct. 822, 92 L.Ed. 1196 (1948) (it is "self-evident" that "there is a 'reasonable possibility' that competition may be adversely affected by a practice under which manufacturers and producers sell their goods to some customers substantially cheaper then they sell their goods to the competitors of these customers"); *Corn Products Refining Co. v. FTC*, 324 U.S. 726, 741-42, 65 S.Ct. 961, 89 L.Ed. 1320 (1945) (effect of differentials in prices which manufacturers must pay for ingredient in their products "may be substantially to lessen competition").

In light of the foregoing, movants cannot prove sufficient antitrust injury unless they can show that Heritage sold its products to HNG's competitors at a lower price than it charged to HNG, or charged HNG more than HNG's competitors were paying for the same kind of merchandise. HNG's complaint states, as support for the § 2(c) claim, that:

> Muller's and Heritage sold the same or substantially similar goods, materials and supplies

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK   Document 93-10   Filed 09/19/2005   Page 10 of 10

Not Reported in F.Supp. Page 10
Not Reported in F.Supp., 1997 WL 543088 (S.D.N.Y.), 1997-2 Trade Cases P 71,967, RICO Bus.Disp.Guide 9350
**(Cite as: Not Reported in F.Supp.)**

to others for less than the prices charged to Hansel 'N Gretel, thereby raising Hansel 'N Gretel's costs of business relative to its competitors, and causing Hansel 'N Gretel to set disadvantageous prices and lose sales relative to its competitors.

It is not entirely clear who the "others" are that HNG refers to. Nonetheless, when taken as a whole, this passage clearly alleges that HNG was charged by Heritage prices higher than those paid by companies who sold in the same market, and HNG's own products were comparatively more expensive as a result. FN12 This is enough to allege antitrust injury, and suffices for standing in a treble damages action. See NL Indus., Inc., 650 F.Supp. at 1123 (D.Kan.1986) (allegation that plaintiff placed at a "competitive disadvantage" because of commercial bribery was sufficient to meet § 2(c) pleading requirements, although it did not say with whom that disadvantage was). Therefore, I deny the motion to dismiss the Robinson-Patman Act claim. To the extent that discovery reveals that plaintiff is unable to prove the above allegation, as I have construed it, that is a proper matter for a summary judgment motion or for trial.

FN12. I need not decide whether HNG must ultimately prove that it actually charged higher prices than its competitors as a result of Heritage's conduct, or whether such a result may be presumed from the fact that it paid more for its supplies as a result of defendant's illegal practice. Compare Hanover Shoe v. United Shoe Machinery Corp., 392 U.S. 481, 491, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) ("[W]hen a buyer shows that the price paid by him for materials purchased for use in his business is illegally high and also shows the amount of the overcharge, he has made out a prima facie case of injury and damage within the meaning of § 4") with J. Truett Payne Co., 451 U.S. at 564 n. 4 (plaintiff had "particularly weak" claim of competitive injury, when it failed to show that favored retailers lowered their prices). This question has not been briefed and, as plaintiffs have alleged that differential pricing between competitors resulted from the Heritage defendants' conduct, it need not be resolved now.

Because plaintiff may proceed on its federal claims, the application to dismiss the pendent state law claims is denied.

*11 Plaintiff is directed to file and serve an amended complaint, in conformity with the above, within thirty days of the date of this opinion. Counsel for all parties are directed to attend a status conference in Room 17C, 500 Pearl Street, at 2:00 P.M. on October 17, 1997.

It is SO ORDERED.

S.D.N.Y.,1997.
Hansel 'N Gretel Brand, Inc. v. Savitsky
Not Reported in F.Supp., 1997 WL 543088 (S.D.N.Y.), 1997-2 Trade Cases P 71,967, RICO Bus.Disp.Guide 9350

Briefs and Other Related Documents (Back to top)

• 1:94cv04027 (Docket) (May. 31, 1994)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.