Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 257581 (S.D.N.Y.), 1996-1 Trade Cases P 71,438
(Cite as: Not Reported in F.Supp.)

Page 1

Not Reported in F.Supp., 1996 WL 257581 (S.D.N.Y.), 1996-1 Trade Cases P 71,438
Briefs and Other Related Documents

United States District Court, S.D. New York.
HYGRADE MILK & CREAM CO., INC., Terminal Dairies, Inc., Sunbeam Farms, Inc., Hytest Milk Corp., Gold Medal Farms, Inc., Queens Farms Dairy, Inc., Babylon Dairy Co., Inc., and Meadowbrook Farms, Inc., Plaintiffs,
v.
TROPICANA PRODUCTS, INC., and Tropicana Products Sales, Inc., Defendants.
No. 88 Civ. 2861 (SAS).

May 16, 1996.

*OPINION AND ORDER*

SCHEINDLIN, District Judge:

*1 Plaintiffs are suing Tropicana Products, Inc. and Tropicana Products Sales, Inc. (together, "Tropicana"), alleging that their pricing practices on sales of orange juice violate Sections 2(a), 2(d), and 2(e) of the Clayton Act, amended by the Robinson-Patman Act (the "Act"), 15 U.S.C. §§ 13(a), (d)-(e) (1973). Tropicana moves for summary judgment dismissing the complaint in its entirety or, alternatively, dismissing the claim for damages. Plaintiffs cross-move for partial summary judgment on their claim that Tropicana violated § 2(a) of the Act. For the reasons set forth below, Tropicana's motion is granted in part and denied in part and Plaintiffs' motion is denied.

BACKGROUND

I. *Facts*

Plaintiffs are milk distributors who purchase Tropicana orange juice for resale to various retailers, mostly bodegas, mom-and-pop grocery stores, chain stores, and cooperatives. FN1 Of the eight Plaintiffs, Babylon Dairy, Inc. ("Babylon"), Queens Farms Dairy, Inc. ("Queens Farms"), and Gold Medal Farms, Inc. ("Gold Medal") are no longer in business. Plaintiffs Terminal Dairies, Inc., Sunbeam Farms, Inc., and Hytest Milk Corp. are wholly-owned subsidiaries of Hygrade Milk & Cream Co., Inc. ("Hygrade"); they are not and have never been direct customers of Tropicana. Hygrade, Queens Farms, Babylon, and Gold Medal all sold their own in-house brands of orange juice as well as Tropicana orange juice.

FN1. There are generally two types of cooperatives. A buying co-op is a group of stores which join together under a common name, make their purchases through a central buying office, and warehouse their product in a jointly owned facility. Buying co-ops purchase directly from Tropicana. An advertising co-op is a group of independent stores which advertise under a common name. These independent stores may purchase product from any distributor and are still eligible for promotional allowances because of the amount of advertising they provide. *See* Affidavit of Terry Schulke ("Schulke Aff."), Vice-President and Director of Grocery Sales for Tropicana, October 1995, ¶¶ 7-8.

The focus of this lawsuit is Tropicana's promotional programs regarding orange juice sales in the New York metropolitan area, known as the "Citrus Bowl." Plaintiffs allege that Tropicana engages in unlawful price discrimination in violation of the Act. In particular, Plaintiffs allege that wholesale food distributors Royal Foods Distributors, Inc. ("Royal") and White Rose Dairy ("White Rose") (together, "Preferred Wholesalers") as well as direct buying chains Waldbaum's, Inc. ("Waldbaum's") and Supermarkets General Corp. ("Pathmark") (together, "Preferred Chains") receive promotions, discounts, and incentives which are unavailable to Plaintiffs or their customers on proportionally equal terms.

Tropicana sells its orange juice directly to 1) dairies; 2) routemen; FN2 3) wholesale food distributors; and 4) direct buying chain retailers. Tropicana has a single list price for its orange juice. Tropicana, however, offers many promotional allowances, discounts, and incentives to some of its purchasers. Tropicana has three promotional programs available to retailers. FN3

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK    Document 93-11    Filed 09/19/2005    Page 2 of 8

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 257581 (S.D.N.Y.), 1996-1 Trade Cases P 71,438
(Cite as: Not Reported in F.Supp.)

Page 2

FN2. Routemen, or jobbers, are independent truck drivers who sell Tropicana product to various retail customers. In both the original Complaint, filed on April 20, 1988, and the First Amended Complaint, filed on August 1, 1988, Plaintiffs alleged that Tropicana engaged in discriminatory practices in favor of jobbers. In the Second Amended Complaint, filed on February 26, 1993, Plaintiffs acknowledge jobbers as purchasers of Tropicana, but define "Favored Buyers" as "direct buying chains, including Defendants Pathmark and Waldbaum's, and [ ] wholesale food distributors, including Defendants White Rose and Royal Food." Second Amended Complaint ¶ 20. There are no allegations of discriminatory practices involving jobbers in the Second Amended Complaint. On January 23, 1996, this Court denied Plaintiffs' motion to amend the complaint to include jobbers as Favored Buyers. *See* Transcript of Oral Argument ("Tr."), at 32. Plaintiffs now argue that the words "wholesale food distributor" include jobbers. The Complaint, however, separately defines jobbers and wholesale food distributors. *See* Second Amended Complaint ¶ 19. Accordingly, any alleged differential treatment of jobbers will not be considered.

FN3. Tropicana claims that these programs are open to all retailers regardless of whether they purchase from Tropicana or a wholesaler. Plaintiffs, however, contend that these programs were not functionally available to their customers.

(1) The Basic Plan. This promotional allowance gives retailers a per case discount on each case of orange juice they purchase. In order to qualify for the allowance, the retailer must (a) notify Tropicana in advance that it intends to participate in the program, (b) engage in some form of advertising (for example, placing a sign in the window advertising the juice at a reduced price or printing a notice in a supermarket flyer), and (c) feature the product at a reduced price to be determined by the retailer. Tropicana's drivers periodically check to ensure that participating retailers are performing. There are approximately seven such promotions during a thirteen week period. Tropicana does not specifically require that any of the allowance be spent for advertising Tropicana products.

*2 (2) Case Volume Incentive ("CVI"). This program is only available to "chain" stores, i.e., cooperatives or direct buying chains. Under this program a retailer receives a discount if it runs some sort of promotion for the product and purchases more Tropicana product in a period than it had purchased in the same period in a previous year.

(3) Tactical Action Fund ("TAF"). Under this program retailers are provided payments for extraordinary advertising performance like a price-reduced coupon or prominent placement of Tropicana product in a circular distributed by the retailer.

Plaintiffs contend that: 1) the Basic Plan is not practically available to their bodega customers or mom-and-pop customers (together, "bodegas" or "bodega customers"); 2) the Basic Plan is administered in a discriminatory fashion; 3) the CVI and TAF programs are not available to bodega customers; 4) "slotting allowances" and "price protection," described below, are given to various retailers but denied to bodega customers; 5) Preferred Wholesalers receive discounts, allowances, and benefits from Tropicana which are not available to them; and 6) Preferred Retailers receive discounts, allowances, and incentives which are not available to them.

DISCUSSION

II. *Legal Standard*

Summary judgment will be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The burden is on the moving party to demonstrate that no material factual dispute exists. *See Gallo v. Prudential Residential Services, Ltd.,* 22 F.3d 1219, 1223 (2d Cir.1994). All ambiguities must be resolved and all inferences must be drawn in favor of the party against whom summary judgment is sought. *See id.* Additionally, if the party opposing summary judgment sets forth a reasonable interpretation of a material fact that conflicts with the interpretation suggested by the movant, then summary judgment must be denied. *See Schering*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 3
Not Reported in F.Supp., 1996 WL 257581 (S.D.N.Y.), 1996-1 Trade Cases P 71,438
**(Cite as: Not Reported in F.Supp.)**

*Corp. v. Home Ins. Co.*, 712 F.2d 4 (2d Cir.1983). However, "where the non-movant will bear the ultimate burden of proof at trial on an issue, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element on the non-moving party's claim." *Brady v. Town of Colchester*, 863 F.2d 205, 210-11 (2d Cir.1988).

Once the moving party has come forward with support demonstrating that there is no genuine issue of material fact to be tried, the burden shifts to the non-moving party to provide similar support setting forth specific facts about which a genuine triable issue remains. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Mere conclusory allegations will not suffice. *See Fed.R.Civ.P. 56(e)*. Affidavits must be based on personal knowledge, not hearsay, and "shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify on the matters stated therein." *Id.*; *see also Beyah v. Coughlin*, 789 F.2d 986, 987 (2d Cir.1986); *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir.1988). In considering the evidence, the trial court's task is "limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." *Gallo*, 22 F.3d at 1224.

### III. Section 2(a) of the Robinson-Patman Act

*3 In order for Plaintiffs to establish a violation of § 2(a) FN4 they must show 1) that Tropicana "discriminat[ed] in price between different purchasers"; and 2) that "the effect of such discrimination may be substantially to lessen competition." FN5 15 U.S.C. § 13(a). Tropicana asserts that Plaintiffs have failed to establish both of these requirements.

> FN4. Section 2(a) states, in relevant part:
> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, ... and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them....
> 15 U.S.C. § 13(a) (1973).

> FN5. The statute also requires that the sales to the different purchasers occurred in interstate commerce and were of commodities of like grade and quality. *See* 15 U.S.C. § 13(a). Neither of these requirements are at issue here.

Price discrimination, for the purposes of the Act, means nothing more than a price differential. *See, e.g., Best Brands Beverage, Inc. v. Falstaff Brewing Corp.*, 842 F.2d 578, 584 (2d Cir.1987). Price discrimination may be either direct of indirect. *See* 15 U.S.C. § 13(a). Direct price discrimination occurs when a seller charges different purchasers different prices; indirect price discrimination occurs when one buyer receives something of value which is not offered to another buyer. *See Robbins Flooring, Inc. v. Federal Floors, Inc.*, 445 F.Supp. 4, 8 (E.D.Pa.1977). There is no price discrimination, however, where a seller offers different prices to each of its purchasers, provided all competing purchasers have an equal opportunity to purchase the seller's product at the different prices. *See FLM Collision Parts, Inc. v. Ford Motor Co.*, 543 F.2d 1019, 1024 (2d Cir.1976), *cert. denied*, 429 U.S. 1097 (1977).

A program which grants discounts or allowances to its customers in an unequal or discriminatory manner may constitute price discrimination. *See FTC v. Morton Salt Co.*, 334 U.S. 37, 42 (1948); *FLM Collision*, 543 F.2d at 1025-26. The Act requires that a seller who provides discounts or allowances must make them functionally (not just theoretically) available to all of its customers. *See Morton Salt*, 334 U.S. at 42 (volume discounts which were theoretically available to all customers but practically unavailable to smaller customers violated the Act). Functional availability, however, does not require that each customer be able to participate or benefit equally. *See L.S. Amster & Co. v. McNeil Labs., Inc.*, 504 F.Supp. 617, 623, 625 (S.D.N.Y.1980) (promotional allowance program which enabled some customers to profit more than others does not violate the Act as long as it is evenly administered and competing customers are able to participate to a significant degree).

Price discrimination standing alone does not violate the Act. *See Best Brands*, 842 F.2d at 584. Plaintiffs must also prove that the price

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 4
Not Reported in F.Supp., 1996 WL 257581 (S.D.N.Y.), 1996-1 Trade Cases P 71,438
(Cite as: Not Reported in F.Supp.)

discrimination causes competitive injury-"a reasonable possibility that the price difference may harm competition." *Falls City Indus. v. Vanco Beverage, Inc.*, 460 U.S. 428, 435 (1983). Actual harm to competition is not required. *Id.* Competitive injury is not limited to competition between the favored purchaser and disfavored purchaser; it also encompasses harm to competition between their customers. FN6 *Id.* at 436.

> FN6. Typically competitive injury may occur at three levels. First, a primary-line injury occurs where the seller's price discrimination harms competition with the seller's competitors. *See, e.g., Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993). Second, a secondary-line injury occurs where a seller's price discrimination harms competition between the favored purchasers and disfavored purchasers. *See, e.g., F.T.C. v. Sun Oil Co.*, 371 U.S. 505 (1963). In order to establish a secondary-line violation the favored purchasers and disfavored purchasers must be in actual competition. *See Best Brands*, 842 F.2d at 584. Third, a tertiary-line violation occurs where the seller's price discrimination harms competition between the customers of the favored purchasers and disfavored purchasers even though the favored purchasers and disfavored purchasers do not compete. *See Falls City*, 460 U.S. at 436.

A prima facie showing of competitive injury may be demonstrated by substantial price differentials to competing purchasers over time. *See Falls City*, 460 U.S. at 435 (citing *Morton Salt*, 334 U.S. at 46, 50-51). Competitive injury may also be shown by proof of lost sales or profits. *Falls City*, 460 U.S. at 434-35. Where competitive injury is inferred from a substantial price difference over time and plaintiffs cannot show evidence of displaced sales, this inference may be overcome by evidence breaking the causal connection between a price differential and lost sales. *Id.* at 435.

*4 Thus, in order to support their § 2(a) claim, Plaintiffs must show that as a result of Tropicana's pricing practices: 1) there is a substantial price difference between the favored purchasers and the disfavored purchasers (price discrimination); and 2) there is a reasonable possibility that the price discrimination may harm competition (competitive injury). Plaintiffs claim that Tropicana's promotional programs are discriminatory and harm competition between their customers and Preferred Retailers, between themselves and Preferred Wholesalers, and between themselves and Preferred Retailers.

### A. *Tropicana's Motion for Summary Judgment*

#### 1. *Preferred Retailers and Plaintiffs' Customers*

Plaintiffs claim that Tropicana's pricing practices harm competition between direct buying chain retailers and Plaintiffs' customers. Plaintiffs contend that the Basic Plan is not functionally available to bodega customers because it is burdensome and economically impractical, and that it is administered in a discriminatory manner. Plaintiffs also claim that allowances, discounts, and incentives that are given to direct buying chains are not available to bodega customers.

##### a. *Availability of Basic Plan*

In order to inform retailers about the Basic Plan, Tropicana sent notifications describing the Plan to its wholesale distributors. *See* Deposition of Terry Schulke ("Schulke Dep."), Vice-President and Director of Grocery Sales for Tropicana, dated March 20, 1995, at 163, 165-66; Deposition of Richard Richer ("Richer Dep."), Director of Finance and Operations of the Eastern Division of Tropicana, dated March 29, 1995, at 142-43; Deposition of Lisa Scanlon ("Scanlon Dep."), Manager of Retail Operations for Tropicana, dated March 22, 1995, at 18; Deposition of William Meyer, Sr. ("Meyer, Sr.Dep."), President of Hygrade, dated April 10, 1995, at 199, 201; Deposition of William Schwartz ("Schwartz Dep."), President of Meadowbrook, dated April 24, 1995, at 222. Tropicana claims that it could not notify bodega customers directly because Plaintiffs would not provide them with customer lists. *See* Schulke Dep. at 159; Richer Dep. at 142-44. Tropicana also advertised the plan in Spanish and English in a trade journal called *Modern Grocer*. *See* Schulke Dep. at 159-60; Richer Dep. at 150; Scanlon Dep. at 18. Plaintiffs admit that their customers were not denied the opportunity to take advantage of the Basic Plan. *See* Meyer, Sr. Dep. at 241; Deposition of Jules Kotcher ("Kotcher Dep."), President of Babylon and Queens Farms, dated April 18, 1995, at 263-64. In fact, some bodega customers

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  Page 5
Not Reported in F.Supp., 1996 WL 257581 (S.D.N.Y.), 1996-1 Trade Cases P 71,438
(Cite as: Not Reported in F.Supp.)

have participated in the Basic Plan. *See, e.g.,* Declaration of Billy Meyer, Jr. ("Meyer, Jr. Decl."), President of Hygrade, dated November 24, 1995, ¶ 25.

Plaintiffs nonetheless contend that the Plan is unworkable and uneconomical for bodegas and Plaintiffs. Plaintiffs had a significant responsibility in implementing the Plan for their bodega customers. Plaintiffs' drivers would solicit bodegas to participate in the promotional program. *See* Meyer, Sr. Dep. at 770; Kotcher Dep. at 326; Schwartz Dep. at 470. It was difficult for the drivers to do this because many bodega owners spoke Spanish and they did not. *See* Schwartz Dep. at 469. In order to facilitate this process, Hygrade produced a flyer describing the program in more understandable terms. FN7 Plaintiffs paid the drivers a commission so that they would take the time to solicit bodegas. *See* Meyer, Sr. Dep. at 770. After a customer agreed to participate in the promotion, Plaintiffs notified Tropicana. *See* Meyer, Sr. Dep. at 770; Schwartz Dep. at 472. Plaintiffs would then pick up advertising signs from Tropicana and deliver them to the bodegas. *See* Meyer, Sr. Dep. at 771; Schwartz Dep. at 471. Plaintiffs would check if the bodega was keeping the sign up for the entire week and report to Tropicana during the promotional week. *See* Schwartz Dep. at 471, 473. Plaintiffs maintained sales records for the bodega during the promotional period for submission to Tropicana. *See* Meyer, Sr. Dep. at 771. Plaintiffs then handled numerous complaints from bodegas who frequently had to wait for extended periods to receive their checks from Tropicana. *Id.* at 769; Kotcher Dep. at 325.

FN7. Tropicana claims that Hygrade's flyer misrepresented the terms and conditions of the promotion.

*5 The vast majority of bodega customers did not participate in the Basic Plan. *See, e.g.,* Meyer, Jr. Decl. ¶ 25. Tropicana contends that they chose not to do so because they did not want to comply with the Plan's minimal requirements. *See* Defendants' Reply Memorandum of Law in Support of Their Motion for Summary Judgment at 5-6. This might be so. However, it is also possible that the Plan was not functionally available to bodega customers. Tropicana's efforts to inform bodega customers of the Plan were limited. While Tropicana informed Plaintiffs of the Plan, Plaintiffs claim that Tropicana never requested a customer list. *See* Kotcher Dep. at 247-48, 324-25; Schwartz Dep. at 243, 374. Although Plaintiffs helped inform bodega customers of the Plan, they never entered into any agreement with Tropicana to do so. Ultimately, it is Tropicana's obligation to inform bodega customers about the Plan. *See* Guides for Advertising Allowances and Other Merchandising Payments and Services ("FTC Guides"), 16 C.F.R. § 240.11. FN8 It is also questionable whether Tropicana's advertisements in a trade journal, which may not have been seen by bodega customers, provided effective notice. *Cf. Exquisite Form Brassiere, Inc. v. FTC,* 301 F.2d 499, 501 (D.C.Cir.1961), *cert. denied,* 369 U.S. 888 (1962) (three advertisements in trade journal was insufficient notice). The inadequacy of the notice is evidenced by the fact that many former bodega customers claim that they were not aware of Tropicana's promotional program. *See* Bodega Declarations in Support of Plaintiffs' Cross-Motion to Amend the Complaint ("Bodega Declarations") ¶ 5. Additionally, those bodega customers who participated in the Plan faced difficulties obtaining promotional materials and receiving payment from Tropicana.

FN8. The FTC Guides are designed to help businesses comply with the requirements of §§ 2(d) and (e) of the Act. The Guides are based on the language and legislative history of the Act as well as court decisions construing the Act. *See* FTC Guides, 16 C.F.R. § 240.1 (1995). They do not have the force of law. *Id.* Such guidelines, however, have the "power to persuade, if lacking the power to control." *General Electric Co. v. Gilbert,* 429 U.S. 125, 142 (1976) (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944) ); *EEOC v. Arabian American Oil Co.,* 499 U.S. 244, 257 (1991). The weight to be given the Guides depends on "the thoroughness evident in [their] consideration, the validity of [their] reasoning, [and their] inconsistency with earlier and later pronouncements." *Skidmore,* 323 U.S. at 140. Without discussing these factors in detail, I note that the FTC Guides' position on a customer's use of promotional allowances has been substantially the same throughout the period relevant to this lawsuit. *See* 16 C.F.R. § 240.11 (1984).

Moreover, Tropicana's promotional allowances bear no relationship to the value of services provided by

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 257581 (S.D.N.Y.), 1996-1 Trade Cases P 71,438
(Cite as: Not Reported in F.Supp.)

Page 6

the retailer. Such a program is inconsistent with the FTC Guides which state that sellers should not overpay for services and that the allowance should be spent solely for the purpose for which it was given. See FTC Guides, 16 C.F.R. § 240.12. It is true that a legitimate allowance program need not guarantee that all customers participate equally or benefit to the same degree, as long the program is evenly administered. See L.S. Amster, 504 F.Supp. at 623, 625. However, the fact that some retailers make thousands of dollars from the Plan while others do not even participate creates an inference that the Plan is not functionally available to all customers.

There is evidence that suggests that bodega customers did not understand the Basic Plan and did not want to comply with its requirements. See Meyer, Jr. Dep. at 369; Meyer, Sr. Dep. at 231-32, 240, 819-20. There is also a question of fact as to whether Tropicana requested customer lists from Plaintiffs. Based on the limited notice provided by Tropicana, the administrative difficulties faced by bodegas participating in the Plan, and the lack of any relationship between the allowance and the value of service provided, a reasonable jury could conclude that the Plan was not functionally available to bodega customers.

b. *Off-Invoice Payments*

\*6 Tropicana permitted Pathmark and Waldbaum's to receive their allowances directly as a discount on their next bill, or "off-invoice." Bodega customers, in contrast, had to "billback" Tropicana after providing the required documentation. Bodega customers were required to submit a "verification" form, proof of advertising, and proof of purchase to Tropicana within 30 days of the promotion. Only after approving the documentation would Tropicana send a check to bodega customers. Tropicana asserts that the reason bodega customers do not receive off-invoice payments is that they do not purchase directly from Tropicana. Tropicana cannot deduct bodega customers' promotional allowance from their next bill because it does not bill them in the first place.

In L.S. Amster, 504 F.Supp. at 620, this Court found that the decision to grant allowances off-invoice is similar to the decision to extend credit. The decision not to grant allowances to a customer on an off-invoice basis will not violate the Act if it is based on a valid business consideration. Id. at 621-22; see also Bouldis, 711 F.2d at 1325 (discriminatory practices in the extension of credit do not violate §

2(a) where they are based on legitimate business reasons). Tropicana grants off-invoice payments to direct buying chains because they promise to perform the required promotional activity and historically have done so. See Schulke Dep. at 169-73. Wholesalers, on the other hand, do not have the authority to make such a commitment on behalf of independent retailers. Furthermore, bodegas have a poor record of complying with the required promotional activity. See Meyer, Jr. Dep at 369; Meyer, Sr. Dep. at 231-32, 240, 819-20. These considerations, coupled with the logistical difficulty of granting off-invoice allowances to bodega customers, are legitimate reasons for differential treatment. See L.S. Amster, 504 F.Supp. at 621-22 (granting off-invoice payments based on prior compliance with the requirements of promotional programs does not violate the Act). Moreover, Plaintiffs have not offered any competent proof that Tropicana's decision to deny off-invoice payments to bodega customers was motivated by anything other than business considerations.

c. *Pre-Pull*

Tropicana customers who participate in the promotional program may receive product which is eligible for the promotional allowance prior to the dates of the promotion. This time period is known as "pre-pull." This period may be different for different customers. See Ex. H to Declaration of Carl Person ("Nov. Person Decl."), attorney for Plaintiffs, dated November, 27, 1995. Pathmark and Waldbaum's, for example, have five days (or one week, as Tropicana does not deliver on the weekends) of pre-pull. See Deposition of Salvatore Olivito ("Olivito Dep."), Vice-President of Dairy for Pathmark, dated October 21, 1993, at 57-58; Deposition of Alexander Garofalo ("Garofalo Dep."), Chilled Products Sales Manager for Tropicana, dated December 3, 1993, at 11-12. As there are seven promotions in a thirteen week quarter, all of their purchases are eligible for the allowance. Plaintiffs, however, only receive one day of pre-pull on behalf of their customers.

\*7 Tropicana claims that the purpose of pre-pull is to allow enough time to get the product in the stores for the promotion. See Defendants' Rule 3(g) Statement ("Def.3(g)") ¶ 61. Tropicana argues that this is necessary because only juice delivered for the promotion-as opposed to juice already existing in inventory-is eligible for the allowance. Tropicana, however, does not require all product which is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 257581 (S.D.N.Y.), 1996-1 Trade Cases P 71,438
(Cite as: Not Reported in F.Supp.)
Page 7

eligible for a promotional allowance to be sold at a lower price. Thus, a customer may purchase product during the pre-pull period or the promotional period and sell it at the regular price after the promotion is over. Tropicana asserts that the reason for the discrepancy in pre-pull periods is that different customers have different delivery considerations. See Def. 3(g) ¶¶ 62-63. Bodegas usually receive daily deliveries. Chains and buying co-ops, on the other hand, usually take delivery at a central warehouse and then distribute the product to the several retail outlets. Some retailers only take delivery once a week. Tropicana claims that it adjusts the pre-pull period depending on the needs of the retailer. See Def. 3(g) ¶¶ 65, 87.

Tropicana's pre-pull practices permit all purchases by direct-buying chains to be eligible for promotional payments, but only permit purchases made by bodega customers for 6 out of 10 days to be eligible. This practice raises an inference of price discrimination. The net effect of this differential treatment is that direct buying chains receive lower prices (through promotional allowances) for nearly twice as long as bodega customers. Tropicana's argument that different pre-pull periods were necessary because of delivery considerations is neither relevant to the question whether a price difference and competitive injury resulted nor a defense to price discrimination under the Act. See 15 U.S.C. §§ 13(a)-(b).

### d. TAF Program

Tropicana claims that the TAF program is available to all retailers. See Schulke Aff. ¶ 10. Although some large supermarkets who are customers of Plaintiffs have received TAF money, see Def. 3(g) ¶ 74, Plaintiffs claim that this program was not available to bodega customers, see, e.g., Meyer, Jr. Decl. ¶ 42. Furthermore, Tropicana's documentation describing the promotional program available to independent grocers makes no mention of the TAF program. See Exs. B and C to Declaration of Carl Person ("Oct. Person Decl."), dated October 18, 1995; Tropicana Ex. 20. Consequently, an issue of fact exists as to whether the TAF program was functionally available to bodega customers.

### e. CVI Program

Tropicana admits that CVI funds are unavailable to individual bodegas. See Def. 3(g) ¶ 72. Tropicana claims that bodegas are excluded from this program because Tropicana is unable to track their purchases for the prior year. According to Tropicana, bodegas would be able to participate in this program if they banded together to form advertising co-ops. Tropicana, however, may not structure a promotional program in a manner that prevents a customer from participating. Cf. Morton Salt, 334 U.S. at 42-44 (quantity discounts which were theoretically available to all purchasers but functionally unavailable to small stores violate the Act). Although the CVI program is not available to individual bodegas, Tropicana contends that "[v]iewed in their entirety, promotional payments are available on proportionally equal terms to all competing retailers." Schulke Aff. ¶ 11 (emphasis added). However, a question of fact exists as to whether the exclusion of bodegas from participating in this program caused price discrimination and competitive injury.

### f. Slotting Allowances and Price Protection

*8 Slotting allowances are payments traditionally made by a manufacturer to a retailer to obtain or retain shelf space for its products. Slotting allowances are designed to cover the retailer's administrative costs in providing and maintaining shelf space for a manufacturer's products. Tropicana admits to paying slotting allowances when demanded by a retailer. See Def. 3(g) ¶ 96. In fact, Tropicana claims to have paid slotting allowances to some of Plaintiffs' supermarket customers. Id. ¶ 97. Tropicana contends that it has never denied a request for slotting allowances from Plaintiffs' bodega customers-bodega customers have just never asked for one. Id. ¶ 98. Plaintiffs respond that their bodega customers never knew that it was available and under what terms it would be granted. See Plaintiffs' Response Rule 3(g) Statement ("Pls.Res.3(g)") ¶ 98. If the existence of a promotional program is not known by the customers of a seller, then it cannot be considered available to them in any meaningful way. See Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft, 19 F.3d 745, 752 (1st Cir.1994). Consequently, a question of fact exists as to whether slotting allowances were functionally available to bodega customers.

"Price protection" is a practice that Tropicana occasionally engaged in when it raised its prices. Where a retailer has a commitment to an advertised promotional price and Tropicana increases its prices

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 257581 (S.D.N.Y.), 1996-1 Trade Cases P 71,438
(Cite as: Not Reported in F.Supp.)

Page 8

prior to the running of the ad, Tropicana will protect the retailer. Pathmark has requested price protection from Tropicana approximately fifteen times in a ten year period. *See* Olivito Dep. at 146-48. Plaintiffs claim that they did not know that Tropicana had a price protection program available for bodegas. *See, e.g.,* Meyer, Jr. Decl. ¶ 50. Some of Hygrade's customers have also received price protection from Tropicana under the same conditions as other retailers. *See* Def. 3(g) ¶ 103; Pls.Res. 3(g) ¶ 103. Hygrade claims, however, that this occurred only after it complained to Tropicana, and that it never knew that such a program existed. *See, e.g.,* Meyer, Jr. Decl. ¶ 50. Moreover, there is no indication that Tropicana ever informed Plaintiffs or their customers that price protection might be available. Accordingly, a question of fact also exists as to whether price protection was functionally available to bodega customers.

g. *Summary*

Resolving all ambiguities and drawing all inferences in Plaintiffs' favor, the evidence demonstrates that the Basic Plan, the TAF program, slotting allowances, and price protection were not available to bodegas. Additionally, the CVI program and equivalent pre-pull periods were denied to bodega customers. Thus, a rational jury could find that these differences constituted a substantial price discrimination over time between bodegas and direct buying chains. Accordingly, Tropicana's motion is only granted with respect to the use of off-invoice allowances. In all other respects, Tropicana's motion for summary judgment on this aspect of Plaintiffs' § 2(a) claim is denied.

2. *Preferred Wholesalers and Plaintiffs*

\*9 Plaintiffs also claim that Tropicana's pricing practices harmed competition between themselves and their competitors Royal and White Rose.

a. *Allowances and Discounts*

Tropicana claims that all wholesalers, including Royal and White Rose, purchase product at the same price and that none of them received any discounts or allowances. *See* Garofalo Dep. at 53; Schulke Dep. at 23, 29; Richer Dep. at 47. Furthermore, Tropicana claims that retailers are equally eligible for promotional allowances regardless of the identity of their wholesaler. *See* Schulke Aff. ¶ 11; *see also* Deposition of Robert Price ("Price Dep."), former Vice-President for Sales and Marketing for Red Apple Supermarkets, dated June 16, 1995, at 13 (stating that any allowance that Red Apple received did not depend on which wholesaler supplied the product).

Plaintiffs, however, claim that retailers purchasing from Royal and White Rose are eligible for certain discounts and allowances which would not have been available to them had they purchased from Plaintiffs. In support of this allegation Plaintiffs submit three documents describing promotional allowances made available to Red Apple, a supermarket that purchased Tropicana product from both Hygrade and Royal. *See* Ex. K to Nov. Person Decl. Each document states on the first page that the allowance only applies to purchases made through Royal. *See id.* at 7832, 7834, 7845. Robert Price of Red Apple admitted that Red Apple, Tropicana, and Royal entered into an arrangement permitting Red Apple to purchase product from Royal for possibly "well in excess" of a dollar per case cheaper than it could from Hygrade. *See* Price Dep. at 15-16. Hygrade contends that it lost its Red Apple account to Royal as a result of this discriminatory treatment. A reasonable trier of fact could conclude that Tropicana discriminated against Plaintiffs by providing allowances or discounts to those who purchased from Preferred Wholesalers.

b. *Pre-Pull*

Plaintiffs claim that Royal and White Rose received preferential pre-pull periods for their customers. A Tropicana business record reveals that when certain retail customers purchased from Royal and White Rose they were given 100% pre-pull, but were given only one-day of pre-pull when purchasing from Plaintiffs. *See* Ex. H to Nov. Person Decl. Tropicana's response is that different retailers have different delivery requirements. This does not address the question of why the same retailer might have different pre-pull periods depending on the identity of the wholesaler.

c. *Off-Invoice*

In the 1980s, Royal decided to advance to certain customers the promotional allowance they would eventually receive. In turn, Tropicana agreed to pay the promotional allowance due to those retailers directly to Royal by deducting it from the invoice.