Westlaw

Page 1

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
(Cite as: Not Reported in F.Supp.2d)

C
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
Briefs and Other Related Documents

United States District Court,S.D. New York.
LINENS OF EUROPE, INC., Plaintiff,
v.
BEST MANUFACTURING, INC., Best Metropolitan Towel and Linen Supply, Inc., Best Textiles LLC, B & M Linen Corp. d/b/a Miron & Sons Laundry, Cascade Linen Supply, Co., Inc., Central Laundry Service Corp. d/b/a Sea Crest Linen, Inc., Stanley Olan, White Plains Coat and Apron, Co., Inc. and Bruce Botchman, Defendants.
No. 03 Civ. 9612(GEL).

Sept. 16, 2004.

Kenneth I. Wirfel, New York, NY, for Plaintiff.
Gerard E. Harper, Paul, Weiss, Rifkind, Wharton & Garrison LLP (Randi D. Adelstein, on the brief), New York, NY, for defendant Best Manufacturing, Inc.
Mark D. Herman, Herman & Beinin, New York, NY, for defendant Best Metropolitan Towel and Linen Supply, Inc.
John Linville, Manatt, Phelps & Phillips, LLP, New York, NY, for defendant Best Textiles LLC.
Joshua Zuckerberg, Pryor Cashman Sherman & Flynn LLP (Ronald H. Schectman, on the brief), New York, NY, for defendant B & M Linen Corp. d/b/a Miron & Sons Linen Service.
L. Donald Prutzman, Tannenbaum Helpern Syracuse & Hirschtritt LLP, New York, NY, for defendants Central Laundry Service Corp. d/b/a Sea Crest Linen Supply and Stanley Olan.
Barry J. Friedberg, Trachtenberg Rodes & Friedberg LLP, New York, NY, for defendant Cascade Linen Supply Co.
Nick S. Williams, Mayer, Brown, Rowe & Maw LLP (Lee H. Rubin, William L. Olsen, on the brief), New York, NY, for defendants White Plains Coat & Apron Co., Inc. and Bruce Botchman.

OPINION AND ORDER

LYNCH, J.

*1 Linens of Europe, Inc. ("LOE") brought this action on December 3, 2003. The complaint alleged that defendants had monopolized the business of supplying and laundering fine linens for upscale restaurants in the Manhattan area in violation of section 2 of the Sherman Act, 15 U.S.C. § 2, and engaged in a pattern of bribery, extortion, assault, intimidation, and other harassment in an effort to exclude LOE from that market in violation of the Racketeer Influenced and Corrupt Organizations Act, Pub.L. No. 91-452, 84 Stat. 941 ("RICO"). Also on December 3, defendants White Plains Coat and Apron Co., Inc. ("White Plains") and Bruce Botchman, its principal, pled guilty to a violation of section 1 of the Sherman Act, 15 U.S.C. § 1. United States v. Botchman, No. 03 Cr. 1427 (S.D.N.Y. Dec. 3, 2004). Defendants subsequently moved to dismiss, arguing, inter alia, that section 2 of the Sherman Act does not forbid "shared monopolies." FN1

FN1. District courts in this and other districts have uniformly held or approved the view that allegations of a "shared monopoly" do not state a claim under section 2 of the Sherman Act, Crimpers Promotions, Inc. v. Home Box Office, Inc., 554 F.Supp. 838, 841 n .2 (S.D.N.Y.1982); Consol. Terminal Sys., Inc. v. ITT World Communications, Inc. 535 F.Supp. 225, 228-29 (S.D.N.Y.1982); accord Flash Elecs., Inc. v. Universal Music & Video Distrib. Corp., 312 F.Supp.2d 379, 396-97 (E.D.N.Y.2004); Santana Prods., Inc. v. Sylvester & Assocs. Ltd., 121 F.Supp.2d 729, 737-38 (E.D.N.Y.1999); Phoenix Elec. Co. v. Nat'l Elec. Contractors Ass'n, Inc., 867 F.Supp. 925, 941 (D. Or 1994); Sun Dun, Inc. v. Coca-Cola Co., 740 F.Supp. 381, 390-91 (D.Md.1990), but the Second Circuit has not addressed the issue. In Harkins Amusement Enters., Inc. v. General Cinema Corp., 850 F.2d 477 (9th Cir.1988), the only court of appeals decision on point, the Ninth Circuit declined to decide "whether the shared monopoly theory may be viable under some circumstances." Id. at 490. The Supreme Court's decision in American Tobacco Co. v. United States, 328 U.S. 781 (1946), affirming the conviction of

Not Reported in F.Supp.2d                                                                                          Page 2
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
(Cite as: Not Reported in F.Supp.2d)

three major tobacco companies for a section 2 conspiracy, has given some courts pause about reaching a categorical conclusion. E.g., *H.L. Hayden Co. v. Siemens Med. Sys., Inc.,* 672 F.Supp. 724, 741-42 (S.D.N.Y.1987). Since LOE has abandoned its § 2 claim, this Court need not consider the issue.

On March 18, 2004, rather than respond to the motions to dismiss, LOE filed an amended complaint, which substituted a claim under section 1 of the Sherman Act, which prohibits combinations in restraint of trade, for the former complaint's section 2 claim, and augmented the allegations with facts admitted by Botchman and White Plains at their guilty plea allocution. LOE submits that these and other amendments to the complaint render the pending motions to dismiss moot. Defendants vigorously deny this contention and argue that the amended complaint, too, fails to state a claim under either the Sherman Act or RICO. For the reasons that follow, defendants' motions are granted in part and denied in part.

BACKGROUND

The facts set forth below, drawn from the amended complaint, must be taken as true for purposes of defendants' motions to dismiss for failure to state a claim. FN2 *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). LOE, a Texas corporation authorized to do business in New York, supplies and launders fine linens, such as tablecloths, napkins, and serviettes, for upscale restaurants. (Compl.¶¶ 4, 27-28.) The corporate defendants, with the exception of Best Textiles LLC and Best Manufacturing, Inc., also supply or launder fine linens. (*Id.* ¶¶ 5-12, 14.) The individual defendants, Stanley Olan and Bruce Botchman, served, at all times relevant to this action, as the owners and presidents of, respectively, Central Laundry Service Corp. d/b/a Sea Crest Linen ("Sea Crest") and White Plains. (*Id.* ¶¶ 13, 15.)

FN2. All citations to the complaint refer to LOE's amended complaint dated March 18, 2004.

LOE alleges that defendants combined to constitute a racketeering enterprise to allocate customers among themselves and, by acts of violence, bribery, extortion, assault, intimidation, defamation, and extortion, to exclude non-members, including LOE, from the market in which they operate. (*Id.* ¶ 17.) LOE denominates defendants' enterprise the "New York Linen Cartel." FN3 (*Id.*) Relying on Botchman's plea allocution, LOE alleges that defendants and others formed the New York Linen Cartel in the mid-1990s (*id.* ¶ 159), though the complaint alleges elsewhere that the combination in restraint of trade began in about 1999. (*Id.* ¶ 129.)

FN3. The Court will adopt this label for the sake of convenience and consistency with the language of the complaint, which must be taken as true for purposes of this motion. Its use in this opinion should not, however, be understood to express or imply any substantive legal conclusion about the nature of the defendants or their activities.

*2 According to the complaint, "[t]he relevant market affected by Defendants' illegal actions is the market for high end and up-scale restaurants and eateries in the Southern District of New York, with a significant concentration in Manhattan (the 'Relevant Market')." (*Id.* ¶ 30.) This market exists because such restaurants use certain expensive, high-quality linens "produced by a limited number of exclusive European companies" (*id.* ¶ 28), and only a few companies provide laundering services for these linens. (*Id.* ¶ 30.) LOE alleges that defendant members of the New York Linen Cartel subject these delicate fine linens "to the same harsh laundering methods used for the synthetic linens," causing them to deteriorate rapidly, yet because of the Cartel's control of the market, the restaurants effectively have no choice but "to either lease linens at inflated prices from the New York Linen Cartel or ... to purchase new linens from them on a continuing basis." (*Id.* ¶¶ 34-35.)

LOE allegedly developed a new method to launder fine linens that avoids damaging them and increases their lifespan significantly. (*Id.* ¶¶ 49-52.) In 1999, after successfully marketing its novel laundering method in the Houston market, LOE sought to enter the New York area market, a strategy essential to LOE's long-term national and international business prospects. (*Id.* ¶¶ 53-55.) Within several months, LOE secured a number of well-known Manhattan restaurants as clients. (*Id.* ¶¶ 56-57.) Observing LOE's attempt to penetrate the Relevant Market, the New York Linen Cartel quickly moved to either drive

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
(Cite as: Not Reported in F.Supp.2d)

Page 3

LOE out of business or force its sale to a member of the Cartel. (Id. ¶ 58.)

LOE alleges that the Cartel fixes prices and allocates customers among its members. (Id. ¶ 38.) At periodic meetings, its members, including defendants, share customer information and agree on which of them will receive the exclusive right to the business of each customer. (Id. ¶ 39.) Apart from these secretive agreements, the Cartel allegedly also uses bribery, intimidation, violence, extortion, and other illegal means to exclude potential competitors, and it has secured the loyalty and aid of the Union of Needletrades, Industrial and Textile Employees ("UNITE!"), a laundry and dry-cleaning workers' union, to carry out some of these acts. (Id. ¶¶ 40-48.) FN4

> FN4. Despite this allegation, LOE has not named UNITE! as a defendant.

LOE's problems with the Cartel began shortly after it entered the New York area market. LOE secured a contract to serve the "21" Club, a well-known restaurant, supplanting defendant Cascade Linen Supply Co. ("Cascade") as its launderer. (Id. ¶¶ 60-61.) At the instance of the Cartel, however, defendant Best Manufacturing, Inc., the supplier of the "21" Club's signature linens, refused to do business with LOE, advising LOE that it would only deal with Cascade. (Id. ¶¶ 61-62.) LOE was thus unable to offer services to the restaurant for eight months and lost the corresponding anticipated revenue. (Id. ¶ 63.)

*3 Meanwhile, also at the behest of the Cartel, defendants B & M Linen Corp. d/b/a Miron & Sons Laundry ("Miron") and Sea Crest took other actions to sabotage LOE's operations. At the time, LOE did not have its own laundering facility; it outsourced the work to local companies, including Miron, which, in turn, introduced LOE to Sea Crest. (Id. ¶¶ 64-65.) Unbeknownst to LOE at the time, the complaint alleges, Miron and Sea Crest were fixtures of the New York Linen Cartel. (Id. ¶¶ 66-67.) Miron destroyed or caused the disappearance of LOE's linens and then lied to LOE about their fate, thus interfering with LOE's inventory and causing it to lose a number of lucrative clients, which defendants subsequently secured. (Id. ¶¶ 68-75.) Sea Crest similarly undermined LOE's relationship with another prestigious restaurant by making false statements about LOE and engaging in predatory pricing. (Id. ¶¶ 76.) Best Metropolitan Towel and Linen Supply, Inc., another defendant, bribed a client not to contract with LOE. (Id. ¶¶ 77.)

Despite the Cartel's continuing interference with LOE's business, LOE persevered, built its own laundering facility, and gradually established a new client base. (Id. ¶¶ 78-93.) Because of LOE's success, and the imminent conclusion of several lucrative contracts between LOE and certain prestigious restaurants, the Cartel redoubled its efforts to put LOE out of business. The Cartel allegedly used UNITE! to disrupt LOE's client relationships in the guise of labor protests and picketing. UNITE! spread false information about and directed baseless accusations at LOE-for example, that LOE uses "sweatshop labor"-and harassed clients at restaurants serviced by LOE. (Id. ¶¶ 96-100.) LOE lost a number of customers to the Cartel as a consequence. (Id. ¶¶ 109-10.) The Cartel also coerced Frette, previously LOE's principal supplier of fine linens, not to deal further with LOE and to sell exclusively to White Plains. (Id. ¶¶ 111-12.)

At the same time, an LOE officer began to receive threats of various degrees from a few persons, including defendants Olan and Botchman, telling LOE to sell its business to White Plains. (Id. ¶¶ 101-04.) Then, on April 12, 2002, a group of thugs brutally attacked this officer at the location of one of LOE's clients (id. ¶ 105); one of them instructed him to "tell [his] boss to sell to White Plains Linen." (Id. ¶ 106.) He continued to receive similar threats after his release from the hospital. (Id. ¶ 107). Another LOE officer quit her job and left the New York area after having received email threats. (Id. ¶ 123.) Moreover, Olan and Botchman implicitly threatened LOE at several meetings, telling LOE that "to survive in New York, it needed to 'cooperate' with the members of the New York Linen Cartel." (Id. ¶ 116; see also id. ¶¶ 121-22.)

In September 2002, the New York Linen Cartel became aware of a pending federal investigation into its activities and consequently ceased to engage in overt activities against LOE. (Id. ¶ 124.) On December 3, 2003, White Plains and Botchman pled guilty to violations of section 1 of the Sherman Act. At his allocution, Botchman admitted that as president of White Plains, he held meetings with other linen suppliers and launderers, and they agreed not to compete with one another and to allocate existing customers among themselves. (Id. ¶¶ 23,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
(Cite as: Not Reported in F.Supp.2d)

Page 4

126-27.)

## DISCUSSION

### I. *Standard on a Motion to Dismiss*

*4 On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the Court must accept as true all well-pleaded factual allegations in the complaint, viewing them in the light most favorable to the plaintiff and drawing all reasonable inferences in its favor, *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996); and applying this standard, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

### II. *Preliminary Objections*

Several defendants raise procedural and other objections that do not bear on the merits or sufficiency of LOE's allegations. The Court will address these objections first.

#### A. *Miron: Colorado River Abstention*

Miron argues that LOE's claims against it should be dismissed pursuant to the abstention doctrine applied by the Supreme Court in *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800 (1976). Under this doctrine, to conserve judicial resources, federal courts may abstain in "exceptional circumstances" where "resolution of existing concurrent state-court litigation could result in comprehensive disposition of litigation." *Woodford v. Comty. Action Agency,* 239 F.3d 517, 522 (2d Cir.2001) (internal quotation marks omitted).

Miron contends that LOE's claims against it simply duplicate claims in a state action that arose out of Miron's alleged destruction of LOE's linens and tortious interference with LOE's business relationship with a hotel client. *Linens of Europe, Inc. v. Miron & Sons Linen Service, Inc.,* No. 20813-02 (N.Y. Sup.Ct., June 11, 2002) (Markus Aff., Ex. C). LOE initially filed this action in Texas on April 19, 2001 (*id.,* Ex. A), but the Texas state court dismissed for want of personal jurisdiction. LOE then refiled the action in New York Supreme Court, Bronx County. Miron argues that, as against it, LOE's federal action is no more than a vexatious effort to recast the state tort and contract claims as federal antitrust and RICO violations, and accordingly, that the Court should abstain from deciding issues at stake in a parallel state-court action.

Unlike the other abstention doctrines, *Colorado River* does not rest "on considerations of state-federal comity or on avoidance of constitutional decisions." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 14-15 (1983). It applies only in a very narrow category of cases involving concurrent jurisdiction, where "considerations of '[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation,' " *Colorado River,* 424 U.S. at 817, clearly justify dismissal in deference to a state proceeding. *Id.* at 817-18; *see also Moses Cone,* 460 U.S. at 16 (*"Only the clearest of justifications will warrant dismissal."*) (quoting *Colorado River,* 424 U.S. at 819; emphasis in original).

*5 Bearing in mind the repeatedly emphasized "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them," *Colorado River,* 424 U.S. at 817; *Village of Westfield v. Welch's,* 170 F.3d 116, 120 (2d Cir.1999), the Second Circuit has enumerated six factors to be weighed to decide whether a district court should exercise its discretion to abstain under *Colorado River:*
> (1) the assumption of jurisdiction by either court over any res or property;
> (2) the inconvenience of the federal forum;
> (3) the avoidance of piecemeal litigation;
> (4) the order in which jurisdiction was obtained;
> (5) whether state or federal law supplies the rule of decision; and
> (6) whether the state court proceeding will adequately protect the rights of the party seeking to invoke federal jurisdiction.

*Id.* at 121; *see also Woodford,* 239 F.3d at 522; *Burnett v. Physician's Online, Inc.,* 99 F.3d 72, 76 (2d Cir.1996). FN5 "No one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counseling against that exercise is required." *Moses Cone,* 460 U.S. at 15-16. But "the balance [is] heavily weighted in favor of the exercise of jurisdiction," *id.* at 16, and therefore, "the facial neutrality of a factor is a basis for retaining jurisdiction, not for yielding it." *Woodford,* 239 F.3d

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                         Page 5
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
(Cite as: Not Reported in F.Supp.2d)

at 522.

FN5. Miron contends that a seventh factor must be considered: "whether the federal action is vexatious or reactive." (Miron Br. 5.) The Second Circuit has never formally cited this factor in its enumeration of the relevant considerations under *Colorado River,* but it has observed that in a footnote in *Moses Cone,* "the Supreme Court stated that it found 'considerable merit' in the idea 'that the vexatious or reactive nature of either the federal or the state litigation may influence the decision whether to defer to a parallel state litigation under *Colorado River.*' " *Telesco v. Telesco Fuel and Mason's Materials, Inc.,* 765 F.2d 356, 363 (2d Cir.1985), quoting *Moses Cone,* 460 U.S. at 17 n. 20. Assuming without deciding that under some circumstances "the vexatious or reactive nature" of an action could offer a sound reason for a federal court to abstain pursuant to *Colorado River,* that factor does not, contrary to Miron's contention, weigh in favor of abstention here. (Miron Br. 8-11.) While Miron complains that this is LOE's third suit against it based on the same factual allegations (Miron Reply Br. 2), that characterization is misleading. As noted, LOE simply refiled its state action in New York after the Texas state court dismissed for want of personal jurisdiction; and the federal action, far from being redundant of LOE's state-law tort and contract claims, raises RICO and Sherman Act claims, the latter of which lie within the federal courts' exclusive jurisdiction. As for LOE's alleged "recycling" of factual allegations, taking the complaint's allegations in the light most favorable to the plaintiff, LOE subsequently discovered that Miron's delicts were part of a broader RICO and antitrust conspiracy. That it filed a federal action on this basis, placing Miron's tortious activity in a different context, does not qualify as "vexatious or reactive."

Applying these factors to Miron's circumstances makes abundantly clear that abstention under *Colorado River* would be inappropriate, if not an abuse of discretion. See *Welch's,* 170 F.3d at 120 (emphasizing that because abstention represents a narrowly circumscribed exception to "a court's normal duty to adjudicate a controversy properly before it, ... discretion must be exercised within the narrow and specific limits prescribed by the particular abstention doctrine involved," and "there is little or no discretion to abstain in a case which does not meet traditional abstention requirements") (internal quotation marks omitted).

First, as Miron concedes, this case implicates no res or property. While Miron argues that absence of a res makes this factor inapplicable (Miron Br. 17), the Second Circuit has said to the contrary that "the facial neutrality of a factor is a basis for retaining jurisdiction, not for yielding it." *Woodford,* 239 F.3d at 522; see also *Welch's,* 170 F.3d at 122 (observing that "the absence of a res points toward exercise of federal jurisdiction") (internal quotation marks and alterations omitted); *De Cisneros v. Younger,* 871 F.2d 305, 307 (2d Cir.1989).

Second, as Miron also concedes, the federal forum does not inconvenience it in any way. (Miron Br. 17.) Indeed, Miron is located in the Southern District of New York. (Compl.¶ 10.) This factor, too, therefore weighs against surrendering jurisdiction. *Woodford,* 239 F.3d at 522-23; *Welch's,* 170 F.3d at 122 ("[W]here the federal court is 'just as convenient' as the state court, that factor favors retention of the case in federal court.").

*6 Third, any concern about the prospect of piecemeal litigation weighs in favor of retaining jurisdiction. LOE's state action involves claims against a single defendant for breach of contract, negligence, conversion, and tortious interference with contract; its federal action mainly involves claims against multiple defendants for antitrust and RICO violations, as well as pendent state-law claims. "Such differences in parties and issues are strong factors against invoking exceptional circumstances as the basis for dismissal." *Alliance of Am. Insurers v. Cuomo,* 854 F.2d 591, 603 (2d Cir.1988). Moreover, due "regard to conservation of judicial resources and comprehensive disposition of [this] litigation," *Colorado River,* 424 U.S. at 817, favors the consolidation of the actions before this Court, where all claims, state and federal, may be resolved, not the converse. "Indeed, abstention is clearly improper when," as here, "a federal suit alleges claims within the exclusive jurisdiction of the federal courts." *Andrea Theatres, Inc. v. Theatre Confections, Inc.,* 787 F.2d 59, 62 (2d Cir.1986); see *Johnson v. Nyack Hosp.,* 964 F.2d 116, 122 (2d Cir.1992) (Sherman

Not Reported in F.Supp.2d                                                                                          Page 6
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
(Cite as: Not Reported in F.Supp.2d)

Act claims within the exclusive jurisdiction of the federal courts). Finally, were Miron to accept LOE's offer to stay the state action (P. Ltr. dated Mar. 19, 2004), FN6 it could render moot any concern with duplicative litigation. See *Woodford,* 239 F.3d at 524. Miron refuses to do so "because it believes the only cognizable claims are those that have already been articulated in" state court. (Miron Br. 14). Needless to say, Miron's belief is irrelevant, and if Miron must now "defend on two litigation fronts" (*id.* 11, citing *Arkwright-Boston Mfrs. Mut. Ins. Co. v. City of New York,* 762 F.2d 205, 211 (2d Cir.1985)), that plight is entirely of its own making.

> FN6. Miron's consent may not be necessary. In its reply brief, Miron represents that the state court already has stayed the state action temporarily in response to LOE's application for an order to show cause with a return date of June 2, 2004. (Miron Reply Br. 6.)

The fourth factor, "the order in which the actions were filed, and whether proceedings have advanced more in one forum than in the other," *Woodford,* 239 F.3d at 522 (internal citations omitted), *may* weigh in favor of abstention, but at best only slightly. While LOE filed the state suit first, (1) neither party represents that the state action is anywhere close to a potential resolution, and (2) even if it were, its resolution would not materially advance the disposition of LOE's federal claims.

Fifth, while LOE alleges pendent state-law claims, its federal claims predominate; indeed, as noted, Sherman Act claims lie within the exclusive jurisdiction of the federal courts. *Johnson,* 964 F.2d at 122. In *Woodford,* the Second Circuit emphasized:
> Even where there are some state-law issues, "the presence of federal law issues must always be a major consideration against surrender.".... And "[i]f there is any substantial doubt" as to whether "complete and prompt" protection of the federal right is available in the sate proceeding, dismissal "would be a serious abuse of discretion."

*7 239 F.3d at 523, quoting *Moses Cone,* 460 U.S. at 26, 28 (brackets in original). To relegate LOE to state court to adjudicate its federal claims against Miron would be impossible, for the Sherman Act claims cannot be brought there, FN7 as well as inefficient, for LOE would then be required to bring the same RICO and antitrust claims in two forums-one for Miron, the other for all the other defendants-raising the very potential for inconsistent verdicts and piecemeal litigation that the *Colorado River* doctrine seeks to avoid.

> FN7. Miron argues that even though LOE cannot bring its Sherman Act claims in state court, it will not be prejudiced because it can bring claims under the Donnelly Act, the analogous New York statute, which affords the same relief. (Miron Br. 16.) The Court need not decide whether the ability to bring suit under an analogous statute that allegedly affords the same relief qualifies as "complete and prompt protection of the federal rights," *Woodford,* 239 F.3d at 523 (internal quotation marks omitted), for the other *Colorado River* factors overwhelmingly weigh against abstention under the circumstances presented here.

Sixth and finally, for the same reasons, while LOE can, as Miron notes, raise its RICO claims and analogous antitrust claims in state court (Miron Br. 16), the Court cannot conclude that "the state court proceeding will adequately protect the rights of the party seeking to invoke federal jurisdiction." *Welch's,* 170 F.3d at 121.

Because the factors enumerated by the Second Circuit overwhelmingly disfavor *Colorado River* abstention under these circumstances, Miron's motion to dismiss on this ground is denied.

### B. *Best Textiles LLC: Successor Liability*

Best Textiles argues the complaint should be dismissed as against it because it is not a proper party. Unlike the other defendants, it is not alleged to be a member of, or affiliated with, the New York Linen Cartel, except insofar as Best Textiles allegedly succeeded to the interests of Best Manufacturing (Com pl.¶ ¶ 7-9), "a linen supply company servicing the restaurant industry," which is another named defendant. FN8 (*Id.* ¶ 5.) Best Textiles, however, contends that it only purchased Best Manufacturing's assets; it did not assume Best Manufacturing's liabilities.

> FN8. LOE's original complaint named did not name Best Manufacturing as a defendant.

Not Reported in F.Supp.2d                                                                                                      Page 7
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
(Cite as: Not Reported in F.Supp.2d)

Allegations of successor liability that do not involve fraud need only satisfy the notice-pleading standard of Fed.R.Civ.P. 8 , *Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.,* 170 F.R.D. 361, 376 (S.D.N.Y.1997); *Int'l Private Satellite Partners, L.P. v. Lucky Cat Ltd.,* 975 F.Supp. 483, 486 (W.D.N.Y.1997), but as always, conclusory allegations do not meet even that liberal standard. *See Old Republic Ins.,* 170 F.R.D. at 376-77; *see also Papasan v. Allain,* 478 U.S. 265, 286 (1986). In response to Best Textiles's motion to dismiss, LOE thus amended its complaint in an effort to allege facts to demonstrate successor liability. Specifically, LOE quotes language from the Asset Purchase Agreement between Best Textiles and Best Manufacturing dated June 15, 2001 ("Agreement"). The Court may therefore refer to the Agreement in resolving this issue. *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991); *Goldman v. Belden,* 754 F.2d 1059, 1065-66 (2d Cir.1985.)

Under New York common law, "a corporation that merely purchases the assets of another corporation is not liable for the seller's debts and liabilities," *Cargo Partner AG v. Albatrans, Inc.,* 207 F.Supp.2d 86, 93 (S.D.N.Y.2002), *aff'd,* 352 F.3d 41 (2d Cir.2003) (*"Albatrans II"*); *Schumacher v. Richards Shear Co*., 59 N.Y.2d 239, 244-45 (1983), except where
  *8 (1) [the purchaser] expressly or impliedly assumed the predecessor's tort liability, (2) there was a consolidation or merger of settler and purchaser, (3) the purchasing corporation was a mere continuation of the selling corporation, or (4) the transaction was entered into fraudulently to escape such obligations.
*Id.* at 245; *see also Albatrans II,* 352 F.3d at 45. Only the first and third exceptions conceivably apply to the allegations in the complaint.

LOE's theory of successor liability seems to be that Best Textiles expressly assumed Best Manufacturing's liabilities. The complaint quotes section 1.4(d) of the Agreement ("Assumed Liabilities"), which provides in relevant part that "[Best Textiles] shall assume all liabilities of [Best Manufacturing] arising under any agreements, arrangements, contracts, ... obligations, customer contracts, vendor contracts and purchase and sale orders to which [Best Manufacturing] is a party and which were entered into prior to the Closing Date." (Korman Aff., Ex. 1, § 1.4(d); Compl. ¶ 8.) Viewing the complaint in the light most favorable to LOE, *Leeds,* 85 F.3d at 53, LOE perhaps means to suggest that Best Manufacturing's alleged antitrust agreements with the members of the New York Linen Cartel (for example, not to compete with one another (Compl.¶ 23)) qualify as "agreements" or "arrangements" within the meaning of section 1.4(d)- or at least, that this is a question of fact that cannot properly be resolved on the pleadings.

This argument fails for two related reasons. First, the complaint does not allege that Best Manufacturing is a member of the New York Linen Cartel whose members allegedly agreed not to compete with one another and to allocate customers among themselves (Compl.¶ ¶ 5, 17); the complaint alleges only that Best Manufacturing "associated" itself with the Cartel. Second, even if such an association could be characterized as an agreement in a colloquial sense, the unambiguous terms of the Agreement make clear that Best Textiles did not agree to assume liabilities arising out of unlawful conspiratorial "agreements" of the sort that LOE has in mind. The Agreement sets out four categories of "Assumed Liabilities" and then expressly excludes other liabilities. (Korman Aff., Ex. 1, § § 1 .4 , 1.5.) As Best Textiles points out, each category of Assumed Liabilities refers to routine commercial liability incurred "in the ordinary course of business" (Best Textiles Reply Br. 3-4; Korman Aff., Ex. 1, § § 1.4(b), (c)), not tortious liability arising out of unlawful activity. To hold that the Agreement implicitly includes the latter sort of liabilities, even though it says nothing about them and expressly excludes liabilities not set forth explicitly, would turn New York law's presumption against successor liability on its head. *See Goldman v. Packaging Indus., Inc.,* 534 N.Y.S.2d 388, 391 (2d Dep't 1988).

A second theory of successor liability apparently advanced by the complaint is that Best Textiles is a "mere continuation" of Best Manufacturing. *Schumacher,* 59 N.Y.2d at 245. The complaint quotes an excerpt from a press release issued by Best Manufacturing (Compl.¶ 9), the full text of which Best Textiles provides in its reply brief:
  *9 Best Manufacturing, Inc. is pleased to announce that it has sold its business to BEST TEXTILES LLC, a new company formed by the existing Best Manufacturing senior management team and Colt Capital Group, a private equity firm based in Westport, CT.
  This transaction completes a process whereby management and ownership of the business has been successfully transitioned from Lester Maslow to an experienced management team led by Glenn S. Palmer, President & Chief Executive Officer.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 8
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548,  RICO Bus.Disp.Guide 10,761
(Cite as: Not Reported in F.Supp.2d)

Best Textiles will continue the business of Best Manufacturing from its corporate headquarters in New York and other locations throughout the country.
(Best Textiles Reply Br. 5.) Construing LOE's quotation of this press release as an allegation of "mere continuation," it nevertheless fails, as a matter of New York law, sufficiently to allege that theory of successor liability.

Courts generally treat the "de-facto-merger" and "mere-continuation" exceptions as one. *Albatrans II,* 352 F.3d at 45 n. 3 (collecting cases); *see also Sands Bros. & Co. v. Ettinger,* No. 03 Civ. 7854, 2004 WL 541846, at *4 n. 5 (S.D.N.Y.2004) ; *Lumbard v. Maglia, Inc.,* 621 F.Supp. 1529, 1535 (S.D.N.Y.1985) (observing that "no criteria can be identified that distinguish' them in any useful manner") (internal quotation marks omitted). *But see Ladjevardian v. Laidlaw-Coggeshall, Inc.,* 431 F.Supp. 834, 839 (S.D.N.Y.1977) (distinguishing the "mere continuation" exception as involving "something in the nature of a corporate reorganization, rather than a mere sale"). For present purposes, it suffices to note that for either exception to apply, it cannot be the case that *two* distinct corporate entities survive the predicate transaction. *See Schumacher,* 59 N.Y.2d at 245 ("mere continuation" exception applies "where only one corporation survives the transaction; the predecessor corporation must be extinguished"); *Ladjevardian,* 431 F.Supp. at 839 ("[T]hat the vendor corporation continued to exist after the sale ... is sufficient to take this case out of the 'mere continuation' exception."); compare *Albatrans II,* 352 F.3d at 46 (seller's dissolution a necessary element of de facto merger); *Ladjevardian,* 431 F.Supp. at 838 (de facto merger "envisions the joining together of the two corporations so that a totally new corporation emerges and the two others cease to exist"). Here, it is undisputed that both Best Manufacturing and Best Textiles continue to exist and operate as separate entities.

Because no exception to New York law's general presumption against successor liability applies to Best Textiles, and the complaint only implicates Best Textiles as the successor to Best Manufacturing, FN9 Best Textiles's motion to dismiss is granted in its entirety.

FN9. The complaint alleges that "Best Manufacturing (and its successor corporation Best Textiles) and Mirons & Sons, associated themselves with the New York Linen Cartel and its objectives of restraining interstate trade or commerce, by engaging in anti-competitive activities at the behest of the New York Linen Cartel, actions that the defendants knew were meant to harm LOE and drive it from the Relevant Market." (Compl.¶ 18.) But except for Best Textiles's purported liability as a successor to Best Manufacturing, the complaint fails to state any factual allegations against Best Textiles; LOE's assertions that it "associated" itself with the Cartel and engaged in "anti-competitive activities" fail to state a viable claim against Best Textiles absent facts alleged elsewhere in the complaint substantiating these conclusory assertions.

III. *The Federal Antitrust Claim*

A. *Antitrust Injury*

Citing the familiar maxim that the antitrust laws protect "competition, not competitors," *Brown Shoe Co. v. United States,* 370 U.S. 294, 320 (1962) , defendants argue that LOE fails to state a claim under section 1 of the Sherman Act because it focuses solely on the harm to itself, without specifying how defendants' conduct "has had an actual adverse effect on competition as a whole in the relevant market." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.* 996 F.2d 537, 543 (2d Cir.1993); *see also Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 334 (1990) (antitrust plaintiff must allege an "injury of the type the antitrust laws were intended to prevent," and that injury must be "attributable to an anticompetitive aspect of the practice under scrutiny") (internal quotation marks omitted); *Todd v. Exxon Corp.,* 275 F.3d 191, 213 (2d Cir.2001) ("An antitrust plaintiff must allege not only cognizable harm to herself, but an adverse effect on competition market-wide.").

*10 Defendants make a number of fair points in this regard. LOE relies heavily, for example, on the guilty plea allocution of White Plains and Botchman. Yet these defendants admitted only that they and other linen supply and laundering companies agreed to allocate customers among themselves and to refrain from competing with one another by, inter alia, fixing prices. (Compl.¶ ¶ 22-23.) It is unclear how this

Not Reported in F.Supp.2d                                                                                     Page 9
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
(Cite as: Not Reported in F.Supp.2d)

conduct-at least, considered in isolation-harmed LOE, for as the Supreme Court has emphasized, such a price-fixing agreement would actually benefit LOE by permitting it to undersell the conspirators and coopt their business. *Atl. Richfield Co.*, 495 U.S. at 336-37; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n. 8 (1986). Furthermore, defendants contend, LOE's claims focus exclusively on harms to itself not caused by the alleged anticompetitive conduct, for example, breaches of contract, torts, and other acts directed at LOE specifically, without alleging how such conduct harmed competition more generally. *See, e.g., Bocobo, M.D. v. Radiology Consultants*, 305 F.Supp.2d 422, 425-28 (D.N.J.2004) (exclusion of radiologist from practicing in a certain region insufficient to allege antitrust injury because it had no effect on the relevant markets). Hence, LOE cannot show that its injury "flows from that which makes defendants' acts unlawful." *Atl. Richfield*, 495 U.S. at 334. Finally, defendants argue, not without some force (e.g., Compl.¶ 133), that LOE alleges antitrust injury in conclusory terms insufficient to withstand a motion to dismiss. *See John's Insulation, Inc. v. Siska Constr. Co.*, 774 F.Supp. 156, 163 (S.D.N.Y.1991) ("[C]onclusory allegations which merely recite the litany of antitrust will not suffice.").

While some of these arguments raise legitimate questions, and LOE may ultimately find itself unable to establish a cognizable antitrust injury, the defendants' motions to dismiss on this ground fail to respect the principle that on a motion to dismiss for failure to state a claim, the complaint must be construed as a whole. *Yoder v. Orthomolecular Nutrition Institute Inc.*, 751 F.2d 555, 562 (2d Cir.1985). LOE alleges an integrated conspiracy to restrain trade in the market for supplying and laundering fine linens. Customer allocation and price-fixing is one element of this conspiracy. The New York Linen Cartel's alleged enlistment of UNITE! to disrupt LOE's business relationships with customers by orchestrating labor strikes is another. Bribery of clients to break contracts or refuse to deal with LOE and to redirect their business to Cartel members is still another. To be sure, considered in isolation, the alleged assault on an LOE principal is "only" a tort, albeit a serious one; in context, however, as LOE alleges, this incident and subsequent threats represented yet another means by which the Cartel sought to restrain competition and control the relevant market.

*11 That LOE fails to specify the names of other competitors harmed by the Cartel's conduct does not necessarily defeat its antitrust claim. First, even if LOE is the only competitor thus far to be damaged by the Cartel's activities, provided that injury flows from anticompetitive conduct generally rather than a particular vendetta against LOE, it suffices to state an antitrust injury; no principle of law requires that more than one competitor be harmed for a harm to competition to exist. Second, discovery may well yield evidence of a more general effect on competition and harm to other competitors. In the antitrust conspiracy context, "where the proof is largely in the hands of the alleged conspirators, dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hosp. Bldg. Co. v. Trs. of the Rex Hosp.*, 425 U.S. 738, 746 (1976) (internal quotation marks and citation omitted); *see also Mirage Resorts, Inc. v. Trump*, No. 97 Civ. 6693, 1998 WL 898340, at *3 (S.D.N.Y. Dec. 22, 1998) (" 'A motion to dismiss for insufficiency should rarely be granted, especially in antitrust cases, where proof of the conspiracy is usually in the hands of the conspirators.' "), quoting *Strobl v. N.Y. Mercantile Exch.*, 561 F.Supp. 379, 383 (S.D.N.Y.1983). The allegations drawn from the guilty pleas of Botchman and White Plains, coupled with the complaint's factual allegations about actions taken against LOE, sufficiently allege antitrust injury to survive defendants' Rule 12(b)(6) motion.

### B. *Market Definition*

Defendants also argue that LOE fails to state a claim under section 1 of the Sherman Act because LOE does not adequately define the Relevant Market, either in terms of the nature of the product or the geographic boundaries in which it allegedly operates. *See Brown Shoe Co.*, 370 U.S. at 324 ("area of effective competition" determined by reference to a product market and a geographic market); *Kramer v. Pollock-Krasner Found.*, 890 F.Supp. 250, 254 (S.D.N.Y.1995) (claim under section 1 of the Sherman Act "must allege a relevant geographic and product market in which trade was unreasonably restrained").

#### 1. *Product Market*

"To survive a motion to dismiss, the alleged product market must (1) include all products reasonably interchangeable, determination of which requires consideration of cross-elasticity of demand; and (2)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.