Not Reported in F.Supp.2d                                                                                                            Page 10
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
(Cite as: Not Reported in F.Supp.2d)

be plausible." *Intellective, Inc. v. Mass. Mut. Life Ins. Co., 190 F.Supp.2d 600, 609 (S.D.N.Y.2002)* (internal quotation marks and citations omitted). Defendants contend that LOE's complaint fails adequately to allege the precise contours of the product market because it does not explain why the Relevant Market includes only "high-end European linens"; fails to mention alternative, interchangeable products; and does not consider that certain restaurants might choose to own and launder their own linens rather than retain one of the participants in the Relevant Market. (White Plains Reply Br. 9.)

*12 This argument goes to the merits of LOE's antitrust claim, not the adequacy of its pleading. The complaint alleges, quite specifically and not implausibly, that certain upscale restaurants in New York use only high-quality linens "produced by a limited number of exclusive European companies" (Compl.¶ 28), because they "seek to convey to the public" a certain image associated with a "luxurious dining experience beyond the simple consumption of fine food and drinks." (*Id.* ¶ 29.) Assuming the truth of these allegations, as the Court must, *Leeds, 85 F.3d at 53*, no functionally-equivalent alternative to these high-quality European linens exists. Perhaps LOE will be unable to establish that, or defendants will be able to prove the contrary, but that showing must await discovery. *See Todd, 275 F.3d at 199-200* ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market.") (collecting cases).

2. *Geographic Market*

Defendants' objection to LOE's definition of the relevant geographic market presents a closer question. LOE defines the geographic market as "the Southern District of New York, with a significant concentration in Manhattan." (Compl.¶ 30.) As defendants rightly emphasize, it is inherently implausible that the relevant geographic market in which LOE competes just happens to correspond precisely to the boundaries of a federal judicial district. (White Plains Br. 13; Best Manufacturing Br. 10.) To maintain that LOE and defendants compete for the linen business of upscale restaurants in Manhattan, the Bronx, and Putnam County, but not in Brooklyn, Queens or northern New Jersey, strains credulity. *Cf. United States v. Ct. Nat'l Bank, 418 U.S. 656, 666-73 (1974)* (holding that the district court erred by finding the boundaries of the relevant market to be coterminous with the borders of the State of Connecticut and remanding for a determination based on "the economically and legally feasible alternative methods of entry" into the relevant market); *Evac, LLC v. Pataki, 89 F.Supp.2d 250, 261 (N.D.N.Y.2000)* (faulting plaintiff's allegation of a relevant geographic market for simply "specif[ying] a number of counties in Northern New York and Vermont," failing to "define a specific geographic market or explain how the Court should draw geographic boundaries").

Yet however inartful LOE's claim that the relevant geographic market is "the Southern District of New York," at its heart this is no more than a technical pleading error. Construed as a whole, the complaint clearly implies that the relevant geographic market roughly corresponds to Manhattan, which *is* a plausible geographic market, for it makes economic sense that Manhattan constitutes a distinct market in which LOE competes with defendants for the business of certain upscale restaurants. Indeed, the complaint alleges, quite plausibly, that LOE sought to break into the New York market precisely "[b]ecause of the concentration of up-scale dining establishments in New York, and because New York is a city of internationally recognized importance in the dining industry." (Compl.¶ 54.) Moreover, the restaurant customers identified by LOE are all located in Manhattan, and in its brief in opposition to Best Manufacturing's motion to dismiss, LOE effectively makes clear that it means Manhattan, subject to possible expansion based on discovery. (P. Br.10.) Under these circumstances-where the relevant geographic market, albeit inartfully defined, is clear from the complaint as a whole-it would be inappropriate to dismiss LOE's Sherman Act claim based on a mere technicality. *See Arfons v. E.I. Du Pont de Nemours & Co., 261 F.2d 434, 435 (2d Cir.1958)* ("It is now well established that dismissals for mere technical defects or ambiguities in the pleadings are not favored.").

C. *Best Manufacturing*

*13 Best Manufacturing, which LOE added as a defendant in its amended complaint, makes a number of additional arguments unique to its status as pled by LOE. Best Manufacturing emphasizes that, unlike the other defendants, it does not launder fine linens; it manufactures them. FN10 (Best Manufacturing Br. 2.) Furthermore, according to an affidavit offered by Neil Cohen, a principal of Best Textiles and former

Case 7:04-cv-08223-KMK   Document 93-15   Filed 09/19/2005   Page 2 of 9

Not Reported in F.Supp.2d                                                                                          Page 11
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
(Cite as: Not Reported in F.Supp.2d)

principal of Best Manufacturing, the latter does not manufacture, and never has manufactured, *fine* linens, as defined in the complaint. (Cohen Aff. ¶¶ 1,6.) Ordinarily, it would be inappropriate for the Court to consider material extraneous to the complaint on a motion to dismiss. *Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir.2000) ("[A] district court errs when it considers affidavits and exhibits submitted by defendants or relies on factual allegations contained in legal briefs or memoranda in ruling on a 12(b)(6) motion to dismiss.") (alterations, internal quotation marks, and citations omitted). But LOE conspicuously declines to challenge the assertion that Best Manufacturing does not manufacture "fine" linens, and far more importantly, the complaint *alleges* that only "a limited number of exclusive European companies" manufacture such linens. (Compl. ¶ 28.) Best Manufacturing is a New York corporation with offices in Manhattan. (Compl. ¶ 5.)

> FN10. The complaint describes Best Manufacturing as "a linen *supply* company servicing the restaurant industry." (Compl. ¶ 5; emphasis added.) But the allegations make clear that Best Manufacturing does not "supply" fine linens in the same sense as the other defendants, which, according to LOE, rent and launder fine linens for upscale restaurants. Rather, it manufactures and supplies them to entities like the other defendants. (*Id.* ¶¶ 61-63; Best Manufacturing Br. 2.) LOE does not allege otherwise or dispute this fact in its opposition brief.

Best Manufacturing also points out that the complaint does not allege that it is a member of the New York Linen Cartel, but only that it "associated" itself with the Cartel, and moreover, only implicates Best Manufacturing in the Cartel's activities by reference to one, rather vague, incident. (Compl. ¶¶ 18, 61-63.) According to the complaint, the "21" Club, formerly a client of Cascade (an alleged member of the Cartel), became dissatisfied with Cascade and thus decided to redirect its business to LOE. (*Id.* ¶ 60.) The Cartel, however, "directed Best Manufacturing, the supplier of '21' Club's signature red and white tablecloths, to refuse to do business with LOE." (*Id.* ¶ 61.) Best Manufacturing then advised LOE that it would only sell the "21" Club's linens to Cascade, and as a consequence, LOE could not fulfill its contractual obligations for eight months. (*Id.* ¶¶ 62-63.)

Given its distinct status relative to the other defendants, and the complaint's very minimal allegations about its conduct, Best Manufacturing advances two arguments. First, it argues that it cannot be liable under the Sherman Act because, by the complaint's own allegations, it is neither a member of the New York Linen Cartel nor a participant in the Relevant Market. This argument fails, however, for those facts cannot exonerate Best Manufacturing if, as the complaint alleges, Best Manufacturing knowingly associated itself with the Cartel and acted at its behest to achieve the conspiracy's objective: to prevent competition in the Relevant Market. *See Spanish Broad. Sys., Inc. v. Clear Channel Communications, Inc.*, 242 F.Supp.2d 1350, 1361 (S.D.Fla.2003) (observing that while a "non-competitor in the relevant market normally cannot be liable for a [Sherman Act] Section One violation," such an entity can be liable "if it enters a conspiracy already existing between two or more competitors") (emphasis omitted). FN11 Of course, Best Manufacturing denies this allegation, contending that it "had a valid business justification for refusing to sell the '21' Club design to [LOE]"; that Cascade owned the "printing screen" used to design the "21" Club's linens, and "it would have been illegal to use that proprietary screen to supply product to a third party, such as [LOE]." (Best Manufacturing Br. 7; *see also* Cohen Aff. ¶¶ 2-3.) If Best Manufacturing can establish the truth of that business justification, it can move for summary judgment at the appropriate juncture. But for purposes of defendants' motions to dismiss, the Court must assume, as the complaint alleges, that Best Manufacturing withheld the linens from LOE at the behest of the Cartel. FN12

> FN11. *See also SmithKline Beecham Corp. v. E. Applicators, Inc.*, No. Civ.A. 99 Cv. 6552, 2002 WL 1197763, at *8 (E.D.Pa. May 24, 2002) ("If ... parties agreed to collude in a manner that adversely affected competition within a relevant market, a non-competitor may be part of that conspiracy."); *Tondas v. Amateur Hockey Ass'n*, 438 F.Supp. 310, 315 (W.D.N.Y.1977) ("Although [defendant] alleges that it does not directly compete with plaintiff, any agreement, contract or conspiracy between it and another party which unreasonably restrained interstate trade or commerce would be violative of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                      Page 12
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
(Cite as: Not Reported in F.Supp.2d)

section 1 of the Sherman Act."); *Ozdoba v. Verney Brunswick Mills, Inc.*, 152 F.Supp. 136, 138 (S.D.N.Y.1946) ("[N]oncompetitors or members of an affiliated group may conspire illegally to restrain the interstate commerce of others and thereby subject themselves to the prohibitions of the anti-trust laws.").

FN12. Nor does it matter whether the "21" Club's signature linens qualify as "fine linens," as defined by the complaint. The complaint, read a whole, alleges that Best Manufacturing's acts at the behest of the Cartel were one part of a much broader, coordinated effort to prevent LOE from entering the Relevant Market in the first place. (Compl.¶ 58, 61.) At times, those efforts may have taken the form of acts directed against parts of LOE's business not focused on the Relevant Market, such as interference with LOE's relationship with upscale restaurant clients that do not use "fine linens." But if the *objective* of such interference was to drive LOE out of New York so that it could not establish a presence in the Relevant Market, then those acts would be in furtherance of the alleged Sherman Act conspiracy.

*14 Second, Best Manufacturing argues LOE cannot state a claim against it on the basis of its refusal to deal with LOE because LOE does not allege that Best Manufacturing possesses market power or an exclusive ability to supply the good at issue. FN13 That is, LOE could have, and indeed ultimately did, go elsewhere to obtain the linens it required to provide services to the "21" Club. (Compl.¶ 63.) *See Floors-N-More, Inc. v. Freight Liquidators*, 142 F.Supp.2d 496, 501-502 (S.D.N.Y.2001) (dismissing complaint for failure to state a claim because, inter alia, defendants' refusal to sell to plaintiff, which required it to seek alternative sources for its goods, could not alone suffice to demonstrate an adverse effect on competition under a Sherman Act rule of reason analysis); *see also Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 133-34 (2d Cir.1978) ; *Nat'l Auto Brokers Corp. v. Gen. Motors Corp.*, 572 F.2d 953, 959-60 (2d Cir.1978). "A manufacturer ... generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984); *see also United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919) (same).

FN13. Market power is " 'the power to control prices or exclude competition.' " *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 97-98 (2d Cir.1998) , quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956).

This argument, however, misapprehends the import of LOE's allegations. LOE does not contend that the "21" Club incident shows Best Manufacturing's power in the Relevant Market under a rule of reason analysis. It argues that this incident demonstrates that Best Manufacturing knowingly joined in, and took action in furtherance of, an existing conspiracy orchestrated by the New York Linen Cartel. (P. Br.5-6.) According to LOE, "Best Manufacturing voluntarily allied itself with the anti-competitive actions of the New York Linen Cartel." (*Id.* 6.) In other words, the issue is not whether the "21" Club incident, considered in isolation, would suffice to allege a section 1 claim under the rule of reason; it almost certainly would not, given that the "21" Club itself does not even appear to be part of the Relevant Market. The issue is whether the "21" Club incident, considered in context, suffices to allege that Best Manufacturing knowingly associated itself with and acted in furtherance of an existing conspiracy. While LOE may ultimately be unable to show that Best Manufacturing refused to deal with it because of unlawful collusion with the New York Linen Cartel, at this stage, before discovery, the allegations about the "21" Club incident suffice to defeat a motion to dismiss. Best Manufacturing's general "right to deal, or refuse to deal, with whomever it likes" applies only "as long as it does so independently," *Monsanto*, 465 U.S. at 761, not if it does so at the instance of a Cartel seeking to maintain a stranglehold on the Relevant Market, as LOE alleges. FN14

FN14. Best Manufacturing also argues that the four-year statute of limitations applicable to antitrust claims, 15 U.S.C. § 15b ; *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971), bars LOE's claims against it. (Best Manufacturing Br. 10-11.) This argument fails because LOE alleges that Best Manufacturing associated itself with and acted in furtherance of the New York Linen Cartel's conspiracy, which continued,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 13
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
**(Cite as: Not Reported in F.Supp.2d)**

according to the complaint, until at least September 2002. (Compl.¶ 124.) See, e.g., *Thomas v. Petro-Wash, Inc.*, 429 F.Supp. 808, 812-13 (M.D.N.C.1977); *Lektro-Vend Corp. v. Vendo Corp.*, 500 F.Supp. 332, 348 (N.D.Ill.1980).

### D. *Conclusion*

Accordingly, with the exception of the motion of Best Textiles, which, for the reasons set forth above, cannot be held liable for Best Manufacturing's alleged conduct, defendants' motions to dismiss LOE's federal antitrust claims are denied.

### IV. *The RICO Claim*

*15 LOE's second federal claim is that the New York Linen Cartel constitutes a racketeering enterprise whose members have conspired to violate one or more subdivisions of 18 U.S.C. § 1962 in violation of § 1962(d). (Compl.¶ 158, 163.) Section 1962(d) makes it unlawful "to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." As defendants note, despite having amended the complaint in response to, inter alia, defendants' objection to LOE's failure to specify which subdivision of § 1962 defendants allegedly violated, LOE even in the amended complaint still does not identify which of these subsections defendants allegedly conspired to violate. (Sea Crest Reply Br. 3.) But the Court need not speculate. LOE's RICO claim fails in any event because it does not adequately plead a "pattern of racketeering activity," that is, "at least two acts of racketeering activity," *id.* § 1961(5), as defined in § 1961(1). See *Zito v. Leasecomm Corp.*, No. 02 Civ. 8074, 2003 WL 22251352, at *5 (S.D.N.Y. Sept. 30, 2003).

*Salinas v. United States*, 522 U.S. 52 (1997), held that to violate § 1962(d), a defendant need not *itself* commit, or agree to commit, two predicate acts; it suffices if he or she conspired with others to do so. *Id.* at 63-66; *United States v. Zichettello*, 208 F.3d 72, 99-100 & n. 13 (2d Cir.2000); *Zito*, 2003 WL 22251352, at *13. But the complaint still must allege two predicate acts intended or accomplished by one or more of the conspirators in the course of conducting the unlawful enterprise. LOE's complaint, again despite having been amended in response to, inter alia, this very objection, still fails to allege a pattern of at least two predicate acts with sufficient clarity to survive a motion to dismiss. Here, as in

*Zito*, it is "impossible to understand what predicate acts are alleged to have been committed by which defendants, or even clearly to understand what the predicate acts are." *Id.* at *9. The operative paragraphs of LOE's RICO conspiracy charge simply refer back to the remainder of the complaint, leaving it to the Court to divine-with cursory guidance from a letter submitted by LOE in lieu of a brief in opposition to defendants' motions-which of the laundry list of incidents set forth in the complaint are alleged to constitute predicate acts. FN15 (Compl.¶ ¶ 163-64.)

> FN15. In paragraph 167, the complaint obliquely, and in wholly conclusory terms, alleges: "Whereas White Plains Linen and Botchman each engaged in at least two predicate acts, the other defendants, by their own acts, joined the conspiracy with the intent to make it succeed in destroying LOE and either driving it from the Relevant Market or forcing its sale to a member of the New York Linen Cartel." Botchman and White Plains pled guilty to a violation of section 1 of the Sherman Act, which is not a predicate act under 18 U.S.C. § 1961(1). The complaint does not otherwise identify the predicate acts allegedly committed by Botchman and White Plains.

LOE alleges that the predicate acts included "bribery, extortion, physical violence, fear of injury, wire fraud, illegal allocation of customers, intimidation and harassment." (*Id.* ¶ 164.) In the first place, some of these-"fear of injury," "illegal allocation of customers," "intimidation and harassment"-do not even qualify as predicate acts under § 1961(1). Similarly, in its letter in opposition to defendants' motion, purportedly clarifying "[t]he necessary predicate acts," LOE cites, inter alia, "interstate telephonic communications by White Plains Linen." (P. Ltr. dated Mar. 23, 2004, at 2.) Needless to say, making interstate telephone calls does not inherently violate any criminal law, let alone constitute a predicate act under § 1961(1). Finally, LOE refers to the assault on one of its officers and an alleged "pattern of harassment," again without explaining how these acts, however deplorable, qualify as predicate acts under § 1961(1). (*Id.*)

*16 Second, even for the acts alleged by LOE that might qualify under § 1961(1), the complaint fails to identify which such acts described elsewhere in the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 14
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
(Cite as: Not Reported in F.Supp.2d)

complaint LOE intends to reference. LOE cites wire fraud, for example, which qualifies as a predicate act. 18 U.S.C. § 1961(1)(B). Yet the complaint fails to describe any act that would be indictable as wire fraud. LOE also cites bribery. (Compl. § 164). Bribery in violation of state law, FN16 however, only counts as a predicate act if it is "punishable by imprisonment for more than one year." Id. § 1961(1)(A). In its letter in opposition to defendants' motions, LOE refers the Court to four instances of bribery described in the complaint: by White Plains (Compl.¶ ¶ 86, 100), Cascade (id. ¶ 87), Best Metropolitan (id. ¶ ¶ 77, 88), and Sea Crest (id. ¶ 81). (P. Ltr. dated Mar. 23, 2004, at 2.) None of these, however, qualifies as a predicate act because New York law makes commercial bribery a felony only if (1) the amount of the bribe exceeds $1000, and (2) the *employer* of the person bribed suffers damage in excess of $250. N.Y. Penal Law § 180.03; see *People v. Wolf*, 98 N.Y.2d 105, 109-11 (2002). While LOE avers that the amounts of some of the bribes exceeded $1000 (*e.g.*, Compl. ¶ ¶ 81, 87-88), it alleges no facts that suggest any harm to the employers of the persons allegedly bribed. FN17

> FN16. LOE does not allege violations of the federal bribery statutes enumerated in § 1961(1) : bribery of public officials, 18 U.S.C. § 201, or bribery to influence sporting contests, *id.* § 224.
>
> FN17. Indeed, in one instance, LOE alleges that a person whom Sea Crest sought to bribe *was* the owner of the restaurant at issue, and hence was himself the "employer." Moreover, the complaint alleges that this person refused the bribe. (Compl.¶ ¶ 81.)

LOE's description of defendants' extortion efforts comes closest to alleging a cognizable predicate act, but upon closer analysis, the complaint's averments in this regard allege, at best, a single act of attempted extortion, not a pattern of two or more such acts. Violations of the Hobbs Act, which proscribes the obstruction of interstate commerce "by robbery or extortion or ... conspir [acy]" to commit those acts, 18 U.S.C. § 1951, qualify as predicate acts. 18 U.S.C. § 1961(1)(B). The complaint alleges that the New York Linen Cartel sought to extort LOE by forcing it to sell its business to White Plains, and in its letter brief, LOE cites the Cartel's efforts in this regard as a predicate act. (Compl. ¶ ¶ 101-07, 115-20; P. Ltr. dated Mar. 23, 2004, at 2.) The Cartel, according to the complaint, repeatedly threatened an LOE officer, and on one occasion, sent a group of thugs to assault him. Each time, agents of the Cartel threatened LOE with harm if it refused to sell itself to White Plains. (Compl.¶ ¶ 101, 103, 106-07.)

The complaint adequately alleges a Hobbs Act violation insofar as it avers that Cartel members attempted to obstruct interstate commerce by inducing LOE, "through the wrongful use of actual or threatened force," to part with its property. *McLaughlin v. Anderson*, 962 F.2d 187, 194 (2d Cir.1992). But multiple acts in furtherance of a *single* extortion episode constitute only a single predicate act of attempted extortion, not a pattern of two or more predicate acts. See *id.* (subsequent acts showing defendant's efforts to " 'mak[e] good' on his threat" insufficient to qualify as distinct predicate acts); see also *Apparel Art Int'l, Inc. v. Jacobson*, 967 F.2d 720, 723 (1st Cir.1992) (observing that "courts ... have consistently held that a single episode does not constitute a 'pattern,' even if that single episode involves behavior that amounts to several crimes"); *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1535 (9th Cir.1992) ("[A]lthough [plaintiff] alleges a number of 'acts,' [defendant's] collective conduct is in a sense a single episode having [a] singular purpose ..., rather than a series of separate, related acts ."); *Tellis v. United States Fid. & Guar. Co.*, 826 F.2d 477, 478 (7th Cir.1986) ( "[M]ultiple acts of mail fraud in furtherance of a single episode of fraud involving one victim and relating to one basic transaction cannot constitute the necessary pattern."); *Passini v. Falke-Gruppe*, 745 F.Supp. 991, 993 (S.D.N.Y.1990). Hence, the complaint alleges, at best, a single episode of extortion directed at a single victim, not two or more such episodes.

*17 Furthermore, even assuming arguendo that LOE alleges two predicate acts, it nonetheless fails to state a claim under RICO because it does not adequately allege a "pattern of racketeering activity." See *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989) (plaintiff "must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity") (emphasis in original); *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir.1999). LOE must therefore allege either "closed-ended continuity," meaning "a series of related predicates extending over a substantial period of time," *H.J.*, 492 U.S. at 242, or "open-ended continuity," meaning "a threat of continuing criminal

Case 7:04-cv-08223-KMK   Document 93-15   Filed 09/19/2005   Page 6 of 9

Not Reported in F.Supp.2d                                                                                      Page 15
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
(Cite as: Not Reported in F.Supp.2d)

activity beyond the period during which the predicate acts were performed." *Cofacredit,* 187 F.3d at 242. The complaint alleges neither.

First, while for good reason the Supreme Court has not attempted to define "substantial period of time" with temporal precision, for "[w]hether the predicates proved establish a threat of continued racketeering activity depends on the specific facts of each case," it has made clear that, in general, "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy [closed-ended continuity]." *H.J.,* 492 U.S. at 242. The Second Circuit has noted in this regard that since *H.J.,* it "has never held a period of less than two years to constitute a 'substantial period of time.' " *DeFalco v. Bernas,* 244 F.3d 286, 321 (2d Cir.2001); *Cofacredit,* 187 F.3d at 242 (same). While this statistic does not, as the Court noted in *Zito,* 2003 WL 22251352, at *16, create a "a pleading requirement" or even necessarily merit much empirical weight, *id.* at *16 n. 5, it does invite skepticism toward allegations of a "pattern" that extends over only a few months. Here, even if the various acts in furtherance of the extortion episode could be deemed two or more predicate acts, those acts all occurred between March and September 2002. (Compl.¶¶ 103, 124.) Moreover, taking into consideration the other relevant factors, including "the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes," *Cofacredit,* 187 F.3d at 242, it is clear that LOE alleges, at best, a concerted effort to exclude *it* from the Relevant Market, not a continuous pattern of racketeering activity.

Second, LOE's allegation that the New York Linen Cartel intends "to continue its RICO activities in the future after the government's enforcement interest has waned" (Compl.¶ 166) fails to allege open-ended continuity because the object of the alleged conspiracy-to destroy LOE, drive it out of the Relevant Market or force it to sell itself to a member of the Cartel (*id.* ¶ 167)-is inherently finite. *United States v. Aulicino,* 44 F.3d 1102, 1112-13 (2d Cir.1995) (collecting cases); *see, e.g., GICC Capital Corp. v. Tech. Fin. Group,* 67 F.3d 463, 466 (2d Cir.1995) (finding scheme to loot *"inherently* terminable" because "[i]t defies logic to suggest that a threat of continued looting activity exists when ... there is nothing left to loot") (emphasis in original).

*18 In short, LOE makes no effort to identify particular criminal acts committed by particular defendant members of the Cartel that qualify as predicate acts; and neither does LOE relate any such acts as part of a pattern of racketeering. Ordinarily, the Court would be inclined to give LOE leave to replead in an effort to cure these defects. *See Zito,* 2003 WL 22251352, at *21. But LOE already amended its complaint in response to defendants' objections to these very defects, and indeed, asserts that its "Amended Complaint follows the teachings of this Court as articulated in *Zito."* (P. Ltr. dated Mar. 23, 2004, at 1.) To the contrary, the amended complaint, like the original one, consists of a chaotic tangle of alleged criminal acts, which LOE simply lists, and eventually defines in conclusory terms as "an unlawful pattern" (Compl.¶ 164). It remains impossible to discern "what predicate acts are alleged to have been committed by which defendants, or even clearly to understand what the predicate acts are." *Id.* at *9. Accordingly, the RICO claim is dismissed with prejudice.

### V. *State-Law Claims*

LOE brings pendent claims under New York law for violations of the Donnelly Act and N.Y. Gen. Bus. Law § 349, and for tortious interference with contract and prospective economic advantage.

### A. *Donnelly Act*

The Donnelly Act, N.Y. Gen. Bus. Law § 340, is New York State's statutory analogue to the Sherman Act, and accordingly, it "should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justify such a result." *X.L.O. Concrete Corp. v. Rivergate Corp.,* 83 N.Y.2d 513, 518 (1994) (internal quotation marks omitted); *Stolow v. Greg Manning Auctions Inc.,* 258 F.Supp.2d 236, 244 n. 8 (S.D.N.Y.2003). Defendants cite no relevant state policies or statutory distinctions between the Sherman and Donnelly Acts that should lead to the Court to analyze LOE's state antitrust claim differently from its federal claim; to the contrary, they urge the Court to dismiss LOE's Donnelly Act claim based on the same objections they raise to the Sherman Act claim. (Sea Crest Br. 19.) For the reasons set forth in connection with the latter claim, the Court declines to do so.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                               Page 16
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
**(Cite as: Not Reported in F.Supp.2d)**

B. *N.Y. Gen. Bus. Law § 349*

To state a claim under N.Y. Gen. Bus. Law § 349, which proscribes "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service," a plaintiff must allege "that (1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Maurizio v. Goldsmith,* 230 F.3d 518, 521 (2d Cir.2000); *see also S.O.K.F.C., Inc. v. Bell Atl. Tricon Leasing Corp.,* 84 F.3d 629, 636 (2d Cir.1996). LOE avers that defendants disseminated false and misleading descriptions of LOE and its business, which "harmed LOE, its customers[,] and the public interest." (Compl.¶¶ 144-45.)

*19 LOE correctly points out that claims under N.Y. Gen. Bus. Law § 349 need not meet the heightened pleading standard applicable to common-law fraud claims. *Joannou v. Blue Ridge Ins. Co.,* 735 N.Y.S.2d 786, 786-7 (2d Dep't 2001). But while competitors such as LOE can bring § 349 claims, *Securitron Magnalock Corp. v. Schnabolk,* 65 F.3d 256, 264 (2d Cir.1995), "the gravamen of the complaint must be consumer injury or harm to the public interest." *Id.* (internal quotation marks omitted); *see also Maurizio,* 230 F.3d at 522. Indeed, to state a claim under this section, a commercial claim "must allege conduct that has significant ramifications for the public at large." *Gucci Am., Inc. v. Duty Free Apparel, Ltd.,* 277 F.Supp.2d 269, 273 (S.D.N.Y.2003) (internal quotation marks omitted).

LOE's complaint does not remotely meet this standard. The sole allegations relating to false and misleading statements concern the incident in which UNITE!, allegedly at the direction of the New York Linen Cartel, distributed leaflets accusing LOE of employing "sweatshop labor" and of failing to provide insurance to their workers. FN18 (Compl.¶¶ 96-98, 108.) The complaint does not allege that consumers or the public at large thereby suffered some harm; rather, this incident, like the others described in the complaint, alleges harm principally, if not exclusively, to LOE. *See Gucci Am.,* 277 F.Supp.2d at 273 (emphasizing that "[c]ourts in this District routinely reject claims brought under § 349 where a commercial claimant does not adequately allege harm to the public interest," and that "disputes between competitors where the core of the claim is harm to another business as opposed to consumers ... constitute situations which courts have found to reflect a public harm that is too insubstantial to satisfy the pleading requirements of § 349"); *Northwestern Mut. Life Ins. Co. v. Wender,* 940 F.Supp. 62, 65 (S.D.N.Y.1996) (party alleging § 349 claim must "charge conduct that is consumer oriented," that is, "acts or practices [that] have broad impact on consumers at large"). FN19 Because LOE's allegations do not adequately allege fraudulent conduct that caused harm to consumers or the public at large, its § 349 claim must be dismissed.

FN18. LOE also alleges that Sea Crest and Olan "sought to undermine LOE's relationship with Gustavino," a restaurant client, through "false statements, predatory pricing, improper special deals and other means." (Compl.¶ 76.) But the only alleged consequence of these false statements was that "Gustavino broke its contract with LOE" (*id.*); LOE does not allege any consumer harm in connection with this incident. Curiously, in defending its § 349 claim, LOE refers the Court to multiple paragraphs in its complaint describing "activities involving anti-competitive actions." (P. Br.12.) Section 349 concerns *deceptive* acts and practices directed at consumers, not anti-competitive conduct generally.

FN19. *Morgan Services, Inc. v. Episcopal Church Home & Affiliates Life Care Comty., Inc.,* 757 N.Y.S.2d 917 (4th Dep't 2003), on which LOE relies (P. Br.12), involved a counterclaim that the plaintiff had engaged in a pattern of fraud over a period of two years against itself and at least fifteen other customers, whereby "plaintiff enters into contracts knowing that it will eventually fail to supply conforming goods and that, when the customer complains and subsequently attempts to terminate the contract, plaintiff uses the liquidated damages clause of the contract as a threat either to force the customer to accept the nonconforming goods or to settle the lawsuit." *Id.* at 917. The Fourth Department concluded that the defendant adequately alleged "that the acts at issue therein are 'consumer-oriented' and are not unique to the parties." *Id.* The same cannot be said for LOE's allegations that UNITE! distributed leaflets containing false information about LOE's labor practices.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 17
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
(Cite as: Not Reported in F.Supp.2d)

C. *Tortious Interference*

Finally, LOE brings claims for tortious interference with contract and with prospective economic advantage. FN20 (Compl.¶ ¶ 147-56.) "To state a claim for tortious interference with contractual relations under New York law, a plaintiff must allege (1) the existence of a valid contract between itself and a third party for a specific term; (2) defendant's knowledge of that contract; (3) defendant's intentional procuring of its breach; and (4) damages." *Granite Partners, L.P. v. Bear, Stearns & Co.,* 17 F.Supp.2d 275, 292-93 (S.D.N.Y.1998) (internal quotation marks omitted). The complaint must also allege that "but for" defendant's tortious interference, there would not have been a breach. *Id.* at 293; *see also Sharma v. Skaarup Ship Mgmt. Corp.,* 916 F.2d 820, 828 (2d Cir.1990). "[T]o state a claim for tortious interference with prospective economic advantage, a plaintiff must show (1) business relations with a third party; (2) defendants' interference with those business relations; (3) defendants acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the relationship." *Purgess v. Sharrock,* 33 F.3d 134, 141 (2d Cir.1994). LOE does not specify which defendant allegedly committed which of these torts. The Court will examine each in turn.

FN20. LOE styles its tortious interference with contract claim a "tortious interference with existing business relations" claim, perhaps to highlight the distinction between this claim and the claim for tortious interference with prospective economic advantage. Research discloses no New York state-court cases that refer to "tortious interference with existing business relations," and the sole federal case that describes the elements of this tort equates it with tortious interference with contract. *Maalouf v. Salomon Smith Barney, Inc.,* No. 02 Civ. 4770, 2003 WL 1858153, at *8 & n. 9 (S.D.N.Y. Apr. 10, 2003).

*20 Best Manufacturing rightly asserts that LOE does not allege that it procured the breach of LOE's contract with the "21" Club. (Best Manufacturing Br. 12.) Hence, LOE cannot maintain a tortious interference with contract claim against Best Manufacturing. On the other hand, taking the complaint's allegations liberally and drawing all inferences in LOE's favor, LOE does state a claim against Best Manufacturing for tortious interference with prospective economic advantage. LOE alleges that it entered into a contract with the "21" Club; that Best Manufacturing interfered with that contract by refusing to supply LOE with the "21" Club's signature linens; that Best Manufacturing refused to deal with LOE at the behest of the New York Linen Cartel, solely to harm LOE; and that, consequently, LOE lost eight months of revenue. (Compl. ¶ ¶ 60-63These allegations appear to state a prima facie claim for tortious interference with prospective economic advantage. *See Purgess,* 33 F.3d at 141.

As to White Plains, Botchman, Cascade, and Best Metropolitan, LOE adequately alleges tortious interference with prospective economic advantage, but fails to state a claim for tortious interference with contract. With respect to each of these defendants, LOE alleges that it "had reached agreements *in principle*" with certain restaurants to provide them linen services, but that these defendants interfered with LOE's prospective business relationships with these restaurants through bribery and other improper means, damaging LOE in amounts set forth in the complaint. (Compl. ¶ ¶ 77, 85-88, 109-10; emphasis added.) At the same time, with regard to these clients, LOE conspicuously does not allege the existence of "a valid contract between itself and a third party for a specific term." *Granite Partners,* 17 F.Supp.2d at 292. Accordingly, based on these facts, LOE cannot maintain claims for tortious interference with contract.

As for Miron, the complaint alleges that it destroyed LOE's linens and prevented LOE from inventorying them properly in an effort to interfere with LOE's business. But LOE fails to specify Miron's specific knowledge of the contract or contracts of which it sought to procure the breach. LOE alleges that "[t]he New York Linen Cartel deployed Miron ... to interfere with and ultimately destroy LOE's business relationship with its customers." But again, it conspicuously does not allege that those customers breached *contracts* with LOE. (Compl.¶ ¶ 67-75.) Hence, while the allegations, liberally construed, suffice to state a claim for tortious interference with prospective economic advantage, they do not state a claim for tortious interference with contract.

Finally, LOE alleges that Sea Crest and Olan "sought to undermine LOE's relationship with Gustavino," another client, through "false statements, predatory pricing, improper special deals and other means." (*Id.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 18
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
(Cite as: Not Reported in F.Supp.2d)

¶ 76.) As a consequence, "Gustavino broke its contract with LOE." (*Id.* ¶ 76.) Sea Crest argues that LOE nonetheless fails to state a claim for tortious interference with contract against it and Olan because LOE does not allege that their actions were the "but for" cause of Gustavino's decision to break its contract with LOE. This is, however, a reasonable inference, which must be drawn in LOE's favor on a motion to dismiss; defendants suggest no other cause for the breach. Accordingly, LOE has stated a viable claim for tortious interference with contract against Sea Crest and Olan. By contrast to the other defendants, however, LOE fails to suggest any way in which Sea Crest and Olan interfered with its prospective economic advantage relative to some client. Paragraph 81, which describes Sea Crest's efforts to bribe the owner of one of LOE's clients, alleges that the bribery efforts failed. Hence, LOE does not allege the necessary actual "injury to the relationship." *Purgess,* 33 F.3d at 141.

## CONCLUSION

*21 For the reasons stated, (1) Best Textiles's motion to dismiss the complaint as to it is granted; (2) plaintiff's claims under RICO and N.Y. Gen. Bus. Law § 349 are dismissed with prejudice; (3) plaintiff's claim for tortious interference with contract is dismissed as to all defendants except Sea Crest and Olan; (4) plaintiff's claim for tortious interference with prospective economic advantage is dismissed as to defendants Sea Crest and Olan only; and (5) the motions to dismiss are otherwise denied.

SO ORDERED.

S.D.N.Y.,2004.
Linens of Europe, Inc. v. Best Mfg., Inc.
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761

Briefs and Other Related Documents (Back to top)

• 1:03cv09612 (Docket) (Dec. 03, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.