Slip Copy
Slip Copy, 2005 WL 1565524 (E.D.N.Y.)
**(Cite as: Slip Copy)**

Page 1

Slip Copy, 2005 WL 1565524 (E.D.N.Y.)
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
    United States District Court,E.D. New York.
        METROPOLITAN TRANSPORTATION
            AUTHORITY, Plaintiff,
                    v.
    Frederick CONTINI, Edward Carroll, Morris
Diminno, Matthew Joseph Downey, James Roemer,
  John Vitiello, Constantine Vafias, David Coakley,
    Robert Santoro, 2 BW Development LLC, Links
 Pepper Construction Inc. d/b/a "Links Construction
     Co, Inc.", Conan Construction Corp., Yankee
        Associates, On-the-Job Carpentry Swilley
     Contracting Corp., Rhino Demo Company, Inc.,
     Bulldog Management & Consulting, Inc. D & D
  Associates, 144 Enterprises LLC d/b/a "City Check
       Cashing" and Broadway Construction, Defendants.
            No. 04-CV-0104 DGTJMA.

                    July 6, 2005.

Shepard Goldfein , William John O'Brien, III , Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, for Plaintiff.
Faith A. Friedman , Stephan P. Scaring, P.C. , Garden City, NY, David A. Krenkel , Krenkel & Monaghan, L.L.C. , Ocen Township, NJ, Michael G. Dowd , New York, NY, Adam Neil Saravay , McCarter & English, LLP, Newark, NJ, for Defendants.

                *MEMORANDUM AND ORDER*

TRAGER, J.
*1 Metropolitan Transportation Authority ("MTA" or "plaintiff"), a New York Public Benefit Corporation that owns and manages public transportation systems in the New York City Area, filed the present action against defendants alleging that defendants participated in a racketeering scheme to defraud the MTA out of millions of dollars in connection with the renovation of the MTA's new headquarters at 2 Broadway, New York, New York.

Plaintiff alleges that defendant 144 Enterprises, LLC d/b/a "City Check Cashing" ("City Check") violated sections 1962(c) and 1962(d) of the Racketeering Influenced and Corrupt Organizations Act ("RICO") and aided and abetted a breach of fiduciary duty under New York law. City Check moves to dismiss the complaint as it pertains to it arguing that it fails to state a claim under Fed.R.Civ.P. 12(b)(6). For the following reasons, defendant's motion is denied.

                    Background

The following facts are taken from plaintiff's complaint and are presumed to be true for the purposes of this motion. This case involves a conspiracy to defraud the MTA out of millions of dollars by submitting false invoices that inflated fees for services performed by elevator operators during a renovation project on the MTA's new headquarters at 2 Broadway in New York City. See Plaintiff's Complaint ("Compl.") ¶¶ 1-2. The MTA alleges that City Check, the defendant making the pending motion, participated in this scheme by laundering the ill-gotten gains of the conspiracy. Id. ¶ 62.

In early 1999, the MTA contracted with Frederick Contini to renovate 2 Broadway in downtown New York City after terminating its contract with Contini's former employer. Id. ¶ 5. Contini was responsible for overseeing the work on the building and coordinating the approval and payment of subcontractor invoices for work performed. Id. The MTA also advanced funds to Contini, to be held "in trust," for the payment of expenses. Id. ¶ 45. Thus, Contini became a fiduciary of the MTA. Id. ¶ 137.

Soon after the MTA awarded Contini the 2 Broadway job, he and the other defendants allegedly devised a scheme to embezzle money from the 2 Broadway project by submitting fraudulent invoices to the MTA for elevator operator services that were never performed. Id. ¶ 6. The invoices also charged inflated rates for both the work done and not done. Id. These invoices were prepared by defendant Links Pepper Construction Inc. d/b/a Links Construction Co. Inc. ("Links"), a shell company set up solely for the purpose of funneling the proceeds of the scheme. Id. Contini submitted eleven Links invoices to the MTA, the first in March 1999 and the last in February 2000. Id. ¶ 57. The MTA issued checks to Links based on the invoices, totaling $13,381,337.54, which were cashed, the funds from which were then distributed to at least six different shell companies controlled by various defendants. Id. Only one

company, defendant Conan Construction Corp., actually employed and paid elevator operators. *Id.*

*2 Links used various methods to deliver the proceeds of the fraudulent invoices to the various shell companies. *Id.* ¶ ¶ 61-64. Of particular relevance for the motion here considered, checks issued by MTA payable to Links were brought to City Check, a licensed check cashing facility located in Jersey City, New Jersey, where the checks were converted to cash or bank checks payable to certain of the defendant companies. *Id.* ¶ 31, 64. The manager of City Check, defendant Santoro, an alleged member of the Genovese crime family who was formerly convicted of money laundering, was the contact at City Check. *Id.* ¶ 62. Santoro negotiated the checks in exchange for a percentage of each check's value. *Id.* The balance was given to Contini and defendant Morris Dimino as kickbacks. *Id.* ¶ 64. The bank checks were often cashed at City Check and the money distributed and pocketed by various defendants. *Id.*

In or about May 2000, approximately fourteen months after the first fraudulent invoice was submitted to the MTA, duly empaneled grand juries in the Eastern District of New York began to investigate whether individuals and unions connected with the 2 Broadway project had violated any federal laws. *Id.* ¶ 65. The grand jury issued several subpoenas to witnesses and requested documentation supporting the invoices submitted to the MTA. *Id.* ¶ ¶ 66-74. Various defendants engaged in a cover-up by creating false documentation in response to the subpoenas and tampered with at least one material witness. Moreover, at least one named defendant gave false testimony before the grand jury. *Id.* This cover-up lasted from May 2000 until at least January 2002. *Id.*

On April 18, 2002, the federal government unsealed a fifty-five count indictment against seven of the nine individually named defendants in this action. *Id.* ¶ 76. Soon after, the other two individual defendants were also charged for their roles in the scheme. *Id.* ¶ ¶ 77, 80. By September 2003, all of the individually named defendants in this suit had pled guilty to all or some of the counts brought against them, including defendant Santoro, who pled guilty to money laundering. *Id.* ¶ 80.

Plaintiff alleges that City Check played an essential role in conducting the RICO scheme because it provided an essential conduit in the distribution of the proceeds of the conspiracy. Further, laundering the money allowed defendants to conceal the conspiracy from plaintiff. Finally, plaintiff claims that City Check aided and abetted Contini's breach of the fiduciary duty he owed plaintiff.

Discussion

(1)

Pattern of Racketeering Activity

The RICO statute, 18 U.S.C. § 1962(c), prohibits a "person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). A "pattern of racketeering activity" may be shown by evidence of two or more predicate acts "that ... themselves amount to, or ... otherwise constitute a threat of, *continuing* racketeering activity." H.J. Inc. v. N.W. Bell Tel. Co., 492 U.S. 229, 240, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (emphasis in original). City Check argues that plaintiff cannot show that the alleged fraud amounts to a RICO violation because the fraud "is limited to one project ... one victim ..., and a period of less than one year." FN1 Memorandum of Law in Support of Defendant 144 Enterprises, LLC's Motion to Dismiss Complaint ("City Check Mem.") at 2.

> FN1. City Check claims that the conspiracy lasted less than one year because it contends that the acts of witness tampering, perjury and submission of false documentation should not be considered part of the overall scheme. The critical question is whether these acts were " 'in the same series of acts or transactions' " as the submission of the fraudulent invoices. U.S. v. Teitler, 802 F.2d 606, 616 (2d Cir.1986). Where, as here, "the obstruction was pointed at the concealment of the other crimes," the acts are properly included as part of the overall conspiracy. U.S. v. Meyerson, No. 87 CR. 796, 1988 WL 68143 at *7 (S.D.N.Y. June 21, 1988). Therefore, including the obstruction of the grand jury investigation, the conspiracy went on for nearly two years, from March 1999, when the first invoice was submitted,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

until January 2001, when the last act of obstruction occurred. However, as discussed *infra,* the duration of the conspiracy is ultimately beside the point.

*3 Regardless of the number of projects, victims involved or duration of the scheme, it is clear that many acts of fraud were committed and that the fraud threatened to continue into the foreseeable future. First, rather than look at the number of projects defendants' scheme affected, the question that should be examined is what the potential life span of the scheme was and whether the defendants' actions posed "a distinct threat of long-term racketeering activity, either implicit or explicit." H.J. Inc., 492 U.S. at 242. Although defendants only chose to submit fraudulent invoices for eleven months, from March 1999 to February 2000, they could clearly have carried on their racketeering activity for a very long time. The "one project," as City Check calls it, was, at the time, proclaimed to be the largest renovation in New York City history and would likely take a substantial and unknowable amount of time to complete. See Comp. ¶¶ 3, 50. Therefore, at the time the elevator operator fraud scheme was conceived and executed, there was no specific end in sight. See Morrow v. Black, 742 F.Supp. 1199, 1207 (E.D.N.Y.1990) (finding that even though predicate acts spanned a few months, continuity existed because at the time of the acts there was a threat of continuing criminal activity). The mere fact that the racketeering activity related to a single project by no means indicates that the fraud would be short-lived or that the illegal scheme would not continue far into the future.

Second, the fact that there was only one victim is irrelevant to whether the continuity element is satisfied. See Procter & Gamble Co. v. Big Apple Indus. Bldgs., 879 F.2d 10 (2d Cir.1989). In *Procter & Gamble Co. v. Big Apple Industrial Buildings,* the Second Circuit found that defendants' multiple fraudulent representations to the plaintiff regarding a *single* project constituted a "pattern of racketeering activity." Id. at 18. The Second Circuit found that the finite nature of the project was irrelevant and that the proper issue for consideration was whether the alleged "acts of racketeering were neither isolated nor sporadic." *Id.* In this case, the fraudulent acts and money laundering were clearly neither isolated or sporadic, but systematic, occurring every month for eleven months, and part of a well-planned and defined scheme.

" 'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." H.J. Inc., 492 U.S. at 241 (citing Barticheck v. Fid. Union Bank/First Natl. State, 832 F.2d 36, 39 (3d Cir.1987)). An " 'analysis of the threat of continuity cannot be made solely from hindsight.' " U.S. v. Aulicino, 44 F.3d 1102, 1112 (2d Cir.1995) (quoting U.S. v. Busacca, 936 F.2d 232, 238 (6th Cir.1991)). Rather, open-ended continuity may be shown if, *"at the time of occurrence"* the racketeering activity threatens future criminal activity. Morrow, 742 F.Supp. at 1207 (emphasis in original). Open-ended continuity may be found even where the predicate acts occur over a very short period of time. U.S. v. Indelicato, 865 F.2d 1370, 1383 (2d Cir.1989) (holding that continuity existed where three murders that were part of a scheme to change leadership in an organized crime family occurred simultaneously).

*4 A threat of continuity may be established where the predicate acts are inherently unlawful and were made in pursuit of inherently unlawful goals even if, as here, the "period spanned by the racketeering acts was short." Aulicino, 44 F.3d at 1111. Essentially, if the nature of the acts indicate that the defendants had a continuing intent and ability to carry on the racketeering activity, a threat of continuity is established. See Id.; Nafta v. Feniks Intl. House of Trade, 932 F.Supp. 422, 427 (E.D.N.Y.1996). Here, the overall goal of the scheme was to embezzle money from the MTA, an act considered inherently unlawful. See Aulicino, 44 F.3d at 1111. City Check allegedly participated in the scheme by laundering the proceeds of the fraud, an act which is also viewed as inherently unlawful. See U.S. v. Coiro, 922 F.2d 1008 (2d Cir.1991) ; Int'l. Bhd. of Teamsters v. Carey, 297 F.Supp.2d 706, 715 (S.D.N.Y.2004). Therefore, City Check's money laundering acts undertaken in pursuit of embezzling money from the MTA show a threat of future criminal conduct sufficient to establish open-ended continuity even though those acts spanned less than one year.

(2)

Operation and Management

City Check also argues that plaintiff has not sufficiently pled that City Check participated in the "operation or management" of the enterprise. The Supreme Court has interpreted § 1962(c)'s required element of "conduct" to "include an element of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

direction," that the defendant had "some part in directing the enterprise's affairs." See Reves v. Ernst & Young, 507 U.S. 170, 178-79, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1998). In Reves, the Supreme Court adopted an "operation or management" test to determine in all RICO cases whether a defendant had sufficient connection to the enterprise to warrant imposing liability. The operation-management test has been recognized as "a very difficult test to satisfy." Amsterdam Tobacco Inc. v. Philip Morris Inc., 107 F.Supp.2d 210, 216 (S.D.N.Y.2000); see also Redtail Leasing, Inc. v. Bellezza, 2001 WL 863556, at *4 (S.D.N.Y. July 31, 2001). The test has, however, been met where defendants had a managerial role in a RICO enterprise, as well as where defendants "exercised broad discretion in carrying out the instructions of [their] principal[s]." United States v. Diaz, 176 F.3d 52, 92 (2d Cir.1999).

The Supreme Court has found that "the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise." Reves, 507 U.S. at 178-179. RICO liability is also applicable to "lower rung participants in the enterprise who are under the direction of upper management." Id. at 184. However, "the simple taking of directions and performance of tasks that are 'necessary or helpful' to the enterprise, without more, is insufficient to bring a defendant within the scope of § 1962(c)." United States v. Viola, 35 F.3d 37, 41 (2d Cir.1994). There is a difference between actual control over an enterprise and mere association with an enterprise; in light of that difference, the test for liability "is not involvement but control." Congregacion de la Mision Provincia de Venezuela v. Curi, 978 F.Supp. 435, 450 (E.D.N.Y.1997) (citing Dept. of Econ. Dev. v. Arthur Anderson & Co., 924 F.Supp. 449, 466 (S.D.N.Y.1996)).

*5 City Check argues that its and Santoro's involvement in the RICO scheme was merely "peripheral" and that City Check was neither "a central player in the alleged underlying scheme" nor responsible for Santoro's acts under the doctrine of respondeat superior. See City Check Mem. at 13. To support this contention, City Check cites a number of cases where banks or other organizations were found not to survive the "operation and management" test even though they knowingly accepted and maintained deposits of fraudulently obtained funds. Id. at 11 (citing Dubai Islamic Bank v. Citibank, N.A., 256 F.Supp.2d 1071 (S.D.N.Y.2003) ; Sundial Intern. Fund Ltd. v. Delta Communications, Inc., 923 F.Supp. 38 (S.D.N.Y.1996) ; Indus. Bank of Latvia v. Baltic Fin. Corp., No. 93-cv-9032, 1994 WL 286162 (S.D.N.Y. June 27, 1994) ; Amalgamated Bank of N.Y. v. Marsh, 823 F.Supp. 209 (S.D.N.Y.1993)).

These cases are distinguishable from the case at bar. First, the defendants in the above-cited cases were considered "outsiders" to the enterprise. Plaintiff's complaint clearly states that Santoro was a full-fledged member of the enterprise and that he was an integral cog in the works. Second, the defendants in each of the above cases did not benefit directly from the scheme, nor did they do anything but passively receive the funds. Here, Santoro received a kickback from each check that he handled and did not merely hold the funds but cut checks as requested so that the money could be distributed to the various entities involved in the scheme.

A more relevant case is American Arbitration Association v. Defonseca, No. 93 CIV. 2424, 1996 WL 363128 (S.D.N.Y. June 28, 1996). In that case, the role of one of the moving defendants in the scheme was to maintain joint control of accounts, deposit checks of fraudulently obtained funds into those accounts and send a portion of the proceeds of these checks to another of the defendants. See id. at *1-*2. The court found that this amounted to participation in the scheme because "[t]he complaint must only state that [the defendant was] in charge of certain aspects of the enterprise." Id. at *5. Like the defendant in Defonseca, Santoro "participated" in the scheme by directing at least part of the money laundering division of the scheme. Therefore, the complaint properly alleges that Santoro was part of the "operation and management" of the scheme.

In determining whether a corporation may bear RICO liability for the actions of its employee " 'the critical question is whether the illegal conduct alleged was known to and participated in by sufficiently high-level employees within a corporation and/or was sufficiently pervasive within the corporation as to be fairly attributed to the corporation.' " Local 857 I.B.T. Pension Fund v. Pollack, 992 F.Supp. 545, 568 (S.D.N.Y.1998) (quoting In re American Honda Motor Co., Inc. Dealerships, 958 F.Supp. 1045, 1051 n. 3 (D.Md.1997)). In addition, the corporation must have received a benefit from its employee's participation in the conspiracy. See id. at 569; Burke v. Dowling, 944 F.Supp. 1036, 1069-1070 (E.D.N.Y.1995). Plaintiff alleges that Santoro was an owner/operator of City Check during the time he participated in the conspiracy. In essence, Santoro is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

alleged to have been in charge of the day-to-day operations of City Check, a sufficiently high level employee to impute knowledge of the wrongdoing on City Check. See Local 875, 992 F.Supp. at 569 (finding that company could be liable under RICO where managing director was involved in enterprise). The issue of the benefit to City Check was not addressed by either party. Therefore, as stated above, plaintiff has properly pled that Santoro participated in the RICO enterprise and City Check is vicariously liable under the theory of *respondeat superior* for his actions.

(3)

Proximate Cause

*6 City Check argues that plaintiff's claim should be dismissed because plaintiff fails to plead that City Check's conduct proximately caused plaintiff's injuries. Under the RICO statute, "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor ..." 18 U.S.C. § 1964(c). The Supreme Court has interpreted this provision to require a "direct relation between the injury asserted and the injurious conduct alleged." Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). The defendant's conduct must therefore be both the factual and proximate cause of the plaintiff's injury. Id.

> Central to the notion of proximate cause is the idea that a person is not liable to all those who may have been injured by his conduct, but only those with respect to whom his acts were a substantial factor in the sequence of responsible causation, and whose injury was reasonably foreseeable or anticipated as a natural consequence.... [T]he reasonably foreseeable victims of a RICO violation are the targets, competitors, and intended victims of the racketeering enterprise.

Baisch v. Gallina, 346 F.3d 366, 373-374 (2d Cir.2003) (internal citations and quotations omitted).

In order to be the proximate cause of a plaintiff's injury in the RICO context, a defendant's acts must have been " 'a substantial factor in the sequence of responsible causation.' " Standardbred Owners Assoc. v. Roosevelt Raceway Assoc., L.P., 985 F.2d 102, 104 (2d Cir.1993) (quoting Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 23-24 (2d Cir.1990)). City Check played an essential role in the scheme to embezzle millions of dollars from the MTA. Without Santoro, at least some of the proceeds could not have been converted to cash and distributed to the participants. If people did not get paid, the scheme would not have continued. Thus, City Check was a "substantial factor" in plaintiff's loss. See Am. Arbitration Assoc., 1996 WL 363128 at *6 (finding that in embezzlement and money laundering scheme, money laundering defendants were a proximate cause of plaintiff's injury).

(4)

RICO Conspiracy

Subdivision (d) of 18 U.S.C. § 1962 prohibits "any person [from] conspir[ing] to violate any of the provisions of subsection (a), (b) or (c) of this section." 18 U.S.C. § 1962(d). "[T]he requirements for RICO's conspiracy charges under § 1962(d) are ...: A 'conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor.' In the civil context, a plaintiff must allege that the defendant 'knew about and agreed to facilitate the scheme.' " Baisch, 346 F.3d at 376-77 (quoting Salinas v. U.S., 522 U.S. 52, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997)).

City Check argues that it cannot be held liable under § 1962(d) because plaintiff did not properly plead continuity under § 1962(c) and because City Check cannot be held vicariously liable for Santoro's actions. As stated above, plaintiff has properly pled continuity and that City Check is liable for Santoro's actions. As Santoro clearly knew about and agreed to participate in the scheme, plaintiff has properly pled that City Check conspired to violate RICO.

(5)

State Law Claim

*7 Plaintiff alleges that City Check and other defendants aided and abetted Contini's breach of fiduciary duty. Under New York law, to state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must allege "(1) a breach of fiduciary obligations to another; (2) that the defendant knowingly induced or participated in the breach; and (3) that the plaintiff suffered damages as a result." In

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                        Page 6
Slip Copy, 2005 WL 1565524 (E.D.N.Y.)
**(Cite as: Slip Copy)**

_re Sharp Int'l Corp., 302 B.R. 760, 770 (E.D.N.Y.2003)_ (citing _Kaufman v. Cohen, 760 N.Y.S.2d 157, 307 A.D.2d 113 (1st Dep't 2003)_).

City Check contends that plaintiff has not properly pled that City Check knew that a fiduciary relationship existed between Contini and the MTA. In its complaint, plaintiff details Contini's fiduciary relationship and alleges that all of the defendants, including City Check, knew of this relationship. This is an issue of fact to be determined after discovery or by a jury. Therefore, it would be inappropriate to dismiss this claim at this early stage of the litigation.

Conclusion

Accordingly, because plaintiff has adequately pled both violations of RICO and aiding and abetting a breach of fiduciary duty in violation of state law, City Check's motion to dismiss is denied.

E.D.N.Y.,2005.
Metropolitan Transp. Authority v. Contini
Slip Copy, 2005 WL 1565524 (E.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 2004 WL 2409916 (Trial Pleading) Answer (Apr. 05, 2004)
• 2004 WL 2409914 (Trial Pleading) Answer (Feb. 19, 2004)
• 2004 WL 2409892 (Trial Pleading) Complaint (Jan. 07, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.