Westlaw.

Not Reported in F.Supp.2d                                                                Page 1
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
(Cite as: Not Reported in F.Supp.2d)

▷
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
Briefs and Other Related Documents

United States District Court,S.D. New York.
Thomas ZITO et al., Plaintiffs,
v.
LEASECOMM CORPORATION, Microfinancial Incorporated, Cardservice International, Inc., E-Commerce Exchange, Inc., On-Line Exchange, Richard Karn Wilson a/k/a Richard Karn, Patrick Rettew, Peter R. Von Bleyleben, Richard F. Latour, Carol Salvo, Paul Schneider, Medtrak Corporation, Charles Burtzloff a/k/a Chuck Burtzloff, John Doe and Eddy Roe, the last two being ficitious names, the real names of said Defendants being presently unknown to Plaintiffs, said fictitious names being intended to designate persons who are acting in concert with the Defendants, Defendants.
No. 02 Civ.8074 GEL.

Sept. 30, 2004.

John C. Klotz, New York, NY, for Plaintiffs Thomas Zito et al.
Andrew P. Fishkin, Charles W. Stotter, Edwards & Angell, LLP, New York, NY, for Defendants Leasecomm Corporation, Microfinancial, Incorporated, Peter R. Von Bleyleben, Richard F. Latour, and Carol Salvo.
Steven M. Bierman, James D. Arden, Mark E. Walli, Sidley Austin Brown & Wood, LLP, New York, NY; Richard J. Grad, Jennifer Altfeld Landau, Sidley Austin Brown & Wood, LLP, Los Angeles, CA, for Defendant Cardservice International, Inc.
Kenneth King, Jason Chue, Patterson, Belknap, Webb & Tyler LLP, New York, NY, for Defendant E-Commerce Exchange, Inc.
James A. Saville, Jr., Hill Rivkins & Hayden LLP, New York, NY, for Defendants On-Line Exchange and Paul Schneider.
Kevin S. Reed, Quinn Emanuel Urquhart Oliver & Hedges, LLP, New York, NY, for Defendant Richard Karn Wilson.
Martin Glenn, John T. Hammer, O'Melveny & Myers LLP, New York, NY, for Defendant Charles Burtzloff.

OPINION AND ORDER

LYNCH, J.
*1 In this civil RICO action, numerous plaintiffs sue Leasecomm Corporation and its parent Microfinancial Inc. ("MFI"), three of its officers (Peter R. Von Bleyleben, Richard F. Latour, and Carol Salvo) (the "MFI Officers"), three of its alleged "dealers and vendors" (Compl.¶ 39) (Cardservice International, E-Commerce Exchange, and On-line Exchange), and several shareholders of those or other dealers (Patrick Rettew and Richard Karn Wilson, shareholders of non-defendant Themeware, Inc.; Medtrak Corporation, a shareholder of defendant On-Line Exchange; and Paul Schneider, the principal shareholder of Medtrak), for damages arising from alleged fraudulent schemes involving the leasing of e-commerce services and products. On defendants' motion, the original complaint was dismissed in September 2003 for failure to state a claim, with leave to replead. See Zito v. Leasecomm Corp., No. 02 Civ. 8074, 2003 WL 22251352 (S.D.N.Y. Sept. 30, 2003) ("Zito I"). Plaintiffs filed an Amended Complaint in November 2003.

All defendants except Rettew and Medtrak (who have not responded to the complaint) have once again moved to dismiss for failure to state claim under the Racketeer Influenced and Corrupt Organizations statute, commonly known as "RICO." 18 U.S.C. §§ 1961-1964. They also challenge the sufficiency of plaintiffs' state law claims. Finally, defendants Karn, On-line Exchange, and Schneider argue for dismissal based on lack of in personam jurisdiction. In response, plaintiffs have once again sought leave to amend the complaint. Defendants' motions will be granted in part and denied in part; plaintiffs' motion to amend will be granted in part.

BACKGROUND

The facts summarized below are taken from the Amended Complaint, the allegations of which must be assumed true for purposes of these motions to dismiss. The crux of the Amended Complaint is that Leasecomm formed an enterprise with various dealers who used unscrupulous and deceptive marketing tactics to lure unsuspecting victims into signing contracts with Leasecomm. These contracts contained unconscionable terms that allowed members of the enterprise to "reap unconscionable

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
(Cite as: Not Reported in F.Supp.2d)

profits" through extreme collection tactics. (¶¶ 73-74, 122-147.)

These central allegations have not changed significantly from those outlined in plaintiffs' original complaint. However, in response to the Court's Opinion in *Zito I*, plaintiffs have attempted to clarify the various schemes alleged, which predicate acts were committed in furtherance of which of them, and by which defendants. Toward this end, plaintiffs have described what they refer to as the "Master Scheme" of the Leasecomm enterprise, as well as various "Implementing Schemes."

### I. The Leasecomm Enterprise

#### A. *General Purpose of Enterprise*

MFI is a "financial intermediary" which "finances activities of third parties through various contracts and legal arrangements which it calls leases." (¶ 45.) MFI conducts "almost all" of its business through defendant Leasecomm. (*Id.*) Prior to 1998, MFI/Leasecomm was engaged in the business of leasing or financing the purchase of "tangible business machine products including credit POS [point of sale] swipe machines." (¶ 57.) Those products were actually marketed by other entities, including defendant Cardservice International ("Cardservice"). (*Id.*) In 1998, MFI/Leasecomm began a program in which it began to lease e-commerce services, "such as web sites, POS software, and merchant accounts." (¶¶ 48, 58.) These products were marketed "as a part of proffered business ventures" by, among others, defendants E-Commerce Exchange ("ECX"), Cardservice, and On-line Exchange ("OX"). (¶ 59.) MFI/Leasecomm entered into "strategic alliances" with these entities, which plaintiffs refer to alternately as MFI/Leascomm's "dealers" or "the Leasecomm Associates." (¶¶ 32, 54-55.)

*2 The Amended Complaint, like the original complaint, focuses on two kinds of conduct by the defendants. The first is the deceptive marketing practices of the MFI/Leasecomm dealers, who plaintiffs allege used deceptive advertising, misrepresentations, and unfair "bait and switch" tactics to corral vulnerable customers into leasing their overpriced and ineffective products. The dealers, however, did not themselves execute the lease agreements with the customers; rather, by prior arrangement with MFI/Leasecomm, they had the customers sign a form contract provided by MFI/Leasecomm, which MFI/Leasecomm later executed. The contracts executing these leases were non-negotiable and contained numerous deceptive terms, which the dealers are alleged to have concealed or misrepresented. The second type of conduct is the aggressive, and allegedly fraudulent and extortionate, enforcement tactics subsequently used by MFI/Leasecomm against defaulting lessees-tactics enabled in part by the leases' allegedly one-sided, unconscionable terms. These collection tactics formed a central and publicly acknowledged part of MFI/Leasecomm's business plan that "distinguish[ed] MFI from its competitors and other leasing companies." (¶¶ 122-124.)

The complaint alleges that the dealers and MFI/Leasecomm constituted a single "enterprise" by virtue of an arrangement between the dealers and MFI/Leasecomm under which the dealers would market Leasecomm products through various "heavy-handed, high-powered mass marketing" techniques, in exchange for a one-time payment of between forty and sixty percent of the face value of the leases from MFI/Leasecomm, while Leasecomm would finance these marketing efforts and the cost of the products offered. (¶¶ 45-70.)

#### B. *Master Scheme and Leasecomm Leases*

The form-lease that customers were asked to sign in purchasing products financed by Leasecomm leases is headed "Non Cancellable Lease Agreement" and states, in bold capitals, that "NEITHER SUPPLIER NOR ANY SALESPERSON IS AN AGENT OF LESSOR NOR ARE THEY AUTHORIZED TO WAIVE OR ALTER THE TERMS OF THIS LEASE." (Am.Compl.Ex. C.) Yet the dealer defendants, according to the complaint, regularly told customers that "the contracts were cancelable." (¶ 112(h).) The complaint alleges that the dealer defendants pressured plaintiffs to sign the leases using illusory inducements such as "waiver of usual fees and rebate coupons for the usual fees ." (¶ 113 & Ex. E.)

The lease includes a space for filling in the lessee's bank account information to permit automatic withdrawals. (Am.Compl.Ex. C.) In smaller type, the lease permits Leasecomm not only to automatically debit the lease charges, but also to charge an additional $5.00 per month if it becomes "necessary to switch to statement billing due to insufficient funds," to continue the lease on a month-to-month

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
(Cite as: Not Reported in F.Supp.2d)

Page 3

basis if the lessee fails to notify Leasecomm sixty days prior to its expiration that he or she opts to terminate the lease, to charge a late fee of fifteen percent of any amount past due, and to charge collection costs (including charges for collection letters and phone calls). (*Id.*) The lease states that lessee "fully recognize[s] [Leasecomm's] right to enforce the lease free from any defenses, offsets [or] counterclaims," that lessee has not received any express or implied warranties for the products leased, and has "unconditionally waive[d] any claims ... against Leasecomm." It also provides for "the exclusive jurisdiction of the Courts of ... Massachusetts" and waives "any objection to venue" there. (*Id.*) Plaintiffs allege improprieties in the execution of the leases, including forging of some lessees' signatures, the use of "witnesses" who did not in fact witness lessees' signatures, failure to fill out essential terms of the lease, and failure to provide copies of leases to lessees. (¶¶ 112, 117.)

*3 Finally, plaintiffs allege that Leasecomm used extortionate means to collect on the leases, such as insulting, harassing, and intentionally harmful rhetoric including disparaging personal remarks, embarrassing messages left with third parties about sending debtors to jail, taunting debtors about their credit and threatening to destroy their credit unless payment was made without objection for each and every charge including unjustified credit fee charges. (¶ 133.) They allege that Leasecomm made unauthorized withdrawals from plaintiffs' bank accounts and that Leasecomm inflated its charges by (1) making "frequent, duplicative contacts" such as multiple collection calls on the same day, and then "charging for each contact" (¶ 136 & Ex. H), and (2) presenting bad checks for payment multiple times on the same day, (¶ 137). Plaintiffs also allege that Leasecomm "obtained thousands of default judgements [*sic*] in Massachusetts and ... sought enforcement of the same." (¶ 139.) The complaint includes a financial presentation made by MFI at an investor conference touting the centrality of its "persistent and innovative collection effort" to its business plan. (Am.Compl.Ex. D.)

### C. *Implementing Schemes*

#### 1. The Internet Tool Box Scheme: Themeware, Cardservice, and the "Karn Infomercial"

Plaintiffs have outlined several "implementing schemes" that they claim were used to further the master enterprise of luring unsuspecting victims into signing Leasecomm leases. The most involved of these, and the one outlined in the most detail, is the "Internet Tool Box" scheme (the "ITB" scheme). This campaign was conducted by non-defendant Themeware, whose shareholders include defendants Richard Karn Wilson (generally referred to in the complaint, and therefore in this Opinion, as "Karn") and Patrick Rettew. Karn is also described as Themeware's "principal spokesman." (¶ 21.)

In 1997, Themeware began marketing, through a television "infomercial" hosted by Karn, a group of products sold together, called the "Internet Tool Box," at a price of $49.95. (¶¶ 167-182.) The infomercial referred to the product as the "Internet Business Tool Box," and led the viewer "to believe that [it] contained software and services worth as much as $800" which would "give them the facility to accept credit cards on their web pages" and enable them to "get [ ] onto the web in thirty minutes and mak[e] money instantly." (¶¶ 189.) It promised a "30 day money back guarantee." (*Id.*) The Tool Box actually consisted of items "many of [which] were readily available for no or nominal charge." (¶ 189(c).) It did not permit purchasers to accept credit cards on their web pages without purchasing additional services from Cardservice "at costs of many thousands of dollars." (¶ 189(f).) Furthermore, the internet connection provided as part of the Tool Box software "specifically stated it was for non-commercial use[ ]." (¶ 189(h).) The Tool Box infomercial was widely broadcast as a part of the Leasecomm Enterprise's "bait and switch" tactics to lure customers into purchasing ineffective and overpriced products, and lock them into Leasecomm contracts. (¶¶ 186-187.)

#### 2. Other Implementing Schemes

*4 Plaintiffs describe various other "implementing schemes" carried out by various defendants in furtherance of the Master Scheme, detailing the manner in which each defendant marketed Leasecomm contracts. Briefly, these are as follows:

##### a. *Cardservice*

Plaintiffs allege that it was Cardservice's practice to "make telephone marketing calls to individuals in order to induce them to purchase both virtual terminals financed by Leasecomm and merchant

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 4
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
(Cite as: Not Reported in F.Supp.2d)

accounts from Cardservice." (¶ 199.) In those calls, "it was represented that the goods and services being sold were fit and appropriate for use by the customers and that the contracts could be cancelled if the customer was dissatisfied." (¶ 200.) When a customer expressed interest, Cardservice would send them a "slick brochure" making various representations about the company that plaintiffs allege are false, and would subject them to "persistent, high-pressure telemarketing harangues that continued to falsely promise money back guarantees and concealed and obfuscated the unfair and deceptive provisions of the Leasecomm contract." (¶¶ 204-208.)

Cardservice also marketed products financed by Leasecomm contracts at "business opportunity seminars and conferences," which were themselves advertised by infomercials. (¶¶ 210, 215.) At these conferences, Cardservice representatives would make product presentations, introduced by conference "trainers" as offering a "special opportunity" for web-based businesses. (¶¶ 217-218.) Using high-pressure tactics, they would push Cardservice products that "could not be purchased unless other products financed by Leasecomm contracts were purchased." (¶¶ 219-220.) The same representations were made that the contracts for these products were cancelable, and "the unfair and deceptive provisions of the Leasecomm contract were concealed." (¶ 222.)

b. *"ECX/OX Scheme" and "ECX Seminar Scheme"*

The implementing scheme allegedly executed by ECX, OX (which is controlled by Medtrak), and non-defendant National Entrepreneur Support Association ("NESA"), is somewhat more complicated. Plaintiffs allege that in 1999, ECX and Leasecomm entered a "strategic alliance" whereby Leasecomm agreed to finance the sale of ECX's products, which primarily consisted of "merchant accounts and related services." (¶¶ 224, 231.) ECX, Medtrack, and Schneider agreed that ECX would in turn finance OX to sell its merchant accounts. (¶ 225.) OX then hired non-defendant NESA to market these merchant accounts; this it did primarily through the circulation of a videotape of a seminar conducted in January 2000, which was itself promoted by a direct-mail campaign. (¶¶ 229, 230, 233.) The products offered in the video consisted of "distributorships" which granted "exclusive territories" to purchasers of ECX merchant accounts. (¶ 233(f).) Those who purchased this option would be entitled to training and "commissions on all business OX did in the distributor's area" as well as the benefit of "extensive" marketing, through infomercials and other promotional activities. (¶ 233(f)-m.).

*5 The video was allegedly deceptive in that it promised that distributors could, with minimal time commitment, skills, or risk, earn a "positive cash flow" (¶ 223(b)) and revenues in the "hundreds of thousands [of] dollars." (¶ 223(e).) The investment necessary was "either $1450 for a one time payment or $89.95 a month for four years." (¶ 223(e).) These payments were to be made to Leasecomm, under the same form-lease that was used in the Master Scheme. Those who received the video were allegedly subjected to the same "high-pressure" sales calls which made the same false representations about the nature of the Leasecomm contracts. (¶ 235.)

ECX is also alleged to have "sponsored or participated in business opportunity seminars and conferences at which it sold products financed by Leasecomm contracts." (¶ 237.) Like the Cardservice Seminar Scheme, the ECX seminars involved a "vendor of ECX products" presenting a "special business opportunity" and using high-pressure tactics to close the deal, while giving false assurances that the contracts were cancellable and concealing their unfair provisions. (¶¶ 239-240.) While plaintiffs allege generally that they were "caused to purchase over-valued defective goods and services" by the ECX seminars (¶ 241), they do not allege describe specific defects or identify particular false representations about the products, as they do with respect to Cardservice. FN1

> FN1. Under the heading "Miscellaneous Schemes," plaintiffs also assert a vague allegation of "numerous other sub-schemes by dozens of other dealers who use[ ] ... similar misrepresentations and obfuscation to sell their products." (¶ 242.) This appears to be an effort to assert future, unspecified claims against additional defendants. Taken alone, this allegation is insufficient, as it fails to specify the identities of the entities involved or the nature of these purported schemes. Of course any effort to add defendants would at this point require the approval of the Court. *See* infra Part V.B. However, the insufficiency is immaterial to the present motions in all other respects in light of the finding that plaintiff's more particular allegations against the individual

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
(Cite as: Not Reported in F.Supp.2d)

Page 5

defendants are sufficient to survive the motions to dismiss.

DISCUSSION

I. Legal Standards

A. *Dismissal under Rule 12(b)(6)*

On a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the Court must accept "as true the facts alleged in the complaint," *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 699-700 (2d Cir.1994), and may grant the motion only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Thomas v. City of New York*, 143 F.3d 31, 36 (2d Cir.1998) (citations omitted); *see also Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir.1996) (when adjudicating motion to dismiss under Fed.R.Civ.P. 12(b)(6), the "issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims" (internal quotation marks and citations omitted)). When deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents attached to the complaint as exhibits or incorporated in it by reference. *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir.1993). All reasonable inferences are to be drawn in the plaintiff's favor, which often makes it "difficult to resolve [certain questions] as a matter of law." *In re Independent Energy Holdings PLC*, 154 F.Supp.2d 741, 748 (S.D.N.Y.2001).

B. *Civil RICO*

Plaintiff's RICO claim, the only federal claim and therefore the basis of federal jurisdiction for the case, is based on 18 U.S.C. § 1962(c), which makes it unlawful for "any person employed by or associated with any [interstate] enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity," and 18 U.S.C. § 1962(d), which penalizes conspiracy to violate, inter alia, § 1962(c).

*6 In order to state a substantive cause of action under § 1962(c), the plaintiff must allege that a defendant engaged in "(1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity" (5) resulting in (6) injury to business or property. *Anatian v. Coutts Bank (Switzerland) Ltd.*, 193 F.3d 85, 89 (2d Cir.1999), quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).

A RICO "enterprise" can be "any individual, partnership, corporation, association, or other legal entity, [or] any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The enterprise cannot, however, be the very defendant that is itself charged with being the "person ... associated with" and "participat[ing] in the conduct of" the enterprise; that is, the enterprise must be distinct from each of the "persons" conducting it. *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 343-44 (2d Cir.1994). Here, plaintiffs allege an "association in fact" consisting of Themeware, Cardservice, OX, ECX, and MFI/Leasecomm.

The "pattern of racketeering activity" must consist of at least two "predicate acts" of racketeering activity within ten years, § 1961(5), where the "acts" are certain violations of state or federal law as set forth in § 1961(1). Plaintiffs here allege predicate acts consisting of wire fraud, 18 U.S.C. § 1343, mail fraud, 18 U.S.C. § 1341, and violations of the Hobbs Act, 18 U.S.C. § 1951. (¶¶ 325-332.)

In order to demonstrate that defendants "conduct[ed] or participate[d], directly or indirectly, in the conduct of" an enterprise, plaintiffs must allege more than mere participation in the enterprise, since to "conduct" the affairs of an enterprise "one must have some part in directing those affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). Plaintiffs must therefore allege facts indicating that each defendant participated in the management of the enterprise. *Id.* The plaintiff must allege facts supporting an inference that each defendant "was aware of the general nature of the conspiracy and that the conspiracy extended beyond the defendant's individual role." *United States v. Zichettello*, 208 F.3d 72, 100 (2d Cir.2000) (quoting trial court's jury instructions). In other words, the general structure of the conspiracy alleged must suggest that the alleged participant "knew what the other conspirators 'were up to' or [that] the situation would logically lead an alleged conspirator 'to suspect he was part of a larger enterprise.' " *Id.* at 99, quoting *United States v. Viola*, 35 F.3d 37, 44-45 (2d Cir.1994).

Courts in this district, in agreement with the holdings of several Courts of Appeals, have carefully scrutinized civil RICO claims at the dismissal stage, since the statute was "enacted expressly, as set forth

Not Reported in F.Supp.2d                                                                                                                Page 6
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
(Cite as: Not Reported in F.Supp.2d)

in the preamble to the Act, 'to seek the eradication of organized crime in the United States" ' and therefore "mere assertion of a RICO claim ... has an almost inevitable stigmatizing effect on those named as defendants." *Katzman v. Victoria's Secret Catalogue,* 167 F.R.D. 649, 654-55 (S.D.N.Y.1996) (quoting *Figueroa Ruiz v. Alegria,* 896 F.2d 645, 650 (1st Cir.1990)); *see also Goldfine v. Sichenzia,* 118 F.Supp.2d 392, 397 (S.D.N.Y.2000) (stating that "[t]his Court looks with particular scrutiny at Civil RICO claims to ensure that the Statute is used for the purposes intended by Congress" and dismissing RICO claim); *Schmidt v. Fleet Bank,* 16 F.Supp.2d 340, 346-49 (S.D.N.Y.1998) (citing *Katzman* and dismissing RICO claims).

II. Plaintiffs' RICO Claims

*7 In dismissing plaintiffs' first Complaint, this Court remarked upon the complexity and abstraction of the RICO statute, noting that these characteristics "render[ed] it difficult for plaintiffs to plead the elements of a cause of action with clarity and concision." *Zito I* at *5. The Court further noted that "the broad-brush, imprecise approach to pleading exemplified by this complaint challenges the defendants' ability to understand what they are being sued for, the Court's ability to understand the plaintiffs' theories, and the plaintiffs' ability to survive judicial scrutiny that may misperceive the plaintiffs' true intentions." *Id.* at *6. While the plaintiffs' Amended Complaint is still far from a model of clarity, they have sufficiently cured the primary defects previously identified by the Court. Although the Amended Complaint does not materially alter plaintiffs' central allegations, it does "spell out more clearly the nature of the enterprise alleged, the specific predicate acts that constitute the pattern of racketeering, and the persons who are alleged to have committed each of those predicate acts." *Id.* The Amended Complaint therefore survives the instant motions to dismiss.

Although defendants filed their motions to dismiss separately, there is significant overlap in the arguments they have presented. For example, defendants have focused on the sufficiency of a few elements of plaintiffs' RICO claims, namely whether plaintiffs have alleged an enterprise, whether they have attributed predicate acts to each defendant, whether such acts are sufficient to constitute a "pattern" of racketeering activity, and whether they have sufficiently alleged that each defendant "conducted" the enterprise. FN2 Thus, before addressing the sufficiency of plaintiffs' specific allegations with respect to each defendant, a few general observations are in order.

> FN2. *Zito I* held that plaintiffs had adequately alleged injury and causation, and defendants do not renew their challenge to these elements. *See Zito I* at *18-*20.

A. *The Enterprise*

The Amended Complaint alleges that an enterprise existed consisting of MFI/Leasecomm and its dealers, namely ECX, Cardservice, and OX. FN3 As this Court noted in addressing plaintiffs' previous complaint, in construing the concept of an "association in fact," courts have attempted to balance the realities of the sometimes amorphous structure of criminal associations with the risk that the statute might be improperly employed to "str[ing] together" predicate acts by unconnected defendants. *Zito I* at *7, citing *Nasik Breeding & Research Farm Ltd. v. Merck & Co.,* 165 F.Supp.2d 514, 539 (S.D.N.Y.2001). The hallmarks of an "association in fact" enterprise are that the group of alleged malefactors must be "associated together for a common purpose of engaging in a course of conduct," and must show "evidence of an ongoing organization, formal or informal, and ... evidence that the various associates function as a continuing unit." *United States v. Turkette,* 452 U.S. 576, 583 (1981). While the question of whether a group of individuals or corporations exhibit such organization and common purpose is ordinarily one of fact, the complaint must allege facts that permit an inference that such an association exists.

> FN3. In *Zito I,* the Court expressed doubt as to whether plaintiff could plead a violation of RICO based on an enterprise consisting of MFI/Leasecomm itself. *See Zito I* at *6. Plaintiffs have apparently abandoned reliance on any such theory, focusing instead on clarifying the structure of the broader alleged enterprise.

*8 In the Amended Complaint, plaintiffs have alleged a hierarchical "hub and spoke" type structure, whereby Leasecomm carefully vetted and supervised its dealers, each of which .. obtained customers for Leasecomm "through heavy-handed, high-powered mass marketing" (¶¶ 50-52, 61), that these dealers in turn joined in the goal of the enterprise "to obtain

money from the purchasers of the Leasecomm contracts ... through trick, deceit, chicane and overreaching" (¶ 71), and that they "were aware that [their] products were being sold through fraudulent marketing practices and that [Leasecomm's] contracts were unconscionable, unfair and deceptive." (¶ 82.) They further allege that this scheme lasted "for a period beginning no later than 1998 and continuing until October 2002." (¶ 83.)

Cardservice and ECX once again challenge the sufficiency of plaintiffs' pleadings, arguing not only that plaintiffs have failed to specify their participation in the enterprise, but also that they have failed to allege that an enterprise existed at all. In support of their position, they argue that: (1) plaintiffs have insufficiently spelled out "the continuity, structure, organization, or personnel of this group" (Cardservice Mem. 15; *see also* ECX Mem. 12), (2) plaintiffs have not alleged facts "indicat[ing] that Themeware and Cardservice, on the one hand, had any involvement in or ever communicated with OX or ECX, on the other hand" (Cardservice Mem. 15), and (3) "business competition between ECX and Cardservice clouds the existence of any 'common purpose' allegedly shared by the participants in the alleged Master Scheme" (ECX Mem. 12).

With respect to the first argument, the Court specifically found in its prior opinion that plaintiffs had adequately alleged that an enterprise existed for purposes of asserting a RICO violation. Specifically, the Court found that the original complaint had adequately alleged "that MFI/Leasecomm's primary customers were marketers of dubious products by fraudulent means, and that the supposedly independent businesses defendants reference in their argument functioned as an integrated system for fleecing the unwary." *Zito I* at *7. What remained to be more clearly alleged was the role of each defendant in that enterprise. The Amended Complaint describes in detail the structure of the enterprise alleged, in which Leasecomm chose and supervised dealers who were known to prey on vulnerable consumers with poor credit ratings, and in which the dealers were aware of and misrepresented or concealed the unfair terms of Leasecomm contracts. It was Leasecomm's financing that permitted the dealers to continue marketing their deficient products, and that financing in turn depended upon the dealers' marketing efforts and Leasecomm's own collection activities. Each therefore had a stake in the success of the other. Plaintiffs have thus alleged facts sufficient to support a finding that the parties identified were "associated together for a common purpose," and have sufficiently outlined the structure, duration, and goals of that association.

*9 The argument that plaintiffs have not alleged interaction between Themeware/Cardservice and ECX and OX, or that ECX and Cardservice were in fact in competition, does not bear on whether or not an enterprise existed. As the Court noted in its prior opinion, "[i]t is commonplace in RICO enterprises for the members of the enterprise to engage in separate schemes or conspiracies, not all of which involve all of the participants in the enterprise." *Zito I* at *8, citing *United States v. Mauro*, 80 F.3d 73, 77 (2d Cir.1996) ; *United States v. Coonan*, 938 F.2d 1553, 1560-61 (2d Cir.1991). The question of whether an "association in fact" existed is distinct from that of what role each defendant played in it, or whether each defendant may be held liable under RICO for participating in it. Similarly, defendants cite no authority holding that competition among participants in an enterprise will negate the existence of that enterprise, and the Court sees no reason that it should.

The Amended Complaint, like the original one, alleges facts sufficient to support a finding that a unitary enterprise existed. Leasecomm is alleged to have centrally controlled the enterprise and supervised each of its dealers, and was therefore aware of each player and of the role each played in furthering its overall goals. Moreover, MFI/Leasecomm made no secret of its business plan, which involved recruiting various businesses like the other members of the alleged enterprise into strategic alliances that would generate the leases that its aggressive collection practices would make profitable. (*See* Am. Compl. Ex. D., collecting slides from conference presentation touting MFI's "persistent and innovative collection effort.") Thus, the other entities that became part of the enterprise were on notice that their arrangements with Leasecomm were not unique, but were part of a larger structure erected by MFI/Leasecomm. Accordingly, whether or not the individual dealers were aware of each other's identities or specific activities, the enterprise itself, an "association in fact" united by a common purpose and orchestrated by Leasecomm, is therefore properly alleged.

B. *Predicate Acts under § 1962(c)*

1. Mail and Wire Fraud

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
(Cite as: Not Reported in F.Supp.2d)

The Amended Complaint asserts as predicate acts wire fraud, 18 U.S.C. § 1343, and mail fraud, 18 U.S.C. § 1341, as well as violations of the Hobbs Act, 18 U.S.C. § 1951. FN4 Plaintiffs identify several mail and wire transmissions that they allege were used to further defendants' schemes. These include: (1) causing contracts to be sent to plaintiffs, (2) causing contracts to be returned to plaintiffs, (3) causing the Karn infomercial to be transmitted, (4) causing the OX video to be mailed to plaintiffs, (5) causing account statements to be mailed to plaintiffs, (6) causing automatic charges to be deducted from plaintiffs' bank accounts and credit cards, (7) causing "dunning calls" to be made to plaintiffs demanding payments. (¶¶ 248-324.)

> FN4. The Hobbs Act allegations will be discussed infra Part II.D.2.

*10 In order to allege a violation of the mail or wire fraud statutes, a plaintiff must allege the elements of the offense: "(i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate mail or wires." _United States v. Autuori_, 212 F.3d 105, 115 (2d Cir.2000). A scheme to defraud "has been described as a plan to deprive a person of something of value by trick, deceit, chicane or overreaching." _Id._, quoting _McNally v. United States_, 483 U.S. 350, 358 (1987), and _Hammerschmidt v. United States_, 265 U.S. 182, 188 (1924) (internal quotation marks omitted).

2. The "Schemes to Defraud"

As the Court held in _Zito I_, at least two of the "schemes" described by the plaintiffs constitute "schemes to defraud" under the wire fraud statutes. The first is, of course, the Master Scheme centering around the Leasecomm leases themselves, in which the participants employed deceptive marketing to lure consumers into purchasing ineffective products and then relied on aggressive collection tactics to enforce the contracts' unconscionable terms. The Amended Complaint spells out in more detail why the leases were unfair, as well as the false and deceptive practices associated with obtaining them. The second is the ITB scheme, marketed through the Karn infomercial, which falsely represented that the products in the Tool Box were suitable for businesses and would allow purchasers to process charges instantly over the internet, when in fact, it was suitable only for personal use and required the purchase of costly additional products in order to function as promised. See _Zito I_ at *14. Each of these represents a fraudulent scheme in and of itself.

None of the other "schemes" alleged by plaintiffs constitutes a fraudulent scheme in and of itself. Of these, the "Cardservice Telemarketing Scheme," the "Cardservice Seminar Scheme," and the "ECX Seminar Scheme" all essentially describe the same general allegations in different contexts: The various defendants associated with each scheme used high-pressure sales tactics to market defective products and push Leasecomm leases, and they lied about or misrepresented key terms of the contracts executing those leases. In each case, the complaint fails to specify the nature of the products associated with the "merchant accounts," or in what ways they were defective. Instead, the central fraud alleged is the marketing of the Leasecomm leases connected with the products. FN5 In truth, therefore, these "schemes" merely represent different contexts-e.g., cold-call telemarketing, business opportunity seminars-in which products financed by Leasecomm leases were sold.

> FN5. Plaintiffs point out that the "slick brochure" mailed in connection with certain of these schemes contained falsehoods stating that Cardservice was privately owned, when in fact it was a publicly traded corporation. (¶ 205-206.) This does not alter the analysis, as plaintiffs do not allege that this statement was in any way material to plaintiffs' decision to purchase the products in question.

The same is true of the "ECX/OX Scheme," although the Amended Complaint describes this scheme in more detail than it does the others. The central allegation of this scheme is that defendants ECX and OX promised purchasers of their products "risk free" access to high returns based on minimal effort, that they would have exclusive distributorships of these products and would receive commissions based on OX sales, and that they would benefit from training and marketing efforts by OX. However the Amended Complaint never states that these promises proved false in any way, or that plaintiffs were injured as a result. For example, plaintiffs do not allege that they did not achieve the promised profits, or that defendants failed to perform the promised marketing campaigns or training. In addition, it fails to specify the nature of the products in question, or in what ways they were defective. The allegations thus fundamentally fail to allege essential elements of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760  
(Cite as: Not Reported in F.Supp.2d)

fraud.

*11 This does not mean, however, as several defendants argue that it does, that plaintiffs' RICO claims must fail. Plaintiffs have designated these as "implementing schemes" for a reason: They served primarily as vehicles to accomplish the overall purposes of the Master Scheme. As such, they are more properly understood as a method of characterizing the role of each defendant in the overall enterprise, and what steps each took to further its goals. In outlining each of these marketing strategies and identifying which defendants were associated with each, plaintiffs have satisfied the Court's requirement that they state clearly "the fraudulent schemes any particular defendant is alleged to have participated in on behalf of the enterprise, and used the mails or wires to further." *Zito I* at *9. The fact that some of them do not serve as "schemes to defraud" in themselves does not detract from their value in setting forth the particular actions each defendant took to further the Master Scheme.

Defendants similarly argue that plaintiffs' claims must fail because the content of many of the mail and wire transmissions was not false in itself. Such falsity is not required. As the Court noted in *Zito I*, "merely proposing an unconscionable contract term is not a crime." *Id.* However, in order to plead a RICO claim based on mail or wire fraud, "[t]he telephone calls or mailings need not have contained misrepresentations themselves." *Miltland Raleigh-Durham v. Myers,* 807 F.Supp. 1025, 1056 (S.D.N.Y.1992), citing *Patrick Carter Assocs., Inc. v. Rent Stabilization Ass'n,* No. 89 Civ. 7716, 1990 WL 195993, at *3 (S.D.N.Y. Nov. 28, 1990); see also *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young,* No. 91 Civ. 2923, 1994 WL 88129, at *9 (S.D.N.Y. Mar. 15, 1994) ("Even mailings that are innocent on their face may be in furtherance of a fraudulent scheme in violation of mail or wire fraud statutes because it is clear that [t]he mailings themselves need not contain misrepresentations." (internal quotation marks omitted)). Rather, plaintiffs must merely assert that the use of the mails or the wires was accomplished "in furtherance of" the scheme alleged, which was itself fraudulent. *Myers,* 807 F.Supp. at 1056. In other words, it is the fraudulence of the scheme itself, not any individual falsehood in any particular mail or wire communication, that must be alleged.

As established above, some of the mailings and wire communications did contain falsehoods-for example, the Karn infomercial used to promote the Internet Tool Box, and the telemarketing calls. However, even those that did not, when viewed in context, clearly served to further the overall scheme to defraud. For example, the mailings of the contracts were followed by telephone calls including high-pressure sales pitches; the terms of the contracts were misrepresented, in the case of the option to cancel, or concealed, in the case of the various unfair terms; plaintiffs were urged to return the contracts with key terms left blank; plaintiffs' signatures were forged or witnesses falsely sworn. The mailing of these documents took place in concert with defendants' overall modus operandi, and can therefore fairly be said to have been conducted "in furtherance of" the overall fraud. Similarly, the deduction of moneys or entry of charges from bank accounts and credit cards, while permitted under the contract due to plaintiffs' default and therefore not false per se, were effectuated with the overall goal of fleecing plaintiffs and with defendants' knowledge of the circumstances that led to the defaults.

3. Requirements of Rule 9(b)

*12 Defendants have further argued that plaintiffs have failed to meet the requirements of Rule 9(b) that "claims based upon fraud, including claims of wire or mail fraud as predicate acts to a RICO claim, must be pleaded with particularity. Fed.R.Civ.P. 9(b)." *Zito I* at *13. This normally requires the complaint to specify the time and place of a fraudulent representation, as well as who made the representation. *Ouaknine v. MacFarlane,* 897 F.2d 75, 79 (2d Cir.1990). However, as noted in *Zito I*, where the complaint describes the "nature and operation of the scheme in which the defendants are alleged to have participated," this requirement may be relaxed. *Zito I* at *28 (quoting *Beth Israel Medical Center v. Smith,* 576 F.Supp. 1061, 1070-71 (S.D.N.Y.1983) (finding that "[i]n view of the complaint's detailed description of the defendants' scheme ... the failure to describe particular letters or telephone calls is not fatal to the complaint")); see also *Center Cadillac, Inc. v. Bank Leumi Trust Co. of New York,* 808 F.Supp. 213, 229 (S.D.N.Y.1992) ("[T]he complaint need not specify the time, place and content of each mail communication where the nature and mechanics of the underlying scheme is sufficiently detailed."). By detailing the various marketing methods each defendant used to push Leasecomm contracts on unsuspecting customers, and by alleging that use of mail and wire communications were central to these methods, plaintiffs have thus generally demonstrated the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                  Page 10
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
(Cite as: Not Reported in F.Supp.2d)

mechanics of the fraudulent scheme and "what the alleged fraud consists of specifically." *Beth Israel,* 576 F.Supp. at 1071, (quoting *Segal v. Gordon,* 467 F.2d 602, 607 (2d Cir.1972)). Their careful enumeration of the defendants' various "schemes" therefore serves to satisfy the requirements of Rule 9(b).

In addition, several defendants have raised the argument that plaintiffs have failed to specify which individuals actually made the telephone calls or sent the letters in question. While it is true that the Court exhorted the plaintiffs in *Zito I* to specify which defendant was responsible for the various predicate acts alleged, to require plaintiffs to describe an enterprise of this scale with the level of specificity demanded by defendants would be pointless. It is neither necessary nor in most cases would it be possible for plaintiffs to include in their pleadings minutia such as the names of the individual telemarketers who made the alleged "dunning calls," the total number of such calls, or the specific dates and times of the calls, as it is precisely this type of information that "lies peculiarly within the opposing parties' knowledge." *Ouaknine v. MacFarlane,* 897 F.2d 75, 81 (2d Cir.1990). "A defendant accused of mail or wire fraud need not be the one who sent the mailing or placed the call. He need only have reasonably foreseen that a third-party would use the mails or interstate wires in the ordinary course of business as a result of defendant's acts." *Am. Arbitration Ass'n v. DeFonseca,* No. 93 Civ. 2424, 1996 WL 363128, at *9 (S.D.N.Y. June 28, 1996). As plaintiffs aptly put it, so long as they properly allege which defendant entity was responsible for causing the alleged communications to be made, "it was not necessary for [the defendant in question] to stuff the envelopes, lick the stamps or drop the mail off at the post office" in order to be held liable. (P. Opp. to Burtzloff Mot. 6.)

### C. *Pattern of Activity*

*13 As discussed at length in *Zito I,* in order to establish a pattern of racketeering activity, plaintiffs must allege that a defendant's predicate acts "themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity." *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 241 (1989). This may be demonstrated by "proving a series of related predicates extending over a substantial period of time," or showing the threat of such continuing activity based on predicates proved. *Id.* at 242. In such cases, where the enterprise is otherwise a legitimate business (as opposed to a strictly criminal enterprise), plaintiffs may satisfy the continuity requirement by showing that these predicates "were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." *Cofacredit, S.A. v. Windsor Plumbing Supply Co.,* 187 F.3d 229, 243 (2d Cir.1999). Although continuity is usually based primarily on the duration of time the predicate acts are alleged to have occurred, "other factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant." *Id.* at 242.

Various defendants claim that the Amended Complaint does not allege the requisite "pattern" of racketeering activity to satisfy the continuity requirement, both because it fails to specify the precise number of racketeering acts, and because the time-period in which the acts were committed is too short. The latter argument was addressed in *Zito I,* which found that there was no bright-line rule setting a floor for the duration that must be specified in order to constitute a "substantial period." Plaintiffs have in most cases alleged a time-frame of at least five years, in many cases continuing to date. (¶¶ 251, 260, 289, 303, 318.) However, their allegations vary; whether a pattern has been adequately alleged against each defendant must therefore be analyzed according to the acts attributed to each defendant.

As for the number of predicate acts alleged, plaintiffs repeatedly claim that this was "[a]t least two and as many as tens of thousands." This statement is repeated verbatim, without distinguishing among defendants or bothering to specify particular dates or times of the mail or wire communications. (¶¶ 251, 260, 289, 303, 318.) Defendants are correct that taken alone, these allegations are conclusory and would be insufficient to sustain a RICO claim under § 1962(c).

However, several factors mitigate this deficiency. First, as discussed in further detail below, the Amended Complaint elsewhere states with more particularity the nature of the activities conducted by each defendant in furtherance of the overall fraudulent scheme or schemes in which it is alleged to have participated. Second, plaintiffs have affixed to the Amended Complaint a sufficient number of exemplars of the communications in question, such as letters, account statements, and faxes, many of which are on the letterhead of various defendants, to indicate that defendants regularly relied on the mails and the wires in accomplishing the goals of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                       Page 11
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
**(Cite as: Not Reported in F.Supp.2d)**

alleged enterprise. (*See, e.g.*, Am. Compl. Ex. E, F, G, H, J.) Third, it is indisputable that the precise number of pieces of mail or telephone calls is the type of knowledge exclusively within the knowledge of the defendants, and thus difficult for plaintiff to estimate prior to discovery. Finally, the clear implication of the Amended Complaint is that the fraudulent schemes alleged were central to the business plans of the corporate defendants, particularly of MFI/Leasecomm, and constituted their regular means of doing business. Thus, to the extent that plaintiffs allege a sufficient number of predicate acts involving each defendant, the overall allegations of the complaint strongly support the idea that those acts constitute a "pattern."

### D. *Sufficiency of RICO § 1962(c) Claims Against Particular Defendants*

#### 1. Predicate Acts Common to All Defendants

\*14 Plaintiffs have organized their allegations of predicate acts into charts outlining which defendant committed which act, the duration and number of those acts, and the schemes they were intended to further. Defendants complain that plaintiffs indiscriminately charge all the defendants with identical predicate acts in furtherance of all of the schemes alleged. This is not exactly accurate: Although there is significant overlap, plaintiffs have charged certain defendants with different predicate acts that others are not associated with, that were allegedly committed in furtherance of "their respective implementing schemes." Moreover, plaintiffs are perfectly free to make the same allegations against multiple entities, so long as they have a good faith basis for doing so and their complaint adequately puts defendants on notice of which claims are being asserted against whom.

Plaintiffs list certain mail and wire transmissions allegedly conducted by each of the defendants, with the exception of Karn, in furtherance of the Master Scheme and their various implementing schemes: (a) mailing the Leasecomm contracts, (b) causing such contracts to be returned, and (c) directing the mailing of account statements. (¶ ¶ 248-263, 284-293.) Plaintiffs variously claim that defendants either caused these acts to be done or "controlled" their commission. (*Id.*)

These allegations make sense in light of the alleged structure of the Leasecomm enterprise, in which dealers sent out Leasecomm contracts and subjected plaintiffs to high-pressure sales tactics, either via telephone or in person, to get them to return the contracts by overnight mail to be executed. It is also only logical that the dealers providing the products at the point of sale would be involved in causing the mailing of account statements to the appropriate individuals. It is thus not improbable that each of the defendants in fact exercised some degree of control over the execution of these alleged acts. These acts are therefore sufficient to qualify as predicate acts by each of the defendants.

All defendants, again with the exception of Karn, are further alleged to have "participated in" and/or FN6 "conducted" acts of mail or wire fraud for procuring signatures on Leasecomm contracts, knowing that the contracts authorized the use of the mails or wires to (a) mail account statements, (b) deduct money from bank accounts and charge credit cards, and (c) make dunning calls. These allegations are also sufficient to constitute predicate acts. As the Second Circuit has held, "it is not significant for purposes of the mail fraud statute that a third-party, rather than the defendant, wrote and sent the letter at issue, providing ... the defendants could reasonably have foreseen that the third-party would use the mail in the ordinary course of business as a result of defendants' act." *U.S. v. Bortnovsky,* 879 F.2d 30, 36 (2d Cir.1989). The collection practices alleged were central to the Leasecomm enterprise and the fraudulent scheme it sought to further. These practices were clearly authorized by the contracts in question, and indeed, depended on the employment of mail and wire transmissions carried out "in the ordinary course of business." By causing the Leasecomm contracts to be executed, defendants should reasonably have foreseen that the use of mails and wires would result.

> FN6. The Amended Complaint has a repeated typo, stating that various defendants "participated in controlled" these acts. It is unclear whether this was intended to be "participated in [and] controlled" or "participated in [or] controlled."

#### 2. Leasecomm Defendants

\*15 In addition to alleging that the Leasecomm Defendants, along with the other defendants discussed above, controlled the mailing and return of the Leasecomm contracts and the mailing of account statements, plaintiffs further allege that the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.