Not Reported in F.Supp.2d                                                                                                Page 12
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
(Cite as: Not Reported in F.Supp.2d)

Leasecomm Defendants were responsible for (a) charging credit cards and withdrawing funds from bank accounts, (b) making dunning calls through Leasecomm agents, and (c) making extortionate demands in violation of the Hobbs Act.

At the outset, the Leasecomm Defendants raise the general argument that plaintiffs have failed to correct the deficiency noted by the Court in *Zito I* that plaintiffs had conflated Leasecomm with its parent company MFI. It is true that the Amended Complaint remains somewhat inconsistent as to which entity is designated. (*Compare, e.g.,* ¶¶ 296 & 298 (naming "Leasecomm") *with* ¶ 303 (naming "Leasecomm Defendants").) However, the Amended Complaint also describes more clearly the relationship between the two entities. (*See* ¶¶ 9-16.) The precise relationship of the parent to the subsidiary entity is a factual matter that need not be resolved now. As this Court noted in another case, under similar circumstances:

> [I]f plaintiffs do not have a good faith basis for their allegations, any defendant that is not promptly dismissed after putting plaintiffs on notice of their error may well be in a position to move for sanctions. Since all of the ... defendants are affiliates ... and since none of them have retained separate counsel or otherwise undergone unnecessary expense, the effort to sort out the proper defendants at this stage (which would in any event permit later amendment of the complaint based on evidence uncovered in discovery) seems inefficient.

*In re Global Crossing Secs. Litig.,* 313 F.Supp.2d 189, 213 (S.D.N.Y.2003). Moreover, as previously stated, plaintiffs are entitled to charge multiple defendants with the same acts. Given that plaintiffs' allegations are now sufficiently clear, their failure to distinguish in every case between these entities is not fatal at this stage of the litigation.

Turning first to the Hobbs Act claims, which are lodged only against the Leasecomm Defendants, FN7 the defense argues roughly as follows: Plaintiffs' Hobbs Act allegations are based on Leasecomm's collection practices; in order to state a claim for a Hobbs Act violation, plaintiffs must allege that defendants used threats in an attempt to obtain property to which they were not entitled; Leasecomm was entitled to collect the money sought on grounds that plaintiffs had breached their contracts; the basis for plaintiffs' claim that Leasecomm was not entitled to the money it sought to collect was that the contracts breached were unconscionable; because unconscionability can only be judged after the fact, it cannot be determined that defendants were not "entitled" to the property they sought to obtain.

> FN7. Plaintiffs' conspiracy claims under § 1962(d) based on Leasecomm's Hobbs Act violations are discussed infra Part II.D.2.

To the extent that plaintiffs' claim is based on a theory of objective unconscionability, defendants' argument is not without merit. However, plaintiffs have also alleged that the defendants *knew* of and actively concealed or misrepresented the unconscionable nature of the contract terms. This is a factual allegation, rather than a legal conclusion, and it must be taken as true on this motion. Indeed, although *Zito I* dismissed plaintiffs' Hobbs Act claims based on other deficiencies that have now been addressed, FN8 it also observed that if plaintiffs' allegations should prove correct, "Leasecomm would not have been 'entitled' to the monies it demanded, and may not even have had reason to believe that it was so entitled." *Zito I* at *12. Plaintiffs' Hobbs Act allegations are thus sufficient to serve as predicate acts for their RICO § 1962(c) claims.

> FN8. *Zito I* dismissed these claims on grounds that plaintiffs had failed to specify the use of extortion or allege an effect on interstate commerce, defects that defendants do not dispute have been cured in the Amended Complaint.

*16 As defendants correctly point out, plaintiffs have not demonstrated a factual basis to support their allegations that the Leasecomm Defendants actually participated in, caused or controlled each of the predicate acts that are attributed to them. For example, although plaintiffs allege that the Leasecomm Defendants committed predicate acts in mailing the Karn infomercial and the OX video, they name only Cardservice, Burtzloff, and Karn as responsible for the creation and transmission of the infomercial, and ECX and the OX defendants as responsible for the mailing of the video. But as established above, plaintiffs need not allege that the Leasecomm Defendants literally performed the predicate mailing or wire transmissions themselves, so long as these acts were foreseeable and intended to effectuate the fraudulent scheme. *Am. Arbitration Ass'n v. DeFonseca,* No. 93 Civ. 2424, 1996 WL 363128, at *9 (S.D.N.Y. June 28, 1996).

The Leasecomm Defendants' role in perpetrating

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK   Document 93-24   Filed 09/19/2005   Page 2 of 11

Not Reported in F.Supp.2d                                                                                        Page 13
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
(Cite as: Not Reported in F.Supp.2d)

these acts is, of course, relevant to the question of whether they "conducted" the enterprise. However, the proper focus of this inquiry is whether they are alleged to have managed the enterprise overall, not whether they controlled each particular predicate act. Plaintiffs have sufficiently made such an allegation against the Leasecomm Defendants. As stated in *Zito I,* "Leasecomm *is* alleged to have formulated the transactions, for the complaint charges that Leasecomm's leases were the linchpin of the schemes and Leasecomm determined both the content of those leases and the means by which they were enforced." *Id.* at *17. The Amended Complaint states that Leasecomm not only created and enforced these contracts, but also that it actively vetted and supervised its dealers and associates, with the knowledge that they made it a practice of preying on vulnerable consumers. (¶ ¶ 51, 61.) It is therefore "charged with constructing and executing an entire method of doing business" that enabled the fraudulent schemes that are the crux of the Amended Complaint. *Zito I* at *17.

As for the individual Leasecomm Defendants, plaintiffs have alleged that Bleyleben and MFI "controlled the enterprise" (¶ 70), that the Leasecomm Officers "supervised and controlled" the racketeering activities described (¶ 14), that Salvo was responsible for the dunning calls and the extortionate collection practices, and that Bleyleben was "upon information and belief ... the principal author of the [Leasecomm] contract." (¶ ¶ 88, 316, 325-332.) "[T]hese defendants have surely been alleged to have participated in the conduct of the affairs of the alleged enterprise ." *Zito I* at *18. Because plaintiffs have sufficiently alleged that the Leasecomm Defendants conducted an enterprise and engaged in a pattern of racketeering activity, the motion to dismiss by these defendants must be denied.

3. Cardservice and Burtzloff FN9

FN9. Karn is not alleged to have violated § 1962(c).

Plaintiffs have similarly stated an adequate RICO § 1962(c) claim against Burtzloff and Cardservice. In addition to the predicate acts discussed above (causing the mailing and return of Leasecomm contracts, the mailing of account statements, and the extortionate collection practices authorized by the Leasecomm contracts), plaintiffs have alleged that Burtzloff and Cardservice caused the transmission of the Karn infomercial, in furtherance of both the Master Scheme and the ITB scheme. Taken together, these acts are more than sufficient to establish a pattern of racketeering activity against both Burtzloff and Cardservice.

*17 As for "conduct of the enterprise," the role Cardservice is alleged to have played is central to both the Master Scheme and the ITB scheme. Cardservice is alleged to have orchestrated a widespread marketing campaign for Leasecomm contracts, involving telemarketing, direct mail, seminars, and infomercials. (¶ 152-166.) The Amended Complaint alleges that Burtzloff and Cardservice controlled the Leasecomm enterprise with Bleyleben, ECX, and MFI (¶ 70), that Burtzloff appeared in the Karn infomercial (¶ 190), and that "[a]t all pertinent times[,] Burtzloff[ ] supervised and controlled Cardservice's marketing and personally participated in the production of the infomercials and promotional mailings in which he appeared on behalf of Cardservice." (¶ 161.) These allegations are sufficient to suggest that Cardservice and Burtzloff "conducted" the enterprise through a pattern of racketeering activity.

Defendants argue that the Amended Complaint fails to state a claim against Cardservice and Burtzloff because it does not allege that the Cardservice dealers had any relationship with ECX or OX. This is not precisely accurate. Plaintiffs allege that "Bleyleben, Burtzloff, and [ ] ECX jointly directed a greatly expanded effort to market Leasecomm contracts as a financing vehicle for internet services." (¶ 48.) While this allegation is not directly supported by further, more concrete allegations of cooperation or knowledge of each other's roles, such an allegation is not necessary, as "there is no heightened pleading requirement for the 'conduct' element of a RICO claim." *Zito I* at *18. Plaintiffs allege that both Burtzloff and ECX knew about the fraudulence of the Leasecomm contracts and the extortionate collection practices that were their ultimate goal, and that Burtzloff played a central role in the management of all aspects of Cardservice's business. While they do not explicitly state that Cardservice otherwise interacted with the other participants in the enterprise, or that it knew that they existed, it can be inferred from Burtzloff's participation in "jointly direct[ing]" the effort to market Leasecomm contracts with Bleyleben and ECX that both ECX and Cardservice knew that the other was involved in furthering the Leasecomm enterprise.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 14
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
**(Cite as: Not Reported in F.Supp.2d)**

### 4. ECX and OX Defendants

In addition to the predicate acts alleged as to all of the defendants, ECX and the OX Defendants, Medtrack and Schneider, are alleged to have caused the mailing of the OX video. This is alleged to have occurred following the taping of the ECX/OX seminar video in January 2000 (¶ 230), and various of these activities are alleged to continue to date. OX employed non-defendant NESA as its agent to market ECX's services, principally ECX's merchant accounts including those promoted by the OX video. (¶ 299.)

As discussed above, the OX video "scheme" did not constitute a separate fraudulent scheme; rather, it was one of many techniques for marketing allegedly fraudulent Leasecomm contracts. Nonetheless, the many mailings of the video may be considered predicate acts in furtherance of the Master Scheme; furthermore, such mailings may be used to establish a "pattern" of racketeering activity, especially when considered in combination with the other predicate acts attributed to the defendants collectively. FN10

> FN10. The participation of OX is alleged in most cases to have occurred from 2000 to date, while the activities of ECX are alleged to have occurred from 1998 to date. (*See* ¶ 251, 260, 289, 303, 318.)

*18 On the issue of control of the enterprise, plaintiffs allege that ECX "jointly directed" the effort to market Leasecomm contracts with Bleyleben and Burtzloff (¶ 48), and that ECX and OX together controlled the marketing effort conducted in connection with the video (¶ 277). It is true that the allegations as to OX are thinner: Aside from these allegations, there is no allegation that the OX defendants otherwise conducted the activities of the Leasecomm enterprise. Nonetheless, the marketing efforts described were sufficiently detailed and complex, and were of a sufficient duration, to be considered a central part of the Master Scheme. The control of these efforts can therefore be said to constitute "conduct of the affairs of the enterprise." Plaintiffs have thus sufficiently pled a violation of § 1962(c) with respect to ECX and the OX Defendants.

### 5. Summary

Because plaintiffs have sufficiently pled each of the elements necessary to state a claim under RICO § 1962(c) against each of the defendants so charged, defendants' motion to dismiss on these grounds will be denied.

### E. *Conspiracy Allegations*

Plaintiffs have also included RICO allegations against each of the defendants, under § 1962(d), based on a "hub-and-spoke" theory of conspiracy. As the Supreme Court has observed, the precise line between a substantive RICO claim under § 1962(c) and one brought for conspiracy to violate RICO under § 1962(d) is often unclear: "[T]hough an 'enterprise' under § 1962(c) can exist with only one actor to conduct it, in most instances it will be conducted by more than one person or entity; and this in turn may make it somewhat difficult to determine just where the enterprise ends and the conspiracy begins, or, on the other hand, whether the two crimes are coincident in their factual circumstances." *Salinas v. United States*, 522 U.S. 52, 65 (1997). The difference in many cases will be that conspiracy may be easier to plead. As the Court stated in *Zito I*, "[i]t is possible to violate § 1962(d) by conspiring with others, even without committing or agreeing to commit any predicate acts oneself." *Zito I* at *13, citing *Salinas*, 522 U.S. at 52. In addition, a defendant may be guilty of conspiracy to violate RICO without a showing that s/he "conducted" the enterprise. *United States v. Zichettello*, 208 F.3d 72, 99 (2d Cir.2000). In order to be guilty of conspiracy under § 1962(d), plaintiffs must show that the conspirator "intend[ed] to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense." *Salinas*, 522 U.S. at 65. Although each conspirator need not explicitly enter an agreement with, or even know the identities of, the other conspirators, *see United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir.1990), the complaint must allege that each of the charged conspirators "had sufficient awareness of the existence of other members of the alleged conspiracy to render them part of the 'rim of the wheel to enclose the spokes." ' *United States v. Zabare*, 871 F.2d 282, 287-88 (2d Cir.1989) (quoting *Kotteakos v. United States*, 328 U.S. 750, 755 (1946)).

*19 As established above, plaintiffs have successfully alleged that an enterprise existed, and that each of the defendants charged with substantive RICO violations under § 1962(c) acted with knowledge of the Master Scheme and with the intention of furthering its goals. Plaintiffs have alleged that these predicate offenses constituted overt acts conducted with the intention of

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
(Cite as: Not Reported in F.Supp.2d)

Page 15

furthering the overall goals of the Master Scheme, and, in the case of the Karn infomercial, of the ITB scheme. They have further sufficiently alleged that the dealer defendants were aware enough of each other's involvement in the enterprise to know of its general contours. While the precise contours of each defendant's knowledge of the scope of the overall conspiracy has yet to be proven, plaintiffs have brought conspiracy allegations against each of the dealer defendants that are sufficient to withstand a motion to dismiss.

Finally, plaintiffs have brought a conspiracy claim against Cardservice, Burtzloff, and Karn for their agreement to perpetrate the ITB scheme through the transmission of the Karn infomercial and its use in marketing Cardservice products. This is, in fact, the only basis for their claim against Karn.

The Amended Complaint alleges that Karn, Burtzloff, and Cardservice joined in producing and marketing the Karn infomercial, knowing that it would be used as a tool to force consumers to purchase Cardservice products. (¶¶ 187, 272-273.) It alleges that Karn, motivated by his Themeware shares, knowingly made material misstatements in the infomercial, that he "joined ... in [its] production and broadcast," and that he caused it to be transmitted. (¶¶ 195, 272, 273, 266.) They allege that he did so knowing that "the purpose of the Karn infomercial was not to sell Internet Tool Boxes, but the services of Cardservice." (¶ 272; see also ¶¶ 185, 187.)

The Amended Complaint thus fairly alleges that Karn joined with Cardservice, Burtzloff, and Leasecomm in order to accomplish the unlawful goals of the ITB scheme. It does not, however, fairly allege that Karn entered into any agreement or relationship with Leasecomm, that he was aware of the Master Scheme or of the Leasecomm contracts, or that he knew of the participation of the other dealer defendants in the Master Scheme. Therefore, although he may be held liable on the theory that he conspired to participate in the ITB scheme, any similar theory based on his participation in the Master Scheme must fail. FN11 But Karn's agreement, as alleged in the Amended Complaint, to participate in the conduct of the enterprise through one of its schemes, which resulted in numerous predicate mailings, is sufficient to state a claim that he conspired to violate RICO.

FN11. In his defense, Karn has argued that he is a mere actor and that he played no role in authoring the false statements or directing the transmission of the infomercial. This may well prove to be the case, but for purposes of the present motion, consideration of these factual assertions is inappropriate. Plaintiffs' allegations must be accepted as true at present; whether or not the facts will bear them out must await discovery.

Plaintiffs have sufficiently alleged RICO violations under both subsections (c) and (d) of § 1962 against each of the moving defendants. Their motions to dismiss on these grounds will therefore be denied.

III. In Personam Jurisdiction

*20 In light of the finding that plaintiffs have adequately stated RICO claims against each of the defendants, the motions by defendants Karn, OX, and Schneider to dismiss for lack of jurisdiction will also be denied.

On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(2), the plaintiff bears the burden of establishing jurisdiction. *In re Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204, 206 (2d Cir.2003). Where the court relies on affidavits and pleadings, before any discovery has taken place, the plaintiff "need only make a *prima facie* showing of personal jurisdiction." *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 364-65 (2d Cir.1986). In establishing its *prima facie* case, the plaintiffs may rely on the complaint, affidavits, and other supporting materials, *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir.1981), and courts must "construe the pleadings and affidavits in plaintiff's favor at this early stage." *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir.1997); see also *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57 (2d Cir.1985) (allegations of jurisdictional fact must be construed in the light most favorable to the plaintiff).

Although plaintiffs' complaint was dismissed in *Zito I*, the Court stated in dictum that it would have jurisdiction over the Leasecomm Defendants under New York State's long-arm statute, N.Y. C .P.L.R. § 302, based on their transaction of business in New York State. *Zito I* at *22. It further found that the Court would have jurisdiction over the remaining defendants because jurisdiction properly lies over co-conspirators where there is jurisdiction over one of the conspirators. *Id.*, citing *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988). That

Case 7:04-cv-08223-KMK   Document 93-24   Filed 09/19/2005   Page 5 of 11

Not Reported in F.Supp.2d                                                                  Page 16
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
(Cite as: Not Reported in F.Supp.2d)

reasoning is adopted today as the holding of the Court.

However, an additional basis for jurisdiction also exists under another provision of RICO, 18 U.S.C. § 1965, which allows for nationwide personal jurisdiction so long as the judicial district in which the case is brought has minimum contacts with at least one defendant. FN12 See *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 71 (2d Cir.1998). Once a district court has jurisdiction over one of the defendants, it may exercise jurisdiction over " 'other parties' not residing in the district, who may be additional defendants of any kind, including co-defendants, third party defendants, or additional counter-claim defendants" where it is shown that "the 'ends of justice' so require." *Id.* This requirement may be met where "it would be impracticable to bring all co-defendants together in a single action because no district court could exercise personal jurisdiction over all of them." *National Asbestos Workers Medical Fund v. Philip Morris, Inc.*, 86 F.Supp.2d 137, 140 (E.D.N.Y.2000); *accord Daly v. Castro Llanes*, 30 F.Supp.2d 407, 413 (S.D.N.Y.1998); *see also Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935 (11th Cir.1997) (exercise of personal jurisdiction under RICO over large domestic banking corporations without significant contacts with forum state nevertheless constitutional, absent any showing by corporations that their ability to defend lawsuit would be compromised significantly if they were required to litigate in forum state).

> FN12. The statute provides in relevant part:
> (a) Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.
> (b) In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.
> 18 U.S.C. § 1965.

*21 Even if these individual defendants were correct that this Court would not have jurisdiction over them under New York Law, jurisdiction under RICO's nationwide jurisdiction statute would be appropriate in the present case. Defendants do not dispute that the Court has personal jurisdiction over at least *one* (if not more) of the defendants under New York's long-arm statute, based on the conduct of business activities in New York and their deriving substantial revenue from interstate commerce. *See* N.Y. C.P.L.R. § 302(a)(1), (3). Indeed, the Court has found that this was so with respect to the Leasecomm Defendants. *Zito I* at *22. In addition, the Amended Complaint alleges that "at all pertinent times, defendant ECX ... was authorized to do business in New York State" and that it "maintained offices for the transaction of business in New York [S]tate and transacted business in and solicited customers in New York State through said offices." (¶ 23.) The Court therefore has jurisdiction over ECX as well as the Leasecomm Defendants. Furthermore, there could be no guarantee that all of these defendants would have sufficient contacts with any one state such that jurisdiction would be proper in the absence of nationwide service of process; according to the Amended Complaint, defendants are variously connected to the states of Massachusetts, California, Delaware, New Jersey, and New York, with little overlap among them. (¶¶ 9, 17, 21, 25.) Nor have the defendants made any showing that they would be unduly compromised by litigating in this district. Accordingly, jurisdiction under § 1965 is in the interests of justice here.

### IV. State Law Claims

Plaintiffs bring claims under state law against "all defendants, jointly and severally," for common law fraud and violations of the Unfair and Deceptive Practices Acts ("UADPA") "of the several states" against the OX defendants, ECX, and Leasecomm for violation of laws regulating franchise offerings, and against all defendants except Karn for intentional and negligent infliction of emotional distress. Defendants respectively move to dismiss on the primary argument that plaintiffs' failure to state a claim under RICO requires the dismissal of their pendant state law claims, an argument that is mooted by the Court's holding that plaintiffs' RICO claims survive. In the alternative, defendants argue that plaintiffs' various state law counts fail to state a claim. The defendants' motions will be granted as to the claims of negligent infliction of emotional distress, granted in part as to the claims of intentional infliction of emotional distress, and denied in all other respects.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 17
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
(Cite as: Not Reported in F.Supp.2d)

### A. *Choice of Law*

In *Zito I*, the Court adopted Leaasecomm's unopposed argument that Massachusetts law applied to plaintiffs' state law claims under the choice of law provision in Leasecomm contracts. Plaintiffs have since explicitly agreed that Massachusetts law applies to their claims. (P. Mem. Supp. Mot. to Amend 2.) Notwithstanding this, defendant ECX argues, with little support or explanation of its reasoning, that the Court should apply the separate law of the states in which each of the individual defendants associated with each "scheme" is said to reside. The sole basis for their argument is a schedule attached to the complaint listing the names of the plaintiffs and their current places of residence. There is no representation that these addresses were the addresses of the plaintiffs at the time their injuries were said to occur. ECX has provided no convincing reason that the choice of law provision in the contracts should not govern the present case, in light of plaintiffs' lack of opposition to that provision. Accordingly, except where otherwise noted, the Court stands by its prior ruling and will apply Massachusetts law to plaintiffs' state law claims.

### B. *Unfair and Deceptive Practices Act and Common Law Fraud*

*22 Section 11 of the Massachusetts Unfair and Deceptive Practices Act (UADPA) grants a private right of action to persons engaged in business that are injured as a result of unfair or deceptive business practices. Mass. Gen. Laws ch. 93A § 11. Defendants argue that plaintiffs have failed to allege any unfair or deceptive statements or practices. The Court has held above that the Amended Complaint alleges that each of the defendants made false or misleading statements in connection with their marketing of Leasecomm contracts, and that Burtzloff, Cardservice, and Karn made false and misleading statements in connection with their marketing of the Internet Tool Box. (*See* ¶¶ 187, 189, 208, 222, 235, 240). This argument thus fails. FN13

FN13. ECX's argument that plaintiffs' UADPA claim fails because "the exercise of contractual rights is not an unfair practice" is without merit. Plaintiffs base their argument not on the exercise of "rights" under the contracts (which, in any event, they claim are unconscionable) but on the misrepresentations that caused them to enter the contracts in the first place.

In order to state a claim for common law fraud under Massachusetts law, a plaintiff must allege "(1) the defendant made a misrepresentation of fact; (2) it was made with the intention to induce another to act upon it; (3) it was made with the knowledge of its untruth; (4) it was intended that it be acted upon, and that it was in fact acted upon; and (5) damage directly resulted therefrom." *Equipment & Systems For Indus., Inc. v. Northmeadows Const. Co.,* 798 N.E.2d 571, 574 (Mass.App.Ct.2003). The Court's findings above similarly establish that plaintiffs have successfully alleged all of the elements of this claim with respect to each of the defendants, and that their allegations are sufficient to meet the requirements of Rule 9(b); it need not rehash these findings here.

### C. *Unlawful Franchise*

Plaintiffs bring claims against ECX, OX, and Leasecomm for violations of the regulations governing the offering of franchises. Applying the New York definition of a "franchise," FN14 *Zito I* found that the description in the original complaint of the ECX/OX video scheme would meet that definition. FN15 Notwithstanding this finding, ECX renews its arguments that plaintiffs have not properly alleged that a franchise relationship existed between ECX, OX, and Leasecomm and their customers. They further argue that because the video did not contain falsehoods, they are not liable under this provision.

FN14. The Court applied New York law based on plaintiffs' having singled out New York franchise law in the original complaint and based on the theory that "New York's statute is considered 'the broadest and most plaintiff-friendly in the nation'" *Zito I* at *25, citing David J. Kaufman, *The New York Franchise Act*, 823 PLI/Comm. 100, 205 (2001). The Amended Complaint similarly references New York Law. As noted below plaintiffs now appear to agree that Massachusetts law applies, but neither party adequately references Massachusetts law on this subject or argues that applying Massachusetts law would affect the analysis or the result.

FN15. The relevant provision defines a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                             Page 18
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
**(Cite as: Not Reported in F.Supp.2d)**

> "franchise" as:
> [A] contract or agreement, either expressed or implied, whether oral or written, between two or more persons by which:
> (a) A franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor, and the franchisee is required to pay, directly or indirectly, a franchise fee, or
> (b) A franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate, and the franchisee is required to pay, directly or indirectly, a franchise fee.
> N.Y. Gen. Bus. L. § 681(3).

The latter argument is without merit. Plaintiffs' claim under this provision is based not on any falsehoods in the video, but on defendants' failure to comply with the applicable regulations governing franchises. As for their first argument, as the Court already ruled in *Zito I*:

> The ECX/OX scheme seems quite literally to fit within the statutory definition of a franchise. The defendants' decision to characterize the payments required of plaintiffs as a "lease" rather than a "franchise fee" cannot obscure the reality that, at least as alleged in the complaint, ECX and OX offered consumers a "business opportunity" to obtain "distributorships" of products apparently provided by ECX or OX, which would be supported by informercials created and transmitted by those companies.... In exchange, the customer would have to pay either a one-time fee or a monthly payment over a four-year period. These allegations adequately assert that the customers were being asked to enter an agreement in which they are "granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchiser, and the franchisee is required to pay, directly or indirectly, a franchise fee." N.Y. Gen. Bus. L. § 681(3)(a).

**\*23** *Zito I* at \*27 (internal citations omitted). Notwithstanding this holding, plaintiffs fail to specify any basis for proceeding on these claims. They offer no persuasive reason that New York law should apply, and although they agree in their briefing that Massachusetts law should apply to their claims generally, they point to no specific Massachusetts statute that defendants have violated. Plaintiffs refer to violations of the regulations implementing the Federal Trade Commission Act, 15 U.S.C. § 45, 16 C.F.R. § 436.1 *et seq.*, but not to any provision of that act, which expressly authorizes enforcement actions only by the FTC, that would permit a private right of action. It is thus entirely unclear on what ground plaintiffs' franchising claims might survive.

However, ECX has not moved to dismiss on this ground, and the grounds on which they have so moved are unavailing. Further inquiry into the viability of these claims must therefore await summary judgment.

### D. *Intentional and Negligent Infliction of Emotional Distress*

Plaintiffs again bring claims for intentional infliction of emotional distress ("IIED") against all defendants except Karn, based on the "dunning calls" committed by Leasecomm agents. Defendants move to dismiss, arguing that plaintiffs have failed adequately to allege the elements of this common law tort. *Zito I* dismissed plaintiffs' claims for intentional infliction of emotional distress ("IIED") on the ground that plaintiffs had failed to allege specific damages suffered by each individual plaintiff. In response, plaintiff has attached a schedule to the Amended Complaint listing the symptoms suffered by each plaintiff.

The elements of IIED under Massachusetts law are:
> (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct, (2) that the conduct was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community, (3) that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe and of a nature that no reasonable man could be expected to endure it.

*Agis v. Howard Johnson Co.*, 355 N.E.2d 315, 318-19 (Mass.1976) (internal citations and quotations omitted). Defendants' challenge is primarily to the sufficiency of the second element of this cause of action. The complaint alleges, however, that defendants conducted a campaign of harassment to intimidate Leasecomm's critics through infiltration of websites established by Leasecomm customers as

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 19
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
(Cite as: Not Reported in F.Supp.2d)

part of their efforts to expose Leasecomm's tactics. (¶ ¶ 140-147.) According to the Amended Complaint, defendants John and Eddy Roe used these websites to post misleading messages about the obligations of Leasecomm's customers, to launch personal attacks such as charges of "perversity including necrophilia" against Leasecomm critics, and to make "obnoxious and offensive" postings in the name of Leasecomm critics "in a deliberate attempt to damage [their] credibility and cause them embarrassment and ridicule." (¶ ¶ 142, 143, 144 & Ex. I.) Plaintiffs allege "on information and belief" that defendants MFI, Peter R. Von Bleyleben, Richard F. Latour, and Carol Salvo knew of these "poisonous postings." (¶ 147.) The complaint further alleges that, over and above harassment of Leasecomm critics, defendants' extreme collection tactics included calls to plaintiffs' parents and spouses, threatening harm such as imprisonment of plaintiffs if outstanding debts were not paid, and resulting in depression and anxiety to both plaintiffs and their loved ones. (¶ ¶ 380-382.) This conduct is so far beyond the bounds of what is acceptable in the normal course of business that, if proven, it would indeed meet the requirement above.

*24 Leasecomm brings a further challenge on the question of damages, arguing that in many cases, the allegations of resulting mental anguish are insufficiently serious, and that in the case of 155 of the plaintiffs, the Amended Complaint still fails to state that they suffered any damages at all. Certainly, those plaintiffs who failed to allege that they suffered any damages have failed to state a claim against the defendants. However, those plaintiffs who have alleged that they were damaged as a result of the Leasecomm's actions have alleged distress that is sufficiently severe to survive a motion to dismiss. Although some of these injuries claimed may turn out to be *de minimis*, the severity of the injuries suffered by each individual plaintiff primarily presents factual issues not properly addressed on a motion to dismiss. Plaintiffs have adequately stated the injuries they have suffered as a result of the alleged behavior, and that is all that is required of them.

ECX and Cardservice further argue that no claim exists for conspiracy to commit IIED, and that such claims cannot be shown based on an allegation of recklessness. On the latter question, the Massachusetts Court has held that such a claim may lie where the plaintiff shows "that the actor intended to inflict emotional distress or that he *knew or should have known* that emotional distress was the likely result of his conduct." *Agis,* 355 N.E.2d at 318 (emphasis added). Plaintiffs have fairly alleged that the dealer defendants knew of Leasecomm's extortionate collection practices; it can therefore be inferred that the dealers knew or should have known that such practices would likely result in mental anguish. For the same reason, it is irrelevant that plaintiffs characterize their claims against some defendants as based on a conspiracy theory. Even if certain defendants did not themselves commit the acts intended to inflict harm on plaintiffs, if those acts were committed by agents of the defendants, as part of a business plan or scheme that they agreed would encompass those acts, which defendants "knew or should have known" would generate emotional distress, those defendants may be liable for their agents' acts.

It should be noted that on a motion to dismiss, the Court must sustain the complaint when it is "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Thomas v. City of New York,* 143 F.3d 31, 36-37 (2d Cir.1998). That plaintiffs' allegations minimally suffice to meet this very favorable standard does not indicate that plaintiffs are likely to be able to establish the facts necessary to overcome the many obstacles to successfully prosecute these claims.

E. *Negligent Infliction of Emotional Distress*

Plaintiffs bring claims against each of the defendants, except Karn, for negligent infliction of emotional distress. Defendants move to dismiss, arguing that such claims require plaintiffs to allege, inter alia, "physical harm manifested by objective symptomatology." See *Payton v. Abbott Labs.,* 437 N.E.2d 171, 181 (Mass.1982). Indeed, Massachusetts courts have repeatedly rejected negligence claims based on emotional harm. *See, e.g. Gutierrez v. Mass. Bay Trans. Auth.,* 777 N.E.2d 552, 566-67 (Mass.2002) (clarifying and reaffirming physical injury element, noting that while the previous requirement of substantiation through expert medical testimony may have been relaxed, this merely expanded "the range of symptoms that may provide the type of objective evidence to prove *physical harm*" (emphasis added)); *Sullivan v. Boston Gas Co.,* 605 N.E.2d 805, 810 (Mass.1993) ("A successful negligent infliction of emotional distress claim must do more than allege 'mere upset, dismay, humiliation, grief, and anger." ' (citing *Corso v. Merrill,* 406 A.2d 300, 304 (N.H.1979) )); *Barthelmes v. Martineau,* No. 982378, 1999 WL 1319194, at *5 (Mass.Super.Ct. Apr. 27, 1999)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK   Document 93-24   Filed 09/19/2005   Page 9 of 11

Not Reported in F.Supp.2d                                                                                                  Page 20
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
(Cite as: Not Reported in F.Supp.2d)

(negligent infliction of emotional distress claim dismissed because no physical harm alleged); *Bowler v. Dep't of Soc. Servs.*, No. MICV 9700772, 1998 WL 1181675, at *3 (Mass.Super.Ct. Oct. 13, 1998) (same). Because plaintiffs have failed to allege physical symptoms sufficient to demonstrate "physical harm manifested by objective symptomatology," their claims for negligent infliction of emotional distress must be dismissed.

## V. Leave to Amend

*25 After the instant motions to dismiss were fully briefed, plaintiffs moved to once again amend their complaint to (1) add one named and various unnamed plaintiffs, (2) add First Data Corp. ("First Data") as a defendant, and (3) generally "amend and supplement their complaint." (P. Mem. in Supp. Mot. to Amend.) This latter request appears to encompass proposals variously to (a) reinstate their claims previously dismissed by the Court under Section 9 of the Massachusetts Unfair and Deceptive Practices Act (UADPA), Mass. Gen. L. Ch. 93A § 9; (b) allow them to claim damages under Massachusetts law for intentional infliction of emotional distress "both as a common law tort and as a part of the damages pursuant to certain statutory violations"; and (c) supplement both their pleading and their arguments against the pending motions to dismiss by introducing additional evidence.

"[L]eave [to amend] shall be freely given where justice so requires." Fed.R.Civ.P. 15(a). However, courts are free to deny such leave "[w]hen it appears that leave to amend is sought in anticipation of an adverse ruling on the original claims." *Pl. Inc. v. Quality Products, Inc.*, 907 F.Supp. 752, 764-65 (S.D.N.Y.1995) (citing *inter alia Ansam Assocs., Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442, 446 (2d Cir.1985) (denying leave to amend because "permitting the proposed amendment would have been especially prejudicial given the fact that ... [the defendant] had already filed a motion for summary judgment")). In addition, where it is apparent to the Court that amending the complaint would be futile, permission to amend should be denied. *Hunt v. Alliance North Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 728 (2d Cir.1998). A proposed amendment is futile if it would not withstand a Rule 12(b)(6) motion to dismiss. *Id.; see also Amaker v. Haponik*, 198 F.R.D. 386, 390-91 (S.D.N.Y.2000).

The Federal Rules require that a motion must "state with particularity the grounds therefore, and shall set forth the relief or order sought." Fed.R.Civ.P. 7(b). In order to meet the requirements of particularity in a motion to amend, "a complete copy of the proposed amended complaint must accompany the motion so that both the Court and opposing parties can understand the exact changes sought." *Smith v. Planas*, 151 F.R.D. 547, 550 (S.D.N.Y.1993). "Where the proposed amended complaint does not accompany the motion to amend, the Court may hold the motion in abeyance pending the filing of that proposed complaint, ... or the Court may deny the motion without prejudice." *Planas*, 151 F.R.D. at 550 (citations omitted).

Plaintiffs have failed to submit a copy of the proposed Second Amended Complaint, leaving the Court and the defendants to guess at the precise nature of the contemplated changes. Indeed, the instant motion to amend exemplifies the rationale for the requirement that motions to amend include a copy of the proposed amendments. Plaintiffs' memorandum of law in support of their motion to amend and the accompanying declaration of their attorney have done precious little to clarify the scope of the proposed amendments, representing instead a collection of disorganized legal arguments and factual assertions that are more often apparently directed at the pending motions to dismiss. Defendants have been forced to respond to all conceivable amendments that plaintiffs' papers might possibly suggest. In response to defendants' briefs, plaintiffs then disavowed any intention to amend in some of the ways attacked by defendants, and explicitly withdrew several of their earlier requests. This process, which incurred considerable expense to defendants, could have been avoided if plaintiffs had included a copy of the proposed amendments with their motion. Plaintiffs have thus failed to meet the particularity requirement for the instant motion.

*26 Because the majority of plaintiffs' proposed amendments, even given the most generous possible construction, are either improper or futile, the motion will be denied, with the exception of plaintiff's request to add Cindy Bugg as a plaintiff.

### A. Abandoned or Disavowed Requests

Plaintiffs initial motion made several vaguely defined requests which they have since apparently abandoned or disavowed. However, because the extent to which some of these requests have been preserved remains unclear in some cases, the Court will address each of them.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

### 1. Section 9 of the Massachusetts Unfair and Deceptive Practices Act

In response to plaintiffs' original request to reinstate their claims under Section 9 of the Massachusetts UADPA, defendants argued at length that this request (1) constituted an impermissible and untimely request for reconsideration, and (2) would be futile for several reasons, including that (a) this section of the statute does not apply to leases for business ventures, (b) plaintiffs offered no reason for their failure to submit the purported "demand letter" required by the statute in prior pleadings, given that it has been continuously in their possession, and (c) the demand letter fails to meet the requirements of the statute. In their reply, plaintiffs withdrew their UADPA request, purportedly because it would have been "duplicative" (P. Reply in Supp. Mot. to Amend 2), but in all likelihood because they recognized its futility in light of defendants' arguments. Although the issue is now moot, defendants would surely have prevailed; any renewed request along these lines will therefore not be taken in good faith.

### 2. Request to Amend and Supplement Complaint

Plaintiffs' have presented an ill-defined request to "amend and supplement" their complaint, presented in the form of a declaration by their attorney which they have attached a series of confusing submissions, many of which appear directed at supplementing their pleadings in an attempt to defeat the pending motions to dismiss. In response, defendants rightly argue that in considering the pending motions to dismiss, the Court should disregard plaintiffs' attempt to supplement their legal arguments and ignore factual matters outside the complaint. In their reply, plaintiffs concede that consideration by the Court for these purposes would be improper, and state that their submissions were directed solely at their motion to amend the complaint should the Court decide against them on the motions to dismiss. (*Id.*)

In their opposition to these pending motions to dismiss, plaintiffs already requested leave to amend should the Court find their pleading deficient. Their motion is thus duplicative, and their failure to incorporate any relevant allegation into their first Amended Complaint is unexplained. Moreover, this request represents the second time plaintiffs have sought leave to amend their complaint *after* pending motions to dismiss were already filed. (*See* Mot. to Amend, Doc. # 36, dated April 21, 2003, filed in connection with opposition to pending motions to dismiss.) Viewed together, these circumstances raise an inference that the newly proposed amendments were in fact direct responses to the arguments raised by defendants in the pending motions. Because such piecemeal pleading is impermissible, these submissions will be disregarded in their entirety, without prejudice to the introduction of relevant evidence at the appropriate time.

### 3. Amendments Related to Intentional Infliction of Emotional Distress

*27 Finally, in their papers supporting their motion to amend, plaintiffs make a further, lengthy argument related to their claims of intentional infliction of emotional distress, claiming vaguely that "damages for the intentional infliction of emotional distress can be recovered both as a common law tort and as part of the damages pursuant to certain statutory violations." (P. Mem. in Supp. Mot. to Amend 3.) They do not specify to which "statutory violations" they are referring, nor do they appear to request any particular relief from the Court in connection with this argument; instead, it appears to be aimed solely at supplementing the prior arguments made in opposition to defendants' pending motions to dismiss their state law claims. Defendants respond by arguing that damages for physical or emotional injury not recoverable under the RICO statute. Plaintiffs in turn concede this point in their reply, and do not include any further arguments on this front. (P. Reply in Supp. Mot. to Amend 2.) To the extent that plaintiffs seek to add any such damage claims in connection with RICO, their motion is denied with prejudice; to the extent that their arguments relate to the dismissal of their state law claims, these arguments are improper and will be disregarded.

### B. *Proposal to Add First Data Corp as a Defendant*

Plaintiffs seek to amend their complaint to add First Data Corp as a defendant under a theory of vicarious liability, based on a purported joint venture with Cardservice. In support of this proposed amendment, plaintiffs point to descriptions in SEC filings of Cardservice and First Data as participating in a "joint venture," as well as to a news article describing the partnership and the fact that First Data had a fifty percent ownership interest in Cardservice during the relevant time-period. (Klotz Dec. Exs. 10, 4.) As plaintiffs point out, as the parent corporation of

Not Reported in F.Supp.2d                                                        Page 22
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
(Cite as: Not Reported in F.Supp.2d)

Cardservice, there is little doubt that First Data has been on notice of the instant claims. (P. Mem. in Supp. Mot. to Amend 6.)

Defendants argue that the current Amended Complaint fails to make the allegations required to state a claim for vicarious liability on the part of First Data. This argument is misdirected. It is true that the current complaint does not state such a claim. However, plaintiffs do not stand on their existing complaint in seeking to state this claim, but rather seek to amend; presumably, any amended complaint would attempt to cure this deficiency. Nevertheless, because plaintiffs have not submitted a copy of the proposed amended complaint, the Court is unable to evaluate whether or not their proposed amendment would succeed in doing so. Plaintiffs do not explain their failure to submit a proposed amended complaint, nor do they describe the substance of any projected allegations concerning First Date's alleged participation in the wrongful acts alleged in the present complaint. Plaintiffs' haphazard approach to pleading cannot be condoned. Accordingly, plaintiffs' motion to add First Data as an additional defendant will be denied.

### C. Proposal to Add Plaintiffs

*28 Plaintiffs seek permission to amend the complaint to join additional plaintiffs, including one named individual, as well as additional and as-yet unnamed plaintiffs. In response to defendants' protest that plaintiffs' request amounts to an impermissible attempt to create an effective class-action without subscribing to the requirements of Rule 23 of the Federal Rules of Civil Procedure, plaintiffs now clarify that "what plaintiffs seek is the right to apply for additions of individuals within a set time frame determined by the Court." (P. Reply in Supp. Mot. to Amend 6.)

The Court will not, and indeed could not, deny any person the opportunity to join in the action as plaintiffs, provided they meet the requirements of Rule 20 of the Federal Rules; however, the Court will not grant plaintiffs blanket permission to add parties in the absence of an individualized finding that such joinder would be appropriate. With respect to the time-frame, joinder of additional parties is commonly allowed, pursuant to the standard case management plan promulgated by this Court and established by agreement of the parties, within a reasonable period after the close of discovery. Because no case management plan has yet been entered in this case in view of the pending motions to dismiss, the issue is not yet ripe. Now that these motions have been decided largely in plaintiffs' favor, the Court anticipates that the parties will confer prior to the next scheduling conference in order to establish a schedule on these matters that is agreeable to all parties. The Court's intervention on this issue should therefore not be necessary. Accordingly, plaintiff's motion to add unnamed and as yet unidentifiable plaintiffs at an unspecified future time is denied, without prejudice to any future application to join additional plaintiffs in accordance with the anticipated case management plan. However, the motion is granted with respect to the one named additional plaintiff, Cindy Bugg.

### CONCLUSION

Defendants' motions to dismiss plaintiffs' claims is denied, except to the extent that plaintiff's claims for negligent infliction of emotional distress are dismissed, and the claims for intentional infliction of emotional distress are dismissed as to those plaintiffs who have not alleged emotional distress damages. Plaintiffs' motion to amend is granted as to the addition of Cindy Bugg as a plaintiff, and denied in all other respects.

SO ORDERED.

S.D.N.Y.,2004.
Zito v. Leasecomm Corp.
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760

Briefs and Other Related Documents (Back to top)

• 1:02cv08074 (Docket) (Oct. 10, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.