DN: X05-CV-00-0180933 S                    : SUPERIOR COURT

STANLEY SHENKER &                          : COMPLEX LITIGATION
ASSOCIATES, INC.                             DOCKET AT STAMFORD

   V.

WORLD WRESTLING FEDERATION                 : OCTOBER 16, 2003
ENTERTAINMENT, INC.

### MEMORANDUM OF DECISION
### RE: MOTION FOR SANCTIONS

## I. INTRODUCTION

Throughout the course of this litigation, Plaintiff Stanley Shenker & Associates, Inc.

("SSAI"), has engaged in serious misconduct during the discovery process.

After more than two years of extensive discovery in this case, including four discovery

extensions, the production of more than 92,000 pages of documents, the taking of more than 25

depositions, and the filing of more than 150 motions, briefs and other pleadings, plaintiff, through

its president and sole owner Stanley Shenker ("Shenker"), now admits to having committed acts

throughout the course of this litigation that include deliberately concealing and/or otherwise refusing

to produce critical documents and repeatedly committing perjury during his deposition testimony.

**A.**  **Overview of the Record**

Shenker has now admitted a wide range of discovery abuses that include:

 (i)  giving perjured deposition testimony;
 (ii)  providing perjured interrogatory answers;
 (iii) fabricating evidence after instituting this action;
 (iv) facilitating the destruction of evidence after instituting this action;
 (v)  concealing evidence and
 (vi) conspiring with third parties to engage in other litigation misconduct.

Shenker testified in this action as SSAI's corporate designee. WWE began Shenker's

deposition on May 30, 2002. The deposition was continued on December 10 and 11, 2002, March

18 and 20, and April 1-2, 2003.

By his own admission, Shenker is a serial perjurer. See, e.g., Shenker's deposition, p. 714 ("When I was giving that [deposition] testimony . . . it was false."); p. 923 ("In . . .prior [deposition] testimony, I wasn't truthful and I left out by omission."); p. 924 ("I didn't tell the whole truth . . . [a]nd I knew at the time it was not the whole truth.") p. 1035 ("I wasn't telling the truth, the whole truth and nothing but the truth."); p. 1056 ("I [deliberately] mislead you."); p. 1531 ("Did I deliberately give you misinformation [in deposition testimony]? Yes.").

Shenker's perjured deposition testimony directly related to a multitude of issues at the heart of both WWE's defenses and its counterclaims. Specifically, for over two years WWE has maintained, as a defense to SSAI's claims and through affirmative counterclaims, that Shenker conspired with James Bell, WWE's former Senior Vice President of Licensing and Merchandising, to defraud WWE and its licensees of money, by: (i) improperly soliciting and splitting a series of kickbacks from at least one WWE licensee, Trinity Products ("Trinity"); and (ii) improperly treating licensing transactions not otherwise commissionable to SSAI as if such deals had been procured and negotiated by SSAI, and subsequently splitting the commissions wrongfully obtained by SSAI as a result.

For well over two years, Shenker consistently and vehemently denied these allegations. Consistent with these denials, Shenker testified throughout the first three days of his deposition that: (i) every payment Shenker made to Bell was for "developmental projects" unrelated to WWE; (ii) these payments amount to no more than $300,000 to $400,000; (iii) SSAI received payments from Trinity pursuant to a "separate oral consulting agreement" in which Bell was not involved; and (iv) Shenker had no ownership interest in any companies other than SSAI, Creative Craft Company and

2

a real estate venture co-owned with his daughter.

Apparently, unbeknownst to Shenker during the first three days of his deposition, SSAI had inadvertently produced to WWE on September 26, 2002, two authentic Bell Consulting invoices, which made clear that Shenker had willfully perjured himself in deposition testimony and interrogatory answers. After being confronted with one of those invoices on the third day of his deposition, Shenker sought to recant much of his prior testimony.

To that end, on March 3, 2003, Shenker served WWE with formal recantations (the "Recantations"), consisting of over 400 substantive changes to his deposition testimony. The recantations made clear that for months, Shenker had deliberately lied under oath. Throughout four days of post-Recantations deposition testimony, Shenker repeatedly admitted to having given deliberately false and misleading testimony.

1.    Shenker's perjured testimony regarding the nature and extent of payments to Bell and Bell Consulting.[1]

Through records produced by SSAI's accountant, WWE learned that both during and after the time Shenker was acting as WWE's exclusive licensing agent, Shenker made substantial payments to Bell, through Bell Consulting, LLC, a company owned and operated by Bell. Shenker repeatedly lied in deposition testimony about the nature and extent of those payments. Specifically, in response to questioning by counsel for WWE, Shenker consistently testified on May 30,

---

[1] The Court notes that its findings do not constitute findings regarding the merits of the underlying case but instead are findings regarding unrefuted admissions of misconduct during the discovery process. Accordingly, the basis for the Court's decision to grant the motion for sanctions is Shenker's own admissions of misconduct. Additionally, Shenker's affidavit filed October 2, 2003 addresses his alleged motives for lying under oath; specifically because Bell asked him to. Whether or not Bell asked him to lie may be relevant to the underlying merits of the case but is irrelevant to the question of whether plaintiff engaged in acts of discovery abuse.

December 10, and December 11, 2002, that every single payment to Bell was made in connection

with "developmental projects" totally unrelated to WWE in which Shenker would invest with Bell.

Shenker's deposition, pp. 46-53, 178-179, 226-227, 418-420, 432-434, 440-443, 455-456, 517-518,

522-523, 526-527, 530-532, 535-536, 542-543, 546, 548, 551-552, 560, 564, 565, 567, 569, 572-

573, 588-589, 605-606, 612, 620.  Shenker also testified that the amount of payments made to Bell

Consulting ranged between $300,000 and $400,000.  Shenker deposition, pp. 49-50.

　　After being confronted with an invoice that evidenced the true nature of his payments to Bell,

Shenker finally admitted in his Recantations and at his March 18 deposition, that rather than being

for "developmental projects," the Bell payments, as alleged in WWE's counterclaims, represented

a percentage of the commissions that Shenker received from WWE on certain WWE licenses, as

well as a percentage of payments that Shenker received directly from WWE licensees such as

Trinity.  Shenker's corrections pp. 1-3, 6, 8, 10, 22-23; Shenker's deposition pp. 1142-1154.

Shenker also admitted that he had deliberately lied under oath to WWE about the payments to Bell:

> Q.　　So that when you testified over the course of three days that
> the payments to Jim Bell were for developmental projects, is
> it fair to say that you knew at the time you were giving that
> testimony that it was false?
> A.　　I would have to say that when I was giving that testimony, it
> was not totally true, yes.
> Q.　　It was false, wasn't it?
> A.　　I would say it was - it was not true; it was false.
> Q.　　It was deliberately false, wasn't it?
> A.　　It was done to try to protect Jim and, therefore, it was also
> deliberately not - it was deliberately misleading, not true.

Shenker deposition, p. 714

　　Shenker also admitted in his Recantations that SSAI had paid Bell approximately $800,000,

twice the amount that Shenker originally had claimed.  Shenker correction p. 1.  As a result of

4

multiple compulsion orders obtained by WWE, additional records became available revealing that Bell actually had been paid in excess of $900,000. After being confronted with evidence of the additional payments to Bell, Shenker admitted to receipt of the additional $100,000. Shenker deposition, pp. 788-792, 1123-128. Shenker's false testimony regarding the nature and extent of payments to Bell clearly concerned a material matter because Shenker's "corrected" explanation constitutes an admission of the bulk of the core allegations comprising WWE's counterclaims and also relates to the claims contained in the operative Complaint.

2.    <u>Shenker's deliberately false and misleading testimony concerning invoices submitted to SSAI by Bell Consulting.</u>

In addition to providing perjured testimony about the nature and extent of SSAI's payments to Bell and Bell Consulting, Shenker also provided perjured testimony about the supporting documents for those payments. As a result of compulsion orders obtained by WWE, SSAI produced Bell Consulting invoices on July 16, 2002, that purported to reflect monies SSAI paid for expenses incurred by Bell with respect to the fictitious "developmental projects" Shenker allegedly had invested in with Bell. When questioned about these invoices, Shenker claimed that all invoices from Bell Consulting should have been "around the product development area." Shenker deposition, p. 612. In reality, however, the invoices SSAI produced were fabricated by Bell and Shenker solely for this litigation. Shenker deposition, pp. 709-710. The fabricated invoices listed phony "developmental projects"; the authentic invoices, on the other hand, listed the WWE licenses on which Shenker and Bell were splitting commissions. In the summer of 2001, during the course of the litigation, Shenker and Bell removed the authentic invoices from SSAI's files and substituted the fabricated invoices in their stead. Shenker deposition, p. 824-826.

5

During his December 11, 2002 deposition, Shenker was confronted with one of the authentic invoices. Shenker deposition, pp. 682-689. Shenker claimed not to recognize the invoice and testified that he had no idea why two invoices would reflect the same date, amount and check number. Shenker deposition, pp. 682-689.

Shenker admitted during his March 18, 2003 deposition that he would use the excuse of a failed memory to avoid disclosing the truth.

> Q.    Do you remember in your first three days of deposition using
>        "I don't remember" to evade disclosing the truth, Mr. Shenker?
> A.    I remember sometimes I didn't remember and sometimes I used it
>        not to remember.
> Q.    To be evasive; correct?
> A.    Yes.

Shenker deposition, p. 921

Based on the fact that Shenker now admits that he substituted fabricated invoices, the Court finds that Shenker knew that this testimony was false, and that the payments to Bell were in fact a split of commissions Shenker received from WWE.

3.    Shenker's deliberately false and misleading testimony regarding the Trinity Kickback Scheme.

WWE's counterclaims allege that the misconduct in which Shenker engaged while serving as WWE's exclusive licensing agent included wrongfully soliciting and/or demanding payments from WWE licensees. When questioned about these payments during the first day of his deposition, Shenker claimed that the payments were made in connection with a "separate oral consulting agreement" pursuant to which Shenker was to be paid two percent of any increase in Trinity's sales that resulted from Shenker's efforts. Shenker deposition, pp. 105-109. Shenker further testified that this agreement with Trinity had nothing to do with Bell, that there would be no reason for Bell to be

6

paid a percentage of Trinity's payments to Shenker, and that Shenker had not paid Bell any money in connection with Shenker's agreement with Trinity. Shenker deposition, pp. 112-113, 174-175. When counsel for WWE confronted Shenker with a check reflecting that ten days after receiving a payment from Trinity, SSAI paid Bell Consulting exactly one half, to the penny, of the amount received from Trinity, Shenker explained this away as "coincidence." Shenker deposition p. 177.

On January 16, 2003, SSAI deposed Trinity. Trinity's President, Robert Goetz, testified in detail regarding the scheme devised by Shenker, whereby Trinity would be granted an exclusive right to sell WWE-licensed products to Wal-Mart if Trinity would pay SSAI a commission of two percent of those sales. Goetz deposition, pp. 61-66. Shenker then recanted his prior testimony, and at his March 18, March 20 and April 2, 2003 depositions, Shenker admitted that: (i) he granted Trinity a secret exclusive right to sell WWE products to Wal-Mart in exchange for two percent of those sales; (ii) he sought to conceal his agreement with Trinity from WWE's counsel; (iii) Bell was a part of the arrangement; and (iv) it was not mere "coincidence" that SSAI issued checks to Bell in amounts equal to exactly one-half of Trinity's payments to SSAI; rather, Shenker agreed to split those payments with Bell. Shenker correction, sheet, pp. 3, 5; Shenker deposition, pp. 1697-1700. Shenker also admitted that he had lied and deliberately misled WWE regarding the Trinity arrangement:

> Q. First you denied any payment from Trinity; correct? That was your first position in this case?
> A. The first position I believe is I denied have payment [sic] from Trinity.
> ************
> Q. You did not tell the whole truth?
> A. I did not tell the whole truth.
> Q. You violated that branch of the oath deliberately, didn't you?
> A. I didn't tell the whole truth under those circumstances.

7

Q.    And you knew at the time you weren't?

A.    And I knew at the time it was not the whole truth.

Shenker deposition, pp. 923-924; see also Shenker correction sheet, p. 5, and Shenker

deposition, pp. 721-723, 1140-1142, 1163.

**B.    Shenker's deliberately false and misleading testimony regarding Stanfull Industrial Limited.**

Shenker also provided perjured testimony regarding companies in which he had an ownership

interest.  On May 30, 2002, Shenker testified that other than SSAI, Creative Craft, and a real estate

venture that he co-owned with his daughter, he had not owned any other companies, in whole or in

part, for the past decade.  Shenker deposition, pp. 19-21.  In his Recantations, however, Shenker

admitted that he also owned a Hong Kong-based company known as Stanfull Industrial Limited

("Stanfull").  Shenker correction sheet, p. 1.  Shenker subsequently admitted at his March 20, 2003

deposition that he made a deliberate and conscious decision to give perjured testimony regarding his

ownership of Stanfull:

Q.    And when I asked you in your first day of deposition whether
you owned any other corporations, you lied and said no;
correct?

A.    Back in May?

Q.    Yes.

A.    Yes. I mislead you.

Q.    And you did that deliberately; right?

A.    Yes, I did.

Q.    And you didn't want me to know about Stanfull, did you?

A.    That's correct.

Shenker deposition, p. 1056-59.

The reasons underlying Shenker's attempts to conceal his ownership of Stanfull are now

8

apparent. First, Shenker used Stanfull as a conduit to launder over $300,000 in payments to Bell,

Shenker deposition, pp. 1290-91. Second Shenker received hundreds of thousands of dollars in

payments from additional WWE licensees - Toy Island, Ringside and Jakks - through Stanfull.

Shenker deposition, pp. 888-889, 899-905, 920-921, 1046-1056. Shenker's perjurious failure to

disclose the existence of Stanfull obviously was part of his scheme to prevent WWE from

discovering the existence and scope of his conspiracy with Bell. Similarly, revealing the existence

of Stanfull would have led to the discovery of the significant, additional, improper payments Shenker

received from WWE licensees.

1.    Shenker's Admitted Production of Fabricated Documents and Participation in the
      Destruction and Concealment of Authentic Documents Responsive to WWE's
      Discovery Requests.

Shenker, as noted above, also conspired with Bell to conceal their fraudulent fee-splitting

arrangement by replacing the original Bell Consulting invoices in Shenker's files with phony

invoices created by Bell in order to give the appearance of propriety to the financial transactions

between them. Shenker deposition, pp. 706-718. Significantly, the original invoices that were

removed from Shenker's files revealed that Shenker was paying Bell fifty percent of the commission

payments that Shenker received in connection with numerous WWE licensees.

Shenker and Bell replaced the original invoices with fraudulent ones during the summer of

2001, before Shenker had produced a single document to WWE, but after the litigation had

commenced. Shenker deposition, p. 939; Shenker testified on March 18, 2003, that he went through

SSAI's files and gave the original, authentic invoices to Bell. Shenker deposition, pp. 706-718.

Shenker further testified that by doing so, he knew that those invoices would not resurface. Shenker

deposition, pp. 956-957. Bell then gave Shenker phony invoices to put in place of the originals.

9

Shenker testified that to ensure that the phony invoices appeared as authentic as possible, he duplicated on them his handwritten notes from the original invoices. Shenker deposition, pp. 961-965. When these tasks were completed, Shenker had a file that by all appearances indicated that the payments Shenker had made to Bell were for "developmental projects" unrelated to WWE. This is the story to which Shenker adhered throughout this litigation, until the filing of his Recantations in March 2003.

Shenker also facilitated the destruction of other critical evidence in the summer of 2001. Shenker testified that he removed from his files original signed letter agreements between SSAI and Bell, which set forth the details of their commission-splitting scheme. Shenker deposition, pp. 718-719, 813-822, 943-960. Shenker gave the letter agreements to Bell with the understanding that, like the invoices, the agreements would be destroyed. Those documents have also not surfaced in this litigation.

Shenker also testified that he and Bell agreed to give false testimony about the nature of the payments and the corresponding invoices, specifically that both men would testify that all payments from SSAI to Bell were for the so-called "developmental projects unrelated to WWE." Shenker deposition, p. 729.

2.    SSAI's Deliberately False and Misleading Responses to WWE's Interrogatories

Shenker's pattern of deception and denial also included the repeated filing of perjured interrogatory responses. Providing false, knowingly incomplete and/or misleading interrogatory answers constitutes perjury, as well as fraud on the opposing party and the court. Dotson v. Bravo, 202 F.R.D. 559, 566 (N.D. Ill. 2001); In re Amtrak Train Crash, 136 F. Supp. 2d 1251 (S.D. Ala. 2001). CF. Chiarappi v. Donovan, No. CV0105095895 2002 WL 31991913 (Conn. Super. Dec. 30,

10

2002). On November 26, 2001, WWE served SSAI with a set of unambiguous interrogatories seeking information regarding any payment that SSAI or Shenker ever requested or received from any WWE licensee. After initially objecting wholesale and refusing to answer the interrogatories, SSAI filed four separate sets of interrogatory responses over the course of the next thirteen months, each of which contained now admittedly perjured information.

In its first set of interrogatory responses, dated January 29, 2002, SSAI disclosed that it had received approximately $35,000 from Trinity, but asserted that the payment was made pursuant to a "separate oral consulting agreement." SSAI continued with this response in its First and Second Amended Responses dated May 28, 2002, and May 29, 2002, respectively. Those amendments resulted from SSAI's need to address a document that WWE had produced on March 17, 2002, that directly related Trinity's payment to SSAI to Trinity's contract with WWE. Specifically, this was a check from Trinity made payable to SSAI in the amount of $28,881.68, on which the words "WWF Royalty" were noted below Shenker's name. Trinity accidentally had sent this check to WWE rather than to SSAI's business address.

The story that SSAI concocted to address this critical piece of evidence relates to the World Wildlife Fund, an entity with which Shenker knew WWE was involved in litigation over the use of the initials "WWF." Tab 2, pp. 148-149. In its Amended Response, SSAI claimed that Goetz, Trinity's president, had asked Shenker for his assistance "in pursuing possible tee-shirt deals with various companies, other than WWFE, with which Mr. Shenker had contact," and that Shenker "believe[d] he contacted the World Wildlife fund [and others] on Mr. Goetz's behalf. The

11

amendments thus were tailored to make it appear as if the reference to "WWF Royalty" on the Trinity check was a reference to the World Wildlife Fund rather than to the World Wrestling Federation.

Shenker has now admitted in deposition testimony that the January 29, 2002 and May 29, 2002 verified interrogatory responses were false and that Trinity's payments to SSAI were not unrelated to WWE. Specifically, Shenker admitted that the Trinity payments were directly related to Trinity's contract with WWE, specifically representing two percent of Trinity's sales of WWE-licensed products to Wal-Mart. Shenker deposition, pp. 1693-1703.

On February 18, 2003, SSAI filed yet another set of amended interrogatory responses to address additional evidence that had come to light making clear that prior verified responses were false. On December 9, 2002, WWE produced Trinity accounting records that showed calculations being computed with respect to two percent of Trinity's sales to Wal-Mart; handwriting on a check stub produced by WWE indicated that payments to Shenker and SSAI represented two percent of Trinity's sales to Wal-Mart. Shenker's third amended interrogatory responses admitted that Shenker had spoken with Goetz about increasing Trinity's business with Wal-Mart, that Trinity was paying two percent on the increase, and that Shenker and Bell were to split the money paid by Trinity. Shenker claimed, however, that it was Bell who arranged the deal between Shenker and Trinity.

On April, 2, 2003, Shenker admitted that he, not Bell, made the arrangement with Goetz, that Shenker granted Trinity a secret exclusive right to sell WWE-licensed products to Wal-Mart, and that in exchange for that right, Trinity paid SSAI and Shenker two percent of those sales.

3.     SSAI's deliberately false and misleading responses relating to additional licensees: Toy Island, Jakks, and Ringside Supplies.

12

SSAI failed to disclose in its January 29, 2002 First Responses, May 28, 2002 First Amended Responses, and May 29, 2002 Second Amended Responses, that Shenker, and/or companies owned by Shenker, had received payments from any WWE licensee other than Trinity. When confronted with the fact that WWE was aware, through Bell's deposition testimony, that Shenker had received a payment from WWE-licensee Jakks Pacific Inc., SSAI filed a third set of amended interrogatory responses to account for this payment. SSAI admitted in those responses that JAKKS had paid Shenker a $40,000 commission for "broker[ing]" a deal in which another WWE licensee, Playmates, sold its inventory and equipment to Jakks. On March 20, 2003, Shenker admitted that he received payments from at least two other WWE licensees, Toy Island and Ringside Supplies, and that those payments were directly related to the licensees' contracts with WWE.

Given the subject matter and the scope of false testimony by Stanley Shenker, the court finds that the plaintiff deliberately and repeatedly committed perjury and a fraud upon this court.[2] The Court further finds that this misconduct resulted in significant delays in the litigation process, expenditure of significant expense to uncover the truth, and a deliberate disregard for the integrity of the civil justice system.[3]

---

[2] There has been absolutely no evidence presented and the Court does not believe that counsel for the plaintiff had any knowledge of the fraud upon the Court being perpetrated by their client. In fact, Shenker states twice in his affidavit that counsel had no knowledge of his misconduct.

[3] Plaintiff originally argued that the motion for sanctions should be denied because it has not had an opportunity to cross-examine Shenker because defendant chose not to continue his deposition. Plaintiff has known since March 10, 2003 that fact discovery was to be completed by August 31, 2003. Shenker is the corporate designee, president and sole owner of the plaintiff. Plaintiff therefore, could have simply submitted an affidavit of Shenker to correct any factual inaccuracies that were not addressed in the deposition. The Court provided plaintiff with an opportunity to submit an affidavit and Shenker has now done so. Counsel for plaintiff has now conceded on the record that there are no factual disputes regarding the discovery abuses and has withdrawn its objection to the use of Shenker's deposition for this motion only. Plaintiff also argues it did not get an opportunity to examine James Bell. With regard to Bell, plaintiff was given the opportunity to cross-examine Bell and Bell chose to exercise his fifth amendment rights. The

13

## DISCUSSION

It is a long and well-established principle, both in Connecticut courts and in state and federal courts throughout the country, that where a litigant's conduct abuses the judicial process, whether through flagrant discovery violations or through other serious litigation misconduct, dismissal is an appropriate sanction. See generally Nat's Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639 (1976) (dismissal sanction "must be available . . .not merely to penalize. . ., but to deter those who might be tempted to such conduct in the absence of such a deterrent"); Aoude v Mobile Oil Corp., 892 F.2d 1114, 1119 (1st Cir. 1989) ("court's processes [should be denied] to one who defiled the judicial system by committing a fraud on the court"); Barnhill v. U.S., 11 F.3d 1360, 1367 (7th Cir 1993) ("[M]isconduct may exhibit such flagrant contempt for the Court and its processes that to allow the offending party to continue to invoke the judicial mechanism for its own benefit would raise concerns about the integrity and credibility of the civil justice system that transcend the interests of the parties immediately before the court.").

### A.     Dismissal of Plaintiff's Action.

Shenker's Recantations and his post-Recantations deposition testimony provide uncontroverted and irrefutable evidence of conduct so violative of the judicial process that dismissal with prejudice of this case is the only appropriate sanction. Plaintiff, through its conduct, has intentionally and repeatedly committed a fraud upon this Court. Pappas v. Pappas, 164 Conn. 242, 245 (1973) (false testimony given in a deposition constitutes a fraud on the court). For the first two years, of this litigation, SSAI, through Shenker, has engaged in perjury and has only attempted to "correct" the record after being caught red-handed. Specifically, Shenker recanted his prior

---

deposition therefore, did take place.

14

testimony only after a third party, Trinity, admitted under oath that it had engaged in a kickback scheme with Shenker and after Shenker was presented with two authentic Bell consulting invoices demonstrating that he was splitting commissions with Bell. Plaintiff argues that he should not be sanctioned because he "voluntarily" recanted his prior testimony. This argument is without merit. Instead, plaintiff through Shenker, intentionally and repeatedly lied and only recanted this testimony when the scheme began to unravel through third party testimony and production of records.

It is well-settled Connecticut policy that courts should "safeguard the proper administration of justice and preserve the public confidence in the purity and efficiency of judicial proceedings." Usowski v. Jacobson, Superior Court, judicial district of Stamford-Norwalk Docket No. X05CV 98016641S, (August 3, 2000, *Tierney, J.*) 2000 WL 11996756, at *5, *aff'd in relevant part*, 68 Conn. App. 785, 793 A.2d 268 (2002), *cert. granted in part*, 261 Conn. 901, 802 A.2d 855 (2002). ("[C]ourts must be vigilant to preserve the overall integrity of the [judicial] system. . . .Preventing litigants from playing 'fast and loose' with the courts [safeguards the administration of justice]." Id.

Connecticut courts, accordingly, have long recognized that they have the power to impose sanctions for litigation misconduct, including, where appropriate, the ultimate sanction of dismissal. See, e.g.; Conway v. City of Hartford, 60 Conn. App. 630, 760 A. 2d 974 (2000); Crivell v. Sears, Roebuck & Co., No. CV970139544, 2000 WL 1861814 (Conn. Super. Ct. Nov. 28, 2000); Usowski v. Jacobson, No. X05CV980166410S, 2000 WL 1196756 (Conn. Super. Ct. Aug. 3, 2000), *aff'd in relevant part*, 68 Conn. App. 785, 793 A.2d 268 (2002), *cert. granted in part*, 261 Conn. 901, 802 A.2d 855 (2002); Asztalos v. Stop & Shop Supermarket, No. CV990263115, 2000 WL 327450 (Conn. Super Ct. Mar. 14, 2000). See also Millbrook Owners Ass'n v. Hamilton Standard, 257

15

10/16/2003 14:03 FAX

Conn. 1, 9-10, 14, 776 A.2d 1115, 1122, 1124 (2001); <u>Mulrooney v. Wambolt</u>, 215 Conn. 211, 223, 575 A.2d 996, 1002 (1990).

Connecticut Practice Book Section 13-14 also provides in pertinent part:

> (a)    If any party has failed to answer interrogatories or to answer them fairly, or has intentionally answered them falsely or in a manner calculated to mislead, or has failed to respond to requests for production . . . or has failed to comply with a discovery order made pursuant to Section 13-13 . . . or has failed otherwise substantially to comply with any other discovery order made pursuant to Sections 13-6 through 13-11, the judicial authority may, on motion, make such order as the ends of justice require.
>
> (b)    Such orders may include the following:
>
>> (1)    the entry of a nonsuit or default against the party failing to comply;
>>
>> (5)    if the party failing to comply is the plaintiff, the entry of a judgment of dismissal.

Connecticut courts have found it necessary on occasion to dismiss a plaintiff's lawsuit as a sanction for litigation misconduct. In <u>Pavlinko v. Yale-New Haven Hospital</u>, 192 Conn. 138, 139 (1984), the Supreme Court addressed the issue of whether dismissal was an appropriate sanction where the plaintiff refused to answer questions at a deposition concerning his removal of hospital records on the grounds of a claim of privilege against self-incrimination.[4] The court applied the following test in resolving this issue:

---

[4] The Court is aware that the test for violation of discovery orders was clarified by the Supreme Court in <u>Millbrook</u>, supra, 257 Conn. at 17. This clarification appears, however, to address violations of separate discovery orders and not the rules of the court contained in the Practice Book, which is what is at issue in this case. In any event, even if the Court were to apply the <u>Millbrook</u> test, the sanction of dismissal is appropriate because the rule contained in Practice Book § 13-7 (interrogatories shall be answered under oath, § 13-30 (deponent placed under oath at deposition) and § 13-14 are absolutely clear. The record reveals that plaintiff intentionally violated these rules and the sanction of dismissal is proportional to the violation.

16

(1) the cause of the deponent's failure to respond to the posed questions, that is, whether it is due to inability rather than the willfulness, bad faith or fault of the deponent; (2) the degree of prejudice suffered by the opposing party, which in turn may depend on the importance of the information requested to that part's case; and (3) which of the available sanctions would, under the particular circumstances, be an appropriate response to the disobedient party's conduct." Id, 144.

The Court in <u>Pavlinko</u> found that dismissal was the was the only appropriate sanction.

"Suffice it to observe at this point that if the disobedient party's refusal to testify is intentional, if a sufficient need for the information requested is shown by the opposing party, and if it does not appear that the disobedient party, having failed to comply with the order embodied in the rules, is inclined to change his position, then dismissal is an appropriate sanction. In such situations dismissal serves not only to penalize those whose conduct warrants such a sanction but also to deter those who might be tempted to such conduct in the absence of such deterrent." Id, 145.

<u>Asztalos v. Stop & Shop Supermarket</u>, No. CV9902631115, 2000 WL 327450 (Conn. Super. Ct. Mar. 14, 2000), a case in which the trial court granted defendant's motion for a sanction of dismissal due to plaintiff's willful failure to comply with discovery, is also instructive because the trial court's opinion reflects the attitude of Connecticut courts toward litigants who willfully abuse the discovery process.

The plaintiff in <u>Asztalos</u> filed suit alleging that she suffered injuries as a result of a slip and fall caused by defendant's negligence. In response to interrogatories, plaintiff denied having been treated for related injuries in the ten years preceding the accident. At her deposition six months later, however, plaintiff acknowledged that she had sustained new injuries during another fall within the preceding ten years, but denied any other falls or injuries. Subsequent discovery revealed that plaintiff had sustained other related injuries during that time. In addition, both plaintiff and her

17

attorney possessed relevant medical records which they had not produced to defendant.

Defendant moved for sanctions pursuant to Connecticut Practice Book Section 13-14, requesting a judgment of dismissal because of plaintiff's continued, intentional and flagrant violations of discovery orders. Plaintiff opposed the motion arguing that the violations of court orders were not intentional, but rather were due to mistake, misunderstanding or misinformation. Plaintiff also argued that because the case had been postponed and no firm trial date had yet been set, there was no real prejudice to defendant.

The court concluded that plaintiff's failure to comply with discovery requests and court orders "was either, at worst an intentional act calculated at misleading defendant, or at best an unfair attempt to gain the advantage of late disclosures," and, therefore, constituted a violation of Practice Book Section 13-14(a). Asztalos, supra, 2000 WL 327450, at *3. The court concluded that plaintiff's failure to comply was willful and the result of bad faith, and that defendant had been prejudiced by plaintiff's actions. In rejecting plaintiff's argument regarding prejudice, the court stated:

> It is true that there is no jury trial date scheduled. However, the trial of this matter was continued because of the plaintiff's failure to completely and honestly comply with discovery requests. Thus, the plaintiff should not benefit. The delay in trial was due to her acts and omissions. Notwithstanding the absence of a jury trial date, this court concludes that the defendant has been severely prejudiced by the failure to make full, fair and timely discovery disclosures.

Id., at *4.

In determining that plaintiff's conduct warranted the most severe sanction of dismissal, the Court also stated that;

> Thee is benefit to ordering a judgment of dismissal in this case to

18

deter others who might be tempted to follow in the path of the plaintiff. We have rules of discovery for a purpose. That purpose is completely thwarted when a party lies under oath, withholds discoverable information, intentionally misleads his/her opponent and/or fails to disclose relevant and discoverable information in a timely fashion. In this case, not only did the plaintiff violate our rules of discovery, but she violated direct orders of this court. The plaintiff was given many opportunities to comply. Each time, non-compliance was accompanied with excuses. . . Certainly, the court's view, to continue to grant the plaintiff further opportunities when she has squandered those previously granted to her, would serve no just purpose. Therefore, this court holds that a judgment of dismissal should enter.

Id. at *4 (emphasis added).

It is clear that dismissal of SSAI's claims with prejudice is warranted.[5] First, Shenker's commission of perjury, and evidence tampering, were undertaken willfully and in bad faith; indeed Shenker had admitted that he intended to withhold the truth from WWE and its counsel, and that he acted in accordance with this plan. Second, WWE has been severely prejudiced by Shenker's scheme to lie and obstruct, regardless of any extension in discovery or the amount of time left before trial. WWE has incurred significant legal fees and costs in this case, and counsel for WWE has put in many hours of work, all of which directly resulted from Shenker's misconduct. Moreover, WWE would be further prejudiced if SSAI's case is not dismissed, as WWE and its counsel would be compelled to expend significantly more time and money in a process that Shenker has abused repeatedly and substantially. Finally, the reasoning of the Asztalos court is persuasive. As in Asztalos, to continue to grant SSAI and Shenker further opportunities, when they have squandered those previously granted to them, would serve no just purpose here. See Also Crivell v. Sears,

---

[5] Plaintiff appears to argue that there must be a separate violation of a court order in order for the sanction of dismissal to be appropriate. This argument is flawed because it ignores that orders are embodied in the Practice Book rules. Pavlinko, supra, 192 Conn. 145.

19

Roebuck & Co. No. CV970139544, 2000 WL 1861841 (Conn. Super. Ct. Nov. 28, 2000), (trial court also granted defendant's motion for judgment of dismissal pursuant to Connecticut General Practice Book Section 13-14 as result of plaintiff's failure to fully, fairly, truthfully and timely respond to interrogatories and request for production of documents).

In sum, the record before the Court necessitates dismissal of this action. Plaintiff has now admitted that he repeatedly and intentionally engaged in perjury regarding issues central to the case until faced with irrefutable evidence that he had testified falsely. Plaintiff also has admitted that evidence was concealed and even in some cases destroyed. This pattern of egregious conduct has resulted in prejudice to the opposing party both in terms of time and expense. Documents have also disappeared as a result of the plaintiff's conduct that might have a bearing on the outcome of this case if it was tried on the merits. Additionally, this is not a situation of simply a "discovery violation addressed to another party" as plaintiff argues in its opposition papers. Plaintiff has deliberately committed a fraud on this Court through Shenker's deposition testimony. The Court has also expended a significant amount of time deciding discovery motions that would not have been necessary if plaintiff had not willfully failed to comply with the discovery process. (See e.g. February 25, 2002 Court Order regarding plaintiff's motion to quash subpoena; December 16, 2002 Court Order of compliance; March 19, 2002 Court Order regarding motion to quash subpoena; October 29, 2002 Order regarding compliance; Court Order dated December 17, 2002.)

To allow this case to continue would be to condone perjury. If the Court were not to dismiss this case based on the record before it, it would be inviting parties in other cases to take a calculated risk of engaging in deliberate misleading conduct with the knowledge that if caught they would only be forced to pay attorney's fees. In sum, while this Court firmly believes and understands that except

under the most unusual circumstances parties should have their day in court, dismissal is the only viable option in this case.

**B.    A Default Judgment in Favor of WWE on its Counterclaims Should Enter as a Result of SSAI's Litigation Misconduct.**

In addition to dismissal, discovery abuse can lead to the sanction of default. Similarly, the Connecticut Practice Book provides that a court may enter "a nonsuit or default against the party failing to comply" with its discovery obligations. Practice Book § 13-14(b)(1).

Connecticut courts routinely enter default judgments against litigants who abuse the discovery process. See e.g, Wren v. MacPherson Interiors, Inc. 69 Conn. App. 349, 350-52, 794 A.2d 1043, 1045-46 (2002) (affirming trial court's entry of default judgment against defendant who failed to respond to discovery requests and to comply with court orders); State v. Ritz Realty Corp., 63 conn. App. 544, 545-46, 776 A.2d 1195, 1996-97 (2001) (affirming trial court's entry of default judgment against defendant who failed to respond to discovery requests); Weldon Bus. Group v. Schweitzer, 22 Conn. App. 552-553-54, 556, 577 A.2d 1126, 1126-28 (1990) (affirming trial court's entry of default judgment against defendant who failed to respond to discovery requests and to comply with court orders); Zaleski v. Zaleski, 21 Conn. App. 185, 186-87, 572 A.2d 76, 77-78 (1990) (same); Skyler Ltd. P'ship v. S.P. Douthett & Co., Inc., 18 Conn. App. 245, 248, 557 A.2d 927, 929 (1989), cert. denied, 212 Conn. 802, 560 A.2d 984 (1989).

- Based on the foregoing authority, and the above record of egregious discovery abuse in this case, the Court hereby enters a default judgment against SSAI and in favor of WWE on each of WWE's counterclaims.

21

**C.**     **This Court will consider Attorney's Fees and Costs Incurred by WWE in Connection with and as a Result of SSAI's Litigation Misconduct.**

A litigant is entitled to a recovery of his attorney's fees and costs where those expenses were incurred as a result of his adversary's litigation misconduct. See <u>Fattibene v. Kealey</u>, 18 Conn. App. 344, 360, 558 A.2d 677, 685 (1989). See also <u>Asztalos v. Stop & Shop Supermarket</u>, No. CV 990263111S, 2000 WL 327450, at *5 (Conn. Super. Ct. Mar. 14, 2000) (awarding "reasonable costs, including attorneys fees," in addition to dismissing plaintiff's action). At the conclusion of the hearing in damages on defendant's counterclaims pursuant to Practice Book § 17-34, the court will consider an award of attorney's fees for expenses directly incurred as a result of plaintiffs' misconduct if such fees have not already been awarded as damages in the underlying matter.

## CONCLUSION

The Plaintiff's case is dismissed with prejudice. A default in favor of defendant on its counterclaims is entered. The parties should contact the Complex Litigation Docket court officer to schedule a hearing in damages pursuant to Practice Book § 17-34.

CHASE T. ROGERS
SUPERIOR COURT JUDGE

22