Eugene Licker (EL 0334)
KIRKPATRICK & LOCKHART NICHOLSON GRAHAM LLP
599 Lexington Avenue
New York, New York 10022-6030
(212) 536-3900 (phone)
(212) 536-3901 (fax)

Jerry S. McDevitt
Curtis B. Krasik
Amy L. Barrette
KIRKPATRICK & LOCKHART NICHOLSON GRAHAM LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, Pennsylvania 15222
(412) 355-6500 (phone)
(412) 355-6501 (fax)

Attorneys for Plaintiff, World Wrestling Entertainment, Inc.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK.
--------------------------------------------------------------X :

WORLD WRESTLING ENTERTAINMENT, INC., :

        Plaintiff, :

    - against - :

JAKKS PACIFIC, INC.; JAKKS PACIFIC (H.K.) :
LIMITED; ROAD CHAMPS LIMITED; THQ, INC.; :
THQ/JAKKS PACIFIC LLC; STANLEY SHENKER :
AND ASSOCIATES, INC.; STANLEY SHENKER; :
BELL LICENSING, LLC; JAMES BELL; JACK :
FRIEDMAN; STEPHEN BERMAN; JOEL :
BENNETT; and BRIAN FARRELL, :

        Defendants. :

--------------------------------------------------------------X :

**JURY TRIAL DEMANDED**

## AMENDED COMPLAINT

P1-1317665 v19

Nature of the Action

1    This action is brought to (a) recover damages caused to World Wrestling Entertainment, Inc. ("WWE") by the pattern of multifaceted racketeering activities set forth herein in connection with a scheme and artifice to defraud WWE by depriving WWE of the intangible right of honest services from WWE's intellectual property licensing agent and its management supervisor of that licensing agent, and to obtain thereby valuable toy licensing rights and a lucrative videogame license at lower than competitive royalty rates; (b) recover damages caused to WWE under the Sherman Act for the per se unlawful price fixing, bid rigging, and market allocation scheme set forth herein; (c) recover damages caused to WWE by the commercial bribery scheme set forth herein pursuant to the Robinson-Patman Act; (d) obtain a declaratory judgment that the videogame license between WWE and THQ/Jakks Pacific LLC ("THQ/Jakks") and toy licensing rights between WWE and Jakks Pacific, Inc. ("Jakks") are void as a result of the illegal activities set forth herein including, but not limited to, commercial bribery and/or inducing and participating in violations of fiduciary duties and the duty of honest services owed WWE by its licensing agent and supervising manager; (e) recover as damages the financial losses which will be associated with voiding the toy and videogame licenses; (f) obtain disgorgement of all profits earned by Defendants as a result of their illegal conduct set forth herein; and (g) recover punitive and other damages for the conduct set forth herein.

2    The licenses at issue herein were and are extremely lucrative licenses which were expected to and did produce millions of dollars in profits to the licensees  THQ, Inc ("THQ") and Jakks are two publicly traded companies whose stock valuations were expected to increase if the revenues from the videogame license and toy licensing rights could be secured.

3.    At all times relevant hereto, Defendants Jack Friedman, Stephen Berman and Joel Bennett were the highest ranking executives of Jakks. Individually and collectively, they were and are in a position to control the affairs of Jakks and foreign subsidiaries owned by Jakks which were used to both implement and conceal certain aspects of the illegal conduct set forth herein.

4.    At all times relevant hereto, Defendant Brian Farrell was the highest ranking executive of THQ and was and is in a position to control the affairs of THQ.

5.    At all times relevant hereto, Defendants Friedman, Berman, Bennett and Farrell were officers of THQ/Jakks and/or otherwise were and are in a position to control the affairs of THQ/Jakks.

6.    At all times relevant hereto, Defendants Friedman, Berman and Bennett realized they would recognize several million dollars in personal profits as a result of stock ownership and options in Jakks if the videogame license and toy licensing rights were secured.

7    At all times relevant hereto, Defendant Farrell realized he would recognize several million dollars in personal profits as a result of stock ownership and options in THQ if the revenues associated with WWE's videogame license were secured.

8.    Defendants have acted in concert through the years to conceal the unlawful conduct set forth herein by a variety of tactics to prevent WWE from discovering their illegal conduct through reasonable diligence, including concealing the relationship between Jakks and WWE's licensing agent and management supervisor, laundering commercial bribes paid to WWE's licensing agent and management supervisor through foreign corporations and bank accounts, falsification of corporate accounting records, collusive and serial perjury by certain of the Defendants in a state court proceeding, destruction of physical evidence, falsification of

physical evidence, incomplete and knowingly false responses to subpoenas duces tecum, false denials that any payments had been made to WWE's licensing agents when requested by WWE to disclose such payments, and by agreements designed to prevent WWE from learning the true set of facts involved in the bidding process for the videogame license.

### The Parties

9.    Plaintiff, World Wrestling Entertainment, Inc ("WWE"), is a Delaware corporation having its principal place of business at 1241 East Main Street, Stamford, Connecticut 06902   WWE is an integrated media and entertainment company principally engaged in the development, promotion and marketing of television programming, pay-per-view programming and live arena events   In the process, WWE creates colorful characters and personas whose names and likenesses can be licensed to third parties, such as Jakks and THQ

10    Defendant Jakks Pacific, Inc. ("Jakks") is a Delaware corporation with its principal place of business at 22619 Pacific Coast Highway, Suite 250, Malibu, California 90265. Jakks is primarily in the business of selling action figures and toys. In connection with WWE's videogame license, Jakks was a competitor of several companies with an interest in obtaining that license, including Acclaim, THQ and Activision.  In connection with that aspect of the illegal conduct set forth herein relating to the videogame license, Jakks acted on its own behalf and then also on behalf of THQ and THQ/Jakks, and has benefited greatly from the illegal conduct set forth herein.  Jakks owns and/or controls Road Champs Limited and Jakks Pacific (H.K.) Limited, two entities utilized by Jakks to effectuate the commercial bribes set forth herein.

11.    Defendant Jakks Pacific (H.K.) Limited ("Jakks Pacific (H.K.)") is a corporation organized under the laws of Hong Kong.  The owners of Jakks Pacific (H.K.) are Defendants

Friedman, who owns 1 of 1,000 outstanding shares, and Jakks Pacific, Inc., which owns 999 of 1,000 outstanding shares. Defendants Friedman and Berman are directors of Jakks Pacific (H.K.)

12.     Road Champs Limited ("Road Champs Ltd.") is a corporation organized under the laws of Hong Kong. The owners of Road Champs Ltd are Defendants Friedman, who owns 1 of 300 outstanding shares, and Road Champs, Inc., which owns 299 of 300 outstanding shares. Road Champs, Inc. is a wholly owned subsidiary of Jakks Pacific, Inc. Defendants Friedman and Berman are directors of Road Champs Ltd.

13.     Defendant Jack Friedman ("Friedman") is an individual who resides at 6351 Kanan Dume Road, Malibu, California 90265. At all times relevant hereto, Friedman was the highest-ranking executive at Jakks and served, and continues to serve, as Chief Executive Officer and Chairman of the Board of Directors of Jakks. Together with Defendant Berman, Friedman co-founded Jakks in or about January 1995.

14.     Until January 20, 1995, Friedman had served as President, Chief Executive Officer and as a Director of THQ's predecessor. On January 20, 1995, in a document executed on behalf of THQ's predecessor by Defendant Farrell, it was agreed that it was in the mutual best interests of Friedman and THQ's predecessor that Friedman resign from each of the aforementioned positions.

15.     Defendant Stephen Berman ("Berman") is an individual who resides at 27465 East Winding Way, Malibu, California 90265. During a portion of the period covered by this Amended Complaint, Berman served as an Executive Vice President of Jakks. Since January 1, 1999, Berman has served as President, Secretary, and Chief Operating Officer of Jakks and served, and continues to serve, on the Board of Directors of Jakks. On information and belief,

prior to co-founding Jakks with Friedman, Berman was a Vice President and Managing Director of THQ International, Inc , a subsidiary of THQ.

16.    Defendant Joel Bennett ("Bennett") is an individual who resides at 6791 Trevino Drive, Moorpark, California 93021. At all times relevant hereto, Bennett was the Chief Financial Officer of Jakks.

17.    Defendant THQ, Inc. ("THQ") is a Delaware corporation with its principal place of business at 27001 Agoura Road, Suite 325, Calabasas Hills, California 91301. THQ is in the business of videogame marketing and sales. THQ authorized Jakks to act on its behalf in order to secure the benefits of a videogame license with WWE and/or has ratified the actions of Jakks and its officers set forth herein. As a result of its knowing and willing participation in the illegal conduct set forth herein, THQ has benefited greatly from the illegal conduct set forth herein.

18.    Defendant Brian Farrell is an individual who resides at 474 Lake Sherwood Drive, Lake Sherwood, California 91361  At all times relevant hereto, Farrell was the President and Chief Executive Officer of THQ and a member of the Board of Directors of THQ  Farrell has served as Chairman of the Board of Directors of THQ since at least August 21, 2001.

19   Defendant THQ/Jakks Pacific LLC ("THQ/Jakks") is a Delaware limited liability corporation having its principal place of business at 22761 Pacific Coast Highway, Suite 226, Malibu, California 90265. THQ/Jakks was formed on June 10, 1998 as part of the illegal conduct set forth herein by Jakks and THQ to be the official licensee for WWE's videogame license  Defendant Berman signed the Certificate of Formation as an authorized person on behalf of THQ/Jakks  THQ and Jakks each own 50% of THQ/Jakks and have agreements in place detailing the manner in which proceeds from the WWE videogame license will be accounted for and ultimately distributed between THQ and Jakks. All actions alleged herein

taken by Jakks and/or THQ after June 10, 1998 in regard to the videogame license were with the authority of THQ/Jakks, which has also ratified those actions

20    Defendant Stanley Shenker & Associates, Inc. ("SSAI") is a New York corporation with its principal place of business at 25 Van Zant Street, Norwalk, Connecticut 06855. SSAI was WWE's licensing agent from in or around April 1995 through June 13, 2000

21    Defendant Stanley Shenker ("Shenker") is an individual who resides in New Canaan, Connecticut  Shenker is, and at all times relevant hereto has been, the President and sole owner of SSAI. At all times relevant hereto, Shenker was also the sole owner and alter ego of a foreign corporation known as Stanfull Industrial, Ltd ("Stanfull") in Hong Kong. Shenker utilized Stanfull for a variety of criminal and fraudulent purposes, including as a money-laundering device to conceal the receipt and payment of bribes and kickbacks, including commercial bribes paid by Jakks utilizing foreign subsidiaries that Jakks owned and/or controlled

22    Defendant Bell Licensing, LLC ("Bell Licensing") is a limited liability company under the laws of Connecticut with its principal place of business located at 405 Silver Creek Lane, Norwalk, Connecticut 06850. Bell Licensing was originally formed as Bell Consulting, LLC in or about March 6, 1998 to be a receptacle for bribes paid to Bell to influence him while serving as an executive and fiduciary of WWE, including, but not limited to, the bribes paid to him in connection with the illegal conduct described herein. On or about July 18, 2002, Bell Consulting, LLC changed its name to Bell Licensing, LLC.

23.    Defendant James Bell ("Bell") is an individual who resides in Norwalk, Connecticut. Bell is, and at all times relevant hereto has been, the President and sole owner of Bell Licensing  At all times relevant hereto, Bell utilized Bell Licensing as a money-laundering

device to conceal the receipt of bribes and kickbacks, including payments from SSAI, Shenker,
Stanfull and Jakks

24.    On February 10, 2005, after the original Complaint in this matter was filed, Bell
waived indictment and plead guilty in an ongoing investigation to a Criminal Information in
United States District Court for the District of Connecticut to a single count of mail fraud in
violation of 18 U.S.C. § 1341 in connection with Bell's receipt of bribes relating to WWE's
licensing program. In a Stipulation of Offense Conduct accompanying his plea, Bell admitted
that "beginning in or before January 1998, and continuing through October 2000, in the District
of Connecticut and elsewhere, JAMES K. BELL    and others known and unknown to the
United States Attorney, did devise a scheme and artifice to defraud WWE, including depriving
WWE of the intangible right of honest services, and to obtain money and property from WWE
through materially false and fraudulent pretenses and representations."

25    Bell's stipulation specifically inculpates SSAI and Shenker in the illegal scheme
which began "in or before January 1998 "

26.    The illegal conduct set forth herein with respect to Bell occurred in the time frame
that Bell has now judicially admitted to being a corrupt fiduciary of WWE. Indeed, the very first
illegal payment to Bell for violating his duty of honest services to WWE was a payment of
monies originating with Jakks in January 1998. That first payment for corrupt services to Bell
was laundered by Jakks through foreign subsidiaries and into a foreign bank account controlled
by Shenker, who then split the money equally with Bell.

<u>Jurisdiction and Venue</u>

27.    This Court has jurisdiction over the subject matter of this action pursuant to 28
U.S.C. § 1331, 28 U.S.C. § 1337 and 15 U.S.C. § 15(a) because WWE has alleged claims arising

under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, the Robinson-Patman Act, 15 U.S.C. § 13 *et seq*, and the Sherman Act, 15 U S C. § 1. This Court may exercise supplemental jurisdiction over WWE's state law claims pursuant to 28 U.S.C. § 1367

28.    Venue is proper under 28 U S C § 1391(b)(2) and/or (b)(3), 15 U.S.C § 15 and 15 U.S.C § 22 because Defendants are found in this district, transact business in this district, are inhabitants of, and/or have an agent in this district

<u>THE ILLEGAL CONDUCT</u>

<u>WWE Hires Bell and SSAI</u>

29.    In or around March 1995, WWE hired Bell as its Director of Domestic Licensing. In October 1996, Bell became Senior Vice President of Licensing and Merchandising, a position he held until his termination on March 24, 2000.

30.    As Senior Vice President of Licensing and Merchandising, Bell occupied a fiduciary position and was responsible for, among other things: (i) procuring licensees for WWE at competitive market royalty rates; (ii) negotiating license agreements between WWE and potential licensees to obtain for WWE, *inter alia*, the highest royalty rates available in a competitive market; (iii) managing WWE's licensing arrangements with its licensees; and (iv) all other activities necessary and/or attendant to the development and maintenance of WWE's licensing program. Pursuant to WWE's licensing program, licensees were granted the right to utilize WWE intellectual property in connection with the licensees' own goods and/or services.

31.    Shortly after securing his position, Bell urged WWE to hire SSAI as an outside licensing agent, touting to WWE Shenker's reported extensive experience and contacts in the licensing business. For at least ten years prior to Bell's introduction of Shenker to WWE in April 1995, Bell and Shenker had maintained both a business and personal relationship.

32    On Bell's recommendation, WWE retained SSAI in or around April 1995 originally as a nonexclusive outside licensing agent. As such, SSAI was to procure and negotiate licensing contracts by utilizing Shenker's alleged contacts in the licensing business. Bell was responsible to supervise SSAI in its licensing endeavors and remained responsible to generate licenses for WWE using his own contacts and by negotiating with prospective licensees who contacted WWE directly.

33.    As a result of their respective positions, Bell, Shenker and SSAI occupied positions of trust and of a fiduciary nature to WWE. During the course of their relationship with WWE, SSAI and Bell both entered into agreements with WWE reflecting and acknowledging their fiduciary roles and unique positions of trust.

34.    On March 2, 1995, Bell executed a Code of Conduct Agreement wherein he agreed, among other things, that he would not:

a.    accept fees, commissions, or property in connection with any transaction on behalf of WWE;

b    accept or offer unauthorized or illegal payments;

c.    use his position directly or indirectly for personal or financial gain;

d    personally take advantage of business opportunities which might be of interest to WWE; and

e.    serve as an officer, director, employee, consultant or promoter of for-profit organizations without WWE's prior approval

### Jakks Obtains Domestic Toy License

35.    After SSAI agreed to be WWE's nonexclusive licensing agent, Friedman approached both Bell and Shenker at the annual New York Toy Fair inquiring whether Jakks

could obtain a toy license from WWE. Bell and Shenker subsequently presented a deal memo to WWE indicating SSAI had procured and negotiated the terms of a toy license with Jakks. On or about October 24, 1995, WWE entered into a domestic toy license with Jakks. The term of the original domestic license was to end on December 31, 1997 with a one-year right to renew if Jakks achieved certain financial requirements.

36.    Pursuant to the terms of the domestic toy license, WWE granted to Jakks the right to use the intellectual property of WWE on goods manufactured for sale to the public, specifically "6 [inch] action figures, rings for the action figures, playsets for action figures, [and] action figures with sound and microphone."

### SSAI's/Shenker's Undisclosed Agency Relationship with Jakks

37.    Shortly after the domestic toy license was entered into, and unknown to WWE, but known to Jakks, Jakks personnel devised a plan to corrupt Shenker by trading on Shenker's lack of ethics and greed

38.    Unknown to WWE, and undisclosed by SSAI, Shenker and Jakks, Shenker entered into financial transactions with Jakks soon after the domestic toy license was entered into wherein he agreed to represent Jakks' interests at the same time he continued to act as WWE's agent on licensing matters involving Jakks

39.    Within a month of signing the domestic toy license, and fully recognizing that it would be seeking further and additional licensing rights from WWE through SSAI and Shenker, Jakks secretly began negotiations with Shenker to have him perform services on its behalf.

40.    Jakks' early efforts to corrupt Shenker as an agent were initiated by Berman on behalf of Jakks, who, as early as November 20, 1995, less than a month after the domestic toy license was executed, initiated discussions to have Shenker serve as Jakks' agent

41.    Soon after letting Shenker know that there was money to be made working for Jakks, Berman told Shenker that Jakks desired to secure additional licensing rights from WWE through Shenker. Shenker agreed to seek such additional rights on behalf of Jakks from WWE

42    In late November 1995, Berman continued to link financial rewards from Jakks to its desire to secure additional rights from WWE through Shenker, telling Shenker that a contract would be forthcoming for Shenker to be Jakks' agent regarding a perfumed doll product to be developed. At the same time, Berman advised Shenker that he and Friedman wanted Shenker's assistance in securing additional WWE licensing rights.

43.    Unknown to WWE at the time, Shenker was neither a reputable man nor successful licensing agent. As of the time Jakks began its efforts to compromise Shenker's loyalties, he was on the verge of personal bankruptcy and willing to abandon ethical and legal standards governing his duties as an agent for money  On December 29, 1995, Shenker filed for bankruptcy in federal court in New Jersey without disclosing to WWE that he had done so. In his bankruptcy petition, Shenker indicated he had no cash on hand; no income; that he was 100% owner of SSAI; that SSAI had no assets and no receivables; that he was over $70,000 in debt to unsecured creditors; and he had approximately $30,000 in secured indebtedness

44    On January 3, 1996, Jakks, with the knowledge of Berman and others at Jakks, transmitted by mail to Shenker a proposed agreement whereby Shenker would, in fact, act as Jakks' agent with respect to the perfumed doll product. In the covering letter transmitting the contract, Jakks continued to trade on the undisclosed conflict of interest it was creating by asking Shenker how soon he could get the domestic toy license with WWE amended to include additional rights.

45.    At no time did Jakks, Friedman, Berman, Bennett, SSAI or Shenker ever disclose to WWE that Jakks was paying Shenker and using him as its agent during the time it was soliciting Shenker to use his status as WWE's licensing agent to obtain additional and valuable licensing rights for Jakks from WWE.

46.    On or about January 3, 1996, Jakks, through Berman, and SSAI entered into a formal contract whereby SSAI agreed to act as Jakks' agent on the perfumed doll deal. In the contract, Jakks promised Shenker a $5,000 nonrefundable advance against future royalties and a percentage of sales of the future product.

47.    In or around the same time that Jakks and SSAI entered into a contract for Shenker to be Jakks' agent on the perfumed doll toy, Friedman and Berman told Shenker that Jakks desired to secure other rights from WWE in the future, including the WWE videogame license. Friedman and/or Berman told Shenker that they wanted him to be Jakks' agent specifically to assist it in acquiring WWE's videogame license notwithstanding that he was known to be an agent of WWE.

48.    On or about February 12, 1996, Jakks paid SSAI $2,500 in connection with Shenker's work as its agent on the perfumed doll deal. The check was drawn on Jakks' corporate account at Bank of America.

49.    The conversation discussing Jakks' desire to retain Shenker to act as its agent on WWE matters occurred two days later at the annual New York Toy Fair on February 14, 1996.

50.    During the conversation regarding Shenker serving as Jakks' agent on WWE matters at the same time he was WWE's agent, a call was placed by Friedman, Berman and Shenker to Mr. Murray Skala, Jakks' outside legal counsel, a member of the Board of Directors of Jakks, and Friedman's personal friend and confidant, regarding the proposed arrangement.

Mr. Skala advised all participants in the call that it would be a conflict of interest for Shenker to serve as Jakks' agent on WWE matters at the same time Shenker was acting as WWE's agent and that such an arrangement could not be done legally without first making full disclosure to WWE and obtaining their consent.

51    Following the conversation with Jakks' corporate counsel on February 14, 1996, neither Friedman, Berman, Shenker, SSAI nor Jakks disclosed the conversation, or Shenker's then existing position as an agent for Jakks, to WWE nor sought its consent to the relationship or the inherent conflict of interest. On information and belief, all three men did not disclose the conversation, or the then-existing relationship between Jakks and Shenker, because they knew WWE would not agree to such an obvious conflict of interest.

52.    During the time period that Jakks was corrupting Shenker, competition in the toy industry was intense between companies seeking valuable intellectual property licenses such as WWE. By corrupting WWE's licensing agent, Jakks knew it could avoid fairly competing for intellectual property rights by trading on the conflicting loyalties of Shenker and SSAI, a business method it utilized and refined thereafter as set forth herein.

53    Despite knowledge of the impropriety of trading on conflicts of interest, Friedman, Berman and Jakks continued to do so.

54.    Indeed, on February 14, 1996, the same date as the aforementioned conversation with Mr. Skala, Friedman and Berman nonetheless solicited Shenker to obtain additional rights for Jakks from WWE in connection with the domestic toy license to permit Jakks to license disposable cameras and photo albums, as well as European distribution rights for certain WWE figures.

55    On March 15, 1996, Friedman again solicited Shenker to have the Jakks domestic toy license amended as Shenker had agreed to do

56.    On or about April 22, 1996, upon SSAI's and Shenker's recommendation, a First Amendment to the domestic toy license was signed granting Jakks the additional rights sought by Jakks. In what would become a pattern, Shenker made no attempt to negotiate better terms for WWE and recommended the additional rights be given to Jakks on the terms offered by Jakks and without determining if competitors of Jakks would pay more for the rights. At no time did Jakks, Berman, Friedman, SSAI or Shenker disclose to WWE that Jakks had sought the rights through Shenker while at the same time paying him monies to be its agent.

### Jakks' Utilization of Shenker to Eliminate Competition

57.    Having utilized Shenker to secure rights for Jakks on its terms while serving as an undisclosed agent of Jakks, Jakks then utilized Shenker to perform additional and further corrupt acts in violation of his fiduciary duties to WWE and obligation of honest services to WWE

58.    In 1996, Playmates Toys, Inc. ("Playmates") was one of the top three competitors of Jakks with respect to action figures, and the competitive environment among toy companies seeking intellectual property licenses was intense. Rather than compete fairly, Jakks utilized its undisclosed relationship with Shenker to drive competition out of the WWE toy market and prevent competition for the videogame license it so fervently desired.

59.    In or around June 1996, WWE entered into an agreement with Playmates granting to Playmates the right to use WWE intellectual property in connection with the sale of goods, including for use in connection with action figures from 8 inches and up in size and mini-figures from 2 inches and under. As such, Playmates would be manufacturing goods competing with those made by Jakks and in fact had the only right to make miniature toy figures of WWE talent

60.    Under the terms of the agreement, Playmates guaranteed WWE $750,000 payable on a schedule set forth in the agreement, with $150,000 of the guarantee payable upon execution of the agreement. Playmates made the $150,000 payment on or about June 20, 1996.

61.    The agreement with Playmates further provided that Playmates would have a right of first negotiation/last refusal to manufacture licensed products for distribution in countries outside the United States, its territories and possessions, Mexico and the U.K. As such, Playmates stood to become the first licensee of action figures in international markets. Jakks had no such right of first negotiation/last refusal in its domestic toy license.

62.    Jakks' officers, including Friedman and Berman, did not want competition in the domestic marketplace from others licensed to make WWE action figures, and were concerned that Playmates might be the first to be given international rights. Jakks' officers expressed their dissatisfaction with Shenker that Playmates had been given such rights, and devised a plan in concert with SSAI and Shenker, again trading on their undisclosed agency relationship, whereby SSAI and Shenker would (a) take all actions desired by Jakks to foreclose competition in licensing areas desired by Jakks, including action figures and the videogame license; (b) obtain licensing rights for Jakks which, when granted, would facilitate Jakks' desire to drive Playmates out of the business of WWE action figures; (c) accept monies for favorable treatment on licensing matters involving Jakks which would be laundered through foreign subsidiaries of Jakks to a foreign bank account controlled by Shenker; and (d) pay Bell if need be for his participation in the illegal conduct

63.    After learning of the Playmates deal with WWE, and to implement their illicit agreement, Berman, as Chief Operating Officer of Jakks Pacific, Inc., on stationery of Jakks (H.K.) Limited, directed two memoranda to Shenker on October 19, 1996  The intent and

purpose of both memos was to have Shenker utilize his influence as WWE's agent to obtain rights in practical conflict with the domestic rights previously granted to Playmates in order to make it impossible for Playmates to effectively exploit the rights it had been granted and to gain rights in international markets before Playmates did so

64.     In the first of his October 19, 1996 memos to Shenker, Berman instructed Shenker to obtain modifications to the domestic toy license to grant rights to Jakks to make 3-inch action figures and 7-inch action figures, an action which would allow Jakks to sell miniature action toys in direct competition with Playmates

65.     In a second memo to Shenker of October 19, 1996, Berman instructed Shenker to obtain international rights for Jakks for 6-inch action figures, 3-inch action figures, and 7-inch action figures.

66.     In both October 19, 1996 memos, Berman advised Shenker of the terms Jakks desired for the grant of such additional rights.

### Jakks Obtains Second Amendment to Toy License and an International Toy License

67.     On January 21, 1997, and on SSAI's and Shenker's recommendation made on the basis of his illicit agreement with Jakks, a Second Amendment to the domestic toy license was executed in the manner sought by Berman in one of his October 19, 1996 memos. The term of the license was also extended through December 31, 1999. Despite the increase in rights being granted to Jakks, Shenker once again made no attempt to negotiate better terms than the terms Berman established in his October 19, 1996 communication to Shenker and simply recommended those terms to WWE. Neither the conflict of interest created by Jakks nor the true purpose of the amendment was disclosed to WWE

68.    On January 29, 1997, Jakks issued a press release announcing what it termed the expansion of the product line covered by the domestic toy license  The additional products noted in the release included the miniatures.

69.    Upon reading Jakks' press release, Playmates immediately expressed concern with Shenker

70.    On January 30, 1997, Playmates directed a letter to Bell, with a copy to Shenker, regarding Jakks' press release of January 29, 1997 and questioned the good faith of WWE for granting rights to Jakks to effectively make the same product as Playmates.  Playmates accused WWE of not acting in good faith to allow two competing companies to market such similar toy lines

71.    On or about February 10, 1997, and on the recommendation of Shenker and SSAI, WWE and Jakks entered into an international toy license having a term which was to end on December 31, 1999  As had been done with the Second Amendment to the domestic toy license, the terms were those sought by Jakks, and Shenker made no attempt to negotiate better terms than the terms indicated by Berman in his October 19, 1996 communication to Shenker.  Once again, neither the conflict of interest nor the true purpose of the recommendation to grant international rights to Jakks was disclosed to WWE.

<u>WWE Retains SSAI as Exclusive Outside Licensing Agent</u>

72.    On March 7, 1997, WWE and SSAI entered into an agreement (the "Agency Agreement") pursuant to which SSAI became WWE's exclusive outside licensing agent.

73.    WWE entered into the Agency Agreement with SSAI without knowledge of the acute improprieties between Jakks and SSAI and Shenker which had occurred and were then occurring, all of which was concealed from WWE

74.     The Agency Agreement provided that the services thereunder would be performed specifically and primarily by Shenker personally. At the time it entered into the March 7, 1997 Agency Agreement with SSAI, WWE did not know that Shenker had been serving as Jakks' agent, did not know of the discussions between Jakks' executives and Shenker aimed at having him be Jakks' agent on WWE matters at the same time Jakks knew he was WWE's agent, and did not know of Shenker's illicit agreement with Jakks to act favorably on Jakks licensing matters. WWE also did not know that Shenker had already secured two amendments to the domestic toy license and the international toy license for Jakks while serving as their undisclosed agent, and did not know of the dishonest purpose of Shenker's recommendations.

75.     Under the contract to be WWE's exclusive outside licensing agent, SSAI was responsible for, *inter alia*, procuring potential licensees and negotiating the terms of prospective licenses to obtain for WWE, *inter alia*, the most favorable terms existing in the market. SSAI was not, however, granted any right to accept licensing proposals or to execute particular agreements on behalf of WWE. Instead, SSAI was to present all licensing proposals it procured and negotiated in deal memo format to Bell, who in turn would recommend to WWE whether to accept the proposal.

76.     In recognition of the fiduciary duties owed WWE by SSAI and Shenker, the Agency Agreement provided that WWE had the right to terminate the Agency Agreement if SSAI or Shenker "engages in any act of fraud, theft, deceit, [or] unethical conduct." The Agency Agreement further provided that if SSAI were terminated for such reasons that it would not be entitled to any further commissions.

77.     In consideration of the services rendered under the Agency Agreement, SSAI was to receive a commission of eleven percent (11%) of royalties and other consideration paid to

WWE with respect to licensing deals specifically negotiated and procured by SSAI which were accepted by WWE. SSAI was not to receive commissions on licensing deals procured and negotiated by Bell, who remained responsible to generate licensing deals using his own contacts and with prospective licensees who contacted WWE

78.    Under the March 7, 1997 Agency Agreement, SSAI also was not entitled to commissions on royalties paid to WWE with respect to, *inter alia*, licenses granted by WWE prior to the commencement of the Agency Agreement. The licenses on which SSAI was not entitled to receive commissions were listed on an Exhibit A to the Agency Agreement. One such license on which SSAI was not entitled to receive commissions was WWE's preexisting videogame license with Acclaim. At the time SSAI entered into the March 7, 1997 Agency Agreement, Acclaim was WWE's exclusive licensee for the manufacture and sale of videogames utilizing WWE intellectual property

The Continuation of the Scheme to Eliminate Playmates and Obtain the Videogame License

79.    In response to the complaints of Playmates made in January of 1997 over the conflicting grant of rights to Jakks, Shenker, after securing the March 7, 1997 Agency Agreement, continued his efforts to assist Jakks in driving Playmates out of the business of WWE action figures. Pursuant to his secretive plan with Jakks, Shenker advised Bell on April 25, 1997 that Jakks was a preferable licensee to Playmates and suggested to Bell that the solution to Playmates' complaints was to have "Jakks buy them out" and shut Playmates out of any promotions or assistance.

80.    In 1997, and while the Playmates dispute was ongoing, Bell realized that his marriage was in trouble and at various times thereafter expressed concern to Shenker of potential financial ruin. Shenker, pursuant to his illicit plan with Jakks, advised Bell that there was money

to be made by Bell for favorable treatment of the licensing rights being sought for Jakks by SSAI and Shenker, including with respect to the plan to eliminate competition by having Jakks buy out Playmates, and for favorable treatment to Jakks in connection with its desire to obtain the videogame license.

81    In order to induce Bell to violate his fiduciary duties and duty of honest services, and in furtherance of his illicit agreement with Jakks to obtain favorable treatment of licensing matters involving Jakks, Shenker promised Bell that monies would be forthcoming originating directly from Jakks for such favorable treatment which he would split with Bell, and that SSAI would split commissions with Bell on the videogame license if Bell went along with the illegal plan to see to it that it was awarded to Jakks.

82    In response, Bell agreed to the corrupt plan to give favorable treatment to Jakks on licensing matters and to violate his fiduciary duties and duty of honest services to WWE in order to do so.

83    On November 6, 1997, and without disclosure to WWE of the illegal plan and scheme then in place, Bell advised Playmates that WWE would absolve Playmates of the obligation of its guarantee to WWE if Playmates would give up its rights in order that those rights could be transferred to Jakks. The effect of this proposal, which was accepted by Playmates, was to deny WWE $376,391.64 left to be paid by Playmates to WWE on their guarantee, as well as royalties over and above the guarantee.

84    In order to obtain the funds needed to pay the bribes it had agreed to pay for favorable treatment on licensing matters, Jakks, through Friedman and/or Berman and/or Bennett, together with Shenker, devised a scheme to conceal the true purpose of the payments, as well as the fact of the payments, by the artifice of a phony invoice which would be paid by

Jakks' foreign subsidiaries to Shenker's foreign bank account in the name of Stanfull   A central

aspect of the scheme was that no records of the payments would exist on Jakks financial records

in America

85     At the direction of Defendants Friedman and/or Berman, and pursuant to their

illicit agreement, Shenker caused to be delivered a handwritten invoice from his foreign

corporation, Stanfull, to Jakks' corporate headquarters in California for $80,000 on or about

January 2, 1998. The cursory description contained on the invoice stated that Jakks was being

billed "For Development of Possible Latex Based Soft Toys with Special Coatings," was dated

January 2, 1998, and stated it was "Payable Immediately "  On the invoice, Shenker directed that

the payment be made to Stanfull's account at the Hang Seng Bank in Hong Kong.  A true and

correct copy of the invoice is attached hereto as Exhibit 1.

86.     The January 2, 1998 invoice was a false and fraudulent invoice, known to be by

all concerned, and was merely a conduit to secure corporate funds for Jakks to pay commercial

bribes and otherwise continue to buy influence with and further corrupt WWE's agents.  No

contract existed between Jakks and Stanfull or Shenker for the development of latex based soft

toys, and neither Shenker nor Stanfull ever developed or delivered any such toys to Jakks

pursuant to the January 2, 1998 invoice.  Aside from the invoice itself, there is not a shred of

backup or documentary evidence supporting the charges nor any other evidence of any kind

verifying that Shenker ever developed latex based soft toys for Jakks paid for by the invoice.

87.     Upon receipt of the January 2, 1998 invoice, Jakks did not record the invoice, nor

any of the ensuing steps it took to pay the invoice, on the financial books and records of the

American parent company to which the invoice had been delivered, even though the invoice

purported to be, and was, payable by Jakks and not one of its foreign subsidiaries.

88    In January of 1998, the internal financial controls of Jakks known to and implemented by Bennett as the Chief Financial Officer required the corporate official authorizing payment of an invoice to sign and approve the invoice.

89    The January 2, 1998 invoice of Stanfull was not signed by the corporate official authorizing payment in the first of many steps designed to conceal the personal involvement of Friedman and/or Berman in the scheme.

90.    In January 1998, after delivering the $80,000 invoice to Jakks, Shenker attended the Hong Kong Toy Show. While there, he met with Berman and further discussed their illegal plan to obtain favorable treatment on Jakks licensing matters, including Bell's agreement to participate in it.

91    During the Hong Kong Toy Show in early January 1998, Berman and Shenker telephoned Bell to confirm Bell's participation in the illegal plan and to inquire as to when the rights owned by Playmates would be transferred to Jakks

92.    Bell confirmed his participation in the illegal plan and that he would convince WWE management to transfer the rights formerly held by Playmates to Jakks

93.    On January 12, 1998, on the recommendation of Shenker, SSAI and Bell, Linda McMahon, President and Chief Executive Officer of WWE, executed the Third Amendment to the domestic toy license granting to Jakks the rights formerly held by Playmates

94    On that same date, January 12, 1998, acting on the direction of Friedman and/or Berman, Bennett, the Chief Financial Officer of Jakks, rather than paying the invoice from available funds of the American parent corporation, advised an overseas agent of Jakks to arrange for the payment of $40,000 to Stanfull pursuant to the $80,000 invoice Shenker had delivered on January 2, 1998.

95.    On or about January 14, 1998, acting upon the direction of Bennett, $40,000 was, in fact, paid to Stanfull via a series of transactions undertaken with the intent to conceal the transactions and bury them in fraudulent accounting of foreign corporations owned by Jakks and bank accounts of those foreign subsidiaries.

96.    On January 14, 1998, $40,000 was withdrawn from an account at the Hang Seng Bank in Hong Kong of Road Champs Ltd. The $40,000 was deposited that same day into Stanfull's bank account at the Hang Seng Bank.

97.    On January 14, 1998, the same day that the Jakks monies were deposited into Stanfull's account, Shenker, acting in concert with Jakks to conceal the disposition of the monies, and with the intent of carrying out the plan to induce Bell to violate his fiduciary duties and duty of honest services, obtained a demand draft for $20,000 payable to James Bell from the Hang Seng Bank, which he subsequently gave to Bell upon returning to the United States, thereby splitting the money from Jakks equally with Bell.

98    At or around the same time Road Champs Ltd. paid the $40,000 to Stanfull, another foreign subsidiary owned and/or controlled by Jakks known as Jakks Pacific (H.K.) sent $40,000 by wire-transfer to Road Champs Ltd. to reimburse Road Champs Ltd. for the $40,000 paid to Stanfull.

99    The general ledgers of Road Champs Ltd. were then falsified to conceal completely the payment to Stanfull. Instead of recording the payment to Stanfull on the general ledger of Road Champs Ltd., the accounting entries made it appear as if the transaction was simply the intercorporate transfer of monies from Jakks Pacific (H.K.) to Road Champs Ltd., with no mention made on the ledger of the payment to Stanfull.

<u>Shenker Returns from Hong Kong to Secure the Videogame License</u>

100    Upon Shenker's return to the United States and after Jakks had made its initial payments to Shenker and Bell in mid-January 1998, Berman, Shenker and Bell met at the annual New York Toy Fair in or around February 1998

101.    At the New York Toy Fair of 1998, all three men discussed the WWE videogame license, the status of renewal negotiations on that license with Acclaim, and the plan to secure those rights to Jakks. When Bell inquired as to how Jakks would perform a videogame license, Shenker reminded Bell that Jakks had helped them both out and that the "favor" needed to be returned.

102.    At that time, Bell was in charge of discussing the possible renewal of the videogame license with Acclaim since it was the existing licensee. If the Acclaim license were renewed, SSAI would not receive any commission.

103.    In early 1998, competition for desirable character and product licenses remained intense, with entities such as Jakks and THQ having to pay increasingly higher royalties in order to secure the intellectual property rights from prospective licensors.

104    In order to implement that aspect of the illegal conduct involving the videogame license, it was agreed and understood by Jakks, Shenker and Bell that Bell would act against renewing the existing videogame license with Acclaim; that neither Bell nor Shenker would discharge their fiduciary duties and duty of honest services to WWE by soliciting bids from other companies who would be interested in securing the videogame license; and that both Bell and Shenker would recommend that the videogame license be granted to Jakks on rates well below market value without ever seeking any competitive bids from any other videogame companies

105    After receiving his share of the initial $40,000 payment from Jakks for dishonest services, and without WWE's knowledge or consent or prior approval, Bell formed Bell

Consulting, LLC on March 6, 1998, now known as Bell Licensing, as a for-profit organization and served as its President. At no time during his employment with WWE did Bell ever disclose to WWE either the formation or existence of Bell Licensing or Bell's role as Bell Licensing's President.

106.    Bell formed Bell Consulting during the time the videogame licensee was ostensibly being selected in order to serve as a vehicle for the receipt of illegal bribes and kickbacks he had received and expected to receive from Jakks and Shenker, the first of which was the $20,000 in monies originating with Jakks laundered through the Hang Seng Bank on January 14, 1998, and the next of which he knew he would receive upon formally recommending to WWE that Jakks be awarded the videogame license.

107.    Following receipt of the $20,000 from Stanfull on or about January 14, 1998 of monies originating with Jakks' foreign subsidiaries in the aforementioned series of transactions and the conversations at the 1998 New York Toy Fair, Bell utilized his influence to steer WWE away from even considering the renewal of Acclaim as the videogame licensee. Prior to the payment of the aforementioned bribe by Jakks, Bell had advised Acclaim that there would be no problem with the renewal of its existing license

108.    After receiving the aforementioned $40,000 from Jakks in January 1998, and in violation of their fiduciary duties and duty of honest services, neither Shenker nor Bell contacted any other potential bidders for the videogame license to solicit bids before making a recommendation to WWE management

109.    Instead, on March 25, 1998, Bell advised Acclaim that he would not even listen to any proposal that Acclaim would make for the renewal of its license  After Acclaim went over

Bell's head and complained to senior management at WWE that it was not being permitted to submit a renewal proposal, Acclaim was told it could do so.

110.   Before Acclaim's formal proposal was ever received, however, and without Shenker or Bell ever soliciting bids from any other videogame companies, Bell initialed a deal memo on March 30, 1998 recommending to senior management at WWE that the videogame license be awarded to "Jakks Pacific-Electronic Game Division" and indicated it was for a "new videogame division of Jakks Pacific." The deal memo listed SSAI as the agent who had negotiated and procured the deal. The terms recommended by Shenker and Bell without even attempting to secure any other bids were well below then prevailing market rates for a videogame license of the quality of WWE.

111.   On March 31, 1998, the day after Bell had initialed the deal memo recommending that the videogame license be awarded to Jakks, Defendant Bennett again directed Mr Wills Hon to use Jakks' foreign subsidiaries to pay another $40,000 to Stanfull. Bennett advised Mr. Hon on the day after Bell had recommended to WWE management that it grant the videogame license to Jakks that it was "imperative" that the funds be available to Stanfull not later than April 2, 1998

112   On or about April 2, 1998, and at the direction of Friedman and/or Berman, Jakks Pacific (H.K.), a foreign subsidiary of Jakks acting on Bennett's instructions, wire-transferred another $40,000 into Stanfull's account at the Hang Seng Bank in Hong Kong.

113.   On or about April 7, 1998, as he had done following the first $40,000 payment from Jakks, Shenker once again split the money from Jakks with Bell by obtaining a demand draft from the Hang Seng Bank for $20,000 payable to Bell Consulting, LLC.

114  On April 8, 1998, WWE management approved the deal memo submitted by Bell and SSAI to grant the videogame license to Jakks  At that time, WWE was not aware of any of the aforementioned payments to Shenker or Bell by Jakks.  Notwithstanding the internal approval of the Jakks deal memo, WWE remained legally free to accept other superior offers until such time as a definitive licensing agreement was executed.

115.  On or about April 15, 1998, principally based on Bell's influence, direction and advice, WWE advised Acclaim that it did not intend to renew Acclaim's videogame license.

116.  The actions of SSAI, Shenker and Bell described above relating to the videogame license were in violation of their fiduciary duties and duty of honest services, and were in direct response to being paid commercial bribes.  SSAI, Shenker and Bell recommended to WWE management that the videogame license be given to Jakks before even seeking or obtaining any proposals from any other videogame companies interested in independently securing the license.

117.  Following Bell's and SSAI's recommendation that the videogame license be given to Jakks, a series of events occurred which threatened to expose the illegal plan to obtain the videogame license at below-market rates by the corruption of WWE's agents.

### THQ's Desperate Condition

118.  In the years preceding 1998, THQ had a videogame license with WWE's principal competitor at the time, World Championship Wrestling, Inc ("WCW").

119.  As a company, THQ's profitability as it entered calendar year 1998 was heavily dependent upon the WCW videogame license  In fiscal year 1997, the WCW license accounted for 39% of THQ's sales

120.   THQ's videogame license with WCW was scheduled to expire, however, on December 29, 1998. If the WCW license was not renewed, THQ would lose what had become the principal economic driver of the company.

121.   On March 3, 1998, Farrell, the President and Chief Executive Officer of THQ, sold 40,000 shares of THQ stock for $1,160,000.

122.   On March 10, 1998, seven days after Farrell sold the aforementioned stock, THQ announced publicly that WCW had determined not to renew its license with THQ, and at the same time disclosed that WCW videogames accounted for 39% of its sales in 1997. In reality, as THQ and Farrell then knew in March of 1998, THQ's economic dependence on revenues associated with its WCW wrestling themed videogames had become almost complete during THQ's first fiscal quarter in 1998. Sales of WCW videogames accounted for 87% of the net sales of THQ in the first quarter of 1998.

123.   THQ's stock tumbled 25% the day after it announced the loss of the WCW license on March 10, 1998. Thereafter, the Securities and Exchange Commission commenced an informal inquiry relating to trading by directors and officers of THQ prior to the public announcement that THQ had lost the WCW videogame license.

124.   At the time, Defendant Farrell attempted to finesse the problems associated with the loss of the WCW license by stating publicly that nothing prevented THQ from making wrestling videogames using either another licensor or fictitious characters.

125.   As a result of the foregoing factors, THQ and Farrell became desperate in March 1998 to secure the rights to produce wrestling videogames to replace its primary source of income which would be lost upon expiration of the WCW license.

126.   Farrell and THQ therefore decided to seek a videogame license from WWE to do so.

### Activision and THQ Emerge as Potential Bidders for Videogame License

127.   Shortly before THQ approached WWE to attempt to secure a videogame license from WWE, however, another competitor who had not been approached and asked to bid by Shenker or Bell due to their illicit agreement with Jakks emerged and expressed interest in securing the license—Activision.

128.   On April 7, 1998, just days after Shenker and Bell had recommended the videogame license be awarded to Jakks on terms well below-market rates, the chairman of Activision wrote to Bell advising that Activision was prepared to move promptly to secure the rights and indicated that Activision's financial strength would allow them to offer the most competitive financial terms.

129.   On April 16, 1998, and pursuant to an initiative undertaken by THQ, representatives of THQ, including Farrell, met with Bell and Shenker for the first time. On information and belief, both Bell and Shenker tried to steer THQ away from seeking the videogame license or even making a proposal for it, telling THQ that it should consider making a proposal instead for arcade games and personal computers. Shenker and Bell did so in order to effectuate their illicit agreement with Jakks and in order to prevent competing bids from ever being made.

130.   On April 17, 1998, the day after first meeting with THQ, Shenker met for the first time with Activision regarding the WWE videogame license. During the meeting, and in the hope Activision would be dissuaded from bidding, Shenker refused to give Activision any terms for a prospective license.

131.   On April 23, 1998, THQ directed a letter signed by Farrell to both Bell and Shenker expressing THQ's continuing desire to obtain the videogame license notwithstanding Shenker's and Bell's attempts to dissuade THQ from bidding.  THQ indicated it would be willing to enter into a nonexclusive multi-year license with guarantees of several million dollars, competitive royalty rates, significant marketing commitments, and stock purchase warrants.  The terms roughly outlined in THQ's letter were clearly superior to the deal with Jakks which Bell and SSAI had already recommended to WWE management and which had been approved based on their recommendation.

132    On April 27, 1998, Activision sent an initial informal proposal to SSAI for the videogame license with WWE.  The Activision informal proposal was only an opening offer but was still clearly superior to the terms offered by Jakks which had already been recommended by SSAI and Bell to WWE.  Activision's initial informal proposal included a higher guaranteed royalty than the Jakks proposal and included stock options in Activision.

133    On information and belief, the expression of interest from two competitors of Jakks for the videogame license jeopardized Jakks' illicit plan to obtain valuable licensing rights at below-market rates by corrupting Shenker and Bell since questions would be raised if WWE went forward with the Jakks proposed license and later learned that WWE agents, SSAI and Bell, had been told that clearly superior offers from THQ and Activision would be forthcoming

134.   In order to conceal the illicit plan and see it to fruition, SSAI and Bell did not provide WWE management with copies of the April 23, 1998 letter from THQ or the April 27, 1998 Activision informal proposal.

135    On information and belief, Shenker and/or Bell instead advised Jakks, through Friedman and/or Berman, of the terms of the two competing proposals, specifically Activision's

initial informal proposal and the terms set forth in THQ's April 23, 1998 letter  Shenker and/or

Bell also advised Jakks of the need to do something so as to avoid detection of the illicit plan.

THQ Joins the Conspiracy to Secure the Videogame License

136.    Jakks, through Friedman and/or Berman and/or Bennett, then engaged in further

and additional illegal conduct in order to deal with the threat of competition presented by the

undesired emergence of THQ and Activision as potential bidders for the videogame license.

137.    In direct response to the threat of competition, and in order to maintain control

over the videogame licensing process it had acquired by the corruption of WWE licensing

agents, Jakks, through Friedman and its other officers, secured the agreement of THQ, through

Farrell and other high ranking executives, not to make an independent bid to secure the

videogame license in its own right, as THQ had indicated it wanted to do and had every business

reason to do so.  Instead, Friedman told Farrell that Jakks was in control of the videogame

license; had access to the terms Activision had informally proposed; and that THQ could

participate in the revenue stream from the videogame license at a lower-than-market royalty rate

if THQ did not independently bid but instead joined with Jakks to make a proposal which would

appear competitive to Activision's initial informal proposal.

138.    Jakks, through Friedman, further advised Farrell that certain considerations would

have to be paid to Jakks and agreed to by THQ in exchange for Jakks' inclusion of THQ in the

anticipated revenue stream associated with the WWE videogame license  Monies and

consideration which otherwise could have, and would have, been offered to WWE by THQ in an

independent, competitive process would have to be paid to Jakks instead.

139.    At the time, THQ had never before joined with Jakks to bid on a videogame

license, and THQ did not need Jakks to formulate or make a proposal for a videogame license.

THQ was completely able in its own right to perform a videogame license with WWE without any involvement by Jakks and had every legitimate business reason to do so given the circumstances existing at the time and had already told WWE it desired to do so

140. Farrell, and THQ, knew full well that Jakks was not even in the videogame business at that time; that Friedman had been effectively removed from the videogame business by THQ itself when his services at THQ were terminated years before; that no legitimate reason existed for Jakks to be discussing with THQ the terms by which THQ would gain rights in WWE's intellectual property; that WWE had licensing agents who were to be negotiating the license on behalf of WWE; and that the information being conveyed by Jakks was at odds with what Shenker and Bell had stated in their meeting with THQ on April 16, 1998.

141. Despite Farrell's and THQ's knowledge of the improprieties involved in Jakks' role, and the impropriety associated with agreeing not to independently bid, Farrell, on behalf of THQ, never called WWE senior management or otherwise took action to alert WWE regarding the obvious irregularities in the bidding process known to him. Instead, he agreed on behalf of THQ not to submit an independent bid but rather to accept the terms insisted upon by Jakks, including the royalty rates to be offered to WWE

142. After being contacted by Jakks and urged not to independently bid on the videogame license, neither THQ nor Farrell ever negotiated with WWE or its known authorized representatives regarding its previously stated desire to secure the videogame license for THQ independently. Instead, it conducted all negotiations with its competitor, Jakks, regarding the WWE videogame license

143. Farrell and THQ either knew of, or were recklessly indifferent toward, the unlawful activity set forth herein but agreed to the illegal plan because they were desperate in

light of the loss of the WCW license and because the terms offered by Jakks to THQ to rig the bids, allocate the license among the conspirators, and fix the price to be offered WWE for its intellectual property were well below the then prevailing rates THQ would otherwise have had to pay to secure a license of the quality of the WWE videogame license  Farrell and THQ knew that THQ would benefit directly and substantially from the unlawful activity

144.  Pursuant to its agreement with Jakks, THQ did not thereafter submit an independent proposal for the WWE videogame license.

145.  Utilizing the confidential information regarding Activision's initial informal proposal which Shenker and/or Bell had provided to Friedman and/or Berman, Jakks and THQ instead devised a proposal designed only to be comparable to Activision's initial informal proposal  On behalf of Jakks and THQ, Friedman thereafter conveyed the terms of the collusive bid to Shenker, who simply wrote down the collusive terms in a proposed deal memo and made no attempt to negotiate better or more substantial terms

146.  On or about May 7, 1998, Shenker prepared a deal memo reflecting the terms provided to him by Friedman as a result of the collusion between Jakks and THQ.  The deal memo indicated that the licensee would be "Jakks/THQ LLC" and listed SSAI as the procuring agent

147  SSAI, Shenker and Bell agreed to the corrupt scheme of Jakks and THQ knowing that Jakks would receive monies over the length of the license which otherwise would have been offered and paid to WWE in a true competitive bidding situation, and agreed to take all action necessary to recommend to WWE management that the videogame license be awarded to Jakks and THQ instead of the only remaining candidate for the license, Activision

148.    Although the terms of Activision's initial informal proposal were provided to Friedman and/or Berman by Shenker and/or Bell and used by Jakks and THQ in formulating their collusive bid, and as an essential part of the conspiracy to foreclose competition, rig the bids, allocate the license to THQ and Jakks, and fix the price to be offered to WWE for the license, Shenker or Bell did not request Activision to increase its initial proposal after receiving the collusive bid of THQ and Jakks  On information and belief, Activision would have improved the terms offered to WWE if it had been permitted to participate in negotiations or bona fide biddings.

149.    As a result of the unlawful conspiracy, Jakks and THQ proposed, and SSAI, Shenker and Bell agreed to recommend to WWE, that the videogame license be of the extraordinary length of ten years with a five-year right of renewal to be vested in Jakks and THQ

150    A licensor of intellectual property, such as WWE with respect to the videogame license, typically receives royalties on the net sales from the licensees once each financial quarter.  All Defendants knew that WWE would receive, for at least forty and potentially sixty fiscal quarters thereafter, below-market royalties and that Jakks would receive from THQ for that same period monies improperly diverted from WWE, as a result of the unlawful conduct described herein

151    By recommending a license of extraordinary length and advising WWE that SSAI had procured and negotiated the license, SSAI, Shenker and Bell also stood personally to make millions of dollars in illegal profits at the expense of their principal, WWE, as a result of the corrupt plan to give Jakks control of the license.  By doing so, Shenker and Bell generated a commission stream to SSAI to split equally with Bell for at least ten and potentially fifteen years

Under the terms of the bribe offered to Bell by Shenker, while acting on behalf of SSAI and as an agent of Jakks, both Shenker and Bell would split commissions each financial quarter for ten and possibly fifteen years in amounts ultimately dependent on sales.

152.    On May 12, 1998, Bell initialed his approval on the May 7, 1998 deal memo and submitted the deal memo to management of WWE, thereby recommending that WWE grant the license to Jakks and THQ.

153.    Late in the day of May 12, 1998, Activision also sent a more formalized version of their initial informal proposal to Shenker. Consistent with their scheme, neither Bell nor SSAI nor Shenker ever sent the formal Activision proposal of May 12, 1998 to WWE management, and neither contacted Activision to request that Activision increase its bid before recommending the Jakks/THQ deal to WWE management. On information and belief, the version of Activision's proposal still represented only an initial proposal and understated the amount Activision would have been willing to pay to obtain the videogame license.

154.    On June 10, 1998, THQ and Jakks caused to be filed a Certificate of Formation in Delaware forming THQ/Jakks Pacific LLC. On that same date, Farrell, as President and Chief Executive Officer of THQ/Jakks, signed the videogame license agreement with WWE on behalf of THQ/Jakks.

155.    THQ stock surged on news that it had obtained rights in a WWE videogame license with a trading volume more than three times its average.

156.    At all times relevant hereto, Jakks, THQ, and the highest ranking officers of each company knew that the THQ/Jakks LLC formed to be the ostensible signatory for the videogame license was a sham necessary to implement the scheme. By establishing a sham LLC to be the

nominal contracting party, Jakks and THQ hoped to create legal limitations on WWE's ability to seek redress against Jakks and THQ if the unlawful conduct were ever discovered by WWE

157.    On June 23, 1998, WWE executed a videogame license agreement with THQ/Jakks effective as of June 10, 1998 (the "videogame license")  The term of the license was to end on December 31, 2009, subject to the right to renew for an additional five years in favor of THQ/Jakks

158.    Both Jakks and THQ have held themselves out to the public and their respective shareholders as being in a "joint venture" or "partnership" with each other with respect to the WWE videogame license and have claimed that it was "jointly obtained." The "partnership" or "joint venture," however, had no legitimate business purpose and was merely intended to effectuate the bid-rigging and license-allocation scheme.

159    In public announcements in the months following execution of the videogame license, both Jakks and THQ stated that they would share the profits of the videogame license equally

160    During the same period it had engaged in the illegal conduct with Jakks to obtain rights in the WWE videogame license, THQ anticipated that royalty rates paid to licensors would range between 19%-22% throughout 1998 in competitive situations untainted by collusion.

161.    In 1998, it was THQ's practice to pay the higher royalties to licensors with proven popularity.  WWE was such a licensor and consistently has been one of the highest revenue producers in THQ's licensing portfolio

162.    Under the terms of the license agreement with WWE resulting from the illegal conduct set forth herein, however, WWE was only promised royalties between 7%-8% for games

on Nintendo 64; Sony PSX and Sega Katana platforms; 6% on Nintendo Game Boy; and 10% on

PC videogames.

163.    The royalty rates in fact promised to WWE were between 50%-66% lower than

what THQ had paid, expected to pay during the relevant time period in 1998, and would have

paid, in a truly competitive situation  Over the term of the license, the damages to WWE

associated with being paid a below-market rate due to collusion instead of the free market rate

exceeds hundreds of millions of dollars in revenues denied WWE

164.    Another result of the illegal conduct orchestrated by the highest ranking

executives of both Jakks and THQ was that millions of dollars would be paid by THQ to Jakks

for its illegal conduct in securing and sharing the revenues from the videogame license with

THQ instead of being offered to WWE, the true owner of the intellectual property. The monies

diverted to Jakks from WWE were a direct result, and indeed the whole point, of the illegal

activities set forth herein insofar as Jakks was concerned  THQ, conversely, obtained rights in

one of the more lucrative videogame licenses at rates well below what THQ had paid for inferior

licenses, and would have paid, in a competitive environment untainted by the multifaceted illegal

conduct

### Extension of Toy License

165.    As another central aspect of the corruption of SSAI, Shenker and Bell, which

Jakks had obtained as a result of the aforementioned illegal conduct, Jakks requested, and SSAI,

Shenker and Bell agreed to recommend, lengthy extensions to the two toy licenses to make the

terms of the licenses coincide with the term of the videogame license. By agreements dated

June 24, 1998, the domestic and international toy licenses between WWE and Jakks were

amended to make the toy licenses coterminous with the videogame license as a necessary and essential part of the commercial bribery scheme

## Additional Payments Related to the Videogame License

166     On information and belief, on or about June 30, 1998, one week after the videogame license was executed, THQ awarded Friedman 230,850 shares of THQ stock worth millions of dollars. On information and belief, the award of stock was payment by THQ to Friedman for his role in the improper and illegal conduct described herein that resulted in the videogame license being awarded to THQ/Jakks.

167.     On July 15, 1998, after the aforementioned licensing rights had been secured, Shenker caused another phony invoice to be delivered to Jakks' corporate headquarters in Malibu, California for $20,000 with a false and fraudulent description for the charges. The fraudulent invoice dated July 15, 1998 was sent to the attention of Berman. As he had done before, and at the direction of Friedman and/or Berman, Bennett directed an overseas agent of a Jakks' foreign subsidiary to make the payment

168     On August 3, 1998, Bennett was advised by an overseas agent of a Jakks' subsidiary that arrangements had been made as instructed for $20,000 to be paid to Stanfull. The payment, once again, was made by Road Champs Ltd to Stanfull's account at the Hang Seng Bank.

169.     On October 8, 1998, Bell Licensing invoiced Stanfull for the $20,000. On October 8, 1998, Shenker caused the invoice to be paid to Bell Licensing on funds drawn from SSAI's account.

170.    The payment of $20,000 on August 4, 1998 to Stanfull was a further and additional payment of a bribe paid to Shenker, and then to Bell by Shenker, for their roles in the illegal conduct and the abandonment of fiduciary duties and honest services owed WWE.

### Defendants' Non-Disclosure

171    At no time during the negotiation of the videogame license or the amendments to the toy licenses did any of the Defendants disclose the existence of the scheme to corrupt WWE's agents or the bribery scheme or the series of payments made by Jakks through foreign subsidiaries to Stanfull and to Bell.

172    At no time during the negotiation of the videogame license did any of the Defendants disclose the existence of the bid rigging and market allocation scheme

### Jakks and THQ Divide the Proceeds from the Illegally Obtained Videogame License

173.    Pursuant to the terms of the videogame license, THQ/Jakks was not authorized to ship any licensed products prior to the fourth quarter of 1999

174    After the videogame license was secured on June 10, 1998 as a result of the illegal conduct set forth herein, Jakks and THQ, through their highest ranking officers, utilized the time between execution of the license and the date they were authorized to first ship WWE products to establish how the proceeds of their illegal conduct would ultimately be divided among them, just as Shenker and Bell had done

175    Through agreements entered into before the first product was shipped in the fourth quarter of 1999, the true nature of the illicit arrangement was fleshed out in agreements between THQ and Jakks

176.    On information and belief, the arrangements made between Jakks and THQ from June 10, 1998 through at least October 25, 1999 involved the highest ranking executives of both

companies, including the individual Defendants herein, and also involved numerous uses of the mails and wires, the full extent of which is known only to THQ, Jakks, and/or THQ/Jakks, the entities who have exclusive possession and control of that evidence.

177. As a result of discussions involving the highest ranking officers of THQ and Jakks, by October 25, 1999, the month before they were authorized to ship products under the license, THQ and Jakks had entered into operating agreements relevant to the videogame license defining the true nature of their relationship and which served to define the manner in which the proceeds of their illegal conduct, including bribery, would be distributed.

178. In the essential terms agreed upon by Jakks and THQ by at least October 25, 1999, THQ agreed to be responsible for funding all operations incidental to the WWE videogame license, including specifically all payments to WWE. THQ also agreed to be exclusively responsible for development, manufacturing, distribution and sales of all WWE videogames, and for the day-to-day operations incidental to performing the videogame license

179. In consideration of Jakks' illicit role in obtaining the WWE's videogame license, THQ also agreed, and in fact guaranteed, that Jakks would be paid a "preferred return" quarterly equal to the greater of a specified dollar amount or specified percentages of the net sales of WWE videogames in amounts that varied based on platform.

180. In other terms agreed to by THQ and insisted upon by Jakks to ensure that THQ did not disclose to WWE the facts and circumstances surrounding the issuance of the videogame license, THQ and Jakks agreed that Jakks would be the sole contact with WWE and that THQ would never initiate contact with WWE nor disclose the facts and circumstances surrounding the issuance of the videogame license known to it