181     As a result of the agreements negotiated between THQ and Jakks prior to the shipment of any WWE videogames, all financial risk to Jakks was eliminated and the videogame license became nothing but a guaranteed revenue stream to Jakks.

182     As a direct result of the scheme to defraud WWE out of monies it was entitled to receive for the exploitation of its intellectual property, Jakks, which neither owns the intellectual property nor performs the videogame license, has been paid substantially more by THQ than WWE has been paid on the videogame license.

183     In 1999, WWE was paid nothing by THQ, Jakks, or THQ/Jakks on the videogame license. By contrast, THQ paid Jakks over $6,000,000 in 1999 related to the illicit deals between them relating to the videogame license. The exact dates of these payments, which on information and belief utilized the mails and/or wires, are known to Jakks, THQ, THQ/Jakks and the individual defendants employed by Jakks and THQ.

184.    Through the year ended December 31, 2004, WWE has been paid approximately $54,000,000 in royalties by THQ on the videogame license. Jakks, through the same period, was paid approximately $64,000,000 by THQ as a result of the illegal conduct set forth herein.

185.    THQ/Jakks has never performed any aspect of the videogame license. From the first shipment of WWE product to today, the videogame license has been performed by THQ.

## The Coverup and Fraudulent Concealment

186     Following the corruption of Shenker and Bell and the inducement to breach their fiduciary duties and duty of honest services in connection with the licensing rights being sought by Jakks, Shenker and Bell split commissions on other licensing deals recommended by SSAI and approved by Bell and/or assigned to SSAI by Bell. All the illegal activity was affirmatively concealed from WWE by SSAI, Shenker and Bell.

187. On March 24, 2000, WWE terminated Bell's employment with WWE for reasons unrelated to Bell's receipt of bribes and kickbacks, none of which were known to WWE at the time.

188. Consistent with its practice of inducing Shenker to believe monies would be forthcoming from Jakks, on or about June 9, 2000, Jakks, through Berman, entered into an "Exclusive Agency Agreement" with SSAI to serve as the exclusive official licensing agent of Road Champs Ltd., promising SSAI 25% of all compensation actually received by Road Champs Ltd. and Jakks. This agreement, like all others, was not disclosed to WWE at the time.

189. On June 13, 2000, WWE terminated the contract of SSAI pursuant to a provision which entitled it to do so for a change in business direction.

190. In October of 2000, SSAI brought an action against WWE for breach of contract in Connecticut state court seeking to be paid commissions on licenses SSAI had allegedly procured, including the toy and videogame licenses (the "Shenker litigation").

191. At various times following the initiation of the Shenker litigation, Shenker, Bell, Friedman, Berman and Bennett, individually and as agents of the corporations they each own, control, and/or operate, have acted in concert to conceal the illegal conduct, including the bribes All involved first concealed and denied the fact of payments to Stanfull and the use of foreign accounts to do so After WWE eventually learned about the payments during discovery in the Shenker litigation, the Defendants directly involved in the payments gave false and inconsistent explanations for the payments, none of which are corroborated by any evidence.

192. In an early attempt to make sure the payments were never discovered in the Shenker litigation, Friedman telephoned Linda McMahon, the Chief Executive Officer of WWE,

and made an unsolicited offer during the early phase of the Shenker litigation to use his good grapes with Shenker to broker a settlement of the Shenker litigation. WWE declined his offer.

193.    In the early phases of the Shenker litigation, Bell and Shenker acted in concert and destroyed invoices Bell had sent to Shenker for the bribes he had been promised to abandon his fiduciary duties to WWE. Bell and Shenker also destroyed contracts they had related to the bribery payments at issue herein.

194.    As a further part of the concealment, Shenker committed perjury and failed to disclose the existence of Stanfull when asked if he owned any corporations other than SSAI Shenker committed perjury in order to conceal the payments originating with Jakks made to Stanfull's foreign bank account.

195.    To further the coverup and conceal their criminal conduct, Shenker and Bell both perjured themselves in the Shenker litigation and testified that neither SSAI nor Shenker had made any payments to Bell relating to WWE licenses  In actual fact, Shenker had made directly, or via money laundered through foreign accounts he controlled, payments in excess of $1,000,000 to Bell and/or Bell Licensing as commercial bribes, including payments of hundreds of thousands of dollars of bribes paid in connection with the agreement to give favorable treatment to Jakks' licensing matters

196.    During the same time Shenker and Bell were obstructing justice as set forth above, THQ and Jakks both represented that no payments had been made to Stanfull, SSAI, Shenker and/or Bell  In response to repeated requests by WWE, all uniformly denied making any payments to Stanfull, SSAI, Shenker and/or Bell

197.    By subpoena dated June 11, 2002, Jakks was ordered to produce a variety of records relating to its dealings with Shenker and Bell, including all documents relating to any

agreements between Jakks and Shenker and/or SSAI and all documents relating to any payments made to SSAI and/or Shenker

198.  Jakks' production of records in response to the subpoena was done by letter dated October 30, 2002. Jakks concealed and did not produce either the $80,000 or the $20,000 invoice it paid to Stanfull in 1998 or any other documentation indicating such payments had been made. Jakks also concealed, and did not produce, documents which demonstrated Shenker had acted as their agent. Jakks' response to the subpoena gave no indication that monies had, in fact, ever been paid to Shenker.

199.  In order to police Jakks' compliance with the license, WWE exercised its right to audit the books and records of Jakks in early 2003.

200.  On January 14, 2003, WWE's auditors requested, in writing, that Jakks provide the auditors with a complete listing of all payments made by Jakks to Shenker, SSAI, Bell and/or Stanfull

201.  On January 17, 2003, Jakks provided yet another false and misleading response to the auditors' request of January 14, 2003 by stating that they had already "provided any documents that may exist" in response to the June 11, 2002 subpoena. As Jakks knew, it had not produced any documents evidencing payments to Shenker, SSAI or Stanfull in response to the June 11, 2002 subpoena even though such records existed. Bennett received a copy of Jakks' false response to WWE's auditors and did nothing to correct it despite his knowledge of the payments at issue, all of which he had personally directed and orchestrated

202.  By email dated February 25, 2003, WWE's auditors responded to Jakks' January 17, 2003 misleading response by pointing out that Jakks had not provided any documents related to payments to Shenker, SSAI or Stanfull in response to the June 11, 2002

subpoena and again asked for copies of all invoices or a description of each transaction whereby payments were made by Jakks to Shenker, SSAI and/or Stanfull

203    On February 25, 2003, in an email response from employees working under the direct supervision of Bennett, Jakks did not respond and disclose the payments but instead advised that the request had been forwarded to their attorneys, who would advise shortly

204.    By March 14, 2003, no response had been received from Jakks' attorneys to the request for disclosure of payments to SSAI, Shenker and Stanfull. By letter dated March 14, 2003 sent to Jakks' corporate counsel, Mr Murray Skala, WWE again requested an answer to the question of whether payments had been made to Shenker, SSAI and Stanfull

205.    On March 19, 2003, Jakks, through its counsel, continued the practice of providing false and misleading information. By letter of that date, Jakks' counsel reiterated the false theme that "the specific information requested was provided months ago" in response to the subpoena. Such statements were false and known by Jakks to be false, as Jakks had not provided any information on the payments made to Shenker via Stanfull in 1998

206.    On March 25, 2003, WWE once again informed Jakks, through its counsel, that the specific information requested had not been provided and again requested specific disclosure.

207.    On March 26, 2003, Jakks' counsel acknowledged that the documents provided in response to the June 2002 subpoena did not include documents reflecting payments to Shenker, SSAI or Stanfull, and then represented "there simply is no additional information of the type you seek." Like all previous statements by Jakks, that statement was false. Jakks had numerous documents evidencing the payments to Stanfull buried in the records of foreign subsidiaries.

208.    Jakks' repeated refusals to disclose documents showing the complete nature of its relationship to Shenker or the payments to Stanfull in 1998 were deliberate, in bad faith, and part

of a plan to fraudulently conceal the illegal conduct and commercial bribery set forth herein at all costs. The relationship between Shenker and Jakks, and the payments made to Stanfull, were known to and orchestrated by the highest-ranking executives of Jakks, at least one of whom serves in an executive capacity for Jakks/THQ. Instead of disclosing the relationships with Shenker or the payments, Jakks repeatedly provided false and misleading information to the effect that no such payments had been made and responses which failed to disclose the true nature of the relationship between Jakks and Shenker.

209    In the Shenker litigation, SSAI, Shenker and Bell also acted in concert to conceal both the existence and extent of the unlawful conduct surrounding the videogame license and amendments to the toy licenses including, but not limited to, the bribes and did so during the same time that Jakks, THQ, and Jakks/THQ were concealing the payments to Stanfull which Jakks had made via foreign subsidiaries. Bell and Shenker both initially denied that any payments had been made to Bell by Shenker. SSAI and Shenker also denied receiving any money from licensees of WWE. When discovery indicated that payments had been made to Bell by Shenker, both falsely claimed the payments were for "developmental projects" unrelated to WWE. As part of their scheme to conceal their illegal conduct, Bell and Shenker created and then produced in discovery numerous fabricated invoices relating to payments from SSAI and/or Shenker to Bell, and destroyed the true invoices reflecting that aspect of the illegal conduct involving bribes and kickbacks. The fabricated invoices were designed to make it appear as if the payments made to Bell by Shenker were for "developmental projects" unrelated to WWE.

210.    In or around September 2002, however, SSAI inadvertently produced to WWE two authentic Bell Licensing invoices it had neglected to destroy which revealed that Bell Licensing had in fact invoiced SSAI for what was described as "consulting services" with respect

to specifically listed WWE licenses  Neither invoice produced at that time listed the videogame

license as one of the licenses for which Bell was invoicing SSAI, and Shenker and Bell

continued to conceal the improprieties involved in the videogame license.

211.   In late December 2002, both Shenker and Bell committed serial perjury by

testifying that the invoices they had fabricated were the actual and true invoices for the payments

SSAI had made to Bell.  Their serial perjury became manifest at the end of their respective

depositions when the true invoices which had been inadvertently produced were shown to them

212   At Bell's deposition in December 2002, he was confronted with the October 8,

1998 check of SSAI paying Bell Consulting $20,000  Bell falsely claimed at that time that the

payment was a "finder's fee" for brokering a deal between Jakks and Playmates  Although Bell

admitted to receiving the payment, he repeatedly and falsely suggested that the monies had come

from Playmates, not Jakks.

213    After being caught in manifest perjury in December 2002, SSAI, through its

counsel, advised the Court that Shenker would be recanting his prior testimony.  Shenker

thereafter spent two months devising what in reality turned out to be just another round of

perjury in which he continued to conceal the full extent and purpose of the payments he had

received from Jakks as well as all other illegal conduct associated with the videogame license

214.   On March 3, 2003, Shenker served WWE with alleged formal recantations

covering every material aspect of his testimony.  The alleged recantations made clear that for

months, Shenker had willfully perjured himself in deposition testimony and interrogatory

answers.  Throughout four days of post-recantation deposition testimony, Shenker repeatedly

admitted to giving false and misleading testimony and then provided equally false and

misleading testimony

215.   In his alleged recantations, Shenker continued to provide false and incomplete evidence on the payments he had received from Jakks and split with Bell. He adopted the same story told by Bell in December of 2002 about the only payment known at that time being a "finder's fee" for brokering a transaction between Jakks and Playmates. He testified that he had received a $40,000 payment from Jakks for a "finder's fee" and had split it with Bell. In his alleged recantation, Shenker admitted to and disclosed only a single $40,000 payment and, like Bell, claimed that amount was paid by Jakks for brokering a deal in which Playmates sold its inventory and equipment to Jakks. He did not, however, disclose or admit to receiving any additional monies from Jakks and continued to conceal both that he had been paid another $60,000 in 1998 by Jakks and the details of exactly when the payments were made. He likewise claimed he had no documentation regarding the only payment from Jakks he admitted to receiving at that time and continued to conceal the invoice for $80,000 containing a description for the payment at odds with his new perjury, just as Jakks was doing at the same time.

216.   In other proceedings in March of 2003, Shenker continued to conceal the true set of facts during his alleged "recantations." In briefings to the Court on March 5, 2003, Shenker again disclosed only one payment from Jakks of $40,000 and reiterated that it was for brokering the Playmates deal. In Shenker's words, "For brokering this deal between licensees, Jakks paid SSAI a $40,000 brokerage fee."

217.   In deposition testimony given on March 18, 2003, Shenker continued to use perjury as a tool to conceal the facts and misdirect WWE as to the timing and sequence of payments from Jakks so as to continue to conceal that additional payments were made during the exact time rights formerly held by Playmates were being transferred to Jakks and the videogame license was being negotiated.

218.    On March 18, 2003, Shenker, under the ruse of a recantation, again perjured himself and testified that a single $40,000 payment from Jakks was the only payment he received from a WWE licensee. To misdirect WWE further, Shenker testified that the invoice from Bell dated October 8, 1998, which was months after the videogame license was executed, was for Bell's split of the supposed "finder's fee" on the Playmates transaction. Shenker did not disclose all the payments to Bell from Jakks; all the splits he had made of Jakks money with Bell; or that all payments were related to the illicit plan to give favorable treatment to Jakks on licensing matters. Shenker further perjured himself and testified he had turned over all evidence of payments from Stanfull to Bell. As he well knew, he had neither disclosed, nor turned over, the evidence of payments made by Jakks to Stanfull which he had split with Bell in January 1998 and April 1998 during the videogame license negotiation period.

219.    On March 20, 2003, Shenker continued utilizing perjury as a tool of concealment under the ruse of a recantation. On that date, he falsely testified that there was only one $40,000 payment made to his foreign bank account which he split with Bell and continued to insist that payment was for brokering the Playmates deal. When asked directly if he received payments from anybody affiliated with Jakks or THQ in connection with the videogame license, Shenker falsely testified: "I don't remember receiving any payments—I don't remember. It could be. I just don't remember."

220.    On March 20, 2003, Shenker further perjured himself to make it appear as if he had worked long and hard putting together a videogame deal between WWE and Jakks and THQ, falsely claiming he had "worked on it for a long time." As Shenker well knew, his "work" on that license consisted of providing Jakks with the terms of Activision's initial offer, and no more, all as previously alleged. Shenker further concealed that aspect of the illegal activities by

testifying, falsely, that he could not remember if he told Berman or Friedman about Activision's initial proposal

221.    WWE presented the evidence of the dishonest and abusive discovery conduct to the Court in the Shenker litigation in a motion for sanctions   The Court wrote an opinion dated October 16, 2003 detailing Shenker and Bell's perjurious and corrupt scheme, and substantively finding they committed fraud upon the Court which warranted the dismissal with prejudice of SSAI's claims against WWE. The Court's opinion can be found at 48 Conn. Supp 357, 844 A.2d 964 (2003)

222.    The Court's opinion explicitly noted that Jakks was one of the WWE licensees that had paid Shenker and that Shenker perjured himself to conceal Stanfull's existence specifically to cover up its role as a conduit for payments to Shenker and Bell from WWE licensees, including specifically from Jakks.

223.    As of the time the Court issued its opinion dated October 16, 2003, which noted that Shenker had perjured himself about Stanfull in order to conceal the payment of money by Jakks, neither THQ nor Jakks had disclosed any payments to Stanfull or Shenker despite prior repeated requests that they do so   Similarly, Jakks had not corrected the false information provided through its counsel on March 26, 2003 that there was no such information to provide.

224.    Jakks' failure to disclose such information by October 16, 2003, and correct its prior misrepresentations, was calculated, deliberate and part of a continuation of its plan to conceal the illegal conduct at all costs   Unknown to WWE as of October 16, 2003, Jakks, through Bennett, had retrieved specific documentary evidence of the payments to Stanfull from its foreign subsidiaries and had provided it to Jakks' outside counsel not later than the first week of September 2003.  Despite their certain knowledge by that time that both Jakks and its counsel

had previously provided false and incorrect information to WWE, neither Jakks nor its counsel disclosed the information to WWE in September or October of 2003

225.   After the Court issued its October 16, 2003 opinion in the Shenker litigation, and in violation of specific court orders of compulsion and his promise to do so, Shenker refused to obtain and produce the records of Stanfull's account at the Hang Seng Bank which were needed to determine the full extent of payments to Stanfull by Jakks. As a result, WWE was compelled to incur considerable trouble and expense to go to Hong Kong in October 2003 to depose the records custodian of the Hang Seng Bank

226.   In the course of that deposition, WWE confirmed that one $40,000 payment had been made to Stanfull's account by Jakks Pacific (H.K.) in April 1998—the very time that WWE was considering to whom to award its videogame license. Records further confirmed that the $40,000 payment was then split equally by a demand draft to Bell a few days later. Based on other incomplete records produced in that deposition, it appeared Jakks had paid Stanfull another $40,000 in January 1998 and $20,000 in August 1998

227   Immediately following those discoveries, on November 5, 2003, WWE's counsel directed a letter to Jakks' counsel transmitting the Court's opinion in the Shenker litigation on WWE's sanction motion and again requested that complete information regarding payments to SSAI, Shenker and/or Stanfull be provided to WWE. By reading the Court's opinion, Jakks would have known that, despite its consistent prior denials of such payments, WWE was in possession of evidence indicating that money had, in fact, been paid to Stanfull by Jakks.

228.   On November 11, 2003, Friedman telephoned WWE's Chief Executive Officer, Linda McMahon, and told her that, in response to WWE's counsel's letter to Jakks' counsel, Jakks had searched its files and found evidence of payments to Stanfull—the fundamental fact

Jakks previously had outright denied for months  Friedman told Mrs. McMahon that the payments were for a perfume deal and $80,000 for "project development" for a mechanical dinosaur project, both of which supposedly were unrelated to WWE

229.    Friedman's statements to Mrs. McMahon were neither accurate nor complete and were a continuation of the concealment. Friedman knew all along that Jakks had paid Shenker, as he was one of the corporate officers who authorized the payments. His suggestion that Jakks had just located the information was also false, as Jakks had unquestionably forwarded the payment information to its outside counsel not later than the first week of September and had that information for two months before WWE's counsel's letter of November 5, 2003 and had not disclosed it  Additionally, the $80,000 in payments made in January and April of 1998 were not for project development as Jakks and Friedman knew, and Friedman completely failed to disclose the $20,000 payment made to Stanfull in August of 1998 after the videogame license and amendments to the toy licenses had been secured

230.    On November 14, 2003, despite its previous repeated denials, Jakks' counsel wrote to WWE's counsel reaffirming Friedman's statements to Mrs  McMahon and produced for the first time any records relating to the payments made by Jakks to Stanfull. Among other things, Jakks produced for the first time the January 2, 1998 $80,000 invoice from Stanfull in Shenker's own handwriting, which Shenker had never produced in the Shenker litigation. Jakks, through its counsel, did not disclose the $20,000 payment made in August 1998 or the phony invoice behind that payment

231    Jakks' alleged explanation for the $80,000 in payments to Stanfull—"project development" costs for a mechanical dinosaur project unrelated to WWE—was completely

inconsistent with the purported explanation offered by Shenker and Bell that they had split a single $40,000 finder's fee for a deal involving WWE licensees, Jakks and Playmates.

232.    The January 2, 1998 invoice in Shenker's own handwriting did not bill Jakks for a finder's fee of $40,000 on Playmates as he and Bell had claimed under oath, but rather for $80,000 for the "development of possible latex based soft toys with special coatings." On information and belief, Jakks concealed this invoice for as long as it could because it knew it was inconsistent with the testimonial positions taken by Shenker and Bell for the payments and because it knew Shenker would have no reason to split the $80,000 paid on the invoice with Bell, as he did, if in fact the payments were for a mechanical dinosaur project unrelated to WWE

233.    Jakks produced the invoice only after it knew WWE was aware of the payments and because, as a publicly traded company, it would reasonably be expected to have some form of documentation for such payments.

234.    In January 2004, WWE again deposed representatives of the Hang Seng Bank and confirmed for the first time that, in fact, three payments had been made to Shenker's Stanfull account in 1998 totaling $100,000 by the foreign subsidiaries of Jakks.

235    In May of 2004, Bell filed a false affidavit in the Connecticut court continuing the tact of falsely denying any connection between the payments he had received in 1998 of monies originating with Jakks and the videogame license  Among other things, Bell claimed he had originally rejected the Jakks deal because Jakks was not then in the videogame business and that Jakks then came back with THQ as a partner

236.    In actual fact, Bell had not originally rejected Jakks because they were not in the videogame business.  As Bell well knew, he and Shenker had recommended the license be given

to Jakks on the day Jakks paid $40,000 to Shenker's foreign bank account, which was then split with Bell

237    Defendants have colluded during their coverup on several different occasions  On one occasion during the period he was planning his supposed recantation after being caught in perjury, Shenker directed his legal counsel for SSAI to contact Jakks' counsel to advise that he would be disclosing that Jakks paid him money.  SSAI's legal counsel did so  Thereafter, Shenker disclosed only what he knew WWE was already aware of – a single $40,000 payment – and, like Jakks, did not disclose the full range and dates of payments.  On another occasion, he directed his counsel to notify Jakks' counsel that Shenker had provided information regarding statements made by Friedman reflecting Friedman's knowledge that SSAI was splitting his commissions with Bell.

238.    Friedman, Berman and Bennett were all deposed in the Shenker litigation and none initially identified the person who negotiated the payments to Stanfull or authorized the payments.  Friedman and Berman both under oath falsely denied being involved in the payments.  Bennett initially falsely claimed under oath not to remember who had authorized the payments  As a result of their testimonial positions, the three highest ranking executives of Jakks hoped to obscure their involvement in the illegal conduct and avoid being questioned about their actions.

239.    In testimony given on July 28, 2004, Friedman also attempted to continue to conceal other aspects of the scheme he had orchestrated, falsely denying that he had been given the terms of Activision's initial offer by Shenker and otherwise failing to disclose the true set of facts and circumstances involved in the bid rigging and price fixing conspiracy he had orchestrated with THQ.

240.    In response to Jakks' officers not identifying the person(s) who authorized the payment, WWE moved the Connecticut Court to enter an order of compulsion requiring Jakks to identify the persons who authorized the payments. Jakks opposed being compelled to do so. After the Court ruled that Jakks must produce a knowledgeable witness, Bennett then appeared again and testified that, under any circumstances then existing in 1998, the payments had to have been authorized by Friedman, Berman, or both, thereby indicating that both men had provided false testimony about their involvement

241.    Although both Jakks and THQ have derived, and continue to derive, material portions of their respective corporate revenues from the videogame license, neither has ever attached the actual operating agreements between them to filings made pursuant to the Securities and Exchange Act. On information and belief, those agreements, and Jakks' interpretation of those agreements, reflect terms designed to prevent disclosure of the facts and circumstances surrounding the videogame license by mandating that THQ is not allowed to initiate contact with WWE nor disclose any of the facts and circumstances involved in the bidding process for WWE's videogame license.

## COUNT I
### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1962(c)
#### (Against All Defendants)

242.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

### RICO Persons

243.   THQ/Jakks, Jakks, Jakks Pacific (H.K.), Road Champs Ltd., THQ, SSAI, Shenker, Bell Licensing, Bell, Friedman, Berman, Bennett and Farrell are each a "person" within the meaning of 18 U.S.C. § 1961(3).

### RICO Enterprise

244.   For the purpose of 18 U.S.C. § 1962(c), THQ/Jakks, Jakks, Jakks Pacific (H.K.), Road Champs Ltd., THQ, SSAI, Shenker, Bell Licensing, Bell, Friedman, Berman, Bennett and Farrell, acting in concert, comprised an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) through a pattern of racketeering activity as set forth below for the purpose of conducting the unlawful activities described herein.

245.   For the purpose of 18 U.S.C. § 1962(c), THQ/Jakks, Jakks, Jakks Pacific (H.K.), Road Champs Ltd., THQ, SSAI, Shenker, Bell Licensing, Bell, Friedman, Berman, Bennett and Farrell each had authority within the enterprise described above and/or conducted or participated in the unlawful conduct set forth herein through the enterprise described above

### Effect on Interstate Commerce

246.   The association-in-fact of THQ/Jakks, Jakks, Jakks Pacific (H.K.), Road Champs Ltd., THQ, SSAI, Shenker, Bell Licensing, Bell, Friedman, Berman, Bennett and Farrell is an entity that engages in and affects interstate commerce by maintaining contacts and conducting economic and other activities throughout the United States and around the world

### Predicate Acts of Racketeering Activity

247   Defendants conducted, engaged in and/or participated in a pattern of predicate acts through the enterprise described above, including the commission of numerous violations of the Federal Mail Fraud Statute, 18 U.S.C. § 1341, the Federal Wire Fraud Statute, 18 U.S.C. §

1343, the Federal Money Laundering Statutes, 18 U.S.C. §§ 1956 and 1957, the Federal Travel

Act, 18 U.S.C. § 1952, the National Stolen Property Act, 18 U.S.C. §§ 2314 and 2315 and New

York Penal Law § 180.03 concerning commercial bribery. Such violations are "predicate acts"

under 18 U.S.C. § 1961(1)(A) and (B).

248.    Much of the evidence demonstrating the commission of predicate acts remains in

the exclusive possession and control of some and/or all of the Defendants.

249.    Nevertheless, Defendants' predicate acts known at this time include, but are not

limited to, the following:

    a.    In furtherance of a scheme or artifice to defraud, and with specific intent

        to defraud, Defendants knowingly used or caused to be used the mails or

        wire communications in violation of 18 U.S.C. § 1341 and/or 18 U.S.C. §

        1343 to deprive the WWE of its intangible right of honest services from

        its licensing agent and supervising managerial employee to obtain thereby

        valuable licensing rights from WWE including several amendments to the

        domestic toy license, an international toy license, a videogame license,

        and further amendments to the domestic and international toy licenses.

        Defendants' specific acts of mail and/or wire fraud include at least the

        following:

        i.    In furtherance of a scheme or artifice to defraud, and with specific

            intent to defraud, on November 20, 1995, Defendant Berman,

            individually and on behalf of Defendant Jakks, transmitted by

            facsimile a letter to Shenker and SSAI requesting that Shenker

            and SSAI perform specified services on behalf of Jakks knowing

            that Jakks intended to seek further licensing rights from WWE

and with the intent to create and then trade on the undisclosed conflict of interest.

ii.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on November 29, 1995, Defendant Berman, individually and on behalf of Defendant Jakks, transmitted a memorandum to Shenker by facsimile confirming that an agreement would be sent to Shenker that week retaining Shenker as Jakks' agent regarding the perfumed dolls and, trading on the undisclosed conflict of interest being created, further advised that "Jack [Friedman] and I would appreciate any assistance from you regarding the Junior Kodak prospect," all in reference to WWE licensing rights

iii.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on January 3, 1996, Defendant Berman, individually and on behalf of Defendant Jakks, authorized a facsimile transmission to SSAI and Shenker transmitting a revised agreement whereby SSAI and Shenker agreed to perform services for Jakks and, trading on the undisclosed conflict of interest, asked "Please advise how soon you can amend the [WWE] agreement to include the disposable cameras and photo albums"

iv.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on February 1, 1996, at the direction of Defendants Friedman and Berman, and on behalf of Defendant Jakks, a memorandum was sent by facsimile to Shenker and SSAI

confirming that all three would meet at the New York Toy Fair on February 14, 1996, the purpose of which was to discuss additional ways Shenker, while an undisclosed agent of Jakks, could assist Jakks in securing for Jakks valuable WWE licensing rights, including amendments to the domestic toy license and the videogame license.

v.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on February 28, 1996, Defendant Berman, individually and on behalf of Defendant Jakks, transmitted by facsimile a memorandum to Shenker confirming their conversation at the February 14, 1996 New York Toy Fair and requesting that Shenker, while acting as an undisclosed agent of Jakks, "forward the necessary amendment to our [WWE] agreement to include Licensed Disposable Cameras and Photo Albums, as well as Europe for distribution of [WWE] Figures as Microphones"

vi.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on March 15, 1996, Defendant Friedman, individually and on behalf of Defendant Jakks, transmitted by facsimile to Shenker stating that he would appreciate "having the amendments sent to [sic] in writing that you verbally agreed to with us  As it has been discussed, it should contain the following amendments:

1.    Amend the agreement for [WWE] to include the Thumb wrestling

2    Amend the agreement for [WWE] Cameras and Photo Albums "

vii.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on April 22, 1996, Defendant Jakks, on the authority of Defendants Berman and Friedman, transmitted by mail to WWE executed copies of the First Amendment to the domestic toy license granting Jakks the rights to make disposable cameras, photo albums and thumb-operated wrestling figures, all as had been requested of Shenker and SSAI by Jakks while Shenker was an undisclosed agent of Jakks. The terms of the First Amendment were exactly as directed by Jakks in its prior correspondence with Shenker, who did not attempt to obtain more favorable terms for WWE.

viii.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on October 19, 1996, Defendant Berman, individually and on behalf of Defendant Jakks, continued to trade on the undisclosed conflict of interest and transmitted by mail and/or wire a memorandum to Shenker advising that Jakks wanted to obtain the international licensing rights for Jakks' WWE products and specifying the terms Jakks wanted in the international license; all in connection with that aspect of the illicit plan to drive Playmates out of the business of WWE toys and to obtain the rights Playmates held at the time

ix    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on October 19, 1996, Defendant Berman,

individually and on behalf of Defendant Jakks, continued to trade on the undisclosed conflict of interest and transmitted by mail and/or wire a memorandum specifying amendments to the domestic toy license desired by Jakks and the terms desired by Jakks, all in connection with that aspect of the illicit plan to drive Playmates out of the business of WWE toys and to obtain the rights Playmates held at the time.

x.     In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on December 30, 1996, Defendant Bennett, individually and on behalf of Defendant Jakks, mailed to WWE an executed copy of the Second Amendment to the domestic toy license, which had been recommended to WWE by Shenker and SSAI while undisclosed agents of Jakks following receipt of Berman's October 19, 1996 memorandum. The terms of the Second Amendment were exactly as directed by Jakks in its October 19, 1996 memoradum to Shenker, who did not attempt to obtain more favorable terms for WWE; all in connection with that aspect of the illicit plan to drive Playmates out of the business of WWE toys and to obtain the rights Playmates held at the time.

xi.     As a reasonably foreseeable result of the artifice to defraud, and in furtherance of it, on or about February 25, 1997, WWE transmitted by mail an executed copy of the International Toy License between Jakks and WWE which Berman, on behalf of Jakks, had sought from Shenker while an undisclosed agent of Jakks by his memorandum of October 19, 1996. The relevant financial terms recommended by Shenker and SSAI to WWE

were the same as proposed by Berman in his October 19, 1996 memorandum, as to the royalty rate, advance guarantee, guaranteed royalty amount and length of term, and reflect no attempt by Shenker to negotiate more favorable terms for WWE, all in connection with that aspect of the illicit plan to drive Playmates out of the business of WWE toys and to obtain the rights Playmates held at the time.

xii.    In furtherance of the scheme or artifice to defraud, and with specific intent to defraud, Bell transmitted by facsimile on November 6, 1997 a letter to Playmates offering to absolve Playmates of liability to WWE if it agreed to transfer its rights to Jakks.

xiii.    In furtherance of the scheme or artifice to defraud, and with intent to defraud, Bell, Shenker and Berman participated in a telephone call during the Hong Kong Toy Show sometime between January 7-10, 1998 to discuss Bell's participation in the scheme to act favorably on licensing matters involving Jakks.

xiv.    On January 12, 1998, as a reasonably foreseeable result of the artifice to defraud, WWE signed and sent by mail and/or facsimile the Third Amendment to the domestic license transferring to Jakks the rights formerly held by Playmates.

xv.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on January 12, 1998, Defendant Bennett, individually and on behalf of Defendant Jakks, and upon authorization of Defendants Friedman and/or Berman, transmitted

by facsimile a direction to Wills Hon of Defendant Jakks Pacific (H.K.) to make payment arrangements for Stanfull's January 2, 1998 invoice

xvi.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on January 14, 1998, pursuant to Defendant Bennett's direction made on behalf of Defendant Jakks and which was authorized by Defendants Friedman and/or Berman, Defendant Road Champs Ltd. wire-transferred $40,000 from its account at the Hang Seng Bank in Hong Kong in an intra-bank transfer to Stanfull's account at the Hang Seng Bank.

xvii.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on January 14, 1998, pursuant to Defendant Bennett's direction made on behalf of Defendant Jakks and authorized by Defendants Friedman and/or Berman, Defendant Jakks Pacific (H.K.) transmitted by facsimile a request to Norwest Bank Minnesota, N.A. ("Norwest Bank") in Hong Kong for telegraphic transfer of $40,000 to Defendant Road Champs Ltd.'s account at the Hang Seng Bank.

xviii.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on January 14, 1998, pursuant to Defendant Bennett's direction made on behalf of Defendant Jakks and authorized by Defendants Friedman and/or Berman, Defendant Jakks Pacific (H.K.) wire-transferred $40,000 from Defendant Jakks Pacific (H.K.)'s account at Norwest Bank to Defendant Road Champs Ltd.'s account at the Hang Seng Bank.

xix.    As a reasonably foreseeable result of Defendants' fraudulent scheme, Norwest Bank transmitted a letter dated January 14, 1998 to Defendant Jakks Pacific (H.K.) confirming that the $40,000 wire-transfer to Defendant Road Champs Ltd. had been completed.

xx.    As a reasonably foreseeable result of Defendants' fraudulent scheme, Hang Seng Bank transmitted a letter dated January 15, 1998 to Defendant Road Champs Ltd. confirming that Defendant Road Champs Ltd.'s account at the Hang Seng Bank had been credited for $40,000 by order of Defendant Jakks Pacific (H.K.)

xxi    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, Defendant Road Champs Ltd. falsified its corporate books and records to conceal its $40,000 payment to Stanfull by making it appear as an inter-company transfer between Defendant Jakks Pacific (H.K.) and Defendant Road Champs Ltd.

xxii    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, Defendant Bennett, individually and on behalf of Defendant Jakks, falsified Defendant Jakks' corporate books and records by failing to record the $40,000 payment to Stanfull

xxiii    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on March 31, 1998, Defendant Bennett, individually and on behalf of Defendant Jakks and upon authorization of Defendants Friedman and/or Berman, transmitted by facsimile a direction to Wills Hon of Defendant Jakks Pacific

(H.K.) to make payment arrangements for the second installment payment of Stanfull's January 2, 1998 invoice, specifically instructing Mr. Hon that it was "imperative" that the payment be made available April 2, 1998.

xxiv    As a reasonably foreseeable result of Defendants' fraudulent scheme, Norwest Bank transmitted a letter dated April 1, 1998 to Defendant Jakks Pacific (H.K.) confirming that Defendant Jakks Pacific (H.K.)'s account had been debited in the amount of $40,000.

xxv.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on April 2, 1998, pursuant to Defendant Bennett's direction made on behalf of Defendant Jakks and authorized by Defendants Friedman and/or Berman, Defendant Jakks Pacific (H.K.) wire-transferred $40,000 from its account at Norwest Bank to Stanfull's account at the Hang Seng Bank

xxvi.    In furtherance of a scheme to defraud, and with specific intent to defraud, Shenker, Friedman and/or Berman participated in telephone calls between April 27, 1998 and May 7, 1998 during which Shenker disclosed the terms of Activision's and THQ's expressions of interest in the videogame license.

xxvii    In furtherance of a scheme to defraud, and with specific intent to defraud, Friedman and/or Berman and Farrell participated in telephone calls between April 27, 1998 and May 7, 1998 discussing the terms on which THQ would be included in the videogame license and other matters alleged herein

xxviii    In furtherance of a scheme to defraud, and with specific intent to defraud, Friedman, on behalf of Defendants Jakks and THQ, participated in a phone call on or about May 7, 1998 in which he provided to Shenker the terms to be offered to WWE for a videogame license to Jakks and THQ.

xxix.    In furtherance of Defendants' scheme or artifice to defraud, and with specific intent to defraud, on May 7, 1998, Defendant Berman, on behalf of Defendants Jakks and THQ, transmitted by facsimile a letter to Defendant Bell regarding toy company strength in marketing vs. videogame strength in marketing, which Defendant Bell subsequently forwarded to Linda McMahon as part of an effort to deceive her that Jakks' and THQ's participation in the videogame license was "right on target."

xxx.    As a reasonably foreseeable result of Defendants' fraudulent scheme, on May 28, 1998, Edward L. Kaufman, Esq., General Counsel of WWE ("Kaufman"), transmitted by Federal Express a letter to Murray Skala, Esq., counsel to Jakks, regarding a draft of the proposed videogame license agreement and attaching a copy of the videogame license deal memo.

xxxi.    As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, and with specific intent to defraud, on June 2, 1998, Defendant Berman, individually and on behalf of Defendants Jakks and THQ, upon authorization of Defendant Friedman, transmitted by facsimile a letter to Defendant Shenker regarding,

among other things, (i) comments regarding the proposed videogame license agreement, which was to be forwarded to Defendants Bell and Shenker on June 3, 1998; (ii) the fifth amendment to Jakks' domestic toy license with WWE; and (iii) the third amendment to Jakks' international toy license with WWE.

xxxii.   As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, on June 3, 1998, Defendant Berman, individually and on behalf of Defendants Jakks and THQ, transmitted by facsimile a letter to Defendants Bell and Shenker, and to Kaufman, enclosing comments regarding the proposed videogame license agreement

xxxiii   As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, on June 3, 1998, Defendant Berman, individually and on behalf of Defendants Jakks and THQ, transmitted by facsimile a letter to Defendants Bell and Shenker, and to Kaufman, enclosing revised comments regarding the proposed videogame license agreement

xxxiv    As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, on June 4, 1998, Daniel Offner, counsel to Defendant THQ, on behalf of Defendants THQ and Jakks, transmitted by facsimile a letter to Kaufman, Geoffrey Bass, Esq., counsel for

Defendant Jakks, Defendant Farrell and Defendant Berman enclosing revisions to the proposed videogame license agreement

xxxv    As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, on June 5, 1998, Defendant Berman, individually and on behalf of Defendants Jakks and THQ, transmitted by facsimile a letter to Defendant Bell enclosing revisions to the proposed videogame license agreement.

xxxvi.    As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, on June 9, 1998, Geoffrey Bass, Esq., counsel for Defendant Jakks, on behalf of Defendants Jakks and THQ, upon authorization of Defendants Friedman and/or Berman, transmitted by facsimile a letter to Kaufman enclosing comments to the revised proposed videogame license agreement.

xxxvii.    As a reasonably foreseeable result of Defendants' fraudulent scheme, on June 10, 1998, Kaufman transmitted by facsimile a redlined version of the proposed videogame license agreement to Geoffrey Bass, Esq., counsel to Defendant Jakks.

xxxviii.    As a reasonably foreseeable result of Defendants' fraudulent scheme, and in furtherance of Defendants' scheme or artifice to defraud, on June 17, 1998, Geoffrey Bass, Esq., counsel for Jakks, on behalf of Defendants Jakks, THQ, and THQ/Jakks, transmitted by facsimile a letter to Kaufman requesting copies of the videogame license agreement executed by WWE for Mr. Bass

to provide to Defendants THQ and Jakks, and attaching a copy of
the videogame license agreement executed by Defendant Farrell,
President and Chief Executive Officer of THQ/Jakks.

xxxix.     As a reasonably foreseeable result of Defendants' fraudulent
scheme, on June 24, 1998, Kaufman transmitted by Federal
Express to Defendant Friedman, on behalf of Defendant Jakks, an
unexecuted copy of the fifth amendment to Jakks' domestic toy
license agreement with WWE.

xl.     As a reasonably foreseeable result of Defendants' fraudulent
scheme, on June 24, 1998, Kaufman transmitted by Federal
Express to Defendant Friedman, on behalf of Defendant Jakks, an
unexecuted copy of the third amendment to Jakks' international
toy license agreement with WWE

xli.     As a reasonably foreseeable result of Defendants' fraudulent
scheme, and in furtherance of Defendants' scheme or artifice to
defraud, on July 1, 1998, Defendant Bennett, individually and on
behalf of Defendant Jakks, upon authorization of Defendant
Friedman, transmitted to WWE a copy of the fifth amendment to
Jakks' domestic toy license with WWE executed by Defendant
Berman.

xlii.     As a reasonably foreseeable result of Defendants' fraudulent
scheme, on or about July 2, 1998, Kaufman transmitted by
Federal Express to Defendant Bennett a fully executed copy of
the fifth amendment to Jakks' domestic toy license agreement
with WWE.

xliii.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on July 27, 1998, Defendant SSAI transmitted by facsimile to Defendant Berman a phony invoice directed to Jakks from Stanfull dated July 15, 1998 in the amount of $20,000 falsely purporting to invoice Defendant Jakks for alleged product development.

xliv.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on July 30, 1998, Defendant Bennett, individually and on behalf of or for the benefit of Defendants Jakks, THQ, and THQ/Jakks, upon authorization of Defendants Friedman and/or Berman, transmitted by facsimile to Elmen Lai of Defendant Road Champs Ltd. a copy of Stanfull's July 15, 1998 invoice, directing that payment be made.

xlv.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on August 3, 1998, pursuant to Defendant Bennett's direction made on behalf of and for the benefit of Defendants Jakks, THQ, and THQ/Jakks, Elmen Lai of Defendant Road Champs Ltd transmitted an email communication to Defendant Bennett confirming that $20,000 was paid to Stanfull.

xlvi.    In furtherance of a scheme or artifice to defraud, and with specific intent to defraud, on August 4, 1998, pursuant to Defendant Bennett's direction made on behalf of and for the benefit of Defendants Jakks, THQ, and THQ/Jakks, Defendant Road Champs Ltd. wire-transferred $20,000 from its account at the

Hang Seng Bank in an intra-bank transfer to Stanfull's account at
the Hang Seng Bank

xlvii    As a reasonably foreseeable result of Defendants' fraudulent acts
and in furtherance of Defendants' scheme or artifice to defraud,
on June 9, 1998, Defendant Farrell, on behalf of Defendants
Jakks, THQ, and THQ/Jakks, transmitted by facsimile a letter to
Defendant Bell regarding his recent meeting with Bell in
Stamford, Connecticut, and meetings between Defendants THQ
and Jakks

xlviii    As a reasonably foreseeable result of Defendants' fraudulent acts
and in furtherance of Defendants' artifice to defraud, on July 2,
1998, WWE transmitted by mail a check in the amount of
$301,751.54 to SSAI, all of which reflected payments to SSAI on
the videogame license with THQ/Jakks

xlix    In furtherance of a scheme or artifice to defraud, and with specific
intent to defraud, on December 21, 1998, Defendant Shenker
caused Defendant SSAI to wire-transfer $280,616 from
Defendant SSAI's checking account at Fleet Bank, headquartered
in Fort Lee, New Jersey, to Stanfull's account at the Hang Seng
Bank, consisting of $165,000 of commissions Defendant SSAI
was paid by WWE on the videogame license.

l    In furtherance of a scheme or artifice to defraud, and with specific
intent to defraud, on January 11, 1999, Defendant Shenker wire-
transferred $280,601 from Stanfull's account at the Hang Seng
Bank to Defendant Bell Licensing's money market account at

Hudson Bank, consisting of $165,000 in commissions Defendant
SSAI was paid by WWE on the videogame license

li.    As a reasonably foreseeable result of Defendants' fraudulent acts
and in furtherance of Defendants' artifice to defraud, on
February 10, 2000 WWE transmitted by mail a check in the
amount of $663,037.70 to SSAI, of which $165,000 represented
payments to SSAI on the videogame license with THQ/Jakks

lii.    As a reasonably foreseeable result of Defendants' fraudulent acts
and in furtherance of Defendants' artifice to defraud, on June 9,
2000, WWE transmitted by mail a check in the amount of
$312,788.55 to SSAI, of which $247,280.90 represented
payments to SSAI on the videogame license with THQ/Jakks

liii.    As a reasonably foreseeable result of Defendants' fraudulent acts
and in furtherance of Defendants' artifice to defraud, on
August 24, 2000, WWE transmitted by mail a check in the
amount of $324,540.66 to SSAI, of which $132,735.44
represented payments to SSAI on the videogame license with
THQ/Jakks.

liv    In furtherance of a scheme or artifice to defraud, and with specific
intent to defraud, Friedman in or around October 2000 telephoned
Linda McMahon offering to broker a settlement between Shenker
and WWE; said call being made in the hope that such a settlement
would serve to forever conceal the illegal conduct set forth herein

lv       In furtherance of a scheme or artifice to defraud, and with specific
intent to defraud, Friedman on or about November 11, 2003
telephoned Linda McMahon and misrepresented the nature,
extent and purpose of payments made to Shenker by Jakks

lvi      Various uses of the mails and wires between and among
Defendants Jakks, Shenker, SSAI, THQ, and THQ/Jakks in
furtherance of the scheme and artifice to defraud by denying
WWE the benefits of honest services from its licensing agents,
the evidence of which is in the exclusive possession of Jakks,
THQ and/or THQ/Jakks.

b.    In violation of the Federal Money Laundering Statutes, 18 U.S.C. §§ 1956
and 1957, Defendants' payment and/or receipt of unlawful bribes and
payments to secure the videogame license and the 1998 amendments to
the toy licenses, and/or subsequent receipt of benefits as a result of the
unlawful bribes, involved the proceeds of commercial bribery, an
enumerated unlawful activity under 18 U.S.C. § 1956, and were designed
to conceal or disguise the nature and the source of such proceeds. In
addition and/or in the alternative, Defendants' payment and receipt of
unlawful bribes and payments to secure the videogame license and the
1998 amendments to the toy licenses, and/or Defendants' subsequent
payment, receipt or transfer of the benefits obtained by commercial
bribery, involved the knowing deposit, withdrawal, transfer or exchange of
funds or a monetary instrument through or to a financial institution of a
value in excess of $10,000, and constituted, represented or was derived
from the proceeds obtained by commercial bribery, an enumerated
unlawful activity under 18 U.S.C. § 1957 Defendants' specific acts of

money laundering in violation of 18 U.S.C. §§ 1956 and 1957 include at least the following:

i.     In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on January 14, 1998, pursuant to Defendant Bennett's direction made on behalf of Defendant Jakks and which was authorized by Defendants Friedman and/or Berman, Defendant Road Champs Ltd. wire-transferred $40,000 from its account at the Hang Seng Bank in Hong Kong in an intra-bank transfer to Stanfull's account at the Hang Seng Bank

ii.     In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on January 14, 1998, pursuant to Defendant Bennett's direction made on behalf of Defendant Jakks and authorized by Defendants Friedman and/or Berman, Defendant Jakks Pacific (H.K.) wire-transferred $40,000 from Defendant Jakks Pacific (H K )'s account at Norwest Bank to Defendant Road Champs Ltd 's account at the Hang Seng Bank

iii.     In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by demand draft dated January 14, 1998 drawn on Stanfull's account at the Hang Seng Bank, Defendant Shenker paid Defendant Bell $20,000 of the $40,000 paid to Stanfull from Defendant Road Champs Ltd.

iv.     In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on April 2, 1998, pursuant to Defendant Bennett's direction made on behalf of Defendant Jakks and authorized by Defendants Friedman and/or Berman,

Defendant Jakks Pacific (H.K.) wire-transferred $40,000 from its account at Norwest Bank to Stanfull's account at the Hang Seng Bank

v     In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by demand draft dated April 7, 1998 drawn on Stanfull's account at the Hang Seng Bank, Defendant Shenker paid Defendant Bell Licensing $20,000 of the $40,000 paid to Stanfull from Defendant Jakks Pacific (H.K.).

vi.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on or about April 7, 1998, Defendant Bell deposited the Stanfull demand draft paid to Defendant Bell Licensing into a MBNA money market account owned by Defendant Bell, which cleared through Citibank located in New York.

vii    In furtherance of Defendants' commercial bribery scheme, on July 3, 1998, Defendant Shenker deposited a check, dated July 3, 1998, from WWE in the amount of $301,751.54 into SSAI's Fleet Bank account, consisting of commissions related to the advance on the videogame license, which represented proceeds derived from Defendants' commercial bribery scheme. The total of SSAI's commission related to the videogame license was $330,000; however, due to an overpayment of commissions in a prior month, WWE deducted $28,248.46 from that amount, thereby SSAI only received $301,751.54 on July 3, 1998.

viii.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on August 4, 1998, pursuant to Defendant Bennett's direction made on behalf of and for the benefit of Defendants Jakks, THQ, and THQ/Jakks, Defendant Road Champs Ltd. wire-transferred $20,000 from its account at the Hang Seng Bank in an intra-bank transfer to Stanfull's account at the Hang Seng Bank.

ix       In furtherance of, and with the intent to conceal proceeds of Defendants' commercial bribery scheme, by check no. 1881, dated October 8, 1998, Defendant Shenker caused Defendant SSAI to pay Defendant Bell Licensing $20,000, drawn on SSAI's checking account at Fleet Bank, headquartered in Fort Lee, New Jersey.

x        In furtherance of, and with the intent to conceal proceeds of Defendants' commercial bribery scheme, on October 9, 1998, Defendant Bell deposited the October 8, 1998 check from Defendant SSAI into Defendant Bell Licensing's Hudson Bank money market account located in Darien, Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey

xi.      In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on December 21, 1998, Defendant Shenker caused Defendant SSAI to wire-transfer $280,616 from Defendant SSAI's checking account at Fleet Bank, headquartered in Fort Lee, New Jersey, to Stanfull's account at the Hang Seng

Bank, consisting in part of $165,000 which was exactly 50% of the advance Defendant SSAI was paid by WWE on the videogame license  Defendant SSAI's transfer to Stanfull was the precursor to Defendant Bell Licensing's receipt of the unlawful proceeds, as Defendant Shenker elected to run the transaction through a foreign bank account in order to conceal the nature and source of the payments

xii.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on January 11, 1999, Defendant Shenker wire-transferred $280,601 from Stanfull's account at the Hang Seng Bank to Defendant Bell Licensing's money market account at Hudson Bank, consisting of $165,000, exactly 50% of the advance Defendant SSAI was paid by WWE on the videogame license.

xiii.    In furtherance of Defendants' commercial bribery scheme, on February 7, 2000 Defendant Shenker deposited a check dated February 4, 2000 from WWE in the amount of $663,037.70 into SSAI's Fleet Bank account, consisting of $165,000 in commissions related to the videogame license, which represented proceeds derived from Defendants' commercial bribery scheme

xiv.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 2595 dated February 22, 2000, drawn on SSAI's bank account at Fleet Bank, headquartered in Fort Lee, New Jersey, Defendant SSAI paid $95,396.90 to Defendant Bell Licensing, consisting of $82,500,

exactly 50% of the commissions paid to Defendant SSAI by WWE on the videogame license.

xv      In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on February 23, 2000, Defendant Bell deposited the February 22, 2000 check from Defendant SSAI into Defendant Bell Licensing's Hudson Bank money market account located in Darien, Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey

xvi.    In furtherance of Defendants' commercial bribery scheme, on June 12, 2000, Defendant SSAI deposited a check, dated June 9, 2000, from WWE, in the amount of $312,788.55 into SSAI's Fleet Bank account, consisting of $247,180.90 of commissions related to the videogame license, which represented proceeds derived from Defendants' commercial bribery scheme.

xvii    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 2832 dated June 16, 2000 drawn on Defendant SSAI's bank account at Fleet Bank, headquartered in Fort Lee, New Jersey, Defendant SSAI paid $124,454 to Defendant Bell Licensing, consisting of $123,590.45, exactly 50% of commissions paid to Defendant SSAI by WWE on the videogame license.

xviii.  In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on June 19, 2000, Defendant Bell deposited Defendant SSAI's June 16, 2000 check into Defendant

Bell Licensing's Hudson Bank money market account located in
Darien, Connecticut, thereby causing the check to clear at Hudson
Bank's main office located in Mahwah, New Jersey

xix    In furtherance of Defendants' commercial bribery scheme, on
August 25, 2000, Defendant Shenker deposited a check, dated
August 18, 2000, in the amount of $324,540.66 into SSAI's Fleet
Bank account, consisting of $132,735.44 of commissions related
to the videogame license, which represented proceeds derived
from Defendants' commercial bribery scheme.

xx.    In furtherance of, and with the intent to conceal proceeds of the
commercial bribery scheme, by check no. 3016 dated
September 10, 2000 drawn on Defendant SSAI's bank account at
Fleet Bank, headquartered in Fort Lee, New Jersey, Defendant
SSAI paid $84,525.29 to Defendant Bell Licensing, consisting of
$66,367.72, exactly 50% of commissions paid to Defendant SSAI
by WWF on the videogame license

xxi.   In furtherance of, and with the intent to conceal proceeds of the
commercial bribery scheme, on September 12, 2000, Defendant
Bell deposited Defendant SSAI's September 10, 2000 check into
Defendant Bell Licensing's Hudson Bank money market account
located in Darien, Connecticut, thereby causing the check to clear
at Hudson Bank's main office located in Mahwah, New Jersey.

xxii.  In furtherance of, and with the intent to conceal proceeds of the
commercial bribery scheme, by check no. 1846 dated
September 14, 2001 drawn on Defendant Shenker's account at

Fleet Bank headquartered in Fort Lee, New Jersey, Defendant

Shenker paid Defendant Bell $52,948, representing a split of the

proceeds from Defendant Shenker's sale of THQ and Jakks stock

acquired pursuant to the videogame license.

xxiii.    In furtherance of, and with the intent to conceal proceeds of the

commercial bribery scheme, on September 24, 2001, Defendant

Bell deposited Defendant Shenker's September 14, 2001 check

into Defendant Bell's Citibank preferred money market account,

account no 47507343, thereby causing the check to clear at

Citibank in New York

xxiv     In furtherance of, and with the intent to conceal proceeds of the

commercial bribery scheme, by check no 1869 dated October 12,

2001 drawn on Defendant Shenker's account at Fleet Bank

headquartered in Fort Lee, New Jersey, Defendant Shenker paid

Defendant Bell $26,994, representing a split of the proceeds of

Defendant Shenker's sale of THQ and Jakks stock acquired

pursuant to the videogame license

xxv.     In furtherance of, and with the intent to conceal proceeds of the

commercial bribery scheme, on October 13, 2001, Defendant Bell

deposited Defendant Shenker's October 12, 2001 check into

Defendant Bell's branch account at Hudson Bank located in

Connecticut, thereby causing the check to clear at Hudson Bank's

main office located in Mahwah, New Jersey

xxvi.    In furtherance of, and with the intent to conceal proceeds of the

commercial bribery scheme, by check no 1894 dated

December 11, 2001 drawn on Defendant Shenker's account at
Fleet Bank headquartered in Fort Lee, New Jersey, Defendant
Shenker paid Defendant Bell $26,944, representing a split of the
proceeds of Defendant Shenker's sale of THQ and Jakks stock
acquired pursuant to the videogame license.

xxvii    In furtherance of, and with the intent to conceal proceeds of the
commercial bribery scheme, on December 13, 2001, Defendant
Bell deposited Defendant Shenker's December 11, 2001 check
into Defendant Bell's branch account at Hudson Bank located in
Connecticut, thereby causing the check to clear at Hudson Bank's
main office located in Mahwah, New Jersey.

xxviii   For the first quarter of 2000, on April 28, 2000, Defendant
THQ/Jakks, on behalf of and with the authorization of Defendants
THQ and/or Farrell and/or Jakks and/or Friedman and/or Berman,
paid WWE $2,247,098 87, consisting of royalties related to the
videogame license.

xxix     For the first quarter of 2000, Defendant THQ, on behalf of and
with the authorization of Defendants THQ/Jakks and/or Farrell,
paid Defendant Jakks $5,303,000 in connection with the
videogame license, and Defendant Jakks, with the authorization
of Defendants Friedman and/or Berman and/or Bennett, engaged
in monetary transactions related to the deposit and/or subsequent
transfer of that payment

xxx.     For the second quarter of 2000, on July 27, 2000, Defendant
THQ/Jakks, on behalf of and with the authorization of Defendants

THQ and/or Farrell and/or Jakks and/or Friedman and/or Berman, paid WWE $1,206,685 84, consisting of royalties related to the videogame license.

xxxi.  For the second quarter of 2000, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $1,600,000 in connection with the videogame license, and Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, engaged in monetary transactions related to the deposit and/or subsequent transfer of that payment.

xxxii.  For the third quarter of 2000, on October 24, 2000, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid WWE $1,593,798.96, consisting of royalties related to the videogame license.

xxxiii.  For the third quarter of 2000, on dates known only to Defendants, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $1,343,000 in connection with the videogame license, and Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, engaged in monetary transactions related to the deposit and/or subsequent transfer of that payment.

xxxiv.  For the fourth quarter of 2000, on January 26, 2001, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid WWE $7,200,339 75, consisting of royalties related to the videogame license

xxxv    For the fourth quarter of 2000, on dates known only to
Defendants, Defendant THQ, on behalf of and with the
authorization of Defendants THQ/Jakks and/or Farrell, paid
Defendant Jakks $9,461,000 in connection with the videogame
license, and Defendant Jakks, with the authorization of
Defendants Friedman and/or Berman and/or Bennett, engaged in
monetary transactions related to the deposit and/or subsequent
transfer of that payment

xxxvi.    For the first quarter of 2001, on April 30, 2001, Defendant THQ,
on behalf of and with the authorization of Defendants THQ/Jakks
and/or Farrell, paid WWE $870,836 70, consisting of royalties
related to the videogame license.

xxxvii    For the first quarter of 2001, on dates known only to Defendants,
Defendant THQ, on behalf of and with the authorization of
Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks
$1,423,000 in connection with the videogame license, and
Defendant Jakks, with the authorization of Defendants Friedman
and/or Berman and/or Bennett, engaged in monetary transactions
related to the deposit and/or subsequent transfer of that payment.

xxxviii.    For the second quarter of 2001, on July 30, 2001, Defendant
THQ, on behalf of and with the authorization of Defendants
THQ/Jakks and/or Farrell, paid WWE $1,065,645 62, consisting
of royalties related to the videogame license

xxxix.    For the second quarter of 2001, on dates known only to
Defendants, Defendant THQ, on behalf of and with the