authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $339,000 in connection with the videogame license, and Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, engaged in monetary transactions related to the deposit and/or subsequent transfer of that payment

xl. For the third quarter of 2001, on October 31, 2001, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid WWE $236,700 91, consisting of royalties related to the videogame license

xli. For the third quarter of 2001, on dates known only to Defendants, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $342,000 in connection with the videogame license, and Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, engaged in monetary transactions related to the deposit and/or subsequent transfer of that payment.

xlii. For the fourth quarter of 2001, on January 25, 2002, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid WWE $4,620,563.52, consisting of royalties related to the videogame license.

xliii. For the fourth quarter of 2001, on dates known only to Defendants, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $6,569,000 in connection with the videogame

license, and Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, engaged in monetary transactions related to the deposit and/or subsequent transfer of that payment

xliv    For the fourth quarter of 2001, on February 1, 2002, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid WWE an additional $303,401 83, consisting of royalties related to the videogame license.

xlv.    For the first quarter of 2002, on April 30, 2002, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid WWE $1,165,557 15, consisting of royalties related to the videogame license.

xlvi    For the first quarter of 2002, on dates known only to Defendants, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $1,572,000 in connection with the videogame license, and Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, engaged in monetary transactions related to the deposit and/or subsequent transfer of that payment

xlvii.    For the second quarter of 2002, on July 26, 2002, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid WWE $1,279,681.37, consisting of royalties related to the videogame license

xlviii.    For the second quarter of 2002, on dates known only to
Defendants, Defendant THQ, on behalf of and with the
authorization of Defendants THQ/Jakks and/or Farrell, paid
Defendant Jakks $1,500,000 in connection with the videogame
license, and Defendant Jakks, with the authorization of
Defendants Friedman and/or Berman and/or Bennett, engaged in
monetary transactions related to the deposit and/or subsequent
transfer of that payment.

xlix.    For the third quarter of 2002, on October 25, 2002, Defendant
THQ, on behalf of and with the authorization of Defendants
THQ/Jakks and/or Farrell, paid WWE $1,106,996.17, consisting
of royalties related to the videogame license.

l.    For the third quarter of 2002, on dates known only to Defendants,
Defendant THQ, on behalf of and with the authorization of
Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks
$1,044,000 in connection with the videogame license, and
Defendant Jakks, with the authorization of Defendants Friedman
and/or Berman and/or Bennett, engaged in monetary transactions
related to the deposit and/or subsequent transfer of that payment.

li    For the fourth quarter of 2002, on January 27, 2003, Defendant
THQ, on behalf of and with the authorization of Defendants
THQ/Jakks and/or Farrell, paid WWE $5,145,649.93, consisting
of royalties related to the videogame license.

lii.    For the fourth quarter of 2002, on dates known only to
Defendants, Defendant THQ, on behalf of and with the

authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $6,030,000 in connection with the videogame license, and Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, engaged in monetary transactions related to the deposit and/or subsequent transfer of that payment.

liii.    For the first quarter of 2003, on April 30, 2003, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid WWE $875,404, consisting of royalties related to the videogame license

liv.    For the first quarter of 2003, on dates known only to Defendants, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $644,000 in connection with the videogame license, and Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, engaged in monetary transactions related to the deposit and/or subsequent transfer of that payment.

lv    For the second quarter of 2003, on July 28, 2003, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid WWE $950,918, consisting of royalties related to the videogame license.

lvi.    For the second quarter of 2003, on dates known only to Defendants, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $465,000 in connection with the videogame

license, and Defendant Jakks, with the authorization of
Defendants Friedman and/or Berman and/or Bennett, engaged in
monetary transactions related to the deposit and/or subsequent
transfer of that payment.

lvii.    For the third quarter of 2003, on October 28, 2003, Defendant
THQ, on behalf of and with the authorization of Defendants
THQ/Jakks and/or Farrell, paid WWE $2,089,446, consisting of
royalties related to the videogame license.

lviii.    For the third quarter of 2003, on dates known only to Defendants,
Defendant THQ, on behalf of and with the authorization of
Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks
$2,095,000 in connection with the videogame license, and
Defendant Jakks, with the authorization of Defendants Friedman
and/or Berman and/or Bennett, engaged in monetary transactions
related to the deposit and/or subsequent transfer of that payment.

lix.    For the fourth quarter of 2003, on January 23, 2004, Defendant
THQ, on behalf of and with the authorization of Defendants
THQ/Jakks and/or Farrell, paid WWE $5,460,091, consisting of
royalties related to the videogame license

lx    For the fourth quarter of 2003, on dates known only to
Defendants, Defendant THQ, on behalf of and with the
authorization of Defendants THQ/Jakks and/or Farrell, paid
Defendant Jakks $6,257,000 in connection with the videogame
license, and Defendant Jakks, with the authorization of
Defendants Friedman and/or Berman and/or Bennett, engaged in

monetary transactions related to the deposit and/or subsequent transfer of that payment.

lxi.    For the first quarter of 2004, on April 29, 2004, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid WWE $853,723, consisting of royalties related to the videogame license.

lxii.    For the first quarter of 2004, on dates known only to Defendants, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $858,000 in connection with the videogame license, and Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, engaged in monetary transactions related to the deposit and/or subsequent transfer of that payment

lxiii    For the second quarter of 2004, on July 27, 2004, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid WWE $1,179,097, consisting of royalties related to the videogame license

lxiv    For the second quarter of 2004, on dates known only to Defendants, Defendant THQ, on behalf of and with the authorization of Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks $524,000 in connection with the videogame license, and Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, engaged in monetary transactions related to the deposit and/or subsequent transfer of that payment

lxv.    For the third quarter of 2004, on October 26, 2004, Defendant
        THQ, on behalf of and with the authorization of Defendants
        THQ/Jakks and/or Farrell, paid WWE $1,321,077, consisting of
        royalties related to the videogame license.

lxvi.   For the third quarter of 2004, on dates known only to Defendants,
        Defendant THQ, on behalf of and with the authorization of
        Defendants THQ/Jakks and/or Farrell, paid Defendant Jakks
        $1,512,000 in connection with the videogame license, and
        Defendant Jakks, with the authorization of Defendants Friedman
        and/or Berman and/or Bennett, engaged in monetary transactions
        related to the deposit and/or subsequent transfer of that payment

lxvii.  For the fourth quarter of 2004, on January 26, 2005, Defendant
        THQ, on behalf of and with the authorization of Defendants
        THQ/Jakks and/or Farrell, paid WWE $6,632,006, consisting of
        royalties related to the videogame license

lxviii  For the fourth quarter of 2004, on dates known only to
        Defendants, Defendant THQ, on behalf of and with the
        authorization of Defendants THQ/Jakks and/or Farrell, paid
        Defendant Jakks $7,050,000 in connection with the videogame
        license, and Defendant Jakks, with the authorization of
        Defendants Friedman and/or Berman and/or Bennett, engaged in
        monetary transactions related to the deposit and/or subsequent
        transfer of that payment

lxix    For the first quarter of 2000, on April 25, 2000, Defendant Jakks,
        with the authorization of Defendants Friedman and/or Berman

and/or Bennett, paid WWE $187,977.12, consisting of royalties related to the international toy license.

lxx     For the second quarter of 2000, on July 27, 2000, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $403,619.94, consisting of royalties related to the international toy license.

lxxi.   For the third quarter of 2000, on October 25, 2000, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $290,236.78, consisting of royalties related to the international toy license.

lxxii.  For the fourth quarter of 2000, on January 25, 2001, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $274,729.85, consisting of royalties related to the international toy license.

lxxiii. For the first quarter of 2001, on April 26, 2001, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $326,135, consisting of royalties related to the international toy license.

lxxiv   For the second quarter of 2001, on July 27, 2001 Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $491,324.43, consisting of royalties related to the international toy license

lxxv    For the third quarter of 2001, on October 24, 2001, Defendant Jakks, with the authorization of Defendants Friedman and/or

Berman and/or Bennett, paid WWE $823,146.52, consisting of royalties related to the international toy license

lxxvi    For the fourth quarter of 2001, on January 16, 2002, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $435,597.77, consisting of royalties related to the international toy license.

lxxvii.    For the first quarter of 2002, on April 19, 2002, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $120,016.51, consisting of royalties related to the international toy license.

lxxviii.    For the second quarter of 2002, on July 23, 2002, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $183,495.25, consisting of royalties related to the international toy license.

lxxix    For the third quarter of 2002, on October 24, 2002, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $1,196,258.28, consisting of royalties related to the international toy license.

lxxx.    For the fourth quarter of 2002, on January 31, 2003, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $348,103.55, consisting of royalties related to the international toy license.

lxxxi    For the first quarter of 2003, on April 22, 2003, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman

and/or Bennett, paid WWE $465,465.16, consisting of royalties related to the domestic and international toy licenses

lxxxii     For the second quarter of 2003, on July 23, 2003, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $517,836.95, consisting of royalties related to the domestic and international toy licenses.

lxxxiii    For the third quarter of 2003, on October 24, 2003, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $849,644.40, consisting of royalties related to the domestic and international toy licenses

lxxxiv.    For the fourth quarter of 2003, on January 23, 2004, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $738,139.48, consisting of royalties related to the domestic and international toy licenses

lxxxv      For the first quarter of 2004, on April 27, 2004, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $704,629.57, consisting of royalties related to the domestic and international toy licenses.

lxxxvi.    For the second quarter of 2004, on July 26, 2004, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $768,216.05, consisting of royalties related to the domestic and international toy licenses

lxxxvii.   For the third quarter of 2004, on October 25, 2004, Defendant Jakks, with the authorization of Defendants Friedman and/or

Berman and/or Bennett, paid WWE $1,082,458 09, consisting of royalties related to the domestic and international toy licenses

lxxxviii. For the fourth quarter of 2004, on January 25, 2005, Defendant Jakks, with the authorization of Defendants Friedman and/or Berman and/or Bennett, paid WWE $1,334,692.83, consisting of royalties related to the domestic and international toy licenses.

c.    In violation of the National Stolen Property Act, 18 U S C. §§ 2314 and 2315, Defendants' payment and/or receipt of unlawful bribes and payments to secure the videogame license and the 1998 amendments to the toy licenses involved the transmittal and/or transfer in interstate commerce of money having a value of at least $5,000, knowing such proceeds were obtained by fraud against WWE. Defendants' specific acts in violation of the National Stolen Property Act include at least the following:

i     As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on July 3, 1998, Defendant Shenker deposited a check dated July 3, 1998 from WWE in the amount of $301,751.54 into SSAI's Fleet Bank account, consisting of commissions related to the advance on the videogame license which Defendants SSAI and Shenker knew had been acquired by fraud

ii.    As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on December 21, 1998, Defendant

Shenker caused Defendant SSAI to wire-transfer $280,616 from Defendant SSAI's checking account at Fleet Bank, headquartered in Fort Lee, New Jersey, to Stanfull's account at the Hang Seng Bank, consisting of $165,000, exactly 50% of the advance Defendant SSAI was paid by WWE on the videogame license which Defendants SSAI and Shenker knew had been acquired by fraud  Defendant SSAI's transfer of this money was the precursor to Defendant Bell Licensing's receipt of the unlawful proceeds as Defendant Shenker elected to run the transaction through a foreign bank account in order to conceal the nature and source of the payment

iii    As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on January 11, 1999, Defendant Shenker wire-transferred $280,601 from Stanfull's account at the Hang Seng Bank to Defendant Bell Licensing's money market account at Hudson Bank, consisting of $165,000, exactly 50% of the advance Defendant SSAI was paid by WWE on the videogame license which Defendants SSAI, Shenker, Bell and Bell Licensing knew had been acquired by fraud.

iv    As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on February 7, 2000 Defendant Shenker deposited a check, dated February 4, 2000, from WWE, in the amount of $663,037 70 into SSAI's Fleet Bank account, consisting of $165,000 in commissions related to the videogame

license, which Defendants SSAI and Shenker knew had been
acquired by fraud.

v       As a result of Defendants' unlawful conduct in connection with
        the videogame license and the 1998 amendments to the toy
        licenses by fraudulent means, by check no 2595 dated
        February 22, 2000, drawn on SSAI's bank account at Fleet Bank
        headquartered in Fort Lee, New Jersey, Defendant SSAI paid
        $95,396.90 to Defendant Bell Licensing, consisting of $82,500,
        exactly 50% of the commissions paid to Defendant SSAI on the
        videogame license which Defendants SSAI, Shenker, Bell and
        Bell Licensing knew had been acquired by fraud.

vi.     As a result of Defendants' unlawful conduct in connection with
        the videogame license and the 1998 amendments to the toy
        licenses by fraudulent means, on February 23, 2000, Defendant
        Bell deposited the February 22, 2000 check from Defendant SSAI
        into Defendant Bell Licensing's Hudson Bank money market
        account located in Darien, Connecticut, thereby causing the check
        to clear at Hudson Bank's main office located in Mahwah, New
        Jersey. Defendants SSAI, Shenker, Bell and Bell Licensing knew
        the proceeds of said check had been acquired by fraud.

vii.    As a result of Defendants' unlawful conduct in connection with
        the videogame license and the 1998 amendments to the toy
        licenses by fraudulent means, on June 12, 2000, Defendant SSAI
        deposited a check, dated June 9, 2000, from WWE, in the amount
        of $312,788 55 into SSAI's Fleet Bank account, consisting of

$247,180.90 of commissions related to the videogame license
which Defendants SSAI and Shenker knew had been acquired by
fraud.

viii.  As a result of Defendants' unlawful conduct in connection with
the videogame license and the 1998 amendments to the toy
licenses by fraudulent means, by check no. 2832 dated June 16,
2000 drawn on Defendant SSAI's bank account at Fleet Bank,
headquartered in Fort Lee, New Jersey, Defendant SSAI paid
$124,454 to Defendant Bell Licensing, consisting of $123,590.45,
exactly 50% of the commissions Defendant SSAI was paid on the
videogame license which Defendants SSAI, Shenker, Bell and
Bell Licensing knew had been acquired by fraud

ix     As a result of Defendants' unlawful conduct in connection with
the videogame license and the 1998 amendments to the toy
licenses by fraudulent means, on June 19, 2000, Defendant Bell
deposited Defendant SSAI's June 16, 2000 check into Defendant
Bell Licensing's Hudson Bank money market account located in
Darien, Connecticut, thereby causing the check to clear at Hudson
Bank's main office located in Mahwah, New Jersey  Defendants
SSAI, Shenker, Bell and Bell Licensing knew the proceeds of
said check had been acquired by fraud.

x.     As a result of Defendants' unlawful conduct in connection with
the videogame license and the 1998 amendments to the toy
licenses by fraudulent means, on August 25, 2000, Defendant
Shenker deposited a check, dated August 18, 2000, in the amount

of $324,540.66 into SSAI's Fleet Bank account, consisting of $132,735.44 of commissions Defendant SSAI was paid on the videogame license which Defendants SSAI and Shenker knew had been acquired by fraud.

xi.   As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy licenses by fraudulent means, by check no. 3016 dated September 10, 2000 drawn on Defendant SSAI's bank account at Fleet Bank, headquartered in Fort Lee, New Jersey, Defendant SSAI paid $84,525.29 to Defendant Bell Licensing, consisting of $66,367.72, exactly 50% of the commissions Defendant SSAI was paid on the videogame license which Defendants SSAI, Shenker, Bell and Bell Licensing knew had been acquired by fraud.

xii   As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on September 12, 2000, Defendant Bell deposited Defendant SSAI's September 10, 2000 check into Defendant Bell Licensing's Hudson Bank money market account located in Darien, Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey. Defendants SSAI, Shenker, Bell and Bell Licensing knew the proceeds of said check had been acquired by fraud.

xiii.   As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy

licenses by fraudulent means, by check no. 1846 dated
September 14, 2001 drawn on Defendant Shenker's account at
Fleet Bank headquartered in Fort Lee, New Jersey, Defendant
Shenker paid Defendant Bell $52,948, representing a split of the
proceeds from Defendant Shenker's sale of THQ and Jakks stock
acquired pursuant to the videogame license which Defendants
Shenker and Bell knew had been acquired by fraud.

xiv.     As a result of Defendants' unlawful conduct in connection with
the videogame license and the 1998 amendments to the toy
licenses by fraudulent means, on September 24, 2001, Defendant
Bell deposited Defendant Shenker's September 14, 2001 check
into Defendant Bell's Citibank preferred money market account,
account no. 47507343, thereby causing the check to clear at
Citibank in New York. Defendants Shenker and Bell knew the
proceeds of said check had been acquired by fraud.

xv.      As a result of Defendants' unlawful conduct in connection with
the videogame license and the 1998 amendments to the toy
licenses by fraudulent means, by check no. 1869 dated
October 12, 2001 drawn on Defendant Shenker's account at Fleet
Bank headquartered in Fort Lee, New Jersey, Defendant Shenker
paid Defendant Bell $26,994, representing a split of the proceeds
of Defendant Shenker's sale of THQ and Jakks stock acquired
pursuant to the videogame license which Defendants Shenker and
Bell knew had been acquired by fraud.

xvi.    As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on October 13, 2001, Defendant Bell deposited Defendant Shenker's October 12, 2001 check into Defendant Bell's branch account at Hudson Bank located in Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey  Defendants Shenker and Bell knew the proceeds of said check had been acquired by fraud.

xvii    As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy licenses by fraudulent means, by check no  1894 dated December 11, 2001 drawn on Defendant Shenker's account at Fleet Bank headquartered in Fort Lee, New Jersey, Defendant Shenker paid Defendant Bell $26,944, representing a split of the proceeds of Defendant Shenker's sale of THQ and Jakks stock acquired pursuant to the videogame license which Defendants Shenker and Bell knew had been acquired by fraud.

xviii.    As a result of Defendants' unlawful conduct in connection with the videogame license and the 1998 amendments to the toy licenses by fraudulent means, on December 13, 2001, Defendant Bell deposited Defendant Shenker's December 11, 2001 check into Defendant Bell's branch account at Hudson Bank located in Connecticut, thereby causing the check to clear at Hudson Bank's main office located in Mahwah, New Jersey  Defendants Shenker

and Bell knew the proceeds of said check had been acquired by
fraud.

d.    In violation of the Federal Travel Act, 18 U.S.C. § 1952, Defendants'
scheme to fraudulently secure the videogame license and the 1998
amendments to the toy licenses through the payment of unlawful bribes
and payments and to use fraudulent conduct to conceal the true nature of
the bribes and payments involved the unlawful use of the mail or a facility
of interstate commerce with the intent to distribute the proceeds of, and/or
facilitate the carrying on of, commercial bribery, an enumerated unlawful
act under 18 U.S.C § 1952 and, thereafter, the commission of an
additional act in furtherance of such commercial bribery scheme. Each of
the specific acts identified above in violation of the Federal Mail and Wire
Fraud Statutes, 18 U.S.C. §§ 1341 and 1343, the Federal Money
Laundering Statutes, 18 U.S.C §§ 1956 and 1957, and the National Stolen
Property Act, 18 U.S.C §§ 2314 and 2315, also constitute separate
violations of the Federal Travel Act, and therefore such allegations are
incorporated herein by reference and reasserted as though fully set forth at
length

e    In violation of New York Penal Law § 180 03, as described herein, certain
Defendants made, authorized and/or participated in the payment of or
agreement to pay unlawful bribes and payments in excess of one thousand
dollars to SSAI, Shenker and/or Bell, who at all relevant times were
employees, agents or fiduciaries of WWE, without WWE's consent, with
the intent to influence their conduct in relation to WWE's affairs to secure
the videogame license and the 1998 amendments to the toy licenses, and
said acts inured to the benefit of and/or were ratified by THQ and

THQ/Jakks. Pursuant to 18 U.S.C. § 1961(1)(A), Defendants' violations of New York Penal Law § 180.03, as set forth below, constitute separate predicate acts under RICO:

i.     In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on January 14, 1998, pursuant to Defendant Bennett's direction made on behalf of Defendant Jakks and which was authorized by Defendants Friedman and/or Berman, Defendant Road Champs Ltd. wire-transferred $40,000 from its account at the Hang Seng Bank in Hong Kong in an intra-bank transfer to Stanfull's account at the Hang Seng Bank

ii.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by demand draft dated January 14, 1998 drawn on Stanfull's account at the Hang Seng Bank, Defendant Shenker paid Defendant Bell $20,000 of the $40,000 paid to Stanfull from Defendant Road Champs Ltd

iii.   In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on April 2, 1998, pursuant to Defendant Bennett's direction made on behalf of Defendant Jakks and authorized by Defendants Friedman and/or Berman, Defendant Jakks Pacific (H.K.) wire-transferred $40,000 from its account at Norwest Bank to Stanfull's account at the Hang Seng Bank.

iv.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by demand draft dated April 7, 1998 drawn on Stanfull's account at the Hang Seng Bank, Defendant

Shenker paid Defendant Bell Licensing $20,000 of the $40,000 paid to Stanfull from Defendant Jakks Pacific (H K )

v.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on August 4, 1998, pursuant to Defendant Bennett's direction made on behalf of and for the benefit of Defendants Jakks, THQ, and THQ/Jakks, Defendant Road Champs Ltd wire-transferred $20,000 from its account at the Hang Seng Bank in an intra-bank transfer to Stanfull's account at the Hang Seng Bank.

vi    In furtherance of, and with the intent to conceal proceeds of Defendants' commercial bribery scheme, by check no. 1881, dated October 8, 1998, Defendant Shenker caused Defendant SSAI to pay Defendant Bell Licensing $20,000, drawn on SSAI's checking account at Fleet Bank, headquartered in Fort Lee, New Jersey

vii    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, on January 11, 1999, Defendant Shenker wire-transferred $280,601 from Stanfull's account at the Hang Seng Bank to Defendant Bell Licensing's money market account at Hudson Bank, consisting of $165,000, exactly 50% of the advance Defendant SSAI was paid by WWE on the videogame license

viii.    In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 2595 dated February 22, 2000, drawn on SSAI's bank account at Fleet Bank,

headquartered in Fort Lee, New Jersey, Defendant SSAI paid $95,396.90 to Defendant Bell Licensing, consisting of $82,500, exactly 50% of the commissions paid to Defendant SSAI by WWE on the videogame license.

ix      In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 2832 dated June 16, 2000 drawn on Defendant SSAI's bank account at Fleet Bank, headquartered in Fort Lee, New Jersey, Defendant SSAI paid $124,454 to Defendant Bell Licensing, consisting of $123,590.45, exactly 50% of commissions paid to Defendant SSAI by WWE on the videogame license.

x.      In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no 3016 dated September 10, 2000 drawn on Defendant SSAI's bank account at Fleet Bank, headquartered in Fort Lee, New Jersey, Defendant SSAI paid $84,525 29 to Defendant Bell Licensing, consisting of $66,367 72, exactly 50% of commissions paid to Defendant SSAI by WWE on the videogame license.

xi.     In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 1846 dated September 14, 2001 drawn on Defendant Shenker's account at Fleet Bank headquartered in Fort Lee, New Jersey, Defendant Shenker paid Defendant Bell $52,948, representing a split of the proceeds from Defendant Shenker's sale of THQ and Jakks stock acquired pursuant to the videogame license

xii.   In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no 1869 dated October 12, 2001 drawn on Defendant Shenker's account at Fleet Bank headquartered in Fort Lee, New Jersey, Defendant Shenker paid Defendant Bell $26,994, representing a split of the proceeds of Defendant Shenker's sale of THQ and Jakks stock acquired pursuant to the videogame license.

xiii.  In furtherance of, and with the intent to conceal proceeds of the commercial bribery scheme, by check no. 1894 dated December 11, 2001 drawn on Defendant Shenker's account at Fleet Bank headquartered in Fort Lee, New Jersey, Defendant Shenker paid Defendant Bell $26,944, representing a split of the proceeds of Defendant Shenker's sale of THQ and Jakks stock acquired pursuant to the videogame license.

<u>Pattern of Racketeering Activity</u>

250.   Defendants knowingly and repeatedly committed the above criminal acts in furtherance of and for the purpose of executing a fraudulent scheme to harm WWE's business

251.   The predicate acts described herein were related to one another as part of a common scheme or plan.

252.   The unlawful conduct described herein constitutes a continuous pattern of racketeering activity  Such unlawful conduct, which began in or around 1995, continues through this date,

<u>Injury to WWE</u>

253    As a direct and proximate result of Defendants' violation of 18 U.S.C. § 1962(c) as described herein, WWE has been injured in its business and property.

## COUNT II
## CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(d)
### (Against All Defendants)

254    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

255    THQ/Jakks, Jakks, THQ, Jakks Pacific (H.K.), Road Champs Ltd., SSAI, Shenker, Bell Licensing, Bell, Friedman, Berman, Bennett and Farrell formed a conspiracy for the purpose of achieving and profiting from the racketeering activities described herein in violation of 18 U.S.C. § 1962(c).

256.    As described herein, each of the Defendants knowingly and intentionally agreed and conspired to commit at least two of the predicate acts set forth above and they did so with the knowledge and intent that such acts were in furtherance of the foregoing pattern of racketeering.

257.    As described herein, Defendants' conspiracy substantially affected interstate commerce as much of the conduct that formed the overt acts of the conspiracy involved interstate commerce, and the damage caused by the conspiracy has harmed a corporation that itself substantially affects interstate commerce.

258.    As a direct and proximate result of the conspiracy in violation of 18 U.S.C. § 1962(d) as described herein, WWE has been injured in its business and property.

## COUNT III
## VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1
### (Against All Defendants except Jakks Pacific (H.K.) and Road Champs Ltd.)

259    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

260.    WWE produces and sells television programming, pay-per-view programming and live arena events in interstate commerce. It also licenses its intellectual property in interstate commerce.

261.    Defendant THQ/Jakks markets and sells videogames in interstate commerce.

262.    Defendant THQ markets and sells videogames in interstate commerce.

263.    Defendant Jakks markets and sells action figures, toys and other products in interstate commerce

264    Defendant SSAI markets and sells its services as a licensing agent in interstate commerce

265.    Acclaim and Activision market and sell videogames in interstate commerce.

266.    At all relevant times, Jakks, THQ, Activision and Acclaim were competitors for the WWE videogame license in the national market for the licensing of intellectual property in characters for videogames

267    All of the Defendants consciously agreed and conspired to unreasonably restrain trade, in a *per se* violation of Section 1 of the Sherman Act, 15 U.S C. § 1 by, among other things, (a) agreeing and conspiring to rig the terms of the bid that would be offered by the conspiring competitors to WWE for the videogame license, including, but not limited to, agreeing to rig the royalty rate that would be offered for the rights under the videogame license, (b) conspiring to prevent THQ from submitting to WWE an independent bid for the videogame license in competition with Jakks, and (c) conspiring to allocate the WWE videogame license to THQ/Jakks to the mutual benefit of all the conspirators  Defendants intended that their

conspiratorial acts would, and their acts in fact did unreasonably restrain trade by foreclosing competition for the videogame license  Further, Defendants intended to, and did, cause the licensing terms offered to WWE to be less favorable to WWE than the terms that competitive bids would have been.

268.    As part of their conspiracy, Defendants conspired to foreclose WWE from receiving competitive, market-level bids for the videogame license from Activision.

269.    As a result of Defendants' conspiracy, WWE suffered antitrust injury in that it was deprived of the benefits of a competitive market for the videogame license  Section 1 of the Sherman Act was intended to ensure WWE's right to a competitive market for the videogame license, in which WWE would receive independent bids from each of the actual and potential videogame producers which were interested in a license from WWE.

270.    WWE was injured in its business or property by the conspiracy to rig the videogame license bid and to allocate the license to THQ/Jakks.  As a direct and proximate result of the conspiracy, WWE received less favorable license terms (including, but not limited to, a lower than market royalty rate) than WWE would have received if the conspiracy had not foreclosed the competitive operation of the market.

271.    The conspiracy took place in, restrained the flow of and adversely affected interstate and foreign commerce in the marketing of videogame licensing rights, the marketing of intellectual property rights and the marketing of videogames.

272    As detailed above, Defendants have actively and willfully concealed the existence of the conspiracy and its effects on WWE in the interstate marketing of WWE's intellectual property rights. For the reasons set forth herein previously, WWE did not know, and in the exercise of reasonable diligence could not have known, of the existence of the conspiracy to rig bids and to allocate the WWE videogame license until well after December 2002—well within the period of the statute of limitations.

### COUNT IV
### DECLARATORY JUDGMENT
### (Against THQ, THQ/Jakks and Jakks Only)

273    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length

274.    As described herein, the videogame license was formed or induced as a result of commercial bribery and/or illegal conduct in violation of New York law

275.    As described herein, the 1998 amendments to the toy licenses were formed or induced as a result of commercial bribery and/or illegal conduct in violation of New York law.

276    As described herein, the commercial bribery and/or illegal conduct was and remains central to the performance of the videogame license.

277.    As described herein, the commercial bribery and/or illegal conduct was and remains central to the performance of the 1998 amendments to the toy licenses

278    Under New York law a contract formed or induced as a result of commercial bribery is void *ab initio*.

279. Thus, an actual dispute and controversy exists with respect to whether the videogame license and the 1998 amendments to the toy licenses are void *ab initio* as a result of the commercial bribery

280. A judicial declaration is, therefore, necessary pursuant to 28 U.S.C. § 2201 *et seq* to determine the parties' rights and obligations under the aforementioned licenses and amendments thereto

**COUNT V**
**DECLARATORY JUDGMENT**
**(Against Defendants THQ, THQ/Jakks and Jakks Only)**

281. Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length

282. Prior to and during the time the videogame license and the 1998 amendments to the toy licenses were negotiated, Jakks knew of and created an undisclosed conflict of interest between SSAI and its principal, Stanley Shenker, and WWE

283. During the time Jakks knew SSAI was WWE's agent, Jakks began the practice of paying Shenker and using him as their agent, none of which was disclosed to WWE.

284. At various times during their undisclosed relationship with Shenker, Jakks personnel would, in writing, direct and inquire of Shenker regarding matters being performed by Shenker on Jakks' behalf and at the same time request he secure modifications and/or amendments to the WWE toy licenses.

285. Jakks traded on the undisclosed conflicts of interests and aided and abetted SSAI and Shenker to violate fiduciary obligations to WWE by seeking and obtaining licensing rights

from WWE through Shenker while he was, and remained, an undisclosed agent of Jakks, and did so detrimentally to WWE's interests

286. Jakks personnel were acutely aware of the impropriety of doing so, and in particular were aware of the impropriety of doing so after being advised by corporate counsel that Jakks could not do so without WWE consent.

287. With knowledge of the impropriety involved, Jakks continued to find ways to corrupt Shenker's loyalties by the payment of monies and/or promises of more contracts, including before, during and after the time Shenker and SSAI were to be negotiating on behalf of WWE with Jakks regarding the videogame license and amendments to the toy licenses.

288 At all times relevant hereto, Jakks knew that it was dealing with a corrupt agent capable of, and actually engaging in, unethical conduct in violation of his fiduciary duties to WWE to the detriment of WWE  Jakks not only concealed such conduct from WWE but also directly fostered it.

289 The payment made at Jakks' direction to Stanfull in January 1998, which was subsequently split with Bell, was the first time Shenker paid Bell monies in what evolved into a corrupt, illegal and wide-ranging bribery and kickback scheme between SSAI, Shenker and Bell during the time both SSAI and Bell were agents and fiduciaries of WWE.

290. In order to induce Bell to act favorably on the licensing initiatives he was pursuing for Jakks, Shenker, as an agent for Jakks, promised Bell that he would split equally all commissions SSAI was paid, as well as profits from the sale of stock SSAI would also receive as compensation, if Bell did as Shenker and SSAI requested and acted favorably on licensing matters involving Jakks.

291.    Bell did recommend the videogame license be granted to THQ and Jakks and further recommended amendments to the toy licenses at the same time   Thereafter, SSAI and Shenker did split commissions and profits from stock sales with Bell in amounts exceeding several hundred thousand dollars

292.    As a direct result of and during the foregoing conduct, the videogame license issued to THQ/Jakks and the amendments to the toy licenses were executed.

293.    The amendments to the domestic toy license beginning with the First Amendment to that license, the international toy license, all amendments to the international toy license, the videogame license, and all amendments to the videogame license are tainted by the illegality of WWE's agents and the conflicts of interest which were known to and facilitated by Jakks for its own benefit and in connection with the videogame license for the benefit of and on behalf of THQ and Jakks.

294.    An actual dispute and controversy exists with respect to whether the aforementioned licensing rights are void for such illegality

295.    A judicial declaration is, therefore, necessary pursuant to 28 U.S.C. § 2201 *et seq* to determine the parties' rights and obligations under the aforementioned licenses and amendments thereto.

## COUNT VI
### VIOLATION OF THE ROBINSON-PATMAN ACT, 15 U.S.C. § 13(c)
### (Against THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett Only)

296.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth herein

297.  Defendants THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett are engaged in interstate commerce and, in the course of such commerce, engaged in the course of commercial bribery described above

298.  As described herein, Jakks, Friedman, Berman and/or Bennett authorized and/or directly paid unlawful bribes and/or payments, through Stanfull, to SSAI, Shenker, Bell Licensing and/or Bell of at least $100,000 to secure favorable and dishonest services in regard to the Jakks licensing matters  Defendants acted with the intent to corruptly to influence the conduct of Shenker, SSAI and Bell in the performance of their duties for WWE, including inducing WWE to enter into the videogame license despite the fact that other competing opportunities were, or could be negotiated to be, more favorable for WWE.

299.  At all relevant times, SSAI, Shenker, and Bell were agents or employees of WWE and thus owed WWE fiduciary duties and obligations.

300.  The payment of unlawful bribes, through Stanfull, to SSAI, Shenker, Bell Licensing and/or Bell, of at least $100,000 as described herein constitutes commercial bribery in violation of 15 U.S C. § 13(c)

301.  By that aspect of the scheme related to the toy licenses, Jakks was also able to foreclose competition for the rights covered by the toy licenses during and in the period those licenses would otherwise have expired but for the extended term granted by the amendments and prevented competition from Playmates

302.  As a direct and proximate result of Defendants' unlawful conduct described herein, WWE was deprived of the benefit of competition between and among Acclaim, Activision, THQ and Jakks, for the purchase of a videogame license for its intellectual property Jakks, THQ and THQ/Jakks, as a consequence of the commercial bribery alleged herein,

obtained the videogame license from WWE upon terms less favorable to WWE than the terms which would have been available to WWE but for Defendants' foreclosure of such competition through, among other things, the bribery of WWE's fiduciaries and the associated fraudulent withholding by those agents of material information regarding Defendants' offers and the competing offers available in a competitive market. WWE was thereby injured in its business and property and was deprived of a fair and competitive return on the innovation and creativity which gave rise to WWE's intellectual property.

## COUNT VII
### VIOLATION OF NEW YORK COMMERCIAL BRIBERY LAW
#### (Against THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett Only)

303.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

304.    As described herein, Jakks, Friedman, Berman and/or Bennett directly paid unlawful bribes and/or payments, through Stanfull, to SSAI, Shenker, Bell Licensing and/or Bell of at least $100,000 to secure favorable and dishonest services in regard to Jakks licensing matters.

305.    At all times relevant to the payment of such bribes and/or payments, as described herein, SSAI, Shenker, and Bell were agents or employees of WWE and thus owed WWE fiduciary duties and obligations

306.    Jakks, Friedman, Berman and/or Bennett's payment of unlawful bribes and/or payments, through Stanfull, to SSAI, Shenker, Bell Licensing and/or Bell of at least $100,000 to secure the WWE videogame license and the 1998 amendments to the toy license, constitutes commercial bribery in violation of New York law

307   The bribery scheme inured not only to the benefit of Jakks, but also to the benefit of THQ and THQ/Jakks, all of whom accepted the benefits and/or ratified the acts and/or are legally liable in any event

308   As a direct and proximate result of Defendants' unlawful conduct described herein, WWE has been injured in its business and property.

309.   In addition, because the videogame license and the 1998 amendments to the toy licenses were obtained by bribery, they should be declared void *ab initio*.

**COUNT VIII**
**FRAUDULENT INDUCEMENT**
**(Against THQ/Jakks, Jakks, THQ, Friedman, Berman, Bennett and Farrell Only)**

310.   Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

311.   As detailed herein, in connection with the discussions leading to execution of the videogame license and the 1998 amendments to the toy licenses and during the performance of those licenses, THQ/Jakks, Jakks, THQ, Friedman, Berman, Bennett and/or Farrell knowingly or recklessly made false and misleading statements to, and also knowingly or recklessly concealed information from and did not disclose information to, WWE regarding (1) the payment of bribes, through Stanfull, to SSAI, Shenker, Bell Licensing and/or Bell of at least $100,000 to secure favorable and dishonest services in regard to Jakks licensing matters, including with respect to the WWE videogame license and the 1998 amendments to the toy licenses, and/or (2) their use of SSAI or Shenker as an undisclosed agent to secure the videogame license and the 1998 amendments to the toy licenses, and/or (3) the collusive and illegal nature of the bidding process.

312   Under the circumstances, THQ/Jakks, Jakks, THQ, Friedman, Berman, Bennett and Farrell had a duty not to make such false and misleading statements, a duty to disclose the

concealed and omitted information, and a duty not to induce or otherwise aid and abet SSAI's, Shenker's and Bell's violation of fiduciary duties.

313.  As described herein, THQ/Jakks, Jakks, THQ, Friedman, Berman, Bennett and Farrell engaged in such conduct with the intent and purpose of inducing reliance thereon by WWE and inducing WWE to enter into the videogame license and the 1998 amendments to the toy licenses

314.  The false and misleading statements, and concealed information, were material to WWE's decision to enter into, induced WWE to enter into, and were reasonably and justifiably relied upon by WWE in entering into, the videogame license and the 1998 amendments to the toy licenses  As THQ/Jakks, Jakks, THQ, Friedman, Berman, Bennett and Farrell knew, WWE would never have entered into the videogame license or the 1998 amendments to the toy licenses had WWE known the true state of affairs regarding the payment of bribes, through Stanfull, to SSAI, Shenker, Bell Licensing and/or Bell and/or the use of SSAI or Shenker as an undisclosed agent and/or the collusive nature of the bidding process.

315.  In fraudulently inducing WWE to enter into the videogame license and the 1998 amendments to the toy licenses, as described herein, THQ/Jakks, Jakks, THQ, Friedman, Berman, Bennett and Farrell acted with malicious purpose and/or dishonest, unfair or improper means to harm WWE.

316.  As a direct and proximate result of Defendants' fraudulent conduct, WWE has been injured in its business and property.

317  In addition, because the videogame license and the 1998 amendments to the toy licenses were obtained on the basis of fraud, the videogame license and the 1998 amendments to the toy licenses should be declared void *ab initio*

## COUNT IX
### UNJUST ENRICHMENT
### (Against THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett Only)

318.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

319.    As described herein, THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett have derived substantial benefits from the videogame license and/or the 1998 amendments to the toy license, to which they were not properly entitled.

320    Accordingly, THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett have unfairly and unjustly enjoyed the benefits of monies to which they were not properly entitled.

321    It would be unfair and unjust for THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett to retain the benefits of such monies, to which they were not properly entitled.

## COUNT X
### INDUCING BREACH OF FIDUCIARY DUTY
### (Against THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett Only)

322    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

323.    As described herein, Bell, SSAI and/or Shenker breached their fiduciary duties owed to WWE by, *inter alia*, accepting bribes of at least $100,000 to secure the WWE videogame license and the 1998 amendments to the toy licenses, secretly acting as an agent of Jakks, participating in the bid rigging and price fixing alleged herein, and/or failing to disclose such conduct

324    As described herein, Defendants herein knowingly induced or participated in Bell, SSAI and/or Shenker's breach of their fiduciary duties by making bribes of at least $100,000,

through Stanfull, to secure the WWE videogame license and the 1998 amendments to the toy licenses, by failing to disclose that Shenker was secretly acting as their agent, and by inducing SSAI, Shenker and Bell to violate their fiduciary duties in connection with the bid rigging and price fixing scheme that resulted in the videogame license being awarded to THQ, Jakks and THQ/Jakks

325.    In seeking to induce SSAI, Shenker and/or Bell to breach their fiduciary duties owed to WWE, Defendants herein acted with malicious purpose and/or dishonest, unfair or improper means to harm WWE.

326.    All actions of Jakks and/or Friedman and/or Berman and/or Bennett in regard to the videogame license were either authorized or ratified by THQ/Jakks and THQ.

327.    As a direct and proximate result of Defendants' unlawful conduct, WWE has been injured in its business and property.

**COUNT XI**
**INDUCING BREACH OF FIDUCIARY DUTY**
**(Against THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett Only)**

328.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

329.    At all relevant times, SSAI and/or Shenker were agents of WWE and thus owed WWE fiduciary duties and obligations.

330.    As described herein, during the time SSAI and/or Shenker were agents of WWE, including, but not limited to, during the time the videogame license and the 1998 amendments to the toy licenses were negotiated, Jakks and/or Friedman and/or Berman and/or Bennett knew of and created an undisclosed conflict of interest between SSAI and/or Shenker, and WWE.

331.  As described herein, during the time Jakks knew SSAI and/or Shenker was WWE's agent, Jakks began the practice of paying Shenker and using him as their agent, none of which was disclosed to WWE

332.  As described herein, at various times during their undisclosed agency relationship with Shenker, Jakks personnel would, in writing, direct and inquire of Shenker regarding matters being performed by Shenker on Jakks' behalf and at the same time request that he secure modifications and/or amendments to Jakks' toy license with WWE on terms desired by Jakks To the detriment of WWE, Shenker recommended such modifications and amendments without attempting to negotiate better terms from Jakks or other entities interested in such rights

333.  As described herein, Jakks personnel were acutely aware of the impropriety of such conduct, and in particular were aware of the impropriety of such conduct after being advised by corporate counsel that Jakks could not do so without WWE's knowledge and consent

334.  Jakks never disclosed to WWE its agency relationship with Shenker

335.  As described herein, SSAI and/or Shenker breached their fiduciary duties to WWE through Shenker's undisclosed conflict of interest by virtue of his undisclosed agency relationship with Jakks and by acting contrary to the interests of WWE.

336.  As described herein, Defendants herein knowingly induced or participated in SSAI's and/or Shenker's breach of fiduciary duty by Jakks maintaining an agency relationship with Shenker despite knowing of Shenker's and/or SSAI's agency relationship with WWE, and Jakks failing to disclose such agency relationship and conflict of interest to WWE at the same time that Jakks was conducting business with WWE, including specifically with respect to the negotiation of valuable licensing rights sought by Jakks

337.  Jakks induced Shenker to violate his fiduciary duties in connection with every licensing right it obtained following execution of the domestic toy license and, with the authority

of Friedman and/or Berman and/or Bennett, paid Shenker for favorable treatment with respect to licensing matters being sought by Jakks, on its own behalf and/or on behalf of THQ and THQ/Jakks, including in regard to obtaining the rights formerly held by Playmates and the videogame license.

338.   All actions of Jakks and/or Freidman and/or Berman and/or Bennett in regard to the videogame license were either authorized or ratified by THQ/Jakks and THQ

339.   In seeking to induce SSAI and/or Shenker to breach their fiduciary duties owed to WWE, Defendants herein acted with malicious purpose and/or dishonest, unfair or improper means to harm WWE.

340.   As a direct and proximate result of Defendants' unlawful conduct, WWE has been injured in its business and property.

## COUNT XII
## CONSTRUCTIVE TRUST
### (Against Defendants THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett Only)

343.   Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

344.   As described herein, Bell, SSAI and/or Shenker breached their fiduciary duties owed to WWE by, *inter alia*, accepting bribes of at least $100,000 to secure the WWE videogame license and the 1998 amendments to the toy license and/or by participating in the bid rigging and price fixing scheme incidental to the videogame license.

345.   As described herein, in violation of their fiduciary duties owed to WWE, Bell, SSAI and/or Shenker caused WWE to enter into the videogame license and the 1998 amendments to the toy licenses

346    As described herein, Defendants herein had notice or knowledge of Bell, SSAI and/or Shenker's breach of their fiduciary duties owed to WWE in causing WWE to enter into the videogame license and the 1998 amendments to the toy licenses.

347    Accordingly, the videogame license and the 1998 amendments to the toy license, and all revenues and profits therefrom, are held by THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett in constructive trust for WWE.

### COUNT XIII
### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Against THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett Only)

348.    Each and every one of the foregoing allegations is incorporated herein by reference as though fully set forth at length

349.    At all times relevant hereto, WWE maintained valid contracts with SSAI, Shenker and/or Bell which required their faithful and honest services and which prohibited unethical conduct, fraud and deceit.

350    Defendants herein had knowledge of WWE's valid contracts with SSAI, Shenker and/or Bell and knew that SSAI, Shenker and Bell acted as fiduciaries of WWE.

351.    As described herein, Defendants herein intentionally sought to and did induce SSAI, Shenker and/or Bell to breach their contracts with WWE

352.    In seeking to induce SSAI, Shenker and/or Bell to breach their contracts, Defendants acted with malicious purpose and/or dishonest, unfair or improper means to harm WWE.

353.    As a direct and proximate result of Defendants' unlawful conduct, WWE has been injured in its business and property.

## COUNT XIV
### PIERCING THE CORPORATE VEIL/ALTER EGO
#### (Against THQ, Jakks, and THQ/Jakks Only)

354.    Each and every one of the foregoing allegations is incorporated herein by reference as though fully set forth at length.

355.    THQ and Jakks exercised complete domination of THQ/Jakks Pacific LLC with respect to the formation and operation of THQ/Jakks Pacific LLC. From inception, Jakks and THQ have each owned 50% of THQ/Jakks.

356.    Since its formation, THQ/Jakks has continued to be an instrument of fraud. THQ/Jakks has never performed the videogame license and has authorized and otherwise been complicit in the scheme to distribute the proceeds of the commercial bribery and antitrust violations set forth herein.

357.    THQ/Jakks Pacific LLC was a sham used to perpetrate and implement a fraud, specifically to be the formal signatory to the videogame license procured by the fraudulent and criminal schemes set forth herein.

358.    As a result, any and all liability of THQ/Jakks Pacific LLC to WWE should be imposed upon THQ and Jakks, jointly and severally.

## COUNT XV
### CONSPIRACY TO COMMIT COMMERCIAL BRIBERY; FRAUDULENT
### INDUCEMENT; INDUCING BREACH OF FIDUCIARY DUTY; AND TORTIOUS
### INTERFERENCE WITH CONTRACTUAL RELATIONS
#### (Against THQ/Jakks, Jakks, THQ,
#### Friedman, Berman and Bennett Only)

359.    Each and every one of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

360.　Defendants entered into an agreement to, *inter alia,* (i) commit commercial bribery; (ii) fraudulently induce WWE to execute the videogame license and the 1998 amendments to the toy licenses without knowledge of Defendants' unlawful bribes to SSAI, Shenker, Bell and/or Bell Licensing of at least $100,000 and Defendants' use of SSAI and/or Shenker as their undisclosed agent; (iii) induce SSAI, Shenker and/or Bell to breach their fiduciary duties owed to WWE; and (iv) tortiously interfere with WWE's contractual relations with SSAI, Shenker and/or Bell, as described in the foregoing substantive Counts of this Amended Complaint.

361.　Each of the Defendants committed one or more overt acts pursuant to and in furtherance of Defendants' conspiracy to unlawfully harm WWE by the unlawful conduct described herein.

362.　Pursuant to and in furtherance of Defendants' conspiracy, Defendants have, among other things, committed the acts described in Count I above, which are overt acts in furtherance of the goals of the conspiracy and which are specifically incorporated herein by reference and made a part hereof

363.　As a direct and proximate result of Defendants' unlawful conspiracy, WWE has been injured in its business and property.

### PRAYER FOR RELIEF

WHEREFORE, WWE respectfully requests that this Honorable Court enter judgment in favor of WWE and order the following relief:

1　All damages proven pursuant to RICO, trebled as permitted by law;

2.　All damages proven pursuant to the Sherman Act, trebled as permitted by law;

3. All damages proven pursuant to the Robinson-Patman Act, trebled as permitted by law;

4 A declaration that the videogame license and the international toy license are void;

5. A declaration that all amendments to the domestic toy license, the international toy license, and the videogame license are void;

6. An accounting of all revenues and profits obtained from all licensing rights illegally obtained;

7. Restitution and/or disgorgement of all revenues and profits obtained from licensing rights illegally obtained to which THQ/Jakks, Jakks, THQ, Friedman, Berman and Bennett were not properly entitled;

8. Restitution and/or disgorgement of all bribes and/or payments paid or received by Defendants;

9. All other actual damages sustained by WWE;

10. Punitive damages;

11. Attorneys' fees and costs; and

12. Such other and further relief as this Court deems just and appropriate

JURY TRIAL DEMANDED

Respectfully submitted,

KIRKPATRICK & LOCKHART NICHOLSON
    GRAHAM LLP

By: Eugene Licker (EL 0334)

KIRKPATRICK & LOCKHART NICHOLSON
    GRAHAM LLP

599 Lexington Avenue
New York, New York 10022-6030
(212) 536-3900 (phone)
(212) 536-3901 (fax)

and

Jerry S. McDevitt
Curtis B. Krasik
Amy L. Barrette

KIRKPATRICK & LOCKHART NICHOLSON
    GRAHAM LLP

535 Smithfield Street
Pittsburgh, Pennsylvania 15222
(412) 355-6500 (phone)
(412) 355-6501 (fax)

Dated: March 30, 2005

Attorneys for Plaintiff, World Wrestling
Entertainment, Inc

126

TOTAL P. 02

# STANFUL INDUSTRIAL LTD.

ROOM 1601-2, 16/F
CAUSEWAY BAY PLAZA I,
489 HENNESSY ROAD,
CAUSEWAY BAY, HONG KONG.

TEL:(852) 2891-7722
FAX:(852) 2891-6833

*INVOICE*

*JAN. 2, 1998*
*PAYABLE IMMEDIATELY*

*TARKS PACIFIC*
*ROOM 1008   10/F*
*PENNESULA CENTRE*
*T.S.T. EAST*
*KOWLOON, HONG KONG*

*FOR DEVELOPMENT OF POSSIBLE*
*LATEX BASED SOFT TOYS WITH*        *US$80,000 00/xx*
*SPECIAL COATINGS*

*PLEASE PAY IMMEDIATELY TO*
*HANG SENG BANK LTD*
*BENEFICAILY  A/C STANFULL INDUSTRIAL LTD*
*A/C NO  296-4-704122*

*NET   U.S.D. $80,000 00/xx*

*SINCERELY*

For and on behalf of
STANFULL INDUSTRIAL LIMITED
企業本有限公司

Authorized Signature(s)

*Salina*
*pls handle*

00080

3-JAN-1998  10:07                     3103176527

EXHIBIT
1

P 02