CONFIDENTIAL

```
Docket No: X05-CV-00-0180933-S    Vol. 4

                                  SUPERIOR COURT
---------------------------------:
STANLEY SHENKER &                : COMPLEX
                                   LITIGATION
ASSOCIATES, INC.,                : DOCKET

         Plaintiff,              :
                                   AT STAMFORD
                                 :
vs.                              :
                                 :
WORLD WRESTLING FEDERATION       :
ENTERTAINMENT, INC.,             :
         Defendant.              :
---------------------------------x
                            One Canterbury Green
                            Stamford, Connecticut
                            March 18, 2003
                            9:30 a.m.

   CONTINUED EXAMINATION BEFORE TRIAL of
STANLEY SHENKER, the Plaintiff in the
above-titled action, held at the above time and
place, before a Notary Public of the State of New
York.


                            Eileen Mulvenna,
                               CSR/RMR
```

Page 750

```
                Stanley Shenker           750
 1
 2   Goodwin. Goodwin & Shipman handled criminal
 3   actions, also.
 4       Q.   And who have you consulted with at
 5   Shipman on criminal law matters?
 6           MR. NOLIN: Object to the form. I
 7       believe -- Mr. Shenker, I don't believe you
 8       have to answer if you're going to give the
 9       substance of the communication. You can
10       ask who he's communicated with at Shipman,
11       but I don't believe the issue of what he's
12       consulted on is appropriate.
13           MR. McDEVITT: I haven't asked for a
14       communication.
15           MR. NOLIN: Yes, you have. He's
16       asked --
17       A.   I --
18           MR. NOLIN: Mr. Shenker, wait a
19       second.
20           MR. McDEVITT: If you want to strike
21       it, strike it.
22           MR. NOLIN: I want the witness to
23       try to answer the question, but you're
24       asking in a way that implicitly asks him to
25       reveal the nature of the communication, the
```

Page 751

```
                Stanley Shenker           751
 1
 2   nature of what he was talking about.
 3           So you can tell Mr. McDevitt who
 4       you've consulted with at Shipman, but when
 5       he puts in about a particular topic, I
 6       believe he's asking you to reveal the
 7       nature of the communications. I don't
 8       believe you have to answer that.
 9           MR. McDEVITT: Is that an
10       instruction not to answer?
11           MR. NOLIN: I'm advising the witness
12       to try to answer the question without
13       revealing privileged communication.
14       Q.   Did you consult with a criminal
15   lawyer at Shipman & Goodwin, Mr. Shenker?
16           MR. NOLIN: I think, Mr. Shenker,
17       you can answer the question by saying who
18       you've consulted with at Shipman.
19           MR. McDEVITT: You either instruct
20       him not to answer --
21           MR. NOLIN: I instruct him not to
22       answer.
23           MR. McDEVITT: -- or let him answer
24       the question.
25           MR. NOLIN: I'll instruct him not to
```

Page 752

```
                Stanley Shenker           752
 1
 2   answer. I'm trying to get the substance of
 3   the testimony here.
 4           MR. McDEVITT: Well, the record will
 5       speak for itself on that.
 6       Q.   Mr. Shenker, did there come a point
 7   in time where you thought you needed the advice
 8   of criminal counsel in this case?
 9       A.   There came a point in time where I
10   wanted to correct a lot of information that was
11   not truthful and in order to do that, at the end
12   of that day of testimony -- at the end of the day
13   of testimony, I was being wheeled out in a
14   wheelchair and I said --
15           MR. NOLIN: Don't reveal what --
16           MR. McDEVITT: Please don't
17       interrupt your witness in the middle of an
18       answer. You told me the same thing.
19           MR. NOLIN: Mr. Shenker, don't --
20       I'm just going to caution you you don't
21       have to reveal what you said to counsel.
22           MR. McDEVITT: If you're going to
23       tell me not to interrupt the witness in the
24       middle of an answer, you should do the same
25       thing.
```

Page 753

```
                Stanley Shenker           753
 1
 2           MR. NOLIN: I have the obligation to
 3       protect the privilege.
 4           MR. McDEVITT: You waived that part
 5       of the privilege anyway. You talked about
 6       what he did in briefs and everything else
 7       so --
 8           MR. NOLIN: Mr. McDevitt --
 9           MR. McDEVITT: -- you can't open the
10       door --
11           MR. NOLIN: -- it hasn't been
12       determined by the court yet. You made a
13       letter statement that there's been a
14       waiver. There's nothing in front of the
15       court. I have an obligation to try to
16       protect the privilege.
17           MR. COLPERT: I think you made it
18       abundantly clear to Mr. Shenker that he's
19       not to waive the privilege, and I think he
20       should answer the question at this time.
21           MR. McDEVITT: That's what I'd like
22       to do.
23           MR. COLPERT: Peter, you've
24       instructed him three or four, even five
25       times. At this point, I think it's clear
```

15 (Pages 750 to 753)

Page 754

```
 1        Stanley Shenker              754
 2   to the witness and he understands --
 3        MR. NOLIN: Mr. Colpert, we don't
 4   need a fourth and fifth lawyer in this
 5   process. Mr. McDevitt is handling this
 6   deposition for today. I don't believe we
 7   need another lawyer in the process.
 8        I'm advising my client -- I was told
 9   not to advise my client, and all I'm doing
10   is stating for the record why I'm going it.
11   Q.   Finish your answer, Mr. Shenker.
12   A.   I came out of that day of deposition
13   and I said to myself this is not right. And
14   Peter said, Stop. I'm going to give you a couple
15   of names you should call and talk to. And I
16   called up another legal firm. I had a phone
17   conference call with them. I drove up to
18   Hartford and met with them.
19   Q.   That day?
20   A.   No, I think it was the next day.
21   The conference call was that day and then my wife
22   drove me. I couldn't drive. My wife drove me
23   up.
24   Q.   Let me make sure I understand. You
25   come out of the third day of your deposition --
```

Page 755

```
 1        Stanley Shenker              755
 2   A.   Yes.
 3   Q.   -- you say something to
 4   Mr. Nolin -- what did you say to him?
 5        MR. NOLIN: Object to the form. He
 6   hasn't testified to that and I'm
 7   instructing him not to answer.
 8        MR. McDEVITT: Yes, he did.
 9   A.   I don't really think I said
10   anything. I think I broke down.
11   Q.   You broke down crying -- crying?
12   A.   Yes.
13   Q.   You didn't make any verbal
14   statements to him? He says, Stop, you need
15   another lawyer? That's your testimony?
16   A.   Basically, that was what happened.
17   Q.   And you didn't tell him why you were
18   crying?
19   A.   No.
20   Q.   You didn't tell him --
21   A.   He stopped -- he said, Stop. He
22   didn't want me to say anything. I just want you
23   to stop.
24   Q.   Did he tell you why you needed
25   another lawyer?
```

Page 756

```
 1        Stanley Shenker              756
 2        MR. NOLIN: Object. That's getting
 3   into privileged communications.
 4   Mr. Shenker, you don't have to say what you
 5   and I discussed.
 6        MR. McDEVITT: If you want to
 7   instruct him, instruct him.
 8        MR. NOLIN: I just instructed him.
 9        MR. McDEVITT: All right.
10   Q.   And, Mr. Shenker, am I correct that
11   the only thing that happened on the third day of
12   your testimony -- it didn't happen on day one.
13   It didn't happen on day two -- is that you were
14   confronted with one of the actual invoices at the
15   end of the deposition and you knew you'd been
16   caught dead to right lying; is that what
17   happened?
18        MR. NOLIN: Object to the form.
19   A.   Not really. Because when I went
20   into the depositions, I didn't know what I was
21   doing either and I was not sure of what it was.
22   Q.   Do you remember when you were shown
23   the actual invoice by Ms. Barrette at the end of
24   the deposition, Exhibit 68? Do you remember
25   that?
```

Page 757

```
 1        Stanley Shenker              757
 2   A.   I remember being shown those
 3   invoices. I remember being asked a lot of
 4   questions, how I felt, what medicines I was on,
 5   what I was doing.
 6   Q.   My question, sir, is do you remember
 7   being shown the actual invoice that Mr. Bell had
 8   sent you at the end of the deposition on day
 9   three?
10   A.   I believe I was shown actually two
11   different ones.
12   Q.   And do you remember -- strike that.
13        Am I correct, sir, that at the time
14   you were shown that at the deposition, you at
15   that point in time thought all those had been
16   removed, taken away by Mr. Bell and destroyed,
17   didn't you?
18   A.   No, that's not what I thought at
19   that time. I mean reality was, I believe those
20   were all gone; but when you asked me what I was
21   thinking about at that time, no.
22   Q.   When you got that invoice sat in
23   front of you, did you realize that you guys had
24   been caught?
25        MR. NOLIN: Object to the form.
```

16 (Pages 754 to 757)

Sullivan Reporting
(914) 949-4545

3287cd92-bec0-4781-80d4-8b19a60e4826

Page 982

```
 1            Stanley Shenker            982
 2        MR. NOLIN:  Object to the form.
 3    A.   -- if I kept a copy at that time.
 4    Q.   Go to page 28565, the part that
 5  mentions Jim Bell.  Do you see where --
 6    A.   What page?
 7    Q.   Page 28565.
 8    A.   Okay.
 9    Q.   Do you see the entry under 1-I,
10  J. Bell Consulting?  It says, "Outstanding
11  amounts as at 1999" and it gives a U.S. dollar
12  figure.  Do you see that?
13    A.   Yes.
14    Q.   You have written by it "settled";
15  correct?
16    A.   Yes.
17    Q.   What did you mean by the notation
18  "settled" written on that document?
19    A.   I would have said that that was paid
20  to him.  It would have meant that it was paid.
21    Q.   What was that account payable for?
22    A.   I've just been looking at it.  I
23  don't know.
24    Q.   Did you know at the time you marked
25  it "settled" what it was for?
```

Page 983

```
 1            Stanley Shenker            983
 2    A.   I don't remember.
 3    Q.   But that would have been a payable
 4  amount due from Stanfull to James Bell?
 5    A.   It would have been a payment I made
 6  from Stanfull to James Bell.  It didn't mean it
 7  was due from Stanfull to James Bell.
 8    Q.   So there would have been a $42,400
 9  payment somewhere from Stanfull to James Bell?
10    A.   Yes.
11    Q.   Have you turned over any evidence of
12  that payment to us, Mr. Shenker?
13    A.   I turned over all the evidence I had
14  of any payments to James Bell.
15    Q.   From Stanfull?
16    A.   You're indicating -- you're getting
17  everything that I have.
18    Q.   My question to you, sir, you turned
19  over all the evidence of payments you've made to
20  Mr. Bell from Stanfull to us?
21    A.   I believe I have.
22    Q.   We've gotten -- go back if you will
23  to January 4th production, January 24th
24  production, Exhibit 71, Mr. Shenker --
25    A.   Got it.
```

Page 984

```
 1            Stanley Shenker            984
 2    Q.   -- would you care to look through
 3  that and find page -- find invoices -- would you
 4  look at document number 28562 in that packet?
 5  It's towards the end.  28562 --
 6    A.   Yes.
 7    Q.   -- am I correct that's an invoice
 8  from Bell Consulting dated 10/8/98; correct?
 9    A.   Yes.
10    Q.   Sent to Stanfull?
11    A.   Right.
12    Q.   For $20,000; correct?
13    A.   Right.
14    Q.   And am I correct that that's for his
15  split on the Playmates transaction?
16    A.   I believe so.
17    Q.   That's not the $42,400, is it?
18    A.   No.
19    Q.   Would you look at the next page --
20    A.   Yes.
21    Q.   -- 28563?
22         Do you see that invoice?
23    A.   Yes.
24    Q.   That's an invoice from
25  Bell Consulting to Stanfull also; correct?
```

Page 985

```
 1            Stanley Shenker            985
 2    A.   That's correct.
 3    Q.   And that invoice is for $280,616;
 4  correct?
 5    A.   That's correct.
 6    Q.   That's not for $42,400, is it?
 7    A.   No, it isn't.
 8    Q.   Do you see any other indication in
 9  the documents that you produced of any other
10  payment to Stanfull or any other payments to
11  Jim Bell from Stanfull other than the $280,616
12  payment and the $20,000 payment?
13    A.   Yes.  On the third page here, it's
14  redacted showing of J. Bell Consultants, a
15  balance.
16    Q.   You're talking about the 42,400?
17    A.   That's what you asked me; correct?
18    Q.   Where's the check for it?
19    A.   The check for it?
20    Q.   Where's the proof of payment that
21  you paid that amount to Mr. Bell?
22    A.   I show that as a payment.  It was a
23  thing coming out of the book -- I don't even show
24  it as deducted in the savings account, so I don't
25  know.
```