LAW OFFICES
SANDAK HENNESSEY & GRECO LLP
970 SUMMER STREET • STAMFORD, CONNECTICUT 06905 • (203) 425-4200 • JURIS NO. 401677

| | | |
|---|---|---|
| DOCKET NO. X05-CV-00-0180933-S | : | SUPERIOR COURT |
| DOCKET NO. X08-CV-00-0180933-S | : | |
| | : | |
| STANLEY SHENKER & ASSOCIATES, INC., | : | COMPLEX LITIGATION |
| | : | DOCKET AT STAMFORD |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| WORLD WRESTLING FEDERATION | : | |
| ENTERTAINMENT, INC., | : | |
| | : | |
| Defendant. | : | MARCH 5, 2003 |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S REQUEST FOR LEAVE TO AMEND

### I.     INTRODUCTION

Plaintiff Stanley Shenker and Associates, Inc. ("SSAI") has moved the Court for leave to

amend its pleadings in response to Defendant's most recent special defenses and counterclaims

in order to comport with SSAI's recently amended interrogatory responses, Stanley Shenker's

amended deposition testimony (submitted on March 3, 2003) and a number of documents which

SSAI had not previously made available to Defendant, but which it has voluntarily produced

within the last five weeks  The new information SSAI has produced is that Mr. Shenker, and

through him, SSAI, was required to make payments to Defendant World Wrestling Federation

Entertainment's ("WWE") executive vice-president, James Bell, over a number of years. As will

be explained below, these payments were not, as WWE alleges in its counterclaim, part of a kick-back scheme which defrauded WWE by creating commission payments for SSAI to which it was not entitled  Nor were they part of a "quid pro quo" or a "shake-down" of licensees. Rather, Bell's request for a share of SSAI's commission payments due to SSAI under WWE's contract was merely the cost to SSAI of doing business in WWE's world

One of WWE's own attorneys, Scott Amann, Esq., blessed the Trinity deal discussed below.  It is ironic at best that WWE would now attempt to use the fact that its own executive took back a share of SSAI's contractual earnings to attempt to deny SSAI any of the millions of dollars in commissions rightfully due to SSAI under its contract with WWE  WWE's current proposed litigation theory might be summarized briefly:  "We took back some of your money, so now we don't have to pay any of your money."

Given the importance to SSAI of being able to amend its pleadings and defend itself against WWE's counterclaims, given the lack of prejudice to WWE since SSAI has moved to extend discovery, and given that SSAI's error was in going along with one of WWE's own executive's requests not to disclose this relationship (at least until SSAI's outside counsel

LAW OFFICES
SANDAK HENNESSEY & GRECO LLP
970 SUMMER STREET  •  STAMFORD, CONNECTICUT 06905  •  (203) 425-4200  •  JURIS NO. 401677

recently learned of it and Shenker realized that he was not bound to the former WWE executive and he could and should disclose), this Court should grant SSAI's request for leave to amend.[1]

## II.  FACTUAL BACKGROUND

Stanley Shenker and Jim Bell were independent business acquaintances before they began their careers at WWE. Mr. Shenker, formerly a teacher, was having a comfortably successful career in the field of educational toy development and licensing. As the years went on, he worked with a number of respected toy and craft companies, including CBS, and throughout the industry built numerous personal connections, trust and a reputation for competence. Jim Bell was also enjoying a successful career, working in marketing and licensing at various mainstream companies such as Jim Henson Productions (of Muppets fame) and Simplicity (the sewing pattern company).

In approximately 1995, at a time when WWE's licensing revenues had dropped precipitously, Jim Bell was hired by WWE to do licensing. WWE years earlier had discovered that it could generate a great deal of revenue simply by licensing out rights to its intellectual property to manufacturers, who would then pay WWE a percentage of their income on licensed

---

1 SSAI recognizes that pursuant to Practice Book Section 10-60(a)(3), WWE has 15 days to object to this Request and only in the event of such objection will the Court be required to rule on the Request. Based on WWE's prior pleadings, briefs and tactics in this matter SSAI expects that WWE will object to this Request. In order to expedite the process, SSAI is filing this brief with the Request so that the matter will be briefed for the Court if and when WWE objects.

LAW OFFICES
SANDAK HENNESSEY & GRECO LLP
970 SUMMER STREET • STAMFORD, CONNECTICUT 06905 • (203) 425-4200 • JURIS NO. 401677

3

products as royalties. Prior to 1995, WWE had great success using a licensing agent called Leisure Concepts, which had generated several hundreds of millions of dollars in sales of WWE licensed products, over twenty-four million dollars in royalties for WWE and millions of dollars in commissions for Leisure Concepts on the royalty payments. As it would later do with SSAI, however, WWE decided unilaterally, after a time, that it would rather keep 100% of the royalties on WWE-licensed products than pay commissions to the company that had generated and worked the licenses. So WWE fired Leisure Concepts.

WWE did not have a significant internal licensing department and lacked Leisure Concept's expertise in licensing  After a couple of years of dramatic decline in licensing revenues, WWE realized that it would need to get outside help once again. WWE hired an experienced marketing executive, James Bell, to attempt to rebuild WWE's licensing programs. Bell, in turn, in late 1995 or early 1996, recommended that Stanley Shenker be hired to handle certain toy licensing for WWE's live events. Mr Shenker was very successful for the WWE on this assignment, but given the scope of his retention he brought in only a handful of licensees for these toy products.

4

In August 1996, Ed de Lange, the then President of WWE, the WWE Vice-President of Consumer Products, and other WWE officials, without Mr. Bell's involvement[2], determined to expand Mr. Shenker's role by making him the exclusive licensing agent for the company. Mr Shenker was given a two-page letter agreement making him the exclusive licensing agent through December 1997, with a commission rate of 20% on domestic deals and 10% on international deals. Thereafter, WWE set about drafting a more formalized contract with Mr. Shenker. That agreement was negotiated by Edward Kaufman, the general counsel of WWE, and Neville Meyer, then co-CEO of WWE. The formal agreement dated March 7, 1997, and ultimately signed by Linda McMahon, made Shenker the WWE's exclusive licensing agent through the world, except for Germany and the Philippines, but set Shenker's standard commission at 11%. It also extended the exclusive licensing agent term to December 31, 1998.

Although the "exclusive agent" contract WWE signed with SSAI permitted WWE to do licensing internally and thereby avoid paying Shenker on those specific accounts, it turned out that Bell's department at WWE was dramatically understaffed, Shenker was terrific at what he did, and Shenker ended up taking care of almost all of the accounts, resulting in very substantial royalty income to WWE and commissions to Shenker on all accounts on which he worked

---

2 During this period Bell was shifted from licensing to be the head of marketing and licensing for WWE. Accordingly, Bell spent much less time on the licensing side of the business and was focused on marketing. This shift in Bell's responsibilities may explain why WWE wanted Mr. Shenker to take a greatly increased role in product licensing and why Bell played little part in the negotiation of Mr. Shenker's new contract.

LAW OFFICES
SANDAK HENNESSEY & GRECO LLP
970 SUMMER STREET  •  STAMFORD, CONNECTICUT 06905  •  (203) 425-4200  •  JURIS NO. 401577

WWE publicly listed Shenker as its exclusive licensing agent and provided Shenker with an office at WWE's headquarters in Stamford. Officers and employees of the WWE routinely referred licensing inquiries to Shenker. WWE officials were so happy with the arrangement that in March 1998 they approached Mr. Shenker with an amendment to his agreement. In exchange for exempting certain German speaking countries, the WWE gave Shenker an extended exclusive agent contract term through December 31, 2003. Although negotiated and drafted by WWE Counsel Ed Kaufman, that extension was formally approved by CEO and then co-owner Linda McMahon

Shenker steadily built for WWE a large portfolio of licensees that would continue to generate very substantial royalties for WWE. These licensees served to provide voluminous free advertising for WWE for years to come. Shenker was the face of licensing for the WWE, which openly advertised him as its exclusive licensing agent. Shenker traveled the world for WWE and visited numerous events and shows to maintain a public presence for the brand. SSAI earned for WWE an exceptionally large royalty income stream and turned the WWE brand into a hot licensing product. WWE was paying Stanley Shenker under WWE's contract the 11% commission on all the revenue he created. The enormous revenues WWE was earning resulted in very substantial revenues for SSAI.

6

When Bell returned to licensing from his stint as the head of WWE marketing, Bell remained a relatively modestly salaried employee, despite his contribution in putting the team together and facilitating the extraordinary growth. Bell continued to be the inside person on product licensing, approving all deals and the artwork that would go with it, but he continued to leave most of the public promotion and travel to Shenker. By the terms of WWE's contract with Shenker, Bell, members of the finance department, the law department and Linda McMahon continued to control the terms of all license agreements and whether any proposal by Shenker would be approved.[3]

WWE's culture and business practices differed greatly from those Bell and Shenker each experienced at such mainstream companies as Jim Henson Productions, CBS and Simplicity. Bell and Shenker soon recognized the following phenomena: WWE's use of its substantial monopoly power in fixing prices among its licensees at the retail level; WWE's CEO Linda McMahon profiting personally by requiring that all WWE business travel take place through a travel agency she owned; WWE's Vice-President of music growing rich, receiving payments from both the licensees and WWE for the same work; and many WWE artists and writers doing freelance work for licensees while working on the WWE payroll. They would have also seen rampant nepotism: the McMahon children were given lucrative positions in the company; and

___

3 Under its Agreement with Shenker, WWE retained the right to accept or reject any agreement or proposal Shenker presented and Shenker had no right to accept or execute any agreement on behalf of WWE.

7

Case 7:04-cv-08223-KMK Filed 09/19/2005 Page 6 of 22

Co-CEO Neville Meyer's son was highly compensated to develop a comic book for the company, which, in fact, was never produced.

## Payments to Bell

During the Spring of 1998, Bell apparently determined that given WWE's executives' practices, it would be appropriate for him to seek more than just his WWE salary from the licensing boom that WWE and SSAI were enjoying and that he had helped Shenker to create. The first time Bell asked Shenker for money acting as a WWE Executive Vice-President was in spring of 1998. Bell met in his WWE office with Robert Goetz, the principal in Trinity Products, an existing WWE licensee and clothing manufacturer, but not then one of SSAI's accounts. Goetz was there to see if he could get Bell to give him a larger part of WWE's tee-shirt business. Midway through the meeting, Bell left his office and approached Shenker. Bell told Shenker that Goetz would pay SSAI 2% as consulting fees for all additional business SSAI could generate for Trinity, which fee income SSAI was then to split with Bell. Bell told Shenker to "go make the deal." Shenker and Goetz then met separately and Goetz told Shenker he wanted an exclusive with Wal-Mart "and would pay 2% to get it." They also discussed other licensing opportunities.

After the meeting, Goetz told his brother about the deal. His brother, a lawyer, suggested that Goetz call WWE's legal department to make sure such a side-deal was acceptable. Goetz

LAW OFFICES
SANDAK HENNESSEY & GRECO LLP
970 SUMMER STREET • STAMFORD, CONNECTICUT 06905 • (203) 425-4200 • JURIS NO. 401577

LAW OFFICES
SANDAK HENNESSEY & GRECO LLP
STAMFORD, CONNECTICUT 06905  •  (203) 425-4200  •  JURIS NO. 401577
970 SUMMER STREET

then called Scott Amann, Esq , an in-house counsel at WWE, about the proposed arrangement.
Attorney Amann reframed the issue, asking Goetz whether he was making a complaint. When
Goetz responded that he was not complaining, Attorney Amann expressed WWE's indifference,
which served to bless the deal, and indicated to Goetz that he could do the deal he had proposed
to Bell. Pursuant to this new assignment, Shenker went to California to visit Trinity's
operations. He also made various phone calls on Trinity's behalf. Although Shenker never
received the written consulting agreement he asked for, he was paid three times by Trinity for a
total of about $60,000. He divided the money evenly with Bell. Shenker did not receive any
descriptive back up on the specific source of the Trinity revenues, and to this day is uncertain
how Goetz and Trinity calculated the payments he received.

Acting as Executive Vice-President of WWE, Bell thereafter began a chain of events that
led ultimately to this motion to amend SSAI's answers to WWE's special defenses and
counterclaims  In 1998, Shenker became aware of a problem with one of WWE's failing
licensees in the toy field. Playmates, a maker of certain toy figures, was going to sell all of its
inventory and molds at a steep discount, which would reduce WWE's royalty income and
devalue the WWE brand. This situation was known to Bell and others at WWE. SSAI
conceived and then brokered a deal, with WWE's approval, for Playmates to sell its excess
inventory and tooling and molds to another WWE licensee, Jakks. With Jakks' acquisition,

9

LAW OFFICES
SANDAK HENNESSEY & GRECO LLP • (203) 425-4200 • JURIS NO. 401577
STAMFORD, CONNECTICUT 06905 •
970 SUMMER STREET •

Playmates did not dump its product on the discount market, and the product was sold by Jakks in accordance with its ordinary distribution and sale of WWE merchandise. SSAI helped prevent any devaluation of the WWE brand. For brokering this deal between licensees, Jakks paid SSAI a $40,000 brokerage fee. The senior executives at WWE, including CEO Linda McMahon and Executive Vice-President Bell, were aware that SSAI would be receiving the fee from Jakks. Bell, however, then requested SSAI to split its fee with him. Bell had not done any work on the deal, but he was the contact person for Shenker and he remained the executive ultimately in charge of all licensing. Shenker felt SSAI's best choice was to make the payment.

In 1998, Bell acting as a WWE Executive Vice-President made requests from SSAI for secret payments related directly to WWE license transactions. Shenker believed that if he wanted to continue his work with Bell and WWE and to receive the income expressly called for in WWE's recently extended contract, he would have to give back part of his earnings to Bell, WWE's Executive Vice-President. Since SSAI had been at work for several years building the licensing base from which royalties (and therefore SSAI's commissions) continued to mount, Shenker did not feel he was in a position to reject Bell's requests for money, thereby risking the loss of the income to which he was already entitled based upon his successful efforts over the prior years.

The first such request in 1998 came as WWE was deciding which of two video games to license. The final decision was Bell's, in his capacity as Executive Vice-President in charge of licensing. The better game and business choice was a game made by a joint venture brought together by SSAI, called Jakks/THQ. The other choice was from an old licensee, Acclaim, which, having been procured years before by Leisure Concepts, presented two significant problems: (1) it required a commission payment roughly double the percentage allowed to SSAI; and (2) it called for a large payment to an agent (Leisure Concepts) no longer on good terms with WWE. The Jakks/THQ product, on the other hand, looked most promising, and it ultimately proved extremely successful. Even more attractive, WWE (and SSAI) obtained substantially more in value on the Jakks/THQ deal because it called for additional payments in the form of THQ stock, the value of which later grew dramatically. In the context of this selection process, Executive Vice-President Bell requested that Shenker and SSAI split their revenues on the Jakks/THQ proposal with him. Knowing the benefits of doing this deal to WWE and to SSAI, Shenker agreed to pay back to Bell half his earnings on that transaction.[4]

Flush with success for his employer, for SSAI and for himself, Bell, still acting in his capacity as WWE's Executive Vice-President in charge of licensing, began to request that he be

---

4 Because the Playmates and Jakks deal took place in the Far East, Shenker received his fee in a company he owns, Stanfull Industrial Limited, based in Singapore. Bell invoiced Stanfull for his share and Shenker paid Bell through Stanfull. When the Jakks/THQ transaction was completed, Bell again invoiced Stanfull, and Shenker and SSAI paid Bell through Stanfull.

11

LAW OFFICES
SANDAK HENNESSEY & GRECO LLP
570 SUMMER STREET  •  STAMFORD, CONNECTICUT 06905  •  (203) 425-4200  •  JURIS NO. 40157

LAW OFFICES
SANDAK HENNESSEY & GRECO LLP
970 SUMMER STREET • STAMFORD, CONNECTICUT 06905 • (203) 425-4200 • JURIS NO. 401677

paid half of SSAI's commissions on various other unrelated licenses. There was no clear pattern evident to SSAI as to which accounts Bell would request SSAI to split its commissions on; some were accounts Shenker alone had brought to WWE and had been servicing without incident for a number of years, others were accounts WWE had turned over to SSAI to service. Both categories of licenses were serviced by SSAI at WWE's request under WWE's contract for years — with the full knowledge of various WWE executives and employees. The only new development was that Bell, acting as WWE's Executive Vice-President, was now selecting some deals for which SSAI had to reduce its contractual income by returning half of its commission to the WWE executive who served as its direct superior.

**Bell Invoices**

Bell invoiced Shenker on the Playmates and Jakks/THQ deals when completed. Thereafter, Bell sent invoices to SSAI for 50% payments whenever WWE sent SSAI a commission check on the accounts Bell had designated. The Bell invoices themselves were presented in the ordinary course and stated that the bill was for "consulting services," listing the names of the relevant WWE licensees. SSAI paid these invoices to Bell Consulting LLC. The invoices were filed along with all other normal SSAI business records and were processed by SSAI's accountant in the ordinary course with SSAI's other financial and tax records. While

12

Bell was still at the WWE, as well as after he left his Vice-President's position at WWE in March 2000, Bell drafted letters of agreement with SSAI to formalize the payment arrangements. (Presumably, this was to ensure that payments would not stop once he left WWE). These letters, delivered in the ordinary course and explicit on their face, are referenced in letters dated August 2001, in which Bell formally ends the letter agreements. Following later instructions by Bell to keep his arrangements secret, SSAI returned copies of the original letters to Bell. SSAI, however, did retain and has recently turned over the 2001 letters to WWE as Bates stamped documents "Confidential SSAI" 28536 and 28537.

When Shenker's attorney advised him that SSAI needed to produce documents related to the case in the Summer of 2001, Shenker informed Bell. Bell told Shenker not to produce the real invoices. Bell personally came to SSAI's office in an effort to obtain all of the previous invoices. While there, Bell presented to Shenker a whole new set of invoices corresponding to the dates and amounts actually paid pursuant to the originals. Bell's new invoices, however, now described "product development" projects for which SSAI had ostensibly been paying Bell. Although some of the projects mentioned did actually exist (e.g. Monster Blaster), the invoices and payments in question were all for the same amounts of the SSAI commissions that Bell had already taken back from Shenker. In an effort to ensure that Bell's original invoices were all

LAW OFFICES
SANDAK HENNESSEY & GRECO LLP
570 SUMMER STREET  •  STAMFORD, CONNECTICUT 06905  •  (203) 425-4200  •  JURIS NO. 401577

13

LAW OFFICES
SANDAK HENNESSEY & GRECO LLP
970 SUMMER STREET  •  STAMFORD, CONNECTICUT 06905  •  (203) 425-4200  •  JURIS NO. 401677

replaced with the new ones, Bell went through SSAI's files with Shenker.[5]  When SSAI was

initially requested to produce financial documents and records pertaining to Bell Consulting,

SSAI produced the substituted invoices along with other actual records.

Because Bell's original invoices, which disclosed explicitly that SSAI was paying Bell in

connection with SSAI's commissions on WWE licenses, had originally been kept among all of

SSAI's ordinary records, they were commingled with the many other financial records of SSAI.

When Bell came over to SSAI's offices to replace the invoices, however, Shenker neglected to

retrieve a couple that were amidst SSAI's voluminous records. Therefore, when SSAI

supplemented its production on certain tax and financial records in August 2002, SSAI through

counsel produced two of the original Bell invoices to WWE (Bates numbers "SSAI Confidential"

23861 and 27309).  The few letters and invoices that Shenker retained, Bates numbers

"Confidential SSAI" 28536-28564, were voluntarily produced in January 2003 by SSAI, after

Shenker determined to disregard Bell's request and make full disclosure of their prior activities.


## Shenker's Correction of the Record

Following WWE's unilateral termination of SSAI's engagement in June 2000 and

WWE's refusal to continue making the payments required under the WWE-drafted and extended

---

5 In an effort to protect himself, Shenker kept a few copies of the original invoices as well as the August 2001 letters
mentioned above.

14

LAW OFFICES
SANDAK HENNESSEY & GRECO LLP
970 SUMMER STREET • STAMFORD, CONNECTICUT 06905 • (203) 425-4200 • JURIS NO. 401577

Agency Agreement, Stanley Shenker was at a loss as to how to proceed to protect his interests under WWE's contract. After all, WWE's was benefiting from the sale of over a billion dollars in WWE-licensed products and the receipt of over $100 million in license revenue. He knew he had a strong case against WWE under the WWE contract. WWE itself had run projections showing that SSAI's future commissions earnings on existing accounts alone would be $18 to $25 million  Although purportedly terminated due to a "change in business direction," it was plain why Shenker was fired. Notwithstanding the enormous financial benefits SSAI had conferred on WWE, the McMahons and other executives at WWE felt that SSAI was making too much money. The SSAI agency termination was under circumstances not unlike those that befell Leisure Concepts years earlier when it, too, had brought great financial success to the then WWF, only to be cut off when the WWF executives saw the total income that the licensing agents earned.

After starting this action in October 2000, Shenker had reluctantly abided by Bell's direction to remain silent. Shenker felt bound to follow Bell's direction as the entire arrangement had been conceived and directed by Bell. Bell had been on the inside at WWE, and Shenker believed both before and after his termination that Bell had better connections to and understanding of what was acceptable to WWE. Shenker knew that the Bell payments had nothing to do with the crux of his suit: that he was wrongfully terminated and that WWE's own

15

contract called for substantial payments to be made in any event. Accordingly, when Bell requested that Shenker not disclose SSAI's payments to Bell, Shenker initially obliged and tried to keep such evidence out of this case.

In late 2002 it came to light that WWE had long earlier procured the testimony of Robert Goetz through a settlement agreement resolving Goetz' prior sworn allegations that WWE had engaged in numerous, substantial and unlawful monopolistic practices, fraud, and other illicit business practices. WWE now planned to try to use the prior Trinity deal negotiated by Bell and Goetz (and blessed by WWE's in-house counsel, Scott Amann, Esq.) as some sort of defense against SSAI's contract claim. Also, in the Summer of 2002, it became apparent that WWE had decided to try to use its Executive Vice-President Bell's requests for payments back from Shenker on the Trinity deal as a new excuse not to pay SSAI the money owed under WWE's contract.

In December 2002, Shenker testified in an as-yet uncompleted and uncertified deposition (amended answers to which were submitted to WWE on March 3, 2003). He was extremely uncomfortable hiding the information Bell had told him to keep secret, because he was under oath. Shenker knew he needed help, but he did not know what to do. He announced to his counsel, Peter Nolin of Sandak Hennessey & Greco LLP, that he had an issue to disclose

LAW OFFICES
SANDAK HENNESSEY & GRECO LLP
970 SUMMER STREET • STAMFORD, CONNECTICUT 06905 • (203) 425-4200 • JURIS NO. 401677

16

Attorney Nolin inferred that Mr. Shenker might need additional advice, and directed Mr. Shenker and SSAI to Shipman & Goodwin, LLP.

In early January, Shenker, while obtaining additional advice, revealed to his Shipman & Goodwin attorneys the Bell requests for payments, and later for silence about those payments. Thereafter, he disclosed to his attorneys at Sandak Hennessey & Greco LLP for the first time these same facts. SSAI's attorneys immediately began the process of producing documents Shenker had withheld, correcting interrogatory responses, helping Shenker amend his deposition testimony, and amending the pleadings. Given the seriousness of what had transpired, SSAI made prompt motions requesting an extension of time for discovery, believing they had the concurrence of WWE's attorneys. When WWE objected to that request, SSAI's attorneys immediately sought intervention from the Court.

## III.    LEGAL STANDARD

Under Practice Book Section 10-60, the Court has discretion as to whether to permit a party to amend its pleadings, although the law favors amendment where there is no prejudice or injustice caused to the other side:

> "The grant or denial of a motion to amend the pleadings is a matter within the discretion of the trial court." *Tedesco v. Julius C. Pagano, Inc.,* 182 Conn. 339, 341, 438 A.2d 95 (1980). In the interest of justice, our courts have generally been most liberal in allowing amendments. Id., at 341, 438 A.2d 95; *Henry v. Klein,* 15 Conn App. 496, 500-501, 545 A.2d 575 (1988). Where a sound reason to amend is shown, the trial court must allow the

LAW OFFICES
SANDAK HENNESSEY & GRECO LLP
970 SUMMER STREET • STAMFORD, CONNECTICUT 06905 • (203) 425-4200 • JURIS NO. 401577

17

LAW OFFICES
SANDAK HENNESSEY & GRECO LLP
970 SUMMER STREET • STAMFORD, CONNECTICUT 06905 • (203) 425-4200 • JURIS NO. 401577

amendment. Refusal under such circumstances constitutes an abuse of discretion. *Cook v. Lawlor*, 139 Conn. 68, 71-72, 90 A.2d 164 (1952); *Clayton v. Clayton,* 115 Conn. 683, 686, 163 A. 458 (1932). "The essential tests are whether the ruling of the court will work an injustice to either [party] and whether the granting of the motion will unduly delay a trial." *Smith v. New Haven*, 144 Conn. 126, 132, 127 A.2d 829 (1956) In the final analysis, the court will allow an amendment unless it will cause an unreasonable delay, mislead the opposing party, take unfair advantage of the opposing party or confuse the issues, or if there has been negligence or laches attaching to the offering party. *Crowell v. Middletown Savings Bank*, 122 Conn. 362, 189 A. 172 (1937).

Moore v. Sergi, 38 Conn. App. 829, 835-36, 664 A.2d 795, 800 (1995).

## IV. ANALYSIS

This is a very unusual situation. The need for this request to amend arises from Stanley Shenker's initial mishandling of a troubling set of circumstances. Never having been in a situation where a high-placed representative of the company he contracted with made demands for return payments and then for silence, Shenker did not initially come forward with the whole truth about his dealings with Bell. Shenker knew that WWE owed him millions of dollars under WWE's contract with SSAI, and he knew that, WWE's Executive Vice-President in charge of the relationship covered by that contract, Bell, had requested that SSAI make substantial payments back to Bell, reducing SSAI's earnings under that contract. At the outset Mr. Shenker did not understand that the contract suit implicated Bell's practices while acting as a WWE Executive Vice-President. Uninitiated and un-counseled, Mr. Shenker initially, and erroneously,

18

followed Bell's directions to keep the matter secret. Once he recognized that he did not feel right about his own deposition testimony, however, he promptly got assistance and made the corrections of the record required under Connecticut practice.

SSAI is now making every effort to correct and clarify the record as required by its continuing duty of disclosure under the Practice Book. SSAI now seeks leave to conform its pleadings to the corrected record, both to admit certain allegations of the WWE and to plead the defenses associated with the record as now corrected. Refusal of permission to amend would cause a gross miscarriage of justice to SSAI. It would restrain SSAI from vigorously defending itself from the WWE's efforts to unjustly keep for itself the benefits derived from the billion dollars of sales of WWE-licensed products, the over $100 million in royalty fees being collected by WWE, and all of the commissions earned by SSAI, the entity that did the work that made it all happen. The WWE litigation objective appears to be to achieve this bold unjust enrichment by claiming that because WWE's *own officer* requested and received back from SSAI half of SSAI's contractual share of certain commissions, WWE may now keep *for itself* all of the commission money WWE owes SSAI under WWE's contract.

A denial of permission to amend would be fundamentally unfair. WWE cannot retain SSAI's share in the enormous profits resulting from SSAI's labor simply because SSAI did not know how best to respond to requests for money by WWE's executive. By WWE's own internal

LAW OFFICES
SANDAK HENNESSEY & GRECO LLP
970 SUMMER STREET · STAMFORD, CONNECTICUT 06905 · (203) 425-4200 · JURIS NO. 401577

19

LAW OFFICES
SANDAK HENNESSEY & GRECO LLP
970 SUMMER STREET • STAMFORD, CONNECTICUT 06905 • (203) 425-4200 • JURIS NO. 401577

estimates, SSAI is being denied its contractual rights under WWE's contract in an amount of $18 to $25 million dollars. WWE cannot rightfully obtain this windfall.

Moreover, there will be no actual prejudice to WWE in permitting the amendment. SSAI has moved the Court for an extension of time for discovery to accommodate inquiry into the new information. Indeed, none of this information should come as a surprise to WWE. WWE has had similar information and documents since the Spring and Summer of 2002 and actually withheld that information from SSAI's counsel until December 2003. SSAI is now in large measure simply admitting facts previously alleged by WWE and seeks only to plead a few additional facts and the legal theories and defenses which naturally flow from the facts alleged by WWE. Moreover, there is still plenty of time before the trial date.

## V.  **CONCLUSION**

For all of the foregoing reasons, SSAI respectfully requests that the Court exercise its discretion to permit SSAI to make the necessary amendments to its Reply to Defendant's Second Amended Special Defenses and Answer to Defendant's Third Amended Counterclaims, attached to the accompanying Request for Leave as Exhibit A.

PLAINTIFF,
STANLEY SHENKER & ASSOCIATES, INC.,

By _____

Peter M. Nolin
Stephanie A. McLaughlin
Sandak Hennessey & Greco LLP
970 Summer Street
Stamford, CT 06905
Juris No. 401577
Tel. (203) 325-8608
Fax. (203) 325-8608

James W. Bergenn
Alexandra M. McHugh
Shipman & Goodwin LLP
One American Row
Hartford, Connecticut 06103
Juris No. 57385
Tel. (860) 251-5000
Fax. (860) 251-5700

Its Attorneys

## CERTIFICATION

This is to certify that a copy of the foregoing has been sent on this 5th day of March 2003:

By hand to:
Richard P. Colbert
Day Berry & Howard
One Canterbury Green
Stamford, CT 06901

By Federal Express to:
Jerry S. McDevitt
Kirkpatrick & Lockhart, LLP
Henry W Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222

Stephanie A McLaughlin