UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

WORLD WRESTLING ENTERTAINMENT, INC.

:

                  Plaintiff,                       04 CV 8223 (KMK)

:              (ECF CASE)

      v.                                           :

JAKKS PACIFIC, INC.; JAKKS PACIFIC (H.K.)
LIMITED; ROAD CHAMPS LIMITED; THQ,     :
INC.; THQ/JAKKS PACIFIC LLC; STANLEY
SHENKER AND ASSOCIATES, INC.; STANLEY :
SHENKER; BELL LICENSING, LLC; JAMES
BELL; JACK FRIEDMAN; STEPHEN BERMAN;  :
JOEL BENNETT and BRIAN FARRELL,

:

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF JONATHAN J. LERNER

        JONATHAN J. LERNER, pursuant to 28 U.S.C. § 1746, declares

under penalty of perjury as follows:

        1.      I am a member of the Bar of the State of New York and a

member of the firm Skadden, Arps, Slate, Meagher & Flom LLP, attorneys for the

JAKKS Defendants.  I respectfully submit this declaration to place before the Court

true and correct copies of the following documents referred to in the JAKKS

Defendants' accompanying Memorandum of Law in support of their Motion to

Dismiss the Sherman Act Claim in the Amended Complaint.

**Exhibit A**    Agency Agreement between WWE and SSAI, dated March 7, 1997.

**Exhibit B**    Videogame License, dated June 10, 1998.

Dated:    New York, New York
September 19, 2005

Jonathan J. Lerner

# Exhibit A

## AGENCY AGREEMENT

THIS AGREEMENT, dated as of March 7, 1997, is between TITAN SPORTS, INC. ("Titan"), a Delaware corporation with its principal place of business at 1241 East Main Street, Stamford, Connecticut 06902, and STANLEY SHENKER & ASSOCIATES, INC. ("SSA" or "Agent"), a New Jersey corporation with its principal place of business at 1225 River Road, Edgewater, New Jersey 07020.

1.    Definitions: For purposes of this Agreement, the following definitions will apply:

(a)  The term "Copyrights" shall mean all copyrights now or hereafter owned by Titan.

(b)  The term "Events" shall mean the professional wrestling exhibitions produced, promoted, and performed by Titan live, or broadcast by free, cable, or pay television, as well as any future iterations thereof, whether in cartoon, comic or animated form.

(c)  The term "Existing Rights Holders" shall mean those parties that have, prior to the commencement of this Agreement, been granted a license by Titan without Agent's involvement to exercise the Merchandising Rights or Broadcasting Rights as set forth on Exhibit "A" which is attached hereto and hereby incorporated by reference.

(d)  The term "Intellectual Property" shall mean the Rights of Publicity, the Trademarks, the Copyrights, and all other proprietary rights relating to the Events.

(e)  The term "Licensee" shall mean a party located in the Territory that is granted a license after this Agreement goes into effect, through the efforts of Agent, to exercise the Merchandising Rights.

(f)  The term "Merchandising Rights" shall mean the right to use the Intellectual Property: (i) in connection with the manufacture, distribution, sale, and advertising in the Territory of merchandise articles of every type and description, both products and promotions, including, without limitation, toys, games, clothing, novelties, household items, paper products, and sporting goods; and (ii) in connection with the preparation and use in the Territory of materials designed to advertise and promote the goods, services or general business operations of a Licensee, including, without limitation, advertisements prepared for all print and audiovisual media uses (including radio, television, and motion pictures), packaging materials, point-of-sale displays, premium items, and other such promotional items.

(g)  The term "Talent" shall mean all individuals who perform in the Events including, without limitation, the professional wrestlers who perform in the Events, as well as any future iterations thereof, either real or fictional, whether in cartoon, comic or animated form.

f:\users\legal2\word\contract\misc\shenkcc.doc
3/25/97

(h) The term "Right of Publicity" shall mean the likenesses, physical characteristics, personalities, characters, and personas of the Talent.

(i) The term "Territory" shall mean the entire world, with the exception of Germany and Philippines.

(j) The term "Trademarks" shall mean all symbols, designs, styles, emblems, logos, and marks used in connection with the Events including, but not limited to, the name WORLD WRESTLING FEDERATION or WWF, the WWF logo or logos, the mark WORLD WRESTLING FEDERATION or WWF SUPERSTARS, and the names of Talent, excluding the initials WWF in block letters.

2.    TERM OF AGREEMENT

The term of this Agreement shall be effective as of August 20, 1996, and shall continue through December 31, 1998 ("Term"), unless terminated pursuant to Paragraph 13, below.

3.    KEY PERSON

SSAI expressly acknowledges and agrees that the services to be performed by it hereunder shall be specifically and primarily performed by Stanley Shenker, who hereinafter shall be described as the "key person" or "Shenker".

4.    Scope of Agency

Subject to the terms and conditions of this Agreement, Titan appoints Agent to act as its exclusive agent in the Territory, except for licensing agreements with Existing Rights Holders and Agent hereby accepts such appointment and agrees to use its best efforts in performing the following services for Titan in the Territory:

a.    negotiating the terms of license agreements with prospective Licensees relating to Merchandising Rights, as described hereinabove. Nothing herein contained shall be construed so as to obligate Titan to accept any agreement presented to Titan by Agent for approval, or negotiated by Agent for Titan, or to grant Agent any right of acceptance or execution of any particular agreement for Titan;

b.    servicing all license agreements except those as noted in Exhibit "A" with Licensees, including, without limitation: (i) providing Licensees with such materials available to Agent relating to the Intellectual Property as they may require in order to make effective use of the Intellectual Property under such agreements; (ii) assisting Titan in assuring that all Licensees use only approved artwork in exploiting the rights granted them under their agreements; (iii) assisting Titan in assuring that all copyright and trademark notice requirements (both governmental and imposed by Titan) are satisfied by Licensees, in accordance with the terms of their agreements; (iv) assisting Titan in assuring that Licensees submit to Titan, for its prior approval, all products and

f:\users\legal2\word\contract\misc\shenkee.doc          2
3/25/97

advertising materials which they propose to manufacture, sell, distribute, or use under their agreements; and (v) otherwise assisting Titan and the Licensees in exploiting the Intellectual Property in the Territory.

5.    Non-Competition

Notwithstanding anything herein to the contrary, Agent agrees that during the term of this Agreement, and for one (1) year after its termination for any reason, or expiration, neither Agent nor the key person shall perform or provide any services similar to those hereunder for any third party engaged or involved in the promotion, distribution, performance, or other dissemination of professional wrestling events or activities.

6.    Compensation to Agent

a.    In full consideration for the services to be rendered under this Agreement, and for the agreement of Non-Competition as set forth above, Agent shall be entitled to receive a commission of eleven (11%) percent of royalties received by Titan on the licensing deals or agreements, including renewals thereof, other than those set forth in Paragraph 6(d) below, negotiated and procured specifically by Agent pursuant to, and during the term of, this Agreement. Said commissions shall be payable to Agent within fifteen (15) business days of receipt by Titan of the royalties from Licensees on which said commissions have been earned. .

b.    As the effective date of this Agreement is specifically agreed to be August 20, 1996, this compensation schedule shall apply to all agreements negotiated and procured by Agent which were consummated and executed by Titan as of the date of the parties' execution of this Agreement and for which Agent has not yet received commissions; however, Agent shall not be required to reimburse Titan on commissions already received by Agent pursuant to the different compensation schedule in effect prior to the execution of this Agreement by Agent.

c.    Agent shall not be entitled to commissions on royalties paid Titan by Licensees as a result of activities by Existing Rights Holders, or as a result of Titan's efforts. Further, Agent shall not be entitled to any compensation as a result of the following activities of Titan in the Territory, unless Titan specifically requests Agent to become involved in any such activity and, in that event, the parties will discuss the appropriate compensation on a case-by-case basis: the exploitation of television rights in the Territory on agreements or deals not procured by Agent; live productions of the Events; the sale of merchandise using the Intellectual Property at the sites of live productions of the Events; or the sale of merchandise using the Intellectual Property via mail order or electronic sales, including sales through Titan catalogs, periodicals, fan clubs, or Internet sites.

d.    Should Titan purchase products containing the Intellectual Property from any entity sourced by SSAI for re-sale through Titan's catalog, venue and/or electronic sales operations, Titan shall compensate SSAI as follows:  seven percent (7%) of net catalog and electronic sales, defined as gross catalog and electronic sales, less twenty-five percent (25%) for

talent royalties; and three and one-half percent (3-1/2%) of net venue sales, defined as gross venue sales, less twenty five percent (25%) for talent royalties and thirty-five percent (35%) for building share,

7.    Expenses of Agent

Agent shall be required to assume, without reimbursement from Titan or any other party, all expenses incurred in performing its obligations hereunder, including, without limitation, all amounts expended in promoting the Intellectual Property and any Events to be performed in the Territory, all salaries, fees, or commissions paid by Agent to any salespeople or personnel, travel expenses, legal expenses, and all direct and indirect expenses of maintaining its offices, unless Titan agrees in writing to reimburse Agent in advance of incurring such expense.

8.    Arbitration

Any disputes between the parties relating to commissions payable to Agent by Titan shall be submitted to binding arbitration in Stamford, Connecticut in accordance with the rules of the American Arbitration Association.

9.    License Agreements/Marketing Plans

a.    License Agreements:  Having negotiated with a prospective Licensee the terms of a license agreement covering the Merchandising Rights, Agent shall forward to Titan a "deal sheet" containing all information needed by Titan to prepare a license agreement with such Licensee. Titan shall supply Agent with a form "deal sheet" for use by Agent.  Agent shall not itself generate license agreements for Licensees, whether for exercise of the Merchandising Rights or otherwise, and Agent itself shall not generate any amendments to or other documents modifying agreements with Licensees.  No license agreement, whether for exercise of Merchandising Rights or otherwise, and no amendment or other document modifying any such agreement, shall become effective until executed by Titan as licensor.

b.    Marketing Plans:  Upon request by Titan, and within a reasonable time period specified by Titan, Agent shall provide Titan with a detailed marketing plan outlining Agent's proposed activities in connection with the promotion and exploitation of the Intellectual Property.  Such written plan shall include, on a country by country basis, categories of product development; nature and amount of advertising and advertising expenditures; proposed methods of operation; royalty projections; and any other information which may be requested by Titan.

c.    Agent Acquires No Rights:  Agent acknowledges that it acquires no rights under this Agreement in the Intellectual Property.  Agent shall have no right to grant to any party any rights in the Intellectual Property.

d.    Titan Right to Negotiate Agreements:  As previously provided herein, Titan reserves the right to negotiate its own license agreements in the Territory with entities that were not

first brought to Titan's attention through Agent's efforts. Titan agrees to advise Agent of any such direct negotiations. Licensees that are parties to such license agreements shall not be deemed "Licensees" for purposes of this Agreement, since they will not be signed to agreements through the efforts of Agent, as required by subparagraph 1(e). However, if Titan elects to have any such licensee serviced by Agent, Titan agrees to allow Agent a commission on royalties collected from such licensee, in an amount to be determined on a case-by-case basis by mutual agreement between Titan and Agent.

10.    Breach of License Agreements by Licensees

a.    If Agent has reason to believe that any Licensee is in material breach of any of the provisions of its license agreement with Titan, Agent shall promptly forward full details relating to such breach to Titan, and shall cooperate with Titan in taking such action against the Licensee as Titan deems appropriate under the circumstances.

b.    If Agent has reason to believe that any party is infringing the Intellectual Property, or otherwise jeopardizing Titan's rights in the Intellectual Property in the Territory, Agent agrees to immediately investigate the matter and to provide Titan with full information regarding the matter. Agent shall also cooperate with Titan in taking such action against infringers as Titan may deem appropriate, including joining as a party in any legal proceeding which Titan may elect to bring against an infringer. All costs of any such proceeding shall be borne by Titan.

11.    Indemnification

Agent agrees to indemnify and hold harmless Titan from any and all claims, liabilities, judgments, losses, costs, damages and expenses resulting therefrom, including reasonable attorneys' fees, arising out of or in connection with any act under, or in violation of this Agreement, by Agent, its employees, contractors, agents, representatives, or assigns.

12.    Confidentiality

Although Agent shall be entitled to hold itself out as Titan's agent pursuant hereto, Agent shall, at all times, maintain the confidentiality of the terms and conditions of this Agreement, and any information concerning Titan, its operations, Talent, Events, finances, and any and all other sensitive or confidential business information, which becomes known to Agent in connection with this Agreement.

13.    Breach and Early Termination

This Agreement may be terminated by Titan prior to its expiration of December 31, 1998 as follows:

a.    Breach: Titan shall have the right, at any time, to terminate this Agreement for the following:

F:\users\legal2\word\contract\misc\shenkcc.doc          5
3/25/97

(i) if Titan determines at any time that the key person ceases to be actively involved in the activities of Agent. In this event, Titan may terminate this Agreement at any time upon written notice to SSAI, provided, however, that SSAI and its assigns shall be entitled to commissions for the term of those agreements negotiated or consummated by Agent pursuant hereto.

(ii) if Titan determines that SSAI has breached any of its obligations or representations in this Agreement. In this event, Titan may terminate this Agreement at any time upon written notice to SSAI, provided, however, that SSAI and its assigns shall be entitled to commissions for the term of those agreements negotiated or consummated by Agent pursuant hereto.

(iii) if Titan changes its strategic business direction, as determined in Titan's sole discretion, including any change in the ownership structure of Titan through the introduction of partners, participants, a joint venture or other similar event. In this event, Titan may terminate this Agreement by providing SSAI with thirty (30) days advance written notice, provided, however, that SSAI and its assigns shall be entitled to commissions for the term of those agreements negotiated or consummated by Agent pursuant hereto.

(iv) if Agent engages in any act of fraud, theft, deceit, unethical conduct. In this event, Titan may terminate this Agreement immediately upon written notice to SSAI, and from that date forward, SSAI shall not be entitled to any further commissions under this Agreement.

b.    Bankruptcy/Insolvency:  In any of the following circumstances Titan shall have the right to terminate this Agreement: (i) if Agent becomes insolvent, or a petition in bankruptcy or for reorganization is filed by or against it, or any insolvency proceedings are instituted by or against it; or (ii) if Agent makes an assignment for the benefit of creditors, is placed in the hands of a receiver, or liquidates its business.

c.    Effect of Termination:  Termination of this Agreement shall be without prejudice to any rights or claims which Titan may otherwise have against Agent. Termination or expiration of this Agreement shall have no effect on any license agreement with any Licensee, but thereafter all dealings which such Licensee has had with Agent under this Agreement shall cease and such Licensee shall deal directly with Titan or such party as Titan may appoint to succeed as Agent.

14.    Miscellaneous

a.    This Agreement supersedes any and all prior agreements between the parties hereto, whether written or oral.

b.    This Agreement shall be binding upon and inure to the benefit of Titan and its successors and assigns, and shall be binding upon Agent, its successors and assigns, but shall

inure only to the benefit of Agent. Agent shall not assign or transfer this Agreement, or any interest in or under this Agreement, without Titan's prior, written consent.

    c.    No waiver or modification of any of the terms of this Agreement shall be valid unless in writing and signed by both parties.

    d.    All notices to be given under this Agreement shall be in writing and shall be given at the respective addresses of the parties as set forth on page one, unless notification of a change in address is given in writing. The date of mailing shall be deemed to be the date the notice is given.

    e.    Titan and Agent shall do all additional things and execute all additional documents that may be necessary or desirable to give full effect to this Agreement.

    f.    Nothing contained in this Agreement shall be construed so as to make the parties partners or joint venturers, or to permit Agent to bind Titan to any agreement.

    g.    This Agreement contains the entire understanding of the parties with respect to its subject matter. Any and all representations or agreements by any agent or representative of any party to the contrary shall be of no force or effect.

    h.    This Agreement shall be construed according to the laws of the State of Connecticut, U.S.A., regardless of the place of performance or execution. The parties further agree that any disputes not arbitrated hereunder for any reason shall be submitted to the appropriate courts of said State, and each agrees to submit to the personal jurisdiction of the State of Connecticut.

i.    If any provision of this Agreement or any part thereof, is determined to be invalid as unenforceable by any court of competent jurisdiction, it is the intention of the parties that the same shall be limited only to the minimum extent necessary to permit compliance with the minimum legal requirement and thereby remain in effect, that no other provision of this Agreement shall be affected thereby and that all other provisions shall continue in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth below.

TITAN SPORTS, INC.

By: _Linda E McMahon_

Linda E. McMahon
President and Co-Chief Executive Officer

Date: _April 2, 1997_

STATE OF CONNECTICUT    )
                        ) ss:
COUNTY OF FAIRFIELD     )

I, _Sally J. Sigler_ , a Notary Public for said County and State, do hereby certify that Linda E. McMahon, President and Co-Chief Executive Officer of Titan Sports, Inc., personally appeared before me this day and acknowledged the due execution of the foregoing Agreement to be her free act and deed for the purposes therein expressed.

WITNESS my hand and notarial seal this 2nd day of _April_ , 1997.

_Sally J. Sigler_
Notary Public

My commission expires: _2/28/2000_

STANLEY SHENKER & ASSOCIATES, LTD.
("SSAL")

By: _Stanley Shenker_

Its: _President_

Date: _3/25/97_

f:\users\legal2\word\contract\misc\shenkcc.doc
3/25/97

8

STATE OF *Connecticut* )
                                     ) ss:
COUNTY OF *Fairfield* )

I, *Sally J. Sigler* , a Notary Public for said County and State, do hereby certify that Stanley Shenker. *President* of Stanley Shenker & Associates, Ltd. personally appeared before me this day and acknowledged the due execution of the foregoing Agreement to be his free act and deed for the purposes therein expressed.

WITNESS my hand and notarial seal this 25th day of *March* , 1997.

*Sally J. Sigler*
Notary Public

My commission expires: *2/28/2000*

f:\users\legal2\word\contract\misc\shenkcc.doc                    9
3/25/97

## EXHIBIT A

### DOMESTIC

Acclaim
Advanced Graphics
ATS
American Greetings
Black Hawk Graphics
Bushwhackers Downunder Restaurant
Carlton Promotion Group
Coliseum Video
Colorvision
Edel USA
High Top Sports
International Promotions
Newfield Publications
MBNA
The Home Game
Prime Sales
Trinity Products
Westrox Corp

### INTERNATIONAL

AOL Bertelsmann-Germany
Bankee Trading-Philippines
Bastei Verlag-Germany
Carlton Books-UK
Copyrights Studio-Indonesia,Malaysia,Singapore
Ehapa Verlag-Germany
Edel-Germany,Austria,Switzerland
Eveni-UK
Funstuff Novelties-Philippines
Grand Knitting-Philippines
Heytec Collection-Germany,Austria,Switzerland
Legion-Germany
Norman James-CN
Panini-Italy
Symposion Verlag-Austria,Germany,Switzerland
The Home Game-CN
Tollhaus-Germany
V-Xport-Kuwait

LICLIST

# Exhibit B

# WORLD WRESTLING FEDERATION
## CONSUMER PRODUCTS LICENSE AGREEMENT

THIS WORLD WRESTLING FEDERATION CONSUMER PRODUCTS LICENSE AGREEMENT ("Agreement"), is entered into on this _____10th_____ day of June, 1998, by and between TITAN SPORTS, INC., a corporation with its principal place of business at Titan Tower, 1241 East Main Street, Stamford, Connecticut 06902 ("Titan"), and ,THQ/JAKKS PACIFIC LLC, a Delaware limited liability company with its principal place of business at 22761 Pacific Coast Highway, Suite 226, Malibu, CA 90265 (the "Licensee"). In consideration of the promises and undertakings set forth below, and for other good and valuable consideration, the receipt and sufficiency of which are hereby established, Titan and Licensee hereby agree as follows:

      1.    <u>Definitions</u>. For purposes of this Agreement the following definitions shall apply:

      (a)    The term "<u>Advertising Materials</u>" shall mean all advertising and promotional materials and all packaging, wrapping, and labeling materials for the Licensed Products (including, by way of illustration but not limitation, catalogs, trade advertisements, flyers, sales sheets, labels, package inserts, hangtags, and displays) which are produced by or for the Licensee and which make use of the Intellectual Property.

      (b)    The term "<u>Copyrights</u>" shall mean all copyrights now or hereafter owned by Titan relating to the Events or the Talent.

      (c)    The term "<u>Date of Execution</u>" shall mean the date set forth above.

      (d)    The term "<u>Events</u>" shall mean the professional wrestling events produced, promoted, and performed by Titan, whether live, via television, or via any other method of dissemination, provided however, the term Events shall not include any comic, cartoon, or animated events, characters, characterizations, designs or visual representations, including without limitation comic books, magazines or portions of magazines, animated television programs or portions of programs, and comic, cartoon or animated internet events, even if such comic, cartoon, or animated events, characters, characterizations, designs or visual representations are subsequently produced, promoted or performed by Titan otherwise. Titan, nonetheless, hereby grants Licensee a first right of refusal of fifteen (15) business days from the time of presentation by Titan to Licensee of proposed terms for the license with respect to items that are not included as Events.

      (e)    The term "<u>Intellectual Property</u>" shall mean the Rights of Publicity, the Trademarks, the Copyrights, and all other proprietary rights relating to the Events.

      (f)    The term "<u>Licensed Products</u>" shall mean the following items: All electronic media gaming rights which shall include, but are not limited to, video games on all platforms (including DVD and internet or on-line), now known or hereinafter invented, for the world and all languages provided, however, that Titan shall also have the right to market games on the internet which are "competitive" with the Licensed Products. Should Titan market games on the internet and should

Titan and Licensee mutually agree that such games are "competitive" with the Licensed Products or if such determination is made by the arbitrator appointed as set forth below, Titan agrees to negotiate in good faith with Licensee regarding a reduction in the amount of the Guaranteed Royalty and Annual Minimums due hereunder and Licensee shall have the option to terminate this Agreement..

Should the parties fail to agree as to whether a particular game is "competitive", such dispute shall be resolved by binding arbitration under the Commercial Arbitration Rules of the American Arbitration Association with the arbitration to be held in New York, New York. The parties shall each pay one-half (1/2) of the costs of the arbitrator and the arbitrator shall thereafter award costs and attorneys' fees to the prevailing party. The arbitration award shall be binding and non-appealable, and may be entered as a final judgment in any court having jurisdiction over the award.

(g)    The term "Net Sales Price" shall mean the Licensee's invoiced billing price to its customers or distributors for the Licensed Products, less returns for damaged goods, discounts and allowances.

(h)    The term "Rights of Publicity" shall mean the likenesses, physical characteristics, personalities, characters, and personas of the Talent.

(i)    The term "Talent" shall mean all individuals who perform in the Events, including, but not limited to, the professional wrestlers who perform in the Events.

(j)    The term "Territory" shall mean Worldwide.

(k)    The term "Trademarks" shall mean all symbols, designs, styles, emblems, logos, and marks used in connection with the Events, including, but not limited to, the name WORLD WRESTLING FEDERATION, the WWF logo or logos, the mark WORLD WRESTLING FEDERATION SUPERSTARS, and the names of the Talent, but excluding the initials WWF in block letters.

2.    Grant of License; Channels of Distribution Reserved to Titan.

(a)    Grant of License.  Titan grants to the Licensee, upon the terms and conditions set forth in this Agreement, the exclusive right and license to use the Intellectual Property in connection with the manufacture, distribution, sale, and advertising of the Licensed Products in the Territory through all channels of distribution except those reserved to Titan under subparagraph 2(b).

(b)    Titan's Channels of Distribution.  The rights granted to the Licensee by Titan under subparagraph 2(a) shall not include the right to distribute the Licensed Products through the following Titan channels of distribution:  (i) sales at World Wrestling Federation Events; (ii) World Wrestling Federation catalog sales; (iii) World Wrestling Federation direct mail sales; (iv) sales via television or other electronic media relating to the World Wrestling Federation and produced by Titan, and (v) World Wrestling Federation vending machine sales.

3.    Period of Agreement.  The period of this Agreement shall commence on the Date

of Execution and end on December 31, 2009, unless terminated earlier pursuant to the terms hereof. Thereafter, if the Licensee wishes to renew this Agreement for an additional five (5) years, it shall provide written notice of such intent to Titan no less than sixty (60) days prior to the commencement of the renewal period in question. In that event, provided the Licensee is not in default of any material term under this Agreement, Licensee has paid to Titan royalties in excess of Twenty Seven Million United States Dollars ($27,000,000) during the Period of this Agreement and Licensee gives notice as set forth above. This Agreement will automatically renew for an additional five (5) years under the terms and conditions set forth herein. Notwithstanding the foregoing, Licensee acknowledges and agrees that it shall not be authorized to ship any Licensed Products hereunder prior to November 16, 1999.

        4.     Royalties. In consideration for the rights granted to it under this Agreement, the Licensee agrees to pay Titan the following royalties:

        (a)     Advance Royalties. On execution of this Agreement the Licensee agrees to pay to Titan the following non-refundable Advance Royalty Amount, which shall be set off as a credit against the royalties due to Titan under subparagraph 4(b):

Advance Royalty Amount

US$ 3,000,000.00

If Titan has not received the Advance Royalty Amount set forth above within fifteen (15) days from the date of Titan's execution of this Agreement, Titan shall have the right to terminate this Agreement, with immediate effect, by providing the Licensee with written notice thereof.

(b)     Percentage Royalties. Percentage royalties shall be computed as follows:

        (i)     The Licensee shall pay Titan the following percentage royalties:

        For video games on Nintendo 64 platform: 7 % of Net Sales Price.
        For video games on Sony PSX & successors platform: 8% of Net Sales Price.
        For video games on Sega Katana and successors platform: 8% of Net Sales Price.
        For video games on Nintendo Game Boy: 6% of Net Sales Price.
        For video games on the PC: 10% of Net Sales Price.
        For all other platforms the royalty percentages shall be negotiated in good faith, but if no agreement is reached, Licensor may not license the Intellectual Property for use with such platform other than to Licensee during the period of this Agreement except as set forth in paragraph 1(f) above.

        All royalty computations under this subparagraph 4(b) shall be made on the basis of the Net Sales Price charged by the Licensee, or, if the Licensee sells a Licensed

Product to a subsidiary or other party controlled by the Licensee, on the basis of the Net Sales Price for such Licensed Product charged by such subsidiary or controlled party on resale of the Licensed Product, provided, however, Licensee shall pay only one royalty and only on a resale if such resale price is higher than the price charged by Licensee to one of its own subsidiaries.

(c)    Guaranteed Royalties.  If the total of all royalties on a cumulative basis payable to Titan under the foregoing subparagraphs 4(a) and 4(b) is less than the Guaranteed Royalty Amounts set forth below, the Licensee shall pay Titan, on or before the dates stated in the payment schedule below, the difference between the Guaranteed Royalty Amount due for the periods stated below and the total of the royalties on a cumulative basis paid to Titan under subparagraphs 4(a) and 4(b):

## Guaranteed Royalty Amount

| Date Due | | Amount Due |
|----------|---|------------|
| On Signing | | US $ 3,000,000 |
| January 30, 2000 | | $1,500,000 |
| January 30, 2001 | | $1,500,000 |
| January 30, 2002 | | $1,500,000 |
| January 30, 2003 | | $1,500,000 |
| January 30, 2004 | | $1,500,000 |
| January 30, 2005 | | $1,500,000 |
| January 30, 2006 | | $1,500,000 |
| January 30, 2007 | | $1,500,000 |
| January 30, 2008 | | $1,500,000 |
| January 30, 2009 | | $1,500,000 |
| | Total: | US $18,000,000.00 |

### RENEWAL PERIOD

| Date | | Amount |
|------|---|--------|
| January 30, 2010 | | $1,500,000 |
| January 30, 2011 | | $1,500,000 |
| January 30, 2012 | | $1,500,000 |
| January 30, 2013 | | $1,500,000 |
| January 30, 2014 | | $1,500,000 |
| | Total: | US $7,500,000 |

5.     Minimum Number of Licensed Products.  Licensee agrees to develop a minimum of two (2) Licensed Products per annual twelve (12) month selling period (the "Annual Minimum") during the period of this Agreement (each referred to as an "Annual Selling Period"), the first Annual Selling Period to commence on January 1, 2000.  Any Licensed Product developed between November 16, 1999 and December 31, 1999 shall be credited to the Annual Minimum during the first Annual Selling Period.  If Licensee develops more than two (2) Licensed Products during any single Annual Selling Period, then such excess shall be applied on a cumulative basis to reduce the Annual Minimums in the next succeeding Annual Selling Periods.  As an example of the operation of the foregoing, if in each of the third (3rd) and fourth (4th) Annual Selling Periods, the Licensee develops three (3) Licensed Products, and in each of the fifth (5th) and sixth (6th) Annual Selling Periods develops one (1) Licensed Product, then Licensee will have fulfilled the Annual Minimum in the fifth and sixth Annual Selling Periods by virtue of the Licensed Products developed in the third (3rd) and fourth (4th) Annual Selling Periods.

6.     Equity.  Upon the effective date of this Agreement, Jakks Pacific, Inc. ("Jakks") and THQ, Inc. ("THQ") shall each provide Titan with 111,250 and Stanley Shenker Associates, Inc. ("SSAI") 13,750 stock options or warrants of their respective companies, exercisable by Titan and SSAI on or before December 31, 2009.  The strike price per share will be $10.00 for Jakks' shares and $23.44 for THQ's shares.  Titan and SSAI agree to any restrictions as may be reasonably necessary to

fwright\winword\jakks.thq.llc3
06/18/985

5

comply with federal and state securities laws and regulations.

7.    <u>Non-Competition</u>  Licensee agrees represents and warrants that during the term of this Agreement and for one (1) year after the termination or expiration thereof, it shall not produce any products or provide any services using the name or other trademarks or service marks associated with World Championship Wrestling, New World Order or any subsidiary or affiliate thereof, or any other wrestling entity owned or controlled by Time Warner, Inc., Turner Broadcasting System, Inc. or any subsidiary or affiliate thereof.  Notwithstanding the foregoing, Titan acknowledges that THQ will continue to sell World Championship Wrestling games under its existing license agreement through June 30, 1999.

8.    <u>Marketing Plans</u>.  Within one hundred and eighty (180) days of a mutually agreed upon date by Titan and Licensee, the Licensee shall provide Titan with a written marketing plan with respect to the Licensed Products. Each such marketing plan shall include, on a Licensed Product-by-Licensed Product basis, a marketing timetable, sales projections, channels and methods of distribution, nature and amount of advertising and advertising expenditures, and any other information which Titan may ask the Licensee to include.  Each marketing plan shall contain specific information for the one-year period immediately succeeding its submission and general estimates or projections for subsequent periods during which this Agreement remains in effect.   All marketing plans and information therein provided by Licensee to Titan shall be treated as confidential information of Licensee and not released to any third parties without the prior written consent of Licensee.

9.    <u>Advertising Expenditures: Promotion of Events.</u>

(a)    <u>Advertising Expenditures</u>:  Licensee shall be required to expend no less than the greater of Five Hundred Thousand Dollars ($500,000) and two percent (2%) of the total annual revenues from sales of the Licensed Products to advertise said Licensed Products via television, print media, radio, billboards or any other form of advertising. As part of said two percent (2%), the Licensee is required to advertise at its own cost, the Licensed Products in the World Wrestling Federation Magazine at no less than two (2) times per year.  Licensee shall keep accurate account and copies of all documents and records relating to said Advertising Expenditures and shall be required to send in quarterly reports simultaneously with its quarterly royalty statements describing the nature and amount of Advertising.

(b)    <u>Promotion of Events.</u>  Licensee agrees that it will incorporate information associated with the Events as directed by Titan on all packaging, product inserts and wrapping materials for the Licensed Products as long as such information is provided to Licensee prior to Licensee finalizing packaging, product inserts and wrapping materials and that such incorporated changes are approved by the third party platform company such as Sony, Nintendo or Sega and will not result in unreasonable costs to Licensee.

10.    <u>Official License Notice</u>.  Licensee shall incorporate an Official License Notice in the form as designated by Titan on all of the Licensed Products at Licensee's cost, however, Titan acknowledges that for Licensed Product on third party platforms, such as Sony, Nintendo, or Sega, as examples but not limitations, such Official License Notice must be accepted and approved by such third party.

11.    <u>Licensee Acknowledgment</u>.    The Licensee by executing this Agreement acknowledges that it has reviewed and understands all provisions of this Agreement, including the attached Standard Terms and Conditions.

12.   <u>Standard Terms and Conditions</u>.   This Agreement is subject to all of the provisions of the Standard Terms and Conditions which are attached to and made a part of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

TITAN SPORTS, INC.
("Titan")

By: *Linda E. McMahon*
Linda E. McMahon
President and CEO

Date: *June 23, 1998*

THQ/JAKKS PACIFIC LLC
("Licensee")

By:_____

Its:_____

Date:_____

By:_____

Its:_____

Date:_____

12.    <u>Standard Terms and Conditions</u>.   This Agreement is subject to all of the provisions of the Standard Terms and Conditions which are attached to and made a part of this Agreement.

13.    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

TITAN SPORTS, INC.
("Titan")

By: *Linda E McMahon*
Linda E. McMahon
President and CEO

Date: *June 23 1998*

THQ/JAKKS PACIFIC LLC
("Licensee")

By: _____

Its: *CEO*

Date: *June 10, 1999*

By: _____

Its: _____

Date: _____

8

12. <u>Standard Terms and Conditions</u>.  This Agreement is subject to all of the provisions of the Standard Terms and Conditions which are attached to and made a part of this Agreement.

13. <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.

TITAN SPORTS, INC.
("Titan")

By: *Linda E. McMahon*
Linda E. McMahon
President and CEO

Date: *June 23, 1998*

THQ/JAKKS PACIFIC LLC
("Licensee")

By: _____

Its: PRESIDENT & CEO

Date: JUNE 10, 1998

By: _____

Its: _____

Date: _____

8

WORLD    WRESTLING    FEDERATION
LICENSE AGREEMENT
STANDARD TERMS AND CONDITIONS

### SECTION A.   QUALITY CONTROLS AND APPROVAL PROCEDURES FOR LICENSED PRODUCTS AND ADVERTISING MATERIALS.

A(1)    Warranty of Quality.  The Licensee warrants that the Licensed Products will be of good quality in design, material, and workmanship and suitable for their intended purpose; that no injurious, deleterious, or toxic substances will be used in or on the Licensed Products; that the Licensed Products will not cause harm when used as instructed and with ordinary care for their intended purpose; and that the Licensed Products will be manufactured, sold, and distributed in strict compliance with all applicable laws and regulations.

A(2)    Approval Procedures for Licensed Products and Advertising Materials; Approval Standards; Time for Approval by Titan.

(a)    General.  The Licensee shall comply with all reasonable procedures which Titan may from time to time adopt regarding its approval of Licensed Products and Advertising Materials which the Licensee proposes to manufacture, sell, or use under this Agreement.   These approval procedures shall be implemented using prescribed forms to be supplied to the Licensee by Titan, and shall incorporate the basic approval requirements and steps outlined in the following sections.   The Licensee agrees to retain all materials relating to approvals in its files while this Agreement remains in effect and for one year thereafter.

(b)    Approval of Licensed Products.  With respect to each different Licensed Product which the Licensee proposes to manufacture and sell under this Agreement, the Licensee shall submit to Titan for its review and approval the following materials in the order stated:

(i) a sample of the video game design in question (that is, a sample of the kind of merchandise article to which the Licensee proposes to add the Intellectual Property in producing the Licensed Product, showing the general quality standard which will be met by the Licensed Product);

(ii) finished art for the Licensed Product, showing the exact use of the Intellectual Property on or in connection with the proposed Licensed Product;

(iii) a preproduction prototype sample of the Licensed Product or video game demo, where appropriate, or a preproduction final sample of the Licensed Product, showing in either case the exact form, finish, and quality the Licensed Product will have when manufactured in production quantities; and

(iv) twenty four (24) identical production samples of the Licensed Product, to be submitted

fwright\winword\jakks.thq.llc3
06/18/989
9

immediately upon commencement of production.

The Licensee shall comply with all of the foregoing approval steps for each Licensed Product, obtaining Titan's written approval at each step of the procedure, unless by prior written notice from Titan it is exempted from any such step with respect to a specific Licensed Product.

(c)    Approval of Advertising Materials.  With respect to each different item of Advertising Material which the Licensee (or any party acting on its behalf) proposes to produce and use under this Agreement, the Licensee shall submit to Titan for its review and approval the following materials, in the order stated:

(i)    proposed written copy for the item of Advertising Material, with attached rough art showing how the Intellectual Property will be used in connection with the copy;

(ii)   a final printed sample of the item, where feasible (as, for example, in the case of labels, hangtags, printed brochures, catalogs, and the like).

The Licensee shall comply with all of the foregoing approval steps for each item of Advertising Material, obtaining Titan's written approval at each step of the procedure, unless by prior written notice from Titan it is exempted from any such step with respect to a specific item of Advertising Material.

(d)    Approval Standards.  Titan shall have the right to disapprove any materials submitted to it under Sections A(2)(b) or A(2)(c) if it determines, in its sole and unfettered discretion, that the materials in question would impair the value and goodwill associated with the Events or Titan's licensing program for the Intellectual Property, by reason of (i) their failure to satisfy the general quality standards including those set forth in Section A(1); (ii) their use of artwork, designs, or concepts which fail to depict accurately the Talent or the Intellectual Property; (iii) their use of materials which are unethical, immoral, or offensive to good taste; (iv) their failure to carry proper copyright or trademark notices; or (v) any other reasonable cause.

(e)    Time for Approval by Titan.  Titan agrees to use reasonable efforts to notify the Licensee in writing of its approval or disapproval of any materials submitted to it under Sections A(2)(b) and A(2)(c) within fifteen (15) days after its receipt of such materials, and agrees, in the case of its disapproval, to notify the Licensee in writing of its reasons for disapproval. In the event Titan fails to approve or disapprove of any materials submitted as provided for above within fifteen (15) days after Titan's receipt of such materials the materials shall be deemed disapproved. If Titan has not done so, then Titan shall within fifteen (15) days thereafter, notify Licensee in writing of its reasons for disapproval.

A(3)    Maintenance of Quality of Licensed Products; Inspection of Production Facilities.  The Licensee agrees to maintain the quality of each Licensed Product manufactured under this Agreement up to the specifications, quality, and finish of the production sample of such Licensed Product approved by Titan under Section A(2)(b), and agrees not to change the Licensed Product in any respect or to make any change in the artwork for the Licensed Product without first submitting to Titan samples showing such proposed changes and obtaining Titan's written approval of such samples. From time to time after it has commenced manufacturing the Licensed Products, the Licensee, upon request,

shall furnish free of charge to Titan a reasonable number of random production samples of any Licensed Product specified by Titan. The Licensee shall also furnish to Titan upon request the addresses of the production facilities used by the Licensee for manufacturing the Licensed Products, and shall make arrangements for Titan or its representatives to inspect such production facilities during reasonable business hours.

     A(4)   Miscellaneous.

     (a)   Artwork for Licensed Products. If the Licensee requests Titan to furnish it with any photographs or special artwork incorporating the Intellectual Property, the Licensee agrees to reimburse Titan for its costs of supplying such materials to the Licensee.

     (b)   Translations. All translations of written material used on or in connection with the Licensed Products or Advertising Materials shall be accurate, and the Licensee, when submitting the Licensed Products and the Advertising Materials for approval, shall provide Titan with English translations of all such written materials in a language other than English.

     (c)   Use of Talent in Licensed Products and Advertising Materials. With prior written consent of Titan Licensee shall be allowed to use any Talent for purposes of explicit endorsement in any Licensed Product or items as contemplated by the definition of Intellectual Property set forth above, and Titan warrants that Licensee will not incur any expense for use of the Talent, other than possibly Licensee may incur a one-time usage fee in connection with personal appearances by each such Talent other than at Titan's Events..

     (d)   Transactions with Other Licensees. The Licensee shall not, without Titan's prior written consent, (i) sell or deliver to another Titan licensee the films or other devices used by the Licensee to produce the Licensed Products; or (ii) print or otherwise produce any items using the Intellectual Property for another Titan licensee.

     (e)   Duplicate Films. If the Licensee in connection with the manufacture of the Licensed Products develops film or other reproductive media incorporating the Intellectual Property, the Licensee, when requested by Titan to do so, shall supply duplicates of such films or other reproductive media to other licensees of Titan outside the Territory, at cost of duplication plus ten percent (10%).

     (f)   Titan's Right to Purchase Licensed Products. In addition to the random production samples of the Licensed Products to be supplied by the Licensee to Titan free of charge under Section A(3), Titan shall be entitled at any time while this Agreement remains in effect to purchase from the Licensee, at the Licensee's best wholesale price, any available quantity of the Licensed Products as may be reasonably available. For any such Licensed Products purchased by Titan, there shall be a royalty due. .

     SECTION B.  EFFORTS TO SELL LICENSED PRODUCTS: RESTRICTIONS ON SALE.

     B(1)   Manufacture and Sale of Licensed Products. The Licensee agrees to manufacture the Licensed Products at the Licensee's own expense in sufficient quantities to meet the reasonably

anticipated demand. The Licensee also agrees to exercise reasonable efforts to advertise and promote the Licensed Products at its own expense and to use its best efforts to sell the Licensed Products in the Territory.

B(2)    Good Faith Effort to Exploit Rights. If within three (3) months after the dates agreed to in the marketing plans by Licensee and Titan, the Licensee has failed to take any good faith steps to exploit the rights granted to it (for example, by seeking to obtain Titan's approval of a proposed Licensed Product, or commencing to manufacture and sell an approved Licensed Product), Titan shall have the right to terminate this Agreement by giving written notice of termination to the Licensee if Licensee has not cured such failure within sixty (60) days after notice of such failure has been given by Titan to Licensee.

B(3)    Restrictions on Sale of Licensed Products. The Licensed Products shall be sold to the public only in the manner in which merchandise articles of the same general description are customarily merchandised to the public. Unless Titan and Licensee so agree, the Licensee shall not use or sell the Licensed Products as premiums, or distribute the Licensed Products to parties which the Licensee has reason to believe intend to use or sell the Licensed Products as premiums. Use or sale of the Licensed Products as "premiums," for purposes of the foregoing provisions, shall mean use or sale of the Licensed Products in connection with the following kinds of promotional activities:   self-liquidator programs; joint merchandising programs; giveaways; sales incentive programs; door openers; traffic builders; and any other kinds of promotional programs designed to promote the sale of the Licensed Products or other goods or services of the Licensee or a third party.

## SECTION C. ROYALTIES: STATEMENTS.

C(1)    Computation of Royalties. All royalties due to Titan shall accrue upon the sale of the Licensed Products, regardless of the time of collection by the Licensee. For purposes of this Agreement, a Licensed Product shall be considered "sold" as of the date on which such Licensed Product is billed, invoiced, shipped, or paid for, whichever event occurs first. If any Licensed Products are consigned to a distributor by the Licensee, the Licensed Products shall be considered "sold" by the Licensee upon the date on which such distributor bills, invoices, ships, or receives payment for any of the Licensed Products, whichever event occurs first.

C(2)    Time of Payment. The Licensee shall pay all royalties owing to Titan under this Agreement for any calendar quarter within thirty (30) days following the end of the calendar quarter in question. All royalty amounts in this Agreement are stated in U.S. Dollars, and all royalty payments shall be made in U.S. Dollars. All royalty statements required to be submitted by the Licensee shall be submitted within thirty (30) days following the end of the calendar quarter to which they relate and shall accompany the royalty payments made to Titan. The failure to make royalty payments when due is a material breach and cause for immediate termination of this Agreement if not received by Titan within ten(10) days of written notice of default sent to Licensee by Titan.

C(3)    Titan Approval of Discounted Sales. If the Licensee proposes to sell any Licensed Product at a price which is less than then percent (10%)above the Licensee's manufactured cost of such Licensed Product, Titan shall have a right of prior approval over the terms of such sale and the percentage royalty to be payable by the Licensee under paragraph 4 with respect to such sale.

C(4)   Deductions; Taxes.

(a)   There shall be no deduction from the royalties owed to Titan for uncollectible accounts, or for taxes, fees, assessments, or other expenses of any kind which may be incurred or paid by the Licensee in connection with: (i) royalty payments to Titan; (ii) the manufacture, sale, distribution, or advertising of the Licensed Products in the Territory; or (iii) the transfer of funds or royalties or the conversion of any currency into U.S. Dollars. It shall be the Licensee's sole responsibility at its expense to obtain the approval of any foreign authorities; to take whatever steps may be required to effect the payment of funds from abroad; to minimize or eliminate the incidence of foreign taxes, fees, or assessments which may be imposed; to protect its investments in foreign territories; to enable it to commence or continue doing business in any foreign territory; and to comply in any and all respects with all applicable laws and regulations.

(b)   Notwithstanding the provisions of the preceding Section C(4)(a), if any country imposes a withholding tax against Titan, as licensor, with respect to the royalties payable to Titan by the Licensee on sales of the Licensed Products in such country, such tax shall be paid by the Licensee on behalf of Titan, and the Licensee may deduct the amount of such withholding tax from the royalties owing to Titan on the condition that the Licensee furnishes to Titan such information as Titan reasonably requires to evidence Licensee's payment of such tax.

C(5)   Royalty Statements.   The Licensee shall furnish to Titan, at the same time it makes payment of royalties, a full and complete statement, duly certified by an officer of the Licensee to be true and accurate, showing the number of each type of Licensed Product sold during the calendar quarter in question, the total gross sales revenues for each such Licensed Product, an itemization of all allowable deductions, if any, the Net Sales Price for each Licensed Product sold, the amount of royalties due with respect to such sales, and the quantities of each Licensed Product on hand and in transit as of the end of such quarter, together with such other pertinent information as Titan may reasonably request from time to time.   The Licensee's royalty accountings shall identify with specificity the types of Intellectual Property used on or in connection with each Licensed Product sold, including the identities of all Talent appearing on each Licensed Product.   There shall be a breakdown of sales of Licensed Products by country, and all figures and monetary amounts shall first be stated in the currency in which the sales were actually made.   If several currencies are involved in any reporting category, that category shall be broken down by each such currency.   Next to each currency amount shall be set forth the equivalent amount stated in U.S. Dollars, and the rate of exchange used in making the required conversion calculation.   The rate of exchange shall be the actual rate of exchange obtained by the Licensee on the date of payment.

C(6)   Royalty Adjustments.   The receipt or acceptance by Titan of any royalty statements furnished pursuant to this Agreement, or the receipt or acceptance of any royalty payments made, shall not preclude Titan from questioning their accuracy at any time.   If any inconsistencies or mistakes are discovered in such statements or payments, appropriate adjustments shall be made immediately by the parties. The Licensee shall pay Titan interest on a late royalty payment at a rate of two percent (2%) above the prime interest rate as published in the Wall Street Journal on the date such payment becomes rate,.

## SECTION D.  BOOKS OF ACCOUNT AND OTHER RECORDS; AUDITS.

D(1)    Retention of Records.  While this Agreement remains in effect and for two years thereafter, the Licensee shall keep full and accurate books of account and copies of all documents and other material relating to this Agreement at the Licensee's principal office.  Titan, by its duly authorized agents and representatives, shall have the right to audit once per calendar year such books, documents, and other material, shall have access thereto during ordinary business hours, and shall be at liberty to make copies of such books, documents, and other material.  At Titan's request, the Licensee shall provide an authorized employee to assist in the examination of the Licensee's records.   The breach of any aspect of this section shall be and is cause for termination of this Agreement, subject to the right to cure within thirty (30) days.

D(2)    Licensee shall, upon ten (10) business days' prior written request by Titan, permit Titan or its duly authorized representatives to enter Licensee's business premises during regular business hours to examine Licensee's books and records regarding the royalties payable to Titan under this Agreement.  In the event that Titan alleges an underpayment of the royalties payable under this Agreement, Titan shall have the right to appoint an independent firm of certified public accountants to examine such books and records, and in the event that such accountants and Licensee's firm of independent certified public accountants are unable to resolve the discrepancy within thirty (30) days thereafter, the two accounting firms shall appoint a third firm of certified public accountants to resolve the dispute and the decision of such third accounting firm shall be final and binding upon Titan and Licensee.  Licensee shall forthwith pay to Titan the amount of any underpayment determined to be due to Titan, and Titan shall forthwith pay to Licensee the amount of any overpayment ultimately determined to be due to Licensee, in either case with interest on the overdue royalty amount at a rate equal to the Prime Rate as published in the Wall Street Journal plus two (2%) percent.  Each party shall pay the costs of its own accountants.  The costs of the accounting firms in conducting the audit pursuant to this paragraph shall be paid by Licensee, unless it is ultimately determined that there has been an overpayment of the royalties due to Titan, no overpayment or an underpayment of the royalties due to Titan which is less than three percent (3%) of the royalty payment(s) in issue, in which case Titan shall pay such costs.

## SECTION E.  TRADEMARK PROTECTION.

E(1)    Trademark Uses Inure to Titan's Benefit.  All trademark uses of the Trademarks and other Intellectual Property by the Licensee shall inure to the benefit of Titan, which shall own all trademarks and trademark rights created by such uses.   The Licensee hereby assigns and transfers to Titan all trademarks and trademark rights created by such uses of the Trademarks and other Intellectual Property, together with the goodwill of the business in connection with which such trademarks are used, provided, however, Licensee retains all rights to its own trademarks.  If during the period of this Agreement Licensee desires to have a specific trademark registered in a country in the territory in which it is making sales, it will advise Titan and Titan will use its best efforts to obtain trademarks registration in the relevant class.

E(2)    Trademark Registrations.  Titan shall have the right, but not the obligation, to file in the appropriate offices of countries of the Territory, at its own expense, trademark applications relating to the use or proposed use by the Licensee of any of the Trademarks and any other Intellectual

Property in connection with the Licensed Products, such filings to be made in the name of Titan.

E(3)    Records Relative to Trademark Uses.   The Licensee shall keep appropriate records (including copies of pertinent invoices and correspondence) relating to the dates when each of the Licensed Products is first placed on sale or sold in each country of the Territory, and the dates of first use in each country of each different element of the Intellectual Property on the Licensed Products and Advertising Materials. If requested to do so by Titan, the Licensee agrees to supply Titan with samples of the trademark usages in question and other information which will enable Titan to complete and obtain trademark applications or registrations, or to evaluate or oppose any trademark applications, registrations, or uses of other parties.

E(4)    Registered User Laws.   As to those countries which require applications to register the Licensee as a registered user of a Trademark or Trademarks or other element of the Intellectual Property used on or in connection with the Licensed Products or which require the recordation of this Agreement, the Licensee agrees to execute and deliver to Titan such documents as may be necessary and as are furnished by Titan for such purposes.

E(5)    Trademark Notices.   The Licensee agrees to affix or to cause its authorized manufacturing sources to affix to the Licensed Products and to the Advertising Materials such trademark notices as may be supplied by Titan., subject to the approval of third party platform providers such as Sony, Nintendo and Sega provided, however, Titan must supply such notices to Licensee with sufficient time to be incorporated in the design and manufacture of the Licensed Products, and that failure to do so because Titan has not so provided such notices shall not be deemed a breach of this Agreement.

E(6)    No Use of Initials WWF.   The Licensee agrees that it will not use the initials WWF in block letters on or in connection with any Advertising Materials or Licensed Products.

## SECTION F.  COPYRIGHT PROVISIONS.

F(1)    Copyright Notices.   The authorization of Titan to the Licensee to make public distribution of the Licensed Products and Advertising Materials is expressly conditioned upon the following agreement of the Licensee. The Licensee agrees to place on all Licensed Products and on all Advertising Materials the copyright notice or notices in the name of Titan specified in writing by Titan., subject to the approval of third party platform providers such as Sony, Nintendo and Sega, provided, however, Titan must supply such notices to Licensee with sufficient time to be incorporated in the design and manufacture of the Licensed Products, and that failure to do so because Titan has not so provided such notices shall not be deemed a breach of this Agreement.

F(2)    Assignment by Licensee.   The Licensee hereby sells, assigns, and transfers to Titan its entire, worldwide right, title, and interest in and to all "new works" or "derivative works" heretofore or hereafter created using the Intellectual Property, including, but not limited to, the copyrights thereon. If parties who are not employees of the Licensee living in the United States make or have made any contribution to the creation of a "new work," so that such parties might be deemed to be "authors" of such "new work" as that term is used in present or future United States copyright statutes, the Licensee agrees to obtain from such parties a comparable full assignment of rights so that the

foregoing assignment by the Licensee vests in Titan full rights in the "new work," free of any claims, interests, or rights of other parties. The Licensee agrees not to permit any of its employees to obtain or reserve by oral or written employment agreements any rights as "authors" of such "new works." At Titan's request, the Licensee agrees to furnish Titan with full information concerning the creation of "new works" and with copies of assignments of rights obtained from other parties. Notwithstanding the foregoing, Licensee retains all copyrights, parents, trade secrets and other rights in and to any software, hardware, product designs, or technology developed and/or used in the Licensed Products by Licensee.

F(3)    If the copyrights, trademarks or other rights to the Intellectual Property, Licensed Products, and translations have not been registered with the U.S. Copyright or Patent and Trademark Offices or corresponding offices in foreign countries, then Licensee shall have the right to register them in the name designated by Titan in writing in accordance with the United States Copyright Act of 1976 and the Universal Copyright Convention and other applicable laws.    Titan hereby authorizes and appoints Licensee as Titan's attorney-in-fact to prepare and sign all documents on Titan's behalf which may be required to obtain full copyright, trademark or other legal benefits, including, but not limited to, extensions and renewals.    Licensee shall have the right to deduct such registration costs from any royalties due hereunder. Licensee to supply Titan with a copy of all copyright, trademarks and patents registered in any government office which is filed on behalf of Titan.

SECTION G.    REPRESENTATIONS AND WARRANTIES.

G(1)    Titan's Representation and Warranty

Titan hereby warrants and represents that:  (i) it is a corporation duly incorporated, validly existing and in good standing under the laws of the jurisdiction in which it is incorporated; (ii) it is the sole and exclusive owner of Intellectual Property; (iii) it has not previously granted rights in, assigned, pledged, licensed or otherwise encumbered the Intellectual Property; (iv) it has the full power to enter into this Agreement and to perform all of the agreements contained herein; (v) it has disclosed to Licensee any copyrighted, trademarked or other materials belonging to third parties with respect to which copyright or trademark notice or credit must appear to the Intellectual Property; (vi) it has obtained in writing any and all permissions and rights necessary for exploitation of the Intellectual Property with respect to all material owned by a third party and incorporated in the Intellectual Property, (vii) except as specifically disclosed to Licensee, that the copyrights, trademarks, and other rights in the Intellectual Property, and the exclusive license granted hereunder will be valid and subsisting during the Term with respect to each country or place of the Territory; (viii) the Intellectual Property does not contain any libelous matter or unlawful material and does not invade any rights of privacy nor infringe upon any trademark, statutory or common law copyright or other rights of third parties; and, (ix) Licensee will not incur any additional expense by way of residuals, profit participation or any other third party payments with respect to Licensee's activities contemplated hereby.

G(2)    (a)    Titan further represents and warrants to Licensee as follows:

(i) Titan has no knowledge of any threatened or actual material adverse change in the governmental regulation of its activities; and

(ii) Titan has no knowledge of any threatened or actual material adverse change in its financial condition and affairs which would interfere with its ability to perform its obligations under this Agreement.

(b)    Titan covenants that during the period of this Agreement Titan will continue to promote the Events and exploit the Intellectual Property in a manner consistent with its current practices.

defend it, which approval shall not be unreasonably withheld or delayed; and (d) a party assuming the defense of a claim or suit against the other party shall not settle such claim or suit without the prior written approval of the other party, which approval shall not be unreasonably withheld or delayed.

H(4)    Product Liability Insurance.  The Licensee agrees to obtain and maintain during the term of this Agreement, at its own expense, product liability insurance providing protection (at a minimum, in the amount of one million dollars ($1,000,000) per occurrence/ two million dollars ($2,000,000) annual aggregate) applicable to any claims, liabilities, damages, costs, or expenses arising out of any defects or alleged defects in the Licensed Products. Such insurance shall include coverage of Titan, its directors, officers, agents, employees, assignees, and successors. Within thirty (30) days after execution of this Agreement by Titan and within thirty (30) days upon the policy's renewal date, the licensee shall cause the insurance company issuing such policy to issue a certificate to Titan naming Titan as an additional insured confirming that such policy has been issued and is in full force and effect and provides coverage of Titan as required by this Section GH4), and also confirming that before any cancellation, modification, or reduction in coverage of such policy, the insurance company shall give Titan thirty (30) days prior written notice of such proposed cancellation, modification, or reduction. In the event that the Licensee's Product Liability Insurance lapses, or if at any time Titan is not covered, or if any other provision of this section is breached, Titan shall have the right to terminate this Agreement by written notice to Licensee if such breach is not cured by Licensee within thirty (30) days after written notice of default from Titan to Licensee.

## SECTION I.  RESERVATION OF RIGHTS.

All rights in and to the Intellectual Property (including premium rights in the Licensed Products) are retained by Titan for its own use, except for the specific rights which are granted to the Licensee under this Agreement  Except as set forth herein, Titan reserves the right to use, and to license other parties to use, the Intellectual Property in the Territory for any purpose Titan may determine.

## SECTION J.  INFRINGEMENTS; CLAIMS.

J(1)    Infringements  When the Licensee learns that a party is making unauthorized uses of the Intellectual Property, the Licensee agrees promptly to give Titan written notice giving full information with respect to the actions of such party. The Licensee agrees not to make any demands or claims, bring suit, effect any settlements, or take any other action against such party without the prior written consent of Titan. The Licensee agrees to cooperate with Titan, at no out-of-pocket expense to the Licensee, in connection with any action taken by Titan to terminate infringements.

J2)    Claims.  If claims or suits are made against Titan or the Licensee by a party asserting the ownership of rights in a name or design which is the same as or similar to one of the elements of the Intellectual Property, and asserting further that the use of a particular element of the Intellectual Property by the Licensee infringes the rights of such party, or if the parties learn that another party has or claims rights in a trademark, name, or design which would or might conflict with the proposed or actual use of an element of the Intellectual Property by the Licensee, Titan and the Licensee agree in any such case to consult with each other on a suitable course of action. In no event shall the Licensee have the right, without the prior written consent of Titan, to acknowledge the validity of the claim of such party, to obtain or seek a license from such party, or to take any other action which might

impair the ability of Titan to contest the claim of such party if Titan elects to contest such claim, subject to Licensee being made whole by Titan for any costs or damages. The Licensee agrees at the request of Titan to make reasonable modifications requested by Titan in the Licensee's use of the element of the Intellectual Property in question or to discontinue use of such element in the country of the Territory in question on the particular Licensed Product or Licensed Products which are involved, if Titan, in its sole discretion, reasonably exercised, determines that such action is necessary or desirable to resolve or settle the claim or suit or eliminate or reduce the threat of a claim or suit by such party. Titan shall have the right to participate fully at its own expense in the defense of any claim or suit instituted against the Licensee with respect to the use by the Licensee of an element of the Intellectual Property.

SECTION K    NO SUBLICENSING OF RIGHTS; AGREEMENTS WITH MANUFACTURERS.

K(1)    Sublicensing.  The Licensee shall not have the right to sublicense any of the rights granted to it under this Agreement except to a subsidiary wholly owned by Licensee, and otherwise with Titan's prior written consent, which shall not be unreasonably withheld or delayed.

K(2)    Agreements with Manufacturers.  The Licensee shall have the right to arrange with another party to manufacture the Licensed Products or components of the Licensed Products for exclusive sale, use, and distribution by the Licensee. The Licensee agrees to enter into a written agreement with all such manufacturers, and agrees to incorporate into such written agreements all of the provisions, for the protection of the rights of Titan, which are contained in the form manufacturer agreement which is available from Titan. The Licensee further agrees to furnish Titan within thirty (30) days of their execution copies of all agreements with such manufacturers. The failure to comply with any aspect of this section is a material breach and Titan shall have the right to immediately terminate this agreement. Notwithstanding the foregoing, Titan acknowledges and accepts that third party platform providers such as Sony, Nintendo and Sega will only sign their own manufacturing agreements, to which Titan agrees to be subject.

K(3)    Enforcement of Manufacturer Agreements.  The Licensee agrees strictly to enforce against its manufacturers all of the provisions which are required to be included in such agreements for the protection of Titan, as provided in Section K(2); to advise Titan of any violations thereof by manufacturers, and of corrective actions taken by the Licensee and the results thereof; and at the request of Titan to terminate such an agreement with any manufacturer which violates any of such provisions for the protection of Titan. If the Licensee fails to exercise such termination rights by giving written notice to the manufacturer within twenty (20) days after being requested to do so in writing by Titan, the Licensee appoints Titan its irrevocable attorney-in-fact to send a notice of termination in the name of the Licensee to the manufacturer for the purpose of terminating the agreement or any specific rights of the party under such agreement.

## SECTION L. BREACH AND TERMINATION.

L(1)    Right of Termination.  In addition to termination rights stated elsewhere in the agreement, Titan shall have the right to terminate this Agreement, by giving written notice to the Licensee, in any of the following situations:

(a)    If the Licensee makes, sells, offers for sale, or distributes or uses any Licensed Product or Advertising Material without having the prior written approval of Titan, as required by Section A, or makes any use of the Intellectual Property not authorized under this Agreement and Licensee fails to cure such breach within thirty (30) days after written notice of such breach given by Titan to Licensee..

(b)    If the Licensee fails to make any Advance Royalty Amount payment or Guaranteed Royalty Amount payment by the date such payment is required under the provisions of paragraph 4, or if the Licensee fails to submit royalty statements and/or royalty payments to Titan during the time period specified in Section C(2) and Licensee fails to cure such breach within thirty (30) days after written notice of such failure is given by Titan to Licensee..

(c)    If the Licensee becomes subject to any voluntary or involuntary order of any governmental agency involving the recall of any of the Licensed Products because of safety, health, or other hazards or risks to the public and Licensee fails to cure the distributing of such Licensed Products within thirty (30) days of notice of default from Titan..

(d)    If, other than under Title 11 of the United States Code, the Licensee becomes subject to any voluntary or involuntary insolvency, cession, bankruptcy, or similar proceedings, or an assignment for the benefit of creditors is made by the Licensee, or an agreement between the Licensee and its creditors generally is entered into providing for extension or composition of debt, or a receiver is appointed to administer the assets of the Licensee, or the assets of the Licensee are liquidated, or any distress, execution, or attachment is levied on such of its manufacturing or other equipment as is used in the production and distribution of the Licensed Products and remains undischarged for a period of thirty (30) days.

(e)    If the Licensee breaches any of the provisions of Section K, M(1), D(1), D(2), H(4) or any of its other material obligations under this Agreement, and Licensee fails to cure such breach within thirty (30) days after written notice of such breach is given by Titan to Licensee.

With respect to any non-monetary breach, failure or default by Licensee, in the event that same cannot with the exercise of reasonable diligence be cured within thirty (30) days, then Titan's right to terminate this Agreement shall be tolled provided Licensee commences to take steps to cure the breach, failure or default within such thirty (30) day period and diligently continues to pursue steps to complete such cure within a reasonable period of time thereafter.

L(2)    Assumption and Rejection Pursuant to United States Bankruptcy Code.  After any order for relief under the Bankruptcy Code is entered against the Licensee or Titan, the Licensee or Titan, as the case may be, must assume or reject this Agreement within sixty (60) days after the order for relief is entered.  If the Licensee or Titan, as the case may be, does not assume this Agreement

within such sixty (60) day period, the other party may, at its sole option, terminate this Agreement immediately by giving written notice to the Licensee or Titan, as the case may be, without further liability on the part of the party terminating the Agreement.

L(3)    Effect of Termination.  Termination of this Agreement under the provisions of this Section L or the provisions set forth elsewhere in this Agreement shall be without prejudice to any rights or claims which Titan or Licensee may otherwise have against the other.  Upon the termination of this Agreement, all royalties on sales previously made shall become due and payable to Titan within thirty (30) days.  Upon the termination of this Agreement under the provisions of Section L(1)(d) or L(2) of this Agreement, the Licensee, its receivers, trustees, assignees, or other representatives shall have no right to sell, exploit, or in any way deal with the Licensed Products, the Advertising Materials, or the Intellectual Property, except with the special written consent and instructions of Titan and except as otherwise provided in Section L(5) below.

L(4)    Discontinuance of Use of Intellectual Property, Etc.  Subject to the provisions of Section L(5), upon the expiration or earlier termination of this Agreement, the Licensee agrees immediately and permanently to discontinue manufacturing, selling, advertising, distributing, and using the Licensed Products and Advertising Materials; immediately and permanently to discontinue using the Intellectual Property; immediately to destroy any films, molds, dies, patterns, or similar items from which the Licensed Products and Advertising Materials were made, where any element of the Intellectual Property is an integral part thereof; and immediately to terminate all agreements with manufacturers, distributors, and others which relate to the manufacture, sale, distribution, and use of the Licensed Products.

L(5)    Disposition of Inventory upon Expiration.  Notwithstanding the provisions of Section L(4), if this Agreement expires in accordance with its terms, and is not terminated for cause by Titan, the provisions of this Section L(5) shall apply.  If the Licensee delivers to Titan on or before the date thirty (30) days prior to the expiration of this Agreement a written inventory listing, on a Licensed Product-by-Licensed Product basis, all Licensed Products in the Licensee's possession, custody, or control as of the date of such inventory, the Licensee shall have the non-exclusive right to sell any Licensed Products listed on such inventory for a period of one hundred eighty (180) days immediately following such expiration, subject to the payment of royalties to Titan on any such sales in accordance with the terms of this Agreement.  Titan shall have the right (but not the obligation) to buy any or all of the Licensed Products listed on such inventory at the Licensee's cost of manufacture.  The sell-off right granted the Licensee under this Section L(5) shall in no event apply to a quantity of any Licensed Product exceeding fifty percent (50%) of the Licensee's average quarterly unit sales of such Licensed Product during the one-year period immediately preceding the expiration of this Agreement.

L(6)    Licensee's Right to Terminate This Agreement    Licensee shall also have the right to terminate this Agreement (without prejudice to any rights which it may have either under the provisions of this Agreement or otherwise), effective as of the date of receipt by Titan of written notice of such termination by Licensee if a petition in bankruptcy is filed with respect to Titan which is not dismissed within sixty (60) days thereafter, a receiver or trustee of any of Titan's property is appointed and such is not vacated within sixty (60) days thereafter or any order shall be made or resolution passed for the winding up of Titan (other than for the purpose of bona fide reconstrucion or amalgamation), which order is not released wtihin sixty (60) days, or if Titan breaches any of its material obligations

with this Agreement which is not cured within thirty (30) days after notice from Licensee..

## SECTION M.  MISCELLANEOUS PROVISIONS.

M(1)  Restriction on Assignments.  Without the prior written consent of Titan, the Licensee shall not directly or indirectly assign, transfer, sublicense, or encumber any of its rights under this Agreement except as otherwise provided in this Agreement. This Agreement shall be binding upon and inure to the benefit of the successors and assigns of Titan.

M(2)  Parties Not Joint Venturers.  Nothing contained in this Agreement shall be construed so as to make the parties partners or joint venturers or to permit the Licensee to bind Titan to any agreement or purport to act on behalf of Titan in any respect.

M(3)  Modifications of Agreement; Remedies.  No waiver or modification of any of the terms of this Agreement shall be valid unless in writing, signed by both parties. Failure by either party to enforce any rights under this Agreement shall not be construed as a waiver of such rights, and a waiver by either party of a default in one or more instances shall not be construed as a continuing waiver or as a waiver in other instances.

M(4)  No Waiver of Termination Rights.  The failure of Titan to exercise any right to terminate the agreement for any of the reasons stated herein shall not be and is not a waiver of the right to terminate for such reason, when and is deemed appropriate by Titan.

M(5)  Invalidity of Separable Provisions.  If any term or provision of this Agreement is for any reason held to be invalid, such invalidity shall not affect any other term or provision, and this Agreement shall be interpreted as if such term or provision had never been contained in this Agreement.

M(6)  Notices.  All notices to be given under this Agreement (which shall be in writing) shall be given at the respective addresses of the parties as set forth on page 1, unless notification of a change of address is given in writing. The date of mailing shall be deemed to be the date the notice is given.  All notices shall be in writing and shall either be served by receipted mail or courier service, such as U.S. Certified or Registered Mail, Return Receipt Requested, or messenger service with proof of receipt, U.S. Express Mail, FedEx, DHL, UPS, or facsimile (receipt confirmed and hard copy sent by receiptped mail or courier service), all charges prepaid. Except as provided herein, such notices shall be deemed given when mailed, faxed or delivered to a receipted mail or courier service, all charges prepaid, except that notices of change of address shall be effective only after the actual receipt thereof.

M(7)  Headings.  The paragraph and section headings of this Agreement are inserted only for convenience and shall not be construed as a part of this Agreement.

M(8)  Entire Understanding.  This Agreement contains the entire understanding of the parties with respect to its subject matter.  Any and all representations or agreements by any agent or representative of either party to the contrary shall be of no effect.

M(9)  Governing Law.  This Agreement shall be construed and governed in accordance

with the laws of the State of New York, regardless of the place or places of its physical execution and performance execution in multiple forms.

## CERTIFICATE OF SERVICE

The undersigned, an attorney duly admitted to practice law before this

Court, hereby certifies under penalty of perjury, that on September 19, 2005, I caused

true copies of the foregoing

- *Notice of Motion to Dismiss the Sherman Act Claim in the Amended Complaint*

- *Declaration of Jonathan J. Lerner in Support of the Motion to Dismiss the Sherman Act Claim in the Amended Complaint*

- *JAKKS Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Sherman Act Claim in the Amended Complaint*

to be served upon the following parties by first-class mail:

Michael A. Cornman
Schweitzer Cornman Gross & Bondell, LLP
292 Madison Avenue
New York, NY 10017

Richard Schaeffer
Dornbush Schaeffer Stongin & Weinstein, LLP
747 Third Avenue
New York, NY 10017

Dated:  New York, New York
           September 19, 2005

                                          s/ Michael H. Gruenglas
                                        Micahel H. Gruenglas (MG 8705)