UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

WORLD WRESTLING ENTERTAINMENT, INC.

                         :

                 Plaintiff,           04 CV 8223 (KMK)

               v.                  :       (ECF CASE)

JAKKS PACIFIC, INC.; JAKKS PACIFIC (H.K.)  :
LIMITED; ROAD CHAMPS LIMITED; THQ,
INC.; THQ/JAKKS PACIFIC LLC; STANLEY     :
SHENKER AND ASSOCIATES, INC.; STANLEY
SHENKER; BELL LICENSING, LLC; JAMES     :
BELL; JACK FRIEDMAN; STEPHEN BERMAN;
JOEL BENNETT and BRIAN FARRELL,        :

               Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# MEMORANDUM OF LAW IN SUPPORT OF THE JAKKS DEFENDANTS' MOTION TO DISMISS THE SHERMAN ACT CLAIM IN THE AMENDED COMPLAINT

FEDER, KASZOVITZ, ISAACSON,
   WEBER, SKALA, BASS & RHINE LLP
Murray L. Skala (MS 9354)
Jonathan D. Honig (JH 7577)
750 Lexington Avenue
New York, New York 10022
Phone: (212) 888-8200
Fax: (212) 888-5968

SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
Jonathan J. Lerner (JL 7117)
Michael H. Gruenglas (MG 8705)
James Keyte (JK 0680)
Maura B. Grinalds (MG 2836)
Four Times Square
New York, New York 10036
Phone: (212) 735-3000
Fax: (212) 735-2000

Attorneys for the JAKKS Defendants

September 19, 2005

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.    WWE's Licensing Arrangements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    C.    The Alleged Bid-Rigging and Market-Allocation Scheme . . . . . . . . . . . . . . . . . 6

ARGUMENT

WWE'S BELATED ANTITRUST CLAIM SHOULD BE
REJECTED AS A MATTER OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

I.    WWE HAS NOT ALLEGED THE REQUISITE
    ANTITRUST INJURY FROM SIMPLE BRIBERY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    A.    WWE Does Not Even Allege a Market Restraint . . . . . . . . . . . . . . . . . . . . . . 12

    B.    WWE Has Not Alleged Any Market-Wide Harm to Competition . . . . . . . . . . . 18

    C.    WWE's Alleged Harm Flows From An Alleged Bribery Scheme, Not
        From Any Injury To Market-Wide Competition . . . . . . . . . . . . . . . . . . . . . . . . 20

II.    IN ANY EVENT, WWE HAS NOT ADEQUATELY PLED A SUBSTANTIVE
    ANTITRUST VIOLATION UNDER SECTION 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        1.    WWE's Per Se Theory Is Directly Contrary to Law . . . . . . . . . . . . . . . . 22

        2.    WWE Has Intentionally Tried to Evade the Rule
            of Reason Standard, Which It Could Never Meet . . . . . . . . . . . . . . . . . 25

III.    WWE'S ATTEMPT TO FALL BACK ON ALLEGATIONS OF BID-RIGGING
    AND MARKET ALLOCATION COLLIDES WITH THE STATUTE OF
    LIMITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

In re American Honda Motor Co., Dealership Relations Litigation, 941 F. Supp.
    528 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Apex Hosiery Co. v. Leader, 310 U.S. 469 (1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Asa Accugrade Inc. v. Am. Numismatic Ass'n, 370 F. Supp. 2d 213, 216 (D.D.C.
    2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328 (1990) . . . . . . . . . . . . . . . . . . 11, 12

In re Beck Industries, Inc., 605 F.2d 624 (2d Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Blue Tree Hotels Investment (Canada), Ltd. v. Starwood Hotels & Resorts
    Worldwide, Inc., 369 F.3d 212 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209 (1993) . . . . . . . . . . 18

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977) . . . . . . . . . . . . . . . 11, 18, 20

Bunker Ramo Corp. v. United Business Forms, Inc., 713 F.2d 1272
    (7th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 22

Business Electronics Corp. v. Sharp Electronics Corp., 485 U.S. 717 (1988) . . . . . . . . . . . 3, 23

In re Buspirone Patent Litig., 185 F. Supp. 2d 363, 378-79 (S.D.N.Y. 2002) . . . . . . . . . . . . . . 27

Calnetics Corp. v. Volkswagen of America, Inc., 532 F.2d 674 (9th Cir 1975) . . . . . . . . . . . 2, 15

Capital Imaging Associates, P.C. v. Mohawk Valley Medical Associates, Inc., 996
    F.2d 537 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 25, 26

Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . 18

In re Ciprofloxacin Hydrochloride Antitrust Litig., 261 F. Supp. 2d 188, 224-25
    (E.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

City of El Paso v. Darbyshire Steel Co., 575 F.2d 521 (5th Cir. 1978) . . . . . . . . . . . . . 27, 28, 29

Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36 (1977) . . . . . . . . . . . . . . . . . . . . . . . 21

FTC v. Indiana Federation of Dentists, 476 U.S. 447 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Federal Paper Board Co. v. Amata, 693 F. Supp. 1376 (D. Conn. 1988) . . . . . . . . . . . . . *passim*

Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design, 73
    F. Supp. 2d 829, 837 (W.D. Mich. 1999) aff'd, 244 F.3d 521 (6th Cir.
    2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Global Discount Travel Services, LLC v. TWA, Inc., 960 F. Supp. 701
    (S.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Hawaii v. Standard Oil Co. of Cal., 405 U.S. 251 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Hill v. A-T-O, Inc., 535 F.2d 1349 (2d Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Hunt v. Crumboch, 325 U.S. 821 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

James Cape & Sons Co. v. PCC Const. Co., No. 05-C- 269, 2005 WL 2176965
    (E.D. Wis. Sept. 6, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

K.M.B. Warehouse Distributors, Inc. v. Walker Manufacturing Co., 61 F.3d 123
    (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Kasada, Inc. v. Access Capital, Inc., No. 01 Civ. 8893, 2004 WL 2903776
    (S.D.N.Y. Dec. 14, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Kearney v. Taylor, 56 U.S. (15 How.) 494 (1854) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Kiepler v. Beller, 944 F.2d 1213 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Larry R. George Sales Co. v. Cool Attic Corp., 587 F.2d 266 (5th Cir. 1979) . . . . . . . . . . . . 2, 18

Love v. Basque Cartel, 873 F. Supp. 563 (D. Wyo. 1995), aff'd sub nom.
    Dry Creek Cattle Co. v. Basque Cartel, 95 F.3d 1161 (10th Cir. 1996) . . . . . . . . . 23, 24

Martinez v. Sanders, No. 02 Civ. 5624, 2004 WL 1234041 (S.D.N.Y. June 3,
    2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Mason v. American Tobacco Co., 346 F.3d 36 (2d Cir. 2003), cert. denied, 541
    U.S. 1057 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Merkle Press v. Merkle, 519 F. Supp. 50 (D. Md. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Municipal of Anchorage v. Hitachi Cable, Ltd., 547 F. Supp. 633
    (D. Alaska 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Mylan Labs, Inc. v. Akzo, N.V., 770 F. Supp. 1053 (D. Md. 1991) . . . . . . . . . . . . . . . . 2, 15, 16

iv

Philip Morris Inc. v. Heinrich, No. 95 Civ. 0328, 1996 WL 363156 (S.D.N.Y.
    June 25, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.,
    75 F.3d 801 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Seaboard Supply Co. v. Congoleum Corp., 770 F.2d 367 (3d Cir. 1985) . . . . . . . . . . . . . . . 2, 15

Sterling Nelson & Sons, Inc. v. Rangen, Inc., 235 F. Supp. 393 (D. Idaho 1964),
    aff'd, 351 F.2d 851 (9th Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90 (2d Cir. 1998) . . . . . . . . . . . . . . . . 19

United States v. Topco Associates, Inc., 405 U.S. 596 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . 22

Virgin Atlantic Airways Ltd. v. British Airways PLC, 257 F.3d 256 (2d Cir. 2001) . . . . . . 19, 20

Volmar Distributors, Inc. v. New York Post Co., 825 F. Supp. 1153 (S.D.N.Y.
    1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 18, 19, 20

Williams Electronic Games, Inc. v. Barry, No. 97 C 3743, 2001 WL 1104619
    (N.D. Ill. Sept. 18, 2001), aff'd sub nom. Williams Electronic
    Games, Inc. v. Garrity, 366 F.3d 569 (7th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . 14

Wolf v. Wagner Spray Tech Corp., 715 F. Supp. 504 (S.D.N.Y. 1989) . . . . . . . . . . . . . . . . . 27

Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321 (1971) . . . . . . . . . . . . . . . . . . 27

STATUTES                                        PAGE(S)

15 U.S.C. § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 21

15 U.S.C. § 15(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

15 U.S.C. § 15(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Pursuant to the Court's Order dated August 18, 2005, Defendants JAKKS Pacific, Inc., JAKKS Pacific (H.K.) Limited, Road Champs Limited, Jack Friedman, Stephen Berman and Joel Bennett (collectively, the "JAKKS Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Sherman Act claim in the Amended Complaint (the "Amended Complaint" or "AC") of World Wrestling Entertainment, Inc. ("WWE"), pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

WWE's Sherman Act claim is merely the latest chapter in WWE's futile effort to manufacture federal subject matter jurisdiction. Lacking diversity of citizenship when WWE determined to shop for a federal forum to pursue claims against the JAKKS Defendants, THQ and the Joint Venture THQ/JAKKS Pacific LLC, WWE attempted to create federal subject matter jurisdiction by dressing up a garden-variety case of alleged commercial bribery into claims under the Racketeering Influenced and Corrupt Organization Act ("RICO") and the Robinson Patman Act ("RPA").

After the JAKKS Defendants moved to dismiss those claims, and it became obvious to WWE that its federal claims could not withstand scrutiny, WWE abruptly attempted, on March 30, 2005, to amend its federal complaint. In straining to stave off dismissal, WWE not only abandoned the core theory of its RICO claim, it also belatedly added a brand new federal claim – the Sherman Act claim. If there were any doubt, and there is none, that WWE's newly minted Sherman Act claim is merely a contrived afterthought to try to create federal jurisdiction where none really exists, it is dispelled by WWE's failure to include it anywhere in its initial 235

paragraph, 73 page scattershot complaint.[1]

        In attempting to transform its routine bribery allegations into a Sherman Act claim, WWE contravenes well-established legal authority that alleged "commercial bribery, standing alone, does not constitute a violation of the Sherman Act." Calnetics Corp. v. Volkswagon of America, Inc., 532 F.2d 674, 687 (9th Cir 1975); accord Federal Paper Board Co. v. Amata, 693 F. Supp. 1376 (D. Conn. 1988) (Blumenfeld, J.). Indeed, "the Sherman Act may not be extended beyond its scope and used to police the morals of the marketplace." Seaboard Supply Co. v. Congoleum Corp., 770 F.2d 367, 372 (3d Cir. 1985) (quoting Sitkin Smelting & Refining Co., Inc. v. FMC Corp., 575 F.2d 440, 448 (3d Cir. 1978)); see also Merkle Press v. Merkle, 519 F. Supp. 50 (D. Md. 1981) (courts must be circumspect in converting ordinary business torts into antitrust violations); Mylan Labs, Inc. v. Akzo, N.V., 770 F. Supp. 1053, 1062-63 n.8 (D. Md. 1991) (refusing to extend Sherman Act claim to "payment of illegal gratuities" because "unfair competition is still competition as required by the Sherman Act."); Larry R. George Sales Co. v. Cool Attic Corp., 587 F.2d 266, 272 (5th Cir. 1979) ("Plaintiff has at most stated causes of action for extortion or for tortious interference of contractual relations, and not any claim under the Sherman Act.")

        Given its tactical origin, it is hardly surprising that WWE's alleged Sherman Act claim suffers from several separate and independent defects, each of which requires dismissal:

---

[1] It bears emphasis that WWE's belated Sherman Act claim is not based on any "new" facts or information supposedly provided by WWE's so-called unnamed "cooperating witness." WWE concedes, as it must, that "I would have amended to include the antitrust claim on the basis of what I had." (Transcript of 4/27/05 Hearing Before Judge Karas at 15:22-24.)

- WWE has not alleged the requisite "antitrust injury." Where the purported conduct is alleged interference with an employer's right to the "honest services" of an agent (AC ¶¶ 57, 81), courts have held that the antitrust laws are not implicated. Absent allegations of actual market restraint or market-wide harm to competitors resulting in Plaintiff's injury, there can be no claim under the Sherman Act.

- Despite its conclusory characterization of the joint JAKKS/THQ proposal to WWE as a "per se" violation of the Sherman Act, in fact, WWE has not pled facts to constitute a per se violation. As a matter of law, such joint bids do not warrant a finding of per se illegality which is reserved for conduct that is "manifestly anticompetitive" and which "always or almost always tend[s] to restrain competition and decrease output." Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 723 (1988). Bereft of a per se violation, WWE has not alleged that the Defendants had the requisite market power in the national market for licensing videogame characters and thus WWE's claim cannot withstand scrutiny under the applicable "rule of reason" analysis.

- WWE's antitrust claim is time-barred. When, as here, the alleged per se bid-rigging or market allocation purportedly arises from an agreement to which the plaintiff is a party, the four-year statute of limitations runs from the date of the agreement -- or June 10, 1998, more than 7 years ago.

3

# FACTUAL BACKGROUND[2]

## A.    The Parties

WWE:  Plaintiff WWE, formerly known as Titan Sports, Inc., is a Delaware corporation whose principal place of business is located in Connecticut.  (AC ¶ 9.)  WWE is an integrated media and entertainment company principally engaged in events involving professional wrestling.  (Id.)

The JAKKS Corporate Defendants:  JAKKS Pacific, Inc. ("JAKKS") is a Delaware corporation whose principal place of business is in California.  (Id. ¶ 10.)  JAKKS is a multi-brand company that designs, develops, produces and markets toys, leisure products and writing instruments for children and adults around the world.  JAKKS Pacific (H.K.) Limited ("JAKKS H.K.") and Road Champs Limited ("Road Champs") are Hong Kong corporations that are wholly owned subsidiaries of JAKKS.  (Id. ¶¶ 11, 12.)

The JAKKS Individual Defendants:  Jack Friedman ("Friedman") is the Chief Executive Officer and Chairman of the Board of Directors of JAKKS and resides in Malibu, California.  (Id. ¶ 13.)  Stephen Berman ("Berman") is the President, Secretary and Chief Operating Officer of JAKKS and serves on JAKKS' Board of Directors and resides in Malibu, California.  (Id. ¶15.)  Joel Bennett ("Bennett") is the Chief Financial Officer of JAKKS and resides in Moorpark, California.  (Id. ¶ 16.)

---

[2] Although the Amended Complaint's factual allegations are, solely for purposes of this motion, accepted as true, "'[l]egal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness.'"  Mason v. Am. Tobacco Co., 346 F.3d 36, 39 (2d Cir. 2003) (alteration in original) (citations omitted), cert. denied, 541 U.S. 1057 (2004).  On a Rule 12(b)(6) motion to dismiss, the Court may properly consider documents that are "integral" to the complaint, see San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 808-09 (2d Cir. 1996), as well as public papers in the legal proceedings between Plaintiff and other defendants in Connecticut.  See Martinez v. Sanders, No. 02 Civ. 5624, 2004 WL 1234041, at *1 n.2 (S.D.N.Y. June 3, 2004).

THQ:  THQ, Inc. ("THQ"), a developer and publisher of interactive entertainment software (videogames), is a Delaware corporation whose principal place of business is in California.  (Id. ¶ 17.)

THQ/JAKKS:  THQ, along with JAKKS, created Defendant THQ/JAKKS Pacific LLC (the "LLC"), a Delaware limited liability corporation whose principal place of business is in California, to jointly obtain and exploit a videogame license from WWE.  (Id. ¶¶ 19.)

Brian Farrell:  Brian Farrell ("Farrell") resides in Lake Sherwood, California and is the President and Chief Executive Officer of THQ.  (Id. ¶ 18.)  Farrell has served as Chairman of THQ's Board of Directors since August 1, 2001.  (Id.)

The Connecticut Defendants:  Stanley Shenker ("Shenker") resides in New Canaan, Connecticut and is the President and sole owner of Stanley Shenker & Associates ("SSAI") and the sole owner of Stanfull Industrial, Ltd. ("Stanfull"), a foreign corporation located in Hong Kong.  (Id. ¶ 21.)  SSAI is a New York corporation whose principal place of business is in Connecticut.  (Id. ¶ 20.)  From approximately April 1995 through June 13, 2000, SSAI was WWE's licensing agent.  (Id.)  James Bell ("Bell") resides in Norwalk, Connecticut and is the President and sole owner of Bell Licensing, LLC.  (Id. ¶ 23.)  Bell Licensing, LLC ("Bell Licensing") is a Connecticut limited liability company whose principal place of business is in Connecticut.  (Id. ¶ 22.)

**B.    WWE's Licensing Arrangements**

Bell was responsible for, among other things, procuring and negotiating license agreements for WWE.  (Id. ¶¶ 29-30.)  In or around April 1995, on Bell's recommendation, WWE hired SSAI as a non-exclusive outside licensing agent to find potential licensees for WWE.  (Id. ¶ 32.)  On or about March 7, 1997, WWE entered into an "Agency Agreement" with

SSAI pursuant to which SSAI became WWE's exclusive outside licensing agent. (Id. ¶ 72, Ex. A

to the accompanying Declaration of Jonathan J. Lerner ("Lerner Decl.").)  SSAI received

commissions (of 11%) on new licensing deals it procured -- but not on deals produced by WWE

or Bell. (AC ¶¶ 77-78.)  The Agency Agreement did not permit SSAI to enter into any agree-

ments on behalf of WWE. (Id. ¶ 75; Lerner Decl. Ex. A.)  Rather, it required SSAI to forward

proposals or "deal sheets" to Bell, who made recommendations to WWE.  WWE alone made the

final decision on licenses.  (Lerner Decl. Ex. A ¶ 9(b).)  Further, the Agency Agreement

specifically addressed SSAI's ability to provide services for other companies, and specifically

allowed SSAI to perform services for other clients.  Its only limitation on SSAI was to preclude it

from representing other professional wrestling companies -- i.e., direct competitors of WWE -- in

finding licensees for them. (Lerner Decl. Ex. A. at § 5.)

### C.    The Alleged Bid-Rigging and Market-Allocation Scheme

WWE purports to allege a bid-rigging and market allocation scheme under the

Sherman Act.  The purported scheme involves a supposed plan by JAKKS and THQ to obtain a

videogame license from WWE by "bribing" Shenker and Bell.[3]  (AC ¶ 104.).  The Amended

Complaint asserts that competition for character and product licenses, like the WWE videogame

license, was "intense" in early 1998. (Id. ¶ 103.)  At that time, the WWE videogame license was

held by a company named Acclaim. (Id. ¶ 78.)  It is undisputed that JAKKS already was an

established WWE licensee, having held a WWE domestic toy license since 1995 (the "Toy

License") (id. ¶ 35) and an international toy license from WWE since 1997. (Id. ¶ 71.)  There is

---

[3]  It bears emphasis that the Amended Complaint makes no allegation of any payments by JAKKS, THQ,
the LLC or any of their officers to Bell, the WWE employee empowered to recommend licenses to
WWE, or that any of such defendants were aware of the commission sharing arrangement between
Shenker and Bell whereby Shenker allegedly "split" the commissions he received from WWE with
respect to numerous licenses with Bell.

no allegation that these existing licenses were procured improperly. Nevertheless, WWE alleges that "[i]n order to implement that aspect of the illegal conduct involving the videogame license," the JAKKS Defendants, Shenker and Bell conspired to "foreclose competition, rig the bids, allocate the license to THQ and JAKKS, and fix the price to be offered to WWE for the [videogame] license." (Id. ¶¶ 104, 148.) The only facts alleged by WWE to demonstrate this so-called scheme are payments by JAKKS' affiliates to Stanfull (id. ¶¶ 95, 112, 168, 170) which WWE characterizes as "bribes" to obtain seven separate licenses or amendments to licenses, including the videogame license. (Id. ¶¶ 21, 56, 67, 71, 93, 112-16, 157, 165.)

Despite years of litigation and discovery, WWE has not alleged a single fact directly linking the alleged payments to the videogame license or any of the other six licenses. Indeed, according to the Amended Complaint, the alleged agreement to pay Stanfull for the videogame license was made pursuant to a January 1998 invoice that was delivered before the videogame license was ever discussed. (AC ¶¶ 85-86, 100-101.) It bears emphasis that WWE admits that in the Connecticut litigation, despite the Connecticut Defendants' admissions with respect to improprieties in dealings with other licensees, and their extensive recantations of sworn testimony, all defendants have consistently and steadfastly denied that any bribes were paid in connection with the videogame license. (See id. ¶¶ 213-20.)

According to WWE, SSAI split the payments Stanfull received from JAKKS with Bell, paying Bell $20,000 of the $40,000 it received on January 14, 1998 (id. ¶ 97) and an additional $20,000 on or about April 7, 1998 from the $40,000 payment received from JAKKS on April 2, 1998. (Id. ¶ 113). WWE alleges that Stanfull received the final purported payment of $20,000 in August 1998. (Id. ¶¶ 168.) WWE also alleges that this same $20,000 payment was transferred to Bell months later in October 1998, purportedly as part of the same bribery scheme.

7

(Id. ¶ 169.)

On March 30, 1998, allegedly in consideration for the $20,000 he had received from SSAI, Bell recommended to WWE that the videogame license be awarded to JAKKS and listed SSAI as the agent that procured the deal. (Id. ¶ 110.) WWE approved the deal memorandum selecting JAKKS as the videogame licensee on April 8, 1998 and a week later, "principally based on Bell's influence," informed its current videogame licensee, Acclaim, that it did not intend to renew Acclaim's license. (Id. ¶¶ 114-15.) WWE admits that the alleged bribe did not preclude further bidding or negotiations, and that even after Bell supposedly told Acclaim on March 25, 1998, that it could not submit a proposal, Acclaim was told by WWE that "it could do so." (Id. ¶¶ 109, 114.)

WWE further concedes that the alleged bribery scheme did not prevent the submission of "clearly superior" bids from other interested companies. (Id. ¶¶ 131-32, 153.) Indeed, WWE admits that even after WWE's management approved Bell's proposal for JAKKS to become the videogame licensee, THQ and Activision submitted proposals for the videogame license that allegedly included terms superior to the JAKKS's proposal. (Id.) As a result of these allegedly superior proposals, WWE's selection of JAKKS was revoked and the process for selecting the video game licensee continued for two more months.

Subsequently, THQ decided to partner with JAKKS and create a Joint Venture – the LLC – to make a proposal for the videogame license. (Id. ¶¶ 137, 146, 154.) On or about May 7, 1998, Shenker allegedly drafted a deal memo recommending that the videogame license be granted to the LLC and listed SSAI as the procuring agent. (Id. ¶ 146.) A few days later, on or about May 12, 1998, Bell approved Shenker's May 7 deal memo and submitted it to WWE management. (Id. ¶ 152.) The proposal was clearly made on behalf of the joint venture of THQ

8

and JAKKS with WWE's full knowledge that it was a joint proposal. (Id. ¶¶ 152, 154.) On June 23, 1998, Linda McMahon, President and CEO of WWE, executed the videogame license agreement with the joint venture LLC, effective as of June 10, 1998. (Id. ¶ 157; see also Lerner Decl. Ex. B.) The signatories to the Videogame License on behalf of the LLC were Brian Farrell, the President and CEO of THQ and Jack Friedman, the CEO of JAKKS Pacific. (Lerner Decl. Ex. B.) The Videogame License also specifically provided that upon its effective date, JAKKS and THQ would each provide stock options or warrants of their respective companies to SSAI and to WWE. (Id. at § 6.) A day later, WWE and JAKKS amended the domestic and international toy licenses to make them coterminous with the videogame license. (AC ¶ 165.)

## ARGUMENT

### WWE'S BELATED ANTITRUST CLAIM SHOULD BE REJECTED AS A MATTER OF LAW

In its latest attempt to create federal jurisdiction – where none really exists – WWE now belatedly claims, for the first time, that Defendants' conduct constitutes a "per se" violation of section 1 of the Sherman Act, 15 U.S.C. § 1. (See AC ¶¶ 259-72.) Specifically, WWE now characterizes the alleged bribery, which is different in nature, scope and purpose from the bribery alleged by WWE in its initial complaint (compare Initial Comp., ¶¶ 42-46, 175, 181, 188, with AC ¶¶ 58, 79, 83-94, 101), as part of a "bid-rigging" and "market allocation" conspiracy that culminated in THQ/JAKKS receiving the 1998 WWE videogame license. (Id. ¶¶ 158, 267.) These supposed "per se" violations, claims WWE, harmed competition for WWE's videogame license. (Id. ¶¶ 267-70.)

As described below, WWE's attempt to cloak their garden-variety bribery allegations in the garb of an antitrust violation – per se or otherwise – runs afoul of nearly every

basic antitrust standard that must be met for WWE to state a cognizable Sherman Act claim. First, WWE has not alleged the requisite "antitrust injury." Courts have long held that where the source of a plaintiff's alleged injury is purported bribery of a disloyal employee, or mere garden-variety business torts, the antitrust laws are simply not implicated. Here, WWE affirmatively alleges that its injury flows directly from disloyal WWE licensing agents rather than from any restraint in what its own Amended Complaint contends is the "national market for the licensing of intellectual property in characters for videogames." (Id. ¶ 266.) Indeed, nothing WWE alleges even remotely suggests a market restraint of any kind, any market-wide harm (in terms of market price or output) or any injury to WWE that even purports to flow from harm to the licensing market alleged by WWE. Standing alone, these fundamental deficiencies mandate dismissal of WWE's Sherman Act claim.

Second, the substance of WWE's antitrust claim does not even come close to satisfying the most basic requirements for pleading a section 1 violation. As a matter of law, Courts have long held that the type of joint proposal described in the Amended Complaint must be analyzed under the "rule of reason," as required for any claims of a purported "foreclosure" of access to other bidders. Stripped of its conclusory "per se" mantra, WWE cannot avoid dismissal of its Sherman Act claim because WWE has not alleged -- and cannot allege -- as it is mandated to do under a rule of reason analysis, that JAKKS and/or THQ have the requisite market power in the alleged national market for licensing videogame characters (a proposition that would be as fanciful as it sounds given the enormity of this alleged market). Under controlling Second Circuit authority, WWE's failure to allege market power further confirms, as a matter of law, that this case has nothing to do with antitrust violations or protecting market-wide competition and is, and always has been, at most, a simple alleged bribery case between two non-diverse parties that

has no business in this federal Court of limited jurisdiction. Accordingly, WWE's antitrust claim should be dismissed with prejudice.

Finally, in its zeal to concoct a "per se" bid-rigging and license-allocation scheme out of the June 1998 THQ/JAKKS videogame license (id. ¶¶ 158, 267), WWE ignores the four-year statute of limitations for Sherman Act claims. Where, as here, an alleged per se bid-rigging or market allocation scheme is supposedly reflected in an agreement to which the antitrust plaintiff is a party, the four-year statute of limitations runs from the date of that allegedly harmful agreement. In its Amended Complaint, WWE specifically alleges that the June 1998 videogame license between it and THQ/JAKKS constitutes illegal bid-rigging and license allocation (id. ¶ 157-58), and that it caused injury to WWE. (Id. ¶ 267.) Therefore, as a matter of law, WWE's seven-year delay before invoking this purported antitrust theory dispositively bars its claim.

## I.    WWE HAS NOT ALLEGED THE REQUISITE ANTITRUST INJURY FROM SIMPLE BRIBERY

Standing under Section 4 of the Clayton Act is limited to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a). To avoid dismissal, a plaintiff must allege an "antitrust injury," that is, "'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990) (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)). This requirement "exists separate and apart from the substantive requirements of the Sherman Act . . . [and] is a hurdle which all private plaintiffs must vault to gain access to antitrust relief." Volmar Distribs., Inc. v. N.Y. Post Co., 825 F. Supp. 1153, 1161 n.5 (S.D.N.Y. 1993) (citing Atl.

11

Richfield Co., 495 U.S. at 341-42). Thus, the antitrust injury requirement must be met regardless

of the type of the antitrust claim involved, including both alleged per se and rule of reason

violations. See Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide,

Inc., 369 F.3d 212, 220 (2d Cir. 2004) (quoting Atl. Richfield Co., 495 U.S. at 340); Volmar

Distribs., Inc., 825 F. Supp. at 1159 (the need for showing an antitrust injury is "at least as great

under the per se rule as under the rule of reason") (citing Atl. Richfield Co., 495 U.S. at 344).

Because the antitrust laws are concerned with protecting market competition in

general rather than individual competitors in particular, an antitrust plaintiff must allege that the

injury it suffered was "caused by acts that had a competition-reducing effect." Volmar Distribs.,

Inc., 825 F. Supp. at 1159. To meet that basic injury standard, an antitrust plaintiff must allege at

a minimum: (i) an actual market restraint; (ii) market-wide harm to competition, such as a

reduction in output or increase in prices to consumers as a result of the restraint; and (iii) that the

conduct that had a competition-reducing effect in a market was the actual direct cause of its own

injury. See id. at 1159-60; see also Fed. Paper Bd. Co. v. Amata, 693 F. Supp. 1376, 1382

(D. Conn. 1988). WWE's Amended Complaint does not satisfy any of these basic requirements.

### A.    WWE Does Not Even Allege a Market Restraint

Perhaps the most fundamental aspect of any section 1 claim is that trade in the

alleged market is in fact restrained; absent alleged facts to support such a conclusion, the antitrust

laws are simply not implicated. Here, the question is whether, according to the allegations of

WWE's own Amended Complaint, other potential licensees (e.g., Acclaim) were free to

communicate and/or negotiate with WWE in competition for the subject license; if so, no market

restraint is present, and the complaint must be dismissed.

Federal Paper Board Co. v. Amata, 693 F. Supp. 1376 (D. Conn. 1988)

12

(Blumenfeld, J.), is directly on point. There, the employee of the plaintiff's paper mill who was in charge of purchasing wastepaper, a raw material for the mill, allegedly accepted bribes and kickbacks from wastepaper suppliers. Id. at 1380. The complaint alleged that the corrupted employee would not allow suppliers who had not bribed him to supply the mill in significant amounts, and that the cost of those bribes were passed on to the plaintiff through the artificially high prices the mill paid for wastepaper. Id. Federal, the owner of the mill, brought a claim alleging that the employee entered into conspiracies with the wastepaper suppliers "for the purposes of gaining commercial advantage, fixing prices of wastepaper supplied to [the plain-tiff's] mill, and restraining competition," conduct that the plaintiff claimed was a per se violation of section 1 of the Sherman Act. Id.

The court granted defendants' motion to dismiss the section 1 claim, holding, as a matter of law, that "[w]hen the only source of [plaintiff's] injury is a disloyal employee, a plaintiff cannot complain of an antitrust injury in order to elevate claims based on an employee's breach of fiduciary duty into Sherman Act claims." Id. at 1384. The court found that while the bribes may have been illegal and unfair methods of competition for the subject contracts, their illegality and unfairness did not support an inference that the bribes restrained competition. Id. at 1383-84. Indeed, "bribery could have been consistent with intense competition among the suppliers -- some of which resorted to illegal measures to gain an advantage." Id. at 1383.

For the antitrust laws to be implicated, the court explained that an antitrust plaintiff must allege a market restraint -- i.e., an agreement or other restraint that precludes other suppliers from dealing with the plaintiff even if they desired to do so. The court found that no such restraint was pled in the complaint. Id. at 1383-84. "There [was] no restraint," the court explained, "because the way was open to Federal to do business with individual suppliers." Id. at

13

1384 n.9. Moreover, the fact that the corrupt employee dealt primarily with suppliers who paid him bribes did not mean that the uncooperative suppliers could not compete: "For example, they might have informed Federal about [the employee's] behavior." Id. at 1383. Likewise, the court observed, nothing in the complaint indicated that the bribes prevented the plaintiff from negotiating with individual suppliers: the corrupt employee did not control Federal, nor was there any allegation that the employee and the suppliers who paid him bribes prevented any other supplier from dealing with Federal had Federal attempted to purchase from another supplier. Id. at 1384.

While the court acknowledged that the employee's disloyalty and Federal's ignorance of the scheme may in fact have deprived Federal of the benefits of competition among wastepaper suppliers, there was no allegation that Federal could not obtain the benefits of competition had it tried to do so. Id. In other words, there was no allegation that competition in the market had been restrained by the defendants' conduct. Id. Thus, even though the disloyal employee prevented plaintiff from enjoying the fruits of that competition, competition in the market was unrestrained. Accordingly, the court concluded that Federal had only alleged injury resulting from commercial bribery and did not suffer any "antitrust injury." Id. at 1385. See also Bunker Ramo Corp. v. United Bus. Forms, Inc., 713 F.2d 1272, 1284 (7th Cir. 1983) (reversing district court decision denying motion to dismiss section 1 claim because facts alleged specified conduct akin to a scheme to defraud, not an antitrust violation); cf. Williams Elec. Games, Inc. v. Barry, No. 97 C 3743, 2001 WL 1104619, at *8 (N.D. Ill. Sept. 18, 2001) (in granting summary judgment on Sherman Act section 1 claim, court concluded that evidence of bribery was "as consistent with an independent competitive market as it is with a conspiracy to restrain trade"), aff'd sub nom. Williams Elec. Games, Inc. v. Garrity, 366 F.3d 569 (7th Cir. 2004).

14

Indeed, other courts have consistently acknowledged that as a matter of law, alleged "commercial bribery, standing alone, does not constitute a violation of the Sherman Act." Calnetics Corp. V. Volkswagon of America, Inc., 532 F.2d 674, 687 (9th Cir 1975); accord Seaboard Supply Co. v. Congoleum Corp., 770 F.2d 367 (3d Cir.1985) (addressing "whether a scheme of commercial bribery between an employee of a manufacturer and an entity which acted as a sales agent comes within the prohibition of either the Sherman or Robinson-Patman Acts" and holding that "[a]lthough the activity was reprehensible and probably violated state civil and criminal law, we agree that the scheme did not come within the scope of the antitrust laws."); In re Am. Honda Motor Co., Dealership Relations Litig., 941 F. Supp. 528, 564 (D. Md. 1996) (granting motion to dismiss Sherman Act claim because although "preferential allocations occasioned by bribes might constitute fraud and common law violations, but they do not constitute per se violations of the Sherman Act"); Mylan Labs., Inc., 770 F. Supp. at 1062-63 n.8 (refusing to extend Sherman Act claim to "payment of illegal gratuities"); Mun. of Anchorage v. Hitachi Cable, Ltd., 547 F. Supp. 633, 645 (D. Alaska 1982) (though commercial bribery was proven, evidence of anticompetitive facts was insufficient to establish a Sherman Act claim); Bunker Ramo Corp., 713 F.2d at 1284 (facts alleged in complaint, i.e., falsifying invoices and paying bribes, specified conduct "more akin to a scheme to defraud than a price-fixing scheme" and did not state a cause of action under section 1 of the Sherman Act).

As the Court held in Sterling Nelson & Sons, Inc. v. Rangen, Inc., 235 F. Supp. 393, 400 (D. Idaho 1964), aff'd, 351 F.2d 851 (9th Cir. 1965):

> The evidence here proves only bribery of an influential state employee which had a detrimental restraining effect upon interstate commerce. This is not the type of misconduct within the purview of the concepts of a combination in restraint of trade or monopoly as used in the Sherman Act . . . [The] Sherman Act must be interpreted in the light of well understood common law doctrines relating to monopolies and restraints of trade such as contracts for the restriction or suppres-

15

sion of competition in the market, agreements to fix prices, divide marketing territories, apportion customers, restrict production and the like. Nothing of that kind occurred here. This is a simple case of buying influence, sometimes called commercial bribery.

235 F. Supp. at 400.[4]

Here, WWE's allegations in this case fall squarely within the holding of Federal Paper Board and its progeny. Nothing in the Amended Complaint alleges that potential licensees were not free to deal with WWE or vice versa in a highly competitive market. On the contrary, WWE affirmatively asserts facts that negate the existence of any possible market restraint. For example, WWE alleges that "[d]uring the time period that Jakks was corrupting Shenker, competition in the toy industry was intense between companies seeking valuable intellectual property licenses such as WWE" (AC ¶ 52 (emphasis added)) and that during the time when the scheme to acquire the videogame license was purportedly hatched, "competition for desirable character and product licensees remained intense." (Id. ¶ 103 (emphasis added).) See, e.g., Mylan Labs., 770 F. Supp. at 1063 & n.8 (dismissing Sherman Act claims based on defendants' alleged payment of illegal gratuities to FDA employees to expedite drug applications where plaintiff "itself characterized competition in the generic drug industry as intense.") WWE also emphasizes that Shenker and Bell did not control WWE (id. ¶ 109), and that neither Bell nor Shenker had authority to grant licenses but rather could only recommend licensees while WWE retained sole authority over all final decisions concerning the selection of licensees. (Id. ¶ 75.)

---

[4] The present case is in sharp contrast to cases in which bribery is incidental to a classic bid rigging conspiracy such as the one alleged in Philip Morris Inc. v. Heinrich, No. 95 Civ. 0328, 1996 WL 363156 (S.D.N.Y. June 25, 1996). In that case, the defendants conspired to submit inflated "dummy bids" to plaintiff in order to assure that one of them would win the contract and receive higher fees from plaintiff pursuant to the rigged bidding process, while co-defendants would receive the alleged bribes and subcontracting work in exchange. No such illegal bid rigging scheme is alleged in this case. On the contrary, as discussed infra, a simple joint bid cannot amount to "bid rigging" as a matter of law.

16

Further WWE admits that other bidders in fact communicated directly with senior executives of WWE to make proposals (id. ¶ 109), and that in the months that elapsed between the initial selection of JAKKS and WWE's decision to grant the license to the LLC, WWE could have elicited and pursued proposals from whomever it wished. (Id. ¶ 114.)

Likewise, WWE not only admits -- but underscores -- that other rivals were not restrained at all from competing in the market by the alleged disloyalty of WWE's licensing agents. Specifically, the Amended Complaint recounts that Acclaim, which held the videogame license prior to the LLC, "went over Bell's head and complained to senior management at WWE that it was not being permitted to submit a renewal proposal," and was then "told [by WWE senior management] that it could do so." (Id. ¶ 109.) The Amended Complaint also emphasizes that even after WWE approved the deal memorandum recommending that the license be granted to JAKKS, "WWE remained legally free to accept other superior offers until such time as a definitive licensing agreement was executed." (Id. ¶ 114.) Further, the Amended Complaint alleges that Activision submitted a prosposal for the videogame license, and might have improved it absent the alleged bribes and disloyalty. (Id. ¶ 148.) In fact, the Amended Complaint establishes the existence of such competition by affirmatively alleging that based on the emergence of "superior" competing bids, WWE rescinded its prior selection of JAKKS and ultimately chose the joint proposal by JAKKS and THQ which provided superior terms. (Id. ¶¶ 114, 127-33, 146, 152, 154, 157.) Just as in Federal Paper Board, there are simply no market restraints alleged in this case -- only alleged bribes and disloyalty that allegedly prevented WWE from fully benefitting from a free and open market.

As a matter of law, these concessions are fatal to WWE's Sherman Act claim. They confirm that no market restraint is even alleged in this case and, in turn, that no cognizable

antitrust injury has been or can be alleged. Indeed, if this Court were to accept WWE's attempt to

convert the alleged bribery and disloyalty claimed here into a "market restraint," it would

effectively federalize innumerable forms of tortious conduct -- despite the admonitions of the

Supreme Court and numerous Courts of Appeals against a vast and unsupported expansion of the

federal antitrust laws.[5] Accordingly, as the court did in Federal Paper Board, this Court must

dismiss the antitrust claim for WWE's complete failure to allege any market restraint.

**B.    WWE Has Not Alleged Any Market-Wide Harm to Competition**

Even if WWE had alleged some form of market restraint -- which it has not -- in

order for WWE to claim an antitrust injury, it still would have to allege an actual harm to

competition in an overall market -- the "type" of harm that implicates a public interest and not

just harm to itself. See Volmar Distribs. Inc., 825 F. Supp. at 1160; Fed. Paper Bd., 693 F. Supp.

at 1382-84; see generally Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 487-89

---

[5] See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 225 (1993) ("[T]he federal antitrust laws . . . do not create a federal law of unfair competition or 'purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.'") (citation omitted); Hawaii v. Standard Oil Co. of Cal., 405 U.S. 251, 262 n.14 (1972) (Congress did not intend the antitrust laws to provide a remedy in damages for all injuries conceivably traced to antitrust violations); Hunt v. Crumboch, 325 U.S. 821, 826 (1945) (Sherman Act "does not purport to afford remedies for all torts committed by persons engaged in interstate commerce"); Apex Hosiery Co. v. Leader, 310 U.S. 469, 512 (1940) ("labor violence during a strike: the Sherman Act was not enacted to. . . afford a remedy for wrongs, which are actionable under state law, and result from combinations and conspiracies which fall short, both in their purpose and effect, of any form of market control of a commodity, such as to 'monopolize the supply, control its price, or discriminate between would-be purchasers."); Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537, 543 (2d Cir. 1993) (concluding that requirement of proof of actual adverse effect on competition ensures that "routine disputes between business competitors" are not violative of the Sherman Act); Kiepler v. Beller, 944 F.2d 1213, 1221 (5th Cir. 1991) (The Sherman Act "does not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce." (quotation omitted); Hill v. A-T-O, Inc., 535 F.2d 1349, 1355-56 (2d Cir. 1976) (fraudulent misrepresentations allegedly intended to restrain competition not cognizable under the Sherman Act); Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1107-08 (7th Cir. 1984) (noting that "'[t]he legislators who passed the Sherman Act did not make ordinary business torts federal torts for which treble damages could be recovered'") (citation omitted); Larry R. George Sales Co. v. Cool Attic Corp., 587 F.2d 266, 272 (5th Cir. 1979) (plaintiff at most stated causes of action for extortion or tortious interference with contractual relations, not a claim under the Sherman Act).

18

(1977) (antitrust laws are intended to protect competition, not competitors). Thus, in order to sustain an antitrust claim, the Second Circuit requires that Plaintiff demonstrate:

> <u>an actual adverse effect on competition as a whole in the relevant market</u>; to prove it has been harmed as an individual competitor will not suffice. <u>Insisting on proof of harm to the whole market fulfills the broad purpose of the antitrust law that was enacted to ensure competition in general, not narrowly focused to protect individual competitors.</u> Were the law construed otherwise, routine disputes between business competitors would be elevated to the status of an antitrust action, thereby trivializing the Act because of its too ready availability.

<u>Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.</u>, 996 F.2d 537, 543 (2d Cir. 1993) (emphasis added) (citations omitted). In other words, a plaintiff must allege that the defendant's conduct had an actual adverse effect on competition in the relevant market it alleges, for example, in the form of higher market prices or a reduction in market-wide output or quality. <u>Virgin Atl. Airways Ltd. v. British Airways PLC</u>, 257 F.3d 256, 264 (2d Cir. 2001); <u>Tops Mkts., Inc. v. Quality Mkts., Inc.</u>, 142 F.3d 90, 96 (2d Cir. 1998); <u>Volmar Distribs., Inc.</u>, 825 F. Supp. at 1160; <u>James Cape & Sons Co. v. PCC Const. Co.</u>, No. 05-C- 269, 2005 WL 2176965, at *2-5 (E.D. Wis. Sept. 6, 2005) (bid rigging scheme resulted in lower prices for consumers and increased competition, thus, motion to dismiss Sherman Act claims granted). Conclusory allegations of such adverse market effects will not suffice. <u>Global Disc. Travel Servs., LLC v. TWA, Inc.</u>, 960 F. Supp. 701, 704 (S.D.N.Y. 1997) (courts need not credit "'conclusory allegations which merely recite the litany of antitrust'" (citation omitted)). Nor can this requirement be sidestepped by blithely assigning a "<u>per se</u>" label to the alleged conduct. <u>See</u> <u>Fed. Paper Bd.</u>, 693 F. Supp. at 1381-82.

      In its haste to construct a Sherman Act claim to replace its discredited RICO and RPA claims, WWE has overlooked (or is hoping this Court will overlook) this essential requirement. To be sure, WWE has alleged a massively broad "national market for the licensing

of intellectual property in characters for videogames." (AC ¶ 266.) However, it has not alleged, and cannot allege, that market-wide prices or output were affected in any way by Defendants' alleged misconduct. Standing alone, this glaring deficiency also requires dismissal of WWE's Sherman Act claim as a matter of law. See Volmar Distribs., Inc., 825 F. Supp. at 1156-60; Virgin Atl. Airways Ltd., 275 F.3d at 264.

### C.  WWE's Alleged Harm Flows From An Alleged Bribery Scheme, Not From Any Injury To Market-Wide Competition

Finally, with respect to the causal dimension of antitrust injury, WWE's Amended Complaint tacitly concedes that its injury flows directly and proximately from the alleged bribes, and more particularly, from the alleged coverup of those bribes and related disloyalty of Shenker and Bell, rather than from any market-wide harm. (See AC ¶¶ 163-64, 182-83, 269-70.) Indeed, WWE does not even attempt to suggest that it has suffered an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick Corp., 429 U.S. at 489 (emphasis added).

As Judge Blumenfeld explained in Federal Paper Board, "[w]hen the only source of [a plaintiff's] injury is a disloyal employee, a plaintiff cannot complain of an antitrust injury in order to elevate claims based on an employee's breach of fiduciary duty into Sherman Act claims." Fed. Paper Bd., 693 F. Supp. at 1384. The court concluded that even if the alleged bribery scheme deprived Federal of the benefits of competition among suppliers, nothing in the complaint alleged that Federal could not have obtained the benefits of competition on its own had it tried to do so. Id. at 1384. Thus, Federal's harm, like WWE's alleged injury here, flowed from the scheme (and the concealment of that scheme) -- not from any reduction in market competition as required to state a claim under the antitrust laws. See id.

On this critical aspect of antitrust injury, the fatal concessions in WWE's

20

Amended Complaint are nothing short of startling. WWE alleges in great detail that competition in this broad licensing market was "intense" (AC ¶¶ 52, 103), that other bidders were free to deal with WWE (id. ¶¶ 109, 114), but that WWE could not enjoy the benefits of that competition "principally" (id. ¶¶ 114-15) because of the alleged breach of fiduciary duty of its agent in not seeking better bids, accepting bribes and concealing the scheme from WWE. (Id. ¶¶ 104, 108, 116, 134, 164, 182-83, 267, 270.) On its face, the Amended Complaint alleges there was no competition-reducing restraint in the marketplace, let alone an injury that flowed from such a reduction in competition. Instead, WWE's injury, like that from any bribe coupled with disloyal employees or agents, flows <u>directly</u> from those alleged state law violations, which is why this antitrust claim does not belong in federal court. See Fed. Paper Bd., 693 F. Supp. at 1384-85.

## II. IN ANY EVENT, WWE HAS NOT ADEQUATELY PLED A SUBSTANTIVE ANTITRUST VIOLATION UNDER SECTION 1

WWE's substantive section 1 claim fails as a matter of law. Not only does WWE improperly attempt to convert an openly-disclosed joint bid into a "<u>per se</u>" violation -- directly contrary to Supreme Court guidance on the subject -- it also ignores a fundamental requirement of the Sherman Act "rule of reason" analysis: the showing that defendants possess "market power" in the alleged relevant market. Here, Defendants' alleged misconduct in no way resembles "<u>per se</u>" activity, and WWE has not even attempted to claim that Defendants possessed market power in a national licensing market for videogame characters as required under the applicable "rule of reason" analysis. (<u>See</u> AC ¶ 266.)

Section 1 of the Sherman Act prohibits contracts or combinations in restraint of trade. 15 U.S.C. § 1. Although section 1 facially would prohibit every commercial contract or arrangement that restrains trade in any way, the Supreme Court has long held that section 1 only governs restraints of trade that are <u>unreasonable</u>. Cont'l T.V. Inc. v. GTE Sylvania Inc., 433 U.S.

36, 49 (1977). To determine whether an agreement or combination unreasonably restrains trade, courts apply one of two methods of analysis. The first is the per se rule, reserved only for certain categories of conduct that have been conclusively presumed to unreasonably restrain competition. For all other alleged restraints, courts are required to apply the "rule of reason," in which the court determines whether a complaint sufficiently alleges that a restraint's anticompetitive effects outweigh its pro-competitive effects on competition. Fed. Paper Bd., 693 F. Supp. at 1381 (citing Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co., 812 F.2d 786, 793 (2d Cir. 1987)). WWE has failed to properly allege that trade has been restrained under either the per se rule or an application of the rule of reason.

### 1. WWE's Per Se Theory Is Directly Contrary to Law

As is often the case where an antitrust plaintiff knows its case would be rejected under a rule of reason analysis, WWE invokes the per se nomenclature of "bid rigging," "price fixing," and "market allocation" throughout its Amended Complaint, as if these labels automatically transformed its factual averments into per se violations. Courts, however, have continually admonished plaintiffs that merely attaching a per se label to a defendant's conduct "does not automatically invoke the per se doctrine." Bunker Ramo Corp., 713 F.2d at 1284 (finding that a defendant's conduct "must be analyzed to determine whether it should receive per se treatment"). Thus, alleged conduct will not be deemed a per se violation of the Sherman Act "until the courts have had considerable experience with that type of conduct and application of the rule of reason has inevitably resulted in a finding of anticompetitive effects." Id. at 1284 (citing United States v. Topco Assocs., Inc., 405 U.S. 596, 607-08 (1972)).

In addition, the Supreme Court has instructed that a finding of per se illegality is "appropriate only for 'conduct that is manifestly anticompetitive,' that is, conduct 'that would

always or almost always tend to restrict competition and decrease output.'" Bus. Elecs. Corp.,
485 U.S. at 723 (citations and quotations omitted); see also FTC v. Indiana Fed'n of Dentists, 476
U.S. 447, 458-59 (1986) ("[W]e have been slow . . . . to extend per se analysis to restraints
imposed in the context of business relationships where the economic impact of certain practices
is not immediately obvious." (citation omitted)).

       Here, WWE purports to force the joint proposal it received from THQ/JAKKS,
and for which it executed the videogame license, into a per se category through the simple
expedient of pejoratively labeling it as "bid-rigging" or a "market allocation." (See AC ¶¶ 143,
148, 158, 172, 267, 270, 272.) Courts do not, however, blindly accept a plaintiff's conclusory
nomenclature, but rather look at the substance of the agreement to assess its competitive effects.
Contrary to WWE's position, it has long been established that "[b]id-rigging should not be
confused with joint bidding, which allows bidders to pool their resources to place bids on
property which they would otherwise be unable to afford." Love v. Basque Cartel, 873 F. Supp.
563, 577 (D. Wyo. 1995), aff'd sub nom. Dry Creek Cattle Co. v. Basque Cartel, 95 F.3d 1161
(10th Cir. 1996).

       Indeed, preventing parties from joining together to make bids would have the
perverse effect of limiting the number of participants that are interested or able to participate in
the bidding process: "'Instead of encouraging competition, it would destroy it.'" Id. (quoting
Kearney v. Taylor, 56 U.S. (15 How.) 494, 520 (1854)); accord In re Beck Indus., Inc., 605 F.2d
624, 635-36 (2d Cir. 1979) ("[B]idding is not improperly chilled by 'the mere fact of an associa-
tion of persons formed for the purpose of bidding' at a sale since this may be 'not only unobjec-
tionable but oftentimes meritorious, if not necessary' to enable the persons associating themselves
to participate in the bidding, rather than to shut out competition.") (citation omitted). As the

Love court explained, applying the per se rule to joint bids would be tantamount to a finding that all joint bids should be outlawed because "it could always be said that joint bidding agreements removed potential bidders from the bidder pool and thus suppressed competition." Love, 873 F. Supp. at 578; see id. at 578-79 (granting motion for summary judgment dismissing Sherman Act claims alleging that buyers formed a cartel to purchase parcels of land at an auction).

On the face of WWE's Amended Complaint, the per se "bid-rigging" label is specious. WWE admittedly was aware that THQ and JAKKS had joined together to form the LLC to bid on the videogame WWE license, and would no longer be bidding separately. (See AC ¶¶ 146, 149, 152, 157-59.) Indeed, in crafting its allegations, WWE took great pains to highlight the weak financial state of THQ leading up to the joint proposal, (see id. ¶¶ 118-26), even though the license required a $3,000,000 "advance royalty", a minimum guarantee of $25,500,000 through the renewal period and more than 200,000 warrants. (Lerner Decl. Ex. B, §§ 4(a), 4(c), 6.) As a matter of law, this removes the THQ/JAKKS videogame license with WWE from any possible per se scrutiny. See Love, 873 F. Supp. at 578 ("[I]t is undisputed that the sellers purposely structured the auction to encourage combination bidding, and actively encouraged joint bidding as the auction progressed. This leads the Court to the inescapable conclusion that although joint bidding removed potential individual bidders from the sale, the sellers considered such bidding to be an important, if not essential, factor in their success in achieving their minimum posted bids."). Accordingly, this Court must, as a matter of law, reject WWE's baseless -- and internally inconsistent -- contention that the conduct it alleges constitutes a per se violation.

### 2.    WWE Has Intentionally Tried to Evade the Rule of Reason Standard, Which It Could Never Meet

WWE's Amended Complaint is equally, if not more, deficient under the rule of reason standard. Not surprisingly, WWE's Amended Complaint does not appear to even attempt to meet the Second Circuit's market power threshold for pleading a section 1 claim -- because it plainly cannot.

To satisfy the rule of reason, a plaintiff must allege that "the challenged action has had an actual adverse effect on competition as a whole in the relevant market; to prove that it has been harmed as an individual competitor will not suffice." Capital Imaging Assocs., P.C., 996 F.2d at 543. In the Second Circuit, this pleading requirement may be met in one of two ways: (1) by alleging facts that may directly demonstrate actual detrimental effects on competition (such as a reduction in market-wide output); or (2) by alleging facts that may indirectly establish that the defendants possess market power (such as a high market share coupled with high entry barriers). Id. at 546. Absent such allegations, a section 1 claim must be dismissed as a matter of law. See K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co., 61 F.3d 123, 128 (2d Cir. 1995) (holding that plaintiff failed to prove direct anticompetitive effects "on the whole Tri-state interbrand exhaust-product market"); see also Asa Accugrade Inc. v. Am. Numismatic Ass'n, 370 F. Supp. 2d 213, 216 (D.D.C. 2005) (granting motion to dismiss Sherman Act claim because the "complaint does not contain any facts to establish that the . . . market as a whole has suffered an anti-competitive injury. This omission alone is fatal to [the] Sherman Act claim[].").

Under this long-established rule of reason standard, WWE's section 1 claim must be dismissed as a matter of law. First, in what WWE has alleged to be the "national market for the licensing of intellectual property in characters for videogames" (AC ¶ 266) -- a market that includes all videogame licenses, of which WWE licenses are a tiny fraction -- WWE has not

25

alleged any facts demonstrating that defendants have market power, such as the ability to raise market-wide prices or reduce market-wide output.[6]  See Kasada, Inc. v. Access Capital, Inc., No. 01 Civ. 8893, 2004 WL 2903776, at *8 (S.D.N.Y. Dec. 14, 2004) (dismissing section 1 claim because plaintiffs failed to allege with specificity that defendants possessed market power in the relevant market); Capital Imaging Assocs., P.C., 996 F.2d at 546 (plaintiff failed to demonstrate detrimental effect on market by failing to adequately allege increase in price or deterioration of quality of service to health plan participants).  On the contrary, WWE concedes, as it must, that competition for videogame licenses in this broad competitive arena was "intense" during the time period in question (AC ¶¶ 52, 103), a concession that demolishes any claim subject to the rule of reason.  See Kasada, 2004 WL 2903776, at *8.

Second, WWE does not -- and cannot -- allege any facts that would even indirectly demonstrate that defendants possess market power in the national market for the licensing of intellectual property in characters for videogames.  For example, WWE does not even attempt to allege that JAKKS and THQ have a large market share -- or any other relevant indicia of market power -- in any relevant market.  See Kasada, 2004 WL 2903776, at *8 (dismissing section 1 claim under the rule of reason because plaintiffs did not allege with any specificity that defendants possess market power in the relevant market); Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design, 73 F. Supp. 2d 829, 837 (W.D. Mich. 1999) ("Market power 'must be alleged in more than vague and conclusory terms to prevent dismissal of the complaint on a defendant's Rule 12(b)(6) motion.'" (citation omitted)), aff'd, 244 F.3d 521 (6th Cir. 2001).

---

[6]  Indeed, there is no possibility that WWE could ever allege or prove that the Defendants possess any amount of market power in the national market for the licensing of intellectual property in characters for videogames, a market which must include, at the very least, the licensing of the likenesses of every conceivable sports personality, every film and television character, and every other personality or character in the entertainment business.

26

Accordingly, WWE's section 1 claim must be dismissed on this independent ground as well.

## III.  WWE'S ATTEMPT TO FALL BACK ON ALLEGATIONS OF BID-RIGGING AND MARKET ALLOCATION COLLIDES WITH THE STATUTE OF LIMITATIONS

Even if WWE were to get past the insurmountable deficiencies in its alleged

antitrust injury, which it cannot, WWE's Amended Complaint -- filed over seven years after its

claimed injury accrued -- still would have to be dismissed based on the statute of limitations.

Under the federal antitrust laws, damages are only recoverable if the suit is

commenced within four years after the claim has accrued. 15 U.S.C. § 15(b); Zenith Radio Corp.

v. Hazeltine Research, Inc., 401 U.S. 321, 338 (1971). "Generally, a cause of action accrues and

the statute begins to run when a defendant commits an act that injures a plaintiff's business."

Zenith Radio Corp., 401 U.S. at 338 (emphasis added); see also In re Buspirone Patent Litig.,

185 F. Supp. 2d 363, 378-79 (S.D.N.Y. 2002) (holding that Sherman Act claim arising out of

allegedly fraudulent settlement agreement was barred by statute of limitations); accord Wolf v.

Wagner Spray Tech Corp., 715 F. Supp. 504, 508-9 (S.D.N.Y. 1989). Here, WWE alleges that

an open and obvious joint bid between JAKKS and THQ (the "LLC"), which acquired the

videogame license effective as of June 10, 1998 (see AC ¶ 157), constituted per se illegal

bid-rigging and market allocation between THQ and JAKKS, which in turn caused WWE injury.

(Id. ¶¶ 158, 267.) These are precisely the type of stale allegations that must be dismissed under

the Sherman Act's four-year statute of limitations.

City of El Paso v. Darbyshire Steel Co., 575 F.2d 521 (5th Cir. 1978), is directly

applicable to this case. In that case, the City of El Paso (the "City") employed a general

contractor and architects to construct and design a new civic center complex. Id. at 522. The

defendants, all steel fabricators, submitted a joint bid in 1970 to the general contractor, and the

architectural firm employed by the City for the project learned that the defendants had worked

out and agreed on a joint bid. Id. In addition, City inspectors had inspected steel for the project

supplied by all three defendants. Id. However, the City waited until 1975 to file suit, alleging

that the defendants conspired to submit a collusive bid -- in violation of section 1 of the Sherman

Act -- to provide the structural steel required for the complex. Id. at 523. The district court

dismissed the case on statute of limitations grounds. On appeal, the City argued that the statute

was tolled by the fraudulent concealment of the defendant's conspiracy. Id. Upholding the

district court's dismissal, the Court of Appeals for the Fifth Circuit held that the statute was not

tolled by fraudulent concealment of the alleged conspiracy to submit a collusive bid. Id. at 524.

The court found that the architect and/or the City itself were notified that steel bidders were

working in concert to provide the general contractor with the steel for the complex, and "no

evidence whatsoever exist[ed] . . . that any of the defendants fraudulently concealed the joint

nature of the bid." Id. (emphasis added).

        While City of El Paso was decided in the context of summary judgment, WWE

affirmatively alleges -- and thereby admits and is bound by -- the very facts that were dispositive

in that case. WWE's own Amended Complaint confirms that WWE knew of the operative facts

of its antitrust claim -- i.e., the alleged collusive "joint venture" and joint bid of JAKKS and THQ

-- at least by the time WWE accepted the THQ/JAKKS licensing bid. (AC ¶¶ 146, 157-58.)

Indeed, the fact that WWE was accepting a joint bid from the THQ/JAKKS LLC, as the

Amended Complaint highlights, was openly and notoriously reflected in the very name of the

entity obtaining the license -- THQ/JAKKS Pacific LLC. (Id. ¶¶ 154, 157.) Further, the license

itself is co-signed on behalf of the LLC by Jack Friedman and Brian Farrell, the CEOs respec-

tively of JAKKS and THQ. (Lerner Decl. Ex. B.) And WWE specifically sought to capitalize on

28

the fact that it was a joint bid by JAKKS and THQ by seeking and obtaining as part of the consideration for the license grants of <u>options and warrants from both JAKKS and THQ</u>. (See <u>id.</u> at § 6.) Significantly, the option grant provision also irrefutably shows WWE's acknowledgment of Shenker's role in the transaction by specifically reciting that both JAKKS and THQ shall also grant options and warrants of their respective companies to <u>SSAI</u>. <u>Id.</u>

These admissions are fatal to WWE's antitrust claim, and preclude, as a matter of law, any contention that the statute of limitations was tolled by any fraudulent concealment of the alleged bid-rigging and market allocation. <u>See</u> <u>City of El Paso</u>, 575 F.2d at 524 ("[I]t appears to have been common knowledge among the parties to the construction project that the defendants were working together."); <u>In re Ciprofloxacin Hydrochloride Antitrust Litig.</u>, 261 F. Supp. 2d 188, 224-25 (E.D.N.Y. 2003) (finding that statute of limitations had not been tolled by defendants' alleged fraudulent concealment of pricing fixing agreement because the agreement was publicly disclosed and should have alerted plaintiffs to potential antitrust violation).[7]

On its face, the Amended Complaint alleges that WWE was "injured" at least as early as June 1998, more than six years before trying to manufacture a Sherman Act claim out of these same facts. As a matter of law, WWE's antitrust claim must also be dismissed as fatally time-barred.

\*    \*    \*    \*

---

[7] WWE's allegation that the underlying <u>bribery scheme</u> leading up to the "bid-rigging" was concealed by the defendants is irrelevant. On the face of its Amended Complaint, WWE's alleged antitrust injury is based on the resulting joint bid and market allocation -- which was well known to WWE at the time. (AC ¶ 267.) Moreover, the Amended Complaint emphasizes that, in March of 1998, at least one prospective licensee, Acclaim, went over the head of the licensing agent and complained to senior management at WWE that it was not being permitted to submit a proposal. (<u>Id.</u> ¶ 109.) Finally, WWE's emphasis on the alleged bribery scheme merely highlights the fact that the alleged harm suffered by WWE stems not from any reduction in competition, but exclusively from the alleged conduct of its licensing agent in allegedly secretly accepting bribes, which simply does not constitute antitrust injury. <u>See</u> Section I.C., <u>supra</u>.

In sum, while WWE pays sporadic lip service to the terminology of antitrust law in its belated Sherman Act claim, it has not come close to meeting the established standards for pleading a section 1 violation. As specifically demonstrated in <u>Federal Paper Board</u>, and as reflected in the Second Circuit's well-established rule of reason jurisprudence, the run-of-the-mill allegations of bribery and disloyalty here have nothing to do with protecting competitive markets or redressing antitrust injuries through a treble damages action. This case always has been, and remains, a business dispute among non-diverse parties governed by state law that simply has no place in this Court.

## CONCLUSION

For all the foregoing reasons, the JAKKS Defendants' motion to dismiss the Sherman Act claim in the Amended Complaint should be granted in all respects with prejudice.

Respectfully submitted,

FEDER, KASZOVITZ, ISAACSON,
  WEBER, SKALA, BASS & RHINE LLP
Murray L. Skala (MS 9354)
Jonathan D. Honig (JH 7577)
750 Lexington Avenue
New York, New York 10022
Phone: (212) 888-8200
Fax: (212) 888-5968

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

By: _____

Jonathan J. Lerner (JL 7117)
Michael H. Gruenglas (MG 8705)
James Keyte (JK 0680)
Maura B. Grinalds (MG 2836)
Four Times Square
New York, New York 10036
Phone: (212) 735-3000
Fax: (212) 735-2000

Attorneys for the JAKKS Defendants

September 19, 2005

30

## CERTIFICATE OF SERVICE

The undersigned, an attorney duly admitted to practice law before this

Court, hereby certifies under penalty of perjury, that on September 20, 2005, I caused

a true copy of the foregoing (corrected) ***JAKKS Defendants' Memorandum of Law***

***in Support of Their Motion to Dismiss the Sherman Act Claim in the Amended***

***Complaint*** to be served upon the following parties by first-class mail:

Michael A. Cornman
Schweitzer Cornman Gross & Bondell, LLP
292 Madison Avenue
New York, NY 10017

Richard Schaeffer
Dornbush Schaeffer Stongin & Weinstein, LLP
747 Third Avenue
New York, NY 10017


Dated:  New York, New York
       September 20, 2005

                   s/ Michael H. Gruenglas
                  Micahel H. Gruenglas (MG 8705)