UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X :
                                                              :
WORLD WRESTLING ENTERTAINMENT, INC.,                          :
                                                              :    04 CV 8223 (KMK)
                              Plaintiff,                      :
                                                              :
            - against -                                       :
                                                              :    October 4, 2005
JAKKS PACIFIC, INC.; JAKKS PACIFIC (H.K.)                     :
LIMITED; ROAD CHAMPS LIMITED; THQ, INC.;                      :
THQ/JAKKS PACIFIC LLC; STANLEY SHENKER                        :
AND ASSOCIATES, INC.; STANLEY SHENKER;                        :
BELL LICENSING, LLC; JAMES BELL; JACK                         :
FRIEDMAN; STEPHEN BERMAN; JOEL                                :
BENNETT; and BRIAN FARRELL,                                   :
                                                              :
                              Defendants.                     :
                                                              :
-------------------------------------------------------------X :


**WORLD WRESTLING ENTERTAINMENT, INC.'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
SHERMAN ACT CLAIM IN THE AMENDED COMPLAINT**

William O. Purcell (WP 5001)
KIRKPATRICK & LOCKHART NICHOLSON GRAHAM LLP
599 Lexington Avenue
New York, New York 10022-6030
(212) 536-3900 (phone)
(212) 536-3901 (fax)

Jerry S. McDevitt
Curtis B. Krasik
Amy L. Barrette
KIRKPATRICK & LOCKHART NICHOLSON GRAHAM LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, Pennsylvania 15222
(412) 355-6500 (phone)
(412) 355-6501 (fax)

Attorneys for Plaintiff, World Wrestling Entertainment, Inc.

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.................................................................................ii

PRELIMINARY STATEMENT...........................................................................1

STATEMENT OF FACTS...................................................................................2

I.   THE STANDARD FOR DISMISSAL OF ANTITRUST CLAIMS
     IS PARTICULARLY RIGOROUS..................................................................12

II.  WWE HAS PLED A PER SE VIOLATION OF SECTION 1 OF THE
     SHERMAN ACT...........................................................................................12

III. DEFENDANTS CANNOT AVOID PER SE LIABILITY BY CALLING
     THEIR CONDUCT JOINT BIDDING...........................................................15

IV.  WWE HAS ALLEGED ANTITRUST INJURY.............................................17

     1.   The Antitrust Injury Requirements Advanced by Defendants
          Do Not Exist In a Per Se Case.................................................................17

     2.   A Seller That Accepts a Rigged Bid Incurs Antitrust Injury.............................21

V.   THE SHERMAN ACT CLAIM IS NOT TIME-BARRED.....................................24

     1.   Statute of Limitations Is an Affirmative Defense................................................24

          A.   Fraudulent Concealment Tolls the Statute and Defendants Have
               Not Challenged the Adequacy of the Fraudulent Concealment
               Allegations......................................................................................25

          B.   The Sherman Act Claim Is Timely Under the Accrual Rule For
               Continuing Conspiracies...................................................................26

          C.   The Speculative Nature of WWE's Damages at the Time the Initial
               Violations Occurred Makes the Claim Timely Now.............................28

CONCLUSION...................................................................................................30

## TABLE OF AUTHORITIES

<u>CASES</u>                                                                     <u>PAGE(S)</u>

Advanced Magnetics, Inc. v. Bayfront Partners, Inc.,
    106 F.3d 11 (2d Cir. 1997)................................................................30

Andrea Theaters, Inc. v. Theatre Confections, Inc.,
    787 F.2d 59 (2d Cir. 1986)................................................................27

Ansul Co. v. Uniroyal, Inc.,
    448 F.2d 872 (2d Cir. 1971)..............................................................29

Arizona v. Maricopa County Med. Soc'y,
    457 U.S. 332 (1982)..................................................................1, 18

Atl. City Elec. Co. v. Gen. Elec. Co.,
    312 F.2d 236 (2d Cir. 1962)..............................................................25

Atl. Richfield Co. v. USA Petroleum Co.,
    495 U.S. 328 (1990).......................................................................22

Bankers Trust Co. v. Rhoades,
    859 F.2d 1096 (2d Cir. 1988)........................................................28, 29

Blanchard & Co. v. Barrick Gold Corp.,
    No. Civ.A. 02-3721, 2003 WL 22071173 (E.D. La. Sept. 3, 2003)................19

Blue Shield of Va. v. McCready,
    457 U.S. 465 (1982)................................................................18, 21, 22

Blue Tree Hotels, Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,
    369 F.3d 212 (2d Cir. 2004)...............................................................22

Bristol Tech., Inc. v. Microsoft Corp.,
    42 F. Supp. 2d 153 (D. Conn. 1998).....................................................19

Brunswick Corp. v. Pueblo Bowl-o-Mat, Inc.,
    429 U.S. 477 (1977).......................................................................22

Bunker Ramo Corp. v. United Bus. Forms, Inc.,
    713 F.2d 1272 (7th Cir. 1983).............................................................16

ii

Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.,
    996 F.2d 537 (2d Cir. 1993)..................................................................20

Cardinal Films, Inc. v. Republic Pictures Corp.,
    148 F. Supp. 156 (S.D.N.Y. 1957).........................................................27

Catalano, Inc. v. Target Sales, Inc.,
    446 U.S. 643 (1980).........................................................................1

Conley v. Gibson,
    355 U.S. 41 (1957)..........................................................................12

Doctor's Hosp. of Jefferson, Inc. v. S.E. Med. Alliance, Inc.,
    123 F.3d 301 (5th Cir. 1997).........................................................19, 20

El Paso v. Darbyshire Steel Co.,
    575 F.2d 521 (5th Cir. 1978)......................................................28, 29, 30

Fed. Paper Bd. Co. v. Amata,
    693 F. Supp. 1376 (D. Conn. 1988)..................................................14, 15

Freeman v. San Diego Ass'n of Realtors,
    322 F.3d 1133 (9th Cir. 2003)..............................................................1

FTC v. Super. Ct. Trial Lawyers Ass'n,
    493 U.S. 411 (1989)........................................................................2, 18

Global Discount Travel Servs. LLC v. Trans World Airlines, Inc.,
    960 F. Supp. 701 (S.D.N.Y. 1997).........................................................20

Hanover Shoe, Inc. v. United Shoe Mach. Corp.,
    392 U.S. 481 (1968)...................................................................26, 27, 28

Hosp. Bldg. Co. v. Trs. of Rex Hosp.,
    425 U.S. 738 (1976)........................................................................12

In re Linerboard Antitrust Litig.,
    CIV NO. 98-5055 & 99-1341, 2000 WL 1475559 (E.D. Pa. Oct. 4, 2000)...................27

In re Magnetic Audiotape Antitrust Litig.,
    No. 99 Civ. 1580(LMM), 2002 WL 975678 (S.D.N.Y. May 9, 2002).....................26

iii

In re Mercedes-Benz Antitrust Litig.,
    157 F. Supp. 2d 355 (D. N.J. 2001)...................................................................19

In re Nasdaq Market-Makers Antitrust Litig.,
    894 F. Supp. 703 (S.D.N.Y. 1995).....................................................................12

In re Nine West Shoes Antitrust Litig.,
    80 F. Supp. 2d 181 (S.D.N.Y. 2000)...................................................................26

James Cape & Sons Co. v. PPC Constr. Co.,
    No. 05-C-269, 2005 WL 2176965 (E.D. Wis. Sept. 6, 2005)........................................20

Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.,
    677 F.2d 1045 (5th Cir. 1982).........................................................................28

Klehr v. A.O. Smith Corp.,
    521 U.S. 179 (1997)..................................................................................27

Love v. Basque Cartel,
    873 F. Supp. 563 (D. Wyo. 1995).....................................................................16

McKenna v. Wright,
    386 F.3d 432 (2d Cir. 2004)..........................................................................24

Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.,
    468 U.S. 85 (1984)................................................................................17, 18

New York v. Hendrickson Bros.,
    840 F.2d 1065 (2d Cir. 1988).........................................................................26

Pace Elecs., Inc. v. Canon Computer Sys., Inc.,
    213 F.3d 118 (3d Cir. 2000)..........................................................................19

Pani v. Empire Blue Cross Blue Shield,
    152 F.3d 67 (2d Cir. 1998)...........................................................................24

Philip Morris Inc. v. Heinrich,
    No. 95 CIV. 0328 (LMM), 1996 WL 363156 (S.D.N.Y. June 28, 1996)..............12, 13, 14, 22

Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.,
    364 U.S. 656 (1961)..................................................................................18

iv

Ramsay v. Vogel,
   970 F.2d 471 (8th Cir. 1992)...............................................................................12, 13

Reiser v. Residential Funding Corp.,
   380 F.3d 1027 (7th Cir. 2004)...................................................................................25

Sanner v. Bd. of Trade of Chicago,
   62 F.3d 918 (7th Cir. 1995).......................................................................................23

Shaw v. United States,
   371 F. Supp. 2d 265 (E.D.N.Y. 2005)......................................................................23

SmithKline Beecham Corp. v. E. Applicators, Inc.,
   No. CIV.A. 99-CV-6552, 2002 WL 1197763 (E.D. Pa. May 24, 2002).....................22

Susser v. Carvel Corp.,
   206 F. Supp 636 (S.D.N.Y. 1962)............................................................................27

Tello v. Dean Witter Reynolds, Inc.,
   410 F.3d 1275 (11th Cir. 2005).................................................................................25

Timken Roller Bearing Co. v. United States,
   341 U.S. 593 (1951)..................................................................................................16

Tops Mkts., Inc. v. Quality Mkts., Inc.,
   142 F.3d 90 (2d Cir. 1998).......................................................................................20

United States v. Ben M. Hogan Co.,
   809 F.2d 480 (8th Cir. 1987)....................................................................................13

United States v. Bensinger Co.,
   430 F.2d 584 (8th Cir. 1970)....................................................................................14

United States v. Dynaelectric Co.,
   Nos. 88-5118, 88-5119, 1988 WL 117173 (6th Cir. Nov. 4, 1988)................13, 14, 22

United States v. Fischbach & Moore, Inc.,
   750 F.2d 1183 (3d Cir. 1984)...................................................................................14

United States v. Flom,
   558 F.2d 1179 (5th Cir. 1977)..................................................................................14

United States v. Gosselin World Wide Moving, N.V.,
    411 F.3d 502 (4th Cir. 2005)...............................................................14

United States v. Koppers Co.,
    652 F.2d 290 (2d Cir. 1981)...........................................................1, 2, 13

United States v. Mobile Materials, Inc.,
    881 F.2d 866 (10th Cir. 1989)............................................................12

United States v. Portsmouth Paving Corp.,
    694 F.2d 312 (4th Cir. 1982)..........................................................13, 23

United States v. Socony-Vacuum Oil Co.,
    310 U.S. 150 (1940)........................................................................18

United States v. W.F. Brinkley & Son Constr. Co.,
    783 F.2d 1157 (4th Cir. 1986)........................................................13, 22

Virgin Atl. Airways Ltd. v. British Airways PLC,
    257 F.3d 256 (2d Cir. 2001)...............................................................20

Volmar Distribs., Inc. v. New York Post Co.,
    825 F. Supp. 1153 (S.D.N.Y. 1993).................................................20, 21

Williams Elecs. Games, Inc. v. Garrity,
    366 F.3d 569 (7th Cir. 2004)..............................................................15

Zenith Radio Corp. v. Hazeltine Research, Inc.,
    401 U.S. 321 (1971)..............................................25, 26, 27, 28, 29, 30

## STATUTES

15 U.S.C. § 1...............................................................................13

Fed.R.Civ.P. 8.............................................................................24

Fed.R.Civ.P. 12(b)(6)...............................................................12, 27

Pursuant to this Court's Order dated August 18, 2005, World Wrestling Entertainment, Inc. ("WWE") respectfully submits this Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Sherman Act Claim set forth in Count III of the Amended Complaint.

### PRELIMINARY STATEMENT

The Sherman Act claim in this case is quite simple and, if Defendants did what is alleged, leaves no room for any defense under clear law. Simply put, WWE has pled that an agreement existed between Jakks and THQ whereby THQ would not independently bid on the WWE videogame license. That is bid-rigging, which is considered price-fixing, and liability flows simply from the existence of such an agreement. United States v. Koppers Co., 652 F.2d 290, 294 (2d Cir. 1981). ("[T]he Sherman Act will be read as simply saying: '[a]n agreement among competitors to rig bids is illegal.'") WWE has also pled that Jakks and THQ combined to fix the price at below-market rates for the WWE videogame license. Combinations between competitors "for the purpose and with the effect of . . . depressing, fixing, pegging, or stabilizing the price" are illegal. Arizona v. Maricopa County Med. Soc'y, 457 U.S. 332, 347 (1982). That is price fixing. As one federal jurist put it:

> No antitrust violation is more abominated than the agreement to fix prices. One manual captures the principle nicely in question and answer format:
> Q.    May competitors agree to fix prices?
> A.    Duh. What do you think.

Freeman v. San Diego Ass'n of Realtors, 322 F.3d 1133, 1144 n.10 (9th Cir. 2003). Bid-rigging and price-fixing between competitors are universally treated as a per se violations of the Sherman Act. Per se violations are "conclusively presumed illegal without further examination under the rule of reason." Catalano, Inc. v. Target Sales, Inc., 446 U.S. 643, 646 (1980).

Given the simplicity of the claim, it is predictable that Defendants open their argument with diversionary rhetoric instead of a demonstration that WWE has not pled a per se violation.

- 1 -

Defendants then gave an inaccurate factual rendition of the Amended Complaint which completely fails to address the specific factual allegations establishing their per se liability. Having no ability to mischaracterize the pertinent allegations, Defendants simply ignored them.

Having constructed a strawman factual scenario necessary for the ensuing legal argument, Defendants argue that the Court has the discretion not to treat bid-rigging and price-fixing as per se violations of the Sherman Act. Defendants suggest that this Court should accept their self-serving and unpled version of events instead of the specific bid-rigging and price-fixing allegations, and not treat this as a per se case, but instead analyze it under a lesser standard of liability—the rule of reason—and then summarily absolve the Defendants of antitrust liability. Yet, the Supreme Court has explicitly rejected the notion that the per se rules are discretionary. FTC v. Super. Ct. Trial Lawyers Ass'n, 493 U.S. 411, 432-33 (1989).

In the end analysis, Defendants did not even attempt to demonstrate what they must—that the Amended Complaint fails to allege facts which, if proven, demonstrate a per se violation of the Sherman Act. Try as they might to redefine the claims more to their liking and ability to defend, the law does not permit it. See Koppers, 652 F.2d at 294 (holding bid-rigging illegal per se and stating "[b]ehavior is illegal per se when the plaintiff need prove only that it occurred in order to win his case, there being no other elements to the offense and no allowable defense.").

## STATEMENT OF FACTS

Defendants' factual characterizations are simply of no moment to the motion. The relevant background and direct allegations of the Amended Complaint pertinent to the Sherman Act claim are as follows:

Defendant Jack Friedman ("Friedman") is the Chairman of the Board and Chief Executive Officer of Jakks Pacific, Inc. ("Jakks"). (AC ¶ 13.) Defendant Stephen Berman

- 2 -

("Berman") is the President, Secretary and Chief Operating Officer of Jakks and a member of the Board of Directors. (AC ¶ 15.) Both men co-founded Jakks in January 1995. (AC ¶ 13.)

Friedman founded Jakks after being forced out of the company he had previously founded—the predecessor to Defendant THQ, Inc. ("THQ"). (AC ¶ 14.) Berman had also been employed at THQ while Friedman ran THQ and was an officer and director of a THQ subsidiary. (AC ¶ 15.) Friedman was replaced as the head of THQ by Defendant Brian Farrell ("Farrell").

In roughly the same time that Friedman resigned from THQ and started Jakks, WWE hired James K. Bell ("Bell") as Director of Domestic Licensing, a position he held until being promoted in October 1996 to Senior Vice President of Licensing and Merchandising. (AC ¶ 29.) Bell was responsible for WWE's licensing program, including negotiating intellectual property licenses at the highest rate available in a competitive market. (AC ¶ 30.) One of Bell's earliest recommendations was that WWE retain Stanley Shenker & Associates, Inc. ("SSAI"), headed by Stanley Shenker ("Shenker"), to be WWE's outside licensing agent. (AC ¶ 31.) On Bell's recommendation, WWE retained SSAI in April of 1995. (AC ¶ 32.) Both Bell and SSAI executed agreements reflecting their roles as fiduciaries to WWE. (AC ¶ 33.)

Under the Agency Agreement between SSAI and WWE, SSAI was to receive a commission of 11% on any licensing deals he procured and negotiated. (Lerner Declaration, Ex. A, p. 3.) SSAI's Agency Agreement further provided that SSAI would not be entitled to any commissions on WWE's pre-existing licenses if such licenses were renewed. Id. WWE's then existing videogame license—Acclaim—was specifically listed as one such license. Id. at Ex. A. Thus, from the onset of its relationship with WWE, SSAI had a decided financial interest in seeing to it that the videogame license was not renewed with Acclaim since SSAI would obtain

- 3 -

the lucrative commissions on the videogame license only if SSAI procured and negotiated that license with another company. (AC ¶ 102.)

In the later part of 1995, Friedman approached Bell and Shenker to obtain a domestic toy license from WWE for Jakks, which was granted to Jakks on October 24, 1995. (AC ¶ 35.) Unknown to WWE, Jakks' officers immediately devised a plan to corrupt Shenker by retaining SSAI to serve as Jakks' agent—none of which was ever disclosed to WWE. (AC ¶¶ 37-40.)

As soon as Jakks secured SSAI's agreement to be its agent, it began to capitalize on the dual agency of SSAI. In early 1996, Friedman and Berman told their agent, SSAI, that Jakks wanted to secure the WWE videogame license when it came up for renewal. (AC ¶¶ 46-7.) Despite being advised by counsel that SSAI could not be an undisclosed agent of Jakks and at the same time be WWE's agent, neither Jakks nor SSAI ever sought WWE's consent or disclosed that SSAI was already Jakks' agent. (AC ¶¶ 49-51.) Instead, Jakks in 1996 used SSAI to obtain an international toy license with WWE on the terms it desired and also devised a plan to drive a competitor, Playmates, Inc. ("Playmates"), out of the business as a competing WWE licensee in the area of action figures. (AC ¶¶ 57-63, 67-71.)

Shenker eventually enlisted Bell into the conspiracy. Shenker told Bell there was money in it for Bell if he recommended favorable licensing treatment on Jakks matters, including their desire to eliminate Playmates as a competitor and to obtain the videogame license. (AC ¶¶ 80-1.) Shenker told Bell he would split monies which Jakks would pay for such favorable treatment and that he also would split his commissions with Bell under the Agency Agreement if Bell went along with the secret plan to steer the videogame license to Jakks. (AC ¶ 81.)

In order to conceal the payments of bribes to WWE's agents, Friedman, Berman, and Shenker agreed to use the cover of a phony invoice from a foreign corporation owned by

- 4 -

Shenker called Stanfull Industrial, Inc. ("Stanfull"). (AC ¶¶ 84-5.) Upon delivery of the phony invoice, it would then be, and was, paid through foreign subsidiaries of Jakks into a bank account of Stanfull in Hong Kong. (AC ¶¶ 84-5, 94-5, 111-12.) The phony invoice for $80,000 was delivered by Shenker to Jakks in California on January 2, 1998. (AC ¶ 85.) The invoice stated it was "For Development of Possible Latex Based Soft Toys with Special Coating." Id. If the description had been accurate, Shenker would have no reason to split the monies paid for such a non-WWE product with Bell, but he unquestionably did so. (AC ¶¶ 97, 113.) Moreover, on receipt of this phony invoice, Jakks officials did not record it anywhere on the books and records of Jakks and, in order to conceal the roles of Friedman and Berman in authorizing the bribes, did not, as usual, require the officer authorizing the payment to sign the invoice. (AC ¶¶ 87-9.)

Shortly after delivering the phony $80,000 invoice to Jakks, Shenker traveled to Hong Kong to meet with Berman and discuss Bell's agreement to participate in the illegal plan to provide favorable treatment to Jakks. (AC ¶¶ 90-1.) While in Hong Kong, both men telephoned Bell to confirm his willingness to do so. (AC ¶¶ 90-2.)

On January 12, 1998, Bell and Shenker recommended to WWE management that the licensing rights formerly held by Playmates be transferred to Jakks, thereby removing Playmates as a competitor. (AC ¶ 93.) On that exact same date, Defendant Joel Bennett ("Bennett"), Jakks' Chief Financial Officer, directed foreign agents of Jakks to deposit $40,000 into Stanfull's foreign bank account, using the $80,000 invoice as the basis for the payment. (AC ¶ 94.) Two days later, and while Shenker was still in Hong Kong, $40,000 was in fact deposited into Stanfull's foreign account by a Jakks foreign subsidiary, which falsified its books and did not record the payment to Stanfull. (AC ¶¶ 96, 98-9.) That same day, Shenker went to the Hang

Seng Bank where Jakks had deposited the money and obtained an instrument designed to conceal the true payor—a demand draft—and split the $40,000 in half with Bell. (AC ¶¶ 96-7.)

The next month, Berman, Shenker and Bell met at the New York Toy Fair. (AC ¶ 100.) By that time, both WWE agents had pocketed Jakks money. All three discussed the status of then ongoing renewal negotiations with Acclaim regarding the videogame license and the plan to secure those rights for Jakks. (AC ¶ 101.)

In early 1998, competition for desirable licenses was intense, with buyers having to pay increasingly higher royalties to secure such licenses. (AC ¶ 103.) In addition to companies like Acclaim and Jakks, companies such as THQ and Activision were competing for such licenses, and none was more lucrative than WWE's prospective license, which would result in hundreds of millions of dollars to the successful bidder. (AC ¶¶ 101, 109, 130-1.)

THQ had a particularly acute need for the WWE license in early 1998. (AC ¶ 125.) Until then, THQ held the licensing rights to make wrestling videogames from a competitor of WWE known as World Championship Wrestling ("WCW"). (AC ¶ 118.) In fiscal year 1997, 39% of THQ's sales were of WCW videogames. (AC ¶ 122.) In the first quarter of 1998, WCW videogames accounted for 87% of THQ's net sales. Id. Problematically, however, THQ learned in early March of 1998 that WCW would not renew the license at the end of 1998, thereby creating a desperate need to secure the rights to produce wrestling videogames to replace its primary source of income. (AC ¶¶ 122-25.) THQ decided to pursue the premier license in that area from WWE. (AC ¶ 126.) Under such circumstances, it is fair to infer that THQ would have been willing to pay WWE even more than the 19%-22% royalties it expected to pay licensors with proven popularity throughout 1998. (AC ¶¶ 160-61.)

Jakks wanted no competition for the videogame license, however, and utilized the services of the corrupted WWE agents to prevent it. To steer the rights to Jakks and avoid competitive bidding, it was agreed that Bell would recommend to WWE management that it not renew with Acclaim; that neither Bell nor Shenker would even solicit bids from other videogame companies; and that both would recommend that the license be given to Jakks on rates which were well below true market value. (AC ¶ 104.)

According to plan, Shenker and Bell, on March 30, 1998, recommended to WWE management that the videogame license be given to Jakks. (AC ¶ 110.) Neither Bell nor Shenker ever attempted to secure bids from other companies. Id. Exactly one day later, Jakks' CFO, Bennett, directed an overseas agent of Jakks that it was "imperative" that a second payment of $40,000 be made to Shenker's Hong Kong bank account, again using the phony $80,000 invoice as the pretextual cover for the payment. (AC ¶ 111.) Once again, Shenker showed up at the Hang Seng Bank days later. (AC ¶ 113.) Once again, he obtained a demand draft designed to conceal the true payor. Id. And once again, acting as a courier from Jakks, he split the Jakks bribe in half by a demand draft payable to Bell Consulting, LLC, a vehicle Bell had established that month to receive the bribes. (AC ¶ 106, 113.)

Thus, no question exists that Jakks monies can be traced directly into the pockets of both WWE agents twice during the exact period Jakks was seeking their recommendation to award the videogame license to Jakks. None of the numerous high ranking officers of Jakks who authorized the payments bothered to tell upper management of WWE that monies had been paid to Shenker through foreign bank accounts during the period he was to be negotiating with them regarding the videogame license on behalf of WWE. (AC ¶ 114.) Shenker did not bother to tell WWE he had taken such payments, or that he had twice split that money with Bell via

untraceable instruments. Id. Bell did not bother to tell WWE that he had twice been given demand drafts from a foreign bank by Shenker at precisely the time Shenker was making recommendations desired by Jakks. Id.

Despite their efforts to lock up the license without having to compete fairly for it, key events occurred shortly after the recommendation to award the license to Jakks. Those events set the stage for the ensuing bid-rigging and price-fixing now at issue. Specifically, two companies who had not been asked to bid independently surfaced to bid on the license. Those two companies were Activision and THQ. (AC ¶¶ 129-30.) On April 16 and 17, 1998, first THQ and then Activision told Shenker and/or Bell of their companies' desire to bid on the license. Id. In both meetings, and in order to prevent either company from entering bids which would threaten the illegal conspiracy, WWE's corrupt agents dissuaded them from bidding. Id.

THQ and Activision, however, were both persistent and documented their continued interest in independently bidding on the license. (AC ¶¶ 131-2.) THQ's and Activision's interest in independently obtaining the videogame license is documented in letters dated April 23, 1998, and April 27, 1998, respectively. Id. The initial indications from both companies were that each would offer clearly superior terms to the bid of Jakks already recommended to management. Id. Defendants' portrayal of events at this critical juncture in their brief is decidedly not what the Amended Complaint alleges. In just two sentences describing this critical juncture where the antitrust violations occurred, Defendants state:

> As a result of these allegedly superior proposals, WWE's selection of Jakks was revoked and the process for selecting the videogame license continued for two more months. Subsequently, THQ decided to partner with Jakks and create a Joint Venture—the LLC—to make a proposal for the videogame license. (Jakks Mem. 8.)

- 8 -

The Amended Complaint makes no such allegations regarding the events which occurred upon receipt of the THQ and Activision initial written solicitations. The allegations WWE <u>did</u> make are the ones Defendants never addressed in their two-sentence characterization of this critical juncture. Specifically, and in relevant part, the Amended Complaint alleged:

134.    In order to conceal the illicit plan and see it to fruition, SSAI and Bell did not provide WWE management with copies of the April 23, 1998 letter from THQ or the April 27, 1998 Activision informal proposal.

135.    On information and belief, Shenker and/or Bell instead advised Jakks, through Friedman and/or Berman, of the terms of the two competing proposals, specifically Activision's initial informal proposal and the terms set forth in THQ's April 23, 1998 letter.

137.    In direct response to the threat of competition . . . Jakks, through Friedman and its other officers, <u>secured the agreement of THQ, through Farrell and other high ranking executives, not to make an independent bid to secure the videogame license in its own right, as THQ had indicated it wanted to do and had every business reason to do so.</u> Instead, Friedman told Farrell that Jakks was in control of the videogame license; had access to the terms Activision had informally proposed; and that THQ could participate in the revenue stream from the videogame license at a lower-than-market royalty rate if THQ did not independently bid but instead joined with Jakks to make a proposal which would appear competitive to Activision's initial informal proposal. (emphasis added)

139.    At the time, THQ had never before joined with Jakks to bid on a videogame license, and THQ did not need Jakks to formulate or make a proposal for a videogame license. THQ was completely able in its own right to perform a videogame license with WWE without any involvement by Jakks and had every legitimate business reason to do so given the circumstances existing at the time and had already told WWE it desired to do so.

141.    Despite Farrell's and THQ's knowledge of . . . the impropriety associated with agreeing not to independently bid, Farrell, on behalf of THQ, never called WWE senior management or otherwise took action to alert WWE regarding the obvious irregularities in the bidding process known to him. Instead, <u>he agreed on behalf of THQ not to submit an independent bid but rather to accept the terms insisted upon by Jakks, including the royalty rates to be offered to WWE.</u> (emphasis added)

142.    After being contacted by Jakks and urged not to independently bid on the videogame license, neither THQ nor Farrell ever negotiated with WWE or its known authorized representatives regarding its previously stated desire to secure the videogame license for THQ independently. Instead, it

- 9 -

conducted all negotiations with its competitor, Jakks, regarding the WWE videogame license.

143.  Farrell and THQ . . . agreed to the illegal plan because they were desperate in light of the loss of the WCW license and because the terms offered by Jakks to THQ to rig the bids, allocate the license among the conspirators, and fix the price to be offered WWE for its intellectual property were well below the then prevailing rates THQ would otherwise have had to pay to secure a license of the quality of the WWE videogame license.

144.  Pursuant to its agreement with Jakks, THQ did not thereafter submit an independent proposal for the WWE videogame license.  (emphasis added)

145.  Utilizing the confidential information regarding Activision's initial informal proposal which Shenker and/or Bell had provided to Friedman and/or Berman, Jakks and THQ instead devised a proposal designed only to be comparable to Activision's initial informal proposal.  On behalf of Jakks and THQ, Friedman thereafter conveyed the terms of the collusive bid to Shenker, who simply wrote down the collusive terms in a proposed deal memo and made no attempt to negotiate better or more substantial terms.

146.  On or about May 7, 1998, Shenker prepared a deal memo reflecting the terms provided to him by Friedman as a result of the collusion between Jakks and THQ.

152.  On May 12, 1998, Bell initialed his approval on the May 7, 1998 deal memo and submitted the deal memo to management of WWE, thereby recommending that WWE grant the license to Jakks and THQ.

154.  On June 10, 1998, THQ and Jakks caused to be filed a Certificate of Formation in Delaware forming THQ/Jakks Pacific LLC.  On that same date, Farrell, as President and Chief Executive Officer of THQ/Jakks, signed the videogame license agreement with WWE on behalf of THQ/Jakks.

156.  At all times relevant hereto, Jakks, THQ, and the highest ranking officers of each company knew that the THQ/Jakks LLC formed to be the ostensible signatory for the videogame license was a sham necessary to implement the scheme.

157.  On June 23, 1998, WWE executed a videogame license agreement with THQ/Jakks effective as of June 10, 1998 . . . The term of the license was to end on December 31, 2009, subject to the right to renew for an additional five years in favor of THQ/Jakks.

160.  During the same period it had engaged in the illegal conduct with Jakks to obtain rights in the WWE videogame license, THQ anticipated that royalty rates paid to licensors would range between 19%-22% throughout 1998 in competitive situations untainted by collusion.

- 10 -

162.  Under the terms of the license agreement with WWE resulting from the illegal conduct set forth herein, however, WWE was only promised royalties between 7%-8% for games on Nintendo 64; Sony PSX and Sega Katana platforms; 6% on Nintendo Game Boy; and 10% on PC videogames.

163.  The royalty rates in fact promised to WWE were between 50%-66% lower than what THQ had paid, expected to pay during the relevant time period in 1998, and would have paid, in a truly competitive situation.

Nowhere in the entirety of Defendants' brief is there any discussion of these highly specific allegations. No attempt is made to demonstrate that these allegations, taken as true as they must be, do not state a claim for bid-rigging and price-fixing.

In the ensuing years, all concerned fraudulently concealed all aspects of the illegal activity, including the antitrust violations. The Amended Complaint sets forth the fraudulent concealment in fifty-seven fact specific paragraphs, which is but a smidgen of the proof WWE will adduce at trial on the subject. (AC ¶¶ 186-241, 272.) Any and all evidence necessary to piece together the circumstances surrounding the issuance of the videogame license was concealed by all concerned, even if it took perjury and destruction of evidence to do so. Id. The intent of the obstruction was to conceal the payment of bribes and the bid-rigging and price-fixing. Id. Indeed, Jakks and THQ actually have operating agreements which affirmatively preclude THQ from initiating any contact with WWE or disclosing the circumstances surrounding the bidding, a tool which Jakks is currently using to bludgeon THQ into continued omerta. (AC ¶¶ 177-8, 180) Significantly, although seeking to raise a limitations defense, Defendants do not challenge the sufficiency of the fraudulent concealment allegations.

On these facts, WWE has stated a claim for a per se violation of the Sherman Act. Indeed, Defendants never argue that the above allegations, taken as true, do not do so.