I.    **THE STANDARD FOR DISMISSAL OF ANTITRUST CLAIMS IS
      PARTICULARLY RIGOROUS**

"[T]he factual allegations of the complaint are presumed to be true and all factual

inferences must be drawn in the plaintiff's favor and against the defendants." In re Nasdaq

Market-Makers Antitrust Litig., 894 F. Supp. 703, 709 (S.D.N.Y. 1995). The Court must deny

the motion unless it appears beyond doubt that WWE can prove no set of facts in support of the

claim entitling it to relief. Conley v. Gibson, 355 U.S. 41, 45-6 (1957). The Supreme Court has

ruled that "in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,'

dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very

sparingly." Hosp. Bldg. Co. v. Trs. of Rex Hosp., 425 U.S. 738, 746 (1976). Thus, the standard

for dismissal of an antitrust claim on a Rule 12(b)(6) motion is "concededly rigorous." Hosp.

Bldg. Co., 425 U.S. at 746.

II.   **WWE HAS PLED A PER SE VIOLATION OF SECTION 1 OF THE SHERMAN
      ACT**

At every turn, Defendants' brief is based on a fundamental mischaracterization of

WWE's Sherman Act claim. That claim is not based upon the bribes paid by Jakks.[1] It is based

on the clear and specific allegations that Jakks and THQ agreed that THQ would not submit an

independent bid but would instead submit a collusive bid with Jakks at below market rates. The

Sherman Act violation results not from the bribes paid to WWE's agents, but from the illegal

agreement to rig the bids and fix the price. See Philip Morris Inc. v. Heinrich, No. 95 CIV. 0328

(LMM), 1996 WL 363156, at *9 (S.D.N.Y. June 28, 1996); Ramsay v. Vogel, 970 F.2d 471, 474

(8th Cir. 1992) (bid-rigging is where "prospective sellers or purchasers in a private transaction

agree upon the price they will offer"); United States v. Mobile Materials, Inc., 881 F.2d 866, 869

---

[1] The bribes are relevant to WWE's claim under the Robinson-Patman Act for reasons WWE has now
briefed.

(10th Cir. 1989) (bid-rigging is "[a]ny agreement between competitors pursuant to which contract offers are to be submitted or withheld from a third party"); United States v. Ben M. Hogan Co., 809 F.2d 480, 482 (8th Cir. 1987) (to establish bid-rigging the plaintiff must show only a conspiracy among one or more competitors "to manipulate the competitive bidding process"); United States v. Portsmouth Paving Corp., 694 F.2d 312, 325 (4th Cir. 1982) ("Any agreement between competitors pursuant to which contract offers are to be submitted to or withheld from a third party constitutes bid-rigging per se violative of 15 U.S.C. section 1.").

A competitor's agreement not to submit a bid constitutes bid-rigging, as is the submission of collusive bids. See Philip Morris, 1996 WL 363156, at *9; United States v. W.F. Brinkley & Son Constr. Co., 783 F.2d 1157, 1161 (4th Cir. 1986) ("[W]here two or more persons agree that . . . one will not submit a bid at all, then there has been an unreasonable restraint of trade which violates the Sherman Antitrust Act."); Portsmouth Paving, 694 F.2d at 325 ("Any agreement between competitors pursuant to which contract offers are submitted to or withheld from a third party constitutes bid-rigging per se . . . ."). Regardless of which competitor initiated the contact, and regardless of the reason, the essence of a bid-rigging claim is that the "agreement by its very nature restrained and suppressed competition," United States v. Dynaelectric Co., Nos. 88-5118, 88-5119, 1988 WL 117173, at *4 (6th Cir. Nov. 4, 1988), and thus the target of the scheme is "clearly deprived . . . of the benefits of a competitive bidding process." W.F. Brinkley, 783 F.2d at 1160.

It is equally well-established, and in fact there is no law to the contrary, that bid-rigging is a form of price-fixing that is a per se violation of Section 1 of the Sherman Antitrust Act. Ramsay, 970 F.2d at 474; Koppers, 652 F.2d at 293 (affirming jury charge that "[a]greements among competitors to rig bids or allocate customers are [] per se unreasonable restraints of trade

and illegal"); <u>see also</u> <u>United States v. Gosselin World Wide Moving, N.V.</u>, 411 F.3d 502, 508

(4th Cir. 2005) (a "'bid-rigging agreement is [a] price-fixing agreement of the simplest kind.'");

<u>Dynaelectric</u>, 1988 WL 117173, at *3 ("[T]he various courts of appeals which have considered

the question have concluded that bid-rigging is both an unreasonable restraint of trade and a per

se violation of section one of the Sherman Act."); <u>United States v. Fischbach & Moore, Inc.</u>, 750

F.2d 1183, 1192 (3d Cir. 1984) ("[P]rice-fixing and bid-rigging are per se violations."); <u>United</u>

<u>States v. Flom</u>, 558 F.2d 1179, 1183 (5th Cir. 1977) ("Conspiracies between firms to submit

collusive, non-competitive, rigged bids are per se violations of the statute."); <u>United States v.</u>

<u>Bensinger Co.</u>, 430 F.2d 584, 589 (8th Cir. 1970) (bid-rigging agreement is a "price-fixing

agreement of the simplest kind"); <u>Philip Morris</u>, 1996 WL 363156, at *9 ("Courts have

specifically classified bid-rigging as a form of price-fixing that constitutes a per se violation.").

Accordingly, WWE's allegations of bid-rigging and price-fixing in connection with the WWE

videogame license states a claim for per se violations under Section 1.

  With one exception, Defendants' brief cited precisely <u>none</u> of these authorities.  The sole

exception was <u>Philip Morris</u>, cursorily dismissed in a footnote because, according to Defendants,

unlike that case, "No . . . illegal bid rigging scheme is alleged in this case." (Jakks Mem. 16 n.4.)

In actuality, the court expressly rejected the same argument asserted by Defendants here—that

the complaint alleged nothing more than commercial bribery outside the scope of the Sherman

Act.  Distinguishing <u>Federal Paper Board Co. v. Amata</u>, 693 F. Supp. 1376 (D. Conn. 1988) and

other commercial bribery cases cited by Defendants, Judge McKenna ruled that Philip Morris,

like WWE here, had alleged more than commercial bribery and had alleged facts detailing a bid-

rigging scheme, which the Sherman Act prohibits.  <u>Philip Morris</u>, 1996 WL 363156, * 9.

Defendants' reliance on Federal Paper and other cases for the proposition that commercial bribery standing alone does not state a Sherman Act claim similarly are misplaced. Neither Federal Paper nor any of the other cases cited involved an agreement among competitors to manipulate the bidding process.[2] WWE's allegations are specifically predicated on such collusion between competitors. Defendants gain no antitrust immunity from the per se liability associated with bid-rigging and price-fixing because they also paid commercial bribes.

## III. DEFENDANTS CANNOT AVOID PER SE LIABILITY BY CALLING THEIR CONDUCT JOINT BIDDING

To avoid the per se illegality of their conduct, Defendants seek to have this Court pronounce that their collusion was a legitimate "joint bid" which actually furthered competition for the license and was made necessary by "the weak financial state of THQ leading up to the proposal." (Jakks Mem. 24.) That contention is plainly inconsistent with WWE's allegations, as well as the Court's role on a motion to dismiss.

Moreover, Defendants' argument ignores that the antitrust violations here occurred while both were horizontal competitors for the license and while both were independently pursuing it. Specifically, the per se violations alleged here occurred when Jakks' highest ranking officers called the highest ranking officers of its horizontal competitor, THQ, and convinced THQ not to independently bid but to join with Jakks to make a below-market bid. Those are the allegations which govern Defendants' attempts to gain dismissal, not some fanciful notion that this was joint bidding which furthered competition and benefited WWE. Likewise, nothing in the Amended Complaint alleges that Jakks and THQ had to pool their resources to bid on property they "would

---

[2] In fact, in Williams Elecs. Games, Inc. v. Garrity, 366 F.3d 569 (7th Cir. 2004), cited by Defendants (Jakks Mem. 14-15), the Seventh Circuit specifically distinguished the commercial bribery before it from circumstances involving "collusion between competitors," which would violate the Sherman Act's prohibition on price-fixing. Id. at 578.

otherwise be unable to afford"—a legal concept Defendants seek to invoke and try at the

pleading stage by suggesting that WWE's own allegations highlighted THQ's weakened

financial status. (Jakks Mem. 23-4.) WWE's Amended Complaint states nothing about THQ's

supposed financial inability to independently bid on the license. WWE did allege that THQ had

every reason to independently bid on WWE's videogame license because at that time it realized

it would lose its principal economic engine at the end of 1998—a license to make videogames

from WWE's competitor. (AC ¶¶ 122-6.) The actual allegations demonstrate that THQ was

more than able to independently bid on the license. (AC ¶¶ 129, 131, 139.) Specifically, after

the license was awarded to THQ/Jakks and before Jakks or THQ ever made any money on the

license, THQ assumed all financial obligations of the license, including responsibility to pay

WWE. (AC ¶¶ 177-8.) In addition, THQ agreed to pay Jakks a "preferred royalty" on the

revenues from the license, which has resulted in THQ paying Jakks sixty-four million dollars to

date. (AC ¶¶ 166, 179, 184.) Thus, THQ not only shouldered the entire financial burden of the

license, it had enough money to pay Jakks for its role in the conspiracy. Indeed, aside from this

license, THQ has never bid on a videogame license with Jakks.[3]

From a legal standpoint, Defendants' arguments are equally unavailing. These are not

the first defendants to try to camouflage per se violations under the mantra of "joint venture." In

Timken Roller Bearing Co. v. United States, 341 U.S. 593, 598 (1951), the defendants, among

---

[3] The cases cited by Defendants for the notion that this Court can refuse to apply per se rules and pronounce the acts of these Defendants proper as a "joint bid" are of no assistance to them, particularly at this juncture. Bunker Ramo Corp. v. United Bus. Forms, Inc., 713 F.2d 1272 (7th Cir. 1983) did not involve price-fixing by competitors or joint bidding. Love v. Basque Cartel, 873 F. Supp. 563 (D. Wyo. 1995) was decided on summary judgment and involved a disgruntled bidder using antitrust laws against a successful bidder in an attempt to set aside a sale to the highest bidder. Notably, the court gave an example of illegal bid rigging in that case as "[C]ompanies A and B agree not to submit bids at all, allowing Company C to set its own price." Id. at 577. The court then found no bid rigging because there were no illegal cooperative competitors in that case. There are in this case.

other things, fixed prices and tried to justify that conduct as "ancillary" to a joint venture. The

Supreme Court rejected the joint venture argument, stating:

> [W]e [do not] find any support in reason or authority for the proposition that
> agreements between legally separate persons and companies to suppress
> competition among themselves and others can be justified by labeling the project
> a 'joint venture.' Perhaps every agreement and combination to restrain trade
> could be so labeled.

Id. at 598.

Moreover, if the reasons for naked bid-rigging and price-fixing are relevant here—and

WWE submits the reasons are not relevant under the per se rule—the presence of those

hallmarks of anticompetitive behavior would, if anything, place upon Defendants a "heavy

burden" of establishing an affirmative defense which competitively justifies the deviation from

the operations of a free market. Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of

Okla., 468 U.S. 85, 113 (1984).[4]  As such, Defendants' joint bidding arguments are meritless and

cannot be resolved on a motion to dismiss in any event.

## IV.    WWE HAS ALLEGED ANTITRUST INJURY

### 1.    The Antitrust Injury Requirements Advanced by Defendants Do Not Exist In a Per Se Case

Defendants' antitrust injury argument is again built on factual and legal fallacies.

Defendants' argument that WWE has not "alleged the requisite antitrust injury from simple

bribery" completely misses the mark. The antitrust injury claimed by WWE on the Sherman Act

---

[4] It is WWE's position that the NCAA decision is of no relevance here for factual and legal reasons.
Factually, as noted, the antitrust violation here occurred prior to the formation of any arguable joint
venture. Legally, the Court in NCAA did not apply the per se rule because the NCAA's television plan
for college football needed horizontal restraints on competition if the product was to be available at all.
NCAA, 468 U.S. at 100-01. No similar situation exists here to depart from the straightforward
application of per se rules. Having found that some horizontal restraints were necessary in the unique
circumstances presented in NCAA, the Court applied the so-called quick look rule of reason analysis
which placed the burden on the NCAA to justify naked price restraints and rejected the NCAA's joint
venture arguments entirely. Id. at 113-4.

count is not dependent on the bribery component of this case. The Sherman Act injury flows from the bid-rigging and price-fixing independently. Jakks did not stop at bribery. Jakks also rigged the bids and fixed the price with its competitor, THQ, and the injury caused by their illegal agreement to do so is recoverable under the Sherman Act. Defendants also attempt to construct a legal fallacy that the antitrust injury requirement mandates allegations of "market restraints," "market-wide harm to competition" and in a related argument "market power." (Jakks Mem. 12, 18, 25.)

None of the alleged requirements are part of a per se case. The purpose of the antitrust injury requirement is not to reinsert into a per se case factors considered only in a rule of reason case. Defendants' suggestions to the contrary have been explicitly rejected in numerous controlling cases. See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 221 (1940) (all price-fixing conspiracies are banned without regard to whether the conspirator has power to control the market); Blue Shield of Va. v. McCready, 457 U.S. 465, 482 (1982) (rejecting argument that private antitrust litigant must prove an actual lessening of competition to recover); Radiant Burners, Inc. v. Peoples Gas Light & Coke Co., 364 U.S. 656, 659-60 (1961) (rejecting in even a rule of reason case any requirement to plead general injury to competitive process to survive motion to dismiss); NCAA v. Board of Regents, 468 U.S. at 109-10 (1984) (noting that proof of market power is never required when there is an agreement not to compete in terms of price); Super. Ct. Trial Lawyers, 493 U.S. at 432-33 (explicitly reversing court of appeals holding that it was permissive, and not required, to apply per se rule against price-fixing without proof of market power); Maricopa County, 457 U.S. at 346 (any combination which tampers with price structure is engaged in unlawful activity even if members of price-fixing group were in no position to control the market).

- 18 -

Indeed, Defendants' argument that a plaintiff alleging a per se violation of Section 1 of the Sherman Act must nevertheless allege and prove that the conspirators' conduct had an adverse impact upon the entire market has been squarely rejected by the courts as a back door attempt to impose an impermissible burden upon claimants under the per se rule.[5]

In Pace Elecs., Inc. v. Canon Computer Sys., Inc., 213 F.3d 118 (3d Cir. 2000), for instance, the Third Circuit held that the concept of antitrust injury did not require evidence of market-wide impact in a per se case, stating:

> Were we to accept the defendants' construction of the antitrust injury requirement, we would, in substance, be removing the presumption of anticompetitive effect implicit in the per se standard under the guise of the antitrust injury requirement.

Id. at 123.

The Third Circuit in Pace reasoned that requiring proof of market-wide impact in a per se case was inconsistent with the Supreme Court's jurisprudence on antitrust injury, since the Supreme Court does not focus on whether the challenged conduct had an actual adverse effect upon a relevant market, but rather on "whether the plaintiffs' injury stemmed from any of the potential anticompetitive dangers which led the Court to label [the per se practice at issue] unlawful in the first instance." Pace, 213 F.3d at 124. Thus, antitrust injury is shown by the type of harm threatened by the violation, not by impact on the market.

> Implicit in the Court's approach is that a plaintiff who had suffered loss as a result of an anticompetitive aspect of a per se restraint of trade agreement would have suffered antitrust injury, without demonstrating that the challenged practice had an actual, adverse economic effect on a relevant market.

Id. at 124.

---

[5] See, e.g., Pace, 213 F.3d at 124; Doctor's Hosp. of Jefferson, Inc. v. S.E. Med. Alliance, Inc., 123 F.3d 301, 305 (5th Cir. 1997); Blanchard & Co. v. Barrick Gold Corp., No. Civ.A. 02-3721, 2003 WL 22071173, at *4 (E.D. La. Sept. 3, 2003); In re Mercedes-Benz Antitrust Litig., 157 F. Supp. 2d 355, 364 (D.N.J. 2001); Bristol Tech., Inc. v. Microsoft Corp., 42 F. Supp. 2d 153, 165 (D. Conn. 1998).

The Fifth Circuit in Doctor's Hospital framed the concept of antitrust injury in much the

same fashion:

> [A]ntitrust injury for standing purposes should be viewed from the perspective of
> the plaintiff's position in the marketplace, not from the merits-related perspective
> of the impact of a defendant's conduct on overall competition.

123 F.3d at 305. The Fifth Circuit then ruled that the trial court "erred in holding that injury to

competition in the market was a prerequisite of [plaintiff's] antitrust injury." Id. at 306.

The cases relied upon by the Defendants to support their contention that WWE must

show market-wide diminution in competition or similar alleged requirements to allege antitrust

injury (Jakks Mem. 18-20) impose no such requirement in a case of per se unlawful conduct. In

three of the opinions[6] relied upon by Defendants, the discussions of market-wide impact on

competition was expressly limited to rule of reason cases. Indeed, Defendants' extensive

quotation from Capital Imaging regarding showing "an actual adverse effect on competition"

omits critical limiting language from the beginning of the first sentence of the quote:

> Under this [rule of reason] test plaintiff bears the initial burden of showing that
> the challenged action has had an actual adverse effect . . . .

976 F.2d at 543. Global Discount Travel Servs. LLC v. Trans World Airlines, Inc., 960 F. Supp.

701 (S.D.N.Y. 1997), also relied upon by Defendants, is similarly a rule of reason case. James

Cape & Sons v. PPC Constr. Co., No. 05-C-269, 2005 WL 2176965, at *1 (E.D. Wisc. Sept. 6,

2005), is likewise irrelevant because the plaintiff there was a competitor of the bid riggers and

not the customer or supplier paying to or receiving from the conspirator a rigged price. Nor is

Volmar Distribs., Inc. v. The New York Post Co., 825 F. Supp. 1153 (S.D.N.Y. 1993) of any

---

[6] Capital Imaging Assocs. v. Mohawk Valley Med. Assocs., 996 F.2d 537, 543 (2d Cir. 1993); Virgin
Atl. Airways v. British Airways PLC, 257 F.3d 256, 264 (2d Cir. 2001); Tops Mkts., Inc. v. Quality
Mkts., Inc., 142 F.3d 90, 96 (2d Cir. 1998).

assistance to the Defendants since in this case WWE has alleged, as the plaintiffs there did not, that it was directly injured "by acts that had a competition-reducing effect," namely the corrupt agreement of Jakks and THQ not to bid in competition with one another in order to fix the price for the license at a non-competitive price. Id. at 1159. Plaintiffs in Volmar were merely competitors of the alleged favored distributors, not, as here, a seller which received a reduced price from the conspirators as a result of rigging the bids for the sale. Id. at 1158.

The Defendants conspired not to have THQ and Jakks bid against one another in order that THQ and Jakks could secure the WWE license at a below-market price, allowing the conspirators to divide among themselves their ill-gotten gains. Depriving WWE of a fair price by avoiding competition was both the object and the result of the conspiracy. Under the correct standards discussed below, WWE has clearly alleged antitrust injury.

### 2.    A Seller That Accepts a Rigged Bid Incurs Antitrust Injury

In enacting the private antitrust remedy in Section 4 of the Clayton Act, "Congress sought to create a private enforcement mechanism that would deter violators and deprive them of the fruits of their illegal actions, and would provide ample compensation to the victims of antitrust violations." McCready, 457 U.S. at 472. To effectuate the "expansive remedial purpose," Section 4 protects "all who are made victims of the forbidden practices by whomever they may be perpetrated." Id. Thus, the Supreme Court has directed that "no requirements to burden the private litigant" are to be added "beyond what is specifically set forth by Congress . . . ." Id., n.9.

As previously demonstrated, Defendants' attempt to inject considerations relevant to rule of reason cases into the "antitrust injury" requirement are flatly inconsistent with longstanding law about the relative simplicity of a per se case. The antitrust injury requirement does not clash

with either the expansive remedial purpose of the Clayton Act giving victims of antitrust

violations a private right of action, nor is it intended to sub silentio overrule decades of unbroken

precedent that price-fixing agreements are per se illegal in all industries.

The "antitrust injury" concept compliments, not contradicts, these core principles of

antitrust law, especially when applied to per se violations such as bid-rigging and price-fixing

between horizontal competitors such as Jakks and THQ. Antitrust injury is nothing more than an

injury of the type the antitrust laws were intended to prevent and that flows from that which

makes the Defendants acts unlawful. In plain English, "[i]t should, in short, be 'the type of loss

that the claimed violations . . . would be likely to cause.'" Brunswick Corp. v. Pueblo Bowl-o-

Mat, Inc., 429 U.S. 477, 489 (1977). When the harm to the antitrust plaintiff is clearly

foreseeable and "the injury alleged is so integral an aspect of the conspiracy," there is no

question that the loss was precisely "'the type of loss that the claimed violations . . . would be

likely to cause.'" McCready, 457 U.S. at 479; see also Blue Tree Hotels, Inv. (Canada), Ltd. v.

Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 220 (2d Cir. 2004).

The victim of a bid-rigging conspiracy suffers an antitrust injury. SmithKline Beecham

Corp. v. E. Applicators, Inc., No. CIV.A. 99-CV-6552, 2002 WL 1197763, at *7 (E.D. Pa.

May 24, 2002). See also Philip Morris, 1996 WL 363156 at *9. The antitrust injury suffered by

the victim of a bid-rigging and price-fixing scheme corresponds exactly to the rationale for

finding a violation of the antitrust laws in the first place. Atl. Richfield Co. v. USA Petroleum

Co., 495 U.S. 328, 334 (1990). Bid-rigging is a per se violation because it deprives the other

party to the transaction of a fair price. Dynaelectric, 1988 WL 117173 at *4 (Bid-rigging

suppressed competition for the contract in question: "These competitive consequences are the

type to which the per se rule is addressed."); W.F. Brinkley, 783 F.2d at 1160 (Per se rule against

- 22 -

bid-rigging was intended to provide parties to the transaction "the benefits of a competitive

bidding process."); Portsmouth Paving, 694 F.2d at 317 (bid-rigging forces the entity soliciting

bids to pay more (or earn less) than it would if there had been free competition).

Here, Jakks and THQ, together with other defendants, conspired to rig the bids through a

corrupt agreement not to compete with one another and then fixed the price at below market rates

in a collusive bid.  That WWE would be injured by doing so is self-evident.  Inflicting that injury

was not merely integral to the conspiracy, but the principal point of it.  When competitors agree

not to bid against each other, and further agree to join together to make a lower bid than would

occur in competitive bidding, it is clearly "likely to cause" the seller to receive less.  Indeed, the

whole point of the conspiracy was to obtain the license at below market rates which in fact were

far less than the 19%-22% THQ was otherwise expecting to pay.  The price reduction resulting

from Defendants' concerted refusal to compete on the transaction is indisputably "attributable to

an anti-competitive aspect of the practice under scrutiny."

The circumstance that WWE is a seller, rather than a buyer, and that it therefore should

have received a higher, rather than a lower, price does not diminish its right to recover.  The

antitrust laws protect a seller's right to get as high a price as competitive bids would allow, just

as they protect a buyer's price to get as low a price as truly competitive bids will allow.  Shaw v.

United States, 371 F. Supp. 2d 265, 272 (E.D.N.Y. 2005).  As the court explained:

> If the co-conspirators had legitimately bid against each other during the "official
> auction," the sale price would presumably have been higher.  Thus, Shaw's
> activities artificially and unlawfully reduced the price that the relevant items sold
> at auction.  For that reason, certain activities including bid-rigging are so
> anticompetitive that they constitute "per se" violations of the antitrust laws.

Id. at 272.  Similarly, in Sanner v. Bd. of Trade of Chicago, 62 F.3d 918 (7th Cir. 1995), the

Seventh Circuit held that farmers who sold soybeans at reduced prices as a result of actions by

the Chicago Board of Trade had antitrust standing:

- 23 -

> [W]e believe that the farmers who sold soybeans at depressed prices have alleged
> an antitrust injury sufficient to withstand the [defendant's] motion to dismiss.

Id. at 927.

In conclusion, WWE's antitrust injury as the intended victim is manifestly obvious.

## V.    THE SHERMAN ACT CLAIM IS NOT TIME-BARRED

Defendants' last argument is that WWE's Sherman Act claim is time-barred. To make

the argument, Defendants once again mischaracterize the antitrust claim, stating "WWE alleges

that an open and obvious joint bid between Jakks and THQ (the "LLC"), which acquired the

video license effective as of June 10, 1998 (see AC ¶ 157) constituted per se illegal bid-rigging

and market allocation between THQ and Jakks, which in turn caused WWE injury (Id. ¶¶ 158,

267)." (Jakks Mem. 27.) That is hardly an accurate or complete description of the referenced

paragraphs or of the antitrust allegations as a whole. As noted, the Sherman Act claim alleges

that Jakks and THQ entered into an antecedent agreement that THQ would not independently bid

on the videogame license and would instead join with its competitor, Jakks, to make a collusive

below market bid and, having done so, formed a sham LLC to be the signatory to the ensuing

license, all the while fraudulently concealing the bid-rigging and price-fixing.

The claim actually pled is not barred by the statute of limitations for several reasons.

### 1.    Statute of Limitations Is an Affirmative Defense

The statute of limitations is an affirmative defense under Fed.R.Civ.P. 8. Affirmative

defenses can only be raised by a motion to dismiss if the defense appears on the face of the

complaint, Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 74 (2d Cir. 1998), and when

attempted, defendants must satisfy the more stringent standard applicable to a motion to dismiss.

McKenna v. Wright, 386 F.3d 432, 436 (2d Cir. 2004). Thus, a motion to dismiss on limitations

grounds can only be granted when the facts supporting the defense appear on the face of the

- 24 -

complaint <u>and</u> it is beyond doubt that plaintiff can prove no set of facts entitling him to relief,

including that plaintiff cannot prove any set of facts which toll the statute. <u>Tello v. Dean Witter</u>

<u>Reynolds, Inc.</u>, 410 F.3d 1275, 1288 n.13 (11th Cir. 2005). For that reason, it is rarely a good

reason to dismiss on limitations grounds under Rule 12(b)(6). <u>Reiser v. Residential Funding</u>

<u>Corp.</u>, 380 F.3d 1027, 1030 (7th Cir. 2004).

     In their brief, Defendants only partially stated one of three separate accrual rules

applicable to antitrust claims. The complete and correct version of the one accrual rule cited by

Defendants is that damages are recoverable if suit is commenced within four years after the

cause of action accrued, <u>plus any additional number of years during which the statute of</u>

<u>limitations was tolled.</u> <u>Zenith Radio Corp. v. Hazeltine Research, Inc.</u>, 401 U.S. 321, 338

(1971). WWE's bid-rigging and price-fixing claims are timely under that accrual rule, plus

under two other accrual rules cited in <u>Zenith</u> but not addressed by Defendants.

### A.    Fraudulent Concealment Tolls the Statute and Defendants Have Not Challenged the Adequacy of the Fraudulent Concealment Allegations

     It is well-established that fraudulent concealment tolls federal statutes of limitation. <u>Atl.</u>

<u>City Elec. v. Gen. Elec. Co.</u>, 312 F.2d 236, 239 (2d Cir. 1962). In clear and specific detail,

WWE pled the non-disclosure of the bid-rigging scheme and the ensuing coverup and fraudulent

concealment of it. (AC ¶¶ 172, 186-241.) Defendants make no attempt at demonstrating, as they

must, that neither those facts nor any others WWE could prove would toll the statute and on that

ground alone their limitation argument must be dismissed. The Amended Complaint alleges a

cover up of the conspiracy when it occurred, and the existence of highly unusual operating

agreements between Jakks and THQ designed to prevent THQ from even initiating contact with

WWE or disclosing any of the facts involved in the bidding process. (AC ¶ 241.) The Amended

Complaint also alleges specific actions taken in the ensuing years to maintain the secrecy of the

conspiracy extending right up to July of 2004, when Friedman falsely denied under oath that he had been given the terms of the Activision proposal.  Id.

Moreover, under controlling Second Circuit law, bid-rigging and price-fixing conspiracies are deemed to be inherently self-concealing.  See New York v. Hendrickson Bros., 840 F.2d 1065, 1083 (2d Cir. 1988) (a collusive bid is as inherently self-concealing as a fake vase sold as a real antique); In re Nine West Shoes Antitrust Litig., 80 F. Supp. 2d 181, 193 (S.D.N.Y. 2000) (plaintiff not required to show defendants took independent affirmative steps to conceal bid-rigging and price-fixing conspiracies since they are self-concealing); In re Magnetic Audiotape Antitrust Litig., No. 99 Civ. 1580 (LMM), 2002 WL 975678, at *2 (S.D.N.Y. May 9, 2002) (merely alleging a price-fixing scheme satisfies the Second Circuit's liberal standard of proving concealment).

In sum, Defendants have not discharged their burden of demonstrating that no set of facts would prove fraudulent concealment to toll the statute.  Indeed, they did not even try to do so.

**B.    The Sherman Act Claim Is Timely Under the Accrual Rule for Continuing Conspiracies**

Zenith does not mandate that WWE's Sherman Act Claim accrued in June 1998 when the license was executed as argued by Defendants.  Rather, this case involves a "continuing violation" of the antitrust laws because the license in question runs for ten years, and possibly fifteen if a renewal option is exercised.  Since the artificially low payments to WWE arising from the antitrust violation are made each quarter throughout the license, every payment throughout the term injures WWE because it is calculated with the artificially low royalty rates caused by the antitrust violations.  See Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 502 n.15 (1968) (although injury first inflicted in 1912, plaintiff's suit filed in 1955 not barred by

- 26 -

statute of limitations because conduct constituted a "continuing violation of the Sherman Act" and "inflicted continuing and accumulating harm" on plaintiff).

In <u>Zenith</u>, the Court delineated the accrual rule for such "continuing violations" established by <u>Hanover</u>. Thus, "[i]n the context of a continuing conspiracy to violate the antitrust laws . . . each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and . . . as to those damages, the statute of limitations runs from the commission of the act." <u>Zenith</u>, 401 U.S. at 338. Under <u>Hanover</u> and <u>Zenith</u>, any act committed by Defendants pursuant to their conspiracy within the limitations period that causes an antitrust injury to WWE gives rise to an action for damages.[7] <u>See also</u> <u>Klehr v. A.O. Smith Corp.</u>, 521 U.S. 179, 189 (1997) ("Antitrust law provides that, in the case of a 'continuing violation,' say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, 'each overt act that is part of the violation and injures the plaintiff,' <u>e.g.</u>, each sale to the plaintiff, 'starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.'"); <u>Andrea Theaters, Inc. v. Theatre Confections, Inc.</u>, 787 F.2d 59, 65 (2d Cir. 1986) (statute of limitations not a bar if plaintiff's claim is based on injuries incurred within the four year limitation period even though the injury stemmed from performance of a contract executed during the pre-limitation period); <u>In re Linerboard Antitrust Litig.</u>, CIV NO. 98-5055 & 99-1341, 2000 WL 1475559, at

---

[7] Even before <u>Hanover</u> and <u>Zenith</u>, numerous courts, including courts in the Southern District of New York, applied the "continuing violation" exception when the contract alleged to be the initial antitrust injury occurred in the pre-limitation period. <u>See, e.g.</u>, <u>Susser v. Carvel Corp.</u>, 206 F. Supp. 636, 651 (S.D.N.Y. 1962) ("[D]efendants' actions were part of a continuing policy of doing business and the plaintiffs are entitled to recover for such unlawful practices as occurred within the four years preceding the filing of their complaint."); <u>Cardinal Films, Inc. v. Republic Pictures Corp.</u>, 148 F. Supp. 156, 160 (S.D.N.Y. 1957) ("The continuing violation involves the defendant's conduct . . . in continuing the practices complained of under the contract.").

*4 (E.D. Pa. Oct. 4, 2000) ("An act constitutes a 'continuing antitrust violation' if it injures the plaintiff over a period of time.") (citing Hanover Shoe, Inc., 392 U.S. at 502 n.15.).

Defendants' reliance on El Paso v. Darbyshire Steel Co., 575 F.2d 521 (5th Cir. 1978) is misguided. In El Paso, the court held that the plaintiff's cause of action was time-barred even though the defendant received continuing benefits in the limitation period pursuant to a contract executed in the pre-limitation period. Id. at 523. Without explanation, the Fifth Circuit made the application of the continuing violation accrual rule set forth in Hanover and Zenith contingent "on whether the antitrust damages were ascertainable at the time of the original antitrust violation." Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1052-53 (5th Cir. 1982) (explaining the court's decision in El Paso which set forth the principle in the Fifth Circuit that "the continuing benefits aspect of the antitrust statute of limitations was not applicable to those situations where antitrust damages were not speculative or unprovable.").

The interpretation of Zenith by the Fifth Circuit is not the law in the Second Circuit. To the contrary, in Bankers Trust Co. v. Rhoades, 859 F.2d 1096, 1104 (2d Cir. 1988), a case wherein the Second Circuit decided the applicable accrual rule for RICO actions, the court looked to accrual rules applicable to antitrust actions for guidance. Id. at 1104. In Bankers, the court outlined the specific accrual rules set forth in Zenith. Id. Notably, the Second Circuit correctly interpreted Zenith as establishing separate accrual rules in antitrust cases for continuing conspiracies and instances where damages were speculative or could not yet be proven. Id.

Accordingly, El Paso is inapplicable to the instant matter.

### C.    The Speculative Nature of WWE's Damages at the Time the Initial Violations Occurred Makes the Claim Timely Now

WWE is entitled to pursue its damages for the four-year period prior to the initiation of its suit under a third separate accrual rule set forth in Zenith because damages could not be

- 28 -

proved with reasonable certainty at the time the antitrust violations occurred. <u>Zenith</u>, 401 U.S. at

339; <u>Bankers</u>, 859 F.2d at 1104; <u>Ansul Co. v. Uniroyal, Inc.</u>, 448 F.2d 872, 884-85 (2d Cir.

1971). When damages resulting from an antitrust violation are too speculative to be calculated

on the date a defendant commits an act injuring a plaintiff's business, the plaintiff may bring an

action anytime within four years of the damages becoming calculable. In such an action,

plaintiff may recover damages occurring within the statutory limitations period that are the result

of the conduct occurring prior to that period. <u>Zenith</u>, 401 U.S. at 339. Indeed, it is this separate

accrual rule which the Fifth Circuit in <u>El Paso</u> improperly conflated with the accrual rule

applicable to continuing conspiracies, which the Second Circuit correctly recognizes as a

separate accrual rule.

 At the time Defendants' initial antitrust violation occurred, WWE's damages were wholly

speculative. Even if one improperly assumes that the antitrust violation is the actual license as

opposed to the antecedent behavior, that license was signed on June 10, 1998. (Lerner

Declaration, Ex. B, p. 8.) However, there are several factors which rendered any damage

calculation at that point entirely speculative.[8] First, WWE is paid a quarterly royalty which is

entirely dependent upon the volume of sales of videogames, and the royalty rate varies for each

platform. <u>Id.</u> at pp. 3-5. Until the products are actually sold, the essential multiplier to a

damages calculation (quantity sold) would have been sheer guesswork. Secondly, although the

license was signed in June of 1998, the license explicitly provided that sales of the product could

not occur until November 16, 1999, since that was when the existing license with Acclaim

expired. (AC ¶ 249(b)(xxviii).) Thus, not even seminal sales data would have been received by

---

[8] Indeed, in their moving papers, Defendants have argued that WWE's injuries are speculative, even now. <u>See</u> Jakks Defendants' December 3, 2004 Pre-Motion Letter; Jakks Defendants' February 16, 2005 Memorandum of Law in Support of Motion to Dismiss, pp. 15, 29-31.

WWE until well into 2000.  In fact, the first quarterly royalty report to WWE was obtained on

April 28, 2000.  Even then, future sales depend on several variables, including the popularity of

the talent of WWE at given points in time, the ability of the licensee to develop next generation

games, and the like.  The presence of these variables further distinguish this case from the El

Paso case relied upon by Defendants, which specifically noted the absence of any variables in

that case precluding a definitive damages calculation.  See El Paso, 575 F.2d at 523.

     WWE commenced this action on October 19, 2004 and added the Sherman Act Claim on

March 30, 2005.  Under relation back principles, the statute was tolled on October 19, 2004 and

under this branch of Zenith, WWE can therefore recover damages for the period from

October 19, 2000 to the present in any event.  See Advanced Magnetics, Inc. v. Bayfront

Partners, Inc., 106 F.3d 11, 19 (2d Cir. 1997) (amended complaint relates back to date of original

pleading when claim asserted in amendment arose out of "the conduct, transaction, or

occurrence" set forth in the original complaint).

## CONCLUSION

     Each and every argument of Defendants is meritless, and their motions should be denied.

Respectfully submitted,

By: Jerry S. McDevitt
Curtis B. Krasik
Amy L. Barrette
535 Smithfield Street
Pittsburgh, Pennsylvania 15222
(412) 355-6500 (phone)
(412) 355-6501 (fax)

- 30 -

William O. Purcell (WP 5001)
599 Lexington Avenue
New York, New York 10022-6030
(212) 536-3900 (phone)
(212) 536-3901 (fax)

KIRKPATRICK & LOCKHART NICHOLSON
GRAHAM LLP

Dated:  October 4, 2005                    Attorneys for Plaintiff, World Wrestling
                                           Entertainment, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of World Wrestling Entertainment, Inc.'s Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Sherman Act Claim in the Amended Complaint was served on the following counsel of record via electronic mail service and first-class U.S. mail, postage prepaid: this 4th day of October, 2005:

John R. Williams
Williams & Pattis, LLC
51 Elm Street, Suite 409
New Haven, CT 06510

Michael A. Cornman
Schweitzer Cornman Gross & Bondell, LLP
292 Madison Avenue
New York, NY 10017

Steven A. Marenberg
Irell & Manella, LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067-4276

Steven M. Bierman
Sidley Austin Brown & Wood
787 Seventh Avenue
New York, NY 10019

Michael A. Freeman
24 West 40th Street
17th Floor
New York, NY 10018

Jonathan J. Lerner
Skadden, Arps, Slate, Meagher &
    Flom, LLP
Four Times Square
New York, NY 10036-6522

Murray L. Skala
Feder, Kaszovitz, Isaacson, Weber,
    Skala, Bass & Rhine, LLP
750 Lexington Avenue
New York, NY 10022-1200

Richard Schaeffer
Dornbush Schaeffer Stongin &
    Weinstein, LLP
747 Third Avenue
New York, NY 10017

_____
Jerry S. McDevitt