Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22071173 (E.D.La.), 2003-2 Trade Cases P 74,172

**(Cite as: 2003 WL 22071173 (E.D.La.))**

**H**

**Motions, Pleadings and Filings**

United States District Court,
E.D. Louisiana.
BLANCHARD & COMPANY, INC., Herbert
Davies, and James f. Holmes
v.
BARRICK GOLD CORPORATION, J.P. Morgan
Chase & Company, and ABC Companies
**No. Civ.A. 02-3721.**

Sept. 3, 2003.

Spiro J. Verras, Gladstone N. Jones, III, Peter Newton Freiberg, Jones, Verras & Freiberg, LLC, New Orleans, LA, for Plaintiffs/Intervenors-Plaintiffs.

David George Radlauer, Corinne G. Hufft, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, LA, Davis B. Allgood, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, LLP, Baton Rouge, LA, Mark D. Wegener, Edward Han, Edward B. Schwartz, Howrey, Simon, Arnold & White, LLP, Washington, DC, James Hazen Ripley Windels, Paul Spagnoletti, Glen Alexander Kopp, Davis, Polk & Wardwell, New York, NY, Alexander McVoy McIntyre, Jr., Amelia Williams Koch, Adam Bennett Zuckerman, Locke Liddell & Sapp, LLP, New Orleans, LA, for Defendants.

*ORDER AND REASONS*

BERRIGAN, J.

*1 In this action, Plaintiffs, Blanchard & Company, Inc. ("Blanchard"), "a retail dealer in rare coins and precious metals," Herbert Davies ("Davies"), "an individual investor in gold," and James F. Holmes ("Holmes"), "a partner in a gold mining enterprise" (collectively "Plaintiffs") allege that Defendants, Barrick Gold Corporation ("Barrick"), "one of the largest gold mining companies in the world," and J.P. Morgan Chase & Company ("Morgan"), "one of the largest banking institutions in the United States" and other unnamed bullion banks (collectively "Defendants") "have violated United States' antitrust law by unlawfully combining to actively manipulate the price of gold and to monopolize the market in

gold." (*See* Rec. Doc. 73 at ¶ ¶ 4(a-c), 5(a-b) & 6).

Specifically, Plaintiffs allege five causes of action: (1) that through their unlawful manipulation of the price of gold, Defendants have caused antitrust injury to Davies as an investor and Blanchard as a retailer of precious metals in violation of 15 U.S.C. § § 1 & 2; (2) that Defendants have caused antitrust injury to Blanchard as a competitor in "the gold market" in violation of 15 U.S.C. § § 1 & 2; (3) that Defendants have caused antitrust injury to Holmes as a partner in a gold mining enterprise in violation of 15 U.S.C. § § 1 & 2; (4) that Defendants have engaged in unfair trade practice in violation of the Louisiana Unfair Trade Practices and Consumer Protection Law ("LUTPA"), La.R.S. 51:1401, *et seq.;* and (5) that Barrick has libeled, slandered and defamed Blanchard. Plaintiffs pray for: (1) injunctive relief terminating "all Master Trading Agreements, spot deferred sales contracts and all other contracts through which Defendants manipulate the market for gold"; (2) damage awards in compensation for each of Plaintiffs' particular injuries; and (3) an award trebling those damages pursuant to the Sherman Act, Clayton Act and LUTPA. (Id. at ¶ 126(a-h)).

The named Defendants have each filed motions to dismiss on all of the counts against them on various grounds. For the following reasons Defendants' motions are DENIED IN PART AND GRANTED IN PART.

I. Background

For the purpose of this opinion, the following facts derived from the Complaint are accepted as true. *Fernandez-Montes v. Allied Pilots Ass'n,* 987 F.2d 278, 284 (5th Cir.1993). Plaintiffs allege that Barrick's "Premium Gold Sales Program," unlike ordinary hedging programs, is a purposeful and unlawful mechanism to manipulate the price of gold both upwards and downwards. The program mechanics are alleged as follows: (1) "Morgan or another bullion bank, acting on Barrick's behalf and at Barrick's instruction" borrows a contractually specified amount of gold from a central bank and physically sells the gold into the spot market; (2) money from the spot sale is then invested by Morgan; (3) Morgan pays the central bank a gold lease rate, a percentage lower than that earned by capital generated from the spot sale--the interest premium or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22071173 (E.D.La.), 2003-2 Trade Cases P 74,172
(Cite as: 2003 WL 22071173 (E.D.La.))

Page 2

contango is profit for Barrick; [FN1] (4) Barrick delivers gold to Morgan at some future date; (5) Morgan returns the gold to the central bank. (Id. at ¶ 8). Plaintiffs further allege that extraordinary favorable terms of the "spot-deferred sales contract" are only available to Barrick and none of its competitors . [FN2] Specifically, under the "spot-deferred sales contract" Morgan permits Barrick to defer repayment of the borrowed gold and waives the requirement for margin. "As a result, while other short sellers have to cover or add additional margin when the price of gold goes up, Barrick often has prearranged derivative contracts in place that give it the ability to *add* to its short positions at the higher prices." (Id. at ¶ 10) (emphasis in original).

> FN1. Plaintiffs allege that "[f]rom 1997 through 2001, Barrick's spot-deferred contracts enabled it, through J.P. Morgan, to borrow gold at 1.5%, sell it into the spot market, invest the proceeds at 6 .5% ... and postpone repayment of the borrowed gold for 15 years." (Rec. Doc. 73 at ¶ 9).

> FN2. Plaintiffs claim that "Barrick recognizes that its 'Premium Gold Sales Program' is unique," and that Barrick admits that "no other gold producer has available to it the combination of margin-free hedging, 10 to 15 year terms and flexible delivery dates ." (Rec. Doc. 73 at ¶ 35). As a result, Plaintiffs claim that "in combination with bullion banks such as J.P. Morgan, Barrick, alone among gold mining companies, is positioned to manipulate the price of gold at will." (Id.).

**\*2** Plaintiffs claim that through the Premium Gold Sales Program "Barrick can afford to manipulate the price of gold *upward"* by reducing its short positions, adding demand or reducing supply, by bolstering the market with negligent or deliberately false bullish prognoses regarding its intent with respect to its short positions, by sponsoring false or misleading investment representations for gold by the World Gold Council and by knowingly sponsoring false statistical data with respect to the gold market and its own trading activities. (Id. at ¶ 15) (emphasis in original). Also, Plaintiffs allege that "Barrick manipulates the price of gold *downward* by injecting massive amounts of additional supply through its short sales." (Id. at ¶ 16) (emphasis in original).

Plaintiffs claim that for its part in the vertical combination, Morgan profits as the largest holder of gold derivatives in the United States. "A derivative is a bilateral contract whose value is derived from the value of an underlying asset or underlying reference rate or index." (Id. at ¶ 59). "[T]he definition of a gold derivative is often expanded to include any predominantly paper product whose value is directly or indirectly dependant upon the price of physical gold." (Id.). "The price of a gold derivative depends on the current price of the underlying commodity (gold). However, the profit or loss realized from the gold derivative is eventually determined by the spot price of gold." (Id. at ¶ 60). This relationship "provides Barrick with a powerful incentive to add physical supplies to the spot market in amounts that depress spot prices." (Id. at ¶ 61). This permits Barrick to "lock in a profit on such contracts from the resulting fall in gold prices." (Id.). Although this mechanism appears to depress the value of gold derivatives held by Morgan, "[g]iven the fact that the derivative market is as much as 100 times the size of the physical market, ... Barrick's ability to influence the price of physical gold can produce phenomenal profits for J.P. Morgan." (Id.).

## II. Standard of Review

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, a district court must accept the factual allegations of the complaint as true and resolve all ambiguities or doubts regarding the sufficiency of the claim in favor of the plaintiff. *See Fernandez-Montes, 987 F.2d at 284.* Unless it appears "beyond a doubt that the plaintiff can prove no set of facts in support of his claim," the complaint should not be dismissed for failure to state a claim. *Id.* at 284-285 (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). However, conclusory allegations or legal conclusions masquerading as factual conclusions will not defeat a motion to dismiss. *See Blackburn v. City of Marshall,* 42 F.3d 925, 931 (5th Cir.1995) (citing *Fernandez-Montes, 987 F.2d at 284).*

**\*3** "This [standard] applies with no less force to a Sherman Act claim." *McLain v. Real Estate Bd. of New Orleans, Inc.,* 444 U.S. 232, 246, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980) (referring to *Conley,* 355 U.S. at 45-46); *see also Syncsort Inc. v. Sequential Software, Inc.,* 50 F.Supp.2d 318, 328 (D.N.J.1999) ("In the antitrust context, the standard for dismissal under Rule 12 is rigorous; antitrust claims are construed liberally.") (citations omitted). "[A]llegations [that] fairly claim that the alleged

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22071173 (E.D.La.), 2003-2 Trade Cases P 74,172
**(Cite as: 2003 WL 22071173 (E.D.La.))**

conspiracy, to the extent it is successful, will place 'unreasonable burdens on the free and uninterrupted flow' of interstate commerce, [ ] are wholly adequate to state a claim." *Hospital Bldg. Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). "And in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Id.,* (quoting *Poller v. Columbia Broadcasting,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458, 464 (1962)).

Nonetheless, in order to infer that an antitrust claim is cognizable, facts must be pleaded with reasonable particularity. *See Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526 n. 17, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) ("[A] district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed."). "When the requisite elements are lacking, the costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint." *Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.,* 836 F.2d 173, 182 (3d Cir.1988) (quoting *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1106 (7th Cir.), *cert. denied,* 470 U.S. 1054, 105 S.Ct.. 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985).

Insistence on factual specificity arises in part to ensure that the purpose of the antitrust laws is invoked. Antitrust laws were designed for the "protection of competition, not competitors." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). As the Supreme Court explained:

> [P]laintiffs ... must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.
> *Id*

Applying these principles to Plaintiffs' Sherman Act claims, the issue in the instant motions is whether the Complaint sufficiently alleges a violation of Sections

1 and 2 of the Sherman Act, to entitle Plaintiffs to go forward with this action. [FN3]

> FN3. Plaintiffs' LUTPA claims and claims against Barrick for libel, slander and defamation and the standards applied thereto, are discussed below in Part III.C and E respectively.

III. Analysis

A. Clayton Act

**\*4** As a prerequisite to bringing an action under the Sherman Act, Plaintiffs must demonstrate antitrust injury and antitrust standing. *See Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 113, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701) ("a private plaintiff must allege threatened loss or damage 'of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful."); *Bell v. Dow Chemical Co.,* 847 F.2d 1179, 1182 (5th Cir.1988) ( "Proving antitrust injury is a necessary requirement for proving standing; the former cannot stand alone from the latter."). "Standing to pursue an antitrust suit exists only if a plaintiff shows: 1) injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status, which assures that other parties are not better situated to bring suit." *Doctor's Hosp. of Jefferson. Inc. v. Southeast Med. Alliance, Inc.,* 123 F.3d 301, 305 (5th Cir.1997) (citing *McCormack v. National Collegiate Athletic Ass'n,* 845 F.2d 1338, 1341 (5th Cir.1988).

The Fifth Circuit has reasoned that antitrust injury for standing purposes "must be viewed from the perspective of the plaintiff's position in the marketplace, not from the merits-related perspective of the impact of a defendant's conduct on overall competition." *Doctor's Hosp.,* 123 F.3d at 305 (5th Cir.1997) ("the antitrust laws do not require a plaintiff to establish a market-wide injury to competition as an element of standing."); *see also, Walker v. U-Haul Co.,* 747 F.2d 1011, 1016 (5th Cir.), *modifying,* 734 F.2d 1068 (5th Cir.1984). So viewed, the alleged losses and competitive disadvantage of Blanchard, Davies and Holmes as a result of Defendants' alleged artificial manipulation of the price of gold and attempted monopoly of both the gold market and the gold derivatives market "fall easily within the conceptual bounds of antitrust

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22071173 (E.D.La.), 2003-2 Trade Cases P 74,172
**(Cite as: 2003 WL 22071173 (E.D.La.))**

injury, whatever the ultimate merits of its case." _Doctor's Hosp._, 123 F.3d at 305.

 Defendants anchor their argument against Plaintiffs' antitrust standing on the fact that Plaintiffs' "fundamental theory in this case is that Defendants have caused a decrease in gold prices to drive out competitors and increase their market share." (_See_ Morgan's Br., Rec. Doc. 76 at 9). Basically, Defendants argue that lower prices, which benefit consumers are an objective of the antitrust laws. _See Atlantic Richfield Co. v. USA Petroleum Co.,_ 495 U.S. 328, 340, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) ("Low prices benefit consumers regardless of how they are set. So long as they are above predatory levels, they do not threaten competition and, hence, cannot give rise to antitrust injury."). Much of Morgan's argument, in particular, against antitrust standing focuses on the fact that Plaintiffs have failed to sufficiently allege a claim for predatory pricing. [FN4]

> FN4. As will be set forth, infra, the Court finds that Plaintiffs have sufficiently alleged a claim under the Sherman Act, despite Plaintiffs' inartful attempt to demonstrate Defendants' conduct as predatory. Although inartfully pleaded, especially with respect to the predatory pricing claim, the Complaint, liberally construed, sufficiently alleges a claim for illegal restraint of trade, monopolization and attempted monopolization. As for predatory pricing, that claim has two elements: "1) the prices complained of are below an appropriate measure of the alleged [would-be] monopolist's costs and 2) ... the alleged [would-be] monopolist has a reasonable chance of recouping the losses through below-cost pricing." _Taylor Publ'g Co. v. Jostens Inc.,_ 216 F.3d 465, 477 (5th Cir.2000) (quoting _Stearns Airport,_ 170 F.3d at 528). Plaintiffs' petition fails to allege facts specific enough to establish that Defendants sold gold into the spot market below an "appropriate measure" of cost. _See Malek Wholesaler, Inc. v. First Film Extruding, Ltd.,_ 97 C 7087, 1998 U.S. Dist. LEXIS 3674, *9-10 (N.D.Ill.Mar.24, 1998) (dismissing predatory pricing claim where complaint failed to allege below cost pricing and reasonable prospect of recoupment); _see also Syncsort Inc. v. Sequential Software, Inc.,_ 50 F.Supp.2d 318 (D.N.J.1999) (holding that failure to allege an essential element of an antitrust claim is sufficient grounds for dismissal). Further, the Court is not certain that Plaintiffs' predatory pricing claim is intelligible in this context--the selling of gold at admittedly market price, albeit a market allegedly manipulated downward by the defendants. Nonetheless, excising Plaintiffs' reliance on predatory pricing from the Complaint, the Court finds that a cognizable claim for monopolization survives. Ignoring the minutiae, the Complaint alleges that Barrick, in combination with Morgan is _artificially_ manipulating the gold market by the sheer size and volume of its activity. This claim will stand or fall on whether the alleged conduct creates an artificial market that manipulates the price of gold or whether the complained of consequences are simply the byproduct of stellar business acumen.

 **\*5** It is well settled that vigorous competition for increased market share is not proscribed by the antitrust laws. _Cargill,_ 479 U.S. at 116 (finding protection of competitors from profits lost due to price competition "perverse"). And, that "typical antitrust injury results from 'increased prices and decreased output.' " (Rec. Doc. 76 at 9) (quoting _Anago, Inc. v. Tecnol Medical Products, Inc .,_ 976 F.2d 248, 249 (5th Cir.1992). However, this is not a typical case. First, it involves gold, an atypical commodity, intimately tied to currency. [FN5] Second, excepting jewelers and industrial fabricators, the principal gold "consumers" are also atypical. They are investors in gold and not the usual type of consumers that antitrust laws were designed to protect.

> FN5. Although the official gold-based international monetary system or the gold standard was abandoned by the United States in 1971, gold "remains an important element of global monetary reserves." World Gold Council, "Chronology of Gold in the International Monetary System" at < http://www.gold.org/index.html> (reporting on the Washington Agreement entered into by fifteen European central banks to regulate gold reserves, especially the leasing of gold due to its "destabilising effect on the gold market").

 Morgan asserts that "Plaintiffs are asking this Court to intervene on their behalf precisely because they are unhappy with the price of gold that has resulted from

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22071173 (E.D.La.), 2003-2 Trade Cases P 74,172
**(Cite as: 2003 WL 22071173 (E.D.La.))**

free market conditions." (Rec. Doc. 76 at 11). The Court agrees that judicial intervention to reconcile a competitor's dissatisfaction with the price of a commodity as a result of free market conditions is antithetical to the antitrust laws. However, the Court disagrees with Morgan's portrayal of Plaintiffs' antitrust claim. Plaintiffs claim that through the Premium Gold Sales Program Defendants have *artificially* manipulated the price of gold up and down for their own benefit and the detriment of others; for example, by manipulating the market downward to decrease price, Barrick drives competitors from the market and purchases gold reserves at bargain prices. This allegation, if true constitutes an antitrust injury for standing purposes. The Plaintiffs, Blanchard, "a retail dealer in rare coins and precious metals," Davies, "an individual investor in gold," and Holmes, "a partner in a gold mining enterprise" would all suffer a direct antitrust injury as a result of the artificial manipulation of the price of gold. Whether Plaintiffs' complained of substantive violations survive summary judgment is another matter altogether. *See Doctor's Hosp.,* 123 F.3d at 305 ("To require summary judgment proof of the substantive violations as a prerequisite to antitrust injury and therefore standing to sue in a case such as this is inefficient and confusing.").

Morgan's reliance on *Sanner v. Board of Trade of Chicago,* 62 F.3d 918, (7th Cir.1995) and *Loeb Indus. Inc. v. Sumitomo Corp.,* 306 F.3d 469 (7th Cir.2002) to show that Plaintiffs lack antitrust standing is unpersuasive. First, nowhere in *Sanner* does the Seventh Circuit apply the Fifth Circuit's analytical distinction between antitrust injury for standing purposes and antitrust injury for a substantive violations.

Second, the fact that the Complaint does not allege that any of the Plaintiffs sold gold at an artificially depressed price does not necessarily preclude antitrust standing. In *Sanner,* the Seventh Circuit granted standing to those farmers who sold soybeans at depressed prices, but specifically denied standing to those farmers who held their soybeans as opposed to selling them in a falling market. However, the complained of antitrust injury in *Sanner* resulted from the Chicago Board of Trade's issuance of resolution requiring holders of long positions in soybean trading futures to liquidate their interests. *Sanner,* concerned an illegal restraint of trade claim, pursuant to Section 1 of the Sherman Act that apparently sought damages alone. *Sanner,* 62 F.3d at 927.

*6 It appears that the Seventh Circuit's denial of standing to non-sellers was in part dependant on the remedy sought. Here, Plaintiffs seek damages *and* injunctive relief, thus, the denial of standing to those non-selling soybean farmers seeking damages in *Sanner,* does not preclude a finding that standing exists in this case. "Congress did not intend the antitrust laws to provide a remedy *in damages* for all injuries that might conceivably be traced to an antitrust violation." *Sanner,* 62 F.3d at 926 (citing *Associated General Contractors,* 459 U.S. at 534 quoting *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 263 n. 14, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972)) (emphasis added). Further, the Court finds that Plaintiffs' monopoly and attempted monopoly claims under Section 1 and Section 2 do not require allegations of the actual sale of gold at artificially depressed prices. *See Lone Star Milk Producers, Inc. v. Dairy Farmers of America, Inc.,* No. 5:00-CV-191, 2001 WL 1701532, at *7 (E.D.Tex., Jan.22, 2001) (citing *United States v. Grinnell Corp.,* 384 U.S. 563, 570-571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Finally, the Court is unpersuaded that *Loeb* precludes a finding that antitrust standing exists. At this point, the Court is unprepared to dismiss this action altogether, simply because calculating and apportioning damages may be difficult.

The Court finds that Plaintiffs have properly pled for standing purposes an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick,* 429 U.S. at 489.

B. Sherman Act

1. Section 1

Section 1 of the Sherman Act proscribes "[e]very contract, combination ... or conspiracy [ ] in restraint of trade or commerce...." 15 U.S.C. § 1. "In order to state a claim for a violation of Section 1, a plaintiff must allege (1) the existence of a conspiracy (2) affecting interstate commerce (3) that imposes an "unreasonable" restraint of trade." *Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 961 F.2d 1148, 1158 (5th Cir.1992). The Court does not address the first two elements because they are undisputedly and sufficiently pleaded in the Complaint. The third element, whether there exists an unreasonable restraint of trade is disputed by Defendants. Unreasonable restraints of trade are grouped into two categories, those that are illegal *per se,* and those that are considered under a "rule of reason" analysis.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22071173 (E.D.La.), 2003-2 Trade Cases P 74,172
(Cite as: 2003 WL 22071173 (E.D.La.))

In order to establish a *per se* violation under Section 1, Plaintiffs must allege either a horizontal agreement, or a vertical agreement to fix prices. *Jayco Systems, Inc. v. Savin Business Machines Corp.,* 777 F.2d 306, 317 (5th Cir.1985), *cert. denied,* 479 U.S. 816, 107 S.Ct. 73, 93 L.Ed.2d 30 (1986). Here, Plaintiffs only allege a vertical combination between the Defendants. Generally a vertical restraint is one "imposed by agreement between firms at different levels of distribution." *Business Electronics Corp. v. Sharp Electronics Corp.,* 485 U.S. 717, 730, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). "[A] vertical restraint is not illegal *per se* unless it includes some agreement on price or price levels." *Id.* at 735-36.

*\*7* Morgan's argument that Plaintiffs fail to allege a specific agreement to fix the price of gold is unpersuasive. The Premium Gold Sales Program as alleged is nothing but a specific agreement to fix prices. Similarly unpersuasive is Barrick's argument that even if the Premium Gold Sales Program does depress the price of gold, that such an agreement by definition cannot be illegal *per se.* (*See* Rec. Doc. 75 at 18) (citing *State Oil Co. v. Khan,* 522 U.S. 3, 18, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) ("vertical agreements to lower prices paid by third-parties cannot constitute *per se* violations under § 1 because of the inherently procompetitive nature of such agreements."). As stated above, this case involves an extraordinary commodity--gold, the consumers of which are principally investors. Unlike ordinary consumers of most marketable commodities, the interests of consumers/holders of investment-gold are not advanced by falling prices. Further, the Court is equally unpersuaded by Barrick's argument that the Complaint fails to allege that the Premium Gold Sales Program established a price to be paid by third parties. The Complaint alleges that through the Premium Gold Sales Program, Defendants manipulate the price of gold, which price is subsequently and by necessity paid by third-parties.

Accordingly, the Court finds that Plaintiffs have adequately alleged a *per se* violation under Section 1 of the Sherman Act. However, even if the Complaint fails to allege a *per se* violation, the Complaint sufficiently alleges a claim under the rule of reason. To assert a claim under the rule of reason, a plaintiff must allege: (1) a relevant product and geographic market; and (2) that the alleged conduct had a substantial anticompetitive effect in the relevant market. *Apani Southwest, Inc. v. Coca-Cola Enterprises, Inc.,* 300 F.3d 620, 627 (5th Cir.2002); *Jayco Systems,* 777 F.2d at 319.

First, the Court is unpersuaded by Defendants' arguments that the Complaint fails to allege a relevant product or geographic market. The Court finds that gold is a unique commodity and that sufficient evidence exists to establish that "the world gold market," "the U.S. spot gold market," "the gold mining market," "the gold derivatives market," "the gold investment market," "the precious metals market," and "the retail coin market" (*see* Rec. Doc. 73 at ¶¶ 4, 69-70, 72, 78 & 81) represent a single integrated market. "[T]he gold market is a single integrated market, ... A change in the price of London good delivery gold bars has a direct and proportionate effect on the value of the inventory of a Far East jeweller." Neuberger, World Gold Council Report, May 2001 at 31; *see also* note 6, *supra.* Additionally, unlike most commodities stocks held as necessary works in progress or as safeguards to future shortage that have volatile lease rates, "[g]old is different .... physical possession of [gold] is not important." *Id.* Lease rates on gold are so stable that "the difference between possession of the gold and a warrant giving entitlement to delivery ... is mainly a question of credit risk." *Id.* Thus, the Court also finds that the market for physical gold and the gold derivatives market are virtually synonymous.

*\*8* Second, the Court is unpersuaded that Plaintiffs have failed to allege a substantial adverse impact on competition. *See Roy B. Taylor Sales, Inc. v. Hollymatic Corp.,* 28 F.3d 1379, 1386 (5th Cir.1994), *cert. denied,* 513 U.S. 1103, 115 S.Ct. 779, 130 L.Ed.2d 673 (1995). "Assessing such an impact requires an inquiry into the conditions of the relevant market." *Id.* at 1386 *and* at n. 38 (citing *R.D. Imports Ryno Indus. v. Mazda Distrib.,* 807 F.2d 1222, 1224 (5th Cir.), *cert. denied,* 484 U.S. 818, 108 S.Ct. 75, 98 L.Ed.2d 38 (1987)) ("Market considerations provide the objective benchmark for the measurement of competitive impact.").

Essentially, Defendants argue that the complained of injury harms certain competitors, namely the Plaintiffs, rather than producing a market wide injury to competition. Barrick focuses on the fact that lower prices generally enhance competition. Morgan focuses on the fact that allegations of "weakened competitors ... without more, is insufficient as a matter of law to support a claim under Section 1." (Rec. Doc. 76 at 17) (citing *Total Ben. Services, Inc. v. Group Ins. Admin., Inc.,* 875 F.Supp. 1228, 1233 (E.D.La.1995). Although the Court does not disagree with these legal propositions urged by Defendants, we are unpersuaded by their application to the instant matter.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22071173 (E.D.La.), 2003-2 Trade Cases P 74,172
**(Cite as: 2003 WL 22071173 (E.D.La.))**

Plaintiffs allege that the Barrick, "one of the largest gold mining companies in the world," and Morgan, "one of the largest banking institutions in the United States" have unlawfully combined as dominate market participants to manipulate the price of gold. *See Total Ben. Services, 875 F.Supp. at 1233* (citing *National Collegiate Athletic Ass'n v. Board of Regents of University of Oklahoma, 468 U.S. 85, 109 n. 38, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984)* (absent market power a defendant's conduct is not likely to have the required impact on competition). [FN6] The Complaint alleges that the market for gold and gold derivatives has contracted during the period at issue, that trading volume has dropped significantly and that a significant number of sophisticated entities have abandoned gold as an investment commodity. (Rec. Doc. 73 at ¶ ¶ 77-79); *see also Total Ben. Services, 875 F.Supp. at 1233* (citing *Kestenbaum v. Falstaff Brewing Corp., 575 F.2d 564, 571 (5th Cir.1978), cert. denied, 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979)* ("The number of firms in the relevant market and their market shares are relevant to this inquiry."). Further, the Complaint alleges that as a result of depressed prices, Barrick has been able to acquire the gold reserves of troubled competitors. (Id. at ¶ 85).

> FN6. The Court recognizes that "market power" as defined in *National Collegiate* as "the ability to raise prices above those that would be charged in a competitive market," is generally followed as the standard definition. *Id., 468 U.S. at 109 n. 38.* However, in that same opinion the Supreme Court offered a broader definition of "market power" as the "ability to alter the interaction of supply and demand." *Id.* at 109. In the instant action, Plaintiffs' essentially allege that Defendants' market power is used to depress the price of gold, injuring gold consumers, primarily investors holding gold as a monetary instrument. The Court finds that in defining "market power" the mechanics of the anticompetitive act-- raising prices above those supported in a competitive market--is less significant than the general ability to manipulate the relationship between supply and demand. In other words the focus of inquiry should be on alleged injury to consumers and not the mechanics of the complained of conduct. *See e.g., Valley Liquors, Inc. v. Renfield Importers, Ltd., 678 F.2d 742, 745 (7th Cir.1982)* (discussing market power as the

ability to "seriously threaten consumer welfare," protection of which is the objective of the Sherman Act). Here, in the extraordinary market for gold and gold derivatives, consumers/investors are readily injured by market participants with sufficient market power to depress price.

The Court finds that Plaintiffs have sufficiently alleged a substantial adverse impact on competition such that the claims pursuant to Section 1 of the Sherman Act should not be dismissed.

### 2. Section 2

Section 2 of the Sherman Act proscribes "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire ... to monopolize any part of the trade or commerce ..." 15 U.S.C. § 2. In order to state a claim for a violation of Section 2, a plaintiff must allege "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *U.S. v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).* "Monopoly power is the power to fix prices and to exclude competition." *Spectrofuge Corp. v. Beckman Instruments, Inc., 575 F.2d 256, 276 (5th Cir.1978)* (citing e.g., *United States v. du Pont & Co., 1956, 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264).* "The attempt offense also has two elements: (1) specific intent to accomplish the illegal result; and (2) a dangerous probability that the attempt will be successful." *Id.* (citations omitted).

**\*9** As with a Section 1 claim, defining the product and geographic markets is a threshold requirement under Section 2. *Id.; see also Crossroads Cogeneration Corp. v. Orange & Rockland Utils., Inc., 159 F.3d 129, 141 (3d Cir.1998)* (affirming dismissal of Section 2 monopoly claim in part for failure to allege relevant market). As discussed above in connection with Section 1, the Court finds that the Complaint sufficiently defines a relevant market. *See* Part III.B.1.

Plaintiffs must also allege "exclusionary conduct," defined as "the creation or maintenance of a monopoly by means other than competition on the merits embodied in the *Grinell* standard." *Stearns Airport Equip. Co. v. FMC Corp., 170 F.3d 518, 522 (5th Cir.1999).* Barrick contends that the sole anticompetitive conduct alleged in the Complaint is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22071173 (E.D.La.), 2003-2 Trade Cases P 74,172
(Cite as: 2003 WL 22071173 (E.D.La.))

Page 8

Plaintiffs' predatory pricing claim. The Court disagrees. As discussed above, the Court discounts Plaintiffs' predatory pricing claim and prefers to read the Complaint more generally. In general, the Complaint sufficiently alleges an anticompetitive scheme to artificially manipulate the price of gold. Whether Defendants' proffer a rational business justification for such conduct and whether liability will attach as a result of this claim is an issue that is not before the Court at this stage in the proceedings. See *Stearns,* 170 F.3d at 522 (discussing antitrust defendant's obligation on summary judgment).

Barrick contends that the Complaint alleges that together the Defendants have "violated United States' antitrust law by unlawfully *combining* ... to monopolize the market in gold." (Rec. Doc. 75 at 11) (citing Rec. Doc. 73 at ¶ 89) (emphasis added by Barrick). Barrick argues that this language states an oligopoly claim, which is not recognized by the antitrust laws. See *Cliff Food Stores, Inc. v. Kroger, Inc.,* 417 F.2d 203, 208 n. 2 (5th Cir.1969) ( "Section 2 refers to monopolies but not to oligopolies ..."). Although the Court agrees with Defendants that an oligopoly claim cannot necessarily stand under Section 2, the Court disagrees with Barrick's assessment of Plaintiffs' Section 2 claim. The Court finds that the Complaint adequately states a claim for Barrick's acquisition or attempted acquisition of monopoly power in the gold mining market and Morgan's acquisition or attempted acquisition of monopoly power in the gold derivatives market. The fact that the alleged unlawful anticompetitive effects are the product of an alleged unlawful combination between distinct corporate entities operating differentiated markets makes them no less actionable. [FN7]

> FN7. Previously, in this opinion the Court recognized for antitrust standing and anticompetitive effect purposes that all gold markets alleged by Plaintiffs are "integrated" and synonymous markets, however, for the purpose of alleging monopoly power the Court finds that the gold mining market and the gold derivatives market are sufficiently differentiated such that a claim for monopolization in each market can be properly alleged. The Court finds no inherent contradiction in this finding.

Morgan counters that Plaintiffs have failed to allege that Morgan possesses monopoly power in any market or that "there is a dangerous probability that

the attempt [to monopolize] will be successful." *Spectrofuge,* 575 F.3d at 276. The Court disagrees. In *Crossroads Cogeneration,* the Third Circuit held that simply alleging market share was insufficient to state a claim under Section 2, and that "something more" was required, including "the strength of competition, probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct, and the elasticity of consumer demand." *Id.* at 159 F.3d at 141 (quoting *Barr Laboratories, Inc. v. Abbott Laboratories,* 978 F.2d 98, 112-13 (3d Cir.1992). The Complaint satisfies these requirements. See, for example, Doc. 73, ¶ 38, 39, 42, 76-82.

*10 Morgan also counters that the Complaint fails to sufficiently allege a claim for attempted monopolization. In support, Morgan relies on *AD/SAT v. Associated Press,* 885 F.Supp. 511, 516 (S.D.N.Y.1995) for the proposition that failure to allege facts from which a court could infer an intent to monopolize is fatal to any attempted monopolization claim. The Court finds AD/SAT distinguishable. In that case, the dismissed plaintiffs failed to even allege an attempted monopolization claim against the defendant at issue. Based on that failure and the absence of any facts alleged from which to infer such a claim, the claim was dismissed. Here, Plaintiffs expressly claim that Morgan's conduct has violated Section 2 of the Sherman Act and have pled facts sufficient to maintain this action. Additionally, the Court is unpersuaded by Morgan's reliance on *Santana Prod., Inc. v. Sylvester & Assoc., Ltd.,* 121 F.Supp.2d 729, 736 (E.D.N.Y.1999) (quoting *American Tobacco Co. v. U.S.,* 328 U.S. 781, 811, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946) ("Plaintiff must allege overt acts by which Defendants intended to gain sufficient market power to 'raise prices or exclude competition when it desired to do so." '). As stated above, the Court does not find that the absence of a specific allegation that Defendants are able to raise prices at will is fatal to this action due to the extraordinary nature of the commodity at issue and the injury to competition as a result of depressed prices. Nevertheless, the Complaint does allege that the Premium Gold Sales Program is a mechanism to manipulate the price of gold both upwards and downwards and alleges facts to infer that both Barrick and Morgan, independently and in tandem enjoy or intend to gain sufficient market power to artificially manipulate price and exclude competition.

Accordingly, Plaintiffs' claims for monopolization and/or attempted monopolization under Section 2 of the Sherman Act should not be dismissed.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22071173 (E.D.La.), 2003-2 Trade Cases P 74,172
**(Cite as: 2003 WL 22071173 (E.D.La.))**

C. LUTPA

Plaintiffs' allege in part that Defendants manipulate the price of gold through unfair competition and unfair and deceptive trade practices. (Rec. Doc. 73 at ¶ ¶ 43-55, 116 & 117). The Louisiana Unfair Trade Practices Act ("LUTPA") proscribes "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce ..." La.R.S. 51:1405(A). It is well settled that only "direct consumers" or "business competitors" have standing to maintain a private right of action under LUTPA. See *Turbos de Acero de Mexico, S.A. v. American Int'l Inv. Corp., Inc.,* 292 F.3d 417, 480 (5th Cir.2002) ("to have standing under LUTPA, [the plaintiff] must demonstrate that it is either a consumer or a business competitor of [the defendant]."). To qualify as a business competitor, a plaintiff "must actually or potentially engage in business that competes directly or indirectly with [the defendant]." *Id.* (citing *Delta Truck & Tractor, Inc. v. J.I. Case Co.,* 975 F.2d 1192, 1205 (5th Cir.1992). The Court finds that Blanchard, "a retail dealer in rare coins and precious metals," Davies, "an individual investor in gold," and Holmes, "a partner in a gold mining enterprise" qualify as direct or indirect business competitors of Barrick. Further, due to the extraordinarily liquid and integrated world-wide market in gold as an investment commodity, the Court finds that all three Plaintiffs also qualify as business competitors of Morgan in its capacity as a dealer in and holder of gold derivatives.

*11 Barrick's reliance on the Court's previous dismissal of a LUTPA claim by Blanchard in another case is unpersuasive. See *Blanchard & Co. v. Contursi,* No.Civ.A. 99-1758, 1999 WL 955363 (E.D.La. Oct.19, 1999) (Berrigan, J.). In that case Blanchard admitted that it was suing the defendants in their roles as wholesalers for allegedly inflating prices, however, Blanchard specifically distinguished itself as a retailer, hence not a consumer or business competitor with the defendants. *Id.* at *3. The facts alleged and the scope of Defendants' conduct in the case at bar are fundamentally inapposite. In *Contursi,* the Court addressed allegations of unfair and deceptive trade practices occurring in a discrete transaction involving Blanchard and specific wholesalers. In contrast here, the Complaint alleges a conspiracy between two dominant and powerful market participants to artificially manipulate the price of gold world-wide.

Although Plaintiffs's status as business competitors

qualify them to bring their LUTPA claims against Defendants, the Court finds that Morgan, as a financial institution regulated by other authority is expressly exempt from the Act. See e.g. *Ponchartrain Leasing Co. v. First Nat'l Bank,* No.Civ.A. 86- 1541, 1987 WL 4932, at *2 (E.D.La. June 24, 1987) (finding LUTPA specifically does not apply to banks); *Scott v. Bank of Coushatta,* 512 So.2d 356, 364 (La.1987) ("exempted from the provisions of [LUPTA] are '[a]ctions or transactions subject to the jurisdiction of ... the state bank commissioner ... and any bank chartered by or under the authority of the United States." '); see also La.R.S. 51:1406(1).

Plaintiffs' argument that Morgan's conduct as alleged in the Complaint is not typical banking practice is unpersuasive. In *Bank of New Orleans & Trust Co. v. Phillips,* 415 So.2d 973 (La.App. 4 Cir.1982), the Louisiana Fourth Circuit Court determined that in a dispute involving the balance of a revolving credit card account, a bank was not acting as a bank, but rather as a commercial credit card company. *Id.* at 975. However, in finding no exemption existed for the bank under LUTPA, the appellate court recognized that the Louisiana legislature specifically repealed the jurisdiction of the State Banking Commissioner over the transaction at issue. See *id.* ("bank credit card transactions are no longer within the jurisdiction of the State Banking Commissioner."). Although the facts of the case at bar are arguably analogous, the Court is not persuaded that Morgan is not acting, in part, as a typical banking institution as alleged in the Complaint. Further, *Phillips,* a Louisiana state law case, involved a Louisiana bank, a Louisiana transaction and the application of Louisiana law. In contrast, Morgan is not chartered in Louisiana, the conduct alleged is not limited to the State of Louisiana and Louisiana law is not the sole authority applicable. Finally, the Court disagrees with Plaintiffs' urged interpretation of the holding in *Phillips.* (See Rec. Doc. 42 at 43) (positing the holding as "when a bank is not acting in its capacity as a banking institution, it is not exempt from LUTPA."). The Court finds the holding in *Phillips* is dependant on the intrastate nature of the facts and law implicated, especially the express repeal of jurisdiction by the Louisiana legislature over credit card transactions. The case at bar is distinguishable.

*12 Accordingly, the Court finds that Plaintiffs' claims under LUTPA remain as against Barrick and should be dismissed as against Morgan.

D. The Act of State Doctrine

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22071173 (E.D.La.), 2003-2 Trade Cases P 74,172
**(Cite as: 2003 WL 22071173 (E.D.La.))**

Barrick contends that Plaintiffs' antitrust and LUTPA claims are barred by the act of state doctrine. Specifically, Barrick argues that because the mechanics of the Premium Gold Sales Program involves the leasing of gold from various national central banks the act of state doctrine precludes judicial intervention. The Court disagrees.

The act of state doctrine proscribes "the courts of one country [from sitting] in judgment on the acts of the government of another done within its own territory." _Underhill v. Hernandez,_ 168 U.S. 250, 252, 18 S.Ct. 83, 42 L.Ed. 456 (1897); _Callejo v. Bancomer, S.A.,_ 764 F.2d 1101, 1115 (5th Cir.1985). Barrick contends that the merits of Plaintiffs' claims cannot be decided without running afoul of this doctrine and "instructing a sovereign to alter its chosen means of allocating and profiting from its own valuable natural resources." (Rec. Doc. 75 at 24) (citing _Int'l Ass'n of Machinists & Aerospace Workers v. OPEC,_ 649 F.2d 1354, 1361 (9th Cir.1981), _cert. denied,_ 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982) (holding act of state doctrine barred exercise of federal court jurisdiction in antitrust action to enjoin oil price-setting by OPEC).

Barrick's reliance on _Hunt v. Mobile Oil Corp.,_ 550 F.2d 68 (2d cir.1977), _cert. denied,_ 343 U.S. 984 (1977) for the proposition that the Court is precluded from adjudicating Plaintiffs' claims because the claims create a "nexus" between Defendants' acts and the acts of an unnamed foreign sovereign is misplaced. In _Hunt,_ the plaintiffs brought an antitrust action against other oil producers alleging a conspiracy "to preserve the competitive advantage of Persian Gulf crude oil over that of Libyan crude oil and to diminish competition from Libyan crude oil producers" resulting in the nationalization of Libya's oil fields to plaintiffs' detriment. _Hunt,_ 550 F.2d at 72. Applying the act of state doctrine, the Second Circuit found that "appellants admit that antitrust liability cannot be attributed to the defendants unless Hunt can prove that but for their combination or conspiracy Libya would not [nationalized certain oil producing properties belonging to plaintiffs]." _Hunt,_ 550 F.2d at 76. The "nexus" described by the Second Circuit, "at the heart of the claim" was plaintiffs' allegation that the loss due to nationalization was a direct result of the complained of antitrust injury. _Id._ Thus, the Second Circuit found that the act of state doctrine was "inescapably raised by the pleadings." _Id._ The Court finds the instant matter distinguishable.

Plaintiffs complained of antitrust injury involves a conspiracy between Defendants to artificially manipulate the price of gold. First, although the mechanics of the alleged manipulation involves leasing gold from foreign sovereigns, the sovereigns themselves are not implicated in the conspiracy nor is the complained of antitrust injury attributable to the foreign sovereigns' acts. An injunction prohibiting Defendants from entering into similar contracts in the future would not prevent any central bank from leasing gold, and the Court would not be impermissibly encroaching on the discretion of a foreign sovereign to manage national assets. Rather, the prayed for injunction would merely prevent _the Defendants_ from further participation in the challenged Premium Gold Sales Program between themselves.

**\*13** Second, the Court is cognizant of the fact that "an injunction terminating all Master Trading Agreements, spot deferred sales contracts and all other contracts through which Defendants manipulate the price of gold" may implicate contractual obligations and interests of the central banks. (_See_ Rec. Doc. 73 at ¶ 126(a)). Thus, with respect to this prayer for relief, Plaintiffs' claims may be impacted by the act of state doctrine. However, the Court is not prepared to dismiss this action altogether at this stage in the proceedings simply because a prayed for remedy might be inappropriate. Discovery will shed light on the Premium Gold Sales Program and the associated interests of the central banks with respect to the existing contracts between the Defendants. [FN8] If the relief requested impermissibly encroaches upon the discretion of a foreign to manage its national assets then the remedy may have to be precluded or adjusted.

> FN8. The Court appreciates that termination of the existing contracts between the Defendants might jeopardize the various central banks' ability to recover gold which they have leased. However, the Court declines to consider this potential issue until discovery sheds more light the nature and extent of the interests involved. Defendants may then reurge dismissal of this remedy if necessary and appropriate.

E. Defamation

The final cause of action is alleged by Blanchard against Barrick in particular for defamation, slander and libel. [FN9] "To maintain an action in defamation, the following elements must be shown:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 11
Not Reported in F.Supp.2d, 2003 WL 22071173 (E.D.La.), 2003-2 Trade Cases P 74,172
**(Cite as: 2003 WL 22071173 (E.D.La.))**

(1) defamatory words; (2) publication; (3) falsity; (4) malice, actual or implied; and (5) resulting injury." *Cangelosi v. Schwegmann Bros. Giant Super Markets,* 390 So.2d 196, 198 (La.1980). [FN10] In order to prevail in a defamation action, the plaintiff must prove that "the defendant, with actual malice or other fault, published a false statement with defamatory words which caused plaintiff damages ." *Bernofsky v. Administrators, Tulane Educational Fund,* Nos.Civ .A. 98-1792 & 98-2102, 2000 WL 422394, at *10 (E.D.La. Apr.18, 2000) (quoting *Sassone v. Elder,* 626 So.2d 345, 350 (La.1993)). The Louisiana Supreme Court defines defamatory statements as follows:

> FN9. The Court considers the slander and libel allegations encompassed within its analysis of Louisiana defamation law. *See Smith v. Berry Co.,* No.Civ.A. 96-1899, 1997 WL 104972, at *1 n. 2, (E.D.La. Mar.6, 1997) (citing *Neuberger, Coerver & Goins v. Times Picayune Publishing Co.,* 597 So.2d 1179, 1183 (La.App. 1 Cir.1992).

> FN10. This standard is often stated in four parts with falsity and defamatory words comprising a single element. *See Trentacosta v. Beck,* 703 So.2d 552, 559 (La.1997) (citing Restatement (Second) of Torts § 558 (1977)).

Statements are defamatory only if the words, taken in context, tend to injure the person's reputation, to expose the person to public ridicule, to deter others from associating or dealing with the person, or to deprive the person of public confidence in his or her occupation.
*Davis v. Borsky,* 660 So.2d 17, 22 (La.1995).

To be actionable, the statements at issue must be statements of fact and not opinion. *Bussie v. Lowenthal,* 535 So.2d 378, 381 (La.1988). "The court decides whether a communication is capable of a particular meaning and whether that meaning is defamatory. *Ratcliff v. Exxonmobil Corp.,* No.Civ.A. 01-2618, 2002 WL 1315625, at *14 (E.D.La., June 13, 2002) (Vance, J.).

Blanchard alleges that certain statements made by Barrick and its representatives are defamatory. (*See* Rec. Doc. 73 at ¶ 97(a-f)). The Court disagrees. The Press Releases and other statements complained of in Paragraph 97(a-f) are lengthy and the Court does not repeat them here verbatim. Relevant portions of these statements are as follows:

"Barrick Gold Corp. today dismissed as ludicrous and totally without merit anti-trust allegations against it referred to in a press release issued by Blanchard ... the Company said the press release contains numerous factual inaccuracies and defamatory statements."
**\*14** (Rec. Doc. 73 at ¶ 97(a)) (December 18, 2002, Barrick Press Release).
"Blanchard has made statements that have no basis in fact and are totally irresponsible and defamatory.... We ... are not prepared to tolerate the dissemination of false statements concerning Barrick that are harmful to our reputation ..."
(Id. at ¶ 97(b)) (January 29, 2003, Barrick Press Release).

Blanchard also complains of comments by a Barrick representative on February 13, 2003, apparently describing this lawsuit and Blanchard statements as "myths being put out there in the market," "misinformation being spread," and "lies." (Id. at ¶ 97(c)). And, comments by a Barrick media representative to Reuters on March 3, 2003, describing this suit as "completely without merit." (Id. at ¶ 97(d)). And, a Barrick Press Release on March 5, 2003, announcing a legal proceeding commenced in Canada against Blanchard for "false and defamatory statements published by Blanchard ... concerning Barrick." (Id. at ¶ 97(e)). Finally, Blanchard complains about Barrick CEO Gregory Wilkins statement on May 7, 2003, that "there is no basis for the lawsuit ... How one company could influence the marketplace is just ridiculous" and calling Plaintiffs' claims "absolutely ridiculous." (Id. at ¶ 97(f)).

The Court finds the above statements by Barrick and its representatives to be statements of opinion, and not statements of fact. *See Autry v. Woodall,* 493 So.2d 716 (La.App. 2 Cir.1986) (affirming dismissal of defamation action where letter by defendant describing plaintiff's lawsuit as meritless and "vindictive" were held to be opinion and not defamatory as a matter of law). Accordingly Blanchard's claim against Barrick for defamation, slander and libel is dismissed for failure to state a claim upon which relief can be granted. [FN11]

> FN11. On June 6, 2003, Donald Doyle, Chief Executive Officer of Blanchard and Neal Ryan, Assistant Vice-President of Blanchard (collectively the "Intervenors") filed a First Supplemental and Amending Complaint in Intervention ("Complaint in Invention") asserting an analogous claim for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22071173 (E.D.La.), 2003-2 Trade Cases P 74,172

**(Cite as: 2003 WL 22071173 (E.D.La.))**

defamation based on the identical statements found in the Complaint. (Rec.Doc. 74). Because the Court finds that Blanchard's defamation claim against Barrick is not actionable, the Court dismisses the Complaint in Intervention for the same reasons.

IV. Conclusion

The Court finds that Plaintiffs have sufficiently alleged causes of action under Section 1 and Section 2 of the Sherman Act against Barrick and Morgan. Additionally, Plaintiffs have sufficiently alleged a cause of action against Barrick under LUTPA, however, Morgan as a banking institution regulated by other authority is expressly exempt from the Act. The Court also finds that Blanchard has failed to allege a cause of action against Barrick for defamation, slander and libel. For the same reasons, the Complaint in Intervention is dismissed.

Accordingly, IT IS ORDERED that Barrick Gold Corporation's Motion to Dismiss is DENIED except with respect to Blanchard's claim for defamation, slander and libel against Barrick. IT IS FURTHER ORDERED that Blanchard & Company, Inc.'s claim against Barrick for defamation, slander and libel is DISMISSED WITH PREJUDICE for failure to state a claim upon which relief may be granted.

IT IS FURTHER ORDERED that J.P. Morgan Chase & Company's Motion to Dismiss is DENIED except with respect to Plaintiffs' LUTPA claims. IT IS FURTHER ORDERED that Plaintiffs' claims against Morgan for unfair trade practice in violation of LUTPA are DISMISSED WITH PREJUDICE for failure to state a claim upon which relief may be granted.

**\*15** IT IS FURTHER ORDERED that the Complaint in Intervention filed by Donald Doyle and Neal Ryan is hereby DISMISSED WITH PREJUDICE for failure to state a claim upon which relief may be granted.

Not Reported in F.Supp.2d, 2003 WL 22071173 (E.D.La.), 2003-2 Trade Cases P 74,172

**Motions, Pleadings and Filings** (Back to top)

• 2004 WL 2467885 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Plaintiffs' Motion to Compel (Sep. 22, 2004)

• 2004 WL 2467858 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Motion for Review of Magistrate's Order (Sep. 02, 2004)

• 2004 WL 2467866 (Trial Motion, Memorandum and Affidavit) Sur-Reply Memorandum of Defendants in Opposition to Plaintiffs' Motion to Continue (Sep. 02, 2004)

• 2004 WL 2467872 (Trial Motion, Memorandum and Affidavit) Plainiffs' Response to Defendants' Sur-Reply (Sep. 02, 2004)

• 2004 WL 2467879 (Trial Motion, Memorandum and Affidavit) Defendant J. P. Morgan Chase & Co.'s Reply Memorandum in Further Support of its Motion to Compel the Rule 30(b)(6) Deposition of Blanchard (Sep. 02, 2004)

• 2004 WL 2467852 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Motion to Continue (Sep. 01, 2004)

• 2004 WL 2467835 (Trial Motion, Memorandum and Affidavit) Defendant Barrick Gold Corporation's Memorandum in Opposition to Appeal of Magistrate's Order (Aug. 24, 2004)

• 2004 WL 2467839 (Trial Motion, Memorandum and Affidavit) Defendants' Joint Memorandum in Opposition to Plaintiffs' Motion to Continue (Aug. 24, 2004)

• 2004 WL 2467814 (Trial Motion, Memorandum and Affidavit) Defendant Barrick Gold Corporation's Reply Memorandum in Support of Motions to Compel (Jun. 09, 2004)

• 2004 WL 2467823 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply Memorandum in Support of Motion to Compel (Jun. 09, 2004)

• 2004 WL 2467805 (Trial Motion, Memorandum and Affidavit) Defendant Barrick Gold Corporation's Memorandum of Law in Opposition to Plaintiffs' Motion to Compel (Jun. 01, 2004)

• 2004 WL 2467783 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Surreply in Opposition to Barrick's Motion to Join Absent Bullion Banks and Gold Producers (Apr. 28, 2004)

• 2004 WL 2467794 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply Memorandum in Support of Motion for Reconsideration (Apr. 28,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22071173 (E.D.La.), 2003-2 Trade Cases P 74,172
**(Cite as: 2003 WL 22071173 (E.D.La.))**

2004)

• 2004 WL 2467770 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to Barrick's Motion to Join Absent Bullion Banks and Gold Producers (Apr. 20, 2004)

• 2004 WL 2467760 (Trial Motion, Memorandum and Affidavit) Defendants' Reply in Support of Motion for Entry of Protective Order (Mar. 26, 2004)

• 2004 WL 2467750 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to Defendants' Motion for Entry of Protective Order (Mar. 19, 2004)

• 2003 WL 23860663 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to Defendants' Motions for Reconsideration (Oct. 21, 2003)

• 2003 WL 23860651 (Trial Pleading) Answer of Defendant Barrick Gold Corporation to the Third Amended Complaint (Oct. 07, 2003)

• 2003 WL 23860638 (Trial Pleading) Answer (Oct. 06, 2003)

• 2003 WL 23860623 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Surreply to J.P. Morgan Chase and Co.'s and Barrick's Reply Memoranda in Further Support of Motion to Dismiss (Jul. 31, 2003)

• 2003 WL 23860603 (Trial Motion, Memorandum and Affidavit) J. P. Morgan Chase & Co.'s Reply Memorandum in Further Support of Motion to Dismiss (Jul. 16, 2003)

• 2003 WL 23860614 (Trial Motion, Memorandum and Affidavit) Supplemental Reply Memorandum in Support of Defendant Barrick Gold Corporation's Motion to Dismiss Third Amended and Supplemental Complaint (Jul. 16, 2003)

• 2003 WL 23860589 (Trial Motion, Memorandum and Affidavit) Supplemental Memorandum in Opposition to Motions to Dismiss for Failure to State a Claim (Jul. 08, 2003)

• 2003 WL 23860578 (Trial Motion, Memorandum and Affidavit) Supplemental Memorandum of J. P. Morgan Chase in Further Support of Motion to Dismiss (Jun. 25, 2003)

• 2003 WL 23860566 (Trial Motion, Memorandum

and Affidavit) Supplemental Memorandum in Support of Motion of Defendant Barrick Gold Corporation to Dismiss (Jun. 24, 2003)

• 2003 WL 23860549 (Trial Pleading) First Supplemental and Amended Complaint in Intervention (Jun. 06, 2003)

• 2003 WL 23860539 (Trial Pleading) Third Supplemental and Amended Complaint (Jun. 04, 2003)

• 2003 WL 23860512 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Surreply Memorandum in Further Opposition to Defendants' Motions to Dismiss (Jun. 02, 2003)

• 2003 WL 23860522 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of J.P. Morgan Chase & Co. in Further Support of Its Motion to Stay Discovery (Jun. 02, 2003)

• 2003 WL 23860498 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to Defendant J.P. Morgan Chase & Co.'s Motion to Stay Discovery (May. 21, 2003)

• 2003 WL 23860466 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Defendant Barrick Gold Corporation in Further Support of Motion to Dismiss the Complaint in Intervention for Failure to State a Claim (Apr. 29, 2003)

• 2003 WL 23860489 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Defendant Barrick Gold Corporation in Further Support of Motion to Dismiss the Complaint for Failure to State a Claim (Apr. 29, 2003)

• 2003 WL 23860451 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of J. P. Morgan Chase in Further Support of Motion to Dismiss (Apr. 25, 2003)

• 2003 WL 23860476 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Motion of Defendant Barrick Gold Corporation to Dismiss for Failure to Join Indispensable Parties (Apr. 25, 2003)

• 2003 WL 23860436 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to Defendant Barrick Gold Corporation's Motion to Stay Discovery (Apr. 22, 2003)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22071173 (E.D.La.), 2003-2 Trade Cases P 74,172
**(Cite as: 2003 WL 22071173 (E.D.La.))**

Page 14

• 2003 WL 23860388 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to Motions to Dismiss for Failure to State a Claim (Apr. 09, 2003)

• 2003 WL 23860401 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to Defendant Barrick's Motion to Dismiss for Failure to Join Indispensable Parties (Apr. 09, 2003)

• 2003 WL 23860418 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to Defendant Barrick's Motion to Dismiss Complaint in Intervention for Failure to State a Claim (Apr. 09, 2003)

• 2003 WL 23860374 (Trial Pleading) Second Supplemental and Amended Complaint (Feb. 27, 2003)

• 2003 WL 23860344 (Trial Pleading) Second Supplemental and Amended Complaint (Feb. 19, 2003)

• 2003 WL 23860325 (Trial Pleading) First Supplemental and Amended Complaint (Feb. 07, 2003)

• 2003 WL 23860359 (Trial Pleading) Complaint in Intervention (Feb. 2003)

• 2002 WL 32716048 (Trial Pleading) Complaint for Injunctive Relief (Dec. 18, 2002)

• 2:02cv03721 (Docket) (Dec. 18, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.