Westlaw.

Slip Copy                                                                                                     Page 1
Slip Copy, 2005 WL 2176965 (E.D.Wis.)
(Cite as: 2005 WL 2176965 (E.D.Wis.))

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Wisconsin.
JAMES CAPE & SONS COMPANY, Plaintiff,
v.
PCC CONSTRUCTION COMPANY, et al.,
Defendants.
No. 05-C-269.

Sept. 6, 2005.
Cristina D. Hernandez-Malaby, Matthew J. Flynn, Quarles & Brady LLP, Milwaukee, WI, for Plaintiff.

Andrew W. Erlandson, Stephen P. Hurley, Hurley Burish & Milliken SC, Madison, WI, Nathan A. Fishbach, Whyte Hirschboeck Dudek SC, Daniel T. Flaherty, Paul J. Stancil, Sean O. Bosack, Godfrey & Kahn SC, Kathryn A. Keppel, Gimbel Reilly Guerin & Brown, Milwaukee, WI, for Defendants.

DECISION AND ORDER

GRIESBACH, J.

*1 This action arises from a bid rigging scheme undertaken by the defendants to obtain state contracts to build streets, roads and airport projects. The defendants, two construction companies and their principal employees, undercut the bids of plaintiff James Cape & Sons by obtaining crucial inside information about Cape's bids from one of Cape's employees. As a result of this, and other, activity, several defendants are now serving prison sentences for their convictions. The defendants have moved to dismiss, arguing that even if all of the allegations in the complaint were taken as true, the plaintiff would state a claim for relief. For the reasons given below, the motion to dismiss will be granted.

I. BACKGROUND
The Wisconsin Department of Transportation employed a closed bidding system for its highway and other construction projects. Contractors interested in projects would be apprised of the particulars about a project and then, after an opportunity to project their own costs and potential profits, they would submit bids. According to the complaint, defendants Ernest and John Streu, principals of the Streu Construction Co., conspired with Michael and James Maples, of Vinton Construction, to share pricing information and divvy up the contracts they wanted to win. They would meet in person or discuss such matters over the telephone, all in an effort to allocate the market for desirable projects between themselves. (Compl.¶ 26.)

Eventually they were able to obtain the cooperation of defendant James Beaudoin, an employee of James Cape & Sons, a rival construction firm. Beaudoin was privy to Cape's bidding information and, before contracts were let by the state, he would phone the other defendants to tip them off about Cape's bid. According to the complaint, this information allowed one or the other of the defendant companies to be the lowest bidder on several state projects, sometimes underbidding Cape by as little as $1500. (Compl.¶ 45.) The complaint alleges this scheme caused injury to James Cape & Sons because the company was prevented from "being awarded multimillion dollar public and private construction contracts which would have resulted in substantial profits to James Cape." (Compl.¶ 1.)

II. ANALYSIS
As the parties rightly observe, a motion to dismiss under Rule 12(b)(6) should be granted only if the complaint fails to state a claim upon which relief may be granted, i.e., that the plaintiff would lose even if all of the complaint's allegations were true. Bressner v. Ambroziak, 379 F.3d 478, 480 (7th Cir.2004).

1. Antitrust Injury

Counts 1 and 2 of the complaint allege that the defendants engaged in unreasonable restraints of trade, in violation of the Sherman Act, 15 U.S.C. § 1, and Wis. Stat. § 133.03. Private civil actions to enforce the Sherman Act are allowed under § 4 of the Clayton Act, 15 U.S.C. § 15(a), which provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States." See also Sanner v. Board of Trade of City of Chicago, 62 F.3d 918, 926 (7th Cir.1995). The Supreme Court has explained quite clearly, however, that all injuries caused by illegal antitrust

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

activities are not necessarily compensable injuries. Instead, only those attributable to so-called "antitrust injuries" are compensable. Such injuries must stem directly from the very reason that the activity is prohibited, not just the activity itself. "Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of the anticompetitive acts made possible by the violation." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). As the Seventh Circuit has summarized it, the antitrust injury doctrine "requires every plaintiff to show that its loss comes from acts that reduce output or raise prices to consumers." Chicago Professional Sports Limited Partnership v. National Basketball Ass'n, 961 F.2d 667, 670 (7th Cir.1992).

*2 However the doctrine is styled, it is clear that there must be an injury resulting from a decrease in competition. Thus, in *Stamatakis Industries, Inc. v. King,* the court found no antitrust injury because the plaintiff failed to establish any harm to consumers. 965 F.2d 469, 471 (7th Cir.1992). "It established a decline in sales, to be sure, but a producer's loss is no concern of the antitrust laws, which protect consumers from suppliers rather than suppliers from each other. *If King's defection should be called unfair competition, it is nonetheless competition."* Id. (italics added). Similarly, in *Phillips Getschow Co. v. Green Bay Brown County Professional Football Stadium Dist.,* a case before this court, I concluded the plaintiff failed to establish an antitrust injury because the ultimate consumer was able to obtain lower bids than it would have if the alleged antitrust activities in that case not occurred. 270 F.Supp.2d 1043 (E.D.Wis.2003). "Whether the competition was proper or improper makes no difference as far as the antitrust claim is concerned." Id. at 1048.

In moving to dismiss these counts, the defendants argue that the complaint has failed to show any "antitrust injury" because by undercutting James Cape & Sons they actually provided *lower* bids to the customer. That is, their bid-rigging activities actually *increased,* rather than restricted, competition, albeit in an illegal manner. Because the antitrust laws are not meant to punish behavior that actually benefits the ultimate consumer, they argue that Cape cannot demonstrate an injury under the antitrust laws. I agree.

The plaintiff makes much of the fact that several defendants have met with criminal sanctions for their conduct, that substantial fines have been levied, and that some of the defendants' activities actually resulted in higher costs to the state. But at issue here is not the conduct of the defendants in general, but the nature of their conduct *vis-a-vis* the plaintiff, and the only conceivable injury the plaintiff suffered here is lost profits. There is no doubt that the plaintiff has been injured in the sense that it was unfairly underbid on government contracts it otherwise would have won (and profited from). But that is not enough. It must also show somehow that it was harmed in an anticompetitive way, and that it cannot do. Its damages would be the amount of profit it would have earned had it won the contracts at issue, but the reason it did not win those contracts is that its bids were *higher* than the others. The consumer here paid a lower price.

The plaintiff relies on dicta from a Seventh Circuit case to show that in some cases competitors-not just consumers-would be entitled to antitrust damages. According to the Seventh Circuit, "[l]osses inflicted by a cartel in retaliation for an attempt by one member to compete with the others are certainly compensable under the antitrust laws." Hammes v. AAMCO Transmissions, Inc., 33 F.3d 774, 783 (7th Cir.1994). While that is no doubt true, in *Hammes* the court was discussing the anticompetitive effects of cartels and cartels' efforts to *prevent* a competitor from underselling their prices. Such retaliatory activities would undoubtedly harm the consumer because they would strengthen the cartel's market power and bolster its members' ability to artificially raise prices. Such behavior is clearly anticompetitive. Nothing like that is alleged to have occurred here, however, at least as regards this plaintiff. According to the complaint, the defendants' actions caused Cape to lose profits, but that injury does not fall within the subset of injuries that can be called antitrust injuries because the predicate acts, at least as they impacted Cape, simply did not "reduce output or raise prices to consumers." Chicago Professional Sports Limited Partnership, 961 F.2d at 670.

*3 Finally, the plaintiff suggests that ruling on its damages at the 12(b)(6) stage is premature because it is not required to detail the scope of its injuries in its complaint. But as the Seventh Circuit noted in *Hammes,* danger lurks in the filing of a lengthy or detailed complaint because it allows one to plead too much. 33 F.3d at 778 ("We continue to be puzzled why lawyers insist on writing prolix complaints that can only get them into trouble.") When it is clear from the facts alleged that the plaintiff does not state

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

a claim, there is little reason to prolong the case on the basis that the Federal Rules require only notice pleading.

2. RICO Claims

Counts 3 and 4 of the complaint assert racketeering claims based on the federal and state Racketeer Influenced and Corrupt Organizations (RICO) laws, 18 U.S.C. § 1962(c) and Wis. Stat. § 943.83(3), which are largely identical. Like the antitrust laws, RICO provides for private civil enforcement: "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]" 18 U.S.C. § 1964(c). RICO makes it unlawful for "any person employed by or associated with [an interstate] enterprise ... to conduct or participate ... in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). The elements, therefore, are "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." United States v. Cummings, 395 F.3d 392, 397 (7th Cir.2005).

The complaint claims that the racketeering activity at issue here was wire fraud, which the defendants committed when they submitted rigged bids. The complaint also claims that the "enterprise" at issue was the Wisconsin Department of Transportation and alleges that the defendants, when they rigged their bids, participated in the "conduct" of that enterprise.

It is on this last point-"conduct" of the enterprise-that the defendants level their protest. They claim that, as outsiders, their actions in rigging bids for DOT contracts had no bearing on the "conduct" of the DOT itself, and, without any greater connection to the DOT's activities they cannot be held liable under RICO. In order to more accurately define what it meant for someone to participate in the conduct of an enterprise, the Supreme Court set forth its "operation or management" test in Reves v. Ernst & Young, 507 U.S. 170, 178- 79, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). There, the Court concluded that the word 'conduct' "requires an element of direction." Id. at 178. 'Participate' means "to take part in." Id. at 179. Thus, although a RICO defendant need not have substantial involvement in the conduct of the enterprise, he does need to have some role in its direction.

The plaintiff notes that outsiders are not always off the hook for RICO liability: "[a]n enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management. An enterprise also might be 'operated' or 'managed' by others 'associated with' the enterprise who exert control over it as, for example, by bribery." Id. at 184. Cape likens the defendants' conduct to outsiders who exercise control by bribery, claiming that "an outsider can control a public bidding process by stealing a competitor's bid information in order to control the order of bids." (Response Br. at 13.) But control over a bidding process is not necessarily control over the enterprise itself. At issue here are individuals and businesses engaged in an activity (the bid process), the rules of which were set by the DOT. Essentially, the defendants cheated. In doing so, however, it cannot be said that they controlled or conducted the affairs of the DOT any more than it could be said that illegal steroid users "conduct" Major League Baseball or illegal blackjack teams "conduct" the casinos they hit. Once the rules for bidding were set by the enterprise, it had little involvement with the actual outcome because it simply took the lowest bid automatically.

*4 The Supreme Court's example of bribery is instructive. Through bribery, an outsider can indeed control an enterprise because he is paying someone on the inside who exercises power, direction or discretion. The briber is, in essence, directing the enterprise himself by proxy. This is made clear by Cummings, supra, in which the Seventh Circuit observed that it might find the requisite enterprise control if an outsider made bribes related to an enterprise's "core functions". 395 F.3d at 399. In Cummings, the court found that outsiders who bribed enterprise insiders nevertheless lacked control over the enterprise because the insiders had no participation in the enterprise's management. 395 F.3d at 399-400. The court found it would be a "different ball game" if the outsider had bribed an insider to cause the enterprise to make fraudulent payments-a core function of the enterprise in question-but there was no evidence of that in Cummings. Id. at 399. Despite plaintiff's efforts to convince otherwise, this case is not that "different ball game." Had the defendants attempted to bribe a DOT insider to receive contracts or confidential bidding information, Cape would have a stronger argument that the defendants sought to exercise control over the enterprise itself. But the defendants here remained purposeful outsiders throughout the bid rigging scheme, hoping never to involve DOT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

employees at all and simply relying on the predetermined rules that the DOT had set up. The enterprise's involvement with the alleged racketeering activity was, if anything, completely passive.

To the extent that the decision in *Lockheed Martin Corp. v. Boeing Co.*, 357 F.Supp.2d 1350, 1359-60 (M.D.Fla.2005) is to the contrary, I respectfully disagree with that decision. The *Lockheed* court framed the issue as involving Boeing's control over "the outcome of the bidding competitions for launch contracts" rather than control of the RICO enterprise itself. *Id.* at 1360. No one doubts here that the bid rigging "controlled" (in a loose sense) the outcomes of the bidding process. But that is not enough. Conduct, the Supreme Court says, "requires an element of direction," *Reves,* 507 U.S. at 178, and the direction must be of the enterprise itself rather than of one's own affairs. "[Section] 1962(c) cannot be interpreted to reach complete 'outsiders' because liability depends on showing that the defendants conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs." *Handeen v. Lemaire,* 112 F.3d 1339, 1348 (8th Cir.1997). The only affairs the defendants controlled here were their own; that the DOT was a passive victim (or beneficiary) of that activity does not mean that the defendants were directing its affairs.

3. State Common Law Claims

Counts 5 and 6 of the complaint raise state common law claims of conspiracy and tortious interference with prospective contract. Having dismissed the claims upon which federal jurisdiction had been founded, I will dismiss these remaining state law claims without prejudice. *See Williams v. Aztar Indiana Gaming Corp.,* 351 F.3d 294, 300 (7th Cir.2003).

III. CONCLUSION

**\*5** For the reasons given above, IT IS ORDERED that the defendants' motions to dismiss are GRANTED. Counts 1 through 4 of the complaint are DISMISSED with prejudice, and counts 5 and 6 are DISMISSED without prejudice.

Slip Copy, 2005 WL 2176965 (E.D.Wis.)

**Motions, Pleadings and Filings (Back to top)**

• 2005 WL 910107 (Trial Pleading) Complaint (Mar. 10, 2005)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.