Westlaw.

Not Reported in F.Supp.

Page 1

Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)

(Cite as: 1996 WL 363156 (S.D.N.Y.))

▷

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
PHILIP MORRIS INCORPORATED, Plaintiff,
v.
Michael HEINRICH, Masta Displays Co., AM-PM Sales Co., Inc., Richard Billies,
Sidney Rothenberg, John Billies, Sonia Graphics, Jose Rivera, Jomar Displays,
Inc., Martin Neier, Joel Spector, Visart Mounting and Finishing Corp., Dani
Siegel, C.D. Baird & Co., Inc., Paul Bielik, Richard T. Billies, Jr.,
Manufacturers Corrugated Box Co., Inc., Irving Etra, Southern Container Corp.,
Steven Grossman, Donald Kasun, Barry Besen, Winko New Jersey, Inc. (formerly
known as Republic Container Corp., a New York corporation), Republic Container
Corp., a New Jersey corporation, Stanley Winikoff, Amy Winikoff, and X-L
Services, Inc., Defendants.
No. 95 CIV. 0328 (LMM).

June 28, 1996.

*MEMORANDUM AND ORDER*

McKENNA, District Judge.

*1 This case involves allegations by the Plaintiff, Philip Morris ("Philip Morris"), of a broad bid-rigging conspiracy on the part of the Defendants to allocate contracts for the production and supply of temporary cardboard "point-of-purchase" graphic displays, used for advertising Philip Morris products at retail locations. Philip Morris primarily charges antitrust violations, invoking the Sherman Act and New York State's Donnelly Act. It also brings claims for common law fraud, breach of fiduciary duty, participation in breaches of fiduciary duty, commercial bribery and commercial bribe receiving.

Most of the Defendants, mainly graphic display vendors, have moved to dismiss the Amended Complaint, filing ten separate notices of motion, with independent supporting and reply briefs. They variously argue that the case should be dismissed pursuant to Fed.R.Civ.P. 9(b), 12(b)(1) and 12(b)(6). The Court has examined the motions collectively, to the extent that the arguments apply equally to all Defendants, and individually, to the extent that Defendants raise arguments particular to their own circumstances. For the reasons stated below, the motions to dismiss are denied as to: Counts I, II, III, and IV to the extent that they accrued after March 4, 1989; and Count VIII. The motions to dismiss are granted as to Counts I, II, III and IV to the extent that they accrued prior to March 4, 1989, without prejudice to Plaintiff's right to replead fraudulent concealment within 60 days; Counts V, VI and VII, without prejudice to Plaintiff's right to replead with particularity, within 60 days; and Counts IX-XIII.

The United States of America ("the Government") moves separately to intervene in this action and to stay the depositions of John E. Clemence ("Clemence") and all other witnesses, as well as the answering of all interrogatories, until the disposition of what it characterizes as a closely-related criminal investigation it is currently conducting in this judicial district. For the reasons stated below, the Court grants the motion to intervene and grants the stay until December 31, 1996. The Government is also granted leave to request an extension of this stay prior to its expiration date, should one become necessary.

Finally, the Court denies the request of Defendants

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.          Page 2

Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)

**(Cite as: 1996 WL 363156 (S.D.N.Y.))**

Visart Mounting and Finishing Corp. ("Visart"), Dani Siegel ("Siegel") and Genetra Affiliates, Inc. ("Genetra") for access to the *ex parte* supplemental affidavit submitted by Rebecca Meiklejohn in support of the Government's opposition to their cross-motion for a show cause hearing. They had cross-moved for the show cause hearing to determine whether the Antitrust Division had breached grand jury secrecy with regard to its investigation. The Court has not considered these materials in connection with the present motions. The cross-movants are directed to submit their reply brief concerning the cross-motion within 10 days of this decision, without the benefit of access to the unreviewed *ex parte* materials.

I. Facts

*2 Philip Morris is a Virginia corporation engaged in the sale of tobacco products. Its Purchasing Department is responsible for buying retail promotional materials, including point-of-purchase cardboard graphic displays and packaging for consumer incentives. (Amend.Compl. at ¶ 5.) The company employed Defendant Michael Heinrich as Director of the Purchasing Department from 1988 through September of 1991. (Amend.Compl. at ¶ 6.) The remainder of the Defendants are manufacturing and service companies, their owners and their affiliates, who sought and received contracts to furnish Philip Morris with graphic display materials and services. In its Amended Complaint, Philip Morris groups these so-called Vendor Defendants into two categories: 1) the Mounting and Finishing Vendor Defendants; and 2) the Corrugated Vendor Defendants. The first group produced graphic displays on lightweight cardboard which they generally purchased from other vendors, while the second group produced displays on a heavier cardboard which they manufactured themselves. (Amend.Compl. at ¶¶ 7-9).

The essence of Philip Morris' Amended Complaint is that these Vendor Defendants, together with Heinrich and other Philip Morris employees, conspired to manipulate Philip Morris' bidding procedures for awarding contracts in order to ensure that the Vendor Defendants would obtain them.

Philip Morris' formalized bidding process for purchasing graphic displays required that for purchases of printed materials between $10,000 and $25,000, the Purchasing Department secure one written bid and at least one alternative verbal price quotation. Purchases between $10,000 (*sic*) and $100,000 required competitive bids from at least three qualified suppliers, with approval of the Director of Purchasing and the Vice President of Marketing Services needed before the job could be awarded to other than the lowest bidder. Purchases exceeding $100,000 required sealed bids from a minimum of three qualified suppliers, with the bids opened and the contract awarded to the lowest bidder at a bid review meeting. Louis T. Cappelli ("Cappelli"), the Graphics Purchasing Manager during all relevant periods, was responsible for soliciting and processing bids. As of 1988, he reported directly to Heinrich. (Amend.Compl. at ¶¶ 42-44.)

A. The Alleged Mounting and Finishing Vendors' Scheme

Philip Morris alleges that beginning no later than 1982, Cappelli ceded his responsibility for the bidding process to Ed Reitman, a sales representative of Defendant Masta Displays Co. ("Masta") who is now deceased, in return for bribes and kickbacks. Reitman, with the cooperation of Defendants AM-PM Sales Co. ("AM-PM"), Richard Billies ("Billies"), Sidney Rothenberg ("Rothenberg") and John Billies, all of whom are affiliates, officers or employees of Masta (collectively, "the Masta Group"), agreed with Cappelli that the Masta Group would supply the two or three requisite bidders for Philip Morris mounting and finishing work, but that Masta would always win the bid and subcontract the work to other vendors, including already existing Philip Morris vendors. (Amend.Compl. at ¶ 51.)

1. Mechanics

*3 According to Philip Morris, the alleged scheme worked as follows. Defendant Jomar Displays, Inc. ("Jomar"), with the approval, knowledge and participation of its officers, Defendants Martin Neier ("Neier") and Joel Spector ("Spector"), and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                         Page 3

Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)

**(Cite as: 1996 WL 363156 (S.D.N.Y.))**

Defendant C.D. Baird & Co., Inc. ("C.D. Baird"), with the approval, knowledge and participation of its officers, Defendants Paul Bielik ("Bielik") and Richard T. Billies, Jr., provided the Masta Group with blank company stationery and envelopes so that the Masta Group could draw up "dummy bids." Prior to submitting any bids to Philip Morris, the Masta Group would ask Jomar and C.D. Baird for legitimate price quotes on the contract. It then inflated those quotes substantially on the dummy bids it submitted to Philip Morris on those companies' letterheads, submitting a lower bid for the same contract on behalf of Masta. When Masta won the contract pursuant to this rigged bidding process, it subcontracted with C.D. Baird or Jomar to perform the work, paying the price offered in its original bid. The Masta Group kept the difference between the original bid and the inflated price paid Masta as its "commission," using part of these proceeds to pay off Cappelli. (Amend.Compl. at ¶¶ 52-54.)

For contracts exceeding $100,000, the Masta Group allegedly asked Jomar and C.D. Baird for quotes. After deciding which company should win the contract, the Masta Group directed the companies to submit specific bids directly to Philip Morris, reflecting greater dollar amounts than the original quote. After the subcontractor received the contract, performed the work and got paid, the Masta Group collected its commission by issuing the performing company an invoice for "consulting fees" in the amount of the overcharge. Eventually, to avoid paying income tax, this system was changed to one in which "money men" representing front companies with no operations invoiced the contracting company directly. These money men paid the Masta Group 90% of the commission, keeping the rest for themselves. As always, kickbacks were allegedly paid out of these commissions. (Amend.Compl. at ¶¶ 58-60.)

Philip Morris claims that Reitman bribed Cappelli, at first, by putting Cappelli's wife on the payroll of Clive Industries ("Clive"), a Connecticut corporation run out of his home. (Amend.Compl. at ¶ 55.) Subsequently, in approximately 1984, Cappelli formed a purported clothing business, KAL Associates ("KAL"), in his wife's name, allegedly, to receive kickbacks from Clive disguised as payments for clothing designs. (Amend.Compl. at ¶ 56.) After Reitman died, Philip Morris claims that Billies provided Cappelli with names of other front companies which would provide checks, in return for KAL invoices for services supposedly rendered. (Amend.Compl. at ¶ 57.)

2. Heinrich's Arrival

After Cappelli's immediate supervisor left Philip Morris in 1988, Billies recommended Heinrich, a friend who worked at Pepsi, to Cappelli. Billies apprised Heinrich of the bid-rigging scheme and obtained his assurance that he would cooperate in furthering it in return for kickbacks if he worked for Philip Morris. With Cappelli's assistance, Heinrich eventually obtained the job, becoming Cappelli's immediate supervisor. (Amend.Compl. at ¶ 61.) Shortly thereafter, he advised Cappelli to bring in Defendant Visart as a fourth vendor, with Defendant Siegel signing most of the bids on behalf of Visart. Billies rigged the bids in the same manner as he did with the other vendors, with the Masta Group receiving "commissions" and paying kickbacks to Cappelli and Heinrich. (Amend.Compl. at ¶¶ 62-64.)

*4 Philip Morris alleges that Billies and his son, Defendant John Billies, paid Heinrich by hand in cash, sometimes in the staircase at the Stella Mare restaurant in New York City, sometimes on the streets of Manhattan and on one occasion, in the back seat of their car. (Amend.Compl. at ¶¶ 65, 68, 70.) Starting in 1989, they also began paying Cappelli in cash. (Amend.Compl. at ¶ 68.) To generate this cash, Philip Morris claims that the Masta Group's money men would invoice AM-PM for goods and services never provided. AM-PM would pay by check, with the money men keeping 10% and paying the Masta Group the rest in cash. (Amend.Compl. at ¶ 69.) Philip Morris terminated Cappelli and Heinrich on September 30, 1991. (Amend.Compl. at ¶ 71.) After Cappelli was terminated, in the late fall of 1991, Rothenberg allegedly took Cappelli into the bathroom at the Garden City Country Club and made a kickback payment of approximately $9,000. (Amend.Compl.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 4
Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)
**(Cite as: 1996 WL 363156 (S.D.N.Y.))**

at ¶ 73.) While the total amount of bribes and kickbacks allegedly paid to Heinrich is unknown, Philip Morris estimates that by the fall of 1991, the Mounting and Finishing Defendants had paid Cappelli over $1 million. (Amend.Compl. at ¶¶ 65, 74.)

In addition to the relationship with Visart, the Masta Group, with the acquiescence of Cappelli and Heinrich, set up Defendant Sonia Graphics ("Sonia") in 1989, ostensibly a minority display products broker, to take advantage of Philip Morris' minority vendor program. Although Defendant Jose Rivera ("Rivera") was purportedly Sonia's sole proprietor, Philip Morris contends that Sonia was set up in Masta's office, shared Masta's telephone and fax numbers and that the same secretary typed Masta's and Sonia's bids. According to Philip Morris, the Masta Group completely controlled Sonia and rigged its bids to facilitate the larger scheme. Rivera knowingly and intentionally either signed falsified, inflated bids, or permitted the Masta Group to do so on his behalf. (Amend.Compl. at ¶ 66.)

Philip Morris charges Cappelli, Heinrich and the Mounting and Finishing Vendor Defendants with furthering their scheme through interstate commerce by use of the mails and the highways. These Defendants also allegedly used the telephone wires to facilitate the scheme by making numerous telephone calls among the conspirators. (Amend.Compl. at ¶¶ 76-78.)

B. The Alleged Corrugated Vendors' Scheme

According to Philip Morris, Cappelli, and eventually Heinrich, engaged in a similar conspiracy with the Corrugated Vendor Defendants, receiving kickbacks in return for offering control of the bidding process to an individual who rigged bids among the Corrugated Vendors. The alleged point man in this network was Harold Roll ("Roll"), also now deceased, who was a sales representative for Defendant Manufacturers Corrugated Box Co., Inc. ("Manufacturers"). The mechanics of this alleged conspiracy were almost identical to those allegedly employed by the Mounting and Finishing Vendors. Roll, with the approval of Manufacturers' Vice President, Defendant Irving Etra, supplied Cappelli with inflated corrugated bids, one from Manufacturers and generally two dummy bids from other Defendants. Manufacturers would always win the contract and in turn, farm out the work to other vendors, receiving a "commission" in return. As was the case with the Masta Group, a portion of these proceeds would be paid to Cappelli and Heinrich as kickbacks. (Amend.Compl. at ¶¶ 79-80.)

*5 Among the bidders Roll supplied Philip Morris were Defendant Genetra, whose bids were often signed by Siegel, and Ultra Print ("Ultra"), a wholly-owned subsidiary of Southern Container Corp. ("Southern"). Clemence was a salesman for Southern who signed Ultra's bids. These Defendants either provided Roll with blank company stationery or submitted bids directly to Philip Morris under Roll's direction. (Amend.Compl. at ¶¶ 81-83.) Eventually, after Cappelli requested new vendors other than Manufacturers to bid for contracts, Roll provided Southern and Republic Container Corp. ("Republic N.Y.", now known as Winko New Jersey, Inc. ("Winko N.J.")). [FN1] These companies, through Southern's officers, Defendants Steven Grossman ("Grossman") and Donald Kasun ("Kasun"), and Republic N.Y.'s officers, Defendants Stanley Winikoff and Amy Winikoff (who were also affiliated with Republic N.J.), agreed to divide up the corrugated vendor contracts. Roll told the Corrugated Vendors what to bid on contracts and received $1.00 per display upon completion of the work. (Amend.Compl. at ¶¶ 84-86).

> FN1. Republic N.Y., formerly known as Republic Container Corp., is now defunct. In late 1990, it changed its name to Winko Packaging, Inc., ultimately merging with Winko New Jersey, Inc. ("Winko N.J."). Amboy Holdings Inc. ("Amboy") changed its name to Republic Container Corp. after the incorporation of Winko Packaging, Inc. and is referred to in the Amended Complaint as "Republic N.J." Philip Morris alleges that Republic N.J.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.          Page 5
Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)
**(Cite as: 1996 WL 363156 (S.D.N.Y.))**

eventually took the place of Republic N.Y. in the corrugated scheme. (Amend. Compl. at ¶ 95.) Thus, they claim that Winko N.J. and Republic N.J. are liable for the acts of Republic N.Y. by virtue of their status as successor and de facto successor, respectively, to Republic N.Y. (Amend.Compl. at ¶¶ 100-101.) The Court concludes that both Winko N.J. and Republic N.J. can be held liable to the same extent as the other Defendants, for purposes of this motion. Furthermore, the statute of limitations, with regard to claims raised against Republic N.J., was tolled when the original complaint was filed. The filing against Republic N.J. as a successor corporation relates back to this date.

In 1989, Philip Morris claims that Billies approached Clemence, promising to use his influence with Heinrich and Cappelli to increase Southern's business with Philip Morris, in return for Southern's paying bribes to Billies instead of Roll. Clemence relayed the proposal to Grossman and Defendant Barry Besen ("Besen"), who was in charge of operations and administration at Southern's Dayton, New Jersey plant, and they instructed him to accept it. Thereafter, Southern paid a commission to the Masta Group for all contracts it received. Roll acquiesced in the deal in order to maintain his position as coordinator of the remainder of the Corrugated Vendor Defendants. (Amend.Compl. at ¶¶ 89-91.)

The Masta Group and Clemence eventually formed Defendant X-L Services, Inc. ("X-L"), in part to provide hand finishing work which Southern could not provide and in part to provide a conduit for Southern to pay commissions to the Masta Group. The procedure called for X-L to invoice Masta for the hand finishing work and Masta to invoice Southern for an amount significantly higher, the difference representing the Masta Group's commission. (Amend.Compl. at ¶¶ 92-93.) Philip Morris claims that Masta, Jomar and Visart also facilitated the Corrugated Vendors' scheme by bidding for corrugated jobs when they had no capacity to perform this type of work, serving merely as dummy bids. (Amend.Compl. at ¶ 94.) Ultimately, Philip Morris alleges, the Corrugated Vendors paid Cappelli hundreds of thousands of dollars in kickbacks in connection with corrugated display work. (Amend.Compl. at ¶ 96.) It claims that Cappelli, the Corrugated Vendors, the Masta Group, Jomar, Neier, Spector, Siegel and Visart availed themselves of interstate commerce in connection with the purportedly fraudulent conduct in the same manner alleged against the Mounting and Finishing Vendors. (Amend.Compl. at ¶¶ 97-99.)

C. Philip Morris' Bidding and Business Policies

*6 During the relevant period, Philip Morris disseminated a written Purchasing Policy to Purchasing Department employees, including Heinrich and Cappelli, providing that no employee involved in purchasing could accept any gift from actual or potential suppliers unless it was of nominal value and merely an extension of courtesy. Furthermore, both Cappelli and Heinrich received a written copy of the company's Business Conduct Policy, prohibiting an employee's acceptance of cash from anyone doing or seeking to do business with Philip Morris. During the relevant period, Cappelli and Heinrich signed Certificates attesting that they had read and understood this Policy and had not contravened it in the preceding year. (Amend.Compl. at ¶¶ 45-50.)

D. The Guilty Pleas

Since as early as March 4, 1993, a number of the Defendants have pleaded guilty in this district to various criminal charges related to the events described above. Jomar and Clemence each pleaded guilty to one count of violating the Sherman Act, for engaging in a combination and conspiracy in unreasonable restraint of trade and commerce, to rig bids and allocate contracts. (Amend. Complaint at ¶¶ 102-103, 112-113.) Cappelli, Rothenberg and Billies all pleaded guilty both to a Sherman Act count and a tax evasion count, arising from the same alleged facts. (Amend. Complaint at ¶¶ 104-107.) Robert Berger

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Page 6
Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)
**(Cite as: 1996 WL 363156 (S.D.N.Y.))**

("Berger"), one of the Mounting and Finishing Vendors' money men, pleaded guilty to one count of tax evasion, while Bert Levine ("Levine"), another of the money men, pleaded guilty to one count of conspiracy to defraud the United States of America and the Internal Revenue Service. (Amend. Compl. at ¶¶ 108-111.)

E. Philip Morris' Claims

Count I of the Amended Complaint brings a claim against Heinrich and the Mounting and Finishing Vendors for violating § 1 of the Sherman Act, 15 U.S.C. § 1, premised upon the alleged bid-rigging scheme. (Amend.Compl. at ¶¶ 118-123.) Count II states the identical claim against the Corrugated Vendors. (Amend.Compl. at ¶¶ 124-131.) Counts III and IV charge the Mounting and Finishing Vendors and the Corrugated Vendors, respectively, with violating New York State's Donnelly Act, N.Y.Gen.Bus.Law § 340, by restraining the free exercise of trade. (Amend.Compl. at ¶¶ 132-141.) Count V pleads common law fraud against the Mounting and Finishing Vendors, while Count VI brings the same claim against the Corrugated Vendors. (Amend.Compl. at ¶¶ 142-159.) Counts VII and VIII plead fraud and breach of fiduciary duty against Heinrich independently. (Amend.Compl. at ¶¶ 160-172.) Counts IX and X plead breach of fiduciary duty [FN2] against the Mounting and Finishing Vendors and the Corrugated Vendors, respectively. (Amend.Compl. at ¶¶ 173-184.) Counts XI and XII charge commercial bribery against the Mounting and Finishing Vendors and the Corrugated Vendors respectively, while Count XIII brings a commercial bribe receiving claim against Heinrich. Count XIV seeks a constructive trust in favor of Philip Morris for all bribes received by Heinrich, while Count XV seeks a forfeiture of all compensation paid to him during the period of his alleged disloyalty and dishonesty.

> FN2. Technically, the Plaintiff charges, "breach of fiduciary duty of another." This claim is more accurately styled, "aiding and abetting breach of fiduciary duty," or "inducement to breach of fiduciary duty."

II. Discussion
A. Rule 12(b)(6) Standard

*7 Rule 12(b)(6) provides that a complaint will be dismissed if there is a "failure to state a claim upon which relief can be granted." In the course of resolving a motion to dismiss pursuant to Rule 12(b)(6), the Court reads the complaint generously, accepting the truth of, and drawing all reasonable inferences from, the well-pleaded factual allegations. *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir.1993); *accord California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 515 (1972); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993); *Allen v. Westpoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir.1991), *cert. denied*, 503 U.S. 960 (1992); *Frasier v. General Elec. Co.*, 930 F.2d 1004, 1007 (2d Cir.1991).

> When determining the sufficiency of plaintiff[s] claim for Rule 12(b)(6) purposes, consideration is limited to the factual allegations in ... [the] complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiff['s] possession or of which plaintiff[ ] had knowledge and relied on in bringing suit. *Brass*, 987 F.2d at 150 (*citing Cortec*, 949 F.2d at 47-48).

The Court will only dismiss a Complaint for failure to state a claim when the Court finds beyond a reasonable doubt that Plaintiff "can prove no set of facts" to support the claim that Plaintiff is entitled to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

The Court is required to draw all reasonable inferences in Plaintiff's favor, but not all possible inferences. *See Correa-Martinez v. Arrillaga-Belendez*, 903 F.2d 49, 58 (1st Cir.1990). Only when "the suggested inference rises to what experience indicates is an acceptable level of probability," must the Court accept it as fact for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 7
Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)
**(Cite as: 1996 WL 363156 (S.D.N.Y.))**

pleading purposes. *Id.* at 52.

### B. The Sherman Act Claims

The Defendants move, in separate briefs, to dismiss the Sherman Act claims pursuant to Fed.R.Civ.P. 12(b)(6). Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. To state a claim under § 1, a party must allege three elements: (1) a combination or conspiracy; (2) that results in a restraint on interstate or foreign commerce; and (3) injury to the plaintiff's business or property. *Oreck Corp. v. Whirlpool Corp.,* 639 F.2d 75, 78 (2d Cir.1980), *cert. denied,* 454 U.S. 1083 (1981). The Defendants, essentially, claim that Philip Morris has failed to satisfy the second requirement.

While the language of the statute seemingly prohibits any restraint of trade, the Supreme Court has required that an "unreasonable" restraint of trade be demonstrated to establish a violation of § 1 . *FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 457 (1986). A trade restraint "may be adjudged unreasonable either because it fits within a class of restraints that has been held to be 'per se' unreasonable, or because it violates what has come to be known as the 'Rule of Reason.' " *Id.* at 458. Under the rule of reason, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint upon competition." *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 49 (1977). While the rule of reason requires a demonstration of anticompetitive effects or actual harm to competition in order to establish an antitrust violation, "[w]hen a *per se* offense is alleged, a showing of anticompetitive effect is *not* required to establish a Sherman Antitrust Act violation." *Bunker Ramo Corp. v. United Business Forms, Inc.,* 713 F.2d 1272, 1283-84 (7th Cir.1983) ; *see also Barrett v. United States Banknote Corp.,* No. 7420, 1992 WL 232055, at *4 (S.D.N.Y. Sept. 2, 1992) ("The plaintiff who successfully alleges a *per se* violation relieves himself of the requirement of showing anticompetitive effect."). A particular course of conduct is not considered a *per se* violation until the courts have had "considerable experience" with that type of conduct and application of the rule of reason has inevitably resulted in a finding of anticompetitive effects. *United States v. Topco Assocs., Inc.,* 405 U.S. 596, 607-08 (1972); *Bunker Ramo,* 713 F.2d at 1284. For the reasons stated below, the Court holds that the conduct alleged in the Amended Complaint falls plainly within the definition of a *per se* violation. Philip Morris has properly pleaded a conspiracy resulting in an unreasonable restraint of trade that injured its business. The Defendants' various arguments supporting the motions to dismiss Counts I and II are rejected and the motions denied.

### 1. Applicability of *Per Se* Rule

*8 The Supreme Court has stated that "agreements among competitors to fix prices on their individual goods or services are among those concerted activities ... held to be within the *per se* category." *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.,* 441 U.S. 1, 8 (1979). In determining whether particular conduct qualifies as price fixing, the Court does not take a literal approach, looking for the mere act of "fixing" a "price." *Id.* at 9. "Not all arrangements among actual or potential competitors that have an impact on price are *per se* violations of the Sherman Act or even unreasonable restraints." *Id.* at 23. Rather, the characterization of particular conduct depends upon its economic impact--"that is, whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output, and in what portion of the market, or instead one designed to 'increase economic efficiency and render markets more, rather than less competitive.' " *Id.* at 19-20 (citation omitted).

Thus, in *Broadcast Music,* the Court ruled that the issuance of blanket licenses to copyrighted musical compositions at fees previously arranged was not *per se* unlawful, despite the fact that it involved "price fixing" in the literal sense. It reasoned that the blanket license was not a "naked restrain [t] of trade," but rather, a practical response to market realities, accompanying "the integration of sales, monitoring and enforcement against unauthorized

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 8
Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)
(Cite as: 1996 WL 363156 (S.D.N.Y.))

copyright use." *Id.* at 20. Consequently, given what the Court perceived to be the lawful, useful purposes of the blanket licenses, it reversed the Court of Appeals' application of the *per se* standard to the facts and remanded the case for rule of reason analysis.

In *Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643 (1980), the Court reaffirmed its commitment to the proposition that price fixing, as a general rule, is unlawful *per se.* The case involved a group of beer wholesalers who allegedly conspired to fix credit terms for purchases by retailers. In noting that "[i]t has long been settled that an agreement to fix prices is unlawful *per se,*" *id.* at 647, the Court concluded that since an agreement to limit credit was tantamount to the elimination of price discounts, the conduct at issue constituted a practice which fell "squarely within the traditional *per se* rule against price fixing." *Id.* at 648. Given that none of the redeeming virtues which accompanied the *Broadcast Music* price fixing existed in *Catalano,* 446 U.S. at 649, the Court did not engage in an analysis of whether the conduct "would always or almost always tend to restrict competition and decrease output." *Broadcast Music,* 441 U.S. at 19-20.

The conduct alleged in this case involves a conspiracy on the part of commercial suppliers and Philip Morris employees to fix prices for goods and services at artificially inflated rates. The Court, accepting the well-pleaded allegations of the Complaint as true, views this behavior, on its face, as price fixing. It finds no evidence of economic or particularized industry circumstances suggesting that the alleged conspiracy developed as a legitimate business response to factors in the marketplace or served any other redeeming purpose. Further analysis under *Broadcast Music,* or any proof of anticompetitive effect, is therefore unnecessary. The alleged conspiracy is an example of price fixing that is unlawful *per se.* Thus, Counts I and II, raising claims under § 1 of the Sherman Act, state claims upon which relief can be granted and may not be dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

*9 Furthermore, the allegations here form a textbook case of bid rigging. Courts have specifically classified bid-rigging as a form of price fixing that constitutes a *per se* violation. *United States v. Koppers Co.,* 652 F.2d 290, 294 (2d Cir.1981), *cert. denied,* 454 U.S. 1083 (1982); *see also United States v. W.F. Brinkley & Son Constr. Co., Inc.,* 783 F.2d 1157, 1161 (4th Cir.1986) ("[W]here two or more persons agree that one will submit a bid for a project higher or lower than the others or that one will not submit a bid at all, then there has been an unreasonable restraint of trade which violates the Sherman Antitrust Act."); *United States v. Fischbach & Moore, Inc.,* 750 F.2d 1183, 1192 (3d Cir.1984) ("[P]rice fixing and bid rigging are *per se* violations."), *cert. denied,* 470 U.S. 1029 (1985); *United States v. Portsmouth Paving Corp.,* 694 F.2d 312, 325 (4th Cir.1982) ("Any agreement between competitors pursuant to which contract offers are submitted to or withheld from a third party constitutes bid rigging *per se.*"); *United States v. Brighton Bldg. & Maintenance Co.,* 598 F.2d 1101, 1106 (7th Cir.) ("An agreement among competitors to rig bids is illegal"), *cert. denied,* 444 U.S. 840 (1979); *United States v. Flom,* 558 F.2d 1179, 1183 (5th Cir.1977) ( "Conspiracies between firms to submit collusive, non-competitive, rigged bids are *per se* violations of the statute"); *Barrett,* 1992 WL 232055, at *4 ("Price fixing and bid rigging generally constitute *per se* violations.... Unlike bid rigging arrangements, however, not every price fixing agreement constitutes a *per se* violation."). As a result, Counts I and II state claims for *per se* violations of the Sherman Act. Demonstration of anticompetitive effect is unnecessary.

The Defendants' argument that the facts of this case constitute nothing more than commercial bribery, outside the scope of the Sherman Act, is without merit. Unlike the cases cited by Defendants, *see, e.g., Calnetics Corp. v. Volkswagen,* 532 F.2d 674, 687 (9th Cir.) (no antitrust violation where commercial bribery alleged without allegations of price fixing or bid rigging), *cert. denied,* 429 U.S. 940 (1976); *Federal Paper Bd. Co. v. Amata,* 693 F.Supp. 1376, 1380 (D.Conn.1988) (bribery, standing alone without allegations of collusion,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.