# TAB 1

Slip Copy                                                                    **Page   1**
Slip Copy, 2004 WL 3270060 (E.D.N.Y.)
**(Cite as: 2004 WL 3270060 (E.D.N.Y.))**
c

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
AIU INSURANCE COMPANY, Eagle Insurance
Company, American Home Assurance
Company, Lion Insurance Company and Newark
Insurance Company, Plaintiffs,
v.
OLMECS MEDICAL SUPPLY, INC., Vega
Medical Supplies, Inc., Elic Burshtein, Eric
Burshtein, Eduard Gurshevich, 138 Medical
Supplies Inc., E.M. International
Trading, Inc., Tah's Distributor's Inc., Jean Pratt
Daniel, M.D., Gary
Friedman, M.D., Shahla Mallick, M.D., Aleksadr
Matrisov, M.D., Brian Meacham,
D.C., Borris Rapoport, D.C., Robert Rook, D.C.,
Chris Steidinger, D.C., Vadium
Surikov, M.D., and Igor Yukelis, M.D.,
Defendants.
No. CV-04-2934 (ERK).

Feb. 22, 2004.
Elan Raviv Kandel, Shapiro, Beilly, Rosenberg,
Aronowitz, Levy & Fox, LLP, Michael Francis
Gallagher, Katten Muchin Zavis Rosenman, New
York, NY, for Plaintiffs.

Vladimir J. Rodney, Law Office Of Feder &
Rodney, PLLC, Brooklyn, NY, Larry H. Weiss,
Weiss & Cohen, Esqs., Matthew J. Conroy, Belesi
& Donovan, P.C., Garden City, NY, Robert H.
Cohen, Lamb & Barnosky, LLP, Melville, NY,
Anthony K. Dilimetin, Dilimetin & Dilimetin, New
York, NY, Maranda E. Fritz, Maranda E. Fritz,
P.C., New York, NY, for Defendants.

Anthony L. Paccione, Katten Muchin Zavis
Rosenman, Esqs., New York, NY, Elan Raviv
Kandel, for Plaintiffs/Defendants.

Roy W. Breitenbach, Garfunkel, Wild & Travis,
P.C., Great Neck, NY, for Claimant.

### MEMORANDUM & ORDER

KORMAN, Chief Judge.

*\*1* Plaintiffs are insurance companies who allege
that defendants engaged in a scheme to exploit the
payment formulas in New York's Comprehensive
Motor Vehicle Insurance Reparations Act (N.Y. Ins.
§ 5101, *et seq.*), and the regulations promulgated
pursuant thereto (11 N.Y.C.R.R. § 65, et seq.).
Specifically, plaintiffs allege that defendants have
stolen money by submitting and causing to be
submitted thousands of fraudulent charges for
medically unnecessary durable medical equipment
and orthotic devices ("Supplies") on behalf of
individuals injured in automobile accidents and
eligible for No-Fault benefits under policies issued
by plaintiffs ("Insureds"). Plaintiffs assert five
causes of action. Plaintiffs seek damages for (1)
racketeering activity pursuant to 18 U.S.C. §
1962(c); (2) racketeering conspiracy pursuant to 18
U.S.C.1962(d); (3) common law fraud; and (4)
unjust enrichment. Plaintiffs additionally seek (5) a
declaratory judgment that they are not obligated to
pay any outstanding fraudulent claims. Defendant
Robert Rook moves to dismiss the complaint on the
grounds that plaintiffs have failed to sufficiently
allege violations of Civil RICO under 18 U.S.C. §
1962; have failed to adequately plead the elements
of common law fraud; and have failed to sufficiently
plead unjust enrichment. Defendant Vadium Surikov
joins in the motion.

### BACKGROUND

Plaintiffs AIU Insurance Co., Eagle Insurance Co.,
American Home Assurance Co., Lion Insurance
Co., and Newark Insurance Co. are insurance
companies. Defendants fall into three catagories: (1)
doctors and chiropractors Jean Pratt Daniel, M.D.,
Gary Friedman, M.D., Shahla Mallick, M.D.,
Aleksandr Martirisov, M.D., Brian Meacham,
D.C., Borris Rapoport, D.C., Robert Rook, D.C.,
Chris Steindinger, Vadium Surikov, M.D. and Igor
Yukelis, M.D. ("Prescribing Doctors"); (2) retailers
of medical supplies Olmecs Medical Supply, Inc.,
and Vega Medical Supply, Inc., and their owners
Elic Burshtein, Eric Burshtein, and Eduard
Gurshevich ("Retail Defendants"); and (3)
wholesalers of medical supplies 138 Medical
Supplies, Inc., E.M. International Trading Inc.,
Tah's Distributor's Inc. ("Wholesale Defendants").
Complaint ¶ 2, Opposition to Defendant Robert
Rook's Motion to Dismiss ("Opposition"), at 2.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Plaintiffs describe the distinct roles of each category of defendant as follows: Prescribing Doctors treat large volumes of Insureds at several clinics, at which time they knowingly prescribe medically unnecessary Supplies and falsely represent that such Supplies are medically necessary. Complaint ¶¶ 8-12. Retail Defendants, who purport to provide the actual Supplies to Insureds, then submit fraudulent claims via mail to plaintiffs. These submissions include the misleading prescriptions and letters of medical necessity from Prescribing Doctors, as well as fraudulent wholesale invoices from Wholesale Defendants (who purport to sell Supplies to Retail Defendants). *Id.* ¶ 13-17. The scheme is designed to exploit the payment formulas in the No-Fault laws.

**\*2** Under the No-Fault laws in New York, automobile insurers are required to reimburse individual Insureds injured in automobile accidents for "basic economic loss" ("No-Fault Benefits") of up to $50,000 for health care goods and services, including medically necessary durable medical equipment [FN1] and orthotic devices. Insureds may assign their No-Fault Benefits to providers of Supplies, such as the Retail Defendants, who may then submit claims for payment directly to plaintiffs. *Id.* ¶ 5-7. Eligible providers of durable medical equipment are entitled to up to 150% of the "documented cost" of the equipment. 11 N.Y.C.R.R. (Appendix 17-C, Part E(b)(1)). *Id.* ¶ 21. For example, a retailer of a bed board who purchases that item legitimately for the documented cost of $10 may submit a claim to an insurance company for $15. Eligible providers of orthotic devices can charge up to 155% of prices listed in New York's Medicaid Fee Schedule. 11 N.Y.C.R.R. (Appendix 17-C, Part F(a)-(c)). *Id.* ¶ 25. Thus, if the maximum price for a basic cervical collar in the Medicaid Fee Schedule is $10, a retailer may submit a claim to plaintiffs for $15 .50.

> FN1. Durable medical equipment includes bed boards, cervical pillows, egg crate mattresses, electrical muscle stimulators, hot/cold packs, infrared lamps, lumbar cushions, massagers, orthopedic car seats, transcutaneous electric nerve stimulators, thermophores (electric moist heating pads), over-the-door cervical traction units, and whirlpool baths. Complaint ¶ 19.

To exploit the reimbursement formula for durable medical equipment, defendants are alleged to routinely seek 150% of "documented costs" reflected in wholesale invoices from Wholesale Defendants which are 2 to 20 times the price of equivalent items from legitimate sources in the marketplace. *Id.* ¶ 22. For example, plaintiffs allege that defendants' documented costs for egg-crate mattresses, cervical traction sets, and hot-cold packs are $78-80, $80, and $29-45, respectively, when such items are readily available for less than $11, $10, and $2. *Id.*

To exploit the formula for reimbursement for orthotic devices, Retail Defendants allegedly submit claims for 155% of expensive versions of specific Supplies when basic versions are what has actually been prescribed, and/or is medically necessary, and/or is provided to the Insureds. *Id.* ¶¶ 24-44. To illustrate, the Medicaid Fee Schedule for lumbar-sacral supports ("LSOs") ranges from $85 to $1,150 for ten different types of supports. *Id.* ¶ 35. According to plaintiffs, without an express indication that a sophisticated LSO is necessary, prescriptions for LSOs should be filled with a flexible or basic LSO, the maximum permissible charge for which is $95. Yet, Retail Defendants purport to fill prescriptions which lack any indication that anything other than a basic LSO is necessary with custom-fabricated LSOs, for which they bill plaintiffs $269. *Id.* ¶ 37. Moreover, while custom-fabricated LSO's take several weeks to construct based on the individual measurements of an Insured, defendants here claim to provide them within a day or two, suggesting that they are not actually provided to the Insureds. *Id.*

Cervical collars are among the most commonly prescribed orthotic devices by the Prescribing Doctors. *Id.* ¶ 29. The Medical Fee Schedule establishes prices for cervical collars from $6.47 to $357 for eight types of collars identified by code. Plaintiffs assert that when no code is indicated, a prescription for a cervical collar should be filled with the most basic collar, the maximum charge for which is between $5.78 to $6.47. *Id.* ¶ 30. Yet, plaintiffs allege that in almost every instance where a prescription for a basic cervical collar has been submitted, defendants have instead filled it with a semi-rigid, thermoplastic foam two-piece cervical collar, for which the maximum permissible fee is $75, and for which plaintiffs are billed $119. ($75 multiplied by 1.55). *Id.* ¶¶ 31-32.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



*3 Thoracic lumbar-sacral supports (lower and middle back supports) ("TLSOs") are another device purportedly provided by Retail Defendants. *Id.* ¶ 39. The Medicaid Fee Schedule for these devices ranges from $144 to $353 for four specific types of basic, flexible TLSOs (code L0300 to L0317). *Id.* ¶ 40. Nonetheless, Prescribing Doctors are alleged to have uniformly prescribed TLSOs with anterior, posterior and lateral control ("TLSOs with APL"). *Id.* ¶ 41. The Medicaid Fee Schedule for TLSOs with APL is $900. *Id.* ¶ 43. Retail Defendants thus submit bills for 155% of $900, or $1,395. Plaintiffs allege that the TLSOs with APL are medically unnecessary for several reasons. Plaintiffs aver that TLSOs with APL, which severely restrict the movement of the user, are normally prescribed to victims of trauma immediately following the trauma to reduce pain and promote healing. Here, however, the TLSOs with APL were typically prescribed 30 to 60 days after each Insured's motor vehicle accident. *Id.* ¶ 42. Additionally, plaintiffs point out that there is no indication in defendants' paperwork that they had the necessary measurements for each individual Insured, or performed the necessary fittings or adjustments for the TLSOs with APL that they purportedly provided to patients. *Id.* ¶ 44.

According to plaintiffs, the documentation provided by Prescribing Doctors and Wholesale Defendants is fraudulent in numerous respects. Prescribing Doctors prescribe unnecessary Supplies with prescriptions that intentionally omit necessary details such as reference to specific models, and the medical condition for which the Supply is necessary, to facilitate--as described above--Retail Defendants ability to submit bills for more expensive versions when only the basic versions, if anything, are medically necessary. Prescribing Doctors also provide letters of medical necessity that omit the actual medical condition for which the prescribed item is purportedly necessary. The letters are also unusual, according to plaintiffs, because they only reference the Insureds once. *Id.* ¶ 46. Plaintiffs aver that the signatures of the Prescribing Doctors on the prescription forms often do not match the signatures for the same doctors on the letters of medical necessity. *Id.* ¶ 45. (Plaintiffs attach copies of the non-matching signatures. *See* Complaint, Ex. C.). Similarly, Wholesale Defendants allegedly provide wholesale invoices which intentionally omit necessary details such as the make, model, size,

features or functions of the Supplies. *Id.* ¶ 47.

Plaintiffs allege that in each and every claim submitted to plaintiffs, defendants have knowingly made some or all of the following misrepresentations:
(A) Made material misrepresentations that the Supplies prescribed by the Prescribing Doctors were medically necessary when, in fact, they were not;
(B) Omitted basic material facts regarding the kind and quality of the durable medical equipment and orthotic devices for which they have sought payment, and/or provided information that is completely meaningless in determining the true kind and quality of any specific item, the medical necessity of that item, or appropriate charges;
*4 (C) Made material misrepresentations that the costs that the Retail Defendants purportedly incurred in purchasing those items from the Wholesale Defendants were legitimate when, in fact, those costs either: (i) were incurred pursuant to illegitimate, undisclosed collusive arrangements between the Retail Defendants and the Wholesale Defendants for the sole purpose of collecting fraudulent charges from the plaintiffs; or (ii) were not actually incurred;
(D) Made the following material misrepresentations regarding cervical collars purportedly provided to Insureds: (i) that the cervical collars prescribed by the Prescribing Doctors were medically necessary when, in fact, they were not, (ii) that a 2 piece semi-rigid thermoplastic foam cervical collar (L0172) was medically necessary when, in fact, a flexible non-adjustable foam cervical collar (L0120) was prescribed, (iii) that they were entitled to collect $119 for 2 piece semi-rigid thermoplastic foam cervical collar (L0172) when, in fact, at most they should have been entitled to collect approximately $10 for a flexible nonadjustable foam cervical collar (L0120), and (iv) that any cervical collars which were provided were designed to benefit the Insureds when, in fact, the apparent lack of necessary measurements, fittings and adjustments in many instances indicates that they were not;
(E) Made the following misrepresentations regarding LSOs purportedly provided to Insureds: (i) that the LSOs prescribed by the Prescribing Doctors were medically necessary when, in fact, they were not, (ii) that any custom fabricated LSOs (L0510) were actually provided to any Insureds

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



when, in fact, they were not, (iii) that custom fabricated LSOs (L0510) were medically necessary when, in fact, basic LSOs (L0500) were prescribed, (iv) that they were entitled to collect $269 for custom fabricated LSO (L0510) when, in fact, at most they should have been entitled to collect approximately $142 for a basic LSO (L0500), and (v) that any LSOs which were provided were designed to benefit the Insureds when, in fact, the apparent lack of necessary measurements, fittings and adjustments in many instances indicates that they were not; and/or (F) Made the following misrepresentations regarding TLSOs with APL purportedly provided to Insureds: (i) that custom fitted TLSOs with APL (L0430) were medically necessary when, in fact, they were not: and (ii) that any TLSOs with APL which were provided were designed to benefit the Insureds when, in fact, the apparent lack of necessary measurements, fittings and adjustments in many instances indicates that they were not. *Id.* ¶ 51.

Plaintiffs claim that they have justifiably relied on the materials provided by defendants. Plaintiffs aver that they are statutorily and contractually obligated to promptly and fairly process claims within 30 days. Plaintiffs allege that the facially valid documents submitted to plaintiffs, along with the material misrepresentations contained within them were designed to, and did, cause the plaintiffs to rely on them. Plaintiffs also aver that Retail Defendants have retained two law firms, Baker & Barshay, LLP, and the Law Office of Edward Shapiro to induce them into promptly paying the fraudulent claims submitted. According to plaintiffs, these firms submit the bills to plaintiffs along with cover letters indicating that the law firms have been hired to collect payment for Retail Defendants. To plaintiffs, this constitutes an implicit threat of litigation if the plaintiffs were to fail to promptly pay Retail Defendants' charges in full. *Id.* ¶¶ 52-53.

*5 Plaintiffs allege that defendants' scheme has resulted in the submission of 480 fraudulent claims, and that they have paid more than $400,000 to the Retail Defendants as a result of the fraudulent scheme. Opposition Memo. at 3, Complaint ¶ 53. Plaintiffs detail 440 claims submitted by Olmecs Medical Supply, Inc., ("Olmecs"), each of which represents a single RICO violation ("RICO Event"). Opposition at 4. For each individual RICO Event,

plaintiffs identify: (i) the supplies billed for; (ii) the billing codes used to identify the items; (iii) Olmecs' charges for each item; (iv) the Wholesale Defendant whose fraudulent invoice submitted by Olmecs in support of its charge; and (v) the date and nature of the mailings associated with each charge. Complaint, Exhibit G. Plaintiffs additionally provide identical categories for 40 fraudulent claims submitted by Retail Defendant Vega Medical Supplies, Inc. ("Vega"). Complaint, Exhibit H. Both Olmecs and Vega are owned and controlled by the same three individuals. Complaint, ¶ 61.

Plaintiffs also list RICO Events organized by the Prescribing Doctor whose prescription allegedly supported the submission. Complaint, Ex. A. For each RICO Event, plaintiffs identify the author, the date of the prescription, and the items prescribed. Plaintiffs identify 79 separate claims supported by prescriptions of Defendant Rook. *Id.* Plaintiffs identify 39 separate claims supported by 63 separate prescriptions of Defendant Surikov. *Id.*

### DISCUSSION

#### I. Standard of Review

In deciding a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), the court's function is merely to assess the legal sufficiency of the complaint rather than to weigh the evidence that might be presented at a trial. *See Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985). In applying this standard, a court must read all well pleaded allegations in the complaint in the light most favorable to the plaintiff. *Commercial Cleaning Services, L.L.C. v. Colin Service Systems, Inc.,* 271 F.3d 374, 380 (2d Cir.2001). A complaint may not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). On such a motion, only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken are considered. *See Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47-48 (2d Cir.1991).

#### II. Civil RICO

##### A. *General Requirements*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



The Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.*, provides for a civil action for treble damages for injuries sustained by any person in his business or property by reason of the defendant's use of racketeering-derived income to invest in, acquire, or control an enterprise engaged in or affecting foreign or interstate commerce. *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 495 (1985); *see also Moss v. Morgan Stanley, Inc.,* 719 F.2d 5, 17 (2d Cir.1983). To state a claim for a violation of RICO, a plaintiff has two pleading burdens. *Moss,* 719 F.2d at 17. First, he must allege that the defendant has violated the substantive RICO statute, 18 U.S.C.1962, which, in pertinent part, states:

**\*6** It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). In so doing, he must allege existence of seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce. *Moss,* 719 F.2d at 17; *see also Davis Lee Pharmacy, Inc., v. Manhattan Central Capital Corp.,* 327 F.Supp.2d 159, 163-164 (E.D.N.Y.2004). And, the elements of a RICO offense must be established as to each individual defendant. *See United States v. Persico,* 832 F.2d 705, 714 (2d Cir.1987). Second, plaintiff must allege that he was "injured in his business or property by reason of a violation of section 1962." *Moss,* 719 F.2d at 17 (quoting 18 U.S.C. § 1964(c) ).

Defendants Rook and Surikov argue that plaintiffs have failed to adequately plead: (1) the existence of an enterprise; (2) moving defendants' participation in the conduct of the enterprise, and (3) the predicate acts underlying the pattern of racketeering activity.

## B. *Enterprise*

Defendants argue that plaintiffs have failed to allege facts necessary to establish an "enterprise" and

instead have merely alleged a "classic hub-and-spokes conspiracy" that fails to satisfy RICO's requirements. "Enterprise" is defined by 18 U.S.C. § 1961(4) to include any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. *See First Capital Asset Management, Inc. v. Satinwood, Inc.,* 385 F.3d 159, 173 (2d Cir.2004). A RICO enterprise is thus "a group of persons associated together for a common purpose of engaging in a course of conduct," the existence of which is proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *See id.* (citing *United States v. Turkette,* 452 U.S. 576, 583 (1981)). The enterprise must be separate from the pattern of racketeering activity, and distinct from the person conducting the affairs of the enterprise. *See First Capital Asset Management,* 385 F.3d at 173 (citing *Turkette,* 452 U.S. at 583).

The Second Circuit has construed "enterprise" liberally, noting that RICO's "language and the history suggest that Congress sought to define the term as broadly as possible...." *United States v. Indelicato,* 865 F.2d 1370, 1382 (2d Cir.1989). "For an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." *First Capital Asset Management,* 385 F.3d at 174 (internal quotation marks omitted). Courts in the Second Circuit look to the "hierarchy, organization, and activities" of an association-in-fact to determine whether "its members functioned as a unit." *United States v. Coonan,* 938 F.2d 1553, 1560-61 (2d Cir.1991). Finally, in pleading the element of "enterprise" under RICO, a plaintiff need satisfy only the notice pleading requirements of Fed. R. Civ. Pr. 8(a). *See In re Sumitomo Copper,* 995 F.Supp. 451, 454 (S.D.N.Y.1998).

**\*7** Defendants argue that the complaint sets forth a "classic hub-and-spokes conspiracy," and point to *New York Auto. Ins. Plan v. All Purpose Agency & Brokerage Inc.,* No. 97 Civ. 3164(KTD), 1998 WL 695869 (S.D.N.Y Oct. 6, 1998), where the district court rejected a purportedly analogous hub-and-spokes conspiracy. *New York Auto Insurance,* however, was decided on a motion for summary judgment, which tested plaintiffs' *proof* that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



defendants had acted together with a common purpose, not plaintiffs' allegations. *See United States Fire Ins. Co. v. United Limousine Service, Inc.,* 303 F.Supp.2d 432, 447 n. 4 (S.D.N.Y 2004). Moreover, the facts of *New York Auto Insurance* are easily distinguished. There, plaintiffs alleged that 127 fraudulent insurance applications were submitted through one insurance broker on behalf of numerous unrelated Insureds. The court held that this conspiracy could not satisfy the requirement that the participants joined together as a group to perpetuate fraud, as each Insured had instead committed similar but independent frauds, and each Insured had acted on a particular occasion to benefit himself or herself and not to benefit any other Insured. Unlike a series of "single two-party conspiracies," plaintiffs here allege a group of individuals sharing a common purpose to engage in a fraudulent course of conduct, namely to defraud plaintiffs of money by exploiting the payment formulas of the No-Fault laws. Plaintiffs describe in detail each defendant's necessary and symbiotic contribution to the overall scheme. *Cf. Moll v. U.S. Life Title Ins. Co.,* 654 F.Supp. 1012, 1031-32 (S.D.N.Y.1987) (dismissing complaint containing allegations that members of enterprise provided settlement services to purchasers of real estate and received kickbacks, because it failed to "specify how these members joined together as a group to achieve these purposes," and lacked "factual allegations regarding the continuity of structure or personnel of this group."). Moreover, unlike the group of unrelated Insureds in *New York Auto Ins. Plan,* the Prescribing Doctors in the case are alleged to work at the same clinics, and, at least in some cases, to prescribe Supplies to the same patients at different stages of treatment. Complaint ¶¶ 77-78.

Defendants also argue that there is no basis for finding an "enterprise" on the grounds that the complaint raises "no possible inference that ... Rook benefitted financially or in any other way from this arrangement ... [nor] that he was aware of any of the other 'spokes' in the alleged scheme." However, as moving defendants appear to concede, neither showing is necessary. *See National Org. for Women, Inc. v. Scheidler,* 510 U.S. 249, 262 (1994) (finding no economic motive requirement for a RICO enterprise.); *United States v. Rastelli,* 870 F.2d 822, 828 (2d Cir.1989) (noting that proof that RICO conspirator agreed with every other conspirator, or knew all the other conspirators, or

had full knowledge of the conspiracy was unnecessary. Rather, "[i]t is sufficient that defendant know the general nature of the enterprise and know that the enterprise extends beyond his individual role."). At this stage, plaintiffs have sufficiently alleged facts allowing the inference that defendants were on notice of the general nature of the enterprise. *See Zito v. Leasecomm Corp.,* No. 02 Civ. 8074(GEL), 2004 WL 2211650 *9 (S.D.N.Y. Sept. 30, 2004). For example, defendants Rook and Surikov are alleged to have written misleading prescriptions for the same patients at different stages of their treatment. Complaint ¶¶ 77-78.

**\*8** As alleged, defendants shared the common purpose to defraud plaintiffs by exploiting the payment formulas of the No-Fault laws, and they worked together to achieve such purposes. At this stage, plaintiffs' allegations of enterprise are adequate.

## C. *Participation*

Defendants argue that plaintiffs have not adequately plead that defendants Rook and Surikov participated in the conduct of an enterprise. The Supreme Court has interpreted the phrase "to participate ... in the conduct of [the] enterprise's affairs" to mean participation in the operation or management of the enterprise. *DeFalco v. Bernas,* 244 F.3d 286, 309 (2d Cir.2001) (citing *Reves v. Ernst & Young,* 507 U.S. 170, 185 (1993)). Under the "operation or management" test, to conduct or participate, directly or indirectly, in the conduct of an enterprise's affairs, "one must have some part in directing those affairs." *Id.* (citing *Reves* 507 U.S. at 179). RICO liability is not limited to those with primary responsibility, nor to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required. *Id.* (citing *Reves,* 507 U.S. at 179).

In this Circuit, the "operation or management" test is rigorously applied. *See United States Fire Ins. Co. v. United Limousine Serv., Inc.,* 303 F.Supp.2d 432, 451-452 (S.D.N.Y.2004). Thus, "[i]t is not enough to merely take directions and perform tasks that are necessary and helpful to the enterprise ... or provide goods and services that ultimately benefit the enterprise." *Id.* Rather, the key question is "whether the provision of these services allows the defendant to direct the affairs of the enterprise." *Id.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



(citing *Schmidt,* 16 F.Supp.2d at 346); *see also United States v. Workman,* 80 F.3d 688, 696 (2d Cir.1996) ("A defendant might well have performed helpful acts without playing any part in directing the enterprise's affairs." (internal citation omitted)). It must be noted, however, that *Reves,* which adopted the operation and management test, was decided on summary judgment. *See generally Reves,* 507 U.S. at 170. It is not always reasonable, however, to expect that when a defrauded plaintiff frames his complaint, he will have available sufficient factual information regarding the inner workings of a RICO enterprise to determine whether a defendant was merely "substantially involved" in the RICO enterprise or participated in the "operation or management" of the enterprise. *Friedman v. Hartmann,* No. 91 Civ. 1523(PKL), 1994 WL 376058, *2 (S.D.N.Y. July 15, 1994). Thus, where the role of the particular defendant in the RICO enterprise is unclear, plaintiffs may well be entitled to take discovery on this question. *See id.*

Defendants provide no argument as to why plaintiffs' allegations fail to suggest that Rook or Surikov played some role in directing of the affairs of the enterprise, save for the unhelpful claim that "plaintiffs' allegations only demonstrate that Rook [and Surikov] wrote prescriptions as part of [their] routine and legitimate business operations." Casting the Prescribing Doctors' conduct in this light, defendants hope to invoke the line of cases cited by *United States Fire,* 303 F.Supp.2d 4 at 451-452, dismissing Civil RICO claims against professional services providers such as lawyers and accountants on the basis that these outsiders merely performed services which in no way could suffice to suggest that they were involved in the direction of the enterprise. *See, e.g., Azrielli v. Cohen Law Offices,* 21 F.3d 512, 521-22 (2d Cir.1994) (dismissing RICO claim against attorneys on the ground that the provision of legal services related to fraudulent real estate transaction was not management of the RICO enterprise); *Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison,* 955 F.Supp. 248, 254 (S .D.N.Y.1997) ("The provision of professional services by outsiders, such as accountants, to a racketeering enterprise, is insufficient to satisfy the participation requirement of RICO, since participation requires some part in directing the affairs of the enterprise itself."); *Industrial Bank of Latvia v. Baltic Financial Corp.,* 1994 WL 286162,*3 (S.D.N.Y. June 24, 1994) (dismissing

RICO claim against bank and individual officers on the ground that "providing banking services--even with knowledge of the fraud--is not enough to state a claim").

**\*9** In contrast to the above-cited cases, the complaint here suggests that moving defendants were vital actors who enabled the scheme by treating the Insureds and providing misleading prescriptions which facilitated the submission of fraudulent claims to plaintiffs, not that they were merely used for their "services" by, or were merely acting at the direction of, the RICO enterprise. *United States Fire,* the case on which defendants rely, held that *Reves* was satisfied by pleadings alleging that defendants "were key participants, by making critical misrepresentations, creating false documents and, ... serving as the point of communication." *United States Fire,* 303 F.Supp.2d at 453. Viewed in a light most favorable to plaintiffs, the Prescribing Doctors here were also "key participants" who made "critical misrepresentations," "created false documents" and served as the point of contact with plaintiffs' clients, the Insureds. Given the early stage of the proceedings, plaintiffs may not yet have had the opportunity to fully understand the nature of the roles of each category of defendant with regard to their respective management or operation capacity. Any future doubts involving moving defendants' relative level of participation should be resolved on summary judgment.

### D. *Pattern of Racketeering Activity: Mail Fraud*

According to defendants, plaintiffs have failed to establish a "pattern of racketeering activity" because they have failed to adequately allege two predicate acts of mail fraud pursuant to 18 U.S.C. 1341.

To establish a "pattern of racketeering activity," a plaintiff must plead at least two predicate acts, and must show that the predicate acts are related and that they amount to, or pose a threat of, continuing criminal activity. *GICC Capital Corp. v. Tech. Fin. Group, Inc.,* 67 F.3d 463, 465-466 (2d Cir.1995) (citing *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239 (1989)). "Predicate acts are related if they have the 'same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " *Davis Lee Pharmacy, Inc., v. Manhattan Central Capital*

*Corp.,* 327 F.Supp.2d 159, 163-164 (E.D .N.Y.2004) (citing *Northwestern Bell Tel. Co.,* 492 U.S. at 240). To satisfy the requirement of a threat of continuing criminal activity, "[a] plaintiff in a RICO action must allege either an open-ended pattern of racketeering activity (i.e., past criminal conduct coupled with a threat of future criminal conduct) or a closed-ended pattern of racketeering activity (i.e., past criminal conduct extending over a substantial period of time)." *First Capital Asset Management, Inc. v. Satinwood, Inc.,* 385 F.3d 159, 180 (2d Cir.2004) (internal citation omitted).

The elements of a claim of mail fraud are (1) the existence of a scheme to defraud involving money or property, and (2) the use of the mails or wires in furtherance of the scheme. *See United States v. Trapilo,* 130 F.3d 547, 551- 52 (2d Cir.1997). Moreover, a plaintiff must allege (3) a specific intent to defraud, either by devising, participating in, or abetting the scheme. *See Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1176 (2d Cir.1993) ; *S.Q.K.F .C., Inc. v. Bell Atlantic TriCon Leasing Corp.,* 84 F.3d 629, 633 (2d Cir.1996).

**\*10** The term "scheme to defraud" is measured by a non-technical standard reflecting fundamental notions of honesty, fair play and right dealing. *See Trapilo,* 130 F.3d at 550. It has been described as a plan to deprive a person "of something of value by trick, deceit, chicane or overreaching." *See United States v. Autuori,* 212 F.3d 105, 115 (2d Cir.2000) (citing *McNally v. United States,* 483 U.S. 350, 358 (1987)). To demonstrate the use of the mails in furtherance of the scheme, a plaintiff must show: "1) that the defendants caused the mailing or use of the wires, namely that they must have acted 'with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, and 2) that the mailing ... was for the purpose of executing the scheme or, in other words, incidental to an essential part of the scheme.' " *In re Sumitomo Copper Litig.,* 995 F.Supp. 451, 455-56 (S.D.N.Y.1998) (internal citations omitted).

In pleading a violation of mail fraud, Rule 9(b) of the Federal Rules of Civil Procedure 9(b) must be satisfied. *In re Sumitomo Copper,* 995 F. Supp at 455. According to Fed.R.Civ.P. 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with

particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally." The purpose of Rule 9(b)'s stricter requirements are threefold: (1) to provide the defendant with fair notice of the claims against her; (2) to protect the defendant from harm to her reputation or goodwill as a result of unfounded allegations of fraud; and (3) to reduce the number of strike suits. *Wood v. Incorporated Village of Patchogue of New York,* 311 F.Supp.2d 344, 351 (E.D.N.Y.2004) (citing *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987)).

Pleading fraud with particularity requires the plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anatian v. Coutts Bank (Switzerland) Ltd.,* 193 F.3d 85, 88 (2d Cir.1999) (internal citation omitted). Where there are multiple defendants, the plaintiff must allege facts specifying each defendant's contribution to the fraud. *DiVittorio,* 822 F.2d at 1247. However, while Rule 9(b) is to be strictly construed in the context of Civil RICO cases, "it should not be applied in a manner which would, in effect, obstruct all plaintiffs, including those with valid claims, from initiating civil RICO actions." *In re Sumitomo Copper Litig.,* 995 F. Supp at 456 (internal quotation omitted). And, it must still be read together with Fed.R.Civ.P. 8(a), which requires a plaintiff to plead only a short, plain statement upon which he is entitled to relief. *Id.*

**\*11** Courts have held that where a plaintiff claims that specific statements or mailings were themselves fraudulent, the complaint should specify the fraud involved, identify the parties responsible for the fraud, and state where and when the fraud occurred. *Id.* (citing *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993). On the other hand, in cases in which the mail was used simply used in furtherance of a master plan to defraud, the mailings need not contain fraudulent information, and a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications, is sufficient to satisfy Rule 9(b). *See In re Sumitomo Copper,* 995 F.Supp. at 456 (citing *Schmuck v. United States,* 489 U.S. 705, 715 (1989)); *see also Brewer v. Village of Old Field,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



311 F.Supp.2d 390, 396 -397 (E.D .N.Y.2004). In complex civil RICO actions involving multiple defendants, Rule 9(b) does not to require that the "temporal or geographic particulars of each mailing made in furtherance of the fraudulent scheme be stated with particularity," but only that the "plaintiff delineate, with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme." *In re Sumitomo Copper,* 995 F.Supp. at 456 (internal citations omitted); *see also Calabrese v. CSC Holdings, Inc.,* No. 02-CV-05171 (ALR), 2003 WL 22052824, *6 (E.D.N.Y. Aug. 13, 2003).

By alleging a complex scheme whereby moving defendants provided misleading prescriptions in order to facilitate the submission of fraudulent bills to plaintiffs, plaintiffs have undoubtedly described a plan to deprive a person "of something of value by trick, deceit, chicane or overreaching." *McNally,* 483 U.S. at 358. It is likewise evident from the pleadings that moving defendants either intended or could have reasonably foreseen that the use of the mails would follow from their actions. Without any argument from defendants to the contrary, and given the that the mailings at issue were ultimately the very communication by which defendants defrauded plaintiffs, it is fair to accept both that defendants either foresaw or could have foreseen the use of the mails, and that the mailings were undertaken for the purpose of executing the scheme.

A slightly more complex question involves whether plaintiffs should be held to the tougher standard because the mailings in this case are alleged to be *per se* fraudulent, requiring them to specify the fraud, identify the parties responsible, and state where and when the fraud occurred, or whether, given the complexity of the scheme, a detailed description of the underlying scheme and the connection therewith of the communications is sufficient. As the court stated in *In re Sumitomo Copper,*

[I]t is difficult to see any useful purpose in requiring that a RICO complaint specifically allege each mailing in furtherance of a complex commercial scheme, at least where, as here, the complaint alleges that numerous mailings of particular kinds were made in furtherance of the scheme. Once the plaintiff alleges with particularity the circumstances constituting the fraudulent scheme, neither the reputational interests nor the notice function served by Rule 9(b) would be advanced in any material way by insisting that a complaint contain a list of letters or telephone calls.

*\*12 In re Sumitomo Copper,* 995 F.Supp. at 456.

This purpose-based rationale would appear to apply with equal force to the allegations here, despite the fact that the mailings themselves are alleged to be *per se* fraudulent. Thus, given the complexity of the scheme alleged, and the numerous actors involved therein, plaintiffs should be held to the more lenient standard. *Sterling National Bank v. A-1 Hotels International, Inc.,* 2001 WL 282687, *1 (S.D.N.Y. Mar. 22, 2001), is instructive. In that case, plaintiff bank entered into an agreement to provide credit card services to A-1 Hotels, a booking agent for hotels. Under the agreement, A-1 would accept customer charges, reserve rooms, and pay the hotel, and Sterling would then purchase and process the debt resulting from customer charges. Moreover, A-1 guaranteed the validity of all charges presented to Sterling. Plaintiffs alleged that defendants committed RICO violations by knowingly submitting (via mail and through the wires) more than two hundred charges over a two year period for unauthorized or non-existent reservations, for amounts in excess of valid charges, or for services not provided by the hotel, or already paid for by customers. In denying a Rule 12(b)(6) motion to dismiss, Judge Lynch found defendants' assertion that the complaint lacked specificity without merit. Without distinguishing between communications alleged to contain fraudulent information, and those merely part of a greater scheme, Judge Lynch quoted *In re Sumitomo Copper,* for the proposition that "[i]n civil RICO cases, Rule 9(b) requires only that the plaintiff delineate, with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme." *Sterling,* 2001 WL 282687 at *3 (quoting *In re Sumitomo Copper,* 104 F.Supp.2d at 319). The requirements of Rule 9(b), in turn, were held to be satisfied at the pleading stage because the complaint "allege[d] over two-hundred fraudulent transactions spread over a two year period, establishe[d] a pattern of the fraud by way of nine specific examples in an attached exhibit ..., and allege[d] the participation of each member in the scheme." *Sterling,* 2001 WL 282687 at *3. Moreover, "the use of mail [was] also alleged and [was] otherwise

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



self-evident from the face of the Complaint." *Id.* at *3; *but see Mezzonen, S.A., v.. Wright,* No. 97 CIV. 9380(LMM), 1999 WL 1037866, *7 (S.D.N.Y. Nov. 16, 1999) (in addressing complex scheme involving numerous communications, some which were *per se* fraudulent and others merely 'in furtherance of the scheme', court noted its obligation to classify each and assess it under the "proper" standard).

Regardless, the pleadings in this case include sufficient detail to satisfy the particularity requirements of Rule 9(b) under either standard. As noted above, plaintiffs provide a detailed chart of 480 separate RICO events, including for each event the Retail Defendant who submitted the claim, the claim number, the Supplies billed for, the prices charged, the dates of the submissions, and the Wholesale Defendant who purportedly provided the Supplies. For example, the first RICO Event details a submission by Retail Defendant Olmecs Medical Supplies (the author of the communication) on July 26, 2000 (the date of the mailing) for numerous Supplies, including a cervical collar, an LSO, and TLSO with APL, purportedly purchased from Wholesale Defendant 138 Medical Supply. The prices charged for each Supply are also listed. By reference to the complaint, it is evident that defendants charged the maximum amount allowable under the Medicaid Fee Schedule for each of these items. Although plaintiffs do not specify the fraud involved for each submission, when the above is viewed in conjunction with the conduct described in the complaint (i.e., how defendants routinely submit claims for unnecessary, expensive cervical collars, LSOs, and TLSOs with APL, *see* Complaint ¶¶ 24-44), the specific fraud is evident. Plaintiffs additionally list 79 and 39 claims supported by prescriptions written by moving defendants Rook and Surikov, respectively. For each claim, plaintiffs include the date upon which the relevant prescriptions were written and the items prescribed. Considered in conjunction with the list of RICO Events, it is possible to determine, for example, that RICO Event 30 was submitted on February 26, 2001 by Olmecs and included charges for an LSO at the maximum rate under the Fee Schedule, and was supported by a prescription written by defendant Rook on September 28, 2000, and, by reference to the Complaint, that this submission was fraudulent because the LSO was not medically necessary, and, in turn, because plaintiffs were overcharged for it.

Thus, plaintiffs have adequately demonstrated those statements they contend are fraudulent, the source of those statements (and, by inference, where the statements were made), when the statements were made, and why the statements are fraudulent. Nothing more is required.

**\*13** The final issue involves scienter. While Rule 9(b) allows for scienter to be plead generally, "a plaintiff must provide some minimal factual basis for conclusory allegations of scienter that give rise to a strong inference of fraudulent intent," either by (1) alleging a motive for committing fraud and a clear opportunity for doing so, or (2) where the motive is not apparent, by identifying circumstances indicating conscious behavior by the defendant, though the strength of the allegations must be correspondingly greater." *Powers v. British Vita P.L.C.,* 57 F.3d 176, 184 (2d Cir.1995) (internal citations and quotations omitted). Plaintiffs have not alleged any particular motive with regard to defendants Rook and Surikov. Moreover, "[w]hen courts speak of clear opportunity to commit fraud, they do not envision the kind of elaborate plot that is alleged to have unfolded in this case ." *Powers,* 57 F.3d at 185. Thus, the adequacy of the pleadings depends on whether plaintiffs have identified ("correspondingly greater") circumstances indicating conscious behavior by the defendants. *Id.* at 184.

Prescribing Doctors are alleged to participate in the scheme by treating the Insureds and then knowingly prescribing unnecessary medical equipment. Plaintiffs allege that the use of generic, nonspecific terms in the prescription forms and letters of medical necessity (as well as the wholesale invoices) is intentional, and designed to conceal from plaintiffs the particulars of the Supplies, thereby preventing plaintiffs from determining the kind and quality of the Supplies, the medical necessity of the Supplies, and the appropriate charges for the Supplies. (Id.¶ 50). Plaintiffs allege that Prescribing Doctors provide a vital link between the enterprise and the Insureds. Complaint ¶ 10. Moreover, plaintiffs aver that Prescribing Doctors "consistently prescribe[ ] virtually the same combination of durable medical equipment and orthotic devices for all Insureds at the same stages of their particular treatment programs ...." *Id.* ¶ 11; Exhibit A. Plaintiffs describe how intentionally misleading prescription forms are essential to the exploitation of the payment formulas in the Medicaid Fee Schedule.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Moving defendants are alleged to have written prescriptions for unnecessary medical supplies for the same patients at different stages of their treatment. Complaint ¶¶ 77-78. Plaintiffs include substantial factual detail in the complaint, including that Prescribing Doctors prescribe the highly restrictive TLSOs with APL 30 to 60 days after the Insureds accident dates, when such items are "typically appropriate post-surgery or immediately following trauma." Viewed collectively, and in a light most favorable to the plaintiffs, the above constitutes circumstances which indicate conscious behavior.

It should be noted, however, that in describing how Retail Defendants exploit the payment formula for cervical collars, plaintiffs detail a scheme which relies on "generic prescriptions which lack any indication that any kind of cervical collar other than a basic cervical collar is (L0120) is necessary." Complaint ¶ 31. Retail Defendants are also alleged to fill sophisticated LSOs based on "generic prescriptions which lack any indication that any type of LSO other than a basic LSO is necessary." Complaint ¶ 36. The generic nature of the forms as described may well indicate conscious behavior by the Prescribing Doctors, but it also gives rise to a competing inference that the Prescribing Doctors, in writing "generic" prescription forms, were in fact intending to prescribe the basic items that a generic prescription would normally call for, but the forms were then misused by the Retail Defendants. That the signatures of the Prescribing Doctors on "generic" letters of medical necessity do not match the signatures for the same doctors on the prescription forms indicates conscious behavior on the part of someone, but it is not clear why it should point to the Prescribing Doctors. (After all, only one of the forms has presumably by been signed by the Prescribing Doctors, and there is an innocent explanation for that signature.) Nonetheless, plaintiffs have set out circumstances indicating conscious behavior by the moving defendants.

III. Common Law Fraud

**\*14** Defendants argue that plaintiffs have failed to sufficiently plead common law fraud because they have failed to plead reliance and scienter. Reply at 6. Defendants additionally argue that any reliance was unreasonable given the adversarial nature of the insurance claims process, and the availability to plaintiffs of a "plethora" of tools with which to deny claims.

To state a claim for common law fraud under New York law, a plaintiff must allege (1) that the defendant made a material false representation, (2) that the defendant intended to defraud the plaintiff thereby, (3) that the plaintiff reasonably relied upon the representation, and (4) that the plaintiff suffered damage as a result of such reliance. *See Chanayil v. Gulati,* 169 F.3d 168, 171 (2d Cir.1999). As noted above, in federal court, fraud must be plead with particularity in accordance with Fed.R.Civ.P. 9(b)'s requirement that "the circumstances constituting fraud ... shall be stated with particularity ... malice, intent, knowledge, and other condition of the mind of a person may be averred generally." *See Amalgamated Bank of New York v. Ash,* 823 F.Supp. 209 (1993).

Assuming all the facts alleged in the complaint to be true for the purposes of assessing whether plaintiff has made out a claim for common law fraud, plaintiffs have stated the facts with sufficient particularity to satisfy Rule 9(b). First, as demonstrated above, plaintiffs have adequately identified those statements they contend are fraudulent, the source of the statements, when the statements were made (and, by inference, where) and through reference to the complaint, why the statements were fraudulent. Second, plaintiffs claim that defendants intentionally made material false representations and omissions regarding, *inter alia,* the medical necessity of Supplies with the intent of deceiving plaintiffs, and causing plaintiffs to make payments to Retail Defendants in the amount of inflated charges. (Complaint ¶¶ 12, 18-51). And, as discussed above, plaintiffs set forth factual circumstances sufficient to indicate conscious behavior by defendants. Plaintiffs further allege to have paid Retail Defendants in reliance on the "facially valid" documents including the materially misleading prescriptions written by the Prescribing Doctors. (*Id.* ¶ 53). Finally, plaintiffs claim to have suffered damages in excess of $400,000 as a result of defendants' fraud. (*Id.*). These allegations are sufficient to meet the particularity requirement of Rule 9(b). *See, e.g., Sterling Nat. Bank v. A-1 Hotels Intern., Inc.,* 2001 WL 282687, *4 (S.D.N.Y. Mar. 22, 2001).

The defendants' related claim that any reliance by

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



the plaintiffs was unreasonable is a question of fact and not one to be resolved on a motion to dismiss.

IV. Unjust Enrichment

Lastly, defendants argue that plaintiffs' claim for unjust enrichment must be dismissed. To state a claim for unjust enrichment under New York law, a plaintiff must establish: "(1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff." *Golden Pac. Bancorp v. FDIC,* 273 F .3d 509, 519 (2d Cir.2001) (citing *Universal City Studios, Inc. v. Nintendo Co.,* 797 F.2d 70, 79 (2d Cir.1986)). An unjust enrichment claim, which is a quasi-contract claim, requires some type of direct dealing or actual, substantive relationship with a defendant. *See Redtail Leasing, Inc. v. Bellezza,* No. 95 Civ. 5191(JFK), 1997 WL 603496*7-8 (S.D.N.Y. Sept. 30, 1997). While the elements of the unjust enrichment claim do not explicitly spell out such a requirement, the requirements that the defendant be enriched at the plaintiff's expense and that good conscience necessitate that the defendant make restitution to the plaintiff, clearly contemplate that the defendant and the plaintiff must have had some type of direct dealing, an actual relationship or some substantive connection. *See In re Motel 6 Sec. Litig.,* Nos. 93- 2183(JFK), 93-2866(JFK), 1997 WL 154011, *7 (S.D.N.Y.Apr.2, 1997).

*15 Defendants argue that plaintiffs have failed to allege that moving defendants were benefitted by the scheme. However, plaintiffs explicitly allege that the Retail Defendants were remunerated by plaintiffs as a result of fraudulent submissions, and that plaintiffs suffered damages in the amount of $400,000. Moreover, plaintiffs allege that defendants constitute an "enterprise" in which moving defendants are alleged to play a vital role. Thus, as plead, it may be inferred that plaintiffs allege that moving defendants shared in the benefit at the expense of plaintiffs, and that the conveyance of that benefit was unjust such that equity would compel the return of the benefit from defendants to plaintiffs. At this stage of the proceedings, plaintiffs' allegations that members of the enterprise were benefitted is sufficient. If, on summary judgment, plaintiffs are unable to demonstrate that particular defendants benefitted from the scheme,

dismissal of the unjust enrichment claim with regard to those defendants would be proper.

*CONCLUSION*

The motion of the defendants Rook and Surikov to dismiss the complaint is denied.

SO ORDERED.

Slip Copy, 2004 WL 3270060 (E.D.N.Y.)

Motions, Pleadings and Filings (Back to top)

. 2004 WL 2409448 (Trial Pleading) Complaint (Jul. 13, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# TAB 2

Not Reported in F.Supp.2d                                                              **Page    1**
Not Reported in F.Supp.2d, 2002 WL 432685 (S.D.N.Y.), RICO Bus.Disp.Guide 10,230
**(Cite as: 2002 WL 432685 (S.D.N.Y.))**
ᴴ

Motions, Pleadings and Filings

United States District Court, S.D. New York.
Benjamin A. ALLEN and Allen Foods, Inc.
Plaintiff,
v.
NEW WORLD COFFEE, INC., New World Coffee
& Bagels, New World Coffee-Manhattan
Bagel, Inc., New World Holdings, Inc., Ramin
Kamfar, Collin Gaffney, and John
Does 1-12 Defendants.
No. 00 CIV. 2610(AGS).

March 19, 2002.

MEMORANDUM ORDER

SCHWARTZ, District J.

Introduction

**\*1** Plaintiffs in this action allege that defendants
(collectively, "defendants" or "New World")
fraudulently induced plaintiffs Benjamin A. Allen
and Allen Foods, Inc. (collectively, "plaintiffs" or
"Allen") to enter into an agreement for the purchase
of a franchise. Allen commenced this action seeking
monetary damages and injunctive and declaratory
relief under the Racketeer Influenced and Corrupt
Organizations Act ("RICO"), 18 U.S.C. § 1962(a)-
(d) and under New York state law for common law
fraud. By Memorandum Order dated March 27,
2001, this Court dismissed plaintiffs' claim under §
1962(c) with prejudice, but granted plaintiffs leave
to replead their claims under § 1962(a), (b), and (d).
*See Allen v. New World Coffee, Inc.,* No. 00 Civ.
2610(AGS), 2001 WL 293683 (S.D.N.Y. Mar. 27,
2001) (*"Allen I "*). Plaintiffs have served an
Amended Complaint and have amplified their RICO
claims under subsections (a), (b), and (d) and their
fraud claims arising under New York common law.
In the Amended Complaint, plaintiffs have added
two new claims based on purported violations of 16
C.F.R. § 436 (disclosure requirements and
prohibitions concerning franchising and business
opportunity ventures) and N.Y. Gen. Bus. Law §
687 (the fraudulent and unlawful practices section of
New York's law on franchises). Defendants move
pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss all of
plaintiffs' claims. For the reasons set forth below,

defendants' motion is granted and plaintiffs' federal
claims are dismissed with prejudice; plaintiffs' state
claims are dismissed without prejudice.

Factual Background

The facts of this case are set forth in detail in *Allen
I* and need not be repeated at length here. In
essence, Allen contends that New World
(franchisors of a chain of coffee and bagel cafes)
made false and misleading statements in an attempt
to induce Allen to invest in a New World franchise.
The alleged misrepresentations included false and
misleading statements concerning the sales and
income potential of New World franchise units and
inflated earnings capability projections. *See Allen I,*
2001 WL 293683, at \*1.

In reliance on these alleged misrepresentations,
Allen entered into a contract with New World
pursuant to which he invested money in a New
World franchise unit in New Brunswick, New
Jersey. [FN1] Allen allegedly suffered damages
because his franchise unit generated revenues
substantially lower than those represented in New
World's projections. Allen claims that New World
used the United States mail, the internet, and
telephones to make its allegedly misleading
solicitations, constituting, *inter alia,* mail and wire
fraud, both predicate offenses under the RICO
statute. *See* 18 U.S.C. § 1961(1).

> FN1. The contract also contained a provision in
> which Allen agreed that "no representations,
> warranties, guarantees or agreements have been
> made to Franchisee..." as well as a provision in
> which Allen agreed to waive any potential RICO
> claim against New World. *See* Defendants'
> Memorandum of Law in Support of Defendants'
> Motion to Dismiss, at 10; *Allen I,* 2001 WL 293683,
> at \*3 n. 5.

New World's Motion

New World moves to dismiss the Amended
Complaint in its entirety on several grounds. It
submits that Allen's claims must be dismissed
because they are brought in violation of a one-year
contractual limitations period in the franchise
agreement. Alternatively, New World contends that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



the Amended Complaint fails to state a claim upon
which relief can be granted under Fed R. Civ. P.
12(b)(6). New World also seeks costs and attorney's
fees pursuant to Fed.R.Civ.P. 11(c).

Legal Standard

**\*2** On a motion to dismiss RICO claims, this Court
must accept the factual allegations contained in the
Amended Complaint and Amended RICO Statement
as true and draw all reasonable inferences in favor of
the non-movant. *See Leatherman v. Tarrant County
Narcotics Intelligence and Coordination Unit,* 507
U.S. 163, 164 (1993) (noting that factual allegations
in the complaint must be accepted as true on motion
to dismiss); *McLaughlin v. Anderson,* 962 F.2d
187, 189 (2d Cir.1992) ("In analyzing the issues on
this motion to dismiss, we must take as true the facts
as alleged in the complaint and as supplemented by
the RICO case statement ordered by the district
court."); *Goldman v. Belden,* 754 F.2d 1059, 1065
(2d Cir.1985) ("the court should not dismiss the
complaint pursuant to Rule 12(b)(6) unless it
appears 'beyond doubt that the plaintiff can prove
no set of facts in support of his claim which would
entitle him to relief" ') (quoting *Conley v. Gibson,*
355 U.S. 41, 45-46 (1957)); *Allen I,* 2001 WL
293683, at \*2. While factual disputes in a motion to
dismiss are resolved in the light most favorable to
the non-moving party, in order to survive a motion to
dismiss, "the complaint must contain allegations
concerning *each of the material elements* necessary
to sustain recovery under a viable legal theory ."
*Pyke v. Laughing,* No. 92-CV-555, 1998 WL
37599, at \*2 (N.D.N.Y. Jan. 26, 1998) (quoting
*Redtail Leasing, Inc. v. Bellezza,* No. 95 Civ.
5191(JFK), 1997 WL 603496, at \*2 (S.D.N.Y.
Sept. 30, 1997) (emphasis in original)).

RICO Claims

The purpose of the RICO statute is to protect
"legitimate businesses from infiltration by organized
crime." *United States v.. Porcelli,* 865 F.2d 1352,
1362 (2d Cir.1989). While on the one hand, "RICO
is to be read broadly," *Sedima S.P.R.L. v. Imrex
Co.,* 473 U.S. 479, 497 (1985), the "inevitable
stigmatizing effect" of a RICO claim on a defendant
means that "courts should strive to flush out
frivolous RICO allegations at an early stage of the
litigation." *Nasik Breeding & Research Farm Ltd. v.
Merck & Co.,* 165 F.Supp.2d 514, 537

(S.D.N.Y.2001) (quoting *Schmidt v.. Fleet Bank,*
16 F.Supp.2d 340, 346 (S.D.N.Y.1998)). Indeed,
there is "always a tension between a liberal
construction of a statute and a tendency to
overextend it to accomplish ends that the statute was
never designed to achieve." GREGORY P.
JOSEPH, CIVIL RICO: A DEFINITIVE GUIDE 3
(2d ed.2000). Consequently, "courts must always be
on the lookout for the putative RICO case that is
really nothing more than an ordinary fraud case
clothed in the Emperor's trendy garb." *Nasik,* 165
F.Supp.2d at 537 (quoting *Schmidt,* 16 F.Supp.2d
at 346). In the instant case, Allen's RICO claims
must fail for exactly this reason--they are nothing
more than fraud claims masquerading as RICO
claims.

A. 18 U.S.C. § 1962(a)

The purpose of 18 U.S.C. § 1962(a) is "to prevent
racketeers from using their illgotten gains to
operate, or purchase a controlling interest in,
legitimate businesses." *Pyke,* 1998 WL 37599, at \*1
(quoting *Mark v. J.I. Racing, Inc.,* 92-CV-5285,
1997 WL 403179, at \*3 (E.D.N.Y. July 9, 1997)
(citation omitted)). In order to state a claim under §
1962(a), plaintiffs must make two basic allegations:
"first, that the defendants used or invested
racketeering income to acquire or maintain an
interest in the alleged enterprise, and second, that
the plaintiff[s] suffered an injury *as a result of that
investment by the defendants." Pyke,* 1998 WL
37599, at \*2 (quoting *Bernstein v. Misk,* 948
F.Supp. 228, 241 (E.D.N.Y.1997) (emphasis
added)). "Failure to satisfy this two part test will
result in the dismissal of the plaintiffs' claims."
*Protter v. Nathan's Famous Sys., Inc.,* 925 F.Supp.
947, 954 (E.D.N.Y.1996) (citing *R.C.M. Exec.
Gallery Corp. v. Rols Capital Co.,* 901 F.Supp.
630, 642 (S.D.N.Y.1995)). This latter requirement
is referred to as the "investment injury." The
rationale for this requirement is that § 1962(a) aims
at punishing not the predicate offenses but the
investment of the ill-gotten gains of the predicate
offenses. *See, e.g., Dornberger v. Metropolitan Life
Ins. Co.,* 961 F.Supp. 506, 525 (S.D.N.Y.1997)
(citing *Ouaknine v. MacFarlane,* 897 F.2d 75, 82-
83 (2d Cir .1990)). In the present case, Allen fails
to allege an investment injury. For this reason, his
claim under 18 U.S.C. § 1962(a) must fail.

**\*3** The "essence of a violation of § 1962(a) is not



Not Reported in F.Supp.2d
(Cite as: 2002 WL 432685, *3 (S.D.N.Y.))

commission of predicate acts but investment of racketeering income." *Discon, Inc. v. NYNEX Corp.,* 93 F.3d 1055, 1063 (2d Cir.1996), *rev'd on other grounds,* 525 U.S. 128 (1998) (quoting *Ouaknine v. MacFarlane,* 897 F.2d 75, 83 (2d Cir.1990)). *See also Allen v. New World Coffee, Inc.,* No. 00 Civ. 2610(AGS), 2001 WL 293683, at *6 (S.D.N.Y. Mar. 27, 2001) (citing *Ouaknine* ); *Mehrkar v. Schulmann,* No. 99 Civ. 10974(DC), 2001 WL 79901, at *5 (S.D.N.Y. Jan. 30, 2001) (citing *Ouaknine* and holding that "plaintiff's § 1962(a) claim is deficient because it fails to allege 'use or investment injury' that is distinct from the injury resulting from the alleged predicate acts of...mail and wire fraud"); *Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.,* 113 F.Supp.2d 345, 383 (E.D.N.Y.2000) ("any injury under section 1962(a) must flow from the use or investment of racketeering income" (quoting *Parker & Parsley Petroleum v. Dresser Indus.,* 972 F.2d 580, 584 (5th Cir.1992))). The mere fact that defendants may have injured plaintiffs is wholly irrelevant unless the plaintiffs' injury stems from the defendants' use of the racketeering income. *See Falise v. American Tobacco Co.,* 94 F.Supp.2d 316, 348 (E.D.N.Y.2000) ("the 'by reason of' language in section 1964(c) requires that the alleged [section 1962(a) ] injury be caused by the investment of the racketeering proceeds."). *See also Compagnie de Reassurance d'Ile de France v. New England Reinsurance,* 57 F.3d 56, 91 (1st Cir.1995); *Danielsen v. Burnside-Ott Aviation Training Ctr., Inc.,* 941 F.2d 1220, 1230 (D.C.Cir.1991). Without this essential element, plaintiffs have at most made out a cause of action for fraud or misrepresentation, but not a violation of RICO.

Plaintiffs' § 1962(a) claim fails because it only alleges injury stemming from the predicate racketeering activity (i.e., mail and wire fraud) and not from New World's investment of the allegedly ill-gotten gains. The Amended Complaint, in a section entitled "Facts Applicable to All Causes of Action," details at length allegations of the predicate offenses (i.e., the franchise seminar, the New World brochure, subsequent meetings, telephone calls, the New World website, etc.). *See* Amended Complaint ¶¶ 15-67. However, at no point in the section do plaintiffs explain or refer to an alleged investment in the RICO enterprise, or state how such investment harmed plaintiffs. This Court noted this deficiency in *Allen I,* 2001 WL 293683, at *7 ("there are no

factual allegations indicating that plaintiffs' injury was the fault of the investment of racketeering income as opposed to the alleged predicate fraudulent acts."). Similarly, in the fourth cause of action (for violation of § 1962(a)), plaintiffs reiterate New World's alleged misrepresentations and conclude that these misrepresentations caused an economic injury. *See* Amended Complaint, ¶¶ 81-90. Plaintiffs' allegations are insufficient as a matter of law to constitute a RICO claim, because nowhere is it alleged that New World's investment of Allen's money caused any injury beyond the predicate acts (i.e., mail and wire fraud).

**\*4** The Amended RICO Statement fares no better. Thus, for example, question 15 of the Amended RICO Statement instructs plaintiffs to "[d]escribe the alleged injury to business or property." In answering the question, plaintiffs state:
"The revenue from plaintiffs' restaurant, and the restaurants of other franchise investors, has been substantially lower than the revenue which defendants asserted that plaintiffs would receive. As a result, plaintiffs have lost money in their New World Franchise."
Amended RICO Statement, at 37. Plaintiffs have thus not made any showing of injury stemming from New World's investment of plaintiffs' money. Similarly, question 16 of the Amended RICO Statement asks plaintiffs to "[d]escribe the direct causal relationship between the alleged injury and the violation of the RICO statutes." *Id.* at 38. In answering the question, plaintiffs mention only their reliance on New World's allegedly false representations and state that this reliance caused plaintiffs to lose money. *Id.* at 38-39. Allegations of injury from the predicate offense without an investment injury, cannot support a cognizable claim under § 1962(a): "[i]n the context of subsection 1962(a), therefore, we have required that the plaintiff allege a 'use or investment injury' that is distinct from the injuries resulting from predicate acts." *Discon, Inc. v. NYNEX Corp.,* 93 F.3d 1055, 1063 (2d Cir.1996), *rev'd on other grounds,* 525 U.S. 128 (1998).

The only place at which Allen makes any attempt to show the requisite investment injury is in answering question 11(a) of the Amended RICO Statement, which instructs plaintiffs to "[s]tate who received the income derived from the pattern of racketeering activity [...]." Amended RICO Statement, at 32.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
(Cite as: 2002 WL 432685, *4 (S.D.N.Y.))

Page 4

Allen states that the corporate defendants derived revenue from the pattern of racketeering. *See id.* at 32-33. Later, in response to question 11(b) which asks that Allen describe the "use or investment of such income," Allen first states that "defendants used the investment of the racketeering income to injure the plaintiffs." *Id.* at 33. More specifically, "[t]he money which defendants received as a result of their pattern of racketeering was invested into New World Coffee [...]." *Id.* at 33. In other words, the RICO person, New World, reinvested its allegedly ill-gotten gains in itself, purportedly causing injury to plaintiffs. [FN2]

> FN2. In Allen's initial RICO Statement, mention was made of a RICO enterprise called "the Racket." *See* RICO Statement at 25 *et seq.* In *Allen I,* this Court determined that "the Racket" was in fact "an illusory enterprise." *Allen I,* 2001 WL 293683, at *8. In its Amended RICO Statement, however, all references to "the Racket" are omitted. Curiously, in the Amended RICO Statement, Allen claims that questions concerning the nature and structure of the enterprise and what benefits the enterprise received from the alleged racketeering activity are "[n]ot applicable because of the dismissal with prejudice of 19[sic] U.S.C. § 1962(c)." Amended Rico Statement, at 32. This Court does not understand why Allen believes a description of the RICO enterprise is germane only to § 1962(c) and not to § 1962(a), (b), and (d).

As a matter of law, reinvestment of racketeering income is insufficient to make out a cause of action under RICO. *See Katzman v. Victoria's Secret Catalogue,* 167 F.R.D. 649, 657 (S.D.N.Y.1996), *aff'd* 113 F.3d 1229 (2d Cir.1997) ("[c]ourts have repeatedly held that the injury causation requirement of § 1962(a) is not satisfied by allegations that a defendant, which is also the enterprise, invested the racketeering income in its general operations, thereby permitting it to continue its pattern of racketeering and cause further injury"); *Soberman v. Groff Studios Corp.,* 99 Civ. 1005(DLC), 1999 WL 349989, at *5 (S.D.N.Y. June 1, 1999) ("allegations that the money was used or invested to further the same scheme are insufficient, since they do not allege a distinct injury"); *Mehrkar v. Schulmann,* No. 99 Civ. 10974(DC), 2001 WL 79901, at *5 (S.D.N.Y. Jan. 30, 2001) ("[m]ere reinvestment of racketeering income into the same racketeering enterprise that generated the income

'does not satisfy the Second Circuit's holding in *Ouaknine* " ') (quoting *Kaczmarek v. International Bus. Machs. Corp.,* 30 F.Supp.2d 626, 628 (S.D.N.Y.1998) (citation omitted)). By alleging that the money received by New World was reinvested back into New World, plaintiffs have shown injury merely from the predicate offenses, not from the investment. "Where reinvestment of racketeering proceeds back into the same RICO enterprise is alleged, the injuries stem proximately not from the investment, but from the predicate acts that make up the racketeering activity." *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.,* 113 F.Supp.2d 345, 384 (E.D.N.Y.2000) (quoting *Falise v. American Tobacco Co.,* 94 F.Supp.2d 316, 349 (E.D.N.Y.2000) (Weinstein, J.)). "Th[e] investment-injury requirement is not satisfied merely because the defendant/enterprise has reinvested money from the racketeering acts back into its own operations, thus enabling the scheme to continue...[P]laintiff must show that it was injured by the investment itself." *Protter v. Nathan's Famous Systems, Inc.,* 925 F.Supp. 947, 954 (E.D.N.Y.1996) (quoting *Update Traffic Sys., Inc. v. Gould,* 857 F.Supp. 274, 282-83 (E.D.N.Y.1994)). Because Allen fails to allege any injury caused by New World's investment (as opposed to injury caused by the predicate racketeering activity), its claim based on § 1962(a) must fail. Plaintiffs' cause of action under 18 U.S.C. § 1962(a) is therefore dismissed with prejudice.

B. 18 U.S.C. § 1962(b)

*5 The purpose of 18 U.S.C. § 1962(b) is "to prohibit the takeover of a legitimate business through racketeering, typically extortion or loansharking." *Pyke v. Laughing,* No. 92-CV-555, 1998 WL 37599, at *1 (N.D.N.Y. Jan. 26, 1998) (quoting *Mark v. J.I. Racing, Inc.,* No. 92-CV-5285, 1997 WL 403179, at *3 (E.D.N.Y. July 9, 1997)). In order to state a claim under § 1962(b), plaintiffs must "allege that the injury was caused by the acquisition or maintenance of control and not by the predicate acts." *Katzman v. Victoria's Secret Catalogue,* 167 F.R.D. 649 (S.D.N.Y.1996), *aff'd* 113 F.3d 1229 (2d Cir.1997). *See also Redtail Leasing, Inc. v. Bellezza,* No. 95 Civ. 5191(JFK), 1997 WL 603496, at *3 (S .D.N.Y. Sept. 30, 1997) (Keenan, J.) (injury must be caused by "acquisition of an interest in an enterprise, *as distinct from an*

Not Reported in F.Supp.2d
(Cite as: 2002 WL 432685, *5 (S.D.N.Y.))

Page   5

*injury resulting from the pattern of racketeering
activity, or the commission of predicate acts.*")
(emphasis added). This so-called "acquisition
injury" is analogous to the investment injury
required by § 1962(a). "Without a distinct
'acquisition injury,' [a plaintiff] cannot state a cause
of action under subsection 1962(b)." *Discon, Inc. v.
NYNEX Corp.,* 93 F.3d 1055, 1063 (2d Cir.1996)
*rev'd on other grounds,* 525 U.S. 128 (1998). *See
also Pyke v. Laughing,* No. 92-CV-555, 1998 WL
37599, at *7 (N.D.N.Y. Jan. 26, 1998) ("[t]o
survive a motion to dismiss [with respect to a §
1962(b) claim], the complaint must specify the
connection between defendants' racketeering activity
and their interest in the... enterprise.") (citations
omitted).

Applying these standards, this Court dismisses
plaintiffs' claims brought under § 1962(b). As noted
above, Allen merely claims injury caused by New
World's fraud and misrepresentations. As a result
Allen fails to make a showing of "acquisition
injury," a failure which is fatal to the § 1962(b)
claim, since "a plaintiff cannot recover under §
1962(b) unless he alleges a distinct injury caused not
by predicate acts but by the defendant's acquisition
or maintenance of an interest in or control of an
enterprise." *Redtail Leasing, Inc. v. Bellezza,* No.
95 Civ. 5191(JFK), 1997 WL 603496, at *3
(S.D.N.Y. Sept. 30, 1997) (quoting *Dornberger v.
Metropolitan Life Ins.. Co.,* 961 F.Supp. 506, 525
(S.D.N.Y.1997)). Plaintiffs offer no factual
allegations to support a claim of distinct acquisition
injury. While plaintiffs may have made allegations
sufficient to support a claim of fraud or
misrepresentation, they have failed to allege a
requisite element of § 1962(b). "By failing to allege
how [plaintiff] was injured by an acquisition or
maintenance of control, [plaintiff] has failed to plead
a violation of § 1962(b)." *Katzman v. Victoria's
Secret Catalogue,* 167 F.R.D. 649, 657
(S.D.N.Y.1996), *aff'd* 113 F.3d 1229 (2d Cir.1997)
. This Court warned plaintiffs of the insufficiency of
their claim in *Allen I,* 2001 WL 293683, at *7
("[i]njury in fact is insufficient to state a Section
1962(b) claim unless such injury was caused by the
acquisition or maintenance of control in the
enterprise and not merely by the predicate acts."").
Plaintiffs' cause of action under 18 U.S.C. §
1962(b) is therefore dismissed with prejudice.

C. 18 U.S.C. § 1962(d)

*6 Section 1962(d) prohibits any conspiracy to
violate § 1962(a), (b), or (c). [FN3] The dismissal
of all of plaintiffs' RICO claims leaves the
conspiracy cause of action without a leg to stand on.
"Any claim under § 1962(d) based on conspiracy to
violate the other subsections of section 1962 must
fail if the substantive claims are themselves
deficient." *Discon, Inc. v. NYNEX Corp.,* 93 F.3d
1055 (2d Cir.1996), *rev'd on other grounds,* 525
U.S. 128 (1998) (citation omitted). *See also
Mehrkar v. Schulmann,* No. 99 Civ. 10974(DC),
2001 WL 79901, at *6 (S.D.N.Y. Jan. 30, 2001)
("[b]ecause plaintiff's other RICO claims fail, the
allegations in the amended complaint cannot set
forth a conspiracy to commit such violations under §
1962(d)); *Pyke v. Laughing,* No. 92-CV-555, 1998
WL 37599, at *9 (N.D.N.Y. Jan 26, 1998) ("[i]n
light of the court's rulings herein that defendants
have not stated a viable RICO claim under sections
1962(a), (b) or (c), their section 1962(d) conspiracy
claim necessarily fails as well..."). Plaintiffs' cause
of action under 18 U.S.C. § 1962(d) is therefore
dismissed with prejudice.

> FN3. This Court dismissed, with prejudice,
> plaintiffs' § 1962(c) claim in *Allen I.*

C.F.R. Claims

In the Amended Complaint, Allen asserts a cause of
action against New World for alleged violations of
16 C.F.R. § 436. While it is doubtful that a private
right of action exists under the regulations, the
Court need not reach that question. In *Allen I,* this
Court granted plaintiffs "leave to replead their
claims *under Sections 1962(a), 1962(b), and
1962(d)...* " *Allen v. New World Coffee,* No. 00
Civ. 2610(AGS), 2001 WL 293683, at *10
(S.D.N.Y. Mar. 27, 2001) (emphasis added).
Virtually identical language was contained in the
"Conclusion" section of *Allen I. Id.* at *10. This
Court did not give leave to Allen to add additional
new claims, especially those of dubious legality.
Accordingly, this Court will not entertain Allen's
new C.F.R. claims. Plaintiffs' cause of action under
16 C.F.R. § 436 is therefore dismissed with
prejudice.

State Law Claims

The remaining claims arise under New York state
law. [FN4] Consequently, this Court lacks subject

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



matter jurisdiction over this action. While the Court recognizes that it may exercise supplemental jurisdiction over these remaining state law claims pursuant to 28 U.S.C. § 1367, a district court may decline to exercise supplemental jurisdiction when "the district court has dismissed all claims over which it has original jurisdiction..." 28 U.S.C. § 1367(c)(3). Accordingly, the Court declines to exercise supplemental jurisdiction and plaintiffs' remaining state law claims are dismissed without prejudice.

> FN4. In the Amended Complaint, Allen has added an alleged violation of N.Y. Gen. Bus. Law § 687, also without leave of the Court. In the original Complaint, all of Allen's state law claims arose out of common law.

Request for Sanctions

New World has requested sanctions in the form of costs and attorney's fees pursuant to Fed.R.Civ.P. 11(c). Under that rule, the imposition of sanctions rests in the sound discretion of the court. Having examined all of the submissions in this action, the Court does not find that sanctions are warranted. Consequently, defendants' request for costs and attorney's fees is hereby denied.

Conclusion

*7 For the reasons set forth above, defendants' motion to dismiss the Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6) is granted; the federal claims are dismissed with prejudice; the state claims are dismissed without prejudice; defendants' request for sanctions is denied. The Clerk of the Court is directed to close the file in this action.

SO ORDERED.

Not Reported in F.Supp.2d, 2002 WL 432685 (S.D.N.Y.), RICO Bus.Disp.Guide 10,230

Motions, Pleadings and Filings (Back to top)

. 2001 WL 34727486 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendants' Motion to Dismiss All Counts in the First Amended Complaint and Request for Sanctions (Aug. 03, 2001)

. 2001 WL 34727487 (Trial Motion, Memorandum and Affidavit) Memorandum of Plaintiffs in Opposition to Defendants' Motion to Dismiss (Aug. 03, 2001)

. 2001 WL 34727488 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Support of Defendants' Motion to Dismiss All Counts in the First Amended Complaint and Request for Sanctions (Aug. 03, 2001)

. 2001 WL 34727503 (Trial Pleading) Plaintiff's First Amended Complaint (May. 01, 2001)

. 2000 WL 34474878 (Trial Motion, Memorandum and Affidavit) Memorandum of Law of Plaintiffs in Sur-Reply to Defendants' Motion to Dismiss (Jul. 11, 2000)

. 2000 WL 34475012 (Trial Pleading) Affirmation of Jimmie Engram in Sur-Reply to Defendants' Motion to Dismiss Counts IV Through VII of the Complaint (Jul. 11, 2000)

. 2000 WL 34474875 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendants' Motion to Dismiss Counts IV Through VII of the Complaint (Jun. 30, 2000)

. 2000 WL 34474876 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Defendants' Motion to Dismiss Counts IV Through VII of the Complaint (Jun. 30, 2000)

. 2000 WL 34474877 (Trial Motion, Memorandum and Affidavit) Memorandum of Plaintiffs in Opposition to Defendants' Motion to Dismiss (Jun. 19, 2000)

. 1:00cv02610 (Docket)
(Apr. 05, 2000)

. 2000 WL 34475011 (Trial Pleading) Verified Complaint (Apr. 04, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# TAB 3

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1692844 (E.D.N.Y.)
**(Cite as: 2000 WL 1692844 (E.D.N.Y.))**
c

**Page 1**

Only the Westlaw citation is currently available.

United States District Court, E.D. New York.
Todd BANK, Plaintiff,
v.
BROOKLYN LAW SCHOOL, Defendant.
No. 97-CV-7470(JG).

Oct. 6, 2000.
Todd C. Bank, Kew Gardens, NY, Plaintiff, pro se.

Mark R. Heller, Bryan Dunlap, Winthrop, Stimpson, Putnam & Roberts, New York, NY, for Defendant.

### MEMORANDUM AND ORDER

GLEESON, J.

**\*1** In March 1993, plaintiff Todd Bank read in *U.S. News & World Report* that the class of 1992 graduates of defendant Brooklyn Law School working in the private sector earned an average of $60,328. Based in part on that information, plaintiff decided to attend Brooklyn Law School and decided not to transfer to another law school a year later. He graduated in 1996. He claims that the $60,328 figure was false and misleading.

Plaintiff, who is representing himself in this case, has converted that straightforward allegation into a 65-page, 225-paragraph complaint that charges, among many other things, that Brooklyn Law School violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.,* in association with various other entities and thousands of individuals. It is exactly this sort of complaint that has given the private right of action under RICO a bad name.

Brooklyn Law School has moved to dismiss the case. For the reasons set forth below, the motion is granted.

### BACKGROUND
A. *The Facts*

The following factual background is based on the allegations contained in plaintiff's second amended complaint.

In December 1992, defendant mailed questionnaires to the 469 graduates of its class of 1992, seeking to obtain information concerning, among other things, their starting salaries upon graduation. (Second Am. Compl. ¶¶ 4, 5.) Defendant determined that the average starting salary of these graduates who were employed in the private sector and who responded to the questionnaire was $60,328. (Second Am. Compl. ¶ 5.) In February 1993, defendant sent the results of the survey, including the aforementioned salary figure, to U.S. News & World Report, Inc. ("U .S. News"). (Second Am. Compl. ¶ 8.) A representative of defendant then verified the accuracy of the information and expressly authorized the results of the survey to be published by U.S. News as part of its annual law school survey. (Second Am. Compl. ¶ 9.) The results of the survey appeared in the March 22, 1993, issue of *U.S. News & World Report* magazine. (Id.).

According to plaintiff, defendant authorized the publication of the salary information despite its knowledge that the information was false. (Second Am. Compl. ¶ 12.) Plaintiff alleges that the true results of the survey indicated a starting salary "materially lower" than the $60,328 figure published in the U.S. News report. (Second Am. Compl. ¶ 11.) He bases this allegation on (1) "Plaintiff's conversations ... with students who graduated in 1992;" (2) statements by the defendant's "own career advisors" comparing the average salary of the class of 1995 with that of the class of 1992; (3) a comparison of average class of 1992 salary figures submitted to U.S. News by both Brooklyn Law School and Cardozo Law School, which "conformed so closely" with one another as to "defy any reasonable belief;" (4) more detailed salary figures published by the defendant in its own publication materials; and (5) a memorandum from Joan G. Wexler, the dean of Brooklyn Law School, concerning the average salary figures for the class of 1995 published by U.S. News in its 1996 annual law school survey. (Second Am. Compl. ¶ 11.) Plaintiff further alleges that defendant was motivated to publish the false salary information to enlarge its applicant pool, to attract more selective students, and to induce prospective students to accept their offers of admission. (Second Am. Compl. ¶ 13.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



*2 In March 1993, plaintiff purchased the March 22, 1993, issue of *U.S. News & World Report* for the sole purpose of reading the law school survey. (Second Am. Compl. ¶ 15.) Plaintiff alleges that he reasonably relied on the average salary information published by U.S. News and was persuaded by the false salary information to attend Brooklyn Law School. (Second Am. Compl. ¶ 16.)

According to plaintiff, he was damaged by the misleading salary information, which allegedly induced him to pay tuition and fees to defendant, as well as related living expenses. (Second Am. Compl. ¶ 17.) Furthermore, he alleges damages in that his law degree is "worth substantially less" than it would have been had the salary information reported by U.S. News been correct. (Second Am. Compl. ¶ 18.) Finally, plaintiff alleges that the false salary information caused him to reject an offer to transfer to the law school at the State University of New York at Buffalo ("SUNY Buffalo") after he completed his first year of law school. [FN1] (Second Am. Compl. ¶ 19.)

> FN1. Plaintiff asserts that "the difference in [Brooklyn Law School's] salary figure, and the salary figure of $41,074 submitted by SUNY Buffalo to U.S. News and published in the March 21, 1994 issue of U.S. News ... was a substantial factor, and the proximate and direct cause, for plaintiff's rejection of [SUNY Buffalo's] offer of admission." (Second Am. Compl. ¶ 19.) Moreover, the tuition and living expenses for two years at SUNY Buffalo were, at a minimum, $30,000 lower than the same costs associated with Brooklyn Law School. (Id.)

Plaintiff alleges that the conduct complained of was "neither sporadic nor isolated." (Second Am. Compl. ¶ 41.) Rather, "Defendant and its agents, associates, and representatives also committed similar acts ... in the years 1991, 1992, 1993, 1994, 1995, 1996, 1997, and 1998." (Id.) Moreover, plaintiff alleges that defendant conducted a second survey of each of its graduating classes for the years 1990 through 1996. (Second Am. Compl. ¶¶ 43, 60, 69, 77, 87, 97, 128.) The "purported results" of these surveys were published each year in the Brooklyn Law School Bulletin (the "Annual Bulletin"). (Second Am. Compl. ¶¶ 44, 62, 71, 78, 88, 112, 129.) The Annual Bulletin was mailed to "more than one thousand prospective students" each year. (Second Am. Compl. ¶¶ 45, 61, 70, 79, 89,

113, 130.) According to plaintiff, the results of these surveys "were false and materially misleading." (Second Am. Compl. ¶¶ 46, 62, 71, 80, 90, 114, 131.)

## B. *The Procedural History*

The initial complaint was filed on December 19, 1997. Defendant then moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiff submitted an amended complaint, and defendant again moved to dismiss. In a memorandum and order dated March 27, 2000 ("March 27 M & O"), Judge Sifton granted defendant's motion to dismiss the amended complaint on several grounds. First, he dismissed on proximate cause grounds, *see Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992), plaintiff's § 1962(c) claim "in as much as it relates to receiving a law degree with a lower value than it would have had had the salary information been accurate." (March 27 M & O at 10.) However, to the extent plaintiff alleges injury in the form of remaining at Brooklyn Law School instead of transferring to SUNY Buffalo, Judge Sifton held that his pleading satisfies the proximate cause requirement. (Id. at 9.)

*3 Judge Sifton then dismissed the RICO claims in their entirety on two separate grounds. He held that plaintiff had failed to allege that any of the nineteen association-in-fact enterprises alleged in the amended complaint had the structural characteristics of such an enterprise, such as a common purpose, an ongoing structure, and an organization that functions as a continuing unit. (Id. at 11-12.) In addition, Judge Sifton dismissed the RICO claims on the ground that plaintiff had failed to plead the racketeering acts of mail and wire fraud with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. (Id. at 12-13.) In this regard, Judge Sifton concluded that plaintiff had failed to "allege a factual basis for his conclusion that the salary information reported in *U .S. News* was not representative of the survey results." (Id. at 13 .)

Judge Sifton granted plaintiff leave to amend the complaint. He stated that "[a]ny amendment seeking to set forth a claim for the diminished value of plaintiff's law degree or loss of earnings following graduation would be futile, and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
**(Cite as: 2000 WL 1692844, \*3 (E.D.N.Y.))**

accordingly leave to amend to allege such a claim is denied." (Id. at 15-16.) However, he observed that "[p]laintiff's allegations indicate that there may be a possibility that plaintiff may cure the deficiencies of his pleading with respect to the enterprise and fraud and thereby provide a jurisdictional basis for his state law claims." (Id. at 16.) The case was reassigned to me the day after Judge Sifton signed the March 27, 2000, memorandum and order.

The second amended complaint is plaintiff's attempt to cure the deficiencies cited in that order. In its motion to dismiss, Brooklyn Law School claims, *inter alia,* that he has failed.

### DISCUSSION
#### A. *The Standard for Dismissal Under Rule 12(b)(6)*

Under Rule 12(b)(6), a court must not dismiss a complaint unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *see also Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College,* 128 F.3d 59, 62-63 (2d Cir.1997). In applying this standard, a district court must "read the facts alleged in the complaint in the light most favorable" to the plaintiff, and accept these allegations as true. *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 249 (1989). In addition, the Supreme Court has instructed that where the plaintiff is proceeding *pro se,* as in the instant case, the district court must liberally construe the complaint's allegations. *See Haines v. Kerner,* 404 U.S. 519, 520 (1972).

#### B. *The RICO Claims*

The complaint seeks recovery pursuant to 18 U.S.C. § 1964(c), which provides that "Any person injured in his business or property by reason of a violation of § 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." Plaintiff alleges that Brooklyn Law School violated both 18 U.S.C. § 1962(c), which makes it unlawful to conduct the affairs of an enterprise through a pattern of racketeering activity, [FN2] and 18 U.S.C. § 1962(d), which prohibits, among other things, conspiracy to violate § 1962(c) . [FN3] Plaintiff specifies mail and wire fraud, indictable

under 18 U .S.C. §§ 1341 and 1343, respectively, as the acts of racketeering activity.

FN2. Specifically, section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." 18 U.S.C. § 1962(c). To establish a civil RICO claim for violation of § 1962(c), a plaintiff must plead "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 520 (2d Cir.1994) (citations omitted).

FN3. Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of [Section 1962]." 18 U.S.C. § 1962(d).

#### 1. *Failure to Plead a RICO Enterprise (The "Association-in-Fact" Enterprises)*

\*4 In his second amended complaint, plaintiff alleges twenty-two different enterprises. Nineteen of them are the "association-in-fact" enterprises that plaintiff alleged in the first amended complaint, [FN4] and plaintiff has not even attempted to cure the pleading deficiencies identified by Judge Sifton in his memorandum and order dismissing that complaint. Arguably, nothing more need be said about this aspect of plaintiff's claims, but I write briefly to explain my agreement with Judge Sifton's reasoning and result.

FN4. These nineteen enterprises are: (1) Defendant, Cardozo Law School, U.S. News, the National Association for Law Placement ("NALP"), graduates of Brooklyn Law School, and graduates of Cardozo Law School; (2) Defendant, Cardozo Laws School, U.S. News, and NALP; (3) Defendant, Cardozo Law School, U.S. News, graduates of Brooklyn Law School, and graduates of Cardozo Law School; (4) Defendant, Cardozo Law School, and U.S. News; (5) Defendant, Cardozo Law School, and NALP; (6) Defendant, Cardozo Law School, NALP, graduates of Brooklyn Law School, and graduates of Cardozo Law School; (7) Defendant, U.S. News, NALP, graduates of Brooklyn Law School, and graduates of Cardozo Law School; (8) Defendant, U.S. News, and NALP; (9) Defendant, U.S. News, and graduates of Brooklyn Law School; (10) Defendant

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and U.S. News; (11) Defendant and Cardozo Law School; (12) Defendant and NALP; (13) Defendant and graduates of Brooklyn Law School; (14) Defendant, NALP, and graduates of Brooklyn Law School; (15) Defendant, Cardozo Law School, graduates of Brooklyn Law School; (16) U.S. News, NALP, and graduates of Brooklyn Law School; (17) U.S. News and NALP; (18) U.S. News and graduates of Brooklyn Law School; and (19) NALP and graduates of Brooklyn Law School. (*Compare* Sifton Op. at 5, *with* Second Am. Compl. ¶ 22.)

A racketeering "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Supreme Court has explained that an association-in-fact enterprise is a "group of persons associated together for a common purpose of engaging in a course of conduct," and is "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette,* 452 U.S. 576, 583 (1981). The RICO enterprise must have an ascertainable structure distinct from the pattern of racketeering activity in which its members engage. *Id.* As the Supreme Court stated in *Turkette,* "[t]he enterprise is not the 'pattern of racketeering;' it is an entity separate and apart from the pattern of activity in which it engages." *Id.* When applying *Turkette,* the Second Circuit has looked for evidence of an enterprise's "hierarchy, organization, and activities," as well as whether its "members functioned as a unit." *United States v. Coonan,* 938 F.2d 1553, 1560-61 (2d Cir.1991), *cert. denied,* 503 U.S. 941 (1992); *see also Moy v. Terranova,* 1999 WL 118773, at *5 (E.D.N.Y.1999) (dismissing a complaint for failure "to offer any allegations regarding the continuity or structure of the group or how the entities joined together").

Thus, an association-in-fact enterprise is not alleged every time a specified combination of individuals (or entities) is alleged to have acted in concert to commit multiple acts that qualify as racketeering acts. A private right of action alleging a violation of § 1962(c) is not a civil conspiracy claim, and the criminal prohibition in § 1962(c) is not a mere super-conspiracy statute. While the proof of the alleged criminal acts (and the pattern they comprise) and the proof of the enterprise "may in particular

cases coalesce," *Turkette,* 452 U.S. at 583, that is far more likely to occur when the charged association-in-fact is wholly illegitimate, as in *Turkette.* Moreover, it does not alter the fact that proof of the pattern "does not necessarily establish" the enterprise. *Id.*

The second amended complaint fails to allege that any of the nineteen associations-in-fact existed as an entity separate and apart from the commission of the alleged acts of mail and wire fraud. These failures are not surprising. It is difficult to fathom how plaintiff could allege in good faith that, for example, Brooklyn Law School, U.S. News, the National Association for Law Placement, and several years of graduates of Brooklyn Law School and Cardozo Law School constituted an ongoing organization that functioned together as a continuing unit separate and apart from Brooklyn Law School's provision of salary information to U.S. News. Nor are there any allegations that even suggest that this or any of the various other alleged enterprises would exist " 'were the predicate acts removed from the equation." ' *Schmidt v. Fleet Bank,* 16 F.Supp.2d 340, 349 (S.D.N.Y.1998) (quoting *Handeen v. Lemaire,* 112 F.3d 1339, 1352 (8th Cir.1997)); *see also Amsterdam Tobacco Inc., v. Philip Morris Inc.,* 107 F.Supp.2d 210, 215 (S.D.N.Y.2000). Finally, "[t]here is no allegation of any kind of chain of command or functional integration, as is typical of classic RICO enterprises ." *Schmidt,* 16 F.Supp.2d at 350. Accordingly, to the extent they are based on Brooklyn Law School's conduct of the affairs of the nineteen alleged associations-in-fact, plaintiff's RICO claims are again dismissed for failure to adequately plead a RICO enterprise.

### 2. *The Failure to Plead Participation in the "Operation or Management" of the Enterprises (The Legal Entity and Individual Enterprises)*

*5 The remaining three enterprises, alleged for the first time in the second amended complaint, are as follows: (1) U.S. News & World Report, Inc., (2) the National Association for Law Placement ("NALP"), and (3) each graduate of Brooklyn Law School and Cardozo Law School to whom questionnaires were mailed by the law schools. [FN5] (Second Am. Compl. ¶ 22.) With respect to these alleged enterprises, plaintiff's RICO claims are again deficient.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

(Cite as: 2000 WL 1692844, *5 (E.D.N.Y.))

Page 5

FN5. This latter group, which is quite large, is not alleged to constitute an association-in-fact. Rather, plaintiff alleges that each of the thousands of individual graduates of these two law schools was an independent enterprise, whose affairs were conducted by Brooklyn Law School through a pattern of racketeering activity. (*See* Pl. Mem. at 2.)

A plaintiff in a § 1962(c) case must prove, *inter alia,* that the defendant conducted or participated in the conduct of the enterprise's affairs. *See* 18 U.S.C. § 1962(c). In *Reves v. Ernst & Young,* 507 U.S. 170, 183 (1993), the Supreme Court held that this element of the claim requires proof that the defendant "participate[d] in the operation or management of the enterprise itself." *Id.* [FN6] The remainder of plaintiff's § 1962(c) claim fails because he does not even attempt to allege that Brooklyn Law School participated in the operation or management of U.S. News, NALP, or each graduate of Brooklyn Law School and Cardozo Law School to whom questionnaires were sent.

FN6. This test is difficult to satisfy, and claims are often dismissed for failure to meet the Second Circuit's "stringent standards." *See, e.g., Azrielli,* 21 F.3d at 521-22 (dismissing RICO claim on ground that provision of legal services related to fraudulent real estate transaction was not management of the RICO enterprise); *Schmidt,* 16 F.Supp.2d at 347 (dismissing RICO claim on grounds that "allowing Schick access to the escrow accounts, approving Schick's overdrafts on 500 separate occasions, failing to notify the relevant authorities of the irregularities in the Schick accounts, misrepresenting to investors the status of the account and helping Schick to conceal the scheme generally ... are really allegations of assistance to the alleged RICO enterprise, not direction of it"); *Redtail Leasing, Inc. v. Bellezza,* 1997 WL 603496, at *5 (S.D.N.Y. Sept. 30, 1997) (dismissing RICO claim where amended complaint alleged facts tending to show that defendants participated in the enterprise's affairs but was "devoid of allegations suggesting that [they] had some part in directing the enterprise's affairs"); *Sundial Int'l Fund Ltd. v. Delta Consultants, Inc.,* 923 F.Supp. 38, 41 (S.D.N.Y.1996) (dismissing RICO claims against individual bank officer and banks who held investors' deposits in fraud scheme because the banks did not solicit the investments or direct the affairs of the operation); *Amalgamated Bank of New York v. Marsh,* 823 F.Supp. 209, 221 (S.D.N.Y.1993) (dismissing RICO claim where amended complaint failed to suggest that defendant "exerted control" over RICO enterprise"); *Morin v. Trupin,* 832 F.Supp. 93, 97-98 (S.D.N.Y.1993) (dismissing RICO claim upon finding that lawyer's provision of allegedly fraudulent tax opinions and information included in PPM for partnership offering insufficient to establish participation in operation and management of enterprise); *Strong & Fisher Ltd. v. Maxima Leather, Inc.,* 1993 WL 277205, at *1 (S.D.N.Y. July 22, 1993) (dismissing RICO claim despite defendant's "substantial persuasive power" to influence the enterprise, which was not enough to demonstrate an ability to conduct the affairs of the enterprise).

The most that can be gleaned from the complaint in this respect is that Brooklyn Law School provided U.S. News with information (including starting salary data) concerning its graduates, (Second Am. Compl. ¶¶ 7-9, 30-35), used a questionnaire designed by NALP to obtain the information from its graduates, (Second Am. Compl. ¶ 36), and mailed the questionnaire to its graduates, some of whom chose to respond by filling out and returning the form, (Second Am. Compl. ¶¶ 38--153). These allegations are not enough to survive a motion to dismiss. *See, e.g., LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.,* 951 F.Supp. 1071, 1090 (S.D.N.Y.1996) (" 'Simply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result." ') (quoting *University of Md. v. Peat Marwick, Main & Co.,* 996 F.2d 1534, 1539 (3d Cir.1993)); *see also Department of Econ. Dev. v. Arthur Anderson & Co.,* 924 F.Supp. 449, 468 (S.D.N.Y.1996) ( "[T]he provision of services-- even essential services--to a RICO enterprise is not the same as controlling the enterprise's affairs.").

Plaintiff's argument in opposition to this aspect of defendant's motion reflects a fundamental misunderstanding of the § 1962(c) claim. Plaintiff asserts that *Reves* cannot bar his claim because Brooklyn Law School is "the primary actor in the fraudulent scheme." (Pl. Mem. at 2.) However, because plaintiff has elected to bring his substantive RICO claim under § 1962(c), the issue raised by *Reves* is not Brooklyn Law School's role in the scheme, but its role in the *enterprise. See Reves,* 507 U.S. at 185 (observing that § 1962(c) has a "more limited reach" in this respect than §§ 1962(a) and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



1962(b)). Specifically, the issue is whether Brooklyn Law School participated in the operation or management of the affairs of the particular enterprises plaintiff chose to allege. In the absence of such an allegation regarding U.S. News, NALP or any of the numerous individual graduates who received the questionnaires, Brooklyn Law School's "primary" role in the alleged fraudulent scheme does not save plaintiff's claim.

### 3. *The Failure to Plead Fraud with Particularity*

**\*6** Plaintiff's RICO claim must also be dismissed because the allegations of fraud that constitute the alleged acts of racketeering once again fail to plead fraud with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. *See Wasserman v. Maimonides Medical Center,* 970 F.Supp. 183, 197 (E.D.N.Y.1997) ("Where the predicate racketeering acts of a RICO claim sound in fraud, as here, the pleading of those predicate acts must satisfy the particularity requirement of Fed.R.Civ.P. 9(b).").

Rule 9(b) provides, in pertinent part, that "in all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). The rule is designed to "provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from 'improvident charges of wrongdoing,' and to protect a defendant against the institution of a strike suit." *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995) (quoting *O'Brien v. National Property Analysts Partners,* 936 F.2d 674, 676 (2d Cir.1991)).

Under Rule 9(b), a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993) . Furthermore, the Second Circuit has cautioned that "we must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a 'license to base claims of fraud on speculation and conclusory allegations.' " *Acito,* 47 F.3d at 52 (quoting *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990)). Accordingly, the complaint must plead "facts that give rise to a strong

inference of fraudulent intent." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994); *accord Mills,* 12 F.3d at 1176; *O'Brien,* 936 F.2d at 676; *Ouaknine v. MacFarlane,* 897 F.2d 75, 80 (2d Cir.1990). This inference may be established "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields,* 25 F.3d at 1128. Measured against these standards, plaintiff's allegations of fraud are inadequate.

### a. *Circumstances Constituting Fraud*

The complaint alleges that Brooklyn Law School knew that the salary figure it reported to U.S. News was false and materially misleading, or was recklessly indifferent to that fact. (*See* Second Am. Compl. ¶ 12.) However, the complaint is devoid of any facts supporting an inference that Brooklyn Law School knowingly or recklessly misstated the information received in response to the survey questionnaires when it reported the average salary figures to U.S. News. Plaintiff points to a memorandum dated April 8, 1996, from Dean Joan G. Wexler to the student body at Brooklyn Law School, in which she stated that U.S. News's method of reporting the salary information of law school graduates is "misleading." (Second Am. Compl. Ex. C.) But Dean Wexler explained in the memorandum that it was misleading because the data reported by U.S. News was gathered only from those graduates who entered the private sector and chose to return the survey. (Id.) The letter expressly states that Brooklyn Law School provided U.S. News with accurate information in response to U.S. News's request. (Id.)

**\*7** The only other purported basis for plaintiff's allegations of fraud stems from his tortured calculation of the average salaries of the 1992 class, which he concludes "reveals the literal impossibility that the $60,328 figure was correct." (*See* Pl.'s Mem. at 6). Plaintiff's calculations, which are set forth in the margin, [FN7] reveal no such thing. Moreover, even if they supported an inference that the figures provided to U.S. News were incorrect, plaintiff's allegations that the figures were provided with fraudulent intent are insufficient.

FN7. Plaintiff's analysis is based on a comparison of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2000 WL 1692844, *7 (E.D.N.Y.))

the 99 questionnaire responses that served as the
basis for the data used in the March 22, 1993, *U.S.
News & World Report* survey with the 174
questionnaire responses that served as the basis for
various data reported in the 1993- 1994 Annual
Bulletin. This analysis, which purportedly supports
plaintiff's allegation that the $60,328 salary figure
was "knowingly or recklessly" miscalculated is, in
part, as follows:

If 99 graduates had an salary of $60,328, then the
total salary of this group would be $5,972,472. The
174 graduates, on the other hand, with an average
salary of $44,042, had a total salary of $7,663,264.
Therefore, the 75 graduates whose responses were
not part of that 99 but were part of the responses
which comprised the figures in the Bulletin must
have made the difference between the 99 graduates'
total salary of $5,972,472 and the 174 graduates'
total salary of $7,663,134. Thus, the 75 graduates
would have had to account for a total salary of
$1,690,662. Dividing that figure by 75 shows that
*this group must have averaged a salary of $22, 542!*
However, such a figure is *lower than the lowest
average* of the five categories of firms listed in the
Bulletin. Thus, even if these 75 graduates were
maximally skewed toward the low end of the salary
spectrum--that is, if they all were positioned with
firms of 2-10 attorneys, the figures of $22,542 still
could not have been their salary average. This is
because they would have comprised virtually the
entire group employed in that bracket--that is, 75 of
77 graduates--yet the group itself averaged $29,900
(and clearly, two additional students in a group of 77
could not have accounted for the average changing
from $22,542 to $29,900). Given that the figure of
$22,542 was derived from the supposed average of
$60,328 of the previously mentioned 99 graduates, *it
simply cannot be true that the 99 graduates's
responses revealed an average salary of $60,328.*
(Pl. Mem. at 7-8.)

### b. *Fraudulent Intent*

As noted above, plaintiff may satisfy the burden
under Rule 9(b) to plead circumstances that "give
rise to a strong inference of fraudulent intent" by
alleging either motive and opportunity to commit
fraud or facts that constitute strong circumstantial
evidence of fraudulent behavior or recklessness.
*Shields,* 25 F.3d at 1128-30. Here, plaintiff fails to
do either.

In an effort to establish motive and opportunity,
plaintiff alleges that the salary figures were intended
by defendant to induce students into applying to
Brooklyn Law School, to enlarge its pool of
applicants, to enable it to be more selective and less
dependant on scholarships and grants to attract high-
caliber students, and to raise the prestige of the
institution. (Second Am. Compl. ¶ 51). Defendant
argues, and I agree, that if the desire to attract first-
rate students and enhance an institution's reputation
were sufficient to give rise to a strong inference of
an intent to deceive, colleges and professional
schools could face countless meritless suits based on
statements   made   in   the   information   they
disseminate. *Cf. Acito,* 47 F.3d at 54 ("Plaintiffs'
allegations that defendants were motivated to
defraud the public because an inflated stock price
would increase their compensation is without merit.
If scienter could be pleaded on that basis alone,
virtually every company in the United States that
experiences a downturn in stock price could be
forced to defend countless fraud actions."); *Shields,*
25 F.3d at 1130 ("If motive could be pleaded by
alleging the defendant's desire for continued
employment, and opportunity by alleging the
defendant's authority to speak for the company, the
required showing of motive and opportunity would
be no realistic check on aspersions of fraud....").

Alternatively, plaintiff argues that defendant's
conduct rises to the level of conscious fraudulent
behavior.   Yet   the   complaint   contains   no
particularized allegations that suggest conscious
misbehavior. Instead, plaintiff observes that the
second amended complaint "sets forth a scheme
involving thirteen episodes over a period of
approximately seven years, each involving hundreds
of mailings as well as the uses of interstate telephone
wire" (Pl. Mem. at 19), and then asserts that the
sheer number of alleged misstatements eliminates
any doubt that he has pleaded conscious behavior.
(Id.) These conclusory allegations fail to establish
any conscious behavior giving rise to an inference of
fraudulent intent on the part of defendant.

### 4. *The RICO Conspiracy Claim*

**\*8** Plaintiff has also alleged a violation of 18
U.S.C. § 1962(d), RICO's conspiracy provision.
This claim must be dismissed as well. The Supreme
Court has held that in order to establish a violation
of § 1962(d), a "conspirator must intend to further



Not Reported in F.Supp.2d
**(Cite as: 2000 WL 1692844, *8 (E.D.N.Y.))**

an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense...." *Salinas v. United States,* 522 U.S. 52, 65 (1997); *see also Cofacredit, S.A. v. Windsor Plumbing Supply Co.,* 187 F.3d 229, 244-45 (2d Cir.1999). In this case, for the reasons stated above, the plaintiff has failed to adequately allege the enterprise element of his § 1962(c) claim. Therefore, the allegations against Brooklyn Law School, if proven, would not suffice to show that a RICO conspiracy existed. *Black Radio Network, Inc. v. NYNEX Corp.,* 44 F.Supp.2d 565, 581 (S.D.N.Y.1999) ("A RICO conspiracy claim must fail, however, if the substantive claims themselves are deficient"); *Schmidt,* 16 F.Supp.2d at 353- 54 ("[T]he Second Circuit has held that there can be no RICO conspiracy without a substantive RICO violation) (collecting cases).

### C. *The Supplemental State Law Claims*

Under 28 U.S.C. § 1367(a), "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Subsection (c)(3) provides that the district court may decline to exercise supplemental jurisdiction over a claim under subsection (a) if "the district court has dismissed all claims over which it has original jurisdiction." Such supplemental jurisdiction is discretionary, and if the federal claims are dismissed before trial, the state claims generally should be dismissed as well. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726 (1966).

Here, there is no independent basis for retaining jurisdiction over the remaining state law claims of fraud, deceit, intentional misrepresentation, negligence, and unjust enrichment. At this early stage of the litigation, it would not serve the interest of judicial economy to retain jurisdiction over these claims. Accordingly, the state law claims are dismissed.

### CONCLUSION

For the reasons set forth above, defendant's motion to dismiss is granted. The Clerk of the Court is advised that this order closes the case.

Not Reported in F.Supp.2d, 2000 WL 1692844 (E.D.N.Y.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

