# TAB 5

Slip Copy
Slip Copy, 2005 WL 2347853 (S.D.N.Y.)
**(Cite as: 2005 WL 2347853 (S.D.N.Y.))**
**H**

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
George DALE, Commissioner of Insurance for the
State of Mississippi, in his
official capacity as Receiver of Franklin Protective
Life Insurance Company, et
al., Plaintiffs,
v.
BANQUE SCS ALLIANCE S.A. and Jeanne-Marie
Wery, Individually and in his
capacity as Officer, Employee and Agent of Banque
SCS Alliance S.A.,
Defendants.
No. 02Civ.3592 (RCC)(KNF).

Sept. 22, 2005.

MEMORANDUM AND ORDER

FOX, Magistrate J.

### I. INTRODUCTION
**\*1** The plaintiffs in this action, the receivers of seven insurance companies ("insurance companies"), allege violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.,* ("RICO" or "RICO Act"), common law fraud, civil conspiracy, and aiding and abetting fraud against defendants Banque SCS Alliance, S.A ("Banque SCS"), and Jeanne-Marie Wery ("Wery") (collectively, "defendants"). The plaintiffs also allege that Banque SCS was negligent in hiring, supervising and retaining Wery. Each of the insurance companies is domiciled in the state of which its receiver is an official. According to the amended complaint, Banque SCS is a Swiss corporation headquartered in Switzerland, and Wery, a citizen of Belgium, is an officer, employee and agent of Banque SCS. In a previous Memorandum and Order, the Court granted an application to dismiss the action for lack of personal jurisdiction ("dismissal order"). The Court found it unnecessary to reach the other grounds for dismissal raised by the defendants, namely *forum non conveniens* and failure to state a claim upon which relief may be granted. *See Dale v. Banque SCS,* No.

02 Civ. 3592, 2004 WL 2389894, at \*4 (S.D.N.Y. Oct. 22, 2004).

Before the Court are the plaintiffs' applications: (1) to amend the judgment of dismissal in the interest of justice, pursuant to Fed.R.Civ.P. 59(e), in light of new evidence pertaining to the court's personal jurisdiction over the defendants ("motion to amend the judgment"); (2) for reconsideration of the dismissal order, pursuant to Local Civil Rule 6.3 ("first motion for reconsideration"); and (3) for reconsideration of the dismissal order with respect to Wery, pursuant to Fed.R.Civ.P. 60(b), in light of, *inter alia,* his subsequent consent to submit to the jurisdiction of this court ("second motion for reconsideration"). Also before the Court are Banque SCS's applications: (a) to strike affidavits submitted by the plaintiffs in support of the first motion for reconsideration ("motion to strike"); and (b) for certification of the previously-entered judgment of dismissal as a final judgment with respect to Banque SCS, pursuant to Fed.R.Civ.P. 54(b) ( "Rule 54[b] motion"), if the second motion for reconsideration is not denied.

The Court will address the instant applications and, to the extent necessary and appropriate, the unaddressed grounds raised in support of the previous motion to dismiss.

### II. BACKGROUND AND FACTS
The plaintiffs allege that from 1990 until 1999, the defendants assisted Martin Frankel ("Frankel") in defrauding the insurance companies of over $200,000,000, thus rendering the insurance companies insolvent. According to the plaintiffs, Frankel devised and executed a scheme to acquire ownership of the insurance companies fraudulently, using funds taken from certain of the insurance companies to purchase others of the insurance companies. The plaintiffs contend that Frankel evaded detection by regulatory authorities and looted the assets of the insurance companies for his own benefit. The plaintiffs maintain that, with the assistance of the defendants and others, Frankel laundered the illegally obtained funds through a series of fraudulent wire transfers to and from, *inter alia,* Banque SCS's correspondent bank account in New York and other accounts it maintained outside New York. As part of this scheme, the defendants

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



allegedly arranged, at Frankel's direction, the incorporation of Bloomfield Investments, Ltd. ("Bloomfield"), a British Virgin Islands corporation whose sole director was an employee or otherwise associated with Banque SCS. Accounts at Banque SCS allegedly were opened in Bloomfield's name and utilized in the laundering of insurance company funds. The plaintiffs allege further that Wery, at Frankel's direction, purchased travelers checks using insurance company funds Frankel obtained illegally, and had the checks shipped to Banque SCS in Switzerland and then to Frankel, and others associated with him, at various New York addresses.

**\*2** The plaintiffs allege further that, with Wery's assistance, Frankel maintained accounts at Merrill Lynch and Bear Stearns under an alias. By the spring of 1998, Wery allegedly had learned that Frankel had gained control of a number of insurance companies and that at least some of the funds Frankel had deposited into Banque SCS accounts had been taken from the insurance companies. The plaintiffs maintain that the defendants helped Frankel conceal his identity on funds transfer documents, and, when regulatory authorities began to uncover Frankel's illegal activities, the defendants helped Frankel liquidate the stolen insurance company assets, so that he could continue to use them if Frankel determined to flee the United States. In light of the foregoing, the plaintiffs maintain that the defendants knew that the funds whose transfers they executed on Frankel's behalf were the product of illegal activities.

The plaintiffs allege that the defendants committed wire fraud, mail fraud and money laundering ("predicate acts"), in order to further several enterprises, within the meaning of 18 U.S.C. § 1962(c), namely: (1) Bloomfield ("Bloomfield enterprise"); (2) each of the insurance companies ("insurance company enterprises"); and (3) a group of individuals and corporate entities that included Frankel, Wery, Banque SCS and numerous others who participated in Frankel's scheme ("association-in-fact enterprise").

### III. DISCUSSION
*First Motion for Reconsideration*

Local Civil Rule 6.3 of this court ("Local Rule 6.3") provides, in pertinent part, that a notice of

motion for reconsideration or reargument "shall be served with ... a memorandum setting forth concisely the matters or controlling decisions which counsel believes the court has overlooked." "Thus, to be entitled to reargument and reconsideration, the movant must demonstrate that the Court overlooked controlling decisions or factual matters that were put before it on the underlying motion." *Hamilton v. Garlock, Inc .,* 115 F.Supp.2d 437, 438 (S.D.N.Y.2000). A motion for reconsideration "is not a motion to reargue those issues already considered when a party does not like the way the original motion was resolved." *In re Initial Pub. Offering Antitrust Litig.,* No. 01 Civ.2014, 2004 WL 789770, at \*1 (S.D.N.Y. April 13, 2004) (quoting *Yurman Design, Inc. v. Chaindom Enters.,* No. 99 Civ. 9307, 2003 WL 22047849, at \*1 [S.D.N.Y. Aug. 29, 2003] ). The decision to grant or deny the motion is within the sound discretion of the court. *See id.*

In the dismissal order, the Court determined that the four correspondent bank accounts maintained by Banque SCS in New York did not subject the defendants to personal jurisdiction under New York Civil Procedure Law and Rules ("CPLR") § 302(a)(1) (" § 302(a)(1)"). In so holding, the Court relied upon *Semi Conductor Materials, Inc. v. Citibank Int'l PLC,* 969 F.Supp. 243, 246 (S.D.N.Y.1997), which stated that "a correspondent bank relationship between a foreign bank and a New York financial institution does not provide sufficient grounds to exercise personal jurisdiction over a foreign bank." The plaintiffs contend, correctly, that the Court's reliance on *Semi Conductor* was misplaced, since the above-quoted statement pertained to an analysis of personal jurisdiction under CPLR § 301, not § 302(a)(1). Accordingly, it is appropriate for the Court to reconsider the points raised by the parties concerning the question of personal jurisdiction under § 302(a)(1).

**\*3** "The burden of proving jurisdiction is on the party asserting it ." *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 507 (2d Cir.1994). "In deciding a pretrial motion to dismiss for lack of personal jurisdiction a district court has considerable procedural leeway. It may determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion ." *Marine Midland Bank, N.A. v. Miller,* 664 F.2d

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



899, 904 (2d Cir.1981). If the court relies solely on pleadings and affidavits, the plaintiff need only make a *prima facie* showing of personal jurisdiction. *See Robinson,* 21 F.3d at 507. In determining whether the plaintiffs have made a *prima facie* showing of personal jurisdiction, the court will construe jurisdictional allegations liberally and take all uncontroverted factual allegations to be true. *Id.*

CPLR § 302(a)(1) provides, in pertinent part, that a New York court may exercise personal jurisdiction over a non-domiciliary "who in person or through an agent ... transacts any business within the state." CPLR 302(a)(1) "extends the jurisdiction of New York state courts to any nonresident who has 'purposely availed [itself] of the privilege of conducting activities within New York and thereby invoked the benefits and protections of its laws....'" *' Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 171 F.3d 779, 787 (2d Cir.1999) (quoting *Parke-Bernet Galleries v. Franklyn,* 26 N.Y.2d 13, 18, 308 N.Y.S.2d 337, 341 [1970] ). "[A] single transaction would be sufficient to fulfill this requirement, so long as the relevant cause of action also arises from that transaction." *Id.* (citations and quotation marks omitted).

With respect to Wery, the Court notes that subsequent to the briefing of the first motion for reconsideration, Wery sought to withdraw his motion to dismiss the complaint, including his objections concerning personal jurisdiction, and consented to the personal jurisdiction of this court. Accordingly, the Court deems the motion to dismiss withdrawn to the extent that it pertains to Wery, and finds that there is no basis upon which to dismiss the amended complaint, as it pertains to Wery, for lack of personal jurisdiction. Therefore, it is appropriate to grant the first motion for reconsideration as it pertains to Wery. As Wery's application to dismiss the complaint has been deemed withdrawn, there is no need to address the other, nonjurisdictional contentions raised therein, as they pertain to Wery.

With respect to Banque SCS, the Court finds that *Indosuez Int'l Finance B.V. v. National Reserve Bank,* 98 N.Y.2d 238, 746 N.Y.S.2d 631 (2002), a decision cited by the plaintiffs in opposition to the motion to dismiss, is controlling on the question of personal jurisdiction under CPLR § 302(a)(1). In that case, a foreign defendant maintained a bank account in New York for the purpose of receiving

payments from the plaintiff in connection with a collection of currency exchange transactions out of which the parties' dispute arose. *Id.* at 242, 633. The New York Court of Appeals determined that this satisfied the requirements of CPLR § 302(a)(1). *Id.* at 246, 636; *see also, Monroy v. Citibank, N.A.,* No. 84 Civ. 1040, 1985 WL 1768, *3-4 (S.D.N.Y. June 21, 1985). According to the amended complaint, Banque SCS maintains several correspondent bank accounts in New York that it used to effect a number of the funds transfers that are the subject of this action. Accordingly, the Court finds that the factual allegations contained in the amended complaint concerning Banque SCS state a *prima facie* case of personal jurisdiction, pursuant to CPLR § 302(a)(1). [FN1] Therefore, it is appropriate to grant the first motion for reconsideration as it pertains to Banque SCS.

> FN1. Banque SCS's argument to the contrary relies upon decisions of this court and a decision of an intermediate New York appellate court all of which predate *Indosuez. See, e.g., Symenow v. State Street Bank and Trust Co.,* 244 A.D.2d 880, 665 N.Y.S.2d 141 (App. Div. 4th Dep't 1997). As the decisions of the New York Court of Appeals are authoritative with respect to questions of New York law, the Court finds Banque SCS's argument to be unpersuasive.

*4 In light of the foregoing, the Court declines to address the other contentions raised in the first motion for reconsideration. As the Court has determined that it has personal jurisdiction over Banque SCS, the other grounds raised in the motion to dismiss will be addressed below, to the extent that they pertain to that defendant.

*Motion to Dismiss*

A.  Forum Non Conveniens

"A *forum non conveniens* motion is decided in two steps. First, the district court asks if there is an alternative forum that has jurisdiction to hear the case.... [In] the second step of the inquiry, ... the district court determines the forum that will be most convenient and will best serve the ends of justice ." *Peregrine Myanmar Ltd. v. Segal,* 89 F.3d 41, 46 (2d Cir.1996). The existence of an alternative forum is a prerequisite to dismissal on grounds of *forum non conveniens. Schertenleib v. Traum,* 589 F.2d

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
(Cite as: 2005 WL 2347853, *4 (S.D.N.Y.))

1156, 1159-60 (2d Cir.1978).

Banque SCS contends that Switzerland would be an adequate alternative forum for this action. However, the Court has before it no information about Swiss jurisdictional law or its likely application to the claims asserted in the instant action. In support of its applications, Banque SCS cites *Schertenleib, supra,* 589 F.2d 1156, and *ACLI Int'l Commodity Servs., Inc. v. Banque Populaire,* 652 F.Supp. 1289 (S.D.N.Y.1987), for the propositions that Switzerland is "generally" an adequate alternative forum and that Swiss courts would have jurisdiction to adjudicate fraud claims against Banque SCS, respectively. However, in each of those cases, the parties submitted expert testimony to the court that enabled it to determine the likely application of Swiss law to the facts presented by the action. No such expert testimony is available here. Moreover, even if *Schertenleib* and *ACLI* contained statements about Swiss law that were pertinent to the instant action, those decisions were issued 27 and 18 years ago, respectively. There is no basis upon which to determine whether conclusions about Swiss law reached nearly two or three decades ago remain accurate.

As the existence of an adequate alternative forum for the instant action has not been demonstrated, the motion to dismiss on the basis of *forum non conveniens* is without merit.

### B. Failure to State a Claim

A court may dismiss an action pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim upon which relief can be granted, only if "it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief." *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). In considering a motion pursuant to this Rule, "the court must accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff." *Id.*

### 1. Common Law Fraud; Aiding and Abetting Fraud

**\*5** Under New York law, a claim for fraud "must assert that a representation of a material fact was made; that such representation was false, and known

to be false by the party making it, or was recklessly made; that such representation was made to deceive and to induce the other party to act upon it; and that the party to whom the representation was made relied upon it to its injury or damage." *Zaref v. Berk & Michaels, P.C.,* 192 A.D.2d 346, 348, 595 N.Y.S.2d 772, 774 (App. Div. 1st Dep't 1993) (internal quotation marks and citation omitted).

In the case at bar, the plaintiffs have alleged that Banque SCS made certain misrepresentations and that the plaintiffs suffered injuries as a result of those misrepresentations. However, it is not alleged that the misrepresentations were made to the plaintiffs, that the misrepresentations were intended to induce any action by the plaintiffs, or that the plaintiffs relied upon the statements to the plaintiffs' detriment.

In light of the foregoing, the plaintiffs' state law claims for fraud and aiding and abetting fraud should be dismissed.

### 2. Section 1962(c) claim

The RICO Act provides, in pertinent part, that:
(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
18 U.S.C. § 1962(c) (" § 1962(c)").

The RICO Act defines "racketeering activity" as, *inter alia,* "any act which is indictable under any of the following provisions of title 18, United States Code: ... section 1341 (relating to mail fraud), [and] section 1343 (relating to wire fraud)...." 18 U.S.C. § 1961(1). The RICO Act also permits those injured by a violation of § 1962 to commence a civil action in order to recover damages. *See* 18 U.S.C. § 1964(c).

Although the elements of fraud under New York law, discussed above, are not coextensive with the elements of mail and wire fraud under 18 U.S.C. §§ 1341, 1343, the differences are not here material. As noted above, the plaintiffs have not alleged that fraudulent statements were made to the plaintiffs. Additionally, the plaintiffs have not alleged any

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



injury to the other persons and entities to whom the allegedly fraudulent statements were made. Consequently, the only alleged predicate acts that need be considered in evaluating the sufficiency of the plaintiffs' RICO allegations are the allegations that Banque SCS engaged in money laundering, in violation of 18 U.S.C. § 1956(a)(1). [FN2]

> FN2. In order to state a claim for money laundering, a plaintiff need only plead: "(1) that the defendant conducted a financial transaction; (2) that the transaction in fact involved the proceeds of specified unlawful activity as defined in [18 U.S.C.] § 1956(c)(7); (3) that the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity; and (4) that the defendant knew that the financial transaction was designed in whole or in part to conceal or disguise the source, ownership, control, etc., of those proceeds." *United States v. Maher,* 108 F.3d 1513, 1527-28 (2d Cir.1997). The plaintiffs have met this standard.

*i) Operation and Management of Enterprises*

In order to conduct or participate, directly or indirectly in the conduct of an enterprise's affairs, within the meaning of 18 U.S.C. § 1962(c), one need not exercise "significant control" over an enterprise, but one must engage in the "operation or management" of the enterprise and "have some part in directing those affairs." *Reves v. Ernst & Young,* 507 U.S. 170, 179 & n. 4, 113 S.Ct. 1163, 1170 & n. 4 (1993). "[S]imple taking of directions and performance of tasks that are necessary or helpful to the enterprise, without more, is insufficient to bring a defendant within the scope of § 1962(c)." *United States v. Viola,* 35 F.3d 37, 41 (2d Cir.1994) (abrogated on other grounds by *Salinas v. United States,* 522 U.S. 52, 118 S.Ct. 469 [1997] ).

\*6 Courts in the Second Circuit typically apply the rule set forth in *Reves* extremely rigorously. *United States Fire Ins. Co. v. United Limousine Service, Inc.,* 303 F.Supp.2d 432, 451 (S.D.N.Y.2004). When a defendant's alleged provision of professional services to an enterprise is the basis for a RICO claim, "[t]he deciding issue ... is 'whether the provision of these services allows the defendant to direct the affairs of the enterprise." ' *Id.* at 452 (quoting *Schmidt v. Fleet Bank,* 16 F.Supp.2d 340, 346 [S.D.N.Y .1998], and collecting cases); *but see*

*Bank Brussels Lambert v. Credit Lyonnais,* No. 93 Civ. 6876, 2000 WL 1694322, at \*4 (S.D.N.Y. Nov. 13, 2000) (finding that plaintiffs' pleading "in substantially the language of the statute" satisfies *Reves* test). Additionally, "[o]ne is liable under RICO if he or she has discretionary authority in carrying out the instructions of" the enterprise's principals. *Baisch v. Gallina,* 346 F.3d 366, 376 (2d Cir.2003) (internal quotation marks omitted).

The plaintiffs allege that Banque SCS and Wery "structured [Bloomfield's] ownership" and that the sole director of Bloomfield was an employee or associate of Banque SCS. Am. Compl. ¶ 40. Therefore, it can be inferred reasonably from the plaintiffs' allegations that Banque SCS had a part in directing the affairs of the Bloomfield enterprise.

The plaintiffs have also alleged that Banque SCS executed funds transfers and provided other banking services in order to assist Frankel, advised Frankel how to conceal the nature and source of his transactions and the spoils of those transactions, and made certain misrepresentations to other banks and participants in the alleged enterprises. According to the amended complaint, essentially all of these activities occurred at Frankel's direction or after consultation with Frankel. The amended complaint provides no basis upon which to infer that Banque SCS exercised discretion in performing these tasks or that these tasks otherwise allowed Banque SCS to direct any part of the affairs of the alleged association-in-fact enterprise or the insurance company enterprises.

Near the end of the amended complaint, the plaintiffs allege, without elaboration, that Banque SCS "knowingly conducted, participated in, controlled, manipulated or directed the enterprises' affairs." Am. Compl. ¶ 151. This allegation finds no support in the numerous allegations in the amended complaint concerning the activities allegedly undertaken by Banque SCS in connection with the RICO enterprises. In light of the great degree of detail with which those activities are set forth in the amended complaint--which is approximately 75 pages in length--it cannot be inferred that there is a basis in fact for the allegation that Banque SCS played a significant role in the direction of the insurance company and association-in-fact enterprises. With respect to those enterprises, the Court finds that the conduct allegedly

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



undertaken by Banque SCS does not satisfy the test set forth in *Reves.*

### ii) RICO Enterprises

*7 In order to violate 18 U.S.C. § 1962(c), a person must be "employed by or associated with" an enterprise. 18 U.S.C. § 1962(c). Under the RICO Act, an " 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "The enterprise must be separate from the pattern of racketeering activity ... and distinct from the person conducting the affairs of the enterprise." *First Capital Asset Management, Inc. v. Satinwood,* 385 F.3d 159, 173 (2d Cir.2004) (internal citations omitted). "For an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." *First Nationwide Bank v. Gelt Funding Corp.,* 820 F.Supp. 89, 98 (S.D.N.Y.1993); *see also Satinwood,* 385 F.3d at 174. Moreover, an association-in-fact must have an existence "separate from the pattern of racketeering activity." *First Capital,* 385 F.3d at 173.

The Bloomfield enterprise consists of a corporate entity, Bloomfield Investments, Ltd. Therefore, the plaintiffs have alleged adequately the existence of that enterprise.

The plaintiffs do not allege that the association-in-fact enterprise had any purpose or activities other than the execution of Frankel's scheme. Consequently, the association-in-fact enterprise does not have any alleged existence apart from the pattern of racketeering activity alleged in the amended complaint, and it does not satisfy the requirement noted in *First Capital.*

Banque SCS contends that the insurance companies cannot be enterprises because they were also "victims" of Frankel's scheme. However, the plaintiffs have alleged that Frankel used each of the insurance companies to further his efforts to gain control of and "loot" the other insurance companies. Consequently, even if the target of a RICO enterprise cannot be the enterprise itself, it can reasonably be inferred from the plaintiffs'

allegations that each insurance company enterprise had targets other than itself. Banque SCS also contends that the plaintiffs have not alleged that Banque SCS was "associated with" any of the insurance company enterprises, *see* 18 U.S.C. § 1962(c), since Banque SCS was not aware of their existence. However, the plaintiffs allege that Wery learned of the existence of the insurance companies at some point in 1998, and allege generally that Wery acted as an agent of Banque SCS. It can be inferred reasonably from such allegations that Banque SCS was aware of the insurance company enterprises, at least as of some time in 1998. Therefore, the premise of Banque SCS's contention on this point does not obtain, and so the contention is without merit.

### iii) Causation

A defendant is liable under 18 U.S.C. § 1964(c) for a violation of 18 U.S.C. § 1962 only if the defendant's "injurious conduct is both the factual and the proximate cause of the injury alleged." *Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 120 (2d Cir.2003). In order to satisfy the proximate causation requirement, the alleged injury must be caused directly by the pattern of racketeering activity or by individual RICO predicate acts, and the alleged injury must be one that was reasonably foreseeable. *Baisch,* 346 F.3d at 373. However, a defendant need not intend any "specific harm[ ] to any particular individual"; it is sufficient that the defendant "causes harm by the creation of substantial risk of harm." *Id.* at 376.

*8 Banque SCS contends that the predicate acts alleged by the plaintiffs were not the factual or proximate cause of the plaintiffs' losses. Banque SCS's argument in support of that contention, however, is addressed principally to the mail and wire fraud allegations and not the money laundering allegations. The amended complaint alleges clearly that, without the numerous money laundering services provided to Frankel by Banque SCS over a multi-year period, Frankel's scheme to remove funds from the insurance companies could not have proceeded without detection. Moreover, according to the plaintiffs, Banque SCS, through its agent, Wery, allegedly learned no later than 1998 that Frankel had gained control of several insurance companies. Additionally, a number of Frankel's alleged wire transfer instructions to Banque SCS

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



were designed to conceal Frankel's activities and, thereby, to ensure that Frankel could continue to acquire insurance companies and remove funds from them improperly. Accordingly, the plaintiffs have alleged adequately that Banque SCS knowingly caused a substantial risk of harm to the insurance companies by effecting acts of money laundering.

In light of the foregoing, the 18 U.S.C. § 1962(c) claim should be dismissed with respect to the association-in-fact and insurance company enterprises.

### 3. Section 1962(d) Claim

The RICO Act provides, in pertinent part: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). In order to be liable for a violation of 18 U.S.C. § 1962(d), a "conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Salinas,* 522 U.S. at 65, 118 S.Ct. at 477. In order for a plaintiff to recover under 18 U.S.C. § 1964(c) for a RICO conspiracy claim, the plaintiff's injury must be caused by an overt act of racketeering or an act that is otherwise wrongful under RICO. *See Beck v. Prupis,* 529 U.S. 494, 503-505, 120 S.Ct. 1608, 1615-1616 (2000).

Banque SCS contends that the RICO conspiracy claim is without merit, on the grounds that: (1) the RICO enterprise allegations and allegations of causation are inadequate; and (2) the plaintiffs do not allege adequately that Banque SCS agreed to assist Frankel by engaging in money laundering. The first contention is addressed above; the plaintiffs have alleged causation adequately and have alleged a RICO enterprise adequately with respect to the Bloomfield enterprise and the insurance company enterprises only. The second contention is without merit; the plaintiffs have alleged that Banque undertook the transactions in question at Frankel's direction, and Frankel consulted Banque SCS on several occasions about strategies for concealing the nature of various transactions.

*9 Accordingly, the plaintiffs state a RICO conspiracy claim with respect to the insurance

company enterprises and the Bloomfield enterprise, and have not stated a RICO conspiracy claim with respect to the association-in-fact enterprise.

### 4. Civil Conspiracy

"No action for civil conspiracy is cognizable in law. A plaintiff first must plead specific wrongful acts which constitute an independent tort." *Smukler v. 12 Lofts Realty, Inc.,* 156 A.D .2d 161, 163, 548 N.Y.S.2d 437, 439 (App. Div. 1st Dep't 1989). The plaintiffs allege that Banque SCS conspired with Frankel to "loot and launder the assets of the [i]nsurance [c]ompanies." Am. Comp. ¶ 171. However, New York law does not recognize torts of "looting" or "laundering." Although the plaintiffs may have alleged tortious conduct by Frankel, they do not specify what tort(s) Banque SCS agreed with Frankel to commit. Accordingly, the amended complaint does not contain a short and plain statement of the plaintiffs' claim for civil conspiracy, *see* Fed.R.Civ.P. 8(a), and the claim should be dismissed.

### 5. Negligent Hiring

The contention that the negligent hiring claim should be dismissed was premised upon the absence of a valid claim against Wery. As that premise does not obtain, the contention is without merit.

### Second Motion for Reconsideration/Motion to Strike/Motion to Amend Judgment/ Rule 54(b) Motion

In light of the foregoing, the plaintiffs' motion to amend the judgment, the plaintiffs' second motion for reconsideration, and the defendants' motion to strike are moot. Consequently, Banque SCS's Rule 54(b) motion, which seeks relief alternative to the denial of the second motion for reconsideration, is also moot.

### IV. CONCLUSION

For the reasons set forth above: (1) The plaintiffs' first motion for reconsideration is granted; (2) the plaintiffs' motion to amend the judgment is denied as moot; (3) the plaintiffs' second motion for reconsideration is denied as moot; (4) the defendants' motion to strike is denied as moot; (5) the motion to dismiss the amended complaint is deemed withdrawn as to Wery; (6) the motion to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
(Cite as: 2005 WL 2347853, *9 (S.D.N.Y.))

dismiss the amended complaint as to Banque SCS is granted with respect to the 18 U.S.C. § 1962(c) claim as it relates to the association-in-fact and insurance company enterprises, the 18 U.S.C. § 1962(d) claim as it relates to the association-in-fact enterprise, the common law fraud claim, the aiding and abetting fraud claim, and civil conspiracy claim; (7) the motion to dismiss the amended complaint as to Banque SCS is denied with respect to the 18 U.S.C. § 1962(c) claim as it relates to the Bloomfield enterprise, the 18 U.S .C. § 1962(d) claim as it relates to the Bloomfield and insurance company enterprises, and the negligent hiring claim; and (8) Banque SCS's Rule 54(b) motion is denied as moot.

The Clerk of Court shall amend the previously entered judgment of dismissal to reflect that the amended complaint is dismissed solely as to Banque SCS, for failure to state a claim, with respect to the claims noted above.

**\*10** Wery and Banque SCS shall serve and file their answers to the amended complaint within twenty days of the date of this order.

Slip Copy, 2005 WL 2347853 (S.D.N.Y.)

Motions, Pleadings and Filings (Back to top)

. 1:02cv03592 (Docket)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 6

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1751135 (S.D.N.Y.), RICO Bus.Disp.Guide 10,316
(Cite as: 2002 WL 1751135 (S.D.N.Y.))

**Page    1**

▷

Motions, Pleadings and Filings

United States District Court, S.D. New York.
Herbert FEINBERG, individually and as assignee of
I.A. Alliance Corp. f/k/a I.
Appel Corporation, Plaintiffs,
v.
Stephen KATZ, Norman Katz and Jose Peschard,
Defendants.
I. APPEL CORPORATION and Herbert Feinberg,
Plaintiffs,
v.
Norman KATZ, Stephen Katz, and Jose Peschard,
No. 99 CIV. 45(CSH).

July 26, 2002.

Purchasing shareholder brought action against selling shareholders and corporate officer alleging violation of Racketeer Influenced and Corrupt Organizations Act (RICO) and various state law claims. On defendant's motion to dismiss, the District Court, Haight, Senior District Judge, held that: (1) purchasing shareholder had standing to recover for pre-sale acts of mismanagement; (2) relation back doctrine extended to initial common law fraud claims to subsequent claim under RICO; (3) creation of fictional out of state tax residence and resulting conviction for failure to pay taxes was wholly irrelevant to misappropriation of corporation's assets claim; and (4) conviction for tax evasion, while not directly relevant to misappropriated corporation's assets claim, was nonetheless admissible at trial to impeach defendant's credibility.

Motion granted in part and denied in part.

West Headnotes

[1] Corporations ⬅ 320(4)
101k320(4) Most Cited Cases
Purchasing shareholder had standing to recover for pre-sale acts of mismanagement under New York law, since alleged fraudulent misappropriation was not revealed before purchase and there was no suggestion that it was taken into account in fair purchase price.

[2] Corporations ⬅ 1.5(3)

101k1.5(3) Most Cited Cases
Under New York law, a parent corporation may not pierce the corporate veil it set up for its own benefit in order to advance the claims of its subsidiary.

[3] Corporations ⬅ 1.5(3)
101k1.5(3) Most Cited Cases
Under New York law, a parent corporation cannot create a subsidiary and then ignore its separate corporate existence whenever it would be advantageous to the parent.

[4] Corporations ⬅ 202
101k202 Most Cited Cases
The fact that an individual closely affiliated with a corporation, such as a principal shareholder or even a sole shareholder, is incidentally injured by an injury to the corporation does not confer standing on the individual under New York law to sue on the basis of either that indirect injury or the direct injury to the corporation.

[5] Corporations ⬅ 202
101k202 Most Cited Cases

[5] Corporations ⬅ 320(4)
101k320(4) Most Cited Cases
Under New York law, where an injury is suffered by a corporation and the shareholders suffer solely through depreciation in the value of their stock, only the corporation itself, or a stockholder suing derivatively in the name of the corporation, may maintain an action against the wrongdoer; an exception to the general rule prohibiting parent corporations from advancing their subsidiary's claims exists when the alleged wrongdoer owes a fiduciary duty directly to the parent corporation and the parent seeks to recover for a breach of that duty which resulted in the diminution in value of the parent's shares of the subsidiary.

[6] Limitation of Actions ⬅ 95(3)
241k95(3) Most Cited Cases
Four year limitations period under Racketeer Influenced and Corrupt Organizations Act (RICO), for purchasing shareholder's claim that other shareholder and corporate officer looted parent corporation, began to run within year of when he purchased other shareholder's stock and took over company; purchasing shareholder immediately

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2002 WL 1751135 (S.D.N.Y.))

Page   2

attempted to rescind purchase agreement alleging fraud as it rapidly became clear that company faced serious financial problems in months after purchase. 18 U.S.C.A. § 1961 et seq.

[7] Limitation of Actions ⬅ 127(3)
241k127(3) Most Cited Cases
Relation back doctrine extended from initial common law fraud claims to subsequent claim under Racketeer Influenced and Corrupt Organizations Act (RICO), since shareholder was on notice that he could have been subject to liability for those fraudulent acts under RICO theory ever since original complaint was filed. 18 U.S.C.A. § 1961 et seq; Fed.Rules Civ.Proc.Rule 15(c), 28 U.S.C.A .

[8] Racketeer Influenced and Corrupt Organizations ⬅ 34
319Hk34 Most Cited Cases
Under the Racketeer Influenced and Corrupt Organizations Act (RICO), an enterprise need not necessarily have a continuity extending beyond the performance of the pattern of racketeering acts alleged, or a structural hierarchy, so long as it is in fact an enterprise as defined in the statute. 18 U.S.C.A. § 1961 et seq.

[9] Racketeer Influenced and Corrupt Organizations ⬅ 36
319Hk36 Most Cited Cases
Under the Racketeer Influenced and Corrupt Organizations Act (RICO), an association in fact enterprise exists if the plaintiff can show that its various associates function as a continuing unit; for an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes. 18 U.S.C.A. § 1961 et seq.

[10] Corporations ⬅ 312(3)
101k312(3) Most Cited Cases

[10] Trusts ⬅ 358(1)
390k358(1) Most Cited Cases
Funds, as specific amounts misappropriated through fraudulent billing, were specifically identifiable, for purpose of conversion and constructive trust claims under New York law, even though funds were not held in segregated account.

[11] Trover and Conversion ⬅ 2
389k2 Most Cited Cases
Under New York law, real property may not be the subject of a conversion claim.

[12] Contribution ⬅ 8
96k8 Most Cited Cases
Under New York law, a party may not obtain contribution for settlement of a claim.

[13] Indemnity ⬅ 20
208k20 Most Cited Cases

[13] Indemnity ⬅ 54
208k54 Most Cited Cases
In New York, an indemnification claim must be grounded in contract either express or implied; to find an implied contract for indemnification, a duty must exist between the third party defendant and the primary plaintiff.

[14] Federal Civil Procedure ⬅ 1126
170Ak1126 Most Cited Cases
Allegations in complaint, of defendant's creation of fictional out of state tax residence and resulting conviction for failure to pay taxes, was wholly irrelevant to claim that he misappropriated corporation's assets, and, consequently, would be stricken; creation of fictional residence and conviction tended to show that defendant wanted to increase his income, but only indirectly by decreasing his taxes, and alleged evasion of income tax liability did not make it more likely that he also increased his income through very different vehicle of looting corporation. Fed.Rules Civ.Proc.Rule 12(f), 28 U.S.C.A.

[15] Federal Civil Procedure ⬅ 1126
170Ak1126 Most Cited Cases
Allegations in complaint concerning defendant's conviction for tax evasion, while not directly relevant to claims that he misappropriated corporation's assets, was nonetheless admissible at trial to impeach defendant's credibility, and, consequently, would not be stricken, since it was crime involving dishonesty. Fed.Rules Civ.Proc.Rule 12(f), 28 U.S.C.A.; Fed.Rules. Evid.Rule 609(a)(2), 28 U.S.C.A.

[16] Federal Civil Procedure ⬅ 1838
170Ak1838 Most Cited Cases
When a motion to dismiss is granted, the usual

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2002 WL 1751135 (S.D.N.Y.))

Page  3

practice is to grant leave to amend the complaint; such leave, which is discretionary, may be denied where the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal. Fed.Rules Civ.Proc.Rule 15, 28 U.S.C.A.

### MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District J.

**\*1** The simmering feud between the plaintiff, Herbert Feinberg, and his former business partner, Norman Katz ("Norman"), has engendered these consolidated cases pitting Feinberg against Norman, Norman's son Stephen Katz ("Stephen"), and their business associate Jose Peschard. The background of these seemingly endless disputes is described in the Court's opinion in a related case filed by Norman Katz to confirm an award issued in an arbitration between him and Feinberg. *See Katz v. Feinberg,* 167 F.Supp.2d 556(S.D.N.Y.2001), *aff'd* 290 F.3d 95 (2d Cir.2002) (the "Arbitration Opinion"), familiarity with which is assumed. In addition to the arbitration case and these two consolidated cases, the disputes have sparked a separate federal complaint also pending before this Court.

Defendants now move pursuant to Rule 12(b)(6) to dismiss the complaints in the two captioned cases for failure to state a claim upon which relief can be granted.

It will be helpful in understanding the issues raised by defendants' motion to dismiss the captioned cases to furnish a brief description of the three pending federal complaints. The complaint under docket number 99 Civ. 45 was originally filed by Feinberg and his company, I. Appel Corporation ("I.Appel"), now known as I.A. Alliance Corp. (the "Company" or "Alliance"), on January 5, 1999 against Stephen Katz. That complaint advanced a claim of common law fraud arising out of Stephen's alleged misappropriation of the Company's assets and falsification of its financial statements. Feinberg and the Company filed another complaint on January 31, 2000 under docket number 00 Civ. 17 against Norman, Stephen and Jose Peschard alleging that the three breached their fiduciary duties to the Company and misappropriated the Company's assets and business opportunities by scheming to take over one of the Company's Mexican subsidiaries. The third

complaint, 01 Civ. 2739, was filed by Alliance as assignee of the claims of the bankruptcy creditors of I. Appel. This latter complaint asserted causes of action of breach of fiduciary duty and fraud against Norman and Stephen Katz for allegedly disguising the Company's true financial condition from its creditors.

After the Court issued the Arbitration Opinion, the defendants agreed to allow plaintiff to amend all three complaints in order to delete allegations and claims that would have been barred by collateral estoppel as a result of the decision. To this end, on October 5, 2001 the first complaint (99 Civ. 45) was amended to delete certain claims and incorporate some of the claims in 00 Civ. 17. [FN1] The Amended Complaint advances six causes of action by Feinberg, individually and as assignee of Alliance, against Stephen Katz, Norman Katz and Jose Peschard. Subject matter jurisdiction is premised upon both federal question jurisdiction and diversity of citizenship. [FN2]

> FN1. The complaint in 00 Civ. 17 is essentially obsolete because the amended complaint in 99 Civ. 45 was reconfigured to incorporate the claims alleged in 00 Civ. 17. As a result, in discussing the two cases which were originally separate I will refer to the single "Amended Complaint" filed on October 5, 2001.

> FN2. The third complaint, 01 Civ. 2739, was amended on March 19, 2002 and now advances fraud, RICO and breach of fiduciary duty claims by Feinberg and Alliance as assignees of the claims of I. Appel's creditors.

The First Claim for Relief is a cause of action under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq,* based on alleged predicate acts of wire and mail fraud. The remaining claims assert causes of action under the common law.

**\*2** The Second Claim is for breach of fiduciary duty against the Katzes and Peschard;

The Third Claim is for conversion against all three defendants;

The Fourth Claim advances an unjust enrichment cause of action against the Katzes and Peschard;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
(Cite as: 2002 WL 1751135, *2 (S.D.N.Y.))

The Fifth Claim seeks the imposition of a constructive trust over the assets the defendants allegedly unlawfully received; and

The Sixth Claim seeks indemnification and/or contribution from the Katzes for legal fees and settlement costs incurred by plaintiff in an unrelated litigation.

The Katzes have moved pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the Amended Complaint's RICO claim and many of its common law claims. [FN3] As for the RICO claim, the Katzes maintain that it suffers from a number of fatal deficiencies including untimeliness, failure to properly allege a RICO enterprise and a pattern of RICO activities, failure to allege predicate acts of wire fraud, and lack of particularity in its fraud pleadings. The Katzes also allege that plaintiff lacks standing to bring the claims, that most of the common law claims are barred in part by the statute of limitations, and that certain of the common law claims fail to state a cause of action. Finally, the Katzes move to strike certain allegations in the Amended Complaint they contend are prejudicial.

> FN3. The Katzes' separate motion to dismiss the third action which was recently filed and is not yet ripe for decision is not addressed in this opinion.
> Jose Peschard has answered the Amended Complaint. Since he is not a moving defendant on the motion to dismiss, the validity of the Amended Complaint's claims against him is not challenged. However, because of the nature of the infirmities in the RICO claim which I describe below, the RICO claim must be dismissed against him as well.

For the reasons that follow, the Court grants defendants' motion to dismiss in part and denies it in part, grants plaintiff leave to replead in one respect, and strikes certain of the allegations in the Amended Complaint as immaterial and unduly prejudicial.

## BACKGROUND

For 20 years Norman Katz and Herbert Feinberg were co-owners of I. Appel. For a number of years until mid-1996, Norman's son Stephen was Executive Vice-President of I. Appel. In July of 1996 the partnership ended when Feinberg purchased all of Norman's stock in a deal that quickly went sour as I. Appel spiraled into

bankruptcy. Amid charges that Norman created fraudulent financial statements, Feinberg commenced an arbitration to rescind the purchase agreement. The arbitration panel denied all of Feinberg's claims of fraud and rescission and granted Katz's request to upwardly adjust the purchase price. In the Arbitration Opinion, this Court confirmed the arbitration award in all respects except the adjustment of the purchase price. The Court of Appeals affirmed that Opinion.

The Amended Complaint's allegations portray fraud of a different nature than the fraud at issue in the arbitration. In this incarnation of their feud, Feinberg charges that for years before the buy-out the Katzes engaged in widespread looting of the Company's assets, the amounts totalling hundreds of thousands of dollars, by means of false expense statements, false vendor invoices, and misuse of corporate department store accounts.

The Amended Complaint also alleges that around the time of the buy-out the Katzes along with Jose Peschard schemed to misappropriate the assets of a Mexican subsidiary of I. Appel, I. Appel de Mexico (the "Mexican Subsidiary"). According to the Amended Complaint, Peschard was hired in 1993 as the legal representative of the Mexican Subsidiary, a necessary corporate position under Mexican law. Amended Complaint at ¶ 55. The Mexican Subsidiary set up three different plants and incorporated different corporations to operate each facility. The third of these, Confecciones Intimas de Zacatecas, S.A. de C.V. (the "Zacatecas Corporation"), incorporated on May 30, 1996, ran the Zacatecas plant and is the subject of the fraud alleged here.

*3 The Amended Complaint avers that even before the Zacatecas plant was set up, the Katzes and Peschard planned to appropriate it for themselves. They allegedly established the corporation in a manner different from the other Mexican operating subsidiaries, issuing stock directly to Peschard and an office employee instead of the Mexican Subsidiary's attorneys as nominal owners. In the Fall of 1996, after I. Appel's financial troubles became apparent, I. Appel engaged an outside consultant to advise it on the Company's operations in Mexico. Peschard, who was then a consultant to the Mexican Subsidiary, allegedly advised the other consultant at the direction of the Katzes to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
(Cite as: 2002 WL 1751135, *3 (S.D.N.Y.))

discontinue operations of the Zacatecas plant and to terminate its lease. In December of that year, the Company ended all manufacturing operations of the Zacatecas plant.

Shortly after I. Appel ceased the Zacatecas plant's operations, Peschard assertedly arranged for the termination of the lease and immediately thereafter, on January 1, 1997, Peschard himself was given a new lease for the plant. Purportedly with funding from the Katzes, Peschard set up a new manufacturing facility at the Zacatecas plant and incorporated SEW-MEX Mexicana S.A. de C.V. ("Sew-Mex") which in May of 1997 became "a fully operational garment manufacturing facility, run and managed by Steven and Norman Katz and Jose Peschard as the titular head." Amended Complaint at ¶ 88. Plaintiff alleges that as the result of the plant's closing the Mexican Subsidiary was forced to pay approximately $50,000 in severance to its former employees. In addition, I. Appel purportedly incurred $50,000 in fees to remove Peschard as the Mexican Subsidiary's legal representative when Peschard refused to resign that position. It also suffered "substantial tax penalties" (Amended Complaint at ¶ 90) as the result of a 1997 audit by Mexican authorities of the Mexican Subsidiary which revealed a prior lack of adherence to Mexican regulations concerning corporate identity and tax requirements.

### DISCUSSION

As with any motion pursuant to Rule 12(b)(6), all well-pleaded factual allegations contained in the Amended Complaint must be treated as true by the Court, *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994), and all reasonable inferences must be made in the plaintiff's favor. *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995). The Court must not dismiss the action "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 335 U.S. 41, 45-46 (1957); *Frasier v. G.E. Co.,* 930 F.2d 1004, 1007 (2d Cir.1991). Generally, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." 2 James Wm. Moore, *Moore's Federal Practice* § 12.34[1][b] (3d ed.2001). Conclusory statements will not substitute for sufficient factual allegations. *See Electronics Communications Corp. v. Toshiba America Consumer Prods., Inc.,* 129

F.3d 240, 243 (2d Cir.1997). In evaluating a Rule 12(b)(6) motion, the Court may look only to the complaint and any exhibits attached to it or other documents incorporated by reference. *Leonard F. v. Israel Discount Bank of New York,* 199 F.3d 99, 107 (2d Cir.1999); *Trugman-Nash v. New Zealand Dairy Board,* No. 93 Civ. 8321, 1996 WL 77933 at *3 (S.D.N.Y. Feb.23, 1996).

### A. Standing

#### 1. The Bangor Punta Rule

*4 [1] I turn first to the defendants' argument that plaintiff Feinberg lacks standing to bring any of the claims related to the misappropriation of corporate assets that occurred before the sale of I. Appel stock by Norman Katz to Feinberg. Defendants rest this argument on the Supreme Court's decision in *Bangor Punta Operations, Inc. v. Bangor & Aroostook Railroad Company,* 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974). In *Bangor Punta,* the Court held that a majority shareholder could not maintain a cause of action against the former owners of the company under the federal antitrust and securities laws because it could not recover for acts of corporate mismanagement that occurred prior to the time it had purchased the stock. *Id.* at 711-12. The case required the Court to apply "the settled principle of equity that a shareholder may not complain of acts of corporate mismanagement if he acquired his shares from those who participated or acquiesced in the allegedly wrongful transactions." *Id.* at 710 The Katzes argue that Feinberg is in the same position as the shareholder in *Bangor Punta* because he purchased all of I. Appel's stock subsequent to the occurrence of the alleged acts of misappropriation and therefore cannot be heard to complain of, or recover for, that misappropriation.

The Katzes' reliance on *Bangor Punta* is based on a faulty premise. Their argument ignores a crucial underpinning of the Court's decision which sets that case apart from the case at bar: in *Bangor Punta,* the Court implicitly assumed that the price of the shares reflected the mismanagement. As the Second Circuit subsequently observed, the Court's decision in *Bangor Punta* "ultimately turned on its view that the plaintiff[ ], having paid a fair price for its shares, suffered no injury as a result of any earlier mismanagement of the acquired corporation." *Siegel*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*v. Converters Transp., Inc.,* 714 F.2d 213, 215 (2d Cir.1983). The purchaser's knowledge of the mismanagement at the time of the stock sale was a crucial assumption in the Court's the conclusion that it could not sue over the mismanagement. In describing the underlying considerations for the equitable principle it relied on, the Court noted that the principle historically applies when the shares are purchased "at a fair price." 417 U.S. at 710. In such a case, the shareholders have "sustained no injury since they had acquired their shares from the alleged wrongdoers after the disputed transactions occurred and had received *full value* for their purchase price." *Id.* at 711 (emphasis added). A recovery would prove a "windfall" since the purchaser "received all they had bargained for." [FN4] *Id.* After noting that the shareholder at issue did not "contend that the purchase transaction was tainted by fraud or deceit, or that it received less than full value for its money," the Court held that the principle applied to bar suit. *Id* .

> FN4. In laying out the considerations underlying the principle the Supreme Court relied primarily on the Nebraska Supreme Court's decision in *Home Fire Insurance Co. v. Barber,* 67 Neb. 644, 661-62, 93 N.W. 1024, 1030-31 (1903), authored by then Commissioner Roscoe Pound. In *Home Fire,* the court held that where the plaintiff shareholders of a corporation had purchased their shares from a wrongdoer at a discount reflecting corporate mismanagement, the corporation had no standing to recover from the wrongdoer.

The same cannot be said in this case. Feinberg contends that he did not know or have reason to suspect that the Katzes misappropriated the Company's assets before he purchased Norman's stock. Indeed, the whole premise of this lawsuit is that the Katzes engaged in fraudulent activity which was not reflected in the purchase price. That circumstance distinguishes *Bangor Punta* and precludes application in this case of the equitable principle denying standing to a purchasing shareholder for recovery from pre-sale acts of mismanagement.

**\*5** In a somewhat analogous situation, the Third Circuit drew the same conclusion. In *Lerman v. Joyce Int'l, Inc.,* 10 F.3d 106 (3d Cir.1993), the plaintiff, a former officer of the defendant's subsidiary, sought to dismiss a RICO counterclaim

the defendant filed as assignee of Litton, the company from which the defendant had purchased the subsidiary. The defendant alleged that while an officer plaintiff had employed a fraudulent billing scheme to misappropriate assets of the subsidiary for his personal use. Plaintiff argued that the RICO counterclaim was barred by *Bangor Punta* because the misappropriation had occurred before Litton sold defendant the subsidiary. The Third Circuit saw no "parallel" between *Bangor Punta* and the defendant's situation. It noted that a resemblance between the two cases might have existed if the defendant had sought to recover from Litton for harm done to the subsidiary before the sale and that the defendant "knew or had reason to know about." *Id.* at 111. Since that was not the case, *Bangor Punta* was distinguishable in part because "the purchase price was inflated because of the racketeering activities, and [defendant] specifically paid for the right to assert claims such as this." [FN5] *Id. See also El Dorado Bancshares, Inc. v. Martin,* 701 F.Supp. 1515, 1521 (D.Kan.1988) (corporation was not precluded under *Bangor Punta* from bringing action against former officers and directors for wrongdoing before stock sale where evidence indicated that stock was not purchased at a price that reflected the wrongdoing).

> FN5. The purchase agreement provided that the subsidiary's assets acquired included "causes of action, judgments, claims and demands of whatsoever nature." 10 F.3d at 108.

Just as in *Lerman,* the Katzes' alleged fraudulent misappropriation was not revealed before the July 1, 1996 purchase and there is no suggestion that it was taken into account in a "fair" purchase price. As a result, this case does not present a danger that the purchasing shareholder will receive more than the benefit of his bargain if recovery for the fraud is allowed. Accordingly, I conclude that the principle espoused in *Bangor Punta* does not preclude Feinberg from maintaining this suit based on the misappropriations that allegedly occurred before the buy-out.

### 2. *Mexican Subsidiary Claims*

**[2]** Relying on the established principle that a parent corporation may not "pierce the corporate veil it set up for its own benefit in order to advance the claims of its subsidiary," *Pennsylvania*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



*Engineering Corp. v. Islip Resource Recovery Agency,* 710 F.Supp. 456, 465 (E.D.N.Y.1989), *see also* 14 N.Y. Jur.2d Business Relationships § 36 (1996) ("One choosing to use a corporation to operate a business cannot, absent special circumstances, disregard the corporate structure and obtain damages personally for harm to the corporation."), defendants argue that all of the claims based on the Mexican Subsidiary fraud allegations must be dismissed because plaintiff has no standing to bring them. In response, plaintiff contends that this lawsuit seeks to recover for damages suffered directly by Alliance, the parent corporation, not by its Mexican Subsidiary. Scrutiny of the complaint refutes this argument.

**\*6 [3]** Defendants correctly posit that Alliance and its sole shareholder cannot bring claims to recover for damages incurred by its subsidiary. This conclusion follows from the principle that "a parent corporation cannot create a subsidiary and then ignore its separate corporate existence whenever it would be advantageous to the parent." *Pennsylvania Engineering,* 710 F.Supp. at 465 (internal quotations and alteration omitted). Numerous courts have dismissed claims brought by corporations when the claims actually belong to a subsidiary or an affiliated corporation. *See id.* (dismissing corporate parent's quantum meruit claim for services rendered by a non-party subsidiary); *Diesel Systems, Ltd. v. Yip Shing Diesel Engineering Company, Ltd.,* 861 F.Supp. 179, 181 (E.D.N.Y.1994) (where plaintiff's sister corporation was party to subject contract plaintiff corporation was not real party in interest and therefore lacked standing to bring tortious interference claim; "A corporation does not have standing to assert claims belonging to a related corporation, simply because their business is intertwined."); *Bross Utilities Service Corp. v. Aboubshait,* 618 F.Supp. 1442, 1445 (S.D.N.Y.1985) (dismissing claims by parent to enforce agreement to which only subsidiary was a party); *Alexander & Alexander of New York Inc. v. Fritzen,* 114 A.D.2d 814, 495 N.Y.S.2d 386, 388 (App. Div. 1st Dep't 1985) (plaintiff had no standing to bring claim of conspiracy to divert business opportunities or to interfere with employment contract because plaintiff's subsidiary was the employer; "to the extent the pleadings disclose any allegation of wrongful conduct, it was clearly directed at [the subsidiary] not [plaintiff]"); *Disston Company v. Sandvik Aktiebolag,* 187

A.D.2d 283, 589 N.Y.S.2d 442, 442 (App. Div. 1st Dep't 1992) (defendant corporation could not set-off against its liability to plaintiff the debt owed by defendant's subsidiary).

In the case at hand, despite Feinberg's argument that the claims asserted belong to Alliance, there can be no doubt that the harmful conduct alleged was directed toward the Mexican Subsidiary. In describing the damages suffered as a result of the Mexican fraud, the Amended Complaint sometimes interchanges I. Appel and its Mexican Subsidiary. Without specifying which company, the Amended Complaint alleges that after the Zacatecas plant closed, "the company" was forced to pay $50,000 in severance to "its former employees." Amended Complaint ¶ 78. Further, plaintiff alleges that *the Mexican Subsidiary* was required to pay unquantified monetary penalties to Mexican tax authorities due to the Katzes' improper acts, ¶ 91, and that *I. Appel* paid over $50,000 in fees and costs to oust Peschard as the legal representative of the Mexican Subsidiary. ¶ 89. More generally, the Amended Complaint alleges that "the plaintiffs" (i.e. Feinberg individually and as assignee of Alliance) suffered over $250,000 in damages as the result of the defendants' improper actions. ¶ 97.

**\*7 [4]** Notwithstanding the Amended Complaint's conflation of the two companies, it is evident that the Zacatecas plant was the object of the alleged fraudulent scheme. That plant belonged to a corporation, the "Zacatecas Corporation," that was set up by the Mexican Subsidiary. The loss of the Zacatecas plant, therefore, was suffered directly by the Zacatecas Corporation or possibly the Mexican Subsidiary. In the scenario depicted I. Appel's role was merely as parent company. Therefore any loss it suffered was through its ownership interest in the Mexican Subsidiary. However, "the fact that an individual closely affiliated with a corporation such as a principal shareholder or even a sole shareholder, is incidentally injured by an injury to the corporation does not confer standing on the individual to sue on the basis of either that indirect injury or the direct injury to the corporation." 14 N.Y. Jur.2d Business Relationships § 36 (footnote omitted); *see also Sound Video Unlimited, Inc. v. Video Shack Inc.,* 700 F.Supp. 127, 136 (S.D.N.Y.1988) ("As a general rule, shareholders cannot bring a RICO action in their individual capacity to redress injuries inflicted upon their

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
(Cite as: 2002 WL 1751135, *7 (S.D.N.Y.))

corporation. This is so even when the plaintiff is the sole shareholder of the injured corporation.") (citations and footnote omitted). As the above-referenced cases make evident, despite his attempt to ignore the formal distinction between the companies, Feinberg as assignee of I. Appel and Alliance has no standing to bring claims based on the loss of the Mexican Subsidiary's plant.

Feinberg suggests that at the very least he has standing to recover the tax penalties and legal fees Alliance paid out directly to settle the tax charges and to oust Peschard. There are two principal difficulties with this argument. First, his contention that I. Appel paid the tax penalties is belied by the Amended Complaint whose allegations control, and which aver that the *Mexican Subsidiary* settled them. *See* Amended Complaint at ¶ 91. This payment allegation dovetails with the allegation that the investigation by the Mexican authorities concerned the Mexican Subsidiary, not its parent corporation. Second, although the Amended Complaint avers that I. Appel bore the costs associated with ousting Peschard, there is no escaping the reality that those costs were the responsibility of the Mexican Subsidiary. Peschard was the legal representative of the Mexican Subsidiary, not of I. Appel. It was the Mexican Subsidiary's responsibility and burden to divest itself of Peschard's services. In his brief and in the Amended Complaint, Feinberg equates harm to the Mexican Subsidiary with harm to I. Appel. But corporate law does not countenance such a view. A subsidiary corporation's separate formal structure must be observed, not ignored whenever it suits the parent corporation's interest, as Feinberg seeks to do in the case at bar. To the extent I. Appel shouldered fiscal responsibility for the benefit of its subsidiary, it may seek recoupment from its subsidiary, not from the defendants. Because the fraudulent diversion scheme alleged in the Amended Complaint was directed toward the Mexican Subsidiary and had only an incidental impact on I. Appel as its parent corporation, plaintiff cannot sue the defendants for the harm caused the subsidiary.

*8 Even if, contrary to my conclusion, I. Appel (and, by assignment, Feinberg) has standing to sue the defendants to recover the funds it paid on behalf of its subsidiary to oust Peschard, this standing would avail it nothing. This injury is too remotely connected to the fraudulent scheme to constitute a cognizable RICO injury. To state a claim under

RICO, plaintiff must allege that his "injuries were both factually and proximately caused by the alleged RICO violation." *In re American Express Co. Shareholder Litig.,* 39 F.3d 395, 399 (2d Cir.1994) (citing *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 266-68, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992)). As the Second Circuit has held:

[T]o plead a direct injury is a key element for establishing proximate causation, independent of and in addition to other traditional elements of proximate cause. Thus, the other traditional rules requiring that defendant's acts were a substantial cause of the injury, and that plaintiff's injury was reasonably foreseeable, are additional elements, not substitutes for alleging (and ultimately, showing) a direct injury.

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,* 191 F.3d 229, 235-36 (2d Cir.1999).

Feinberg has alleged no direct RICO injury resulting from the legal fees it paid to sever ties with Peschard because those fees were the result not of the alleged fraud but of Peschard's alleged refusal to resign as the legal representative of the Mexican Subsidiary. Amended Complaint at ¶ 89. His refusal to resign may have been spiteful but it was not directly related to the alleged predicate acts of mail and wire fraud that he and the Katzes committed in an effort to commandeer the Zacatecas plant. Peschard is alleged to have used his role as a consultant to the Mexican Subsidiary to advise it to close the plant and to take over the lease. If the alleged fraud had never come to light, the Mexican Subsidiary might may never have sought the faithless Peschard's removal as legal representative, but it was his refusal to withdraw as representative-- not the fraud--which caused that injury. Accordingly, the plaintiff cannot recover under RICO for the fees I. Appel paid to remove Peschard. *Cf. Nassiri v. Craumer,* No. 95 Civ. 1668(LAP), 1996 WL 209985, * 3-4 (S.D.N.Y. April 30, 1996) (plaintiff had no standing to bring RICO claim which alleged injuries related to the termination of his employment; his firing was the result of a confrontation with his employer about the fraud, not the fraud itself).

[5] An exception to the general rule prohibiting parent corporations from advancing their subsidiary's claims exists when the alleged wrongdoer owes a fiduciary duty directly to the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



parent corporation and the parent seeks to recover for a breach of that duty which resulted in the diminution in value of the parent's shares of the subsidiary. "In such a case, the plaintiff parent shareholder has standing to recover for that decline in value, despite the fact that the subsidiary corporation may itself have a claim against the defendant for the direct injury to it." *Quantel Corp. v. Niemuller*, 771 F.Supp. 1361, 1367 (S.D.N.Y.1991). The general rule is that "where an injury is suffered by a corporation and the shareholders suffer solely through depreciation in the value of their stock, only the corporation itself ... or a stockholder suing derivatively in the name of the corporation may maintain an action against the wrongdoer." *Vincel v. White Motor Corp.*, 521 F.2d 1113, 1118 (2d Cir.1975). For the exception to apply, the wrongdoer must have "breached a duty owed to the shareholder *independent* of any duty owing to the corporation wronged." *Abrams v. Donati*, 66 N.Y.2d 951, 953, 498 N.Y.S.2d 782, 783, 489 N.E.2d 751 (1985) (emphasis added).

*9 This exception does not apply here because there is no allegation that at the time of the wrongdoing any of the defendants owed *I. Appel* a fiduciary duty. Peschard was never a fiduciary of I. Appel. Norman ceased owing I. Appel any fiduciary duties after the stock sale on July 1, 1996, and Stephen resigned as an officer in August of 1996. But the critical actions of the defendants in co-opting the Zacatecas plant occurred in the Fall of 1996 and Spring of 1997 when Peschard, at the Katzes' instigation, urged the closing of the plant and took over its lease. Accordingly, because it cannot reasonably be said that plaintiff seeks to recover for a breach of fiduciary duty owed to I. Appel, this is not an appropriate case for the invocation of the exception.

### B. *RICO Statute of Limitations*

The Katzes move to dismiss the RICO claim as untimely to the extent it arises from alleged acts of misappropriation occurring before October 5, 1997. A four year statute of limitations has been held to apply to claims arising under RICO. *See Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). To be timely, such claims must be based on injuries that were discovered or should have been discovered within four years of bringing suit. *See Tho Dinh*

*Tran v. Alphonse Hotel Corp.*, 281 F.3d 23, 35 (2d Cir.2002). The Amended Complaint adding the RICO claim against the Katzes was filed on October 5, 2001. Given the four-year limitations period, the Katzes urge the Court to dismiss the claim as related to the scheme to loot I. Appel's assets since all of those fraudulent acts are alleged to have occurred before the Company was sold on July 1, 1996--more than five years before the filing of the Amended Complaint. [FN6]

> FN6. Defendants do not argue that any RICO claim stemming from the Mexican fraud is untimely. But as I have concluded in Part A.2. *supra,* plaintiff lacks standing to bring that claim in any event.

Plaintiff counters that Fed.R.Civ.P. 15(c) allows the Amended Complaint to relate back to the initial complaint in 99 Civ. 45 filed on January 5, 1999, which alleged common law fraud against Stephen Katz arising from the same core acts of misappropriation as the RICO claim. Doing so would save RICO claims arising from activities occurring after January 5, 1995, but only as to Stephen because Norman was not a defendant in that action. Plaintiff also argues that his claims are timely under the discovery rule of accrual which applies to RICO claims because "Feinberg had no knowledge of the Katzes' misappropriation scheme until well after the closing for the Purchase Agreement on July 1, 1996." Plaintiff's Memorandum ("Pl.Mem.") at p. 62.

For the reasons explained below, I conclude that the RICO claim arising from the misappropriation scheme is untimely as against Norman, but timely as against Stephen.

### 1. *Norman*

[6] Plaintiff cannot maintain his RICO claim against Norman for injuries arising from acts of looting occurring before October 5, 1997. Looting allegations against Norman were first pleaded in the Amended Complaint on October 5, 2001. Thus, only injuries caused by Norman occurring after October 5, 1997 are timely. Since all acts of fraudulent billing and the like occurred before July 1, 1996, the RICO claim arising out of such injuries is untimely as against Norman. Applying the "discovery" rule as plaintiff urges does not extend the limitations period with respect to Norman



Not Reported in F.Supp.2d
(Cite as: 2002 WL 1751135, *9 (S.D.N.Y.))

because it cannot seriously be contended that
Feinberg could not have discovered the fraudulent
misappropriation at any time before October 5,
1997. Assuming without deciding that Feinberg
should not be held accountable for failing to
discover the injuries before he purchased Norman's
stock and took over the Company in July of 1996,
he should have at least discovered the injuries within
the next year. This is especially true given that
Feinberg immediately attempted to rescind the
Purchase Agreement as it rapidly became clear that
the Company faced serious financial problems in the
months after July 1, 1996. Indeed, Feinberg filed a
demand for arbitration on May 7, 1997 alleging that
Norman had committed acts of fraud. He should
have been on notice of other financial irregularities
and alerted to possible malfeasance at least by that
date. Because he did not file the RICO claim against
Norman until more than four years later, the claim
is untimely.

2. *Stephen*

*10 [7] Plaintiff concedes that his RICO claims
cannot be based on injuries inflicted before January
5, 1995. Plaintiff's Memorandum in Opposition
("Pl.Mem.") at p. 60. However, because many of
the acts of alleged misappropriation occurred after
that date, the central question is whether the
relation-back doctrine should be applied to save his
claim to the extent that it arises from injuries
occurring between January 5, 1995 (four years
before the original complaint was filed) and October
5, 1997 (four years before the Amended Complaint
was filed). If the relation-back doctrine does not
apply, the RICO claim arising from the
misappropriation scheme is barred because all of the
acts of misappropriation occurred well before
October 5, 1997. If it does apply, plaintiff may
recover for acts of misappropriation by Stephen
occurring after January 5, 1995.

Rule 15(c) allows an amended pleading to relate
back to the date of the original pleading when "the
claim or defense asserted in the amended pleading
arose out of the conduct, transaction, or occurrence
set forth or attempted to be set forth in the original
pleading." In order for a new claim to relate back,
"the basic claim must have arisen out of the conduct
set forth in the original pleading ...." *Schiavone v.
Fortune,* 477 U.S. 21, 29, 106 S.Ct. 2379, 91
L.Ed.2d 18 (1986). The key consideration is

"whether the original complaint gave the defendant
fair notice of the newly alleged claims." *Wilson v.
Fairchild Republic Co.,* 143 F.3d 733, 738 (2d
Cir.1998). Plaintiff's position is that the Amended
Pleading relates back to the date of the original
complaint because the original complaint it sets forth
the same core acts of misappropriation as the
predicate acts in the RICO claim in the Amended
Complaint.

Defendants argue that because RICO claims are of
an entirely different species than common law fraud
claims and subject the defendants to more severe
penalties, the relation-back doctrine cannot extend to
claims that convert garden variety fraud into RICO
causes of action. Defendants cite two district court
cases in support of this position, each holding of
which held that a RICO claim could not relate-back
to a common law fraud pleading even though both
arose out of the same wrongful conduct. *See
Burghart v.. Landau,* No. 82 Civ. 2181, 1991 WL
82064 (S.D.N.Y. May 9, 1991); *Radiology Center,
S.C. v. Stife, Nicolaus & Company, Inc.,* No. 86 C
10166, 1992 WL 225568 (N.D.Ill. Sept.8, 1992).

The defendants' position untenable in light of more
recent Second Circuit decisions which indicate that
RICO claims may permissibly relate back to claims
of common law fraud. *Tho Dinh Tran,* 281 F.3d at
35, involved a claim under the Fair Labor Standards
Act ("FLSA") to which a RICO claim had been
added in an amended complaint. The Second Circuit
held that the district court should not have allowed
the plaintiff to add the RICO claim as it was
untimely and did not relate back to the FLSA claim.
In concluding that the RICO claim could not relate
back because it was based on illegal conduct "that
was not alleged in any form in the original
complaint," the court reasoned that:
*11 If the original complaint referred to general
acts of fraud or other predicate acts that might
support a RICO claim, then a later amendment
adding a RICO claim would "relate back" to the
original complaint. *See Benfield v. Mocatta Metals
Corp.,* 26 F.3d 19, 23 (2d Cir.1994). Even if the
description of such an act of fraud was not fully
developed or specifically described as part of a
RICO conspiracy, it would put the defendants on
notice that the conduct was at issue.
281 F.3d at 36. The court suggested that such a
RICO claim could relate back because it would
amount to "merely adding a new legal theory based

Not Reported in F.Supp.2d
(Cite as: 2002 WL 1751135, *11 (S.D.N.Y.))

on the same facts as those presented in the original complaint ...." *Id. Benfield,* the case cited by *Tho Dihn Tran,* reversed the lower court's dismissal on limitations grounds of a RICO cause of action in an amended complaint where the initial complaint alleged only commodities fraud. The Second Circuit held that because there was "commonality" between the allegations of commodities fraud in the original complaint and in the RICO claim, the RICO claim was not untimely because it would have related back to the fraud claim. The court found it significant that "[a]lthough RICO requires more in the way of evidence, proof of the RICO cause of action nonetheless involves evidence of the underlying fraudulent acts pleaded [in the original complaint]." 26 F.3d at 23 (citation omitted). With the original fraud allegations the plaintiff was "placed on notice that a RICO claim, based in large part on the fraud already alleged, might be made against it." *Id.*

The court's reasoning in these decisions undercuts the Katzes' position. Although dicta, the *Tho Dihn Tran* court's discussion furnishes an instructive an example of the kind of RICO claim that would relate back which essentially describes the claim at bar-- where the predicate acts are the same as the acts of common law fraud in the original complaint. The *Benfield* court earlier came to the same conclusion in its holding. These decisions strongly suggest that defendants are put on notice sufficient to satisfy Rule 15(c) when acts of malfeasance that become RICO predicate acts are first alleged under a different fraud theory. This is so even when the acts of fraud are "not fully developed," *Tho Dihn Tran,* 281 F.3d at 36, and no hint of a future RICO claim is given.

In this case, the allegations of misappropriation that underlay the original fraud claim against Stephen Katz are virtually the same as those constituting the RICO predicate acts. Applying the reasoning of *Tho Dihn Tran* and *Benfield,* Stephen has been on notice that he could be subject to liability for these fraudulent acts under a RICO theory ever since the original complaint was filed. Accordingly, the RICO claim pleaded in the Amended Complaint relates back to the date of the original complaint. As a result, to the extent that it is otherwise viable, plaintiff may base his RICO claim against Stephen on injuries that occurred on or after January 5, 1995.

### C. *RICO Enterprise*

**\*12** Under 18 U.S.C. § 1962(c), it is unlawful "for any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ...." "Enterprise" is defined under the statute as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

The Amended Complaint alleges that Stephen and Norman Katz constituted an association-in-fact enterprise (the "Katz Enterprise"). Amended Complaint at ¶ 16. According to the allegations, "The Katz Enterprise, which also included corporations such as FKG Services, Inc. and individuals such as Bob Gainer engaged in the systematic looting of assets of Alliance for the personal benefit of the Katzes." *Id.*

In order to demonstrate an "association-in-fact" enterprise, the plaintiff must show that a "group of persons associated together for a common purpose of engaging in a course of conduct which functioned then as a continuing unit." *Procter & Gamble Co. v. Big Apple Industrial Buildings, Inc.,* 879 F.2d 10, 18 (2d Cir.1987) (internal quotations omitted) (citing *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981)). The Katzes argue that the RICO claim should be dismissed for two reasons: (1) the allegations do not show that the Katzes functioned as a "continuing unit," and (2) the Amended Complaint does not adequately allege the existence of an enterprise extending beyond the objectives of the racketeering acts charged.

### 1. *Sole Purpose to Commit Racketeering Acts*

The second argument must be rejected because it rests on a legal standard that has been expressly disavowed by the Second Circuit. The Katzes base their argument on several district court decisions within this circuit which hold that a plaintiff cannot adequately plead a RICO enterprise if it is not distinct from the racketeering acts themselves. *See Schmidt v. Fleet Bank,* 16 F.Supp.2d 340, 349-50 (S.D.N.Y.1998); *Goldfine v. Sichenzia,* 118 F.Supp.2d 392, 400 (S.D.N.Y.2000); *Heffernan v.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
(Cite as: 2002 WL 1751135, *12 (S.D.N.Y.))

*HSBC Bank USA,* No. 99 Cv 07981, 2001 WL 803719, *5 (E.D.N.Y. March 29, 2001); *Black Radio Network, Inc. v. NYNEX Corp.,* 44 F.Supp.2d 565, 580 (S.D.N.Y.1999). Defendants correctly cite these cases as standing for the proposition that an enterprise cannot exist if it has no purpose separate and apart from commission of the illegal activity. *Goldfine, Heffernan,* and *Black Radio Network* all derive this proposition exclusively from *Schmidt. Schmidt,* in turn, rests its holding on a series of cases emanating from the Eighth Circuit which hold that if the sole purpose of a purported enterprise is to commit the predicate acts there can be no enterprise under RICO. *See Schmidt,* 16 F.Supp.2d at 349 (citing cases).

[8] The defendants' reliance on *Schmidt* and its progeny is as disturbing as it is unavailing. The Second Circuit pointedly disagreed with *Schmidt* on precisely the point for which defendants cite it months before defendants filed their reply brief on this motion. *See Pavlov v. Bank of New York Co., Inc.,* 25 Fed. Appx. 70, 2002 WL 63576 (2d Cir. Jan.14, 2002) (unpublished decision).    [FN7]  In *Pavlov,* the Second Circuit reversed the district court's dismissal of a RICO claim on the ground that the complaint did not allege an enterprise because the alleged enterprise constituted merely an aggregation of the predicate racketeering acts. In reversing, the court of appeals noted that the district court relied on Eighth Circuit precedent, as well as *Schmidt. Id.* 2002 WL 63576, ----1. The Second Circuit disapproved of this reasoning, summarizing its view as follows:

> FN7. Although the Second Circuit rules do not permit citation to unpublished decisions, *see* CTA2 Rule § 0.23, I believe that it is appropriate for me to consider *Pavlov* because the case expressly disapproves of the main case cited by the defendants.

*13 Our Circuit has rejected the Eighth Circuit's restrictive approach to the enterprise element.... The enterprise need not necessarily have a continuity extending beyond the performance of the pattern of racketeering acts alleged, or a structural hierarchy, so long as it is in fact an enterprise as defined in the statute.
*We have repeatedly found a sufficient enterprise where the complaint alleges a group without centralized hierarchy formed for the sole purpose of carrying out a pattern of racketeering acts.*

*Id.* (citations omitted) (emphasis added).

As the unpublished nature of the decision implies, it did not break new ground. The reasoning of the Eighth Circuit on which *Schmidt* stands was dismissed by the Second Circuit long before *Pavlov,* as this Court previously recognized. In *Hansel 'n Gretel Brand, Inc. v. Savitsky,* No. 94 Civ. 4027(CSH), 1997 WL 543088, *2 (S.D.N.Y. Sept.3, 1997), I rejected the defendants' argument that the enterprise element of a RICO claim had not been met because the plaintiff failed to allege that the defendants who comprised the enterprise played roles distinct from the racketeering activity. I noted that the defendants derived their argument from a passage in *Turkette* in which the Supreme Court stated that "[t]he 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages." 452 U.S. at 583. My analysis of the defendants' argument in *Hansel 'n Gretel* is equally applicable to the Katzes' argument here and is therefore worth quoting at length:

> Defendants interpret this passage, not without reason, to hold that the evidence necessary to establish an enterprise must be distinct from that which a plaintiff must adduce to show a pattern of racketeering activity. The majority of circuits embrace this reading. The Second Circuit, however, has not. In *United States v. Mazzei,* 700 F.2d 85 (2d Cir.1983), the Circuit considered the impact of *Turkette,* and specifically rejected the notion that proof of enterprise and pattern be distinct, "so long as the proof offered is sufficient to satisfy both elements." *Id.* at 89. The court has restated that conclusion on numerous subsequent occasions.

1997 WL 543088, *2 (citations omitted). In *Mazzei,* the court of appeals recognized its disagreement with the Eighth Circuit's position. 700 F.2d at 89 ("The appellant correctly notes that the Eighth Circuit's position on the 'distinctness' issue is at odds with our analysis.").

Given the Second Circuit's clarity on this issue, it is puzzling that the *Schmidt* court followed the Eighth Circuit's approach; and, given the *Pavlov* decision, it is clear that the defendants cannot rely on *Schmidt.* In light of the clear Second Circuit precedent which allows an enterprise to be comprised of a group formed for the sole purpose of engaging in fraudulent activity, I cannot accept the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2002 WL 1751135, *13 (S.D.N.Y.))

Katzes' argument that the plaintiff has failed to adequately allege an enterprise because the Katz Enterprise existed purely to commit the fraud plaintiff alleges.

### 2. Continuing Unit

*14 [9] An association-in-fact enterprise, such as the Katz Enterprise, exists if the plaintiff can show that its "various associates function as a continuing unit." *Turkette,* 452 U.S. at 583. "For an association of individuals to constitute an 'enterprise,' the individuals must 'share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes.' " *First Nationwide Bank v. Gelt Funding, Corp.,* 820 F.Supp. 89, 98 (S.D.N.Y.1993) (quoting *Moll v. U.S. Life Title Ins. Co.,* 654 F.Supp. 1012, 1031 (S.D.N.Y.1987)). Defendants argue that Katz Enterprise does not qualify as such because the well-pleaded allegations do not show that the Katzes worked together as a continuing unit to perpetrate the fraud on the Company.

Nearly all of the allegations in the Amended Complaint regarding the misappropriation scheme detail acts of looting by Stephen, not by Norman. The Amended Complaint is replete with references to the "Katzes' " collective fraud, but all of the examples of the fraud, save one, involve Stephen alone. The only specific act by Norman is his alleged use of "dummy" invoices in 1993 to bill I. Appel for more than $10,000 worth of purported expenses for "consultation and repairs" by a company which had in point of fact provided architectural and construction services to Norman's synagogue. Amended Complaint at ¶ 37. In contrast, the Amended Complaint alleges that for years *Stephen* maintained a hidden I. Appel bank account into which he transferred I. Appel funds and converted them to his personal use, *id.* at ¶¶ 20-25; that *Stephen* prepared countless dummy invoices for bogus services to I. Appel, ¶¶ 26, 29, 34, 35; and that *Stephen's* wife used I. Appel department stores for personal items. ¶¶ 41-43. *Stephen,* not Norman, is alleged to be the signatory on the checks in payment of the dummy invoices. ¶ 39. *Stephen* is also alleged to have submitted false expense reports by which he bilked I. Appel out of thousands of dollars each year, and to have created an entity, FKG Services Inc. ("FKG"), which he used to create still more fictitious invoices. ¶ 31.

Apart from the allegation regarding Norman's 1993 synagogue invoices, the only allegations against Norman are conclusory, lumping him together with Stephen without supporting facts that show his participation and sometimes with facts that show only *Stephen's* involvement. For example, the Amended Complaint alleges that " 'the Katzes created dummy invoices [from FKG] for nonexistent services denominated as 'Outside Service Appel," ' ¶ 32, and that "the Katzes caused Alliance to pay FKG for phantom services that were never provided," ¶ 33. But the Amended Complaint alleges that *Stephen* set up FKG. ¶ 31. While it also alleges that both Norman and Stephen "controlled" FKG, there are no facts set forth which indicate the manner in which Norman, who apparently did not set up the company, controlled FKG. As a further example, the Amended Complaint alleges that "Stephen and Norman Katz" instructed the Alliance accounts payable department to prepare checks in payment of the invoices ¶ 39, but discloses no facts concerning Norman's instructions and alleges that the checks were only signed by Stephen. Moreover, the Amended Complaint avers that "The Katzes also stole money through the use of corporate or personal accounts at various department stores," ¶ 40, but furnishes examples only of Stephen's wife's use of those accounts.

*15 Apart from failing to demonstrate that Norman himself committed acts of misappropriation (except for the synagogue invoices), the Amended Complaint also fails to set forth factual allegations that show that Norman may have acted in concert with Stephen by directing or benefitting from Stephen's acts. While at its outset the Amended Complaint vaguely alleges that Stephen acted "with the full knowledge and consent of his father," ¶ 22, it does not set forth facts that give rise to an inference of that knowledge or consent. To be sure, Norman and Stephen are alleged to have "worked intimately in managing I. Appel," lived in the same building and generally spent a great deal of time together, ¶ 12, but that legitimate proximity alone does not reasonably suggest Norman's complicity in Stephen's malfeasance. Nor, as plaintiff seems to suggest, does the closeness of the filial relationship indict Norman. Other than the 1993 synagogue invoices, none of the misappropriation is alleged to have benefitted Norman. For example, many of the invoices Stephen shepherded through I. Appel involved services performed on Stephen's private

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2002 WL 1751135, *15 (S.D.N.Y.))

boat, ¶ 34- 35, and the department store fraud directly benefitted Stephen's wife.

In short, while the Amended Complaint broadly avers that father and son jointly undertook to loot the Company, it is devoid of facts suggesting that Norman took part in or reaped the benefits of Stephen's acts of misappropriation. Without any facts which might suggest that Norman knew of and participated in Stephen's assorted fraudulent activities, there can be no reasonable suggestion that the two worked together toward the common purpose of looting I. Appel. It is therefore simply not a reasonable inference to be drawn from the factual allegations that the Katzes constituted a "continuing unit" sufficient to comprise a RICO association-in-fact. Accordingly, the RICO claim must be dismissed.

That Norman is alleged to have engaged in instances of synagogue-related false invoicing in 1993 does not compel a different conclusion. These are the only examples of misappropriation by Norman and they do not involve Stephen. The fact that Norman may have engaged in isolated acts of false billing unconnected to Stephen's does not reasonably suggest that the two were *joined together* in an overarching scheme to misappropriate the Company's assets and that they worked in concert to achieve this goal. Instead, in light of the absence of allegations connecting Norman to Stephen's wrongdoing, taking the synagogue allegations in the light most favorable to plaintiff they show at most that Norman separately defrauded the Company, not a synergy between the two men. *Cf. Hansel 'n Gretel,* 1997 WL 543088, * 4 (complaint failed to allege single RICO enterprise where it alleged that two groups worked on two similarly structured but entirely separate schemes to bilk the same company).

To the extent that the conclusory allegation that Norman "controlled" FKG suggests his involvement in a fraudulent billing scheme using dummy FKG invoices, that involvement also fails to demonstrate a viable enterprise. All the false FKG invoices are alleged to have been created in 1992 and 1993. Therefore, even assuming Stephen and Norman worked together to bilk the Company through FKG, the timing of that activity does not suggest a unit that "continued" beyond mid-1993. Considered favorably to plaintiff, they might show that Norman

and Stephen shared a common purpose to misappropriate Company assets in 1992 and 1993, well before the applicable limitations period, but they do not in any way suggest that the association-in-fact continued beyond that time.

*16 Nor can plaintiff salvage the enterprise element by pointing to the Amended Complaint's conclusory allegations that Norman "conspired" with Stephen and that they "regularly and systematically misappropriated large sums of money" from the Company. Such generalized allegations, unbacked by facts showing how the defendants acted together, are insufficient to plead a RICO enterprise. *Cf. First Nationwide Bank,* 820 F.Supp. at 98 ("Conclusory allegations that disparate parties were associated in fact by virtue of their involvement in the real estate industry in the 1980s are insufficient to sustain a RICO claim, absent allegations as to how the members were associated together in an 'enterprise.' "); *cf. Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1092 (2d Cir.1995) ("General, conclusory allegations need not be credited ... when they are belied by more specific allegations of the complaint.").

Arguably the conclusion that the Katzes did not function as a continuing unit with respect to the misappropriation scheme does not preclude a finding that Norman, Stephen and Peschard constituted a separate enterprise with the aim of expropriating the Zacatecas plant. The difficulty with this proposition, however, is that the Amended Complaint does not in fact allege two separate enterprises. It alleges a single association-in-fact spearheaded by Norman and Stephen with one broad objective--looting I. Appel--and covering the acts of misappropriation beginning in 1992 through the Mexican Subsidiary fraud in 1996 and 1997. As I have held, because the well-pleaded facts do not allege that Stephen and Norman worked as a continuing unit to misappropriate the assets of the Company, the single enterprise alleged in the Amended Complaint does not properly allege a RICO enterprise. Assuming *arguendo* that I could conclude despite the Amended Complaint's clarity on this element that it properly alleges two separate enterprises and that the one involving the Mexican scheme is adequate, that victory would only be Pyrrhic, since I have held that plaintiff lacks standing to bring a RICO claim arising from that scheme.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
(Cite as: 2002 WL 1751135, *16 (S.D.N.Y.))

D. *Common Law Claims*

1. *Conversion/Constructive Trust Claims*

[10] Defendants argue that plaintiff's conversion and constructive trust claims must be dismissed because the Amended Complaint does not identify specific segregated property or funds sought to be recovered. [FN8] This argument must be rejected. Contrary to defendants' contention, such claims do not require an allegation that specific funds are presently held in a separate account. Defendants' Brief in Opposition at 24. The cases which defendants cite in support of their argument state the general proposition that in order for money to be subject to conversion or constructive trust it must be "specifically identifiable." *Peters Griffin Woodward, Inc. v. WCSC, Incorporated,* 88 A.D.2d 883, 452 N.Y.S.2d 599, 600 (App. Div. 1st Dep't 1982) (conversion); *In re Weis Securities, Inc.,* 605 F.2d 590, 597 (2d Cir.1978) ( "before a constructive trust may arise[ ] there must be a Res a segregated fund or property to which the trust can attach."). Many of the cited cases involve bank deposits. With respect to bank deposits, given their unique nature, courts have frequently held that funds must be specifically identifiable vis-a-vis the bank's other funds in order for conversion or constructive trust to apply. This translates into a requirement that funds must be held in a segregated, identifiable account in order for such a claim to be viable. As one court in this district explained:

> FN8. The parties assume that New York law governs the common law claims. Since the Court has no reason to believe otherwise, it will apply New York law to those claims for purposes of this motion.

*17 Under law, funds deposited in a bank become the property of the bank, and the bank becomes indebted to the depositor for the amount of the funds deposited. Therefore, a conversion claim, predicated on the unlawful use of funds belonging to another, is not sustainable between a bank and a depositor with a standard debtor-creditor relationship.... [I]n [the situation of special deposits where the bank acts as bailee], a conversion claim could be sustainable due to the depositor's property right to the funds at issue. *Nwachukwu v. Chemical Bank,* No. 96 Civ. 5118, 1997 WL 441941, ----5-6 (S.D.N.Y. Aug.6, 1997)

(citation omitted). *See Fundacion Museo de Arte v. CBI-TDB Union Bancaire Privee,* 160 F.3d 146, 148 (2d Cir.1998) ("[F]unds deposited in a bank account are not sufficiently specific and identifiable, in relation to the bank's other funds, to support a claim for conversion against the bank.") (internal quotations omitted); *Citadel Management Inc. v. Telesis Trust, Inc.,* 123 F.Supp.2d 133, 151 (S.D.N.Y.2000) ("[A]lthough the Amended Complaint does allege the existing balance in the Telesis and Hertzog's Chase accounts when the $5 million transfer was made, there is no allegation that the funds were in any manner segregated within the accounts while held there, which is a prerequisite to stating a claim for conversion against the derivative defendants.") (footnote omitted).

The case at bar does not involve bank or investment accounts and therefore the special need for a segregated account does not arise. Moreover, many courts have held conversion and constructive trust claims over money that was as identifiable as the funds involved here. *Nissho Iwai American Corporation v. Siedler,* No. 94 Civ. 513, 1995 WL 555699, *3 (S.D.N.Y. Sept. 18, 1995), is representative. In that case plaintiff brought a RICO claim and common law claims alleging that the defendants engaged in a false billing scheme to embezzle nearly $1,000,000 from the plaintiff. The plaintiff submitted evidence of the specific amounts of the 31 checks defendants caused Nissho to issue in their false billing scheme. The court granted the plaintiff's motion for summary judgment on its conversion claim, noting that the plaintiff had demonstrated that it had title to the funds embezzled and that the defendants wrongfully converted them.

The funds at issue in *Nissho,* just as those here, were specific amounts misappropriated through fraudulent billing. Yet the fact that they were not held in any identifiable account was no bar to a successful conversion claim. *See also Utica Mutual Ins. Co. v. Avery,* 261 A.D.2d 802, 690 N.Y.S.2d 760, 761 & n. 1 (App. Div. 3rd Dep't 1999) (noting that claim to recover money embezzled from town "arguably" "fits the definition of conversion"); *United Features Syndicate, Inc. v. Miller Features Syndicate, Inc.,* No. 01 Civ. 2491, 2002 WL 389155, * 18 (S.D.N.Y. March 11, 2002) (funds wrongfully taken by defendants that were held in trust for plaintiff's benefit were " 'specifically identifiable' in the same manner as a chattel so as to

Not Reported in F.Supp.2d
(Cite as: 2002 WL 1751135, *17 (S.D.N.Y.))

be the proper subject of an action in conversion");
*Key Bank of New York v. Grossi*, 227 A.D.2d 841,
642 N.Y.S.2d 403, 405 (App. Div.3d Dep't 1996)
(proceeds of auctions of plaintiff's cars and boat
which were not alleged to be held in a segregated
account were clearly "sufficiently identifiable for the
purposes of an action for conversion"). The same is
true for constructive trust claims. *See Schmid, Inc.
v. Zucker's Gifts, Inc.*, 766 F.Supp. 118, 120
(S.D.N.Y.1991) (allowing a constructive trust claim
over funds defendants derived from improper sales
of Hummel figurines in circumvention of plaintiff's
exclusive contract to sell Hummel figurines in the
United States).

*18 [11] The Amended Complaint alleges that
specific amounts of money were misappropriated by
the Katzes from the Company. These funds are
"specifically identifiable" despite the fact that they
are not alleged to be held by the defendants in a
segregated account. Accordingly, I deny defendants'
motion to dismiss the conversion and constructive
trust claims on this ground. [FN9]

FN9. To the extent plaintiff's conversion claim arises
from the expropriation of the Zacatecas plant,
however, it may not lie. Real property may not be
the subject of a conversion claim. *Roemer and
Featherstonhaugh P.C. v. Featherstonhaugh*, 267
A.D.2d 697, 699 N.Y.S.2d 603, 604 (App. Div.3d
Dep't 1999). In *Roemer*, the Appellate Division
affirmed dismissal of a conversion cause of action
which was based on the plaintiff's claim that the
defendant diverted real property that belonged to the
plaintiff. The court held that "whether the property
claimed to have been converted is real property, as
alleged in the complaint, or an interest or expectancy
in a business opportunity, as plaintiff now alleges,
conversion will not lie." *Id.* Feinberg's analogous
claim that the defendants diverted the Mexican
Subsidiary's business opportunity in the Zacatecas
plant obviously cannot be sustained. *See also
Garelick v. Carmel*, 141 A.D.2d 501, 529 N.Y.S.2d
126, 127 (App. Div.2d Dep't 1988) ("An action
sounding in conversion does not lie where the
property involved is real property ."). I have already
concluded that plaintiff lacks standing to bring claims
arising from the Mexican fraud, including common
law claims. However, the fact that the subject matter
involves real property is an alternative reason for
dismissal of the conversion claim arising from that
fraud.

2. *Indemnification*

Plaintiff claims that the Katzes are liable to
indemnify him for legal fees and settlement
payments Alliance incurred in connection with a
lawsuit filed in 1997 by Val Mode, a company
whose assets Feinberg agreed to purchase in June of
1996. The sellers of Val Mode sued Feinberg and
Alliance claiming that the financial statements upon
which they relied in agreeing to sell Val Mode were
false and misleading. Amended Complaint at ¶ 113.
Feinberg claims here that the financial statements
were false and misleading as a result of the fraud
perpetrated     by     the     Katzes,     and     seeks
"Indemnification" and/or "contribution" from them
for the legal fees and settlement payments incurred
in that suit. Defendants move to dismiss the claim
arguing that neither contribution nor indemnification
is available as a matter of law.

It is unclear whether plaintiff seeks indemnification,
contribution or both. The Sixth Claim for Relief
contains the heading "Indemnification," but avers
that the plaintiff is "entitled to contribution from
defendants." ¶ 116. It makes no difference which
form of relief the plaintiff intends to seek, however,
because both are unavailable.

[12] Plaintiff does not challenge defendants'
contention that a claim for contribution is
inappropriate because under New York law a party
may not obtain contribution for settlement of a
claim. *See, e.g., Rosado v. Proctor & Schwartz,
Inc.*, 66 N.Y.2d 21, 24, 494 N.Y.S.2d 851, 484
N.E.2d 1354 (1985). Given that the Amended
Complaint alleges that Alliance settled the Val Mode
lawsuit, plaintiff may not now seek contribution for
any part of that settlement payment.

[13] As for indemnification, in New York such a
claim must be grounded in contract either express or
implied. *McDermott v. City of New York*, 50
N.Y.2d 211, 216, 428 N.Y.S.2d 643, 406 N.E.2d
460 (1980) ("The right to indemnity ... springs from
a contract, express or implied, and full, not partial,
reimbursement is sought") (internal quotations
omitted). The Amended Complaint does not allege
that the Katzes had an express contractual obligation
to indemnify Alliance or Feinberg for claims arising
from the sale of Val Mode. The indemnification
claim must therefore derive from implied contract.
To find an implied contract for indemnification "a



Not Reported in F.Supp.2d
(Cite as: 2002 WL 1751135, *18 (S.D.N.Y.))

duty must exist between the third-party defendant and the primary plaintiff." *Kemron Environmental Services, Inc. v. Environmental Compliance, Inc.*, 184 A.D.2d 755, 585 N.Y.S.2d 475, 476 (App. Div.2d Dep't 1992). This precept stems from the recognition that "[a] person who, in whole or in part, has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other, is entitled to indemnity." *McDermott*, 50 N.Y.2d at 216, 428 N.Y.S.2d 643, 406 N.E.2d 460 (internal quotations omitted).

**\*19** For the Katzes to be obligated to indemnify Feinberg, the Katzes must have had an independent legal duty to *Val Mode*--the plaintiff in the underlying claim. But the facts alleged in the Amended Complaint fail reveal no such duty on the part of the Katzes. Accordingly, the indemnification claim must be dismissed. *See Waldorf Steel Fabricators, Inc. v. Trocom Constr. Corp.*, 244 A.D.2d 479, 664 N.Y.S.2d 326, 328 (App. Div.2d Dep't 1997) (rejecting general contractor's claim that prime contractor should be required to indemnify it for any liability to subcontractor because prime contractor did not owe any duty directly to the subcontractor); *Travelers Indemnity Co. v. AMR Services Corp.*, 921 F.Supp. 176, 182 (S.D.N.Y.1996) (dismissing defendant's indemnification claim against third-party defendant because defendant had not alleged that third-party defendant owed plaintiff a duty); *Kemron*, 585 N.Y.S.2d at 476 (same).

### 2. *Statute of Limitations*

Defendants move to partially dismiss most of the common law claims on statute of limitations grounds. Defendants correctly note that under New York law, a six-year statute of limitations applies to the breach of fiduciary duty, unjust enrichment and constructive trust claims, and a three-year statute of limitations applies to the conversion claim. Since the first allegations of misappropriation were lodged against Stephen in the January 5, 1999 complaint, defendants argue that the conversion claim must be dismissed insofar as it is based on conduct occurring prior to January 5, 1996, and the breach of fiduciary duty, unjust enrichment and constructive trust claims must be dismissed to the extent based on conduct occurring before January 5, 1993. With respect to Norman, because the charges of

misappropriation were first advanced against him in the Amended Complaint filed on November 5, 2001, defendants contend that the unjust enrichment, breach of fiduciary duty and constructive trust claims may be based only on actions committed after November 5, 1995. Defendants further argue that the conversion claim against him must be dismissed in its entirety because the Amended Complaint does not allege any conduct relevant to that claim occurring after November 5, 1998, within the three-year limitations period for that claim.

Plaintiff does not specifically oppose this aspect of the defendants' motion. In view of the lack of opposition and because the defendants' argument is sound, I grant this aspect of their motion. Accordingly, plaintiff may not recover against Stephen on claims of breach of fiduciary duty, unjust enrichment or constructive trust claims for conduct occurring before January 5, 1993, and may not recover on a conversion theory for conduct before January 5, 1996. As against Norman, plaintiff may recover on a breach of fiduciary duty, unjust enrichment or constructive trust theory only for conduct of his occurring after November 5, 1995. The conversion claim against Norman must be dismissed in its entirety as the Amended Complaint does not allege any actions constituting conversion by Norman within the three-year limitations period.

### E. *Motion to Strike*

**\*20** **[14]** The defendants move to strike two paragraphs in the Amended Complaint pursuant to Fed.R.Civ.P. 12(f) as containing irrelevant and prejudicial information. The two paragraphs involved appear under the heading "Allegations Common to All Causes of Action" and primarily involve Stephen's tangles with New York State tax authorities. Paragraph 12 alleges:

12. Prior to July 1, 1996, Stephen Katz and his father, Norman Katz, worked intimately in managing Alliance, had adjoining offices and conferred together many times each day in making all production, financial, sales, and administrative decisions for the corporation, and together were responsible for handling the day-to-day business affairs of Alliance. These activities were carried on from their offices in New York City. In addition, they lived in the same building, had breakfast together on most mornings, traveled together, and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2002 WL 1751135, *20 (S.D.N.Y.))

jointly engaged in many other personal and business activities, *such as the creation of identical false out-of-state primary residences to evade New York Sate and New York City income taxes.* (Emphasis added). Although the Katzes do not specify, based on their argument it is the last clause of this paragraph which defendants find objectionable. The other paragraph at issue alleges:

50. Stephen Katz has a documented history of cheating on his taxes. Thus, on March 5, 1998, Stephen Katz pleaded guilty to violation of § 1801(a) of the New York State Tax Law, for failure to file New York State and City Resident Personal Income Tax Returns for the tax year 1996. He simultaneously arranged with the New York State Department of Taxation and Finance to resolve unpaid tax liabilities, based upon his Form W-2 income, for his failure to file personal income tax returns for prior years. The New York County District Attorney's investigation revealed that at all times since 1976, while actually a resident of New York City, Stephen Katz claimed that his place of residence was, variously, in the State of New Jersey, or Connecticut, or Tennessee.

Rule 12(f) allows the Court to "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." It is well-recognized that as a general matter motions to strike are "disfavored and will not be granted unless the matter asserted clearly has no bearing on the issue in dispute." *Smith v. AVSC International, Inc.,* 148 F.Supp.2d 302, 317 (S.D.N.Y.2001) (internal quotations omitted). However, "[w]here the materiality of the alleged matter is highly unlikely, or where its effect would be prejudicial, the Court may order it stricken." *Reiter's Beer Distributors, Ind. v. Christian Schmidt Brewing Co.,* 657 F.Supp. 136, 144 (E.D.N.Y.1987). Defendants argue that the referenced allegations are "gratuitous" as they are unrelated to any of the other factual allegations and are raised merely as a form of "character assassination." Defendants' Brief at p. 28. Plaintiff counters that the allegations are relevant to demonstrate "Stephen's motivation for undertaking the misappropriation scheme, namely increasing his income while evading tax liability for that increase," Plaintiff's Brief at p. 66, and that the allegation concerning his conviction is relevant because it will be admissible to impeach Stephen's credibility if he testifies at trial.

*21 I disagree with plaintiff's assessment of the relevancy of these allegations. The purported creation by Stephen and Norman of fictional out-of-state tax residences and Stephen's resulting conviction for failing to pay taxes are wholly irrelevant to the claim that they misappropriated the Company's assets. The fact that they may have sought to decrease their New York State and City tax bills by claiming to be out-of-state residents has no apparent connection to their activities at I. Appel. The creation of fictional residencies and Stephen's conviction may tend to show that the Katzes wanted to increase their income, but only indirectly by decreasing their taxes. Their alleged evasion of income tax liability does not make it more likely that they also increased their income through the very different vehicle of looting I. Appel.

[15] The allegations concerning Stephen's conviction for tax evasion, while not directly relevant to the claims at bar, would nonetheless be admissible at trial to impeach Stephen's credibility under Fed.R.Evid. 609(a)(2) since it is a crime involving dishonesty. For that reason, I will allow only the second sentence of paragraph 50--the one directly involving his conviction--to stand. *Cf. American Arbitration Association, Inc. v. DeFonseca,* No. 93 Civ. 2424(CSH), 1996 WL 363128, * 12 (S.D.N.Y. June 28, 1996) (refusing to strike allegation in complaint concerning one defendant's incarceration for bank fraud because "[a]t the very least, that information may be admissible to impeach [the defendant's] credibility, should he testify.") The other information in paragraph 50 concerning the details of his conviction and the last sentence of paragraph 12 have no bearing on the claims in the Amended Complaint and serve merely to inflame the reader against the Katzes. Accordingly, those allegations must be stricken. *Cf. Smith,* 148 F.Supp.2d at 317 (striking allegations of discrimination by defendant toward dissimilar third parties as irrelevant to discrimination claim).

F. *Other Arguments*

Given the view I take of the sufficiency of the RICO cause of action, I do not reach defendants' arguments that the plaintiff fails to allege a pattern of RICO activity, that the allegations of wire and mail fraud are not pleaded with sufficient

Not Reported in F.Supp.2d
(Cite as: 2002 WL 1751135, *21 (S.D.N.Y.))

particularity under Fed.R.Civ.P. 9(b), and that predicate acts of mail or wire fraud are not sufficiently alleged with respect to the Mexican Subsidiary fraud and certain of the acts of misappropriation.

### G. *Leave to Replead*

[16] Plaintiff requests leave to further amend the complaint in the event the Amended Complaint is found deficient. "When a motion to dismiss is granted the usual practice is to grant leave to amend the complaint." *Hayden v. County of Nassau,* 180 F.3d 42, 53 (2d Cir.1999). Such leave, which is discretionary, may be denied "where the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal." *Id.* In this case it is appropriate to grant the request only in part. It is inconceivable that plaintiff could plead any set of facts that demonstrate standing with respect to injuries arising out of the Mexican Subsidiary fraud. Nor is there reason to believe that plaintiff could transform the facts pleaded into proper indemnification or contribution claims or that he could somehow extend the limitations period of the RICO claims. These infirmities are fundamental and cannot be repaired by more artful pleading. Accordingly, plaintiff may not amend the complaint to cure those deficiencies. However, although I have found that plaintiff failed to sufficiently allege a RICO enterprise on the facts pleaded, I cannot say that it would be impossible for plaintiff to amend his complaint to repair the faults in the enterprise allegation. Accordingly, I will allow him to replead the enterprise element if he can do so consistent with the obligations imposed by Fed.R.Civ.P. 11.

### CONCLUSION

**\*22** Defendants' motion to dismiss the Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6) is granted in part and denied in part.

The First Claim under RICO is dismissed in its entirety with leave to replead consistent with this Opinion.

The Sixth Claim for indemnification and/or contribution is dismissed without leave to replead.

The last clause of paragraph 12 of the Amended Complaint and all but the second sentence of

paragraph 50 will be stricken as irrelevant and inflammatory.

The Second, Third, Fourth and Fifth claims, for breach of fiduciary duty, conversion, unjust enrichment and constructive trust, respectively, may stand as temporally delimited above.

Plaintiff may file a Second Amended Complaint consistent with this Opinion on or before August 16, 2002. If a Second Amended Complaint is filed, defendants must answer or otherwise move on or before September 9, 2002.

The foregoing is SO ORDERED.

Not Reported in F.Supp.2d, 2002 WL 1751135 (S.D.N.Y.), RICO Bus.Disp.Guide 10,316

Motions, Pleadings and Filings (Back to top)

. 2002 WL 32495916 (Trial Pleading) Answer (May. 13, 2002)

. 2002 WL 32595397 (Trial Pleading) Answer (May. 13, 2002)

. 2002 WL 32496024 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss (Mar. 12, 2002)

. 2002 WL 32595395 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss (Mar. 12, 2002)

. 2001 WL 34545616 (Trial Motion, Memorandum and Affidavit) Memorandum of Law of Defendants Norman and Stephen Katz for Dismissal of the Complaint and Alternative Relief (Dec. 13, 2001)

. 2001 WL 34611361 (Trial Motion, Memorandum and Affidavit) Memorandum of Law of Defendants Norman and Stephen Katz for Dismissal of the Complaint and Alternative Relief (Dec. 13, 2001)

. 2001 WL 34611359 (Trial Pleading) Amended Complaint (Nov. 05, 2001)

. 1:99cv00045 (Docket) (Jan. 05, 1999)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
**(Cite as: 2002 WL 1751135, \*22 (S.D.N.Y.))**

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

