# TAB 7

Not Reported in F.Supp.                                                                              **Page 1**
Not Reported in F.Supp., 1997 WL 543088 (S.D.N.Y.), 1997-2 Trade Cases P 71,967,
RICO Bus.Disp.Guide 9350
**(Cite as: 1997 WL 543088 (S.D.N.Y.))**
►

Motions, Pleadings and Filings

United States District Court, S.D. New York.
HANSEL 'N GRETEL BRAND, INC., Plaintiff,
v.
Stewart SAVITSKY, Renate Savitsky, ABN-INL,
Muller's Meat Limited, David
Muller, Heritage Corrugated Box Corp., Jeffrey
Schatz, Gerald Rebouillat and
Jane Doe, Defendants.
No. 94 Civ. 4027(CSH).

Sept. 3, 1997.

MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

**\*1** Defendants Heritage Corrugated Box
Corporation ("Heritage") and Jeffrey Schatz
(collectively "the Heritage defendants") move to
dismiss this action, brought under § 1962 of the
Racketeering and Corrupt Organizations Act
("RICO"), § 2(c) of the Robinson-Patman Act, and
state common law, for failure to state a claim. For
reasons set forth below, the motion is denied as to
the § 2(c) claim, granted as to the RICO claim, and
plaintiff is granted leave to amend its RICO
allegations.

### BACKGROUND
The complaint and RICO Case Statement filed by
plaintiff Hansel 'N Gretel Brand, Inc. ("HNG")
allege the following facts, which I must take as true
for purposes of this motion. [FN1]

> FN1. With defendant's consent, HNG filed an
> amended complaint in this action on November 25,
> 1996. It contains no changes relevant to the issues
> now before me.

HNG is a New York Corporation engaged in the
manufacture and distribution of meats, cold cuts,
and other delicatessen products. During the period
at issue, defendant Stewart Savitsky was the
company's Senior Vice President, and managed its
day-to-day affairs. In this capacity, Savitsky
conducted a kickback scheme, in which certain of
HNG's suppliers overcharged the company for their

products, and then returned the excess profits to
Savitsky, his wife defendant Renate Savitsky, and
the pseudonymous Gerard Rebouillat, the unknown
recipient of some of these funds. By participating
in this scheme, the defendant suppliers were
permitted to maintain their accounts with HNG.

The complaint specifically charges two suppliers
with compliance in Savitsky's plot: Muller's Meats
Limited ("Muller's"), which supplied HNG with
various beef products, and Heritage, which served
as HNG's supplier of corrugated boxes and other
packaging and shipping materials. The principals
of these companies, defendants David Muller and
Schatz, respectively, knew of this scheme, and
directed the participation of their companies therein.
[FN2]

> FN2. David Muller and Muller's are referred to
> subsequently as the "Muller defendants."

Savitsky's improper dealings with Heritage
commenced in the late 1980's. At that time,
Savitsky and Schatz arranged for Heritage to
overcharge HNG for its products, and to reflect this
overcharge on fraudulent invoices. Heritage than
mailed all or substantially all of this overcharge to
Savitsky via Rebouillat and others. The resulting
payments totalled over $ 250,000. As a result of
this plan, Heritage charged HNG more for its goods
than it did other purchasers.

Savitsky's arrangement with Muller's followed the
same pattern in all essential respects. [FN3]
Plaintiff does not contend, however, that Muller's
had any relationship with Heritage, that the two
companies or their principals were aware that the
other was engaged in similar conduct, or that they
benefited in any way from each other's actions.

> FN3. In regards to the Muller scheme, plaintiff states
> that Savitsky created a phony association, defendant
> ABN-INL, to send out fraudulent invoices and
> receive kickback payments. Amended Complaint ¶
> ¶ 28, 30. ABN-INL is not alleged to have played
> any role in Savitsky's dealings with the Heritage
> defendants.

These kickback arrangements continued until

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1997 WL 543088, *1 (S.D.N.Y.))

Page 2

February 1994, when HNG and its sole shareholder, Milton Rattner, learned of the scheme, and terminated Savitsky's employment. Several months later, plaintiff commenced the instant action. It seeks, *inter alia,* treble damages under RICO and the Robinson-Patman Act.

The RICO cause of action set forth in plaintiff's complaint alleges that all of the identified defendants in this action, along with HNG itself, constituted a RICO enterprise. The purpose of this enterprise, according to the complaint, was twofold: to "bilk Hansel 'N Gretel out of millions of dollars by overcharging Hansel 'N Gretel for essential supplies," and "to arrogate to one or more of the defendant 'persons' the proceeds of those overcharges through illegal bribes and kickbacks...." Plaintiff asserts that Heritage and Schatz used the mails to send Savitsky the kickbacks, as well as to forward fraudulent invoices. These actions, according to plaintiff, constituted numerous instances of mail fraud in violation of 18 U.S.C. § 1341, purportedly establishing the requisite predicate acts for a RICO claim. [FN4]

> FN4. The complaint also charges defendants with violating 18 U.S.C. § 1343, the wire fraud statute. In its RICO statement, HNG also states that defendants' conduct constituted commercial bribery in violation of New York Penal Law § 180.03. That assertion is not made in the complaint.

*2 The present movants argue that the RICO claim is defective, as it fails to allege a cognizable enterprise, and does not properly plead a pattern of racketeering activity. Furthermore, they contend that plaintiff's cause of action under the Robinson-Patman Act must be dismissed because it does not set forth the requisite "competitive injury." Finally, movants ask the Court to dismiss all pendent state law claims, in the event their motion is granted as to the federal causes of action.

### DISCUSSION

### I. RICO

To state a cause of action under § 1962, plaintiff must allege: "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affects interstate or foreign commerce." *Moss v. Morgan Stanley,* 719 F.2d 5, 17 (2d Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). I will address, in turn, movants' challenges to the sufficiency of these allegations in the present pleadings.

### A. Enterprise

Initially, I consider the Heritage defendants' claim that the enterprise element has not been met because plaintiff has failed to "properly plead that an actual enterprise existed in which the defendants played roles separate and apart from the racketeering activity alleged." Heritage Mem. at 11. This contention is based on language contained in *United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), in which the Supreme Court stated the following:

That a wholly criminal enterprise comes within the ambit of the statute does not mean that a 'pattern of racketeering activity' is an 'enterprise'.... The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages.

*Id.* at 583.

Defendants interpret this passage, not without reason, to hold that the evidence necessary to establish an enterprise must be distinct from that which a plaintiff must adduce to show a pattern of racketeering activity. The majority of circuits have embraced this reading. *See Chang v. Chen,* 80 F.3d 1293, 1297 (9th Cir.1996) ("Six Circuits have interpreted the Supreme Court's decision in *Turkette* to require a RICO enterprise to have an ascertainable structure separate and apart from the pattern of racketeering activity in which it engages.") (citations omitted). The Second Circuit, however, has not. In *United States v. Mazzei,* 700 F.2d 85 (2d Cir.), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983), the Circuit considered the impact of *Turkette,* and specifically rejected the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



notion that proof of enterprise and pattern be distinct, "so long as the proof offered is sufficient to satisfy both elements." *Id.* at 89.   The court has restated that conclusion on numerous subsequent occasions.   *See United States v. Coonan,* 938 F.2d 1553, 1560 (2d Cir.1991) ("we have previously indicated that proof of various racketeering acts may be relied on to establish the existence of the charged enterprise"), *cert. denied,* 503 U.S. 941, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992);   *United States v. Ferguson,* 758 F.2d 843, 853 (2d Cir.) ("RICO charges may be proven even when the enterprise and predicate acts are functionally equivalent, and the proof used to establish them coalesced.") (citations and internal quotation marks omitted), *cert. denied,* 474 U.S. 841 (1985);   *Moss,* 719 F.2d at 22 ( *Mazzei* rejected view that "the evidence offered to prove the 'enterprise' and 'pattern of racketeering activity' must be distinct");   *United States v. Bagaric,* 706 F.2d 42, 55 (2d Cir.) ("We have upheld application of RICO to situations where the enterprise was, in effect, no more than the sum of the predicate racketeering acts."), *cert. denied,* 464 U.S. 840 (1983), *abrogated on other grounds, Nat'l Organization for Women, Inc. v. Scheidler,* 510 U.S. 249, 260, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994).   *See also Chang,* 80 F.3d at 1297 (Second Circuit is one of two which "interpret[ ] *Turkette* to permit the organization constituting the enterprise to be no more than the sum of the predicate racketeering acts.").

**\*3** In light of this overwhelming authority, defendants' argument must fail as a matter of law. The task for this Court, on the instant motion, is not to determine whether the same evidence was adduced to support the "enterprise" and "pattern" elements;   rather, I must decide whether the enterprise pled by plaintiff, viewed on its own terms, is cognizable under RICO.

Movants also argue that HNG may not be both the victim of the racketeering activity and a member of the enterprise.   For many years, courts had rejected this argument.   *See, e.g., Sun Sav. and Loan Ass'n v. Dierdorff,* 825 F.2d 187, 190 n. 6 (9th Cir.1987) ;   *United States v. Kovic,* 684 F.2d 512, 516-17 (7th Cir.), *cert. denied,* 459 U.S. 972, 103 S.Ct. 304, 74 L.Ed.2d 284 (1982);   *Com-Tech Assocs. v. Computer Assocs. Int'l, Inc.,* 753 F.Supp. 1078, 1088 (E.D.N.Y.1990), *aff'd,* 938 F.2d 1574 (2d Cir.1991);   *Temple Univ. v. Salla Bros., Inc.,* 656

F.Supp. 97, 102 (E.D.Pa.1986).   Then, in *Nat'l Organization for Women, Inc. v. Scheidler,* 510 U.S. 249, 259, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994), the Supreme Court stated: "the enterprise in subsection (c) [of § 1962] connotes generally the vehicle through which the unlawful pattern of racketeering activity is committed, rather than the victim of that activity."

In response to *Scheidler,* courts have divided on whether a victim of racketeering activity may still comprise part of a racketeering enterprise. *Compare Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.,* 46 F.3d 258, 267 (3rd Cir.1995) ("a victim corporation drained of its own money by pilfering officers and employees could not reasonably be viewed as the enterprise through which employee persons carried out their racketeering activity") *with LaSalle Bank Lake View v. Seguban,* 937 F.Supp. 1309, 1323 (N.D.Ill.1996) ("this Court does not agree with the leap of logic made by the Third Circuit from the Supreme Court's *Scheidler* statement that 'enterprises' 'generally ' are not 'victims' to the conclusion that enterprises cannot be 'victims' ") (emphasis in original).   I agree with *Lasalle Bank* that the language in *Scheidler* was not intended to prescribe a blanket rule.   In the present case, however, it makes little sense to say that HNG was a participant in an enterprise whose guiding purpose was to bilk HNG. Any amended complaint, therefore, should not include HNG in the alleged enterprise.   In any event, the argument is one of form, not substance.   I cannot envision how the exclusion of HNG will have any impact on the further proceedings in this case.

The Heritage defendants also assert generally that the entities and individuals identified in the complaint cannot make up a valid RICO enterprise. In so doing, movants have set a tall order for themselves.   The statute defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).   As is clear from this language, Congress sought to make the definition "as broad [[[ ] as possible ." *United States v. Indelicato,* 865 F.2d 1370, 1382 (2d Cir.) (en banc), *cert. denied,* 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989).   *See also United States v. Angelilli,* 660 F.2d 23, 31 (2d Cir.1981) ("On its face, the definition of 'enterprise' is quite broad"),

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1997 WL 543088, *3 (S.D.N.Y.))

Page 4

*cert. denied,* 455 U.S. 910, 102 S.Ct. 1258, 71 L.Ed.2d 449 (1982). As the statute defines an enterprise as any entity, legal or non-legal, the definition can be read to include virtually "anything that exists." *Angelilli,* 660 F.2d at 31.

**\*4** Nonetheless, the caselaw does place limits on what may constitute an enterprise. The Supreme Court has defined an enterprise as "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). Evidence of an "ongoing organization", in which the members "function as a continuing unit," suffices to prove an enterprise. *The Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.,* 879 F.2d 10, 15 (2d Cir.1989) (*citing Turkette,* 452 U.S. at 583), *cert. denied,* 493 U.S. 1022 (1990). An entity is not properly included in the enterprise when it is not "an integral part of the fraudulent scheme." *United States v. District Council,* 778 F.Supp. 738, 757-58 (S.D.N.Y.1991) (Haight, J.) (*citing United States v. Porcelli,* 865 F.2d 1352, 1364 (2d Cir.), *cert. denied,* 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989)).

The complaint before me alleges that all of the identified defendants, along with HNG, formed a RICO enterprise. Movants contend that this group cannot constitute an enterprise, as the Heritage defendants never associated with the Muller defendants, nor were they aware that their conduct was part of a larger scheme. Rather, defendants maintain, HNG has asserted nothing more than that these two groups of defendants engaged in similar conduct, and that they both had dealings with Savitsky. This, they reason, does not suffice to allege a RICO enterprise.

HNG seeks to parry this attack by contending that the Heritage and Muller defendants were united by a common purpose: to "bilk" HNG. In support of this argument, plaintiff cites *United States v. Errico,* 635 F.2d 152 (2d Cir.1980), *cert. denied,* 453 U.S. 911, 101 S.Ct. 3142, 69 L.Ed.2d 994 (1981).

Errico was the "linchpin" of a conspiracy to fix horse races. Two other sets of actors participated in the scheme in which he was involved: bettors who used inside information to wager on the fixed races, and jockeys who accepted bribes to hold their horses back. On appeal, Errico argued that this collection of individuals could not be classified as an enterprise, an argument the Second Circuit rejected. The court of appeals found that the "circle of bettors" and "circle of jockeys"--joined through Errico--had the requisite "community of interest" and core of "continuing personnel" to constitute that "group of individuals associated in fact" that is required for a RICO enterprise. *Id.* at 156.

I decline to accept plaintiff's contention that *Errico* is analogous to the present case. Although *Errico* also concerned two sets of individuals that did not have any contact with each other, both groups were integral components of the race-fixing scheme, without whom the plot could not have been executed. Each depended on the other to carry out its role properly, and if the other did not do as expected, no one could have profited from the plan.

In the case at bar, the Muller and Heritage defendants engaged in two unconnected operations, albeit employing similar methodologies. HNG is able to claim that these sets of defendants shared similar goals only by defining those goals at such a level of generality as to deprive them of any meaning. If it is sufficient, under RICO, to allege that two parties are both members of a common enterprise because they sought to "bilk" the same company, then two burglars who sought to rob the same apartment on different nights may constitute an enterprise, as they shared the common aim of depriving the tenants of their valuables.

**\*5** The instant case is distinguishable from this example only in that both the Heritage and Muller defendants worked in concert with the same cast of characters, and primarily, Stewart Savitsky. I do not think that this fact alone is sufficient to render two groups, at work on two similarly structured but entirely separate schemes, part of a single enterprise. *See First Nationwide Bank v. Gelt Funding, Corp.,* 820 F.Supp. 89, 98 (S.D.N.Y.1993) (where "several borrowers committed a similar but independent fraud with the aid of a particular lender," such a "series of discontinuous independent frauds is no more an enterprise than it is a single conspiracy"), *aff'd,* 27 F.3d 763 (2d Cir.1994), *cert. denied,* 513 U.S. 1079, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995). The Muller defendants and the Heritage defendants shared neither a "community of interests", when those interests are defined with any specificity, nor

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1997 WL 543088, *5 (S.D.N.Y.))

were they part of an ongoing organization. Moreover, to the extent Savitsky and his associates constitute a common core of individuals, that core cannot be transmuted into an association-in-fact enterprise by linking it to two disparate schemes.

This ruling does not end my inquiry. HNG asks, in the event that its RICO cause of action is dismissed, that it be permitted to file an amended complaint alleging "an enterprise involving the Heritage [d]efendants, Savitsky and his affiliates." Defendant's Mem. at 8 n. 6. In essence, plaintiff seeks to divide the enterprise in two: one centered around Savitsky's arrangement with the Muller defendants, the other arising out of his dealings with the Heritage defendants. [FN5]

> FN5. HNG does not say that it wishes to include the Muller defendants in a separate enterprise. I presume, however, that the footnote seeking leave to amend HNG's complaint was not an invitation to the Court to excise the Muller defendants from the RICO claim. I will not assume that plaintiff sought to surrender its cause of action against these parties without a more direct statement of this intent. Thus, I read plaintiff's application as one directed at alleging two distinct enterprises.

Movants ask the Court, before it permits such amendment, to require plaintiff to explain its theory of this enterprise. [FN6] Heritage Reply Mem. at 2 n. 1. I find, on the basis of the present record, that the enterprises HNG seeks to present in an amended complaint fall within the outlines of this element as set forth by statute and caselaw. Savitsky, his affiliates, and the Heritage defendants comprised a common core of persons, who acted in concert in pursuit of a common goal: to carry out the commercial bribery scheme described in detail above. The same can be said for an enterprise involving the Muller defendants.

> FN6. Movants also contend that the amended complaint would not remedy their other objections to plaintiff's RICO claim. Those challenges will be addressed below.

Although leave to amend a complaint should be freely granted, I may deny such leave if the amendment would be futile. [FN7] *Foman v.. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). I therefore will consider the remaining

challenge to the sufficiency of HNG's RICO allegations. In doing so, I note that the elements of RICO must be pled as to each of the separate RICO enterprises. *See Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co.,* 758 F.Supp. 64, 77 (D.P.R.1991).

> FN7. Although plaintiff has already filed an amended complaint, this should not deter me from permitting the submission of a further revised pleading. The first amended complaint was submitted with defendants' consent, and contained only minor revisions. Moreover, the changes I direct in this opinion are largely formalistic.

*B. Pattern*

Movants contend that plaintiff has failed to plead a sufficient pattern of racketeering activity, because it has alleged only that the Heritage defendants participated in a "single scheme of commercial bribery." Heritage Mem. at 12. While the complaint states that the Heritage defendants engaged in numerous instances of mail fraud, movants contend that that does not suffice to set forth a pattern, as the mailings each related to a "single, limited goal." *Id.*

*6 To plead a pattern under RICO, a plaintiff must establish that the predicate acts are related to one another, and that they pose a threat of continuing racketeering activity. *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 240, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). The relationship prong may be met by a showing of "temporal proximity, or common goals, or similarity of methods, or repetitions." *Indelicato,* 865 F.2d at 1382. There is no requirement, under RICO, that plaintiff allege a pattern of more than one "scheme". In fact, an *en banc* sitting of the Second Circuit specifically rejected that contention. *See id.* at 1383 ("We doubt that Congress meant to exclude from the reach of RICO multiple acts of racketeering simply because ... they further but a single scheme .").

Recently, the court of appeals has qualified the language of *Indelicato,* noting that "courts must take care to ensure that the plaintiff is not artificially fragmenting a singular act into multiple acts simply to invoke RICO." *Schlaifer Nance & Co. v. The Estate of Andy Warhol,* 119 F.3d 91, 1997 WL 378986, at *6 (2d Cir. July 10, 1997) ("*Schlaifer* ").

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1997 WL 543088, *6 (S.D.N.Y.))

Page 6

Thus, where the acts complained of are merely "subparts of the singular act, and not a 'pattern' of separate acts with an underlying purpose," plaintiff cannot show the requisite continuity to meet the pattern requirement. *Id.*

Although the boundaries established in *Schlaifer* are somewhat hazy, I do not believe the allegations presented by plaintiff herein can be characterized as an artificial subdivision of a single act. In *Schlaifer,* the predicate acts all arose from the process of drawing up a single contractual agreement. Here, each individual act set forth in the complaint was necessary to secure a separate overcharge of HNG, and to kickback a distinct sum of money to Savitsky and his compatriots. The fact that these acts were directed at the same end does not place them outside the reach of RICO; indeed, the allegation that the acts furthered a similar aim may be necessary to meet the "relatedness" prong of the pattern element.

The cases cited by movants do not support their argument. A RICO claim was rejected in *Certilman v. Harcastle, Ltd.,* 754 F.Supp. 974, 980 (E.D.N.Y.1991) because the complaint failed to allege two predicate acts. In *Barsam v. Pure Tech Int'l, Inc.,* 864 F.Supp. 1440 (S.D.N.Y.1994), the court declined to find a pattern directed at a "single fraudulent end," but did so in the context of finding that plaintiff had failed to meet the continuity prong of the pattern element, because the acts had occurred over "a limited period of time." *Id.* at 1450.

Having rejected the Heritage defendants' primary challenge to this element, I find that plaintiff's pleadings sufficiently set forth a RICO pattern. Clearly, the acts charged are related to one another; movants essentially concede as much by stating that they shared a common goal. Moreover, HNG has pleaded the requisite degree of continuity. "Continuity ... is centrally a temporal concept." *H.J. Inc.,* 492 U.S. at 242. In order to demonstrate that defendants' conduct possessed sufficient continuity, a RICO plaintiff must allege either a "closed-ended" pattern, in which the criminal conduct "extended over a substantial period of time," or an "open-ended" pattern, in which the past wrongdoing carried with it the threat of future criminal activity. *GICC Capital Corp. v. Technology Finance Group, Inc.,* 67 F.3d 463, 466 (2d Cir.1995), *cert. denied,* 518 U.S. 1017, 116

S.Ct. 2547, 135 L.Ed.2d 1067 (1996). In the instant case, plaintiff states that the Heritage defendants engaged in commercial bribery, carried out by fraudulent use of the mails, from 1988 to 1994. In an appendix to its Case Statement, plaintiff submits a list of the payments and purportedly fraudulent invoices sent by Heritage to Savitsky, stretching from November 1990 to February 1994. Although there is no bright-line test for finding a closed-ended pattern, *see Metromedia Co. v. Fugazy,* 983 F.2d 350, 369 (2d Cir .1992), *cert. denied,* 508 U.S. 952, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993), a period of over three years is generally of sufficient length to meet this standard. *See id.* (period of at least two years sufficient); *see also Proctor & Gamble Co. v. Big Apple Indus. Bldgs, Inc.,* 879 F.2d 10, 18 (2d Cir.1989) (holding, prior to *H.J.,* that racketeering activities spanning nearly two years were enough to establish pattern), *cert. denied,* 493 U.S. 1022 (1990).

**\*7** In light of the foregoing, plaintiff's submission of an amended complaint would not be futile. Thus, I dismiss HNG's RICO claims with leave to amend so as to allege two separate RICO enterprises. I leave open the possibility that fairness to the defendants may necessitate a bifurcated trial, so that separate juries may hear evidence of each distinct enterprise.

## II. Robinson-Patman Act

Plaintiff also charges that the conduct of the Heritage defendants transgressed § 2(c) of the Robinson-Patman Act, and seeks treble damages for this purported violation. The section at issue reads as follows:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1997 WL 543088, *7 (S.D.N.Y.))

Page  7

15 U.S.C. § 13(c).

The Robinson-Patman Act was passed in an attempt to curb price discrimination which benefitted certain large chain stores, which were able to use their purchasing power to extract preferential purchasing terms. Section 2(c) was directed at preventing such retailers from using "dummy brokerage fees as a means of securing price rebates." *See FTC v. Harry Broch & Co.,* 363 U.S. 166, 169, 80 S.Ct. 1158, 4 L.Ed.2d 1124 (1960); *see also Seaboard Supply Co. v. Congoleum Corp.,* 770 F.2d 367, 371 (3rd Cir.1985). Suppliers would be forced to go through such brokers, who would perform no service and would merely pass on their fees to their employer. As a result of this *de facto* rebate, large distributors who used such brokers purchased their goods at lower prices, which allowed them to undersell their independent competitors. *See* Keller W. Allen and Meriwether D. Williams, *Commercial Bribery, Antitrust Injury and Section 2(c) of the Robinson-Patman Anti-Discrimination Act,* 26 Gonz.L.Rev. 167, 171 (1990/91); 2 *The Robinson-Patman Act: Policy and Law,* 1983 A .B.A. Sec. Antitrust L. Mon. 4 at ix.

Although this was the primary purpose of § 2(c), "Congress in its wisdom phrased § 2(c) broadly, not only to cover the other methods then in existence but all other means by which brokerage could be used to effect price discrimination." *Broch & Co.,* 363 U.S. at 169. Specifically, the Supreme Court noted that "the debates on the bill show clearly that § 2(c) was intended to proscribe other practices such as the 'bribing' of the seller's broker by the buyer." *Id.* at 169 n. 6. *Cf. California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 513, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) ( "bribery of a public official may constitute a violation of § 2(c)"). Thus, commercial bribery falls generally within the ambit of this section.

*8 Movants argue that a claim cannot be maintained under this section unless plaintiff can show some sort of "competitive injury", a term whose meaning will be discussed at greater length *infra.* Plaintiff denies that such a requirement can be read into this statute, and in any event contends that it has sufficiently pled such an injury.

I agree with HNG that nothing in the language of the Act requires that a § 2(c) plaintiff allege any sort of special damages. However, the genesis of the "competitive injury" requirement is not found in this section, but rather arises from the standing requirements for bringing a private damages suit under the antitrust laws. The Robinson-Patman Act does not provide for a private right of action for treble damages. Such a right is granted by § 4 of the Clayton Act, [FN8] codified at 15 U.S.C. § 15(a), which authorizes such suits by "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." *See Schwimmer v. Sony Corp.,* 637 F.2d 41, 46 (2d Cir.1980) (standing to raise claim under § 2(a) of Robinson-Patman Act "is derived from Section 4 of the Clayton Act"); *Federal Paper Bd. Co. v. Amata,* 693 F.Supp. 1376, 1386 (D.Conn.1988) ( "Private plaintiff standing to sue for violations of the Robinson-Patman Act is provided by section 4 of the Clayton Act"); *Abernathy v. Bausch & Lomb, Inc.,* 97 F.R.D. 470, 476 (N.D.Tex.1983) ("Although section 2(c) may state a per se violation for which no showing of anticompetitive effect is required in a government enforcement action, in a private action brought under section 4 of the Clayton Act the requirement of antitrust injury still obtains").

    FN8. The Robinson-Patman Act amended the Clayton Act, and thus § 2(c) is sometimes referred to as part of the latter statute. To avoid confusion, I will refer to § 2(c) of the Robinson-Patman Act, and § 4 of the Clayton Act.

Before a plaintiff may recover treble damages under § 4, it "must make some showing of actual injury attributable to something the antitrust laws were designed to prevent." [FN9] *J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 562, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981). The Supreme Court has made clear, moreover, that an "antitrust injury" should "reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation" *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). HNG thus must show some injury to competition before it may obtain damages under § 2(c). [FN10] As HNG is not seeking any sort of injunctive relief, the fate of its § 2(c) cause of action turns on the sufficiency of such a showing.

    FN9. A number of the cases which rejected the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



notion that competitive injury must be pled as part of a § 2(c) damages claim have simply looked at the language of this section, and have not considered the requisites of the Clayton Act. *See Calnetics Corp. v. Volkswagen of America, Inc.,* 532 F.2d 674, 696 (9th Cir.), *cert. denied,* 429 U.S. 940 (1976); *Gregoris Motors v. Nisan Motor Corp. in USA,* 630 F.Supp. 902, 910 (E.D.N.Y.1986) (anti-competitive injury requirement not "part of the plain language of the statute.").

In *Municipality of Anchorage v. Hitachi Cable, Ltd.,* 547 F.Supp. 633 (D.Ak.1982), the Court made reference to § 4, but ultimately found that, in passing § 2(c), Congress sought in part to protect the fiduciary relationship between broker and client. The court held, therefore, that the scope of § 2(c) standing "must be expanded to include those who are injured by the destruction of fiduciary obligations." *Id.* at 640. This reasoning was based entirely on the language and history of § 2(c). It is inconsistent, however, with the requisites of a private damages action brought under § 4 of the Clayton Act, as set forth above.

FN10. HNG places great reliance on *John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.,* 588 F.2d 24 (2d Cir.1978), *cert. denied,* 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979), which it construes as definitively putting to rest the notion that competitive injury must be alleged to state a damages claim under § 2(c). HNG Mem. at 15. That case, which considered a price discrimination claim brought under § 2(a), stated that "[p]roof of injury to competition is not a jurisdictional prerequisite, but instead is part of a Robinson-Patman plaintiff's substantive burden in demonstrating a violation of the Act." *John B. Hull,* 588 F.2d at 27. *John B. Hull* did not address the pleading requirements of the Clayton Act discussed above, as plaintiffs therein sought injunctive relief, not damages. Instead the case was addressed to the specific elements of § 2(a) which, unlike § 2(c), requires that the violation "lessen competition." 15 U.S.C. § 13(a). Were I to read that case as applying generally to Robinson-Patman claims brought under other provisions of the Act, it would not be of much aid to plaintiff. Because, under *John B. Hull,* plaintiff must ultimately demonstrate some injury to competition, a complaint would, at very least, need to set forth some basis for such injury. I do not, however, see that decision as addressing anything more than the requirements for

an action seeking injunctive relied under § 2(a). To the extent it can be read, as plaintiff wishes, to reject the competitive injury requirement in a treble damages case, it is inconsistent with *J. Truett Payne Co.*

The question of what constitutes an injury to competition in commercial bribery cases brought under § 2(c) is one that has given rise to many conflicting authorities. The most stringent reading of this requirement is that only the competitors of the company that has benefitted from a violation of the antitrust laws have standing to sue under § 2(c). According to this view, although "a company may be injured when a supplier bribes an employee of that company in order to make a sale, the purchaser's injury is not cognizable under the antitrust laws because it is not a 'competitive injury' ". *Bunker Ramo Corp. v. Cywan,* 511 F.Supp. 531, 533 (N.D.Ill.1981). Instead, "it is the supplier's competitors who have suffered competitive injury as a consequence of the bribe and it is they who have standing to sue under the antitrust scheme." *Id. See also Larry R. George Sales Co. v. Cool Attic Corp.,* 587 F.2d 266, 272 (5th Cir.1979) (per curiam) ("Only if Plaintiff was in the same business and in competition [with the parties that acted in violation of § 2(c) ] would he have standing under [section 4 of the Clayton act]").

*9 Other courts have sought to articulate different tests. Thus, the Third Circuit has found that claims of commercial bribery under § 2(c) have been allowed only where the bribe passed between the seller and buyer, or vice versa. *See Seaboard Supply Co.,* 770 F.2d at 371. The Fourth Circuit, in contrast, has suggested that all successful claims of this sort involve "the corruption of an agency or employment relationship." *Stephen Jay Photography, Ltd. v. Olan Mills, Inc.,* 903 F.2d 988 (4th Cir.1990).

At least one court has reasoned that, because § 2(c) was intended to apply to commercial bribery, any claim setting forth such misconduct has successfully presented a wrong of the sort that the antitrust laws were designed to prevent. *Edison Elec. Institute v. Henwood,* 832 F.Supp. 413, 418 (D.D.C.1993). While this opinion correctly identified commercial bribery as one of the targets of § 2(c), the antitrust motivation behind the legislation lay in Congress's desire to prevent price discrimination. I do not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1997 WL 543088, *9 (S.D.N.Y.))

believe that the "antitrust injury" requirement is met merely by demonstrating that a particular act fell somewhere within the purpose underlying a certain provision generally classified as an antitrust statute. *See J. Truett Payne Co.,* 451 U.S. at 568 ("even if there has been a violation of the Robinson-Patman Act, petitioner is not excused from its burden of proving antitrust injury and damages"). Rather, I must look to whether the goal of the "antitrust laws" in general, the protection of competition, is implicated by the conduct at issue before determining if that conduct supports an action under § 4 of the Clayton Act. Thus, "injury, although causally related to an antitrust violation, nevertheless will not qualify as an antitrust injury unless it is attributable to an anti-competitive aspect of the practice under scrutiny...." *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (*citing Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 109-10, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986).

To determine the requisites of such an "injury to competition", I seek guidance from application of antitrust injury principles in other contexts. Specifically, the caselaw governing suits under § 2(a) of the Robinson-Patman Act, is directly relevant to this question.

Section 2(a) sets forth the general prohibition against price discrimination. [FN11] As stated above, the primary *antitrust* purpose of § 2(c) was to prevent the use of brokerage arrangements as a mask for such discrimination. *See Amata,* 693 F.Supp. at 1388 ("main purpose" of § 2(c) was to prohibit price discrimination exercised through brokerage payments); *NL Indus., Inc. v. Gulf & Western Indus., Inc.,* 650 F.Supp. 1115, 1123 (D.Kan.1986) ("The general view is that Congress' intent in enacting § 2(c) was to prevent disguised price discrimination"). While the law was also directed at commercial bribery, that practice has no relation to the inhibition of competition, at least as targeted by the Robinson-Patman Act, unless it subjected competitors to discriminatory pricing. *See Amata,* 693 F.Supp. at 1389 (no antitrust injury without showing that bribes permitted competitors to buy supplies at lower cost); Allen and Williams at 179 ("To logically fit into the protection of the antitrust laws in general, and section 2(c) in particular, a buyer must prove that an overcharge resulting from the commercial bribery allowed

competitors to illegally undercut the buyer's prices, and thereby increase the competitors' sales volume at the buyer's expense"). Without such an anticompetitive effect, there is no antitrust injury on which plaintiff can base its standing under § 4 of the Clayton Act.

> FN11. This section reads in relevant part:
> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce ... and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with the customers of either of them.
> 15 U.S.C. § 13(a).

**\*10** When a section 2(a) claim is brought by a buyer who has allegedly been discriminated against directly by the seller, it "must first prove that, as the disfavored purchaser, it was engaged in actual competition with the favored purchaser(s) at the time of the price differential." *Best Brands Beverage, Inc. v. Falstaff Brewing Corp.,* 842 F.2d 578, 584 (2d Cir.1987). Although the present case concerns § 2(c), the same principle must apply. Absent such discrimination against parties engaged in actual competition, I discern no anticompetitive effect arising out of the kickbacks at issue which harmed plaintiff.    If such discrimination is shown, however, antitrust concerns would be implicated, and a private action for treble damages may lie. *See FTC v. Morton Salt Co.,* 334 U.S. 37, 50-51, 68 S.Ct. 822, 92 L.Ed. 1196 (1948) (it is "self-evident" that "there is a 'reasonable possibility' that competition may be adversely affected by a practice under which manufacturers and producers sell their goods to some customers substantially cheaper then they sell their goods to the competitors of these customers"); *Corn Products Refining Co. v. FTC,* 324 U.S. 726, 741-42, 65 S.Ct. 961, 89 L.Ed. 1320 (1945) (effect of differentials in prices which manufacturers must pay for ingredient in their products "may be substantially to lessen competition").

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1997 WL 543088, *10 (S.D.N.Y.))

In light of the foregoing, movants cannot prove sufficient antitrust injury unless they can show that Heritage sold its products to HNG's competitors at a lower price than it charged to HNG, or charged HNG more than HNG's competitors were paying for the same kind of merchandise. HNG's complaint states, as support for the § 2(c) claim, that:

  Muller's and Heritage sold the same or substantially similar goods, materials and supplies to others for less than the prices charged to Hansel 'N Gretel, thereby raising Hansel 'N Gretel's costs of business relative to its competitors, and causing Hansel 'N Gretel to set disadvantageous prices and lose sales relative to its competitors.

It is not entirely clear who the "others" are that HNG refers to. Nonetheless, when taken as a whole, this passage clearly alleges that HNG was charged by Heritage prices higher than those paid by companies who sold in the same market, and HNG's own products were comparatively more expensive as a result. [FN12] This is enough to allege antitrust injury, and suffices for standing in a treble damages action. *See NL Indus., Inc.,* 650 F.Supp. at 1123 (D.Kan.1986) (allegation that plaintiff placed at a "competitive disadvantage" because of commercial bribery was sufficient to meet § 2(c) pleading requirements, although it did not say with whom that disadvantage was). Therefore, I deny the motion to dismiss the Robinson-Patman Act claim. To the extent that discovery reveals that plaintiff is unable to prove the above allegation, as I have construed it, that is a proper matter for a summary judgment motion or for trial.

  FN12. I need not decide whether HNG must ultimately prove that it actually charged higher prices than its competitors as a result of Heritage's conduct, or whether such a result may be presumed from the fact that it paid more for its supplies as a result of defendant's illegal practice. *Compare Hanover Shoe v. United Shoe Machinery Corp.,* 392 U.S. 481, 491, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) ("[W]hen a buyer shows that the price paid by him for materials purchased for use in his business is illegally high and also shows the amount of the overcharge, he has made out a prima facie case of injury and damage within the meaning of § 4") *with J. Truett Payne Co.,* 451 U.S. at 564 n. 4 (plaintiff had "particularly weak" claim of competitive injury, when it failed to show that favored retailers lowered their prices). This question has not been briefed and, as plaintiffs have alleged that differential pricing

between competitors resulted from the Heritage defendants' conduct, it need not be resolved now.

Because plaintiff may proceed on its federal claims, the application to dismiss the pendent state law claims is denied.

**\*11** Plaintiff is directed to file and serve an amended complaint, in conformity with the above, within thirty days of the date of this opinion. Counsel for all parties are directed to attend a status conference in Room 17C, 500 Pearl Street, at 2:00 P.M. on October 17, 1997.

  It is SO ORDERED.

 Not Reported in F.Supp., 1997 WL 543088 (S.D.N.Y.), 1997-2 Trade Cases P 71,967, RICO Bus.Disp.Guide 9350

   Motions, Pleadings and Filings (Back to top)

. 1:94cv04027 (Docket)
(May. 31, 1994)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# TAB 8

Not Reported in F.Supp.2d                                                                    **Page 1**
Not Reported in F.Supp.2d, 2001 WL 803719 (E.D.N.Y.), RICO Bus.Disp.Guide 10,078
**(Cite as: 2001 WL 803719 (E.D.N.Y.))**

United States District Court, E.D. New York.
Michael G. HEFFERNAN, et al.
v.
HSBC BANK USA fka Marine Midland Bank, and
Dennis L. Helliwell.
No. 1:99CV07981.

March 29, 2001.

MEMORANDUM AND ORDER

NICKERSON, J.

**\*1** Plaintiffs brought this action under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* (RICO), seeking to recover funds lost as a result of a "Ponzi" scheme perpetrated by Dennis Helliwell, allegedly in concert with defendant HSBC Bank ("Bank"), which was then known as Marine Midland Bank (also "Bank"). The Bank moves to dismiss the complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6), and because it is barred under the Private Securities Litigation Reform Act, Pub.L. No. 104-67, 109 Stat. 737 (1995).

According to the complaint, Helliwell began a scheme while an employee of the Bank in the 1980s. He solicited "investments" from relatives or friends, promising to invest the money for them in a "Trust B" account returning 18-20 percent interest per annum. He actually deposited the funds in his personal accounts at the Bank. When "investors" requested the proceeds from their "investment," Helliwell either convinced them to "reinvest" the funds, or he paid them out of the proceeds from the "investments" of new victims.

Helliwell was discharged from the Bank in October 1991 due to a "downsizing," but continued to use the accounts and represent to his "investors" that he was authorized to accept investments on behalf of the phony Trust B. After an action was brought against him by the Securities and Exchange Commission (SEC), Helliwell pled guilty to one count of mail fraud in November 1996.

Plaintiffs are victims of Helliwell's scheme, and allege that the Bank had information from April 1991 that Helliwell was soliciting investments in the phony trust, representing to investors that the trust was an instrument of the Bank, and making irregular deposits and withdrawals from his accounts at the Bank that the Bank failed to report to federal banking authorities. The Bank allegedly caught Helliwell mis-representing himself and the trust on Bank letterhead, and received other evidence of his fraud, but did nothing to stop the scheme.

Plaintiffs further allege the following. The Bank took affirmative steps to conceal the fraud. The Bank and its officers lent credibility to Helliwell's scheme by public association with him. Until 1996 they allowed Helliwell falsely to represent that he was authorized by the Bank to solicit investments for the trust account, long after Helliwell's termination from the Bank's employment, and long after its officers had discovered the fraudulent nature of the scheme.

In 1995, Congress enacted the Private Securities Litigation Reform Act ("Reform Act"), Pub.L. No. 104-67, 109 Stat. 737 (1995). The Reform Act amended RICO by narrowing the kind of conduct that could qualify as a predicate act. Section 107 of the Reform Act (known as the "RICO Amendment") amended RICO, 18 U.S.C. § 1964(c), to provide in relevant part:

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States District Court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, *except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.*

**\*2** Pub.L. No. 104-67, 109 Stat. 737 (1995) (emphasis added).

The Conference Committee Report accompanying § 107 states that the amendment was intended not simply "to eliminate securities fraud as a predicate offense in a civil RICO action," but also to prevent

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2001 WL 803719, *2 (E.D.N.Y.))

Page  2

a plaintiff from "plead[ing] other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud." H.R. Conf. Rep. No. 104-369, at 47 (1995).

The legislative history shows that Congress enacted the RICO Amendment "to address a significant number of frivolous actions based on alleged securities law violations." *See* 141 Cong. Rec. H2771 (daily ed. Mar. 7, 1995) (statement of Rep. Cox). The amendment eliminated any conduct actionable as fraud in the purchase or sale of securities as a predicate act for a private cause of action under RICO.

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b), and Rule 10b-5 promulgated thereunder, is the provision under which a complaint of securities fraud may be brought. It provides:
Employment of manipulative and deceptive devices.
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.

The essential elements of a claim under these sections are "(1) damage to plaintiff; (2) caused by reliance on defendant's misrepresentations or omissions of material facts, or on a scheme by defendant to defraud; (3) made with an intent to deceive, manipulate or defraud (scienter); (4) in connection with the purchase or sale of securities; and (5) furthered by defendant's use of the mails [or] any facility of a national securities exchange." *Manufacturers Hanover Trust Co. v. Smith Barney, Harris Upham & Co .,* 770 F.Supp. 176, 179

(S.D.N.Y.1991).

The "in connection with" requirement mandates that the alleged fraud concern the "fundamental nature of the [securities]: namely, characteristics and attributes that would induce ... investors to buy or sell the particular [securities]." *Id.* at 181.

The gravamen of plaintiffs' complaint in this action is that the Bank and its employee Trench made "statements and omissions [that] were knowingly false and misleading" in allowing Helliwell's victims to believe that Helliwell solicited investments in the phony Trust B under the authority of the Bank.

*3 Plaintiffs allege that, "despite its discoveries and actual knowledge" of Helliwell's fraud, the Bank made deliberate decisions to refrain from notifying regulatory authorities. According to the complaint, Bank officer Trench contacted Helliwell and "set forth the general content of an affidavit to be submitted by Helliwell" saying that Trust B had no relationship to the Bank and that Helliwell himself guaranteed all investments in the Trust. Bank "executives knew this affidavit to be blatantly false" and, "notwithstanding" the contents of the affidavit, allowed Helliwell to continue to solicit "Trust B" investments.

Plaintiffs allege further that the Bank aborted and concealed its investigation of Helliwell's activities, and "after receiving the affidavit from Helliwell, MMB's legal department confiscated all of the notes" of the Bank executives involved. Trench then responded to an inquiry from First Virginia Bank regarding investments by "Trust B" investor Charles Pooley, that Helliwell was never authorized by the Bank to solicit investments in any "Trust B" account offered by the Bank, and that he had personally confirmed with the investor and with Helliwell that the "Trust B" investments were a personal arrangement between Pooley and Helliwell.

The complaint is unequivocal in its allegations that Trench and others at the Bank made false and misleading statements perpetrating a fraud in connection with the phony "Trust B" investments. Paragraph 63 of the complaint states:
Trench's statements and omissions were knowingly false and misleading. He knew that Helliwell was in fact purporting to act on [the Bank]'s behalf. He

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2001 WL 803719, *3 (E.D.N.Y.))

falsely stated that he personally had contacted Pooley, and that Pooley had told him the "Trust B" notes represented funds given to Helliwell, personally, to invest on Pooley's behalf. In fact, neither Trench nor any one else from [the Bank] ever contacted Pooley. Additionally, Trench and others at [the Bank] knew that Helliwell was in fact defrauding the "Trust B" investors, Charles Pooley included, yet failed to alert First Virginia.

Paragraph 64 of the complaint continues: Trench's letter was intended to accomplish two objectives for [the Bank]. First, [the Bank] sought to conceal the fraudulent nature of the "Trust B" scheme and thereby prevent First Virginia from itself reporting the fraud to the authorities. Second, to minimize its visibility in the scheme, as a hedge against subsequent legal proceedings, [the Bank] disclaimed any sponsorship or affiliation with "Trust B."

Further, the complaint contends that the Bank permitted Helliwell to continue to solicit investments in the "Trust B" accounts ... continued to accept large deposits marked for "Trust B" into Helliwell's accounts ... permitted Helliwell to make large withdrawals from his account at [the Bank] and continued to accept third party fund transfers from investors into the account. [The Bank] did so though plainly aware of Helliwell's continuing fraudulent solicitation of investments in [the Bank]'s purported "Trust B" account.

**\*4** These false and misleading statements and omissions were made my mail in the form of bank statements and Trench's letter, and allegedly induced plaintiffs into investing and continuing to invest in Helliwell's phony trust. Plaintiffs adamantly contend that the Bank was a central participant in the scheme, an "insider," not merely a "secondary actor," but rather had a "central position" and "an indispensable, prominent role" in the scheme.

They also allege that the Bank obstructed the investigation of Helliwell's fraud in connection with the SEC's action against Helliwell. Bank officials are alleged to have denied that the Bank had investigated Helliwell, and in response to subpoenas, repeatedly denied the existence of internal documents related to that investigation until threatened with action by the SEC.

This conduct would be actionable as fraud in the purchase or sale of securities under the plain language of Rule 10(b)(5). In addition, primary liability under 10(b)(5) may be imposed on persons who had knowledge of fraud and participated in it, committing fraudulent acts amounting to something more than aiding and abetting. *See Securities & Exchange Comm'n v. First Jersey Securities,* 101 F.3d 1450 (2d Cir.1996); *In Re Health Management, Inc. Securities Litigation,* 970 F.Supp. 192, 209 (E.D.N.Y.1997); *S.E .C. v. U.S. Environmental, Inc.,* 1998 WL 559027 (2d Cir. Aug. 25, 1998); *Mishkin v. Ageloff,* 1998 U.S. Dist. LEXIS 14890, at *55 (S.D.N.Y. Sept. 23, 1998). Whether or not the complaint alleges scienter with sufficient specificity to satisfy the heightened requirements of Fed.R.Civ.P. 9(b) applicable to Rule 10(b)(5) does not alter the fact that such an action itself is properly brought for securities fraud under Rule 10(b)(5) and not, pursuant to the Reform Act, under RICO.

This court agrees with the Bank that the Reform Act's exception for "any action against any person that is criminally convicted in connection with the fraud" applies to Helliwell, but does not apply to the Bank.

Plaintiffs' RICO complaint against the Bank is barred by the Reform Act.

### III

The Bank also moves to dismiss plaintiffs' RICO claims for failure to state a claim under Fed.R.Civ.P. 12(b)(6). On a motion to dismiss under that Rule, "the court must accept as true the factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff." *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995) (internal citations omitted). Only if there are no facts alleged under which the plaintiff could prevail may the court dismiss the complaint. *See Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102 (1957). The court may take notice of matters of public record in making its determinations on a motion to dismiss. *See Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 75 (2d Cir.1998).

Plaintiffs allege that the Bank committed violations of 18 U.S.C. § 1962(a), (c) and (d). Under 18 U.S.C. § 1962(c), it is unlawful "for any person

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of an unlawful debt."

*5 Plaintiff alleges that the Bank violated 18 U.S.C. § 1962(c) by participating in the conduct of three "enterprises" with Helliwell. First is the "Trust B Enterprise," defined as the "ongoing contractual and business relationship between [the Bank] and Helliwell surrounding Helliwell's [Bank] checking accounts." Second is the "Dennis L. Helliwell Trust B Enterprise" defined as a sole proprietorship operated by Helliwell in which he invested the income received from his pattern of racketeering. Third is the "Helliwell Group, Ltd. Enterprise," defined as a corporation created and operated by Helliwell in which he invested income from his pattern of racketeering.

Plaintiffs contend that the Bank participated in the conduct of the affairs of these enterprises through predicate acts referenced in 18 U.S.C. § 1961(1), which constitute a pattern of racketeering activity.

The acts they allege are 1) accepting Helliwell's deposits while knowing that the funds were proceeds of criminal activity, in violation of the money laundering statutes, 18 U.S.C. §§ 1956-57; 2) failing to file Currency Transaction Reports for some of Helliwell's checking account withdrawals, in violation of the Currency and Foreign Transactions reporting Act, 31 U.S.C. § 5322; and 3) Allan Trench's violating the mail fraud statute, 18 U.S.C. § 1341, by sending a letter to the First Virginia Bank responding to their inquiry regarding one of the phony investments.

Trench allegedly made false statements that he had personally spoken with the investor and ascertained that the investor understood that the Bank was not involved in "Trust B" and he failed to inform First Virginia Bank that Helliwell was soliciting investments in a fraudulent fund.

The Supreme Court has held that an association-in-fact enterprise is a "group of persons associated together for a common purpose of engaging in a course of conduct," and is "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette,* 452 U.S. 576, 583 (1981). The RICO enterprise must have a structure distinct from the pattern of racketeering activity in which its members engage. *Id.* "The enterprise is not the 'pattern of racketeering;' it is an entity separate and apart from the pattern of activity in which it engages." *Id.*

When applying *Turkette,* the Second Circuit has looked for evidence of the "hierarchy, organization, and activities" of the enterprise, and whether its "members functioned as a unit." *United States v. Coonan,* 938 F.2d 1553, 1560-61 (2d Cir.1991), cert. denied, 503 U.S. 941 (1992); *see also Moy v. Terranova,* 1999 WL 118773, at *5 (E.D.N.Y.1999) (dismissing a complaint for failure "to offer any allegations regarding the continuity or structure of the group or how the entities joined together").

An association-in-fact enterprise is not created every time a combination of individuals or entities acts in concert to commit racketeering acts. While proof of a pattern of criminal acts may in some cases overlap with proof of the existence of the enterprise, proof of the pattern "does not necessarily establish" the enterprise. *Id. See also, Bank v. Brooklyn Law School,* 2000 WL 1692844 (E.D.N.Y.) (Gleeson, J.).

*6 A plaintiff in a § 1962(c) case must prove that the defendant conducted or participated in the conduct of the enterprise's affairs, not merely its own. *See* U.S.C.1962(c). In *Reves v. Ernst & Young,* 507 U.S. 170, 183 (1993), the Supreme Court held that this element of the claim requires proof that the defendant "participate[d] in the operation or management of the enterprise itself." *Id.* Courts in the Second Circuit have interpreted this standard stringently.

In *Schmidt v. Fleet Bank,* 16 F.Supp.2d 340, 353-54 (S.D.N.Y.1998) the court dismissed investors' RICO claims against the bank for the allegedly fraudulent actions of Schick, an investment advisor. The court found that "allowing Schick access to the escrow accounts, approving Schick's overdrafts on 500 separate occasions, failing to notify the relevant authorities of the irregularities in the Schick accounts, misrepresenting to investors the status of



the account and helping Schick to conceal the scheme generally ... are really allegations of assistance to the alleged RICO enterprise, not direction of it."

Similarly, in *Sundial Int'l Fund Ltd. v. Delta Consultants, Inc .,* 923 F.Supp. 38, 41 (S.D.N.Y.1996), the court dismissed RICO claims against an individual bank officer and banks who held investors' deposits in a fraud scheme, despite allegations that they knew of the fraudulent source of the deposits, because the banks did not solicit the investments or direct the affairs of the operation. *See also Bank v. Brooklyn Law School,* 2000 WL 1692844 at *5 (E.D.N.Y.) (issue under § 1962(c) is whether defendant participated in the management of the affairs of the particular enterprises plaintiff chose to allege, not the defendant's "primary" role in the scheme).

Here, plaintiffs have alleged that the Bank accepted Helliwell's deposits and withdrawals knowing them to be the proceeds of fraud, and that it did not adequately investigate or report his fraudulent activities once it allegedly discovered them. Specifically, plaintiff alleges that Bank officer Trench and members of the Bank's legal departments should have contacted Helliwell's "investors" and warned them of his scheme.

Plaintiffs also point to the fact that Helliwell used Bank stationery to perpetrate some of his fraud, and that Bank employees continued to associate socially with Helliwell, ostensibly lending an air of legitimacy to Helliwell's fraudulent activities.

But none of this rises to the level of an enterprise claim against the Bank. These are at most allegations of assistance to an enterprise, not participation in its direction or operation.

Plaintiffs have not adequately alleged an identifiable hierarchy, organization, or functioning unit comprised of the Bank and the "Trust B Enterprise", the "Dennis L. Helliwell Trust B Enterprise" or the "Helliwell Group, Ltd. Enterprise." They have alleged no "continuous structure" of any enterprise distinct from the pattern of racketeering activity in which Helliwell engaged. They do not allege any "chain of command" or "functional integration" of the activities of Helliwell, the Bank, or any of the alleged

enterprises. *See Schmidt,* 16 F.Supp. at 343-44. The only common factor uniting these parties is the sum of the fraudulent activities alleged. There is no alleged other purpose to any of the purported enterprises. Plaintiffs have not sufficiently alleged that the Bank was a member of any enterprise sufficient to state a claim under § 1962(c).

**\*7** Plaintiffs' claims under 18 U.S.C. § 1962(a) also fail. Under that section, it is unlawful for "any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income ... in ... the establishment or operation of, any enterprise ..."

Plaintiffs allege that Helliwell invested money he received from his pattern or racketeering in the "Dennis L. Helliwell Trust B Enterprise" and the "Helliwell Group, Ltd. Enterprise" and that the Bank aided and abetted Helliwell's violations of § 1962(a).

But RICO does not provide a cause of action for "aiding and abetting." In *Central Bank of Denver v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164 (1994) the Supreme Court noted that the text of the 1934 Act does not extend to those who aid and abet a violation of § 10(b) or Rule 10b-5. *Id.* at 177. The Court refused to infer a private right of action for aiding and abetting from the text of the statute absent an express statutory creation of that right.

The Court held that the enactment of a statute creating private civil liability for a primary violation of a statute does not give rise to a presumption that such liability extends to aiders and abettors. *Id.* at 182. The Court reasoned that Congress knew how to proscribe aiding and abetting and chose not to do so under the plain language of the statute. *Id.* at 177. The Court said that "aiding and abetting a wrongdoer ought to be actionable in certain instances," but that the issue is not whether imposing private civil liability on aiders and abettors is good policy but "whether aiding and abetting is covered by the statute." *Id.*

Several courts in this circuit have held that the reasoning in *Central Bank* forecloses aiding and abetting liability for a civil RICO violation because the text of 18 U.S.C. § 1962 does not reveal a congressional intent to impose civil liability for such

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



conduct. *See, e.g., Lippe v. Bairnco Corp.,* 218 B.R. 294, 303-04 (S.D.N.Y.1998); *Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison,* 955 F.Supp. 248, 255-57 (S.D.N.Y.1997). Plaintiffs' § 1962(a) claim against the Bank is not legally cognizable.

Plaintiffs' conspiracy allegations are also deficient. Under 18 U .S.C. § 1962(d), "[i]t shall be unlawful for any person to conspire to violate any of the provisions (a), (b), or (c) of this section." Plaintiffs allege that the Bank "agreed and conspired with Helliwell, whether explicitly or tacitly, to conduct or participate, directly or indirectly" in the operation or management of the enterprise, which plaintiffs define as the ongoing business relationship between Helliwell and the Bank via his accounts at the Bank.

The Supreme Court has held that in order to establish a violation of § 1962(d), a "conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense...." *See Salinas v. United States,* 522 U.S. 52, 65 (1997); *see also Cofacredit, S.A. v. Windsor Plumbing Supply Co.,* 187 F.3d 229, 244-45 (2d Cir.1999).

**\*8** Plaintiffs have pled no more than conclusory allegations of participation in a conspiracy. In order to survive a motion to dismiss, a complaint under § 1962(d) must plead specifically that each defendant knowingly agreed to further the purpose of the enterprise through the commission of particular crimes. The complaint may not merely incorporate by reference the allegations of the remainder of the complaint and then state in a conclusory manner that the defendants conspired to commit them. *See Com-Tech Associates v. Computer Associates International, Inc.,* 753 F.Supp. 1078 (E.D.N.Y.1990), *aff'd,* 938 F.2d 1574 (2d Cir.1991).

In addition, for the reasons stated above, plaintiffs in this case have failed adequately to allege the enterprise element of their § 1962(c) claim. Therefore, the allegations against the Bank, if proven, would not suffice to show that a RICO conspiracy existed. *See Schmidt,* 16 F.Supp.2d 340, 353-54) ("there can be no RICO conspiracy without a substantive RICO violation"). Plaintiffs' claims under § 1962(d) are therefore dismissed.

**III**

Plaintiffs sued the Bank in New York Supreme Court in January 1998. Plaintiffs' amended complaint set forth six claims against the Bank, for fraud, negligence, negligent supervision, *respondeat superior,* breach of contract, and conversion. In January 1999, the state court granted the Bank's motion to dismiss in its entirety.

Plaintiffs appealed, and on December 14, 1999 the Appellate Division, First Department reinstated plaintiffs' conversion claim insofar as it is based on the theory that the Bank, allegedly a fiduciary to the plaintiffs, knowingly allowed Helliwell to withdraw trust funds allegedly held in his Bank accounts for their benefit. On October 26, 2000, the state court entered a judgment dismissing as barred by the statute of limitations the conversion claims of all but two plaintiffs, Robert J. Castle and J. Michael Collard.

The court found that only deposits made by Helliwell to his accounts at the Bank within three years prior to the filing of the lawsuit on January 13, 1998, were timely. Thus Collard's claims arising from Helliwell's deposits of Collard's investments prior to January 13, 1995 were also dismissed as time-barred. Collard's claim arising from $8,550 deposited on July 18, 1995, and Castle's claim arising from a deposit of $47,300 deposited on January 5, 1996, are timely under New York law.

Congress provided in 28 U.S.C. § 1738 that "[t]he ... judicial proceedings of any court of any such State ... shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State...." Accordingly the federal courts consistently have applied *res judicata* and collateral estoppel to causes of action and issues decided by state courts. *Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 416, 66 L.Ed.2d 308 (1980).

**\*9** Under *res judicata,* a final judgment on the merits of an action precludes the parties from relitigating issues that were or could have been raised in that action. *Id.* at 94. Under collateral estoppel, once a court decides an issue of fact or law necessary to its judgment, that decision precludes relitigation of the same issue on a different cause of action between the same parties. *Parklane Hosiery*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



*Co. v. Shore,* 439 U.S. 322, 326 (1979).

Under New York law, an action dismissed in a New York court for failure to sue within the applicable statute of limitations is considered a determination "on the merits" for *res judicata* purposes. *See Bray v. New York Life Ins.,* 851 F.2d 60, 64 (2d Cir.1988). New York courts view such a dismissal as "on the merits" because a statute of limitations is a legislative limit on a party's ability to bring an action, *see United States v. Kubrick,* 444 U.S. 111, 117 (1979), and a dismissal based on a statute of limitations constitutes a final resolution of the party's remedy in that it "bars the remedy sought to be enforced and terminates the right of access to the courts for enforcement of the existing right." *Consolidated Rail v. Primary Indus. Corp.,* 868 F.Supp. 566, 576 (S.D.N.Y.1994). *See also EFCO Corp. v. U.W. Marx, Inc.,* 124 F.3d 394, 397-98 (2d Cir.1997).

Thus, the New York Supreme Court's judgment has the same preclusive effect in this court as it does in a New York court. *See Kremer v. Chemical Construction Co.,* 456 U.S. 461, 466 (1982). The only state law claims properly remaining before this court are the conversion claims of plaintiffs Robert J. Castle and those of J. Michael Collard arising from amounts he gave Helliwell after July 18, 1995.

Under 28 U.S.C. § 1367(a), "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Subsection (c)(3) provides that the district court may decline to exercise supplemental jurisdiction over a claim under subsection (a) if "the district court has dismissed all claims over which it has original jurisdiction." Such supplemental jurisdiction is discretionary, and if the federal claims are dismissed before trial, the state claims generally should be dismissed as well. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726 (1966).

Here, there is no independent basis for retaining jurisdiction over the remaining state conversion claims of plaintiffs Collard and Castle. Since those claims are currently pending in the state court, it

would not serve the interest of judicial economy to retain jurisdiction over them. Accordingly, the state law claims are dismissed.

IV

Plaintiffs' § 1962(c) and § 1962(d) claims against Dennis Helliwell fail to differentiate between the "person" and the "enterprise" as separate and distinct entities. *See Bennett v. United States Trust Co.,* 770 F.2d 308, 315 (2d Cir.1985), *cert. denied,* 474 U.S. 1058 (1986). Distinguishing between the person and the enterprise is indispensable in alleging RICO enterprise corruption, in that "[y]ou cannot associate with yourself, any more than you can conspire with yourself, just by giving yourself a nom de guerre," *McCullough v. Suter,* 757 F.2d 142 (7th Cir.1985) (Posner, J.). Thus, plaintiffs have failed to state a claim against Helliwell under § 1962(c) or (d).

**\*10** Plaintiffs' § 1962(a) complaint against Helliwell fails to establish that he "invested" any of the proceeds from the scheme in anything other than the scheme itself. Plaintiffs allege that Helliwell used his ill-gotten proceeds to "insinuate himself into high society" and

> to adopt a lavish lifestyle and give the appearance of great personal capability and success. This permitted him to work his way into the social circles of the wealthy and successful, which further enhanced his credibility and the credibility of 'Trust B.' Through these machinations, Helliwell was better able to lure new investors, and to assure existing investors of the desirability of their existing and future 'Trust B' investments.

Allegations that a defendant reinvested income from a fraudulent scheme to perpetuate and sustain the scheme are insufficient to allege investment injury under § 1962(a). *See Ouaknin v. MacFarlane,* 897 F.2d 75, 83 (2d Cir.1990); *Building Industry Fund v. Local Union No. 3,* 992 F.Supp. 162, 175 (E.D.N.Y.1996), *aff'd,* 141 F.3d 1151 (2d Cir.1998). The requirement of an "investment injury" is not satisfied because the defendant/enterprise has reinvested money from the racketeering acts back into its own operations, thus enabling the scheme to continue." *Update Traffic Systems, Inc. v. Gold,* 857 F.Supp. 274, 283 (E.D.N.Y.1994).

Thus, the RICO complaint against Helliwell is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



dismissed. The court declines to exercise supplement jurisdiction over any remaining state law claims against Helliwell.

This case is dismissed in its entirety.

So ordered.

### JUDGMENT

A Memorandum and Order of the Honorable Eugene H. Nickerson, United States District Judge, having been filed on March 29, 2001, granting the defendants' motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6) and because it is barred under the Private Securities Litigation Reform Act, Pub.L. No. 104-67, 109 Stat. 737 (1995); and declining to exercise supplemental jurisdiction over any remaining state law claims against Helliwell; it is

ORDERED and ADJUDGED that the plaintiffs take nothing of the defendants; that the defendants' motion to dismiss is granted; and, that the Court declines to exercise supplemental jurisdiction over any remaining state law claims.

Not Reported in F.Supp.2d, 2001 WL 803719 (E.D.N.Y.), RICO Bus.Disp.Guide 10,078

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# TAB 9

Slip Copy                                                                                                                    **Page   1**
Slip Copy, 2005 WL 1711164 (E.D.N.Y.)
**(Cite as: 2005 WL 1711164 (E.D.N.Y.))**

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Elaine HILL, Plaintiff,
v.
Robert DIDIO, in his official capacities and as a
private person et al., Sonia
Metellus, in her official capacities and as a private
person et al., Defendant.
No. 05CV1220FBLB.

July 20, 2005.
Elaine Hill, Brooklyn, NY, for the Plaintiff, pro
se.

Robert D. DiDio, Law Office of Robert DiDio,
New York, NY, for Defendant Robert DiDio.

*MEMORANDUM & ORDER*

BLOCK, J.

**\*1** *Pro se* plaintiff, Elaine Hill ("Hill"), having
paid the requisite filing fee, brought this action
against defendants Robert DiDio ("DiDio") and
Sonia Metellus ("Metellus"), asserting various
claims of criminal activity including a claim under
the Racketeer Influenced and Corrupt Organizations
Act ("RICO"), as well as related state law claims.
DiDio has moved to dismiss the Complaint pursuant
to Fed.R.Civ.P. 9(b) and 12(b)(6); Metellus, who
was just served on July 1, 2005, has not yet
appeared. *See* Docket Entry No. 10. For the reasons
set forth below, the Complaint is dismissed in its
entirety.

BACKGROUND
Hill's Complaint provides the following facts. Hill
retained Didio, an attorney, to file a *habeas corpus*
petition on behalf of her son, Sundhe Moses
("Moses"). In exchange, Hill agreed to pay DiDio
$10,000 between May 2001 and November 2002,
and tendered a significant down payment to DiDio
in May 2001. Notwithstanding the down payment,
on June 29, 2001, Moses filed the *habeas* petition
*pro se* because the statute of limitations was set to
expire and he could not reach DiDio. Thereafter,
Hill (1) failed to file an appearance until two years

after his acceptance of the payment, (2) twice
requested additional time to review a magistrate's
Report and Recommendation ("R & R"), denying
Moses' *habeas* petition, (3) ultimately never
responded to the R & R, and (4) refused to respond
to Hill's inquiries.

  Hill subsequently retained Metellus, another
attorney, for approximately $3,5000 to recover her
payment to DiDio, and to file a successive *habeas*
petition on behalf of Moses. Metellus (1) like
DiDio, failed to file a *habeas* petition on Moses's
behalf, (2) failed to file a law suit against DiDio
although she did send a letter to DiDio threatening
to file legal action if he did not return the $10,000,
and (3) also like DiDio, failed to respond to Hill's
inquiries. As a result, Hill claims that DiDio and
Metellus had "a meeting of the minds and engaged
[in] a conspiracy to defraud the Plaintiff out of just
services." Compl. ¶ 32 (emphasis added).

  In addition to the state-law claims, Hill claims that
DiDio and Metellus's conduct amounted to
violations of the following sections of the federal
criminal code: conspiracy against rights, *see* 18
U.S.C. § 241, deprivation of rights, *see* 18 U.S.C.
§ 242, mail fraud, *see* 18 U.S.C. § 1341,
embezzlement, *see* 18 U.S.C. § 645, and RICO, 18
U.S.C. §§ 1961 et seq.

DISCUSSION
A. Standard of Review

  Where, as here, a party is proceeding *pro se,* the
Court must "read the [*pro se* papers] liberally, and
… interpret them to raise the strongest arguments
that they suggest." *Burgos v. Hopkins,* 14 F.3d 787,
790 (2d Cir.1998). A district court, however, has
the inherent authority to "dismiss a frivolous
complaint *sua sponte* even when the plaintiff has
paid the required filing fee." *Fitzgerald v. First East
Seventh Street Tenants Corp.,* 221 F.3d 362, 364
(2d Cir.2000). "A complaint is frivolous when,
among other things, it is based on an indisputably
meritless legal theory, *i.e.,* it lacks an arguable basis
in law." *Tapia-Ortiz v. Winter,* 185 F.3d 8, 11 (2d
Cir.1999).

  B. Criminal Code Violations

  **\*2** "It is … a general precept of criminal law that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



unless the statute specifically authorizes a private right of action, none exists." *Vasile v. Dean Witter Reynolds, Inc.,* 20 F.Supp.2d 465, 477 (E.D.N.Y.1998). There is no private right of action for any of Hill's claims of criminal activity claim with the exception of her RICO claim. *See, e.g., Vasile,* 20 F.Supp.2d at 278 (no private right of action under conspiracy-against-rights statute, 18 U.S.C. § 241); *Official Publications, Inc. v. Kable News Co.,* 884 F.2d 664, 667 (2d Cir.1989) (same under mail-fraud statute, 18 U.S.C. § 1341). Therefore, Hill's claims, except with respect to the RICO claim, are dismissed for lack of jurisdiction. *See Binder & Binder PC v. Barnhart,* 399 F.3d 128 (2d Cir.2005) (court has a *sua sponte* obligation to address jurisdictional issues).

C. RICO Claim

To state a claim under RICO, Hill must allege: "(1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity," and (5) "injury to business or property as a result of the RICO violation." *Anatian v. Coutts Bank (Switzerland) Ltd.,* 193 F.3d 85, 88 (2d Cir.1999). "In perhaps its least developed form, an enterprise may be found where there is simply a 'discrete economic association existing separately from the racketeering activity." ' *First Capital Asset Mgmt., Inc. v. Satinwood,* 385 F .3d 159 (2d Cir.2004)). Demonstration of a "pattern of racketeering activity" requires that Hill plead at least two predicate racketeering acts, which include, *inter alia,* mail and wire fraud, that occurred within a ten-year period, *see* 18 U.S.C. § 1961(1) & (5), and "show that the predicate acts are related and that they amount to, or pose a threat of, continuing criminal activity." *GICC Capital Corp. v. Technology Fin. Group, Inc.,* 67 F.3d 463, 465 (2d Cir.1995).

Even under the liberal pleading rules afforded to *pro se* plaintiffs, at most, DiDio and Medullus may have each committed one predicate racketeering act by falsely promising to represent her son in exchange for payment from her. However, even assuming *arguendo* that these acts did constitute two predicate racketeering acts, she cannot establish that DiDio and Metellus *together* formed an "enterprise" under 18 U.S.C. § 1961(4); there is simply no basis to find "a discrete economic association [between DiDio and Metellus] existing separately from the racketeering activity." Moreover, she cannot establish that the predicate racketeering acts "amount to, or pose a threat, of continuing criminal activity." Hill's RICO claim is dismissed as frivolous.

D. State Law Claims

Because the Court has dismissed all of Hill's federal claims, it must now consider whether to retain jurisdiction over her state-law claims. Where it has original jurisdiction over a claim, a federal district court may exercise supplemental jurisdiction over all other claims that are so related to that claim that they form part of the same case or controversy. *See* 28 U.S.C. § 1367(a). In deciding whether to exercise supplemental jurisdiction, the Court should consider whether an exercise of jurisdiction is justified by the interests of judicial economy, convenience, fairness to litigants, and comity. *See Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7 (1988). Where, as here, all federal claims have been dismissed before trial, these factors generally "point toward declining to exercise jurisdiction over the remaining state-law claims[,]" *id.;* accordingly, Hill's remaining state-law claims are dismissed.

CONCLUSION

*3 Hill's Complaint is dismissed. Whereas, ordinarily, the Court would allow a plaintiff an opportunity to amend her Complaint, *see Cruz v. Gomez,* 202 F.3d 593 (2d Cir.2000), it need not afford that opportunity where, as here, it is clear that repleading would be futile.

SO ORDERED.

Slip Copy, 2005 WL 1711164 (E.D.N.Y.)

Motions, Pleadings and Filings (Back to top)

. 2005 WL 923929 (Trial Pleading) (Mar. 21, 2005)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

