# TAB 10

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 465291 (S.D.N.Y.), RICO Bus.Disp.Guide 10,234
**(Cite as: 2002 WL 465291 (S.D.N.Y.))**
H

Motions, Pleadings and Filings

United States District Court, S.D. New York.
INTERNATIONAL TELECOM, INC., d/b/a LC
COMMUNICATIONS, Plaintiff,
v.
GENERADORA ELECTRICA DEL ORIENTE,
S.A., Antonio Jorge Alvarez, and
Telecommunicaciones de Guatemala, S.A.,
Defendants,
and Douglas LAPIN, Additional Defendant On
Counterclaims.
No. 00 CIV. 8695(WHP).

March 27, 2002.
Alfred Ferrer III, Esq., Eaton & Van Winkle, New
York, for Plaintiff.

Francis X. Markey, Esq., N.W. Washington,
D.C., for Plaintiff.

Brian L. Gardner, Esq., Sullivan, Chester &
Gardner, LLP, New York, for Defendants
Generadora Electrica Del Oriente, S.A. and Antonio
Jorge Alvarez.

Everett C. Johnson, Jr., Esq., Abid R. Qureshi,
Esq., Latham & Watkins, N.W. Washington, D.C.,
for Defendant Telecommunicaciones de Guatemala,
S.A.

MEMORANDUM AND ORDER

PAULEY, District J.

*1 This is a diversity action that arises out of an
international telecommunications service agreement
between plaintiff International Telecom, Inc.
("ITI"), a United States provider of telephone
services, and Generadora Electrica Del Oriente,
S.A. ("GEDO"), a Guatemalan telecommunications
facility. Defendant Telecommunicaciones de
Guatemala, S.A. ("Telgua") is the dominant
telecommunications provider in Guatemala. In
answering, GEDO filed counterclaims against ITI
and its president, Douglas Lapin, as well as cross-
claims against Telgua.

Two sets of motions have descended upon this
Court. Telgua has moved to dismiss the claims

against it for lack of personal jurisdiction pursuant
to Rule 12(b)(2) of the Federal Rules of Civil
Procedure or, in the alternative, to dismiss the
action in its entirety on forum non conveniens
grounds. ITI and Lapin have moved to dismiss
certain of GEDO's counterclaims pursuant to Rule
9(b) and Rule 12(b)(6). For the reasons stated
below, Telgua's motion to dismiss the claims against
it for lack of personal jurisdiction is granted. In
addition, ITI's and Lapin's motion to dismiss
counterclaims asserted by GEDO is granted.

Background
The following facts are derived from the pleadings
filed in this action, and may be summarized as
follows:

ITI operates telecommunications facilities within
the United States and provides both domestic and
international long distance service. (Am.Compl.¶
3.) In 1998, ITI sought to expand its business into
Guatemala and, in March of that year, entered into
an International Telecommunications Service
Agreement (the "Service Agreement") with
defendant GEDO, a Guatemalan corporation that
operates telecommunications facilities within
Guatemala. (Am.Compl.¶¶ 4,7.) Pursuant to the
Service Agreement, GEDO contracted to provide at
least 100 telephone lines to enable ITI to terminate
telephone traffic from the United States to
Guatemala at a specified rate per minute.
(Am.Compl.¶ 7.) In order to terminate traffic for
ITI, GEDO needed to connect with the dominant
national carrier in Guatemala, defendant Telgua.
(Am.Compl.¶ 7.) Thus, GEDO served as ITI's
intermediary for the purpose of selling international
telephone service from the United States to
Guatemala. (Am.Compl.¶ 7.)

Performance of the Service Agreement commenced
in late 1998 and continue for eight months until
May 1999, when Telgua terminated GEDO's
service. (Am. Compl. ¶ 8; Am. Answer ¶ 81.)
Telgua did not restore service until July 1999.
(Am.Compl.¶ 9.) In September 1999, Telgua
terminated GEDO's service again and informed
GEDO and ITI that they would have to pay Telgua
an increased rate before service would be restored,
pledging to refund the payments at a later date.
(Am.Compl.¶ 9.) Service was not restored and the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2002 WL 465291, *1 (S.D.N.Y.))

monies were never refunded. (Am.Compl.¶ 9.) GEDO, through legal actions financed by ITI, sued Telgua, obtained an injunction, and brought criminal charges against the company and its employees. (Am.Compl.¶ 10.) In return for ITI's financial support, GEDO agreed that any award or settlement secured from the actions against Telgua would be applied, in the first instance, to repay ITI for overpayments made to Telgua and for expenses incurred in keeping GEDO in business as a result of Telgua's service interruptions. (Am.Compl.¶ 11.)

*2 In May 2000, Telgua and ITI, acting on GEDO's behalf as well, entered settlement negotiations, but no agreement was reached. (Am.Compl.¶¶ 12-13.) Thereafter, in August 2000, Telgua restored service pursuant to a Guatemalan court order. (Am. Answer ¶ 13.) Then, unbeknowst to ITI, Telgua and GEDO commenced separate settlement negotiations in October 2000. (Am.Compl.¶ 14.) Ultimately, according to the amended complaint, Telgua agreed to pay GEDO $850,000 and, in return, GEDO agreed to enter into an interconnection agreement with Telgua on terms that would make it economically impossible for GEDO to comply with the Service Agreement with ITI. (Am.Compl.¶¶ 14-15.) As a result of the settlement, GEDO also sought to drop the civil and criminal actions initiated against Telgua on ITI's behalf. (Am.Compl.¶ 15.) In November 2000, GEDO informed ITI of its intent to disregard the accord concerning the apportionment of settlement proceeds received from Telgua. (Am.Compl.¶ 17.)

ITI filed suit in this court to recover for breach of the Service Agreement and the agreement concerning the apportionment of settlement proceeds, conversion, breach of fiduciary duty and fraud. On the breach of the Service Agreement claim alone, ITI claims that it is due no less than $17,600,000 in lost profits. (Am.Compl.¶ 21.) In its answer, GEDO counterclaims that ITI fraudulently reported and misrepresented the amount of telephone traffic terminated to Guatemala and asserts that ITI has withheld payment in excess of $1,200,000. (Am. Answer ¶¶ 82-83, 91.) GEDO asserts its counterclaims under the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1964(c), and for breach of contract and fraud. As for its cross-claims, GEDO has sued Telgua for breach of contract, fraudulent inducement and indemnification in connection with the

settlement agreement.

Discussion
I. Telgua's Motion To Dismiss Based On *Lack Of Personal Jurisdiction*

Telgua has moved to dismiss the claims against it on the grounds that the company has insufficient contacts with New York to subject it to personal jurisdiction in this forum.

On a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), the plaintiff bears the burden of showing that the court has jurisdiction over the defendant. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 171 F.3d 779, 784 (2d Cir.1999). Where, as here, the parties have conducted jurisdictional discovery but no evidentiary hearing has been held, the plaintiff must allege facts that, "if credited ..., would suffice to establish jurisdiction over the defendant." *Chaiken v. VV Publ'g Corp.,* 119 F.3d 1018, 1025 (2d Cir.1997) (quoting *Metropolitan Life Ins. Co. v. Roberston-Ceco Corp.,* 84 F.3d 560, 567 (2d Cir.1996)). At this stage, the Court must construe all pleadings and affidavits in the light most favorable to the plaintiff. *Landoil Resources Corp. v. Alexander & Alexander Servs., Inc.,* 918 F.2d 1039, 1043 (2d Cir.1990).

*3 It is not disputed that personal jurisdiction in a diversity action is determined by the law of the state in which the district court sits, here, New York. *Koehler v. Bank of Bermuda, Ltd.,* 101 F.3d 863, 865 (2d Cir.1996). The issue before this Court is whether Telgua is subject to personal jurisdiction under New York law on the theory that it is present in New York within the meaning of Section 301 of the New York Civil Practice Law and Rules ("CPLR") or that it committed a tort outside New York causing injury within the state under CPLR 302(a)(3), a provision of New York's long-arm statute.

CPLR 301, as construed by New York courts, permits a court to exercise jurisdiction over a foreign corporation on any cause of action if the defendant is "engaged in such a continuous and systematic course of 'doing business' here as to warrant a finding of its 'presence' in this jurisdiction." *McGowan v. Smith,* 52 N .Y.2d 268, 272, 437 N.Y.S.2d 643, 645 (1981); *accord*



Not Reported in F.Supp.2d
(Cite as: 2002 WL 465291, *3 (S.D.N.Y.))

*Welinsky v. Resort of the World D.N.V.,* 839 F.2d 928, 929 (2d Cir.1988); *Hoffritz For Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55, 58 (2d Cir.1985). A foreign corporation is "present" in New York if it does business in the state "not occasionally or casually, but with a fair measure of permanence and continuity." *Tauza v. Susquehanna Coal Co.,* 220 N.Y. 259, 267 (1917); *accord Landoil Resources,* 918 F.2d at 1043; *Hoffritz,* 763 F.2d at 58.

The "doing business" test is a "simple pragmatic one," *Bryant v. Finnish Nat'l Airline,* 15 N.Y.2d 426, 432, 260 N.Y.S.2d 625, 629 (1965), and New York courts generally have focused on four non-exclusive indicia of jurisdiction: the existence of an office in New York; the solicitation of business in New York; the presence of bank accounts or other property in New York; and the presence of employees or agents in New York. *Landoil Resources,* 918 F.2d at 1043; *Hoffritz,* 763 F.2d at 58; *Frummer v. Hilton Hotels Int'l, Inc.,* 19 N.Y.2d 533, 537, 281 N.Y.S.2d 41, 44-45 (1967); *Bryant,* 15 N.Y.2d at 430-31, 260 N.Y.S.2d at 627-28. This Court is not persuaded that ITI and GEDO have made a sufficient showing to establish a prima facie case for general jurisdiction over Telgua.

Telgua is a Guatemalan corporation that provides telecommunications services in Guatemala. The company's headquarters are located in Guatemala City and all 3,000 of its employees work and reside in Guatemala. Telgua does not maintain any offices in New York, nor any state in the United States, and is not licensed to do business in New York. The company does not have a registered agent for service of process in New York; it has no New York subsidiaries, divisions or affiliates; it has no New York telephone listing or mailing address; it does not advertise or solicit business in New York; and it owns no real property in New York.

ITI and GEDO seek to establish Telgua's business presence in New York by adverting to its limited banking arrangements in the state and various incidental contacts to the forum. Upon examination, those contacts do not confer general jurisdiction over Telgua.

*4 More specifically, ITI and GEDO point to Telgua's $140 million credit facility entered in June 1999 with Citibank, N.A. in New York. A single financing arrangement, such as Telgua's credit facility, is insufficient to constitute the continuous and systematic activity required to warrant the exercise of general personal jurisdiction. *See Hastings v. Piper Aircraft Corp.,* 274 A.D.2d 435, 438, 84 N.Y.S.2d 580, 583-84 (1st Dep't 1948) (the borrowing of money by a non-resident defendant from a New York bank "is not the jurisdictional conduct of business on the part of the borrower and does not warrant a holding that the defendant is present within the jurisdiction").

The fact that Telgua also maintains a U.S. dollar account at Citibank in New York does not enhance ITI's and GEDO's jurisdictional showing. The Citibank U.S. dollar account is not Telgua's primary bank account and the company does not use it to pay a significant portion of its operational expenses. Telgua's primary bank accounts are located in Guatemala and the company uses those accounts to pay wages and other operational expenses. (Deposition of Eduardo Mayora Alvarado ("Mayora Dep.") at 204.) Consequently, even when considered in tandem, Telgua's banking activities with Citibank are not so systematic and central as to conclude that it is doing business in New York. *See Bank of America v. Whitney Cent. Nat'l Bank,* 261 U.S. 171, 172 (1923) (holding that defendant Louisiana bank not doing business in New York despite its relationship with six New York banks that performed numerous transactions for defendant bank and in each of which defendant "carrie[d] continuously an active, regular deposit account"); *Semi Conductor Materials, Inc. v. Citibank Int'l, Inc.,* 969 F.Supp. 243, 246 (S.D.N.Y.1997) (holding that foreign defendant's maintenance of four active bank accounts in Citibank, N.A.'s New York office and the use of one of those accounts to receive plaintiff's confirmation fee paid in connection with the letter of credit underlying the suit did not constitute "doing business" for purposes of CPLR 301); *cf. Huangyan Import & Export Corp. v. Nature's Farm Prods., Inc.,* No. 99 Civ. 9404(SHS), 2000 WL 1224814, at *5 (S.D.N.Y. Aug. 29, 2000) (holding that substantial and central banking relationship with Bank of China New York that continued for a period of over ten years sufficient to confer jurisdiction under CPLR 301); *Georgia-Pacific Corp. v. Multimark's Int'l Corp.,* 265 A.D.2d 109, 111, 706 N.Y.S.2d 82, 83 (1st Dep't 2000) (holding that the use of a single bank account "for the receipt of substantially all of the income of a foreign corporation and for the payment

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2002 WL 465291, *4 (S.D.N.Y.))

of substantially all of its business expenses" subjects defendant to personal jurisdiction under CPLR 301).

The other purported New York contacts highlighted by ITI and GEDO fail to substantiate their argument that Telgua is present in New York for purposes of CPLR 301. ITI and GEDO state that pursuant to a forum selection clause in the Service Agreement, any dispute under the contract shall be venued in New York State courts or the federal court in the Southern District of New York. Telgua, however, is not a party to the Service Agreement and no party to this action asserts that Telgua is bound by its terms. Next, ITI and GEDO claim that Telgua was formed in a corporate transaction using financial services firms in New York. Nevertheless, the record shows that Telgua was created by an act of the Guatemalan legislature in 1997 as part of the privatization of the country's telecommunications industry. (*See* Guatel Share Purchase Agreement dated Oct. 1, 1998.) Thus, while New York attorneys and bankers may have worked on the privatization of Telgua's public predecessor, Telgua itself was a product of the process, not a participant in it.

**\*5** Finally, revenue generated from international telephone calls placed between the United States (including New York) and Guatemala which, pursuant to bilateral agreements with U.S. telecommunications carriers, either originate or terminate in Guatemala is insufficient to confer jurisdiction over Telgua. *See, e.g., Access Telecom, Inc. v. MCI Telecomm. Corp.,* 197 F.3d 694, 717 (5th Cir.1999) (holding that contacts incidental to the provision of international telecommunications services do not constitute "doing business" for jurisdictional purposes). While Telgua also offers 1-800 service from the United States to Guatemala, this service is neither advertised nor disseminated in the United States; it is provided only to Guatemalans traveling to the United States. (Mayora Dep. at 148-59, 154.) Notably, the 1-800 service is facilitated by a U.S. telecommunications carrier, which provides service in the United States and connects the call to Telgua's network. Such a contact with New York "is not enough to support a finding that the corporate owner of the [number] is within [New York's] jurisdiction." *Ziperman v. Frontier Hotel of Las Vegas,* 50 A.D.2d 581, 582, 374 N.Y.S.2d 697, 700 (2d Dep't 1975) (holding that a nondomiciliary hotel's solicitation of guests through a toll-free telephone number in a local directory not

sufficient to establish jurisdiction under CPLR 301).

ITI further contends that the Court may exercise personal jurisdiction over Telgua under CPLR 302(a)(3), a provision of New York's long-arm statute. CPLR 302(a)(3) requires that a plaintiff demonstrate, among other things, that the nondomiciliary defendant "committ[ed] a tortious act without the state causing injury to person or property within the state." *See also McGowan,* 52 N.Y.2d at 273, 437 N.Y.S.2d at 645. To satisfy this requirement, ITI argues that it suffered a loss in New York because its New York customers were denied advantageous rates for calls to Guatemala and it was denied revenues from those calls. An injury, however, does not occur within the state simply because ITI or its customers ultimately may have suffered remote economic consequences in New York due to Telgua's alleged fraud or tortious interference. The situs of non-physical, commercial injury is "where the first effect of the tort was located that ultimately produced the final economic injury" or, alternatively stated, the location of the "original event that caused the injury." *Bank Brussels,* 171 F.3d at 792; *accord Mareno v. Rowe,* 910 F.2d 1043, 1046 (2d Cir.1990) ("The situs of the injury is the location of the original event which caused the injury, not the location where the resultant damages are subsequently felt by the plaintiff.") (quoting *Carte v. Parkoff,* 152 A.D.2d 615, 616, 543, N.Y.S.2d 718, 719 (2d Dep't 1989)). Thus, despite the fact that ITI may have suffered economic consequences in New York, the location of the original event that caused its economic harm is Guatemala, the place where Telgua is alleged to have illegally severed GEDO's network connection and where GEDO allegedly breached the agreement concerning the allocation of settlement proceeds.

**\*6** For its own account, GEDO baldly asserts that Telgua is subject to jurisdiction in New York pursuant to CPLR 302. It fails, however, to specify any injury in New York that would subject Telgua to suit in New York under CPLR 302(a)(3). While GEDO also appears to argue that the facts undergirding its counterclaims form a nexus with the privatization of Guatemala's telecommunications industry, that connection is simply too tenuous to subject Telgua to jurisdiction under CPLR 302(a)(1) . *See McGowan,* 52 N.Y.2d at 272, 437 N.Y.S.2d at 645 (under CPLR 302(a)(1), there must be "some

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

articulable nexus between the business transacted and the cause of action sued upon"). None of GEDO's counterclaims arise out of matters related to the formation of Telgua.

Accordingly, Telgua's motion to dismiss the claims against it for lack of personal jurisdiction is granted. [FN1]

> FN1. GEDO suggests in its opposition papers that in the event this Court determines that personal jurisdiction over Telgua does not exist, the entire action should be dismissed on the basis that Telgua is an indispensable party. Since GEDO has not formally requested such relief, and ITI has not been afforded an opportunity to respond, this Court declines to act on GEDO's request.

## II. *The Motion To Dismiss GEDO's Counterclaims*

GEDO has asserted four counterclaims against ITI and Lapin relating to the provision of monthly billing notices required under the Service Agreement and alleged underreporting of the volume of minutes for which it was to be paid. ITI and Lapin move to dismiss the RICO claim (first counterclaim), the claim for fraudulent inducement (third counterclaim) and the claim for fraudulent conversion (fourth counterclaim) for failure to satisfy the particularity requirements of Rule 9(b). Separately, ITI and Lapin move to dismiss the RICO counterclaim on the further ground that it fails to state a claim pursuant to Rule 12(b)(6).

Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). This provision applies to RICO claims for which fraud is the predicate illegal act. *Moore v. PaineWebber, Inc.,* 189 F.3d 165, 172 (2d Cir.1999). To survive scrutiny under Rule 9(b), fraud allegations generally should specify the time, place, speaker and content of an alleged misrepresentation. *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987); *O'Brien v. National Prop. Analysts Partners,* 719 F.Supp. 222, 225 (S.D.N.Y.1989). In instances where the alleged fraud is premised on an omission, a plaintiff must specify the person responsible for the failure to speak, the context of the omission and the manner in which the omission misled the plaintiff. *Odyssey Re (London) Ltd. v. Stirling*

*Cooke Brown Holdings Ltd.,* 85 F.Supp.2d 282, 293 (S.D.N.Y.2000). Where, as here, there are multiple defendants, the complaint must disclose the specific nature of each defendant's participation in the alleged fraud. *DiVittorio,* 822 F.2d at 1247; *O'Brien,* 719 F.Supp. at 225-26.

Allegations of fraud ordinarily cannot be based on information and belief. *Segal v. Gordon,* 467 F.2d 602, 608 (2d Cir.1972). Still, this pleading restriction may be relaxed where the matter is peculiarly within the knowledge of the defendant. *DiVittorio,* 822 F.2d at 1247; *O'Brien,* 719 F.Supp. at 226. When pleading on information and belief is appropriate, the allegations must be accompanied by a statement of facts upon which the belief is founded. *Stern v. Leucadia Nat'l Corp.,* 844 F.2d 997, 1003 (2d Cir.1988); *Segal,* 467 F.2d at 608.

*7 Because of the stigmatizing effect on those named as defendants in a RICO claim, "courts must always be on the lookout for the putative RICO case that is really 'nothing more than an ordinary fraud case clothed in the Emperor's trendy garb." ' *Schmidt v. Fleet Bank,* 16 F.Supp.2d 340, 346 (S.D.N.Y.1998). Indeed, the " 'overwhelming trend' amongst the lower courts is to apply Rule 9(b) strictly in order to effect dismissal of civil RICO suits." *In re Sumitomo Copper Litigation,* 995 F.Supp. 451, 456 (S.D.N.Y.1998) (Pollack, J.).

On a motion to dismiss pursuant to Rule 12(b)(6), a court typically must accept the material facts alleged in the complaint as true and construe all reasonable inferences in a plaintiff's favor. *Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 188 (2d Cir.1998). A court should not dismiss a complaint for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995). Dismissal is proper when the plaintiff fails to plead the basic elements of a cause of action. *See Wright v. Giuliani,* No. 99 Civ. 10091(WHP), 2000 WL 777940, at *4 (S.D.N.Y. June 14, 2000).

### A. Fraud

GEDO appears to rely on three acts of fraud to support the three challenged counterclaims: (i) the misstatement of three monthly notices at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



approximately $8,000, devalued from approximately $150,000 (Am. Answer ¶¶ 82-87); (ii) the fraudulent inducement of the Service Agreement without intent to perform (Am. Answer ¶¶ 93-94, 97); and (iii) failing to provide five monthly notices as required by the Service Agreement (Am. Answer ¶ 97). Those acts are not pled with the requisite particularity.

First, while GEDO points to the three allegedly fraudulent notices, GEDO does not adequately identify the speaker or differentiate among those who are alleged to have spoken fraudulently. Instead, GEDO refers to "[ITI], Lapin and others in and outside of [ITI] as yet to be identified." (Am. Answer ¶ 82.) Rule 9(b) was enacted to preclude such imprecise group pleadings.

Second, while it is alleged that three fraudulent notices were transmitted by facsimile from Florida to Guatemala, GEDO does not plead specifically when those alleged acts occurred. Also, it is unclear from the pleadings where the other alleged fraudulent acts took place. *See Stander v. Financial Clearing & Servs. Corp.,* 718 F.Supp. 1204, 1209 (S.D.N.Y.1989) (plaintiff must specify "the time and place of each [fraudulent] statement and the person responsible for making [the statement]").

Third, GEDO does not adequately plead why the three monthly notices were fraudulent. GEDO bases the misrepresentation on information and belief, yet provides no sources for its conclusory allegations. *See Liberty Ridge LLC v. RealTech Sys. Corp.,* 173 F.Supp.2d 129, 137 (S.D.N.Y.2001) ("Even when pleading on information belief, however, plaintiffs are required to include a statement of facts upon which the allegations of fraud are based."); *Moll v. U.S. Life Title Ins. Co. of New York,* 654 F.Supp. 1012, 1035 (S.D.N.Y.1987) ("the sources of the information and belief should be sufficiently identified so as to allow each defendant and the Court to review the sources and determine, at the pleading stage, whether an inference of fraud may be fairly drawn from the information contained therein"). GEDO simply alleges that ITI, Lapin, and others "yet to be specifically identified were aware of the actual usage and intentionally kept the true amount from GEDO." (Am. Answer ¶ 83.)

**\*8** Accordingly, the fraud allegations that support GEDO's first, third and fourth counterclaims fail to satisfy the particularity requirements of Rule 9(b) and thus cannot be sustained.

### B. *The RICO Claim*

ITI and Lapin also challenge the legal sufficiency of the RICO counterclaim. GEDO alleges that ITI, Lapin and "other individuals as yet to be identified" participated in the conduct of the affairs of the racketeering enterprise in violation of 18 U.S.C. § 1962(c) and 1964(c).

In pleading a private civil action under the RICO statute based on a violation of Section 1962(c), a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 (1985); *accord United States v. Allen,* 155 F.3d 35, 40 (2d Cir.1998). In addition, plaintiff must allege that he was "injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c).

ITI and Lapin argue that GEDO's RICO counterclaim should be dismissed for failing to allege a proper RICO enterprise and a sufficient pattern of racketeering activity. This Court finds that GEDO's RICO counterclaim fails on both scores.

### 1. *Sufficiency of the "enterprise" allegations*

ITI and Lapin argue that the RICO counterclaim is deficient because GEDO alleges that the enterprise consists solely of ITI and its employees or agents and, moreover, does not allege an enterprise that functions as a continuing unit.

The RICO statute defines "enterprise" as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Under 18 U.S.C. § 1962(c), an enterprise and the persons conducting the affairs of an enterprise must be distinct. *Discon, Inc. v. NYNEX Corp.,* 93 F.3d 1055, 1063 (2d Cir.1996), *vacated on other grounds,* 525 U.S. 128 (1998). A plaintiff may not circumvent this distinctness requirement by alleging a RICO enterprise that "consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



of the defendant." *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,* 30 F.3d 339, 344 (2d Cir.1994); *accord Anatian v. Coutts Bank (Switzerland) Ltd.,* 193 F.3d 85, 89 (2d Cir.1999); *Bennett v. United States Trust Co. of New York,* 770 F.2d 308, 315 (2d Cir.1985); *Black Radio Network, Inc. v. NYNEX Corp.,* 44 F.Supp.2d 565, 581 (S.D.N.Y. Apr. 14, 1999); *cf. Cedric Kushner Promotions, Ltd. V. King,* 121 S.Ct. 2087, 2092 (2001) (holding that president and sole shareholder of closely held corporation is a "person" distinct from the corporate entity and subject to liability under RICO). While "a single entity simultaneously can be both the person and one of a number of members of the enterprise," *Dornberger v. Metropolitan Life Ins. Co.,* 961 F.Supp. 506, 524 (S.D.N.Y.1997), this is so only when the enterprise is distinct from each of the RICO persons. *See NRB Indus., Inc. v. R.A. Taylor & Assocs., Inc.,* 97 Civ. 181(JSR), 1998 WL 3638, at *2 (S.D.N.Y. Jan. 7, 1998) (citing *Securitron Magnalock Corp. v. Schnabolk,* 65 F.3d 256, 263 (2d Cir.1995)).

*9 The first counterclaim names ITI and Lapin as RICO persons and further states that the enterprise is an "association-in-fact" consisting of ITI, Lapin, and "others in and outside of [ITI], as yet to be identified." Without further factual allegations that enlarge the group comprising the enterprise, this pleading runs afoul of the distinctiveness requirement. While it is alleged that the enterprise acted outside the "regular affairs" of ITI, GEDO names no additional persons outside the corporate plaintiff and its president, Lapin. On such a basis alone, an enterprise does not exist for purposes of RICO.

Moreover, a RICO plaintiff must allege an ongoing organization, formal or informal, whose various associates function as a continuing unit. *United States v. Turkette,* 452 U.S. 576, 583 (1981); *United States v. Mazzei,* 700 F.2d 85, 88-89 (2d Cir.1983). Thus, facts must be alleged establishing "an entity separate and apart from the pattern of activity in which it engages." *Turkette,* 452 U.S. at 583. This Circuit has explicitly rejected the view that proof offered to prove the "enterprise" and the "pattern of racketeering activity" must necessarily be distinct. *Mazzei,* 700 F.2d at 89; *In re Sumitomo Cooper Litig.,* 104 F.Supp.2d 314, 318 (S.D.N.Y.2000) (Pollack, J.).

Here, apart from identifying two purported RICO persons, GEDO does not allege an ongoing organization whose associates function as a continuing unit. Quite simply, as a by-product of the insufficiently pled claim, ITI and Lapin do not have adequate notice of the alleged enterprise of which they are members. Nothing in the pleading suggests that the members of the enterprise, even those as yet unidentified, formed a unit with a structure, a hierarchy, or a continuity. *See Dietrich v. Bauer,* 76 F.Supp.2d 312, 348-49 (S . D.N.Y.1999); *First Nationwide Bank v. Gelt Funding Co.,* 820 F.Supp. 89, 98 (S.D.N.Y.1993), *aff'd,* 27 F.3d 763 (2d Cir.1994).

Accordingly, GEDO's first counterclaim cannot be sustained for failure to plead a legally cognizable enterprise.

### 2. *Pattern of racketeering activity*

As an independent and alternative basis, the RICO counterclaim must be dismissed for failure to state a sufficient pattern of racketeering activity. The RICO statute defines "racketeering activity" to include a myriad of criminal offenses defined by federal and state law. *See* 18 U.S.C. § 1961(1). Here, GEDO presumably charges ITI and Lapin with wire fraud, in violation of 18 U.S.C. § 1343, in that international wires were used to transmit three allegedly false notices from Florida to Guatemala. ( *See* Am. Answer ¶ 82.)

RICO defines "pattern of racketeering activity" as requiring "at least two acts of racketeering activity" committed in a ten year period. 18 U.S.C. § 1961(5). As pled, the three purportedly fraudulent facsimiles sent from Florida to Guatemala in 1998 constitute sufficient predicate acts. However, to establish a pattern, one must also demonstrate that the predicate acts are "related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239 (1989).

*10 Continuity may be either closed- or open-ended. *H.J. Inc.,* 492 U.S. at 239. "Close-ended continuity is demonstrated by predicate acts that 'amount to continued criminal activity,' by a particular defendant." *Cofacredit v. Windsor Plumbing Supply Co., Inc.,* 187 F.3d 229, 242 (2d Cir.1999). A plaintiff must demonstrate "a series of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months ... do no satisfy this requirement." *Cofacredit,* 187 F.3d at 242. The Second Circuit has never held a period of less than two years to constitute a "substantial period of time." *Cofacredit,* 187 F.3d at 242 (citing *GICC Capital Corp. v. Technology Finance Group, Inc.,* 67 F.3d 463, 467 (2d Cir.1995)); *see also Metromedia Co. v. Fugazy,* 983 F.2d 350, 369 (2d Cir.1992) (finding closed-ended continuity when predicate acts occurred over a period of two years). On the other hand, to demonstrate open-ended continuity, one must "show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Cofacredit,* 187 F.3d at 242.

Here, the alleged fraudulent acts took place during an eight-month period following the inception of the Service Agreement in 1998. Because, as GEDO concedes (Am. Answer ¶ 81), service under the contract continued for a finite period of eight months, there is no threat of continuing criminal acts. Hence, GEDO cannot demonstrate open-ended continuity.

Similarly, close-ended continuity is not adequately alleged. Although GEDO alleges three acts of fraud in connection with the Service Agreement, only one--the transmission of three fraudulent monthly notices during the eight-months of uninterrupted service--constitutes wire fraud and hence a predicate act for purposes of establishing a pattern under RICO. Since the duration of a pattern of racketeering activity is measured by the RICO predicate acts, *see H.J. Inc.,* 492 U.S. at 242 (continuity test looks to period during which predicate acts were committed), the duration here spans no more than eight months. Thus, even assuming that the acts of wire fraud committed on GEDO were sufficiently related to form a single pattern of racketeering activity, the predicate acts that ITI and Lapin allegedly committed spanned less than one year, an unsubstantial period of time. *See Cofacredit,* 187 F.3d at 244 (finding predicate acts lasting less than one year to be an insufficient length of time to demonstrate close-ended continuity).

Accordingly, GEDO's RICO counterclaim cannot be sustained for the additional reason that it fails to plead a pattern of racketeering activity.

Conclusion

For the reasons stated, this Court grants Telgua's motion to dismiss the claims against it based on lack of personal jurisdiction. This includes the affirmative claims filed by plaintiff ITI and the cross-claims filed by defendant GEDO. In addition, the motion of ITI and Lapin to dismiss certain counterclaims asserted by defendant GEDO is granted. The first counterclaim under the RICO statute is dismissed with prejudice pursuant to Rule 12(b)(6) and Rule 9(b). Leave to amend on the RICO counterclaim is not granted because GEDO is inappropriately attempting to balloon a garden-variety breach of contract or fraud matter into an unworkable RICO suit. Nevertheless, the third and fourth counterclaims asserted by GEDO are dismissed without prejudice and with leave to amend for failure to comply with Rule 9(b). To the extent permitted, GEDO shall serve and file an answer with its amended counterclaims within twenty (20) business days of the date of this Memorandum and Order.

**\*11** SO ORDERED:

Not Reported in F.Supp.2d, 2002 WL 465291 (S.D.N.Y.), RICO Bus.Disp.Guide 10,234

Motions, Pleadings and Filings (Back to top)

. 1:00cv08695 (Docket) (Nov. 14, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# TAB 11

Slip Copy                                                    **Page  1**
Slip Copy, 2005 WL 783255 (E.D.N.Y.)
**(Cite as: 2005 WL 783255 (E.D.N.Y.))**

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Gil KADOURI and Dorit Kadouri, Plaintiffs,
v.
David FOX, Expert Realty, Hasida Molnar, Ferenc
Molnar, and "John Doe(s)," Real
Names Unknown, Defendants.
No. 03 CV 1725(NG).

Jan. 24, 2005.

Michael A. Haskel, Mantel & Haskel, Garden City,
NY, for Plaintiffs.

Perry Dean Freedman, Mount Kisco, NY, for
Defendants.

*OPINION AND ORDER*

GERSHON, District Judge.

**\*1** Plaintiffs' Complaint asserts claims under the
Racketeer Influenced and Corrupt Organizations
Act, 18 U.S.C.1962(c), 1962(d), 1964(c), ("RICO")
against defendants Hasida Molnar, Ferenc Molnar
and Expert Realty, as well as state law claims for
fraud, negligence, and breach of contract. The
Complaint also asserts RICO claims against
defendants David Fox and John Doe(s), as well as
state law claims against Fox for breach of contract
and negligence. Defendant Fox and, separately,
defendants Expert Realty, Hasida Molnar, and
Ferenc Molnar have moved to dismiss, pursuant to
Federal Rule of Civil Procedure 12(b)(6), for failure
to state a claim under RICO. For the reasons
detailed below, the court dismisses all claims against
all defendants.

BACKGROUND
The following facts are alleged in the Complaint:

Plaintiffs Gil and Dorit Kadouri are the owners of
residential property located at 75-09 177th Street in
Fresh Meadows, New York. Defendant Expert
Realty is a real estate brokerage in New York that
employed defendants Hasida and Ferenc Molnar. In
the summer of 2000, plaintiffs enlisted Expert
Realty for assistance in finding a tenant for the

Fresh Meadows property. If Expert Realty could
identify a suitable tenant, the contemplated
agreement would position Expert Realty as the
manager of the property while plaintiffs were away
for an extended trip to Israel. Realty agreed to find a
suitable tenant, conduct a financial investigation of
the tenant, collect rent, periodically inspect the
premises, and handle various administrative tasks
related to the property such as collecting plaintiffs'
mail.

In August of 2000, Expert Realty, through the
Molnars, presented defendant Fox to plaintiffs as the
proposed tenant. According to the Complaint,
Hasida Molnar made numerous favorable
representations to plaintiffs about Fox's background
and financial stability. Plaintiffs allege that these
representations were false and that defendants H.
Molnar and F. Molnar were aware of their falsity.
Relying on the representations of defendants,
plaintiffs ultimately accepted Fox as the tenant.

In September of 2000, Fox sublet the Fresh
Meadows property to an unidentified individual
("John Doe"), who immediately began to use the
property for growing, processing, and selling
marijuana. Converting the property to suit this
enterprise caused substantial damage, as did the
actual process of growing marijuana. According to
the Complaint, the Molnars and Expert Realty did
not sufficiently monitor the premises; in particular
they did not adequately investigate the excessive
water consumption. Plaintiffs allege that the
defendants engaged in numerous telephone calls in
which they concealed the deteriorating situation in
Fresh Meadows and that the Molnar defendants
made numerous misrepresentations to plaintiffs via
the telephone and mails which induced plaintiffs to
remain in Israel as their property was being
damaged. These telephone calls and mailings took
place between July of 2000 and July of 2002.

DISCUSSION
**\*2** A motion to dismiss under Federal Rule of Civil
Procedure 12(b)(6) should be granted only where it
"appears beyond doubt that the plaintiff can prove
no set of facts in support of his claim that would
entitle him to relief." *Cooper v. Parsky,* 140 F.3d
433, 440 (2d Cir.1998). Plaintiffs' factual
allegations must be accepted as true, *Zinermon v.
Burch,* 494 U.S. 113, 118 (1990), and the court

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



must draw all inferences in favor of plaintiffs. *Thomas v. City of New York,* 143 F.3d 31, 37 (2d Cir.1998).

RICO provides a private right of action to a "person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). Section 1962(c) states:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18. U.S.C. § 1962(c). RICO's definition of "racketeering activity" includes dealing in a controlled substance, as well as "any act which is indictable under" 18 U.S.C. § 1343 (wire fraud) or 18 U.S.C. § 1341 (mail fraud). *See* 18 U.S.C. § 1961(1)(b). Under the mail and wire fraud statutes, "any scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," which involves use of the mails or wire is indictable. *See* 18 U.S.C. §§ 1341, 1343. RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *See* 18 U.S.C. § 1961(4). At least two acts of racketeering activity are required to establish a "pattern" under RICO. *See* 18 U.S.C. § 1961(5). However, plaintiffs must also show that the two acts are (1) related and that (2) they amount to, or pose a threat of, continuing criminal activity. *See Schlaifer Nance & Co. v. Estate of Warhol,* 119 F.3d 91, 97 (2d Cir.1997); *United States v. Indelicato,* 865 F.2d 1370, 1381 (2d Cir.1989), *cert. denied,* 493 U.S. 811 (1989).

I. RICO claims against Hasida Molnar and Expert Realty

Claims 1 and 2 of the Complaint allege violation of RICO through wire fraud and mail fraud, respectively. Plaintiffs' RICO claims fail because their allegations of wire and mail fraud are insufficient. Allegations of mail and wire fraud, subject as they are to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure, must include facts sufficient to create a "strong inference" of fraudulent intent. *See*

*First Capital Asset Management Inc. v. Satinwood,* 385 F.3d 159, 178-179 (2d Cir.2004); *McLaughlin v. Anderson,* 962 F.2d 187, 191 (2d Cir .1992); *Ouaknine v. MacFarlane,* 897 F.2d 75, 80 (2d Cir.1990); *Cosmas v. Hassett,* 886 F.2d 8, 12 (2d Cir.1989). Here, plaintiffs' wire fraud allegations suggest, at worst, negligence and not fraud. Plaintiffs assert that Hasida Molnar told them over the telephone that "she knew Fox, that Fox owned his own construction company ... and that Fox was a suitable and reliable tenant for the Premises." Complaint 35(a). The only other wire fraud allegations against Hasida Molnar involve telephone calls in which plaintiffs allege that H. Molnar "failed to provide the Kadouris with a full account of ongoing events and transactions at the Premises." *See* Complaint 37. Plaintiffs' conclusions regarding this activity, outlined in their brief, reach far beyond inferences that reasonably can be drawn from the facts alleged in the Complaint. The logic of plaintiffs' argument is that, because illegal activity was occurring at their house, the management company was necessarily engaging in fraud when it did not inform plaintiffs of the illegal activity. However, there are no allegations in the Complaint that suggest that defendants H. Molnar and Realty were aware of the illegal activity, much less that they fraudulently concealed it. Indeed, the very information that plaintiffs argue should have put the Molnars and Realty on notice was communicated to plaintiffs by Hasida Molnar in the allegedly fraudulent telephone conversations. Thus, plaintiffs allege that among the acts of wire fraud were calls made by defendant H. Molnar to plaintiffs advising them that the "water and sewer bill" was "very high." *See Complaint ¶* 35(b). Plaintiffs also allege that H. Molnar alerted them to the presence of "John Doe," Fox's alleged accomplice in the marijuana-growing scheme. *See Complaint ¶* 35(c)(I). Such communications weigh against an inference that H. Molnar was attempting to defraud plaintiffs by concealing the nature of the activities occurring at the Fresh Meadows property. Put another way, plaintiffs' allegations cannot create a "strong inference" of fraudulent intent when they allege that defendant H. Molnar alerted them to suspicious activity that it was within her power to conceal.

*3 Plaintiffs have also failed to state a claim of mail fraud. Plaintiffs allege only that defendants induced them to allow Expert Realty to receive their mail in order to be able to conceal from plaintiffs any

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



information that "might have aroused suspicion." *See Complaint* ¶ 45(a). However, apart from plaintiffs' conclusory assertion of defendants' purpose, they include no facts suggesting that defendants actually concealed any information through the mails, or that their stated purpose for receiving plaintiffs' mail was false. Plaintiffs inexplicably cite defendants' receipt of "water and sewer bills that showed water consumption far in excess of the customary water usage at the Premises," as evidence of mail fraud. Complaint 45(b). As discussed above, that defendants communicated this fact to plaintiffs weighs against a finding of fraudulent intent. Thus, plaintiffs' allegations of wire fraud and mail fraud cannot constitute the predicate acts of racketeering activity required by RICO.

Even if plaintiffs had sufficiently alleged fraud, their claims would fail because they have not alleged sufficient continuity under RICO. The alleged activity of defendants cannot constitute a pattern under RICO because it neither amounts to, nor poses a threat of, continuing criminal activity. "[A] plaintiff in a RICO action must allege either an open-ended pattern of racketeering activity (i.e., past criminal conduct coupled with a threat of future criminal conduct) or a closed-ended pattern of racketeering activity (i.e., past criminal conduct extending over a substantial period of time)." *See First Capital,* 385 F.3d at 180 (quoting *GICC Capital Corp. v. Tech. Fin. Group, Inc.,* 67 F.3d 463, 466 (2d Cir.1995), *cert. denied,* 518 U.S. 1017 (1996)). Plaintiffs' allegations are insufficient to support the existence of either open-ended or closedended continuity.

In order to constitute a closed-ended pattern of racketeering activity, defendants' activities would have to have extended over "a substantial period of time." *See id.* In this Circuit, the alleged racketeering activity generally must have extended over at least two years in order to be considered a substantial period of time. *See id.* However, while such a temporal allegation is necessary, allegations that the activity extended over more than two years are not sufficient in themselves for the court to find a closed-ended pattern of racketeering activity. *See id.* The determination of whether or not there is closed-ended continuity depends on several factors, including "the length of time over which the alleged predicate acts took place, the number and variety of

acts, the number of participants, the number of victims, and the presence of separate schemes." *See GICC,* 67 F.3d at 467. Consideration of these factors weighs against a finding of a closed-ended pattern. There are only two victims of the alleged racketeering activity, Gil and Dorit Kadouri, a married couple whose interests are conjoined. The two victims were not harmed by separate schemes. Only one scheme is alleged, and plaintiffs were simultaneously injured by the same activity. Plaintiffs have alleged neither a great variety, nor a great number of acts of wire fraud and mail fraud, the only two racketeering activities alleged. There appears to be only one alleged participant in the wire and mail fraud, Hasida Molnar.

*4 Furthermore, plaintiffs' allegations suggest that the racketeering activity took place over a time period barely constituting two years. According to the Complaint, the first act of wire fraud committed by defendants occurred in July of 2000, when defendant H. Molnar allegedly misrepresented the background of defendant Fox over the telephone. *See Complaint* ¶ 35(a). The last alleged act of wire fraud took place in July of 2002, when H. Molnar allegedly fraudulently placated plaintiffs about the state of their property. *See Complaint* ¶ 35(c)(v). The alleged mail fraud took place over an even shorter period of time that was completely subsumed by the alleged period of the wire fraud. The Complaint asserts that "from in or about September 2000 to in or about December 2001," mail was sent from H. Molnar and Expert Realty to plaintiffs for the purpose of maintaining Expert Realty's status as monitor of the Fresh Meadows property and to conceal the criminal activity occurring on the premises. *See Complaint* ¶ 45. Thus, plaintiffs' allegations make clear that the alleged racketeering activity extended for, at most, two years. This is the bare minimum of what might constitute a "substantial period of time" in this circuit. *See First Capital,* 385 F.3d at 181 (noting that the Second Circuit has never found a closed-ended pattern where the predicate acts spanned fewer than two years). In light of the Complaint's failure to allege the other aspects of a RICO pattern, the duration of the alleged racketeering activity is insufficient for a finding of a closed-ended pattern.

In order to constitute an open-ended pattern of racketeering activity, defendants' activities must threaten to continue into the future. Plaintiffs "must

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Defalco v. Burns,* 244 F.3d 286, 323 (2d Cir.2001) (quoting *Cofacredit S.A. v. Windsor Plumbing Supply Co.,* 187 F.3d 229, 242 (2d Cir.1999)), *cert denied,* 534 U.S. 891 (2001). Because it cannot be inferred from plaintiffs' allegations that such a threat existed, defendants' activities cannot constitute an open-ended pattern of racketeering activity. The contract to manage the property was for a fixed period and the lease was for a fixed period of two years. Though plaintiffs allege that the lease could have been renewed indefinitely, this appears inconsistent with the explicitly fixed arrangement between the plaintiffs and defendants. More importantly, that the lease could have continued beyond two years is not sufficient to create open-ended continuity. "In assessing whether or not the plaintiff has shown open-ended continuity, the nature of a RICO enterprise and of the predicate acts are relevant ." *Defalco,* 244 F.3d at 323. Expert Realty is not alleged to be an enterprise "engaged primarily in racketeering activity," and therefore plaintiffs must allege facts supporting either that "the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." *See id.* On the basis of the facts alleged in the Complaint, no inference supporting either of these conclusions is possible. The alleged predicate acts were omissions limited to a highly particularized situation. Plaintiffs have not alleged that defendants similarly defrauded any other parties, or that they were defrauded beyond the one scenario described in the Complaint. It is not alleged that Expert Realty is a sham company, set up to facilitate the acquisition of facilities for drug dealers. Plaintiffs have failed to demonstrate open-ended continuity.

II. RICO Claim against David Fox

**\*5** Plaintiffs assert a separate RICO claim against defendants Fox and Doe, in Claim 3 of the Complaint. Other than alleging that the defendants engaged in a marijuana production and distribution enterprise, they make no attempt to set forth the requirements of an enterprise, nor do they ever identify what conduct was engaged in by Fox in furtherance of the enterprise other than that he knowingly sublet the home to Doe, whose purpose was to grow marijuana there.

A RICO enterprise is a group connected by common activity and a common purpose, "the existence of which is proven 'by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.' " *First Capital,* 385 F.3d at 173 (quoting *United States v. Turkette,* 452 U.S. 576, 583 (1981)). Plaintiffs have failed to allege the existence of an ongoing organization with regard to the alleged marijuana growing and dealing. The Complaint is devoid of facts describing Fox's role in the alleged enterprise, and it fails to include any specific allegations regarding the ongoing activities of the enterprise. There is no allegation from which to infer that Fox was one of "various associates function [ing] as a continuing unit." *See id.*

Moreover, even if the enterprise allegations were sufficient, the Complaint cannot meet the requirement of alleging a pattern of racketeering activity by Fox. Under 18 U.S.C.1962(c) it is "unlawful for any person employed by or associated with any enterprise ... to conduct or participate ... in the conduct of such enterprise's affairs through a pattern of racketeering activity." Plaintiffs in a civil RICO suit must specify what activities comprise the alleged racketeering. *See DeJesus v. Sears, Roebuck and Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996), *cert. denied,* 519 U.S. 1007 (1996). Plaintiffs have asserted only one act of racketeering that was the proximate cause of the harm, *i.e.,* the conversion of plaintiffs' property into a marijuana growing facility. However, one "act" of converting a premises to a drug manufacturing facility cannot be divided into multiple acts of racketeering. *Cf. United States v. Biaggi,* 909 F.2d 662, 686 (2d Cir.1990) ("If the commission of an offense and its false denial could establish a 'pattern,' then every offense related to a criminal enterprise would be eligible for inclusion in a pattern whenever the offender falsely denied its commission. That is not what Congress intended."), *cert. denied,* 499 U.S. 904 (1991). Our Court of Appeals has cautioned that "courts must take care to ensure that the plaintiff is not artificially fragmenting a singular act into multiple acts simply to invoke RICO." *See Schlaifer,* 119 F.3d at 98.

The "two acts" requirement is a component of RICO's requirement that a pattern of racketeering activity be demonstrated. The legislative history of RICO indicates that Congress did not intend to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



include potentially isolated acts of criminal behavior. *See Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496 (1985). Though plaintiffs loosely reference "the production, manufacture, sale and other dealings in marijuana and controlled substances," there are no specific allegations of such activity on the part of Fox beyond involvement in the conversion of plaintiffs' property to the illegal purpose. In sum, plaintiffs have failed to allege a pattern with regard to defendant Fox.

*6 Even if plaintiffs had alleged more than one act of racketeering by Fox, their claims would fail because they have not alleged sufficient continuity under RICO. As described above, plaintiffs' allegations set forth one scheme, involving one identified defendant and one unidentified defendant, and two related victims, and plaintiffs have not demonstrated that there was a "threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Defalco,* 244 F.3d at 323 (quoting *Cofacredit,* 187 F.3d at 242). That the lease was limited to two years evidences that plaintiffs and defendant Fox foresaw and scheduled a termination of Fox's interest in the Fresh Meadows property. Plaintiffs' allegations indicate that the activity taking place on the property caused plaintiffs to be suspicious about what was occurring at their property. Given these facts, the court cannot accept plaintiffs' assertion that Fox could have expected that plaintiffs would allow their property to be so utilized for an indefinite amount of time without inspection. Nor have plaintiffs alleged a threat of continuing criminal activity beyond this particular scheme. There are no allegations that Fox has engaged in similar activity before or since the incidents detailed in the Complaint.

Even if the court accepted plaintiffs' argument that it must be presumed that Fox engaged in a pattern of drug distribution subsequent to the property conversion, plaintiff's allegations do not support the conclusion that Fox's conduct was the proximate cause of their injuries. *See Ideal Steel SupplyCorp. v. Anza,* 373 F.3d 251, 257 (2d Cir.2004) (civil RICO plaintiff "must plead and prove that the violation not only was the logical, or 'but for,' cause of the injury but also was its legally cognizable, or proximate, cause"); *Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 124 (2d Cir.2003) ("we have repeatedly emphasized that the reasonably foreseeable victims of a RICO violation are the

targets, competitors and intended victims of the racketeering enterprise."), *cert. denied,* 540 U.S. 1012 (2003). While plaintiffs were injured by the conversion of their house for illegal purposes, the actual "racketeering activity" was the production, packaging and distribution of marijuana, not the conversion. Plaintiffs have failed to demonstrate that they were the targets, competitors, or intended victims of the inherently illegal racketeering activity, the dealing in marijuana. In sum, the causal link between Fox's alleged conversion of the property and the plaintiffs' injury is simply too weak for plaintiffs to base a RICO claim upon it. For all of these reasons, plaintiffs' substantive RICO claim against Fox is dismissed.

### III. RICO Conspiracy

Claim 4 of the Complaint alleges conspiracy in violation of RICO between H. Molnar, F. Molnar, and Fox. Because plaintiffs have not adequately alleged a substantive violation of RICO against these defendants, the court also dismisses the RICO conspiracy claim against all of them. *See First Capital,* 385 F.3d at 182; *see also Discon, Inc. v. NYNEX Corp.,* 93 F.3d 1055, 1064 (2d Cir.1996), *vacated on other grounds,* 525 U.S. 128, 119 (1998).

### IV. Supplemental Jurisdiction

*7 The federal claims being dismissed, the court declines to exercise supplemental jurisdiction over the remaining state claims against all defendants. *See* 28 U.S.C. § 1367. Claims 5, 6, 7, 8, 9, and 10, for common law fraud, breach of contract, and negligence, are therefore dismissed.

### V. Leave to Replead

Federal Rule of Civil Procedure 15(a) directs that leave to amend should be "freely given." However, particularly in the case of pleading a claim under a statute such as RICO, which sets forth exacting pleading requirements, leave to replead can be denied where granting it would be futile. *See, e.g., In re American Express Co. Shareholders Litig.,* 39 F.3d 395, 402 (2d Cir.1994) (affirming district court's denial of leave to replead RICO claim where "(a)ppellants have not indicated how they could satisfy RICO's proximate cause requirement"). Such futility is present here. There is no reason to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



**(Cite as: 2005 WL 783255, \*7 (E.D.N.Y.))**

Page   6

conclude that plaintiffs can add allegations which could overcome the multiple deficiencies in the existing pleading. Leave to replead is therefore denied.

Conclusion

The motions to dismiss of plaintiffs Hasida Molnar, Ferenc Molnar, Expert Realty, and David Fox are granted. The Complaint is dismissed.

SO ORDERED.

Motions, Pleadings and Filings (Back to top)

. 1:03cv01725 (Docket)
(Apr. 09, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# TAB 12

64 F.3d 657 (Table)                                                                    **Page 1**
64 F.3d 657 (Table), 1995 WL 508894 (4th Cir.(Va.)), 1995-2 Trade Cases P 71,108,
RICO Bus.Disp.Guide 8878
**Unpublished Disposition**
**(Cite as: 64 F.3d 657, 1995 WL 508894 (4th Cir.(Va.)))**
c

Briefs and Other Related Documents

NOTICE:    THIS    IS    AN    UNPUBLISHED
OPINION.

(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing in
the Federal Reporter. Use FI CTA4 Rule 36 for
rules regarding the citation of unpublished
opinions.)

United States Court of Appeals, Fourth Circuit.
Jeannine Z. LEONARD; J. Gilbert Leonard;
Daniel J. Leonard, Plaintiffs-
Appellants,
and
John E. Leonard, Plaintiff,
v.
J.C. PRO WEAR, INCORPORATED, d/b/a Pro
Jersey; Craig Katchen; James L.
O'Llaughlin; Montgomery Ward & Company,
Defendants-Appellees.
No. 94-1498.

Aug. 29, 1995.

Appeal from the United States District Court for the
Eastern District of Virginia, at Alexandria.   Albert
V. Bryan, Jr., Senior District Judge. (CA-93-545-
A).

E.D.Va.

AFFIRMED.

ARGUED:    David    Thomas    Ralston,   Jr.,
LEONARD, RALSTON, STANTON & DANKS,
Washington, DC, for Appellants.    William Judah
Shieber, COVINGTON & BURLING, Washington,
DC, for Appellee Montgomery Ward;   John A.C.
Keith, David John Gogal, BLANKINGSHIP &
KEITH, P.A., Fairfax, VA, for Appellees Pro
Wear, et al.   ON BRIEF:   Thomas J. Stanton,
Mary   Gayle   Holden,   Seanan   B.   Murphy,
LEONARD, RALSTON, STANTON & DANKS,
Washington, DC, for Appellants.   Robert D. Wick,
COVINGTON & BURLING, Washington, DC, for
Appellee   Montgomery   Ward;    Elizabeth   V.C.

Morrogh,   BLANKINGSHIP   &   KEITH,   P.A.,
Fairfax, VA, for Appellees Pro Wear, et al.

Before WIDENER and MICHAEL, Circuit Judges,
and CHAPMAN, Senior Circuit Judge.

OPINION

PER CURIAM:

**\*\*1**  Appellants  Jeannine,  Gilbert,  and  Daniel
Leonard (plaintiffs) [FN1] appeal from the district
court's grant of summary judgment on numerous
counts of a complaint alleging RICO activity, 18
U.S.C. §§ 1961-1968, several antitrust violations,
15 U.S.C. § 1 (Sherman Act), 15 U.S.C. § 13(c)
(Robinson-Patman Act), a state-law illegal business
conspiracy, Va.Code §§ 18.2-499 to -500, state-law
false advertising, Va.Code § 18.2-216, and breach
of contract on the part of J.C. Pro Wear, Inc.,
Montgomery Ward & Co., Inc., James O'Laughlin,
and Craig Katchen.   For the reasons stated below,
we affirm the district court's grant of summary
judgment.

Our review of the grant of a motion for summary
judgment is *de novo*.   *Sylvia Development Corp. v.
Calvert County,* 48 F.3d 810, 817 (4th Cir.1995).
"Summary judgment is justified if, from the totality
of the evidence presented, including pleadings,
depositions,   answers   to   interrogatories,   and
affidavits, the court is satisfied that there is no
genuine factual issue for trial and the moving party
is entitled to judgment as a matter of law."   *Sylvia
Development,* 48 F.3d at 817;   see Fed.R.Civ.P.
56(c).    In addition, this court must " 'draw any
permissible inference from the underlying facts in
the light most favorable to the party opposing the
motion,' "   *Sylvia Development,* 48 F.3d at 817
(quotation omitted), but "the non-moving party must
do more than present a 'scintilla' of evidence in its
favor....    [It] must present sufficient evidence ...
that 'reasonable jurors could find by a
preponderance of the evidence' for the non-
movant....[I]f the evidence is 'merely colorable' or
'not significantly probative,' a motion for summary
judgment may be granted." *Sylvia Development,* 48
F.3d at 818 (quotations omitted).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



64 F.3d 657 (Table)
(Cite as: 64 F.3d 657, 1995 WL 508894, **1 (4th Cir.(Va.)))

Page 2

Taking all facts and reasonable inferences in the light most favorable to plaintiffs, the facts of this case are as follows. Pro Wear, con trolled by Katchen and O'Laughlin and Karen, O'Laughlin's wife, entered into a Sidetrips Licensing Agreement with Montgomery Ward in February 1988, by which Pro Wear would lease space (kiosks) in Montgomery Ward's stores to sell licensed athletic clothing and related items. The Sidetrips Agreement was superseded by a Master Licensing Agreement in November 1989. Under both agreements, Montgomery Ward would receive a fee of 12-13% of gross sales from each Pro Jersey kiosk, and the Master Agreement included a provision for minimum rent as well. Pro Wear would then solicit and procure sublicensees to operate the Pro Jersey kiosks in certain Montgomery Ward stores.

In August 1988, Pro Wear advertised in several Virginia newspapers regarding the opportunity to "own your own" sports apparel shop. The advertisement represented that there would be "no minimum rent," and that one could "net $50-$70,000 1st year" for a "$39,500 investment." Plaintiffs responded to the advertisement and began discussions with Pro Wear regarding the purchase of Pro Jersey licenses. During these discussions, and in advertising and promotional documents mailed by Katchen and O'Laughlin on behalf of Pro Wear, a number of representations were made to the Leonards, including that they could net $50 to $70,000 annually per kiosk, that they needed no prior retail sales experience to operate a kiosk, and that they could build up equity in each kiosk and freely sell their ownership interest at a profit. In addition, the Pro Wear defendants omitted several facts during these negotiations, including that the defendants conducted no market analysis of the proposed kiosks, that operation of a kiosk entailed financial risks, and that resales of Pro Jersey businesses were subject to approval by Montgomery Ward.

**2 Plaintiffs entered into several sublicense contracts with Montgomery Ward by signing supplements to the licensing agreement stating their understanding that they were bound by the provisions of the licensing agreement.

Plaintiffs immediately began experiencing financial difficulties in operating their kiosks. As a result, in October 1992 O'Laughlin wrote a letter to Montgomery Ward suggesting that Montgomery Ward "[s]hrink [Gilbert Leonard's store in] Springfield A.S.A.P." Montgomery Ward did so. In addition, Pro Wear refused to obtain or to guarantee payment for merchandise for several of John and Jeannine Leonard's kiosks, despite an alleged agreement to do so, upon learning that the Leonards owed Pro Wear a sum of money.

Moreover, beginning in April 1990, there was a dispute over the equity interest of sublicensees in the Montgomery Ward-Pro Wear licenses and the power of sublicensees to transfer or sell their interests. In July 1990, Montgomery Ward advised Pro Wear, in accordance with the Licensing Agreements, that sublicensees had no right to sell their sublicenses but that Montgomery Ward would permit such sales during a single 90-day period, after which it would enforce the transfer restrictions in the Master Agreement. Pro Wear notified sublicensees that, after the 90-day period, they could sell their fixtures and furnishings for a price not to exceed $25,000 and their inventories as they wished, but that "you can not sell your lease," and that any party interested in assuming a Pro Jersey kiosk would have to be approved by Pro Wear and Montgomery Ward.

Finally, Pro Wear, acting as the plaintiffs' agent for the procurement of supplies, accepted commissions or discounts from several suppliers on the purchase of inventories by or for the plaintiffs. These commissions and discounts were undisclosed to the plaintiffs. In exchange for these commissions and discounts, Pro Wear guaranteed plaintiffs' payment of the purchase price for supplies, although plaintiffs claim that these guarantees were required by the contracts between Pro Wear and plaintiffs.

The plaintiffs' businesses failed, and they suffered significant financial losses. They brought suit against Pro Wear, Montgomery Ward, Katchen, and O'Laughlin on numerous legal theories. On cross-motions for summary judgment, the district court granted summary judgment to the defendants on all but one count of the complaint, which count was subsequently settled. The district court entered a final order and the plaintiffs appealed therefrom.

I. *Breach of Contract*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Plaintiffs allege that their contract with Pro Wear consisted of a composite of various oral and written agreements, the newspaper advertisements, and the abovementioned representations and omis sions, among others.   This argument is without merit. The Sidetrips and the Master Licensing Agreements, both of which were provided to, read by, and subscribed by plaintiffs, contained integration clauses, stating that no prior understandings were part of the agreement and no subsequent modifications could be made unless in writing and signed by all parties.   There were several ancillary written agreements made between Pro Wear and the sublicensees, but none of them is relevant to the claims made by plaintiffs.

**3 Moreover, all actions allegedly taken by the defendants after plaintiffs entered the Licensing Agreements were properly within the terms of those agreements.   Even if the plaintiffs believe they were fraudulently induced to enter the Licensing Agreements, they did not raise that claim and we express no opinion as to it.   We find no evidence in the record to support plaintiffs' claim of breach of contract by Pro Wear.   Nothing in the licensing agreements or the ancillary contracts promised plaintiffs any return of capital, any equity interest, or any maximum investment.   The district court so found, and we agree.   We, like the district court, are unwilling and unable to release plaintiffs from the terms of their bargain because they claim that they did not understand the plain language of those terms.   Accordingly, we affirm the decision of the district court that there was no valid claim of breach of contract against Pro Wear.

In this context, we will now address plaintiffs' remaining claims.

II. *RICO*

Plaintiffs allege that Katchen, O'Laughlin, and Montgomery Ward participated in Pro Wear's solicitation of potential investors for the purpose of defrauding plaintiffs and others, in violation of 18 U.S.C. § 1962(c) (count one), and that Montgomery Ward collected and received income derived from a RICO enterprise, in violation of 18 U.S.C. § 1962(a) (count two).   We agree with the district court that plaintiffs' evidence of a pattern of racketeering activity is insufficient to sustain these claims.

Regarding Katchen and O'Laughlin, we agree with the district court that no pattern of racketeering activity has been established by the plaintiffs.   For such a pattern to exist, there must be "a threat of continued criminal activity," *H.J. Inc. v. Northwestern Bell,* 492 U.S. 229, 239 (1989), and a showing that "ongoing unlawful activities ... pose a special threat to social well-being." *Menasco, Inc. v. Wasserman,* 886 F.2d 681, 684 (4th Cir.1989).

In contrast, the scheme allegedly engaged in by Katchen and O'Laughlin was narrowly focused, with the single purpose of procuring the Leonards' investment in sublicenses for the Montgomery Ward licenses.   See *International Data Bank, Ltd. v. Zepkin,* 812 F.2d 149, 155 (4th Cir.1987).   There is no evidence in the record that anyone other than the Leonards was defrauded or was the subject of a scheme to defraud by Katchen and O'Laughlin.   See *Myers v. Finkle,* 950 F.2d 165, 169 (4th Cir.1991); *Menasco,* 886 F.2d at 684; *Zepkin,* 812 F.2d at 154 (prospectus defrauding ten investors does not constitute RICO pattern).   Moreover, the Leonards have presented no evidence of fraud other than the advertisements,         solicitation         materials, representations, and omissions made by Pro Wear in inducing the Leonards to invest in the kiosks, all of which occurred over a seven-month period.   This period of time has been held to be insufficient to constitute a RICO pattern in those circuits that have addressed the issue.   See *Primary Care Investors, Seven, Inc. v. PHP Healthcare Corp.,* 986 F.2d 1208, 1215 (7th Cir.1993) (eleven-month scheme "insubstantial" under RICO); *Hughes v. Consol-Pennsylvania Coal Co.,* 945 F.2d 594, 609-11 (3d Cir.1991) (twelve months insubstantial for RICO purposes), *cert. denied,* 60 U.S.L.W. 3600, 3812, 3815 (U.S. June 1, 1992); see also *H.J. Inc.,* 492 U.S. at 242 ("Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy [the continuity] requirement."); *Menasco,* 886 F.2d at 684 (noting that the fraudulent transaction in that case "took place over approximately one year," and stating that "[c]learly, these acts do not constitute" a RICO pattern).   While we do not hold that a seven-month scheme is *per se* insufficient to establish a RICO claim, we think it evident on these facts that the district court properly granted summary judgment to Katchen and O'Laughlin on count one.

**4 Accordingly, we find insufficient evidence that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



64 F.3d 657 (Table)                                                                      **Page   4**
**(Cite as: 64 F.3d 657, 1995 WL 508894, **4 (4th Cir.(Va.)))**

Montgomery Ward was participating in RICO activity. We also note that there is almost no evidence in the record that Montgomery Ward knew of any of the alleged acts of fraud committed by Katchen and O'Laughlin. We thus affirm the grant of summary judgment as to Montgomery Ward on count one.

Because there was insufficient evidence of any RICO activity from which Montgomery Ward could have received proceeds, the district court was correct in granting summary judgment to Montgomery Ward on count two.

III. *Antitrust*

A. *Sherman Act*

The district court granted summary judgment to the defendants on plaintiffs' Sherman Act claims because there was no injury to competition and because defendants' actions with respect to these claims were permissible under both Licensing Agreements.

Initially, we agree with the district court that the defendants' restrictions on the resale or assignment of plaintiffs' sublicenses were permissible under the plain language of the Licensing Agreements. Plaintiffs allege in count three that these contract restrictions constitute an unlawful restraint of trade. This assertion is patently without merit. Contrary to plaintiffs' assertion, they did not bargain for the right to freely assign their interests. Plaintiffs have demonstrated no anticompetitive effects of the contractual no-assignment restrictions. We agree with the reasoning of *Clarke v. Amerada Hess Corp.,* 500 F.Supp. 1067, 1072 (S.D.N.Y.1980), that "[t]he problem with [plaintiff's] theory is that … these 'restraints' flow from one source: [Montgomery Ward's] retention of property rights in the dealership. " The contractual prohibition on assignment or resale in this case is not an antitrust violation, and we affirm the district court's grant of summary judgment on count three.

In count four, plaintiffs allege that the $25,000 limit on the resale price of sublicensees' fixtures and furnishings constitutes illegal price-fixing and is a *per se* violation of the Sherman Act. Initially, there is no record evidence that Montgomery Ward was in any way involved in the establishment of this

$25,000 limit on furniture and fixtures resales, and count four was properly dismissed as to it. Thus, there is no evidence of any combination or conspiracy between Pro Wear and Montgomery Ward with respect to the $25,000 limit. See, e.g., *Stephen Jay Photography, Ltd. v. Olan Mills, Inc.,* 903 F.2d 988, 994 (4th Cir.1990) ("Concerted activity is an essential element of a section 1 claim…. To survive a motion for summary judgment in an antitrust conspiracy case, a plaintiff must establish that there is a genuine issue of fact whether the defendant entered into an illegal conspiracy."). So there is no liability of Montgomery Ward on that account.

To the extent that Pro Wear may unilaterally have purported to impose a vertical restraint on the resale price of its sublicensees' fixtures and furniture, it did so without any authority whatsoever, contractual or otherwise. Plaintiffs purchased their fixtures and furniture independently of the Licensing Agreements, and so far as this record shows remained free to remove their fixtures and furnishings and resell these items at whatever price they might obtain on the open market. Although Pro Wear's conduct may be in violation of its contract with plaintiffs or other law, we have no doubt that the unilateral and unauthorized imposition of a resale price maximum on plaintiffs' fixtures and furnishings does not constitute a contract, combination, or conspiracy in restraint of trade for purposes of the antitrust laws. Accordingly, the district court correctly granted summary judgment to defendants on count four.

**5 Plaintiffs do not argue in their briefs any impropriety of the district court's grant of summary judgment on count five, which alleged an illegal price-fixing agreement between Pro Wear and one of the Pro Jersey suppliers, Starter, so we affirm the district court's grant of summary judgment on that count.

B. *State-Law Business Conspiracy*

Count eight alleges that Montgomery Ward and Pro Wear conspired to reduce the values of plaintiffs' businesses and force them out of business, in violation of the Virginia Business Conspiracy Act, Va.Code §§ 18.2-499 to -500. It is apparent from the record that plaintiffs' businesses were not operating successfully from the outset, and thus that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



64 F.3d 657 (Table)
(Cite as: 64 F.3d 657, 1995 WL 508894, **5 (4th Cir.(Va.)))

Montgomery Ward had a business justification for being concerned about the loss of profits from those businesses. The only evidence that Montgomery Ward actually interfered with the operation of any of plaintiffs' businesses, and thus that Montgomery Ward and Pro Wear conspired to do anything at all, is the letter from O'Laughlin to a Montgomery Ward employee referring to Gilbert Leonard as a "scum bag" and suggesting that the size of Leonard's store in Springfield, Virginia be reduced, followed nine days later by a letter from Montgomery Ward to O'Laughlin informing him that, in accordance with the terms of the license agreement, Montgomery Ward was reducing the size of the kiosk in Springfield. Montgomery Ward had a contractual right to make such a reduction in the leased space on seven days' notice, which notice was given. Thus, Montgomery Ward's decision to reduce the size of the Springfield location was a valid exercise of its contractual rights.

However, plaintiffs argue that the recent opinion in *Commercial Business Systems, Inc. v. Bellsouth Services, Inc.,* 453 S.E.2d 261 (Va.1995), lowers the standard of proof of a business conspiracy under Virginia law by making it possible to establish an illegal business conspiracy by proving that lawful acts were committed with the motive to "willfully and maliciously injur[e] another in his ... trade [or] business." Va.Code §§ 18.2-499, 500. In the *Commercial Business* case, the court reversed and remanded the trial court's grant of summary judgment to defendants on the business-conspiracy claims because the Virginia Business Conspiracy statutes do not require proof of actual malice but only legal malice, *i.e.* that a defendant "acted intentionally, purposely, and without lawful justification," 453 S.E.2d at 267, and because it is not necessary for a plaintiff to show that defendant's "primary and overriding purpose was to injure [plaintiff's] trade or business," (emphasis omitted) in a case where "all of [defendant's] motives were illegitimate." 453 S.E.2d at 267.

In contrast, in this case plaintiffs have presented no evidence of improper motive. Although the O'Laughlin letter clearly casts Gilbert Leonard in a derogatory light, the mere fact that O'Laughlin did not like Leonard, standing alone, cannot constitute evidence of an unlawful motive. Moreover, the letter also makes reference (albeit cryptic) to Leonard's poor business acumen, thus evidencing a

legitimate motive for reducing the size of his Springfield operation. Plaintiffs present no other evidence of any unlawful motive, and thus no evidence that defendants acted in concert with malice, as required by the Business Conspiracy Act. See *Commercial Business,* 453 S.E.2d at 267.

**6 The *Commercial Business* case did not change the requirement that in Virginia, "[t]here can be no conspiracy to do an act which the law allows. Thus, to survive demurrer, an allegation of conspiracy ... must at least allege an unlawful act or an unlawful purpose." *Hechler Chevrolet, Inc. v. General Motors Corp.,* 337 S.E.2d 744, 748 (Va.1985) (affirming lower court's sustaining of demurrer to conspiracy claim where franchisor legally terminated or refused to renew franchise with no unlawful purpose). Plaintiffs have simply failed to meet their burden of showing any unlawful motive or legal malice in defendants' performance of what was undoubtedly a legal act.

### C. Robinson-Patman

Plaintiffs assert in count ten that Pro Wear violated Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c), which proscribes the payment or receipt of "anything of value as a commission, brokerage or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise," whether the payment of such compensation is made to a party to the transaction or to an "agent, representative, or other intermediary" of a party other than the party making the payment. The district court found that Pro Wear's acceptance of commissions and discounts from the sublicensees' suppliers was not price discrimination for purposes of Section 2(c) and that in any event the commissions and discounts were paid for services rendered by Pro Wear, namely the guarantee by Pro Wear of sublicensees' payment for the supplies. We agree with the district court that there was no antitrust injury alleged by plaintiffs in this case, see *Metrix Warehouse, Inc. v. Daimler-Benz AG,* 828 F.2d 1033, 1046-47 (4th Cir.1987), *cert. denied,* 486 U.S. 1017 (1988); 15 U.S.C. § 15(a), because there is no evidence that plaintiffs paid more than their competitors as the result of these discounts and commissions to Pro Wear. See *Metrix Warehouse,* 828 F.2d at 1046-47 ("[I]t was MBNA's burden to demonstrate a causal connection

64 F.3d 657 (Table)
(Cite as: 64 F.3d 657, 1995 WL 508894, **6 (4th Cir.(Va.)))

Page  6

between Metrix's unlawful program and its lost profits.").

Moreover, plaintiffs argue that the evidence supports a claim for commercial bribery under Section 2(c). Assuming without deciding that such a claim exists, see *Stephen Jay Photography,* 903 F.2d at 993 (discussing the existence *vel non* of a commercial-bribery claim under Section 2(c)), we find no evidence to support it. There is no evidence that the commissions paid to Pro Wear were intended to or did unlawfully influence or corrupt Pro Wear's conduct. In fact, plaintiffs do not dispute that the commissions were paid in exchange for Pro Wear's guarantee of the sublicensees' payment for suppliers' goods, but argue instead that Pro Wear was contractually obligated to guarantee the sublicensees' purchases in any event. [FN2]

We do not think that a pre-existing contractual obligation is relevant to an analysis under Section 2(c), which states that such commissions are legal if given in exchange "for services rendered in connection with the sale or purchase of ... merchandise." It seems clear that the sublicensees' suppliers paid Pro Wear in exchange for Pro Wear's guarantee, a service rendered in connection with the sale of the suppliers' merchandise. Some sublicensees had this service, some did not. The payments were in exchange for services rendered, whether Pro Wear's acceptance of them was proper under agency principles or not.

**7 Thus, the plaintiffs have not shown any evidence of "actual injury of a type that Section 2(c) was designed to prevent." *Metrix,* 828 F.2d at 1046. The district court's grant of summary judgment to Pro Wear on count ten is accordingly affirmed.

IV. *False Advertising*

Plaintiffs assert in count nine that Pro Wear's advertisements in Virginia newspapers constituted false advertising under Va.Code §§ 18.2-216 (making false advertising unlawful) and 59.1-68.5 (giving a private right of action under Section 18.2-216). The district court found that this claim was barred by the two-year statute of limitations applicable to fraud claims, Va.Code § 8.01-243(A), and we agree.

V.

The plaintiffs' brief lists six principal assignments of error, three of which are subdivided into eleven sub-assignments of error. We have mentioned each with particularity where the assignment deserves mention. In all events, we are of opinion that none of the assignments of error, whether or not mentioned with particularity or otherwise, are meritorious.

The judgment of the district court is accordingly

*AFFIRMED.*

FN1. The original plaintiffs were John, Jeannine, Gilbert, and Daniel Leonard. John Leonard has not appealed from the final order of the district court, and thus we need not decide the validity of the order of dismissal of John's claims with prejudice, which was entered after the notice of appeal was filed in this action. Defendants claim that because John Leonard's claims have been dismissed, his wife, Jeannine, has no interest in any sublicense and thus is not a proper party to this appeal. Because the complaint alleged that Mrs. Leonard did purchase interests in several of the sublicenses, Mrs. Leonard's claims do not depend upon the survival of her husband's. Thus, the defendants' suggestion that Mrs. Leonard is not a proper party to this appeal is a challenge to the federal courts' subject matter jurisdiction on the basis of her standing to sue these defendants. Such a challenge cannot be waived. See *Smith v. County of Albemarle,* 895 F.2d 953, 954 (4th Cir.), *cert. denied,* 498 U.S. 823 (1990); Fed.R.Civ.P. 12(h)(3). However, the Pro Wear defendants admitted in their answer that Jeannine Leonard did purchase, with her husband, several interests in Pro Jersey kiosks, and the record evidence cited by the defendants to refute this jurisdictional fact does not establish that Mrs. Leonard owned no interest in any Pro Jersey location. Whether she owned an interest in each of them, as the complaint alleges, need not be decided here, because that is not a jurisdictional question but an issue to be proved on the merits of her claims. It is sufficient for purposes of determining jurisdiction that Mrs. Leonard has established without dispute that she owned some interest in the kiosks. We thus reject the challenge to Mrs. Leonard's standing to sue these defendants.

FN2. The Appendix references relied upon by

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



64 F.3d 657 (Table)
**(Cite as: 64 F.3d 657, 1995 WL 508894, \*\*7 (4th Cir.(Va.)))**

plaintiffs (J. A.1120, 1127-35) do not support in fact
that Pro Wear had otherwise contractually agreed to
guarantee the plaintiffs' purchase of merchandise.

64 F.3d 657 (Table), 1995 WL 508894 (4th
Cir.(Va.)), 1995-2 Trade Cases P 71,108, RICO
Bus.Disp.Guide 8878 Unpublished Disposition

Briefs and Other Related Documents (Back to top)

. 1994 WL 16048763  (Appellate Brief) Reply Brief
of Appellants (Sep. 23, 1994)Original Image of this
Document (PDF)

. 1994 WL 16048762   (Appellate Brief) Brief of
Appellee Montgomery Ward & Co., Incorporated
(Aug. 26, 1994)Original Image of this Document
with Appendix (PDF)

. 1994 WL 16048765   (Appellate Brief) Brief of Pro
Wear Appellees (Aug. 26, 1994)Original Image of
this Document with Appendix (PDF)

. 1994 WL 16048764   (Appellate Brief) Brief of
Appellants (1994)Original Image of this Document
with Appendix (PDF)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

