# TAB 13

Not Reported in F.Supp.2d  
Not Reported in F.Supp.2d, 1999 WL 118773 (E.D.N.Y.)  
**(Cite as: 1999 WL 118773 (E.D.N.Y.))**

Page 1

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, E.D. New York.  
Awilda MOY, Horatio Francis, Margaret Beaulieu and Olivia Lewis, individually  
and on behalf of all others similarly situated,  
Plaintiffs,  
v.  
Albert A. TERRANOVA, Melany K. Terranova, David Ruggieri, Jule J. Goldberg, Richard D. Griffiths, Thomas C. Creasy, Jr., Gaspar V. Garcia, John Doe, Jane Doe and John Doe, Inc., Defendants.  
No. 87 CV 1578(SJ).

March 2, 1999.  
Willkie Farr & Gallagher, New York, By Roger Netzer, Esq., for Class Plaintiffs.

Burstein & Fass LLP, New York, By Judd Burstein, Esq., for Defendants Albert A. Terranova and Melany K. Terranova.

MEMORANDUM AND ORDER

JOHNSON, District J.

*1 Plaintiffs Awilda Moy, Horatio Francis, Margaret Beaulieu and Olivia Lewis ("Plaintiffs") bring this class action, individually and on behalf of all others similarly situated, against Albert and Melany Terranova and other defendants ("Defendants"). Plaintiffs allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d), as well as state law causes of action. Presently before the Court is the Terranovas' motion to dismiss Plaintiffs' Third Amended Complaint ("Complaint") in its entirety for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the following reasons, the motion is granted in part with respect to Plaintiffs' RICO claims and their cause of action for "common law fraud and misrepresentation."

BACKGROUND [FN1]

FN1. A prior opinion in this case contains a more detailed statement of the factual background. *Moy v. Adelphi Institute,* 866 F.Supp. 696 (E.D.N.Y.1994).

Plaintiffs were formerly enrolled at Adelphi Institute, Inc. ("Adelphi"), which owned and operated private business and data processing schools throughout the United States until its bankruptcy in 1987. The schools-- including six facilities in the New York City boroughs of Brooklyn, Queens, and Manhattan (the "New York facilities")--purported to offer instruction in accounting, business administration, secretarial services, computer programming and word processing to individuals seeking entry-level positions in business. Adelphi was allegedly part of an interstate network of entities that included similar business and vocational schools throughout the United States (the "interstate network"), some of which were owned and operated by other Defendants in the case.

Albert Terranova ("Terranova") was Chairman, Chief Executive Officer and principal shareholder (with his wife Melany) of Adelphi. [FN2] He was authorized by the New York State Education Department to operate Adelphi's New York facilities. He was also Chief Executive Officer, Chairman of the Board and stockholder of Midwest Educational Systems, Inc., which owned and operated two other schools in the alleged interstate network, National College and Huron College.

FN2. Melany Terranova is now named as a Defendant only for purposes of the community-property laws of the State of Arizona. Third Amended Complaint ¶ 18. Hence, the case against her will stand or fall together with that against her husband. References hereinafter to "Terranova" will therefore refer to Albert Terranova only.

The complaint avers that Adelphi failed to provide the vocational training and placement services promised to enrolling students. Instead, Terranova and the other Defendants allegedly used the schools as a vehicle in a scheme to unlawfully obtain large sums of federal and state student grant monies and federally guaranteed student loan funds. Defendants purportedly sent salesmen into poor neighborhoods to recruit students on a commission basis, and induced students to enroll and apply for state and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



federal student assistance by systematically making fraudulent representations, such as: (1) attending Adelphi's New York facilities would enable Plaintiffs to obtain high-paying jobs, which would be available upon completion of their studies; (2) state and federal grants would cover their costs, and no loans would be needed; (3) Plaintiffs would receive a monthly stipend within weeks of enrollment; and (4) Plaintiffs would be given a high school equivalency diploma (G.E.D.) as part of the program. Defendants allegedly administered sham entrance examinations and admitted students into the program without regard to whether they could potentially benefit from the courses offered.

*2 Once recruited, Plaintiffs were forced to obtain student loans to pay for their classes. Plaintiffs allege that class instructors were unqualified and unlicensed or were replaced with unqualified substitutes when absent, and that Defendants canceled classes or reduced the number of hours of instruction. In addition, they contend that Defendants failed to furnish equipment necessary to complete the curriculum and did not provide job placement assistance. Plaintiffs claim that the Defendants' alleged failure to provide the promised education caused damages that include the value of Plaintiff's lost time while enrolled at Adelphi, monies paid toward tuition, and the amount of their indebtedness as a result of the loans.

On May 5, 1993, Defendants filed a motion to dismiss the original complaint in this action, which alleged eight claims for relief under federal and state law. The motion was granted in part as to claims alleging violation of Title IV of the Higher Education Resources and Assistance Act, 20 U.S.C. § 1070, negligent misrepresentation and breach of fiduciary duty. *Moy v. Adelphi Institute,* 866 F.Supp. 696 (E.D.N.Y.1994). The complaint was subsequently amended several times, most recently in August 1997, to allege that Terranova was the alter ego of Adelphi, drop RICO claims under 18 U.S.C. §§ 1962(a) and (b) and withdraw claims previously asserted against Melany Terranova (she remains a defendant only for the purposes of the community-property laws of the State of Arizona). Terranova then filed the present motion.

DISCUSSION
I. Standard for Motion to Dismiss

In considering a motion to dismiss made pursuant to Rule 12(b)(6), the court must construe all allegations in the complaint as true and must make all reasonable inferences in the light most favorable to the plaintiff. *See Jenkins v. McKeithen,* 395 U.S. 411, 421 (1969); *LaBounty v. Adler,* 933 F.2d 121, 123 (2d Cir.1991). Dismissal under Rule 12(b)(6) should be granted only when it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Yusuf v. Vassar College,* 35 F.3d 709, 713 (2d Cir.1994) (citing *Conley v.. Gibson,* 355 U.S. 41, 45-46 (1957)).

II. Civil RICO

The RICO statute provides, in relevant part:
It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.
18 U.S.C. § 1962(c). An "enterprise" is defined to include "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity," while a "person" may include "any individual or entity capable of holding a legal or beneficial interest in property." *Bernstein v. Misk,* 948 F.Supp. 228, 235 (E.D.N.Y.1997) (quoting 18 U.S.C. §§ 1961(3) and (4)).

*3 To state a claim for damages under section 1962(c), Plaintiffs must first allege that "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in, (6) an enterprise (7) the activities of which affect interstate or foreign commerce." *Id.* at 234 (citing *Moss v. Morgan Stanley, Inc.,* 719 F.2d 5, 17 (2d Cir.1983), *cert. denied,* 465 U.S. 1025 (1984)). Second, they must allege that they were "injured in [their] business or property by reason of a violation of § 1962." *Bernstein,* 948 F.Supp. at 234.

The Third Amended Complaint states that Defendants "have conducted and participated in, directly or indirectly, the affairs of the following enterprises through a pattern of racketeering activity ... (1) Adelphi Institute; (2) the association in fact

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d  
(Cite as: 1999 WL 118773, *3 (E.D.N.Y.))

Page 3

comprised of the interstate network; and (3) the association in fact comprised of Adelphi's New York facilities." Third Amended Complaint ¶ 86. It also alleges that Terranova was the alter ego of Adelphi. *Id.* at ¶¶ 80-81. Terranova presents two arguments in support of dismissing Plaintiffs' RICO claims: (1) that Plaintiffs fail to allege a distinct RICO "enterprise" as required for both claims; and (2) that they fail to allege an agreement by Terranova to commit two predicate acts in furtherance of the enterprise, as required to establish conspiracy to engage in a pattern of racketeering under section 1962(d).

A. Adelphi or the New York facilities as a distinct enterprise

It is well established that "the person and the enterprise referred to must be distinct" and, accordingly, "a corporate entity may not be both the RICO person and the RICO enterprise under section 1962(c)." *E.g., Riverwoods Chappaqua Corp. v. Marine Midland Bank,* 30 F.3d 339, 344 (2d Cir.1994); *Bennett v. U.S. Trust Co.,* 770 F.2d 308, 315 (2d Cir.1985), *cert. denied,* 474 U.S. 1058 (1986). Furthermore, since a corporation only functions through its employees and agents, "this distinctiveness requirement may not be circumvented by alleging a conspiracy between the defendant [corporation] and its own employees or agents carrying on the regular affairs of the defendant." *China Trust Bank of New York v. Standard Chartered Bank, PLC,* 981 F.Supp. 282, 286 (S.D.N.Y.1997); *see Riverwoods,* 30 F.3d at 344-45 (bank and two of its loan officers could not form RICO enterprise) *Hitchcock v. Woodside Literary Agency,* 15 F.Supp.2d 246, 250 (E.D.N.Y.1998) (corporation and its owner-operators could not form enterprise). The distinct enterprise requirement applies equally to Plaintiffs' claim under section 1962(d); "if 'the prior claims do not state of cause of action for substantive violations of RICO,' then a RICO conspiracy claim necessarily 'does not set forth a conspiracy to commit such violations." ' *Schmidt v. Fleet Bank,* 16 F.3d 340, 353 (S.D.N.Y.1998) (quoting *Discon, Inc. v. NYNEX Corp.,* 93 F.3d 1055, 1064 (2d Cir.1996), *vacated on other grounds,* 119 S.Ct. 493 (1998)).

*4 With respect to Plaintiffs' allegation that the enterprise in this case consisted of Adelphi, the distinct enterprise requirement has clearly not been satisfied. Far from alleging a distinct RICO person and enterprise, the Third Amended Complaint explicitly states that Terranova and Adelphi are one and the same. [FN3] Nor does the alleged association in fact of Adelphi's New York facilities constitute an enterprise distinct from Terranova. The Second Circuit has held that the logic of *Riverwoods* prohibits a RICO claim based upon an alleged enterprise comprised of "legally separate entities" if such entities "were acting within the scope of a single corporate structure, guided by a single corporate consciousness." *Discon,* 93 F.3d at 1064 ("It would be inconsistent for a RICO person ... to be subject to liability simply because it is separately incorporated, whereas otherwise it would not be held liable under *Riverwoods.*"); *see also China Trust Bank,* 981 F.Supp. at 286-87 (dismissal warranted where enterprise consisted solely of defendant bank and its New York branch, which was alleged to operate within same corporate structure). A fortiori, the facilities at which Adelphi conducted business in New York--which Plaintiffs concede were not even separate legal entities-- cannot form an enterprise distinct from Adelphi.

> FN3. *See, e.g.,* Third Amended Complaint at ¶ 81 ("Terranova was the alter ego of Adelphi because corporate formalities were regularly disregarded.... Members of the board of directors, other than Terranova, did not function in any meaningful way as directors.").

Plaintiffs contend that they have mitigated the distinctiveness problem by not naming Adelphi as a defendant, arguing that a controlling shareholder is distinct from the corporation he or she controls and therefore can be held liable under *Riverwoods.* Their reliance on *Securitron Magnalock Corp. v. Schnabolk,* 65 F.3d 256 (2d Cir.1995), *cert. denied,* 516 U.S. 1114 (1996) and *Sluka v. Estate of Herink,* No. 94 Civ. 4999, 1996 WL 612462 (E.D.N.Y. Aug. 13, 1996) for this proposition is misplaced. In *Securitron,* the Second Circuit held that two corporations and an individual (Schnabolk) who owned or operated each of them constituted an association-in-fact enterprise and that Schnabolk, along with each corporation, was also a proper RICO "person." 65 F.3d at 262-63. Unlike the present case, *Securitron* involved corporations that were expressly found to be distinct from one another, and thus the alleged enterprise, "while consisting of no more than those three RICO

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



persons, [was] distinct from each of them." *Id.* at 263 (noting that "these corporations were active, operating businesses rather than two stacks of stationary"). Since there was only a "partial overlap" between each RICO person and the RICO enterprise, dismissal pursuant to *Riverwoods* was not warranted. *See Riverwoods,* 30 F.3d at 344; *Jacobson v. Cooper,* 882 F.2d 717, 720 (2d Cir.1989).

*Sluka* similarly involved an alleged association-in-fact between several corporations and their individual shareholders, officers or agents. The corporate defendants were alleged to be alter egos of one another and of the deceased Herink (their former controlling shareholder and operator). The court dismissed the complaint pursuant to Fed.R.Civ.P. 9(b) for failure to plead fraud with sufficient particularity and held that, in any amended pleading, the plaintiffs must either drop the corporations--but not Herink--as defendants or eliminate the alter ego allegation. 1996 WL 612462, at **5-8. While Plaintiffs rely on this decision to argue that the rationale expressed in *Riverwoods* affects only the liability of corporations under section 1962(c), rather than individuals, the court did not directly address that issue; nor was such a conclusion necessary to its decision. [FN4] Other courts have squarely rejected Plaintiffs' interpretation of *Riverwoods,* and Plaintiff's position appears to be foreclosed by the opinion in *Discon. See Discon,* 93 F.3d at 1064 (stating that it would be "especially inappropriate" to hold that individual defendants "acting on behalf of the enterprise-corporation" are "distinct" from the enterprise); *CPF Premium Funding, Inc. v. Ferrarini,* No. 95 Civ. 4621, 1997 WL 158361, at **12-13 (S.D.N.Y. April 3, 1997) ("*Discon* leaves little room for doubt: when an individual ... has acted in a corporation's behalf, he does not function as an entity distinct from that corporation, and should not be held liable under § 1962(c)."); *see also Protter v. Nathan's Famous Sys. Inc.,* 925 F.Supp. 947, 956 (E.D.N.Y.1996) (holding, prior to *Discon,* that corporate officers acting in the course of their employment did not form an association-in-fact enterprise distinct from the corporation and could not be held individually liable under RICO). [FN5]

> FN4. The court described the allegations in the complaint as solely encompassing acts carried out by the individual defendants in the course of the corporations' business. *Id.* at *7. Since it rejected as inconsistent with *Riverwoods* the proposition that "a corporation and its employees, officers or directors may constitute a RICO enterprise distinct from the corporation itself," *see id.* (quotation omitted), the court appears to have assumed that the *Riverwoods* limitation on RICO liability applies only to instances where the corporation, rather than an individual officer or agent, is alleged to be the RICO "person" as well as the enterprise. However, this distinction was not expressly stated and would have been dictum in any event, since the court had already concluded that the complaint should be dismissed under Rule 9(b).

> FN5. The only other cases from this circuit cited by Plaintiffs were decided before *Discon* and are thus inapposite. *See Toto v. McMahon, Brofman, Morgan & Co.,* No. 93 Civ. 5894, 1995 WL 46691, at *7 (S.D.N.Y. February 7, 1995); *United States v. Weinberg,* 656 F.Supp. 1020, 1024 (E.D.N.Y.1987).

B. The interstate network as a distinct enterprise

*5 Plaintiffs have not pleaded sufficient facts to state a claim alleging that the interstate network constituted a RICO enterprise. The Supreme Court has explained that an enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct," and is "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette,* 452 U.S. 576, 583 (1981). "Courts in the Second Circuit should look to the 'hierarchy, organization, and activities' of an association-in-fact to determine whether 'its members functioned as a unit.' " *Bernstein,* 948 F.Supp. at 235 (quoting *United States v. Coonan,* 938 F.2d 1553, 1560-61 (2d Cir.1991), *cert. denied,* 503 U.S. 941 (1992)).

Here, Plaintiffs identify a number of companies allegedly forming the interstate network and Defendants' positions with or ownership interests in those companies, but otherwise fail to offer any allegations regarding the continuity or structure of the group or how the entities joined together; indeed, the complaint does not even allege that the group's participants shared a common purpose. Instead, it essentially describes acts carried out by Terranova and others on behalf of Adelphi. Plaintiffs' conclusory "naming of a string of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



entities" does not adequately allege an enterprise and, therefore, their RICO claims should be dismissed. *Richmond v. Nationwide Cassel. L.P.,* 52 F.3d 640, 646 (7th Cir.1995) (affirming dismissal of complaint); *see also First Nationwide Bank v. Gelt Funding, Corp.,* 820 F.Supp. 89, 98 (S.D.N.Y.1993) (dismissing complaint that contained only "[c]onclusory allegations that disparate parties were associated in fact by virtue of their involvement in the real estate industry in the 1980s"), *aff'd,* 27 F.3d 763 (2d Cir.1994), *cert. denied,* 513 U.S. 1079 (1995); *A. Burton White, M.D., P.C. v. Beer,* 679 F.Supp. 207, 210-11 (E.D.N.Y.1988) (dismissing RICO claim where complaint simply listed "persons employed by or associated with Starwood," without "a description of the structure of Starwood as an enterprise, the purpose of the enterprise and an allegation that the enterprise continued indefinitely"). Given the Court's holding, it is not necessary to consider Terranova's contention that the section 1962(d) claim should also be dismissed for failure to adequately state his role in the alleged conspiracy.

III. State Law Claims

A. Pendent jurisdiction

Plaintiffs have alleged a violation of section 349 of the New York General Business Law, "common law fraud and misrepresentation," breach of contract and fraudulent inducement to enter into contract. Since this Court's jurisdiction was invoked based solely upon the presence of a federal question, Terranova argues that the Court should decline to exercise pendent jurisdiction over the state law claims.

The decision whether to exercise pendent jurisdiction is discretionary, and involves consideration of "judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1988) (citing *United Mine Workers v. Gibbs,* 383 U.S. 715 (1966)). Furthermore, it is "appropriate to take account ... of the already completed course of the litigation." *Gibbs,* 383 U.S. at 727. In this case, given that litigation has now been pending for over eleven years and discovery has long since been completed, dismissal of the state law claims would be fundamentally unfair and wasteful. *See Purgess v. Sharrock,* 33 F.3d 134, 138 (2d Cir.1994) ("If ... dismissal of the federal claim occurs late in the action, after there has been substantial expenditure in time, effort, and money in preparing the dependent claims, knocking them down with a belated rejection of supplemental jurisdiction may not be fair.") (quotation omitted). Accordingly, while not bound to do so, this Court will exercise its discretion to retain jurisdiction over Plaintiffs' state law claims.

B. Common law misrepresentation and fraudulent inducement

*6 Finally, Terranova seeks dismissal of Plaintiffs' misrepresentation and fraudulent inducement claims on the ground that they are necessarily duplicative of the breach of contract claim. Under New York law, "no cause of action to recover damages for fraud arises when the only fraud alleged relates to a breach of contract," and Plaintiffs' third cause of action (for "fraud and misrepresentation") should therefore be dismissed. *S.S.I.G. Realty, Inc. v. Bologna Holding Corp.,* 624 N.Y.S.2d 225, 227 (N.Y.App.Div.1995); *see also Volga-Inconsult-Invest v. United Management Corp.,* No. 93 Civ. 4229, 1997 WL 139005, at *5 (E.D.N.Y. March 4, 1997) ("The failure to perform a promise of a future act that itself constitutes a contractual obligation does not state a fraud claim."). However, the claim that Defendants made promises with a preconceived intention of not performing them "alleges a representation of present fact ... collateral to, but which was the inducement for the contract," and thus is not duplicative. *Deerfield Communications Corp. v. Chesebrough-Ponds, Inc.,* 502 N.E.2d 1003, 1004 (N.Y.1986) (quotations and citations omitted); *see also United Management Corp.,* 1997 WL 139005, at *5 ("[M]isrepresentation of a present fact, as opposed to a future intention, does state a claim for fraudulent inducement, which is separate from a contract claim."). Because Plaintiffs have pleaded the elements of a claim for fraudulent inducement, dismissal of that cause of action is not warranted.

CONCLUSION

For the reasons stated above, Plaintiffs' first and third causes of action, alleging violations of 18 U.S.C. §§ 1962(c) and (d) and "common law fraud and misrepresentation," respectively, are hereby dismissed with prejudice. Otherwise, Terranova's motion is denied and Plaintiffs may proceed on the remaining claims.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d  
**(Cite as: 1999 WL 118773, \*6 (E.D.N.Y.))**

Page 6

SO ORDERED.

Not Reported in F.Supp.2d, 1999 WL 118773 (E.D.N.Y.)

Motions, Pleadings and Filings (Back to top)

. 1:87cv01578 (Docket)  
(Dec. 26, 1990)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# TAB 14

203 F.3d 821 (Table) **Page 1**
203 F.3d 821 (Table), 2000 WL 123943 (4th Cir.(W.Va.)), 2000-1 Trade Cases P 72,781
**Unpublished Disposition**
(Cite as: 203 F.3d 821, 2000 WL 123943 (4th Cir.(W.Va.)))
H

Briefs and Other Related Documents

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA4 Rule 36 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Fourth Circuit.
Patricia L. PATTERSON, individually and on behalf of all others similarly
situated; Robert Patterson, individually and on behalf of all others similarly
situated, Plaintiffs-Appellants,
v.
FORD MOTOR CREDIT COMPANY; Dutch Miller Chevrolet, Incorporated, and all other motor vehicle dealerships similarly situated,
Defendants-Appellees.
No. 98-2774.

Argued Oct. 27, 1999.
Decided Feb. 2, 2000.

Appeal from the United States District Court for the Southern District of West Virginia, at Huntington. Robert J. Staker, Senior District Judge. (CA-98- 6, CA-98-86-3).

James William St Clair, St Clair & Levine, Huntington, WV, for appellants.

Thomas M. Byrne, Sutherland, Asbill & Brennan, L.L.P., Atlanta, GA, for appellees.

ON BRIEF: William D. Levine, St Clair & Levine, Huntington, WV, for appellants. Kristen Jones Indermark, Sutherland, Asbill & Brennan, L.L.P., Atlanta, GA; Robert H. Sweeney, Jr., Scott D. Maddox, Jenkins Fenstermaker, P.L.L.C., Huntington, WV; Michael T. Chaney, Kay, Casto, Chaney, Love & Wise, Charleston, WV, for appellees.

Before MURNAGHAN, NIEMEYER, and TRAXLER, Circuit Judges.

OPINION

PER CURIAM.

**\*1** Patricia and Robert Patterson appeal from the district court's order dismissing, pursuant to Rule 12(b)(6), their claims against Dutch Miller Chevrolet, Incorporated ("Dutch Miller") and Ford Motor Credit Company ("FMCC") under section 2(c) of the Robinson-Patman Act, *see* 15 U.S.C.A. § 13(c) (West 1997), in which they contend that Dutch Miller and FMCC violated anti-trust laws when Dutch Miller received compensation for assigning the Pattersons' installment contract to FMCC. We affirm.

I.

The Pattersons decided to purchase a sport utility vehicle from Dutch Miller, provided that they could obtain affordable financing. The Pattersons allege that in order to induce them to close the deal, Dutch Miller promised to use its best efforts to secure favorable financing for the Pattersons. According to the Pattersons, Dutch Miller's financial personnel represented that 14.75 percent was the best interest rate available, and the Pattersons, relying upon this information, entered into an installment agreement to purchase the vehicle from Dutch Miller at an interest rate of 14.75 percent. The terms of the agreement required the Pattersons to make monthly installment payments of the purchase price along with interest. The total cost of financing the vehicle at this rate was $9,110.61, assuming the Pattersons made each installment payment as scheduled. It is undisputed that FMCC was not a party to this agreement.

Dutch Miller then assigned the installment sales contract to FMCC, which agreed to purchase the contract from Dutch Miller at an interest rate lower than the 14.75 percent rate provided by the terms of the contract. [FN1] In return for placing the financing with FMCC, Dutch Miller was paid the difference (known generally as a"discount" or the "dealer's participation") between the finance charge at the higher interest rate set forth in the installment contract and the finance charge at the lower interest rate that FMCC was willing to extend. According to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



the Pattersons, Dutch Miller knew-- before the installment contract was executed--that FMCC was willing to buy the paper from Dutch Miller at a rate lower than 14.5 percent. Moreover, the Pattersons allege that the defendants had arranged for the assignment of the contract before the Pattersons executed it.

> FN1. The Pattersons contend that FMCC agreed to purchase the installment sales contract from Dutch Miller at a rate of 10.75 percent. *See* Brief of Appellants at 4.

A couple of additional facts bear mentioning. The Pattersons do not allege that they sought financing through an outside source or that they attempted to compare the interest rate quoted by Dutch Miller with rates offered by other lenders in the retail market. Likewise, there are no allegations that FMCC would have been willing to extend to the Pattersons a more favorable rate than 14.75 percent had the Pattersons sought financing directly from FMCC in the retail market.

The Pattersons brought this action in state court, alleging that Dutch Miller and FMCC violated the Robinson-Patman Act when FMCC paid Dutch Miller a "discount" in connection with the assignment of the Pattersons' installment sales contract. Even though the Pattersons do not suggest that the underlying sale of the vehicle was not at arm's length, Dutch Miller, according to the complaint, began serving as the Pattersons' agent responsible for obtaining favorable financing. The Pattersons claim that the discount payment amounted to a commercial bribe from FMCC to the agent for the Pattersons, Dutch Miller, in violation of section 2(c) of the Robinson-Patman Act.

**2 The complaint also alleged that Dutch Miller ran afoul of the West Virginia Consumer Credit Protection Act by negotiating a retail interest rate that was higher than FMCC was offering to dealers like Dutch Miller. And, the Pattersons asserted that Dutch Miller and FMCC had engaged in a civil conspiracy to defraud them and violate state and federal law, including the Robinson-Patman Act. [FN2]

> FN2. The complaint also purported to be a class action. The Pattersons, however, did not obtain class certification.

The defendants removed the action to district court and moved to dismiss the complaint. The district court dismissed the Robinson-Patman claim and the claim that alleged conspiracy to violate the Robinson-Patman Act, reasoning that the Act applies only to transactions involving tangible goods and that the payment from FMCC to Dutch Miller did not involve goods. With respect to the Pattersons' remaining claims, which arose under West Virginia law, the district court declined to exercise supplemental jurisdiction because it believed the claims raised novel issues of state law. *See* 28 U.S.C.A. § 1367(c)(1) (West 1993). The remaining claims were thus remanded to state court.

II.

A.

The Robinson-Patman Act was aimed at curbing certain practices maintained by large buyers or sellers of goods to evade antitrust restrictions on price discrimination. "One method employed to circumvent the Clayton Act was through the use of 'dummy brokerages' " whereby, for instance, "a large buyer with economic clout might insist that in order to do business sellers must pay a fee to a designated 'broker' ... [who] would then turn the money over to the large buyer." *Stephen Jay Photography, Ltd. v. Olan Mills, Inc.*, 903 F.2d 988, 992 (4th Cir.1990). Section 2(c) of the Robinson-Patman Act was directed primarily toward this practice:

It shall be unlawful for any person engaged in commerce ... to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

15 U.S.C.A. § 13(c). The language of this provision is broad, however, and may well apply to other techniques used to effect price discrimination. The Supreme Court has noted that section 2(c) might proscribe commercial bribery, *see FTC v. Henry Broch & Co.*, 363 U.S. 166, 169-70 n. 6 (1960),

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

203 F.3d 821 (Table)  
(Cite as: 203 F.3d 821, 2000 WL 123943, **2 (4th Cir.(W.Va.)))

Page 3

and some circuit courts of appeal have so held, *see Stephen Jay Photography,* 903 F.2d at 992 n. 6 (collecting cases). Whether commercial bribery comes within the scope of this section remains an open question in this circuit. *See id.* at 991-93. We need not resolve this question, however, since the Pattersons' claim fails even if commercial bribery were prohibited by section 2(c) of the Robinson-Patman Act.

**3** The district court concluded that the payment of the dealer's participation--the alleged bribe--did not fall within the purview of section 2(c) because it did not involve the sale of tangible goods. And, indeed, the circuit courts of appeal appear to be in agreement that section 2(c) covers only transactions that involve the transfer of tangible goods. *See, e.g., Harris v. Duty Free Shoppers Ltd. Partnership,* 940 F.2d 1272, 1274 (9th Cir.1991); *Union City Barge Line, Inc. v. Union Carbide Corp.,* 823 F.2d 129, 140-41 (5th Cir.1987); *Freeman v. Chicago Title & Trust Co.,* 505 F.2d 527, 529-31 (7th Cir.1974) (per curiam).

The Pattersons do not quarrel with this general proposition. Rather, they urge us to conclude that since FMCC's purchase of the installment sales contract made the underlying sale possible, the "dominant nature" of the transaction was the transfer of a tangible good, *i.e.,* the automobile. We cannot agree. It is undisputed that FMCC was not a party to the sales contract. It is undisputed that FMCC was not a buyer or seller of goods. It is undisputed that the Pattersons played no role in Dutch Miller's assignment of the installment contract to FMCC. And, the Pattersons do not allege that the installment sales contract was contingent upon the acceptance of the installment contract by FMCC or financing by FMCC.

These facts compel the conclusion that the purchase of the installment sales contract by FMCC was part of a separate transaction from the underlying automobile sale. We think it is clear, therefore, that the assignment of the contract was a matter wholly between Dutch Miller and FMCC. Of course, the purchase of an installment sales contract is not a transaction involving tangible goods. *See Freeman,* 505 F.2d at 530-31 (rejecting the argument that the transfer of a tangible physical document is a transaction involving goods). Because an installment sales contract is "a writing ... which evidence[s]

both a monetary obligation and a security interest in ... specific goods," W.Va.Code Ann. § 46-9-105(1)(b) (Michie Supp.1999), it qualifies as chattel paper, which is not a tangible good, *see* W.Va.Code Ann. § 46-9-105(1)(h) (Michie Supp.1999). The essence of chattel paper is the obligation that it represents, which is clearly intangible. Therefore, the alleged "bribe" between FMCC and Dutch Miller is not one which involves goods.

The fact that the alleged bribe is unconnected to the sale of goods is underscored by the Pattersons' own allegations that Dutch Miller somehow served as their agent. Even if we assume the truth of the Pattersons' conclusory claim that Dutch Miller was their agent, they only allege that Dutch Miller was their agent for purposes of obtaining financing, nothing more. Indeed, the Pattersons concede that the extension of credit to finance a purchase of goods is not equivalent to the sale of goods. *See* Brief of Appellants at 12.

Because the alleged bribe--the amount paid by FMCC to Dutch Miller--was connected only to the purchase and transfer of the installment sales contract, it was not a transaction in tangible goods within the reach of section 2(c) of the Robinson-Patman Act. Accordingly, we affirm the district court's decision on the grounds that the alleged bribe was not paid in connection with a transaction involving tangible goods.

B.

**4** In an attempt to circumvent the district court's ruling that the alleged purchase of the contract by FMCC was not a transaction involving goods, the Pattersons argue that we should look past the technicalities of the arrangement and view the execution of the installment sales contract and its subsequent assignment to FMCC as one transaction, not two. They allege that these two transactions occurred simultaneously, that FMCC's "purchase" of the contract made the sale of the contract possible, and that therefore the "dominant nature" of the single transaction was the transfer of tangible goods.

Assuming this is true, we are presented with another basis, perhaps even more compelling than the first, on which to affirm the district court's decision. In order for a commercial bribery claim to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



be cognizable under section 2(c) of the Robinson-Patman Act, the alleged bribe must traverse the "seller-buyer" line. *See Stephen Jay Photography,* 903 F.2d at 992. As we have previously explained:
> In the appellate decisions which have found commercial bribery within the ambit of section 2(c) the common thread has been the passing of illegal payments from seller to buyer or vice versa.... [B]y restricting liability to situations when the seller-buyer line has been passed, courts have narrowed the scope of section 2(c) and upheld Congress' intent to leave the relationships of legitimate brokerages unaffected by section 2(c).

*Id.* (internal citations and quotation marks omitted). Thus, the Pattersons' claim must include a contention that the payment from FMCC to Dutch Miller crossed the seller-buyer line.

The complaint characterizes Dutch Miller as the Pattersons' agent during what they say was really a single transaction. Common sense dictates that it is not possible for Dutch Miller to be on different sides of the same transaction. Obviously, the Pattersons do not and cannot allege that Dutch Miller was acting as the Patterson's agent during the actual *purchase* of the vehicle because Dutch Miller was the seller. They had a directly adversarial relationship to each other since, as would any seller, Dutch Miller hoped to extract the highest price possible from the Pattersons, and the Pattersons wished to pay as little as possible. Under such circumstances, the payment by FMCC to Dutch Miller could not possibly be construed to cross the seller-buyer line with respect to the purchase of the vehicle.

III.

Because we conclude that the Pattersons failed to state a claim under the Robinson-Patman Act, their claim that Dutch Miller and FMCC conspired to violate the Robinson-Patman Act fails as well. Accordingly, we affirm the dismissal of the Pattersons' federal claims, and we hold that the district court did not abuse its discretion by refusing to exercise supplemental jurisdiction over the remaining state law claims. *See* 28 U.S.C.A. § 1367(c)(3); *Jordahl v. Democratic Party of Va.,* 122 F.3d 192, 203 (4th Cir.1997). The decision of the district court is affirmed.

**\*\*5** *AFFIRMED.*

Briefs and Other Related Documents (Back to top)

. 1999 WL 33616534 (Appellate Brief) Reply Brief of Appellants Patricia L. Patterson, Robert Patterson and the Class They Represent (Mar. 23, 1999)Original Image of this Document (PDF)

. 1999 WL 33616535 (Appellate Brief) Brief of Appellees Ford Motor Credit Company and Dutch Miller Chevrolet, Inc. (Mar. 08, 1999)Original Image of this Document with Appendix (PDF)

. 98-2774 (Docket)
(Dec. 10, 1998)

. 1998 WL 34083581 (Appellate Brief) Appellants' Brief (1998)Original Image of this Document (PDF)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



# TAB 15

1976 WL 1315            Page 1
Not Reported in F.Supp., 1976 WL 1315 (S.D.N.Y.), 1976-2 Trade Cases P 61,074
**(Cite as: 1976 WL 1315 (S.D.N.Y.))**
c

United States District Court; S.D. New York.
Charles G. Rodman, as Trustee of the Estate of W. T. Grant Co.
v.
Mark S. Haines, Daniel Quinlan, John W. Waits d/b/a John W. Waits Associates,
JWW, Inc., Centurion Development Corp., Centurion of Louisiana, Inc., Mid-America Development, Development Corp. of Mid-America, Inc., Umbaugh Pole Building Co., Inc. a/k/a Umbaugh Co., and Frontier Development Corp.
No. 75 Civ. 471-CLB

Filed September 14, 1976

BRIEANT, D. J.

Memorandum Decision

*1 W. T. Grant Company [FN1] ("Grant") instituted this action on January 31, 1975 under circumstances which have been set forth in this Court's unreported Memorandum Decision of May 8, 1975 [1975-1 TRADE CASES P 60,324]. General familiarity with that decision is assumed. The Court therein dismissed Count One of the complaint ("the Sherman Act Claim") for failure to state a claim upon which relief could be granted. The Court also dismissed Counts Two through Twenty-Nine because there was no valid federal claim as to which pendent jurisdiction of these myriad state law causes of action could be found. Plaintiff was granted leave to replead. Also, for reasons therein stated, the Court vacated personal service upon defendants Haines and Quinlan, and also denied a motion by Haines to disqualify plaintiff's counsel. The order denying disqualification was unanimously affirmed on March 9, 1976. *W. T. Grant Co. v. Haines* [1976-1 TRADE CASES P 60,788], 531 F. 2d 671 (2d Cir. 1976).

FN1 On October 2, 1975, while this action was pending, Grant filed a petition for an arrangement under Section 322 of Chapter XI of the Bankruptcy Act, 11 U. S. C. § 722, with the United States District Court in the Southern District of New York. *In re W. T. Grant Company,* 75 B 1735. On February 12, 1976, Bankruptcy Judge Galgay of this Court signed an order requiring the liquidation of Grant within sixty (60) days. Thereafter, on July 2, 1976, by order of this Court, Charles Rodman as trustee of the estate of W. T. Grant Company was substituted as party plaintiff in this action and the title of the action was amended accordingly. The term "Plaintiff" as used throughout this opinion refers to W. T. Grant Company whenever the context so indicates.

On May 22, 1975, plaintiff moved for reargument, claiming that the Court had overlooked controlling principles of law in dismissing the Sherman Act Claim, and had improperly vacated service upon Haines and Quinlan. On December 1, 1975, the Court granted reargument solely with respect to that portion of the Memorandum Decision which dismissed Count One.

[*Brokerage Claim*]
In the intervening period, plaintiff filed and served an amended complaint which tracked the dismissed complaint very closely, except that plaintiff has now asserted in Count One a claim arising under Section 2(c) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U. S. C. § 13(c) ("the Robinson-Patman Act Claim"). Counts Two through Twenty-Eight once against assert causes of action arising under state law which are said to be pendent to the federal claim pleaded in Count One of the amended complaint. Plaintiff now also alleges that subject matter jurisdiction over these state law claims exists by reason of diversity of citizenship, and this is apparently not disputed by the defendants.

Haines, Quinlan and the various "Waits defendants" [FN2] have now moved to dismiss the amended complaint on the grounds that there is no jurisdiction over their persons and that Count One fails to assert a valid federal claim upon which relief can be granted. F. R. civ. P. 12(b)(2), 12(b)(6). The Waits defendants further assert that venue is improper in the Southern District of New York and move for dismissal on that ground. F. R. Civ. P. 12(b)(3).

FN2 These are John W. Waits, John W. Waits doing business as John W. Waits Associates, JWW. Inc., Centurion Development Corporation, Centurion of Louisiana, Inc., Mid-America Development,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Development Corporation of Mid-America, Inc., and Frontier Development Corporation.

*2 After all of the above motions had been argued, and marked fully submitted, plaintiff moved for an order (1) establishing the allegations of the complaint to be true as against Haines, (2) holding Haines in contempt, and (3) granting plaintiff a default judgment against Haines on the ground that Haines had wilfully disobeyed an order of this Court, dated April 12, 1976, requiring him to appear for a deposition at the offices of plaintiff's counsel on May 12, 1976. F. R. Civ. P. 37(b)(2)(A)(C)(D).

On January 7, 1976 the case had been settled and discontinued as to defendant Christensen only.

*Plaintiff's Motion for Reargument.*

The Court adheres to that portion of its Memorandum Decision of May 8, 1975 which dimissed the Sherman Act Claim, and relies upon the reasoning therein set forth.

Section 4 of the Clayton Act, 15 U. S. C. § 15, is the operative section which permits private actions to be brought against those who violate the antitrust laws. That section states:
Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court of the United States . . . and shall recover threefold the damages by him sustained.

Courts have declined to read the reference to "any person who shall be injured" broadly, but have limited such actions by certain "standing" requirements. The general test in this Circuit is that a plaintiff must allege a causative link (running from the antitrust violation to his injury), which is "direct" rather than incidental and which indicates that the victim's property was in the "target area" of the defendant's illegal act. *Billy Baxter Inc. v. Coca-Cola Corp.* [1970 TRADE CASES P 73,307], 431 F. 2d 783, 787 (2d Cir. 1970), cert. denied, 401 U. S. 923 (1971); *Calderone Enterprises Inc. v. United Artists Theatre Circuit, Inc.* [1972 TRADE CASES P 73,788], 454 F. 2d 1292 (2d Cir. 1971, cert. denied, 406 U. S. 930 (1972). In applying this test, the Court will examine both the form of the violation alleged in the complaint and the nature of its effect on plaintiff's own business activities. See also, *Vandervelde v. Put and Call Brokers and Dealers Ass'n* [1972 TRADE CASES P 73,931], 344 F. Supp. 118 (S. D. N. Y. 1972).

[*Employee Conspiracy*]
Reading the complaint in the light most favorable to the plaintiff, as the Court must on a motion to dismiss, it alleges a conspiracy among certain former employees of Grant and the various Waits defendants to influence the decisions of Grant's real estate department in approving proposed store leases in shopping centers. The conspiracy was carried out by means of bribes or payments made to Haines, Quinlan and Christensen, all of whom occupied positions of responsibility with Grant which gave them the power to recommend certain lease locations and terms offered by the Waits defendants, in preference to those proffered by others. The complaint alleges that Grant suffered injury when its faithless employees recommended a number of poorly located and/or overpriced shopping center sites being developed by Waits, which Grant subsequently leased upon unfavorable terms.

[*Target Area*]
*3 The target area here is that part of the economy consisting of the competitors of Waits, landlords, builders and contractors who are engaged in the building, developing and leasing of shopping centers. Grant was not within this target area.

*Motion to Dismiss for Lack of Jurisdiction Over the Person.*

For purposes of this motion it is not disputed that Haines, Quinlan, and the various Waits defendants were each duly served with process in their respective home states pursuant to F. R. Civ. P. 4(e) and CPLR § 313. These defendants do, however, claim that there was no proper predicate for this exercise of jurisdiction and that as a result, this Court lacks jurisdiction over their persons. To supply that predicate plaintiff relies, not surprisingly, on New York's long-arm statute, CPLR § 302.

Section 302(a)(2) of the CPLR allows a New York court to ". . . exercise personal jurisdiction over any nondomiciliary, . . . who in person or through an agent: . . . commits a tortious act within the state."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



The complaint and the affidavits of Robert J. Kelly, [FN3] the former Vice-President and General Counsel of Grant, show clearly that Haines and Quinlan are non-domiciliaries who personally committed tortious acts within New York State. While Haines and Quinlan lived in Georgia and Illinois, respectively, and worked out of regional offices in their home states, they frequently came to New York City for meetings of the Real Estate Committee at Grant's corporate headquarters. During 1973 and 1974 Quinlan traveled to New York at least 16 times and Haines came here at least 28 times on business (Affidavit of Robert J. Kelly, sworn to November 14, 1975, pp. 3-4). The purpose of these business trips was to permit regional representatives such as Haines and Quinlan to make recommendations in person to Grant's Real Estate Screening Committee, which met to consider various proposals for leasing space in shopping centers and commercial districts around the country.

> FN3 Upon a motion to dismiss for lack of personal jurisdiction, a court may rely on affidavits to establish the requisite jurisdictional facts. *Ghazoul v. International Management Services, Inc.,* 398 F. Supp. 307 (S. D. N. Y. 1975); *Lynn v. Cohen,* 359 F. Supp. 565 (S. D. N. Y. 1973); 2A *Moore's Federal Practice,* P 12.14 at 2336.

Reading the complaint in the light most favorable to the plaintiff, Haines and Quinlan made presentations at committee meetings in New York City in support of proposals to lease space in shopping centers which were being developed by the various Waits defendants. In so doing they acted motivated by bribery and breached the fiduciary duty of undivided loyalty which as agents they owed to their principal. This they did in New York. The relationship of principal and agent requires straight-forward and open dealing on the part of the agent, who must act in accordance with the highest principles of fidelity. When Haines and Quinlan spoke up in support of these lease proposals and failed to disclose that they had received payments from Waits, they breached their fiduciary duties and committed tortious acts in New York State.

*4 Insofar as concerns the various Waits defendants, the Affidavit of John A. Christensen, sworn to March 31, 1976, and the deposition testimony of George Auerbach, a salesman for defendant Umbaugh Pole Building Company, taken on May 12, 1975, clearly establish that John Waits, acting personally and as agent for the other Waits defendants, committed tortious acts within New York State. In December, 1972, Waits met with Christensen and Auerbach in the latter's office in Middletown, New York. They discussed the planning and construction of a private stable which was to be built on Christensen's estate in Connecticut and was to be paid for by Waits. In addition, in February 1973, at a meeting in New York City with Auerbach and Christensen, Waits signed a contract for the construction of this private stable. Defendant Mid-America Development paid for the stable by sending payment directly to Umbaugh's offices in Middletown, New York. A few months later, a basically similar arrangement was made for the construction of fencing around the stable.

The private stable and fencing were allegedly brides paid for by Waits and given to Christensen for the purpose of influencing the latter in the conduct of the business affairs of his employer, Grant. Under New York law one who bribes a corporate officer in order to defraud the corporation is liable to the corporation as a joint tortfeasor, *Public Shoe Stores, Inc. v. Goldstein,* 22k A. D. 350, 233 N. Y. S. 73 (1st Dept. 1929). Accordingly, the negotiation and signing by Waits of the contract to build an improvement on Christensen's Connecticut estate, whether or not it was a transaction of business in this state, constituted the commission of a tortious act in New York against Grant. Furthermore, the damages were incurred in New York, the location of Grant's pocketbook.

Plaintiff has satisfied its burden of showing *prima facie* that personal jurisdiction exists over the persons of Haines, Quinlan, Waits and the various Waits defendants, pursuant to CPLR § 302(a)(2). *United States v. Montreal Trust Co.,* 358 F. 2d 231 (2d Cir.), cert. denied, 384 U. S. 919 (1966). Defendants' Rule 12(b)(2) motions are therefore denied.

*Motion to Dismiss for Failure to State a*

*Claim Upon Which Relief Can Be Granted.*
Defendants Haines, Quinlan and the various Waits defendants have also moved to dismiss on the ground that Count One of the Amended Complaint based upon the Robinson-Patman Act does not state

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



a claim upon which relief can be granted.

Title 15 U. S. C. § 13(c) states in relevant part:
It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein which such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, or any party to such transaction other than the person by whom such compensation is so granted or paid.

*5 It is well-settled that this statute, § 2(c) of the Clayton Act, as amended by the Robinson-Patman Act, should be construed without reference to § 2(a), the section dealing with price discrimination in the purchase and sale of commodities. *Federal Trade Commission v. Henry Broch & Co.* [1960 TRADE CASES P 69,728], 363 U. S. 166, 171 (1960); *Rangen, Inc. v. Sterling Nelson & Sons, Inc.* [1965 TRADE CASES P 71,583], 351 F. 2d 851, 857 (9th Cir. 1965), cert. denied, 383 U. S. 936 (1966).

As is clear from the Act itself as well as from the Supreme Court's opinion in *Broch, supra,* § 2(c) was aimed at abuses of the brokerage function, whether in the form of outright payments, discounts, allowances, or price reductions, through which large buyers obtained discriminatory price preferences over smaller ones by virtue of their greater purchasing power.

Congress of course did not thereby intend to ban all brokerage payments; it was well-recognized that brokers often performed important services for sellers seeking an outlet for their goods as well as for buyers seeking a steady source of supply. What was prohibited were payments by one party to the other party's broker, which created a danger that such payments would be another type of price preference, of which large buyers could take advantage by forming dummy brokerage companies and demanding that sellers pay brokerage fees to these dummies, or by taking kick-backs from their own agents or brokers.

[*Commercial Bribery*]
Plaintiff, however, seeks to extend the protection of § 2(c) to a case involving commercial bribery and breach of fiduciary duty. He relies on footnote 6 to the Supreme Court's opinion in the *Broch* case, *supra* at pp. 169-70, where, in referring to the broad scope of § 2(c), it is stated:
. . . the debates on the bill show clearly that § 2(c) was intended to proscribe other practices such as the "bribery" of a *seller's broker* by the *buyer.* (Emphasis added)

Plaintiff's reliance on this section is misplaced. The recipients of the bribes in this case were not brokers but employees. And perhaps more importantly, Grant and Waits were never in a buyer-seller relationship.

[*Sale of Goods*]
Plaintiff correctly points out that some courts have read this footnote expansively and have applied § 2(c) to cover cases where bribes were paid to officers or employees as opposed to brokers. See *Rangen, Inc. v. Sterling Nelson & Sons, supra; Fitch v. Kentucky-Tennessee Light & Power Co.* [1940- 1943 TRADE CASES P 56,280], 136 F. 2d 12 (6th Cir. 1943); *Canadian Ingersoll-Rand Co. v. D. Loveman & Sons, Inc.,* 227 F. Supp. 829 (N. D. Ohio 1964). But see, *Zestee Foods Inc. v. Fruehauf Corporation* [1975-1 TRADE CASES P 60,363], 390 F. Supp. 595 (N. D. Okl. 1974). Yet all of the cases relied upon by plaintiff involved bribes paid by sellers to employees of the buyer within the context of commercial transactions involving the *sale of goods.* As the 9th Circuit stated in *Rangen, supra* at p. 858:
*6 . . . that subsection [§ 2(c)] also encompasses cases of commercial bribery tending to undermine the fiduciary relationship between a buyer and its agent, representative, or other intermediary *in a transaction involving the sale or purchase of goods, wares, or merchandise.* (Emphasis added)

In *Fitch, supra,* the President of a utility had accepted commission payments from an important coal supplier of the utility. The Sixth Circuit concluded, *supra* at p. 16:
. . . it is the acceptance of commissions from a seller by an agent of the buyer *in connection with the sale of merchandise* in the course of interstate commerce, that is also envisaged by the statute. In this case, payment of commissions by the Coal



Company to Fitch *in connection with the sale of the coal* was unlawful and in direct contravention of the Act. (Emphasis added)

This Court concludes, that not every instance of commercial bribery is made illegal by § 2(c). This conclusion is based in part upon a careful reading of the decisions relied upon by plaintiff, which indicates that the Courts were dealing there with bribes and payments limited to the context of commercial transactions involving the sale of goods. It is also based upon principles of statutory interpretation, through which a Court examines the purpose and intent of the legislature in enacting a law. With regard to the Robinson-Patman Act, the Supreme Court stated in *Broch, supra* at p. 174:
Congress enacted the Robinson-Patman Act to prevent sellers and sellers' brokers from yielding to pressures of a large buying organization by granting unfair preferences *in connection with the sale of goods.* (Emphasis added)

The underscored language quoted above from each of these opinions is not to be regarded as mere surplusage; rather it indicates a recognition that Congress was seeking basically to regulate commercial sales transactions, and abuses of the brokerage function, whether in the form of bribes, preferences or discounts in sales of goods.

Here the bribes were given not in connection with an attempt to obtain some sort of preference in a transaction involving the sale of goods, but in order to obtain favorable recommendations on proposals relating to the leasing of real estate in local shopping centers.

Whatever else might be encompassed by § 2(c), bribes paid to employees of a potential lessee of real property are not covered by that section, since they do not involve abuses of the brokerage function in a transaction involving the sale of goods. The giving and receiving of such bribes is illegal under other state laws, but this Court concludes that plaintiff has failed to state a claim in Count One of the Amended Complaint upon which relief can be granted. Defendant's motion to dismiss that Count is therefore granted. Count Two is also dismissed. See, *Steingart v. Equitable Life Assurance Society of the United States* [1973-2 TRADE CASES P 74,805], 366 F. Supp. 790, 793 (S. D. N. Y. 1973).

[*State Law*]
As for the various other claims asserted in Counts Three through Twenty-Eight, the Court adheres to its previous ruling. These appear to allege valid causes of action arising under New York State law. There is subject matter jurisdiction based on complete diversity of citizenship, adequately pleaded in the amended complaint.

*Motion to Dismiss for Improper Venue.*

*7 Venue of the diversity claims is proper in this District under 28 U. S. C. § 1391(a). The unrefuted affidavits of John A. Christensen, sworn to November 5, 1975, show that money and checks were paid to him in New York City by Haines and Quinlan, two of the alleged co-conspirators. The damage was suffered here. This motion is denied.

*Motion for Sanctions Against Haines.*

On April 12, 1976 this Court ordered the defendant Haines to appear for a deposition to be held on May 12, 1976 at the offices of plaintiffs counsel in New York City. The purpose of this deposition was to inquire pursuant to CPLR § 6220 whether Haines has or had an interest in any property in New York State or whether there are or have been owing to him any debts in this State since January 31, 1975. The only condition precedent found in the Court's order was that proof of the deposit by Grant of $500.00 with the Clerk of this Court should be served upon Haines' attorney. This sum was to be held by the Clerk as security for Haines' travel expenses to New York, if, upon future application, the Court should find that there was no reasonable basis to believe that Haines had any interest in any property, or any debts owing to him, in New York. If so, the Court anticipated it would thereafter order Grant to pay Haines' reasonable and actual travel expenses.

[*Failure to Appear*]
On April 27, 1976, attorneys for Grant duly deposited $500.00 with the Clerk of this Court and filed proof thereof with Haines' attorney. On May 12, 1976 Mr. Haines failed to appear for his deposition.

Plaintiff then moved for an order pursuant to Rule 37, (1) establishing the facts as alleged in the complaint as true against the defendant Haines, (2)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



1976 WL 1315
(Cite as: 1976 WL 1315, *7 (S.D.N.Y.))

Page 6

granting a default judgment against Haines, (3) holding Haines in contempt of court, (4) directing the Clerk to refund the $500.00 security for travel expenses, and (5) directing Haines and/or his attorney to pay plaintiff's reasonable expenses, including attorneys' fees, caused by Haines' failure to obey the Order of this Court.

On May 25, 1976 this Court heard oral argument on plaintiff's Rule 37 motion. Haines' attorney pointed out that plaintiff had therefore failed to substitute the bankruptcy trustee as party plaintiff, although the Court had made an oral direction on April 5, 1976 that such substitution be effected. Because of this failure, Haines' counsel had informed plaintiff's counsel by letter dated April 30, 1976, that they would not participate further in this litigation until the trustee had been substituted. This has now been done.

The Court does not regard plaintiff's slowness in substituting the trustee as an excuse for Haines' failure to appear at his deposition on May 12, 1976. Were Haines truly aggrieved thereby, the proper course would have been to apply, either by motion or order to show cause, for a stay or a protective order. If, for some other reason, Haines could not appear on that date, Haines' attorney should have applied either to this Court or to opposing counsel for a reasonable continuance. Haines' counsel's unilateral decision not to participate further in the action until the trustee was substituted was entirely unjustified.

*8 Rule 37(b)(2) provides that the Court may make ". . . such orders in regard to the filure as are just," including but not limited to granting a default judgment, establishing the facts in accordance with the claim of the party seeking the order, or holding the disobedient person in contempt. [FN4]

> FN4 Haines' failure to appear for his deposition after being served with proper notice could also be sanctioned under Rule 37(d)9 However, since the Court specifically ordered him to appear, it would seem that Rule 37(b)(2) is more specifically directed at what occurred here, which is the unexcused disobedience of a formal, signed court order. However, the sanctions which may be imposed under Rule 37(d) are substantially the same as those available pursuant to Rule 37(b)(2).

In deciding whether or not to impose such extreme sanctions, or any sanctions, this Court must consider the totality of circumstances surrounding the failure. *Flaks v. Koegel,* 504 F. 2d 702 (2d Cir. 1974); *Trans World Airlines, Inc. v. Hughes* [1971 TRADE CASES P 73,690], 449 F. 2d 51 (2d Cir. 1971), reversed on other grounds [1973-1 TRADE CASES P 74,295], 409 U. S. 363 (1973).

Our purpose is to litigate controversies on the merits wherever possible, rather than to enter judgments on default, or as a result of sanctions imposed on clients for real or apparent failures by lawyers to make certain their clients' discovery obligations are fairly and properly discharged. Haines, accordingly, although he shows no substantial justification or extenuating circumstances, shall have one more chance to comply, failing which his default will be noted and a further application may be made to this Court on notice for an order striking his answer.

Settle an order on five (5) days notice, which order shall also set a new date for Haines' deposition which is to be scheduled on or before October 29, 1976.

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

