UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
WORLD WRESTLING ENTERTAINMENT, INC.

                              Plaintiff,                    04 CV 8223 (KMK)

           v.                                 (ECF CASE)

JAKKS PACIFIC, INC.; JAKKS PACIFIC (H.K.)
LIMITED; ROAD CHAMPS LIMITED; THQ,
INC.; THQ/JAKKS PACIFIC LLC; STANLEY
SHENKER AND ASSOCIATES, INC.; STANLEY
SHENKER; BELL LICENSING, LLC; JAMES
BELL; JACK FRIEDMAN; STEPHEN BERMAN;
JOEL BENNETT; and BRIAN FARRELL,

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

# REPLY MEMORANDUM OF LAW IN SUPPORT OF
# THE JAKKS DEFENDANTS' MOTION TO DISMISS
# THE SHERMAN ACT CLAIM IN THE AMENDED COMPLAINT

| | |
|---|---|
| FEDER, KASZOVITZ, ISAACSON,<br>  WEBER, SKALA, BASS & RHINE LLP<br>Murray L. Skala (MS 9354)<br>Jonathan D. Honig (JH 7577)<br>750 Lexington Avenue<br>New York, New York 10022<br>Phone: (212) 888-8200<br>Fax: (212) 888-5968 | SKADDEN, ARPS, SLATE<br>  MEAGHER & FLOM LLP<br>Jonathan J. Lerner (JL 7117)<br>Michael H. Gruenglas (MG 8705)<br>James Keyte (JK 0680)<br>Maura B. Grinalds (MG 2836)<br>Four Times Square<br>New York, New York 10036<br>Phone: (212) 735-3000<br>Fax: (212) 735-2000 |

                        Attorneys for the JAKKS Defendants

October 18, 2005

## TABLE OF CONTENTS

                                                                                            Page

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ......................................................................................................................... 3

I.     THQ and JAKKS's Agreement to Submit a Joint Bid Is Not Per Se Bid-Rigging ............. 3

II.    WWE's Response Confirms that Its Sherman Act Claim is Time-Barred ......................... 8

       A.     WWE's Complaint Negates Any Fraudulent Concealment .................................. 8

       B.     Royalty Payments Under the Licensing Contract Are Not New,
              Independent Acts Under the "Continuing Conspiracy" Doctrine ........................ 11

       C.     The Extent of Alleged Damages Need Not Be Certain At the Time of the
              Alleged Violation for the Statute of Limitations to Begin Running ..................... 13

III.   The Source of WWE's Alleged Injury Remains Bribes and Disloyalty, Not the
       THQ/JAKKS Joint Bid ....................................................................................................... 14

CONCLUSION ..................................................................................................................... 15

## TABLE OF AUTHORITIES

### CASES

Al George, Inc. v. Envirotech Corp., 939 F.2d 1271 (5th Cir. 1991) .............................. 12

Andrea Theaters, Inc. v. Theatre Confections, Inc., 787 F.2d 59 (2d Cir. 1986) ....... 11, 12

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977).............................. 14

In re Buspirone Patent Litigation, 185 F. Supp. 2d 363 (S.D.N.Y. 2002) ...................... 12

In re Ciprofloxacin Hydrochloride Antitrust Litigation, 261 F. Supp. 2d 188
    (E.D.N.Y. 2003) ...............................................................................3, 9, 10, 11, 12

City of El Paso v. Darbyshire Steel Co., 575 F.2d 521 (5th Cir. 1978) ................. 2, 10, 12

Copperweld Corp. v. Independent Tube Co., 467 U.S. 752 (1984).................................7

County of Stanislaus v. Pacific Gas & Electric Co., No. 93 CV-F-93-5866, 1995
    WL 819150 (E.D. Cal. Dec. 18, 1995), aff'd, 114 F.3d 858 (9th Cir. 1997).............. 12

Federal Paper Board Co. v. Amata, 693 F. Supp. 1376 (D. Conn. 1988) .......... 1, 3, 14, 15

Hanover Shoe, Inc. v. United Shoe Machine Corp., 392 U.S. 481 (1968)....................... 11

Higgins v. N.Y. Stock Exchange, Inc., 942 F.2d 829 (2d Cir. 1991) .............................. 13

Hyer v. Richmond Traction, Co., 168 U.S. 471 (1897) ...................................4, 5, 6, 7, 14

International Neutronics, Inc. v. Isometric, Inc. (In re International Neutronics,
    Inc.), 28 F.3d 965 (9th Cir. 1994) ......................................................................... 5, 10

Kearney v. Taylor, 56 U.S. 494 (1853).................................................................... 3, 4, 7

Klehr v. A.O. Smith Corp., 521 U.S. 179 (1997) ..................................................... 11, 12

Love v. Basque Cartel, 873 F. Supp. 563 (D. Wyo. 1995), aff'd, 95 F.3d 1161
    (10th Cir. 1996) .................................................................................... 5, 6, 7, 8

McMullen v. Hoffman, 174 U.S. 639 (1899) ..................................................................5

In re Merrill Lynch Ltd. Partnership Litigation, 154 F.3d 56 (2d Cir. 1998)............... 8, 12

New York v. Hendrickson Brothers., Inc., 840 F.2d 1065
    (2d Cir. 1988) ................................................................................... 3, 9, 10, 13

NYNEX Corp., v. Discon, Incorp., 525 U.S. 128 (1998) ........................................................ 8

Paycom Billing Services, Inc. v. Mastercard International, Inc., No.
  CIVA03CV6150DGT, 2005 WL 711658 (E.D.N.Y Mar. 29, 2005).......................... 7

Philip Morris Inc. v. Heinrich, No. 95  1996 WL 363156
  (S.D.N.Y. June 28, 1996)................................................................................... 8, 9

Pinney Dock & Transport Co. v. Penn. Central Corp., 838 F.2d 1445
  (6th Cir. 1988) ..................................................................................................... 10

Ross v. Kirschenbaum (In re Beck Industries), 605 F.2d 624 (2d Cir. 1979) ................ 5, 7

Southtrust Corp. v. Plus System, Inc., 913 F. Supp. 1517 (N.D. Ala. 1995) ................... 14

State v. Road Constructors, Inc., 474 N.W. 2d 224 (Ct. App. Minn. 1991)....................... 6

Twombly v. Bell Atlantic Corp., __ F.3d. __, 2005 WL 2420523 (2d Cir. Oct. 3, 2005) ............ 8

Timken Roller Bearing Co. v. United States, 341 U.S. 593 (1951), overruled by,
  Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984) ................... 6, 7

United States v. Dynalectric Co., 861 F.2d 722, text available at
1998 WL 117173 (6th Cir. Nov. 4, 1988) ......................................................... 8

United States v. Portsmouth Paving Corp., 694 F.2d 312 (4th Cir. 1982) ........................ 8

United States v. W.F. Brinkley & Son Construction Co., 783 F.2d 1157 (4th Cir.
  1986)..................................................................................................................... 8

Vitale v. Marlborough Gallery, No. 93 Civ. (PKL) 6276, 1994 WL 654494
  (S.D.N.Y. July 5, 1994) ...................................................................................... 13

Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321 (1971) ...................... 11, 13

**PRELIMINARY STATEMENT**

In response to the JAKKS Defendants' motion to dismiss (Def. Mem.), WWE has thrown in the towel on any suggestion that its Sherman Act claim can withstand standard "rule of reason" scrutiny. WWE effectively concedes, as it must, that it has not alleged a "market restraint" (see Def. Mem. 12-18), or any "market-wide harm to competition" (id. at 18-20), or any "antitrust injury" flowing from any such market-wide harm (id. at 20-21), or any antitrust misconduct that involves an exercise of "market power" or in any way harms consumers (id. at 25-27). Stripped of these required elements, WWE has gone for broke on its unprecedented "per se" antitrust theory that, standing alone, the open and disclosed agreement between THQ and JAKKS to submit a joint bid for the WWE license (a joint bid that was knowingly accepted by WWE's president) constituted "bid-rigging," within the extreme category of criminal misconduct deemed a "per se" violation of the Sherman Act. Ignoring the stark contrast between a bid-rigging conspiracy, which can only exist in secrecy, and the open joint bid submitted by JAKKS and THQ, WWE then argues that because "bid-rigging" (and resulting "price-fixing") is inherently "self-concealing," WWE's over six-year delay before branding the joint bid it accepted as "bid-rigging" does not run afoul of the four-year statute of limitations. At the same time, to distance itself from cases dismissing bribery dressed up as antitrust actions (e.g., Federal Paper Board), WWE repeatedly insists that its Sherman Act Claim is a "simple" bid-rigging case (Pl. Mem. 1, 12) that has nothing to do with the bribery alleged in its Amended Complaint (id. at 12) -- which is the only arguably concealed conduct at issue here.

We agree that WWE's sole reliance on a per se bid-rigging theory has made this a very "simple" case (and simple motion to decide), but for different reasons:

First, WWE does not dispute (nor can it) that, on the face of the Amended Complaint ("AC"), THQ and JAKKS openly joined together to make a bid for the video game

license, which was accepted by WWE in the form of a 10-year licensing agreement with THQ/JAKKS.  (See, e.g., AC ¶¶ 146, 154, 157; Pl. Mem. at 15, 23, 24.)  Given this admission, WWE is reduced to arguing that it is JAKKS and THQ's "antecedent" agreement "not to bid separately" (as manifested in the joint bid) that constitutes the bid-rigging, which is per se illegal.  The "simple" answer to this argument is that, over a century ago, the Supreme Court held that joint bids cannot be categorized as void against public policy (i.e., per se illegal in modern parlance), because they can be beneficial -- even though all joint bids necessarily involve an antecedent agreement not to bid separately.  Since then, every court to address the issue has concurred that joint bids disclosed to the seller are not subject to the per se treatment, and must be assessed under the rule of reason standard (which WWE admits it cannot meet).

        Second, by trying to recast its claim as one of "simple" per se bid-rigging -- i.e., jettisoning the bribery and disloyalty allegations that it pled as the source of its claimed injury -- WWE backs itself into a statute of limitations corner from which it cannot escape.  In attempting to justify its untimely Sherman Act claim, which it failed even to include among the federal claims in its initial overblown complaint, as a pure "bid-rigging" case based on an agreement between THQ and JAKKS not to bid separately, WWE falls prey to the statute of limitations. City of El Paso v. Darbyshire Steel Co., 575 F.2d 521 (5th Cir. 1978) similarly involved a joint bid that was open and obvious to the buyer.  WWE does not, and cannot, deny that it knew of, and accepted, a joint bid from THQ/JAKKS.  In keeping with its per se theory, WWE's bid-rigging injury occurred in 1998 when it knowingly accepted the THQ/JAKKS joint license proposal.  WWE itself alleges, and still argues, that its damages could be computed at the time of contracting (June 1998) just by comparing the royalty it received from THQ/JAKKS with what it allegedly could have obtained in a competitive market (a more than 50% difference according to

2

WWE, see AC ¶ 163). On their face, these allegations not only mirror El Paso, but also demolish all of WWE's own "tolling" arguments, because:

(1) the alleged "bid-rigging" was not "self-concealing" at all (yet another reason the joint JAKKS/THQ bid was not bid-rigging in the first place);

(2) as a matter of law, an alleged illegal contract which runs for several years constitutes only one illegal act and injury (at the time of contracting) and is not a "continuing conspiracy." See, e.g., In re Ciprofloxacin Hydrochloride Antitrust Litig., 261 F. Supp. 2d 188, 227 (E.D.N.Y. 2003); and,

(3) for statute of limitations purposes, WWE cannot affirmatively allege damages based on a drastically below-market royalty rate, while simultaneously claiming that its damages would have been too speculative at that time to bring suit. In all events, courts applying the antitrust laws routinely estimate damages (including anticipated lost sales) of "what would have been" absent the alleged misconduct. See New York v. Hendrickson Bros., Inc., 840 F.2d 1065, 1077 (2d Cir. 1988).

Finally, try as it might, WWE cannot help but confess that the source of its alleged injury is not the joint bid by THQ/JAKKS or any so-called "bid-rigging," but, rather, is the alleged bribery and related disloyalty of Shenker and Bell in not seeking higher bids from other potential bidders. (See Def. Mem. 20-21.) Despite the bid-rigging mantra it invokes throughout its opposition brief, WWE claims that absent the alleged disloyalty of its agents, it would have received higher bids from Acclaim, Activism and other potential bidders. (See Pl. Mem. 7-8.) In reality, the real source of WWE's alleged injury remains the alleged bribes and disloyalty, which places this case squarely within Federal Paper Board Co. v. Amata, 693 F. Supp. 1376 (D. Conn. 1988), and out of federal court, where it should never have been brought.

**ARGUMENT**

**I.    THQ and JAKKS's Agreement to Submit a Joint Bid Is Not Per Se Bid-Rigging**

In Kearney v. Taylor, 56 U.S. 494 (1853), relied on in the JAKKS Defendants' moving brief but ignored by WWE, the Supreme Court squarely addressed whether a joint bid among competitors should be set aside as against public policy -- i.e., today's per se category --

3

on the ground that "all such associations tend to prevent competition." Id. at 519. The Court held that because joint bids have the potential to be "meritorious," the purpose and effect of the "association" on competition must be assessed (i.e., the modern rule of reason). Id. at 520-21. In so doing, the Supreme Court specifically rejected the theory, advanced here by WWE, that the "antecedent" agreement not to bid separately makes joint bids categorically anticompetitive:

> It is true that <u>in every association formed to bid at the sale</u> . . . <u>there is an agreement, express or implied, that no other member will participate in the bidding</u>; and, hence, in one sense, it may be said to have the effect to prevent competition . . . . [But a] doctrine which would prohibit associations of individuals to bid . . . as preventing competition . . . is too narrow and limited for practical business life, and would often times lead inevitably to the evil consequences it was intended to avoid. . . . <u>We must, therefore, look beyond the mere fact of an association</u> . . . formed for the purpose of bidding at this sale, <u>as it may be not only unobjectionable, but often times meritorious</u>.

Id. at 520-21 (emphasis added).

Decades later, the Supreme Court made it pellucid that agreements to bid jointly are "not <u>per se</u> void," where "disclosed" to the seller, and cannot be considered bid-rigging (as the Court then described that "vice"). Hyer v. Richmond Traction Co., 168 U.S. 471, 477-78 (1897). In Hyer, on a "demurrer," the Court emphasized that the complaint, like WWE's here, alleged that there was no concealment of the fact that two competitors, who were previously pursuing separate bids, joined to make a single bid. The question in Hyer -- as here -- was whether, as a matter of law, "the agreement to unite in one application [is] against public policy, and void?" Id. at 477. In rejecting per se condemnation of agreements to bid jointly, the Court underscored that where a joint bid is not "secret," the seller itself has the ability to assess the motives of the joint bidders and the benefits, vel non, of agreeing to accept it. Id. (while joint proposals might "lessen competition" they are not "forbidden by public policy" because they "are public and avowed and not secret. The risk, as well as the profit, is joint and openly assumed. . . .

4

The public agents . . . can more justly estimate the motives of the bidders and the merits of the bid") (citation and internal quotation marks omitted).[1]

More recently, the Second Circuit opined that "bidding is not improperly chilled by 'the mere fact of an association of [competitors] formed for the purpose of bidding' since this may be 'not only unobjectionable but often times meritorious.'" Ross v. Kirschenbaum (In re Beck Indus.) ("Beck"), 605 F.2d 624, 635-36 (2d Cir. 1979) (quoting Kearney, 56 U.S. 495). Indeed, in Beck, the Court found that it was the undisclosed nature of the particular joint bid to the trustee/seller that was objectionable, not the underlying "antecedent" agreement to bid jointly. Id. at 636-37. Compare Int'l Neutronics, Inc. v. Isometric, Inc. (In re Int'l Neutronics, Inc.), 28 F.3d 965, 970 (9th Cir. 1994) (rejecting Sherman Act claim to void a joint bid from two competitors who previously bid separately because of trustee's prior acceptance of joint offer: "the Trustee bases his present antitrust claim on collusive behavior of Isomedix and RSI that was known to him at the time he sought confirmation of the sale, and, indeed, the 'collusion' was apparent on the face of the bid").

Likewise, in the Love case (cited in Defendants' moving papers) the court relied on both Kearney and Beck to hold that it is "legally insupportable" to "label" joint bidding as bid-rigging and then try to condemn it as per se unlawful. See Love v. Basque Cartel, 873 F. Supp. 563, 577-78 (D. Wyo. 1995), aff'd, 95 F.3d 1161 (10th Cir. 1996). As the court explained, allowing per se scrutiny would "essentially outlaw joint bids of any kind since it could always be

---

[1] Endorsing its prior holding in Kearney -- "that agreements to unite in bidding are not per se void" -- the Court in Hyer distinguished joint bids from secret agreements "merely to abstain from bidding," which can mislead the seller, id. at 478, because a disclosed joint bid -- like the one here -- the seller is in the position to assess the merits of the bid, and therefore per se treatment is inappropriate. Id; see also McMullen v. Hoffman, 174 U.S. 639, 652 (1899) (distinguishing between deceptive agreements to submit "fictitious" bids, which should be void, and a disclosed joint bid that is not against public policy even "'though it might prevent the rivalry of the parties'") (citation omitted).

5

said that joint bidding agreements removed potential bidders from the bidder pool and thus suppressed competition." Id. This, of course, is precisely WWE's insensible and unsupported per se theory here. Not surprisingly, state courts have also uniformly held that agreements to bid jointly do not warrant per se treatment. See, e.g., State v. Road Constructors, Inc., 474 N.W. 2d 224, 225-26 & n.1 (Ct. App. Minn. 1991) (interpreting state antitrust law "consistently with federal law developed under the Sherman act" and holding that "[t]he submission of joint bids . . . does not necessarily discourage competition and raise prices [and] is not so facially anticompetitive that inquiry into actual market impact is unjustified . . . .").

Like its discredited attempt to ride roughshod over the uniform case law and statutory history precluding its Robinson-Patman Act claim, WWE's Sherman Act claim flouts the holdings of every court for over 150 years, including the Supreme Court in Hyer, which recognize that an agreement not to bid separately -- but rather to submit a joint bid -- does not warrant per se treatment. Given these long-established antitrust principles, WWE has indeed made this case "simple" to decide. Just as in Hyer, WWE admits in its Amended Complaint and in its response papers that THQ and JAKKS combined to make an openly joint bid, which WWE accepted, (see, e.g., Compl. ¶¶ 137, 139, 152, 154, 157; Pl. Mem. at 15, 23, 24), thusly barring its per se claim, as a matter of law.

In this context, WWE's reliance on a hodgepodge of cases involving "sham" joint ventures used to "camouflage" price-fixing conspiracies is badly misplaced. (See Pl. Mem. at 16-17.) Not a single one of those cases involves an openly joint bid or even addresses whether disclosed joint bids can constitute per se bid-rigging.[2] At the same time, courts have uniformly

---

² For example, Timken Roller Bearing Co. v. United States, 341 U.S. 593 (1951), overruled by Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984), involved a continuing conspiracy
*(cont'd)*

6

held that joint ventures are subject to the rule of reason analysis. E.g., Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc., No. CIVA03CV6150DGT, 2005 WL 711658, at *3 (E.D.N.Y Mar. 29, 2005) (holding that "[b]ecause MasterCard is organized as a joint venture, its policies must be analyzed under the rule of reason" and granting motion to dismiss for failure to allege requisite harm to competition); see Copperweld Corp. v. Indep. Tube Co., 467 U.S. 752, 768 (1984) ("[C]ombinations, such as . . . joint ventures . . . are judged under a rule of reason.").

Unable to plead ignorance of the joint bid itself, WWE attempts to evade this fatal defect by advancing the legally discredited position that the per se bid-rigging lies not in the THQ/JAKKS joint bid, but in the "antecedent" agreement between them not to bid "independently for the WWE license." (See Pl. Mem. at 1, 15, 24.) As the Supreme Court, Second Circuit and other joint-bidding cases have recognized in rejecting the application of per se treatment to joint bids, every joint bid necessarily involves an "express or implied" agreement not to bid independently. See Kearney, 56 U.S. at 520; Hyer, 168 U.S. at 478; Beck, 605 F. 2d at 635-36; Love, 873 F. Supp. at 577-78. Thus, to condemn that agreement as per se unlawful would be to make all joint bidding per se illegal. See Hyer, 168 U.S. at 478; Love, 873 F. Supp. at 577.[3] Given WWE's own admission that it accepted a joint bid from THQ/JAKKS, its

---

*(cont'd from previous page)*
between Timken Roller Bearing Co. and two foreign companies in which Timken held ownership interests, to eliminate worldwide competition in the manufacture and sale of antifriction bearings by "(1) allocat[ing] trade territories among themselves; (2) fix[ing] prices on products of one sold in the territory of the others; (3) cooperat[ing] to protect each other's markets and to eliminate outside competition; and (4) participat[ing] in cartels to restrict imports to, and exports from, the United States." Id. at 596. The Court refused to permit defendants to escape liability for these quintessentially anticompetitive activities by labeling their association as a "joint venture." Id. at 597.

[3]  To be sure, these joint bidding cases acknowledge that an antitrust plaintiff still may challenge a joint bid as anticompetitive, and may challenge the purpose and effect of the joint bid itself, but must do so under the rule of reason and, therefore, must plead the requisite elements of market-wide harm to competition. Given WWE's concession that it is unable to meet that standard, WWE's frivolous Sherman Act claim must be dismissed, as a matter of law. See, e.g., Paycom, 2005 WL 711658, at *3.

7

characterization of the alleged agreement not to bid independently as per se "bid-rigging" is legally indefensible. WWE fails to cite a single case that holds otherwise.[4]

## II. WWE's Response Confirms that Its Sherman Act Claim is Time-Barred

WWE's per se bid-rigging theory only exacerbates its statute of limitations problem, which dooms its Sherman Act claim, based on the Amended Complaint's allegations.[5]

### A. WWE's Complaint Negates Any Fraudulent Concealment

WWE first argues that the statute of limitations should be tolled because the alleged antitrust violation was fraudulently concealed -- a position antithetical to its own per se theory.[6] While WWE argues that it adequately "pled the non-disclosure of the bid-rigging

---

[4] None of the per se secret bid-rigging and price-fixing conspiracy cases cited by WWE (see Pl. Mem. at 13-14) involved a disclosed joint bid at all, let alone one knowingly accepted by the plaintiff. See, e.g., United States v. Portsmouth Paving Corp., 694 F.2d 312, 325 (4th Cir. 1982) (conspiracy to trade projects by agreeing secretly to withhold bids or to submit artificially high "complimentary" bids on certain projects); United States v. W.F. Brinkley & Son Constr. Co., 783 F.2d 1157, 1159 (4th Cir. 1986) (secret agreements between defendants that one would intentionally submit a high or "'complementary'" bid to ensure that the other would be the low bidder (citation omitted)); United States v. Dynalectric Co., 861 F.2d 722, text available at 1998 WL 117173, at *4 (6th Cir. Nov. 4, 1988) (unpublished table decision) (concealed agreement to submit artificially high bids so that defendant would be the low bidder); Philip Morris Inc. v. Heinrich, No. 95 CIV. 0328, 1996 WL 363156, at *3, 8 (S.D.N.Y. June 28, 1996) ("textbook" case of secret bid-rigging with orchestrated "dummy bids" to predetermine winners).

[5] WWE's reliance on the Second Circuit's recent decision in Twombly v. Bell Atlantic Corp., __ F.3d. __, 2005 WL 2420523, at *6, 13 (2d Cir. Oct. 3, 2005) is unavailing because that case merely held on a motion to dismiss that a plaintiff could rely on conscious parallelism of competitors to show an agreement in restraint of trade without also alleging "plus factors." Here JAKKS does not challenge WWE's pleading of an agreement between THQ and JAKKS, but rather, WWE's erroneous legal theory that such an agreement to bid jointly and openly imposes per se liability. Cf. NYNEX Corp. v. Discon, Incorp., 525 U.S. 128, 135 (1998) (vacating portion of decision that improperly applied per se rule where rule of reason applied).

[6] To establish fraudulent concealment, WWE must plead three elements with particularity: (1) the JAKKS Defendants' wrongful concealment of their actions; (2) WWE's failure to discover the operative facts that are the basis of its claim within the limitations period; and (3) WWE's due diligence in pursuing the discovery of their claim. See In re Merrill Lynch Ltd. P'ship Litig., 154 F.3d 56, 60 (2d Cir. 1998); see also Hendrickson, 840 F.2d at 1083. Not only does WWE admit that the joint bid and "antecedent" agreement were not concealed, but there is no allegation that WWE undertook any due diligence to discover this allegedly concealed conspiracy. Indeed, in Philip Morris, 1996 WL 363156, on which WWE relies heavily, the Court dismissed the plaintiff's Sherman Act claims predating 1989 as time

*(cont'd)*

8

scheme" (Pl. Mem. at 25), WWE explicitly alleges that the bid for the videogame license was openly made as a joint bid by JAKKS and THQ. (AC ¶¶ 146, 154, 157-58.) By definition, a joint bid involves an agreement not to bid separately. (See supra, Section I.) Thus, the agreement between JAKKS and THQ to bid jointly (as opposed to separately) was not concealed in any way, and was fully known to WWE when its president executed the License Agreement. The only arguably concealed conduct alleged by WWE is the alleged bribery, which WWE maintains is not "relevant" to its Sherman Act claim. (Pl. Mem. at 12.) To obfuscate this fact, WWE contends that JAKKS and THQ "formed a sham LLC to be the signatory," (Pl. Mem. at 24), but does not dispute that the signatories to the Videogame License for the LLC were the respective CEOs of THQ and JAKKS, making no secret of the companies comprising the LLC.

WWE trots out a number of inapposite cases to argue that bid-rigging and price-fixing conspiracies are inherently "self-concealing," and that the statute of limitations for such claims is tolled. (Pl. Mem. at 26.) In Hendrickson, the Court of Appeals explained why actual bid-rigging conspiracies are considered inherently self-concealing: "[I]f a bidrigging conspiracy exists, it must remain concealed to be successful. Any knowledge of the conspiracy would lead plaintiff to seek action immediately and result in the collapse of the conspiracy." 840 F.2d at 1084 (citation and internal quotation marks omitted). The alleged conduct that forms the basis of WWE's Sherman Act claim, the joint bid, is the opposite -- it is open and obvious. As such, it does not fall within the self-concealing doctrine. See In re Ciprofloxacin, 261 F. Supp. 2d at 224 (rejecting claim of fraudulent concealment to toll statute of limitations where "the alleged

---

*(cont'd from previous page)*
barred for failure to plead all elements of fraudulent concealment, see id. at *12 -- even though (unlike here) it was a "textbook case of bid-rigging," id. at *8, involving a broad ten-year conspiracy to collusively submit "dummy bids" to win contracts at inflated prices, resulting in guilty pleas to criminal Sherman Act charges.

collusion . . . was not secret" and the "agreements [] were immediately disclosed to the public") (emphasis added).  Not surprisingly, not a single one of WWE's "self-concealing" cases involves a joint bid.  See, e.g., Hendrickson, 840 F.2d at 1084 (elaborate bid rigging conspiracy among several contractors to submit collusive and "dummy bids" for highway contracts over a two year period).  Indeed, in Hendrickson, the Court of Appeals acknowledged that the statute of limitations should not be tolled if -- as here -- the plaintiff "had a suspicion of collusive bidding on a single contract . . . that should have alerted it to its claim of an overall conspiracy."  Id. at 1085; cf. In re Neutronics, 29 F.3d at 970 (holding that any "collusion" was "apparent on the face" of a joint bid).

    By contrast, the agreement between JAKKS and THQ to bid jointly was not only disclosed to WWE, but was expressly recognized by WWE when it executed the videogame license agreement with the THQ/JAKKS LLC and sought and obtained as part of the consideration for the license, grants of options and warrants from both JAKKS and THQ.  (See Ex. B to Sept. 19, 2005 Lerner Decl. at § 6.)  "Such a situation cannot be characterized as a self-concealing fraud."  In re Ciprofloxacin, 261 F. Supp. 2d at 224; see also Pinney Dock & Transp. Co. v. Penn. Cent. Corp., 838 F.2d 1445, 1471-72 (6th Cir. 1988) ("Self-concealment of [a] conspiracy sufficient to toll the statute of limitations refers to activities in furtherance of a conspiracy which by their nature defy detection.") (emphasis added) (internal quotation marks and citation omitted); El Paso, 575 F.2d at 524 (affirming dismissal based on statute of limitations grounds because "no evidence whatsoever exist[ed] . . . that any of the defendants fraudulently concealed the joint nature of the bid") (emphasis added).  Here, WWE concedes that it knew that JAKKS and THQ had agreed to bid jointly when it executed the videogame license agreement.  At a minimum, this knowledge "should have alerted [WWE] to its claim," and the

10

four-year statute of limitations period must be calculated from the date of that license.

### B. Royalty Payments Under the Licensing Contract Are Not New, Independent Acts Under the "Continuing Conspiracy" Doctrine

WWE also erroneously invokes the accrual rule for "continuing conspiracies" to extend the statute of limitations for its Sherman Act claim. As a matter of law, while the license agreement between WWE and THQ/JAKKS may continue to operate for several years, it constitutes only one act for purposes of the statute of limitations, and the statute begins to run at the time of contracting. Thus, the statute is not tolled by any "continuing conspiracy."

At the outset, it bears emphasis that "courts within the Second Circuit consistently have looked unfavorably on continuing violation arguments and that compelling circumstances must exist before the limitations period will be extended." In re Ciprofloxacin, 261 F. Supp. 2d at 228 (internal quotation marks omitted) (emphasis added). WWE has provided no basis, much less compelling circumstances, to invoke a continuing conspiracy exception to the statute of limitations here. To do so, WWE must allege that it has been injured by "continued, separate antitrust violations within the limitations period." Id. (internal quotation marks and citation omitted). Therefore, "to restart the statute of limitations, the plaintiff must allege an overt act which (1) is a new and independent act that is not merely a reaffirmation of a previous act; and (2) inflict[s] new and accumulating injury on the plaintiff." Id. (alteration in original) (internal quotation marks and citation omitted).[7] WWE does not, and cannot, meet this standard.

---

[7] WWE's reliance on Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 502 n.15 (1968) and Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 339 (1971) is way off base. In Hanover Shoe, the statute of limitations was tolled under the continuing violation exception because the defendant had employed an ongoing scheme, including use of a series of anticompetitive leases. See Hanover Shoe, 392 U.S. at 483-84. Zenith, which recognized but did not apply the continuing violation exception, has been consistently interpreted to require a new and independent act, rather than mere performance of the allegedly anticompetitive contract, in order to toll the limitations period. See Zenith, 401 U.S. at 338-341. Nor do Klehr v. A.O. Smith Corp., 521 U.S. 179, 189 (1997), or Andrea Theaters,

*(cont'd)*

11

WWE argues that each payment under the licensing contract constitutes a new overt act in continuation of the alleged conspiracy. Courts repeatedly have rejected this precise argument in refusing to extend or restart the statute of limitations under similar circumstances. See, e.g., In re Merrill Lynch, 154 F.3d at 60 ("Similarly, the collection of annual fees occurred in each year of the life of the partnerships. Collection in later years cannot be viewed as a separate and distinct fraud creating new injuries as it was simply a part of the alleged scheme."); accord In re Ciprofloxacin, 261 F. Supp. 2d at 227-30; In re Buspirone Patent Litig., 185 F. Supp. 2d 363, 378-79 (S.D.N.Y. 2002). Indeed, in In re Ciprofloxacin, the court concluded that "such acts are not sufficient to extend or restart the limitations period because the performance of an allegedly anticompetitive, pre-existing contract is not a new predicate act." 261 F. Supp. 2d at 229 (emphasis added); see also County of Stanislaus v. Pac. Gas & Elec. Co., No. 93 CV-F-93-5866, 1995 WL 819150, at *24 (E.D. Cal. Dec. 18, 1995) ("[P]erformance of the alleged anticompetitive contracts during the limitations period is not sufficient to restart the period."), aff'd, 114 F.3d 858 (9th Cir. 1997).[8]

---

*(cont'd from previous page)*
Inc. v. Theatre Confections, Inc., 787 F.2d 59, 65 (2d Cir. 1986), support WWE's attempt to apply a continuing violation exception. Klehr and Andrea Theaters mandate that to apply the continuing violation exception, an "overt act" must be committed. Id. at 65; 521 U.S. at 189. Such an overt act must be new and independent, and "not merely the abatable but unabated inertial consequences of some pre-limitations actions." Al George, Inc. v. Envirotech Corp., 939 F.2d 1271, 1274 (5th Cir. 1991).

[8]    Likewise, in El Paso, 575 F.2d at 523, the Fifth Circuit held that the statute of limitations period is not revived by payments made in performance of the contract at the center of the alleged unlawful conspiracy. On this point, the operative facts are indistinguishable from those in El Paso, where the plaintiff alleged that the defendants, who combined to bid jointly, conspired to submit a collusive bid (which the court ultimately held was not concealed from the plaintiff). Unable to distinguish El Paso, WWE baldly asserts that its interpretation of the continuing conspiracies doctrine has not been adopted in the Second Circuit. To the contrary, however, the Fifth Circuit's holding and reasoning in El Paso are fully consistent with those of courts within the Second Circuit. See In re Ciprofloxacin, 261 F. Supp. 2d at 227-30; In re Buspirone, 185 F. Supp. 2d at 378-79. In fact, in In re Buspirone, this Court approvingly cited El Paso. See 185 F. Supp. 2d at 379.

C.  **The Extent of Alleged Damages Need Not Be Certain at the Time of the Alleged Violation for the Statute of Limitations to Begin Running**

Finally, WWE argues that the four-year statute of limitations should be extended "because damages could not be proved with reasonable certainty at the time the antitrust violations occurred." (Pl. Mem. at 28-30.)  The limited "speculative damages" exception to the statute of limitations, see Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 339-40 (1971); Higgins v. N.Y. Stock Exch., Inc., 942 F.2d 829, 832 (2d Cir. 1991), does not apply here. Under the exception, "if future damages are unascertainable, a cause of action for such damages does not accrue until they occur." Vitale v. Marlborough Gallery, No. 93 Civ. (PKL) 6276, 1994 WL 654494, at *6 (S.D.N.Y. July 5, 1994) (granting motion to dismiss based on affirmative defense that Sherman Act claim was barred by statute of limitations).

This exception only applies in cases where the existence of damages themselves are uncertain and not in cases, such as this one, where only the "extent of damage" is allegedly uncertain. Id.  Here, WWE alleges in the Amended Complaint that at the time when the alleged violation occurred THQ alone would have paid between 50-60% more than THQ/JAKKS (AC ¶ 163), yet now argues in its opposition that the damage calculation at the time was "entirely speculative." (Pl. Mem. 29.)  Based on WWE's own allegations, the statute of limitations was not tolled because "[t]he extent of these damages . . ., while uncertain, is not so speculative that it could not be estimated." Vitale, 1995 WL 654494, at *4 (emphasis in original).  Indeed, if WWE's tolling theory were correct, which it is not, the statute of limitations would be virtually meaningless in antitrust cases, as courts routinely are faced with uncertain damage estimates provided by conflicting experts who attempt to approximate "what would have been" if not for the alleged violation. Hendrickson, 840 F.2d at 1077.  Accordingly, WWE cannot avail itself of the speculative damages exception.

13

### III. The Source of WWE's Alleged Injury Remains Alleged Bribes and Disloyalty, Not the THQ/JAKKS Joint Bid

Finally, to distance itself from Federal Paper Board Co. v. Amata, 693 F. Supp. 1376 (D. Conn. 1988), WWE has been forced to argue that the sole source of its claimed antitrust injury is the reduction of competition presumed from the THQ/JAKKS joint bid and nothing more -- not bribes, not disloyalty and not cover-ups. (See Pl. Mem. at 17-24.) But, as WWE acknowledges, even in a per se case the alleged injury must flow from conduct which makes defendants' acts unlawful. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977). As a result, WWE's "antitrust injury" argument is legally indefensible.

First, WWE now argues that the only antitrust injury it has suffered is, and has always been, based only on the reduction in competition between THQ and JAKKS in agreeing to bid jointly. It is indisputable, however, that WWE itself was free to require THQ and JAKKS to bid separately or to reject that joint bid altogether. See Southtrust Corp. v. Plus Sys., Inc., 913 F. Supp. 1517, 1522 (N.D. Ala. 1995) (finding no antitrust injury where plaintiff bank, which challenged contract containing no-surcharge rule for automated teller machines, had voluntarily executed the allegedly per se unlawful agreement); see also Hyer, 168 U.S. at 478 (the value of competitive bidding is not lost, even through joint bidding, when the seller is "free" to accept or reject the various applicants). Thus, WWE itself is more accurately viewed as the source of its alleged "injury" with respect to the THQ/JAKKS joint bid, and the antitrust laws simply do not provide after-the-fact redress to a seller that is free to require as much competition in bidding as it desires.

Second, if, as the Amended Complaint makes clear, the real alleged injury here was WWE's inability to obtain higher bids from Acclaim and Activision and other potential bidders (see AC ¶ 104, 147, 148, 163, 164), WWE's alleged injury flows directly and solely from

the alleged bribery and disloyalty of Bell and Shenker.  Indeed, WWE conceded, as it must, that this is the true source of its claimed injury.  (See, e.g., Pl. Mem. at 7-8 (because of the bribes, Bell and Shenker never solicited bids from other videogame companies).)  Such a scheme, of course, is precisely what the court in Federal Paper Board found could not constitute antitrust injury.  693 F. Supp. at 1384 ("When the only source of a [plaintiff's] injury is a disloyal employee, a plaintiff cannot . . . elevate [a] . . . breach of fiduciary duty into Sherman Act claims.").

On the face of the Amended Complaint, the source of WWE's injury is either its disloyal employees and agents or its own completely voluntary decision to accept a joint bid from THQ/JAKKS that it was free to reject.  Either way, and under any Sherman Act standard, WWE cannot allege that it suffered an antitrust injury by not obtaining the royalty rate that, in retrospect, it wishes it had negotiated.

## CONCLUSION

For the foregoing reasons and those set forth in the moving papers, the JAKKS Defendants respectfully request that WWE's Sherman Act claim be dismissed with prejudice.

FEDER, KASZOVITZ, ISAACSON,
 WEBER, SKALA, BASS & RHINE LLP
Murray L. Skala (MS 9354)
Jonathan D. Honig (JH 7577)
750 Lexington Avenue
New York, New York 10022
Phone:  (212) 888-8200
Fax:  (212) 888-5968

SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP

By:  s\ *Michael H. Gruenglas*
Jonathan J. Lerner (JL 7117)
Michael H. Gruenglas (MG 8705)
James Keyte (JK 0680)
Maura B. Grinalds (MG 2836)
Four Times Square
New York, New York 10036
Phone:  (212) 735-3000
Fax:  (212) 735-2000

Attorneys for the JAKKS Defendants

October 18, 2005

15