UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
WORLD WRESTLING ENTERTAINMENT, INC.

                    Plaintiff,                04 CV 8223 (KMK)

        v.                           (ECF CASE)

JAKKS PACIFIC, INC.; JAKKS PACIFIC (H.K.)
LIMITED; ROAD CHAMPS LIMITED; THQ,
INC.; THQ/JAKKS PACIFIC LLC; STANLEY
SHENKER AND ASSOCIATES, INC.; STANLEY
SHENKER; BELL LICENSING, LLC; JAMES
BELL; JACK FRIEDMAN; STEPHEN BERMAN;
JOEL BENNETT; and BRIAN FARRELL,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## COMPENDIUM OF UNREPORTED DECISIONS CITED IN THE MEMORANDA OF LAW IN SUPPORT OF THE JAKKS DEFENDANTS' MOTION TO DISMISS THE SHERMAN ACT CLAIM IN THE AMENDED COMPLAINT

### VOLUME 1 of 4

FEDER, KASZOVITZ, ISAACSON,
  WEBER, SKALA, BASS & RHINE LLP
Murray L. Skala (MS 9354)
Jonathan D. Honig (JH 7577)
750 Lexington Avenue
New York, New York 10022
Phone: (212) 888-8200
Fax: (212) 888-5968

SKADDEN, ARPS, SLATE
  MEAGHER & FLOM LLP
Jonathan J. Lerner (JL 7117)
Michael H. Gruenglas (MG 8705)
James Keyte (JK 0680)
Maura B. Grinalds (MG 2836)
Four Times Square
New York, New York 10036
Phone: (212) 735-3000
Fax: (212) 735-2000

Attorneys for the JAKKS Defendants

October 18, 2005

# INDEX

**CASES**                                                                           **TAB**

County of Stanislaus v. Pacific Gas & Electric Co., No. 93 CV-F-93-5866, 1995 WL
    819150 (E.D. Cal. Dec. 18, 1995), aff'd, 114 F.3d 858 (9th Cir. 1997) ....................1

James Cape & Sons Co. v. PCC Const. Co., No. 05-C-269, 2005 WL 2176965 (E.D.
    Wis. Sept. 6, 2005) ...............................................................................................2

Kasada, Inc. v. Access Capital, Inc., No. 01 Civ. 8893, 2004 WL 2903776 (S.D.N.Y.
    Dec. 14, 2004)........................................................................................................3

Martinez v. Sanders, No. 02 Civ. 5624, 2004 WL 1234041 (S.D.N.Y. June 3, 2004) ..................4

Paycom Billing Services, Inc. v. Mastercard International, Inc., No. Civ. A 03-CV-6150
    (DGT), 2005 WL 711658 (E.D.N.Y. Mar. 29, 2005)...........................................5

Philip Morris Inc. v. Heinrich, No. 95 Civ. 0328, 1996 WL 363156 (S.D.N.Y. June 25,
    1996).......................................................................................................................6

Twombly v. Bell Atlantic Corp., --- F.3d ----, 2005 WL 2420523 (2d Cir. Oct. 3, 2005)............7

United States v. Dynalectric Co., 861 F.2d 722, text available at 1988 WL117173 (6th
    Cir. Nov. 4,1988) ..................................................................................................8

Vitale v. Marlborough Gallery, No. 93 Civ. (PKL) 6276, 1994 WL 654494 (S.D.N.Y.
    July 5, 1994) ..........................................................................................................9

Williams Electronic Games, Inc. v. Barry, No. 97 C 3743, 2001 WL 1104619 (N.D. Ill.
    Sept. 18, 2001), aff'd sub nom, Williams Electronic Games, Inc. v. Garrity, 366 F.3d
    569 (7th Cir. 2004) ..............................................................................................10

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 819150 (E.D.Cal.), 1996-1 Trade Cases P 71,305, Util. L. Rep. P 14,082
(Cite as: 1995 WL 819150 (E.D.Cal.))

**Page 1**

H

United States District Court, E.D. California.
COUNTY OF STANISLAUS, a public entity, and
Mary Grogan, an individual, on
behalf of themselves, and all entities and persons
similarly situated
v.
PACIFIC GAS & ELECTRIC CO., Pacific Gas
Transmission Co., a wholly owned
subsidiary of Pacific Gas & Electric Co., and
Alberta and Southern Gas Co.
Ltd., a wholly owned subsidiary of Pacific Gas &
Electric Co. and a foreign
corporation.
No. CV-F-93-5866-OWW.

Dec. 18, 1995.

### I. INTRODUCTION

WANGER, District Judge:

*1 This matter comes before the Court on Defendants' motion to dismiss plaintiffs' amended complaint filed after the August 24, 1994, Memorandum Opinion deciding a prior motion to dismiss the original complaint for failure to state a claim. The original Memorandum Opinion to the extent not inconsistent with this opinion is incorporated by this reference.

#### A. *Parties*

The plaintiffs in this class action are individuals and entities who received natural gas service from defendant Pacific Gas & Electric Company (PG & E) during the period from February 1988 through October 1993. [FN1] There are two alleged subclasses of plaintiffs: core customers and non-core customers. [FN2] "[C]ore customers are residential and commercial customers without alternate fuel capability." (Amended Complaint (hereinafter AC) at ¶ 15). Mary Grogan, an individual, is the class representative for core customers. Non-core customers are large commercial and industrial consumers that use more than 250,000 therms per year and are capable of purchasing gas from alternative sources. The County of Stanislaus (County) is the class representative for non-core customers, both who core elected and did not core elect. The County

maintains all class members suffered common injury, denial of access to competitively priced Canadian gas.

PG & E is a public utility company that provides natural gas service throughout central and northern California. Defendant Pacific Gas Transmission Company (PGT), is a wholly-owned subsidiary of PG & E. PGT owns and operates a gas pipeline extending from the Canada-United States border to California. Defendant Alberta and Southern Gas Company (A & S), a Canadian corporation, is also a wholly-owned subsidiary of PG & E. It is an aggregator and exporter of Canadian natural gas.

#### B. *Plaintiffs' Allegations*

The Canadian province of Alberta holds large natural gas reserves. In the 1950s, PG & E constructed a pipeline between California and Canada so that it could purchase Canadian gas. (AC, ¶ 31). PG & E created A & S to purchase gas from producers in Alberta and to contract for transportation of the gas from Alberta to the Canadian border at Kingsgate, British Columbia. [FN3] At that point, PGT bought the gas from A & S and sent it through PGT's pipeline, which ends at the California state line. (AC, ¶ 32). Once the gas reached California, it was purchased by PG & E and sold to end users in the northern and central regions of the state.

A & S purchased gas from a pool of Alberta gas producers, which Plaintiffs allege acted as a cartel. (AC, ¶ 36-37). A & S did not negotiate individual contracts with each member of the cartel. Rather, the cartel negotiated a single price for all of its members, which was approved by a vote of the producers. (AC, ¶¶ 40, 59). The cartel required A & S to purchase a specified volume of gas. Under so-called "take-or-pay" provisions of the cartel contracts, if A & S did not purchase 90% of the contract volume on an annual basis, it had to pay the cartel for gas not taken. (AC, ¶¶ 43-44).

*2 Plaintiffs allege that prior to 1984, A & S contracted to purchase quantities of natural gas in excess of the needs of the California market, as part of PG & E's corporate strategy to expand its market share. (AC, ¶¶ 43- 44). However, A & S proved

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1995 WL 819150, *2 (E.D.Cal.))

unable to meet its large purchasing obligations, allegedly because PG & E failed to develop markets outside California. Consequently, A & S incurred take-or-pay obligations. By July 1984, A & S's "total potential [take-or-pay] liabilities under existing cartel contracts exceeded approximately $2 billion." (AC, ¶ 45). According to Plaintiffs, "this huge potential obligation was a liability of PG & E shareholders and not California customers." (Id.).

In 1984, PG & E allegedly conspired with the cartel to renegotiate the cartel gas contracts. The renegotiated contracts reduced PG & E's existing and future take-or-pay obligations. Plaintiffs aver that in addition to reducing these obligations, the parties restructured them so that they would be paid off by California rate-payers.

In exchange for the reductions in take-or-pay obligations, A & S agreed to pay inflated prices for cartel gas. (AC, ¶¶ 53, 55). Plaintiffs allege that A & S contracted to buy gas at rates above the prevailing market rate for Canadian gas. The price A & S paid for cartel gas was based upon a "netback" formula. The "netback" price was calculated by subtracting the cost of transportation from Alberta to California from the price of gas produced in southwestern United States and transported to California. (AC, ¶¶ 58). The cost of producing United States gas is significantly greater than the cost of Canadian gas production. It is claimed that independent (non-cartel) Canadian producers were willing and able to sell gas to A & S at lower prices. (AC, ¶ 40, 42). PG & E allegedly failed to use its substantial economic base, and A & S failed to use its economic bargaining power as the largest single purchaser of natural gas in Canada, to negotiate lower prices. (AC, ¶ 55).

In addition to the price-fixing conspiracy, Plaintiffs contend Defendants prevented PG & E's competitors from gaining necessary access to PGT's pipeline. Deregulation of the natural gas industry made it possible for non-core users of natural gas to satisfy their fuel requirements by purchasing directly from producers. (AC ¶ 64). However, non-core consumers seeking to buy inexpensive Canadian gas needed access to PGT's pipeline to transport the gas to California. It is alleged that PG & E foreclosed pipeline access by filling it with expensive cartel gas earmarked for core customers. PG & E "stuffed" the pipeline by causing its Utility Electric Generation Department (UEG) to elect core service and encouraging other non-core customers to elect core service. The increase in demand for core service caused a corresponding increase in the volume of gas transmitted through PGT's pipeline. Consequently, non-core customers who wanted to purchase gas directly from producers were denied access to inexpensive Canadian natural gas because PGT's entire capacity was dedicated to supplying gas to core customers and those non-core customers who elected core service. Filling the pipeline with cartel gas also benefitted Defendants because it enabled them to consume excess gas that had been prepaid, but not taken, under the take-or-pay obligations.

*3 The price-fixing conspiracy and the denial of pipeline access benefitted Defendants in three ways. First, in exchange for paying higher prices, PG & E was able to restructure its take-or-pay obligations to "reduce or eliminate significant shareholder liabilities," at the expense of California ratepayers. (AC, ¶ 50). Second, the hundreds of millions of dollars that the cartel received annually in excess profits benefited A & S board members and officers, who allegedly had board memberships and ownership interests in cartel producers. (AC, ¶¶ 50-51). Third, PG & E, PGT, and A & S earned higher revenues and profits, "which resulted in larger annual bonuses and incentive packages for certain PG & E executives." (AC, ¶ 50).

Plaintiffs assert ten claims for relief. The first four claims relate to the alleged price-fixing conspiracy; Plaintiffs claim violation of Sherman Act section 1, the Wilson Tariff Act, Clayton Act section 3, and the California Cartwright Act. The fifth through eighth claims pertain to anticompetitive denial of pipeline access under the Sherman Act, Wilson Tariff Act, Clayton Act, and Cartwright Act. The ninth claim alleges violation of the California Unfair Business Practices Act. Plaintiffs' tenth claim seeks injunctive relief.

C. *Regulatory Structure and History*

Natural gas imports from Canada to the United States are subject to regulation by Canadian, federal, and state agencies. The first level of regulation is Canadian. Natural gas may not be removed from Alberta for resale unless there is a finding of producer support and the price has been calculated

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                            **Page 3**
**(Cite as: 1995 WL 819150, \*3 (E.D.Cal.))**

according to one of two approved methods. *See* Mem.Op. at 2-3 (discussing Canadian regulatory structure). The details of the Canadian regulatory structure are not relevant to this motion.

At the federal level, there are two agencies responsible for regulating natural gas sales. First, under section 3 of the National Gas Act (NGA), the Economic Regulatory Administration (ERA) must approve the foreign natural gas imports. The ERA approves a proposed import unless it "will not be consistent with the public interest." 15 U.S.C. § 717b. In making this "public interest" determination, the ERA considers: the competitiveness of the imported gas, the need for the gas, and the security of the supply. *See TransCanada Pipelines, Ltd. v. FERC,* 878 F.2d 401, 407 (D.C.Cir.1989).

In addition to ERA oversight, Sections 4(c) and 4(d) of the NGA, 15 U.S.C. §§ 717c(c) and (d), require sellers of natural gas in interstate commerce to file their rates with the Federal Energy Regulatory Commission (FERC). Under § 4(a) of the Act, 15 U.S.C. § 717c(a), the FERC will approve the rates charged by wholesalers of natural gas only if the rates are "just and reasonable." However, the scope of the FERC's review of wholesale prices for imported gas is limited. The FERC may not redetermine the reasonableness or competitiveness of an import arrangement approved by the ERA. *Trans-Canada Pipelines,* 878 F.2d at 407. In such instances the FERC's jurisdiction is limited to the classification of costs so that Canadian and domestic sources of gas are treated equally. *Id.* at 411; *Pacific Gas Transmission Company,* 64 F.E.R.C. ¶ 61,032, at 61,484.

\*4 California has its own regulatory agency, the Public Utilities Commission (CPUC), which has authority to regulate rates charged to the public by California utilities. The CPUC must approve all utility rates or rate changes. Cal.Pub.Util.Code § 454(a) (West.Supp.1995). The CPUC applies a "just and reasonable" standard when examining proposed utility rates. Cal.Pub.Util.Code § 451 (West Supp.1995)

Plaintiffs' claims must be understood within the context of the regulatory review conducted by the ERA, FERC, and the CPUC. Much of the regulatory history pertaining to Plaintiffs' price-

fixing claims was reviewed in the August 25, 1994 Memorandum Opinion which decided Defendants' prior motion to dismiss. Mem.Op. at 25-32. A brief review is necessary here, along with a more detailed examination of the regulatory activity applicable to Plaintiffs' pipeline access claims.

In 1984, PGT sought ERA approval of its new contracts with A & S. The renegotiated contracts contained a significant price reduction. They also reduced PGT's take-or-pay obligation and its minimum physical take obligation. Under the amended contract, the contracts were subject to semi-annual review. To determine if the PGT gas import agreements were in the public interest, ERA examined the volume of gas, base price, price adjustment, take-or-pay obligations, make up provisions, length of the contract, and other terms bearing on marketability of the gas. Mem.Op. at 27; *New Policy Guidelines and Delegation Orders,* 49 Fed.Reg. 6684, 6688 (1984).

The ERA permitted interested parties to intervene in the review process. The CPUC intervened on behalf of core and non-core California ratepayers in support of the renegotiated contracts. Of nineteen intervenors, six opposed ERA approval on the ground that the import price was not competitive in the California market. *Re Pacific Gas Trans. Co.,* 1 E.R.A. ¶ 70,574, at 72, 322 (1984). Some intervenors objected to the volume proposed to be imported on the ground that future development of domestic gas supplies would be adversely affected. *Id.* However, ERA review and approval of the terms of the renegotiated contracts found these objections meritless:

The substantial reduction in PGT's take-or-pay obligations, the elimination of its minimum physical take obligations, the reduction in the price of the Canadian gas imported by PGT, and the flexibility provided by the semi-annual review and redetermination provisions amply demonstrate that PGT's import arrangement is competitive and market-responsive, and can be expected to remain so over the term of the underlying contract.
*Final Order Granting Amendments to Authorization to Import Natural Gas from Canada,* 1 ERA ¶ 70,591, at 72,386 (1985). The ERA's review of the contract between A & S and PGT did not include scrutiny of the producer contracts between A & S and the alleged cartel of Canadian gas producers. The terms of the producer contracts

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1995 WL 819150, *4 (E.D.Cal.))

Page   4

remain confidential. Plaintiffs do not suggest what provisions of the Canadian producer contracts with A & S may have any bearing on the complaint. [FN4]

*5 Based upon its review of the import contract between A & S and PGT, the ERA authorized PGT to import up to 1,023 MMcf of Canadian natural gas per day at the current rate, subject to semi-annual price renegotiations. *Id.* To assure that the contract remained competitive, the ERA required PGT to file quarterly reports showing the quantity and price of gas purchased monthly. Upon each filing, intervenors had the opportunity to oppose changes. 1 ERA ¶ 72, at 386-87. PGT's import authorization ran through October 1993. On September 12, 1989, the ERA extended PGT's import authorization through October 31, 2005. *Pacific Gas Transmission Company,* DOE/FE Opinion and Order No. 387, 1 FE ¶ 70,371 at 71,422 (March 6, 1990). [FN5] However, PG & E and PGT terminated the import contracts with A & S in October of 1993. Since 1984, the ERA continuously approved PGT's gas import volumes and prices. Mem.Op. at 27.

The alleged anticompetitive conduct was also subject to FERC regulation. Because the international contract between A & S and PGT was regulated by the ERA, the FERC had no jurisdiction to review the reasonableness or competitiveness of the import price arrangement approved by the ERA. *TransCanada Pipelines,* 878 F.2d at 407. Nevertheless, the FERC administered several regulatory programs that provided transportation rights on PGT's pipeline to non-core end users of natural gas.

One such regulatory program enabled pipeline operators such as PGT to apply to FERC for an individual certificate of public convenience and necessity to transport natural gas on behalf of an end user. *See* 15 U.S.C. § 717f(c). The certificates were not widely used because they only authorized transportation of limited volumes to a specified location over a finite duration. Notice and a hearing was required for each requested certificate. *Id.* Nonetheless, PGT obtained certificates for at least nine shippers during the mid-1980s. *Re Pacific Gas Trans. Co.,* 40 F.E.R.C. ¶ 61,193, at 61,622 n. 29 (1987). The County does not allege that it ever sought PGT pipeline transportation service.

In October, 1985, FERC adopted the blanket certificate program, which eliminated many of the restrictions associated with individual certificates of public convenience. *See* 50 Fed.Reg. 42408 (1985) . The goal of the blanket certificate program was to provide end users (not PG & E) greater access to gas transportation. The blanket certificate authorized interstate pipelines to become "open access" transporters, obligated to transport gas in competition with their own gas on a first come, first served, basis. *See* 18 C.F.R. §§ 284.1-284.9, 284.221, *et seq.* Pipelines, such as PGT, that obtained a blanket certificate were only required to provide transportation if there was available capacity. 50 Fed.Reg. 42408, 42435 (1985).

PGT sought to participate in the blanket certificate program. PGT intended to provide, by lottery, interruptible [FN6] transportation service to the extent it was available. 40 F.E.R.C. at 61, 193. It received bids from 118 end users for transportation space far in excess of available capacity. FERC issued PGT a blanket certificate in July, 1990 upon a finding of enhanced competition in gas supplies and transportation rights, approving PGT's lottery. *Re Pacific Gas Trans. Co.,* 52 F.E.R.C. ¶ 62,075 (1990). The County does not allege participation in the lottery or impropriety in PGT's conduct of the lottery.

*6 Another gas transportation option available to non-core end users was the so-called "Section 311" shipper queue. 15 U.S.C. § 3371(a). Under this program, interstate pipelines could obtain "self-implementing" authority to transport gas for certain end users by submitting tariffs to the FERC for approval. PGT received authorization to be a Section 311 shipper in 1987. *See* 40 F.E.R.C. ¶ 61,193; 48 F.E.R.C. ¶ 61,125 (approving modifications to tariffs in 1989). In 1992, the FERC issued Order No. 636, which required pipelines to broker their firm capacity rights. The County does not allege it sought access to this program.

In addition to the federal regulation of A & S and PGT by the ERA and the FERC, at the state level, the CPUC continuously reviewed and approved the 1984 restructuring of PG & E's long-term Canadian gas supply contracts with A & S. It found that the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1995 WL 819150, *6 (E.D.Cal.))

reductions in price and take-or-pay obligations were reasonable and that no customer cost increases resulted. CPUC Reasonableness Decision, at 39-46 (1991) (hereinafter Reasonableness Dec.).

In 1986, the CPUC restructured and actively regulated the natural gas procurement and transportation industry in California by segmenting natural gas consumers into two categories: core and non-core. Core customers are defined as residential and commercial consumers with no alternatives to purchasing gas from utilities while non-core customers are comprised of large consumers that have alternatives for fuel. The CPUC accorded core customers the highest priority for gas supply and transportation "because of their status as captive customers and their end-use characteristics." 22 C.P.U.C.2d 491, 505 (1986). Non-core customers received a lower priority. They were permitted to elect core service if they wished. *Id.* at 505-06; 520-21. Otherwise, non-core customers could purchase gas and transportation from utilities, such as PG & E, on a "best efforts" basis or they could arrange their own gas procurement and simply purchase transportation from the utility. *Id.*

Core election by non-core customers proved to be a popular program. Although some parties claimed that core election should be restricted, the CPUC determined that core election benefited both core and non-core consumers because it increased PG & E's bargaining power with Canadian producers. *Re Natural Gas Procurement and System Reliability,* 30 C.P.U.C.2d 545, 558-60 (1988). The CPUC stated in its reasonableness decision that, "it was prudent for PG & E to maximize core election as a means to secure the benefits of competition for the captive Core customers." Reasonableness Dec. at 59 (1991). Nevertheless, the CPUC criticized PG & E for its "failure to maximize the bargaining leverage which core election offered in negotiating with the A & S pool." *Id.* at 60. PG & E served both captive core and core elect customers from the same supply at the same gas cost. 37 C.P.U.C.2d 583, 628 (1990).

**\*7** PG & E significantly increased the size of the core program by choosing core service for its Utility Electric Generation Department (UEG), a non-core customer that uses natural gas to generate electricity. Core election by UEG and other non-core users substantially increased the volume of gas transported on PGT's pipeline. Consequently, firm transportation capacity for non-core users who wished to purchase gas directly from Canadian producers was reduced. Some end users complained that the size of the core program prevented non-core customers from obtaining pipeline space. However, the CPUC determined that "to the extent that goals of open access and low cost reliable core service conflicted, [CPUC's] first priority was to safeguard core customers' interests." Reasonableness Dec. at 55. Nevertheless, in 1990 the CPUC limited UEG's election of core service of its annual requirements, declining to zero over four years. 37 C.P.U.C.2d 87, 109 (1990); 41 C.P.U.C.2d 668, 694 (1991).

In 1990, the CPUC created the Customer Identified Gas (CIG) program, which required PG & E to allocate 250 MMcf per day of its firm capacity rights on PGT's pipeline to noncore customers. PG & E would purchase gas for a specific customer, transport the gas from Canada to California, and then resell it. CIG customers were given transportation priority equal to that of the core program. 37 C.P.U.C.2d at 607, 610. In 1991, the CPUC adopted an interim capacity brokering program. Under this program, utilities were required to make available to non-core customers any transportation capacity in excess of that required to serve core customers. *See* 41 C.P.U.C.2d at 681-82. The CPUC addressed contentions that core elections by PG & E's UEG prevented non-core customers from gaining pipeline access and found although reducing the volume of UEG core election increased the cost of gas for non-core customers, the CPUC's first priority was to safeguard core customers' interests and found the UEG election achieved lower prices for core customers. Reasonableness Dec. at 55, 59, 66-67.

Stanislaus County, the non-core class representative, does not allege that it sought transportation capacity through any of the FERC or the CPUC programs.

## II. DISCUSSION
### A. *Judicial Notice*

The parties request judicial notice of some 89 documents, totaling approximately 2,000 pages. [FN7] Federal Rule of Evidence 201 provides in pertinent part: "A judicially noticed fact must be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1995 WL 819150, *7 (E.D.Cal.))

one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.    A court shall take judicial notice if requested by a party and supplied with the necessary information."    Federal courts may "take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to the matters at issue." *U.S. ex rel Robinson Rancheria Citizens Council v. Borneo,* 971 F.2d 244, 248 (9th Cir.1992).    "[O]n a motion to dismiss a court may properly look beyond the complaint to matters of public record and doing so does not convert a Rule 12(b)(6) motion to one for summary judgment." *Mack v. South Bay Beer Distrib., Inc.,* 798 F.2d 1279, 1282 (9th Cir.1986).

**\*8** Plaintiffs and Defendants request judicial notice of three types of documents: (1) decisions of federal agencies, such as the ERA, OFE, and FERC; (2) decisions of the CPUC; (3) public records of governmental entities; and (4) decisions of Canadian regulatory entities.  Decisions of federal and state agencies may be judicially noticed. *Nugget Hydroelectric v. Pacific Gas & Elec.* [1992-2 TRADE CASES ¶ 70,068], 981 F.2d 429, 435 (9th Cir.1992), *cert. denied,* 508 U.S. 908, 113 S.Ct. 2336 (1993) (taking judicial notice of decisions of the CPUC); *Cunningham v. Litton Indus.,* 413 F.2d 887, 889 n. 2 (9th Cir.1969) (taking judicial notice of decisions of the Equal Employment Opportunities Commission). Likewise, the Court may properly take judicial notice of public records of the CPUC, and other governmental entities. *Mack,* 798 F.2d at 1282. Finally, the Court may take judicial notice of "authoritative sources of foreign law." *McGhee v. Arabian American Oil Co.,* 871 F.2d 1412, 1424 & n. 10 (9th Cir.1989).    The parties' requests for judicial notice of these documents are GRANTED.

Defendants object to four of the items Plaintiffs seek to have judicially noticed: (1) testimony of Geoffrey Bellenger before the CPUC; (2) an Opening Brief filed by the Division of Ratepayer Advocates [FN8] (DRA); (3) a DRA Report on the Reasonableness of Gas and Electric Operations; and (4) portions of PG & B's Complaint for Injunctive and Declaratory Relief against the CPUC, filed December 21, 1994.  As the Court previously held,

testimony and pleadings submitted for judicial notice are hearsay and if objected to "will be considered for the fact that they exist as submitted, not for the truth of disputed assertions of fact or argument." Mem.Op. at 10; *see also Liberty Mutual Ins. Co. v. Rotches Pork Packers, Inc.,* 969 F.2d 1384, 1388 (2d Cir.1992) (pleadings in other proceedings may not be judicially noticed for their truth).   The Court takes judicial notice of these four documents for the fact that they exist, but not for the truth of the matters stated therein, except to the extent that the fourth document collaterally estops PG & E as a judicial admission.

### B. *The Amended Price-Fixing Claims Are Barred By The Filed Rate Doctrine*

Defendants move to dismiss Plaintiffs' price-fixing claims on the ground that they are barred by the filed rate doctrine.   Plaintiffs contend the filed rate doctrine does not apply to the price-fixing claims because: (1) these claims are premised on activity outside the jurisdiction of the relevant regulatory agencies; and (2) do not challenge the rate Defendants charged for gas, but rather their alleged "non-rate activity" that precluded market competition.

Under the filed rate doctrine, courts may not redetermine the reasonableness of rates filed with the appropriate agency. *See, e.g., Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 576-78 (1981).   The doctrine bars the imposition of treble damages when it is alleged that the rate filed with and approved by the relevant agency was the product of an antitrust violation. *Square D Co. v. Niagara Frontier Tariff Bureau* [1986-1 TRADE CASES ¶ 67,105], 476 U.S. 409, 422 (1986); *Keogh v. Chicago & Northwestern Railway Co.,* 260 U.S. 156, 163-64 (1922).     Two principles guide the application of the filed rate doctrine in this case.

**\*9** First, the scope of immunity from treble damages under the filed rate doctrine is defined by the reach of the federal agency's exclusive jurisdiction. *Barnes v. Arden Mayfair, Inc.* [1985-1 TRADE CASES ¶ 66,535], 759 F.2d 676, 679 (9th Cir.1985) (rejecting defendants' claimed immunity under filed rate doctrine because the alleged antitrust activities were "beyond the scope of the ICC's jurisdiction").   Supreme Court decisions make clear

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that the doctrine is "a matter of enforcing the Supremacy Clause." *Nantahala Power & Light Co. v. Thornburg,* 476 U.S. 953, 964 (1986). It prevents the judiciary from usurping power that Congress assigned to a federal regulatory agency. *Id.* (citing *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 581-82 (1981)). One of the considerations underlying the doctrine is "preservation of the agency's primary jurisdiction over reasonableness of rates." *Arkansas Louisiana Gas Co.,* 453 U.S. at 581-82. "The filed rate doctrine is not limited to 'rates' *per se,* but applies to any activity under the controlling agency's regulatory power." Mem.Op. at 15.

The filed rate doctrine may be asserted with respect to matters within the agency's jurisdiction, even if the agency did not make a determination on the on the issue that the plaintiff seeks to raise in court. *Mississippi Power & Light v. Mississippi,* 487 U.S. 354, 374 (1988) (hereinafter *MPL* ). ("The Mississippi Supreme Court erred in adopting the view that the preemptive effect of FERC jurisdiction turned on whether a particular matter was actually determined in the FERC proceedings."). "The reasonableness of rates and agreements regulated by FERC may not be collaterally attacked in state or federal courts. The only appropriate forum for such a challenge is before the Commission or a court reviewing the Commission's order." *Id.* at 375.

Second, the filed rate doctrine applies even when it is alleged that the filed rate is the product of antitrust violations that were not investigated by the controlling agency *Square D Co. v. Niagara Frontier Tariff Bureau,* 476 U.S. 409, 415-17 (1986). It was alleged in *Square D* that five Canadian motor carriers conspired to fix the prices for freight transportation between Canada and the United States. *Id.* at 411-12. The plaintiffs maintained that the rates the carriers filed with the Interstate Commerce Commission violated the Sherman Act. They argued that the filed rate doctrine did not bar recovery of treble damages because the tariffs filed with the ICC "were not challenged in a formal ICC hearing before they were allowed to go into effect." *Id.* at 417. The Court rejected this argument, stating that:

"The Court of Appeals, however, properly concluded that *Keogh* was not susceptible to such a narrow reading: "Rather than limiting its holding to cases where, as in *Keogh,* rates had been

investigated and approved by the ICC, the Court said broadly that shippers could not recover treble-damages for overcharges whenever tariffs have been filed."

*10 *Id.* at 417 n. 19 (quoting *Square D Co. v. Niagara Frontier Tariff Bureau,* 760 F.2d 1347, 1351 (2d. Cir.1985)).

Finally, the filed rate doctrine precludes the plaintiff in an antitrust suit from claiming speculative damages. To establish injury, the plaintiff would have to prove a hypothetical lower rate that would have been charged in the absence of the conspiracy and the acceptability of those rates to the appropriate regulatory agency. *Keogh v. Chicago & N.R. Co.,* 260 U.S. 156, 164 (1922).

The price-fixing claims for treble damages in the original complaint were previously found to be barred by the filed rate doctrine. Mem.Op. at 36-42. Plaintiffs concede that "the Amended Complaint does not alter the substance of Plaintiffs' price-fixing claims." Plaintiffs' Opp. at 6:7-8. The Court previously determined that Plaintiffs' price-fixing claims against PG & E and PGT seeking damages for the difference between the fixed price and the Canadian market price for gas purchased, were barred by the filed rate doctrine. No new arguments why the filed rate doctrine does not bar the price-fixing claims against PG & E and PGT are presented. Plaintiffs contend that A & S is not protected by the filed rate doctrine because it is outside the jurisdiction of the ERA, FERC, and the CPUC. By analyzing A & S as a free standing supplier, plaintiffs assert that A & S's Canadian contracts are not subject to regulatory oversight. However, the *Keogh* analysis as to PGT applies with equal force to A & S, the other party to the contract. Mem.Op. at 10, 32, 34. ERA approval of the import contract bars the claim that the price of gas sold by A & S pursuant to the contract violates the antitrust laws.

There are only three notable differences between the price-fixing allegations in the Amended Complaint and Plaintiffs' Original Complaint. The Amended Complaint does not specifically allege that inflated Canadian gas rates were passed on to PG & E's customers "penny for penny." Nevertheless, this can be inferred from the allegation that the rate PG & E's customers paid consisted of the cost of Canadian gas and the cost of transportation from

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

WestLaw.

Case 7:04-cv-08223-KMK   Document 114-2   Filed 10/18/2005   Page 11 of 38

Not Reported in F.Supp.
(Cite as: 1995 WL 819150, *10 (E.D.Cal.))

Page  8

Alberta to California, because PG & E passes on its full gas costs to ratepayers. (AC ¶¶ 57-58); *Re Application of Pacific Gas & Elec. Co. for Authority to Adjust Its Elec. Rate,* at 5-6 (March 16, 1994). Next, Plaintiffs now allege the legal conclusion that the acts complained of in the Amended Complaint occurred outside the jurisdiction of the relevant regulatory bodies. (AC, ¶¶ 5, 53). This allegation is addressed below.   Finally, Plaintiffs allege that non-core customers, as well as core customers, were injured by the price-fixing conspiracy.   Plaintiffs' Opp. at 21:3-6.   Non-core customers who elected core service stand in the same position as core customers;   they purchased gas out of PG & E's core portfolio. *Re New Regulatory Framework for Gas Utilities,* 22 C.P.U.C.2d 491, 531 (1986). With respect to the filed rate doctrine, the analysis is the same for core and non-core plaintiffs who core elected.

*11 Plaintiffs argue that the filed rate doctrine does not apply to the conduct of Canadian corporations, such as A & S, because they are outside the regulatory jurisdiction of federal and state agencies. Defendants counter that A & S is protected by the filed rate doctrine because its gas contracts with PGT were approved by the ERA.   Both the seller and the purchaser have a complete defense to antitrust liability if the sales price is the filed rate. *See Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571 (1981) (buyer of natural gas protected by filed rate doctrine);   *Montana-Dakota Utils. Co. v. Northwestern Pub. Serv. Co.,* 341 U.S. 246, 248 (1951) (seller of electric power entitled to filed rate defense).   Here, A & S sold gas to PGT at the rate approved by the ERA;   the filed rate doctrine applies equally to A & S as seller, and to PGT as buyer. *Square D Co. v. Niagara Frontier Tariff Bureau, Inc., supra,* 476 U.S. at 414, 417.   After agency approval of filed rates, even unregulated conduct which results in fixing the amount of the rate cannot be the subject of an antitrust complaint.

Plaintiffs' final argument is that application of the filed rate doctrine to this unique circumstance would extend the rule beyond its prior limits.   They claim that even if the A & S PGT, PGT-PG & E and PG & E-customer rates were approved by federal and state agencies, the "heart" of the alleged price-fixing conspiracy is the agreement between A & S and the cartel of Canadian producers.   This agreement was outside the reach of all the relevant regulatory

agencies;   neither federal nor state agencies reviewed the gas sales between A & S and the cartel.

Plaintiffs' argument fails for two reasons.   First, the approved rate in the A & S-PGT contract is based upon the netback formula price A & S paid to the cartel and the cost of transportation from Alberta to the Canadian border. Hence, "the [ERA] reviewed the price of gas paid by A & S [to the cartel] as a component of the A & S-PGT international contract." (Mem.Op. at 32).   It is undisputed that ERA has jurisdiction to determine whether import prices for natural gas are competitive in domestic markets.   One of the factors the ERA must consider is the price A & S paid to its suppliers, the cartel producers.  In this antitrust suit, Plaintiffs ask the Court and ultimately a jury to substitute their judgment for that of the ERA, FERC, and CPUC as to the competitiveness of the price A & S paid "the cartel" for gas.   This threatens to undermine jurisdiction that Congress gave to the ERA and runs counter to the very purpose of the filed rate doctrine. *Nantahala Power and Light Co. v. Thornburg,* 476 U.S. 953, 964 (1986) (purpose of filed rate doctrine is to enforce Supremacy Clause by ensuring that judiciary does not usurp authority Congress granted to a federal agency).

Second, Plaintiffs claim that the filed rate doctrine should not apply because the filed rate is the product of a foreign conspiracy, is not unique. *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,* 476 U.S. 409 (1986). In *Square D,* the plaintiffs alleged that five Canadian motor carriers conspired to fix prices for freight transportation between Canada and the United States.   The carriers filed the allegedly fixed prices with the Interstate Commerce Commission (ICC). *Id.* at 412-13.   The rates were never challenged before the ICC nor did the ICC ever explicitly determine the rates were proper.   The plaintiffs' argument that the filed rate doctrine should not apply because "there was no ICC hearing in this case and [ ] *Keogh* did not involve allegations of [this] type of covert legal violations" was rejected: [the rates were] "lawful," "in the same sense that rates filed in *Keogh* were lawful." *Id.* at 417 n. 19.   The filed rate doctrine applies to bar the price fixing claims.

*12 The alleged "competitor exception" to the *Keogh* rule does not aid the County.   The County

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1995 WL 819150, *12 (E.D.Cal.))

does not claim to have been harmed by exclusionary conduct unrelated to the filed rate for gas, because non-core customers paid the same filed rates for gas that core customers paid. *See, e.g., In re Lower Lake Erie Iron Ore Antitrust Litigation* [1993-1 TRADE CASES ¶ 70,249], 998 F.2d 1144, 1159 (3d Cir.1993), *cert. denied,* 510 U.S. 1091, 114 S.Ct. 921 (1994).

As in *Keogh,* Plaintiffs' claims require proof of a hypothetical rate for gas that would have been charged and approved by the ERA, FERC, and CPUC, absent the alleged conspiracy between A & S and the Canadian gas cartel. Plaintiffs argue at length about non-rate conduct, foreclosure of market and denial of access in an attempt to distinguish this case from the filed rate cases. No conduct of defendants in establishing the price paid for natural gas and in allocating transportation rights was independent from rate regulation on the federal and state level. The price-fixing claims against PG & E, PGT, and A & S are barred by the filed rate doctrine. Defendants' motion to dismiss these claims is GRANTED without leave to amend.

### C. *State Action Bars the Price-Fixing Claims Against PG & E*

The Court previously determined that Plaintiffs' federal price-fixing claims against PG & E were barred by the state action doctrine. (Mem.Op. at 47, 56- 58). Defendants again move to dismiss these claims, arguing that the Amended Complaint does not plead new facts that defeat the state action defense and citing *California Retail Liquor Dealers Ass'n v. Medcal Aluminum, Inc.,* 445 U.S. 97 (1980). In substance the new complaint alleges PG & E conspired to pay the cartel an excessive price to benefit the cartel. (AC, ¶¶ 53-55; *e.g.,* AC, ¶¶ 83-84.) *See also Nugget Hydraulic, L.P. v. Pacific Gas & Elec. Co.* [1992-2 TRADE CASES ¶ 70,068], 981 F.2d 429, 434-35 (9th Cir.1992), *cert. denied,* 508 U.S. 908, 113 S.Ct. 2336 (1993) (allegations of bad faith or anticompetitive notice do not avoid the state action doctrine).

Plaintiffs suggest the CPUC statutory scheme for regulation of natural gas prices and transportation is "at best neutral." However, the CPUC in the regulatory history, cited at p. 35 of the opposition memo, demonstrates its objective to utilize its regulatory oversight to achieve the policy of enhanced competition in gas markets. Plaintiffs provide no new authority to suggest that PG & E in its transportation arrangements with PGT, or in the price it paid PGT for gas purchases, or in the price PGT paid A & S, did not pass through penny for penny all such costs to PG & E; all of which is directly within the ambit of CPUC regulation. [FN9] As to the A & S contracts, plaintiffs do not allege those contracts concern anything more than the price of gas, which may include a transportation charge, a subject that is comprehensively and actively regulated by the CPUC. Defendants' motion to dismiss the federal price-fixing claims against PG & E on the ground they are barred by the state action doctrine is GRANTED, with prejudice.

### D. *The Filed Rate Doctrine Immunizes Defendants From The Pipeline Access Claims*

**\*13** Defendants assert the filed rate doctrine immunizes them from antitrust scrutiny for the volumes of gas they imported through PGT's pipeline. Plaintiffs contend the filed rate doctrine is not applicable because it only extends to "rate-related activity." They maintain the Defendants conspired to preclude competition by access to gas pipelines available to PG & E, which foreclosed non-core buyers from buying pipeline gas, and that this anticompetitive conduct is unrelated to gas rates. (AC, ¶¶ 67, 76-77). Defendants counter that the filed rate doctrine "applies to any matter that falls within the regulatory agency's plenary jurisdiction over rates." (Defs.' Mem. at 26:3-4). According to Defendants, the volumes of gas they imported were approved by the ERA.

"The filed rate doctrine is not limited to 'rates' *per se,* but applies to any activity under the controlling agency's regulatory power." (Mem.Op. at 15). Supreme Court decisions make clear that the doctrine is "a matter of enforcing the Supremacy Clause." *Nantahala Power and Light Co. v. Thornburg,* 476 U.S. 953, 964 (1986). It prevents the judiciary from usurping power that Congress assigned to a federal regulatory agency. *Id.* (citing *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 581-82 (1981)). The scope of filed rate immunity is defined by the reach of the federal agency's exclusive jurisdiction. *Barnes v. Arden Mayfair, Inc.* [1985-1 TRADE CASES ¶ 66,535], 759 F.2d 676, 679 (9th Cir.1985) (rejecting defendants' claimed immunity under filed rate doctrine because

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1995 WL 819150, *13 (E.D.Cal.))

the alleged antitrust activities were "beyond the scope of the ICC's jurisdiction").

The filed rate doctrine may be asserted with respect to matters within the agency's jurisdiction, even if the agency did not make a determination on the issue that the plaintiff seeks to raise in court. *MPL, supra,* 487 U.S. 354, 374 (1988) ("The Mississippi Supreme Court erred in adopting the view that the preemptive effect of FERC jurisdiction turned on whether a particular matter was actually determined in the FERC proceedings.") "The reasonableness of rates and agreements regulated by FERC may not be collaterally attacked in state or federal courts. The only appropriate forum for such a challenge is before the Commission or a court reviewing the Commission's order." *Id.* at 375.

Plaintiffs seek to limit the holdings of *Nantahala* and *MPL* to their facts. However, there is no principled basis for distinguishing those cases from this case. Here, no relevant conduct concerning gas price or volume occurred in Canada that was not reviewed under the ERA approval of the PGT-A & S, PGT-PG & E contracts.

Plaintiffs also argue that the filed rate doctrine does not apply here because Defendants engaged in "non rate-related" anticompetitive conduct. However, the cases cited by Plaintiffs are consistent with the principles drawn from *Nantahala* and *MPL. In re Lower Lake Erie Iron Ore Antitrust Lit.,* 998 F.2d 1144, 1158-59 (3rd Cir.1993); *Pinney Dock & Trans. Co. v. Penn Cent. Corp.* [1988-1 TRADE CASES ¶ 67,876], 838 F.2d 1445, 1456-57 (6th Cir.1988). In *In re Lower Lake,* the plaintiffs alleged that a group of railroad companies conspired to prevent the development of new docking facilities. The claim that the defendants' anticompetitive acts resulted in unreasonably high rates for rail transport was dismissed under the filed rate doctrine. *In re Lower Lake,* 998 F.2d at 1154. Nevertheless, the claim that defendants restrained competition by placing unreasonable restrictions on the sale or lease of their dock space survived because this conduct "[did] not implicate the ICC's exclusive jurisdiction and therefore [was] not barred by Keogh." *Id.* at 1158. The Sixth Circuit reached a similar result in a analogous case, *Pinney Dock,* 838 F.2d at 1456-58. Although both of these cases analyze the scope of filed rate immunity in terms of "rate-related" verses "anticompetitive non-rate

activity", *In re Lower Lake,* 998 F.2d at 1159; *Pinney Dock,* 838 F.2d at 1457-58, both the Supreme Court and the Ninth Circuit have stated that the touchstone for application of the filed rate doctrine is the extent of the reviewing agency's jurisdiction. *MPL,* 487 U.S. at 374, 380 (Scalia, J., concurring) ("What this case comes down to, then, is whether FERC's asserted jurisdiction ... is supported by the provisions of the Federal Power Act."); *Barnes v. Arden Mayfair, Inc.,* 759 F.2d 676, 679 (9th Cir.1985).

**\*14** Defendants argue the ERA possesses jurisdiction to scrutinize the quantities of gas PGT purchased from A & S and the ERA did in fact approve the amounts PGT purchased. In so doing, the ERA determined the competitiveness of the import arrangement in the market to be served. Under Section 3 of the NGA, 15 U.S.C. § 717b, the ERA is required to authorize gas imports unless the import "will not be consistent with the public interest." In making this public interest determination, the ERA considers the following factors: "the competitiveness of the imported gas, the need for it, and the security of the supply." *TransCanada Pipelines, Ltd. v. FERC,* 878 F.2d 401, 407 (D.C.Cir.1989) (citing 49 Fed.Reg. 6684, 6690 (1984) (DOE Guidelines)). The DOE guidelines provide that "[t]he terms and conditions of the gas purchase contract, taken together, must provide a supply of gas that the importer can market competitively over the term of the contract." 49 Fed.Reg. 6684, 6688 (1984). "[T]he authorization of a given volume of gas at up to a particular price is a decision by the ERA that the particular import is in the public interest, and that no market failure has been shown that has or would interfere with the pipeline's acting in its own interest to acquire gas on the most favorable terms." *TransCanada Pipelines,* 878 F.2d at 407. The ERA also has authority to: consider a competitor's complaints re price and volumes in new purchase contracts; amendments to pricing and take provisions in existing contracts, and other competitive concerns. (See authorities collected at Reply Mem. at 13, n. 12-22).

The ERA approved PGT's contract to purchase gas from A & S. *Final Order Granting Amendments to Authorization to Import Natural Gas from Canada,* 1 ERA ¶ 70,591 (1985). In so doing, it specifically authorized PGT "to import up to 1,023 MMcf [FN10] of Canadian gas per day for the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      **Page 11**
**(Cite as: 1995 WL 819150, \*14 (E.D.Cal.))**

period November 1, 1985 through October 31, 1993." *Id.* at 72,387. The terms of this contract were subject to quarterly review by the ERA. *Id.* There is no merit to Plaintiffs' contention that the ERA did not approve the volumes PGT agreed to purchase from A & S. [FN11] In fact, several domestic natural gas suppliers objected to the gas volumes PGT proposed to import. *Re Pacific Gas Trans. Co.*, 1 E.R.A. ¶ 70,574, at 72,322 (1984). These objections were considered and rejected. Plaintiffs' argument that PGT had discretion to purchase less misses the mark. Plaintiffs do not complain too little Canadian gas was imported. PGT was authorized to purchase "up to 1,023 MMcf"; if PGT did not purchase more than 1,023 MMcf per day, the filed rate doctrine applies. Plaintiffs do not allege PGT exceeded its purchase authority or that an excess volume was transported.

Although the ERA did not specifically address the potential anticompetitive effect of the authorized volumes on PGT's pipeline capacity, no objection to the PGT/A & S import contract was raised on that ground. *See id.* at 72,384-8; *id.* at 72,322-23. The ERA had jurisdiction to address these concerns. As in *MLP*, since the Plaintiffs did not raise these issues before the ERA, they are barred from collaterally attacking the ERA's decision through private antitrust litigation. *MLP*, 487 U.S. at 375. It cannot seriously be contended that the ERA as reviewing agency, did not have jurisdiction to determine the effect of the volume of natural gas imported by PGT. In approving gas import agreements the ERA had to " 'consider international trade policy, foreign policy, ... national security interests,' and 'other factors as may be appropriate.' " *Panhandle Producers Royalty Owners Ass'n v. ERA*, 822 F.2d 1105, 1107 (D.C.Cir.1987).

\*15 Plaintiffs suggest that the ERA's authorization of the PGT-A & S gas contract does not provide a complete defense to their pipeline access claims because those claims involve "other allegations of wrongdoing," and "more than a mere challenge to the volume of gas purchased by defendants from the cartel," that the ERA did not address (e.g. the conspiracy between A & S and the cartel of Canadian gas producers to "stuff" PGT's pipeline with cartel gas so that independent Canadian producers could not sell gas to non-core users). However, the amended complaint alleges just that. (AC, ¶¶ 49, 64-65, 67, 69). Moreover, the ERA

authorized the very conduct that Plaintiffs complain of PGT's purchase of large quantities of Canadian gas, found to be consistent with the public interest. (Mem.Op. at 25-26).

Finally, Plaintiffs argue that the *"Pike County "* exception to the filed rate doctrine applies in this case. *See Pike County Light & Power Co. v. Pennsylvania Pub. Util. Comm'n*, 465 A.2d 735 (Pa.Commw.Ct.1983) (holding state utilities commission may review conduct of utility that falls outside jurisdiction of any federal regulatory agency); *see also Kentucky West Virginia Gas v. Pennsylvania Pub. Util. Comm'n*, 837 F.2d 600 (3rd Cir.), *cert. denied*, 488 U.S. 941 (1988). The *Pike County* exception has not been applied to permit private antitrust actions brought by utility ratepayers. (Mem.Op. at 20). Even if *Pike County* were extended to private enforcement actions, it would not apply here because Plaintiffs do not seek review of conduct that falls outside the jurisdiction of the relevant regulatory agencies, but rather they seek court antitrust review of regulatory decisions setting prices and volumes for purchased gas and transportation rights provided by contract to deliver the gas.

Defendants' motion to dismiss the pipeline access claims on the ground that they are barred by the filed rate doctrine is GRANTED.

*E. State Action Bars Plaintiffs' Pipeline Access Claims*

The law pertaining to the state action defense can be summarized as follows: Federal antitrust laws are subject to supercession by state regulatory programs. *Parker v. Brown* [1940-1943 TRADE CASES ¶ 56,250], 317 U.S. 341, 530-51 (1943) ("[N]othing in the language of the Sherman Act or its history ... suggests its purpose was to restrain a state or its officer and agents from activities directed by its legislature."). The rule is grounded in principles of federalism and state sovereignty. *Federal Trade Commission v. Ticor Title Insurance* [1992-1 TRADE CASES ¶ 69,847], 505 U.S. ---, 112 S.Ct. 2169, 2176 (1992). Nevertheless, federalism does not justify a broad interpretation of state sovereignty. 112 S.Ct. at 2178. State action immunity is narrowly construed. *Id.*

Private entities may claim state action immunity.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Case 7:04-cv-08223-KMK    Document 114-2    Filed 10/18/2005    Page 15 of 38

Not Reported in F.Supp.                                                                  Page 12
(Cite as: 1995 WL 819150, *15 (E.D.Cal.))

*Patrick v. Burget* [1988- 1 TRADE CASES ¶ 67,997], 486 U.S. 94 (1988). When applying the state action doctrine, courts and commentators have not distinguished between antitrust actions based on the Sherman Act and those based on other antitrust statutes. *Yeager's Fuel v. Pennsylvania Power & Light* [1994-1 TRADE CASES ¶ 70,576], 22 F.3d 1260, 1265 n. 7 (3rd Cir.1994). State action immunity is an affirmative defense. *Id.* at 1266 ( *citing FTC v. Ticor Title Ins. Co.,* 504 U.S. 621, 112 S.Ct. 2169, 2172 (1992).

**\*16** In *California Retail Liquor Dealers Ass'n v. Midcal Aluminum Inc.* [1980-1 TRADE CASES ¶ 63,201], 445 U.S. 97, 105 (1980) (hereinafter *Midcal* ) the Supreme Court set forth the test for determining whether a state anticompetitive mechanism operates because of a deliberate and intended state policy, such that the federal antitrust laws are superseded. First, "the challenged restraint must be clearly articulated and affirmatively expressed as state policy." *Midcal,* 445 U.S. at 105. Second, "the policy must be actively supervised by the State itself." *Id.*

### 1. *The CPUC's Authority To Regulate Is "Clearly Articulated"*

The first prong of *Midcal* requires a showing that "the challenged restraint [is] clearly articulated and affirmatively expressed as state policy." *Midcal,* 445 U.S. at 105. The principal point of contention between the parties is whether the CPUC's authority to regulate gas transmission is "clearly articulated" by California's legislature. According to Defendants, state law authorizes the CPUC to regulate all aspects of gas utility service, including transportation. Plaintiffs assert "the legislation cited by Defendants is neutral as to the challenged anticompetitive actions" and therefore the restraint is not "clearly articulated." (Plaintiffs' Opp. at 35:3-4). Plaintiffs further argue that because Defendants' conduct is contrary to the stated CPUC policy of promoting competition there is no clearly articulated policy regulating Defendants' acts. However, the CPUC was undeterred by the fact it asserted no direct jurisdiction over A & S and Canadian producers; it nonetheless actively regulated PG & E's gas prices and services including the A & S-producer contracts, "because such transactions ... might adversely affect the interests of ratepayers." A-82-04-001, at 13-14 (1993); 43 C.P.U.C.2d 275, 283 (1992); *Re App.*

*of PG & E Co.,* D 94-03-050, at 29-30 (1994).

The first question is whether the California legislature has clearly articulated a regulatory policy regarding the alleged anticompetitive conduct of Defendants. However, Defendants need not demonstrate that the legislature authorized the specific conduct challenged if the law authorized the CPUC to regulate the Canadian contracts:

"A private party acting pursuant to an anticompetitive regulatory program need not point to specific, detailed legislative authorization for its challenged conduct. As long as the State as sovereign clearly intends to displace competition in a particular field with a regulatory structure, the first prong of the *Midcal* test is satisfied."

*Southern Motor Carriers Rate Conference v. United States* [1985-1 TRADE CASES ¶ 66,485], 471 U.S. 48, 63 (1985). *Southern Motor Carriers* holds that statutory language authorizing the regulatory agency to proscribe "just and reasonable" [FN12] rates satisfy this requirement. *Id.* at 63-64; *see also* Cal.Pub.Util.Code §§ 728, 729 (West 1975); *Metro Mobile CTS, Inc. v. NewVector Communications, Inc.* [1987-1 TRADE CASES ¶ 67,619], 661 F.Supp. 1504, 1516 (D.Ariz.1987); (holding a "constitutional and statutory mandate that [a state agency] prescribe just and reasonable rates is enough in and of itself to satisfy the first prong of *Midcal* ") *Id.* at 1516; *aff'd,* 892 F.2d 62 (9th Cir.1989); *Davis v. Southern Bell Tel. & Tel. Co.* [1991-1 TRADE CASES ¶ 69,407], 755 F.Supp. 1532, 1538 (S.D.Fla.1991).

**\*17** The CPUC has broad statutory authority to regulate public utilities. *Consumer Lobby Against Monopolies v. Public Utils. Comm'n,* 25 Cal.3d 891, 905 (1979). It is statutorily authorized to determine whether a public utility's methods of "distribution" and "transmission" are "unjust" or "unreasonable"; and to "determine how [interstate pipeline] capacity held by the utilities is allocated to customers and other shippers." Cal.Pub.Util.Code § 761 (West 1975); *see also Re Natural Gas Procurement and Reliability Issues,* 41 C.P.U.C.2d 668, 691-92 (1991) ("Transportation of natural gas is a service and a method of transmission under Section 761."). The CPUC also must "establish priorities among the types or categories of customers of ... every gas corporation." Cal.Pub.Util.Code § 2771 (West 1994). "The commission shall determine which of such customers and uses provide

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



*the most important public benefits and serve the greatest public need* and shall categorize all other customers in order of descending priority based upon these standards." *Id.* (emphasis added). Section 2774 provides that:

"In the event and ... gas corporation experiences any shortage of capacity or capability in the generation, production, or *transmission* of ... gas ... the commission shall, to the extent practicable, order that service be temporarily reduced by an amount that reflects the priorities established pursuant to this chapter...."

Cal.Pub.Util.Code § 2774 (West 1994) (emphasis added).

These statutes demonstrate the California Legislature's intent to displace, at least partially, free market competition with regulation. Defendants maintain that the alleged unlawfulness of their conduct is irrelevant for purposes of state action. In analyzing the clear articulation requirement, it is not determinative that defendants' conduct may be anticompetitive. *New England Motor Rate Bureau Inc. v. FTC* [1990-2 TRADE CASES ¶ 69,108], 908 F.2d 1064, 1074 (1st Cir.1990).

As in *Southern Motor Carriers,* the legislature has empowered the CPUC to regulate PG & E's gas transmission to ensure that it is just and reasonable. The statutory mandate that the CPUC prioritize the needs of gas customers according to "public benefits" and apportion gas transmission capability according to these priorities is a clear articulation of California's intent "to displace price competition ... with a regulatory structure." *Southern Motor Carriers,* 471 U.S. at 65. Plaintiffs' argument to the contrary ignores plain statutory language and the CPUC's own interpretations regarding its authority to regulate transportation capacity. *Re Natural Gas Procurement and Reliability Issues,* 41 C.P.U.C.2d 668, 677, 691-92 (1991) ("[P]ursuant to Section 761 , the commission has the authority to require PG & E to change the way it offers transportation service and to require PG & E to assign firm capacity rights to noncore customers.").

*18 Here, plaintiffs assert Defendants are not entitled to state action immunity as their conduct violated California's "policy of competition and open access to the natural gas market." (Plaintiffs' Opp. at 36:10); 30 C.P.U.C.2d 576, 585 (1988).

This position is unsupported by Ninth Circuit precedent:

"[Plaintiff]'s contention that PG & E performed these acts in bad faith, and therefore in contravention of state policy, is to no avail. In *Llewellyn v. Crothers* [1985-2 TRADE CASES ¶ 66,685], 765 F.2d 769 (9th Cir.1985), we rejected a claim that the bad faith behind the anticompetitive conduct of certain government officials destroyed their immunity under the state action doctrine."

*Nugget Hydroelectric v. Pacific Gas & Elec Co.* [1992-2 TRADE CASES ¶ 70,068], 981 F.2d 429, 434 (9th Cir.1992). So long as the *Midcal* requirements are met, state action immunity attaches to Defendants' conduct even if it is allegedly inconsistent with the state's regulatory policies. The appropriate forum for Plaintiffs' claim that Defendants violated the California's regulatory policies is before the CPUC, not federal court. *Llewellyn v. Crothers,* 765 F.2d 769, 774 (9th Cir.1985). Plaintiffs, for reasons best known to them, chose not to participate in any of the CPUC proceedings directed to the conduct they complain of here.

### 2. *The CPUC Actively Supervised The Allocation Of Pipeline Access*

The purpose of the active supervision requirement is

"to determined whether the State was exercised sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties. Much as in causation inquiries, the analysis asks whether the State has played a substantial role in determining the specifics of the economic policy."

*FTC v. Ticor Title Ins. Co.,* 112 S.Ct. 2169, 2177 (1992). Plaintiffs argue that although the CPUC exercised some supervision over PG & E's conduct, it did not, and could not, supervise the private anticompetitive agreements between A & S and Canadian gas producers. According to Plaintiffs, once these agreements were executed, the CPUC was unable to prevent Defendants from "stuffing" the pipeline and could only "regulate around" the antitrust violations.

In general, the CPUC cannot order a utility to alter or breach its contracts. *California Water & Tel. Co. v. Public Util. Comm'n,* 51 Cal.2d 478, 488 (1959);

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Case 7:04-cv-08223-KMK    Document 114-2    Filed 10/18/2005    Page 17 of 38

Not Reported in F.Supp.                                                    Page 14
(Cite as: 1995 WL 819150, *18 (E.D.Cal.))

*Application of PG & E Co.*, 76 C.P.U.C. 134, 139 (1973). However, the CPUC asserts its power to modify contracts when necessary to protect the public interest. *Re Rate Design for Unbundled Gas Utility Services*, 22 C.P.U.C.2d 444, 484 (1986) ("[W]e are duty bound to protect the public welfare and accordingly can give no ironclad guarantee that contractual provisions will be immune from modification in circumstances in which those provisions unequivocally thwart public interest."). The CPUC held that "all PG & E's gas supply contracts, including those with PGT and A & S, should be subject to reasonableness review...." 37 C.P.U.C.2d 583, 617 (1990). For example, the CPUC decided in 1990 that the A & S contracts needed to be renegotiated in order to increase pipeline capacity for non-core users. *Re Refinements to the Regulatory Framework for Gas Utilities*, 37 C.P.U.C.2d 87, 104-05 (1990) ("[W]e expect the A & S contracts to be renegotiated.").

*19 Plaintiffs allege that PG & E denied pipeline access to non-core users by implementing its core election program. According to Plaintiffs, PG & E filled PGT's pipeline capacity by encouraging non-core customers, including UEG, the largest non-core customer, to elect core service. However, the core election program, and UEG's core election in particular, were continuously reviewed by the CPUC. In 1988, the CPUC recognized and approved core elections that resulted in less pipeline access for non-core customers, but found that it "was prudent for PG & E to maximize core election as a means to secure the benefits of competition for captive core customers" and also acknowledged that even if non-core customers benefited from cheaper spot market gas, prices for core and other customers would be higher. *Re Natural Gas Procurement and System Reliability*, 30 C.P.U.C.2d 545, 558-60 (1988). Subsequently, the C.P.U.C. began to reduce the amount of gas that it permitted PG & E to transport on PGT's pipeline so that more capacity would be available for non-core customers. *See* 37 C.P.U.C.2d at 618-20 (reducing percentage of UEG's core election); 41 C.P.U.C.2d at 694 (same). In doing this, the CPUC ruled it could reduce such volume of gas without regard to A & S or PGT contractual commitments, because PG & E ratepayers had not guaranteed those contracts. 37 C.P.U.C.2d at 617. In 1991, the CPUC ordered PG & E to make 250 MMcf per day of PGT pipeline capacity available to non-core customers.

37 C.P.U.C.2d at 594, 609. This was increased to 466 MMcf per day, approximately 43% of PGT's capacity, in 1993. 41 C.P.U.C.2d at 681, 706.

The regulatory record belies Plaintiffs' assertion that the CPUC did not actively supervise, review, and expressly authorize Defendants' conduct by permitting PG & E's core election program, with knowledge of its effect on pipeline capacity. The CPUC played a substantial role in the development of PG & E's gas import programs. The CPUC's decisions were not dictated by the terms of A & S's natural gas contracts, but rather the CPUC actively regulated PG & E's gas rates and volumes in derogation of the terms or objectives of the foreign contracts. *Sandy River Nursing Care v. Aetna Cas. & Sur.* [1993-1 TRADE CASES ¶ 70,136], 985 F.2d 1138, 1147 (1st Cir.), *cert. denied*, 510 U.S. 818, 114 S.Ct. 70 (1993). The federal antitrust denial of access claims against PG & E are barred by the state action defense and must be dismissed.

Defendants contend that PGT and A & S may also assert the state action defense. They rely on the decisions of the CPUC which reviewed and found reasonable the agreements between PG & E, PGT and A & S, including volumes of gas purchased, transported, effect on pipeline capacity, allocation of take-or-pay liabilities, and PG & E's guarantee of A & S's financing for the take or pay liabilities. 27 C.P.U.C. Reasonableness Dec. at 39-46; 37 C.P.U.C.2d 87, 104-105 (1990); 41 C.P.U.C.2d at 668, 688-90 (1991); *Re Pacific Gas and Elec. Co.*, D93267, at 5 (1981) and D85752 (1976). As the agreements and conduct of PGT and A & S relative to Plaintiffs' anticompetitive claims were the subject of active state regulation by the CPUC under the same clearly articulated and affirmatively expressed state policy as to PG & E's gas prices and transportation agreements, and because all Plaintiffs are alleged PG & E customers, state action immunity also bars the claims against PGT and A & S, despite the fact these firms were indirectly regulated. Put another way, the CPUC's rate setting and pipeline access orders are intervening legal causes of Plaintiff's alleged injuries. *Atlantic Richfield Co. v. USA Petroleum Co.* [1990-1 TRADE CASES ¶ 69,019], 495 U.S. 328, 334 (1990); *cf. Kaiser Cement Corp. v. Fischbach and Moore, Inc.* [1986-2 TRADE CASES ¶ 67,196], 793 F.2d 1100, 1104-05 (9th Cir.1986) *cert. denied*, 479 U.S. 949 (1986).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Case 7:04-cv-08223-KMK    Document 114-2    Filed 10/18/2005    Page 18 of 38

Not Reported in F.Supp.    Page 15
(Cite as: 1995 WL 819150, *19 (E.D.Cal.))

\*20 Finally, PG & E's objection to the CPUC's jurisdiction to have regulated the PGT and A & S contracts "is not an appropriate basis for disregarding state action immunity," even if state regulation is erroneous. *Lease Lights, Inc. v. Public Serv. Co.* [1988-1 TRADE CASES ¶ 68,112], 849 F.2d 1330, 1334 (10th Cir.1988), *cert. denied,* 488 U.S. 1019 (1989); *see also City of Columbia v. Oman Outdoor Advertising, Inc.,* 499 U.S. 365, 371- 72 (1991) (federal courts would become state administrative appeals tribunals).

F. *Substantive Validity Of Plaintiffs' Claims For Denial Of Pipeline Access*

1. *Core Customers Cannot Assert Denial of Access Claims*

Defendants move to dismiss the denial of access claims brought on behalf of core customers such as Mary Grogan. They contend core customers fail to state an antitrust claim for denial of pipeline access because they are customers, not competitors, of Defendants.

Defendants construe Plaintiffs' denial of access claim as invoking the essential facility doctrine, which prohibits those with monopoly power over an "essential facility" from denying others access to the facility, absent a legitimate business reason. *City of Anaheim v. Southern Cal. Edison Co.* [1992-1 TRADE CASES ¶ 69,853], 955 F.2d 1373, 1379 (9th Cir.1992). The elements of a claim for denial of an essential facility are: "(1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." *Id.* at 1380. Plaintiffs acknowledge that core customers are not competitors of PG & E [FN13] and therefore cannot allege an essential facility claim.

However, Plaintiffs deny that their access claims are premised upon the "essential facility" doctrine. They contend the essential facility doctrine only applies to Sherman Act monopoly Section 2 claims. Plaintiffs allege the doctrine does not apply to Sherman Act Section 1 claims for conspiracy to restrain trade. However, Plaintiffs' analysis ignores the caselaw which applies the essential facility doctrine to Section 1 claims, to Section 2 claims, and also to cases in which only a single entity controls the essential facility. *See, e.g., United States v. Terminal R.R. Ass'n.,* 224 U.S. 383, 394 (1912); *McKenzie v. Mercy Hosp.* [1988-2 TRADE CASES ¶ 68,180], 854 F.2d 365, 369 (10th Cir.1988). Moreover, the doctrine has been applied in a case where a utility denied competitors' access to its gas pipeline. *See Illinois ex rel. Burris v. Panhandle Eastern Co.* [1991-1 TRADE CASES ¶ 69,455], 935 F.2d 1469, 1482-83 (7th Cir.1991); *City of Chanute v. Williams Natural Gas Co.* [1990-2 TRADE CASES ¶ 69,185], 743 F.Supp. 1437, 1461 (D.Kan.1990). Ultimately, the core customers cannot allege an antitrust injury from denial of access to the pipeline. They do not compete for access to pipelines. The only injury they can allege, as consumers, is that they were overcharged for gas. Their remedy for rate improprieties is before the CPUC, not the federal court. *Keogh, supra;* (Mem.Op. at 36-38). The denial of access claims brought on behalf of core customers are dismissed for failure to state a claim, without leave to amend.

2. *The County Lacks Standing To Pursue Its Claim For Denial Of Access*

\*21 Defendants also move to dismiss the denial of access claims brought on behalf of non-core customers by the County. Defendants maintain that the County's failure to request or to be denied access to the PGT pipeline is fatal to an essential facility claim, or any other antitrust claim asserting denial of pipeline access. The County argues that prior demand for access is not a prerequisite to its claim. It contends that it has properly alleged standing and causation. [FN14]

Plaintiffs' claim for denial of pipeline access is premised upon the essential facility doctrine. [FN15] To state a claim for denial of access to an essential facility, the plaintiff must allege that it requested the access sought. [FN16] For example, the Ninth Circuit affirmed summary judgment against a plaintiff claiming denial of "relative size share access" to power transmission facilities in part because plaintiff "admit[ted] that it never requested relative size share access to [defendant's] transmission facilities." *City of Vernon v. Southern Cal. Edison* [1992-1 TRADE CASES ¶ 69,717], 955 F.2d 1361, 1367 (9th Cir.), *cert. denied,* 506 U.S. 908, 113 S.Ct. 305 (1992); *see also Cleary v. Nat'l Distillers & Chem. Corp.* [1974-2 TRADE CASES ¶ 75,330], 505 F.2d 695, 697 (9th

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
(Cite as: 1995 WL 819150, *21 (E.D.Cal.))

Cir.1974) ("A plaintiff can have no relief when his failure to obtain a desired product is attributable to his own failure to make a request.")

Plaintiff does not allege that it is excused from requesting access on futility grounds. During the relevant period, the County could have attempted to obtain access to the PGT pipeline in several different ways. Under § 7(c) of the NGA, it could have sought a certificate of public convenience and necessity to transport natural gas. Several shippers gained access to PGT's pipeline in this way. *Re Pacific Gas Trans. Co.,* 40 F.E.R.C. at 61,622 n. 29 (1987). Alternatively, it could have sought a so-called "blanket certificate" under the FERC program adopted in October of 1985. PGT anticipated that there would be great interest in this new program, and, with approval of the FERC conducted a 1987 lottery for the purpose of allocating its available transportation capacity. [FN17] *Id.* at 61, 616-19. The County does not allege that it participated in the lottery. The County also could have participated in the CPUC's Customer-Identified-Gas Program, by which the CPUC required PG & E to use approximately 25% of PGT's pipeline capacity to transport gas on behalf of non-core customers. Moreover, in 1991, PGT offered the Section 311 shipper queue lottery for interruptible transportation rights. Had the County sought access to PGT's pipeline by one of these methods it might have obtained transportation rights, as other, similarly situated non-core customers did; even though the lack of capacity of the PGT pipeline, cuts against the element of the doctrine that it was feasible to provide the facility. The County's failure to seek access and the absence of denial of access caused by PGT bars its denial of access claims. [FN18] Plaintiffs' arguments that that there was no pipeline capacity and that their access, if sought, would have been denied are minimalized by the undisputed fact that Plaintiffs never sought access to the PGT pipeline and do not allege futility as an excuse in the complaint.

### G. *Pleading Conspiracy To Deny Access.*

**\*22** Defendants argue that even accepting Plaintiffs' allegations that Defendants conspired with the cartel to fix prices, no facts are pled that show any agreement between those parties to foreclose access to PGT pipeline capacity. (AC. ¶¶ 65-67, 115-16, 122, 128-29). Plaintiffs respond that the necessary

allegations appear at ¶¶ 46, 48. The conduct alleged is unilateral action by PG & E and its subsidiaries, without the involvement of the cartel, whose members had no interest in gas transportation; *The Janery, Inc. v. James Jens, Inc.,* 849 F.2d 1148, 1152 (9th Cir.1988), with the exception that plaintiffs claim that PG & E and the cartel sought to "[reduce and eliminate] PG & E's existing and future TOP liabilities." (AC ¶ 46). The other consequence of the alleged conspiracy is that "PG & E made certain that pipeline open access would not be a problem for the cartel." (AC ¶ 48). An antitrust conspiracy may not be inferred without facts which support the existence of collusive, as opposed to independent conduct. *Berry v. Blue Cross,* 805 F.2d 866, 870 (9th Cir.1986). A parent (PG & E) and its wholly owned subsidiaries are not legally capable of conspiring under the antitrust laws because they constitute a single enterprise for purposes of Section 1 of the Sherman Act. *The Volbroth Co. v. Sanui Corp.,* 9 F.3d 1455, 1463 (9th Cir.1993) *denied,* --- U.S. ----, 114 S.Ct. 163 (1994). The motion to dismiss is GRANTED as to the conspiracy to deny access claims (the first, sixth, seventh, and eighth).

### H. *The Claim For Injunctive Relief Is Moot.*

Plaintiffs' tenth claim seeks to enjoin Defendants from "engaging in, carrying out, or renewing any contracts, agreements, trusts or practices having the purpose or effect of continuing or renewing the aforesaid violations of federal and state law or any contract, agreement, trust or practice having like or similar purpose or effect." Defendants move to dismiss this claim for mootness, asserting that it is premised upon past conduct, which is not reasonably likely to recur. Plaintiffs counter that injunctive relief is needed to remedy the lingering effects of Defendants' antitrust conspiracy.

"Article III of the United States Constitution confers jurisdiction on federal courts over 'cases' and 'controversies' and has been construed to prevent advisory opinions" and to assure that the requisite personal interest continue throughout the existence of the litigation. *Native Village of Noatak v. Blatchford,* 38 F.3d 1505, 1509 (9th Cir.1994) (quoting *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 397 (1980)). A case is moot if "the issues are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Murphy*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                                    Page 17
(Cite as: 1995 WL 819150, *22 (E.D.Cal.))

*v. Hunt,* 455 U.S. 478, 481 (1982). "The basic question in determining mootness is whether there is a present controversy as to which effective relief can be granted." *Northwest Envtl. Defense Center v. Gordon,* 849 F.2d 1241, 1244 (9th Cir.1988). Defendants bear the heavy burden of demonstrating mootness. *County of Los Angeles v. Davis,* 440 U.S. 625, 631 (1979).

**\*23** "As a general rule, '[p]ast wrongs are not enough for the grant of an injunction,' an injunction will issue only if the wrongs are ongoing or likely to recur." *FTC v. Evans Products Co.* [1985-2 Trade Cases ¶ 66,864], 775 F.2d 1084, 1087 (9th Cir.1985). For example, where defendant ceases the allegedly wrongful conduct while the case is pending, injunctive relief is still available if there are continuing effects from the violation that can be remedied. *Northwest Envtl.,* 849 F.2d at 1244-45 ("[If] the court can still act to remedy such harm by limiting its future adverse effects, the parties clearly retain a legally cognizable interest in the outcome.").

All of the conspiratorial acts Plaintiffs complained of have ceased. One month before the original complaint was filed in this case, Defendants terminated the allegedly anticompetitive contracts. Plaintiffs aver no continuing harm from these past acts, *i.e.* the price-fixing scheme is not alleged to have affected current gas prices, nor do Plaintiffs contend that prior limitations on pipeline access are presently causing harm.

Since no continuing harm from the prior anticompetitive acts exists, there is no basis for an injunction, absent "some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *United States v. W.T. Grant Co.* [1953 Trade Cases ¶ 67,493], 345 U.S. 629, 633 (1953). Plaintiffs suggest there is a need for injunctive relief because Defendants have entered into "other unknown, unseen gas supply contracts." This conclusory statement, unsupported by facts showing a "cognizable danger" of current or future antitrust violations, is insufficient to support the injunction claim. Nor will termination of the injunction claim bar plaintiffs from bringing a future suit if specific new and different wrongful conduct is identified. Plaintiffs' tenth claim for injunctive relief is DISMISSED with prejudice.

*I. The Denial Of Access Claims Are Barred By The Statute Of Limitations*

The statute of limitations for recovery of damages under a federal antitrust claim is four years. 15 U.S.C. § 15b. The same limitations period applies to California Cartwright Act claims and claims under the Unfair Business Practices Act. Cal.Bus. & Prof.Code § 16750.1 (Cartwright Act) (West 1987); *id.* § 17208 (Unfair Business Practices Act) (West 1987). Plaintiffs can only recover damages for overt acts in furtherance of the alleged conspiracy within the limitations period, here measured from December 3, 1989. *Pace Indus., Inc. v. Three Phoenix Co.* [1987-1 Trade Cases ¶ 67,494], 813 F.2d 234, 237 (9th Cir.1987); *In re Multidistrict Vehicle Air Pollution* [1979-1 Trade Cases ¶ 62,529], 591 F.2d 68, 71 (9th Cir.1979). Where a continuing antitrust conspiracy is alleged, "an overt act by the defendant is required to restart the statute of limitations and the statute runs from the last overt act." *Pace Indus., Inc.,* 813 F.2d at 237. There appears to be no dispute that alleged price-fixing activities prior to December 3, 1989, are barred. Defendants do not argue the bar of limitations against alleged price-fixing after December 3, 1989.

**\*24** With respect to the denial of access claims, the following overt acts are alleged: (1) renegotiating the A & S gas contracts in 1984; (2) encouraging non-core customers to elect core service; and (3) causing UEG to elect core service (May 1988). The resulting harm, elimination of noncore customers' access was alleged to occur immediately after May 1, 1988. (AC ¶ 66). Plaintiffs do not allege the contracts were wrongfully modified as to volume after December 3, 1989. In this case, all of the overt acts pertaining to Plaintiffs' denial of access claims occurred prior to December 3, 1989, more than four years before the filing of the complaint.

Plaintiffs contend that the statute of limitations runs from PG & E's last purchase of gas under the 1984 contracts, in 1993, and the conspiracy is a continuing one. In *In re Lower Lake Eire Iron Ore Antitrust Litigation, supra,* 998 F.2d at 1172-73; *Hanover Shoe, Inc. v. United Shoe Machinery Corp.* [1968 Trade Cases ¶ 72,490], 392 U.S. 481, 502 n. 15 (1968). However, performance of the alleged anticompetitive contracts during the limitations

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1995 WL 819150, *24 (E.D.Cal.))

period is not sufficient to restart the period. *Aurora Enter. v. NBC* [1982-2 Trade Cases ¶ 64,956], 688 F.2d 689, 694 (9th Cir.1982) ("[T]hat defendants receive a benefit today as a result of a contract executed in 1966 ... is not enough to restart the statute of limitations."); *Eichman v. Fotomat Corp.* [1989-1 Trade Cases ¶ 68,485], 880 F.2d 149, 160 (9th Cir.1989). That Defendants renegotiated the price of gas or continued to receive gas under their contracts does not restart the limitations period for the denial of access claims. Nor does *Hanover Shoe,* supra, 377 F.2d at 794-95 dictate otherwise. There, the time barred conduct was not the same and any recovery was limited to the limitations period.

### J. *Wilson Tariff Act Claims.*

It has been determined that the Sherman Act claims cannot survive these motions. The same defenses bar the Wilson Tariff Act claims as a matter of law. See *Western Concrete Structure Co. v. Mitsui & Co.* [1985-1 Trade Cases ¶ 66,621], 760 F.2d 1013, 1019 (9th Cir.), *cert. denied,* 474 U.S. 903 (1985).

### K. *The Clayton Act Claims.*

Liability for illegal exclusive dealing is not assessable against buyers. (Mem.Op. at 67-68); *McGuire v. C.B.S., Inc.* [1968 Trade Cases ¶ 72,563], 399 F.2d 902, 906 (9th Cir.1968). Any sales by PG & E are not the ones complained of by plaintiffs.

Section 3 of the Clayton Act prohibits:
"Any person engaged in commerce, ... [from making] a sale or contract for sale of goods ... or other commodities, ... on the condition, agreement or understanding that the ... purchaser ... shall not use or deal in ... other commodities of a competitor ... of the ... seller...."
15 U.S.C. § 14.

Plaintiffs' price-fixing claims are based on A & S agreements to purchase natural gas from "the cartel" at inflated prices. Plaintiffs contend that PGT and PG & E are downstream buyers. (AC ¶¶ 34, 39-42, 53, 55). But, plaintiffs do not allege A & S sales to PGT, or that PGT's sales to PG & E are unlawful "exclusive dealing" agreements. Nor are Defendants, as parent and subsidiary corporations, legally capable of conspiring, *Copperweld Corp. v. Independence Tube Corp.* [1984-2 Trade Cases ¶

66,065], 467 U.S. 752, 771, (1984), or legally capable of entering into an exclusive dealing arrangement, *Advanced Health Care-Service, Inc. v. Radford Comm. Hosp.* [1990-2 Trade Cases ¶ 69,152], 910 F.2d 139, 152 (4th Cir.1990).

*25 No sufficient denial of access exclusive dealing arrangement is alleged. Rather, the Clayton Act claim only identifies gas sales. (AC, ¶ 32). A service contract or sale of intangibles is not prohibited by Section 3 of the Clayton Act. *Chelson v. Oregonian Publishing Co.* [1983-2 Trade Cases ¶ 65,618], 715 F.2d 1368, 1372 (9th Cir.1983). Transportation services are not goods or commodities under Section 3. *Cf. Fleetway, Inc. v. Pub. Serv. Interstate Transp. Co.* [1932-1939 Trade Cases ¶ 55,061], 72 F.2d 761, 763 (3d Cir.1934), *cert. denied,* 293 U.S. 626 (1935). The Section 3 Clayton Act claims for gas and transportation rights alleging anticompetitive exclusive dealing arrangements must be dismissed with prejudice.

### L. *Cartwright Act Claims.*

Defendants argue Plaintiffs' denial of access claim under state anticompetition law is exempt from liability under the implied repeal doctrine due to the CPUC regulation of gas pipeline access. *Phonetele, Inc. v. AT & T* [1981-2 Trade Cases ¶ 64,413], 664 F.2d 716, 731-32 (9th Cir.1981), *cert. denied,* 459 U.S. 1145 (1983).

Plaintiffs respond the CPUC has no authority to regulate PGT or A & S. However, it is regulation of the challenged conduct that determines availability of the defense. *Id.* The pervasiveness of such state regulation has been previously analyzed. "Plain repugnancy" exists between the state antitrust laws and CPUC policy to regulate transportation rights access, even if the regulatory environment for natural gas is moving to deregulation and open competition. Cases cited by plaintiffs to support a finding of no repugnancy are factually distinguishable. (*See* Def.Reply Mem. at 45 n. 78).

A separate legal defense is raised under Cal.Pub.Util.Code § 1759, which grants exclusive jurisdiction to the California Supreme Court to review and affect the orders and actions of the CPUC. Plaintiffs' Cartwright Act claims for denial of access seek redress for Defendants' pipeline

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1995 WL 819150, *25 (E.D.Cal.))

Page  19

access activities which were reviewed and directed by the CPUC to protect core ratepayers. The Court cannot permit "an award of damages [which] would [ ] hinder or frustrate the Commission's declared supervisory and regulatory policies." *Waters v. Pacific Tel. Co.*, 13 Cal.3d 1, 4 (1974).

Defendants further argue that Cal.Pub.Util.Code § 2775 bars the denial of access claims because the CPUC allocated PG & E's rights to PGT pipeline capacity. Plaintiffs respond that denial of pipeline access resulted from requirements of the Canadian contracts not CPUC rulings. The CPUC issued orders concerning capacity brokering among core and non-core customers; rejected objections that reallocation would interfere with A & S-producer contracts; and expressly overrode A & S-producer contracts. 43 C.P.U.C.2d at 286; D.94-03-050 at 29-30. If the plaintiffs were denied PGT pipeline access, it was as a result of CPUC orders, which bars these claims under Cal.Pub.Util.Code § 2775.

*26 The Cartwright Act claims must be dismissed as to all defendants without leave to amend.

### CONCLUSION
For the reasons analyzed above, Plaintiffs' first amended complaint and each and every claim thereof is dismissed with prejudice. Defendants' counsel shall prepare a judgment in conformity with this opinion and lodge it with the court within five (5) days following the date of service of this opinion by the clerk of the court.

SO ORDERED.

FN1. Plaintiffs' motion for class certification was granted on August 25, 1994. *See* Memorandum Opinion & Orders Re: (1) Plaintiffs' Motion For Class Certification; (2) Defendants' Motion To Dismiss, at 10-14 (August 25, 1994) (hereinafter Mem.Op.).

FN2. Defendants correctly dispute the existence of a non-core subclass. They contend that the Court only certified the class of core customers and have filed a separate motion to decertify the noncore subclass, which is addressed by a separate memorandum opinion.

FN3. A & S arranged to have NOVA, an Alberta corporation, transport the gas from Alberta to British

Columbia. Within British Columbia, the gas was conveyed by ANG. (AC, ¶ 32).

FN4. Plaintiffs have been denied discovery of the A & S Canadian producer gas contracts. Nowhere have plaintiffs described what "anticompetitive" provisions the A & S "cartel" agreements contain, other than to "fix a price" that plaintiffs allege exceeds the market. It is not alleged what interest the Canadian producers have in transportation rights to which plaintiffs claim pipeline access rights.

FN5. In 1989, the Department of Energy transferred authority over the natural gas import and authorization program from the to the Office of Fossil Energy (FE). Delegation Order 0204-127, 54 Fed.Reg. 11436 (1989).

FN6. Interruptible transportation, as opposed to firm transportation, can be stopped at any time. Some end users cannot use interruptible transportation because their applications require a steady, reliable supply of natural gas.

FN7. Though voluminous, these documents are necessary, for the most part, to understanding and resolving the issues presented.

FN8. The DRA is a statutorily-created advocate charged with representing public utility customers and subscribers in proceedings before the CPUC. Cal.Pub.Util.Code § 309.5 (West Supp.1995).

FN9. Plaintiffs contend that state action does not bar the claims against PGT and A & S. Since Defendants do not move to dismiss the claims against PGT and A & S on the basis of state action, it is unnecessary to decide whether state action applies the [sic] price-fixing claims against PGT and A & S.

FN10. PGT's capacity is 1,066 MMcf per day. Reasonableness Dec. at 98 (1991).

FN11. The concluded, "PGT's import arrangement is competitive and market-responsive and can be expected to remain so over the term of the underlying contract." *Id.* at 72,386.

FN12. The statute enumerated various factors that the regulatory agency was to consider in arriving at "just and reasonable" rates. The Court noted that these factors "[bore] no discernable relationship to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



the prices that would be set by a perfectly efficient and unregulated market." *Southern Motor* Carriers, 471 U.S. at 65 n. 25

FN13. By definition, core customers are incapable of competing with PG & E to purchase gas. Plaintiffs allege in the complaint that core customers "had no choice but to purchase their gas from PG & E." (AC, ¶ 16).

FN14. Plaintiffs argue the County is a less direct victim of the alleged anticompetitive conduct complained of and that other directly injured claimants exist. *Lucas v. Bechtel Corp.* [1986-2 Trade Cases ¶ 67,290], 800 F.2d 839, 844-45 (9th Cir.1986). It is unnecessary to decide the standing issue on this theory. Moreover, if the County's claim is made as a customer, the claim is barred by the filed rate and state action doctrines.

FN15. Plaintiffs' argument that the denial of access claims do not depend upon the essential facility doctrine were previously discussed and rejected. Even if the denial of access claim is not characterized as a claim for denial of an essential facility, in general, one who claims to have been denied entrance to the market must have taken " 'substantial and demonstrable steps to enter an industry and ... (been) thwarted in that purpose by antitrust violations.' " *In re Dual-Deck Video Cassette Recorder Litig.* [1993-2 Trade Cases ¶ 70,445], 11 F.3d 1460, 1464 (9th Cir.1993) (quoting *Solinger v. A & M Records, Inc.* [1978-2 Trade Cases ¶ 62,401], 586 F.2d 1304, 1309 (9th Cir.1975), *cert. denied,* 441 U.S. 908 (1979)). Here, the County did not take "substantial and demonstrable" steps to enter the market for Canadian natural gas imports because it did not attempt to gain access to PGT's pipeline. This failure bars it from pursuing its claim that it was denied entrance to the market by Defendants' alleged antitrust violations.

FN16. Even under general antitrust principles, a would-be competitor must allege substantial demonstrable steps to enter the industry. *Solinger*, 586 F.2d at 1309.

FN17. PGT received bids totaling far in excess of its available pipeline capacity.

FN18. 40 F.E.R.C. at 61, 625 n. 9, demonstrates causation in fact is lacking for the independent reason that the PGT pipeline lacked the capacity to accommodate the County.

Not Reported in F.Supp., 1995 WL 819150 (E.D.Cal.), 1996-1 Trade Cases P 71,305, Util. L. Rep. P 14,082

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



114 F.3d 858                                                                    **Page   1**

114 F.3d 858, 65 USLW 2794, 1997-1 Trade Cases P 71,823, Util. L. Rep. P 14,159,
97 Cal. Daily Op. Serv. 4027, 97 Daily Journal D.A.R. 6786
**(Cite as: 114 F.3d 858)**

▷

Briefs and Other Related Documents

United States Court of Appeals,
Ninth Circuit.
COUNTY OF STANISLAUS, a Public Entity;
Mary Grogan; Ron Demirdjian,
Plaintiffs-Appellants,
v.
PACIFIC GAS AND ELECTRIC COMPANY, a
California Corporation; Pacific Gas
Transmission Company, a wholly owned subsidiary
of Pacific Gas & Electric
Company, Defendants-Appellees.
No. 96-15275.

.

Argued and Submitted Feb. 11, 1997.
Decided May 29, 1997.

Core and noncore customers of natural gas local
distribution company (LDC) brought class action
against company, company's interstate pipeline
subsidiary, and company's gas aggregator and
exporter Canadian subsidiary, alleging price fixing
and market preclusion through denial of pipeline
access in violation of Sherman Antitrust Act, Wilson
Tariff Act, Clayton Act, and California's Cartwright
Act.    Defendants moved to dismiss complaint.
The United States District Court for the Eastern
District of California, Oliver W. Wanger, J., 1995
WL 819150, granted motion.    Customers appealed.
The Court of Appeals, Hawkins, Circuit Judge, held
that: (1) as a matter of first impression, filed-rate
doctrine barred federal antitrust market preclusion
claims; (2) filed-rate doctrine barred federal antitrust
price-fixing claims; and (3) filed-rate doctrine
barred state antitrust price-fixing and market
preclusion claims.

Affirmed.

West Headnotes

[1] Federal Courts ⚖═ 776
170Bk776 Most Cited Cases
Court of Appeals would review plaintiffs' appeal
from district court's dismissal of complaint for
failure to state claim de novo.    Fed.Rules
Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

[2] Gas ⚖═ 14.1(1)
190k14.1(1) Most Cited Cases
Court of Appeals applies filed-rate doctrine to rates
filed with Federal Energy Regulatory Commission
(FERC) out of deference to congressional scheme of
uniform    regulation;    otherwise,    Court    would
impermissibly usurp function that Congress has
assigned to federal regulatory body.    Natural Gas
Act, § 4(c, d), 15 U.S.C.A. § 717c(c, d).

[3] Monopolies ⚖═ 12(16)
265k12(16) Most Cited Cases

[3] States ⚖═ 18.84
360k18.84 Most Cited Cases
Filed-rate doctrine applies both to federal antitrust
actions and to state law causes of action relating to
rates established by federal regulatory agencies; to
permit recovery under state law would allow state
court, or federal court applying state law, to
undermine authority of federal agency, and would
impermissibly contravene supremacy clause of
Constitution.    U.S.C.A. Const. Art. 6, cl. 2;
Sherman Act, § 1 et seq., as amended, 15 U.S.C.A.
§ 1 et seq.;    Wilson Tariff Act, § 73 et seq., as
amended, 15 U.S.C.A. § 8 et seq.;    Clayton Act, §
1 et seq., 15 U.S.C.A. § 12 et seq.

[4] Monopolies ⚖═ 12(16)
265k12(16) Most Cited Cases
Filed-rate doctrine barred federal antitrust price-
fixing claims of customers of natural gas local
distribution company (LDC) against company and
others alleging that rates approved by Federal
Energy Regulatory Commission (FERC) were
product of antitrust violations, and seeking alleged
overcharge and treble damages; and claim for damages
based on filed rate would be too speculative because
it would require showing that hypothetical lower
rate should and would have been adopted by
Commission.    Sherman Act, § 1 et seq., as
amended, 15 U.S.C.A. § 1 et seq.;    Wilson Tariff
Act, § 73 et seq., as amended, 15 U.S.C.A. § 8 et
seq.;    Clayton Act, § 1 et seq., 15 U.S.C.A. § 12 et

seq.;    Natural Gas Act, §§ 4(a, c, d), 7, 15
U.S.C.A. §§ 717c(a, c, d), 717f; Natural Gas
Policy Act of 1978, § 311(a), 15 U.S.C.A. §
3371(a); 18 C.F.R. §§ 284.1-284.9, 284.221-

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

114 F.3d 858                                                           **Page   2**
**(Cite as: 114 F.3d 858)**

284.227.

[5] Monopolies ⟺ 28(9)
265k28(9) Most Cited Cases
Award of treble damages is not available remedy for plaintiff claiming that rate submitted to, and approved by, Federal Energy Regulatory Commission (FERC) was product of antitrust violation. U.S.C.A. Const. Art. 6, cl. 2; Sherman Act, § 1 et seq., as amended, 15 U.S.C.A. § 1 et seq.; Wilson Tariff Act, § 73 et seq., as amended, 15 U.S.C.A. § 8 et seq.; Clayton Act, § 1 et seq., 15 U.S.C.A. § 12 et seq.; Natural Gas Act, § 4(c, d), 15 U.S.C.A. § 717c(c, d).

[6] Monopolies ⟺ 12(16)
265k12(16) Most Cited Cases
Filed-rate doctrine precludes antitrust claims seeking damages on basis of rates filed with federal regulatory agency. Sherman Act, § 1 et seq., as amended, 15 U.S.C.A. § 1 et seq.; Wilson Tariff Act, § 73 et seq., as amended, 15 U.S.C.A. § 8 et seq.; Clayton Act, § 1 et seq., 15 U.S.C.A. § 12 et seq.

[7] Monopolies ⟺ 12(16)
265k12(16) Most Cited Cases
Filed-rate doctrine barred market preclusion antitrust claims of customers of natural gas local distribution company (LDC) claiming that company and subsidiary's import practices, which had received Economic Regulatory Administration (ERA) approval, detrimentally affected customers' ability to obtain less expensive gas by effectively denying customers access to subsidiary's pipeline; ERA approval established import volume as conclusively reasonable and foreclosed any challenge to importation volumes, including claim that company and subsidiary illegally "stuffed" pipeline with alleged Canadian cartel gas. U.S.C.A. Const. Art. 6, cl. 2; Sherman Act, § 1 et seq., as amended, 15 U.S.C.A. § 1 et seq.; Wilson Tariff Act, § 73 et seq., as amended, 15 U.S.C.A. § 8 et seq.; Clayton Act, § 1 et seq., 15 U.S.C.A. § 12 et seq.; Natural Gas Act, §§ 3(a), 4(a, c, d), 7, 15 U.S.C.A. §§ 717b(a), 717c(a, c, d), 717f; Natural Gas Policy Act of 1978, § 311(a), 15 U.S.C.A. § 3371(a); 18 C.F.R. §§ 284.1-284.9, 284.221-284.227.

[8] Monopolies ⟺ 12(16)
265k12(16) Most Cited Cases

Filed-rate doctrine barred state antitrust price-fixing and market preclusion claims of core and noncore customers of natural gas local distribution company (LDC) under California's Cartwright Act; Federal Energy Regulatory Commission (FERC) had determined that company's wholesale prices were just and reasonable and Economic Regulatory Administration (ERA) had established that pipeline subsidiary's proposed import volumes were in the public interest. Natural Gas Act, §§ 3(a), 4(a, c, d,), 7, 15 U.S.C.A. §§ 717b(a), 717c(a, c, d), 717f; Natural Gas Policy Act of 1978, § 311(a), 15 U.S.C.A. § 3371(a); West's Ann.Cal.Bus. & Prof.Code § 16700 et seq.; 18 C.F.R. §§ 284.1-284.9, 284.221-284.227.

[9] Public Utilities ⟺ 119.1
317Ak119.1 Most Cited Cases
Filed-rate doctrine bars all claims, state and federal, that attempt to challenge rate that federal regulatory agency has reviewed and filed.

**\*859** Frank C. Damrell, Jr. and Lisa L. Gillispie, Damrell, Nelson, Schrimp, Pallios & Ladine, Modesto, California, together with Bruce L. Simon, Cotchett & Pitre, Burlingame, California, and Tony J. Tanke, Tanke & Willemsen, Belmont, California, for the plaintiffs-appellants.

Marie L. Fiala and M. Laurence Popofsky, Heller, Ehrman, White & McAuliffe, San Francisco, California, for the defendants-appellees.

Appeal from the United States District Court for the Eastern District of California, Oliver W. Wanger, District Judge, Presiding. D.C. No. CV-93- 05866-OWW.

Before:    BRUNETTI,    FERNANDEZ,    and HAWKINS, Circuit Judges.

                    **\*860** OPINION

HAWKINS, Circuit Judge:

The issues in this appeal are at the intersection of federal regulation of interstate commerce and the antitrust laws.   We are asked to determine what interest must yield when federal regulatory review leads to allegedly anticompetitive behavior: specifically, whether federal review of natural gas importation, transportation, and sales precludes antitrust claims for behavior underlying or leading

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



to the regulatory result.  We hold that it does and therefore affirm the district court's dismissal of plaintiffs' claims.

## FACTUAL AND PROCEDURAL HISTORY

Plaintiffs-appellants in this class action are individuals and entities who received natural gas ("gas") service from defendant Pacific Gas & Electric Company ("PG & E") from February 1988 through October 1993.  Within the plaintiff class are two types of gas customers:  core customers and non-core customers.  Core customers, according to plaintiffs' complaint, "are residential and commercial customers without alternate fuel capability."  Plaintiff Mary Grogan is the class representative for the core customers.  Non-core customers, by contrast, are large commercial and industrial consumers that are capable of purchasing gas from alternative sources.   The County of Stanislaus ("County") is a non-core customer.

Defendant-appellee PG & E is a public utility company that supplies natural gas to millions of commercial and residential customers in northern and central California.  Defendant-appellee Pacific Gas Transmission Company ("PGT") is a wholly-owned subsidiary of PG & E.   PGT owns and operates a gas pipeline that extends from the Canada-United States border to California.  Defendant-appellee Alberta & Southern Gas Company ("A & S"), a Canadian corporation, also is a wholly-owned subsidiary of PG & E.  A & S is an aggregator and exporter of Canadian gas.

During the time period relevant to this lawsuit, defendant A & S negotiated contracts with a group of natural gas producers from Alberta, Canada, for the sale of gas to PG & E.  Plaintiffs allege that the Alberta producers acted as a cartel, and that A & S and the cartel conspired to increase the price paid for gas above the prevailing market rate for Canadian gas. [FN1]

> FN1. A & S based the price it paid for gas on a "netback" formula, which arrives at a price by subtracting the cost of transportation from Alberta to California from the price of gas produced in the southwestern United States and transported to California.  This is one of only two methods of price calculation that the Canadian regulatory structure permits.  The other permissible method of price calculation requires the parties to submit to arbitration.

At the United States border, A & S sold the gas to defendant PGT, which owned the pipeline that transported the gas to California.  At the California border, PGT sold the gas to PG & E. In addition to the price-fixing conspiracy, plaintiffs contend that defendants prevented PG & E's competitors from gaining necessary access to PGT's pipeline.  Plaintiffs allege that PG & E purchased excessive quantities of cartel gas in order to "stuff" the pipeline and prevent competitors from supplying gas to non-core customers in California.  Plaintiffs further allege that PG & E caused its Utility Electric Generation Department ("UEG") to elect core service, which effectively filled the pipeline and foreclosed access for non-core customers.

Plaintiffs assert the following claims for relief:  (1) price fixing in violation of section 1 of the Sherman Act, the Wilson Tariff Act, section 3 of the Clayton Act, and California's Cartwright Act;  and (2) denial of pipeline access in violation of the Sherman Act, the Wilson Tariff Act, the Clayton Act, and California's Cartwright Act. [FN2]

> FN2. The remaining claims--claims for injunctive relief--became moot when the contracts expired in October 1993 and are not before us on this appeal.

Several levels of federal and state review scrutinized the gas purchase and transportation process described above.  After review by Canadian agencies, the agreement for the import of gas from Alberta was subject to United States agency review.  Two federal agencies regulate natural gas imports and *861 sales:   the Economic Regulatory Administration ("ERA") and the Federal Energy Regulatory Commission ("FERC").

Under section 3 of the Natural Gas Act ("NGA"), ERA reviews foreign natural gas imports and must approve a proposed importation of natural gas unless the import "will not be consistent with the public interest."  15 U.S.C. § 717b(a).  ERA considers the competitiveness of the imported gas, the need for the gas, and the security of the gas supply.  Pursuant to Department of Energy policy, the "primary consideration" is the "competitiveness of an import arrangement in the market served."  *Pacific Gas Transmission Co.* [*PGT II* ], 1 E.R.A. ¶ 70,591 at 72,386 (1985).   In a series of orders,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



ERA first granted conditional, then final approval to the proposed sale and importation from A & S to PGT. *See id.; Pacific Gas Transmission Co.* [*PGT I* ], 1 E.R.A. ¶ 70,574 at 72,321 (1984). ERA found that "PGT's import arrangement is competitive and market responsive, and can be expected to remain so over the term of the underlying contract." *PGT II* at 72,386.

In addition to ERA review, sections 4(c) and (d) of the NGA require sellers of natural gas in interstate commerce to file their rates with FERC. 15 U.S.C. §§ 717c(c), (d). In this case, FERC reviewed the price that PG & E paid to PGT for the gas to ensure that the price was "just and reasonable." 15 U.S.C. § 717c(a). Though FERC may not redetermine the reasonableness or competitiveness of an import arrangement approved by ERA, it must independently ensure that Canadian and domestic sources of gas receive equal treatment. *See TransCanada Pipelines Ltd. v. FERC,* 878 F.2d 401, 407, 411 (D.C.Cir.1989).

Moreover, FERC administers several programs that provide transportation rights on PGT's pipeline to non-core customers. For example, pipeline operators such as PGT could apply to FERC for an individual certificate of public convenience and necessity to transport natural gas on behalf of a non-core customer. *See* 15 U.S.C. § 717f. Though the certificates received only limited use because of the administrative burden they imposed, PGT did obtain certificates for at least nine shippers during the 1980s. *Re Pacific Gas Trans. Co.,* 40 F.E.R.C. ¶ 61,193 at 61,622 n. 29 (1987). The County does not allege that it ever sought access to PGT's pipeline pursuant to this program.

In 1985, FERC adopted the "blanket certificate" program, intended to provide customers with greater access to gas transportation. *See* 50 Fed.Reg. 42408 (1985). The program authorized interstate pipelines to transport gas in competition with their own gas on a first-come, first-served basis. *See* 18 C.F.R. §§ 284.1-284.9, 284.221--284.227. PGT employed a lottery system to offer access under the blanket certificate program and received bids from customers for transportation access far exceeding available pipeline capacity. The County does not allege participation in the lottery, nor does it allege impropriety by PGT in conducting the lottery.

Non-core customers may also seek access through a program known as the "Section 311" shipper queue. *See* 15 U.S.C. § 3371(a). Under this program, interstate pipeline operators can transport gas for certain customers by submitting tariffs to FERC for approval. Although PGT received approval in 1987 to act as a section 311 shipper, the County does not allege that it sought access to this program.

In addition to federal regulation, a California state agency regulates the rates that utilities charge within the state. The California Public Utilities Commission ("CPUC") retrospectively reviews rates and the costs underlying those rates to ensure that the rates are "just and reasonable." Cal.Pub.Util.Code § 451. The core/non-core distinction results from a 1986 CPUC program designed to ensure a consistent supply of gas for the core customers while allowing some purchasing flexibility to non-core customers. *See Re New Regulatory Framework for Gas Utilities,* 22 C.P.U.C.2d 491, 505, 1986 WL 215056 (1986). As part of the program, non-core customers could elect core service and be treated as core customers. *Id.* at 520-21.

Many PG & E customers chose to core-elect. In addition, PG & E elected core service for its UEG. As a result of the core-**\*862** election program, non-core customers suffered a reduction in transportation capacity. In response to their complaints, however, CPUC determined that core election benefitted core and non-core customers by increasing PG & E's bargaining power with Canadian producers. *Re Natural Gas Procurement and System Reliability,* 30 C.P.U.C.2d 545, 558-60, 1988 WL 391270 (1988). Thus, CPUC endorsed a PG & E strategy to maximize core-election by its non-core customers.

CPUC nonetheless implemented several programs designed to ensure transmission capacity for non-core customers. In 1990, CPUC required PG & E to allocate a portion of its pipeline rights to non-core customers. In 1991, CPUC adopted a program that required PG & E to make available to non-core customers any transportation capacity in excess of that required to serve core customers. The County, a non-core customer, does not allege that it sought to take advantage of either of these programs.

[1] After plaintiffs filed their initial complaint in this matter, defendants filed a Rule 12(b)(6) motion

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



to dismiss, which the district court granted in part and denied in part. The district court granted plaintiffs leave to amend the complaint. Plaintiffs filed an amended complaint, which added A & S as a defendant. The district court granted defendants' renewed motion to dismiss on a number of grounds without leave to amend. We review plaintiffs' timely appeal de novo. *Oscar v. University Students Co-op. Ass'n,* 965 F.2d 783, 785 (9th Cir.1992) (en banc).

### ANALYSIS

The district court, in ruling on defendants' motions to dismiss, held that the filed rate doctrine barred all of plaintiffs' claims for damages.

Since the 1920s, the "filed rate" or "filed tariff" doctrine has barred antitrust recovery by parties claiming injury from the payment of a filed rate for goods or services. *Keogh v. Chicago Northwestern Ry. Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). The doctrine has been the target of criticism since its inception. Recently, the Supreme Court acknowledged criticism of the doctrine, but affirmed its vitality as a "rule [that] has been an established guidepost at the intersection of the antitrust and interstate commerce statutory regimes for some 6 1/2 decades." *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,* 476 U.S. 409, 423, 106 S.Ct. 1922, 1930, 90 L.Ed.2d 413 (1986).

In *Keogh,* a private shipper claimed that rates submitted to and approved by the Interstate Commerce Commission ("ICC") pursuant to the Interstate Commerce Act had been fixed by a conspiracy that violated the Sherman Act. The shipper alleged that, as a result of the conspiracy, the rates were "higher than the rates would have been, if competition had not been thus eliminated." *Keogh,* 260 U.S. at 160, 43 S.Ct. at 48. The Supreme Court rejected the shipper's claim, agreeing with defendants that ICC approval of their rates conclusively established the rates as "reasonable and nondiscriminatory." *Id.* at 161, 43 S.Ct. at 49.

[2] *Montana-Dakota Utilities Co. v. Northwestern Public Service Co.,* 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951), applied the filed rate doctrine to rates filed with the Federal Power Commission (FERC's predecessor) and rejected a claim that defendant's allegedly fraudulent conduct had led to

illegal and unreasonably high rates. *See id.* at 251-52, 71 S.Ct. at 695. The Court held that:

the right to a reasonable rate is the right to the rate which the Commission files or fixes, and that, except for review of the Commission's orders, the courts can assume no right to a different one on the ground that, in its opinion, it is the only or the more reasonable one.

*Id.; see also Nantahala Power & Light Co. v. Thornburg,* 476 U.S. 953, 962-63, 106 S.Ct. 2349, 2355, 90 L.Ed.2d 943 (1986) (describing *Montana-Dakota* ). We apply the filed rate doctrine out of deference to a "congressional scheme of uniform ... regulation." *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 579, 101 S.Ct. 2925, 2931, 69 L.Ed.2d 856 (1981) Otherwise, we would impermissibly "usurp[ ] a function that Congress has assigned to a state regulatory body." *Id.* at 582, 101 S.Ct. at 2932; *see also Mississippi Power & Light v. Mississippi ex rel. Moore,* *863 487 U.S. 354, 371, 108 S.Ct. 2428, 2438, 101 L.Ed.2d 322 (1988); *Nantahala,* 476 U.S. at 964, 106 S.Ct. at 2355-56.

[3] The filed rate doctrine applies both to federal antitrust actions and to state law causes of action relating to rates established by federal agencies. *See Arkansas Louisiana Gas,* 453 U.S. at 580, 101 S.Ct. at 2931- 32. To permit recovery under state law would allow a state court (or a federal court applying state law) to undermine the authority of a federal agency, *id.* at 582, 101 S.Ct. at 2932-33, and would impermissibly contravene the Supremacy Clause. *See id.*

Here, the sale and transportation of natural gas from Canada to California cleared several levels of state and federal review: FERC reviewed the price that PG & E paid to PGT for the gas; ERA reviewed the import contract between A & S and PGT; and CPUC reviewed the retail prices that PG & E charged to its California customers. For purposes of the filed rate doctrine, the two levels of federal review are sufficient to bar the claims--state and federal--that plaintiffs press in this action.

Plaintiffs assert three types of antitrust claims: price fixing, "market preclusion" or denial of access, and state antitrust claims. We conclude that the filed rate doctrine bars all claims in this case, and we address each type of claim separately.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



A. Federal Price Fixing Claims

[4] Plaintiffs claim that defendants' FERC-approved rates were the product of antitrust violations, and seek as damages the "overcharge" that resulted from the fixed prices. This is precisely what the filed rate doctrine prohibits. As we recognized in *Cost Management Servs. v. Washington Natural Gas Co.,* 99 F.3d 937 (9th Cir.1996), a claim for damages based on a filed rate would be too speculative, because it:

> would require a showing that a hypothetical lower rate should and would have been adopted by [FERC]. Whether or not the agency would have actually approved a different rate was a question best left to the agency itself, rather than the courts. 99 F.3d at 944.

[5] Plaintiffs' complaint, which seeks treble damages on the ground that alleged antitrust activities caused plaintiffs to pay an inflated rate for their gas, asks for that which *Keogh* and its progeny will not allow; "an award of treble damages is not an available remedy for a [plaintiff] claiming that the rate submitted to, and approved by, [FERC] was the product of an antitrust violation." *Square D,* 476 U.S. at 422, 106 S.Ct. at 1929; *see also H.J. Inc. v. Northwestern Bell Telephone Co.,* 954 F.2d 485, 488 (8th Cir.1992) ("The filed rate doctrine prohibits a party from recovering damages measured by comparing the filed rate and the rate that might have been approved absent the conduct in issue.").

[6] Plaintiffs cannot meaningfully distinguish *Square D,* which concerned a Canadian conspiracy to fix rates for freight transportation occurring outside the purview of the ICC. *Square D,* 476 U.S. at 414, 106 S.Ct. at 1925. Plaintiffs in the instant case have characterized the activities of A & S and the alleged cartel as "beyond the U.S. border" and "outside the authority of domestic regulatory agencies." *Square D* rejected such a "narrow reading" of the filed rate doctrine, *id.* at 417 n. 19, 106 S.Ct. at 1927 n. 19, adhering to *Keogh* 's rule that antitrust damages are not available for claims based on filed rates. *See id.* at 422, 106 S.Ct. at 1929-30. The same result obtains here: the filed rate doctrine precludes antitrust claims seeking damages on the basis of filed rates.

B. Federal "Market Preclusion" Claims

[7] The filed rate doctrine also bars plaintiffs' claims that defendants' gas purchasing agreements operated to deny plaintiffs access to the PGT pipeline, such that plaintiffs could not independently arrange to procure less expensive gas. Plaintiffs' denial of access claims are, at core, a challenge to the quantity of gas that PG & E purchased from Canadian producers; because such quantities had received ERA approval and authorization, the claims cannot overcome the filed rate doctrine's clear instruction that *864 ERA-approved volumes are conclusively reasonable.

Application of the filed rate doctrine to ERA review is a matter of first impression. This case requires us to address a claim that the defendants' import practices--which had received ERA review and approval--detrimentally affected plaintiffs' ability to obtain less expensive natural gas. Guided by Supreme Court precedent, the complimentary jurisdiction of ERA and FERC, and the Supremacy Clause, we hold that ERA approval establishes an import volume as conclusively reasonable and thereby forecloses any challenge to importation volumes. As a result, plaintiffs in this litigation cannot complain that PG & E and PGT illegally "stuffed" their pipeline with cartel gas; ERA approval of those volumes of gas precludes any such complaint.

In *Nantahala,* the Supreme Court applied the filed rate doctrine to a FERC-ordered allocation of power and concluded that "the filed rate doctrine is not limited to 'rates' *per se.*" 476 U.S. at 966, 106 S.Ct. at 2357. *Nantahala* involved a decision of the North Carolina Supreme Court, which had affirmed an allocation of power by North Carolina's Utility Commission ("NCUC") that differed from a prior FERC allocation. The *Nantahala* Court held, on the basis of the filed rate doctrine, that FERC's ordered allocation preempted a subsequent reallocation by NCUC. *Id.* at 972-73, 106 S.Ct. at 2360. According to the Supreme Court,

> The North Carolina court's ruling that Nantahala had purchased an unreasonably large quantity of high-cost power ... conflicts with FERC's orders in the same manner as would a refusal to recognize a FERC-approved price as a reasonable cost for purposes of retail ratemaking.
> *Id.* at 973, 106 S.Ct. at 2360.

Just as the North Carolina court in *Nantahala* was

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

powerless to reject FERC's allocation, we cannot allow plaintiffs' claims to proceed given ERA's authorization of PGT's import volumes as "just and reasonable."

Although plaintiffs correctly note that the Supreme Court in *Nantahala* left open the possibility that a claim concerning the quantity of power purchased might survive the filed rate doctrine, [FN3] plaintiffs' claims do not fall within this narrow question.  The question not answered in *Nantahala* concerned *rates* filed with *FERC,* whereas this case concerns *volumes* filed with *ERA.*  The difference is critical, and fatal to plaintiffs' denial of access claims:  because the volumes in the instant case had received ERA approval, they--like the filed rates in *Keogh*--are *conclusively reasonable,* and not subject to the challenge that plaintiffs raise.  *See Montana-Dakota,* 341 U.S. at 251-52, 71 S.Ct. at 695-96 (right to reasonable rate nothing more than the right to filed rate).  *Nantahala* concerned action by FERC only;  here, because, along with FERC price approval, PG & E filed the particular quantity purchased with ERA, the quantity was conclusively reasonable, and the *Nantahala* exception is not applicable.

> FN3. The Supreme Court in *Nantahala* did not entirely foreclose the possibility of a claim based on allocation: Without deciding this issue, we may assume that a particular *quantity* of power procured by a utility from a particular source could be deemed unreasonably excessive if lower cost power is available elsewhere, even though the higher cost power actually purchased is obtained at a FERC-approved, and therefore reasonable, *price.*
> 476 U.S. at 972, 106 S.Ct. at 2360 (emphasis in original).

Plaintiffs invoke a legion of cases in an attempt to bring their claims outside the filed rate doctrine, none of which has particular relevance here. Plaintiffs' reliance on *In re Lower Lake Erie Iron Ore Antitrust Litigation,* 998 F.2d 1144 (3rd Cir.1993) is misplaced.  In *Lower Lake Erie,* steel companies, trucking companies, and dock companies filed suit against railroad companies, alleging that the railroads "conspired ... to preclude potential competitors from entering the market of lake transport, dock handling, storage and land transport of iron ore." *Id.* at 1151.  At issue in *Lower Lake Erie* was "whether the railroads' rate-

making activity occurred within the legal framework of the [Interstate Commerce Act]." *Id.* at 1152. The district court in *Lower Lake Erie* dismissed, on the basis of the filed rate doctrine, *\*865 the steel companies' claims "based on the allegation that, absent the conspiracy, these plaintiffs would have paid lower rates for costs associated with the transportation of ore." *Id.* at 1154.

The claims that survived dismissal in *Lower Lake Erie* have no relevance here.  In that case, if the anticompetitive conduct had not occurred, an entirely new alternative--shipping by truck as opposed to rail--would have been available to the steel companies.  The railroads' rates were only coincidentally implicated because "the steel companies were compelled to continue to pay the railroad fixed rates." *Id.* at 1160.  In the instant case, by contrast, no matter what the reality of the alleged anticompetitive behavior, plaintiffs here would still be paying PG & E's rates.  That those rates could theoretically be lower is precisely what compels application of the filed rate doctrine. *Lower Lake Erie* simply is not relevant.

Similarly unhelpful to plaintiffs are *Cellular Plus, Inc. v. Superior Court,* 14 Cal.App.4th 1224, 18 Cal.Rptr.2d 308 (1993), and *Clipper Exxpress v. Rocky Mountain Motor Tariff,* 690 F.2d 1240 (9th Cir.1982).  As explained in greater detail below, *Cellular Plus* concerns only state law causes of action and only those situations where no federal agency has exercised review.  *See* 14 Cal.App.4th at 1240-43, 18 Cal.Rptr.2d 308.  Because two federal agencies exercised regulatory authority in the instant case, *Cellular Plus* has no relevance, particularly to this federal cause of action.

*Clipper Exxpress* likewise involved a set of facts that renders it irrelevant to our present inquiry. The plaintiff in *Clipper Exxpress* sought damages based on allegedly anticompetitive activities of defendants that, for two years, prevented plaintiff from filing a proposed rate with the ICC. 690 F.2d at 1246.  Two principal facts guided our decision not to apply the filed rate doctrine in *Clipper Exxpress:*  (1) the rate, because known and ultimately approved, would not require a court to speculate as to damages;  and, (2) the plaintiff had no remedy before the ICC. *Id.* at 1266- 67.  That simply is not the case here.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



In the instant case, the only known rates are those that defendants filed with FERC, ERA, and CPUC. To determine the damages that plaintiffs seek would require us to engage in the speculation that *Keogh* and its progeny forbid. In addition, plaintiffs here sought to challenge defendants' rates before state and federal agencies; that they received unsatisfactory results does not permit a court to step in and fashion its own remedy. The markedly different facts in *Clipper Exxpress* produced, appropriately, a markedly different result.

Finally, the three recent Ninth Circuit cases that plaintiffs contend have narrowed the filed rate doctrine have not done so in a manner helpful to their claims. *See Central Office Telephone, Inc. v. AT & T,* 108 F.3d 981 (9th Cir.1997); *Columbia Steel Casting Co. v. Portland General Elec. Co.,* 103 F.3d 1446 (9th Cir.1996), as amended on denial of rehearing, 111 F.3d 1427 (9th Cir.1997); *Cost Management Servs.,* 99 F.3d at 937.

*Central Office Telephone* involved a contract dispute. *See* 108 F.3d at 987-89. Defendant AT & T made promises that plaintiff claimed were not kept. We refused to apply the filed rate doctrine because "this case does not involve rates or rate setting." 108 F.3d at 990. By contrast, the instant case *only* involves rates and rate setting, and requires that we apply the filed rate doctrine.

The unique facts of *Columbia Steel* prompted us to reject the defendant's attempt to invoke the filed rate doctrine. *See* 103 F.3d at 1465. An agreement between two electric utilities divided the city into exclusive service territories. The plaintiff steel company was a customer of one utility, Portland General Electric, and was thwarted in its efforts to receive power from the other utility, Portland Power and Light. *Id.* at 1454. We refused to apply the filed rate doctrine because the case did not present a situation of hypothetical rate speculation. As we noted in *Columbia Steel,*
> The conduct challenged in this case is *not* [Portland General's] refusal to sell electricity to Columbia Steel at a lower rate. Rather, the challenged conduct is the *non-competition agreement* that prevented Columbia Steel from buying electricity at [Portland Power's] lower rates.

***866** Id.* at 1465 (emphasis added). We cannot say the same for the conduct alleged here, which amounts to little more than a refusal to sell gas to

plaintiffs at a lower rate.

Lastly, *Cost Management Services* does not rescue plaintiffs' claims. *Cost Management Services* involved application of the "competitor exception" to the filed rate doctrine, an exception not helpful to any plaintiffs to the present action. *See* 99 F.3d at 945. The competitor exception does not aid the County or other non-core customers, who, though they might have competed with PG & E to purchase gas, did not take advantage of any of the programs for alternative access that FERC and CPUC offered. By failing to seek such alternative access, non-core customers paid the same filed rates for gas as core customers paid and cannot claim injury from exclusionary conduct unrelated to these filed rates.

Our conclusion that the filed rate doctrine bars plaintiffs' denial of access claim receives additional support from plaintiffs' complaint, which seeks as relief damages based on the difference between the rate paid for gas-- a filed rate--and the rate potentially available from other Canadian producers. In reality, though framed as a challenge to access, this claim, too, is little more than a challenge to rates that FERC approved and filed for gas that PG & E imported, especially in light of plaintiffs' failure to seek access to alternative suppliers of gas. The filed rate doctrine bars the denial of access claims.

### C. State Law Claims

**[8][9]** As noted above, the filed rate doctrine bars *all* claims--state and federal--that attempt to challenge a rate that a federal agency has reviewed and filed. In the instant case, FERC determined that PG & E's wholesale prices were "just and reasonable," and ERA established that PGT's proposed import volumes were "in the public interest." Accordingly, plaintiffs can challenge neither the price of the gas nor the volume of gas procured. It makes no difference that plaintiffs choose to bring some of their claims under state law; on the facts of this case, the filed rate doctrine acts to bar all the challenges that plaintiffs assert. *See Arkansas Louisiana Gas,* 453 U.S. at 580, 101 S.Ct. at 2931-32; *Chicago & North Western Transp. Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 326, 101 S.Ct. 1124, 1134-35, 67 L.Ed.2d 258 (1981). The district court properly dismissed the state law claims as barred by the filed rate

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



doctrine.

Nor does *Cellular Plus* salvage plaintiffs' state law claims. *Cellular Plus* distinguished *Keogh* and *Square D*, holding that California's Cartwright Act "need not be interpreted as narrowly as the Sherman Act." 14 Cal.App.4th at 1241, 18 Cal.Rptr.2d 308. *Cellular Plus* concerned cellular telephone rates in California and involved no federal agencies and no federally filed rates. *Cellular Plus* merely declined to create a state filed rate doctrine where rates filed with the CPUC were not subject to federal review. *See, e.g., id.* at 1242, 18 Cal.Rptr.2d 308 ("the instant action pertains to the cellular telephone industry and the [CPUC's] regulatory authority ... whereas *Keogh* and *Square D* dealt with the ICC's regulatory authority"). [FN4]

> FN4. The *Cellular Plus* court gave a litany of reasons for its decision not to follow *Keogh* and *Square D*, *see* 14 Cal.App.4th at 1242, 18 Cal.Rptr.2d 308, and though several of those reasons make clear that *Cellular Plus* is readily distinguishable from the instant case, the most salient reason is the total absence of federal review.

Throughout its discussion of the filed rate doctrine, the *Cellular Plus* court emphasized the absence of "any California decision similar to *Keogh* " because *Cellular Plus* did not concern the preclusive effect of *federally filed* rates. *See id.* The rates in the instant case received two levels of extensive federal review, and that federal review gives rise to application of the filed rate doctrine. Moreover, the challenge in *Cellular Plus* was to the retail prices filed in California, over which CPUC had authority; in the instant case, plaintiffs challenge the wholesale price paid in Canada, a price reviewed by ERA, filed with FERC, and not subject to question by CPUC. *See, e.g., Nantahala,* 476 U.S. at 966, 106 S.Ct. at 2357 ("a State may not conclude in setting retail rates that the FERC-approved wholesale rates are unreasonable").    *867 We conclude that *Cellular Plus* simply has no relevance here.

## CONCLUSION
We AFFIRM the district court's dismissal of all of plaintiffs-appellants' claims on the ground that the filed rate doctrine bars such antitrust challenges to federally reviewed and filed rates. [FN5]

> FN5. In light of our determination that the filed rate

doctrine bars all of plaintiffs' claims, we need not reach the merits of the other defenses that defendants have raised.

114 F.3d 858, 65 USLW 2794, 1997-1 Trade Cases P 71,823, Util. L. Rep. P 14,159, 97 Cal. Daily Op. Serv. 4027, 97 Daily Journal D.A.R. 6786

Briefs and Other Related Documents (Back to top)

. 1996 WL 33418884  (Appellate Brief) Defendants-Appellees' Brief in Opposition to Opening Brief of Plaintiffs/Appellants (Oct. 03, 1996)Original Image of this Document (PDF)

. 1996 WL 33545210  (Appellate Brief) Opening Brief of Plaintiffs/Appellants (Jul. 17, 1996)Original Image of this Document (PDF)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



2

Slip Copy
Slip Copy, 2005 WL 2176965 (E.D.Wis.)
(Cite as: 2005 WL 2176965 (E.D.Wis.))

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
E.D. Wisconsin.
JAMES CAPE & SONS COMPANY, Plaintiff,
v.
PCC CONSTRUCTION COMPANY, et al.,
Defendants.
No. 05-C-269.

Sept. 6, 2005.

Cristina D. Hernandez-Malaby, Matthew J. Flynn,
Quarles & Brady LLP, Milwaukee, WI, for
Plaintiff.

Andrew W. Erlandson, Stephen P. Hurley, Hurley
Burish & Milliken SC, Madison, WI, Nathan A.
Fishbach, Whyte Hirschboeck Dudek SC, Daniel T.
Flaherty, Paul J. Stancil, Sean O. Bosack, Godfrey
& Kahn SC, Kathryn A. Keppel, Gimbel Reilly
Guerin & Brown, Milwaukee, WI, for Defendants.

DECISION AND ORDER

GRIESBACH, J.

**\*1** This action arises from a bid rigging scheme
undertaken by the defendants to obtain state
contracts to build streets, roads and airport projects.
The defendants, two construction companies and
their principal employees, undercut the bids of
plaintiff James Cape & Sons by obtaining crucial
inside information about Cape's bids from one of
Cape's employees. As a result of this, and other,
activity, several defendants are now serving prison
sentences for their convictions. The defendants have
moved to dismiss, arguing that even if all of the
allegations in the complaint were taken as true, the
plaintiff would state a claim for relief. For the
reasons given below, the motion to dismiss will be
granted.

I. BACKGROUND
The Wisconsin Department of Transportation
employed a closed bidding system for its highway
and other construction projects. Contractors
interested in projects would be apprised of the
particulars about a project and then, after an
opportunity to project their own costs and potential

profits, they would submit bids. According to the
complaint, defendants Ernest and John Streu,
principals of the Streu Construction Co., conspired
with Michael and James Maples, of Vinton
Construction, to share pricing information and divvy
up the contracts they wanted to win. They would
meet in person or discuss such matters over the
telephone, all in an effort to allocate the market for
desirable projects between themselves. (Compl.¶
26.)

Eventually they were able to obtain the cooperation
of defendant James Beaudoin, an employee of James
Cape & Sons, a rival construction firm. Beaudoin
was privy to Cape's bidding information and, before
contracts were let by the state, he would phone the
other defendants to tip them off about Cape's bid.
According to the complaint, this information
allowed one or the other of the defendant companies
to be the lowest bidder on several state projects,
sometimes underbidding Cape by as little as $1500.
(Compl.¶ 45.) The complaint alleges this scheme
caused injury to James Cape & Sons because the
company was prevented from "being awarded
multimillion dollar public and private construction
contracts which would have resulted in substantial
profits to James Cape." (Compl.¶ 1.)

II. ANALYSIS
As the parties rightly observe, a motion to dismiss
under Rule 12(b)(6) should be granted only if the
complaint fails to state a claim upon which relief
may be granted, i.e., that the plaintiff would lose
even if all of the complaint's allegations were true.
*Bressner v. Ambroziak,* 379 F.3d 478, 480 (7th
Cir.2004).

1. Antitrust Injury

Counts 1 and 2 of the complaint allege that the
defendants engaged in unreasonable restraints of
trade, in violation of the Sherman Act, 15 U.S.C. §
1, and Wis. Stat. § 133.03. Private civil actions to
enforce the Sherman Act are allowed under § 4 of
the Clayton Act, 15 U.S.C. § 15(a), which provides
that "any person who shall be injured in his business
or property by reason of anything forbidden in the
antitrust laws may sue therefor in any district court
of the United States." *See also Sanner v. Board of
Trade of City of Chicago,* 62 F.3d 918, 926 (7th
Cir.1995). The Supreme Court has explained quite

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
(Cite as: 2005 WL 2176965, *1 (E.D.Wis.))

clearly, however, that all injuries caused by illegal antitrust activities are not necessarily compensable injuries. Instead, only those attributable to so-called "antitrust injuries" are compensable. Such injuries must stem directly from the very reason that the activity is prohibited, not just the activity itself. "Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of the anticompetitive acts made possible by the violation." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). As the Seventh Circuit has summarized it, the antitrust injury doctrine "requires every plaintiff to show that its loss comes from acts that reduce output or raise prices to consumers." *Chicago Professional Sports Limited Partnership v. National Basketball Ass'n,* 961 F.2d 667, 670 (7th Cir.1992).

*2 However the doctrine is styled, it is clear that there must be an injury resulting from a decrease in competition. Thus, in *Stamatakis Industries, Inc. v. King,* the court found no antitrust injury because the plaintiff failed to establish any harm to consumers. 965 F.2d 469, 471 (7th Cir.1992). "It established a decline in sales, to be sure, but a producer's loss is no concern of the antitrust laws, which protect consumers from suppliers rather than suppliers from each other. *If King's defection should be called unfair competition, it is nonetheless competition.*" *Id.* (italics added). Similarly, in *Phillips Getschow Co. v. Green Bay Brown County Professional Football Stadium Dist.,* a case before this court, I concluded the plaintiff failed to establish an antitrust injury because the ultimate consumer was able to obtain lower bids than it would have if the alleged antitrust activities in that case not occurred. 270 F.Supp.2d 1043 (E.D.Wis.2003). "Whether the competition was proper or improper makes no difference as far as the antitrust claim is concerned." *Id.* at 1048.

In moving to dismiss these counts, the defendants argue that the complaint has failed to show any "antitrust injury" because by undercutting James Cape & Sons they actually provided *lower* bids to the customer. That is, their bid-rigging activities actually *increased,* rather than restricted, competition, albeit in an illegal manner. Because the

antitrust laws are not meant to punish behavior that actually benefits the ultimate consumer, they argue that Cape cannot demonstrate an injury under the antitrust laws. I agree.

The plaintiff makes much of the fact that several defendants have met with criminal sanctions for their conduct, that substantial fines have been levied, and that some of the defendants' activities actually resulted in higher costs to the state. But at issue here is not the conduct of the defendants in general, but the nature of their conduct *vis-a-vis* the plaintiff, and the only conceivable injury the plaintiff suffered here is lost profits. There is no doubt that the plaintiff has been injured in the sense that it was unfairly underbid on government contracts it otherwise would have won (and profited from). But that is not enough. It must also show somehow that it was harmed in an anticompetitive way, and that it cannot do. Its damages would be the amount of profit it would have earned had it won the contracts at issue, but the reason it did not win those contracts is that its bids were *higher* than the others. The consumer here paid a lower price.

The plaintiff relies on dicta from a Seventh Circuit case to show that in some cases competitors-not just consumers-would be entitled to antitrust damages. According to the Seventh Circuit, "[l]osses inflicted by a cartel in retaliation for an attempt by one member to compete with the others are certainly compensable under the antitrust laws." *Hammes v. AAMCO Transmissions, Inc.,* 33 F.3d 774, 783 (7th Cir.1994). While that is no doubt true, in *Hammes* the court was discussing the anticompetitive effects of cartels and cartels' efforts to *prevent* a competitor from underselling their prices. Such retaliatory activities would undoubtedly harm the consumer because they would strengthen the cartel's market power and bolster its members' ability to artificially raise prices. Such behavior is clearly anticompetitive. Nothing like that is alleged to have occurred here, however, at least as regards this plaintiff. According to the complaint, the defendants' actions caused Cape to lose profits, but that injury does not fall within the subset of injuries that can be called antitrust injuries because the predicate acts, at least as they impacted Cape, simply did not "reduce output or raise prices to consumers." *Chicago Professional Sports Limited Partnership,* 961 F.2d at 670.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*3** Finally, the plaintiff suggests that ruling on its damages at the 12(b)(6) stage is premature because it is not required to detail the scope of its injuries in its complaint. But as the Seventh Circuit noted in *Hammes,* danger lurks in the filing of a lengthy or detailed complaint because it allows one to plead too much. 33 F.3d at 778 ("We continue to be puzzled why lawyers insist on writing prolix complaints that can only get them into trouble.") When it is clear from the facts alleged that the plaintiff does not state a claim, there is little reason to prolong the case on the basis that the Federal Rules require only notice pleading.

2. RICO Claims

Counts 3 and 4 of the complaint assert racketeering claims based on the federal and state Racketeer Influenced and Corrupt Organizations (RICO) laws, 18 U.S.C. § 1962(c) and Wis. Stat. § 943.83(3), which are largely identical. Like the antitrust laws, RICO provides for private civil enforcement: "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]" 18 U.S.C. § 1964(c). RICO makes it unlawful for "any person employed by or associated with [an interstate] enterprise ... to conduct or participate ... in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). The elements, therefore, are "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *United States v. Cummings,* 395 F.3d 392, 397 (7th Cir.2005).

The complaint claims that the racketeering activity at issue here was wire fraud, which the defendants committed when they submitted rigged bids. The complaint also claims that the "enterprise" at issue was the Wisconsin Department of Transportation and alleges that the defendants, when they rigged their bids, participated in the "conduct" of that enterprise.

It is on this last point-"conduct" of the enterprise-that the defendants level their protest. They claim that, as outsiders, their actions in rigging bids for DOT contracts had no bearing on the "conduct" of the DOT itself, and, without any greater connection

to the DOT's activities they cannot be held liable under RICO. In order to more accurately define what it meant for someone to participate in the conduct of an enterprise, the Supreme Court set forth its "operation or management" test in *Reves v. Ernst & Young,* 507 U.S. 170, 178- 79, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). There, the Court concluded that the word 'conduct' "requires an element of direction." *Id.* at 178. 'Participate' means "to take part in." *Id.* at 179. Thus, although a RICO defendant need not have substantial involvement in the conduct of the enterprise, he does need to have some role in its direction.

The plaintiff notes that outsiders are not always off the hook for RICO liability: "[a]n enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management. An enterprise also might be 'operated' or 'managed' by others 'associated with' the enterprise who exert control over it as, for example, by bribery." *Id.* at 184. Cape likens the defendants' conduct to outsiders who exercise control by bribery, claiming that "an outsider can control a public bidding process by stealing a competitor's bid information in order to control the order of bids." (Response Br. at 13.) But control over a bidding process is not necessarily control over the enterprise itself. At issue here are individuals and businesses engaged in an activity (the bid process), the rules of which were set by the DOT. Essentially, the defendants cheated. In doing so, however, it cannot be said that they controlled or conducted the affairs of the DOT any more than it could be said that illegal steroid users "conduct" Major League Baseball or illegal blackjack teams "conduct" the casinos they hit. Once the rules for bidding were set by the enterprise, it had little involvement with the actual outcome because it simply took the lowest bid automatically.

**\*4** The Supreme Court's example of bribery is instructive. Through bribery, an outsider can indeed control an enterprise because he is paying someone on the inside who exercises power, direction or discretion. The briber is, in essence, directing the enterprise himself by proxy. This is made clear by *Cummings, supra,* in which the Seventh Circuit observed that it might find the requisite enterprise control if an outsider made bribes related to an enterprise's "core functions". 395 F.3d at 399. In *Cummings,* the court found that outsiders who

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy
(Cite as: 2005 WL 2176965, *4 (E.D.Wis.))

bribed enterprise insiders nevertheless lacked control over the enterprise because the insiders had no participation in the enterprise's management. 395 F.3d at 399-400. The court found it would be a "different ball game" if the outsider had bribed an insider to cause the enterprise to make fraudulent payments-a core function of the enterprise in question-but there was no evidence of that in *Cummings. Id.* at 399. Despite plaintiff's efforts to convince otherwise, this case is not that "different ball game." Had the defendants attempted to bribe a DOT insider to receive contracts or confidential bidding information, Cape would have a stronger argument that the defendants sought to exercise control over the enterprise itself. But the defendants here remained purposeful outsiders throughout the bid rigging scheme, hoping never to involve DOT employees at all and simply relying on the predetermined rules that the DOT had set up. The enterprise's involvement with the alleged racketeering activity was, if anything, completely passive.

To the extent that the decision in *Lockheed Martin Corp. v. Boeing Co.,* 357 F.Supp.2d 1350, 1359-60 (M.D.Fla.2005) is to the contrary, I respectfully disagree with that decision. The *Lockheed* court framed the issue as involving Boeing's control over "the outcome of the bidding competitions for launch contracts" rather than control of the RICO enterprise itself. *Id.* at 1360. No one doubts here that the bid rigging "controlled" (in a loose sense) the outcomes of the bidding process. But that is not enough. Conduct, the Supreme Court says, "requires an element of direction," *Reves,* 507 U.S. at 178, and the direction must be of the enterprise itself rather than of one's own affairs. "[Section] 1962(c) cannot be interpreted to reach complete 'outsiders' because liability depends on showing that the defendants conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs." *Handeen v. Lemaire,* 112 F.3d 1339, 1348 (8th Cir.1997). The only affairs the defendants controlled here were their own; that the DOT was a passive victim (or beneficiary) of that activity does not mean that the defendants were directing its affairs.

3. State Common Law Claims

Counts 5 and 6 of the complaint raise state common law claims of conspiracy and tortious interference

with prospective contract. Having dismissed the claims upon which federal jurisdiction had been founded, I will dismiss these remaining state law claims without prejudice. *See Williams v. Aztar Indiana Gaming Corp.,* 351 F.3d 294, 300 (7th Cir.2003).

### III. CONCLUSION
**\*5** For the reasons given above, IT IS ORDERED that the defendants' motions to dismiss are GRANTED. Counts 1 through 4 of the complaint are DISMISSED with prejudice, and counts 5 and 6 are DISMISSED without prejudice.

Slip Copy, 2005 WL 2176965 (E.D.Wis.)

Motions, Pleadings and Filings (Back to top)

. 2005 WL 910107 (Trial Pleading) Complaint (Mar. 10, 2005)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

