UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
WORLD WRESTLING ENTERTAINMENT, INC.

                Plaintiff,

          v.

JAKKS PACIFIC, INC.; JAKKS PACIFIC (H.K.)
LIMITED; ROAD CHAMPS LIMITED; THQ,
INC.; THQ/JAKKS PACIFIC LLC; STANLEY
SHENKER AND ASSOCIATES, INC.; STANLEY
SHENKER; BELL LICENSING, LLC; JAMES
BELL; JACK FRIEDMAN; STEPHEN BERMAN;
JOEL BENNETT; and BRIAN FARRELL,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

04 CV 8223 (KMK)
(ECF CASE)

## COMPENDIUM OF UNREPORTED DECISIONS CITED IN THE MEMORANDA OF LAW IN SUPPORT OF THE JAKKS DEFENDANTS' MOTION TO DISMISS THE SHERMAN ACT CLAIM IN THE AMENDED COMPLAINT

### VOLUME 2 of 4

FEDER, KASZOVITZ, ISAACSON,
  WEBER, SKALA, BASS & RHINE LLP
Murray L. Skala (MS 9354)
Jonathan D. Honig (JH 7577)
750 Lexington Avenue
New York, New York 10022
Phone: (212) 888-8200
Fax: (212) 888-5968

SKADDEN, ARPS, SLATE
  MEAGHER & FLOM LLP
Jonathan J. Lerner (JL 7117)
Michael H. Gruenglas (MG 8705)
James Keyte (JK 0680)
Maura B. Grinalds (MG 2836)
Four Times Square
New York, New York 10036
Phone: (212) 735-3000
Fax: (212) 735-2000

Attorneys for the JAKKS Defendants

October 18, 2005

# INDEX

**CASES**                                                                                                                    **TAB**

County of Stanislaus v. Pacific Gas & Electric Co., No. 93 CV-F-93-5866, 1995 WL
    819150 (E.D. Cal. Dec. 18, 1995), aff'd, 114 F.3d 858 (9th Cir. 1997) ....................................1

James Cape & Sons Co. v. PCC Const. Co., No. 05-C-269, 2005 WL 2176965 (E.D.
    Wis. Sept. 6, 2005) ....................................................................................................2

Kasada, Inc. v. Access Capital, Inc., No. 01 Civ. 8893, 2004 WL 2903776 (S.D.N.Y.
    Dec. 14, 2004)............................................................................................................3

Martinez v. Sanders, No. 02 Civ. 5624, 2004 WL 1234041 (S.D.N.Y. June 3, 2004) .................4

Paycom Billing Services, Inc. v. Mastercard International, Inc., No. Civ. A 03-CV-6150
    (DGT), 2005 WL 711658 (E.D.N.Y. Mar. 29, 2005)...............................................5

Philip Morris Inc. v. Heinrich, No. 95 Civ. 0328, 1996 WL 363156 (S.D.N.Y. June 25,
    1996) ...........................................................................................................................6

Twombly v. Bell Atlantic Corp., --- F.3d ----, 2005 WL 2420523 (2d Cir. Oct. 3, 2005)............7

United States v. Dynalectric Co., 861 F.2d 722, text available at 1988 WL117173 (6th
    Cir. Nov. 4,1988)........................................................................................................8

Vitale v. Marlborough Gallery, No. 93 Civ. (PKL) 6276, 1994 WL 654494 (S.D.N.Y.
    July 5, 1994) ...............................................................................................................9

Williams Electronic Games, Inc. v. Barry, No. 97 C 3743, 2001 WL 1104619 (N.D. Ill.
    Sept. 18, 2001), aff'd sub nom, Williams Electronic Games, Inc. v. Garrity, 366 F.3d
    569 (7th Cir. 2004) ...................................................................................................10

Not Reported in F.Supp.2d                                                    **Page  1**
Not Reported in F.Supp.2d, 2004 WL 2903776 (S.D.N.Y.), 2005-1 Trade Cases P 74,693
(Cite as: 2004 WL 2903776 (S.D.N.Y.))

c

Motions, Pleadings and Filings

United States District Court,
S.D. New York.
KASADA, INC., John Michaels, Inc., Gabbey
Design Group, Inc., Garment Makers,
Inc., Theordore Sadaka, Karen Sadaka and Gladys
Sadaka, Plaintiffs,
v.
ACCESS CAPITAL, INC., Westgate Financial
Corp., Finova Capital, Inc., UCC Asset
Management Corp., Star Funding, Inc., Omni
Commerical, L.L.C., Commercial
Services, Inc., d/b/a C.I.T. Group, Rosenthal &
Rosenthal, Miles M. Stuchin and
Richard I. Simon, Defendants.
No. 01 Civ. 8893(GBD).

Dec. 14, 2004.

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

*1 Plaintiffs bring suit alleging price fixing and
monopoly claims in violation of the Sherman Act §§
1, 2, the Clayton Act § 4, the New York State
Donnelly Act, and pendant common law claims.
Defendants filed motions to dismiss pursuant to
Federal Rule of Civil Procedure 12(b)(6). For the
reasons below, defendants' motions to dismiss are
granted in part and denied in part.

## I. Background

Plaintiffs are garment manufacturers, their
principals and related entities who bring suit against
various credit institutions alleging price fixing and
monopoly in violation of federal and state antitrust
statutes and state common law. Plaintiffs Kasada,
Inc., John Michaels, Inc., Gabbey Design Group,
Inc. and Garment Makers, Inc. are corporations
engaged in the business of domestic garment
manufacturing. Complaint at 2-3, ¶¶ 4-7. Plaintiff
Theodore Sadaka is the principal officer of plaintiffs
Garment Makers, Inc. and John Michaels, Inc..
Plaintiff Karen Sadaka is a principal officer of
plaintiff Kasada, Inc. Plaintiff Gladys Sadaka is a
principal officer of plaintiff Gabbey Design Group,
Inc. *Id.* at 3, ¶ 8.

Plaintiffs' allegations revolve around the business
of factoring, a form of commercial finance by which
credit institutions provide financing to clients in
exchange for the right to collect the client's accounts
receivable. These credit institutions, commonly
referred to as factors, advance up to 80% of the
worth of a garment manufacturers' invoices in
exchange for fees and interest. Complaint at 8, ¶ 20.
The factor also assumes the risk of collecting the
client garment manufacturers' accounts receivable.
*Id.* A factor assumes that credit risk, however, only
after it has checked whether its client garment
manufacturer is selling to a creditworthy purchaser.
The garment manufacturer, in turn, uses that credit
to purchase raw materials to produce their product.
*Id.*

Plaintiffs allege that the defendants mutually agreed
to      stop     credit-checking    plaintiff    garment
manufacturers, denied them credit and/or withdrew
their funding. The refusal by a factor to credit check
a garment manufacturer results in "the garment
manufacturer [being] unable to obtain virtually any
fabric or other raw materials on credit." *Id.* at 10, ¶
24. Specifically, plaintiffs allege that Westgate
Financial Corp. and Finova Capital, Inc. allegedly
discontinued their funding of plaintiff John
Michaels, Inc. *Id.* at 4, ¶ 11. Finova Capital, Inc.
also allegedly denied credit to John Michaels, Inc.
*Id.* at 5, ¶ 12. Defendants Rosenthal & Rosenthal
("Rosenthal") and Star Funding, Inc. are alleged to
have withdrawn funding from plaintiff Gabbey
Design, Group, Inc. *Id.* at 3, 5, 6 ¶¶ 6, 13, 16.
Defendant Omni Commercial denied credit and
refused to release monies to plaintiff Garment
Makers, Inc. and caused defendant C.I.T. to deny
credit to Garment Makers, Inc. as well. *Id.* at 3, 5,
¶ ¶ 7, 14. The plaintiffs also allege that defendant
Access Capital "published false accusations against
plaintiffs, which caused plaintiffs to be group
boycotted by defendants." *Id.* at 3, ¶ 7. Plaintiffs
further claim that "Access Capital designed and
orchestrated the group boycott of plaintiffs and
caused defendants to deny credit ... and caused
plaintiffs to cease operations." *Id.* at 4, ¶ 10.
Individual defendants Miles M. Stuchin and Richard
I. Simon are alleged to be the presidents of Access
Capital, Inc. and Westgate Financial Corp.,
respectively. *Id.* at 6, ¶ 17. Each are alleged to have
"conspired with other defendants to conduct a group

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
(Cite as: 2004 WL 2903776, *1 (S.D.N.Y.))

boycott against plaintiffs." *Id.* at 6-7 ¶¶ 17-18.

**\*2** Plaintiffs assert that defendants' actions precluded them from receiving the credit they needed to purchase fabric or other raw materials. This, in turn, caused some of them to lose money and "to cease operations." Complaint at 2-4, ¶¶ 4-10. [FN1] Without specifically identifying which defendants were involved and which plaintiffs were affected, plaintiffs allege that the "factoring defendants, engaged in boycotting certain plaintiffs, denied credit to certain plaintiffs, fixed costs and interest rates, published letters to plaintiffs' customers, and agreed with other factors to fund certain manufacturers and to deny funding to other manufacturers, and to drive them out of business." *Id.* at 11, ¶ 25. Plaintiffs claim that the defendants communicated with each other, shared credit information, and agreed to make credit decisions together. Complaint at 12, ¶ 30. These communications allegedly occurred during meetings of the Uptown Credit Group and the Thursday Group. [FN2] Plaintiffs maintain that these groups "allowed defendants to conduct their secret meetings and made many of their collective credit decisions at these meetings and during telephone calls and other contacts." *Id.* at 12, ¶ 28. Plaintiffs argue that the defendants' denial of credit constitutes a group boycott in violation of Section 1 of the Sherman Act. In addition, plaintiffs allege that the defendants "controlled the price and interest rates for factoring" constituting illegal price-fixing in violation of Section 1 of the Sherman Act. *Id.* at 18, ¶ 57. Plaintiffs also claim that defendants' actions constitute illegal price-fixing in the "piece goods" market, arguing that the "piece goods market is impacted adversely by antitrust violations through the resulting reduction of price and client competition among the factors." [FN3] *Id.* at 8, ¶ 20.

FN1.  Without specifically identifying which manufacturers, plaintiffs allege that "numerous garment manufacturers have been driven out of business." Plaintiffs' complaint, however, is devoid of any allegation that any of the plaintiffs have gone out of business. To the contrary, plaintiffs complaint alleges that each corporate plaintiff "was and still is a domestic Corporation duly organized and licensed to do business within the State of New York." Complaint at 2-3, ¶¶ 4-7.

FN2.  Uptown Credit Group and the Thursday Group are not parties to this litigation.

FN3.  The piece goods market is the market for raw materials such as fabric, buttons, trim and other accessories.

Plaintiffs also claim that the defendants violated Section 2 of the Sherman Act by engaging "in an unlawful combination and conspiracy to unreasonably restrain and monopolize interstate commerce." Complaint at 12, ¶ 30. Plaintiffs allege that the defendants acted as "one," in that defendants "black listed certain customers and weeded out those that they targeted to drive out of business." *Id.* at 11, ¶ 27 (internal quotations omitted). Plaintiffs assert that through these actions, the defendants "have engaged in predatory and anti-competitive conduct, with a specific intent to monopolize, and have achieved monopoly power." *Id.* at 17, ¶ 53. This conspiracy to monopolize allegedly occurred in two markets: the factoring market for domestic garment manufacturers and the piece goods market. Plaintiffs claim that the defendants "factor 90% of the factored piece goods vendors in the United States." *Id.* at 10, ¶ 24. Plaintiffs also allege that all the defendants are members of the Uptown Credit Group and the Thursday Group, which plaintiffs maintain are designed "to maintain a monopoly over the industry, and they collectively agreed unlawfully to deny plaintiffs credit." *Id.* at 9, ¶ 22. Plaintiffs allege that "[c]ollectively, defendants involved in these two groups control over 85% of [the] factoring market for garment manufacturing and virtually all of the piece goods manufacturing segment of that market." *Id.* [FN4]

FN4.  Plaintiffs also assert claims under the Clayton Act § 4, the Donnelly Act of the State of New York, as well as the following common law claims: trade libel, defamation, injurious falsehood, interference with commercial relations, and breach of contract.

**\*3** Defendants submitted motions to dismiss plaintiffs' claims, arguing that the plaintiffs failed to allege a violation of Section 1 of the Sherman Act. Specifically, defendants argue that plaintiffs failed to make sufficient allegations to establish that: the defendants entered into an agreement to boycott; the defendants engaged in price-fixing; and the defendants caused plaintiffs to suffer an antitrust injury rather than an injury specific to plaintiffs.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d

**(Cite as: 2004 WL 2903776, \*3 (S.D.N.Y.))**

Defendants also maintain that plaintiffs have failed to sufficiently allege a violation of Section 2 of the Sherman Act, arguing that plaintiffs' complaint fails to allege: a conspiracy by defendants to monopolize the market; an abuse of power by defendants; an antitrust injury; and a relevant market. [FN5] Defendants further argue that plaintiffs have failed to state a claim under the Section 4 of the Clayton Act, the Donnelly Act, or other state laws.

> FN5. Defendants C.I.T. Group and Rosenthal & Rosenthal submitted a brief in support of their motion to dismiss. Their arguments to dismiss plaintiff's federal claims were adopted by Westgate Financial Corp., Richard I. Simon, and Omni Commercial. In lieu of filing a motion, defendants Star Funding, Inc. and UCC Asset Management submitted a letter dated March 12, 2002 stating that "counsel for plaintiff and [these defendants] have agreed that to the extent that portion of the decision of the Court regarding the federal claims (and the Donnelly Act claim) applies to all Moving Defendants, it shall also be deemed to apply to Star and UCC." Similarly, defendants Access Capital, Inc. and Miles M. Stuchin, in a letter dated February 7, 2002, informed the Court that "[i]n lieu of filing a formal motion to dismiss the plaintiffs' complaint, [defendants] submit this letter to join and adopt the legal arguments made by counsel for [Finova], [C.I.T.], [Rosenthal & Rosenthal], [Omni], [Westgate], and [Simon] in connection with their respective motions to dismiss."

## II. *Discussion*

Federal Rule of Civil Procedure 12(b)(6) allows a party to move to dismiss a complaint where the complaint "fail[s] ... to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). In reviewing a motion to dismiss, this Court accepts the allegations in the complaint as true and draws all reasonable inferences in favor of the non-moving party. *See Patel v. Searles,* 305 F.3d 130, 134-35 (2d Cir.2002). A motion to dismiss will only be granted if the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. *See Citibank, N.A. v. K-H Corp.,* 968 F.2d 1489, 1494 (2d Cir.1992). In considering a motion to dismiss under Fed.R.Civ.P. 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference. *Kramer v. Time Warner, Inc.,* 937 F.2d

767, 773 (2d Cir.1991); *see also Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 71 (2d Cir.1998)(in evaluating motions to dismiss, a court must limit its review to the allegations contained within the four corner's of the complaint).

Although no heightened pleading requirements apply in antitrust cases, *Todd v. Exxon Corporation,* 275 F.3d 191, 198 (2d Cir.2001), a plaintiff must do more than cite relevant antitrust language to state a claim for relief. *See TV Communications Network, Inc. v. Turner Network Television, Inc.,* 964 F.2d 1022, 1024 (10th Cir.1992). "A plaintiff must allege sufficient facts to support a cause of action under the antitrust laws. Conclusory allegations that the defendant violated those laws are insufficient." *Id.* (citing *Klebanow v. new York Produce Exch.,* 344 F.2d 294, 299 (2d Cir.1965)). Furthermore, "[i]t is not ... proper to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been" set forth in the complaint. *George Haug Co. v. Rolls Royce Motor Cars Inc.,* 148 F .3d 136, 139 (2d Cir.1998). The complaint must set forth enough information to suggest that relief would be based on some recognized legal theory. *Fort Wayne Telsat v. Entertainment and Sports Programming Network,* 753 F.Supp 109, 111 (S.D.N.Y.1990). "In practice, a complaint must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Id.* (quoting *District of Columbia v. Air Florida, Inc.,* 750 F.2d 1077, 1081-82 (D.C.Cir.1984)).

### A. *Section 1 of the Sherman Act*

\*4 Section 1 of the Sherman Act prohibits "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. This blanket prohibition against any restraint of trade has been delineated into two separate doctrines. The first doctrine finds certain conduct illegal *per se* .

In construing and applying the Sherman Act's ban against contracts, conspiracies, and combinations in restraint of trade, the Court has held that certain agreements or practices are so plainly anticompetitive, and so often lack any redeeming virtue, that they are conclusively presumed illegal without further examination under the rule of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d

(Cite as: 2004 WL 2903776, *4 (S.D.N.Y.))

Page    4

reason generally applied in Sherman Act cases.

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 7-8, 99 S.Ct. 1551, 1556, 60 L.Ed.2d 1 (1979)(internal quotations and citations omitted). Examples of *per se* illegal conduct include horizontal restraints, i.e. agreements between competitors at the same level of market structure, like agreements to fix prices and group boycotts. *See, Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 212, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959)(finding group boycotts unreasonable *per se* ); *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940)(finding price fixing unreasonable *per se* ); *Michelman v. Clark-Schwebel Fiber Glass Corporation,* 534 F.2d 1036, 1043 (2d Cir.1976) (finding that a group boycott, because of its inherently anti-competitive nature, is unreasonable *per se* and thus always illegal).

Conduct that does not fall within the *per se* rule is subject to the rule of reason analysis. Under the rule of reason, the anticompetitive consequences of a challenged practice are weighed against the business justifications upon which it is predicated and its putative procompetitive impact, and a judgment with respect to its reasonableness is made. *See* KAYE SCHOLER, KAYE SCHOLER'S ANTITRUST DESKBOOK, 6 (3d ed.2002). For example, allegations of agreements between entities at different market levels that restrain trade i.e., vertical agreements, are analyzed under the rule of reason. *Electronics Communications Corp. v. Toshiba America Consumer Prods. Inc.,* 129 F.3d 240, 243 (2d Cir.1997)("Absent price-fixing between a supplier and distributor, vertical restraints are generally subject to 'rule of reason' analysis.") *Id.*

 a. Per se *Illegal Conduct: Group Boycott and Price Fixing*

Plaintiffs allege that the defendants violated Section 1 of the Sherman Act "by engaging in an unlawful group boycott and a concomitant price-fixing conspiracy" in which the defendants collectively refused to credit check certain garment manufacturers. Complaint at 18, ¶ 56. Plaintiffs further claim that defendants colluded to fix the price and interest rates for factoring as well as the price of the piece goods purchased by the garment manufacturers.

*5 Defendants argue that plaintiffs' complaint alleges no facts to support a finding that an agreement or conspiracy to boycott existed and that plaintiffs' complaint "alleges only the naked conclusion that the defendants conspired and agreed. No specific agreement is alleged with any factual particularity--no dates, no details, no places, no participants, no purpose, no decisions, no terms, no actions." Defendant C.I.T.'s Memorandum of Law in Support of Its Motions to Dismiss the Complaint ("C.I.T.Brief") at 7. Defendants also argue that the plaintiffs have failed to state a claim to establish price fixing in either the factoring market or the piece goods market.

 i. *Group Boycott*

Courts have found that group boycotts, because of their anti-competitive nature, are unreasonable *per se* and therefore always illegal. *See Klor's, Inc.,* 359 U.S. at 212; *Michelman v. Clark-Schwebel Fiber Glass Corporation,* 534 F.2d at 1043. Plaintiffs allege that the defendants conspired to conduct a group boycott against plaintiffs by denying them credit.

Defendants routinely communicated with each other, had access to each others' databases and credit information, consulted with each other regarding credit decision, shared confidential information, and agreed together when making credit decisions concerning garment manufacturers.

Complaint at 12, ¶ 30. Plaintiffs, however, fail to provide sufficient factual allegations to support this claim. There is no allegation that a particular plaintiff, once refused to be credit checked by one factor, was subsequently refused by each of the other factors. *Compare Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc. and The Uptown Credit Group, Inc.,* 2002 WL 31164482, * 9 (S.D.N.Y.2002)(in finding that plaintiff stated a claim for group boycott, the Court found that "the gravamen of plaintiff's amended complaint is that C.I.T. and the other factors agreed that once C.I.T. refused to credit check a manufacturer, the other factors would refuse to check that manufacturer's credit as well"). *Id.* There is no allegation that a particular garment manufacturer applied for and was refused to be credit checked by all of the defendants.

Conversely, there is no allegation that a particular factor refused to credit check all of the plaintiffs.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Plaintiffs' complaint specifically alleges that specific defendants denied credit to specific plaintiffs, withheld from a specific plaintiff credit or refused to release to a specific plaintiff monies allegedly owed. Complaint at 3-7, ¶¶ 6-18. Plaintiffs allege that "after a group meeting of defendants," defendants Westgate Financial Corp. and Finova Capital, Inc. refused to continue funding plaintiff John Michaels and that Finova Capital, Inc. denied credit to John Michaels, Inc. *Id.* at 4, 5 ¶¶ 11- 12. "[A]fter a group meeting of defendants," defendants Rosenthal & Rosenthal and Star Funding, Inc. are alleged to have withdrawn funding to plaintiff Gabbey Design. *Id.* at 3, 5, 6 ¶¶ 6, 13, 16. "[A]fter a group meeting of defendants," defendant Omni Corp. is alleged to have refused to release monies to plaintiff Garment Makers, Inc. *Id.* at 3, ¶ 7. "[A]fter a group meeting of defendants," defendant Omni Commercial is alleged to have denied credit to plaintiff Garment Makers, Inc. and caused defendant C.I.T. to deny credit to Garment Makers, Inc. There is, furthermore, no allegation that the plaintiffs are one organization, belong to the same association, or that they possess any contractual relationship. Lastly, plaintiffs allegation that defendants "used subjective criteria and denied credit based upon malice, ill will, a personal dislike of management, rumors with no bearing on the customer's creditworthiness, or simply due to negligence" belies their argument that a collective decision not to credit check certain plaintiffs was because of a conspiracy to boycott. Complaint at 10, ¶ 24. Rather, this allegation supports a finding that credit-checking decision were made independently by each factor based on subjective criteria.

*6 Plaintiffs' also argue that the defendants "engaged in group meetings" to share "credit information" and "had access to each other's databases and credit information." Complaint at 11-12, ¶¶ 27, 28, 30. Although "information exchange" has been found to be an example of a facilitating practice that a court could use to help support an inference of a price-fixing agreement, [FN6] the exchange of information between business firms concerning the credit-worthiness of customers has long been held not to violate the Sherman Act." *Michelman v. Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1048 (2d Cir.1976); *see also Cement Mfrs. Protective Ass'n v. United States*, 268 U.S. 588, 604, 45 S.Ct. 586, 591 (1925). [FN7] Furthermore, "the dissemination to competitors of

information concerning the credit-worthiness of customers aids sellers in gaining information necessary to protect themselves against fraudulent or insolvent customers." *Michelman*, 534 F.2d at 1048 . Lastly, the Second Circuit has held that "it is not a violation of Section 1 to exchange such information, provided that any action taken in reliance upon it is the result of each firm's independent judgment, and not of agreement ." *Id.*

> FN6. *See Todd v. Exxon Corporation*, 275 F.3d 191, 198 (2d Cir.2001).

> FN7. Although the Supreme Court has found that the exchange of information itself, as opposed to merely using the information exchanged as evidence upon which to infer a price-fixing agreement, violates Section 1 of the Sherman Act under a Rule of Reason analysis, plaintiffs in the present case have made no such argument and therefore, this type of violation will not be entertained by the Court.

In the absence of factual allegations to support their claim, plaintiffs claim of group boycott is dismissed. *See Fort Wayne Telsat v. Entertainment and Sports Programming Network*, 753 F.Supp. at 115 (finding that local subscription company had to do more than merely allege existence of a conspiracy; company was required to prove factual basis for the allegation); *see also Garshman v. Universal Resources Holding Inc.*, 824 F.2d 223, 230 (3d Cir.1987)("The allegation of unspecified contracts with unnamed other entities to achieve unidentified anticompetitive effects does not meet the minimum standards for pleading a conspiracy in violation of the Sherman Act." *Id.*); *Heart Disease Research Foundation v. General Motors Corp.*, 463 F.2d 98, 100 (2d Cir.1972)("a bare bones statement of conspiracy or of injury under the antitrust laws without any supporting facts permits dismissal"). *Id.*

ii. *Price Fixing*

Plaintiffs' claim of price fixing is equally conclusory. Plaintiffs allege that the defendants "have dominated the factoring market for domestic garment manufacturers for many years [and] used their control over [the] market to fix conditions," specifically by controlling "the price and interest rates for factoring." *Id.* at 18, ¶¶ 56-57. Plaintiffs allege that by colluding and agreeing to drive their own clients out of business, the defendant factors

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
(Cite as: 2004 WL 2903776, *6 (S.D.N.Y.))

have "enhance[d] their overall competitive position and [reduced] [their] collective credit risk exposure." *Id.* at 18, ¶ 57. Defendants argue that "[p]laintiffs do not allege, even in conclusory fashion, that defendants fixed the price of the product they provide: factoring and financial serves. There is no allegation that the price, terms, conditions, interest rates or any other aspect of defendants' factoring services were fixed." C.I.T. Brief at 11.

**\*7** Similar to plaintiffs' arguments in *Dresses for Less, Inc.* 2002 WL 31164482, plaintiffs' in the present case argue that the factor's denial of credit is analogous to the facts of *Catalano v. Target Sales, Inc.* 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980). In *Catalano,* competing beer wholesalers agreed to fix the credit terms on which they would sell beer to retailers. Specifically, the wholesalers agreed to require that the retailers pay in advance or upon delivery, and to discontinue the practice of accepting late payments without interest. *Id.* at 644-45. The Court held that "credit terms must be characterized as an inseparable part of price. An agreement to terminate the practice of giving credit is thus tantamount to an agreement to eliminate discounts, and thus falls squarely within the traditional *per se* rule against price fixing." *Id.* at 648. Unlike *Catalano,* however, the present complaint alleges that the defendants specifically denied credit to the plaintiffs alone and not to all of their customers. Most importantly, there is no allegation that the defendants conspired or agreed to fix the price or terms of credit. Plaintiffs' price fixing argument hinges on the allegation that by not extending credit to the plaintiffs, the defendants "minimized their risks and costs of doing business" thereby controlling the price and interest rates for factoring. Complaint at 18, ¶ 57. Plaintiffs, however, do not state how the denial of credit to specific garment manufacturers affected market prices. *Dresses for Less, Inc.* 2002 WL 31164482 at *10. Plaintiffs claims of price fixing in the factoring industry are completely conclusory, unsupported by factual allegations and are, therefore, dismissed.

Furthermore, plaintiffs appear to allege that defendants have also fixed the prices in the piece goods market. Plaintiffs argue that "when defendants conspire to withdraw funding, they are actually fixing the prices of the goods." Plaintiffs' Brief at 18. Plaintiffs apparent argument is that

piece goods cost more to the plaintiffs as a result of defendants denial of credit. This allegation is insufficient to find that the defendants conspired or agreed to fix prices in the piece goods market. Plaintiffs claim that defendants fixed prices in the piece goods market, therefore, is also dismissed.

### b. *The Rule of Reason*

In alleging a violation of Section 1 of the Sherman Act under the rule of reason, a plaintiff bears the burden of showing that the challenged action has an actual adverse effect on competition as a whole in the relevant market. *Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs., Inc.,* 996 F.2d 537, 543 (2d Cir.1993). It is not sufficient for plaintiffs merely to show that they have suffered injury due to the alleged agreement; they must also demonstrate "an actual adverse effect on competition market-wide." *Electronics Communications Corp., v. Toshiba,* 129 F.3d at 244. "The injury to a relevant market requirement assures that the Sherman Act protected competition as a whole in the relevant market, and not the individual competitors within that market." *Dresses for Less, Inc.* 2002 WL 31164482 * 7(S.D.N.Y.2002)(internal quotations omitted).

**\*8** In support of their rule of reason claim, plaintiffs allege that

[e]ach of the agreements entered into among the defendants was an agreement in restraint of trade in violation of 15 U.S.C. § 1, intending to achieve anti competitive effects. Each agreement violates the Sherman Act under the Rule of Reason because its pro-competitive effects are outweighed by its anti-competitive effects.

Complaint at 19, ¶ 65. Plaintiffs also claim that "[a]s a result of defendants' conduct, plaintiffs have been damaged in an amount to be determined at trial in excess of $40,000,000.00 for which defendants are jointly liable." *Id.* at 19, ¶ 66. Plaintiffs also allege that

piece goods market is impacted adversely by antitrust violations through the resulting reduction of price and client competition among the factors. The domestic garment manufacturing market is adversely affected by the antitrust violations through the resulting increase in piece goods prices and the elimination of garment manufacturers from the marketplace.
*Id.* at 8, ¶ 20.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

These allegations are insufficient to establish a violation under the rule of reason. Plaintiffs make no allegations from which the Court could infer that defendants' alleged actions had "any anticompetitive effect beyond the injury to plaintiffs." *See Granite Partners. L.P v. Bear, Stearns & Co., Inc.* 17 F.Supp.2d 275, 297-98 (S.D.N.Y.1998). As discussed *supra,* plaintiffs have not articulated with any particularity the effect of the defendants' alleged actions on the piece goods market. Alleging that the price they paid for piece goods increased as a result of their concomitant inability to receive credit to purchase those goods falls short of alleging an anticompetitive effect beyond personal injury to the plaintiffs. Furthermore, the allegation that client competition among the factors was reduced is conclusory and unsubstantiated. Lastly, plaintiffs' allegation of an anticompetitive effect on the domestic garment manufacturing marker is also conclusory. Plaintiffs claim that garment manufacturers were eliminated from the marketplace. However, they do not allege what garment manufacturers, other than themselves, were affected by defendants' alleged actions. Indeed, plaintiffs' claims center on their injury alone and not on a broader injury to competition generally. Plaintiffs, therefore, have also failed to allege the requisite antitrust injury to competition resulting from defendants' actions.

A plaintiff that fails to plead an actual injury to competition may nonetheless show antitrust injury by showing that the defendant possesses "market power" sufficient to inhibit competition on a market-wide basis. *Dresses for Less,* 2002 WL 31164482 at * 7 (S.D.N.Y.2002). Market power is defined as the power to raise prices significantly above the competitive level without losing all of one's business. *See id.; see also CDC Technologies,* 186 F.3d 74, 81 (2d Cir.1999)(internal citations and quotations omitted). Plaintiffs do not allege with any specificity that defendants possess market power in the factoring market. Plaintiffs, furthermore, do not allege that the defendants sought to raise the price for credit market-wide in a manner that affected competition. Plaintiffs' Second Cause of Action alleging a violation under the Rule of Reason is therefore dismissed.

**B. *Section 2 of the Sherman Act***

**\*9** Plaintiffs claim that the defendants have

conspired to monopolize both the factoring market for domestic piece goods vendors and the factoring market for domestic garment manufacturers. [FN8] They allege that the defendants "engaged in an unlawful combination and conspiracy to unreasonably restrain and monopolize interstate commerce." Complaint at 12, ¶ 30. Plaintiffs assert that the "[d]efendants acted as "one" and that they "black listed certain customers and weeded out those that they targeted to drive out of business." *Id.* at 11, ¶ 27. Defendant C.I.T. argues that plaintiffs' complaint fails to allege a conspiracy to monopolize, an abuse of monopoly power, an antitrust injury or a relevant market. [FN9] Defendant Rosenthal similarly argues that plaintiffs have failed to allege an antitrust injury, an abuse of monopoly power or a relevant market. [FN10]

> FN8. Although plaintiffs did not specify in their complaint that their third cause of action constituted a conspiracy to monopolize claim as opposed to a monopolization claim, in their Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Complaint ("Plaintiffs' Brief"), plaintiffs argue that their complaint alleges a conspiracy to monopolize. *See* Plaintiffs' Brief at 20.

> FN9. C.I.T. also asserts that they should not even be a defendant in this matter as they are not alleged to have had a factoring contract with the plaintiffs and were not a party to any of the alleged tortious conduct that C.I.T. claims is the gravamen of plaintiffs' complaint. C.I.T. argues that they are "named as a defendant solely because of [their] alleged market share and because [they] attended, along with other factors, weekly meetings of two industry credit groups. That is not enough to state a claim under any law, including the antitrust laws." C.I.T. Brief at 1.

> FN10. Rosenthal likewise argues that "CIT was added to the Complaint simply to permit a Section 2 claim to be asserted." Rosenthal Brief at 13.

Section 2 of the Sherman Act provides that "every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize, any part of the trade or commerce among the several States" shall have committed an illegal act. 15 U.S.C. § 2. In order to state a claim of conspiracy to monopolize under Section 2, a plaintiff must allege (1) a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d

**Page 8**

(Cite as: 2004 WL 2903776, *9 (S.D.N.Y.))

concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize. *Electronics Communications Corp. v. Toshiba America Consumer Products, Inc.,* 129 F.3d 240, 246 (2d Cir.1997). "Intent alone is not sufficient, however; the defendant's power in the relevant market must be established, to establish whether the defendant is a monopolist or is threatening to become one." *Id.* Furthermore, "a short plain statement of a claim for relief which gives notice to the opposing party is all that is necessary in antitrust cases, as in other cases under the Federal Rules." *George C. Frey Ready-Mixed Concrete, inc. v. Pine Hill Concrete Mix Corp.,* 554 F.2d 551, 554 (2d Cir.1977). Lastly, "[i]n antitrust cases in particular, the Supreme Court has stated that dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *George Haug Co. v. Rolls Royce Motor Cars Inc.,* 148 F.3d 136, 139 (2d Cir.1998)(internal quotations and citations omitted).

Plaintiffs' complaint presents colorable claims of a conspiracy to monopolize under Section 2. The gravamen of plaintiffs' Section 2 claims, and indeed of all of plaintiffs' federal claims, is that the defendants conspired to selectively choose which garment manufacturers would receive credit and which would not. This choice, in effect, ultimately decided which manufacturers went out of business and which ones did not. Complaint at 20, ¶ 68. Whether through the defendants' alleged membership in both the Uptown Credit Group and the Thursday Group, or through other unspecified meetings, plaintiffs maintain that the defendants "shared all credit information and in effect merged the companies." *Id.* at 11, ¶ 27. It is at these meetings and "during telephone calls and other contacts" that the alleged concerted action took place. *Id.* at 12, ¶ 28.

**\*10** Similar to their arguments to dismiss plaintiffs' Section 1 claims, defendants contend that the plaintiffs have failed to specify the conspiracy claims with any particularity, citing several cases where antitrust conspiracy actions were dismissed for failing to allege any supporting facts. *See Telectronics Proprietary. Ltd., v. Medtronic, Inc.,* 687 F.Supp 832, 839 (S.D.N.Y.1988)(quoting *Heart Disease Research Foundation v. General Motors Corp.,* 463 F.2d 98, 100 (2d Cir.1972)). [FN11] Unlike their Section 1 claim, however,

plaintiffs have alleged facts sufficient to support a preliminary finding of concerted action among the defendants. [FN12]

> FN11. Unlike the plaintiff in *Telectronics,* who did not name the others who allegedly conspired with the defendants, plaintiffs in the instant case have alleged that all the defendants conspired with each other to monopolize the factoring markets for garment manufacturers and for piece goods vendors.

> FN12. Sections 1 and 2 of the Sherman Act require proof of conspiracies which are reciprocally distinguishable from and independent of each other, although the objects of the conspiracies may partially overlap. *See American Tobacco Co. v. United States,* 328 U.S. 781, 788, 66 S.Ct. 1125, 1129, 90 L.Ed. 1575 (1946).

Plaintiffs, furthermore, allege several overt acts in furtherance of the alleged conspiracy. Plaintiffs claim that the defendants

deliberately created a monopoly by merging their interests, eliminating competition, and working to together control the business, by agreeing and deciding to give Plaintiffs credit or not, setting the prices, controlling every credit decision relative to factored sales, issuing substantially the same unconscionable contract, and having the ability to drive manufacturers out of business, including plaintiffs.

Complaint at 13, ¶ 33. Plaintiffs further allege that the defendants

have the power to drive manufacturers out of business by their agreements together to control the market and in turn control the garment manufacturers by choosing which manufacturers they would withhold payments to and deny credit to, fixing costs of goods at artificially high prices, and charging exorbitant fees.

Complaint at 9, ¶ 21. These allegations are sufficient to allege overt acts in furtherance of the conspiracy.

Plaintiffs have also specifically alleged the defendants' intent to monopolize. Plaintiffs claim that the defendants "engaged in the acts and practice alleged herein with the specific intent to achieve or maintain monopoly power in the two affected markets." Complaint at 20, ¶ 69. Plaintiffs further allege that the defendants' merging of interests gave the defendants "a dominant share in the factored

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



domestic manufacturing market" and in the piece goods market, as well as "the power to drive manufacturers out of business by their agreements together to control the market and in turn control the garment manufacturers." *Id.* at 9, ¶ 21. This alleged monopoly power came from the defendants' ability to "control 85% of factoring market for garment manufacturing" and "90% of the factored piece goods vendors in the United States." *Id.* at 9, 10 ¶¶ 22, 24. Although the allegation of market share is not the same as one alleging monopoly power, the existence of monopoly power may be inferred from a predominant share of the market. *See United States v. Grinnel Cop.,* 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1703-04, 16 L.Ed.2d 778 (1966). The higher the market share, the stronger the inference of monopoly power. *See Broadway Delivery Corp. v. United Parcel Serv. of America, Inc.,* 651 F.2d 122, 129 (2d Cir.1981).

*11 Defendants further argue that plaintiffs' fail to allege an anticompetitive effect harmful to competition or antitrust injury. "Market share is not enough to allege a violation of Section 2 because monopoly power is not unlawful *per se.*" Defendant C.I.T. Brief at 14 (internal quotations and citations omitted). An "antitrust injury" is an

> injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violations or of anticompetitive acts made possible by the violation. It should, in short, be the type of loss that the claimed violations ... would likely cause.

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *see also Mr. Furniture Warehouse, Inc. v. Barclays American/Commerical Inc.,* 919 F.2d 1517, 1522 (11th Cir.1990)(finding that a "monopolist's refusal to deal becomes actionable under the antitrust laws only where the refusal is designed to have an anticompetitive effect, whether to gain greater market share, to drive up prices, or to obtain some other illegal goal"). To state an antitrust injury, a plaintiff must demonstrate that defendants' conduct "has had an actual adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice." *Capital Imaging,* 996 F.2d at 543; *see also Brunswick Corp.,* 429 U.S. at 488 ("The antitrust laws ... were enacted for 'the

protection of competition, not competitors .'")(quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)). Plaintiffs, however, have proffered sufficient allegations displaying harm to competition and antitrust injury. Plaintiffs allege that

> [d]efendants have violated Section 2 of the Sherman Act, 15 U.S.C. § 2, because they have acted with specific intent to archive (sic) or maintain monopoly power in the factoring market for domestic piece goods and garment manufacturers by merging with competitors and unlawfully utilizing its resulting economic leverage to fix piece goods prices and to drive out of business garment manufacturers that potentially enhance defendants' overall credit risk exposure.

Complaint at 20, ¶ 70. Plaintiffs also maintain that the defendants'

> actions have harmed consumers in that the manufacturer has to charge higher prices and the manufacturers that were forced out of business prevented consumers from having the freedom to choose from quality merchandise suppliers since there is a limited product.

Complaint at 16, ¶ 49. These allegations are sufficient to allege both the anticompetitive effect of, as well as the antitrust injury resulting from, defendants' actions.

Lastly, defendants argue that the plaintiffs have failed to adequately allege a relevant market. "A complaint must allege a relevant product market in which the anticompetitive effects of the challenged activity can be assessed." *Yellow Page Solutions, Inc. v. Bell Atlantic Yellow Pages Co.,* 2001 WL 1468168 (S.D.N.Y.2001). However, because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd v. Exxon Corporation,* 275 F.3d 191, 199 (2d Cir.2001). "To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes--analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible." *Id.* at 199 (internal citations omitted). "Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2004 WL 2903776, *11 (S.D.N.Y.))

Page 10

explanation as to why a market should be limited in a particular way." *Id.*

*12 Plaintiffs allege that the "relevant market is the factoring market for domestic garment manufacturers." Complaint at 8, ¶ 20. Plaintiffs further claim that factors are distinguishable from banks and other credit institutions in that factors are willing to grant credit without the borrower having to put up collateral outside of the borrower's invoices and incoming accounts receivable. *Id.* Plaintiffs also claim that the "piece goods market is impacted adversely by antitrust violations through the resulting reduction of price and client competition among the factors. The domestic garment manufacturing market is adversely affected by the antitrust violations through the resulting increase in piece goods prices and the elimination of garment manufacturers from the marketplace." *Id.* Defendants' motions to dismiss plaintiffs' Section 2 claims are denied.

C. *Clayton Act*

Plaintiffs also assert claims under Sections 4 and 7 of the Clayton Act. Complaint at 1, ¶ 1. [FN13] Plaintiffs make the same allegation they did under their Section 1 and Section 2 claims alleging that the

FN13. The Fourth Cause of Action of plaintiffs' complaint does not specify which section of the Clayton Act was violated. In paragraph 1 of their complaint, plaintiffs allege a violation of Section 4. Section 4, however, does not provide a substantive claim for relief but rather enables plaintiffs who have been injured under the antitrust laws to sue for damages. *See Floors-N-More, Inc. v. Freight Liquidators,* 142 F.Supp.2d 496, 499-500 (S.D.N.Y.2001); *see also Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). In contrast, plaintiffs argue in their Memorandum of Law in Opposition to Defendants' Motion to Dismiss that they have adequately alleged a claim under Section 7 of the Clayton Act. Plaintiffs do not reference any other section of the Clayton Act. The Court, therefore, will construe plaintiffs' Clayton Act claim as one being under Section 4 and Section 7 of that act.

[d]efendants violated the Clayton Act because it has acted with specific intent to achieve or maintain its

monopoly power in the factoring market for domestic piece goods and garment manufacturers by merging with competitors and unlawfully utilizing its resulting economic leverage to fix piece goods prices and to drive out of business garment manufacturers to enhance defendants' overall credit risk exposure.
Complaint at 21, ¶ 76.

The Supreme Court summarized the purpose of Section 7 of the Clayton Act in *United States v. Falstaff Brewing Corp.,* 410 U.S. 526, 531-32, 93 S.Ct. 1096, 1099-1100, 35 L.Ed.2d 475 (1973): Section 7 of the Clayton Act forbids mergers in any line of commerce where the effect may be substantially to lessen competition or tend to create a monopoly. [FN14] The section proscribes many mergers between competitors in a market, *United States v. Continental Can Co.,* 378 U.S. 441 (84 S.Ct. 1738, 12 L.Ed.2d 953) (1964); *Brown Shoe Co. v. United States,* 370 U.S. 294 (82 S.Ct. 1502, 8 L.Ed.2d 510) (1962); it also bars certain acquisitions of a market competitor by a noncompetitor, such as a merger by an entrant who threatens to dominate the market or otherwise upset market conditions to the detriment of competition, *FTC v. Procter & Gamble Co.,* 386 U.S. 568, 578-580 (87 S.Ct. 1224, 1230-1231, 18 L .Ed.2d 303) (1967). Suspect also is the acquisition by a company not competing in the market but so situated as to be a potential competitor and likely to exercise substantial influence on market behavior. Entry through merger by such a company, although its competitive conduct in the market may be the mirror image of that of the acquired company, may nevertheless violate § 7 because the entry eliminates a potential competitor exercising present influence on the market. *Id.,* at 580-581 (87 S.Ct. at 1231-1232); *United States v. Penn-Olin Chemical Co.,* 378 U.S. 158, 173-174 (84 S.Ct. 1710-1718, 12 L.Ed.2d 775) (1964).

FN14. Section 7 of the Clayton Act provides that
No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly. 15 U.S.C. § 18.

**\*13** None of the preceding situations exist in the present case. Plaintiffs allegations of a 'merger' are conclusory and unsupported by any factual allegations. Plaintiffs do not allege the existence of either a merger agreement or an acquisition agreement to support its Section 7 claim. Plaintiffs' Section 7 claim, therefore, is dismissed.

### D. *Donnelly Act*

Plaintiffs also assert claims under the Donnelly Act of the State of New York. Specifically, plaintiffs allege that the defendants
entered into agreements with other factoring companies to engage in group boycotts where they refused to approve credits for New York based garment manufacturers, unlawfully fixed piece goods prices for those manufacturers, drove them out of business, and enabled the factors to maintain supra-competitive pricing structures and stable market shares, among other anticompetitive effects.

Complaint at 22, ¶ 79. Plaintiffs further assert that

[t]he unlawful reduction of the number of garment manufacturers competing in the market has resulted in artificially maintained and non-competitive levels of prices for factoring services throughout New York and has enabled the factors to stabilize their respective market shares in a way that could not have been achieved or maintained had the factors operated in a genuinely competitive environment.
Complaint at 22, ¶ 80. Defendants move to dismiss plaintiffs' Donnelly Act claims on the same grounds that it moved to dismiss the Sherman Act claims.

The Donnelly Act, N.Y. Gen. Bus. Law § 340, states that "[e]very contract, agreement, arrangement or combination whereby a monopoly ... is or may be established or maintained, or whereby competition ... may be restrained" is illegal. N.Y. Gen. Bus. Law § 340(1). The Donnelly Act was patterned after the Sherman Act and has been narrowly construed to encompass only those causes of action falling within the Sherman Act. *See State v. Mobil Oil Corp.*, 38 N.Y .2d 460, 381 N.Y.S.2d 426, 427, 344 N.E.2d 357 (1976); *accord Great*

*Atlantic & Pacific Tea Co., Inc. v. Town of East Hampton*, 997 F.Supp. 340 (E.D.N.Y.1998) (finding Donnelly Act is modeled after the Sherman Antitrust Act and is generally interpreted in accordance with federal precedent); *see also Anheuser-Busch, Inc. v. Abrams*, 71 N.Y.2d 327, 335, 525 N.Y.S.2d 816, 820, 520 N.E.2d 535 (1988) (Donnelly Act was modeled on the Sherman Act and is to be construed in accord with it). Accordingly, defendants' motion to dismiss plaintiffs' Donnelly Act claims is granted in part and denied in part. Plaintiffs' Donnelly Act claims of price-fixing and group boycott are therefore dismissed.

### E. *State Law Claims*

In addition to plaintiffs' federal and state antitrust claims, plaintiffs also allege the following pendant state law claims: trade libel; defamation, libel and slander; injurious falsehood; interference with commercial relations; and breach of contract. Each of these claims, with the exception of plaintiffs' breach of contract claim, have been alleged as conspiracies to commit the alleged tortious acts. In presenting their claims in this manner, plaintiffs allege that all of the defendants are liable for the tortious conduct. Specifically, plaintiffs' Sixth, Seventh, Eighth and Ninth Causes of Action claim that all of the defendants "engaged in an unlawful combination and conspiracy" to commit trade libel; defamation, libel and slander; injurious falsehood; and interference with commercial relations.

**\*14** Under New York law, however, "a mere conspiracy to commit a [tort] is never of itself a cause of action." *Alexander & Alexander v. Fritzen*, 68 N.Y.2d 968, 510 N.Y.S.2d 546, 503 N.E.2d 102 (1986) (citations omitted). An independent tort must form the basis of a claim of civil conspiracy. *See Demalco v. Feltner*, 588 F.Supp. 1277, 1278 (S.D.N.Y.1984); *Smukler v. 12 Lofts Realty*, 156 A.D.2d 161, 548 N.Y.S.2d 437, 439 (1st Dep't 1989), app. den., 76 N.Y.2d 701, 557 N.Y.S.2d 878, 557 N.E.2d 114 (1990). "[A] defendant may be held liable in tort for conspiracy to do an unlawful thing, or to do a lawful thing in an unlawful manner." *Arlinghaus v. Ritenour*, 622 F.2d 629, 639 (2d Cir.1980)(internal citations omitted); *see Banque Nationale de Paris v. Prudential Sec., Inc.*, 1997 WL 639257, at *3 (S.D.N.Y. Oct. 16, 1997). The purpose of civil

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



conspiracy is to "establish[ ] joint liability by co-participants in a particular tortious conduct." *Sackman v. Liggett Group, Inc.,* 965 F.Supp. 391, 395 (E.D.N.Y.1997). A successful claim for civil conspiracy requires a plaintiff to show the primary tort plus the following four elements: " '( [1] ) a corrupt agreement between two or more persons [;] ( [2] ) an overt act in furtherance of the agreement[;] ( [3] ) the parties' intentional participation in the furtherance of a plan or purpose [;] and ( [4] ) the resulting damage or injury." ' *Andre Emmerich Gallery, Inc. v. Segre,* 1997 WL 672009, at *10 (S.D.N.Y. Oct. 29, 1997) (quoting *Chrysler Capital Corp. v. Century Power Corp.,* 778 F.Supp. 1260, 1267 (S.D.N.Y.1991)).

Plaintiffs provide no factual support for their conclusory allegations of a conspiracy to commit any of these torts. Plaintiffs claims of a conspiracy to commit these torts, therefore, is dismissed as to all plaintiffs. Furthermore, as will be seen, plaintiffs have also failed to allege facts sufficient to support their claims of the underlying torts.

a. *Trade Libel and Injurious Falsehood*

Plaintiffs Sixth and Eighth Causes of Action allege independent trade libel and injurious falsehood claims against all the defendants. In support of their trade libel claim, plaintiffs allege that the [d]efendants have engaged in an unlawful combination and conspiracy to cause the publication of untruths disparaging plaintiffs, such as plaintiffs' actions are fraudulent, their products and services are of inferior quality, they misappropriated inventories and are poor risks. Such publications being accompanied by an intent to cause competitive injury, personal hostility, and bad faith. These untruths were published maliciously and without reasonable or probable cause to believe in the truth thereof. These publications of injurious falsehoods constituted, and continue to constitute, the tort of trade libel for which defendants are jointly and severally liable. Complaint at 23, ¶ 87.

Similarly, in support of their injurious falsehood claim, plaintiffs restate many of the same conclusory allegations in their trade libel claim. Plaintiffs maintain that the

*15 [d]efendants have engaged in an unlawful combination and conspiracy to cause the

publication of untruths disparaging plaintiffs, such publication being accompanied by an intent to cause competitive injury, personal hostility, and bad faith. These untruths were published maliciously and without reasonable or probable cause to believe in the truth thereof. These publications of injurious falsehoods such as plaintiffs committed fraud, stole money, fraudulently conveyed assets, misrepresented themselves, and lied to their customers, and switched receivables constitute the tort of injurious falsehood. Defendants made these statements and published these statements knowing they were false and knowing and intending to cause harm to plaintiffs. These statements in fact caused harm to plaintiffs' in that plaintiffs' customers stopped doing business with plaintiffs and other factors withdrew funding from plaintiffs and factors refuse to factor plaintiffs.
Complaint at 25, ¶ 92.

These conclusory allegations are insufficient to support plaintiffs' claim of trade libel or injurious falsehood. The allegations fail to identify which specific defendants committed these torts. Furthermore, the allegations fail to identify the false statements made by any defendant. However, in their Seventh Cause of Action for defamation, slander and libel, plaintiffs make allegations from which the Court may infer false statements in support of their trade libel and injurious falsehood claims. Plaintiffs allege that Miles M. Stuchin "defamed and slandered Plaintiffs by writing and publishing false and libelous letters, including a letter dated November 3, 2000, and telephone calls, mainly during October 2000 and through and including December 2000, and oral communications to Plaintiffs' clients and to the industry." Complaint at 6, ¶ 17. Stuchin and defendant Access Capital, of which he is president, are alleged to have defamed[,] libeled and slandered plaintiffs in that on many dates during the time between October 2000 and February 2001, defendant and his employees including Vincent Grillo called and wrote plaintiffs' customers and others in the industry stating that plaintiffs "committed fraud," "stole money," "fraudulently conveyed assets," "misrepresented themselves" and "lied" to their customers, and "switched receivables.
Complaint at 6, ¶ 17. Lastly, plaintiffs maintain that in a letter dated January 16, 2001, defendants Richard I. Simon and Westgate Financial, of which

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



he is allegedly president, "accused Gabbey Design of theft and fraud and created allegations of false, untrue, and malicious charges against Gabbey." Complaint at 7, 15, ¶¶ 18, 43. These statements were published to Rosenthal & Rosenthal, Bruce Cohen, Dana Flaxman, Access Capital, Star Funding, John Michaels, and Gabbey, among others. *Id.* at 15, ¶ 43. [FN15]

FN15. Plaintiffs have not pled their trade libel or injurious falsehood claim against all defendants with any specificity. The only defendants identified as having made false statements are Miles M. Stuchin, Access Capital, Richard I. Simon and Westgate Financial. The Court will therefore treat plaintiffs' claims of trade libel and injurious falsehood as against those defendants only. If indeed plaintiffs intended to allege these claims against all of the defendants, those claims are dismissed as conclusory and unsupported by specific allegations of published false statements.

Although pled separately, the torts of trade libel and injurious falsehood require the same allegations to be pled. The distinction between the two is slight; courts having articulated that statements disparaging another's product were called "trade libel," another's business "injurious falsehood," and another's title "slander of title." *Payrolls & Tabulating, Inc. v. Sperry Rand Corp.,* 22 A.D.2d 595, 257 N.Y.S.2d 884, 887 (1st Dep't 1965). "The tort of trade libel or injurious falsehood consists of the knowing publication of false matter derogatory to the plaintiff's business of a kind calculated to prevent others from dealing with the business or otherwise interfering with its relations with others, to its detriment." *Waste Distillation,* 136 A.D.2d 633, 634, 523 N.Y.S.2d 875 (2nd Dep't 1988); *see also Global Merch., Inc. v. Lombard & Co.,* 234 A.D.2d 98, 99, 650 N.Y.S.2d 724 (1st Dep't 1996) ("trade libel … requires 'knowing publication of false matter derogatory to the plaintiff's business.' ") (quoting *Waste Distillation,* 136 A.D.2d at 634, 523 N.Y.S.2d 875). "The utterance or furnishing of false and misleading information may be actionable if done maliciously or with the intention to harm another, or so recklessly and without regard to its consequences, that a reasonably prudent person should anticipate that damage to another will naturally follow." *Penn-Ohio Steel Corp. v. Allis-Chalmers Mfg. Co.,* 7 A.D.2d 441, 444, 184 N.Y.S.2d 58, 61 (App. Div. 1st Dep't 1959).

**\*16** The elements of a claim of injurious falsehood or trade libel are: (i) falsity of the alleged statements; (ii) publication to a third person; (iii) malice; and (iv) special damages. *See Drug Research Corp. v. Curtis Publishing Co.,* 7 N.Y.2d 435, 440, 199 N.Y.S.2d 33, 37, 166 N.E.2d 319 (1960); *see also Computech Int'l, Inc. v. Compaq Computer Corp.,* No. 02 Civ. 2628, 2002 WL 31398933, at \*5 (S.D.N.Y.Oct.24, 2002). The requirement of pleading and proving special damages is applied strictly. *See id.* at \*6. Thus, a motion to dismiss a claim of injurious falsehood may be granted for failure to allege special damages with the requisite specificity. *See id.; see also Drug Research Corp.,* 7 N.Y.2d at 440-41, 199 N.Y.S.2d at 37-38, 166 N.E.2d 319.

Plaintiffs' claims of trade libel and injurious falsehood, like their defamation, slander and libel claims, are premised on two letters dated November 3, 2000 and January 16, 2001 as well as telephone calls made during October 2000 and through and including December 2000. Plaintiffs complaint, however, does not allege with particularity to whom the November 3, 2000 letter was written. [FN16] Plaintiffs' claim regarding the November 3, 2000 letter, therefore, is dismissed. Furthermore, all of plaintiffs' trade libel and injurious falsehood claims against all defendants must be dismissed because plaintiffs failed to allege special damages with sufficient particularity. Under New York law, plaintiffs' special damages claim, premised on their loss of business, must be "fully and accurately stated." *Drug Research Corp. v. Curtis Pub. Co.,* 7, N.Y.2d 435, 440-41, 199 N.Y.S.2d 33, 37-38, 166 N.E.2d 319 (N.Y.1960)(finding that special damages were not adequately alleged where the damage claim was a round figure [$5,000,000] with no attempt at itemization); *see also Rall v. Hellman,* 284 A.D.2d 113, 114, 726 N.Y.S.2d 629, 632 (App. Div. 1st Dep't 2001)(finding that complaint was deficient because it failed to identify special damages with sufficient particularity). Plaintiffs allege damages "in an amount to be determined at trial but not less than $40,000,000.00." Complaint at 23, 26, ¶¶ 87, 93. This allegation is insufficient under New York law and cannot survive defendants' motion to dismiss.

FN16. Plaintiffs do, however, allege that "[o]n December 5, 2000, Defendant Stuchin telephoned Rosenthal & Rosenthal and falsely accused plaintiffs

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



of committing fraud, stealing money, and switching invoices in a fraudulent conveyance" Complaint at 15, ¶ 42. Plaintiffs also allege the third person to whom Westgate published false statements: "on or about January 16, 2001 Defendants, including Westgate Financial Corp., accused Gabbey Design of theft and fraud and created allegations of false, untrue, and malicious charges against Gabbey. Defendants published these statements to Rosenthal & Rosenthal, Bruce Cohen, Dana Flaxman, Access Capital, Star Funding, John Michaels, and Gabbey, among others." Complaint at 15, ¶ 43.

b. *Defamation, Libel, Slander*

In their Seventh Cause of Action, plaintiffs assert claims of defamation, libel and slander. Premised on the same set of allegations as their trade libel and injurious falsehood claims, plaintiffs' defamation, libel and slander claim is based on false statements allegedly made by defendants Stuchin, Access Capital, Simon and Westgate Financial in two letters dated November 3, 2000 and January 16, 2001, as well as oral statements made on the telephone from October 2000 through and including February 2001. Complaint at 6, 13, 14, 24, ¶¶ 17, 36, 37, 89. As with plaintiffs trade libel and injurious falsehood claims, plaintiffs' claim regarding the November 3, 2000 letter fails to specify to whom the letter was published and is, therefore, dismissed.

*17 Although defendants Westgate, Simon, Access and Stuchin argue that plaintiffs claim must be dismissed for failing to specify to whom all of the alleged defamatory statements were made, plaintiffs' complaint does allege that "[o]n December 5, 2000, Defendant Stuchin telephoned Rosenthal & Rosenthal and falsely accused plaintiffs of committing fraud, stealing money, and switching invoices in a fraudulent conveyance." Complaint at 15, ¶ 42. Plaintiffs further assert

[t]hat on or about January 16, 2001 Defendants, including Westgate Financial Corp., accused Gabbey Design of theft and fraud and created allegations of false, untrue, and malicious charges against Gabbey. Defendants published these statements to Rosenthal & Rosenthal, Bruce Cohen, Dana Flaxman, Access Capital, Star Funding, John Michaels, and Gabbey, among others. Complaint at 15, ¶ 43. [FN17]

FN17. Additionally, plaintiffs maintain that Omni

Corp. "slandered plaintiffs to many in the industry." Complaint at 3, ¶ 7. Although plaintiffs allege that Omni Corp. and not named defendant Omni Commercial, LLP slandered the plaintiffs, assuming *arguendo* that the plaintiffs allegation is directed towards defendant Omni Commercial, plaintiffs' claim would still be dismissed for failure to state a claim. Plaintiffs do not allege a specific defamatory statement; to whom these statements were made; nor any special damages to support their claim.

Under New York law, the elements of a defamation cause of action are: (i) a defamatory statement of fact concerning the plaintiff, (ii) publication to a third party by the defendant, (iii) falsity of the defamatory statement, (iv) some degree of fault, and (v) special damages or per se actionability (defamatory on its face). *See Dillon v. City of New York,* 261 A.D.2d 34, 37- 38, 704 N.Y.S.2d 1, 5 (App. Div. 1st Dep't 1999); *Celle v. Filipino Reporter Enters. Inc.,* 209 F.3d 163, 176 (2d Cir.2000). As a general rule, a statement is defamatory per se if it "tends to disparage a person in the way of his office, profession or trade." *Celle,* 209 F.3d at 179 (emphasis in original); *see also Aronson v. Wiersma,* 65 N.Y.2d 592, 594, 493 N.Y.S.2d 1006, 1008, 483 N.E.2d 1138 (1985). If a statement is defamatory *per se,* injury is assumed and the statement is actionable without proof of special damages. Special damages are those which flow directly from the injury to a plaintiff's reputation caused by the defamation and which involve the loss of something having economic or pecuniary value. *See Celle,* 209 F.3d at 179 (citing *Matherson v. Marchello,* 100 A.D.2d 233, 235, 473 N.Y.S.2d 998, 1000 (App. Div.2d Dep't 1984)). Lastly, "a plaintiff in a libel action must identify a plausible defamatory meaning of the challenged statement or publication." *Celle* 209 F.3d at 178. If the statement is susceptible of only one meaning, it becomes the court's responsibility to determine, as a matter of law, whether that one meaning is defamatory. On the other hand, if the words are reasonably susceptible of multiple meanings, some of which are not defamatory, it becomes the trier of fact's responsibility to determine in what sense the words were used and understood. *See id.*

Although plaintiffs allege that all of the defendants committed defamation, plaintiffs' complaint only supports claims against defendants Stuchin, Access Capital, Simon and Westgate Financial. Stuchin and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2004 WL 2903776, *17 (S.D.N.Y.))

Access Capital are alleged to be responsible for the November 3, 2000 letter as well as the oral communications between October 2000 and February 2001. Defendants Simon and Westgate are alleged to be responsible for the January 16, 2001 letter. As plaintiffs' complaint does not refer to any other communications, plaintiffs claims against all other defendants are dismissed.

**\*18** Plaintiffs' claims against defendants Stuchin and Access Capital regarding the November 3, 2000 letter are dismissed for failing to allege with specificity the exact words contained in the November 3, 2000 letter that plaintiffs' claim are libelous. Plaintiffs' insufficient pleading of the allegedly defamatory statement goes hand in hand with their failure to identify a plausible defamatory meaning for that statement. Plaintiffs further fail to allege to whom that letter was published. Lastly, plaintiffs fail to allege special damages or that the defamatory words contained in the letter should be considered by the Court as defamatory *per se*. *See Church of Scientology Int'l v. Eli Lilly & Co.*, 778 F.Supp 661, 668 (S.D.N.Y.1991)(dismissing claim that failed "to provide both the context and the precise language of" the alleged statements).

Plaintiffs allegations concerning the January 16, 2001 letter allegedly written by defendants Simon and Westgate Financial suffer from the same deficiencies as their claims regarding the November 3, 2000 letter. Plaintiffs fail to articulate the libelous statement made in that letter and also fail to allege either special damages or that the libelous statement reaches *per se* liability. Although plaintiffs allege to whom that letter was sent, that allegation alone is insufficient to support plaintiffs' claims. Plaintiffs' libel claim regarding the January 16, 2001 letter is therefore dismissed.

Plaintiffs claims regarding telephone calls and other oral communications that occurred between October 2000 and February 2001 against Stuchin and Access Capital are dismissed except for one slander allegation: "[o]n December 5, 2000, Defendant Stuchin telephoned Rosenthal & Rosenthal and falsely accused plaintiffs of committing fraud, stealing money, and switching invoices in a fraudulent conveyance." Complaint at 15, ¶ 42. Under New York law, there are four elements necessary to establish a *prima facie* case of slander: (1) an oral defamatory statement of fact, (2)

regarding the plaintiff, (3) published to a third party by the defendant, and (4) injury to the plaintiff. The fourth element is presumed when the defamatory statement takes the form of slander *per se. Weldy v. Piermont Airlines, Inc.*, 985 F.2d 57, 61-62 (2d Cir.1993) (citations omitted). Defamation *per se* "consist[s] of statements (i) charging plaintiff with a serious crime; (ii) that tend to injure another in his or her trade, business or profession; (iii) that plaintiff has a loathsome disease; or (iv) imputing unchastity to a woman." *Liberman v. Gelstein*, 80 N.Y.2d 429, 435, 590 N.Y.S.2d 857, 605 N.E.2d 344 (1992). The second type of defamation *per se* is "limited to defamation of a kind incompatible with the proper conduct of the business, trade, profession or office itself. The statement must be made with reference to a matter of significance and importance for that purpose, rather than a more general reflection upon the plaintiff's character or qualities". *Id.* Thus, "charges against a clergyman of drunkenness and other moral misconduct affect his fitness for the performance of the duties of his profession, although the same charges against a business man or tradesman do not so affect him". *Id.* at 436, 590 N.Y.S.2d 857, 605 N.E.2d 344 (citations omitted). For the purposes of this motion, therefore, plaintiff has adequately pled a *prima facie* case of slander. Defendants' motion to dismiss plaintiffs' claim of slander based on this telephone call is denied.

### c. *Interference with Commercial Relations*

**\*19** In their Ninth Cause of Action, plaintiffs also allege a claim of interference with commercial relations. Plaintiffs maintain that the [d]efendants have induced Plaintiffs' clients to refrain from purchasing from Plaintiffs by publishing disparaging and false statements about the products and services of Plaintiff, such publications being accompanied by an intent to cause competitive injury, personal hostility, bad faith, knowing the matter was false, by creating the impression and belief that to work with plaintiffs would jeopardize such customers' continued status, and by Defendants having purposely induced or otherwise caused third persons not to enter into or continue business relations with Plaintiffs.
 Complaint at 13, ¶ 34. These allegations are insufficient to state a claim of tortious interference with business relations against all of the defendants. The only allegations which specify direct conduct by

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



particular defendants are actions by defendants Access Capital and Stuchin against plaintiff John Michaels. Plaintiffs allege that Access Capital and Stuchin "interfered with an unrelated lawsuit plaintiffs were involved in, illegally diverted and opened plaintiffs' personal and business mail." Complaint at 6, ¶ 17. Plaintiffs assert that

on or about and after October 27, 2000, Defendant Access intentionally and illegally diverted, opened and withheld Plaintiffs' mail, made illegal financial threats and demands upon Plaintiff John Michaels' accounts causing many of John Michael's accounts to withhold payments and caused John Michaels to be unable to operate its business.

Complaint at 14, ¶ 40. Plaintiffs maintain that [d]efendants' actions constitute interference of John Michaels' and other plaintiffs' contractual relationships with its customer accounts, and disrupted the normal operation of John Michaels' and plaintiffs' business, causing a great loss of booked orders plus future sales. Defendants acted intentionally with the knowledge that their actions would cause John Michaels' accounts to stop payments for shipments received and that the factors would refuse to do business with plaintiffs, and that plaintiffs' customers would refuse to do business with plaintiffs.

Complaint at 15, ¶ 41.

In order to state a claim for tortious interference with contractual relations under New York law, a plaintiff must allege "(1) the existence of a valid contract between itself and a third party for a specific term; (2) defendant's knowledge of that contract; (3) defendant's intentional procuring of its breach; and (4) damages." *150 East 58th St. Partners, L.P. v. Wilkhahn Wilkening & Hahn GmbH & Co.,* No. 97 CIV. 4262(SHS), 1998 WL 65992, at *1 (S.D.N.Y.Feb.17, 1998) (quoting *Riddell Sports Inc. v. Brooks,* 872 F.Supp. 73, 77 (S.D.N.Y.1995)); *see Jews for Jesus, Inc. v. Jewish Community Relations Council of N.Y., Inc.,* 968 F.2d 286, 292 (2d Cir.1992); *Union Carbide Corp. v. Montell N.V.,* 944 F.Supp. 1119, 1136 (S.D.N.Y.1996); *Foster v. Churchill,* 87 N.Y.2d 744, 749-50, 665 N.E.2d 153, 156, 642 N.Y.S.2d 583, 586 (1996).

**\*20** The standard for demonstrating tortious interference with business relations "is somewhat more stringent." *Campo v. 1st Nationwide Bank,* 857 F.Supp. 264, 273 (E.D.N.Y.1994); *see*

*International Minerals and Resources, Inc. v. Pappas,* 761 F.Supp. 1068, 1075 (S.D.N.Y.1991). A plaintiff must allege that defendants interfered with business or economic relations between the plaintiff and a third party, either with the sole purpose of harming the plaintiff or by dishonest, unfair, or improper means. *See PPX Enters., Inc. v. Audiofidelity Enters., Inc.,* 818 F.2d 266, 269 (2d Cir.1987); *Fonar Corp. v. Magnetic Resonance Plus, Inc.,* 957 F.Supp. 477, 482 (S.D.N.Y.), cert. denied, 522 U.S. 908, 118 S.Ct. 265, 139 L.Ed.2d 191 (1997); *Houbigant, Inc. v. ACB Mercantile,* 914 F.Supp. 964, 995 (S.D.N.Y.1995); *Campo,* 857 F.Supp. at 273. Indeed, the defendant "must interfere with the business relationship directly; that is, the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff." *Fonar Corp.,* 957 F.Supp. at 482.

Defendants Access and Stuchin argue that plaintiffs fail under both standards. First, defendants argue that plaintiffs fail to allege that they were "actually and wrongfully prevented from entering into or continuing in a specific business relationship." *Solar Travel Corp. v. Bachtomi,* 2001 WL 641151 (S.D.N.Y.2001); *Korn v. Princz,* 226 A.D.2d 278, 641 N.Y.S.2d 283 (1st Dep't 1996). Defendants further contend that plaintiffs have not alleged that a contract would have been entered into but for the alleged actions of Access and Stuchin. *See, e.g., Bankers Trust Co. v. Bernstein,* 169 A.D.2d 400, 563 N.Y.S.2d 821 (1st Dep't 1991).

Plaintiffs' claims against defendants Stuchin and Access Capital must be dismissed. Plaintiffs do not allege with any specificity the contracts it claims were breached or the business relations it claims were prevented from going forward as a result of either Stuchin's or Access Capital's actions. Plaintiffs also fail to identify the third parties that plaintiffs had either a contractual or prospective business relationships with. Plaintiffs' claim of tortious interference with commercial relations is, therefore, dismissed.

### d. Breach of Contract

As is the case with all of their claims, in their breach of contract claim, plaintiffs do not specify which plaintiffs had contractual relationships with which defendants, generally alleging that the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



[d]efendants conduct and the unlawful acts in restraint of trade have caused the breach of their respective contracts with plaintiffs, and, Defendants have breached their contractual duties to each plaintiff separately and apart from their anti-competitive conduct. Defendants also engaged in the following additional actions that further breached its covenants of good faith and fair dealing. Defendants' bad faith actions contributed substantially to the demise of the plaintiffs, and caused each of the plaintiffs' substantial financial loss. The contracts themselves are unconscionable, against public policy, and predatory.

**\*21** Complaint at 26-27, ¶ 98. Indeed the only allegations that support a breach of contract claim which specifically identify a breach by a particular defendant of a contract with a specific plaintiff are against defendants Westgate and Star Funding. Plaintiffs allege that

Westgate Financial confiscated Plaintiff John Michael's client inventory and sold it to a salvage company, never gave plaintiffs credit for payments made, refused to give advance funding, breached their contract, and caused a loss in excess of Two Million Dollars. Defendants misappropriated Plaintiffs' inventory and charged unlawfully high interest rates causing serious financial loss to John Michael's.

Complaint at 13, ¶ 35. Plaintiffs further allege that they

were coerced and forced under duress to use the factor Star Funding, and then Star Funding immediately breached their contract based upon Rosenthal & Rosenthal's request not to go forward with its funding to Gabbey, all of this occurred after Star Funding and Rosenthal & Rosenthal met with defendants and agreed to force plaintiffs out of business.

Complaint at 14, ¶ 38.

In order to state a claim for breach of contract, plaintiffs must allege: (1) the existence of a contract; (2) adequate performance of the contract by the plaintiff; (3) breach of the contract provisions by the defendants; and (4) damages resulting from the breach. *See Terwilliger v. Terwilliger,* 206 F.3d 240, 246 (2d Cir.2000). As plaintiffs have only alleged contracts with defendants Westgate and Star Funding, plaintiffs breach of contract claim against all other defendants are dismissed. Plaintiffs claims against these remaining defendants are also dismissed for failing to allege adequate performance

of the contract by the plaintiffs as well as damages resulting from the breach.

### III. *Conclusion*

Defendants' motions to dismiss plaintiffs' claims under Section 1 of the Sherman Act are granted. Defendants' motions to dismiss plaintiffs' claims under Section 2 of the Sherman Act are denied. Defendants' motions to dismiss plaintiffs' claims under the Clayton Act are granted. Defendants' motions to dismiss plaintiffs' price-fixing and group boycott claims under the Donnelly Act are granted. Defendant's motion to dismiss plaintiffs' monopolization claims under the Donnelly Act are denied. Defendants' motions to dismiss all of plaintiffs' claims of trade libel, injurious falsehood, tortious interference with commercial relations and breach of contract are granted. Defendants' motion to dismiss plaintiffs' defamation, libel and slander claims is granted in part and denied in part. All of plaintiffs' defamation, libel and slander claims are dismissed except for plaintiffs' slander claim regarding the alleged December 5, 2000 telephone call.

Not Reported in F.Supp.2d, 2004 WL 2903776 (S.D.N.Y.), 2005-1 Trade Cases P 74,693

Motions, Pleadings and Filings (Back to top)

. 1:01cv08893 (Docket)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



4

Not Reported in F.Supp.2d                                                                    **Page  1**
Not Reported in F.Supp.2d, 2004 WL 1234041 (S.D.N.Y.)
**(Cite as: 2004 WL 1234041 (S.D.N.Y.))**
**H**

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Mildred MARTINEZ, Plaintiff,
v.
Steven SANDERS, individually and in his official
capacity as Assemblyman for
the 74th Assembly District of the State of New
York, Defendant.
No. 02 Civ.5624(RCC).

June 3, 2004.

OPINION & ORDER

CASEY, J.

*1 Mildred Martinez ("Plaintiff") sues her former
employer, New York State Assemblyman Steven
Sanders ("Defendant"), alleging that she was
terminated in violation of the: (1) First Amendment
to the U .S. Constitution; (2) Free Speech Clause of
the New York State Constitution; (3) Employee
Retirement Income Security Act of 1974 ("ERISA");
and (4) Equal Protection Clause of the New York
State Constitution. Plaintiff also seeks various forms
of injunctive relief, including reinstatement to her
position. [FN1] Defendant now moves to dismiss
the complaint pursuant to Federal Rules of Civil
Procedure 12(b)(2) and (6) and to strike allegedly
immaterial and impertinent matter from the
complaint pursuant to Federal Rule of Civil
Procedure 12(f). For the reasons set forth below,
Defendant's motion is GRANTED IN PART AND
DENIED IN PART.

> FN1. Plaintiff alleged seven additional claims in the
> Complaint, but has failed to oppose the motion to
> dismiss them. As further discussed below, the Court
> concludes that Plaintiff has abandoned these claims.
> Therefore, the Court will only discuss the merits of
> the above-enumerated claims.

BACKGROUND

For purposes of this motion, the Complaint's
factual allegations are accepted as true and all
inferences are drawn in Plaintiff's favor. *See*

*Connolly v. McCall,* 286 F.2d 122, 125 (2d
Cir.2001).

Plaintiff has worked as a political activist in New
York City since 1980. (Second Amended Complaint
[Compl.] ¶ 8.) During the course of her political
career, Plaintiff developed an "extensive political
network ... consisting of voters and street
campaigners" in the Lower East Side. (*Id.*) Plaintiff
worked for Assemblyman Sheldon Silver from 1979
until 1995. (*Id.* ¶¶ 9, 17.) In 1995, after a
redrawing of political district lines, Plaintiff
requested a transfer to Defendant's office so that she
could continue to serve the Lower East Side. (*Id.* ¶
17.) On September 5, 1995, Defendant hired
Plaintiff as a full-time employee . [FN2] (*Id.* ¶¶ 17-
18; Employer's Report of Work-Related Accident/
Occupational Disease, Ex. A to Defendant's Reply
Memorandum .)

> FN2. In Plaintiff's Second Amended Complaint she
> did not provide her job title. Defendant attached
> Plaintiff's worker's compensation claim as an exhibit
> in his Reply Memorandum of Law, in which Plaintiff
> used the term "community liaison" to describe her
> position in Defendant's office. Although Plaintiff did
> not use the term community liaison to describe her
> job title in the complaint, the Court can nonetheless
> consider her New York State Worker's
> Compensation claim form as evidence of her
> employment title. *See Evans v. New York Botanical
> Garden,* No. 02 Civ. 3591, 2002 WL 31002814, at
> *4 (S.D.N.Y. Sept. 4, 2002) ("A court may take
> judicial notice of the records of state administrative
> procedures, as these are public records, without
> converting a motion to dismiss to one for summary
> judgment."); *Tsai v. Rockefeller Univ.,* 137
> F.Supp.2d 276, 280 n. 2 (S.D.N.Y.2001) ("[T]he
> Court may take judicial notice of reports of
> administrative bodies without converting a motion to
> dismiss into one for summary judgment."),
> However, as discussed in further detail below,
> Plaintiff's use of the term community liaison only
> shows evidence of Plaintiff's job title, not her actual
> employment duties and responsibilities, a factor
> possibly dispositive of her ree speech claims.

Plaintiff alleges that Defendant requires his
employees to support only the political candidates
that he endorses. (Compl.¶¶ 6, 14, 30, 127.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                              Page  2
(Cite as: 2004 WL 1234041, *1 (S.D.N.Y.))

Plaintiff further alleges that Defendant threatens his employees with termination and loss of their pension rights if they refuse to support and campaign for his chosen political candidates. (*Id.* ¶ 23.) Plaintiff alleges that to this end, Defendant required her to use vacation and sick time, as well as weekends, to participate in campaign activities for his chosen candidates. (*Id.* ¶ 24.) These campaign activities included soliciting voters by phone, campaigning in the community, and handing-out flyers. (*Id.* ¶¶ 25, 33.)

In 2001, Mark Green and Fernando Ferrer both sought the Democratic nomination for New York City mayor. (*Id.* ¶¶ 37-39, 42.) Defendant, who supported Green, asked his employees to lobby and campaign for Green's nomination. (*Id.* ¶¶ 38- 39.) Defendant wanted his employees to recruit Hispanic political activists in the Lower East Side to support Green's mayoral candidacy. (*Id.* ¶ 39.) Despite the fact that Plaintiff informed Defendant that she intended to support Ferrer, Defendant pressured her to campaign for Green. (*Id.* ¶¶ 42, 46.) When Plaintiff informed Defendant that she would not support Green because she was strongly committed to the Ferrer campaign, Defendant told her that he would not force her to campaign for Green, but that she had to refrain from criticizing him. (*Id.* ¶¶ 48-49.)

*2 On May 8, 2001, Plaintiff injured her wrist in a job-related accident. (*Id.* ¶ 50.) Due to the injury, she was unable to return to work until October 2001. (*Id.* ¶ 57.) While absent from work, Plaintiff campaigned on Ferrer's behalf. (*Id.* ¶¶ 54-57.) For example, she recruited one-hundred members of the Puerto Rican community to support Ferrer and lobbied members of a community-based political organization, the Village Democratic Club, to support Ferrer. (*Id.* ¶¶ 54-56.) Plaintiff alleges that Defendant has significant influence over the Village Democratic Club. (*Id.* ¶ 54.)

When Plaintiff returned to work on October 2, 2001, Defendant fired her. (*Id.* ¶¶ 58-59, 63.) Plaintiff alleges that Defendant was upset that she had publically supported Ferrer and asked Defendant if she had considered her job when she decided to support him. (*Id.* ¶ 59.) Defendant told Plaintiff that she had "embarrass[ed] the elected officials of this district" and "ruined the political street operations for Mark Green." (*Id.*)

On July 19, 2002, Plaintiff filed her complaint. On October 25, 2002, Plaintiff filed a Second Amended Complaint alleging that when Defendant terminated her employment he violated her federal and state free speech rights, ERISA, and New York State's equal protection guarantees. Plaintiff also sought reinstatement to her position and to enjoin Defendant from what she alleges is the illegal practice of coercing employees to campaign for candidates that Defendant supports. The complaint contained eight additional claims, which as stated below, have been abandoned. Defendant denies that he terminated Plaintiff because of her political activities and affiliations. (Memorandum of Law in Support of Defendant's Motion to Dismiss [Def.'s Mot.] at 8.) Defendant argues, however, that even assuming that her speech was the basis of her termination, Plaintiff's claims should be dismissed. (*Id.*)

DISCUSSION

I. Motion to Dismiss Standard

A court may dismiss a complaint for failure to state a claim if it appears beyond doubt that the plaintiff can prove no set of facts in support of a claim which would entitle the plaintiff to relief. *See Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). In considering a motion to dismiss, the Court must take as true all the facts stated in the complaint and "draw all reasonable inferences in the plaintiff's favor." *Jackson Nat'l Life Ins. v. Merrill Lynch & Co.,* 32 F.3d 697, 700 (2d Cir.1995). As such, "a complaint should not be dismissed simply because a plaintiff is unlikely to succeed on the merits." *Baker v. Cuomo,* 58 F.3d 814, 818 (2d Cir.1995).

II. Abandoned Claims

In her Second Amended Complaint, Plaintiff brings twelve claims against Defendant relating to her alleged wrongful termination. The Defendant moved to dismiss all twelve claims pursuant to Federal Rules of Civil Procedure 12(b)(2) and (6). Plaintiff opposed the motion with respect to only six claims. Plaintiff failed to oppose dismissal of a federal claim alleging racial discrimination in violation of 42 U.S.C. § 1981 and claims under: (1) N.Y. Executive Law § 296(1)(a); (2) New York City Administrative Code § 8-107(1)(a); (3) New York Labor Law §§ 201-d and 740; and (4) New York Election Law §§ 17-154 and 17-156. Plaintiff also failed to oppose dismissal of her claims which alleged a common-law prima facie tort. [FN3]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
(Cite as: 2004 WL 1234041, *2 (S.D.N.Y.))

Page 3

FN3. Defendant claims that in addition to these enumerated claims, Plaintiff failed to oppose dismissal of her freedom of speech claim under the New York State Constitution. However, when opposing the motion, Plaintiff did, in fact, contest dismissal of this claim. (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss [Pl.'s Opp'n] at 21.) This claim has not been abandoned.

**\*3** Because Plaintiff did not address Defendant's motion to dismiss with regard to these claims, they are deemed abandoned. *See Dineen v. Stramka,* 228 F.Supp.2d 447, 454 (S.D.N.Y.2002) (finding that plaintiff's failure to address claims in opposition papers "enabl[es] the Court to conclude that [plaintiff] has abandoned them"); *Anti-Monopoly, Inc. v. Hasbro, Inc.,* 958 F.Supp. 895, 907 n. 11 (S.D.N.Y.1997) (holding that plaintiff's failure to provide any argument opposing defendant's motion "provides an independent basis for dismissal" and "constitutes abandonment of the issue"); *see also Taylor v. City of New York,* 269 F.Supp.2d 68, 75 (E.D.N.Y.2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").

III. "Immaterial" and "Impertinent" Information in the Complaint

Defendant moves to strike ten paragraphs of the complaint on the ground that they contain immaterial and impertinent allegations against one of the Defendant's colleagues. Rule 12(f) provides that, "Upon motion made by a party before responding to a pleading ... the court may order stricken from any pleading any ... immaterial, impertinent, or scandalous matter." A court has inherent authority to strike matters which it deems improper. *See Sierra v. United States,* No. 97 Civ. 9329, 1998 WL 599715, at \*9 (S.D.N.Y. Sept. 10, 1998). Plaintiff has failed to oppose Defendant's timely Rule 12(f) motion. Therefore, the Court may grant Defendant's motion on default. *See, e.g., Loew v. Kolb,* No. 03 Civ. 5064, 2003 WL 22077454, at \*1 (S.D.N.Y. Sept. 8, 2003) (granting restraining order in light of respondent's failure to oppose motion); *Garcia v. NYPD PCT 41,* 1997 WL 563809, at \*3 (S.D.N.Y. Sept. 10, 1997) ("Plaintiff's failure to file a memorandum of law or any response whatsoever, standing alone, provides

me sufficient basis to grant defendants' motions to dismiss."); *Singh v. New York City Dep't of Corrs.,* 1995 WL 733560, at \*1 (S.D.N.Y. Dec. 12, 1995) (stating that because plaintiff did not respond to defendants' motion nor sought an extension, defendants' motion for summary judgment and/or judgment on the pleadings should be granted on default); *Fed. Trade Comm'n v. Metro. Communications Corp.,* No. 94 Civ. 0142, 1995 WL 540050, at \*1 (S.D.N.Y. Sept. 11, 1995) (granting Rule 12(f) motion on default). However, the allegations in paragraphs 9 and 17 concerning Plaintiff's prior employment with Assemblyman Sheldon Silver and how she came to work for Defendant contain appropriate background evidence that is properly admissible and relevant. Defendant's motion to strike therefore is granted only as to paragraphs 10, 12-16, 35, and 40, which have no possible relation to the claims against Defendant.

IV. Free Speech Claims

Plaintiff argues that Defendant violated her right to free speech guaranteed under the U.S. and the New York State Constitutions when Defendant terminated her because she publicly supported and campaigned for a political candidate whom Defendant did not support. The Court will not separately address Plaintiff's state claim because "[f]ree speech claims under the First Amendment and the New York State Constitution are subject to the same standards and the Court's analysis applies to both [claims]." *Housing Works, Inc. v.. Turner,* 179 F.Supp.2d 177, 199 n. 25 (S.D.N.Y.2001). Plaintiff argues that she is entitled to constitutional protection from dismissal because the First Amendment protects her political speech and affiliations.

**\*4** The issue before the Court, then, is whether the First Amendment prohibits a state politician from firing an employee based on the employee's public support for a political candidate. A similar issue was presented in *Gordon v. Griffith,* 88 F.Supp.2d 38 (E.D.N.Y.2000). In that case, the court held as a matter of first impression that, "legislative aides occupying positions in which their public speech may reasonably be associated with, or mistaken for, that of the legislator's may constitutionally be dismissed for their public speech." *Gordon,* 88 F.Supp.2d at 57-58.

*Gordon* principally relied on the Supreme Court's decisions in *Elrod v. Burns,* 427 U.S. 347 (1976)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



and *Branti v. Finkel*, 445 U.S. 507 (1980), both of which involved patronage dismissals. [FN4] In *Elrod*, the Supreme Court held that patronage dismissals should be limited to "policymaking positions" and that only those positions are exempt from First Amendment protection. *Elrod*, 427 U.S. at 372. Four years later, the Court modified *Elrod* in the *Branti* decision. There the Court held that the proper inquiry to determine whether an employee's speech is protected is not whether the person has the title of "policymaker," but "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 518. To that end, courts should inquire as to whether the "position may be appropriately considered political." *Id.*

> FN4. The term "patronage dismissal" may encompass a broad range of activity, such as dismissing employees on a partisan basis or placing loyal supporters in government jobs that may have been made available by political discharge. *See Elrod*, 426 U.S. at 354 (discussing the practice of patronage dismissal).

The plaintiff in *Gordon*, a "Community Relations Director" for a New York State Assemblyman, was fired for participating in and speaking at a press conference and protest rally against police brutality. These events were held outside a police precinct within the Assemblyman's legislative district. *Gordon*, 88 F.Supp.2d at 40-41. The Assemblyman terminated the plaintiff's employment because of her participation in the protest and for opposing his "friends" at the police precinct. *Id.* Under these facts, *Gordon* held that a state assemblyman could constitutionally terminate an aide in order "to protect his relationship with the local police officers and with his electorate generally." *Id.* at 58. As the court in *Gordon* stated, "The close affiliation of aides and the legislators they serve generates a strong public perception of association between the two" which "leads the public to assume that their views are identical." *Id.* at 50. Based on the fact that constituents could reasonably understand the legislative aide's speech to be an expression of the Assemblyman's position, *Gordon* held that the aide's speech was not protected by the First Amendment. *See id.* at 57-58. Because elected representatives are expected to account for their policy views and legislative actions, "[m]aintaining

a clear voice between legislators and constituents is a significant government interest, warranting restrictions on the speech of political aides where that speech may create misperceptions about the legislator's views." *Id.* at 49.

*5 *Gordon* made clear that its holding did not apply to all legislative aides, but was limited only to those legislative aides who hold a political position and serve the legislator in a capacity in which the aide's voice could be mistaken for the voice of the elected official. *See id.* at 57 ("Staffers holding positions that are so connected to a legislator's lawmaking and representation roles that constituents might reasonably associate their speech for that of the legislator's are not entitled to First Amendment protection from dismissal where political interests and constituent relations are at issue."). Therefore, to determine if an aide's speech is protected by the First Amendment, it is essential for the court to ascertain the precise nature of the aide's position. If, for instance, the aide holds a clerical or non-political position, the aide's speech is protected by the First Amendment. *See id.* at 52 ("To accord non-clerical legislative aides holding politically sensitive positions First Amendment tenure for their public speech is unwarranted.").

In *Gordon*, the plaintiff's job title and responsibilities were undisputed; it was evident from the record that the plaintiff was a "non-clerical" aide who held a political position. The *Gordon* court therefore highlighted the plaintiff's position as the Assemblyman's "Community Relations Director." The court also found that the plaintiff's responsibilities included speaking to community leaders and groups "on behalf" of the Assemblyman. *See id.* at 40. It is for this reason that the *Gordon* court characterized the plaintiff as the Assemblyman's "alter-ego within the district." *Id.* at 58. The court therefore concluded that the plaintiff's speech was not protected because speaking on the Assemblyman's behalf was an essential component of her job, such that her speech could have been understood to reflect the Assemblyman's position. *See id.* at 57.

Here, the record before the Court lacks a detailed or definitive description of Plaintiff's duties while Defendant employed her. [FN5] Unlike *Gordon*, the Court cannot say that Plaintiff functioned as the Assemblyman's "alter-ego" or that she had the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

responsibility of speaking to the public on his behalf. Absent information pertaining to the nature of Plaintiff's position, the Court could only speculate as to the scope of her job responsibilities (that is, whether her position was clerical or non-clerical and political or non-political). Without knowing the precise nature of her employment, the Court cannot make a determination about whether Plaintiff's campaign activities are protected under the First Amendment.

> FN5. While the Court does take judicial notice of the fact that Plaintiff described her position as "community liaison" in a worker's compensation application, see *supra* note 2, this title alone is not sufficient to determine the exact nature of her employment.

Defendant represents that Plaintiff held a political and non-clerical job. To support this characterization, Defendant, citing to paragraph nineteen of the Second Amended Complaint, characterizes Plaintiff's job as communicating with the "Hispanic community on [Defendant's] behalf." (Def.'s Mot. at 9.) However, this characterization misconstrues the complaint. The complaint merely states that Plaintiff was the only Hispanic individual that Defendant employed and makes no mention at all of the fact that Plaintiff spoke to the Hispanic community on Defendant's behalf. While it is clear from the complaint that the Plaintiff was a vocal political activist, it is unclear whether, as part of her job description, the Defendant expected her to speak to the community on his behalf and whether constituents could have reasonably associated her speech with that of Defendant. The precise nature of Plaintiff's employment—a fact dispositive of whether Plaintiff's First Amendment rights were violated—has not yet been definitively developed. [FN6]

> FN6. If Plaintiff was hired as a clerical aide then her political speech and affiliations are protected by the First Amendment. However, if Plaintiff served in a non-clerical function, one in which her designated role was to campaign throughout the community and speak to the community on behalf of Defendant, the First Amendment does not shield her from termination. *See Gordon*, 88 F.Supp.2d at 57.

\*6 Drawing all factual inferences in Plaintiff's favor, Defendant's motion to dismiss the free speech claim is denied.

### V. ERISA Claim

Plaintiff argues that Defendant terminated her employment in violation of ERISA. Unlike Plaintiff's First Amendment claims, this claim must be dismissed.

Title I of ERISA states that it does "not apply to any employee benefit plan if ... such plan is a governmental plan." 29 U.S.C. § 1003(b)(1). ERISA defines "governmental plan" as any "plan established or maintained for its employees ... by the government of any State or political subdivision thereof." *Id.* § 1002(32). ERISA, which Congress enacted "to curb abuses which were rampant in the *private* pension system," does not apply to public sector employee benefit plans. *Roy v. Teacher Ins. & Annuity Ass'n,* 878 F.2d 47, 49 (2d Cir.1989).

As a state government employee, Plaintiff was a member of the New York State and Local Employees' Retirement System, established under Article 2 of the New York Retirement and Social Security Law. This pension plan is a governmental plan exempt from ERISA's purview. *See id.* at 48-49 (holding that an "Optional Retirement Program" for the State University of New York was a governmental plan exempt from ERISA coverage); *Clissuras v. Teachers' Ret. Sys.,* Nos. 02 Civ. 8130, 8138, 2003 WL 1701992, at \*4 (S.D.N.Y. Mar. 28, 2003) (holding that plaintiff's ERISA claims must be dismissed because plaintiff's plan, which provided benefits to public employees of the State University of New York, qualified as a governmental plan); *Trang v. Local 1549,* No. 98 Civ. 5927, 2001 U.S. Dist. LEXIS 12676, at \*18 n. 1 (S.D.N.Y. Aug. 7, 2001) (holding that because "ERISA does not govern government plans such as NYCERS [New York City Employees' Retirement System] ... even a liberal reading of the complaint would not permit the court to entertain plaintiff's 'ERISA claim' ").

For the reasons stated above, the ERISA claim is dismissed.

### VI. New York State Equal Protection Claim

Plaintiff argues that Defendant violated her equal protection rights guaranteed by the New York State Constitution. Unlike the federal enabling statutes, which permit actions for damages following the violation of a constitutional right, "[n]o explicit constitutional or statutory authority sanctions a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

private right of action for violations of the New York State Constitution." *Wahad v. FBI,* 994 F.Supp. 237, 238 (S.D.N.Y.1998) (citing *Brown v. State of New York,* 674 N.E.2d 1129, 1137 (N.Y.1996)). Thus, in order for the Court to "recognize a damage remedy it must be implied from the Constitution itself." *Brown,* 674 N.E.2d at 1137.

In *Brown,* the New York State Court of Appeals considered an appeal of a Court of Claims decision, which held that direct actions for violations of the New York State Constitution are not cognizable in any state court without some link to a common-law tort. *Id.* at 1131. The Court of Appeals modified that decision and recognized a "narrow" private right of action against the State for equal protection and search and seizure violations of the New York State Constitution. *Id.* at 1131, 1138-39, 1141, 1144. Although *Brown* did recognize a narrow private right of action for violations of the state constitution, "it is unavailable where an alternative remedy will adequately protect the interests at stake." *Coakley v. Jaffe,* 49 F.Supp.2d 615, 628-29 (S.D.N.Y.1999) (holding that plaintiff has no right of action under the New York State Constitution because "any violation of plaintiff's right to be free from unreasonable searches or seizures can be vindicated" through plaintiff's viable Fourth Amendment claim); *see also Bath Petroleum Storage, Inc. v. Sovas,* 136 F.Supp.2d 52, 58 (N .D.N.Y.2001) (holding that *Brown* was inapplicable and declining to find a private right of action under the New York State Due Process Clause because "[h]ere, unlike *Brown,* Plaintiffs have stated a viable Section 1983 claim against defendants"); *Flores v.. City of Mount Vernon,* 41 F.Supp.2d 439, 447 (S.D.N.Y.1999) (holding that plaintiff's New York State Constitutional claims should be dismissed "because no private right of action exists for violation of the New York State Constitution where a Plaintiff has alternative damage remedies" under Section 1983); *Wahad,* 994 F.Supp. at 240 (holding that "the existence of alternative damage remedies under Section 1983 obviates the need to imply a private right of action under the State Due Process Clause"); *Martinez v. City of Schenectady,* 761 N.E.2d 560, 563 (N.Y.2001) (declining to extend *Brown* because the "constitutional tort claim here is neither necessary to effectuate the purposes of the State constitutional protections plaintiff invokes, nor appropriate to ensure full realization of her rights"

since the exclusion of evidence and the reversal of the conviction was itself an adequate remedy); *Lyles v. State,* 752 N.Y.S.2d 523, 526-27 (Ct.Cl.2002) (holding that the "narrow" ruling in *Brown* does not give the plaintiff an implied constitutional tort remedy since "the alleged wrongs could have been redressed by timely interposed common law tort claims"); *Remley v. State of New York,* 665 N.Y.S.2d 1005, 1009 (Ct.Cl.1997) (holding that "no useful purpose would be served by implying a remedy under the [state] Constitution" because "the common-law remedy vindicates the right protected by the constitutional provision"). Here, Plaintiff could have alleged discrimination damage claims under the Equal Protection Clause of the Fourteenth Amendment and employment discrimination claims under the New York State Executive Law and the New York City Administrative Code.

*7 Plaintiff nonetheless asks the Court to find a private cause of action against a government official in his individual capacity, an issue that *Brown* never addressed. The *Brown* court did not specifically state whether suits could be maintained against government officials in their individual capacities and no court has so extended *Brown'* s holding. In fact, the Court is not aware of any reported case to extend *Brown* beyond its "narrow" holding that a private right of action could be implied against the State in the Court of Claims for violation of the Equal Protection and Search and Seizure Clauses of the New York State Constitution. *See, e.g., Coakley,* 48 F.Supp.2d at 628- 29; *Flores,* 41 F.Supp.2d at 447; *Martinez,* 761 N.E.2d at 563. Likewise, the Court declines to extend *Brown* to this case. Given that alternative remedies could have adequately protected Plaintiff, the Court does not imply a private remedy under the New York State Equal Protection Clause. Accordingly, Plaintiff's state constitutional equal protection claim is dismissed. [FN7]

FN7. Plaintiff's opposition memorandum attempts to assert a federal equal protection claim by stating that "[t]he Complaint clearly alleges that claims are brought under the Fourteenth Amendment" of the United States Constitution. (Pl.'s Opp'n at 21.) Plaintiff's Second Amended Complaint only mentions the Fourteenth Amendment in the paragraph asserting that the Court possesses jurisdiction over the case. (Compl.¶ 3.) However, Plaintiff fails to assert a Fourteenth Amendment claim in the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2004 WL 1234041, *7 (S.D.N.Y.))

enumerated list of her causes of action. Because Plaintiff failed to include a Fourteenth Amendment claim in the complaint, the Court will not consider it. *See Goel v. United States Dep't of Justice*, No. 03 Civ. 0579, 2003 WL 22047877 at *1 n. 4 (S.D.N.Y. Aug. 29, 2003) (holding that "allegations in a memorandum of law … cannot serve as means to amend [plaintiff's] complaint").

## VII. Eleventh Amendment

The only remaining claims are Plaintiff's requests for reinstatement and other injunctive relief and her free speech claims. The Court now considers, in turn, the extent to which the Eleventh Amendment allows these claims to proceed.

The Eleventh Amendment provides, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Although literally construed the Eleventh Amendment speaks of actions against the state by citizens of another state, it has long been recognized that the Eleventh Amendment also covers suits against states and agents of the state brought by their own citizens. *See Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir.2003); *Dube v. State Univ. of New York*, 900 F.2d 587, 594 (2d Cir.1990).

Defendant argues that Plaintiff may not sustain her request for reinstatement in light of the Eleventh Amendment. However, reinstatement is a form of prospective equitable relief. *See Bankers v. Travelers Cos.*, 180 F.3d 358, 365 (2d Cir.1999); *Padilla v. Metro-North Commuter R.R.*, 92 F.3d 117, 121-22 (2d Cir.1996). Prospective relief is not barred by the Eleventh Amendment. *See Edelman v. Jordan*, 415 U.S. 651, 677 (1974) (holding that retroactive and not prospective injunctive relief is barred under the Eleventh Amendment); *Dwyer v. Regan*, 777 F.2d 825, 836 (2d Cir.1985) ("Reinstatement is purely prospective injunctive relief that orders the state official to return the former employee to the state's payroll…. [A]n order that reinstatement be granted or that a reinstatement hearing be conducted is the sort of prospective relief that is not barred by the Eleventh Amendment."); *see also Russell v. Dunston*, 896 F.2d 664, 668 (2d Cir.1990). Accordingly, the Eleventh Amendment does not bar Plaintiff's reinstatement claim. [FN8] *See, e.g., Komlosi v. New York State Office of*

*Mental Retardation & Developmental Disabilities*, 64 F.3d 810, 814 (2d Cir.1995); *Campbell v. City Univ. Construction Fund*, No. 98 Civ. 5463, 1999 WL 435132, at *2 (S.D.N.Y. June 25, 1999).

> FN8. Plaintiff's claim to restrain Defendant from continuing to require employees to work for his political allies likewise remains viable. Defendant seeks to dismiss this injunctive request on the grounds that it appears unlikely that she will be rehired, and later subjected to harm. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983). Because Plaintiff's reinstatement claim survives this motion, the Court cannot conclude that Plaintiff has failed to demonstrate the possibility of future harm.

**\*8** Plaintiff has sued Defendant for violation of his free speech rights under the U.S. and New York State Constitutions in both his official and individual capacities. Whether the Eleventh Amendment bars these claims depends initially on the capacity in which he is sued. As for the claim premised on a violation of federal law, Defendant has moved to limit Plaintiff's claims for monetary damages against him in his official capacity. "The Eleventh Amendment bars the award of money damages against state officials in their official capacities." *Ford*, 316 F.3d at 354; *see Green v. Mansour*, 474 U.S. 64, 69 (1985). To the extent that Defendant is sued for monetary damages in his official capacity, the relief is barred by the Eleventh Amendment. Because the Eleventh Amendment does not extend to the free speech claims against Defendant in his individual capacity, Plaintiff may ultimately recover against Defendant in his individual capacity. *See Dube*, 900 F.2d at 595.

Likewise, as for the free speech claim premised on state constitutional law, Plaintiff may only recover monetary damages against Defendant in his individual capacity. The Eleventh Amendment deprives the federal courts of jurisdiction over state law claims against state officials in their official capacities. *See Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir.1993); *see also Pennhurst State School & Hosp. v. Halderman*, 464 U.S. 89, 106 (1984). On the other hand, "[t]he jurisdictional limitation recognized in *Pennhurst* does not apply to an individual capacity claim seeking *damages* against a state official, even if the claim is based on state law." *Bad Frog Brewery, Inc. v. New York State Liquor Auth.*, 134 F.3d 87,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
(Cite as: 2004 WL 1234041, *8 (S.D.N.Y.))

102 (2d Cir.1998); *see also Pennhurst,* 465 U.S. at 111 n. 21.

The Eleventh Amendment does not innoculate Defendant from being sued in his individual capacity on either the federal or state claim. *See Dube,* 900 F.2d at 595. The Court therefore must examine the Defendant's claims of qualified immunity.

### VIII. Qualified Immunity

Defendant has asserted the affirmative defense of qualified immunity as a shield from being sued in his individual capacity. Qualified immunity may shield a government official performing, as was Defendant, a discretionary, as opposed to a ministerial, function. *See Harlow v. Fitzgerald,* 457 U.S. 800, 817-18 (1982); *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995). Whether Defendant is entitled to qualified immunity depends on a two-part algorithm. First, the Court must take the facts in the light most favorable to the plaintiff and determine whether the plaintiff has alleged a constitutional violation under current law. *See Saucier v. Katz,* 533 U.S. 194, 202 (2001). Second, the Court must then ask whether the defendant's conduct was objectively reasonable with reference to clearly established law at the time of the conduct in question. *See id.* at 232-33. The Supreme Court has made it clear that the threshold inquiry under a qualified immunity defense is the existence or nonexistence of a constitutional right. "The law might be deprived of this explanation were a court simply to skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case." *Id.* at 201. Therefore, the qualified immunity inquiry must proceed in proper sequence and first resolve whether the complaining conduct violated a constitutional right.

*\*9 As presently developed, the record fails to answer this question. The evidence before the Court does not precisely define the nature of Plaintiff's employment, thus precluding the Court from determining whether Plaintiff's campaign activities were protected under the First Amendment. *See supra* Part IV. If Plaintiff served as a clerical aide, then her political speech and affiliations are protected by the First Amendment. *See Gordon,* 88 F.Supp.2d at 57. On the other hand, if she served in a non-clerical role in which she campaigned throughout the community, she would be afforded

no First Amendment protection from termination. *Id.* Concededly, the qualified immunity defense overlaps with Defendant's claims on the merits. *See, e.g., Dube,* 900 F.2d at 601 (Mahoney, generally concurring). Nonetheless, at this juncture the Court must determine that Defendant cannot successfully erect a qualified immunity defense.

### CONCLUSION

For the foregoing reasons, all claims are dismissed except for Plaintiff's free speech claims against Defendant in his individual capacity and Plaintiff's requests for injunctive relief. Additionally, Defendant's motion to strike paragraphs 10, 12-16, 35, and 40 from the complaint is granted. The parties are directed to appear before the Court for a conference on June 18, 2004 at 9:30 a.m. to address the status of the case.

So Ordered:

Motions, Pleadings and Filings (Back to top)

. 1:02cv05624 (Docket)
(Jul. 19, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



5

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 711658 (E.D.N.Y.), 2005-1 Trade Cases P 74,751
(Cite as: 2005 WL 711658 (E.D.N.Y.))

c

Motions, Pleadings and Filings

United States District Court,
E.D. New York.
PAYCOM BILLING SERVICES, INC., Plaintiff,
v.
MASTERCARD INTERNATIONAL, INC.,
Defendant.
No. CIVA03CV6150DGT RLM.

March 29, 2005.

Jeffrey I. Shinder, Jeffrey Issac Shinder, Constantine Cannon, P.C., New York, NY, for Plaintiff.

Bruce A. Colbath, Jay N. Fastow, Weil Gotshal & Manges LLP, New York, NY, for Defendant.

*MEMORANDUM AND ORDER*

TRAGER, J.

*1 Paycom Billing Services, Inc. ("Paycom" or "plaintiff"), a processing service for internet credit card transactions, filed the present lawsuit against MasterCard International, Inc. ("MasterCard" or "defendant"), a national bank card association, alleging that MasterCard conspired with its member banks to restrain trade in violation of sections one and two of the Sherman Antitrust Act ("Sherman Act"), 15 U.S.C.A. §§ 1, 2. MasterCard now moves to dismiss the complaint pursuant to Rule 12(b)(6), Fed.R.Civ.P., for failure to state a claim. For the following reasons, MasterCard's motion to dismiss is granted. [FN1]

> FN1. MasterCard moves, in the alternative, to compel the joinder of Paycom's acquiring bank as a necessary party pursuant to Fed.R.Civ.P. 12(b)(7). Although the motion is of questionable merit, it need not be considered as it is rendered moot by the dismissal of the complaint.

Background

Plaintiff is a Delaware corporation with its principal place of business in Marina del Rey, California. *See* Complaint and Jury Demand ("Compl.") ¶ 37. Plaintiff contracts with internet businesses to make sales on their behalf and accepts MasterCard, Visa and other forms of electronic payment for those sales. *Id.* ¶ 40. Most of plaintiff's clients provide online digital "adult" content. *Id.* ¶ 42.

Defendant is a Delaware corporation with its principal place of business in Purchase, New York. *Id.* ¶ 38. Defendant is a national bank card association structured as an open joint venture with 25,000 member banks. *Id.* A member bank may issue MasterCard-branded payment cards ("issuing bank"). A member bank may also process transactions received from merchants that accept MasterCard-branded payment cards, a procedure known in the industry as "acquiring" ("acquiring bank"). *Id.* ¶ 48-53.

There are a number of different types of cards that may bear MasterCard's brand: credit cards, T & E cards and debit cards. [FN2] *See id.* ¶¶ 48- 53. "Credit cards permit consumers to borrow money from the issuing bank and repay and revolve the loan over time." *Id.* ¶ 48. "T & E cards permit a consumer to borrow the money for a retail purchase from issuing banks and to repay the loan without incurring interest charges during a grace period." *Id.* ¶ 49. "Debit cards permit consumers to pay for purchases with funds from their asset accounts." *Id.* ¶ 51.

> FN2. Because the processing of transactions using any of these three types of cards is identical, distinguishing between them is unnecessary for purposes of this opinion. Therefore, credit, T & E and debit cards will all be referred to as "payment cards."

A traditional MasterCard payment card transaction involves four parties: a cardholder, a merchant, an acquiring bank and an issuing bank. *Id.* ¶ 21. A cardholder makes a purchase by physically presenting his/her payment card to a merchant and signing a receipt. *Id.* At the end of the day, the merchant sends all of its payment card transactions to its acquiring bank. *Id.* ¶ 24. The acquiring bank credits the merchant's account the amount of the transactions, less certain fees that generally constitute up to two to four percent of the total transaction amount. *Id.* ¶ 21. The acquiring bank sorts the transactions and presents them to the various issuing banks. *Id.* ¶¶ 21, 24. Each issuing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    **Page 2**
**(Cite as: 2005 WL 711658, *1 (E.D.N.Y.))**

bank examines the cardholders' accounts and, if it approves the transactions, credits the acquiring bank's account the amount of the transactions, discounted by fees that constitute one to two percent of the purchase prices. *Id.*

*2 Transactions involving plaintiff work slightly differently. Because plaintiff's clients lack the technical expertise and resources to process credit card transactions, they contract with plaintiff, who accepts sales on the client's behalf and processes payment card transactions. *Id.* ¶ 41. Instead of the traditional four parties involved, therefore, there are five: the cardholder, merchant/plaintiff's client, plaintiff, acquiring bank and issuing bank. First, a cardholder visits one of plaintiff's client's websites and, upon deciding that it would like to purchase access to that website, is re-directed to plaintiff's website, where the cardholder provides payment card information and receives a user name and password to access plaintiff's client's website. *Id.* ¶¶ 40, 42. Plaintiff then credits the merchant's account, less plaintiff's contracted-for-fees. *Id.* ¶ 40. Plaintiff then sends the information to its acquiring bank, which credits plaintiff's accounts, less the acquiring bank's fees. *Id.* The acquiring bank then sends the information to the issuing bank, which examines the transaction and, if approved, credits the acquiring bank's account, less its fees. *Id.*

From time to time, cardholders claim that purchases made on their MasterCard accounts are fraudulent. When this happens, the issuing bank will refund a cardholder's money and then issue a "chargeback" to the acquiring banks for the given transaction, a process whereby the issuing bank debits the amount of the transaction, less fees, from the acquiring bank's account. *Id.* ¶ 77. The acquiring bank will then debit the same amount, less fees, from the merchant's account. *Id.* Under MasterCard's policies, if, and only if, the merchant produces a signed sales receipt, the acquiring bank will re-present the transaction to the issuing bank, which will ordinarily approve the transaction. *Id.* The merchant's account will then be credited the amount of the original transaction. *Id.* If no signed receipt is available, as is the case with all internet transactions, the merchant must bear the entire cost of the alleged fraud under MasterCard's policies. *Id.* ¶ 80.

Plaintiff claims that this refund policy, called the

"chargeback system," violate sections one, two or both of the Sherman Act. Plaintiff challenges three additional MasterCard policies on the same grounds. These policies, discussed *infra* are: (1) MasterCard's Competitive Programs Policy, (2) MasterCard's Cross-Border Acquiring Rules and (3) MasterCard's Internet Merchant Qualification Mandates. These policies and their effects on the relevant markets are discussed in turn below.

Discussion
(1)
Relevant markets

Plaintiff claims that there are six relevant markets in this case and that the geographic dimension of all the markets is the United States. The broadest market is the " 'general purpose card network services" ' market. Compl. ¶ 50 (quoting *U.S. v. Visa/MasterCard,* 163 F.Supp.2d 322, 338 (S.D.N.Y.2001)). The next three markets are the "general purpose credit card services to merchants," the "general purpose credit and T & E card services to merchants" and the "general purpose debit card services to merchants". *Id.* ¶¶ 48-51. For these purposes, defendant does not challenge plaintiff's market definitions, and precedent supports their adequacy at this stage of the proceedings. *See generally, U.S. v. Visa U.S.A., Inc.,* 344 F.3d 229, 238- 240 (2d Cir.2003); *In re Visa Check/ Mastermoney Antitrust Litig.,* No. 96-CV-5238 (JG), 2003 WL 1712568 at *3 (E.D.N.Y.2003).

*3 In addition, plaintiff claims two distinct "payment card processing services" markets. Compl. ¶¶ 52, 53. The first is broader and includes the processing of all payment card transactions, regardless of whether performed over the internet or through a "brick and mortar" [FN3] merchant. The second is a submarket of the first and includes only those transactions made over the internet. Defendant also does not challenge the definition of these two markets for purposes of this motion.

> FN3. A "brick and mortar" merchant sells goods and/or services in person, not over the internet. Compl. ¶ 25.

(2)
MasterCard's Chargeback System

Plaintiff alleges that MasterCard's "chargeback system" is a violation of section one of the Sherman Act. Under defendant's "chargeback system,"

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2005 WL 711658, *3 (E.D.N.Y.))

Page 3

internet merchants cannot dispute a claim of fraud and may be fined by MasterCard if MasterCard determines that there have been an excessive number of claims of fraudulent transactions on the merchant's website. *See* Compl. ¶¶ 79, 84. As stated above, when a claim of fraud is made, a merchant will be charged the transaction price unless it can present a signed receipt. Internet merchants cannot provide signed receipts and thus always bear the costs of actual fraud and claimed fraud under defendant's system. *Id.* ¶ 79. Although other payment card brands allow an internet merchant to disprove fraud through other means, [FN4] defendant has chosen not to do so. *Id.* ¶¶ 73, 106. Hence, plaintiff has borne the significant cost of creating its own anti-fraud measures. *Id.* ¶¶ 113-119.

> FN4. Visa instituted a policy, "Verified by Visa," whereby cardholders choose personal identification numbers that the cardholder gives to an internet merchant when he makes an online purchase. Compl. ¶ 106. Plaintiff does not detail Discover's anti-fraud measures, but claims that its chargeback system is less onerous overall than MasterCard's. *Id.* ¶ 74.

Plaintiff claims that defendant's "chargeback system" is a violation of antitrust laws because it constitutes an agreement among defendant's member banks not to compete regarding risk allocation for internet transactions. In addition, plaintiff alleges that the fines and penalties imposed by defendant's "chargeback" policy constitute price-fixing by defendant's member banks.

In response, MasterCard argues that plaintiff does not have standing to assert that the "chargeback system" violates the Sherman Act because it has not suffered an "antitrust injury." In order to properly plead an "antitrust injury," a "plaintiff must allege threatened loss or damage 'of the type the antitrust laws were designed to prevent and that flows from that which makes the defendants' acts unlawful." ' *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 113, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)). Therefore, in order to determine whether a plaintiff's claimed injury flows from an unlawful act, it must first be determined whether the act was an antitrust violation.

Because MasterCard is organized as a joint venture, its policies must be analyzed under the rule of reason. *See Copperweld Corp. v. Indep. Tube Co.,* 467 U.S. 752, 768, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) ("[C]ombinations, such as ... joint ventures ... are judged under a rule of reason.") Under the rule of reason, an agreement, such as the one alleged here, is only an antitrust violation if it "will have an actual adverse effect on competition in the relevant market." *Elec. Communications Corp. v. Toshiba Am. Consumer Prods.,* 129 F.3d 240, 244 (2d Cir.1997).

**\*4** Where a dispute involves a single product by a manufacturer or service provider, courts have generally found that where inter-brand competition exists, an agreement to limit *intra*-brand competition does not harm competition. *See e.g., Elec. Communications Corp.,* 129 F.3d at 244; *K.M.B. Warehouse Distrib., Inc. v. Walker Mfg. Co.,* 61 F.3d 123, 127 (2d Cir.1995); *Oreck Corp. v. Whirlpool Corp.,* 579 F.2d, 126, 131 (2d Cir.1978) . Although these cases generally involve agreements between manufacturers and distributors to limit competition by eliminating one brand of the same manufacturer's product, the circumstances here are analogous. MasterCard's policies only restrict competition within its own brand. Moreover, this restriction may inhibit MasterCard's ability to compete in the market for internet merchant services. Since there are other payment card brands readily available in the market that provide more favorable terms to plaintiff, such as Visa and Discover, internet merchants like plaintiff may choose to cease accepting MasterCard-branded payment cards or, at the very least, inform their customers that they prefer other brands because the "chargeback system" is burdensome.

Plaintiff thus has not shown how MasterCard's policies harm competition in any of the relevant markets. Instead, plaintiff has merely shown that MasterCard's "chargeback system" harms plaintiff because it increases its costs. Accordingly, plaintiff has failed to indicate how the "chargeback system" is an unlawful agreement in violation of section one of the Sherman Act. Plaintiff therefore does not have standing because it cannot show that it suffered an "antitrust injury" since its injury did not flow from any antitrust violation. [FN5]

> FN5. Although the plaintiff in its complaint and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2005 WL 711658, *4 (E.D.N.Y.))

**Page 4**

during oral argument cited the Second Circuit's decision in *U.S. v. Visa U.S.A.*, that case is of limited relevance here as plaintiff has not pled that Visa in any way conspired with MasterCard in instituting the contested policies. In particular, plaintiff's claim that the MasterCard banks are engaged in a conspiracy not to compete regarding risk allocation or price-fixing for internet transactions appears on its face to lack merit. These same banks are handling Visa payment card transactions with less stringent chargeback policies. This would appear to undermine this alleged "conspiracy."

### (3)
### Competitive Programs Policy

Plaintiff claims that defendant's "Competitive Programs Policy" ("CPP") violates sections one and two of the Sherman Act. The CPP prohibits MasterCard member banks from issuing any competing cards except Visa. Compl. ¶ 69. Visa has a reciprocal policy. *Id.* In an action brought by the United States Department of Justice, these policies were determined to violate section one of the Sherman Act. *Visa U.S.A.*, 344 F.3d at 243.

In *Visa U.S.A.*, the Second Circuit found that the CPP's exclusion of American Express and Discover from a segment of the market constituted an antitrust violation. *Id.* at 241. Specifically, the CPP prevented American Express and Discover from contracting with banks to issue American Express-branded and Discover-branded credit, debit and charge cards, resulting in fewer American Express and Discover cards available to the public and fewer transactions involving these cards. *Id.*

Plaintiff claims that the CPP harmed it because Discover could not gain sufficient power in the general purpose or credit and T & E markets to challenge MasterCard and its onerous "chargeback system." A plain reading of its pleading, however, shows that Paycom's claimed injuries are merely derivative of the injury to Discover. "The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party" to enforce a claim. *Assoc. Gen. Contractors of C.A. Inc. v. C.A. State Council of Carpenters,* 459 U.S. 519, 542, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). In fact, plaintiffs more suitable than Paycom have already brought a successful challenge to the CPP in

this circuit. *See Visa U.S.A.*, 344 F.3d 229. Plaintiff is a remote party and allowing it to recover under this theory could result in punishing MasterCard multiple times for the same offense. Thus, plaintiff does not have standing on this theory.

**\*5** Further, the amount of plaintiff's damages is highly speculative. *Assoc. Gen. Contractors*, 459 U.S. at 542 (finding no standing where damages were highly speculative because plaintiff was indirectly effected by alleged antitrust violation). Plaintiff claims that the CPP has allowed MasterCard to maintain its allegedly onerous and anti-competitive "chargeback system." However, in order to determine plaintiff's damages, a court would first have to determine how many additional Discover transactions would have occurred if the CPP did not exist. This would amount to pure speculation. Next, albeit probably less speculative, a court would have to determine how many of those additional transactions would be the subject of fraud claims. In any case, any damages would be indirect and any endeavor in making the initial calculation would be entirely fanciful.

Plaintiff also asserts, with reference to its section two attempt-to-monopolize claim, that it has suffered damages because the CPP has prevented it and other companies from entering into the general purpose payment card market. However, "[w]here ... the claim asserted is that the defendant unlawfully prevented the plaintiff from engaging in a business, particularized allegations of preparedness are essential." *D.L. Auld Co. v. Park Electrochemical Corp.,* 651 F.Supp. 528, 587 (E.D.N.Y.1986) (quoting *Indium Corp. of A. v. Semi-Alloys, Inc.,* 591 F.Supp. 608, 613 (N.D.N.Y.1984)). Plaintiff makes no such allegations in its complaint. It makes no claim that it sought to or was ever prepared to enter the general purpose payment card market.

For the reasons stated above, plaintiff lacks standing to challenge the CPP under the Sherman Act.

### (4)
### MasterCard's cross-border acquiring rules

Plaintiff argues that MasterCard's cross-border acquiring rules violate section one of the Sherman Act. Under defendant's cross-border acquiring rules,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                    **Page 5**
(Cite as: 2005 WL 711658, *5 (E.D.N.Y.))

non-United States member banks may not act as acquiring banks for MasterCard transactions. Compl. ¶ 124. Plaintiff claims that this policy limits competition among acquiring banks and therefore is an antitrust violation.

Like MasterCard's "chargeback system," the cross-border acquiring rules are subject to rule of reason analysis. Similar to the "chargeback system," the cross-border acquiring rules simply reduce competition within the MasterCard brand. What Visa, American Express and Discover do is not disclosed and no claim of conspiracy among these corporations is alleged. Therefore this policy also does not harm competition.

Moreover, were this action brought by foreign banks, the antitrust injury of this rule would appear clear, whereas, here, limiting the number of acquiring banks competing for American internet merchants' business may actually benefit, rather than harm, plaintiff's business. Since plaintiff's clients can contract either with plaintiff or directly with an acquiring bank for payment processing services, the fewer acquiring banks, the less competition for plaintiff's clients. In light of the benefit conferred on plaintiff by the cross-border acquiring rules, plaintiff cannot assert an antitrust injury. *Matsuhita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 583, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (finding as a matter of law that plaintiffs could not recover damages where plaintiffs stood to gain from defendants' alleged antitrust conspiracy).

*6 Consequently, plaintiff has neither pled that the cross-border acquiring rules violate section one of the Sherman Act, nor demonstrated standing to assert an antitrust claim because, with regard to MasterCard's cross-border acquiring rules, it has not suffered an antitrust injury.

(5)

MasterCard's Internet Merchant Qualification Mandates

Plaintiff claims that MasterCard's Internet Merchant Qualification Mandates ("IMQMs") also violate sections one and two of the Sherman Act. Under IMQMs, plaintiff would have to alter its business model in order to continue accepting MasterCard transactions. Businesses like plaintiff's are relatively new, and payment card corporations,

like Visa, Discover and MasterCard, at first had difficulty categorizing transactions with them. Compl. ¶ 127. Initially, MasterCard treated plaintiff like it did any other internet merchant in its system, such as amazon.com or bloomingdales.com. *Id.* ¶ 129. Plaintiff's acquiring bank processed plaintiff's transactions in the same manner as other internet merchants, and MasterCard did not impose any additional rules on plaintiff regarding fraud protection measures or the way in which plaintiff dealt with its clients or consumers. *Id.*

In 2002, MasterCard re-interpreted its policies and ceased to classify plaintiff as a regular merchant and instead chose to treat plaintiff as an "aggregator," an existing classification in MasterCard's system. [FN6] *Id.* MasterCard defines an aggregator as a business that collects other merchants' transactions and deposits them into a single account. *Id.* Plaintiff does not offer any explanation in its complaint why the aggregator classification confers any economic benefit on MasterCard. Since MasterCard policies prohibit transactions with aggregators, plaintiff was threatened with the possibility of either changing its business model to avoid the aggregator classification or ceasing to accept MasterCard-branded payment cards. *Id.* Plaintiff claims that MasterCard's sole reason for changing the classification was to force plaintiff "to deliver its merchant customers to a MasterCard acquiring bank." *Id.*

> FN6. MasterCard's memorandum of law does not offer an explanation as to why it chose to reclassify the plaintiff as an aggregator. However, it may be to protect MasterCard cardholders from fraudulent charges as transactions originating from adult content websites which, like plaintiff's client's, have a high rate of fraud. *See* Memorandum of Law in Support of Defendant MasterCard International Incorporated's Motion to Dismiss the Complaint Under Fed.R.Civ.P. 12(b)(6) at 2 (citing *Taxpayer Beware: Schemes, Scams and Cons: Hearing before the Committee on Finance, United States Senate,* 107th Cong. 31-33, app. at 109, 112 (2001)).

Plaintiff alleges that MasterCard has chosen an unnecessary and anti-competitive way of dealing with plaintiff and other internet payment processing service corporations. The aggregator classification has left plaintiff with two options if it wishes to continue to accept MasterCard payments, either of which would substantially change its business

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

model. *Id.* ¶ 129-130. Under the first option, plaintiff may become a "Merchant Service Provider," whereby it ceases to accept transactions and instead introduces merchants to acquiring banks. *Id.* ¶ 129. The alternative is that plaintiff must comply with the following MasterCard policies: (1) prohibit its customers from displaying prices on their websites [FN7] and (2) allow consumers to use a "shopping cart," whereby they may purchase goods and services from multiple Paycom clients in a single transaction. *Id.* ¶ 131.

> FN7. This policy is the exact opposite of Visa's policy for merchants like Paycom. Visa prohibits Paycom from displaying prices on its website and requires that Paycom's customers display prices on their websites. Comp. ¶ 131.

**\*7** Plaintiff alleges that the IMQMs are merely a disguised attempt to force plaintiff, and merchants like it, out of business. However, plaintiff has not properly plead that it has suffered an "antitrust injury." *Cargill,* 479 U.S. at 113 ("[P]laintiff must allege threatened loss or damage 'of the type the antitrust laws were designed to prevent and the flows from that which makes the defendants' acts unlawful.") (quoting *Brunswick,* 429 U.S. at 489). The antitrust laws were enacted for the "protection of competition, not competitors." *George Haug Co. v. Rolls Royce Motor Cars, In.,* 148 F.3d 136, 139 (2d Cir.1998) (quoting *Brunswick,* 429 U.S. at 488 ). "Injury to an individual competitor, even if that competitor is effectively excluded from the market as the result of a contract, combination, or conspiracy, is not sufficient injury to state a claim under the Sherman Act." *See Beyer Farms, Inc. v. Elmhurst Dairy, Inc.,* 142 F.Supp.2d 296, 304 (E.D.N.Y.2001) (citing *Eastway Const. Corp. v. N.Y.,* 762 F.2d 243, 250 (2d Cir.1985)).

Assuming, *arguendo,* that plaintiff is a competitor of MasterCard acquiring banks, plaintiff has not plead any harm to the broader payment processing services market. Plaintiff has only pled that its business is harmed by the IMQMs. Plaintiff concedes that if it no longer accepted MasterCard transactions, its customers could simply switch to one of plaintiff's competitor websites that do accept MasterCard. Compl. ¶ 60. Second, plaintiff, and other merchants like it, can still accept other payment cards and, therefore, compete for payment processing services, although in a more limited

manner. Thus, plaintiff has not pled any harm to competition but has instead merely pled harm to its business; this is insufficient to confer antitrust standing. *Brunswick,* 429 U.S. at 488 (holding that plaintiff did not have antitrust standing because defendant's actions merely harmed plaintiff's business and not competition in the relevant market).

Conclusion

For the foregoing reasons, defendant's motion is granted and plaintiff's complaint is dismissed in its entirety. The Clerk of the Court is directed to close this case.

Not Reported in F.Supp.2d, 2005 WL 711658 (E.D.N.Y.), 2005-1 Trade Cases P 74,751

Motions, Pleadings and Filings (Back to top)

. 2004 WL 2648077 (Trial Motion, Memorandum and Affidavit) Paycom's Memorandum of Law in Opposition to Mastercard's Motion to Dismiss the Complaint (May. 26, 2004)

. 2004 WL 3257540 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendant Mastercard International Incorporated's Motion to Dismiss the Complaint Under Fed. R. Civ. P. 12(b)(6) (Apr. 28, 2004)

. 2003 WL 23884731 (Trial Pleading) Complaint and Jury Demand (Dec. 05, 2003)

. 1:03cv06150 (Docket)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

