UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
WORLD WRESTLING ENTERTAINMENT, INC.

                    Plaintiff,                    04 CV 8223 (KMK)
          v.                                      (ECF CASE)

JAKKS PACIFIC, INC.; JAKKS PACIFIC (H.K.)
LIMITED; ROAD CHAMPS LIMITED; THQ,
INC.; THQ/JAKKS PACIFIC LLC; STANLEY
SHENKER AND ASSOCIATES, INC.; STANLEY
SHENKER; BELL LICENSING, LLC; JAMES
BELL; JACK FRIEDMAN; STEPHEN BERMAN;
JOEL BENNETT; and BRIAN FARRELL,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**COMPENDIUM OF UNREPORTED DECISIONS CITED IN THE MEMORANDA OF
LAW IN SUPPORT OF THE JAKKS DEFENDANTS' MOTION TO DISMISS THE
SHERMAN ACT CLAIM IN THE AMENDED COMPLAINT**

**VOLUME 3 of 4**


FEDER, KASZOVITZ, ISAACSON,
  WEBER, SKALA, BASS & RHINE LLP
Murray L. Skala (MS 9354)
Jonathan D. Honig (JH 7577)
750 Lexington Avenue
New York, New York 10022
Phone: (212) 888-8200
Fax: (212) 888-5968

SKADDEN, ARPS, SLATE
  MEAGHER & FLOM LLP
Jonathan J. Lerner (JL 7117)
Michael H. Gruenglas (MG 8705)
James Keyte (JK 0680)
Maura B. Grinalds (MG 2836)
Four Times Square
New York, New York 10036
Phone: (212) 735-3000
Fax: (212) 735-2000


Attorneys for the JAKKS Defendants


October 18, 2005

# INDEX

**CASES**                                                                                              **TAB**

County of Stanislaus v. Pacific Gas & Electric Co., No. 93 CV-F-93-5866, 1995 WL
   819150 (E.D. Cal. Dec. 18, 1995), aff'd, 114 F.3d 858 (9th Cir. 1997) ....................................1

James Cape & Sons Co. v. PCC Const. Co., No. 05-C-269, 2005 WL 2176965 (E.D.
   Wis. Sept. 6, 2005) ...................................................................................................................2

Kasada, Inc. v. Access Capital, Inc., No. 01 Civ. 8893, 2004 WL 2903776 (S.D.N.Y.
   Dec. 14, 2004)...........................................................................................................................3

Martinez v. Sanders, No. 02 Civ. 5624, 2004 WL 1234041 (S.D.N.Y. June 3, 2004) .................4

Paycom Billing Services, Inc. v. Mastercard International, Inc., No. Civ. A 03-CV-6150
   (DGT), 2005 WL 711658 (E.D.N.Y. Mar. 29, 2005)................................................................5

Philip Morris Inc. v. Heinrich, No. 95 Civ. 0328, 1996 WL 363156 (S.D.N.Y. June 25,
   1996)..........................................................................................................................................6

Twombly v. Bell Atlantic Corp., --- F.3d ----, 2005 WL 2420523 (2d Cir. Oct. 3, 2005)............7

United States v. Dynalectric Co., 861 F.2d 722, text available at 1988 WL117173 (6th
   Cir. Nov. 4,1988).......................................................................................................................8

Vitale v. Marlborough Gallery, No. 93 Civ. (PKL) 6276, 1994 WL 654494 (S.D.N.Y.
   July 5, 1994) ..............................................................................................................................9

Williams Electronic Games, Inc. v. Barry, No. 97 C 3743, 2001 WL 1104619 (N.D. Ill.
   Sept. 18, 2001), aff'd sub nom, Williams Electronic Games, Inc. v. Garrity, 366 F.3d
   569 (7th Cir. 2004) ................................................................................................................10

6

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)
(Cite as: 1996 WL 363156 (S.D.N.Y.))

**Page   1**

▷

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
PHILIP MORRIS INCORPORATED, Plaintiff,
v.
Michael HEINRICH, Masta Displays Co., AM-PM
Sales Co., Inc., Richard Billies,
Sidney Rothenberg, John Billies, Sonia Graphics,
Jose Rivera, Jomar Displays,
Inc., Martin Neier, Joel Spector, Visart Mounting
and Finishing Corp., Dani
Siegel, C.D. Baird & Co., Inc., Paul Bielik,
Richard T. Billies, Jr.,
Manufacturers Corrugated Box Co., Inc., Irving
Etra, Southern Container Corp.,
Steven Grossman, Donald Kasun, Barry Besen,
Winko New Jersey, Inc. (formerly
known as Republic Container Corp., a New York
corporation), Republic Container
Corp., a New Jersey corporation, Stanley Winikoff,
Amy Winikoff, and X-L
Services, Inc., Defendants.
No. 95 CIV. 0328 (LMM).

June 28, 1996.

*MEMORANDUM AND ORDER*

McKENNA, District Judge.

**\*1** This case involves allegations by the Plaintiff, Philip Morris ("Philip Morris"), of a broad bid-rigging conspiracy on the part of the Defendants to allocate contracts for the production and supply of temporary cardboard "point-of-purchase" graphic displays, used for advertising Philip Morris products at retail locations. Philip Morris primarily charges antitrust violations, invoking the Sherman Act and New York State's Donnelly Act. It also brings claims for common law fraud, breach of fiduciary duty, participation in breaches of fiduciary duty, commercial bribery and commercial bribe receiving.

Most of the Defendants, mainly graphic display vendors, have moved to dismiss the Amended Complaint, filing ten separate notices of motion, with independent supporting and reply briefs. They variously argue that the case should be dismissed pursuant to Fed.R.Civ.P. 9(b), 12(b)(1) and 12(b)(6). The Court has examined the motions collectively, to the extent that the arguments apply equally to all Defendants, and individually, to the extent that Defendants raise arguments particular to their own circumstances. For the reasons stated below, the motions to dismiss are denied as to: Counts I, II, III, and IV to the extent that they accrued after March 4, 1989; and Count VIII. The motions to dismiss are granted as to Counts I, II, III and IV to the extent that they accrued prior to March 4, 1989, without prejudice to Plaintiff's right to replead fraudulent concealment within 60 days; Counts V, VI and VII, without prejudice to Plaintiff's right to replead with particularity, within 60 days; and Counts IX-XIII.

The United States of America ("the Government") moves separately to intervene in this action and to stay the depositions of John E. Clemence ("Clemence") and all other witnesses, as well as the answering of all interrogatories, until the disposition of what it characterizes as a closely-related criminal investigation it is currently conducting in this judicial district. For the reasons stated below, the Court grants the motion to intervene and grants the stay until December 31, 1996. The Government is also granted leave to request an extension of this stay prior to its expiration date, should one become necessary.

Finally, the Court denies the request of Defendants Visart Mounting and Finishing Corp. ("Visart"), Dani Siegel ("Siegel") and Genetra Affiliates, Inc. ("Genetra") for access to the *ex parte* supplemental affidavit submitted by Rebecca Meiklejohn in support of the Government's opposition to their cross-motion for a show cause hearing. They had cross-moved for the show cause hearing to determine whether the Antitrust Division had breached grand jury secrecy with regard to its investigation. The Court has not considered these materials in connection with the present motions. The cross-movants are directed to submit their reply brief concerning the cross-motion within 10 days of this decision, without the benefit of access to the unreviewed *ex parte* materials.

I. Facts
**\*2** Philip Morris is a Virginia corporation engaged

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                              **Page  2**
(Cite as: 1996 WL 363156, *2 (S.D.N.Y.))

in the sale of tobacco products. Its Purchasing Department is responsible for buying retail promotional materials, including point-of-purchase cardboard graphic displays and packaging for consumer incentives. (Amend.Compl. at ¶ 5.) The company employed Defendant Michael Heinrich as Director of the Purchasing Department from 1988 through September of 1991. (Amend.Compl. at ¶ 6.) The remainder of the Defendants are manufacturing and service companies, their owners and their affiliates, who sought and received contracts to furnish Philip Morris with graphic display materials and services. In its Amended Complaint, Philip Morris groups these so-called Vendor Defendants into two categories: 1) the Mounting and Finishing Vendor Defendants; and 2) the Corrugated Vendor Defendants. The first group produced graphic displays on lightweight cardboard which they generally purchased from other vendors, while the second group produced displays on a heavier cardboard which they manufactured themselves. (Amend.Compl. at ¶¶ 7-9).

The essence of Philip Morris' Amended Complaint is that these Vendor Defendants, together with Heinrich and other Philip Morris employees, conspired to manipulate Philip Morris' bidding procedures for awarding contracts in order to ensure that the Vendor Defendants would obtain them. Philip Morris' formalized bidding process for purchasing graphic displays required that for purchases of printed materials between $10,000 and $25,000, the Purchasing Department secure one written bid and at least one alternative verbal price quotation. Purchases between $10,000 (*sic* ) and $100,000 required competitive bids from at least three qualified suppliers, with approval of the Director of Purchasing and the Vice President of Marketing Services needed before the job could be awarded to other than the lowest bidder. Purchases exceeding $100,000 required sealed bids from a minimum of three qualified suppliers, with the bids opened and the contract awarded to the lowest bidder at a bid review meeting. Louis T. Cappelli ("Cappelli"), the Graphics Purchasing Manager during all relevant periods, was responsible for soliciting and processing bids. As of 1988, he reported directly to Heinrich. (Amend.Compl. at ¶¶ 42- 44.)

A. The Alleged Mounting and Finishing Vendors' Scheme

Philip Morris alleges that beginning no later than 1982, Cappelli ceded his responsibility for the bidding process to Ed Reitman, a sales representative of Defendant Masta Displays Co. ("Masta") who is now deceased, in return for bribes and kickbacks. Reitman, with the cooperation of Defendants AM-PM Sales Co. ("AM-PM"), Richard Billies ("Billies"), Sidney Rothenberg ("Rothenberg") and John Billies, all of whom are affiliates, officers or employees of Masta (collectively, "the Masta Group"), agreed with Cappelli that the Masta Group would supply the two or three requisite bidders for Philip Morris mounting and finishing work, but that Masta would always win the bid and subcontract the work to other vendors, including already existing Philip Morris vendors. (Amend.Compl. at ¶ 51.)

### 1. Mechanics

*3 According to Philip Morris, the alleged scheme worked as follows. Defendant Jomar Displays, Inc. ("Jomar"), with the approval, knowledge and participation of its officers, Defendants Martin Neier ("Neier") and Joel Spector ("Spector"), and Defendant C.D. Baird & Co., Inc. ("C.D. Baird"), with the approval, knowledge and participation of its officers, Defendants Paul Bielik ("Bielik") and Richard T. Billies, Jr., provided the Masta Group with blank company stationery and envelopes so that the Masta Group could draw up "dummy bids." Prior to submitting any bids to Philip Morris, the Masta Group would ask Jomar and C.D. Baird for legitimate price quotes on the contract. It then inflated those quotes substantially on the dummy bids it submitted to Philip Morris on those companies' letterheads, submitting a lower bid for the same contract on behalf of Masta. When Masta won the contract pursuant to this rigged bidding process, it subcontracted with C.D. Baird or Jomar to perform the work, paying the price offered in its original bid. The Masta Group kept the difference between the original bid and the inflated price paid Masta as its "commission," using part of these proceeds to pay off Cappelli. (Amend.Compl. at ¶¶ 52-54.)

For contracts exceeding $100,000, the Masta Group allegedly asked Jomar and C.D. Baird for quotes. After deciding which company should win the contract, the Masta Group directed the companies to submit specific bids directly to Philip Morris, reflecting greater dollar amounts than the original

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



quote. After the subcontractor received the contract, performed the work and got paid, the Masta Group collected its commission by issuing the performing company an invoice for "consulting fees" in the amount of the overcharge. Eventually, to avoid paying income tax, this system was changed to one in which "money men" representing front companies with no operations invoiced the contracting company directly. These money men paid the Masta Group 90% of the commission, keeping the rest for themselves. As always, kickbacks were allegedly paid out of these commissions. (Amend.Compl. at ¶¶ 58-60.)

Philip Morris claims that Reitman bribed Cappelli, at first, by putting Cappelli's wife on the payroll of Clive Industries ("Clive"), a Connecticut corporation run out of his home. (Amend.Compl. at ¶ 55.) Subsequently, in approximately 1984, Cappelli formed a purported clothing business, KAL Associates ("KAL"), in his wife's name, allegedly, to receive kickbacks from Clive disguised as payments for clothing designs. (Amend.Compl. at ¶ 56.) After Reitman died, Philip Morris claims that Billies provided Cappelli with names of other front companies which would provide checks, in return for KAL invoices for services supposedly rendered. (Amend.Compl. at ¶ 57.)

### 2. Heinrich's Arrival

After Cappelli's immediate supervisor left Philip Morris in 1988, Billies recommended Heinrich, a friend who worked at Pepsi, to Cappelli. Billies apprised Heinrich of the bid-rigging scheme and obtained his assurance that he would cooperate in furthering it in return for kickbacks if he worked for Philip Morris. With Cappelli's assistance, Heinrich eventually obtained the job, becoming Cappelli's immediate supervisor. (Amend.Compl. at ¶ 61.) Shortly thereafter, he advised Cappelli to bring in Defendant Visart as a fourth vendor, with Defendant Siegel signing most of the bids on behalf of Visart. Billies rigged the bids in the same manner as he did with the other vendors, with the Masta Group receiving "commissions" and paying kickbacks to Cappelli and Heinrich. (Amend.Compl. at ¶¶ 62-64.)

\*4 Philip Morris alleges that Billies and his son, Defendant John Billies, paid Heinrich by hand in cash, sometimes in the staircase at the Stella Mare restaurant in New York City, sometimes on the

streets of Manhattan and on one occasion, in the back seat of their car. (Amend.Compl. at ¶¶ 65, 68, 70.) Starting in 1989, they also began paying Cappelli in cash. (Amend.Compl. at ¶ 68.) To generate this cash, Philip Morris claims that the Masta Group's money men would invoice AM-PM for goods and services never provided. AM-PM would pay by check, with the money men keeping 10% and paying the Masta Group the rest in cash. (Amend.Compl. at ¶ 69.) Philip Morris terminated Cappelli and Heinrich on September 30, 1991. (Amend.Compl. at ¶ 71.) After Cappelli was terminated, in the late fall of 1991, Rothenberg allegedly took Cappelli into the bathroom at the Garden City Country Club and made a kickback payment of approximately $9,000. (Amend.Compl. at ¶ 73.) While the total amount of bribes and kickbacks allegedly paid to Heinrich is unknown, Philip Morris estimates that by the fall of 1991, the Mounting and Finishing Defendants had paid Cappelli over $1 million. (Amend.Compl. at ¶¶ 65, 74.)

In addition to the relationship with Visart, the Masta Group, with the acquiescence of Cappelli and Heinrich, set up Defendant Sonia Graphics ("Sonia") in 1989, ostensibly a minority display products broker, to take advantage of Philip Morris' minority vendor program. Although Defendant Jose Rivera ("Rivera") was purportedly Sonia's sole proprietor, Philip Morris contends that Sonia was set up in Masta's office, shared Masta's telephone and fax numbers and that the same secretary typed Masta's and Sonia's bids. According to Philip Morris, the Masta Group completely controlled Sonia and rigged its bids to facilitate the larger scheme. Rivera knowingly and intentionally either signed falsified, inflated bids, or permitted the Masta Group to do so on his behalf. (Amend.Compl. at ¶ 66.)

Philip Morris charges Cappelli, Heinrich and the Mounting and Finishing Vendor Defendants with furthering their scheme through interstate commerce by use of the mails and the highways. These Defendants also allegedly used the telephone wires to facilitate the scheme by making numerous telephone calls among the conspirators. (Amend.Compl. at ¶¶ 76-78.)

### B. The Alleged Corrugated Vendors' Scheme

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1996 WL 363156, *4 (S.D.N.Y.))

According to Philip Morris, Cappelli, and eventually Heinrich, engaged in a similar conspiracy with the Corrugated Vendor Defendants, receiving kickbacks in return for offering control of the bidding process to an individual who rigged bids among the Corrugated Vendors. The alleged point man in this network was Harold Roll ("Roll"), also now deceased, who was a sales representative for Defendant Manufacturers Corrugated Box Co., Inc. ("Manufacturers"). The mechanics of this alleged conspiracy were almost identical to those allegedly employed by the Mounting and Finishing Vendors. Roll, with the approval of Manufacturers' Vice President, Defendant Irving Etra, supplied Cappelli with inflated corrugated bids, one from Manufacturers and generally two dummy bids from other Defendants. Manufacturers would always win the contract and in turn, farm out the work to other vendors, receiving a "commission" in return. As was the case with the Masta Group, a portion of these proceeds would be paid to Cappelli and Heinrich as kickbacks. (Amend.Compl. at ¶¶ 79-80.)

*5 Among the bidders Roll supplied Philip Morris were Defendant Genetra, whose bids were often signed by Siegel, and Ultra Print ("Ultra"), a wholly-owned subsidiary of Southern Container Corp. ("Southern"). Clemence was a salesman for Southern who signed Ultra's bids. These Defendants either provided Roll with blank company stationery or submitted bids directly to Philip Morris under Roll's direction. (Amend.Compl. at ¶¶ 81-83.) Eventually, after Cappelli requested new vendors other than Manufacturers to bid for contracts, Roll provided Southern and Republic Container Corp. ("Republic N.Y.", now known as Winko New Jersey, Inc. ("Winko N.J.")). [FN1] These companies, through Southern's officers, Defendants Steven Grossman ("Grossman") and Donald Kasun ("Kasun"), and Republic N.Y.'s officers, Defendants Stanley Winikoff and Amy Winikoff (who were also affiliated with Republic N.J.), agreed to divide up the corrugated vendor contracts. Roll told the Corrugated Vendors what to bid on contracts and received $1.00 per display upon completion of the work. (Amend.Compl. at ¶¶ 84-86).

FN1. Republic N.Y., formerly known as Republic Container Corp., is now defunct. In late 1990, it changed its name to Winko Packaging, Inc.,

ultimately merging with Winko New Jersey, Inc. ("Winko N.J."). Amboy Holdings Inc. ("Amboy") changed its name to Republic Container Corp. after the incorporation of Winko Packaging, Inc. and is referred to in the Amended Complaint as "Republic N.J." Philip Morris alleges that Republic N.J. eventually took the place of Republic N.Y. in the corrugated scheme. (Amend. Compl. at ¶ 95.) Thus, they claim that Winko N.J. and Republic N.J. are liable for the acts of Republic N.Y. by virtue of their status as successor and de facto successor, respectively, to Republic N.Y. (Amend.Compl. at ¶¶ 100-101.) The Court concludes that both Winko N.J. and Republic N.J. can be held liable to the same extent as the other Defendants, for purposes of this motion. Furthermore, the statute of limitations, with regard to claims raised against Republic N.J., was tolled when the original complaint was filed. The filing against Republic N.J. as a successor corporation relates back to this date.

In 1989, Philip Morris claims that Billies approached Clemence, promising to use his influence with Heinrich and Cappelli to increase Southern's business with Philip Morris, in return for Southern's paying bribes to Billies instead of Roll. Clemence relayed the proposal to Grossman and Defendant Barry Besen ("Besen"), who was in charge of operations and administration at Southern's Dayton, New Jersey plant, and they instructed him to accept it. Thereafter, Southern paid a commission to the Masta Group for all contracts it received. Roll acquiesced in the deal in order to maintain his position as coordinator of the remainder of the Corrugated Vendor Defendants. (Amend.Compl. at ¶¶ 89-91.)

The Masta Group and Clemence eventually formed Defendant X-L Services, Inc. ("X-L"), in part to provide hand finishing work which Southern could not provide and in part to provide a conduit for Southern to pay commissions to the Masta Group. The procedure called for X-L to invoice Masta for the hand finishing work and Masta to invoice Southern for an amount significantly higher, the difference representing the Masta Group's commission. (Amend.Compl. at ¶¶ 92-93.) Philip Morris claims that Masta, Jomar and Visart also facilitated the Corrugated Vendors' scheme by bidding for corrugated jobs when they had no capacity to perform this type of work, serving merely as dummy bids. (Amend.Compl. at ¶ 94.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1996 WL 363156, *5 (S.D.N.Y.))

Ultimately, Philip Morris alleges, the Corrugated Vendors paid Cappelli hundreds of thousands of dollars in kickbacks in connection with corrugated display work. (Amend.Compl. at ¶ 96.)   It claims that Cappelli, the Corrugated Vendors, the Masta Group, Jomar, Neier, Spector, Siegel and Visart availed themselves of interstate commerce in connection with the purportedly fraudulent conduct in the same manner alleged against the Mounting and Finishing Vendors. (Amend.Compl. at ¶¶ 97-99.)

C. Philip Morris' Bidding and Business Policies

*6 During the relevant period, Philip Morris disseminated a written Purchasing Policy to Purchasing Department employees, including Heinrich and Cappelli, providing that no employee involved in purchasing could accept any gift from actual or potential suppliers unless it was of nominal value and merely an extension of courtesy. Furthermore, both Cappelli and Heinrich received a written copy of the company's Business Conduct Policy, prohibiting an employee's acceptance of cash from anyone doing or seeking to do business with Philip Morris.   During the relevant period, Cappelli and Heinrich signed Certificates attesting that they had read and understood this Policy and had not contravened it in the preceding year. (Amend.Compl. at ¶¶ 45-50.)

D. The Guilty Pleas

Since as early as March 4, 1993, a number of the Defendants have pleaded guilty in this district to various criminal charges related to the events described above.   Jomar and Clemence each pleaded guilty to one count of violating the Sherman Act, for engaging in a combination and conspiracy in unreasonable restraint of trade and commerce, to rig bids and allocate contracts. (Amend. Complaint at ¶¶ 102-103, 112-113.)    Cappelli, Rothenberg and Billies all pleaded guilty both to a Sherman Act count and a tax evasion count, arising from the same alleged facts. (Amend. Complaint at ¶¶ 104-107.)    Robert Berger ("Berger"), one of the Mounting and Finishing Vendors' money men, pleaded guilty to one count of tax evasion, while Bert Levine ("Levine"), another of the money men, pleaded guilty to one count of conspiracy to defraud the United States of America and the Internal Revenue Service. (Amend. Compl. at ¶¶ 108-111.)

E. Philip Morris' Claims

Count I of the Amended Complaint brings a claim against Heinrich and the Mounting and Finishing Vendors for violating § 1 of the Sherman Act, 15 U.S.C. § 1, premised upon the alleged bid-rigging scheme. (Amend.Compl. at ¶¶ 118-123.)   Count II states the identical claim against the Corrugated Vendors. (Amend.Compl. at ¶¶ 124-131.)    Counts III and IV charge the Mounting and Finishing Vendors and the Corrugated Vendors, respectively, with violating New York State's Donnelly Act, N.Y.Gen.Bus.Law § 340, by restraining the free exercise of trade. (Amend.Compl. at ¶¶ 132-141.)   Count V pleads common law fraud against the Mounting and Finishing Vendors, while Count VI brings the same claim against the Corrugated Vendors. (Amend.Compl. at ¶¶ 142-159.)   Counts VII and VIII plead fraud and breach of fiduciary duty against Heinrich independently. (Amend.Compl. at ¶¶ 160-172.)   Counts IX and X plead breach of fiduciary duty [FN2] against the Mounting and Finishing Vendors and the Corrugated Vendors, respectively. (Amend.Compl. at ¶¶ 173-184.)    Counts XI and XII charge commercial bribery against the Mounting and Finishing Vendors and the Corrugated Vendors respectively, while Count XIII brings a commercial bribe receiving claim against Heinrich.   Count XIV seeks a constructive trust in favor of Philip Morris for all bribes received by Heinrich, while Count XV seeks a forfeiture of all compensation paid to him during the period of his alleged disloyalty and dishonesty.

> FN2. Technically, the Plaintiff charges, "breach of fiduciary duty of another."    This claim is more accurately styled, "aiding and abetting breach of fiduciary duty," or "inducement to breach of fiduciary duty."

II. Discussion

A. Rule 12(b)(6) Standard

*7 Rule 12(b)(6) provides that a complaint will be dismissed if there is a "failure to state a claim upon which relief can be granted."    In the course of resolving a motion to dismiss pursuant to Rule 12(b)(6), the Court reads the complaint generously, accepting the truth of, and drawing all reasonable inferences from, the well-pleaded factual allegations. *Brass v. American Film Technologies,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                          **Page  6**
**(Cite as: 1996 WL 363156, \*7 (S.D.N.Y.))**

*Inc.,* 987 F.2d 142, 150 (2d Cir.1993); *accord California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 515 (1972); *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993); *Allen v. Westpoint-Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47-48 (2d Cir.1991), *cert. denied,* 503 U.S. 960 (1992); *Frasier v. General Elec. Co.,* 930 F.2d 1004, 1007 (2d Cir.1991).

> When determining the sufficiency of plaintiff[s] claim for Rule 12(b)(6) purposes, consideration is limited to the factual allegations in ... [the] complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiff['s] possession or of which plaintiff[ ] had knowledge and relied on in bringing suit. *Brass,* 987 F.2d at 150 (*citing Cortec,* 949 F.2d at 47-48).

The Court will only dismiss a Complaint for failure to state a claim when the Court finds beyond a reasonable doubt that Plaintiff "can prove no set of facts" to support the claim that Plaintiff is entitled to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

The Court is required to draw all reasonable inferences in Plaintiff's favor, but not all possible inferences. *See Correa-Martinez v. Arrillaga-Belendez,* 903 F.2d 49, 58 (1st Cir.1990). Only when "the suggested inference rises to what experience indicates is an acceptable level of probability," must the Court accept it as fact for pleading purposes. *Id.* at 52.

### B. The Sherman Act Claims

The Defendants move, in separate briefs, to dismiss the Sherman Act claims pursuant to Fed.R.Civ.P. 12(b)(6). Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. To state a claim under § 1, a party must allege three elements: (1) a combination or conspiracy; (2) that results in a restraint on interstate or foreign commerce; and (3) injury to the plaintiff's business or property. *Oreck Corp. v. Whirlpool Corp.,* 639 F.2d 75, 78 (2d Cir.1980), *cert. denied,* 454 U.S. 1083 (1981). The

Defendants, essentially, claim that Philip Morris has failed to satisfy the second requirement.

While the language of the statute seemingly prohibits any restraint of trade, the Supreme Court has required that an "unreasonable" restraint of trade be demonstrated to establish a violation of § 1. *FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 457 (1986). A trade restraint "may be adjudged unreasonable either because it fits within a class of restraints that has been held to be *'per se'* unreasonable, or because it violates what has come to be known as the 'Rule of Reason.' " *Id.* at 458. Under the rule of reason, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint upon competition." *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 49 (1977). While the rule of reason requires a demonstration of anticompetitive effects or actual harm to competition in order to establish an antitrust violation, "[w]hen a *per se* offense is alleged, a showing of anticompetitive effect is *not* required to establish a Sherman Antitrust Act violation." *Bunker Ramo Corp. v. United Business Forms, Inc.,* 713 F.2d 1272, 1283-84 (7th Cir.1983); *see also Barrett v. United States Banknote Corp.,* No. 7420, 1992 WL 232055, at \*4 (S.D.N.Y. Sept. 2, 1992) ("The plaintiff who successfully alleges a *per se* violation relieves himself of the requirement of showing anticompetitive effect."). A particular course of conduct is not considered a *per se* violation until the courts have had "considerable experience" with that type of conduct and application of the rule of reason has inevitably resulted in a finding of anticompetitive effects. *United States v. Topco Assocs., Inc.,* 405 U.S. 596, 607-08 (1972); *Bunker Ramo,* 713 F.2d at 1284. For the reasons stated below, the Court holds that the conduct alleged in the Amended Complaint falls plainly within the definition of a *per se* violation. Philip Morris has properly pleaded a conspiracy resulting in an unreasonable restraint of trade that injured its business. The Defendants' various arguments supporting the motions to dismiss Counts I and II are rejected and the motions denied.

### 1. Applicability of *Per Se* Rule

\*8 The Supreme Court has stated that "agreements among competitors to fix prices on their individual goods or services are among those concerted

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Case 7:04-cv-08223-KMK    Document 114-4    Filed 10/18/2005    Page 10 of 41

Not Reported in F.Supp.                                                    Page   7
(Cite as: 1996 WL 363156, *8 (S.D.N.Y.))

activities ... held to be within the *per se* category."
*Broadcast Music, Inc. v. Columbia Broadcasting
Sys., Inc.,* 441 U.S. 1, 8 (1979). In determining
whether particular conduct qualifies as price fixing,
the Court does not take a literal approach, looking
for the mere act of "fixing" a "price." *Id.* at 9.
"Not all arrangements among actual or potential
competitors that have an impact on price are *per se*
violations of the Sherman Act or even unreasonable
restraints." *Id.* at 23. Rather, the characterization
of particular conduct depends upon its economic
impact--"that is, whether the practice facially
appears to be one that would always or almost
always tend to restrict competition and decrease
output, and in what portion of the market, or instead
one designed to 'increase economic efficiency and
render markets more, rather than less competitive.' "
*Id.* at 19-20 (citation omitted).

 Thus, in *Broadcast Music,* the Court ruled that the
issuance of blanket licenses to copyrighted musical
compositions at fees previously arranged was not
*per se* unlawful, despite the fact that it involved
"price fixing" in the literal sense. It reasoned that
the blanket license was not a "naked restrain [t] of
trade," but rather, a practical response to market
realities, accompanying "the integration of sales,
monitoring and enforcement against unauthorized
copyright use." *Id.* at 20. Consequently, given
what the Court perceived to be the lawful, useful
purposes of the blanket licenses, it reversed the
Court of Appeals' application of the *per se* standard
to the facts and remanded the case for rule of reason
analysis.

 In *Catalano, Inc. v. Target Sales, Inc.,* 446 U.S.
643 (1980), the Court reaffirmed its commitment to
the proposition that price fixing, as a general rule, is
unlawful *per se*. The case involved a group of beer
wholesalers who allegedly conspired to fix credit
terms for purchases by retailers. In noting that "[i]t
has long been settled that an agreement to fix prices
is unlawful *per se*," *id.* at 647, the Court concluded
that since an agreement to limit credit was
tantamount to the elimination of price discounts, the
conduct at issue constituted a practice which fell
"squarely within the traditional *per se* rule against
price fixing." *Id.* at 648. Given that none of the
redeeming virtues which accompanied the *Broadcast
Music* price fixing existed in *Catalano,* 446 U.S. at
649, the Court did not engage in an analysis of
whether the conduct "would always or almost

always tend to restrict competition and decrease
output." *Broadcast Music,* 441 U.S. at 19-20.

 The conduct alleged in this case involves a
conspiracy on the part of commercial suppliers and
Philip Morris employees to fix prices for goods and
services at artificially inflated rates. The Court,
accepting the well-pleaded allegations of the
Complaint as true, views this behavior, on its face,
as price fixing. It finds no evidence of economic or
particularized industry circumstances suggesting that
the alleged conspiracy developed as a legitimate
business response to factors in the marketplace or
served any other redeeming purpose. Further
analysis under *Broadcast Music,* or any proof of
anticompetitive effect, is therefore unnecessary.
The alleged conspiracy is an example of price fixing
that is unlawful *per se*. Thus, Counts I and II,
raising claims under § 1 of the Sherman Act, state
claims upon which relief can be granted and may not
be dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

 ***9** Furthermore, the allegations here form a
textbook case of bid rigging. Courts have
specifically classified bid-rigging as a form of price
fixing that constitutes a *per se* violation. *United
States v. Koppers Co.,* 652 F.2d 290, 294 (2d
Cir.1981), *cert. denied,* 454 U.S. 1083 (1982); *see
also United States v. W.F. Brinkley & Son Constr.
Co., Inc.,* 783 F.2d 1157, 1161 (4th Cir.1986)
("[W]here two or more persons agree that one will
submit a bid for a project higher or lower than the
others or that one will not submit a bid at all, then
there has been an unreasonable restraint of trade
which violates the Sherman Antitrust Act."); *United
States v. Fischbach & Moore, Inc.,* 750 F.2d 1183,
1192 (3d Cir.1984) ("[P]rice fixing and bid rigging
are *per se* violations."), *cert. denied,* 470 U.S. 1029
(1985); *United States v. Portsmouth Paving Corp.,*
694 F.2d 312, 325 (4th Cir.1982) ("Any agreement
between competitors pursuant to which contract
offers are submitted to or withheld from a third
party constitutes bid rigging *per se*."); *United
States v. Brighton Bldg. & Maintenance Co.,* 598
F.2d 1101, 1106 (7th Cir.) ("An agreement among
competitors to rig bids is illegal"), *cert. denied,* 444
U.S. 840 (1979); *United States v. Flom,* 558 F.2d
1179, 1183 (5th Cir.1977) ( "Conspiracies between
firms to submit collusive, non-competitive, rigged
bids are *per se* violations of the statute"); *Barrett,*
1992 WL 232055, at *4 ("Price fixing and bid
rigging generally constitute *per se* violations....

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Unlike bid rigging arrangements, however, not every price fixing agreement constitutes a *per se* violation."). As a result, Counts I and II state claims for *per se* violations of the Sherman Act. Demonstration of anticompetitive effect is unnecessary.

The Defendants' argument that the facts of this case constitute nothing more than commercial bribery, outside the scope of the Sherman Act, is without merit. Unlike the cases cited by Defendants, *see, e.g., Calnetics Corp. v. Volkswagen,* 532 F.2d 674, 687 (9th Cir.) (no antitrust violation where commercial bribery alleged without allegations of price fixing or bid rigging), *cert. denied,* 429 U.S. 940 (1976); *Federal Paper Bd. Co. v. Amata,* 693 F.Supp. 1376, 1380 (D.Conn.1988) (bribery, standing alone without allegations of collusion, does not establish antitrust claim), Philip Morris has alleged more than mere commercial bribery: it has alleged facts detailing an extensive bid rigging scheme involving the Defendants. This is precisely the type of conduct that the Sherman Act prohibits. Thus, the cases cited by the Defendants are distinguishable.

### 2. Rule of Reason
The Court need not apply the rule of reason to Counts I and II. Nonetheless, it holds that even if the claims did not state *per se* price fixing violations, they would properly allege Sherman Act claims for unreasonable restraint of trade under this analysis as well.

### 3. Statute of Limitations
\*10 A majority of the Defendants contend that the Sherman Act counts should be dismissed for failing to satisfy the statute of limitations for filing antitrust actions. "Any action to enforce any cause of action under sections 15, 15a or 15c of this title shall be forever barred unless commenced within four years after the cause of action accrued." 15 U.S.C. § 15b . Philip Morris filed its initial complaint on January 17, 1995. Thus, according to the Defendants, any conduct alleged to constitute a Sherman Act violation which accrued prior to January 17, 1991 is time-barred. In the context of a continuing conspiracy to violate antitrust laws, a separate cause of action is said to accrue each time an act of the defendant injures the plaintiff. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338 (1971). This requires an overt act: claims

premised upon damages which result from conduct which occurred outside the limitations period are time-barred. *Argus Inc. v. Eastman Kodak Co.,* 552 F.Supp. 589, 594 (S.D.N.Y.1982), *aff'd,* 801 F.2d 38 (2d Cir.1986), *cert. denied,* 479 U.S. 1088 (1987). Since Philip Morris alleges that bid rigging continued "from the early 1980s through 1991," (Amend.Compl. at ¶¶ 120, 126), then it is possible to conclude, reading the facts in favor of the Plaintiff, that antitrust injuries accrued subsequent to January 17, 1991. To the extent that Counts I and II derive from antitrust injuries alleged to have accrued during this period, the counts, on their face, satisfy the statute of limitations and may not be dismissed.

### i. § 16(i) Tolling
Furthermore, the federal government's filing of a criminal information against Defendant Jomar on March 4, 1993 tolled the statute of limitations as of that date, pursuant to 15 U.S.C. § 16(i). This provision provides:
[w]henever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws ... the running of the statute of limitations in respect of every private or State right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter: *Provided, however, That* whenever the running of the statute of limitations in respect of a cause of action arising under section 15 or 15c of this title is suspended hereunder, any action to enforce such cause of action shall be forever barred unless commenced either within the period of suspension or within four years after the cause of action accrued.
Philip Morris brings its Sherman Act claims pursuant to § 15. Consequently, if counts I and II are deemed to be "based in whole or in part on any matter complained of in" the federal government's criminal proceeding against Jomar, then the counts are timely to the extent that they are premised upon antitrust causes of action which accrued after March 4, 1989.

\*11 Several Defendants argue that the government's action against Jomar involves a different conspiracy among different Defendants, and thus, may only toll the statute of limitations for the specific parties named in the government's action, or at the very

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

least, for the parties allegedly involved in the Mounting and Finishing conspiracy. The Supreme Court has held, however, that "[t]he private plaintiff is not required to allege that the same means were used to achieve the same objectives of the same conspiracies by the same defendants." *Leh v. General Petroleum Corp.*, 382 U.S. 54, 59 (1965). In fact, the statute of limitations may be tolled against defendants to the private suit even if they were "named neither as a defendant nor as a coconspirator by the Government." *Zenith Radio,* 401 U.S. at 335.

> We see nothing destructive of Congress' purpose in holding that [§ 16(i) ] tolls the statute of limitations against all participants in a conspiracy which is the object of a Government suit, whether or not they are named as defendants or conspirators therein; indeed, to so hold materially furthers congressional policy by permitting private litigants to await the outcome of Government suits and use the benefits accruing therefrom.

> *Id.* at 336.

Nonetheless, the Court must exercise care to insure that "reliance upon the government proceeding is not mere sham and that the matters complained of in the government proceeding bear a real relation to the private plaintiff's claim for relief." *Leh,* 382 U.S. at 59. It does so by comparing the plaintiff's complaint with the complaint in the government proceeding on which the plaintiff relies. *Id.* While the complaints need not be identical, the Third Circuit has defined "real relation" by stating that there must be a "substantial identity" in order to invoke § 16(i) tolling. *New Jersey v. Morton Salt Co.,* 387 F.2d 94, 98 (3d Cir.1967), *cert. denied,* 391 U.S. 967 (1968). The Second Circuit has not provided a definition for when the similarity between the two complaints is enough for tolling, but it has ruled that there is an insufficient basis when the only similarity is that some of the defendants are the same. *Peto v. Madison Square Garden Corp.,* 384 F.2d 682, 682 (2d Cir.1967) (no "real relation" between claims where conspiracies in two complaints are entirely different, involve different sports activities and cover different periods of time), *cert. denied,* 390 U.S. 989 (1968); *see also Charley's Tour and Transp., Inc. v. Interisland Resorts, Ltd.,* 618 F.Supp. 84, 86 (D.Haw.1985) (no tolling where cases involved different markets [rental rates for hotel rooms versus charter bus market], different defendants and different means of

proof).

In this case, the Court holds that there is a "real relation" between the criminal information filed against Jomar and Philip Morris' Amended Complaint. The Jomar information alleges that Jomar and its coconspirators engaged in a combination and conspiracy to unreasonably restrain trade by rigging bids and allocating contracts for the supply of graphic materials to Philip Morris. (Amend.Compl. at ¶ 102.) Philip Morris, in its Amended Complaint, makes the same allegations against a number of Defendants, elaborating upon the mechanics of the scheme. The fact that Philip Morris identifies two overlapping cells of Defendants which arranged the schemes to accommodate Philip Morris' bidding process does not alter the fact that the participants, objects and mechanics of the Mounting and Finishing Vendors' and the Corrugated Vendors' schemes were essentially the same. At the very least, this is a factual question. Thus, the Court finds that Philip Morris can argue a set of facts that the criminal information filed against Jomar tolled the statute of limitations pursuant to § 16(i) as to all other Defendants, as of March 4, 1993. The Court need not determine when this tolling terminated, since the criminal information filed against Cappelli on January 3, 1994, (Amend.Compl. at ¶ 104), in any event, was filed prior to the termination of the Jomar proceedings. Thus, it may be tacked onto the Jomar tolling. As the Cappelli proceedings had not terminated as of the date the Amended Complaint was filed, the Sherman Act claims are timely to the extent that they are based upon claims which accrued after March 4, 1989.

### ii. Fraudulent Concealment

**\*12** As for claims accruing prior to March 4, 1989, Philip Morris argues that they are timely as well on the theory that the statute of limitations tolled from the start on account of the Defendants' fraudulent concealment. An antitrust plaintiff may prove fraudulent concealment sufficient to toll the statute of limitations by establishing: "(1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part." *New York v. Hendrickson Bros., Inc.,* 840 F.2d 1065, 1083 (2d

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1996 WL 363156, *12 (S.D.N.Y.))

Cir.1988), *cert. denied,* 488 U.S. 848 (1988). The Second Circuit has characterized bid-rigging conspiracies as inherently self-concealing activities. The plaintiff satisfies the first prong of the fraudulent concealment test by demonstrating the existence of the conspiracy. *Id.* at 1083-84.

While pleading of the Defendants' affirmative acts is not necessary under *Hendrickson* to meet the first prong of the doctrine in a case of an alleged bid-rigging scheme, "such pleading may be necessary to sufficiently allege the second and third elements." *New York v. Cedar Park Concrete Corp.,* 684 F.Supp. 1229, 1232 (S.D.N.Y.1988). "The burden rests squarely on the party pleading fraudulent concealment.... Courts furthermore require particularity in pleading fraudulent concealment." *Donahue v. Pendleton Woolen Mills, Inc.,* 633 F.Supp. 1423, 1443 (S.D.N.Y.1986). General assertions of ignorance and due diligence without more specific explanation for the delay in bringing a suit will not satisfy these pleading requirements. *Id.* at 1233. In this case, Philip Morris has not specifically alleged in any detail when it became aware of the conspiracy. While it infers that it learned of it subsequent to the unsealing of records from criminal proceedings against some of the Defendants, as well as from information provided by Cappelli and Clemence as part of their cooperation agreements, (Amend.Compl. at 14, n. 1, 24, n. 2), nowhere does Philip Morris assert exactly when it acquired the "actual knowledge" of its causes of action against the Defendants. *See Cedar Park,* 684 F.Supp. at 1233.

Furthermore, Philip Morris has not adequately pleaded diligence in attempting to discover the alleged fraud. While it states that it undertook an internal investigation, "[m]ore specific information is required as to the difficulties, if any, [it encountered] with the progression of the investigation.... Moreover, plaintiff should allege, with more specificity, when, despite these obstacles, it acquired 'actual knowledge.' " *Id.* The date by which a Plaintiff should have discovered the existence of fraud may be a question of fact, *American Credit Indemnity Co. v. Legge,* 829 F.Supp. 649, 650-51 (S.D.N.Y.1993), but Philip Morris must nonetheless first allege some facts sufficient to argue that it was diligent and did not learn of the alleged fraud until a time within the statute of limitations period. Thus, even reading

the Amended Complaint generously for the Plaintiff, the Court rules that Philip Morris has failed adequately to plead fraudulent concealment. Accordingly, the Court grants the Defendants' motion to dismiss the portions of the Amended Complaint that seek damages for claims arising prior to March 4, 1989, without prejudice to the Plaintiff's repleading the fraudulent concealment sections within 60 days. As discussed below, since antitrust claims do not require pleading with particularity, Philip Morris' assertions in the Amended Complaint that both schemes continued through 1991, given the generous reading accorded plaintiffs' complaints in 12(b)(6) motions, satisfactorily states a claim against each of the Defendants subsequent to March 4, 1989. Thus, dismissal of causes of action accruing prior to this date does not result in dismissal of any individual defendant from the Amended Complaint for purposes of this motion.

### 4. Pleading Requirements
*13 The liberal system of notice pleading applies to antitrust causes of action. *In re NASDAQ Market-Makers Antitrust Lit.,* 894 F.Supp. 703, 710 (S.D.N.Y.1995); Fed.R.Civ.P. 8(a). Philip Morris need not plead its antitrust claims with the particularity required by Fed.R.Civ.P. 9(b). Thus, while it is not enough to merely state that a conspiracy has taken place, "great leeway should be allowed the pleader, since by the nature of the conspiracy, the details may not be readily known at the time of the pleading." *Id.* (quoting 2A James W. Moore et al., & J. Lucas, Moore's Federal Practice ¶ 8.17(5) (1986)); *see also Hospital Bldg. Co. v. Trustees of Rex Hosp.,* 425 U.S. 738, 746 (1976) ("[I]n antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly") (citation omitted); 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1228, at 221-24 (2d ed. 1990). Furthermore, "[a]n overt act need not be pleaded against each defendant, because a single overt act by just one of the conspirators is enough to sustain a conspiracy claim on the merits." *Cedar Park,* 665 F.Supp. at 246-47. Identifying the co-conspirators and describing the nature and effect of the alleged conspiracy is sufficient. *Alco Standard Corp. v. Schmid Bros., Inc.,* 647 F.Supp. 4, 6 (S.D.N.Y.1986).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Case 7:04-cv-08223-KMK    Document 114-4    Filed 10/18/2005    Page 14 of 41

Not Reported in F.Supp.                                                    Page 11
(Cite as: 1996 WL 363156, *13 (S.D.N.Y.))

In the Amended Complaint, Philip Morris more than satisfies the pleading requirements for a Sherman Act claim, identifying all of the coconspirators and explaining in some detail the nature and effect of the alleged conspiracy. The Court rejects the argument of certain defendants that Philip Morris failed to allege necessary particulars as to how and when individual Defendants joined the conspiracy. This degree of specificity is clearly not required by Rule 8(a). *Three Crown Ltd. Partnership v. Caxton Corp.,* 817 F.Supp. 1033, 1047 (S.D.N.Y.1993). The Sherman Act claims satisfy pleading requirements.

Furthermore, as the Amended Complaint satisfies the notice requirements for an antitrust action, the demand of Defendants Winko N.J. and Republic N.Y. for a more definite statement pursuant to Fed.R.Civ.P. 12(e) is denied.

### C. The Donnelly Act Claims

New York State's Donnelly Act, [FN3] N.Y.Gen.Bus.Law § 340 (1988), prohibiting restraint of trade, is modeled after the Sherman Act and is generally construed in light of federal precedent. *Anheuser-Busch, Inc. v. Abrams,* 71 N.Y.2d 327, 335, 525 N.Y.S.2d 816, 820 (1988); *State v. Mobil Oil Corp.,* 38 N.Y.2d 460, 463, 381 N.Y.S.2d 426, 428 (1976). The New York State Court of Appeals has definitively asserted that the *per se* rule applies in price fixing cases under the Donnelly Act. *People v. Rattenni,* 81 N.Y.2d 166, 171-72, 597 N.Y.S.2d 280, 283 (1993). In fact, New York courts have specifically held bid-rigging to be a *per se* violation. *People v. Schwartz,* 554 N.Y.S.2d 686, 686-87 (App.Div.2d Dep't 1990). Thus, the Court holds that Philip Morris has adequately alleged Donnelly Act claims. As the same statute of limitations which applies to the Sherman Act also applies to the Donnelly Act, *see* N.Y.Gen.Bus.Law § 340(5), the motions to dismiss Counts III and IV are assessed in the same manner as Counts I and II. To the extent that the claims arise from causes of action accruing after March 4, 1989, the motions to dismiss are denied. The motions to dismiss causes of action accruing prior to this date are granted, without prejudice to Philip Morris' right to replead the elements of fraudulent concealment within 60 days.

FN3. The statute provides, in relevant part:
1. Every contract, agreement, arrangement or combination whereby A monopoly in the conduct of any business, trade or commerce or in the furnishing of any service in this state, is or may be established or maintained, or whereby

Competition or the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state is or may be restrained ... is hereby declared to be against public policy, illegal and void. N.Y.Gen.Bus.Law § 340 (1988).

### D. Common Law Fraud

**\*14** Counts V, VI and VII allege common law fraud, respectively, against the Mounting and Finishing Vendors (Amend.Compl. at ¶ 143), the Corrugated Vendors along with the members of the Masta Group who took part in their alleged scheme, (Amend.Compl. at ¶ 151), and Heinrich. (Amend.Compl. at ¶ 161). The majority of the Defendants move to dismiss the fraud claims for failing to plead the counts with particularity, pursuant to Fed.R.Civ.P. 9(b), and failure to satisfy the statute of limitations.

### 1. Rule 9(b) Particularity

Fed.R.Civ.P. 9(b) states:
(b) Fraud, Mistake, Condition of the Mind. In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

The purpose of Rule 9(b) is threefold: it is designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from "improvident charges of wrongdoing," and to protect the defendant from the institution of a strike suit. *O'Brien v. National Property Analysts Partners,* 936 F.2d 674, 676 (2d Cir.1991). In reviewing a decision to dismiss on 9(b) grounds, the truth of plaintiff's allegations is assumed. *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987). The pleadings must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements. *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989); *see also McLaughlin v. Anderson,* 962 F.2d 187, 191 (2d Cir.1992); *June Ox v. Union Central Life Ins. Co.,* No. 94-

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



CIV-4754, 1995 WL 296541, at \*3 (S.D.N.Y. May 15, 1995). Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud. *DiVittorio,* at 1247. Finally, the complaint must assert that the defendant had an intent to defraud, or allege circumstances from which an inference of such intent may be drawn. *Id.; see Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987), *cert. denied,* 484 U.S. 1005 (1988), *overruled en banc on other grounds, United States v. Indelicato,* 865 F.2d 1370 (2d Cir.1989).

Rule 9(b) is to be construed in light of Rule 8's more lenient pleading requirement of "a short and plain statement of the claim." *Keenan v. D.H. Blair & Co., Inc.,* 838 F.Supp. 82, 86 (S.D.N.Y.1993). Thus, when the facts are peculiarly within the opposing party's knowledge, a plaintiff may base his allegations upon information and belief. *DiVittorio,* 822 F.2d at 1247. However, that exception to Rule 9(b)'s particularized pleading requirement "does not constitute a license to base claims of fraud on speculation or conclusory allegations." *Karasyk v. Marc Commodities Corp.,* 770 F.Supp. 824, 830 (S.D.N.Y.1991). Where pleading is permitted on information and belief, a complaint must adduce specific facts supporting a strong inference of fraud, or it will not satisfy a relaxed pleading standard. *Id.*

**\*15** In this case, the Court finds nothing improper about Philip Morris having pleaded its fraud claims on information and belief, given the reality that a bid rigging conspiracy is by its nature self-concealing. This reality does not release a plaintiff from its burden under Rule 9(b), however. While this standard is normally strict, the Court will relax it in a case where the Plaintiff demonstrates that the Defendants' own conduct has interfered with the discovery of facts necessary to properly plead fraud. *See Bethlehem Steel Corp. v. Fischbach and Moore, Inc.,* 641 F.Supp. 271, 276 (E.D.Pa.1986) ( Rule 9(b) satisfied where plaintiff alleges general time frame, the bid-rigging, its reliance on the conduct and the alleged damage). Philip Morris has not so demonstrated here. While it has stated that "certain of the facts upon which this [complaint] is based are solely within the defendants' knowledge," (Amend.Compl. at 14, n. 1), it has not shown what efforts it has undertaken to discover the necessary facts, explained the problems encountered in doing

so, or alleged other information inferring the existence of such facts. On the contrary, the company's cooperation agreements with Cappelli and Clemence, both of whom are alleged to have been key players in the fraudulent schemes, indicate that it has access to more detailed information concerning the alleged fraud. Yet, with the exception of certain instances in which bribes are claimed to have been paid, Philip Morris has largely failed to plead these particulars. *Luce v. Edelstein,* 802 F.2d 49, 54 (2d Cir.1986). Unlike antitrust actions, fraud claims require more than simple notice pleading. If Philip Morris knows specifics about when and how the supposed misrepresentations occurred, it should plead them. If it does not, it should explain why not. As it stands now, Rule 9(b) has not been satisfied. Accordingly, Counts V, VI and VII [FN4] are dismissed. Philip Morris is granted leave to replead within 60 days.

> FN4. Although Heinrich has not submitted a brief requesting that Count VII be dismissed, the Court does so *sua sponte. Fischer v. Yaakov,* 575 N.Y.S.2d 310, 310 (App.Div. 1st Dep't 1991).

### 2. Scienter

Assuming that the fraud counts are repleaded in conformity with Rule 9(b), the Court holds that they properly plead scienter. While Rule 9(b) itself relaxes the scienter requirement, the Plaintiff must still plead a factual basis sufficient to raise a "strong inference" of knowledge. *O'Brien,* 936 F.2d at 676 . The Amended Complaint contains numerous facts showing conscious behavior on the part of all the Defendants involved in the alleged fraud to hide from Philip Morris the bid-rigging scheme.

### 3. Duty to Disclose

Some Defendants claim that they have no liability for fraud, based upon concealment or omission, because they had no duty to disclose the information that was allegedly concealed. Contrary to Defendants' arguments, however, in a case such as this, where they are accused of bid-rigging, Defendants have a duty to disclose regardless of whether they have a fiduciary or confidential relationship with the Plaintiff. *Three Crown Ltd. Partnership v. Caxton Corp.,* 817 F.Supp. 1033, 1049 (S.D.N.Y.1993) (duty to disclose where defendants create "artificial market" or "price mirage").

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.    **Page 13**
(Cite as: 1996 WL 363156, *15 (S.D.N.Y.))

4. Statute of Limitations

**\*16** In New York, an "action for fraud must be commenced within six years of the commission of the fraud or within two years from its discovery, whichever is longer." *Chase v. Columbia Nat'l Corp.*, 832 F.Supp. 654, 659 (S.D.N.Y.1993); N.Y.Civ.Prac.L. & R. 208(g), 213(8) (McKinney 1990 and Supp.1995). As the claims have been dismissed for failure to plead with particularity, the Court need not determine whether the statute of limitations has been satisfied. Furthermore, since the counts do not specify when the alleged acts of fraud were committed or discovered, the Court *cannot* determine their timeliness. If the claims are properly repleaded, the Court will assess their conformity with the statute of limitations at that time.

E. Breach of Fiduciary Duty

Count VIII states a claim for breach of fiduciary duty against Heinrich while Counts IX and X allege breach of fiduciary duty of another [FN5] against the Mounting and Finishing Vendors and the Corrugated Vendors, respectively. Most Defendants have moved to dismiss these claims citing the statute of limitations. New York provides no express statute of limitations for breach of fiduciary duty claims. *Mejia-Ricart v. Bear Stearns & Co.*, No. 95-CIV-582, 1996 WL 94810, at \*3 (S.D.N.Y. Mar. 4, 1996). Courts have applied either a three-year or six-year limitations period, depending on the nature of the substantive relief sought. *Ghandour v. Shearson Lehman Bros. Inc.*, 624 N.Y.S.2d 390, 392 (App.Div. 1st Dep't 1995). When the only damages sought are legal, the statute of limitations is generally three years. Where the nature of the relief sought is equitable, the claim is governed by a six-year statute of limitations. *Toto v. McMahan, Brafman, Morgan & Co.*, No. 93-CIV-5894, 1995 WL 46691, at \*11 (S.D.N.Y.1995); *see also Renz v. Beeman*, 589 F.2d 735, 749 (2d Cir.1978) (six-year period applied where plaintiff sought imposition of constructive trust), *cert. denied*, 444 U.S. 834 (1979); *Loengard v. Santa Fe Indus., Inc.*, 70 N.Y.2d 262, 266-67, 519 N.Y.S.2d 801, 803-04 (1987) (where breach of fiduciary obligation claim is equitable in nature, six-year statute of limitations governs). Furthermore, courts have applied the six-year period when the plaintiff's claim has its genesis in the parties' contractual relationship. *Mejia-Ricart*, 1996 WL 94810, at \*3; *Varnberg v.*

*Minnick,* 760 F.Supp. 315, 333 (S.D.N.Y.1991).

> FN5. The parties have variously characterized this cause of action as aiding and abetting breach of fiduciary duty and inducement to breach of fiduciary duty. The particular label used to describe the substantive action is irrelevant for purposes of this discussion.

While the Plaintiff in this case seeks only damages against the Vendor Defendants in Counts IX and X, it requests equitable relief against Heinrich in Counts XIV and XV in the form of a constructive trust and forfeiture. These counts indirectly reference Count VIII, noting Heinrich's acceptance of bribes and "disloyalty" during his period of employment. Given the nature of the relief sought against Heinrich, as well as the fact that the breach of fiduciary duty claim against him arises from his alleged violations of his employment terms, the Court will apply a six-year statute of limitations to the claim against Heinrich.

**\*17** The Court rejects Philip Morris' contention that *Dolmetta v. Uintah Nat'l Corp.*, 712 F.2d 15, 19 (2d Cir.1983), establishes a six-year statute of limitations for aiding and abetting breach of fiduciary duty. *Dolmetta* simply held that the purported aiding and abetting breach of fiduciary duty claim at issue, in reality, amounted to nothing more than a simple fraud and thus was subject to the statute of limitations for fraud. In fact, courts in this district have interpreted New York law to apply a three-year statute of limitations to claims for inducing breach of fiduciary duty. *Fireman's Fund Ins. Co. v. Fraund*, No. 88-CIV-2765, 1989 WL 31490, at \*9 (S.D.N.Y. March 31, 1989); *Whitney v. Citibank*, No. 81-CIV-5832, 1985 WL 566, at \*5 (S.D.N.Y. April 19, 1985) (dictum).

Philip Morris filed its original complaint on January 17, 1995. Claims accruing against Heinrich prior to January 17, 1989 and against the remainder of the Defendants prior to January 17, 1992 must be dismissed as time-barred. As Philip Morris has alleged bid-rigging through 1991, Count VIII against Heinrich is timely. [FN6] Counts IX and X, against the remaining Vendor Defendants, are not. Accordingly, Counts IX and X are dismissed, while Count VIII survives.

> FN6. While Heinrich has not raised any arguments

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1996 WL 363156, *17 (S.D.N.Y.))

Page 14

for dismissal of this claim, the Court notes in passing that Count VIII need not be pleaded with particularity.

## F. Commercial Bribery

Counts XI and XII allege commercial bribery against the Mounting and Finishing and Corrugated Vendor Defendants respectively, while Count XIII charges Heinrich with commercial bribe receiving. All three counts derive from the New York State Penal Law. N.Y. Penal Law §§ 180.03, 180.08 (McKinney 1988). The Defendants move to dismiss Counts XI and XII, arguing that there is no private cause of action for violations of the penal code, that they fail to satisfy the statute of limitations and that they are not pleaded with particularity.

In a similar case involving the Texas Commercial Bribery statute, this Court refused to imply a private right of action under the penal statute where one did not expressly exist.

No case has come to the Court's attention in which a private cause of action for commercial bribery has been implied under this statute. In the absence of any guidance from state courts, federal courts are hesitant to imply private rights of action from state criminal statutes. Moreover, courts should consider whether a private right of action is necessary to protect the intended beneficiaries of a statute when determining whether to imply a private right of action.

*In re Integrated Resources, Inc. Real Estate Ltd. Partnership Sec. Lit.,* 851 F.Supp. 556, 564 (S.D.N.Y.1994) (citation omitted). The Court also noted that there was no reason to imply a private right of action because if the plaintiffs' allegations had merit, they would be entitled to recover on their common law claims for breach of fiduciary duty. *Id.* While this case involved Texas law, it is nonetheless instructive. As was true in *Integrated Resources,* if Philip Morris' allegations had been timely and properly pleaded, it would have been entitled to recover for both common law fraud and breach of fiduciary duty. Thus, it seems equally unnecessary to create a private right of action arising from New York penal law in this instance.

**\*18** Furthermore, New York case law is far from clear as to whether a private cause of action exists for New York's Commercial Bribery statute. Some

older cases, cited by Philip Morris, seem to accept the possibility, but fall short of affirmatively establishing such a cause of action. *Galella v. Onassis,* 353 F.Supp. 196, 227 (S.D.N.Y.1972) (violations of a prohibitory statute give rise to tort liability), *rev'd on other grounds,* 487 F.2d 986 (2d Cir.1973); *Shemin v. A. Black & Co.,* 240 N.Y.S.2d 622 (App.Div. 1st Dep't 1963) (tacitly acknowledging existence of private right of action, but noting that claim not proven); *31 Hillside Realty Corp. v. Norton,* 101 N.Y.S.2d 437, 440 (Special Term, Bronx Co.1950) (where violation is punishable by penal law, there is no reason why it should not be actionable civilly); *see also Texwood Ltd v. Gerber,* 621 F.Supp. 585, 589-90 (S.D.N.Y.1985) (noting lack of cited authority for proposition that private right of action exists under commercial bribery statute, but allowing that employer may recover bribes paid to employee in violation). Recent case law, however, has cast doubt upon the vitality of these earlier decisions. *Curiale v. Capolino,* 883 F.Supp. 941, 948 (S.D.N.Y.1995) (citing *CPC Int'l v. McKesson Corp.,* 70 N.Y.2d 268, 275-76, 519 N.Y.S.2d 804, 807-08 (1987) (rejecting implied private causes of action for two regulatory statutes)). The New York Court of Appeals has stated that the Legislature should specify in the statute itself whether private litigants are intended to have a cause of action under its provisions. *Burns Jackson Miller Summit & Spitzer v. Lindner,* 59 N.Y.2d 314, 325, 464 N.Y.S.2d 712, 716 (1983). Absent such a directive, the courts are to determine themselves, considering such factors as legislative history, consistency with the overall legislative scheme of creating the private right and whether the plaintiff is one of the class for whose special benefit the statute was enacted. *Id.* Given the lack of any clear guidance from the New York courts on this issue, the Court adopts the logic of *Integrated Resources,* declining the invitation to imply a private cause of action under New York's Commercial Bribery statute.

Even if there were a private right of action, the Court holds that the applicable statute of limitations period is three years. Thus, the claims are untimely anyway. Counts XI, XII and XIII are dismissed. [FN7]

FN7. Once again, the Court dismisses the claim against Heinrich *sua sponte.* The cause of action

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



cannot be maintained given the Court's view that such a private right has not been established.

### G. The Government's Motions to Intervene And Stay Discovery

Rule 24(a) of the Federal Rules of Civil Procedure provides that a party may intervene as of right in an action "when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest...." Fed.R.Civ.P. 24(a)(2). Alternatively, Rule 24(b) permits permissive intervention "when an applicant's claim or defense and the main action have a question of law or fact in common." Fed.R.Civ.P. 24(b)(2). As a rule, district courts in this Circuit have allowed the government to intervene in civil actions, especially when the government wishes to do so for the limited purpose of moving to stay discovery. *Twenty First Century Corp. v. LaBianca,* 801 F.Supp. 1007, 1009 (E.D.N.Y.1992). In this civil case, as in *LaBianca,* the Government seeks to intervene to protect its companion criminal prosecution from prejudice. Because the Government has a limited purpose for intervention--moving to stay civil discovery by way of interrogatories and depositions, excluding document discovery, however, pending disposition of the criminal case--this intervention will not "unduly delay or prejudice the adjudication." Fed.R.Civ.P. 24(b)(2). In such circumstances, a district court does not abuse its discretion in allowing intervention under either of the provisions of Rule 24. *LaBianca,* 801 F.Supp. at 1009 (citing *SEC v. Chestman,* 861 F.2d 49, 50 (2d Cir.1988)). Therefore, the Government's motion to intervene is granted.

**\*19** A federal district court has the inherent discretionary power to stay an action. *Id.* at 1010. Granting a stay of a civil proceeding to await the outcome of a pending parallel criminal investigation is appropriate when the interests of justice seem to require such action. The Court must balance the competing interests of the litigants, non-parties, the public interest and the convenience of the courts in making such determinations. *Id.* The Government contends that if the civil discovery is not stayed, the criminal investigation will be prejudiced, as the Defendants may have an opportunity to gain

evidence to which they are not entitled under criminal discovery rules. The Court holds that this justification provides grounds for granting the stay. In consideration of the Defendants' interest in expediting litigation of the civil suit, however, discovery (excluding document discovery) is stayed only through December 31, 1996, without prejudice to the Government's right to request an extension should one become necessary. The Government, of course, will have to make such a request and demonstrate its necessity prior to the stay's expiration.

### H. *Ex Parte* Status Of Government Affidavit

The Court has not considered the affidavit submitted *ex parte* and will not do so for purposes of deciding the cross-motion for a show cause hearing. Thus, as the document is irrelevant to a determination, it need not be turned over to the Defendants. The Defendants are directed to submit their reply brief on the cross-motion, without reference to the unreviewed *ex parte* affidavit, within 20 days of the date of this decision.

### III. Conclusion

The motions to dismiss Counts I-IV alleging Sherman Act and Donnelly Act claims are denied as to claims which accrued subsequent to March 4, 1989 and granted as to claims which accrued prior March 4, 1989. Philip Morris is granted leave to replead fraudulent concealment within 60 days of the date hereof.

The motions to dismiss Counts V-VI, sounding in common law fraud, are granted, and Count VII is dismissed *sua sponte,* without prejudice to Philip Morris' right to replead the alleged fraud with particularity within 60 days of the date hereof.

The Court retains Count VIII against Heinrich for breach of fiduciary duty.

The motions to dismiss Counts IX-X, for breach of fiduciary duty of another, are granted, with leave for Philip Morris to replead fraudulent concealment within 60 days of the date hereof.

The motions to dismiss Counts XI-XIII, alleging commercial bribery and commercial bribe receiving, are granted.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
**(Cite as: 1996 WL 363156, \*19 (S.D.N.Y.))**

The government's motion to intervene is granted, and its motion for a stay of discovery (excluding document discovery) is granted, such stay to expire on December 31, 1996 unless, by application made prior to that date, the government shows reason for an extension thereof.

SO ORDERED.

Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)

Motions, Pleadings and Filings (Back to top)

. 1:95cv00328 (Docket)
(Jan. 17, 1995)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



7

2005 WL 2420523                                                                                    **Page   1**
--- F.3d ----, 2005 WL 2420523 (2nd Cir.(N.Y.))
**(Cite as: 2005 WL 2420523 (2nd Cir.(N.Y.)))**
**H**

Briefs and Other Related Documents

Only the Westlaw citation is currently available.

United States Court of Appeals,
Second Circuit.
William TWOMBLY, individually and on behalf of
all others similarly situated
and Lawrence Marcus, individually and on behalf of
all others similarly
situated, Plaintiffs-Appellants,
v.
BELL ATLANTIC CORPORATION, BellSouth
Corporation, Qwest Communications
International, Inc., SBC Communications Inc. and
Verizon Communications Inc.,
Defendants-Appellees.
Docket No. 03-9213.

Argued: Sept. 15, 2004.
Decided: Oct. 3, 2005.

Background: Consumers brought putative class
action against incumbent local exchange carriers
(ILECs), alleging antitrust conspiracy both to
prevent competitive entry into local telephone and
Internet service markets and to avoid competing
with each other in their respective markets. The
United States District Court for the Southern
District of New York, Gerald Lynch, J., 313
F.Supp.2d 174, granted ILECs' motion to dismiss,
and consumers appealed.

 Holdings: The Court of Appeals, Sack, Circuit
Judge, held that:
 (1) no heightened pleading standard applies in
antitrust actions;
 (2) "plus factors" are not required to be pleaded in
order to state Sherman Act antitrust claim based on
parallel conduct, although pleaded factual predicate
must include conspiracy among realm of plausible
possibilities; and
 (3) consumers stated antitrust claim by alleging,
inter alia, that ILECs had not attempted to compete
meaningfully in each others' territories that
surrounded their own despite having acknowledged
inherent profitability of doing so.
 Vacated and remanded.

[1] Federal Courts ⟨⟩ 776

170Bk776 Most Cited Cases

[1] Federal Courts ⟨⟩ 794
170Bk794 Most Cited Cases
Court of Appeals reviews de novo district court's
dismissal of complaint for failure to state claim,
accepting as true all facts alleged in complaint and
drawing all inferences in favor of plaintiff.
Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

[2] Monopolies ⟨⟩ 28(6.2)
265k28(6.2) Most Cited Cases
No heightened pleading standard applies in antitrust
actions, since civil procedure rules do not require it.
Fed.Rules Civ.Proc.Rule 8(a), 28 U.S.C.A.

[3] Monopolies ⟨⟩ 28(6.2)
265k28(6.2) Most Cited Cases
In order to state claim for antitrust violation under
Sherman Act, plaintiff must allege that: (1)
defendants were involved in contract, combination
or conspiracy that (2) operated unreasonably to
restrain interstate trade, together with factual
predicate upon which those assertions are made.
Sherman Act, § 1 et seq., as amended, 15 U.S.C.A.
§ 1 et seq.; Fed.Rules Civ.Proc.Rule 8(a), 28
U.S.C.A.

[4] Federal Civil Procedure ⟨⟩ 2484
170Ak2484 Most Cited Cases
In order to survive motion for summary judgment or
for directed verdict in Sherman Act antitrust action
seeking damages, plaintiff must present evidence
that tends to exclude possibility that alleged
conspirators acted independently. Sherman Act, § 1
et seq., as amended, 15 U.S.C.A. § 1 et seq.

[4] Monopolies ⟨⟩ 28(8)
265k28(8) Most Cited Cases
In order to survive motion for summary judgment or
for directed verdict in Sherman Act antitrust action
seeking damages, plaintiff must present evidence
that tends to exclude possibility that alleged
conspirators acted independently. Sherman Act, § 1
et seq., as amended, 15 U.S.C.A. § 1 et seq.

[5] Federal Civil Procedure ⟨⟩ 2484
170Ak2484 Most Cited Cases
"Plus factors" required to survive summary
judgment motion in Sherman Act antitrust action,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



2005 WL 2420523                                                                    **Page  2**
**(Cite as: 2005 WL 2420523 (2nd Cir.(N.Y.)))**

i.e. additional circumstances which, when viewed in conjunction with parallel acts alleged, can serve to allow fact-finder to infer conspiracy, may include common motive to conspire, evidence that shows that parallel acts were against apparent individual economic self-interest of alleged conspirators, or evidence of high level of interfirm communications. Sherman Act, § 1 et seq., as amended, 15 U.S.C.A. § 1 et seq.

[5] Monopolies ⟨= 12(1.4)
265k12(1.4) Most Cited Cases
"Plus factors" required to survive summary judgment motion in Sherman Act antitrust action, i.e. additional circumstances which, when viewed in conjunction with parallel acts alleged, can serve to allow fact-finder to infer conspiracy, may include common motive to conspire, evidence that shows that parallel acts were against apparent individual economic self-interest of alleged conspirators, or evidence of high level of interfirm communications. Sherman Act, § 1 et seq., as amended, 15 U.S.C.A. § 1 et seq.

[6] Monopolies ⟨= 28(6.2)
265k28(6.2) Most Cited Cases
"Plus factors" are not required to be pleaded in order to state Sherman Act antitrust claim based on parallel conduct, since those factors may not be required elements of action at trial if, e.g., conspiracy can be proved directly; however, pleaded factual predicate must include conspiracy among realm of plausible possibilities. Sherman Act, § 1 et seq., as amended, 15 U.S.C.A. § 1 et seq.; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

[7] Monopolies ⟨= 12(2)
265k12(2) Most Cited Cases
Consumers stated Sherman Act antitrust claim against incumbent local exchange carriers (ILECs), in complaint that asserted conspiracy both to prevent competitive entry into local telephone and Internet service markets, in contravention of purposes of Telecommunications Act, and to avoid competing with each other in their respective markets, by alleging that ILECs had not attempted to compete meaningfully in other ILECs' territories surrounding their own despite having acknowledged inherent profitability of doing so, and that ILECs had interfered with competing local exchange carriers' (CLECs') customer relationships by, e.g., denying access to essential network equipment. Sherman

Act, § 1 et seq., as amended, 15 U.S.C.A. § 1 et seq.; Communications Act of 1934, § 251, as amended, 47 U.S.C.A. § 251.

 J. Douglas Richards, Milberg Weiss Bershad Hynes & Lerach LLP (Michael M. Buchman, Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY; Richard S. Schiffrin, Joseph H. Meltzer, Krishna Narine, Schiffrin & Barroway, LLP, Bala Cynwyd, PA; of counsel), New York, NY, for Plaintiffs-Appellants.

 Mark C. Hansen, Kellogg, Huber, Hansen, Todd & Evans, P.L.L.C. (Michael K. Kellogg, Sean A. Lev, Kellogg, Huber, Hansen, Todd & Evans, P.L.L.C., Washington, DC; Paul K. Mancini, William M. Schur, SBC Communications Inc., San Antonio, TX; John Thorne, Robert J. Zastrow, Verizon Communications Inc., Arlington, VA; Jay P. Lefkowitz, Kirkland & Ellis LLP, New York, NY; Hector Gonzalez, Mayer, Brown, Rowe & Maw LLP, New York, NY; Richard J. Favretto, Miriam R. Nemetz, Mayer, Brown, Rowe & Maw LLP, Washington, DC; J. Henry Walker, Marc W.F. Galonsky, Ashley Watson, BellSouth Corporation, Atlanta, GA; Peter K. Vigeland, Wilmer Cutler Pickering LLP, New York, NY; William J. Kolasky, Wilmer Cutler Pickering LLP, Washington, DC; Timothy M. Boucher, Qwest Communications International, Inc., Denver, CO; of counsel), Washington, DC, for Defendants-Appellees.

 Before: SACK, RAGGI, and HALL, Circuit Judges.

 SACK, Circuit Judge.

 *1 In an amended complaint filed in the United States District Court for the Southern District of New York, the plaintiffs allege that the defendant telecommunications providers [FN1] conspired not to compete against one another in their respective geographic markets for local telephone and high-speed Internet services, and to prevent competitors from entering those markets, in violation of Section 1 of the Sherman Act. At the time the complaint was filed, Section 1 provided:
Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 1 (2000) (amended 2004). [FN2] The district court (Gerard E. Lynch, *Judge* ) concluded that the amended complaint fails to allege sufficient facts from which a conspiracy can be inferred and therefore granted the defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

Because we disagree with the standard that the district court applied in reviewing the sufficiency of the plaintiffs' allegations, we vacate its judgment and remand for further proceedings.

## BACKGROUND

This case arises in the wake of the Telecommunications Act of 1996, Pub L. No. 104-104, 110 Stat. 56 (codified at scattered sections of Titles 15 and 47 of the United States Code) ("Telecommunications Act" or the "Act"), which was designed to promote competition in the market for local telephone service. *Twombly v. Bell Atl. Corp.,* 313 F.Supp.2d 174, 177 (S.D.N.Y.2003). The Act requires that the defendants--so-called "Baby Bells" or "Incumbent Local Exchange Carriers" ("ILECs"), which were created following the 1984 breakup of the American Telephone & Telegraph Co. ("AT & T")--open their government-sanctioned regional monopolies over local telephone service to competition from so-called "Competitive Local Exchange Carriers" ("CLECs"), including by allowing CLECs to connect their own telephone networks to those of the ILECs, by providing the CLECs with access to the ILECs' network elements for "just, reasonable, and nondiscriminatory" rates, and by allowing the CLECs to purchase the ILECs' telecommunications services at wholesale rates for resale to subscribers. 47 U.S.C. § 251(c); *Twombly,* 313 F.Supp.2d at 177. In exchange, the Act permits the ILECs to enter the market for long-distance service in which they were prohibited from participating since the breakup of AT & T. 47 U.S.C. § 271; *Twombly,* 313 F.Supp.2d at 177.

**\*2** The plaintiffs allege that the defendants,

motivated by the desire to protect their respective geographic monopolies and otherwise unsustainable profit margins, have resisted the mandate of the 1996 Telecommunications Act by conspiring with one another to keep CLECs from competing successfully in the defendants' respective territories. *Twombly,* 313 F.Supp.2d at 177-78. The plaintiffs also allege that the defendants, who among them control more than ninety percent of the market for local telephone service in the United States, Amended Complaint ("Am.Compl.") ¶ 48, have agreed not to compete with one another in their respective territories, *id.* ¶¶ 40-41; *Twombly,* 313 F.Supp.2d at 178. According to the plaintiffs, the result of this alleged conspiracy has been to drive CLECs out of business, to restrain competition in the market for local telephone and high-speed Internet services, and to injure the plaintiffs by forcing them, as consumers of those services, to pay at rates higher than they would otherwise pay in a competitive environment. *Twombly,* 313 F.Supp.2d at 178.

The amended complaint alleges several factual bases for its far-reaching claims of a two-pronged antitrust conspiracy.

*Agreement Not to Compete*

As an initial matter, the plaintiffs allege "parallel conduct" on the part of the ILECs in not competing with each other, which they assert "would be anomalous in the absence of an agreement ... not to compete." Am. Compl. ¶ 40. Specifically, they allege that for various historical reasons, the defendants' respective service territories are not entirely contiguous, with some of the defendants serving pockets of territory that are entirely surrounded by the territories of their supposed competitors. *Id.* ¶¶ 40-41. For example, according to the allegations, defendant SBC serves most of the State of Connecticut, even though defendant Verizon serves the surrounding northeastern states, and SBC also serves California and Nevada, even though defendant Qwest serves the surrounding western states. *Id.* ¶ 40. Similarly, Verizon serves many small patches of territory in various western and midwestern states that are otherwise primarily served by SBC. *Id.* While the plaintiffs contend that these geographic anomalies should provide Verizon and Qwest with "substantial competitive advantages" in competing with SBC for business in Connecticut,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



and California and Nevada, respectively, and SBC with similar advantages in competing with Verizon in the west and midwest, none of those companies has sought to compete with the others "in a meaningful manner." *Id.* ¶ 41. The plaintiffs deem this to be a situation that would be "unlikely" absent an agreement not to compete. *Id.* They suggest that this result is especially odd in that the defendants have publicly complained that the Telecommunications Act hurts their businesses by forcing them to provide CLECs with access to their networks at rates that are below the cost of maintaining those networks. *Id.* ¶ 39. By this same economic logic, the plaintiffs argue, the ILECs should be scrambling to compete with one another as CLECs, thereby benefitting from inexpensive access to their competitors' networks. *Id.*

**\*3** The plaintiffs also point to a statement allegedly made by Richard Notebaert, the current Chief Executive Officer of defendant Qwest and the former Chief Executive Officer of Ameritech Corp., which merged with defendant SBC in 1999. *Id.* ¶ 42. In a newspaper article published in October 2002, Notebaert was quoted as saying that for Qwest, competing in the territory of SBC/Ameritech "might be a good way to turn a quick dollar but that doesn't make it right." *Id.* (quoting Jon Van, *Ameritech Customers Off Limits: Notebaert,* Chi. Trib., Oct. 31, 2001, at Business 1). According to the plaintiffs, that statement, coming at a time when Qwest's revenues were declining and it was losing money, constituted an admission of collusive conduct among the ILECs. *Id.* ¶¶ 42-44.

And the plaintiffs point to a letter from two members of the House of Representatives to then-Attorney General John Ashcroft requesting that the Department of Justice investigate the extent to which the Baby Bells' "very apparent non-competition policy in each others' markets is coordinated." *Id.* ¶ 45 (quoting Letter from Rep. John Conyers Jr. and Rep. Zoe Lofgren to Att'y Gen. John D. Ashcroft (Dec. 18, 2002)).

In addition, the plaintiffs assert that the defendants communicate frequently with one another "through a myriad of organizations," providing an opportunity for a conspiracy to form and be conducted without the likelihood of detection. *Id.* ¶ 46. At the same time, they assert that "[t]he structure of the market for local telephone services is such as to make a

market allocation agreement feasible" even in the absence of frequent communications, in part because "[i]f one of the [d]efendants had broken ranks and commenced competition in another's territory the others would quickly have discovered that fact." *Id.* ¶¶ 48-49.

*Agreement to Prevent CLECs from Competing Successfully*

The plaintiffs further allege that from the day of the Telecommunications Act's enactment until the present, the defendants have sought to interfere with the ability of CLECs to compete successfully, including by negotiating "unfair agreements" with CLECs for access to the ILECs' telephone networks, by providing CLECs with poor quality connections to those networks, and by interfering with the CLECs' relationships with the CLECs' own customers, such as by continuing to bill customers even after they have entered agreements for services with CLECs. *Twombly,* 313 F.Supp.2d at 177-78; Am. Compl. ¶¶ 47, 64.

The plaintiffs cite a report by a consumer group, the Consumer Federation of America ("CFA"), which suggested that the defendants " 'have refused to open their markets by dragging their feet in allowing competitors to interconnect, refusing to negotiate in good faith, litigating every nook and cranny of the law, and avoiding head-to-head competition like the plague.' " *Id.* ¶ 47 (quoting Consumer Fed'n of Am., *Lessons From 1996 Telecommunications Act: Deregulation Before Meaningful Competition Spells Consumer Disaster* 1 (Feb.2001)).

**\*4** The plaintiffs allege that the defendants share a common motivation for their behavior in preventing the CLECs from competing because, were any one of the ILECs to allow meaningful competition in the geographic area it controls, "the resulting greater competitive inroads into that [d]efendant's territory would [reveal] the degree to which competitive entry by CLECs would [be] successful in the other territories in the absence of such conduct." Am. Compl. ¶ 50. Moreover, they contend, "the greater success of any CLEC that made substantial competitive inroads into one [d]efendant's territory would [enhance] the likelihood that such a CLEC might present a competitive threat in other [d]efendants' territories as well." *Id.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



*The District Court's Decision*

In dismissing the plaintiffs' amended complaint, the district court concluded that the allegations of "conscious parallelism" of the defendants' actions, taken by themselves, are not sufficiently probative, on a motion to dismiss, of conspiratorial intentions that would support a finding of antitrust-law violations. *Twombly,* 313 F.Supp.2d at 179-82, 184, 189. Instead, applying this Circuit's case law with respect to Sherman Act claims at the summary judgment stage, the court required the plaintiffs to "establish[ ] at least one 'plus factor' that tends to exclude independent self-interested conduct as an explanation for defendants' parallel behavior." *Id.* at 179. Such a factor, the court noted, could be, for example, "evidence that the parallel behavior would have been against individual defendants' economic interests absent an agreement, or that defendants possessed a strong common motive to conspire." *Id.* (citing *Apex Oil Co. v. DiMauro,* 822 F.2d 246, 253-54 (2d Cir.1987), *cert. denied,* 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987), *and cert. denied sub nom. Coastal Corp. v. Apex Oil Co.,* 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (1987)). While acknowledging that applying this standard in the context of a motion to dismiss "is somewhat in tension with Fed.R.Civ.P. 8, which requires only a 'short and plain statement of the claim,' " *id.* at 180 (quoting Fed.R.Civ.P. 8), the court concluded that such a standard is nonetheless appropriate for two reasons. First, it wrote, insofar as parallel behavior by competing companies is not itself illegal absent an agreement to restrain trade, "the doctrine of conscious parallelism [would] allow[ ] plaintiffs to state a claim by alleging conduct that is, in itself, not prohibited by § 1 of the Sherman Act." *Id.* at 181. Accordingly, the court concluded, "allowing simple allegations of parallel conduct to entitle plaintiffs to discovery circumvents both § 1's requirement of a conspiracy and Rule 8's requirement that complaints state claims on which relief can be granted." *Id.* Second, the court continued, "allegations of plus factors are necessary to give defendants notice of plaintiff's theory of the conspiracy." *Id.* "[T]here is simply no way to defend against such a claim without having some idea of how and why the defendants are alleged to have conspired." *Id.*

*5 Applying that standard, the court concluded that the plaintiffs fail to allege facts "suspicious enough

to suggest that defendants are acting pursuant to a mutual agreement rather than their own individual self-interest." *Id.* at 182. First, given the ILECs' stated opposition to the pricing structure imposed by the Telecommunications Act, the court wrote, their "parallel action" to "attempt to discourage CLECs from entering the market and to render it difficult for them to survive once they had entered ... does not naturally give rise to an inference of an agreement, since the behavior of each ILEC in resisting the incursion of CLECs is fully explained by the ILEC's own interests in defending its individual territory." *Id.* at 183.

Second, the district court also rejected the plaintiffs' claim that the defendants conspired not to compete against one another in their respective markets even though such behavior might have been financially advantageous to them in the short term. The court suggested that the plaintiffs' theory of the case erroneously assumes that operating a telephone business as an ILEC is substantially similar to operating a telephone business as a CLEC in territory controlled by another company. *Id.* at 185. In fact, the court wrote, the two businesses are "entirely different"; while ILECs are "self-sufficient," CLECs are "completely dependent" on their contractual relationships with the ILECs in whose territories they operate. *Id.* As a result, "an ILEC's market power in its home territory does not translate into market power as a CLEC in another ILEC's territory," such that "ILECs acting as CLECs are in much the same position as other, smaller, CLECs." *Id.* at 186. Even brand recognition and geographic proximity do not help, the court wrote, because the ILEC competing as a CLEC "is still dependent on its relationship with the [local] ILEC for survival." *Id.* at 186-87.

Moreover, the court noted, the plaintiffs' own allegations of how difficult it is to operate a successful CLEC cast doubt on their assertion that ILECs should be expected to attempt to compete with one another as CLECs in their respective territories. *Id.* at 187. "Plaintiffs' allegations raise the inference that each ILEC is well aware that becoming a CLEC in another market would be extremely difficult in the face of opposition from the local ILEC, because it is using the same tactics against CLECs in its market." *Id.* Accordingly, "there is no apparent reason for an ILEC to attempt to push out of its own territory and brave the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



barriers thrown up by other ILECs." *Id.*

Finally, the court rejected the plaintiffs' contention that the statement by Qwest CEO Notebaert in any way suggests collusion among the defendants. *Id.* at 188. "Considered in context," the court reasoned, "Notebaert's statement [ ] suggest[ed] only that he did not consider becoming a CLEC to be a sound long-term business plan, because all of the ILECs were challenging [47 U.S.C.] § 251 and its pricing structure through litigation, and the legal landscape in which CLECs operate could have changed at any time." *Id.*

*6 The district court therefore granted the defendants' motion to dismiss the plaintiffs' complaint in its entirety. *Id.* at 189. The plaintiffs appeal.

DISCUSSION
On appeal, the plaintiffs argue principally that the district court erred by applying, on a motion to dismiss, a heightened, "plus factors" standard of pleading ordinarily applicable as the standard of proof at the summary judgment and trial stages. In addition, the plaintiffs contend that even were there a "plus factors" pleading requirement, the district court erred in applying that standard by not accepting all of the plaintiffs' allegations as true and by not drawing all inferences in their favor. Because we conclude that the district court applied an incorrect standard for evaluating the defendants' motion to dismiss, we need not, and therefore do not, reach the plaintiffs' second argument.

I. Standard of Review

[1] We review *de novo* the dismissal of a complaint for failure to state a claim, accepting as true all facts alleged in the complaint and drawing all inferences in favor of the plaintiff. *Todd v. Exxon Corp.,* 275 F.3d 191, 197 (2d Cir.2001). "A complaint should not be dismissed for failure to state a claim 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Id.* at 197-98 (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "At the pleading stage ... the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of*

*N.Y.,* 375 F.3d 168, 177 (2d Cir.2004) (citation, brackets, and internal quotation marks omitted).

II. The Notice Pleading Standard

*A. General Principles*

Fed.R.Civ.P. 11(b) provides:
By presenting to the court ... a pleading ... an attorney ... is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, [the pleading is presented for a proper purpose, and]--
....
(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery ....
*Id.* At least in theory, then, when a complaint is filed by counsel, it arrives at the door of the district court with the warrant of counsel that "allegations and other factual contentions" contained in the complaint "have evidentiary support or, if specifically so identified"--presumably by being stated as being "to the best of [his or her] knowledge, information, and belief"--"are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery." *Id.* 11(b)(3).

*7 As for the contents of the complaint, Rule 8(a) provides only that it "shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends ..., (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks." Fed.R.Civ.P. 8(a); *see also id.,* Rule 8(e)(1) ("Each averment of a pleading shall be simple, concise, and direct."). As the Supreme Court recognized nearly half a century ago, the Rules thus set forth a pleading standard under which plaintiffs are required to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Conley,* 355 U.S. at 47, 78 S.Ct. 99. "Fair notice" is "that which will enable

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so that it may be assigned the proper form of trial." *Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) (citation and internal quotation marks omitted). The complaint thus need not "set out in detail the facts upon which" the claim is based. *Conley,* 355 U.S. at 47, 78 S.Ct. 99.

"[T]he purpose of pleading is to facilitate a proper decision on the merits," *Conley,* 355 U.S. at 48, 78 S.Ct. 99, and not simply to screen out complaints based on a lack of artful lawyering before any facts have been discovered, *id.* "[O]rdinary pleading rules are not meant to impose a great burden upon a plaintiff." *Dura Pharms., Inc. v. Broudo,* --- U.S. ----, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005); *see also* Fed.R.Civ.P. 8(f) ("All pleadings shall be so construed as to do substantial justice.").

*B. Heightened Pleading Standards*

The Rules do establish more demanding pleading requirements for certain kinds of claims. *See, e.g.,* Fed.R.Civ.P. 9(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."). But as the language of Rule 9 makes clear, and as the Supreme Court has recently confirmed, instances requiring such particularized pleading are narrowly circumscribed by the Rules. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 513, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions."). Antitrust actions are not among those exceptions.

In *Swierkiewicz,* the Supreme Court noted that it had previously "declined to extend" heightened pleading requirements to "other contexts" beyond "fraud or mistake." *Id.* (citing *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993)); *see also Leatherman,* 507 U.S. at 168, 113 S.Ct. 1160 (noting that while "the Federal Rules do address in Rule 9(b) the question of the need for greater particularity in pleading certain actions, [they] do not include among the enumerated actions any reference to complaints alleging municipal liability under § 1983[, and] *[e]xpressio unius est exclusio alterius* "). The *Swierkiewicz* Court unanimously

reaffirmed that approach with respect to the allegations of employment discrimination before it. *See Swierkiewicz,* 534 U.S. at 513, 122 S.Ct. 992 ("[C]omplaints in these cases, as in most others, must satisfy only the simple requirements of Rule 8(a)."). "A requirement of greater specificity for particular claims is a result that 'must be obtained by the process of amending the Federal Rules, and not by judicial interpretation.' " *Id.* at 515, 122 S.Ct. 992 (quoting *Leatherman,* 507 U.S. at 168, 113 S.Ct. 1160). Echoing *Conley,* the Court explained that "[t]he liberal notice pleading of Rule 8(a) is the starting point of a simplified pleading system, which was adopted to focus litigation on the merits of a claim." *Id.* at 514, 122 S.Ct. 992.

**\*8** Our recent opinion in *Wynder v. McMahon,* 360 F.3d 73 (2d Cir.2004), a race discrimination case, is instructive. The district court had "impos[ed] specific conditions on the form and content of" a complaint beyond those required by Rule 8(a). *Id.* at 74. We held that to have been improper. We said:
It is hardly debatable that the district court's order called for the plaintiff to supply a complaint that substantially exceeded the requirements of Rule 8. Under *Swierkiewicz,* Rule 8 pleading is extremely permissive. 534 U.S. at 512-13, 122 S.Ct. 992. As the Supreme Court there noted, Rule 8(a)(2) provides (a) that a complaint must include only "a short and plain statement of the claim showing that the pleader is entitled to relief," and (b) that such a statement simply " 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.' " 534 U.S. at 512, 122 S.Ct. 992 (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). [FN3] In the case before us, the district court demanded far more than a short and plain statement of the claims and the grounds upon which they rest.
*Id.* at 77. We went on to conclude that the plaintiff's pleading, however imperfect, had satisfied the permissive standard of Rule 8, rightly understood.
In the case before us, plaintiff's submission is a model of neither clarity nor brevity, and we can sympathize with the district court's displeasure with it, but it is sufficient to put the defendants on fair notice. In *Simmons,* we defined fair notice as "that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so that it may be assigned the proper form of trial." 49

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



F.3d at 86 (internal quotation marks omitted); *see also Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir.1988) (fair notice is judged by whether the complaint enables defendants "to answer and prepare for trial"). [The plaintiff's] complaint, at its core, achieves these ends.

*Id.* at 79. We therefore vacated the district court's dismissal and remanded for further proceedings.

### C. Heightened Pleading in Antitrust Cases

[2] Antitrust claims are, for pleading purposes, no different. We have consistently rejected the argument--put forward by successive generations of lawyers representing clients defending against civil antitrust claims--that antitrust complaints merit a more rigorous pleading standard, whether because of their typical complexity and sometimes amorphous nature, or because of the related extraordinary burdens that litigation beyond the pleading stage may place on defendants and the courts. *See Todd,* 275 F.3d at 198 ("No heightened pleading requirements apply in antitrust cases."); *George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.,* 554 F.2d 551, 553- 54 (2d Cir.1977) (rejecting the argument that "antitrust claims, because of their complexity, must be pleaded with greater specificity than other claims," and concluding that "a short plain statement of a claim for relief which gives notice to the opposing party is all that is necessary in antitrust cases, as in other cases under the Federal Rules... [;][t]he discovery process is designed to provide whatever additional sharpening of the issues may be necessary"); *Nagler v. Admiral Corp.,* 248 F.2d 319, 322-23 (2d Cir.1957) (noting that "[i]t is true that antitrust litigation may be of wide scope and without a central point of attack, so that defense must be diffuse, prolonged, and costly," and that "many defense lawyers have strongly advocated more particularized pleading in this area of litigation," but concluding that "it is quite clear that the federal rules contain no special exceptions for antitrust cases"). Indeed, it has been argued from time to time that antitrust cases are less suitable candidates for dismissal at the pleading stage than some other kinds of litigation because evidence of the claimed illegality is likely to be in the exclusive control of the defendants. *See Hosp. Bldg. Co. v. Trs. of Rex Hosp.,* 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976) ("[I]n antitrust cases, where 'the proof is largely in the hands of the alleged

conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." (quoting *Poller v. Columbia Broad. Sys., Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962))).

\*9 True, we have said that "[a]lthough the Federal Rules permit statement of ultimate facts, a bare bones statement of conspiracy or of injury under the antitrust laws without any supporting facts permits dismissal." *Heart Disease Research Found. v. Gen. Motors Corp.,* 463 F.2d 98, 100 (2d Cir.1972); *see also Klebanow v. N.Y. Produce Exch.,* 344 F.2d 294, 299 (2d Cir.1965) ("A mere allegation that defendants violated the antitrust laws as to a particular plaintiff and commodity no more complies with Rule 8 than an allegation which says only that a defendant made an undescribed contract with the plaintiff and breached it, or that a defendant owns a car and injured plaintiff by driving it negligently."). "[M]inimal requirements are not tantamount to nonexistent requirements." *Gooley v. Mobil Oil Corp.,* 851 F.2d 513, 514 (1st Cir.1988).

In *Klebanow,* for example, we rejected as insufficient a complaint that alleged simply that the defendants had engaged "in an illegal contract combination and conspiracy with others, unknown to the plaintiffs, to restrain and monopolize trade in, and to fix the price of, cottonseed oil," causing damages in excess of $11 million. *Klebanow,* 344 F.2d at 296 (internal quotation marks omitted). Judge Friendly, writing for the Court, noted that the complaint "furnishe[d] not the slightest clue as to what conduct by the defendants is claimed to constitute 'an illegal contract combination and conspiracy.' " *Id.* at 299. **[FN4]**

But in *United States v. Employing Plasterers' Ass'n,* 347 U.S. 186, 74 S.Ct. 452, 98 L.Ed. 618 (1954), the Supreme Court considered a complaint in a civil action brought by the federal government against a trade association, a labor union, and the union's president. Between them, the defendants were responsible for some sixty percent of the Chicago-area plastering contracting market. *Id.* at 187, 74 S.Ct. 452. The government alleged that the defendants had violated Section 1 by "act[ing] in concert to suppress competition among local plastering contractors, ... prevent[ing] out-of-state contractors from doing any business in the Chicago area and ... bar[ring] entry of new local contractors

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



without approval by a private examining board set up by the union." *Id.* at 188, 74 S.Ct. 452. "The effect of all this," according to the government, was "an unlawful and unreasonable restraint of the flow in interstate commerce of materials used in the Chicago plastering industry." *Id.* The district court dismissed the complaint, concluding "that there was no allegation of fact which showed that these powerful local restraints had a sufficiently adverse effect on the flow of plastering materials into Illinois." *Id.*

The Supreme Court disagreed, noting that "the complaint alleged that continuously [for more than a decade] a local group of people were to a large extent able to dictate who could and who could not buy plastering materials that had to reach Illinois through interstate trade if they reached there at all." *Id.* at 189, 74 S.Ct. 452. The Court continued:
  *10 Under such circumstances it goes too far to say that the Government could not possibly produce enough evidence to show that these local restraints caused unreasonable burdens on the free and uninterrupted flow of plastering materials into Illinois....
  The Government's complaint may be too long and too detailed in view of the modern practice looking to simplicity and reasonable brevity in pleading. It does not charge too little. It includes every essential to show a violation of the Sherman Act. And where a bona fide complaint is filed that charges every element necessary to recover, summary dismissal of a civil case for failure to set out evidential facts can seldom be justified.
  *Id.*

Three years later, the Court again emphasized the limited factual proffer required to satisfy the pleading requirement in a Section 1 case. It noted in *Radovich v. National Football League,* 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957), that "[t]he test as to sufficiency laid down by Mr. Justice Holmes ... is whether 'the claim is wholly frivolous,' " *id.* at 453, 77 S.Ct. 390 (quoting *Hart v. B.F. Keith Vaudeville Exchange,* 262 U.S. 271, 274, 43 S.Ct. 540, 67 L.Ed. 977 (1923)). Although the Court acknowledged that "the complaint might have been more precise in its allegations concerning the purpose and effect of the conspiracy," it concluded: " '[W]e are not prepared to say that nothing can be extracted from this bill that falls under the act of Congress.' " *Id.* (quoting *Hart,* 262

U.S. at 274, 43 S.Ct. 540).

Less than eight months later, we cautioned against extensive antitrust pleading in which unnecessary details "double the bulk without increasing enlightenment." *Nagler,* 248 F.2d at 325. Describing the plaintiffs' complaint as an "imposing document consisting of twelve or more printed pages," *id.* at 324, we said that we "must look beyond the mere mountain of words to the meaning sought to be conveyed," *id.* at 325. "So looking," we concluded, "we can have no doubt that plaintiffs say the supplier defendants have given their favored customers ... price discounts and other special favors (listed in some detail) which have lost sales to the plaintiffs, destroyed their capacity to compete, and forced some of them out of business." *Id.* While noting that the complaint did "lack a direct allegation that the defendants conspired together," we said that "as to this the trier of facts may draw an inference of agreement or concerted action from the 'conscious parallelism' of the defendants' acts of price cutting and the like." *Id.* Accordingly, we reversed the district court's dismissal of the complaint, concluding that the complaint should not "be burdened with possibly hundreds of specific instances" of the antitrust violations alleged. *Id.* at 326. "[S]uch pleading of the evidence is surely not required and is on the whole undesirable." *Id.* "It is a matter for the discovery process, not for allegations of detail in the complaint." *Id.*

  *11 [3] The factual predicate that is pleaded does need to include conspiracy among the realm of plausible [FN5] possibilities. *See, e.g., Todd,* 275 F.3d at 200 ("To survive a Rule 12(b)(6) motion to dismiss [in a Section 1 case], an alleged product market must [*inter alia* ] ... be 'plausible.' " (citing *Hack v. President & Fellows of Yale Coll.,* 237 F.3d 81, 86 (2d Cir.2000), *cert. denied,* 534 U.S. 888, 122 S.Ct. 201, 151 L.Ed.2d 142 (2001))); *see also DM Research, Inc. v. College of American Pathologists,* 170 F.3d 53, 56 (1st Cir.1999) (affirming dismissal where, "without more detail, it is highly implausible to suppose that [one of the defendants] or its members ha[d] any reason to 'agree' with" the other defendant unlawfully); *TV Communications Network, Inc. v. Turner Network Television, Inc.,* 964 F.2d 1022, 1026 (10th Cir.1992) (dismissing antitrust complaint in part on the basis of the implausibility of the conspiracy alleged); *cf. Asahi Glass Co., Ltd. v. Pentech*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



*Pharms., Inc.,* 289 F.Supp.2d 986, 995 (N.D.Ill.2003) (Posner, J., sitting by designation) ("[S]ome threshold of plausibility must be crossed at the outset before a patent antitrust case should be permitted to go into its inevitably costly and protracted discovery phase."). If a pleaded conspiracy is implausible on the basis of the facts as pleaded--if the allegations amount to no more than "unlikely speculations"--the complaint will be dismissed. *DM Research,* 170 F.3d at 56. But short of the extremes of "bare bones" and "implausibility," a complaint in an antitrust case need only contain the "short and plain statement of the claim showing that the pleader is entitled to relief" that Rule 8(a) requires.

We tackled this issue in the Section 1 context in *Discon, Inc. v. NYNEX Corp.,* 93 F.3d 1055 (2d Cir.1996), *vacated on other grounds,* 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998). Our analysis of the complaint under review began,
> In this case, we believe that the District Court may have been misled by a poorly drafted complaint into categorizing the arrangement as one that is presumptively legal. Since the complaint may properly be understood to allege arrangements that might be shown to be unlawful, we are obliged to reverse in part and remand. We believe that the complaint states a cause of action under Section One of the Sherman Act ....

*Id.* at 1059.

We continued:
> To state a claim under Section One of the Sherman Act, [the plaintiff] must allege (1) that the NYNEX Defendants entered into a contract, combination, or conspiracy, and (2) that their agreement was in restraint of trade. *See* 15 U.S.C. § 1.

*Id.* And then, by way of footnote, we said:
> The NYNEX Defendants devote a single footnote in their brief to the argument that [the plaintiff] failed to allege a "conspiracy" in restraint of trade. Although [the plaintiff's] complaint is not a model of clarity, it alleges that NYNEX, MECo, and AT & T Technologies conspired to defraud the rate-paying public and that this agreement apparently contemplated some form of discrimination against [the plaintiff]. More specifically, the complaint alleges the existence of various meetings between NYNEX procurement personnel, MECo officers, and agents of AT & T Technologies. These allegations are sufficient to defeat a motion to dismiss.

**\*12** *Id.,* n. 3 (citation omitted). The Supreme Court reversed, *NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998), but on the grounds that the legal theory underlying the asserted cause of action was incorrect, not that the factual allegations contained in the complaint were otherwise insufficient. [FN6]

While these decisions do not offer a bright-line rule for identifying the factual allegations required to state an antitrust claim, they suggest that the burden is relatively modest. The requirements of Rule 8 "notice pleading" as applied to claims under Section 1 of the Sherman Act remain relatively straightforward. Section 1 proscribes "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. Interpreting this prohibition, the Supreme Court "has long recognized that Congress intended to outlaw only unreasonable restraints." *State Oil Co. v. Khan,* 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) . [FN7] As a general matter, then, a Section 1 plaintiff must allege that (1) the defendants were involved in a contract, combination, or conspiracy that (2) operated unreasonably to restrain interstate trade, together with the factual predicate upon which those assertions are made. *See Tops Mkts., Inc. v. Quality Mkts., Inc.,* 142 F.3d 90, 95-96 (2d Cir.1998); *Discon, Inc.,* 93 F.3d at 1059. [FN8]

III. "Plus Factors" at the Pleading Stage

*A. On Summary Judgment*

**[4][5]** A plaintiff's claim, under the ordinarily applicable standard, will not survive a defendant's motion for summary judgment--a stage that this litigation has, of course, yet to reach--"[w]here the record taken as a whole could not lead a rational trier of fact to find for the [plaintiff on that claim]." *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) In making this determination, all " 'inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the [plaintiff].' " *Id.* (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam)) (alteration in original). In a case brought under Section 1 of the Sherman Act,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



however, "the range of permissible inferences from ambiguous evidence" is limited, *id.* at 588, 106 S.Ct. 1348, because antitrust laws prohibit only contracts, combinations, or conspiracies--and not independent parallel conduct--that operate unreasonably to restrain trade, *see Apex Oil,* 822 F.2d at 253. Although "[p]arallel conduct can be probative evidence bearing on the issue of whether there is an antitrust conspiracy," *id.,* it may also, as the district court in the instant case pointed out, "simply [be] the result of similar decisions by competitors who have the same information and the same basic economic interests," *Twombly,* 313 F.Supp.2d at 181. Accordingly, in a Section 1 case where there is no "direct, 'smoking gun' evidence," *Todd,* 275 F.3d at 198,

*13 conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. To survive *a motion for summary judgment or for a directed verdict,* a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently. *Matsushita,* 475 U.S. at 588, 106 S.Ct. 1348 (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) (citations omitted, emphasis added)). Thus, on a motion for summary judgment in a case involving alleged violations of Section 1, "courts have held that a plaintiff must show the existence of additional circumstances, often referred to as 'plus' factors, which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy." *Apex Oil,* 822 F.2d at 253. These "plus factors" may include: "a common motive to conspire," *id.* at 254, evidence that "shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators," *id.* (citation and internal quotation marks omitted), and evidence of "a high level of interfirm communications," *id.; accord Todd,* 275 F.3d at 198.

*B. On Motion to Dismiss.*

We are reviewing the grant of a motion to dismiss, not the grant of a motion for summary judgment, however. To survive a motion to dismiss, as we have explained, an antitrust claimant must allege only the existence of a conspiracy and a sufficient supporting factual predicate on which that allegation

is based.

[6] As discussed in part II.C. of this opinion, the pleaded factual predicate must include conspiracy among the realm of "plausible" possibilities in order to survive a motion to dismiss. *Nagler* suggests that a pleading of facts indicating parallel conduct by the defendants can suffice to state a plausible claim of conspiracy. *Nagler,* 248 F.2d at 325. Thus, to rule that allegations of parallel anticompetitive conduct fail to support a plausible conspiracy claim, a court would have to conclude that there is no set of facts that would permit a plaintiff to demonstrate that the particular parallelism asserted was the product of collusion rather than coincidence. Of course, if a plaintiff can plead facts in addition to parallelism to support an inference of collusion--what we have referred to above as "plus factors" at the summary judgment stage--that only strengthens the plausibility of the conspiracy pleading. But plus factors are not *required* to be pleaded to permit an antitrust claim based on parallel conduct to survive dismissal. Of course, as we have explained in the previous section of this opinion, *after* discovery, a plaintiff confronting a summary judgment motion is required to adduce admissible evidence of "plus factors" if it seeks to have the trier of fact infer an unlawful conspiracy in restraint of trade from consciously parallel conduct.

*14 We cannot know at the pleading stage whether the plaintiffs here will seek to rely on such an inference from parallelism based on "plus factors" or not. But there is no reason we can perceive to require the plaintiffs to include allegations of "plus factors" in their complaint, since they may not be required to establish "plus factors" at trial--if, for example, they can prove conspiracy directly. [FN9]

We acknowledge that district courts have occasionally elided the distinction between the standard applicable to Rule 12(b)(6) and Rule 56 motions on the basis of a well-founded concern that to do otherwise would be to condemn defendants to potentially limitless "fishing expeditions" [FN10]-- discovery pursued just "in case anything turn[s] up" [FN11]--in hopes, perhaps, of a favorable settlement in any event. In several recent cases, including this one, district courts have dismissed Sherman Act complaints because they did not contain substantial allegations of facts beyond "conscious parallelism" sufficient to support an inference that the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



defendants' actions were more likely than not conspiratorial. *See Twombly,* 313 F.Supp.2d at 180 ("In the context of parallel conduct allegations, simply stating that defendants engaged in parallel conduct, and that this parallelism must have been due to an agreement, would be equivalent to a conclusory, 'bare bones' allegation of conspiracy."); *see also Kramer v. Pollock-Krasner Found.,* 890 F.Supp. 250, 256 (S.D.N.Y.1995) (dismissing a Sherman Act claim "for failure to allege a sufficient factual basis," because "the defendants' allegedly conspiratorial actions could equally have been prompted by lawful, independent goals which do not constitute a conspiracy"); *Yellow Page Solutions, Inc. v. Bell Atl. Yellow Pages Co.,* No. 00 CIV. 5663, 2001 WL 1468168, at *14, 2001 U.S. Dist. LEXIS 18831, at *42 (S.D.N.Y. Nov.19, 2001) (dismissing a Sherman Act complaint for failure to state a claim because "uniformity does not permit an inference of a conspiracy where the conduct is in each party's individual self-interest"). *But cf. Levitch v. Columbia Broad. Sys., Inc.,* 495 F.Supp. 649, 675 (S.D.N.Y.1980) (dismissing a Sherman Act claim because "in order to state a valid claim under § 1, a plaintiff must, at a minimum, allege how [the defendants'] decisions are interdependent by at least suggesting that there is some reason to believe that the defendants were committed to a common end"), *aff'd,* 697 F.2d 495 (2d Cir.1983). As the district court in the instant case accurately stated: "While the Second Circuit's case law on parallel conduct conspiracies has developed mainly in the context of summary judgment, district courts have required that plaintiffs allege plus factors in order to withstand motions to dismiss as well." *Twombly,* 313 F.Supp.2d at 179-80.

The district court viewed the requirement that Section 1 plaintiffs plead "plus factors" as sensible because antitrust laws do not prohibit parallel conduct and because "the defendants [need] notice of plaintiff[s'] theory of the conspiracy." *Id.* at 181. To these considerations, the defendants add a third on appeal: the fear that, unless antitrust plaintiffs are required to plead "plus factors," "*any* claim asserting parallel conduct [will] survive a motion to dismiss." Appellees' Br. at 29. Without a heightened pleading requirement, the defendants predict, "[a]ntitrust cases [will] clog the courts for years, cost defendants millions of dollars to defend, and ... threaten to reward plaintiffs' attorneys for bringing meritless claims." *Id.* at 29-30.

*15 We are not unsympathetic to these concerns, but we find the arguments based on them ultimately unconvincing. At the pleading stage, we are concerned only with whether the defendants have "fair notice" of the claim, and the conspiracy that is alleged as part of the claim, against them--that is, enough to "enable [the defendants] to[, *inter alia,*] answer and prepare for trial," *Simmons,* 49 F.3d at 86--not with whether the conspiracy can be established at trial.

The *Nagler* Court admonished that while an antitrust defense will often prove "diffuse, prolonged, and costly," *Nagler,* 248 F.2d at 322, the remedy to that problem is not to be found in abandoning the rules of notice pleading and raising the bar on plaintiffs in the absence of a legislative mandate to do so. "[A] considerable part of federal litigation is of a lengthy and burdensome nature and we are not justified in frowning on a Congressional policy so definitely cherished as is [that expressed by 15 U.S.C. § 1]." *Id.* at 326. Thus, in a regime that contemplates the enforcement of antitrust laws in large measure by private litigants, although litigation to summary judgment and beyond may place substantial financial and other burdens on the defendants, neither the Federal Rules nor the Supreme Court has placed on plaintiffs the requirement that they plead with special particularity the details of the conspiracies whose existence they allege. *Cf. Radovich,* 352 U.S. at 453-54, 77 S.Ct. 390 (noting that Congress "has provided sanctions allowing private enforcement of the antitrust laws by an aggrieved party," and that "[i]n the face of such a policy this Court should not add requirements to burden the private litigant beyond what is specifically set forth by Congress in those laws"). [FN12]

We are mindful that a balance is being struck here, that on one side of that balance is the sometimes colossal expense of undergoing discovery, that such costs themselves likely lead defendants to pay plaintiffs to settle what would ultimately be shown to be meritless claims, that the success of such meritless claims encourages others to be brought, and that the overall result may well be a burden on the courts and a deleterious effect on the manner in which and efficiency with which business is conducted. If that balance is to be re-calibrated, however, it is Congress or the Supreme Court that must do so. [FN13] *See Swierkiewicz,* 534 U.S. at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



2005 WL 2420523
(Cite as: 2005 WL 2420523, *15 (2nd Cir.(N.Y.)))

Page 13

515, 122 S.Ct. 992 ("A requirement of greater specificity for particular claims is a result that must be obtained by the process of amending the Federal Rules, and not by judicial interpretation." (internal quotation marks and citation omitted)).

### IV. Applying the Notice Pleading Standard to This Appeal

[7] Accepting as true the facts alleged in the amended complaint, which are described at some length in the Background section of this opinion, above, and drawing all inferences in favor of the plaintiffs, we conclude that the plaintiffs have satisfied their burden at the pleading stage.

*16 As the district court pointed out, to support their single claim of a conspiracy under Section 1 of the Sherman Act, the plaintiffs allege an agreement to employ two anticompetitive tactics to maintain their respective monopoly control over discrete geographic markets. *Twombly*, 313 F.Supp.2d at 182. Pursuant to the first tactic, the defendants allegedly conspired "to collectively keep CLECs from successfully entering [the defendants' respective] markets." *Id.* Pursuant to the other, they allegedly agreed "to refrain from attempting to enter each other's markets as CLECs." *Id.*

The amended complaint alleges that the conspiracy began on February 6, 1996, around the time the Telecommunications Act became law, and has continued to the present day. Am. Compl. ¶ 64. It further alleges that the defendants together control more than ninety percent of the market for local telephone service in the continental United States, *id.* ¶ 48, and that they, together with other, unnamed "persons, firms, corporations and associations," engaged in the conspiracy, *id.* ¶ 16. While the amended complaint does not identify specific instances of conspiratorial conduct or communications, it does set forth the temporal and geographic parameters of the alleged illegal activity and the identities of the alleged key participants. It further alleges that the conduct was undertaken specifically to preserve historic monopoly conditions, and to thwart the pro-competitive purposes of the Telecommunications Act, *id.* ¶¶ 25-34, 47, a claim that, if true, would doubtless constitute an unreasonable restraint of trade. And it specifically alleges an effect on interstate commerce, noting that the defendants provide local telephone

and high-speed Internet services "across state lines," that they "regularly and frequently solicited customers and sent bills and received payments via the mail throughout the United States," and that the "marketing, sale and provision of local telephone and/or high speed Internet services regularly occurs in and substantially affects interstate trade and commerce." *Id.* ¶ 52.

With respect to the allegation that the defendants conspired not to invade each other's territory, the amended complaint asserts that most of the defendants are dominant in particular geographic areas that surround small pieces of territory controlled by other defendants, yet none have attempted to compete meaningfully in the surrounded territories. Am. Compl. ¶¶ 40-41. The amended complaint further alleges that the ILECs have conceded that competing as CLECs would be inherently profitable, because they have complained that the Telecommunications Act requires them to charge CLECs below-cost rates for network access. *Id.* ¶ 39. In addition, the amended complaint points to the alleged admission by defendant Qwest's CEO that such competition "might be a good way to turn a quick dollar but that doesn't make it right," even though Qwest was losing considerable amounts of money at the time the statement was made. *Id.* ¶¶ 42-44. [FN14]

*17 The factual allegations in support of the alleged conspiracy to keep CLECs from entering the ILECs' respective territories are that the ILECs have engaged in a variety of activities, such as interfering with the CLECs' customer relationships by continuing to bill customers who switched to the CLECs' services, denying the CLECs access to essential network equipment and facilities, and providing erroneous and confusing bills to the CLECs for their services, all designed to drive the CLECs out of business. *Id.* ¶ 47. According to the amended complaint, the defendants have frequent opportunities to organize and conduct their conspiracy through industry organizations, *id.* ¶ 46, and a common incentive to do so, because were even one ILEC to decline to participate, a successful CLEC in its territory would be better positioned to compete against other ILECs and would demonstrate that CLECs could succeed in the absence of anti-competitive conduct, *id.* ¶ 50. [FN15]

We conclude that these allegations [FN16] are

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



sufficient to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests," *Conley,* 355 U.S. at 47, 78 S.Ct. 99, and to "enable [the defendants] to answer and prepare for trial," *Simmons,* 49 F.3d at 86. Under the principles we have described and our decision in *Discon, Inc. v. NYNEX Corp., supra,* these allegations are enough successfully to withstand a motion to dismiss.

Whether the plaintiffs will be able to prevail in response to a motion for summary judgment after discovery or at trial is, of course, an entirely different matter. We have and express no view as to the merits of the plaintiffs' underlying claims and mean to imply none. Indeed, our analysis of the arguments made on appeal, which we have stated at some length, convinces us that it is premature to arrive at any such view. But even if "it ... [were to] appear [to us] on the face of the pleadings that a recovery is very remote and unlikely ... that is not the test" on a motion to dismiss, *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), and would not warrant an affirmance here.

CONCLUSION

For the foregoing reasons, we vacate the judgment of the district court and remand the case to the court for further proceedings.

FN1. The defendants-appellees are: Bell Atlantic Corp. ("Bell Atlantic"), BellSouth Corp. ("BellSouth"), Qwest Communications International, Inc. ("Qwest"), SBC Communications Inc. ("SBC"), and Verizon Communications Inc. ("Verizon").

FN2. The penalty provisions of the Sherman Act were amended on June 22, 2004, after this appeal was filed, to increase the maximum fines to $100,000,000 for a corporation and $1,000,000 for any other person, or imprisonment of up to ten years, or both. *See* Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub.L. No. 108-237, tit. II, § 215(a), 118 Stat. 661, 668.

FN3.
Other provisions of Rule 8 are inextricably linked to Rule 8(a)'s simplified notice pleading standard. Rule 8(e)(1) states that "[n]o technical forms of pleading or motions are required," and Rule 8(f) provides that "[a]ll pleadings shall be so construed as to do substantial justice." This simplified notice pleading standard relies on liberal discovery rules and

summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims. "The provisions for discovery are so flexible and the provisions for pretrial procedure and summary judgment so effective, that attempted surprise in federal practice is aborted very easily, synthetic issues detected, and the gravamen of the dispute brought frankly into the open for the inspection of the court." 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1202, p. 76 (2d ed.1990)
*Wynder,* 360 F.3d at 77 n. 6 (footnote in the original; renumbered).

FN4. The Court concluded, however, that it would be "improper" to dismiss the case without permitting the plaintiffs to amend their pleadings. *Klebanow,* 344 F.2d at 299-300.

FN5. One circuit court has employed this definition of "plausible" in another context: " 'superficially worthy of belief: CREDIBLE.' " *Mendoza Manimbao v. Ashcroft,* 329 F.3d 655, 664 (9th Cir.2003) (quoting Webster's Third New International Dictionary 1736 (1976)). The Supreme Court in *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), used the same term in the context of a motion for summary judgment. *See Matsushita,* 475 U.S. at 596-97, 106 S.Ct. 1348 ("[T]he absence of any plausible motive to engage in the conduct charged is highly relevant to whether a 'genuine issue for trial' exists within the meaning of Rule 56(e)."). As we note, however, language setting forth a summary judgment standard must be used with care in assessing a motion to dismiss.

FN6. The notion that a properly pleaded Section 1 claim must fall somewhere on the spectrum between providing more than not "furnish[ing] the slightest clue" as to what the defendants did wrong, *Klebanow,* 344 F.2d at 299, and offering "hundreds of specific instances" of malfeasance, *Nagler,* 248 F.2d at 326, comports with the law of our sister circuits, *see, e.g., S. Austin Coalition Cmty. Council v. SBC Communications Inc.,* 274 F.3d 1168, 1171 (7th Cir.2001) ("As long as Rule 8 stands unaltered, and there is no antitrust parallel to the Private Securities Litigation Reform Act, courts must follow the norm that a complaint is sufficient if any state of the world consistent with the complaint *could* support relief." (emphasis in original)), *cert. denied,* 537

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



U.S. 814, 123 S.Ct. 81, 154 L.Ed.2d 18 (2002); *DM Research, Inc.*, 170 F.3d at 55, 56 (noting that a Section 1 complaint "need not include evidentiary detail," but that "the discovery process is not available where, at the complaint stage, a plaintiff has nothing more than unlikely speculations"); *Estate Constr. Co. v. Miller & Smith Holding Co., Inc.*, 14 F.3d 213, 221 (4th Cir.1994) ("[I]n order to adequately allege an antitrust conspiracy, the pleader must provide, *whenever possible, some* details of the time, place and alleged effect of the conspiracy; it is not enough merely to state that a conspiracy has taken place." (citations and internal quotation marks omitted, emphasis added)); *Mun. Utils. Bd. v. Ala. Power Co.*, 934 F.2d 1493, 1501 (11th Cir.1991) ("A plaintiff must plead sufficient facts so that each element of the alleged antitrust violation can be identified.... However, the alleged facts need not be spelled out with exactitude." (citation and internal quotation marks omitted)); *Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 182 (3d Cir.1988) (" 'Although detail is unnecessary, the plaintiffs must plead the facts constituting the conspiracy, its object and accomplishment[, such as] ... the date of the alleged conspiracy [or] its attendant circumstances ... [or] who made [incriminating] statements, where, when or to whom.' ") (quoting *Black & Yates v. Mahogany Ass'n*, 129 F.2d 227, 231-32 (3d Cir.1941)).

FN7. Conduct can be deemed unreasonable in two ways. Certain conduct is considered *per se* unreasonable because it has "such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit." *State Oil Co.*, 522 U.S. at 10, 118 S.Ct. 275. In most cases, however, conduct must be evaluated under a "rule of reason" standard, "according to which the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *Id.*

FN8. These requirements generally accord with those of courts in other Circuits, though some courts have chosen to divide the inquiry into three prongs, rather than two. *See, e.g., Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1062 (9th Cir.2001); *Armstrong Surgical Ctr., Inc. v. Armstrong County Mem'l Hosp.*, 185 F.3d 154, 157 (3d Cir.1999),

*cert. denied*, 530 U.S. 1261, 120 S.Ct. 2716, 147 L.Ed.2d 982 (2000); *Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 961 F.2d 1148, 1158 (5th Cir.1992), *cert. denied sub nom. Dillard v. Sec. Pacific Corp.*, 506 U.S. 1079, 113 S.Ct. 1046, 122 L.Ed.2d 355 (1993); *In re Carbon Black Antitrust Litig.*, No. Civ. A. 03-10191-DPW, MDL No. 1543, 2005 WL 102966, at *5, 2005 U.S. Dist LEXIS 660, at *29 (D.Mass. Jan.18, 2005) [hereinafter " *Carbon Black* "].

FN9. The plaintiffs point to the holdings of various district courts that have recently reached similar conclusions. *See In re Tableware Antitrust Litig.*, 363 F.Supp.2d 1203, 1206 (N.D.Cal.2005) (noting that "[i]n considering whether a complaint provides insufficient factual support for a legally viable theory of relief, a useful thought experiment is to ask 'what [the] plaintiff [could] plead in an amended complaint to repair the defect,' " and rejecting the proposition that Rule 8 requires allegations of " 'when [the conspiracy] conversations took place, how many occurred, who participated, where the conversations took place, [and] what topics were discussed' as well as ... 'meeting dates,' 'meeting places' and [names of] 'individuals employed by ... [d]efendants who allegedly participated' "); *Carbon Black*, 2005 WL 102966, at *7 n. 7, 2005 U.S. Dist LEXIS 660, at *35 n. 7 (noting that where the question is "[h]ow much evidence of an illegal agreement must antitrust plaintiffs plead to avoid dismissal for failure to state a claim ... [t]he answer is certainly some quantum less than will be required at later stages" of the litigation (citation and internal quotation marks omitted, first alteration in original)); *In re Pressure Sensitive Labelstock Antitrust Litig.*, 356 F.Supp.2d 484, 492 (M.D.Pa.2005) (noting that "a plaintiff 'need *not* allege the existence of ... plus factors in order to plead an antitrust cause of action' " (quoting *Lum v. Bank of Am.*, 361 F.3d 217, 230 (3d Cir.2004) and adding emphasis)); *N. Jackson Pharmacy, Inc. v. Express Scripts, Inc.*, 345 F.Supp.2d 1279, 1286 (N.D.Ala.2004) (noting that " 'plus factor' allegations serve to substantiate a plaintiff's conspiracy allegation; their purpose is not to clarify an otherwise incomprehensible claim," and that "[j]ust as an employment-discrimination plaintiff need not allege 'circumstances that support an inference of discrimination,' there is no need for an antitrust plaintiff to allege a 'plus factor [which] generates an inference of illegal price fixing.' " (citations omitted, second alteration in original)).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



FN10. *But cf. Hickman v. Taylor,* 329 U.S. 495, 507, 67 S.Ct. 385, 91 L.Ed. 451 (1947) ("[T]he deposition-discovery rules are to be accorded a broad and liberal treatment. No longer can the time-honored cry of 'fishing expedition' serve to preclude a party from inquiring into the facts underlying his opponent's case.").

FN11. Charles Dickens, *David Copperfield* 159 (Jeremy Tambling ed., Penguin Books 1996) (1850). *Cf. Weinstock v. Columbia Univ.,* 224 F.3d 33, 49-50 (2d Cir.2000) ("Plaintiff would have us follow the advice of David Copperfield's mentor, the amicable Mr. Micawber, and let matters proceed in the hope that 'something will turn up.' This notion is inconsistent with the text and policy behind Rule 56 of the Federal Rules of Civil Procedure, which was intended to prevent such calendar profligacy." (citation omitted)).

FN12. The Federal Rules are not blind to the financial and other strains that meritless complaints place on defendants and on the judiciary. *See, e.g.,* Fed.R.Civ.P. 1 ("These rules ... shall be construed and administered to secure the just, speedy, and inexpensive determination of every action."). The Rules provide a variety of mechanisms for alleviating these burdens, *see, e.g.,* Fed.R.Civ.P. 11(c) (providing sanctions against parties for making frivolous or baseless claims, or claims brought for an improper purpose), including provisions for ridding the courts and defendants of clearly non-meritorious litigation before discovery, *see, e.g.,* Fed.R.Civ.P. 12(b)(6) (permitting dismissal for "failure to state a claim upon which relief can be granted"); Fed.R.Civ.P. 12(c) (permitting judgment on the pleadings). The Rules also provide "pretrial procedures ... to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues," as well as to do away with non-meritorious claims as the litigation progresses. *Conley,* 355 U.S. at 48 & n. 9, 78 S.Ct. 99.

FN13. Congress has, for example, attempted to do just that with respect to securities litigation. *See* Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 77z-1-2, 78j-1, 78u-4-5 (1997 & Supp.2003); Securities Litigation Uniform Standards Act of 1998, Pub.L. No. 105-353, 112 Stat. 3227 (amending scattered provisions of 15 U.S.C., including 15 U.S.C. §§ 77p, 77v, 78bb).

FN14. The complaint also relies on a report by the CFA in support of the proposition that the defendants have "avoid[ed] head-to-head competition like the plague." Am. Compl. ¶ 47 (quoting CFA, *Lessons From 1996 Telecommunications Act: Deregulation Before Meaningful Competition Spells Consumer Disaster* 1 (Feb.2001) (citation and internal quotation marks omitted)). And it cites a letter from two members of the House of Representatives to the Attorney General requesting an investigation into alleged antitrust violations by the Baby Bells. *Id.* ¶ 45 (citing Letter from Rep. John Conyers Jr. and Rep. Zoe Lofgren to Attorney General John D. Ashcroft (Dec. 18, 2002)). These documents, however, even if they are ultimately deemed to constitute admissible evidence, are irrelevant at the pleading stage. An allegation that someone has made a similar allegation does not, without more, add anything to the complaint's allegations of fact.

FN15. The fact that the defendants have engaged in parallel conduct against their self-interest has been recognized as a "plus factor" that, if proved at trial, can support the inference of collusion necessary for a jury finding of conspiracy. *Apex Oil,* 822 F.2d at 254. Thus, while plaintiffs pursuing section 1 actions are not required to plead "plus factors" to state a claim of conspiracy based on parallel anticompetitive conduct, the fact that the plaintiffs appear to be able to do so here makes it particularly difficult to conclude that the allegations contained in the complaint are insufficient to state a claim.

FN16. The amended complaint again cites the CFA report, this time for the proposition that the defendants' actions against CLECs may be coordinated. *Id.* ¶ 47. As we concluded, *supra* note 14, the CFA report consists of mere allegations, and thus does not provide factual support for the claims in the amended complaint.

--- F.3d ----, 2005 WL 2420523 (2nd Cir.(N.Y.))

Briefs and Other Related Documents (Back to top)

. 03-9213   (Docket)
(Nov. 17, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



8

861 F.2d 722 (Table)                                                          **Page 1**
861 F.2d 722 (Table), 1988 WL 117173 (6th Cir.(Ky.)), 1988-2 Trade Cases P 68,319
**Unpublished Disposition**
(Cite as: 861 F.2d 722, 1988 WL 117173 (6th Cir.(Ky.)))
H

NOTICE:    THIS    IS    AN    UNPUBLISHED
OPINION.

(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing in
the Federal Reporter. Use FI CTA6 Rule 28 and FI
CTA6 IOP 206 for rules regarding the citation of
unpublished opinions.)

United States Court of Appeals, Sixth Circuit.
UNITED STATES of America, (88-5118) Plaintiff-
Appellee,
v.
DYNAELECTRIC COMPANY, Defendant-
Appellant.
UNITED STATES of American, (88-5119)
Plaintiff-Appellee,
v.
G.W. Walther EWALT, Defendant-Appellant.
Nos. 88-5118, 88-5119.

Nov. 4, 1988.

W.D.KY., 674 F.Supp. 240.

AFFIRMED.

On Appeal from the United States District Court for
the Western District of Kentucky.

Before KEITH, RALPH B. GUY, Jr., and ALAN
E. NORRIS, Circuit Judges.

PER CURIAM.

**\*\*1** Defendants appeal their convictions pursuant to
a guilty plea, claiming that the indictment under
which they were charged was fatally defective
because it did not charge an agreement which
constitutes bid-rigging in violation of the Sherman
Act. Based on our conclusion that the indictment
properly sets forth the elements of the offense and
that defendants' conduct constituted a violation, we
affirm the defendants' convictions.

I.

Beginning sometime in 1980, Big Rivers, a non-
profit electric cooperative, undertook the
construction of an electrical generating power plant

in Ohio County, Kentucky. This plant, designated
the D.B. Wilson Station, Unit 1, required extensive
electrical work and, in February 1982, Big Rivers
invited five electrical contractors, including
defendant Dynaelectric Company, to submit sealed
bids for the electrical work, designated Contract
680. Competitive bidding for Contract 680 was
required by the Rural Electrification Administration,
United States Department of Agriculture, the
guarantor of the federal loan used to finance the
construction. All five contractors submitted bids
on Contract 680 on or near the due date of April 26,
1982. After receiving and evaluating the bids, Big
Rivers' board of directors awarded the contract to
the low bidder, Dynalectric, which had submitted a
bid for $15.8 million. On April 22, 1982, four
days before the bids on Contract 680 were due,
representatives of Dynalectric and the other four
bidders met at LaGuardia Airport and agreed among
themselves that Dynalectric would be the low bidder
on Contract 680, and that the other companies
would submit bids on the contract which were
higher than the bids submitted by Dynalectric.

On April 23, 1987, a federal grand jury indicted
Dynalectric Company; Dynalectric's president,
G.W. Walther Ewalt; and an executive of a
competing company, Kenneth Seales, for violating
section one of the Sherman Act. 15 U.S.C. § 1.
The one-count indictment alleged that between
approximately 1982 and 1985, the defendants and
others conspired to rig bidding on Contract 680, and
that the agreement was an unreasonable restraint of
interstate trade and commerce. The indictment
alleged that the agreement caused the following
effects: (a) the price of the contract "was fixed and
established artificially and non-competitively"; (b)
the competition for the contract was "restrained and
suppressed"; (c) Big Rivers was "denied the right to
receive competitive and non-collusive bids"; and
(d) Big Rivers was "denied the benefits of free and
open competition" for the contract.

Prior to the date set for trial, defendants moved to
dismiss the indictment on the ground that it failed to
allege an offense. The district court denied the
motion. Thereafter, defendants Dynalectric and
Ewalt entered pleas of guilty. Co-defendant Seales,
who is not a party to this appeal, proceeded to trial

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and was convicted; therefore, our discussion of the defendants throughout the remainder of this opinion will be confined to defendants Dynalectric and Ewalt. [FN1]

**\*\*2** On appeal, the defendants claim that the district court erred in finding that the indictment properly charged an offense under the Sherman Act. Defendants argue that the agreement described in the indictment does not constitute bid-rigging violative of the Sherman Act because there is no allegation that the agreement between the competitors either (a) restricted output or raised prices or (b) created the threat of restricting output or raising prices. [FN2]

## II.

Rule 7(c)(1) of the Federal Rules of Criminal Procedure states: "The indictment ... shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." In *Hamling v. United States,* 418 U.S. 87 (1974), the Supreme Court held that "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Id.* at 117 (citations omitted).

Defendants were charged with violating section one of the Sherman Act which reads in pertinent part as follows: "Every contract, combination ... or conspiracy, in restraint of trade or commerce ... is declared to be illegal." 15 U.S.C. § 1. Throughout its history, the courts have interpreted this statute to prohibit only agreements which unreasonably restrain trade.

Courts have utilized two methods in determining whether restraints of trade unreasonably restrict competition--the *per se* rule and the rule of reason. In *National Society of Professional Engineers v. United States,* 435 U.S. 679 (1978), the Court stated:

There are, thus, two complimentary categories of antitrust analysis.     In the first category are agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality--they are "illegal *per se.*"     In the second category are agreements whose competitive effect can only be

evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed.

*Id.* at 692.    Except in those cases where the alleged agreement or activity is "manifestly anticompetitive," there is a general presumption in favor of applying the rule of reason standard.  *See Continental T.V. v. GTE Sylvania,* 433 U.S. 36, 49-50 (1977).  In *Northern Pacific Railway v. United States,* 356 U.S. 1 (1958), the Court described generally the type of case in which application of the *per se* rule, as opposed to the rule of reason, would be appropriate:

However, there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.    This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable--an inquiry so often wholly fruitless when undertaken.

**\*\*3** 356 U.S. at 5.

As the court reiterated in *Broadcast Music, Inc. v. CBS,* 441 U.S. 1 (1979), " '[i]t is only after considerable experience with certain business relationships that courts classify them as *per se* violations....' "  *Id.* at 9 (quoting *United States v. Topco Associates, Inc.,* 405 U.S. 596, 607-608 (1972)).   As the district court noted in its order denying the defendants' motion to dismiss, the various courts of appeals which have considered the question have concluded that bid-rigging is both an unreasonable restraint of trade and a *per se* violation of section one of the Sherman Act.  *See, e.g., United States v. Sargent Electric Co.,* 785 F.2d 1123, 1127 (3d Cir.), *cert. denied,* 479 U.S. 819 (1986);    *United States v. W.F. Brinkley & Son Construction Co.,* 783 F.2d 1157, 1159-60 (4th Cir.1986); *United States v. Koppers Co.,* 652 F.2d

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



290, 293 (2d Cir.), *cert. denied*, 454 U.S. 1083 (1981).

Defendants claim, however, that the district court incorrectly assumes, without actually deciding, that the agreement alleged in the indictment did in fact constitute bid-rigging. In *United States v. Ben M. Hogan Co.*, 809 F.2d 480 (8th Cir.), *cert. denied*, 108 S.Ct. 84 (1987), the Eighth Circuit recently stated that, "[t]o establish bid-rigging, the government needed to show only that Hogan conspired with one or more of its competitors to manipulate the competitive-bidding process with respect to one or more ... jobs." 809 F.2d at 482. The indictment at issue in this case clearly alleges an agreement among competitors to manipulate the competitive bidding process for Contract 680, and the district court properly characterized the alleged activity as bid-rigging, particularly after noting that "each of the five independent electrical contractors, who would normally be in competition with each other, allegedly entered into a pact to rig their bids for submission to [Big Rivers]." (App. 99-100).

Defendants next argue that the district court merely "labelled" the acts set forth in the indictment as bid-rigging, and then improperly concluded that bid-rigging is, *ipso facto*, a *per se* violation of the Act. Such an analysis, defendants argue, violates the teachings of *Broadcast Music* and *Jefferson Parish Hospital v. Hyde*, 466 U.S. 2 (1984).

In *Broadcast Music*, the Court warned that "easy labels do not always supply ready answers [to the question of whether certain acts are *per se* violations of the Act]." 441 U.S. at 8. Instead, the Court held, it is necessary to determine whether the agreement is "within or without that category of behavior to which we apply the label '*per se* price fixing.' That will often, but not always, be a simple matter." *Id.* at 9 (footnote omitted).

In *Jefferson Parish*, the Court emphasized in its analysis of the case that a "definitional question" must precede any application of the *per se* rule:

Of course, the Sherman Act does not prohibit "tying"; it prohibits "contract [s] ... in restraint of trade." Thus, in a sense the question whether this case involves "tying" is beside the point. The legality of petitioners' conduct depends on its competitive consequences, not on whether it can be

labelled "tying." If the competitive consequences of this arrangement are not those to which the *per se* rule is addressed, then it should not be condemned irrespective of its label.

\*\*4 466 U.S. at 21, n. 34.

The indictment in this case alleges an agreement among the bidders on Contract 680 to allow Dynalectric to submit the lowest bid to Big Rivers, while each remaining bidder would submit non-competitive bids. This agreement by its very nature restrained and suppressed competition for Contract 680, *Koppers*, 652 F.2d at 295, and "clearly deprived [Big Rivers] of the benefits of a competitive bidding process." *Brinkley*, 783 F.2d at 1160. These competitive consequences are the type to which the *per se* rule is addressed, and the district court properly concluded that the activities alleged in the indictment amount to a *per se* violation of the Sherman Act.

Defendants argue further, however, that the indictment fails to charge an offense under section one of the Sherman Act because it does not "allege an agreement between competitors that either (a) restricts output or raises prices or (b) creates the threat of restricting output or raising prices." [FN3] We disagree. In order to be found *per se* violative of section one of the Sherman Act, bid-rigging must have the competitive consequences to which the *per se* rule is addressed but does not, of necessity, entail proof of a restriction on output or raising of prices. The indictment at issue in this case alleges that, as a result of the agreement entered into by the defendants, the price of Contract 680 was fixed and established artificially and non-competitively; competition for Contract 680 was restrained and suppressed; Big Rivers was denied the right to receive competitive and non-collusive bids for Contract 680; and Big Rivers was denied the benefits of free and open competition for the contract. These competitive consequences as alleged in the indictment are of the type to which the Sherman Act and the *per se* rule are addressed. The indictment properly set forth the elements of the offense charged and fairly informed the defendants of the charge against which they were to defend. *Hamling*. We therefore conclude that the district court properly denied the defendants' motion to dismiss the indictment based on the alleged failure of the indictment to charge an offense, and AFFIRM

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



861 F.2d 722 (Table)
**(Cite as: 861 F.2d 722, 1988 WL 117173, \*\*4 (6th Cir.(Ky.)))**

the defendants' convictions.

> FN1. Defendant Seales has filed a separate appeal.

> FN2. Due to the entry of the guilty pleas below, defendants have waived all non-jurisdictional defects to the convictions and are limited to raising jurisdictional questions on appeal. *United States v. Norris,* 281 U.S. 619 (1930).

> FN3. As authority for this argument the defendants cite and seem to rely primarily upon "Criminal Enforcement of the Antitrust Laws:    Targeting Naked Cartel Restraints," Charles F. Rule, Assistant Attorney General, Antitrust Division, 36th Annual Antitrust Spring Meeting, American Bar Association (March 24, 1988), wherein Mr. Rule states:    "In general, the conduct that we have prosecuted criminally can be described by four inter-related criteria:    ... (2) the agreements have as their inherently likely effect the raising of price and restricting of output...."

861 F.2d 722 (Table), 1988 WL 117173 (6th Cir.(Ky.)), 1988-2 Trade Cases    P 68,319 Unpublished Disposition

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

