UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
WORLD WRESTLING ENTERTAINMENT, INC.

                       Plaintiff,                         04 CV 8223 (KMK)
       v.                                      (ECF CASE)

JAKKS PACIFIC, INC.; JAKKS PACIFIC (H.K.)
LIMITED; ROAD CHAMPS LIMITED; THQ,
INC.; THQ/JAKKS PACIFIC LLC; STANLEY
SHENKER AND ASSOCIATES, INC.; STANLEY
SHENKER; BELL LICENSING, LLC; JAMES
BELL; JACK FRIEDMAN; STEPHEN BERMAN;
JOEL BENNETT; and BRIAN FARRELL,

                       Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**COMPENDIUM OF UNREPORTED DECISIONS CITED IN THE MEMORANDA OF
LAW IN SUPPORT OF THE JAKKS DEFENDANTS' MOTION TO DISMISS THE
SHERMAN ACT CLAIM IN THE AMENDED COMPLAINT**

**VOLUME 4 of 4**

FEDER, KASZOVITZ, ISAACSON,
  WEBER, SKALA, BASS & RHINE LLP
Murray L. Skala (MS 9354)
Jonathan D. Honig (JH 7577)
750 Lexington Avenue
New York, New York 10022
Phone: (212) 888-8200
Fax: (212) 888-5968

SKADDEN, ARPS, SLATE
  MEAGHER & FLOM LLP
Jonathan J. Lerner (JL 7117)
Michael H. Gruenglas (MG 8705)
James Keyte (JK 0680)
Maura B. Grinalds (MG 2836)
Four Times Square
New York, New York 10036
Phone: (212) 735-3000
Fax: (212) 735-2000

Attorneys for the JAKKS Defendants

October 18, 2005

## INDEX

**CASES**                                                                                                     **TAB**

County of Stanislaus v. Pacific Gas & Electric Co., No. 93 CV-F-93-5866, 1995 WL
    819150 (E.D. Cal. Dec. 18, 1995), aff'd, 114 F.3d 858 (9th Cir. 1997) ....................................1

James Cape & Sons Co. v. PCC Const. Co., No. 05-C-269, 2005 WL 2176965 (E.D.
    Wis. Sept. 6, 2005) ...........................................................................................................…..2

Kasada, Inc. v. Access Capital, Inc., No. 01 Civ. 8893, 2004 WL 2903776 (S.D.N.Y.
    Dec. 14, 2004)...................................................................................................................3

Martinez v. Sanders, No. 02 Civ. 5624, 2004 WL 1234041 (S.D.N.Y. June 3, 2004) .................4

Paycom Billing Services, Inc. v. Mastercard International, Inc., No. Civ. A 03-CV-6150
    (DGT), 2005 WL 711658 (E.D.N.Y. Mar. 29, 2005).................................................5

Philip Morris Inc. v. Heinrich, No. 95 Civ. 0328, 1996 WL 363156 (S.D.N.Y. June 25,
    1996).................................................................................................................................6

Twombly v. Bell Atlantic Corp., --- F.3d ----, 2005 WL 2420523 (2d Cir. Oct. 3, 2005).............7

United States v. Dynalectric Co., 861 F.2d 722, text available at 1988 WL117173 (6th
    Cir. Nov. 4,1988) ...........................................................................................................8

Vitale v. Marlborough Gallery, No. 93 Civ. (PKL) 6276, 1994 WL 654494 (S.D.N.Y.
    July 5, 1994) ....................................................................................................................9

Williams Electronic Games, Inc. v. Barry, No. 97 C 3743, 2001 WL 1104619 (N.D. Ill.
    Sept. 18, 2001), aff'd sub nom, Williams Electronic Games, Inc. v. Garrity, 366 F.3d
    569 (7th Cir. 2004) ........................................................................................................10

9

Not Reported in F.Supp.                                                                                    **Page** 1
Not Reported in F.Supp., 1994 WL 654494 (S.D.N.Y.), 1994-1 Trade Cases P 70,654, 32 U.S.P.Q.2d 1283
**(Cite as: 1994 WL 654494 (S.D.N.Y.))**
▷

United States District Court, S.D. New York.
Joan VITALE, Plaintiff,
v.
MARLBOROUGH GALLERY, The Pollock-
Krasner Foundation, The Pollock-Krasner
Authentication Board, Inc., Donald McKinney,
Francis Valentine O'Connor, Eugene
Victor Shaw, E.V. Thaw & Co., Jason McCoy,
Jason McCoy, Inc. and Francis K.
Lloyd, Defendants.
No. 93 Civ. (PKL) 6276.

July 5, 1994.
Carl E. Person, New York City, for plaintiff.

Joseph H. Lessem, Cowan, Liebowitz & Latman,
P.C., New York City, for Pollock-Krasner,
defendants.

OPINION AND ORDER

LEISURE, District Judge.

*1 This action arises out of plaintiff's inability to
sell a painting as a Jackson Pollock original because
of defendants' alleged monopolization of the market
for Pollock paintings, in violation of the Sherman
Antitrust Act, 15 U.S.C. §§ 1, 2. Plaintiff also
alleges a violation of the Lanham Act, 15 U.S.C. §
1125(a), based on defendants' publication of a
catalogue describing the painting as a forgery.
Finally, in her amended complaint, plaintiff asserts
state law claims for product disparagement,
unauthorized publication, unjust enrichment, breach
of constructive trust, violation of § 349 of the New
York General Business Law, and interference with
advantageous business relationships.

As an initial matter, this Court notes that in
assessing the adequacy of plaintiff's allegations, the
Court relies on plaintiff's amended complaint filed
during the pendency of defendants' motion.
According to Fed.R.Civ.P. 15(a), the plaintiff may
amend his complaint "once as a matter of course
before a responsive pleading is served." Otherwise,
a plaintiff may do so only "by leave of court or by
written consent of the adverse party." Fed.R.Civ.P.
15(a). While plaintiff has not made a motion
seeking leave to amend, defendants, in their reply
memorandum, endeavor to have this Court dismiss

plaintiff's amended complaint. Accordingly, this
Court treats defendants' reply as fulfilling the
written consent requirement to plaintiff's filing of
the amended complaint. [FN1]

Defendants Pollock-Krasner Foundation, The
Pollock-Krasner Authentication Board, Inc., Donald
McKinney, Francis Valentine O'Connor, Eugene
Victor Thaw, E.V. Thaw & Co., Jason McCoy and
Jason McCoy, Inc., have moved this Court for an
order dismissing this action pursuant to
Fed.R.Civ.P. 12(b)(6) and 8(a) for failure to state a
claim upon which relief can be granted. For the
reasons stated below, the motion is hereby granted.
[FN2]

BACKGROUND
In 1969, plaintiff Joan Vitale, an art and antiques
dealer, bought a painting, purportedly signed by
Jackson Pollock, at an antique auction in
Pennsylvania. Complaint at 2, 15. The following
day, plaintiff inquired about the potential value of
the painting at the Parke Bernet Gallery in New
York. Plaintiff was allegedly informed that as a
Pollock original, the painting could sell at auction
for anywhere between $125,000 and $165,000, but
that she would not be able to auction the painting
without first obtaining the approval of Lee Krasner,
Pollock's widow. Id. at 15. Plaintiff contacted
Krasner through defendant Marlborough Gallery to
arrange a time at which plaintiff could show the
painting to Krasner. Plaintiff brought the painting
to the Marlborough Gallery in order to meet Krasner
and obtain approval. Here she was told to leave the
painting overnight with the gallery and to return the
following day. Upon arriving at the Marlborough
Gallery the following day, plaintiff was met by a
group of people, among whom were three men who
allegedly introduced themselves as Assistant District
Attorneys from the Manhattan District Attorney's
Office. Id. at 17-18. After questioning plaintiff
about her acquisition of the painting, the men
allegedly informed her that they would need to hold
the painting as evidence in an ongoing art forgery
case but that they would return the painting at the
close of the case. Id. at 19. The men also asked
several questions concerning two other paintings
marked F/K which plaintiff had seen while
purchasing the Pollock painting. During the years
from 1969 to 1974, the painting remained in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK   Document 114-5   Filed 10/18/2005   Page 5 of 37

Not Reported in F.Supp.                                          Page 2
(Cite as: 1994 WL 654494, *1 (S.D.N.Y.))

defendants' possession. Plaintiff made repeated inquiries, but the painting was not returned. *Id.* at 20.

**\*2** Plaintiff did not retrieve her painting from defendants until 1974, five and a half years later. *Id.* at 21. In 1978, a picture of the painting appeared in the *Jackson Pollock Catalogue Raisonne* ("Catalogue"). Plaintiff's painting was among the paintings categorized as false attributions or forgeries. *Id.* at 22. Plaintiff contends that the Catalogue, published by the Yale University Press, serves a gatekeeping function for the market for modern and contemporary paintings, as it provides the only definitive list of Pollock's works for auction houses and galleries throughout America. Plaintiff also alleges that the false information in the Catalogue concerning her painting was supplied exclusively by the defendants, and that defendants were, in essence, black listing the painting by describing it as a forgery. *Id.*

Despite the blacklisting of the painting, plaintiff sought to sell it in New York. Upon contacting Parke Bernet, Christie's Gallery and ten other galleries in New York in or about the fall of 1974, plaintiff was told by each that they could not sell the painting without a letter of authentication from the Marlborough Gallery, the Krasner Foundation or the Krasner Committee. *Id.* at 23. Co-conspirators Parke Bernet and Christie's allegedly refused to accept the painting for sale at auction without the Krasner Foundation's or the Marlborough Gallery's approval, despite the fact that other qualified experts were willing to authenticate the painting. *Id.* at 21. Plaintiff alleges that the whimsical practices of authenticating paintings have been perpetuated by the Committee to this day, despite the death of Pollock's widow Lee Krasner in 1984. *Id.* at 2, 25. Based on her continued inability to sell the painting at auction, or privately through galleries, dealers, investors, collectors or museums, plaintiff brought the instant antitrust action in September of 1993, alleging damages in excess of $15,000, 000. Plaintiff claims that no Pollock painting other than those recognized as authentic by the Committee can be sold. Plaintiff alleges that the defendants' [FN3] control of the process of authentication and sale of Pollock paintings constitutes an unlawful restraint of trade in violation of § 1 and § 2 of the Sherman Antitrust Act.

DISCUSSION
I. *STANDARD FOR A MOTION TO DISMISS*

Defendants have moved for an order dismissing plaintiff's claim pursuant to Fed.R.Civ.P. 12(b)(6) and 8(a). In deciding defendants' motion, this Court must apply "the familiar standard for review of a Rule 12(b)(6) motion, which requires a court to construe any well-pleaded factual allegations in the complaint in favor of the plaintiff and dismiss the complaint only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Gagliardi v. Village of Pawling,* 18 F.3d 188, 191 (2d Cir.1994) (quoting *Allen v. West-Point-Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, (1957))}.

**\*3** "The court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Festa v. Local 3 International Brotherhood of Electrical Workers,* 905 F.2d 35, 37 (2d Cir.1990). Thus, a motion to dismiss must be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974) (citing *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). "When determining the sufficiency of plaintiffs' claim for Rule 12(b)(6) purposes, consideration is limited to the factual allegations in plaintiff's amended complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (citing *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47-48 (2d Cir.1991), cert. denied, 503 U.S. 960, 112 S.Ct. 1561 (1992)).

Defendants raise a number of defenses to plaintiff's claims, *inter alia:* (1) plaintiff's failure properly to allege a relevant product market; (2) plaintiff's failure to allege antitrust standing or injury; (3) plaintiff's failure to allege overt acts causing injury within the four years prior to suit, thus rendering plaintiff's claims time barred; and, (4) plaintiff's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1994 WL 654494, *3 (S.D.N.Y.))

failure to assert her claim within the statutory period under 15 U.S.C. § 1125(a).

## II. THE RELEVANT PRODUCT MARKET

Defendants contend that plaintiff has failed properly to allege a relevant product market. As a threshold matter this Court addresses plaintiff's assertion of a relevant market. Generally, under § 1 and § 2 of the Sherman Antitrust Act, a plaintiff must allege a contract, combination, or conspiracy constituting an unlawful restraint of trade. *See* 15 U.S.C. § 1; *Acquaire v. Canada Dry Bottling Co.,* slip op., No. 93-7368, at 4026 (2d Cir. May 13, 1994). A prerequisite to any antitrust claim, however, is the specification of which "trade or commerce," or which relevant product market, is allegedly restrained. *See Theatre Party Assocs., Inc. v. Shubert Org., Inc.,* 695 F.Supp. 150, 153 (S.D.N.Y.1988) (Section 2); *Frito-Lay, Inc. v. Bachman Co.,* 659 F.Supp. 1129, 1136 (S.D.N.Y.1986) (Section 1).

In determining the relevant market, the general rule is that "commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce,' monopolization of which may be illegal." *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 395 (1956); *see Frito-Lay, Inc.,* 659 F.Supp. at 1136. A market within a market, also termed a submarket, may also be the subject of a monopoly provided that its confines are well defined through the rule of reasonable interchangeability. *See Frito Lay, Inc.,* 659 F.Supp. at 1137 (finding salted snack foods may constitute a submarket of snack foods actionable under 15 U.S.C. § 1, provided that salted snack foods are not reasonably interchangeable with nonsalted snack foods). Furthermore, a single product may qualify as a submarket where the product is unique and there is no practical substitute. *See id.* The existence of a single product submarket is determined by reference to the following criteria: (1) public recognition of the submarket as a separate economic entity; (2) the products peculiar characteristics and uses; (3) the products distinct customers; (4) the products distinct prices and sensitivity to price changes and specialized factors. [FN4] *See Brown Shoe Co. v. United States,* 370 U.S. 294, 325 (1962); *Frito-Lay, Inc.,* 659 F.Supp. at 1137.

*4 Plaintiff alleges that the relevant market is contemporary and modern paintings and that Jackson Pollock paintings constitute a distinct and independent submarket. Examining plaintiff's assertion of a submarket in light of the above criteria, the Court finds, for the purposes of this motion to dismiss, that Jackson Pollock paintings may constitute a submarket, the monopolization of which may be unlawful under 15 U.S.C. § 1 or § 2. According to plaintiff's allegations, both exhibitions and sales of Pollock paintings are advertised as Pollock sales and not under the general rubric of modern art sales, thus signalling public recognition of a distinct submarket for Pollock paintings. Also, as any major art purchase may be motivated by highly subjective tastes, one cannot assume that a Rothko or a Franz Kline is interchangeable with a Pollock, as a salted peanut may be interchangeable with a salted corn chip. *See also Frito-Lay, Inc.,* 659 F.Supp. at 1138. In the esoteric world of art collecting, a Rothko painting would by no means satisfy the same artistic taste as would a Pollock painting. *See, e.g.,* "A Tour That Moves from Calligraphy to Pollock," *New York Times,* June 24, 1994, at 28 (describing Pollock as a highly distinctive artist who works "on his own plane"). Accordingly, this Court finds, for the purposes of the instant motion, that plaintiff has adequately alleged a submarket, sufficient to state a claim under 15 U.S.C. § 1 or § 2.

## III. PLAINTIFF'S § 1 and § 2 ANTITRUST CLAIMS

Defendants also raise the statute of limitations as an affirmative defense to plaintiff's antitrust claims. The statute of limitations for federal antitrust actions is four (4) years. *See* 15 U.S.C. § 15b (1982). Defendants move to dismiss the § 1 and § 2 claims contending that the plaintiff has failed to allege overt acts resulting in injury to plaintiff within the four years preceding the initiation of this lawsuit.

Generally, an antitrust "cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338 (1971); *accord Higgins v. New York Stock Exchange, Inc.,* 942 F.2d 829, 832 (2d Cir.1991). [FN5] The alleged anticompetitive acts giving rise to plaintiff's injury and cause of action occurred either in 1974, when plaintiff first learned of her

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
(Cite as: 1994 WL 654494, *4 (S.D.N.Y.))

Page 4

inability to sell the painting as a Pollock original, or, at the very latest, in 1978, when defendants allegedly caused plaintiff's painting to be blacklisted in the Catalogue. When the anticompetitive act causing the injury and giving rise to the cause of action occurs outside of the statutory period, the claim is time barred. *See Wolf*, 715 F.Supp. at 508.

In her amended complaint, plaintiff alleges the following anticompetitive acts: (1) the Committee has "refused to authenticate various Pollock paintings"; (2) the Committee has failed to use reasonable means to determine whether a painting is authentic; (3) the co-conspirators and defendants "have been preparing" a revised edition of the Jackson Pollock Catalogue Raisonne, listing plaintiff's painting once again as a forgery; (4) defendants have failed to withdraw from the conspiracy and failed to allow Pollock paintings to be authenticated by those other than the Committee members. However, these assertions fail to cure the time barred nature of this action, because plaintiff fails to allege an injury resulting from these acts. As discussed above, an overt act resulting in injury to the plaintiff must occur within the statutory time frame. *See Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1039 (2d Cir.1992) (citing *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295 (2d Cir.1979), *cert. denied*, 444 U.S. 1093 (1980)). Plaintiff fails to allege that any attempt was made to have the painting authenticated by the Committee at any time between 1989 and 1993, the four year period prior to initiation of this suit. Thus, both the injury giving rise to plaintiff's claim and the acts causing that injury are well outside the statutory period for an antitrust claim. *See Wolf*, 715 F.Supp. at 508.

*5 There are, however, two exceptions to the statute of limitations defense in antitrust actions. These are the continuing conspiracy exception and the speculative damages exception. To come within the first of these, the continuing conspiracy exception, a plaintiff must allege that she has been injured by "continued, separate antitrust violations within the limitations period." *Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299, 1301 (9th Cir.), *cert. denied*, 479 U.S. 886 (1986); *see also Kahn*, 970 F.2d at 1039-40. Thus to restart the statute of limitations plaintiff must allege an overt act which (1) is a "new and independent act

that is not merely a reaffirmation of a previous act"; and (2) "inflict[s] new and accumulating injury on the plaintiff." *Pace Industries, Inc. v. Three Phoenix Co.*, 813 F.2d 234 (9th Cir.1987). Defendants contend that plaintiff alleges only a continuation or reaffirmation of an allegedly wrongful act originally occurring in 1978, the reaffirmation of which allegedly occurred during the period 1989 to 1993, long after the statute of limitations had already run.

To support her argument for a continuing conspiracy, plaintiff alleges the following "overt acts": (1) the Committee has "*continued* to meet" to determine whether paintings in general should be authenticated; (2) defendants and co-conspirators have *continued* to require authentication by the Committee; (3) defendants and co-conspirators have *continued* to maintain an essential facility in New York for the auctioning of modern and contemporary paintings; and, (4) defendants "have taken no action to advise plaintiff" that she may sell her painting at auction in New York; (5) defendants and co-conspirators have *continued* to artificially manipulate the prices for modern and contemporary art. *See* Complaint at 31-33.

Even construing plaintiff's allegations liberally, plaintiff fails to allege a continuing conspiracy. Plaintiff's allegation of a refusal to recognize and sell plaintiff's painting as an authentic Pollock amounts at best to no more than a refusal to deal with the plaintiff. If an initial refusal to deal with a party is final, the statute of limitations begins to run and does not restart when the plaintiff makes subsequent unsuccessful efforts to deal with the defendant. *See Pace*, 813 F.2d at 237-39 (finding a permanent and final decision "made outside the limitations period does not constitute a continuing violation even if the injury continues within the statute period"); *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 714-15 (11th Cir.1984). Based on all the allegations herein, this Court finds that defendants' initial refusal to deal was final, and, accordingly, defendants continued failure to advise and continued requirement of authentication do not give rise to a new cause of action. [FN6]

Furthermore, courts in this Circuit "consistently have looked unfavorably on continuing violation arguments." *Blesedell v. Mobil Oil Co.*, 708 F.Supp. 1408, 1415 (S.D.N.Y.1989); *accord La*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



*Beach v. Nestle Co.,* 658 F.Supp. 676, 687 (S.D.N.Y.1987). In fact, only "compelling circumstances" will warrant application of the exception to the statute of limitations. *La Beach,* 658 F.Supp. at 687. Even construing all factual allegations in the light most favorable to the plaintiff, as required by Fed.R.Civ.P. 12(b)(6), this Court finds that neither defendants' continued failure to advise nor their continued requirements of authentication constitute compelling circumstances.

**\*6** The second exception to the statute of limitations bar is the speculative damages exception. According to this exception, if future damages are unascertainable, a cause of action for such damages does not accrue until they occur. *See Zenith,* 401 U.S. at 339; *see Higgins v. New York Stock Exchange, Inc.,* 942 F.2d 829, 832 (2d Cir.1991) (refusing to find an exception to the date of injury rule for accrual of action, since it was not the *rare case* in which the damages caused by an antitrust injury are so speculative that the court is unwilling to estimate them) (emphasis added). Although plaintiff has raised a speculative damages argument in only very vague terms, this Court finds that her claim does not qualify for this exception. Generally, uncertain damages, which prevent recovery, are distinguishable from the uncertain extent of damage, which does not prevent recovery. *See Pace Industries, Inc.,* 813 F.2d at 240 (quoting *In re Multidistrict Vehicle Air Pollution,* 591 F.2d 68, 73 (9th Cir.), *cert. denied,* 444 U.S. 900 (1979)

Plaintiff's allegations with respect to her injury are based on her inability to sell the painting at auction. The *extent* of these damages, *i.e.,* the value obtainable at auction, while uncertain, is not so speculative that it could not be estimated. Accordingly, plaintiff's damages are not speculative and plaintiff's claim does not qualify under the speculative damages exception. *See, e.g., Higgins,* 942 F.2d at 832; *Pace,* 813 F.2d at 240. Since neither the speculative damages exception nor the continuing conspiracy exception to the statute of limitations applies, plaintiff's first and second causes of action are dismissed as time barred.

## IV. PLAINTIFF'S CLAIM FOR VIOLATION OF THE LANHAM ACT

Plaintiff also asserts a federal claim based on the publication of plaintiff's painting in the *Jackson Pollock Catalogue Raisonne,* published by the Yale University Press in 1978. Plaintiff alleges that the listing of her painting in the Catalogue as a forgery constitutes a violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

The Lanham Act does not provide its own statute of limitations. Therefore, this Court must borrow the appropriate analogous state statute of limitations. *See Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 462-65 (1975). Defendants argue that the appropriate state law equivalent cause of action is injury to property. The Court finds, however, that the more analogous cause of action is one based in fraud and, accordingly, the appropriate statute of limitations is six years. *See PepsiCo, Inc. v. Dunlop Tire & Rubber Corp.,* 578 F.Supp. 196, 223 (S.D.N.Y.1984).

Generally speaking, the Lanham Act "has been employed successfully to combat a wide variety of deceptive commercial practices." *PPX Enterprises Inc. v. Audiofidelity Enterprises, Inc.,* 818 F.2d 266, 270. It provides a statutory remedy for trademark infringement and unfair competition to a party injured by a competitor's false designation of origin of its product, and also provides a remedy for false or misleading advertisements of fact. *See Romm Art Creations Ltd. v. Simcha Int'l Inc.,* 786 F.Supp. 1126, 1132-34 (E.D.N.Y.1992).

**\*7** To state a cause of action under 15 U.S.C. § 1125(a), a plaintiff must set forth well pleaded factual allegations sufficient to demonstrate, *inter alia,* a false designation of origin or false description or advertisement of fact. *See Consumers Union of U.S., Inc. v. New Regina Corp.,* 664 F.Supp. 753, 764 n. 12 (S.D.N.Y.1987); *see also Johnson & Johnson * Merck Consumer Pharmaceuticals Co. v. Smithkline Beecham Corp.,* 960 F.2d 294, 297 (2d Cir.1992). Even conferring plaintiff the benefit of a six year statute of limitations, the allegation that the 1978 publication of the Catalogue supports a cause of action is clearly time barred.

Plaintiff attempts to circumvent the statute of limitations by premising her claim not only on the original publication of the Catalogue in 1978, but also on the contention that defendants' and co-conspirators' are preparing a revised edition of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Catalogue. This contention cannot salvage her claim, in that, the alleged preparation of the revised edition does not support a claim under the Lanham Act.

The essence of a Lanham Act claim for false advertising is deception of the consumer public. *See Getty Petroleum Corp. v. Island Transportation Corp.,* 878 F.2d 650, 655 (2d Cir.1989) ("A Lanham Act plaintiff seeking damages is normally expected to prove actual consumer confusion or deception resulting from the violation"); *Coors Brewing Co. v. Anheuser-Busch Companies, Inc.,* 802 F.Supp. 965 (S.D.N.Y.1992); *see also American Needle & Novelty v. Drew Pearson Marketing,* 820 F.Supp. 1072, 1978 (N.D.Ill.1993) (finding that private letter addressed to nonconsuming agent was not "advertising" within meaning of Lanham Act). [FN7]

Plaintiff's bald and conclusory assertion that defendants' and alleged co-conspirators are preparing to distribute a catalogue some time in the future are not sufficient to survive the instant motion. The Court notes that plaintiff's allegations appear to present this Court with an issue that may be premature for adjudication. [FN8]

While the Court need not reach this issue in dismissing plaintiff's claim, the Court notes that, contrary to defendant's assertion, the Lanham Act, amended in 1988, is no longer limited to misrepresentations of the quality of a defendant's own goods, but applies equally to misrepresentations of a plaintiff's goods by defendant. *See* S.Rep. No. 100-515, reprinted in 1988 U.S.Code Cong. & Admin.News, 5577, 5603; *see also Media Arts Int'l, Ltd. v. Trillium Health Products,* 25 U.S.P.Q.2d (E.D.Pa.1992) (finding infomercial making false statements about competitor's juicer actionable under Lanham Act).

## V. PENDENT STATE CLAIMS

In addition to alleging federal claims under 15 U.S.C. § 1, § 2, and 15 U.S.C. § 1125(a), plaintiff also asserts state law claims. Where a court has jurisdiction over one or more aspects of a case, it may properly assert jurisdiction over any other aspects of the case that share a common nucleus of operative facts. *See United Mine Workers v. Gibbs,* 383 U.S. 715 (1966); *Roco Carriers, Ltd. v. M/V*

*Nurnberg Express,* 899 F.2d 1292 (2d Cir.1990). Although the exercise of pendent jurisdiction is a matter of the district court's discretion, once a court dismisses all federal claims, "the balance of factors ... will point toward declining to exercise jurisdiction over the remaining state-law claims." *Morse v. University of Vermont,* 973 F.2d 122, 127 (2d Cir.1992) (quoting *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1988)). Therefore, in exercising its discretion, this Court dismisses all pendent state law claims.

## VI. SANCTIONS

**\*8** Defendants also request the Court to sanction plaintiff under Fed.R.Civ.P. 11 for bringing a claim which defendants contend had no chance of success whatsoever. Rule 11 "explicitly and unambiguously imposes an affirmative duty on each attorney to conduct a reasonable inquiry into the viability of a pleading before it is signed." *Knipe v. Skinner,* 19 F.3d 72 (2d Cir.1994) (quoting *Eastway Const. Corp. v. City of New York,* 762 F.2d 243, 253 (2d Cir.1985)). Thus a court may impose sanctions when one party asserts a claim which to the best of plaintiff's "knowledge, information and belief formed after a reasonable inquiry" was not "warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law." Fed.R.Civ.P. 11.

The goal of Rule 11 is to "discourag[e] dilatory and abusive litigation tactics and eliminat[e] frivolous claims and defenses, thereby speeding up and reducing the costs of the litigation process." *McMahon v. Shearson/American Express., Inc.,* 896 F.2d 17, 21 (2d Cir.1990). "In deciding whether the signer of a pleading, motion, or other paper has crossed the line between zealous advocacy and plain pettifoggery, the court applies an objective standard of reasonableness." *United States v. International Brotherhood of Teamsters,* 948 F.2d 1338, 1344 (2d Cir.1991). "Rule 11 is not intended to chill an attorney's creative, imaginative or enthusiastic advocacy on his client's behalf. So long as his pleadings meet the test of reasonableness and are not interposed for ... improper purposes ... sanctions are not warranted." *McMahon,* 896 F.2d at 22. This applies even to those "positions that may arguably be at odds with existing precedent." *Cross & Cross Properties, Ltd. v. Everett Allied Co.,* 886 F.2d 497, 504 (2d Cir.1989). "Thus, not all

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
(Cite as: 1994 WL 654494, *8 (S.D.N.Y.))

Page 7

unsuccessful legal arguments are frivolous or warrant sanction." *Mareno v. Rowe,* 910 F.2d 1043 (2d Cir.1990), *cert. denied,* 498 U.S. 1028 (1991). Moreover, "[c]ourts should ... resolve all doubts in favor of the signer." *Cross,* 886 F.2d at 504.

Having reviewed the arguments raised by plaintiff's counsel in the instant case, the Court concludes that the imposition of Rule 11 sanctions is not merited. Although plaintiff's claims were dismissed by the Court, they did not rise to the level of frivolousness that would make the imposition of sanctions appropriate.

## CONCLUSION

For the reasons stated above, defendants motion to dismiss for failure to state a claim is granted and the action is dismissed in its entirety. Additionally, defendants' request for sanctions is denied.

SO ORDERED.

FN1. Additionally, since leave to amend pleadings is "freely granted," *Foman v. Davis,* 371 U.S. 178, 182 (1962); *see Richardson Greenshields Secur., Inc. v. Mui-Hin Lau,* 825 F.2d 647, 653 n. 6 (2d Cir.1987), this Court hereby grants plaintiff leave to amend *nunc pro tunc,* and accepts the amended complaint as duly filed.

FN2. Although only the above named defendants have moved this Court, this opinion applies with equal force and effect to the remaining defendants, the Marlborough Gallery and Francis K. Lloyd, under res judicata or law of the case doctrines. *See Arizona v. California,* 460 U.S. 605, 618-19 (1988).

FN3. Plaintiff has named the following as co-conspirators but not defendants: members of the Pollock-Krasner Authentication Board not already named as defendants, each of the Marlborough Galleries not already named as defendants, the Parke Bernet Gallery, Sotheby's, Christie Manson & Woods International, the Yale University Press, Lee Krasner, the Krasner Estate and various leading art museums.

FN4. This factor can be reduced to an analysis of the cross-elasticity of demand in the market. In assessing the cross-elasticity of demand between products, the Court must consider the responsiveness of the sales of one product to price changes of another. Posing such a question in the instant action would, for instance, require the Court to examine whether the change in price of a Rothko painting would affect the demand of a Pollock painting.

FN5. While section 1 and 2 of the Antitrust Act are distinct causes of action, both are confined by the statute of limitations set forth in 15 U.S.C. and both cause of action are measured by the date-of-injury rule. *See Wolf v. Wagner Spray Tech Corp.,* 715 F.Supp. 504, 508 (S.D.N.Y.1989).

FN6. The Ninth Circuit has analogized antitrust injury giving rise to a cause of action in a manner relevant to the instant action: "When turned away from the theater at eight o'clock because the performance is sold out, his exclusion occurs at eight, not during the performance or when it concludes at eleven o'clock." *In re: Multidistrict Vehicle Air pollution,* 591 F.2d 68, 71 (9th Cir.), *cert. denied sub nom. AMF, Inc. v. General Motors Corp.,* 444 U.S. 900 (1979); *see Orgell, Inc. v. Geary's Stores,* 640 F.2d 936 (9th Cir.) (finding injury was the result of an initial refusal and subsequent refusals merely restated the previous final decision therefore time barring the action), *cert. denied,* 454 U.S. 816 (1981).

FN7. Explicit in the language of § 1125 is the requirement of public deception. The Act applies to any person using in commerce any false or misleading description of fact which "is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1125(a). *See Alfred Dunhill, Ltd. v. Interstate Cigar Co.,* 499 F.2d 232 (2d Cir.1974) (stating that a claim for false advertising brought pursuant to the Lanham Act should be based on "false advertising" as that term is commonly understood).

FN8. In general, courts should avoid "entangling themselves in abstract disagreements." *In re Drexel Burnham Lambert Group,* 995 F.2d 1138, 1146 (2d Cir.1993) (discussing the doctrine of ripeness) (quoting *Abbott Lab v. Gardner,* 387 U.S. 136, 148 (1967)).

Not Reported in F.Supp., 1994 WL 654494 (S.D.N.Y.), 1994-1 Trade Cases P 70,654, 32 U.S.P.Q.2d 1283

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



10

Not Reported in F.Supp.2d                                                                        **Page  1**
Not Reported in F.Supp.2d, 2001 WL 1104619 (N.D.Ill.), 2001-2 Trade Cases  P 73,500,
RICO Bus.Disp.Guide 10,148
**(Cite as: 2001 WL 1104619 (N.D.Ill.))**
**H**

Motions, Pleadings and Filings

United States District Court, N.D. Illinois, Eastern
Division.
WILLIAMS ELECTRONIC GAMES, INC., et al.,
Plaintiffs,
v.
Gregory S. BARRY, et al., Defendants.
No. 97 C 3743.

Sept. 18, 2001.

MEMORANDUM OPINION AND ORDER

GETTLEMAN, District J.

*1 Plaintiff Williams Electronic Games, Inc. has
brought an eight count third amended complaint
against Gregory Barry, its former employee, and
Lorna Barry, James S. Garrity, Lawrence J. Gnat,
Linda Gnat, Richard S. Slupik, as well as three of
plaintiff's former vendors, Arrow Electronics Inc.,
Milgray Electronics, Inc., and Microcomp Inc., for
damages arising out of an alleged fraudulent
kickback scheme. Counts I and II, directed against
all defendants except Milgray, allege violations of
the Racketeer Influence and Corrupt Organization
Act ("RICO"), 18 U.S.C. § 1961 *et seq.* Count III,
brought against Arrow, Garrity, Milgray, Lawrence
Gnat and Slupik, alleges Sherman Act Violations,
15 U.S.C. § 1 *et seq.* Count IV, against all
defendants, alleges state law claims for breach of
fiduciary duty and inducement to breach fiduciary
duty. Count V, against all defendants, alleges
common law fraud and conspiracy. Count VI,
alleges violations of the Illinois Consumer Fraud
and Deceptive Business Practices Act ("CFA"), 815
ILCS 505/1 *et seq.* Count VII alleges breach of
contract and restitution against Barry only, and
Count VIII seeks an equitable accounting and
constructive trust against all defendants.

All defendants have answered the third amended
complaint and have asserted various affirmative
defenses. In addition, Milgray has filed a
counterclaim against plaintiff, and a cross-claim
against Lawrence Gnat, Slupik and Microcomp.

Presently before the court are eight separate

motions. For convenience, the court has grouped the
motions into three categories: 1) motions regarding
or attacking plaintiff's complaint: a) Arrow's motion
for summary judgment on RICO, consumer fraud,
fiduciary duty, constructive trust and punitive
damages; b) Arrow's and Milgray's joint motion for
summary judgment on price fixing; c) Milgray's
motion for summary judgment on consumer fraud,
fiduciary duty, constructive trust and punitive
damages and; d) Linda Gnat's motion for summary
judgment on all counts directed toward her; 2)
motions attacking Milgray's cross-claim and
counterclaims: a) Lawrence Gnat's and
Microcomp's motion for summary judgment; b)
Slupik's motion for summary judgment and; c)
Williams' motion for summary judgment; and 3)
plaintiff's motion for summary judgment on certain
affirmative defenses asserted by the various
defendants. As set forth in detail below, the motions
are granted in part and denied in part.

Discussion [FN1]

    FN1. The basic allegations of plaintiff's complaint
    cam be gleaned from the court's previous opinion.
    *Williams Elec. Games, Inc. v. Barry,* 42 F.Supp.2d
    785 (N.D.Ill.1999) ("Williams I"). Familiarity with
    the facts and the players is assumed.

*I. Motions regarding plaintiff's complaint*

*A. Arrow and Milgray*

*1. Counts I and IIRICO*

In Counts I and II, plaintiff charges Arrow with
violating civil RICO and conspiracy to violate RICO
under 18 U.S.C. § 1962(c)(d). Arrow has moved for
summary judgment on both counts, arguing that
plaintiff has no evidence to establish: 1) that Arrow
authorized or acquiesced in Garrity's alleged
misconduct; 2) a RICO enterprise; or 3) a pattern of
racketeering activity.

To establish a claim under § 1962(c), plaintiff must
prove: 1) the existence of an enterprise that affects
interstate commerce; 2) that the defendant was
employed by or associated with the enterprise; 3)
that the defendant participated in the conduct of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                          **Page  2**
(Cite as: 2001 WL 1104619, *1 (N.D.Ill.))

enterprise's affairs; and 4) that the defendant participated through a pattern of racketeering activity. *Williams I*, 42 F.Supp.2d at 790. Arrow challenges all elements, but in particular the requirement that the defendant participate in the conduct of the enterprise's affairs.

**\*2** In the instant action, plaintiff does not allege that Arrow participated directly in the affairs of the alleged enterprise, but is liable only for Garrity's alleged fraud based on *respondeat superior*. In *Williams I*, the court thoroughly reviewed the law on *respondeat superior* liability under RICO and held that Arrow could be held liable for Garrity's conduct under § 1962(c), but only if Garrity's wrongful acts are: 1) related to and committed within the course of employment; 2) committed in furtherance of the corporation's business; and 3) authorized or subsequently acquiesced in by the corporation. *Id.* at 792. The court dismissed the RICO counts without prejudice because plaintiff had failed to allege the last element. Subsequently, plaintiff sought and was granted leave to file a third amended complaint adding back the RICO allegations based on facts uncovered during the course of discovery.

Arrow now argues that the little bit of evidence "uncovered" by plaintiff fails in any way to demonstrate that Arrow either authorized or acquiesced in Garrity's conduct. Although the court agrees that plaintiff's case appears thin at best, there are sufficient facts in dispute under Fed.R.Civ.P. 56 to submit to a jury. As Arrow correctly notes, plaintiff has no direct evidence, i.e., no witness statements or documents, showing definitively that anyone at Arrow knew that Garrity was paying kickbacks to Barry. There is some evidence, however, from which a jury could infer that persons at Arrow were aware that someone at Arrow was paying kickbacks to plaintiff.

Larry Suida, a former buyer for plaintiff, testified that in late 1989 or early 1990, while he was still working at plaintiff, Garrity asked Suida to come in and introduce himself and his line of Arrow products. Garrity gave his sales speech and then said, "two percent of anything you give me goes back into your pocket." The meeting then ended. Suida said that this was the only time he had ever been approached in such a fashion. Suida did not tell anyone at Arrow, but did tell his outgoing purchase

manager, Vice President of purchasing, Larry Kesselman, when Kesselman questioned why Suida refused Arrow's business. He did not name Garrity specifically.

Three or four years later in 1994, Suida left plaintiff to work at Capcom, plaintiff's competitor. Capcom was a start-up company at the time and Arrow wanted to do business with it. Arrow sent a four or five person contingent to meet with Suida. Suida told this group that "I was aware of who they were and I was aware of their kickback policy. And it is in the best interest that we just leave it like it is, and I was a little surprised." He was surprised because he got no reaction from any of the Arrow people. He did not specifically mention Garrity or the alleged 2% kickback, or plaintiff when referring to kickbacks, because the Arrow people did not ask. He did, however, have a conversation with the Arrow people about the extremely large amount of business Arrow was doing with plaintiff and how much money Garrity was earning in commissions, expressing surprise that plaintiff was not a "house account."

**\*3** Although this evidence is slight, a jury could infer from Suida's testimony that people at Arrow knew that Garrity was paying kickbacks to Barry. Arrow is correct that another inference is that Suida was impliedly seeking kickbacks of his own and was unhappy with Arrow's policy against it. A third plausible explanation is that the Arrow people thought Suida was referring to Arrow's policy regarding limits on gifts to buyers. Any of these explanations are possible, but under Fed.R.Civ.P. 56, all reasonable inferences are to be drawn in favor of the nonmovant. *Fisher v. Transco Services- -Milwaukee, Inc.,* 979 F.2d 1239, 1242 (7th Cir.1992). Accordingly, the court concludes that there is sufficient evidence that Arrow ratified Garrity's action to defeat summary judgment.

Next, Arrow argues that plaintiff has not established a RICO enterprise involving Arrow. As Arrow points out, plaintiff's RICO case statement lists three enterprises involving Arrow: 1) the association-in-fact of Barry and Lorna Barry, together with Arrow, Milgray, Garrity, Microcomp, Linda Gnat, Lawrence Gnat, Slupik, Procomponents, Donald Barry, Kathleen Barry, ETAK and APC and its agents and representatives including Harold G. Krause and Michael Iatomasi;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
(Cite as: 2001 WL 1104619, *3 (N.D.Ill.))

2) Barry, together, with Lorna Barry, Arrow, Garrity, Slupik, Lawrence Gnat, Milgray and Microcomp; and 3) Barry, together with Lorna Barry, Arrow, Milgray, Microcomp, Linda Gnat, Lawrence Gnat and Slupik.

Arrow argues that the evidence shows that these enterprises are nothing more than random lists of defendants, none of which had structure, continuity, hierarchy, differentiation of roles, or a common purpose required of a RICO enterprise. As this court has noted, the hallmark of an enterprise is structure. *Williams I,* 42 F.Supp.2d at 793-94 (citing *United States v. Rogers,* 89 F.3d 1326 (7th Cir.1996)). A RICO enterprise is an ongoing structure of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchy or consensual decision making. *Id.* Although there must be some structure to distinguish an enterprise from a mere conspiracy, there need not be much. The continuity of an informal association and a differentiation among roles can provide the separate structure. *Id* .

It is true, as Arrow asserts, that plaintiff has not conclusively established any of the enterprises identified in the RICO case statement. Plaintiff has, however, provided sufficient evidence of an association-in-fact between Barry, Garrity and Williams with Barry and Garrity having diverse roles, and Arrow allowing itself to be sued to perpetrate the fraud and accepting the benefit thereof. Moreover, there is some circumstantial evidence that Gnat, Slupik and Milgray may also have joined this enterprise. [FN2]

> FN2. As noted in the section of this opinion discussing plaintiff's price fixing claim, the evidence of agreement between Garrity and Milgray (Slupik and/or Lawrence Gnat) was insufficient to meet plaintiff's burden under § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, of tending to exclude the possibility of independent action by the defendants. Coupled with the evidence of Barry's association with Garrity, the evidence is sufficient to create an issue of fact as to whether an enterprise existed, absent the heightened standard required under § 1.

Accordingly, the court concludes that there is sufficient evidence to submit to a jury on whether plaintiff can establish a RICO enterprise involving Arrow.

**\*4** Finally, Arrow attacks plaintiff's evidence that Arrow engaged in a pattern of racketeering activity. RICO requires at least two acts of racketeering activity within a ten year period. 18 U.S.C. § 1961(5). While two acts are required, two acts alone are generally not sufficient. *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 237 (1989). The two acts must be related and amount to or pose a threat of continued activity. "In other words a RICO plaintiff ... must show continuity plus relationship with respect to the alleged predicate acts." *Corley v. Rosewood Care Center, Inc.,* 142 F.3d 1041, 1048 (7th Cir.1998).

In the instant case, plaintiff has evidence of numerous repeated acts of mail fraud which have the same or similar purposes, results, participants, victims or methods of commission, leaving the relationship prong uncontested. *H.J. Inc.,* 492 U.S. at 237. Instead, Arrow challenges the continuity aspect of the pattern.

Continuity over a closed period may be demonstrated by proof of a series of related predicate acts extending over a period of time. Closed period continuity is analyzed under a five factor test: "the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes, and the occurrence of distinct injuries." *Morgan v. Bank of Waukegan,* 804 F.2d 970-75 (7th Cir.1989). Although no single factor is determinative, duration is "the single most important aspect of the closed-ended continuity analysis. *Id.* at 781.

In the instant case, the alleged scheme lasted almost eight years, and involved thousands of alleged acts of mail fraud consisting of false or overpriced invoices. Despite this lengthy involvement and the enormity of the number of acts, Arrow argues that there is only a single scheme, with a single victim, and a single injury, preventing a finding of continuity. In support of this argument Arrow relies on cases such as *Midwest Grinding Co., Inc. v. Spitz,* 976 F.2d 1016, 1019 (7th Cir.1992) and *Jones v. Lampe,* 845 F.2d 755, 757 (7th Cir.1988), in which the Seventh Circuit has cautioned against the use of multiple instances of similar acts of mail fraud to find continuity. For example, in *Midwest Grinding,* the court stated that the number of instances of mail and wire fraud may be "no

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



indication of continuity since the multiplicity of such acts may be no indication of the underlying fraudulent activity. 976 F.2d at 1024-25. In *Jones*, the court stated that multiple acts of mail fraud in furtherance of a single episode of fraud involving one victim and relating to one basic transaction cannot constitute the necessary pattern. 845 F.2d at 757.

In contrast to these cases is *Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1300 (7th Cir.1987), in which Seventh Circuit held that a seven month single scheme which defrauded a single victim established a pattern of racketeering activity because each instance of false billing inflicted an injury separate and independent of the previous and succeeding instances of false billing. "[T]he repeated infliction of economic injury upon a single victim of a single scheme is sufficient to establish a pattern of racketeering activity for purposes of civil RICO. *Id.* at 1305.

**\*5** In *Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.*, 63 F.3d 516, 524 (7th Cir.1995), the court analyzed the divergence between the *Jones* line of cases and the *Liquid Air* case. The court notes a distinguishing pattern. In the *Jones* type cases, there was an interdependence amongst the predicate acts and each act was not responsible for a discreet injury. The acts were all necessary to perpetrate a single large fraud. In contrast, in *Liquid Air* each false invoice on its own deprived the plaintiff of a specific amount of revenue. Each invoice represented a discreet attempt to defraud Liquid Air and had little to do with the previous or subsequent false invoices.

As noted in *Williams I*, 42 F.Supp.2d at 795, the instant case is more similar to *Liquid Air* than *Midwest Grinding* or *Jones*. Each separate invoice from Arrow to plaintiff represented an allegedly discreet attempt to defraud plaintiff and had nothing to do with the previous false invoices. Accordingly, the court concludes that there is sufficient evidence of a pattern of racketeering activity to survive summary judgment. Arrow's motion for summary judgment on Counts I and II is, therefore, denied.

### 2. Count III--Price Fixing

In Count III, plaintiff alleges that Arrow and Milgray have violated Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. [FN3] Specifically, plaintiff charges that between September 1994 and June 1996 Arrow (through Garrity) and Milgray (through Gnat and Slupik) agreed to "fix, raise, stabilize and maintain prices of components known as 'eproms.' ' Arrow and Milgray have moved for summary judgment on this count, arguing that plaintiff has failed to present evidence sufficient to meet its burden on two of the three elements of its claim.

> FN3. 15 U.S.C. § 1 provides in pertinent part:
> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among several States, or with foreign nations, is declared to be illegal.

#### a. *Standards*

A price fixing claim under Section 1 requires proof of three elements: 1) a contract, combination or conspiracy; 2) resulting in an unreasonable restraint of trade in the relevant market; and 3) an accompanying injury. *Denny's Marina, Inc. v. Renfro Products, Inc.*, 8 F.3d 1217, 1220 (7th Cir.1993). Arrow and Milgray argue that plaintiff has no admissible evidence of a conspiracy or agreement, or a cognizable antitrust injury.

"On a claim of concerted price fixing, the antitrust plaintiff must present evident sufficient to carry its burden of proving that there was such an agreement." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763 (1984). "To prevail there must be evidence that tends to exclude the possibility of independent action by the [defendants]. That is, there must be direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Reserve Supply Corp. v. Owens-Corning Fiberglass Corp.*, 971 F.2d 37, 48-49 (7th Cir.1992) (quoting *Market Force, Inc. v. Wauwatosa Realty Co.*, 906 F.2d 1167, 1170-71 (7th Cir.1990) (quoting *Monsanto*, 465 U.S. at 768)). As emphasized by the Court, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). Therefore, "to survive a motion for summary judgment a plaintiff

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2001 WL 1104619, *5 (N.D.Ill.))

seeking damages for a violation of § 1 must present evidence that tends to exclude the possibility that the alleged conspirators acted independently." *Id.* quoting *Monsanto*, 465 U.S. at 474. In other words, a non-moving plaintiff "must show that the inference of conspiracy is reasonable in light of the competing inference of independent action." *Valley Liquors, Inc. v. Renfield, Importers, Ltd.*, 822 F.2d 656, 660 (7th Cir.1987).

**\*6** Because antitrust law limits the range of permissible inferences as described above, the Seventh Circuit has articulated an analytical scheme to be applied when ruling on motions for summary judgment on price fixing claims. *Market Force*, 906 F.2d at 1171. The court should inquire:

1) is the plaintiff's evidence of conspiracy ambiguous, i.e., is it as consistent with the defendants' permissible independent interests as with an illegal conspiracy; and if so, 2) is there any evidence that tends to exclude the possibility that the defendants were pursing these independent interest. [*Id.*]

In making this inquiry, the court first examines the plaintiff's evidence of a conspiracy among the defendants. Next, the court examines whether the defendants have offered evidence tending to show that the conduct complained of is as compatible with the defendants' legitimate business activities as with illegal conspiracy. Finally, if, after this examination the court concludes that the evidence of conspiracy is "ambiguous," it must then determine whether the plaintiff can point to any evidence that tends to exclude the possibility that the defendants were pursuing their legitimate independent interests. *Reserve Supply Corp.*, 971 F.2d at 49.

*b. Analysis*

Following this analytical approach, the court examines the evidence of record to determine whether plaintiffs can survive Arrow's motion for summary judgment.

*1. Evidence of conspiracy*

As would be expected, plaintiff has no direct evidence of a conspiracy between Arrow and Milgray. Barry, who was the recipient of the alleged kickbacks, admitted that he had no direct knowledge of any collusion between Arrow and Milgray in general, or between Gnat and Slupik and Garrity specifically. Indeed, all of the individuals involved denied any agreement to maintain prices, or even discussing the topic, with Gnat and Slupik also denying paying any kickbacks to Barry. Interestingly, Garrity invoked his Fifth Amendment privilege against self incrimination when questioned about whether he paid any kickbacks, but explicitly denied any agreement with Slupik and Gnat to set prices or their respective shares of Williams' business. Additionally, Garrity testified that it was Barry who approached him about a kickback scheme rather than the other way around, as asserted by Barry.

Without any direct evidence of conspiracy, plaintiff is left to pointing to a number of circumstantial facts that it argues support an inference that Garrity, Gnat and Slupik conspired to restrain trade in the eprom market by fixing the price and market shares of plaintiffs' business. In particular, plaintiff goes to great pains to suggest the existence of a "joint kickback scheme" between Arrow and Milgray. Arrow and Milgray argue that there is no evidence of a joint kickback scheme and, in any event, the relevant question with respect to Count III is whether there was a "joint price fixing scheme," because a simple kickback scheme does not violate antitrust law.

**\*7** Plaintiff attempts to establish a conspiracy by setting forth evidence that supports an inference of horizontal price fixing. Plaintiff argues that the record demonstrates that "amidst a sustained period of mutual contact between Arrow's account executive and Milgray's general manager, the two companies implemented virtually identical kickback programs which had the effect of raising and sustaining prices, as well as allocating market share between them by excluding competing quotes." To support this argument plaintiff points to Barry's testimony that he did not "check for competitive prices because, as long as others within Williams did not complain, I was willing to purchase at whatever prices were quoted by the salesmen who were paying me kickbacks." Of course, this testimony is equally as consistent with an independent kickback scheme (or even a joint scheme) as it is with a "conspiracy" to set prices, particularly since Barry admitted he was receiving kickbacks from others besides Arrow and Milgray. Even more important, however, is that Barry

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2001 WL 1104619, *7 (N.D.Ill.))

repeatedly testified that he did not care about competitive pricing because he got better service from Arrow, and that he would have purchased from Arrow at the same prices without the kickbacks because of that service.

Plaintiff also argues that Barry observed circumstantial evidence of collusion. First, Barry testified that Garrity and Gnat excused themselves to keep their conversations out of earshot. [FN4] The mere opportunity to conspire, however, does not support an inference of conspiracy. "The evidence of informal communications among parties does not unambiguously support an inference of conspiracy." *Market Force,* 906 F.2d at 1173.

> FN4. The court will assume for purposes of this motion that Barry so testified. Plaintiffs' record citation does not support the statement, and Gnat denied discussing Barry with Garrity.

Next, plaintiff argues that Barry's testimony demonstrates that Garrity and Slupik always knew the other's prices even though Barry had not communicated them to the other, that they openly criticized other distributor competitors but not each other, and that Garrity, Gnat and Slupik jointly entertained Barry at sporting events. Plaintiff argues that these "facts" show that Arrow and Milgray maintained a fiction of reasonable pricing and, contrary to their own economic self interest, did not try to undercut each other. Unfortunately for plaintiff, the record is not quite as undisputed as plaintiff suggests. Garrity and Gnat both testified that they never jointly entertained Barry. There is evidence that Garrity and Gnat knew each other from Gnat's previous employment with Arrow, and that Garrity and Gnat shared hockey tickets with a group of five or more persons, but both denied jointly entertaining Barry. Moreover, Barry's own testimony is that Garrity continually tried to steal business away from Gnat and Milgray throughout the alleged kickback period, activity that is totally inconsistent with plaintiff's alleged conspiracy claim.

Plaintiff next argues that the kickback program had such a high degree of coordination between Arrow and Milgray that it defies coincidence. To support this argument, plaintiff points to the fact that both before and after the "alleged scheme" Arrow had minimal sales to plaintiff. Again, however, this is equally consistent with an independent kickback scheme as it is with a conspiracy to restrain trade. Obviously, plaintiff's purchases from Arrow were reduced once plaintiff discovered that Barry was taking bribes for his business. Plaintiff's suggestion that this falloff in business leads to the conclusion of a conspiracy is implausible

**\*8** According to plaintiff, however, the most striking evidence of collusion is the uniqueness of the bribery program instituted by Arrow and Milgray. Unlike the bribes paid by American Progress Circuits and Pro Components Inc., which were "traditional kickbacks" made by check after each order was placed, Arrow and Milgray paid a flat rate in cash at regular monthly intervals. The rate was tied to projected annualized volume of plaintiff's purchases. Both Arrow and Milgray reevaluated the payment program at midyear.

Although this evidence is slightly stronger than the rest of plaintiff's case, it certainly cannot be described as unambiguous. First, there is nothing unique about kickbacks being paid in cash. Indeed, the record reveals that Pro Components did pay some of its kickbacks in cash. Moreover, the manner in which the kickbacks were made could just as easily have been set by Barry as by Garrity and Slupik.

Finally, plaintiff argues that the similarity between Arrow's and Milgray's prices during the period leads to the inference of conspiracy. According to plaintiff, Arrow's and Milgray's prices "managed to come within pennies on their 'blind' bids to plaintiff." Plaintiff argues that no other supplier came even close to such pinpoint precision. Arrow's expert's testimony, however, is that "the data revealed no closer relationship between Arrow and Milgray in their pricing than among the other firms in this industry ." For one type of eprom, Arrow's expert testified that for two-thirds of the months covered Arrow and Milgray charged different prices, while Hallmark and Milgray charged the same price more than half the time.

Even if plaintiff is correct, parallel pricing alone is insufficient to support a Sherman Act claim. *See Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp.,* 346 U.S. 537, 541 (1954). This is particularly true where, as here, plaintiff's employee had the ability to set the prices charged. The

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

evidence in this instant case shows that Barry was willing to sell to any supplier that paid a bribe. This is as consistent with an independent competitive market as it is with a conspiracy to restrain trade. *See Federal Paper Board Co., Inc. v. Amata,* 693 F.Supp. 1376, 1380 (D.Conn.1988). Nor is plaintiff helped by its argument that Arrow and Milgray not only reduced their prices in tandem immediately after Williams removed Barry, but that their prices immediately diverged. Again, even if true, this is equally consistent with a simple commercial bribery scheme with Barry in charge.

### 2. *Legitimate business justification for actions*

Neither Arrow nor Milgray has suggested that there is any "legitimate" business justification for Garrity's and Gnat's conduct in the sense that commercial bribery can never be "legitimate." Instead, they have argued that plaintiff's evidence is as consistent with a simple bribery scheme that does not support a charge of conspiring to restrain trade in violation of Section 1.

### 3. *Evidence tending to exclude possibility of independent action*

*9 Because, as demonstrated above, the evidence of the existence of a conspiracy among Arrow and Milgray is ambiguous. Plaintiff may survive summary judgment only by offering "evidence that tends to exclude the possibility that the defendants were pursuing ... independent actions." *Market Force,* 906 F.2d at 1173-74. There is no evidence suggested by plaintiff that sufficiently refutes the possibility that Arrow and Milgray were independently bribing Barry, as were others, or were independently acquiescing to Barry's demands. Certainly, under either scenario defendants would be acting within their own economic self interest. Defendants' scenario offers a plausible and justifiable alternative interpretation of their conduct that rebuts the allegedly conspiracy. *Id.* Accordingly, Arrow's and Milgray's motion for summary judgment on Count III is granted. [FN5]

> FN5. Because the court has concluded that there is insufficient evidence of conspiracy to survive summary judgment, there is no need to address defendants' second argument regarding cognizable antitrust injury.

### 3. *Count IV--Breach of Fiduciary Duty*

In Count IV, plaintiff alleges that Arrow and Milgray participated in and induced Barry to breach his fiduciary duty to plaintiff.. Arrow and Milgray argue that the count should be dismissed because it is an equitable claim for which plaintiff has an adequate remedy at law. In support of this proposition, plaintiff cites *National Union Fire Insurance Co. v. Wilkins-Lowe & Co., Inc .,* 29 F.3d 337, 341 (7th Cir.1994), for its statement that a "third party who colludes with a fiduciary in committing a breach of the fiduciary's duty, and who benefits thereby, is under a duty of restitution to the beneficiary." That court also stated, however, that "liability may be premised upon a defendant's participation in a fiduciary's breach of trust." *Id.* Although a constructive trust may be an available remedy for a defendant's participation in a fiduciary's breach of duty, *National Union* does not stand for these defendants' asserted proposition that the claim is an equitable one unavailable without the absence of an adequate remedy at law. Indeed, breach of fiduciary duty cases are governed, in part, by the substantive law of contracts, *Cherney v. Soldinger,* 299 Ill.App.3d 1066, 1073 (1st Dist.1998), and a third party who participates in a breach of a fiduciary's duty becomes directly liable to the aggrieved party. *Village of Wheeling v. Stavros,* 89 Ill.App.3d 450, 454 (1st Dist.1980). Accordingly, Arrow's and Milgray's motion to dismiss Count IV is denied.

### 4. *Count VI--Consumer Fraud*

In Count VI, plaintiff charges Arrow and Milgray with violating the Illinois Consumer Fraud and Deceptive Trade Practices Act ("CFA"), (815 ILCS § 505/1 *et seq.* Arrow and Milgray argue that the count fails as a matter of law, because plaintiff is not a "consumer" within the meaning of the CFA, and plaintiff's claim fails to implicate any consumer-protection concerns.

To establish a claim under the CFA plaintiff must show: 1) a deceptive act or practice; 2) an intent by defendant that the plaintiff rely on the deception; and 3) that the deception occurred in the course of conduct involving a trade or commerce. *In re: Albergo,* 275 Ill.App.3d 439, 448 (2d Dist.1995). "Where the alleged deception involves two businesses which are not consumers, a deceptive act

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

or practice is actionable under the CFA if the alleged deception involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns." *Id.*

*10 A "consumer" is defined as one "who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business before his use or that of a member of his household." 815 ILCS § 505/1(e). In the instant case, plaintiff purchased the components in question not for its own use, but to incorporate into its product for resale, and therefore is not a consumer. Plaintiff must, therefore, offer evidence that the alleged deception involves the market generally or otherwise relates to consumer protection concerns. Plaintiff has offered no such evidence, and the court's review of the thousands of pages of materials presented has uncovered none. The mere fact that plaintiff's product may ultimately be sold to a consumer is too attenuated. *See Stepan Co. v. Winter Panel Corp.,* 948 F.Supp. 802, 807 (N.D.Ill.1996). Accordingly, because plaintiff cannot establish a "consumer nexus," Arrow's and Milgray's motion for summary judgment on Count VI is granted.

### 5. *Count VIII--Accounting or Constructive Trust*

In Count VIII, plaintiff seeks an equitable accounting of both Arrow's and Milgray's benefits from the alleged fraud and an imposition of a constructive trust on each defendant. Arrow and Milgray argue that the count should be dismissed because accounting and constructive trusts are remedies and not claims or causes of actions. The case Arrow and Milgray rely upon, *3 Com Corp. v. Electronic Recovery Specialists, Inc.,* 104 F.Supp.2d 932, 942 (N .D. Ill.2000), however, makes clear that Illinois law provides for a claim for accounting, the elements of which are generally the absence of adequate remedy at law and either a breach of fiduciary relationship, a need for discovery, fraud, or the existence of mutual accounts which are of a complex nature. *Id.* If the accounting claim is based on a breach of fiduciary duty, as is the instant case, no lack of adequate remedy at law need be alleged.

Because plaintiff has alleged all the elements of its claim for accounting, Arrow's and Milgray's motion to dismiss Count VIII is denied.

### 6. *Punitive Damages*

Finally, Arrow's and Milgray's motion to strike plaintiff's claims for punitive damages is denied. Arrow's motion (adopted by Milgray) is based on its claim that there is insufficient evidence that Arrow ratified Garrity's actions. This court has already rejected this argument in denying Arrow's motion for summary judgment on the RICO counts (I and II).

### B. *Linda Gnat--Motion for Summary Judgment*

The third amended complaint names Linda Gnat in Counts I and II (RICO), IV (breach of fiduciary duty), V (fraud), VI(CFA) and VIII (accounting and constructive trust), all of which are based on the allegation that Slupik and Linda's husband, Lawrence Gnat, were paying kickbacks to Barry for purchasing component parts from Microcomp, a company owned by Linda and Lawrence. Linda has moved for summary judgment on all counts, arguing that plaintiff has offered no evidence to establish that Linda participated in or had knowledge of the alleged fraudulent scheme.

*11 Plaintiff alleges generally that Microcomp, through Lawrence Gnat, paid kickbacks to Barry in exchange for Barry placing orders with it. Linda Gnat was president of Microcomp throughout the period of time that the alleged fraud took place. Linda argues that plaintiff improperly seeks to hold her individually liable for the corporation's wrongdoing without evidence of her individual participation. *See Prince v. Zazove,* 959 F.2d 1395, 1401 (7th Cir.1992).

Lawrence Gnat, Slupik, and nonparty Henry Sylwestrzak, all then employees of Milgray, formed Microcomp in 1985. Microcomp was a parts broker, specializing in obtaining hard-to-find parts, while Milgray was a distributor for manufacturers. Sometime in 1987, Milgray became aware of Microcomp and Gnat's connection to it. [FN6] At that time Gnat met in New York with three members of Milgray's senior management to discuss Microcomp and Gnat's role in it. At that meeting, Milgray reviewed Microcomp's tax returns, corporate structure and types of parts that Microcomp was selling. Milgray told Gnat that he should not have any partners in Microcomp, could not become an officer of Microcomp and should

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
(Cite as: 2001 WL 1104619, *11 (N.D.Ill.))

never take any business away from Milgray. Milgray told Gnat to reduce his "visibility" in Microcomp. Gnat agreed.

> FN6. Lawrence Gnat bought out both Slupik and Sylwestrzak sometime in 1987, either immediately before or immediately after Gnat's meeting with Milgray in New York.

As a result of Gnat's meeting with Milgray, Linda Gnat became president of Microcomp in 1987. To lower Lawrence Gnat's visibility, Linda used her maiden name, Benedyk, to run the business.

Microcomp entered into a consulting agreement with LG Consulting, run by Lawrence Gnat. LG Consulting received 15% of gross sales made on behalf of Microcomp, or 50% of Microcomp gross profits generated by LG Consulting. The LG Consulting bank account was a personal account to which Linda Gnat had full access.

Plaintiff does not contest Linda's assertion that plaintiff must demonstrate that she had some knowledge that her husband or Slupik was bribing Barry. It argues that the record contains both direct evidence in the form of deposition testimony, and circumstantial evidence to meet this burden. The court disagrees.

First, plaintiff has pointed to no deposition testimony that directly establishes that Linda was aware of the alleged bribes. She specifically denied having any knowledge, and Barry testified that he knew of nothing that would indicate Linda was aware that her husband was paying kickbacks for business.

Unable to come up with any direct evidence, plaintiff attempts to weave together an argument based on the fact that Linda used her maiden name, rather than Gnat, and allowed her husband and Slupik to sign her initials as the salesman on purchase orders. These facts, according to plaintiff, allowed Lawrence Gnat's fraud to prosper for four years.

While the facts stated above might indicate an attempt to deceive Milgray about Microcomp's business, none of these facts demonstrate that Linda was aware of the alleged bribery scheme, or participated in the fraud against plaintiff. This

conclusion is strengthened by the fact that Linda began using her maiden name four years before Microcomp began selling any parts to plaintiff. This fact alone demonstrates that Linda's use of her maiden name was not used with the intent to prevent plaintiff (as opposed to Milgray) from discovering her husband's actions, as plaintiff suggests.

*12 Accordingly, because plaintiff has offered no evidence that Linda Gnat was a participant in the fraud or the alleged inducement of Barry to breach his fiduciary duty to plaintiff, Linda's motion for summary judgment is granted on all counts.

II. *Motions Regarding Milgray's Counterclaim and Cross-claims*

Milgray has filed a counterclaim against plaintiff, and cross-claims against Barry, Gnat, Slupik and Microcomp, charging Gnat and Slupik with fraud (Count I) and plaintiff, Barry, Gnat, Slupik and Microcomp with breach of fiduciary duty (Count II), tortious interference with business opportunity (Count III), common law fraud (Count IV), civil conspiracy (V) and, CFA violations (Count VI). Count VII is brought solely against plaintiff for negligent supervision of Barry. Gnat, Slupik, Microcomp and plaintiff have moved for summary judgment on all counts.

A. *Gnat and Slupik*

Gnat and Slupik each argue that Milgray has released all claims that they may have had against them when it terminated their employment and then entered into written severance agreements containing broad mutual general releases. Milgray claims that the releases were fraudulently induced by Gnat and Slupik.

As noted above, Gnat was hired as general manager by Milgray in 1984. Slupik worked for Milgray as a sales representative under Gnat. In 1985, Gnat, Slupik and Sylwestrzak started Microcomp. In 1987 Milgray learned of Microcomp, was concerned, and met with Gnat in New York. Gnat testified that he was told to not have any partners and to reduce his visibility in Microcomp, but was not told that he could not continue with Microcomp as long as he did not compete with Milgray. Milgray executives have testified that Gnat was told to quit Microcomp immediately. In either event, Gnat did not end his

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

affiliation with Microcomp, but instead bought out Gnat and Sylwestrzak and made his wife president.

Ten years later, in 1997, Bell Industries (with whom Milgray was in the process of merging) received a call from plaintiff and learned about Microcomp and Gnat's affiliation with it, and that Microcomp was selling product to plaintiff. Robert Walker of Bell disclosed these facts to Thomas Woolf (regional manager at Milgray). Woolf had been at the 1984 meeting with Gnat regarding Gnat's involvement with Microcomp. Woolf was upset and annoyed about Gnat's continued involvement with Microcomp and told Walker, "I am going to fire him." Walker told Woolf "no don't fire him, we're working with [plaintiff] in their investigation, and when we [Bell and Milgray] consolidate, we'll take care of the problem."

Two months later, on March 31, 1997, Woolf met with Gnat and terminated him effective as of that date. Woolf handed Gnat a written severance agreement, and told him he had to sign it if he wanted any severance pay. He then suggested that Gnat review it with a lawyer or an accountant. Gnat reviewed it with his accountant, and then requested a greater amount of severance pay, to which Milgray agreed. Gnat changed the agreement, signed it and sent it to Milgray. Woolf then signed it for Milgray. The agreement contains a very broad mutual general release:

*13 2. *MUTUAL RELEASES.* Subject only to the performance of the obligations set forth in this agreement, the parties hereby release and forever discharge each other, their respective successors and assigns from any and all claims, sums of money, debts, liabilities, demands, obligations, costs, expenses, and causes of action of every kind, nature, and description whatsoever, whether known or unknown, contingent, absolute, or otherwise, which either of said parties now holds or at any time heretofore has held against the other, to the date of this agreement. In entering into the releases set forth herein, the parties mutually waive the provisions of California Civil Code Section 1542, which provides as follows:
"A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."
Or any similar statute, law, rule, or regulation

applicable in the State of Illinois.
It is expressly understood and agreed that the possibility that any unknown claims exist was explicitly taken into account by each of the parties in determining the amount of consideration to be paid for the giving of the releases contained herein, and a portion of such consideration, having been bargained for between the parties with the knowledge of the possibility of the existence of such unknown claims, was given in exchange for a full accord, satisfaction and discharge of all such claims.

Slupik was terminated on April 11, 1997. At the time of his termination he was handed a check containing a memorandum stating "terminated 4/11/ 97." Two days later, he wrote to John Tortorici of Milgray arguing for a greater severance payment and complaining of age discrimination. On April 22, 1997, Slupik and Tortorici signed a Bell Severance Agreement approved by Bell's lawyers. The Slupik agreement contains the exact same mutual general release as contained in the Gnat agreement.

There is no question, and thus Milgray does not argue otherwise, that the terms of the mutual general releases cover Milgray's claims against Gnat and Slupik. Thus, if the agreements are valid, the claims have been waived. Milgray argues that the court should rescind the agreements because of Gnat's and Slupik's failure to disclose their dealings with Microcomp prior to executing the agreements. *See Allstate Financial Corp. v. Utility Trailer of Illinois, Inc.,* 936 F.Supp. 525, 529 (N.D.Ill.1996) (if fiduciary relationship exists between the contracting parties, a duty to disclose material information exists and a party's breach of this duty is considered the same as a false statement).

There are two problems with this argument. First, as Gnat argues, the evidence unequivocally demonstrates that the agreements were negotiated and executed *after* Gnat and Slupik had been terminated. Once terminated, any fiduciary relationship and concomitant duty to disclose ended. *See Dames & Moore v. Baxter & Woodman, Inc.,* 21 F.Supp.2d 817, 823 (N.D.Ill.1998).

*14 Moreover, and perhaps more important, Milgray cannot establish justifiable reliance on any alleged omission. To establish that the agreements were entered fraudulently, Milgray must establish

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



the elements of fraud, including misrepresentation of a material fact and reasonable reliance on the misrepresentation. *Allstate,* 936 F.Supp. at 528. At the time it entered into the agreements containing the general releases insisted upon by it, Milgray knew of Microcomp, and Gnat's involvement with it. It knew enough that Woolf wanted to terminated Gnat, but was told not to do so. It was apparently investigating, but failed to raise the issue with Gnat or Slupik. Woolf testified that when he terminated Gnat he could have asked about Microcomp, but was under directions not to bring it up. It "was Milgray's and Bell's choice not to ask questions of Mr. Gnat concerning Microcomp."

To be actionable, "fraud must induce reliance--- must in other words be both believed (if it is not believed, it can hardly be described as fraud) and acted on." *Sain v. Nagel,* 997 F.Supp. 1002, 1014 (N.D.Ill.1998) (quoting *Ampat/Midwest Inc. v. Illinois Tool Works, Inc.,* 896 F.2d 1035, 1041 (7th Cir.1990)). The victim of a fraud cannot close his eyes to a known risk and he cannot close his eyes to a risk that is obvious. *Id.* To decide whether a party to an agreement justifiably relied on a material omission, courts look to all the circumstances surrounding the transaction, including the parties' relative knowledge of available facts, the opportunity to investigate the facts, and prior business experience. *Id.* at 1015.

In the instant case, the undisputed evidence demonstrates not that Milgray relied on any omission, but that it knew Gnat and Slupik were omitting what Milgray deemed material, and elected to ignore (and in fact avoid) that omission. Under these circumstances, Milgray cannot establish justifiable reliance, and the agreements are valid. All claims against Gnat and Slupik have been released. Accordingly, Gnat's and Slupik's motions for summary judgment on Milgray's cross-claims are granted.

B. *Williams and Microcomp*

Williams and Microcomp argue that Milgray's release of Gnat and Slupik operates to release all joint tortfeasors. "At common law, the unconditional release of one of two or more joint tortfeasors releases the other tortfeasors, even though the latter were not a party to the release or specifically identified in the release unless a contrary intent appeared from the face of the instrument." *Cherney v. Soldinger,* 299 Ill.App.3d 1066, 1070 (1st Dist.1998) (citing *Porter v. Ford Motor Co.,* 96 Ill.2d 190, 195 (1983). "The common law rule applied not only to those who were technically joint tortfeasors, but to wrongdoers whose conduct produced the same single injury." *Id.* The rule is also applied outside the scope of the tort area to co-obligors on a contract. *Id.* Thus, under common law, all of Milgray's claims against Williams and Microcomp were released when Milgray released Gnat, because the claims all produced the same single injury. *Id.*

*15 Milgray argues that the common law rule has been "upended" by the Illinois Joint Tortfeasor Contribution Act, 740 ILCS 100/2(c), which provides:

When a release or covenant not to sue or not to enforce judgment is given in good faith to one or more persons liable in tort arising out of the same injury or the same wrongful death, it does not discharge any of the tortfeasors from liability for the injury or wrongful death unless its terms so provide ....

The provisions of the Act do not apply, however, where liability is predicated on upon a breach of fiduciary duty. *Cherney,* 299 Ill.App.3d at 1071 (citing *American Environmental Inc. v. 3-J Co .,* 222 Ill.App.3d 242, 247 (1991). "By its own terms, section 2(c) of the Act governs releases given to "persons liable in tort" for the same injury. *Id.* The Act was intended only to abolish the rule that produced an involuntary discharge of "joint tortfeasors." *Id.* The Act does not direct itself to co-obligors, persons liable in contract, or to wrongdoers liable under any theory other than tort," all of which are covered by the common law. *Id.*

Moreover, the Act only covers certain tortfeasors. Intentional tortfeasors, such as those liable for fraud as alleged in the instant case, are not entitled to contribution under the Act, and thus § 2(c)'s provisions on releases is not applicable. *See Gerill Corp. v. Hargrove,* 128 Ill.2d 179, 206 (1989). Therefore, § 2(c) does not apply to Milgray's claims against Microcomp and Williams. Accordingly, the release of Larry Gnat and Slupik released Williams and Milgray, and Microcomp's and Williams' motions for summary judgment on Milgray's counterclaim and cross-claims are granted.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

### III. *Motions Regarding Affirmative Defenses*

Williams has moved for summary judgment on certain affirmative defenses raised by Arrow, Milgray, the Gnats and Microcomp. [FN7]

> FN7. Because Arrow has taken the lead on these arguments, the court will refer to the defenses brought by Arrow in its discussion.

### A. *Statute of Limitations/Laches*

Arrow has argued that some or all of plaintiff's claims may be barred by the applicable statute of limitations or by laches. Plaintiff argues that because the fraud continued until 1996 and suit was filed in 1997, no claim is so barred. [FN8]

> FN8. The parties appear to agree that the relevant limitation periods for plaintiff's state and federal claims range from three to five years.

Arrow argues first that when harm is caused by separate acts (as opposed to a continuing problem), the statute of limitations runs anew for damages caused in each instance of wrongdoing. *Gass v. Metro East Sanitary District,* 186 Ill.App.3d 1077, 1087 (5th Dist.1989). Additionally, Arrow argues that the "continuing violation" doctrine applies only to nuisance or trespass, not fraud. *See Hertel v. Sullivan,* 261 Ill.App.3d, 156, 161 (4th Dist.1994).

For fraud cases, Illinois follows the discovery rule. *Knox College v. Celotex Corp.,* 88 Ill.2d 407 (1981) . This rule provides that the "limitations period does not begin to run until there exists actual or constructive knowledge" of both an injury and that someone may be at fault for its existence. *Cary v. Kerr-McGee Chemical Corp.,* 999 F.Supp. 1109, 1115 (N.D.Ill.1998). At that time, the burden is placed on the injured party to inquire as to the existence of a cause of action. *Id.* A determination of the point in time that the limitation period commences is most often a jury question. *Id.*

*16 In the instant case, there is evidence that plaintiff was put on notice of the potential for bribes as early as 1990, when Larry Suida told his supervisors that he had been offered a bribe by an Arrow representative. A jury could infer that from that point on plaintiff was aware that Garrity was "dirty" and should have investigated when purchases

from Arrow increased dramatically. Moreover, Kim Walman, plaintiff's vice president for purchasing and material control, testified that in 1994 rumors ran rampant that plaintiff's buyers were accepting gratuities from vendors. This evidence is sufficient to raise a question of fact as to if and when plaintiff had knowledge of Barry's activities. Accordingly, plaintiff's motion for summary judgment on the statute of limitations and laches defenses is denied.

### B. *Ratification*

Plaintiff argues that there is no evidence that plaintiff ratified Barry's fraud. The Suida testimony, however, is sufficient for a jury to conclude that plaintiff authorized Barry's conduct that it now denounces as fraud, either by knowing exactly what he was doing, or by choosing to turn a blind eye to it. *Eastern Trading Co. v. Refco, Inc.,* 229 F.3d 617, 625 (7th Cir.2000). Accordingly, plaintiff's motion for summary judgment on ratification is denied.

### C. *Extortion*

Arrow has asserted an extortion defense, maintaining that plaintiff's claims are barred because Barry refused to do business with Arrow unless he received a kickback. *Citing U.S. v. George,* 477 F.2d 508 (7th Cir.1973), plaintiff argues that there is no evidence of extortion. Garrity testified that Barry approached him about kickbacks. Moreover, Barry testified that it was "mere coincidence" that salesmen from seven different vendors all approached him at approximately the same time about paying him kickbacks. A reasonable jury could reject this testimony as implausible, and conclude, as plaintiff's original complaint charged, that Barry was the one making demands. *See Kraft General Foods, Inc. v. Cattrell,* 18 F.Supp.2d 280, 283 (S.D.N.Y.1998). Accordingly, plaintiff's motion for summary judgment on extortion is denied.

### D. *Failure to Mitigate*

Finally, Arrow argues that plaintiff has failed to mitigate its damages. Plaintiff argues that this defense is akin to contributory negligence which is not a defense to fraud. *Refco,* 229 F.3d at 624. In Illinois, however, the doctrine of mitigation of damages "applied in virtually every type of case in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
(Cite as: 2001 WL 1104619, *16 (N.D.Ill.))

which recovery of a money judgment or award is authorized." *Culligan Rock River Water Conditioning Co. v. Gearhart*, 111 Ill.App.3d 254, 258 (2d Dist.1982). Arrow's mitigation claim is based on its assertion that plaintiff turned a blind eye to Barry's alleged activity. Because that is a factual question, plaintiff's motion for summary judgment on the defense of failure to mitigate damages is denied.

E. *In Peri Delicto; Unclean Hands; Equal Involvement*

*17 Plaintiff has moved for summary judgment on Arrow's common law defenses of *in peri delicto*, unclean hands, and equal involvement. The three defenses, which are similar in nature, are all based on Arrow's claim that plaintiff knew of or turned a blind eye to Barry's receipt of kickbacks.

The equitable defense of *in peri delicto* or "in equal fault," is rooted in the common law notion that a plaintiff's recovery may be barred by his own wrongful conduct. *Pinter v. Dahl*, 486 U.S. 622, 632 (1988). Traditionally, the *in peri delicto* defense was limited to situations were the plaintiff bore at least substantially equal responsibility for its injury, and where the parties' culpability arose out of the same illegal act. *Id.* Contemporary courts have expanded application of the defense to situations more closely analogous those encompassed by the "unclean hands" doctrine, where the plaintiff has participated in some of the same sort of wrongdoing as the defendant. *Id.* (citing *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 138 (1968)). In *Perma Life*, the Court concluded that such a broadened construction should not be applied to litigation arising under federal regulatory statutes, concluding (in a plurality opinion) that a narrow, more traditional formulation should apply to private actions under the antitrust laws. *Perma Life*, 392 U.S. at 145.

"Unclean hands," a companion principle to *in peri delicto*, *In re Olympia Brewing Co. Securities Litigation*, 1985 WL 3928 at *3 (N.D.Ill. Nov. 13, 1985), prevents a party from obtaining equitable relief if he himself has engaged in misconduct. *See Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U .S. 806, 814-15 (1945). As the Seventh Circuit has noted, an unjust enrichment claim or other equitable relief is denied

to a plaintiff whose recklessness caused his claimed injury. "If the unclean hands defense tells us one thing, it is that equity does not find a benefit unjust where a plaintiff, through his own misconduct, intentionally places himself at risk. *TRW Title Insurance Co. v. Security Union Title Insurance Co.*, 153 F.3d 822, 829 (7th Cir.1998).

"Equal involvement" is the name given to the narrow *in peri delicto* defense recognized in *Perma Life*, and later extended to securities actions in *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306-11 (1985). "The equal involvement defense is more demanding of those asserting it than the *in peri delicto* defense and only bars the claims of a plaintiff who truly bore at least substantially equal responsibility [as the defendant] for the violation of the federal law at issue." *Roma Construction Co. v. aRusso*, 96 F.3d 566, 582 (1st Cir.1996) (Lynch, J., concurring) (quoting *Bateman Eichler*, 472 U.S. at 308).

Arrow's assertion of all three of the defenses relies on its claim that at some point plaintiff either became aware of Barry's activities, or turned a blind eye to it. Larry Suida's testimony that he told the vice president of purchasing that Arrow offered him a bribe, coupled with the dramatic increase in business with Arrow once Suida left, raises a question of fact on this issue. Accordingly, plaintiff's motion for summary judgment on the *in peri delicto*, unclean hands, and equal involvement defenses is denied.

F. *Assumption of Risk*

*18 Finally, Microcomp has asserted assumption of risk as an affirmative defense. Because assumption of risk is a defense to negligence claims, not intentional torts, plaintiff's motion for summary judgment on this defense is granted. *McGill v. Duckworth*, 944 F.2d 344, 352 (7th Cir.1991), *overruled on other grounds, Farmer v. Brennan*, 511 U.S. 865 (1994).

CONCLUSION
For the reasons set forth above, Arrow's motion for summary judgment on RICO, consumer fraud, inducement of breach of fiduciary duty, constructive trust, and punitive damages is granted as to plaintiff's consumer fraud claims, and denied in all other respects. Milgray's motion for summary

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
(Cite as: 2001 WL 1104619, *18 (N.D.Ill.))

judgment on consumer fraud, inducement of breach of fiduciary duty, accounting and constructive trust is granted as to consumer fraud and denied in all other respects. Arrow's and Milgray's joint motion for summary judgment on price fixing is granted. Linda Gnat's motion for summary judgment on all counts is granted.

Lawrence Gnat's and Microcomp's motion for summary judgment as to Milgray's cross-complaint is granted. Richard Slupik's motion for summary judgment as to Milgray's cross-complaint is granted. Plaintiff's motion for summary judgment as to Milgray's counterclaim is granted.

Plaintiff's motion for summary judgment on certain affirmative defenses is denied as to ratification, extortion, *in peri delicto*, unclean hands, equal involvement, mitigation of damages, statute of limitations, and laches, and granted as to assumption of risk.

This matter is set for a status report on September 26, 2001, at 9:30 a.m., at which time the court will set a trial date.

Not Reported in F.Supp.2d, 2001 WL 1104619 (N.D.Ill.), 2001-2 Trade Cases P 73,500, RICO Bus.Disp.Guide 10,148

Motions, Pleadings and Filings (Back to top)

. 2003 WL 23469308 (Trial Motion, Memorandum and Affidavit) Memorandum Opinion and Order (Jul. 28, 2003)

. 2003 WL 23469309 (Trial Motion, Memorandum and Affidavit) Notice of Motion (Feb. 24, 2003)

. 2003 WL 23469310 (Trial Motion, Memorandum and Affidavit) Notice of Motion (Feb. 21, 2003)

. 2003 WL 23469311 (Trial Motion, Memorandum and Affidavit) Memorandum Opinion and Order (Jan. 21, 2003)

. 2002 WL 32487846 (Trial Motion, Memorandum and Affidavit) Notice of Motion (Nov. 14, 2002)

. 2002 WL 32487848 (Trial Motion, Memorandum and Affidavit) Notice of Filing (Oct. 03, 2002)

. 2002 WL 32487831 (Trial Motion, Memorandum and Affidavit) Notice of Filing (May. 15, 2002)

. 2002 WL 32487845 (Trial Motion, Memorandum and Affidavit) Notice of Filing (May. 03, 2002)

. 2002 WL 32487852 (Trial Motion, Memorandum and Affidavit) Defendant Arrow Electronics, Inc.'s Motion for Judgment on Equitable Claims (May. 03, 2002)

. 2002 WL 32487842 (Trial Motion, Memorandum and Affidavit) Notice of Filing (Apr. 05, 2002)

. 2002 WL 32487834 (Trial Motion, Memorandum and Affidavit) Defendant Arrow Electronics, Inc.'s Motion for Judgment as a Matter of Law at the Close of All the Evidence (Mar. 12, 2002)

. 2002 WL 32487841 (Trial Motion, Memorandum and Affidavit) Notice of Motion (Mar. 11, 2002)

. 2002 WL 32487832 (Trial Motion, Memorandum and Affidavit) Notice of Filing (Mar. 08, 2002)

. 2002 WL 32487838 (Trial Motion, Memorandum and Affidavit) Notice of Filing (Mar. 08, 2002)

. 2002 WL 32487850 (Trial Motion, Memorandum and Affidavit) Notice of Filing (Mar. 08, 2002)

. 2002 WL 32487843 (Trial Motion, Memorandum and Affidavit) Notice of Filing (Mar. 06, 2002)

. 2002 WL 32487844 (Trial Motion, Memorandum and Affidavit) Notice of Filing (Mar. 06, 2002)

. 2002 WL 32487840 (Trial Motion, Memorandum and Affidavit) Arrow's Motion in Limine Regarding Testimony of James M. Garrity (Mar. 04, 2002)

. 2002 WL 32487833 (Trial Motion, Memorandum and Affidavit) Notice of Filing (Feb. 28, 2002)

. 2002 WL 32487851 (Trial Motion, Memorandum and Affidavit) Milgray Electronics, Inc.'s Motion in Limine to Preclude Williams from Eliciting Testimony from Gnat and Slupik in Which They Invoke the Fifth Amendment (Feb. 27, 2002)

. 2002 WL 32487839 (Trial Motion, Memorandum and Affidavit) Arrow and Milgray's Motion in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
**(Cite as: 2001 WL 1104619, \*18 (N.D.Ill.))**

Limine Regarding Potential Testimony of Roger Dee (Feb. 25, 2002)

. 2002 WL 32487847 (Trial Motion, Memorandum and Affidavit) Notice of Motion (Feb. 19, 2002)

. 2002 WL 32487849 (Trial Motion, Memorandum and Affidavit) Notice of Motion (Feb. 13, 2002)

. 2002 WL 32487835 (Trial Motion, Memorandum and Affidavit) Arrow and Milgray's Reply in Support of Their Motion to Strike Plaintiff's Claim for Gross Profits (Jan. 25, 2002)

. 2002 WL 32487836 (Trial Motion, Memorandum and Affidavit) Notice of Filing (Jan. 18, 2002)

. 2002 WL 32487837 (Trial Motion, Memorandum and Affidavit) Arrow and Milgray's Motion to Strike Plaintiff's Claim for Gross Profits (Jan. 10, 2002)

. 2001 WL 34497737 (Trial Motion, Memorandum and Affidavit) Notice of Motion (Dec. 17, 2001)

. 2001 WL 34497738 (Trial Motion, Memorandum and Affidavit) Notice of Filing (Dec. 10, 2001)

. 2001 WL 34497739 (Trial Motion, Memorandum and Affidavit) Arrow Electronics, Inc.'s Responses to Motions in Limine (Dec. 10, 2001)

. 2001 WL 34497740 (Trial Motion, Memorandum and Affidavit) Milgray's Response in Opposition to Gnat's Motion in Limine to Exclude Any Evidence Relating to the Microcomp Fraud (Dec. 10, 2001)

. 2001 WL 34497741 (Trial Motion, Memorandum and Affidavit) Milgray Electronics, Inc.'s Response in Opposition to Richard Slupik's Motion in Limine (Dec. 10, 2001)

. 2001 WL 34497742 (Trial Motion, Memorandum and Affidavit) Notice of Filing (Dec. 10, 2001)

. 2001 WL 34497743 (Trial Motion, Memorandum and Affidavit) Plaintiff's Opposition to Defendant Arrow's Motions in Limine (Dec. 10, 2001)

. 2001 WL 34497744 (Trial Motion, Memorandum and Affidavit) Notice of Filing (Dec. 10, 2001)

. 2001 WL 34497745 (Trial Motion, Memorandum and Affidavit) Defendant Garrity's Memorandum in Opposition to Plaintiff's Motion-in-Limine to Preclude Testimony at Trial on Subjects as to Which he Invoked the Fifth Amendment Privilege During Discovery (Dec. 10, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



366 F.3d 569                                                                                    **Page** 1
366 F.3d 569, 2004-1 Trade Cases P 74,390, RICO Bus.Disp.Guide 10,669
(Cite as: **366 F.3d 569**)

▷

Briefs and Other Related Documents

United States Court of Appeals,
Seventh Circuit.
WILLIAMS ELECTRONICS GAMES, INC. et al.,
Plaintiffs-Appellants,
v.
James M. GARRITY et al., Defendants-Appellees.
Milgray Electronics, Inc., Defendant/Counter-
Plaintiff/Cross-Plaintiff/Cross-
Appellant,
v.
Williams Electronics Games, Inc., Plaintiff/
Counter-Defendant/Cross-Appellee,
and
Lawrence J. Gnat and Richard S. Slupik,
Defendants/Cross-Defendants/Cross-
Appellees.
No. 03-1648, 03-1665, 03-1669.

Argued Feb. 24, 2004.
Decided April 29, 2004.

**Background:** Video game manufacturer brought suit for fraud and related misconduct against two of its components suppliers, alleging that suppliers bribed manufacturer's buyer to buy from them, and against salesman for one of the suppliers. Other supplier cross-claimed against two of its employees. The United States District Court for the Northern District of Illinois, Robert W. Gettleman, J., 42 F.Supp.2d 785, 2001 WL 1104619, dismissed claims under Racketeer Influenced and Corrupt Organizations Act (RICO), Sherman Act and Illinois Consumer Fraud and Deceptive Business Practices Act, dismissed cross-claim and, following jury trial, the Court, 2003 WL 164213, entered judgment on jury's fraud verdict against salesman. Manufacturer appealed. Supplier cross-appealed.

**Holdings:** The Court of Appeals, Posner, Circuit Judge, held that:
(1) instructions on affirmative defenses of ratification and in pari delicto were erroneous;
(2) there was no evidence of concerted action, as required to support Sherman Act claim;
(3) there was no RICO enterprise;
(4) manufacturer could maintain claim under Illinois Consumer Fraud and Deceptive Business Practices Act based on injury to "any person"; and

(5) supplier's employees did not obtain release by fraud.
Affirmed in part, reversed in part and remanded.

West Headnotes

[1] Fraud ⚖ 36
184k36 Most Cited Cases

[1] Torts ⚖ 123
379k123 Most Cited Cases
(Formerly 379k16)
Under Illinois law, victim's negligence is not a defense to intentional tort, such as fraud.

[2] Fraud ⚖ 35
184k35 Most Cited Cases

[2] Fraud ⚖ 36
184k36 Most Cited Cases
Video game manufacturer's alleged negligence in failing to discover that its buyer was taking bribes from suppliers would not exonerate suppliers of their fraud, under Illinois law, but if manufacturer, after discovering the bribe-taking decided that it was on the whole beneficial, and decided not to fire its buyer or otherwise discipline him, that would amount to ratification.

[3] Fraud ⚖ 20
184k20 Most Cited Cases
If video game manufacturer knew all along that its buyer was taking bribes from suppliers, there was no fraud by suppliers on manufacturer, under Illinois law.

[4] Action ⚖ 4
13k4 Most Cited Cases
Defense of in pari delicto is intended for situations in which victim is participant in misconduct giving rise to his claim.

[5] Action ⚖ 4
13k4 Most Cited Cases
Fact that video game manufacturer's buyer was bribed by two employees of supplier, to supplier's detriment, did not establish fault on part of manufacturer as would support in pari delicto defense to manufacturer's fraud claim against supplier under Illinois law.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw

366 F.3d 569
(Cite as: 366 F.3d 569)

[6] Principal and Agent ☞ 180
308k180 Most Cited Cases
Under Illinois law, agent's knowledge is not imputed to his principal when agent is acting adversely to principal.

[7] Principal and Agent ☞ 160.5
308k160.5 Most Cited Cases
Under Illinois law, generally, when agent acts entirely on his own behalf, doing things that could not possibly be interpreted as the merely overzealous or ill-judged performance of his duties as agent, he is acting outside scope of the agency and principal is not bound.

[8] Damages ☞ 30
115k30 Most Cited Cases

[8] Damages ☞ 36
115k36 Most Cited Cases
Under Illinois law, victim of commercial bribery, who usually is the principal of an agent who was bribed, can obtain by way of remedy either the damages that he has sustained or profits that the bribe yielded; the total profits would consist of bribe itself, plus revenue that bribe generated for the briber, minus cost of goods sold and any other variable costs incurred in making the sales that generated that revenue.

[9] Damages ☞ 114
115k114 Most Cited Cases
Under Illinois law, amount of bribe paid is not a profit to the briber, but an expense, and it should not enter into net profit calculation, in determining damages; however, it can be used as minimum estimate of damages, on theory that no one would pay a bribe who didn't anticipate garnering net additional revenue at least equal to amount of the bribe and that additional revenue is, at least as a first approximation, an additional expense to person whose agent was bribed.

[10] Implied and Constructive Contracts ☞ 4
205Hk4 Most Cited Cases
Restitution is available in any intentional-tort case in which tortfeasor has made profit that exceeds victim's damages, whether or not tort involved breach of fiduciary duty.

[11] Implied and Constructive Contracts ☞ 4
205Hk4 Most Cited Cases

Just as damages can be obtained either in suit at law, or, in equity suit, under "clean up" doctrine, or by imposition of constructive trust on moneys wrongfully withheld from plaintiff, or by surcharging trustee for losses that he has caused to trust, restitution can be awarded in either suit at law or suit in equity.

[12] Trusts ☞ 91
390k91 Most Cited Cases
Constructive trust can be sought as equitable remedy for legal as well as equitable wrong.

[13] Trusts ☞ 91
390k91 Most Cited Cases
When restitution is sought in law case and plaintiff is not seeking to impress lien on particular property, but just wants award of profits, he cannot obtain constructive trust, because there is no res for trust to attach to.

[14] Implied and Constructive Contracts ☞ 4
205Hk4 Most Cited Cases
Since video game manufacturer was entitled to seek equitable restitution for supplier's breach of fiduciary obligation, it could seek legal damages from jury and, if it thought it could obtain larger recovery by way of restitution, an order of restitution from the judge.

[15] Jury ☞ 14.5(2.1)
230k14.5(2.1) Most Cited Cases
When equitable remedy is sought in conjunction with legal remedy, legal claim is tried first and jury's findings bind the judge, in order to vindicate right to jury trial on legal claims.

[16] Action ☞ 27(1)
13k27(1) Most Cited Cases

[16] Implied and Constructive Contracts ☞ 4
205Hk4 Most Cited Cases
Despite the equitable origins of remedies for fraud, suit complaining of fraud is treated as case at law if legal rather than equitable remedy is sought, and since restitution is equally a legal and equitable remedy, it can be sought from jury in fraud case.

[17] Monopolies ☞ 28(7.5)
265k28(7.5) Most Cited Cases
Although suppliers may have charged video game manufacturer higher prices than they would have

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

366 F.3d 569
(Cite as: 366 F.3d 569)

had they not been bribing manufacturer's buyer, there was no evidence of concerted action by two suppliers, as required to support manufacturer's Sherman Act claim. Sherman Act, § 1 et seq., as amended, 15 U.S.C.A. § 1 et seq.

[18]  Racketeer  Influenced  and  Corrupt
Organizations ⬅⬆ 39
319Hk39 Most Cited Cases
Briber and the bribed were not, solely by virtue of that unlovely relation, a Racketeer Influenced and Corrupt Organizations Act (RICO) "enterprise." 18 U.S.C.A. § 1961 et seq.

[19] Consumer Protection ⬅⬆ 1
92Hk1 Most Cited Cases
Business purchaser is not a "consumer," under Illinois Consumer Fraud and Deceptive Business Practices Act, because his only use of the purchased product is as input into making of product that he sells. 815 ILCS 505/1 et seq.

[20] Consumer Protection ⬅⬆ 6
92Hk6 Most Cited Cases

[20] Consumer Protection ⬅⬆ 32
92Hk32 Most Cited Cases
Alleged fraud on video game manufacturer, through suppliers' bribery of manufacturer's buyer, was of sufficient magnitude to be likely to affect market generally, as required for manufacturer to maintain claim under Illinois Consumer Fraud and Deceptive Business Practices Act based on injury to "any person"; alleged fraud was likely to harm patrons of game arcades in which the video games were played. S.H.A. 815 ILCS 505/10a(a).

[21] Release ⬅⬆ 17(.5)
331k17(.5) Most Cited Cases
Release obtained by fraud or by breach of fiduciary obligation is unenforceable, under Illinois law.

[22] Fraud ⬅⬆ 17
184k17 Most Cited Cases
After being fired, employees were no longer fiduciaries of their employer, and, before executing releases of employer's claims against them, Illinois law did not require that they disclose that they had breached their fiduciary duty to employer by competing with it.
*572 Edward M. Kay, Clausen Miller, Damon E. Dunn, Glenn A. Rice, Funkhouser Vegosen

Liebman & Dunn, Chicago, IL, for Plaintiffs-Appellants.

Anthony Pinelli, Chicago, IL, John N. Gallo (argued), Sidley Austin Brown & Wood, Chicago, IL, for Defendants-Appellees.

James R. Ferguson (argued), Mayer, Brown, Rowe & Maw, Chicago, IL, for Defendant-Counter Plaintiff-Appellant and Defendants-Appellees.

Damon E. Dunn (argued), Funkhouser Vegosen Liebman & Dunn, Chicago, IL, for Plaintiff-Counter  Defendant-Appellee  and  Plaintiff-Appellant.

Wilson P. Funkhouser, Funkhouser Vegosen Liebman & Dunn, Chicago, IL, for Plaintiff-Counter Defendant-Appellee.

Kenneth M. Kliebard (argued), Howrey, Simon, Arnold & White, Chicago, IL, for Defendants-Cross Defendants-Appellees.

Before POSNER, RIPPLE, and EVANS, Circuit Judges.

POSNER, Circuit Judge.

Williams, the manufacturer of *Mortal Kombat* and other video games, brought suit for fraud and related misconduct, federal and state (Illinois law governs the state law claims), against two of its components  suppliers,  Arrow  and  Milgray. (National Union, Williams's insurer, joined as a plaintiff, but need not be discussed separately.) Williams charges the suppliers with, among other things, having bribed one of its buyers, Greg Barry, to buy from them. Williams also named as a defendant James Garrity, a salesman for Arrow. Milgray counterclaimed. It charged that Williams had conspired with two of Milgray's employees, Gnat and Slupik (against whom Milgray filed cross-claims), to defraud Milgray by purchasing components from a company named Microcomp that Gnat and Slupik had created and were operating in violation of their duty to their employer.

The jury returned a verdict for Williams against Garrity for $78,000 but exonerated the other defendants.  The judge then rejected Williams's equitable claims.  Williams appeals--as does

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Milgray, because the judge rejected its claims against Williams, Gnat, and Slupik. We'll discuss Williams's claims first.

Barry received more than $100,000 in cash bribes from Arrow and Milgray over a four-year period during which these two suppliers sold Williams some $100 million in component parts. Eventually Williams discovered Barry's bribe-taking and fired him. The company may have been careless in failing to discover the bribes sooner; it may even have known about the bribes but not cared because it thought it was getting a good price and excellent service from Arrow and Milgray. That is a matter of fierce dispute but Williams does admit being aware that some of its suppliers, not limited to Arrow and Milgray, were giving gift certificates ranging from $25 to $500 to its employees at Christmas time. Williams had no policy against its employees' accepting Christmas gifts, provided that any gift in excess of $100 was disclosed to and approved by a company audit board, except that buyers (such as Barry) were forbidden to accept any gift, period. The cash bribes received by Barry were not considered by either donor or recipient to be Christmas gifts.

Commercial bribery is a garden variety of fraud, e.g., *Ash v. Wallenmeyer,* 879 F.2d 272, 273 (1989) , appeal after remand, *Ash v. Georgia-Pacific Corp.,* 957 F.2d 432 (7th Cir.1992); see *Ginsburg v. United States,* 909 F.2d 982, 989-91 (7th Cir.1990); *Walker v. Marshall Field & Co.,* 179 Ill.App. 3 (1913), here consisting of the suppliers' concealing from Williams the fact that they were bribing its buyer. The judge gave a standard fraud instruction. It required the jury to find that Williams *573 had justifiably relied on the facts known to it in continuing to purchase from Arrow and Milgray--or in other words that Williams hadn't known about the bribes. At the request of the defendants, however, the judge also gave instructions on the affirmative defenses of ratification and *in pari delicto.* He instructed the jury that if Williams had known or "should have known" of the defendants' bribing Barry, it should find that Williams had ratified the fraud and could not recover damages. And likewise if Williams had been *in pari delicto* (equally at fault) with the defendants, which it would be, the judge told the jury, if Williams either (1) "was aware of a general practice of bribery of its buyers by its suppliers" or

(2) "knew or was recklessly indifferent to the fact that Greg Barry was soliciting and/or accepting kickbacks from Williams' vendors." The jury found that Williams had proved fraud, in accordance with the instruction on fraud, but also found that the corporate defendants (Garrity did not assert these defenses) had proved both affirmative defenses; and so Arrow and Milgray were exonerated.

[1][2] The instructions on the affirmative defenses were erroneous at a quite fundamental level. As countless cases affirm, a victim's negligence is not a defense to an intentional tort, such as fraud. *Chapman v. Hosek,* 131 Ill.App.3d 180, 86 Ill.Dec. 379, 475 N.E.2d 593, 599 (1985); *Ty Inc. v. Softbelly's Inc.,* 353 F.3d 528, 537 (7th Cir.2003); *Eastern Trading Co. v. Refco, Inc.,* 229 F.3d 617, 625 (7th Cir.2000); *In re Mercer,* 246 F.3d 391, 421 (5th Cir.2001). (For that matter, it is no longer a complete defense to an unintentional tort, having been replaced by the partial defense of comparative negligence. E.g., *Spinozzi v. ITT Sheraton Corp.,* 174 F.3d 842, 847 (7th Cir.1999); *Alvis v. Ribar,* 85 Ill.2d 1, 52 Ill.Dec. 23, 421 N.E.2d 886, 896-97 (Ill.1981). That should have been a clue as to how the law would treat the victim's negligence in the setting of an intentional tort.) Yet by instructing the jury that it should return a verdict for the defendants if it found that Williams "should have known" that Barry was taking bribes, the judge allowed the jury to exonerate the defendants on the basis of the carelessness of their victim in failing to discover that it *was* a victim.

The error was compounded by a misunderstanding of the legal meaning of ratification. Had Williams after discovering Barry's bribe-taking decided that it was on the whole beneficial to Williams (maybe because it allowed Williams to pay him a lower salary!), and had decided not to fire him or otherwise discipline him, that would be ratification, much as if a restaurant owner decided after discovering that his headwaiter was accepting tips in order to seat patrons to condone the practice (still common, especially in nightclubs). Cf. *State v. Brewer,* 258 N.C. 533, 129 S.E.2d 262, 276 (1963) . Or as if Barry, as Williams's agent, had made an unauthorized transaction on Williams's behalf that Williams, after discovering the transaction, had decided was in its interest after all, and so it would retain the benefits of it. E.g., *Eastern Trading Co. v. Refco, Inc., supra,* 229 F.3d at 625; *Hurd v.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Wildman, Harrold, Allen and Dixon,* 303 Ill.App.3d 84, 236 Ill.Dec. 482, 707 N.E.2d 609, 616 (1999); *Progress Printing Corp. v. Jane Byrne Political Committee,* 235 Ill.App.3d 292, 176 Ill.Dec. 357, 601 N.E.2d 1055, 1067-68 (1992). Obviously it couldn't retain the profits of the transaction but shuck off the costs on the ground that it had never authorized the transaction and therefore wasn't bound by it. See *Extra Equipamentos E Exportacao Ltda. v. Case Corp.,* 361 F.3d 359, 360 (7th Cir.2004).

[3] But that isn't the defendants' theory. It is that Williams knew all along *574 about Barry's bribe-taking. If so, this would exonerate the defendants, all right, because it would mean there had been no fraud in the first place, not that the fraud had been washed away by ratification. No ratification instruction should have been given, let alone one that misstated the law by supposing that ratification can be premised on a careless accident.

[4] The defense of *in pari delicto* is intended for situations in which the victim is a participant in the misconduct giving rise to his claim, *Pinter v. Dahl,* 486 U.S. 622, 636, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988); *Crawford v. Colby Broadcasting Corp.,* 387 F.2d 796, 798 (7th Cir.1967), as in the classic case of the highwayman who sued his partner for an accounting of the profits of the robbery they had committed together. Note, "The Highwayman's Case," 9 *L.Q. Rev.* 197, 197-99 (1893) (*Everet v. Williams* (Ex. 1725)); *Byron v. Clay,* 867 F.2d 1049, 1051-52 (7th Cir.1989); see also *Cisna v. Sheibley,* 88 Ill.App. 385 (1899). It has been extended to the case-- illustrated not by the *in pari delicto* defense asserted by Arrow and Milgray but by the separate *in pari delicto* defense asserted by Milgray--in which each party is accused of having wronged the other; Milgray, as we'll see, claims that Williams committed fraud against it at the same time that it was committing fraud against Williams.

That is not the character of the *in pari delicto* defense that Arrow and Milgray asserted jointly against Williams. Clause (2) of the instruction ("knew or was recklessly indifferent to the fact that Greg Barry was soliciting and/or accepting kickbacks from Williams' vendors") barred Williams from recovering against either defendant if the jury found that Williams knew that, or was recklessly indifferent to whether, Barry was taking bribes. This part of the instruction didn't define a defense distinct from ratification, but merely repeated in different words the instruction on ratification, except that for negligence it properly substituted reckless indifference, which the law treats for most purposes including this one the same as knowledge. E.g., *Vigortone AG Products, Inc. v. PM AG Products, Inc.,* 316 F.3d 641, 645 (7th Cir.2002); *AMPAT/Midwest, Inc. v. Illinois Tool Works Inc.,* 896 F.2d 1035, 1041-42 (7th Cir.1990) . Clause (1) ("was aware of a general practice of bribery of its buyers by its suppliers") likewise repeated the defense of ratification in the guise of *in pari delicto* (as if it helps a jury to have instructions translated into Latin!), but reinjected negligence as a basis for barring Williams by suggesting that Williams's knowledge of a "general practice," presumably a reference to the Christmas gifts, should have alerted it to the possibility that Barry was taking big bribes.

Apart from the fact that the two affirmative-defense instructions were at once erroneous and confusingly overlapping, they made a confusing mish-mash with the instruction on prima facie fraud. The jury found that Williams had been justified in relying on the facts known to it, yet how could it find that and at the same time find that Williams both had ratified the fraud and had been equally at fault with the defendants? There is a possible path, as we're about to see, but we can have no confidence that it is the one the jury actually took.

So Williams is entitled to a new trial on fraud--but not, as it urges, to a judgment based on the jury's finding of prima facie fraud. The jury *may* have based its findings of ratification and equal fault simply on negligence by Williams--the instructions would have permitted that--in which event Williams would be entitled to a judgment. But, again given the confusing medley of instructions, we cannot have any *575 confidence that that was the jury's thought process.

The separate *in pari delicto* instruction that the judge gave with respect to Milgray's claim against Williams and its former employees required the jury to bring in a verdict for Milgray if it found (as it did) that "Williams, acting through its agent Barry, knowingly participated in Slupik's and/or Gnat's unlawful diversion of business from Milgray to Microcomp." (Remember that Gnat and Slupik

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

were employees of Milgray who formed a company that sold components to Williams in competition with Milgray.) This instruction did not commit the error of injecting the issue of the victim's negligence into an intentional-tort case, but it had no basis in law, because it required no showing that Williams benefited from, or even knew anything about, Gnat's and Slupik's conduct. All the instruction required the jury to find was that Williams was "acting through its agent Barry," which we take to mean, and which the jury probably understood to mean as well, nothing more than that Barry was Williams's agent.

[5][6][7] Barry doubtless harmed Milgray by buying from Microcomp, and Milgray could sue him for that harm. But the fact that Barry was bribed not only by Milgray, to Milgray's benefit, but also by two employees of Milgray, to Milgray's detriment, does not establish fault on the part of Williams. An agent's knowledge is not imputed to his principal when the agent is acting adversely to the principal, *Ash v. Georgia-Pacific Corp., supra,* 957 F.2d at 436; *Lease Resolution Corp. v. Larney,* 308 Ill.App.3d 80, 241 Ill.Dec. 304, 719 N.E.2d 165, 170 (1999), as Barry was. "[I]n general when an agent acts *entirely* on his own behalf, doing things that could not possibly be interpreted as the merely overzealous or ill-judged performance of his duties as agent, he is acting outside the scope of the agency and the principal is not bound." *Hartmann v. Prudential Ins. Co. of America,* 9 F.3d 1207, 1210 (7th Cir.1993) (emphasis in original). It is not as if Gnat's and Slupik's fraud benefited Williams. It made Milgray another victim, along with Williams itself, of Barry's fraud; it did not make Williams equally at fault with Barry. *Lawyers Title Ins. Corp. v. Dearborn Title Corp.,* 118 F.3d 1157, 1164 (7th Cir.1997). The instruction was an example of blaming the victim, with a vengeance.

Williams might be liable to Milgray under one theory or another, but it was not a participant in the fraud against Milgray, especially when we consider that, so far as appears, Williams lost, and Milgray on balance benefited, from Barry's conduct. The only fault of Williams mentioned by the instruction is Barry's bribe-taking; the jury was not asked to find that Williams authorized or ratified Barry's conduct or even that it was negligent in failing to prevent it.

The defendants argue that if we reverse the judgment in their favor, damages should be capped at $78,000, the amount of the verdict against Garrity, the Arrow salesman who bribed Barry on Arrow's behalf. It happens that that was the amount of the bribes that Garrity paid. But it corresponds neither to the damages that Williams may have sustained as a result of Garrity's bribing Barry (and remember that Milgray as well as Arrow bribed him) nor to the profits that the defendants may have made from the bribery by overcharging Williams, though the bribes might as well see be a lower-bound estimate of the damages that Arrow, Garrity's employer--and Arrow alone--inflicted on Williams. The $78,000 figure is a token of the jury's confusion and an unreliable guide to either Williams's total loss or the defendants' gain.

*576 [8] We have mentioned the defendants' gain as well as Williams's loss because in addition to seeking damages for the fraud perpetrated upon it, Williams asked the judge to impose a constructive trust in its favor on the profits that the defendants had made from their bribery. The victim of commercial bribery, who usually as here is the principal of an agent who was bribed, can obtain by way of remedy either the damages that he has sustained (the damages remedy) or the profits that the bribe yielded (the restitution or unjust enrichment remedy). 2 Dan B. Dobbs, *Dobbs Law of Remedies, Damages-Equity-Restitution* § 10.6, p. 698 (2d ed.1993). The total profits would consist of the bribe itself (received by Barry, of course, not by Garrity or Arrow), plus the revenue that the bribe generated for the briber, minus the cost of goods sold and any other variable costs incurred in making the sales that generated that revenue. See *Hill v. Names & Addresses, Inc.,* 212 Ill.App.3d 1065, 157 Ill.Dec. 66, 571 N.E.2d 1085, 1096-97 (1991); *Taylor v. Meirick,* 712 F.2d 1112, 1120-22 (7th Cir.1983).

[9] Commercial bribery is a deliberate tort, and one way to deter it is to make it worthless to the tortfeasor by stripping away all his gain, since if his gain exceeded the victim's loss a damages remedy would leave the tortfeasor with a profit from his act. *Id.* at 1120. The amount of the bribe paid is of course not a profit to the briber, but an expense, and it should not enter into the net profit calculation sketched above. It can be used as a minimum estimate of damages, however, on the theory that no

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

one would pay a bribe who didn't anticipate garnering net additional revenue at least equal to the amount of the bribe; and that additional revenue is, at least as a first approximation, an additional expense to the person whose agent was bribed. *Continental Management, Inc. v. United States,* 208 Ct.Cl. 501, 527 F.2d 613, 619 (1975); *Donemar, Inc. v. Molloy,* 252 N.Y. 360, 169 N.E. 610, 611 (1930). Arrow presumably jacked up its prices to Williams by at least $78,000 to cover the cost of the bribes that it was paying Barry to swing business its way, as otherwise it would have lost rather than made money from bribing him. The implication is that had it not been for the bribes, Arrow's prices to Williams would have been at least $78,000 lower. So that amount is a minimum estimate of the loss to Williams caused by Arrow's bribing Barry.

[10][11] Restitution is available in any intentional-tort case in which the tortfeasor has made a profit that exceeds the victim's damages (if the damages exceed the profit, the plaintiff will prefer to seek damages instead), whether or not the tort involved a breach of fiduciary duty, *Roberts v. Sears, Roebuck & Co.,* 617 F.2d 460, 464 (7th Cir.1980) (fraud); *Cross v. Berg Lumber Co.,* 7 P.3d 922, 932-36 (Wyo.2000); Douglas Laycock, "The Scope and Significance of Restitution," 67 *Tex. L.Rev.* 1277, 1286 (1989), though commercial bribery normally will involve such a breach. The only thing that turns on the precise character of the defendant's wrongdoing is, in some cases, the availability of equitable as distinct from legal restitution. Just as damages can be obtained either in a suit at law, or, in an equity suit, under the "clean up" doctrine, *May Dept. Stores Co. v. Federal Ins. Co.,* 305 F.3d 597, 603 (7th Cir.2002); *Medtronic, Inc. v. Intermedics, Inc.,* 725 F.2d 440, 442 (7th Cir.1984); *Vowell v. Fairfield Bay Community Club, Inc.,* 346 Ark. 270, 58 S.W.3d 324, 328 (2001); *Clark v. Teeven Holding Co.,* 625 A.2d 869, 881 (Del.Ch.1992), or by the imposition of a constructive trust on moneys wrongfully withheld from the plaintiff, *May Dept. Stores Co. v. Federal Ins. Co., supra,* 305 F.3d at 603; *Wal-Mart Stores, *577 Inc. Associates' Health & Welfare Plan v. Wells,* 213 F.3d 398, 400-01 (7th Cir.2000), or by surcharging a trustee for the losses that he has caused to the trust, *Restatement (Second) of Trusts* § 205(a) (1959); John H. Langbein, "What ERISA Means by 'Equitable': The Supreme Court's Trail of Error in *Russell, Mertens,* and *Great-West,*" 103 *Colum. L.Rev.* 1317, 1335-38

(2003), so restitution, too, can be awarded in either a suit at law or a suit in equity. *Great-West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 213, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002); *SEC v. Lipson,* 278 F.3d 656, 663 (7th Cir.2002); *Health Cost Controls of Illinois, Inc. v. Washington,* 187 F.3d 703, 710 (7th Cir.1999); *Reich v. Continental Casualty Co.,* 33 F.3d 754, 756 (7th Cir.1994). If as in this case the wrong consists of a breach of fiduciary obligation--the kind of breach traditionally actionable in suits in equity (fiduciary obligations were an invention of the English chancery court, *In re Estate of Karmey,* 468 Mich. 68, 658 N.W.2d 796, 799 n. 3 (2003) (per curiam); *Beckman v. Farmer,* 579 A.2d 618, 651 n. 42 (D.C.1990); 3 Austin Wakeman Scott & William Franklin Fratcher, *The Law of Trusts* § 197 (4th ed.1988))--the usual form that restitution takes is to impress a constructive trust on the profits of wrongdoing, with the defendant the trustee and the plaintiff, of course, the beneficiary. *Health Cost Controls of Illinois, Inc. v. Washington, supra,* 187 F.3d at 710-11; *Chicago Park District v. Kenroy, Inc.,* 78 Ill.2d 555, 37 Ill.Dec. 291, 402 N.E.2d 181, 186 (1980); *Village of Wheeling v. Stavros,* 89 Ill.App.3d 450, 44 Ill.Dec. 701, 411 N.E.2d 1067, 1069-70 (1980).

[12][13] But if all that the plaintiff is seeking is a sum of money equal to the defendant's profit, an order of restitution will do fine, *Great-West Life & Annuity Ins. Co. v. Knudson, supra,* 534 U.S. at 212-14, 122 S.Ct. 708, and the device of a constructive trust is surplus; the device comes into its own only when the plaintiff is seeking title to specific property in the defendant's hands. Which means, by the way, that the imposition of a constructive trust can be sought as an equitable remedy for a legal as well as an equitable wrong (on both points see *Health Cost Controls of Illinois, Inc. v. Washington, supra,* 187 F.3d at 710-11; also *Frederickson v. Blumenthal,* 271 Ill.App.3d 738, 208 Ill.Dec. 138, 648 N.E.2d 1060, 1061-62 (1995)), just as, in a suit for damages for breach of contract, the court can order an equitable accounting if the computation of damages involves complexities that would baffle a jury. *Kirby v. Lake Shore & Michigan Southern R.R.,* 120 U.S. 130, 134, 7 S.Ct. 430, 30 L.Ed. 569 (1887). For completeness, we note that when restitution is sought in a law case and the plaintiff is not seeking to impress a lien on particular property, but just wants an award of profits, he cannot obtain a constructive trust,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

because there is no *res* (that is, no fund or other specific piece of property) for the trust to attach to. *Great-West Life & Annuity Ins. Co. v. Knudson, supra*, 534 U.S. at 212-14, 122 S.Ct. 708; *People ex rel. Hartigan v. Candy Club*, 149 Ill.App.3d 498, 103 Ill.Dec. 167, 501 N.E.2d 188, 191 (1986) ; 2 Dobbs, *supra*, § 6.1(3). He can still get restitution in such a case, but as a legal remedy for a legal wrong, not as an equitable remedy for a legal or an equitable wrong.

[14][15] Williams's situation was in between. It was not seeking to impose a lien on particular property, so it had no basis for seeking a constructive trust. But the wrong for which it was seeking a remedy (properly described as restitution, or, what is synonymous as a practical matter, an accounting for profits, *Great-West Life & Annuity Ins. Co. v. Knudson, supra*, 534 *578 U.S. at 213 n. 2, 122 S.Ct. 708; *People ex rel. Hartigan v. Candy Club, supra*, 103 Ill.Dec. 167, 501 N.E.2d at 190; 1 Dobbs, *supra*, § 4.3(1), rather than as the imposition of a constructive trust) was an equitable wrong, a breach of fiduciary obligation, and so Williams was entitled to seek equitable restitution. And therefore it could seek (legal) damages from a jury and then, if it thought it could obtain a larger recovery by way of restitution, an order of restitution from the judge, since equitable remedies are determined by judges rather than by juries. *Hill v. Names & Addresses, Inc., supra*, 157 Ill.Dec. 66, 571 N.E.2d at 1095-96; *Medcom Holding Co. v. Baxter Travenol Laboratories, Inc.*, 984 F.2d 223, 228-30 (7th Cir.1993). Of course it could not keep both damages and profits, only the larger of the two. And of course when an equitable remedy is sought in conjunction with a legal remedy the legal claim is tried first and the jury's findings bind the judge, in order to vindicate the right to a jury trial on legal claims. *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 479, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962); *Snider v. Consolidation Coal Co.*, 973 F.2d 555, 559 (7th Cir.1992).

[16] The jury having exonerated the defendants, the judge refused to order equitable relief; but since we are setting aside the jury's verdict, the judge's ruling on equitable relief falls with it. Again for completeness, we note that since restitution is a legal as well as an equitable remedy, Williams could have sought such relief from the jury. No one doubts that Williams was entitled to have a jury try its claim of fraud; despite the equitable origins of remedies for fraud a suit complaining of fraud is treated as a case at law if a legal rather than an equitable remedy is sought. *Strom v. Goldman, Sachs & Co.*, 202 F.3d 138, 143-47 (2d Cir.1999); *Skippy, Inc. v. CPC Int'l Inc.*, 674 F.2d 209, 214 (4th Cir.1982); *Plechner v. Widener College, Inc.*, 569 F.2d 1250, 1258 (3d Cir.1977); *Hyde Properties v. McCoy*, 507 F.2d 301, 305 (6th Cir.1974); 8 James Wm. Moore, *Moore's Federal Practice* § 38.30[1][e] (3d ed.2003). And since restitution is equally a legal and an equitable remedy, it can be sought from a jury in a fraud case.

[17] We turn now to Williams's statutory claims, all of which the judge threw out. One was that Arrow and Milgray had conspired to fix the prices they charged Williams, in violation of section 1 of the Sherman Act. They *might* have gotten together, agreed not to give volume discounts to Williams (Williams was a very good customer, and might have been expected to receive such discounts), and agreed to bribe Barry not to demand any discounts from them. And then there might be a good Sherman Act claim. But there is no evidence of concerted action by the two suppliers. The fact that both may have charged higher prices than they would have done had they not been bribing Barry does not show that they agreed on those prices, or for that matter agreed to bribe Barry. For even if both suppliers agreed with him separately to pay the bribes, one would expect the prices of both to rise, since otherwise the suppliers wouldn't both be profiting from the bribes. But the common price increase would not in that case be the result of collusion, and commercial bribery that does not involve any collusion between competitors does not violate the Sherman Act's prohibition against price-fixing. E.g., *Bunker Ramo Corp. v. United Business Forms, Inc.*, 713 F.2d 1272, 1279-85 (7th Cir.1983); *Calnetics Corp. v. Volkswagen of America, Inc.*, 532 F.2d 674, 687-88 (9th Cir.1976) ; compare *DeLong Equipment Co. v. Washington Mills Electro Minerals Corp.*, 990 F.2d 1186, 1196-1201 (11th Cir.1993).

*579 [18] Another nonstarter is Williams's RICO claim, which alleges an "enterprise" consisting of Arrow, Milgray, and Barry. How could that be an enterprise? If briber and bribed constitute, solely by virtue of that unlovely relation, a RICO enterprise, then any time one person bribes another both have

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

violated RICO. We cannot see the sense of that. It
is true that bribery is one of the offenses upon which
a RICO claim can be based, 18 U.S.C. § 1961(1);
*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
140 F.3d 494, 527-28 (3d Cir.1998), but the bribe
itself is not the RICO offense; it is the predicate act
of the RICO enterprise and, as in *Ash v.
Wallenmeyer, supra*, 879 F.2d at 275-76, there is no
enterprise here. Cf. *Bachman v. Bear, Stearns &
Co., Inc.*, 178 F.3d 930 (7th Cir.1999).

[19] Williams's last statutory claim is under the
Illinois Consumer Fraud and Deceptive Business
Practices Act, 815 ILCS 505/1 *et seq.* The judge
rejected the claim on the ground that Williams is not
a consumer. Actually, it is a consumer as defined in
the Act, if the Act is read literally, because it
purchased components from Arrow and Milgray not
for resale but instead for use in manufacturing its
video games, which are products that it sells, not
resells. "The term 'consumer' means any person
who purchases or contracts for the purchase of
merchandise not for resale in the ordinary course of
his trade or business but for his use or that of a
member of his household." 815 ILCS 505/1(e).
However, we rejected the literal reading in *First
Comics, Inc. v. World Color Press, Inc.*, 884 F.2d
1033, 1039-40 (7th Cir.1989), lest the Act so read
"supplant many common law breach of contract and
fraud cases, something the Illinois legislature surely
did not intend." *Id.* at 1039. In the non-literal
reading adopted by that case, the business purchaser
is not a consumer, because his only use of the
purchased product is as an input into the making of
a product that he sells, in contrast to the individual
who consumes a six-pack of beer for pleasure or
nutrition rather than incorporating the beer into a
product (his beer belly is not for sale).

[20] In any event the section under which Williams
sued does not protect just consumers, but any
person. 815 ILCS 505/10a(a); see also 10a(c). The
courts have, it is true, glossed this provision to
require that the fraud be of sufficient magnitude to
be likely to affect the market generally, *Bank One
Milwaukee v. Sanchez*, 336 Ill.App.3d 319, 270
Ill.Dec. 642, 783 N.E.2d 217 (2003); *Speakers of
Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 868 (7th
Cir.1999), and thus be likely to harm consumers in
the colloquial sense of the ultimate buyers of the
finished product, or in this case the patrons of the
game arcades in which the video games

manufactured by Williams are played. But that
requirement is satisfied. The fraud must have added
something, and maybe a lot, to Williams's input
costs, and given Williams's position in the video
game market some part of the increase would
undoubtedly have been passed on to consumers in
the form of higher prices. Passing on is impossible
if a seller faces a horizontal demand curve, meaning
that the slightest increase in price would cause his
sales to plummet to zero. But that is an
unreasonable assumption with regard to a
differentiated product; there is no perfect substitute
for *Mortal Kombat*.

Last is the appeal from the dismissal of the cross-
claim against Gnat and Slupik. Milgray fired them
apparently not knowing that they were still
operating Microcomp though they had promised
years earlier to terminate this unauthorized
competition with their employer. Milgray gave
them severance pay in exchange for *580 a blanket
release of any legal claims they might have against
Milgray; Slupik had threatened to sue for age
discrimination. In exchange for their release, Gnat
and Slupik received an equally broad release of any
claims that Milgray might have against them.
Milgray now argues that because Gnat and Slupik
were, as employees, fiduciaries of Milgray, they
were required before accepting the releases to
disclose that they had breached their fiduciary duty
to Milgray by competing with it through
Microcomp.

[21][22] The district judge was right to dismiss this
claim. (He dismissed Milgray's counterclaim
against Williams at the same time, on the ground
that the release of Gnat and Slupik released their
alleged joint tortfeasor as well. Milgray
acknowledges that the ruling was correct if Gnat and
Slupik were released.) It is true that a release,
however broad in its terms, might be obtained by
fraud, or by a breach of fiduciary obligation, and in
either event it would be unenforceable. *Havoco of
America, Ltd. v. Sumitomo Corp. of America*, 971
F.2d 1332, 1341 (7th Cir.1992); *Cwikla v. Sheir*,
345 Ill.App.3d 23, 280 Ill.Dec. 158, 801 N.E.2d
1103, 1112 (2003); *Phil Dressler & Associates, Inc.
v. Old Oak Brook Investment Corp.*, 192 Ill.App.3d
577, 139 Ill.Dec. 629, 548 N.E.2d 1343, 1347
(1989). But Gnat and Slupik had already been fired
when they negotiated for the release. They were no
longer fiduciaries of Milgray; they were negotiating

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

at arm's length. They could not without being
guilty of fraud make misrepresentations to induce
the release--if asked, they could not have denied
their shenanigans with Microcomp. But unless they
were fiduciaries, they had no legal duty to disclose
damaging information merely because it would be
valuable to the person on the other side of the
negotiation. E.g., *Weisblatt v. Colky,* 265
Ill.App.3d 622, 202 Ill.Dec. 462, 637 N.E.2d
1198, 1200 (1994); *McCormick v. McCormick,* 118
Ill.App.3d 455, 74 Ill.Dec. 73, 455 N.E.2d 103,
112 (1983). That is about as fundamental a principle
of commercial law as there is. People would have
little incentive to hunt for bargains if they had to
disclose to the seller the true value of the seller's
property. See *Laidlaw v. Organ,* 15 U.S. (2
Wheat.) 178, 194-95, 4 L.Ed. 214 (1817); *Market
Street Associates Ltd. Partnership v. Frey,* 941 F.2d
588, 593-94 (7th Cir.1991); 1 E. Allan
Farnsworth, *Farnsworth on Contracts* § 4.11, pp.
472-74 (3d ed.2004); Anthony T. Kronman,
"Mistake, Disclosure, Information, and the Law of
Contracts," 7 *Journal of Legal Studies* 1 (1978).

To summarize, the judgment is affirmed insofar as
it dismissed the cross-claim and Williams's RICO
and antitrust claims, but is otherwise reversed, and
the case is remanded for further proceedings
consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED.

366 F.3d 569, 2004-1 Trade Cases   P 74,390,
RICO Bus.Disp.Guide 10,669

Briefs and Other Related Documents (Back to top)

. 2003 WL 22721309 (Appellate Brief) Brief of
Plaintiffs-Appellants/Plaintiffs-Counter-Defendants-
Cross-Appellees Williams Electronics and National
Union Fire Insurance Company of Pittsburgh, PA
(Aug. 11, 2003)Original Image of this Document
with Appendix (PDF)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

