Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1

Not Reported in F.Supp.2d, 2002 WL 1751135 (S.D.N.Y.), RICO Bus.Disp.Guide 10,316

**(Cite as: 2002 WL 1751135 (S.D.N.Y.))**

▷

**Motions, Pleadings and Filings**

United States District Court, S.D. New York.
Herbert FEINBERG, individually and as assignee
of I.A. Alliance Corp. f/k/a I.
Appel Corporation, Plaintiffs,
v.
Stephen KATZ, Norman Katz and Jose Peschard,
Defendants.
I. APPEL CORPORATION and Herbert Feinberg,
Plaintiffs,
v.
Norman KATZ, Stephen Katz, and Jose Peschard,
**No. 99 CIV. 45(CSH).**

July 26, 2002.

Purchasing shareholder brought action against
selling shareholders and corporate officer alleging
violation of Racketeer Influenced and Corrupt
Organizations Act (RICO) and various state law
claims. On defendant's motion to dismiss, the
District Court, Haight, Senior District Judge, held
that: (1) purchasing shareholder had standing to
recover for pre-sale acts of mismanagement; (2)
relation back doctrine extended to initial common
law fraud claims to subsequent claim under RICO;
(3) creation of fictional out of state tax residence
and resulting conviction for failure to pay taxes was
wholly irrelevant to misappropriation of
corporation's assets claim; and (4) conviction for
tax evasion, while not directly relevant to
misappropriated corporation's assets claim, was
nonetheless admissible at trial to impeach
defendant's credibility.

Motion granted in part and denied in part.

West Headnotes

**[1] Corporations ☞320(4)**
101k320(4) Most Cited Cases
Purchasing shareholder had standing to recover for
pre-sale acts of mismanagement under New York
law, since alleged fraudulent misappropriation was
not revealed before purchase and there was no
suggestion that it was taken into account in fair
purchase price.

**[2] Corporations ☞1.5(3)**
101k1.5(3) Most Cited Cases
Under New York law, a parent corporation may not
pierce the corporate veil it set up for its own benefit
in order to advance the claims of its subsidiary.

**[3] Corporations ☞1.5(3)**
101k1.5(3) Most Cited Cases
Under New York law, a parent corporation cannot
create a subsidiary and then ignore its separate
corporate existence whenever it would be
advantageous to the parent.

**[4] Corporations ☞202**
101k202 Most Cited Cases
The fact that an individual closely affiliated with a
corporation, such as a principal shareholder or even
a sole shareholder, is incidentally injured by an
injury to the corporation does not confer standing
on the individual under New York law to sue on the
basis of either that indirect injury or the direct
injury to the corporation.

**[5] Corporations ☞202**
101k202 Most Cited Cases

**[5] Corporations ☞320(4)**
101k320(4) Most Cited Cases
Under New York law, where an injury is suffered
by a corporation and the shareholders suffer solely
through depreciation in the value of their stock,
only the corporation itself, or a stockholder suing
derivatively in the name of the corporation, may
maintain an action against the wrongdoer; an

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                     Page 2

Not Reported in F.Supp.2d, 2002 WL 1751135 (S.D.N.Y.), RICO Bus.Disp.Guide 10,316

**(Cite as: 2002 WL 1751135 (S.D.N.Y.))**

exception to the general rule prohibiting parent corporations from advancing their subsidiary's claims exists when the alleged wrongdoer owes a fiduciary duty directly to the parent corporation and the parent seeks to recover for a breach of that duty which resulted in the diminution in value of the parent's shares of the subsidiary.

**[6] Limitation of Actions ☞95(3)**
241k95(3) Most Cited Cases
Four year limitations period under Racketeer Influenced and Corrupt Organizations Act (RICO), for purchasing shareholder's claim that other shareholder and corporate officer looted parent corporation, began to run within year of when he purchased other shareholder's stock and took over company; purchasing shareholder immediately attempted to rescind purchase agreement alleging fraud as it rapidly became clear that company faced serious financial problems in months after purchase. 18 U.S.C.A. § 1961 et seq.

**[7] Limitation of Actions ☞127(3)**
241k127(3) Most Cited Cases
Relation back doctrine extended from initial common law fraud claims to subsequent claim under Racketeer Influenced and Corrupt Organizations Act (RICO), since shareholder was on notice that he could have been subject to liability for those fraudulent acts under RICO theory ever since original complaint was filed. 18 U.S.C.A. § 1961 et seq; Fed.Rules Civ.Proc.Rule 15(c), 28 U.S.C.A.

**[8] Racketeer Influenced and Corrupt Organizations ☞34**
319Hk34 Most Cited Cases
Under the Racketeer Influenced and Corrupt Organizations Act (RICO), an enterprise need not necessarily have a continuity extending beyond the performance of the pattern of racketeering acts alleged, or a structural hierarchy, so long as it is in fact an enterprise as defined in the statute. 18 U.S.C.A. § 1961 et seq.

**[9] Racketeer Influenced and Corrupt Organizations ☞36**
319Hk36 Most Cited Cases

Under the Racketeer Influenced and Corrupt Organizations Act (RICO), an association in fact enterprise exists if the plaintiff can show that its various associates function as a continuing unit; for an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes. 18 U.S.C.A. § 1961 et seq.

**[10] Corporations ☞312(3)**
101k312(3) Most Cited Cases

**[10] Trusts ☞358(1)**
390k358(1) Most Cited Cases
Funds, as specific amounts misappropriated through fraudulent billing, were specifically identifiable, for purpose of conversion and constructive trust claims under New York law, even though funds were not held in segregated account.

**[11] Trover and Conversion ☞2**
389k2 Most Cited Cases
Under New York law, real property may not be the subject of a conversion claim.

**[12] Contribution ☞8**
96k8 Most Cited Cases
Under New York law, a party may not obtain contribution for settlement of a claim.

**[13] Indemnity ☞20**
208k20 Most Cited Cases

**[13] Indemnity ☞54**
208k54 Most Cited Cases
In New York, an indemnification claim must be grounded in contract either express or implied; to find an implied contract for indemnification, a duty must exist between the third party defendant and the primary plaintiff.

**[14] Federal Civil Procedure ☞1126**
170Ak1126 Most Cited Cases
Allegations in complaint, of defendant's creation of fictional out of state tax residence and resulting conviction for failure to pay taxes, was wholly irrelevant to claim that he misappropriated

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 1751135 (S.D.N.Y.), RICO Bus.Disp.Guide 10,316

**(Cite as: 2002 WL 1751135 (S.D.N.Y.))**

corporation's assets, and, consequently, would be stricken; creation of fictional residence and conviction tended to show that defendant wanted to increase his income, but only indirectly by decreasing his taxes, and alleged evasion of income tax liability did not make it more likely that he also increased his income through very different vehicle of looting corporation. Fed.Rules Civ.Proc.Rule 12(f), 28 U.S.C.A.

**[15] Federal Civil Procedure ⟐1126**
170Ak1126 Most Cited Cases

Allegations in complaint concerning defendant's conviction for tax evasion, while not directly relevant to claims that he misappropriated corporation's assets, was nonetheless admissible at trial to impeach defendant's credibility, and, consequently, would not be stricken, since it was crime involving dishonesty. Fed.Rules Civ.Proc.Rule 12(f), 28 U.S.C.A.; Fed.Rules. Evid.Rule 609(a)(2), 28 U.S.C.A.

**[16] Federal Civil Procedure ⟐1838**
170Ak1838 Most Cited Cases

When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint; such leave, which is discretionary, may be denied where the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal. Fed.Rules Civ.Proc.Rule 15, 28 U.S.C.A.

MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District J.

*1 The simmering feud between the plaintiff, Herbert Feinberg, and his former business partner, Norman Katz ("Norman"), has engendered these consolidated cases pitting Feinberg against Norman, Norman's son Stephen Katz ("Stephen"), and their business associate Jose Peschard. The background of these seemingly endless disputes is described in the Court's opinion in a related case filed by Norman Katz to confirm an award issued in an arbitration between him and Feinberg. *See Katz v. Feinberg,* 167 F.Supp.2d 556(S.D.N.Y.2001), *aff'd* 290 F.3d 95 (2d Cir.2002) (the "Arbitration

Opinion"), familiarity with which is assumed. In addition to the arbitration case and these two consolidated cases, the disputes have sparked a separate federal complaint also pending before this Court.

Defendants now move pursuant to Rule 12(b)(6) to dismiss the complaints in the two captioned cases for failure to state a claim upon which relief can be granted.

It will be helpful in understanding the issues raised by defendants' motion to dismiss the captioned cases to furnish a brief description of the three pending federal complaints. The complaint under docket number 99 Civ. 45 was originally filed by Feinberg and his company, I. Appel Corporation ("I.Appel"), now known as I.A. Alliance Corp. (the "Company" or "Alliance"), on January 5, 1999 against Stephen Katz. That complaint advanced a claim of common law fraud arising out of Stephen's alleged misappropriation of the Company's assets and falsification of its financial statements. Feinberg and the Company filed another complaint on January 31, 2000 under docket number 00 Civ. 17 against Norman, Stephen and Jose Peschard alleging that the three breached their fiduciary duties to the Company and misappropriated the Company's assets and business opportunities by scheming to take over one of the Company's Mexican subsidiaries. The third complaint, 01 Civ. 2739, was filed by Alliance as assignee of the claims of the bankruptcy creditors of I. Appel. This latter complaint asserted causes of action for breach of fiduciary duty and fraud against Norman and Stephen Katz for allegedly disguising the Company's true financial condition from its creditors.

After the Court issued the Arbitration Opinion, the defendants agreed to allow plaintiff to amend all three complaints in order to delete allegations and claims that would have been barred by collateral estoppel as a result of the decision. To this end, on October 5, 2001 the first complaint (99 Civ. 45) was amended to delete certain claims and incorporate some of the claims in 00 Civ. 17. [FN1] The Amended Complaint advances six causes of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 4

Not Reported in F.Supp.2d, 2002 WL 1751135 (S.D.N.Y.), RICO Bus.Disp.Guide 10,316

**(Cite as: 2002 WL 1751135 (S.D.N.Y.))**

action by Feinberg, individually and as assignee of Alliance, against Stephen Katz, Norman Katz and Jose Peschard. Subject matter jurisdiction is premised upon both federal question jurisdiction and diversity of citizenship. [FN2]

> FN1. The complaint in 00 Civ. 17 is essentially obsolete because the amended complaint in 99 Civ. 45 was reconfigured to incorporate the claims alleged in 00 Civ. 17. As a result, in discussing the two cases which were originally separate I will refer to the single "Amended Complaint" filed on October 5, 2001.

> FN2. The third complaint, 01 Civ. 2739, was amended on March 19, 2002 and now advances fraud, RICO and breach of fiduciary duty claims by Feinberg and Alliance as assignees of the claims of I. Appel's creditors.

The First Claim for Relief is a cause of action under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq, based on alleged predicate acts of wire and mail fraud. The remaining claims assert causes of action under the common law.

**\*2** The Second Claim is for breach of fiduciary duty against the Katzes and Peschard;

The Third Claim is for conversion against all three defendants;

The Fourth Claim advances an unjust enrichment cause of action against the Katzes and Peschard;

The Fifth Claim seeks the imposition of a constructive trust over the assets the defendants allegedly unlawfully received; and

The Sixth Claim seeks indemnification and/or contribution from the Katzes for legal fees and settlement costs incurred by plaintiff in an unrelated litigation.

The Katzes have moved pursuant to Fed.R.Civ.P.

12(b)(6) to dismiss the Amended Complaint's RICO claim and many of its common law claims. [FN3] As for the RICO claim, the Katzes maintain that it suffers from a number of fatal deficiencies including untimeliness, failure to properly allege a RICO enterprise and a pattern of RICO activities, failure to allege predicate acts of wire fraud, and lack of particularity in its fraud pleadings. The Katzes also allege that plaintiff lacks standing to bring the claims, that most of the common law claims are barred in part by the statute of limitations, and that certain of the common law claims fail to state a cause of action. Finally, the Katzes move to strike certain allegations in the Amended Complaint they contend are prejudicial.

> FN3. The Katzes' separate motion to dismiss the third action which was recently filed and is not yet ripe for decision is not addressed in this opinion.
> Jose Peschard has answered the Amended Complaint. Since he is not a moving defendant on the motion to dismiss, the validity of the Amended Complaint's claims against him is not challenged. However, because of the nature of the infirmities in the RICO claim which I describe below, the RICO claim must be dismissed against him as well.

For the reasons that follow, the Court grants defendants' motion to dismiss in part and denies it in part, grants plaintiff leave to replead in one respect, and strikes certain of the allegations in the Amended Complaint as immaterial and unduly prejudicial.

BACKGROUND

For 20 years Norman Katz and Herbert Feinberg were co-owners of I. Appel. For a number of years until mid-1996, Norman's son Stephen was Executive Vice-President of I. Appel. In July of 1996 the partnership ended when Feinberg purchased all of Norman's stock in a deal that quickly went sour as I. Appel spiraled into bankruptcy. Amid charges that Norman created fraudulent financial statements, Feinberg commenced an arbitration to rescind the purchase

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 1751135 (S.D.N.Y.), RICO Bus.Disp.Guide 10,316

**(Cite as: 2002 WL 1751135 (S.D.N.Y.))**

agreement. The arbitration panel denied all of Feinberg's claims of fraud and rescission and granted Katz's request to upwardly adjust the purchase price. In the Arbitration Opinion, this Court confirmed the arbitration award in all respects except the adjustment of the purchase price. The Court of Appeals affirmed that Opinion.

The Amended Complaint's allegations portray fraud of a different nature than the fraud at issue in the arbitration. In this incarnation of their feud, Feinberg charges that for years before the buy-out the Katzes engaged in widespread looting of the Company's assets, the amounts totalling hundreds of thousands of dollars, by means of false expense statements, false vendor invoices, and misuse of corporate department store accounts.

The Amended Complaint also alleges that around the time of the buy-out the Katzes along with Jose Peschard schemed to misappropriate the assets of a Mexican subsidiary of I. Appel, I. Appel de Mexico (the "Mexican Subsidiary"). According to the Amended Complaint, Peschard was hired in 1993 as the legal representative of the Mexican Subsidiary, a necessary corporate position under Mexican law. Amended Complaint at ¶ 55. The Mexican Subsidiary set up three different plants and incorporated different corporations to operate each facility. The third of these, Confecciones Intimas de Zacatecas, S.A. de C.V. (the "Zacatecas Corporation"), incorporated on May 30, 1996, ran the Zacatecas plant and is the subject of the fraud alleged here.

*3 The Amended Complaint avers that even before the Zacatecas plant was set up, the Katzes and Peschard planned to appropriate it for themselves. They allegedly established the corporation in a manner different from the other Mexican operating subsidiaries, issuing stock directly to Peschard and an office employee instead of the Mexican Subsidiary's attorneys as nominal owners. In the Fall of 1996, after I. Appel's financial troubles became apparent, I. Appel engaged an outside consultant to advise it on the Company's operations in Mexico. Peschard, who was then a consultant to the Mexican Subsidiary, allegedly advised the other

consultant at the direction of the Katzes to discontinue operations of the Zacatecas plant and to terminate its lease. In December of that year, the Company ended all manufacturing operations of the Zacatecas plant.

Shortly after I. Appel ceased the Zacatecas plant's operations, Peschard assertedly arranged for the termination of the lease and immediately thereafter, on January 1, 1997, Peschard himself was given a new lease for the plant. Purportedly with funding from the Katzes, Peschard set up a new manufacturing facility at the Zacatecas plant and incorporated SEW-MEX Mexicana S.A. de C.V. ("Sew-Mex") which in May of 1997 became "a fully operational garment manufacturing facility, run and managed by Steven and Norman Katz and Jose Peschard as the titular head." Amended Complaint at ¶ 88. Plaintiff alleges that as the result of the plant's closing the Mexican Subsidiary was forced to pay approximately $50,000 in severance to its former employees. In addition, I. Appel purportedly incurred $50,000 in fees to remove Peschard as the Mexican Subsidiary's legal representative when Peschard refused to resign that position. It also suffered "substantial tax penalties" (Amended Complaint at ¶ 90) as the result of a 1997 audit by Mexican authorities of the Mexican Subsidiary which revealed a prior lack of adherence to Mexican regulations concerning corporate identity and tax requirements.

### DISCUSSION

As with any motion pursuant to Rule 12(b)(6), all well-pleaded factual allegations contained in the Amended Complaint must be treated as true by the Court, *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir.1994), and all reasonable inferences must be made in the plaintiff's favor. *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir.1995). The Court must not dismiss the action "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 335 U.S. 41, 45-46 (1957); *Frasier v. G.E. Co.*, 930 F.2d 1004, 1007 (2d Cir.1991). Generally, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 1751135 (S.D.N.Y.), RICO Bus.Disp.Guide 10,316

**(Cite as: 2002 WL 1751135 (S.D.N.Y.))**

motion to dismiss." 2 James Wm. Moore, *Moore's Federal Practice* § 12.34[1][b] (3d ed.2001). Conclusory statements will not substitute for sufficient factual allegations. *See Electronics Communications Corp. v. Toshiba America Consumer Prods., Inc.*, 129 F.3d 240, 243 (2d Cir.1997). In evaluating a Rule 12(b)(6) motion, the Court may look only to the complaint and any exhibits attached to it or other documents incorporated by reference. *Leonard F. v. Israel Discount Bank of New York*, 199 F.3d 99, 107 (2d Cir.1999); *Trugman-Nash v. New Zealand Dairy Board*, No. 93 Civ. 8321, 1996 WL 77933 at *3 (S.D.N.Y. Feb.23, 1996).

*A. Standing*

*1. The Bangor Punta Rule*

*4 [1] I turn first to the defendants' argument that plaintiff Feinberg lacks standing to bring any of the claims related to the misappropriation of corporate assets that occurred before the sale of I. Appel stock by Norman Katz to Feinberg. Defendants rest this argument on the Supreme Court's decision in *Bangor Punta Operations, Inc. v. Bangor & Aroostook Railroad Company*, 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974). In *Bangor Punta*, the Court held that a majority shareholder could not maintain a cause of action against the former owners of the company under the federal antitrust and securities laws because it could not recover for acts of corporate mismanagement that occurred prior to the time it had purchased the stock. *Id.* at 711-12. The case required the Court to apply "the settled principle of equity that a shareholder may not complain of acts of corporate mismanagement if he acquired his shares from those who participated or acquiesced in the allegedly wrongful transactions." *Id.* at 710 The Katzes argue that Feinberg is in the same position as the shareholder in *Bangor Punta* because he purchased all of I. Appel's stock subsequent to the occurrence of the alleged acts of misappropriation and therefore cannot be heard to complain of, or recover for, that misappropriation.

The Katzes' reliance on *Bangor Punta* is based on

a faulty premise. Their argument ignores a crucial underpinning of the Court's decision which sets that case apart from the case at bar: in *Bangor Punta*, the Court implicitly assumed that the price of the shares reflected the mismanagement. As the Second Circuit subsequently observed, the Court's decision in *Bangor Punta* "ultimately turned on its view that the plaintiff[ ], having paid a fair price for its shares, suffered no injury as a result of any earlier mismanagement of the acquired corporation." *Siegel v. Converters Transp., Inc.*, 714 F.2d 213, 215 (2d Cir.1983). The purchaser's knowledge of the mismanagement at the time of the stock sale was a crucial assumption in the Court's the conclusion that it could not sue over the mismanagement. In describing the underlying considerations for the equitable principle it relied on, the Court noted that the principle historically applies when the shares are purchased "at a fair price." 417 U.S. at 710. In such a case, the shareholders have "sustained no injury since they had acquired their shares from the alleged wrongdoers after the disputed transactions occurred and had received *full value* for their purchase price." *Id.* at 711 (emphasis added). A recovery would prove a "windfall" since the purchaser "received all they had bargained for." [FN4] *Id.* After noting that the shareholder at issue did not "contend that the purchase transaction was tainted by fraud or deceit, or that it received less than full value for its money," the Court held that the principle applied to bar suit. *Id* .

> FN4. In laying out the considerations underlying the principle the Supreme Court relied primarily on the Nebraska Supreme Court's decision in *Home Fire Insurance Co. v. Barber*, 67 Neb. 644, 661-62, 93 N.W. 1024, 1030-31 (1903), authored by then Commissioner Roscoe Pound. In *Home Fire*, the court held that where the plaintiff shareholders of a corporation had purchased their shares from a wrongdoer at a discount reflecting corporate mismanagement, the corporation had no standing to recover from the wrongdoer.

The same cannot be said in this case. Feinberg

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 1751135 (S.D.N.Y.), RICO Bus.Disp.Guide 10,316

**(Cite as: 2002 WL 1751135 (S.D.N.Y.))**

contends that he did not know or have reason to suspect that the Katzes misappropriated the Company's assets before he purchased Norman's stock. Indeed, the whole premise of this lawsuit is that the Katzes engaged in fraudulent activity which was not reflected in the purchase price. That circumstance distinguishes *Bangor Punta* and precludes application in this case of the equitable principle denying standing to a purchasing shareholder for recovery from pre-sale acts of mismanagement.

*5 In a somewhat analogous situation, the Third Circuit drew the same conclusion. In *Lerman v. Joyce Int'l, Inc.,* 10 F.3d 106 (3d Cir.1993), the plaintiff, a former officer of the defendant's subsidiary, sought to dismiss a RICO counterclaim the defendant filed as assignee of Litton, the company from which the defendant had purchased the subsidiary. The defendant alleged that while an officer plaintiff had employed a fraudulent billing scheme to misappropriate assets of the subsidiary for his personal use. Plaintiff argued that the RICO counterclaim was barred by *Bangor Punta* because the misappropriation had occurred before Litton sold defendant the subsidiary. The Third Circuit saw no "parallel" between *Bangor Punta* and the defendant's situation. It noted that a resemblance between the two cases might have existed if the defendant had sought to recover from Litton for harm done to the subsidiary before the sale and that the defendant "knew or had reason to have known about." *Id.* at 111. Since that was not the case, *Bangor Punta* was distinguishable in part because "the purchase price was inflated because of the racketeering activities, and [defendant] specifically paid for the right to assert claims such as this." [FN5] *Id. See also El Dorado Bancshares, Inc. v. Martin,* 701 F.Supp. 1515, 1521 (D.Kan.1988) (corporation was not precluded under *Bangor Punta* from bringing action against former officers and directors for wrongdoing before stock sale where evidence indicated that stock was not purchased at a price that reflected the wrongdoing).

> FN5. The purchase agreement provided that the subsidiary's assets acquired included "causes of action, judgments,

claims and demands of whatsoever nature." 10 F.3d at 108.

Just as in *Lerman,* the Katzes' alleged fraudulent misappropriation was not revealed before the July 1, 1996 purchase and there is no suggestion that it was taken into account in a "fair" purchase price. As a result, this case does not present a danger that the purchasing shareholder will receive more than the benefit of his bargain if recovery for the fraud is allowed. Accordingly, I conclude that the principle espoused in *Bangor Punta* does not preclude Feinberg from maintaining this suit based on the misappropriations that allegedly occurred before the buy-out.

*2. Mexican Subsidiary Claims*

[2] Relying on the established principle that a parent corporation may not "pierce the corporate veil it set up for its own benefit in order to advance the claims of its subsidiary," *Pennsylvania Engineering Corp. v. Islip Resource Recovery Agency,* 710 F.Supp. 456, 465 (E.D.N.Y.1989), *see also* 14 N.Y. Jur.2d Business Relationships § 36 (1996) ("One choosing to use a corporation to operate a business cannot, absent special circumstances, disregard the corporate structure and obtain damages personally for harm to the corporation."), defendants argue that all of the claims based on the Mexican Subsidiary fraud allegations must be dismissed because plaintiff has no standing to bring them. In response, plaintiff contends that this lawsuit seeks to recover for damages suffered directly by Alliance, the parent corporation, not by its Mexican Subsidiary. Scrutiny of the complaint refutes this argument.

*6 [3] Defendants correctly posit that Alliance and its sole shareholder cannot bring claims to recover for damages incurred by its subsidiary. This conclusion follows from the principle that "a parent corporation cannot create a subsidiary and then ignore its separate corporate existence whenever it would be advantageous to the parent." *Pennsylvania Engineering,* 710 F.Supp. at 465 (internal quotations and alteration omitted). Numerous courts have dismissed claims brought by

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 1751135 (S.D.N.Y.), RICO Bus.Disp.Guide 10,316

**(Cite as: 2002 WL 1751135 (S.D.N.Y.))**

corporations when the claims actually belong to a subsidiary or an affiliated corporation. *See id.* (dismissing corporate parent's quantum meruit claim for services rendered by a non-party subsidiary); *Diesel Systems, Ltd. v. Yip Shing Diesel Engineering Company, Ltd.,* 861 F.Supp. 179, 181 (E.D.N.Y.1994) (where plaintiff's sister corporation was party to subject contract plaintiff corporation was not real party in interest and therefore lacked standing to bring tortious interference claim; "A corporation does not have standing to assert claims belonging to a related corporation, simply because their business is intertwined."); *Bross Utilities Service Corp. v. Aboubshait,* 618 F.Supp. 1442, 1445 (S.D.N.Y.1985) (dismissing claims by parent to enforce agreement to which only subsidiary was a party); *Alexander & Alexander of New York Inc. v. Fritzen,* 114 A.D.2d 814, 495 N.Y.S.2d 386, 388 (App. Div. 1st Dep't 1985) (plaintiff had no standing to bring claim of conspiracy to divert business opportunities or to interfere with employment contract because plaintiff's subsidiary was the employer; "to the extent the pleadings disclose any allegation of wrongful conduct, it was clearly directed at [the subsidiary] not [plaintiff]"); *Disston Company v. Sandvik Aktiebolag,* 187 A.D.2d 283, 589 N.Y.S.2d 442, 442 (App. Div. 1st Dep't 1992) (defendant corporation could not set-off against its liability to plaintiff the debt owed by defendant's subsidiary).

In the case at hand, despite Feinberg's argument that the claims asserted belong to Alliance, there can be no doubt that the harmful conduct alleged was directed toward the Mexican Subsidiary. In describing the damages suffered as a result of the Mexican fraud, the Amended Complaint sometimes interchanges I. Appel and its Mexican Subsidiary. Without specifying which company, the Amended Complaint alleges that after the Zacatecas plant closed, "the company" was forced to pay $50,000 in severance to "its former employees." Amended Complaint ¶ 78. Further, plaintiff alleges that *the Mexican Subsidiary* was required to pay unquantified monetary penalties to Mexican tax authorities due to the Katzes' improper acts, ¶ 91, and that *I. Appel* paid over $50,000 in fees and costs to oust Peschard as the legal representative of

the Mexican Subsidiary. ¶ 89. More generally, the Amended Complaint alleges that "the plaintiffs" (i.e. Feinberg individually and as assignee of Alliance) suffered over $250,000 in damages as the result of the defendants' improper actions. ¶ 97.

*7 [4] Notwithstanding the Amended Complaint's conflation of the two companies, it is evident that the Zacatecas plant was the object of the alleged fraudulent scheme. That plant belonged to a corporation, the "Zacatecas Corporation," that was set up by the Mexican Subsidiary. The loss of the Zacatecas plant, therefore, was suffered directly by the Zacatecas Corporation or possibly the Mexican Subsidiary. In the scenario depicted I. Appel's role was merely as parent company. Therefore any loss it suffered was through its ownership interest in the Mexican Subsidiary. However, "the fact that an individual closely affiliated with a corporation such as a principal shareholder or even a sole shareholder, is incidentally injured by an injury to the corporation does not confer standing on the individual to sue on the basis of either that indirect injury or the direct injury to the corporation." 14 N.Y. Jur.2d Business Relationships § 36 (footnote omitted); *see also Sound Video Unlimited, Inc. v. Video Shack Inc.,* 700 F.Supp. 127, 136 (S.D.N.Y.1988) ("As a general rule, shareholders cannot bring a RICO action in their individual capacity to redress injuries inflicted upon their corporation. This is so even when the plaintiff is the sole shareholder of the injured corporation.") (citations and footnote omitted). As the above-referenced cases make evident, despite his attempt to ignore the formal distinction between the companies, Feinberg as assignee of I. Appel and Alliance has no standing to bring claims based on the loss of the Mexican Subsidiary's plant.

Feinberg suggests that at the very least he has standing to recover the tax penalties and legal fees Alliance paid out directly to settle the tax charges and to oust Peschard. There are two principal difficulties with this argument. First, his contention that I. Appel paid the tax penalties is belied by the Amended Complaint whose allegations control, and which aver that the *Mexican Subsidiary* settled them. *See* Amended Complaint at ¶ 91. This

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 1751135 (S.D.N.Y.), RICO Bus.Disp.Guide 10,316

**(Cite as: 2002 WL 1751135 (S.D.N.Y.))**

payment allegation dovetails with the allegation that the investigation by the Mexican authorities concerned the Mexican Subsidiary, not its parent corporation. Second, although the Amended Complaint avers that I. Appel bore the costs associated with ousting Peschard, there is no escaping the reality that those costs were the responsibility of the Mexican Subsidiary. Peschard was the legal representative of the Mexican Subsidiary, not of I. Appel. It was the Mexican Subsidiary's responsibility and burden to divest itself of Peschard's services. In his brief and in the Amended Complaint, Feinberg equates harm to the Mexican Subsidiary with harm to I. Appel. But corporate law does not countenance such a view. A subsidiary corporation's separate formal structure must be observed, not ignored whenever it suits the parent corporation's interest, as Feinberg seeks to do in the case at bar. To the extent I. Appel shouldered fiscal responsibility for the benefit of its subsidiary, it may seek recoupment from its subsidiary, not from the defendants. Because the fraudulent diversion scheme alleged in the Amended Complaint was directed toward the Mexican Subsidiary and had only an incidental impact on I. Appel as its parent corporation, plaintiff cannot sue the defendants for the harm caused the subsidiary.

\*8 Even if, contrary to my conclusion, I. Appel (and, by assignment, Feinberg) has standing to sue the defendants to recover the funds it paid on behalf of its subsidiary to oust Peschard, this standing would avail it nothing. This injury is too remotely connected to the fraudulent scheme to constitute a cognizable RICO injury. To state a claim under RICO, plaintiff must allege that his "injuries were both factually and proximately caused by the alleged RICO violation." *In re American Express Co. Shareholder Litig.,* 39 F.3d 395, 399 (2d Cir.1994) (citing *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 266-68, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992)). As the Second Circuit has held:

[T]o plead a direct injury is a key element for establishing proximate causation, independent of and in addition to other traditional elements of proximate cause. Thus, the other traditional rules

requiring that defendant's acts were a substantial cause of the injury, and that plaintiff's injury was reasonably foreseeable, are additional elements, not substitutes for alleging (and ultimately, showing) a direct injury.

*Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,* 191 F.3d 229, 235-36 (2d Cir.1999).

Feinberg has alleged no direct RICO injury resulting from the legal fees it paid to sever ties with Peschard because those fees were the result not of the alleged fraud but of Peschard's alleged refusal to resign as the legal representative of the Mexican Subsidiary. Amended Complaint at ¶ 89. His refusal to resign may have been spiteful but it was not directly related to the alleged predicate acts of mail and wire fraud that he and the Katzes committed in an effort to commandeer the Zacatecas plant. Peschard is alleged to have used his role as a consultant to the Mexican Subsidiary to advise it to close the plant and to take over the lease. If the alleged fraud had never come to light, the Mexican Subsidiary might may never have sought the faithless Peschard's removal as legal representative, but it was his refusal to withdraw as representative--not the fraud--which caused that injury. Accordingly, the plaintiff cannot recover under RICO for the fees I. Appel paid to remove Peschard. *Cf. Nassiri v. Craumer,* No. 95 Civ. 1668(LAP), 1996 WL 209985, \* 3-4 (S.D.N.Y. April 30, 1996) (plaintiff had no standing to bring RICO claim which alleged injuries related to the termination of his employment; his firing was the result of a confrontation with his employer about the fraud, not the fraud itself).

[5] An exception to the general rule prohibiting parent corporations from advancing their subsidiary's claims exists when the alleged wrongdoer owes a fiduciary duty directly to the parent corporation and the parent seeks to recover for a breach of that duty which resulted in the diminution in value of the parent's shares of the subsidiary. "In such a case, the plaintiff parent shareholder has standing to recover for that decline in value, despite the fact that the subsidiary corporation may itself have a claim against the

Not Reported in F.Supp.2d                                                    Page 10

Not Reported in F.Supp.2d, 2002 WL 1751135 (S.D.N.Y.), RICO Bus.Disp.Guide 10,316

**(Cite as: 2002 WL 1751135 (S.D.N.Y.))**

defendant for the direct injury to it." *Quantel Corp. v. Niemuller,* 771 F.Supp. 1361, 1367 (S.D.N.Y.1991). The general rule is that "where an injury is suffered by a corporation and the shareholders suffer solely through depreciation in the value of their stock, only the corporation itself ... or a stockholder suing derivatively in the name of the corporation may maintain an action against the wrongdoer." *Vincel v. White Motor Corp.,* 521 F.2d 1113, 1118 (2d Cir.1975). For the exception to apply, the wrongdoer must have "breached a duty owed to the shareholder *independent* of any duty owing to the corporation wronged." *Abrams v. Donati,* 66 N.Y.2d 951, 953, 498 N.Y.S.2d 782, 783, 489 N.E.2d 751 (1985) (emphasis added).

*\*9* This exception does not apply here because there is no allegation that at the time of the wrongdoing any of the defendants owed *I. Appel* a fiduciary duty. Peschard was never a fiduciary of I. Appel. Norman ceased owing I. Appel any fiduciary duties after the stock sale on July 1, 1996, and Stephen resigned as an officer in August of 1996. But the critical actions of the defendants in co-opting the Zacatecas plant occurred in the Fall of 1996 and Spring of 1997 when Peschard, at the Katzes' instigation, urged the closing of the plant and took over its lease. Accordingly, because it cannot reasonably be said that plaintiff seeks to recover for a breach of fiduciary duty owed to I. Appel, this is not an appropriate case for the invocation of the exception.

*B. RICO Statute of Limitations*

The Katzes move to dismiss the RICO claim as untimely to the extent it arises from alleged acts of misappropriation occurring before October 5, 1997. A four year statute of limitations has been held to apply to claims arising under RICO. *See Agency Holding Corp. v. Malley-Duff & Assocs., Inc.,* 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). To be timely, such claims must be based on injuries that were discovered or should have been discovered within four years of bringing suit. *See Tho Dinh Tran v. Alphonse Hotel Corp.,* 281 F.3d 23, 35 (2d Cir.2002). The Amended Complaint adding the RICO claim against the Katzes was filed

on October 5, 2001. Given the four-year limitations period, the Katzes urge the Court to dismiss the claim as related to the scheme to loot I. Appel's assets since all of those fraudulent acts are alleged to have occurred before the Company was sold on July 1, 1996--more than five years before the filing of the Amended Complaint. [FN6]

> FN6. Defendants do not argue that any RICO claim stemming from the Mexican fraud is untimely. But as I have concluded in Part A.2. *supra,* plaintiff lacks standing to bring that claim in any event.

Plaintiff counters that Fed.R.Civ.P. 15(c) allows the Amended Complaint to relate back to the initial complaint in 99 Civ. 45 filed on January 5, 1999, which alleged common law fraud against Stephen Katz arising from the same core acts of misappropriation as the RICO claim. Doing so would save RICO claims arising from activities occurring after January 5, 1995, but only as to Stephen because Norman was not a defendant in that action. Plaintiff also argues that his claims are timely under the discovery rule of accrual which applies to RICO claims because "Feinberg had no knowledge of the Katzes' misappropriation scheme until well after the closing for the Purchase Agreement on July 1, 1996." Plaintiff's Memorandum ("Pl.Mem.") at p. 62.

For the reasons explained below, I conclude that the RICO claim arising from the misappropriation scheme is untimely as against Norman, but timely as against Stephen.

*1. Norman*

[6] Plaintiff cannot maintain his RICO claim against Norman for injuries arising from acts of looting occurring before October 5, 1997. Looting allegations against Norman were first pleaded in the Amended Complaint on October 5, 2001. Thus, only injuries caused by Norman occurring after October 5, 1997 are timely. Since all acts of fraudulent billing and the like occurred before July 1, 1996, the RICO claim arising out of such injuries is untimely as against Norman. Applying the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 1751135 (S.D.N.Y.), RICO Bus.Disp.Guide 10,316

**(Cite as: 2002 WL 1751135 (S.D.N.Y.))**

"discovery" rule as plaintiff urges does not extend the limitations period with respect to Norman because it cannot seriously be contended that Feinberg could not have discovered the fraudulent misappropriation at any time before October 5, 1997. Assuming without deciding that Feinberg should not be held accountable for failing to discover the injuries before he purchased Norman's stock and took over the Company in July of 1996, he should have at least discovered the injuries within the next year. This is especially true given that Feinberg immediately attempted to rescind the Purchase Agreement as it rapidly became clear that the Company faced serious financial problems in the months after July 1, 1996. Indeed, Feinberg filed a demand for arbitration on May 7, 1997 alleging that Norman had committed acts of fraud. He should have been on notice of other financial irregularities and alerted to possible malfeasance at least by that date. Because he did not file the RICO claim against Norman until more than four years later, the claim is untimely.

*2. Stephen*

**\*10** [7] Plaintiff concedes that his RICO claims cannot be based on injuries inflicted before January 5, 1995. Plaintiffs Memorandum in Opposition ("Pl.Mem.") at p. 60. However, because many of the acts of alleged misappropriation occurred after that date, the central question is whether the relation-back doctrine should be applied to save his claim to the extent that it arises from injuries occurring between January 5, 1995 (four years before the original complaint was filed) and October 5, 1997 (four years before the Amended Complaint was filed). If the relation-back doctrine does not apply, the RICO claim arising from the misappropriation scheme is barred because all of the acts of misappropriation occurred well before October 5, 1997. If it does apply, plaintiff may recover for acts of misappropriation by Stephen occurring after January 5, 1995.

Rule 15(c) allows an amended pleading to relate back to the date of the original pleading when "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence

set forth or attempted to be set forth in the original pleading." In order for a new claim to relate back, "the basic claim must have arisen out of the conduct set forth in the original pleading ...." *Schiavone v. Fortune,* 477 U.S. 21, 29, 106 S.Ct. 2379, 91 L.Ed.2d 18 (1986). The key consideration is "whether the original complaint gave the defendant fair notice of the newly alleged claims." *Wilson v. Fairchild Republic Co.,* 143 F.3d 733, 738 (2d Cir.1998). Plaintiff's position is that the Amended Pleading relates back to the date of the original complaint because the original complaint it sets forth the same core acts of misappropriation as the predicate acts in the RICO claim in the Amended Complaint.

Defendants argue that because RICO claims are of an entirely different species than common law fraud claims and subject the defendants to more severe penalties, the relation-back doctrine cannot extend to claims that convert garden variety fraud into RICO causes of action. Defendants cite two district court cases in support of this position, each holding of which held that a RICO claim could not relate-back to a common law fraud pleading even though both arose out of the same wrongful conduct. *See Burghart v.. Landau,* No. 82 Civ. 2181, 1991 WL 82064 (S.D.N.Y. May 9, 1991); *Radiology Center, S.C. v. Stife, Nicolaus & Company, Inc.,* No. 86 C 10166, 1992 WL 225568 (N.D.Ill. Sept.8, 1992).

The defendants' position untenable in light of more recent Second Circuit decisions which indicate that RICO claims may permissibly relate back to claims of common law fraud. *Tho Dinh Tran,* 281 F.3d at 35, involved a claim under the Fair Labor Standards Act ("FLSA") to which a RICO claim had been added in an amended complaint. The Second Circuit held that the district court should not have allowed the plaintiff to add the RICO claim as it was untimely and did not relate back to the FLSA claim. In concluding that the RICO claim could not relate back because it was based on illegal conduct "that was not alleged in any form in the original complaint," the court reasoned that:

    **\*11** If the original complaint referred to general acts of fraud or other predicate acts that might

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 12

Not Reported in F.Supp.2d, 2002 WL 1751135 (S.D.N.Y.), RICO Bus.Disp.Guide 10,316

**(Cite as: 2002 WL 1751135 (S.D.N.Y.))**

support a RICO claim, then a later amendment adding a RICO claim would "relate back" to the original complaint. *See Benfield v. Mocatta Metals Corp.,* 26 F.3d 19, 23 (2d Cir.1994). Even if the description of such an act of fraud was not fully developed or specifically described as part of a RICO conspiracy, it would put the defendants on notice that the conduct was at issue.

281 F.3d at 36. The court suggested that such a RICO claim could relate back because it would amount to "merely adding a new legal theory based on the same facts as those presented in the original complaint ...." *Id. Benfield, t*he case cited by *Tho Dihn Tran,* reversed the lower court's dismissal on limitations grounds of a RICO cause of action in an amended complaint where the initial complaint alleged only commodities fraud. The Second Circuit held that because there was "commonality" between the allegations of commodities fraud in the original complaint and in the RICO claim, the RICO claim was not untimely because it would have related back to the fraud claim. The court found it significant that "[a]lthough RICO requires more in the way of evidence, proof of the RICO cause of action nonetheless involves evidence of the underlying fraudulent acts pleaded [in the original complaint]." 26 F.3d at 23 (citation omitted). With the original fraud allegations the plaintiff was "placed on notice that a RICO claim, based in large part on the fraud already alleged, might be made against it." *Id.*

The court's reasoning in these decisions undercuts the Katzes' position. Although dicta, the *Tho Dihn Tran* court's discussion furnishes an instructive an example of the kind of RICO claim that would relate back which essentially describes the claim at bar--where the predicate acts are the same as the acts of common law fraud in the original complaint. The *Benfield* court earlier came to the same conclusion in its holding. These decisions strongly suggest that defendants are put on notice sufficient to satisfy Rule 15(c) when acts of malfeasance that become RICO predicate acts are first alleged under a different fraud theory. This is so even when the acts of fraud are "not fully developed," *Tho Dihn Tran,* 281 F.3d at 36, and no hint of a future RICO

claim is given.

In this case, the allegations of misappropriation that underlay the original fraud claim against Stephen Katz are virtually the same as those constituting the RICO predicate acts. Applying the reasoning of *Tho Dihn Tran* and *Benfield,* Stephen has been on notice that he could be subject to liability for these fraudulent acts under a RICO theory ever since the original complaint was filed. Accordingly, the RICO claim pleaded in the Amended Complaint relates back to the date of the original complaint. As a result, to the extent that it is otherwise viable, plaintiff may base his RICO claim against Stephen on injuries that occurred on or after January 5, 1995.

*C. RICO Enterprise*

*12 Under 18 U.S.C. § 1962(c), it is unlawful "for any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ...." "Enterprise" is defined under the statute as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

The Amended Complaint alleges that Stephen and Norman Katz constituted an association-in-fact enterprise (the "Katz Enterprise"). Amended Complaint at ¶ 16. According to the allegations, "The Katz Enterprise, which also included corporations such as FKG Services, Inc. and individuals such as Bob Gainer engaged in the systematic looting of assets of Alliance for the personal benefit of the Katzes." *Id.*

In order to demonstrate an "association-in-fact" enterprise, the plaintiff must show that a "group of persons associated together for a common purpose of engaging in a course of conduct which functioned then as a continuing unit." *Procter & Gamble Co. v. Big Apple Industrial Buildings, Inc.,* 879 F.2d 10, 18 (2d Cir.1987) (internal quotations omitted) (citing *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981)).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.