The only basis for jurisdiction asserted by Plaintiffs on appeal is that, because two named plaintiffs assert claims in excess of $75,000, the district court should have exercised supplemental jurisdiction over the claims of all remaining class members. (Pl. Br. at 3-4, 21-25).[8]  But Plaintiffs do not appeal (*see* Pl. Br. at 3-4) the district court's decision that these two plaintiffs with claims exceeding $75,000 failed to allege facts sufficient to establish complete diversity of citizenship, *Pavlov*, 135 F. Supp. 2d at 432 (A324-25).  Hence, because those plaintiffs did not establish original jurisdiction, this Court need not consider whether the district court should have exercised any "supplemental" jurisdiction. *See Nowak* v. *Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996) (court "cannot exercise supplemental jurisdiction unless there is first a proper basis for original . . . jurisdiction").

Moreover, even if two plaintiffs had a valid basis for original jurisdiction over any claim, the Supreme Court rejected the use of supplemental jurisdiction over claims by class members that do not meet the

---

[8]    Plaintiffs do not pursue the claim (*see* Pl. Br. at 3-4, 21-25) rejected by the district court, *Pavlov*, 135 F. Supp. 2d at 437 (A322-23), that the matter-in-controversy requirement may be met by aggregating Plaintiffs' claims. *See Zahn*, 414 U.S. at 298-301 (claims of class members may not be aggregated to meet the matter-in-controversy requirement); *Snyder* v. *Harris*, 394 U.S. 332, 335-37 (1969) (same).

-24-

matter-in-controversy requirement in *Zahn* v. *International Paper Co.*, 414 U.S. 291, 297-302 (1973). *See, e.g., Mehlenbacher* v. *Akzo Nobel Salt, Inc.*, 216 F.3d 291, 297 (2d Cir. 2000) ("In *Zahn* . . . the Supreme Court held that supplemental jurisdiction could not be exercised over the claims of class members that do not satisfy the amount in controversy.").

Plaintiffs argue that Congress overruled *Zahn* in 1990 when it codified common law principles of supplemental jurisdiction in 28 U.S.C. § 1367. Section 1367(a) provides that

> (a) Except as provided in subsections (b) or (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a). Section 1367(b) prohibits the exercise of supplemental jurisdiction with respect to certain parties, and Section 1367(c) sets forth

-25-

certain cases in which district courts may decline to exercise supplemental jurisdiction.[9]

Every district court in this Circuit that has addressed the issue of whether § 1367 overrules *Zahn* has rejected that argument. *See, e.g., Colon* v. *Rent-A-Center, Inc.*, 13 F. Supp. 2d 553, 560-562 (S.D.N.Y. 1998); *Bernard* v. *Gerber Food Prods. Co.*, 938 F. Supp. 218, 223-24 (S.D.N.Y. 1996); *cf. Mehlenbacher*, 216 F. 3d at 297 (this Court has not reached this issue). Other Circuits are split on this issue. *Compare Free* v. *Abbott Labs.* (*In re Abbott Labs.*), 51 F.3d 524, 527-29 (5th Cir. 1995) (finding that § 1367 overruled *Zahn*), *aff'd by an equally divided court*, 529 U.S. 333 (2000), *with Leonhardt* v. *Western Sugar Co.*, 160 F.3d 631, 640-41 (10th Cir. 1998) (finding that § 1367 did not overrule *Zahn*).

The district court correctly found that, in passing § 1367, Congress did not overrule *Zahn*. *See Pavlov*, 135 F. Supp. 2d at 431 (A323);

---

[9]     For example, a court may decline to exercise supplemental jurisdiction over claims that substantially predominate over claims over which the district court has original jurisdiction. 28 U.S.C. § 1367(c)(2). Assuming *arguendo* that the district court in this case could exercise supplemental jurisdiction, dismissal could be affirmed on the alternate basis that the claims of the many class members that do not meet the matter-in-controversy requirement predominate over the claims by the only two plaintiffs that are even alleged to have claims of $75,000 or more. *Id.*

*Pavlov*, 2000 WL 424185 at *2 (A158). Section 1367(a) does no more than codify general principles of pendent jurisdiction in effect long before the Supreme Court decided *Zahn*. *See IUE ALF-CIO Pension Fund* v. *Herrmann*, 9 F.3d 1049, 1052 n.2 (2d Cir. 1991) ("1367(a) . . . codifies the common law doctrine of pendent jurisdiction"); H.R. REP. NO. 101-734, at 28-29 & n.15 (1990), *reprinted in* 1990 U.S.C.C.A.N. at 6874-85 & n.15 (stating that § 1367(a) codifies the scope of supplemental jurisdiction announced in *United Mine Workers* v. *Gibbs*, 383 U.S. 715 (1966)). The statutory language does not refer to class actions, and nothing in that language indicates such a large expansion of pendent jurisdiction. Indeed, the language of the statute—referring to "other claims . . . related to the claims in the action" and "joinder or intervention of additional parties"—is ill-suited to apply to class actions. *See, e.g.,* FED. R. CIV. P. 23(a) (a class action is used when "the class is so numerous that joinder of all members is impracticable").

Congress is presumed to know the state of the law when it passes legislation. *See Cannon* v. *University of Chicago*, 441 U.S. 677, 696-97 (1979). Thus, if Congress intended to overrule *Zahn* seventeen years after it was decided, it would have made its intention clear. *See, e.g.,* *Edmonds* v. *Compagnie Generale Transatlantique*, 443 U.S. 256, 267

-27-

(1979) ("At the very least, one would expect some hint of a purpose to work such a change, but there was none."); *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran*, 456 U.S. 353, 378-82 (1982) (holding that Congressional silence in the face of judicial rulings permitting a private right of action indicated an "inten[t] to preserve the pre-existing remedy"); *Zahn*, 414 U.S. at 302. Plaintiffs fail to point to any portion of § 1367, or any of its legislative history, in which Congress indicated such an intent.

Indeed, far from being silent on the issue, Congress made clear in passing § 1367 that it intended to preserve *Zahn*. The Federal Courts Study Committee ("Study Committee"), which made the recommendation that led to Section 1367, *see* H.R. REP. NO. 101-734, at 27 (1990), *reprinted in* 1990 U.S.C.C.A.N. at 6873, declined to adopt a proposal by a subcommittee to overrule *Zahn*. *See Meritcare Inc.* v. *St. Paul Mercury Ins. Co.*, 166 F.3d 214, 219 (3d Cir. 1999) (discussing Study Committee's consideration of proposal). Congress similarly made clear that it intended to preserve *Zahn*. *See* H.R. REP. NO. 101-734, at 29 & n.17, *reprinted in* 1990 U.S.C.C.A.N. at 6875 & n.17 (§ 1367 did not affect *Zahn*).

Plaintiffs argue that, by not mentioning Rule 23 of the Federal Rules of Civil Procedure in § 1367(b)—which limits exercise of supplemental jurisdiction over certain claims asserted under Civil Rules 14,

-28-

19, 20 and 24—Congress intended to overrule *Zahn* (Pl. Br. at 22-23); but

this turns the logic of § 1367 on its head. In *Finley* v. *United States*, 490

U.S. 545 (1989), the Supreme Court held that where federal question

jurisdiction existed under the Federal Tort Claims Act, a district court could

not rely upon the common law doctrine of pendent jurisdiction to join a

related state-law claim against a non-diverse defendant because to do so

would violate § 1332. *Finley*, 490 U.S. at 553-56. Congress recognized that

*Finley* "virtually invited Congress to codify supplemental jurisdiction."

H.R. REP. NO. 101-734, at 28, *reprinted in* 1990 U.S.C.C.A.N. at 6874.

Thus, § 1367(a) simply "authorize[s] jurisdiction in a case like *Finley*, as

well as essentially restore[s] the pre-*Finley* understanding of the authori-

zation for and limits on other forms of supplemental jurisdiction." *Id.*

By enacting § 1367(b), Congress made certain that the new

statutory supplemental jurisdiction could not be used to evade the complete

diversity requirement in a diversity case:

> In diversity-only actions, the district courts may not hear
> plaintiffs' supplemental claims when exercising supplemental
> jurisdiction would encourage plaintiffs to evade the juris-
> dictional requirement of 28 U.S.C. § 1332 by the simple
> expedient of naming initially only those defendants whose
> joinder satisfies section 1332's requirements and later adding
> claims not within original federal jurisdiction against other
> defendants who have intervened or been joined on a
> supplemental basis.

H.R. REP. NO. 101-734, at 29, *reprinted in* 1990 U.S.C.C.A.N. at 6875; *see also id.* n.16. In class actions, however, class members do not "intervene[]" or "join[]" the action; rather, a court must determine at the outset whether each member of the proposed class satisfies the jurisdictional requirements. *Zahn*, 414 U.S. at 297-302; *Leonhardt*, 160 F. 3d at 640 (the issue is when a "plaintiff can bring an *initial* diversity-based class action under Rule 23, where the court's original jurisdiction is based on § 1332. The omission of Rule 23 from § 1367(b) has no bearing on that question."). Thus, § 1367(b), which was designed to limit the reach of supplemental jurisdiction through joinder, intervention and other means not applicable to class actions, did not "affect [the] jurisdictional requirements of 28 U.S.C. § 1332 in diversity-only class actions, as those requirements were interpreted prior to *Finley*." H.R. REP. NO. 101-734, at 29 & n.17, *reprinted in* 1990 U.S.C.C.A.N. at 6875 (citing *Supreme Tribe of Ben Hur* v. *Cauble*, 255 U.S. 356 (1921) (requiring complete diversity of class representatives), and *Zahn* (requiring that all class members meet the matter-in-controversy requirement)).

        Recognizing that Congress clearly expressed its intention not to overrule *Zahn*, Plaintiffs instead contend that this Court need not consider legislative intent because the language of § 1367 is unambiguous in overruling *Zahn*. (Pl. Br. at 23-25). That too is incorrect. Section 1367

-30-

makes no mention of overruling *Zahn*, uses language ill-suited to class actions, and does not otherwise indicate that supplemental jurisdiction can defeat the well-settled principle that all proposed members of a class must meet the matter-in-controversy requirement. Congress surely would have clearly so indicated had it intended to overrule this long-standing precedent. *See, e.g., Edmonds*, 443 U.S. at 267; *Curran*, 456 U.S. at 378-82. The district court's decision should be affirmed.

### III.

## THE DISTRICT COURT'S *FORUM NON CONVENIENS* ANALYSIS PROVIDES ANOTHER BASIS FOR AFFIRMANCE.

The district court properly concluded that the Second Amended Complaint should be dismissed on grounds of *forum non conveniens*. *Pavlov*, 135 F. Supp. 2d at 433-38 (A325-35). Although the district court relied upon *forum non conveniens* to dismiss only the conversion claims of Onara Partners and S&K Trust—because those were the only claims remaining after the court's decisions on other grounds—the district court's analysis applies to all of the claims asserted by all Plaintiffs. In particular, this Court repeatedly has held that the absence of a RICO cause of action in a foreign forum does not preclude dismissal where that forum can adequately adjudicate the subject matter of the dispute. *See, e.g., Alfadda* v. *Fenn*, 159 F.3d 41, 47 (2d Cir. 1998); *PT United Can Co.* v. *Crown Cork &*

*Seal Co.*, 138 F.3d 65, 74 (2d Cir. 1998); *Transunion Corp.* v. *PepsiCo, Inc.*, 811 F.2d 127, 129 (2d Cir. 1987). Accordingly, the district court's *forum non conveniens* analysis alone provides an ample basis for this Court to affirm dismissal.[10]

Plaintiffs concede that the district court's decision is entitled to "substantial deference" so long as it has "considered all relevant public and private interest factors" and "may be reversed only when there has been a clear abuse of discretion." (Pl. Br. at 27 (quoting *American Dredging*, 510 U.S. at 455)). *Accord Alfadda*, 159 F.3d at 45 ("The decision lies wholly within the broad discretion of the district court and should be reversed only if that discretion has been clearly abused." (citation omitted)). Plaintiffs do not refer to any "clear abuse of discretion." Instead, they argue that "the district court both failed to apply the correct legal analysis, and displayed an erroneous understanding of the facts central to the case." (Pl. Br. at 25-26).

---

[10]    Because the district court already had dismissed the other plaintiffs' claims, it required BNY to consent to personal jurisdiction in Russia in an action brought by Onara Partners and S&K Trust only. (*See* A337-41). This limitation is of no consequence, however, because Plaintiffs based their personal jurisdiction argument solely on a concern that BNY no longer had a presence in Russia, *see Pavlov*, 135 F. Supp. 2d at 434 (A328) (referring to A71, A90), and BNY introduced an uncontroverted declaration that its Moscow representative office remained open (A147-48), subjecting BNY to jurisdiction there (A53).

Yet Plaintiffs do not identify (*see* Pl. Br. at 25-32) any erroneous legal standard or misapplication of law by the district court, nor do they refer to any "erroneous understanding of the facts" that the district court did not distill directly from the allegations of the Second Amended Complaint, *see, e.g., Pavlov*, 135 F. Supp. 2d at 429 & nn.3-4 (A318-19); *id.* at 436-37 & nn.59, 61 (A332-33). The district court's thoughtful and comprehensive analysis should be affirmed.[11]

A.    **Plaintiffs Do Not Take Issue With the District Court's Conclusion That Russian Courts Offer an Adequate Alternative Forum.**

The district court correctly found that "Russian 'arbitration' courts—which are in reality, commercial courts"—provide an adequate forum for Plaintiffs' claims. *Pavlov*, 135 F. Supp. 2d at 433-35 (A326-30). The only other court that has considered the issue of the adequacy of Russian courts recently reached the same result. *See Parex Bank* v. *Russian Sav. Bank*, 116 F. Supp. 2d 414, 423-25 (S.D.N.Y. 2000) (Sweet, J.)

---

[11]    Plaintiffs agree that determination of whether a complaint should be dismissed on *forum non conveniens* grounds is judged first by determining whether an adequate alternative forum exists and then by applying a balancing test involving both "private" and "public" interests. *Gulf Oil Corp.* v. *Gilbert*, 330 U.S. 501, 507-09 (1947); *Pavlov*, 135 F. Supp. 2d at 433 (A326). (*See* Pl. Br. at 26 (quoting *American Dredging*, 510 U.S. at 447-49)). As explained below, the district court appropriately determined that these factors favored dismissal of this action.

(Russia's judicial system, and in particular its arbitration courts, "affords adequate procedural protections").

Plaintiffs do not dispute this determination on appeal, acknowledging "that findings that a foreign jurisdiction is inadequate are rare." (Pl. Br. at 29); *accord Murray* v. *British Broad. Corp.*, 81 F.3d 287, 292 (2d Cir. 1996) ("The requirement of an alternative forum is ordinarily satisfied if the defendant is amenable to process in another jurisdiction, except in 'rare circumstances' when the 'remedy offered by the other forum is clearly unsatisfactory.'" (quoting *Piper Aircraft*, 454 U.S. at 254 n.22)).[12] Instead, Plaintiffs cite to another decision by Judge Sweet that did not reach

---

[12]    Plaintiffs cite without explanation to two affidavits (submitted by Plaintiffs' counsel and counsel representing three entities suing BNY in another action) to support the inadequacy arguments they made to the district court. (Pl. Br. at 28-29). Those self-serving affidavits were disputed by Professor Paul Stephan, an expert in Russian law at the University of Virginia School of Law, who explained that the arbitration courts in Moscow provided an adequate forum for adjudication of the claims brought by Plaintiffs. (A51-54; A149-55). As the district court correctly explained, this Court "has made it clear that '[i]t is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation.'" *Pavlov*, 135 F. Supp. 2d at 433-34 & n.35 (A327) (quoting *Chesley* v. *Union Carbide Corp.*, 927 F.2d 60, 66 (2d Cir. 1991)); *accord, e.g.*, *PT United Can*, 138 F.3d at 73 (the court may not "judg[e] the quality of a foreign justice system absent a showing of inadequate procedural safeguards"); *In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India in December, 1984*, 809 F.2d 195, 198 (2d Cir. 1987).

-34-

the issue of adequacy because Judge Sweet found that the public and private

interests did not favor dismissal.[13]  (Pl. Br. at 29 (citing *In re Livent, Inc.*

*Sec. Litig.*, 78 F. Supp. 2d 194 (S.D.N.Y. 1999))).  Here, however, the

district court properly determined that all of these interests weighed in favor

of dismissal.

**B.      The District Court Correctly Found That
          Private Interests Favored Dismissal.**

        Plaintiffs concede, as they must, that the district court was

correct to give Plaintiffs' choice of forum less weight because Plaintiffs are

foreign, and they allege only indirect injury flowing from the alleged looting

of Inkombank, which already has a representative acting on its behalf in the

Russian courts. *Pavlov*, 135 F. Supp. 2d at 435-36 (A331).  (*See* Pl. Br. at

27-28 (quoting *R. Maganlal & Co.* v. *M.G. Chem. Co.*, 942 F.2d 164, 167-

68 (2d Cir. 1991), for the proposition that a foreign plaintiff's choice of

forum is entitled to "less weight")).  The Supreme Court has explained that

---

[13]     Ironically, Judge Sweet found in a later decision that the Russian court
system "affords adequate procedural protections." *Parex Bank*, 116
F. Supp. 2d at 425.

this rule is "fully justified" by the purpose of the *forum non conveniens*

doctrine:

> When the home forum has been chosen, it is reasonable to
> assume that this choice is convenient. When the plaintiff is
> foreign, however, this assumption is much less reasonable.
> Because the central purpose of any *forum non conveniens*
> inquiry is to ensure that the trial is convenient, a foreign
> plaintiff's choice deserves less deference.

*Piper Aircraft*, 454 U.S. at 255-56. As this Court held in a case similar in

many respects to this case, "[l]ittle or no deference can be paid to the

plaintiffs' choice of a United States forum when all but a few of the 200,000

plaintiffs are Indian citizens located in India" and the Indian representative

appointed by the government "now prefers Indian courts." *See In re Union

Carbide*, 809 F.2d at 202.[14]

Plaintiffs do not argue that the district court failed to identify or

consider any other private interest factor. *See Pavlov*, 135 F. Supp. 2d at

436 (A331-32). Instead, Plaintiffs' only disagreement with that analysis is

to assert without record support that the district court misconstrued the

"Russian component" to their allegations. (Pl. Br. at 29-31).

---

[14] Similarly, Plaintiffs' argument that BNY "was sued in [its] home
district" (Pl. Br. at 28) "is robbed of significance" if BNY is subject to
or consents to Russian jurisdiction. *In re Union Carbide*, 809 F.2d at
203.

Yet the Second Amended Complaint has as its central claim that Inkombank executives and others engaged in "systematic looting of [Inkom]bank assets" (SAC ¶¶ 1 (A162)), which caused Inkombank to fail and the purported class to lose all of their deposits (SAC ¶¶ 11, 43 (A167, A178)).  The district court correctly determined that litigation of these allegations would require extensive Russian discovery, most of which is not available to a United States court.  *Pavlov*, 135 F. Supp. 2d at 436 (A332-33).  Plaintiffs cannot seriously dispute that conclusion, alleging as they do that the Russian bank Inkombank "stood at the heart of the Enterprise."  (SAC ¶ 4 (A163)).

The district court correctly held that it would have been unable to compel the production of witnesses or documents from Russia, while BNY would remain subject to compulsory process in Russia.  *Pavlov*,

135 F. Supp. 2d at 436 (A332); *see* 28 U.S.C. § 1782 (discovery in aid of foreign proceedings).[15]

The district court properly determined that litigation of many of the issues central to the Second Amended Complaint, such as whether Inkombank's failure was caused by the scheme alleged by Plaintiffs or by economic turmoil in Russia resulting from the August 1998 collapse of the

---

[15]    The district court's experience with that problem in this case reinforced its conclusion: After Plaintiffs attempted to obtain discovery from "from an official of the Ministry of Justice of the Russian Federation" using a purported "Letter of Request" under the Hague Convention of March 18, 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters, 23 U.S.T. § 2255, T.I.A.S. No. 7444, and the Agreement Between the United States and Russia on Cooperation in Criminal Law Matters, Feb. 5, 1996, State Dept. No. 96-38, 1995 WL 831037, the district court ordered Plaintiffs to withdraw that request, because Russia is not a signatory to the Hague Convention and the other treaty does not have any application to civil discovery. *Pavlov* v. *Bank of New York Co.*, No. 99 Civ. 10347, 2000 WL 1508251 (S.D.N.Y. Oct. 11, 2000).

Plaintiffs' "treaty" request provides a clear example of the sort of mischief that could occur were this Russian matter litigated in an American court. That request, served without the district court's prior approval, referred to the Hague Convention (to which Russia is not a signatory) and miscited the criminal cooperation treaty as one that applied as well to "judicatory matters," Pavlov, 2000 WL 1508251 at *1, presumably in the hopes that documents selectively produced from Plaintiffs' Russian associates might appear to have been obtained through some formal process. Of course, BNY would have had no opportunity to subpoena any other documents or to take a deposition to inquire about the provenance of the documents produced.

Russian ruble, *see Parex Bank*, 116 F. Supp. 2d at 419, would require substantial documentary and testimonial discovery in Russia, along with the use of Russian experts familiar with the effect of the collapse of the Russian ruble on Inkombank and other Russian banks. *Pavlov*, 135 F. Supp. 2d at 436 (A332-33). Similarly, evidence about whether Inkombank's depositors have been able to recover their deposits in Russian proceedings similar to bankruptcy (*see* A55; A153-54; A252 (describing payments to be made to Inkombank depositors)) is located in Russia, as are the "vast majority" of the plaintiff depositors who allegedly have suffered losses (SAC ¶ 45 (A179)). *See* Pavlov, 135 F. Supp. 2d at 436 (A332).

This Court has held that the location of witnesses and documentary evidence is a key consideration in *forum non conveniens* analysis. *See, e.g.*, *Allstate Life Ins. Co.* v. *Linter Group Ltd.*, 994 F.2d 996, 1001 (2d Cir. 1993); *Schertenleib* v. *Traum*, 589 F.2d 1156, 1165 (2d Cir. 1978). According to the Second Amended Complaint, many of these witnesses and documents are likely to be in Russia. (*See, e.g.*, SAC ¶ 4 (A163); ¶¶ 20-25 (A169-71); SAC ¶¶ 38-42 (A177-78); SAC ¶ 45 (A179)). Moreover, because the credibility of class members, Inkombank principals and other residents of Russia is highly relevant here, this Court has

explained that the inability of the district court to secure live testimony takes

on "added importance." *Alfadda*, 159 F.3d at 48.

Finally, the district court correctly identified the difficulty of

dealing with testimony and documents in the Russian language. *Pavlov*, 135

F. Supp. 2d at 436 (A332); *accord, e.g., In re Union Carbide*, 809 F.2d at

201. Plaintiffs' only response—that this conclusion was "unsupported by

the pleading or any other record" (Pl. Br. at 31)—borders on the bizarre.

When the district court considered BNY's motion, the only two witnesses

deposed by Plaintiffs had used translators, several of the documents relied

upon by Plaintiffs were in Russian (*see, e.g.*, A266-69; A271; A138-39

(translation)), statutes referred to by Plaintiffs' counsel were in Russian

(A78-83), and Plaintiffs themselves attempted to seek discovery through a

"purported Letter of Request" from a supposed official of the Ministry of

Justice of the Russian Federation, *Pavlov*, 2000 WL 1508251, at *1.

## C.    The District Court Correctly Found That Public Interests Favored Dismissal.

Again, Plaintiffs do not argue that the district court failed to

identify or consider any public interest factor. *See Pavlov*, 135 F. Supp. 2d

at 436-38 (A333-35). Plaintiffs instead assert without support that "the

district court . . . mischaracterized the essence of the complaint" when it

concluded that "[t]his at root is predominately a Russian affair." (Pl. Br. at

31 (quoting *Pavlov*, 135 F. Supp. 2d at 437 (A333)). Yet the passage cited by Plaintiffs relies directly on the Second Amended Complaint. *Pavlov*, 135 F. Supp. 2d at 437 & n.61 (A333-34); *see id.* at 436 & n.59 (A332). Indeed, the Second Amended Complaint makes clear that depositors of a Russian bank—the "vast majority" of whom are resident in Russia (SAC ¶ 45 (A179))—seek recovery for an alleged scheme in which Russian principals of that Russian bank joined together with a few BNY employees to engage in activity in Russia to convert the depositors' rubles. (*See* SAC ¶¶ 2, 13, 66-131 (A162, A167-68, A187-219)). Plaintiffs allege that a key part of this activity was the infiltration of the Russian banking system by Russian organized crime (SAC ¶¶ 13, 42, 46 (A167-68, A178, A179)), and that the Russian bank "Inkombank stood at the heart of the Enterprise" (SAC ¶ 4 (A163)). Russia clearly has a very strong interest in this dispute, where most of the conduct took place, and "[t]hat is where [its] consequences should be determined." *Younis* v. *American Univ. in Cairo*, 30 F. Supp. 2d 390, 396 (S.D.N.Y. 1998).

      In contrast, the district court correctly found that New York's interest is limited here. The only New York interest asserted by Plaintiffs is the connection to BNY. Yet the district court found that this interest could be served by government and regulatory investigations and pending

shareholder derivative actions. *Pavlov*, 135 F. Supp. 2d at 437 (A333-34).
As the district court correctly held, these other proceedings could address the
issues of the proper functioning of an American bank and corporate
responsibility, whereas Plaintiffs' claims raise only a "private dispute about
monetary loss allegedly suffered by depositors in a Russian bank." *Id.*[16]

Russia's overriding interest is perhaps most clearly apparent in
considering the Supreme Court's admonition that "[i]n cases which touch
the affairs of many persons," there is an interest in "holding the trial in their
view and reach rather than in remote" regions "where they can learn of it by
report only." *Gilbert*, 330 U.S. at 508-09. Here, the issues in this litigation
"touch" primarily Russian depositors in Inkombank and the Russian
community concerned about allegations of Russian organized crime. Those
people, not the citizens of New York, have a direct interest in having this
case heard in their community.

Plaintiffs also complain that the district court placed undue
emphasis on the administrative burdens of handling this litigation. (Pl. Br. at

---

[16]    Even the New York connection of BNY (a bank doing business
around the world) is attenuated in this case. The BNY employee most
prominently mentioned in the Second Amended Complaint, Natasha
Gurfinkel, no longer works there, and Plaintiffs allege that she lives in
"either Moscow or London" and has filed an action against BNY in a
court in Moscow. (SAC ¶ 32 (A173-74)).

-42-

15, 31-32). Yet the Supreme Court and this Court have repeatedly cited those burdens in upholding *forum non* dismissals. *See, e.g., Gilbert*, 330 U.S. at 508-09; *Alfadda*, 159 F.3d at 46; *Blanco* v. *Banco Indus. de Venezuela, S.A.*, 997 F.2d 974, 983 (2d Cir. 1993); *In re Union Carbide*, 809 F.2d at 201 (referring to the administrative difficulties on "an already overburdened court").

Finally, Plaintiffs do not dispute the district court's conclusion that Russian law would apply to at least some aspects of Plaintiffs' conversion claims. *See Pavlov*, 135 F. Supp. 2d at 437-38 & n.63 (A334-35). Again, both the Supreme Court and this Court have reasoned that the applicability of foreign law favors dismissal based on *forum non conveniens*. *See, e.g., Piper Aircraft Co.*, 454 U.S. at 260 ("Consideration of these problems was clearly appropriate under *Gilbert*; in that case we explicitly held that the need to apply foreign law pointed towards dismissal."); *Blanco*, 997 F.2d at 983 ("The district court was entitled to conclude that such questions of Venezuelan substantive and procedural law are better addressed by Venezuelan courts.").

*      *      *

In sum, all of the private and public interest factors favor dismissal here. The district court's comprehensive analysis, conducted after

-43-

dealing with many of the difficulties of litigating this matter in the United

States, was clearly appropriate, and certainly was not a "clear abuse of

discretion." *American Dredging*, 510 U.S. at 455. The district court's *forum*

*non conveniens* analysis provides another, separate basis for affirmance of

the district court's dismissal of all of Plaintiffs' claims.

### IV.

### THE COURT ALSO MAY AFFIRM ON THE INDEPENDENT BASIS THAT PLAINTIFFS DO NOT HAVE STANDING.

While the district court's thoughtful analysis provides a

compelling basis to dismiss all of the claims in the Second Amended

Complaint, this Court also may affirm dismissal on a ground the district

court did not reach, *i.e.*, that Plaintiffs lack standing to pursue their claims.

Plaintiffs' claims of injury to Inkombank may be pursued only by.

Inkombank or its receiver, not by depositors indirectly injured by the alleged

injury to Inkombank.

Plaintiffs allege that they are depositors to whom Inkombank

owes money.  (SAC ¶¶ 20-27 (A169-172)).  If those allegations are true,

Plaintiffs are general creditors of Inkombank, like any other persons or

entities to whom that bank owes money.  Nevertheless, Plaintiffs attempt to

-44-

plead causes of action against BNY for the injuries allegedly inflicted on

Inkombank, and only indirectly on Plaintiffs.

        Black-letter law provides, however, that claims alleging injury

to creditors of a bank arising from injury to the bank are properly pursued by

the bank itself, or its receiver.[17] *See* 1B MICHIE, BANKS AND BANKING,

ch. 3, § 69, at 101-03 (1993). This Court has recognized this doctrine:

> As a general rule, wrongdoing by bank officers that adversely
> affects all depositors creates a liability which is an asset of the
> bank, and only the bank or its receiver may sue for its recovery.

*Adato* v. *Kagan*, 599 F.2d 1111, 1117 (2d Cir. 1979) (citing *Michelsen* v.

*Penney*, 10 F. Supp. 537, 539 (S.D.N.Y. 1934) & 1 MICHIE, BANKS AND

BANKING, ch. 3, § 69, at 289-91 (1973)). In *Adato*, this Court acknowledged

this rule in the context of plaintiffs' federal securities and banking law

claims.[18] Other courts have applied the same rule to tort and RICO actions.

---

[17]    Under Russian law, an "arbitration manager" is appointed to pursue
claims on behalf of Inkombank and its creditors. (*See* A55, A152-53).
Indeed, Inkombank already has established a mechanism for repaying
depositors. (*See* A252).

[18]    In *Adato*, this Court recognized the general rule but held that plaintiffs
in that case could pursue their claims because their own separate
funds—as opposed to the bank's general deposits—had been
deposited into shell corporations created by bank officials, and thus
the plaintiffs stood "in a different position from that of other
depositors . . . whose interests are represented by the FDIC." 599
F.2d at 1114-15, 1117.

*See, e.g., Hamid* v. *Price Waterhouse,* 51 F.3d 1411, 1419-21 (9th Cir. 1995)
(RICO); *In re Sunrise Sec. Litig.,* 916 F.2d 874, 878-79 (3d Cir. 1990)
(RICO); *Brandenburg* v. *Seidel,* 859 F.2d 1179, 1191 (4th Cir. 1988)
(RICO); *In re Longhorn Sec. Litig.,* 573 F. Supp. 255, 272-73 (W.D. Okla.
1983) (common law negligence); *Michelsen,* 10 F. Supp. at 538-40 (tort
claims); *accord FDIC* v. *Renda,* 692 F. Supp. 128, 137 (D. Kan. 1988)
(mentioning application of rule to "causes of action for negligence or
wrongdoing").

Courts have stressed the importance of this rule in the RICO
context as arising from the requirement that a plaintiff allege damage
causation. In enacting RICO, Congress adopted the same language that it
had used in Section 4 of the Clayton Act: The right to bring an action for
damages under RICO is limited to "[a]ny person injured in his business or
property by reason of a violation of section 1962 of this chapter." 18 U.S.C.
§ 1964(c). Thus, the Supreme Court held in *Sedima, S.P.R.L.* v. *Imrex Co.,*
473 U.S. 479 (1985), that a RICO plaintiff "only has standing if, and can
only recover to the extent that, he has been injured in his business or
property by the conduct constituting the violation [of § 1962]." *Id.* at 496.
This standing requirement mandates that a RICO plaintiff establish not only
"but for" causation, but also proximate causation. *Holmes* v. *Securities*

*Investor Prot. Corp.*, 503 U.S. 258, 267-68 (1992); *In re Am. Express Co. S'holder Litig.*, 39 F.3d 395, 399 (2d Cir. 1994).

Hence, even if a plaintiff asserting a RICO claim can demonstrate that "but for" the defendant's conduct he would not have been injured, he also must show that he suffered a proximate (*i.e.*, direct) injury. Just as in the antitrust context, shareholders and creditors allegedly injured by virtue of damages inflicted on a corporation do not have standing to bring a RICO claim, because they have suffered only *indirect* injuries. *See, e.g., Miller v. Generale Bank Nederland, N.V. (In re Interpictures, Inc.)*, 217 F.3d 74, 76 (2d Cir. 2000) ("Appellant's status as a creditor to the debtor does not give him either standing to prosecute or a possessory interest in this [RICO] claim."); *Manson v. Stacescu*, 11 F.3d 1127, 1130-31 (2d Cir. 1993) (creditors and shareholders do not have standing to pursue RICO claim that the corporation was looted); *Rand v. Anaconda-Ericsson, Inc.*, 794 F.2d 843, 849 (2d Cir. 1986) (plaintiff shareholders claiming decrease in value of their shares lacked standing to bring a RICO claim because "[t]he legal injury, if any, was to the firm," and thus the "RICO action . . . is a corporate asset"); *Warren v. Manufacturers Nat'l Bank of Detroit*, 759 F.2d 542, 544 (6th Cir. 1985) (decrease in value of corporate assets is "insufficient direct harm to give the shareholder standing to sue in his own right" (quoting *Stevens v.*

-47-

*Lowder*, 643 F.2d 1078, 1080 (5th Cir. 1981)); *cf. Associated Gen.*

*Contractors of Cal., Inc.* v. *California State Council of Carpenters*, 459 U.S.

519, 533-35 & n.29 (1983) (neither stockholders nor creditors may recover

under the antitrust laws). Put differently, "[a]n individual indirectly injured

by a RICO violation cannot maintain a RICO action in his or her own name,

since his or her claims are derivative of the directly injured party's claims."

*In re Sunrise Sec. Litig.*, 108 B.R. 471, 475 (E.D. Pa. 1989), *aff'd*, 916 F.2d

874 (3d Cir. 1990).

   The Third Circuit extensively analyzed this rule in *In re*

*Sunrise*, a case involving facts remarkably similar to the allegations here.

The plaintiffs were depositors of a failed bank who claimed that the insiders

of two banks (the depositors' bank and its successor) and others looted the

banks' assets and misrepresented the first bank's financial condition. 916

F.2d at 875-77. The depositors asserted a RICO claim seeking to recover the

portion of their deposits that had not been reimbursed. *Id.* at 877. The court

held that the "[p]laintiffs lack standing to bring an individual suit against

defendants on the basis of conduct that primarily injured [the banks] and

only indirectly injured depositors because such a claim belongs to the

institutions." *Id.* at 883. The court reasoned that "[t]he injury — loss of

principal or interest — is sustained by all depositors and is incidental to and

dependent on injury to the institution." *Id.* at 887. Thus, the court affirmed the dismissal of the action because "permitting depositors to bring individual actions for such injuries would invariably impair the rights of other general creditors and claimants with superior interests." *Id.* The court noted that "[t]his principle has special significance" because of the efforts of the receiver "to recover the institution's assets . . . for equitable distribution among *all* depositors and creditors." *Id.* at 888.

These principles apply to Plaintiffs' RICO and conversion claims. The crux of Plaintiffs' claim is that the participants in the "Global Custody RICO Enterprise" engaged in "systematic looting of the assets" of Inkombank (SAC ¶ 1 (A161-62)) and, as a result of this "embezzlement, conversion and misappropriation of funds," that bank "was rendered insolvent," lost its banking license and now cannot pay all of its creditors. (SAC ¶¶ 144-49 (A227-28)). Similarly, Plaintiffs allege that they were injured as a result of the RICO violation "in that the assets of Inkombank were almost entirely depleted . . . and the members of the plaintiff class lost virtually all" their deposits. (SAC ¶ 159 (A231)). Plaintiffs' conversion claims also allege that all of Inkombank's depositors were deprived of the funds they had deposited. (SAC ¶¶ 169-80 (A244-46)). This is just the sort of injury to the bank that "affects all depositors," *Adato*, 599 F.2d at 1117,

and for which Plaintiffs' damages are "incidental to and dependent on injury to the institution," *In re Sunrise*, 916 F.2d at 886. Indeed, the Second Amended Complaint seeks to certify a class of "all" depositors, who are alleged to have lost their deposits as a result of the looting and subsequent collapse of the bank. (*See* SAC ¶¶ 11-12, 43-44, 159, 171-72, 176-77 (A167, A178-79, A231, A244-45)). Just as in *In re Sunrise*, such a claim is an improper attempt to move Plaintiffs ahead of other creditors.

Plaintiffs' only response below to this clear line of authority was to argue that they have standing under Russian law, referring to the suggestion in the Third Circuit's decision in *In re Sunrise*, 916 F.2d at 879-90, that a federal court may look to state derivative action law in assessing whether a RICO claim should be pursued by a bank or its depositors. This argument is unavailing with respect to both Plaintiffs' RICO and conversion claims.

As the court in *In re Sunrise* expressly held, the determination of whether Plaintiffs have standing under RICO, a federal statute, is a *federal* question. *Id.* at 879. The Third Circuit looked to Florida law merely for "guidance," while noting that many courts (including this one) have relied solely on federal common law to determine standing to sue under RICO. *Id.* at 881 & n.9. Although similar "guidance" from New York law

-50-

in this case also would require dismissal of Plaintiffs' RICO claim, *see Vincel* v. *White Motor Corp.*, 521 F.2d 1113, 1118 (2d Cir. 1975), the law in this Circuit is clear that federal law, not state law, applies to this question. *See Manson* v. *Stacescu*, 11 F. 3d 1127, 1130-32 (2d Cir. 1993); *Rand* v. *Anaconda-Ericsson, Inc.*, 794 F.2d 843, 849 (2d Cir. 1986) (dismissing shareholders' RICO claim, without reference to state law, because claim alleging injury to the corporation "is a corporate asset" that cannot be pursued by shareholders); *In re Sunrise*, 916 F.2d at 881 n.9 (citing *Rand*). Indeed, in *Manson* this Court, referring to "important policy concerns," specifically *rejected* the plaintiffs' reliance on state law, holding that plaintiff creditors and shareholders did not have standing because "[t]here are sound reasons for limiting standing under RICO to plaintiffs whose injuries are personal and directly caused by the RICO violations." 11 F.3d at 1131-32.

By contending that they had standing under Russian law to pursue their conversion claims, Plaintiffs apparently concede that New York law precludes their conversion claims. This Court need not address the choice-of-law question, however, because Plaintiffs do not provide any authority to counter the opinion of BNY's Russian law expert (*see* A149-55) that Russian law also would employ a causation analysis to determine

-51-

whether the claims are properly brought by Plaintiffs or by Inkombank or its receiver.

Despite placing before the district court two lengthy affidavits (A67-83, A85-145), Plaintiffs failed to cite to any Russian law or decision permitting a creditor of a bank to sue a third party for alleged losses caused by a bank's demise. Instead, Plaintiffs merely cited to broadly-worded statutes and to the lack of any "derivative action" under Russian law. Plaintiffs nowhere respond to or address the expert declaration submitted by BNY that explains that the Russian-law causation analysis would conclude that Inkombank's representative is the proper party to pursue claims on behalf of depositors. (A149-52).[19]

---

[19]    Even if Plaintiffs were correct (as they argued below) that Russian law determines whether they have standing to bring a conversion claim but that New York law applies to all other aspects of their conversion claims, Plaintiffs have failed to plead a cause of action for conversion. It is a fundamental concept of banking law that a depositor conveys cash to a bank in exchange for claims against the bank: "[T]he depositor has no longer any claim on the money deposited; his claim is on the bank for a like amount of money." 5A MICHIE, BANKS AND BANKING, ch. 9, § 4B, at 45-50 & n.43 (1994 & Supp. 2000) (citing cases); *accord, e.g., United States v. BCCI Holdings (Luxembourg), S.A.*, 980 F. Supp. 2, 7-8 (D.D.C. 1997) (citing New York law, rejecting claim to "ownership of the disputed funds" because "[o]nce a deposit is accepted by a bank, it becomes part of the general deposits of the bank, and . . . the bank acquires an ownership interest in the transferred funds and the transferee acquires a cause of action against the bank"). Plaintiffs do not assert that these

(continued ...)

*     *     *

Even if this Court were to disagree with any portion of the

district court's decision, it should affirm dismissal of all Plaintiffs' claims

for lack of standing. Those claims, if they had any merit, are assets of

Inkombank that should be pursued by that bank or its receiver, not by

Plaintiffs seeking to recover for indirect injuries with preference over the

claims of other Inkombank creditors.

---

(... continued)

rights have been taken away, only that they might not receive full
payment. (*See* SAC ¶¶ 20-27, 43 (A169-72)). Thus, under New York
law, there would be no cause of action for conversion because nothing
of Plaintiffs' has been "converted." *See* 5A Michie, BANKS AND
BANKING, ch. 9, § 4b, at 50 & n. 43; *BCCI Holdings*, 980 F. Supp. at
7-8.

## CONCLUSION

For the foregoing reasons, this Court should affirm the

judgment below.

Dated:  New York, New York
        August 20, 2001

                            Respectfully submitted,

                            *John L. Warden*
                            John L. Warden
                            Bruce E. Clark
                            Richard H. Klapper
                            Marc De Leeuw
                            Jeffrey J. Chapman

                            SULLIVAN & CROMWELL
                            125 Broad Street
                            New York, New York  10004
                            (212) 558-4000

                            *Counsel for Defendants-Appellees*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(c) OF THE FEDERAL RULES OF APPELLATE PROCEDURE

I, Jeffrey J. Chapman, hereby certify that the foregoing Brief

for Defendants-Appellees The Bank of New York Co. Inc. and The Bank of

New York contains 11,742 words exclusive of the corporate disclosure

statement, table of contents, table of citations and certificates by counsel.


Jeffrey J. Chapman