UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WORLD WRESTLING ENTERTAINMENT, INC.,

                    Plaintiff,

        -v-

JAKKS PACIFIC, INC., JAKKS PACIFIC (H.K.)
LTD., ROAD CHAMPS LTD., THQ, INC.,
THQ/JAKKS PACIFIC L.L.C., STANLEY
SHENKER & ASSOCS., INC., BELL LICENSING,
L.L.C., JACK FRIEDMAN, STEPHEN BERMAN,
JOEL BENNETT, BRIAN FARRELL, STANLEY
SHENKER, JAMES BELL,

                    Defendants.

---

Case No. 04-CV-8223 (KMK)

OPINION AND ORDER
ECF Case

APPEARANCES:

Jerry McDevitt, Esq.
Amy Lyn Barrette, Esq.
William Purcell, Esq.
Kirkpatrick & Lockhart Nicholson Graham, LLP
Pittsburgh, PA
*Counsel for Plaintiff*

Jonathan Lerner, Esq.
Maura Barry Grinalds, Esq.
Michael Gruenglas, Esq.
Skadden, Arps, Slate, Meagher & Flom, LLP
New York, NY
Jonathan Honig, Esq.
Feder, Kaszovitz, Isaacson, Weber, Skala, Bass & Rhine LLP
New York, NY
*Counsel for Defendants Jakks Pacific, Inc., Jack Friedman,*
*Stephen Berman, and Joel Bennett*

Steven Marenberg, Esq.
Irell & Manella LLP
Los Angeles, CA
*Counsel for Defendant THQ, Inc.*
*and Brian Farrell*

Richard Schaeffer, Esq.
Bruce Handler, Esq.
Dornbush, Mensch, Mandelstam & Schaeffer, L.L.P.
New York, NY
*Counsel for THQ/Jakks Pacific L.L.C.*

Michael Alan Freeman, Esq.
Law Offices of Michael A. Freeman and McCallion & Associates
New York, NY
*Counsel for Defendants Stanley Shenker*
*and Stanley Shenker & Assocs., Inc.*


KENNETH M. KARAS, District Judge:

Plaintiff World Wrestling Entertainment, Inc. ("WWE") filed this action against

Defendants Jakks Pacific, Inc. ("Jakks"), Jakks Pacific H.K. Ltd. ("Jakks H.K."), Road Champs,

Ltd. ("Road Champs"), THQ, Inc. ("THQ"), THQ/Jakks Pacific LLC ("THQ/Jakks"), Stanley

Shenker & Associates, Inc. ("SSAI"), Bell Licensing, LLC ("Bell Licensing"), Stanley Shenker

("Shenker"), James Bell ("Bell"), Jack Friedman ("Friedman"), Stephen Berman ("Berman"),

Joel Bennett ("Bennett"), and Brian Farrell ("Farrell").  Plaintiff's original Complaint asserted

federal claims arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO"),

18 U.S.C. § 1962(c), (d), and the Robinson-Patman Act, 15 U.S.C. § 13(c).  The Complaint also

alleged causes of action under New York State law for commercial bribery, fraudulent

inducement, unjust enrichment, breach of fiduciary duty, inducement of breach of fiduciary duty,

tortious interference with contractual relations, and conspiracy to engage in each of the above

acts.

As will be discussed more fully below, on March 31, 2005, Plaintiff filed an Amended

Complaint.  The Amended Complaint contains more detailed factual allegations of wrongdoing

by Defendants and also adds a Sherman Act cause of action. Plaintiff seeks compensatory, statutory, and punitive damages, a declaration that the licensing agreements entered into or extended as a result of the alleged bribery are void, an accounting of all revenues and profits obtained by Defendants under the licenses, disgorgement and/or restitution for any improper revenues and/or profits obtained under the agreements, disgorgement and/or restitution of any amounts allegedly paid to Defendants as bribes, and attorney's fees and costs.

All Defendants have moved to dismiss the RICO causes of action on the ground that they fail to adequately plead a RICO enterprise. Certain Defendants have also moved to dismiss the Robinson-Patman and Sherman Act causes of action against them. Furthermore, Defendants Shenker and SSAI have moved to dismiss the RICO causes of action on res judicata and abstention grounds.[1] For the reasons discussed in detail herein, the Motions to Dismiss the RICO causes of action are denied and the Motions to Dismiss the Robinson-Patman and Sherman Act causes of action are granted.

## I. Background

### A. Parties

This action involves a large number of parties with various roles in the unlawful scheme alleged by Plaintiff. For clarity, the Court provides a summary of the Parties and their respective roles in the alleged scheme.

_____

[1]The Defendants have also moved to dismiss the RICO causes of action on other grounds, as well as the state law causes of action. Those motions have not been fully briefed for reasons discussed below, and therefore, are not considered here. Also, Defendants moved for transfer of venue, but have since withdrawn those Motions. (*See* Letter from Michael A. Freeman to the Court, Jan. 24, 2006; Letter from Richard Schaeffer to the Court, Jan. 23, 2006; Letter from Jonathan J. Lerner to the Court, Jan. 20, 2006; Letter from Steven A. Marenberg to the Court, Jan. 19, 2006)

Plaintiff WWE is principally engaged in the development, promotion, and marketing of television and pay-per-view programming and live arena events related to professional wrestling. (Am. Compl. ¶ 9)  As part of its business, WWE also creates characters whose names and likenesses may be licensed to third parties.  (Am. Compl. ¶ 9)

Defendant Jakks principally sells action figures and toys.  (Am. Compl. ¶ 10)  Defendant Jack Friedman is the Chief Executive Officer and Chairman of Jakks.  (Am. Compl. ¶ 13)  He co-founded Jakks with Defendant Berman.  (Am. Compl. ¶ 13)  Prior to founding Jakks, Friedman was the CEO of Defendant THQ.  (Am. Compl. ¶ 14)

Jakks and Friedman also own Jakks H.K. and Road Champs, both Hong Kong Corporations.  (Am. Compl. ¶¶ 11-12)

During the times relevant to the Amended Complaint, Defendant Berman was the Executive Vice President of Jakks.  (Am. Compl. ¶ 15)  Berman also served at times as Jakks's President, Secretary, and Chief Operating Officer.  He currently serves on Jakks's Board of Directors.  (Am. Compl. ¶ 15)

Defendant Bennett was Jakks's Chief Financial Officer during the times relevant to the Complaint. (Am. Compl. ¶ 16)

Defendant THQ, Inc. markets and sells video games.  (Am. Compl. ¶ 17)  Defendant Farrell is the President, Chief Executive Officer, and a member of the Board of Directors of THQ.  (Am. Compl. ¶ 18)

THQ and Jakks formed THQ/Jakks Pacific LLC as a joint venture on June 10, 1998. (Am. Compl. ¶ 19)  THQ/Jakks was formed in order to be the official licensee for WWE's video game license.  (Am. Compl. ¶ 19)  Defendant Berman was authorized to act on behalf of the joint

4

venture.  (Am. Compl. ¶ 19)

Defendant SSAI served as WWE's licensing agent from approximately April 1995 through June 13, 2000.  (Am. Compl. ¶ 20)  Defendant Shenker is the sole owner and President of SSAI.  (Am. Compl. ¶ 21)  He is also the sole owner and alleged alter ego of a Hong Kong corporation known as Stanfull Industrial, Ltd.  (Am. Compl. ¶ 21)  Shenker allegedly used Stanfull for a variety of criminal and fraudulent enterprises.  (Am. Compl. ¶ 21)

Defendant Bell Licensing is a limited liability company and was allegedly formed to launder bribes paid to Bell while he was an executive at WWE.  (Am. Compl. ¶ 22)  Defendant Bell is a former WWE executive and is the President and sole owner of Bell Licensing.  (Am. Compl. ¶ 23)  On February 10, 2005, Bell pled guilty in the United States District Court for the District of Connecticut to one count of mail fraud in violation of 18 U.S.C. § 1342 in connection with his receipt of bribes relating to WWE's licensing program.  (Am. Compl. ¶ 24)

B.  Facts

For purposes of this Motion, the Court accepts as true the allegations in the Amended Complaint, which are:  In March 1995, WWE hired Bell to negotiate and procure licenses for its intellectual property.  (Am. Compl. ¶ 29)  From October 1996 to his termination on March 24, 2000, Bell served as WWE's Senior Vice President of Licensing and Merchandising.  (Am. Compl. ¶ 29)

At Bell's urging, WWE entered into a nonexclusive agency agreement with SSAI in April 1995.  (Am. Compl. ¶ 32)  SSAI was to procure and negotiate licensing contracts on behalf of WWE.  (Am. Compl. ¶ 32)  The agreement between SSAI and WWE provided that SSAI would receive a commission of eleven percent of royalties on licenses negotiated by SSAI.  (Am.

Compl. ¶ 77)

Shortly after SSAI and WWE entered into the agency agreement in 1995, Friedman approached Bell and Shenker at the annual New York Toy Fair.  (Am. Compl. ¶ 35)  Friedman inquired about obtaining a license on behalf of Jakks to make WWE toys.  (Am. Compl. ¶ 35)  On October 24, 1995, WWE and Jakks entered into a domestic toy license which was scheduled to terminate on December 31, 1997, with a one-year right to renew.  (Am. Compl. ¶ 35)

At around the same time, Shenker and SSAI entered into undisclosed agreements with Jakks to represent Jakks's interests at the same time as Shenker and SSAI were serving as WWE's agents.  (Am. Compl. ¶¶ 40-46)  At first, Shenker's work for Jakks was on matters unrelated to WWE.  But at the New York Toy Fair in 1996, Shenker and Jakks discussed hiring Shenker as Jakks's agent on WWE matters as well.  (Am. Compl. ¶ 49)  Jakks's outside legal counsel, however, advised that such an arrangement would present a conflict of interest for Shenker unless Shenker disclosed the arrangement to WWE and obtained WWE's full consent.  (Am. Compl. ¶ 50)  Nevertheless, without informing WWE, Shenker and Jakks entered into an arrangement whereby Shenker would secretly serve as Jakks's agent in negotiations with WWE.  (Am. Compl. ¶¶ 53-56)

On February 12, 1996, Jakks paid SSAI $2,500 in connection with Shenker's work as its agent.  (Am. Compl. ¶ 48)  Shortly thereafter, on April 22, 1996, the domestic toy license between WWE and Jakks was amended to provide additional rights to Jakks.  (Am. Compl. ¶ 56)  According to WWE, in compensation for his services, Jakks and Shenker agreed that Shenker would accept bribes from Jakks, and split them with Bell if necessary, to obtain various toy and video game licenses from WWE.  The monies used to pay the bribes would be laundered through

foreign shell corporations.  (Am. Compl. ¶ 62)

Pursuant to SSAI's and Shenker's recommendation, on January 21, 1997, WWE amended the domestic toy license with Jakks a second time, further expanding Jakks's domestic licensing rights.  (Am. Compl. ¶¶ 64-67)  Subsequently, on February 10, 1997, again on the recommendation of SSAI and Shenker, WWE entered into an international toy licensing agreement with Jakks.  (Am. Compl. ¶ 71)  Shenker's dual role in these negotiations was never disclosed to WWE.  On March 17 1997, WWE hired SSAI as its exclusive outside licensing agent.  (Am. Compl. ¶ 72)

Plaintiff also alleges that Defendants conspired on behalf of Jakks to obtain the video game license from WWE, which had been previously licensed to video game-maker Acclaim. (Am. Compl. ¶¶ 100-03)  WWE alleges that Shenker wanted Jakks to have the video game license because SSAI and Shenker would not receive royalties from the Acclaim license, which had been negotiated before SSAI was hired.  (Am. Compl. ¶¶ 83, 102)  In order to procure the video game license, on January 14, 1998, Jakks paid a bribe to Shenker in the form of payment for a false invoice, (Am. Compl. ¶¶ 85-86, 95) which Jakks laundered through offshore entities, including Shenker's alter ego, Stanfull.  (Am. Compl. ¶¶ 86-87, 94-99)  Shenker then paid Bell a portion of the monies received from Jakks in order to secure his assistance.  (Am. Compl. ¶ 97) In turn, Bell agreed to prohibit Acclaim from submitting a proposal to renew its video game license with WWE and to instead have the license awarded to Jakks.  (Am. Compl. ¶ 104)

WWE contends that Bell failed to forward superior offers and proposals from Jakks's competitors to WWE's management in order to protect the scheme to award the license to Jakks. (Am. Compl. ¶ 104)  Specifically, according to the Amended Complaint, Bell tried to convince

7

WWE management not to renew the video game license with Acclaim, tried to convince Acclaim not to bid, and submitted a deal memo recommending granting the license to Jakks without seeking any other bidders.  (Am. Compl. ¶¶ 107-08)  Upon Bell's recommendation, WWE informed Acclaim in April 1998 that it would not be renewing its license.  (Am. Compl. ¶ 115)

In the meantime, one of WWE's licensees for action figures, Playmates, had begun complaining in January 1997 that Jakks had been granted conflicting domestic rights by WWE.  (Am. Compl. ¶ 79)  At the direction of Shenker and Jakks, and in order to eliminate competition against Jakks, Bell offered to absolve Playmates of the obligation of its guarantee to WWE if Playmates would give up its rights to produce action figures.  (Am. Compl. ¶¶ 80-83)  WWE alleges that this agreement cost the company its guarantee and royalties above the guarantee.  (Am. Compl. ¶ 83)

Jakks was also facing competition in bidding on the video game license from THQ, and a new bidder, Activision.  (Am. Compl. ¶¶ 127-29)  On March 30, 1998, Bell recommended that WWE accept Jakks's offer for the video game license.  (Am. Compl. ¶ 110)  Subsequently, without solicitation from Bell or Shenker, Activision and THQ emerged as potential bidders in early April 1998.  (Am. Compl. ¶¶ 127-29)  In response, Bell and Shenker attempted to convince THQ and Activision not to bid, going so far as to refuse to provide them with prospective terms for a bid.  (Am. Compl. ¶ 129)  Nevertheless, THQ and Activision submitted informal proposals which were superior to Jakks's previously submitted proposal.  (Am. Compl. ¶ 131-32)  In order to protect the bribery scheme, Shenker and/or Bell concealed the informal proposals from WWE, but advised Jakks of the terms of THQ's and Activision's proposals.  (Am. Compl. ¶ 134-35, 145)

Notwithstanding their efforts to conceal the bribery scheme, Jakks became concerned that WWE would learn of the superior offers from THQ and Activision. (Am. Compl. ¶ 133) In order to save the scheme, Jakks approached THQ with an offer to act as joint venture partners in securing the video game license. With THQ as a partner, Jakks could make a more competitive offer to WWE, while continuing to make a generous profit on the license. THQ would be required to pay both Jakks and WWE for the license, while also funding and managing the licensed operations. (Am. Compl. ¶¶ 137, 178-79, 182-85)

According to WWE, THQ accepted the offer because it was in desperate financial straits after the cancellation of one of its most lucrative licenses. (Am. Compl. ¶¶ 119-25) The Amended Complaint further alleges that THQ knew Jakks had never been in the video game business, knew that it was improper for Jakks to discuss with THQ the terms by which THQ could gain access to WWE's intellectual property, and knew that what Jakks was telling THQ was different from what Bell and Shenker had shared earlier. (Am. Compl. ¶¶ 139-43, 164)

In early May 1998, Bell submitted a deal memo recommending granting the video game license to THQ and Jakks as a joint venture. (Am. Compl. ¶ 152) Shortly thereafter, Activision sent a more formalized version of its earlier informal proposal, which was also superior to the THQ/Jakks proposal. (Am. Compl. ¶ 153) However, Bell and Shenker did not forward the Activision proposal to WWE management. (Am. Compl. ¶ 153)

Jakks and THQ agreed to form a joint venture on June 10, 1998. (Am. Compl. ¶ 154) On that same day, WWE and THQ/Jakks executed a licensing agreement. (Am. Compl. ¶ 154) The agreement was for ten years with a five-year right to renew — an allegedly long amount of time for such an agreement. (Am. Compl. ¶¶ 148, 157) The terms of the domestic and

international toy licenses, which Jakks already had with WWE, were extended to coincide with the term of the video game license.  (Am. Compl. ¶ 165)

WWE alleges that the royalties it received under the June 10, 1998 deal were below-market because Shenker and Bell had foreclosed competitive bidding and because some of the money that should have been paid to WWE was instead paid by THQ to Jakks.  (Am. Compl. ¶¶ 150, 160-63)

The June 10, 1998 deal allegedly resulted in profits for Bell and Shenker, as well as for Jakks and THQ.  In addition to payments from Jakks, Bell and Shenker received a portion of the revenue stream pursuant to SSAI's agency agreement with WWE.  Shenker split the commission with Bell under their unlawful plan.  (Am. Compl. ¶¶ 151, 166-70)

On March 24, 2000, WWE terminated Bell's employment for reasons unrelated to the bribery scheme (which, at the time, WWE did not know about).  (Am. Compl. ¶ 187)  On June 13, 2000, WWE terminated its contract with SSAI based on a change of business direction.  (Am. Compl. ¶ 189)  In October 2000, SSAI brought a breach of contract claim against WWE in Connecticut state court seeking to be paid commissions on licenses SSAI had allegedly procured for WWE  (Am. Compl. ¶ 190)  WWE cross-claimed against SSAI, sent interrogatories to SSAI, Shenker, Bell, Jakks, and THQ, and deposed Shenker, Friedman, Berman, and Bennett during the course of discovery in the Connecticut state court action.  (Am. Compl. ¶¶ 191-239)  WWE alleges that, during the Connecticut litigation, Defendants destroyed evidence of the bribery, provided perjured testimony, made false statements to auditors, and concealed documents.  (Am. Compl. ¶¶ 191-239)  Eventually, WWE discovered the purportedly unlawful scheme, despite Defendants' alleged attempts to conceal it.  (Am. Compl. ¶¶ 210-12)

On October 16, 2003, the Connecticut state court dismissed with prejudice SSAI's action against WWE and entered a default judgment in favor of WWE as a sanction for Shenker's concealment of critical documents and repeated perjured deposition testimony. (Am. Compl. ¶ 221) *See also Stanley Shenker and Assocs., Inc. v. World Wrestling Fed'n Entm't, Inc.*, 844 A.2d 964, 978 (Conn. Super. Ct. 2003). WWE alleges that Defendants continued concealing documents and giving perjured testimony even after Shenker was sanctioned. (Am. Compl. ¶¶ 228-30, 235, 239)

     C.  Procedural History

On January 25, 2005, the Court held a pre-motion conference with the Parties to discuss Defendants' requests to file motions to dismiss. At that conference, the Court established a briefing schedule. In accordance with that schedule, each Defendant filed a Motion to Dismiss the certain causes of action alleged against them pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiff's response to each Motion to Dismiss was due on March 31, 2005. Instead of responding to the Motions to Dismiss, however, Plaintiff filed an Amended Complaint. In its Amended Complaint, Plaintiff reasserted its RICO, Robinson-Patman Act, and New York state law claims. Plaintiff also added a claim under the Sherman Act, 15 U.S.C. § 1.[2] Plaintiff did

---

[2]The Complaint alleges fifteen counts. Not all counts are alleged against each Defendant. The specific allegations are as follows:

- Count I (against all Defendants): Violation of RICO, 18 U.S.C. § 1962(c). (Am. Compl. ¶¶ 242-53);
- Count II (against all Defendants): Conspiracy to Violate RICO, 18 U.S.C. § 1962(d). (Am. Compl. ¶¶ 254-58);
- Count III (against all Defendants except Jakks H.K. and Road Champs): Violation of the Sherman Act, 15 U.S.C. § 1. (Am. Compl. ¶¶ 259-72);
- Count IV (against THQ, THQ/Jakks, and Jakks): Declaratory Judgment as to whether the video game license and the 1998 amendments to the toy license are void because they

not, however, accompany its Amended Complaint with a memorandum explaining how the

Amended Complaint addressed the arguments raised in Defendants' Motions to Dismiss.[3]

Defendants understandably had an adverse reaction to Plaintiff's lack of substantive response to

the comprehensively briefed motions, and made an application for sanctions against Plaintiff.

The Court declined to impose any sanctions even though it found Plaintiff's tactical choices to be

less than ideal.

---

were formed as a result of commercial bribery in violation of New York law. (Am. Compl. ¶¶ 273-80);

- Count V (against THQ, THQ/Jakks, and Jakks): Declaratory Judgment as to whether the video game license and the 1998 amendments to the toy license are void because of Shenker's and Bell's illegal acts and conflict of interest which was known to Jakks, in violation of New York law. (Am. Compl. ¶¶ 281-95);

- Count VI (against THQ/Jakks, Jakks, THQ, Friedman, Berman, and Bennett): Violation of the Robinson-Patman Act, 15 U.S.C. § 13(c). (Am. Compl. ¶¶ 296-302);

- Count VII (against THQ, THQ/Jakks, Jakks, Friedman, Berman, and Bennett): Violation of the New York commercial bribery law. (Am. Compl. ¶¶ 303-09);

- Count VIII (against THQ, THQ/Jakks, Jakks, Friedman, Berman, Bennett, and Farrell): Fraudulent inducement in violation of New York law. (Am. Compl. ¶¶ 310-17);

- Count IX (against THQ, THQ/Jakks, Jakks, Friedman, Berman, and Bennett): Unjust enrichment in violation of New York law. (Am. Compl. ¶¶ 318-21);

- Counts X and XI (against THQ, THQ/Jakks, Jakks, Friedman, Berman, and Bennett): Inducing breach of fiduciary duty in violation of New York law. (Am. Compl. ¶¶ 322-40);

- Count XII (against THQ, THQ/Jakks, Jakks, Friedman, Berman, and Bennett): Constructive trust under New York law. (Am. Compl. ¶¶ 343-47);

- Count XIII (against THQ, THQ/Jakks, Jakks, Friedman, Berman, and Bennett): Tortious interference with contractual relations in violation of New York law. (Am. Compl. ¶¶ 348-53);

- Count XIV (against THQ, THQ/Jakks, and Jakks): Piercing the corporate veil under New York law. (Am. Compl. ¶¶ 354-58);

- Count XV (against THQ, THQ/Jakks, Jakks, Friedman, Berman, and Bennett): Conspiracy to commit commercial bribery; fraudulent inducement; inducing breach of fiduciary duty; and tortious interference with contractual relations in violation of New York law. (Am. Compl. ¶¶ 359-63)

[3]On September 1, 2005, Defendants James Bell and Bell Licensing, L.L.C. withdrew their Motions to Dismiss.

However, rather than requiring Defendants to file new motions to dismiss the Amended Complaint, the Court ordered bifurcated briefing. First, the Court ordered the Plaintiff to respond to three threshold issues raised in the Defendants' original Motions to Dismiss which remained applicable to the Amended Complaint and were potentially dispositive. Those three issues are: (1) whether Plaintiff sufficiently alleged the existence of a RICO enterprise pursuant to 18 U.S.C. § 1962(c); (2) whether Plaintiff pleaded a cause of action under the Robinson-Patman Act, 15 U.S.C. § 13(c); and (3) whether Plaintiff is estopped from pursuing its RICO claim against Defendants Shenker and SSAI because it is duplicative of litigation commenced in Connecticut state court. Second, the Court set a schedule for briefing Plaintiff's Sherman Act claim, which was raised for the first time in the Amended Complaint.

The Court held oral argument on the threshold issues and the Sherman Act claim on January 11, 2006. This Opinion and Order addresses only those issues fully briefed and argued as of January 11, 2006.

## II. Discussion

### A. Standard of Review

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a party may seek to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In examining a motion to dismiss, the Court must "accept as true the factual allegations made in the complaint and draw all inferences in favor of the plaintiffs." *Grandon v. Merrill Lynch & Co., Inc.*, 147 F.3d 184, 188 (2d Cir. 1998). "The court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d

Cir. 1985). Dismissal is appropriate "only if there are no legal grounds upon which relief may be granted." *Virgilio v. City of New York*, 407 F.3d 105, 111 (2d Cir. 2005).

### B. RICO Enterprise Pleading Requirement

Defendants seek dismissal of the RICO claims in Counts I and II on several grounds. The only one fully briefed to this point is Defendants' claim that Plaintiff failed to properly plead a RICO enterprise distinct from the alleged racketeering acts.[4] In particular, Defendants contend that while Plaintiff may allege an enterprise that is an association-in-fact, a properly pled RICO enterprise must be comprised of more than just the predicate acts of racketeering. Rather, according to Defendants, a RICO enterprise must be an "ongoing enterprise" whose members "function as a continuing unit." (Jakks Mem. 27-28 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981))). This requires Plaintiff to allege the existence of an ongoing organization that has an identifiable hierarchy and organization, and involves conduct that demonstrates that the enterprise's members work together toward a common purpose.

Plaintiff, on the other hand, argues that an enterprise can merely be the sum of the alleged predicate acts, and that no separate, ascertainable structure is required. (WWE Mem. in Opp. to Defs.' Mot. to Dismiss 19, 22 ("WWE Resp.")) In its Amended Complaint, Plaintiff contends that there are sufficient allegations to satisfy this minimal burden. Thus, resolution of the dispute

---

[4]In addition to the enterprise argument, Defendants have also argued that Plaintiff's RICO claim should be dismissed for the following reasons: (1) failure to allege a threat of continued criminal activity (Jakks Mem. of Law in Supp. of Mot. to Dismiss Am. Compl., 18-24 ("Jakks Mem.")); (2) failure to establish a pattern of racketeering activity (Jakks Mem. 24-27); (3) failure to allege a pecuniary injury to its business or property (Jakks Mem 29-31); (4) failure to seek enjoinment of future conduct (Jakks Mem. 31-32); and (4) failure to properly plead the RICO predicate acts (Jakks Mem. 32-35). For the reasons stated earlier, the Court is only addressing the enterprise argument at this time. *See supra* Part I.C.

14

on the point of law is dispositive, for Plaintiff admits that its Complaint does not allege a RICO

enterprise that has an ascertainable structure beyond the purported racketeering acts.  (Hr'g Tr.

143-44, Jan. 11, 2006 ("Tr."))

RICO defines an "enterprise" to include any "individual, partnership, corporation,

association, or other legal entity, and any union or group of individuals associated in fact

although not a legal entity."  18 U.S.C. § 1961(4).  According to the Supreme Court, a RICO

enterprise is "a group of persons associated together for a common purpose of engaging in a

course of conduct," which must be proved "by evidence of an ongoing organization, formal or

informal, and by evidence of the various associates functioning as a continuing unit."  *Turkette*,

452 U.S. at 583.  Moreover, a RICO enterprise "is an entity separate and apart from the pattern of

activity in which it engages."  *Id.*  Thus, "[t]he existence of an enterprise at all times remains a

separate element which must be proved."  *Id.*

"Defendants interpret [*Turkette*], not without reason, to hold that the evidence necessary

to establish an enterprise must be distinct from that which a plaintiff must adduce to show a

pattern of racketeering activity."  *Hansel 'N Gretel Brand, Inc. v. Savitsky*, No. 94 Civ. 4027,

1997 WL 543088, at *2 (S.D.N.Y. Sept. 3, 1997), *abrogated on other grounds by Blue Tree*

*Hotels Inv. (Canada), LTD. v. Starwood Hotels & Resorts*, 369 F.3d 212, 218 (2d Cir. 2004).

However, Defendants rely on much more than the passages quoted above from *Turkette* in

support of their argument.  For example, Defendants cite the Second Circuit's relatively recent

decision in *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004), and

numerous other district court decisions within this Circuit that provide express support for

Defendants' position.

The panel in *First Capital* cited *Turkette* for support of the proposition that "the enterprise must be separate from the pattern of racketeering activity."  385 F.3d at 173.  The panel further noted that legitimacy is "by no means a prerequisite to a RICO enterprise," and, in fact, commented that in its "least developed form, an enterprise may be found where there is simply a 'discrete economic association existing separately from the racketeering activity.'"  *Id.* (quoting *United States v. Anderson*, 626 F.2d 1358, 1372 (8th Cir. 1980)).  Thus, in describing the enterprises alleged in that case, the panel found that the complaint failed "to detail any course of fraudulent or illegal conduct separate and distinct from the alleged predicate racketeering acts themselves – a requirement in this circuit."  *Id.* at 174 (citing *First Nationwide Bank v. Gelt Funding Corp.*, 820 F. Supp. 89, 98 (S.D.N.Y. 1993)).  Moreover, the panel observed that the complaint "failed to provide us with any solid information regarding the 'hierarchy, organization, and activities' of the alleged association-in-fact enterprise, *United States v. Coonan*, 938 F.2d 1553, 1560-61 (2d Cir. 1991), from which we could conclude that its 'members functioned as a unit.'"  *Id.* (quoting *Nasik Breeding & Research Farm Ltd. v. Merck & Co.*, 165 F. Supp. 2d 514, 539 (S.D.N.Y. 2001)).

There is little doubt that if *First Capital* was the only Second Circuit decision discussing the elements of a RICO enterprise, Defendants' Motion to Dismiss would be summarily granted.  However, over two decades ago a panel of the Second Circuit confronted the same argument being made by Defendants here: "Mazzei claims that to establish a violation of RICO, there must be proof that the alleged enterprise was distinct from the alleged pattern of racketeering activity. . . . To support this contention, he relies principally on [*Turkette*] and *United States v. Bledsoe*, 674 F.2d 647 (8th Cir. 1982)."  *United States v. Mazzei*, 700 F.2d 85, 88 (2d Cir. 1980)

(alteration added). In explicitly rejecting this claim, the *Mazzei* panel held:

> We agree that *Turkette* requires the government to prove both the existence of an "enterprise" and a "pattern of racketeering activity." We do not, however, read *Turkette* to hold that proof of these separate elements be distinct and independent, as long as the proof offered is sufficient to satisfy both elements. There is nothing in the language or legislative history of the Act to support the appellant's view. Moreover, it does not make sense to import a "distinctiveness" requirement in RICO cases. The appellant would have us rule that his actions are beyond the purview of RICO because he engaged only in point shaving and did not commit criminal acts other than those specifically contemplated in the conspiracy. Mazzei's interpretation would lead to the anomalous result that a large scale underworld operation which engaged solely in trafficking of heroin would not be subject to RICO's enhanced sanctions, whereas small-time criminals jointly engaged in infrequent sales of contraband drugs and illegal handguns arguably could be prosecuted under RICO. The Court will not place its *imprimatur* on such a counter-productive interpretation.

700 F.2d at 89.

Two other things are noteworthy about *Mazzei*. First, in rejecting the same claim made by Defendants in this case, the panel acknowledged that "the Eighth Circuit's position on the 'distinctness' issue is at odds with our analysis" (citing, *inter alia*, *Bledsoe*, 674 F.2d 647 and *Anderson*, 626 F.2d 1358), but reiterated that it was "not persuaded by that precedent," and noted that, in fact, it had been "implicitly rejected" by earlier Second Circuit decisions. *Mazzei*, 700 F.2d at 89-90 (citing *United States v. Errico*, 635 F.2d 152, 156 (2d Cir. 1980) and *United States v. Altese*, 542 F.2d 104, 106 (2d Cir. 1976)).[5] Second, the Court has never explicitly overruled

---

[5] In *Errico*, the panel upheld the RICO conviction of defendants whose enterprise was solely engaged in the fixing of horse races. *See* 635 F.2d at 156 ("A circle of jockeys – including Amy and others – who were joined through Errico with a circle of bettors . . . regularly attempted to profit and did profit from the illegal fixing of races. The two circles came together and continued to operate with that single, illegal purpose from at least August, 1974 through March 24, 1975. That community of interest and continuing core of personnel provides the 'group of

*Mazzei*, and, in fact, has reaffirmed its core holding on numerous occasions. *See Coonan*, 938 F.2d at 1560 ("[W]e have previously indicated that proof of various racketeering acts may be relied on to establish the existence of the charged enterprise."); *United States v. Ferguson*, 758 F.2d 843, 853 (2d Cir. 1985) ("RICO charges may be proven even when the enterprise and predicate acts are functionally equivalent, and the proof used to establish them coalesced." (citations omitted)); *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 22 (2d Cir. 1983) (*Mazzei* rejected "the Eighth Circuit's view that the evidence offered to prove the 'enterprise' and 'pattern of racketeering' must necessarily be distinct"); *United States v. Bagaric*, 706 F.2d 42, 55 (2d Cir. 1983) ("We have upheld application of RICO to situations where the enterprise was, in effect, no more than the sum of the predicate racketeering acts."), *abrogated on other grounds by Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 260 (1994). Indeed, other circuits have recognized that *Mazzei* places the Second Circuit in the minority on the question of ascertainable structure/distinctiveness of RICO enterprises. *See Chang v. Chen*, 80 F.3d 1293, 1297 (9th Cir. 1996) (noting that the Second Circuit is one of two [out of eight circuits to have confronted the issue] which "interpret[] *Turkette* to permit the organization constituting the enterprise to be no more than the sum of the predicate racketeering acts").

To blunt the force of *Mazzei*, in addition to *First Capital*, Defendants turn to the district courts within the Second Circuit to claim that their view of what Plaintiff must allege about a RICO enterprise is the correct one. On this score, there is no question that Defendants can cite to many more district court decisions that embrace Defendants' position than Plaintiff can to support its side. *See, e.g.*, *Stein v. New York Stair Cushion Co., Inc.*, No. 04 Civ. 4741, 2006 WL

---

individuals associated in fact' that is required for a RICO conviction.").

319300, at *3 (E.D.N.Y. Feb. 10, 2006) ("The enterprise is not the pattern of racketeering

activity; it is an entity separate and apart from the pattern of activity in which it engages."); *Dale

v. Banque SCS Alliance, S.A.*, No. 02 Civ. 3592, 2005 WL 2347853, at *7 (S.D.N.Y. Sept. 22,

2005) ("The plaintiffs do not allege that the association-in-fact enterprise had any purpose or

activities other than the execution of Frankel's scheme.  Consequently, the association-in-fact

enterprise does not have any alleged existence apart from the pattern of racketeering activity

alleged in the amended complaint, and it does not satisfy the requirement noted in *First

Capital*."); *Singh v. Parnes*, 199 F. Supp. 2d 152, 163 (S.D.N.Y. 2002) ("There is no indication

that in carrying out the activities Singh alleges, the defendants were carrying out the affairs of an

unlawful enterprise as defined by the statute, rather than their own affairs or those of their

institutional employers, principals or partners."); *Int'l Telecom, Inc. v. Generadora Electrica Del

Oriente, S.A.*, No. 00 Civ. 8695, 2002 WL 465291, at *9 (S.D.N.Y. March 27, 2002) ("Nothing

in the pleading suggests that the members of the enterprise, even those as yet unidentified,

formed a unit with a structure, hierarchy, or a continuity."); *Nasik Breeding*, 165 F. Supp. 2d at

539 ("Nasik has failed to present specific details of any hierarchy, organization, or unity among

the various alleged conspirators."); *Pavlov v. Bank of New York Co., Inc.*, 135 F. Supp. 2d 426,

430 (S.D.N.Y. 2001) ("[T]here must be more to an 'enterprise' than simply an aggregation of

predicate acts of racketeering activity.  In other words, an 'enterprise' must exhibit more

structure than is inherent simply in the alleged pattern or [sic] racketeering activity.") (citing

*Stephens, Inc. v. Geldermann, Inc.*, 962 F.2d 808, 815 (8th Cir. 1992) and *Bledsoe*, 674 F.2d at

664), *rev'd*, 25 Fed.Appx. 70 (2d Cir. 2002) (unpublished opinion)); *Goldfine v. Sichenzia*, 118

F. Supp. 2d 392, 401 (S.D.N.Y. 2000) ("[I]n a fraud-based RICO claim, if the sole purpose of the

19

alleged enterprise is to perpetrate the alleged fraud, there can be no enterprise for RICO

purposes."); *Amsterdam Tobacco Inc. v. Philip Morris Inc.*, 107 F. Supp. 2d 210, 215 (S.D.N.Y.

2000) ("Here, as in *Schmidt*, there is insufficient allegation of any enterprise involving Defendant

. . . .  There is no legally discernable and sufficient distinction between the alleged enterprise and

the alleged pattern of racketeering activity."); *Black Radio Network, Inc. v. NYNEX Corp.*, 44 F.

Supp. 2d 565, 580 (S.D.N.Y. 1999) ("The enterprise . . . must . . . be an entity separate from the

pattern of racketeering activity in which it engages."); *Bank v. Brooklyn Law School*, No. 97 Civ.

7470, 2000 WL 1692844, at *4 (E.D.N.Y. Oct. 6, 2000) ("The second amended complaint fails

to allege that any of the nineteen associations-in-fact existed as an entity separate and apart from

the commission of the alleged acts of mail and wire fraud."); *Schmidt v. Fleet Bank*, 16 F. Supp.

2d 340, 349 (S.D.N.Y. 1998) ("The enterprise 'cannot simply be . . . the minimal association

which surrounds the [pattern racketeering] acts.'  In other words, the members of the group as a

whole must have a common link other than the racketeering activity.'") (quoting, *inter alia*,

*Bledsoe*, 674 F. 2d at 664 (alteration in original)).

The courts within the Second Circuit, however, are not unanimous, as some have adhered

to *Mazzei* and its specific rejection of the Eighth Circuit's view expressed in *Stephens* and

*Bledsoe.  See Nat'l Group for Commc'ns and Computers Ltd. v. Lucent Techs. Inc.*, 03 Civ.

6001, 2006 WL 490057, at *14 n.30 (S.D.N.Y. Feb. 28, 2006) (noting that *Mazzei* and *Errico*

suggest that "the enterprise element may be established merely by proof of defendants

cooperation in a common pattern of racketeering acts," and that "[o]ther circuits have adopted

more demanding pleading standards requiring plaintiffs to demonstrate that the association-in-

fact enterprise has a structure independent of the underlying pattern of predicate acts.") (citing,

*inter alia*, *Bledsoe*, 674 F.2d 647); *Feinberg v. Katz*, No. 99 Civ. 45, 2002 WL 1751135, at *13

(S.D.N.Y. July 26, 2002) ("In light of the clear Second Circuit precedent which allows an

enterprise to be comprised of a group for the sole purpose of engaging in fraudulent activity, I

cannot accept the Katzes' argument that the plaintiff has failed to adequately allege an enterprise

because the Katz Enterprise existed purely to commit the fraud plaintiff alleges."); *Hansel 'N*

*Gretel*, 1997 WL 543088, at *2 (noting that the Second Circuit remains in the minority of the

circuits to have decided the question of distinctiveness of a RICO enterprise).

Additionally, a deeper look at the cases lining up with Defendants reveals that they

provide insufficient support for Defendants' motion.  To begin, only two of the district court

decisions noted above were appealed to the Second Circuit.  In one, *First Nationwide*, the Second

Circuit affirmed the district court's dismissal of the complaint solely on the grounds that plaintiff

had not alleged an injury ripe for suit under RICO, and that plaintiff had not sufficiently pleaded

proximate cause from any alleged RICO violation.  27 F.3d 763.  In the other appealed decision,

*Pavlov*, the Second Circuit reversed, in an unpublished opinion, the district court's dismissal of

the RICO complaint.[6]  Thus, none of the district court decisions ripened into Second Circuit

authority that adopted Defendants' view of the enterprise element.

Moreover, very few of the district court decisions explicitly considered *Mazzei* and its

---

[6]The Court does not cite or rely on the Circuit's unpublished opinion reversing the district court, as the Second Circuit's rules prohibit citation to the opinion.  2d Cir. R. 0.23.  However, it remains true that the district court's dismissal of the complaint was reversed, even if the grounds are not precedent in this Circuit.  It bears noting that the district court dismissed the RICO counts in the complaint solely on the basis that they failed to adequately plead the elements of enterprise (relying on the Eighth Circuit's decisions in *Stephens* and *Bledsoe*).  *See Pavlov*, 135 F. Supp. 2d at 429-31.  Once the district court dismissed the RICO counts, it then declined to exercise supplemental jurisdiction over the state law claims and also dismissed them for lack of diversity jurisdiction and on *forum non conveniens* grounds.  *Id.* at 431-38.

progeny.  For example, in *Schmidt* the court explicitly relied on the very same Eighth Circuit

decision (*Bledsoe*) that the *Mazzei* panel rejected, in holding that an enterprise "cannot simply be

the minimal association which surrounds the [pattern racketeering] acts."  16 F. Supp. 2d at 349

(quoting *Stephens*, 962 F.2d at 815 which was quoting *Bledsoe* 674 F.2d at 664).  While the

*Schmidt* court attempted in a footnote to distinguish the Second Circuit's decision in *Moss*, there

is no mention of *Mazzei* anywhere in the opinion (perhaps because *Mazzei* was not brought to the

court's attention), or any discussion of the Second Circuit's rejection of *Bledsoe* in *Mazzei*.

     The *Schmidt* decision proved to be significant in that it took on a life of its own, being

cited by numerous courts in this Circuit (and elsewhere) for the proposition (earlier rejected in

*Mazzei*) that there must be an ascertainable structure to a RICO enterprise beyond the mere

accumulation of racketeering acts.  *See, e.g.*, *Nasik Breeding*, 165 F. Supp. 2d at 539; *Pavlov*,

135 F. Supp. 2d at 430 n.8; *Goldfine*, 118 F. Supp. 2d at 401; *Amsterdam Tobacco*, 107 F. Supp.

2d at 215-16; *Bank*, 2000 WL 1692844, at *4; *Black Radio*, 44 F. Supp. 2d at 580.  Yet, in none

of these decisions is there a reconciliation (again, perhaps because none was offered by the

parties) between the *Schmidt* court's express reliance on the same Eighth Circuit authority

rejected in *Mazzei*.  Thus, this string of cases does not provide a satisfactory resolution of the

apparent inconsistency between Defendants' position and binding precedent in this Circuit.  *See*

*Feinberg*, 2002 WL 1751135, at *13 ("The reasoning of the Eighth Circuit on which *Schmidt*

stands was dismissed by the Second Circuit" long ago.).  Moreover, while the show of hands

among the district courts within the Second Circuit is impressive and supports Defendants'

position, the weight of these decisions is insufficient for this Court to conclude that *Mazzei*

sleeps with the fishes.  *See Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484

(1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."); *Priester v. Senkowski*, No. 01 Civ. 3441, 2002 WL 1448303, at *7 (S.D.N.Y. July 3, 2002) ("Based on this principle of *stare decisis* [discussed in *Rodriguez*], this Court is constrained to follow the holding of [the Second Circuit]." (alterations added)); *United States v. Russotti*, 780 F. Supp. 128, 131 (S.D.N.Y. 1991) (noting that a district court is to follow Second Circuit precedent, even though intervening district court decision is inconsistent with circuit precedent, particularly where the district court decision does not cite or discuss circuit precedent); Steven G. Calabresi & Gary Lawson, *Equity and Hierarchy: Reflections on the Harris Execution*, 102 Yale L.J. 255, 276 n.106 (1992) ("The hierarchical structure of Article III dictates that inferior courts faithfully apply the precedents of superior courts, just as the hierarchical structure of Article II requires executive officials to follow presidential precedents.").[7]

But what about the Second Circuit's decision in *First Capital*? There is no question that Defendants' reliance on certain statements in that case is proper and persuasive. However, there also appears to be no doubt that these same statements are inconsistent with the holdings of *Mazzei* and its progeny. *Compare First Capital*, 385 F.3d at 174 ("The Amended Complaint

---

[7]The Court is bound to follow precedent even if it disagrees with it. *See State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) ("The Court of Appeals was correct in applying that principle [that lower courts are to follow binding precedent of the Supreme Court] despite disagreement with [that precedent] for it is this Court's prerogative alone to overrule one of its precedents."). Here, for example, there is much to be said for the view that RICO should not be used to bring a "civil conspiracy claim," and that the "criminal prohibition in § 1962(c) is not a mere super-conspiracy statute." *Bank*, 2000 WL 1692844, at *4. Until told otherwise by the Second Circuit, however, the Court can do little with this view in light of *Mazzei*.

fails . . . to detail any course of fraudulent or illegal conduct separate and distinct from the alleged predicate racketeering acts themselves – a requirement in this Circuit."), *with Bagaric*, 706 F.2d at 55 ("We have upheld application of RICO to situations where the enterprise was, in effect, no more than the sum of the predicate racketeering acts." (*citing Mazzei*, 700 F.2d at 88-89)). Furthermore, as noted, it is beyond dispute that neither the Second Circuit nor the Supreme Court has expressly overruled *Mazzei*. This is critical because this Court cannot ignore binding Second Circuit precedent, unless it is expressly or implicitly overruled. *See Anderson v. Recore*, 317 F.3d 194, 201 (2d Cir. 2003) ("We will follow a precedent from this circuit unless a Supreme Court decision or an en banc holding of this court implicitly or explicitly overrules the prior decision."); *Russotti*, 780 F. Supp. at 131 ("[I]t is axiomatic that a district court cannot simply take a position contrary to that of its circuit court . . . ."); *Danna v. Air France*, 334 F. Supp. 52, 62 (S.D.N.Y. 1971) ("[A] District Court is not empowered to reject Supreme Court precedent on the ground that it is moribund except in the clearest of cases.").

In the absence of an express decision overruling *Mazzei*, the remaining question is whether it has been implicitly overruled. The Court is unaware of any such decision, and Defendants have failed to identify the case that implicitly neutered *Mazzei*. Instead, at oral argument, counsel for Defendants suggested that the Second Circuit's decisions in *United States v. Porcelli*, 865 F.2d 1352 (2d Cir. 1989) and *United States v. Indelicato*, 865 F.2d 1370 (2d Cir. 1989) have reconciled *Mazzei* "as an evidence case." (Tr. 14, 19) According to Defendants, the Second Circuit has construed *Mazzei* to stand only for the proposition that the proof of the enterprise and the predicate acts may coalesce, (Tr. 19) but does not reject the notion that the "[e]nterprise minus racketeering acts must be greater than zero." (Tr. 23) However, in

describing *Mazzei*, the Second Circuit has explicitly held that RICO permits "situations where the enterprise was, in effect, no more than the sum of the predicate acts." *Bagaric*, 706 F.2d at 55. In other words, under *Mazzei*, enterprise minus racketeering acts can equal zero. *See Indelicato*, 865 F.2d at 1381 (noting that the "concepts of relatedness and continuity are attributes of [a pattern of] activity, not of a RICO enterprise."); *Nat'l Group*, 2006 WL 490057, at *14 ("The Second Circuit . . . does not require RICO plaintiffs to *plead* continuity beyond the performance of racketeering acts." (emphasis added) (citing *Indelicato*, 865 F.2d at 89)). Moreover, in neither *Porcelli* nor *Indelicato* is there any critical commentary directed at *Mazzei* or its reasoning. In fact, *Porcelli* mentions *Mazzei* only once to support the proposition that in "many cases . . . the enterprise itself is the vehicle for the racketeering activity." 865 F.2d at 1362 (citing *Mazzei* as one of two examples). And in *Indelicato*, the Circuit sitting en banc, merely described (without a hint of regret) the holding in *Mazzei* as rejecting the contention that the enterprise and the pattern of racketeering activity must be distinct. 865 F.2d at 1375 (citing, *inter alia*, *Moss*, 719 F.2d at 22). Thus, there is nothing about either decision that could support the suggestion that *Mazzei* was implicitly overruled.[8]

Defendants also believe *First Capital*, while not overruling *Mazzei*, should control as it is "the most extensive analysis in a civil context of any of the cases." (Tr. 25) The Court is unaware, however, of any Second Circuit decision limiting the reach of *Mazzei* to criminal cases, and does not believe there would be a logical way to distinguish a civil from a criminal RICO

---

[8]Nor is there anything in *Coonan* that suggests an implicit retreat from *Mazzei*. In fact, the panel in *Coonan* cited *Mazzei* and *Bagaric* for the notion that "[c]ommon sense suggests that the existence of an association-in-fact is oftentimes more readily proven by 'what it *does*, rather than by abstract analysis of its structure.'" 938 F.2d at 1560 (quoting *Bagaric*, 706 F.2d at 56 and citing *Mazzei*, 700 F.2d at 88-89).

enterprise.  Moreover, to the extent Defendants are hinting that *First Capital* implicitly overruled *Mazzei*, the argument suffers from the fact that the validity of the plaintiffs' pleading regarding the RICO enterprises at issue in that case was not before the *First Capital* panel.  In fact, none of the three district court decisions that were on appeal in *First Capital* dismissed the complaint on the ground that the plaintiffs failed to properly allege that the enterprise was distinct from the racketeering acts.  Instead, the RICO causes of action in the district courts were dismissed for failure to properly plead a pattern of racketeering activity, and for lack of standing and personal jurisdiction.  *See First Capital*, 385 F.3d at 165-72.  Thus, the parties on appeal did not brief the adequacy of the allegations regarding the enterprises, and, therefore, did not discuss or even cite *Mazzei* in their briefs to the Second Circuit.  *See* Br. for Plaintiffs-Appellants, No. 03 Civ. 7897, 2004 WL 3355134 (Feb. 17, 2004); Resp. Br. for Defendants-Appellees, No. 03 Civ. 7897, 2004 WL 3355135 (Mar. 22, 2004); Reply Br. for Plaintiffs-Appellants, No. 03 Civ. 7897, 2004 WL 3355131 (Apr. 6, 2004).

In the end, therefore, it is insufficiently clear to this Court that *First Capital* should be read to implicitly overrule *Mazzei*, thereby constraining this Court to follow *Mazzei*.  *Cf. Russotti*, 780 F. Supp. at 131 (refusing to apply later district court opinion that contradicted earlier Second Circuit authority that was not even brought to the attention of the district court).  Therefore, the Defendants' Motion to Dismiss the RICO counts for failure to properly plead an enterprise pursuant to § 1962(c) is denied.

## C.  Robinson-Patman Act

In Count VI of the Amended Complaint, Plaintiff claims that Defendants' alleged bribery scheme violates § 2(c) of the Robinson-Patman Act ("RPA").  Specifically, Plaintiff alleges that

the RPA Defendants engaged in an illegal bribery scheme to obtain Plaintiff's toy and video game licenses.  (Am. Compl. ¶¶ 296-302)  The RPA Defendants seek dismissal of this count, arguing that it fails to state a cause of action because:  (i) § 2(c) of the RPA only applies to the purchase or sale of "goods, wares, or merchandise"; and (ii) Plaintiff lacks standing to bring an RPA claim because it fails to allege an antitrust injury.  (Jakks Mem. 10-16)   For the reasons discussed below, the Court agrees with the first argument and, therefore, does not reach the second.

Section 2(c) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(c), states:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

15 U.S.C. § 13(c).

Plaintiff reads this provision as "straightforward" (WWE Resp. 28), yet Justice Frankfurter commented that "precision of expression is not an outstanding characteristic of the Robinson-Patman Act." *Automatic Canteen Co. of Am. v. FTC*, 346 U.S. 61, 65 (1953).[9]

---

[9]A practitioner has observed:

> Linguistically, Section 2(c) is a genuine piece of art.  It has 115 words, all in one sentence.  There are no semicolons, no clauses, just a few commas – and there has even been a debate about

27

Plaintiff also asserts that this provision is to be interpreted to include intangibles, such as

licenses, yet, as discussed below, virtually every court to have considered the issue in the last

seven decades has held otherwise.  Indeed, one judge in this district has imposed Rule 11

sanctions on a party for even alleging that § 2(c) covers intangible services.  *See Empire State*

*Pharm. Soc'y, Inc. v. Empire Blue Cross and Blue Shield of Greater New York*, 778 F. Supp.

1253, 1258 (S.D.N.Y. 1991) (holding that in light of "abundance of authority" that the RPA

"applies only to goods and commodities," it was "objectively unreasonable" for plaintiff to have

brought RPA claim in case involving insurance services).

A little history is in order.  "Section 2, 'when originally enacted as part of the Clayton Act

in 1914 was born of a desire by Congress to curb the use by financially powerful corporations of

localized price-cutting tactics which had gravely impaired the competitive position of other

sellers.'"  *Volvo Trucks North Am., Inc. v. Reeder-Simco GMC, Inc.*, – US –, – , 126 S. Ct. 860,

869 (2006) (quoting *FTC v. Anheuser-Busch, Inc.*, 363 U.S. 536, 543, 544 n.6 (1960)).

However, "[a] lengthy investigation revealed that large chain buyers were obtaining competitive

advantages in several ways other than direct price[] concessions and were thus avoiding the

impact of the Clayton Act."  *FTC v. Henry Broch & Co.*, 363 U.S. 166, 168-69 (1959).  "One of

the favorite means of obtaining an indirect price concession was by setting up 'dummy' brokers

who were employed by the buyer and who, in many cases, rendered no services.  The large

---

whether the commas are in the right places.  As you might expect
in such a situation, no one has ever come forward to take full
responsibility for its drafting.

Mark L. Yeager, *Developments – 1984: Living with the Robinson-Patman Act*, 53 Antitrust L.J.
1029 (1985).

buyers demanded that the seller pay 'brokerage' to these fictitious brokers who then turned it over to their employer." *Id.* at 169. It was primarily in response to this harsh business practice that Congress enacted the Robinson-Patman Act. *See Volvo Trucks*, 126 S. Ct. at 869 ("Augmenting that provision in 1936 with the Robinson-Patman Act, Congress sought to target the perceived harm to competition occasioned by powerful buyers, rather than sellers; specifically, Congress responded to the advent of large chain stores, enterprises with the clout to obtain lower prices for goods than smaller buyers." ); *see also Philip Morris, Inc. v. Grinnell Lithographic Co.*, 67 F. Supp. 2d 126, 130 (E.D.N.Y. 1999) ("Section 2(c) was enacted primarily to prevent large buyers from obtaining indirect price discrimination by demanding that the suppliers pay fees to bogus brokers, which fees would then be returned to the buyers."). However, while motivated principally to eliminate the use of dummy brokers, "Congress in its wisdom phrased § 2(c) broadly, not only to cover the other methods then in existence but all other means by which brokerage could be used to effect price discrimination." *Broch*, 363 U.S. at 169. Or, as Chief Judge Walker recently noted, "[t]he *sine qua non* of a § 2(c) violation . . . is an improper payment, *i.e.*, a payment of a commission, brokerage, or discount other than for services actually rendered." *Blue Tree Hotels Inv. (Canada), Ltd.*, 369 F.3d at 223. Thus, as the Supreme Court and the Second Circuit have made clear, the RPA seeks to proscribe the payment of any kind to brokers or their equivalents for services not rendered.

Notwithstanding this history, Plaintiff claims that § 2(c) applies to "services" such as the licenses at issue in this action. First, Plaintiff cites to a "diagram" of § 2(c) in *Blue Tree*. (WWE

Mem. 28-29).[10]  However, nothing about this diagram, or the holding in *Blue Tree*, supports

Plaintiff's claim.  Indeed, the court in *Blue Tree* merely held that plaintiffs had failed to state an

RPA claim because they had not alleged that the payments to defendants were improper.  369

F.3d at 224.  The court was not asked to decide, and obviously did not decide, the question

presented here.[11]  In this context, then, the "diagram" does not shed any light on § 2(c).

Moreover, there is nothing in the structure of the "diagram" that requires this Court to adopt

Plaintiff's reading of the statute.  Instead, the diagram begs the question of whether the "services

rendered" are an exception to the proscribed payment to brokers (or their equivalents), or if the

"services rendered" language is modified by the sale or purchase of goods.  Thus, the diagram

can hardly be viewed as binding precedent from the Second Circuit on whether § 2(c) applies to

services or other intangible products.

---

[10]The diagram breaks down § 2(c) as follows:

> It is unlawful for any person to
> (1) pay (or receive) –
> a. anything of value as a commission, brokerage, or other compensation, *or*
> b. any allowance or discount in lieu of brokerage,
> *except* for services rendered in connection with a sale or purchase of goods,
> (2) when the payment is made to (or by)
> a. the other party to the transaction, or
> b. an agent, representative or other intermediary where the intermediary is
> (i) acting for or in behalf of, or
> (ii) subject to the direct or indirect control of
> any party to the transaction other than the person by whom compensation is paid.

*Blue Tree Hotels Inv. (Canada), Ltd.*, 369 F.3d at 218.

[11]In *Blue Tree*, the district court dismissed the complaint on the grounds that plaintiffs
had failed to allege any competitive injury from defendants' alleged conduct.  369 F.3d at 214.
Though affirming dismissal of the complaint on the ground identified above, the *Blue Tree* court
noted that the district court had erred in this conclusion, noting that to prevail on a claim under §
2(c), a plaintiff need only plead an antitrust injury.  *Id.* at 219.

Second, Plaintiff cites language (but not the holding) in a seventy-year-old Second Circuit decision that is not on point. Specifically, Plaintiff quotes from a portion of *Biddle Purchasing Co. v. FTC*, 96 F.2d 687 (2d Cir. 1938), to claim that the phrase "in connection with the sale or purchase of goods, wares, or merchandise" is only a part of the "services rendered" exception. The quote is as follows:

> The report of the House and Senate Conference Committee, submitted in referring to the bill in its present form, interprets the section as having this meaning[:]
>
> 'This subsection permits the payment of compensation by a seller to his broker or agent for services actually rendered in his behalf; likewise by a buyer to his broker or agent for services in connection with the purchase of goods actually rendered in his behalf; but it prohibits direct or indirect payment of brokerage except for such services rendered . . . .' House Rep., 2951, 74th Congress, 2d Session.

(WWE Resp. 29) (quoting *Biddle*, 96 F.2d at 691 n.1). Plaintiff's selective quotation from *Biddle*, however, is far off the mark.

As with *Blue Tree*, the quote should be put into context. Biddle Purchasing Co. supplied market information, for a monthly fee, to subscribers who were in turn wholesalers and distributors. *Id.* at 689. Biddle also acted as a broker, selling goods on behalf of "numerous manufacturers, canners, and packers," to Biddle's subscribers. *Id.* For brokering these sales, Biddle received commissions from the sellers. *Id.* The buyers (subscribers) would receive back the commissions paid to Biddle by the sellers. In the vast majority of these sales, the commissions refunded to the buyers were no more than they had paid for the subscription services they received from Biddle. *Id.* However, in some instances, the commissions paid to Biddle exceeded the subscription fees and the excess was given to the buyers, thus in effect

31

giving these buyers a discount.  *Id.*  It was this practice that the FTC found objectionable, and which led to the appeal.  *Id.*

In upholding the FTC's order, the Second Circuit noted that "the statute prohibits payment of brokerage by the seller to the buyer or his agent or representative or controlled intermediary, except for services rendered."  *Id.* at 691.  It was after this comment that the court then cited the House and Senate Report (as quoted above in Plaintiff's brief).  The purpose of quoting this part of the legislative history was not, as Plaintiff suggests, to define the "services rendered" exception, but to make clear that the exception "prohibit[ed] payments which were made here to the buyers."  *Id.*  Indeed, the court went on to note that based on this legislative history, it was fair to conclude that "Congress must have intended that payments by sellers should not be made to buyers through any one acting as agent for the buyer."  *Id.* at 691.  This all led to the bottom line in *Biddle*: "[T]he brokerage fees by the sellers to the Biddle Company could not be made in good faith as compensation for services rendered, since the fees are intended for the buyers and are immediately transmitted to them."  *Id.* at 691-92.

As should be clear from this description of the background and holding in *Biddle*, the question presented before the court in that case bore no resemblance to the question presented here.  Therefore, the quotation from the legislative history, either standing alone or in the context in which it was quoted, does not support Plaintiff's cause.

Finally, Plaintiff points to a footnote in the Eight Circuit's decision in *Ideal Plumbing Co., v. Benco, Inc.*, 529 F.2d 972 (8th Cir. 1976).  (WWE Resp. 29)  In this footnote, the court observed that:

> It is also apparent that the terminology "goods, wares, or

32

> merchandise" in the statute may merely modify the "services
> rendered" exception and therefore constitute only an element to be
> determined when a defendant contends that the concession was
> made in exchange for services rendered.

529 F.2d at 978 n.6.  As with the other threads, Plaintiff is unable to weave this footnote into a

winning argument.  First, Plaintiff's quotation leaves out the earlier part of the footnote, where

the court noted that "[s]ince the evidence was such that the District Court could hold as a matter

of law that the price reduction extracted from [defendant] . . . was not compensation in lieu of

brokerage, it is unnecessary to examine at length the District Court's alternative findings," which

included a finding that § 2(c) did not apply since the contract was for services.  *Id.*   In other

words, the court's comment on the "services rendered" exception was pure dicta.  Second,

Plaintiff also left out the next portion of the footnote, where the court noted that there were

decisions in other circuits holding that § 2(c) applied only to "goods, wares, or merchandise," and

not to services.  *Id.*  It was after recognizing this line of authority, that the court offered, but did

not adopt, the counter-argument, quoted by Plaintiff, that the reference to goods, wares, or

merchandise "*may* merely modify the 'services rendered' exception . . . ."  *Id.*  (emphasis

added).[12]  Thus, this footnote does not constitute the holding of the court and, therefore, is

insufficient to carry the day.

    In the end, Plaintiff is not able to cite a single holding that supports its reading of the

statute.  Instead, in its quiver, Plaintiff only has a "diagram," one out-of-context quotation from

two Second Circuit decisions that do not remotely deal with the issue presented, and, at best,

---

[12]In support of this point, the court cited to the *Biddle* court's quote from the legislative
history, which Plaintiff relies upon as well.  As discussed above, relying on that quote is
misguided.  Also, it bears noting that no other court has adopted the *Ideal Plumbing* court's
interpretation of the quote from *Biddle*.

equivocal dicta from another circuit.

Plaintiff's offering is paltry compared to the scores of cases that line up squarely with Defendants' view of the statute, which is that it simply does not, by its terms and consistent with its legislative history, cover services or other intangible items such as licenses. This authority spans each decade since enactment of the RPA, and includes jurisdictions covering virtually every time zone in the continental United States. *See Union City Barge Line, Inc. v. Union Carbide Corp.*, 823 F.2d 129, 141 (5th Cir. 1987) ("[T]he dominant nature of redelivery is a service, not a good. Thus, Gulf Coast's admittedly unlawful actions fall outside the statute's commercial bribery reach."); *May Dep't Store v. Graphic Process Co.*, 637 F.2d 1211, 1214 (9th Cir. 1980) ("It is necessary for an action under section 2(c) of the Robinson-Patman Act that the transactions between the parties constitute a sale of 'goods, wares, or merchandise. . . .'"); *Freeman v. Chicago Title and Trust Co.*, 505 F.2d 527, 529-30 (7th Cir. 1974) ("[W]e find no affirmative evidence that Congress intended section 2(c) to be the only Robinson-Patman provision applicable to intangibles. . . ."); *Webb-Crawford Co. v. FTC*, 109 F.2d 268, 270 (5th Cir. 1940) (noting that "services rendered" only modifies the preceding phrase relating to brokerage fees); *Yeager v. Waste Mgmt., Inc.*, 3:89 Civ. 7248, 1994 WL 761959, at *1 (N.D. Ohio Sept. 30, 1994) (granting defendant's summary judgment motion because complaint related only to landfill services); *Myano Mach. USA, Inc. v. Zonar*, No. 92 Civ. 2385, 1993 WL 23758, at *6 (N.D. Ill. Jan. 29, 1993) (granting motion to dismiss where payments related to "sale of a business opportunity, even the opportunity to sell goods"); *Empire State Pharm. Soc.*, 778 F. Supp. at 1258 (imposing Rule 11 sanctions on plaintiff for claiming in a complaint that § 2(c) applies to services); *Callahan v. Commonwealth Land Title Ins. Co.*, Civ. A. Nos. 88-7656, 88-

8319, 1990 WL 168273, at *10 (E.D. Pa. Oct. 29, 1990) (Section 2(c) "is restricted to transactions for the sale and purchase of goods, wares or merchandise."); *Fiore v. Kelly Run Sanitation, Inc.*, 609 F. Supp. 909, 916 (W.D. Pa. 1985) ("In order to allege an action under Section 2(c) of the Robinson-Patman Act, . . . the complaint must state that the transactions between the parties constitute a sale of goods, wares, or merchandise and not merely a contract for services." (quotations omitted)); *Rodman v. Haines*, No. 75 Civ. 471, 1976 WL 1315, at *6 (S.D.N.Y. Sept. 14, 1976) ("Whatever else might be encompassed by § 2(c), bribes paid to employees of a potential lessee of real property are not covered by that section, since they do not involve abuses of the brokerage function in a transaction involving the sale of goods."); *County Theatre Co. v. Paramount Film Distrib. Corp.*, 146 F. Supp. 933, 934 (E.D. Pa. 1956) (noting that "licensing of motion picture films" is not covered by § 2(c)).

Furthermore, while neither the Supreme Court nor the Second Circuit has squarely addressed the issue, there is dicta or language in decisions from both courts that is consistent with Defendants' interpretation. For example, in a footnote declining to address plaintiff's argument, raised for the first time on appeal, that providing surcharges and discounts not in connection with services rendered violates § 2(c) of the RPA, the Second Circuit, in addition to rejecting the claim as waived, noted that § 2(c) proscribes such practices "only 'in connection with the sale or purchase of goods, wares, or merchandise . . . .'" *Gordon v. NY Stock Exchange Inc.*, 498 F.2d 1303, 1305 n.7 (2d Cir. 1974) (quoting 15 U.S.C. § 13(c)). And, in at least two cases, the Supreme Court has described § 2(c) as relating to transactions involving "goods." *See Volvo Trucks*, 126 S. Ct. at 869 (discussing Congress's intent in enacting the RPA to address "enterprises with the clout to obtain lower prices for *goods* than smaller buyers could demand"

(emphasis added)); *Broch*, 363 U.S. at 174 ("Congress enacted the Robinson-Patman Act to prevent sellers and sellers' brokers from yielding to pressures of large buying organization by granting unfair preferences in connection with the sale of *goods*." (emphasis added)).[13]

Plaintiff attempts to escape the weight of this vast authority through two arguments. First, Plaintiff claims that many of these cases should be ignored because they pre-date the Supreme Court's thirty-year-old decision in *Abbott Labs. v. Portland Retail Druggists Ass'n*, 425 U.S. 1, 12 (1976), which held that the RPA is to be construed liberally, and that exceptions to its application should be strictly construed. Yet, in making that rather unremarkable statement, the Court cited to cases dating back to the 1950s. *Id.* In any event, there is nothing about that unsurprising comment that should undo seven decades of jurisprudence, particularly when not a single court has expressed a different view since *Abbott Labs* was decided. In fact, the Second Circuit only two years ago reaffirmed the view that the courts "have strictly construed" the term "commodities" in § 2(a) of the RPA to include "only 'tangible products of trade.'" *Innomed Labs*, 368 F.3d at 156 (quoting *May Dep't Store*, 637 F.2d at 1214).[14] While this Court recognizes that §§ 2(a) and 2(c) should be independently interpreted, the fact that the Second Circuit (and other circuits) continue to strictly construe the meaning of "commodities" in § 2(a),

[13]This interpretation of § 2(c) is consistent with the common interpretation of other provisions of the RPA. For example, like § 2(c), § 2(a) has also been interpreted to apply only to tangible goods. *See Innomed Labs, LLC v. Alza Corp.*, 368 F.3d 148, 156 (2d Cir. 2004) (construing "commodities" in § 2(a) strictly to mean only "tangible products of trade"); *Empire State Pharm. Soc., Inc.*, 778 F. Supp. at 1258 (declining to apply § 2(a) to insurance services contract).

[14]In 1979, three years after *Abbott Labs*, the Second Circuit, noting the "strict view of the meaning of the term 'commodities'" taken by other circuits, held that the sale of advertising was not a transaction involving "commodities" under § 2(a) of the RPA. *Ambook Enters. v. Time Inc.*, 612 F.2d 604, 609-10 (2d Cir. 1979).

even in the distant wake of *Abbott Labs*, is instructive.

Finally, Plaintiff criticizes at least one of the decisions cited above (the Seventh Circuit's decision in *Freeman*), because in that case the court "admit[ted] that it actually had to repunctuate the statute to achieve its interpretation of the statute." (WWE Resp. 31) Even if true, however, the Seventh Circuit's view is not wrong. The Supreme Court long ago observed that:

> Punctuation marks are not part of an act. To determine the intent of the law, the court, in construing the statute, will disregard the punctuation, or will repunctuate, if that be necessary, in order to arrive at the natural meaning of the words employed.

*United States v. Shreveport Grain & Elevator Co.*, 287 U.S. 77, 82-83 (1932); *see also Hammock v. Loan & Trust Co.*, 105 U.S. 77, 84-85 (1882) (noting that courts "should disregard the punctuation, or repunctuate, if need be, to render the true meaning of the statute"). More recently, the Supreme Court unanimously observed that while "the meaning of a statute will typically heed the commands of its punctuation," a "purported plain meaning analysis based only on punctuation is necessarily incomplete and runs the risk of distorting a statute's true meaning." *United States Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 454 (1993).

The pertinent part of the statute proscribes the payment or receipt of payment "of anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise." In *Freeman*, the Seventh Circuit suggested that a comma should have been inserted between "rendered" and "in connection." 505 F.2d at 529-30.[15] By doing

---

[15]For different reasons, the Fifth Circuit came to the same conclusion over sixty years ago. *See Webb-Crawford*, 109 F.2d at 270 ("The punctuation as published is confusing. We

this, the punctuation would better reflect the statute's meaning, as well as reflect Congress's

intent in enacting the RPA.  As noted above, the primary practice that Congress was seeking to

eliminate in the RPA was the use of dummy brokers, i.e., fictitious entities that were receiving

payments for no services rendered.  Thus, § 2(c) should be viewed accordingly, as barring only

those payments made where there is no consideration given for the fee, i.e., no brokerage services

rendered.  Viewed as such, the "services rendered" exception relates to the brokerage fees, or

their equivalents, and is not further limited by reference to "the sale or purchase of goods, wares,

or merchandise."  Indeed, if the statute were to be read as suggested by Plaintiff, by leaving out

the comma, § 2(c) "would apparently prohibit the payment of a commission in connection with

the purchase or sale of intangibles even if 'services' had been rendered."  *Freeman*, 505 F.2d at

530 n.5.  Plainly, this is not what Congress enacted, or intended to enact.  Therefore, Plaintiff's

concern about grammatical anarchy is unfounded.

    Ultimately, this issue ends where it started, with Judge Sprizzo's admonition to a plaintiff

who appeared to ignore the "abundance of authority establishing that the Robinson-Patman Act

applies only to goods and commodities and does not apply to services."  *Empire State Pharm.*

*Co.*, 778 F. Supp. at 1258.  Accordingly, because the alleged bribes here related only to licenses,

and not to any goods, Defendants' Motion to Dismiss Count VI is granted.

    D.  Duplicative Litigation

    The next question is whether Plaintiff can maintain an action against the Shenker

Defendants in federal court.  The Shenker Defendants argue that Plaintiff should be estopped

_____

think the true meaning is better indicated by taking the comma out after 'thereof,' and inserting it
after 'rendered.'  Commas are not to be suffered to defeat the legislative meaning.").

from pursuing a civil RICO action against them in federal court because it is duplicative of litigation in Connecticut state court arising out of the same events.

In October 2000, SSAI brought a breach of contract claim against WWE in Connecticut state court seeking license commissions it was allegedly due.  (Am. Compl. ¶ 190)  WWE filed counterclaims against SSAI and discovery ensued.  On October 16, 2003, the Connecticut Superior Court entered an Order dismissing SSAI's claims with prejudice and granting a default judgment in favor of WWE on its counterclaims.  *See Stanley Shenker and Assocs., Inc.*, 844 A.2d at 974, 977 ("Shenker's recantations and his postrecantations deposition testimony provide uncontroverted and irrefutable evidence of conduct so violative of the judicial process that dismissal with prejudice of the present case is the only appropriate sanction. . . . Based on . . . the record of egregious discovery abuse in the present case, the court hereby enters a default judgment against [SSAI] and in favor of [WWE] on each of [WWE's] counterclaims.")  The Shenker Defendants argue that the Connecticut Order constitutes a sufficiently final judgment such that Plaintiff should be estopped from pursuing its current RICO claim against them in federal court.

The Shenker Defendants assert three different grounds for their estoppel claim:  (1) res judicata; (2) the prior pending action doctrine; and (3) the "one satisfaction" rule.  The Court will address each one in turn.

### 1.  Res Judicata

"'Where there is a final state court judgment, a federal court looks to that state's rules of res judicata to determine the preclusive effect of that judgment.'"  *AmBase Corp. v. City Investing Co. Liquidating Trust*, 326 F.3d 63, 72 (2d Cir. 2003) (quoting *Town of Deerfield, N.Y.*

39

*v. FCC*, 992 F.2d 420, 429 (2d Cir.1993) and 28 U.S.C. § 1738). Here, the Court must look to

the state laws of Connecticut to determine if res judicata applies.[16]

In Connecticut, the elements of res judicata are: (1) identity of the parties to the actions;

(2) the same claim, demand, or cause of action at issue; (3) a final judgment on the merits by a

court of competent jurisdiction in the first matter; and (4) the parties had a full opportunity to

litigate the matter. *See Tirozzi v. Shelby Ins. Co.*, 719 A.2d 62, 65 (Conn. App. Ct. 1998).

Where the elements are met, res judicata raises an "absolute bar to a subsequent action on the

same claim." *Joe's Pizza, Inc. v. Aetna Life and Cas. Co.*, 675 A.2d 441, 448 (Conn. 1996).

Claims which could have been brought in the prior action are also barred. *See Rivet v. Regions*

---

[16]Plaintiff argues that the affirmative defense of res judicata cannot be raised in a Rule 12(b)(6) motion unless all relevant facts are shown in the court's own record, of which the court can take judicial notice. (WWE Resp. 2) *See Day v. Moscow*, 955 F.2d 807, 811 (2d Cir. 1992) ("Generally res judicata is an affirmative defense to be pleaded in the defendant's answer.") (citing Fed. R. Civ. P. 8(c)). Plaintiff asserts that the Shenker Defendants' submission of WWE's counterclaims in the Connecticut action and the Connecticut Order do not contain all relevant facts and are not in this Court's own record. (WWE Resp. 2; Tr. 125) However, the issue of res judicata is raised by the Amended Complaint because Plaintiff seeks to recover against the Shenker Defendants damages arising out of the same transaction alleged in Plaintiff's Connecticut cross-complaint. *Cf. IHS Acquisition XV, Inc. v. Kings Harbor Care Center*, No. 98 Civ. 7621, 1999 WL 223152, at *2 (S.D.N.Y. Apr. 16, 1999) (denying motion to dismiss based on affirmative defense of illegality where complaint did not raise the issue of illegality). Moreover, the Court properly can take judicial notice of the filings and the October 16, 2003 Order in the Connecticut state court action. *See Green v. Warden, U.S. Penitentiary*, 699 F.2d 364, 369 (7th Cir. 1983) ("[F]ederal courts may also take notice of proceedings in other courts, both within and outside of the federal judicial system, if the proceedings have a direct relation to matters at issue."). The Connecticut filings present the allegations and the Connecticut Order outlines the judgement and the basis for the judgment in state court. Therefore, the Motion to Dismiss is appropriate at this stage. *See AmBase Corp.*, 326 F.3d at 72 (finding res judicata properly raised on a motion to dismiss where court took judicial notice of relevant facts in the record); *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998) ("An affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint."); *Day*, 955 F.2d at 811 (holding that res judicata may be raised in a pre-answer motion to dismiss).

*Bank of Louisiana,* 522 U.S. 470, 476 (1998) (noting that res judicata prohibits relitigation of issues that either "were or could have been raised" (quotations omitted)).

In order to determine if res judicata applies, the Court must compare "the complaint in this action with the pleadings and the judgment in the earlier action." *Joe's Pizza, Inc.*, 675 A.2d at 447. Here, the Court has the Amended Complaint, the October 16, 2003 Order from the Connecticut court, WWE's answer and counterclaim in Connecticut, and the stipulated pre-judgment remedy in the Connecticut action. Therefore, the Court has a sufficient basis for determining the application of res judicata.

Because the Defendants chose to raise the affirmative defense of res judicata in a Rule 12(b)(6) motion, Defendants must accept the more stringent standard of review for a motion to dismiss. The defense must be supported by facts appearing on the face of the complaint and the motion may be granted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1494 (2d Cir. 1992).

a. Identity of Parties

Here, the first requirement for res judicata is met – the parties in the state and federal actions are the same or in privity. Although Shenker is not presently a party in his personal capacity in the Connecticut action, he is in privity with SSAI because he is the President and sole shareholder of SSAI. *See Joe's Pizza, Inc.*, 675 A.2d at 445 (adopting § 59 of the Restatement (Second) of Judgments in holding that a judgment against the shareholders of a closely held corporation is binding upon the corporation). SSAI and WWE are parties in both this action and the Connecticut action.

<u>                                        b.  Identity of Claims</u>

As to the second requirement, Connecticut takes a transactional approach in determining whether claims are the same.  *See AmBase*, 326 F.3d at 73 ("'The determination, therefore, whether the doctrine shall be invoked is now based on the underlying transaction and not on substantive legal theories or types of relief which are sought.'" (quoting *Maldonado v. Flynn*, 417 A.2d 378, 381-82 (Del. Ch. 1980))).  Transaction refers to a "'common nucleus of operative facts.'"  *Id.* (quoting *Schnell v. Porta Sys. Corp.*, No. Civ. 12,948, 1994 WL 148276, at *4 (De. Ch. Apr. 12, 1994).  "'[I]f the pleadings framing the issues in the first action would have permitted the raising of the issue sought to be raised in the second action, and if the facts were known, or could have been known, to the plaintiff in the second action at the time of the first action,' then the claims in the second action are precluded."  *Id.*  (quoting *Ezzes v. Ackerman,* 234 A.2d 444, 445-56 (De. 1967)).

A comparison of the pleadings and the Order in the Connecticut case reveals that this action arises out of a common nucleus of operative facts as the Connecticut action.  WWE's counterclaims in the Connecticut action consist of allegations that Shenker and Bell received kickbacks from WWE's licensees, including Jakks, in exchange for licenses.  (Freeman Decl. Exs. C, E; Gruenglas Decl. Exs. C, E)  These same facts – that potential licensees, including Jakks, made improper payments to Shenker, SSAI and/or Bell in order to obtain favorable licensing agreements – form the core of WWE's RICO allegations in this action.  *See Tafflin v. Levitt*, 493 U.S. 455, 458 (1990) (holding that state and federal courts have concurrent jurisdiction over civil RICO claims).

Despite Shenker's perjury and Shenker's and Bell's destruction of evidence, WWE knew

about Stanfull and Jakks's role in the bribery scheme during the pendency of the Connecticut

action and could have added a RICO claim in that action.  In the October 16, 2003 Order

dismissing Shenker's complaint and entering a default judgment in favor of WWE, the court

noted that Shenker had perjured himself about the existence of Stanfull and about improper

payments made by licensees, including Jakks.  *Stanley Shenker and Assocs., Inc.*, 844 A.2d at

970.  WWE, therefore, knew before the entry of the Order about Stanfull and the payments by

Jakks to Shenker.  Indeed, WWE had obtained copies of invoices revealing the payment scheme

between Bell and Shenker as early as September 26, 2002.  (Freeman Decl. Ex. B)  Moreover, in

February 2003, WWE alleged a RICO violation against Bell in an action in Connecticut court.

(Gruenglas Decl. Ex. C)  WWE filed its motion for sanctions in the Shenker action, upon which

the October 16, 2003 Order was based, on May 23, 2003.  (WWE Resp. 7)  Thus, even if WWE

did not know the full extent of the facts supporting a RICO claim, WWE knew enough to plead a

RICO violation in Connecticut state court.[17]  *See Rivet*, 522 U.S. at 474 (res judicata bars

relitigation of "issues that were or could have been raised" in previous action).

### c.  Final Judgment on the Merits

The third requirement is that the judgment be both on the merits and final.  However, this

requirement cannot be met here.  Connecticut Justice Roberts explicitly stated in the 2003 Order

that the court's "findings do not constitute findings regarding the merits of the underlying case."

*Stanley Shenker and Assocs., Inc.*, 844 A.2d at 966 n.1.  The court's basis for dismissing the

---

[17]Plaintiff argues that Shenker cannot rely upon the doctrine of res judicata because he
perjured himself and destroyed evidence in the Connecticut action, which precluded Plaintiff
from pleading the RICO claim in that action.  (WWE Resp. 3)  The discussion above reveals that,
despite Shenker's initial perjury, he was forced to "come clean" before the action was over and
with sufficient time for WWE to add a RICO claim in that action.

action and entering a default judgment in favor of WWE was Shenker's "own admissions of [discovery] misconduct," not the underlying merits. *Id.*

Furthermore, the October 16, 2003 Order is not a final judgment. In Connecticut, a default judgment ordinarily "admits the material facts constituting a cause of action." *Kloter v. Carabetta Enters., Inc.*, 442 A.2d 63, 64 (1982). The party against whom the default judgment was entered, however, "may still contest liability at a hearing in damages, provided that he has given notice . . . of his intention to do so." *Id.* Where timely notice is given pursuant to Connecticut Practice Book § 17-34, a defaulting party may still "contradict the allegations of the complaint and prove matters of defense in addition to contesting the amount of damages." *Whalen v. Ives*, 654 A.2d 798, 804 (Conn. App. Ct. 1995); *cf. Lawton v. Weiner*, 882 A.2d 151, 162-63 (Conn. App. Ct. 2005) (precluding defaulted party from challenging allegations in the complaint because he failed to file a timely notice of defenses).

The Shenker Defendants have served notice in Connecticut court pursuant to Connecticut Practice Book § 17-34 that "they intend to challenge certain material allegations of WWE's counterclaims and to assert various defenses at the damages hearing." (Letter from Michael A. Freeman to the Court 2, Jan. 19, 2006) The provisions of § 17-34 essentially give the Shenker Defendants an opportunity to re-open the default judgment that was entered against them. *See Schwartz v. Milazzo*, 852 A.2d 847, 850 (Conn. App. Ct. 2004) ("This approximates what the defendant[s] would have been able to do if [they] had filed an answer and special defenses." (quotations omitted)). Therefore, there is nothing to suggest that the dismissal and default entered on October 16, 2003 was final.

d.  Full and Fair Opportunity to Litigate

As to the fourth and final element, WWE did not have an opportunity to fully and fairly litigate its RICO claim in the Connecticut action. Even though WWE had sufficient facts to plead a RICO violation against the Shenker Defendants in the Connecticut action, because of Shenker's persistent and pervasive abuse of the discovery process, WWE never had an opportunity to actually litigate its counterclaims. The October 16, 2003 Order dismissed SSAI's suit against WWE and entered a default judgment in favor of WWE as a sanction for Shenker's perjury and abuse of the discovery process. The Connecticut court did not reach any conclusions regarding WWE's allegations against SSAI or SSAI's defenses to those allegations. As such, WWE's counterclaims were not litigated in the Connecticut action.

The Shenker Defendants cannot meet the third and fourth requirements for res judicata according to Connecticut law. Therefore, the Shenker Defendants' Motion to preclude Plaintiff's RICO claim on the ground of res judicata is denied without prejudice. If circumstances change such that the requirements for res judicata are met, the Shenker Defendants may inform the Court at that time, and, if appropriate, seek leave to refile the Motion.

### 2. Prior Pending Action Doctrine

Alternatively, Defendants argue that the Court should dismiss or stay this action under its inherent power as articulated in the prior pending action doctrine. *See Cont'l Time Corp. v. Swiss Credit Bank*, 543 F.Supp. 408, 410 (S.D.N.Y. 1982). If the Court finds that there has not been a final adjudication on the merits in the Connecticut actions, the Court can abstain from exercising its jurisdiction by dismissing the federal action in favor of the prior pending state proceedings. But, as Plaintiff points out, the Court is to exercise its power to abstain only in extraordinary circumstances. *Colorado River Water Conservation Dist. v. United States*, 424

U.S. 800, 813 (1976) ("Abstention from the exercise of federal jurisdiction is the exception, not the rule.")

Where subject matter jurisdiction is proper, federal courts have a "'virtually unflagging obligation'" to exercise that jurisdiction. *Bethlehem Contracting Co. v. Lehrer/McGovern, Inc.*, 800 F.2d 325, 327 (2d Cir. 1986) (quoting *Colorado River*, 424 U.S. at 817-18) "[T]he decision whether to dismiss a federal action because of parallel state-court litigation does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 16 (1983).

The factors the court should consider include:  (1) the assumption of jurisdiction by either court over any res or property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained by the concurrent forums; (5) whether state or federal law supplies the rule of decision; and (6) whether the state court proceeding will adequately protect the rights of the party seeking to invoke federal jurisdiction. *See id.* at 19, 23-27; *see also Linens of Europe, Inc. v. Best Mfg., Inc.*, No. 03 Civ. 9612, 2004 WL 2071689, at *5 (S.D.N.Y. Sep. 16, 2004) (citing *Vill. of Westfield v. Welch's*, 170 F.3d 116, 120 (2d Cir. 1999)).  "The weight to be given to any one factor may vary greatly from case to case, depending on the particular setting of the case." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 16.

a.  Jurisdiction Over the Res

The first factor is the Court's assumption of jurisdiction over the res or any property. This factor weighs against abstention here because there is neither res nor property at stake in

either jurisdiction. "'[T]he facial neutrality of a factor is a basis for retaining jurisdiction, not for yielding it.'" *Linens of Europe, Inc.*, 2004 WL 2071689, at *5 (quoting *Woodford v. Community Action Agency of Greene County, Inc.*, 239 F.3d 517, 522 (2d Cir. 2001)).

b.  Inconvenience of the Federal Forum

The next factor is the inconvenience of the federal forum.  This factor also weighs against abstention.  One consideration in determining this factor is the distance between the state and federal fora.  Here, the distance is not far from Connecticut to New York.  *See SST Global Tech., LLC v. Chapman*, 270 F. Supp. 2d 444, 465 (S.D.N.Y. 2003) (holding that the distance between the federal forum in New York and the state forum in Delaware was not sufficiently far to find the federal forum inconvenient).

c.  Avoidance of Piecemeal Litigation

The next factor invokes the obvious desire to avoid piecemeal litigation.  This factor also weighs against abstention.  WWE did not bring a RICO cause of action against the Shenker Defendants in Connecticut state court.  For the reasons discussed above, WWE is not precluded under res judicata from now bringing a RICO claim against the Shenker Defendants in federal court.  However, if the Court were to abstain as to the Shenker Defendants on the RICO claim, WWE would still be required to litigate its RICO action against the remaining Defendants now, and then return to federal court after the completion of the state court action, and potentially litigate the same RICO claim against the Shenker Defendants.  Thus, if anything, abstention here would be more likely to result in piecemeal litigation.

Furthermore, because of the procedural posture of the case, all claims against all parties cannot be resolved in one forum.  *See SST Global Tech., LLC*, 270 F. Supp. 2d at 465 ("A related

47

aspect of piecemeal litigation . . . is whether resolution in one forum will resolve the claims as to all parties."). SSAI sued WWE in state court. WWE cross-claimed against SSAI, but asserted neither a RICO violation nor an RPA or Sherman Act violation. WWE's federal action against SSAI includes those claims. Even if the Court abstained on the RICO claim, SSAI would be required to litigate the RPA and Sherman Act claims in federal court. Therefore, piecemeal litigation would not be avoided by abstaining. *Linens of Europe, Inc.*, 2004 WL 2071689, at *6 ("'Indeed, abstention is clearly improper when,' as here, 'a federal suit alleges claims within the exclusive jurisdiction of the federal courts.'") (quoting *Andrea Theatres, Inc. v. Theatre Confections, Inc.*, 787 F.2d 59, 62 (2d Cir.1986)); *SST Global Tech., LLC*, 270 F. Supp. 2d at 465; *Johnson v. Nyack Hosp.*, 964 F.2d 116, 122 (2d Cir. 1992) (finding that Sherman Act claims are within the exclusive jurisdiction of the federal courts).[18]

### d. Order in Which Actions Were Filed

The next factor – the order in which the actions were filed – clearly weighs in favor of abstention. SSAI filed its action in state court in October 2000. (Am. Compl. ¶ 190) The federal court action was filed in October 2004, four years later. However, "priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made on the two actions." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 21. In the state court action, extensive discovery has been conducted consisting of "the production of more than 92,000 pages of documents, the taking of more than twenty-five depositions, and the filing of more than 150 motions, briefs and other pleadings." *Stanley Shenker and Assocs., Inc.*,

---

[18]While the Court dismisses the RPA and Sherman Act claims, Plaintiff still may pursue the anti-trust claims, either through an appeal or by seeking leave to amend the Amended Complaint.

844 A.2d at 966.  The Connecticut court has rendered several judgments in the case and a hearing

on damages is scheduled.[19]  In the federal action, on the other hand, no discovery has occurred

and the court has not rendered any substantive judgments.

### e.  Law Which Supplies the Rule of Decision

The next factor involves consideration of which law governs.  This factor weighs heavily

against abstention because federal law supplies the rule of decision on the RICO, RPA, and

Sherman Act claims.  *See Johnson*, 964 F.2d at 122.

### f.  Adequate Protection of Rights

Finally, the Court is to consider whether the state court will adequately protect WWE's

rights.  This factor also weighs against abstention.  The claims asserted against the Shenker

Defendants in the federal action are not the same as the cross-claims asserted by WWE against

SSAI in the Connecticut action.  *Compare Radioactive, J.V. v. Manson*, 153 F. Supp. 2d 462, 476

(S.D.N.Y. 2001) (finding that state court could adequately protect plaintiff's rights because all

claims were raised in both the federal and state actions).  Although WWE has the potential to

recover treble damages in both the state and federal actions, *see* 18 U.S.C. § 1964(c); Conn. Stat.

Gen. § 52-564, WWE cannot amend its Connecticut complaint to include a Sherman Act claim

because the federal courts have exclusive jurisdiction over such claims.  Because its claims

against the Shenker Defendants include a cause of action over which the federal courts have

exclusive jurisdiction, WWE's rights cannot be adequately protected in state court.  *Andrea*

---

[19]As discussed above, the Shenker Defendants intend to challenge WWE's claims at the
damages hearing pursuant to Connecticut Practice Book § 17-34.  Consequently, the damages
hearing is not in the posture of an ordinary damages hearing.  That said, the Connecticut case is
significantly closer to conclusion than the federal case.

*Theatres, Inc.*, 787 F.2d at 62 ("[A]bstention is clearly improper when a federal suit alleges claims within the exclusive jurisdiction of the federal courts.").  Moreover, as noted above, while WWE could pursue its RICO claims against the Shenker Defendants in Connecticut, it is unclear that it could also pursue those claims in Connecticut against the remaining Defendants.  Thus, it is optimal for WWE to bring the RICO claims against all Defendants here in federal court.

g.  Balancing the Factors

In balancing the factors outlined above, the Court must keep in mind that the "balance [is] heavily weighted in favor of the exercise of jurisdiction," *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 16, and that "no single factor is necessarily decisive."[20] *DeCisneros v. Younger*, 871 F.2d 305, 307 (2d Cir. 1989).  The first, second, third, fifth, and sixth factors all weigh against abstention.  Only the fourth factor – the order in which the actions were filed – weighs in favor of abstention.  Even though the Connecticut action is nearly complete, abstaining would not avoid piecemeal litigation because WWE would be required to litigate the RICO claims in federal court against

---

[20]The Shenker Defendants urge the Court to also consider whether WWE's federal claims are "vexatious or reactive."  (Shenker Reply 8)  The Supreme Court credited the suggestion that the purpose behind filing a second lawsuit could be useful in deciding whether to abstain.  However, the Court did not adopt it as a factor.  *See Moses H. Cone*, 460 U.S. at 17 n.20.

In any event, the Shenker Defendants argue that, because WWE has already obtained a default judgment in Connecticut, which entitles them to damages commensurate to what they could recover in federal court, WWE's subsequent federal suit must have been filed with a vexatious purpose.  However, the default judgment in favor of WWE appears to have entitled WWE to little more than a delayed trial on the merits in the form of a damages hearing.  *See supra* Part II.D.1.  Additionally, although the RICO claim arose out of the same facts as WWE's cross-claims in Connecticut court, WWE has obtained additional facts (despite the Shenker Defendants' alleged attempts to conceal them), named additional Defendants, and added federal causes of action.  Thus, there is nothing to suggest that WWE's federal suit was a "reactive defensive maneuver . . . to delay the state proceeding and postpone final resolution of its dispute" with the Shenker Defendants.  *Calvert Fire Ins. Co. v. Am. Mut. Reinsurance Co.*, 600 F.2d 1228, 1234 (7th Cir. 1979).

the remaining Defendants and there is a possibility of further litigation of the RPA and Sherman
Act claims.  The law of decision on both the RICO, RPA, and Sherman Act claims is federal law
and the federal forum is not inconvenient for any Party.  Accordingly, the Court finds that this
case does not fall into one of the narrow exceptions to the mandate that it exercise its proper
jurisdiction.[21]

### 3.  "One Satisfaction Rule"

Finally, the Shenker Defendants contend that the "one satisfaction rule" bars Plaintiff
from pursuing its RICO claim against them in federal court.  The "one satisfaction rule" states
that "[a] plaintiff may not recover twice for the same injury."  *Phelan v. Local 305 of the United
Assoc. of Journeymen*, 973 F.2d 1050, 1063 (2d Cir. 1992).  The key inquiry here is whether the
injury for which WWE sued in state court is the same as that for which it is suing under RICO in
the federal court.  "To the extent that the damages that may be established in the two actions may
prove identical, there can be but one satisfaction."  *Continuous Zinc Furnace Co. v. Am. Smelting
& Refining Co.*, 61 F.2d 958, 959 (2d Cir. 1932).

As discussed in the context of the application of res judicata above, it appears that
Plaintiff's state and federal claims against the Shenker Defendants are based on the same injury.

---

[21]A comparison with a case where the court found that the balance of factors weighed in
favor of abstention illustrates why abstention is inappropriate here.  In *Radioactive, J.V.*, 153 F.
Supp. 2d at 476, the court noted, among other things, that California (where the state action was
commenced) and New York (where the federal action was commenced) were sufficiently far
from one another to render the federal forum inconvenient, that plaintiff's complaint in the
federal action was identical to its cross-complaint in the state action and the state court had
refused to dismiss the state action, that all of the claims in both actions were governed by state
law, and that there was no reason to believe the state court could not adequately protect the
plaintiff's interest.  153 F. Supp. at 473-78.  None of those considerations is present here.  Thus,
abstention is not appropriate here.

Plaintiff's counterclaims in the Connecticut action allege, in sum and substance, that SSAI, through Shenker, conspired with Bell to provide favorable licensing terms to Plaintiff's licensees in exchange for unlawful payments from those licensees.  In addition, Shenker allegedly conspired with Bell to defraud Plaintiff into paying SSAI license commissions to which it was not entitled.  (Am. Compl. ¶¶ 151, 186)  Plaintiff's RICO claim in federal court includes the same factual allegations.  (Am. Compl. ¶¶ 249-58)

To the extent that Plaintiff recovers on its counterclaims in the Connecticut action, and to the extent that Plaintiff cannot show that the Connecticut claims arose from different facts or that the injury suffered was different, WWE's state court recovery should be set off against any recovery Plaintiff receives on its federal civil RICO claim.  *See Phelan*, 973 F.2d at 1063 (holding that damages recovered in federal court action should be reduced by amount recovered in NLRB proceeding); *United States v. Zan Mach. Co., Inc.*, 803 F. Supp. 620, 624 (E.D.N.Y. 1992) (reducing government's set off against one tortfeasor by the amount recovered in settlement with another tortfeasor where claims arose out of same allegations and injury to the government was the same).

        E.  Sherman Act Claim

            1. The Antitrust Allegations

In Count III of the Amended Complaint, Plaintiff alleges that all Defendants, other than Jakks Pacific and Road Champs, conspired to unreasonably restrain trade, in violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  Defendants seek dismissal of this Count, claiming that Plaintiff:  (i) has not alleged the requisite antitrust injury from Defendants' conduct; (ii) has not pled a substantive antitrust violation under § 1; and (iii) cannot prevail because the four-year

52

statute of limitations ran before the Complaint was filed.  The Court finds the first argument

persuasive and dismisses Count III on that basis.

      To put Defendants' Motion in the proper perspective, it is important to review Plaintiff's

allegations regarding the purported antitrust violation.  In Count III, Plaintiff alleges that

Defendants conspired to unreasonably restrain trade by "agreeing and conspiring to rig the terms

of the bid that would be offered by the conspiring competitors to [Plaintiff] for the videogame

license," including the royalty rate ultimately accepted by Plaintiff.  (Am. Compl. ¶ 267)

According to the Amended Complaint, the "bid rigging" conspiracy "foreclos[ed] competition"

for the video game license.  (Am. Compl. ¶ 267)  As a result, Plaintiff "received less favorable

license terms (including, but not limited to, a lower than market royalty rate) than WWE would

have received if the conspiracy had not foreclosed the competitive operation of the market."

(Am. Compl. ¶ 270)

      The factual allegations, however, tell a different story.  In early 1997, Defendant Jakks

was allegedly concerned about intense competition in the market for WWE toys from a company

known as Playmates.  (Am. Compl. ¶¶ 57-62)  In particular, Jakks was concerned that Playmates

could get WWE's first international toy license, as well as other domestic toy licenses.  To

eliminate this competitive threat, Jakks allegedly directed the Shenker Defendants to use their

influence with WWE to obtain licensing rights for Jakks that would conflict with the domestic

licensing rights previously given to Playmates, which the Shenker Defendants purportedly did.

(Am. Compl. ¶¶ 63-66)  Also, through the supposedly corrupt influence of Shenker, Jakks

obtained an amendment to its original toy license agreement and an agreement procuring WWE's

international toy license.  (Am. Compl. ¶¶ 67-68, 71)  As might be expected, Playmates did not

react favorably to being squeezed out, and complained to WWE about not acting in good faith by
not permitting Playmates to submit a competing bid to WWE.  (Am. Compl. ¶ 70)

      In reaction, Shenker, who by then had been retained by WWE as its exclusive licensing
agent (allegedly without WWE's knowledge of the corrupt arrangement between Jakks and the
Shenker Defendants), approached Bell about having Jakks buy Playmates out in order to
eliminate them as a competitor.  (Am. Compl. ¶ 79)  It was also around this time that Shenker
allegedly first proposed to Bell, who was going through marital difficulties, the possibility of
accepting payments in return for favorable treatment of Jakks's licensing rights, including those
rights that WWE might sell in connection with video games.  (Am. Compl. ¶ 80)  Bell is alleged
to have agreed "to the corrupt plan to give favorable treatment to Jakks on licensing matters and
to violate his fiduciary duties and duty of honest services to WWE in order to do so."  (Am.
Compl. ¶ 82)  In November 1997, as part of this plan, Bell persuaded Playmates to give up its
licensing rights, thus allegedly denying WWE $376,391.64 left to be paid by Playmates to WWE
on its licensing guarantee.  (Am. Compl. ¶¶ 83, 92-93)  According to the Complaint, Shenker and
Bell were paid for these allegedly corrupt services in January 1998.  (Am. Compl. ¶¶ 84-91, 94-
99)

      Fresh from this success, Jakks is said to have turned its attention to the WWE video game
license, which was up for renewal and was held at that time by a company known as Acclaim.
(Am. Compl. ¶¶ 100-01)  Bell was in charge of the video game license renewal, and, therefore as
part of the allegedly corrupt plan to assist Jakks, Bell and Shenker were to ensure that Acclaim
would not get to renew that license.  (Am. Compl. ¶ 104)  Indeed, the Amended Complaint
alleges that Bell was expecting to receive a sum of money when he "formally recommend[ed] to

WWE that Jakks be awarded the video game license." (Am. Compl. ¶ 106)  Doing as he was

paid to do, Bell allegedly advised Acclaim that he would not even review any application for a

license renewal, and Bell and Shenker made no effort to contact any other potential bidder for the

video game license.  (Am. Compl. ¶¶ 108-09)  As had Playmates, Acclaim complained to WWE

management about being boxed out of a competitive process.  (Am. Compl. ¶ 109)  Nonetheless,

Bell recommended to WWE management that it grant the video game license to Jakks.  (Am.

Compl. ¶ 111)  For this deed, Bell allegedly received $20,000 a few days thereafter.  (Am.

Compl. ¶ 113)  Unaware of the payments to Bell or Shenker, on April 8, 1998, WWE

management approved Jakks as the video game licensee, and advised Acclaim that it would not

renew its license.  (Am. Compl. ¶ 114)

However, things did not go as smoothly with the video game license as it had with the toy

license.  According to the Amended Complaint, "a series of events occurred *which threatened to*

*expose the illegal plan to obtain the video game license at below-market rates by corruption of*

*WWE's agents*." (Am. Compl. ¶ 117) (emphasis added)  Soon after Bell and Shenker had

recommended to WWE that it grant Jakks the video game license, two other companies,

Activision and Defendant THQ contacted Bell and/or Shenker to express an interest in bidding

for the video game license, and Activision even went so far as to submit informal proposals for

the license.  (Am. Compl. ¶¶ 127-29, 131-32)  According to the Amended Complaint, the specter

of these two competitors "jeopardized Jakks' illicit plan to obtain valuable licensing rights at

below-market rates by corrupting Shenker and Bell since questions would be raised if WWE

went forward with the Jakks proposed license and later learned that WWE agents, [Shenker] and

Bell, had been told that clearly superior offers from THQ and Activision would be forthcoming."

55

(Am. Compl. ¶ 133)

According to the Amended Complaint, Bell, Shenker, and Jakks acted quickly to conceal their ongoing bribery scheme to corruptly influence the licensing of WWE's intellectual property rights.  For example, "*[i]n order to conceal the illicit plan and see it to fruition*, SSAI and Bell did not provide WWE management with copies of the April 23, 1998 letter from THQ or the April 27, 1998 Activision informal proposal."  (Am. Compl. ¶ 134) (emphasis added) Furthermore, "[i]n direct response to the threat of competition, *and in order to maintain control over the videogame licensing process it had acquired by the corruption of WWE licensing agents*, Jakks . . . secured the agreement of THQ . . . not to make an independent bid to secure the video game license in its own right."  (Am. Compl. ¶ 137) (emphasis added)  Indeed, to bring THQ into the fold, Defendant Friedman allegedly told Defendant Farrell "that Jakks was in control of the videogame license, had access to the terms Activision had informally proposed, and that THQ could participate in the revenue stream from the videogame license at a lower-than-market royalty rate if THQ did not independently bid but instead joined Jakks to make a proposal . . . ."  (Am. Compl. ¶ 137)  THQ agreed, and became part of a joint venture with Jakks that submitted a bid to WWE.  (Am. Compl. ¶¶ 144, 146, 154)

Based on the allegedly corrupt recommendation of Bell and Shenker, on June 10, 1998, WWE executed a licensing agreement with the Jakks/THQ joint venture, after having earlier accepted their joint bid.  (Am. Compl. ¶¶ 146-49, 151)  It is important to note, however, that according to the Complaint, WWE management never knew about Activision's interest in submitting a bid.  In fact, Shenker and Bell ignored, and did not forward to WWE management, a formal proposal later prepared by Activision.  They also did not solicit an increased bid from

Activision.  (Am. Compl. ¶ 153)  Moreover, Bell and Shenker allegedly shared Activision's earlier informal bid with Jakks and THQ officials so they could make their bid slightly more comparable to Activision's informal offer.  (Am. Compl. ¶ 145)  As a result, according to the Amended Complaint, the joint bid ultimately accepted by WWE was allegedly fifty to sixty percent lower than what WWE could have earned from a competitive bid, thus costing WWE millions of dollars of lost royalties.  (Am. Compl. ¶¶ 163-64)

After Jakks secured the video game license, its allegedly corrupt relationship with Shenker and Bell continued.  On June 24, 1998, "as a necessary and essential part of the commercial bribery scheme," Shenker and Bell secured an extension of the terms of Jakks's domestic and international toy licenses to coincide with the term of the video game license. (Am. Compl. ¶ 165)  When the commercial bribery scheme was once again threatened with exposure during discovery associated with SSAI's suit against WWE in Connecticut state court, Jakks allegedly took steps to conceal the scheme.  For example, in response to a subpoena dated June 11, 2002, Jakks reportedly failed to produce any documents reflecting payments made to Shenker or revealing the fact that Shenker had acted as Jakks's agent.  (Am. Compl. ¶ 198)  In response to WWE's repeated requests, Jakks allegedly continued to deny having made payments to Shenker.  (Am. Compl. ¶¶ 201-07)  It was not until November 11, 2003, after Shenker had recanted his perjured testimony in the Connecticut action and the Connecticut Order was issued in which Jakks was specifically identified as one of WWE's licensees that had made improper payments to Shenker, that Jakks "found" evidence of payments to Shenker in its files and turned them over to WWE.  (Am. Compl. ¶¶ 214-20, 222, 228, 230)

2.  Discussion

57

Before discovery, courts should dismiss antitrust complaints "sparingly" where the proof of the alleged antitrust violation is largely in the hands of the defendants. *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746-47 (1976) (characterizing the standard for dismissal of antitrust allegations as "concededly rigorous"); *see also Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll.*, 128 F.3d 59, 63 (2d Cir. 1997) (finding allegations of interstate commerce sufficient to plead interstate commerce component of antitrust violations). "Nevertheless, an antitrust complaint is insufficient if it simply contains 'conclusory allegations which merely recite the litany of antitrust.'" *Rock TV v. Time Warner, Inc.*, No. 97 Civ. 0161, 1998 WL 37498, at *2 (S.D.N.Y. Jan. 30, 1998) (quoting *Sage Realty Group v. ISS Cleaning Servs. Group, Inc.*, 936 F. Supp. 130, 135 (S.D.N.Y. 1996)). "Rather, an antitrust complaint must adequately . . . define the relevant product market, . . . allege antitrust injury, [and] . . . allege conduct in violation of the antitrust laws." *Rock TV*, 1998 WL 37498, at *2 (quotations and citations omitted) (ellipses in original).

Plaintiff claims that the conduct described above in detail violates § 1 of the Sherman Antitrust Act. However, that provision does not provide for a private right of action. Instead, a plaintiff alleging injury from an antitrust violation may seek damages only under § 4 of the Clayton Act, which authorizes private lawsuits by "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a). "It is a well-established principle that, while the United States is authorized to sue anyone violating the federal antitrust laws, a private plaintiff must demonstrate 'standing.'" *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 436 (2d Cir. 2005). "This standing requirement originates in the Supreme Court's recognition that, although § 4 of the Clayton Act appears to

58

confer a broad private right of action for antitrust damages, 'Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.'" *Daniel*, 428 F.3d at 436-37 (quoting *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 534 (1983)); *see also HyPoint Tech. Inc. v. Hewlett-Packard Co.*, 949 F.2d 874, 877 (6th Cir. 1991) ("Antitrust standing to sue is at the center of all antitrust law and policy.  It is not a mere technicality.  It is the glue that cements each suit with the purposes of the antitrust laws, and prevents abuses of these laws.").  In part, this is in recognition of the oft-quoted observation that "the antitrust laws . . . were enacted 'for the protection of *competition*, not *competitors*.'" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (quoting *Brown Shoe v. United States*, 370 U.S. 294, 320 (1962)).

"In order to have standing to bring a private antitrust action, a plaintiff must allege both antitrust injury and antitrust standing." *Arnold Chevrolet LLC v. Tribune Co.*, No. 04 Civ. 3097, 2006 WL 497202, at *5 (E.D.N.Y. March 2, 2006); *see also Balaklaw v. Lovell*, 14 F.3d 793, 798 n.2 (2d Cir. 1994).  Based on several Supreme Court decisions, the Second Circuit recently articulated the following factors to consider when determining antitrust standing:

> [A]n injury in fact (1) to plaintiffs' business or property, (2) that is not remote from or duplicative of that sustained by a more directly injured party, (3) that qualifies as an "antitrust injury," and (4) that translates into reasonably quantifiable damages.

*Daniel*, 428 F.3d at 437-38 (citations omitted).[22]

---

[22]*Accord In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165-66 (3rd Cir. 1993) (noting that the factors include:  "'(1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type

The usual starting point for any standing inquiry is whether plaintiff has alleged an antitrust injury. *See Balaklaw*, 14 F.3d at 797 n.9 (describing "two-pronged analysis" beginning with question of whether plaintiff suffered from antitrust injury); *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 395 (7th Cir. 1993) (noting that antitrust injury and causation are determined before evaluating other factors). Antitrust injury is more than just a personal injury. *See Arnold Chevrolet*, 2006 WL 497202, at *5. Rather, "[a]ntitrust injury involves a causation requirement in order to define the class of potential plaintiffs eligible to bring suit – those 'injured . . . by anything forbidden in the antitrust laws.'" *Greater Rockford*, 998 F.2d at 395 (quoting *In re Indus. Gas Antitrust Litig.*, 681 F.2d 514, 516 (7th Cir. 1982) (ellipses in original)); *see also Brunswick Corp.*, 429 U.S. at 97. "In establishing antitrust injury, courts must first delineate the *type* of interests protected by the antitrust laws, and second, must determine whether the violation was the cause-in-fact of the injury: that 'but for' the violation, the injury would not have occurred." *Greater Rockford Energy*, 998 F.2d at 395 (citations and quotations omitted).

In conducting this inquiry, "it is useful to distinguish the question of whether an antitrust

for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addressed the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.'") (quoting *Associated Gen. Contractors of California, Inc.*, 459 U.S. at 545); 2 Phillip E. Areeda, Herbert Hovenkamp & Roger D. Blair, *Antitrust Law* ¶ 335a (2d ed. 2000) ("In addition to proving everything that would entitle the government to relief, the private plaintiff must also show (1) that the acts violating the antitrust laws caused . . . the private party plaintiff injury in fact to its business or property; (2) that this injury is not too remote or duplicative of the recovery of a more directly injured person; (3) that such injury is 'antitrust injury,' which is defined as the kind of injury that the antitrust laws were intended to prevent and flows from that which makes defendants' acts unlawful; and, in a damage case, (4) that the damages claimed or awarded measure such injury in a reasonably quantifiable way." (quotations omitted)).

violation occurred from whether plaintiffs have standing to pursue it.  To avoid confusing these issues, some courts and commentators have suggested assuming the existence of a violation in addressing the issue of standing." *Daniel*, 428 F.3d at 437.  Here, while it "is by no means clear" that Plaintiff has sufficiently alleged an antitrust violation, *id.*, for purposes of this Motion the Court will presume that Plaintiff has pled a *per se* violation of § 1.[23]

Plaintiff suggests that merely by asserting a *per se* violation, in this case the allegedly corrupt agreement between Jakks and THQ to submit a joint bid, Plaintiff has established antitrust injury.  (WWE Sherman Act Resp. 20-21)  This is a curious claim since the Supreme Court has expressly rejected the idea that "no antitrust injury need be shown where a *per se* violation is involved." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 341 (1990).  "The *per se* rule is a method of determining whether § 1 of the Sherman Act has been violated, but it does not indicate whether a private plaintiff has suffered antitrust injury and thus may recover damages under § 4 of the Clayton Act." *Atl. Richfield*, 495 U.S. at 341-42; *see also* Areeda, *supra*, ¶ 337 ("Just as harm to competition is thus presumed in finding a substantive violation, an occasional court presumed antitrust injury as well.  However, such a presumption confuses the violation with the remedy.  No matter how clear the violation, the private plaintiff must still

---

[23]The Parties have sacrificed a great number of trees in briefing the question of whether the alleged joint bid by THQ/Jacks is governed by the rule of reason or *per se* analysis (Jakks Sherman Act Mem. 21-27; WWE Sherman Act Resp. 17-24; Jakks Sherman Act Reply 3-8).  Plaintiff argues strenuously that the joint bid by Jakks/THQ was part of a textbook bid-rigging scheme, which is a *per se* violation, while Jakks insists that the joint bid was lawful, under the rule of reason, as it was accepted by WWE knowing that it was a joint bid submitted by competitors.  (Jakks Sherman Act Mem. 22-24; WWE Sherman Act Resp. 21-24; Jakks Sherman Act Reply 3-8)  Resolution of this dispute, while potentially interesting, is unnecessary. *See Sage Realty*, 936 F. Supp. at 135 n.4 (granting motion to dismiss for failure to allege antitrust injury, even assuming plaintiffs' substantive antitrust allegations to be true).

prove that it was actually injured in order to recover damages."). Thus, while a *per se* violation

may relieve Plaintiff from demonstrating that a particular restraint on trade is unreasonably anti-

competitive under § 1 of the Sherman Act, *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S.

717, 723 (1988), it says nothing about whether that unreasonable restraint resulted in an antitrust

injury to Plaintiff under the Clayton Act. *See In Town Hotels Ltd. P'ship. v. Marriott Int'l, Inc.*,

246 F. Supp. 2d 469, 475 (S.D. W.Va. 2003) ("Even when the defendant's conduct is presumed

to injure competition, the question remains whether this particular plaintiff's injury was caused

by the competition-reducing aspect of the defendant's conduct."). "To recover under the Clayton

Act private plaintiffs must demonstrate that the injuries they suffered were caused by acts that

had a competition-reducing effect." *Volmar Distribs., Inc. v. New York Post Co.*, 825 F. Supp.

1153, 1159 (S.D.N.Y. 1993); *see also Daniel*, 428 F.3d at 438 ("The fact that private plaintiffs

have been injured by acts that violate the antitrust laws is not enough to confer standing to

sue.").[24]

Under these standards, Plaintiff's Amended Complaint fails to allege an antitrust injury

and fails to allege that but for Defendants' joint bid, Plaintiff would not have suffered any such

---

[24]There even is authority for the proposition, contrary to Plaintiff's suggestion, that "to satisfy the antitrust injury requirement, a plaintiff must show that 'the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice.'" *Sage Realty*, 936 F. Supp. at 135 (quoting *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 543 (2d Cir. 1993)). Plaintiff attempts to distinguish *Capital Imaging* as a case involving an antitrust allegation governed by the rule of reason, however, the Supreme Court has made clear that "[t]he need for . . . showing [antitrust injury] is at least as great under the *per se* rule as under the rule of reason." *Atl. Richfield*, 495 U.S. at 344. In any event, even if the Court assumes that Defendants' conduct had an actual adverse effect on competition, Plaintiff has failed to allege an antitrust injury from that adversely affected competition, or that Defendants' conduct was the cause of any antitrust injuries.

injury.  Fairly read, the Amended Complaint describes in impressive detail an extensive and, if true, astounding commercial bribery scheme.  The scheme initially only involved Jakks allegedly making improper payments to the Shenker Defendants to ensure that they steered whatever WWE licensing business they could to Jakks.  After a while, however, it became apparent to Jakks and the Shenker Defendants that coopting Bell would be essential not only to the continuation of the toy licenses, but to the future acquisition of the lucrative video game license. What initially made Bell indispensable was Playmates's effort to circumvent Shenker and make an appeal directly to WWE for a fair opportunity to bid on WWE's licenses.  Thus, Bell was brought into the bribery scheme and allegedly did what he was paid to do – get Playmates to agree to a buy-out.

Soon after the Playmates buy-out, Jakks and Shenker made a corrupt play for the video game license.  The first phase involved using Bell to scare off the current license-holder, Acclaim, from seeking to put in a renewal bid.  That apparently worked because Acclaim faded from the picture before there was any Jakks/THQ joint bid.  The next phase involved Shenker and Bell making a concerted effort to not solicit any bids for the video game license from any company other than Jakks.  Initially, this also worked as WWE, based on the recommendations of the allegedly crooked Bell and Shenker, accepted the Jakks bid.  However, the alleged schemers did not anticipate two unsolicited bidders (Activision and THQ), who appeared determined to get their potential bids to WWE management.  Specifically, concerned that any such end-run to WWE management would expose the bribery scheme, (Am. Compl. ¶ 137) Jakks approached THQ, told it that the bid was fixed, and convinced THQ to join in the scheme or face certain defeat in the bidding process.  The Amended Complaint says nothing of what happened to

63

Activision, other than that its formal bid, which the Amended Complaint acknowledges was more lucrative than what WWE accepted, was blocked by Bell and Shenker from getting to WWE management. Because this bid never made its way to WWE management, according to the Amended Complaint, WWE suffered the loss of millions of dollars of royalties.

As alleged, it is clear that Plaintiff has not suffered from an antitrust injury. Even if Defendants intended to engage in a bid-rigging scheme, and that scheme had a "competition-reducing effect" – both dubious assumptions – nothing about Jakks's cooptation of THQ, even in combination with the bribery scheme, prevented WWE from negotiating licensing agreements with other vendors. As such this case is virtually identical to *Fed. Paper Bd. Co. v. Amata*, 693 F. Supp. 1376 (D. Conn. 1988).

In *Amata*, plaintiff's employee, Amata, took bribes from suppliers in return for him recommending sales to plaintiff. *Id.* at 1380. The price at which plaintiff purchased its supplies concededly was inflated as a result of the bribes, thus plainly causing plaintiff economic injury. *Id.* Yet, the *Amata* court, in granting the motion to dismiss, held that there was no *antitrust* injury because there was no allegation that non-bribing suppliers could not compete, or that plaintiff could not purchase from non-bribing suppliers. *Id.* at 1383-84 (finding no claim in the complaint to suggest that suppliers who refused to pay bribes to Amata were "precluded from taking competitive actions in order to secure sales with Federal" or that "Amata and the suppliers paying him bribes could have prevented any other supplier from dealing with Federal"). The court recognized (as does this Court) that the bribes were unfair competition, but that alone did not make them an actionable restraint on trade under § 4 of the Clayton Act. *Id.* at 1383; *see also Calnetics Corp. v. Volkswagen*, 532 F.2d 674, 687 (9th Cir. 1976) (finding no antitrust

injury where there were allegations of commercial bribery without allegations of other acts tending to restrain trade); *Sterling Nelson & Sons, Inc. v. Rangen, Inc*, 235 F. Supp. 393 (D. Idaho 1964) (finding no antitrust injury where influential state employee was bribed to steer contracts to a particular company).

Plaintiff's allegation that Jakks and THQ engaged in bid rigging and price fixing does not change the analysis, because THQ and Jakks were only two of several competitors for the video game license. As in *Amata*, WWE failed to demonstrate how the joint bid, even combined with the bribery of Shenker and Bell, prevented competitive bids from being offered to, or accepted by, WWE's management. Indeed, the allegations in the Amended Complaint are even more problematic for Plaintiff here than in *Amata* because the Amended Complaint identifies competitors that were active in the bidding process for the video game licenses. Acclaim and Activision submitted proposed bids to Plaintiff despite Bell's and Shenker's attempts to discourage them from bidding. Given these allegations, the Amended Complaint fails to allege how the mere submission of the joint bid, by itself, caused antitrust harm to WWE. Put another way, even if the joint bid was artificially low, there is no allegation that WWE was forced to accept that bid.

Plaintiff counters by asserting that it suffered an antitrust injury because it was the victim of a bid-rigging conspiracy. Implicit in Plaintiff's argument is that all bid-rigging schemes necessarily deprive the "other party to the transaction of a fair price." (WWE Sherman Act Resp. 22) Yet, that is not at all true here. Plaintiff is really a victim of its own choice, albeit a choice allegedly influenced by its corrupt employee, to accept Defendants' joint (lower) bid in lieu of

other higher bids.[25]  Thus, there is no cognizable antitrust injury from the alleged joint bid or the

bribery scheme.

Aside from failing to allege an antitrust injury, Plaintiff fails to adequately allege that any

anti-competitive conduct was the cause of Plaintiff's injuries.  As noted, to "satisfy the antitrust

injury requirement, a § 4 plaintiff must show that its injury 'flows from that which makes

defendants' acts unlawful,' that 'but for' the alleged violation, the injuries would not have

occurred."  *Greater Rockford Energy*, 998 F.2d at 401 (quoting *Brunswick*, 429 U.S. at 489 and

*MCI Commc'ns. Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983)); *see also*

*Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 41 (2d Cir. 1986) ("[A]n essential element in

plaintiff[']s claim is that the injuries alleged would not have occurred but for [defendants']

antitrust violation."); *Cont'l Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater N.Y.,*

*Inc.*, 198 F.R.D. 41, 46 (E.D.N.Y. 2000) ("In order to satisfy the antitrust injury requirement, the

---

[25]Because Defendants did not rig all, or even close to all, of the bids available to WWE, this case is different from *Philip Morris Inc. v. Heinrich*, No. 95 Civ. 0328, 1996 WL 363156 (S.D.N.Y. June 28, 1996).  In that case, Philip Morris employed a formal bidding process where the purchasing department would secure one written bid and at least one alternative verbal price quotation.  *Id.* at *2.  The defendants' scheme took advantage of this by ensuring that all competitors for contracts agreed to submit inflated bids to plaintiff, further agreeing that one company would be the lowest bidder and would subcontract the work out to the losing bidders. *Id.* at *3.  The winning bidder kept the difference between the legitimate bids and the inflated bids as a "commission" for its services, and paid some of the proceeds as kickbacks to two of the plaintiff's employees.  *Id.*

Unlike in *Philip Morris*, the Defendants here did not engage in the same type of bid-rigging scheme, nor did they seek to include all would-be bidders in any such scheme. Therefore, the injury to Plaintiff here from any joint bid is far different from what it was there. Moreover, in this case, contrary to Plaintiff's efforts to spin otherwise, the crux of the Defendants' anti-competitive conduct is the bribery of the licensing agents and purchasers, with the joint bid being a means of promoting the success of that scheme.  In *Philip Morris*, however, the bribery was the means of insuring success of the bid-rigging scheme.

plaintiff[] must establish that the injuries would not have occurred but for the defendants'

antitrust violations." (quotations omitted)).  "An antitrust violation need not be the sole cause of

the alleged injuries, but the plaintiff must establish, with a fair degree of certainty, that the

violation was a material element of, and substantial factor in producing, the injury." *Greater*

*Rockford Energy*, 998 F.2d at 401; *accord Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1494

(8th Cir. 1992) ("The case law is clear . . . that the treble-damage plaintiff may not recover for

losses due to factors other than the defendant's anticompetitive violations.").

Here, the defect in the Amended Complaint is neither a lack of evidence, for the Court

does not at this stage weigh the evidence, nor a failure to explain the cause of the lost royalties.

On the contrary, the Amended Complaint provides detailed allegations regarding the true cause

of WWE's lost earnings, but that cause is not the purportedly illegal joint bid.  Instead, it is clear

from the Amended Complaint that the reason WWE never took a higher bid, and therefore never

made more money, is because it was prevented from learning about any such bids by Shenker

and Bell, who supposedly acted as they did because of substantial bribes from Jakks.  In other

words, it cannot be said, based on the Amended Complaint's allegations regarding the bribery

scheme, that but for the joint bid, WWE would not have foregone the millions in royalties it did.

*See Valley Prods. Co., Inc. v. Landmark*, 128 F.3d 398, 404 (6th Cir. 1997) (affirming dismissal:

"The loss of logoed amenity sales suffered by Valley upon cancellation of its vendor agreement

flowed directly from the cancellation, as we see it; the sales losses would have been suffered as a

result of the cancellation whether or not HFS had entered into the alleged tying arrangements

with the franchisees."); *Greater Rockford Energy*, 998 F.2d at 402 ("We . . . find that as a matter

of law, plaintiffs have failed to show with a fair degree of certainty that the antitrust violation

was a material and substantial factor causing their alleged injuries."). Thus, the alleged antitrust violation, which does not include the bribes, is not alleged to have caused WWE's injuries. Dismissal of this cause of action is therefore appropriate. *See Hodges v. WSM, Inc.*, 26 F.3d 36, 39 (6th Cir. 1994) (affirming dismissal of complaint: "Because plaintiffs did not allege, nor could they, that the illegal antitrust conduct was a necessary predicate of their injury or that defendants could exclude plaintiffs only by engaging in the antitrust violation, it was appropriate to dismiss the case pursuant to [Fed. R. Civ. P.] 12(b)(6)."); *Indium Corp. of Am. v. Semi-Alloys, Inc.*, 566 F. Supp. 1344, 1354 (N.D.N.Y. 1983) (granting motion to dismiss because complaint is "deficient in its statement of injury, and in its statement of the relationship between the alleged antitrust violation and its alleged injury").

## IV. Conclusion

For the reasons stated above, Defendants' Motion to Dismiss Counts I and II for failure to properly plead an enterprise pursuant to § 1962(c) is DENIED; Defendants' Motion to Dismiss Count III is GRANTED; the Shenker Defendants' Motion to Dismiss based on res judicata abstention principles is DENIED; and Defendants' Motion to Dismiss Count VI is GRANTED.

SO ORDERED.

Dated:        March 3l , 2006
             New York, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

68

SERVICE LIST:

Jerry McDevitt, Esq.
Amy Lyn Barrette, Esq.
William Purcell, Esq.
Kirkpatrick & Lockhart Nicholson, Graham, LLP (PA)
535 Smithfield Street
Pittsburgh, PA 15222

Jonathan Lerner, Esq.
Maura Barry Grinalds, Esq.
Skadden, Arps, Slate, Meacher & Flom LLP
Four Times Square
New York, NY 10036-6522
*Counsel for Jakks Pacific, Inc.*
*Jack Friedman, Stephen Berman,*
*and Joel Bennett*

Jonathan Honig, Esq.
Feder, Kaszovitz, Isaacson, Weber, Skala,Bass & Rhine LLP
750 Lexington Avenue
New York, NY 10022
*Counsel for Jakks Pacific, Inc.*
*Jack Friedman, Stephen Berman,*
*and Joel Bennett*

Steven Marenberg, Esq.
Irell & Manella LLP
1800 Avenue of The Stars
Los Angeles, CA 90067
*Counsel for Defendant THQ, Inc.*
*and Brian Farrell*

Richard Schaeffer, Esq.
Bruce Handler, Esq.
Dornbush, Mensch, Mandelstam
& Schaeffer, LLP
747 Third Avenue
New York, NY 10017
*Counsel for THQ/Jakks Pacific LLC*

Michael Alan Freeman, Esq.
Law Offices of Michael A. Freeman and McCallion & Associates
24 W. 40th St., 17th Floor
New York, NY 10018
*Counsel for Defendants Stanley Shenker*
*and Stanley Shenker & Assocs., Inc.*