UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
:
WORLD WRESTLING ENTERTAINMENT, INC., :
: 04 CV 8223 (KMK)
Plaintiff, : (ECF CASE)
:
- against - :
: April 11, 2006
JAKKS PACIFIC, INC.; JAKKS PACIFIC (H.K.) :
LIMITED; ROAD CHAMPS LIMITED; THQ, INC.; :
THQ/JAKKS PACIFIC LLC; STANLEY SHENKER :
AND ASSOCIATES, INC.; STANLEY SHENKER; :
BELL LICENSING, LLC; JAMES BELL; JACK :
FRIEDMAN; STEPHEN BERMAN; JOEL :
BENNETT; and BRIAN FARRELL, :
:
Defendants. :
:
-----------------------------------------------------------------X :

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
REARGUMENT OF THE COURT'S DISMISSAL OF
WORLD WRESTLING ENTERTAINMENT, INC.'S SHERMAN ACT
CLAIM PURSUANT TO THE COURT'S MARCH 31, 2006 OPINION AND ORDER**

William O. Purcell (WP 5001)
KIRKPATRICK & LOCKHART NICHOLSON GRAHAM LLP
599 Lexington Avenue
New York, New York 10022-6030
(212) 536-3900 (phone)
(212) 536-3901 (fax)

Jerry S. McDevitt
Curtis B. Krasik
Amy L. Barrette
KIRKPATRICK & LOCKHART NICHOLSON GRAHAM LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, Pennsylvania 15222
(412) 355-6500 (phone)
(412) 355-6501 (fax)

Attorneys for Plaintiff, World Wrestling Entertainment, Inc.

# **TABLE OF CONTENTS**

|    |    | Page |
|----|----|------|
| I. | INTRODUCTION | 1 |
| II. | ARGUMENT | 2 |
|   | A. The Court's March 31 Order Misapplied the Applicable Legal Standards to the Allegations of WWE's Amended Complaint | 2 |
|   | B. The Court's Ruling that Jakks' Bribery of Shenker and Bell Somehow Precludes Antitrust Injury Is Improper on this Record and Unfounded as a Matter of Law | 6 |
| III. | CONCLUSION | 11 |

Plaintiff World Wrestling Entertainment, Inc. ("WWE") respectfully submits this memorandum of law in support of its motion for reargument (the "Motion for Reargument") of the Court's dismissal of WWE's Sherman Act claim pursuant to the Court's March 31, 2006 Opinion and Order (the "March 31 Order").

## I. **INTRODUCTION**

Pursuant to its March 31 Order, the Court dismissed WWE's Sherman Act claims for lack of antitrust injury essentially based on its conclusion that:

> The reason WWE never took a higher bid, and therefore never made more money, is because it was prevented from learning about any such bids by Shenker and Bell, who supposedly acted as they did because of substantial bribes from Jakks. In other words, it cannot be said, based on the Amended Complaint's allegations regarding the bribery scheme, that but for the joint bid, WWE would not have foregone the millions in royalties it did. Thus, the alleged antitrust violation, which does not include the bribes, is not alleged to have caused WWE's injuries.

March 31 Order at 67-68 (citations omitted). In dismissing WWE's Sherman Act claim on this basis, the Court erred by misconstruing the salient allegations of WWE's Amended Complaint and misapplying governing law. Specifically, the Court misapplied the antitrust injury standards set forth in the March 31 Order to the allegations of WWE's Amended Complaint, all of which must be taken as true as this stage of the proceedings. Indeed, in violation of the well-established Rule 12(b)(6) standard, applied with particular stringency in the context of antitrust claims, the Court's March 31 Order ignored, failed to draw inferences in favor of, and at times flatly rejected, allegations of WWE's Amended Complaint that undeniably plead cognizable antitrust injury.

In accordance with the applicable case law, WWE's Amended Complaint alleges that "but for" THQ's anticompetitive agreement with Jakks not to submit an independent bid for the

WWE videogame license, THQ would have submitted a bid of at least a 20% royalty rate (commensurate with THQ's licenses in 1998 with other established licensors) in contrast to the 6-10% royalty rate of the bid THQ and Jakks actually submitted. Irrespective of any bids that the Court concluded—prematurely, on the current preliminary record—WWE supposedly did not learn about as a result of Shenker and Bell's corruption, that alleged 10-14 percentage point delta between the royalty rate THQ would have bid but for its unlawful agreement with Jakks and the lower royalty rate actually bid indisputably constitutes antitrust injury under the law. Accordingly, WWE's Sherman Act claim should not have been dismissed at this stage of the proceedings.

## II. ARGUMENT

### A. The Court's March 31 Order Misapplied the Applicable Legal Standards to the Allegations of WWE's Amended Complaint

Under the familiar Rule 12(b)(6) standard, "the court must deny the motion [to dismiss] unless 'it appears beyond reasonable doubt that the plaintiff[] can prove no set of facts in support of [its] claim[] which entitle [it] to relief.'" *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 198 (E.D.N.Y. 2003) (*citing Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). "At the motion to dismiss stage, the issue 'is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." *Stolow v. Greg Manning Auctions*, 258 F. Supp. 2d 236, 242 (S.D.N.Y. 2003) (*citing Phelps v. Kapnolas*, 308 F.3d 180, 184-85 (2d Cir. 2002)). Indeed, "even if 'it . . . [were to] appear to [the Court] on the face of the pleadings that a recovery is very remote and unlikely . . . that is not the test' on a motion to dismiss." *Twombly v. Bell Atlantic Corp.*, 425 F.3d 99, 119 (2d Cir. 2005) (citations omitted) (reversing dismissal of Sherman Act claims on motion to dismiss).

2

Motions to dismiss are particularly disfavored in antitrust cases: "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746 (1976); *see also Poller v. Columbia Broad. Sys.*, 368 U.S. 464, 473 (1962) ("summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot"); *Twombly*, 425 F.3d at 114 ("To survive a motion to dismiss, . . . an antitrust claimant must allege only the existence of a conspiracy and a sufficient supporting factual predicate on which that allegation is based") (emphasis added).

More specifically, "the existence of an 'antitrust injury' is not typically resolved through motions to dismiss." *Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 876 (3d Cir. 1995) (emphasis added); *see also Schuylkill Energy Res. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (citing *Brader*, 64 F.3d at 876); *Theme Promotions v. News Am. FSI*, 35 Fed. Appx. 463, 466 (9th Cir. 2002) (reversing dismissal of antitrust claim for lack of antitrust injury because "[w]hile [plaintiff] may not have provided the most detailed description of facts from which to infer antitrust injury, its allegation is sufficient to survive a motion to dismiss in an antitrust case where 'dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly'") (citations omitted); *Advanced Health-Care Servs. v. Radford Cmty. Hosp.*, 910 F.2d 139, 149 (4th Cir. 1990) (reversing dismissal of antitrust claim for lack of antitrust standing because "[t]he plaintiff in these cases has made colorable allegations that it has lost income as a direct result of the defendants' anti-competitive actions . . . . This states a causal antitrust injury with sufficient specificity to survive a motion to dismiss on that ground."); *Continental Airlines v. United Air Lines*, 120 F. Supp. 2d 556, 569 n.25 (E.D. Va. 2000) (ruling that "skeletal"

3

allegations of antitrust injury were sufficient to sustain plaintiffs' pleading burden because "an analysis of antitrust injury is more properly conducted after discovery.") (citations omitted).

As cited in the Court's March 31 Order, "to satisfy the antitrust injury requirement, a § 4 plaintiff must show that its injury flows from that which makes defendant's acts unlawful, that but for the alleged violation the injuries would not have occurred." March 31 Order at 66, *citing Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 401 (7th Cir. 1993) (quotations omitted). In plain English, as WWE described in its Memorandum of Law in Opposition to Defendants' Motions to Dismiss Sherman Act Claim (the "WWE Antitrust Brief"), this means "[i]t should, in short, be the type of loss that the claimed violations . . . would be likely to cause." WWE Antitrust Brief at 22, *citing Brunswick Corp. v. Pueblo Bowl-o-Mat, Inc.*, 429 U.S. 477, 489 (1977).

Here, WWE's Amended Complaint alleges, *inter alia,* the following facts that plead cognizable antitrust injury, none of which were addressed in the Court's March 31 Order:

> 137. "In direct response to the threat of competition . . . <u>Jakks, through Friedman and its other officers, secured the agreement of THQ, through Farrell and other high ranking executives, not to make an independent bid to secure the videogame license in its own right, as THQ had indicated it wanted to do and had every business reason to do so.</u> Instead, Friedman told Farrell . . . that THQ could participate in the revenue stream from the videogame license at a lower-than-market royalty rate if THQ did not independently bid . . . ." (emphasis added)
>
> 139. "At the time, THQ had never before joined with Jakks to bid on a videogame license, and THQ did not need Jakks to formulate or make a proposal for a videogame license."
>
> 141. "<u>[Farrell] agreed on behalf of THQ not to submit an independent bid but rather to accept the terms insisted upon by Jakks, including the royalty rates to be offered to WWE.</u>" (emphasis added)
>
> 144. "<u>Pursuant to its agreement with Jakks, THQ did not thereafter submit an independent proposal for the WWE videogame license.</u>" (emphasis added)

4

> 160. "During the same period it had engaged in the illegal conduct with Jakks to obtain rights in the WWE videogame license, THQ anticipated that royalty rates paid to licensors would range between 19%-22% throughout 1998 in competitive situations untainted by collusion."
>
> 162. "Under the terms of the license agreement with WWE resulting from the illegal conduct set forth herein, however, WWE was only promised royalties between 7%-8% for games on Nintendo 64; Sony PSX and Sega Katana platforms; 6% on Nintendo Game Boy; and 10% on PC videogames."
>
> 163. "<u>The royalty rates in fact promised to WWE were between 50%-66% lower than what THQ had paid, expected to pay during the relevant time period in 1998</u>, and would have paid, in a truly competitive situation." (emphasis added)

In short, WWE has alleged that despite intending to independently bid on the WWE videogame license, THQ entered into an anticompetitive agreement with Jakks not to submit such an independent bid, and that but for this agreement THQ would have submitted a bid for the WWE videogame license with a royalty rate of at least 20% in contrast to the bid ultimately submitted by THQ and Jakks with a royalty rate of 6-10%. These allegations <u>must</u> be taken as true at this stage of the proceedings. *In re NASDAQ Market-Makers Antitrust Litig.*, 894 F. Supp. 703, 709 (S.D.N.Y. 1995) (*citing Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) ("[T]he factual allegations of the complaint are presumed to be true and all factual inferences must be drawn in the plaintiff's favor and against the defendants."); *see also Roman v. Cessna Aircraft Co.*, 55 F.3d 542, 543-44 (10th Cir. 1995) (reversing dismissal of antitrust claim on motion to dismiss for lack of antitrust injury because "the court erroneously failed to take the complaint's factual allegations as true and construe them most favorably to [the plaintiff]").

Accordingly, irrespective of any other wrongdoing in the case, WWE has alleged that but for the bidding collusion by THQ and Jakks—the specific antitrust violation at issue—WWE would have received a bid from THQ 10-14 percentage points higher than the bid actually received. This lost 10-14 percentage points in the royalty rate is alleged to have directly resulted

from the anticompetitive agreement between THQ and Jakks; it thus indisputably is an injury to WWE "flowing from that which makes the acts [bid rigging] unlawful," thereby constituting antitrust injury. Indeed, as a matter of law and common sense, the victim of a bid rigging conspiracy that receives a lower bid than it otherwise would have received from the colluding competitor in the absence of such an anticompetitive agreement suffers antitrust injury. *See SmithKline Beecham v. E. Applicators,* No. CIV.A. 99-CV-6552, 2002 WL 1197763, at *7 (E.D. Pa. May 24, 2002); *Philip Morris, Inc. v. Heinrich,* No. 95 CIV. 0328 (LMM), 1996 WL 363156, at *9 (S.D.N.Y. June 28, 1996); *see also Ice Cream Liquidation v. Land O'Lakes,* 253 F. Supp. 2d 262, 272 (D. Conn. 2003), *citing Knevelbaard Dairies v. Kraft Foods,* 232 F.3d 979, 988 (9th Cir. 2000) ("When horizontal price-fixing causes buyers to pay more . . . than the price that would prevail in a market free of the unlawful trade restraint, antitrust injury occurs.").

**B.     The Court's Ruling that Jakks' Bribery of Shenker and Bell Somehow Precludes Antitrust Injury Is Improper on this Record and Unfounded as a Matter of Law**

The Court's dismissal of WWE's Sherman Act Claim was based on its finding that WWE did not establish antitrust injury because any injury to WWE <u>exclusively</u> was the result Shenker and Bell's corruption. March 31 Order at 67-68. This ruling was fundamentally in error.

First, the Court effectively made definitive evidentiary rulings—based on nothing more than its review of WWE's Amended Complaint—as to the causation of WWE's injury (i.e., that it was entirely attributable to Shenker and Bell's corruption), which were unwarranted and improper as a matter of law. Significantly, as the Court correctly noted in its March 31 Order, "[a]n antitrust violation need not be the sole cause of the alleged injuries, but the plaintiff must establish, with a fair degree of certainty, that the violation was a material element of, and substantial factor in producing, the injury." March 31 Order at 67, *citing Greater Rockford Energy,* 998 F.2d at 401 (emphasis added); *see also Engine Specialties v. Bombardier Ltd.,* 605

6

F.2d 1, 14 (1st Cir. 1979) ("Plaintiffs need not prove that that antitrust violation was the sole cause of their injury, but only that it was a material cause.").

Determinations as to the causation of, and materiality of factors contributing to, a plaintiff's injury are factual issues to be determined by the fact finder. *Morales-Villalobos v. Garcia-Llorens,* 316 F.3d 51, 55 (1st Cir. 2003) (reversing dismissal of antitrust claims on motion to dismiss for lack of antitrust standing because "but for" causation involved factual issues that could not be decided on a motion to dismiss); *Chiropractic Cooperative Ass'n of Mich. v. Am. Med. Ass'n,* 867 F.2d 270, 275-76 (6th Cir. 1989); *In re Disposable Contact Lens Antitrust Litig.,* 2001-1 Trade Cases P 73, 150 2001 WL 203964, at *6 (M.D. Fla. Jan. 5, 2001). As such, it is never appropriate for the Court to resolve factual disputes on these issues, and certainly not on a Rule 12(b)(6) record in the face of WWE's allegations to the contrary.[1] Conversely, in fact, the Court was required to accept as true WWE's allegations that it lost at least 10-14 percentage points from the royalty rate it would have received if THQ had not colluded with Jakks, and to resolve all inferences in WWE's favor from such allegations.

Nevertheless, in addition to failing to give due effect to the allegations set forth in Section II.A above, the Court repeatedly misconstrued WWE's allegations and used those misconstructions against WWE's interests. Most notably, in the Court's attempt to summarize allegations on pages 63-64 leading to its conclusion that WWE supposedly did not suffer

---

[1] Tellingly, *Greater Rockford Energy* was decided on summary judgment and the standards it articulated specifically contemplate the development of a discovery record. Indeed, it is implausible for a plaintiff to establish anything with a fair degree of certainty, let alone that "the [antitrust] violation was a material element of, and substantial factor in producing, the injury" on the pleadings alone. By contrast, none of the three cases the Court cited involving a Rule 12(b)(6) dismissal for lack of antitrust injury involved disputed issues of causation or the materiality of factors contributing to the plaintiff's injury. March 31 Order at 67-68. To be sure, none of the three cases in any way held, as the Court did here, that the defendants' alleged commercial bribery precluded antitrust injury.

7

antitrust injury, each purported allegation is incorrect in ways adverse to WWE. Specifically: (i) Bell did not "scare off" Acclaim—after WWE accepted the initial Jakks proposal, Acclaim was told that WWE did not intend to renew the license, Amended Complaint ¶ 115; (ii) Jakks did not tell "THQ to join in the scheme or face certain defeat in the bidding process"—Jakks (through Defendant Friedman) told THQ that Jakks controlled the videogame license and that THQ could participate in the revenue stream from the videogame license at a below market royalty rate, Amended Complaint ¶ 137; and (iii) Activision did not submit a formal bid that was more lucrative than what WWE accepted—Activision submitted an informal bid the terms of which were disclosed to Jakks to match, which they did in their collusive bid with THQ; however, Activision did not make a "formal" bid and no Activision bid was more lucrative than what WWE accepted, Amended Complaint ¶ 148.

In violation of the well established Rule 12(b)(6) standards, the Court's ruling largely contradicted, and certainly failed to draw inferences in favor of, core allegations of WWE's Amended Complaint regarding fact-intensive issues including the causation and materiality of factors contributing to WWE's injury. By colluding, Jakks and THQ deprived WWE of a bid 10-14 percentage points higher than any other alleged bid regardless of what illegal means Defendants used to deprive WWE of the benefit of any other competing bid.

Second, the Court's ruling erroneously presupposed that Jakks' bribery of Shenker and Bell precluded antitrust injury.[2] That Defendants' unlawful conduct included bribing Shenker

---

[2] The March 31 Order assumes that Shenker and Bell, in fact, were bribed. However, assuming *arguendo,* this fact ultimately were not accepted by the jury, WWE certainly should not be precluded from arguing that some or all of its injury was caused by THQ and Jakks' collusion in violation of the Sherman Act. In the absence of bribes to Shenker and Bell, such injury presumably would be cognizable antitrust injury. Yet, the Court's ruling on the current preliminary record improperly forecloses WWE's antitrust claim without knowing how the evidentiary record will develop going forward.

8

and Bell in addition to their agreement not to compete for the WWE videogame license certainly does not insulate Defendants from antitrust liability for their collusive bidding. Indeed, it is well-settled that "[w]hen bribery is coupled with other acts tending to restrain trade, a claim under the Sherman Act may be established." *Municipality of Anchorage v. Hitachi Cable*, 547 F. Supp. 633, 645 (D. Alaska 1982); *see also Williams Elecs. Games v. Garrity*, 366 F.3d 569, 578 (7th Cir. 2004) (Chief Judge Posner noting that commercial bribery involving "collusion between competitors" would violate the Sherman Act's prohibition against price-fixing); *Smithkline Beecham*, 2002 WL 1197763, at *7 (allegations that defendants conspired to exclude submission of lower bids to enable corrupt agent to accept rigged bid properly alleged antitrust injury); *Phillip Morris*, 1996 WL 363156, at *9 (ruling that plaintiff "has alleged more than mere commercial bribery: it has alleged facts detailing an extensive bid rigging scheme involving the Defendants. This is precisely the type of conduct that the Sherman Act prohibits"); *City of Atlanta v. Ashland-Warren, Inc.*, No. C 81-106A, 1981 WL 2187, at *3 (N.D. Ga. Aug. 20, 1981) ("Here Western has alleged more than a case of buying influence or commercial bribery in that Western has alleged a combination and conspiracy to supplant competition in concrete contracting services . . . which have been held to be per se violations of § 1 of the Sherman Act.").

The March 31 Order ignores this critical distinction. In particular, the Court's principal reliance on *Federal Paper Board Company v. Amata*, 693 F. Supp. 1376 (D. Conn. 1988), is fundamentally misplaced. Simply put, *Amata* did not involve any allegation of collusion among competitors to manipulate the bidding process and thus did not involve a restraint of trade subject to the antitrust laws. It, therefore, stands for nothing more than the unremarkable proposition that commercial bribery, standing alone, without allegations of collusion does not

establish an antitrust claim. As properly distinguished by Judge McKenna in *Philip Morris*, *Amata* (and *Calnetics Corp. v. Volkswagen of Am., Inc.*, 532 F.2d 674 (9th Cir. 1976) also relied on by the Court) are entirely inapposite to circumstances involving anticompetitive collusion between competitors in the bidding process, as WWE alleges between THQ and Jakks here.[3] *Philip Morris*, 1996 WL 363156, at *9; *see also Municipality of Anchorage*, 547 F. Supp. at 645 (distinguishing *Calnetics*); *City of Atlanta*, 1981 WL 2187, at *3 (distinguishing *Calnetics*).

Moreover, the Court's finding that "even if the joint bid was artificially low, there is no allegation that WWE was forced to accept that bid," March 31 Order at 65, leads to the anomalous result that colluding competitors could immunize a bid rigging agreement from antitrust scrutiny simply by bribing the inside decision-maker. For instance, if a company (in the position of WWE) solicits bids from three sellers in a five seller market and those three collude, the buyer is not "forced" to accept their bid yet that company unquestionably incurs antitrust injury from the collusion. In that regard, as described in WWE's Antitrust Brief, *Smithkline Beecham* and *Philip Morris* both found antitrust injury resulting from the defendants' bid rigging agreement despite the defendants' bribery of the employees and/or agents making the decision on the bid. Indistinguishable from the Court's ruling here, those companies were not forced to accept the rigged bids. Yet, the fact that the bids were accepted by the corrupt employee/agent did not preclude antitrust injury. The issue in those cases, and properly the issue here too, is whether there was collusion between competitors irrespective of any bribery of the decision-

---

[3] The Court's finding that "[a]s in *Amata*, WWE failed to demonstrate how the <u>joint bid</u>, even combined with the bribery of Shenker and Bell, prevented competitive bids from being offered to, or accepted by, WWE's management" is unfounded because, in stark contrast to this case, there was no "joint bid" or other collusion between competitors at issue in *Amata*.

10

maker on the bid.[4] Conversely, the Court has cited no authority, and WWE is aware of no authority, for the proposition that a victim of alleged collusion between competitors in the bidding process in addition to the corruption of the plaintiff's employee or agent, cannot plead cognizable antitrust injury as a matter of law.

### III. CONCLUSION

For all the foregoing reasons, WWE's Motion for Reargument should be granted and the Court should reinstate WWE's Sherman Act claim.

Respectfully submitted,

By: _____
Jerry S. McDevitt (Pro hac vice)
Curtis B. Krasik (Pro hac vice)
Amy L. Barrette (Pro hac vice)
535 Smithfield Street
Pittsburgh, Pennsylvania 15222
(412) 355-6500 (phone)
(412) 355-6501 (fax)

---

[4] The Court's attempts to distinguish *Phillip Morris* are unfounded and indeed inappropriate under the law governing motions to dismiss. The Court held that, in contrast to *Phillip Morris*, the alleged scheme here did not "seek to include all would-be bidders" and therefore the injury to WWE is far different from what it was there. *See* March 31 Order at 66 n.25. The Court, however, does not explain why the injury to WWE supposedly is different. To the contrary, the injury under both schemes is the corruption of the competitive bidding process as a result of the competitors' collusion. The Court's characterization of WWE's allegations as "spin" is fundamentally the Court rejecting the truth of WWE's allegations, contrary to the Rule 12(b)(6) standard, and also improper factfinding by the Court on a matter reserved for a jury to decide.

11

William O. Purcell (WP 5001)
599 Lexington Avenue
New York, New York 10022-6030
(212) 536-3900 (phone)
(212) 536-3901 (fax)

KIRKPATRICK & LOCKHART NICHOLSON
GRAHAM LLP

Attorneys for Plaintiff, World Wrestling
Entertainment, Inc.

Dated: April 11, 2006

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR REARGUMENT OF THE COURT'S DISMISSAL OF WORLD WRESTLING ENTERTAINMENT, INC.'S SHERMAN ACT CLAIM PURSUANT TO THE COURT'S MARCH 31, 2006 OPINION AND ORDER was served on the following counsel of record via electronic mail service and first-class U.S. mail, postage prepaid this 11th day of April, 2006:

John R. Williams, Esq.
John R. Williams & Associates, LLC
51 Elm Street, Suite 409
New Haven, CT  06510

Michael A. Cornman, Esq.
Schweitzer Cornman Gross & Bondell, LLP
292 Madison Avenue
New York, NY  10017

_____
Jerry S. McDevitt