

Not Reported in F.Supp. Page 1
Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)
**(Cite as: 1996 WL 363156 (S.D.N.Y.))**

▷

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
PHILIP MORRIS INCORPORATED, Plaintiff,
v.
Michael HEINRICH, Masta Displays Co., AM-PM Sales Co., Inc., Richard Billies,
Sidney Rothenberg, John Billies, Sonia Graphics, Jose Rivera, Jomar Displays,
Inc., Martin Neier, Joel Spector, Visart Mounting and Finishing Corp., Dani
Siegel, C.D. Baird & Co., Inc., Paul Bielik, Richard T. Billies, Jr.,
Manufacturers Corrugated Box Co., Inc., Irving Etra, Southern Container Corp.,
Steven Grossman, Donald Kasun, Barry Besen, Winko New Jersey, Inc. (formerly
known as Republic Container Corp., a New York corporation), Republic Container
Corp., a New Jersey corporation, Stanley Winikoff, Amy Winikoff, and X-L
Services, Inc., Defendants.
**No. 95 CIV. 0328 (LMM).**

June 28, 1996.

*MEMORANDUM AND ORDER*

McKENNA, District Judge.

**\*1** This case involves allegations by the Plaintiff, Philip Morris ("Philip Morris"), of a broad bid-rigging conspiracy on the part of the Defendants to allocate contracts for the production and supply of temporary cardboard "point-of-purchase" graphic displays, used for advertising Philip Morris products at retail locations. Philip Morris primarily charges antitrust violations, invoking the Sherman Act and New York State's Donnelly Act. It also brings claims for common law fraud, breach of fiduciary duty, participation in breaches of fiduciary duty, commercial bribery and commercial bribe receiving.

Most of the Defendants, mainly graphic display vendors, have moved to dismiss the Amended Complaint, filing ten separate notices of motion, with independent supporting and reply briefs. They variously argue that the case should be dismissed pursuant to Fed.R.Civ.P. 9(b), 12(b)(1) and 12(b)(6). The Court has examined the motions collectively, to the extent that the arguments apply equally to all Defendants, and individually, to the extent that Defendants raise arguments particular to their own circumstances. For the reasons stated below, the motions to dismiss are denied as to: Counts I, II, III, and IV to the extent that they accrued after March 4, 1989; and Count VIII. The motions to dismiss are granted as to Counts I, II, III and IV to the extent that they accrued prior to March 4, 1989, without prejudice to Plaintiff's right to replead fraudulent concealment within 60 days; Counts V, VI and VII, without prejudice to Plaintiff's right to replead with particularity, within 60 days; and Counts IX-XIII.

The United States of America ("the Government") moves separately to intervene in this action and to stay the depositions of John E. Clemence ("Clemence") and all other witnesses, as well as the answering of all interrogatories, until the disposition of what it characterizes as a closely-related criminal investigation it is currently conducting in this judicial district. For the reasons stated below, the Court grants the motion to intervene and grants the stay until December 31, 1996. The Government is also granted leave to request an extension of this stay prior to its expiration date, should one become necessary.

Finally, the Court denies the request of Defendants Visart Mounting and Finishing Corp. ("Visart"), Dani Siegel ("Siegel") and Genetra Affiliates, Inc. ("Genetra") for access to the *ex parte* supplemental affidavit submitted by Rebecca Meiklejohn in support of the Government's opposition to their cross-motion for a show cause hearing. They had cross-moved for the show cause hearing to determine whether the Antitrust Division had breached grand jury secrecy with regard to its investigation. The Court has not considered these materials in connection with the present motions. The cross-movants are directed to submit their reply brief concerning the cross-motion within 10 days of this decision, without the benefit of access to the unreviewed *ex parte* materials.

I. Facts
**\*2** Philip Morris is a Virginia corporation engaged in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  Page 2
Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)
**(Cite as: 1996 WL 363156 (S.D.N.Y.))**

the sale of tobacco products. Its Purchasing Department is responsible for buying retail promotional materials, including point-of-purchase cardboard graphic displays and packaging for consumer incentives. (Amend.Compl. at ¶ 5.) The company employed Defendant Michael Heinrich as Director of the Purchasing Department from 1988 through September of 1991. (Amend.Compl. at ¶ 6.) The remainder of the Defendants are manufacturing and service companies, their owners and their affiliates, who sought and received contracts to furnish Philip Morris with graphic display materials and services. In its Amended Complaint, Philip Morris groups these so-called Vendor Defendants into two categories: 1) the Mounting and Finishing Vendor Defendants; and 2) the Corrugated Vendor Defendants. The first group produced graphic displays on lightweight cardboard which they generally purchased from other vendors, while the second group produced displays on a heavier cardboard which they manufactured themselves. (Amend.Compl. at ¶¶ 7-9).

The essence of Philip Morris' Amended Complaint is that these Vendor Defendants, together with Heinrich and other Philip Morris employees, conspired to manipulate Philip Morris' bidding procedures for awarding contracts in order to ensure that the Vendor Defendants would obtain them. Philip Morris' formalized bidding process for purchasing graphic displays required that for purchases of printed materials between $10,000 and $25,000, the Purchasing Department secure one written bid and at least one alternative verbal price quotation. Purchases between $10,000 (*sic*) and $100,000 required competitive bids from at least three qualified suppliers, with approval of the Director of Purchasing and the Vice President of Marketing Services needed before the job could be awarded to other than the lowest bidder. Purchases exceeding $100,000 required sealed bids from a minimum of three qualified suppliers, with the bids opened and the contract awarded to the lowest bidder at a bid review meeting. Louis T. Cappelli ("Cappelli"), the Graphics Purchasing Manager during all relevant periods, was responsible for soliciting and processing bids. As of 1988, he reported directly to Heinrich. (Amend.Compl. at ¶¶ 42- 44.)

A. The Alleged Mounting and Finishing Vendors' Scheme

Philip Morris alleges that beginning no later than 1982, Cappelli ceded his responsibility for the bidding process to Ed Reitman, a sales representative of Defendant Masta Displays Co. ("Masta") who is now deceased, in return for bribes and kickbacks. Reitman, with the cooperation of Defendants AM-PM Sales Co. ("AM-PM"), Richard Billies ("Billies"), Sidney Rothenberg ("Rothenberg") and John Billies, all of whom are affiliates, officers or employees of Masta (collectively, "the Masta Group"), agreed with Cappelli that the Masta Group would supply the two or three requisite bidders for Philip Morris mounting and finishing work, but that Masta would always win the bid and subcontract the work to other vendors, including already existing Philip Morris vendors. (Amend.Compl. at ¶ 51.)

1. Mechanics

*3 According to Philip Morris, the alleged scheme worked as follows. Defendant Jomar Displays, Inc. ("Jomar"), with the approval, knowledge and participation of its officers, Defendants Martin Neier ("Neier") and Joel Spector ("Spector"), and Defendant C.D. Baird & Co., Inc. ("C.D. Baird"), with the approval, knowledge and participation of its officers, Defendants Paul Bielik ("Bielik") and Richard T. Billies, Jr., provided the Masta Group with blank company stationery and envelopes so that the Masta Group could draw up "dummy bids." Prior to submitting any bids to Philip Morris, the Masta Group would ask Jomar and C.D. Baird for legitimate price quotes on the contract. It then inflated those quotes substantially on the dummy bids it submitted to Philip Morris on those companies' letterheads, submitting a lower bid for the same contract on behalf of Masta. When Masta won the contract pursuant to this rigged bidding process, it subcontracted with C.D. Baird or Jomar to perform the work, paying the price offered in its original bid. The Masta Group kept the difference between the original bid and the inflated price paid Masta as its "commission," using part of these proceeds to pay off Cappelli. (Amend.Compl. at ¶¶ 52-54.)

For contracts exceeding $100,000, the Masta Group allegedly asked Jomar and C.D. Baird for quotes. After deciding which company should win the contract, the Masta Group directed the companies to submit specific bids directly to Philip Morris, reflecting greater dollar amounts than the original quote. After the subcontractor received the contract, performed the work and got paid, the Masta Group collected its commission by issuing the performing company an invoice for "consulting fees" in the amount of the overcharge. Eventually, to avoid paying income tax, this system was changed to one in which "money men" representing front companies with no operations invoiced the contracting company

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK    Document 136-4    Filed 04/11/2006    Page 3 of 15

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)
**(Cite as: 1996 WL 363156 (S.D.N.Y.))**

Page 3

directly. These money men paid the Masta Group 90% of the commission, keeping the rest for themselves. As always, kickbacks were allegedly paid out of these commissions. (Amend.Compl. at ¶ ¶ 58-60.)

Philip Morris claims that Reitman bribed Cappelli, at first, by putting Cappelli's wife on the payroll of Clive Industries ("Clive"), a Connecticut corporation run out of his home. (Amend.Compl. at ¶ 55.) Subsequently, in approximately 1984, Cappelli formed a purported clothing business, KAL Associates ("KAL"), in his wife's name, allegedly, to receive kickbacks from Clive disguised as payments for clothing designs. (Amend.Compl. at ¶ 56.) After Reitman died, Philip Morris claims that Billies provided Cappelli with names of other front companies which would provide checks, in return for KAL invoices for services supposedly rendered. (Amend.Compl. at ¶ 57.)

2. Heinrich's Arrival

After Cappelli's immediate supervisor left Philip Morris in 1988, Billies recommended Heinrich, a friend who worked at Pepsi, to Cappelli. Billies apprised Heinrich of the bid-rigging scheme and obtained his assurance that he would cooperate in furthering it in return for kickbacks if he worked for Philip Morris. With Cappelli's assistance, Heinrich eventually obtained the job, becoming Cappelli's immediate supervisor. (Amend.Compl. at ¶ 61.) Shortly thereafter, he advised Cappelli to bring in Defendant Visart as a fourth vendor, with Defendant Siegel signing most of the bids on behalf of Visart. Billies rigged the bids in the same manner as he did with the other vendors, with the Masta Group receiving "commissions" and paying kickbacks to Cappelli and Heinrich. (Amend.Compl. at ¶ ¶ 62-64.)

**\*4** Philip Morris alleges that Billies and his son, Defendant John Billies, paid Heinrich by hand in cash, sometimes in the staircase at the Stella Mare restaurant in New York City, sometimes on the streets of Manhattan and on one occasion, in the back seat of their car. (Amend.Compl. at ¶ ¶ 65, 68, 70.) Starting in 1989, they also began paying Cappelli in cash. (Amend.Compl. at ¶ 68.) To generate this cash, Philip Morris claims that the Masta Group's money men would invoice AM-PM for goods and services never provided. AM-PM would pay by check, with the money men keeping 10% and paying the Masta Group the rest in cash. (Amend.Compl. at ¶ 69.) Philip Morris terminated Cappelli and Heinrich on September 30, 1991. (Amend.Compl. at ¶ 71.) After Cappelli was terminated, in the late fall of 1991, Rothenberg allegedly took Cappelli into the bathroom at the Garden City Country Club and made a kickback payment of approximately $9,000. (Amend.Compl. at ¶ 73.) While the total amount of bribes and kickbacks allegedly paid to Heinrich is unknown, Philip Morris estimates that by the fall of 1991, the Mounting and Finishing Defendants had paid Cappelli over $1 million. (Amend.Compl. at ¶ ¶ 65, 74.)

In addition to the relationship with Visart, the Masta Group, with the acquiescence of Cappelli and Heinrich, set up Defendant Sonia Graphics ("Sonia") in 1989, ostensibly a minority display products broker, to take advantage of Philip Morris' minority vendor program. Although Defendant Jose Rivera ("Rivera") was purportedly Sonia's sole proprietor, Philip Morris contends that Sonia was set up in Masta's office, shared Masta's telephone and fax numbers and that the same secretary typed Masta's and Sonia's bids. According to Philip Morris, the Masta Group completely controlled Sonia and rigged its bids to facilitate the larger scheme. Rivera knowingly and intentionally either signed falsified, inflated bids, or permitted the Masta Group to do so on his behalf. (Amend.Compl. at ¶ 66.)

Philip Morris charges Cappelli, Heinrich and the Mounting and Finishing Vendor Defendants with furthering their scheme through interstate commerce by use of the mails and the highways. These Defendants also allegedly used the telephone wires to facilitate the scheme by making numerous telephone calls among the conspirators. (Amend.Compl. at ¶ ¶ 76-78.)

B. The Alleged Corrugated Vendors' Scheme

According to Philip Morris, Cappelli, and eventually Heinrich, engaged in a similar conspiracy with the Corrugated Vendor Defendants, receiving kickbacks in return for offering control of the bidding process to an individual who rigged bids among the Corrugated Vendors. The alleged point man in this network was Harold Roll ("Roll"), also now deceased, who was a sales representative for Defendant Manufacturers Corrugated Box Co., Inc. ("Manufacturers"). The mechanics of this alleged conspiracy were almost identical to those allegedly employed by the Mounting and Finishing Vendors. Roll, with the approval of Manufacturers' Vice President, Defendant Irving Etra, supplied Cappelli with inflated corrugated bids, one from Manufacturers and generally two dummy bids from other Defendants.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  Page 4
Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)
**(Cite as: 1996 WL 363156 (S.D.N.Y.))**

Manufacturers would always win the contract and in turn, farm out the work to other vendors, receiving a "commission" in return. As was the case with the Masta Group, a portion of these proceeds would be paid to Cappelli and Heinrich as kickbacks. (Amend.Compl. at ¶ ¶ 79-80.)

 **\*5** Among the bidders Roll supplied Philip Morris were Defendant Genetra, whose bids were often signed by Siegel, and Ultra Print ("Ultra"), a wholly-owned subsidiary of Southern Container Corp. ("Southern"). Clemence was a salesman for Southern who signed Ultra's bids. These Defendants either provided Roll with blank company stationery or submitted bids directly to Philip Morris under Roll's direction. (Amend.Compl. at ¶ ¶ 81-83.) Eventually, after Cappelli requested new vendors other than Manufacturers to bid for contracts, Roll provided Southern and Republic Container Corp. ("Republic N.Y.", now known as Winko New Jersey, Inc. ("Winko N.J.")). [FN1] These companies, through Southern's officers, Defendants Steven Grossman ("Grossman") and Donald Kasun ("Kasun"), and Republic N.Y.'s officers, Defendants Stanley Winikoff and Amy Winikoff (who were also affiliated with Republic N.J.), agreed to divide up the corrugated vendor contracts. Roll told the Corrugated Vendors what to bid on contracts and received $1.00 per display upon completion of the work. (Amend.Compl. at ¶ ¶ 84-86.)

> FN1. Republic N.Y., formerly known as Republic Container Corp., is now defunct. In late 1990, it changed its name to Winko Packaging, Inc., ultimately merging with Winko New Jersey, Inc. ("Winko N.J."). Amboy Holdings Inc. ("Amboy") changed its name to Republic Container Corp. after the incorporation of Winko Packaging, Inc. and is referred to in the Amended Complaint as "Republic N.J." Philip Morris alleges that Republic N.J. eventually took the place of Republic N.Y. in the corrugated scheme. (Amend. Compl. at ¶ 95.) Thus, they claim that Winko N.J. and Republic N.J. are liable for the acts of Republic N.Y. by virtue of their status as successor and de facto successor, respectively, to Republic N.Y. (Amend.Compl. at ¶ ¶ 100-101.) The Court concludes that both Winko N.J. and Republic N.J. can be held liable to the same extent as the other Defendants, for purposes of this motion. Furthermore, the statute of limitations, with regard to claims raised against Republic N.J., was tolled when the original complaint was filed. The filing against Republic N.J. as a successor corporation relates back to this date.

 In 1989, Philip Morris claims that Billies approached Clemence, promising to use his influence with Heinrich and Cappelli to increase Southern's business with Philip Morris, in return for Southern's paying bribes to Billies instead of Roll. Clemence relayed the proposal to Grossman and Defendant Barry Besen ("Besen"), who was in charge of operations and administration at Southern's Dayton, New Jersey plant, and they instructed him to accept it. Thereafter, Southern paid a commission to the Masta Group for all contracts it received. Roll acquiesced in the deal in order to maintain his position as coordinator of the remainder of the Corrugated Vendor Defendants. (Amend.Compl. at ¶ ¶ 89-91.)

 The Masta Group and Clemence eventually formed Defendant X-L Services, Inc. ("X-L"), in part to provide hand finishing work which Southern could not provide and in part to provide a conduit for Southern to pay commissions to the Masta Group. The procedure called for X-L to invoice Masta for the hand finishing work and Masta to invoice Southern for an amount significantly higher, the difference representing the Masta Group's commission. (Amend.Compl. at ¶ ¶ 92-93.) Philip Morris claims that Masta, Jomar and Visart also facilitated the Corrugated Vendors' scheme by bidding for corrugated jobs when they had no capacity to perform this type of work, serving merely as dummy bids. (Amend.Compl. at ¶ 94.) Ultimately, Philip Morris alleges, the Corrugated Vendors paid Cappelli hundreds of thousands of dollars in kickbacks in connection with corrugated display work. (Amend.Compl. at ¶ 96.) It claims that Cappelli, the Corrugated Vendors, the Masta Group, Jomar, Neier, Spector, Siegel and Visart availed themselves of interstate commerce in connection with the purportedly fraudulent conduct in the same manner alleged against the Mounting and Finishing Vendors. (Amend.Compl. at ¶ ¶ 97-99.)

 C. Philip Morris' Bidding and Business Policies

 **\*6** During the relevant period, Philip Morris disseminated a written Purchasing Policy to Purchasing Department employees, including Heinrich and Cappelli, providing that no employee involved in purchasing could accept any gift from actual or potential suppliers unless it was of nominal value and merely an extension of courtesy. Furthermore, both Cappelli and Heinrich received a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK    Document 136-4    Filed 04/11/2006    Page 5 of 15

Not Reported in F.Supp.                                                                                                               Page 5
Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)
**(Cite as: 1996 WL 363156 (S.D.N.Y.))**

written copy of the company's Business Conduct Policy, prohibiting an employee's acceptance of cash from anyone doing or seeking to do business with Philip Morris. During the relevant period, Cappelli and Heinrich signed Certificates attesting that they had read and understood this Policy and had not contravened it in the preceding year. (Amend.Compl. at ¶¶ 45-50.)

D. The Guilty Pleas

Since as early as March 4, 1993, a number of the Defendants have pleaded guilty in this district to various criminal charges related to the events described above. Jomar and Clemence each pleaded guilty to one count of violating the Sherman Act, for engaging in a combination and conspiracy in unreasonable restraint of trade and commerce, to rig bids and allocate contracts. (Amend. Complaint at ¶¶ 102-103, 112-113.) Cappelli, Rothenberg and Billies all pleaded guilty both to a Sherman Act count and a tax evasion count, arising from the same alleged facts. (Amend. Complaint at ¶¶ 104-107.) Robert Berger ("Berger"), one of the Mounting and Finishing Vendors' money men, pleaded guilty to one count of tax evasion, while Bert Levine ("Levine"), another of the money men, pleaded guilty to one count of conspiracy to defraud the United States of America and the Internal Revenue Service. (Amend. Compl. at ¶¶ 108-111.)

E. Philip Morris' Claims

Count I of the Amended Complaint brings a claim against Heinrich and the Mounting and Finishing Vendors for violating § 1 of the Sherman Act, 15 U.S.C. § 1, premised upon the alleged bid-rigging scheme. (Amend.Compl. at ¶¶ 118-123.) Count II states the identical claim against the Corrugated Vendors. (Amend.Compl. at ¶¶ 124-131.) Counts III and IV charge the Mounting and Finishing Vendors and the Corrugated Vendors, respectively, with violating New York State's Donnelly Act, N.Y.Gen.Bus.Law § 340, by restraining the free exercise of trade. (Amend.Compl. at ¶¶ 132-141.) Count V pleads common law fraud against the Mounting and Finishing Vendors, while Count VI brings the same claim against the Corrugated Vendors. (Amend.Compl. at ¶¶ 142-159.) Counts VII and VIII plead fraud and breach of fiduciary duty against Heinrich independently. (Amend.Compl. at ¶¶ 160-172.) Counts IX and X plead breach of fiduciary duty [FN2] against the Mounting and Finishing Vendors and the Corrugated Vendors, respectively. (Amend.Compl. at ¶¶ 173-184.)

Counts XI and XII charge commercial bribery against the Mounting and Finishing Vendors and the Corrugated Vendors respectively, while Count XIII brings a commercial bribe receiving claim against Heinrich. Count XIV seeks a constructive trust in favor of Philip Morris for all bribes received by Heinrich, while Count XV seeks a forfeiture of all compensation paid to him during the period of his alleged disloyalty and dishonesty.

> FN2. Technically, the Plaintiff charges, "breach of fiduciary duty of another." This claim is more accurately styled, "aiding and abetting breach of fiduciary duty," or "inducement to breach of fiduciary duty."

II. Discussion

A. Rule 12(b)(6) Standard

*7 Rule 12(b)(6) provides that a complaint will be dismissed if there is a "failure to state a claim upon which relief can be granted." In the course of resolving a motion to dismiss pursuant to Rule 12(b)(6), the Court reads the complaint generously, accepting the truth of, and drawing all reasonable inferences from, the well-pleaded factual allegations. *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir.1993); *accord California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 515 (1972); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993); *Allen v. Westpoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir.1991), *cert. denied*, 503 U.S. 960 (1992); *Frasier v. General Elec. Co.*, 930 F.2d 1004, 1007 (2d Cir.1991).

> When determining the sufficiency of plaintiff[s] claim for Rule 12(b)(6) purposes, consideration is limited to the factual allegations in ... [the] complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiff['s] possession or of which plaintiff[ ] had knowledge and relied on in bringing suit. *Brass*, 987 F.2d at 150 (*citing Cortec*, 949 F.2d at 47-48).

The Court will only dismiss a Complaint for failure to state a claim when the Court finds beyond a reasonable doubt that Plaintiff "can prove no set of facts" to support the claim that Plaintiff is entitled to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

The Court is required to draw all reasonable inferences in Plaintiff's favor, but not all possible

Not Reported in F.Supp. Page 6
Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)
**(Cite as: 1996 WL 363156 (S.D.N.Y.))**

inferences. See *Correa-Martinez v. Arrillaga-Belendez,* 903 F.2d 49, 58 (1st Cir.1990). Only when "the suggested inference rises to what experience indicates is an acceptable level of probability," must the Court accept it as fact for pleading purposes. Id. at 52.

### B. The Sherman Act Claims

The Defendants move, in separate briefs, to dismiss the Sherman Act claims pursuant to Fed.R.Civ.P. 12(b)(6). Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. To state a claim under § 1, a party must allege three elements: (1) a combination or conspiracy; (2) that results in a restraint on interstate or foreign commerce; and (3) injury to the plaintiff's business or property. *Oreck Corp. v. Whirlpool Corp.,* 639 F.2d 75, 78 (2d Cir.1980), *cert. denied,* 454 U.S. 1083 (1981). The Defendants, essentially, claim that Philip Morris has failed to satisfy the second requirement.

While the language of the statute seemingly prohibits any restraint of trade, the Supreme Court has required that an "unreasonable" restraint of trade be demonstrated to establish a violation of § 1. *FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 457 (1986). A trade restraint "may be adjudged unreasonable either because it fits within a class of restraints that has been held to be *'per se'* unreasonable, or because it violates what has come to be known as the 'Rule of Reason.' " Id. at 458. Under the rule of reason, "the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint upon competition." *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 49 (1977). While the rule of reason requires a demonstration of anticompetitive effects or actual harm to competition in order to establish an antitrust violation, "[w]hen a *per se* offense is alleged, a showing of anticompetitive effect is *not* required to establish a Sherman Antitrust Act violation." *Bunker Ramo Corp. v. United Business Forms, Inc.,* 713 F.2d 1272, 1283-84 (7th Cir.1983); *see also Barrett v. United States Banknote Corp.,* No. 7420, 1992 WL 232055, at *4 (S.D.N.Y. Sept. 2, 1992) ("The plaintiff who successfully alleges a *per se* violation relieves himself of the requirement of showing anticompetitive effect."). A particular course of conduct is not considered a *per se* violation until the courts have had "considerable experience" with that type of conduct and application of the rule of reason has inevitably resulted in a finding of anticompetitive effects. *United States v. Topco Assocs., Inc.,* 405 U.S. 596, 607-08 (1972); *Bunker Ramo,* 713 F.2d at 1284. For the reasons stated below, the Court holds that the conduct alleged in the Amended Complaint falls plainly within the definition of a *per se* violation. Philip Morris has properly pleaded a conspiracy resulting in an unreasonable restraint of trade that injured its business. The Defendants' various arguments supporting the motions to dismiss Counts I and II are rejected and the motions denied.

### 1. Applicability of *Per Se* Rule

**\*8** The Supreme Court has stated that "agreements among competitors to fix prices on their individual goods or services are among those concerted activities ... held to be within the *per se* category." *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.,* 441 U.S. 1, 8 (1979). In determining whether particular conduct qualifies as price fixing, the Court does not take a literal approach, looking for the mere act of "fixing" a "price." Id. at 9. "Not all arrangements among actual or potential competitors that have an impact on price are *per se* violations of the Sherman Act or even unreasonable restraints." Id. at 23. Rather, the characterization of particular conduct depends upon its economic impact--"that is, whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output, and in what portion of the market, or instead one designed to 'increase economic efficiency and render markets more, rather than less competitive.' " Id. at 19-20 (citation omitted).

Thus, in *Broadcast Music,* the Court ruled that the issuance of blanket licenses to copyrighted musical compositions at fees previously arranged was not *per se* unlawful, despite the fact that it involved "price fixing" in the literal sense. It reasoned that the blanket license was not a "naked restrain [t] of trade," but rather, a practical response to market realities, accompanying "the integration of sales, monitoring and enforcement against unauthorized copyright use." Id. at 20. Consequently, given what the Court perceived to be the lawful, useful purposes of the blanket licenses, it reversed the Court of Appeals' application of the *per se* standard to the facts and remanded the case for rule of reason analysis.

In *Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643 (1980), the Court reaffirmed its commitment to the proposition that price fixing, as a general rule, is unlawful *per se.* The case involved a group of beer

Not Reported in F.Supp.  
Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)  
**(Cite as: 1996 WL 363156 (S.D.N.Y.))**

Page 7

wholesalers who allegedly conspired to fix credit terms for purchases by retailers. In noting that "[i]t has long been settled that an agreement to fix prices is unlawful *per se," id.* at 647, the Court concluded that since an agreement to limit credit was tantamount to the elimination of price discounts, the conduct at issue constituted a practice which fell "squarely within the traditional *per se* rule against price fixing." *Id.* at 648. Given that none of the redeeming virtues which accompanied the *Broadcast Music* price fixing existed in *Catalano,* 446 U.S. at 649, the Court did not engage in an analysis of whether the conduct "would always or almost always tend to restrict competition and decrease output." *Broadcast Music,* 441 U.S. at 19-20.

The conduct alleged in this case involves a conspiracy on the part of commercial suppliers and Philip Morris employees to fix prices for goods and services at artificially inflated rates. The Court, accepting the well-pleaded allegations of the Complaint as true, views this behavior, on its face, as price fixing. It finds no evidence of economic or particularized industry circumstances suggesting that the alleged conspiracy developed as a legitimate business response to factors in the marketplace or served any other redeeming purpose. Further analysis under *Broadcast Music,* or any proof of anticompetitive effect, is therefore unnecessary. The alleged conspiracy is an example of price fixing that is unlawful *per se.* Thus, Counts I and II, raising claims under § 1 of the Sherman Act, state claims upon which relief can be granted and may not be dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

**\*9** Furthermore, the allegations here form a textbook case of bid rigging. Courts have specifically classified bid-rigging as a form of price fixing that constitutes a *per se* violation. *United States v. Koppers Co.,* 652 F.2d 290, 294 (2d Cir.1981), *cert. denied,* 454 U.S. 1083 (1982); *see also United States v. W.F. Brinkley & Son Constr. Co., Inc.,* 783 F.2d 1157, 1161 (4th Cir.1986) ("[W]here two or more persons agree that one will submit a bid for a project higher or lower than the others or that one will not submit a bid at all, then there has been an unreasonable restraint of trade which violates the Sherman Antitrust Act."); *United States v. Fischbach & Moore, Inc.,* 750 F.2d 1183, 1192 (3d Cir.1984) ("[P]rice fixing and bid rigging are *per se* violations."), *cert. denied,* 470 U.S. 1029 (1985); *United States v. Portsmouth Paving Corp.,* 694 F.2d 312, 325 (4th Cir.1982) ("Any agreement between competitors pursuant to which contract offers are submitted to or withheld from a third party constitutes bid rigging *per se.*"); *United States v. Brighton Bldg. & Maintenance Co.,* 598 F.2d 1101, 1106 (7th Cir.) ("An agreement among competitors to rig bids is illegal"), *cert. denied,* 444 U.S. 840 (1979); *United States v. Flom,* 558 F.2d 1179, 1183 (5th Cir.1977) ( "Conspiracies between firms to submit collusive, non-competitive, rigged bids are *per se* violations of the statute"); *Barrett,* 1992 WL 232055, at \*4 ("Price fixing and bid rigging generally constitute *per se* violations.... Unlike bid rigging arrangements, however, not every price fixing agreement constitutes a *per se* violation."). As a result, Counts I and II state claims for *per se* violations of the Sherman Act. Demonstration of anticompetitive effect is unnecessary.

The Defendants' argument that the facts of this case constitute nothing more than commercial bribery, outside the scope of the Sherman Act, is without merit. Unlike the cases cited by Defendants, *see, e.g., Calnetics Corp. v. Volkswagen,* 532 F.2d 674, 687 (9th Cir.) (no antitrust violation where commercial bribery alleged without allegations of price fixing or bid rigging), *cert. denied,* 429 U.S. 940 (1976); *Federal Paper Bd. Co. v. Amata,* 693 F.Supp. 1376, 1380 (D.Conn.1988) (bribery, standing alone without allegations of collusion, does not establish antitrust claim), Philip Morris has alleged more than mere commercial bribery: it has alleged facts detailing an extensive bid rigging scheme involving the Defendants. This is precisely the type of conduct that the Sherman Act prohibits. Thus, the cases cited by the Defendants are distinguishable.

2. Rule of Reason

The Court need not apply the rule of reason to Counts I and II. Nonetheless, it holds that even if the claims did not state *per se* price fixing violations, they would properly allege Sherman Act claims for unreasonable restraint of trade under this analysis as well.

3. Statute of Limitations

**\*10** A majority of the Defendants contend that the Sherman Act counts should be dismissed for failing to satisfy the statute of limitations for filing antitrust actions. "Any action to enforce any cause of action under sections 15, 15a or 15c of this title shall be forever barred unless commenced within four years after the cause of action accrued." 15 U.S.C. § 15b. Philip Morris filed its initial complaint on January 17, 1995. Thus, according to the Defendants, any conduct alleged to constitute a Sherman Act violation which accrued prior to January 17, 1991 is time-barred. In the context of a continuing conspiracy to

Not Reported in F.Supp.  
Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)  
**(Cite as: 1996 WL 363156 (S.D.N.Y.))**

Page 8

violate antitrust laws, a separate cause of action is said to accrue each time an act of the defendant injures the plaintiff. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338 (1971). This requires an overt act: claims premised upon damages which result from conduct which occurred outside the limitations period are time-barred. *Argus Inc. v. Eastman Kodak Co.,* 552 F.Supp. 589, 594 (S.D.N.Y.1982), *aff'd,* 801 F.2d 38 (2d Cir.1986), *cert. denied,* 479 U.S. 1088 (1987). Since Philip Morris alleges that bid rigging continued "from the early 1980s through 1991," (Amend.Compl. at ¶ ¶ 120, 126), then it is possible to conclude, reading the facts in favor of the Plaintiff, that antitrust injuries accrued subsequent to January 17, 1991. To the extent that Counts I and II derive from antitrust injuries alleged to have accrued during this period, the counts, on their face, satisfy the statute of limitations and may not be dismissed.

### i. § 16(i) Tolling

Furthermore, the federal government's filing of a criminal information against Defendant Jomar on March 4, 1993 tolled the statute of limitations as of that date, pursuant to 15 U.S.C. § 16(i). This provision provides:

> [w]henever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws ... the running of the statute of limitations in respect of every private or State right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter: *Provided, however,* That whenever the running of the statute of limitations in respect of a cause of action arising under section 15 or 15c of this title is suspended hereunder, any action to enforce such cause of action shall be forever barred unless commenced either within the period of suspension or within four years after the cause of action accrued.

Philip Morris brings its Sherman Act claims pursuant to § 15. Consequently, if counts I and II are deemed to be "based in whole or in part on any matter complained of in" the federal government's criminal proceeding against Jomar, then the counts are timely to the extent that they are premised upon antitrust causes of action which accrued after March 4, 1989.

**\*11** Several Defendants argue that the government's action against Jomar involves a different conspiracy among different Defendants, and thus, may only toll the statute of limitations for the specific parties named in the government's action, or at the very least, for the parties allegedly involved in the Mounting and Finishing conspiracy. The Supreme Court has held, however, that "[t]he private plaintiff is not required to allege that the same means were used to achieve the same objectives of the same conspiracies by the same defendants." *Leh v. General Petroleum Corp.,* 382 U.S. 54, 59 (1965). In fact, the statute of limitations may be tolled against defendants to the private suit even if they were "named neither as a defendant nor as a coconspirator by the Government." *Zenith Radio,* 401 U.S. at 335.

> We see nothing destructive of Congress' purpose in holding that [§ 16(i) ] tolls the statute of limitations against all participants in a conspiracy which is the object of a Government suit, whether or not they are named as defendants or conspirators therein; indeed, to so hold materially furthers congressional policy by permitting private litigants to await the outcome of Government suits and use the benefits accruing therefrom.

*Id.* at 336.

Nonetheless, the Court must exercise care to insure that "reliance upon the government proceeding is not mere sham and that the matters complained of in the government proceeding bear a real relation to the private plaintiff's claim for relief." *Leh,* 382 U.S. at 59. It does so by comparing the plaintiff's complaint with the complaint in the government proceeding on which the plaintiff relies. *Id.* While the complaints need not be identical, the Third Circuit has defined "real relation" by stating that there must be a "substantial identity" in order to invoke § 16(i) tolling. *New Jersey v. Morton Salt Co.,* 387 F.2d 94, 98 (3d Cir.1967), *cert. denied,* 391 U.S. 967 (1968). The Second Circuit has not provided a definition for when the similarity between the two complaints is enough for tolling, but it has ruled that there is an insufficient basis when the only similarity is that some of the defendants are the same. *Peto v. Madison Square Garden Corp.,* 384 F.2d 682, 682 (2d Cir.1967) (no "real relation" between claims where conspiracies in two complaints are entirely different, involve different sports activities and cover different periods of time), *cert. denied,* 390 U.S. 989 (1968); *see also Charley's Tour and Transp., Inc. v. Interisland Resorts, Ltd.,* 618 F.Supp. 84, 86 (D.Haw.1985) (no tolling where cases involved different markets [rental rates for hotel rooms versus charter bus market], different defendants and different means of proof).

In this case, the Court holds that there is a "real relation" between the criminal information filed

Not Reported in F.Supp.  
Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)  
**(Cite as: 1996 WL 363156 (S.D.N.Y.))**

Page 9

against Jomar and Philip Morris' Amended Complaint. The Jomar information alleges that Jomar and its coconspirators engaged in a combination and conspiracy to unreasonably restrain trade by rigging bids and allocating contracts for the supply of graphic materials to Philip Morris. (Amend.Compl. at ¶ 102.) Philip Morris, in its Amended Complaint, makes the same allegations against a number of Defendants, elaborating upon the mechanics of the scheme. The fact that Philip Morris identifies two overlapping cells of Defendants which arranged the schemes to accommodate Philip Morris' bidding process does not alter the fact that the participants, objects and mechanics of the Mounting and Finishing Vendors' and the Corrugated Vendors' schemes were essentially the same. At the very least, this is a factual question. Thus, the Court finds that Philip Morris can argue a set of facts that the criminal information filed against Jomar tolled the statute of limitations pursuant to § 16(i) as to all other Defendants, as of March 4, 1993. The Court need not determine when this tolling terminated, since the criminal information filed against Cappelli on January 3, 1994, (Amend.Compl. at ¶ 104), in any event, was filed prior to the termination of the Jomar proceedings. Thus, it may be tacked onto the Jomar tolling. As the Cappelli proceedings had not terminated as of the date the Amended Complaint was filed, the Sherman Act claims are timely to the extent that they are based upon claims which accrued after March 4, 1989.

ii. Fraudulent Concealment

 *12 As for claims accruing prior to March 4, 1989, Philip Morris argues that they are timely as well on the theory that the statute of limitations tolled from the start on account of the Defendants' fraudulent concealment. An antitrust plaintiff may prove fraudulent concealment sufficient to toll the statute of limitations by establishing: "(1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part." New York v. Hendrickson Bros., Inc., 840 F.2d 1065, 1083 (2d Cir.1988), cert. denied, 488 U.S. 848 (1988). The Second Circuit has characterized bid-rigging conspiracies as inherently self-concealing activities. The plaintiff satisfies the first prong of the fraudulent concealment test by demonstrating the existence of the conspiracy. Id. at 1083-84.

 While pleading of the Defendants' affirmative acts is not necessary under Hendrickson to meet the first prong of the doctrine in a case of an alleged bid-rigging scheme, "such pleading may be necessary to sufficiently allege the second and third elements." New York v. Cedar Park Concrete Corp., 684 F.Supp. 1229, 1232 (S.D.N.Y.1988). "The burden rests squarely on the party pleading fraudulent concealment.... Courts furthermore require particularity in pleading fraudulent concealment." Donahue v. Pendleton Woolen Mills, Inc., 633 F.Supp. 1423, 1443 (S.D.N.Y.1986). General assertions of ignorance and due diligence without more specific explanation for the delay in bringing a suit will not satisfy these pleading requirements. Id. at 1233. In this case, Philip Morris has not specifically alleged in any detail when it became aware of the conspiracy. While it infers that it learned of it subsequent to the unsealing of records from criminal proceedings against some of the Defendants, as well as from information provided by Cappelli and Clemence as part of their cooperation agreements, (Amend.Compl. at 14, n. 1, 24, n. 2), nowhere does Philip Morris assert exactly when it acquired the "actual knowledge" of its causes of action against the Defendants. See Cedar Park, 684 F.Supp. at 1233.

 Furthermore, Philip Morris has not adequately pleaded diligence in attempting to discover the alleged fraud. While it states that it undertook an internal investigation, "[m]ore specific information is required as to the difficulties, if any, [it encountered] with the progression of the investigation.... Moreover, plaintiff should allege, with more specificity, when, despite these obstacles, it acquired 'actual knowledge.' " Id. The date by which a Plaintiff should have discovered the existence of fraud may be a question of fact, American Credit Indemnity Co. v. Legge, 829 F.Supp. 649, 650-51 (S.D.N.Y.1993), but Philip Morris must nonetheless first allege some facts sufficient to argue that it was diligent and did not learn of the alleged fraud until a time within the statute of limitations period. Thus, even reading the Amended Complaint generously for the Plaintiff, the Court rules that Philip Morris has failed adequately to plead fraudulent concealment. Accordingly, the Court grants the Defendants' motion to dismiss the portions of the Amended Complaint that seek damages for claims arising prior to March 4, 1989, without prejudice to the Plaintiff's repleading the fraudulent concealment sections within 60 days. As discussed below, since antitrust claims do not require pleading with particularity, Philip Morris' assertions in the Amended Complaint that both schemes continued through 1991, given the generous reading

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)  
**(Cite as: 1996 WL 363156 (S.D.N.Y.))**

Page 10

accorded plaintiffs' complaints in 12(b)(6) motions, satisfactorily states a claim against each of the Defendants subsequent to March 4, 1989. Thus, dismissal of causes of action accruing prior to this date does not result in dismissal of any individual defendant from the Amended Complaint for purposes of this motion.

### 4. Pleading Requirements

**\*13** The liberal system of notice pleading applies to antitrust causes of action. *In re NASDAQ Market-Makers Antitrust Lit.,* 894 F.Supp. 703, 710 (S.D.N.Y.1995); Fed.R.Civ.P. 8(a). Philip Morris need not plead its antitrust claims with the particularity required by Fed.R.Civ.P. 9(b). Thus, while it is not enough to merely state that a conspiracy has taken place, "great leeway should be allowed the pleader, since by the nature of the conspiracy, the details may not be readily known at the time of the pleading." *Id.* (quoting 2A James W. Moore et al., & J. Lucas, Moore's Federal Practice ¶ 8.17(5) (1986)); *see also Hospital Bldg. Co. v. Trustees of Rex Hosp.,* 425 U.S. 738, 746 (1976) ("[I]n antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly") (citation omitted); 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1228, at 221-24 (2d ed. 1990). Furthermore, "[a]n overt act need not be pleaded against each defendant, because a single overt act by just one of the conspirators is enough to sustain a conspiracy claim on the merits." *Cedar Park,* 665 F.Supp. at 246-47. Identifying the co-conspirators and describing the nature and effect of the alleged conspiracy is sufficient. *Alco Standard Corp. v. Schmid Bros., Inc.,* 647 F.Supp. 4, 6 (S.D.N.Y.1986).

In the Amended Complaint, Philip Morris more than satisfies the pleading requirements for a Sherman Act claim, identifying all of the coconspirators and explaining in some detail the nature and effect of the alleged conspiracy. The Court rejects the argument of certain defendants that Philip Morris failed to allege necessary particulars as to how and when individual Defendants joined the conspiracy. This degree of specificity is clearly not required by Rule 8(a). *Three Crown Ltd. Partnership v. Caxton Corp.,* 817 F.Supp. 1033, 1047 (S.D.N.Y.1993). The Sherman Act claims satisfy pleading requirements.

Furthermore, as the Amended Complaint satisfies the notice requirements for an antitrust action, the demand of Defendants Winko N.J. and Republic N.Y. for a more definite statement pursuant to Fed.R.Civ.P. 12(e) is denied.

### C. The Donnelly Act Claims

New York State's Donnelly Act, [FN3] N.Y.Gen.Bus.Law § 340 (1988), prohibiting restraint of trade, is modeled after the Sherman Act and is generally construed in light of federal precedent. *Anheuser-Busch, Inc. v. Abrams,* 71 N.Y.2d 327, 335, 525 N.Y.S.2d 816, 820 (1988); *State v. Mobil Oil Corp.,* 38 N.Y.2d 460, 463, 381 N.Y.S.2d 426, 428 (1976). The New York State Court of Appeals has definitively asserted that the *per se* rule applies in price fixing cases under the Donnelly Act. *People v. Rattenni,* 81 N.Y.2d 166, 171-72, 597 N.Y.S.2d 280, 283 (1993). In fact, New York courts have specifically held bid-rigging to be a *per se* violation. *People v. Schwartz,* 554 N.Y.S.2d 686, 686-87 (App.Div.2d Dep't 1990). Thus, the Court holds that Philip Morris has adequately alleged Donnelly Act claims. As the same statute of limitations which applies to the Sherman Act also applies to the Donnelly Act, *see* N.Y.Gen.Bus.Law § 340(5), the motions to dismiss Counts III and IV are assessed in the same manner as Counts I and II. To the extent that the claims arise from causes of action accruing after March 4, 1989, the motions to dismiss are denied. The motions to dismiss causes of action accruing prior to this date are granted, without prejudice to Philip Morris' right to replead the elements of fraudulent concealment within 60 days.

> FN3. The statute provides, in relevant part:
> 1. Every contract, agreement, arrangement or combination whereby A monopoly in the conduct of any business, trade or commerce or in the furnishing of any service in this state, is or may be established or maintained, or whereby
> Competition or the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state is or may be restrained ... is hereby declared to be against public policy, illegal and void. N.Y.Gen.Bus.Law § 340 (1988).

### D. Common Law Fraud

**\*14** Counts V, VI and VII allege common law fraud, respectively, against the Mounting and Finishing Vendors (Amend.Compl. at ¶ 143), the Corrugated Vendors along with the members of the Masta Group who took part in their alleged scheme, (Amend.Compl. at ¶ 151), and Heinrich. (Amend.Compl. at ¶ 161). The majority of the

Not Reported in F.Supp.  
Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)  
**(Cite as: 1996 WL 363156 (S.D.N.Y.))**

Page 11

Defendants move to dismiss the fraud claims for failing to plead the counts with particularity, pursuant to Fed.R.Civ.P. 9(b), and failure to satisfy the statute of limitations.

              1. Rule 9(b) Particularity

Fed.R.Civ.P. 9(b) states:

  (b) Fraud, Mistake, Condition of the Mind. In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

  The purpose of Rule 9(b) is threefold: it is designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from "improvident charges of wrongdoing," and to protect the defendant from the institution of a strike suit. O'Brien v. National Property Analysts Partners, 936 F.2d 674, 676 (2d Cir.1991). In reviewing a decision to dismiss on 9(b) grounds, the truth of plaintiff's allegations is assumed. DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir.1987). The pleadings must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements. Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir.1989); see also McLaughlin v. Anderson, 962 F.2d 187, 191 (2d Cir.1992); June Ox v. Union Central Life Ins. Co., No. 94-CIV-4754, 1995 WL 296541, at *3 (S.D.N.Y. May 15, 1995). Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud. DiVittorio, at 1247. Finally, the complaint must assert that the defendant had an intent to defraud, or allege circumstances from which an inference of such intent may be drawn. Id.; see Beck v. Manufacturers Hanover Trust Co., 820 F.2d 46, 50 (2d Cir.1987), cert. denied, 484 U.S. 1005 (1988), overruled en banc on other grounds, United States v. Indelicato, 865 F.2d 1370 (2d Cir.1989).

 Rule 9(b) is to be construed in light of Rule 8's more lenient pleading requirement of "a short and plain statement of the claim." Keenan v. D.H. Blair & Co., Inc., 838 F.Supp. 82, 86 (S.D.N.Y.1993). Thus, when the facts are peculiarly within the opposing party's knowledge, a plaintiff may base his allegations upon information and belief. DiVittorio, 822 F.2d at 1247. However, that exception to Rule 9(b)'s particularized pleading requirement "does not constitute a license to base claims of fraud on speculation or conclusory allegations." Karasyk v. Marc Commodities Corp., 770 F.Supp. 824, 830 (S.D.N.Y.1991). Where pleading is permitted on information and belief, a complaint must adduce specific facts supporting a strong inference of fraud, or it will not satisfy a relaxed pleading standard. Id.

 *15 In this case, the Court finds nothing improper about Philip Morris having pleaded its fraud claims on information and belief, given the reality that a bid rigging conspiracy is by its nature self-concealing. This reality does not release a plaintiff from its burden under Rule 9(b), however. While this standard is normally strict, the Court will relax it in a case where the Plaintiff demonstrates that the Defendants' own conduct has interfered with the discovery of facts necessary to properly plead fraud. See Bethlehem Steel Corp. v. Fischbach and Moore, Inc., 641 F.Supp. 271, 276 (E.D.Pa.1986) ( Rule 9(b) satisfied where plaintiff alleges general time frame, the bid-rigging, its reliance on the conduct and the alleged damage). Philip Morris has not so demonstrated here. While it has stated that "certain of the facts upon which this [complaint] is based are solely within the defendants' knowledge," (Amend.Compl. at 14, n. 1), it has not shown what efforts it has undertaken to discover the necessary facts, explained the problems encountered in doing so, or alleged other information inferring the existence of such facts. On the contrary, the company's cooperation agreements with Cappelli and Clemence, both of whom are alleged to have been key players in the fraudulent schemes, indicate that it has access to more detailed information concerning the alleged fraud. Yet, with the exception of certain instances in which bribes are claimed to have been paid, Philip Morris has largely failed to plead these particulars. Luce v. Edelstein, 802 F.2d 49, 54 (2d Cir.1986). Unlike antitrust actions, fraud claims require more than simple notice pleading. If Philip Morris knows specifics about when and how the supposed misrepresentations occurred, it should plead them. If it does not, it should explain why not. As it stands now, Rule 9(b) has not been satisfied. Accordingly, Counts V, VI and VII  [FN4] are dismissed. Philip Morris is granted leave to replead within 60 days.

    FN4. Although Heinrich has not submitted a brief requesting that Count VII be dismissed, the Court does so *sua sponte.* Fischer v. Yaakov, 575 N.Y.S.2d 310, 310 (App.Div. 1st Dep't 1991).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)  
**(Cite as: 1996 WL 363156 (S.D.N.Y.))**

Page 12

### 2. Scienter

Assuming that the fraud counts are repleaded in conformity with Rule 9(b), the Court holds that they properly plead scienter. While Rule 9(b) itself relaxes the scienter requirement, the Plaintiff must still plead a factual basis sufficient to raise a "strong inference" of knowledge. O'Brien, 936 F.2d at 676. The Amended Complaint contains numerous facts showing conscious behavior on the part of all the Defendants involved in the alleged fraud to hide from Philip Morris the bid-rigging scheme.

### 3. Duty to Disclose

Some Defendants claim that they have no liability for fraud, based upon concealment or omission, because they had no duty to disclose the information that was allegedly concealed. Contrary to Defendants' arguments, however, in a case such as this, where they are accused of bid-rigging, Defendants have a duty to disclose regardless of whether they have a fiduciary or confidential relationship with the Plaintiff. Three Crown Ltd. Partnership v. Caxton Corp., 817 F.Supp. 1033, 1049 (S.D.N.Y.1993) (duty to disclose where defendants create "artificial market" or "price mirage").

### 4. Statute of Limitations

**\*16** In New York, an "action for fraud must be commenced within six years of the commission of the fraud or within two years from its discovery, whichever is longer." Chase v. Columbia Nat'l Corp., 832 F.Supp. 654, 659 (S.D.N.Y.1993); N.Y.Civ.Prac.L. & R. 208(g), 213(8) (McKinney 1990 and Supp.1995). As the claims have been dismissed for failure to plead with particularity, the Court need not determine whether the statute of limitations has been satisfied. Furthermore, since the counts do not specify when the alleged acts of fraud were committed or discovered, the Court *cannot* determine their timeliness. If the claims are properly repleaded, the Court will assess their conformity with the statute of limitations at that time.

### E. Breach of Fiduciary Duty

Count VIII states a claim for breach of fiduciary duty against Heinrich while Counts IX and X allege breach of fiduciary duty of another [FN5] against the Mounting and Finishing Vendors and the Corrugated Vendors, respectively. Most Defendants have moved to dismiss these claims citing the statute of limitations. New York provides no express statute of limitations for breach of fiduciary duty claims. Mejia-Ricart v. Bear Stearns & Co., No. 95-CIV-582, 1996 WL 94810, at \*3 (S.D.N.Y. Mar. 4, 1996).

Courts have applied either a three-year or six-year limitations period, depending on the nature of the substantive relief sought. Ghandour v. Shearson Lehman Bros. Inc., 624 N.Y.S.2d 390, 392 (App.Div. 1st Dep't 1995). When the only damages sought are legal, the statute of limitations is generally three years. Where the nature of the relief sought is equitable, the claim is governed by a six-year statute of limitations. Toto v. McMahan, Brafman, Morgan & Co., No. 93-CIV-5894, 1995 WL 46691, at \*11 (S.D.N.Y.1995); see also Renz v. Beeman, 589 F.2d 735, 749 (2d Cir.1978) (six-year period applied where plaintiff sought imposition of constructive trust), *cert. denied*, 444 U.S. 834 (1979); Loengard v. Santa Fe Indus., Inc., 70 N.Y.2d 262, 266-67, 519 N.Y.S.2d 801, 803-04 (1987) (where breach of fiduciary obligation claim is equitable in nature, six-year statute of limitations governs). Furthermore, courts have applied the six-year period when the plaintiff's claim has its genesis in the parties' contractual relationship. Mejia-Ricart, 1996 WL 94810, at \*3; Varnberg v. Minnick, 760 F.Supp. 315, 333 (S.D.N.Y.1991).

> FN5. The parties have variously characterized this cause of action as aiding and abetting breach of fiduciary duty and inducement to breach of fiduciary duty. The particular label used to describe the substantive action is irrelevant for purposes of this discussion.

While the Plaintiff in this case seeks only damages against the Vendor Defendants in Counts IX and X, it requests equitable relief against Heinrich in Counts XIV and XV in the form of a constructive trust and forfeiture. These counts indirectly reference Count VIII, noting Heinrich's acceptance of bribes and "disloyalty" during his period of employment. Given the nature of the relief sought against Heinrich, as well as the fact that the breach of fiduciary duty claim against him arises from his alleged violations of his employment terms, the Court will apply a six-year statute of limitations to the claim against Heinrich.

**\*17** The Court rejects Philip Morris' contention that Dolmetta v. Uintah Nat'l Corp., 712 F.2d 15, 19 (2d Cir.1983), establishes a six-year statute of limitations for aiding and abetting breach of fiduciary duty. *Dolmetta* simply held that the purported aiding and abetting breach of fiduciary duty claim at issue, in reality, amounted to nothing more than a simple fraud and thus was subject to the statute of limitations for fraud. In fact, courts in this district have interpreted

Case 7:04-cv-08223-KMK     Document 136-4     Filed 04/11/2006     Page 13 of 15

Not Reported in F.Supp.                                                                 Page 13
Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)
**(Cite as: 1996 WL 363156 (S.D.N.Y.))**

New York law to apply a three-year statute of limitations to claims for inducing breach of fiduciary duty. *Fireman's Fund Ins. Co. v. Fraund,* No. 88-CIV-2765, 1989 WL 31490, at *9 (S.D.N.Y. March 31, 1989); *Whitney v. Citibank,* No. 81-CIV-5832, 1985 WL 566, at *5 (S.D.N.Y. April 19, 1985) (dictum).

Philip Morris filed its original complaint on January 17, 1995. Claims accruing against Heinrich prior to January 17, 1989 and against the remainder of the Defendants prior to January 17, 1992 must be dismissed as time-barred. As Philip Morris has alleged bid-rigging through 1991, Count VIII against Heinrich is timely. [FN6] Counts IX and X, against the remaining Vendor Defendants, are not. Accordingly, Counts IX and X are dismissed, while Count VIII survives.

> FN6. While Heinrich has not raised any arguments for dismissal of this claim, the Court notes in passing that Count VIII need not be pleaded with particularity.

F. Commercial Bribery

Counts XI and XII allege commercial bribery against the Mounting and Finishing and Corrugated Vendor Defendants respectively, while Count XIII charges Heinrich with commercial bribe receiving. All three counts derive from the New York State Penal Law. N.Y. Penal Law § § 180.03, 180.08 (McKinney 1988). The Defendants move to dismiss Counts XI and XII, arguing that there is no private cause of action for violations of the penal code, that they fail to satisfy the statute of limitations and that they are not pleaded with particularity.

In a similar case involving the Texas Commercial Bribery statute, this Court refused to imply a private right of action under the penal statute where one did not expressly exist.

> No case has come to the Court's attention in which a private cause of action for commercial bribery has been implied under this statute. In the absence of any guidance from state courts, federal courts are hesitant to imply private rights of action from state criminal statutes. Moreover, courts should consider whether a private right of action is necessary to protect the intended beneficiaries of a statute when determining whether to imply a private right of action.

*In re Integrated Resources, Inc. Real Estate Ltd. Partnership Sec. Lit.,* 851 F.Supp. 556, 564 (S.D.N.Y.1994) (citation omitted). The Court also noted that there was no reason to imply a private right of action because if the plaintiffs' allegations had merit, they would be entitled to recover on their common law claims for breach of fiduciary duty. *Id.* While this case involved Texas law, it is nonetheless instructive. As was true in *Integrated Resources,* if Philip Morris' allegations had been timely and properly pleaded, it would have been entitled to recover for both common law fraud and breach of fiduciary duty. Thus, it seems equally unnecessary to create a private right of action arising from New York penal law in this instance.

*18 Furthermore, New York case law is far from clear as to whether a private cause of action exists for New York's Commercial Bribery statute. Some older cases, cited by Philip Morris, seem to accept the possibility, but fall short of affirmatively establishing such a cause of action. *Galella v. Onassis,* 353 F.Supp. 196, 227 (S.D.N.Y.1972) (violations of a prohibitory statute give rise to tort liability), *rev'd on other grounds,* 487 F.2d 986 (2d Cir.1973); *Shemin v. A. Black & Co.,* 240 N.Y.S.2d 622 (App.Div. 1st Dep't 1963) (tacitly acknowledging existence of private right of action, but noting that claim not proven); *31 Hillside Realty Corp. v. Norton,* 101 N.Y.S.2d 437, 440 (Special Term, Bronx Co.1950) (where violation is punishable by penal law, there is no reason why it should not be actionable civilly); *see also Texwood Ltd v. Gerber,* 621 F.Supp. 585, 589-90 (S.D.N.Y.1985) (noting lack of cited authority for proposition that private right of action exists under commercial bribery statute, but allowing that employer may recover bribes paid to employee in violation). Recent case law, however, has cast doubt upon the vitality of these earlier decisions. *Curiale v. Capolino,* 883 F.Supp. 941, 948 (S.D.N.Y.1995) (citing *CPC Int'l v. McKesson Corp.,* 70 N.Y.2d 268, 275-76, 519 N.Y.S.2d 804, 807-08 (1987) (rejecting implied private causes of action for two regulatory statutes)). The New York Court of Appeals has stated that the Legislature should specify in the statute itself whether private litigants are intended to have a cause of action under its provisions. *Burns Jackson Miller Summit & Spitzer v. Lindner,* 59 N.Y.2d 314, 325, 464 N.Y.S.2d 712, 716 (1983). Absent such a directive, the courts are to determine themselves, considering such factors as legislative history, consistency with the overall legislative scheme of creating the private right and whether the plaintiff is one of the class for whose special benefit the statute was enacted. *Id.* Given the lack of any clear guidance from the New York courts on this issue, the Court adopts the logic of *Integrated Resources,* declining the invitation to imply a private

Not Reported in F.Supp.  
Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)  
**(Cite as: 1996 WL 363156 (S.D.N.Y.))**

Page 14

cause of action under New York's Commercial Bribery statute.

Even if there were a private right of action, the Court holds that the applicable statute of limitations period is three years. Thus, the claims are untimely anyway. Counts XI, XII and XIII are dismissed. [FN7]

> FN7. Once again, the Court dismisses the claim against Heinrich *sua sponte.* The cause of action cannot be maintained given the Court's view that such a private right has not been established.

G. The Government's Motions to Intervene And Stay Discovery

Rule 24(a) of the Federal Rules of Civil Procedure provides that a party may intervene as of right in an action "when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest...." Fed.R.Civ.P. 24(a)(2). Alternatively, Rule 24(b) permits permissive intervention "when an applicant's claim or defense and the main action have a question of law or fact in common." Fed.R.Civ.P. 24(b)(2). As a rule, district courts in this Circuit have allowed the government to intervene in civil actions, especially when the government wishes to do so for the limited purpose of moving to stay discovery. *Twenty First Century Corp. v. LaBianca,* 801 F.Supp. 1007, 1009 (E.D.N.Y.1992). In this civil case, as in *LaBianca,* the Government seeks to intervene to protect its companion criminal prosecution from prejudice. Because the Government has a limited purpose for intervention--moving to stay civil discovery by way of interrogatories and depositions, excluding document discovery, however, pending disposition of the criminal case--this intervention will not "unduly delay or prejudice the adjudication." Fed.R.Civ.P. 24(b)(2). In such circumstances, a district court does not abuse its discretion in allowing intervention under either of the provisions of Rule 24. *LaBianca,* 801 F.Supp. at 1009 (citing *SEC v. Chestman,* 861 F.2d 49, 50 (2d Cir.1988)). Therefore, the Government's motion to intervene is granted.

*19 A federal district court has the inherent discretionary power to stay an action. *Id.* at 1010. Granting a stay of a civil proceeding to await the outcome of a pending parallel criminal investigation is appropriate when the interests of justice seem to require such action. The Court must balance the competing interests of the litigants, non-parties, the public interest and the convenience of the courts in making such determinations. *Id.* The Government contends that if the civil discovery is not stayed, the criminal investigation will be prejudiced, as the Defendants may have an opportunity to gain evidence to which they are not entitled under criminal discovery rules. The Court holds that this justification provides grounds for granting the stay. In consideration of the Defendants' interest in expediting litigation of the civil suit, however, discovery (excluding document discovery) is stayed only through December 31, 1996, without prejudice to the Government's right to request an extension should one become necessary. The Government, of course, will have to make such a request and demonstrate its necessity prior to the stay's expiration.

H. *Ex Parte* Status Of Government Affidavit

The Court has not considered the affidavit submitted *ex parte* and will not do so for purposes of deciding the cross-motion for a show cause hearing. Thus, as the document is irrelevant to a determination, it need not be turned over to the Defendants. The Defendants are directed to submit their reply brief on the cross-motion, without reference to the unreviewed *ex parte* affidavit, within 20 days of the date of this decision.

III. Conclusion

The motions to dismiss Counts I-IV alleging Sherman Act and Donnelly Act claims are denied as to claims which accrued subsequent to March 4, 1989 and granted as to claims which accrued prior March 4, 1989. Philip Morris is granted leave to replead fraudulent concealment within 60 days of the date hereof.

The motions to dismiss Counts V-VI, sounding in common law fraud, are granted, and Count VII is dismissed *sua sponte,* without prejudice to Philip Morris' right to replead the alleged fraud with particularity within 60 days of the date hereof.

The Court retains Count VIII against Heinrich for breach of fiduciary duty.

The motions to dismiss Counts IX-X, for breach of fiduciary duty of another, are granted, with leave for Philip Morris to replead fraudulent concealment within 60 days of the date hereof.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 15
Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)
**(Cite as: 1996 WL 363156 (S.D.N.Y.))**

The motions to dismiss Counts XI-XIII, alleging commercial bribery and commercial bribe receiving, are granted.

The government's motion to intervene is granted, and its motion for a stay of discovery (excluding document discovery) is granted, such stay to expire on December 31, 1996 unless, by application made prior to that date, the government shows reason for an extension thereof.

SO ORDERED.

Not Reported in F.Supp., 1996 WL 363156 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 1:95cv00328 (Docket) (Jan. 17, 1995)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.