UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x
:
WORLD WRESTLING ENTERTAINMENT, INC.,  :  Case No. 04 CV 8223 (KMK)
:  (ECF CASE)
Plaintiff,  :
:
v.  :
:
JAKKS PACIFIC, INC.; JAKKS PACIFIC (H.K.)  :
LIMITED; ROAD CHAMPS LIMITED; THQ, INC.;  :
THQ/JAKKS PACIFIC LLC; STANLEY SHENKER  :
AND ASSOCIATES, INC.; STANLEY SHENKER;  :
BELL LICENSING, LLC; JAMES BELL; JACK  :
FRIEDMAN; STEPHEN BERMAN; JOEL  :
BENNETT; and BRIAN FARRELL,  :
:
Defendants.  :
:
------------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF THQ INC. AND BRIAN FARRELL'S MOTION TO DISMISS THE RICO CLAIMS IN THE AMENDED COMPLAINT

SIDLEY AUSTIN LLP
Steven M. Bierman (SB 6615)
Isaac S. Greaney (IG 0922)
787 Seventh Avenue
New York, New York 10019
Phone: (212) 839-5300
Fax: (212) 839-5599

IRELL & MANELLA LLP
Steven A. Marenberg (*Pro Hac Vice*)
Philip M. Kelly (*Pro Hac Vice*)
1800 Avenue of the Stars
Los Angeles, California 90067
Phone: (310) 277-1010
Fax: (310) 203-7199

*Attorneys for Defendants THQ Inc. and Brian Farrell*

## TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ........................................................................ 1

II.   FACTS .......................................................................................................... 3

III.  ARGUMENT ................................................................................................. 6

      A.   WWE's RICO Claims against the THQ Defendants Fail .................................... 6

           1.   The THQ Defendants Did Not Participate in the "Operation or
                Management" of the RICO Enterprise ...................................................... 6

           2.   The THQ Defendants Did Not Engage in a Pattern of
                Racketeering Activity .............................................................................. 9

                a)   The Alleged Bribery Scheme Does Not Constitute a
                     RICO Pattern ................................................................................ 10

                b)   WWE Cannot Allege Closed-Ended Continuity ......................... 11

                c)   WWE Cannot Allege Open-Ended Continuity ........................... 13

           3.   The THQ Defendants Did Not Commit Any Predicate Acts of
                Racketeering ........................................................................................... 15

      B.   Imposing Vicarious Liability on the THQ Defendants Would Be
           Improper ........................................................................................................ 18

           1.   The Alleged Bribery Scheme Took Place Before the THQ
                Defendants Had Any Association with Jakks ........................................ 18

           2.   Even If THQ Had Been Associated with Jakks at the Time of
                the Alleged Bribery Scheme, THQ Cannot Be Vicariously
                Liable Because It Was Not a "Central Figure" or "Aggressor" ............. 19

IV.   CONCLUSION ............................................................................................. 24

TABLE OF AUTHORITIES

Page(s)

**Cases**

131 Main Street Assocs. v. Manko,
        897 F. Supp. 1507 (S.D.N.Y. 1995)............................................................ 20

Amendolare v. Schenkers Int'l Forwarders, Inc.,
        747 F. Supp. 162 (E.D.N.Y. 1990) ....................................................... 2, 20

Andrews v. Metro North Commuter R.R. Co.,
        882 F.2d 705 (2d Cir. 1989)..................................................................... 5

Bingham v. Zolt,
        683 F. Supp. 965 (S.D.N.Y. 1988) .................................................... 13, 17

Clapp v. Greene,
        743 F. Supp. 273 (S.D.N.Y. 1990) .................................................... 13, 17

Cofacredit, S.A. v. Windsor Plumbing Supply Co.,
        187 F.3d 229 (2d Cir. 1999)..................................................... 2, 10, 11, 14

Copperweld Corp. v. Independence Tube Corp.,
        467 U.S. 752 (1984)................................................................................ 22

Crown Heights Jewish Community Council v. Fischer,
        63 F. Supp. 2d 231 (E.D.N.Y. 1998) ....................................................... 15

Dale v. Banque SCS Alliance S.A.,
        2005 WL 2347853 (S.D.N.Y. Sept. 22, 2005).......................................... 6

DeJesus v. Sears, Roebuck & Co.,
        87 F.3d 65 (2d Cir. 1996)................................................................ passim

Dep't of Econ. Dev. v. Arthur Andersen & Co.,
        924 F. Supp. 449 (S.D.N.Y. 1996) ............................................................ 7

Discon, Inc. v. Nynex Corp.,
        93 F.3d 1055 (2d Cir. 1996)..................................................................... 18

Dubai Islamic Bank v. Citibank, N.A.,
        256 F. Supp. 2d 158 (S.D.N.Y. 2003)....................................................... 16

First Capital Asset Mgmt. v. Satinwood, Inc.,
        385 F.3d 159 (2d Cir. 2004)................................................... 10, 11, 13, 15

Page(s)

First Nationwide Bank v. Gelt Funding Corp.,
    27 F.3d 763 (2d Cir. 1994)........................................................................ 16, 17, 23

GICC Capital Corp. v. Tech. Finance Group, Inc.,
    67 F.3d 463 (2d Cir. 1995)........................................................................ 13, 17

Gruber v. Prudential-Bache Sec., Inc.,
    679 F. Supp. 165 (D. Conn. 1987).............................................................. 19

H.J. Inc. v. Nw. Bell Tel. Co.,
    492 U.S. 229 (1989).................................................................................. 11

Hecht v. Commerce Clearing House, Inc.,
    897 F.2d 21 (2d Cir. 1990)......................................................................... 18

Int'l Bhd. of Teamsters v. Carey,
    163 F. Supp. 2d 271 (S.D.N.Y. 2001)........................................................ 10

Jerome M. Sobel & Co. v. Fleck,
    2003 WL 22839799 (S.D.N.Y. Dec. 1, 2003) ........................................ 13, 17

Jordan (Berm.) Inv. Co. v. Hunter Green Invs. Ltd.,
    154 F. Supp. 2d 682 (S.D.N.Y. 2001)........................................................ 15

Lange v. Hocker,
    940 F.2d 359 (8th Cir. 1991) ...................................................................... 7

LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.,
    951 F. Supp. 1071 (S.D.N.Y. 1996)..................................................... 2, 6, 8

Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.,
    354 F. Supp. 2d 293 (S.D.N.Y. 2004)........................................................ 10

Mills v. Polar Molecular Corp.,
    12 F.3d 1170 (2d Cir. 1993)....................................................................... 17

Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP,
    2004 WL 112948 (S.D.N.Y. Jan. 22, 2004) ............................................. 23

Polycast Tech. Corp. v. Uniroyal, Inc.,
    728 F. Supp. 926 (S.D.N.Y. 1989) ............................................................ 11

Qatar Nat'l. Navigation & Transp. Co. Ltd. v. Citibank, N.A.,
    1992 WL 276565 (S.D.N.Y. 1992)............................................................ 19

Redtail Leasing, Inc. v. Bellezza,
    1997 WL 603496 (S.D.N.Y. Sept. 30, 1997).............................................. 8

Page(s)

Reves v. Ernst & Young,
    507 U.S. 170 (1993) ........................................................................ 2, 6, 7

Roeder v. Alpha Industries, Inc.,
    814 F.2d 22 (1st Cir. 1987) ................................................................. 10

Ruby Dev. Corp. v. Charrim Dev. Corp.,
    742 F. Supp. 1213 (E.D.N.Y. 1990) ...................................................... 12

Scheiner v. Wallace,
    832 F. Supp. 687 (S.D.N.Y. 1993) ........................................................ 15

Schlaifer Nance & Co. v. Estate of Warhol,
    119 F.3d 91 (2d Cir. 1997) ........................................................... 2, 10, 19

Schmidt v. Fleet Bank,
    16 F. Supp. 2d 340 (S.D.N.Y. 1998) ............................................... passim

Shaw v. Rolex Watch, U.S.A., Inc.,
    673 F. Supp. 674 (S.D.N.Y. 1987) ........................................................ 15

Shields v. Citytrust Bancorp, Inc.,
    25 F.3d 1124 (2d Cir. 1994) .................................................................. 22

Strong & Fisher, Ltd. v. Maxima Leather, Inc.,
    1993 WL 277205 (S.D.N.Y. July 22, 1993) ............................................ 8

Timken Roller Bearing Co. v. United States,
    341 U.S. 593 (1951) .............................................................................. 22

United States v. Alkins,
    925 F.2d 541 (2d Cir. 1993) .................................................................. 17

United States v. Biaggi,
    909 F.2d 622 (2d Cir. 1990) .................................................................. 12

United States v. McKeon,
    738 F.2d 26 (2d Cir. 1984) ...................................................................... 5

United States v. Viola,
    35 F.3d 34 (2d Cir. 1994) ........................................................................ 7

United States v. Walgren,
    885 F.2d 1417 (9th Cir. 1989) ............................................................... 11

USA Certified Merchants v. Koebel,
    262 F. Supp. 2d 319 (S.D.N.Y. 2003) ................................................... 20

Page(s)

Vemco, Inc. v. Camardella,
    23 F.3d 129 (6th Cir. 1994) .......................................................................... 12, 13, 17

Watral v. Silvernails Farms, LLC,
    177 F. Supp. 2d 141 (E.D.N.Y. 2001) ...................................................................... 12

Weber v. King,
    110 F. Supp. 2d 124 (E.D.N.Y. 2000 ...................................................................... 21

## Statutes

18 U.S.C. § 1957 ...................................................................................................... 15

18 U.S.C. § 1962(c) .............................................................................................. 6, 7, 9

18 U.S.C. § 2314 ...................................................................................................... 15

## Rules

Fed. R.Civ. P. 9(b) ............................................................................................... 15, 17

Pursuant to the Court's order made at the April 26, 2006, status conference, defendants THQ Inc. ("THQ") and Brian Farrell (collectively, the "THQ Defendants") submit this memorandum in support of their Federal Rule of Civil Procedure 12(b)(6) motion to dismiss the two RICO causes of action – for violation of RICO and conspiracy to violate RICO – in the Amended Complaint of plaintiff World Wrestling Entertainment, Inc. ("WWE").

## I.    PRELIMINARY STATEMENT

Sometimes you can plead too much but say too little.  WWE's Amended Complaint is a case in point.  WWE's original pleading described a discrete and short-lived conspiracy, "implemented in early 1998" and concluding with a "final" bribery payment in August 1998 with a goal of obtaining a single videogame license.  (Original Complaint ("Compl.") ¶¶ 46, 87.)  In an effort to remedy the patent shortcomings of the RICO claim in its original pleading that were identified in Defendants' previous motions to dismiss (e.g., no continuity, no pattern, etc.), WWE has filed an Amended Complaint that attempts to transmogrify the originally alleged scheme into a sprawling, multifaceted conspiracy controlled by the Jakks Defendants[1] that spans almost a decade, originating as early as 1995, with its aims to affect multiple licenses, including a domestic and international toy license, as well as the videogame license.  (Amended Complaint ("AC") ¶¶ 37-40, 249.a.i, 249.b.lxvii.)

As explained below, whatever the efficacy of this endeavor as to other defendants in this case,[2] as to the THQ Defendants, the end result is an Amended Complaint that fails even more surely to satisfy the prerequisites of a RICO claim than the original pleading.  Indeed, the froth of the additional allegations in the Amended Complaint serves only to highlight the limited role

---

[1] The "Jakks Defendants" consist of Jakks Pacific, Inc. ("Jakks"), Jakks Pacific (H.K.) Limited, Road Champs Limited, Jack Friedman, Stephen Berman, and Joel Bennett.

[2] Of course, we do not mean to suggest, even for a moment, that WWE's Amended Complaint is sufficient to state a RICO claim against any defendant in this case.  Nor do we imply that the allegations of this pleading are, in fact, true.  Rather, we have assumed, as is required, the truth of these allegations only for purposes of this motion pursuant to Fed. R. Civ. P. 12(b)(6).

in the alleged scheme that THQ Defendants are alleged to have played, a role that falls far short of that required to constitute a cognizable RICO claim against the THQ Defendants

Specifically, the RICO claims (the only remaining bases for federal jurisdiction following the dismissal of WWE's antitrust claims) in WWE's Amended Complaint are deficient as to the THQ Defendants for all of the following independent reasons:

- **The Amended Complaint fails to allege that THQ Defendants participated in the "operation or management" of any RICO enterprise.** WWE has fallen far short of satisfying this "very difficult" test, LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co., 951 F. Supp. 1071, 1090 (S.D.N.Y. 1996), as it does not and cannot allege that the THQ Defendants played a role in "*directing* the enterprise's affairs." Reves v. Ernst & Young, 507 U.S. 170, 179 (1993) (emphasis added).

- **WWE has failed to allege a sufficient RICO "pattern."** Instead, WWE alleges that the THQ Defendants participated in a *single* bribery scheme to secure a *single* videogame license. This unitary scheme is not sufficient to satisfy the RICO "pattern" requirement. Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 98 (2d Cir. 1997).

- **WWE has failed to allege either the closed- or open-ended continuity required of a RICO claim.** WWE cannot allege closed-ended continuity because the THQ Defendants' involvement with the alleged bribery scheme lasted only a few months, far short of the two years required by Second Circuit precedent. Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 244 (2d Cir. 1999). WWE cannot allege open-ended continuity because the Amended Complaint alleges the end of the conspiracy and therefore forecloses any notion that the scheme presented any threat of continued criminal activity. Id. at 244.

- **The Amended Complaint does not allege sufficient predicate acts of racketeering by either of the THQ Defendants.** WWE alleges no specific, non-conclusory allegations that each of THQ and Brian Farrell knowingly engaged in the criminal activity alleged. DeJesus v. Sears, Roebuck & Co., 87 F.3d 65, 70 (2d Cir. 1996).

- **Allegations of "vicarious liability" cannot salvage the RICO claims against the THQ Defendants.** The THQ Defendants' role in the alleged RICO enterprise was brief, powerless, and decidedly not "central." See Amendolare v. Schenkers Int'l Forwarders, Inc., 747 F. Supp. 162, 168 (E.D.N.Y. 1990). Even if vicarious liability were applicable here (which it is not), these allegations fall well short of the "substantial burden" required to invoke vicarious RICO liability. Schmidt v. Fleet Bank, 16 F. Supp. 2d 340, 351 (S.D.N.Y. 1998).

- **WWE's RICO claims are barred by the applicable four-year statute of limitations.** As explained in detail in the Jakks Defendants' Memorandum of Law, in

which the THQ Defendants hereby join, WWE either knew or should have known of its alleged injury (below-market royalty rates) the moment it entered into the license agreements. Thus, WWE's claims became barred no later than June 24, 2002.[3]

For all or any of these reasons, the Court should grant the motions of Defendants THQ and Brian Farrell to dismiss the RICO and RICO conspiracy claims alleged in the Amended Complaint. And, since once these claims are dismissed no basis for federal jurisdiction remains, the entire action against the THQ Defendants should be dismissed as well.

## II.    FACTS

All of WWE's claims are based on an alleged scheme devised as early as 1995 by the Jakks Defendants to funnel certain WWE toy and videogame licenses to Jakks via bribes paid to defendants James Bell and Stanley Shenker. (Amended Complaint ("AC") ¶ 62, 249.a.i.). WWE's core allegation is as follows:

> Jakks' officers . . . devised a plan in concert with SSAI and Shenker, again trading on their undisclosed agency relationship, whereby SSAI and Shenker would (a) take all actions desired by Jakks to foreclose competition in licensing areas desired by Jakks, including action figures and the videogame license; (b) obtain licensing rights for Jakks which, when granted, would facilitate Jakks' desire to drive Playmates out of the business of WWE action figures; (c) accept monies for favorable treatment on licensing matters . . . ; and (d) pay Bell if need be for his participation in the illegal conduct.

(Id. ¶ 62.) With specific respect to the videogame license, WWE alleges that in exchange for payments to Shenker and Bell,

> it was agreed and understood by Jakks, Shenker and Bell that Bell would act against renewing the existing videogame license with Acclaim; that neither Bell nor Shenker would discharge their fiduciary duties and duty of honest services to WWE by soliciting bids from other companies who would be interested in securing the videogame license; and that both Bell and Shenker would recommend that the videogame license be granted to Jakks on rates well below market value without ever seeking any competitive bids from any other videogame companies.

---

[3] The THQ Defendants incorporate by reference and join in the Jakks Defendants' arguments regarding the statute of limitations, the Jakks Defendants' argument that WWE's alleged RICO injury is too speculative to state a claim, and the Jakks Defendants' argument that WWE's prayer for relief renders the RICO claim void. Because the Jakks Defendants' arguments are fully applicable to the THQ Defendants, they will not be addressed further herein.

(Id. ¶ 104.)  This scheme to secure the videogame license for Jakks, however, was allegedly interrupted by the "intense" competition in the videogame licensing industry, with several other companies contacting WWE about the license.  (Id. ¶ 103.)  First, Acclaim, the then-holder of the WWE videogame license, complained to WWE management that Bell was refusing to consider Acclaim's proposal and was then permitted to submit a renewal bid.  (Id. ¶ 109.)  Then Activision, another major player in the videogame industry, wrote to Bell advising that it was prepared to bid on the videogame license.  (Id. ¶¶ 127-28.)  Finally, on April 16, 1998, THQ entered the scene and its representatives met with Bell and Shenker to announce that THQ wanted to compete for the videogame license.  (Id. ¶ 129.)  WWE alleges that Shenker and Bell, fearful that their plan was about to be ruined, tried to dissuade Activision and THQ from competing for the videogame license.  (Id. ¶¶ 129-30.)  These attempts failed and Activision and THQ submitted initial proposals for the videogame license in late April 1998, each of which was "clearly superior" to Jakks' bid.  (Id. ¶¶ 131-32.)  WWE alleges that Shenker and Bell concealed both proposals from WWE management and shared them with Jakks.  (Id. ¶¶ 134-35.)

According to WWE, Jakks dealt with the "threat of competition presented by the undesired emergence of THQ and Activision as potential bidders for the videogame license" by seeking out THQ and proposing that the two combine forces and submit a joint bid to WWE.  (Id. ¶ 136-37.)  WWE alleges that "Friedman told Farrell that Jakks was in control of the videogame license; had access to the terms Activision had informally proposed; and that THQ could participate in the revenue stream from the videogame license at a lower-than-market royalty rate if THQ did not independently bid but instead joined with Jakks to make a proposal which would appear competitive to Activision's initial informal proposal."  (Id. ¶ 137.)  Farrell then allegedly "agreed on behalf of THQ not to submit an independent bid but rather to accept the terms insisted upon by Jakks, including the royalty rates to be offered to WWE."  (Id. ¶ 141.)  At no point does WWE allege that Jakks told THQ or Brian Farrell about the purported bribery scheme.

Shenker prepared a deal memo reflecting Jakks' terms with the licensee as "Jakks/THQ LLC" and Bell recommended the deal to WWE management on May 12, 1998. (Id. ¶¶ 146, 152.) On June 10, 1998, defendant THQ/Jakks Pacific LLC ("THQ/Jakks") was formed and Farrell, THQ/Jakks' President and CEO, executed the WWE videogame license. (Id. ¶ 154.) WWE executed the license on June 23, 1998. (Id. ¶ 157.) WWE alleges that the "final payment" of the bribery scheme was invoiced on July 15, 1998 and paid on August 4, 1998.[4]

WWE alleges scores of "predicate acts" deriving from the above scheme, but only a fraction – involving wire fraud and "money laundering" – are alleged to involve the THQ Defendants. The three predicate acts of wire fraud consist of the following facially innocent acts: (1) Brian Farrell had an unspecified number of phone conversations with Friedman and/or Berman about the THQ/Jakks videogame license (AC ¶¶ 249.a.xxvii); (2) a lawyer for THQ faxed revisions to the proposed license agreement (id. ¶ 249.a.xxxiv); and (3) Farrell faxed a letter to Bell about "his recent meeting with Bell in Stamford, Connecticut, and meetings between Defendants THQ and Jakks to discuss the Joint Venture" (id. ¶ 249.a.xlvii). WWE does not allege how such communications were allegedly fraudulent. The "money laundering" allegations merely recount the royalty payments THQ paid to WWE and Jakks, pursuant to the terms of the videogame license and LLC agreement, respectively. (AC ¶¶ 249.b.xxix, xxxi-lxviii.) As explained further below, these payments are irrelevant to WWE's RICO claim, as they do not constitute racketeering activity.

---

[4] While WWE's Amended Complaint characterizes the alleged $20,000 payment on August 4, 1998 as a "further and additional payment of a bribe paid to Shenker" (AC ¶ 170), WWE's original Complaint called the payment the "final payment" in the alleged bribery scheme (Compl. ¶ 87). This admission remains binding on WWE despite its amendment: "A party . . . cannot advance one version of the facts in its pleadings, conclude that its interests would be better served by a different version, and amend its pleadings to incorporate that version, safe in the belief that the trier of fact will never learn of the change in stories." United States v. McKeon, 738 F.2d 26, 31 (2d Cir. 1984); see also Andrews v. Metro North Commuter R.R. Co., 882 F.2d 705, 707 (2d Cir. 1989) ("The amendment of a pleading does not make it any the less an admission of the party.").

## III.    ARGUMENT

**A.    WWE's RICO Claims against the THQ Defendants Fail**

WWE's attempt to pin RICO liability on the THQ Defendants fails to satisfy several key elements of the RICO statute.  The Amended Complaint fails to allege sufficiently that the THQ Defendants (1) participated in the "operation or management" of the alleged RICO enterprise; (2) engaged in a continuous "pattern" of racketeering activity; or (3) committed any predicate acts of racketeering.

### 1.    The THQ Defendants Did Not Participate in the "Operation or Management" of the RICO Enterprise

To state valid RICO claims against the THQ Defendants, WWE must allege that the THQ Defendants "participate[d], directly or indirectly, in the conduct of [the RICO] enterprise's affairs."  18 U.S.C. § 1962(c).  "In order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs."  Reves v. Ernst & Young, 507 U.S. 170, 179 (1993).  Accordingly, unless a party has some part in the "operation or management" of the enterprise's affairs, he or she cannot be liable under RICO.  Id. at 179-83.

"As interpreted by courts in this district and others, the 'operation or management' test set forth by the Supreme Court in Reves is a very difficult test to satisfy."  LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co., 951 F. Supp. 1071, 1090 (S.D.N.Y. 1996).  "Courts in the Second Circuit typically apply the rule set forth in Reves extremely rigorously," Dale v. Banque SCS Alliance S.A., 2005 WL 2347853, at *6 (S.D.N.Y. Sept. 22, 2005), and have not hesitated to dismiss RICO claims with prejudice at the Rule 12(b)(6) stage for failing to allege adequately "operation or management" over the RICO enterprise.  See Schmidt v. Fleet Bank, 16 F. Supp. 2d 340, 346-47 (S.D.N.Y. 1998) (dismissing with prejudice under Rule 12(b)(6) for failure to allege adequately "operation and control" and citing numerous cases in this district where RICO claims were dismissed for failing to allege "operation and control").

Indeed, the "simple taking of directions and performance of tasks that are 'necessary and helpful' to the enterprise, without more, is insufficient to bring a defendant within the scope of

1962(c)." Id. at 346 (citing United States v. Viola, 35 F.3d 34, 41 (2d Cir. 1994)).  Further, there is a "substantial difference between actual control over an enterprise and association with an enterprise in ways that do not involve control; only the former is sufficient under Reves because 'the test is not involvement but control.'"  Id. (citing Dep't of Econ. Dev. v. Arthur Andersen & Co., 924 F. Supp. 449, 466 (S.D.N.Y. 1996)).

WWE's revised version of the alleged bribery scheme in the Amended Complaint highlights the absence of the THQ Defendants from the planning and control of the alleged RICO enterprise.  The Amended Complaint alleges that the bribery scheme was devised as early as 1995 by and among Jakks, its officers, and Shenker.  (AC ¶ 37-40, 62-63.)  WWE offers absolutely no allegations that either THQ or Brian Farrell was involved in any way with Jakks, WWE, the videogame license, or the bribery scheme at that time.  Indeed, WWE paints the alleged conspiracy as revolving solely around Jakks and its desire to procure favorable licensing deals from WWE.  (AC ¶ 62 ("Jakks' officers . . . devised a plan in concert with SSAI and Shenker . . . whereby SSAI and Shenker would (a) take all actions desired by Jakks to foreclose competition in licensing areas desired by Jakks, including action figures and the videogame license . . . .").)  In fact, by the time the THQ Defendants allegedly entered the picture years later in April 1998, they were alleged to be competing *against* Jakks in an effort to obtain the videogame license for THQ.  (Id. ¶ 131.)  The THQ Defendants simply could not have participated in the control or management of the alleged enterprise since they were not associated with it, and in fact were competing against it, for nearly the entirety of the enterprise's purported existence.[5]

---

[5] The Amended Complaint's conclusory allegations that the THQ Defendants "ratified" the conduct of the Jakks Defendants (e.g., AC ¶ 249.e) cannot save WWE's operation or management theory, as (a) the allegations should be disregarded because they are without factual support, DeJesus v. Sears, Roebuck & Co., 87 F.3d 65, 70 (2d Cir. 1996), and (b) after-the-fact "ratification" by definition cannot constitute direction.  See Lange v. Hocker, 940 F.2d 359, 362 (8th Cir. 1991) ("[A]ttempting to ratify a disputed transaction is not a predicate act.")

Further, the Amended Complaint's new allegations portraying THQ as a company

desperate for a new licensing agreement – and therefore "recklessly indifferent" toward the

alleged improprieties of Jakks' offer – militates against finding a cognizable RICO claim has

been pleaded by WWE.  (Id. ¶ 143.)  WWE specifically alleges that, in agreeing to team with

Jakks, THQ was forced "to accept the terms insisted upon by Jakks, including the royalty rates to

be offered to WWE."  (Id. ¶ 141.)  These allegations make clear that Jakks alone controlled the

scheme WWE describes.  At best, WWE's allegations portray THQ as powerless to alter the

arrangement between Jakks and THQ or between Jakks and WWE.  As such, WWE has fallen

far short of making the requisite allegations that THQ and its CEO Brian Farrell participated in

the "operation or management" of the alleged RICO enterprise.  See, e.g., Schmidt, 16 F. Supp.

2d at 346-47 (holding allegations insufficient to find "operation and management" even though

"there is no doubt that plaintiffs have alleged wrongful acts that were allegedly of real

importance to Schick's scheme"); Redtail Leasing, Inc. v. Bellezza, 1997 WL 603496, at *5

(S.D.N.Y. Sept. 30, 1997) (dismissing on 12(b)(6) motion and finding that complaint tended to

show that defendants participated in enterprise's affairs but was "devoid of allegations suggesting

that [they] had some part in directing the enterprise's affairs"); LaSalle Nat'l Bank, 951 F. Supp.

at 1090-91 (holding allegations of assistance insufficient to show control); Strong & Fisher, Ltd.

v. Maxima Leather, Inc., 1993 WL 277205, at *1 (S.D.N.Y. July 22, 1993) (same).

The juxtaposition of the Amended Complaint's allegations to those found inadequate in

Schmidt underscores just how woefully deficient WWE's claims against the THQ Defendants

are.  In Schmidt, the Court held that allegations of defendant Fleet Bank's knowing assistance of

another defendant (Schick) in running a RICO enterprise by committing a number of wrongful

acts were insufficient to find RICO liability.  16 F. Supp. 2d at 347.  Fleet Bank was alleged to

have knowingly participated in the scheme by "allowing Schick access to the escrow accounts,

approving Schick's overdrafts on 500 separate occasions, failing to notify the relevant authorities

of the irregularities in the Schick accounts, misrepresenting to investors the status of the accounts

and helping Schick to conceal the scheme generally."  Id. at 347.  The Court found such

allegations inadequate to allege sufficiently operation or management of the RICO enterprise. The Court held that the complaint presented "allegations of *assistance* to the alleged RICO enterprise, not direction of it." Id. (emphasis in original).  The Court further noted that "[t]he weakness of plaintiffs' allegations with regard to the Fleet Defendants is also highlighted by comparison to the allegations against Schick, who clearly did operate and manage any RICO enterprise that may have existed." Id. at 348.

The THQ Defendants are not alleged to have done anything even comparable to the allegations against Fleet Bank, which were insufficient to find "operation and management." Here, the entirety of the creation, preparation, and implementation of the bribery scheme was allegedly the work of Shenker, Bell, and the Jakks Defendants.  Unlike Fleet Bank, the THQ Defendants – at most – are alleged to have been associated with the RICO enterprise in only the final months of the alleged scheme: from THQ's agreement to team up with Jakks in April 1998 to the alleged final payment to Shenker in August 1998 (a payment that the Amended Complaint never claims the THQ Defendants even knew about).  During the course of the bribery scheme, all the Amended Complaint alleges is that the THQ Defendants agreed to bid jointly with Jakks *on terms set by Jakks*.  Like the situation in Schmidt, "the weakness of [WWE's] allegations with regard to" the THQ Defendants is "highlighted by comparison to the allegations" against Shenker, Bell, and the Jakks Defendants.  The primary allegations of wrongdoing in the Amended Complaint relate solely to them.  When compared to those parties' substantial alleged roles, WWE cannot credibly argue that the THQ Defendants' alleged role in the RICO enterprise's affairs rose to the level of "operation or management."  Accordingly, the RICO claims against the THQ Defendants should be dismissed with prejudice.

**2.     The THQ Defendants Did Not Engage in a Pattern of Racketeering Activity**

To succeed on its RICO claims, WWE must allege a "pattern of racketeering activity." 18 U.S.C. § 1962(c).  WWE must allege facts establishing both the pattern itself – consisting of two or more acts of racketeering activity within a ten-year period – and "continuity" – that "the racketeering predicates are related, and that they amount to or pose a threat of continued criminal

activity." Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 242 (2d Cir. 1999).

WWE must also allege that THQ and Brian Farrell *each* engaged in a pattern of racketeering

activity.  The law is clear in the Second Circuit that in this context the Court must "evaluate the

RICO allegations with respect to *each defendant individually*." First Capital Asset Mgmt. v.

Satinwood, Inc., 385 F.3d 159, 180 (2d Cir. 2004) (emphasis added); see also Int'l Bhd. of

Teamsters v. Carey, 163 F. Supp. 2d 271, 280-281 (S.D.N.Y. 2001) ("In determining the

duration of a pattern of racketeering activity, courts focus solely on the predicate acts of

racketeering each defendant is alleged to have committed.")  When WWE's allegations are

isolated and examined as to THQ and Brian Farrell individually, WWE's allegations fail to

demonstrate either a RICO pattern or RICO continuity.

    **a)    The Alleged Bribery Scheme Does Not Constitute a RICO Pattern**

        Properly construed, the "pattern" of racketeering activity alleged in the Amended

Complaint against the THQ Defendants falls far short of what the law requires.  At best, the

Amended Complaint alleges that the THQ Defendants participated in a single bribery scheme to

secure a single videogame license.  WWE, however, attempts to place this unitary scheme within

the bounds of RICO by slicing it paper thin into dozens of predicate acts, a ploy that has been

soundly rejected by this Circuit: "[C]ourts must take care to ensure that the plaintiff is not

artificially fragmenting a singular act into multiple acts simply to invoke RICO." Schlaifer

Nance & Co. v. Estate of Warhol, 119 F.3d 91, 98 (2d Cir. 1997); see also Roeder v. Alpha

Industries, Inc., 814 F.2d 22, 31 (1st Cir. 1987) ("A bribe, which by any realistic appraisal is

solitary and isolated is not transformed into a threatening 'pattern of racketeering activity' . . .

simply because the bribe is implemented in several steps and involves a number of acts of

communication."); Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc., 354 F. Supp. 2d 293,

304 (S.D.N.Y. 2004) (noting "the Second Circuit's oft-stated admonition that courts should guard

against the meritless fragmentation of a single predicate act into multiple acts for the mere

purpose of pursuing a RICO claim").  WWE's allegations against the THQ Defendants amount to

a single scheme to secure the WWE videogame license and do not constitute a "pattern" under Second Circuit law.[6]

### b)    WWE Cannot Allege Closed-Ended Continuity

RICO "[c]ontinuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 241 (1989). Closed-ended continuity requires allegations of "a series of related predicates extending over a substantial period of time." Id. at 242. "Since the Supreme Court decided H.J., Inc., [the Second Circuit] has never held a period of less than *two years* to constitute a 'substantial period of time'" for purposes of closed-ended continuity." Cofacredit, 187 F.3d at 244 (emphasis added); see also First Capital, 385 F.3d at 181 ("Thus, while two years may be the minimum duration necessary to find closed-ended continuity, the mere fact that predicate acts span two years is insufficient, without more, to support a finding of a closed-ended pattern."). WWE has not adequately alleged that the THQ Defendants engaged in two years of racketeering activity. Even assuming for the sake of argument that the THQ Defendants joined the alleged scheme when it agreed to submit a joint bid for the videogame license in April 1998, the scheme was entirely finished upon the final payment of the bribery scheme in August 1998. (Compl. ¶ 87.) This four-month period of alleged racketeering activity is insufficient to meet the requirements of closed-ended continuity. See Cofacredit, 187 F.3d at 244 (holding that predicate acts spanning less than a year did not "demonstrate closed-ended continuity under our precedents").

---

[6] To the extent WWE attempts to disaggregate the unitary bribery scheme along the lines of the various federal statutes the Amended Complaint invokes, WWE's pleading still fails, as courts have forbidden such fragmentation as well. See Polycast Tech. Corp. v. Uniroyal, Inc., 728 F. Supp. 926, 945 (S.D.N.Y. 1989) ("The defendants are alleged to have committed a single illegal act that, because of the plaintiffs' own actions, happened to have produced two statutory violations. Defendants' single set of fraudulent statements cannot be split into two separate acts of racketeering activity in this manner."); United States v. Walgren, 885 F.2d 1417, 1426 (9th Cir. 1989) ("[A] RICO conviction cannot be based solely upon [a] single act, even though that act may have violated two separate laws.").

To avoid the weight of existing precedent in this Circuit, WWE attempts in the Amended Complaint to extend the duration of the RICO scheme – and the THQ Defendants' involvement therein – by alleging a "cover up" of the bribery scheme and the (allegedly improper) payment of royalties to WWE and Jakks under the terms of the videogame license and LLC agreement.  (AC ¶¶ 186-241 (cover up), 249.b.xxix, xxxi-lxviii (royalties).)  Neither set of allegations succeeds.

First, the case law is clear that attempts to cover up prior acts of racketeering are insufficient to extend a RICO scheme to satisfy the closed-ended continuity requirement.  See, e.g., United States v. Biaggi, 909 F.2d 622, 685-86 (2d Cir. 1990) (holding that commission of one predicate act and later denial of that act do not constitute separate predicate acts); Vemco, Inc. v. Camardella, 23 F.3d 129, 134 (6th Cir. 1994) (holding that "actions taken years later by a party to avoid a court judgment" did not count as predicate acts to extend RICO pattern); Watral v. Silvernails Farms, LLC, 177 F. Supp. 2d 141, 150 (E.D.N.Y. 2001) (refusing plaintiffs' attempt to extend duration of RICO scheme by invoking cover-up actions that took place after scheme ended); Ruby Dev. Corp. v. Charrim Dev. Corp., 742 F. Supp. 1213, 1217 (E.D.N.Y. 1990) (holding that "allegations of concealment on the part of the wrongdoer" cannot satisfy continuity requirement, "[o]therwise every past act of wrongdoing which a wrongdoer attempts to conceal might be the basis for finding continuity").

Second, WWE's allegations of a cover up do not sufficiently implicate THQ to satisfy the continuity requirement as to THQ.  WWE includes only the barest and most conclusory allegation against THQ: "In the Shenker litigation, SSAI, Shenker and Bell also acted in concert to conceal both the existence and extent of the unlawful conduct surrounding the videogame license and amendments to the toy licenses including, but not limited to, the bribes and did so during the same time that Jakks, THQ, and Jakks/THQ were concealing the payments to Stanfull which Jakks had made via foreign subsidiaries." (AC ¶ 209.)  As to THQ, WWE makes no effort to describe what it did to "conceal" the alleged payments to Stanfull – this in stark contrast to the voluminous detail WWE provides in describing the other defendants' alleged cover up activities. WWE's conclusory allegation of a cover up is insufficient to extend the "pattern" of THQ's

alleged racketeering activity. As to Brian Farrell, WWE does not even attempt to charge him personally with any knowledge of or participation in any alleged cover up.

Third, THQ's payment of monies due under the videogame license and LLC agreement is not criminal or racketeering activity, since it is mere compliance with the applicable contracts – including the contract to which WWE is a party. Courts in this Circuit and elsewhere have held that such activity does not constitute racketeering activity and thus cannot be used to extend the RICO pattern. See Bingham v. Zolt, 683 F. Supp. 965, 970 (S.D.N.Y. 1988) (refusing to consider as part of RICO enterprise continuing control and receipt of income from allegedly fraudulently created companies and holding that "subsequent enjoyment of the proceeds of the scheme" does not constitute "continuous criminal activity"); Clapp v. Greene, 743 F. Supp. 273, 278 (S.D.N.Y. 1990) (rejecting claim that continuing to pay compensation to partners allegedly bribed to join firm extends RICO patten); GICC Capital Corp. v. Tech. Finance Group, Inc., 67 F.3d 463, 467 (2d Cir. 1995) (holding that "temporal aspect" of RICO scheme is measured by racketeering activity alone); Vemco, Inc. v. Camardella, 23 F.3d 129, 134 (6th Cir. 1994) (holding that defendants' "conduct in sending out billing notices from 1991 through 1992 pursuant to an allegedly fraudulent contract cannot be cited by plaintiffs to extend the duration of the fraudulent scheme"); Jerome M. Sobel & Co. v. Fleck, 2003 WL 22839799, at *11 (S.D.N.Y. Dec. 1, 2003) (holding that mail and wire communications relating to collection of fees made in course of "otherwise lawful performance of accounting services" did not constitute predicate acts to extend RICO pattern). WWE's kitchen-sink approach to the Amended Complaint cannot save its closed-ended continuity theory.

### c)    WWE Cannot Allege Open-Ended Continuity

WWE also cannot allege an actionable scheme under an open-ended continuity theory. It is well-settled that a scheme that has a clearly defined endpoint, one that is "inherently terminable," cannot pose a "threat of continued criminal activity" as is required under the open-ended continuity standard. First Capital, 385 F.3d at 180-81; see also GICC, 67 F.3d at 446 ("It

defies logic to suggest that a threat of continued looting activity exists when, as plaintiff admits, there is nothing left to loot."); Cofacredit, 187 F.3d at 244 (holding that when fraudulent scheme has come to its necessary conclusion, it cannot "imply a threat of continued racketeering activity"). Here, WWE alleges not only the alleged racketeering plan, but also how it successfully reached its endpoint.

The RICO scheme alleged by WWE is summarized in Paragraph 62 of the Amended Complaint:

> Jakks' officers . . . devised a plan in concert with SSAI and Shenker, again trading on their undisclosed agency relationship, whereby SSAI and Shenker would (a) take all actions desired by Jakks to foreclose competition in licensing areas desired by Jakks, including action figures and the videogame license; (b) obtain licensing rights for Jakks which, when granted, would facilitate Jakks' desire to drive Playmates out of the business of WWE action figures; (c) accept monies for favorable treatment on licensing matters . . . ; and (d) pay Bell if need be for his participation in the illegal conduct.

WWE further alleges how Jakks succeeded in obtaining the license rights it sought: the expansion of its domestic toy license at the expense of Playmates, the international toy license, and the videogame license. (AC ¶¶ 68, 71, 83, 93, 157.) These licenses were allegedly procured via a series of payments to WWE's licensing agents – payments which ended with the "final payment" in August 1998. (Compl. ¶ 87.) These allegations describe the entire scheme from beginning to end, with Jakks getting all of the license rights it sought and paying all of the bribery payments necessary. Nowhere in the Amended Complaint does WWE even intimate that there were other license rights Jakks sought to procure by bribery or other fraudulent means. Indeed, as the scheme pertains to the THQ Defendants, they are alleged only to have been involved with the videogame license and nothing else. There is no allegation – nor could there be – that the THQ Defendants did anything that would remotely imply a threat of future racketeering activity. Accordingly, WWE's Amended Complaint cannot support a theory of open-ended continuity against the THQ Defendants.

1502103

- 14 -

### 3.    The THQ Defendants Did Not Commit Any Predicate Acts of Racketeering

The Amended Complaint's allegations of "predicate acts" committed by the THQ

Defendants are legally insufficient for a number of reasons. WWE fails to allege properly that

THQ and Brian Farrell each engaged in the requisite number of RICO predicate acts. "In the

context of a RICO claim, *each defendant* must be alleged to have engaged in two or more

predicate acts." Jordan (Berm.) Inv. Co. v. Hunter Green Invs. Ltd., 154 F. Supp. 2d 682, 692

(S.D.N.Y. 2001) (emphasis added). In addition, WWE falls far short of complying with "the

heightened pleading requirements of Fed. R.Civ. P. 9(b) for allegations of fraudulent predicate

acts." First Capital Asset Mgmt. v. Satinwood, Inc., 385 F.3d 159, 178 (2d Cir. 2004).

For the THQ Defendants to have violated *any* of the predicate-act statutes set forth in the

Amended Complaint, each must have acted with criminal intent. See, e.g., Scheiner v. Wallace,

832 F. Supp. 687, 699 (S.D.N.Y. 1993) ("To find violations of mail and wire fraud statutes that

satisfy the 'predicate acts' requirement of RICO, Plaintiffs must satisfactorily allege: first,

participation in a scheme to defraud; and second, *knowing use of the interstate mails or interstate

wires in furthering the scheme* (emphasis added)); Crown Heights Jewish Community Council v.

Fischer, 63 F. Supp. 2d 231, 239 (E.D.N.Y. 1998) ("To establish that defendants have engaged in

money laundering activity prohibited by [18 U.S.C. §] 1957, plaintiffs must prove . . . that

defendants *knowingly* conducted a monetary transaction in criminally derived property . . . ."

(emphasis added)); Shaw v. Rolex Watch, U.S.A., Inc., 673 F. Supp. 674, 679 (S.D.N.Y. 1987)

(violating [18 U.S.C. §] 2314 requires that defendant transport "plaintiff's property . . . with

*knowledge* that the property was taken by fraud" (emphasis added)).

WWE attempts to allege that the THQ Defendants "either knew of, or were recklessly

indifferent toward, the unlawful activity" enumerated in the Amended Complaint (AC ¶ 143).

But this conclusory allegation gets WWE nowhere. At no point does WWE allege that anyone

told Farrell or anyone else at THQ of the unlawful acts alleged in the Amended Complaint.

Rather, all the THQ Defendants are alleged to have been told was that "Jakks was in control of

the videogame license; had access to the terms Activision had informally proposed; and that

THQ could participate in the revenue stream from the videogame license at a lower-than-market royalty rate" if THQ submitted a joint bid with Jakks.  (AC ¶ 137.)  This information is insufficient to charge either of the THQ Defendants with knowledge of the bribery scheme. Even if one reads charitably the allegations that THQ should have known that something improper was going on (see id. ¶¶ 139-41), there is no indication that THQ agreed to the joint bid *knowing* that Jakks was engaged in allegedly illegal activity.  Having nowhere alleged any factual basis for THQ's knowledge of the bribery scheme, the conclusion must be disregarded. See DeJesus v. Sears, Roebuck & Co., 87 F.3d 65, 70 (2d Cir. 1996) ("A complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)."); First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 771-72 (2d Cir. 1994) (requiring factual basis for allegation before it may be accepted as fact); Dubai Islamic Bank v. Citibank, N.A., 256 F. Supp. 2d 158, 164 (S.D.N.Y. 2003) (rejecting RICO claim and discounting "conclusory allegation that Citibank participated in the alleged money laundering" because "in fact it is the actions principally of [others] which allegedly are in question").  Thus, the properly construed factual allegations of the Amended Complaint at best charge the THQ Defendants with reckless indifference – a state of mind insufficient to establish the criminal intent required under the wire fraud and money laundering statutes.

Turning to the specific predicate acts, the THQ Defendants' alleged predicate acts were purported wire fraud and "money laundering."  The predicate acts of wire fraud consist of the following: (1) Brian Farrell had an unspecified number of phone conversations with Friedman and/or Berman about the THQ/Jakks videogame license.  (AC ¶¶ 249.a.xxvii); (2) a lawyer for THQ faxed revisions to the proposed license agreement (id., ¶ 249.a.xxxiv); and (3) Farrell faxed a letter to Bell about "his recent meeting with Bell in Stamford, Connecticut, and meetings between Defendants THQ and Jakks to discuss the Joint Venture" (id., ¶ 249.a.xlvii).  The Amended Complaint is devoid of allegations explaining how these communications were fraudulent, were known to be fraudulent by the THQ Defendants, or were otherwise known to be part of the bribery scheme – especially since WWE nowhere alleges that THQ or Brian Farrell

was told of the bribes. Moreover, WWE's conclusory allegations that the THQ Defendants wire fraud acts were done with "specific intent to defraud" (id. ¶¶ 249.a.xxvii, xxxiv, xlvii) are supported by no factual basis and must be disregarded. First Nationwide Bank, 27 F.3d at 771-72. Accordingly, WWE cannot argue that such innocent acts are criminal acts of wire fraud. United States v. Alkins, 925 F.2d 541, 550 (2d Cir. 1993) ("If an individual believes that the information set forth in a mailing is true, it follows that he cannot have the requisite intent to defraud" necessary to support liability for mail and/or wire fraud). Finally, none of the wire fraud allegations pertaining to the THQ Defendants offer any specifics of how the alleged statements were false, the circumstances of such statements, or any inference of fraudulent intent. Such conclusory allegations are insufficient under Rule 9(b). See, e.g., Mills v. Polar Molecular Corp., 12 F.3d 1170, 1176 (2d Cir. 1993) (holding that allegations of predicate mail and wire fraud acts must explain why the communications were fraudulent.)

The "money laundering" allegations leveled at THQ merely recount the royalty payments THQ paid to WWE and Jakks, pursuant to the terms of the videogame license and LLC agreement, respectively. (AC ¶¶ 249.b.xxix, xxxi-lxviii.) These predicate acts are irrelevant, as payments made in the performance of a contract do not constitute predicate acts that may support a RICO claim, even if the contract was allegedly tainted by fraud. See Bingham, 683 F. Supp. at 970 (holding improper "characterizing the defendant's subsequent enjoyment of the proceeds of the scheme as continuous criminal activity"); Clapp, 743 F. Supp. at 278 (holding that law firm's continued payment of compensation to partners allegedly bribed to join firm did not "transform a single bribe into a pattern for RICO purposes"); GICC, 67 F.3d at 467 (holding that predicate acts must involve racketeering activity to be included in RICO pattern); Vemco, 23 F.3d at 134 (6th Cir. 1994) ("[S]ending out billing notices from 1991 through 1992 pursuant to an allegedly fraudulent contract cannot be cited by plaintiffs to extend the duration of the fraudulent scheme."); Jerome M. Sobel, 2003 WL 22839799, at *11 (holding that mail and wire communications relating to collection of fees made in course of "otherwise lawful performance

of accounting services" did not constitute predicate acts to extend RICO pattern).  THQ's making of its contractually obligated royalty payments simply does not qualify as racketeering activity.

The insufficient wire fraud allegations and the irrelevant "money laundering" allegations point to the unavoidable conclusion that WWE has alleged no cognizable predicate acts against the THQ Defendants in the Amended Complaint.  For this additional reason, the RICO claims should be dismissed.[7]

**B.    Imposing Vicarious Liability on the THQ Defendants Would Be Improper**

The applicable law demonstrates that WWE cannot make out its RICO claims against the THQ Defendants.  Should WWE resort to arguing that the THQ Defendants are vicariously liable for the actions of the Jakks Defendants, presumably on the basis of "partnership" liability, WWE will likewise fail.

**1.    The Alleged Bribery Scheme Took Place Before the THQ Defendants Had Any Association with Jakks**

As an initial matter, any claim that the THQ Defendants are vicariously liable, under any theory, for the Jakks Defendants' alleged bribery scheme fails for the simple reason that neither THQ nor Brian Farrell had any affiliation or association with the Jakks Defendants, WWE, or the videogame license at the time the bribery scheme was implemented and largely completed.  As alleged by WWE, the RICO scheme was devised and put into action as early as 1995, with the first bribe payment made in January 1998.  (AC ¶¶ 37, 62-63, 85-94.)  The Amended Complaint does not mention THQ's involvement with any of the parties until April 1998, at which point

---

[7]  WWE's claim against the THQ Defendants for conspiracy to violate the provisions of RICO must fail because it is well-settled that "if the 'prior claims do not state a cause of action for substantive violations of RICO,' then a RICO conspiracy claim necessarily 'does not set forth a conspiracy to commit such violations.'"  Schmidt, 16 F. Supp. 2d at 353 (quoting Discon, Inc. v. Nynex Corp., 93 F.3d 1055, 1064 (2d Cir. 1996)).  Moreover, there are *no* allegations that the THQ Defendants ever agreed with others to commit any RICO violations; the Amended Complaint's nonconclusory allegations claim only that THQ agreed to work with Jakks and submit a joint bid.  See Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 25 (2d Cir. 1990) (affirming Rule 12(b)(6) dismissal of RICO conspiracy claim: "Because the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement.").

WWE acknowledges that THQ was competing *against* Jakks to obtain the videogame license. (AC ¶ 131.) The bribery scheme allegedly committed by the Jakks Defendants plainly pre-dates the THQ Defendants' association with Jakks and cannot be imputed to either THQ or Brian Farrell under any theory of vicarious liability or agency. Plainly, any acts committed by the Jakks Defendants were not done on behalf of, or in furtherance of, any association with the THQ Defendants, as none existed.

WWE cannot avoid this fate by arguing that the final payment of the bribery scheme took place after THQ had entered into the LLC with Jakks. As discussed above, WWE's efforts to slice the singular bribe into a number of separate acts in order to invoke RICO is unavailing. Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 98 (2d Cir. 1997) ("[C]ourts must take care to ensure that the plaintiff is not artificially fragmenting a singular act into multiple acts simply to invoke RICO."). The unitary bribery scheme was devised and implemented well before the THQ Defendants had any association with Jakks.

> **2.     Even If THQ Had Been Associated with Jakks at the Time of the Alleged Bribery Scheme, THQ Cannot Be Vicariously Liable Because It Was Not a "Central Figure" or "Aggressor"**

Even if the THQ Defendants had been associated with the Jakks Defendants when the alleged bribery scheme was implemented and carried out, WWE still cannot allege that the THQ Defendants are vicariously liable for the actions of the Jakks Defendants. WWE must overcome a "substantial burden" in seeking to hold the THQ Defendants vicariously liable for the acts of other defendants. Schmidt, 16 F. Supp. 2d at 351 (citing Qatar Nat'l. Navigation & Transp. Co. v. Citibank, N.A., 1992 WL 276565, at *7 (S.D.N.Y. Sept. 29, 1992)). Courts in the Second Circuit "generally have been hostile to claims of vicarious liability under RICO," since "'invoking RICO's punitive, financially ruinous treble damage remedy' could conceivably interfere with the very market forces that RICO was designed to protect." Id. (citing Gruber v. Prudential-Bache Sec., Inc., 679 F. Supp. 165, 181 (D. Conn. 1987)).

In the *respondeat superior* context, courts in this Circuit have held that "corporations may not be held vicariously liable for the actions of their employees in violation of the RICO

statute 'where the plaintiff has not alleged any facts which portray the company as an active

perpetrator of the fraud or a central figure in the criminal scheme.'" USA Certified Merchants v.

Koebel, 262 F. Supp. 2d 319, 327 (S.D.N.Y. 2003); see also Schmidt, 16 F.Supp.2d at 351

(same); DeJesus v. Sears, Roebuck and Co., 1995 WL 122726, at *4 (S.D.N.Y. Mar. 22, 1995)

(in the Second Circuit vicarious liability under civil RICO is available "only in limited

circumstances, such as where 'the corporation may fairly be said to be central figure (or

aggressor) in the alleged scheme.'"); Amendolare v. Schenkers Int'l Forwarders, Inc., 747 F.

Supp. 162, 168 (E.D.N.Y. 1990) ("[V]icarious liability under RICO is only permitted when the

defendant corporation can be characterized as the 'central' or 'controlling' figure in the RICO

enterprise.")

The court in USA Certified Merchants outlined the analysis for determining whether a

corporation is an "aggressor":

> In order to determine that a corporation is directly involved or central to the RICO
> scheme alleged, Plaintiffs must show that a corporate officer or director had
> knowledge of or was recklessly indifferent toward the unlawful activity. Even
> upon such a finding, other factors, including the number of high-level employees
> involved, their degree of participation in the alleged scheme, as well as the extent
> of the corporation's benefit from the scheme, should then be considered before
> corporate liability is properly attributed.

262 F. Supp. 2d at 328 (citations omitted) (citing Amendolare, 747 F. Supp. at 169). Note also

"the fact that a corporation benefits from an illegal scheme does not in itself establish that the

corporation participated as a 'central figure' in that scheme." Schmidt, 16 F. Supp. 2d at 352.

While, as outlined immediately below, the Amended Complaint does not lay out a case

sufficient to satisfy the "central figure" analysis, the "central figure" analysis is inapposite to this

case. RICO case law on vicarious liability has generally been limited to the application of

ordinary principles of *respondeat superior* and partnership liability. See, e.g., USA Certified

Merchants, 262 F. Supp. 2d at 327 (discussing whether "corporations may not be held

vicariously liable *for the actions of their employees*" (emphasis added)); 131 Main Street Assocs.

v. Manko, 897 F. Supp. 1507, 1533 (S.D.N.Y. 1995) ("The question before us is whether *normal*

*doctrines of partnership liability* apply in a civil action brought under § 1962(c) of RICO." (emphasis added)).  Courts have used the "central figure" analysis to determine whether these ordinary principles of agency liability should apply in a particular RICO context.

There are two reasons why this analysis is inapplicable to the case at bar.  First, the vicarious liability to be imposed on THQ is not based upon the actions of an employee or a partner, but a fellow limited liability company member.  The ordinary principles of agency and liability that govern the members of an LLC are markedly different from those that govern partnerships.  See, e.g., Weber v. King, 110 F. Supp. 2d 124, 128 (E.D.N.Y. 2000) (LLC "members are afforded corporate-like limited liability protection, i.e., members do not have personal liability for the debts, obligation, or liabilities of the LLC.").  The corporate-like protections of LLCs shield THQ from the mutual liability rules applicable to partnerships.  As to Brian Farrell, he is not alleged to be either an employer or a partner, so neither *respondeat superior* liability nor partnership liability is applicable to him.

To the extent that WWE attempts to pin vicarious liability on THQ on the theory that THQ and Jakks were "joint venturers" between the time they agreed to pursue the videogame license together and the formation of THQ/Jakks Pacific LLC (the "LLC"), WWE will likewise fail.[8]  In its original Complaint, WWE specifically alleged that Jakks "solicited THQ to become a Joint Venture partner," "THQ agreed to become a Joint Venture partner," and the "Joint Venture" submitted a bid to WWE.  (Compl. ¶¶ 76-77.)  Thereafter, on June 10, 1998, the "Joint Venture" formed the LLC.  (Id. ¶ 84.)  The Amended Complaint, however, conspicuously omits any reference to any joint venture between THQ and Jakks.  Rather, WWE alleges that THQ and Jakks agreed to submit a joint bid via "Jakks/THQ LLC."  (AC ¶¶ 137, 145.)  While WWE notes that "Jakks and THQ have held themselves out to the public and their respective shareholders as being in a 'joint venture' or 'partnership' with each other . . ." (AC ¶ 158), WWE otherwise has deleted completely its allegations that THQ and Jakks were joint venturers.  Indeed, this deletion

---

[8] Of course, since WWE never alleges that Brian Farrell was a joint venturer with THQ Jakks, or anyone else, joint venture liability cannot attach to him.

was a strategic move on WWE's part in its failed attempt to plead an antitrust claim: if WWE admitted that THQ and Jakks were joint venturers, the joint bid would have been reviewed under the rule of reason, not the per se standard that WWE sought. See, e.g., Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768 (1984). The lone remaining joint venture allegation in the Amended Complaint is merely an attempt to invoke the sham exception to the joint venture analysis, see Timken Roller Bearing Co. v. United States, 341 U.S. 593, 598 (1951), and is insufficient to plead joint venture liability against THQ. In any event, WWE may not resurrect and rely upon its abandoned prior allegations. Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect."). WWE has waived any claim that THQ and Jakks were at any time joint venturers subject to partnership liability.

Second, it is illogical to apply the "central figure" test here, where the THQ Defendants' liability would be derived from one or more alleged co-conspirators' actions. This imposition of vicarious liability runs afoul of the well-settled requirement outlined above that the plaintiff allege and prove the RICO elements *for each defendant individually*: each defendant must have committed sufficient predicate acts, engaged in a continuous pattern of racketeering activity, etc. To hold an alleged co-conspirator vicariously liable for the actions of another co-conspirator would simply be an end run around the individualized nature of the RICO inquiry. As such, the "central figure" analysis is inapplicable here.

Should the Court conduct the "central figure" analysis, imposing vicarious liability on the THQ Defendants remains inappropriate. WWE does not allege that either THQ or Brian Farrell was either a "central figure" or "aggressor" in any RICO scheme, nor could WWE make such allegations in good faith. It is illogical to argue that either THQ or Brian Farrell was a "central figure" or "aggressor" in the alleged bribery scheme that was admittedly devised and implemented years before either was even involved with Jakks or WWE. While WWE's Amended Complaint now includes a bare, unsupported allegation that the THQ Defendants "knew of, or were recklessly indifferent toward the unlawful activity set forth" in the Amended

Complaint (AC ¶ 143), the remainder of the "central figure" factors do not support imposing vicarious liability here. First, WWE's Amended Complaint names no "high-level employees" other than Brian Farrell. Second, and more importantly, the THQ Defendants' "degree of participation" in the bribery scheme – to the extent it even exists – is not alleged to be "central" or "aggressive." It bears repeating that WWE alleges that THQ was invited to join Jakks' bid for the videogame license only after the bribery scheme was near completion, when it was endangered by THQ's competing bid. (Id. ¶¶ 136-37.) Further, THQ was allegedly brought into the fold on terms set exclusively by Jakks. (Id. ¶ 141.) These allegations are inconsistent with any argument that THQ or Brian Farrell was a "central figure" or "aggressor" in the RICO scheme; rather, the THQ Defendants, at best, were powerless, last-minute additions to the plan.

This conclusion holds true even more so for Brian Farrell, who is nowhere alleged to have been the driving force behind the alleged scheme. There is no basis for holding him responsible for the acts of either his employer or his employer's business partner. In sum, the allegations of the Amended Complaint are insufficient to impose vicarious liability on either THQ or Brian Farrell, especially in light of WWE's failures, detailed above, to make out a case of primary liability.[9]

---

[9] It need be noted only in passing that the conclusory allegations that defendants Friedman, Berman, and/or Bennett were acting on behalf of the THQ Defendants cannot rescue WWE's vicarious liability argument as it is undisputed that they are officers of Jakks and not THQ. The repeated, bare allegations that certain Jakks officers were "acting on behalf of" the THQ Defendants (and others) must be disregarded by the Court as they are inconsistent with the facts alleged by WWE. DeJesus v. Sears, Roebuck & Co., 87 F.3d 65, 70 (2d Cir. 1996) ("A complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)."); First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 772 (2d Cir. 1994) ("Courts do 'not accept conclusory allegations on the legal effect of the events plaintiff has set out if these allegations do not reasonably follow from his description of what happened.'" (quoted in parenthetical)); Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP, 2004 WL 112948, at *6 (S.D.N.Y. Jan. 22, 2004) (In RICO action, "Plaintiffs' conclusory allegations that Medina and CDSA were 'agents' of defendants Andersen and PWC, . . . [are] insufficient to withstand defendants' motion to dismiss.").

## IV.    CONCLUSION

For the foregoing reasons, the THQ Defendants respectfully request that their motion to dismiss be granted and, since the RICO claims are the only remaining bases of federal subject matter jurisdiction, that the THQ Defendants be dismissed from the case entirely.

Dated: June 2, 2006

SIDLEY AUSTIN LLP
Steven Bierman (SB 6615)
Isaac Greaney (IG 0922)
787 Seventh Avenue
New York, New York 10019
Phone: (212) 839-5300
Fax: (212) 839-5599

Respectfully submitted,

IRELL & MANELLA LLP
Steven A. Marenberg (*Pro Hac Vice*)
Philip M. Kelly (*Pro Hac Vice*)
1800 Avenue of the Stars
Los Angeles, California 90067
Phone: (310) 277-1010
Fax: (310) 203-7199

By: _____
Steven A. Marenberg
Attorneys for Defendants THQ Inc. and
Brian Farrell

1502103

- 24 -