UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x
                                     :

WORLD WRESTLING ENTERTAINMENT, INC.,     :     Case No. 04 CV 8223 (KMK)
                                       :     (ECF CASE)

                Plaintiff,           :

                                       :

              v.                     :

                                       :

JAKKS PACIFIC, INC.; JAKKS PACIFIC (H.K.)    :
LIMITED; ROAD CHAMPS LIMITED; THQ, INC.;    :
THQ/JAKKS PACIFIC LLC; STANLEY SHENKER    :
AND ASSOCIATES, INC.; STANLEY SHENKER;    :
BELL LICENSING, LLC; JAMES BELL; JACK    :
FRIEDMAN; STEPHEN BERMAN; JOEL    :
BENNETT; and BRIAN FARRELL,    :

              Defendants.       :

                                       :

------------------------------------------------------------------ x

**COMPENDIUM OF UNREPORTED DECISIONS CITED IN THE THQ DEFENDANTS'
MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE
RICO CLAIMS IN THE AMENDED COMPLAINT**

SIDLEY AUSTIN LLP                     IRELL & MANELLA LLP
Steven M. Bierman (SB 6615)          Steven A. Marenberg (*Pro Hac Vice*)
Isaac S. Greaney (IG 0922)            Philip M. Kelly (*Pro Hac Vice*)
787 Seventh Avenue                  1800 Avenue of the Stars
New York, New York 10019            Los Angeles, California 90067
Phone: (212) 839-5300                Phone: (310) 277-1010
Fax: (212) 839-5599                   Fax: (310) 203-7199

*Attorneys for Defendants THQ Inc. and Brian Farrell*

## INDEX OF CASES

**Cases**                                                                **Tab**

Dale v. Banque SCS Alliance S.A.
 2005 WL 2347853 (S.D.N.Y. Sept. 22, 2005)........................................................A

DeJesus v. Sears, Roebuck and Co.
 1995 WL 122726 (S.D.N.Y. Mar. 22, 1995) ..........................................................B

Jerome M. Sobel & Co. v. Fleck
 2003 WL 22839799 (S.D.N.Y. Dec. 1, 2003) .........................................................C

Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP
 2004 WL 112948 (S.D.N.Y. Jan. 22, 2004) ...........................................................D

Qatar Nat'l Navigation & Trans. Co. v. Citibank, N.A.
 1992 WL 603496 (S.D.N.Y. Sept. 29, 1992)...........................................................E

Redtail Leasing, Inc. v. Bellezza
 1997 WL 603496 (S.D.N.Y. Sept. 30, 1997)...........................................................F

Strong & Fisher, Ltd. v. Maxima Leather, Inc.
 1993 WL 277205 (S.D.N.Y. July 22, 1993) ............................................................G

Dated:  June 2, 2006

Respectfully submitted,

SIDLEY AUSTIN LLP
Steven Bierman (SB 6615)
Isaac Greaney (IG 0922)
787 Seventh Avenue
New York, New York 10019
Phone: (212) 839-5300
Fax: (212) 839-5599

IRELL & MANELLA LLP
Steven A. Marenberg (*Pro Hac Vice*)
Philip M. Kelly (*Pro Hac Vice*)
1800 Avenue of the Stars
Los Angeles, California 90067
Phone: (310) 277-1010
Fax: (310) 203-7199

By: _____
Philip M. Kelly
Attorneys for Defendants THQ, Inc. and
Brian Farrell

**Tab A**



Slip Copy                                                                                      Page 1
Slip Copy, 2005 WL 2347853 (S.D.N.Y.)
**(Cite as: Slip Copy)**

▷

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
George DALE, Commissioner of Insurance for the
State of Mississippi, in his official capacity as
Receiver of Franklin Protective Life Insurance
Company, et al., Plaintiffs,
v.
BANQUE SCS ALLIANCE S.A. and Jeanne-Marie
Wery, Individually and in his capacity as Officer,
Employee and Agent of Banque SCS Alliance S.A.,
Defendants.
**No. 02Civ.3592 (RCC)(KNF).**

Sept. 22, 2005.

MEMORANDUM AND ORDER
FOX, Magistrate J.

I. INTRODUCTION

*1 The plaintiffs in this action, the receivers of seven
insurance companies ("insurance companies"), allege
violations of the Racketeer Influenced and Corrupt
Organizations Act, 18 U.S.C. § 1961, et seq.,
("RICO" or "RICO Act"), common law fraud, civil
conspiracy, and aiding and abetting fraud against
defendants Banque SCS Alliance, S.A ("Banque
SCS"), and Jeanne-Marie Wery ("Wery")
(collectively, "defendants"). The plaintiffs also allege
that Banque SCS was negligent in hiring, supervising
and retaining Wery. Each of the insurance companies
is domiciled in the state of which its receiver is an
official. According to the amended complaint,
Banque SCS is a Swiss corporation headquartered in
Switzerland, and Wery, a citizen of Belgium, is an
officer, employee and agent of Banque SCS. In a
previous Memorandum and Order, the Court granted
an application to dismiss the action for lack of
personal jurisdiction ("dismissal order"). The Court
found it unnecessary to reach the other grounds for
dismissal raised by the defendants, namely *forum non
conveniens* and failure to state a claim upon which
relief may be granted. *See Dale v. Banque SCS*, No.
02 Civ. 3592, 2004 WL 2389894, at *4 (S.D.N.Y.
Oct. 22, 2004).

Before the Court are the plaintiffs' applications: (1) to
amend the judgment of dismissal in the interest of

justice, pursuant to Fed.R.Civ.P. 59(e), in light of
new evidence pertaining to the court's personal
jurisdiction over the defendants ("motion to amend
the judgment"); (2) for reconsideration of the
dismissal order, pursuant to Local Civil Rule 6.3
("first motion for reconsideration"); and (3) for
reconsideration of the dismissal order with respect to
Wery, pursuant to Fed.R.Civ.P. 60(b), in light of,
*inter alia,* his subsequent consent to submit to the
jurisdiction of this court ("second motion for
reconsideration"). Also before the Court are Banque
SCS's applications: (a) to strike affidavits submitted
by the plaintiffs in support of the first motion for
reconsideration ("motion to strike"); and (b) for
certification of the previously-entered judgment of
dismissal as a final judgment with respect to Banque
SCS, pursuant to Fed.R.Civ.P. 54(b) ( "Rule 54[b]
motion"), if the second motion for reconsideration is
not denied.

The Court will address the instant applications and, to
the extent necessary and appropriate, the unaddressed
grounds raised in support of the previous motion to
dismiss.

II. BACKGROUND AND FACTS

The plaintiffs allege that from 1990 until 1999, the
defendants assisted Martin Frankel ("Frankel") in
defrauding the insurance companies of over
$200,000,000, thus rendering the insurance
companies insolvent. According to the plaintiffs,
Frankel devised and executed a scheme to acquire
ownership of the insurance companies fraudulently,
using funds taken from certain of the insurance
companies to purchase others of the insurance
companies. The plaintiffs contend that Frankel
evaded detection by regulatory authorities and looted
the assets of the insurance companies for his own
benefit. The plaintiffs maintain that, with the
assistance of the defendants and others, Frankel
laundered the illegally obtained funds through a
series of fraudulent wire transfers to and from, *inter
alia,* Banque SCS's correspondent bank account in
New York and other accounts it maintained outside
New York. As part of this scheme, the defendants
allegedly arranged, at Frankel's direction, the
incorporation of Bloomfield Investments, Ltd.
("Bloomfield"), a British Virgin Islands corporation
whose sole director was an employee or otherwise

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                    Page 2
Slip Copy, 2005 WL 2347853 (S.D.N.Y.)
**(Cite as: Slip Copy)**

associated with Banque SCS. Accounts at Banque SCS allegedly were opened in Bloomfield's name and utilized in the laundering of insurance company funds. The plaintiffs allege further that Wery, at Frankel's direction, purchased travelers checks using insurance company funds Frankel obtained illegally, and had the checks shipped to Banque SCS in Switzerland and then to Frankel, and others associated with him, at various New York addresses.

**\*2** The plaintiffs allege further that, with Wery's assistance, Frankel maintained accounts at Merrill Lynch and Bear Stearns under an alias. By the spring of 1998, Wery allegedly had learned that Frankel had gained control of a number of insurance companies and that at least some of the funds Frankel had deposited into Banque SCS accounts had been taken from the insurance companies. The plaintiffs maintain that the defendants helped Frankel conceal his identity on funds transfer documents, and, when regulatory authorities began to uncover Frankel's illegal activities, the defendants helped Frankel liquidate the stolen insurance company assets, so that he could continue to use them if Frankel determined to flee the United States. In light of the foregoing, the plaintiffs maintain that the defendants knew that the funds whose transfers they executed on Frankel's behalf were the product of illegal activities.

The plaintiffs allege that the defendants committed wire fraud, mail fraud and money laundering ("predicate acts"), in order to further several enterprises, within the meaning of 18 U.S.C. § 1962(c), namely: (1) Bloomfield ("Bloomfield enterprise"); (2) each of the insurance companies ("insurance company enterprises"); and (3) a group of individuals and corporate entities that included Frankel, Wery, Banque SCS and numerous others who participated in Frankel's scheme ("association-in-fact enterprise").

### III. DISCUSSION

*First Motion for Reconsideration*

Local Civil Rule 6.3 of this court ("Local Rule 6.3") provides, in pertinent part, that a notice of motion for reconsideration or reargument "shall be served with ... a memorandum setting forth concisely the matters or controlling decisions which counsel believes the court has overlooked." "Thus, to be entitled to reargument and reconsideration, the movant must demonstrate that the Court overlooked controlling

decisions or factual matters that were put before it on the underlying motion." *Hamilton v. Garlock, Inc* ., 115 F.Supp.2d 437, 438 (S.D.N.Y.2000). A motion for reconsideration "is not a motion to reargue those issues already considered when a party does not like the way the original motion was resolved." *In re Initial Pub. Offering Antitrust Litig.,* No. 01 Civ.2014, 2004 WL 789770, at \*1 (S.D.N.Y. April 13, 2004) (quoting *Yurman Design, Inc. v. Chaindom Enters.,* No. 99 Civ. 9307, 2003 WL 22047849, at \*1 [S.D.N.Y. Aug. 29, 2003] ). The decision to grant or deny the motion is within the sound discretion of the court. *See id.*

In the dismissal order, the Court determined that the four correspondent bank accounts maintained by Banque SCS in New York did not subject the defendants to personal jurisdiction under New York Civil Procedure Law and Rules ("CPLR") § 302(a)(1) (" § 302(a)(1)"). In so holding, the Court relied upon *Semi Conductor Materials, Inc. v. Citibank Int'l PLC,* 969 F.Supp. 243, 246 (S.D.N.Y.1997), which stated that "a correspondent bank relationship between a foreign bank and a New York financial institution does not provide sufficient grounds to exercise personal jurisdiction over a foreign bank." The plaintiffs contend, correctly, that the Court's reliance on *Semi Conductor* was misplaced, since the above-quoted statement pertained to an analysis of personal jurisdiction under CPLR § 301, not § 302(a)(1). Accordingly, it is appropriate for the Court to reconsider the points raised by the parties concerning the question of personal jurisdiction under § 302(a)(1).

**\*3** "The burden of proving jurisdiction is on the party asserting it ." *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 507 (2d Cir.1994). "In deciding a pretrial motion to dismiss for lack of personal jurisdiction a district court has considerable procedural leeway. It may determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion ." *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir.1981). If the court relies solely on pleadings and affidavits, the plaintiff need only make a *prima facie* showing of personal jurisdiction. *See Robinson,* 21 F.3d at 507. In determining whether the plaintiffs have made a *prima facie* showing of personal jurisdiction, the court will construe jurisdictional allegations liberally and take all uncontroverted factual allegations to be true. *Id.*

CPLR § 302(a)(1) provides, in pertinent part, that a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

New York court may exercise personal jurisdiction over a non-domiciliary "who in person or through an agent ... transacts any business within the state." CPLR 302(a)(1) "extends the jurisdiction of New York state courts to any nonresident who has 'purposely availed [itself] of the privilege of conducting activities within New York and thereby invoked the benefits and protections of its laws....' " _Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,_ 171 F.3d 779, 787 (2d Cir.1999) (quoting _Parke-Bernet Galleries v. Franklyn,_ 26 N.Y.2d 13, 18, 308 N.Y.S.2d 337, 341 [1970] ). "[A] single transaction would be sufficient to fulfill this requirement, so long as the relevant cause of action also arises from that transaction." _Id._ (citations and quotation marks omitted).

With respect to Wery, the Court notes that subsequent to the briefing of the first motion for reconsideration, Wery sought to withdraw his motion to dismiss the complaint, including his objections concerning personal jurisdiction, and consented to the personal jurisdiction of this court. Accordingly, the Court deems the motion to dismiss withdrawn to the extent that it pertains to Wery, and finds that there is no basis upon which to dismiss the amended complaint, as it pertains to Wery, for lack of personal jurisdiction. Therefore, it is appropriate to grant the first motion for reconsideration as it pertains to Wery. As Wery's application to dismiss the complaint has been deemed withdrawn, there is no need to address the other, nonjurisdictional contentions raised therein, as they pertain to Wery.

With respect to Banque SCS, the Court finds that _Indosuez Int'l Finance B.V. v. National Reserve Bank,_ 98 N.Y.2d 238, 746 N.Y.S.2d 631 (2002), a decision cited by the plaintiffs in opposition to the motion to dismiss, is controlling on the question of personal jurisdiction under CPLR § 302(a)(1). In that case, a foreign defendant maintained a bank account in New York for the purpose of receiving payments from the plaintiff in connection with a collection of currency exchange transactions out of which the parties' dispute arose. _Id._ at 242, 633. The New York Court of Appeals determined that this satisfied the requirements of CPLR § 302(a)(1). _Id._ at 246, 636; _see also, Monroy v. Citibank, N.A.,_ No. 84 Civ. 1040, 1985 WL 1768, *3-4 (S.D.N.Y. June 21, 1985). According to the amended complaint, Banque SCS maintains several correspondent bank accounts in New York that it used to effect a number of the funds transfers that are the subject of this action. Accordingly, the Court finds that the factual allegations contained in the amended complaint concerning Banque SCS state a _prima facie_ case of personal jurisdiction, pursuant to CPLR § 302(a)(1).[FN1] Therefore, it is appropriate to grant the first motion for reconsideration as it pertains to Banque SCS.

> FN1. Banque SCS's argument to the contrary relies upon decisions of this court and a decision of an intermediate New York appellate court all of which predate _Indosuez. See, e.g., Symenow v. State Street Bank and Trust Co.,_ 244 A.D.2d 880, 665 N.Y.S.2d 141 (App. Div. 4th Dep't 1997). As the decisions of the New York Court of Appeals are authoritative with respect to questions of New York law, the Court finds Banque SCS's argument to be unpersuasive.

*4 In light of the foregoing, the Court declines to address the other contentions raised in the first motion for reconsideration. As the Court has determined that it has personal jurisdiction over Banque SCS, the other grounds raised in the motion to dismiss will be addressed below, to the extent that they pertain to that defendant.

*Motion to Dismiss*

*A.* Forum Non Conveniens

"A _forum non conveniens_ motion is decided in two steps. First, the district court asks if there is an alternative forum that has jurisdiction to hear the case.... [In] the second step of the inquiry, ... the district court determines the forum that will be most convenient and will best serve the ends of justice ." _Peregrine Myanmar Ltd. v. Segal,_ 89 F.3d 41, 46 (2d Cir.1996). The existence of an alternative forum is a prerequisite to dismissal on grounds of _forum non conveniens. Schertenleib v. Traum,_ 589 F.2d 1156, 1159-60 (2d Cir.1978).

Banque SCS contends that Switzerland would be an adequate alternative forum for this action. However, the Court has before it no information about Swiss jurisdictional law or its likely application to the claims asserted in the instant action. In support of its applications, Banque SCS cites _Schertenleib, supra,_ 589 F.2d 1156, and _ACLI Int'l Commodity Servs., Inc. v. Banque Populaire,_ 652 F.Supp. 1289 (S.D.N.Y.1987), for the propositions that Switzerland is "generally" an adequate alternative forum and that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 4
Slip Copy, 2005 WL 2347853 (S.D.N.Y.)
**(Cite as: Slip Copy)**

Swiss courts would have jurisdiction to adjudicate fraud claims against Banque SCS, respectively. However, in each of those cases, the parties submitted expert testimony to the court that enabled it to determine the likely application of Swiss law to the facts presented by the action. No such expert testimony is available here. Moreover, even if *Schertenleib* and *ACLI* contained statements about Swiss law that were pertinent to the instant action, those decisions were issued 27 and 18 years ago, respectively. There is no basis upon which to determine whether conclusions about Swiss law reached nearly two or three decades ago remain accurate.

As the existence of an adequate alternative forum for the instant action has not been demonstrated, the motion to dismiss on the basis of *forum non conveniens* is without merit.

### B. Failure to State a Claim

A court may dismiss an action pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim upon which relief can be granted, only if "it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief." *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). In considering a motion pursuant to this Rule, "the court must accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff." *Id.*

#### 1. Common Law Fraud; Aiding and Abetting Fraud

*5 Under New York law, a claim for fraud "must assert that a representation of a material fact was made; that such representation was false, and known to be false by the party making it, or was recklessly made; that such representation was made to deceive and to induce the other party to act upon it; and that the party to whom the representation was made relied upon it to its injury or damage." *Zaref v. Berk & Michaels, P.C.,* 192 A.D.2d 346, 348, 595 N.Y.S.2d 772, 774 (App. Div. 1st Dep't 1993) (internal quotation marks and citation omitted).

In the case at bar, the plaintiffs have alleged that Banque SCS made certain misrepresentations and that the plaintiffs suffered injuries as a result of those misrepresentations. However, it is not alleged that the misrepresentations were made to the plaintiffs, that the misrepresentations were intended to induce any action by the plaintiffs, or that the plaintiffs relied upon the statements to the plaintiffs' detriment.

In light of the foregoing, the plaintiffs' state law claims for fraud and aiding and abetting fraud should be dismissed.

#### 2. *Section 1962(c)* claim

The RICO Act provides, in pertinent part, that:
(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c) (" § 1962(c)").

The RICO Act defines "racketeering activity" as, *inter alia,* "any act which is indictable under any of the following provisions of title 18, United States Code: ... section 1341 (relating to mail fraud), [and] section 1343 (relating to wire fraud)...." 18 U.S.C. § 1961(1). The RICO Act also permits those injured by a violation of § 1962 to commence a civil action in order to recover damages. *See* 18 U.S.C. § 1964(c).

Although the elements of fraud under New York law, discussed above, are not coextensive with the elements of mail and wire fraud under 18 U.S.C. § § 1341, 1343, the differences are not here material. As noted above, the plaintiffs have not alleged that fraudulent statements were made to the plaintiffs. Additionally, the plaintiffs have not alleged any injury to the other persons and entities to whom the allegedly fraudulent statements were made. Consequently, the only alleged predicate acts that need be considered in evaluating the sufficiency of the plaintiffs' RICO allegations are the allegations that Banque SCS engaged in money laundering, in violation of 18 U.S.C. § 1956(a)(1).[FN2]

FN2. In order to state a claim for money laundering, a plaintiff need only plead: "(1) that the defendant conducted a financial transaction; (2) that the transaction in fact involved the proceeds of specified unlawful activity as defined in [18 U.S.C.] § 1956(c)(7); (3) that the defendant knew that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the property involved in the financial transaction represented the proceeds of some form of unlawful activity; and (4) that the defendant knew that the financial transaction was designed in whole or in part to conceal or disguise the source, ownership, control, etc., of those proceeds." *United States v. Maher, 108 F.3d 1513, 1527-28 (2d Cir.1997).* The plaintiffs have met this standard.

*i) Operation and Management of Enterprises*

In order to conduct or participate, directly or indirectly in the conduct of an enterprise's affairs, within the meaning of 18 U.S.C. § 1962(c), one need not exercise "significant control" over an enterprise, but one must engage in the "operation or management" of the enterprise and "have some part in directing those affairs." *Reves v. Ernst & Young, 507 U.S. 170, 179 & n. 4, 113 S.Ct. 1163, 1170 & n. 4 (1993).* "[S]imple taking of directions and performance of tasks that are necessary or helpful to the enterprise, without more, is insufficient to bring a defendant within the scope of § 1962(c)." *United States v. Viola, 35 F.3d 37, 41 (2d Cir.1994)* (abrogated on other grounds by *Salinas v. United States, 522 U.S. 52, 118 S.Ct. 469 [1997] ).*

*6 Courts in the Second Circuit typically apply the rule set forth in *Reves* extremely rigorously. *United States Fire Ins. Co. v. United Limousine Service, Inc., 303 F.Supp.2d 432, 451 (S.D.N.Y.2004).* When a defendant's alleged provision of professional services to an enterprise is the basis for a RICO claim, "[t]he deciding issue ... is 'whether the provision of these services allows the defendant to direct the affairs of the enterprise.' " *Id.* at 452 (quoting *Schmidt v. Fleet Bank, 16 F.Supp.2d 340, 346 [S.D.N.Y .1998],* and collecting cases); *but see Bank Brussels Lambert v. Credit Lyonnais, No. 93 Civ. 6876, 2000 WL 1694322, at *4 (S.D.N.Y. Nov. 13, 2000)* (finding that plaintiffs' pleading "in substantially the language of the statute" satisfies *Reves* test). Additionally, "[o]ne is liable under RICO if he or she has discretionary authority in carrying out the instructions of" the enterprise's principals. *Baisch v. Gallina, 346 F.3d 366, 376 (2d Cir.2003)* (internal quotation marks omitted).

The plaintiffs allege that Banque SCS and Wery "structured [Bloomfield's] ownership" and that the sole director of Bloomfield was an employee or associate of Banque SCS. Am. Compl. ¶ 40. Therefore, it can be inferred reasonably from the plaintiffs' allegations that Banque SCS had a part in directing the affairs of the Bloomfield enterprise.

The plaintiffs have also alleged that Banque SCS executed funds transfers and provided other banking services in order to assist Frankel, advised Frankel how to conceal the nature and source of his transactions and the spoils of those transactions, and made certain misrepresentations to other banks and participants in the alleged enterprises. According to the amended complaint, essentially all of these activities occurred at Frankel's direction or after consultation with Frankel. The amended complaint provides no basis upon which to infer that Banque SCS exercised discretion in performing these tasks or that these tasks otherwise allowed Banque SCS to direct any part of the affairs of the alleged association-in-fact enterprise or the insurance company enterprises.

Near the end of the amended complaint, the plaintiffs allege, without elaboration, that Banque SCS "knowingly conducted, participated in, controlled, manipulated or directed the enterprises' affairs." Am. Compl. ¶ 151. This allegation finds no support in the numerous allegations in the amended complaint concerning the activities allegedly undertaken by Banque SCS in connection with the RICO enterprises. In light of the great degree of detail with which those activities are set forth in the amended complaint-which is approximately 75 pages in length-it cannot be inferred that there is a basis in fact for the allegation that Banque SCS played a significant role in the direction of the insurance company and association-in-fact enterprises. With respect to those enterprises, the Court finds that the conduct allegedly undertaken by Banque SCS does not satisfy the test set forth in *Reves.*

*ii) RICO Enterprises*

*7 In order to violate 18 U.S.C. § 1962(c), a person must be "employed by or associated with" an enterprise. 18 U.S.C. § 1962(c). Under the RICO Act, an " 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "The enterprise must be separate from the pattern of racketeering activity ... and distinct from the person conducting the affairs of the enterprise." *First Capital Asset Management, Inc. v. Satinwood, 385 F.3d 159, 173 (2d Cir.2004)* (internal citations omitted). "For an association of individuals

to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." *First Nationwide Bank v. Gelt Funding Corp.,* 820 F.Supp. 89, 98 (S.D.N.Y.1993); *see also Satinwood,* 385 F.3d at 174. Moreover, an association-in-fact must have an existence "separate from the pattern of racketeering activity." *First Capital,* 385 F.3d at 173.

The Bloomfield enterprise consists of a corporate entity, Bloomfield Investments, Ltd. Therefore, the plaintiffs have alleged adequately the existence of that enterprise.

The plaintiffs do not allege that the association-in-fact enterprise had any purpose or activities other than the execution of Frankel's scheme. Consequently, the association-in-fact enterprise does not have any alleged existence apart from the pattern of racketeering activity alleged in the amended complaint, and it does not satisfy the requirement noted in *First Capital.*

Banque SCS contends that the insurance companies cannot be enterprises because they were also "victims" of Frankel's scheme. However, the plaintiffs have alleged that Frankel used each of the insurance companies to further his efforts to gain control of and "loot" the other insurance companies. Consequently, even if the target of a RICO enterprise cannot be the enterprise itself, it can reasonably be inferred from the plaintiffs' allegations that each insurance company enterprise had targets other than itself. Banque SCS also contends that the plaintiffs have not alleged that Banque SCS was "associated with" any of the insurance company enterprises, *see* 18 U.S.C. § 1962(c), since Banque SCS was not aware of their existence. However, the plaintiffs allege that Wery learned of the existence of the insurance companies at some point in 1998, and allege generally that Wery acted as an agent of Banque SCS. It can be inferred reasonably from such allegations that Banque SCS was aware of the insurance company enterprises, at least as of some time in 1998. Therefore, the premise of Banque SCS's contention on this point does not obtain, and so the contention is without merit.

### *iii) Causation*

A defendant is liable under 18 U.S.C. § 1964(c) for a violation of 18 U.S.C. § 1962 only if the defendant's "injurious conduct is both the factual and the

proximate cause of the injury alleged." *Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 120 (2d Cir.2003). In order to satisfy the proximate causation requirement, the alleged injury must be caused directly by the pattern of racketeering activity or by individual RICO predicate acts, and the alleged injury must be one that was reasonably foreseeable. *Baisch,* 346 F.3d at 373. However, a defendant need not intend any "specific harm[ ] to any particular individual"; it is sufficient that the defendant "causes harm by the creation of substantial risk of harm." *Id.* at 376.

**\*8** Banque SCS contends that the predicate acts alleged by the plaintiffs were not the factual or proximate cause of the plaintiffs' losses. Banque SCS's argument in support of that contention, however, is addressed principally to the mail and wire fraud allegations and not the money laundering allegations. The amended complaint alleges clearly that, without the numerous money laundering services provided to Frankel by Banque SCS over a multi-year period, Frankel's scheme to remove funds from the insurance companies could not have proceeded without detection. Moreover, according to the plaintiffs, Banque SCS, through its agent, Wery, allegedly learned no later than 1998 that Frankel had gained control of several insurance companies. Additionally, a number of Frankel's alleged wire transfer instructions to Banque SCS were designed to conceal Frankel's activities and, thereby, to ensure that Frankel could continue to acquire insurance companies and remove funds from them improperly. Accordingly, the plaintiffs have alleged adequately that Banque SCS knowingly caused a substantial risk of harm to the insurance companies by effecting acts of money laundering.

In light of the foregoing, the 18 U.S.C. § 1962(c) claim should be dismissed with respect to the association-in-fact and insurance company enterprises.

### *3. Section 1962(d) Claim*

The RICO Act provides, in pertinent part: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). In order to be liable for a violation of 18 U.S.C. § 1962(d), a "conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Salinas,* 522 U.S. at 65, 118

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

S.Ct. at 477. In order for a plaintiff to recover under 18 U.S.C. § 1964(c) for a RICO conspiracy claim, the plaintiff's injury must be caused by an overt act of racketeering or an act that is otherwise wrongful under RICO. *See Beck v. Prupis*, 529 U.S. 494, 503-505, 120 S.Ct. 1608, 1615-1616 (2000).

Banque SCS contends that the RICO conspiracy claim is without merit, on the grounds that: (1) the RICO enterprise allegations and allegations of causation are inadequate; and (2) the plaintiffs do not allege adequately that Banque SCS agreed to assist Frankel by engaging in money laundering. The first contention is addressed above; the plaintiffs have alleged causation adequately and have alleged a RICO enterprise adequately with respect to the Bloomfield enterprise and the insurance company enterprises only. The second contention is without merit; the plaintiffs have alleged that Banque undertook the transactions in question at Frankel's direction, and Frankel consulted Banque SCS on several occasions about strategies for concealing the nature of various transactions.

*9 Accordingly, the plaintiffs state a RICO conspiracy claim with respect to the insurance company enterprises and the Bloomfield enterprise, and have not stated a RICO conspiracy claim with respect to the association-in-fact enterprise.

### 4. Civil Conspiracy

"No action for civil conspiracy is cognizable in law. A plaintiff first must plead specific wrongful acts which constitute an independent tort." *Smukler v. 12 Lofts Realty, Inc.*, 156 A.D .2d 161, 163, 548 N.Y.S.2d 437, 439 (App. Div. 1st Dep't 1989). The plaintiffs allege that Banque SCS conspired with Frankel to "loot and launder the assets of the [i]nsurance [c]ompanies." Am. Comp. ¶ 171. However, New York law does not recognize torts of "looting" or "laundering." Although the plaintiffs may have alleged tortious conduct by Frankel, they do not specify what tort(s) Banque SCS agreed with Frankel to commit. Accordingly, the amended complaint does not contain a short and plain statement of the plaintiffs' claim for civil conspiracy, *see* Fed.R.Civ.P. 8(a), and the claim should be dismissed.

### 5. Negligent Hiring

The contention that the negligent hiring claim should be dismissed was premised upon the absence of a valid claim against Wery. As that premise does not obtain, the contention is without merit.

### Second Motion for Reconsideration/Motion to Strike/Motion to Amend Judgment/ Rule 54(b) Motion

In light of the foregoing, the plaintiffs' motion to amend the judgment, the plaintiffs' second motion for reconsideration, and the defendants' motion to strike are moot. Consequently, Banque SCS's Rule 54(b) motion, which seeks relief alternative to the denial of the second motion for reconsideration, is also moot.

### IV. CONCLUSION

For the reasons set forth above: (1) The plaintiffs' first motion for reconsideration is granted; (2) the plaintiffs' motion to amend the judgment is denied as moot; (3) the plaintiffs' second motion for reconsideration is denied as moot; (4) the defendants' motion to strike is denied as moot; (5) the motion to dismiss the amended complaint is deemed withdrawn as to Wery; (6) the motion to dismiss the amended complaint as to Banque SCS is granted with respect to the 18 U.S.C. § 1962(c) claim as it relates to the association-in-fact and insurance company enterprises, the 18 U.S.C. § 1962(d) claim as it relates to the association-in-fact enterprise, the common law fraud claim, the aiding and abetting fraud claim, and civil conspiracy claim; (7) the motion to dismiss the amended complaint as to Banque SCS is denied with respect to the 18 U.S.C. § 1962(c) claim as it relates to the Bloomfield enterprise, the 18 U.S .C. § 1962(d) claim as it relates to the Bloomfield and insurance company enterprises, and the negligent hiring claim; and (8) Banque SCS's Rule 54(b) motion is denied as moot.

The Clerk of Court shall amend the previously entered judgment of dismissal to reflect that the amended complaint is dismissed solely as to Banque SCS, for failure to state a claim, with respect to the claims noted above.

*10 Wery and Banque SCS shall serve and file their answers to the amended complaint within twenty days of the date of this order.

S.D.N.Y.,2005.
Dale v. Banque SCS Alliance S.A.
Slip Copy, 2005 WL 2347853 (S.D.N.Y.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 8
Slip Copy, 2005 WL 2347853 (S.D.N.Y.)
**(Cite as: Slip Copy)**


Briefs and Other Related Documents (Back to top)

• 1:02cv03592 (Docket) (May. 09, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Tab B**



Not Reported in F.Supp.                                                                    Page 1
Not Reported in F.Supp., 1995 WL 122726 (S.D.N.Y.), 1995-1 Trade Cases P 70,948,   RICO Bus.Disp.Guide
8788
**(Cite as: Not Reported in F.Supp.)**

**H**
Briefs and Other Related Documents

United States District Court, S.D. New York.
Edwin De Jesus, et al., Plaintiffs,
v.
SEARS, ROEBUCK AND CO., Defendant.
**93 Civ. 2605 (MBM).**

Mar. 22, 1995.

Patrick M. Wall, New York City, Daryl J. Hudson,
III, Washington, DC, Adrian F. Lanser, III, Lanser,
Levinson & Paul, P.C., Centerville, GA, for
plaintiffs.
Theodore N. Mirvis, Paul K. Rowe, Meir Feder,
Wachtell, Lipton, Rosen & Katz, New York City, for
defendant.

OPINION AND ORDER

MUKASEY, District Judge.
*1 Plaintiffs Edwin De Jesus, Carolyn Penzo,
Richard C. Larkin, Albert G. Napolitano, William M.
Cooke, Leonard Foland, Randy Lane, and 10,000
other persons who allegedly worked as
Neighborhood Office Agents ("NOAs") for Allstate
Insurance Company, sue Sears, Roebuck &
Company, Inc., the sole owner of Allstate, for
Allstate's alleged violation of the Sherman and
Clayton Acts, 15 U.S.C. § § 1, 13-15, the Employee
Retirement Income Security Act ("ERISA"), 29
U.S.C. § § 1001 et seq.,[FN1] and the Racketeer
Influenced and Corrupt Organizations Act ("RICO"),
18 U.S.C. § § 1961 et seq. Plaintiffs allege also
various state law claims. Defendant moves to
dismiss the federal claims, pursuant to Fed.R.Civ.P.
12(b) and 9(b), and to dismiss the state claims for
lack of jurisdiction. For the reasons set forth below,
defendant's motion is granted, and the plaintiffs' third
amended complaint is dismissed, without leave to
replead.

I.

Plaintiffs, residents of various states, allege that in
1984, Sears "secretly began a fraudulent scheme" to
cause individual Allstate agents to "shoulder the

lion's share" of office costs, "ensure the failure" of
these agents once they had developed a "book of
business" so that Allstate could take over their
business without paying for the initial operating
costs, and place the agents "in such a state of
financial insecurity" that they would agree to assume
new positions at Allstate even though this meant
abandoning their pension and welfare benefits.
(Complt. ¶ ¶ 7, 9) As part of the scheme, Sears
allegedly conspired to create a new entity, TAC, in
1992, which it allegedly capitalized with all of
Allstate's insurance business, and part of Sears' short-
term corporate debt. (Complt. ¶ 23) Sears allegedly
did this to mask liabilities totalling hundreds of
millions of dollars. (Id.) The alleged scheme came
to life as the NOA program, which was part of a new
plan called Foundation for Growth. Previously,
Allstate directly paid office expenses; under the new
plan, Allstate provided each NOA with a limited
office expense allowance for rent and office
maintenance based on a percentage of the premiums
earned by each NOA. (RICO Case Statement, Ex. B)

Plaintiffs allege that Allstate coerced or fraudulently
induced them to enter the NOA program by
threatening loss of employment, discriminatory
treatment, relocation to undesirable offices, reduction
in secretarial assistance and telecommunication
equipment, and competition from other Allstate
agents, and by deceptive tactics such as making false
promises that Allstate would underwrite the cost of
running an office and misinforming them about
potential earnings and Allstate's marketing assistance.
(Complt. ¶ 13) Once the Allstate agents became
NOAs, plaintiffs allege that Sears, through Allstate,
required those NOAs who wished to advertise in the
"Yellow Pages" to do so through Woodward Direct,
an entity allegedly controlled by Sears. (Id. at ¶ 20)
Sears, through Allstate, allegedly required also that
each NOA lease a computer from Sears in order to
access Allstate's data base, and instructed the NOAs
that they were "employees" rather than "independent
contractors" for income tax purposes. Plaintiffs
assert, however, that unlike employees, they had to
pay for rent, utilities, liability insurance, payroll,
secretarial assistance, and other expenses normally
paid by independent contractors. (Id. at ¶ 21)

*2 Plaintiffs claim that Allstate paid only a "small
portion" of NOAs' expenses, and that rather than

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 2
Not Reported in F.Supp., 1995 WL 122726 (S.D.N.Y.), 1995-1 Trade Cases P 70,948,   RICO Bus.Disp.Guide 8788
**(Cite as: Not Reported in F.Supp.)**

severing their relationship with Allstate entirely, thereby relinquishing their right to accumulated benefits, they instead paid their own expenses in anticipation of future profits.    When the expected profits did not materialize, numerous NOAs allegedly "lost substantial portions of their life savings in the hopeless task of trying to 'save' Allstate's NOA stores." (Complt. ¶ 17)  By the early 1990s, at least one plaintiff had declared bankruptcy, others were making significantly less money than they had expected, and at least one gave up his pension benefits to become an Allstate Neighborhood Exclusive Agent. (*Id.* at ¶ 13)

## II.

Plaintiffs' first two claims allege that Sears violated the antitrust laws, 15 U.S.C. §§ 1, 13-15, by engaging in an illegal "tying" arrangement, based on its alleged requirement that NOAs purchase their Yellow Page advertising through a service allegedly controlled by Sears (Complt. ¶ ¶ 24-28), and that they lease a Sears computer at a cost above the market rate. (*Id.* at ¶ ¶ 29-33)  Because plaintiffs' complaint fails to allege an unlawful tying arrangement, their antitrust claims are dismissed.

A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product." *Yentsch v. Texaco, Inc.,* 630 F.2d 46, 56 (2d Cir.1980) (quotation omitted).    The essence of an invalid tying arrangement "lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 12 (1984).   This Circuit requires allegations and proof of five elements before finding a tie illegal:  1) a tying and a tied product;  2) evidence of actual coercion by the seller that forced the buyer to accept the tied product;  3) sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product;  4) anticompetitive effects in the tied market;   and 5) involvement of a "not insubstantial" amount of interstate commerce in the tied product market.    *Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.,* 880 F.2d 1514, 1516-17 (2d Cir.1989).

Reading the complaint in the light most favorable to plaintiffs, there are two alleged tying arrangements:

first, that some plaintiffs were forced, as a condition of employment, to advertise through an entity allegedly controlled by Sears;  second, that in order for plaintiffs to access the Allstate data base, they had to lease, at above market cost, a Sears computer. Neither allegation states an illegal tying arrangement. In the first arrangement, plaintiffs fail to establish a proper tying and tied product.  The tying product appears to be employment as an NOA, and the tied product is advertising in the Yellow Pages through Woodward Direct.    There is no precedent in this Circuit suggesting that employment alone is a tying product.    The one case supporting this proposition, *Bazal v. Belford Trucking Co., Inc.,* 442 F.Supp. 1089, 1093-1096 (S.D.Fla.1977), has not been followed in any circuit. *Bazal* is also distinguishable from the facts of this case because in *Bazal,* plaintiff established that defendant had the requisite market power, *id.* at 1096-97, while here, plaintiffs failed to allege Allstate's market power, by stating its market share, its advantage over competitors, or its sale of a unique product.  *See Suburban Propane v. Proctor Gas, Inc.,* 953 F.2d 780, 788-89 (2d Cir.1992) (no illegal tying arrangement absent evidence on market power or uniqueness); *Trans Sport, Inc. v. Starter Sportswear, Inc.,* 964 F.2d 186, 192 (2d Cir.1992) (plaintiffs must "allege facts sufficient to support an inference that [defendant] had appreciable economic power in the tying product") (quotation omitted); *305 East 24th Owners Corp. v. Parman Co.,* 714 F.Supp. 1296, 1305-06 (S.D.N.Y.1989) (to establish market power, plaintiffs must show that the "seller's share of the market is high, or that the seller has some advantage not shared by his competitors in the market for the tying product.... [or] the unique character of the tying product") (quotations omitted), *aff'd,* 994 F.2d 94 (2d Cir.1993).    Even assuming, *arguendo,* that employment at Allstate could be a tying product, plaintiffs' claim involving the alleged illegal tying arrangement with Woodward Direct must be dismissed for failing to allege either Allstate's market power or the uniqueness of its product.    *See 305 East 24th Owners Corp.,* 714 F.Supp. at 1305 ("economic power in the market for the tying product is the most crucial element").

**\*3** The second alleged tying arrangement involved Allstate's requirement that plaintiffs lease a Sears computer in order to access the Allstate data base. For this alleged tying arrangement, the computer is the tied product, and the data base is the tying product.    A basic requirement of an illegal tying arrangement is that the defendant actually sell both the tying and tied products. *Trans Sport, Inc.,* 964

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

F.2d at 192 (coercion can be shown where "manufacturer goes beyond persuasion and conditions its retailer's purchase of one product on the purchase of another product") (quotation omitted); _Gonzalez, 880 F.2d at 1516_ (tying arrangement is agreement by party to "sell one product but only on the condition that the buyer also purchases a different ... product") (quotation omitted). Because there is no claim that plaintiffs were required to pay for the Allstate data base, their allegation of an illegal tying arrangement must fail. The principal case plaintiffs rely on, _Digidyne Corp. v. Data Gen. Corp., 734 F.2d 1336, 1338-39 (9th Cir.1984), cert. denied, 473 U.S. 908 (1985),_ is not to the contrary. In _Digidyne,_ the Court recognized that "the purchase of one (tying product) being conditioned on purchase of the other (tied product)" is a prerequisite for an illegal tying arrangement, and that plaintiff established that both the tying and tied product were purchased. Because plaintiffs have failed to allege this threshold requirement, their second alleged illegal tying arrangement also does not state a valid claim.

### III.

In claims four through six, plaintiffs allege that Sears violated RICO, 18 U.S.C. § § 1962(a)-(c) by directing Allstate to coerce and/or fraudulently induce Allstate employees to become NOAs. The alleged fraud perpetrated by Allstate employees (Complt. ¶ 13; RICO Case Statement ¶ 3), which was purportedly "caused by, known to and ratified by Sears" (RICO Case Statement ¶ 2), included alleged false statements about office expenses, expected earned income, working hours, and potential for business growth. (Complt. ¶ 13; RICO Case Statement ¶ 2) Plaintiffs allege further that Sears, through Allstate, caused two documents to be mailed to high-ranking Sears and Allstate officials: "Foundation for Growth," a plan setting forth the goals of the NOA program; and "The Allstate Agent Distribution System: Booz-Allen-Hamilton Study," a 1984 report allegedly analyzing the possible effects of implementing the NOA program. (RICO Case Statement ¶ 5) Plaintiffs assert that beginning in 1986, Sears, through Allstate, mailed or transmitted through facsimile thousands of copies of a document soliciting potential NOAs, and that NOAs' applications and contracts were sent also through the mails. (_Id._) These various mailings and facsimile transmissions allegedly violated the mail and wire fraud statutes, 18 U.S.C. § § 1341, 1343, and

comprised the predicate acts required under RICO.

Because plaintiffs' RICO claims are based on predicate acts of mail and wire fraud, their pleadings must comply with Fed.R.Civ.P. 9(b). _Giuliano v. Everything Yogurt, Inc., 819 F.Supp. 240, 244 (E.D.N.Y.1993)_ (citing _Beck v. Manufacturers Hanover Trust Co., 820 F.2d 46, 49-50 (2d Cir.1987), cert. denied, 484 U.S. 1005 (1988))._ Fed.R.Civ.P. 9(b) provides: "In all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally." To specify fraud with particularity, plaintiffs must allege specifically the circumstances of the fraud, including the content of any alleged misrepresentation, the date and place of the misrepresentation, and the identity of the speaker or writer. _Cohen v. Koenig, 25 F.3d 1168, 1173 (2d Cir.1994)._ Plaintiffs must provide also factual allegations to support a "strong inference" that defendants had fraudulent intent. _Wexner v. First Manhattan Co., 902 F.2d 169, 172 (2d Cir.1990)._ Strong inference can be established either by identifying circumstances showing conscious behavior by defendants, _Cosmas v. Hassett, 886 F.2d 8, 13 (2d Cir.1989),_ or by presenting facts which show a motive for committing fraud and an opportunity for doing so. _Turkish v. Kasenetz, 27 F.3d 23, 28 (2d Cir.1994)._

*4 Plaintiffs have failed to satisfy the Rule 9(b) requirements. First, Allstate employees' alleged false statements concerning NOAs' potential future income, working hours, and business growth are, as Judge Friendly put it, examples of "alleging fraud by hindsight." _Denny v. Barber, 576 F.2d 465, 470 (2d Cir.1978)._ Mere "puffery" or opinions as to future events, or failure to fulfill promises to perform future acts, absent "an intent to perform at the time the promise was made," are insufficient grounds for alleging fraud. _Cohen v. Koenig, 25 F.3d at 1172; Kubin v. Miller, 801 F.Supp. 1101, 1116 (S.D.N.Y.1992)._ The only potential factual underpinning to the panoply of allegations against Allstate is that various Allstate agents "knew" that their statements to plaintiffs were false when made. Such conclusory allegations are insufficient under Rule 9(b) to convert what may possibly be contract claims into fraud claims. _O'Brien v. National Property Analysts Partners, 936 F.2d 674, 677 (2d Cir.1991); Drexel Burnham Lambert, Inc. v. Saxony Heights Realty Assocs., 777 F.Supp. 228, 235 (S.D.N.Y.1991); Dickinson v. Kaplan, 763 F.Supp._

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                Page 4
Not Reported in F.Supp., 1995 WL 122726 (S.D.N.Y.), 1995-1 Trade Cases P 70,948,   RICO Bus.Disp.Guide 8788
(Cite as: Not Reported in F.Supp.)

694, 701 (E.D.N.Y.1990), aff'd, 963 F.2d 1522 (2d Cir.1992).

Second, both the complaint and RICO Case Statement fail to allege fraud with particularity against Sears, the named defendant in this case. Plaintiffs' papers make clear that Allstate, and not Sears, actually sent the alleged fraudulent material through the mails or over the wires. (RICO Case Statement ¶ 5) The alleged fraudulent document soliciting potential NOAs also does not state what plaintiffs assert, namely that Sears, through Allstate, allegedly promised to pay for office expenses. In fact, Allstate promised only that an office expense allowance would be calculated according to a formula using premium percentages. (Id.; Ex. B) Plaintiffs assert that the Booz-Allen-Hamilton study demonstrates that Sears "anticipated that agent revenue would decline" at the time NOAs were offered "an expense plan premised on expanding market share" (Pl.Mem. at 18), but that claim does not comport with what the study actually states. The several pages of the study attached as an exhibit to the RICO Case Statement show that NOAs "will need to sell more to achieve comparable income" and that the office expense allowance program "provides strong new business incentive." (RICO Case Statement, Ex. B) Thus, there is nothing contradictory about what the study seems to reveal, and what Sears, through Allstate, allegedly reported to potential NOAs. In situations where an exhibit is attached to a party's pleadings, the document itself, and not the party's interpretation of that document, prevails. See Artco, Inc. v. Kidde, Inc., No. 88 Civ. 5734, 1989 WL 140284, at *3 (S.D.N.Y. Nov. 15, 1989) ("The exhibits, not the pleadings, control"). Because the document does not say what plaintiffs claim it says, there is nothing to suggest that either Allstate or Sears had a duty to disclose any of the possible implications of the Booz-Allen-Hamilton Study (RICO Case Statement ¶ 5, Ex. B), which was apparently sent by Allstate officials to other unnamed Allstate and Sears officials. See Adler v. Berg Harmon Assocs., 816 F.Supp. 919, 924 (S.D.N.Y.1993) (particularity requirement of Rule 9(b) applies to allegations of fraudulent omissions). Plaintiffs therefore must rely on a theory of vicarious liability to satisfy the requirements of Rule 9(b). However, courts in this Circuit have recognized such theories for civil RICO actions only in limited circumstances, such as where "the corporation may fairly be said to be a central figure (or aggressor) in the alleged scheme." Larco, Inc. v. Chase Manhattan Bank, N.A., 866 F.Supp. 132, 140 (S.D.N.Y.1994) (quoting Gruber v. Prudential-Bache Securities, Inc., 679 F.Supp. 165, 181 (D.Conn.1987); Tribune Co. v. Purcigliotti, 869 F.Supp. 1076, 1089 n. 8 (S.D.N.Y.1994) ("the weight of authority in this district and other circuits is against the imposition of vicarious liability as a basis for civil liability under RICO") (quotation omitted).

*5 Having failed to demonstrate any evidence suggesting that Sears, and not Allstate, was the central figure behind the alleged fraudulent acts, plaintiffs may pass the Rule 9(b) threshold only by demonstrating that Sears had a motive for committing fraud, and an opportunity for doing so. Plaintiffs argue that the essence of Sears' alleged fraudulent scheme was to "ensure the failure" of the NOA program in order to take over the agents' "book of business." (Complt. ¶ 9) For Sears to have created a large national program, expended significant sums of money developing and implementing it, for the main purpose of destroying it defies "informed economic self-interest" and therefore fails to allege sufficient motive. Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir.1994); Atlantic Gypsum Co. v. Lloyds Int'l Corp., 753 F.Supp. 505, 514 (S.D.N.Y.1990).

Because plaintiffs have failed to plead fraud with particularity as to Sears, the named defendant, as required by Fed.R.Civ.P. 9(b), their RICO claims must be dismissed. With the dismissal of all of the federal claims, there is no good reason to assert jurisdiction over plaintiffs' pendent state claims. United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966). Finally, in view of the two prior opportunities plaintiffs have had to amend their complaint, I see no reason to invite a fourth attempt to plead a cognizable claim. The complaint is dismissed.

    FN1. Plaintiffs have withdrawn their ERISA claim and consented to its dismissal. (Pl.Mem. at 11)

S.D.N.Y.,1995.
De Jesus v. Sears, Roebuck and Co.
Not Reported in F.Supp., 1995 WL 122726 (S.D.N.Y.), 1995-1 Trade Cases P 70,948,   RICO Bus.Disp.Guide 8788

Briefs and Other Related Documents (Back to top)

• 1:93cv02605 (Docket) (Apr. 21, 1993)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 122726 (S.D.N.Y.), 1995-1 Trade Cases P 70,948,  RICO Bus.Disp.Guide 8788
**(Cite as: Not Reported in F.Supp.)**

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Tab C**

Westlaw.

Not Reported in F.Supp.2d                                                          Page 1
Not Reported in F.Supp.2d, 2003 WL 22839799 (S.D.N.Y.), RICO Bus.Disp.Guide 10,594
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents

United States District Court,S.D. New York.
JEROME M. SOBEL & CO. and Jerome M. Sobel,
Plaintiffs,
v.
Ira FLECK, Diane Fleck, Angela Patrizi, Steven
Frazzetto, Bakhtaver Irani, M.D., Bakhtaver Irani,
M.D., P.A., and Aspi Irani, Defendants.
**No. 03 Civ.1041 RMB GWG.**

Dec. 1, 2003.

*REPORT AND RECOMMENDATION*
GORENSTEIN, Magistrate J.
**\*1** Jerome M. Sobel & Company (the "Partnership")
is a New York partnership engaged in the practice of
certified public accounting. Its principal, Jerome M.
Sobel, and the Partnership (collectively, "Sobel")
have brought this action against Ira Fleck ("Fleck"),
formerly a partner of the Partnership; Diane Fleck,
Angela Patrizi, and Steven Frazzetto, formerly
employees of the Partnership (collectively, the
"employee defendants"); and Bakhtaver Irani, M.D.,
Bakhtaver Irani, M.D., P.A., and Aspi Irani,
recipients of accounting services provided by Fleck
(collectively, "the Iranis"). The complaint alleges six
causes of action-two claims under the Racketeer
Influenced and Corrupt Organizations Act ("RICO"):
(i) violation of 18 U.S.C. § 1962(c); (ii) violation of
18 U.S.C. § 1962(d); and four state law claims: (iii)
breach of contract (against Fleck); (iv) breach of
fiduciary duty (against Fleck and the employee
defendants); (v) conversion (against Fleck); (vi)
common law fraud (against Fleck and the employee
defendants). Sobel alleges that the Court has
jurisdiction over their claims pursuant to 18 U.S.C. §
1964 (RICO), 28 U.S.C. § 1331 (federal question),
and 28 U.S.C. § 1367 (supplemental jurisdiction).
Complaint, filed February 14, 2003 ("Compl."), ¶ 9.

The defendants have moved to dismiss the complaint
in its entirety for failure to state a claim pursuant to
Fed.R.Civ.P. 12(b)(6) and 9(b). Notice of Motion,
filed July 8, 2003. For the reasons set forth below, the
motion to dismiss should be granted.

*I. BACKGROUND*

The following allegations from the complaint are
assumed to be true for purposes of this motion.

Jerome M. Sobel and Fleck entered into a partnership
agreement on May 5, 1980, forming a general
partnership under the name Jerome M. Sobel &
Company. Compl. ¶ 31. Pursuant to the agreement,
the two partners were to share net profits in a ratio
equal to the fees paid by their respective clients, *id.* ¶
32, and costs were to be borne by the Partnership, *id.*
¶ 37.

The complaint alleges that from at least 1991
continuing until September 2002, Fleck performed
accounting-related services for the Iranis, expending
the time and resources of the Partnership, while
causing payments to be made to himself personally.
*Id.* ¶¶ 40-41. Fleck failed to disclose such services
and payments to Sobel, in violation of the partnership
agreement. *Id.* ¶ 45. The complaint alleges that the
Iranis agreed to this arrangement. *Id.* ¶ 41.

Sobel's complaint further alleges that the three
employee defendants entered into oral agreements
with Fleck at the time of their respective dates of
employment, under which they agreed to assist him
in performing services on behalf of the Iranis without
disclosing the work or the fees to Sobel. Compl. ¶
42. Frazzetto was hired by the Partnership on a per
diem basis to perform general accounting services in
or about 1992. *Id.* ¶ 110. Patrizi was hired on a full-
time basis to perform general accounting services in
or about 1999. *Id.* ¶ 108. Diane Fleck was hired by
the Partnership on a part-time basis to perform
administrative duties on or about December 31, 1999.
*Id.* ¶ 112.

**\*2** The complaint charges all of the defendants with
"repeated" violations of the mail and wire fraud
statutes, 18 U.S.C. §§ 1341, 1343. Compl. ¶ ¶ 80-
81. In furtherance of the scheme to defraud, the
defendants used the United States Postal Service,
telephone, electronic mail, and/or facsimile
transmittals to communicate between the
Partnership's offices in New York and the Iranis'
residences or business locations in New Jersey. *Id.* ¶
¶ 11, 24-29, 51-61, 64. It is not alleged that any of
the mail or wire communications were themselves
fraudulent. Rather, the complaint alleges that they
were the means by which Sobel, the employee

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

defendants and the Iranis communicated with each other or transmitted documents necessary for the completion of accounting services, such as tax returns. *See id.*

## II. *APPLICABLE LEGAL STANDARDS*

In resolving a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974); *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

Nonetheless, the Court is not required to accept as true " 'conclusions of law or unwarranted deductions of fact." ' *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 771 (2d Cir.1994) (quoting 2A James William Moore & Jo Desha Lucas, *Moore's Federal Practice* ¶ 12.08, at 2266-69 (2d ed.1984)), *cert. denied,* 513 U.S. 1079 (1995). "This principle applies with even greater force in a fraud case governed by the more stringent pleading requirements of Fed.R.Civ.P. 9(b)." *Id.* It is well-established law in this Circuit that the particularity requirements of Fed.R.Civ.P. 9(b) are applicable to RICO claims where, as here, such claims are based on mail fraud under 18 U.S.C. § 1341 or wire fraud under 18 U.S.C. § 1343. *McCoy v. Goldberg,* 748 F.Supp. 146, 156 (S.D.N.Y.1990) (citing cases); *see also Plount v. Am. Home Assurance Co.,* 668 F.Supp. 204, 206-07 (S.D.N.Y.1987) ("all of the concerns that dictate that fraud be pleaded with particularity exist with even greater urgency in civil RICO actions").

Fed.R.Civ.P. 9(b) requires that "[i]n all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity." "To satisfy the particularity requirement of Rule 9(b), a complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Cosmas,* 886 F.2d at 11 (citing *Goldman v. Belden,* 754 F.2d 1059, 1069-70 (2d Cir.1985)). However, while "the fraud alleged must be stated with particularity ... the requisite intent of the alleged [perpetrator] of the fraud need not be alleged with great specificity." *Chill v. Gen. Elec. Co.,* 101 F.3d 263, 267 (2d Cir.1996) (citations omitted); *see also* Fed.R.Civ.P. 9(b) ("[T]he circumstances constituting fraud ... shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."). Nonetheless, a plaintiff must "allege facts that give rise to a strong inference of fraudulent intent." *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 812 (2d Cir.1996) (citations omitted).

*3 Given the potential breadth of claims and trebling of damages available under RICO, particular scrutiny is warranted in considering civil RICO claims. Because the mere assertion of a civil RICO claim "has an almost inevitable stigmatizing effect on those named as defendants[,] ... courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." *Figueroa Ruiz v. Alegria,* 896 F.2d 645, 650 (1st Cir.1990); *accord Katzman v. Victoria's Secret Catalogue,* 167 F.R.D. 649, 655 (S.D.N.Y.1996), *aff'd,* 113 F.3d 1229 (2d Cir.1997). "RICO treble damages provisions are not available to remedy every possible injury that can, with some ingenuity, be attributed to a defendant's injurious conduct." *Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 116 (2d Cir.), *cert. denied,* -S. Ct. -, 2003 WL 21909353 (Nov. 10, 2003). Thus, courts must attempt to distinguish between claims consistent with Congress' intentions in passing RICO-"protecting legitimate businesses from infiltration by organized crime," *United States v. Porcelli,* 865 F.2d 1352, 1362 (2d Cir.), *cert. denied,* 493 U.S. 810 (1989)-and traditional state court actions "cast in terms of RICO violations" simply to "gain access to treble damages and attorneys fees in federal court." *Feirstein v. Nanbar Realty Corp.,* 963 F.Supp. 254, 257 (S.D.N.Y.1997) (citation omitted).

## III. *DISCUSSION*

### A. *Section 1962(c) Claim*

To state a claim for damages under 18 U.S.C. § 1962(c), a plaintiff must satisfy two pleading burdens. First, the plaintiff must allege that the defendants violated § 1962, the substantive RICO provision. This requires the plaintiff to allege "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 3
Not Reported in F.Supp.2d, 2003 WL 22839799 (S.D.N.Y.), RICO Bus.Disp.Guide 10,594
**(Cite as: Not Reported in F.Supp.2d)**

invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan Stanley Inc.,* 719 F.2d 5, 17 (2d Cir.1983) (quoting 28 U.S.C. § 1962(a)-(c)), *cert. denied,* 465 U.S. 1025 (1984). Second, the plaintiff must allege that it was injured in its business or property by reason of a violation of § 1962. *See* 18 U.S.C. § 1964(c). Each of these "requirements ... must be established as to each individual defendant." *De Falco v. Bernas,* 244 F.3d 286, 306 (2d Cir.), *cert. denied,* 534 U.S. 891 (2001).

In the present motion, defendants argue that the complaint should be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b) on the grounds that: (1) Sobel has failed to establish any predicate acts of "racketeering activity" with regard to any defendant, *see* Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint, filed July 8, 2003 ("Def.Mem."), at 6-15; (2) the complaint fails to sufficiently allege a "pattern" of such "racketeering activity," *id.* at 15-18; and (3) Sobel has failed to show that a RICO violation caused his injuries, *id.* at 18-19. As discussed further below, the Court rejects the defendants' argument as to the first point but accepts their argument on the second point. Accordingly, it is unnecessary to reach the third point.

### 1. *Predicate Acts of Racketeering Activity*

*4 Section 1961(1) defines "racketeering activity" as certain criminal acts under state and federal law including mail fraud, 18 U .S.C. § 1341, and wire fraud, 18 U.S.C. § 1343. *See* 18 U.S.C. § 1961(1)(B). The statute requires a plaintiff to plead at least two predicate acts of racketeering activity. 18 U.S.C. § 1961(5). But "while two acts are necessary, they may not be sufficient." *Sedima S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 497 n. 14 (1985). "A complaint alleging mail and wire fraud must show (1) the existence of a scheme to defraud, (2) defendant's knowing and intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme." *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.,* 84 F.3d 629, 633 (2d Cir.1996) (citation omitted).

Defendants do not contest that the pleadings establish the existence of a scheme to defraud. Instead, they challenge the sufficiency of the mail and wire fraud allegations on the grounds that (a) the complaint fails to allege any specific use of interstate mails or wires,

(b) no two acts have been attributed to any defendant, and (c) Sobel cannot establish the requisite fraudulent intent. Each of these arguments is addressed separately.

#### a. *Use of interstate mails or wires*

The defendants argue that the complaint is "fatally deficient" because it is "utterly devoid" of any facts regarding any specific use of the mail or interstate wires that would support a claim for mail or wire fraud. Def. Mem. at 8. For each of the years 1991 through 2001, the complaint describes accounting services performed by Fleck in detail-such as preparation of tax returns for specified individuals or entities. Following each description, the complaint alleges:

In furtherance of such scheme, tax documents were prepared and forwarded through the interstate mails, and via interstate e-mail and facsimile transmission between defendant Ira [Fleck's] office at Sobel Co. located in Long Island, New York, and the office of Irani, P.A. located in Rutherford, New Jersey, tax returns and other financial documents were filed in the State of New Jersey under the name of Sobel Co., and checks in payment for such services were mailed from Irani, P.A .... to defendant Ira [Fleck] ..., or arrangements were made between defendant Ira [Fleck] and defendant Bakhtaver [Irani, M.D.] or defendant Aspi [Irani] via interstate mail or e-mail or facsimile transmission to have the checks picked up or otherwise delivered to defendant Ira [Fleck].

Compl. ¶ ¶ 51-61, 64. No additional allegations are made regarding interstate mail or wire transactions. Defendants argue that this language is "conclusory and wholly unsubstantiated boilerplate" and thus insufficient to satisfy Sobel's pleading burden. Def. Mem. at 8.

At issue is whether Sobel's allegations must be specific as to the time, date and contents of the alleged mail and wire fraud. In *Mills v. Polar Molecular Corp.,* the Second Circuit stated broadly that "allegations of predicate mail and wire fraud acts should state the contents of the communications, who was involved, where and when they took place, and explain why they were fraudulent ." 12 F.3d 1170, 1176 (2d Cir.1993); *accord Bernstein v. Misk,* 948 F.Supp. 228, 239 (E.D.N.Y.1997) (summary legal conclusions that defendants "illegally used the United States mails in violation of 18 U.S.C. § 1341" found insufficient); *Qantel Corp. v. Niemuller,* 771 F.Supp. 1361, 1369 (S.D.N.Y.1991) (complaint inadequate

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                          Page 4
Not Reported in F.Supp.2d, 2003 WL 22839799 (S.D.N.Y.), RICO Bus.Disp.Guide 10,594
(Cite as: Not Reported in F.Supp.2d)

because plaintiff failed to identify the actual number of telephone calls made and the precise dates on which they occurred); *McCoy,* 748 F.Supp. at 153-54 (complaint alleging that documents were "delivered" or "sent" lacked the detail necessary for the court to determine that the United States mails were employed).

**\*5** But contrary to defendants' argument, Def. Mem. at 14-15, *Mills* does not require in all instances that a complaint identify specific fraudulent statements contained in the communications made via the interstate mail and wire. The Supreme Court has made clear that to satisfy the mail fraud statute, the mailings themselves need not actually contain false or misleading statements, as long as they further an underlying scheme that itself has a fraudulent, deceptive purpose. *See Schmuck v. United States,* 489 U.S. 705, 715 (1989) (upholding mail fraud conviction in which the routine mailing of title documents furthered fraudulent scheme to purchase used cars, roll back their odometers, and resell them at artificially inflated prices). Thus, even "innocent" mailings may "satisfy the mailing element under the mail fraud statute where the mailing is part of the execution of the scheme." *Center Cadillac, Inc. v. Bank Leumi Trust Co. of N.Y.,* 808 F.Supp. 213, 228 (S.D.N.Y.1992) (citing *Schmuck,* 489 U.S. at 715), *aff'd,* 99 F.3d 401 (2d Cir.1995). To satisfy the element of mail fraud requiring the use of the mails in furtherance of a scheme to defraud, *see* 18 U.S.C. § 1341, the mailings need not be an essential part of the scheme as long as they are "incident to an essential part of the scheme," *Pereira v. United States,* 347 U.S. 1, 8 (1954); *accord Schmuck,* 489 U.S. at 715. The same rule applies to the wire fraud statute. *See, e.g., United States v. Utley,* 2000 WL 620218, at \*1 (S.D.N.Y. May 12, 2000). Thus, to survive a motion to dismiss in such a case, the complaint need not identify false statements contained in the mailings or wire transmissions themselves.

Furthermore, where the mailings or wire transmissions themselves are not false or misleading, Rule 9(b)'s particularity requirements do not apply to the description of the mailings or wire transmissions. In *In re Sumitomo Copper Litigation,* the court held as follows:
In cases in which a plaintiff claims that specific statements or mailings were themselves fraudulent, i.e., themselves contained false or misleading information, the complaint should specify the fraud involved, identify the parties responsible for the fraud, and where and when the fraud occurred. *See*

*Mills,* 12 F.3d at 1175 (citing [*Cosmas,* 886 F.2d at 11] ); *McLaughlin [v. Anderson],* 962 F.2d [187,] 191 (2d Cir.1992); *Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986).
In cases in which the plaintiff claims that the mails or wires were simply used in furtherance of a master plan to defraud, the communications need not have contained false or misleading information themselves. *See Schmuck,* 489 U.S. at 715. *In such cases, a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications, is sufficient to satisfy Rule 9(b).* *Spira v. Nick,* 876 F.Supp. 553, 559 (S.D.N.Y.1995); [*Center Cadillac,* 808 F.Supp. at 229].

**\*6** 995 F.Supp. 451, 456 (S.D.N.Y.1998) (emphasis added). This holding is supported by logic. First, a description of a mailing in furtherance of a scheme to defraud-but which is not itself fraudulent-does not qualify as an "averment of fraud" within the meaning of Rule 9(b). *Id.; Spira,* 876 F.Supp. at 559. Second, the holding is consistent with the notice pleading philosophy enunciated in Fed.R.Civ.P. 8(a) and a plaintiff's obvious need for discovery when knowledge of the mailings is in the defendant's exclusive possession. *See Ouaknine v. MacFarlane,* 897 F.2d 75, 79 (2d Cir.1990) ( "Rule 9(b), however, must be read together with Rule 8(a) which requires only a 'short and plain statement' of the claims for relief."); *New England Data Servs., Inc. v. Becher,* 829 F.2d 286, 289-90 (1st Cir.1987) (where mail or wire fraud allegations are insufficient under Rule 9(b), dismissal should not be automatic; rather, courts should consider, *inter alia,* whether the information is in defendant's exclusive control); *Center Cadillac,* 808 F.Supp. at 228 (complaint sufficient where it indicates general content of misrepresentations and time period and sufficiently apprizes defendants of their involvement in the scheme); *see also Calabrese v. CSC Holdings, Inc.,* 2003 WL 22052824, at \*6 (E.D.N.Y. Aug. 13, 2003) (where a plaintiff alleges that mail and wire fraud were in furtherance of a larger scheme to defraud, "Rule 9(b) only requires the plaintiff to delineate, with adequate particularity, the specific circumstances constituting the overall fraudulent scheme").

Here, the overall scheme to defraud by Fleck has been described in detail and the complaint clearly explains the relationship between the mailings or wire communications and the scheme to defraud. Accordingly, it is sufficient to satisfy Rule 9(b).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 5
Not Reported in F.Supp.2d, 2003 WL 22839799 (S.D.N.Y.), RICO Bus.Disp.Guide 10,594
(Cite as: Not Reported in F.Supp.2d)

### b. Attributing acts to each defendant

"The focus of section 1962(c) is on the individual patterns of racketeering activity engaged in by a defendant, rather than on the collective activities of the members of the enterprise." _United States v. Persico,_ 832 F.2d 705, 714 (2d Cir.1987), _cert. denied,_ 486 U.S. 1022 (1988). In contrast, § 1962(d) focuses on the collective activities of all the members. _See id._ Thus, to establish a violation of § 1962(c), plaintiffs must allege that each defendant committed at least two predicate acts of racketeering activity. _See De Falco,_ 244 F.3d at 306. This is consistent with Rule 9(b)'s particularity requirement where multiple defendants are charged with fraud. _See DiVittorio v. Equidyne Extractive Indus., Inc.,_ 822 F.2d 1242, 1247 (2d Cir.1987) ("Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." (citation omitted)). Under the mail and wire fraud statutes, it is not necessary to allege, however, that the defendants have personally used the mails or wires; it is sufficient that a defendant "causes" the use of the mails or wires. _See_ 18 U.S.C. § § 1341, 1343. Thus, "it is not significant for purposes of the mail fraud statute that a third-party, rather than defendant, wrote and sent the letter at issue, provid[ed] ... the defendants could reasonably have foreseen that the third-party would use the mail in the ordinary course of business as a result of defendants' act." _United States v. Bortnovsky,_ 879 F.2d 30, 36 (2d Cir.1989).

*7 Here, the complaint alleges that each of the defendants are directly connected to the scheme to defraud perpetrated by Fleck. The scheme consisted of Fleck and the employee defendants performing numerous accounting-related services for the Iranis during the years 1991-2002 for which payments were kept secret in contravention of the partnership agreement. With respect to the Iranis, the complaint alleges that they agreed to pay Fleck "personally, with no amount of such payment to be disclosed to plaintiffs or included in the total fees deposited in the Partnership account." Compl. ¶ 41.[FN1] With respect to the employee defendants, it is likewise alleged that they "each agreed that they would act in concert to assist [Fleck] in performing accounting-related services ... without disclosure of any of this work to Sobel or Sobel Co., and without disclosing any of the fees generated from this work to Sobel or Sobel Co." _Id._ ¶ 42.

FN1. This allegation is fleshed out in an affidavit filed by Jerome M. Sobel in which it is alleged that the Iranis "were aware that none of the fees paid to Fleck were shared by the Partnership, and intentionally concealed this fact from me and Sobel Co. for their own benefit." Affidavit in Opposition to Motion to Stay Discovery and For Leave to Amend Complaint, filed August 1, 2003 ("Sobel Aff."), ¶ 5.

For each of the twelve years, the complaint details numerous tax filings, audits and other accounting services provided to the Iranis and alleges that the mails and/or wires were used to prepare and file these documents. _See_ Com pl. ¶ ¶ 51-61, 64. Although the complaint is unable to specifically attribute any particular predicate act to a particular defendant, the allegations are sufficient because each of the defendants would have expected that Fleck's performance of accounting services would result in the mailing of numerous documents between Fleck and the Iranis and/or wire communications over the course of many years of providing such services.

In sum, the complaint alleges a sufficiently close connection between the defendants and the scheme to provide accounting services in violation of the partnership agreement that each of the defendants "could reasonably have foreseen" that the mail or wires would be used "in the ordinary course of business as a result of" their acts. _Bortnovsky,_ 879 F.2d at 36.

### c. Fraudulent intent

Fed.R.Civ.P. 9(b) does not require intent to be pled with particularity. However, a plaintiff must "allege facts that give rise to a strong inference of fraudulent intent." _San Leandro,_ 75 F.3d at 812. This can be done in two ways, either "(1) by identifying circumstances indicating conscious behavior by the defendant through 'correspondingly' strong allegations; or (2) by alleging a motive for committing fraud and a clear opportunity for doing so." _Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.,_ 85 F.Supp.2d 282, 295 (S.D.N.Y.2000) (citing _Powers v. British Vita, P.L.C.,_ 57 F.3d 176, 184 (2d Cir.1995)), _aff'd,_ 2001 WL 46565 (2d Cir. Jan. 18, 2001). The Second Circuit has stated that " '[m]otive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.' " _Chill,_ 101 F.3d at 268

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                       Page 6
Not Reported in F.Supp.2d, 2003 WL 22839799 (S.D.N.Y.), RICO Bus.Disp.Guide 10,594
(Cite as: Not Reported in F.Supp.2d)

(quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir.1994)).

*8 Defendants do not argue that the complaint fails to establish Fleck's intent to defraud Sobel. Nonetheless, it bears noting that the complaint sufficiently alleges Fleck's intent through allegations of his "conscious behavior." For example, the complaint states that Fleck "made false and misleading statements to Plaintiffs Sobel and Sobel Co. each year," Compl. ¶ 46, "deposited the checks received from [the Iranis] into several of his personal accounts," *id.* ¶ 66, "directed or influenced the unlawful activities" of the alleged enterprise, *id.* ¶ 73, and "utilized the employees, property, resources, and services of the Partnership ... without the knowledge or consent of Sobel," *id.* ¶ 70. In addition, the complaint sufficiently alleges concrete benefits-specifically, payments-Fleck realized as a consequence of his omissions. *Id.* ¶ 65.

The Iranis argue that the complaint "alleges nothing more than their receipt of accounting services and their payment for the same to Defendant Ira Fleck, then a partner in the Plaintiff partnership." Def. Mem. at 12. While that is arguably true for the complaint itself, an affidavit by Sobel submitted in response to the motion to dismiss alleges specifically that the Iranis "were aware that none of the fees paid to Fleck were shared by the Partnership, and intentionally concealed this fact from me and Sobel Co. *for their own benefit.*" Sobel Aff. ¶ 5. Despite having the opportunity to do so, Fleck made no argument in response to this affidavit suggesting that it would be insufficient to show the Iranis' fraudulent intent. Accordingly, while the Court could dismiss the complaint as it is, it would be something of an empty exercise since the complaint as supplemented by this allegation "allege[s] a motive for committing fraud," *Odyssey Re*, 85 F.Supp.2d at 295, and thus meets the requirement that Sobel allege fraudulent intent.

With regard to the employee defendants, the complaint alleges that they "each agreed that they would act in concert to assist [Fleck] in performing accounting-related services ... without disclosure of any of this work to Sobel or Sobel Co., and without disclosing any of the fees generated from this work to Sobel or Sobel Co." Compl. ¶ 42. Sobel also alleges that the employee defendants "destroyed and concealed material documents relevant to the fees." *Id.* ¶ 48. In the affidavit submitted in response to the motion to dismiss, Sobel alleges that the employee defendants "agreed ... to conceal from [Jerome Sobel] fees generated by [the Iranis] that were paid directly

to Fleck, and to conceal from [Jerome Sobel] material documents in connection with the work performed by Fleck and the fees generated." Sobel Aff. ¶ 6. Taken with the allegations of the original complaint, these allegations are sufficient to show the "conscious behavior" of the employee defendants, demonstrating their fraudulent intent.

*9 In sum, the complaint as supplemented by the affidavit sufficiently alleges predicate acts of wire and mail fraud against all the defendants.

### 2. *Pattern of Racketeering Activity*

RICO defines a "pattern of racketeering activity" as "at least two acts of racketeering activity" committed within a ten-year period. 18 U.S.C. § 1961(5). The Supreme Court has held that to establish a "pattern" of racketeering activity, plaintiffs "must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989). "Continuity" of criminal activity in this context encompasses "both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241. The complaint here alleges a series of predicate acts of finite duration ending in September 2002. *See* Compl. ¶¶ 78-79. Accordingly, Sobel does not attempt to establish open-ended continuity. *See Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir.1999) (to satisfy open-ended continuity, plaintiff must show the "threat of continuing criminal activity beyond the period during which the predicate acts were performed"). Thus, the issue here is whether closed-ended continuity has been alleged.

In the Second Circuit, the existence of closed-ended continuity is measured "by weighing a variety of non-dispositive features, including, *inter alia,* the length of time over which the alleged predicated acts took place, the number and variety of acts, the number of participants, the number of victims, and the presence of separate schemes." *GICC Capital Corp. v. Tech. Fin. Group, Inc.*, 67 F.3d 463, 467 (2d Cir.1995) (citations omitted), *cert. denied,* 518 U.S. 1017 (1996); *accord Cofacredit,* 187 F.3d at 242. Although continuity is "centrally a temporal concept," *H.J. Inc.,* 492 U.S. at 242, " 'a scheme's duration alone is not dispositive,' " *Weizmann Inst. of Sci. v. Neschis,* 229 F.Supp.2d 234, 256 (S.D.N.Y.2002) (quoting *Pier Connection, Inc. v.*

Not Reported in F.Supp.2d                                                                                Page 7
Not Reported in F.Supp.2d, 2003 WL 22839799 (S.D.N.Y.), RICO Bus.Disp.Guide 10,594
(Cite as: Not Reported in F.Supp.2d)

*Lakhani*, 907 F.Supp. 72, 78 (S.D.N.Y.1995)); *see also Schnell v. Conseco, Inc.*, 43 F.Supp.2d 438, 446 (S.D.N.Y.1999) ("While, when taken in isolation, the time period of the alleged racketeering conduct may support a finding of closed-ended continuity, such a finding is not automatic in light of the other factors to be considered."); *Pier Connection*, 907 F.Supp. at 75 ("[i]n determining whether continuity exists the court should not limit its consideration to the duration of the scheme" (citation omitted)). Rather, a court must examine the "overall context in which the acts took place." *United States v. Kaplan*, 886 F.2d 536, 542 (2d Cir.1989), *cert. denied*, 493 U.S. 1076 (1990). Each of the *GICC Capital* factors is considered separately.

### a. Duration of the scheme

**\*10** Turning first to the temporal aspect of Sobel's allegations, the complaint alleges that Fleck, with the collusion of the Iranis and the employee defendants, "made false and deceptive statements" on numerous occasions regarding the nature and extent of the fees he was receiving. Compl. ¶ ¶ 6, 41-42, 46. The underlying scheme to defraud Sobel is alleged to have begun in 1991 and to have ended in 2002, although no details have been provided as to when the misrepresentations were made. None of the employee defendants could have been involved in this scheme for the entire time period given that they were hired by the Partnership at various times after 1991-two as late as 1999. *Id.* ¶ ¶ 108, 110, 112.

To establish closed-ended continuity, a plaintiff is required to prove " 'a series of related predicates extending over a substantial period of time.' " *Cofacredit*, 187 F.3d at 242 (quoting *H.J. Inc.*, 492 U.S. at 242). *H.J. Inc.* indicates that "[p]redicate acts extending over a few weeks or months ... do not satisfy this requirement." 492 U.S. at 242. Since the Supreme Court decided *H.J. Inc.* the Second Circuit itself has noted that it has not found closed-ended continuity in an alleged pattern of racketeering activity that lasted less than two years. *De Falco*, 244 F.3d at 321; *Cofacredit*, 187 F.3d at 242. However, there is no bright-line test for determining whether a period of time is "substantial" for the purposes of closed-ended continuity. Accepting Sobel's allegation that the employee defendants were each involved in the scheme to defraud from the outset of their respective dates of employment, Compl. ¶ 42, the shortest duration of any individual defendant's fraudulent activities was approximately two years and nine months; the duration of Fleck's and the

Iranis' activities is alleged to have spanned eleven years and nine months. All in all, this factor weighs in favor of finding continuity.

### b. Number and variety of acts

The consideration of closed-ended continuity normally focuses on the predicate acts alleged. But one salient feature of Sobel's complaint is that the predicate acts of mail and wire fraud were of the "innocent" variety-that is, they are not alleged to have themselves been fraudulent. Rather, they were merely the instrumentalities used to effectuate Fleck's fraudulent scheme. Courts that have addressed the RICO "pattern" requirement in cases of this kind have recognized that the "pattern" requirement must be evaluated in the context of the overall fraudulent scheme rather than based on any "innocent" mailing or wire transmissions. For example, in *Kehr Packages, Inc. v. Fidelcor, Inc.*, the Third Circuit noted that "[a]lthough the mailing is the actual criminal act, the instances of deceit constituting the underlying fraudulent scheme are more relevant to the continuity analysis." 926 F.2d 1406, 1414 (3d Cir.), *cert. denied*, 501 U.S. 1222 (1991). Citing *Kehr Packages*, the Eighth Circuit held that "mailings are insufficient to establish the continuity factor unless they contain misrepresentations themselves. The court must look to the underlying scheme to defraud." *Wisdom v. First Midwest Bank*, 167 F.3d 402, 407 (8th Cir.1999). The Fourth and the Seventh Circuits have come to similar conclusions. *See Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir.2000) ("[W]e are cautious about basing a RICO claim on predicate acts of mail and wire fraud because it will be the unusual fraud that does not enlist the mails or wires in its service at least twice." (internal quotation marks and citations omitted)); *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 781 (7th Cir.1994) ("The Seventh Circuit ... does not look favorably on relying on many instances of mail and wire fraud to form a pattern." (citations omitted)).

**\*11** Indeed, focusing the continuity analysis on otherwise "innocent" acts of mail or wire fraud "would extend RICO's scope to allegations of mail fraud based upon two or more otherwise routine business mailings, a result we believe Congress did not intend." *Kehr*, 926 F.2d at 1414. This principle has also been applied in this District. In concluding that closed-ended continuity had not been alleged with respect to a fraudulent scheme, the court in *Schnell* noted that "[w]hile plaintiff's complaint

Not Reported in F.Supp.2d                                                                                          Page 8
Not Reported in F.Supp.2d, 2003 WL 22839799 (S.D.N.Y.), RICO Bus.Disp.Guide 10,594
**(Cite as: Not Reported in F.Supp.2d)**

alleges a number of predicate mail and wire fraud acts in furtherance of this scheme, these acts are in themselves innocuous and are not alleged to be false or misleading in any way." 43 F.Supp.2d at 446. Tellingly, the only case cited by Sobel other than *H.J. Inc.* that found closed-ended continuity, *see* Memorandum of Law in Opposition to Defendants' Motion to Dismiss, filed August 1, 2003, at 17-19, is *Com-Tech Associates v. Computer Associates International, Inc.,* 753 F.Supp. 1078 (E.D.N.Y.1990), aff'd, 938 F.2d 1574 (2d Cir.1991), which involved multiple predicate acts of mail fraud that were not "innocent" but which themselves contained fraudulent statements. *See id.* at 1091.

The Second Circuit has warned that "courts must take care to ensure that the plaintiff is not artificially fragmenting a singular act into multiple acts simply to invoke RICO." *Schlaifer Nance & Co. v. Estate of Warhol,* 119 F.3d 91, 98 (2d Cir.1997) (acts relating to a single contract and a single scheme to defraud were not continuous for RICO purposes even though they spanned over three years). That is precisely what is occurring here. The predicate acts of mailings and wire communications alleged by Sobel were not inherently unlawful. The fees obtained by Fleck resulted from his otherwise lawful performance of accounting services. The mail and wires were used to conduct this lawful business. There is no allegation that any fax, phone call, tax return or mailing contained any fraudulent statement. Thus, the complaint does not allege a "number and variety" of predicate acts for purposes of addressing the continuity requirement. Instead, there was a single unitary fraudulent scheme with no disparate acts of illegal conduct. The only improper conduct was the continuing failure to disclose the receipt of accounting fees to Sobel. Thus, this factor weighs against a finding of closed-ended continuity.

### c. Presence of separate schemes to defraud

As just discussed, Sobel has alleged only one scheme to defraud. Furthermore, that scheme had only one limited goal: to deprive Sobel of certain revenues. Although it is not necessary to allege multiple schemes, the cases finding no closed-ended continuity have typically involved a single narrow scheme such as occurred here. *See, e.g., Weizmann Inst.,* 229 F.Supp.2d at 257 (single fraudulent scheme to gain control of decedent's assets); *Schnell,* 43 F.Supp.2d at 445-46 (scheme to defraud with the single goal of seizing control of a corporation); *Feirstein,* 963 F.Supp. at 260 (acts of mail fraud all

related to single scheme not to pay New York taxes); *Bernstein,* 948 F.Supp. at 238 (single, non-complex scheme to obtain financing for a purchase of property and then default on the loan); *Pier Connection,* 907 F.Supp. at 78 (using "several different tactics" does not change the nature of a single scheme with the goal of seizing control of plaintiff's business). Thus, this factor too favors the defendants.

### d. Number of participants

*12 With respect to the number of participants, Sobel has alleged that several individuals or entities participated in the scheme to defraud: Fleck, the employee defendants and the Iranis. However, it is clear from the complaint that Fleck was the major perpetrator in that he "directed" the unlawful activities, Compl. ¶ 73, "utilized" Partnership employees and resources, *id.* ¶ 70, and realized the benefits of the scheme, *id.* ¶ 65. Indeed, Fleck alone entered into the partnership agreement with Sobel, thereby agreeing to share all revenues. *Id.* ¶¶ 31-34. As for the employee defendants, apart from their work on behalf of the Iranis, they were apparently otherwise performing their routine job responsibilities. Likewise, the Iranis were receiving and paying for routine accounting services, even if it was not in accordance with the agreement between Fleck and Sobel. There are no allegations that either the employee defendants or the Iranis played anything but peripheral roles in the scheme to defraud. In *Bernstein,* the fact that one person perpetrated the scheme to defraud, using various other individual and entities as "fronts," was relevant in determining that closed-ended continuity had not been established. 948 F.Supp. at 232, 238. Fleck's overarching control of the scheme to defraud Sobel likewise weighs against closed-ended continuity.

### e. Number of victims

The last *GICC Capital* factor is the number of victims involved. *See* 67 F.3d at 467. Here, Sobel is the only victim. The Second Circuit has noted that the presence of only one victim does not by itself preclude a RICO pattern. *Cosmos Forms Ltd. v. Guardian Life Ins. Co. of Am.,* 113 F.3d 308, 310 (2d Cir.1997). Nonetheless, many cases finding no closed-ended continuity have pointed to the existence of only one such victim. *See, e.g., Weizmann Inst.,* 229 F.Supp.2d at 257 (plaintiffs, other potential beneficiaries of decedent's assets, were the sole victims); *Schnell,* 43 F.Supp.2d at 446 (alleged

fraudulent seizure of corporation harmed only a single class of victims - the corporation's public shareholders); *Feirstein,* 963 F.Supp. at 260 ("This narrow class of alleged victims is not the kind of broad-based unlawful activity that RICO was designed to address."); *Bernstein,* 948 F.Supp. at 238 (criminal activity was focused on only one group of purchasers); *Pier Connection,* 907 F.Supp. at 78 (sole victim was a single firm in the garment trade). Thus, the presence of only Sobel as the victim is a factor favoring the defendants.

*f. Summary*

In sum, the only *GICC Capital* factor that favors a finding of closed-ended continuity is the duration of the fraudulent scheme. All of the other factors counsel against such a finding, including the lack of variety among the predicate acts, the presence of only one scheme with a narrow goal, the small number of participants and the presence of only one victim. In the end, these factors far outweigh the duration of the fraudulent conduct. *See, e.g., Al-Abood,* 217 F.3d at 238 ("[T]he narrow focus of the scheme here-essentially a dispute between formerly close family friends-combined with the commonplace predicate acts [of mail and wire fraud] persuades us that the facts here do not satisfy the pattern requirement."). This case is similar in many ways to *Lefkowitz v. Bank of New York,* 2003 WL 22480049 (S.D.N.Y. Oct. 31, 2003), in which the court found no closed-ended continuity in a scheme that consisted of alleged fraudulent acts spanning a nine-year period, *id.* at *1, where sixteen predicate RICO claims were alleged, but where the complaint "essentially alleg[ed] that a small number of parties engaged in activities with a narrow purpose directed at a single or at most three victims: namely, defrauding [plaintiff]," *id.* at *9. In dismissing the RICO claims, *Lefkowitz* noted that "[c]ourts have uniformly and consistently held that schemes involving a single, narrow purpose and one or few participants directed towards a single victim do not satisfy the RICO requirement of a closed or open pattern of continuity." *Id.* at *8 (citing cases); *accord Bernstein,* 948 F.Supp. at 238 ("Courts in the Second Circuit have generally held that where the conduct at issue involves a limited number of perpetrators and victims and a limited goal, the conduct is lacking in closed-ended continuity."). Case law is replete with instances where the narrowness of a scheme has resulted in a finding that there was no closed-ended continuity. *See, e.g., Weizmann Inst.,* 229 F.Supp.2d at 256-57; *Schnell,* 43 F.Supp.2d at 445-46; *Feirstein,*

963 F.Supp. at 260-61; *Bernstein,* 948 F.Supp. at 238; *Pier Connection,* 907 F.Supp. at 78.

*13 Because Sobel has failed to sufficiently allege a "pattern" of racketeering activity, the § 1962(c) claim should be dismissed. Accordingly, the Court need not reach the parties' arguments regarding RICO causation.

B. *Section 1962(d) Conspiracy Claim*

Section 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." To establish the existence of a RICO conspiracy, a plaintiff must prove "the existence of an agreement to violate RICO's substantive provisions." *Cofacredit,* 187 F.3d at 244 (internal quotation marks and citation omitted). Because a substantive violation of RICO has not been adequately pled, the conspiracy claim must necessarily fail. *See, e.g., Discon, Inc. v. NYNEX Corp.,* 93 F.3d 1055, 1064 (2d Cir.1996) ("Any claim under § 1962(d) based on a conspiracy to violate the other subsections of § 1962 necessarily must fail if the substantive claims are themselves deficient." (quoting *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1191 (3d Cir.1993))), *vacated on other grounds,* 525 U.S. 128 (1998); *Bernstein,* 948 F.Supp. at 241 n. 4 ("dismissal of the substantive RICO claims mandates dismissal of plaintiffs' RICO conspiracy claim as well" (citing *Purgess v. Sharrock,* 806 F.Supp. 1102, 1110 n. 9 (S.D.N.Y.1992))). Thus, Sobel's § 1962(d) claims should also be dismissed.

C. *State Law Claims*

The complaint includes four state law claims against Fleck and the employee defendants. *See* Compl. ¶ ¶ 91-131. Federal courts have jurisdiction over state law claims if the state and federal claims "derive from a common nucleus of operative fact." *United Mine Workers v. Gibbs,* 383 U.S. 715, 725 (1966); *see also* 28 U.S.C. § 1367(a) ("the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III"). However, "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Gibbs,* 383 U.S. at 726. Furthermore, 28 U.S.C. §

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 10
Not Reported in F.Supp.2d, 2003 WL 22839799 (S.D.N.Y.), RICO Bus.Disp.Guide 10,594
**(Cite as: Not Reported in F.Supp.2d)**

1367(c) gives district courts discretion to decline to exercise supplemental jurisdiction where "the district court has dismissed all claims over which it has original jurisdiction." Here, the RICO claims provided the only basis for federal jurisdiction. Thus, the Court should decline to exercise supplemental jurisdiction over Sobel's state law claims.

## IV. *MOTION TO AMEND*

Sobel seeks leave to amend the complaint in the event that the Court finds the complaint insufficient. *See* Sobel Aff. ¶ ¶ 1, 14. Rule 15(a) provides that "leave [to amend a pleading] shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). Thus, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) (citing cases), *cert. denied,* 503 U.S. 960 (1992). While it seems unlikely that Sobel can cure the problem of the failure to show closed-ended continuity, leave to amend should be granted since no previous amendments have been made to the complaint and the Court cannot say beyond doubt that Sobel is not aware of additional facts that would cure this defect.

**\*14** Accordingly, Sobel should be granted leave to file an amended complaint should he be able to plead facts that would cure the deficiencies described herein.

### *Conclusion*

For the foregoing reasons, the defendants' motion to dismiss should be granted with respect to the entire complaint with leave to replead within thirty days.

## *PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to file any objections. *See also* Fed.R.Civ.P. 6(a), (e). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Honorable Richard M. Berman, 40 Centre Street, New York, New York 10007, and to the undersigned at the same address. Any request for an extension of time to file objections must be directed to Judge Berman. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985).

S.D.N.Y.,2003.
Jerome M. Sobel & Co. v. Fleck
Not Reported in F.Supp.2d, 2003 WL 22839799 (S.D.N.Y.), RICO Bus.Disp.Guide 10,594

Briefs and Other Related Documents (Back to top)

• 1:03cv01041 (Docket) (Feb. 14, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.