**Tab D**

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 112948 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

▷

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
NUEVO MUNDO HOLDINGS, et al., Plaintiffs,
v.
PRICEWATERHOUSE COOPERS LLP, et al.,
Defendants.
**No. 03 Civ.0613 GBD.**

Jan. 22, 2004.

**Background:** Shareholders and directors of Peruvian bank placed into administration by Peruvian government brought action against two New York accounting firms, asserting claims for fraud, tortious interference, negligence, malpractice, prima facie tort, breach of contract, and violations of Racketeer Influenced and Corrupt Organizations Act (RICO), seeking to hold firms liable for actions of two Peruvian accounting firms with which bank did business. Firms moved to dismiss, and plaintiffs moved to amend complaint.

**Holdings:** The District Court, Daniels, J., held that:

1(1) allegations of affiliate relationship were insufficient to support New York firms' liability;

2(2) allegations did not support existence of principal-agent relationship;

3(3) allegations did not support alter ego theory of liability;

4(4) allegations did not support liability under partnership theory; and

5(5) leave to amend complaint was not warranted.

Motion to dismiss granted; motion to amend denied.

West Headnotes

**[1] Principal and Agent 308 ☜1**

308 Principal and Agent
   308I The Relation
      308I(A) Creation and Existence
         308k1 k. Nature of the Relation in General.
Most Cited Cases
Allegations of affiliate relationship between New York accounting firms and Peruvian accounting firms were insufficient to hold New York firms liable for actions of Peruvian firms, inasmuch as member firms in international accounting association were not part of single firm and were neither agents nor partners of other member firms simply by virtue of using same brand name.

**[2] Principal and Agent 308 ☜23(5)**

308 Principal and Agent
   308I The Relation
      308I(A) Creation and Existence
         308k18 Evidence of Agency
            308k23 Weight and Sufficiency
               308k23(5) k. Sufficiency to Support Verdict or Finding as to Agency. Most Cited Cases
Conclusory allegations that two Peruvian accounting firms were each an "agent" of the New York accounting firm that was member of same international accounting association, because each Peruvian firm had represented itself as being a part of the respective New York firm, did not support existence of principal-agent relationship between Peruvian and New York firms, so as to allow shareholders and directors of Peruvian firms' client to hold New York firms liable for Peruvian firms' alleged wrongful conduct. Restatement (Second) of Agency § 1 cmt. b.

**[3] Corporations 101 ☜1.7(1)**

101 Corporations
   101I Incorporation and Organization
      101k1.7 Pleading and Procedure in Determining Corporate Entity
         101k1.7(1) k. In General. Most Cited Cases
Conclusory allegations of control, without any supportive factual allegations, were insufficient to show that each of two Peruvian accounting firms, belonging to different international accounting associations, was the alter ego of New York accounting firm belonging to same respective association, and therefore neither New York firm could be held liable, on veil-piercing grounds, to shareholders and directors of bank for which each Peruvian firm had performed accounting services,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 112948 (S.D.N.Y.)

(Cite as: Not Reported in F.Supp.2d)

Page 2

based on alleged wrongful acts of associated Peruvian firm.

[4] Partnership 289 ⟋52

289 Partnership
  289I The Relation
    289I(C) Evidence
      289k51 Weight and Sufficiency
        289k52 k. In General. Most Cited Cases

Allegations that one New York accounting firm was possibly a partnership of all its affiliates, and that, at one time, all officers of second New York accounting firm were partners, were insufficient to show that either New York firm was partner of respective Peruvian accounting firm sharing membership in same international accounting association, and thus did not support liability against New York firms based on alleged wrongful conduct by two Peruvian firms which purportedly harmed directors and shareholders of Peruvian firms' client.

[5] Federal Civil Procedure 170A ⟋851

170A Federal Civil Procedure
  170AVII Pleadings and Motions
    170AVII(E) Amendments
      170Ak851 k. Form and Sufficiency of Amendment. Most Cited Cases

Leave to file amended complaint was not warranted when review of proposed amended complaint demonstrated that it still suffered from defects in prior complaint, and that amendment would therefore be futile. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

OPINION

DANIELS, J.

*1 Plaintiffs bring suit alleging several claims under common law, breach of contract and a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964 et. seq. Defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and 12(b)(7). Defendants' motion to dismiss is granted.

I. Background

Plaintiffs Nuevo Mundo Holdings S.A., Jacques Simon levy Calvo, Vitaly Franco Varon, Herbert Herschkowicz Grosman, Isy Levy Calvo, David Levy Pesso, Jacques Franco Sarfaty, Sassone Franco

Sarfaty and Jose Porudominsky Gabel are the Peruvian and Panamanian shareholders and directors of Banco Nuevo Mundo S.A. ("Nuevo Mundo"), a bank organized under Peruvian law that is not a party to this action. Plaintiffs' claims arise from the loss that plaintiffs allegedly suffered when the Peruvian government placed Neuvo Mundo into administration.

The named defendants, PricewaterhouseCoopers LLP ("PWC") and Arthur Andersen LLP ("Andersen")(collectively, "Defendants"), are accounting firms located in New York City. Plaintiffs make no allegations that defendants directly participated in any of the events that led to Nuevo Mundo being placed into administration by the Peruvian government. Rather, plaintiffs' sole allegation against these defendants is that Sociedad de Auditoria Medina, Zalvidar y Asociados ("Medina") and Collas Dongo-Soria y Asociados ("CDSA"), the two accounting firms with which Nuevo Mundo conducted business, "operate under the control of" Andersen and PWC and are "so identified therewith" as to make the defendants liable for the actions of Medina and CDSA. Complaint ¶¶ 47, 58.

The events central to plaintiffs' claims all occurred in Peru. There are no allegations that any events that occurred in the United States. On December 5, 2000, the Superintendency of Banking and Insurance of Peru ("SBS") ordered Neuvo Mundo into administration after an inspection conducted by SBS found that Nuevo Mundo was in poor financial condition and presented "the highest risk of liquidity due to withdrawals of" cash deposits. Complaint ¶ 35. Plaintiffs allege that after being ordered into administration, "control of the administration, operations and assets of [Nuevo Mundo] w[as] wrongfully taken from its officers, directors, shareholders, and/or investors." Complaint ¶ 38. Subsequently, the Peruvian government advised plaintiffs that Nuevo Mundo would be sold and that the investors would lose their entire investment. Investment banks were invited to take charge of the sale of Nuevo Mundo, and the government ruled that any transfer of equity in Nuevo Mundo could not benefit the shareholders.[FN1] Complaint ¶¶ 43-45.

FN1. Subsequently, on August 19, 2003, the Superior Court of Justice of Lima, Lima's highest court, reversed "the Order of the Superintendent of Banking and Insurance, which declared that Banco Nuevo Mundo

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 3
Not Reported in F.Supp.2d, 2004 WL 112948 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

had zero capital and, therefore, the shareholders, Plaintiff, [Nuevo Mundo Holdings] had no further rights or interest in the bank. The decision holds the action of the Superintendent to be illegal and unconstitutional. The decision orders the Superintendent to restore the rights of the shareholders of Plaintiff, NMH, which owns the bank." Furthermore, "[t]he decision of the Supreme Court, of May 2003, orders the Superintendent to stop the liquidation of the bank." Affirmation of Jacques Simon Levy Calvo at 2.

CDSA, a Peruvian accounting firm alleged to be affiliated with defendant PricewaterhouseCoopers, was retained by Nuevo Mundo "to be its independent auditor for the calendar year 1999." Complaint ¶ 47. Plaintiffs allege that in April 2001, after CDSA submitted an audit report regarding Neuvo Mundo's financial status, SBS "wrongfully required and demanded that [CDSA] make several changes in the said draft audit report, including devaluing [Nuevo Mundo's] loan portfolio, and make other changes so as to revalue [Nuevo Mundo's] asset balance so that it would become a negative instead of a positive amount." Complaint ¶ 49. Plaintiffs assert that CDSA submitted its allegedly unlawful final audit report in July 2001.

*2 Medina, a Peruvian accounting firm alleged to be affiliated with defendant Arthur Andersen, was retained by SBS in March or April, 2001 to conduct a financial audit of Neuvo Mundo for the year 2000. Plaintiffs allege that SBS "wrongfully, fraudulently and illegally directed [Medina] to revise previous audit reports issued on [Neuvo Mundo's] financial condition ... [and] undervalued [Nuevo Mundo's] loan portfolio by approximately U.S. $200,000,000.00 ... in violation of generally accepted accounting principles, standards and practices." Complaint ¶ ¶ 59-60.

Plaintiffs allege nine causes of action against defendants including common law claims for fraud, tortious interference, negligence, malpractice, prima facie tort and punitive damages. Plaintiffs have also alleged a claim under R.I.C.O., 18 U.S.C. § 1964 et. seq. against both defendants and a breach of contract claim against PricewaterhouseCoopers LLP.

## II. Discussion

Federal Rule of Civil Procedure 12(b)(6) allows a party to move to dismiss a complaint where the complaint "fail[s] ... to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). In reviewing a motion to dismiss, this Court accepts the allegations in the complaint as true and draws all reasonable inferences in favor of the non-moving party. See Patel v. Searles, 305 F.3d 130, 134-35 (2d Cir.2002). A motion to dismiss will only be granted if the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. See Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1494 (2d Cir.1992). In considering a motion to dismiss under Fed.R.Civ.P. 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference. Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir.1991); see also Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 71 (2d Cir.1998)(in evaluating motions to dismiss, a court must limit its review to the allegations contained within the four corner's of the complaint).

### A. Defendants' Liability

[1] In their complaint, plaintiffs allege that "[CDSA] operates under the control of defendant PWC, and is so identified therewith, as to make Defendant PWC responsible and liable for the actions and conduct of its Peruvian affiliate." Complaint ¶ 47. Against defendant Andersen, plaintiffs allege that "[Medina] operates under the control of Defendant Andersen, and is so identified therewith as to make Defendant Andersen responsible and liable for the actions and conduct of [Medina]." Complaint ¶ 58. Plaintiffs make no allegations of direct liability on the part of defendants Andersen or PWC. Rather, plaintiffs' allegations assert a vicarious relationship between the accounting firms in Peru and their respective defendant affiliates in the United States. Other than the allegations contained in paragraphs 47 and 58, plaintiffs proffer no other facts specifically describing the nature of the relationship upon which their claims are based.

*3 Allegations of an affiliate relationship, however, are insufficient to hold defendants liable for the actions of either Medina or CDSA. Member firms in an international accounting association are not part of a single firm and are neither agents nor partners of other member firms simply by virtue of using the same brand name. See e.g., In re Lernout & Hauspie Sec. Litig., 230 F.Supp.2d 152, 170 (D.Mass.2002). During oral argument, defendants articulated that "the U.S. entities are member firms, and they use the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 4
Not Reported in F.Supp.2d, 2004 WL 112948 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Andersen and Price Waterhouse Coopers name, ...
And what they have in common is simply that they
both use ... the brand name Andersen or PWC in
order to provide accounting services in their
respective countries." Transcript of Oral Argument
dated Sept. 17, 2003 at 34. Defendants maintain that
the member firms are all autonomous. U.S. Firms are
autonomous from the Peruvian firms and all the other
member firms throughout the world. They have
separate capital structure. They have separate
management and organization. They are autonomous
firms. They have contracts with the worldwide entity,
which requires them to follow certain kinds of
standards and procedures in order to be able to use
the brand name. But that's the only relationship
between the U.S. entities and the Peruvian entities.

*Id.* at 35. Indeed, courts have declined to treat
different firms as a single entity, holding them liable
for one another's acts, simply because they shared an
associational name and/or collaborated on certain
aspects of a transaction. *See In re Lernout,* 230
F.Supp.2d at 170-71 (D.Mass.2002) (rejecting theory
that KPMG entities should be held jointly and
severally liable for each other's acts and statements
because they hold themselves out as a single entity);
*see also In re AM Int'l Inc. Sec. Litig.,* 606 F.Supp.
600, 607 (S.D.N.Y.1985)(dismissing complaint
against Price Waterhouse entities outside the U.S.
after rejecting argument that all Price Waterhouse
affiliates worldwide were "in fact one entity, and
acted as agents of one another"); *see also Reingold, v.
Deloitte, Haskins & Sells,* 599 F.Supp. 1241, 1249,
1254 n. 10 (S.D.N.Y.1984)(holding that existence of
DH & S International, "an organization composed of
a large number of affiliated accounting firms," did
not prove DH & S was "a single worldwide entity"
even though some brochures described DH & S as "a
single cohesive worldwide organization").

Absent any allegations of direct liability, in order to
hold the defendants vicariously liable for the actions
of the Peruvian accounting firms, plaintiffs must
allege facts in support of one of the following three
relationships: a principal/agent relationship; an alter-
ego relationship; or a partnership. Plaintiffs, however,
have not specifically alleged facts in support of any
one of these relationships in their complaint.

Plaintiffs proffer all three relationships in their
responsive papers, arguing that the "[d]efendants and
the overall companies overseeing the activities of
local affiliates are implicated because there is overall
training and supervision of all affiliates and peer
review meetings held to assure compliance with the

accepted professional standards and ethical
requirements of what each affiliate is doing."
Plaintiffs' Memorandum of Law in Opposition to
Defendants' Motion to Dismiss ("Plaintiffs' Brief") at
3. Plaintiffs also claim that the main purpose of
[PricewaterhouseCoopers International Limited] and
[Arthur Andersen Worldwide S.C.], separate
corporate entities that are not parties to this litigation,
is "to assure that the affiliates act properly and in
accordance with their worldwide requirements. This
is the essence of our Alter Ego Theory of Liability....
There is ... a common bond requiring that all
affiliates act honestly and according to prescribed
rules, regulations and accounting standards."
Plaintiffs' Brief at 11. Furthermore, plaintiffs argue
that "Arthur Andersen may be a partnership of all its
affiliates," and that "[a]t one time, ... all [Arthur
Andersen] officers were partners." *Id.* at 7, 11.

**\*4** During oral argument, plaintiffs' counsel, in
response to the Court's query to further explain the
basis for vicarious liability, responded: "I think we
have already articulated one aspect of this
relationship. I think it can be shown that a
principal/agent relationship exists. The nature of the
relationship should make the principal liable for the
acts of its agent. And I think we can show that in the
way in which we describe the relationship between
these affiliates and the global and/or New York
entities that we've already joined." Transcript of oral
argument heard September 17, 2003 at 79.

Lastly, in a subsequent letter to the Court dated
October 1, 2003 submitted in support of plaintiffs'
proposed Second Amended Complaint, they "allege
... that all principals of [Arthur Andersen], wherever
they may be, are, or were, partners. As partners, the
actions of any one subjects all to liability." Plaintiff's
letter dated October 1, 2003 at 2, ¶ 2. Plaintiffs also
reiterated its principal/agent allegation: "[i]n
addition, we believe that the Peruvian affiliates
cloaked with the names respectively of [Arthur
Andersen] and [PricewaterhouseCoopers] and under
the aegis of the other accounting firms (present and
future defendants), are the 'apparent agents' of those
latter accounting firms." *Id.* Plaintiffs further
proffered an alter-ego argument as the basis for
vicarious liability: "[m]oreover, we allege that the
corporate veil may be pierced since we have
information and so allege that the Peruvian
accounting firms are seriously undercapitalized so as
to limit liability in an improper manner." *Id.*

Regardless of which relationship plaintiffs argue, if
their claims are to withstand defendants' motion to

Not Reported in F.Supp.2d                                                                      Page 5
Not Reported in F.Supp.2d, 2004 WL 112948 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

dismiss, their complaint must clearly and specifically articulate allegations of fact which can support the existence of at least one of these relationships.[FN2]

FN2. Plaintiffs also attempt to argue that CDSA and Medina are the subsidiaries of the named defendants. Although their complaint is devoid of any factual allegations of a subsidiary/parent relationship, plaintiffs cite *U.S. v. Bestfoods, Inc.,* 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1999) for the proposition that the "[d]efendants, their world wide overseers and the local affiliates are integrated in terms of responsibilities for good accounting practices and there is a symbiosis of the companies." Plaintiffs' Brief at 8. The Supreme Court in *Bestfoods,* however, rejected that plaintiff's failure to supervise argument; holding that activities that involve a subsidiary's facility but which are consistent with the parent corporation's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct parental liability. *Id.,* 524 U.S. at 72, 118 S.Ct. 1876, 141 L.Ed.2d 43.

### 1. Agency Relationship

[2] In order to establish a principal/agent relationship, a party must demonstrate the following elements: (1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) an understanding between the parties that the principal is to be in control of the undertaking. *See Restatement (Second) of Agency § 1* cmt. b (1958); *see also Rubin Bros. Footwear, Inc. v. Chemical Bank,* 119 B.R. 416, 422 (S.D.N.Y.1990). Actual agency is created by "written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." *Itel Containers Int'l Corp. v. Atlanttrafik Express Service Ltd.,* 909 F.2d 698, 702 (2d Cir.1990) (quoting Restatement § 26)). "[W]hether such an agency exists depends upon the actual interactions of the putative agent and principal and not on the perception a third party may have of the relationship." *See Manchester Equipment Co., Inc. v. American Way and Moving Co., Inc.,* 60 F.Supp.2d 3, 8 (E.D.N.Y.1999).

*5 Furthermore, a party must allege that "the agent acts subject to the principal's direction and control." *Shulman Transport Enterprises, Inc. v. Pan American World Airways, Inc.,* 744 F.2d 293, 295 (2d Cir.1984). The importance of control by the principal is paramount. "There is no agency relationship where the alleged principal has no right of control over the alleged agent." *Morgan Guar. Trust Co. of N.Y. v. Republic of Palau,* 657 F.Supp. 1475, 1481 n. 2 (S.D.N.Y.1987); see also *Rubin Bros.,* 119 B.R. at 422 ("No agency relationship can be established where the alleged principal lacks the essential right of control over the alleged agent.") (citing Shulman Transport, 744 F.3d at 295); *Lee v. Kim,* No. 93 Civ. 8280, 1994 WL 586435, *3 (S.D.N.Y. Oct.25, 1994) ("Where the principal does not exercise control over the professed agent, no agency relationship exists."). When the elements of an agency relationship have been proven, the corporation acting as principal will be held liable for the torts committed, by the agent while acting within the scope of the agency. See, e.g., *Fletcher v.. Atex, Inc.,* 861 F.Supp. 242, 247 (S.D.N.Y.1994) ("[P]rincipals are liable for the tortious acts of their agents."), aff'd, 68 F.3d 1451 (2d Cir.1995).

In their complaint, plaintiffs make two allegations regarding defendants Andersen and PWC in support of their claims:
Plaintiffs BNM and NMH relied on representations made by [CDSA] that it was part of and operated under the control of Defendant PWC, the well-known international accounting firm, and that [CDSA] used the same international accounting standards as are used by Defendant PWC in providing accounting services throughout the world.... [CDSA] operates under the control of defendant PWC, and is so identified therewith, as to make Defendant PWC responsible and liable for the actions and conduct of its Peruvian affiliate.

Complaint ¶ 47. Plaintiffs further allege that:Upon information and belief, [Medina] represented itself, directly, indirectly or implicitly, as Defendant Andersen, the well-known international accounting firm, to show its ability and experience as auditor.... [Medina] operates under the control of Defendant Andersen, and is so identified therewith as to make Defendant Andersen responsible and liable for the actions and conduct of [Medina].

Complaint ¶ 58.

Without any further factual allegations, plaintiffs'

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

complaint fails to support a bald assertion that an agency relationship existed between the defendants and their Peruvian affiliates. Plaintiffs make no allegation of a manifestation by either PWC or Andersen that CDSA or Medina were to act on their behalf. Plaintiffs make no allegation that there was an understanding between PWC and CDSA or between Andersen and Medina that the U.S. entities were to be in control of the Peruvian entities' accounting services. Furthermore, there are no facts alleged which suggest that the defendants ever participated in the decision as to how the audit reports submitted by CDSA or Medina were completed, and certainly none which would support an inference that the defendants were either aware of, or in fact contributed to, the decision to alter those audit reports.

**\*6** Plaintiffs solely allege that they "relied on representations made by [CDSA] that it was part of and operated under the control of [PWC]," and that "[Medina] represented itself, directly, indirectly or implicitly, as Defendant Andersen." Complaint ¶ 47, 58. At best, plaintiffs' agency claim is based on alleged representations not made by the defendants, but made by the defendant's Peruvian affiliates who are not parties to this litigation. The Second Circuit, however, has held that the authority of an agent can only be established by tracing it to its source in some word or act of the alleged principal. *See Karavos Compania Naviera S.A. v. Atlantica Export Corp.*, 588 F.2d 1, 10 (2d Cir.1978). The agent cannot confer authority upon himself or make himself an agent merely by saying that he is one. *Id.*

Plaintiffs' conclusory allegations that Medina and CDSA were "agents" of defendants Andersen and PWC, because they represented themselves as part of defendants, are therefore insufficient to withstand defendants' motion to dismiss. *See DeJesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 70 (2d Cir.1996) ("A complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6).") (internal quotations omitted); *Neubauer v. Eva-Health USA, Inc.*, 158 F.R.D. 281, 285 (S.D.N.Y.1994) (holding that bare allegation of control did not suffice to allege control person liability "as the Court need not accept as true on a motion to dismiss allegations which amount simply to legal conclusions"); *Coraggio v. Time Inc. Magazine Co.*, No. 94 Civ. 5429, 1995 WL 242047, \*3 (S.D.N.Y. April 26, 1995) (allegation that parent "controls" subsidiary held insufficient to allege single employer liability under Title VII; "While a claim should not be dismissed unless it appears plaintiff can prove no set of facts entitling

her to relief, some reasonable particularity is required ... The instant complaint contains nothing more than a conclusory and unsupported allegation of control.") (citation omitted).

Construing the factual allegations in the complaint in plaintiffs' favor, those allegations are insufficient as a matter of law to demonstrate the existence of a principal/agent relationship between defendant PWC and CDSA, or between defendant Andersen and Medina.

### 2. *Alter-Ego Claim*

[3] "Alter ego theory" and the doctrine of "piercing the corporate veil" are one and the same under New York law. *See Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 138 (2d Cir.1991)(finding that the doctrine of piercing the corporate veil and the "alter ego theory" are indistinguishable and "should be treated as interchangeable"). To pierce the corporate veil under New York law, a plaintiff must prove that: (1) the owner exercised such control that the corporation has become a mere instrumentality of the owner, who is the real actor; (2) the owner used this control to commit a fraud or "other wrong"; and (3) the fraud or wrong results in an unjust loss or injury to the plaintiff. *See Freeman v. Complex Computing Co., Inc.*, 119 F.3d 1044, 1052 (2d Cir.1997) (citations omitted). Courts have recognized that the element of control may be predicated upon the concept of equitable ownership. *See id. at 1051-53.* Pursuant to this approach, an individual who "exercise[s] considerable authority over [the corporation] ... to the point of completely disregarding the corporate form and acting as though [its] assets [are] his alone to manage and distribute" may be deemed the equitable owner of the corporation and its assets, notwithstanding the fact that the individual is not a shareholder and does not occupy a formal position of authority. *Id.* at 1051 (citation omitted).

**\*7** The element of control is established by factors indicating that the corporation is the mere alter ego of another corporation or an individual, such as:
1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e. issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office

Not Reported in F.Supp.2d                                                    Page 7
Not Reported in F.Supp.2d, 2004 WL 112948 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arm's length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Passalacqua, 933 F.2d at 139* (quoted in *Carte Blanche, 1993 WL 316985, at \*2, 1993 U.S.App. LEXIS 21214, at \*4-5).*

Plaintiffs make no factual allegations in their complaint that support an alter ego theory for piercing the corporate veil. Their argument arises for the first time in their opposition brief where plaintiffs suggest an "Alter Ego Theory of Liability" premised on the unpleaded assertions that (1) non-parties PWC International and Andersen Worldwide Societe Cooperative "oversaw the activities of the affiliates," and (2) "the supervisory groups and all affiliates were in close contact, with periodic meetings following mandated training." Plaintiffs' Brief at 7 and 11. Outside of their conclusory allegations of control, the complaint is devoid of any factual allegations to support a finding of alter-ego. Without any supportive factual allegations, plaintiffs have failed to allege sufficient facts to avoid dismissal of their alter ego claim.

### 3. Partnership

[4] Under New York law, the party "pleading the existence of a partnership has the burden of proving its existence." *Central Nat'l Bank, Canajoharie v. Purdy, 249 A.D.2d 825, 826, 671 N.Y.S.2d 866 (N.Y.App.Div.1998).* Thus, plaintiffs' claim of vicarious liability on this basis cannot survive a motion to dismiss unless plaintiff pleads sufficient facts in support of each of the required elements of a partnership. *See US Airways Group v. British Airways PLC, 989 F.Supp. 482, 493 (S.D.N.Y.1997).* Those elements are 1) the sharing of profits and losses of the enterprise; 2) the joint control and management of the business; 3) the contribution by each party of property, financial resources, effort skill or knowledge; and 4) an intention of the parties to be partners. *See NYNEX Corp. v. Shared Resources Exch., No. 89 Civ. 14577, 1990 WL 605347, at \*5 (N.Y.Sup.Ct. Sept.10, 1990); Hoskin v. New*

*Grovetown Assoc., 129 Misc.2d 222, 492 N.Y.S.2d 685, 687 (N.Y.Sup.Ct.1985).*

**\*8** As previously noted, the only allegations in plaintiffs' complaint that can support vicarious liability through a partnership are found in ¶ 47 and ¶ 58. In their opposition brief, plaintiffs argue that "[i]n fact, Arthur Andersen *may be* a partnership of all its affiliates." Plaintiffs Memo at 7 (emphasis added). They further argue that "[a]t one time, ... all [Andersen] officers were partners." Plaintiffs Memo at 11. Even assuming these arguments, plaintiffs still have not plead facts that would establish all four elements of a partnership. Equally important is plaintiffs own admission in their opposition brief that "[d]efendants may not be partners in the legal sense." Plaintiffs' Brief at 11. Similar to their other attempts to establish vicarious liability, plaintiffs have failed to allege sufficient facts to establish the existence of a partnership.

Having failed to sufficiently allege a theory of vicarious liability either under a theory of agency, alter-ego, or partnership, plaintiffs have not alleged sufficient facts to support any tort or contractual claims against defendants PWC and Andersen, nor any claim under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964 *et. seq.* Defendants' motion to dismiss the complaint in its entirety is therefore granted.[FN3]

> FN3. Defendants make three additional arguments: that plaintiffs' complaint must be dismissed for failure to join necessary and indispensable parties; plaintiffs' claims are precluded under the Act of State Doctrine and the Foreign Sovereign Compulsion Defense; and plaintiffs have generally failed to state a claim. As this Court has granted defendants' motions to dismiss on alternative grounds, it will not further address the merits of these arguments.

### B. *Leave to File a Second Amended Complaint*

[5] Plaintiffs also moved to again amend their complaint. Defendants' oppose such a motion as untimely and futile. At the time they submitted their motion, plaintiffs failed to submit a proposed second amended complaint. At the time of oral argument, the Court allowed plaintiffs to submit a *proposed* Second Amended Complaint. A review of the Second Amended Complaint shows that despite additional allegations, plaintiffs' complaint still suffers from the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 8
Not Reported in F.Supp.2d, 2004 WL 112948 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

deficiencies inherent in their original. Plaintiffs' Second Amended Complaint would similarly fail to withstand motions to dismiss under <u>Fed.R.Civ.P. 12(b)(6)</u> for failing to allege vicarious liability.

In their Second Amended Complaint, plaintiffs seek to add two additional defendants: PricewaterhouseCoopers International Limited ("PWC International") and Andersen Worldwide Societe Cooperative ("Andersen Worldwide") and hold them also vicariously liable for the actions of CDSA and Medina. Plaintiffs, however, have added insufficient additional allegations to support their claims against current defendants PWC and Andersen. Plaintiffs now attempt to shift their focus toward finding PWC International and Andersen Worldwide vicariously liable for the actions of CDSA and Medina.[FN4] Their proposed claims against these entities, however, would fail for the same reasons they fail against defendants Andersen and PWC; plaintiffs' conclusory allegations of agency, partnership or alter-ego are unsupported by sufficient factual allegations.

> FN4. In support of their vicarious liability theory, plaintiffs have added the following further assertions:
> Upon information and belief, [CDSA and Medina] were and are undercapitalized at about $300,000 each and, as such, Plaintiffs can prove that the accounting firm Defendants herein are liable under the theory of piercing the corporate veil. By use of interchangeable names given to the public and undercapitalized subsidiaries, Defendant accounting firms become liable for the acts of [CDSA and Medina], which were purposefully limiting their liability due to undercapitalization.
> Complaint at 24-5, ¶ 74.
> Defendant accounting firms act as principals in that they cloaked [CDSA and Medina] with apparent authority and made them agents. The acts of the Peruvian affiliate are binding on Defendant accounting firms.
> Complaint at 25, ¶ 75.

Despite the liberal policy toward amendment embodied in <u>Rule 15(a) of the Federal Rules of Civil Procedure</u>, "leave to amend should not be granted where it is futile." *<u>Bruce v. Martin,</u> 702 F.Supp. 66, 69 (S.D.N.Y.1988); see <u>Foman v. Davis,</u> 371 U.S. 178, 192, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); <u>Albany Ins. Co. v. Esses,</u> 831 F.2d 41, 45 (2d Cir.1987)*. For

example, leave to amend is properly denied when the amended complaint "would not survive a motion to dismiss." *<u>Prudential Ins. Co. of America v. BMC Indus., Inc.,</u> 655 F.Supp. 710, 711 (S.D.N.Y.1987); see also <u>S.S. Silberblatt, Inc. v. East Harlem Pilot BlockBuilding 1 Housing Dev. Fund Co.,</u> 608 F.2d 28, 42 (2d Cir.1979); <u>Health-Chem Corp. v. Baker,</u> 915 F.2d 805, 810 (2d Cir.1990)*( "where ... there is not merit to the proposed amendments, leave to amend should be denied") *Id.* In the absence of additional allegations sufficient to support their claims, plaintiffs' motion to amend is denied as futile.

S.D.N.Y.,2004.
Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP
Not Reported in F.Supp.2d, 2004 WL 112948 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1:03cv00613 (Docket) (Jan. 27, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Tab E**



Not Reported in F.Supp.                                                                                    Page 1
Not Reported in F.Supp., 1992 WL 276565 (S.D.N.Y.), RICO Bus.Disp.Guide 8116
**(Cite as: Not Reported in F.Supp.)**

▷
Briefs and Other Related Documents

United States District Court, S.D. New York.
QATAR NATIONAL NAVIGATION &
TRANSPORTATION CO. LTD., Plaintiff,
v.
CITIBANK, N.A., Defendant.
CITIBANK, N.A., Defendant and Third-Party
Plaintiff,
v.
Leonard FLOCCO, Martec Petroleum & Energy
Corp., Surico Inc., and Sanjay Suri, Third-Party
Defendants.
**No. 89 Civ. 0464 (CSH).**

Sept. 29, 1992.

MEMORANDUM OPINION AND ORDER
HAIGHT, District Judge:
*1 Plaintiff Qatar National Navigation &
Transportation Co. Ltd. ("QNNT") objects to the
Report and Recommendation of Magistrate Judge
Francis of November 13, 1991, which recommends
dismissing the fifth and sixth causes of action of the
Second Amended Complaint of July 1, 1991. For
the reasons set forth below, the Magistrate Judge's
recommendations are affirmed.

BACKGROUND

The underlying facts are fully recounted in
Magistrate Judge Francis' opinion. In summary, the
action arises out of a contract for the sale of marine
diesel oil by plaintiff QNNT to third-party defendant
Surico, Inc. ("Surico")

On November 28, 1985, QNNT made an offer to
Heiza Martec AG ("Heiza Martec"), an oil trading
company, to sell 300,000 metric tons of diesel oil.
The terms of the agreement required the purchaser to
pay with an irrevocable letter of credit and QNNT to
post a performance bond of 2% of the value of the
oil, also in the form of an irrevocable letter of credit.
On December 18, 1985, Heiza Martec notified
QNNT that Surico of San Francisco would purchase
the oil. On December 23, 1985, an agreement was
executed between QNNT and Surico for the sale of
the oil for $75 million to be supplied at 25,000 metric

tons per month during 1986. Surico failed to
produce the letter of credit required under the
contract and QNNT declared the contract void on
January 19, 1986. On the same day, Surico proposed
purchasing the oil in partnership with Martec. H.Z.
Mandour, on behalf of QNNT, stated it would reopen
the transaction only if Citibank, Heiza Martec's bank,
would confirm in writing that it would provide the
letter of credit. Second Amended Complaint ¶¶ 13-
26.

On January 21, 1986 Leonard Flocco, an Assistant
Vice-President and Manager of Citibank's branch
office in Bronxville, New York, sent a telex to
QNNT stating,
On behalf of our client Martec Petroleum and Energy
Corp., we inform that our client is ready for the
purchase of the 25,000 metric tons of marine diesel
per month for one year with renewals, as specified in
contract between Martec Petroleum and Energy Corp.
and Surico Inc. on January 17, 1986.
Our client will proceed to issue the necessary letter of
credit revolving for each shipment, to the bank
account of your designation....

*Id.* ¶ 27.

During the period January 22-30, 1986, H.Z.
Mandour on behalf of QNNT communicated with
Flocco on numerous occasions concerning the letter
of credit and was assured that Martec was a customer
in good standing with the financial ability to purchase
the oil and that Citibank was in the process of issuing
the letter of credit for Surico and Martec. The
Magistrate Judge concluded that in these
communications, Flocco misrepresented the financial
ability of Surico and Martec to pay for the oil. *Id.* ¶¶
27-36; Report at 2-3.

The Letter of Credit Department of Citibank sent a
tested telex on February 14, 1986 to QNNT stating
that Citibank's telex of January 21, 1986 quoted
above had been "simply informational and conveys
absolutely no engagement or responsibility on the
part of Citibank N.A." On February 15, 1986 QNNT
informed Martec, Surico, and Citibank that it
considered the contract breached since Citibank had
not conveyed to it the requisite letter of credit. On
February 16, 1986 QNNT sold the oil prepared under
the contract elsewhere and claims that it sustained
losses of $44 million on the sale. Second Amended

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                      Page 2
Not Reported in F.Supp., 1992 WL 276565 (S.D.N.Y.), RICO Bus.Disp.Guide 8116
**(Cite as: Not Reported in F.Supp.)**

Complaint ¶¶ 40-42.

**\*2** On February 23, 1986 QNNT attempted to cancel the 2% performance letter of credit held by Citibank. The advising bank, First Chicago International Bank ("First Chicago"), informed QNNT that the beneficiary had not consented to the cancellation. Citibank released the letter of credit to Surico and on May 23, 1986, Sanjay Suri on behalf of Surico presented allegedly false documents which specified that QNNT had not performed under the contract and demanded payment of the performance bond. Suri presented a letter along with the documents requesting First Chicago to transfer the amount due under the performance letter of credit to Surico's account with Citibank "Branch # 165 Bankers name Mr. Leonard Flocco". First Chicago refused to honor the draft. *Id.* ¶¶ 48-62.

QNNT makes the following claims in its second amended complaint concerning the role of Citibank in the alleged scheme to defraud it: first, Citibank breached its contract to issue a letter of credit for the sale of the oil; second, Citibank is estopped from showing "the truth contrary to its agreements to issue said letter of credit" since QNNT had relied upon it; third, Citibank made misrepresentations as part of a scheme to defraud QNNT; fourth, Citibank negligently advised QNNT that Martec and Surico were financially capable of issuing the letters of credit pursuant to the oil purchase contract; fifth, Citibank, Flocco, and others conspired to defraud QNNT through a pattern of racketeering activity in violation of <u>18 U.S.C. § 1962(c)</u>, the Racketeering Influenced and Corrupt Organizations statute (RICO); sixth, Citibank violated <u>18 U.S.C. § 1962(d)</u> by conspiring to violate <u>18 U.S.C. § 1962(c)</u>. *Id.* ¶¶ 65-85, 217-21.

## DISCUSSION

Defendant Citibank moved to dismiss QNNT's fifth and sixth claims pursuant to <u>Federal Rules of Civil Procedure 9(b)</u> and <u>12(b)(6)</u>. In his Report of November 13, 1991, the Magistrate Judge recommended that the motion be granted and found that QNNT failed to allege facts showing scienter on Citibank's part, a required element of the underlying RICO predicate acts of fraud. Additionally, the Magistrate Judge rejected plaintiff's argument that Citibank could be held liable for RICO violations under a theory of vicarious liability. Report at 8, 11, 13.

Plaintiff filed timely objections to the Report and claims that the Magistrate Judge incorrectly relied on matters outside the second amended complaint in reaching his decision on the <u>Rule 12(b)(6)</u> motion. Additionally, it avers that the Court failed to accept as true pleaded allegations concerning scienter on the part of Citibank to commit fraud, the role of Citibank's letter of credit department in the scheme, Flocco and the letter of credit department's intent to benefit Citibank, and Martec's and Surico's intent to purchase QNNT's oil. Finally, QNNT claims that the Court incorrectly rejected plaintiff's arguments that respondeat superior and apparent authority doctrines apply to RICO actions. Pl.'s Objection to Report at 26-27.

### Consideration of Outside Materials

**\*3** Plaintiff claims that Magistrate Judge Francis examined materials outside of the second amended complaint in reaching his conclusions. Plaintiff bases his objection on <u>Rule 12(b)(6)</u> which provides that:

If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

The plaintiff specifically objects to footnote 3 on page 6-7 of the Report in which the Magistrate Judge writes, "Additional documents, most of them not included by QNNT in the Second Amended Complaint, are nonetheless relevant to understanding Mr. Flocco's dealings with QNNT and the scope of Citibank's knowledge of his conduct." In the footnote, the Magistrate Judge cites documents produced earlier in the litigation which concerned additional misrepresentations made by Flocco and the results of a polygraph examination of Flocco. These documents were reviewed *in camera* by Magistrate Judge Francis in early 1990 and eventually produced to the plaintiff. Def.'s Mem. in Answer to Pl.'s Objections at 65; Pl.'s Reply Mem. at 8.

Plaintiff claims that the Court should have treated the motion as arising under Rule 56 since it considered outside materials, relying on *Festa v. Local 3 Intern. Broth. of Elec. Workers,* 905 F.2d 35 (2d Cir.1990).

Not Reported in F.Supp.                                                                      Page 3
Not Reported in F.Supp., 1992 WL 276565 (S.D.N.Y.), RICO Bus.Disp.Guide 8116
**(Cite as: Not Reported in F.Supp.)**

In *United States v. District Council of New York City and Vicinity of United Broth. of Carpenters and Joiners of America*, 778 F.Supp. 738 (S.D.N.Y.1991), this Court summarized the Second Circuit law on Rule 12(b)(6) motions:

The Second Circuit has held that on a motion to dismiss, the district court should only consider allegations on the face of the complaint. Documents outside of the complaint can be considered if they are attached as exhibits or incorporated by reference, *see Cosmas* [*v. Hasset*], 886 F.2d [8,] 13 [ (2d Cir.1989) ], but if additional material is considered the motion to dismiss should be converted to a motion for summary judgment. *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir.1991). However, the Second Circuit has considered a prospectus that was not attached to the complaint and was only given "limited quotations" in the complaint, because it declined "to create a rule permitting a plaintiff to evade a properly argued motion to dismiss simply because plaintiff has chosen not to attach the prospectus to the complaint or to incorporate it by reference." *I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d. Cir.1991); *see Kramer*, 937 F.2d at 774 (district court may consider public documents filed with S.E.C.). Since the main problem with considering documents outside the complaint on a motion to dismiss is lack of notice to the plaintiff, "[w]here plaintiff has actual notice of all of the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated." *Cortec Industries, Inc. v. Sum Holdings, L.P.*, 949 F.2d 42 at 48 (2d Cir1991).

*4 *Id.* at 749 n. 3.

The question is whether documents appearing only in a footnote to the Report were relied upon by the Magistrate Judge within the meaning of 12(b)(6) and if so, whether the plaintiff can be considered "on notice" as in *Cortec Industries* with respect to documents with which he was served during earlier litigation.

Magistrate Judge Francis satisfied Rule 12(b)(6) by presenting a version of the facts directly attributed to the amended complaint and by concluding that on the face of the complaint, the plaintiff's allegations are insufficient to defeat dismissal of the RICO allegations. In the offending footnote, the Magistrate Judge makes no argument but appears to

mention the outside documents only in passing. Furthermore, this footnote appears in the background section of his Report and not as support for his conclusions. The mere presence of references to outside documents in a footnote to a Magistrate Judge's Report does not render the report invalid where the pleadings are insufficient on their face to defeat a motion to dismiss parts of the complaint. I will therefore consider whether the Magistrate Judge's conclusions are warranted on the basis of the plaintiff's pleadings alone.

### RICO Allegations-Scienter

The plaintiff attempts to bring a civil action under 18 U.S.C. § 1962(c) which states, "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Plaintiff alleges that Citibank is a "person" within the meaning of the statute and that Martec, Surico or Heiza Martec in combination or individually constitute an "enterprise". Complaint ¶ 82-83.

The Magistrate Judge concluded that plaintiff failed to allege with particularity the required element of scienter on the part of Citibank to violate the RICO act. Plaintiff responds that scienter is a "subjective" matter and therefore, need not be plead with the specificity required for fraud. Pl.'s Reply Mem. at 18. In the case relied upon by plaintiff, *Ouaknine v. MacFarlane*, 897 F.2d 75 (2d. Cir.1990), the Second Circuit said, "Allegations of scienter are not subjected to the more exacting consideration applied to the other components of fraud. They are sufficient where ... the allegations lie peculiarly within the opposing parties' knowledge and are accompanied by information that raises a strong inference of fraud." *Id.* at 81.

Plaintiff avers that the second amended complaint satisfies the above standard. However, the general allegations to which the plaintiff refers provide no basis for a "strong inference of fraud" on the part of Citibank. Complaint ¶ ¶ 75, 84-87, 206-11, 214. The plaintiff alleges that Citibank, Flocco, and others conspired with the enterprise,
*5 in the conduct of such Enterprise's affairs through a pattern of racketeering activity, to wit:
a) Multiple instances of mail fraud in violation of 18 U.S.C. Section 1341;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                  Page 4
Not Reported in F.Supp., 1992 WL 276565 (S.D.N.Y.), RICO Bus.Disp.Guide 8116
**(Cite as: Not Reported in F.Supp.)**

b) Multiple instances of wire fraud in violation of 18 U.S.C. Section 1343;
c) Conspiracy to commit larceny in violation of Penal Law Sections 20.00 and 155.05(2)(d); and
d) Conspiracy to commit forgery in the third degree in violation of Penal Law Section 20.00 and 170.05.

*Id.* ¶ 84.

Plaintiff further attempts to provide a factual basis for its allegations against Citibank by identifying numerous, specific communications which it claims "constitute the RICO 'predicate acts,' " or alleged acts of wire and mail fraud, listed in appendix A to the second amended complaint. *Id.* ¶¶ 96-175, App. A; Pl.'s Reply Mem. at 19-20. Although the plaintiff painstakingly explicates the misleading statements in each telex, they were all generated by Flocco. Plaintiff does not provide any evidence that Citibank in addition to Flocco, bears responsibility for the statements in these telexes. The plaintiff's substitution of "Citibank (Flocco)" for "Flocco" when describing conspiratorial or fraudulent activity does not demonstrate Citibank's culpability. In order to create an strong inference that Citibank was involved, the plaintiff must allege some higher level of complicity than merely the participation of Flocco and the use of Citibank equipment to perpetrate the scheme.

Plaintiff asserts the conclusory claim that Citibank acted "with reckless tolerance of the illegal activities of Flocco and the Letter of Credit Department and others and with wanton and reckless disregard of the rights of [QNNT] and others." *Id.* ¶ 206. Scienter may include recklessness; *see Breard v. Sacknoff & Weaver, Ltd., 941 F.2d 142, 144 (2d Cir.1991).* Mere negligence, however, does not satisfy the scienter pleading requirement since the entity held liable under RICO must itself have been actively engaged in a pattern of racketeering. *See Dakis on behalf of Dakis Pension Plan v. Chapman, 574 F.Supp. 757, 760 (N.D.Cal.1983).* Magistrate Judge Francis correctly observed that the facts alleged do no more than support an inference of unwitting corporate participation on the part of Citibank.

Magistrate Judge Francis concluded:
Here QNNT alleges little to support an inference that Citibank was an active participant in the alleged scheme to defraud QNNT. QNNT has offered no facts that would support an inference that Citibank did more than unwittingly supply the telex machines and other equipment by which Mr. Flocco made the communications of which QNNT complains. No facts support any inference that Citibank learned of Mr. Flocco's misconduct earlier than February 14, 1986, after he had made the alleged misrepresentations to QNNT; therefore QNNT cannot claim that Citibank knowingly participated in the fraudulent scheme to induce it to contract to sell oil to Surico.
*6 Moreover, as the court below noted, Citibank had no apparent motive to participated in Flocco's fraud.

Magistrate Judge Francis said:
Similarly, the claim that Citibank conspired with Mr. Flocco to defraud QNNT must fail because QNNT has not alleged facts that would support an inference that Mr. Flocco intended his misrepresentations to benefit Citibank. Citibank would not be benefited if, as QNNT alleges, the scheme required Citibank to renege on its promise to issue a letter of credit in case of a falling oil market; in such circumstances, there would be no transaction upon which Citibank could charge a commission. Conceivably, had Martec gone forward with the purchase of oil from QNNT, a benefit to Citibank might have occurred that would not have taken place without Mr. Flocco's misrepresentations. However, QNNT alleges no facts to support an inference that Mr. Flocco's intent was to benefit Citibank under these circumstances, either. It is evident that Citibank would not have provided the letter of credit that Mr. Flocco promised to issue on behalf of Martec had Citibank known the true state of Martec's finances [sic] condition. This conclusion is supported by Citibank's 2/14/86 communication to Martec, disclaiming an obligation to issue the letter of credit (Compl. ¶ ) (sic), and its 12/23/86 and 12/24/86 communications canceling a letter of credit issued in connection with Martec's agreement to purchase oil from Capetown Corporation (Compl. ¶¶ 41, 187-88), as well as by (sic) Citibank's instructions to Mr. Flocco, beginning in March, 1986, that he have no further dealings with Martec. (*e.g.* Memorandum of 3/21/86 from Arthur Lloyd to Leonard Flocco; *see supra* at 6 n. 3). Conceivably, if the purchase of oil had gone through and Martec did not have sufficient assets to make good on the credit extended to it, Citibank would have been liable for the amounts due to QNNT or any other seller. Thus, the only reasonable inference to be drawn from the facts pleaded is that Mr. Flocco was putting Citibank in jeopardy rather than intending to benefit it.

Report at 10-12 (footnote omitted).

To satisfy the scienter element, a plaintiff need not

Not Reported in F.Supp.                                                                                    Page 5
Not Reported in F.Supp., 1992 WL 276565 (S.D.N.Y.), RICO Bus.Disp.Guide 8116
**(Cite as: Not Reported in F.Supp.)**

allege facts which show a defendant had a motive for committing fraud, so long as plaintiff adequately identifies circumstances indicating "conscious behavior" by the defendant from which an intent to defraud may fairly be inferred. _Cosmas v. Hassett, 886 F.2d 8, 13 (2d Cir.1989)._ However, where a particular defendant's nature to defraud is not apparent, the strength of the circumstantial allegations must be correspondingly greater. _Beck v. Manufacturers Hanover Trust Co., 820 F.2d 46, 50 (2d Cir.1987), cert. denied, 484 U.S. 1005 (1988)._ In the case at bar, the circumstances militate against, not in favor, of an inference of fraudulent intent on Citibank's part.

For the reasons stated above, I concur in Magistrate Judge Francis' determination that the plaintiff has failed to allege scienter adequately.

### _Respondeat Superior_

*7 Plaintiff alleges that even if Citibank did not directly participate in the fraudulent scheme, it is vicariously liable for the actions of its employee Flocco under the theory of respondeat superior or the common law theory of apparent authority. Plaintiff objects to the Magistrate Judge's conclusion that courts in general and the courts of this district in particular reject vicarious liability in civil RICO actions.

Plaintiff correctly notes that the Second Circuit has not yet spoken on the matter of whether a corporation can be held vicariously liable under the civil RICO statute for the actions of its employees.

Plaintiff in its memorandum describes the multiple approaches of courts to the question of vicarious liability in RICO actions and claims that the facts of this case support holding Citibank liable under four theories of corporate liability. Pl.'s Objection to Report at 51. Specifically, QNNT claims that Citibank can be held liable since: 1) Flocco acted with actual authority in perpetrating the RICO predicate acts; _e.g., see Connors v. Lexington Ins. Co., 666 F.Supp. 434, 453 (E.D.N.Y.1987)_ (a legitimate business may be held liable in the RICO context under respondeat superior); 2) Citibank would have benefited from the letter of credit scheme; _see, e.g., D & S Auto Parts, Inc. v. Schwartz, 838 F.2d 964, 967 (7th Cir.1988), cert. denied 486 U.S. 1061 (1988)_ (employer may be held liable under RICO statute only for action undertaken by employee with the intent of benefiting employer);

3) Flocco was a high level employee; _see, e.g. Gruber v. Prudential-Bache Securities, Inc., 679 F.Supp. 165, 181 (D.Conn.1987)_ (court may find corporation liable for RICO violation, if it determines "an officer or director had knowledge of or was recklessly indifferent to" the violative activity); and 4) Citibank is the RICO "person" but not the RICO "enterprise"; _e.g. Bennett v. United States Trust Co. of New York, 770 F.2d 308 (2d Cir.1985), cert. denied, 474 U.S. 1058 (1986)_ (corporation may not be both the RICO "person" and "enterprise").

Decisions in this district generally hold that corporations may not be held vicariously liable for the actions of their employees in violation of the RICO statute "where the plaintiff has not alleged any facts which portray the company as an active perpetrator of the fraud or a central figure in the criminal scheme." _Philan Ins. Ltd. v. Frank B. Hall & Co., Inc., 748 F.Supp. 190, 198 (S.D.N.Y.1990); see also Metro Furniture Rental Inc. v. Alessi, 770 F.Supp. 198, 201 (S.D.N.Y.1991); Kahn v. Chase Manhattan Bank, N.A., 760 F.Supp. 369, 373 (S.D.N.Y.1991)._

Essentially, vicarious liability has been held to be at odds with Congressional intent in enacting RICO since the statute was designed to protect corporations from criminal infiltration rather than hold them liable. _Kahn, 760 F.Supp at 373; Banque Worms v. Luis A. Duque Pena E. Hijos, Ltd., 652 F.Supp. 770, 772 (S.D.N.Y.1986)._ In _Rush v. Oppenheimer & Co. Inc., 628 F.Supp. 1188, 1194-95 (S.D.N.Y.1985),_ Judge Sweet said, "Superimposing vicarious liability doctrines on the RICO criminality requirements would in this context permit the 'enterprise' which is the conduit for these activities, to become the defendant by way of imputation, in a transparent attempt to reach a deeper pocket than the actual violator or perpetrator of the predicate racketeering acts."

*8 Relying on _D & S Auto Parts, Inc. v. Schwartz, 838 F.2d at 967,_ plaintiff claims that vicarious liability for RICO violations may be imposed when the employee undertakes the action for the benefit of the employer. Pl.'s Objection at 48, 51-52. Pl.'s Reply Mem. at 20-29. In the Plaintiff's Objection to the Report, plaintiff suggests that Citibank stood to benefit from Flocco's activities in the form of large transaction fees for supplying letters of credit. Pl.'s Objection at 51-52. Plaintiff further alleges that Magistrate Judge Francis failed to treat the allegations that Flocco acted for the benefit of Citibank true as pleaded. But "baldly conclusory"

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 6
Not Reported in F.Supp., 1992 WL 276565 (S.D.N.Y.), RICO Bus.Disp.Guide 8116
**(Cite as: Not Reported in F.Supp.)**

and "groundless" allegations will not defeat dismissal under 12(b)(6), _Duncan v. AT & T Communications, Inc._, 668 F.Supp. 232, 234 (S.D.N.Y.1987), and the Magistrate Judge was not bound to accept as true conclusory pleadings unsupported by facts.

In its second amended complaint, although plaintiff does claim that Flocco participated in the fraud to make money for Citibank, it fails to allege facts tending to indicate that Citibank knew of Flocco's misrepresentations before February 14, 1986. Complaint ¶ ¶  66, 86, 91, 181, 191, 199.   As the Seventh Circuit said in _D & S Auto Parts, Inc. v. Schwartz_, 838 F.2d at 967, "An employee violating RICO without his employer's knowledge is highly unlikely to be acting for his employer's benefit." Thus, the facts alleged by the plaintiff are not sufficient to allow an inference that Flocco acted for Citibank's benefit.

The plaintiff has correctly noted that in many of the cases cited by the defendant in which courts reject vicarious liability, the corporation is the RICO "person" as well as the RICO "enterprise".   Pls' Reply Mem. at 37.   The identical argument failed to convince the court in _Banque Worms:_
A number of other district courts have similarly rejected vicarious liability and RICO when the employer/corporation is a passive victim of racketeering activity.   The plaintiff attempts to distinguish these cases by claiming that they focus on the distinction between the RICO "person" and the RICO "enterprise," finding that an "enterprise" cannot also be liable as a "person" under section 1962(c).   _The plaintiff argues that Flota is not the enterprise in this action, but should be responsible for the acts of the "person," its employee Abadia, because the latter acted with the force of the corporation behind him.     This yields the absurd result specifically denounced in the above cases, i.e., holding an innocent corporation liable for the unauthorized wrongdoing of a lower level employee._

652 F.Supp. at 773 (emphasis added) (citations omitted).   _Banque Worms_ makes it clear that even where the defendant corporation is not the RICO "enterprise", holding a corporation liable for the RICO violations of its employees conflicts with the purpose of the RICO statute.   Furthermore, although the plaintiff claims that Flocco was not a "lower level employee", Flocco does not constitute an "officer or director" for whose activity the corporation may be liable, according to _Gruber v. Prudential-Bache_, 679 F.Supp. at 189.

*9 The plaintiff makes a further argument that the Supreme Court's decision in _American Soc. of Mechanical Engineers, Inc. v. Hydrolevel Corp._, 456 U.S. 556 (1982), which held the Society liable for antitrust violations committed by its agents, supports vicarious liability on the part of Citibank in this case. Pl.'s Objection at 53.     However, I agree with the analysis of the First Circuit in _Schofield v. First Commodity Corp. of Boston_, 793 F.2d 28, 33 (1st Cir.1986) on _Hydrolevel_ 's applicability to the question of vicarious liability in RICO actions:
Unlike section 1962(c), however, with its precise language of relationship between two entities, the antitrust laws sweep broadly and extend liability to "[e]very person", 15 U.S.C. § § 1, 2, 3, and define "person" to include corporations and associations, 15 U.S.C. § 7....
In contrast to the antitrust and securities provisions at issue in those cases, the language of section 1962(c) is phrased so as to limit rather than expand the range of potential violators.     Moreover, the legislative history tells us that Congress had a specific target in mind with this statute, the individual wrongdoer, in contrast to the more general purposes behind the antitrust and securities acts.

_Id._ at 33.     _See also D & S Auto Parts, Inc. v. Schwartz_, 838 F.2d at 968 (holding _Hydrolevel_ rule inapplicable to RICO liability); _Banque Worms_, 652 F.Supp. at 772 (rejecting a similarity between corporate liability in antitrust and RICO actions).

Since the plaintiff failed to allege any factual basis upon which I could infer that Citibank was an active participant in the alleged letter of credit scheme and this district does not recognize RICO liability of a corporation for the acts of its employees, the plaintiff's fifth and sixth causes of action were correctly dismissed by Magistrate Judge Francis. Accordingly, I affirm the Magistrate Judge's Report and Recommendations.

It is SO ORDERED.

S.D.N.Y.,1992.
Qatar Nat. Navigation & Transp. Co., Ltd. v. Citibank, N.A.
Not Reported in F.Supp., 1992 WL 276565 (S.D.N.Y.), RICO Bus.Disp.Guide 8116

Briefs and Other Related Documents (Back to top)

• 1:89cv00464 (Docket) (Jan. 20, 1989)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                 Page 7
Not Reported in F.Supp., 1992 WL 276565 (S.D.N.Y.), RICO Bus.Disp.Guide 8116
**(Cite as: Not Reported in F.Supp.)**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Tab F**



Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 603496 (S.D.N.Y.)
**(Cite as: 1997 WL 603496 (S.D.N.Y.))**

Page 1

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
REDTAIL LEASING, INC., Hull Trading Company,
Robert J. Rosener, and Steven
Paskvallich, individually and on behalf of all others
similarly situated,
Plaintiffs,
v.
Leonard BELLEZZA, Michael Borlinghaus, Jeffrey
F. Green, Joseph P. Greenwald,
Heinz Grein, Steven Krysty, Joanne Latona-
Administratrix of The Estate of
Angelo Latona, Joseph Latona, Val Maiale,
Christopher M. Garvey, Darrin
Gleeman, Seymour Gleeman, Edwin Karger, and
David Simon, Defendants.
**No. 95 Civ. 5191(JFK).**

Sept. 30, 1997.
Sachnoff & Weaver, Ltd., Chicago, IL, of Counsel
John W. Moynihan, Pollack & Greene New York
City, of Counsel Alan Pollack, for plaintiff.

Weil, Gotshal & Manges Llp New York City, of
Counsel Greg A. Danilow, Jason M. Halper, Michael
J. Aiello, for defendants Darrin Gleeman, Seymour
Gleeman and Edwin Karger.

KEENAN, J.

OPINION and ORDER
**\*1** Before the Court is the joint motion of
Defendants Darrin Gleeman, Seymour Gleeman and
Edwin Karger to dismiss the first amended class
action complaint, pursuant to Fed.R.Civ.P. 12(b)(1)
and 12(b)(6), and Plaintiffs' motion for class
certification, pursuant to Fed.R.Civ.P. 23(a) and
(b)(3). For the reasons stated below, the Court
grants the Moving Defendants' motion to dismiss,
and the Court grants Plaintiffs' motion for class
certification.

***Background***
Plaintiffs allege that beginning in 1989, a group of
people, including the Moving Defendants, created an
organization to obtain material, nonpublic inside
information regarding public entities for the purpose
of disseminating that information among the group so
that the members of the group could engage in illegal
insider trading in those securities. Among the
securities that Plaintiffs claim that this insider trading
ring traded by using the material, nonpublic inside
information were Ambase Corp., ACCO/Swingline,
AT & T, Birmingham Steel Corp., Chubb, Columbia
Pictures, Kay Jeweler Inc ., Motel 6, L.P., R.H. Macy
& Co., Northwest Airlines, Time Warner, Inc.,
United Airlines, and Wang Laboratories.

According to the Amended Complaint, Defendant
Christopher Garvey, who worked as a paralegal at the
law firm Skadden, Arps, Slate, Meagher & Flom,
would obtain material, nonpublic inside information
and provide this inside information to Defendant
Darrin Gleeman, who was Garvey's roommate and
friend. *See* Am.Compl. (¶ ¶ 12-13, 43. While the
Amended Complaint states that the insider trading
ring had several sources of material, nonpublic
information, Plaintiffs allege that Garvey was the
"primary source" of the material inside information
central to the insider trading ring's conspiracy. *See*
Am.Compl. (¶ ¶ 41, 48. Darrin Gleeman would
allegedly provide Garvey's inside information to his
father, Defendant Seymour Gleeman, who was
employed by IBM in New York City. *See*
Am.Compl. (¶ 43. On several occasions, Seymour
Gleeman allegedly purchased through foreign
accounts, common stock and call options for the
Garvey-recommended securities. To conceal his
identity, Seymour Gleeman allegedly used false
identification to open various trading accounts in
1989 and 1990 in Luxembourg and Austria. Id.
Seymour Gleeman would also provide Garvey's
inside information to Defendant Edwin Karger, who
was an IBM coworker of Seymour Gleeman. *See*
Am .Compl. (¶ 44. Karger would then provide the
Garvey inside information to his friend Defendant
Leonard Bellezza. Both Karger and Bellezza would
then allegedly trade on the inside information, and
Bellezza would allegedly provide the information to
others in the insider trading ring. Defendants
Seymour and Darrin Gleeman allegedly shared in the
kickbacks paid to Garvey for obtaining and sharing
the inside information with the ring. *See* Am.Compl.
(¶ ¶ 42-43.

The focus of this lawsuit concerns the insider trading

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 2
Not Reported in F.Supp., 1997 WL 603496 (S.D.N.Y.)
**(Cite as: 1997 WL 603496 (S.D.N.Y.))**

ring's alleged utilization of material, nonpublic information regarding the proposed acquisition of Motel 6, L.P., a Dallas-based national chain of owner-operated economy motels, by Accor, S.A., a French-based company. The insider trading ring was allegedly part of a conspiracy to trade on highly sensitive inside information about tender offer negotiations occurring in New York between Motel 6's largest shareholder, Kohlberg Kravis Roberts & Company, and Accor. This alleged insider trading on the Motel 6 shares and call options occurred between May 18, 1990 and July 12, 1990, when Accor made a public announcement that it would made a tender offer for Motel 6. Plaintiffs sold Motel 6 shares and call options contemporaneously with Defendants' purchase of the same during the alleged insider trading period of May 18, 1990 to July 12, 1990. Plaintiffs claim that through the insider trading in Motel 6 securities, Defendants generated illegal profits in excess of $4 million, and that Plaintiffs and the proposed class suffered millions of dollars in damages due to Defendants' misconduct in the sharing of and trading on the material, nonpublic inside information concerning the Accor tender offer.

**\*2** While the Amended Complaint alleges that the inside information came primarily from Garvey, who informed Darrin Gleeman, who then informed his father Seymour Gleeman, who in turn informed Defendant Karger, who informed Bellezza and Bellezza tipped off the others involved, this usual chain of events did not happen with regard to material, nonpublic inside information concerning the Motel 6 tender offer negotiations. Rather, the inside information came from another source and was disseminated in a different manner. Hugh Thrasher, executive vice-president of Motel 6 in charge of communication at the time of the tender offer negotiations, allegedly tipped his friend Carl Harris about the tender offer negotiations. *See* Am.Compl. (¶ (¶ 102-03. Harris then allegedly told Gregg Shawzin, who then told John Anderson. *See* Am.Compl. (¶ 107, 111. Anderson purportedly tipped off Defendant Joseph Greenwald, who allegedly tipped Defendants Jeffrey Green and Joseph Latona. *See* Am. Compl. (¶ (¶ 113, 118. Defendants Green and Latona allegedly tipped Defendant David Simon. *See* Am.Compl. (¶ 124. Defendant Latona also allegedly tipped Defendant Michael Borlinghaus, who then allegedly tipped Defendants Heinz Grein, Steven Krysty, and Leonard Bellezza. *See* Am.Compl. (¶ (¶ 130, 131, 139, 141. Defendant Bellezza allegedly tipped Defendant Karger, who allegedly tipped Defendant Seymour Gleeman. *See* Am.Compl. (¶ (¶ 143, 145. All of

these individuals are alleged to have purchased Motel 6 stock or call options based upon this material, nonpublic inside information.

Based upon the insider trading ring's alleged activities, Plaintiffs filed this instant action stating claims for federal RICO violations, violations of § 10(b), Rule 10b-5, § 14(e), and Rule 14e-5 of the Exchange Act, as well as state law claims for common law fraud, unjust enrichment and violations of New York's Consumer Protection Act.

Defendants Darrin Gleeman, Seymour Gleeman and Edwin Karger now move jointly to dismiss all claims against them in this action, on the grounds that Plaintiffs have failed to state a claim upon which relief may be granted. Plaintiffs have named the Moving Defendants in the first, third, fourth, fifth, sixth, and seventh claims for relief. Plaintiffs do not seek relief against the Moving Defendants in the second claim for relief, pursuant to § § 10(b) and 14(e) of the Exchange Act and Rules 10b-5 and 14e-3 promulgated thereunder.

***Discussion***
**A. The Motion to Dismiss**

A motion to dismiss for failure to state a claim should be granted only if it appears beyond doubt that a plaintiff can prove no set of facts in support of a claim that would entitle the plaintiff to relief. *See Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The factual allegations set forth in the complaint must be accepted as true, *see Zinermon v. Burch,* 494 U.S. 113, 118, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), and the court must view those allegations in the light most favorable to the pleader. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Nevertheless, the complaint must contain allegations concerning each of the material elements necessary to sustain recovery under a viable legal theory. *See Connolly v. Havens,* 763 F.Supp. 6, 9 (S.D.N.Y.1991).

**1. Section 1962(b)--RICO Acquisition Claim**

**\*3** The third claim for relief alleges a violation of 18 U.S.C. § 1962(b). Section 1962(b) provides:
It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 3
Not Reported in F.Supp., 1997 WL 603496 (S.D.N.Y.)
**(Cite as: 1997 WL 603496 (S.D.N.Y.))**

18 U.S.C. § 1962(b).    To state a claim under §
1962(b), a plaintiff must plead that they were injured
by a defendants' acquisition of an interest in an
enterprise, as distinct from an injury resulting from
the pattern of racketeering activity, or commission of
predicate acts.    *See Discon, Inc. v. Nynex Corp., 93
F.3d 1055, 1062-63 (2d Cir.1996)* (finding that the
plaintiff did not state a claim under § 1962(b)
because the plaintiff "has not alleged any injury
stemming from the 'acquisition or maintenance' of
[the enterprise] by [the defendant], only injuries
resulting from the commission of predicate acts");
*Lightning Lube, Inc. v. Citco Corp.,* 4 F.2d 1153,
1190 (3d Cir.1993) ("in order to recover under [ §
1962(b) ], a plaintiff must show injury from the
defendant's acquisition or control of an interest in a
RICO enterprise, in addition to injury from the
predicate acts.").    As explained by Judge Sand in
*Dornberger v. Metropolitan Life Ins. Co.,* 961
F.Supp. 506, 525 (S.D.N.Y.1997),

> to state a claim under § 1962(b), a plaintiff must
> allege an injury by reason of the defendant's
> acquisition or maintenance of an interest in or
> control of an enterprise ... As with § 1962(a), it is
> not sufficient merely to allege an injury caused by
> the predicate acts themselves ... The rationale for
> this "acquisition injury requirement analogous to
> that of the investment injury requirement of §
> 1962(a)--the essence of a § 1962(b) violation is
> not the commission of predicate acts, but rather the
> acquisition or maintenance of an interest in or
> control of an enterprise ... Thus, a plaintiff cannot
> recover under § 1962(b) unless he alleges a
> distinct injury caused not by predicate acts but by
> the defendant's acquisition or maintenance of an
> interest in or control of an enterprise.

*Id.* at 525; *see also Lightning Lube,* 4 F.3d at 1190
("Such an injury [[[under § 1962(b) ] may be
shown, for example, where the owner of an enterprise
infiltrated by the defendant as a result of racketeering
activities is injured by the defendant's acquisition or
control of his enterprise." (citations omitted)).    A
plaintiff who is injured solely as a result of predicate
acts may sue only under § 1962(c), "whose essence
is the commission of predicate acts in connection
with conducting the affairs of an enterprise."
*Dornberger,* 961 F.Supp. at 525.    The Moving
Defendants contend that Plaintiffs have not alleged
any "acquisition injury" distinct from the injury
resulting from the underlying racketeering activity,
and therefore this claim must be dismissed.    The
Court agrees.

*4 Plaintiffs have only alleged facts showing injuries
that resulted from the underlying pattern of

racketeering activity.    According to the facts alleged
in the Amended Complaint, and as conceded in
Plaintiffs' papers in opposition to this motion,
Plaintiffs suffered millions of dollars in damages as a
result of Defendants' illegal insider trading purchases
of Motel 6 securities.    *See* Am.Compl. (¶ (¶ 4; Pls.'
Mem. in Opp. at 10 ("The Complaint alleges that the
plaintiffs and the putative class suffered damages
totalling millions of dollars as a result of the
defendants' ... illegal insider trading purchases of SIX
securities.").    Plaintiffs offer no factual allegations to
show how Defendants' acquisition of or maintenance
of an interest in or control of the enterprise injured
Plaintiffs in a manner distinct from the racketeering
activity itself.    Thus, Plaintiffs' § 1962(c) claim
encompasses all of their alleged injuries.    Without
any factual allegations to support a claim of a distinct
acquisition injury, Plaintiffs cannot state a cause of
action under § 1962(b), and the Court grants the
Moving Defendants' motion to dismiss this claim.
*See Katzman v. Victoria's Secret Catalogue,* 167
F.R.D. 649, 657 (S.D.N.Y.1996) ("[T]o state a claim
under § 1962(b), a plaintiff must allege that the
injury was caused by the acquisition or maintenance
of control and not by the predicate acts.... By failing
to allege how she was injured by an acquisition or
maintenance of control, [plaintiff] has failed to plead
a violation of § 1962(b)." (citations omitted)), *aff'd,*
113 F.3d 1229 (2d Cir.1997).    The third claim, as
against the Moving Defendants, is dismissed.

## 2. Section 1962(c)--RICO Conduct Claim

The fourth claim for relief alleges a violation of 18
U.S.C. § 1962(c).    Section 1962(c) provides:

> It shall be unlawful for any person employed by or
> associated with any enterprise engaged in, or the
> activities of which affect, interstate or foreign
> commerce, to conduct or participate, directly or
> indirectly, in the conduct of such enterprise's
> affairs through a pattern of racketeering activity or
> collection of unlawful debt.

18 U.S.C. § 1962(c).    In *Reves v. Ernst & Young,*
507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525
(1993) the Supreme Court found that liability under §
1962(c) requires that a defendant be a participant "in
the operation or management of the enterprise itself."
*Id.* at 185.    The Supreme Court stated:

> Once we understand the word "conduct" to require
> some degree of direction and the word "participate"
> to require some part in that direction, the meaning
> of § 1962(c) comes into focus.    *In order to
> "participate, directly or indirectly, in the conduct
> of such enterprise's affairs," one must have some
> part in directing those affairs.    Of course, the*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 4
Not Reported in F.Supp., 1997 WL 603496 (S.D.N.Y.)
**(Cite as: 1997 WL 603496 (S.D.N.Y.))**

word "participate" makes clear the RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required.

**\*5** *Id.* at 1170 (emphasis added). Therefore, to state a claim for liability under § 1962(c), Plaintiffs must allege that the Gleemans and Karger participated "in the operation or management of the enterprise itself," which requires that these Defendants must have had some part in directing the enterprise's affairs.

The Moving Defendants contend that the Amended Complaint contains no factual allegations suggesting that the Gleemans or Karger directed, managed or operated the affairs of the enterprise alleged in the § 1962(c) claim. Because liability under § 1962(c) "may not be imposed on one who merely 'carries on' or 'participates' in an enterprise's affairs," *Biofeedtrac Inc. v. Koliner Optical Enters. & Consultants, S.R.L., 832 F.Supp. 585, 590-91 (E.D.N.Y.1993)*, the Moving Defendants assert that this § 1962(c) claim must be dismissed. The Court agrees.

The Amended Complaint is devoid of allegations suggesting that the Gleemans or Karger had some part in directing the enterprise's affairs. Certainly, the alleged facts tend to show that the Moving Defendants participated in the enterprise's affairs. But other than passing on inside information to others, trading on inside information and receiving some kickbacks for illegal trades, none of the allegations in the Amended Complaint raise the inference that these three men had a role in managing or directing the enterprise's affairs. *See Stone v. Kirk,* 8 F.3d 1079, 1091 (6th Cir.1993) (defendant who "was associated with the" enterprise and "engaged in a pattern of racketeering activity when he repeatedly violated the anti-fraud provisions of the [federal] securities" laws was not liable under § 1962(c) because he "had no part in directing" the enterprise's affairs). A defendant does not "direct" an enterprise's affairs under § 1962(c) merely by engaging in wrongful conduct that assists the enterprise.

In opposition to this motion, Plaintiffs offered new allegations to support their claim that the Moving Defendants had some part in directing the enterprise's affairs, however, these allegations do not appear in the Amended Complaint. *See* Pls.' Mem. in Opp. at 12-13 (alleging, among other things, that Darrin

Gleeman conceived of the inside trading idea and encouraged Garvey to obtain employment with a law firm to obtain inside information, that the Moving Defendants determined the kickbacks to be paid to Garvey in order to protect that source of information, that the Moving Defendants had the "primary responsibility" to disseminate the Garvey inside information to the others and to place trades on the inside information). Papers in response to a Rule 12(b)(6) motion to dismiss cannot cure a defect in the pleadings. *See O'Brien v. National Property Analysts Partners, 719 F.Supp. 222, 229 (S.D.N.Y.1989)*. Insofar as the Amended Complaint contains no factual allegations to indicate that the Moving Defendants participated in the operation or management of the enterprise itself, the Court grants the motion to dismiss the § 1962(c) claim against them. However, in light of the new allegations put forth by Plaintiffs in the memorandum of law and affidavit in opposition to this motion, and the fact that those allegations raise the inference that some of the Moving Defendants may have had a part in directing the enterprise, the Court grants Plaintiffs leave to replead the Amended Complaint with regard to this specific claim and these Moving Defendants.

**3. Section 1962(d)--Conspiracy to Violate § § 1962(b)-(c)**

**\*6** Plaintiffs first claim for relief alleges that Defendants engaged in a conspiracy to violate 18 U.S.C. § § 1962(b)-(c), in violation of § 1962(d). Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). The Moving Defendants argue that this claim must be dismissed because Plaintiffs' substantive RICO § 1962(b) and § 1962(c) claims against them are deficient and must be dismissed. The Court concludes that the § 1962(d) claim should be dismissed for another reason.

Upon a careful review of the Amended Complaint, the Court finds that like the § § 1962(b) and 1962(c) claims, Plaintiffs have made no more than conclusory allegations with regard to the § 1962(d) claim against the Moving Defendants. The factual allegations just do not support a claim that the Moving Defendants conspired to violate § 1962(b) or § 1962(c). However, because the Court granted Plaintiffs leave to replead the Amended Complaint in light of the new factual allegations relevant to the § 1962(c) claim, the Court also grants Plaintiffs leave to replead this claim against the Moving Defendants consistent with the new allegations.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 603496 (S.D.N.Y.)
**(Cite as: 1997 WL 603496 (S.D.N.Y.))**

Page 5

### 4. New York General Business Law Section 349(a) Claim

The fifth claim for relief alleges a violation of § 349(a) of the New York General Business Law. Section 349(a) prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [the] state." N.Y. Gen.Bus. Law § 349(a). This Court has addressed the applicability of § 349(a) to securities transactions and found that " § 349 should not be applied to investment transactions in securities" because the purpose of § 349 "is to protect consumers ... [and] [c]ourts have therefore been reluctant to apply the section to transactions that are 'different in kind and degree from those that confront the average consumer who requires the protection of a state against fraudulent practices.' " *In re Motel 6 Sec. Litig.*, Nos. 93-2183(JFK), 93- 2866(JFK), 1995 WL 431326, at *6-7 (S.D.N.Y. July 20, 1995) (citations omitted). This holding also applies to this case for the reasons discussed by the Court in that decision. Therefore, the Court grants the Moving Defendants' motion to dismiss this fifth claim for relief.

### 5. Common Law Fraud Claim

The sixth claim for relief alleges that Defendants committed common law fraud. To state a claim for common law fraud claim, a plaintiff must allege that a defendant (1) made a material false representation or omission, (2) knowing of its falsity, (3) intending to defraud, (4) upon which the plaintiff reasonably relied, and (5) the plaintiff suffered injury as a result. *See Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir.1995).

The Moving Defendants contend that the common law fraud claim must be dismissed because Plaintiffs have not adequately alleged that the Moving Defendants had a duty to disclose the material inside information or that Plaintiffs adequately pleaded the other elements of a common law fraud claim. Upon examination of the Complaint, the Court concludes that Plaintiffs have failed to alleged facts to support the common law fraud element of direct reliance on Defendants' material omissions.

*7 Common law fraud claims must be supported by factual allegations demonstrating the plaintiff's actual, direct reliance on the misrepresentation or omission. *See Golden Budha Corp. v. Canadian Land Co.*, 931 F.2d 196, 202 (2d Cir.1991); *Turtur v.*

*Rothschild Registry Int'l, Inc.*, No. 92- 8710(RAP), 1993 WL 338205, at *6 (S.D.N.Y. Aug.27, 1993). Consequently, common law fraud claims

> are distinct from actions brought under the federal securities laws, which "permit a rebuttable presumption of reliance where a plaintiff purchases his shares on the open market."

Common law fraud cases such as the present one are therefore to be distinguished from cases that involved a fraud on the market theory or other theories in which reliance on a material omission is presumed to have existed and which are applicable primarily in the context of federal securities fraud claims arising under section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

*Turtur*, 1993 WL 338205, at *7 (citations omitted); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 246-47, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (observing that actions under § 10(b) and Rule 10b-5 are distinct from common law deceit and misrepresentation claims and are designed to add to the protections provided investors by common law). Unlike § 10(b) and Rule 10b-5 claims based on a fraud-on-the-market theory, common law fraud claims do not enjoy a presumption of reliance once a material omission and duty to speak have been sufficiently pleaded. Because the factual allegations focus solely on an insider trading conspiracy that perpetrated a fraud on the market, and Plaintiffs have alleged no connection to Defendants, let alone the Moving Defendants, other than a "contemporaneous trading" relationship, [FN1] Plaintiffs have not alleged facts to support a claim of actual, direct reliance on the Moving Defendants' omissions. *See Schultz v. Commercial Programming Unlimited Inc.*, No. 91-7924(LJF), 1992 WL 396434, at *4 (S.D.N.Y.1992) (stating that "this Court will not permit Schultz to circumvent the [reliance] requirement by infusing the fraud on the market theory into his common law fraud action" and dismissing the common law fraud claim); *In re 3COM Securities Litigation*, 761 F.Supp. 1411, 1419 (N.D.Cal.1990) (finding that Plaintiff adequately pleaded reliance for a 10b-5 claim, but dismissing common law fraud claim because Plaintiff had not adequately pleaded actual reliance for that claim). In that Plaintiffs have failed to plead facts to support the direct reliance element of the common law fraud claim, the Court grants the Moving Defendants' motion to dismiss this sixth claim for common law fraud.

> FN1. The Court notes that, of the three Moving Defendants, the Amended

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                      Page 6
Not Reported in F.Supp., 1997 WL 603496 (S.D.N.Y.)
**(Cite as: 1997 WL 603496 (S.D.N.Y.))**

Complaint alleges only that Defendants Seymour Gleeman and Edwin Karger purchased the Motel 6 securities during the period in question. Plaintiffs make no allegation that Defendant Darrin Gleeman illegally traded the Motel 6 securities.

### 6. Unjust Enrichment Claim

The seventh claim for relief alleges that Defendants have been unjustly enriched at the expense of Plaintiffs. To state a claim for unjust enrichment, a plaintiff must allege that
(1) defendant was enriched, (2) enrichment was at plaintiff's expense and (3) the circumstances were such that equity and good conscience require defendant to make restitution.
**\*8** *Violette v. Armonk Assocs., L.P.,* 872 F.Supp. 1279, 1282 (S.D.N.Y.1995); *see also Dolmetta v. Unitak Nat'l Corp.,* 712 F.2d 15, 20 (2d Cir.1983).

The Moving Defendants contend that under New York law, unjust enrichment requires direct dealing, or privity, between the parties. Because Plaintiffs allege no such privity, the Moving Defendants argue that the unjust enrichment claim must be dismissed. Plaintiffs counterargue that privity is not a required element of an unjust enrichment claim.

This Court agrees with the Moving Defendants that an unjust enrichment claim, which is a quasi-contract claim, requires some type of direct dealing or actual, substantive relationship with a defendant. As this Court recently held,
While the elements of the unjust enrichment claim ... do not explicitly spell out such a requirement, those elements imply a more substantive relationship, or closer nexus, between a defendant and a plaintiff than Plaintiffs have alleged in this case. The requirements that the defendant be enriched at the plaintiff's expense and that good conscience necessitate that the defendant make restitution to the plaintiff, clearly contemplate that the defendant and the plaintiff must have had some type of direct dealing, an actual relationship or some greater substantive connection than is alleged in this case.
*See In re Motel 6 Sec. Litig.,* Nos. 93-2183(JFK), 93-2866(JFK), 1997 WL 154011, at \*7 (S.D.N.Y. Apr.2, 1997).

In the instant case, Plaintiffs do not allege any direct dealings or actual, substantive relationship with any of the Defendants, let alone the Moving Defendants. At most, Plaintiffs claim to have had a contemporaneous trading relationship with Defendants. Plaintiffs contend that the Defendants were unjustly enriched at Plaintiffs' expense in purchasing shares of Motel Six based upon inside information during the same time period in which Plaintiffs sold their shares. These factual allegations do not sound in the quasi-contract common law claim of unjust enrichment. In the absence of any factual allegations that Plaintiffs had a more substantive connection to the Moving Defendants beyond a contemporaneous trading relationship, Plaintiffs have not alleged facts to support a claim that the Moving Defendants were unjustly enriched at the Plaintiffs' expense and that the Moving Defendants should make restitution to Plaintiffs. *Cf. Martes v. USLIFE Corp.,* 927 F.Supp. 146, 149 (S.D.N.Y.1996) (holding that an unjust enrichment claim lies only where the defendant possesses money or received a benefit which defendant should not retain because it belongs to the plaintiff, and dismissing the unjust enrichment claim because defendant received nothing that belonged to plaintiff and had no contractual or other relationship with plaintiff). Therefore, the Court grants the Moving Defendants' motion to dismiss the seventh claim for unjust enrichment.

### B. Plaintiffs' Motion for Class Certification

**\*9** Plaintiffs seek an order pursuant to Fed.R.Civ.P. 23(a) and (b)(3) certifying a plaintiff class consisting of:
[A]ll persons other than the Defendants who sold shares of [Motel 6 L.P.] ("SIX") or sold call options on SIX shares between May 18, 1990 and July 12, 1990, inclusive (the "Class Period.") and who traded contemporaneously with Defendants' purchases of SIX shares or call options.
Compl. ¶ 33. Rule 23 contains a two-tier test for class certification. First, Plaintiffs must meet Rule 23(a)'s four requirements for defining a class: a class so numerous that joinder is impracticable; questions of law or fact common to the class; named parties with interests typical of the class; and class representatives who will provide fair and adequate representation of absent members of the class. *See* Fed.R.Civ.P. 23(a). Second, Plaintiffs must demonstrate that the case falls within one of Rule 23(b)'s three categories where class action is appropriate. In this action, Plaintiffs seek certification under Rule 23(b)(3), which permits the maintenance of a class action where the court finds that the questions of law or fact common to the members of the class predominate and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. *See*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 7
Not Reported in F.Supp., 1997 WL 603496 (S.D.N.Y.)
**(Cite as: 1997 WL 603496 (S.D.N.Y.))**

Fed.R.Civ.P. 23(b)(3).

Upon an examination of the Amended Complaint in this securities fraud insider trading case, as well as Plaintiffs' papers in support of this motion, the Court concludes that Plaintiffs' proposed class satisfies all of the requirements of Rule 23(a) as well as Rule 23(b)(3).  *See In re Motel 6 Securities Litig.*, No. 93-2183(JFK), 1996 WL 53189 (S.D.N.Y. Sept. 18, 1996) (granting the plaintiffs' motion to certify class in related securities fraud action based upon the Motel 6 insider trading).   Furthermore, to the extent that Defendants have not submitted papers in opposition to this motion, Defendants have implicitly agreed to the relief sought in Plaintiffs' motion for class certification.

Conclusion

For the reasons stated above, the Court grants Defendants Darrin Gleeman, Seymour Gleeman and Edwin Karger's joint motion to dismiss the first, third, fourth, fifth, sixth and seventh claims for relief. Plaintiffs may replead the first and fourth claims for relief consistent with this opinion, and the Amended Complaint is to be filed by October 28, 1997.   The Court grants Plaintiffs' motion for class certification.

**SO ORDERED.**

Not Reported in F.Supp., 1997 WL 603496 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

•           1:95cv05191                    (Docket) (Jul. 12, 1995)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Tab G**

Westlaw.

Not Reported in F.Supp.                                                                                    Page 1
Not Reported in F.Supp., 1993 WL 277205 (S.D.N.Y.),  RICO Bus.Disp.Guide 8364
**(Cite as: Not Reported in F.Supp.)**

**H**
Briefs and Other Related Documents

United States District Court, S.D. New York.
STRONG & FISHER LTD., Stock Kojima
International, Inc. and Picusa Piel, S.A. Plaintiffs,
v.
MAXIMA LEATHER, INC., Susan Cohen, Emanuel
Cohen and Kenneth Karlstein, Nationsbanc
Commercial Corp., Citizen & Southern Commercial
Corp., and Haver, Miller & Porchenick Defendants.
**No. 91 Civ. 1779 (JSM).**

July 22, 1993.

John P. Bermingham, Oyster Bay, NY, for plaintiffs.
James R. DeVita, New York City, for defendants
Emanuel Cohen, Susan Cohen and Kenneth
Karlstein.
James M. Kaplan, Wilson, Elser, Moskowitz,
Edelman & Dicker, New York City, for defendants
Haver Miller & Porchenek.
Kurt J. Wolff, Otterbourg, Steindler, Houston &
Rosen, P.C., New York City for defendants Citizens
& Southern Commercial Corp. and Nationsbanc
Commercial Corp.

*MEMORANDUM ORDER and OPINION*

MARTIN, District Judge:
**\*1** Presently before the Court is the motion of
defendants Citizens & Southern Commercial Corp.
("C & S") and Nationsbanc Commercial Corp.
("Nationsbanc") to dismiss the amended complaint
which is based on allegations of violations of the
RICO statute, to wit, 18 U.S.C. § 1962(c), both as
principals (Second Cause of Action), and aiders and
abetters (Third Cause of Action).

The essence of plaintiffs' allegations is that C & S,
which was the factor for several companies
controlled by Susan and Emanuel Cohen, to wit,
Maxima Leather, Inc. ("Maxima"), Maxima Plus,
Item Ltd. ("Item") and Melanzona Ltd.
("Melanzona"), participated in the affairs of those
entities which are alleged to be enterprises within the
meaning of the RICO statute through a pattern of
racketeering activity or aided and abetted the RICO
violations engaged in by those entities.

While the amended complaint clearly alleges a
fraudulent scheme by the Cohens in which the
various corporate entities were used to obtain
merchandise by fraud and dispose of the merchandise
for cash, the issue before the Court is whether or not
the complaint adequately alleges that these two
defendants participated in or aided and abetted the
RICO violations alleged.

The allegations of the complaint with respect to these
defendants fall into four categories:  (1) a specific
allegation that C & S through one of its employees
made a fraudulent statement as to Maxima's
creditworthiness in order to induce a vendor to sell
leather to Maxima;  (2) allegations that, in reviewing
the status of its factored accounts with the Cohens'
corporations, C & S failed to take actions that it was
entitled to take which would have put plaintiffs on
notice of the existence of the fraud and the corporate
defendants' inability to pay their debts;      (3)
allegations that C & S and Nationsbanc consented to
the use of their names in lulling letters sent to the
creditors of the corporations;  and (4) allegations that,
at various times during 1992, C & S and Nationsbanc
engaged in perjury and obstruction of justice in
connection with this action by concealing evidence
and giving knowingly false testimony.

The defendants' motion to dismiss the Second Cause
of Action which charges these defendants as
principals in a violation of 18 U.S.C. § 1962(c) is
controlled by the Supreme Court's recent decision in
*Reves v. Ernst & Young,* 507 U.S. 170, 113 S.Ct.
1163 (1993).   In that case, the Supreme Court held
that the words of the statute which impose liability
only on those who "conduct or participate directly or
indirectly in the conduct of such enterprises' affairs"
require that the person charged with the § 1962(c)
violation must have some part in directing the affairs
of the RICO enterprise.   Here, the enterprises alleged
in the complaint are the corporate defendants
Maxima, Item and Melanzona, and the complaint
fails to allege facts which support a conclusion that
these defendants had some part in directing their
activities.   The fact that, as a major creditor of those
corporations, these defendants had substantial
persuasive power to induce management to take
certain actions and had the legal authority to take
other actions that could affect these corporations is
not equivalent to having the power to "conduct or
participate directly or indirectly in the conduct in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                          Page 2
Not Reported in F.Supp., 1993 WL 277205 (S.D.N.Y.),   RICO Bus.Disp.Guide 8364
(Cite as: Not Reported in F.Supp.)

affairs of those corporations." Thus, the motion to dismiss the Second Cause of Action is granted.

**\*2** The more difficult question is whether the complaint adequately alleges that these defendants aided and abetted the RICO violations which have been alleged against Susan and Emanuel Cohen.

In order to be liable as an aider and abetter, a defendant must aid and abet two predicate acts. *U.S. v. Rastelli,* 870 F.2d 822, 832 (2d Cir.1989). "Conclusory allegations or bare statements, however, will not withstand a motion to dismiss, particularly where the alleged purpose of the conspiracy is to defraud." *First City National Bank v. Federal Deposit Insurance Corporation,* 730 F.Supp. 501, 509 (E.D.N.Y.1990). In order to adequately plead an aiding and abetting claim, the complaint must clearly allege which predicate acts the defendant aided and abetted and how the defendant participated as an aider and abetter. *See United States v. District Council of New York City and Vicinity of the United Brotherhoods of Carpenters and Joiners of America,* 778 F.Supp. 738, 751 (S.D.N.Y.1991). The instant complaint refers to only one incident that would support a claim that C & S aided and abetted a fraud. Paragraph 273 and 274 allege:
"273.   On September 10, 1990, ROBERT SODICKSON of PEARCE, acting on behalf of PICUSA, inquired of C & S as to whether MAXIMA was creditworthy for a shipment of $150,000 worth of skins."
"274.  C & S, upon information and belief through CLAPMAN, advised SODICKSON that MAXIMA was very creditworthy, stating 'Maxima is a good account whom we have worked with for many years.' "

The complaint alleges that, based on C & S' knowledge of the precarious financial statement of Maxima, C & S knew this statement to be false and made this statement to induce Picusa to make unsecured deliveries to Maxima. While this single act might be sufficient to make C & S a participant in a conspiracy to defraud, more is needed to establish RICO liability.

In order to establish a RICO violation, the commission of two predicate acts alone are not sufficient. The predicate acts must form "a pattern of racketeering activity", i.e., "the predicate acts must be related and constitute a threat of continued racketeering activity." *Comtech Associates v. Computer Associates Int'l.,* 753 F.Supp. 1078, 1090 (E.D.N.Y.1990).

One inference from the allegations set forth above is that C & S deliberately deceived the representative of Picusa and, at least in that one instance, participated in a fraud perpetrated by the Cohens and Maxima, but that allegation is not sufficient to sustain a finding that C & S knowingly aided and abetted a series of predicate acts constituting a pattern of racketeering activity. Nor do the other allegations of the complaint support that contention. In the circumstances here, C & S' business judgment not to take certain action that it might have been entitled to take to protect its interest in Maxima's assets or to collect the debt outstanding cannot be transformed into aiding and abetting of the Cohens' and Maxima's criminal enterprises. *See Reves v. Ernst & Young, supra,* 507 U.S. 170, 113 S.Ct. at 1174. Plaintiffs' general allegation that these defendants consented to the use of their names in lulling letters is simply insufficient under Rule 9(b) to allege that they knowingly aided and abetted predicate acts of mail fraud.

**\*3** Finally, the allegations that these defendants engaged in obstruction of justice in connection with this litigation in 1992 cannot in any way demonstrate that these defendants aided and abetted the RICO violations committed by the Cohens and their corporation in 1990 and 1991 which injured these plaintiffs. *U.S. v. Shulman,* 624 F.2d 384, 387 (2d Cir.1980) ("A person cannot be found guilty of aiding and abetting a crime that already has been committed.").

For the foregoing reasons, the complaint against C & S and Nationsbanc is dismissed.

SO ORDERED.

S.D.N.Y.,1993.
Strong & Fisher Ltd. v. Maxima Leather, Inc.
Not Reported in F.Supp., 1993 WL 277205 (S.D.N.Y.), RICO Bus.Disp.Guide 8364

Briefs and Other Related Documents (Back to top)

• 1:91cv01779 (Docket) (Mar. 14, 1991)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.