UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
WORLD WRESTLING ENTERTAINMENT, INC.
                        :

              Plaintiff,                    04 CV 8223 (KMK)

                        :       (ECF CASE)

      v.                         :

JAKKS PACIFIC, INC.; JAKKS PACIFIC (H.K.)
LIMITED; ROAD CHAMPS LIMITED; THQ,    :
INC.; THQ/JAKKS PACIFIC LLC; STANLEY
SHENKER AND ASSOCIATES, INC.; STANLEY :
SHENKER; BELL LICENSING, LLC; JAMES
BELL; JACK FRIEDMAN; STEPHEN BERMAN;  :
JOEL BENNETT; and BRIAN FARRELL,

                        :

              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OF LAW IN SUPPORT OF THE JAKKS DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

FEDER, KASZOVITZ, ISAACSON, WEBER,
  SKALA, BASS & RHINE LLP
Murray L. Skala (MS 9354)
Jonathan D. Honig (JH 7577)
750 Lexington Avenue
New York, New York 10022
Phone:  (212) 888-8200
Fax: (212) 888-5968

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Jonathan J. Lerner (JL 7117)
Michael H. Gruenglas (MG 8705)
Maura B. Grinalds (MG  2836)
Shannon Frankel (SF 8693)
Four Times Square
New York, New York  10036
Phone:  (212) 735-3000
Fax:  (212) 735-2000

*Attorneys for the JAKKS Defendants*

June 2, 2006

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................... iii

PRELIMINARY STATEMENT ..................................................... 1

STATEMENT OF PERTINENT FACTUAL BACKGROUND ........................... 3

    A.    WWE's Licensing Arrangements ........................................ 3

    B.    The Alleged RICO Scheme .......................................... 3

ARGUMENT .................................................................... 6

I.    THE COMPLAINT FAILS TO ALLEGE THE REQUISITE CONTINUOUS PATTERN OF RACKETEERING ACTIVITY ........................................... 6

    A.    The Amended Complaint Fails Adequately to Allege Continuity ............. 7

        1.    WWE's Attempt to Artificially Stretch the "Front-End" of the RICO Scheme Through Unrelated Acts Fails as a Matter of Law ....... 8

        2.    Even if the $2,500 Perfumed Doll Deal and Subsequent Alleged Acts Were Included, Closed-Ended Continuity Still Would Not Exist ...................................................... 12

        3.    WWE's "Back-End" Attempt to Artificially Stretch the RICO Scheme by Alleging a "Cover-up" Also Fails as a Matter of Law ...... 13

        4.    WWE Fails To Allege Open-Ended Continuity ................... 15

    B.    The Alleged Bribery Scheme Does Not Constitute a Pattern of Racketeering Activity ........................................... 17

II.    WWE'S ALLEGED RICO INJURY IS TOO SPECULATIVE TO STATE A CLAIM ................................................................... 19

III.    WWE'S RICO CLAIMS ARE TIME BARRED .................................. 21

    A.    The Applicable Four-Year Statute of Limitations ....................... 21

    B.    WWE's RICO Claim Accrued Once It Had Inquiry Notice of its RICO Injury ...................................................... 23

i

C.    WWE Was Repeatedly Placed on Inquiry Notice of Its Injury by 1998 . . . . . . . 25

    1.    The Seven Licenses that Constitute WWE's Alleged RICO
       "Injury" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    2.    The Increasing Storm Warnings Alerting WWE to its RICO Injury . . . . 27

       (a)    The Conflicting and Financially Detrimental Playmates
           Deals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

       (b)    Direct Complaints to WWE by A Competing Bidder,
           Acclaim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

       (c)    The Sudden Emergence of the Superior JAKKS/THQ
           Joint Bid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

D.    The Cumulative Effect of the Multiple Storm Warnings Indisputably
    Constitutes Knowledge or Inquiry Notice on WWE's Part . . . . . . . . . . . . . . . . . 30

E.    WWE's Failure to Exercise Due Diligence Precludes Tolling Here . . . . . . . . . 32

IV.    WWE'S CLAIMS ARE BARRED BY THE 2004 RELEASE . . . . . . . . . . . . . . . . . . . . . 33

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

# TABLE OF AUTHORITIES

<u>CASES</u>                                                                <u>PAGE(S)</u>

<u>Agency Holding Corp. v. Malley-Duff & Associates, Inc.</u>, 483 U.S. 143 (1987) . . . . . . . . . 17, 21

<u>Allen v. Berenson Pari-Mutuel of N.Y.</u>, No. 95 Civ. 10289, 1998 WL 80168 (S.D.N.Y. Feb. 25, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

<u>Andrea Doreen Ltd. v. Bldg. Material Local Union 282</u>, 299 F. Supp. 2d 129 (E.D.N.Y. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

<u>Apollon Waterproofing & Restoration, Inc. v. Bergassi</u>, No. 01 Civ. 8388, 2003 WL 1397394 (S.D.N.Y. Mar. 20, 2003), <u>aff'd</u>, 87 F. App'x 757 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

<u>Armstrong v. McAlpin</u>, 699 F.2d 79 (2d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 27

<u>Atlantic Gypsum Co. v. Lloyds International Corp.</u>, 753 F. Supp. 505 (S.D.N.Y.1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

<u>Bernstein v. Misk</u>, 948 F. Supp. 228 (E.D.N.Y. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

<u>Bingham v. Zolt</u>, 683 F. Supp. 965 (S.D.N.Y. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

<u>Blue Cross & Blue Shield of New Jersey, Inc.</u>, 113 F. Supp. 2d 345 (E.D.N.Y. 2000). . . . . . . . 31

<u>Brodeur v. City of New York</u>, No. 04-CV-1859, 2005 WL 1139908 (E.D.N.Y. May 13, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

<u>Butala v. Agashiwala</u>, 916 F. Supp. 314 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 32

<u>Cheung v. New York Palace Hotel</u>, No. 03-CV-0091, 2005 WL 2387573 (E.D.N.Y. Sept. 28, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

<u>Clapp v. Greene</u>, 743 F. Supp. 273 (S.D.N.Y. 1990), <u>aff'd mem.</u>, 930 F.2d 912 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

<u>Cofacredit, S.A. v. Windsor Plumbing Supply Co.</u>, 187 F.3d 229 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6, 8, 14, 15, 19

Cougar Audio, Inc. v. Reich, No. 99 Civ. 4498, 2000 WL 420546 (S.D.N.Y. Apr. 18, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Crivera v. City of New York, No. 03 CV 447, 2004 WL 339650 (E.D.N.Y. Feb. 23, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

DLT Res., Inc. v. Credit Lyonnais Rouse, Ltd., No. 00 Civ. 3560, 2001 WL 25695 (S.D.N.Y. Jan. 10, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

De La Fuente v. DCI Telecomms., Inc., 206 F.R.D. 369 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . 31

Dodds v. Cigna Securities Inc., 12 F.3d 346 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Econ. Opportunity Comm'n of Nassau County, Inc. v. County of Nassau, Inc., 47 F. Supp. 2d 353 (E.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Evans v. City of Chicago, 434 F.3d 916 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

FD Prop. Holding, Inc. v. US Traffic Corp., 206 F. Supp. 2d 362 (E.D.N.Y. 2002) . . . . . . . . . 15

Feinstein v. Resolution Trust Corp., 942 F.2d 34 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . 11

First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 12, 13, 14, 15

First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763 (2d Cir. 1994) . . . . . . . . . . . . . . . . 10

First Nationwide Bank v. Gelt Funding, Corp., 820 F. Supp. 89 (S.D.N.Y. 1993), aff'd, 27 F.3d 763 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

In re Flag Telecom Holdings, Ltd. Sec. Litig., 352 F. Supp. 2d 429 (S.D.N.Y. 2005) . . . . . . . . 10

GICC Capital Corp. v. Tech. Finance Group, Inc., 67 F.3d 463 (2d Cir. 1995) . . . . . . . 8, 15, 16

H.J. Inc. v. Nw. Bell Telegraph Co., 492 U.S. 229 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Hecht v. Commerce Clearing House, Inc., 897 F.2d 21 (2d Cir. 1990) . . . . . . . . . . . . . . . . . 2, 19

Industrial Risk Insurers v. Port Auth. of New York, 387 F. Supp. 2d 299 (S.D.N.Y. 2005) . . . . 34

Isaak v. Trumbull Savings & Loan Co., 169 F.3d 390 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . 24

Int'l Bhd. of Teamsters v. Carey, 297 F. Supp. 2d 706 (S.D.N.Y. 2004) . . . . . . . . . . . . . . 14, 15

Isaak v. Trumbull Savings & Loan Co., 169 F.3d 390 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . 24

Jerome M. Sobel & Co. v. Fleck, No. 03 Civ. 1041, 2003 WL 22839799
    (S.D.N.Y. Dec. 1, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Kalnit v. Eichler, 264 F.3d 131 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Kinley Corp. v. Integrated Res. Equity Corp., 851 F. Supp. 556 (S.D.N.Y. 1994) . . . . . . . . . . 31

Klehr v. A.O. Smith Corp., 521 U.S. 179 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

LC Capital Partners, LP v. Frontier Insurance Group, Inc., 318 F.3d 148 (2d Cir.
    2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 31

Lefkowitz v. Bank of N.Y., No. 01 Civ. 6252, 2003 WL 22480049 (S.D.N.Y. Oct. 31,
    2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Linens of Europe, Inc. v. Best Manufacturing, Inc., No. 03 Civ. 9612, 2004 WL
    2071689 (S.D.N.Y. Sept. 16, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc., 354 F. Supp 2d 293
    (S.D.N.Y. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17,18, 19

Marcoux v. America Airlines, Inc., No. 04 CV 1376, 2006 WL 842888 (E.D.N.Y.
    Mar. 28, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

Mason v. America Tobacco Co., 346 F.3d 36 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Mathews v. Kidder, Peabody & Co., 260 F.3d 239 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . 25, 32

Medinol Ltd. v. Boston Scientific Corp., 346 F. Supp. 2d 575 (S.D.N.Y. 2004). . . . . . . . . . . . 13

In re Merrill Lynch Ltd. P'ships Litig., 7 F. Supp. 2d 256 (S.D.N.Y. 1997) . . . . 23, 24, 25, 32, 33

Mezzacappa Brothers, Inc. v. City of New York, No. 03 Civ. 0223, 2003 WL
    22801429 (S.D.N.Y. Nov. 24, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Moll v. U.S. Life Title Insurance Co. of N.Y., 700 F. Supp. 1284 (S.D.N.Y. 1988) . . . . . . . . . 33

Mussett v. Baker Material Handling Corp., 844 F.2d 760 (10th Cir. 1988) . . . . . . . . . . . . . . . 34

Nat'l Group for Commc'ns & Computers Ltd. v. Lucent Techs., Inc.
    420 F. Supp. 2d 253, 264 (S.D.N.Y. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 33

Plater-Zyberk v. Abraham, No. Civ. A. 97-3322, 1998 WL 67545 (E.D. Pa. Feb.
    17, 1998), aff'd mem., 203 F. 3d 817 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Polycast Tech. Corp. v. Uniroyal, Inc., 728 F. Supp. 926 (S.D.N.Y. 1989) . . . . . . . . . . . . . . . 19

Ray Larsen Associates, Inc. v. Nikko America, Inc., No. 89 Civ. 2809, 1996 WL
    442799 (S.D.N.Y. Aug. 6, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 14, 19

Richard v. Hoechst Celanese Chemical Group, Inc., 355 F.3d 345 (5th Cir. 2003) . . . . . . . . . 21

Roeder v. Alpha Industries, Inc., 814 F.2d 22 (1st Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . 17, 18

Rotella v. Wood, 528 U.S. 549 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 21, 22, 23, 24

Ruby Development Corp. v. Charrim Development Corp., 742 F. Supp. 1213
    (E.D.N.Y. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Santana Prods., Inc. v. Bobrick Washroom Equip., Inc., 69 F. Supp. 2d 678
    (M.D. Pa. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91
    (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10, 12, 13, 17, 18

Shamis v. Ambassador Factors Corp., No. 95 Civ. 9818, 1997 WL 473577
    (S.D.N.Y. Aug. 18, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Stein v. N.Y. Stair Cushion Co., No. 04-CV-4741, 2006 WL 319300 (E.D.N.Y.
    Feb. 10, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Straight Arrow Products v. Conversion Concepts, Inc., No. 01-221, 2001 WL
    1530637 (E.D. Pa. Dec. 3, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Strates Shows, Inc. v. Amusements of America, Inc., 379 F. Supp. 2d 817
    (E.D.N.C. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

In re Taxable Municipal Bond Security Litigation, 51 F.3d 518 (5th Cir. 1995) . . . . . . . . . . . 20

Tellis v. U.S. Fid. & Guaranty Co., 826 F.2d 477 (7th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . 17

Tho Dinh Tran v. Alphonse Hotel Corp., 281 F.3d 23 (2d Cir. 2002) . . . . . . . . . . . . . . . . 22, 33

Town of Poughkeepsie v. Espie, 402 F. Supp. 2d 443 (S.D.N.Y. 2005). . . . . . . . . . . . . . . . . .32

In re Tri-Star Techs. Co., 257 B.R. 629 (Bankr. D. Mass. 2001) . . . . . . . . . . . . . . . . . . . . . . . . 19

Tsipouras v. W&M Props., Inc., 9 F. Supp. 2d 365 (S.D.N.Y. 1998) . . . . . . . . . . . . . . . . . . . . . 20

In re Ultrafem Inc. Sec. Litig., 91 F. Supp. 2d 678, 692 (S.D.N.Y. 2000). . . . . . . . . . . . . . . . . 23

United States v. Carson, 52 F.3d 1173 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

United States v. Philip Morris USA, Inc., 396 F.3d 1190 (D.C. Cir.), cert. denied,
      126 S. Ct. 478 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Vemco, Inc. v. Camardella, 23 F.3d 129 (6th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

Watral v. Silvernails Farms, LLC, 177 F. Supp. 2d 141, 150 (E.D.N.Y. 2001). . . . . . . . . . . . . 14

Williams v. Stone, 109 F.3d 890 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Wood v. Carpenter, 101 U.S. 135 (1879) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 32

World Wrestling Entm't Inc. v. Jakks Pacific, Inc., No. 04-CV-82223, 2006 WL
      851152 (S.D.N.Y. Mar. 31, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 9, 28, 29

Wynne v. Equilease Corp., No. 94 CIV. 4992, 1995 WL 764236 (S.D.N.Y. Dec.
      27, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Zhu v. First Atlantic Bank, No. 05 Civ. 96, 2005 WL 2757536 (S.D.N.Y. Oct. 25,
      2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Zola v. Gordon, 685 F. Supp. 354 (S.D.N.Y. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

<u>STATUTES</u>                                                                                      <u>PAGE(S)</u>

Fed. R. Civ. P. 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

S. Rep. No. 91-617, at 158 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

18 U.S.C. § 1961(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

18 U.S.C. § 1962(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

18 U.S.C. § 1964(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

18 U.S.C. § 1964(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 19

Defendants JAKKS Pacific, Inc., JAKKS Pacific (H.K.) Limited, Road Champs Limited, Jack Friedman, Stephen Berman and Joel Bennett (collectively, the "JAKKS Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the amended complaint (the "Amended Complaint" or "AC") of World Wrestling Entertainment, Inc. ("WWE"), pursuant to Federal Rules of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

WWE filed this action on October 19, 2004 (the "Complaint" or "Compl."). In accordance with the Court's 1/25/05 scheduling order, entered after a conference at which WWE stood firmly on its Complaint, on February 28, 2005, the JAKKS Defendants moved to dismiss the Complaint. Instead of filing its opposition brief on March 31, 2005, as mandated by the Court, WWE unilaterally filed the Amended Complaint on March 30, 2005, without prior warning or leave of the Court.

On August 18, 2005, after extensive briefing and two hearings to redress WWE's actions, the Court established a bifurcated briefing schedule pursuant to which WWE would be required initially to respond to (a) the dispositive issues raised by JAKKS' dismissal motion addressed to the RICO "enterprise" and Robinson-Patman claim,[1] and (b) a new dismissal motion directed to the Sherman Act claim added in the Amended Complaint. On March 31, 2006, the Court granted Defendants' motion to dismiss the Robinson-Patman Act and Sherman Act claims, while declining to dismiss WWE's RICO claims for failure to allege a RICO enterprise (the "March 31 Decision"). Following the March 31 Decision, federal subject matter jurisdiction now depends entirely on WWE's federal

---

[1] These threshold issues were those determined to have remained unaffected by WWE's Amended Complaint. (8/18/05 Tr. at 8-10; 1/11/06 Tr. at 156.) WWE has attempted to revise this procedural history by asserting that the threshold issues were selected by Defendants as their strongest arguments. (1/11/06 Tr. at 155.) WWE's position is inaccurate. (1/11/06 Tr. at 156; 4/26/06 Tr. at 11-12.)

RICO claims, which are fatally defective. Indeed, WWE urged the Court to jettison its state court claims if it dismisses WWE's RICO claims. (4/26/06 Tr. at 11.)

Despite the fifty pages of re-engineered allegations added to its Amended Complaint, WWE's RICO claims continue to suffer from a host of fatal flaws. WWE's RICO claims against the JAKKS Defendants still boil down to a single alleged bribery scheme to obtain a series of licensing rights between 1996 and 1998 (the "Licenses") from a single victim (WWE) at allegedly below-market rates. WWE's RICO claims must be dismissed for the following separate and independent reasons:

- Under settled legal authority, the Amended Complaint fails to allege the requisite "continuity" necessary to constitute a pattern of racketeering activity. See Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 242 (2d Cir. 1999). See Point I.A., infra.

- WWE's artificial attempt to "slice and dice" a single alleged bribery scheme into several individual predicate acts violates "the Second Circuit's oft-stated admonition that courts should guard against the meritless fragmentation of a single predicate act into multiple acts for the mere purpose of pursuing a RICO claim." Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc., 354 F. Supp 2d 293, 304 (S.D.N.Y. 2004). See Point I.B. infra.

- WWE's speculative claim that it lost the opportunity to pursue other offers fails to allege the concrete injury to its "business or property by reason of a violation of" the RICO statute required to state a claim under RICO. 18 U.S.C. § 1964(c). See Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 24 (2d Cir. 1990). See Point II, infra.

- Because WWE's own allegations establish that WWE knew, or should have known, of its alleged RICO injury by 1998, at the latest, its RICO claims are time barred under RICO's four-year statute of limitations. Rotella v. Wood, 528 U.S. 549 (2000). See Point III, infra.

Wholly apart from the myriad defects in WWE's RICO claims, its claims are all also barred by the "Settlement Agreement and General Release of All Claims" that WWE provided to JAKKS in 2004 for valuable consideration after an audit that, WWE itself admits, targeted the very payments on which the Amended Complaint is predicated. See Point IV, infra.

2

## STATEMENT OF PERTINENT FACTUAL BACKGROUND[2]

### A.    WWE's Licensing Arrangements

James Bell ("Bell") was the WWE official responsible for procuring and negotiating license agreements for WWE. (AC ¶¶ 29, 30.) In or around April 1995, on Bell's recommendation, WWE hired Stanley Shenker & Associates ("SSAI") owned by Stanley Shenker ("Shenker") as a non-exclusive outside licensing agent to assist in procuring and negotiating licensing contracts. (Id. ¶¶ 31, 32.) Not until March 7, 1997, did WWE and SSAI enter into an "Agency Agreement," pursuant to which SSAI became WWE's "exclusive outside licensing agent," which precluded WWE from using other outside agents, but only barred SSAI from representing WWE's competitors. (Id. ¶ 72; see Ex. A to the June 2, 2006 Declaration of Jonathan J. Lerner, exhibits to which are cited as "Ex.") At no time was SSAI or Bell empowered to enter into agreements on behalf of WWE. (AC ¶ 75; Ex. A ¶¶ 4(a), 9(a).) SSAI was required to present licensing proposals to Bell, who made recommendations to WWE management, which, alone, made the final decision on all licensing agreements. (Id. ) Under the terms of the Agency Agreement, SSAI received an eleven percent (11%) commission on licenses it procured. (AC ¶ 77.)

### B.    The Alleged RICO Scheme

In the original Complaint, WWE alleged that Defendants engaged in a commercial bribery scheme involving "bribes and/or payments . . . of at least $100,000 to secure the WWE videogame license ["Videogame License"] for the [LLC] and the 1998 amendments to the toy license ["Toy

---

[2]  Additional factual background is recited in World Wrestling Entm't Inc. v. Jakks Pac., Inc., No. 04-CV-82223, 2006 WL 851152, at *1-6 (S.D.N.Y. Mar. 31, 2006) (hereinafter, the "March 31 Decision"). Although WWE's factual allegations are accepted as true on this Motion,"'[l]egal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness.'" Mason v. Am. Tobacco Co., 346 F.3d 36, 39 (2d Cir. 2003) (citation omitted).

License"]." (Compl. ¶¶ 175, 181, 188.) Thus, the alleged RICO scheme centered on a simple alleged <u>quid pro quo</u> – a $100,000 bribe to secure the Videogame License and concomitant amendments to the Toy License. Belatedly recognizing that its original short-lived RICO scheme lacked the requisite "continuity," WWE has recast the same set of "facts" in its Amended Complaint to manufacture an artificially extended RICO scheme commencing in November 1995, now described as a scheme to deprive WWE of Shenker's and Bell's honest services. (AC ¶¶ 1, 249(a).)

On or about October 24, 1995, following discussions with Bell and Shenker, JAKKS entered into the domestic Toy License with WWE, which is not challenged. (<u>Id.</u> ¶ 35.) After obtaining this first License, JAKKS allegedly set out to "corrupt" Shenker to secure additional unspecified licensing rights from WWE. (<u>Id.</u> ¶ 37.) Thus, after proposing to do so on November 29, 1995 (AC ¶ 249a(ii)), on January 3, 1996, JAKKS retained SSAI for $2,500 to develop a perfumed doll. (<u>Id.</u> ¶¶ 42, 44, 45, 48.) WWE alleges that on or about April 22, 1996, Shenker first "delivered" under this alleged scheme with JAKKS, when WWE agreed to grant JAKKS additional rights under the First Amendment to the Domestic Toy License. (<u>Id.</u> ¶ 56.) Even though Shenker supposedly had been already "corrupted" by JAKKS, in or around June 1996, WWE licensed action figures to a key competitor of JAKKS', Playmates Toys, Inc. ("Playmates").[3] (<u>Id.</u> ¶¶ 58, 59.) Beginning on October 19, 1996, JAKKS expressed interest in obtaining domestic license rights to produce action figures in "practical conflict" with the rights held by Playmates. (<u>Id.</u> ¶¶ 63-66.) On January 21, 1997,

---

[3] Playmates' license with WWE allowed it to produce WWE action figures in sizes 8" and larger and 2" and smaller, in practical conflict with the rights given JAKKS under the Toy License. (<u>Id.</u> ¶ 59.) Despite the alleged corruption of Shenker – but not Bell – at that time, Playmates was able to obtain better contract terms than JAKKS (<u>id.</u> ¶ 61), including a "right of first negotiation/last refusal" to manufacture licensed products internationally, while JAKKS' First Amendment to the Domestic Toy Licenses lacked this right. (<u>Id.</u>)

JAKKS obtained these rights, pursuant to a Second Amendment to the Domestic Toy License. (Id. ¶ 67.)  On January 30, 1997, Playmates complained to WWE about these conflicting rights and questioned WWE's good faith in granting them. (Id. ¶ 70.)  On or about February 10, 1997, undaunted by Playmates' protests, WWE granted JAKKS an International Toy License. (Id. ¶¶ 69-71.) On November 6, 1997, allegedly to help JAKKS acquire Playmates' licensing rights, Bell, then corrupted by Shenker,  advised Playmates that WWE would forgive Playmates' guarantee of $376,391 owed to WWE so that its toy rights could be transferred to JAKKS. (Id. ¶¶ 79-83.)  On January 12, 1998, WWE's CEO, Linda McMahon, executed the Third Amendment to the domestic Toy License conveying the Playmates' toy rights to JAKKS. (Id. ¶ 93.)

In its original Complaint, WWE unequivocally asserted that the $100,000 in payments by JAKKS' affiliate to SSAI's affiliate, Stanfull, pursuant to two invoices issued in the first seven months of 1998, were "bribes" to obtain the Videogame License and Toy License extension (Comp. ¶¶ 36, 44 et seq., 90) – a closed-ended RICO scheme lasting at most only seven months, and plainly lacking the requisite "continuity."  In a contrived effort to roll back the RICO "continuity clock," WWE now retroactively recycles these same payments as bribes to enable JAKKS to acquire rights formerly held by Playmates (AC ¶¶ 8, 57, 62), a claim found nowhere in the original Complaint.

In addition to attributing these payments to the Playmates transaction in around late 1997, WWE also now apportions $40,000 of the $100,000 "bribe" to the procurement of the Videogame License by the LLC in 1998. (Id. ¶¶ 106 et seq., 157.)  On March 25, 1998, Bell allegedly told WWE's existing Videogame licensee, Acclaim, that it would not be allowed to bid on the Videogame License, prompting Acclaim to go "over Bell's head" directly to WWE senior management, who overruled Bell and told Acclaim it could bid. (Id. ¶ 109.)  On March 30, 1998, Bell recommended

to WWE that the Videogame License be awarded to JAKKS. (Id. ¶ 110.) On April 8, 1998, without

awaiting Acclaim's formal proposal, WWE approved Bell's recommendation. (Id. ¶¶ 114-15.)

Shortly thereafter, THQ and Activision approached Bell and Shenker allegedly with superior

proposals for the Videogame License. (Id. ¶ 133.) Consequently, JAKKS allegedly decided to

partner with THQ and create a new joint venture – the LLC – to make an improved proposal for the

Videogame License, which Bell submitted to WWE on May 12, 1998. (Id. ¶¶ 133, 146, 152.) On

June 23, WWE executed the Videogame License with the LLC, effective as of June 10, 1998. (Id.

¶ 157.) A day later, WWE and JAKKS amended the Domestic and International Toy Licenses to

make them coterminous with the Videogame License. (Id. ¶ 165.)

ARGUMENT

## I.     THE COMPLAINT FAILS TO ALLEGE THE REQUISITE CONTINUOUS PATTERN OF RACKETEERING ACTIVITY

Despite the creative reengineering of its old allegations, WWE's RICO claims against the

JAKKS Defendants still fail to allege the required "'pattern of racketeering activity,'" which consists

of "'at least two [predicate] acts of racketeering activity'" committed in a ten-year period, 18 U.S.C.

§ 1961(5), which "'amount to or pose a threat of continued criminal activity.'" Cofacredit, 187 F.3d

at 242 (quoting H.J. Inc. v. N.W. Bell Tel. Co., 492 U.S. 229, 239 (1989)). While the original

Complaint alleged a single seven month bribery scheme to gain favorable Licenses from WWE, from

January 2, 1998 through July 15, 1998 (Compl. ¶¶ 46, 44 et seq., 90) – a facially inadequate duration

to satisfy the minimum two-year requirement for closed-ended continuity, see Point I.A., infra – the

Amended Complaint still alleges a single bribery scheme to obtain favorable Licenses from WWE,

which WWE broadly describes as a scheme "to deprive the WWE of its intangible right of honest

6

services" from its agents to obtain "valuable licensing rights from WWE." (AC ¶¶ 1, 249a.)

In an effort to "cure" the lack of RICO continuity, WWE has artificially stretched its alleged bribery scheme from seven months to slightly over two years by tacking on as alleged predicate acts (1) a heretofore unchallenged and wholly unrelated $2,500 perfumed doll transaction between JAKKS and Shenker starting in late 1995 and early 1996 (id. ¶¶ 42, 46-48), and (2) three subsequent licensing transactions from April 22, 1996 to February 10, 1997 (see chart at p. 25-26, infra), all of which occurred before Shenker was WWE's exclusive outside agent and before Bell was allegedly corrupted – which was the sine qua non of the scheme. (Id. ¶ 63.) WWE's strained attempt to graft these attenuated transactions onto its deficient single scheme is insufficient to satisfy either of the essential RICO requirements of "continuity" or a "pattern" of racketeering.

## A.    The Amended Complaint Fails Adequately to Allege Continuity

When pleading a pattern of racketeering, a plaintiff must allege facts that would establish "that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989) (emphasis added). Under H.J. Inc., "[c]ontinuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." 492 U.S. at 241. To satisfy closed-ended continuity, a plaintiff must allege a series of related predicate acts extending over "a substantial period of time." Id. at 242. Open-ended continuity requires a plaintiff to plead past criminal conduct coupled with a threat of future criminal conduct. Id. at 241-42. WWE alleges neither closed-ended nor open-ended continuity.

Since the Supreme Court's decision in H.J. Inc., "'[the Second Circuit] has never found a closed-ended pattern where the predicate acts spanned fewer than two years." First Capital Asset

Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 181 (2d Cir. 2004); Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 244 (2d Cir. 1999) ("[T]he predicate acts that the . . . Defendants committed spanned less than one year – a period of insufficient length to demonstrate closed-ended continuity under our precedents."); GICC Capital Corp. v. Tech. Fin. Group, Inc., 67 F.3d 463, 467-68 (2d Cir. 1995) (citing schemes under two years lacking closed-ended continuity).

### 1. WWE's Attempt to Artificially Stretch the "Front-End" of the RICO Scheme Through Unrelated Acts Fails as a Matter of Law

Here, despite WWE's disingenuous attempt to connect the dots back to the $2,500 payment in 1995, any scheme to corrupt WWE's agents to "obtain thereby" the Licenses on favorable terms (AC ¶ 1) necessarily required the corruption and complicity of Bell, which WWE repeatedly admits did not occur before November 1997 (AC ¶ 83) – rendering the scheme still less than one year. Bell's guilty plea itself stated that the scheme began "in or before January 1998" (id. ¶¶ 24, 25) – not 1995, and WWE admits that Bell's first payment from the scheme was not until January 1998 (id. ¶ 26). WWE also concedes, as it must, that until March 1997 Shenker was merely one of WWE's non-exclusive outside licensing agents. (Id. ¶¶ 32, 37.) As such, he competed with an unlimited number of potential competing proposers of WWE's licenses – as well as Bell, who also procured licenses, supervised Shenker and was responsible to search out and obtain for WWE "the highest royalty rates in a competitive market." (Id. ¶ 30.) Shenker was unable to bind WWE. His proposals went to Bell, who decided whether to submit them to WWE for approval. (Id. ¶¶ 32, 36.)

WWE's own admission that "the competitive environment among toy companies seeking intellectual property licenses was intense" (AC ¶ 58) demolishes WWE's preposterous attempt to stretch the scheme back to 1995 – years before Bell's alleged corruption. Given the admitted

8

"intense competition," any "below-market bid" submitted by Shenker simply would have had no chance of success without Bell, who was expressly responsible for overseeing the license negotiations "to obtain for WWE, inter alia, the highest royalty rates available in a competitive market" (id. ¶ 30) (a duty conspicuously absent from Shenker's alleged responsibilities, see id. ¶ 32). Indeed, in this "environment," without Bell, any "low ball" bid submitted by Shenker for Jakks would not be accepted and could only harm both Jakks and Shenker because WWE alleges that a host of competitive bids were readily available for Bell to forward. By WWE's own admission, the alleged scheme to deprive WWE of the honest services of Shenker to obtain valuable licensing rights (id. ¶ 1) could not possibly exist without Bell's complicity, which WWE alleges did not occur before November 1997. See March 31 Decision at *30 ("coopting Bell" was essential to prevent competitors from appealing directly to WWE). At most, the alleged scheme, culminating in a series of alleged bribe payments to Stanfull between January 12, 1998 and August 3, 1998, lasted nine months – far short of the minimum two years. (Id. ¶¶ 94, 168.) On this basis alone, WWE cannot satisfy the requirement of closed-ended continuity.

WWE's belated attempt to satisfy the minimum two year closed-ended continuity requirement by improperly tacking on acts dating back to 1995 involving a legitimate $2,500 "perfumed doll" transaction (AC ¶¶ 42, 46-48), which it did not challenge in its original Complaint (see Compl. ¶ 141), and which did not even involve WWE, is wholly unavailing.[4] Given its own admissions in

---

[4] Likewise, the JAKKS Defendants' generic communications with Shenker in February 1996 (AC ¶ 49), or an expression of general interest in obtaining WWE licenses (id. ¶ 47), without more, and prior to the complicity of Bell, cannot possibly be depicted as part of a RICO scheme. After all, WWE itself admits that it had retained Shenker to solicit just such inquiries from his contacts in the licensing business. (Id. ¶ 32.) For the same reason, WWE's attempt to challenge a November 1995 discussion between JAKKS and Shenker before Shenker even became WWE's exclusive agent is

(continued...)

the Amended Complaint, WWE's conclusory assertion that the $2,500 perfume transaction – without a scintilla of supporting factual allegation that it lacked substance – was intended to corrupt Shenker fails as a matter of law. Indeed, WWE's conclusory allegations – which are all WWE offers to link the perfumed doll deal to any conceivable improper conduct – cannot stave off dismissal. "'Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.'" In re Flag Telecom Holdings, Ltd. Sec. Litig., 352 F. Supp. 2d 429, 443 (S.D.N.Y. 2005) (quotation omitted); see also First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 771 (2d Cir. 1994). This applies with special force where, as here, "'plaintiffs's view of the facts defies economic reason, . . . [it] does not yield a reasonable inference of fraudulent intent.'" Kalnit v. Eichler, 264 F.3d 131, 140-41 (2d Cir. 2001) (alterations in original) (quotation omitted); accord, e.g., Atlantic Gypsum Co. v. Lloyds International Corp., 753 F.Supp. 505, 514 (S.D.N.Y.1990) (dismissing RICO case where "[p]laintiffs' theory of an alleged scheme to defraud defies logic" and "plaintiffs' view of the facts defie[d] economic reason").

As a matter of law, "'acts . . . [that] are unrelated to the predicate acts which allegedly injured plaintiff . . . cannot be considered as part of the activity to extend the scope of the pattern.'" Shamis v. Ambassador Factors Corp., No. 95 Civ. 9818, 1997 WL 473577, at *15 (S.D.N.Y. Aug. 18, 1997) (citation omitted) (fraudulent schemes against other victims could not be used to "bolster" continuity). To comprise a RICO pattern, the predicate acts must be "related;" i.e., they must "'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" Schlaifer Nance & Co.

---

[4] (...continued)
unavailing. (Id. ¶¶ 40, 49, 72.)

v. Estate of Warhol, 119 F.3d 91, 97 (2d Cir. 1997); Ray Larsen Assocs., Inc. v. Nikko Am., Inc.,

No. 89 Civ. 2809, 1996 WL 442799, at *6-7 (S.D.N.Y. Aug. 6, 1996) (tax evasion was not related

to RICO scheme to defraud plaintiff: "[a]lthough these two types of conduct may be interrelated

in the sense that both have the effect of generally increasing defendants' funds, the relationship

between the two types of conduct is simply too remote to support a claim under RICO").

Here, the alleged "predicate acts" dating back to November 1995 and early 1996 bear no

relation to the alleged bribery scheme involving the Licenses because they involve different

participants and purposes. There is no allegation, nor could there be, that as a non-exclusive agent

until March 1997, hired to present opportunities to WWE, Shenker was prohibited from providing

services to other clients. Even after 1997, the Agency Agreement itself forecloses any such claim.

(See Ex. A.) On its face, the perfumed doll deal, which is the sole basis WWE proffers for rolling

back the RICO clock to 1995 and "tainting" the Licenses up through 1997, is unrelated to the RICO

scheme at the heart of the Amended Complaint because it involves:

- Remote transactions: **The 1995 transaction occurred two years before the alleged corruption of Bell which is the linchpin of the scheme.** See Feinstein v. Resolution Trust Corp., 942 F.2d 34, 44-45 (1st Cir. 1991) (affirming dismissal of RICO claim and holding that predicate acts are not related, even if the victims are the same, because "plaintiffs' RICO claim founders on the bald assertion that . . . two episodes, nearly two years apart in time, hundreds of miles apart in space, and involving two largely distinct groups of participants, were somehow pieces of a unitary scheme.");

- Lack of Crucial Participants: **Significantly, the perfumed doll deal does not involve or corrupt Bell in any way or result in any payments to him.** See Marcoux v. Am. Airlines, Inc., No. 04 CV 1376, 2006 WL 842888, at *10-11 (E.D.N.Y. Mar. 28, 2006) (scheme involving amendments to the union Constitution, which does not allege conduct by all defendants, was unrelated to the scheme of defrauding flight attendants into ratifying a collective bargaining agreement and thus could not be considered in analyzing continuity); Andrea Doreen Ltd. v. Bldg. Material Local Union 282, 299 F. Supp. 2d 129, 156 (E.D.N.Y. 2004) (predicate act was not related to alleged RICO scheme because the participants in the predicate act were different than participants in other predicate acts); Bernstein v. Misk, 948

11

F. Supp. 228, 236-37 (E.D.N.Y. 1997) (in scheme to defraud lending institutions, predicate acts involving different participants, methods and purposes were unrelated to the predicate acts which allegedly injured plaintiffs); and

- <u>Different Goals</u>: **The 1995 perfumed doll deal, which WWE has never disputed as a legitimate transaction, does not pertain to the acquisition of a WWE License, or involve corrupting Bell.** <u>See</u> <u>Schlaifer Nance</u>, 119 F.3d at 97 (goal of a scheme to induce plaintiff to enter into a license agreement was unrelated to the fraudulent manipulation of the license agreement itself); <u>Marcoux v. Am. Airlines, Inc.</u>, No. 04 CV 1376, 2006 WL 842888, at *11 (E.D.N.Y. Mar. 28, 2006) (allegations pertaining to airline union's internal governance were unrelated to purpose of alleged RICO scheme, which was to defraud airline attendants into entering into unfavorable restructuring agreement); <u>Andrea Doreen</u>, 299 F. Supp. 2d at 154 (holding that attempted bribery could not constitute a predicate act because it lacked the goal of the other predicate acts, to retaliate against plaintiff).

Because the 1995 perfumed doll deal is so remote from the alleged scheme to obtain the favorable Licenses, and lacks a crucial participant in WWE's core RICO scheme (AC ¶ 1) , it simply cannot be welded onto that scheme to supply RICO "continuity." <u>Schlaifer</u>, 119 F.3d at 97-98.

## 2. Even if the $2,500 Perfumed Doll Deal and Subsequent Alleged Acts Were Included, Closed-Ended Continuity Still Would Not Exist

Even if the 1995 perfumed doll deal and subsequent license inquiries were not too attenuated and unrelated to be appended to WWE's RICO "pattern," which they are, RICO continuity still would be lacking: "[W]hile two years may be the *minimum* duration necessary to find closed-ended continuity, the mere fact that predicate acts span two years is insufficient, without more, to support a finding of a closed-ended pattern." <u>First Capital</u>, 385 F.3d at 181. Even if WWE could depict the 1995 transactions as part of a continuous scheme to corrupt WWE's agents, it still would not satisfy the continuity requirement: "[c]ourts have uniformly and consistently held that schemes involving a single, narrow purpose and one or few participants directed towards a single victim <u>do not satisfy the RICO requirement of a closed or open pattern of continuity</u>." <u>Lefkowitz v. Bank of N.Y.</u>, No. 01 Civ. 6252, 2003 WL 22480049, at *8 (S.D.N.Y. Oct. 31, 2003) (emphasis added).

Courts in this Circuit frequently have dismissed RICO claims spanning more than two years for lack of closed-ended continuity where, as here, the RICO scheme involves a limited purpose, a small number of participants, and a single victim.  See, e.g., First Capital, 385 F.3d at 180-82 (finding no closed-ended continuity even though predicate acts spanned two and one-half years); Schlaifer Nance, 119 F.3d at 97-98 (fraudulent acts spanning over three years did not satisfy continuity for RICO purposes because they related to single scheme to defraud); Stein v. N.Y. Stair Cushion Co., No. 04-CV-4741, 2006 WL 319300, at *8 (E.D.N.Y. Feb. 10, 2006) (finding no continuity where predicate acts spanned over four years but involved single scheme of narrow scope, one victim and limited number of participants).[5]

These precedents directly bar WWE's attempt to deploy RICO as a super conspiracy statute. Despite WWE's fanciful draftsmanship, the so-called RICO scheme involves only a single alleged goal – the bribery of WWE's agent to obtain favorable Licenses, which ended in 1998 once the desired Licenses were secured – a small number of perpetrators, and a single alleged victim, WWE. In this context, WWE's attempt to recycle its original RICO claim, involving an alleged $100,000 bribe to obtain two Licenses in a seven month period, into a longer scheme just over two years involving additional WWE Licenses fails to satisfy closed-end continuity.

> **3.    WWE's "Back-End" Attempt to Artificially Stretch the RICO Scheme by Alleging a "Cover-up" Also Fails as a Matter of Law**

WWE also improperly attempts to extend the duration of the alleged scheme on the "back-

---

[5]  See also e.g., Medinol Ltd. v. Boston Scientific Corp., 346 F. Supp. 2d 575, 615-16 (S.D.N.Y. 2004) (predicate acts spanning three years did not satisfy continuity requirement because alleged "pattern" was directed at one victim, and involved only one scheme with narrow goal and limited number of participants); Bernstein, 948 F. Supp. at 238 (no closed-ended continuity in four year scheme where complaint alleged single, non-complex scheme to obtain financing for property and default on loan, involving one set of victims and one major perpetrator).

end" by including actions by the JAKKS Defendants allegedly taken to cover up their prior alleged predicate acts after WWE became engaged in litigation with SSAI and Bell.  (AC ¶¶ 192, 196-209, 228-232, 235, 237-239, 249 (a) (1iv).)  As a legal matter, alleged efforts to "cover up" prior predicate acts cannot satisfy the RICO continuity requirement.  See, e.g., Ray Larsen, 1996 WL 442799, at *7 n.8 (rejecting as predicate acts after-the-fact alleged obstruction of justice: "[E]fforts by a defendant to cover up the underlying conduct are inadequate to satisfy the continuity requirement of the RICO statute."); Int'l Bhd. of Teamsters v. Carey, 297 F. Supp. 2d 706, 716 (S.D.N.Y. 2004) (refusing to include "coverup activity described in the Amended Complaint . . . directed at concealing past activity" in pattern of racketeering), aff'd, 124 F. App'x 41 (2d Cir. 2005).[6]

Nor can WWE satisfy the continuity requirement as to the JAKKS Defendants based on alleged actions by other defendants.  (See, e.g., AC ¶¶ 186, 193, 195, 209.)  Continuity must be assessed as to each defendant solely on the basis of that specific defendant's predicate acts.  See First Capital, 385 F.3d at 180 (in analyzing continuity, court must "evaluate the RICO allegations with respect to each defendant individually"); Cofacredit, S.A., 187 F.3d at 242 ("Closed-ended continuity is demonstrated by predicate acts that 'amount to continued criminal activity,' by a particular defendant." (emphasis added) (citation omitted)); Int'l Bhd. of Teamsters v. Carey, 163 F. Supp. 2d

---

[6]  See also e.g., Watral v. Silvernails Farms, LLC, 177 F. Supp. 2d 141, 150 (E.D.N.Y. 2001) (rejecting attempt to extend one year bribery scheme to satisfy RICO continuity by "tacking on statements made during the course of [the] litigation as constituting obstruction of justice"), aff'd, 51 Fed. App'x 62 (2d Cir. 2002); Ruby Dev. Corp. v. Charrim Dev. Corp., 742 F. Supp 1213, 1217 (E.D.N.Y. 1990) ("allegations of concealment on the part of the wrongdoer" could not satisfy continuity requirement, "[o]therwise every past act of wrongdoing which a wrongdoer attempts to conceal might be the basis for finding continuity"); Vemco, Inc. v. Camardella, 23 F.3d 129, 134 (6th Cir. 1994) (disregarding "actions taken years later by a party to avoid a court judgment on RICO predicate acts," including defiance of court order to produce documents and deeming remaining predicate acts spanning 17 months insufficient to show continuity).

271, 280-81 (S.D.N.Y. 2001) (in determining duration for continuity, "courts focus solely on the predicate acts of racketeering each defendant is alleged to have committed." (emphasis added)).

### 4. WWE Fails To Allege Open-Ended Continuity

The Amended Complaint does not even come close to satisfying "open-ended" continuity which requires the predicate acts to "'amount to or pose a threat of continued criminal activity.'" First Capital, 385 F.3d at 180 (citation omitted). Where, as here, the criminal acts have a natural ending point, the scheme is "inherently terminable," foreclosing open-ended continuity. Id. at 180-81 (no continuing threat of racketeering activity because the alleged fraud was "inherently terminable"); Cofacredit, 187 F.3d at 244 (multiple acts of mail and wire fraud against factoring company and bank over eleven months to obtain cost-free inventory was inherently terminable because, when $1.5 million credit insurance limit was reached, no more fraud could be committed); GICC, 67 F.3d at 466 (alleged scheme to loot company assets was inherently terminable because, once all assets were looted, scheme would necessarily end).[7] Here, the alleged scheme to defraud WWE to obtain the Licenses by corrupting its agents was inherently terminable: once the Licenses were obtained in 1998, the scheme was completed as well. Thus, there is no open-ended continuity as a matter of law.

WWE's conclusory allegation in the Amended Complaint – that "[s]uch unlawful conduct, which began in or around 1995, continues through this date" (AC ¶ 252) – is flatly contradicted by

---

[7] See also e.g., Int'l Bhd. of Teamsters, 297 F. Supp. 2d at 715-18 (alleged fraud and embezzlement relating to union election were inherently terminable because "[o]nce the election occurred, the schemes, and their alleged sponsoring enterprise, necessarily came to an end"); FD Prop. Holding, Inc. v. US Traffic Corp., 206 F. Supp. 2d 362, 371 (E.D.N.Y. 2002) (alleged mail, wire and bank fraud to obtain payments of $1.3 million in connection with sale of one product was inherently terminable); Econ. Opportunity Comm'n of Nassau County, Inc. v. County of Nassau, Inc., 47 F. Supp. 2d 353, 366-67 (E.D.N.Y. 1999) (scheme to obtain control over bus terminal and real estate properties lacked continuity as the acquisition of control "'even if by fraudulent means, provided a natural end to [their] project'" (citation omitted)).

WWE's own pleading.  WWE admits that the "enterprise" alleged here – including the JAKKS Defendants, Bell and Shenker – could not possibly pose any threat of repetition because WWE terminated both Bell and Shenker in 2000, over six years ago (id. ¶¶ 187, 189), thereby preventing the alleged "enterprise" from committing any further alleged misconduct.  Indeed, the JAKKS Defendants are not alleged to have committed any unlawful acts in furtherance of the alleged scheme since the Licenses were procured in 1998.  Nor would they have any conceivable reason to commit unlawful acts in furtherance of a scheme that ended when they achieved their alleged goal of obtaining the Licenses.

Nor can WWE demonstrate open-ended continuity by cataloguing the JAKKS Defendants' mere ongoing receipt of revenues from the Licenses. (Id. ¶¶ 249(a)(xlviii)-(liii).)  As a matter of law, "continuity" for purposes of RICO is measured only by the criminal predicate acts, not by the subsequent actions, even if such actions are pursuant to agreements allegedly acquired unlawfully. See GICC, 67 F.3d at 467 (for "temporal aspect of plaintiff's [RICO] claim," court looks only at period of actual racketeering activity to measure continuity); Vemco, Inc., 23 F.3d at 134 (billing statements in 1991 and 1992 for payments "pursuant to an allegedly fraudulent contract cannot be cited by plaintiffs to extend the duration of the fraudulent scheme" which was completed in 1988).[8]

---

[8]  See also Clapp v. Greene, 743 F. Supp. 273, 278 (S.D.N.Y. 1990) (continued payment of compensation to attorneys bribed to breach partnership agreement "will not transform a single alleged bribe into a pattern for RICO purposes"), aff'd mem., 930 F.2d 912 (2d Cir. 1991); Jerome M. Sobel & Co. v. Fleck, No. 03 Civ. 1041, 2003 WL 22839799, at *11 (S.D.N.Y. Dec. 1, 2003) (mail and wire fraud related to fees earned from the performance of "otherwise lawful" accounting services on fraudulently obtained agreements did not extend RICO scheme), Plater-Zyberk v. Abraham, No. Civ. A. 97-3322, 1998 WL 67545, at *10 (E.D. Pa. Feb. 17, 1998) ("defendant's retention or use of his assets" derived from misappropriation of plaintiff's interest in two companies and intellectual property could not "establish open-ended continuity"), aff'd mem., 203 F. 3d 817 (3d Cir. 1999); Bingham v. Zolt, 683 F. Supp. 965, 970 (S.D.N.Y. 1988) ("defendant's subsequent (continued...)

16

**B.      The Alleged Bribery Scheme Does Not Constitute
         a Pattern of Racketeering Activity**

Given the fundamental importance to a bona fide RICO claim of an actual non-sporadic

pattern of racketeering activity,[9] the Second Circuit has admonished that "courts must take care to

ensure that the plaintiff is not artificially fragmenting a singular act into multiple acts simply to

invoke RICO." Schlaifer Nance, 119 F.3d at 98; see also Maddaloni Jewelers, 354 F. Supp. 2d at

303 (holding that "a completed act of extortion along with the intermediate steps toward completion

of that act constitute one predicate act, not multiple distinct attempts") (emphasis added); Tellis v.

U.S. Fid. & Guar. Co., 826 F.2d 477, 478-79 (7th Cir. 1986) ("[M]ultiple acts of mail fraud in

furtherance of a single episode of fraud involving one victim and relating to one basic transaction

cannot constitute the necessary pattern [under RICO]."); Zhu v. First Atl. Bank, No. 05 Civ. 96, 2005

WL 2757536, at *4 (S.D.N.Y. Oct. 25, 2005) (numerous communications in furtherance of alleged

scheme simply do not create a pattern of two or more predicate acts). Flouting these precepts, WWE

artificially deconstructs a single alleged bribery scheme directed at a singular narrow alleged purpose

– securing WWE Licenses through a series of payments to WWE's agents – into a series of

intermediate steps towards completion of this single scheme, which WWE tries to pass off as

separate RICO "predicate acts" to manufacture a "pattern."

---

[8] (...continued)
enjoyment of the proceeds of the scheme" was not "continuous criminal activity").

[9]  "[T]he heart of any RICO complaint is the allegation of a pattern of racketeering." Agency
Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143, 154 (1987); see also S. Rep. No. 91-
617, at 158 (1969) ("The target of [RICO] is thus not sporadic activity. The infiltration of legitimate
business normally requires more than one 'racketeering activity' and the threat of continuing activity
to be effective. It is this factor of continuity plus relationship which combines to produce a
pattern.").

This identical tactic was rejected in <u>Roeder v. Alpha Industries, Inc.</u>, 814 F.2d 22, 31 (1st Cir. 1987), which held that the alleged bribery of a company employee to obtain subcontracts <u>did not</u> constitute a RICO "pattern," even though it was effectuated through three installment payments disguised as payments for a marketing study and eleven phone calls and eight letters constituting wire and mail fraud. In language equally applicable here, the court held in salient part:

> A bribe, which by any realistic appraisal is solitary and isolated, is not transformed into the threatening 'pattern of racketeering activity' with which Congress was concerned simply because the bribe is implemented in several steps and involves a number of acts of communication.

<u>Id.</u> (citation omitted). In this Circuit as well, courts consistently have rejected attempts, like WWE's, to manufacture RICO patterns by artificially slicing and dicing purported predicate acts. <u>See, e.g.</u>, <u>Schlaifer Nance</u>, 119 F.3d at 96-98 (deeming multiple predicate acts mere "subparts" of one fraudulent act in negotiation of licensing agreement, not a "pattern"); <u>Maddaloni Jewelers</u>, 354 F. Supp. 2d at 303-05 (dismissing RICO claims and deeming repeated attempts at extortion resulting in a payment to secure various favorable services a single predicate act). <u>See also</u> <u>Linens of Europe, Inc. v. Best Mfg., Inc.</u>, No. 03 Civ. 9612, 2004 WL 2071689, *15-16 (S.D.N.Y. Sept. 16, 2004) (dismissing RICO conspiracy claim based on a "laundry list of incidents" because the "multiple acts in furtherance of a <u>single</u> extortion episode constitute only a single predicate act . . . not a pattern of two or more predicate acts").

By splintering the single alleged bribery scheme for favorable licensing rights into multiple predicate acts, WWE squarely contravenes "the Second Circuit's oft-stated admonition that courts should guard against the meritless fragmentation of a single predicate act into multiple acts for the

mere purpose of pursuing a RICO claim." <u>Maddaloni</u>, 354 F. Supp. 2d at 304.[10]  Thus, WWE's attempt to transform its garden variety state law bribery case into a RICO pattern to access federal court – like its ill-conceived federal antitrust claims – fails as a matter of law.[11]

## II.    <u>WWE'S ALLEGED RICO INJURY IS TOO SPECULATIVE TO STATE A CLAIM</u>

WWE's RICO claims must also be dismissed because WWE fails to allege any pecuniary injury to its "business or property by reason of a violation of" the RICO statute so as to state a claim under RICO.  <u>See</u> 18 U.S.C. § 1964(c).  At best, WWE alleges, without any particularity, that it has been damaged by losing the opportunity to entertain other potential offers for the Licenses.  (AC ¶ 302.)[12]  Courts have routinely held that the kind of speculative loss alleged here fails to state a claim under RICO.  <u>See, e.g.</u>, <u>Hecht v. Commerce Clearing House, Inc.</u>, 897 F.2d 21, 24 (2d Cir. 1990) (affirming dismissal of employee's RICO claims alleging injury in the form of lost commissions because such losses were too speculative to support a RICO claim); <u>In re Tri-Star</u>

---

[10]  WWE's attempt to manufacture a pattern of racketeering activity by depicting the single bribery scheme as violations of different federal statutes, (<u>see, e.g.</u>, AC ¶ 247) is also unavailing.  An action that violates more than one law can only constitute one predicate act.  <u>See</u> <u>Maddaloni</u>, 354 F. Supp. 2d at 304  n.5; <u>see also</u> <u>Polycast Tech. Corp. v. Uniroyal, Inc.</u>, 728 F. Supp. 926, 945 (S.D.N.Y. 1989).

[11]  Dismissal of WWE's RICO claim under 18 U.S.C. § 1962(c) mandates dismissal of its RICO conspiracy claim as well.  <u>See</u> <u>Cofacredit, S.A.</u>, 187 F.3d at 244-45.  WWE's conclusory RICO conspiracy claim also fails to plead any factual basis for finding a "conscious agreement" among the alleged RICO co-conspirators to commit RICO predicate acts.  <u>Ray Larsen Assocs., Inc.</u>, 1996 WL 442799, at *9.

[12]  WWE's conclusory allegations that THQ agreed to pay JAKKS an unquantified amount of money that "otherwise could have, and would have, been offered to WWE by THQ in an independent, competitive process" (AC ¶ 138) are entirely speculative – if not knowingly baseless.  Even though WWE admittedly knows the terms of the other offers from THQ and Activision (<u>see</u> <u>id.</u> ¶¶ 131, 132), it conspicuously fails to allege these terms, let alone that they <u>exceeded the LLC proposal WWE accepted</u>.

19

Techs. Co., 257 B.R. 629, 640-41 (Bankr. D. Mass. 2001) (dismissing plaintiff's RICO claim because plaintiff did not allege monetary loss arising from employee's misconduct in receiving kickbacks).

The claimed loss of a potential opportunity to earn unquantified profits that WWE has alleged here has been repeatedly held insufficient to confer standing under RICO. See Cougar Audio, Inc. v. Reich, No. 99 Civ. 4498, 2000 WL 420546, at *8 (S.D.N.Y. Apr. 18, 2000) (dismissing RICO claims based on alleged commercial bribery, holding that "[t]he abstract form of harm suffered by one who loses the chance to bargain with all the facts . . . is not sufficient to sustain a RICO allegation with commercial bribery predicates").[13] Any doubt that WWE's claims and injury are wholly speculative has now been put to rest by its own unequivocal admissions that "damages could not be proved with reasonable certainty" and that its damages were "wholly speculative." (See WWE Mem. of Law in Opp. to Defendant's Motion to Dismiss the Sherman Act Claim at 28-29.)

Moreover, WWE's claim for damages resulting from the lost opportunity to entertain other potential offers is a quintessential claim for lost profits, which is expressly prohibited under New York law, which controls here. See First Nationwide Bank v. Gelt Funding, Corp., 820 F. Supp. 89,

---

[13] Accord In re Taxable Mun. Bond Sec. Litig., 51 F.3d 518, 522-23 (5th Cir. 1995) (lost opportunity to obtain a loan did "not constitute an injury that confers standing to bring a RICO cause of action"); see also Evans v. City of Chicago, 434 F.3d 916, 928 (7th Cir. 2006) (alleged loss of ability to pursue employment and lost income after false imprisonment did not constitute a cognizable injury to business or property for RICO standing); Tsipouras v. W&M Props., Inc., 9 F. Supp. 2d 365, 368 (S.D.N.Y. 1998) (a bonus was not recoverable under RICO because its accrual was speculative and its amount unquantified); Allen v. Berenson Pari-Mutuel of N.Y., No. 95 Civ. 10289, 1998 WL 80168, at *3 (S.D.N.Y. Feb. 25, 1998) (manipulation of purses for certain horse races was not cognizable injury under RICO where plaintiffs could not "quantify with any certainty the extent of damages" allegedly suffered); Strates Shows, Inc. v. Amusements of America, Inc., 379 F. Supp. 2d 817, 825 (E.D.N.C. 2005) (holding that alleged injury to a "'mere expectancy interest or an "'intangible property interest'"'" cannot confer RICO standing and dismissing plaintiff's RICO claim) (internal citations omitted).

.

95 (S.D.N.Y. 1993) (dismissing plaintiff's RICO claim because there was no "provable loss" and observing that "New York law expressly prohibits recovery of 'lost profits' in fraud actions, and plaintiff's RICO claims – which sound almost exclusively in fraud – cannot include a claim for 'lost profits'"), aff'd, 27 F.3d 763 (2d Cir. 1994).[14]

## III.    WWE'S RICO CLAIMS ARE TIME BARRED

### A.    The Applicable Four-Year Statute of Limitations

Assuming, arguendo, and solely for purposes of this Motion, that WWE suffered a RICO injury and could state a viable RICO claim, which it cannot, its stale RICO claims from 1995 would be time barred under the four-year limitations period applicable to civil RICO actions. See Agency Holding, 483 U.S. at 156-56. In Rotella v. Wood, 528 U.S. 549, 555-56 (2000), the Supreme Court held that a RICO claim accrues when the plaintiff discovers or reasonably should have discovered its injury, and is not tolled until discovery of the pattern of predicate acts. Recognizing the salutary policies for statutes of limitation,[15] the Court refused to extend the accrual period for a RICO claim

---

[14] WWE's request for equitable relief under RICO, including rescission of the Licenses, restitution and/or disgorgement (AC (Prayer for Relief at (4), (7), (8))) to redress past conduct – not to restrain future conduct – is legally foreclosed under 18 U.S.C. § 1964(a). See United States v. Carson, 52 F.3d 1173, 1181-82 (2d Cir. 1995) (vacating order on the grounds that the disgorgement of kickbacks must be intended solely to "prevent and restrain" future conduct); accord United States v. Philip Morris USA, Inc., 396 F.3d 1190, 1197 (D.C. Cir.) (holding that disgorgement is unavailable under RICO statute), cert. denied, 126 S. Ct. 478 (2005); Richard v. Hoechst Celanese Chemical Group, Inc., 355 F.3d 345, 354-55 (5th Cir. 2003) (where RICO plaintiff improperly sought disgorgement to redress past conduct, not to restrain future conduct, its RICO claim was "void").

[15] See, e.g., Wood v. Carpenter, 101 U.S. 135, 139 (1879) ("Statutes of limitation are vital to the welfare of society and are favored in the law. They are found and approved in all systems of enlightened jurisprudence. They promote repose by giving security and stability to human affairs. An important public policy lies at their foundation. They stimulate to activity and punish negligence. While time is constantly destroying the evidence of rights, they supply its place by a presumption which renders proof unnecessary. Mere delay, extending to the limit prescribed, is itself a conclusive
(continued...)

21

until discovery of the RICO <u>pattern</u>, even where the elements of that pattern were not evident at the time of the injury, because such a rule would undermine "the basic policies of all limitations provisions: repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities." <u>Rotella</u>, 528 U.S. at 555. Accordingly, the Court adopted the more restrictive "injury discovery rule" to promote the "objective [of RICO] of encouraging prompt litigation to combat racketeering." <u>Id.</u> at 558 n.3.

In determining whether a RICO claim is time barred, courts look not only to when the injury was actually discovered, but when it <u>should have been</u> discovered. <u>Tho Dinh Tran v. Alphonse Hotel Corp.</u>, 281 F.3d 23, 35 (2d Cir. 2002) (RICO statute of limitations begins to run "'when the plaintiff discovers or should have discovered the RICO injury'") (citations omitted); <u>Nat'l Group for Commc'ns & Computers Ltd. v. Lucent Techs., Inc.</u> ("<u>NGCC</u>"), 420 F. Supp. 2d 253, 264 (S.D.N.Y. 2006) (Buchwald, J.) (same); <u>DLT Res., Inc. v. Credit Lyonnais Rouse, Ltd.</u>, No. 00 Civ. 3560, 2001 WL 25695, at *4 (S.D.N.Y. Jan. 10, 2001).

In the Amended Complaint, WWE claims it was injured by its allegedly faithless agents' grant of licensing rights at "lower than competitive royalty rates" to JAKKS and the LLC. (AC ¶¶ 1, 270, 302.) WWE asserts that its RICO injury was manifested in the seven Licenses because (1) they were granted at below-market terms (AC ¶¶ 1, 160-63), and (2) the Videogame License and extension to the Toy License provided for extraordinarily long terms. (AC ¶¶ 149, 150.) It is undisputed that these Licenses were executed, and all these alleged RICO injuries therefore occurred, if ever, between 1996 and 1998 – over six years before this action was commenced on October 19,

_____

[15] (...continued)
bar.").

2004. Accepting (solely for this Motion) WWE's own allegations of its injury in its Amended Complaint, the conclusion is ineluctable that WWE knew, or should have known, of its alleged RICO injury no later than 1998. Accordingly, WWE's RICO claims are time barred as a matter of law. See Rotella, 528 U.S. at 555.

### B.   WWE's RICO Claim Accrued Once It Had Inquiry Notice of its RICO Injury

A RICO claim accrues, and the statute of limitations begins to run, as soon as a plaintiff is on inquiry notice of an injury. See Apollon Waterproofing & Restoration, Inc. v. Bergassi, No. 01 Civ. 8388, 2003 WL 1397394, at *3 (S.D.N.Y. Mar. 20, 2003) (dismissing plaintiff's RICO claim and stating that "if plaintiffs were on inquiry notice of the alleged RICO injury . . . their RICO claims are time-barred" if more than four years has passed), aff'd, 87 F. App'x 757 (2d Cir. 2004); In re Merrill Lynch Ltd. P'ships Litig., 7 F. Supp. 2d 256, 266 (S.D.N.Y. 1997) (dismissing plaintiffs' RICO complaint because plaintiffs were on inquiry notice more than four years before claim was brought), aff'd, 154 F.3d 56 (2d Cir. 1998); Butala v. Agashiwala, 916 F. Supp. 314, 318 (S.D.N.Y. 1996) (dismissing plaintiff's RICO claim as time barred where the facts alleged in the complaint indicated that the plaintiff, with reasonable diligence, should have discovered his injuries).

The Court of Appeals has squarely held that where – as here – the facts alleged in the complaint establish inquiry notice and a lack of diligence, "resolution of the issue on a motion to dismiss is appropriate." Dodds v. Cigna Secs. Inc., 12 F.3d 346, 350, 352 n.3 (2d Cir. 1993). Courts routinely grant motions to dismiss time barred RICO claims where, as here, notice is apparent from the complaint. See, e.g., LC Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d 148, 156 (2d Cir. 2003) (upholding dismissal of fraud claim because "storm warnings" were evident on the face of the detailed complaint); In re Ultrafem Inc. Sec. Litig., 91 F. Supp. 2d 678, 692 (S.D.N.Y. 2000)

23

("Dismissal is appropriate when the facts from which knowledge may be imputed are clear from the pleadings and the public disclosures themselves.").[16]

It bears emphasis that notice of a RICO <u>injury</u> does not require actual knowledge or notice of the facts that constitute <u>the alleged RICO pattern</u>. In <u>Rotella</u>, a plaintiff who had been discharged from a psychiatric institution in 1986 brought a RICO action in 1997, within three years after the owners of the psychiatric facility pled guilty to criminal fraud charges relating to illegal agreements with its doctors, who plaintiff claimed wrongfully kept him hospitalized through 1986 simply to maximize their profits. <u>Rotella</u>, 528 U.S. at 551 n.1. The Court rejected Rotella's argument that his RICO claim accrued only when he knew about the pattern of wrongdoing, which was not discovered until the facility pled guilty in 1994. <u>Id.</u> at 553-55. The Court held that "discovery of the injury, not discovery of the other elements of a claim, is what starts the clock." <u>Id.</u> at 555. Thus, the RICO claim accrued in 1986 when the plaintiff was discharged <u>even if he did not then know of the facts forming the pattern of racketeering activity</u>, and even though "a considerable effort may be required before a RICO plaintiff can tell whether a pattern of racketeering is demonstrable." <u>Id.</u> at 556. Likewise, in this case, WWE's RICO claim accrued once it knew or should have known of its RICO injury (<u>i.e.</u>, issuance of its Licenses at below market rates), <u>not</u> when WWE ultimately discovered the full details of the alleged predicate acts that supposedly comprise its RICO pattern.

_____

[16] Moreover, inquiry notice of a RICO injury does not require actual knowledge of all the details of that injury. <u>See</u> <u>Isaak v. Trumbull Sav. & Loan Co.</u>, 169 F.3d 390, 399 (6th Cir. 1999) (in affirming dismissal of RICO complaint on statute of limitations grounds, court emphasized that "'Inquiry notice is triggered by evidence of the possibility of fraud, not full exposition of the scam itself.' . . . 'Knowledge of all facts is not required to set off the prescriptive clock. Thus, the clock begins to tick when a plaintiff senses 'storm warnings,' not when he hears thunder and sees lightning.'") (citations omitted); <u>accord</u> <u>In re Merrill Lynch</u>, 7 F. Supp. 2d at 266 ("[a] plaintiff need not be aware of all aspects of the alleged fraud to be on inquiry notice").

Inquiry notice itself triggers a <u>duty</u> to investigate, and a putative RICO plaintiff is charged with all knowledge he would have obtained had he undertaken that investigation, even if he does not:

> "Where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him."

<u>Armstrong v. McAlpin</u>, 699 F.2d 79, 88 (2d Cir. 1983) (citation omitted); <u>accord</u> <u>In re Merrill Lynch</u>, 7 F. Supp. 2d at 266; <u>see also</u> <u>Mathews v. Kidder, Peabody & Co.</u>, 260 F.3d 239, 252 (3d Cir. 2001) (once defendant establishes existence of storm warnings, burden shifts to plaintiffs to show they "exercised reasonable due diligence and yet were unable to discover their injuries").

### C.    WWE Was Repeatedly Placed on Inquiry Notice of Its Injury by 1998

The gravamen of the Amended Complaint is that JAKKS compromised two of WWE's agents which injured WWE by causing it to enter into seven below-market license agreements with JAKKS. (AC ¶¶ 1, 249.) WWE alleges more than a <u>dozen separate events</u>, including procurement of the Licenses themselves, between 1996 and 1998, each of which, taken alone, and all of which collectively, provided WWE with actual knowledge, and, a <u>fortiori</u>, placed it on inquiry notice, of its RICO injury more than four years before it commenced this action.

### 1.    The Seven Licenses that Constitute WWE's Alleged RICO "Injury"

WWE alleges that all seven of the Licenses executed by JAKKS and WWE between April 22, 1996 and June 24, 1998 injured WWE because JAKKS obtained them at below market rates as a result of unlawful RICO activity that deprived WWE of the honest services of its agents that should have ensured a competitive bidding process for these Licenses. (<u>Id.</u> ¶¶ 1, 249.) The Licenses are:

| License | Date | For | Amended Complaint ¶¶ |
|---------|------|-----|----------------------|
| The first amendment to the domestic toy license (the "First Amendment") | April 22, 1996 | Grants JAKKS rights to license disposable cameras and photo albums, and European distribution rights for certain toys | 54, 56, and 249(a)(vii) |
| The second amendment to the domestic toy license (the "Second Amendment") | January 21, 1997 | Grants JAKKS rights to 3" and 7" inch action figures and extends term of the toy license to 12/31/99 | 64, 67, and 249(a)(x) |
| The international toy license (the "International Toy License") | February 10, 1997 | Grants JAKKS international rights | 65, 71, 249(a)(xi) |
| The third amendment to the domestic toy license (the "Third Amendment") | January 12, 1998 | Grants JAKKS rights to action figures less than 2" and more than 8", previously held by Playmates | 93, 249(a)(xiv) |
| The Videogame License entered into between WWE and the LLC | effective as of June 10, 1998 | Grants the LLC rights to use WWE's intellectual property in video games for "extraordinary" 10 year term with a 5-year right of renewal | 145, 149, 157 |
| Extension of the Domestic Toy License | June 24, 1998 | Extends JAKKS' Domestic Toy License to be coterminous with the Videogame License term | 149, 165 |
| Extensions of the International Toy License | June 24, 1998 | Extends JAKKS' International Toy License to same "extraordinary" term as Videogame License and Domestic Toy License | 149, 165 |

Throughout this period, WWE admits that "the competitive environment among toy companies seeking intellectual property licenses was intense." (Id. ¶ 58.) Nevertheless (and despite the numerous irregularities alleged in the Amended Complaint), WWE does not allege that it made any inquiry into how JAKKS managed to obtain seven licenses during a two-year period at allegedly below market rates. Indeed, the Amended Complaint is devoid of any inquiry by WWE into the competitiveness of the bidding process – despite the numerous red flags detailed in the Amended Complaint, including allegations of (1) consistent favoritism toward JAKKS, (2) the grant of conflicting license rights to JAKKS, (3) a huge financial loss by WWE in the Playmates deal allegedly to benefit JAKKS, (4) complaints by other competitors about negotiations involving

26

JAKKS, (5) Bell's recommendation of JAKKS' proposal without awaiting the Acclaim bid which senior management had promised to consider, and (6) the abrupt and unexplained metamorphosis of the JAKKS videogame proposal – after its approval by senior WWE management – into the even more lucrative joint JAKKS/THQ joint bid in 1998.

WWE's own allegations detail these numerous increasingly powerful storm warnings, which placed it on inquiry notice no later than 1998 to the "probability," see Armstrong, 699 F.2d at 88, of its injury that (a) the Licenses were not being subjected to the rigorous competitive bidding process that WWE claims was required, and (b) WWE's agents were not obtaining the best terms for WWE, as they allegedly were supposed to do. (AC ¶ 30.)  Thus, WWE's RICO claims accrued no later than June 1998 and are time barred now.

### 2.    The Increasing Storm Warnings Alerting WWE to its RICO Injury

#### (a)    The Conflicting and Financially Detrimental Playmates Deals

In June 1996, Playmates, allegedly a fierce competitor of JAKKS (AC ¶ 58), was awarded the rights to make WWE-related action figures (up to 2" in height and above 8") which would directly compete with the 6" action figures being marketed by JAKKS under its October 24, 1995 Domestic Toy License.  (Id. ¶ 35, 36, 59.)  WWE alleges that, as part of the "illicit plan to drive Playmates out of the business of WWE toys," JAKKS used its improper influence with Shenker to obtain the Second Amendment on January 21, 1997, granting it rights in "practical conflict" with the rights WWE had licensed to Playmates six months earlier.  (Id. ¶¶ 63-70, 249a(ix)-(x).)  If there were any doubt that WWE was mandated to inquire about the Second Amendment which clashed with the license given to Playmates only six months before, and there is not, it is dispelled by Playmates' January 30, 1997 letter to WWE senior management, accusing WWE of failing to act in "good faith"

27

by granting JAKKS rights to "effectively make the same product as Playmates." (<u>Id.</u> ¶ 70.)  <u>See also</u> March 31 Decision at *26 (noting that "Playmates did not react favorably to being squeezed out, and complained to WWE . . ."). This direct complaint by a competitor placed WWE on inquiry notice to investigate the process behind the Second Amendment (and the ensuing Licenses).[17]

Indeed, WWE alleges that favoritism toward JAKKS even imposed <u>direct financial losses</u> on WWE – without eliciting any inquiry by WWE.  In November 1997, Bell allegedly proposed to Playmates that "WWE . . . absolve Playmates of its obligations of its guarantee to WWE if Playmates would give up its rights in order that those rights could be transferred to JAKKS," which (when accepted by Playmates) resulted in "deny[ing] WWE of $376,391.64 left to be paid by Playmates to WWE on their guarantee, as well as royalties over and above the guarantee." (<u>Id.</u> ¶ 83.)  Despite the loss of <u>almost $400,000 of guaranteed revenue</u> simply to enable JAKKS to obtain licensing rights held by Playmates, WWE does not plead it made a <u>single inquiry</u> into why its agents were allegedly favoring JAKKS in this way, or whether there had been any competitive bidding for Playmates' rights.  Nor did WWE make any such inquiry when Playmates' rights were transferred to JAKKS on January 12, 1998 by the Third Amendment.  (<u>Id.</u> ¶ 93.)

      **(b)**    <u>**Direct Complaints to WWE by A Competing Bidder, Acclaim**</u>

Playmates was not the only competitor to complain directly to WWE.  Acclaim, the existing licensee of the WWE's videogame rights prior to 1998, also complained directly to WWE senior management that it was being shut out of the 1998 bidding for renewal of its license.  (<u>Id.</u> ¶¶ 101-02.)

---

[17]  It bears emphasis that the Amended Complaint does not contain a single factual allegation that, at the time of Playmates' January 1997 letter challenging WWE's good faith, the senior WWE official, Bell, was in any way compromised (AC ¶¶ 70,  80-82) or that the Playmates letter was not forwarded to other WWE senior management.  Moreover, at all times, all of the proposed licenses brought to WWE by Bell or Shenker were still subject to WWE's final approval (<u>Id.</u> ¶ 75.).

See March 31 Decision at *26 (noting that "[a]s had Playmates, Acclaim complained to WWE management about being boxed out of a competitive process.") As WWE affirmatively alleges: "Acclaim went over Bell's head and complained to senior management at WWE that it was not being permitted to submit a renewal proposal." (Id. ¶¶ 107, 109.) Thus, WWE itself concedes, as it must, that by 1998 WWE's senior management was unequivocally warned by yet another competitor of JAKKS that precisely the injury WWE now claims to be at the heart of its RICO claim was occurring: WWE's "agents" were not allowing a competitor to submit a competitive bid on the Videogame License. At the very minimum, this startling concession, coupled with WWE's admitted knowledge that Shenker had a monetary incentive to steer the Videogame License away from Acclaim in order to obtain his 11% commission (id. ¶¶ 78, 151), compelled further inquiry by WWE into the negotiations behind the Videogame License. Despite this red flag, WWE made no further inquiry – even though it claims it wound up awarding that License at allegedly 50% to 66% below market (id. ¶ 163), and paying Shenker an 11% commission for the privilege!

WWE alleges that before Acclaim even submitted a bid for the Videogame License, Bell recommended to WWE and its senior executive, Linda McMahon, on March 30, 1998, that WWE grant the Videogame License to JAKKS at "terms . . . . well below then prevailing market rates." (Id. ¶ 110.) McMahon approved Bell's deal memo (id. ¶ 114) without making any inquiry as to how JAKKS, which "was not even in the videogame business at that time" (id. ¶ 140), got this "sweet deal," at rates far below market. (Id. ¶ 150). Indeed, WWE did not even question the absence of any bid from Acclaim – despite its earlier complaint to WWE.

(c)    The Sudden Emergence of the Superior JAKKS/THQ Joint Bid

WWE's utter indifference to the proverbial blizzard of storm warnings about the nature of the bidding process is further demonstrated by its remarkably passive response to the sudden emergence of a radically different and more lucrative Videogame License proposal by the joint venture of JAKKS/THQ on May 12, 1998, (id. ¶ 152) – just two months after Bell recommended – and WWE agreed – that the License be awarded to JAKKS alone, on substantially inferior terms. (Id. ¶ 110.) To be sure, WWE now alleges that the reason JAKKS inexplicably decided to "bid against itself" with THQ after already securing WWE's approval was to avoid detection of its illicit scheme to get licensing rights at "below-market rates" should WWE later learn of superior offers by THQ and Activision, (id. ¶ 133), but this cannot possibly justify, much less excuse, WWE's failure to raise any questions at the time about the genesis of this abrupt new proposal by the LLC.

WWE fails to allege that it made any of the most rudimentary inquiries, such as "What precipitated this new offer?", "Why is JAKKS unilaterally increasing its offer?", "Did THQ offer to bid alone?","Did any other bidders try to bid?" and/or "What were these bids?"  Of course, if there were any substance to WWE's allegations, and there is not, any one of these questions would have revealed the existence of other bidders, including Activision and THQ, with previously undisclosed superior offers, information that would not only have exposed – but thwarted – the alleged lack of competitive bidding – the very RICO injury WWE now alleges.  (Id. ¶¶ 127-133.)

D.    The Cumulative Effect of the Multiple Storm Warnings
Indisputably Constitutes Knowledge or Inquiry Notice on WWE's Part

In sum, WWE made no inquiry about the Licenses it now alleges were the products of unlawful RICO activity, even though it was in the midst of a veritable typhoon of storm warnings.

30

While any one of the foregoing storm warnings standing alone would be sufficient to trigger inquiry notice, in the aggregate, they indisputably compelled further investigation. In determining whether there is a duty to inquire, courts look to the totality of the circumstances. See LC Capital Partners LP, 318 F.3d at 156 (holding that because the company in a securities fraud case announced three substantial "reserve charges" within four years, the investors had a duty of inquiry ); De La Fuente v. DCI Telecomms., Inc., 206 F.R.D. 369, 383 (S.D.N.Y. 2002) (it is not necessary that any one "storm warning" create a duty to inquire as a matter of law, but rather "[t]he issue . . . is whether the objective facts and circumstances, taken as a whole, provided inquiry notice") (emphasis in original); Blue Cross & Blue Shield of New Jersey, Inc., 113 F. Supp. 2d 345, 382 (E.D.N.Y. 2000) ("Inquiry notice exists when, under the totality of the circumstances, 'a reasonable [person] of ordinary intelligence would have discovered the existence of the fraud.'" (citation omitted)).

WWE asserts that despite an intensely competitive market, JAKKS was able to secure seven licenses from WWE at below market terms, without competitive bids in approximately two years (April 1996 - June 1998), in the face of nasty complaints from at least two competitors, all of which had to be – and were – approved by WWE. WWE's sophistication as a major licensor of intellectual property (AC ¶ 9) with a presumptive appreciation of the "market rates" for its licenses further compels the conclusion that it was placed on inquiry notice by 1998. Kinley Corp. v. Integrated Res. Equity Corp., 851 F. Supp. 556, 568 (S.D.N.Y. 1994) ("Plaintiffs' sophistication in financial matters can be considered in determining when inquiry notice is triggered."); Wynne v. Equilease Corp., No. 94 CIV. 4992, 1995 WL 764236, at *5 (S.D.N.Y. Dec. 27, 1995) (same).

Where, as here, a plaintiff could have discovered its RICO injury with due diligence, the limitations period is not tolled by its failure to do so. To the contrary "[t]here must be reasonable

31

diligence; and the means of knowledge are the same thing in effect as knowledge itself." Wood v.

Carpenter, 101 U.S. 135, 143 (1879); see also In re Merrill Lynch, 7 F. Supp. 2d at 266 (once a

plaintiff is placed on inquiry notice, "he has a duty to inquire, and he will be charged with all

knowledge that he would have obtained had he exercised reasonable diligence"); accord Mathews,

260 F.3d at 252. Given the plethora of stark warning signs, the Amended Complaint establishes that

WWE knew or should have known of its alleged RICO injury (seven allegedly "bad" licenses), at

the latest, more than six and a half years before it commenced this action. Yet, no inquiry was made.

WWE's belated challenge to these Licenses to extract a better economic deal must therefore fail.

### E.    WWE's Failure to Exercise Due Diligence Precludes Tolling Here

Any attempt by WWE to invoke the doctrine of fraudulent concealment to toll the statute of

limitations is unavailing. To invoke this exceptional equitable doctrine, WWE must establish (1)

that Defendants concealed material facts related to their wrongdoing, (2) the concealment prevented

WWE's discovery within the limitations period, and (3) WWE exercised due diligence in pursuing

the discovery of its claim. See Town of Poughkeepsie v. Espie, 402 F. Supp. 2d 443, 452 (S.D.N.Y.

2005) (citation omitted), aff'd, 67 F. App'x 40 (2d Cir. 2003)).[18]

WWE's lack of diligence is fatal to its attempt to invoke the doctrine of fraudulent

concealment. As the Supreme Court has held, "'reasonable diligence' does matter, and a plaintiff

who is not reasonably diligent may not assert 'fraudulent concealment'" as a basis for the tolling of

the RICO statute of limitations. Klehr v. A.O. Smith Corp., 521 U.S. 179, 194 (1997). A plaintiff

---

[18]   All three elements of the fraudulent concealment doctrine must be satisfied and pled with
particularity to satisfy Fed. R. Civ. P. 9(b). See, e.g., In re Merrill Lynch, 7 F. Supp. 2d at 274; see
also Butala v. Agashiwala, 916 F. Supp. 314, 318 (S.D.N.Y. 1996).

must show diligence <u>throughout the initial period</u> to benefit from equitable tolling.[19]  <u>See Tho Dinh Tran</u>, 281 F.3d at 36-37 (plaintiff must show it "'exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled'" (citation omitted)).  In <u>NGCC</u>, the court dismissed plaintiff's RICO claim and rejected plaintiff's fraudulent concealment argument, because – as here – the plaintiff did not plead any investigative efforts throughout the initial period to warrant equitable tolling.  <u>See NGCC</u>, 420 F. Supp. 2d at 268.  The fact that the plaintiffs (like WWE) only sought out evidence to support a RICO cause of action <u>after</u> commencing litigation was insufficient. <u>Id.</u>; <u>see also</u> <u>In re Merrill Lynch</u>, 7 F. Supp. 2d at 275 (rejecting claim of fraudulent concealment where plaintiffs failed to plead specific inquiries to defendants once inquiry notice was triggered).  Accordingly, WWE's RICO claims must be dismissed as untimely.

## IV.    <u>WWE'S CLAIMS ARE BARRED BY THE 2004 RELEASE</u>

Dismissal of the Amended Complaint is also warranted because WWE's claims are precluded by a General Release and Settlement Agreement executed by WWE in 2004 that unconditionally released JAKKS from any liability associated with, and barred WWE from suing JAKKS on, the very claims alleged in the Amended Complaint.  Contrary to WWE's representations to the Court, (<u>see</u> (1/11/06 Tr. at 163-64); (4/26/06 Tr. at 6)), the existence of a release is a proper threshold ground upon which to grant a motion to dismiss.  <u>See Cheung v. New York Palace Hotel</u>, No. 03-CV-0091, 2005 WL 2387573, at *2 (E.D.N.Y. Sept. 28, 2005) (dismissing plaintiff's claim because

---

[19]  Reliance on a fiduciary does not excuse the lack of a diligent inquiry.  <u>See</u> <u>Zola v. Gordon</u>, 685 F. Supp. 354, 365 (S.D.N.Y. 1988) ("[I]n cases involving fiduciary relationships, tolling ceases to work to a plaintiff's benefit when the plaintiff possesses sufficient facts that he must engage in some inquiry, and he fails to live up to that obligation."); <u>Moll v. U.S. Life Title Ins. Co. of N.Y.</u>, 700 F. Supp. 1284, 1293 (S.D.N.Y. 1988) (reliance on counsel did not absolve plaintiffs from duty diligently to keep themselves informed).

plaintiff had signed release releasing defendant); <u>Brodeur v. City of New York</u>, No. 04-CV-1859,

2005 WL 1139908, at *4 (E.D.N.Y. May 13, 2005) (granting motion for judgment on the pleadings

because plaintiff was "'precluded under the unambiguous terms of the settlement agreement'")

(citation omitted); <u>Mezzacappa Bros., Inc. v. City of New York</u>, No. 03 Civ. 0223, 2003 WL

22801429, at *1 (S.D.N.Y. Nov. 24, 2003) (holding that "the release and res judicata (either

individually or together) provide ample bases for dismissing this entire action with prejudice").[20]

WWE alleges that in January 2003 it commenced an audit (the "Audit") of JAKKS that

WWE admits specifically targeted "all payments made by JAKKS to Shenker, SSAI, Bell and/or

Stanfull." (AC ¶ 200.)  WWE claims that in response to the auditor's questions in early 2003,

JAKKS failed to produce documents evidencing such payments. (<u>Id.</u> ¶¶ 201-06.)  Significantly,

WWE admits that prior to the execution of the 2004 Release, it knew about the payments to Stanfull

that were sought in the Audit. (<u>Id.</u> ¶¶ 209-11, 215-20, 222, 226, 228, 230, 234.)[21]

---

[20]  <u>See also</u> <u>e.g.</u>, <u>Industrial Risk Insurers v. Port Auth. of New York</u>, 387 F. Supp. 2d 299, 305, 308
(S.D.N.Y. 2005); <u>Crivera v. City of New York</u>, No. 03 CV 447, 2004 WL 339650, at *3-4 (E.D.N.Y.
Feb. 23, 2004); <u>accord</u> <u>Williams v. Stone</u>, 109 F.3d 890, 892, 896 (3d Cir. 1997); <u>Mussett v. Baker
Material Handling Corp.</u>, 844 F.2d 760, 762 (10th Cir. 1988).  Dismissal is also proper where, as
here, there is a binding covenant not to sue.  <u>See</u> <u>Straight Arrow Prods. v. Conversion Concepts, Inc.</u>,
No. 01-221, 2001 WL 1530637, at *6 (E.D. Pa. Dec. 3, 2001); <u>Santana Prods., Inc. v. Bobrick
Washroom Equip., Inc.</u>, 69 F. Supp. 2d 678, 686 n.12 (M.D. Pa. 1999).

[21]  WWE's attempt in the Amended Complaint to expunge its prior admission that the Audit was
pivotal to their claims (coupled with WWE's repeated attempts to defer briefing the Release issue,
(<u>see</u> 1/11/06 Tr. at 154, 4/26/06 Tr. at 6), bespeaks WWE's recognition that its claims are
encompassed by the audit and directly barred by the Release.  In its original Complaint, WWE
alleged that "[i]n response to the repeated requests by WWE, <u>pursuant</u> to . . . audits of both THQ and
Jakks' books and records . . . all uniformly denied making any payments to Stanfull, SSAI, Shenker
and/or Bell." (Compl. ¶ 100 (emphasis added)).  After JAKKS raised the Release in its initial
dismissal motion (at 36-37), WWE strategically excised the critical reference to the Audit and now
alleges, without any context, that "[in] response to repeated requests by WWE, all uniformly denied
making any payments to Stanfull, SSAI, Shenker and/or Bell." (AC ¶ 196.)

On January 15, 2004, fully aware of the payments that were allegedly concealed by JAKKS during the Audit – which form the basis of WWE's Amended Complaint – WWE entered into a "Settlement Agreement and General Release of All Claims" with JAKKS (Ex. B), for which JAKKS paid WWE $200,000.  (Id. at 1.)  The Release unambiguously operates to bar "any and all claims" of any nature whatsoever "arising from or relating to the Audit," whether "known or unknown." (See id.)  Despite the then pending litigation between WWE and Shenker and Bell, the Release expressly includes a "Covenant Not To Sue," which bars WWE from bringing any action against JAKKS "arising out of or relating in any way to the Audit including but not limited to the matters released in [the Release]."  (Id. (emphasis added).)  Because WWE is now barred, as a matter of law, from bringing its claims here against JAKKS, which spring from the very payments it admits were targeted in the Audit, WWE's Amended Complaint must be dismissed.

## CONCLUSION

For all the foregoing reasons, the JAKKS Defendants' motion to dismiss the Amended Complaint should be granted in all respects, with prejudice.

Respectfully submitted,

FEDER, KASZOVITZ, ISAACSON,
  WEBER, SKALA, BASS & RHINE LLP
Murray L. Skala (MS 9354)
Jonathan D. Honig (JH 7577)
750 Lexington Avenue
New York, New York 10022
Phone: (212) 888-8200
Fax: (212) 888-5968

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

By:     /s/ Jonathan J. Lerner
        Jonathan J. Lerner (JL 7117)
        Michael H. Gruenglas (MG 8705)
        Maura B. Grinalds (MG 2836)
        Shannon Frankel (SF 8693)
        Four Times Square
        New York, New York  10036
        Phone: (212) 735-3000
        Fax: (212) 735-2000

*Attorneys for the JAKKS Defendants*
35