

# FORM 10-Q

## JAKKS PACIFIC INC – JAKK

**Filed: November 09, 2004 (period: September 30, 2004)**

Quarterly report which provides a continuing view of a company's financial position

# Table of Contents

## PART I

| | |
|---|---|
| **Item 2** | Management s Discussion and Analysis of Financial Condition and Results of Operations 14 |
| **Item 2.** | Management s Discussion and Analysis of Financial Condition and Results of Operations |
| **Item 3.** | Quantitative and Qualitative Disclosures About Market Risk |
| **Item 4.** | Controls and Procedures |

## PART II.

OTHER INFORMATION

| | |
|---|---|
| **Item 1.** | Legal Proceedings |
| **Item 4.** | Submission of Matters to a Vote of Security Holders |
| **Item 6.** | Exhibits |

SIGNATURES

EX–31.1

EX–31.2

EX–32.1

EX–32.2

# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

## Form 10–Q

(Mark one)

☑     **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended September 30, 2004

or

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from     to

Commission file number: 0–28104

# JAKKS Pacific, Inc.

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Delaware** | **95–4527222** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **22619 Pacific Coast Highway** **Malibu, California** | **90265** |
| *(Address of principal executive offices)* | *(Zip Code)* |

Registrant's telephone number, including area code:

(310) 456–7799

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☑    No ☐

Indicate by a check mark whether the registrant is an accelerated filer (as defined in Rule 12b–2 of the Exchange Act).    Yes ☑    No ☐

The number of shares outstanding of the issuer's common stock is 26,231,706 (as of November 9, 2004).

---

JAKKS PACIFIC, INC. AND SUBSIDIARIES

INDEX TO QUARTERLY REPORT ON FORM 10–Q

Quarter Ended September 30, 2004

ITEMS IN FORM 10–Q

| | | | Page |
|---|---|---|---|
| Facing page | | | |
| Part I | | FINANCIAL INFORMATION | |
| Item 1 | | Financial Statements | |
| | | Condensed consolidated balance sheets — December 31, 2003 and September 30, 2004 (unaudited) | 2 |
| | | Condensed consolidated statements of operations for the three and nine months ended September 30, 2003 and 2004 (unaudited) | 3 |
| | | Condensed consolidated statements of comprehensive income for the three and nine | 4 |

months ended September 30, 2003 and 2004 (unaudited)

Condensed consolidated statements of cash flows for the nine months ended
September 30, 2003 and 2004 (unaudited)                                              5
Notes to condensed consolidated financial statements (unaudited)                    6

Item 2     Management's Discussion and Analysis of Financial Condition and Results of
           Operations                                                               14
Item 3     Quantitative and Qualitative Disclosures About Market Risk               21
Item 4     Controls and Procedures                                                  21
Part II    OTHER INFORMATION
Item 1     Legal Proceedings                                                        22
Item 2     Unregistered Sales of Equity Securities and Use of Proceeds            None
Item 3     Defaults Upon Senior Securities                                        None
Item 4     Submission of Matters to a Vote of Security Holders                       22
Item 5     Other Information                                                       None
Item 6     Exhibits                                                                 23
Signatures                                                                          24
Certification of CEO Pursuant to Section 302
Certification of CFO Pursuant to Section 302
Certification of CEO Pursuant to Section 906
Certification of CFO Pursuant to Section 906

## DISCLOSURE REGARDING FORWARD–LOOKING STATEMENTS

This report includes "forward–looking statements" within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. For example, statements included in this report regarding our financial position, business strategy and other plans and objectives for future operations, and assumptions and predictions about future product demand, supply, manufacturing, costs, marketing and pricing factors are all forward–looking statements. When we use words like "intend," "anticipate," "believe," "estimate," "plan" or "expect," we are making forward–looking statements. We believe that the assumptions and expectations reflected in such forward–looking statements are reasonable, based on information available to us on the date hereof, but we cannot assure you that these assumptions and expectations will prove to have been correct or that we will take any action that we may presently be planning. We are not undertaking to publicly update or revise any forward–looking statement if we obtain new information or upon the occurrence of future events or otherwise.

JAKKS PACIFIC, INC. AND SUBSIDIARIES

CONDENSED CONSOLIDATED BALANCE SHEETS

| | December 31, 2003 | September 30, 2004 |
|---|---|---|
| | (In thousands, except share amounts) | |
| | (*) | (Unaudited) |
| **ASSETS** | | |
| Current assets | | |
| Cash and cash equivalents | $118,182 | $131,796 |
| Marketable securities | 19,345 | 20,091 |
| Accounts receivable, net of allowances for uncollectible accounts of $7,877 and $6,243, respectively | 86,119 | 129,041 |
| Inventory, net of reserves for potential product obsolescence of $5,025 and $5,509, respectively | 44,400 | 49,315 |
| Prepaid expenses and other current assets | 16,762 | 27,987 |
| Total current assets | 284,808 | 358,230 |
| Office furniture and equipment | 6,563 | 7,539 |
| Molds and tooling | 34,481 | 34,684 |
| Leasehold improvements | 2,429 | 2,409 |
| Total | 43,473 | 44,632 |
| Less accumulated depreciation and amortization | 31,751 | 32,786 |
| Property and equipment, net | 11,722 | 11,846 |
| Investment in joint venture | 9,097 | 4,265 |
| Goodwill, net | 206,952 | 291,179 |
| Trademarks, net | 11,568 | 11,795 |
| Intangibles and other, net | 13,217 | 12,553 |
| Total assets | $537,364 | $689,868 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current liabilities | | |
| Accounts payable and accrued expenses | $ 50,168 | $126,712 |
| Income taxes payable | 2,021 | 13,020 |
| Current portion of long term debt | 19 | — |
| Total current liabilities | 52,208 | 139,732 |
| Long term debt, net of current portion | 98,042 | 98,000 |
| Deferred income taxes | 1,164 | 1,164 |
| Total liabilities | 151,414 | 238,896 |
| Stockholders' equity | | |
| Preferred stock, $.001 par value; 5,000,000 shares authorized; nil outstanding | — | — |
| Common stock, $.001 par value; 100,000,000 shares authorized; 24,866,940 and 26,231,706 shares issued and outstanding, respectively | 25 | 26 |
| Additional paid-in capital | 245,219 | 275,624 |
| Retained earnings | 141,055 | 175,774 |
| Accumulated comprehensive loss | (349) | (452) |
| Total stockholders' equity | 385,950 | 450,972 |
| Total liabilities and stockholders' equity | $537,364 | $689,868 |

(*)   Derived from audited financial statements

See accompanying notes to condensed consolidated financial statements.

JAKKS PACIFIC, INC. AND SUBSIDIARIES

CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS

For the Three and Nine Months Ended September 30, 2003 and 2004 (Unaudited)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2003 | 2004 | 2003 | 2004 |
| | (In thousands, except per share data) | | | |
| Net sales | $90,308 | $206,083 | $231,358 | $389,464 |
| Cost of sales | 54,082 | 124,282 | 139,784 | 235,915 |
| Gross profit | 36,226 | 81,801 | 91,574 | 153,549 |
| Selling, general and administrative expenses | 24,348 | 51,004 | 65,428 | 107,781 |
| Recall Costs | (700) | — | 2,000 | — |
| Income from operations | 12,578 | 30,797 | 24,146 | 45,768 |
| Profit from joint venture | (937) | (911) | (1,303) | (1,275) |
| Interest, net | 923 | 785 | 794 | 1,954 |
| Income before provision for income taxes | 12,592 | 30,923 | 24,655 | 45,089 |
| Provision for income taxes | 3,022 | 7,113 | 5,917 | 10,370 |
| Net income | $ 9,570 | $ 23,810 | $ 18,738 | $ 34,719 |
| Earnings per share — basic | $ 0.40 | $ 0.91 | $ 0.77 | $ 1.35 |
| Earnings per share — diluted | $ 0.39 | $ 0.88 | $ 0.76 | $ 1.32 |

See accompanying notes to condensed consolidated financial statements.

3

JAKKS PACIFIC, INC. AND SUBSIDIARIES

CONDENSED CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME

For the Three and Nine Months Ended September 30, 2003 and 2004 (Unaudited)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2003 | 2004 | 2003 | 2004 |
| | (In thousands) | | | |
| Net income | $9,570 | $23,810 | $18,738 | $34,719 |
| Other comprehensive loss (income), net of tax: | | | | |
| Foreign currency translation adjustment | — | (67) | — | 103 |
| Comprehensive income | $9,570 | $23,877 | $18,738 | $34,616 |

See notes to condensed consolidated financial statements.

4

Table of Contents

### JAKKS PACIFIC, INC. AND SUBSIDIARIES

### CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS

#### For the Nine Months Ended September 30, 2003 and 2004 (Unaudited)

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2003 | 2004 |
| | (In thousands) | |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Net income | $ 18,738 | $ 34,719 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation and amortization | 6,743 | 7,212 |
| Compensation adjustment for repriced stock option grants | (393) | 5,857 |
| Loss on disposal of property and equipment | — | 59 |
| Earned compensation from restricted stock grants | — | 2,695 |
| Change in operating assets and liabilities | | |
| Accounts receivable | (28,684) | (31,109) |
| Inventory | (1,765) | 1,468 |
| Prepaid expenses and other current assets | (4,543) | (3,531) |
| Investment in joint venture | 4,278 | 4,832 |
| Accounts payable and accrued expenses | 15,888 | 56,788 |
| Income taxes payable | 5,362 | 7,380 |
| Total adjustments | (3,114) | 51,651 |
| Net cash provided by operating activities | 15,624 | 86,370 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Cash paid for net assets acquired, net of cash acquired | (21,168) | (68,063) |
| Purchase of property and equipment | (3,042) | (4,565) |
| Other assets | (653) | (2,137) |
| Net purchase of marketable securities | (18,321) | (78) |
| Repayment of notes receivable from officers | 1,113 | — |
| Net cash used by investing activities | (42,071) | (74,843) |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Proceeds from stock options and warrants exercised | 743 | 2,148 |
| Repurchase of common shares | (4,221) | — |
| Repayment of long term debt | (19) | (61) |
| Net proceeds from issuance of convertible notes payable | 94,366 | — |
| Net cash provided by financing activities | 90,869 | 2,087 |
| Net increase in cash and cash equivalents | 64,422 | 13,614 |
| Cash and cash equivalents, beginning of period | 68,412 | 118,182 |
| Cash and cash equivalents, end of period | $132,834 | $131,796 |
| Supplemental disclosure of cash flow information: | | |
| Cash paid during the period for: | | |
| Income taxes | $ 2,922 | $ 707 |
| Interest | $ 19 | $ 2,268 |

Non cash investing and financing activity:

On June 10, 2004, the Company issued 749,005 shares of its common stock valued at approximately $14.9 million in connection with the acquisition of Play Along.

See accompanying notes to condensed consolidated financial statements.

5

JAKKS PACIFIC, INC. AND SUBSIDIARIES

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS

(Unaudited)
September 30, 2004

**Note 1 — Basis of Presentation**

The accompanying 2003 and 2004 unaudited interim condensed consolidated financial statements included herein have been prepared by the Company, without audit, pursuant to the rules and regulations of the Securities and Exchange Commission (the "SEC"). Certain information and footnote disclosures normally included in financial statements prepared in accordance with accounting principles generally accepted in the United States of America have been condensed or omitted pursuant to such rules and regulations. However, the Company believes that the disclosures are adequate to prevent the information presented from being misleading. These financial statements should be read in conjunction with the financial statements and the notes thereto included in our Form 10–K, which contains financial information for the three years in the period ended December 31, 2003.

The information provided in this report reflects all adjustments (consisting solely of normal recurring accruals) that are, in the opinion of management, necessary to present fairly the results of operations for this period. The results for this period are not necessarily indicative of the results to be expected for the full year.

The condensed consolidated financial statements include the accounts of JAKKS Pacific, Inc. and its wholly–owned subsidiaries.

The retail toy industry is inherently seasonal. Generally, in the past, the Company's sales have been highest during the third and fourth quarters, and collections for those sales have been highest during the succeeding fourth and first fiscal quarters. Sales of writing instrument products are likewise seasonal with sales highest during the second and third quarters, as are the Company's Go Fly a Kite, Funnoodle and Storm outdoor products, which are largely sold in the first and second quarters. The Company's working capital needs have been highest during the third and fourth quarters.

While the Company has taken steps to level sales over the entire year, sales are expected to remain heavily influenced by the seasonality of its toy products. The result of these seasonal patterns is that operating results and demand for working capital may vary significantly by quarter. Orders placed with the Company for shipment are cancelable until the date of shipment. The combination of seasonal demand and the potential for order cancellation makes accurate forecasting of future sales difficult and causes the Company to believe that backlog may not be an accurate indicator of its future sales. Similarly, financial results for a particular quarter may not be indicative of results for the entire year.

Basic earnings per share has been computed using the weighted average number of common shares. Diluted earnings per share has been computed using the weighted average number of common shares and common share equivalents (which consist of warrants, options, and convertible debt to the extent they are dilutive).

**Note 2 — Business Segments and Geographic Data**

The Company is a worldwide producer and marketer of children's toys and related products, principally engaged in the design, development, production and marketing of traditional toys, including boys' action figures, vehicles and playsets, craft and activity products, writing instruments, compounds, girls' toys, plush, construction toys, and infant and preschool toys. The Company's reportable segments are North America Toys, International and Other.

The North America Toys segment, which includes the United States and Canada, and the International toy segment, which includes sales to non–North American markets, include the design, development, production and marketing of children's toys and related products. The Company also has an additional segment classified as Other, which sells various products to the specialty markets in the United States.

6

Table of Contents

JAKKS PACIFIC, INC. AND SUBSIDIARIES

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

(Unaudited)

Segment performance is measured at the operating income level. All sales are made to external customers, and general corporate expenses have been attributed to the North America Toy segment, which is a dominant segment. Segment assets are comprised of all assets, net of applicable reserves and allowances.

Results are not necessarily those that would be achieved were each segment an unaffiliated business enterprise. Information by segment and a reconciliation to reported amounts for the three and nine months ended September 30, 2003 and 2004 are as follows (in thousands):

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2003 | 2004 | 2003 | 2004 |
| **Net Sales** | | | | |
| North America Toys | $73,149 | $185,645 | $197,928 | $350,832 |
| International | 17,151 | 20,352 | 33,363 | 38,464 |
| Other | 8 | 86 | 67 | 168 |
| | $90,308 | $206,083 | $231,358 | $389,464 |

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2003 | 2004 | 2003 | 2004 |
| **Operating Income** | | | | |
| North America Toys | $10,188 | $27,743 | $20,325 | $41,228 |
| International | 2,389 | 3,041 | 3,816 | 4,520 |
| Other | 1 | 13 | 5 | 20 |
| | $12,578 | $30,797 | $24,146 | $45,768 |

| | September 30, | |
|---|---|---|
| | 2003 | 2004 |
| **Assets** | | |
| North America Toys | $438,198 | $621,452 |
| International | 102,746 | 68,128 |
| Other | 47 | 288 |
| | $540,991 | $689,868 |

The following tables present information about the Company by geographic area as of September 30, 2003 and 2004 and for the three and nine months ended September 30, 2003 and 2004 (in thousands):

| | September 30, | |
|---|---|---|
| | 2003 | 2004 |
| **Long–lived Assets** | | |
| United States | $182,580 | $289,784 |
| Hong Kong | 52,603 | 31,455 |
| Europe | 3,305 | 3,305 |
| | $238,488 | $324,544 |

7

JAKKS PACIFIC, INC. AND SUBSIDIARIES

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

(Unaudited)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2003 | 2004 | 2003 | 2004 |
| Net Sales by Geographic Area | | | | |
| United States | $73,156 | $177,568 | $196,693 | $340,063 |
| Europe | 14,607 | 14,892 | 28,097 | 29,016 |
| Canada | 1,135 | 8,164 | 3,535 | 10,936 |
| Hong Kong | 660 | 1,226 | 842 | 2,469 |
| Other | 750 | 4,233 | 2,191 | 6,980 |
| | $90,308 | $206,083 | $231,358 | $389,464 |

Note 3 — Inventories

Net inventories include the ex–factory cost of goods, in–bound freight and duty and are stated at the lower of cost (first–in, first–out) or market and consist of the following (in thousands):

| | December 31, 2003 | September 30, 2004 |
|---|---|---|
| Deposits and raw materials | $ 1,033 | $ 3,313 |
| Finished goods | 43,367 | 46,002 |
| | $44,400 | $49,315 |

Note 4 — Convertible Senior Notes

Pursuant to the terms of a Purchase Agreement, dated June 9, 2003, the Company sold an aggregate of $98 million of 4.625% Convertible Senior Notes due June 15, 2023 and received net proceeds from the issuance of these convertible notes payable of approximately $94.4 million. The holders of the notes may convert the notes into shares of the Company's common stock at any time at an initial conversion price of $20.00 per share, subject to certain circumstances described in the notes. The Company pays cash interest on the notes at an annual rate of 4.625% of the principal amount at issuance, from the issue date to June 15, 2010, payable on June 15 and December 15 of each year, with the first payment having been made on December 15, 2003. After June 15, 2010, the Company will not pay cash interest on the notes. At maturity, on June 15, 2023, the Company will redeem the notes at their accreted principal amount, which will be equal to $1,811.95 (181.195%) per $1,000 principal amount at issuance.

The Company may redeem the notes at its option in whole or in part beginning on June 15, 2010, at 100% of their accreted principal amount plus accrued and unpaid interest (including contingent interest and additional amounts), if any, payable in cash. Holders of the notes may also require the Company to repurchase all or part of their notes on June 15, 2010, for cash, at a repurchase price of 100% of the principal amount per note plus accrued and unpaid interest (including contingent interest and additional amounts), if any. Holders of the notes may also require the Company to repurchase all or part of their notes on June 15, 2013 and June 15, 2018 at a repurchase price of 100% of the accreted principal amount per note plus accrued and unpaid interest (including contingent interest and additional amounts), if any. Any repurchases at June 15, 2013 and June 15, 2018 may be paid in cash, in shares of common stock or a combination of cash and shares of common stock.

**JAKKS PACIFIC, INC. AND SUBSIDIARIES**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)**

**(Unaudited)**

**Note 5 — Credit Facility**

In October 2001, the Company and all of its domestic subsidiaries jointly and severally secured a syndicated line of credit totaling $50 million with a consortium of banks led by Bank of America, N.A. ("Line of Credit"). In June 2003, the Company and the banks amended the loan agreements governing the Line of Credit (the "Loan Agreements"), pursuant to which amendment (i) the banks suspended certain of the Company's covenants under the Loan Agreements, including those that prohibited us from consummating the Convertible Senior Notes offering (See Note 4) without the banks' consent, and (ii) the banks' obligations to extend credit under the Line of Credit were simultaneously suspended. There had never been any outstanding borrowings under the Line of Credit since its inception. On August 6, 2004, the Company and all of its domestic subsidiaries notified Bank of America that it was terminating the Line of Credit (under which there were no outstanding borrowings) effective August 13, 2004. The original maturity date of the Line of Credit was October 10, 2004.

**Note 6 — Earnings Per Share**

The following table is a reconciliation of the weighted average shares used in the computation of basic and diluted earnings per share for the periods presented (in thousands, except per share data):

| | Three Months Ended September 30, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2003 | | | 2004 | | |
| | Income | Weighted Average Shares | Per–Share | Income | Weighted Average Shares | Per–Share |
| **Earnings per share — basic** | | | | | | |
| Income available to common stockholders | $9,570 | 24,177 | $0.40 | $23,810 | 26,167 | $0.91 |
| **Effect of dilutive securities** | | | | | | |
| Options, warrants and convertible debt | — | 452 | | — | 852 | |
| **Earnings per share — diluted** | | | | | | |
| Income available to common stockholders plus assumed exercises | $9,570 | 24,629 | $0.39 | $23,810 | 27,019 | $0.88 |

| | Nine Months Ended September 30, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2003 | | | 2004 | | |
| | Income | Weighted Average Shares | Per–Share | Income | Weighted Average Shares | Per–Share |
| **Earnings per share — basic** | | | | | | |
| Income available to common stockholders | $18,738 | 24,249 | $0.77 | $34,719 | 25,650 | $1.35 |
| **Effect of dilutive securities** | | | | | | |
| Options, warrants and convertible debt | — | 467 | | — | 693 | |
| **Earnings per share — diluted** | | | | | | |
| Income available to common stockholders plus assumed exercises | $18,738 | 24,716 | $0.76 | $34,719 | 26,343 | $1.32 |

9

JAKKS PACIFIC, INC. AND SUBSIDIARIES

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

(Unaudited)

Note 7 — Common Stock and Preferred Stock

The Company has 105,000,000 authorized shares of stock consisting of 100,000,000 shares of $.001 par value common stock and 5,000,000 shares of $.001 par value preferred stock.

On June 10, 2004, the Company issued 749,005 shares of its common stock valued at $14.9 million in connection with the acquisition of the assets of Play Along, Inc., Play Along (Hong Kong) Limited and PA Distribution, Inc. (collectively, "Play Along").

In February 2003, the Company's Board of Directors approved a buyback of up to $20 million of our common stock. During 2003, the Company repurchased and retired 554,500 shares of its common stock at an aggregate cost of approximately $6.1 million. There were no common stock repurchases during the nine months ended September 30, 2004.

Note 8 — Acquisitions

On June 10, 2004, the Company purchased substantially all of the assets and assumed certain liabilities of Play Along. The total purchase price of $85.7 million consisted of cash paid in the amount of $70.8 million and the issuance of 749,005 shares of the Company common stock valued at $14.9 million and resulted in goodwill of $83.9 million. In addition, the Company agreed to pay an earn–out of up to $10.0 million per year for the three calendar years following the acquisition up to an aggregate amount of $30.0 million based on the achievement of certain financial performance criteria which will be recorded as goodwill when and if earned. Play Along designs and produces traditional toys, which it distributes domestically and internationally. This acquisition expands our product offerings in the pre–school area and brings new product development and marketing talent to the Company. The Company's results of operations have included Play Along from the date of acquisition. In accordance with FASB Statement of Financial Accounting Standards No. 141 "Business Combinations" ("SFAS 141"), the allocation of the purchase price is based on studies and valuations that are currently being performed and is expected to be completed in the fourth quarter of 2004.

The total amount of goodwill from the Play Along acquisition is expected to be deductible for income tax purposes. The total purchase price was allocated to the estimated fair value of assets acquired and liabilities assumed, as set forth in the following table (in thousands):

|  | Play Along |
|---|---|
| Current assets acquired | $ 22,801 |
| Property and equipment, net | 546 |
| Other assets | 884 |
| Liabilities assumed | (22,424) |
| Goodwill | 83,879 |
| Purchase Price | $ 85,686 |

In May 2003, the Company purchased the product lines, and related assets and assumed certain liabilities from P&M Products USA, Inc. and an affiliated United Kingdom company, P&M Products Limited, (collectively "P&M"). The total purchase price of approximately $22.0 million consisted of cash paid in the amount of $20.7 million and liabilities of $0.6 million and resulted in goodwill of $16.2 million. Additionally, the patent for Blopen, one of P&M's significant product lines, was purchased for $1.8 million in cash in a separate transaction with the patent owner that previously licensed Blopen to P&M. This acquisition expanded the product offerings in the Company's activities category. The Company's results of operations have included P&M from the date of acquisition.

10

**JAKKS PACIFIC, INC. AND SUBSIDIARIES**

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

(Unaudited)

The total amount of goodwill from the P&M acquisition is expected to be deductible for income tax purposes. The total purchase price was allocated to the estimated fair value of assets acquired and liabilities assumed, as set forth in the following table (in thousands):

|  | P&M |
|---|---|
| Current assets acquired | $ 5,121 |
| Property and equipment, net | 17 |
| Other assets | 11 |
| Liabilities assumed | (633) |
| Goodwill | 16,191 |
| Purchase Price | $ 20,707 |

The following unaudited pro forma information represents the Company's consolidated results of operations as if the acquisitions of Play Along and P&M had occurred on January 1, 2003 and after giving effect to certain adjustments including the elimination of certain general and administrative expenses and other income and expense items not attributable to on-going operations, interest expense, and related tax effects. Such pro forma information does not purport to be indicative of operating results that would have been reported had the acquisitions of Play Along and P&M occurred on January 1, 2003 or future operating results.

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | 2003 | 2004 | 2003 | 2004 |
|  | (In thousands, except per share data) | | | |
| Net Sales | $158,075 | $206,083 | $355,422 | $434,150 |
| Net income | $ 25,655 | $ 23,812 | $ 36,905 | $ 35,378 |
| Earnings per share — basic | $ 1.03 | $ 0.91 | $ 1.48 | $ 1.36 |
| Weighted average shares outstanding — basic | 24,926 | 26,167 | 24,998 | 26,092 |
| Earnings per share — diluted | $ 1.01 | $ 0.88 | $ 1.45 | $ 1.32 |
| Weighted average shares and equivalents outstanding — diluted | 25,378 | 27,019 | 25,465 | 26,785 |

**Note 9 — Stock Option Plans**

In December 2002, the FASB issued Statement of Financial Accounting Standards No. 148 "Accounting for Stock-Based Compensation — Transition and Disclosure an Amendment of FASB Statement No. 123" ("SFAS 148"). SFAS 148 amends Statement of Financial Accounting Standards No. 123, Accounting for Stock-Based Compensation ("SFAS 123"), to provide alternative methods of transition for an entity that voluntarily changes to the fair value based method of accounting for stock-based employee compensation. It also amends the disclosure provisions of that Statement to require prominent disclosure about the effects on reported net income of an entity's accounting policy decisions with respect to stock-based employee compensation. Finally, SFAS 148 amends APB Opinion No. 28, Interim Financial Reporting, to require disclosure about those effects in interim financial information.

At September 30, 2004, the Company had stock-based employee compensation plans and accounted for those plans under the recognition and measurement principles of APB Opinion No. 25, Accounting for Stock Issued to Employees, and related Interpretations. No stock-based employee compensation cost is reflected in

JAKKS PACIFIC, INC. AND SUBSIDIARIES

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

(Unaudited)

net income, as all options granted under those plans had an exercise price equal to the market value of the underlying common stock on the date of grant. However, certain options had been repriced in October 2000 resulting in compensation adjustments, which have been reflected in net income. The following table illustrates the effect on net income and earnings per share if the Company had applied the fair value recognition provisions of SFAS 123, to stock–based employee compensation.

In 2003 and 2004, the fair value of each employee option grant was estimated on the date of grant using the Black–Scholes option–pricing model with the following assumptions used: risk–free rate of interest of 4%; dividend yield of 0%, with volatility of 138%; and expected lives of five years.

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2003 | 2004 | 2003 | 2004 |
| | (In thousands, except per share data) | | | |
| Net income, as reported | $9,570 | $23,810 | $18,738 | $34,719 |
| Add(deduct): Stock–based employee compensation expense included in reported net income, net of related tax effects | (452) | 1,406 | (393) | 5,857 |
| Deduct: Total stock–based employee compensation expense determined under fair value method for all awards, net of related tax effects | (963) | (1,344) | (2,706) | (3,826) |
| Pro forma net income | $8,155 | $23,872 | $15,639 | $36,750 |
| Earnings per share: | | | | |
| Basic — as reported | $ 0.40 | $ 0.91 | $ 0.77 | $ 1.35 |
| Basic — pro forma | $ 0.34 | $ 0.91 | $ 0.64 | $ 1.43 |
| Diluted — as reported | $ 0.39 | $ 0.88 | $ 0.76 | $ 1.32 |
| Diluted — pro forma | $ 0.33 | $ 0.88 | $ 0.63 | $ 1.40 |

Note 10 —   Marketable Securities

At September 30, 2004, marketable securities were categorized as available for sale and related unrealized holding gains or losses were included as a component of stockholders' equity. At December 31, 2003 and September 30, 2004, cost approximated fair market value.

Note 11 —   Recent Accounting Pronouncements

In January 2003 and as revised in December 2003, FASB issued FASB Interpretation No. 46, "Consolidation of Variable Interest Entities" ("Interpretation 46") and FASB Interpretation No. 46R. Interpretations 46 and 46R require companies with a variable interest in a variable interest entity to apply this guidance as of the beginning of the first reporting period after December 15, 2003. If applicable, the application of the guidance could result in the consolidation of a variable interest entity. Interpretations 46 and 46R are not applicable to the Company, as it is not the beneficiary of any variable interest entities.

At its meeting on September 30, 2004, the Emerging Issues Task Force (EITF) reached a final consensus that the dilutive effect of contingent convertible debt instruments must be included in dilutive earnings per share regardless of whether the triggering contingency has been satisfied. This consensus, EITF Issue 04–8, requires application on a retroactive basis and restatement of prior period earnings per share. The final consensus, subject to approval by the FASB, is expected to be effective for periods ending after December 15, 2004. Had this consensus been in effect at September 30, 2004 and September 30, 2003, the

JAKKS PACIFIC, INC. AND SUBSIDIARIES

NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

(Unaudited)

Company's diluted earnings per share would have been $0.77 and $0.35 for the respective quarters and $1.20 and $0.70 for the respective nine months then ended.

**Note 12 — Subsequent Events**

On October 19, 2004, the Company was named as a defendant in a lawsuit commenced by World Wrestling Entertainment, Inc. ("WWE") in the U.S. District Court for the Southern District of New York concerning its toy licenses with WWE and the video game license between WWE and the joint venture company operated by THQ, Inc. ("THQ") and the Company. Further named as defendants were THQ, the joint venture, certain of the Company's foreign subsidiaries, Jack Friedman (the Company's Chairman and Chief Executive Officer), Stephen Berman (the Company's Chief Operating Officer, President and Secretary and a member of the Company's Board of Directors), Joel Bennett (the Company's Chief Financial Officer), Stanley Shenker and Associates, Inc., Bell Licensing, LLC, Stanley Shenker and James Bell.

WWE is seeking treble, punitive and other damages (including disgorgement of profits) in an undisclosed amount and a declaration that the video game license with the joint venture and an amendment to the Company's toy licenses with WWE are void and unenforceable. The lawsuit alleges violations by the defendants of the Racketeer Influenced and Corrupt Organization Act ("RICO") and the anti-bribery provisions of the Robinson–Patman Act, and various claims under state law. WWE has stated in its publicly-filed documents that it intends for the toy and video game licenses to continue during the pendency of the litigation.

The Company's toy licenses with the WWE commenced in 1995 and are scheduled to expire in 2009. The joint venture's license with the WWE commenced in 1998 and is scheduled to expire in 2009 (subject to the joint venture's right to extend that license for an additional five years).

The Company believes that the WWE's claims are without merit and it intends to defend vigorously against them.

On November 5, 2004, a class action lawsuit was filed in the United States District Court for the Southern District of New York. According to plaintiffs' counsel, the complaint alleges that defendants issued positive statements concerning increasing sales of JAKKS' WWE licensed products and that these statements were false and misleading because WWE was contending that the WWE licenses had been obtained through a pattern of commercial bribery, that JAKKS' relationship with the WWE was being negatively impacted by the WWE's contentions and that there was an increased risk that the WWE would either seek modification or nullification of the licensing agreements with JAKKS. The plaintiffs in the class are described as purchasers of the Company's common stock between February 17, 2004 and October 19, 2004.

The lawsuit seeks compensatory and other damages in an undisclosed amount, alleging violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b–5 promulgated thereunder by each of the defendants (namely the Company and Messrs. Friedman, Berman and Bennett), and violations of Section 20(a) of the Exchange Act by Messrs. Friedman, Berman and Bennett.

The Company believes that on November 8, 2004 a second lawsuit seeking class action status was filed against the Company in the United States District Court for the Southern District of New York on behalf of all persons who purchased the Company's securities between February 17, 2004 and October 19, 2004. Although the Company has not yet received a copy of the complaint in such action, it believes the lawsuit is seeking to represent the same class of purchasers of the Company's common stock with respect to the same subject matter as is involved in the November 5, 2004 class action.

The Company believes that the claims underlying both of the class actions are without merit and intends to defend vigorously against them.

13

JAKKS PACIFIC, INC. AND SUBSIDIARIES

Item 2.    *Management's Discussion and Analysis of Financial Condition and Results of Operations*

The following discussion and analysis of financial condition and results of operations should be read together with our Condensed Consolidated Financial Statements and Notes thereto which appear elsewhere herein.

**Recent Developments**

In May 2003, we purchased the product lines and related assets and assumed certain liabilities from P&M Products USA, Inc. and an affiliated United Kingdom company, P&M Products Limited, (collectively, "P&M"). The total purchase price of approximately $22.0 million consisted of cash paid in the amount of $20.7 million and liabilities of $0.6 million and resulted in goodwill of $16.2 million. Additionally, the patent for Blopen, one of P&M's significant product lines, was purchased for $1.8 million in cash in a separate transaction with the patent owner that previously licensed Blopen to P&M. This acquisition expanded the product offerings in our activities category. Our results of operations have included P&M from the date of acquisition.

On June 10, 2004, we purchased substantially all of the assets and assumed certain liabilities from Play Along. The total purchase price of $85.7 million consisted of cash paid in the amount of $70.8 million and the issuance of 749,005 shares of our common stock valued at $14.9 million and resulted in goodwill of $83.9 million. In addition, we agreed to pay an earn–out of up to $10.0 million per year for the three calendar years following the acquisition up to an aggregate amount of $30.0 million based on the achievement of certain financial performance criteria which will be recorded as goodwill when and if earned. Play Along designs and produces traditional toys, which it distributes domestically and internationally. This acquisition expands our product offerings in the pre–school area and brings new product development and marketing talent to us. In accordance with FASB Statement of Financial Accounting Standards No. 141 "Business Combinations" ("SFAS 141"), the allocation of the purchase price is based on studies and valuations that are currently being performed and is expected to be completed in the fourth quarter of 2004. Our results of operations have included Play Along from the date of acquisition.

On August 6, 2004, we notified Bank of America that we were terminating the Line of Credit (under which there were no outstanding borrowings) effective August 13, 2004. The original maturity date of the credit facility was October 10, 2004.

On October 19, 2004, we were named as defendants in a lawsuit commenced by World Wrestling Entertainment, Inc. ("WWE") in the U.S. District Court for the Southern District of New York concerning our toy licenses with WWE and the video game license between WWE and the joint venture company operated by THQ, Inc. ("THQ") and us. Further named as defendants were THQ, the joint venture, certain of our foreign subsidiaries, Jack Friedman (our Chairman and Chief Executive Officer), Stephen Berman (our Chief Operating Officer, President and Secretary and a member of our Board of Directors), Joel Bennett (our Chief Financial Officer), Stanley Shenker and Associates, Inc., Bell Licensing, LLC, Stanley Shenker and James Bell.

WWE is seeking treble, punitive and other damages (including disgorgement of profits) in an undisclosed amount and a declaration that the video game license with the joint venture and an amendment to our toy licenses with WWE are void and unenforceable. The lawsuit alleges violations by the defendants of the Racketeer Influenced and Corrupt Organization Act ("RICO") and the anti–bribery provisions of the Robinson–Patman Act, and various claims under state law. WWE has stated in its publicly–filed documents that it intends for the toy and video game licenses to continue during the pendency of the litigation.

Our toy licenses with the WWE commenced in 1995 and are scheduled to expire in 2009. The joint venture's license with the WWE commenced in 1998 and is scheduled to expire in 2009 (subject to the joint venture's right to extend that license for an additional five years).

We believe that the WWE's claims are without merit and we intend to defend vigorously against them.

14

On November 5, 2004, a class action lawsuit was filed in the United States District Court for the Southern District of New York. According to plaintiffs' counsel, the complaint alleges that defendants issued positive statements concerning increasing sales of our WWE licensed products and that these statements were false and misleading because WWE was contending that the WWE licenses had been obtained through a pattern of commercial bribery, that our relationship with the WWE was being negatively impacted by the WWE's contentions and that there was an increased risk that the WWE would either seek modification or nullification of the licensing agreements with us. The plaintiffs in the class are described as purchasers of our common stock between February 17, 2004 and October 19, 2004.

The lawsuit seeks compensatory and other damages in an undisclosed amount, alleging violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b–5 promulgated thereunder by each of the defendants (namely the Company and Messrs. Friedman, Berman and Bennett), and violations of Section 20(a) of the Exchange Act by Messrs. Friedman, Berman and Bennett.

We believe that on November 8, 2004 a second lawsuit seeking class action status was filed against us in the United States District Court for the Southern District of New York on behalf of all persons who purchased our securities between February 17, 2004 and October 19, 2004. Although we have not yet received a copy of the complaint in such action, we believe the lawsuit is seeking to represent the same class of purchasers of our common stock with respect to the same subject matter as is involved in the November 5, 2004 class action.

We believe that the claims underlying both of the class actions are without merit and intend to defend vigorously against them.

**Results of Operations**

The following unaudited table sets forth, for the periods indicated, certain statement of operations data as a percentage of net sales.

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|  | 2003 | 2004 | 2003 | 2004 |
|---|---|---|---|---|
| Net sales | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of sales | 59.9 | 60.3 | 60.4 | 60.6 |
| Gross profit | 40.1 | 39.7 | 39.6 | 39.4 |
| Selling, general and administrative expenses | 27.0 | 24.7 | 28.3 | 27.7 |
| Recall costs | (0.8) | — | 0.9 | — |
| Income from operations | 13.9 | 15.0 | 10.4 | 11.7 |
| Profit from joint venture | (1.0) | (0.4) | (0.6) | (0.3) |
| Interest, net | 1.0 | 0.4 | 0.3 | 0.5 |
| Income before provision for income taxes | 13.9 | 15.0 | 10.7 | 11.5 |
| Provision for income taxes | 3.3 | 3.5 | 2.6 | 2.7 |
| Net income | 10.6% | 11.5% | 8.1% | 8.8% |

*Three Months Ended September 30, 2004 and 2003*

*Net Sales.* Net sales were $206.1 million in 2004 compared to $90.3 million in 2003, representing an increase of 128.2%. The increase in net sales was primarily due to an increase in sales of our traditional toy products of $49.5 million, including TV Games, WWE action figures and accessories and Dolls, and the addition of $72.6 million in sales from our recent Play Along acquisition, as well as international sales of $11.4 million, partially offset by a decrease in sales of our crafts and activities and writing instruments of $16.3 million and our seasonal products of $1.4 million, including water guns and junior sports toys.

*Gross Profit.* Gross profit increased $45.6 million, or 125.8%, to $81.8 million, or 39.7% of net sales, in 2004 from $36.2 million, or 40.1% of net sales, in 2003. The overall increase in gross profit was attributable to the increase in net sales. The decrease in gross profit margin of 0.4% of net sales was primarily due to an

15

increase in royalty expense as a percentage of net sales due to changes in the product mix to more products with higher royalty rates from products with lower royalty rates or proprietary products with no royalties.

*Selling, General and Administrative Expenses.* Selling, general and administrative expenses were $51.0 million in 2004 and $24.3 million in 2003, constituting 24.7% and 27.0% of net sales, respectively. The overall increase of $26.7 million in such costs was primarily due to the impact of stock–based compensation, an increase in legal ($4.4 million) and bonus ($2.3 million) expenses, and the addition of overhead related to the operations of Play Along ($13.6 million). Due to the increases in our grants of restricted stock awards and the price of our common stock in 2004 compared to a moderate decrease in the price of our common stock in 2003, we had stock–based compensation charges of $2.5 million compared to a credit of $0.5 million in 2003. The increase in direct selling expenses ($9.4 million) is primarily due to an increase in advertising and promotional expenses in 2004 in support of the sell–through of our various products at retail. We produced and aired television commercials in support of several of our products, including World Wrestling Entertainment, Dragon Ball and Mucha Lucha action figures, TV Games, and Flying Colors products in 2004, and World Wrestling Entertainment and Dragon Ball action figures and Flying Colors products in 2003. From time to time, we may increase our advertising efforts, if we deem it appropriate for particular products.

*Recall Costs.* There were no recall costs in the third quarter of 2004. In the second quarter of 2003, we accrued a $2.7 million charge for the recall of one of our products, and in the third quarter of 2003, we recorded a credit of $0.7 million for the recovery of recall costs from one of our third–party factories.

The remaining component of the recall costs is as follows (in thousands):

| | Accrued Balance June 30, 2004 | Accrual | Actual | Accrued Balance September 30, 2004 |
|---|---|---|---|---|
| Recall costs | $ 83 | $ — | $ 83 | $ — |

*Profit from Joint Venture.* Profit from joint venture in 2004 was $0.9 million as compared to $0.9 million in 2003 with stronger sales of existing titles in 2004 compared to five new lower–priced vehicle combat games plus lower carryover sales in 2003.

*Interest, Net.* Interest income resulting from higher average cash balances during 2004 than in 2003 was offset by lower interest rates and accrued interest expense of $1.1 million for the convertible senior notes issued in June 2003.

*Provision for Income Taxes.* Provision for income taxes included Federal, state and foreign income taxes in 2003 and 2004, at effective tax rates of 24.0% in 2003 and 23.0% in 2004, benefiting from a flat 17.0% Hong Kong Corporation Tax on our income arising in, or derived from, Hong Kong for 2003 and 2004, respectively. As of September 30, 2004, we had deferred tax assets of approximately $4.5 million for which no allowance has been provided since, in the opinion of management, realization of the future benefit is probable. In making this determination, management considered all available evidence, both positive and negative, as well as the weight and importance given to such evidence.

### Nine Months Ended September 30, 2004 and 2003

*Net Sales.* Net sales were $389.5 million in 2004 compared to $231.4 million in 2003, representing an increase of 68.3%. The increase in net sales was primarily due to an increase in sales of our traditional toy products of $115.0 million, including TV Games, WWE and Dolls, and the addition of $80.7 million in sales from our recent Play Along acquisition, as well as international sales of $14.7 million, was partially offset by a decrease in sales of our crafts and activities and writing instruments of $35.5 million and our seasonal products of $16.9 million, including water guns and junior sports toys.

*Gross Profit.* Gross profit increased $62.0 million, or 67.7%, to $153.5 million, or 39.4% of net sales, in 2004 from $91.6 million, or 39.6% of net sales, in 2003. The overall increase in gross profit was attributable to the increase in net sales. The decrease in gross profit margin of 0.2% of net sales was primarily due to an increase in royalty expense as a percentage of net sales due to changes in the product mix to more products with higher royalty rates from products with lower royalty rates or proprietary products with no royalties.

16

*Selling, General and Administrative Expenses.* Selling, general and administrative expenses were $107.8 million in 2004 and $65.4 million in 2003, constituting 27.7% and 28.3% of net sales, respectively. The overall increase of $42.4 million in such costs was primarily due to the impact of stock–based compensation, an increase in legal ($6.0 million) and bonus ($5.3 million) expenses, and the addition of overhead related to the operations of Play Along ($14.7 million). Due to the increases in our grants of restricted stock awards and the price of our common stock in 2004 compared to a moderate decrease in the price of our common stock in 2003 we had stock–based compensation charges of $8.5 million compared to a credit of $0.4 million in 2003. The increase in direct selling expenses ($11.7 million) is primarily due to an increase in advertising and promotional expenses in 2004 in support of the sell–through of our various products at retail. We produced and aired television commercials in support of several of our products, including World Wrestling Entertainment, Dragon Ball and Mucha Lucha action figures, TV Games, and Flying Colors products in 2004, and World Wrestling Entertainment and Dragon Ball action figures and Flying Colors products in 2003. From time to time, we may increase our advertising efforts, if we deem it appropriate for particular products.

*Recall Costs.* There were no recall costs in the first nine months of 2004. In the second quarter of 2003, we accrued a $2.7 million charge for the recall of one of our products, and in the third quarter of 2003, we recorded a credit of $0.7 million for the recovery of recall costs from one of our third–party factories.

The remaining component of the recall costs is as follows (in thousands):

|  | Accrued Balance December 31, 2003 | Accrual | Actual | Accrued Balance September 30, 2004 |
|---|---|---|---|---|
| Recall costs | $ 490 | $  — | $490 | $  — |

*Profit from Joint Venture.* Profit from joint venture in 2004 was $1.3 million as compared to $1.3 million in 2003 with stronger carryover sales of existing titles in 2004 compared to five new lower–priced vehicle combat games plus lower carryover sales in 2003.

*Interest, Net.* Interest income resulting from higher average cash balances during 2004 than in 2003 was offset by lower interest rates and accrued interest expense of $3.4 million for the convertible senior notes issued in June 2003.

*Provision for Income Taxes.* Provision for income taxes included Federal, state and foreign income taxes in 2003 and 2004, at effective tax rates of 24.0% in 2003 and 23.0% in 2004, benefiting from a flat 17.0% Hong Kong Corporation Tax on our income arising in, or derived from, Hong Kong for 2003 and 2004, respectively. As of September 30, 2004, we had deferred tax assets of approximately $4.5 million for which no allowance has been provided since, in the opinion of management, realization of the future benefit is probable. In making this determination, management considered all available evidence, both positive and negative, as well as the weight and importance given to such evidence.

## Seasonality and Backlog

The retail toy industry is inherently seasonal. Generally, our sales have been highest during the third and fourth quarters, and collections for those sales have been highest during the succeeding fourth and first fiscal quarters. Sales of writing instrument products are likewise seasonal with sales highest during the second and third quarters, as are our Go Fly a Kite, Funnoodle, and Storm outdoor products, which are largely sold in the first and second quarters. Our working capital needs have been highest during the third and fourth quarters.

While we have taken steps to level sales over the entire year, sales are expected to remain heavily influenced by the seasonality of our toy products. The result of these seasonal patterns is that operating results and demand for working capital may vary significantly by quarter. Orders placed with us for shipment are cancelable until the date of shipment. The combination of seasonal demand and the potential for order cancellation makes accurate forecasting of future sales difficult and causes us to believe that backlog may not be an accurate indicator of our future sales. Similarly, financial results for a particular quarter may not be indicative of results for the entire year.

17

**Recent Accounting Pronouncements**

In January 2003 and as revised in December 2003, FASB issued FASB Interpretation No. 46, "Consolidation of Variable Interest Entities" ("Interpretation 46") and FASB Interpretation No. 46R. Interpretations 46 and 46R require companies with a variable interest in a variable interest entity to apply this guidance as of the beginning of the first reporting period after December 15, 2003. If applicable, the application of the guidance could result in the consolidation of a variable interest entity. Interpretations 46 and 46R are not applicable to us, as we are not the beneficiary of any variable interest entities.

At its meeting on September 30, 2004, the Emerging Issues Task Force (EITF) reached a final consensus that the dilutive effect of contingent convertible debt instruments must be included in dilutive earnings per share regardless of whether the triggering contingency has been satisfied. This consensus, EITF Issue 04–8, requires application on a retroactive basis and restatement of prior period earnings per share. The final consensus, subject to approval by the FASB, is expected to be effective for periods ending after December 15, 2004. Had this consensus been in effect at September 30, 2004 and September 30, 2003, our diluted earnings per share would have been $0.77 and $0.35 for the respective quarters and $1.20 and $0.70 for the respective nine months then ended.

**Liquidity and Capital Resources**

As of September 30, 2004, we had working capital of $218.5 million, as compared to $232.6 million as of December 31, 2003. This decrease was primarily attributable to disbursements related to the acquisition of Play Along, though offset in part by increases generated by our operating results.

Operating activities provided net cash of $86.4 million in 2004, as compared to $15.6 million in 2003. Net cash was provided primarily by net income which was adjusted for non–cash charges, including earned compensation from stock option grants and restricted stock grants and depreciation and amortization, as well as an increase in the cash received from the preferred return from THQ joint venture, a decrease in inventory and increases in accounts payable and accrued expenses and income taxes payable, which were offset in part by increases in accounts receivable and prepaid expenses and other current assets. Other than open purchase orders, issued in the normal course of business, we have no obligations to purchase finished goods from our manufacturers. As of September 30, 2004, we had cash and cash equivalents and marketable securities of $151.9 million.

Our investing activities used net cash of $74.8 million in 2004, as compared to $42.1 million in 2003, consisting primarily of cash paid for the purchase of office furniture and equipment and molds and tooling used in the manufacture of our products and other assets, cash paid for the purchase of net assets from Play Along and the purchase of marketable securities. In 2003, our investing activities consisted primarily of cash paid for the purchase of office furniture and equipment and molds and tooling used in the manufacture of our products and other assets, cash paid for the purchase of net assets from P&M and the purchase of marketable securities, partially offset by the repayment of notes receivable from officers. As part of our strategy to develop and market new products, we have entered into various character and product licenses with royalties ranging from 1% to 18% payable on net sales of such products. As of September 30, 2004, these agreements required future aggregate minimum guarantees of $26.7 million, exclusive of $12.3 million in advances already paid.

Our financing activities provided net cash of $2.1 million in 2004, consisting primarily of proceeds from the exercise of stock options and warrants, partially offset by the repayment of long term debt. In 2003, financing activities provided net cash of $90.9 million, consisting primarily of net proceeds from the sale of convertible senior notes payable and proceeds from the exercise of stock options and warrants, partially offset by the repurchase of our common stock and the repayment of long term debt.

In February 2003, our Board of Directors approved a buyback of up to $20 million of our common stock. During 2003, we repurchased and retired 554,500 shares of our common stock at an aggregate cost of approximately $6.1 million. There were no common stock repurchases during the nine months ended September 30, 2004.

18

In May 2003, we purchased the product lines and related assets and assumed certain liabilities from P&M Products USA, Inc. and an affiliated United Kingdom company, P&M Products Limited, (collectively, "P&M"). The total purchase price of approximately $22.0 million consisted of cash paid in the amount of $20.7 million and liabilities of $0.6 million and resulted in goodwill of $16.2 million. Additionally, the patent for Blopen, one of P&M's significant product lines, was purchased for $1.8 million in cash in a separate transaction with the patent owner that previously licensed Blopen to P&M. This acquisition expanded the product offerings in our activities category. Our results of operations have included P&M from the date of acquisition.

Pursuant to the terms of a Purchase Agreement, dated June 9, 2003, we sold an aggregate of $98 million of 4.625% Convertible Senior Notes due June 15, 2023 and received net proceeds from the issuance of these convertible notes payable of approximately $94.4 million. The holders of the notes may convert the notes into shares of our common stock at any time at an initial conversion price of $20.00 per share, subject to certain circumstances described in the notes. We pay cash interest on the notes at an annual rate of 4.625% of the principal amount at issuance, from the issue date to June 15, 2010, payable on June 15 and December 15 of each year, with the first payment having been made on December 15, 2003. After June 15, 2010, we will not pay cash interest on the notes. At maturity, on June 15, 2023, we will redeem the notes at their accreted principal amount, which will be equal to $1,811.95 (181.195%) per $1,000 principal amount at issuance.

We may redeem the notes at our option in whole or in part beginning on June 15, 2010, at 100% of their accreted principal amount plus accrued and unpaid interest (including contingent interest and additional amounts), if any, payable in cash. Holders of the notes may also require us to repurchase all or part of their notes on June 15, 2010, for cash, at a repurchase price of 100% of the principal amount per note plus accrued and unpaid interest (including contingent interest and additional amounts), if any. Holders of the notes may also require us to repurchase all or part of their notes on June 15, 2013 and June 15, 2018 at a repurchase price of 100% of the accreted principal amount per note plus accrued and unpaid interest (including contingent interest and additional amounts), if any. Any repurchases at June 15, 2013 and June 15, 2018 may be paid in cash, in shares of common stock or a combination of cash and shares of common stock.

In January 2004, Kay Bee Toys filed for bankruptcy protection under Chapter 11. As a result, we have reserved $2.1 million for potential bad debt, which represents 84% of their $2.5 million pre–petition accounts receivable balance. Although their ability to continue their business is uncertain, we do not anticipate that the bankruptcy of Kay Bee Toys will have a material effect on future earnings due to increasing sales to other retailers.

On June 10, 2004, we purchased substantially all of the assets and assumed certain liabilities from Play Along. The total purchase price of $85.7 million consisted of cash paid in the amount of $70.8 million and the issuance of 749,005 shares of our common stock valued at $14.9 million and resulted in goodwill of $83.9 million. In addition, we agreed to pay an earn–out of up to $10.0 million per year for the three calendar years following the acquisition up to an aggregate amount of $30.0 million based on the achievement of certain financial performance criteria which will be recorded as goodwill when and if earned. Play Along designs and produces traditional toys, which it distributes domestically and internationally. This acquisition expands our product offerings in the pre–school area and brings new product development and marketing talent to us. In accordance with FASB Statement of Financial Accounting Standards No. 141 "Business Combinations" ("SFAS 141"), the allocation of the purchase price is based on studies and valuations that are currently being performed and is expected to be completed in the fourth quarter of 2004. Our results of operations have included Play Along from the date of acquisition.

On October 19, 2004, we were named as defendants in a lawsuit commenced by World Wrestling Entertainment, Inc. ("WWE") in the U.S. District Court for the Southern District of New York concerning our toy licenses with WWE and the video game license between WWE and the joint venture company operated by THQ, Inc. ("THQ") and us. Further named as defendants were THQ, the joint venture, certain of our foreign subsidiaries, Jack Friedman (our Chairman and Chief Executive Officer), Stephen Berman (our Chief Operating Officer, President and Secretary and a member of our Board of Directors), Joel Bennett

19

Table of Contents

(our Chief Financial Officer), Stanley Shenker and Associates, Inc., Bell Licensing, LLC, Stanley Shenker and James Bell.

WWE is seeking treble, punitive and other damages (including disgorgement of profits) in an undisclosed amount and a declaration that the video game license with the joint venture and an amendment to our toy licenses with WWE are void and unenforceable. The lawsuit alleges violations by the defendants of the Racketeer Influenced and Corrupt Organization Act ("RICO") and the anti–bribery provisions of the Robinson–Patman Act, and various claims under state law. WWE has stated in its publicly–filed documents that it intends for the toy and video game licenses to continue during the pendency of the litigation.

Our toy licenses with the WWE commenced in 1995 and are scheduled to expire in 2009. The joint venture's license with the WWE commenced in 1998 and is scheduled to expire in 2009 (subject to the joint venture's right to extend that license for an additional five years).

We believe that the WWE's claims are without merit and we intend to defend vigorously against them.

On November 5, 2004, a class action lawsuit was filed in the United States District Court for the Southern District of New York. According to plaintiffs' counsel, the complaint alleges that defendants issued positive statements concerning increasing sales of our WWE licensed products and that these statements were false and misleading because WWE was contending that the WWE licenses had been obtained through a pattern of commercial bribery, that our relationship with the WWE was being negatively impacted by the WWE's contentions and that there was an increased risk that the WWE would either seek modification or nullification of the licensing agreements with us. The plaintiffs in the class are described as purchasers of our common stock between February 17, 2004 and October 19, 2004.

The lawsuit seeks compensatory and other damages in an undisclosed amount, alleging violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b–5 promulgated thereunder by each of the defendants (namely the Company and Messrs. Friedman, Berman and Bennett), and violations of Section 20(a) of the Exchange Act by Messrs. Friedman, Berman and Bennett.

We believe that on November 8, 2004 a second lawsuit seeking class action status was filed against us in the United States District Court for the Southern District of New York on behalf of all persons who purchased our securities between February 17, 2004 and October 19, 2004. Although we have not yet received a copy of the complaint in such action, we believe the lawsuit is seeking to represent the same class of purchasers of our common stock with respect to the same subject matter as is involved in the November 5, 2004 class action.

We believe that the claims underlying both of the class actions are without merit and intend to defend vigorously against them.

In October 2001, we and all of our domestic subsidiaries jointly and severally secured a syndicated line of credit totaling $50.0 million with a consortium of banks led by Bank of America, N.A. ("Line of Credit"). In June 2003, we and the banks amended the loan agreements governing the Line of Credit (the "Loan Agreements"), pursuant to which amendment (i) the banks suspended certain of our covenants under the Loan Agreements, including those that prohibited us from consummating the Convertible Senior Notes offering without the banks' consent, and (ii) the banks' obligations to extend credit under the Line of Credit were simultaneously suspended. There had never been any outstanding borrowings under the Line of Credit since its inception. On August 6, 2004, we notified Bank of America that we were terminating the Line of Credit (under which there were no outstanding borrowings) effective August 13, 2004. The original maturity date of the Line of Credit was October 10, 2004.

We believe that our cash flow from operations, cash and cash equivalents on hand and marketable securities will be sufficient to meet our working capital and capital expenditure requirements and provide us with adequate liquidity to meet our anticipated operating needs for at least the next 12 months. Although operating activities are expected to provide cash, to the extent we grow significantly in the future, our operating and investing activities may use cash and, consequently, this growth may require us to obtain additional sources of financing. There can be no assurance that any necessary additional financing will be

20

available to us on commercially reasonable terms, if at all. We intend to finance our long-term liquidity requirements out of net cash provided by operations, marketable securities and cash on hand.

**Item 3.**    *Quantitative and Qualitative Disclosures About Market Risk*

Market risk represents the risk of loss that may impact our financial position, results of operations or cash flows due to adverse changes in financial and commodity market prices and rates. We are exposed to market risk in the areas of changes in United States and international borrowing rates and changes in foreign currency exchange rates. In addition, we are exposed to market risk in certain geographic areas that have experienced or remain vulnerable to an economic downturn, such as China. We purchase substantially all of our inventory from companies in China, and, therefore, we are subject to the risk that such suppliers will be unable to provide inventory at competitive prices. While we believe that, if such an event were to occur we would be able to find alternative sources of inventory at competitive prices, we cannot assure you that we would be able to do so. These exposures are directly related to our normal operating and funding activities. Historically and as of September 30, 2004, we have not used derivative instruments or engaged in hedging activities to minimize our market risk.

**Interest Rate Risk**

In August 2004, we terminated our Line of Credit. In June 2003, we issued convertible senior notes payable of $98.0 million with a fixed interest rate of 4.625% per annum. Accordingly, we are not generally subject to any direct risk of loss arising from changes in interest rates.

**Foreign Currency Risk**

We have wholly-owned subsidiaries in Hong Kong and in the United Kingdom. Sales by these operations made on a FOB China or Hong Kong basis are denominated in U.S. dollars. However, purchases of inventory and Hong Kong operating expenses are typically denominated in Hong Kong dollars and domestic sales and operating expenses made in the United Kingdom are typically denominated in British Pounds, thereby creating exposure to changes in exchange rates. Changes in the British Pound or Hong Kong dollar/ U.S. dollar exchange rates may positively or negatively affect our gross margins, operating income and retained earnings. The British Pound gave rise to the other comprehensive loss in the balance sheet at September 30, 2004. The exchange rate of the Hong Kong dollar to the U.S. dollar has been fixed by the Hong Kong government since 1983 at HK$7.80 to US$1.00 and, accordingly, has not represented a currency exchange risk to the U.S. dollar. We do not believe that near-term changes in these exchange rates, if any, will result in a material effect on our future earnings, fair values or cash flows, and therefore, we have chosen not to enter into foreign currency hedging transactions. We cannot assure you that this approach will be successful, especially in the event of a significant and sudden change in the value of the Hong Kong dollar or British Pound.

**Item 4.**    *Controls and Procedures*

(a) *Evaluation of disclosure controls and procedures.*

Our Chief Executive Officer and Chief Financial Officer, after evaluating the effectiveness of our disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) as of the end of the period covered by this Quarterly Report, have concluded that as of that date, our disclosure controls and procedures were adequate and effective to ensure that information required to be disclosed by us in the reports we file or submit with the Securities and Exchange Commission is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms.

(b) *Changes in internal control over financial reporting.*

There were no changes in our internal control over financial reporting identified in connection with the evaluation required by Exchange Act Rules 13a-15(d) and 15d-15 that occurred during the period covered by this Quarterly Report that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

## PART II. OTHER INFORMATION

**Item 1.**    *Legal Proceedings*

On October 19, 2004, we were named as defendants in a lawsuit commenced by World Wrestling Entertainment, Inc. ("WWE") in the U.S. District Court for the Southern District of New York concerning our toy licenses with WWE and the video game license between WWE and the joint venture company operated by THQ, Inc. ("THQ") and us. Further named as defendants were THQ, the joint venture, certain of our foreign subsidiaries, Jack Friedman (our Chairman and Chief Executive Officer), Stephen Berman (our Chief Operating Officer, President and Secretary and a member of our Board of Directors), Joel Bennett (our Chief Financial Officer), Stanley Shenker and Associates, Inc., Bell Licensing, LLC, Stanley Shenker and James Bell.

WWE is seeking treble, punitive and other damages (including disgorgement of profits) in an undisclosed amount and a declaration that the video game license with the joint venture and an amendment to our toy licenses with WWE are void and unenforceable. The lawsuit alleges violations by the defendants of the Racketeer Influenced and Corrupt Organization Act ("RICO") and the anti–bribery provisions of the Robinson–Patman Act, and various claims under state law. WWE has stated in its publicly–filed documents that it intends for the toy and video game licenses to continue during the pendency of the litigation.

Our toy licenses with the WWE commenced in 1995 and are scheduled to expire in 2009. The joint venture's license with the WWE commenced in 1998 and is scheduled to expire in 2009 (subject to the joint venture's right to extend that license for an additional five years).

We believe that the WWE's claims are without merit and we intend to defend vigorously against them.

On November 5, 2004, a class action lawsuit was filed in the United States District Court for the Southern District of New York. According to plaintiffs' counsel, the complaint alleges that defendants issued positive statements concerning increasing sales of our WWE licensed products and that these statements were false and misleading because WWE was contending that the WWE licenses had been obtained through a pattern of commercial bribery, that our relationship with the WWE was being negatively impacted by the WWE's contentions and that there was an increased risk that the WWE would either seek modification or nullification of the licensing agreements with us. The plaintiffs in the class are described as purchasers of our common stock between February 17, 2004 and October 19, 2004.

The lawsuit seeks compensatory and other damages in an undisclosed amount, alleging violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b–5 promulgated thereunder by each of the defendants (namely the Company and Messrs. Friedman, Berman and Bennett), and violations of Section 20(a) of the Exchange Act by Messrs. Friedman, Berman and Bennett.

We believe that on November 8, 2004 a second lawsuit seeking class action status was filed against us in the United States District Court for the Southern District of New York on behalf of all persons who purchased our securities between February 17, 2004 and October 19, 2004. Although we have not yet received a copy of the complaint in such action, we believe the lawsuit is seeking to represent the same class of purchasers of our common stock with respect to the same subject matter as is involved in the November 5, 2004 class action.

We believe that the claims underlying both of the class actions are without merit and intend to defend vigorously against them.

**Item 4.**    *Submission of Matters to a Vote of Security Holders*

We mailed a Proxy Statement on or about August 9, 2004 to our stockholders of record as of July 28, 2004 in connection with our 2004 Annual Meeting of Stockholders, which was held on September 10, 2004 at the Sherwood Country Club, 320 West Stafford Road, Thousand Oaks, California, 91361. At the Meeting, the stockholders voted on two matters, both of which were approved.

The first matter was the election of the members of the Board of Directors. The seven directors elected and the tabulation of the votes (both in person and by proxy) was as follows:

| Nominees for Directors | For | Against | Withheld |
|---|---|---|---|
| Jack Friedman | 22,276,042 | 0 | 334,163 |
| Stephen Berman | 22,274,978 | 0 | 335,227 |
| Dan Almagor | 22,539,493 | 0 | 70,712 |
| David Blatte | 21,039,157 | 0 | 1,571,048 |
| Robert Glick | 21,021,271 | 0 | 1,588,934 |
| Michael Miller | 22,405,696 | 0 | 204,509 |
| Murray L. Skala | 20,845,578 | 0 | 1,764,627 |

There were no broker held non–voted shares represented at the Meeting with respect to this matter.

The second matter upon which the shareholders voted was the proposal to ratify the appointment by the Board of Directors of PKF, Certified Public Accountants, A Professional Corporation, as independent certified public accountants for the Company for 2004. The tabulation of the votes (both in person and by proxy) was as follows:

| For | Against | Abstentions |
|---|---|---|
| 22,238,419 | 353,541 | 18,245 |

There were no broker held non–voted shares represented at the Meeting with respect to this matter.

Item 6.    *Exhibits*

| Number | Description |
|---|---|
| 3.1.1 | Restated Certificate of Incorporation of the Company(1) |
| 3.1.2 | Certificate of Amendment of Restated Certificate of Incorporation of the Company(2) |
| 3.2.1 | By–Laws of the Company(1) |
| 3.2.2 | Amendment to By–Laws of the Company(3) |
| 4.1 | Indenture, dated as of June 9, 2003, by and between the Registrant and Wells Fargo Bank, N.A.(4) |
| 4.2 | Form of 4.625% Convertible Senior Note(4) |
| 4.3 | Registration Rights Agreement, dated as of June 9, 2003, by and among the Registrant and Bear, Stearns & Co. Inc.(4) |
| 31.1 | Rule 13a–14(a)/15d–14(a) Certification of Chief Executive Officer(5) |
| 31.2 | Rule 13a–14(a)/15d–14(a) Certification of Chief Financial Officer(5) |
| 32.1 | Section 1350 Certification of Chief Executive Officer(5) |
| 32.2 | Section 1350 Certification of Chief Financial Officer(5) |

(1)    Filed previously as an exhibit to the Company's Registration Statement on Form SB–2 (Reg. No. 333–2048–LA), effective May 1, 1996, and incorporated herein by reference.

(2)    Filed previously as exhibit 4.1.2 of the Company's Registration Statement on Form S–3 (Reg. No. 333–74717), filed on March 9, 1999, and incorporated herein by reference.

(3)    Filed previously as an exhibit to the Company's Registration Statement on Form SB–2 (Reg. No. 333–22583), effective May 1, 1997, and incorporated herein by reference.

(4)    Filed previously as an exhibit to the Company's Quarterly Report on Form 10–Q for the quarter ended June 30, 2003, filed on August 14, 2003, and incorporated herein by reference.

(5)    Filed herewith.

23

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Registrant:

JAKKS PACIFIC, INC.

By:                              /s/ JOEL M. BENNETT

Joel M. Bennett
*Executive Vice President and*
*Chief Financial Officer*
*(Duly Authorized Officer and*
*Principal Financial Officer)*

Date: November 9, 2004

24

Exhibit 31.1

## CERTIFICATIONS

I, Jack Friedman, certify that:

I have reviewed this quarterly report on Form 10–Q of JAKKS Pacific, Inc. ("Registrant");

Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal controls over financial reporting, or caused such internal controls over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

By:                                    /s/ JACK FRIEDMAN
_____

Jack Friedman
*Chairman and Chief Executive Officer*

Date: November 9, 2004

Exhibit 31.2

I, Joel M. Bennett, certify that:

I have reviewed this quarterly report on Form 10–Q of JAKKS Pacific, Inc. ("Registrant");

Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal controls over financial reporting, or caused such internal controls over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

By:                    /s/ JOEL M. BENNETT

_____

Joel M. Bennett
*Chief Financial Officer*

Date: November 9, 2004

Exhibit 32.1

Written Statement of the Chief Executive Officer Pursuant to 18 U.S.C. Section 1350

Pursuant to 18 U.S.C. Section 1350, the undersigned officer of JAKKS Pacific, Inc. ("Registrant"), hereby certifies that the Registrant's Quarterly Report on Form 10–Q for the three and nine months ended September 30, 2004 (the "Report") fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934 and that the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Registrant.

/s/ JACK FRIEDMAN

Jack Friedman
*Chairman and Chief Executive Officer*

Date: November 9, 2004

**Exhibit 32.2**

Written Statement of the Chief Financial Officer Pursuant to 18 U.S.C. Section 1350

Pursuant to 18 U.S.C. Section 1350, the undersigned officer of JAKKS Pacific, Inc. ("Registrant"), hereby certifies that the Registrant's Quarterly Report on Form 10–Q for the three and nine months ended September 30, 2004 (the "Report") fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934 and that the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Registrant.

/s/ JOEL M. BENNETT

Joel M. Bennett
*Chief Financial Officer*

Date: November 9, 2004

Created by 10KWizard    www.10KWizard.com