Westlaw.

Not Reported in F.Supp.                                                                                                         Page 1
Not Reported in F.Supp., 1991 WL 207473 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

H
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.
Daria AQUILIO, as Trustee of the Mae H. Vance Trust, Jeffrey Meltzer, William Vance and Donald J. Aquilio, Plaintiffs.
v.
Ralph MANAKER, Peter Sontag, James Dullum, Leslie Meil and Corves Consulting, Inc., Defendants.
Daria AQUILIO, as Trustee of the Mae H. Vance Trust, Jeffrey Meltzer, William Vance and Donald J. Aquilio, Plaintiffs,
v.
Steve LEUPKE, Defendant.
**Nos. 90-CV-45, 91-CV-93.**

Oct. 10, 1991.

Donald J. Aquilio, Roswell, Ga., for plaintiff.
Ali Pappas Paltz & Cox Syracuse, N.Y. (C. Andrew Pappas, of counsel), Ginsburg Feldman & Bress Washington, D.C. (Jonathan Ginsburg, of counsel), for defendants.

MEMORANDUM-DECISION AND ORDER
McCURN, Chief Judge.

I. OVERVIEW

*1 This obviously bitter litigation has arisen out of the strained corporate relationship between four shareholders (plaintiffs) and directors and officers (defendants) of the now-defunct corporation, Sontag, Annis & Associates ("SAA"). Among the plaintiffs is Donald Aquilio ("Aquilio"). [FN1] Aquilio has represented all of the plaintiff shareholders' interests throughout the corporate relationship and into this litigation.

SAA was a close corporation incorporated in Delaware with its principal place of business in Maryland. The name SAA was changed to Corves Consulting, Inc. ("Corves") in early 1987. All parties agree that the corporate entity essentially remained the same despite the name change; Corves was the successor-in-interest to SAA. Corves dissolved in 1988. Now-defunct Corves is a defendant in this action.

The four plaintiffs originally filed suit against all of the named defendants plus others in January, 1990. After various procedural battles in this Court, two defendants were dismissed from the litigation, and the remaining case is now driven by plaintiffs' second amended complaint. The remaining defendants have filed a counterclaim against Aquilio for indemnity and/or contribution.

The case against one of the two "dismissed" defendants, Steve Leupke, was dismissed by this Court for want of proper service. The plaintiffs subsequently refiled their suit against Leupke in early 1991. *Aquilio v. Leupke,* 91-CV-0093. Leupke also counterclaimed against Aquilio for indemnity and/or contribution. By all parties' submissions, the allegations and causes of action in the Leupke claim are virtually identical to those appearing in the original claim. Therefore, the parties have incorporated both cases into the motions currently before the Court.

Jurisdiction is based upon complete diversity of citizenship, 28 U.S.C. § 1332 (1988), as well as upon 28 U.S.C. § 1331 (1988) (federal question jurisdiction) in conjunction with section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa (1988), and section 1964 of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964 (1988).

The parties, especially the plaintiffs, have exhaustively discussed all of the issues now before the Court with countless pages of briefs, letters, and supplemental memoranda. While the Court appreciates being well-informed, it directs that in the future the parties limit their submissions to a maximum of twenty (20) pages each and include a table of contents as to points made and exhibits referenced to. Also, this Court reminds both parties of Local Rule 10(E), which states that "[r]eply papers may be filed with leave of the court upon a showing of necessity therefor." Reply briefs are usually warranted only to bring to the Court's attention new developments not previously discussed. Many of the papers in the present case simply reiterate points already before the Court, and do not raise new arguments. This Court will not be so liberal in allowing such paper wars in the future.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK   Document 163-2   Filed 07/07/2006   Page 2 of 13

Not Reported in F.Supp. Page 2
Not Reported in F.Supp., 1991 WL 207473 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

## II. STATEMENT OF FACTS [FN2]

***2** Aquilio and defendant Ralph Manaker were partners in the former Syracuse law firm of Birnbaum, Manaker & Aquilio. In 1983, co-defendant Peter Sontag sought the law firm's assistance in the formation of SAA, a proposed closely-held corporation in the travel management consultation business. Manaker was allegedly responsible for bringing Sontag's business to the firm. Complaint ¶ 15. Aquilio and the firm performed the necessary legal work, including preparation of a Private Placement Memorandum. *Id.*

SAA required $600,000 capitalization in order to commence business operations. The plaintiffs, including Aquilio, invested various sums of money to help form the needed capital. The parties sharply dispute what motivated the plaintiffs to invest in SAA. Aquilio alleges that Manaker and Sontag influenced Aquilio to personally invest $70,000 and further convinced him to solicit clients, friends and family to invest another $180,000 in SAA. Complaint ¶ 18. Aquilio further alleges that Sontag and Manaker made a series of oral representations and assurances to him in order to induce plaintiffs' investments. Most notably, Aquilio alleges that:

(a) Sontag promised that he would not use his controlling share to act oppressively in dealing with the minority shareholders;

(b) Sontag promised he would observe his fiduciary duties to shareholders and "make full disclosure of SAA business in reports" sent to shareholders; and

(c) Manaker promised he would use his pre-agreed Officer and Director positions to monitor Sontag's compliance with his representations, and to otherwise protect the minority shareholders.

*Id.*[FN3]

As a result of these alleged representations, in 1983 Aquilio and the other plaintiff/shareholders entered into a subscription agreement to become minority shareholders of SAA.[FN4] Sontag served on the board of directors ("board") and as President,[FN5] and Manaker served as board member, General Counsel, and Secretary-Treasurer. The remaining defendants, *i.e.* James Dullum, Leslie Meil, and Peter Leupke, served as either members of the board of directors or else as "advisory attendees" to the board at various times from the inception of SAA until Corves' dissolution. The plaintiffs were neither directors nor officers of the corporation. By virtue of the subscription agreement (executed by the initial SAA investors at the time of formation), SAA shares could not be sold without the approval of the board of directors. Plaintiffs Aquilio and Vance were among the signatories to the agreement.

The new corporate relationship was by all accounts stable through 1984. Manaker and Sontag complied with the alleged oral representations upon which Aquilio and the other plaintiffs relied when they purchased their stock. In early 1985, however, unrelated internal hostilities and malevolence within the Birnbaum, Manaker & Aquilio lawfirm jolted the stability of the corporate relationship. The antagonism apparently caused a "falling-out" between Manaker and Aquilio.[FN6] Aquilio and the co-plaintiffs subsequently sought to sell their SAA shares and, pursuant to the subscription agreement, requested SAA approval. SAA assigned Manaker to represent the board of directors in the necessary transactions.

***3** The parties' actions during the next thirty months relating to Aquilio's efforts to sell the plaintiffs' shares gave rise to a substantial portion of the plaintiffs' causes of action. Manaker, in his capacity as SAA representative, notified Aquilio on December 7, 1985 that SAA would purchase Aquilio's interest for $150,000, and gave Aquilio ten days to accept (*i.e.* by December 17, 1985). Aquilio responded in a timely manner, but stated that (1) the sale price for his entire interest was $200,000, and (2) plaintiff Vance's shares would have to be simultaneously purchased at the same value per share.

The SAA board held a meeting on December 17, 1985 ("December 17, 1985 meeting") at which it adopted a resolution to accept Aquilio's proposal. Aquilio alleges that Manaker never disclosed the board's resolution to him, despite negotiating on the sale with Aquilio on at least three occasions after its adoption. Aquilio contends that he remained unaware of the board's resolution until late 1989, when he came across the information during the discovery phase of unrelated litigation.

Two months after the board's meeting, in February, 1986, Aquilio learned from Manaker that SAA was engaged in negotiations with a third party concerning the third party's acquisition of SAA. Though the negotiations proved fruitless, Aquilio alleges that he and his co-plaintiffs would have sold their SAA shares for the board's offering price had they known about the resolution. Write the plaintiffs, "[b]ut for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1991 WL 207473 (N.D.N.Y.)  
**(Cite as: Not Reported in F.Supp.)**

Page 3

Manaker's nondisclosure and concealment [of the December 17, 1985 resolution], Plaintiffs would have entered into a contract per the 12/17/85 resolution no later than 1/31/86 and obtained their asking price" for their shares. Plaintiffs' Complaint, at ¶ 42. Instead, plaintiffs continued to hold their respective shares in SAA.

The next month (March, 1986), Manaker and Aquilio met yet again to negotiate the sale of the plaintiff's SAA shares. According to Aquilio, "Manaker informed Aquilio that he [Manaker] would use his influence and position on the Board to block any such transaction and he would acquire the shares personally or there would be no transaction." Plaintiffs' Complaint, at ¶ 43.[FN7] The negotiations concerning the sale of plaintiffs' shares of SAA thereafter ceased. Aquilio alleges that in the all subsequent communication with SAA he was informed that the plaintiffs' shares were worth less than Aquilio's $200,000 offer. The plaintiffs essentially contend that the defendants down-played the value of SAA to Aquilio.

In January, 1987, Aquilio and his co-plaintiffs finally sold their respective SAA interests at their original cost, *i.e.* below the $200,000 approved at the December 17, 1985 board meeting. Some of the defendants (identities unknown) purchased the plaintiffs shares. Just seven months later, in July, 1987, Citicorp Information Management Services ("CIMS") initiated its acquisition of SAA (then renamed Corves), and purchased the defendants' shares. The plaintiffs allege that the defendants ("Manaker and other individual Defendants") sold their SAA shares to CIMS at a 400% profit. Plaintiffs' Complaint, at ¶ 50.

**\*4** Three years after selling their shares, in January 1990, the plaintiffs brought this action against Manaker, Sontag, and other members of the SAA/Corves board. The complaint set forth the following causes of action:

1. Intentional Interference with Economic Prospect, through fraud and breach of fiduciary obligations (asserted against Manaker only, and only by Aquilio, the Trust, and Vance), Complaint ¶¶ 28-51;

2. Conspiracy and Aiding and Abetting Manaker in the matters set forth in the first count (against Sontag only, and only by Aquilio, the Trust, and Vance), Complaint ¶¶ 52-58;

3. Violations of Securities Exchange Act of 1934 § 10(b) and SEC Rule 10b-5 (against all defendants, but only on behalf of Aquilio, Trust, and Vance), Complaint ¶¶ 59-67;

4. Violations of Securities Exchange Act of 1934 § 10(b) and SEC Rule 10b-5 (against all defendants, but only on behalf of Meltzer), Complaint ¶¶ 68-75;

5. Common law fraud, deceit, and breach of fiduciary obligations (on behalf of all plaintiffs against all defendants), Complaint ¶¶ 76-79; and

6. Violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964 (1988) (on behalf of all plaintiffs, against Manaker and Sontag only), Complaint ¶¶ 80-88.

The defendants have moved to dismiss each cause of action for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), and on grounds that certain plaintiffs contractually released the defendants from liability arising out of the corporate relationship. Also, the defendants moved to dismiss counts three and four (Securities Exchange Act § 10(b) and SEC Rule 10b-5) pursuant to the applicable statute of limitations. The defendants have filed a counterclaim against Aquilio for contribution and indemnification.

The plaintiffs, in turn, move for leave of the Court to pursue the following actions:

-file a third amended complaint (in the event that the Court grants the motions to dismiss);

-file a consolidated amended complaint combining the *Manaker* and *Leupke* actions;

-amend their complaint to add more particular allegations of fraud;

-amend complaint to add a Florida RICO count on behalf of plaintiff Vance; and

-join new plaintiffs.

Plaintiffs also move for an order to compel certain discovery. Finally, Aquilio moves for dismissal of all defendants' counterclaims.

For the reasons discussed herein, defendants' motions to dismiss counts one, two, and six are denied in their entirety. Defendants' motions to dismiss counts three and four are granted in their entirety. Defendants' motions to dismiss count five is granted

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK    Document 163-2    Filed 07/07/2006    Page 4 of 13

Not Reported in F.Supp.
Not Reported in F.Supp., 1991 WL 207473 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 4

only as it relates to defendant Corves; the motion is denied in all other respects. Aquilio's motion to dismiss defendants' counterclaims is granted. Plaintiffs' motions to amend and/or consolidate their complaints, add new parties, and compel discovery are denied in accordance with the terms of this decision.

***5** Each motion will be addressed *seriatim*. All parties agree that the facts and arguments in the *Leupke* action are sufficiently similar to those in the *Manaker* action to justify consolidating them for purposes of this motion. This Court will draw the necessary distinctions when necessary.

### III. DISCUSSION

*A. Defendants' Motions to Dismiss*

Although there are others, the predominant issue now before the Court is limited to whether plaintiffs in their complaints have stated claims upon which relief can be granted. The standard which this Court must apply is set forth most clearly in *Fry v. Trump,* 681 F.Supp. 252, 255 (D.N.J.1988):

The scrutiny employed when deciding a motion to dismiss a complaint for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure is significantly circumscribed. The complaint must be liberally construed in favor of the plaintiffs, and it should not be dismissed unless plaintiffs could prove *no* set of facts in support of their claim which would entitle them to relief.... All facts pleaded by the plaintiffs must be taken as true and all reasonable inferences must be drawn in their favor.... Furthermore, the complaint will not be dismissed unless some insuperable bar to relief is apparent *on its face.*

(emphasis added).

The defendants initially move to dismiss all of the counts of the complaint brought by Aquilio, Daria Aquilio, and Vance, on grounds that those plaintiffs signed a release of liability for claims against all defendants. Since this Court's determination of defendants' motions to dismiss is based solely on examination of the face of plaintiffs' complaint, *see Fry,* 681 F.Supp. at 255, the question of whether the alleged contractual releases serve to bar plaintiffs' claims is not properly before this Court at this time. If the facts so warrant, the defendants may consider raising that affirmative defense in a motion for summary judgment.

*1. Defendants' Motion to Dismiss Counts One and Two (Intentional Interference with Economic Prospects)*

Although the Second Circuit case law is somewhat disjointed with respect to this tort, this Court holds, without passing judgment on the merits of their claim, that the plaintiffs have stated in counts one and two claims for intentional interference with economic prospects upon which relief can be granted.

Two preliminary matters must be addressed before discussing the substance of defendants' motion. First, the wording of plaintiffs' complaint in count one. The language is ambiguous, rendering analysis of this cause of action difficult. The first count states:

28. This count is against Manaker by Aquilio/Trust and Vance for intentional interference in economic prospect through fraud and breach of fiduciary obligations.

Complaint ¶ 28. This charge lends itself to two interpretations. The plaintiffs are alleging either (1) intentional interference in economic prospect, *by means of either* fraud *or* breach of fiduciary obligations; or (2) intentional interference in economic prospect through fraud, *and* (as a separate claim) breach of fiduciary obligations.

**\*6** Either method of pleading might be permissible. *See, e.g., Avnet v. American Motorists Ins.,* 115 F.R.D. 588, 592 (S.D.N.Y.1987). Regardless of which interpretation this Court adopts, the plaintiffs can withstand the defendants' motion to dismiss counts one and two. This is because with respect to breach of fiduciary duty, the allegations in counts one and two against Manaker and Sontag are seemingly the same as those raised against all defendants (including Manaker and Sontag) in count five. Without passing judgment on whether the complaint is therefore duplicious, this Court finds that the plaintiffs have stated in count five a claim for breach of fiduciary duty. *See* Discussion *infra* pp. 29-31. Since counts one, two and five really state the same cause of action for breach of fiduciary duty against Manaker and Sontag, defendants motions to dismiss claims of breach of fiduciary duty for failure to state a claim upon which relief can be granted are denied. Moreover, for the reasons stated herein, the plaintiffs

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK   Document 163-2   Filed 07/07/2006   Page 5 of 13

Not Reported in F.Supp.  
Not Reported in F.Supp., 1991 WL 207473 (N.D.N.Y.)  
**(Cite as: Not Reported in F.Supp.)**

Page 5

have stated claims for all of their fraud-based accusations. The defendants have not raised the question of whether the complaint is duplicious; therefore, this Court will not address that issue today.

The second preliminary issue concerns choice of law. At first blush, the parties appear to agree that New York law is applicable, *see* Memoranda of Law, *passim* (both parties apply New York law to discussion of this issue), and this Court generally agrees with that analysis. There is some suggestion that Delaware law might apply to analysis of the plaintiffs' underlying breach of fiduciary duty allegation, because Corves-SAA's successor-was a Delaware corporation. *See* Defendants' Memorandum of Law in Support, at 7 n. 3 (citing *Caballero v. Anselmo,* 720 F.Supp. 1088, 1099 (S.D.N.Y.1989)). At oral argument, the defense clarified its position, suggesting that New York law should apply to the tort of intentional interference, but Delaware law should apply to the element thereof relating to breach of fiduciary duty. As the defendants properly noted, *Caballero* stands for the proposition that the law of the state of incorporation governs actions arising from corporate relationships and obligations. *Caballero,* 720 F.Supp. at 1099. *But see Cavalier Label Co. v. Polytam,* 687 F.Supp. 872, 879 (S.D.N.Y.1988) ("The tort of fraud is considered to be committed where the misrepresentation is uttered"). Generally, however, the parties offer independent views on the question of choice of law.

The controversy, as a practical matter, is inconsequential. This is because, as previewed above and discussed below, this Court is able to find that plaintiffs have stated a claim of breach of fiduciary duty even under Delaware law. As for the overriding claim of tortious interference, cursory comparison of New York versus Delaware law suggests that the elements necessary to satisfy this tort under New York State law are more stringent and expansive than those under Delaware law. *Compare, e.g., PPX Enterpr. v. Audio Fidelity Enterpr.,* 818 F.2d 266, 269 (2d Cir.1987) with *DeBonaventura v. Nationwide Ins.,* 428 A.2d 1151, 1153 (Del.1981). To state a claim for intentional interference with business opportunities under Delaware law, the plaintiff would have to allege facts indicating that (1) the plaintiff had a reasonable probability of a business opportunity, (2) defendant intentionally interfered with that opportunity, (3) proximate causation, and (4) damages. *DeBonaventura,* 428 A.2d at 1153. The New York standard is more stringent because it requires the plaintiff to allege each of these elements *plus* improper motive on the part of the defendant. *See PPX,* 818 F.2d at 269.

**\*7** As a matter of common logic, if plaintiffs have stated a claim for tortious interference under New York law, then *a fortiori* they have stated a claim for tortious interference under Delaware law. For reasons discussed below, the plaintiffs have stated a claim even under the more stringent New York standard. Since the parties have not sufficiently briefed the Court on this issue and application of Delaware law would apparently not affect this Court's ruling, the Court will not resolve the choice of law issue today.

The rule in New York State governing claims for intentional interference with economic advantage was set forth by the Second Circuit in *PBX Enterpr. v. Audio Fidelity Enterpr.,* 818 F.2d 266, 269 (2d Cir.1987):

In order to prevail on a claim of tortious interference with prospective economic advantage, a plaintiff is required to show "the defendant's interference with business relations existing between the plaintiff and a third party, *either* with the sole purpose of harming the plaintiff *or* by means that are 'dishonest, unfair or in any other way improper.' " ... If the defendant's interference is intended, at least in part, to advance its own competing interest, then the claim will fail unless the means employed include criminal or fraudulent conduct.

(citations omitted) (emphasis in original). The defendants in the present case do not focus on whether plaintiffs have alleged "intentional interference." *See* Defendants' Memorandum of Law in Support, at 5-6. Rather, the gravamen of the defendants' argument is that plaintiffs have not alleged the requisite improper purpose for the defendants' actions. *See id.; PBX,* 818 F.2d at 269 (defendants' improper purpose is an element of the tort). With respect to improper purpose under the *PBX* standard, the plaintiffs can withstand defendants' motion to dismiss if they have alleged facts showing that Manaker's and Sontag's sole motivation in acting was to harm the plaintiffs, *i.e.* Manaker and Sontag had no personal interest in acting, *or* that Manaker's and Sontag's conduct (in interfering with Aquilio) was criminal or fraudulent in nature. *PBX,* 818 F.2d at 269; *see also, e.g., Volvo North Amer. v. Mens Int'l Prof. Tennis Council,* 857 F.2d 55, 74 (2d Cir.1988); *Automotive Elec. Serv. v. Association of Auto. Distr.,* 747 F.Supp. 1483, 1509

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 6
Not Reported in F.Supp., 1991 WL 207473 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

(E.D.N.Y.1990).

Here the plaintiffs have satisfied the "alternative" requirement, alleging facts indicating that Manaker and Sontag acted by fraud. To state a claim for fraud, the plaintiffs must allege that the defendants uttered a material, false representation with an intent to defraud the plaintiffs, and that the plaintiffs reasonably relied thereon and suffered damage as a result. *E.g. Katara v. D.E. Jones Commodities,* 835 F.2d 966, 970-71 (2d Cir.1987). The plaintiffs have done so. For example, the complaint alleges that Manaker and Sontag "induced Aquilio to personally invest $70,000 and further induced him to solicit clients of the Lawfirm, friends and family to invest another $180,000 in SAA by their joint verbal representations and assurances...." Complaint ¶ 18. Here the plaintiffs have indeed alleged material false representations upon which plaintiffs reasonably relied. *See also* Complaint ¶ ¶ 38-42 & *passim* (defendants intentionally undervalued SAA stock in statements to plaintiffs).

**\*8** Sontag and Manaker raise three principle points supporting their motion to dismiss. They argue first that the facts alleged constitute strong business tactics but not fraud. That argument is more appropriate at a motion for summary judgment; whether the acts alleged actually constitute fraud is not for the Court to decide during the present motion. *See, e.g., Cruz v. Beto,* 405 U.S. 319, 322 (1972) (court accepts as true plaintiffs' allegations for purposes of resolving motion to dismiss). The plaintiffs here have sufficiently alleged facts which, if true, a reasonable jury might be able to find fraudulent.

Second, and more persuasively, Manaker and Sontag submit that the more proper standard for tortious interference with prospective economic advantage was set forth by the Second Circuit in *Nifty Foods v. Great Atlantic & Pacific Tea,* 614 F.2d 832, 838 (2d Cir.1980). There the Second Circuit held that the tort requires proof that the defendant's *sole* motive was to inflict injury and that the defendant used unlawful means to do so. *Nifty,* 614 F.2d at 838. In other words, under *Nifty* a defendant cannot be held liable for tortious interference if s/he was motivated at least in part by personal gain. *Id.; see also United States Football League v. National Football League,* 634 F.Supp. 1155, 1189 (S.D.N.Y.1986). Indeed, if *Nifty* were controlling then defendants would prevail on their motion to dismiss counts one and two because, by plaintiffs' own admissions in their complaints, Manaker and Sontag were motivated in large part by their own personal interests. *See* Complaint ¶ ¶ 46, 50.

In this Court's view, however, *Nifty* was an aberration that has since been abandoned by the Second Circuit; the current standard was set forth by the Second Circuit six years later in *PBX,* 818 F.2d at 269. Certainly the two standards (*Nifty* and *PBX* ) are inconsistent. The former requires that the defendant's *sole* motive be to injure the plaintiff; the latter allows that the defendant can be motivated by self-interest if s/he acted criminally or fraudulently. This Court is left to determine which of these inconsistent standards applies.

The Second Circuit has apparently chosen the *PBX* standard over *Nifty Foods.* In the single tortious interference case it has faced since deciding *PBX* in 1987, the court applied the *PBX* standard instead of the *Nifty* standard. *Volvo North Amer.,* 857 F.2d at 75. Furthermore, to this Court's knowledge every district court within the circuit that has confronted a tortious interference case since *PBX* was decided in 1987 has applied the *PBX* standard; none has applied *Nifty.* See *Sutton Import-Export v. Starcrest of Calif.,* 762 F.Supp. 68, 71 (S.D.N.Y.1991); *Automotive Elec. Serv.,* 747 F.Supp. at 1508; *Paper Corp. of the United States v. Schoeller Tech. Papers,* 724 F.Supp. 110, 119 (S.D.N.Y.1989); *Northwestern Nat'l Ins. v. Alberts,* 717 F.Supp. 148, 155 (S.D.N.Y.1989); *Pennsylvania Engineering v. Islip Resource Recov. Agency,* 710 F.Supp. 456, 464 (E.D.N.Y.1989). Most of these district courts simply ignored the *Nifty* standard. In sum, the case precedent overwhelmingly compels this Court to apply the *PBX* standard and not the *Nifty* standard to plaintiffs' tortious interference claims.

**\*9** If the case precedent were not enough, this Court is also persuaded by the fact that the authority upon which the court in *Nifty* relied does not support the "sole motivation" requirement that *Nifty* articulated. *See Nifty,* 614 F.2d at 838 (citing *Beardsley v. Kilmer,* 236 N.Y. 80, 140 N.E. 203 (1923)). The plaintiffs correctly note that *Beardsley* actually set forth the exact standard the court later adopted in *PBX* (defendant can be liable for tortious interference even if motivated by self-interest, so long as plaintiff proves that defendant acted by crime or fraud). This Court declines to apply the *Nifty* standard understandably proposed by the defendants, and instead adopts the widely-accepted *PBX* standard for analyzing the sufficiency of plaintiffs' tortious interference cause of action. For the reasons stated above, the plaintiffs have sufficiently stated a cause of action for tortious interference with economic

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK   Document 163-2   Filed 07/07/2006   Page 7 of 13

Not Reported in F.Supp.                                                                                                          Page 7
Not Reported in F.Supp., 1991 WL 207473 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

prospects pursuant to the *PBX* standard.

Finally, defendants argue that the plaintiffs have not stated a claim upon which relief can be granted because they have failed to plead fraud with sufficient particularity. Federal R.Civ. P. 9(b) requires that "in all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity." Fed.R.Civ. P. 9(b); *see, e.g.,* DiVittorio v. Equidyne Extractive Indus., 822 F.2d 1242, 1247 (2d Cir.1987) (and cases cited therein). Rule 9(b) presents two open-ended variables with which courts have struggled: "circumstances" and "particularity." As illustrated by the parties' extensive briefs on this issue, this Court is faced with a myriad of authority purporting to instruct on what constitutes adequate pleading of fraudulent "circumstances" stated with "particularity." This is because the word "circumstances," by its very definition, will vary with each situation. *See, e.g.,* The Limited v. McCrory, 683 F.Supp. 387, 393 (S.D.N.Y.1988) (circumstances of fraud for Rule 9(b) purposes vary with each case).

This Court has heretofore set forth guidelines for determining whether claims of fraud have been sufficiently pleaded.

"Circumstances" have been defined to include such matters as the time, place and contents of false representations, as well as the identity of the persons making the representation and what was obtained or given up thereby.... In requiring such "circumstances" to be pleaded, this court recognizes that Rule 9(b) requires only sufficient particularity to permit a defendant to frame a responsive pleading.... Moreover, this court should require less specificity when many of the relevant facts are solely within the defendants' knowledge.

Jim Forno's Continental Motors v. Subaru, 649 F.Supp. 746, 753 (N.D.N.Y.1986) (McCurn, J.); *see also* Klein v. Goetzman, 1991 WESTLAW 127393, at *2-3 (July 12, 1991) (McCurn, C.J.).

The plaintiffs have satisfied the particularity of fraudulent circumstances requirement. Specifically, the plaintiffs have alleged that Manaker and Sontag fraudulently induced them in May, 1983 to invest in SAA by making false oral representations. Complaint ¶ 18. Aquilio has indicated in very clear terms the specific representations made by the defendants. *See id.* The plaintiffs further allege that throughout 1986 Manaker and Sontag then continuously and fraudulently concealed the substance of the December 17, 1985 meeting and resolution regarding sale of the shares from Aquilio, who was acting on his own behalf and on behalf of the remaining co-plaintiffs. Complaint ¶ ¶ 38-42. As a result of these alleged fraudulent activities, the plaintiffs purchased and then were unable to sell their shares of stock in SAA. When the plaintiffs finally sold their shares, they did so "for cost," *i.e.* without the return they allegedly could have enjoyed had Manaker and Sontag acted without fraud. In so alleging, the plaintiffs have proffered the time, place and contents of false representations, as well as the identity of the persons making the representation and what was obtained or given up thereby. *Cf.* Jim Forno's, 649 F.Supp. at 753. Moreover, the charges are set forth with such particularity that the defendants, regardless of whether they agree with plaintiffs' allegations, have sufficient information to frame a responsive pleading. *See id.*

**\*10** To reiterate, this Court's ruling concerning the adequacy of the plaintiffs' complaint in no manner speaks to the merit of plaintiffs' claims. *E.g.* Cruz, 405 U.S. at 322. Defendants can take up that issue, if warranted, on a motion for summary judgment. Today this Court merely holds that in Counts one and two plaintiffs have stated a claim upon which, if true, relief can be granted. *See* Fed.R.Civ.P. 12(b)(6).

*2. Defendants' Motions to Dismiss Counts 3 and 4 (Securities Exchange Act of 1934 § 10(b) and Rule 10b-5)*

Defendants move to dismiss plaintiffs' federal securities claims (counts three and four) on grounds of (1) statute of limitations, and (2) failure to state a claim upon which relief can be granted. Since this Court holds that these claims are barred by the statute of limitations, it need not reach the issue of whether plaintiffs have stated a cognizable claim.

This past spring's Supreme Court ruling in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 111 S.Ct. 2773 (June 20, 1991) is binding on the present case. There the Court held, "[l]itigation instituted pursuant to § 10(b) and Rule 10b-5 ... must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation." Lampf, 111 S.Ct. at 2782. There is therefore a three year statute of repose; regardless of when the plaintiff discovers the fraud, a suit is time barred if it is not brought within three years of the actual violation. Id. at 2781-82. Significantly, the Court applied its new time barr

Not Reported in F.Supp.  
Not Reported in F.Supp., 1991 WL 207473 (N.D.N.Y.)  
**(Cite as: Not Reported in F.Supp.)**

Page 8

retroactively to hold that the plaintiff's action in that case was untimely and therefore dismissed. *Id.* at 2782; *see also James B. Beam Distilling v. Georgia,* 111 S.Ct. 2439 (1991).

The parties in the instant case disagree on exactly when plaintiffs first discovered the alleged fraud, as well as when the violations actually occurred. A review of the complaint, however, shows that the latest possible date on which plaintiffs discovered the alleged fraud was in August, 1987. By their own admission, "[p]laintiffs first learned of the CIMS-SAA transaction in August of 1987." Complaint ¶ 66. That this was a "discovery" of fraud is evidenced by the very next line of plaintiffs' complaint: plaintiffs "made demand for information on the same, were given misleading and incomplete explanation by Manaker in response, *continued to investigate until November 1989....*" *Id.* (emphasis added). Plaintiffs admitted at oral argument that the investigation was warranted because they grew suspicious of the transaction from the moment they learned of it in August, 1987; after all, the sale was just months after plaintiffs sold their shares to the defendants. That plaintiffs felt the need to conduct an investigation lasting over two years after learning of the transaction suggests that their knowledge constituted more than a mere "storm warning," as plaintiffs suggested at oral argument. Based on plaintiffs' own complaint, this Court is convinced that the plaintiffs were put on adequate notice of the alleged fraud, at least enough to begin their own investigation, in August, 1987.

**\*11** Based on their August, 1987 discovery date, suit under Rule 10b-5 must have been filed within one year thereafter, in August, 1988. Since plaintiffs failed to file this suit until January, 1990, they missed the statute of limitations. The *Lampf* and *James B. Beam Distilling* holdings directly reject plaintiffs's argument that the newly defined statute of limitations should not be applied retroactively to his case; *Lampf* also rejects plaintiffs' suggestion that the doctrine of equitable tolling should apply to the one year statute of limitations. *Lampf,* 111 S.Ct. at 2782.[FN8] Accordingly, counts three and four of plaintiffs' complaints, alleging violations of the federal securities statutes, are dismissed with prejudice.

*3. Defendants' Motion to Dismiss Count Five (Common law fraud, deceit, and breach of fiduciary duty)*

*a. Common law fraud and deceit*

Defendants' motion to dismiss the fifth count with respect to the fraud and deceit theories is supported in large part by their argument that the plaintiffs failed to plead fraud and/or deceit with sufficient particularity as required by Fed.R.Civ.P. 9(b). For the reasons discussed above with respect to the identical challenge to counts one and two, this Court finds that the plaintiffs have stated a claim of fraud as against Manaker and Sontag with sufficient particularity to satisfy Rule 9(b). *See supra* p. 21 (citing *Jim Forno's,* 649 F.Supp. at 753).

This Court also finds that the plaintiffs have stated a claim of fraud or deceit as against the remaining defendants with sufficient particularity, with the exception of Corves. *See Katara,* 835 F.2d at 970-71 (elements of fraud: material misrepresentation with intent to defraud, plus reasonable reliance thereon and resulting damages). The defendants correctly note that there is not one particular allegation of fraud against Corves or its predecessor (SAA) in plaintiffs' complaint. Since count five states no claim against Corves, let alone a claim with particular allegations of fraud, count five of the complaint is dismissed as against Corves.

With respect to the remaining defendants, the plaintiffs have stated the circumstances, *i.e.* such matters as the time, place and contents of false representations, as well as the identity of the persons making the representation, with the requisite particularity. *See, e.g., Jim Forno's,* 649 F.Supp. at 753. Most notably, the plaintiffs allege that during Aquilio's sale negotiations the defendants knowingly circulated two letters to the plaintiffs which intentionally and deceptively misstated (1) the value of SAA, and (2) the nature of CIMS's acquisition bid (which ultimately succeeded). Complaint ¶ 61. The plaintiffs have provided copies of the letters in the Appendix to their complaint, and have specifically alleged how the defendants (except for Corves) were involved in its fraudulent effect. *Id.*

**\*12** The defendants argue that the Rule 9(b) particularity requirement is not satisfied because the complaint improperly accuses the defendants of acting collectively, instead of apprising of the circumstances surrounding each individual defendant's fraud. *See* Defendants' Memorandum of Law in Support, at 16 (citing, *e.g., Lou v. Belzberg,* 728 F.Supp. 1010, 1022 (S.D.N.Y.1990); *Gonzalez v. Paine, Webber, Jackson & Curtis,* Fed.Sec.L.Rep.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK     Document 163-2     Filed 07/07/2006     Page 9 of 13

Not Reported in F.Supp.
Not Reported in F.Supp., 1991 WL 207473 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 9

(CCH) ¶ 98, 867, at 94,513 (S.D.N.Y.1982)). The controlling Second Circuit case appears to be *Zerman v. Ball,* 735 F.2d 15, 22-23 (2d Cir.1984), in which a fraud complaint failed because it did not particularize the circumstances constituting fraud with respect to particular defendants. Indeed, as a general rule, "when more than one defendant is charged with fraud, the complaint must particularize each defendant's alleged participation in the fraud." *Lou,* 728 F.Supp. at 1022. *See also* this Court's decision in *Klein v. Goetzman,* 1991 WESTLAW 127393, at \*2-3 (July 12, 1991) (McCurn, C.J.).

In *Zerman* as well as each of the cases cited by the defendants, however, the Court had a genuine question as to which allegations of fraud involved which of the named defendants. *See, e.g., Zerman,* 753 F.2d at 22; *Lou,* 728 F.Supp. at 1022 (complaint contained "nothing beyond conclusory allegations"); *Leslie v. Minson,* 679 F.Supp. 280, 285 (S.D.N.Y.1988) ("It is not at all clear [from the complaint] who told what to whom and when"). In other words, the defendants were not put on notice as to the particular acts of fraud alleged against them so as to be able to prepare a defense. *See DiVittorio,* 822 F.2d at 1247. That plainly is not the situation in the case at bar. The plaintiff certainly would have been wiser to list each defendant individually, but there is no doubt from reading the complaint as to which defendant is accused of what act of fraud. *E.g.* Complaint ¶ 61 (letters condoned by all defendants in their capacities members of the SAA board). *Cf. Banowitz v. State Exchange Bank,* 600 F.Supp. 1466, 1469 (N.D.Ill.1985) ( "group pleading" permitted).

The purpose of Rule 9(b) is, in large part, to notify co-defendants of the particular act of fraud alleged. *DiVittorio,* 822 F.2d at 1247 (three purposes behind Rule 9(b)). In light of its purpose, the group pleading proscription cannot be read so literally as to justify dismissal of a complaint simply because the plaintiffs did not list the defendants by name, when the activities in which the individual defendants were allegedly involved are made abundantly clear from the face of the complaint. This Court's decision today is consistent with its July decision in *Klein,* in which this Court held that group pleading of fraud against outside directors of a corporation was impermissible. There the complaint plainly did not inform the individual defendants of their particular acts of alleged wrongdoing. *Klein,* 1991 WESTLAW 127393, at \*3-4. Significantly, this Court explicitly noted in *Klein* that group pleading alleging against defendants is at times permissible, for instance when "the defendants are 'insiders or affiliates participating in the offer of the securities in question.' " *Id.* at \*2 (quoting *Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986)).

**\*13** While this Court does not hesitate to state that it seriously questions whether the plaintiffs will be able to withstand a motion for summary judgment on these claims, the fact remains that the plaintiffs here, unlike those in *Klein,* have stated with sufficient particularity the circumstances surrounding each defendant's alleged fraud. *See DiVittorio,* 822 F.2d at 1247 (the complaint provides defendants with sufficient notice to enable them to prepare a defense). Accordingly, this Court rejects defendants' motions to dismiss for want of particularity, with the exception of the claim against Corves, which is dismissed for failure to state a claim upon which relief can be granted.

*b. Breach of fiduciary duty*

The plaintiffs have also stated a cognizable cause of action for breach of fiduciary duty. Once again, the parties do not agree on the applicable choice of law. Unlike the discussion *supra* concerning tortious interference with economic prospects, however, the laws in Delaware and New York governing breach of fiduciary duty are markedly different, at least enough to require this Court to decide and apply the correct choice of law. Plaintiffs' contentions notwithstanding, "New York follows the rule that the law of the state of incorporation governs the existence and extent of corporate fiduciary obligations as well as the liability for violations of such obligations." *Caballero,* 720 F.Supp. at 1098-99. Since SAA (and later as Corves) was a Delaware corporation and the plaintiffs allege the existence of a fiduciary duty arising from the defendants' corporate positions, Delaware law governs consideration of the fifth count.

To state a claim for breach of fiduciary duty under Delaware law, a plaintiff must satisfy a three-pronged test. The plaintiff must allege:

1. the existence of a fiduciary duty;

2. a breach of that duty;

3. knowing participation in the breach by the defendants.

*Rabkin v. Phillip A. Hunt Chem.,* 547 A.2d 963, 967

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 10
Not Reported in F.Supp., 1991 WL 207473 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

(Del.Ch.1986). With respect to the first element of the test, requiring plaintiff to allege the existence of a fiduciary duty, plaintiffs indeed assert in their complaint that a fiduciary duty exists, Complaint ¶ 76. The plaintiffs, however, do not elaborate on the particular fiduciary duty to which they are referring nor suggest the scope of the duty implicated. *See id.* This Court is once again obligated to liberally construe the complaint in favor of the plaintiffs, draw all reasonable inferences therefrom, and refuse to dismiss a count unless plaintiff could prove no set of facts in support of their claim which would entitle them to relief. *E.g. Fry,* 681 F.Supp. at 255. From that perspective this Court finds that plaintiffs' allegations implicate defendants' fiduciary duties under Delaware law.

The Southern District of New York discussed directors' fiduciary duties to shareholders under Delaware corporations law in *Caballero,* 720 F.2d at 1099. That court observed:

*14 Delaware corporations law provides that although directors generally do not occupy a fiduciary position with respect to stockholders in direct personal dealing as opposed to dealings with stockholders as a class, Delaware does create a duty in special circumstances where advantage is taken of inside information by a corporate insider who deliberately misleads an ignorant stockholder, when the latter relies on the misrepresentation or omission.

*Id.* (citing, *e.g., Kors v. Carey,* 158 A.2d 136, 143 (Del.Ch.1960); *Lank v. Steiner,* 224 A.2d 242, 245 (Del.Ch.1966)). With the exception of their cause of action against Corves, the plaintiffs certainly allege throughout their papers that the defendants withheld information for their personal gain; to be sure, that is the thrust of plaintiffs' complaint. Complaint ¶¶ 61-62, 77-78 (defendants circulated letters to mislead plaintiffs in valuing the business of SAA and omitting other material information). Without yet again discussing *ad nauseam* the substance of plaintiffs' complaint, this Court finds the plaintiffs' allegation that they relied on defendants' endorsement of letters which misrepresented SAA's value sufficiently states a claim of breach of fiduciary duty under Delaware law. *See Caballero,* 720 F.2d at 1099.

Defendants' motion to dismiss the fifth count of plaintiffs' complaint is denied, except as it relates to Corves; plaintiffs' cause of action against Corves is dismissed for failure to state a claim upon which relief can be granted.

*4. Defendants' Motion to Dismiss Count Six (RICO against Sontag and Manaker)*

Plaintiffs allege that Manaker and Sontag began, in 1983, to engage in a pattern of fraud "for the purpose of extricating Manaker from his financial problems and enriching Sontag," Complaint ¶ 83, in violation of RICO §§ 1962(c), (d), 18 U.S.C. §§ 1962(c), (d). Plaintiffs then list various activities which they allege constituted the fraudulent conduct and the period of time over which it occurred.

To state a cause of action under the claimed sections of RICO, plaintiffs must allege that the defendants conducted or participated in the affairs of an enterprise "through a pattern of racketeering activity" while employed by or associated with that enterprise, § 1962(c), or conspired to violate one of the RICO sections, § 1962(d). The defendants' motion to dismiss is grounded on the theory that the plaintiffs have failed to sufficiently allege the existence of "a pattern of racketeering activity." Specifically, defendants contend that plaintiffs failed to properly allege (1) the predicate acts of fraud with the specificity required by Rule 9(b), and (2) a "pattern of racketeering activity." Since this is the limit of defendants' argument, this Court will not venture into unchallenged areas of plaintiffs' RICO claims, and instead will confine its discussion to those arguments raised by the defendants.

The Court will not spend any more time addressing defendants' Rule 9(b) lack of specificity challenge. If anything, the allegations within plaintiffs' Count # 6 are more explicit than those articulated earlier in the complaint which this Court has found to be sufficiently particular. *See, e.g.,* Complaint ¶ 85 (listing specific allegations of Manaker's and Sontag's fraudulent activity). Since plaintiffs' claims place defendants on sufficient notice of the specific incidents of fraud alleged, *see DiVittorio,* 822 F.2d at 1247, this Court again finds that plaintiffs have alleged the predicate acts with sufficient particularity.

*15 More pressing is the defendants' argument that plaintiffs have failed to allege a "pattern of racketeering activity." Indeed, RICO requires plaintiff to prove such a pattern, *see* § 1962(c), and the Supreme Court recently set forth the standard this Court must apply in determining whether a pattern has been sufficiently alleged to withstand a Rule 12(b)(6) motion. *H.J. v. Northwestern Bell Tele.,* 109 S.Ct. 2893 (1989). To state a claim of a pattern

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1991 WL 207473 (N.D.N.Y.)  
**(Cite as: Not Reported in F.Supp.)**

Page 11

of racketeering activity, the plaintiff must allege the existence of two or more racketeering predicates, and that (1) the predicates are related and (2) they amount to *or* pose a threat of continued criminal activity. H.J., 109 S.Ct. at 2900; United States v. Long, 917 F.2d 691, 697 (2d Cir.1990).

In light of the foregoing analysis, it is clear that the plaintiffs have sufficiently alleged the existence of two or more predicate acts. In paragraph 85 alone, the plaintiffs alleged multiple incidents of fraud, the validity of which is not now before this Court. Furthermore, the plaintiffs have alleged that the predicates are related. From the start plaintiffs alleged that Manaker and Sontag acted to bolster their personal financial standing at the expense of the plaintiffs. According to the Supreme Court, that allegation of common purpose, result, participants, victims, and method is sufficient to show that the predicate acts were related. See H.J., 109 S.Ct. at 2901.

The more difficult element of "pattern of racketeering activity" is that which requires proof of continuous criminal activity. Fortunately, the Supreme Court's *H.J.* decision gives this Court some guidance, because that case dealt directly with construing the uncertain term "continuous activity." See generally H.J., 109 S.Ct. 2893. While acknowledging that defining "continuity" requires a case-specific analysis, the Court has made clear that it is not enough that the predicates be related; they must relate in a manner that signifies continuous conduct, an ongoing scheme with long-term goals. Id. at 2902. See id. Hence, the crux of the continuity requirement appears to be the *manner* by which the related acts are performed; the series of predicate acts, each by itself illegal, must be committed in furtherance of a larger, *ongoing* scheme. The idea that the underlying scheme be "ongoing" satisfies RICO's "continuity" requirement. See id.

In this Court's view the plaintiffs have satisfied the continuity requirement. As stated *supra,* discerning this requirement is the most difficult because it requires a case-specific analysis, see H.J., 109 S.Ct. at 2902 ("the development of these concepts [of continuity] must await future cases"). The parties' arguments notwithstanding, not much case law addressing continuity in this type of unique fact pattern has surfaced since the Supreme Court announced the *H.J.* standard in 1989. See, e.g., Farberware v. Groben, 764 F.Supp. 296, 305-07 (S.D.N.Y.1990); Azurite v. Amster & Co., 730 F.Supp. 571, 581 (S.D.N.Y.1990), *cited in*

Defendants' Response to Plaintiffs' Supplemental Memorandum of Law, at 5-6 (stating "continuity" standards in light of *H.J.,* but applying case-specific analysis). Despite the lack of helpful precedent, this Court is convinced that each of the predicate acts alleged in paragraph 85 are not merely related, but are also connected in such a way which, if true, can be considered "continuous." They mark a series of events, *to wit* intentional issuance of misleading statements communications or omissions of material information, which were committed in an *ongoing* manner in furtherance of Manaker's and Sontag's alleged scheme for personal wealth. Since the existence of "ongoing activity" as an indicator of continuity has been sufficiently pleaded by the plaintiffs, along with the other requirements of "pattern of racketeering," this Court finds that the plaintiffs have stated a claim for RICO upon which relief can be granted.

### B. Aquilio's Motion to Dismiss Defendants' Counterclaims

**\*16** Aquilio moves to dismiss defendants' counterclaims for indemnity and/or contribution from him on grounds that the plaintiffs' underlying complaint alleges intentional torts, and indemnity and/or contribution are not available from one who was allegedly negligent in preventing an intentional tort. Plaintiffs' Memorandum of Law in Opposition, at 116 (citations omitted). At oral argument, defendants agreed that an intentional tortfeasor is not entitled to indemnification or contribution from a negligent third party. Defendants submitted that they included this cause of action in anticipation of the unlikely event that any of the defendants is found liable for negligent behavior.

Upon thorough review of plaintiffs' complaint, this Court can glean no allegation of negligent conduct for which defendants might be held liable. Every one of plaintiffs' causes of action alleges intentional conduct; to be sure, evidence of negligence at trial would likely be inadmissible as irrelevent. Furthermore, defendants are unable to point to any allegation of negligence in the plaintiffs' complaint. Given defendants' failure to allege any facts under which they may be entitled to indemnity and/or contribution, their counterclaim is dismissed for failure to state a claim upon which relief could be granted, pursuant to Rule 12(b)(6).

### C. Plaintiffs' Motions for Leave to Amend Complaint

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 12
Not Reported in F.Supp., 1991 WL 207473 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

To review, plaintiffs seek leave to amend their second-amended complaint for the following purposes: (1) correct defects to the extent that they result in dismissal today; (2) file a consolidated amended complaint combining the *Manaker* and *Leupke* actions; (3) amend their complaint to add more particular allegations of fraud; (4) amend complaint to add a Florida RICO count against on behalf of plaintiff Vance; and (5) join new plaintiffs.

Plaintiffs' success in most of today's motions renders further clarificaiton of their complaints uneccessary. Also, at the conclusion of oral argument, this Court ordered that the *Manaker* and *Leupke* actions be consolidated for joint trial. Accordingly, the motions for leave to correct defects, file a consolidated amended complaint combining the *Manaker* and *Leupke* actions, and add more particular allegations of fraud, are all denied with prejudice as moot or otherwise uneccesary.

As for the remaining motions (to add a Florida RICO count on behalf of plaintiff Vance and join new plaintiffs), the Court notes that leave to amend a complaint "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). This Court has addressed motions for leave to amend on numerous occasions in the past year alone. *See, e.g., Davis Acoustical v. Carolina Freight,* 765 F.Supp. 1142, 1143 (N.D.N.Y.1991) (McCurn, C.J.); *Fox v. Board of Trustees,* 764 F.Supp. 747, 757-58 (N.D.N.Y.1991) (McCurn, C.J.); *Duffy v. Anitec Image,* 1991 WESTLAW 44834 (N.D.N.Y.1991) (McCurn, C.J.). In many past instances this Court has referred to *Foman v. Davis,* 371 U.S. 178, 182 (1962), as the controlling authority governing leave to amend complaints. In *Foman,* the Supreme Court instructed that leave to amend should be granted in the absence of an apparent or declared reason, such as undue delay, bad faith, or undue influence. *Foman,* 371 U.S. at 182.

**\*17** In considering plaintiffs' motions for leave to amend, this Court also remains cognizant of the Second Circuit's statement that a "[p]laintiff clearly has no right to a second amendment." *Denny v. Barber,* 576 F.2d 465, 471 (2d Cir.1978). The plaintiffs still carry some burden, however minimal, of showing that "justice so requires" leave to amend. Fed.R.Civ. P. 15(a); *see Denny,* 576 F.2d at 471. In the case at bar, the plaintiffs' papers are simply devoid of any reason stating why this court *should* grant leave to amend. Instead, plaintiffs argue simply that, *e.g.,* "[d]efense advances no reason ... to deny

the relief." Plaintiffs' Supplemental Memorandum of Law (7/29/91), at 4.

Plaintiffs' statement is not only inaccurate but beside the point; the fact is that plaintiffs still carry the burden to inform the Court *why* leave to amend is warranted. Since plaintiffs simply have not convinced this Court, from even the most liberal construction of their papers, that "justice so requires" granting leave to amend, plaintiffs' motions to amend their complaint are denied in their entirety without prejudice to renew.

*D. Plaintiffs' Motion to Compel Production*

Through their motion to compel, plaintiffs seek production of (1) cassettes containing tape recordings of SAA's October 2, 1986 shareholders' meeting, and (2) every contract, agreement or memoranda thereof between Corves and CIMS. Plaintiffs also seek to recover costs incurred in pursuing this motion, pursuant to Fed.R.Civ.P. 37(a)(4). At oral argument, the parties agreed that plaintiffs' demands have been satisfied. This motion is therefore denied as moot. If plaintiffs wish to pursue recovery of costs for this motion, they should file a separate motion with this Court, specifically informing the Court as to why, in light of today's decision, they fall within the scope of Rule 37(a)(4).

IV. CONCLUSION

Defendants' motions to dismiss counts one, two, and six are denied in their entirety. Defendants' motions to dismiss counts three and four are granted in their entirety. Defendants' motions to dismiss count five is granted only as it relates to defendant Corves; the motion is denied in all other respects. Defendants' motions to dismiss on grounds of contracutal releases is denied without prejudice to renew in the form of a motion for summary judgment. Plaintiff Aquilio's motion to dismiss defendants' counterclaims is granted. Plaintiffs' motions to amend and/or consolidate their complaints, add new parties, and compel discovery are denied in accordance with the terms of this decision. This Court orders consolidation of the *Manaker* and *Leupke* actions for joint trial. The motions in the *Leupke* action are treated in the same manner as their respective motions in *Manaker,* as discussed herein.

IT IS SO ORDERED.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 13
Not Reported in F.Supp., 1991 WL 207473 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

FN1. All references to "Aquilio" are to Donald Aquilio. References to co-plaintiff Daria Aquilio will be specifically designated as such.

FN2. In considering defendants' motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) (failure to state a claim upon which relief can be granted), this Court is obliged to accept as true all of the factual allegations set forth in plaintiffs' second-amended complaint. *See, e.g., Capital Imaging Assoc. v. Mohawk Valley Medical Assoc.,* 725 F.Supp. 669, 676 (N.D.N.Y.1989) (McCurn, C.J.). Unless otherwise noted, references throughout this recitation of the facts are to the corresponding paragraphs of plaintiffs' second-amended complaint.

FN3. Sontag and Manaker, by contrast, allege that they accommodated Aquilio's persistent requests that he (Aquilio), his fiends, family and clients be permitted to invest in SAA. *E.g.* Manaker's Answer, at ¶ 18. To be sure, defendants assert that other investors were available, but Aquilio "insistently requested that he and [the other investors] should be permitted to acquire an interest in SAA." *E.g.* Manaker Counterclaim, at ¶ 16.

FN4. Plaintiffs Meltzer, Vance, and Aquilio became shareholders in 1983. Daria Aquilio, as trustee of the Mae H. Vance Trust (hereinafter "Trustee" or "Trust"), acquired her interest later through a pledge agreement with Aquilio.

FN5. Sontag was President of SAA until 1984, at which time he became Chief Executive Officer until 1987; he was a member of the Board of Directors from inception until 1987.

FN6. The parties spend undue time offering vastly divergent accounts of the source of the antagonism. *Cf.* Plaintiffs' Complaint, at ¶ 27; Manaker's Answer, at ¶ 27. Fortunately, the same is not relevant to the motions before the Court.

FN7. Although Manaker acknowledges that the meeting occurred and that sale of plaintiffs' shares was discuss, he unequivocally denies uttering the alleged statements. *E.g.* Manaker Response, at ¶ 43.

FN8. Plaintiffs suggested for the first time at oral argument that *Lampf* 's rejection of equitable tolling applies only to the three-year statute of repose; equitable tolling, according to plaintiffs, may still be applied to the one-year discovery statute of limitations. The Court rejected that distinction outright, stating that "the equitable tolling doctrine is fundamentally inconsistent with the 1-and-3-year structure." *Lampf,* 111 S.Ct. at 2782 (three year maximum was intended to *replace* equitable tolling in securities actions). The plaintiffs' purported distinction, while creative, is without merit in light of *Lampf.*

N.D.N.Y.,1991.
Aquilio v. Manaker
Not Reported in F.Supp., 1991 WL 207473 (N.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 5:91cv00093 (Docket) (Jan. 24, 1991)
• 5:90cv00045 (Docket) (Jan. 11, 1990)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.