Westlaw.

Not Reported in F.Supp.2d                                                                                                                           Page 1
Not Reported in F.Supp.2d, 2005 WL 1139908 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,E.D. New York.
Christopher BRODEUR, Plaintiff,
v.
THE CITY OF NEW YORK, Defendant.
**No. 04-CV-1859 (JG).**

May 13, 2005.

Corey Stark, Michael G. O'Neill, New York, New York, for Plaintiff.
Michael A. Cardozo, Corporation Counsel of the City of New York, New York, New York, By: Sheryl A. Bruzzese, Assistant Corporation Counsel, for Defendant.

*MEMORANDUM AND ORDER*
GLEESON, J.
**\*1** Plaintiff Christopher Brodeur brings this action pursuant to 42 U.S.C. § 1983 alleging that after he was arrested in March and June of 1997 he was unlawfully strip-searched while incarcerated at Riker's Island. The City of New York (the "City") moves for judgment on the pleadings, arguing that Brodeur's claims are (1) barred by a settlement agreement from a prior action; (2) precluded under the doctrine of *res judicata;* and (3) time barred. For the reasons set forth below, the motion is granted.[FN1]

> FN1. By letter dated November 16, 2004, Brodeur withdrew his claim concerning strip searches that took place in March 1997. *See* letter dated November 16, 2004 from Michael G. O'Neill to the Court, attached as Ex. F. to the Bruzzese Declaration.

*BACKGROUND*

A. *General Background and Procedural History*[FN2]

> FN2. This background information is based on Brodeur's complaint and opposition brief; his complaint in a prior action-*Brodeur v. City of New York,* 99 CV 0651 (S.D.N.Y.) (*"Brodeur II"*)-the settlement of which is the basis of the City's motion; the *Brodeur II* settlement agreement and general release; and filings and docket entries in *Tyson v. City of New York,* 97-CV-03762 (S.D.N.Y.).

On January 29, 1999, Brodeur brought an action under 42 U.S.C. § 1983 alleging violations of his due process rights under the Fifth and Fourteenth Amendments against, among others, The City of New York and Mayor Rudolph Giuliani. *See* Bruzzese Decl. Ex B., Third Amended Complaint, *Brodeur II.*[FN3] That action was grounded, in part, on an assertion that Brodeur was falsely arrested on June 12, 1997. On that day, Brodeur attempted to hold a press conference on the steps of City Hall announcing his decision to run for Mayor as a candidate named "John Doe." Although he was wearing a paper bag over his head to disguise his identity, Brodeur was arrested for violating an order of protection (failing to stay away from the "place of business" of Colleen Roche, Giuliani's press secretary). Brodeur asserted that the arrest was pretextual, and that he was being retaliated against for being a "relentless" critic of the Giuliani administration.

> FN3. *Brodeur II* was the second case Brodeur brought against the City alleging that he was being retaliated against for criticizing Mayor Giuliani and his administration. On June 3, 1996, Brodeur filed a complaint in the Southern District of New York. *See Brodeur v. City of New York, 1998 WL 557599, at \*1 (S.D.N.Y. Sept. 2, 1998)* (*"Brodeur I"*). On April 22, 1997, the district court dismissed the complaint against most defendants. *Id.* On October 1, 1997, "the Second Circuit dismissed plaintiff's appeal of [the April 22, 1997 ruling] as 'so indisputably lacking in merit as to be frivolous.' " *Id.* (quoting *Brodeur v. City of New York,* No. 97-7698 (2d Cir.1997)). The amended complaint in *Brodeur I* included allegations concerning Brodeur's March 5, 1997 arrest. *Id*. On September 2, 1998, the *Brodeur I* action was dismissed as to all defendants with prejudice. *Id.* at \*9.

After Brodeur's arrest, he was taken to Riker's Island, where he was subjected to one or more strip searches

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1139908 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 2

"pursuant to an official policy of the New York City Department of Corrections." FN4 Opp'n Br. at 4. In the *Brodeur II* complaint, in addition to describing the circumstances surrounding the June 12, 1997 arrest, Brodeur asserted that:

> FN4. The number of strip searches alleged by Brodeur is immaterial to the disposition of this motion. Accordingly, for the purposes of this motion only, I assume that Brodeur was subject to a single strip search following his June 12, 1997 arrest.

In plaintiff's criminal proceedings, the Assistant District Attorney assigned to prosecute plaintiff informed the Criminal Court that [Mayor Giuliani] had taken a strong personal interest in the case, or words to that effect....
Giuliani's personal interest in plaintiff's criminal proceedings had a substantial influence on the course of those proceedings from the time of plaintiff's arrest until his acquittal....
Giuliani's strong personal interest in plaintiff's criminal charges caused him to be processed through the jail system, when he would otherwise have been released on a desk appearance ticket, caused the criminal court to set an absurdly high bail, and influenced the criminal court not to dismiss criminal charges against plaintiff that were defective on their face.
All of the foregoing caused plaintiff to spend unwarranted time in jail and in baseless criminal proceedings, in effect punishing the plaintiff without ever having been convicted of a crime.

*Brodeur II,* Third Am. Compl. ¶¶ 45-48.

On January 3, 2003, Brodeur and the City settled *Brodeur II,* executing a Stipulation and Order of Settlement and Dismissal. Bruzzese Decl. Ex. D. The City agreed to pay Brodeur $35,000, the action was dismissed with prejudice, and Brodeur released the defendants, including the City of New York, "from any and all liability, claims, or rights of action arising from and contained in the complaint in this action." *Id.* Brodeur signed a general release in connection with the settlement, which reads in its entirety as follows:

**\*2** Know that I, Christopher Brodeur, the plaintiff in the action entitled *Brodeur v. City of New York, et al.,* 99 Civ. 0651(WHP) (KNF), in consideration of the payment of Thirty-Five Thousand Dollars ($35,000.00) by the City of New York, do hereby release and discharge the defendants Donald Costello and Richard Dowd; their successors or assigns; all past and present officials, employees, representatives and agents of the New York City Police Department and the City of New York; and the City of New York from any and all claims which were or could have been alleged by me in the aforementioned action arising out of the events alleged in the complaint in said action, including all claims for attorney's fees and costs. This Release may not be changed orally.

Bruzzese Decl. Ex. E.

In this action, Brodeur asserts that the reason he did not allege an unlawful strip search in *Brodeur II* was because he believed that he was a class member in *Tyson v. City of New York,* 97-CV-03762 (S.D.N.Y.), and relied on that action to vindicate such a claim.

1. *The* Tyson *Class Action*

On May 22, 1997, a class action was filed alleging that the City of New York unconstitutionally subjected all pre-trial arrestees in Manhattan to strip searches without reasonable cause. O'Neill Decl. Ex. A, Compl., *Tyson v. City of New York,* 97-CV-03762 (S.D.N.Y.). The proposed class consisted of "all persons who had been or will be arrested for misdemeanor or lesser offenses in New York County and then were or will be strip searched pursuant to City, DOC, and NYPD policy, practice and custom." *Id.* ¶ 17. The class was certified on April 13, 1998, and included persons alleging unlawful strip searches between July 1, 1996 and June 13, 1997. O'Neill Decl. Ex. C, *Tyson* Docket Report. When Brodeur filed *Brodeur II* in 1999, he was "aware of the pendency of the [*Tyson*] class action and relied on it for the vindication [sic] of his illegal strip searches." Opp'n Br. at 4. On January 9, 2001, a proposed stipulation of settlement was filed in *Tyson.* The stipulation stated that "[t]he Settlement Class shall not include any individual who has previously commenced any civil litigation challenging any arrest(s) which resulted in his/her detention in Central Booking in Manhattan and Queens during the class period and has prevailed, settled, or had his/her complaint dismissed on the merits." O'Neill Decl. Ex. B, Stipulation of Settlement, *Tyson v. City of New York,* ¶ 1. On July 5, 2001, the district court entered final judgment approving the *Tyson* settlement. On November 18, 2002, Brodeur was notified that he was not a member of the *Tyson* class and would not be eligible for any damages from the *Tyson* case. On May 5, 2004, Brodeur filed this action seeking money damages for the strip search following his

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                Page 3
Not Reported in F.Supp.2d, 2005 WL 1139908 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

June 12, 1997 arrest.

DISCUSSION

A. *The Standard for a Rule 12(c) Motion*

Under Rule 12(c) of the Federal Rules of Civil Procedure, a party may move for judgment on the pleadings "[a]fter the pleadings are closed but within such time as not to delay the trial." In deciding a Rule 12(c) motion, a court applies the same standard that applies to a motion under Rule 12(b)(6). *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). A court must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff. *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). Dismissal may be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Walker v.. City of New York,* 974 F.2d 293, 298 (2d Cir.1992) (internal quotation omitted); *see also Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002) ("a court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.") (internal quotation and brackets omitted).

*3 When considering a 12(b)(6) motion, a court must generally limit itself to facts stated in the complaint, documents attached to the complaint, and documents incorporated by reference. *Newman & Schwartz v. Asplundh Tree Expert Co., Inc.,* 102 F.3d 660, 662 (2d Cir.1996). A court may also consider documents a plaintiff relies on that are integral to the complaint, as well as public documents of which the plaintiff has notice. *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47-48 (2d Cir.1991). Here, both parties have provided public documents integral to Brodeur's complaint. These documents are: (1) the complaint, settlement agreement, and general release in *Brodeur II, see* Bruzzese Decl. Exs. B, D, and E, respectively; and (2) the complaint, stipulation of settlement, and docket sheet in the *Tyson* class action, *see* O'Neill Decl. Exs. A-C, respectively. Neither party has suggested that these documents are not properly before the court on this motion, and I have considered them in deciding this motion. *See Cortec,* 949 F.2d at 48 ("Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated.").

B. *The Settlement Agreement and General Release*

The City argues that the *Brodeur II* settlement agreement and general release preclude Brodeur from bringing the claim in this case-that he was subjected to an unconstitutional strip search following his June 12, 1997 arrest. I agree.

Settlement agreements and general releases are contracts construed according to general principles of contract law. *Collins v. Harrison-Bode,* 303 F.3d 429, 433 (2d Cir.2002) (settlement agreements); *Albany Sav. Bank, F.S.B. v. Halpin,* 117 F.3d 669, 672 (2d Cir.1997) (general releases). A court's primary objective in interpreting contracts is "to give effect to the intent of the parties as revealed by the language of their agreement." *Compagnie Financiere de Cic et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.,* 232 F.3d 153, 157 (2d Cir.2000). The threshold determination is whether the contract language is unambiguous; if it is, "courts must take care not to alter or go beyond the express terms of the agreement." *Red Ball Interior Demolition Corp. v. Palmadessa,* 173 F.2d 481, 484 (2d Cir.1999); *see also Shklovskiy v. Khan,* 273 A.D.2d 371, 372 (2d Dep't 2000) ("[w]here the language of the release is clear, effect must be given to the intent of the parties as indicated by the language employed."). Also, where a contract is unambiguous, a party's subjective intent is irrelevant. *See Retrofit Partners I, L.P. v. Lucas Indus., Inc.* 201 F.3d 155, 161 (2d Cir.2000) ( "extrinsic evidence may not be used to create ambiguity in an otherwise unambiguous agreement;" and thus, what a party thinks an agreement means is irrelevant.) (internal quotation omitted); *see also Strumlauf v. Sandine Originals, Inc.,* 55 N.Y.2d 976, 978 (1982) (Fuchsberg, J., dissenting) ("it is almost hornbook law that the intent of the parties to a written agreement is to be found primarily in their 'expressed words' rather than their 'subjective intent.' ").

*4 Determining whether the contract language is ambiguous is a question of law to be decided from the face of the agreement itself, without reference to extrinsic evidence. *Collins,* 303 F.3d at 433. Contract language is ambiguous if "it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Compagnie Financiere,* 232 F.3d at 158 (internal quotation omitted). The words of a contract "should be considered, not as if isolated from the context, but

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK    Document 163-3    Filed 07/07/2006    Page 4 of 5

Not Reported in F.Supp.2d                                                                                         Page 4
Not Reported in F.Supp.2d, 2005 WL 1139908 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

in the light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance and a sensible meaning of words should be sought." *Collins,* 303 F.3d at 433 (2d Cir.2002) (quoting *Kass v. Kass,* 91 N.Y.2d 554, 566 (1998)). A contract is not made ambiguous "simply because the parties urge different interpretations." *Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992); *see also Blackie v. State of Me.,* 75 F.3d 716, 721 (1st Cir.1996) ("a contract is not ambiguous merely because a party to it, often with a rearward glance colored by self-interest, disputes an interpretation that is logically compelled.").

Here, both parties contend that the release is unambiguous-Brodeur is barred from bringing "any and all claims which were or could have been alleged by [him] ... arising out of the events alleged in the complaint"-but dispute whether the post-arrest strip search falls within the ambit of "events alleged in the complaint." Brodeur argues that the release excludes the strip search claim because the complaint "contained no allegations concerning strip searches or any part of his incarceration at Riker's Island.... The 1999 complaint limited itself to the manner and motivation of plaintiff's arrest, his prosecution and a search of his home." Opp'n Br. at 6. The City argues that the release includes any claim for an unlawful strip search because such a claim was a result of the arrest: "whether plaintiff limited his complaint to unlawful arrest, malicious prosecution, or the illegal search of plaintiff's apartment is not significant. Likewise, it simply does not matter if the 1999 action did not allege any facts relating to plaintiff's alleged strip searches because it is clear that any claim pertaining to an unlawful strip search on March 5, 1997 or June 12, 1997 stems directly from plaintiff's arrests on March 5, 1997 and June 12, 1997. As such, these claims *could have been brought* in plaintiff's prior action and are, therefore, precluded under the unambiguous terms of the settlement agreement." Br. at 11 (emphasis in original).

I agree with the City that the unlawful strip search claim arises out of the events alleged in the complaint.[FN5] In addition to the circumstances surrounding the June 12, 1997 arrest, the complaint states that Giuliani's interest in Brodeur's criminal proceedings "had a substantial influence from the course of those proceedings *from the time of plaintiff's arrest until his acquittal;"* that Giuliani's interest "caused him to be *processed through the jail system;"* and that because of this, Brodeur "spen[t] *unwarranted time in jail* and in baseless criminal proceedings, in effect punishing the plaintiff without ever having been convicted of a crime." *Brodeur II,* Third Am. Com pl. ¶ 45-48 (emphases added). While not specifically describing strip searches, the complaint includes injuries that occurred post-arrest, while Brodeur was being "processed through the jail system." An objective reading of the settlement, release and complaint require the conclusion that the settlement and release unambiguously express an intent of the parties to resolve Brodeur's claims of false arrest and post-arrest mistreatment, including the alleged strip search. Accordingly, I find that, in exchange for $35,000, Brodeur released the city of any such claim arising out of his June 12, 1997.[FN6]

> FN5. I do not agree with the City's suggestion that Brodeur's allegations in the *Brodeur II* complaint, other than that he was falsely arrested on June 12, 1997, are irrelevant. The question is not, as the City would have it, whether in addition to the false arrest claim, Brodeur could have brought a claim for the unlawful search in *Brodeur II,* which he certainly could have done. *See* Fed.R.Civ.P. 18 (a plaintiff asserting a claim *may* join as many claims as he has against an opposing party). The question under the release is different; it is whether the claim at issue arises out of *the events alleged in the complaint.* The City argues that because Brodeur would not have been subject to an unconstitutional search but for his arrest, the search is a necessary part of the false arrest "event." The City makes this same claim in *res judicata* terminology, that the arrest and the search arise from the same operative nucleus of fact. Br. at 15. But Brodeur's false arrest claim is that members of the New York City police force retaliated against him for his criticisms of Mayor Giuliani. His strip search claim is that there was an unconstitutional municipal policy targeting all pre-trial detainees, and Brodeur was but one victim. While it usually makes sense for a plaintiff to bring the two claims together, a false arrest and subsequent unlawful strip search do not necessarily form a single legal transaction. *Cf. Mary Beth G. v. City of Chicago,* 723 F.2d 1263, 1279-80 (7th Cir.1984) (explaining, in the context of whether attorney fees should be awarded, that false arrest and a subsequent unlawful strip search are distinct claims).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                              Page 5
Not Reported in F.Supp.2d, 2005 WL 1139908 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

FN6. At oral argument, Brodeur's counsel made the strained argument that the references to jail in the *Brodeur II* complaint-"being processed through the *jail* system"; "spending unwarranted time in *jail*"-did not refer to Riker's Island, where Brodeur allegedly was strip-searched following his arrest. Instead, counsel asserts that "jail" in the complaint meant only "Central Booking." Thus, according to counsel's definition, a strip search on Riker's Island would not arise from Brodeur's allegations of post-arrest mistreatment in "jail." Where one party to a contract intends that a word used in (or referred to by) a contract (such as "jail") have an improbably narrow meaning (such as "Central Booking"), he should make sure that the contract defines the word accordingly. An objective reading of the word "jail" in the context of the settlement and release is that it encompasses Riker's Island. *Cf.* New York City Department of Corrections History, *at* http://www.ci.nyc.ny.us/html/doc/html/history.html (referring to the ten "jails" that comprise Riker's Island).

**\*5** The subjective intent that Brodeur implicitly asserts he had while signing the release reinforces why courts focus on the objective language of contracts. Brodeur asserts that when he filed the *Brodeur II* complaint, he relied on the *Tyson* class action to vindicate his claim of an unlawful strip search following his June 12, 1997 arrest. He further asserts, however, that on November 18, 2002, six weeks before he signed the release in *Brodeur II,* he was told that he was not included in the *Tyson* class. Brodeur thus implicitly asserts that when signing the *Brodeur II* release, he actually intended, notwithstanding the broad terms of the release, to preserve his right to sue the City for the strip search. That undisclosed intent would hardly be apparent to the City as they executed a broad settlement of all claims that could have arisen from allegations in the *Brodeur II* complaint, including allegations concerning Brodeur's post-arrest treatment. If Brodeur wanted to carve out of the settlement his strip search claim in light of his exclusion from the *Tyson class,* all he had to do was say so, and insist on a release that did not bargain such a claim away. He did not do so then, and is thus precluded from bringing this action now.FN7

FN7. Because of my decision on the merits, I need not address the City's *res judicata* or timeliness arguments.

CONCLUSION

For the reasons set forth above, the motion to dismiss is granted and the case is dismissed. The Clerk of the Court is respectfully directed to close the case.
So Ordered.

E.D.N.Y.,2005.
Brodeur v. City of New York
Not Reported in F.Supp.2d, 2005 WL 1139908 (E.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 2004 WL 2410338 (Trial Pleading) Answer (Aug. 6, 2004)
• 2004 WL 2410328 (Trial Pleading) Complaint and Jury Demand (May 5, 2004)
• 1:04cv01859 (Docket) (May. 05, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.