Not Reported in F.Supp.2d                                                                                                Page 1
Not Reported in F.Supp.2d, 2003 WL 21981806 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

H
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,E.D. New York.
In re KEYSPAN CORPORATION Securities Litigation
**No. 01 CV 5852(ARR).**

July 30, 2003.

Company's senior officers and directors moved to dismiss securities fraud suit. The District Court, Ross, J., held that: (1) investors adequately pleaded securities fraud violation, and (2) certain forward-looking earnings predictions made by the company fell within safe-harbor provision of the Private Securities Litigation Reform Act (PSLRA), however, those which were made in tandem with, and were premised upon, misrepresentations of existing facts did not merit the protection of the statutory safe harbor.

Motion denied.

West Headnotes

**[1] Securities Regulation 349B ⚷60.53**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.50 Pleading
                    349Bk60.53 k. Misrepresentation. Most Cited Cases

Investors pleaded specific facts demonstrating that company's senior officers and directors possessed information about major problems at one of its subsidiaries, that the existence of those problems contradicted the company's rosy public representations, and that officers and directors waited six months before revealing those problems to the public. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[2] Securities Regulation 349B ⚷60.45(1)**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation

                349Bk60.43 Grounds of and Defenses to Liability
                    349Bk60.45 Scienter, Intent, Knowledge, Negligence or Recklessness
                        349Bk60.45(1) k. In General. Most Cited Cases

In securities fraud action, investors established scienter by alleging facts that constituted strong circumstantial evidence of conscious misbehavior or recklessness; investors alleged that company's senior officers and directors knew facts or had access to information suggesting the inaccuracy of their public statements, which continued to extol without qualification the company's performance and outlook, despite information about major problems at one of its subsidiaries. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[3] Securities Regulation 349B ⚷60.27(5)**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
                    349Bk60.27 Misrepresentation
                        349Bk60.27(5) k. Forecasts, Estimates, Predictions or Projections. Most Cited Cases

Company-issued statements, "Our dividend yield and growth make us confident of increasing long-term value for our shareholders," and "I think we have a greater growth potential in our territory than any company in our industry," constituted inactionable general expressions of optimism where nothing suggested that the optimistic statements were based on misrepresentations of existing facts. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[4] Securities Regulation 349B ⚷60.27(5)**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
                    349Bk60.27 Misrepresentation
                        349Bk60.27(5) k. Forecasts,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK   Document 163-10   Filed 07/07/2006   Page 2 of 16

Not Reported in F.Supp.2d                                                                                        Page 2
Not Reported in F.Supp.2d, 2003 WL 21981806 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Estimates, Predictions or Projections. Most Cited Cases

Certain forward-looking earnings predictions made by the company fell within safe-harbor provision of the Private Securities Litigation Reform Act (PSLRA); however, those which were made in tandem with, and were premised upon, misrepresentations of existing facts did not merit the protection of the statutory safe harbor. Securities Exchange Act of 1934, § 21E(c)(1), as amended, 15 U.S.C.A. § 78u-5(c)(1).

**[5] Securities Regulation 349B ⚷60.40**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
           349BI(C)7 Fraud and Manipulation
                349Bk60.39 Persons Liable
                    349Bk60.40 k. In General; Control Persons. Most Cited Cases

Investors adequately pleaded control person liability of company's senior officers and directors because they sufficiently alleged that those defendants were culpable participants in the primary securities fraud violation. Securities Exchange Act of 1934, § 20(a), as amended, 15 U.S.C.A. § 78t(a); Securities Exchange Act of 1934, § 20A(a), as amended, 15 U.S.C.A. § 78t-1(a).


Mark D. Smilow, Weiss & Yourman, New York, NY, S. Gene Cauley, Cauley Geller Bowman & Coates, LLP, Little Rock, AR, for Lead Plaintiffs.
Michael J. Chepiga, Simpson Thacher & Bartlett, New York, NY, for defendant KeySpan.
Robert J. Higgins, Dickstein Shapiro Morin & Oshinsky, LLP, Washington, DC, for defendants Catell, et al.

*OPINION AND ORDER*

ROSS, J.

**\*1** The lead plaintiffs in this action represent a proposed class of persons who purchased stock in defendant KeySpan Corporation ("KeySpan," or "the Company") between March 24, 2000, and July 17, 2001. In addition to KeySpan, plaintiffs name as defendants four of the Company's most senior officers and directors during the relevant period ("the individual defendants"), Robert Catell, the chairman and chief executive officer; Craig Matthews, the vice chairman and chief operating officer; Gerald Luterman, the chief financial officer; and William Feraudo, a member of KeySpan's board and the president of its subsidiary KeySpan Services, Inc. ("KSI"). By amended class action complaint filed April 7, 2003 ("the amended complaint," or "AC"), plaintiffs allege that defendants violated Section 10(b) of the Securities exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 of the regulations promulgated thereunder, 17 C.F.R. § 240.10b-5. Plaintiffs further allege that the individual defendants, by virtue of their status as controlling persons in the Company, are liable under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Plaintiffs also assert claims against the individual defendants for insider trading in violation of Section 20A of the Exchange Act, 15 U.S.C. § 78t-1(a). Defendants have moved to dismiss the amended complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, *et seq.* For the reasons below, the motion is denied. Defendants motion in the alternative to strike certain allegations of the complaint is granted in part and denied in part.


BACKGROUND

I. Procedural History


On November 27, 2001, Magistrate Judge Go ordered the consolidation of four actions against defendants, the first of which had been filed on August 28, 2001. On May 13, 2002, the lead plaintiffs filed the Consolidated Class Action Complaint, alleging a class period extending from November 4, 1999, to January 24, 2002. By order dated March 18, 2003, the court granted defendants' motion to dismiss the complaint but authorized plaintiffs to replead the portions of the complaint addressed to the nondisclosure of operational and financial problems at Roy Kay, Inc., a KeySpan subsidiary. *See In re KeySpan Corp. Sec. Litig,* No 01 Civ. 5852(ARR), 2003 WL 1702279, at \*27 (E.D.N.Y. Mar. 21, 2003). Plaintiffs have done so, alleging a class period dating from March 24, 2000, to July 17, 2001.


II. Plaintiffs' Allegations


The amended complaint alleges the following facts. Plaintiffs are purchasers of KeySpan stock during the class period. Defendant KeySpan is the largest investor-owned energy utility company in New York, a registered holding company under the Public Utilities Holding Company Act of 1935 ("PUHCA"),

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK   Document 163-10   Filed 07/07/2006   Page 3 of 16

Not Reported in F.Supp.2d                                                                                                  Page 3
Not Reported in F.Supp.2d, 2003 WL 21981806 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

a member of the Standard & Poor's 500 Index, and the manager of a portfolio of subsidiary service companies. The individual defendants were among the most senior executives at the Company during the class period.

### A. Acquisition of Roy Kay

***2** Following a "rocky" merger with Long Island Lighting Company in 1998, the Company's stock price began to fall, losing almost one fourth of its market value in 1999. AC ¶ ¶ 4, 6. As part of a strategy to prove to investors and analysts that KeySpan was a "growth" company, defendants sought to expand the Company's nascent energy services unit, which was formed in 1997. AC ¶ 9. This unit, which provided unregulated energy services to homes and businesses, derived half of its revenues from the installation of gas equipment, such as boilers, furnaces, central air conditioners, and heaters. AC ¶ 9.

Beginning in 1998, the energy services unit acquired numerous subsidiaries, including three engineering construction companies in the New York metropolitan area in January 2000. AC ¶ ¶ 9, 50. Among these three companies was Roy Kay, Inc., a contracting company based in Freehold, New Jersey, which KeySpan purchased for approximately $20 million. AC ¶ ¶ 9, 50, 53. On February 4, 2000, the Wall Street Journal reported that KeySpan expected these three acquisitions to provide as much as 20% of KeySpan's profits within five years. AC ¶ 50. That same day, KeySpan issued a press release quoting defendant Catell as stating, "These acquisitions are consistent with KeySpan Energy's aggressive strategy to expand our home-energy and business-solutions companies. Our goal is to become the premier energy company in the Northeast and this is a major step to achieving that goal." AC ¶ 51.

The press release also quoted defendant Feraudo, who stated, "The acquisitions are key to achieving the earnings goals set for the year. The Companies we've acquired are among the leading energy service companies headquartered in New York and New Jersey.... KeySpan will build on the impressive credentials and formidable reputations of our new subsidiaries.... The fit is a natural." AC ¶ 51.

### B. Roy Kay's Financial and Operational Problems

At the time of its acquisition and throughout the class period, Roy Kay was experiencing major operational and financial difficulties. AC ¶ ¶ 57-79. On February 10, 2000, Roy Kay received notification from New York City that it was potentially in default of its general contracting commitments on a project with the city. AC ¶ 58. On March 20, 2000, the city concluded that Roy Kay was in fact in default and terminated the contract. AC ¶ 58. On October 11, 2001, Roy Kay acknowledged in a letter to the State University Construction Fund that it was behind schedule on two projects and agreed to a new schedule. AC ¶ 59. However, Roy Kay failed to adhere to the new schedule and was declared in default by letters dated January 23, 2001, and February 5, 2001. AC ¶ 59. On December 7, 2000, counsel for Mason Tenders District Council Trust informed Roy Kay of its default on an obligation to make approximately $200,000 in contributions to certain funds. AC ¶ 61. On December 18, 2000, the Internal Revenue Service mailed a "Final Notice and Notice of Intent to Levy" in connection with Roy Kay's failure to pay more than $100,000 in taxes owed for the 1999 calendar year. AC ¶ 62.

***3** On January 19, 2001, the New York City Transit Authority informed Roy Kay that it was in default on a general contracting project known as the Rail Control Center ("the Rail project"). AC ¶ 63. As a result, the Liberty Bond Service was forced to deliver on its performance bond. AC ¶ 63. By letter dated March 20, 2001, Liberty informed both Roy Kay and KeySpan of its required performance and of its intent to seek reimbursement from Roy Kay and KeySpan of at least $5 million. AC ¶ 63. In turn, in April 2001, KeySpan reserved $3 million in Roy Kay's financial statements. AC ¶ 64.

On January 25, 2001, Feraudo met with two of the principals of Roy Kay at Roy Kay's headquarters in New Jersey. AC ¶ 65. The conversation, which was recorded, concerned Roy Kay's difficulties meeting many of its contractual and financial commitments. Discussing Roy Kay's default on the Rail project and its problems performing its obligations under its other contracts, Feraudo stated:
I can't work like this anymore. O.K. I can't. You get two disqualifications, I get Tom Murphy threaten a third one. O.K. The landing stations want to sue us. So I mean, I have fucking vendors calling me every day, calling Bob Catell every day. It is really getting out of hand. It's unbelievable. Instead of getting better, it's getting worse. I can't allow this to go anymore [*sic* ]. I have put together a plan that is why we are down here tonight. I want to try to go through this plan, see if we can all get on board with it, and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 4
Not Reported in F.Supp.2d, 2003 WL 21981806 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

see if we can get ourselves out of this situation. So that's what I want to walk through with you because I can't, I can't let this go on. And I suspect I'm going to have to put in another big chunk of cash in here.

AC ¶ 65(b). Regarding the reference to "another big chunk of cash," the amended complaint alleges that on 36 separate occasions beginning January 31, 2000-less than two weeks after KeySpan's acquisition of Roy Kay-the Company provided Roy Kay with cash credit totaling $31.5 million. AC ¶ 57. KeySpan provided this money "in response to repeated and severe cash shortfalls that threatened Roy Kay's ability to continue operating." AC ¶ 57.

Later during the January 25, 2001 meeting Feraudo stated:
But I mean the situation is you have serious cash problems.... I think you got big very quick. And I don't think the systems and the processes were in place to keep track with that. Then we ended up in cash problem [*sic* ].... Then all of a sudden this whole thing, which is all tied together, starts to creek. And what happened now? It's so far in a ditch, you can never win. You're never going to generate enough cash to keep these people happy. I mean some of these vendors are out there 6 months, 7 months.... I know I am going to have to put some more money. I think one of the things we have to do is get you current so you don't have a vendor up your ass every five minutes. Get the projects under control and get the billing going correctly.

**\*4** AC ¶ 65(c). The conversation also reflects that Roy Kay, beyond its problems paying its vendors, was unable to meet its own payroll. AC ¶ 68.

Discussing KeySpan's plan to take over the Rail project and to deal with Roy Kay's other problem contracts, Feraudo stated:
I want to take out the projects in distress. O.K. And my intent is to fix them to the best of my fucking ability, O.K. I'm at the point where I don't even give a shit if we just break even. If we can fucking break even I'll raise a flag, O.K. I don't want to take major fucking losses on these projects.

So ... let's re-systematize Roy Kay. We gotta get back our reputation, O.K. Our reputation is fucking shit on Long Island. You can't believe the fucking letters I'm getting and it just becomes a snowballing, a snowballing thing. The other day a vendor refused to deliver now to [KSI's Consumer Services division] ... because Roy Kay owes them money.... We got damaged reputation [*sic* ]. We got to fix that because our whole fucking, our whole fucking future is based on our reputation.

AC ¶ 70.

Feraudo regularly received Works in Progress reports ("WIP reports") relating to Roy Kay's operations. AC ¶ 72. These reports, which were issued monthly, contained "up to the minute progress, profitability and financial and operational information and benchmarks pertaining to all active contracting engagements undertaken by Roy Kay." AC ¶ 71. These reports were reviewed by the Board of Directors, and were used in preparing consolidated statements for all of the entities in KSI (Roy Kay's immediate parent), statements in turn reviewed by Feraudo's superiors at KeySpan. AC ¶ 72.

The March 31, 2001 report reflected a gross loss at Roy Kay of approximately $4 million. AC ¶ 73. (The amended complaint does not specify what period this loss pertains to.) The April report, which Feraudo received on April 30, 2001, showed a gross loss of $40 million since fiscal year 2000, negative contract revenue of more than $7 million over the same period, and a gross loss on all contracts from inception to date of almost $25 million. AC ¶ 78. The May report, which Feraudo received on May 23, 2001, reflected a gross loss of $44.5 million since fiscal year 2000, negative contract revenue of more than $15 million over the same period, and a gross loss on all contracts from inception to date of almost $31 million. AC ¶ 79. The report also indicated that the $13 million in profit recorded for fiscal year 2000 would have to be reversed. AC ¶ 79.

Because of the multiple problems at Roy Kay, on April 20, 2001, Feraudo terminated the employment of the Kays and installed new management. AC ¶ ¶ 74, 143. On April 23, 2001, KeySpan sued the Kays in New Jersey state court for fraud, among other things. AC ¶ 143. In court filings, KeySpan alleged that the Kays "had overstated earnings, as well as the work performed on projects, and improperly transferred costs." AC ¶ 143. KeySpan also alleged that the Kays had presented KeySpan with false financial and profit and loss statements. AC ¶ 143. The Kays have filed counterclaims in the litigation, which is still ongoing. AC ¶ 143.

**\*5** On April 23, 2001, as he was working on the Company's financial reports for the first quarter of 2001, defendant Matthews sent an email to defendant

Not Reported in F.Supp.2d         Page 5
Not Reported in F.Supp.2d, 2003 WL 21981806 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Luterman, who forwarded it to Feraudo. AC ¶ 76. The email asked, "Since we are a few cents ahead for the first quarter, is there any sense to taking some additional reserve for Roy Kay[?] I understand what we took is all expected to be written off but there may be some funds related to [receivable] collections that we may be sued for by the principals just terminated." AC ¶ 76. Feraudo responded, "I think we have done enough for the first quarter[,] 6-7 million [.][T]his is what we are aiming for[.][I] will not be able to have a more accurate number until next quarter." AC ¶ 76.

On June 28, 2001, Feraudo wrote an email to Catell concerning the impact of Roy Kay on KeySpan's earnings. Feraudo wrote that he was "trying to complete the total impact of [R]oy [K]ay by next week on earnings," and asked Catell for advice on how and when to account for the losses at Roy Kay. AC ¶ 80. Feraudo explained that he and others were deciding between "taking the full brunt of this hit" all at once and "shifting some of the hurt to goodwill." AC ¶ 80. Catell responded that he needed "to see all the numbers" before deciding. AC ¶ 81.

On July 17, 2001, the last day of the class period, the Company issued a press release and filed a Form 8-K with the Securities and Exchange Commission ("SEC") stating that it would take a $53.6 million special charge ($30.1 million after tax) in its energy services business in the second quarter on account of the problems at Roy Kay. AC ¶¶ 14, 126. The special charge amounted to a reduction in earnings of $0.22 a share. AC ¶ 127. That same day, the Company held a conference call to discuss the special charge and revised earnings estimates. AC ¶¶ 128-29. During the call, Luterman admitted that KeySpan had become aware of the problems at Roy Kay in March and April 2001, but claimed that it had taken until July "to put our hand around the size and scope of it." AC ¶ 129. Luterman stated that after identifying the problems in March and April, KeySpan enlisted the help of outside experts, including Arthur Andersen, its auditor at the time, to assess the full scope of the situation. AC ¶ 129; Def. Aff., Ex. 5 at 6, 8 (Transcript of July 17, 2001 Conf. Call).

On October 23, 2001, the Company reported that it was discontinuing the general contracting business of KSI Contracting (the Company's new name for the Roy Kay company). AC ¶ 136. The Company also reported that it was taking a $56.6 million after-tax charge to reflect the costs of completing current projects and of discontinuing general contracting activities. AC ¶ 136. The Company also disclosed a $5.5 million special charge to earnings for the first quarter of 2001 stemming from operational losses at Roy Kay. AC ¶ 136.

C. Defendants' Alleged False and Misleading Statements

1. Fiscal Year 2000

a. March 24, 27, 2000; April 26, 2000; May 12, 2000

*6 On March 24, 2000, the first day of the class period, KeySpan reported in a press release that its earnings were "significantly ahead of analysts' estimates for the first quarter of 2000 and could be up to 7 percent higher for calendar year 2000." AC ¶ 84. In the release, Catell attributed the higher numbers to the Company's success implementing its growth strategy. AC ¶ 84. These results were confirmed in an 8-K form filed March 27, 2000. AC ¶ 84.

On April 26, 2000, the Company issued a press release reporting that first quarter consolidated earnings increased 30%, or $134.5 million, over the previous year. AC ¶ 85. These results were confirmed in the Company's first quarter Form 10-Q, filed May 12, 2000. AC ¶ 87. The 10-Q also reported that the Company's assets had increased by approximately $200 million in its energy services unit due to acquisitions, including that of Roy Kay. AC ¶ 87.

The amended complaint alleges that the foregoing statements were materially false and misleading because "they failed to include the true results of the financially troubled Roy Kay operations, which were required to be included in the financial reports for virtually the entire quarter inasmuch as the purchase of Roy Kay was completed in January 2000." AC ¶¶ 86, 88. Plaintiffs allege that the earnings reports lacked a reasonable basis because they did not account for "the continuing and mounting contract losses" at Roy Kay. AC ¶ 86. Furthermore, defendants' statements allegedly "concealed the facts that Roy Kay lacked proper accounting controls; that it had material unrecorded liabilities, exceeding the cost of the acquisition; that substantial cash infusions were advanced to Roy Kay to support the survival of its operations; and that substantial and material cost overruns, delays and disputes ... materially compromised Roy Kay's viability and contribution to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 6
Not Reported in F.Supp.2d, 2003 WL 21981806 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

KeySpan." AC ¶ 86. Plaintiffs assert that these alleged concealments violated generally accepted accounting principles ("GAAP") because they failed, in violation of Financial Accounting Standards Board ("FASB") regulations 5 and 38, to account for the probable contingencies for existing circumstances involving uncertainty as to future outcome. AC ¶ 86.

As a result of the foregoing statements, the amended complaint alleges, KeySpan's stock price rose almost 18% from the beginning of the class period through May 15, 2000, the first full day of trading after the May 12, 2000 filing. AC ¶ 89.

  b. July 12, 26, 2000; August 8, 10, 2000; October 24, 31, 2000

On July 12, 2000, the Company filed an 8-K form reporting the unaudited consolidated financial statements of KeySpan and Eastern Enterprises (which it had acquired in November 1999, AC ¶ ¶ 6, 46) for the quarter ended March 31, 2000, and for the year ended December 31, 1999. AC ¶ 90. On July 26, 2000, the Company filed another 8-K, and issued a press release, reporting its earnings for the second quarter of 2000. AC ¶ 91. The reported second-quarter results exceeded analysts' expectations and represented an increase of $47.1 million over the same period in the previous year. AC ¶ 91. The release highlighted this overall increase, as well as the profits of the energy services segment, profits that contrasted with the net loss of that segment during the same quarter in 1999. AC ¶ 91. The amended complaint alleges that the July 12 and 26 statements were false and misleading. AC ¶ ¶ 90, 91.

*7 On August 8, 2000, in an interview on the financial broadcast program "Your World with Neil Cavuto," Catell touted KeySpan's growth prospects. Catell stated that "KeySpan is a good investment," with "greater growth potential in our territory than any company in our industry." AC ¶ 92. Catell also commented on the low-interest rates prevailing at the time, stating," We are generally a capital intensive business. So the fact that we can borrow money at lower rates, that helps us, improves our bottom line...." AC ¶ 92. The amended complaint alleges that Catell's statements were false and misleading for failing to disclose both the problems at Roy Kay and the fact that "it was only because the Company concealed the crisis at Roy Kay that KeySpan's credit standings remained so high that it could borrow money on a continuing basis at lower rates." AC ¶ 93.

On August 10, 2000, the Company filed a Form 10-Q, reporting earnings of $47.08 million for the second quarter, an increase over the same period in 1999. AC ¶ 94. This report is alleged to be false and misleading for the same reasons as were the statements made in March through July 2000. AC ¶ 95. In response to this report and the other statements in July and August 2000, the Company's stock price closed at $35.828 on August 11, 2000, up 18% from May 15, 2000, and almost 40% from the beginning of the class period. AC ¶ 96.

The Company reported its third-quarter earnings in an October 24, 2000 press release and in a Form 10-Q filed October 31, 2000. AC ¶ ¶ 97-98. The Company reported earnings of $13.2 million, which represented an increase of $0.10 a share over the earnings for the same period in 1999. AC ¶ ¶ 97-98. The press release highlighted the profits from the energy-related services segment, which were reported to be $9.6 million. AC ¶ 97. The amended complaint alleges that these reported results were false and misleading for the same reasons as the earlier statements.

As an alleged result of these statements, KeySpan's stock price closed at $35.313 on November 1, 2000. AC ¶ 100. Another alleged result of KeySpan's ongoing concealment of the problems at Roy Kay was the "A-" rating assigned by Fitch on November 8, 2000, to KeySpan's $1.65 billion senior unsecured debt shelf registration. AC ¶ 101. The debt issuance represented by the shelf registration was necessitated by the Eastern acquisition. AC ¶ 101.[FN1] In assigning the rating, Fitch was misled by its ignorance (which it shared with the investing public) of the problems at Roy Kay, and it expressly relied on KeySpan's stated plans to continue to expand its unregulated retail energy operations. AC ¶ 101.

> [FN1.] More specifically, the amended complaint alleges that "[t]he debt issuance represented by the shelf registration was anticipated to be sold by year-end 2000 to replace the Company's short-term debt and commercial paper expected to be issued in an equal amount under the Company's capital markets bridge facility in order to make the Eastern purchase." AC ¶ 101.

  c. January 25, 2001, and March 30, 2001

On January 25, 2001, KeySpan issued a press release

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and filed a Form 8-K reporting earnings for the fourth quarter of 2000 and for the entire fiscal year 2000. AC ¶ 106. The release stated, "Catell ... emphasized that KeySpan is in an excellent position to continue its earnings growth in 2001. 'We are pleased that our 2000 earnings ... were ... 49% higher than 1999. All of our business segments performed exceptionally well." ' AC ¶ 107. The release further quoted Catell as stating,

**\*8** We have a sound strategy and a strong foundation for future earnings growth. All our business segments have a positive outlook and should be able to build upon this years strong performance.... We maintain a rigorous budget process to control costs and expect to achieve our synergy savings target. As a result, we except to earn between $2.60 to $2.65 per share in 2001.

AC ¶ 107. In addition, the Company highlighted KSI's first annual profit, which added $40.9 million to KeySpan's consolidated earnings, compared with a loss of $2.5 million in the previous year. AC ¶ 106. The Company's annual 10-K form for the year 2000, filed March 30, 2001, confirmed KSI's earnings and those for the Company as a whole. AC ¶ 110.

The amended complaint alleges that the foregoing press release and earnings statements were materially false and misleading because "KeySpan failed to properly disclose and/or record losses for the troubled Roy Kay operations, the totality of which actually reversed approximately $100 million of the reported earnings." AC ¶ 108. Plaintiffs further allege that KeySpan's reporting of KSI's profitability was false and misleading "due to the necessary reserves and charges that should have been taken in the period to offset the financial and operational difficulties and improprieties plaguing Roy Kay." AC ¶ 108. In light of these difficulties, plaintiffs also allege that Catell's statements that "[a]ll of [KeySpan's] segments performed exceptionally well" and "have a positive outlook," and that the Company maintained a rigorous budget process, were false and misleading. AC ¶ 108.

In the alternative, plaintiffs allege that the statements were false and misleading for failing to disclose "material accounting issues at Roy Kay and the inevitable divestiture of its general contracting business" occasioned by the Company's registration under PUHCA, AC ¶¶ 108, 113.[FN2] The amended complaint also alleges that the earnings reports for 2000 violated Accounting Research Bulletin No. 45, Long-Term Construction-Type Contracts ("ARB No. 45"), inasmuch as "provision for total projected loss on all contracts expected to result in a loss had to be (but was not) made during the period in which the current estimate of total contract costs exceeded the current estimate of total contract revenues." AC ¶ 112.

> [FN2]. As defendants point out, the court's previous order dismissed with prejudice plaintiff's claim that the Company did not disclose the potential negative effects on Roy Kay of KeySpan's registration under PUHCA. *See KeySpan,* 2003 WL 1702279, at ----17-19, 27. The PUHCA-related allegations in the amended complaint fall squarely within the scope of this prohibition, and the court has therefore disregarded them.

Plaintiffs allege that as a result of the foregoing misrepresentations, KeySpan's stock price rose to over $40 per share on April 10, 2001. AC ¶ 115. Furthermore, an analyst at Credit Lyonnais reiterated a "buy" recommendation for KeySpan and assigned it a 12-month target price of $50. AC ¶ 114.

1. Fiscal Year 2001

a. April 26, 2001, and May 7, 2001

In an April 26, 2001 press release, the Company reported record earnings of $223.3 million for the first quarter of 2001. AC ¶ 117. In light of these results, the Company increased its earnings forecast for the year 2001 to $2.70 a share. AC ¶ 117. In the press release, the Company highlighted KSI's $2 million earnings before interest and taxes ("EBIT"). AC ¶ 117. The Company filed a Form 10-Q on May 7, 2001, that confirmed these results and the earnings forecast. AC ¶ 119.

**\*9** The amended complaint alleges that these statements were materially false and misleading for failing to account for or to otherwise disclose the financial and operational crises at Roy Kay. AC ¶¶ 118-19. In particular, the statements failed to report that KeySpan actually had a first quarter operating loss of $5.5 million as a result of these crises. AC ¶¶ 118-19. As mentioned, it was not until October 23, 2001, that KeySpan disclosed the $5.5 million loss.

As a result of these misrepresentations, the amended complaint alleges, KeySpan's stock rose to $40 a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK   Document 163-10   Filed 07/07/2006   Page 8 of 16

Not Reported in F.Supp.2d                                                                                                              Page 8
Not Reported in F.Supp.2d, 2003 WL 21981806 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

share on May 17, 2001. AC ¶ 124. As another alleged result, on May 17, 2001, Fitch assigned an Arating to KeySpan's $1 billion senior unsecured debt offering made as part of a universal shelf registration filed May 3, 2001. AC ¶ 121. As with the November 2000 rating, this Fitch rating was allegedly based on misreported financial data that concealed the problems at Roy Kay. AC ¶ 122. Again, Fitch expressly relied on the reported plans of the Company to continue to expand its unregulated retail energy operations, which included Roy Kay, through acquisitions and internal growth. AC ¶ 122.

### b. June 25, 2001

On June 25, 2001, KeySpan announced in a press release that it was combining its unregulated business into KeySpan Energy and Services and Supply, and its regulated businesses into KeySpan Energy Delivery. AC ¶ 125. KeySpan stated that these actions would permit it "to implement [its] growth strategy and [were] consistent with the evolution of [its] organizational structure into regulated and unregulated businesses." AC ¶ 125.

Plaintiffs' allege that these statements were false and misleading because they failed to disclose the problems at Roy Kay. AC ¶ 125. In so doing, the statements are alleged to have falsely suggested that the transition was proceeding according to plan and without material problems. AC ¶ 125.

### D. Scienter Allegations

The amended complaint alleges that the individual defendants acted with scienter insofar as they knew throughout the class period, yet deliberately concealed from the public, that Roy Kay was experiencing severe financial and operational problems. As evidence of defendants' knowledge of the problems at Roy Kay, plaintiffs point to the ongoing "emergency injections" of cash to Roy Kay beginning as early as January 2000, AC ¶ 145; the January 25, 2001 meeting between Feraudo and the Kays at which Feraudo stated, among other things, that unhappy vendors were calling him and Catell every day; and the WIP reports, which Feraudo admitted in a deposition in the New Jersey litigation that he regularly received. Based on this evidence, plaintiffs allege that defendants knew of the dire situation at Roy Kay "no later than the fall of 2000." AC ¶ 13(b). Despite this knowledge, plaintiffs allege, defendants consciously misled the investing public by concealing this material information until July 17, 2001.

**\*10** In addition to alleging "conscious misbehavior," plaintiffs also allege that defendants had both "motive and opportunity" to commit fraud. The amended complaint alleges that during the class period the four individual defendants sold $27 million worth of their personal shares and vested options of KeySpan stock, and that this figure represented a high percentage of their available stock. AC ¶¶ 21-25, 147. Plaintiffs allege that the "timing and magnitude of these sales," which took place in two "tranches" during the class period, reveal defendants' fraudulent intent. AC ¶ 147. The first group of sales took place in December 2000, when the defendants allegedly became aware of numerous particular problems at Roy Kay and of the severity of the situation there generally. AC ¶ 148. The second group of sales took place in May 2001, at a time when among other things, the Company's stock price was peaking, the Roy Kay situation was at its bleakest, and the Company sought a favorable rating from Fitch for its public debt. AC ¶¶ 149, 155.

### E. Other Allegations

As mentioned, the amended complaint alleges that defendants' treatment of the Roy Kay situations violated GAAP. The complaint contains a separate section entitled "Violations of GAAP," which in addition to the particular violations outlined above, alleges a variety of other accounting irregularities. AC ¶¶ 164-73. In sum, these allegations contend that defendants' financial statements violated standard accounting principles because they "did not timely reflect the losses incurred during the Class Period." AC ¶ 173.

The amended complaint asserts that plaintiffs' reliance on defendants' misstatements can be established by the fraud-on-the-market doctrine. Plaintiffs allege facts purporting to establish that KeySpan's securities were traded in an efficient market, that the market promptly digested information regarding KeySpan from all publicly available sources, such as those containing the statements enumerated in the amended complaint, and that these statements had the effect of creating an unrealistically positive public assessment of KeySpan's financial situation, an assessment reflected in the Company's overinflated stock price. AC ¶¶ 158-62. Under the circumstances, plaintiffs allege, it is right to presume that plaintiffs relied on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK   Document 163-10   Filed 07/07/2006   Page 9 of 16

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21981806 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 9

defendants' public misrepresentations in purchasing KeySpan stock. AC ¶ 162.

### III. Defendants' Motion

In the instant motion, defendants raise several grounds for dismissal. Defendants argue that the amended claims (1) constitute "nothing more than inactionable fraud by hindsight," Def. Mem. at 9; (2) fail to plead with particularity facts sufficient to create a strong inference of scienter; (3) fail to state a claim based on GAAP violations; (4) allege fraud based on inactionable general expressions of optimism and forward-looking statements; and (5) fail to state a claim under either Section 20(a) or Section 20A of the Exchange Act. Defendants further argue that the amended complaint should be dismissed without leave to replead.

### DISCUSSION

#### I. Legal Standards

##### A. Fed.R.Civ.P. 12(b)(6)

**\*11** Under Rule 12(b)(6), a case should be dismissed only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v.. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). As it decides a defendant's motion to dismiss, "the court must accept as true all the factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff." *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll.,* 128 F.2d 59, 63 (2d Cir.1997). The central question is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

#### B. Section 10(b) and Rule 10b-5 of the Exchange Act and Fed.R.Civ.P. 9(b)

"To state a cause of action under Section 10(b) and Rule 10b-5, a plaintiff must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury." *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 808 (2d Cir.1996); *see also Ganino v. Citizens Utilities Co.,* 228 F.3d 154, 161 (2d Cir.2000) ("Section 10(b) ... bars conduct involving manipulation or deception, manipulation being practices ... that are intended to mislead investors by artificially affecting market activity, and deception being misrepresentation, or nondisclosure intended to deceive.") (citation and internal quotation marks omitted).

Under the PSLRA, a plaintiff pleading a violation of Section 10(b) and Rule 10b-5 must "specify each statement alleged to have been misleading, the reason or reasons the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." 15 U.S.C. § 78u-4(b)(1); *see also In re Scholastic Corp., Sec. Litig.,* 252 F.3d 63, 69 (2d Cir.2001). Rule 9(b) of the Federal Rules of Civil Procedure also requires that the circumstances of the alleged fraud be stated "with particularity." Fed.R.Civ.P. 9(b). In the securities fraud context, Rule 9(b) requires that "[t]he complaint must identify the statements plaintiff asserts were fraudulent and why, in plaintiff's view, they were fraudulent, specifying who made them, and where and when they were made." *In re Scholastic Corp.,* 252 F.2d at 69-70 (citing *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)).

A plaintiff must also allege that the fraudulent statement or omission that the defendant had a duty to disclose was material. The Second Circuit recently summarized the standard for pleading materiality as follows:

At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions. *See Basic Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (adopting the standard in *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), for § § 10(b) and Rule 10b-5 actions); *Glazer v. Formica Corp.,* 964 F.2d 149, 154-55 (2d Cir.1992). " '[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." ' *Basic,* 485 U.S. at 231-32, 108 S.Ct. 978, 99 L.Ed.2d 194 (quoting *TSC Indus.,* 426 U.S. at 449, 96 S.Ct. 2126, 48 L.Ed.2d 757).

Case 7:04-cv-08223-KMK   Document 163-10   Filed 07/07/2006   Page 10 of 16

Not Reported in F.Supp.2d                                                                                                       Page 10
Not Reported in F.Supp.2d, 2003 WL 21981806 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*12** *Ganino,* 228 F.3d at 161-62.

Finally, the complaint must allege that the defendant made the material misstatement or omission with scienter, or " 'an intent to deceive, manipulate or defraud." ' *Ganino,* 228 F.3d at 168 (citing *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). Under the PSLRA, the complaint must plead facts giving rise to a "strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2); *see also Kalnit v. Eichler,* 264 F.3d 131, 138 (2d Cir.2001). A plaintiff satisfies this standard " '(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." ' *Kalnit,* 264 F.3d at 138 (quoting *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995)); *see also Novak v. Kasaks,* 216 F.3d 300, 310-11 (2d Cir.2000) (PSLRA adopted the "strong inference" standard developed in prior Second Circuit caselaw).

APPLICATION

I. Fraud by Hindsight

In dismissing the previous complaint, the court stated, "Although the complaint is long on details of the mounting difficulties at Roy Kay, it is short on facts suggesting that any of the defendants had contemporaneous knowledge of these difficulties." *KeySpan,* 2003 WL 1702279, at \*24. Defendants quote this passage several times; arguing that the amended complaint suffers from the same defect. The court disagrees.

"Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *Acito,* 47 F.3d at 53. To adequately plead securities fraud, the plaintiff must allege facts indicating that the allegedly false statements were "false at the time made." *San Leandro,* 75 F.3d at 812 (inactionable "fraud by hindsight" where "[p]laintiffs have made no showing that defendants' descriptions of [the company's] performance were not based on the facts available to the company at the time the statements were made").

[1] Although defendants argue that plaintiffs simply take facts disclosed by defendants at the end of the class period and allege in conclusory fashion that defendants knew but concealed this information all along, the amended complaint belies this characterization. Plaintiffs allege facts demonstrating with particularity that defendants were aware of severe financial and operational difficulties at Roy Kay-difficulties that posed a clear threat to KeySpan's earnings-in January 2001 at the latest. Nevertheless, defendants continued to issue public statements for the next six months indicating that all was well with the Company and getting better. The excerpts from the January 25, 2001 meeting between Feraudo and the Kays reveal that at that time at least Feraudo and Catell knew, *inter alia,* that Roy Kay was in default on at least one project and that the bond company had requested that KeySpan take over the project from Roy Kay; that Roy Kay was experiencing grave problems with several other constructions projects; that Roy Kay had two disqualifications and was threatened with a third; that a number of Roy Kay's vendors, many of whom were calling Feraudo and Catell "every day," had not been paid, some for six months or more, AC ¶ 65(b); and that Roy Kay's "serious cash problems" included an inability to meet its own payroll, AC ¶ ¶ 65(c), 67.

**\*13** Moreover, Feraudo's comments at the January 25, 2001 meeting reveal an awareness of the impact that the problems at Roy Kay could have, and were already having, on keySpan's own prospects. In particular, Feraudo referred to the necessity of KeySpan's providing Roy Kay with "another big chunk of cash," AC ¶ 65(b), something plaintiffs allege KeySpan had to do 36 times during the class period. Furthermore, Feraudo more than once expressed concern about the negative effects Roy Kay's problems were having on KeySpan's reputation, stating, for example, "[R]ight now we're in a poison, where I got to tell you KeySpan's reputation is being killed with this." AC ¶ 69. Far from being an immaterial business "wobble[ ]," which is how defendants characterize it in their motion, Def. Mem. at 24, the damage to KeySpan's reputation threatened, in Feraudo's words at the time, KeySpan's "whole ... future." AC ¶ 70. These and other statements by Feraudo at the meeting, as well as the vehemence of his tone, undermine defendants' contention that "[n]o allegations support a conclusion that the [d]efendants had any indication that [the] specific problems [at Roy Kay] might become material to KeySpan." Def. Reply at 5. The statements also belie defendants' argument that the Company had no reason to believe the problems at Roy Kay "might impact the financial statements of its grandparent," KeySpan. Def. Mem. at 24.

The monthly WIP reports, which the amended complaint alleges defendants began receiving at least

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK   Document 163-10   Filed 07/07/2006   Page 11 of 16

Not Reported in F.Supp.2d                                                                                       Page 11
Not Reported in F.Supp.2d, 2003 WL 21981806 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

as early as March 31, 2001, further indicate defendants' knowledge of the threat posed by the Roy Kay situation at a time when they were publicly touting KeySpan's positive outlook without qualification. The WIP report received March 31, 2001, reflected a gross loss at Roy Kay of approximately $4 million; the April report, which Feraudo received on April 30, 2001, showed a gross loss of $40 million since fiscal year 2000, negative contract revenue of more than $7 million over the same period, and a gross loss on all contracts from inception to date of almost $25 million. The May report, which Feraudo received on May 23, 2001, reflected even greater losses over the same time frame. Although these reports were reviewed at meetings of KeySpan's board, and were specifically used in the preparation of KSI's consolidated earnings statements (which Feraudo passed on to his superiors), defendants did not publicly account for the losses reflected in these reports until at least July 17, 2001.

Rather than inform investors of the threat posed by the situation at Roy Kay, defendants' public statements led investors to believe that all was well at the Company in general and at KSI, Roy Kay's direct parent, in particular.[FN3] From the Company's public statements throughout the class period, an investor in the first half of 2001 would have been presented with the following information: KeySpan had acquired Roy Kay in early 2000 as part of an "aggressive strategy to expand [its] home-energy and business-solutions companies." AC ¶ 51. Not only was this acquisition, along with two others, a "major step" in that strategy, AC ¶ 50, but the Company expected the acquisitions to provide as much of 20% of its profits within five years. Throughout 2000, both the Company as a whole and its energy-services division, of which KSI was a part, continued to grow. In fact, as reported on January 25, 2001, KSI had its first annual profit in 2000. That same day, the Company stated that "[a]ll of [its] business segments performed exceptionally well," and that "[a]ll [its] business segments have a positive outlook." AC ¶¶ 106-07.

  FN3. In a footnote, defendants argue that the court should dismiss the claims against Feraudo and Matthews because neither of them is alleged to have made any of the challenged statements. Def. Mem. at 26 n.16. However, the group pleading doctrine permits plaintiffs "to circumvent the general pleading rule that fraudulent statements must be linked directly to the party accused of fraudulent intent." *In re CINAR Corp. Securities Litigation,* 186 F.Supp.2d 279, 318 (E.D.N.Y.2002). According to this doctrine, "[i]n cases of corporate fraud where the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group published information', it is reasonable to assume that these are the collective actions of the officers." *Id.* (citations and quotation marks omitted). "To satisfy Rule 9(b), plaintiffs simply need to identify the misleading statements with particularity and specify the roles of the individual defendants in the misrepresentations." *Id.* (citations and quotation marks omitted). Defendants do not contest the applicability of this doctrine to the claims against Feraudo and Matthews, but its viability after the PSLRA. However, as defendants recognize, courts in the Southern District and Eastern District of New York have continued to apply the doctrine. *See, e.g., id.* ("Although the 'group pleading' doctrine was adopted [by the Second Circuit, *see DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987)] before the PSLRA was enacted, district courts in the Second Circuit have concluded that the PSLRA does not affect it.") (citing cases). In the absence of any more persuasive authority than some district court cases from other circuits, this court finds no reason to depart from the prevailing rule in this circuit. Accordingly, the claims against Feraudo and Matthews may go forward, notwithstanding that they did not personally make the statements at issue.

**\*14** Three months later, despite clear knowledge that one of its business segments had an exceptionally negative outlook, with tens of millions of dollars of recorded losses, the Company continued to present an unvarnished public image of itself, reporting record first-quarter consolidated earnings and highlighting the earnings of KSI in particular. Five months after the January meeting, on June 25, 2001, the Company continued to keep investors in the dark as to even the potential for significant losses stemming from Roy Kay. On that day, the Company stated merely that it was reorganizing its unregulated businesses (which included Roy Kay) in a move designed "to implement [the Company's] growth strategy." AC ¶ 125. Not until almost a month later were investors

Not Reported in F.Supp.2d     Page 12
Not Reported in F.Supp.2d, 2003 WL 21981806 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

provided information revealing that this "growth strategy" was not an unalloyed success.

Defendants point to a number of facts that supposedly demonstrate that they were unaware throughout the class period that their positive reports and earnings forecasts were false or misleading for failing to account for the situation at Roy Kay. For instance, defendants minimize the significance of Feraudo's comments to the Kays at the January 2001 meeting, arguing that these demonstrate an awareness merely of "some problems at specific Roy Kay job sites-all of which were then thought to be fixable." Def. Reply at 5. Defendants further argue that the April 23 email sent by Matthews to Luterman, and forwarded to Feraudo, demonstrates the individual defendants' uncertainty as to the size and scope of the financial fallout from Roy Kay. Defendants also point to Feraudo's June 28, 2001 email to Catell, which likewise supposedly reveals that almost until the moment of disclosure in July 2001, "KeySpan was struggling to determine the impact of Roy Kay on the Company's earnings." Def. Mem. at 24. As further support for this version of events, defendants note that they only learned of the full impact of Roy Kay "after an extensive investigation" conducted with the help of "team of outside expert consultants." Def. Mem. at 12, 8. Defendants stress that Roy Kay concealed its true financial condition from KeySpan, as evidenced by Roy Kay's initial reporting of $13 million in profits for fiscal year 2000. Defendants argue that it was not until the initiation of litigation in April 2001 that defendants had access to Roy Kay's true records. Finally, defendants emphasize that Roy Kay was a "small subsidiary of KeySpan's subsidiary, KSI," and that Roy Kay represented only .00075% or .00017% of KeySpan's total assets. Def. Mem. at 11 & n.6. Defendants argue that "[t]hese extremely low percentages help explain why potential financial and operational problems at such a small subsidiary of KSI would not have been expected to become material to KSI's parent, KeySpan." *Id.* at 11 n. 6.

Defendants mischaracterize the allegations of the amended complaint. In particular, the court cannot accept defendants' assertion that Feraudo's January 2001 statements reveal his knowledge merely of "some problems" and his belief that all these problems were "fixable." Fairly read, Feraudo's comments to the Kays indicate an awareness of much more than Roy Kay's "difficulty performing on a few specific contracts." Def. Reply at 20. Rather, the comments show Feraudo to be aware of thoroughgoing difficulties threatening the company as a whole, and also suggest Feraudo's uncertainty, at best, as to whether the problems were "fixable." *See* AC ¶ 70 ("I'm at the point where I don't even give a shit if we just break even. If we can fucking break even I'll raise a flag, O.K. I don't want to take major fucking losses on these projects."); AC ¶ 65(c) ("It's so far in a ditch, you can never win."). Additionally, the comments concerning the threat to KeySpan's own reputation and its "whole ... future" suffice to establish awareness of a material threat to KeySpan itself.

**\*15** More fundamentally, defendants' arguments misapprehend the nature of a motion to dismiss. Even though this is an action for securities fraud, the court must still read the complaint in the light most favorable to plaintiffs and must not draw factual inferences in favor of defendants. As Judge Scheindlin recently explained:

[t]his case illustrates that motions to dismiss in securities fraud cases have become all too common where the procedural posture of the case renders most of the defendants' arguments futile. Many motions to dismiss ask the court to engage in judgment calls which are better made by the trier of fact.... While Congress has acted to discourage the filing of strike suits, nothing Congress has done suggests that the general principles of a motion to dismiss are no longer applicable in securities fraud cases. In affirming dismissals in securities fraud cases, the decisions of our Court of Appeals must not be mistaken for license to draw inferences which a district court is not permitted to draw on a motion to dismiss. Rather, in deciding a motion to dismiss, a court must be mindful that all reasonable inferences are to be drawn in the plaintiffs' favor.

*In re Initial Public Offering Sec. Litig.,* 154 F.Supp.2d 741, 747-48 (S.D.N.Y.2001) (citation omitted), *abrogated in part on other grounds,* 241 F.Supp.2d 281 (S.D.N.Y.2003); *see also Florida State Bd. of Admin. v. Green Tree Fin. Corp.,* 270 F.3d 645, 666 (8th Cir.2000) ("Whether defendants could have believed during the class period that the reserves were an adequate response is a question of fact that cannot render the complaints inadequate, lest the heightened pleading requirements of the Reform Act replace the function of a trial.").[FN4]

> FN4. Moreover, to the extent defendants' emphasis that Roy Kay was a "small subsidiary of [a] subsidiary" is meant to suggest that any misrepresentation or omission concerning Roy Kay was not material, the court rejects the suggestion. "A

Case 7:04-cv-08223-KMK   Document 163-10   Filed 07/07/2006   Page 13 of 16

Not Reported in F.Supp.2d                                                                                                Page 13
Not Reported in F.Supp.2d, 2003 WL 21981806 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

complaint may not properly be dismissed ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino,* 228 F.3d at 162. That is not the case here. KeySpan's problems with Roy Kay were not "obviously unimportant to a reasonable investor." This is so even though Roy Kay, as measured by its acquisition price, represented only a small percentage of KeySpan's total assets. *See id.* at 162-63 (rejecting the formulaic use of numerical benchmarks to determine materiality). In any event, the Roy Kay-related losses and potential losses of which defendants were aware during the class period far exceeded the price KeySpan paid to acquire Roy Kay.

Plaintiffs have pleaded specific facts demonstrating that as of January 2001, defendants possessed information about major problems at one of its subsidiaries; that the existence of these problems contradicted the Company's rosy public representations; and that defendants waited six months before revealing these problems to the public. The amended complaint thus does more than "look at later disclosures and then claim that prior ones were misleading because they did not disclose the same facts, without even attempting to show that those facts were known or knowable earlier." Def. Mem. at 13. The facts defendants cite to explain why the Company waited so long to disclose the Roy Kay situation may well, at later stages to the litigation, prove to be persuasive evidence that defendants did not commit securities fraud. At this stage, however, defendants' explanations are to no avail.[FN5]

> FN5. For the same reason, the court cannot credit defendants' assertions that its accounting methods during the class period did not violate ARB No. 45. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1421 (3d Cir.2001) (whether defendants violated GAAP is "best resolved by expert testimony, and thus should not be addressed on a motion to dismiss"). In any event, it is not clear from the face of the amended complaint and from the publicly available documents defendants cite that defendants did not violate ARB No. 45. Furthermore, defendants do not contest the factual basis for the other alleged violations of GAAP, but merely assert that the allegations are irrelevant because plaintiffs have not adequately alleged scienter. As described below, however, the court finds that plaintiffs have adequately pleaded scienter.

## II. Scienter

[2] As mentioned, a plaintiff may establish scienter by alleging facts (a) that show "that defendants had both motive and opportunity to commit fraud," or (b) "that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit,* 264 F.3d at 138. Whether or not plaintiffs have satisfied the former prong, the court finds that they have satisfied the latter.[FN6]

> FN6. In light of its finding that plaintiffs have adequately pleaded conscious misbehavior, the court need not address motive and opportunity. *See Ganino,* 228 F.3d at 170 ("Of course, if the court decides on remand that the Complaint successfully pleaded the defendants engaged in conscious or reckless misbehavior, it need not also consider the motive and opportunity prong of scienter.").

**\*16** Defendants' arguments as to why plaintiffs have not shown conscious misbehavior echo their arguments as to why the amended complaint pleads only fraud by hindsight. Their arguments fail for substantially the same reasons. *See Manavazian v. Atec Group, Inc.,* 160 F.Supp.2d 468, 478 (E.D.N.Y.2001) ( "When information contrary to the alleged misrepresentations is alleged to have been known by defendants at the time the misrepresentations were made, the falsity and scienter requirements are essentially combined.") (citations and quotation marks omitted). Defendants characterize plaintiffs' allegations as mere conclusory assertions that do not demonstrate an awareness that any of the problems at Roy Kay could affect KeySpan's profitability. As described above, however, the court disagrees with defendants' characterization of the amended complaint. Specifically, the court reads Feraudo's comments at the January 25, 2001 meeting as establishing, with particularity, that both Feraudo and Catell (at a minimum) were aware of serious problems at Roy Kay that threatened that company's fundamental health and represented a significant drain on KeySpan's own finances and reputation.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK   Document 163-10   Filed 07/07/2006   Page 14 of 16

Not Reported in F.Supp.2d                                                                                                      Page 14
Not Reported in F.Supp.2d, 2003 WL 21981806 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Nevertheless, the Company did not publicly reveal these problems until six months later. These allegations suffice to create a strong inference that defendants "knew facts or had access to information suggesting" the inaccuracy of their public statements, Novak, 216 F.3d at 311, which continued to extol without qualification the Company's performance and outlook in "all segments." This inference is not negated, at this stage of the litigation, by defendants' alternative explanations as to why they did not reveal the problems and losses at Roy Kay until July. As mentioned, a motion to dismiss is not a trial. *See* Aldridge v. A.T. Cross Corp., 284 F.3d 72, 82 (1st Cir.2002) (citing Helwig v. Vencor, 251 F.3d 540, 553 (6th Cir.2001) (en banc)) ("Inferences [of scienter] must be reasonable and strong-but not irrefutable.... Plaintiffs need not foreclose all other characterizations of fact, as the task of weighing contrary accounts is reserved for the fact finder."); *see also, e.g.,* In re Initial Public Offering Sec. Litig., 241 F.Supp.2d at 332 (" 'Even under the PSLRA, the district court, on a motion to dismiss, must draw all reasonable inferences from the particular allegations in the plaintiff's favor, while at the same time requiring the plaintiff to show a strong inference of scienter.' ") (citing Aldridge, 284 F.3d at 78); *In re Revlon, Inc., Sec. Litig.,* No. 99 Civ. 10192(SHS), 2001 WL 293820, at *8 (S.D.N.Y. Mar.27, 2001) ("[Defendants] arguments raise disputed issues of fact, which are not resolveable on a motion to dismiss the complaint .").

The WIP reports, which Feraudo admitted to receiving on a regular basis, only strengthen the allegations of scienter as to him, of course. However, the court finds that these reports, in combination with the other allegations in the complaint, also create a strong inference of scienter as to Matthews and Luterman. *See* Manayazian, 160 F.Supp.2d at 485 ("[S]cienter allegations, like materiality, should be examined in the context of the other allegations in the complaint.") (citing *Rothman,* 220 F.3d at 94). The amended complaint cites testimony of Feraudo that these reports were regularly passed on to KeySpan's board, of which at least Matthews was a member.[FN7] Feraudo also testified that the reports were used by his subordinates to prepare KSI's consolidated statements, which were then regularly passed on to Feraudo's superiors. It is a reasonable inference that Luterman, the chief financial officer of KeySpan, would thus have had access to these reports. It is equally reasonable to infer that Matthews, the chief operating officer, whose focus included "the integration of acquisitions," AC ¶ 23, would also have been apprized of these reports and of the situation KSI generally. Indeed, the April 23, 2001 email from Matthews to Luterman reveals that both defendants were, at a minimum, aware of the litigation with Roy Kay and of the possibility that this could affect KeySpan's earnings. Furthermore, it was Luterman himself who stated at the July 17, 2001 press conference that the Company had discovered the problems at Roy Kay in March and April of that year. In sum, the court finds that these allegations suffice to create a strong inference that Luterman and Matthews, in addition to Catell and Feraudo, acted with scienter.

> FN7. The amended complaint does not specifically allege that Luterman was a member of the board. AC ¶ 24.

### III. General Expressions of Optimism and Forward-Looking Statements

**\*17** Defendants argue that if the court does not dismiss the amended complaint in its entirety, it should nevertheless strike certain statements as inactionable general expressions of optimism, and other statements as inactionable forward-looking statements. With respect to the identified statements from the year 2000 only, the court agrees with defendants.

#### A. Optimistic Statements

"[S]tatements containing simple economic projections, expressions of optimism, and other puffery are insufficient" to form the basis of a claim of securities fraud. Novak, 216 F.3d at 315; *see also, e.g.,* Lasker v. New York State Elec. & Gas Co., 85 F.3d 55, 59 (2d Cir.1996) (statements by company that it maintained its "commitment to create earnings opportunities" and that its "business strategies [would] lead to continued prosperity" constituted inactionable puffery). On the other hand, "defendants may be liable for misrepresentations of existing facts." Novak, 216 F.3d at 315.

[3] Defendants argue that the following two statements from the year 2000 constitute inactionable general expressions of optimism: "Our dividend yield and growth ... make us confident of increasing long-term value for our shareholders," AC ¶ 84 (quoting March 24, 2000 press release); "I think we have a greater growth potential in our territory than any company in our industry," AC ¶ 92 (quoting August 8, 2000 interview with Catell). Defendants also point

Not Reported in F.Supp.2d                                                                                                     Page 15
Not Reported in F.Supp.2d, 2003 WL 21981806 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

to statements concerning the Company's growth strategy that defendants made in January and June of 2001. Plaintiffs contend all of these projections were "premised on misrepresentations of *existing fact*," inasmuch as defendants knew that the situation at Roy Kay undermined KeySpan's growth potential. Pl. Mem. at 62 (emphasis in original).

With respect to the two statements from 2000, the court agrees with defendants. With respect to the two statements from 2001, the court agrees with plaintiffs. Although the amended complaint might permit an inference that defendants knew of the situation at Roy Kay at the very end of 2000, nothing in the complaint permits an inference of earlier knowledge. Nothing therefore suggests that the optimistic statements in March and August of 2000 were based on misrepresentations of existing facts. Accordingly, the statements amount to nothing more than the sort of puffery that courts have rejected.

The opposite is true with respect to defendants' 2001 statements. As detailed above, the complaint alleges that beginning in January 2001, defendants were in possession of yet failed to disclose facts inconsistent with their public statements. Defendants thus "did more than just offer rosy predictions." *Novak,* 216 F.3d at 315; *see also, e.g., In re Xerox,* 165 F.Supp.2d at 218 (not puffery where "plaintiffs allege that defendants made specific statements, including but not limited to those characterized by the defendants as merely reflecting optimism, knowing they were contrary to the company's actual situation").

B. Forward-Looking Statements

*18 [4] Under the safe-harbor provision of the PSLRA, "a statement concerning projections or future plans cannot give rise to a securities fraud claim if either: (1) it is accompanied by meaningful cautionary language, or (2) the plaintiff fails to prove the statement was made with actual knowledge that it was false or misleading." *In re Ashanti Goldfields Securities Litigation,* 184 F.Supp.2d 247, 266 (E.D.N.Y.2002) (citing 15 U.S.C. § § 78u-5(c)(1)). However, "it is well recognized that even when an allegedly false statement has both a forward-looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply." *In re Independent Energy Holdings PLC Sec. Litig.,* 154 F.Supp.2d 741, 757 (S.D.N.Y.2001) (citations omitted). Moreover, the safe harbor provision "do[es] not apply to the complaint's allegations of misstatements and omissions." *Credit Suisse First Boston Corp. v. ARM Fin. Group, Inc.,* 99 Civ. 12046(WHP), 2001 WL 300733, *8 (S.D.N.Y. Mar. 28, 2001).

Defendants identify several earnings predictions made by the Company in 2000 and 2001 and argue that these are inactionable because plaintiffs have pleaded no facts showing that defendants made the statements with actual knowledge of their falsity. The court agrees with defendants that the particular language identified from the March 2000 press release and Form 8-K is forward-looking, and that plaintiffs have not alleged facts demonstrating its falsity when made. Accordingly, the excerpts identified on page 28 of defendants' memorandum fall within the safe harbor. As for the statements from 2001, plaintiffs have pleaded facts that support a claim that the isolated snippets identified by defendants were made in tandem with, and were premised upon, misrepresentations of existing facts. The 2001 statements thus do not merit the protection of the statutory safe harbor.

IV. Sections 20(a) and 20A of the Exchange Act

[5] Defendants argue for dismissal of plaintiffs' claims under sections 20(a) and 20A almost exclusively on the basis of plaintiffs' alleged failure to plead an adequate primary violation of Section 10(b) or Rule 10b-5. In light of the court's denial of defendants' motion to dismiss the primary claims, this argument fails. Defendants also argue, in a footnote, that plaintiffs have not adequately pleaded control person liability because they have not sufficiently alleged that any of the individual defendants were culpable participants in the primary violation. The court disagrees. As described, plaintiffs have adequately pleaded conscious misconduct on the part of each of the individual defendants.

CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the Amended Complaint is denied, except insofar as defendants seek to strike certain statements from the year 2000, identified in the body of the opinion, as inactionable statements of optimism and forward-looking statements. The parties are directed to contact the chambers of Magistrate Judge Marilyn Go to begin discovery.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                  Page 16
Not Reported in F.Supp.2d, 2003 WL 21981806 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*19** SO ORDERED.

E.D.N.Y.,2003.
In re KeySpan Corp.
Not Reported in F.Supp.2d, 2003 WL 21981806 (E.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1:01cv05852 (Docket) (Aug. 28, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.