a well-known brokerage firm, represented by reputable counsel, or when some form of vouching occurs, the projections are read in the aura of a halo" and concluding that such context creates a jury question). Clearly, and the Amended Complaint so alleges, these insiders did not tell their WWE that they were in Defendants' pocket and delivering to Defendants sub-market deals.

Tellingly, <u>none</u> of the cases Defendants cite to support their statute of limitations argument involve the corruption of insiders.[14] To the contrary, they all involve instances of fraud by <u>outsiders</u>—who had no relationship of trust with the plaintiff. In those cases, the credibility of the outsiders is discounted in light of contradictory objective evidence (such as prospectuses and news articles evincing the fraud). *See, e.g., In re Merrill Lynch Ltd. P'ships Litig.*, 7 F. Supp. 2d 256, 267 (S.D.N.Y. 1997). Here, by contrast, even assuming that WWE was presented with some objective evidence of its RICO injury, that evidence, weighed against an explanation by its then-licensing agent (Shenker) and corporate officer (Bell), creates a fact issue as to whom WWE reasonably should have believed.[15]

---

[14]  The only case Defendants cite involving the corruption of insiders is *Town of Poughkeepsie v. Espie*, 402 F. Supp. 2d 443 (S.D.N.Y. 2005). That case, however, is inapposite because the plaintiff conceded knowledge of its RICO injury. *Id.* at 451 n.6 ("The Town concedes that its RICO action accrued on September 18, 1996.").

[15]  The distinction between "outsiders" and insiders" comports with the rule in many states that knowledge, inquiry notice, and the obligation to diligently pursue claims is relaxed in the context of a fiduciary setting or for a breach of fiduciary duty claim. *See Strock v. USA Cycling, Inc.*, Nos. 00-CV-2285-JLK, 01-CV-2444-JLK, 2006 WL 1223151, at *4 (D. Col. May 8, 2006) ("Where a fiduciary relationship exists between the plaintiff and the defendant, however, the plaintiff's expected level of diligence in discovering an injury and its cause is relaxed."); *Knapp v. Knapp*, 100 P.2d 759, 761 (Cal. 1940) (holding inquiry notice "has been relaxed in cases involving confidential relationships, because facts which would justify investigation in the ordinary case would not excite suspicion where the circumstances show a right to rely upon the representations of another and the same degree of diligence should not be required"); *Frederick Rd. Ltd. P'ship v. Brown & Sturm*, 756 A.2d 963, 975 (Md. 2000) ("a relationship which is built on trust and confidence generally gives the confiding party the right to relax his or her guard and rely on the good faith of the other party so long as the relationship continues to exist"); *Kurtz v. Trepp*, 375 N.W.2d 280, 284 (Iowa Ct. App. 1985) ("The diligence requirement is also greatly relaxed when a fiduciary relationship between the parties is established.").

37

The facts and inferences drawn from the Amended Complaint paint a starkly different picture than the one Defendants depict. The Amended Complaint alleges that Bell was WWE's Senior Vice President of Licensing and Merchandising, and that Bell highly touted Shenker as having "extensive experience and contacts in the licensing business" (AC ¶¶ 29, 31). These two well-respected insiders made sure every deal went through them, before Bell would recommend deals to WWE (AC ¶ 75). A jury could easily find that Bell and Shenker were "buffers" between WWE and Defendants' unlawful activities, using their expertise and reputation to skew important aspects of all the deals and mislead WWE into thinking that those deals were fair. Indeed, both had to do so in order for the scheme to work. And, as the Amended Complaint alleges, they worked together to affirmatively conceal any information which would have exposed their schemes, including on the videogame license. When WWE began to "inquire" into the manner in which Shenker and Bell comported themselves while agents of WWE, those inquires were met on all fronts by perjury, destruction of evidence and fabrication of evidence by Shenker, Bell and the Jakks Defendants.

These reasonable inferences drawn from the Amended Complaint negate Defendants' revisionist hyperbole of "storm warnings." In any event, these alleged "storm warnings," all disputed by WWE, underscore the pure factual questions that go to the heart of whether and when WWE was placed on notice as to the probability (not mere possibility) of its RICO injury. *See Newman v. Warnaco Group, Inc.*, 335 F.3d 187, 193 (2d Cir. 2003) (finding fraud "must be probable, not merely possible" before a duty of inquiry arises); *Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp. 2d 274, 298 (S.D.N.Y. 2004) (finding that "[a]vailable information must establish a probability, not a possibility of fraud to trigger inquiry notice," and recognizing that "in the context of dismissal, defendants bear a heavy burden in establishing that the plaintiff was on

inquiry notice as a matter of law" (footnotes and quotation marks omitted)). Pinpointing the time when WWE may have had constructive knowledge of its RICO injury depends on these inferences—inferences that can and must be drawn from the Amended Complaint in favor of WWE at this stage of the proceedings—and create disputed factual issues that cannot be decided on a motion to dismiss, or indeed even on summary judgment. *Robertson*, 609 F.2d at 591 ("When conflicting inferences can be drawn from the facts, however, summary judgment is inappropriate.").

### 2.    The Amended Complaint Sufficiently Pleads Fraudulent Concealment to Toll the Statute of Limitations

In reality, WWE lacked sufficient notice of Defendants' schemes because of Defendants' systematic and fraudulent concealment of their criminal enterprise—which equitably tolls the limitations period. To obtain tolling, the Amended Complaint need only allege: "(1) wrongful concealment by the defendant, (2) which prevented the plaintiff's discovery of the nature of the claim within the limitations period, and (3) due diligence in pursuing discovery of the claim." *G-I Holdings, Inc. v. Baron & Budd*, 238 F. Supp. 2d 521, 540 (S.D.N.Y. 2002) (*quoting Butala v. Agashiwala*, 916 F. Supp. 314, 319 (S.D.N.Y. 1996)).

The Amended Complaint alleges with great specificity Defendants' fraudulent concealment (*see* AC ¶¶ 8, 38, 39, 43, 45, 56, 67, 71, 73, 83, 89, 97, 99, 105, 134, 186-241). Significantly, Defendants do not contest the adequacy of WWE's fraudulent concealment allegations. Rather, Defendants dispute that the Amended Complaint alleges WWE's due diligence in pursuing discovery of the claim. Defendants appear to contend that WWE failed to allege due diligence throughout the limitations period and therefore cannot obtain the benefit of tolling. The problem with this contention, however, is that it is nothing more than a variation on Defendants' defunct inquiry notice argument.

39

Like the issue of inquiry notice, due diligence is a highly factual question, inappropriate for resolution on a motion to dismiss. *See Robertson*, 609 F.2d at 591; *Dietrich v. Bauer*, 76 F. Supp. 2d 312, 345 (S.D.N.Y. 1999) ("[T]he question of whether [plaintiff] engaged in due diligence in pursuing his claims cannot be answered on the instant motion to dismiss. Indeed, even in the context of a summary judgment motion, this Court has noted the care that must be taken in deciding such a motion, because the question of whether a plaintiff exercised reasonable diligence is usually a question of fact for the jury to decide."). And, like the issue of inquiry notice, the burden is "<u>extraordinary</u>" for dismissal at this stage in the proceedings. *See In re Sumitomo Copper Litig.*, 194 F.R.D. 480, 483 (S.D.N.Y. 2000) ("This Court has previously noted defendants' extraordinary burden in proving plaintiffs' constructive knowledge and inquiry notice so as to defeat plaintiffs' claims of fraudulent concealment before allowing such claims to reach the trier of fact."); *In re Sumitomo Copper Litig.*, 104 F. Supp. 2d 314, 324 (S.D.N.Y. 2000) (extending "extraordinary" and "extreme circumstances" standard to fraudulent concealment claim considered on a motion to dismiss); *G-I Holdings*, 238 F. Supp. 2d at 541 ("A motion to dismiss on the basis of a plaintiff's failure to engage in due diligence cannot be granted unless the 'undisputed facts' show a lack of reasonable diligence.").

Thus, WWE's reasonable diligence in pursuing its RICO claims is a fact-intensive inquiry that cannot be resolved on a Rule 12(b)(6) motion to dismiss. As described in detail in the Amended Complaint, and as previously adjudicated in the Shenker state court litigation, Defendants' active concealment of the unlawful activities prevented WWE from possessing immediate knowledge, both actual and constructive, until at the earliest December 2002. At that time, WWE began diligently pursuing the evidence in an effort to determine what had occurred,

as the Amended Complaint clearly alleges (*see* AC ¶¶ 190-241).[16] Defendants' dispute with those allegations of the Amended Complaint is a question for the trier of fact to resolve. Indeed, a jury may not take so kindly to Defendants who try to escape justice by contending that the victim should have figured out they were crooks earlier. Their unilateral mischaracterization of the facts at this juncture certainly does not and cannot rise to the level of presenting extraordinary or extreme circumstances to warrant dismissal as a matter of law.

3.    **The Separate Accrual of WWE's RICO Injury Precludes Dismissal of the Entire Claim**

Even assuming arguendo WWE had knowledge of its RICO injury more than four years before commencing this action, which it did not, Defendants are wrong to suggest that dismissal of WWE's entire RICO claim is required. The Second Circuit recognizes a rule of "separate accrual" for RICO claims, where "each time plaintiff discovers or should have discovered an injury caused by defendant's violation of §1962, a new cause of action arises as to that injury, regardless of when the actual violation occurred." *Bankers Trust*, 859 F.2d at 1105. In other words, new injuries arising from a RICO violation create new causes of action which allow the plaintiff to recover for all injuries incurred within four years from the filing of the complaint. *Id.*

Under the separate accrual rule, at a minimum, all new injuries WWE alleges it incurred dating back to the filing of its original complaint on October 19, 2000 would be timely. Thus, even if the Court were to find WWE had notice of its RICO injury before 2000—a finding precluded by the allegations of the Amended Complaint, particularly in light of the host of

---

[16]    The two cases cited by Defendants suggesting that WWE must show diligence throughout the initial period to benefit from equitable tolling are inapposite because the plaintiffs in those cases had constructive knowledge of the claim during the initial period, thereby triggering their duty to diligently investigate. *See Tho Dinh Tran v. Alphonse Hotel Corp.*, 281 F.3d 23, 37 (2d Cir. 2002); *Nat'l Group for Commc'ns & Computers Ltd. v. Lucent Techs. Inc.*, 420 F. Supp. 2d 253, 268 (S.D.N.Y. 2006).

41

pertinent factual disputes described above—WWE has pled new and separate injuries from 2000

onward that would nonetheless be timely. For instance, because the artificially low payments

made under the licenses are paid separately each quarter throughout the license, each separate

payment represents a new injury and thus is recoverable if incurred within four years of filing

WWE's original complaint. *See Bingham v. Zolt*, 66 F.3d 553, 561 (2d Cir. 1995) (holding that

each diversion of a royalty payment constituted a new injury and thus created a new cause of

action); *Local 851 of Int'l Bhd. of Teamsters v. Kuehne & Nagle Air Freight Inc.*, No. 97 CV

0378, 1998 WL 178873, at *4 (S.D.N.Y. Mar. 6, 1998) ("Each unlawful payment constitutes a

separate injury to Local 851 caused by the RICO violation. The bulk of these payments were

made after October 31, 1992. The RICO claims for the injuries that occurred after October 31,

1992 are not barred by the statute of limitations."); *see also Hanover Shoe, Inc. v. United Shoe

Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968) (although injury first inflicted in 1912, plaintiff's

suit filed in 1955 not barred by statute of limitations because conduct constituted a "continuing

violation of the Sherman Act" and "inflicted continuing and accumulating harm" on plaintiff).

Thus, at a minimum, WWE has stated timely claims for RICO injuries incurred since 2000.

**E.    WWE's Allegations Against the THQ Defendants and THQ/Jakks Satisfy the
       "Operation or Management" Test**

"In this Circuit, the 'operation or management' test typically has proven to be a

relatively low hurdle for plaintiff to clear . . . especially at the pleading stage." *First Capital*,

385 F.3d at 176; *see also Levine*, 2006 WL 709098, at *6 ("The Second Circuit has described the

test as a 'relatively low hurdle for plaintiffs to clear, especially at the pleading stage.'") (*citing

First Capital*, 385 F.3d at 176). Although Defendants previously extolled *First Capital* as "the

most recent precedent from the Second Circuit and its binding precedent" (Transcript of January

11, 2006 Conference at 98:9-14) when it suited their purposes, the THQ Defendants

42

conspicuously omit the foregoing controlling standard entirely while THQ/Jakks bury it in a footnote following prominent citation to conflicting district court opinions that generally predate *First Capital* and, in three subsequent cases, simply fail to follow controlling Second Circuit authority. Thus contrary to the authorities on which the THQ Defendants and THQ/Jakks purport to rely, the Second Circuit has refused to apply a rigorous or difficult standard for satisfying the operation or management test. Rather, the express purpose of the test is <u>not</u> to construct insuperable pleading requirements but merely to ensure the proof establishes that a defendant had "sufficient connection to the enterprise to warrant imposing liability." *DeFalco v. Bernas*, 244 F.3d 286, 309 (2d Cir. 2001); *see also Contini*, 2005 WL 1565524, at *4. In any event, the question of operation or management typically is one of fact reserved for trial and, therefore, is not properly resolved on a motion to dismiss. *See United States v. Allen*, 155 F.3d 35, 42-43 (2d Cir. 1998) (denying summary judgment in holding operation or management to be a matter for fact-finder).

To satisfy this low pleading hurdle as recognized by the Second Circuit, a plaintiff need only allege that a defendant played "<u>some</u> part in directing the enterprise's affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (emphasis in original); *see also First Capital*, 385 F.3d at 176. In fact, the Supreme Court has cautioned that "RICO liability is not limited to those with primary responsibility for the enterprise's affairs . . . ." *Reves*, 507 U.S. at 179; *Contini*, 2005 WL 1565524, at *4. In *Reves*, the Supreme Court specifically rejected a standard that would have required a defendant to have "<u>significant control</u> over or within an enterprise." *Reves*, 507 U.S. at 179 n.4 (emphasis in original). Instead, "RICO liability is also applicable to 'lower rung participants in the enterprise who are under the direction of upper management.'" *Contini*, 2005 WL 156524, at *4 (*citing Reves*, 507 U.S. at 184). Thus, "[t]he complaint must only state that

43

they were in charge of certain aspects of the enterprise." *Am. Arbitration Ass'n, Inc. v. DeFonseca*, No. 93 CIV. 2424 (CSH), 1996 WL 363128, at *5 (S.D.N.Y. June 28, 1996) (*citing Reves*, 507 U.S. at 184).

As described in detail above, the Amended Complaint plainly makes such allegations against the THQ Defendants and THQ/Jakks (AC ¶ 249(b)(xxviii)-(lxviii)). Contrary to the THQ Defendants' and THQ/Jakks' revisionist attempts to minimize their roles in the enterprise, the Amended Complaint alleges, among other things, that THQ "agreed to be exclusively responsible for development, manufacturing, distribution, and sales of all WWE videogames, and for the day-to-day operation incidental to performing the videogame license" (AC ¶ 179). As a practical matter, therefore, THQ is and was indispensable to the enterprise, its pursuit of the videogame license, and to the distribution of proceeds from the illegally obtained videogame license.[17] THQ/Jakks equally is an indispensable part of the enterprise, as it (by Farrell) executed the license on behalf of Jakks and THQ, then agreed to several related agreements regarding the manner in which the license would be performed and the money laundered from the illegal activity (AC ¶¶ 154, 174-82).

Furthermore, the THQ Defendants' and THQ/Jakks' argument that they were not involved in the operation or management of the enterprise because they arrived on the scene after the initial corruption of Shenker and Bell fails to take into account the pleaded circumstances of their involvement, their integral roles in the culmination and implementation of Defendants' criminal enterprise, and their ensuing money laundering. It also is irrelevant under the law in any event. For RICO liability to attach, "participation in a series of transactions does not require

---

[17]  The formation of the LLC is irrelevant to determining THQ's and Farrell's individual RICO liability because "members of limited liability companies, such as corporate officers, may be held personally liable if they participate in the commission of a tort in furtherance of company business." *Rothstein v. Equity Ventures, LLC*, 750 N.Y.S.2d 625, 627 (N.Y. App. Div. 2002).

44

participation in each transaction." *United States v. Teitler*, 802 F.2d 606, 615 (2d Cir. 1986);

*Zito v. Leasecomm Corp.*, No. 02 Civ.8074 GEL, 2004 WL 2211650, at *9 (S.D.N.Y. Sept. 30,

2004) ("It is common place in RICO enterprises for the members . . . to engage in separate

schemes or conspiracies, not all of which involve all of the participants in the enterprise.").

Similarly, there is no requirement that the members of an enterprise must participate throughout

the life of the enterprise. *See United States v. Hewes*, 729 F.2d 1302, 1310-11 (11th Cir. 1984);

*United States v. Feldman*, 853 F.2d 648, 659 (9th Cir. 1988) ("Continuity does not require that

each member of the enterprise participate in it from beginning to end."). Indeed, a "criminal

enterprise is more, not less, dangerous if it is versatile, flexible, diverse in its objectives and

capabilities." *United States v. Masters*, 924 F.2d 1362, 1367 (7th Cir. 1991); *see also Williams*

*v. Mohawk Indus., Inc.*, 411 F.3d 1252, 1259 (11th Cir. 2005), *vacated on other grounds,* 126

S.Ct. 2016 (2006) ("[T]here has never been any requirement that the 'common purpose' of the

enterprise be the sole purpose of each and every member of the enterprise.").

    Moreover, the cases cited by the THQ Defendants and THQ/Jakks are completely

inapposite to the circumstances here. All of those cases involve complaints dismissed under the

"operation or management" test in two distinct situations:

> (1) the defendant is an outsider that merely rendered goods or services to the enterprise
>
> (i.e., a lawyer, accountant, consultant), *see Amsterdam Tobacco Inc. v. Philip Morris*
>
> *Inc.*, 107 F. Supp. 2d 210, 217 (S.D.N.Y. 2000) ("Producing the product that
>
> ultimately was smuggled does not equate to operation or management of the
>
> smuggling enterprise."); *Dept. of Econ. Dev. v. Arthur Anderson & Co.*, 924 F. Supp.
>
> 449, 465-68 (S.D.N.Y. 1996) ("*Reves* makes it more difficult to find 'outsiders' such
>
> as accountants or lawyers liable under § 1962(c)."); or

(2) the defendant is a passive conduit through which proceeds from the enterprise may

flow at some point, *see Zhu v. First Atl. Bank*, No. 05 Civ. 96(NRB), 2005 WL

2757536, at *5 (S.D.N.Y. Oct. 25, 2005) ("Citibank and FAB do not remotely satisfy

[the operation or management test], as each bank merely transferred funds that the

plaintiff requested they transfer."); *Redtail Leasing, Inc. v. Bellezza*, No. 95 Civ. 5191

JFK, 1999 WL 32941, at *4-5 (S.D.N.Y. Jan. 22, 1999) (holding that recipients of

insider information did not operate or control the insider trading ring); *Schmidt v.*

*Fleet Bank*, 16 F. Supp. 2d 340, 347 (S.D.N.Y. 1998) (holding that providing

financing to a RICO enterprise did not constitute participation in the affairs of the

enterprise); *Congregacion de la Mision Provincia de Venezuela v. Curi*, 978 F. Supp.

435, 450 (S.D.N.Y. 1997) (holding that lawyer's mere receipt of fraudulently

obtained funds, without allegations of participation in the enterprise from which those

funds derived, did not satisfy the operation or management test).[18]

In stark contrast to these circumstances, the THQ Defendants and THQ/Jakks are alleged

to have been central and indeed indispensable participants in the enterprise itself. As described

above, THQ/Jakks is alleged to have been formed by the Jakks Defendants and the THQ

Defendants as a sham LLC to facilitate and implement the scheme to acquire the WWE

videogame license. After doing so, THQ then "agreed to be exclusively responsible for

development, manufacturing, distribution, and sales of all WWE videogames, and for the day-to-

---

[18] THQ/Jakks' reliance on *Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 276 F. Supp. 2d 1276, 1290 (S.D. Ga. 2003) and *Fleischhauer v. Feltner*, 879 F.2d 1290, 1298-99 (6th Cir. 1989)—apart from the fact that these cases have no precedential value in this Circuit—is wholly misplaced. Contrary to those cases, in which the defendants were not yet in existence during the alleged racketeering activity, THQ/Jakks was formed on June 10, 1998, and thus certainly did exist during the alleged racketeering activity alleged in WWE's Amended Complaint. Indeed, THQ/Jakks is alleged to have been formed for the specific purpose of facilitating and implementing Defendants' unlawful scheme. To that end, THQ/Jakks necessarily existed so as to be the licensee under the videogame license dated June 10, 1998.

day operation incidental to performing the videogame license" (AC ¶¶ 154, 179). Farrell is the

highest ranking executive of THQ, who was and is in a position to control the affairs of THQ

(AC ¶ 4). In addition, Farrell, on behalf of THQ, entered into the unlawful agreement with

Jakks' Friedman not to independently bid on the WWE videogame license but rather to collude

with the Jakks Defendants to obtain the license at below-market rates pursuant to a rigged

bidding process (AC ¶¶ 136-144). Their participation in the unlawful conduct at issue is

qualitatively and quantitatively incomparable to the peripheral actors in the cases on which they

attempt to rely. *See Contini*, 2005 WL 1565524, at *4-5 (distinguishing *Schmidt* and "a number

of cases where banks or other organizations were found not to survive the 'operation and

management' test even though they knowingly accepted and maintained deposits of fraudulently

obtained funds" in denying motion to dismiss against a company whose owner/operator was

alleged to be "a full-fledged member of the enterprise and . . . an integral cog in the works");

*Sumitomo Corp. v. Chase Manhattan Bank*, No. 99Civ.4004(JSM), 2000 WL 1616960, at *1

(S.D.N.Y. Oct. 30, 2000) (distinguishing *Schmidt* and other cases in which banks were passive

conduits because the defendants' "fraudulent financing operation" itself is alleged to be the

enterprise and the complaint adequately alleged the defendants' participation in its affairs).

    Accordingly, WWE's Amended Complaint more than satisfies the Second Circuit's "low

hurdle" for the "operation or management" test at the pleading stage against the THQ Defendants

and THQ/Jakks. In any event, the THQ Defendants' and THQ/Jakks' protestations contrary to

the allegations of WWE's Amended Complaint that they could not have operated or controlled

the enterprise involve "factual dispute[s] that cannot be resolved on a motion to dismiss." *See*

*Thomas v. Ross & Hardies*, 9 F. Supp. 2d 547, 556 (D. Md. 1998).

F.    **The Amended Complaint Sufficiently Alleges RICO Predicate Acts Committed by the THQ Defendants and THQ/Jakks**

The THQ Defendants and THQ/Jakks both argue that the Amended Complaint does not adequately allege that they committed any RICO predicate acts. In essence, these defendants merely echo the tired refrain that the mail and wire fraud allegations supposedly are not plead with sufficient particularity under Fed. R. Civ. P. 9 and the allegations of the remaining predicate acts supposedly are improperly "conclusory"—leaving aside, of course, the preceding approximately 240 paragraphs of the Amended Complaint setting forth the particulars of Defendants' unlawful activities in exacting detail. In making these arguments, the THQ Defendants and THQ/Jakks fundamentally misapply the relevant pleading standards and deliberately misconstrue the allegations of the Amended Complaint, and the reasonable inferences therefrom, against WWE contrary to the applicable standard of review on a Rule 12(b)(6) motion to dismiss.

1.    **The Challenged Predicate Acts Are Adequately Alleged**

a.    **Mail and Wire Fraud**

(i)    **The Amended Complaint Adequately Alleges That The THQ Defendants And THQ/Jakks Committed Mail And Wire Fraud**

As an initial matter, although RICO claims based on mail and wire fraud generally must be plead with particularity under Rule 9(b) of the Federal Rules of Civil Procedure, "Rule 9(b) must be construed in light of Rule 8, which requires a short, plain statement of the facts upon which a claim is based." *Center Cadillac, Inc. v. Bank Leumi Trust Co. of N.Y.*, 808 F. Supp. 213, 228 (S.D.N.Y. 1992). Thus, "[i]n ruling on a motion to dismiss under Rule 9(b), 'the court must read the complaint generously, and draw all inferences in favor of the pleader.'" *Id. (citing Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989)). "The court must deny a motion to dismiss

48

under Rule 9(b) as long as some of the allegations of fraud are adequate." *Center Cadillac*, 808

F. Supp. at 229 (denying motion to dismiss as to certain defendants because "[r]eading the

complaint in the light most favorable to Plaintiffs," the fraud allegations were sufficient).

The elements of mail or wire fraud are: (1) a scheme to defraud; (2) of money or

property; and (3) use of the mails or wires in furtherance of the scheme. *See United States v.*

*Ramirez*, 420 F.3d 134, 144 (2d Cir. 2005). A "scheme to defraud" also includes a scheme to

deprive another of their right to an employee's or agent's honest services. 18 U.S.C. § 1346;

*United States v. Rybicki*, 354 F.3d 124, 134 (2d Cir. 2003). Each use of the mails or wires

constitutes a separately chargeable offense. *Ramirez*, 420 F.3d at 145.

The use of the mails or wires need <u>not</u> be an essential element of the scheme; it is

sufficient for the mailing only to be "incident to an essential part of a scheme" or "a step in the

plot." *Schmuck v. United States*, 489 U.S. 705, 710-11 (1989); *see also United States v. Slevin*,

106 F.3d 1086, 1089 (2d Cir. 1996). Similarly, the mailings themselves need not contain any

misrepresentations or contribute directly to the deception of the plaintiffs. *Schmuck*, 489 U.S. at

714. Even "innocent" or "routine" mailings or wire communications still satisfy the mailing

element if in furtherance of the scheme. *Id.* In addition, it is not necessary that the THQ

Defendants or THQ/Jakks actually undertake the mailings—"the offense consists of the

foreseeable use of the mails by <u>anyone</u> in furtherance of a scheme to which [the defendant] was a

party." *Spira*, 876 F. Supp. at 560 (emphasis in original); *see also United States v. Bortnovsky*,

879 F.2d 30, 36 (2d Cir. 1989). In short,

> each defendant would be indictable for mail fraud if he or she
> knowingly adhered to a fraudulent scheme and one or more
> mailings foreseeably were made in furtherance of that scheme,
> irrespective of by whom the mailings were made. . . . Each would
> be separately indictable, moreover, for each mailing so made.

*Spira*, 876 F. Supp. at 560 (citation omitted).

"In complex civil RICO actions involving multiple defendants, therefore, Rule 9(b) does not require that the temporal or geographic particulars of each mailing or wire transmission made in furtherance of the fraudulent scheme be stated with particularity. In such cases, Rule 9(b) requires only that the plaintiff delineated, with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme." *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998) (citations omitted); *see also Jerome M. Sobel & Co. v. Fleck*, No. 03 Civ.1041 RMB GWG, 2003 WL 22839799, at *5-6 (S.D.N.Y. Dec. 1, 2003) (in pleading RICO predicate acts of mail and wire fraud in a case where a plaintiff alleges "innocent" uses of the mails or wires that do not themselves contain fraudulent misrepresentations or omissions but were simply in furtherance of a master scheme or plan, the plaintiff need only allege a detailed description of the underlying scheme to satisfy Rule 9(b)); *USA Certified Merchs.*, 262 F. Supp. 2d at 332 (noting that detailed description of the underlying scheme and connection to the mail and wire communications is sufficient to satisfy Rule 9(b)); *Spira*, 876 F. Supp. at 559-60 ("Once the plaintiff alleges with particularity the circumstances constituting the fraudulent scheme, neither the reputational interests nor the notice function served by Rule 9(b) would be advanced in any material way by insisting that a complaint contain a list of letters or telephone calls.").

The Amended Complaint goes significantly over and above the minimum pleading standard for fraud, alleging—in spades—a detailed description not only of Defendants' schemes and each Defendant's role therein but specific mail and wire communications on which WWE's predicate acts of fraud are based. In particular, the Amended Complaint alleges in abundant detail specific conduct by the THQ Defendants and THQ/Jakks in furtherance of Defendants'

scheme (AC ¶¶ 118-64, 173-85). In this regard, the THQ Defendants' and THQ/Jakks' self-serving mischaracterization of the Amended Complaint as alleging, respectively, only three and eight attributable predicate acts of mail or wire fraud, are disingenuous and in contravention of well-established case law (*see* THQ Br. at 16-17; THQ/Jakks Br. at 22). As a matter of law, numerous additional predicate acts of mail or wire fraud are attributable to them because the uses of the mails or wires in connection with Defendants' unlawful schemes were reasonably foreseeable or known by them to follow in the ordinary course of business (*see, e.g.*, AC ¶ 249(a)(xxviii)-(xxxvii), (xliii)-(lvi)). *See Pereira v. United States*, 347 U.S. 1, 8-9 (1954); *Bortnovsky*, 879 F.2d at 36; *Spira*, 876 F. Supp. at 560.

### (ii)    The Amended Complaint Adequately Alleges That The THQ Defendants And THQ/Jakks Had The Requisite Scienter

The THQ Defendants and THQ/Jakks also claim that the Amended Complaint fails to allege that they had the requisite scienter for mail or wire fraud. Predictably, the THQ Defendants and THQ/Jakks fail to recognize that, in contrast to other elements of fraud, "fraudulent intent may be averred generally." *Center Cadillac*, 808 F. Supp. at 229 (collecting cases); *Powers v. British Vita, P.L.C.*, 57 F.3d 176, 184 (2d Cir. 1995) (finding that intent need not be alleged with great specificity because it is unrealistic to expect a plaintiff to know a defendant's actual state of mind).

To adequately allege fraudulent intent, a complaint need only provide "a factual basis that gives rise to a strong inference of intent to defraud, knowledge of the falsity, or a reckless disregard for the truth." *Center Cadillac*, 808 F. Supp. at 229 (collecting cases); *see also O'Malley v. N.Y. City Transit Auth.*, 896 F.2d 704, 706 (2d Cir. 1990) ("[I]ntentional fraud or 'reckless indifference to the truth' is a necessary component of mail fraud.") (citations omitted). Scienter can be proven with circumstantial evidence. *Cofacredit, S.A. v. Windsor Plumbing*

51

*Supply Co.*, 187 F.3d 229, 241 (2d Cir. 1999). A strong inference of fraudulent intent is

established by: "(1) alleging facts to show that defendants had both motive and opportunity to

commit fraud, or by (2) alleging facts that constitute strong circumstantial evidence of conscious

misbehavior or recklessness." *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629,

634 (2d Cir. 1996); *see also Cofacredit*, 187 F.3d at 241. "Plaintiffs must demonstrate that each

Defendant had a specific intent to defraud either by devising, participating in, or aiding and

abetting the scheme." *Center Cadillac,* 808 F. Supp. at 230.

The Amended Complaint clearly alleges facts demonstrating that the THQ Defendants

had a strong motive to join the association-in-fact enterprise and engage in schemes to defraud

WWE of its intellectual property rights in the videogame license and the honest services of

Shenker and Bell, including, among other things:

- In the first quarter of 1998, the primary economic driver of THQ's business was its wrestling-themed videogame license with World Championship Wrestling, WWE's principal competitor at the time (AC ¶¶ 118-20). WCW videogames accounted for 39% of THQ's sales in 1997 and 87% in the first quarter of 1998 (AC ¶ 122);

- When THQ announced that it had lost the WCW license on March 10, 1998—seven days after Farrell sold 40,000 of THQ stock for $1.2 million—THQ's stock plummeted 25% (AC ¶¶ 122-23). At the time, Farrell announced publicly that nothing prevented THQ from continuing to sell wrestling videogames using another licensor or fictitious characters (AC ¶¶ 123-24). As of the second quarter of 1998, therefore, THQ and Farrell were desperate to find a wrestling-themed videogame license to take the place of the WCW license (AC ¶¶ 125-26);

- In April 1998, Farrell contacted WWE with an informal proposal by THQ to obtain a videogame license (AC ¶¶ 129-31);

- As a result of THQ's proposal (and because Activision, another potential licensee, also had submitted an unsolicited proposal), Friedman advised Farrell "that Jakks was in control of the videogame license; had access to the terms Activision had informally proposed; and that THQ could participate in the revenue stream from the videogame license at a lower-than-market royalty rate if THQ did not independently bid but instead joined with Jakks to make a proposal . . ." (AC ¶ 137);

52

- "THQ had never before joined with Jakks to bid on a videogame license, and THQ did not need Jakks to formulate or make a proposal for a videogame license. THQ was completely able in its own right to perform a videogame license with WWE without any involvement by Jakks and had every legitimate reason to do so given the circumstances existing at the time and had already told WWE it desired to do so" (AC ¶ 139);

- "Despite Farrell's and THQ's knowledge of the improprieties involved in Jakks's role, and the impropriety associated with agreeing not to independently bid," Farrell agreed on behalf of THQ to accept the terms insisted upon by Jakks and not to submit an independent bid while never alerting WWE to the obvious irregularities in the bidding process (AC ¶ 141); and

- In short, WWE alleges: "Farrell and THQ either knew of, or were recklessly indifferent toward, the unlawful activity set forth herein but agreed to the illegal plan because the were desperate in light of the loss of the WCW license and because the terms offered by Jakks to THQ to rig the bids, allocate the license among the conspirators, and fix prices to be offered WWE for its intellectual property were well below the then prevailing rates THQ would otherwise have had to pay to secure a license of the quality of the WWE videogame license. Farrell and THQ knew that THQ would benefit direct and substantially from the unlawful activity (AC ¶ 143).

Based on these allegations, it properly can and should be inferred that the THQ

Defendants' decision to go along with Friedman's proposal was highly irregular and atypical.

*See 131 Main St. Assocs. v. Manko*, 897 F. Supp. 1507, 1529 (S.D.N.Y. 1995) ("[A]typicality, at

least in business affairs, may circumstantially suggest the possibility of fraud"). By virtue of

their experience in the videogame industry, THQ and Farrell were undoubtedly familiar with

typical competitive bidding procedures (AC ¶¶ 17-18). They had already demonstrated the

desire and ability to submit an independent proposal for the WWE license (AC ¶¶ 129, 131,

139). They also knew that they were fully able to perform the videogame license without

assistance from Jakks, with whom THQ never partnered in the past to bid on a videogame

license and has not partnered since (AC ¶¶ 131, 139). In fact, as the THQ Defendants were also

aware, Jakks was not even in the videogame business when Friedman professed that Jakks was

already in control of the license (AC ¶¶ 139-40). Although Jakks would have no involvement in

53

the performance of the videogame license, the THQ Defendants agreed to pay Jakks "a 'preferred return' quarterly equal to the greater of a specified dollar amount or specified percentages of the net sales of WWE videogames in amounts that varied based on platforms" effectively for doing nothing (AC ¶ 179). The THQ Defendants also awarded Friedman— precisely one week after the videogame license was executed—230,850 shares of THQ stock worth millions of dollars, the timing and circumstances of which raise the inference that it was in consideration for Friedman's role in the improper and unlawful conduct in obtaining the videogame license (AC ¶ 166).

These facts alone would lead anyone—and particularly insiders in the videogame industry such as the THQ Defendants—to suspect that the videogame license was being obtained by fraud. Nevertheless, the THQ Defendants agreed to the Jakks Defendants' patently unlawful proposals and abandoned all independent pursuit of the license—even though THQ had every incentive to out-bid Jakks and obtain the fruits of the license for itself (AC ¶¶ 141-42, 144).[19]  A reasonable inference thus arises that the THQ Defendants knew and/or were recklessly indifferent to the fact that the bidding process for the WWE videogame license was corrupted by fraud. By knowingly electing to join the association-in-fact enterprise, the THQ Defendants exhibited the requisite scienter. They accepted the benefit of the unlawful conduct committed by

---

[19]  As further motive for the fraud, Farrell and THQ knew that THQ would benefit substantially if it obtained an interest in WWE's videogame license at the below-market rate proposed by the Jakks Defendants (AC ¶ 143). Farrell knew that he personally would realize millions in profits from stock ownership and options in THQ (AC ¶ 7). Indeed, THQ stock surged when it announced it had obtained rights to the WWE license (AC ¶ 155).

Furthermore, all Defendants, including the THQ Defendants and THQ/Jakks, knew that as a result of their scheme, WWE would receive below-market royalty rates for forty to sixty fiscal quarters—further evidence of fraudulent intent (AC ¶¶ 160-63). *See United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994) ("When the 'necessary result' of the actor's scheme is to injure others, fraudulent intent may be inferred from the scheme itself.").

the enterprise up to that point, and had the requisite intent for any predicate acts occurring thereafter.

With specific regard to THQ/Jakks, the Amended Complaint further alleges, among other things, that:

- Farrell executed the videogame license on behalf of THQ/Jakks (AC ¶ 154);

- "THQ and Jakks each own 50% of THQ/Jakks and have arrangements in place detailing the manner in which proceeds from the WWE videogame license will be accounted for and ultimately distributed between THQ and Jakks," which arrangements are uniquely in the knowledge and possession of Defendants (AC ¶¶ 19, 176); and

- Defendant Berman and Defendant Farrell have executed contracts on behalf of THQ/Jakks (AC ¶¶ 19, 154).

For the same reasons described in detail above, THQ/Jakks' entry into the enterprise as the party to the videogame license through Farrell and Berman, and its operation of the videogame license through THQ and Jakks equally exhibit THQ/Jakks' requisite scienter. Indeed, THQ/Jakks cannot play a "shell game" of liability whereby it continually denies that it did anything wrong or knew of anything wrong even though it only acted through Farrell, Berman, THQ and Jakks—all of whom are demonstrated to have the requisite scienter.[20]

       **b.**    **Money Laundering**

The THQ Defendants and THQ/Jakks challenge the sufficiency of those money laundering predicate acts based upon the payments made by each (and on each other's behalf) to WWE and Jakks in connection with the videogame license (*see* THQ Br. at 17-18; THQ/Jakks

---

[20]  The scienter of THQ/Jakks may be inferred from the existence of scienter on the part of either THQ or Jakks or both. *See 131 Main St. Assocs.*, 897 F. Supp. at 1534 ("joint and several liability is not inconsistent with the scienter requirement that must be met to prove RICO's fraud-based predicate acts"). "[I]n the partnership context, the scienter requirement is satisfied as long as the partner or partners actually involved in the wrongdoing[ ] acted with scienter." *Id. (quoting N.W. Nat'l Bank of Minneapolis v. Fox & Co.*, 102 F.R.D. 507, 512 (S.D.N.Y. 1984)).

Br. at 23-24; AC ¶ 249(b)(xxviii)-(lxviii)).  These predicate acts adequately allege money

laundering in violation of 18 U.S.C. § 1957.[21]

Section 1957 prohibits knowingly engaging in a monetary transaction in criminally

derived property of a value greater than $10,000 that is derived from specified unlawful activity.

18 U.S.C. § 1957(a); *United States v. McCarthy*, 271 F.3d 387, 394-95 (2d Cir. 2001), *abrogated*

*on other grounds by Eberhart v. United States*, 126 S. Ct. 403, 403-04 (2005) (per curiam).  To

establish money laundering, it is not even necessary that "the defendant knew that the offense

from which the criminally derived property was derived was specified unlawful activity."  *See* 18

U.S.C. § 1957(c).  Rather, it is only necessary that the defendant knew that the money was

"criminally derived."  *United States v. Reiss*, 186 F.3d 149, 154 (2d Cir. 1999).  Here, the

Amended Complaint alleges facts from which it can be inferred that the THQ Defendants and

THQ/Jakks knew that the videogame license was obtained by an unlawful scheme involving

dishonest services, which by that time included bribery and mail and wire fraud to place its

partner in control of the grant of the license.  Thus, the Amended Complaint alleges that the

THQ Defendants and THQ/Jakks at least knew that the videogame license was obtained through

some criminal activity.  Accordingly, WWE has alleged the requisite intent for the challenged

money laundering allegations as well.

The crimes of commercial bribery, mail fraud and wire fraud are all "specified unlawful

activity" within the meaning of § 1957.  *See* 18 U.S.C. §§ 1957(f)(3) (incorporating definition of

---

[21]  THQ/Jakks only challenges the sufficiency of these allegations under 18 U.S.C. § 1956, not § 1957
(*see* THQ/Jakks Br. at 23-24), and the two cases cited by THQ/Jakks only involve § 1956. *See United
States v. Maher*, 108 F.3d 1513 (2d Cir. 1997); *Leung v. Law*, 387 F. Supp. 2d 105 (E.D.N.Y. 2005). As
*Leung* makes clear, however, a violation of § 1956 requires "that the defendant knew that the financial
transaction was designed in whole or in part to conceal or disguise the source, ownership, control, etc., of
those proceeds," an element that is not part of § 1957.

"specified unlawful activity" from § 1956(c)(7)(A), which, in turn, incorporates RICO's definition of "racketeering activity" contained in 18 U.S.C. § 1961(1)). Consequently, any money earned by the members of the association-in-fact enterprise due to their control of the videogame license are proceeds obtained from a criminal offense. Each of the monetary transactions alleged in paragraph 247(b)(xxviii)-(lxvii) of the Amended Complaint—all of which represent either (i) videogame license royalties paid by (or on behalf of) THQ and THQ/Jakks; or (ii) sums paid to Jakks by THQ (and on behalf of THQ/Jakks) as part of the LLC agreement— represent a separate violation of § 1957. They are, therefore, adequately alleged RICO predicate acts of money laundering.

To call these predicate acts "irrelevant," as the THQ Defendants do (THQ Br. at 17-18), deliberately ignores Congress's express inclusion of such violations in RICO's definition of "racketeering activity." 18 U.S.C. § 1961(1). The cases cited by the THQ Defendants cannot support ignoring these adequately alleged money laundering predicate acts, as none of those cases even involve allegations of money laundering predicate acts, which Congress expressly included in the definition of "racketeering activity" (*see* THQ Br. at 17).[22]

---

[22]  In addition to the § 1957 money laundering predicate acts discussed herein, paragraph 249(b)(viii) of the Amended Complaint also alleges a predicate act of money laundering in violation of both §§ 1956 and 1957, which is attributable to the THQ Defendants and THQ/Jakks under the principles of vicarious liability (*see* Section II.G below).

   Certain predicate acts of commercial bribery are also attributable to the THQ Defendants and THQ/Jakks (AC ¶ 247(e)(v) and (vi)). These bribes occurred after these Defendants had joined the enterprise and the scheme to obtain the videogame license through bribery and fraud, and thus are attributable to them by vicarious liability as well (*see* Section II.G below).

   Finally, the Travel Act violations incorporate by reference the conduct described in the other predicate act allegations (AC ¶ 249(d)). Contrary to the argument of THQ/Jakks, they in no way depend on whether the other predicate acts are deemed to be legally sufficient (*see* THQ/Jakks Br. at 24-25).

**G.    The THQ Defendants and THQ/Jakks May Be Held Vicariously Liable for the Jakks Defendants' Unlawful Conduct**

    **1.    Partnership Liability Principles Apply to WWE's RICO Claims Against the THQ Defendants and THQ/Jakks**

In addition to independently satisfying the pleading elements for RICO as described

above, the THQ Defendants and THQ/Jakks also are vicariously liable based on the Jakks

Defendants' unlawful conduct. Fundamentally, the THQ Defendants' claim that "[c]ourts in the

Second Circuit generally have been hostile to claims of vicarious liability under RICO" (THQ

Br. at 19) simply is not accurate. To the contrary, this Court has ruled that "[w]hen conduct is

proscribed by a federal statute and civil liability for that conduct is explicitly or implicitly

imposed, the normal rules of agency law apply in the absence of some indication that Congress

had a contrary intent." *USA Certified Merchs., LLC v. Koebel*, 262 F. Supp. 2d 319, 329

(S.D.N.Y. 2003) (*quoting Bernstein v. IDT Corp.*, 582 F. Supp. 1079, 1083-84 (D. Del. 1984)).

Particularly as regards RICO, there is "nothing in RICO or its legislative history which would

suggest that the normal rules of agency law should not apply to the civil liability created by that

statute . . . ." *Connors v. Lexington Ins. Co.*, 666 F. Supp. 434, 453 (S.D.N.Y. 1987) (*quoting

Bernstein*, 582 F. Supp. at 1083-84); *see also Amendolare v. Schenkers Int'l Forwarders, Inc.*,

747 F. Supp. 162, 171 (E.D.N.Y. 1990) (finding that application of agency doctrine "would not

contravene the language or policy underlying RICO").[23]

---

[23]    Every Circuit to specifically address the issue similarly has recognized the application of agency principles to civil liability under RICO. *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1406-07, 1409 (11th Cir. 1994) (applying general agency principles to vicarious liability under RICO where the principal derived some benefit from the RICO violation); *Davis v. Mut. Life Ins. Co. of N.Y.*, 6 F.3d 367, 378-79 (6th Cir. 1993) (finding no prohibition on "the imposition of liability vicariously on corporate 'persons' on account of the acts of their agents, particularly where the corporation benefited by those acts"); *Brady v. Dairy Fresh Prods. Co.*, 974 F.2d 1149, 1154-55 (9th Cir. 1992) ("We hold that an employer that is benefited by its employee's or agent's violations of section 1962(c) may be held liable under the doctrines of respondeat superior and agency when the employer is distinct from the enterprise . . . ."); *Brubaker v. City of Richmond*, 943 F.2d 1363, 1378-79 (4th Cir. 1991) (reversing entry of Rule 11 sanctions against plaintiffs for RICO claim seeking to hold the City liable based on agency law because

More specifically, this Court has ruled that normal doctrines of partnership liability—which the Court described as "a subspecies of vicarious liability"—apply in a civil action brought under § 1962(c) of RICO. *131 Main St. Assocs.*, 897 F. Supp. at 1533-34 ("[H]aving considered the language and purpose of § 1962(c), and of the RICO statute as a whole, we see no basis for concluding that the statutory scheme would be disrupted by the application of partnership liability in the civil RICO context."). Applying Sections 24 and 26 of New York Partnership Law which, read together, provide for joint and several liability of the partnership for actions taken by any partner in the business of the partnership or with the authority of the co-partners, Judge Sand found that general partners may be vicariously liable for the RICO violations of their partnerships and co-partners. *131 Main St. Assocs.*, 897 F. Supp. at 1535 (*citing* N.Y. P'ship Law §§ 24, 26 (McKinney 1998)).[24]

Courts in other jurisdictions similarly have applied general partnership law to hold partners liable under § 1962(c) for the RICO violations of their partnerships and co-partners. *Burns v. MBK P'ship*, No. Civ. 03-3021-CO, 2003 WL 23979014, at *13 (D. Or. Nov. 5, 2003) ("Liability based on the acts of co-partners is appropriate as to plaintiffs' RICO claim as well."); *Fortney v. Kuipers*, No. 98 C 5387, 1999 WL 102772, at *12 (N.D. Ill. Feb. 22, 1999) (holding that all partners in a law firm could be vicariously liable under RICO for one partner's actions); *Avianca, Inc. v. Corriea*, Civ. A. No. 85-3277(RCL), 1992 WL 93128, at *14 (D.D.C. Apr. 13,

---

"[n]either the RICO statute itself nor controlling precedent foreclosed this respondeat superior theory"); *Petro-Tech, Inc. v. Western Co. of N. Am.*, 824 F.2d 1349, 1356-59 (3d Cir. 1987) (applying general agency principles to recognize vicarious liability under civil RICO).

[24] Section 24 provides, "[w]here, by a wrongful act or omission of any partner acting in the ordinary course of the business of the partnership, or with the authority of his co-partners, loss or injury is caused to any person, not being a partner in the partnership, . . . the partnership is liable therefore to the same extent as the partner so acting or omitting to act." N.Y. P'ship Law § 24 (McKinney 2005). Section 26, in turn, provides that "[a]ll partners are jointly and severally liable for everything chargeable to the partnership under section twenty-four." *Id.* § 26.

1992) (holding that law partner could be vicariously liable under RICO for his partner's actions because "partners are routinely held jointly and severally liable for the actions of their partners"); *Thomas*, 9 F. Supp. 2d at 558 (finding vicarious liability applicable because "holding a partnership liable for the RICO violations of its partner under doctrine of agency and partnership liability serves Congress's goal of deterring individuals from controlling organizations through a pattern of racketeering activity."); *Morley v. Cohen*, 610 F. Supp. 798, 811 (D. Md. 1985) (concluding that "a corporation or partnership can be held liable under RICO for the acts of its agents and/or representatives committed within the scope of their authority").

Contrary to the THQ Defendants' suggestion that vicarious liability somehow would be inconsistent with RICO's underlying purpose, this Court and others have concluded that imposing partnership liability actually <u>furthers</u> "both the compensatory and deterrent goals of the RICO statute." *Brady*, 974 F.2d at 1155; *see also 131 Main St. Assocs.*, 897 F. Supp. at 1533-34 (*citing United States v. Turkette*, 452 U.S. 576, 591 (1981)); *Thomas*, 9 F. Supp. 2d at 558. "[I]f partners are held civilly liable for the RICO violations of their partnership and co-partners, they will have an added incentive to take steps to reign in misconduct by their colleagues." *131 Main St. Assocs.*, 897 F. Supp. at 1534. Thus, "[h]olding a partnership liable when it benefits from the acts of its partners will prevent the partnership from being unjustly enriched and will help serve Congress's goal of compensating victims of racketeering activities." *Thomas*, 9 F. Supp. 2d at 558. These principles apply with particular force here given that the racketeering activities at issue were personally conducted by the highest-ranking officer of THQ and THQ/Jakks.[25]

---

[25] The THQ Defendants correctly note that most cases involving vicarious liability fall under the rubric of respondeat superior, as opposed to partnership liability, and thus are inapposite to this case. In the respondeat superior context, typically large, "deep pocket" corporations are alleged to be liable for the acts of relatively low-level employees without the knowledge—and often contrary to the interests—of corporate executives. These concerns, however, are inapposite to partnership liability. Indeed, as the District Court for the District of Columbia pertinently observed, "whereas it may be unjust to hold a

2.    **Partnership Liability Principles Under RICO Equally Apply to Joint Venturers**

It is well-settled that the law governing the relationship of joint venturers is the same as

that governing partners. *Gramercy Equities Corp. v. Dumont*, 531 N.E.2d 629, 632 (N.Y. 1988)

("[A joint venture] is in a sense a partnership for a limited purpose, and it has long been

recognized that the legal consequences of a joint venture are equivalent to those of a

partnership"); *see also Zeibak v. Nasser*, 82 P.2d 375, 380 (Cal. 1938) ("The rule is that the

rights and liabilities of joint adventurers, as between themselves, are governed by the same

principles which apply to a partnership."). In particular, joint venturers' liability "for torts is

governed by the law applicable to partnerships . . . ." *Rallone v. Misericordia*, 259 N.Y.S.2d

947, 951 (N.Y. App. Div. 1965). As such, partnership liability principles under RICO equally

apply to joint venturers.

The Amended Complaint alleges that "THQ and Jakks have held themselves out to the

public and their respective shareholders as being in a 'joint venture' or 'partnership' with each

other with respect to the WWE videogame license and have claimed that it was 'jointly

obtained'" (AC ¶ 158).[26] That Jakks and THQ converted their partnership into a limited liability

---

corporation trebly liable for a single employee's criminal acts, the situation changes dramatically in the partnership context . . . . Partners are routinely held jointly and severally liable for the actions of their partners." *Avianca*, 1992 WL 93128, at \*14. In any event, even under the inapposite respondeat superior caselaw cited by the THQ Defendants, a company is vicariously liable for the actions of its employees in violation of RICO where the plaintiff has alleged facts which portray the company as an active perpetrator of the fraud or a central figure in the criminal scheme. *USA Certified Merchs.*, 262 F. Supp. 2d at 328. "In order to demonstrate that a corporation is directly involved or central to the RICO scheme alleged, Plaintiffs must show that a corporate officer or director had knowledge of or was recklessly indifferent toward the unlawful activity." *Id.* In light of the Amended Complaint's extensive allegations of Farrell's personal and direct involvement in the racketeering activities, there can be no dispute that a corporate officer of THQ (the CEO) and THQ/Jakks (authorized signatory to the videogame license) had knowledge of the unlawful conduct.

[26]    In light of this allegation, the THQ Defendants' argument that the Amended Complaint supposedly "conspicuously omits any reference to any joint venture between THQ and Jakks" is demonstrably false (THQ Br. at 21). The THQ Defendants' further argument that "WWE has waived any claim that THQ and Jakks were at any time joint venturers subject to partnership liability" (THQ Br. at 22) is utterly

corporation in or around June 1998 does not alter the analysis. "A partnership or limited

partnership that has been converted [into a LLC] pursuant to this chapter [N.Y. Ltd. Liab. Co.

Law § 1007(a)] is for all purposes the same entity that existed before the conversion." *Baker v.*

*Dorfman, P.L.L.C.*, No. 99Civ.9385(DLC), 2000 WL 1010285, at *5 (S.D.N.Y. July 21, 2000)

(*citing* N.Y. Ltd. Liab. Co. Law § 1007(a)), *aff'd*, 232 F.3d 121 (2d Cir. 2000). Specifically, "all

debts, obligations, liabilities and penalties of the converting partnership or limited partnership

continue as debts, obligations, liabilities and penalties of the converted limited liability

company." N.Y. Ltd. Liab. Co. Law § 1007(a)(ii). This Court has further ruled that an LLC—

like THQ/Jakks—may be subject to successor liability for RICO claims where, *inter alia*, the

LLC is "a mere continuation" of its predecessor, or the formation of the LLC "is a fraudulent

effort to avoid the liabilities of the predecessor." *Am. Buying Ins. Servs., Inc. v. Kornreich &*

*Sons, Inc.,* 944 F. Supp. 240, 249 (S.D.N.Y. 1996) (denying motion to dismiss RICO claims

based on allegations sufficient to support successor liability); *Network Enters., Inc. v. APBA*

*Offshore Prods., Inc.*, No. 01 Civ. 11765(CSH), 2002 WL 31050846, at *7 (S.D.N.Y. Sept. 12,

2002). Such successor liability principles apply "regardless of whether the predecessor or

successor organization was a corporation or some other form of business organization." *Graham*

*v. James*, 144 F.3d 229, 240 (2d Cir. 1998) (*quoting* 63 Am. Jur. 2d Products Liability § 117

(1984) (finding that successor liability would apply to conversion from sole proprietorship to

LLC).

WWE's Amended Complaint alleges that the formation of the LLC THQ/Jakks "was a

sham necessary to implement the scheme" (AC ¶ 156). The Amended Complaint goes on to

allege, of particular pertinence, "[b]y establishing a sham LLC to be the nominal contracting

---

unfounded, and belies the THQ Defendants' acute awareness of their liability under the partnership
principles applicable to joint ventures described herein.

party [to the videogame license] Jakks and THQ hoped to create legal limitations on WWE's ability to seek redress against Jakks and THQ if the unlawful conduct were ever discovered by WWE" (*id.*). The Amended Complaint further alleges that THQ agreed "to be exclusively responsible for development, manufacturing, distribution, and sales of all WWE videogames, and for the day-to-day operations incidental to performing the videogame license" (AC ¶ 178). In essence, WWE alleges that Jakks has no involvement in the performance of the videogame license yet was to "be paid a 'preferred return' quarterly equal to the greater of a specified dollar amount or specified percentages of the net sales of WWE videogames in amounts that varied based on platforms" (AC ¶ 179).

It is well-established that "[n]o person or persons can organize a sham corporation with the intention of working through it and in its name for their own individual purposes, and escape liability for their wrongful conduct." *Robert Findlay Mfg. Co. v. Hygrade Lighting Fixture Corp.*, 288 F. 80, 81 (E.D.N.Y. 1923); *see also Quaid v. Ratkowsky*, 170 N.Y.S. 812, 815 (N.Y. App. Div. 1918) ("[T]here has been for years a growing indisposition to permit corporate entity to be employed either as an instrumentality or as a cloak for fraud or for successful evasion of the law."). To that end, this Court will pierce the veil of an LLC to hold its members personally liable where "a member has treated the LLC consistently as its alter ego or used it to commit fraud." *Zulawski v. Taylor*, No. 2004/12400, 2005 WL 3823584, at *3 (N.Y. Sup. Ct. July 1, 2005). To determine whether a corporate entity should be disregarded, this Court has identified five relevant criteria, including, specifically, "the intent of the shareholders or incorporators to avoid civil or criminal liability [and] . . . whether the corporation is merely a sham." *Goldberg v. Colonial Metal Spinning & Stamping Co.*, No. 92 Civ. 3721 (JFK), 1993 WL 361672, at *5

(S.D.N.Y. Sept. 14, 1993). Based on the allegations of WWE's Amended Complaint, therefore, the THQ Defendants and THQ/Jakks cannot use the LLC as a blanket shield to liability.

### 3. Under Well-Settled Agency Law Principles, the THQ Defendants and THQ/Jakks May Be Found Vicariously Liable on WWE's RICO Claims

The touchstone of agency law is that a principal is bound by the acts and knowledge of its agent. *Mayer v. Dean*, 22 N.E. 261 (N.Y. 1889); *Shamlian v. Wells*, 242 P. 483, 484-85 (Cal. 1925). "The general rule of partnership liability is that a partner is an agent for the partnership, and a partnership is liable for the wrongful acts of its partners committed in the ordinary course of the business of the partnership." *Thomas*, 9 F. Supp. 2d at 556 (*citing* Revised Uniform Partnership Act §§ 301 & 305 (1994)); *see also In re Wedtech Corp.*, 88 B.R. 619, 623 (Bankr. S.D.N.Y. 1988) (*citing* N.Y. P'ship Law § 24 (McKinney 1948)); *Rickless v. Temple*, 84 Cal. Rptr. 828, 844 (Cal. Ct. App. 1970).

Such liability applies regardless of whether the THQ Defendants or THQ/Jakks participated in or had any knowledge of the illegal activities. *In re Wedtech Corp.*, 88 B.R. at 623 ("It is axiomatic that the joint and several liability of a partner and the partnership for a partner's conduct within the scope of the partnership business requires neither actual participation in nor knowledge of the wrongful conduct before liability may be imposed . . . ."). When illegal activities are done in the performance of the business of the partnership or joint venture, all partners reap the benefits of such actions and so the knowledge and actions of one partner are imputed to all partners. *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 689 n.9 (2d Cir. 1983); *Rickless*, 84 Cal. Rptr. at 844. The THQ Defendants and THQ/Jakks are not free to receive the fruits of the bargain without adopting the instrumentalities employed by their partner; they are bound by the Jakks Defendants' fraud, even if ignorant of the fraud and intending no

fraud themselves. *Young v. N.Y. State Elec. & Gas Corp.*, 55 N.Y.S.2d 150, 153-54 (N.Y. Sup.

Ct. 1945); *Rickless*, 84 Cal. Rptr. at 844.

Vicarious liability particularly has been applied to claims of fraud involving one member

of the partnership or joint venture regardless of its knowledge or culpability. *See In re*

*Tsurukawa*, 287 B.R. 515, 524 (Bankr. 9th Cir. 2002); *Rickless*, 84 Ca. Rptr. at 844; *Koam*

*Produce, Inc. v. Dimare Homestead, Inc.*, 213 F. Supp. 2d 314, 325 (S.D.N.Y. 2002) (finding it

would "fly in the face of the evidence, of statute and common law, and of common sense" not to

apply vicarious liability to employer for employee's fraud); 48A C.J.S. Joint Ventures § 60

(2004) ("Lack of actual knowledge of any wrongdoing and innocence of fraud, in themselves, do

not absolve one joint venturer of liability for the fraud of another joint venturer acting within the

scope and authority of the joint venture.").

Accordingly, the THQ Defendants and THQ/Jakks are liable for the Jakks Defendants'

wrongful conduct in corrupting WWE's fiduciaries Shenker and Bell, which facilitated their

obtaining the videogame license—the *sine qua non* of the partnership in the first instance. N.Y.

P'ship Law § 24 (McKinney 2005) ("[T]he partnership is liable therefore to the same extent as

the partner so acting or omitting to act); Cal. Corp. Code § 16305 (2005) ("A partnership is liable

for . . . a wrongful act or omission . . . of a partner"); *B.F. Goodrich Co. v. Naples*, 121 F. Supp.

345, 353 (S.D. Cal. 1954) ("[T]he act of every partner for apparently carrying on the business of

the partnership, including his wrongful acts, such as fraud and deceit, bind the partnership.");

*Gross v. Newburger, Loeb & Co.*, 426 N.Y.S.2d 667, 675 (N.Y. Sup. Ct. 1980) (*citing Matter of*

*Peck*, 99 N.E. 258 (N.Y. 1912)).[27]

---

[27] The THQ Defendants' contention that "[t]he ordinary principles of agency and liability that govern
the members of an LLC are markedly different from those that govern partnerships" completely misses
the point. The partnership between Jakks and THQ, which subjects THQ to liability for Jakks's wrongful
acts, arose prior to the formation of the LLC. Regardless, "[m]embers of limited liability companies, such

65

4.    **The THQ Defendants And THQ/Jakks Ratified The Jakks Defendants'**
**Unlawful Conduct Committed Prior To The Formation Of Their Partnership**

The THQ Defendants and THQ/Jakks likewise are vicariously liable for the Jakks

Defendants' conduct even if it is construed as being outside the scope of the parties' agency

relationship (i.e., before the parties' partnership was formed) based on the THQ Defendants' and

THQ/Jakks' ratification of such conduct. *See Cologne Life Reinsurance Co. v. Zurich*

*Reinsurance (N. Am.), Inc.*, 730 N.Y.S.2d 61, 69 (N.Y. App. Div. 2001); *Rakestraw v.*

*Rodrigues*, 8 Cal. 3d 67, 73-75 (1972). As a matter of law, the THQ Defendants and THQ/Jakks

are deemed to have ratified Jakks' actions because they: (1) accepted the benefits of the acts

with actual or imputed knowledge of the material facts surrounding the transaction, *see Hewett v.*

*Marine Midland Bank of Southeastern New York, N.A.*, 449 N.Y.S.2d 745, 751 (N.Y. App. Div.

1982) ("If the principal accepts the benefits of its agent's misdeeds, with actual or imputed

knowledge, it ratifies the agent's action."); *Rakestraw*, 8 Cal. 3d at 73-75; and/or (2) despite lack

of knowledge of the material facts surrounding the transaction, the THQ Defendants and

THQ/Jakks were in a position to learn such facts and failed to do so yet continued to accept the

benefits of such acts. *See Richardson Greenshields Sec. Inc. v. Lau*, 819 F. Supp. 1246, 1260

(S.D.N.Y. 1993) (holding father responsible for son's commodities trading losses because,

though the son was not authorized to use his father's trading account, the father ratified the

trades by failing to investigate them); *Volandri v. Hlobil*, 339 P.2d 218, 219-20 (Cal. Ct. App.

1959) ("Ordinarily, the law requires that a principal be apprised of all the facts surrounding a

---

as officers, 'may be held personally liable if they participate in the commission of a tort in furtherance of
company business.'" *Recovery Racing, LLC v. Sunrise Motors, LLC*, No. 12834-04, 2005 WL 3193701,
at *5 (N.Y. Sup. Ct. Nov. 23, 2005) (*quoting Rothstein v. Equity Ventures, LLC*, 299 A.D.2d 472, 474
(Sup. Ct. App. 2002)); *see also Landa v. Herman*, No. 105360/03, 2005 WL 2899876, at *1 (N.Y. Sup.
Ct. Oct. 27, 2005) (*citing* N.Y. Ltd. Liab. Co. Law § 1205(a)). In light of the extensive allegations of
THQ's and Farrell's misconduct, WWE's Amended Complaint states RICO claims against them above
and beyond the Jakks Defendants' misconduct.

transaction before he will be held to have ratified the unauthorized acts of an agent. However, where ignorance of the facts arises from the principal's own failure to investigate and the circumstances are such as to put a reasonable man upon inquiry, he may be held to have ratified despite lack of full knowledge.").

As described in detail in Section II.F above, the Amended Complaint abundantly alleges that the THQ Defendants and THQ/Jakks knew and/or were recklessly indifferent to the obviously irregular and corrupt bidding process for the WWE videogame license engineered by the Jakks Defendants, Shenker and Bell. Despite such knowledge, the THQ Defendants and THQ/Jakks willingly accepted—and continue to accept—the benefits of that unlawful conduct. Moreover, the Amended Complaint specifically alleges with respect to ratification that "THQ authorized Jakks to act on its behalf in order to secure the benefits of a videogame license with WWE and/or has ratified the actions of Jakks and its officers set forth herein" (AC ¶ 17); and that all actions "taken by Jakks and/or THQ after June 10, 1998 with regard to the videogame license were with the authority of THQ/Jakks" and were ratified by THQ/Jakks (AC ¶ 19). These allegations more than adequately place the THQ Defendants and THQ/Jakks on notice of WWE's claims that they ratified the Jakks Defendants' prior unlawful conduct so as to be vicariously liable for such conduct under partnership liability principles. No more is required at this phase.

## H.    WWE's RICO Conspiracy Claims Are Adequately Alleged

In addition to adequately alleging substantive RICO claims under § 1962(c), WWE's Amended Complaint adequately pleads RICO conspiracy claims in violation of § 1962(d). To state a RICO conspiracy claim under controlling law, WWE need only allege that each Defendant "adopt[ed] the goal of furthering or facilitating the criminal endeavor." *Salinas v.*

*United States*, 522 U.S. 52, 64 (1997); *In re Sumitomo Copper Litig.*, 104 F. Supp. 2d 314, 321

(S.D.N.Y. 2000) ("The Supreme Court held that plaintiffs need only allege that CLR knew of

and agreed to facilitate the scheme.") (internal quotations omitted).  "One can be a conspirator by

agreeing to facilitate only some of the acts leading to the substantive offense." *Salinas*, 522 U.S.

at 64; *State Farm Mut. Auto. Ins. Co. v. CPT Med. Serv., P.C.*, 375 F. Supp. 2d 141, 151

(E.D.N.Y. 2005) (*quoting Salinas*, 522 U.S. at 63) ("[A] conspiracy may exist even if a

conspirator does not agree to commit or facilitate each and every part of the substantive

offense.").

      "In applying this analysis, [the court] need inquire only whether an alleged conspirator

knew what the other conspirators were up to or whether the situation would logically lead an

alleged conspirator to suspect he was part of a larger enterprise." *In re Sumitomo Copper Litig.*,

104 F. Supp. 2d at 322 (internal quotations omitted).  With specific regard to a RICO conspiracy

involving mail and wire fraud, this Court has ruled that "as each indictable mail fraud offense is

an act of racketeering activity under 18 U.S.C. § 1961, the requirement of an agreement to

commit at least two acts of racketeering activity would be satisfied by conscious adherence to a

fraudulent scheme pursuant to which two mailings in furtherance of the scheme were

foreseeable." *Spira*, 876 F. Supp. at 560.  As described in detail above, the Amended Complaint

more than satisfies these standards which the Second Circuit describes as "even more relaxed"

than the "low hurdle" to satisfy the operation or management test under § 1962(c).  *First Capital*,

385 F.3d at 178.  As a result, Defendants' attempt to erect artificial pleading burdens, all of

which are unsupported by, and indeed squarely contradictory to, controlling law should be

rejected.

First, THQ/Jakks inexplicably claims that under § 1962(d) each defendant must agree to commit two or more predicate acts (THQ/Jakks Br. at 25). The Supreme Court, however, has decidedly rejected any such requirement. *Salinas*, 522 U.S. at 64 ("The RICO conspiracy statute, § 1962(d), broadened conspiracy coverage by omitting the requirement of an overt act; it did not, at the same time, work the radical change of requiring the Government to prove each conspirator agreed that he would be the one to commit two predicate acts."). To the contrary, each conspirator "is responsible for the acts of each other. And so long as the partnership in crime continues, the partners act for each other in carrying it forward." *Id.* (citation omitted). "[I]f conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators" under § 1962(d). *Id.*

In contrast to § 1962(c), the focus of § 1962(d) is on the collective activities of the enterprise. *See United States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987) ("The focus of section 1962(c) is on the individual patterns of racketeering engaged in by a defendant, rather than the collective activities of the members of the enterprise, which are proscribed by section 1962(d)."). Accordingly, in assessing the pattern of racketeering activity in a RICO conspiracy count, the Court must consider all the alleged predicate acts together regardless as to which defendant they are most directly attributable. *In re Motel 6 Sec. Litig.*, Nos. 93 Civ. 2183 (JFK), 93 Civ. 2866 (JFK), 1997 WL 154011, at *4 (S.D.N.Y. Apr. 2, 1997) (in the context of a § 1962(d) conspiracy, "[t]he Court need not examine one defendant's actions in isolation when considering continuity").

As long as a complaint alleges two predicate acts intended or accomplished by one or more of the conspirators in the course of conducting the unlawful enterprise, any other conspirators that are alleged to "adopt the goal of furthering or facilitating the criminal

69

endeavor" are equally liable under § 1962(d). *Salinas,* 522 U.S. at 65; *see also State Farm*, 375

F. Supp. 2d at 151-53 (RICO conspiracy claim properly pleaded where defendants in "support"

roles allegedly "agreed to and acted in furtherance of the overall objective of the conspiracy").

Once a conspiracy is shown to exist, the evidence sufficient to link another defendant to it need

not be overwhelming. *In re Sumitomo Copper Litig.*, 104 F. Supp. 2d at 322 (*quoting United*

*States v. Diaz*, 176 F.3d 52, 97 (2d Cir. 1999)). Thus, even if the Court were to determine that

the Amended Complaint fails to allege the commission of two predicate acts by any defendant,

which it clearly should not, the conspiracy claim against that defendant still stands.

　　Second, Defendants' perfunctory argument that dismissal of WWE's § 1962(c)

substantive RICO claims would "mandate" dismissal of its § 1962(d) conspiracy claims simply

is not the law. To the contrary, the Supreme Court has ruled, "[i]t is elementary that a

conspiracy may exist and be punished whether or not the substantive crime ensues, for the

conspiracy is a distinct evil, dangerous to the public, and so punishable in itself." *Salinas*, 522

U.S. at 64 (RICO conspiracy conviction upheld where defendant acquitted of substantive RICO

violations) (emphasis added); *see also State Farm*, 375 F. Supp. 2d at 150-51 (rejecting

argument that substantive RICO violation is necessary to maintain RICO conspiracy claim).

70

### III. CONCLUSION

For all the foregoing reasons, Defendants' motions to dismiss should be denied in their entirety.[28]

Respectfully submitted,

By: _____

Jerry S. McDevitt (Pro hac vice)
Curtis B. Krasik (Pro hac vice)
Amy L. Barrette (Pro hac vice)
535 Smithfield Street
Pittsburgh, Pennsylvania 15222
(412) 355-6500 (phone)
(412) 355-6501 (fax)

William O. Purcell (WP 5001)
599 Lexington Avenue
New York, New York 10022-6030
(212) 536-3900 (phone)
(212) 536-3901 (fax)

KIRKPATRICK & LOCKHART NICHOLSON GRAHAM LLP

Attorneys for Plaintiff, World Wrestling Entertainment, Inc.

Dated:  July 7, 2006

---

[28] The Jakks Defendants' motion to dismiss also should be denied for the reasons set forth in WWE's Memorandum of Law in Support of Motion to Strike Exhibit B to the Declaration of Jonathan J. Lerner dated June 2, 2006 filed concurrently herewith, which are incorporated herein by reference.

71

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS DATED JUNE 2, 2006 was served on the following counsel of record via electronic mail service and first-class U.S. mail, postage prepaid this 7th day of July, 2006:

> John R. Williams, Esq.
> John R. Williams & Associates, LLC
> 51 Elm Street, Suite 409
> New Haven, CT  06510

> Michael A. Cornman, Esq.
> Schweitzer Cornman Gross & Bondell, LLP
> 292 Madison Avenue
> New York, NY  10017

_____
Jerry S. McDevitt