

U.S. Department of Justice

*United States Attorney*
*District of Connecticut*

---

*Brien McMahon Federal Building*
*915 Lafayette Boulevard, Room 309*
*Bridgeport, Connecticut 06604*

*(203) 696-3000*
*Fax (203) 579-5575*
*www.usdoj.gov/usao/ct*

February 10, 2005

John Williams, Esquire
51 Elm Street, Suite 409
New Haven, Connecticut 06510

Re: <u>United States v. James K. Bell</u>

Dear Mr. Williams:

This letter confirms the plea agreement entered into between your client, James K. Bell (the "defendant"), and the United States Attorney's Office for the District of Connecticut (the "Government") concerning the referenced criminal matter.

## The Plea and Offense

The defendant agrees to waive his right to be indicted and to plead guilty to a one-count information charging him with mail fraud, in violation of Title 18 U.S.C. § 1341. He understands that to be guilty of this offense the following essential elements of the offense must be satisfied:

1. There was a scheme and artifice to defraud World Wrestling Entertainment, Inc. (hereinafter WWE) (including a scheme to deprive WWE of the intangible right of honest services) by means of means of materially false and fraudulent pretenses, representations and promises.

2. Defendant, knowingly and willfully and with the intent to defraud, participated in the scheme.

3. Money and property were the objects of the scheme.

4. In the execution of the scheme, the defendant knowingly caused the use of the United States mails (or private or commercial interstate carrier), namely, the WWE's mailing of commission checks.

## The Penalties

This offense carries a maximum penalty of 5 years imprisonment and a $250,000 fine. In addition, under 18 U.S.C. § 3583, the Court may impose a term of supervised release of not more than three years, to begin at the expiration of any term of imprisonment imposed. The defendant understands that should he violate any condition of the supervised release during its term, he may be required to serve

a further term of imprisonment of up to two years with no credit for the time already spent on supervised release.

The defendant also is subject to the alternative fine provision of 18 U.S.C. § 3571. Under this section, the maximum fine that may be imposed on the defendant is the greatest of the following amounts: (1) twice the gross gain to the defendant (namely $3,893,268) resulting from the offense; (2) twice the gross loss resulting from the offense; or (3) $250,000.

In addition, the defendant is obligated by 18 U.S.C. § 3013 to pay a special assessment of $100 on the count of conviction. The defendant agrees to pay the special assessment to the Clerk of the Court on the day the guilty plea is accepted.

Finally, unless otherwise ordered, should the Court impose a fine of more than $2,500 as part of the sentence, interest will be charged on the unpaid balance of a fine amount not paid within 15 days after the judgment date. 18 U.S.C. § 3612(f). Other penalties and fines may be assessed on the unpaid balance of a fine pursuant to 18 U.S.C. §§3572 (h), (i) and § 3612(g).

Restitution

In addition to the other penalties provided by law, the Court must also order that the defendant make restitution under 18 U.S.C. §3663A. The scope and effect of the order of restitution are set forth in the attached Rider Concerning Restitution. Restitution is payable immediately unless ordered otherwise by the Court. The defendant acknowledges and agrees to make restitution to the WWE in the amount of $1,946,634.

The Sentencing Guidelines

1.      Applicability

The defendant understands that, although the application of the United States Sentencing Guidelines is not mandatory, they are advisory, and the Court is required to consider any applicable Sentencing Guidelines as well as other factors enumerated in 18 U.S.C. § 3553(a) to tailor an appropriate sentence in this case. See United States v. Booker, 543 U.S. ___ (2005). The defendant expressly understands that the Sentencing Guidelines determinations will be made by the Court, by a preponderance of evidence, based upon input from the defendant, the Government, and the United States Probation Officer who prepares the presentence investigation report. The defendant further understands that he has no right to withdraw his guilty plea if his sentence or the Guideline application is other than he anticipated.

2.      Acceptance of Responsibility

At this time, the Government agrees to recommend that the Court reduce by three levels the defendant's Adjusted Offense Level under section §3E1.1 of the Sentencing Guidelines, based on the defendant's prompt recognition and affirmative acceptance of personal responsibility for the offense. This recommendation is conditioned upon the defendant's full, complete, and truthful disclosure to the

Probation Office of information requested, of the circumstances surrounding his commission of the offense, of his criminal history, and of his financial condition. In addition, this recommendation is conditioned upon the defendant timely providing complete information to the Government concerning his involvement in the offense to which he is pleading guilty. The defendant expressly understands that the Court is not obligated to accept the Government's recommendation on the reduction.

The Government will not make this recommendation if the defendant engages in any acts which (1) indicate that the defendant has not terminated or withdrawn from criminal conduct or associations (Sentencing Guideline section §3E1.1); (2) could provide a basis for an adjustment for obstructing or impeding the administration of justice (Sentencing Guideline §3C1.1); or (3) constitute a violation of any condition of release. Moreover, the Government will not make this recommendation if the defendant seeks to withdraw his plea of guilty. The defendant expressly understands that he may not withdraw his plea of guilty if, for the reasons explained above, the Government does not make this recommendation.

### iii    Stipulation

Pursuant to section 6B1.4 of the Sentencing Guidelines, the defendant and the Government have entered into a stipulation which is attached to and made a part of this plea agreement. The defendant understands that this stipulation does not purport to set forth all of the relevant conduct and characteristics that may be considered by the Court for purposes of sentencing. The defendant expressly understands that this stipulation is not binding on the Court. The defendant also understands that the Government and the United States Probation Office are obligated to advise the Court of any additional relevant facts that subsequently come to their attention.

### iv.    Guideline Stipulation and Calculation

The Government and the defendant stipulate the defendant's applicable Sentencing Guidelines to be calculated as follows (Guidelines Manual effective Nov. 1, 1998) and that such a sentence is reasonable:

| | |
|---|---|
| Base offense level under § 2F1.1(a) | 6 |
| Adjust for loss in excess of $1.5 million but less than $2.5 million under § 2F1.1(b)(1)(M) | +12 |
| Adjust for more than minimal planning under § 2F1.1(b)(2) | + 2 |
| Adjust for Abuse of Position of Trust under § 3B1.3 | + 2 |

Adjust for Acceptance of Responsibility
under § 3E1.1                                      - 3

Total offense level                              <u>19</u>

An offense level of 19, with a criminal history Category I, which the parties calculate the defendant to be based on the representation of the defendant, results in an applicable guideline range of 30-37 months incarceration and a fine range of $6,000 - $60,000.   (The Government reserves the right to recalculate the defendant's criminal history if the defendant's representation is not accurate.)

The defendant expressly understands that the Court is not bound by this agreement on the Guideline and fine ranges specified above.  The defendant further expressly understands that he will not be permitted to withdraw the plea of guilty if the Court imposes a sentence outside the Guideline range or fine range set forth in this agreement.

In the event the Probation Office or the Court contemplates any sentencing calculations different from those stipulated by the parties, the parties reserve the right to respond to any inquiries and make appropriate legal arguments regarding the proposed alternate calculations.  Moreover, the Government expressly reserves the right to challenge or defend any sentencing determination, other than that stipulated by the parties, in any post-sentencing proceeding.

     v.  Waiver of Right to Appeal
         <u>or Collaterally Attack Sentence</u>

The defendant acknowledges that under certain circumstances he is entitled to appeal his conviction and sentence. 18 U.S.C. § 3742.  It is specifically agreed that the defendant will not appeal or collaterally attack in any proceeding, including but not limited to a motion under 28 U.S.C. § 2255 and/or §2241, the conviction or sentence of imprisonment imposed by the Court if that sentence does not exceed 37 months incarceration, a fine range of $60,000, and a three year term of supervised release, even if the Court imposes such a sentence based on an analysis differed from that specified above. Similarly, the Government will not appeal a sentence imposed within or above the stipulated sentencing range.  The defendant expressly acknowledges that he is knowingly and intelligently waiving his appellate rights.

     vi.  <u>Information to the Court</u>

The Government expressly reserves its right to address the Court with respect to an appropriate sentence to be imposed in this case.  Moreover, it is expressly understood that the Government will discuss the facts of this case, including information regarding the defendant's background and character, 18 U.S.C. § 3661, with the United States Probation Office and will provide the Probation Officer with access to its file, with the exception of grand jury material.

## Waiver of Rights

### Waiver of Right to Indictment

The defendant understands that he has the right to have the facts of this case presented to a federal grand jury, consisting of between sixteen and twenty-three citizens, twelve of whom would have to find probable cause to believe that he committed the offense set forth in the information before an indictment could be returned. The defendant expressly acknowledges that he is knowingly and intelligently waiving his right to be indicted.

### Waiver of Trial Rights and Consequences of Plea

The defendant understands that he has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent him.

The defendant understands that he has the right to plead not guilty or to persist in that plea if it has already been made, the right to a public trial, the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against him, the right not to be compelled to incriminate himself, and the right to compulsory process for the attendance of witnesses to testify in his defense. The defendant understands that by pleading guilty he waives and gives up those rights and that, if the plea of guilty is accepted by the Court, there will not be a further trial of any kind.

The defendant understands that if he pleads guilty, the Court may ask him questions about each offense to which he pleads guilty, and if he answers those questions falsely under oath, on the record, and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making false statements.

### Waiver of Statute of Limitations

The defendant understands and agrees that should the conviction following the defendant's plea of guilty pursuant to this plea agreement be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this plea agreement may be commenced or reinstated against the defendant, notwithstanding the expiration of the statute of limitations between the signing of this plea agreement and the commencement or reinstatement of such prosecution. The defendant agrees to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date the plea agreement is signed.

### Waiver of Right To Post-Conviction DNA Testing of Physical Evidence

The defendant understands that the Government has various items of physical evidence in its possession in connection with this case that could be subjected to DNA testing. The defendant further understands that following conviction in this case, he could file a motion with the Court to require DNA testing of physical evidence pursuant to 18 U.S.C. § 3600 and § 3600A in an attempt to prove his innocence. The defendant fully understands his right to have all the physical evidence in this case tested for DNA, has discussed this right with his counsel, and knowingly and voluntarily waives his right to

have such DNA testing performed on the physical evidence in this case. Defendant fully understands that because he is waiving this right, the physical evidence in this case will likely be destroyed or will otherwise be unavailable for DNA testing in the future.

## Acknowledgement of Guilt; Voluntariness of Plea

The defendant acknowledges that he is entering into this agreement and is pleading guilty freely and voluntarily because he is guilty. The defendant further acknowledges that he is entering into this agreement without reliance upon any discussions between the Government and him (other than those described in the plea agreement letter), without promise of benefit of any kind (other than the concessions contained in the plea agreement letter), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges his understanding of the nature of the offense to which he is pleading guilty, including the penalties provided by law. The defendant also acknowledges his complete satisfaction with the representation and advice received from his undersigned attorney. The defendant and his undersigned counsel are unaware of any conflict of interest concerning counsel's representation of the defendant in the case.

## Scope of the Agreement

The defendant acknowledges and understands that this agreement is limited to the undersigned parties and cannot bind any other federal authority, or any state or local authority. The defendant acknowledges that no representations have been made to him with respect to any civil or administrative consequences that may result from this plea of guilty because such matters are solely within the province and discretion of the specific administrative or governmental entity involved. Finally, the defendant understands and acknowledges that this agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving him.

## Collateral Consequences

The defendant further understands that he will be adjudicated guilty of each offense to which he has pleaded guilty and will be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to possess firearms. The defendant understands that the Government reserves the right to notify any state or federal agency by which he is licensed, or with which he does business, as well as any current or future employer of the fact of his conviction.

## Satisfaction of Federal Criminal Liability; Breach

The defendant's guilty plea, if accepted by the Court, will satisfy the federal criminal liability of the defendant in the District of Connecticut as a result of his participation in the kickback scheme involving WWE licensing agreements, which forms the basis of the Information in this case.

The defendant understands that if, before sentencing, he violates any term or condition of this agreement, engages in any criminal activity, or fails to appear for sentencing, the Government may void all or part of this agreement. If the agreement is voided in whole or in part, defendant will not be permitted to withdraw his plea of guilty.

<u>No Other Promises</u>

     The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this plea agreement, and none will be entered into unless set forth in writing, signed by all the parties.

     This letter shall be presented to the Court, in open court, and filed in this case.

                   Very truly yours,

                   JOHN H. DURHAM
                   DEPUTY UNITED STATES ATTORNEY

                   CHRISTOPHER W. SCHMEISSER
                   ASSISTANT UNITED STATES ATTORNEY

     The defendant certifies that he has read this plea agreement letter and its attachment, that he has had ample time to discuss this agreement and its attachment with counsel and that he fully understands and accepts its terms.

_____
JAMES K. BELL                  _____
The Defendant                Date

     I have thoroughly read, reviewed and explained this plea agreement and its attachment(s) to my client who advises me that he understands and accepts its terms.

_____
JOHN WILLIAMS, ESQ.         _____
Attorney for the Defendant     Date

<u>STIPULATION OF OFFENSE CONDUCT</u>

The defendant James K. Bell and the Government stipulate and agree to the following offense conduct that gives rise to the defendant's agreement to plead guilty to the information:

At all times relevant to this Information, World Wrestling Entertainment, Inc. (formerly World Wrestling Federation, Inc.), (hereinafter "WWE") was a Delaware Corporation with its principal place of business in Stamford, Connecticut. WWE, among other things, creates, produces and markets entertainment for both live and television audiences featuring professional wrestlers for whom WWE has developed a character profile, a storyline, and a role in the WWE productions.

During all times relevant hereto, JAMES K. BELL, the defendant herein, was employed by WWE with responsibilities for, among other things, overseeing the licensing of WWE intellectual property. It was part of his job description to identify potential licensees, negotiate licensing agreements, and develop new licensing strategies in order to benefit WWE. BELL also owned and operated Bell Consulting, LLC.

During all times relevant hereto, another individual, referred to herein as SS, was an acquaintance of BELL. BELL arranged for this individual, through SS's wholly owned entity, "SS and Associates, Inc." (SSAI), to become a licensing agent for WWE.

As a result of its creation and promotion of the professional wrestlers' characters, WWE owns as part of its intellectual property the use of the characters' likeness, name, storyline, and related features. WWE's intellectual property also includes its logo and related production titles.

It is part of the business of WWE to enter into licensing agreements with manufacturers who wish to create and sell products which utilize WWE's intellectual property. Such manufacturers include garment makers, toy makers, videogame manufacturers, and others. Generally, a licensing agreement permits the manufacturer to produce items for sale that include WWE intellectual property and in exchange require the payment of a fee or royalty to WWE by the manufacturer. The royalty is generally determined by a percentage of the total sales of the licensed items.

Licensing agreements entered into with WWE also required the manufacturer to keep track of and report sales of items utilizing WWE intellectual property on a periodic basis. It was common practice during the relevant period for licensees to report sales and submit royalty payments simultaneously.

After receiving royalty payments, WWE would determine whether and to what extent the professional wrestlers' characters were featured in the products manufactured so that a portion of the royalties received by WWE could be in turn passed on to the individual wrestler.

During the time relevant hereto, JAMES K. BELL, the defendant herein, an employee of WWE, identified potential licensees, negotiated licensing agreements and developed new licensing strategies in order to benefit WWE.

In approximately 1994, BELL arranged for SS, through his wholly owned entity SSAI to become a licensing agent for WWE. As a licensing agent, it was among SS's responsibilities to identify potential licensing opportunities for WWE, negotiate new licensing agreements and otherwise promote WWE licensing for the benefit of WWE. WWE retained authority for final approval of all licensing agreements. This approval was usually sought from and given by BELL.

As compensation for SS's efforts as a licensing agent, WWE agreed to pay SSAI a commission based upon a percentage of total revenue generated by each licensee procured by SSAI.

Thereafter, when WWE received periodic sales reports and royalty payments from licensees, WWE first determined whether the licensee was one that had been procured by SSAI, and, if it was such a licensee, then the amount of commission due to SSAI would be calculated and a check sent, usually by mail, to SSAI.

Beginning in or before January 1998, and continuing through October 2000, in the District of Connecticut and elsewhere, JAMES K. BELL, the defendant herein, and others known and unknown to the United States Attorney, did devise a scheme and artifice to defraud WWE, including depriving WWE of the intangible right of honest services, and to obtain money and property from WWE through materially false and fraudulent pretenses and representations. Specifically, BELL did arrange for SSAI to receive commissions on certain WWE licensing agreements to which SSAI was not entitled; BELL received kickbacks from SSAI relating to these licensing agreements, monies to which he was not entitled; and BELL thereby deprived WWE of its intangible right to honest services from BELL and caused financial loss to WWE.

It was part of this scheme and artifice to defraud that the following occurred in the District of Connecticut and elsewhere:

When potential licensees approached or contacted BELL at WWE, rather than negotiate a licensing agreement "in house," BELL would advise SS of the contacts so that SS could arrange the licensing agreements and receive commissions on those agreements.

Similarly, BELL would advise SS that he was going to add SSAI to a pre-existing licensing agreement as the licensing agent so that SSAI would begin to receive commission payments from those agreements, even though BELL knew SSAI had no entitlement to such commissions.

BELL and SS agreed that the commissions paid by WWE to SSAI as a result of the above-described licensing agreements would be evenly split between SS and BELL. Similarly, on occasion, BELL arranged with SSAI to receive 50% of SSAI's commission on a particular licensing agreement notwithstanding that SSAI may not have procured or negotiated the licensing agreement. Thereafter, BELL completed internal documentation at WWE reflecting that SSAI should be paid a commission on a pre-existing licensing agreement notwithstanding that SSAI had no role in the procurement of the licensing agreement. Thereafter, BELL completed and provided to the accounting department at WWE documents which reflected that SSAI was to receive commissions under the licensing agreements.

As a result of the licensing agreements, WWE received royalties and sales reports on a periodic basis and thereafter sent to SSAI commission checks for commissions purportedly due thereon. At or

about the time SSAI received the commission checks from WWE, BELL created an "invoice" for services rendered by Bell Consulting, LLC and submitted the invoice to SSAI. The amount reflected in the invoice was for an amount equal to 50% of the commission paid by WWE to SSAI on the licensing agreements. SSAI then prepared a check payable to Bell Consulting, LLC representing the 50% kickback for commissions paid to SSAI on the licensing agreements.

It was further part of the scheme to defraud WWE that BELL and SSAI agreed to receive and did receive a kickback from a certain licensee who manufactured T-shirts (the "T Shirt licensee"). The T-Shirt licensee agreed to pay and did pay SSAI 2% of its sales of WWE apparel in exchange for favorable terms in its licensing agreement with WWE. BELL and SSAI split this 2% payment evenly.

On or about the dates set forth below, for the purpose of executing the scheme and artifice, the defendant knowingly caused to be mailed and reasonably could have foreseen the mailing of the items identified below:

| DATE | DESCRIPTION OF ITEM MAILED |
|---|---|
| March 3, 2000 | Check from WWE in the amount of $122,154.69 payable to SSAI representing payment of commissions due on one or more of the licensing agreements |
| May 15, 2000 | Check from WWE in the amount of $439,240.43 payable to SSAI representing payment of commissions due on one or more of the licensing agreements |
| June 9, 2000 | Check from WWE in the amount of $312,788.55 payable to SSAI representing payment of commissions due on one or more of the licensing agreements |
| July 17, 2000 | Check from WWE in the amount of $2,675.73 payable to SSAI representing payment of commissions due on one or more of the licensing agreements |
| October 24, 2000 | Check from WWE in the amount of $38,214.63 payable to SSAI representing payment of commissions due on one or more of the licensing agreements |

The defendant stipulates and agrees that the relevant guidelines loss is $1,946,634.

The written stipulation above is incorporated into the preceding plea agreement.  It is understood, however, that the defendant and the Government reserve their right to present additional relevant offense conduct to the attention of the Court in connection with sentencing.


_____
JAMES K. BELL
The Defendant

_____
CHRISTOPHER W. SCHMEISSER
Assistant U.S. Attorney


_____
JOHN WILLIAMS, ESQ.
Attorney for the Defendant

# RIDER CONCERNING RESTITUTION

The Court shall order that the defendant make restitution under 3 U.S.C. § §3663A. The order of restitution may include:

1.    If the offense resulted in damage to or loss or destruction of property of a victim of the offense, the order of restitution shall require the defendant to:

A. Return the property to the owner of the property or someone designated by the owner; or

B. If return of the property is impossible, impracticable, or inadequate, pay an amount equal to:

The greater of -

(I)    the value of the property on the date of the damage, loss, or destruction;  or

(II)    the value of the property on the date of sentencing, less the value as of the date the property is returned.

2. In any case, reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.

The order of restitution has the effect of a civil judgment against the defendant.  In addition to the court ordered restitution, the court may order that the conditions of its order of restitution be made  a condition of probation or supervised release.  Failure to make restitution as ordered may result in a revocation of probation, or a modification of the conditions of supervised release, or in the defendant being held in contempt under 18 U.S.C. § 3583(e). Failure to pay restitution may also result in the defendant's re-sentencing to any sentence which might originally have been imposed by the Court. See 18 U.S.C. §3614. The Court may also order that the defendant give notice to any victim(s) of his offense under 18 U.S.C. § 3555.

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA    :    CASE NO.
                            :      )
            V.              :
                            :    Violation: 18 U.S.C. §1341
                            :              [Mail Fraud]
JAMES K. BELL               :

INFORMATION

The United States Attorney charges:

COUNT I

Persons, Parties and Entities

1.  At all times relevant to this Information, World
Wrestling Entertainment, Inc. (formerly World Wrestling
Federation, Inc.), (hereinafter "WWE") was a Delaware Corporation
with its principal place of business in Stamford, Connecticut.
WWE, among other things, creates, produces and markets
entertainment for both live and television audiences featuring
professional wrestlers for whom WWE has developed a character
profile, a storyline, and a role in the WWE productions.

2.  During all times relevant hereto, JAMES K. BELL, the
defendant herein, was employed by WWE with responsibilities for,
among other things, overseeing the licensing of WWE intellectual
property.  It was part of his job description to identify
potential licensees, negotiate licensing agreements, and develop
new licensing strategies in order to benefit WWE.   BELL also
owned and operated Bell Consulting, LLC.

3. During all times relevant hereto, another individual, referred to herein as SS, was an acquaintance of BELL. BELL arranged for this individual, through SS's wholly owned entity, "SS and Associates, Inc." (SSAI), to become a licensing agent for WWE.

## Background

4. As a result of its creation and promotion of the professional wrestlers' characters, WWE owns as part of its intellectual property the use of the characters' likeness, name, storyline, and related features. WWE's intellectual property also includes its logo and related production titles.

5. It is part of the business of WWE to enter into licensing agreements with manufacturers who wish to create and sell products which utilize WWE's intellectual property. Such manufacturers include garment makers, toy makers, videogame manufacturers, and others. Generally, a licensing agreement permits the manufacturer to produce items for sale that include WWE intellectual property and in exchange require the payment of a fee or royalty to WWE by the manufacturer. The royalty is generally determined by a percentage of the total sales of the licensed items.

6. Licensing agreements entered into with WWE also required the manufacturer to keep track of and report sales of items utilizing WWE intellectual property on a periodic basis. It was

2

common practice during the relevant period for licensees to report sales and submit royalty payments simultaneously.

7.  After receiving royalty payments, WWE would determine whether and to what extent the professional wrestlers' characters were featured in the products manufactured so that a portion of the royalties received by WWE could be in turn passed on to the individual wrestler.

8.  During the time relevant hereto, JAMES K. BELL, the defendant herein, an employee of WWE, identified potential licensees, negotiated licensing agreements and developed new licensing strategies in order to benefit WWE.

9.  In approximately 1994, BELL arranged for SS, through his wholly owned entity SSAI to become a licensing agent for WWE.  As a licensing agent, it was among SS's responsibilities to identify potential licensing opportunities for WWE, negotiate new licensing agreements and otherwise promote WWE licensing for the benefit of WWE.  WWE retained authority for final approval of all licensing agreements.  This approval was usually sought from and given by BELL.

10.  As compensation for SS's efforts as a licensing agent, WWE agreed to pay SSAI a commission based upon a percentage of total revenue generated by each licensee procured by SSAI.

11.  Thereafter, when WWE received periodic sales reports and royalty payments from licensees, WWE first determined whether

3

the licensee was one that had been procured by SSAI, and, if it
was such a licensee, then the amount of commission due to SSAI
would be calculated and a check sent, usually by mail, to SSAI.

### The Scheme and Artifice to Defraud

12.   Beginning in or before January 1998, and continuing
through October 2000, in the District of Connecticut and
elsewhere, JAMES K. BELL, the defendant herein, and others known
and unknown to the United States Attorney, did devise a scheme
and artifice to defraud WWE, including depriving WWE of the
intangible right of honest services, and to obtain money and
property from WWE through materially false and fraudulent
pretenses and representations.   Specifically, BELL did arrange
for SSAI to receive commissions on certain WWE licensing
agreements to which SSAI was not entitled; BELL received
kickbacks from SSAI relating to these licensing agreements,
monies to which he was not entitled; and BELL thereby deprived
WWE of its intangible right to honest services from BELL and
caused financial loss to the WWE.

13.   It was part of this scheme and artifice to defraud that
the following occurred in the District of Connecticut and
elsewhere:

A.   When potential licensees approached or contacted
BELL at WWE, rather than negotiate a licensing agreement "in
house," BELL would advise SS of the contacts so that SS could

4

arrange the licensing agreements and receive commissions on those agreements.

B.  Similarly, BELL would advise SS that he was going to add SSAI to a pre-existing licensing agreement as the licensing agent so that SSAI would begin to receive commission payments from those agreements, even though BELL knew SSAI had no entitlement to such commissions.

C.  BELL and SS agreed that the commissions paid by WWE to SSAI as a result of the licensing agreements referenced in paragraphs 13A and 13B (the "licensing agreements"), would be evenly split between SS and BELL.

D.  Similarly, on occasion, BELL arranged with SSAI to receive 50% of SSAI's commission on a particular licensing agreement notwithstanding that SSAI may not have procured or negotiated the licensing agreement.

E.  Thereafter, BELL completed internal documentation at WWE reflecting that SSAI should be paid a commission on a pre-existing licensing agreement notwithstanding that SSAI had no role in the procurement of the licensing agreement.

F.  Thereafter, BELL completed and provided to the accounting department at WWE documents which reflected that SSAI was to receive commissions under the licensing agreements.

G.  As a result of the licensing agreements, WWE received royalties and sales reports on a periodic basis and

5

thereafter sent to SSAI commission checks for commissions
purportedly due thereon.

H.   At or about the time SSAI received the commission
checks from WWE, BELL created an "invoice" for services rendered
by Bell Consulting, LLC and submitted the invoice to SSAI.   The
amount reflected in the invoice was for an amount equal to 50% of
the commission paid by WWE to SSAI on the licensing agreements.

I.   SSAI then prepared a check payable to Bell
Consulting, LLC representing the 50% kickback for commissions
paid to SSAI on the licensing agreements.

J.   It was further part of the scheme to defraud WWE
that BELL and SSAI agreed to receive and did receive a kickback
from a certain licensee who manufactured T-shirts (the "T Shirt
licensee").   The T-Shirt licensee agreed to pay and did pay SSAI
2% of its sales of WWE apparel in exchange for favorable terms in
its licensing agreement with WWE.   BELL and SSAI split this 2%
payment evenly.

14.   On or about the dates set forth below, for the purpose
of executing the scheme and artifice, the defendant knowingly
caused to be mailed and reasonably could have foreseen the
mailing of the items identified below:

DATE                    DESCRIPTION OF ITEM MAILED

March 3, 2000           Check from WWE in the amount of $122,154.69
                        payable to SSAI representing payment of
                        commissions due on one or more of the
                        licensing agreements

6

May 15, 2000          Check from WWE in the amount of $439,240.43
                      payable to SSAI representing payment of
                      commissions due on one or more of the
                      licensing agreements

June 9, 2000          Check from WWE in the amount of $312,788.55
                      payable to SSAI representing payment of
                      commissions due on one or more of the
                      licensing agreements

July 17, 2000         Check from WWE in the amount of $2,675.73
                      payable to SSAI representing payment of
                      commissions due on one or more of the
                      licensing agreements

October 24, 2000      Check from WWE in the amount of $38,214.63
                      payable to SSAI representing payment of
                      commissions due on one or more of the
                      licensing agreements

All in violation of Title 18, United States Code, § 1341.


UNITED STATES OF AMERICA


JOHN H. DURHAM
DEPUTY UNITED STATES ATTORNEY


PETER S. JONGBLOED
SUPERVISORY ASSISTANT
UNITED STATES ATTORNEY


CHRISTOPHER W. SCHMEISSER
ASSISTANT UNITED STATES ATTORNEY


7