UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

GRAND JURY B-05-2

| | |
|---|---|
| UNITED STATES OF AMERICA : | Criminal No. |
| : | |
| v.                    : | |
| :                     | VIOLATIONS: |
| :                     | 18 U.S.C. § 371 [Conspiracy] |
| STANLEY SHENKER       : | 18 U.S.C. §§ 2314, 2 [Interstate Transportation |
| :                     | of Money Obtained By Fraud] |
| :                     | |

## INDICTMENT

The Grand Jury charges:

### COUNT ONE
(Conspiracy to Commit Interstate Transportation of Money
Obtained by Fraud and Wire Fraud)

#### The Defendant

1. At all times relevant to this Indictment, STANLEY SHENKER, the defendant

herein, was a resident of New Jersey and Connecticut.

2. SHENKER was the sole corporate officer of Stanley Shenker and Associates, Inc.

("SSAI"), a New York corporation with its principal place of business in Norwalk, Connecticut.

SHENKER used SSAI as the principal method of paying kickbacks, as discussed below.

#### The Victim Company

3. At all times relevant to this Indictment, World Wrestling Entertainment, Inc.

(formerly World Wrestling Federation Entertainment, Inc. and Titan Sports Inc.) (hereinafter

"WWE") was a Delaware corporation with its principal place of business in Stamford,

Connecticut. WWE was a media and entertainment company, which, among other things,

created entertainment featuring professional wrestlers for whom WWE had developed a storyline and a role in WWE productions.

## SHENKER's Coconspirator

4. During all times relevant hereto, James K. Bell, an insider at WWE and **SHENKER's** coconspirator, who is not a defendant herein, was a resident of Norwalk, Connecticut. WWE employed Bell as its Senior Vice President of Licensing and Merchandising with responsibilities for, among other things, procuring licensees for WWE. It was part of Bell's job description to identify potential toy, T-shirt, or videogame manufacturers that would use WWE characters and storylines in their products (hereinafter Licensees). As discussed more fully below, Bell was instrumental in hiring **SHENKER** at WWE. In or about March 1998, Bell formed Bell Consulting, LLC, and used it to receive kickback payments from **SHENKER**, such payments totaling approximately $1 million over the next several years and dwarfing Bell's annual salary. The payments were only a fraction of the commissions WWE ultimately paid **SHENKER**.

## WWE Hires SHENKER to Serve as Its Agent

5. **SHENKER** was a long time business associate of Bell. WWE originally hired **SHENKER** and SSAI in 1995 as a nonexclusive licensing agent on Bell's urging. Under the terms of a new 1997 contract between SSAI and WWE, SSAI became WWE's exclusive worldwide licensing agent, with the exception of Germany and the Philippines. **SHENKER**, as the designated "key person" at SSAI, was to find potential Licensees. The SSAI 1997 contract, signed by **SHENKER** as President of SSAI, stated that if SSAI engaged in any act of fraud, theft, deceit or unethical conduct, the WWE could terminate the agreement and SSAI would not be entitled to any further commissions under the agreement. The 1997 contract was extended in

- 2 -

1998 by letter agreement with the same terms, although **SHENKER** gave up being the licensing agent for Austria, Switzerland and other German-speaking European countries.

### WWE's Right to, and its Employees' Duty to Provide, Honest Services

6. At all times relevant to this Indictment, WWE had an intangible right to the honest services and ethical conduct of its employees.

7. As a condition of his employment, Bell signed a Conflict of Interest and Code of Conduct agreement where he agreed not to engage in any activities or have any financial interests that would appear to impair his independence or appear to conflict with his responsibilities to WWE. Bell was not authorized to accept fees or commissions from anyone other than WWE relating to WWE transactions without WWE approval. Bell's loyalty to his employer continued after he left WWE under the terms of his February 2000 severance agreement where WWE agreed to continue to compensate him through March 27, 2001, and he in turn agreed to provide reasonable assistance and cooperation to WWE in activities related to any pending or future lawsuit or claims involving WWE and to cooperate with WWE counsel to assist their efforts.

### Licensing of WWE Intellectual Property and Employment Contracts

8. It was part of WWE's business to license to toy, T-shirt, video and other manufacturers WWE characters and storylines in exchange for the payment of a royalty to WWE by the manufacturer Licensee. Representatives of WWE would identify potential licensing opportunities for WWE and negotiate new licensing agreements. WWE retained the authority for the final approval of all licensing agreements, and Bell had substantial say in the approval of such licensing agreements.

9. Under SSAI's 1997 contract with WWE, and as modified in the 1998 extension, WWE agreed to pay SSAI, as licensing agent, a commission based upon a percentage of total revenue generated by each Licensee procured by SSAI. Typically the commission was 11% of royalties received by WWE on licensing deals negotiated and procured specifically by SSAI with the commission paid for the duration of the licensing agreement or its renewal. Under the contract between SSAI and WWE, SSAI was, as a general matter, not entitled to receive royalties based on business separately generated by WWE or relating to a list of certain Licensees previously under contract with WWE, but did provide that SSAI could separately negotiate for a fee to be determined on a case-by-case basis as mutually agreed between SSAI and WWE.

10. Where SSAI was the designated agent on an account, WWE would determine the amount of commission due to SSAI and issue a commission check to SSAI.

### The Conspiracy and its Objects

11. From in or about January 1998 until in or about March 2003, in the District of Connecticut and elsewhere, **STANLEY SHENKER**, the defendant herein, knowingly and willfully conspired and agreed with James Bell to commit offenses against the United States, namely:

(a) to transport, transmit and transfer in interstate commerce, securities, goods and money valued at $5,000 or more, knowing the same to have been stolen, converted and taken by fraud, contrary to Title 18, United States Code, Section 2314; and

(b) to devise a scheme and artifice to defraud WWE of money, property and honest services and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, by transmission of wire communications in interstate and foreign

- 4 -

commerce for the purpose of executing that scheme and artifice, contrary to Title 18, United States Code, Sections 1343 and 1346.

**The Principal Goals of the Conspiracy**

12. The principal goals of the conspiracy were for **SHENKER** and Bell: (a) to enrich themselves by obtaining monies relating to WWE and its Licensees to which they were not entitled; (b) to affirmatively conceal their acts from WWE in order to continue to receive and retain monies to which they were not entitled; (c) to deprive WWE of honest services, by compromising employee loyalty and integrity through their secret arrangement to split between themselves royalty commissions paid to SSAI and other monies SSAI received from WWE Licensees; and (d) to provide false and misleading information to WWE during the course of civil litigation in an effort to obtain additional anticipated economic benefits and avoid disgorgement of their ill-gotten gains.

**The Manner and Means of the Conspiracy**

13. Among the means and methods employed by **SHENKER** and Bell to further and carry out the conspiracy and to effect its unlawful objects were those set forth below in ¶¶ 14-28:

14. **SHENKER** and Bell agreed that **SHENKER** would secretly kick back to Bell half of the monies and other benefits, including stock, that SSAI and **SHENKER** received from WWE and Licensees arising from certain WWE Licensee arrangements. As a result of the agreement: (a) Bell remained in his position of authority at WWE thereby ensuring that **SHENKER** received preferential treatment; (b) SSAI and **SHENKER** received licensing contracts to which SSAI did not independently procure the client and avoided the possibility of

- 5 -

reduced commission rates paid by WWE under those contracts; and (c) **SHENKER** interfered with, and corrupted, Bell's loyalty and contractual duties to WWE by making repeated payments to Bell to ensure that Bell would act in the best interests of **SHENKER** and not in the best interests of WWE.

15. **SHENKER** would typically submit to WWE terms of proposed licensing deals, that would be formalized at WWE into a "Licensing Contract Proposal," outlining the terms of the licensing arrangement. SSAI would be identified as the agent on the deal and thus entitled to commission payments, without noting that SSAI intended to kick back half of the commissions to Bell. Neither **SHENKER** nor Bell disclosed that on certain of these deals **SHENKER** had not originated the deal and thus was not contractually entitled to receive a full 11% of royalty payments. **SHENKER,** through SSAI, made secret payments to Bell of approximately half the commission payments SSAI received on such deals and concealed these payments from WWE.

16. **SHENKER** and Bell also extracted from at least one other WWE Licensee, a T-shirt manufacturer, a side deal to advance the interest of the Licensee, rather than WWE, on a WWE related transaction. **SHENKER** and Bell agreed to split and did split the fee from the side deal and concealed the split arrangement from WWE.

17. From in or about October 1998 until in or about March 2002, **SHENKER,** by way of the checks outlined below in ¶¶ 28a-28t, paid Bell approximately $1 million in secret payments relating to WWE Licensees, including payments made after Bell lost his employment at WWE in or about March 2000 and after WWE terminated **SHENKER's** agency contract with WWE in about June 2000.

- 6 -

## SHENKER's and Bell's Efforts to Further their Arrangement

18. **SHENKER** and Bell took steps to affirmatively perpetuate their secret kickback arrangement and the economic benefits flowing from it, including by concealing the kickback payments from WWE; attempting to disguise the source of the payments from **SHENKER's** accountant; creating invoices for the kickback payments (hereafter "the original invoices") that falsely suggested Bell Consulting had earned the kickback monies by providing, by way of example, independent consulting services to certain WWE Licensees; and then engaging in repeated acts of deception and fabrication of evidence during ensuing civil litigation with WWE.

## SHENKER Uses a Foreign Bank to Conceal the Secret Payments

19. In or about November and December 1998, **SHENKER** sought to conceal splitting commissions with Bell by using a foreign bank account. Rather than make the kickback payment to Bell directly, **SHENKER** issued a check from his SSAI checking account for $280,616 to Stanful Industrial Ltd., a foreign corporation in Hong Kong owned and controlled by **SHENKER**. The check was deposited in that corporation's bank account in Hong Kong, which was controlled by **SHENKER**. Shortly thereafter, in or about January 1999, **SHENKER** caused Stanful Industrial Ltd. to wire transfer $280,601 in foreign commerce to Bell Consulting, LLC, an entity owned and established by Bell.

20. **SHENKER** (a) hid from his accountant the fact that he owned any foreign company or had any foreign bank account; (b) misled his accountant about the purpose of the $280,616 check; (c) hid from the United States Internal Revenue Service the fact that he controlled any foreign bank account when he filed his federal income tax returns; and (d) was not truthful when giving sworn testimony in or about May 2002 during a civil deposition about having any

ownership interest in a foreign company.

### SHENKER and Bell Continue The Deception During the Civil Litigation

21.  After the WWE terminated SHENKER as a WWE agent, SHENKER sued WWE in the Superior Court for the State of Connecticut in October 2000 to recover certain additional commission payments although he was not entitled to these monies from WWE in light of the fraudulent, deceitful, and unethical conduct described above.

22.  By keeping the kickbacks secret, SHENKER could contend and did contend that WWE was contractually obligated to pay him commissions relating to approximately 92 Licensees and anticipated that the receipt of economic benefits from his secret arrangement with Bell would continue beyond March 2003 and possibly until the end of 2009 or thereafter, depending on licensing renewals. Bell, in turn, had as of the date of SHENKER's lawsuit yet to receive all the payments from SHENKER relating to their kickback arrangement and would face loss of the payments and disgorgement if their kickback arrangement was uncovered.

23.  Throughout the civil litigation, SHENKER made additional secret payments to Bell as part of their secret agreement to share profits from stock that SHENKER had received from a toy company Licensee relating to a WWE transaction.

24.  During the civil litigation in Connecticut, WWE sought to obtain information, also known as "discovery," from SHENKER and Bell. In particular, WWE requested that SHENKER and Bell provide discovery by producing documents and testifying under oath in civil depositions.

- 8 -

## SHENKER and Bell Create False New Invoices in the Litigation

25. **SHENKER** and Bell continued to mislead WWE and its Pennsylvania based attorneys during the civil litigation. Aware that the original invoices, though false, still reflected that SSAI paid Bell monies relating to current Licensees of the WWE, **SHENKER** and Bell agreed in or about 2002 to create and did create false new invoices (hereafter "false new invoices"). The false new invoices, designed to replace the original invoices, created the false impression that the payments received by Bell from SSAI related to developmental projects entirely separate from **SHENKER**'s and Bell's business dealings with WWE.

## SHENKER Testifies Falsely Under Oath

26. **SHENKER** took additional steps to defraud WWE:

(a) in or about May 2002, **SHENKER** falsely denied in a deposition that he paid Bell money related to WWE license agreements by falsely testifying under oath that it "never happened." In particular, **SHENKER** falsely testified that: (i) any payments made to Bell had been for developmental projects outside of the WWE; (ii) the payment SSAI received from a certain T-shirt manufacturer was not related to a WWE license arrangement; and (iii) he did not know whether he split commissions he had received from that manufacturer with Bell;

(b) in or about July 2002, **SHENKER** caused his civil counsel to send the false new invoices to WWE's counsel by Federal Express, a commercial interstate carrier; and

(c) in or about December 2002, **SHENKER** falsely testified under oath in a deposition about the payments he had received from a certain T-shirt manufacturer that had not been disclosed to WWE and the secret payments that he had made to Bell. In particular, **SHENKER** now falsely and repeatedly claimed not to remember why he had made repeated

- 9 -

payments to Bell from 1998 through 2002 other than some type of developmental work purportedly unrelated to WWE.

### Overt Acts in Furtherance of the Conspiracy

27.     In furtherance of the conspiracy and to accomplish its unlawful objects, in the District of Connecticut and elsewhere, **SHENKER** and his coconspirator Bell committed and caused to be committed the various overt acts of deception and concealment set forth in ¶¶ 25 and  26a-26c and those acts set forth below in ¶ 28.

28.     These overt acts include **SHENKER's** secret payments made out to Bell and Bell Consulting, LLC, drawn on SSAI's and **SHENKER's** bank account at Fleet Bank in New Jersey which were, in most instances, deposited by Bell into the Bell Consulting bank account he controlled at Hudson Bank (formally Lafayette American Bank) in Darien, Connecticut and which traveled in interstate commerce between Connecticut and New Jersey.

| Overt Act | Dates (on or about) | Check # | From | To | Amount |
|-----------|---------------------|---------|------|-----|--------|
| a | 10/8/98 | 1881 | SSAI (Shenker) | Bell Consulting LLC (Bell) | $20,000 |
| b | 1/11/99 | wire transfer | Stanfull Industrial LTD (Shenker) | Bell Consulting LLC | $280,601 |
| c | 2/15/99 | 2017 | SSAI (Shenker) | Bell Consulting LLC | $5,550 |
| d | 2/25/99 | 2034 | SSAI (Shenker) | Bell Consulting LLC | $62,682 |
| e | 4/31/99 | 2134 | SSAI (Shenker) | Bell Consulting LLC | $3,016 |
| f | 5/10/99 | 2148 | SSAI (Shenker) | Bell Consulting LLC | $30,505 |
| g | 5/11/99 | 2151 | SSAI (Shenker) | Bell Consulting LLC | $14,440 |

| Overt Act | Dates (on or about) | Check # | From | To | Amount |
|---|---|---|---|---|---|
| h | 6/1/99 | 2181 | SSAI (Shenker) | Bell Consulting LLC | $34,610 |
| i | 8/16/99 | 2277 | SSAI (Shenker) | Bell Consulting LLC | $3,566 |
| j | 9/16/99 | 2318 | SSAI (Shenker) | Bell Consulting LLC | $49,896 |
| k | 11/30/99 | 2448 | SSAI (Shenker) | Bell Consulting LLC | $28,305 |
| 1 | 2/22/00 | 2595 | SSAI (Shenker) | Bell Consulting LLC | $95,396 |
| m | 3/22/00 | 2661 | SSAI (Shenker) | Bell Consulting LLC | $2,666 |
| n | 5/15/00 | 2758 | SSAI (Shenker) | Bell Consulting LLC | $10,888 |
| o | 6/16/00 | 2832 | SSAI (Shenker) | J. Bell Consulting LLC | $124,454 |
| p | 9/10/00 | 3016 | SSAI (Shenker) | Bell Consulting LLC | $84,525 |
| q | 11/6/00 | 3145 | SSAI (Shenker) | Bell Consulting LLC | $581 |
| r | 9/14/01 | 1846 | Shenker | Jim Bell | $52,948 (proceeds of stock split) |
| s | 10/12/01 | 1869 | Shenker | Jim Bell | $26,994 (proceeds of stock split) |
| t | 12/11/01 | 1894 | Shenker | Jim Bell | $26,944 (proceeds of stock split |
| u | 3/28/02 | 1941 | Shenker | Jim Bell | $15,000 (advance of proceeds of stock split) |

All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO through FOUR

## (Interstate Transportation of Money Obtained by Fraud)

29. The allegations set forth in ¶¶ 1 through 10 and ¶¶ 12 through 28 of Count 1 of this Indictment are hereby realleged and incorporated as though set forth in full herein.

### The Fraud

30. From in or about January 1998 to in or about March 2003, in the District of Connecticut and elsewhere, **STANLEY SHENKER**, the defendant herein, did knowingly and willfully steal, convert, and take money from the WWE by fraud, which fraud was in substance as set forth in ¶¶ 12 through 28 of Count One of this Indictment.

### The Transportation of Checks and Money In Interstate Commerce

31. On or about the dates listed for each count below, in the District of Connecticut and elsewhere, **STANLEY SHENKER** did transport, transmit and transfer in interstate commerce, securities, goods and money valued at $5,000 and more, knowing the same to have been stolen, converted and taken by fraud, by providing kickback checks to Bell reflecting Bell's fraudulent split of certain WWE licensing fees, such checks being written by **SHENKER** on SSAI's New Jersey bank account, deposited by Bell at Bell's bank in Connecticut, and then transported from Connecticut in interstate commerce to New Jersey, with each check constituting a separate count of this Indictment as enumerated below:

| Count | Approximate date of Interstate Transportation | Check Number | Amount of Check |
|-------|-----------------------------------------------|--------------|-----------------|
| 2 | 2/22/00 | 2595 | $95,396 |

- 12 -

| Count | Approximate date of Interstate Transportation | Check Number | Amount of Check |
|-------|------------------------------------------------|--------------|-----------------|
| 3 | 6/16/00 | 2832 | $124,454 |
| 4 | 9/10/00 | 3016 | $84,525 |

All in violation of Title 18, United States Code, Sections 2314 and 2.

A TRUE BILL

_____

FOREPERSON

UNITED STATES OF AMERICA

_____
JOHN H. DURHAM
DEPUTY UNITED STATES ATTORNEY

_____
ANTHONY KAPLAN
SUPERVISORY ASSISTANT
UNITED STATES ATTORNEY

_____
RICHARD J. SCHECHTER
SENIOR LITIGATION COUNSEL

_____
CHRISTOPHER W. SCHMEISSER
ASSISTANT UNITED STATES ATTORNEY

- 13 -