

Not Reported in F.Supp. Page 1
Not Reported in F.Supp., 1992 WL 73473 (S.D.N.Y.), Fed. Sec. L. Rep. P 96,654
**(Cite as: Not Reported in F.Supp.)**

C
Briefs and Other Related Documents

United States District Court, S.D. New York.
ACADEMIC INDUSTRIES, INC. and Academic Deer Bridge Communications, Inc., Plaintiffs,
v.
UNTERMEYER MACE PARTNERS, LTD., Edwin Fancher, Frank L. Mace, Salle Podos Untermeyer, and Robert Young, Defendants.
**No. 90 Civ. 1052 (LBS).**

April 1, 1992.

Lieberman, Rudolph & Nowak, New York City, for plaintiffs; Henry Pitman, of counsel.
Turchin & Hoffman, P.C., New York City, for defendants Untermeyer Mace Partners, Ltd., Frank L. Mace, and Salle Podos Untermeyer; Morton J. Turchin, of counsel.
Lawrence M. Philips, New York City, for defendants Edwin Fancher and Robert Young.

OPINION
SAND, District Judge.
**\*1** This action arises out of defendants' allegedly fraudulent agreement to raise capital for plaintiff Academic Industries ("AI") by assisting it with a private placement. According to plaintiffs' amended complaint (the "Amended Complaint"):

[D]efendants perpetrated their fraud by inducing AI to enter into a contract with UMP [Untermeyer Mace Partners] under which UMP was to provide investment banking and legal services to AI in return for a substantial fee and stock in ADBC-a corporation to be formed by UMP pursuant to its contract with AI. Unknown to AI, defendants, in truth and in fact, never intended to perform the services specified and, indeed, were incapable of providing the services they represented they would and could perform.

Amended Complaint ¶ 8. The Amended Complaint charges the defendants with violations of the federal securities laws, violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, common law fraud, and breach of contract.

Defendants previously filed motions to dismiss the Amended Complaint, which this Court denied by memorandum endorsements dated May 25, 1992. Defendants have now filed a second set of motions, seeking various forms of relief including summary judgment, limitation of plaintiffs' damages, and amendment of the pre-trial order. Defendants UMP, Mace, and Untermeyer also seek leave to amend their answer and dismissal of the cross-claim asserted by defendants Fancher and Young. Plaintiffs have cross-moved for an "order *in limine* " precluding defendants from introducing certain "extrinsic evidence" aimed at establishing their *in pari delicto* defense, and for the addition of two witnesses to the pre-trial order.

This Court heard oral argument on the motions on March 16, 1992 and rendered oral rulings with respect to a number of the above issues. *See* Transcript Proceedings dated March 16, 1992 (hereinafter "Transcript"). This Opinion memorializes the results reached at oral argument, and resolves the remainder of the issues raised by the motions.

1. *Summary Judgment Dismissing the Amended Complaint*

Defendants first argue that summary judgment should be granted in their favor. Having reviewed the parties' submissions and heard oral argument, we are satisfied that there are material issues of fact requiring a trial. Defendants' motions for summary judgment dismissing the Amended Complaint are therefore denied.

2. *Limitation of Plaintiffs' Damages*

Defendants next seek "partial summary judgment" limiting any potential damages to plaintiffs' out-of-pocket expenditures, which in this case amount to approximately $56,000. Defendants' argue that plaintiffs' recovery should be limited in this manner for two reasons: first, because consequential damages are generally unavailable in fraud actions; and second, because even if consequential damages were available, plaintiffs' proof is too speculative to permit recovery.[FN1]

**\*2** In support of their first argument, defendants cite

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK    Document 165-2    Filed 07/07/2006    Page 2 of 6

Not Reported in F.Supp.  
Not Reported in F.Supp., 1992 WL 73473 (S.D.N.Y.), Fed. Sec. L. Rep. P 96,654  
**(Cite as: Not Reported in F.Supp.)**

Page 2

a number of cases stating that indemnification, and not profit, is the goal behind tort damages, and suggesting that a fraud plaintiff may therefore not recover for either anticipated profits or foregone business opportunities. *See, e.g., Alpert v. Shea Gould Climenko & Casey,* 559 N.Y.S.2d 312, 314 (1st Dep't 1990) (fraud damages are "limited to that which is necessary to restore a party to the position occupied before commission of the fraud"); *Skrine v. Staiman,* 292 N.Y.S.2d 275, 276 (2d Dep't 1968), *aff'd,* 246 N.E.2d 529 (N.Y.1969) ("In fraud actions, indemnification and not profit is the key to the damage award."). Defendants assert that these cases require that plaintiffs' damages be limited to their out-of-pocket disbursements.

Although we do not quarrel with the defendants' basic contention-that a plaintiff alleging fraud is not entitled to the traditional contractual measure of recovery or "benefit of the bargain" standard-it is clear that consequential damages may be awarded where necessary to compensate a plaintiff for costs incurred in reliance on a fraudulent misrepresentation. The Second Circuit has stated explicitly that "[d]amages for fraud include the costs incurred in preparing for, performing, or passing up other business opportunities," *Ostano Commerzanstalt v. Telewide Sys.,* 880 F.2d 642, 649 (2d Cir.1989), as long as the plaintiff can "establish the causal nexus with a good deal of certainty." *Zeller v. Bogue Elec. Mfg. Corp.,* 476 F.2d 795 (2d Cir.), *cert. denied,* 414 U.S. 908 (1973).

Applying these principles to the case at hand, we find that many of the consequential damages pleaded in the Amended Complaint are at least theoretically recoverable in the fraud-based actions. Plaintiffs allege, for example, that as a result of defendants' representation that AI would soon have the capital to produce colorized editions of its books, they refrained from renewing various licenses for their black and white editions and from accepting other offers to colorize the books. *See* Amended Complaint ¶ 39. To the extent that plaintiffs demonstrate that they declined to pursue these business opportunities in reliance on defendants' representations, and to the extent that they prove that nexus with sufficient certainty, any resulting damages will be recoverable. To be distinguished, however, are any profits plaintiffs would have earned had UMP carried through on its promises and enabled plaintiffs to produce the colorized versions. Recovery of those profits would grant plaintiffs a full "benefit of the bargain" recovery and would place plaintiffs in a better position than if the fraud had never occurred.

Defendants' second argument is that even if consequential damages are available, as we have determined they are, plaintiffs' proof is far too speculative to permit recovery. At oral argument, plaintiffs' counsel suggested that we refrain from gauging the sufficiency of plaintiffs' proof of damages and instead submit the damage issue to the jury on special interrogatories. *See* Transcript at 43. We find that proposal to be a sensible one and the Magistrate Judge who will, with the parties' consent, preside at the trial should proceed in this fashion.

3. *The Statute of Frauds Defense.*

**\*3** Defendants UMP, Untermeyer and Mace next seek leave to amend their answer to allege a Statute of Frauds defense as to the contract cause of action against UMP. Defendants argue that the contract alleged to have been breached was an oral one, and that plaintiffs are therefore barred from enforcing it under two separate provisions of the New York Statute of Frauds.[FN2]

*General Obligations Law § 5-710(10)*

Defendants first rely on General Obligations Law § 5-701(10), which declares void any oral agreement:

to pay compensation for services rendered in negotiating ... the purchase, sale [or] exchange ... of a business opportunity, business, its good will, inventory, fixtures or an interest therein, including a majority of the voting stock interest in a corporation and including the creating of a partnership interest.

N.Y.Gen.Oblig.Law § 8-319 (McKinney's 1989). Defendants characterize the alleged oral contract as "a brokers' agreement to sell a business opportunity" which falls within the statutory bar to enforcement. *See* Reply Memorandum of Law at 8.

In response to defendants' assertions, plaintiffs call attention to the fact that § 5-701(10) refers explicitly to negotiations for the transfer of "a majority of the voting stock interest in a corporation." In light of that explicit reference, they argue that the provision "by its terms is limited to agreements to sell a controlling block of voting shares," and that it does not apply here because the shares to be sold by defendants were concededly non-voting. *See* Transcript at 28.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 73473 (S.D.N.Y.), Fed. Sec. L. Rep. P 96,654
**(Cite as: Not Reported in F.Supp.)**

Page 3

A number of cases construing the scope of § 5-701(10) confirm that the transfer of the majority of the voting stock of a corporation falls within the statute as a type of "business" or "business opportunity." Those cases also make clear, however, that "the clarifying language incorporated in the statute is illustrative rather than restrictive," and that the transfer of a minority interest may still fall within the statute's purview as long as the stock at issue constitutes "a controlling interest" in the corporation. Clivner v. Ackerman, 274 N.Y.S.2d 112, 114 (1966), aff'd, 291 N.Y.S.2d 759 (1st Dep't 1968). The crucial inquiry is whether the proposed stock transfer "clothe[s] the purchaser with the right to dictate the business policies of the corporation," so that "it exceeds the realm of simple investment and becomes a transfer of a business or business opportunity." Clivner, 274 N.Y.S.2d at 114; see also Karlin v. Avis, 457 F.2d 57, 60 (2d Cir.), cert. denied, 409 U.S. 849 (1972); Hiller v. Franklin Mint, Inc., 485 F.2d 48, 50 (3d Cir.1973) (adopting *Clivner's* rationale).

In this case, defendants do not dispute that the shares they were allegedly to have sold were non-voting. The purchasers of those shares would have been mere investors, therefore, rather than active participants in the business of the corporation. As such, we conclude that § 5-701(10) does not provide a basis for asserting a Statute of Frauds defense to the breach of contract claim.

### UCC § 8-319

**\*4** Defendants also rely on U.C.C. § 8-319, a separate New York Statute of Frauds which provides that:

A contract for the sale of securities is not enforceable by way of action or defense unless

(a) there is some writing signed by the party against whom enforcement is sought ... sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price.

Plaintiffs respond that § 8-319 applies only to contracts for the sale of securities between principals, and that it does not bar contracts such as the one at issue which merely established the terms by UMP was to act as plaintiffs' "sales agent" or "broker." See Plaintiffs' Memorandum of Law at 48.

Plaintiffs are correct in asserting that a contract which merely defines the contours of an agency relationship does not fall within this section of the Statute of Frauds. As the Practice Commentary to § 8-319 explains:

As between a broker and his customer the applicability of this section will depend upon whether or not the broker acts as agent, or (as in some transactions on the over the counter markets) as principal, sells to or purchases from his customer.

....

Where the broker acts as agent the contract between broker and customer is not "for the sale of securities." It is a contract of employment....

Were it clear that the contract was limited to the terms by which UMP was to sell stock on plaintiffs' behalf, therefore, we would have no difficulty concluding that it was not subject to the requirements of § 8-319. Accord Hill v. Franklin Mint, Inc., 485 F.2d at 51 (construing § 8-319).

At oral argument, however, defendants suggested that even if the agreement as alleged by plaintiffs was primarily a contract of employment, it also contained a provision regarding the *actual* sale of securities *to defendants.* See Transcript at 4 ("The section does control because this is an oral contract to sell and buy securities. What I mean by that is the oral contract as claimed by [AI's President] was that UMP would buy two million shares of ADBC stock, and, therefore, it was in the contract terms and you can't prove it by oral contract."). Defendants argue that that "term" of the alleged oral contract brings the entire oral agreement within the purview of § 8-319.

Plaintiffs do not directly deny that the agreement to sell defendants two million shares of stock was a component of the oral contract, but instead emphasize that the shares were delivered to and paid for by defendants prior to this litigation. Because that aspect of the agreement was fully executed, they argue that the oral contract comes within § 8-319(b) of the statute, which creates an exception to the writing requirement in cases where "delivery of the security has been accepted or payment has been made."

Having considered the parties' arguments with respect to this issue, we find it impossible to decide at this juncture whether § 8-319 applies. Although it appears that the oral agreement as alleged by plaintiffs dealt primarily with UMP's obligation to

Case 7:04-cv-08223-KMK    Document 165-2    Filed 07/07/2006    Page 4 of 6

Not Reported in F.Supp. Page 4
Not Reported in F.Supp., 1992 WL 73473 (S.D.N.Y.), Fed. Sec. L. Rep. P 96,654
**(Cite as: Not Reported in F.Supp.)**

sell stock on their behalf, we are unsure of the relationship-if any-between those employment-related "terms" and the fully executed "term" regarding the sale of stock to defendants. If the latter term was an integral part of the contract as a whole, § 8-319 might prevent its enforcement.

**\*5** In short, the question of whether this contract was sufficiently "for the sale of securities" to trigger § 8-319 is too fact-intensive to resolve prior to trial. Defendants' motion to amend their answer to assert a Statute of Frauds defense based on § 8-319 is therefore granted, subject of course to their ability to prove its applicability at trial.

### 4. *The In Pari Delicto Defense and Plaintiffs' Motion in Limine.*

Defendants UMP, Untermeyer and Mace also seek leave to amend their answer to assert an *in pari delicto* defense based on David Oliphant's FN3 alleged violation of an Internal Revenue Service ("IRS") currency reporting requirement. Defendants claim that a person named Mario Sacco paid Oliphant $50,000 cash for the single subscription unit sold pursuant to the private placement, and that instead of reporting that transaction to the IRS, Oliphant converted the cash into a series of bank checks to evade the banking laws. Defendants apparently wish to introduce evidence of the transaction to "show the fact that Mr. Oliphant had a scheme here and to show his sophistication." *See* Transcript at 47.

Plaintiffs raise two issues with respect to the sale to Sacco. First, they oppose the motion to amend on the grounds that even if an IRS violation occurred, it is too remote from the alleged fraudulent scheme to constitute a proper *in pari delicto* defense. Conceding that the alleged violation would be proper grounds for impeaching Oliphant's character, however, plaintiffs have moved for an order *in limine* precluding defendants from proving it through extrinsic proof such as Sacco's deposition testimony.

At oral argument, following plaintiffs' counsel's representation that Oliphant would be a live witness at the trial, Transcript at 48, this Court determined that while the alleged violation did not provide the basis for a proper *in pari delicto* defense, it was available for the purpose of impeaching Oliphant's credibility. *Id.* at 51. We also held that the violation could not be proved by extrinsic evidence, unless Oliphant testified at trial "in a manner which would make that evidence otherwise pertinent and admissible." *Id.*

In accordance with those findings, defendants' motion to amend the answer to assert this defense is denied. Plaintiffs' motion *in limine* is granted on the representation that Oliphant will testify at trial and be subject to cross-examination with respect to the terms of the transaction with Sacco.

### 5. *Dismissal of Fancher's Cross-Claim.*

Defendants UMP, Mace and Untermeyer's (for the purposes of this section, the "Moving Defendants") motion papers also request dismissal of the "cross-claim" asserted by Fancher and Young. At oral argument, however, the Moving Defendants alerted us to the fact that the term "crossclaim" was something of a "misnomer." *See* Transcript at 12. The cross-claim asserts, and the Moving Defendants resist, both Fancher and Young's request for contribution and indemnification as well as Fancher's demand for repayment of his $15,000. *See* Transcript at 12. Each of these matters is taken up in turn.

### *Indemnification and Contribution.*

**\*6** Fancher and Young's Answer and Cross-Claim demands "full indemnification, including reasonable legal fees, or, in the alternative, contribution from Mace, Untermeyer and UMP for any liability assigned to either Fancher or Young arising out of any claims of plaintiff." The Moving Defendants seek a determination that indemnification is unavailable in the § 10(b) and common law fraud actions, and that both indemnification and contribution are unavailable in the RICO action. The Moving Defendants do not appear to challenge Fancher and Young's right to seek contribution in the § 10(b) or common law fraud actions. That right is available in the former type of action among "joint tortfeasors" and in the latter type of action among "joint, concurrent, successive, independent, alternative and intentional tortfeasors." *See Dep't of Economic Dev. v. Arthur Andersen & Co., 747 F.Supp. 922, 932 & 935 (S.D.N.Y.1990)* (hereinafter "*Arthur Andersen*").

The Moving Defendants are correct in stating that neither contribution nor indemnification is available in a RICO cause of action. *Arthur Andersen, 747 F.Supp. at 931, 932; Minpeco, S.A. v. Conticommodity Serv., Inc., 677 F.Supp. 151, 154*

Case 7:04-cv-08223-KMK    Document 165-2    Filed 07/07/2006    Page 5 of 6

Not Reported in F.Supp. Page 5
Not Reported in F.Supp., 1992 WL 73473 (S.D.N.Y.), Fed. Sec. L. Rep. P 96,654
**(Cite as: Not Reported in F.Supp.)**

(S.D.N.Y.1988). Moreover, because indemnity is unavailable to a party who has himself recklessly or intentionally contributed to a plaintiff's injury, *Arthur Andersen,* 747 F.Supp. at 931, and because both common law fraud and § 10(b) liability require a finding of intent or scienter, Fancher and Young are precluded from seeking indemnification in those actions as well. In the event that Fancher and Young are found liable to plaintiffs, therefore, their rights to seek indemnity and contribution from the other defendants should be limited in the above manner.

*Fancher's Cross-Claim for $15,000.*

Completely separate from the claims for contribution and indemnity is Fancher's demand for "$15,000 from Mace, Untermeyer and/or UMP." That cross-claim is based on Fancher's allegation that he was fraudulently induced to invest $50,000 in UMP by Mace and Untermeyer, and that contrary to their representations that the money would be held in escrow, Untermeyer "broke escrow" and used $15,000 of Fancher's money for her personal benefit. *See* Fancher and Young's Answer and Cross-Claim ¶¶ 41-42. The remaining $35,000 was returned to Fancher in October 1989.

The Moving Defendants urge us to dismiss Fancher's cross-claim for lack of jurisdiction, arguing that there is no diversity between the parties and the claim is not sufficiently intertwined with the main actions to confer ancillary jurisdiction. *See* Brief on Behalf of UMP, Untermeyer and Mace at 45. Without reaching the merits of that contention, we feel compelled to dismiss the cross-claim for a different reason: our inability to discern the legal theory under which it is asserted.

As mentioned above, the instant cross-claim is described in the Answer and Cross-Claim only as a "demand ... for $15,000 from Mace, Untermeyer and/or UMP to Fancher." In the pre-trial order, the parties pose the question to be tried with respect to this cross-claim as: "Is Fancher due $15,000 from defendants UMP, Untermeyer and/or Mace as a result of the facts and circumstances presented?" Pre-Trial Order dated March 22, 1991 at 73. Because we are unable to discern the legal theory under which the cross-claim is asserted, we are similarly unable to gauge its legal sufficiency. Fancher's cross-claim is therefore dismissed, without prejudice to repleading.

6. *Expansion of the Pre-Trial Order.*

**\*7** The parties have also filed a number of motions aimed at expanding the pre-trial order. Defendants UMP, Untermeyer and Mace seek permission to add certain exhibits, while plaintiffs seek permission to add two witnesses.

As set forth at oral argument, defendants' motion to add the exhibits is granted. *See* Transcript at 33. The addition of Charles Spanakos is granted on defendants' consent. *Id.* at 32. The addition of Joel Leifer is granted, and Leifer may testify as an expert assuming that he can qualify as an expert. Leifer must respond to defendants' interrogatories relating to his qualifications and positions as an expert, and defendants may thereafter take his deposition. *Id.* at 33-34.

7. *Referral to Magistrate Judge for Trial.*

As we noted previously, the parties have consented to proceed to trial before a Magistrate Judge subsequent to this Court's ruling on these motions. Having now disposed of the pending pre-trial motions, this action is referred to a Magistrate Judge for all further proceedings, including trial and entry of final judgment.

SO ORDERED.

> FN1. Defendants' first argument is addressed to the common law fraud, securities fraud, and RICO causes of action. Defendants concede that "benefit of the bargain" damages are available in a breach of contract action, *see* Brief on Behalf of Mace, Untermeyer and UMP at 40, but contend that plaintiffs' proof with respect to such damages is "too remote" to warrant recovery.

> FN2. While ordinarily we would consider whether plaintiffs would be prejudiced by the lateness of defendants' proposed amendment, plaintiffs made clear at oral argument that they opposed the amendment on the grounds of "futility" rather than timeliness. *See* Transcript at 3, 28.

> FN3. David Oliphant is the President of Academic Industries.

S.D.N.Y.,1992.
Academic Industries, Inc. v. Untermeyer Mace

Not Reported in F.Supp. Page 6
Not Reported in F.Supp., 1992 WL 73473 (S.D.N.Y.), Fed. Sec. L. Rep. P 96,654
**(Cite as: Not Reported in F.Supp.)**

Partners, Ltd.
Not Reported in F.Supp., 1992 WL 73473 (S.D.N.Y.), Fed. Sec. L. Rep. P 96,654

Briefs and Other Related Documents (Back to top)

• 1:90cv01052 (Docket) (Feb. 16, 1990)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.