Westlaw.

Slip Copy, 2006 WL 522462 (S.D.N.Y.), RICO Bus.Disp.Guide 11,042
(Cite as: Slip Copy)

C
Briefs and Other Related Documents

United States District Court,S.D. New York.
CITY OF NEW YORK, Plaintiff,
v.
Deborah POLLOCK, Marla Lopez, Eric Gladstein,
New Start Management Corporation (f/k/a Palazzolo
Management Corporation), New Start Management II
Corporation (f/k/a Palazzolo Management II
Corporation), Quest Property Management IV
Corporation, Quest Property Management V
Corporation, Quest Property VI Corporation, Quest
Property VII Corporation, John Does 1-20,
Defendants.
Eric GLADSTEIN, Cross-Claimant,
v.
Deborah POLLOCK, Marla Lopez, New Start
Management Corporation (f/k/a Palazzolo
Management Corporation), New Start Management II
Corporation (f/k/a Palazzolo Management II
Corporation), Quest Property Management IV
Corporation, Quest Property Management V, Quest
Property Management VI, Quest Property
Management VII Corporation, John Does 1-20,
Cross-Defendants.
Deborah POLLOCK, New Start Management
Corporation (f/k/a Palazzolo Management
Corporation), New Start Management II Corporation
(f/k/a Palazzolo Management II Corporation), Cross-
Claimants,
v.
Marla LOPEZ, Eric Gladstein, Quest Property
Management IV, Corporation Quest Property
Management V Corporation, Quest Property
Management VI Corporation, Quest Property
Management VII Corporation, John Does 1-20,
Cross-Defendants.
No. 03 Civ. 0253(PAC).

March 3, 2006.

*ORDER AND ORDER*
CROTTY, J.

CONTENTS.
FACTS.
The Parties.                                                                                                    4
*Jiggetts* Relief.                                                                                             5

*1 Plaintiff City of New York ("City" or "Plaintiff")
moves for summary judgment on three claims in its
Amended Complaint against Defendant Deborah
Pollock ("Pollock"), Defendant New Start
Management Corporation (f/k/a Palazzolo
Management Corporation), Defendant New Start
Management II Corporation (f/k/a Palazzolo
Management II Corporation),[FN1] Defendant Eric
Gladstein ("Gladstein"), Defendant Quest Property
Management VI Corporation, and Defendant Quest
Property Management VII Corporation.[FN2] [FN3] The
City contends that the Defendants' pleas of guilty in
related state criminal proceedings collaterally estop
them from denying substantive and conspiracy
violations of the Racketeer Influenced and Corrupt
Organizations Act ("RICO"), 18 U.S.C. § § 1961-68,
and, as well, a claim of common law fraud. Pollock
Defendants and the Gladstein Defendants cross-move
for summary judgment on the theory that their
agreed-upon payments of "restitution" in the related
criminal proceedings collaterally estop the City from
seeking damages in this civil RICO action. For the
reasons set forth below, the Court grants the City's
motion and denies the Defendants' motions. For ease
of reference, the Court provides the following table
of contents.

FN1. Defendant Pollock and affiliated
corporate Defendants New Start
Management Corporation and New Start
Management II Corporation are referred to
collectively as the "Pollock Defendants."

FN2. Defendant Gladstein and affiliated
corporate Defendants Quest Property
Management VI Corporation and Quest
Property Management VII Corporations are
referred to collectively as the "Gladstein
Defendants." All of the Defendants are
referred to collectively as "the Defendants."

FN3. The City does not seek summary
judgment against remaining Defendant
Marla Lopez ("Lopez").

Slip Copy                                                                                                    Page 2
Slip Copy, 2006 WL 522462 (S.D.N.Y.), RICO Bus.Disp.Guide 11,042
(Cite as: Slip Copy)

CLA, Related Activities, and State Criminal                                     7
Proceedings.
   -Pollock Guilty Plea and Allocution.                                        7
   -Gladstein Guilty Plea and Allocution.                                      10
Use of U.S. Mail and Wires.                                                          11
Kickbacks / Bribery.                                                                 11
Total Payments.                                                                      12


DISCUSSION.
I.   Standard of Review.                                                      12
II.  RICO Claims.
   A.   Statutory Provisions.                                         13
   B.   Application.                                                  14
      1.   Civil Rico Liability Against Pollock.            15
         -Persons.                                              15
         -Commission of Two or More Acts of            15
Racketeering Activity.
         -Pattern.                                               19
         -Participation.                                       21
         -Enterprise.                                           21
         -Affecting Interstate Commerce.                 23
         -Injury to Business or Property.                  23
      2.   Civil RICO Liability Against Gladstein.         24
   C.   Collateral Estoppel.                                          25
      1.   Overview of Collateral Estoppel               26
Doctrine.
      2.   Application of Collateral Estoppel             28
Doctrine to Pollock and Gladstein.
      3.   No Collateral Estoppel Effect on the City.      30
   D.   Damages.                                                      35
      1.   Set-Off After Trebling.                          35
      2.   Joint and Several Liability.                     36
III.  Common-Law Fraud Claim.                                                  37
IV. Pollock's Request to File an Answer to the                                      37
Amended Complaint.
CONCLUSION.                                                                           37

FACTS [FN4]


FN4. The facts outlined here are taken in main part from the City's submission pursuant to Local Civil Rule 56.1 of the Southern District of New York entitled "Statements of Material Facts on Motion for Summary Judgment." Defendants contend that numerous genuine issues of material fact exist. In such instances, the Court notes Defendants' purported disputed facts. Many of the Pollock and Gladstein Defendants' "facts" contradict their plea allocutions.

*2 The Parties. Plaintiff is the City of New York ("City" or "Plaintiff") and the New York City Human Resources Administration ("HRA") is an administrative agency of the City. Defendants include individuals and affiliated corporate entities. Pollock founded and directed Community Law Advocates ("CLA"), a not-for-profit corporation, in 1998.[FN5] Defendant Marla Lopez ("Lopez") was an employee of CLA. Defendant Gladstein was, at all relevant times, president of four corporations, in which he held an ownership interest. These corporations included Defendants Quest Property Management IV, V, VI, and VII Corporations. Quest Property Management VI and VII Corporations have appeared in the action. During the relevant period, Pollock owned 50% of Defendant New Start Management Corporation (f/k/a Palazzolo Management Corporation)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                           Page 3
Slip Copy, 2006 WL 522462 (S.D.N.Y.), RICO Bus.Disp.Guide 11,042
**(Cite as: Slip Copy)**

and 50% of Defendant New Start Management II Corporation (f/k/a Palazzolo Management II Corporation).

> FN5. Pollock maintains that she was not the sole founder of CLA (Pollock Defs.' Local Rule 56.1 Statement ¶ 2). Pollock, however, points to no facts that anyone else took a leadership role at CLA such as she had (Kliegerman Decl., Ex. B, Pollock Dep. 13:4-18, July 21, 2004). Rather than facts, Pollock appears to raise quibbles at the periphery of essential facts.

*Jiggetts* Relief. *Jiggetts* relief takes its name from the named plaintiff in a lawsuit brought by the Legal Aid Society of New York ("LAS"), *Jiggetts v. Grinker,* 75 N.Y.2d 411, 554 N.Y.S.2d 92, 553 N.E.2d 570 (1990). The *Jiggetts* plaintiffs are public assistance recipients seeking to ensure that the "shelter allowance" provided as part of "family assistance" is adequate to pay rents in New York City. The New York State Court of Appeals ruled in *Jiggetts* that the shelter allowance was inadequate to avoid homelessness and directed the New York State Office of Temporary Disability Assistance ("OTDA") to augment the shelter allowance provided to families. *Jiggetts v. Grinker,* 75 N.Y.2d at 421, 554 N.Y.S.2d 92, 553 N.E.2d 570. Rather than increase the "shelter allowance" for all "family assistance" recipients, however, OTDA developed a procedure whereby individuals on public assistance and "at risk" of homelessness could apply to OTDA to obtain an increased shelter allowance: "at risk" meant the tenants had to demonstrate that they were in danger of being evicted through Housing Court related documents (such as, for example, a Housing Court petition for non-payment, judgment, order or stipulation).[FN6] When an application was based on a Housing Court petition, the individual filing the petition on behalf of the public assistance recipient had to certify that "the client has no affirmative defenses that would result in the reduction of rent or the abatement of some of the arrears." Under the procedure, applicants for *Jiggetts* relief could not seek such assistance directly from OTDA; instead, OTDA required that applications be filed either by LAS or by a community-based organization approved by OTDA and trained by LAS.

> FN6. Pollock disputes this fact and maintains that a "three-day notice," prior to commencing a Housing Court non-payment proceeding, sufficed and that not all recipients of *Jiggetts* relief were in imminent danger of homelessness as some resided in shelters or lived with others

(Pollock Defs.' Local Rule 56.1 Statement ¶¶ 16-17). None of these purported fact are relevant or material: none of the 69 false *Jiggetts* applications (upon which the state criminal proceeding was based) involved a "three-day notice" or an applicant who resided in a shelter or lived with others. Pollock's contention is also belied by the *Jiggetts* applications themselves, which contain a check-off for "Court Papers," and ask whether "Housing Court judgment, order, or stipulation is attached" (Rubin Decl. Ex. R, A10). If such Housing Court documentation is not attached, the form instructs the person completing the application to submit a "copy of the Housing Court petition." *Id.* In any event, Pollock failed to present any evidence-documentary or otherwise-to refute the City's contention other than her bare allegation.

Once OTDA approved an application for *Jiggetts* relief, HRA would make the augmented shelter allowance payments. Such payments, on behalf of tenants on public assistance, would be made and sent directly to landlords.[FN7] From 1998 to 2000, a special procedure was in place involving emergency payments on behalf of applicants facing immediate eviction but whose applications for *Jiggetts* relief were pending with OTDA. HRA processed these "*Jiggetts* pre-approvals" directly and issued payments for rent arrears.

> FN7. Pollock disputes that HRA made *Jiggetts* payments directly to landlords and contends that HRA made some *Jiggetts* payments to social services providers (Pollock Defs.' Local Rule 56.1 Statement ¶ 14). This is not relevant, material, or dispositive since Pollock was charged with and pled to charges in connection with the filing of false *Jiggetts* applications (which contained fake Housing Court petitions or petitions that had never been served on tenants) for which she secured payments to which neither she nor the landlords were entitled.

**\*3** CLA, Related Activities, and the State Criminal Proceedings. During the relevant period, OTDA approved CLA to file *Jiggetts* applications on behalf of eligible tenants facing eviction. CLA was a New York corporation, which Pollock controlled and directed.[FN8] OTDA discovered that some of the *Jiggetts* applications filed by CLA on behalf of different applicants in the Bronx contained Housing Court petitions with an identical index number and uncovered sixty-nine instances of false *Jiggetts* applications filed by CLA to OTDA. In March, 2001, a grand jury indicted Defendants

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 4
Slip Copy, 2006 WL 522462 (S.D.N.Y.), RICO Bus.Disp.Guide 11,042
**(Cite as: Slip Copy)**

on various counts related to the filing of false *Jiggetts* applications.

> FN8. Pollock disputes this fact and contends that, for a segment of the relevant period, she did not direct CLA and did not maintain day-to-day involvement with the organization (Pollock Defs.' Local Rule 56.1 Statement ¶¶ 2, 27; Pollock Aff. ¶ 11 (attached as an unnumbered exhibit to the Kliegerman Declaration)). She admits, however, that CLA had no more than two employees at any time and that CLA employed Lopez during the entire relevant time. Typically, Pollock does not suggest who was in charge. Apparently, her idea of creating a fact is to deny the factual allegation, without any suggestion as to what the facts may be.

- Pollock Guilty Plea and Plea Allocution

In March, 2002, the Pollock Defendants and Lopez commenced trial, but the Pollock Defendants withdrew their not guilty pleas and entered guilty pleas on seven felony counts in the indictment.[FN9]

> FN9. On March 19, 2002, Lopez also withdrew a plea of not guilty and pled guilty to a felony charge of offering a false instrument in the first degree (Rubin Decl., Ex. J, at 832).

• Count One charged Pollock with conspiracy in the fourth degree in violation of New York Penal Law § 105.10 in that Pollock entered into a conspiracy to commit grand larceny by agreeing to submit false applications for *Jiggetts* relief to OTDA and HRA and used CLA as a means of stealing money from OTDA and HRA.
• Count Two charged Pollock with larceny in the second degree in that Pollock individually and as the head of CLA stole property exceeding $50,000 from HRA in the form of *Jiggetts* payments.
• Count Three charged Pollock, Palazzolo Management Corporation and Palazzolo Management II Corporation with the crime of defrauding the government in that Pollock, on behalf of the corporations, "engaged in a scheme to defraud the State by filing false or fraudulent statements that [Pollock] knew would get the government to issue a *Jiggetts* check and that the property [she] got out of this exceeded one thousand dollars."
• Additional counts charged that Pollock, acting together with Defendants Lopez, CLA, and Palazzolo Management Corporation, committed the crime of grand larceny in the third degree (Counts Six and Eight) and of offering a false

instrument in the first degree (Counts Seven and Nine).

In all, Pollock pled guilty to one count each of conspiracy in the fourth degree, of grand larceny in the second degree, and of defrauding the government and two counts each of grand larceny in the third degree and of offering a false instrument for filing in the first degree.[FN10]

> FN10. Pollock also pled guilty under a separate indictment to filing a false New York State personal income tax return and related crimes (Rubin Decl. Ex. K, at 1).

Among other admissions, during her plea allocution, Pollock admitted to filing 69 false *Jiggetts* applications (of which at least nine were for tenants in buildings which Pollock partly owned). Pollock admitted telling three or four landlords that CLA would enable them to obtain *Jiggetts* relief payments without filing petitions in Housing Court and to receiving 10% in kickbacks from landlords in exchange for rent payments obtained through such applications. Pollock admitted that CLA filed false *Jiggetts* applications to obtain *Jiggetts* payments for defendants Palazzolo Management Corporations I and II; that she illegally obtained over $50,000 from HRA for herself and for CLA through the submission of false *Jiggetts* applications; and, further, that she illegally obtained funds for two tenants named Lucy Rodriguez and Wanda Rodriguez. Pollock further admitted that she filed false applications for emergency "preapprovals" from HRA.

**\*4** At sentencing, the state court gave Pollock a three-year conditional discharge, noting her "long and distinctive career before she threw it all away to be part of this conspiracy" (Rubin Decl., Ex. G, at 777), and did not impose either a prison term or probation. *Id. at 756, 554 N.Y.S.2d 92, 553 N.E.2d 570.* Also, as part of her sentence, Pollock agreed to conduct one thousand hours of community service and to pay $100,000 in restitution, *id.,* which she did. Of this sum, the state and federal shares constitute $25,000 and $50,000 respectively and the City will retain only $25,000.

When the City filed its own civil RICO action in 2003, Pollock sought to withdraw her guilty plea because she claimed that counsel failed to advise her of the civil collateral consequence of the guilty plea. The state trial court, however, in a detailed decision discussed below denied Pollock's motion. [FN11] That court never suggested that the $100,000 restitution payment should be in satisfaction of all civil exposure.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN11. The Amended Complaint contained additional background information on Pollock and Lopez. Prior to 1998, Pollock worked in Bronx Housing Court for the LAS as a Senior Advocacy Coordinator helping tenants obtain *Jiggetts* relief. Am. Compl. ¶ 24. Lopez worked at LAS as a paralegal. *Id.* ¶ 25, 554 N.Y.S.2d 92, 553 N.E.2d 570. In 1998, Pollock founded CLA as a non-profit organization. *Id.* ¶ 27, 554 N.Y.S.2d 92, 553 N.E.2d 570. Pollock served as Executive Director and Lopez as vice president and assistant director. *Id.* During the time Pollock operated CLA, Pollock became a landlord and obtained 50% ownership of Defendant New Start Management Corporation and also of Defendant New Start II Management Corporation. *Id.* ¶ 29, 554 N.Y.S.2d 92, 553 N.E.2d 570. Each corporation owned a single residential building in which apartments were rented to many families already receiving *Jiggetts* relief. *Id.* In the spring of 1999, while continuing to serve as director of CLA and owning residential buildings in the Bronx, Pollock also became a paid consultant to HRA. *Id.* ¶ 30, 554 N.Y.S.2d 92, 553 N.E.2d 570. Her responsibilities included oversight of the Rental Assistance Unit, which was responsible for granting *Jiggetts* emergency pre-approvals. *Id.* In February, 2000, Pollock was designated to serve as HRA's Executive Deputy Commissioner in charge of the Office of New Initiatives. *Id.*

- Gladstein Guilty Plea and Plea Allocution

On January 25, 2002, Defendant Gladstein pled guilty to a count of grand larceny. Quest Management IV, V, and VII Corporations pled guilty to grand larceny in the third degree and Quest Management VI Corporation pled guilty to attempted grand larceny in the third degree. As part of the plea agreement, Gladstein was convicted of petit larceny, a misdemeanor, instead of a felony. During his plea allocution, Gladstein admitted to filing false *Jiggetts* applications and to entering into an agreement with Pollock, CLA, and Lopez to do so. Gladstein further admitted to collecting $40,581 in *Jiggetts* payments through the scheme. The plea was conditioned on Gladstein making a $40,581 restitution payment. Gladstein made the $40,851 payment, which will be distributed in accordance with the respective city, state, and federal shares (*i.e.,* 25-25-50) and the City will receive approximately $10,212 of these monies.

Use of U.S. Mail and Wires. CLA sent all or nearly all of the fraudulent *Jiggetts* applications to OTDA through the U.S. mail.[FN12] CLA sent some of the fraudulent requests for emergency "pre-approvals" to HRA by telecopier.[FN13]

FN12. Lopez Aff. ¶ 10, Mar. 16, 2005.

FN13. Both Gladstein and Pollock attempt to raise issues related to the use of mail and wires in connection with applications to OTDA for *Jiggetts* relief and to HRA for emergency "pre-approvals." *See, e.g.,* Pollock Defs.' Local Rule 56.1 Statement ¶ 30; Gladstein Defs.' Local Rule 56.1 Statement in Response to Pl.'s Local Rule 56.1 Statement ¶ 77). But other than suggesting that the Court carefully scrutinize Lopez's affidavit, neither Gladstein nor Pollock suggest how the fraudulent applications were delivered, if not by mail.

Kickbacks / Bribery. By agreement between CLA and the Palazzolo landlords, the Palazzolo landlords paid to CLA ten percent of all moneys they received from the fraudulent *Jiggetts* applications filed by CLA.

Pollock informed Gladstein of CLA's ten percent fee;[FN14] Gladstein paid Pollock ten percent of all moneys he and Quest IV, V, VI, and VII received as *Jiggetts* relief in connection with applications CLA filed. During her plea allocution, Pollock admitted that the ten percent kickbacks comprised part of the scheme and that in instances involving such fees CLA "expedited" those applications. Pollock stated during her allocution that Lopez was aware why these landlords received "special treatment." Further, Pollock admitted to receiving approximately $17,000 in such payments from landlords.

FN14. Pollock now contends that CLA did not impose on landlords a 10% fee on *Jiggetts* payments obtained on their behalf; instead, Pollock maintains that the 10% payments were voluntary and constituted donations (Pollock Defs.' Local Rule 56.1 Statement ¶ ¶ 79-83). Aside from being preposterous, Pollock's contention is irrelevant to her role and that of CLA in filing 69 false *Jiggetts* applications. Whether Pollock charged landlords, or was the object of their charitable largess, is ultimately not dispositive of the issue of liability and raises no genuine issue of fact.

**\*5** Total Payments.[FN15] As a result of the sixty-nine fraudulent *Jiggetts* applications, HRA issued payments to landlords totaling $334,141.77. HRA was reimbursed for these payments at a rate of fifty percent with federal funds and twenty-five percent with state funds; the City paid the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                    Page 6
Slip Copy, 2006 WL 522462 (S.D.N.Y.), RICO Bus.Disp.Guide 11,042
**(Cite as: Slip Copy)**

remaining twenty-five percent or $83,535.44.

> FN15. The evidence in this summary judgment motion focuses exclusively on the *Jiggetts* fraudulent applications, which CLA submitted to OTDA. HRA made additional payments in connection with applications by CLA for emergency "pre-approvals." The City contends that the New York State Office of Welfare Inspector General reported that $612,000 was obtained by Pollock in emergency pre-approvals in which Pollock made misrepresentations to HRA's Rental Assistance Unit (Pl.'s Br. 8). Plaintiffs assert that HRA approved almost 300 requests from CLA for *Jiggetts* pre-approvals and that Pollock herself collected fifteen awards for her tenants at a cost of $27,714. *Id.* The City further contends that Pollock represented that OTDA's approval of *Jiggetts* applications was forthcoming but in many instances these applications had not been filed with OTDA or had been rejected. *Id.* Plaintiff does not seek to recover damages in connection with these payments (February 24, 2006 Oral Argument), and they are abandoned.

DISCUSSION

I. STANDARD OF REVIEW

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P. 56(c).* Summary judgment should only be granted if "the nonmoving party 'has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof'." *Berger v. United States,* 87 F.3d 60, 65 (2d Cir.1996) (citation omitted).

The Court "resolve[s] all ambiguities, and credit[s] all rational factual inferences, in favor of the [nonmoving party]." *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 122 (2d Cir.2004) (citation omitted). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 37 (2d Cir.1994). The Court should, thus, grant summary judgment only "[w]hen no rational jury could find in

favor of the nonmoving party because the evidence to support its case is so slight." *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994) (citation omitted).

II. RICO Claims

A. Statutory Provisions

The RICO statute makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). RICO's conspiracy provision makes it "unlawful for any person to conspire to violate" any of its substantive provisions. § 1962(d). "To establish a RICO claim, a plaintiff must show: '(1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962'." *De Falco v. Bernas,* 244 F.3d 286, 305 (2d Cir.2001) (citation omitted). "[T]o establish a violation of 18 U.S.C. § 1962(c) [which the City seeks to do here], a plaintiff must establish that a defendant, through the commission of two or more acts constituting a pattern of racketeering activity, directly or indirectly participated in an enterprise, the activities of which affected interstate or foreign commerce." *Id. at 306* (citations omitted).

**\*6** "RICO defines 'racketeering activity' to include a host of criminal offenses, which are in turn defined by federal and state law." *Cofacredit, S.A. v. Windsor Plumbing Supply Co. Inc.,* 187 F.3d 229, 242 (2d Cir.1999) (citing 18 U.S.C. § 1961(1)). Here, the City charges Defendants with racketeering activity involving mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343. The statute further defines "pattern of racketeering activity" as "requir[ing] at least two acts of racketeering activity" occurring within a ten-year period. 18 U.S.C. § 1961(5). "To establish a pattern, a plaintiff must also make a showing that the predicate acts of racketeering activity by a defendant are 'related, and that they amount to or pose a threat of continued criminal activity'." *Cofacredit,* 187 F.3d at 242 (citation omitted). The RICO statute defines "enterprise" to "include[ ] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

B. Application

The Court examines whether the City makes a showing, based on undisputed facts, of each of the elements in the RICO claims for which the City seeks summary judgment.[FN16]

> FN16. At Oral Argument, counsel for both sets of defendants conceded that the admissions in the plea allocutions satisfy all of the elements necessary for civil RICO liability. Counsel for the Gladstein Defendants added a *caveat:* the sole evidence before the Court regarding the use of the mails was an affidavit from Defendant Lopez and that, given the threat of liability, Lopez's statements are self-interested and should not be credited by the Court. The Court declines to so rule and notes that neither Gladstein nor Pollock offered any facts to controvert Lopez's testimony.

1. Civil RICO Liability Against Pollock

To state a claim for damages under RICO, a plaintiff must demonstrate that the defendant has violated the substantive RICO statute, 18 U.S.C. § 1962, and that the plaintiff was "injured in his business or property by reason of a violation of § 1962." § 1964(c). Such a showing entitles the plaintiff to treble damages plus costs, including attorney's fees. *Id.* To demonstrate the first prong, *i.e.,* criminal RICO, the plaintiff must demonstrate "seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan Stanley, Inc.,* 719 F.2d 5, 17 (2d Cir.1983).

Persons. All of the Defendants, being either individuals or corporations who held or could hold ownership interests in property, fall under the statute's definition of person. 18 U.S.C. § 1961(3) (defining "person" to "include [ ] any individual or entity capable of holding a legal or beneficial interest in property").

Commission of Two or More Acts of Racketeering Activity. Civil liability requires a showing of "at least two acts of racketeering activity" occurring within a ten-year period. 18 U.S.C. § 1961(5). Such "predicate acts" involve violations of other specified federal statutes or state laws, § 1961(1), which include mail fraud, § 1341, and wire fraud. § 1343. The essential elements of mail and wire fraud violations include: "(1) use of the mails [or

wires] to further (2) a scheme to defraud with (3) money or property as the object of the scheme." *Porcelli v. United States,* 404 F.3d 157, 162 (2d Cir.2005) (dealing with mail fraud); *United States v. Zagari,* 111 F.3d 307, 327 (2d Cir.1997) (same as to mail and wire fraud).

**\*7** "To prove a scheme to defraud, the government must prove three elements: (1) the existence of the scheme, (2) fraudulent intent (including some contemplated actual harm or injury), and (3) materiality." *United States v. Thomas,* 377 F.3d 232, 242 (2d Cir.2004) (citations omitted). Defendants admitted to engaging in a scheme to defraud the City in the form of *Jiggetts* payments. During Pollock's plea allocution, she admitted as such:

THE COURT: Was anyone else besides you in charge of running CLA?

DEFENDANT POLLOCK: Running CLA? Marla had the title of assistant director.

THE COURT: Who was the boss at CLA, who owns CLA?

DEFENDANT POLLOCK: I guess I was.

THE COURT: How many people did you have working for you?

DEFENDANT POLLOCK: No more than two at a time.

THE COURT: And the people who worked for you, they didn't ask for petitions and notice of petitions and proof of service, none of them were checking to make sure that there was a properly commenced proceeding because you didn't want that. That's they way you were running the business without following the rules as OTDA set them, is that right?

DEFENDANT POLLOCK: It was a carelessly run business.

THE COURT: And Marla and the other people, they weren't asking for these notices either because you knew that as did everybody else that OTDA wouldn't issue a check without the proper paperwork as defined in the Housing Court for filing a Housing Court action, is that true?

DEFENDANT POLLOCK: That's true.

THE COURT: You made it perfectly clear to everybody else in the business that you didn't want them to hold up filing *Jiggetts* applications to make landlords go serve tenants and wait for the answer and wait for a Judge to review the papers and get the defenses.

The way the business ran is that this was a short cut around the Housing Court?

DEFENDANT POLLOCK: Yes.

THE COURT: And everybody else working, everybody processing the applications for your business processed them according to this short cut?

DEFENDANT POLLOCK: Processed the 69 according to the short cut.

(Rubin Decl., Ex. G at 762-64, June 7, 2005.) This

excerpt, among many other admissions in the allocution, shows-undeniably and unquestionably-that Pollock admitted to the existence of a scheme; that Defendants acted with fraudulent intent; and that the *Jiggetts* applications contained material misrepresentations. *See also* id. at 763, 554 N.Y.S.2d 92, 553 N.E.2d 570 (Pollock admitting that she "knew ... that OTDA wouldn't issue a check without the proper paperwork"); id. at 771, 554 N.Y.S.2d 92, 553 N.E.2d 570 (Pollack "knew" that filing of fraudulent *Jiggetts* applications would enable her to obtain *Jiggetts* payments).

Pollock also admitted that money was the object of the scheme in that she and others received *Jiggetts* payments and ten-percent payments from landlords as well. In addition to the admission regarding the false *Jiggetts* applications excerpted above, Pollock also allocuted to payments she received as a landlord:

**\*8** THE COURT: And you yourself as a landlord, for some of these buildings you owned via Palazzolo Management Corp. and by Palazzolo Management Corp. II, you got *Jiggetts* payments for your tenants without having to go to Housing Court to try to evict them, is that true?

DEFENDANT POLLOCK: For some.

THE COURT: For some?

DEFENDANT POLLOCK: Yes.

*Id.* at 764, 554 N.Y.S.2d 92, 553 N.E.2d 570.

With regard to the kickbacks, Pollock allocuted as follows:

THE COURT: Ms. Pollock, were you getting a percentage, ten percent from some of the landlords in exchange for information processing the *Jiggetts* application[s] without them having to go to Court for some of the landlords?

DEFENDANT POLLOCK: For some, yes.

THE COURT: And, did at least some of the landlords who were those paying you this ten percent, did you insure that their applications at [CLA] get expedited?

DEFENDANT POLLOCK: Yes.

*Id.* at 769, 554 N.Y.S.2d 92, 553 N.E.2d 570.

Finally, CLA's customary practice was to mail the *Jiggetts* applications to OTDA and to fax emergency "pre-approval" applications to HRA. In her affidavit, Lopez stated as follows: "I personally completed and submitted hundreds of [*Jiggetts*] requests to the State as well as a smaller number of requests to HRA for emergency relief" (Lopez Aff. ¶ 9); "[b]oth [*Jiggetts*] Applications and requests for emergency relief were also sometimes prepared by Deborah Pollack or others at CLA, *id.*; "[o]f the [*Jiggetts*] Applications I filed with the

State while I was at CLA, I mailed all or nearly all of them using the U.S. mail, id. ¶ 10, 554 N.Y.S.2d 92, 553 N.E.2d 570; "[o]f the requests for emergency relief I submitted to HRA while I was at CLA, some were submitted to HRA by facsimile and some were submitted by hand." *Id.* ¶ 11, 554 N.Y.S.2d 92, 553 N.E.2d 570. Pollock lends further support to the Court's conclusion that the *Jiggetts* applications were more likely than not mailed in stating "[t]hat CLA filed a multitude of *Jiggetts* applications on behalf of eligible tenants" (Pollock Defs.' Local Statement 56.1 Statement ¶ 101).

The Gladstein Defendants suggest careful scrutiny of Lopez's affidavit because she is interested. But in the absence of any suggestion by the Gladstein or Pollock Defendants of how the *Jiggetts* applications were delivered, no basis exists to challenge Lopez and the Court is unwilling to speculate that there may have been some other, mysterious delivery system.

In sum, the admissions contained in Pollock's allocutions, along with Lopez's affidavit, make a sufficient showing of mail fraud to satisfy the "two acts" of "racketeering activity" elements of the civil RICO claim.

Pattern. The RICO statute requires a showing of a "pattern of racketeering activity," which requires at least two acts of racketeering activity within a ten year period. 18 U.S.C. § 1961(5). "[T]o prove a pattern of racketeering activity a plaintiff ... must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Relatedness exists where the pattern " 'embraces criminal acts that have the same or similar purposes, results, participants, victims or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events'." *Id.* at 240 (citing 18 U.S.C. § 3575(e)). Here, relatedness is established by the similarity in methods, purposes, participants, results, and victims: CLA employed similar, if not identical, methods in submitting multiple, fraudulent applications to HRA and OTDA to obtain *Jiggetts* payments and "pre-approval" grants.

**\*9** In addition to relatedness, "a plaintiff ... must prove ... continuity of racketeering activity, or its threat, *simpliciter.*" *Id.* at 241. " 'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* (citation omitted). Closed-ended pattern of racketeering activity involves past criminal conduct "extend[ed] over a substantial period of time;" open-

ended pattern of racketeering activity entails "past criminal conduct coupled with a threat of future criminal conduct." *GICC Capital Corp. v. Technology Fin. Gp., Inc., 67 F.3d 463, 466 (2d Cir.1995)* (quotation marks omitted).

With regard to open-ended continuity, "where the enterprise primarily conducts a legitimate business, there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc., 187 F.3d at 243.* Pollock's plea allocution indicated that submitting fraudulent *Jiggetts* applications was a regular way of operating CLA:

THE COURT: And the people who worked for you, they didn't ask for petitions and notices of petitions and proof of service, none of them were checking to make sure that there was a properly commenced proceeding because you didn't want that. That's the way you were running the business without following the rules as TODA set them, is that right?
DEFENDANT POLLOCK: It was a carelessly run business.
....
THE COURT: The way the business ran is that this was a short cut around the Housing Court?
DEFENDANT POLLOCK: Yes.

(Rubin Decl. Ex. G, at 762-63.)

Setting aside the purported number of requests for fraudulent HRA "pre-approvals," the sheer number of the *Jiggetts* applications-69 fully documented applications, *id.* Ex. T-also shows that the submission of false applications was not sporadic or isolated, that this practice was CLA's regular way of operating,[FN17] and provides additional support of open-ended continuity. Moreover, the conspiracy here did not involve "an 'inherently terminable' scheme." *Cofacredit, 187 F.3d at 244.* Had it not been for HRA's discovery of the scheme, CLA could have continued its racketeering activity. *De Falco v. Bernas, 244 F.3d at 324* (concluding that the evidence indicated that defendants would have continued extorting plaintiffs into the future). [FN18]

FN17. Pollock's assertion that she publicly touted CLA's approach and practice of obtaining 10% fees from landlords as an innovation lends further support to the conclusion that open-ended continuity existed (Kliegerman Decl., Ex. B, Pollock Dep. 64:19-24, July 21, 2004).

FN18. Whether CLA engaged in closed-ended continuity is a fact-intensive inquiry, *H. J., Inc. 492 U.S. at 242,* which poses a closer question. The Second Circuit "has never found a closed-ended pattern where the predicate acts spanned fewer than two years." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 181 (2d Cir.2004)* (citation omitted). "Although continuity is 'primarily a temporal concept, other factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists'." *Id.* (citations omitted). Here, plaintiffs make a showing of a scheme involving a significant number of fraudulent acts, *i.e.,* 69 false *Jiggetts* applications, which were submitted to OTDA from May 13, 1998 to December 13, 2000-over a nineteen-month period. In *dicta,* the Second Circuit has noted that "[p]eriods of 19 or 20 months ... have been held sufficient to support a finding of continuity." *Metromedia Co., v. Fugazy, 983 F.2d 350, 369 (2d Cir.1992)* (citing cases in other circuits). Given the volume of predicate acts, the City has met its burden with regard to closed-ended continuity as well.

Participation. Pollock unquestionably participated and in fact directed the activities of CLA. In her allocution, Pollock admitted to being the "boss" of CLA (Rubin Decl., Ex. G, at 762; *see also* Lopez Aff. ¶ (Pollock supervised Lopez)). As CLA's boss, she "conducted" and "participated" in the conduct of CLA within the meaning of the RICO statute. *Reves v. Ernst & Young, 507 U.S. 170, 185, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993)* (holding that " 'to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs,' *§ 1962(c),* one must participate in the operation or management of the enterprise itself").

**\*10** Enterprise. CLA meets the statutory definition of an enterprise under the RICO statute as it was incorporated. *18 U.S.C. § 1961(4)* (" 'enterprise' includes any ... corporation"); *see also* Kliegerman Decl., Ex. B, at 15 (September 7, 2005) (July 21, 2004 Pollock Deposition in which Pollock testified that CLA was incorporated). In addition, Pollock admitted that an enterprise existed and that she participated in that enterprise:
THE COURT: When did you first become involved in the conspiracy?
DEFENDANT POLLOCK: Sometime in '98.
THE COURT: What did you do, yourself, to help make this scheme possible; what did you do?
DEFENDANT POLLOCK: It was my job to submit the

preapprovals.
....
THE COURT: Who else was helping you with this conspiracy, named in the indictment?
....
DEFENDANT POLLOCK: Several of the landlords that were named in the indictment. Mr. Gladstein, Mr. Coletti.
THE COURT: And-
DEFENDANT POLLOCK: Palazzolo Management I and II.

(Rubin Decl., Ex. G, at 759-60.)THE COURT: You made it perfectly clear to everybody else in the business that you didn't want them to hold up filing *Jiggetts* applications to make landlords go serve tenants and wait for the answer and wait for a Judge to review the papers and get the defenses.
The way the business ran is that this was a short cut around the Housing Court?
DEFENDANT POLLOCK: Yes.

*Id.* at 763. "The Supreme Court has explained that a RICO enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct,' the existence of which is proven 'by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit'." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.,* 385 F.3d 159, 173 (2d Cir.2004) (citing *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). Pollock allocuted to just such an entity.

Affecting Interstate Commerce. "The law in [the Second] Circuit does not require RICO plaintiffs to show more than a minimal effect on interstate commerce." *De Falco v. Bernas,* 244 F.3d at 309 (citation omitted). Receipt by the enterprise of federal funds satisfies the showing of interstate commerce impact. *Godlewska v. Human Dev't Assoc., Inc.,* No. 03 Civ. 3985, 2005 U.S. Dist. LEXIS 36998, at *30 (July 18, 2005) ("The Medicare/Medicaid connection [and defendant enterprise's receipt of federal funds] unquestionably would have bolstered plaintiffs' claim that [the defendant enterprise] is engaged in interstate commerce."). In her plea allocution, Pollock admitted to receiving *Jiggetts* payments as a landlord as part of the scheme (Rubin Decl. Ex. G, at 764) and Pollock does not contest that "the *Jiggetts* payments were funded 50% by the Federal government, 25% by the State, and 25% by the City" (Pollock Defs.' Local Rule 56.1 Statement ¶ ¶ 13, 15, 85-87).

*11 Injury to Business or Property. Defendants do not dispute the City's charge and documentary evidence that CLA's submission of fraudulent applications caused HRA

to disburse a total of $334,141.77 in *Jiggetts* payments (Pollock Defs.' Local Rule 56.1 Statement ¶ 84; Gladstein Defs.' Local Rule 56.1 Statement in Response to Plaintiff's Statement ¶ ¶ 85-87), of which 25% or $83,535.44 (after reimbursement of 50% from federal funds and 25% from state funds) constituted the City's loss. Further, Pollock pled to stealing property from HRA (Rubin Decl. Ex. H, at 770 (admitting to stealing in excess of $50,000 from HRA), 771-72 (admitting to stealing in excess of $3,000 from HRA), 773-74 (same, different act)). The theft of government funds constitutes injury to business or property under RICO. *Porcelli v. United States,* 303 F.3d 452, 456-57 (2d Cir.2002) (affirming denial of habeas petition in RICO and mail fraud conviction based on under-reporting of sales taxes); *City of New York v. Cyco.net, Inc.,* 383 F.Supp.2d 526, 555 (S.D.N.Y.2005) (city tax losses "property" for purposes of RICO). Thus, the City has made a showing of this element as well.
* * * * *

The aforegoing analysis demonstrates, as Defense counsel conceded during Oral Argument, that the City has before the Court evidence sufficient to satisfy every element for civil RICO liability under 18 U.S.C. § 1962(c) against Pollock.

2. Civil RICO Liability Against Gladstein

The City moves for summary judgment against Gladstein on its RICO conspiracy claim. This provision makes it "unlawful for any person to conspire to violate any of the [substantive] provisions" of § 1962. 18 U.S.C. § 1962(d). Unlike other federal conspiracy provisions, "[t]here is no requirement of some overt act or specific act" for a finding of RICO conspiracy. *Salinas v. United States,* 522 U.S. 52, 63, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997). Nor, does the statute require that the plaintiff show that "each conspirator agreed that he would be the one to commit two predicate acts." *Id.* at 64. In fact, in analyzing the requirements for proving a RICO conspiracy, the Supreme Court stated that:
A conspirator must intend to further an endeavor which, if completed would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor. He may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion. One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense. It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil ... and so

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

punishable in itself.

*Id.* at 65 (citation omitted).

Thus, "[t]o establish the existence of a RICO conspiracy, a plaintiff must prove the existence of an agreement to violate RICO's substantive provisions," and "that if the agreed-upon predicate acts had been carried out, they would have constituted a pattern of racketeering activity." *Cofacredit,* 187 F.3d at 244-45. Gladstein in his plea allocution admits as follows "I agreed with Debra Pollack and CLA and Marla to submit false housing petitions" (Rubin Decl. Ex. H, at 4). The discussion regarding Pollock's liability, *supra,* demonstrated that the City has put forth evidence of a pattern of racketeering activity. Gladstein further admitted to benefitting from the scheme by obtaining $40,851 in *Jiggetts* payments through these false petitions. *Id.* at 5, 554 N.Y.S.2d 92, 553 N.E.2d 570; *see also id.* (further admitting to making 10% kickbacks to CLA on all of the fraudulently obtained *Jiggetts* payments). Thus, Gladstein's admissions during his plea allocution make the requisite showing for a RICO conspiracy violation.

### C. Collateral Estoppel

*12 The City contends that the evidence before the Court on its summary judgment motion demonstrates undisputed facts that prove all of the elements necessary for civil RICO liability (Pl.'s Mem. 10) and that such evidence is "[b]ased almost entirely on facts that Pollock and Gladstein are collaterally estopped from challenging." *Id.* By contrast, the Pollock and the Gladstein defendants maintain that the City is collaterally estopped from seeking damages because the payments Pollock and Gladstein made as part of their plea agreements constitute "full restitution" (Pollock Defs.' Mem 5; Gladstein Defs.' Mem. 2-4). The Court concludes that Pollock and Gladstein are collaterally estopped from denying any facts to which they allocuted as part of their plea in the state criminal proceedings and that the City is not collaterally estopped from seeking civil RICO damages over and above the restitution already paid.

### 1. Overview of Collateral Estoppel Doctrine

"[A] federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984); *see also Parsons Steel, Inc. v. First Alabama Bank,* 474 U.S. 518, 523, 106 S.Ct. 768, 88 L.Ed.2d 877 (1986) (same).

Thus, "[u]nder 28 U.S.C. § 1738, a federal court generally is required to consider first the law of the State in which the judgment was rendered to determine its preclusive effect." *Marrese v. American Acad. of Orthopaedic Surgeons,* 470 U.S. 373, 375, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985).

The New York Court of Appeals has described the claim preclusion as follows:
The doctrine of collateral estoppel precludes a party from relitigating an issue which has previously been decided against him in a proceeding in which he had a fair opportunity to fully litigate the point. It is a doctrine intended to reduce litigation and conserve the resources of the court and litigants and is based upon the general notion that it is not fair to permit a party to relitigate an issue that has already been decided against it. There are now but two requirements which must be satisfied before the doctrine is invoked. First, the identical issue necessarily must have been decided in the prior action and be decisive of the present action, and second, the party to be precluded from relitigating the issue must had a full and fair opportunity to contest the prior determination.

*Kaufman v. Eli Lilly & Co.,* 65 N.Y.2d 449, 455, 492 N.Y.S.2d 584, 482 N.E.2d 63 (1985) (citations and quotation marks omitted). "Collateral estoppel attaches only if it is clear that these 'strict requirements' have been satisfied, lest a party be 'precluded from obtaining at least one full hearing on his or her claim'." *Wight v. Bankamerica Corp.,* 219 F.3d 79, 88 (2d Cir.2000) (citing *Gramatan Home Investors, Corp. v. Lopez,* 46 N.Y.2d 481, 414 N.Y.S.2d 308, 386 N.E.2d 1328 (1979)).

With regard to the preclusive effect of criminal convictions generally, the New York Court of Appeals has noted that:
*13 In limited circumstances, a particular issue expressly or necessarily decided in a criminal proceeding may be given preclusive effect in a subsequent affected civil action. Parties may avail themselves of collateral estoppel if the issue is identical in both actions, necessarily decided in the prior criminal action and decisive in the civil action, provided, however, that the party ousted from a day in court by application of collateral estoppel had a full and fair opportunity in the prior action to litigate the now-foreclosed issue.

*Allstate Insur. Co. v. Zuk,* 78 N.Y.2d 41, 45, 571 N.Y.S.2d 429, 574 N.E.2d 1035 (1991) (citation omitted); *see also D'Arata v. New York Cent. Mut. Fire Ins. Co.,* 76 N.Y.2d 659, 664, 563 N.Y.S.2d 24, 564 N.E.2d 634 (1990) ("[T]his Court has recognized that, in appropriate situations, an issue decided in a criminal proceeding may be given preclusive effect in a subsequent civil action.").

As to the preclusive effect of guilty pleas, the New York Court of Appeals has suggested that such an effect may be proper where "a guilty plea [is] made in a formal court proceeding following a thorough allocution establishing that the defendant understands the rights he is waiving and that he has admitted each of the essential elements of the crime charged." *Halyalkar v. Board of Regents,* 72 N.Y.2d 261, 269, 532 N.Y.S.2d 85, 527 N.E.2d 1222 (1988). New York courts have given preclusive effect to guilty pleas in such circumstances. *See, e.g., Searles v. Dalton,* 299 A.D.2d 788, 789, 751 N.Y.S.2d 84 (3d Dep't 2002) (stating that "an issue decided in a criminal proceeding may be given preclusive effect in a subsequent civil action and such preclusive effect is possible regardless of whether the underlying criminal proceeding was resolved by a jury trial or a guilty plea," however abstaining from doing so in that instance due to a "sparse record," which lacked details regarding the plea and the defendant's allocution (citations omitted)); *see also Kuriansky v. Professional Care, Inc.,* 158 A.D.2d 897, 900, 551 N.Y.S.2d 695 (3d Dep't 1990) (collateral estoppel can apply to guilty plea); *Abrahao v. Perrault,* 147 A.D.2d 824, 824, 537 N.Y.S.2d 913 (3d Dep't 1989) (same); *Carmel v. Lunney,* 119 A.D.2d 50, 53, 505 N.Y.S.2d 735 (3d Dep't 1986) (same); *Merchants Mut. Ins. Co. v. Arzillo,* 98 A.D.2d 495, 504, 472 N.Y.S.2d 97 (2d Cir.1984) (same). Although the Second Circuit has noted that it appears that New York courts do not uniformly grant guilty pleas preclusive effect, *see Wight v. Bankamerica Corp.,* 219 F.3d at 88, it has interpreted and given such preclusive effect to a state court guilty plea. *Jones v. County of Albany,* No. 96-7626, 1997 U.S.App. LEXIS 11760, at ----2-3 (2d Cir. May 19, 1997).[FN19]

FN19. *Jones v. County of Albany,* a Second Circuit case, provides some helpful guidance. No. 96-7626, 1997 U.S.App. LEXIS 11760 (2d Cir. May 19, 1997). Here the Circuit Court noted as follows:

Issues actually litigated in state court have the same preclusive effect in a § 1983 action as they would in the courts of the state where the previous judgment was rendered. [Plaintiff] was convicted upon a guilty plea [and] failed to appeal the conviction ..... Under New York law, a party is collaterally estopped from relitigating an issue in a second proceeding if the identical issue was necessarily decided in the prior proceeding, and if the litigant precluded had a full and fair opportunity to litigate the issue in the prior proceeding. Jones is thus collaterally estopped from contesting the issues necessarily

decided by his conviction and cannot contest the truth of the facts leading to his termination. *Id.* at ----2-3.

2. Application of Collateral Estoppel Doctrine to Pollock and Gladstein

The Pollock and Gladstein Defendants vehemently dispute the City's position that they are collaterally estopped from challenging the facts underlying their guilty pleas.[FN20] Application of the New York test to this case, however, shows that both prongs of collateral estoppel are satisfied. The analysis of RICO liability for both the Pollock Defendants and the Gladstein Defendants, *see supra* Pt. II.B.1 & II.B.2, show "identity of issue": plea allocution admissions correspond to and satisfy each and every element of a substantive RICO violation for the Pollock Defendants and of RICO conspiracy for the Gladstein Defendants.

FN20. In fact, the Pollock and Gladstein Defendants argue that the City itself is collaterally estopped from seeking additional recovery beyond the restitution paid as part of their state plea agreements. The Court addresses this argument *infra.*

*14 In addition, Pollock and Gladstein had a "full and fair opportunity to contest the prior determination." *Kaufman,* 65 N.Y.2d at 455, 492 N.Y.S.2d 584, 482 N.E.2d 63. While it is best to be cautious in asserting that in New York guilty pleas are given automatic preclusive effect, New York authority clearly establishes that where there have been detailed allocutions during formal court proceedings, defendants will be collaterally estopped from denying specific facts to which they allocuted and pled. Pollock's and Gladstein's plea allocutions each occurred during formal court proceedings (Rubin Decl. Exs. G, H). In each instance, the state trial court judges asked detailed questions regarding the facts underlying the counts in the indictment to which Pollock and Gladstein pled guilty. *Id.*

Moreover, in Pollock's instance, Pollock moved to withdraw her guilty plea after the City started their civil RICO action, on the theory (in part) that Pollock was unaware of the civil collateral consequences of her guilty plea. Justice Richter, who presided at trial, took Pollock's guilty plea, and sentenced her, refused to vacate Pollock's guilty plea. Justice Richter held that Pollock's guilty plea was knowing and voluntary, and outlined both the comprehensiveness and specificity of the plea allocution (Rubin Decl. Ex. K). In particular, Justice Richter noted that the plea colloquy between Pollock and the Court was

"lengthy, detailed and extensive." *Id.* at 2, 492 N.Y.S.2d 584, 482 N.E.2d 63. Justice Richter further stressed that "[t]he plea proceeding, which totals 37 pages of the trial transcript," showed that Pollock "made a complete legal and factual allocution to the crimes" to which Pollock pled guilty. *Id.* Based on a careful review of the plea allocution transcript, this Court agrees with Justice Richter's assessments and conclusions regarding Pollock's plea allocution. Tellingly, on Pollock's argument that her $100,000 restitution payment ought to be given preclusive effect, Justice Richter's detailed opinion is silent as to this issue. Had Justice Richter thought for a moment that Pollock's restitution of $100,000 meant she had no civil collateral exposure, she would plainly have said so. Her silence on this aspect speaks volumes.

Thus, the Court concludes that the City has satisfied both prongs of the New York test for collateral estoppel: "identity of issue" and "full and fair litigation."

### 3. No Collateral Estoppel Effect On the City

The City, moreover, is not collaterally estopped from seeking to vindicate rights to which it is entitled under RICO. Defendants point to no *facts* to show that, as part of the plea agreements entered into with the State, the City agreed in any way affirmatively to waive its rights (Pollock Defs.' Local Rule 56.1 Statement ¶ ¶ 94-100; Gladstein Aff. 8-11). The City was not a party to any of the plea agreements at issue; no term of the plea agreement addressed, let alone prohibited collateral civil consequences; moreover, the City was not even present during the admittedly "extensive and ongoing negotiations conducted with attorneys from the office of the Attorney General of the State of New York" (Pollock Aff. ¶ 16). Any asserted oral representations made by the state prosecutor that the payments would constitute "full restitution," (Pollock Aff. ¶ ¶ 16-18; Gladstein Aff. at 9-10,) could not-standing alone-bind the City, an entirely separate party, neither present nor represented during the negotiations or the plea.

**\*15** The Pollock and Gladstein Defendants argue that the City is in privity with the State and thus collaterally estopped from seeking additional damages beyond the restitution already jointly paid. The Court rejects this argument. Without question, the City was not a party to the state criminal proceeding. *Juan C. v. Cortines,* 89 N.Y.2d 659, 666, 657 N.Y.S.2d 581, 679 N.E.2d 1061 (1997) (in privity analysis, examining participation in prior action). "Since the source of authority of two government entities is not dispositive of whether they are in privity for collateral estoppel purposes, both the circumstances of the actual relationship between the two

agencies as demonstrated by the record and their statutory relationship are relevant." *Id.* (citations and internal quotation marks omitted). The Restatement Second of Judgments notes that:

In some circumstances, a prior determination that is binding on one agency and its officials may not be binding on another agency and its officials.... If the second action involves an agency or official whose functions and responsibilities are so distinct from those of the agency or official in the first action that applying preclusion would interfere with the proper allocation of authority between them, the earlier judgment should not be given preclusive effect in the second action.

Restatement (Second) of Judgments § 36, cmt. f.

In order for privity to control, "[t]he party estopped by the representation of a party to the action must have been so closely related to the interest of the party to be fairly considered to have had his day in court" and "[t]here must be a 'substantial identity' of the parties such that the party to the actual was the virtual representative of the party estopped." *United States v. Romero,* 836 F.2d 39, 43 (1st Cir.1987). "Whether a party is virtually representative of a non-party is a question of fact determined on a case-by-case basis." *Id.* Here, although the City had an interest in the outcome of the state criminal proceedings, it without question exercised "no measure of control whatsoever over the criminal proceedings." *Davis v. Eide,* 439 F.2d 1077, 1078 (9th Cir.1971) (conducting privity analysis). In addition, the City and the State are sufficiently distinct entities with regard to function and responsibilities that it cannot be said that they had "substantial identity" such that the State was the virtual representative of the City (*e.g.,* for one, distinct state and local roles and obligations in the administration of the *Jiggetts* payments is apparent in this case).

With regard to Pollock-who paid $100,000 in restitution related to fraudulent acts that caused $334,141.77 in governmental funds to be issued [FN21]-the Court "see[s] no reason why the principles of fairness, justice, and judicial economy embodied in the doctrine of collateral estoppel require that this doctrine be expanded to bind [the City,] a party ... remote from the action decided." *United States v. Romero,* 836 F.2d at 44. This conclusion is further buttressed by the April 24, 2003 Decision and Order of New York State Supreme Court Justice Richter, which denied Pollock's request to vacate her guilty plea and which was sought to avoid the civil collateral consequences of the instant action. In that decision, Justice Richter emphasized that:

FN21. The $334,141.77 constitutes damages for

which sufficient evidence existed to prove liability. The New York States Office of Welfare Inspector General reported that an additional $612,000 was obtained by Pollock in emergency pre-approvals for which sufficient evidence could not be collected to prove liability. *See supra* note 15.

**\*16** • "Pollock ... made a complete legal and factual allocution to the crimes" to which Pollock pled guilty (Rubin Decl. Ex. K at 2); and
• "Pollock's claims of confusion and distress are belied by the lengthy, detailed and extensive plea colloquy between her and the Court. The plea proceeding ... is replete with examples of Pollock's mental coherence, rational thinking and intelligent discourse." *Id.*

With regard to the collateral effects of her plea, Justice Richter stated as follows:
After her plea, Pollock was served with a federal civil RICO complaint seeking treble damages based on the facts underlying this criminal prosecution. Pollock now claims that her counsel failed to tell her that a civil suit could be filed against her and that her plea would collaterally estop her from contesting the underlying facts of any such suit. However, the filing of a civil suit months after her plea has no bearing on whether Pollock's plea was entered knowingly, voluntarily and intelligently. Pollock cites no case law to support her claim that her lawyer had an obligation to inform her of the possibility that such a suit could be filed and its potential ramifications, nor has the Court found any. However, it is well-settled that neither the Court nor defense counsel has the obligation to inform a defendant of collateral consequences of a plea. *People v. Ford,* 86 N.Y.2d 397, 633 N.Y.S.2d 270, 657 N.E.2d 265 (1995). Failure to warn against collateral consequences will not warrant vacating a plea because they are peculiar to the individual and generally result from actions taken by agencies the court does not control. *Id.* The Court concludes that the filing of a subsequent civil suit is a collateral consequence of a plea, and that a defendant need not be so warned.

*Id.* at 5-6 (omitting some citations). Here, the sentencing judge before whom the entire proceeding had been conducted addressed the exact issue before this Court and determined that Pollock *was* potentially civilly liable for additional damages in a separate RICO action apart from the restitution to which she agreed to pay. Justice Richter's decision provides further support for this Court's conclusion that the City is not collaterally estopped from seeking RICO damages against Pollock.

With respect to Gladstein, it is clear the restitution amount

he paid, $40,851, was precisely the amount he wrongfully and illegally obtained through the false *Jiggetts* applications. That does not insulate him from RICO's additional treble civil damages. The City was not in privity with the State and, thus, that Gladstein is not immunized from the collateral consequences of his guilty plea.

Gladstein and Pollock both raise a public policy concern that permitting the City to pursue civil RICO claims where defendants paid restitution as part of their plea agreements will create disincentives for defendants to enter into plea agreements. While the City's approach may be viewed as innovative, it is really a new twist on an old theme.[FN22] At the end of the day, civil collateral consequences to criminal proceedings, involving both convictions after trial and guilty pleas, are hardly uncommon and it is the prerogative of parties endowed with such statutory rights and privileges to pursue them. *See, e.g., Roso v. Saxon Energy Corp.,* 758 F.Supp. 164, 167 (S.D.N.Y.1991)* (plaintiff sought summary judgment on civil RICO claims subsequent to conviction in state criminal proceeding); *City of New York v. Liberman,* No. 85 Civ. 4958, 1988 U.S. Dist. LEXIS 580, at ----1-4 (S.D.N.Y. Jan. 14, 1988) (City sought motion for summary judgment on civil RICO claims following guilty plea in state criminal proceeding); *see also Qualis Care, L.P. v. Hall,* No. 95 Civ. 4955, 1999 U.S. Dist. LEXIS 13417, at *18 (S.D.N.Y. Sept. 1, 1999) (plaintiffs sought summary judgment on civil RICO claims subsequent to guilty plea in federal criminal proceeding); *Twenty First Century L.P. I v. Labianca,* 19 F.Supp.2d 35, 42-44 (E.D.N.Y.1998) (plaintiffs sought summary judgment on civil RICO claims subsequent to federal criminal proceedings in which some defendants pled guilty and others were convicted following trial).

FN22. Notably, the City could also have sued under the False Claims Act. 31 U.S.C. § § 3729-812. While such an approach would have introduced more variables out of the City's control (*e.g.,* depending on whether the Government decided to take over the litigation, among others), it could have potentially resulted in significantly greater recovery for the City and reduced other litigation challenges.

**\*17** In summary, the Court concludes that Pollock and Gladstein are collaterally estopped from denying facts to which they specifically pled and that the City is not collaterally estopped from bringing this instant action for civil RICO damages.

Slip Copy                                                                                                      Page 15
Slip Copy, 2006 WL 522462 (S.D.N.Y.), RICO Bus.Disp.Guide 11,042
**(Cite as: Slip Copy)**

### D. Damages

As noted previously, HRA disbursed $334,141.77 in payments in connection with fraudulent *Jiggetts* applications, which CLA submitted to OTDA. HRA was reimbursed 75% of those funds with federal (50%) and state (25%) funds resulting in a total City loss of $83,535.44. Pollock and Gladstein paid a total of $140,851 in restitution,[FN23] of which the City is only entitled to 25% or $35,212.75. Under the statute, HRA is entitled to treble damages. 18 U.S.C. § 1964(c).[FN24]

> FN23. Pursuant to their respective plea agreements, Pollock paid $100,000 in restitution and Gladstein paid $40,851.

> FN24. A prevailing plaintiff in a civil RICO suit is also entitled to costs and reasonable attorney's fees. 18 U.S.C. § 1964(c).

### 1. Set-Off After Trebling

The Second Circuit has not had occasion to pass directly on the issue of whether, as a general rule, a set-off occurs before or after the trebling of RICO damages.[FN25] Other courts, however, have deducted the set-off after trebling damages. *Morley v. Cohen,* 888 F.2d 1006, 1013 (4th Cir.1989) (citing cases); *see also Liquid Air Corp. v. Rogers,* 834 F.2d 1297, 1310 (7th Cir.1987) ("We conclude that setting-off damages *after* trebling is more likely to effectuate the purposes behind RICO.") Thus, the Court here will deduct the amount Pollock and Gladstein paid in restitution in the state criminal proceedings after trebling-that is, three times $83,535.44 equaling $250,606.33 less the restitution to which HRA is entitled (*i.e.,* $35,212.75 or 25% of $140,851), which amounts to $215,393.58.

> FN25. The one instance in which the Second Circuit discussed the issue involved the unique circumstance of a RICO violation whose central purpose was to prevent the collection of a claim or judgment and based on the facts presented there the Circuit declined to permit the set-off following trebling of damages. *Stochastic Decisions, Inc. v. DiDomenico,* 995 F.2d 1158, 1166 (2d Cir.1993).

### 2. Joint and Several Liability

While the Second Circuit has not addressed whether litigants are jointly and severally liable for civil RICO damages, it has affirmed joint and several forfeiture

liability for criminal RICO violations. *United States v. Benevento,* 836 F.2d 129, 130 (2d Cir.1988) (affirming *United States v. Benevento,* 663 F.Supp. 1115 (S.D.N.Y.1987)). With regard to civil RICO liability, "[e]very circuit in the country that has addressed the issue has concluded that the nature of ... civil ... RICO offenses requires imposition of joint and several liability because all defendants participate in the enterprise responsible for the RICO violations." *United States v. Phillip Morris USA, Inc.,* 316 F.Supp.2d 19, (D.D.C.2004) (collecting cases from various circuits). Thus, Pollock and Gladstein are jointly and severally liable for any RICO damages imposed pursuant to a Judgment in this action. *Sterling Nat'l Bank v. A-1 Hotels Int'l, Inc.,* No. 00 Civ. 7352, 2002 U.S. Dist. LEXIS 4944, at *10 (S.D.N.Y. Mar.26, 2002) (imposing joint and several liability for civil RICO claims).

The City stated a concern that it may not be made whole even if it recovers if the federal and state governments demand their respective shares from the $215,393.58 judgment. The Court, however, notes that should the federal and state governments require 75% reimbursement from the City's recovery in this lawsuit, the City will retain $53,848.39 (25% of $215,393.58). As stated earlier, HRA's out-of-pocket loss was $83,535.44 and the City will receive $35,212.75 as their share of Pollock's and Gladstein's restitution payments (25% of $140,851); the City's losses, thus, after it receives its share of the restitution payments will be reduced to $48,322.69. Thus, even if the City does not get to retain the benefit of RICO's trebled damages they will be made whole and even obtain $5,525.70 beyond their losses (*i.e.,* $53,848.39 less $48,322.69).

### III. Common-Law Fraud Claim

**\*18** Because the Court finds that Plaintiff is entitled to summary judgment on the RICO claims, it is unnecessary to rule on the common-law fraud claim.

### IV. Pollock's Request to File an Answer to the Amended Complaint

The Court grants Pollock's request to file an Answer to the City's Amended Complaint.

### CONCLUSION

For the foregoing reasons, the Court GRANTS the Pollock Defendants' motion to file an Answer to the Amended Complaint; GRANTS Plaintiff's motion for

Slip Copy                                                                                   Page 16
Slip Copy, 2006 WL 522462 (S.D.N.Y.), RICO Bus.Disp.Guide 11,042
**(Cite as: Slip Copy)**

partial summary judgment against all Defendants (except Lopez) on the RICO claims; DENIES Pollock Defendants' cross-motion for summary judgment: and DENIES Gladstein Defendants' cross-motion for summary judgment.

Further, Plaintiff City is entitled to a judgment of $215,393.58 against all Defendants (except Defendant Lopez) for which they are jointly and severally liable.
SO ORDERED

S.D.N.Y.,2006.
City of New York v. Pollock
Slip Copy, 2006 WL 522462 (S.D.N.Y.), RICO Bus.Disp.Guide 11,042

Briefs and Other Related Documents (Back to top)

• 1:03cv00253 (Docket) (Jan. 13, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.