

Not Reported in F.Supp.2d                                                                                                                    Page 1
Not Reported in F.Supp.2d, 2002 WL 72932 (S.D.N.Y.), RICO Bus.Disp.Guide 10,201
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents

United States District Court, S.D. New York.
PANIX PROMOTIONS, LTD. and Panix of the United States, Inc., Plaintiffs,
v.
Lennox LEWIS, New Jersey Sports Productions, Inc., d/b/a Main Events, et al., Defendants.
Lennox LEWIS, Third-Party Plaintiff,
v.
Panos ELIADES, Third-Party Defendant.
NEW JERSEY SPORTS PRODUCTIONS, INC., d/b/a Main Events, Third-Party Plaintiff,
v.
Panos ELIADES, John Does 1-5, fictitious persons and Richard Roe Corporations 1-5, fictitious entities, Third-Party Defendants.
**No. 01-Civ. 2709(HB).**

Jan. 17, 2002.

OPINION & ORDER

BAER, J.

***1** Defendant and third-party plaintiff Lennox Lewis ("Lewis"), the world heavyweight boxing champion and the subject of a lawsuit by his promoters, alleges counterclaims against his promoters, Panix Promotions, Ltd. ("Panix"), Panix of the United States, Inc. (Panix U.S.), and third-party claims against Panos Eliades ("Eliades"), for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962 *et seq.,* and several other claims. Additionally, New Jersey Sports Productions, Inc., d/b/a Main Events ("Main Events"), Lewis' co-promoter and co-defendant, brings its own counterclaim against the Panix companies, and a third-party claim against Eliades and fictitious John Does and Richard Roe Corporations, for violation of RICO, in addition to numerous other claims. The Panix companies and Eliades (collectively the "Panix entities") move to dismiss solely the RICO claims of both Lewis and Main Events under Fed.R.Civ.P. 12(b)(6) ("Rule 12(b)(6)") and Fed.R.Civ.P. 9(b) ("Rule 9(b)"). For the following reasons, the motion is GRANTED, in part, and DENIED in part.

I. BACKGROUND

A. Procedural Background

The pleadings at issue here, vis a vis the timing of the motion to dismiss, are a bit unusual. The motion was fully briefed and submitted to the Court on December 3, 2001, the last day to file dispositive motions according to the amended pre-trial scheduling order. Notably, the defendant Main Events failed to submit any papers in opposition to the motion, save for a two-page letter dated December 3, 2001. Subsequent to service of the initial moving papers, but prior to December 3, 2001, the Court granted leave to the Panix companies to amend their complaint. I also granted leave to Lewis and Main Events to amend their responsive pleadings. For Lewis, it was his second amendment. In light of the last minute amendments to Lewis' and Main Events' pleadings, which were drafted with the benefit of the Panix companies' moving papers already in hand, Panix was permitted in the interests of justice to submit one last letter brief to supplement its reply. While I found the bobbing and weaving to be dizzying, eventually the briefs were submitted. For our purposes, I refer to Lewis' second amended pleading as the "Lewis Compl.," and Main Events' first amended pleading as the "Main Events Compl."

B. Factual Background

In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the court "must accept the material facts alleged in the complaint as true." *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994). The following facts, unless otherwise noted, are as alleged by Lewis and Main Events.

The RICO claims at issue here arise from the counterclaims and third-party complaints of Main Events and Lewis. Lewis presently faces a lawsuit by his promoters Panix and Panix U.S.[FN1] for a variety of claims that sound in breach of contract. Lewis counters with claims against Panix, Panix U.S. and third-party defendant Eliades-a shareholder in, and head of, the Panix companies, for RICO violations and six other claims not at issue here. Lewis originally had named a number of others as third-party defendants. Those claims have been withdrawn

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                     Page 2
Not Reported in F.Supp.2d, 2002 WL 72932 (S.D.N.Y.), RICO Bus.Disp.Guide 10,201
**(Cite as: Not Reported in F.Supp.2d)**

and discontinued. For the most part, however, each is still named as a participant in the alleged RICO enterprise. These non-party individuals include: (1) Milton Chwasky ("Chwasky"), a lawyer who guided the legal affairs of Lewis, Eliades and Panix, who is an officer of Panix U.S., and (2) Richard Ashken ("Ashken") a citizen of the United Kingdom who advised Lewis on a number of financial investments and had signatory authority for Lewis' financial accounts.

> FN1. Panix is a United Kingdom corporation that has acted as Lewis' promoter since around 1994. Panix U.S. is a New York State corporation and wholly owned subsidiary of Panix. Starting in 1998, Panix U.S. served as Lewis' co-promoter with Panix.

**\*2** Main Events, a New Jersey corporation, acted as Lewis' co-promoter with the Panix entities. Main Events is a co-defendant with Lewis and brings a RICO counterclaim against the Panix entities and a third-party complaint of its own against Eliades and a variety of other unnamed third-party defendants John Does 1-5 and Richard Roe Corporations 1-5 for RICO violations and nine other claims not at issue here.

I recount Lewis' and Main Events' RICO claims in turn.

Lewis claims that Panix, Panix U.S., Eliades, Chwasky, Ashken and other persons employed by Eliades and Panix formed the "Eliades Enterprise." (Lewis Compl. ¶ 72). While the "purported goal" of the Eliades Enterprise was to provide a type of full-service management of all aspects of Lewis' career, from commercials and management, to legal counsel and financial advice, its goal in fact was to defraud and "loot" Lewis through a variety of related schemes. (Lewis Compl. ¶ ¶ 73-74). Additionally, Panix and Panix U.S. constituted two other racketeering enterprises. (Lewis Compl. ¶ ¶ 75-76). The purported fraudulent activities were furthered by the use of faxes and telephones, in violation of 18 U.S.C. § 1343.

From 1994 through October 2000, Lewis entered into agreements with Eliades whereby Lewis was to pay Panix a percentage of the monies earned from his bouts, in addition to the monies earned by the Panix companies as Lewis' promoters. In return, Eliades promised he would supervise all of Lewis' financial and legal affairs by handling most of Lewis' financial transactions and using Lewis' funds to hire the appropriate professionals. After securing Lewis' trust, however, Eliades, in conjunction with the Eliades Enterprise, allegedly defrauded Lewis in an "overarching scheme." (Lewis Compl. ¶ ¶ 78-79). Lewis' complaint recites the following variety of fraudulent activities.

*i. Fraudulent securing of management fees*

Lewis claims that from sometime in 1995 through July 2000, he relied on Panix's false promises to provide legitimate promotional and management services. Instead, so the story goes, Panix fraudulently paid itself more than $17 million in management fees over the 4-year period. (Lewis Compl. ¶ 80).

*ii. The Running Account Fraud*

Additionally, from 1995 through 2000, while in control of all of Lewis' funds, Eliades and Panix failed to "ensure that Lewis received all the benefits of the monies due to him." (Lewis Compl. ¶ 81). Lewis claims that Chwasky similarly neglected to take steps to protect the boxer's financial interests, as did Ashken, although both were aware of "potential financial irregularities." (Lewis Compl. ¶ 81). Eliades, instead of paying Lewis his purse after each bout, set up "running accounts" in which Panix intermingled its own funds with Lewis'. This system of running accounts allegedly deprived Lewis of hundreds of thousands of dollars in interest and investment income. Additionally, Eliades and Panix, upon transferring monies between a running account maintained in United States Dollars to, or from, an account in England, charged Lewis a higher exchange rate than was charged to Panix by its bank. (Lewis Compl. ¶ 83). Further, Lewis contends that his earned monies from various bouts were not credited to the United States running account until a substantial time subsequent to when Panix actually received those monies in its own accounts. In this way, Lewis claims that the monies he earned for his February 1997 bout with Oliver McCall were not credited until April 1, 1997; monies earned for a July 1997 bout with Henry Akinwande were not credited until October 21, 1997; monies earned for an October 1997 bout against Andrew Golota were not credited until April 1998; monies earned for a March 1998 bout against Shannon Briggs were not credited until July 1998; monies earned for a March 1999 bout

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                         Page 3
Not Reported in F.Supp.2d, 2002 WL 72932 (S.D.N.Y.), RICO Bus.Disp.Guide 10,201
**(Cite as: Not Reported in F.Supp.2d)**

against Evander Holyfield were not credited until November 1999; monies earned for a November 1999 bout against Holyfield were not credited until April 2000, and; monies earned for an April 2000 bout against Michael Grant were not credited until the fall of 2000.

*iii. Shortchanging Lewis' Purses*

***3** Further, Lewis claims that Panix and Eliades stole money from him through non-payment of the amount due from his bouts, or at least did not credit the running account properly. In his complaint, Lewis provides specific dates, bouts, and monetary amounts that were not credited to his account in the period from December 1998 to November 1999. (Lewis Compl. ¶ 88).

*iv. Other Frauds*

Lewis alleges numerous other frauds. They include: (1) a failure to credit approximately $350,000 of sponsorship money and other income to Lewis' running account from January 1999 through February 2000 (Lewis Compl. ¶ 89); (2) that Panix misrepresented and inflated the cost of Chwasky's legal fees with respect to litigation in September 1996 and its failure to credit the proper amount from a settlement fund to Lewis' running account (Lewis Compl. ¶ 90); (3) how Eliades misrepresented to Lewis payments made from Lewis' account with respect to the proposed purchase of Mike Tyson's management contract in April 1998 and April 1999 (Lewis Compl. ¶ 91); (4) how Eliades misrepresented from late 1999 through the summer of 2000 as to the legal fees for Lewis' dispute in relation to his bout with Michael Gant (Lewis Compl. ¶¶ 92-93); (5) that Eliades misrepresented to Lewis ticket sales and income generated from a fight with Frans Botha in July 2000 (Lewis Coml. ¶¶ 94-95); (6) that Ashken, at the direction of Eliades, transferred monies from Lewis' bank account to Eliades, without Lewis' approval, once in March 31, 2000 and another time on April 12, 2000 (Lewis Compl. ¶¶ 96-97); (7) that Ashken, with Eliades approval and knowledge, persuaded Lewis to make investments for which Ashken was paid "substantial commissions," which he shared with Eliades (Lewis Compl. ¶ 98); (8) that Panix paid "exorbitant" legal fees to Chwasky with respect to Lewis' matters; (Lewis Compl. ¶ 99); and (9) how Eliades entered into a televison contract with a Polish television station, POLSTAT, in March of 1999, by which he secured

profits but failed to conditionally inform Lewis of the agreement and his alleged double-dealing (Lewis Compl. ¶ 100).

Main Events also brings RICO claims, although not as extensively set forth as Lewis', against the Panix companies and Eliades in which Main Events alleges they essentially misrepresented the nature of their role as Lewis' co-promoter and thereby caused injury to Main Events.

Main Events alleges that, as early as 1993, Panix operated in a dual capacity as Lewis' manager and co-promoter, by which Panix "used its leverage as manager to force" Main Events to share its promotional profits. (Main Events Compl. ¶ 8). By 1998, Panix, with Eliades, used the "leverage as manager" to enable Panix U.S. to participate as a co-promoter. To further increase this leverage, Eliades allegedly misrepresented to Main Events that Lewis owned the majority interest in Panix. The purported fraudulent activities were furthered by the use of the mails, in violation of 18 U.S.C. § 1341, and faxes and telephones, in violation of 18 U.S.C. § 1343.

II. ARGUMENT

A. Standard of Review

**\*4** A claim will be dismissed pursuant to Rule 12(b)(6) when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *See Tarshis v. Riese Organization,* 211 F.3d 30, 35 (2d Cir.2000). Additionally, the court is required to accept as true all of the facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor. *See Madonna v. United States,* 878 F.2d 62, 65 (2d. Cir.1989). A motion to dismiss should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99 (1957).

B. The RICO Claims

Although Lewis and Main Events fail to specify the RICO section under which they bring their claims, it is clear from the language of the complaints that they intend to make their allegations pursuant to section 1962(c). *See Bennett v. U.S. Trust Co. of New York,* 770 F.2d 308, 314 (2d Cir.1985) (construing the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 72932 (S.D.N.Y.), RICO Bus.Disp.Guide 10,201
**(Cite as: Not Reported in F.Supp.2d)**

Page 4

applicable RICO section, where plaintiff failed to specify it in the complaint).

To state a claim under section 1962(c), a plaintiff must allege "(1) that the defendant (2) through the commission of two or more predicate acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly participates in (6) an 'enterprise' (7) the activities of which affect interstate commerce. *Moss v. Morgan Stanley, Inc.,* 719 F.2d 5, 17 (2d Cir.1983).

While it is true that "RICO was an aggressive initiative to supplement old remedies and develop new methods for fighting crime," *see Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 498 (1985), specifically organized crime and racketeering, it was never intended to be limited solely to allegations with respect to organized crime and the stereotypical mobster defendant. *See Moss,* 719 F.2d at 21. Instead, "RICO is to be read broadly," and is to "be liberally construed to effectuate its remedial purposes ... nowhere more evident than in the provision for a private action ..." *See Sedima, S.P.R.L.,* 473 U.S. at 498 (internal quotations omitted) ("Congress wanted to reach both 'legitimate' and 'illegitimate' enterprises. The former enjoy neither an inherent capacity for criminal activity nor immunity from its consequences."). It is under this broad rubric that Lewis and Main Events now seek to bring their RICO claims.

The Panix entities move to dismiss Lewis' and Main Events' RICO claims on the grounds that (1) they fail to plead an "enterprise," (2) they fail to allege a pattern of racketeering, (3) they fail to plead the predicate acts of fraud with particularity as required under Rule 9(b), and (4) they fail to sufficiently plead a RICO conspiracy.

I first address the sufficiency of Lewis' RICO claims.

*1. Lewis' Enterprises*

Section 1962(c) prohibits "any person employed by or associated with any enterprise .. to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ..." 18 U.S.C. § 1962(c). Therefore, to establish liability under 1962(c), the plaintiff must show "the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 121 S.Ct. 2087, 2090 (2001).

**\*5** Lewis alleges three enterprises: (1) the Eliades Enterprise, an association-in-fact enterprise formed by Panix, Panix U.S., Eliades, Chwasky, Ashken and other persons employed by Eliades or Panix; (2) the Panix Enterprise, and (3) the Panix U.S. Enterprise. All three purported enterprises are sufficiently plead.

*i. Lewis' "Eliades Enterprise"*

The RICO statute defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

The Supreme Court stated, in its seminal case on the issue, that "a group of individuals associated in fact" refers to "a group of persons associated together for a common purpose of engaging in a course of conduct" that "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *U.S. v. Turkette,* 452 U.S. 576, 583 (1981). This is to say that a valid enterprise has a "hierarchy, organization and activities and it must exhibit structural continuity which exists where there is an organizational pattern or system of authority that provides a mechanism for directing the group's affairs on a continuing, rather than ad hoc, basis." *Pavlov v. The Bank of New York Co., Inc.,* 135 F.Supp.2d 426, 429-30 (S.D.N.Y.2001) (citing cases) (internal quotations omitted).

The Panix entities argue that the Lewis RICO claim fails because the enterprise does not "exhibit more structure than is inherent in the alleged pattern or racketeering activity." *Pavlov,* 135 F.Supp.2d at 430 ("there must be more to an 'enterprise' than simply an aggregation of predicate acts of racketeering activity"); *see also Turkette,* 452 U.S. at 583.

I disagree. Lewis' claims more than meet the structural continuity element of a RICO claim. Lewis asserts that the Eliades Enterprise was essentially a full-service organization, comprised of a lawyer (Chwasky), a promotional division (Panix and Panix U.S.), a manager (Eliades) and a financial advisor (Ashken), in addition to others, that provided Lewis with management in all aspects of his boxing career. (Lewis Compl. ¶ 73). Therefore, unlike the enterprise dismissed in *Allen v. New World Coffee, Inc.,* 2001 WL 293683 (S.D.N.Y.2001), the Eliades

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                       Page 5
Not Reported in F.Supp.2d, 2002 WL 72932 (S.D.N.Y.), RICO Bus.Disp.Guide 10,201
**(Cite as: Not Reported in F.Supp.2d)**

Enterprise existed apart from the alleged racketeering activities. Cf. Allen, 2001 WL 293683 *8 (dismissing RICO claim on the basis, in part, that enterprise was an "illusory" entity that existed solely to perpetrate the alleged racketeering activity). Rather, the Eliades Enterprise evinces a "continuity of structure." Cf. First Nationwide Bank v. Gelt Funding Corp., 820 F.Supp. 89, 98 (S.D.N.Y.1993) (dismissing RICO claim where plaintiffs failed to allege "facts regarding the continuity of structure" of the alleged enterprise). Further, the complaint has not "simply strung together all of the defendants ... and labeled the resulting group an association-in-fact enterprise." Cf. Nasik Breeding & Research Farm, Ltd. v. Merck & Co., Inc., 165 F.Supp.2d 514, 539 (S.D.N.Y.2001). In *Nasik,* the court dismissed the complaint where the plaintiffs merely stated in a conclusory fashion that the defendants "combined in an association-in-fact" that "shared a common purpose, unity and identifiable structure." Nasik, 165 F .Supp.2d at 539. Here, the plaintiffs allegations are not so nebulous. Lewis instead claims that the defendants engaged in a variety of activities to defraud Lewis over a period of at least four years, that included making overpayments to themselves, charging inflated or fraudulent legal bills, misrepresenting financial opportunities and withholding money due Lewis from various bouts, all to his detriment. (Lewis Compl. ¶¶ 77-100).

### ii. Lewis' Panix and Panix U.S. Enterprises

**\*6** Lewis' purported Panix and Panix U.S. Enterprises must stand as well, in light of the Supreme Court's recent holding in *Cedric Kushner Promotions.*

With respect to these enterprises, Lewis claims that Eliades participated in both the "Panix Enterprise" and the "Panix U.S. Enterprise" through a pattern of racketeering. In *Cedric Kushner Promotions,* the Court held that an individual acting even within the scope of his authority for a corporation was distinct from the corporation, and thus could be subject to RICO liability. In a fact pattern not dissimilar from ours, the Court found that the defendant Don King, a boxing promoter, was a distinct "person" from the "enterprise", Don King Productions, which was a corporation that promoted boxers and of which King was president. *See Cedric Kushner Promotions,* 121 S.Ct. at 2091 ("The corporate owner/employee, a natural person, is distinct from the corporation itself ... and we find nothing in the [RICO] statute that requires more separateness than that."). Eliades' relationship with Panix, and Panix U.S., provides a mirror image of the facts in *Cedric Kushner Promotions.* Consequently, I find the enterprise prong of the statute is satisfied with respect to the Panix Enterprise and Panix U.S. Enterprise.

However, Lewis' additional assertions in his Third Counterclaim/Third-Party Claim that Panix U.S. participated as a "person" in the Panix Enterprise, and similarly in his Fifth Claim/Fifth Third-Party Claim that Panix participated as a "person" in the Panix U.S. Enterprise, must fail. The Second Circuit has held that such a construct, where a division or subsidiary of an "enterprise" is alleged to also constitute a distinct "person," can not constitute a RICO claim. *See* Discon, Inc. v. NYNEX Corp., 93 F.3d 1055, 1063-64 (2d Cir.1996) (holding that affiliated corporations are not "persons" distinct from an alleged "enterprise" consisting of the affiliated corporations), *rev'd in part on other grounds,* 525 U.S. 128 (1998); Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A., 30 F.3d 339, 344 (2d Cir.1994) (affirming dismissal of a RICO claim that alleged a corporation was the person, and the corporation, together with all its employees and agents, was the enterprise). Therefore, Panix is not liable in connection with the Panix U.S. Enterprise, nor is Panix U.S. liable in connection with the Panix Enterprise. Neither Panix company, however, is insulated from liability with respect to their activity under the Eliades Enterprise, nor Eliades as to his activity under the Panix and Panix U.S. Enterprises.

### 2. Pattern of Racketeering

"Under any prong of § 1962, a plaintiff in a civil RICO suit must establish a "pattern of racketeering activity." GICC Capital Corp. v. Technology finance Group, Inc., 67 F.3d 463, 465 (2d Cir.1995). To establish a pattern, the plaintiff must show that the predicate acts are related and that they amount, or pose a threat of, continuing criminal activity. GICC Capital Corp., 67 F.3d at 465. Further, the plaintiff "must allege either an open-ended pattern of racketeering activity (i.e., past criminal conduct coupled with a threat of future criminal conduct) or a closed-ended pattern of racketeering activity (i.e., past criminal conduct extending over a substantial period of time)." Schlaifer Nance & Company v. Estate of Andy Warhol, 119 F.3d 91, 97 (2d Cir.1997).

**\*7** The Panix entities assert that Lewis fails to satisfy the continuity requirement because the alleged predicate acts establish, not a pattern of activity, but

Case 7:04-cv-08223-KMK     Document 165-29     Filed 07/07/2006     Page 6 of 8

Not Reported in F.Supp.2d                                                                                                Page 6
Not Reported in F.Supp.2d, 2002 WL 72932 (S.D.N.Y.), RICO Bus.Disp.Guide 10,201
**(Cite as: Not Reported in F.Supp.2d)**

rather a limited fraud on a single victim. *See Dempsy v. Sanders,* 132 F.Supp.2d 222, 228 (S.D.N.Y.2001) (finding that continuity can not exist where plaintiff "alleges a single scheme promulgated for the limited purpose of defrauding a single victim"). However, it must also be said that "Congress did not mean to exclude from the reach of RICO multiple acts of racketeering simply because ... they further but a single scheme." *Schlaifer,* 119 F.3d at 98 (internal quotations and citations omitted).

Lewis' case is not like *Dempsy,* where a one-year scheme barely grazed the jaw and was insufficient. Here, the scheme extends more than four years. Further, Lewis' claim, which includes a series of frauds, involving numerous fight contracts, is different from *Schlaifer* where the Circuit found that a series of fraudulent acts touching only a single agreement did not constitute a "pattern ." *Schlaifer,* 119 F.3d at 98.

While "close-ended continuity can only be shown through conduct occurring over a substantial period of time," *De Falco v. Bernas,* 244 F.3d 286, 321 (2d Cir.2001), a duration of two years has been held sufficient. *See De Falco,* 244 F.3d at 321. Further, Lewis has established for purposes of a motion to dismiss the requisite close-ended continuity, and additionally, a pattern of racketeering, as the alleged fraudulent acts were neither "sporadic" nor "isolated," but rather took place from time to time over the course of at least four years. *See, e.g. Azrielli v. Cohen Law Offices,* 21 F.3d 512, 520 (2d Cir.1994).

*3. Predicate Acts Plead with Particularity*

Rule 9(b) states with respect to fraud claims that "the circumstances constituting fraud ... shall be stated with particularity." This pleading requirement "applies to RICO claims for which fraud is the predicate illegal act." *Moore v. PaineWebber, Inc.,* 189 F.3d 165, 173 (2d Cir.1999).

Under Rule 9(b) in the context of RICO, a pleading must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anatian v. Coutts Bank (Switzerland) Ltd.,* 193 F.3d 85, 88 (2d Cir.1999) (internal quotations and citations omitted). Further, a plaintiff who claims wire fraud must also identify the connection of the predicate act with the defendant's fraudulent scheme. *See Moore,* 189 F.3d at 172-73. Lewis has met the standard.

In his complaint, Lewis provides an 11-page recitation of the nature of the fraudulent scheme, already outlined above. To provide the particularity necessary under Rule 9(b), Lewis also attaches a stack of faxes and other wire correspondence, purportedly transmitted by the participants in the Eliades, Panix and Panix U.S. Enterprises, in interstate and foreign commerce, the relevance of which he explains in a summary fashion. In deciding a motion to dismiss under Rule 12(b)(6), however, the Court may consider "facts stated on the face of the complaint and in documents appended to the complaint or incorporated in the complaint ..." *Automated Salvage Transport, Inc. v. Wheelabrator Environmental Systems, Inc.,* 155 F .3d 59, 67 (2d Cir.1998). A cursory review of the "stack" reveals that Lewis includes at least two-and actually many more-examples of wire transmissions with each defendant or participant in the purported RICO schemes. *See, e.g. Allen,* 2001 WL 293683 [*]4 (noting that fraud must be plead with particularity as to each defendant) (citing *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1176 (2d Cir.1993); *see also Procter & Gamble Co. v. Big Apple Industrial Buildings, Inc.,* 879 F.2d 10, 15 (2d. Cir.1989) (noting that at least two predicate acts must be present to constitute a pattern, and two acts alone may not always suffice). While Lewis' complaint is frequently verbose, it can not be said that the attachments, combined with the 11-page narrative, fails to provide the requisite detail and notice as required by Rule 9(b). *See, e.g. Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989) (noting that the purpose of Rule 9(b), in part, is to provide the defendant with fair notice of the plaintiff's claim).

*4. Lewis RICO Conspiracy Claims*

**\*8** To state a cause of action under section 18 U.S.C. § 1962(d), RICO's conspiracy provision, a plaintiff must allege that "each defendant by words or actions, manifested an agreement to commit two predicate acts in furtherance of the common purpose of a RICO enterprise." *Allen,* 2001 WL 293683,[*]8 (quoting *Colony at Holbrook, Inc. v. Strata, Inc.,* 928 F.Supp. 1224, 1238 (E.D.N.Y.1996). Since I have dismissed Panix as a defendant in connection with Lewis's Panix U.S. Enterprise, and similarly dismissed Panix U.S. as a defendant in Lewis' Panix Enterprise, that leaves Eliades as the sole defendant liable with respect to those two claims. As a consequence, Lewis' conspiracy allegations must fail since an agreement between two or more persons is a

Not Reported in F.Supp.2d                                                                                                Page 7
Not Reported in F.Supp.2d, 2002 WL 72932 (S.D.N.Y.), RICO Bus.Disp.Guide 10,201
**(Cite as: Not Reported in F.Supp.2d)**

prerequisite to a conspiracy claim. *See Kashi v. Gratsos,* 790 F.2d 1050, 1055 (2d Cir.1986) (conspiracy requires a corrupt agreement between two or more persons). Lewis' Fourth and Sixth Counterclaims/Fourth and Sixth Third-Party Claims for RICO conspiracy are therefore dismissed.

Lewis' conspiracy claim with respect to the Eliades Enterprise, however, survives. Although substantive RICO claims must withstand the heightened pleading requirement of Rule 9(b), Lewis correctly points out that no such obligation governs an allegation of RICO conspiracy, which is instead held to the more liberal pleading requirements of Fed.R.Civ.P. 8(a). *See Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 26 n. 4 (2d Cir.1990). The Second Circuit stated that the court need only inquire into a RICO conspiracy claim with respect to "whether an alleged conspirator knew what the other conspirators were up to or whether the situation would logically lead an alleged conspirator to suspect he was part of a larger enterprise." *United States v. Zichetello,* 208 F.3d 72, 99 (2d Cir.2000). In addition to Lewis' conclusory statement that "[u]pon information and belief, each ... defendant knew the general nature of the conspiracy ..." (Lewis Compl. ¶ 108), Lewis also alludes in his complaint to instances where each member of the Eliades Enterprise had knowledge of the fraudulent activity of the others, or possessed a fraudulent intent.

*5. The Main Events' Complaint*

While the Panix entities argue to dismiss Main Events' RICO claim on several grounds, e.g. failure to plead an enterprise, failure to plead under Rule 9(b), failure to plead a pattern of racketeering, I find the Main Events RICO claim insufficient for a more basic premise not addressed by the parties-that of standing.

A plaintiff must satisfy three elements to establish standing under RICO: "(1) a violation of section 1962; (2) injury to business or property; and (3) causation of the injury by the violation." *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 767 (2d Cir.1994) (quoting *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 23 (2d Cir.1990)). Generally, to establish standing in any type of claim, a plaintiff must have suffered an "injury in fact" that is "concrete and particularized" and neither "conjectural" nor "hypothetical." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992). The RICO injury element offers no exception to the general rule, as the RICO claim must evidence damages that are "clear and definite." *First Nationwide Bank,* 27 F.3d at 768; *see Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1106 (2d Cir.1988).

**\*9** Main Events fails to plead a cognizable injury under RICO. It claims that (1) "Eliades and Panix U.K. used its leverage as manager to force the sharing by Main Events promotional profit with it," (Main Events Compl. ¶ 8), and the Eliades Enterprise "used the same leverage as manager to enable Panix U.S. to participate in [Lewis'] bouts as a co-promoter." (Main Events Compl. ¶ 9). Additionally, Main Events asserts, in conclusory fashion, that it "acted to its detriment and was injured by virtue of Eliades' untrue statements regarding Lewis' alleged ownership of Panix, U.K." (Main Events Compl. ¶ 12). Main Events further implies that the racketeering activity caused Panix and Panix U.S. to breach its contractual duty of good faith and fiduciary duty (Main Events Compl. ¶ 15). Finally, Main Events claims that the members of the purported Eliades Enterprise, "[d]espite their duties to Main Events ... engaged in a massive scheme to defraud ... Main Events ..." (Main Events Compl. 16). Damages are alleged for no less than $1 million.

These claims of injury, however, do not establish standing for two interrelated reasons: they do not set forth a cognizable basis to determine the extent of the injury, and they neglect to show that such injuries, if any, were proximately caused by the alleged predicate acts of fraud.

"RICO provides a civil remedy only to those persons injured "by reason of" the defendant's predicate acts." *First Nationwide Bank,* 27 F.3d at 769. From this language, courts in this Circuit require that the defendant's violation be the "proximate cause of the plaintiff's injury, i.e,. that there was a direct relationship between the plaintiff's injury and the defendant's injurious conduct ." *First Nationwide Bank,* 27 F.3d at 769. Further, in determining whether proximate cause exists in a RICO action predicated on fraud, as here, the Court can consider the "magnitude of the fraudulent statements," the "temporal connection" between the alleged misrepresentations and the injury, and the presence of other intervening factors. *First Nationwide Bank,* 27 F.3d at 770-72.

Here, Main Events suggests that its damages essentially constituted the "leverage" employed by Panix in its attempt to share in Lewis' purses as a co-promoter, and Panix's breach of contract and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d	Page 8
Not Reported in F.Supp.2d, 2002 WL 72932 (S.D.N.Y.), RICO Bus.Disp.Guide 10,201
**(Cite as: Not Reported in F.Supp.2d)**

fiduciary duties. This leaves much in the way of assumption and fails to demonstrate sufficient proximate cause. An alleged loss of "leverage," or breach of contract are not the types of injury to "business or property" contemplated under RICO, and instead wrongly seeks to mask an action that sounds in breach of contract in the more potent garb of a RICO claim. See Goldfine v. Sichenzia, 118 F.Supp.2d 392, 394 (S.D.N.Y.2000) (McMahon, J.) ("I surmise that every member of the federal bench has before him or her at least one-and possibly more- garden variety fraud or breach of contract cases that some Plaintiff has attempted to transform into a vehicle for treble damages ..."). The inquiry under proximate cause is whether Main Events' damages of $1 million were proximately caused by the alleged predicate acts, not as the result of a contract dispute. See Sedima, S.P.R.L. v. Imrex Company, Inc., 472 U.S. 479, 495 (1985) (stating that to establish a RICO claim a plaintiff must allege that it was the *racketeering activities* that caused the injury) (emphasis added).

**\*10** Whether the alleged racketeering activities may have played a role in causing the Eliades Enterprise to breach its contract with Main Events, or allowed it to exert "leverage," cries out for an additional link in the causal chain to construe a RICO cause of action. This is not proximate cause.

Further, it would appear that Lewis, not Main Events, was the direct or primary victim of the fraud that Main Events alleges. A plaintiff such as Main Events, that stands as a secondary, indirect victim to the alleged racketeering acts, does not establish standing to sue under RICO. See Holmes v. Securities Investor Protection Corporation et al., 503 U.S. 258, 274 (1992) ( "Allowing suits by those injured only indirectly would ... undermine the effectiveness of treble-damages suits.").

In the absence of a direct causal relationship in Main Events' claim, its RICO action merely rests on speculation. There is no basis to determine the magnitude of the fraudulent activity or how it contributed, if at all, to Main Events' detriment. See First Nationwide Bank, 27 F.3d at 770 (dismissing RICO complaint, in part, because it provided no reliable measure of the magnitude of the misrepresentations). Significantly, Main Events fails to set forth the terms of its co-promotional agreement with Panix and, while it asserts that it was forced to share in Lewis' purses, Main Events is silent as to whether it was ever entitled to anything more if Panix had never entered the story.

I therefore dismiss Main Events' RICO claim, the First Counterclaim/Third-Party Claim, for lack of standing.

### III. CONCLUSION

For the above reasons, Panix entities' motion to dismiss is GRANTED, but only with respect to Main Events' First Counterclaim/First Third-Party Claim, Lewis' Fourth Counterclaim/Fourth Third-Party Claim, and Lewis' Sixth Counterclaim/Sixth Third-Party Claim. The Panix entities' motion is DENIED with respect to all remaining claims by Lewis and Main Events. This case is set for trial February 4, 2002. The pretrial order, motions in limine, including any exhibit or deposition disputes, will be fully briefed with courtesy copies to chambers by January 22, 2002. Jury selection will begin at 9:30 a.m. on February 1, 2002, oral argument on any motions will follow.

SO ORDERED

S.D.N.Y.,2002.
Panix Promotions, Ltd. v. Lewis
Not Reported in F.Supp.2d, 2002 WL 72932 (S.D.N.Y.), RICO Bus.Disp.Guide 10,201

Briefs and Other Related Documents (Back to top)

• 1:01cv02709 (Docket) (Mar. 29, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.