Westlaw.

Not Reported in F.Supp.2d                                                                                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 50873 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Anthony SPINALE and G & T Terminal Packaging Co., Inc., Plaintiffs,
v.
UNITED STATES, Ann M. Veneman, Secretary of Agriculture, United States Department of Agriculture, David L. Ball, William Cashin, Paul I. Cutler, Edmund R. Esposito, Glenn A. Jones, Elias Malavet, Michael Strusiak, Michael Tsamis and Thomas Vincent Defendants.
No. 03Civ.1704KMWJCF.

Jan. 9, 2004.

*REPORT AND RECOMMENDATION*
FRANCIS, Magistrate J.
**\*1** The plaintiffs, G & T Terminal Packaging Co., Inc. ("G & T"), a corporation that purchases potatoes for sale to wholesalers and retailers, and Anthony Spinale, the president of G & T, bring this action in the aftermath of a bribery scandal at Hunts Point Terminal Market in the Bronx. The plaintiffs allege that the defendants coerced monetary payments or facilitated such extortion in violation of Section 1962(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* Certain defendants-namely the United States, the United States Department of Agriculture (the "USDA"), and Ann M. Veneman, Secretary of the USDA (collectively, the "Federal Defendants"), as well as Paul I. Cutler and Elias Malavet-have moved to dismiss the Complaint pursuant to Rules (12)(b)(1) and (12)(b)(6) of the Federal Rules of Civil Procedure.

For the reasons stated below, I recommend that the motions be granted.

*Background*

G & T is a New York corporation with its principal place of business at the Hunts Point Terminal Market. (Complaint ("Compl.") ¶ 29). G & T purchases potatoes from shippers across the country and either sells them to various wholesalers and retailers or repackages them for sale to consumers in various supermarkets. (Compl.¶ 29). Anthony Spinale was the president and sole stockholder of G & T from 1964 through 2002. (Compl.¶ 31).

Pursuant to the Agricultural Marketing Act of 1946 (the "AMA"), 7 U.S.C. § 1622(h), the USDA provides inspection services for a fee to wholesale produce dealers such as G & T to determine whether their agricultural products meet the quality standards of both the shipper and the dealer. (Compl.¶ ¶ 13-14). The inspection certifies that "the produce is free from damage due to various germs, worms and insects," as well as other defects that would render it unsafe for consumption. (Compl.¶ 15). The Agricultural Marketing Service (the "AMS"), an arm of the USDA, is responsible for issuing regulations establishing quality grades for a wide variety of agricultural products pursuant to the Perishable Agricultural Commodities Act (the "PACA"), 7 U.S.C. § 499a *et seq.* (Compl.¶ ¶ 4, 16). Any person with a financial interest in the produce can request an inspection from a licensed USDA agricultural inspector. (Compl.¶ ¶ 17, 19). A grower or shipper of produce, for instance, may call for an inspection before a product is delivered in order to document its quality at its place of origin. (Compl.¶ 19). Similarly, a dealer may request an inspection at the time the product arrives if it contests the quality of the product. (Compl.¶ 19). The AMS has exclusive jurisdiction over these inspections, and AMS inspectors act as impartial referees in resolving disputes about the quality of delivered produce. (Indictment in *United States v. Ball,* 99 Cr. 1085 (*"Ball* Indictment"), attached as Exh. A to Compl., ¶ 4). The AMS inspection office for New York City is located at the Hunts Point Terminal Market. (Compl.¶ ¶ 18, 21). An application for an inspection is generally received by the AMS office the night before the inspection is to take place. (*Ball* Indictment ¶ 9). During the inspection, the inspector will examine random samples of the produce to determine the official AMS grade for the shipment. (*Ball* Indictment ¶ 11). The inspection certificate is filed with the AMS office at the Hunts Point Terminal Market, and copies are provided to the applicant and the grower whose produce is at issue. (*Ball* Indictment ¶ 12).

**\*2** Defendants David L. Ball, William Cashin, Paul I. Cutler, Edmund R. Esposito, Glenn A. Jones, Elias Malavet, Michael Strusiak, Michael Tsamis, and

Thomas C. Vincent (collectively, the "Inspector Defendants") were all employed by the USDA as inspectors assigned to the Hunts Point office during the relevant time periods. (Compl.¶ ¶ 32-40). In March 1999, William Cashin became a confidential informant for the government and was ultimately indicted and convicted for bribery of a public official in violation of 18 U.S.C. § 201(b). (Compl.¶ 41). On October 27, 1999, the other eight Inspector Defendants were charged with engaging in a pattern of racketeering activity with a RICO enterprise-the AMS office at the Hunts Point Terminal-in violation of 18 U.S.C. § 201(b)(2) and 18 U.S.C. § 1962(c). (Compl.¶ ¶ 42-48). It was alleged that these defendants "accepted cash payments (usually $50 per lot) from owners and employees of wholesale produce firms in exchange for agreeing to alter the results of produce inspections by 'downgrading' produce." (*Ball* Indictment at 1, 7, 11, 12). On February 9, 2000, Mr. Ball, Mr. Cutler, Mr. Esposito, Mr. Jones, Mr. Malavet, Mr. Strusiak, and Mr. Tsamis pled guilty to bribery, and the RICO charges were dropped with respect to these defendants. (Transcript of pleas, attached as Exh. B to Compl., at 14-15, 28). Mr. Vincent pled guilty to the RICO charge on December 13, 1999. (Transcript of Vincent plea, attached as Exh. B to Compl., at 5-7).

According to the plaintiffs, "[i]t was common knowledge that for many years complaints had been made to senior administrators in the USDA that Receivers in the Hunts Point Market could not obtain timely or fair inspections." (Compl.¶ 48). Because of the bribery scheme among the inspectors, Mr. Spinale claims that the inspection reports he received were not accurate. (Compl.¶ 51). For instance, when G & T "ordered an inspection of a load of produce which they received at Hunts Point, the inspections would not reflect the true condition of the produce; that is, the inspections would fail to show all the defects, decay and other existing problems in the product." (Compl.¶ 53). Moreover, "inspectors would not arrive to conduct the inspections in a timely fashion," which is pertinent given the perishable nature of the goods. (Compl.¶ 54). Mr. Spinale attempted to report these fraudulent inspections to AMS supervisors at Hunts Point and to AMS officials in Washington, D.C. (Compl.¶ 56). However, since he required "fair and accurate inspections immediately in order to properly run [his] business, [his] only option was to pay the inspectors." (Compl.¶ 58). In support of the RICO claim, the plaintiffs allege 85 specific racketeering acts committed by the Inspector Defendants. The alleged acts span the period from November 4, 1998 through August 12, 1999, and involve payoffs ranging from $50.00 to $360.00. (Compl.¶ 86(a)-(gggg)). Six of the specifically alleged racketeering acts involve bribes that were given to William Cashin by Mr. Spinale himself. (Compl.¶ 86(u), (x), (tt), (ooo), (bbbb), (ffff)). Mr. Spinale was ultimately indicted on nine counts of bribing a public official, which included five of the incidents alleged in the Complaint. (Indictment in *United States v. Spinale,* 99 Cr. 1093, attached as Exh. D to Compl.; Compl. ¶ 86(u), (x), (tt), (ooo), (bbbb)).

**\*3** On January 26, 2001, Mr. Spinale pled guilty to one count of bribing a public official in violation of 18 U.S.C. § 201(b)(1)(A). (Transcript of plea ("Plea Tr."), attached as Exh. A to Declaration of Jonathan Marks dated September 19, 2003) ("Marks Decl."), at 2nd unnumbered page). In his plea, Mr. Spinale stated that he "paid money to [USDA Inspector] Bill Cashin for the purpose of influencing the outcome of his inspection report on a load of potatoes," telling the inspector "the specific amount I wanted him to put in the inspection report." (Plea Tr. at 10th-11th unnumbered pages). Although Mr. Spinale has never appealed or attempted to vacate his conviction, the plaintiffs devote a substantial portion of the complaint in this case to a collateral attack on Mr. Spinale's guilty plea. According to the plaintiffs, it was Mr. Spinale's "fervent desire to go to trial with the case in order to prove his innocence of the charges, and, in order to prove that he was extorted by the Defendant inspectors into making the payments," but his attorney "coerced him" into pleading guilty. (Compl.¶ ¶ 64, 66). "Immediately after accepting the plea arrangement, after having had an opportunity to think about what happened, [Mr.] Spinale realized that he had made a grievous error, and that he had desired all along to go to trial." (Compl.¶ 67). Mr. Spinale "maintains that he was not guilty of any of the charges against him ." (Compl.¶ 68). He attempts to explain that he was coerced into paying the bribes and did not attempt to take advantage of the inspections to seek excessive downgrades from suppliers. (Compl.¶ ¶ 59, 84). The plaintiffs argue that Mr. Spinale was "not himself" at the time of his plea due to a "medical condition." (Compl.¶ 66). However, during his plea, Mr. Spinale stated that his ability to see, hear, and understand the proceedings was not affected by any medical condition, that he was satisfied with his attorney, and that he understood his right to plead not guilty and go to trial; he confirmed that he was pleading "voluntarily, ... of [his] own free will and choice." (Plea Tr. at 5th-10th unnumbered pages).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK    Document 165-32    Filed 07/07/2006    Page 3 of 13

Not Reported in F.Supp.2d                                                                                                    Page 3
Not Reported in F.Supp.2d, 2004 WL 50873 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

The Complaint contains three claims for relief. The first alleges a RICO violation under 18 U.S.C. § 1962(c). (Compl.¶ ¶ 71-153). The Complaint states that "the association in fact of the [Federal Defendants] and [the Inspector Defendants] constituted a 'RICO' 'enterprise' within the meaning of 18 U.S.C. § 1961(4)." (Compl.¶ 72). The defendants "engaged in a pattern of conduct which furthered the scheme to coerce bribes, extort money, loans and illegal gratuities from the produce Wholesalers at the Hunts Point Terminal Market." (Compl.¶ 72). The Complaint also alleges that the Federal Defendants aided and abetted the Inspector Defendants in the RICO enterprise by under-staffing Hunts Point, staffing it with under-qualified inspectors, giving inspectors excessive discretion in determining the produce grade, and providing insufficient training and supervision of inspectors. (Compl.¶ ¶ 80, 137, 140, 142-43, 145-46, 153). In the second claim for relief, the plaintiffs allege that the Federal Defendants "breach[ed] [their] contract with Plaintiffs" by failing to provide timely inspections without the use of "coercion and extortion." (Compl.¶ 154). In the third claim, they accuse the Federal Defendants of fraud based on misrepresentations that the government would provide "timely, fair and accurate inspections," as well as the government's failure to inform the plaintiffs that they would not receive fair inspections "without being subjected to extortion." (Compl.¶ ¶ 161, 163-64). As a result of the alleged RICO violations, the plaintiffs claim the following injuries: (1) "anxiety and mental anguish" based on the coercion that motivated Mr. Spinale to plead guilty; (2) damage to Mr. Spinale's health "as a result of his home confinement term of one year, which was the outcome of his conviction of charges of which he was innocent;" (3) "enormous monetary losses" suffered by Mr. Spinale personally "as a direct and proximate result of the racketeering activities;" (4) and "enormous losses" suffered by G & T "as a result of the actions of the [Federal Defendants], and the actions of the [Inspector Defendants]." (Compl.¶ ¶ 149-52). The total amount of losses is alleged to be "in the hundreds of thousands of dollars." (Compl.¶ 153).

*Discussion*

**\*4** The defendants have moved to dismiss the Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir.2000). Although the court must afford the complaint a "broad[ ] and liberal [ ]" construction, "argumentative inferences favorable to the party asserting jurisdiction should not be drawn." Cole v. Aetna Life & Casualty, 70 F.Supp.2d 106, 109 (D.Conn.1999) (internal quotation marks and citation omitted); *see also* Klein & Vibber, P.C. v. Collard & Roe P.C., 3 F.Supp.2d 167, 169 (D.Conn.1998), *aff'd,* 201 F.3d 431 (2d Cir.1999). The burden of proving subject matter jurisdiction rests with the plaintiff, *see* Makarova, 201 F.3d at 113, and the court may look to evidence outside the pleadings when determining whether the plaintiff has met its burden. *See* City of New York v. Federal Deposit Insurance Corp., 40 F.Supp.2d 153, 160 (S.D.N.Y.1999) (citing Kamen v. American Telephone & Telegraph Co., 791 F.2d 1006, 1011 (2d Cir.1986)).

On a motion to dismiss pursuant to Rule 12(b)(6), the court's function is to rule on the legal sufficiency of the claim as stated in the complaint. *See* Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir.1985). A court should not dismiss a claim unless it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v.. Gibson, 355 U.S. 41, 45-46 (1957); *see also* Hishon v. King & Spalding, 467 U.S. 69, 73 (1984). In deciding the motion, the court must accept the complaint's factual allegations as true and draw all reasonable inferences in the plaintiff's favor. Bolt Electric Inc. v. City of New York, 53 F.3d 465, 469 (2d Cir.1995). "[A] complaint must include only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' " Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002) (quoting Fed.R.Civ.P. 8(a)(2)). A complaint is sufficient if it "give[s] the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.* (quoting Conley, 355 U.S. at 47).

The plaintiffs allege that this Court has subject matter jurisdiction over their RICO claim pursuant to 28 U.S.C. § 1331 because the claim "arise[s] under the laws and Constitution of the United States," and also pursuant to 18 U.S.C. § 1964(c) since the claim seeks recovery for violations of Section 1962. (Compl.¶ 27(a), (b)). The plaintiffs assert that subject matter jurisdiction is available for the remainder of their claims under 28 U.S.C. § 1367(a), since the breach of contract and fraud claims are part of the same case or controversy as the claims arising under federal law. (Compl.¶ 27(c)).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                    Page 4
Not Reported in F.Supp.2d, 2004 WL 50873 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*5** Since the Federal Defendants have moved to dismiss on different grounds from those advanced by Mr. Malavet and Mr. Cutler, I will discuss their motions separately.

A. *Federal Defendants' Motion to Dismiss*

1. *RICO Claims*

RICO authorizes a private cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). To state a claim for damages based upon a violation of section 1962, plaintiffs must establish that "a defendant, through the commission of two or more acts constituting a pattern of racketeering activity, directly or indirectly participated in an enterprise, the activities of which affected interstate or foreign commerce." De Falco v. Bernas, 244 F.3d 286, 306 (2d Cir.2001); *see also* Moss v. Morgan Stanley, Inc., 719 F.2d 5, 17 (2d Cir.1983). An "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). A "pattern of racketeering activity" may be found if plaintiffs allege "at least two acts of racketeering activity, one of which occurred after [October 15, 1970] and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). In addition, the United States Supreme Court has held that RICO plaintiffs must show that "racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 239 (1989). Predicate acts include violations of various state and federal criminal statutes, including those prohibiting extortion, mail fraud, wire fraud, and bank fraud. 18 U.S.C. § 1961(1). Section 1962(c) requires that the "persons" liable and the "enterprise" be distinct entities. De Falco, 244 F.3d at 307; Bennett v. United States Trust Co. of New York, 770 F.2d 308, 315 (2d Cir.1985); *cf.* B.F. Hirsch v. Enright Refining Co., 751 F.2d 628, 634 (3d Cir.1984).

Claims for violations of RICO generally need only meet the notice pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure. *See* McLaughlin v. Anderson, 962 F.2d 187, 194 (2d Cir.1992) (extortion as predicate act); Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 26 n. 4 (2d Cir.1990) (RICO conspiracy claim). However, any alleged predicate acts involving fraud must be pled with the specificity required by Rule 9(b). *See* Mills v. Polar Molecular Corp., 12 F.3d 1170, 1176 (2d Cir.1993). Plaintiffs must specify the allegedly fraudulent statements, identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent. *See id.* Plaintiffs must also plead facts that give rise to a strong inference that the defendant possessed fraudulent intent. *See id.*

**\*6** The Federal Defendants assert that the plaintiffs' RICO claims should be dismissed for failure to state a claim pursuant to Rule 12(b)(6). They argue that the plaintiffs "frame their RICO claim against the [Federal Defendants] as one of 'aiding and abetting' a RICO enterprise," and that "courts in this district have routinely declined to recognize [this] as a cause of action." (Memorandum of Law in Support of the Federal Defendants' Motion to Dismiss the Complaint ("Fed.Def.Memo.") at 5). The Federal Defendants also argue that, even assuming that a right of action exists, the plaintiffs' RICO claim is barred by sovereign immunity. (Fed. Def. Memo. at 5-6).

a. *Aiding and Abetting*

Courts in this district have routinely held that "aiding and abetting" a RICO enterprise is not a valid cause of action. *See* In re Motel 6 Securities Litigation, 161 F.Supp.2d 227, 235 n. 7 (S.D.N.Y.2001)("[W]ithout express statutory authorization, plaintiffs cannot bring aiding and abetting claims under RICO statutes."); Goldfine v. Sichenzia, 118 F.Supp.2d 392, 406 (S . D.N.Y.2000)("Courts in this District have long held that there is no private right of action for aiding and abetting a RICO violation."); Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison, 955 F.Supp. 248, 256 (S.D.N.Y.1997) ( "Nowhere in the text of Section 1962 is there any indication that Congress intended to impose aiding and abetting liability for a violation of the RICO statute."). Thus, to the extent that the plaintiffs' RICO claim against the Federal Defendants rests on allegations of "aiding and abetting," it must be dismissed. *See* Goldfine, 118 F.Supp.2d at 406.[FN1]

FN1. The plaintiffs assert that "there are Lower Court Southern District of New York cases which hold that there is a RICO cause

Case 7:04-cv-08223-KMK    Document 165-32    Filed 07/07/2006    Page 5 of 13

Not Reported in F.Supp.2d                                                                 Page 5
Not Reported in F.Supp.2d, 2004 WL 50873 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

of action for aiding and abetting," and they cite *LaSalle National Bank v. Duff & Phelps Credit Rating Co.,* 951 F.Supp. 1071, 1089 (S.D.N.Y.1996), as supporting this contention. (Plaintiff's Memorandum of Law in Opposition to the Motion to Dismiss of the United States, Ann M. Veneman, Secretary of Agriculture & the United States Department of Agriculture ("Pl.Opp.Memo.") at 7). Careful reading of *LaSalle,* however, shows that the court in that case did *not* recognize a cause of action for aiding and abetting a RICO violation. The court stated that it "agrees with Judge Mukasey's analysis [in *Department of Economic Development v. Arthur Anderson & Co.,* 924 F.Supp. 449, 475 (S.D.N.Y.1996)] and recommends dismissal of plaintiffs' claim of aiding and abetting a RICO violation on the ground that there is no such cause of action." *Id.* at 1089. The statements the plaintiffs cite to simply assumed the viability of such a cause of action as a predicate for an alternative ground for dismissing the action. *Id.* at 1089 ("Even If an Aiding and Abetting Claim Were Viable, Plaintiffs' Claim Fails."). Thus, the plaintiffs' contention that there is a RICO cause of action for aiding and abetting is not supported by case law in this District.

The Complaint might be read, however, as alleging that the Federal Defendants directly participated in the RICO violations. (Compl.¶ ¶ 77, 80). The plaintiffs claim that the Federal Defendants "directly and indirectly allowed the 'RICO' enterprise to continuously operate from in or about 1980 to 1999 by empowering the Defendants, its employees, with the authority to conduct inspections without proper supervision and training." (Compl.¶ 80). Nevertheless, even if the Federal Defendants were chargeable with a direct RICO violation, the claims against them would be barred by sovereign immunity.

b. *Sovereign Immunity*

The Federal Defendants assert that "any civil RICO claims against the USDA or against Secretary Veneman, sued here in her official capacity, should [ ] be dismissed as barred by sovereign immunity." (Fed. Def. Memo. at 7).[FN2] The plaintiffs respond that since the "USDA inspection office is operated as a business," and not a "governmental entity," sovereign immunity does not act as a bar. (Plaintiff's Memorandum of Law in Opposition to the Motion to Dismiss of the United States, Ann M. Veneman, Secretary of Agriculture & the United States Department of Agriculture ("Pl.Opp.Memo.") at 8).

> FN2. Although Ann M. Veneman is named as an individual defendant, the Complaint makes no specific reference to her, other than asserting that she is a "person" for purposes of Section 1961(3). (Compl.¶ 71). The plaintiffs do not specify her individual contribution to the RICO enterprise. The claims are therefore properly considered as claims against her in her official capacity as Secretary of Agriculture, and she will be considered along with the United States as a Federal Defendant. *See Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 510 (2d Cir.1994) ("[a]n action against ... federal officers in their official capacities is essentially a suit against the United States.").

For a suit against the United States or its agencies to survive a motion to dismiss, the plaintiff must identify a specific statute that waives the sovereign immunity of the government for that type of claim. Principles of sovereign immunity dictate that the United States cannot be sued without its consent. *United States v. Mitchell,* 463 U.S. 206, 212 (1983); *Robinson,* 21 F.3d at 510. Congress can waive the United States' sovereign immunity only through unequivocal statutory language and may impose conditions on such a waiver. *Lane v. Pena,* 518 U.S. 187, 192 (1996); *United States v. Dalm,* 494 U.S. 596, 608 (1990); *United States v. Mottaz,* 476 U.S. 834, 841 (1986). If the United States has not waived its sovereign immunity, or if the conditions under which the United States has agreed to waive that immunity have not been met, federal subject matter jurisdiction does not exist. *Federal Deposit Insurance Corp. v. Meyer,* 510 U.S. 471, 475 (1994); *Morales v. United States,* 38 F.3d 659, 660 (2d Cir.1994).

**\*7** Although the language of the RICO statute is broad, courts have held that the United States is not considered a "person" under RICO and therefore, as matter of law, is not a proper party to a RICO claim. In *United States v. Bonanno Organized Crime Family of La Cosa Nostra,* 879 F.2d 20 (2d Cir.1989), the United States attempted to sue as an "injured person" under RICO. The Second Circuit rejected the United States' status as a RICO plaintiff, stating:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                          Page 6
Not Reported in F.Supp.2d, 2004 WL 50873 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Under RICO, a "person" can sue or be sued, and the statute does not distinguish between the definition of a potential plaintiff and defendant. The disadvantage of being a "person" within the meaning of RICO is that it subjects qualifying entities to the powerful and expansive criminal and civil liability provisions of the Act. Whether the government has standing to sue and whether it has waived its sovereign immunity may, in the abstract, be different questions, but in this case the answer to one is apparently the answer to both.

*Id.* at 22-23 (citations omitted). The court found that the United States could not be a "person" for RICO purposes without an "unequivocal expression" of intent by Congress to "expose the government to RICO liability," and that no such waiver could be found in the RICO statute. *Id.* at 23-26.

Along these lines, other courts have rejected RICO claims brought against the United States as a defendant, holding that the statute does not contain the requisite express and unequivocal waiver of the United States' sovereign immunity. *See Peia v. United States,* 152 F.Supp.2d 226, 234 (D.Conn.2001); *Andrade v. Chojnacki,* 934 F.Supp. 817, 831 (S.D.Tex.1996); *McMillan v. Department of the Interior,* 907 F.Supp. 322, 326 (D.Nev.1995), *aff'd,* 87 F.3d 1320 (9th Cir.1996). The definition of "person" in RICO does not explicitly mention the federal government, as is required for a waiver of federal sovereign immunity. *See Lane,* 518 U.S. at 192 ("A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text and will not be implied.") (citations omitted).

Finally, some courts have stated that, while the legislative history of RICO may indicate an intention by Congress to render local governmental entities liable, it cannot be read to suggest that the United States or federal agencies should be liable. *See Donahue v. Federal Bureau of Investigation,* 204 F.Supp.2d 169, 174 (D.Mass.2002); *cf. Lane,* 518 U.S. at 192 ("A statute's legislative history cannot supply a waiver that does not appear clearly in any statutory text."); *United States v. Angelilli,* 660 F.2d 23, 32-33 (2d Cir.1981) (holding local government liable based on RICO's legislative history).

The plaintiffs nevertheless claim that the PACA establishes the USDA's inspection service as a business, since the fees paid by the person requesting the inspection cover the costs of the service and are to be deposited in the United States Treasury. (Pl. Opp. Memo. at 8-9). The plaintiffs argue that this is significant because if "the Federal Defendants, in operating the inspection service, are not engaged in the business of government, but in the business of providing a service for a fee," then they are not protected by sovereign immunity. (Pl. Opp. Memo. at 10). But the plaintiffs cite no cases to support their proposition that a federal agency waives sovereign immunity if it acts like a business enterprise. Moreover, aside from the fact that the fees paid by the person requesting an inspection will cover the cost of providing the service itself, the plaintiffs offer no explanation of how the USDA acts as a business and not a federal agency. The plaintiffs do not dispute the well-established principle that Congress can waive the United States' sovereign immunity only through unequivocal statutory language. Neither the PACA nor the AMA provides for a waiver of the United States' sovereign immunity for RICO claims. *See* 7 U.S.C. § 499a *et seq.;* 7 U.S.C. § 1621 *et seq.; see also Advantage Produce Marketing Co. v. Caito Produce,* No. C2-89-095, 1991 WL 424983, at *6 (S.D.Ohio May 10, 1991) ("The provisions of [PACA] are wholly devoid of any indication that the United States intended to waive its sovereign immunity.").

**\*8** It follows that the RICO claims against the United States must be dismissed. Likewise, RICO claims against the USDA and Secretary Veneman should also be dismissed. *See Drake v. Panama Canal Commission,* 907 F.2d 532, 534 (5th Cir.1990) ("[sovereign] immunity [of the U.S.] extends to the government's officers and agencies"); *National Commodity and Barter Association v. Gibbs,* 886 F.2d 1240, 1246-47 (10th Cir.1989); *Golyar v. McCausland,* 738 F.Supp. 1090, 1096 (W.D.Mich.1990) (sovereign immunity applies to federal agency when it is the named defendant).

### 2. *Breach of Contract Claim*

The plaintiffs' second claim against the Federal Defendants alleges a breach of contract as a result of the USDA's failure "to provide to Plaintiffs timely [ ] inspections without the employment of coercion and extortion by its inspectors." (Compl.¶ 154). The plaintiffs go on to state that Mr. Spinale has suffered "enormous monetary losses as a direct and proximate result of the breach of contract." (Compl.¶ 158). Although the amount of damages the plaintiffs are claiming is still unknown, they estimate it to be "in the hundreds of thousands of dollars." (Compl.¶ 160).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
Not Reported in F.Supp.2d, 2004 WL 50873 (S.D.N.Y.)  
**(Cite as: Not Reported in F.Supp.2d)**

Page 7

The Federal Defendants assert that the breach of contract claim fails for lack of subject matter jurisdiction under the Tucker Act, 28 U.S.C. § § 1346, 1491. (Fed. Def. Memo. at 10, n. 10).[FN3] The Tucker Act provides for both a waiver of sovereign immunity and subject matter jurisdiction over non-tort claims against the Government. The Act vests concurrent jurisdiction in the district court and the Court of Federal Claims where the amount in dispute is less than $10,000. 28 U.S.C. § 1346(a)(2); *see* C.H. Sanders Co. v. BHAP Housing Development Fund Co., 903 F.2d 114, 119 (2d Cir.1990). However, under the Act only the Court of Federal Claims has jurisdiction over claims exceeding $10,000. 28 U.S.C. § 1491(a)(1); C.H. Sanders, 903 F.2d at 119. While claims exceeding $10,000 can be brought in the district court, in such cases an independent waiver of sovereign immunity must be found *outside* the Tucker Act. *Id.*

> FN3. In *Mitchell, 463 U.S. at 215,* the Supreme Court affirmed that the Tucker Act accomplishes the necessary waiver of sovereign immunity for the United States to be subject to jurisdiction on a breach of contract claim. A party must specify a substantive cause of action outside the Tucker Act but need not identify a separate waiver of sovereign immunity. *Id.* at 218-19.

The plaintiffs in this case have not identified any independent waiver of sovereign immunity outside the Tucker Act. Accordingly, because the Complaint alleges damages in the "hundreds of thousands of dollars," the Court of Federal Claims has exclusive jurisdiction over this claim. The plaintiffs' assertion that this Court should exercise pendent jurisdiction over the contract claims pursuant to 28 U.S.C. § 1367(a)(Pl. Opp. Memo. at 13) also fails because of the absence of a waiver of sovereign immunity. For the foregoing reasons, the plaintiffs' breach of contract claim should be dismissed.

### 3. Fraud Claim

The plaintiffs' third claim asserts that the Federal Defendants "knowingly and willfully misrepresented to Plaintiffs that they could obtain timely, fair and accurate inspections of the product which they received." (Compl.¶ 163). The Complaint alleges that the Federal Defendants "knowingly permitted the extortion, which [the Inspector Defendants] employed, to continue." (Compl.¶ 165). The Federal Defendants move to dismiss this claim under Rule 12(b)(1), claiming that the Court lacks subject matter jurisdiction over all claims sounding in tort. (Fed. Def. Memo. at 10).

*9 Although the plaintiffs do not specifically bring the third claim pursuant to the Federal Tort Claims Act (the "FTCA"), the FTCA provides the exclusive remedy for torts committed by federal agencies and is thus the proper basis for this claim.[FN4] The FTCA provides both a basis for subject matter jurisdiction and a waiver of sovereign immunity. Under 28 U.S.C. § 1346(b)(1):

> FN4. The plaintiffs assert in their memorandum of law opposing this motion that they have not alleged a cause of action under the FTCA and are "alleging breach of contract issues." (Pl. Opp. Memo. at 19). Although I fail to see how the fraud claims could be construed as a breach of contract, they should be dismissed under either approach. If the fraud claims are, as plaintiffs claim, claims for breach of contract, they should be dismissed for lack of subject matter jurisdiction pursuant to the Tucker Act.

the district courts ... shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

The waiver of sovereign immunity is found in 28 U.S.C. § 2674, which states that "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances."

Exhaustion of administrative remedies is a jurisdictional prerequisite under the FTCA. *See McNeil v. United States, 508 U.S. 106, 113 (1993); Robinson, 21 F.3d at 510.* 28 U.S.C. § 2675(a) provides:

An action shall not be instituted upon a claim against the United States for money damages for injury or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                Page 8
Not Reported in F.Supp.2d, 2004 WL 50873 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

loss of property ... caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail. The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section.

The burden is on the plaintiff in a tort claim against the United States to "both plead and prove compliance with the statutory requirements." *In re Agent Orange Product Liability Litigation,* 818 F.2d 210, 214 (2d Cir.1987).

The Federal Defendants claim that the plaintiffs have not exhausted their administrative remedies: "[T]he USDA has not received from Plaintiffs (or from Plaintiffs' counsel of record) an administrative claim or any other written notification of a tort claim concerning the allegations raised in the Complaint." (Fed. Def. Memo. at 12). The USDA asserts that the USDA "has no record of receiving an executed [official grievance form] from G & T, or its duly authorized representatives, concerning the circumstances set forth in the complaint." (Declaration of Kenneth E. Cohen dated May 16, 2003 ("Cohen Decl."), ¶ 4). Although the plaintiffs do not specifically address the requirements of Section 2675(a), the Complaint does assert that Mr. Spinale "on many occasions complained and brought to the attention of the supervisors of the AMS office at the Hunts Point Terminal Market and at the central office of the AMS in Washington D.C. the unfair inspections that were being conducted by their inspectors; however [he] never received any response from the government." (Compl.¶ 56). The Complaint also states that "[Mr.] Spinale would call the Washington office of the AMS office and complain to Donald Paradis, a USDA official, if he believed that an inspection was incorrect, improper, unfair, or untimely, to no avail." (Compl.¶ 52). The plaintiffs' allegations, however, are insufficient to satisfy the FTCA's administrative exhaustion requirement.

**\*10** A formal claim is not filed for purposes of 28 U.S.C. § 2675 until a federal agency receives from a claimant written notification that is "accompanied by a claim for money damages in a sum certain for injury to or loss of property ... and is accompanied by evidence of his authority to present [the] claim." 28 C.F.R. § 14.2(a). In *Johnson v. Smithsonian Institution,* 189 F.3d 180 (2d Cir.1999), the Second Circuit considered whether the FTCA requirements had been satisfied by letters sent from a family to the Smithsonian Institute demanding the return of disputed artwork. The court held that "the letters did not include a claim for a sum certain and therefore did not constitute the filing of a formal administrative claim for FTCA purposes." *Id.* at 190. In *Kendall v. Watkins,* 998 F.2d 848, 852 (10th Cir.1993), the court held that the plaintiff's letters to a federal agency outlining the type of remedy she wanted did not satisfy the FTCA's formal administrative claim requirement since the letters did not state a specific monetary sum. Similarly, the plaintiffs in this case have not demonstrated that they demanded a sum certain in damages from the federal government, nor have they asserted that their complaints to the AMS were ever reduced to writing.

Since the plaintiffs have not met the exhaustion requirement under the FTCA, their fraud claim against the Federal Defendants should be dismissed.

B. *Inspector Defendants' Motion to Dismiss*

Elias Malavet and Paul I. Cutler, both individually named Inspector Defendants, have moved to dismiss the RICO claims against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Although these two defendants have not filed their motions jointly, the motions raise the same arguments and therefore will be considered together.[FN5]

> FN5. It should be noted that the motion to dismiss does not apply to the other individually named defendants who have not filed motions at this time.

1. *Physical and Emotional Damages*

The moving Inspector Defendants first assert that the plaintiffs "cannot recover RICO damages for physical and emotional pain and suffering." (Defendant Elias Malavet's Memorandum of Law in Support of his Motion to Dismiss the Complaint ("Malavet Memo.") at 10). In the Complaint, the plaintiffs make several claims for damages, including compensation for Mr. Spinale's "anxiety and mental anguish, as a result of the wrongful acts of Defendant Cashin, since he was innocent of the criminal charges lodged against him, and was coerced to plead guilty

Case 7:04-cv-08223-KMK    Document 165-32    Filed 07/07/2006    Page 9 of 13

Not Reported in F.Supp.2d                                                                                  Page 9
Not Reported in F.Supp.2d, 2004 WL 50873 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

and was convicted of a crime he did not commit." (Compl.¶ 149). Additionally, the Complaint alleges that Mr. Spinale's "health has suffered as a result of his home confinement term of one year, which was the outcome of his conviction of charges of which he was innocent." (Compl.¶ 150).

To state a claim under RICO, the plaintiffs must identify an injury to "business or property by reason of" a RICO violation. 18 U.S.C. § 1964. Courts have uniformly held that damages for personal injuries and emotional distress are not recoverable under RICO. *See* Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc., 191 F.3d 229, 241 (2d Cir.1999) (noting "the lack of a RICO damages remedy for even direct personal injuries"); Williams v. Dow Chemical Co., 255 F.Supp.2d 219, 225 (S.D.N.Y.2003); Le Paw v. BAT Industries P.L.C., No. 96 Civ. 4373, 1997 WL 242132, at *2 (E.D.N.Y. Mar. 6, 1997) ("In other words, claims for personal injuries or emotional distress are not cognizable under RICO."); Shaw v. Rolex Watch U.S.A., Inc., 776 F.Supp. 128, 134-35 (S.D.N.Y.1991). Thus, Mr. Spinale cannot recover damages for any physical or emotional injuries he may have sustained as a result of the alleged RICO violations.

2. *Damage to Business and Property*

**\*11** The plaintiffs also claim that they suffered "enormous monetary losses as a direct and proximate result of the racketeering activities." (Compl.¶ 151). These types of damages are recoverable under RICO. The moving Inspector Defendants contend, however, that the plaintiffs "have not alleged a legally cognizable RICO injury proximately caused by the alleged enterprise," and that the Complaint should therefore be dismissed. (Malavet Memo. at 10). At this stage of the proceedings, the plaintiffs are only required to provide "a short and plain statement of the claim showing that [they are] entitled to relief." Fed.R.Civ.P. 8(a)(2). *See* Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir.1988) (dismissal "is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised").

The acts for which the plaintiffs are claiming damages are varied. Six of the racketeering acts alleged in the Complaint involve instances where Mr. Spinale himself offered bribes to individual inspectors. (Compl.¶ 86(u), (x), (tt), (ooo), (bbbb), (ffff)). The other acts involve bribes paid by individuals other than Mr. Spinale, although those persons are not always identified. (Compl.¶ 86). It seems, therefore, that the plaintiffs may be claiming damages under several different theories. First, the plaintiffs claim that because Mr. Spinale himself was "coerced and extorted" to pay bribes, he was damaged both by the loss of the bribe money and by the penalties and business losses that accompanied his guilty plea. (Compl.¶ ¶ 150-51). The second theory of damages seems to be that because the Inspector Defendants only issued "fair and accurate" inspections for produce purchasers who offered them bribes, thereby permitting the corrupt purchasers to pay discounted prices for "out of grade" produce, these corrupt purchasers were given a competitive advantage over the plaintiffs. (Compl.¶ ¶ 53, 58, 60, 69). Thus, the plaintiffs claim they were injured when the Inspector Defendants took bribes from third parties. Finally, it may be the case that the plaintiffs are claiming damages for injuries that allegedly resulted when Mr. Spinale did not participate in the bribery scheme-namely, damages the plaintiffs suffered every time they purportedly received an inaccurate inspection because they did not pay a bribe.

a. *Bribes Paid by Mr. Spinale*

The moving Inspector Defendants argue that because Mr. Spinale pled guilty to bribery, he "should not be permitted to profit in the form of RICO treble damages from the very acts which render him as a felon." (Malavet Memo. at 10-11).[FN6] The Inspector Defendants allege that the plaintiffs should be barred from making any RICO claims where the predicate acts would be bribes given by Mr. Spinale himself to the AMS Inspectors. They argue that because Mr. Spinale voluntarily gave these bribes in exchange for an advantageous inspection of his produce, he is precluded from claiming that he should be compensated for being "forced" to participate in the bribery scheme.

> FN6. In Mr. Cutler's *pro se* motion, he likewise asserts that Mr. Spinale, "by having pleaded guilty to bribing a public official, was involved in the Hunts Point Market bribery scheme," and that his "guilty plea and lack of specific evidence" are "cause for dismissal of his claim." (Affidavit/Affirmation of Paul I. Cutler in Support of Motion to Dismiss dated June 16, 2003 ("Culter Aff."), ¶ VII).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK    Document 165-32    Filed 07/07/2006    Page 10 of 13

Not Reported in F.Supp.2d                                                                                              Page 10
Not Reported in F.Supp.2d, 2004 WL 50873 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*12** Mr. Spinale pled guilty to bribing a public official in violation of 18 U.S.C. § 201(b)(1)(A). (Marks Decl., Exh. A). This section makes it a crime to "directly or indirectly, corruptly give[ ], offer[ ] or promise [ ] anything of value to any public official ... with intent ... to influence any official act." The elements of the offense are that: (1) the defendant gave, offered, or promised something of value as described in the indictment; (2) the person accepting the bribe was an official of the United States or was acting on behalf of the United States; and (3) the defendant intended to influence an official act. 2 Edward J. Devitt et al., Federal Jury Practice and Instructions § 25.03 (4th ed.1990). By pleading guilty, Mr. Spinale admitted to each of the three elements. See McCarthy v. United States, 394 U.S. 459, 466 (1969) ("[A] guilty plea is an admission of all the elements of a formal criminal charge."). Further, his guilty plea prohibits Mr. Spinale from proceeding with a claim that requires him to prove a fact that is contrary to any of the elements of the crime to which he pleaded guilty. See United States v. Podell, 572 F.2d 31, 35 (2d Cir.1978) ("[A] criminal conviction, whether by jury verdict or guilty plea, constitutes estoppel ... in a subsequent civil proceeding as to those matters determined by the judgment in the criminal case.").

During his plea allocution, Mr. Spinale admitted that he "paid money to Bill Cashin for the purpose of influencing the outcome of his inspection report on a load of potatoes." (Plea Tr. at 10th unnumbered page). He specifically stated, "I told him the specific amount I wanted him to put in the inspection report." (Plea Tr. at 10th-11th unnumbered pages). Mr. Spinale thus conceded that he voluntarily gave Inspector Cashin money with the intention of securing a benefit for himself. Although the plaintiffs now claim that Mr. Spinale "did not give money to inspectors in order to downgrade the inspections so that he could re-negotiate the price of the produce to a lower price" and instead claim that Mr. Spinale was "coerced and extorted into paying money to the inspectors," these assertions are directly contrary to those made in his plea. (Compl.¶ 84). In his plea, Mr. Spinale acknowledged that he was "paying [Inspector Cashin] to dictate what he was putting into the report" and admitted that at the time he knew what he was doing was wrong. (Plea Tr. at 11th unnumbered page). The plaintiffs' damages claims are predicated on a finding by the court that Mr. Spinale was forced into pleading guilty for crimes he did not voluntarily commit. (Compl.¶ ¶ 148-52). The Inspector Defendants are correct in their assertion

that Mr. Spinale cannot now assert "a factual position in a legal proceeding that is contrary to a position previously taken by him in a prior proceeding." (Malavet Memo. at 14) (quoting Bates v. Long Island Railroad Co., 997 F.2d 1028, 1037 (2d Cir.1993)). Civil lawsuits may not be used to collaterally attack criminal convictions. See Heck v. Humphrey, 512 U.S. 477, 485-86 (1994); Stichting Ter Behartiging Van De Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt International B.V. v. Schreiber, 327 F.3d 173, 180 (2d Cir.2003). To the extent that the plaintiffs are now attempting to claim that Mr. Spinale was forced into paying the bribes covered by his guilty plea,[FN7] those claims should be disregarded.[FN8]

> FN7. Although Mr. Spinale only pled guilty to one count of bribery, he stated during his plea allocation that "[o]n the other dates in the Indictment, I paid Mr. Cashin $100 per inspection to influence the outcome of the report." (Plea Tr. at 11th unnumbered page). While this statement may not have the same collateral estoppel effect as his guilty plea, Mr. Spinale's admission that he paid money to gain an advantageous report shows that his own actions, not the Inspector Defendants' "extortion," caused his injuries (i.e., loss of the bribe money). Mr. Spinale also asserts vaguely that "[a]dditionally, other inspectors engaged in coercion and extortion in order to obtain money from [him]." (Compl. ¶ 70 n. 2). If, indeed, Mr. Spinale was "forced" to pay bribes to other inspectors without intending to receive or actually receiving a benefit, he may be able to make out a RICO claim. The plaintiffs should therefore be allowed to replead, consistent with their obligations under Rule 11 of the Federal Rules of Civil Procedure, only those allegations relating to bribes paid to the Inspector Defendants *not* mentioned in Mr. Spinale's indictment.

> FN8. It is possible to read the Complaint as alleging that Mr. Spinale's guilty plea does not bar his claim because the bribes he paid were extorted from him by the Inspector Defendants. Even were Mr. Spinale to assert a sufficient factual basis for an extortion defense-a question that need not be reached in deciding this motion-he still would not be entitled to have his conviction vacated. This is because by pleading guilty, Mr. Spinale

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                       Page 11
Not Reported in F.Supp.2d, 2004 WL 50873 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

"waived all ... non-jurisdictional defenses and cannot raise them now by collateral attack." *LaMagna v. United States,* 646 F.2d 775, 778 (2d Cir.1981); *see also United States v. Coffin,* 76 F.3d 494, 496 (2d Cir.1996). Therefore, so long as Mr. Spinale's guilty plea represented a voluntary and intelligent choice, *United States v. Muench,* 694 F.2d 28, 34 (2d Cir.1982), he has waived the right to assert an extortion defense.

**\*13** Mr. Spinale has never questioned the voluntariness of his plea in the context of his criminal proceeding. He has never brought a formal motion challenging his plea pursuant to 28 U.S.C. § 2255. Because the damages he is now claiming would require findings that are directly contrary to facts set forth in his plea, they cannot be awarded. There is thus no basis upon which Mr. Spinale can now claim a RICO injury based on bribes he admitted to giving to the Inspector Defendants.[FN9]

> FN9. The Inspector Defendants also suggest that the plaintiffs' "unclean hands," provide an absolute defense to a civil RICO claim. It is unclear whether this doctrine may properly be applied to civil RICO claims. The Second Circuit has not ruled on this issue, although other circuits have. The First Circuit, in *Roma Construction Co. v. Russo,* 96 F.3d 566, 571-75 (1st Cir.1996), suggested that the doctrine does not apply but ultimately concluded that the plaintiffs did not have "unclean hands." The Eleventh and Seventh Circuits have opined that such a doctrine may apply in civil RICO actions. *See Sikes v. Teleline, Inc.,* 281 F.3d 1350, 1366 n. 41 (11th Cir.2002) (discussing the "curious nature" of a gambler bringing a RICO claim against a bookie and noting "the possibility that the plaintiffs may be barred from bringing such a claim by the 'unclean hands' doctrine"); *Laborers' International Union of North America v. Caruso,* 197 F.3d 1195, 1197-98 (7th Cir.1999) (evaluating "unclean hands" argument in the context of summary judgment). The Third Circuit has applied the doctrine in the context of determining whether an injunction, after trial, can be denied. *Northeast Women's Center, Inc. v. McMonagle,* 868 F.2d 1342, 1354-55 (3d Cir.1989). Given that the plaintiffs cannot show a RICO injury in connection with the claims pled in the instant Complaint, this issue need not be resolved at this time.

b. *Bribes Offered by Third Parties*

To show that an injury resulted "by reason of" the actions of the Inspector Defendants, the plaintiffs must allege "that the defendant's violations were a proximate cause of the plaintiff's injury, i.e., that there was a direct relationship between the plaintiff's injury and the defendant's injurious conduct." *Standardbred Owners Association v. Roosevelt Raceway Associates, L .P.,* 985 F.2d 102, 104 (2d Cir.1993). This requires showing not only that the Inspector Defendants' alleged RICO violations were the "but-for" cause or cause-in-fact of the plaintiffs' injury, but also that the violations were the legal or proximate cause. *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 268 (1992); *Standardbred Owners,* 985 F.2d at 104.

The *Holmes* court identified three reasons for RICO's requirement of direct injury:

First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors. Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.

503 U.S. at 269 (citations omitted).

Following *Holmes,* the Second Circuit has repeatedly reaffirmed that only "the targets, competitors and intended victims of the racketeering enterprise" have standing to bring civil RICO claims. *Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 124 (2d Cir.2003); *see also Lewis ex rel. American Express Co. v. Robinson (In re American Express Co. Shareholder Litigation),* 39 F.3d 395, 400 (2d Cir.1994) (denying RICO standing to American Express shareholders because injury to the shareholders was neither the "preconceived purpose" nor the "specifically-intended consequence" of a scheme to discredit an American Express

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK    Document 165-32    Filed 07/07/2006    Page 12 of 13

Not Reported in F.Supp.2d                                                                                           Page 12
Not Reported in F.Supp.2d, 2004 WL 50873 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

competitor); *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 23-24 (2d Cir.1990) (holding that whistleblower's loss of employment for failure to cooperate in a RICO scheme was not proximately caused by racketeering activity because the employee was not "the target of the racketeering activity").

**\*14** Accordingly, where damages to a plaintiff derive from its injury as a third party, the plaintiff lacks standing to bring a RICO action. *See Laborers Local 17,* 191 F.3d at 239-41 (concluding that union health and benefit fund lacked standing under RICO to sue tobacco companies for increased medical costs resulting from participants' and beneficiaries' tobacco-related illnesses because increased costs to the funds were a secondary result of direct harm caused by companies to participants and beneficiaries); *Rand v. Anaconda-Ericsson, Inc.,* 794 F.2d 843, 849 (2d Cir.1986). There is no direct injury if the plaintiff's injuries are "derivative of damage to a third party." *Laborers Local 17,* 191 F.3d at 237.

In this case, even if the plaintiffs were able to prove that their business suffered due to the bribery scheme, the connection between the RICO violation and the competitive injury alleged is too attenuated to satisfy the proximate cause requirement. The damage the plaintiffs would have suffered is not a direct result of bribes paid by third parties (who were the purported victims), but, at best, a remote consequence of those acts. As such, it cannot support the plaintiff's RICO claim. *See Khurana v. Innovative Health Care Systems, Inc.,* 130 F.3d 143, 149-50 (5th Cir.1997) (finding loss of business income too remote to satisfy proximate causation requirement); *Laborers Local 17,* 191 F.3d at 241. "Central to the notion of proximate cause [under RICO] is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his acts were 'a substantial factor in the sequence of responsible causation,' and whose injury was 'reasonably foreseeable or anticipated as a natural consequence.' " *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 769 (2d Cir.1994) (quoting *Hecht,* 897 F.2d at 23-24); *see also Laborers Local 17,* 191 F.3d at 235-36.

In *Callahan v. A.E.V., Inc.,* 182 F.3d 237 (3d Cir.1999), the Third Circuit found that although evidence of loss of business was adequate to avoid summary judgment on claims under the Sherman Act, this type of injury was not sufficient to show proximate causation to support a RICO claim. In *Callahan,* the defendant opened several supermarket-style beer distributorships in the Pittsburgh area, in violation of the Pennsylvania Liquor Code which limits an entrepreneur to owning or operating one beer distributorship. *Id.* at 240. The plaintiffs, owners and operators of smaller stores that sold beer, claimed that if the defendant had not defrauded the Pennsylvania Liquor Control Board ("LCB") into issuing more than one distributorship license to it, the LCB would have put the defendant out of business. *Id.* at 241-42. By staying in business, the defendant "was able to use [its] control of several stores to obtain volume discounts by buying for the stores in the aggregate. The plaintiffs were then harmed by the defendants' ability to sell at lower prices." *Id.* at 242. The court rejected the plaintiffs' RICO claims for several reasons. First, it found that "it would be difficult to trace the chain from the fraud on the LCB to particular actions of the defendants, and then to particular portions of the plaintiffs' losses, because the fraud only directly affects the LCB." *Id.* at 264. "[E]ven if we could say that the plaintiffs' losses were entirely attributable to the defendants' ability to obtain [volume] discounts, we would be hard-pressed to say that those discounts were *entirely* attributable to [the defendant's] fraud on a third party, the LCB." *Id.* Thus, "[a]s in *Holmes* ... this causation chain is much too speculative and attenuated to support a RICO claim." *Id.* (citation omitted). Second, the court observed that "recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries." *Id.* (quoting *Holmes,* 503 U.S. at 269). In particular, the court noted that the wholesalers from whom the defendant obtained its volume discounts suffered damages identical to the plaintiffs.' *Id.* at 265. Thus, "[d]etermining how to apportion damages ... would require exactly the same sort of apportionment determination condemned in *Holmes,"* and "[t]his difficulty in apportioning damages among the potential plaintiffs suggests that proximate causation is not present." *Id.* at 265. Based on these factors, the court determined that "the plaintiffs cannot demonstrate a proximate causal connection between their injuries and the defendants' alleged racketeering activities." *Id.* at 267.

**\*15** The analysis in the case at hand is the same. Here, there is a bribery scheme that allegedly affected the market. The plaintiffs here are also trying to claim damages based on loss of business and market share. They thus face the same problems in establishing proximate cause as the plaintiffs in *Callahan.* In addition to the difficulties a court would have in determining how much of the plaintiffs'

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK    Document 165-32    Filed 07/07/2006    Page 13 of 13

Not Reported in F.Supp.2d                                                            Page 13
Not Reported in F.Supp.2d, 2004 WL 50873 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

business losses were attributable to the racketeering activity, the court would also face the problem of apportioning damages among other wholesalers or vendors who may have suffered similar injury to their business. Most importantly, however, the court in *Callahan* focused on the directness of the injury. Here, the racketeering activity was directed at the individuals paying bribes to the Inspector Defendants. The plaintiffs cannot recover damages since they were only a third party to those transactions,[FN10] precisely the type of indirect injury that does not establish proximate causation under *Holmes.* As a result, the plaintiffs' RICO claims based on the bribes given to AMS inspectors by individuals other than Mr. Spinale should be dismissed.

> FN10. Of course, Mr. Spinale also claims direct injury as a result of his own payment of bribes, an issue addressed above.

c. *Damage For Failure to Receive Accurate Inspections*

Finally, it may be that the plaintiffs are also claiming damage on they theory that they received inaccurate inspections when they refused to bribe the Inspector Defendants. While the plaintiffs do not specifically assert this as an injury for which they are claiming relief, they do state that there were times where the inspections they received "would not reflect the true condition of the produce." (Compl.¶ 53). The plaintiffs seem to imply that the Inspector Defendants deliberately misgraded their produce in order to coerce them into paying bribes. (Compl.¶ ¶ 53-58). If the plaintiffs do claim damages based on those allegedly inaccurate inspections, there may be proximate cause, as the injury would be more direct than the competitive injury claims discussed previously. *See In re American Honda Motor Co., Inc. Dealerships Relations Litigation,* 941 F.Supp. 528, 545 (D.Md.1996). The Complaint, however, is too vague for the Court to determine whether the plaintiffs intended to assert such a claim. The plaintiffs would ultimately have to prove both that they, in fact, received inaccurate inspections on specific occasions and that this was the result of the Inspector Defendants' efforts to extort bribes. Moreover, such a claim would run up against a variety of potential defenses, including the unclean hands defense as well as a statute of limitations defense based on the fact that the bulk of this claim presumably accrued before Mr. Spinale began paying bribes. Nonetheless, the plaintiffs should be allowed to assert such a claim if they can do so consistent with their obligations under Rule 11 of the Federal Rules of Civil Procedure. This claim should therefore be dismissed without prejudice to being repled.

*Conclusion*

**\*16** For the reasons stated above, the motions of both the Federal Defendants and the Inspector Defendants should be granted and the claims asserted against them dismissed. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Kimba M. Wood, Room 1610, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

S.D.N.Y.,2004.
Spinale v. U.S.
Not Reported in F.Supp.2d, 2004 WL 50873 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1:03cv01704 (Docket) (Mar. 12, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.