Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
**(Cite as: Not Reported in F.Supp.2d)**

▷
Briefs and Other Related Documents

United States District Court,S.D. New York.
Thomas ZITO et al., Plaintiffs,
v.
LEASECOMM CORPORATION, Microfinancial
Incorporated, Cardservice International, Inc., E-
Commerce Exchange, Inc., On-Line Exchange,
Richard Karn Wilson a/k/a Richard Karn, Patrick
Rettew, Peter R. Von Bleyleben, Richard F. Latour,
Carol Salvo, Paul Schneider, Medtrak Corporation,
Charles Burtzloff a/k/a Chuck Burtzloff, John Doe
and Eddy Roe, the last two being ficitious names, the
real names of said Defendants being presently
unknown to Plaintiffs, said fictitious names being
intended to designate persons who are acting in
concert with the Defendants, Defendants.
**No. 02 Civ.8074 GEL.**

Sept. 30, 2004.

John C. Klotz, New York, NY, for Plaintiffs Thomas
Zito et al.

Andrew P. Fishkin, Charles W. Stotter, Edwards &
Angell, LLP, New York, NY, for Defendants
Leasecomm Corporation, Microfinancial,
Incorporated, Peter R. Von Bleyleben, Richard F.
Latour, and Carol Salvo.

Steven M. Bierman, James D. Arden, Mark E. Walli,
Sidley Austin Brown & Wood, LLP, New York, NY;
Richard J. Grad, Jennifer Altfeld Landau, Sidley
Austin Brown & Wood, LLP, Los Angeles, CA, for
Defendant Cardservice International, Inc.

Kenneth King, Jason Chue, Patterson, Belknap,
Webb & Tyler LLP, New York, NY, for Defendant
E-Commerce Exchange, Inc.

James A. Saville, Jr., Hill Rivkins & Hayden LLP,
New York, NY, for Defendants On-Line Exchange
and Paul Schneider.

Kevin S. Reed, Quinn Emanuel Urquhart Oliver &
Hedges, LLP, New York, NY, for Defendant Richard
Karn Wilson.

Martin Glenn, John T. Hammer, O'Melveny & Myers
LLP, New York, NY, for Defendant Charles
Burtzloff.

OPINION AND ORDER
LYNCH, J.
**\*1** In this civil RICO action, numerous plaintiffs sue

Leasecomm Corporation and its parent
Microfinancial Inc. ("MFI"), three of its officers
(Peter R. Von Bleyleben, Richard F. Latour, and
Carol Salvo) (the "MFI Officers"), three of its alleged
"dealers and vendors" (Compl.¶ 39) (Cardservice
International, E-Commerce Exchange, and On-line
Exchange), and several shareholders of those or other
dealers (Patrick Rettew and Richard Karn Wilson,
shareholders of non-defendant Themeware, Inc.;
Medtrak Corporation, a shareholder of defendant On-
Line Exchange; and Paul Schneider, the principal
shareholder of Medtrak), for damages arising from
alleged fraudulent schemes involving the leasing of
e-commerce services and products. On defendants'
motion, the original complaint was dismissed in
September 2003 for failure to state a claim, with
leave to replead. *See Zito v. Leasecomm Corp., No.
02 Civ. 8074, 2003 WL 22251352 (S.D.N.Y. Sept.
30, 2003)* ("*Zito I"* ). Plaintiffs filed an Amended
Complaint in November 2003.

All defendants except Rettew and Medtrak (who have
not responded to the complaint) have once again
moved to dismiss for failure to state claim under the
Racketeer Influenced and Corrupt Organizations
statute, commonly known as "RICO." 18 U.S.C. §
§ 1961-1964. They also challenge the sufficiency of
plaintiffs' state law claims. Finally, defendants Karn,
On-line Exchange, and Schneider argue for dismissal
based on lack of in personam jurisdiction. In
response, plaintiffs have once again sought leave to
amend the complaint. Defendants' motions will be
granted in part and denied in part; plaintiffs' motion
to amend will be granted in part.

BACKGROUND

The facts summarized below are taken from the
Amended Complaint, the allegations of which must
be assumed true for purposes of these motions to
dismiss. The crux of the Amended Complaint is that
Leasecomm formed an enterprise with various
dealers who used unscrupulous and deceptive
marketing tactics to lure unsuspecting victims into
signing contracts with Leasecomm. These contracts
contained unconscionable terms that allowed
members of the enterprise to "reap unconscionable
profits" through extreme collection tactics. (¶ ¶ 73-
74, 122-147.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
**(Cite as: Not Reported in F.Supp.2d)**

These central allegations have not changed significantly from those outlined in plaintiffs' original complaint. However, in response to the Court's Opinion in *Zito I,* plaintiffs have attempted to clarify the various schemes alleged, which predicate acts were committed in furtherance of which of them, and by which defendants. Toward this end, plaintiffs have described what they refer to as the "Master Scheme" of the Leasecomm enterprise, as well as various "Implementing Schemes."

### I. The Leasecomm Enterprise

#### A. *General Purpose of Enterprise*

MFI is a "financial intermediary" which "finances activities of third parties through various contracts and legal arrangements which it calls leases." (¶ 45.) MFI conducts "almost all" of its business through defendant Leasecomm. (*Id.*) Prior to 1998, MFI/Leasecomm was engaged in the business of leasing or financing the purchase of "tangible business machine products including credit POS [point of sale] swipe machines." (¶ 57.) Those products were actually marketed by other entities, including defendant Cardservice International ("Cardservice"). (*Id.*) In 1998, MFI/Leasecomm began a program in which it began to lease e-commerce services, "such as web sites, POS software, and merchant accounts." (¶ ¶ 48, 58.) These products were marketed "as a part of proffered business ventures" by, among others, defendants E-Commerce Exchange ("ECX"), Cardservice, and On-line Exchange ("OX"). (¶ 59.) MFI/Leasecomm entered into "strategic alliances" with these entities, which plaintiffs refer to alternately as MFI/Leascomm's "dealers" or "the Leasecomm Associates." (¶ ¶ 32, 54-55.)

**\*2** The Amended Complaint, like the original complaint, focuses on two kinds of conduct by the defendants. The first is the deceptive marketing practices of the MFI/Leasecomm dealers, who plaintiffs allege used deceptive advertising, misrepresentations, and unfair "bait and switch" tactics to corral vulnerable customers into leasing their overpriced and ineffective products. The dealers, however, did not themselves execute the lease agreements with the customers; rather, by prior arrangement with MFI/Leasecomm, they had the customers sign a form contract provided by MFI/Leasecomm, which MFI/Leasecomm later executed. The contracts executing these leases were

non-negotiable and contained numerous deceptive terms, which the dealers are alleged to have concealed or misrepresented. The second type of conduct is the aggressive, and allegedly fraudulent and extortionate, enforcement tactics subsequently used by MFI/Leasecomm against defaulting lessees-tactics enabled in part by the leases' allegedly one-sided, unconscionable terms. These collection tactics formed a central and publicly acknowledged part of MFI/Leasecomm's business plan that "distinguish[ed] MFI from its competitors and other leasing companies." (¶ ¶ 122-124.)

The complaint alleges that the dealers and MFI/Leasecomm constituted a single "enterprise" by virtue of an arrangement between the dealers and MFI/Leasecomm under which the dealers would market Leasecomm products through various "heavy-handed, high-powered mass marketing" techniques, in exchange for a one-time payment of between forty and sixty percent of the face value of the leases from MFI/Leasecomm, while Leasecomm would finance these marketing efforts and the cost of the products offered. (¶ ¶ 45-70.)

#### B. *Master Scheme and Leasecomm Leases*

The form-lease that customers were asked to sign in purchasing products financed by Leasecomm leases is headed "Non Cancellable Lease Agreement" and states, in bold capitals, that "NEITHER SUPPLIER NOR ANY SALESPERSON IS AN AGENT OF LESSOR NOR ARE THEY AUTHORIZED TO WAIVE OR ALTER THE TERMS OF THIS LEASE." (Am.Compl.Ex. C.) Yet the dealer defendants, according to the complaint, regularly told customers that "the contracts were cancelable." (¶ 112(h).) The complaint alleges that the dealer defendants pressured plaintiffs to sign the leases using illusory inducements such as "waiver of usual fees and rebate coupons for the usual fees ." (¶ 113 & Ex. E.)

The lease includes a space for filling in the lessee's bank account information to permit automatic withdrawals. (Am.Compl.Ex. C.) In smaller type, the lease permits Leasecomm not only to automatically debit the lease charges, but also to charge an additional $5.00 per month if it becomes "necessary to switch to statement billing due to insufficient funds," to continue the lease on a month-to-month basis if the lessee fails to notify Leasecomm sixty days prior to its expiration that he or she opts to terminate the lease, to charge a late fee of fifteen

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760

(Cite as: Not Reported in F.Supp.2d)

percent of any amount past due, and to charge collection costs (including charges for collection letters and phone calls). (*Id.*) The lease states that lessee "fully recognize[s] [Leasecomm's] right to enforce the lease free from any defenses, offsets [or] counterclaims," that lessee has not received any express or implied warranties for the products leased, and has "unconditionally waive[d] any claims ... against Leasecomm." It also provides for "the exclusive jurisdiction of the Courts of ... Massachusetts" and waives "any objection to venue" there. (*Id.*) Plaintiffs allege improprieties in the execution of the leases, including forging of some lessees' signatures, the use of "witnesses" who did not in fact witness lessees' signatures, failure to fill out essential terms of the lease, and failure to provide copies of leases to lessees. (¶ ¶ 112, 117.)

**\*3** Finally, plaintiffs allege that Leasecomm used extortionate means to collect on the leases, such as insulting, harassing, and intentionally harmful rhetoric including disparaging personal remarks, embarrassing messages left with third parties about sending debtors to jail, taunting debtors about their credit and threatening to destroy their credit unless payment was made without objection for each and every charge including unjustified credit fee charges.

(¶ 133.) They allege that Leasecomm made unauthorized withdrawals from plaintiffs' bank accounts and that Leasecomm inflated its charges by (1) making "frequent, duplicative contacts" such as multiple collection calls on the same day, and then "charging for each contact" (¶ 136 & Ex. H), and (2) presenting bad checks for payment multiple times on the same day, (¶ 137). Plaintiffs also allege that Leasecomm "obtained thousands of default judgements [*sic*] in Massachusetts and ... sought enforcement of the same." (¶ 139.) The complaint includes a financial presentation made by MFI at an investor conference touting the centrality of its "persistent and innovative collection effort" to its business plan. (Am.Compl.Ex. D.)

### C. *Implementing Schemes*

#### 1. The Internet Tool Box Scheme: Themeware, Cardservice, and the "Karn Infomercial"

Plaintiffs have outlined several "implementing schemes" that they claim were used to further the master enterprise of luring unsuspecting victims into signing Leasecomm leases. The most involved of these, and the one outlined in the most detail, is the "Internet Tool Box" scheme (the "ITB" scheme). This campaign was conducted by non-defendant Themeware, whose shareholders include defendants Richard Karn Wilson (generally referred to in the complaint, and therefore in this Opinion, as "Karn") and Patrick Rettew. Karn is also described as Themeware's "principal spokesman." (¶ 21.)

In 1997, Themeware began marketing, through a television "infomercial" hosted by Karn, a group of products sold together, called the "Internet Tool Box," at a price of $49.95. (¶ ¶ 167-182.) The infomercial referred to the product as the "Internet Business Tool Box," and led the viewer "to believe that [it] contained software and services worth as much as $800" which would "give them the facility to accept credit cards on their web pages" and enable them to "get [ ] onto the web in thirty minutes and mak[e] money instantly." (¶ ¶ 189.) It promised a "30 day money back guarantee." (*Id.*) The Tool Box actually consisted of items "many of [which] were readily available for no or nominal charge." (¶ 189(c).) It did not permit purchasers to accept credit cards on their web pages without purchasing additional services from Cardservice "at costs of many thousands of dollars." (¶ 189(f).) Furthermore, the internet connection provided as part of the Tool Box software "specifically stated it was for non-commercial use[ ]." (¶ 189(h).) The Tool Box infomercial was widely broadcast as a part of the Leasecomm Enterprise's "bait and switch" tactics to lure customers into purchasing ineffective and overpriced products, and lock them into Leasecomm contracts. (¶ ¶ 186-187.)

#### 2. Other Implementing Schemes

**\*4** Plaintiffs describe various other "implementing schemes" carried out by various defendants in furtherance of the Master Scheme, detailing the manner in which each defendant marketed Leasecomm contracts. Briefly, these are as follows:

##### a. *Cardservice*

Plaintiffs allege that it was Cardservice's practice to "make telephone marketing calls to individuals in order to induce them to purchase both virtual terminals financed by Leasecomm and merchant accounts from Cardservice." (¶ 199.) In those calls, "it was represented that the goods and services being sold were fit and appropriate for use by the customers

Not Reported in F.Supp.2d                                                                                      Page 4
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
**(Cite as: Not Reported in F.Supp.2d)**

and that the contracts could be cancelled if the customer was dissatisfied." (¶ 200.) When a customer expressed interest, Cardservice would send them a "slick brochure" making various representations about the company that plaintiffs allege are false, and would subject them to "persistent, high-pressure telemarketing harangues that continued to falsely promise money back guarantees and concealed and obfuscated the unfair and deceptive provisions of the Leasecomm contract." (¶¶ 204-208.)

Cardservice also marketed products financed by Leasecomm contracts at "business opportunity seminars and conferences," which were themselves advertised by infomercials. (¶¶ 210, 215.) At these conferences, Cardservice representatives would make product presentations, introduced by conference "trainers" as offering a "special opportunity" for web-based businesses. (¶¶ 217-218.) Using high-pressure tactics, they would push Cardservice products that "could not be purchased unless other products financed by Leasecomm contracts were purchased." (¶¶ 219-220.) The same representations were made that the contracts for these products were cancelable, and "the unfair and deceptive provisions of the Leasecomm contract were concealed." (¶ 222.)

### b. *"ECX/OX Scheme" and "ECX Seminar Scheme"*

The implementing scheme allegedly executed by ECX, OX (which is controlled by Medtrak), and non-defendant National Entrepreneur Support Association ("NESA"), is somewhat more complicated. Plaintiffs allege that in 1999, ECX and Leasecomm entered a "strategic alliance" whereby Leasecomm agreed to finance the sale of ECX's products, which primarily consisted of "merchant accounts and related services." (¶¶ 224, 231.) ECX, Medtrack, and Schneider agreed that ECX would in turn finance OX to sell its merchant accounts. (¶ 225.) OX then hired non-defendant NESA to market these merchant accounts; this it did primarily through the circulation of a videotape of a seminar conducted in January 2000, which was itself promoted by a direct-mail campaign. (¶¶ 229, 230, 233.) The products offered in the video consisted of "distributorships" which granted "exclusive territories" to purchasers of ECX merchant accounts. (¶ 233(f).) Those who purchased this option would be entitled to training and "commissions on all business OX did in the distributor's area" as well as the benefit of "extensive" marketing, through infomercials and

other promotional activities. (¶ 233(f)-m.).

**\*5** The video was allegedly deceptive in that it promised that distributors could, with minimal time commitment, skills, or risk, earn a "positive cash flow" (¶ 223(b)) and revenues in the "hundreds of thousands [of] dollars." (¶ 223(e).) The investment necessary was "either $1450 for a one time payment or $89.95 a month for four years." (¶ 223(e).) These payments were to be made to Leasecomm, under the same form-lease that was used in the Master Scheme. Those who received the video were allegedly subjected to the same "high-pressure" sales calls which made the same false representations about the nature of the Leasecomm contracts. (¶ 235.)

ECX is also alleged to have "sponsored or participated in business opportunity seminars and conferences at which it sold products financed by Leasecomm contracts." (¶ 237.) Like the Cardservice Seminar Scheme, the ECX seminars involved a "vendor of ECX products" presenting a "special business opportunity" and using high-pressure tactics to close the deal, while giving false assurances that the contracts were cancellable and concealing their unfair provisions. (¶¶ 239-240.) While plaintiffs allege generally that they were "caused to purchase over-valued defective goods and services" by the ECX seminars (¶ 241), they do not allege describe specific defects or identify particular false representations about the products, as they do with respect to Cardservice.[FN1]

> FN1. Under the heading "Miscellaneous Schemes," plaintiffs also assert a vague allegation of "numerous other sub-schemes by dozens of other dealers who use[ ] ... similar misrepresentations and obfuscation to sell their products." (¶ 242.) This appears to be an effort to assert future, unspecified claims against additional defendants. Taken alone, this allegation is insufficient, as it fails to specify the identities of the entities involved or the nature of these purported schemes. Of course any effort to add defendants would at this point require the approval of the Court. *See infra* Part V.B. However, the insufficiency is immaterial to the present motions in all other respects in light of the finding that plaintiff's more particular allegations against the individual defendants are sufficient to survive the motions to dismiss.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
**(Cite as: Not Reported in F.Supp.2d)**

DISCUSSION

I. Legal Standards

A. *Dismissal under Rule 12(b)(6)*

On a motion to dismiss under *Fed.R.Civ.P. 12(b)(6)*, the Court must accept "as true the facts alleged in the complaint," *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697, 699-700 (2d Cir.1994)*, and may grant the motion only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Thomas v,. City of New York, 143 F.3d 31, 36 (2d Cir.1998)* (citations omitted); *see also Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir.1996)* (when adjudicating motion to dismiss under *Fed.R.Civ.P. 12(b)(6)*, the "issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims" (internal quotation marks and citations omitted)). When deciding a motion to dismiss pursuant to *Rule 12(b)(6)*, the Court may consider documents attached to the complaint as exhibits or incorporated in it by reference. *Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir.1993)*. All reasonable inferences are to be drawn in the plaintiff's favor, which often makes it "difficult to resolve [certain questions] as a matter of law." *In re Independent Energy Holdings PLC, 154 F.Supp.2d 741, 748 (S.D.N.Y.2001)*.

B. *Civil RICO*

Plaintiff's RICO claim, the only federal claim and therefore the basis of federal jurisdiction for the case, is based on *18 U.S.C. § 1962(c)*, which makes it unlawful for "any person employed by or associated with any [interstate] enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity," and *18 U.S.C. § 1962(d)*, which penalizes conspiracy to violate, inter alia, *§ 1962(c)*.

**\*6** In order to state a substantive cause of action under *§ 1962(c)*, the plaintiff must allege that a defendant engaged in "(1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity" (5) resulting in (6) injury to business or property. *Anatian v. Coutts Bank (Switzerland) Ltd., 193 F.3d 85, 89 (2d Cir.1999)*, quoting *Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985)*.

A RICO "enterprise" can be "any individual, partnership, corporation, association, or other legal entity, [or] any union or group of individuals associated in fact although not a legal entity." *18 U.S.C. § 1961(4)*. The enterprise cannot, however, be the very defendant that is itself charged with being the "person ... associated with" and "participat[ing] in the conduct of" the enterprise; that is, the enterprise must be distinct from each of the "persons" conducting it. *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A., 30 F.3d 339, 343-44 (2d Cir.1994)*. Here, plaintiffs allege an "association in fact" consisting of Themeware, Cardservice, OX, ECX, and MFI/Leasecomm.

The "pattern of racketeering activity" must consist of at least two "predicate acts" of racketeering activity within ten years, *§ 1961(5)*, where the "acts" are certain violations of state or federal law as set forth in *§ 1961(1)*. Plaintiffs here allege predicate acts consisting of wire fraud, *18 U.S.C. § 1343*, mail fraud, *18 U.S.C. § 1341*, and violations of the Hobbs Act, *18 U.S.C. § 1951*. (¶¶ 325-332.)

In order to demonstrate that defendants "conduct[ed] or participate[d], directly or indirectly, in the conduct of" an enterprise, plaintiffs must allege more than mere participation in the enterprise, since to "conduct" the affairs of an enterprise "one must have some part in directing those affairs." *Reves v. Ernst & Young, 507 U.S. 170, 179 (1993)*. Plaintiffs must therefore allege facts indicating that each defendant participated in the management of the enterprise. *Id.* The plaintiff must allege facts supporting an inference that each defendant "was aware of the general nature of the conspiracy and that the conspiracy extended beyond the defendant's individual role." *United States v. Zichettello, 208 F.3d 72, 100 (2d Cir.2000)* (quoting trial court's jury instructions). In other words, the general structure of the conspiracy alleged must suggest that the alleged participant "knew what the other conspirators 'were up to' or [that] the situation would logically lead an alleged conspirator 'to suspect he was part of a larger enterprise.' " *Id. at 99*, quoting *United States v. Viola, 35 F.3d 37, 44-45 (2d Cir.1994)*.

Courts in this district, in agreement with the holdings of several Courts of Appeals, have carefully scrutinized civil RICO claims at the dismissal stage, since the statute was "enacted expressly, as set forth in the preamble to the Act, 'to seek the eradication of organized crime in the United States' ' and therefore "mere assertion of a RICO claim ... has an almost

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d　　　　　　　　　　　　　　　　　　　　　　　Page 6
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
**(Cite as: Not Reported in F.Supp.2d)**

inevitable stigmatizing effect on those named as defendants." *Katzman v. Victoria's Secret Catalogue,* 167 F.R.D. 649, 654-55 (S.D.N.Y.1996) (quoting *Figueroa Ruiz v. Alegria,* 896 F.2d 645, 650 (1st Cir.1990)); *see also Goldine v. Sichenzia,* 118 F.Supp.2d 392, 397 (S.D.N.Y.2000) (stating that "[t]his Court looks with particular scrutiny at Civil RICO claims to ensure that the Statute is used for the purposes intended by Congress" and dismissing RICO claim); *Schmidt v. Fleet Bank,* 16 F.Supp.2d 340, 346-49 (S.D.N.Y.1998) (citing *Katzman* and dismissing RICO claims).

## II. Plaintiffs' RICO Claims

**\*7** In dismissing plaintiffs' first Complaint, this Court remarked upon the complexity and abstraction of the RICO statute, noting that these characteristics "render[ed] it difficult for plaintiffs to plead the elements of a cause of action with clarity and concision." *Zito I* at \*5. The Court further noted that "the broad-brush, imprecise approach to pleading exemplified by this complaint challenges the defendants' ability to understand what they are being sued for, the Court's ability to understand the plaintiffs' theories, and the plaintiffs' ability to survive judicial scrutiny that may misperceive the plaintiffs' true intentions." *Id.* at \*6. While the plaintiffs' Amended Complaint is still far from a model of clarity, they have sufficiently cured the primary defects previously identified by the Court. Although the Amended Complaint does not materially alter plaintiffs' central allegations, it does "spell out more clearly the nature of the enterprise alleged, the specific predicate acts that constitute the pattern of racketeering, and the persons who are alleged to have committed each of those predicate acts." *Id.* The Amended Complaint therefore survives the instant motions to dismiss.

Although defendants filed their motions to dismiss separately, there is significant overlap in the arguments they have presented. For example, defendants have focused on the sufficiency of a few elements of plaintiffs' RICO claims, namely whether plaintiffs have alleged an enterprise, whether they have attributed predicate acts to each defendant, whether such acts are sufficient to constitute a "pattern" of racketeering activity, and whether they have sufficiently alleged that each defendant "conducted" the enterprise.[FN2] Thus, before addressing the sufficiency of plaintiffs' specific allegations with respect to each defendant, a few general observations are in order.

FN2. *Zito I* held that plaintiffs had adequately alleged injury and causation, and defendants do not renew their challenge to these elements. *See Zito I* at \*18-\*20.

### A. *The Enterprise*

The Amended Complaint alleges that an enterprise existed consisting of MFI/Leasecomm and its dealers, namely ECX, Cardservice, and OX.[FN3] As this Court noted in addressing plaintiffs' previous complaint, in construing the concept of an "association in fact," courts have attempted to balance the realities of the sometimes amorphous structure of criminal associations with the risk that the statute might be improperly employed to "str[ing] together" predicate acts by unconnected defendants. *Zito I* at \*7, citing *Nasik Breeding & Research Farm Ltd. v. Merck & Co.,* 165 F.Supp.2d 514, 539 (S.D.N.Y.2001). The hallmarks of an "association in fact" enterprise are that the group of alleged malefactors must be "associated together for a common purpose of engaging in a course of conduct," and must show "evidence of an ongoing organization, formal or informal, and ... evidence that the various associates function as a continuing unit." *United States v. Turkette,* 452 U.S. 576, 583 (1981). While the question of whether a group of individuals or corporations exhibit such organization and common purpose is ordinarily one of fact, the complaint must allege facts that permit an inference that such an association exists.

FN3. In *Zito I,* the Court expressed doubt as to whether plaintiff could plead a violation of RICO based on an enterprise consisting of MFI/Leasecomm itself. *See Zito I* at \*6. Plaintiffs have apparently abandoned reliance on any such theory, focusing instead on clarifying the structure of the broader alleged enterprise.

**\*8** In the Amended Complaint, plaintiffs have alleged a hierarchical "hub and spoke" type structure, whereby Leasecomm carefully vetted and supervised its dealers, each of which .. obtained customers for Leasecomm "through heavy-handed, high-powered mass marketing" (¶¶ 50-52, 61), that these dealers in turn joined in the goal of the enterprise "to obtain money from the purchasers of the Leasecomm contracts ... through trick, deceit, chicane and overreaching" (¶ 71), and that they "were aware that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 7
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
**(Cite as: Not Reported in F.Supp.2d)**

[their] products were being sold through fraudulent marketing practices and that [Leasecomm's] contracts were unconscionable, unfair and deceptive." (¶ 82.) They further allege that this scheme lasted "for a period beginning no later than 1998 and continuing until October 2002." (¶ 83.)

Cardservice and ECX once again challenge the sufficiency of plaintiffs' pleadings, arguing not only that plaintiffs have failed to specify their participation in the enterprise, but also that they have failed to allege that an enterprise existed at all. In support of their position, they argue that: (1) plaintiffs have insufficiently spelled out "the continuity, structure, organization, or personnel of this group" (Cardservice Mem. 15; *see also* ECX Mem. 12), (2) plaintiffs have not alleged facts "indicat[ing] that Themeware and Cardservice, on the one hand, had any involvement in or ever communicated with OX or ECX, on the other hand" (Cardservice Mem. 15), and (3) "business competition between ECX and Cardservice clouds the existence of any 'common purpose' allegedly shared by the participants in the alleged Master Scheme" (ECX Mem. 12).

With respect to the first argument, the Court specifically found in its prior opinion that plaintiffs had adequately alleged that an enterprise existed for purposes of asserting a RICO violation. Specifically, the Court found that the original complaint had adequately alleged "that MFI/Leasecomm's primary customers were marketers of dubious products by fraudulent means, and that the supposedly independent businesses defendants reference in their argument functioned as an integrated system for fleecing the unwary." *Zito I* at *7. What remained to be more clearly alleged was the role of each defendant in that enterprise. The Amended Complaint describes in detail the structure of the enterprise alleged, in which Leasecomm chose and supervised dealers who were known to prey on vulnerable consumers with poor credit ratings, and in which the dealers were aware of and misrepresented or concealed the unfair terms of Leasecomm contracts. It was Leasecomm's financing that permitted the dealers to continue marketing their deficient products, and that financing in turn depended upon the dealers' marketing efforts and Leasecomm's own collection activities. Each therefore had a stake in the success of the other. Plaintiffs have thus alleged facts sufficient to support a finding that the parties identified were "associated together for a common purpose," and have sufficiently outlined the structure, duration, and goals of that association.

**\*9** The argument that plaintiffs have not alleged interaction between Themeware/Cardservice and ECX and OX, or that ECX and Cardservice were in fact in competition, does not bear on whether or not an enterprise existed. As the Court noted in its prior opinion, "[i]t is commonplace in RICO enterprises for the members of the enterprise to engage in separate schemes or conspiracies, not all of which involve all of the participants in the enterprise." *Zito I* at *8, citing *United States v. Mauro*, 80 F.3d 73, 77 (2d Cir.1996); *United States v. Coonan*, 938 F.2d 1553, 1560-61 (2d Cir.1991). The question of whether an "association in fact" existed is distinct from that of what role each defendant played in it, or whether each defendant may be held liable under RICO for participating in it. Similarly, defendants cite no authority holding that competition among participants in an enterprise will negate the existence of that enterprise, and the Court sees no reason that it should.

The Amended Complaint, like the original one, alleges facts sufficient to support a finding that a unitary enterprise existed. Leasecomm is alleged to have centrally controlled the enterprise and supervised each of its dealers, and was therefore aware of each player and of the role each played in furthering its overall goals. Moreover, MFI/Leasecomm made no secret of its business plan, which involved recruiting various businesses like the other members of the alleged enterprise into strategic alliances that would generate the leases that its aggressive collection practices would make profitable. (*See* Am. Compl. Ex. D., collecting slides from conference presentation touting MFI's "persistent and innovative collection effort.") Thus, the other entities that became part of the enterprise were on notice that their arrangements with Leasecomm were not unique, but were part of a larger structure erected by MFI/Leasecomm. Accordingly, whether or not the individual dealers were aware of each other's identities or specific activities, the enterprise itself, an "association in fact" united by a common purpose and orchestrated by Leasecomm, is therefore properly alleged.

B. *Predicate Acts under* § 1962(c)

1. Mail and Wire Fraud

The Amended Complaint asserts as predicate acts wire fraud, 18 U.S.C. § 1343, and mail fraud, 18 U.S.C. § 1341, as well as violations of the Hobbs

Not Reported in F.Supp.2d                                                                                          Page 8
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
**(Cite as: Not Reported in F.Supp.2d)**

Act, 18 U.S.C. § 1951.[FN4] Plaintiffs identify several mail and wire transmissions that they allege were used to further defendants' schemes. These include: (1) causing contracts to be sent to plaintiffs, (2) causing contracts to be returned to plaintiffs, (3) causing the Karn infomercial to be transmitted, (4) causing the OX video to be mailed to plaintiffs, (5) causing account statements to be mailed to plaintiffs, (6) causing automatic charges to be deducted from plaintiffs' bank accounts and credit cards, (7) causing "dunning calls" to be made to plaintiffs demanding payments. (¶¶ 248-324.)

> FN4. The Hobbs Act allegations will be discussed infra Part II.D.2.

**\*10** In order to allege a violation of the mail or wire fraud statutes, a plaintiff must allege the elements of the offense: "(i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate mail or wires." *United States v. Autuori,* 212 F.3d 105, 115 (2d Cir.2000). A scheme to defraud "has been described as a plan to deprive a person of something of value by trick, deceit, chicane or overreaching." *Id.,* quoting *McNally v. United States,* 483 U.S. 350, 358 (1987), and *Hammerschmidt v. United States,* 265 U.S. 182, 188 (1924) (internal quotation marks omitted).

### 2. The "Schemes to Defraud"

As the Court held in *Zito I,* at least two of the "schemes" described by the plaintiffs constitute "schemes to defraud" under the wire fraud statutes. The first is, of course, the Master Scheme centering around the Leasecomm leases themselves, in which the participants employed deceptive marketing to lure consumers into purchasing ineffective products and then relied on aggressive collection tactics to enforce the contracts' unconscionable terms. The Amended Complaint spells out in more detail why the leases were unfair, as well as the false and deceptive practices associated with obtaining them. The second is the ITB scheme, marketed through the Karn infomercial, which falsely represented that the products in the Tool Box were suitable for businesses and would allow purchasers to process charges instantly over the internet, when in fact, it was suitable only for personal use and required the purchase of costly additional products in order to function as promised. *See Zito I* at \*14. Each of these represents a fraudulent scheme in and of itself.

None of the other "schemes" alleged by plaintiffs constitutes a fraudulent scheme in and of itself. Of these, the "Cardservice Telemarketing Scheme," the "Cardservice Seminar Scheme," and the "ECX Seminar Scheme" all essentially describe the same general allegations in different contexts: The various defendants associated with each scheme used high-pressure sales tactics to market defective products and push Leasecomm leases, and they lied about or misrepresented key terms of the contracts executing those leases. In each case, the complaint fails to specify the nature of the products associated with the "merchant accounts," or in what ways they were defective. Instead, the central fraud alleged is the marketing of the Leasecomm leases connected with the products.[FN5] In truth, therefore, these "schemes" merely represent different contexts-e.g., cold-call telemarketing, business opportunity seminars-in which products financed by Leasecomm leases were sold.

> FN5. Plaintiffs point out that the "slick brochure" mailed in connection with certain of these schemes contained falsehoods stating that Cardservice was privately owned, when in fact it was a publicly traded corporation. (¶ 205-206.) This does not alter the analysis, as plaintiffs do not allege that this statement was in any way material to plaintiffs' decision to purchase the products in question.

The same is true of the "ECX/OX Scheme," although the Amended Complaint describes this scheme in more detail than it does the others. The central allegation of this scheme is that defendants ECX and OX promised purchasers of their products "risk free" access to high returns based on minimal effort, that they would have exclusive distributorships of these products and would receive commissions based on OX sales, and that they would benefit from training and marketing efforts by OX. However the Amended Complaint never states that these promises proved false in any way, or that plaintiffs were injured as a result. For example, plaintiffs do not allege that they did not achieve the promised profits, or that defendants failed to perform the promised marketing campaigns or training. In addition, it fails to specify the nature of the products in question, or in what ways they were defective. The allegations thus fundamentally fail to allege essential elements of fraud.

**\*11** This does not mean, however, as several

defendants argue that it does, that plaintiffs' RICO claims must fail. Plaintiffs have designated these as "implementing schemes" for a reason: They served primarily as vehicles to accomplish the overall purposes of the Master Scheme. As such, they are more properly understood as a method of characterizing the role of each defendant in the overall enterprise, and what steps each took to further its goals. In outlining each of these marketing strategies and identifying which defendants were associated with each, plaintiffs have satisfied the Court's requirement that they state clearly "the fraudulent schemes any particular defendant is alleged to have participated in on behalf of the enterprise, and used the mails or wires to further." *Zito I* at *9. The fact that some of them do not serve as "schemes to defraud" in themselves does not detract from their value in setting forth the particular actions each defendant took to further the Master Scheme.

Defendants similarly argue that plaintiffs' claims must fail because the content of many of the mail and wire transmissions was not false in itself. Such falsity is not required. As the Court noted in *Zito I,* "merely proposing an unconscionable contract term is not a crime." *Id.* However, in order to plead a RICO claim based on mail or wire fraud, "[t]he telephone calls or mailings need not have contained misrepresentations themselves." *Miltland Raleigh-Durham v. Myers,* 807 F.Supp. 1025, 1056 (S.D.N .Y.1992), citing *Patrick Carter Assocs., Inc. v. Rent Stabilization Ass'n,* No. 89 Civ. 7716, 1990 WL 195993, at *3 (S.D.N.Y. Nov. 28, 1990); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young,* No. 91 Civ. 2923, 1994 WL 88129, at *9 (S.D.N.Y. Mar. 15, 1994) ("Even mailings that are innocent on their face may be in furtherance of a fraudulent scheme in violation of mail or wire fraud statutes because it is clear that [t]he mailings themselves need not contain misrepresentations." (internal quotation marks omitted)). Rather, plaintiffs must merely assert that the use of the mails or the wires was accomplished "in furtherance of" the scheme alleged, which was itself fraudulent. *Myers,* 807 F.Supp. at 1056. In other words, it is the fraudulence of the scheme itself, not any individual falsehood in any particular mail or wire communication, that must be alleged.

As established above, some of the mailings and wire communications did contain falsehoods-for example, the Karn infomercial used to promote the Internet Tool Box, and the telemarketing calls. However, even those that did not, when viewed in context, clearly served to further the overall scheme to defraud. For example, the mailings of the contracts were followed by telephone calls including high-pressure sales pitches; the terms of the contracts were misrepresented, in the case of the option to cancel, or concealed, in the case of the various unfair terms; plaintiffs were urged to return the contracts with key terms left blank; plaintiffs' signatures were forged or witnesses falsely sworn. The mailing of these documents took place in concert with defendants' overall modus operandi, and can therefore fairly be said to have been conducted "in furtherance of" the overall fraud. Similarly, the deduction of moneys or entry of charges from bank accounts and credit cards, while permitted under the contract due to plaintiffs' default and therefore not false per se, were effectuated with the overall goal of fleecing plaintiffs and with defendants' knowledge of the circumstances that led to the defaults.

### 3. Requirements of Rule 9(b)

**\*12** Defendants have further argued that plaintiffs have failed to meet the requirements of Rule 9(b) that "claims based upon fraud, including claims of wire or mail fraud as predicate acts to a RICO claim, must be pleaded with particularity. *Fed.R.Civ.P. 9(b).*" *Zito I* at *13. This normally requires the complaint to specify the time and place of a fraudulent representation, as well as who made the representation. *Ouaknine v. MacFarlane,* 897 F.2d 75, 79 (2d Cir.1990). However, as noted in *Zito I,* where the complaint describes the "nature and operation of the scheme in which the defendants are alleged to have participated," this requirement may be relaxed. *Zito I* at *28 (quoting *Beth Israel Medical Center v. Smith,* 576 F.Supp. 1061, 1070-71 (S.D.N.Y.1983) (finding that "[i]n view of the complaint's detailed description of the defendants' scheme ... the failure to describe particular letters or telephone calls is not fatal to the complaint")); *see also Center Cadillac, Inc. v. Bank Leumi Trust Co. of New York,* 808 F.Supp. 213, 229 (S.D.N.Y.1992) ( "[T]he complaint need not specify the time, place and content of each mail communication where the nature and mechanics of the underlying scheme is sufficiently detailed."). By detailing the various marketing methods each defendant used to push Leasecomm contracts on unsuspecting customers, and by alleging that use of mail and wire communications were central to these methods, plaintiffs have thus generally demonstrated the mechanics of the fraudulent scheme and "what the alleged fraud consists of specifically." *Beth Israel,* 576 F.Supp. at 1071, (quoting *Segal v. Gordon,* 467

Case 7:04-cv-08223-KMK    Document 165-37    Filed 07/07/2006    Page 10 of 22

Not Reported in F.Supp.2d                                                                                        Page 10
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
(Cite as: Not Reported in F.Supp.2d)

F.2d 602, 607 (2d Cir.1972)). Their careful enumeration of the defendants' various "schemes" therefore serves to satisfy the requirements of Rule 9(b).

In addition, several defendants have raised the argument that plaintiffs have failed to specify which individuals actually made the telephone calls or sent the letters in question. While it is true that the Court exhorted the plaintiffs in *Zito I* to specify which defendant was responsible for the various predicate acts alleged, to require plaintiffs to describe an enterprise of this scale with the level of specificity demanded by defendants would be pointless. It is neither necessary nor in most cases would it be possible for plaintiffs to include in their pleadings minutia such as the names of the individual telemarketers who made the alleged "dunning calls," the total number of such calls, or the specific dates and times of the calls, as it is precisely this type of information that "lies peculiarly within the opposing parties' knowledge." *Ouaknine v. MacFarlane,* 897 F.2d 75, 81 (2d Cir.1990). "A defendant accused of mail or wire fraud need not be the one who sent the mailing or placed the call. He need only have reasonably foreseen that a third-party would use the mails or interstate wires in the ordinary course of business as a result of defendant's acts." *Am. Arbitration Ass'n v. DeFonseca,* No. 93 Civ. 2424, 1996 WL 363128, at *9 (S.D.N.Y. June 28, 1996). As plaintiffs aptly put it, so long as they properly allege which defendant entity was responsible for causing the alleged communications to be made, "it was not necessary for [the defendant in question] to stuff the envelopes, lick the stamps or drop the mail off at the post office" in order to be held liable. (P. Opp. to Burtzloff Mot. 6.)

C. *Pattern of Activity*

**\*13** As discussed at length in *Zito I,* in order to establish a pattern of racketeering activity, plaintiffs must allege that a defendant's predicate acts "themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity." *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 241 (1989). This may be demonstrated by "proving a series of related predicates extending over a substantial period of time," or showing the threat of such continuing activity based on predicates proved. *Id.* at 242. In such cases, where the enterprise is otherwise a legitimate business (as opposed to a strictly criminal enterprise), plaintiffs may satisfy the continuity requirement by showing that these

predicates "were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." *Cofacredit, S.A. v. Windsor Plumbing Supply Co.,* 187 F.3d 229, 243 (2d Cir.1999). Although continuity is usually based primarily on the duration of time the predicate acts are alleged to have occurred, "other factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant." *Id.* at 242.

Various defendants claim that the Amended Complaint does not allege the requisite "pattern" of racketeering activity to satisfy the continuity requirement, both because it fails to specify the precise number of racketeering acts, and because the time-period in which the acts were committed is too short. The latter argument was addressed in *Zito I,* which found that there was no bright-line rule setting a floor for the duration that must be specified in order to constitute a "substantial period." Plaintiffs have in most cases alleged a time-frame of at least five years, in many cases continuing to date. (¶¶ 251, 260, 289, 303, 318.) However, their allegations vary; whether a pattern has been adequately alleged against each defendant must therefore be analyzed according to the acts attributed to each defendant.

As for the number of predicate acts alleged, plaintiffs repeatedly claim that this was "[a]t least two and as many as tens of thousands." This statement is repeated verbatim, without distinguishing among defendants or bothering to specify particular dates or times of the mail or wire communications. (¶¶ 251, 260, 289, 303, 318.) Defendants are correct that taken alone, these allegations are conclusory and would be insufficient to sustain a RICO claim under § 1962(c).

However, several factors mitigate this deficiency. First, as discussed in further detail below, the Amended Complaint elsewhere states with more particularity the nature of the activities conducted by each defendant in furtherance of the overall fraudulent scheme or schemes in which it is alleged to have participated. Second, plaintiffs have affixed to the Amended Complaint a sufficient number of exemplars of the communications in question, such as letters, account statements, and faxes, many of which are on the letterhead of various defendants, to indicate that defendants regularly relied on the mails and the wires in accomplishing the goals of the alleged enterprise. (*See, e.g.,* Am. Compl. Ex. E, F, G, H, J.) Third, it is indisputable that the precise number of pieces of mail or telephone calls is the

Not Reported in F.Supp.2d                                                    Page 11
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
**(Cite as: Not Reported in F.Supp.2d)**

type of knowledge exclusively within the knowledge of the defendants, and thus difficult for plaintiff to estimate prior to discovery. Finally, the clear implication of the Amended Complaint is that the fraudulent schemes alleged were central to the business plans of the corporate defendants, particularly of MFI/Leasecomm, and constituted their regular means of doing business. Thus, to the extent that plaintiffs allege a sufficient number of predicate acts involving each defendant, the overall allegations of the complaint strongly support the idea that those acts constitute a "pattern."

### D. *Sufficiency of RICO § 1962(c) Claims Against Particular Defendants*

#### 1. Predicate Acts Common to All Defendants

**\*14** Plaintiffs have organized their allegations of predicate acts into charts outlining which defendant committed which act, the duration and number of those acts, and the schemes they were intended to further. Defendants complain that plaintiffs indiscriminately charge all the defendants with identical predicate acts in furtherance of all of the schemes alleged. This is not exactly accurate: Although there is significant overlap, plaintiffs have charged certain defendants with different predicate acts that others are not associated with, that were allegedly committed in furtherance of "their respective implementing schemes." Moreover, plaintiffs are perfectly free to make the same allegations against multiple entities, so long as they have a good faith basis for doing so and their complaint adequately puts defendants on notice of which claims are being asserted against whom.

Plaintiffs list certain mail and wire transmissions allegedly conducted by each of the defendants, with the exception of Karn, in furtherance of the Master Scheme and their various implementing schemes: (a) mailing the Leasecomm contracts, (b) causing such contracts to be returned, and (c) directing the mailing of account statements. (¶ ¶ 248-263, 284-293.) Plaintiffs variously claim that defendants either caused these acts to be done or "controlled" their commission. (*Id.*)

These allegations make sense in light of the alleged structure of the Leasecomm enterprise, in which dealers sent out Leasecomm contracts and subjected plaintiffs to high-pressure sales tactics, either via telephone or in person, to get them to return the

contracts by overnight mail to be executed. It is also only logical that the dealers providing the products at the point of sale would be involved in causing the mailing of account statements to the appropriate individuals. It is thus not improbable that each of the defendants in fact exercised some degree of control over the execution of these alleged acts. These acts are therefore sufficient to qualify as predicate acts by each of the defendants.

All defendants, again with the exception of Karn, are further alleged to have "participated in" and/or [FN6] "conducted" acts of mail or wire fraud for procuring signatures on Leasecomm contracts, knowing that the contracts authorized the use of the mails or wires to (a) mail account statements, (b) deduct money from bank accounts and charge credit cards, and (c) make dunning calls. These allegations are also sufficient to constitute predicate acts. As the Second Circuit has held, "it is not significant for purposes of the mail fraud statute that a third-party, rather than the defendant, wrote and sent the letter at issue, providing ... the defendants could reasonably have foreseen that the third-party would use the mail in the ordinary course of business as a result of defendants' act." *U.S. v. Bortnovsky,* 879 F.2d 30, 36 (2d Cir.1989). The collection practices alleged were central to the Leasecomm enterprise and the fraudulent scheme it sought to further. These practices were clearly authorized by the contracts in question, and indeed, depended on the employment of mail and wire transmissions carried out "in the ordinary course of business." By causing the Leasecomm contracts to be executed, defendants should reasonably have foreseen that the use of mails and wires would result.

FN6. The Amended Complaint has a repeated typo, stating that various defendants "participated in controlled" these acts. It is unclear whether this was intended to be "participated in [and] controlled" or "participated in [or] controlled."

#### 2. Leasecomm Defendants

**\*15** In addition to alleging that the Leasecomm Defendants, along with the other defendants discussed above, controlled the mailing and return of the Leasecomm contracts and the mailing of account statements, plaintiffs further allege that the Leasecomm Defendants were responsible for (a) charging credit cards and withdrawing funds from bank accounts, (b) making dunning calls through

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
**(Cite as: Not Reported in F.Supp.2d)**

Leasecomm agents, and (c) making extortionate demands in violation of the Hobbs Act.

At the outset, the Leasecomm Defendants raise the general argument that plaintiffs have failed to correct the deficiency noted by the Court in *Zito I* that plaintiffs had conflated Leasecomm with its parent company MFI. It is true that the Amended Complaint remains somewhat inconsistent as to which entity is designated. (*Compare, e.g.,* ¶¶ 296 & 298 (naming "Leasecomm") *with* ¶ 303 (naming "Leasecomm Defendants").) However, the Amended Complaint also describes more clearly the relationship between the two entities. (*See* ¶¶ 9-16.) The precise relationship of the parent to the subsidiary entity is a factual matter that need not be resolved now. As this Court noted in another case, under similar circumstances:

[I]f plaintiffs do not have a good faith basis for their allegations, any defendant that is not promptly dismissed after putting plaintiffs on notice of their error may well be in a position to move for sanctions. Since all of the ... defendants are affiliates ... and since none of them have retained separate counsel or otherwise undergone unnecessary expense, the effort to sort out the proper defendants at this stage (which would in any event permit later amendment of the complaint based on evidence uncovered in discovery) seems inefficient.

*In re Global Crossing Secs. Litig.,* 313 F.Supp.2d 189, 213 (S.D.N.Y.2003). Moreover, as previously stated, plaintiffs are entitled to charge multiple defendants with the same acts. Given that plaintiffs' allegations are now sufficiently clear, their failure to distinguish in every case between these entities is not fatal at this stage of the litigation.

Turning first to the Hobbs Act claims, which are lodged only against the Leasecomm Defendants,[FN7] the defense argues roughly as follows: Plaintiffs' Hobbs Act allegations are based on Leasecomm's collection practices; in order to state a claim for a Hobbs Act violation, plaintiffs must allege that defendants used threats in an attempt to obtain property to which they were not entitled; Leasecomm was entitled to collect the money sought on grounds that plaintiffs had breached their contracts; the basis for plaintiffs' claim that Leasecomm was not entitled to the money it sought to collect was that the contracts breached were unconscionable; because unconscionability can only be judged after the fact, it cannot be determined that defendants were not "entitled" to the property they sought to obtain.

FN7. Plaintiffs' conspiracy claims under § 1962(d) based on Leasecomm's Hobbs Act violations are discussed infra Part II.D.2.

To the extent that plaintiffs' claim is based on a theory of objective unconscionability, defendants' argument is not without merit. However, plaintiffs have also alleged that the defendants *knew* of and actively concealed or misrepresented the unconscionable nature of the contract terms. This is a factual allegation, rather than a legal conclusion, and it must be taken as true on this motion. Indeed, although *Zito I* dismissed plaintiffs' Hobbs Act claims based on other deficiencies that have now been addressed,[FN8] it also observed that if plaintiffs' allegations should prove correct, "Leasecomm would not have been 'entitled' to the monies it demanded, and may not even have had reason to believe that it was so entitled." *Zito I* at *12. Plaintiffs' Hobbs Act allegations are thus sufficient to serve as predicate acts for their RICO § 1962(c) claims.

FN8. *Zito I* dismissed these claims on grounds that plaintiffs had failed to specify the use of extortion or allege an effect on interstate commerce, defects that defendants do not dispute have been cured in the Amended Complaint.

*16 As defendants correctly point out, plaintiffs have not demonstrated a factual basis to support their allegations that the Leasecomm Defendants actually participated in, caused or controlled each of the predicate acts that are attributed to them. For example, although plaintiffs allege that the Leasecomm Defendants committed predicate acts in mailing the Karn infomercial and the OX video, they name only Cardservice, Burtzloff, and Karn as responsible for the creation and transmission of the infomercial, and ECX and the OX defendants as responsible for the mailing of the video. But as established above, plaintiffs need not allege that the Leasecomm Defendants literally performed the predicate mailing or wire transmissions themselves, so long as these acts were foreseeable and intended to effectuate the fraudulent scheme. *Am. Arbitration Ass'n v. DeFonseca,* No. 93 Civ. 2424, 1996 WL 363128, at *9 (S.D.N.Y. June 28, 1996).

The Leasecomm Defendants' role in perpetrating these acts is, of course, relevant to the question of whether they "conducted" the enterprise. However, the proper focus of this inquiry is whether they are

Not Reported in F.Supp.2d                                                                                                                Page 13
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
**(Cite as: Not Reported in F.Supp.2d)**

alleged to have managed the enterprise overall, not whether they controlled each particular predicate act. Plaintiffs have sufficiently made such an allegation against the Leasecomm Defendants. As stated in *Zito I,* "Leasecomm *is* alleged to have formulated the transactions, for the complaint charges that Leasecomm's leases were the linchpin of the schemes and Leasecomm determined both the content of those leases and the means by which they were enforced." *Id.* at *17. The Amended Complaint states that Leasecomm not only created and enforced these contracts, but also that it actively vetted and supervised its dealers and associates, with the knowledge that they made it a practice of preying on vulnerable consumers. (¶ ¶ 51, 61.) It is therefore "charged with constructing and executing an entire method of doing business" that enabled the fraudulent schemes that are the crux of the Amended Complaint. *Zito I* at *17.

As for the individual Leasecomm Defendants, plaintiffs have alleged that Bleyleben and MFI "controlled the enterprise" (¶ 70), that the Leasecomm Officers "supervised and controlled" the racketeering activities described (¶ 14), that Salvo was responsible for the dunning calls and the extortionate collection practices, and that Bleyleben was "upon information and belief ... the principal author of the [Leasecomm] contract." (¶ ¶ 88, 316, 325-332.) "[T]hese defendants have surely been alleged to have participated in the conduct of the affairs of the alleged enterprise ." *Zito I* at *18. Because plaintiffs have sufficiently alleged that the Leasecomm Defendants conducted an enterprise and engaged in a pattern of racketeering activity, the motion to dismiss by these defendants must be denied.

3. Cardservice and Burtzloff [FN9]

FN9. Karn is not alleged to have violated § 1962(c).

Plaintiffs have similarly stated an adequate RICO § 1962(c) claim against Burtzloff and Cardservice. In addition to the predicate acts discussed above (causing the mailing and return of Leasecomm contracts, the mailing of account statements, and the extortionate collection practices authorized by the Leasecomm contracts), plaintiffs have alleged that Burtzloff and Cardservice caused the transmission of the Karn infomercial, in furtherance of both the Master Scheme and the ITB scheme. Taken together, these acts are more than sufficient to establish a pattern of racketeering activity against both Burtzloff and Cardservice.

**\*17** As for "conduct of the enterprise," the role Cardservice is alleged to have played is central to both the Master Scheme and the ITB scheme. Cardservice is alleged to have orchestrated a widespread marketing campaign for Leasecomm contracts, involving telemarketing, direct mail, seminars, and infomercials. (¶ 152-166.) The Amended Complaint alleges that Burtzloff and Cardservice controlled the Leasecomm enterprise with Bleyleben, ECX, and MFI (¶ 70), that Burtzloff appeared in the Karn infomercial (¶ 190), and that "[a]t all pertinent times[,] Burtzloff[ ] supervised and controlled Cardservice's marketing and personally participated in the production of the infomercials and promotional mailings in which he appeared on behalf of Cardservice." (¶ 161.) These allegations are sufficient to suggest that Cardservice and Burtzloff "conducted" the enterprise through a pattern of racketeering activity.

Defendants argue that the Amended Complaint fails to state a claim against Cardservice and Burtzloff because it does not allege that the Cardservice dealers had any relationship with ECX or OX. This is not precisely accurate. Plaintiffs allege that "Bleyleben, Burtzloff, and [ ] ECX jointly directed a greatly expanded effort to market Leasecomm contracts as a financing vehicle for internet services." (¶ 48.) While this allegation is not directly supported by further, more concrete allegations of cooperation or knowledge of each other's roles, such an allegation is not necessary, as "there is no heightened pleading requirement for the 'conduct' element of a RICO claim." *Zito I* at *18. Plaintiffs allege that both Burtzloff and ECX knew about the fraudulence of the Leasecomm contracts and the extortionate collection practices that were their ultimate goal, and that Burtzloff played a central role in the management of all aspects of Cardservice's business. While they do not explicitly state that Cardservice otherwise interacted with the other participants in the enterprise, or that it knew that they existed, it can be inferred from Burtzloff's participation in "jointly direct[ing]" the effort to market Leasecomm contracts with Bleyleben and ECX that both ECX and Cardservice knew that the other was involved in furthering the Leasecomm enterprise.

4. ECX and OX Defendants

Not Reported in F.Supp.2d                                                                Page 14
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
**(Cite as: Not Reported in F.Supp.2d)**

In addition to the predicate acts alleged as to all of the defendants, ECX and the OX Defendants, Medtrack and Schneider, are alleged to have caused the mailing of the OX video. This is alleged to have occurred following the taping of the ECX/OX seminar video in January 2000 (¶ 230), and various of these activities are alleged to continue to date. OX employed non-defendant NESA as its agent to market ECX's services, principally ECX's merchant accounts including those promoted by the OX video. (¶ 299.)

As discussed above, the OX video "scheme" did not constitute a separate fraudulent scheme; rather, it was one of many techniques for marketing allegedly fraudulent Leasecomm contracts. Nonetheless, the many mailings of the video may be considered predicate acts in furtherance of the Master Scheme; furthermore, such mailings may be used to establish a "pattern" of racketeering activity, especially when considered in combination with the other predicate acts attributed to the defendants collectively.[FN10]

> **FN10.** The participation of OX is alleged in most cases to have occurred from 2000 to date, while the activities of ECX are alleged to have occurred from 1998 to date. (*See* ¶ 251, 260, 289, 303, 318.)

**\*18** On the issue of control of the enterprise, plaintiffs allege that ECX "jointly directed" the effort to market Leasecomm contracts with Bleyleben and Burtzloff (¶ 48), and that ECX and OX together controlled the marketing effort conducted in connection with the video (¶ 277). It is true that the allegations as to OX are thinner: Aside from these allegations, there is no allegation that the OX defendants otherwise conducted the activities of the Leasecomm enterprise. Nonetheless, the marketing efforts described were sufficiently detailed and complex, and were of a sufficient duration, to be considered a central part of the Master Scheme. The control of these efforts can therefore be said to constitute "conduct of the affairs of the enterprise." Plaintiffs have thus sufficiently pled a violation of § 1962(c) with respect to ECX and the OX Defendants.

### 5. Summary

Because plaintiffs have sufficiently pled each of the elements necessary to state a claim under RICO § 1962(c) against each of the defendants so charged, defendants' motion to dismiss on these grounds will be denied.

### E. *Conspiracy Allegations*

Plaintiffs have also included RICO allegations against each of the defendants, under § 1962(d), based on a "hub-and-spoke" theory of conspiracy. As the Supreme Court has observed, the precise line between a substantive RICO claim under § 1962(c) and one brought for conspiracy to violate RICO under § 1962(d) is often unclear: "[T]hough an 'enterprise' under § 1962(c) can exist with only one actor to conduct it, in most instances it will be conducted by more than one person or entity; and this in turn may make it somewhat difficult to determine just where the enterprise ends and the conspiracy begins, or, on the other hand, whether the two crimes are coincident in their factual circumstances." *Salinas v. United States,* 522 U.S. 52, 65 (1997). The difference in many cases will be that conspiracy may be easier to plead. As the Court stated in *Zito I,* "[i]t is possible to violate § 1962(d) by conspiring with others, even without committing or agreeing to commit any predicate acts oneself." *Zito I* at \*13, citing *Salinas,* 522 U.S. at 52. In addition, a defendant may be guilty of conspiracy to violate RICO without a showing that s/he "conducted" the enterprise. *United States v. Zichettello,* 208 F.3d 72, 99 (2d Cir.2000). In order to be guilty of conspiracy under § 1962(d), plaintiffs must show that the conspirator "intend[ed] to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense." *Salinas,* 522 U.S. at 65. Although each conspirator need not explicitly enter an agreement with, or even know the identities of, the other conspirators, *see United States v. Maldonado-Rivera,* 922 F.2d 934, 963 (2d Cir.1990), the complaint must allege that each of the charged conspirators "had sufficient awareness of the existence of other members of the alleged conspiracy to render them part of the 'rim of the wheel to enclose the spokes.' ' *United States v. Zabare,* 871 F.2d 282, 287-88 (2d Cir.1989) (quoting *Kotteakos v. United States,* 328 U.S. 750, 755 (1946)).

**\*19** As established above, plaintiffs have successfully alleged that an enterprise existed, and that each of the defendants charged with substantive RICO violations under § 1962(c) acted with knowledge of the Master Scheme and with the intention of furthering its goals. Plaintiffs have alleged that these predicate offenses constituted overt acts conducted with the intention of furthering the overall goals of the Master Scheme, and, in the case of the Karn infomercial, of the ITB scheme. They have further sufficiently alleged that

Not Reported in F.Supp.2d                                                                 Page 15
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
**(Cite as: Not Reported in F.Supp.2d)**

the dealer defendants were aware enough of each other's involvement in the enterprise to know of its general contours. While the precise contours of each defendant's knowledge of the scope of the overall conspiracy has yet to be proven, plaintiffs have brought conspiracy allegations against each of the dealer defendants that are sufficient to withstand a motion to dismiss.

Finally, plaintiffs have brought a conspiracy claim against Cardservice, Burtzloff, and Karn for their agreement to perpetrate the ITB scheme through the transmission of the Karn infomercial and its use in marketing Cardservice products. This is, in fact, the only basis for their claim against Karn.

The Amended Complaint alleges that Karn, Burtzloff, and Cardservice joined in producing and marketing the Karn infomercial, knowing that it would be used as a tool to force consumers to purchase Cardservice products. (¶ ¶ 187, 272-273.) It alleges that Karn, motivated by his Themeware shares, knowingly made material misstatements in the infomercial, that he "joined ... in [its] production and broadcast," and that he caused it to be transmitted. (¶ ¶ 195, 272, 273, 266.) They allege that he did so knowing that "the purpose of the Karn infomercial was not to sell Internet Tool Boxes, but the services of Cardservice." (¶ 272; *see also* ¶ ¶ 185, 187.)

The Amended Complaint thus fairly alleges that Karn joined with Cardservice, Burtzloff, and Leasecomm in order to accomplish the unlawful goals of the ITB scheme. It does not, however, fairly allege that Karn entered into any agreement or relationship with Leasecomm, that he was aware of the Master Scheme or of the Leasecomm contracts, or that he knew of the participation of the other dealer defendants in the Master Scheme. Therefore, although he may be held liable on the theory that he conspired to participate in the ITB scheme, any similar theory based on his participation in the Master Scheme must fail.[FN11] But Karn's agreement, as alleged in the Amended Complaint, to participate in the conduct of the enterprise through one of its schemes, which resulted in numerous predicate mailings, is sufficient to state a claim that he conspired to violate RICO.

FN11. In his defense, Karn has argued that he is a mere actor and that he played no role in authoring the false statements or directing the transmission of the infomercial. This may well prove to be the case, but for

purposes of the present motion, consideration of these factual assertions is inappropriate. Plaintiffs' allegations must be accepted as true at present; whether or not the facts will bear them out must await discovery.

Plaintiffs have sufficiently alleged RICO violations under both subsections (c) and (d) of § 1962 against each of the moving defendants. Their motions to dismiss on these grounds will therefore be denied.

### III. In Personam Jurisdiction

**\*20** In light of the finding that plaintiffs have adequately stated RICO claims against each of the defendants, the motions by defendants Karn, OX, and Schneider to dismiss for lack of jurisdiction will also be denied.

On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(2), the plaintiff bears the burden of establishing jurisdiction. *In re Magnetic Audiotape Antitrust Litigation,* 334 F.3d 204, 206 (2d Cir.2003). Where the court relies on affidavits and pleadings, before any discovery has taken place, the plaintiff "need only make a *prima facie* showing of personal jurisdiction." *CutCo Indus., Inc. v. Naughton,* 806 F.2d 361, 364-65 (2d Cir.1986). In establishing its *prima facie* case, the plaintiffs may rely on the complaint, affidavits, and other supporting materials, *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir.1981), and courts must "construe the pleadings and affidavits in plaintiff's favor at this early stage." *PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1108 (2d Cir.1997); *see also Hoffritz for Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55, 57 (2d Cir.1985) (allegations of jurisdictional fact must be construed in the light most favorable to the plaintiff).

Although plaintiffs' complaint was dismissed in *Zito I,* the Court stated in dictum that it would have jurisdiction over the Leasecomm Defendants under New York State's long-arm statute, N.Y. C .P.L.R. § 302, based on their transaction of business in New York State. *Zito I* at \*22. It further found that the Court would have jurisdiction over the remaining defendants because jurisdiction properly lies over co-conspirators where there is jurisdiction over one of the conspirators. *Id.,* citing *Kreutter v. McFadden Oil Corp.,* 71 N.Y.2d 460, 467 (1988). That reasoning is adopted today as the holding of the Court.

However, an additional basis for jurisdiction also

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 16
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
**(Cite as: Not Reported in F.Supp.2d)**

exists under another provision of RICO, 18 U.S.C. § 1965, which allows for nationwide personal jurisdiction so long as the judicial district in which the case is brought has minimum contacts with at least one defendant.FN12 *See PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 71 (2d Cir.1998). Once a district court has jurisdiction over one of the defendants, it may exercise jurisdiction over " 'other parties' not residing in the district, who may be additional defendants of any kind, including co-defendants, third party defendants, or additional counter-claim defendants" where it is shown that "the 'ends of justice' so require." *Id.* This requirement may be met where "it would be impracticable to bring all co-defendants together in a single action because no district court could exercise personal jurisdiction over all of them." *National Asbestos Workers Medical Fund v. Philip Morris, Inc.*, 86 F.Supp.2d 137, 140 (E.D.N.Y.2000); *accord Daly v. Castro Llanes*, 30 F.Supp.2d 407, 413 (S.D.N.Y.1998); *see also Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935 (11th Cir.1997) (exercise of personal jurisdiction under RICO over large domestic banking corporations without significant contacts with forum state nevertheless constitutional, absent any showing by corporations that their ability to defend lawsuit would be compromised significantly if they were required to litigate in forum state).

> FN12. The statute provides in relevant part:
> (a) Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.
> (b) In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.
> 18 U.S.C. § 1965.

**\*21** Even if these individual defendants were correct that this Court would not have jurisdiction over them under New York Law, jurisdiction under RICO's nationwide jurisdiction statute would be appropriate in the present case. Defendants do not dispute that the Court has personal jurisdiction over at least *one* (if not more) of the defendants under New York's long-

arm statute, based on the conduct of business activities in New York and their deriving substantial revenue from interstate commerce. *See* N.Y. C.P.L.R. § 302(a)(1), (3). Indeed, the Court has found that this was so with respect to the Leasecomm Defendants. *Zito I* at \*22. In addition, the Amended Complaint alleges that "at all pertinent times, defendant ECX ... was authorized to do business in New York State" and that it "maintained offices for the transaction of business in New York [S]tate and transacted business in and solicited customers in New York State through said offices." (¶ 23.) The Court therefore has jurisdiction over ECX as well as the Leasecomm Defendants. Furthermore, there could be no guarantee that all of these defendants would have sufficient contacts with any one state such that jurisdiction would be proper in the absence of nationwide service of process; according to the Amended Complaint, defendants are variously connected to the states of Massachusetts, California, Delaware, New Jersey, and New York, with little overlap among them. (¶¶ 9, 17, 21, 25.) Nor have the defendants made any showing that they would be unduly compromised by litigating in this district. Accordingly, jurisdiction under § 1965 is in the interests of justice here.

## IV. State Law Claims

Plaintiffs bring claims under state law against "all defendants, jointly and severally," for common law fraud and violations of the Unfair and Deceptive Practices Acts ("UADPA") "of the several states" against the OX defendants, ECX, and Leasecomm for violation of laws regulating franchise offerings, and against all defendants except Karn for intentional and negligent infliction of emotional distress. Defendants respectively move to dismiss on the primary argument that plaintiffs' failure to state a claim under RICO requires the dismissal of their pendant state law claims, an argument that is mooted by the Court's holding that plaintiffs' RICO claims survive. In the alternative, defendants argue that plaintiffs' various state law counts fail to state a claim. The defendants' motions will be granted as to the claims of negligent infliction of emotional distress, granted in part as to the claims of intentional infliction of emotional distress, and denied in all other respects.

### A. *Choice of Law*

In *Zito I*, the Court adopted Leaasecomm's unopposed argument that Massachusetts law applied

Case 7:04-cv-08223-KMK     Document 165-37     Filed 07/07/2006     Page 17 of 22

Not Reported in F.Supp.2d                                                                    Page 17
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
**(Cite as: Not Reported in F.Supp.2d)**

to plaintiffs' state law claims under the choice of law provision in Leasecomm contracts. Plaintiffs have since explicitly agreed that Massachusetts law applies to their claims. (P. Mem. Supp. Mot. to Amend 2.) Notwithstanding this, defendant ECX argues, with little support or explanation of its reasoning, that the Court should apply the separate law of the states in which each of the individual defendants associated with each "scheme" is said to reside. The sole basis for their argument is a schedule attached to the complaint listing the names of the plaintiffs and their current places of residence. There is no representation that these addresses were the addresses of the plaintiffs at the time their injuries were said to occur. ECX has provided no convincing reason that the choice of law provision in the contracts should not govern the present case, in light of plaintiffs' lack of opposition to that provision. Accordingly, except where otherwise noted, the Court stands by its prior ruling and will apply Massachusetts law to plaintiffs' state law claims.

### B. *Unfair and Deceptive Practices Act and Common Law Fraud*

**\*22** Section 11 of the Massachusetts Unfair and Deceptive Practices Act (UADPA) grants a private right of action to persons engaged in business that are injured as a result of unfair or deceptive business practices. *Mass. Gen. Laws ch. 93A § 11*. Defendants argue that plaintiffs have failed to allege any unfair or deceptive statements or practices. The Court has held above that the Amended Complaint alleges that each of the defendants made false or misleading statements in connection with their marketing of Leasecomm contracts, and that Burtzloff, Cardservice, and Karn made false and misleading statements in connection with their marketing of the Internet Tool Box. (*See* ¶ ¶ 187, 189, 208, 222, 235, 240). This argument thus fails.[FN13]

> **FN13.** ECX's argument that plaintiffs' UADPA claim fails because "the exercise of contractual rights is not an unfair practice" is without merit. Plaintiffs base their argument not on the exercise of "rights" under the contracts (which, in any event, they claim are unconscionable) but on the misrepresentations that caused them to enter the contracts in the first place.

In order to state a claim for common law fraud under Massachusetts law, a plaintiff must allege "(1) the defendant made a misrepresentation of fact; (2) it was made with the intention to induce another to act upon it; (3) it was made with the knowledge of its untruth; (4) it was intended that it be acted upon, and that it was in fact acted upon; and (5) damage directly resulted therefrom." *Equipment & Systems For Indus., Inc. v. Northmeadows Const. Co., 798 N.E.2d 571, 574 (Mass.App.Ct.2003)*. The Court's findings above similarly establish that plaintiffs have successfully alleged all of the elements of this claim with respect to each of the defendants, and that their allegations are sufficient to meet the requirements of Rule 9(b); it need not rehash these findings here.

### C. *Unlawful Franchise*

Plaintiffs bring claims against ECX, OX, and Leasecomm for violations of the regulations governing the offering of franchises. Applying the New York definition of a "franchise," [FN14] *Zito I* found that the description in the original complaint of the ECX/OX video scheme would meet that definition. [FN15] Notwithstanding this finding, ECX renews its arguments that plaintiffs have not properly alleged that a franchise relationship existed between ECX, OX, and Leasecomm and their customers. They further argue that because the video did not contain falsehoods, they are not liable under this provision.

> **FN14.** The Court applied New York law based on plaintiffs' having singled out New York franchise law in the original complaint and based on the theory that "New York's statute is considered 'the broadest and most plaintiff-friendly in the nation' " *Zito I* at *25, citing David J. Kaufman, *The New York Franchise Act, 823 PLI/Comm. 100, 205 (2001)*. The Amended Complaint similarly references New York Law. As noted below plaintiffs now appear to agree that Massachusetts law applies, but neither party adequately references Massachusetts law on this subject or argues that applying Massachusetts law would affect the analysis or the result.

> **FN15.** The relevant provision defines a "franchise" as:
> [A] contract or agreement, either expressed or implied, whether oral or written, between two or more persons by which:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 18
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
**(Cite as: Not Reported in F.Supp.2d)**

(a) A franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor, and the franchisee is required to pay, directly or indirectly, a franchise fee, or

(b) A franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate, and the franchisee is required to pay, directly or indirectly, a franchise fee. N.Y. Gen. Bus. L. § 681(3).

The latter argument is without merit. Plaintiffs' claim under this provision is based not on any falsehoods in the video, but on defendants' failure to comply with the applicable regulations governing franchises. As for their first argument, as the Court already ruled in *Zito I*:

The ECX/OX scheme seems quite literally to fit within the statutory definition of a franchise. The defendants' decision to characterize the payments required of plaintiffs as a "lease" rather than a "franchise fee" cannot obscure the reality that, at least as alleged in the complaint, ECX and OX offered consumers a "business opportunity" to obtain "distributorships" of products apparently provided by ECX or OX, which would be supported by informercials created and transmitted by those companies.... In exchange, the customer would have to pay either a one-time fee or a monthly payment over a four-year period. These allegations adequately assert that the customers were being asked to enter an agreement in which they are "granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchiser, and the franchisee is required to pay, directly or indirectly, a franchise fee." N.Y. Gen. Bus. L. § 681(3)(a).

**\*23** *Zito I* at \*27 (internal citations omitted). Notwithstanding this holding, plaintiffs fail to specify any basis for proceeding on these claims. They offer no persuasive reason that New York law should apply, and although they agree in their briefing that Massachusetts law should apply to their claims generally, they point to no specific Massachusetts statute that defendants have violated. Plaintiffs refer to violations of the regulations implementing the Federal Trade Commission Act, 15 U.S.C. § 45, 16 C.F.R. § 436.1 *et seq.,* but not to any provision of that act, which expressly authorizes enforcement actions only by the FTC, that would permit a private right of action. It is thus entirely unclear on what ground plaintiffs' franchising claims might survive.

However, ECX has not moved to dismiss on this ground, and the grounds on which they have so moved are unavailing. Further inquiry into the viability of these claims must therefore await summary judgment.

D. *Intentional and Negligent Infliction of Emotional Distress*

Plaintiffs again bring claims for intentional infliction of emotional distress ("IIED") against all defendants except Karn, based on the "dunning calls" committed by Leasecomm agents. Defendants move to dismiss, arguing that plaintiffs have failed adequately to allege the elements of this common law tort. *Zito I* dismissed plaintiffs' claims for intentional infliction of emotional distress ("IIED") on the ground that plaintiffs had failed to allege specific damages suffered by each individual plaintiff. In response, plaintiff has attached a schedule to the Amended Complaint listing the symptoms suffered by each plaintiff.

The elements of IIED under Massachusetts law are: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct, (2) that the conduct was extreme and outrageous, was beyond all possible bounds of decency and was utterly intolerable in a civilized community, (3) that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe and of a nature that no reasonable man could be expected to endure it.

*Agis v. Howard Johnson Co.,* 355 N.E.2d 315, 318-19 (Mass.1976) (internal citations and quotations omitted). Defendants' challenge is primarily to the sufficiency of the second element of this cause of action. The complaint alleges, however, that defendants conducted a campaign of harassment to intimidate Leasecomm's critics through infiltration of websites established by Leasecomm customers as part of their efforts to expose Leasecomm's tactics. (¶ ¶ 140-147.) According to the Amended Complaint, defendants John and Eddy Roe used these websites to

post misleading messages about the obligations of Leasecomm's customers, to launch personal attacks such as charges of "perversity including necrophilia" against Leasecomm critics, and to make "obnoxious and offensive" postings in the name of Leasecomm critics "in a deliberate attempt to damage [their] credibility and cause them embarrassment and ridicule." (¶ ¶ 142, 143, 144 & Ex. I.) Plaintiffs allege "on information and belief" that defendants MFI, Peter R. Von Bleyleben, Richard F. Latour, and Carol Salvo knew of these "poisonous postings." (¶ 147.) The complaint further alleges that, over and above harassment of Leasecomm critics, defendants' extreme collection tactics included calls to plaintiffs' parents and spouses, threatening harm such as imprisonment of plaintiffs if outstanding debts were not paid, and resulting in depression and anxiety to both plaintiffs and their loved ones. (¶ ¶ 380-382.) This conduct is so far beyond the bounds of what is acceptable in the normal course of business that, if proven, it would indeed meet the requirement above.

**\*24** Leasecomm brings a further challenge on the question of damages, arguing that in many cases, the allegations of resulting mental anguish are insufficiently serious, and that in the case of 155 of the plaintiffs, the Amended Complaint still fails to state that they suffered any damages at all. Certainly, those plaintiffs who failed to allege that they suffered any damages have failed to state a claim against the defendants. However, those plaintiffs who have alleged that they were damaged as a result of the Leasecomm's actions have alleged distress that is sufficiently severe to survive a motion to dismiss. Although some of these injuries claimed may turn out to be *de minimis,* the severity of the injuries suffered by each individual plaintiff primarily presents factual issues not properly addressed on a motion to dismiss. Plaintiffs have adequately stated the injuries they have suffered as a result of the alleged behavior, and that is all that is required of them.

ECX and Cardservice further argue that no claim exists for conspiracy to commit IIED, and that such claims cannot be shown based on an allegation of recklessness. On the latter question, the Massachusetts Court has held that such a claim may lie where the plaintiff shows "that the actor intended to inflict emotional distress or that he *knew or should have known* that emotional distress was the likely result of his conduct." *Agis,* 355 N.E.2d at 318 (emphasis added). Plaintiffs have fairly alleged that the dealer defendants knew of Leasecomm's extortionate collection practices; it can therefore be inferred that the dealers knew or should have known

that such practices would likely result in mental anguish. For the same reason, it is irrelevant that plaintiffs characterize their claims against some defendants as based on a conspiracy theory. Even if certain defendants did not themselves commit the acts intended to inflict harm on plaintiffs, if those acts were committed by agents of the defendants, as part of a business plan or scheme that they agreed would encompass those acts, which defendants "knew or should have known" would generate emotional distress, those defendants may be liable for their agents' acts.

It should be noted that on a motion to dismiss, the Court must sustain the complaint when it is "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Thomas v. City of New York,* 143 F.3d 31, 36-37 (2d Cir.1998). That plaintiffs' allegations minimally suffice to meet this very favorable standard does not indicate that plaintiffs are likely to be able to establish the facts necessary to overcome the many obstacles to successfully prosecute these claims.

### E. *Negligent Infliction of Emotional Distress*

Plaintiffs bring claims against each of the defendants, except Karn, for negligent infliction of emotional distress. Defendants move to dismiss, arguing that such claims require plaintiffs to allege, inter alia, "physical harm manifested by objective symptomatology." *See Payton v. Abbott Labs.,* 437 N.E.2d 171, 181 (Mass.1982). Indeed, Massachusetts courts have repeatedly rejected negligence claims based on emotional harm. *See, e.g. Gutierrez v. Mass. Bay Trans. Auth.,* 777 N.E.2d 552, 566-67 (Mass.2002) (clarifying and reaffirming physical injury element, noting that while the previous requirement of substantiation through expert medical testimony may have been relaxed, this merely expanded "the range of symptoms that may provide the type of objective evidence to prove *physical harm*" (emphasis added)); *Sullivan v. Boston Gas Co.,* 605 N.E.2d 805, 810 (Mass.1993) ("A successful negligent infliction of emotional distress claim must do more than allege 'mere upset, dismay, humiliation, grief, and anger.' ' (citing *Corso v. Merrill,* 406 A.2d 300, 304 (N.H.1979))); *Barthelmes v. Martineau,* No. 982378, 1999 WL 1319194, at \*5 (Mass.Super.Ct. Apr. 27, 1999) (negligent infliction of emotional distress claim dismissed because no physical harm alleged); *Bowler v. Dep't of Soc. Servs.,* No. MICV 9700772, 1998 WL 1181675, at \*3

Not Reported in F.Supp.2d                                                                Page 20
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
**(Cite as: Not Reported in F.Supp.2d)**

(Mass.Super.Ct. Oct. 13, 1998) (same). Because plaintiffs have failed to allege physical symptoms sufficient to demonstrate "physical harm manifested by objective symptomatology," their claims for negligent infliction of emotional distress must be dismissed.

## V. Leave to Amend

**\*25** After the instant motions to dismiss were fully briefed, plaintiffs moved to once again amend their complaint to (1) add one named and various unnamed plaintiffs, (2) add First Data Corp. ("First Data") as a defendant, and (3) generally "amend and supplement their complaint." (P. Mem. in Supp. Mot. to Amend.) This latter request appears to encompass proposals variously to (a) reinstate their claims previously dismissed by the Court under Section 9 of the Massachusetts Unfair and Deceptive Practices Act (UADPA), Mass. Gen. L. Ch. 93A § 9; (b) allow them to claim damages under Massachusetts law for intentional infliction of emotional distress "both as a common law tort and as a part of the damages pursuant to certain statutory violations"; and (c) supplement both their pleading and their arguments against the pending motions to dismiss by introducing additional evidence.

"[L]eave [to amend] shall be freely given where justice so requires." Fed.R.Civ.P. 15(a). However, courts are free to deny such leave "[w]hen it appears that leave to amend is sought in anticipation of an adverse ruling on the original claims." *Pl. Inc. v. Quality Products, Inc.,* 907 F.Supp. 752, 764-65 (S.D.N.Y.1995) (citing *inter alia Ansam Assocs., Inc. v. Cola Petroleum, Ltd.,* 760 F.2d 442, 446 (2d Cir.1985) (denying leave to amend because "permitting the proposed amendment would have been especially prejudicial given the fact that ... [the defendant] had already filed a motion for summary judgment")). In addition, where it is apparent to the Court that amending the complaint would be futile, permission to amend should be denied. *Hunt v. Alliance North Am. Gov't Income Trust, Inc.,* 159 F.3d 723, 728 (2d Cir.1998). A proposed amendment is futile if it would not withstand a Rule 12(b)(6) motion to dismiss. *Id.; see also Amaker v. Haponik,* 198 F.R.D. 386, 390-91 (S.D.N.Y.2000).

The Federal Rules require that a motion must "state with particularity the grounds therefore, and shall set forth the relief or order sought." Fed.R.Civ.P. 7(b). In order to meet the requirements of particularity in a motion to amend, "a complete copy of the proposed

amended complaint must accompany the motion so that both the Court and opposing parties can understand the exact changes sought." *Smith v. Planas,* 151 F.R.D. 547, 550 (S.D.N.Y.1993). "Where the proposed amended complaint does not accompany the motion to amend, the Court may hold the motion in abeyance pending the filing of that proposed complaint, ... or the Court may deny the motion without prejudice." *Planas,* 151 F.R.D. at 550 (citations omitted).

Plaintiffs have failed to submit a copy of the proposed Second Amended Complaint, leaving the Court and the defendants to guess at the precise nature of the contemplated changes. Indeed, the instant motion to amend exemplifies the rationale for the requirement that motions to amend include a copy of the proposed amendments. Plaintiffs' memorandum of law in support of their motion to amend and the accompanying declaration of their attorney have done precious little to clarify the scope of the proposed amendments, representing instead a collection of disorganized legal arguments and factual assertions that are more often apparently directed at the pending motions to dismiss. Defendants have been forced to respond to all conceivable amendments that plaintiffs' papers might possibly suggest. In response to defendants' briefs, plaintiffs then disavowed any intention to amend in some of the ways attacked by defendants, and explicitly withdrew several of their earlier requests. This process, which incurred considerable expense to defendants, could have been avoided if plaintiffs had included a copy of the proposed amendments with their motion. Plaintiffs have thus failed to meet the particularity requirement for the instant motion.

**\*26** Because the majority of plaintiffs' proposed amendments, even given the most generous possible construction, are either improper or futile, the motion will be denied, with the exception of plaintiff's request to add Cindy Bugg as a plaintiff.

### A. Abandoned or Disavowed Requests

Plaintiffs initial motion made several vaguely defined requests which they have since apparently abandoned or disavowed. However, because the extent to which some of these requests have been preserved remains unclear in some cases, the Court will address each of them.

1. Section 9 of the Massachusetts Unfair and

Deceptive Practices Act

In response to plaintiffs' original request to reinstate their claims under Section 9 of the Massachusetts UADPA, defendants argued at length that this request (1) constituted an impermissible and untimely request for reconsideration, and (2) would be futile for several reasons, including that (a) this section of the statute does not apply to leases for business ventures, (b) plaintiffs offered no reason for their failure to submit the purported "demand letter" required by the statute in prior pleadings, given that it has been continuously in their possession, and (c) the demand letter fails to meet the requirements of the statute. In their reply, plaintiffs withdrew their UADPA request, purportedly because it would have been "duplicative" (P. Reply in Supp. Mot. to Amend 2), but in all likelihood because they recognized its futility in light of defendants' arguments. Although the issue is now moot, defendants would surely have prevailed; any renewed request along these lines will therefore not be taken in good faith.

2. Request to Amend and Supplement Complaint

Plaintiffs' have presented an ill-defined request to "amend and supplement" their complaint, presented in the form of a declaration by their attorney which they have attached a series of confusing submissions, many of which appear directed at supplementing their pleadings in an attempt to defeat the pending motions to dismiss. In response, defendants rightly argue that in considering the pending motions to dismiss, the Court should disregard plaintiffs' attempt to supplement their legal arguments and ignore factual matters outside the complaint. In their reply, plaintiffs concede that consideration by the Court for these purposes would be improper, and state that their submissions were directed solely at their motion to amend the complaint should the Court decide against them on the motions to dismiss. (*Id.*)

In their opposition to these pending motions to dismiss, plaintiffs already requested leave to amend should the Court find their pleading deficient. Their motion is thus duplicative, and their failure to incorporate any relevant allegation into their first Amended Complaint is unexplained. Moreover, this request represents the second time plaintiffs have sought leave to amend their complaint *after* pending motions to dismiss were already filed. (*See* Mot. to Amend, Doc. # 36, dated April 21, 2003, filed in connection with opposition to pending motions to dismiss.) Viewed together, these circumstances raise an inference that the newly proposed amendments were in fact direct responses to the arguments raised by defendants in the pending motions. Because such piecemeal pleading is impermissible, these submissions will be disregarded in their entirety, without prejudice to the introduction of relevant evidence at the appropriate time.

3. Amendments Related to Intentional Infliction of Emotional Distress

**\*27** Finally, in their papers supporting their motion to amend, plaintiffs make a further, lengthy argument related to their claims of intentional infliction of emotional distress, claiming vaguely that "damages for the intentional infliction of emotional distress can be recovered both as a common law tort and as part of the damages pursuant to certain statutory violations." (P. Mem. in Supp. Mot. to Amend 3.) They do not specify to which "statutory violations" they are referring, nor do they appear to request any particular relief from the Court in connection with this argument; instead, it appears to be aimed solely at supplementing the prior arguments made in opposition to defendants' pending motions to dismiss their state law claims. Defendants respond by arguing that damages for physical or emotional injury not recoverable under the RICO statute. Plaintiffs in turn concede this point in their reply, and do not include any further arguments on this front. (P. Reply in Supp. Mot. to Amend 2.) To the extent that plaintiffs seek to add any such damage claims in connection with RICO, their motion is denied with prejudice; to the extent that their arguments relate to the dismissal of their state law claims, these arguments are improper and will be disregarded.

B. *Proposal to Add First Data Corp as a Defendant*

Plaintiffs seek to amend their complaint to add First Data Corp as a defendant under a theory of vicarious liability, based on a purported joint venture with Cardservice. In support of this proposed amendment, plaintiffs point to descriptions in SEC filings of Cardservice and First Data as participating in a "joint venture," as well as to a news article describing the partnership and the fact that First Data had a fifty percent ownership interest in Cardservice during the relevant time-period. (Klotz Dec. Exs. 10, 4.) As plaintiffs point out, as the parent corporation of Cardservice, there is little doubt that First Data has been on notice of the instant claims. (P. Mem. in Supp. Mot. to Amend 6.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                        Page 22
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760
**(Cite as: Not Reported in F.Supp.2d)**

Defendants argue that the current Amended Complaint fails to make the allegations required to state a claim for vicarious liability on the part of First Data. This argument is misdirected. It is true that the current complaint does not state such a claim. However, plaintiffs do not stand on their existing complaint in seeking to state this claim, but rather seek to amend; presumably, any amended complaint would attempt to cure this deficiency. Nevertheless, because plaintiffs have not submitted a copy of the proposed amended complaint, the Court is unable to evaluate whether or not their proposed amendment would succeed in doing so. Plaintiffs do not explain their failure to submit a proposed amended complaint, nor do they describe the substance of any projected allegations concerning First Date's alleged participation in the wrongful acts alleged in the present complaint. Plaintiffs' haphazard approach to pleading cannot be condoned. Accordingly, plaintiffs' motion to add First Data as an additional defendant will be denied.

### C. *Proposal to Add Plaintiffs*

**\*28** Plaintiffs seek permission to amend the complaint to join additional plaintiffs, including one named individual, as well as additional and as-yet unnamed plaintiffs. In response to defendants' protest that plaintiffs' request amounts to an impermissible attempt to create an effective class-action without subscribing to the requirements of Rule 23 of the Federal Rules of Civil Procedure, plaintiffs now clarify that "what plaintiffs seek is the right to apply for additions of individuals within a set time frame determined by the Court." (P. Reply in Supp. Mot. to Amend 6.)

The Court will not, and indeed could not, deny any person the opportunity to join in the action as plaintiffs, provided they meet the requirements of Rule 20 of the Federal Rules; however, the Court will not grant plaintiffs blanket permission to add parties in the absence of an individualized finding that such joinder would be appropriate. With respect to the time-frame, joinder of additional parties is commonly allowed, pursuant to the standard case management plan promulgated by this Court and established by agreement of the parties, within a reasonable period after the close of discovery. Because no case management plan has yet been entered in this case in view of the pending motions to dismiss, the issue is not yet ripe. Now that these motions have been decided largely in plaintiffs' favor, the Court

anticipates that the parties will confer prior to the next scheduling conference in order to establish a schedule on these matters that is agreeable to all parties. The Court's intervention on this issue should therefore not be necessary. Accordingly, plaintiff's motion to add unnamed and as yet unidentifiable plaintiffs at an unspecified future time is denied, without prejudice to any future application to join additional plaintiffs in accordance with the anticipated case management plan. However, the motion is granted with respect to the one named additional plaintiff, Cindy Bugg.

### CONCLUSION

Defendants' motions to dismiss plaintiffs' claims is denied, except to the extent that plaintiff's claims for negligent infliction of emotional distress are dismissed, and the claims for intentional infliction of emotional distress are dismissed as to those plaintiffs who have not alleged emotional distress damages. Plaintiffs' motion to amend is granted as to the addition of Cindy Bugg as a plaintiff, and denied in all other respects.

SO ORDERED.

S.D.N.Y.,2004.
Zito v. Leasecomm Corp.
Not Reported in F.Supp.2d, 2004 WL 2211650 (S.D.N.Y.), RICO Bus.Disp.Guide 10,760

Briefs and Other Related Documents (Back to top)

• 1:02cv08074 (Docket) (Oct. 10, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.