Westlaw.

Not Reported in F.Supp.2d, 2003 WL 21738604 (E.D.N.Y.), 2003-2 Trade Cases  P 74,137
**(Cite as: Not Reported in F.Supp.2d)**

C

Briefs and Other Related Documents

United States District Court,E.D. New York.
Martin BENNETT, Community Health Pharmacy,
Inc., and 167 Street Prescription Center, Inc., d/b/a
167 RX Center, Plaintiffs,
v.
CARDINAL HEALTH MARMAC
DISTRIBUTORS, INC., H.D. Smith Wholesale Drug
Company, Inc., Kinray, Inc., Remo Drug Corporation
and Amerisource Corporation, Defendants.
**No. 02 CV 3095(JG).**

July 14, 2003.

Pharmacies and their principal shareholder sued wholesale suppliers of pharmaceuticals, alleging violations of the Sherman Act, the Clayton Act, the Robinson-Patman Act, and state law resulting from suppliers' alleged refusal to deal after pharmacies' principal shareholder declined to allow suppliers to determine buyer of one of the pharmacies. Upon suppliers' motion to dismiss for failure to state a claim, the District Court, Gleeson, J., held that: (1) principal shareholder's asserted harm was entirely derivative of harm allegedly suffered by pharmacies, and did not allege antitrust injury required to support claims; (2) pharmacies failed to allege that suppliers' conduct was per se violation of Sherman Act, or that suppliers' conduct had actual adverse effect on competition in relevant market, as required to support claim of refusal to deal under Sherman Act; (3) pharmacies failed to allege tied products, existence of exclusive dealing arrangement, or sufficient facts relating to acquisition of assets or stock by suppliers, as required to support claims under Clayton Act; (4) pharmacies failed to allege that suppliers discriminated against them by not according proportionally equal terms as were extended to other buyers in same geographic area, as required to support claim under Robinson-Patman Act; and (5) pharmacies' claims under state business law, which were patterned under Sherman Act, were not cognizable.

Motion granted.

West Headnotes

**[1] Federal Civil Procedure 170A** ⌐1833

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
            170AXI(B)5 Proceedings
                170Ak1827 Determination
                    170Ak1833 k. Affidavits. Most Cited
Cases

**Federal Civil Procedure 170A** ⌐2533.1

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2533 Motion
                    170Ak2533.1 k. In General. Most
Cited Cases
Defendant's motion to dismiss would be treated as a motion to dismiss for failure to state a claim rather than as a motion for summary judgment, with court's consideration of plaintiff's affidavits that were submitted in opposition to dismissal, even though consideration of matters outside pleadings generally would have required conversion of motion into one for summary judgment; both parties invited court to consider plaintiff's affidavits, and plaintiff asserted that summary judgment was not appropriate because discovery was needed. Fed.Rules Civ.Proc.Rules 12(b)(6), 56, 28 U.S.C.A.

**[2] Antitrust and Trade Regulation 29T** ⌐972(5)

29T Antitrust and Trade Regulation
    29TXVII Antitrust Actions, Proceedings, and
Enforcement
        29TXVII(B) Actions
            29Tk972 Pleading
                29Tk972(2) Complaint
                    29Tk972(5) k. Injury to Business or
Property. Most Cited Cases
        (Formerly 265k28(6.7))
Principal shareholder of pharmacies that brought antitrust claims against wholesale suppliers of pharmaceuticals failed to sufficiently allege antitrust injury, as required to support claims under Sherman Act and Clayton Act; shareholder's harm was entirely derivative of harm allegedly suffered by pharmacies as result of their alleged refusal to supply products. Sherman Act, § 1 et seq., as amended, 15 U.S.C.A. §

Not Reported in F.Supp.2d                                                                 Page 2
Not Reported in F.Supp.2d, 2003 WL 21738604 (E.D.N.Y.), 2003-2 Trade Cases P 74,137
**(Cite as: Not Reported in F.Supp.2d)**

1 et seq.; Clayton Act, § 1 et seq., 15 U.S.C.A. § 12 et seq.

**[3]** **Antitrust and Trade Regulation 29T** 972(5)

29T Antitrust and Trade Regulation
   29TXVII Antitrust Actions, Proceedings, and Enforcement
      29TXVII(B) Actions
         29Tk972 Pleading
            29Tk972(2) Complaint
               29Tk972(5) k. Injury to Business or Property. Most Cited Cases
      (Formerly 265k28(6.7))
Two pharmacies failed to allege antitrust injury, as required to support claim that suppliers of pharmaceuticals, who allegedly refused to supply pharmaceutical products after pharmacies' principal shareholder declined to allow suppliers to determine buyer of pharmacy, violated Sherman Act's refusal to deal or anti-monopoly provisions; suppliers' conduct did not constitute per se violation of Sherman Act as group boycott or concerted denial designed to disadvantage pharmacies as competitor of suppliers, and pharmacies did not allege facts to support bare assertion that suppliers' refusal to supply two pharmacies had actual adverse effect on competition in relevant market. Sherman Act, § 1 et seq., as amended, 15 U.S.C.A. § 1 et seq.

**[4]** **Antitrust and Trade Regulation 29T** 972(3)

29T Antitrust and Trade Regulation
   29TXVII Antitrust Actions, Proceedings, and Enforcement
      29TXVII(B) Actions
         29Tk972 Pleading
            29Tk972(2) Complaint
               29Tk972(3) k. In General. Most Cited Cases
      (Formerly 265k28(6.3))
Pharmacies' allegations that suppliers of pharmaceuticals refused to sell products to them, in response to pharmaceutical owner's decision not to sell one of the pharmacies to entity of suppliers' choosing, failed to state claim under Clayton Act as illegal tying or exclusive dealing arrangement; pharmacies did not allege tied product sold on condition that another be purchased, and did not allege that exclusive dealing arrangement existed. Clayton Act, § 1 et seq., 15 U.S.C.A. § 12 et seq.

**[5]** **Antitrust and Trade Regulation 29T** 972(3)

29T Antitrust and Trade Regulation
   29TXVII Antitrust Actions, Proceedings, and Enforcement
      29TXVII(B) Actions
         29Tk972 Pleading
            29Tk972(2) Complaint
               29Tk972(3) k. In General. Most Cited Cases
Pharmacies' allegations that suppliers of pharmaceuticals refused to sell products to them, in response to pharmaceutical owner's decision not to sell one of the pharmacies to entity of suppliers' choosing, failed to state claim under provision of Clayton Act prohibiting one person from acquiring assets or stock of another where effect would be to substantially lessen competition or create a monopoly; pharmacies alleged no facts relating to suppliers' acquisition of assets that would have such effects. Clayton Act, § 1 et seq., 15 U.S.C.A. § 12 et seq.

**[6]** Antitrust and Trade Regulation 29T 884

29T Antitrust and Trade Regulation
   29TX Antitrust and Prices
      29TX(G) Particular Industries or Businesses
         29Tk884 k. Medical Supplies and Pharmaceuticals. Most Cited Cases
      (Formerly 382k928 Trade Regulation)
Pharmacies' allegations that suppliers of pharmaceuticals refused to sell products to them, in response to pharmaceutical owner's decision not to sell one of the pharmacies to entity of suppliers' choosing, failed to state claim under provision of Robinson-Patman Act prohibiting discrimination in favor of one purchaser of commodity against another on terms not accorded to all purchasers on proportionally equal terms; Act did not prohibit supplier from choosing its customers and from refusing to deal with prospective customers to whom it did not wish to sell. 15 U.S.C.A. § 13(e).

**[7]** **Antitrust and Trade Regulation 29T** 972(3)

29T Antitrust and Trade Regulation
   29TXVII Antitrust Actions, Proceedings, and Enforcement
      29TXVII(B) Actions
         29Tk972 Pleading

Not Reported in F.Supp.2d                                                                                              Page 3
Not Reported in F.Supp.2d, 2003 WL 21738604 (E.D.N.Y.), 2003-2 Trade Cases P 74,137
(Cite as: Not Reported in F.Supp.2d)

29Tk972(2) Complaint
        29Tk972(3) k. In General. Most Cited
Cases
        (Formerly 265k28(6.3))
Pharmacies' allegations that suppliers of pharmaceuticals refused to sell products to them, in response to pharmaceutical owner's decision not to sell one of the pharmacies to entity of suppliers' choosing, failed to state claim for violation of state business law that was modeled on Sherman Act; pharmacies simply realleged antitrust claims under state law, allegations did not state cognizable claim under Sherman Act, and pharmacies did not allege any state policy, difference in statutory language, or legislative history that would justify interpreting state law differently than federal antitrust statute. Sherman Act, § 1 et seq., as amended, 15 U.S.C.A. § 1 et seq.; McKinney's General Business Law § 340.

G. Oliver Koppell, Paul E. Kerson, Koppell, Leavitt, Kerson, Leffler & Duane, LLP, New York, NY, for Plaintiffs.
Steven E. Bizar, Buchanan Ingersoll Professional Corporation, New York, NY, for Defendant, Amerisource Corporation.
Bruce W. Bieber, Barr & Hass LLP, Spring Valley, NY, for Defendant, Kinray, Inc.
Thomas A. Guida, Baker & Hostetler, LLP, New York, NY, for Defendant, Cardinal Health Marmac Distributors, Inc.
Howard M. Rubin, Goetz, Fitzpatrick, Most & Bruckman, LLP, New York, NY, for Defendant, H.D. Smith Wholesale Drug Co., Inc.

*MEMORANDUM AND ORDER*
GLEESON, J.
*1 Plaintiffs Martin Bennett, Community Health Pharmacy, Inc. ("CHP"), and 167 Street Prescription Center, Inc. d/b/a/ 167 RX Center ("167 RX Center") bring this action against the defendants Cardinal Health Marmac Distributors, Inc. ("Cardinal"), H.D. Smith Wholesale Drug Company, Inc. ("H.D.Smith"), Kinray, Inc. ("Kinray"), Remo Drug Corp. ("Remo"), and Amerisource Corp. ("Amerisource"), alleging violations of: (1) the Sherman Antitrust Act (the "Sherman Act"), 15 U.S.C. § § 1 and 2; (2) the Clayton Act, 15 U.S.C. § § 14, 15, 18 and 22; (3) the Robinson-Patman Act, 15 U.S.C. § 13; and (4) the Donnelly Act, N.Y. General Business Law § § 340-41 (McKinney 1988). Pursuant to Federal Rule of Civil Procedure 12(b)(6), Amerisource moved to dismiss all plaintiffs' claims asserted against it. Other defendants joined in the motion, and plaintiffs agreed at oral argument that if

the motion is granted, the case should be dismissed as against all defendants. For the reasons set forth below, the motion is granted.

*BACKGROUND*

Bennett is the principal shareholder of the corporate plaintiffs, CHP and 167 RX Center, which operate pharmacies in Newark, New Jersey, and in the Bronx, New York, respectively. The defendants are wholesale suppliers of pharmaceuticals to pharmacies located in New York City and the surrounding metropolitan area.

Sometime in February 2002, Bennett contracted to sell the Bronx pharmacy to Raheel Pervez. Harvey Tanenbaum, the president of defendant H.D. Smith, informed Bennett that he disapproved of the proposed sale to Pervez and told Bennett to sell the Bronx pharmacy to someone else. The other defendants also apparently disapproved of the proposed sale and "directed [ ] Bennett to sell the pharmacy ... to a person or corporation of [their] choosing." (Compl. at 4.) Bennett declined to allow the defendants to determine the buyer of Bennett's pharmacy.

Sometime thereafter, each of the defendants began to refuse to distribute pharmacy supplies to either of Bennett's pharmacies. Bennett alleges that "defendants combined and conspired to prevent [him] from selling his business and to thereby destroy the value of plaintiff's investment." (Compl. at 4.) As a result of defendants' refusal to deal, Bennett has had great difficulty supplying his pharmacies. In addition, Bennett has been unable to consummate the sale with Pervez.

*DISCUSSION*

A. *The Procedural Posture*

[1] The plaintiffs have exhibited some procedural confusion in their response to the motion. The motion was made pursuant to Federal Rule of Civil Procedure 12(b)(6), on the ground that the complaint fails to state claims on which relief may be granted. In opposition, plaintiffs filed (a) an affirmation of counsel that consists primarily of personal testimonial to Martin Bennett's good character, and an exhortation that the "defendants must be brought to justice" (Affirmation of Paul E. Kerson, dated Oct. 10, 2002, at 3) ("Kerson Aff."); and (b) affidavits

Not Reported in F.Supp.2d                                                                            Page 4
Not Reported in F.Supp.2d, 2003 WL 21738604 (E.D.N.Y.), 2003-2 Trade Cases P 74,137
**(Cite as: Not Reported in F.Supp.2d)**

(totaling 34 pages) from Bennett, Peter Pervez (Raheel Pervez's father), Diana Zeno Bennett (Bennett's wife, who works at 167 RX Center), Julie Hernandez (who works at 167 RX Center), and Chandrika Patel (who works at CHP). The affidavits elaborate upon plaintiffs' claims.[FN1] For example, Diana Bennett describes the relationship between Bennett's pharmacies and their wholesale suppliers. In 2001, H.D. Smith offered Bennett the most liberal payment terms of all the wholesalers. Because the pharmacies had cash flow problems, H.D. Smith became the principal supplier of CHP and 167 RX Center. In early 2002, Bennett informed H.D. Smith that he was in negotiations to sell 167 RX Center. In February of 2002, Bennett and H.D. Smith began to have disagreements regarding payment terms and outstanding balances. Those disagreements led to Tanenbaum's February 27, 2002 visit to 167 RX Center, during which Tanenbaum screamed at Bennett about his decision to sell to Pervez, and threatened that Bennett would never get any merchandise if he persisted in doing so. That threat, plaintiffs claim, was carried out by the refusal to deal that is the focus of this action.[FN2]

> **FN1.** The affidavits submitted by plaintiffs also allege additional details about where the defendants formed their plan to refuse to deal with CHP and 167 RX Center. The affidavit from Pervez's father asserts that representatives of the defendants "all meet together every month at an Italian restaurant on Francis Lewis Blvd. in Whitestone, Queens" to "set terms for the entire industry;" "Business terms are set. Prices are set. Customer lists are divided ." (Pervez Aff. at 3.) Plaintiffs apparently contend that the concerted refusal to deal in this case was hatched at that Italian restaurant. (Pls.' Opp'n Mem. at 2.)

> **FN2.** Unless otherwise specified, "Bennett" refers to plaintiff Martin Bennett, and "Pervez" refers to Raheel Pervez, the would-be purchaser of 167 RX Center.

**\*2** In its reply memorandum, Amerisource objected to plaintiffs' submission of affidavits, pointing out (correctly) that they were beyond the pleadings and not properly considered on a motion to dismiss. In a sur-reply, plaintiffs chastised defendants for their "lack of understanding" of the Federal Rules of Civil Procedure, which, plaintiffs charged, defendants "stand ... on their ear" by objecting to the affidavits.

(Pls.' Reply in Opp'n to Mot. to Dismiss ("Pls.' Sur-reply") at 1, 2.) In castigating defendants, plaintiffs cited to the part of Rule 12(b) that states as follows:
If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Also, because Fed.R.Civ.P. 8(e) requires "concise" and "direct" pleadings, plaintiffs argue, they had to submit affidavits to present their case. (Pls.' Sur-reply at 2.) Indeed, they criticize defendants for *not* submitting any affidavits in support of their motion to dismiss. (*Id.* at 3. ("Defendant Amerisource Corp.'s Reply Brief is a poor substitute for an Affidavit of someone within Amerisource Corp[.] with knowledge of the facts of the case.").)

It is unusual, though not unheard of, for a plaintiff to trigger the conversion of a defendant's Rule 12(b)(6) motion into a summary judgment motion. *See* 5A Charles Alan Wright & Arthur R Miller, *Federal Practice and Procedure* § 1366 (2d ed. 1990) ("Tactically, the pleader is unlikely to initiate the introduction of outside material because if he does, the Rule 12(b)(6) motion, which is rarely granted on the merits, will be converted into a motion for summary judgment and may result in a binding final determination against him."). Thus, this is an atypical situation, in which the plaintiffs seek to justify my consideration of the extensive extrinsic evidence they submitted by reference to my authority to convert their opponent's motion into a Rule 56 motion. (Pls.' Sur-reply at 2.)

At oral argument, however, plaintiffs waffled. When pressed on issues of market definition and market share, counsel asserted that discovery was needed, and that the case is only "at the pleading stage." (Tr. at 21.)[FN3] Thus, counsel asked that I consider the affidavits, but not convert the motion into a motion for summary judgment. (*Id.*) Yet, when pressed on whether I could grant or deny the motion under Rule 56 as readily as under Rule 12(b), plaintiffs' counsel answered "yes." (*Id.*)

> **FN3.** Oral argument on the motion to dismiss took place on November 15, 2002.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 5
Not Reported in F.Supp.2d, 2003 WL 21738604 (E.D.N.Y.), 2003-2 Trade Cases P 74,137
**(Cite as: Not Reported in F.Supp.2d)**

I conclude that the motion should be disposed of under Rule 12(b)(6). As a general rule, that conclusion would preclude me from considering at all material not in the pleadings, such as the lawyer's affirmation and the affidavits submitted by plaintiffs. Obviously, it would be error for me to grant a motion to dismiss based in part on such material if it were submitted by the moving party. *See Newman & Schwartz v. Asplundh Tree Expert Co.,* 102 F.3d 660, 662 (2d Cir.1996). But in these circumstances, I see no harm in considering these additional allegations as though they were asserted in the complaint. I have been invited by both sides to do just that. (Tr. at 3, 21.) Moreover, the considerable additional light they shed on plaintiffs' claims makes it clear to me that granting leave to amend the complaint would be futile.

**\*3** Having determined to consider the motion as a motion to dismiss under Rule 12(b)(6), I am required to accept the factual assertions in the complaint (and, in this case, the affidavits submitted by plaintiffs) as true, and to draw all reasonable inferences in favor of the plaintiff. *Zinermon v. Burch,* 494 U.S. 113, 118, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990); *Charles W. v. Maul,* 214 F.3d 350, 356 (2d Cir.2000). The motion may not be granted unless it appears beyond doubt that the plaintiffs can prove no set of facts which would entitle them to relief. *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997).

### B. *Bennett's Standing*

[2] In order to assert an antitrust claim, a plaintiff must allege an antitrust injury, *i.e.,* some harm that is cognizable under the antitrust laws. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Specifically, "[t]he injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Id.* Where injuries sustained by officers or stockholders are merely derivative of those sustained by an injured company, the harm is insufficient to confer antitrust standing on those individuals. *G.K.A. Beverage Corp. v. Honickman,* 55 F.3d 762, 766-67 (2d Cir.1995).

Bennett does not have standing to assert the antitrust claims here. His harm is entirely derivative of the harm allegedly suffered by the corporate plaintiffs as a result of the defendants' refusal to supply pharmaceutical products. Accordingly, to the extent the claims are asserted by Bennett, they are dismissed

not only because of the substantive defects addressed below, but for the additional reason that he lacks standing.

### C. *The Sherman Act Claims*

[3] CHP and 167 RX Center bring claims under § § 1 and 2 of the Sherman Act, 15 U.S.C. § § 1 and 2. Section 1 prohibits "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. Section 2 makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2.

As stated above, in order to maintain an action under § § 1 and 2 of the Sherman Act, a plaintiff must allege that it has suffered an antitrust injury. "The antitrust injury requirement obligates a plaintiff to demonstrate, as a threshold matter, that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice." *George Huag Co. v. Rolls Royce Motor Cars Inc.,* 148 F.3d 136, 139 (2d Cir.1998) (citations and internal quotation marks omitted) (emphasis in original). "[A] plaintiff may succeed only when the loss he asserts derives from activities that have a 'competition-*reducing*' effect." ' *Tops Markets, Inc. v. Quality Markets, Inc.,* 142 F.3d 90, 96 (2d Cir.1998) (quoting *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 342-344, 110 S.Ct. 1884, 109 L.Ed.2d 333) (1990) (emphasis in original). Actual adverse effects include reduced output, decreased quality, increased prices or the imposition of barriers to entry. *Id.*

**\*4** Plaintiffs argue that they need not show that defendants' refusal to deal with them had an actual adverse effect on competition because the challenged conduct constituted a "group boycott" actionable as a *per se* violation of the Sherman Act. The Supreme Court has applied a *per se* rule of illegality where the challenged action falls into the category of "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pac. R.R. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 2

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 6
Not Reported in F.Supp.2d, 2003 WL 21738604 (E.D.N.Y.), 2003-2 Trade Cases  P 74,137
**(Cite as: Not Reported in F.Supp.2d)**

L.Ed.2d 545 (1958). While certain concerted refusals to deal or group boycotts fall into this category, others do not. Compare *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) (refusal to sell appliances to retailer warranted *per se* analysis) *with Federal Trade Comm'n v. Indiana Fed'n of Dentists,* 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) (refusal to submit x-rays to insurers for use in benefit determinations was not *per se* unlawful). Therefore, the mere allegation of a concerted refusal to deal does not justify application of the *per se* rule. *Northwest Wholesale Stationers v. Pacific Stationery and Printing Co.,* 472 U.S. 284, 298, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985).

Generally, the cases to which the *per se* rule has been applied "involved joint efforts by a firm or firms to disadvantage *competitors* by either directly denying or persuading or coercing suppliers or customers to deny relationships the *competitors* need in the competitive struggle." *Id.* at 295 (internal quotation marks omitted) (emphasis added). The precise circumstances under which the *per se* rule is applied to group boycotts is a recognized source of confusion in antitrust law. *Id.* at 294 ("There is more confusion about the scope and operation of the *per se* rule against group boycotts than in reference to any other aspect of the *per se* doctrine") (quoting L. Sullivan, *Law of Antitrust* 229-230 (1977)); *Bogan v. Hodgkins,* 166 F.3d 509, 515 (2d Cir.1999). In the Second Circuit, when the anticompetitive effects on the relevant market are not obvious or "clearly apparent," courts have denied group boycotts or concerted denials *per se* treatment. *Id.* (citing *Union Circulation Co. v. Federal Trade Comm'n,* 241 F.2d 652, 657 (2d Cir.1957)).

In this case, the anticompetitive effects of defendants' refusal to deal are neither apparent nor obvious. Plaintiffs' attempt to draw an analogy between this case and *Klor's,* 359 U.S. at 207, is unpersuasive. In *Klor's,* a direct competitor was the driving force behind the concerted refusal to supply the plaintiff. Plaintiffs in this case have made no allegation that a competitor of theirs was behind the alleged boycott. Also, unlike the other cases upon which plaintiffs rely, there is no allegation that the purpose of the boycott was to harm a competitor of the participants in the boycott, *i.e.,* the wholesaler defendants. *See, e.g., id.; Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988); *United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). Where no competitor of either the defendants

or the plaintiffs is in some way related to the concerted refusal to deal, it is difficult to conceive of the anticompetitive effects of the challenged conduct. Accordingly, this case does not present a group boycott that warrants the presumption of anticompetitive effects justifying application of the *per se* rule. *Bogan,* 166 F.3d at 515 ("The categories of *per se* illegal conduct are an approximation, a shortcut to reach conduct that courts can safely assume would surely have an anticompetitive effect.")

**\*5** Where the *per se* rule is inapplicable, the plaintiff must "demonstrate, as a threshold matter, that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market." *George Huag,* 148 F.3d at 139 (citations and internal quotation marks omitted) (emphasis in original). Plaintiffs contend that defendants' refusal to deal with CHP and 167 RX Center "will substantially lessen competition in and tend to create a monopoly in the wholesale supply of local pharmacies throughout the State of New York, New Jersey and Connecticut." (Compl. at 5.) However, plaintiffs allege no facts that support their bare assertion that the concerted refusal to supply the two plaintiff pharmacies had an actual effect on competition in that market. *See Tops Markets,* 142 F.3d at 96 (actual adverse effects on competition include reduced output, decreased quality, increased prices or the imposition of barriers to entry). Moreover, I cannot conceive of how a joint refusal to supply CHP and 167 RX Center could help the defendants control the market to supply pharmacies in the tri-state New York metropolitan area. This contention simply makes no sense. If a group of suppliers of pharmacies indeed decided to control the wholesale pharmacy supply market, acting together to drive out of business one pharmacy in Newark and one other in the Bronx would not be a logical or, even an imaginable, way to start.

In fact, as plaintiffs' counsel argued orally, the plaintiffs have different theory, as follows: Tanenbaum, the president of H.D. Smith, found out that Bennett was selling his Bronx pharmacy to Pervez. Tanenbaum wanted Bennett to sell the pharmacy to someone else instead.[FN4] When Bennett refused, Tanenbaum got the other defendants to agree not to supply Bennett's two pharmacies. As counsel put it, it "should not happen ... that all of a sudden because one company, [H.D.] Smith and Mr. Tannenbaum [sic] are angry with Mr. Bennett for whatever reason or try to get Mr. Bennett to change his favored purchaser, that everybody should stop dealing with him. That is in fact the definition, in my

Not Reported in F.Supp.2d                                                                                                    Page 7
Not Reported in F.Supp.2d, 2003 WL 21738604 (E.D.N.Y.), 2003-2 Trade Cases  P 74,137
**(Cite as: Not Reported in F.Supp.2d)**

view, of a per se violation, of interference with competition." (Tr. at 24.)

> FN4. Although it is not clear, plaintiffs may be claiming that H.D. Smith wanted the Bronx pharmacy for itself, and sought to purchase it through a "front" man. (Zeno Bennett Aff. at 6.)

This is not even an antitrust theory, let alone the "definition" of a *per se* violation. As stated above, the antitrust laws protect competition, not particular competitors, and there is nothing about Tanenbaum's (and the defendants') alleged retaliation against Bennett that could have affected competition in any market.[FN5] I conclude that there is no set of facts on which the defendants' refusal to deal with one pharmacy in Newark and another in the Bronx would entitle either pharmacy to relief under the Sherman Act.

> FN5. Perhaps sensing this weakness, plaintiffs' counsel also advanced a domino theory: "Today they will accommodate Mr. Tannenbaum [sic], tomorrow [they will] accommodate one of the other companies or one of their principals. That's what's going on here." (Tr. at 23.) I hold here that only today's accommodation fails to make out an antitrust claim. Moreover, I express no view as to whether the conduct attributed to Tanenbaum in the affidavits submitted by plaintiffs violates laws other than the antitrust laws underlying the claims in this case.

### D. *The Clayton Act Claims*

[4] Plaintiffs bring claims against defendants under § § 3, 4, 7, 15, and 16 of the Clayton Act, 15 U.S.C. § § 14, 15, 18, 25, and 26. Only § § 3 and 7 provide private causes of action, and plaintiffs have failed to even attempt to explain why the conduct they allege violates those provisions.

**\*6** Section 3 of the Clayton Act provides, in pertinent part:
It shall be unlawful for any person ... to ... make a sale or contract for sale of goods ... on the condition, agreement, or understanding that the ... purchaser thereof shall not use or deal in the goods ... of a competitor or competitors ... where the effect ... may be to substantially lessen competition or tend to

create a monopoly in any line of commerce.

15 U.S.C. § 14. The statute provides a cause of action for anticompetitive product tying and exclusive dealing arrangements. In order to prove an illegal "tying" arrangement, a buyer must show, *inter alia,* that one product was sold on the condition that another be purchased as well. *See In re Visa Check/MasterMoney Antitrust Litigation,* 280 F.3d 124, 133 n. 5 (2d Cir.2001), *cert denied,* 536 U.S. 917, 122 S.Ct. 2382, 153 L.Ed.2d 201 (2002) (addressing tying claim under § 1 of Sherman Act). In order to prove an illegal exclusive dealing arrangement, plaintiffs must show, *inter alia,* that the defendants established a single distributor as the sole outlet for their products in a particular geographic area. *See, e.g., United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967) (addressing exclusive dealership claim under § 1 of the Sherman Act), *overruled on other grounds by Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) (rejecting the *per se* rule stated in *Schwinn* ).

Plaintiffs have failed to state a tying claim because they have not alleged a tying product or a tied product. They have failed to state a claim for exclusive dealing because they do not alleged that an exclusive dealing arrangement existed.

[5] Section 7 of the Clayton Act prohibits one person from acquiring the assets or stock of another person where the effect would be to substantially lessen competition or to create a monopoly. 15 U.S.C. § 18. Plaintiffs allege no facts relating to the acquisition of assets or stock by the defendants that would have such effects. Accordingly, this claim fails as well.

### E. *The Robinson-Patman Act Claim*

[6] Plaintiffs allege violations of § 2(e) of the Robinson-Patman Act, 15 U.S.C. § 13(e), which provides:
It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 8
Not Reported in F.Supp.2d, 2003 WL 21738604 (E.D.N.Y.), 2003-2 Trade Cases  P 74,137
**(Cite as: Not Reported in F.Supp.2d)**

Specifically, plaintiffs allege that defendants violated this provision "[b]y refusing to deliver wholesale pharmacy supplies to plaintiffs Martin Bennett, 167 [RX Center] and CHP, defendants ... discriminated against [plaintiffs] by not according to them, proportionally equal terms as were extended to other pharmacies throughout the New York City and suburban metropolitan area including Northern New Jersey." (Compl. at 6-7.) However, the Robinson-Patman Act "does not prohibit a seller from choosing its customers and from refusing to deal with prospective purchasers to whom, for whatever reason, it does not wish to sell." *Harper Plastics, Inc. v. Amoco Chemicals Corp., 617 F.2d 468, 470 (7th Cir.1980); New Amsterdam Cheese Corp. v. Kraftco Corp., 363 F.Supp. 135, 142 (S.D.N.Y.1973)* ("termination of one distributor in favor of another has been upheld as perfectly lawful and not in restraint of trade under the Clayton Act as amended by the Robinson-Patman Act"). Accordingly, plaintiffs fail to state a claim under the Act.

### F. *The Donnelly Act Claims*

**\*7** [7] Plaintiffs also bring claims under the Donnelly Act, N.Y. General Business Law § § 340-41 (McKinney 1988). The Donnelly Act was "modeled on the Sherman Act and is to be construed in accordance with it." *Geneva Pharms. Tech. Corp. v. Barr Lab, Inc., 201 F.Supp.2d 236, 279 (S.D.N.Y.2002).* Plaintiffs "simply reallege[ ] the federal antitrust claims under the Donnelly Act and fail[ ] to allege any state policy, differences in statutory language or legislative history that would justify giving the Donnelly Act a different interpretation than the federal antitrust statutes." *Id* . Therefore, plaintiffs' claims under the state antitrust law fail for the same reasons they fail under the federal antitrust law.

### CONCLUSION

For the reasons set forth above, the motion to dismiss is granted, and the case is dismissed as against all defendants. The Clerk is directed to enter judgment for the defendants and to close the case.
So Ordered.

E.D.N.Y.,2003.
Bennett v. Cardinal Health Marmac Distributors, Inc.
Not Reported in F.Supp.2d, 2003 WL 21738604 (E.D.N.Y.), 2003-2 Trade Cases  P 74,137

Briefs and Other Related Documents (Back to top)

• 1:02cv03095 (Docket) (May. 24, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.