

Not Reported in F.Supp. Page 1
Not Reported in F.Supp., 1981 WL 2187 (N.D.Ga.), 1982-1 Trade Cases P 64,527
**(Cite as: Not Reported in F.Supp.)**

United States District Court; N.D. Georgia, Atlanta Division.
**City of Atlanta, et al.**
v.
**Ashland-Warren, Inc., et al.**
**Civil Action No. C 81-106A**
C 81-106A

Filed August 20, 1981

TIDWELL, D. J.
**\*1** [*Editor's Note: In full text except for omissions as indicated by asterisks*.]

**Memorandum Opinion**

Western Contracting Corporation ("Western") a defendant in this antitrust matter, has asserted a counterclaim against the City of Atlanta ("City") together with a cross-claim against F. O. Thacker ("Thacker") and F. O. Thacker Contracting Company ("Thacker Contracting"). Both the City and the Thacker parties filed motions to dismiss the claims asserted against them under Rule 12(b) of the Federal Rules of Civil Procedure. On July 9, 1981, this court entered an order ruling on those motions to dismiss. The court now issues the following memorandum opinion regarding the issues presented to the court in those motions.

The facts supporting both the counter-claim and the cross-claim are identical and are alleged by Western as follows: During the period from 1976 through 1978, the City solicited bids for a series of construction contracts known as contracts M-1 through M-7 for the paving of aircraft taxiways and aprons, passenger parking lots, streets, and ancillary facilities in connection with the construction of the Midfield Terminal at the Hartsfield Atlanta International Airport. The City employed detailed prequalification procedures for the M series contracts requiring the submission of extensive data by prospective bidders regarding their capability to perform the contracts, including their ability to meet affirmative action and minority business participation requirements. Western alleges that following the submission of bid documents and after the bid closing dates for several of the M series contracts, the City allowed bidders an additional time within which to submit additional information. Low bidders on contracts M-1 through M-5 were allegedly awarded the contracts after being afforded an opportunity to fulfill requests for additional information and to otherwise satisfy the City as to their compliance with the City's requirements. Specifically, Western alleges that after the bidding had closed and bids opened for Contract M-5, the City's Contract Compliance Officer, Clinton Stanford, Jr., requested additional information from the apparent low bidder concerning whether cross-claim defendant Thacker Contracting, a minority concrete subcontractor, would be used by the low bidder if the contract were in fact awarded. Upon written confirmation from the joint-venture which had submitted the low bid that Thacker Contracting would indeed receive the subcontract, the City awarded the contract to the joint-venture upon the recommendation of the City Director of Purchasing & Real Estate William Swift and its Contract Compliance Officer Stanford.

Western completed the prequalification documents required in connection with the solicitation of bids on contract M-6 and submitted detailed responses to all requests for information. On July 21, 1981, Swift notified Western that Western was qualified in all respects to bid on contract M-6. Western timely submitted its bid on contract M-6 which bids were opened in Atlanta on August 29, 1981. Daniel E. Everist, Vice President of Western, was present at the bid opening in Atlanta. After reviewing the bids, the City announced publicly that the low bidder on contract M-6 was Western, approximately $400,000 lower than the second lowest bid, submitted by a joint-venture composed of Wright Contracting Company and Claussen Paving Company. The next day Swift called Western's headquarters in Sioux City, Iowa and requested that some additional information be supplied before 5:00 p. m. that day. Swift also noted that certain signature pages were not executed, and, upon a Western employee's explanation that it was a mere oversight, requested that an officer of Western execute the pages. Later that day, Everist called Swift and explained to Swift that Western could easily provide the requested additional information from its headquarters over the telephone that afternoon, but that Everist could not possibly get to Atlanta to execute the signature pages that day. Swift agreed that the City would be satisfied if the needed information would be supplied via telephone and Everist could execute the signature

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 2
Not Reported in F.Supp., 1981 WL 2187 (N.D.Ga.), 1982-1 Trade Cases P 64,527
**(Cite as: Not Reported in F.Supp.)**

pages the following morning. Stanford, Contract Compliance Officer, called Western and spoke with Guy Pinkman, Paving Manager, to receive the information. Pinkman identified certain minority subcontractors Western planned to use and Stanford requested that dollar amounts be listed for each subcontractor. Stanford also inquired whether Western planned to use Thacker Contracting as a subcontractor for the concrete work, and Pinkman replied in the negative. Stanford and Pinkman then agreed that Pinkman would calculate the dollar amounts and call Stanford to provide those figures. Following Stanford's call, F. O. Thacker, President of Thacker Contracting, called Western's headquarters several times. On one occasion he inquired of a Western employee whether Western would "go with his price" and was told that it would not. Thacker eventually was able to reach Pinkman and inquired as to why Western was not planning to use Thacker Contracting for the concrete work. Pinkman replied that Western could do its own concrete work substantially cheaper than Thacker Contracting's bid. Thacker then stated that Stanford had called Thacker and Thacker was to call Stanford back before 5:00 p.m. that day. Pinkman later called Stanford to supply the additional figures which revealed that minority subcontractors were to perform 28% of the work under Western's bid. Western alleges that this percentage exceeded City goals for minority business participation.

**\*2** Everist arrived at Swift's office on the morning of August 31, 1981 to execute the signature pages. Everist was informed by Swift and Stanford that the City had decided not to award contract M-6 to Western, and they refused to allow Everist to sign the pages in question. Contract M-6 was awarded to the Wright/Claussen joint-venture, the second lowest bidder. Western alleges that the Wright/Claussen bid on contract M-6 included Thacker Contracting as the subcontractor for a substantial dollar volume of concrete work. Western also alleges that Thacker Contracting was the largest single beneficiary of the minority subcontracting requirement for construction of the Midfield Terminal, receiving approximately 16 million dollars in subcontracts, or approximately 23% of the minority subcontracts awarded for said construction.

Western's counterclaim contains six counts and its cross-claim against the Thacker parties contains four counts. The cross-claim contains allegations identical to the first four counts of the counterclaim against the City and the Court will address counts one through four of the counterclaim and cross-claim together. Count I is an antitrust claim, Counts II and III seek relief under 42 U. S. C. § 1983 and Count IV is based upon the Organized Crime Control Act of 1970, 18 U. S. C. § § 1961, *et seq.* Counts V and VI of the counterclaim are based on state law.

*Antitrust Claim*

In Count I, Western alleges that the City conspired with the Thacker defendants to force the inclusion of Thacker Contracting as a subcontractor on the M series paving contracts and that such combination and conspiracy was for the purpose and effect of restraining competition in the market for concrete services in connection with paving contracts let by the City for the construction of Midfield Terminal in violation of Section 1 of the Sherman Act, 15 U. S. C. § 1. The City and the Thacker parties argue that the allegations in Count I fail to state a claim under the antitrust laws because the claim is merely that the City specified a particular subcontractor or that the Thacker defendants bribed City officials. The defendants argue that neither of these claims resemble the types of claims which fall within the proscriptions of the Sherman Act. Western contends that the contracts were let by the City under statutes and regulations which required public bidding and that the defendants have conspired to circumvent the bidding processes, to the injury of Western and the public. Western maintains that it was deprived of the profit of doing its own concrete work and the public has been forced to pay a higher price for the services of Thacker Contracting.

The mere designation of a particular supplier or subcontractor is not a violation of the Sherman Act where the choice of that product is not hampered by unlawful efforts to restrain competition. *United States v. Yellow Cab Co.* [1946-1947 TRADE CASES P 57,576], 332 U. S. 218 (1947); *Security Fire Door Co. v. County of Los Angeles* [1973-2 TRADE CASES P 74,699], 484 F. 2d 1028 (9th Cir. 1973); *Parmelee Transportation Co. v. Keeshin* [1961 TRADE CASES P 70,061], 292 F. 2d 794 (7th Cir. 1961). Contrary to the characterization urged by the defendants, a careful reading of Count I reveals that Western alleges that competition for concrete contracting services was thwarted by the City's unlawful conspiracy with the Thacker parties. As such, the allegations in Count I contest more than the mere designation of a particular subcontractor. *Cf. Guthrie v. Genessee New York* [1980-81 TRADE CASES P 63,605], 494 F. Supp. 950 (W. D. N. Y. 1980) (allegations of agreement between county and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK    Document 170-4    Filed 07/31/2006    Page 3 of 8

Not Reported in F.Supp. Page 3
Not Reported in F.Supp., 1981 WL 2187 (N.D.Ga.), 1982-1 Trade Cases P 64,527
**(Cite as: Not Reported in F.Supp.)**

corporate defendants to restrict competition in award of exclusive contract at county airport); *Mason City Center Associates v. City of Mason City* [1979-1 TRADE CASES P 62,628], 468 F. Supp. 737 (N. D. Iowa 1979) (allegations of agreement between city and individual defendants to exclude all competing developers).

**\*3** The defendants next contend that even assuming some unlawful conduct on the part of certain City officials, the allegations at most state a claim of bribery of a public official which is not a violation of the Sherman Act. Both the City and the Thacker parties also argue that the Sherman Act is not a lowest responsible bidder statute and that Western has adequate state law remedies for any violations of public bidding statutes or any misconduct of public officials; however, the fact that Western may also have remedies at state law as the City and the Thacker parties contend is not determinative of its federal antitrust claim. *Woods Exploration & Production Co. v. Aluminum Co. of America* [1971 TRADE CASES P 73,422], 438 F. 2d 1286 (5th Cir. 1971).

Claims of commercial bribery are cognizable under the antitrust laws and state a claim for violation of § 2(c) of the Clayton Act as amended by the Robinson-Patman Act, 15 U. S. C. § 13. *California Motor Transport Co. v. Trucking Unlimited* [1972 TRADE CASES P 73,795], 404 U. S. 508 (1972); *Rangen, Inc. v. Sterling Nelson & Sons* [1965 TRADE CASES P 71,583], 351 F. 2d 851 (9th Cir. 1965). Some courts, however, have held that allegations of commercial bribery, standing alone, will not support a claim for relief under § § 1 and 2 of the Sherman Act. *Calnetics Corp. v. Volkswagen of America, Inc.* [1976-1 TRADE CASES P 60,757], 532 F. 2d 674 (9th Cir. 1976); *Sterling Nelson & Sons, Inc. v. Rangen, Inc.* [1964 TRADE CASES P 71,263], 235 F. Supp. 393 (D. Idaho 1964). A similar result has been reached in the Seventh Circuit in *Parmelee Transportation Co. v. Keeshin* [1961 TRADE CASES P 70,061], 292 F. 2d 794 (7th Cir. 1961). In that case evidence of the wrongful conduct of a public official and the successful bidder leading to an award of the bid was not sufficient to prove a violation of the Sherman Act where there was no evidence that competition for the contract at issue was eliminated. Central to the holding in *Parmelee,* though, was the absence of any proof of a detrimental impact on competition which is the cornerstone of Sherman Act liability. See *Northern Pacific Railway Co. v. United States* [1958 TRADE CASES P 68,961], 356 U. S. 1 (1958). Similarly, the Ninth Circuit has indicated that the case before it in *Calnetics* did not present a question of "under what circumstances a claim of commercial bribery tied to claims of other acts tending to restrain trade would state a cause of action under § § 1 and 2 of the Sherman Act." *Calnetics Corp. v. Volkswagen of America, Inc.* [1976-1 TRADE CASES P 60,757], 532 F. 2d 674, 687 n. 20 (9th Cir. 1976).

Here Western has alleged more than a case of buying influence or commercial bribery in that Western has alleged a combination and conspiracy to supplant competition in concrete contracting services in connection with the construction of Midfield Terminal. Western argues that the City's efforts to force the inclusion of Thacker Contracting in as many paving contracts as possible was an unreasonable restraint of trade somewhat akin to reciprocal dealing or tying arrangements which have been held to be per se violations of § 1 of the Sherman Act. *Northern Pacific Railway Co. v. United States* [1958 TRADE CASES P 68,961], 356 U. S. 1 (1958); *Spartan Grain & Mill Co. v. Ayers* [1978-2 TRADE CASES P 62,280], 581 F. 2d 419 (5th Cir. 1978). At this point the court cannot say that Western could prove no set of facts which would entitle it to relief under § 1 of the Sherman Act.

**\*4** The City also argues that Western has not alleged any facts which show that the alleged restraint was prejudicial to the public interest. The allegations do contain facts which if proved would show that the combination and conspiracy tended to prejudice the public interest through the lessening of competition for concrete contracting services in connection with the Midfield Terminal construction. *Larry R. George Sales Co. v. Cool Attic Corp.* [1979-1 TRADE CASES P 62,419], 587 F. 2d 266 (5th Cir. 1979). Accordingly, Count I is sufficient in this respect.

The Thacker parties maintain that Western's allegations establish only that the Thacker defendants were successful in persuading the City to reject Western's bid because Western failed to use Thacker Contracting as a subcontractor. They claim an absolute First Amendment right to petition their government and argue that Western's complaint fails to state a claim for a violation of the Sherman Act because any conduct on their part to influence City officials to reject Western's bid is outside the scope of the antitrust laws under the doctrine of *Eastern Railroad Presidents Conference v. Noerr Motor Freight Inc.* [1961 TRADE CASES P 69,927], 365 U. S. 127 (1961) and its progeny. Western argues that the First Amendment does not provide an

Case 7:04-cv-08223-KMK     Document 170-4     Filed 07/31/2006     Page 4 of 8

Not Reported in F.Supp.                                                                                                                    Page 4
Not Reported in F.Supp., 1981 WL 2187 (N.D.Ga.), 1982-1 Trade Cases  P 64,527
**(Cite as: Not Reported in F.Supp.)**

absolute bar to prosecution under the federal antitrust laws and that the *Noerr* doctrine is inapplicable to the facts of this case where the Thacker defendants were conspiring with the City in its commercial capacity.

In *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.* [1961 TRADE CASES P 69,927], 365 U. S. 127 (1961), the plaintiffs, trucking companies and a trade association, sued the railroads, a railroad association and a public relations firm for antitrust violations alleging that the railroads had engaged the public relations firm to conduct a publicity campaign against the trucks designed to foster the adoption and retention of laws and law enforcement practices destructive of the trucking industry. The Court held that no violation of the Sherman Act could be predicated upon mere attempts to influence the passage or enforcement of laws. The Court found that agreements or associations which seek to persuade the legislative or executive branch to take a particular action with respect to legislation which could produce a trade restraint or monopoly are "essentially dissimilar" to those agreements normally held violative of the Act. This essential dissimilarity considered together with the necessity for the free flow of information to the government when it acts in a representative capacity and the important constitutional questions concerning the First Amendment right to petition provided the basis for Sherman Act immunity. Further, the Court held that the purpose of the defendants was irrelevant as long as the action was taken to secure the passage or enforcement of laws and illegal or unethical conduct on the part of the defendants did not transform the political activity into that which violated the Sherman Act. The Court did note that exceptions could exist where the political activity was a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." *Id.* at 144.

**\*5** First Amendment considerations were only a part of the rationale for the Court's decision in *Noerr*. Thus, *Noerr* does not support immunity based on First Amendment grounds alone. The contention that the First Amendment right of petition provides an absolute immunity from the antitrust laws was squarely addressed in *California Motor Transport Co. v. Trucking Unlimited* [1972 TRADE CASES P 73,795], 404 U. S. 508 (1972), in which the Court extended the antitrust immunity recognized in *Noerr* to the agency and adjudicatory setting. The Court, however, accorded different treatment to unethical conduct in the adjudicatory setting than similar conduct might have received in a legislative or executive context. The Court found that the right of access to agencies and courts "is a part of the right of petition protected by the First Amendment. Yet that does not necessarily give [petitioners] immunity from the antitrust laws." *Id.* at 513. "First Amendment rights may not be used as the means or the pretext for achieving 'substantive evils' which the legislature has the power to control." *Id.* at 515 (cites omitted). Thus, the Thacker parties do not have absolute immunity based on First Amendment grounds and Western's claims cannot be dismissed on this ground.

Western contends that *Noerr* should not be applied where parties are alleged to have conspired with the government in its commercial capacity. The Supreme Court has not addressed the particular situation presented by the instant case, where individuals are accused of conspiring with a governmental entity to achieve a particular anticompetitive result in the context of the government's purchase of services and materials. In two cases which did involve government procurement, the Court has reached different results. In *Continental Ore Co. v. Union Carbide & Carbon Corp.* [1962 TRADE CASES P 70,361], 370 U. S. 690 (1962), the Court was faced with a Sherman Act challenge to actions of a defendant in the control of its wholly owned subsidiary which was also the exclusive purchasing agent for the Office of Metals Controller of the Canadian Government. Although the defendants relied heavily on *Noerr,* the court found *Noerr* to be inapposite.

Respondents were engaged in private commercial activity, no element of which involved seeking to procure *the passage or enforcement of laws*. To subject them to liability under the Sherman Act for eliminating a competitor from the Canadian market by exercise of the discretionary power conferred upon Electro Met of Canada by the Canadian Government would effectuate the purposes of the Sherman Act and would not remotely infringe upon any of the constitutionally protected freedoms spoken of in *Noerr*.

*Id.* at 708 (emphasis added).

In *United Mine Workers of America v. Pennington* [1965 TRADE CASES P 71,46 2], 381 U. S. 657 (1965), the defendants were accused of conspiring to influence the minimum wage determinations made by the Secretary of Labor and the buying policies of the Tennessee Valley Authority. The trial court had erroneously instructed the jury to focus on intent, but

Case 7:04-cv-08223-KMK     Document 170-4     Filed 07/31/2006     Page 5 of 8

Not Reported in F.Supp.                                                                                                              Page 5
Not Reported in F.Supp., 1981 WL 2187 (N.D.Ga.), 1982-1 Trade Cases  P 64,527
**(Cite as: Not Reported in F.Supp.)**

the Court held that such actions were outside the scope of the Sherman Act whether considered alone or as part of a broader scheme. The Court distinguished the facts in *Pennington* from the situation before the Court in *Continental Ore*. In *Continental Ore* the Canadian Government's exclusive purchasing agent was alleged to have been a co-conspirator and there was no indication that the Canadian Government would have approved the joint efforts to monopolize. 381 U. S. at 671. Although some language in *Pennington* could be read broadly to immunize all efforts to influence government officials, both the minimum wage determinations of the Secretary of Labor and the buying policy of the TVA were *policy* determinations made by governmental officials or entities within the category of enforcement of legislation and as such would fall directly under the reasoning of *Noerr*. See George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc. [1970 TRADE CASES P 73,121], 424 F. 2d 25 (1st Cir. 1970).

***6** Western contends that the situation at bar is clearly distinguishable from the situation before the Court in *Noerr* and *Pennington*. Western contends that the City was acting under statutes and regulations which required public bidding, thus free and open competition was mandated in the selection of construction services which the City wished to purchase. Western maintains that where, as here, the City is acting under public bidding statutes as a participant in the marketplace, the factors requiring immunity in *Noerr* are not present and no immunity should be granted. Several courts have refused to apply a blanket immunity from the antitrust laws whenever the conduct at issue involves a governmental entity and have determined that immunity is particularly unwarranted when the challenged contacts are with the government in its capacity as consumer rather than with the government in its policy making role. The leading case supporting this line of judicial thought is George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc. [1970 TRADE CASES P 73,121], 424 F. 2d 25 (1st Cir. 1970). In *Paddock,* the plaintiff alleged that the defendants' selling efforts had violated § §  1 and 2 of the Sherman Act by conspiring to require the use of their own specifications in the public swimming pool industry to the exclusion of those of their competitors. The plaintiff challenged the methods by which the defendants "pressured" the government architects to accept their specifications. The defendants first raised the issue of state-action immunity from the antitrust laws which is afforded by the holding in Parker v. Brown [1940-1943 TRADE CASES P 56,250], 317 U. S. 341 (1943). Under this doctrine, courts recognize immunity from the antitrust laws in situations where there is a valid state mandate that compels the particular anticompetitive restraint complained of. See City of Lafayette v. Louisiana Power & Light Co. [1978-1 TRADE CASES P 61,936], 435 U. S. 389 (1978); Goldfarb v. Virginia State Bar [1975-1 TRADE CASES P 60,35 5], 421 U. S. 773 (1975). Although neither party has raised a *Parker* immunity here, the language used by the court in *Paddock* is particularly helpful to describe the government in a consumer or commercial context.

In the case at bar, however, the state policy is neither anti-competitive nor neutral. When the government acts under laws requiring competitive bidding, it signifies its intent to respond to the signals of a competitive market on the same terms as any other consumer, an intent which is entirely consistent with the aims of the Sherman Act. This intent would be frustrated, and the ultimate cost to the public substantially increased, if some sellers could nevertheless engage in anticompetitive practices merely because they were dealing with the government.

424 F. 2d at 31.
In discussing the application of *Noerr* immunity, the court determined that the key to *Noerr* was the political nature of the conduct challenged and that the decision was "aimed at insuring uninhibited access to government policy makers." Id. at 32. The court denied that the defendants' dealings with a government official administering public bidding statutes were the kind of actions which would be immunized under *Noerr*.***7** [T]he efforts of an industry leader to impose his product specifications by guile, falsity, and threats on a harried architect hired by a local school board hardly rise to the dignity of an effort to influence the passage or enforcement of laws. By "enforcement of laws" we understand some significant policy determination in the application of a statute, not a technical decision about the best kind of weld to use in a swimming pool gutter.

* * *

The state legislatures, by enacting statutes requiring public bidding, have decreed that government purchases will be made according to strictly economic criteria. Paddock is free to seek legislative change in this basic policy, but until such change is secured, Paddock's dealings with officials who administer the bid statutes should be subject to the same limitations as its dealings with private consumers. Indeed, to hold otherwise might impair

Case 7:04-cv-08223-KMK    Document 170-4    Filed 07/31/2006    Page 6 of 8

Not Reported in F.Supp.
Not Reported in F.Supp., 1981 WL 2187 (N.D.Ga.), 1982-1 Trade Cases P 64,527
**(Cite as: Not Reported in F.Supp.)**

Page 6

the effectiveness of competitive bidding. We conclude, therefore, that the immunity for efforts to influence public officials in the enforcement of laws does not extend to efforts to sell products to public officials acting under competitive bidding statutes.

*Id.* at 32, 33 (cites omitted).

The Fifth Circuit has similarly interpreted the *Noerr* immunity doctrine to be limited to instances in which the political considerations present in *Noerr* are implicated.
Basic to *Noerr* is a belief that regulation of competition by the political process is legitimate and not proscribed by the Sherman Act, an enactment which is itself a political decision. For the political process to be effective there must be freedom of access, regardless of motive, to ensure the "right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws." *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.* [1961 TRADE CASES P 69,927], 365 U. S. at 139, 81 S. Ct. at 530. Where these political considerations are absent the *Noerr* doctrine is inapplicable. The policies of the Sherman Act should not be sacrificed simply because defendants employ governmental processes to accomplish anti-competitive purposes. Otherwise, with governmental activities abounding about us, government could engineer many to antitrust havens. We think that the doctrine should not be extended unless the factors upon which *Noerr* rested are present and require the same result.

*Woods Exploration & Production Co. v. Aluminum Co. of America* [1971 TRADE CASES P 73,422], 438 F. 2d 1286, 1296-97 (5th Cir. 1971) (cites omitted). The Thacker parties have argued that the decision in *Woods,* to deny *Noerr* immunity in a quasi-adjudicatory setting, was undercut by the Supreme Court's decision in *California Motor Transport Co. v. Trucking Unlimited* [1972 TRADE CASES P 73,795], 404 U. S. 508 (1972) which extended *Noerr* protection to group use of the channels and procedures of state and federal agencies and courts to advocate their business and economic interests. The Supreme Court in *California Motor,* however, reaffirmed its earlier determination that *Noerr* immunity was predicated on two equally significant grounds: (1) the government's need for information when it acts in a representative capacity and (2) the right of petition. Thus, the Fifth Circuit's basic understanding of *Noerr* was not undercut and is applicable here.

**\*8** Other courts have also interpreted the immunity afforded the defendants' activities in *Noerr* to be inapplicable in situations where the government is not making policy and is otherwise acting as a participant in the marketplace. In *Sacramento Coca-Cola Bottling Co., Inc. v. International Brotherhood of Teamsters* [1971 TRADE CASES P 73,502], 440 F. 2d 1096 (9th Cir. 1971), the court reversed a grant of judgment on the pleadings where the complaint alleged that due to threats, duress and other coercive tactics exercised by the defendants on state fair officials, the officials forbid the sale of the plaintiff's product. The court relied on *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.* [1970 TRADE CASES P 73,121], 424 F. 2d 25 (1st Cir. 1970), to conclude that the basic thrust of *Noerr* is political and immunity should not be extended to situations in which public officials were engaged in purely commercial dealings. Similarly, the Court of Appeals for the District of Columbia has determined that where a government agency is obligated to carry out policy as already made such as in a procurement situation, the rationale of *Noerr,* that of guaranteeing access to aid in the formulation of government policy, does not apply and no immunity should be granted. *Hecht v. Pro-Football, Inc.* [1971 TRADE CASES P 73,559], 444 F. 2d 931 (D. C. Cir. 1971). *Accord. General Aircraft Corp. v. Air America, Inc.* [1979-1 TRADE CASES P 62,452], 482 F. Supp. 3 (D. D. C. 1979); *In Re Airport Car Rental Antitrust Litigation* [1979-2 TRADE CASES P 62,746], 474 F. Supp. 1072 (N. D. Ca. 1979).

The defendants have cited but one case which has considered the governmental/commercial distinction advanced by Western but rejected that distinction. *In Re Airport Car Rental Antitrust Litigation,* 1981-1 TRADE CASES P 63,983 (N. D. Ca. 1981). *("Airport II")*. This decision represents a reconsideration of an earlier opinion in that case, *In Re Airport Car Rental Antitrust Litigation* [1979-2 TRADE CASES P 62,746], 474 F. Supp. 1072 (N. D. Ca. 1979) *("Airport I"),* in which a different judge had denied summary judgment to several of the defendants on the grounds that *Noerr* immunity does not apply where parties seek to influence government officials in their commercial capacity. On the summary judgment motions of different defendants, the court in *Airport II* rejected the governmental/commercial distinction recognized in *Airport I;* however, that determination was unnecessary to the decision since the court found that all the plaintiff had challenged was the defendants' "joint action to influence the decisions of others, not

Case 7:04-cv-08223-KMK     Document 170-4     Filed 07/31/2006     Page 7 of 8

Not Reported in F.Supp.                                                                                                           Page 7
Not Reported in F.Supp., 1981 WL 2187 (N.D.Ga.), 1982-1 Trade Cases P 64,527
**(Cite as: Not Reported in F.Supp.)**

to impose a restraint upon trade. . . . That kind of action falls outside the scope of the Sherman Act." 1981-1 TRADE CASES P 63,983 at 76, 092. Besides being unnecessary to the decision, the court's determination was squarely at odds with authority from within its own circuit. See Sacramento Coca-Cola Botting Co. v. Local 150, International Brotherhood of Teamsters [1971 TRADE CASES P 73,502], 440 F. 2d 1096, 1099 (9th Cir. 1971).

**\*9** The Thacker parties also rely on Sun Valley Disposal Co. v. Silver State Disposal Co. [1970 TRADE CASES P 73,009], 420 F. 2d 341 (9th Cir. 1969), and Metro Cable Co. v. CATV of Rockford, Inc. [1975-1 TRADE CASES P 60,250], 516 F. 2d 220 (7th Cir. 1975), cases which applied *Noerr* immunity to attempts to influence public officials. These cases are distinguishable from the instant case since the grant of an exclusive garbage franchise in *Sun Valley* and the grant of an exclusive cable franchise in *Metro Cable* were clearly legislative functions as the Metro Cable court so noted, 516 F. 2d at 228. Moreover, the Seventh Circuit has held that *Noerr* immunity does not shield all dealings with governmental officials. In Kurek v. Pleasure Driveway & Park District [1977-1 TRADE CASES P 61,448], 557 F. 2d 580 (7th Cir. 1977), vacated [1978-1 TRADE CASES P 61,986], 435 U. S. 992 (1978), *earlier opinion reinstated,* 583 F. 2d 378 (7th Cir. 1978), former concessionaires at municipal golf courses brought an action against the park district, its members and officers, the current licensee and others alleging that threats of an exclusive license to one of the defendants and demands for uniformly increased fees were used by the defendants in a conspiracy to coerce the plaintiffs into raising and fixing their retail prices. The plaintiff further alleged that the award of the license to the new licensee which had made a sham proposal to the officials was made to punish the plaintiffs. The court rejected the contention that its earlier holding in *Metro Cable* supported a blanket application of *Noerr*. It found that there was no state mandate for the government officials to engage in the challenged activities and that the new licensee's conduct was not essentially dissimilar from that which would violate the antitrust laws in a private context. The court reasoned that the absence of a state mandate or authority to engage in the challenged activities reduced the need for citizen input such that *Noerr* would not provide immunity in that instance. The court further determined that a contract proposal did not fall within the ambit of the right petition.

"Immunity from the antitrust laws is not lightly implied." California v. Federal Power Commission [1962 TRADE CASES P 70,302], 369 U. S. 482, 485 (1962). The court concludes that the immunity afforded in *Noerr* should not be applied to shield all efforts to influence government officials. Thus, where the activity challenged is not essentially dissimilar from conduct normally held violative of the Act, and, considering the governmental context, where the government is not operating in a policy making role, such as in the case where the government is acting as a consumer in the marketplace, *Noerr* should not be applied to shield conduct which would otherwise be violative of the Sherman Act.

The Thacker parties characterize the City's decision to reject Western's bid as one involving considerations of "whether acceptance of an incomplete bid such as Western's would further or hinder enforcement of the City's affirmative action program, a squarely governmental decision which any affected citizen, and particularly a minority citizen, had every right to seek to influence." Thus they argue that even if the court determines that *Noerr* immunity will not be applied to all efforts to influence governmental officials, the conduct challenged here, efforts to influence the implementation or enforcement of the City's affirmative action programs in the context of constructing one of the world's largest airports, was exactly the kind of conduct granted immunity in *Noerr*. Contrary inferences can be drawn from the complaint and must be drawn in the context of this motion to dismiss for failure to state a claim. Western alleges that it had complied with the detailed prequalification procedures designed to evaluate the adequacy of its compliance with equal employment opportunity and affirmative action programs and Executive Order 11246. Further, Western alleges that the percentage of minority involvement included in its bid was well above the City's minority participation goal. Counterclaim and Cross-claim §§ 8, 16. Accordingly, the court is unable to conclude as a matter of law that the activity challenged by Western is protected by the *Noerr* doctrine from prosecution under the antitrust laws at this point in the proceedings.

**\*10** Another reason for rejecting a grant of *Noerr* immunity at this point in the litigation is the existence of what some courts have labeled a co-conspirator exception to *Noerr*. Support for this exception may be found in language in United Mine Workers v. Pennington [1965 TRADE CASES P 71,462], 381 U. S. 657, 671 (1965), which seems to distinguish

Case 7:04-cv-08223-KMK    Document 170-4    Filed 07/31/2006    Page 8 of 8

Not Reported in F.Supp. Page 8
Not Reported in F.Supp., 1981 WL 2187 (N.D.Ga.), 1982-1 Trade Cases P 64,527
**(Cite as: Not Reported in F.Supp.)**

*Pennington* from *Continental Ore Co. v. Union Carbide & Carbon Corp.* [1962 TRADE CASES P 70,361, 370 U. S. 690 (1962) where *Noerr* was found inapplicable on the basis of allegations in *Continental* that the exclusive government purchasing agent was a participant in the alleged conspiracy to monopolize. See generally *California Motor Transport Co. v. Trucking Unlimited* [1972 TRADE CASES P 73,795], 404 U. S. 508, 513 (1972); *Duke & Co., Inc. v. Foerster* [1975-2 TRADE CASES P 60,433], 521 F. 2d 1277 (3d Cir. 1975); *Harman v. Valley National Bank* [1968 TRADE CASES P 72,497], 339 F. 2d 564 (9th Cir. 1964); *In Re Airport Car Rental Litigation,* 1981-1 TRADE CASES P 63,983 (N. D. Ca. 1981); *Mason City Center Associates v. City of Mason City* [1979-1 TRADE CASES P 62,628], 468 F. Supp. 737 (N. D. Iowa 1979). Accordingly, Western's allegations that the City itself is a co-conspirator precludes applying the *Noerr* immunity to the actions of the Thacker parties, at least at this stage of the proceedings.

Finally, the Thacker parties raise lack of causations as grounds for dismissal of all four counts of Western's cross-claim. They contend that Western's bid was defective as a matter of law and that the City was precluded from accepting such a bid by federal regulations. Western has alleged that its bid was incomplete in certain respects, but the City agreed to allow Western to correct those deficiencies. When the City learned that Western had decided not to use Thacker Contracting, the City refused to allow Western to complete the bid and awarded the contract to another entity. Western alleges that the conspiracy between the City and the Thacker parties had the purpose of excluding any general contractor who would not use Thacker Contracting and that was the real motivation for the rejection of Western's bid. The Thacker parties rely on opinions of the Comptroller General that a bidder's failure to commit itself, prior to bid opening, to applicable affirmative action requirements requires rejection of the bid as a matter of law. *In the Matter of Sachs Electric Co.,* 55 Comp. Gen. 1260 (1976); *In Re Welch Construction,* 75-1 CPD P 146 (1975). The Comptroller General, however, has recognized that bidders may commit themselves in manners other than specified in the solicitation. *In the Matter of Sachs Electric Co., supra.* A determination of the responsiveness of the bid need not be made by the court at this time since the court determines that Western has alleged a sufficient casual nexus between the challenged actions of the Thacker parties and the rejection of Western's bid to withstand a motion to dismiss.

**\*11** * * *

In accordance with the foregoing and the order of July 9, 1981, Count III of the counterclaim and the cross-claim has been dismissed in its entirety together with Count VI of the counterclaim. Western will have ten (10) days in which to amend the allegations in Counts II and IV of the counterclaim and cross-claim and Count V of the counterclaim as these counts were dismissed without prejudice. The City and the Thacker parties will have twenty (20) days from the filing of the amended claims in which to serve responsive pleadings.

N.D.Ga. 1981.
City of Atlanta v. Ashland-Warren, Inc.
Not Reported in F.Supp., 1981 WL 2187 (N.D.Ga.), 1982-1 Trade Cases P 64,527

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.