Westlaw

Not Reported in F.Supp.2d                                                                                                                 Page 1
Not Reported in F.Supp.2d, 2002 WL 1197763 (E.D.Pa.), 2002-1 Trade Cases P 73,709
**(Cite as: Not Reported in F.Supp.2d)**

H

United States District Court, E.D. Pennsylvania.
SMITHKLINE BEECHAM CORPORATION,
Plaintiff,
v.
EASTERN APPLICATORS, INC., Richard W. Grear, Professional Roof Services, Inc. Blaine Chipola, Jottan, Inc., Toby Chrostowski, D'onofrio General Contractors Corp., and John D'Onofrio, Defendants.
**No. CIV.A. 99-CV-6552.**

May 24, 2002.

*MEMORANDUM*

Reed, S.J.

***1** Plaintiff SmithKline Beecham Corporation ("SKB") has filed this action asserting claims of violations by the defendants of the Sherman Act, 15 U.S.C. § 1 *et seq.,* as well as supplemental state law claims of misrepresentation, civil conspiracy and breach of contract. The cause of action arises out of the bidding process for a roof repair project in a building owned by SKB. Plaintiff alleges that the defendants engaged in a bid-rigging conspiracy by submitting collusive bids to make the lowest bid submitted by defendant Eastern Applicators, Inc. ("Eastern") appear competitive and reasonable. Now before the Court are the motions of defendants for summary judgment. For the reasons set forth below, the motions of defendants Eastern and Professional Roof Services, Inc. will be granted in part and denied in part; the motions of defendants Richard Grear, Blaine Chipola, Jottan, Inc. and Toby Chrostowski will be denied; and the motion of defendants D'Onofrio General Contractors Corp. and John D'Onofrio will be granted.

*Background* [FN1]

FN1. All facts are reviewed in the light most favorable to the non-moving party, as required on a motion for summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

In 1996, plaintiff hired a roofing consultant, defendant Professional Roof Services, Inc. ("PRS") to assist them in overseeing the repairs on the fifth, sixth and twelfth floor of an office building owned by plaintiff in Philadelphia. PRS agreed to oversee the roof repairs and to manage the competitive bidding process to hire a roofing contractor for plaintiff. With SKB's approval, PRS prepared specifications for the roof repairs, adopting a plan to install a foam roof over the existing roofs rather than tear off the existing roofs prior to replacement. In preparation of the bids and specifications, PRS requested defendant Eastern to develop a budget for the SKB foam roofing project.

In a round of bidding in April to May of 1997, PRS invited Eastern, defendant D'Onofrio General Contractors ("D'Onofrio") and Puff, Inc. to submit bids for the SKB project. After Puff, Inc. declined to join, defendant Jottan Inc. ("Jottan") was invited into the bidding process and submitted a bid. On June 24, 1997, SKB awarded the project to Eastern and requested the repairs of the roofs of only the fifth and sixth floors. Between June 24 and September 30, 1997, Eastern completed the roof repairs according to the specifications provided by PRS.

Sometime after the project's completion, the U.S. Department of Justice ("DOJ") began an investigation into allegations of bid-rigging in the SKB project. SKB was informed that there was a roofing contractor who had felt excluded from the project and who made a complaint to the DOJ. On December 9, 1999, the DOJ closed its investigation without initiating civil or criminal proceedings against the defendants. On December 28, 1999, SKB filed the instant action.

*Legal Standard*

Federal Rule of Civil Procedure 56(c) states that summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." For a dispute to be "genuine," the evidence must be such that a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d     Page 2
Not Reported in F.Supp.2d, 2002 WL 1197763 (E.D.Pa.), 2002-1 Trade Cases P 73,709
**(Cite as: Not Reported in F.Supp.2d)**

reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party may not rely merely upon bare assertions, conclusory allegations, or suspicions. *Fireman's Ins. Co. v. DuFresne,* 676 F.2d 965, 969 (3d Cir.1982).

*Analysis*

1. Antitrust Claim

**\*2** Under Section 1 of the Sherman Act, "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce ... is declared to be illegal." 15 U.S.C. § 1. As construed by the courts, the provision prohibits concerted action in "unreasonable" restraint of trade. *See State Oil Co. v. Khan,* 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997). What constitutes unreasonable restraint of trade is normally subject to judicial determination pursuant to a "rule of reason" test that requires an analysis of, among other factors, the relevant business, the conditions both prior and subsequent to the restraint, and the history, nature and impact of the restraint. *Id.* Nevertheless, some concerted actions are considered so presumptively and perniciously anti-competitive as to constitute "per se" violations of the antitrust statute. *Id.* A "per se" analysis allows the assessing court to curtail its review of the relevant industry and the impact of the alleged restraint, and effectively reduces the evidence required to prove an antitrust violation. *See Rossi v. Standard Roofing, Inc.,* 156 F.3d 452, 461 (3d Cir.1998). "Bid-rigging," as alleged by plaintiff in the instant action, falls within the ambit of a per se violation. *See United States v. Sargent Elec. Co.,* 785 F.2d 1123, 1127 (3d Cir.), *cert. denied, sub nom., Lord Elec. Co. v. United States,* 479 U.S. 819, 107 S.Ct. 82, 93 L.Ed.2d 36 (1986).

To prove a violation of Section 1, the plaintiff must show the following:
(1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy.

*Rossi,* 156 F.3d at 464-65. Where the "per se" analysis is applied, the second and third elements are presumed to be satisfied. *Id.* Thus, where a per se violation is alleged, the plaintiff must show the existence of a genuine issue of material fact regarding concerted action, injury and proximate causation to survive a motion for summary judgment. *Id.*

To prove the element of concerted action, a plaintiff may use either direct or circumstantial evidence. *See id.* at 465. When the plaintiff relies solely on circumstantial evidence in proving concerted action, however, the traditional summary judgment standard is slightly altered. *Id.* at 465-66 (citing *Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 761, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); citing also *Matshushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538)). The permissible inferences that a court may draw from circumstantial evidence are limited by concerns of divining the "fine line [that] separates unlawful concerted action from legitimate business practices." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.,* 998 F.2d 1224, 1230 (3d Cir.1993). To ensure that proper business activities are not chilled by overzealous antitrust prosecution, courts may not infer conspiracies from "conduct as consistent with permissible competition as with illegal conspiracy." *Matshushita,* 475 U.S. at 588 (citing *Monsanto Co.,* 465 U.S. at 764).

To survive a motion for summary judgment on a claim for violation of Section 1, a plaintiff must present evidence that " 'tends to exclude the possibility' that the alleged conspirators acted independently." *Id.* (quoting *Monsanto,* 465 U.S. at 764). "[I]n the absence of direct evidence or strong circumstantial evidence of an agreement," a plaintiff must assert a plausible economic theory supporting its antitrust claim. *Petruzzi,* 998 F.2d at 1231. "If [the defendants] had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." *Rossi,* 156 F.3d at 466 (quoting *Matshushita,* 475 U.S. at 596). Moreover, even if plaintiff sets forth a plausible motive for defendants to conspire, evidence consisting solely of ambiguous conduct would not create an issue of fact sufficient to survive a motion

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK     Document 170-6     Filed 07/31/2006     Page 3 of 9

Not Reported in F.Supp.2d                                                                                                              Page 3
Not Reported in F.Supp.2d, 2002 WL 1197763 (E.D.Pa.), 2002-1 Trade Cases P 73,709
**(Cite as: Not Reported in F.Supp.2d)**

for summary judgment. *Id.* (citing *Matsushita,* 475 U.S. at 597 n. 21).

**\*3** While there is no special burden on antitrust plaintiffs opposing summary judgment, there is a requirement that the nonmoving party's inferences be reasonable in order to reach the jury. *Id.* (citing *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992)). Conversely, antitrust defendants are not entitled to summary judgment "merely by showing that there is a plausible explanation for their conduct." *Id.* at 467. "Thus, where the nonmoving party has put forth evidence that provides an inference of concerted action, the moving party 'bears the burden of proving that drawing the inference of unlawful behavior is unreasonable.'" *Id.* (quoting *Petruzzi's,* 998 F.2d at 1230). "Finally, while ambiguous conduct cannot create a triable issue of fact, when 'the alleged conduct is facially anticompetitive and exactly the harm the antitrust laws aim to prevent, no special care need be taken in assigning inferences to circumstantial evidence.'" *Id.* (quoting *Alvord-Polk, Inc. v. F. Schumacher & Co.,* 37 F.3d 996, 999-1000 (3d Cir.1994)).

a. Concerted Action

i. Defendants PRS, Blaine Chipola, Eastern and Richard Grear

Plaintiff cites several facts to support its claim that PRS, through its president Blaine Chipola, colluded to ensure that Eastern succeeded in attaining the SKB project. First, prior to the round of bidding at issue, there had been a first round of bidding in March 1997, wherein PRS invited only large conventional roofing companies with no experience in foam roof application. Of the three conventional roofing contractors invited to submit bids, United States Roofing Corporation ("U.S.Roofing") and Belcher Roofing Corporation ("Belcher"), submitted bids on March 26, 1997. Both had designated Eastern as their foam roof applicator subcontractor, although Eastern is a non-union company while both U.S. Roofing and Belcher have union contracts that would otherwise prevent subcontracting work to Eastern. Eastern had submitted a price quote of roughly $374,000 to the two bidding companies; U.S. Roofing and Belcher submitted bids for repair of the fifth and sixth floors of $552,000 and $495,000, respectively. Upon the advice of PRS, SKB had rejected both bids as too high.

Second, SKB proffers the testimony of John DiNenna, president of JJD Urethane ("JJD"), the contractor who had contacted the DOJ, and Robert P. Piccione, president of Hygrade Insulators ("Hygrade").[FN2] Both testified that they had not been invited to submit bids for the SKB projects despite the fact that they were two of the few GE-certified foam roofing companies in the area. [FN3] They further testified that had they been invited into the second round of bidding for the SKB project in 1997, they would have submitted bids in the amount of $225,000 and $256,000, respectively, for the repair of the fifth and sixth floors. SKB also observes that PRS had failed to invite bids from JJD and Hygrade despite DiNenna's specific questions directed to Chipola about the SKB project. (DiNenna Deposition, Def. Exh. 17 at 73-74.) According to DiNenna's testimony, Chipola falsely represented to him in March of 1997 that SKB had decided not to go ahead with the project. (*Id.* at 71-72.) After the completion of the project, Chipola later informed DiNenna that the project had been bid by other GE-certified roofers, again falsely representing that Hygrade was one of the bidding companies. (October 10, 2002 Hearing, Def. Exh. 3 at 96.) DiNenna further testified that Chipola had told DiNenna, "[Richard] Grear [of Eastern] said he'll get the bidders." (DiNenna Deposition, Def. Exh. 17 at 134.)

> [FN2]. After filing the instant action, SKB had requested Piccione and DiNenna to calculate a competitive bid, including a normal profit, for the roofing project at issue based on the plans, specifications, job site inspection, and costs in effect during 1997. Pursuant to a *Daubert* hearing held on October 10, 2001, Piccione and DiNenna were admitted as experts on the issue of what would have been a free market bid for the SKB project in 1997.
>
> [FN3]. The specifications designed by PRS required a roofing system by General Electric ("GE"), which requires a roofing contractor certified by GE to apply the system for the customer to receive a GE warranty. Originally, the specifications required the contractor for the SKB project to be GE-certified, although this requirement was later waived.

**\*4** Third, SKB argues that the sheer disparity between the bids submitted by the defendants is proof

Case 7:04-cv-08223-KMK     Document 170-6     Filed 07/31/2006     Page 4 of 9

Not Reported in F.Supp.2d                                                                                                                  Page 4
Not Reported in F.Supp.2d, 2002 WL 1197763 (E.D.Pa.), 2002-1 Trade Cases P 73,709
**(Cite as: Not Reported in F.Supp.2d)**

that the bids were pre-arranged. On or around May 9, 1997, D'Onofrio, Eastern and Jottan bid $462,000, $374,000 and $462,100, respectively, for the combined repair of fifth and sixth floors. They also bid $715,000, $617,000 and $764,400, respectively, for the combined repair of the fifth, sixth and twelfth floors. SKB maintains that the gap between Eastern's and the other contractor defendants' bids, and the gap between the Eastern's and the bids later calculated by JJD and Hygrade, are illustrative of the uncompetitive nature of the bidding that took place.

In addition, SKB highlights the following facts to support its claim that Eastern, through its employee Richard Grear, colluded to ensure that Eastern succeeded in attaining the SKB project. Grear admitted to contacting William Rush, Sr. of Puff, Inc. and Toby Chrostowski of Jottan, to ask whether they would be submitting bids in the second round. (Grear Deposition, Def. Exh. 10 at 86-88.) Chrostowski had testified that he had been invited to bid on the SKB project through Grear. (Chrostowski Deposition, Def. Exh. 25 at 17-20.) Grear further admitted to offering a "price" for the project; he testified that the price offered was to perform the foam roof subcontracting for Chrostowski, as he knew that Jottan did not have the ability to apply foam roofing. (Grear Deposition, Def. Exh. 10 at 87-90.) Chrostowski testified that Grear's offer of a "price" could have been a request for a complimentary bid, but that Chrostowski declined Grear's offer. (*Id.* at 48-53.)

SKB further notes that although Chrostowski may have declined Grear's offer, he did request and receive from Chipola the "budget" that PRS had calculated for the project with Eastern prior to the bidding processes. (Chrostowski Deposition, Def. Exh. 25 at 42-43.) SKB observes that the $460,000 budget Chipola sent to Chrostowski was over $100,000 higher than the original budget calculated and given to SKB. (Chipola Deposition, Def. Exh. 4 at 81-82.) Rather than inspect the job site, Chrostowski relied on the budget provided by PRS to calculate Jottan's bid, and submitted a $462,100 bid that was only $100 more than D'Onofrio's. (*Id.* at 40-41.)

**\*5** Where there is no direct evidence or *strong* circumstantial evidence of collusion, a plaintiff must assert a plausible economic theory supporting its antitrust claim. *See Petruzzi, 998 F.2d at 1231*. If there was no rational economic motive to conspire, the court may not infer a conspiracy from ambiguous conduct that is as consistent with legitimate business purposes as with concerted activity. *See Rossi, 156 F.3d at 466*. Where, however, a plaintiff provides evidence from which a court may infer concerted activity, whether from evidence provided with a plausible economic theory or through strong circumstantial evidence, defendants must show that the inference of unlawful behavior is unreasonable. *Id.*

Plaintiff argues that the facts as set forth above constitute strong circumstantial evidence of collusion among the defendants. In contrast, defendants posit that the facts asserted are at most ambiguous supporting evidence. Defendants further maintain that they had no motive to enter into a bid-rigging scheme, and that they acted independently and for legitimate business purposes. Specifically, they state that SKB had requested the inclusion of the two conventional roofing companies in the first round and that at most SKB has proven that PRS did not include all possible roofing companies in the second round. With regard to Grear's contact with other bidding companies, Eastern cites *In re Baby Food Antitrust Litig., 166 F.3d 112, 133 (3d Cir.1999)*, in which the Third Circuit Court of Appeals explained, "evidence of social contacts and telephone calls among representatives of the defendants was insufficient to exclude the possibility that the defendants acted independently." Accordingly, they argue that because plaintiff has provided only ambiguous evidence, the Court may not infer collusive activity for purposes of assessing the motions for summary judgment.

Contrary to defendants' assertions, I find that the evidence outlined above, while by no means conclusive, to be sufficiently persuasive to draw an inference that PRS, Chipola, Eastern and Grear had colluded to circumvent a competitive bidding process and had arranged matters to ensure Eastern would submit the lowest bid for plaintiff's project. Defendants have failed to establish that such inference is unreasonable. "When deciding a motion for summary judgment, [ ] a court's role remains circumscribed in that it is inappropriate for a court to resolve factual disputes and to make credibility determinations." *Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir.1992)*. Defendants' arguments countering SKB's assertions, with particular regard to the alleged failure of PRS to invite bids from JJD and Hygrade, as well as Grear's contacts with the companies in the second round of bidding, would require determinations of credibility that are impermissible for the Court to make at the summary judgment stage. Nor have they persuaded the Court that there was no motive for the defendants to conspire to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 5
Not Reported in F.Supp.2d, 2002 WL 1197763 (E.D.Pa.), 2002-1 Trade Cases P 73,709
**(Cite as: Not Reported in F.Supp.2d)**

engage in bid-rigging; [FN4] unlike the alleged predatory pricing conspiracy in *Matsushita Elec.*, which the Supreme Court held to be highly implausible as it would have required the defendants to sustain losses for decades with no foreseeable profits, the success of the alleged bid-rigging scheme here was not "speculative" nor unreasonable. *See Matsushita Elec., 475 U.S. at 592-4*.

> FN4. Although set in the context of the road construction and maintenance business, *JTC Petroleum Co. v. Piasa Motor Fuels, Inc.,* 179 F.3d 1073, 1075 (7th Cir.1999) (Posner, J.) provides an informative analysis of the industry conditions conducive to bid-rigging schemes, including local markets with a limited number of competitors, standardized services, and consumers constrained to give business to the lowest bidder. Under such circumstances, it is "unsurprising" that evidence would show competitors agreed not to compete and allocated business among themselves. *Id.*

Accordingly, I conclude that plaintiff has shown that a genuine issue of material fact exists sufficient for plaintiff's antitrust violation claim to survive the motions of PRS, Chipola, Eastern and Grear for summary judgment.

### ii. Jottan and Toby Chrostowski

**\*6** As described in the allegations against PRS and Eastern set forth above, to support its antitrust violation claim against Jottan and Chrostowski, SKB relies on the allegations that Grear recruited Jottan to submit a bid in plaintiff's project and that Grear offered Chrostowksi a "price" prior to Jottan's bid submission. Additionally, as previously discussed, Chrostowski admitted to calculating his bid of $462,000 based on the budget of $460,000 that he received from PRS (elevated by Chipola to $100,000 over the original budget) rather than on Chrostowski's own inspection of the SKB building site. SKB further notes that Jottan was located in central New Jersey, a relatively far distance away from the SKB job site in Philadelphia; did not have GE certification, personnel nor equipment for foam roofing application; and would most likely have had to subcontract out the foam roof application portion of the job. (Chrostowski Deposition, Def. Exh. 25 at 10, 36-40.) SKB argues that these facts constitute strong circumstantial evidence that Jottan and Chrostowski participated in the alleged bid-rigging scheme and submitted a non-competitive bid, thereby allowing Eastern to submit the lowest bid for the SKB project.

While weaker than the evidence directed against Eastern and PRS, when combined with that evidence as a whole, plaintiff has set forth some evidence that tends to exclude the possibility that Jottan and Chrostowski acted independently in calculating and submitting a bid for the SKB project. Defendants have failed to show that drawing an inference of collusion by Jottan and Chrostowski would be unreasonable. Accordingly, I conclude that plaintiff has shown the existence of a genuine issue of material fact sufficient for plaintiff's antitrust violation claim to survive the motion of Jottan and Chrostowski for summary judgment.

### iii. D'Onofrio and John D'Onofrio

In contrast to the evidence gathered against the other defendants, the circumstantial evidence asserted against D'Onofrio and its president John D'Onofrio is sparse. D'Onofrio, in contrast to Jottan, is a GE-certified foam roof applicator, and there is no evidence that D'Onofrio was contacted by Grear or received the budget calculated by PRS prior to the submission of D'Onofrio's bid. Plaintiff characterizes as suspicious the facts that D'Onofrio is located in Brooklyn, NY, more than 100 miles from the job site, and that D'Onofrio's $462,000 bid was exactly $2000 more than the budget sent to Jottan, and only $100 less than Jottan's bid. In addition, SKB argues that the fact that D'Onofrio's bid was more than $100,000 over Eastern's successful bid belies D'Onofrio's testimony that he bid to win the project. (D'Onofrio Deposition, Def. Exh. 26 at 65.) Nevertheless, plaintiff's primary argument against D'Onofrio is that it is unreasonable to believe that Eastern and PRS would have invited D'Onofrio to submit a bid without D'Onofrio's compliance in their bid-rigging scheme.

I find that this is insufficient evidence from which to infer collusion. As testified by plaintiff's proffered experts, they themselves have commonly bid on projects more than 100 miles from their offices. (October 10, 2001 Hearing at 43, 81.) Additionally, John D'Onofrio has affirmed that he visually inspected the SKB site, and provided the bid specifications and package to his estimator, Mike Mathieu, who prepared a bid in the normal course of business and using standard bid preparation procedures. (D'Onofrio Exh. 3 at ¶ 9.) The mere coincidence of the proximity of D'Onofrio's bid to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                         Page 6
Not Reported in F.Supp.2d, 2002 WL 1197763 (E.D.Pa.), 2002-1 Trade Cases  P 73,709
**(Cite as: Not Reported in F.Supp.2d)**

Jottan's or the budget provided to Jottan, in light of the lack of any proof that D'Onofrio was provided with any guidance by PRS, Eastern or Jottan, is unpersuasive.

***7** Nor is there merit to the argument that D'Onofrio must have been implicated in the conspiracy if all of the other actors were engaged in collusion. SKB has argued that it is unreasonable to believe that the alleged bid-rigging scheme could have survived without the participation of all of the bidding companies. However, D'Onofrio has provided an affidavit by Laurence Parisi, an architect with 34 years of experience who has supervised a number of projects for which D'Onofrio has submitted a bid. Parisi affirmed that D'Onofrio typically bids on the higher end of project bids, and that its bid for the SKB project was consistent with bids it submitted for similar foam roofing projects. It is conceivable that PRS and Eastern foresaw that D'Onofrio would bid higher than Eastern. In any event, I find that drawing an inference of collusion by D'Onofrio primarily from the fact that others were allegedly involved in bid-rigging to be unreasonable.

Similarly, plaintiff need not show that all of the named defendants were part of the conspiracy for them to be liable for antitrust violations. That plaintiff may not survive summary judgment as to one defendant does not warrant granting summary judgment in favor of all of the remaining defendants. Accordingly, I conclude that plaintiff has not shown a genuine issue of material fact as to D'Onofrio's participation in the alleged bid-rigging scheme, and will grant summary judgment in favor of D'Onofrio and John D'Onofrio on Count 1 of the complaint.

b. Antitrust Injury

Defendants have argued that SKB cannot show that it was injured as a proximate result of the alleged bid-rigging because the bid prepared by Piccione of Hygrade reflected an incorrect square footage figure for the fifth floor. Defendants thus argue that had Piccione used the actual greater square footage, his bid for the fifth floor roof repair would thereby have been higher than Eastern's bid for the fifth floor roof repair. Although SKB failed to address this argument in its response, the Court notes that defendants have not described how Piccione's incorrect square footage measurement for the fifth floor affected his combined bid for the fifth and sixth floor roof repairs. Defendants also ignore DiNenna's testimony that JJD would have submitted a bid more than $100,000 lower than Eastern's successful bid. In assessing proximate causation of an antitrust injury, courts look to " '(1) the physical and economic nexus between the alleged [antitrust] violation and the harm to the plaintiff,' and (2) 'more particularly, ... the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy' under the antitrust laws." *Steamfitters Local No. 420 Welfare Fund v. Philip Morris, Inc.,* 171 F.3d 912, 922 (3d Cir.1999), *cert. denied,* 528 U.S. 1105, 120 S.Ct. 844, 145 L.Ed.2d 713 (2000) (quoting *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 478, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982)). Plaintiff has alleged that defendants conspired to exclude the submission of lower bids in order to force SKB's acceptance of Eastern's bid, and that a lower bid would have been submitted in the absence of defendants' concerted action. Thus, plaintiff has alleged an injury integral to the conspiracy and within the concern of Congress. I conclude that plaintiff has shown that there is a genuine issue of material fact as to whether it suffered an injury proximately caused by the alleged antitrust violation.

c. PRS and Chipola as Non-Competitor

***8** PRS and Chipola have further moved for summary judgment on the antitrust violation claim on the grounds that neither PRS nor Chipola as its employee were competitors of the other defendants. PRS and Chipola cite *Advanced Power Sys., Inc. v. Hi-Tech Sys., Inc.,* 801 F.Supp. 1450 (E.D.Pa.1992) and *United States v. Sargent Elec. Co.,* 785 F.2d 1123 (3d Cir.1986), for the proposition that "[a]n agreement among persons who are not actual or potential competitors in a relevant market is for Sherman Act purposes *brutum fulmen.* " *Sargent Elec.,* 785 F.2d at 1127. PRS and Chipola fundamentally misread the meaning of this proposition. The cited cases stand simply for the notion that the Sherman Act is not violated by an agreement between parties that would not affect competition within a relevant market. If, however, parties agreed to collude in a manner that adversely affected competition within a relevant market, a non-competitor party may be part of that conspiracy. *See United States v. MMR Corp.,* 907 F.2d 489, 498 (5th Cir.1990) ("[A] noncompetitor can join a Sherman Act bid-rigging conspiracy among competitors. If there is a horizontal agreement between A and B, there is no reason why others joining that conspiracy must be competitors.") Plaintiff has alleged that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d   Page 7
Not Reported in F.Supp.2d, 2002 WL 1197763 (E.D.Pa.), 2002-1 Trade Cases P 73,709
**(Cite as: Not Reported in F.Supp.2d)**

defendants engaged in a horizontal agreement to force SKB to accept Eastern's uncompetitive bid, and that PRS actively aided in this agreement. PRS and Chipola may therefore be equally liable for a violation of the Sherman Act.

### 2. Misrepresentation Claims

In Counts 2 and 3 of the complaint, SKB asserts claims of intentional or fraudulent misrepresentation and of negligent misrepresentation. To succeed on its claim of intentional misrepresentation or fraud, plaintiff must prove the following elements:
(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

Gibbs v. Ernst, 538 Pa. 193, 207-08, 647 A.2d 882 (1994) (citation omitted). The elements of a claim for negligent misrepresentation are:(1) a misrepresentation of a material fact; (2) the representor must either know of the misrepresentation, must make the misrepresentation without knowledge as to its truth or falsity or must make the representation under circumstances in which he ought to have known of its falsity; (3) the representor must intend the representation to induce another to act on it; and (4) injury must result to the party acting in justifiable reliance on the misrepresentation. Thus, negligent misrepresentation differs from intentional misrepresentation in that to commit the former, the speaker need not know his or her words are untrue, but must have failed to make reasonable investigation of the truth of those words.

Gibbs, 538 Pa. at 210, 647 A.2d 882 (citation omitted). Plaintiff's misrepresentation claims are based entirely on the theory that defendants misrepresented the collusive nature of their bids. Thus, defendants argue that because plaintiff cannot prove that the defendants were colluding, the claim of intentional misrepresentation must fail. Because I conclude that there exists a genuine issue of material fact as to whether Eastern, Grear, PRS, Chipola, Jottan and Chrostowski were engaged in bid-rigging, their motion for summary judgment on Counts 2 and 3 of the complaint will be denied. Because plaintiff has failed to show the existence of a genuine issue of material fact with regard to D'Onofrio's participation, summary judgment will be granted in favor of D'Onofrio and John D'Onofrio on Counts 2 and 3 of the complaint.

### 3. Civil Conspiracy

**\*9** In Count 4 of the complaint, plaintiff alleges a claim for civil conspiracy. To prove a civil conspiracy, plaintiff must show "that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means." Thompson Coal Co. v. Pike Coal Co., 488 Pa. 198, 211, 412 A.2d 466 (1979). As with the misrepresentation claims asserted by plaintiff, the success of SKB's civil conspiracy claim is dependent on plaintiff's ability to prove defendants participated in the alleged bid-rigging scheme. Because I conclude that there exists a genuine issue of material fact as to whether Eastern, Grear, PRS, Chipola, Jottan and Chrostowski were engaged in bid-rigging, their motion for summary judgment on Count 4 of the complaint will be denied. Because plaintiff has failed to show the existence of a genuine issue of material fact with regard to D'Onofrio's participation, summary judgment will be granted in favor of D'Onofrio and John D'Onofrio on Count 4 of the complaint.

### 4. Breach of Contract

In Count 5 of the complaint, SKB also assert a claim for breach of contract against Eastern and PRS. Both defendants have moved for summary judgment on this count on the grounds that there was no agreement between SKB and Eastern or PRS. Defendants further observe that even were the existence of agreements between the parties to be inferred, plaintiff has not shown that the terms of any contract were breached.

SKB maintains, however, that it entered into an agreement with PRS, and that the agreement comprises the PRS proposal letter dated January 24, 1997, SKB's authorization for PRS to proceed, and supplemental oral understandings reached between the parties during the course of the project. Plaintiff argues that by conspiring to have the roofing companies submit inflated bids, PRS breached its agreement with SKB.

The PRS January 24, 1997 proposal letter provides a non-exhaustive list of PRS's services, including the preparation of detailed specification documents for the roof repair; developing a list of contractors with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK    Document 170-6    Filed 07/31/2006    Page 8 of 9

Not Reported in F.Supp.2d                                                                                                Page 8
Not Reported in F.Supp.2d, 2002 WL 1197763 (E.D.Pa.), 2002-1 Trade Cases P 73,709
**(Cite as: Not Reported in F.Supp.2d)**

SKB personnel to submit bids; conducting the pre-bid meeting with the contractors; reviewing all bids with SKB and providing any necessary recommendations; conducting a pre-job meeting with the successful bidding contractor; inspection of the progress of the job and delivery of progress reports to SKB; provision of a post-construction infrared analysis; and conducting a post-construction conference and inspection for warranty approval. (Def.Exh. 2.) The proposal letter further states that PRS's fee would be 4% of the project not to exceed $9,500. (*Id.*) The SKB purchase order dated January 27, 1997 states that PRS was to "provide services to manage and ... follow to completion the repair of 6th Floor roof area at a cost of 4% of actual repair cost but not to exceed $9,500.00" and to "provide service to survey 12th floor roof level and provide report on asbestos areas- no charge." (*Id.*) Plaintiff has not provided a written copy of the acceptance of PRS's offer letter, which might have provided additional terms upon which the parties agreed. Nor has plaintiff provided an affidavit or referred to the record for details as to what were the specific "oral understandings" between the parties. Plaintiff does not deny that the roofs of the SKB building were properly repaired in accordance with the specifications designed by PRS. Once PRS established the facial absence of a genuine issue of material fact, the burden was on plaintiff to show the existence of a genuine issue. *See Matshushita Elec., 475 U.S. at 586*. SKB has not shown that PRS agreed to solicit the lowest available bids from contractors; thus, SKB has failed to show what specific terms of its agreement with PRS were breached. I conclude that plaintiff has not established the existence of a genuine issue of material fact as to whether PRS breached an agreement with SKB, and will grant summary judgment in favor of PRS on Count 5 of the complaint.

By wholly failing to address Eastern's argument, SKB appears to concede the lack of a claim for breach of contract as against Eastern. Accordingly, summary judgment will be granted in favor of Eastern on Count 5 of the Complaint.

### 5. Breach of Implied Duty of Good Faith and Fair Dealing

**\*10** Subsumed within its claim for breach of contract in Count 5 of the complaint, plaintiff also asserted that defendants Eastern and PRS breached their implied duty of good faith and fair dealing. This is a cause of action separate from a claim for breach of contract for which a plaintiff may recover; nevertheless, Pennsylvania law recognizes an independent cause of action for breach of duty of good faith and fair dealing only in very limited circumstances. *Northview Motors, Inc. v. Chrysler Motors Corp.,* 227 F.3d 78, 91 (3d Cir.2000) (citing *Creeger Brick and Building Supply, Inc. v. Mid-State Bank and Trust Co.,* 385 Pa.Super. 30, 560 A.2d 151, 154 (Pa.Super.Ct.1989)). Pennsylvania courts do not recognize a claim for bad faith where "the allegations of bad faith are 'identical to' a claim for 'relief under an established cause of action.' " *Id.* at 91-92 (quoting *Parkway Garage, Inc. v. City of Philadelphia,* 5 F.3d 685, 701-702 (3d Cir.1993)). If plaintiff can state a claim for relief under an established cause of action, there is simply "no reason to imply a separate tort for breach of a duty of good faith." *Parkway Garage,* 5 F.3d at 701. Contrary to plaintiff's assertion, a claim for bad faith is not recognizable merely because plaintiff may not be able to survive summary judgment on the established cause of action. In the instant action, plaintiff's claim for bad faith is identical to its claim for antitrust violations. Because an adequate remedy exists to address plaintiff's allegation of bid-rigging by defendants, I predict that Pennsylvania state law would not imply a separate duty of good faith under the circumstances as alleged. Accordingly, summary judgment will be granted to defendants Eastern and PRS on the claim for breach of implied duty of good faith and fair dealing.

### *Conclusion*

For the foregoing reasons, I conclude that plaintiff has shown a genuine issue of material fact exists as to the claims asserted against defendants Eastern, Grear, PRS, Chipola, Jottan and Chrostowski on Counts 1, 2, 3, and 4 of the complaint. Accordingly, the defendants' motions for summary judgment on these claims will be denied.

I further conclude that plaintiff has not shown there to be a genuine issue of material fact as to the claims asserted against Eastern and PRS on Count 5 of the complaint, or the claims asserted against D'Onofrio and John D'Onofrio on all counts. Accordingly, the motions for summary judgment on these claims will be granted.

An appropriate Order follows.

### *ORDER*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                               Page 9
Not Reported in F.Supp.2d, 2002 WL 1197763 (E.D.Pa.), 2002-1 Trade Cases P 73,709
**(Cite as: Not Reported in F.Supp.2d)**

AND NOW, this 24th day of May, 2002, upon consideration of the motions of defendants for summary judgment (Doc. Nos.54-58), the response of plaintiff thereto (Doc. No. 59), the replies thereto, the sur-reply thereto, the response to the sur-reply, and the pleadings, depositions, answers to interrogatories, admissions on file and affidavits of record, and having concluded, for the reasons set forth in the foregoing memorandum, that as to some claims there are no genuine issues of material fact and defendants are entitled to judgment as a matter of law and as well, that there remain some genuine issues of material fact, IT IS HEREBY ORDERED that:

(1) defendants' motion for summary judgment is DENIED as to plaintiff's claim against Eastern Applicators, Inc. ("Eastern"), Richard Grear, Professional Roof Services, Inc. ("PRS"), Blaine Chipola, Jottan, Inc. ("Jottan") and Toby Chrostowski under Counts 1, 2, 3, and 4 of the complaint; and

**\*11** (2) defendants' motion is GRANTED
(a) in favor of defendants Eastern and PRS on Count 5 of the complaint, and
(b) in favor of defendants D'Onofrio General Contractors Corp. and John D'Onofrio as to all claims for relief.

It is FURTHER ORDERED that judgment is entered in favor of D'Onofrio General Contractors Corp. and John D'Onofrio and against SmithKline Beecham Corporation.

E.D.Pa.,2002.
Smithkline Beecham Corp. v. Eastern Applicators, Inc.
Not Reported in F.Supp.2d, 2002 WL 1197763 (E.D.Pa.), 2002-1 Trade Cases P 73,709

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.