# **TAB 3**

LEXSEE 2001 U.S. DIST. LEXIS 19111

**DAVID A. KOSOWER, Plaintiff, - against - HOWARD GUTOWITZ, EATONI ERGONOMICS, INC. and EATONI ERGONOMICS, LLC, Defendants.**

**00 Civ. 9011 (JGK)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2001 U.S. Dist. LEXIS 19111*

**November 18, 2001, Decided**
**November 21, 2001, Filed**

**DISPOSITION:** [*1] Defendants' motion to dismiss Count I granted and to dismiss Counts II, III, and IV denied. Defendant Eatoni's motion to dismiss Counts V and VI granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff, a physicist and scientist, sued defendant, a company and its president, for breach of contract based on a partnership agreement, a declaratory judgment that he was a joint inventor, and alternatively copyright infringement, trade secret misappropriation, unjust enrichment, and quantum meruit. Defendants moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

**OVERVIEW:** The scientist and the president were social acquaintances who allegedly formed a partnership through an oral agreement to research, design, develop, and market a reduced-size keyboard system. The scientist contributed capital to the partnership in the form of research and development services and intellectual property assets in exchange for a partnership interest in an amount reasonably based on the quantity and quality of his contributions. He never received any compensation. The president filed several patent applications as the sole inventor of the product developed by the partnership. The court found that the elements of a valid partnership agreement did not exist because there was never an agreement about the share of the losses of the partnership. There were issues of fact with respect as to whether the scientist qualified as a joint inventor of the technology even though the scientist did not detail his contributions with particularity in the complaint. There were questions of fact as to whether the copyright registration was valid. There were unresolved issues of whether defendants owed the scientist a duty of confidentiality.

**OUTCOME:** Defendants' motion to dismiss was granted in part and denied in part.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN1] On a motion to dismiss, the allegations in the complaint are accepted as true. In deciding a motion to dismiss, all reasonable inferences must be drawn in the plaintiff's favor. A district court's function on a motion to dismiss is not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient. Therefore, a defendant's motion should only be granted if it appears that a plaintiff can prove no set of facts in support of his claim that will entitle him to relief.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN2] In deciding the motion, a district court may consider documents referenced in the complaint and documents that are in a plaintiff's possession or that the plaintiff knew of and relied on in bringing suit.

*Civil Procedure > Federal & State Interrelationships > Choice of Law > General Overview*
[HN3] Where the parties agree to the application of the forum law, their consent concludes the choice of law inquiry.

2001 U.S. Dist. LEXIS 19111, *

*Business & Corporate Law > General Partnerships > Management Duties & Liabilities > General Overview*
*Contracts Law > Debtor & Creditor Relations*
*Contracts Law > Types of Contracts > Oral Agreements*
[HN4] Under New York law, the factors to be considered in determining whether parties have agreed to form a partnership are: (1) sharing of profits, (2) sharing of losses, (3) ownership of partnership assets, (4) joint management and control, (5) joint liability to creditors, (6) intention of the parties, (7) compensation, (8) contribution of capital, and (9) loans to the organization. A partnership can be formed through an oral agreement. The existence of a partnership can be inferred through circumstantial evidence.

*Contracts Law > Formation > Ambiguity & Mistake > General Overview*
*Governments > Legislation > Vagueness*
[HN5] A contract must be definite in its material terms in order to be enforceable. Definiteness as to material matters is of the very essence in contract law. Impenetrable vagueness and uncertainty will not do. A mere agreement to agree, in which a material term is left for future negotiations, in unenforceable. The definiteness requirement can be satisfied without an explicit contract term if the contract contains a methodology for determining the missing term or refers to an extrinsic standard that makes the agreement's meaning clear.

*Business & Corporate Law > General Partnerships > Formation > General Overview*
*Business & Corporate Law > General Partnerships > Management Duties & Liabilities > Rights of Partners > Losses & Profits*
[HN6] It is axiomatic that the essential elements of a partnership must include an agreement between the principals to share losses as well as profits. A partnership is not formed when one of the alleged partners is not personally liable for the expenses of the partnership. Calling an organization a partnership does not make it one.

*Patent Law > Jurisdiction & Review > General Overview*
*Patent Law > Originality > Correction of Inventorship Errors*
*Patent Law > U.S. Patent & Trademark Office Proceedings > Continuation Applications > General Overview*
[HN7] A district court has jurisdiction under *28 U.S.C.S. § 1338*(a) over a claim, which arises under any act of Congress relating to patents. A district court has jurisdiction over a well-pleaded complaint that establishes that

federal patent law creates the cause of action or that a plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims. A well pleaded claim to correct the designation of inventorship raises an issue of federal patent law under *35 U.S.C.S. § 116* that is substantial enough to satisfy the jurisdictional test.

*Patent Law > Originality > Correction of Inventorship Errors*
*Patent Law > Originality > Joint & Sole Inventorship*
[HN8] See *35 U.S.C.S. § 116.*

*Governments > Courts > Authority to Adjudicate*
*Patent Law > Jurisdiction & Review > Subject Matter Jurisdiction > Appeals*
*Patent Law > Originality > Correction of Inventorship Errors*
[HN9] A district court has the power to instruct a party to change the inventorship designation on a foreign patent application.

*Patent Law > Claims & Specifications > Enablement Requirement > General Overview*
*Patent Law > Date of Invention & Priority > General Overview*
*Patent Law > Originality > Joint & Sole Inventorship*
[HN10] To be a joint inventor, an individual must (1) contribute in some significant manner to the conception or reduction to practice of the invention, (2) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) do more than merely explain to the real inventors well-known concepts and/or the current state of the art.

*Copyright Law > Civil Infringement Actions > Elements > Copying by Defendants*
*Copyright Law > Civil Infringement Actions > Presumptions & Requirements > Presumption of Copyright Validity*
*Copyright Law > Civil Infringement Actions > Presumptions & Requirements > Presumption of Validity of Facts in Registration Certificate*
[HN11] The elements of a copyright infringement action are (1) ownership of a valid copyright and (2) copying of constituent elements of the work that are original. A certificate of copyright registration is prima facie evidence that a copyright is valid, *17 U.S.C.S. § 410*(c), and shifts the burden to a defendant to prove that it is not.

*Copyright Law > Collective & Derivative Works > Collective Works*
*Copyright Law > Collective & Derivative Works > Scope of Protection*
*Copyright Law > Subject Matter > General Overview*
[HN12] To be protected by copyright law, a compilation must meet three criteria: (1) the collection and assembly of preexisting data; (2) the selection, coordination, or arrangement of that data; and (3) a resulting work that is original, by virtue of the selection, coordination, or arrangement of the data contained in the work. To be original, a compilation need only exhibit a minimal amount of creativity.

*Trade Secrets Law > Civil Actions > Discovery*
*Trade Secrets Law > Misappropriation Actions > General Overview*
*Trade Secrets Law > Protected Information > General Overview*
[HN13] To state a claim for misappropriation of a trade secret, the plaintiff must allege that (1) he possessed a trade secret; and (2) the defendants used that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means. A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.

*Torts > Business Torts > Unfair Business Practices > General Overview*
*Trade Secrets Law > Civil Actions > Questions of Fact*
*Trade Secrets Law > Protection of Secrecy > General Overview*
[HN14] In the context of a trade secret, secrecy is generally an issue of fact.

*Contracts Law > Types of Contracts > Implied-in-Law Contracts*
[HN15] To recover on an unjust enrichment claim, a plaintiff must prove that a defendant was enriched, that such enrichment was at plaintiff's expense, and that the circumstances were such that in equity and good conscience the defendant should return the money or property to the plaintiff. To make out a quantum meruit claim, a plaintiff must demonstrate: the performance of services in good faith, acceptance of the services by the person to whom they are rendered, an expectation of compensation therefor, and the reasonable value of the services.

*Contracts Law > Remedies > Equitable Relief > General Overview*
*Contracts Law > Types of Contracts > Implied-in-Law Contracts*
[HN16] Both unjust enrichment and quantum meruit actions are quasi-contract claims. To recover under a theory of quasi contract, a plaintiff must demonstrate that services were performed for a defendant resulting in its unjust enrichment.

**COUNSEL:** For DAVID A. KOSOWER, plaintiff: Alan B. Howard, Virginia R. Richard, Winston & Strawn, New York, NY.

HOWARD GUTOWITZ, defendant, Pro se, New York, NY.

For EATONI ERGONOMICS, INC., EATONI ERGONOMICS, LLC, defendants: David J. DeToffol, New York, NY.

**JUDGES:** John G. Koeltl, United States District Judge.

**OPINIONBY:** John G. Koeltl

**OPINION:**

**OPINION AND ORDER**

**JOHN G. KOELTL, District Judge:**

The plaintiff, David A. Kosower ("Kosower"), is a scientist who alleges that he entered a partnership agreement with defendant Howard Gutowitz ("Gutowitz") to develop and market a reduced-size keyboard for use in connection with portable computing devices. Kosower's Complaint alleges six claims. Kosower asserts a breach of contract claim alleging that Gutowitz violated the terms of the partnership agreement by excluding him from the partnership and failing to give him shares in Eatoni Ergonomics, Inc., a [*2] Delaware corporation with a principal place of business in New York that was formed as a result of the alleged partnership (Count I). Kosower also seeks a declaration that he is a joint inventor on certain technologies for which Gutowitz has filed or may file patent applications (Count II). In addition, Kosower asserts copyright infringement (Count III), trade secret misappropriation (Count IV), unjust enrichment (Count V), and quantum meruit (Count VI) claims against the defendants in the alternative, in the event that the Court finds that there was no partnership agreement.

The defendants have moved to dismiss the Complaint pursuant to *Fed. R. Civ. P. 12(b)(6)* for failure to

2001 U.S. Dist. LEXIS 19111, *

state a claim upon which relief can be granted. The motion is granted in part and denied in part.

I.

A.

[HN1] On a motion to dismiss, the allegations in the complaint are accepted as true. See *Grandon v. Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir. 1998).* In deciding a motion to dismiss, all reasonable inferences must be drawn in the plaintiff's favor. See *Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir. 1995); Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989).* [*3] The court's function on a motion to dismiss is "not to weigh t he e vidence t hat might b e p resented a t trial b ut merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).* Therefore, the defendants' present motion should only be granted if it appears that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. See *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); Grandon, 147 F.3d at 188;* see also *Goldman, 754 F.2d at 1065.*

[HN2] In deciding the motion, the court may consider documents referenced in the complaint and documents that are in the plaintiff's possession or that the plaintiff knew of and relied on in bringing suit. See *Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir. 1993); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir. 1991); I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co., Inc., 936 F.2d 759, 762 (2d Cir. 1991); Skeete v. IVF America, Inc., 972 F. Supp. 206, 208 (S.D.N.Y. 1997).* [*4]

B.

The Court accepts the following factual allegations solely for the purposes of this motion to dismiss. The plaintiff, a United States citizen, is a physicist and scientist who was most recently a staff scientist at the Commissariat a L'Energie Atomique in Saclay, France. (Compl. PP 1, 9.) The plaintiff has significant experience in computers and computer programming. (Compl. P 10.) Gutowitz is the president, chief executive officer, and majority shareholder of Eatoni Ergonomics, Inc. and was most recently affiliated with the Ecole Super Leave de Physique et Chimie Industrielles in Paris, France. (Compl. P 11.)

The plaintiff and Gutowitz met as social acquaintances. (Compl. P 12.) In the Spring of 1998, the plaintiff, Gutowitz, and a computer programmer named Eugene Skepner ("Skepner") allegedly formed a partnership through an oral agreement (the "Eatoni partnership"). (Compl. PP 12, 14.) The purpose of the Eatoni partner-

ship was to research, design, develop and market a reduced-size keyboard system for use in connection with portable computing devices such as cellular telephones and personal digital assistants (the "Eatoni project"). (Compl. P 12.) Gutowitz allegedly asked the [*5] plaintiff to join the Eatoni partnership because the plaintiff had technical, mathematical, and computer skills needed to complete the Eatoni project. (Compl. P 13.)

The plaintiff was to contribute capital to the Eatoni partnership in the form of research and development services and certain intellectual property assets. (Compl. P 15.) The plaintiff was to receive a partnership interest in an amount reasonably based on the quantity and quality of the services and assets he contributed to the partnership. (Compl. P 15.) While other contributors to the Eatoni project, including Skepner, have received compensation, the plaintiff was never compensated for his work on the Eatoni project. (Compl. P 15.) The plaintiff also has not been reimbursed for certain business expenses. (Compl. P 18.)

Between the Spring of 1998 and September 1999, the plaintiff devoted more than 1,000 hours to the Eatoni project. (Compl. P 17.) The Eatoni project sought to find a way to enter text into a device through a small keyboard with only a handful of keys. (Compl. P 19.) The Eatoni project used "optimal codes" where certain letters are entered unambiguously by using a shift key and the remaining letters are [*6] entered ambiguously and mapped through a software engine onto unique words or short lists of words. (Compl. P 20.) The plaintiff's work focused primarily on selecting optimal codes and designing the software engine with a corresponding database of word frequencies. (Compl. P 21.)

As Gutowitz and others acknowledged, the plaintiff made a number of critical technical contributions without which the Eatoni project would not have succeeded. (Compl. P 22.) The plaintiff also made significant business contributions to the Eatoni project. (Compl. P 24.) The plaintiff alleges that the defendants are marketing a reduced-sized keyboard system u nder the name "Word-Wise," which incorporates the plaintiff's technical contributions to the Eatoni project. (Compl. P 23.)

In an electronic mail message dated January 21, 1999, Gutowitz referred to the plaintiff as a "founder" of the Eatoni partnership. (Compl. P 25 (alterations in original).) In an electronic mail message dated April 14, 1999, Gutowitz referred to his relationship with the plaintiff as a "Siskel and Ebert" relationship. (Compl. P 25.) The plaintiff entered into contracts on behalf of the Eatoni partnership with the knowledge of Gutowitz, [*7] including non-disclosure agreements with potential agents for the Eatoni partnership. (Compl. P 26.) The plaintiff and Gutowitz attended meetings with various

2001 U.S. Dist. LEXIS 19111, *

persons during which Gutowitz represented that he and the plaintiff were partners. (Compl. P 27.) The plaintiff was involved with the management of the Eatoni partnership and involved in major management decisions, including the recruiting and hiring of employees. (Compl. P 28.) In an electronic mail message dated September 14, 1999, Eatoni consultant Scott Murphy advised Gutowitz that: "Notwithstanding the angst that has clearly intensified between David and yourself, it is in no ones best interest to initiate new partnership agreement terms that will make it more difficult to acquire [OEM] licensing terms." (Compl. P 29 (emphasis and alterations in original).)

In November 1998, the Eatoni partners discussed forming a separate company to market and sell the reduced-sized keyboard system they were developing. (Compl. P 30.) The partners discussed distributing shares in the company to the partners in direct proportion to the hours of service and value of ideas contributed by each of them to the Eatoni partnership. (Compl. [*8] P 30.) While there was no determination concerning the appropriate distribution of shares, there was an understanding that shares would be distributed. (Compl. P 30.) In reliance on the understanding that his work would be rewarded with equity, the plaintiff increased his level of work on the Eatoni project. (Compl. P 30.)

In an electronic mail message dated April 27, 1999, Gutowitz reaffirmed the understanding that equity would be distributed and indicated his belief that the plaintiff and Skepner were each entitled to a 1% equity interest in the company and additional compensation for their time spent working on the Eatoni project at a rate of 40 shares per billable hour, up to 5% total equity in the company. (Compl. P 31.) The plaintiff and Skepner would also be awarded an additional 0.5% equity for "extraordinary service." (Compl. P 31.) The plaintiff responded that Gutowitz' proposed valuation of the plaintiff's contribution to the Eatoni partnership was grossly inadequate. (Compl. P 31.) The parties continued discussions to determine an appropriate distribution and the plaintiff continued working on the Eatoni project, but Gutowiz continued to propose what the plaintiff characterizes [*9] as "insultingly low percentages of shares." (Compl. P 32.) In an electronic mail message dated August 4, 1999, Gutowitz stated that he believed that the plaintiff was entitled to a 1.88% "sweat equity" interest in the company. (Compl. P 33.)

Following August 1999, the relationship between Gutowitz and the plaintiff soured. (Compl. P 34.) The plaintiff stopped working on the Eatoni project. (Compl. P 34.)

On December 10, 1998, Gutowitz filed United States Provisional Patent Application Serial No.

60/111,665 with the United States Patent and Trademark Office (the "USPTO") as a sole inventor. (Compl. P 35.) The plaintiff alleges that the provisional application was co-authored by the plaintiff and related to the Eatoni project. (Compl. P 35.) The provisional application is now abandoned pursuant to 35 U.S.C. § 111(b)(5). (Compl. P 35.)

On December 9, 1999, Gutowitz filed as a sole inventor, pursuant to the Patent Cooperation Treaty ("PCT"), International Application No. PCT/US99/29343 for "Touch-Typable Devices Based on Ambiguous Codes and Methods to Design Such Devices," claiming priority on the provisional application. (Compl. P 36.) The PCT application designates [*10] seventy-nine (79) countries and regional patent offices, including the United States. (Compl. P 36.) The plaintiff alleges that he should have been named as a joint inventor on this patent application and others that Gutowitz may have filed. (Compl. PP 37, 39.)

On September 27, 1999, after terminating his relationship with the plaintiff, Gutowitz formed a Delaware limited liability company under the name Eatoni Ergonomics, LLC to market and sell the reduced-size keyboard system developed by the Eatoni partnership. (Compl. P 41.) The plaintiff was not given any shares in Eatoni Ergonomics, LLC. (Compl. P 41.)

On February 16, 2000, Gutowitz formed a Delaware corporation under the name Eatoni Ergonomics, Inc. ("Eatoni Inc.") (Compl. P 42.) Eatoni Ergonomics, Inc. is the entity that is primarily marketing and selling the reduced-size keyboard developed by the Eatoni partnership. (Compl. P 43.) Eatoni Ergonomics, Inc. is currently valued in excess of $ 10 million, and Gutowitz owns a majority interest in the company. (Compl. P 44.)

The plaintiff asserts six causes of action. Count I alleges a breach of contract claim under New York law against Gutowitz. It alleges that the plaintiff [*11] entered a valid partnership agreement with Gutowitz and Skepner. The plaintiff claims that Gutowitz materially breached the Eatoni partnership agreement by (a) excluding the plaintiff from the Eatoni partnership and (b) failing to provide the plaintiff with shares in Eatoni Ergonomics, Inc. reflecting his contribution to the Eatoni partnership. He seeks an accounting of the profits realized by the Eatoni partnership and damages.

In Count II, the plaintiff seeks a declaration that he is a joint inventor with respect to any patent applications filed by Gutowitz where the plaintiff is a joint inventor within the meaning of 35 U.S.C. § 116. The plaintiff also seeks an order requiring the defendants to amend any pending patent applications to name the plaintiff as a joint inventor.

2001 U.S. Dist. LEXIS 19111, *

Counts III through VI are asserted in the event that the Court finds that the plaintiff and Gutowitz are not partners. In Count III, the plaintiff brings a copyright infringement claim against the defendants for infringing the plaintiff's copyright in the Foreign Word Frequency Database. Counts IV to VI allege claims of trade secret misappropriation, unjust enrichment, and quantum meruit. [*12] n1

n1 The plaintiff asserts that the breach of contract, trade secret misappropriation, unjust enrichment, and quantum meruit claims are governed by New York law. The defendants do not dispute that New York law governs. Therefore, the Court will apply New York law to these claims. See *Am. Fuel Corp. v. Utah Energy Dev. Co., Inc., 122 F.3d 130, 134 (2d Cir. 1997)* ("[HN3] where the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry"); *John St. Leasehold, LLC v. Capital Mgmt Res., L.P., 154 F. Supp. 2d 527, 544 n.5 (S.D.N.Y. 2001).*

II.

The defendants first argue that the plaintiff's breach of contract claim under New York law must be dismissed because there was no partnership agreement between the plaintiff and Gutowitz. They argue that any alleged partnership agreement was too indefinite with respect to its material terms, and that there could be no partnership because the plaintiff did not agree to share in the losses of the partnership. [*13]

[HN4] Under New York law, the factors to be considered in determining whether parties have agreed to form a partnership are: "(1) sharing of profits, (2) sharing of losses, (3) ownership of partnership assets, (4) joint management and control, (5) joint liability to creditors, (6) intention of the parties, (7) compensation, (8) contribution of capital, and (9) loans to the organization." *Brodsky v. Stadlen, 138 A.D.2d 662, 526 N.Y.S.2d 478, 479 (App. Div. 1988)* (citation omitted); see also *Herman v. Blockbuster Entm't Group, 18 F. Supp. 2d 304, 314 (S.D.N.Y. 1998),* aff'd *182 F.3d 899 (2d Cir. 1999),* cert. denied *528 U.S. 1020 (1999).* A partnership can be formed through an oral agreement. See *Jabara v. Songs of Manhattan Island Music Co., 1989 U.S. Dist. LEXIS 1727, No. 86 Civ. 3412, 1989 WL 16614,* at *11 (S.D.N.Y. Feb. 24, 1989); *Prince v. O'Brien, 234 A.D.2d 12, 650 N.Y.S.2d 157, 158 (App. Div. 1996); Missan v. Schoenfeld, 95 A.D.2d 198, 465 N.Y.S.2d 706, 712 (App. Div. 1983).* The existence of a partnership can be inferred through circumstantial evidence. See *Sacco v. Iselin, 1986 U.S. Dist. LEXIS 16362, No. 84 Civ. 877,*

*1986 WL 14908,* [*14] at *3 (S.D.N.Y. Dec. 19, 1986); *Prince, 650 N.Y.S.2d at 158; Cohen v. Biernoff, 84 A.D.2d 802, 444 N.Y.S.2d 152, 153 (App. Div. 1981).*

The alleged partnership agreement described in the complaint is indefinite with respect to the material term of the amount of profit sharing. [HN5] A contract must be definite in its material terms in order to be enforceable. "Definiteness as to material matters is of the very essence in contract law. Impenetrable vagueness and uncertainty will not do." *Martin Delicatessen, Inc. v. Schumacher, 52 N.Y.2d 105, 417 N.E.2d 541, 543, 436 N.Y.S.2d 247 (N.Y. 1981)* (citation omitted); see *Spectrum Research Corp. v. Interscience, Inc., 242 A.D.2d 810, 661 N.Y.S.2d 871, 872 (App. Div. 1997).* "[A] mere agreement to agree, in which a material term is left for future negotiations, in unenforceable." *Martin Delicatessen, 417 N.E.2d at 543* (citations omitted). The definiteness requirement can be satisfied without an explicit contract term if the contract contains a methodology for determining the missing term or refers to an extrinsic standard that makes the agreement's meaning clear. [*15] See *166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp., 78 N.Y.2d 88, 575 N.E.2d 104, 105-06, 571 N.Y.S.2d 686 (N.Y. 1991); Cobble Hill Nursing Home, Inc. v. Henry and Warren Corp., 74 N.Y.2d 475, 548 N.E.2d 203, 206, 548 N.Y.S.2d 920 (N.Y. 1989); Martin Delicatessen, 417 N.E.2d at 544.*

The plaintiff argues that he and Gutowitz agreed that the plaintiff's interest would be "reasonably based on the quantity and quality of services and assets contributed" by the plaintiff to the partnership. (Compl. P 15.) The language that the partnership interest would be "reasonably" based on the "quantity and quality of services and assets contributed" is too indefinite to enforce. See, e.g., *Freedman v. Pearlman, 271 A.D.2d 301, 706 N.Y.S.2d 405, 408 (App. Div. 2000)* (terms "fair compensation" and "equitably divide the draw" were too indefinite to be enforced). The plaintiff acknowledges that the parties continued discussions about the appropriate distribution that the plaintiff was entitled to for his work as late as April 1999, a year after the alleged partnership agreed was entered into. (Compl. P 32.) The plaintiff also concedes [*16] that in April, 1999 Gutowitz offered him a 1% equity interest in the partnership which could be increased up to 5.5%, but the plaintiff rejected this share as grossly inadequate. It is clear that there was never a meeting of the minds with respect to the plaintiff's share of the partnership profits or how that share could be objectively calculated. The plaintiff has not identified any extrinsic standard or methodology that the parties allegedly agreed to in order to calculate the plaintiff's partnership interest. On its face, the plaintiff's complaint only describes an indefinite agreement to agree with respect to the material terms of the alleged partnership agreement

that was never finalized. The plaintiff has not alleged a sufficiently definite contract that would support a breach of contract claim. See, e.g., *Alter v. Bogoricin, 1997 U.S. Dist. LEXIS 17369, No. 97 Civ. 0662, 1997 WL 691332,* at *6-7 (S.D.N.Y. Nov. 6, 1997); *Jabara, 1989 U.S. Dist. LEXIS 1727, 1989 WL 16614,* at *11-12.

Additionally, there is no allegation in the complaint that the plaintiff and Gutowitz agreed to share in the losses of the partnership. "[HN6] It is axiomatic that the essential elements of a partnership must include an agreement [*17] between the principals to share losses as well as profits." *Chanler v. Roberts, 200 A.D.2d 489, 606 N.Y.S.2d 649, 651 (App. Div. 1994)*(citation omitted); accord *Jabara, 1989 U.S. Dist. LEXIS 1727, 1989 WL 16614,* at *12; *Sacco, 1986 U.S. Dist. LEXIS 16362, 1986 WL 14908,* at *3. Relying on *Ramirez v. Goldberg, 82 A.D.2d 850, 439 N.Y.S.2d 959, 961 (App. Div. 1981),* the plaintiff argues that he agreed to share in the losses of the partnership because by working for the partnership he risked losing the value of the services that he contributed to the partnership if that partnership was unsuccessful. But *Ramirez* also held that a partnership was not formed when one of the alleged partners was not personally liable for the expenses of the partnership. *439 N.Y.S.2d at 961. Ramirez does not obviate the requirement that partners agree to share losses personally for there to be a partnership. See *Rivkin v. Coleman, 978 F. Supp. 539, 543 (S.D.N.Y. 1997); Artco, Inc. v. Kidde, Inc., 1993 U.S. Dist. LEXIS 21227, No. 88 Civ. 5734, 1993 WL 962596,* at *10-11 (S.D.N.Y. Dec. 28, 1993). n2 There is no allegation that the plaintiff ever agreed to this necessary element of a partnership. [*18] Finally, the complaint alleges that Gutowitz referred to the plaintiff as a partner and that others referred to their arrangement as a partnership. But "calling an organization a partnership does not make it one." *Brodsky, 526 N.Y.S.2d at 480.* Therefore, the amended complaint does not state a claim for breach of contract against Gutowitz because it does not plead the elements of a valid partnership agreement between Gutowitz and the plaintiff. Accordingly, the defendants' motion to dismiss Count I is granted. n3

n2 The plaintiff also cites two cases from the Appellate Division for the proposition that an agreement to share losses is not an essential element of a partnership agreement. In *Chipman v. Steinberg, 106 A.D.2d 343, 483 N.Y.S.2d 256, 257-58 (App. Div. 1984),* aff'd *65 N.Y.2d 842, 482 N.E.2d 925, 493 N.Y.S.2d 129 (N.Y. 1985),* the Appellate Division found that a sharing of losses is not always and exclusively an indicium of partnership, but it did not hold that a sharing of losses was not required for a partnership. Indeed,

the court found that a court may read in a loss sharing element, and the court ultimately held that there was no partnership agreement in that case. In *Vincent v. Macbeth, 211 A.D. 110, 206 N.Y.S. 870, 872 (App Div. 1924),* the court found that "while an agreement to share in the profits and losses as such is not specifically shown, nevertheless the testimony ... leads to the conclusion that it was the intention of the parties to become partners." The decision does not hold that the partnership that was found to exist did not include the basic element of a sharing of the profits and losses, and it appears that only profits were at issue in the case because the plaintiff sought a dissolution of the partnership and an accounting.

[*19]

n3 The plaintiff concedes that Count I is not asserted against any defendant other than Gutowitz.

III.

The defendants next move to dismiss Count II of the amended complaint, which seeks a declaration that the plaintiff is a joint inventor pursuant to *35 U.S.C. § 116* on the defendants' pending patent applications for technologies originating from the Eatoni project. The defendants acknowledge that Gutowitz has filed patent applications with the Patent and Trademark Office ("PTO") and with the World Intellectual Property Organization pursuant to the Patent Cooperation Treaty. n4

n4 At oral argument, counsel for the defendants acknowledged that the defendants had filed a patent application with the Patent and Trademark Office.

With respect to the national patent application pending before the PTO, the defendants argue that this Court has no subject matter jurisdiction to decide an inventorship issue [*20] with respect to a pending patent application. They argue that under *35 U.S.C. § 116* issues with respect to inventorship in a pending PTO application should be addressed to the PTO and not to the Court. n5 However, [HN7] this Court has jurisdiction under *28 U.S.C. § 1338*(a) over this claim, which arises under "any Act of Congress relating to patents ...." In *Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 808-09, 100 L. Ed. 2d 811, 108 S. Ct. 2166 (1988),* the Supreme Court held that a district court has jurisdiction over a well-pleaded complaint that establishes "that

federal patent law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims." In this case the plaintiff correctly argues that his well pleaded claim to correct the designation of inventorship raises an issue of federal patent law under § 116 that is substantial enough to satisfy the jurisdictional test. See *Hunter Douglas, Inc. v. Harmonic Design, Inc., 153 F.3d 1318, 1330 (Fed. Cir. 1998),* [*21] overruled on other grounds by *Midwest Indus., Inc. v. Karavan Trailers, Inc., 175 F.3d 1356* (Fed. Cir.), cert. denied, *528 U.S. 1019, 145 L. Ed. 2d 409, 120 S. Ct. 527 (1999);* see also *H eineken Tech. Servs., B.V. v. Darby, 103 F. Supp. 2d 476, 479 (D. Mass. 2000).* n6

n5 *35 U.S.C. § 116* provides in relevant part: "[HN8] Whenever ... through error an inventor is not named in an application, and such error arose without any deceptive intention on his part, the Director may permit the application to be amended accordingly, under such terms as he prescribes."

n6 The sole case from the Federal Circuit relied upon by the defendants, *GAF Bldg. Materials Corp. v. Elk Corp. of Dallas, 90 F.3d 479 (Fed. Cir. 1996),* held only that a court cannot adjudicate a validity and infringement suit over a future patent because the dispute was purely hypothetical. In this case, the plaintiff seeks to correct a pending application and does not seek an adjudication of the validity or infringment of the yet-to-be-issued patent.

[*22]

The defendants next argue that the Court has no power to issue a declaration of inventorship with respect to an international patent application. However, the Court of Appeals for the Federal Circuit has recently ruled that [HN9] a court has the power to instruct a party to change the inventorship designation on a foreign patent application. See *Chou v. Univ. of Chicago, 254 F.3d 1347, 1360 (Fed. Cir. 2001).*

Finally, the defendants argue that Count II must be dismissed because the plaintiff has not established that he is a joint inventor of the "Touch-Typable Devices Based on Ambiguous Codes and Methods to Design Such D evices" for which G utowitz i s a pplying for p atents. The defendants claim that the plaintiff only co-authored a draft of the patent application. [HN10] To be a joint inventor, an individual must "(1) contribute in some significant manner to the conception or reduction to practice of the invention, (2) make a contribution to

the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) do more than merely explain to the real inventors well-known concepts and/or the current state [*23] of the art." *Pannu v. Iolab Corp., 155 F.3d 1344, 1351 (Fed. Cir. 1998).*

The p laintiff a lleges i n his c omplaint t hat h e made critical contributions to the "Touch-Typable Devices Based on Ambiguous Codes and Methods to Design Such Devices." There are issues of fact with respect to whether the plaintiff qualifies as a joint inventor of this technology that cannot be resolved on this motion to dismiss. T he d efendants a rgue t hat t he p laintiff h as n ot detailed his contributions with particularity, but there is no requirement that patent inventorship claims be pleaded with particularity. The allegations with respect to this claim are sufficiently specific to survive a motion to dismiss. Therefore, the defendants' motion to dismiss Count II of the amended complaint is denied.

IV.

The defendants have moved to dismiss Count III, in which the plaintiff argues that the defendants infringed his copyright in the Foreign Word Frequency Database. The defendants argue that the Foreign Word Frequency Database is an unoriginal compilation that does not merit copyright protection.

[HN11] The elements of a copyright infringement action are "(1) ownership of a valid copyright and (2) copying [*24] of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1991);* accord *Whimsicality, Inc. v. Rubie's Costume Co., Inc., 891 F.2d 452, 455 (2d Cir. 1989); Range Road Music, Inc. v. Music Sales Corp., 76 F. Supp. 2 d 375, 379 (S.D.N.Y. 1999).* A certificate of copyright registration is prima facie evidence that a copyright is valid, *17 U.S.C. § 410(c); Whimsicality, 891 F.2d at 455,* and shifts the burden to the defendant to prove that it is not. See *Hasbro Bradley, Inc. v. Sparkle Toys, Inc., 780 F.2d 189, 192 (2d Cir. 1985).*

[HN12] To be protected by copyright law, a compilation must meet three criteria: "(1) the collection and assembly of preexisting data; (2) the selection, coordination, or arrangement of that data; and (3) a resulting work that is original, by virtue of the selection, coordination, or arrangement of the data contained in the work." *Key Publications, Inc. v. Chinatown Today Publishing Enter., Inc., 945 F.2d 509, 512 (2d Cir. 1991)* (citation omitted). To be original, a compilation need only [*25] exhibit a "minimal amount of creativity." *Key Publications, 945 F.2d at 512.*

The plaintiff has obtained a copyright registration for the Foreign Word Frequency Database. Therefore, it is the defendants' burden to prove that the registration is not valid. The defendants argue that the Foreign Word Frequency Database does not exhibit the requisite minimal amount of creativity. However, the plaintiff argues that the selection criteria upon which he relied exhibited creativity and produced an original work. There are issues of fact with respect to the nature of the plaintiff's selection process that cannot be resolved on a motion to dismiss. Therefore, the defendants' motion to dismiss Count III is denied.

## V.

The defendants move to dismiss Count IV, the plaintiff's trade secret action. [HN13] To state a claim for misappropriation of a trade secret, the plaintiff must allege that (1) he possessed a trade secret; and (2) the defendants used that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means. *Integrated Cash Mgmt. Serv., Inc. v. Digital Transactions, Inc., 920 F.2d 171, 173 (2d Cir. 1990); Ez-Tixz, Inc. v. Hit-Tix, Inc., 919 F. Supp. 728, 737 (S.D.N.Y. 1996).* [*26] "A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Lehman v. Dow Jones & Co., Inc., 783 F.2d 285, 297 (2d Cir. 1986).*

The defendants argue that the plaintiff has not identified a trade secret. However, the complaint alleges that the defendants have misappropriated the plaintiff's Foreign Word Frequency Database and software in products marketed by the defendants. The plaintiff alleges that these items were trade secrets and has therefore sufficiently alleged the first element of a trade secret misappropriation claim. The factual issue of whether these items are in fact trade secrets cannot be decided on this motion to dismiss.

The defendants argue that the Foreign Word Frequency Database and software is not secret because it was obtained from public sources. [HN14] Secrecy is generally an issue of fact. *Lehman, 783 F.2d at 298.* The issue of whether these items were secret cannot be resolved on this motion to dismiss.

Finally, the defendants argue that they owed the plaintiff no duty [*27] of confidentiality. However, the plaintiff alleges that he disclosed these secrets to Gutowitz in confidence as a fiduciary pursuant to their expected ongoing relationship. The issue of whether Gutowitz had an obligation to keep the Foreign Word Frequency Database and software confidential is an issue of fact that cannot be decided on this motion to dismiss.

Because there are unresolved issues of fact that prevent the resolution of the plaintiff's trade secrets claim, the defendants' motion to dismiss Count IV is denied.

## VI.

Finally, Eatoni Ergonomics, Inc. and Eatoni Ergonomics, LLC (the "Eatoni defendants") move to dismiss the plaintiff's claims for unjust enrichment and quantum meruit against them. n7 The Eatoni defendants argue that the plaintiff did not render any services for them until after the plaintiff performed the services alleged in the complaint.

> n7 Defendant Gutowitz has not moved to dismiss the unjust enrichment and quantum meruit claims against him.

[HN15] To recover on an unjust enrichment claim, [*28] "a plaintiff must prove that the defendant was enriched, that such enrichment was at plaintiff's expense, and that the circumstances were such that in equity and good conscience the defendant should return the money or property to the plaintiff." *Dolmetta v. Uintah Nat'l Corp., 712 F.2d 15, 20 (2d Cir. 1983)* (citation omitted). To make out a quantum meruit claim, a plaintiff must demonstrate: "the performance of services in good faith, acceptance of the services by the person to whom they are rendered, an expectation of compensation therefor, and the reasonable value of the services." *Freedman, 706 N.Y.S.2d at 408* (citation omitted).

[HN16] Both unjust enrichment and quantum meruit actions are quasi-contract claims. See, e.g., *Michele Pommier Models, Inc. v. Men Women NY Model Mgmt., Inc., 14 F. Supp. 2d 331, 338 (S.D.N.Y. 1998),* aff'd *173 F.3d 845 (2d Cir. 1999)* (unjust enrichment as quasi-contract claim); *Heller v. Kurz, 228 A.D.2d 263, 643 N.Y.S.2d 580, 581 (App. Div. 1996)* (quantum meruit as quasi-contract claim). "To recover under a theory of quasi contract, a plaintiff must demonstrate that services [*29] were performed for the defendant resulting in its unjust enrichment." *Kagan v. K-Tel Entertainment, Inc., 172 A.D.2d 375, 568 N.Y.S.2d 756, 757 (App. Div. 1991)* (emphasis in original); see also *Shortcuts Editorial Servs., Inc. v. Kaleidoscope Sports and Entm't, L.L.C., 183 Misc. 2d 334, 706 N.Y.S.2d 572, 573 (App. Div. 2000).*

The plaintiff has not alleged a claim of unjust enrichment or quantum meruit against the Eatoni defendants. The Eatoni defendants were only formed after the plaintiff terminated his relationship with Gutowitz. The plaintiff does not describe any services that he performed for the Eatoni defendants. The fact that the Eatoni defendants may have benefitted from the plaintiff's work is

insufficient to support a quasi contract claim. See, e.g., *Int'l Customs Assocs., Inc. v. Ford Motor Co., 893 F. Supp. 1251, 1258 (S.D.N.Y. 1995)*, aff'd *201 F.3d 431 (2d Cir. 1999)*, cert. denied, *530 U.S. 1264, 147 L. Ed. 2d 987, 120 S. Ct. 2723 (2000)*; *Kagan, 568 N.Y.S.2d at 757.* In responding to the current motion, the plaintiff relies on theories of successorship and alter ego liability, but those [*30] theories are not pleaded in the complaint. Therefore, the Eatoni defendants' motion to dismiss the unjust enrichment and quantum meruit claims against them is granted.

### CONCLUSION

1. The defendants' motion to dismiss Count I is granted. The Eatoni defendants' motion to dismiss Counts V and VI against them is granted. Because this is the first time that these claims have been dismissed and it

cannot be said that the plaintiff can plead no set of facts to support such claims, these causes of action are dismissed without prejudice to repleading.

2. The defendants' motion to dismiss Counts II, III, and IV is denied.

3. The plaintiff shall serve and file any amended complaint in conformity with this opinion within thirty (30) days.

**SO ORDERED.**
**Dated: New York, New York**

**November 18, 2001**

**John G. Koeltl**

**United States District Judge**

# TAB 4

1 of 1 DOCUMENT

**ANNE M. MARCOUX, JILL LINDSAY, KIRSTEN EVANS, CONSTANCE LaMATTINA, ELIZABETH LEE PRICE, JUDITH ALEXANDER, DEBORAH DEAN, CHRISTINA FORD, PATTI GENTRY, LaTONYA K. GILLMORE, JANET GOLD, DALE HAGAR, JULIE HORAN, LOUIS HORTER, CAROL JOHNSON, MOLLY KAIMAN, BEVERLEY KALKHOF, NANCYANNE KELLO, PATRICIA KENNEDY, JANET KIRBY, JOHN KLINE, DOTTIE LONG, KAREN RIVOIRA, LAURENCE E. SALOMON III, DANIEL SANTIAGO, REBECCA SMITH, and DEBORAH WHITTINGTON on Behalf of themselves and all others similarly situated (i.e., the "Class"); CONSTANCE LaMATTINA also on behalf of Subclass I, KIRSTEN EVANS, JILL LINDSAY and ELIZABETH LEE PRICE also on Behalf of Subclass II; DEBORAH WHITTINGTON also on Behalf of Subclass III, and JANET KIRBY also on Behalf of Subclass IV, Plaintiffs, - against - AMERICAN AIRLINES, INC., A.M.R. CORPORATION, ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS, and JOHN WARD, as President of Association of Professional Flight Attendants, Defendants.**

**04 CV 1376 (NG)(KAM), 03 CV 4987 (NG)(KAM), 04 CV 634 (NG)(KAM)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK**

*2006 U.S. Dist. LEXIS 14130; 179 L.R.R.M. 2546*

**March 28, 2006, Decided**

**COUNSEL:** [*1] For Ann M. Marcoux, Constance LaMattina, Elizabeth Lee Price, Judith Alexander, Patty Gentry, Janet Gold, Dale Hagar, Carol Johnson, Patricia Kennedy, Dottie Long, Lisa Palermo, Karen Rivoira, Laurence E. Salomon, III, Daniel Santiago, Rebecca Smith, Deborah Whittington, on behalf of themselves and all others similatly situated (i.e. the "Class"), Elizabeth Lee Price, also on behalf of SubClass 1, Constance LaMattina, also on behalf of SubClass II, Deborah Whittington, also on behalf of SubClass III, Janet Kirby, also on behalf of SubClass IV, Plaintiffs (1:04-cv-01376-NG-KAM): Emily Maruja Bass, Law OFfices of Emily Bass, Brooklyn, NY; Martin Garbus, Mark J. Rachman, Davis & Gilbert, LLP, New York, NY; Michael S. Haber, Law Office of Michael Haber, New York, NY.

For Janet Kirby, Plaintiff (1:04-cv-01376-NG-KAM): Michael S. Haber, Law Office of Michael Haber, New York, NY; Emily Maruja Bass, Law OFfices of Emily Bass, Brooklyn, NY; Mark J. Rachman, Davis & Gilbert, LLP, New York, NY.

For John Kline, Added by way of consolidation, Nancyanne Kello, Added by way of consolidation, Beverley Kalkhof, Added by way of consolidation, Molly Kaiman, Added by way of consolidation, Louis [*2]

Horter, Added as Plaintiff by way of Consolidation, Julie Horan, Added as plaintiff by way of consolidation, La-Tonya K. Gillmore, Added as plaintiff by way of Consolidation, Deborah Dean, Added as plaintiff by way of consolidation, Kirsten Evans, Added as a plaintiff by way of consolidation, Plaintiffs (1:04-cv-01376-NG-KAM): Michael S. Haber, Law Office of Michael Haber, New York, NY; Emily Maruja Bass, Law OFfices of Emily Bass, Brooklyn, NY.

For Christina Ford, Added as plaintiff by way of consolidation, Jill Lindsay, Party Plaintiff added by way of consolidation, Plaintiffs (1:04-cv-01376-NG-KAM): Michael S. Haber, Law Office of Michael Haber, New York, NY; Emily Maruja Bass, Law OFfices of Emily Bass, Brooklyn, NY; Steven Mark Nachman, Law Offices of Steven M. Nachman, New York, NY.

For American Airlines Inc., A.M.R. Corporation, Defendants (1:04-cv-01376-NG-KAM): Melissa C. Rodriguez, Thomas Edward. Reinert, Jr., Morgan Lewis & Bockius, LLP, New York, NY; Sam Scott Shaulson, Morgan, Lewis & Bockius LLP, New York, NY U.S.A; Christine Bannon Cox, Morgan Lewis & Bockius LLP, Washington, DC.

Case 7:04-cv-08223-KMK    Document 172-3    Filed 08/11/2006    Page 14 of 24

Page 2

2006 U.S. Dist. LEXIS 14130, *; 179 L.R.R.M. 2546

For Association of Professional Flight Attendents, Defendant (1:04-cv-01376-NG-KAM):  [*3]  Michael L. Winston, Stephen B. Moldof, Travis M. Mastroddi, Cohen, Weiss and Simon, LLP, New York, NY; Michael S. Haber, Law Office of Michael Haber, New York, NY.

For John Ward, as President of Association of Professional Flight Attendants, Defendant (1:04-cv-01376-NG-KAM): Michael L. Winston, Stephen B. Moldof, Travis M. Mastroddi, Cohen, Weiss and Simon, LLP, New York, NY.

For Christina Ford, John Klein, Deborah Dean, Kirsten Evans, LaTonya K. Gillmore, Julie Horan, Louis Horter, Molly Kaiman, Beverley Kalkhof, Nancyanne Kello, on behalf of themselves and all others similarly situated, and, as to Kirsten Evans, on behalf also of Subclass I, Plaintiffs (1:03-cv-04987-NG-KAM): Michael S. Haber, Law Office of Michael Haber, New York, NY; Steven Mark Nachman, Law Offices of Steven M. Nachman, New York, NY.

For Association of Professional Flight Attendants, John Ward, as President of Association of Professional Flight Attendants, Defendants (1:03-cv-04987-NG-KAM): Michael L. Winston, Stephen B. Moldof, Travis M. Mastroddi, Cohen, Weiss and Simon, LLP, New York, NY.

For American Airlines, Inc., Defendant (1:03-cv-04987-NG-KAM): Thomas E. Reinert, Jr., Morgan, Lewis [*4] & Bockuis, LLP, Washington, DC; Thomas Edward. Reinert, Jr., Morgan, Lewis & Bockius, LLP, New York, NY.

For AMR Corp., Defendant (1:03-cv-04987-NG-KAM): Thomas Edward. Reinert, Jr., Morgan, Lewis & Bockius, LLP, New York, NY.

For Jill Lindsay, individually and on behalf of all others similarly situated, Plaintiff (1:04-cv-00634-NG-KAM): David Nathan Lake, Jeffrey G. Huron, Huron Maki & Johnson, Los Angeles, CA; Jennifer Raphael Komsky, Huron Maki & Johnson LLP, Los Angeles, CA.

For Association of Professional Flight Attendants, a business entity of unknown type, Defendant (1:04-cv-00634-NG-KAM): Glenn Rothner, Rothner Segall & Greenstone, Pasadena, CA; Michael L. Winston, Stephen B. Moldof, Travis M. Mastroddi, Cohen, Weiss and Simon, LLP, New York, NY.

For AMR Corporation, a Delaware corporation also known as American Airlines, Defendant (1:04-cv-00634-NG-KAM): Chris A. Hollinger, Jeffrey Edward Raskin, Robert A. Siegel, O'Melveny & Myers, Los Angeles,

CA; Sam Scott Shaulson, Morgan, Lewis & Bockius LLP, New York, NY U.S.A; Thomas E. Reinert, Jr., Morgan, Lewis & Bockuis, LLP, Washington, DC.

JUDGES: Nina Gershon, United States District Judge.

OPINIONBY: Nina Gershon

OPINION: [*5]

OPINION & ORDER

GERSHON, United States District Judge:

This action is one in a series of lawsuits arising out of defendant American Airlines Inc.'s ("American's") 2003 reorganization and the activities surrounding the negotiation and ratification of the subsequent concessionary agreements with American's employees' unions. Plaintiffs are "former and retired employees of American, members of the defendant union, the Association of Professional Flight Attendants ("APFA"), and current or former members of APFA's Bargaining Unit." Plaintiffs' First Amended Consolidated Class Action Complaint, P6 ("Amended Complaint"). They bring this action to set aside what they characterize as an "unlawful and unratified agreement between American Airlines and the labor union representing its flight attendants . . . ." Amended Complaint P1. Plaintiffs originally filed three related actions in this court, *Ford v. Association of Professional Flight Attendants, et al.* 03-CV-4987, *Lindsay v. Association of Professional Flight Attendants,* 04-CV-634, and *Marcoux v. American Airlines, Inc.,* 04-CV-1376. The actions were consolidated, and plaintiffs filed the Consolidated Class [*6] Action Complaint on July 12, 2004, and amended it on November 30, 2004. Plaintiffs, who have not yet moved for class certification, identify four subclasses: (1) members of APFA who were entitled to vote on the ratification question, (2) members of APFA who voted in opposition to ratification, (3) members of the class who were furloughed, and (4) members of the class who have retired since the time of the alleged wrongdoing. Unless noted otherwise, plaintiffs' claims are brought on behalf of the class and all subclasses.

In addition to claims against American, the Amended Complaint asserts claims against American's parent company, AMR Corporation ("AMR") (jointly, the "Company Defendants"), as well as claims against APFA and its then-President, John Ward (jointly, the "Union Defendants"). In twenty-two Counts, plaintiffs allege violations of the Railway Labor Act, *45 U.S.C. § § 151 et seq.* ("RLA"), and the duty of fair representation ("DFR"), as well as violations of the Labor Management Reporting and Disclosure Act, *29 U.S.C. § § 401 et seq.* ("LMRDA"), the Racketeer Influenced and Corrupt Or-

Case 7:04-cv-08223-KMK     Document 172-3     Filed 08/11/2006     Page 15 of 24

Page 3

2006 U.S. Dist. LEXIS 14130, *; 179 L.R.R.M. 2546

ganization Act, *18 U.S.C. § § 1961* [*7] *et seq.* ("RICO"), and state common law.

Company Defendants move to dismiss all of plaintiffs' state claims as preempted by federal law. Union Defendants move to dismiss some of plaintiffs' claims under the LMRDA. All defendants move to dismiss plaintiffs' claims alleging violations of RICO.

## BACKGROUND

The allegations in the Amended Complaint, described below, are taken as true for the purposes of defendants' motions to dismiss. n1

> n1 Plaintiffs have not contested the Company Defendants having attached various documents, such as the Restructuring Participation Agreement and the union's constitution, which are referred to in the Amended Complaint, to their motion. The attachment of such documents does not convert this motion to one for summary judgment. *See Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002)*. In any event, it was unnecessary to rely on anything other than the Amended Complaint itself in resolving the motions.

Prior to May 1, 2003, the terms and conditions [*8] of plaintiffs' employment were governed by a collective bargaining agreement that had been in effect since November 1, 1998 (the "1998 Agreement"). The 1998 Agreement was duly ratified by union members and was implemented in accordance with the RLA. The amendable date--the earliest time that either party could require the other to enter into negotiations to modify the agreement--for the 1998 Agreement was November 30, 2004. Notwithstanding this date, American approached APFA in or around December 2002 to begin to negotiate voluntary concessions from the flight attendants. American communicated to APFA that it had been experiencing a steady financial decline that was exacerbated by the terrorist attacks on September 11, 2001. Citing a fragile economy, problems in the airline industry, and a large drop in air travel, American asked APFA if it would voluntarily roll back flight attendant pay increases of three percent (3%) that were scheduled for 2003. Shortly thereafter, American announced that it would need "permanent" labor cost savings of $ 1.8 billion per year, of which APFA members were expected to contribute $ 340 million, through a collectively bargained mid-term agreement, called [*9] the Restructuring Participation Agreement ("RPA"). American further represented that, to avoid bankruptcy--which carried an additional loss of $ 130 million in cost savings and the furlough of 2,500 more flight attendants than originally contemplated in the initial spending cuts--APFA would need to enter into the RPA by March 31, 2003. This deadline was later extended to April 15, 2003.

APFA's constitution requires collective bargaining agreements to be ratified by the membership. The Negotiating Committee presents the proposed agreement to the Executive Committee. If the Executive Committee accepts the agreement, it is presented to the membership for ratification. However, if the Executive Committee rejects the proposed agreement, the Negotiating Committee may present it to the Board of Directors, which has the power to override the Executive Committee's rejection and submit the proposed agreement to the membership for approval. In either event, the membership is entitled to take at least 30 days prior to voting to consider the agreement. The APFA constitution also provides for secret, mail-in, paper balloting and requires that the membership receive the complete changes [*10] to any proposed collective bargaining agreement prior to or at the start of the balloting period. An agreement is ratified and thus binding upon the membership once a majority of members in good standing vote in favor of ratification.

To meet American's April 15, 2003 deadline, APFA's Board of Directors passed a resolution on March 19, 2003, suspending the 30-day consideration period prior to the commencement of balloting and permitting the use of electronic ballots. On March 31, 2003, APFA's Negotiating Committee reached agreement with American on the final terms of the RPA, and the Executive Committee recommended presenting it to the APFA membership for ratification. The balloting was scheduled to begin the first week of April, and end on April 15, 2003.

Throughout the balloting period, APFA maintained a hotline that broadcast various messages purporting to provide updated information to the membership. Plaintiffs allege that these recorded messages served only to present false and misleading information to the APFA members regarding American's economic forecast and to pressure APFA members into ratifying the RPA by stating, among other things, that if the membership rejected the [*11] proposal, negotiations would be discontinued. Plaintiffs also suggest that APFA misrepresented its position regarding the members' ability to change their votes by stating that "[APFA] determined that it would be most in keeping with APFA's normal, prescribed voting procedures to not allow a member to change their vote." In fact, as discussed below, APFA members were permitted to change their votes during the one-day extension of voting.

Plaintiffs also allege that defendants engaged in additional activities to induce APFA members to ratify the

Case 7:04-cv-08223-KMK    Document 172-3    Filed 08/11/2006    Page 16 of 24

Page 4

2006 U.S. Dist. LEXIS 14130, *; 179 L.R.R.M. 2546

RPA. Plaintiffs assert that defendants knew that the membership had voted to reject the RPA on April 14th and sought to exert "undue pressure and scare tactics" to get individuals who had not voted to cast ballots in favor of the RPA before the deadline. For example, defendants, among other things, called flight attendants and suggested that, if the RPA were rejected, American would declare bankruptcy; and they held "impromptu" meetings at airports to garner support for the RPA. Plaintiffs assert that these pressure tactics were targeted specifically to those flight attendants that American and APFA knew had not yet voted. Despite these efforts, [*12] on April 15, 2003, the APFA membership voted to reject the RPA, with the final tally being 9,842 against ratifying the RPA, and 9,309 for ratifying the RPA. Subsequently, American and APFA agreed to extend the voting until April 16, 2003.

During the additional day of voting, APFA allowed members who had previously voted to change their votes. Plaintiffs assert that the second round of voting was tainted by illegal electioneering practices which were initiated by American and willfully ignored by APFA. These practices included American and APFA, both subtly and overtly, creating a "frenzy" and "sheer panic" among APFA members by suggesting that American would declare bankruptcy if the RPA were rejected. Defendants' objectionable conduct included placing "pop-up" notices supporting ratification on the flight services' website and providing money or a "minor gratuity" to flight attendants who had voted "No" to ratification in exchange for their changing their votes to "Yes." As a result of these efforts, 1,262 votes were cast, and the membership ratified the RPA, with the final tally being 10,761 votes in favor of ratifying the RPA, and 9,652 votes opposing ratification.

On or around [*13] April 17, 2003, it was revealed that American had, despite its precarious financial position, established a Supplemental Executive Retirement Program for its top 45 executives and cash retention bonuses for its top six executives. Upon learning of the bonus programs, defendant John Ward immediately sent a letter to American demanding that the APFA membership be given a "fresh opportunity to vote on the proposed terms of the restructuring agreement in an untainted environment." Shortly thereafter, Ward sent another letter asserting that American's "material breach of its obligation to disclose all relevant information" necessitated a re-balloting. APFA's Board of Directors formalized this request by passing a resolution on April 22, 2003, directing APFA's National Ballot Committee to conduct a re-ballot.

On or around April 23, 2003, APFA and American began negotiating additional terms to the RPA. The resulting provisions shortened the life of the RPA by eight months, made the collective bargaining agreement amendable in three years, allowed pay increases in the event that American became financially viable and granted the right to substitute another concession in exchange for reinstating [*14] a previously-surrendered concession relating to the calculation of flight attendants' salaries. These additional terms, which John Ward maintained were still a "tremendous sacrifice" on APFA's behalf, were added to the RPA on April 25, 2003 by way of a letter agreement which purported to "resolve all disputes" concerning the negotiation, ratification, and effectiveness of the RPA.

The Amended Complaint contains other allegations directed expressly to the RICO claims. These will be addressed below.

## DISCUSSION

All defendants having answered, they move, pursuant to *Rule 12(c) of the Federal Rules of Civil Procedure*, for judgment on the pleadings dismissing certain claims in the Amended Complaint. A motion for judgment on the pleadings under *Rule 12(c)* is reviewed under the same standard as a *Rule 12(b)(6)* motion to dismiss. *Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir. 1999)*. That is, the motion should be granted only where it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Cooper v. Parsky, 140 F.3d 433, 440 (2d. Cir. 1998)*. [*15] Plaintiffs' factual allegations must be accepted as true, *Zinermon v. Burch, 494 U.S. 113, 118, 110 S. Ct. 975, 108 L. Ed. 2d 100 (1990)*, and the court must draw all inferences in favor of plaintiffs. *Thomas v. City of New York, 143 F.3d. 31, 37 (2d Cir. 1998)*.

### A. State Law Claims

In addition to their claims under the RLA and the DFR, plaintiffs, relying on the same factual allegations which form the bases of their RLA and DFR claims, assert nine state common law claims. American or the Company Defendants move to dismiss the eight claims directed against them. n2 Count Ten alleges that American breached individual employer contracts with its employees by interfering with their rights under RLA Section 2, Third and Fourth, to designate and be represented by bargaining representatives of their choice. See *45 U.S.C. § 152*, Third and Fourth. Counts Twelve and Sixteen allege that the Company Defendants intentionally interfered with contractual relations between APFA and its members by causing APFA to breach certain provisions of its constitution and bylaws relating to balloting and electioneering practices. Counts Seventeen and Eighteen assert breach [*16] of implied contract claims against the Company Defendants based on an implied duty not to interfere with internal union balloting. Counts

Case 7:04-cv-08223-KMK    Document 172-3    Filed 08/11/2006    Page 17 of 24

Page 5

2006 U.S. Dist. LEXIS 14130, *; 179 L.R.R.M. 2546

Nineteen and Twenty assert unjust enrichment claims against the Company Defendants for allegedly wrongful conduct in obtaining APFA members' approval of the RPA. Finally, Count Twenty alleges that the Company Defendants engaged in fraud and misrepresentation during the RPA negotiations by falsely communicating that American was on the verge of bankruptcy and by failing to disclose material facts relating to its financial state. Like plaintiffs' claims under the RLA and the DFR, all of these state law claims arise out of occurrences during the negotiation and ratification of the collectively bargained RPA. The Company Defendants argue that they are therefore preempted by federal law.

> n2 Count Eleven, brought on behalf of members of the class who were entitled to vote on ratification, alleges that APFA breached a contract (the APFA constitution) with its members by engaging in unlawful balloting and negotiating activity. APFA has not moved to dismiss this claim.

[*17]

The RLA provides a comprehensive federal regulatory scheme for the resolution of disputes in the rail and air transportation industries. Specifically, the RLA governs the process of negotiation of "agreements concerning rates of pay, rules and working conditions" between carriers and their employees. *45 U.S.C. § § 152, 156.* It protects the right of employees to designate the bargaining representative of their choosing and imposes obligations on carriers and unions with respect to the negotiation of agreements and the settlement of disputes. *See 45 U.S.C. § 152.* Under the RLA, disputes between labor and management are categorized as either "major" or "minor". *See Consolidated Rail Corp. v. Railway Labor Exec. Ass'n., et al., 491 U.S. 299, 302, 109 S. Ct. 2477, 105 L. Ed. 2d 250 (1989) ("Conrail").*

"Major" disputes seek to create contractual rights; they involve disputes arising out of the formation of collective bargaining agreements or efforts to secure such agreements. *See id.; 45 U.S.C. § § 152, Seventh and 156.* n3 This category of disputes looks to the "acquisition of rights for the future, not to assertion of rights claimed [*18] to have vested in the past." *Elgin, J. & E.R. Co. v. Burley, 325 U.S. 711, 723, 65 S. Ct. 1282, 89 L. Ed. 1886 (1945).* Major disputes arise only when there is no existing collective bargaining agreement in place or where a party seeks to change the terms of an existing agreement, in effect, formally creating a new agreement. In the event of a major dispute, the RLA requires the parties to undergo a lengthy process of bargaining and mediation. *See Conrail, 491 U.S. at 302-3.* If the bar-

gaining and mediation fails, the parties are encouraged to submit to arbitration. *Id.*

> n3 Section 2, Seventh states that no carrier "shall change the rates of pay, rules, or working conditions of its employees...except in the manner prescribed in such agreements," or through the mediation procedures established in Section 6.

The parties to "minor" disputes, on the other hand, seek to enforce contractual rights arising out of an existing collective bargaining agreement. *See Conrail, 491 U.S. at 303.* Labor disputes [*19] are deemed minor disputes if they arise or grow out of "grievances or out of the interpretation and application of agreements concerning rates of pay, rules or working conditions." *Id.; see also Hawaiian Airlines Inc. v. Norris, 512 U.S. 246, 252-53, 114 S. Ct. 2239, 129 L. Ed. 2d 203 (1994) ("Hawaiian Airlines").* Under the RLA, parties to minor disputes are required to submit to "compulsory and binding arbitration before the National Railroad Adjustment Board" or "before an adjustment board established by the employer and the unions representing the employees." *See Conrail, 491 U.S. at 303-4.* The adjustment boards have exclusive jurisdiction over minor disputes, and judicial review of any arbitral decision is limited. *See id. at 304.*

Here, plaintiffs' state law claims attack Company Defendants' conduct while negotiating and pursuing ratification of the collectively bargained RPA. While couched in state law terminology, all of these claims rely on the identical factual allegations supporting the RLA claims and therefore are "major" disputes under the RLA. Under the preemption doctrine set forth in *San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S. Ct. 773, 3 L. Ed. 2d 775 (1959),* [*20] state law claims are presumptively preempted if they concern conduct that is actually or arguably either prohibited or protected by federal labor law. *See Belknap v. Hale, 463 U.S. 491, 498, 103 S. Ct. 3172, 77 L. Ed. 2d 798 (1983).* Although *Garmon* preemption first arose in the context of the National Labor Relations Act ("NLRA"), and *Garmon* itself concerned the primary jurisdiction of the National Labor Relations Board ("NLRB"), the *Garmon* preemption doctrine has been extended to conduct governed by the RLA. *See Broth. of R.R. Trainmen v. Jacksonville Terminal Co., 394 U.S. at 369, 383-84 & n.19* (applying *Garmon* preemption principles while noting that "there is . . . no administrative agency equivalent to the NLRB with jurisdiction over railway labor disputes"). Thus, state claims that attempt to regulate conduct protected or prohibited by the RLA are preempted. In the RLA context, as in cases arising under *Section 301*

Case 7:04-cv-08223-KMK   Document 172-3   Filed 08/11/2006   Page 18 of 24

Page 6

2006 U.S. Dist. LEXIS 14130, *; 179 L.R.R.M. 2546

of the Labor Management Relations Act, 1947, ("LMRA"), as amended, *29 U.S.C. § § 141 et seq.,* preemption is driven by the need for uniform federal regulation of labor-management relations. *See Peterson v. Air Line Pilots Ass'n, 759 F.2d 1161, 1169 (4th Cir. 1985)* [*21] (finding that "the risk of state interference with the effective administration of national labor policy is present [in the RLA context] even though the exclusive jurisdiction of the arbitrator is not at issue"); *cf. Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 211, 105 S. Ct. 1904, 85 L. Ed. 2d 206 (1985)* (noting, in a *Section 301* case, that interests in interpretive uniformity and predictability require that labor-contract disputes be resolved by reference to federal law).

In this case, there is no dispute that American owed plaintiffs certain statutory duties under the RLA and that APFA had a duty of fair representation with respect to plaintiffs. n4 There is also no dispute that, under the RLA, hybrid DFR claims may be asserted against an employer and that such claims are governed by federal law. *See Czosek v. O'Mara, 397 U.S. 25, 29-30, 90 S. Ct. 770, 25 L. Ed. 2d 21 (1970).* Counts One through Nine in the Amended Complaint, which defendants do not move to dismiss, allege RLA and DFR or hybrid DFR violations based on all defendants' conduct during the negotiation for and ratification of the RPA. For example, plaintiffs challenge defendants' actions in "extending the balloting to April 16, 2003," "denying the [*22] flight attendants the opportunity to cast their ballots in a calm atmosphere," "deliberately creating a firestorm of fear and frenzy," and "failing to assure the integrity of the balloting process and the accuracy of any tallies." Plaintiffs' state law claims assert common law theories based on identical conduct.

n4 The duty of fair representation, although not an explicit statutory requirement, has been fashioned judicially as a corollary to "the exclusive agent's statutory authority to represent all members of a designated unit" and requires the union "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *See Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 74-77, 111 S. Ct. 1127, 113 L. Ed. 2d 51; Vaca v. Sipes, 386 U.S. 171, 177, 87 S. Ct. 903, 17 L. Ed. 2d 842 (1967).* Because federal labor law defines the scope of the duty of fair representation a union owes to its members, state law claims that are "mere refinements" of the duty of fair representation also are preempted. *See Peterson, 759 F.2d at 1170.*

[*23]

*Garmon* carved out two narrow exceptions to the preemption doctrine which recognize that major disputes are not preempted where state regulation of conduct "deeply rooted in local feeling and responsibility" or matters of "merely peripheral concern" to federal labor relations law are at stake. *Garmon, 359 U.S. at 243-44.* These exceptions highlight the court's responsibility "to determine the scope of the general rule by examining the state interests in regulating the conduct in question and the potential for interference with the federal regulatory scheme." *Farmer v. United Broth. of Carpenters and Joiners of America, Local 25 et al., 430 U.S. 290, 297, 97 S. Ct. 1056, 51 L. Ed. 2d 338 (1977).* Here, none of the challenged state law claims falls within either exception. Rather, each goes to the heart of the federal interest in ensuring the fair and orderly negotiation of working conditions by carriers and employees. The interests asserted by the plaintiffs are precisely those protected by federal labor law, not interests "deeply rooted in local feeling and responsibility." *See Bensel v. Allied Pilots Ass'n., 387 F.3d 298, 321-22 (3d Cir. 2004).* "Far from being of [*24] only 'peripheral concern' to federal labor law, plaintiffs' state law claims strike at the core of conduct and relationships governed" by the RLA. *Cooper v. TWA Airlines, LLC, 349 F.Supp.2d 495, 506 (E.D.N.Y. 2003).*

Plaintiffs attempt to avoid preemption as to some of their state law claims by arguing that they do not arise from the effort to achieve a collectively bargained agreement, but rather arise from the breach of separate, individual contracts. Plaintiffs claim the existence of two types of independent contractual obligations. Count Twelve--which is alleged only on behalf of members of the class who were entitled to vote on ratification--and Count Sixteen assert that the Company Defendants interfered with the plaintiffs' contractual relations with APFA as set forth in the union's constitution and bylaws. Counts Ten, Seventeen and Eighteen rely on the RLA itself. In Count Ten, plaintiffs argue that, since Section 2, Eighth of the RLA provides that the Third, Fourth, and Fifth paragraphs of Section 2, are part of the contract of employment between the carrier and each employee, "to the extent that American has violated Section 2, Third and Fourth of the RLA, [ *25] it has also violated its contracts of employment." n5 Counts Seventeen and Eighteen allege breaches of implied contracts between the Company Defendants and the flight attendants not to interfere with union balloting procedures. On oral argument, plaintiffs acknowledged that these implied contracts also arise solely from obligations imposed on the carrier under the RLA.

Case 7:04-cv-08223-KMK    Document 172-3    Filed 08/11/2006    Page 19 of 24

Page 7

2006 U.S. Dist. LEXIS 14130, *; 179 L.R.R.M. 2546

n5 Section 2, Third provides, in relevant part, that "representatives ... shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives . . . ." 45 U.S.C. § 152, Third.

Section 2, Fourth provides, in relevant part, that "employees shall have the right to organize and bargain collectively through representatives of their own choosing ... no carrier, its officers or agents, shall deny or in any way question the right of its employees to join, organize or assist in organizing the labor organization of their choice . . . ." 45 U.S.C. § 152, Fourth.

[*26]

First, as discussed earlier, plaintiffs are alleging major disputes as all of these claims deal explicitly with alleged misconduct by American or the Company Defendants during the negotiation and ratification of the RPA, and these claims are in essence no different from their RLA and hybrid DFR claims. n6 Second, plaintiffs' allegations do not amount to claims of individualized contracts protected by state law. The rights set forth in the RLA, which plaintiffs allege create implied individual contracts, are governed by federal law and are rights that employees have during the course of their effort to obtain a collectively bargained agreement. Such rights are wholly within the purview of the RLA, and thus any state law claims alleging violations of those rights are assuredly preempted.

n6 Counts Twelve and Sixteen assert in effect hybrid RLA/DFR claims against American and, just like the other state law claims against the Company Defendants, are predicated on conduct surrounding the negotiation and ratification of the RPA. The hybrid RLA/DFR claims against American are, therefore, major disputes that are preempted under Garmon. See Cooper v. TWA Airlines, LLC, 274 F.Supp.2d 231, 248-49 (E.D.N.Y. 2003); Cooper v. TWA Airlines, LLC, 2005 U.S. Dist. LEXIS 41007, 2005 WL 3863435 (E.D.N.Y. July 18, 2005).

[*27]

Plaintiffs' reliance on Hawaiian Airlines to argue that these so-called individual claims should be viewed as not subject to preemption obfuscates the difference between federal preemption over major disputes under the RLA, which is at issue here, and federal preemption

of disputes regarding the interpretation of collectively bargained agreements, which is not at issue, but was the subject of Hawaiian Airlines. The defendant in Hawaiian Airlines argued that the plaintiff's claim under a state whistleblower statute could be heard only by the RLA's arbitral boards and thus was preempted. The Supreme Court disagreed on the grounds that the only source of the claimed rights was state law and not the collectively bargained agreement and that interpretation of the collectively bargained agreement was not required. In essence, the state law claims were not minor disputes and therefore could proceed in state court. Nothing in the Supreme Court's decision suggests that major disputes regarding the negotiation and ratification of collectively bargained agreements can be heard as state law claims. n7

n7 Plaintiffs' reliance on Sullivan v. American Airlines, 424 F.3d 267 (2d Cir. 2005), is also misplaced. There, the Court of Appeals for the Second Circuit recognized that, under Hawaiian Airlines, state law claims that are disguised minor disputes are preempted by the RLA. Sullivan, 424 F.3d at 273. Sullivan held, however, that, even where state law claims qualify as minor disputes under the RLA, and even though a defendant can assert preemption in the state court as a defense, the misnamed jurisdictional doctrine of "complete preemption" does not create federal jurisdiction authorizing removal of the action from state court to federal court. Sullivan provides no support for plaintiffs' position here.

[*28]

In sum, the eight state law claims against American or the Company Defendants are dismissed as preempted by federal law.

**B. LMRDA Claims**

Counts Thirteen, Fourteen and Fifteen assert claims under Section 411 of the LMRDA, 29 U.S.C. §§ 411(a)(1), which provides that:

Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

Case 7:04-cv-08223-KMK    Document 172-3    Filed 08/11/2006    Page 20 of 24

Page 8

2006 U.S. Dist. LEXIS 14130, *; 179 L.R.R.M. 2546

Defendants seek dismissal of Counts Fourteen and Fifteen, and parts of Count Thirteen, on the ground that the court lacks jurisdiction to hear the claims.

In *Members for a Better Union v. Bevona, 152 F.3d 58 (2d. Cir. 1998)*, the Court of Appeals for the Second Circuit held that there is no jurisdiction unless the "specific allegations in the complaint reflect an infringement of rights protected under Title I of the LMRDA." In *Bevona,* union members sought [*29] to enjoin certain voting procedures mandated by the union leadership regarding a vote on proposed amendments to the union's constitution. Specifically, plaintiffs charged that the union wrongfully refused to publish the proposed amendments in the union newspaper, scheduled the vote at times that did not accommodate all employment shifts, and published the executive committee's negative recommendation in the union newspaper without giving plaintiffs the opportunity to present an opposing view. The Court found that, although the union's actions may have dissuaded some members from voting, there was no discriminatory denial because the "same detriments applied equally to the class." *Id. at 65.* Under *Bevona,* then, mere allegations of unfairness do not state a claim under *Section 411(a)(1).* Rather, to be within the court's jurisdiction under that Section, plaintiffs' claims must allege that APFA granted rights to some of its members, but denied those same rights to others, in order to carry out a discriminatory goal.

Plaintiffs have satisfied the jurisdictional threshold with respect to the claim alleged in Count Thirteen. n8 Defendants do not dispute that the language [*30] of paragraph 312 of Count Thirteen, which alleges that "the Union violated *29 U.S.C. § 411* by permitting members to change their votes from 'No' to 'Yes,' but not vice versa," meets the *Bevona* test. Defendants recognize that this allegation meets the jurisdictional prerequisite because it pleads that the union favored certain of its members (those voting in opposition to ratification), by granting them the right to change their vote to "yes," but denied that same right to those who had voted in favor of ratification and wanted to change their votes to "no." In essence, this alleged denial of voting rights sought to ensure ratification of the RPA, by discriminating against those employees in opposition to ratification.

n8 Count Thirteen is alleged only on behalf of members of the class who cast ballots in opposition to ratification.

Defendants nonetheless ask the court to treat the allegations of Count Thirteen as three separate claims in

order to obtain dismissal of the other two "claims, [*31] " namely, paragraph 310, which alleges that APFA "violated *29 U.S.C. § 411* by reopening a vote that was already officially closed so that there could be no extended voting," and paragraph 311 which alleges that APFA permitted members to change their votes during the extension period. Defendants' application to dismiss individual sentences within Count Thirteen is denied. A claim is not to be dissected sentence by sentence. It is enough, at this stage of the litigation, that Count Thirteen, as noted above, states a claim under the LMRDA.

Count Fourteen alleges, on behalf of members of the class who voted in opposition to ratification, that the Union Defendants improperly used the National Balloting Committee's resources to distribute only information in support of ratification, and thereby denied those opposed to ratification the same privileges enjoyed by the "yes" voters. The Second Circuit rejected a similar argument in *Bevona*--where the union had refused to publish opposing views in the union newspaper--on the ground that, even though the information provided to the membership was one-sided, all of the membership received it. Therefore, the court held, [*32] no individual was granted rights or information that was discriminatorily denied to others. *See Bevona, 152 F.3d at 58.*

Finally, Count Fifteen alleges, on behalf of all members entitled to vote on the ratification question, that APFA wrongfully dispensed with the membership's vote by "substituting" for it the Board of Directors' vote, thereby effectively denying to the union members their rights and privileges as voting members of the union. Plaintiffs urge the court to consider this claim in light of *Smith v. Bowers, 337 F.Supp.2d 576 (S.D.N.Y. 2004).* There, the ballots of three local unions were disqualified after the locals allowed their members to vote after the time that was designated by union leadership to end balloting. Although the votes of these locals were originally counted in the national totals, the national leadership disqualified the votes. The Court held that, under *Bevona,* the jurisdictional threshold was met because plaintiffs undisputedly alleged disparate treatment by the national union leadership, in that the votes of certain of the unions' members (those who voted before the end of balloting) were counted, while others (those [*33] of the three locals) were not. *Id. at 588.* In contrast, here, no such disparate treatment within the voting class is alleged. Rather, since the alleged denial of voting rights extended across the entire membership, regardless of whether members voted for or against ratification of the RPA, no members were granted any greater or lesser privileges than others. *See Local Union 20, et al. v. United Broth. of Carpenters and Joiners of America, et al., 223 F.Supp.2d 491, 498 (S.D.N.Y. 2002).*

Case 7:04-cv-08223-KMK    Document 172-3    Filed 08/11/2006    Page 21 of 24

Page 9

2006 U.S. Dist. LEXIS 14130, *; 179 L.R.R.M. 2546

In sum, the court has jurisdiction over Count Thirteen, but not over Counts Fourteen and Fifteen, and Counts Fourteen and Fifteen are dismissed.

## C. RICO Claims

In Count Twenty-two, plaintiffs assert as to all defendants both a substantive violation of *18 U.S.C. § 1962(c)* and a conspiracy, under *18 U.S.C. § 1962(d)*, to violate *Section 1962(c)*. *18 U.S.C. § 1962(c)* makes it unlawful, in relevant part,

> for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly [*34] or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *See 18 U.S.C. § 1961(4)*. Plaintiffs must allege a pattern of "racketeering activity" consisting of "at least two predicate acts . . . which amount to or pose a threat of continued criminal activity." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 178 (2d. Cir. 2004)*. "Racketeering activity" is defined to include "any act which is indictable under" *18 U.S.C. § 1343* (wire fraud), *18 U.S.C. § 1341* (mail fraud), *18 U.S.C. § 1951* (the Hobbs Act), *18 U.S.C. § 1952* (the Travel Act), and *29 U.S.C. § 186* (restrictions on payments and loans to labor organizations). *See 18 U.S.C. 1961(1)(B)*. Under the mail and wire fraud statutes, "any scheme or artifice to defraud or for obtaining money [*35] or property by means of false or fraudulent pretenses, representations, or promises," which involves use of the mails or wire is indictable. *See 18 U.S.C. §§ 1341, 1343*. Plaintiffs here rely upon allegations of thousands of acts said to violate the aforementioned statutes. Defendants principally argue that, despite the number of alleged predicate acts, plaintiffs fail to plead the required pattern of racketeering.

In the Amended Complaint, plaintiffs greatly expand their original RICO claims. They allege that, beginning as early as December of 2002 and continuing through at least September of 2004, American and APFA formed an association-in-fact for the dual purposes of (1) devising and carrying out a scheme to fraudulently induce American's flight attendants to enter into the RPA and (2) devising and implementing the strategy allowing the APFA Board of Directors to substitute its own approval of the

RPA for the decision of the APFA membership. Plaintiffs categorize defendants' alleged wrongful activity in furtherance of these plans into four "implementing schemes." As with the facts discussed above, any additional allegations described below are taken as [*36] true for purposes of the pending motions.

First Implementing Scheme

In mid-February 2003, American sought to scare APFA members into voluntarily relinquishing current wages and benefits packages by falsely asserting that American was suffering from a financial crisis arising, in part, from labor costs. Specifically, plaintiffs allege, APFA endorsed American's false statements, even though they had access to American's books and records, which should have indicated that American's economic outlook was more positive than previously communicated. Plaintiffs also allege that APFA reiterated American's false representations to the membership, with knowledge that the representations were false. Each telephonic message, union publication, and/or American publication that contained the allegedly false representations, and was communicated via mail or wire to the APFA members, is alleged as a separate predicate act under RICO.

Second Implementing Scheme

From April 15 to April 16, 2003, American and APFA allegedly used "coercion, vote rigging and, ultimately diktat or decree" to aggressively pursue votes in favor of ratification during the one-day extension of voting on the [*37] RPA ratification question. Specifically, plaintiffs assert that American and APFA formed "get-out-the-vote" squads to aggressively pressure members either to vote in favor of ratification or, if they had already voted "no," to change their votes to "yes." Plaintiffs also allege that American and APFA had insider knowledge as to whether and how members had voted on the ratification question. Plaintiffs contend that this alleged coercion and extortion violated the Hobbs and Travel Acts and, therefore, are predicate acts under RICO. Plaintiffs also allege that American, in effect, paid certain flight attendants a "gratuity" to vote, or arranged or paid for them to call in their vote to the American Arbitration Association, in violation of *29 U.S.C. § 186*, with each payment constituting a predicate act under RICO.

Defendants are also charged with meeting, via telephone conference, between April 22 and April 23 of 2003, to devise and implement the strategy of causing APFA's Board of Directors to usurp the flight attendants' power to hold another vote on the ratification question. Plaintiffs claim that, when John Ward executed the letter agreement between American [*38] and APFA, the de-

Case 7:04-cv-08223-KMK    Document 172-3    Filed 08/11/2006    Page 22 of 24

Page 10

2006 U.S. Dist. LEXIS 14130, *; 179 L.R.R.M. 2546

fendants effectively eliminated the members' opportunity to hold another vote regarding the proposed RPA. Plaintiffs allege that defendants violated the mail and wire fraud statutes by posting the Board of Director's resolution (which was in furtherance of the substitution scheme) on APFA's website and subsequently mailing it to the APFA membership.

Third Implementing Scheme

Defendants allegedly sought to continue the life of the RPA by ensuring that individuals associated with the "Ward Regime" remained in office. To this end, APFA and John Ward worked together to engage in deception and vote manipulation to re-elect Ward as President in the APFA election scheduled to occur on January 29, 2004. After a runoff between the final two candidates, John Ward and Tommie Hutto-Blake, APFA announced that Ward had won the election by five votes. However, in approximately mid-August of 2004, after investigating and reinstating certain disqualified votes, the Department of Labor determined that Tommie Hutto-Blake had actually won the January 29, 2004 election. APFA subsequently installed her as President. Plaintiffs allege that APFA "manufactured a majority" and, with [*39] knowledge of the falsity of the results, wrongfully announced that John Ward had won on January 29, 2004. Plaintiffs contend that each time the erroneous results were published, or either telephonically or electronically disseminated, defendants violated the mail and wire fraud statutes.

Fourth Implementing Scheme

In May of 2004, allegedly in furtherance of its plans to "sanction practices in which it was already engaged without constitutional authority" and to "further the goals of the criminal enterprise," the Union Defendants proposed several amendments to the APFA constitution to its membership. The amendments sought to: (1) allow union leadership to appoint members of the Negotiating Committee; (2) grant the Board of Directors wider discretion in deciding voting procedures; (3) codify the "voter eligibility" rule that had been used in determining eligibility in the January 29, 2004 National Officer election; (4) alter the number and composition of the Balloting Committee, and (5) limit the membership's ability to initiate the process of proposing amendments to the APFA constitution. On August 11, 2004, APFA's membership voted the amendments down. Plaintiffs claim that, [*40] although the proposed amendments were not in and of themselves criminal, they were related to pursuing the goals of the criminal enterprise. Therefore, each mailing in furtherance of the proposed amendments constituted an act of mail fraud under *18 U.S.C. § 1341*.

Pattern of Racketeering Activity

Plaintiffs have failed to plead facts establishing a RICO pattern. Although a pattern requires only a minimum of two predicate acts, plaintiffs must also show that the predicates are (1) related and that (2) they amount to or pose a threat of continuing criminal activity. *See Schlaifer Nance & Co. v. Estate of Andy Warhol, 119 F.3d 91, 97 (2d Cir. 1997)*; *United States v. Indelicato, 865 F.2d 1370, 1381 (2d Cir. 1989)*, cert. denied, *493 U.S. 811, 110 S. Ct. 56, 107 L. Ed. 2d 24 (1989)*. Predicate acts are related if they "have the same or similar purposes, results, participants, victims or methods of commission, or are otherwise interrelated by distinguishing characteristics, and are not isolated events." *H.J., Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 240, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989)*. Continuity is established by facts demonstrating either [*41] an "open-ended pattern of racketeering activity (i.e., past criminal conduct coupled with a threat of future conduct) or a closed-ended pattern of racketeering activity (i.e., past criminal conduct extending over a substantial period of time)." *See GICC Capital Corp. v. Tech.Fin. Group, Inc., 67 F.3d 463, 466 (2d Cir. 1995)*.

1. Relatedness

To begin with, plaintiffs' First, Second and Third Implementing Schemes relate to the single overarching goal of inducing the flight attendants to enter into the RPA, and ensuring the continuation of the RPA. Plaintiffs' characterization of the facts as setting forth three separate schemes is artificial. *See Schlaifer Nance & Co., 119 F. 3d at 98* ("Courts must take care to ensure that plaintiff is not artificially fragmenting a singular act into multiple acts simply to invoke RICO.").

The Fourth scheme, which pertains to the internal governance of the Union, alleges no conduct by the Company Defendants, is unrelated to the goal of defrauding the flight attendants into ratifying the RPA and cannot be fairly viewed as a means of continuing the criminal enterprise. It therefore is not properly included in the [*42] RICO pattern. *See Schlaifer Nance & Co., 119 F.3d at 97* (schemes unrelated to pattern of racketeering activity where goals are unrelated to the underlying enterprise). Therefore, the Fourth scheme--and its alleged underlying predicate acts-- are not properly considered in analyzing whether the continuity requirement has been met.

2. Continuity

Treating the First through Third implementing schemes as related, plaintiffs do not meet RICO's continuity requirements. "Closed-ended" continuity is demonstrated by a "series of related predicates extending over a substantial period of time" *Cofacredit S.A. v. Windsor*

Case 7:04-cv-08223-KMK    Document 172-3    Filed 08/11/2006    Page 23 of 24

Page 11

2006 U.S. Dist. LEXIS 14130, *; 179 L.R.R.M. 2546

*Plumbing Supply Co., Inc.,* 187 F.3d 229, 242 (2d Cir. 1999). The Second Circuit has indicated that a minimum of two years is required to show "a substantial period of time." *Id.* ("Since the Supreme Court decided *H.J., Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989), this Court has never held a period of less than two years to constitute 'a substantial period of time'"). Thus, in this Circuit, closed-ended continuity is primarily a temporal concept, even though courts may weigh such other factors as "the number [*43] and variety of acts, the number of participants, the number of victims and the presence of separate schemes." *See GICC Capital Corp.,* 67 F.3d at 467.

The First through Third schemes extended from mid-February of 2003 through January 29, 2004, indicating that the criminal enterprise continued for approximately eleven and a half months. (Even if the scheme could be treated as beginning in December of 2002 and continuing until action by the Department of Labor, it lasted only until mid-August of 2004, or a period of twenty months.) n9 Indeed, as to the Company Defendants, who are not alleged to have participated in the Third or Fourth schemes, the enterprise lasted only from mid-February of 2003 through April 25, 2003. This falls far short of the Second Circuit's two-year minimum requirement. Plaintiffs do not dispute that their allegations do not meet the two-year requirement, but argue that the existence of multiple schemes and thousands of predicate acts of mail and wire fraud overcome this deficit. However, as noted above, plaintiffs are artificially fragmenting what is essentially one alleged criminal purpose--inducing the flight attendants to ratify the RPA--into [*44] multiple schemes. Thus, without more, merely alleging a large number of mailings and calls is insufficient to meet plaintiffs' burden. Plaintiffs' speculative assertion that discovery may establish that defendants' first predicate act occurred at least three months earlier than alleged does not overcome the deficiency of the Amended Complaint.

> n9 Even if the Fourth Implementing Scheme were included, plaintiffs allege an enterprise lasting either eighteen months (from mid-February 2003 through August 11, 2004), or at most, twenty months (from-mid December 2002 through August 11, 2004). In either event, plaintiffs do not reach the two-year minimum.

Plaintiffs alternatively argue that they have sufficiently pled an open-ended pattern of racketeering activity. Even if the court were to consider all four schemes to be related, plaintiffs offer no facts indicating that a threat of continuing criminal activity exists beyond the period during which the predicate acts were performed. *See De Falco v. Bernas,* 244 F.3d 286, 323 (2d Cir. 2001). [*45]

Open-ended continuity requires an assessment of "the nature of the RICO enterprise, and of the predicate acts." *Cofacredit S.A.,* 187 F.3d at 242. Where, as here, defendants are operating legitimate businesses, plaintiffs are required to plead facts indicating that there existed the threat of continued criminal activity in furtherance of defendants' plans. *See GICC Capital Corp.,* 67 F.3d 463 at 466. For example, in *Cosmos Forms v. Guardian Life Ins. Co. of Am.,* 113 F.3d 308 (2d Cir. 1997), defendants, who were salespersons in two separate companies, engaged in a scheme of inflating prices on paper orders for personal profit. The Court of Appeals found that plaintiffs met the open-ended continuity requirement because defendants had committed the unlawful acts regularly for fifteen months and only stopped because they had been caught by their respective companies. In contrast, plaintiffs here have not demonstrated such an ongoing threat of criminal activity. The alleged criminal goal, the fraudulent ratification of the RPA, was accomplished on April 25, 2003, Ward's challenger assumed office as President of APFA in mid-August of 2004, and the proposed [*46] constitutional amendments were voted down by the APFA membership on August 11, 2004. *Id.* (finding that even if alleged acts were presumed to be true, it was clear that the scheme was "inherently terminable" and thus could not have continued). n10

> n10 Defendants assert various other arguments in support of dismissing the RICO claims. Because plaintiffs have failed to plead a pattern of racketeering activity, it is unnecessary to separately consider any of these arguments.

### RICO Conspiracy

Finally, plaintiffs claim that all defendants conspired to violate the substantive provisions of *18 U.S.C. 1962(c).* Since plaintiffs' substantive RICO claim fails for lack of sufficient pattern allegations, the RICO conspiracy claim cannot survive. *See Cofacredit, S.A.,* 187 F.3d 229, 245 (2d Cir. 1999).

### CONCLUSION

For the reasons discussed above, the Company Defendants' motion to dismiss Counts Ten, Twelve, Sixteen, Seventeen, Eighteen, Nineteen, Twenty, Twenty one and [*47] Twenty-two is granted. The Union Defendants' motion to dismiss is granted as to Counts Fourteen, Fifteen and Twenty-two, and denied as to Count Thirteen.

### SO ORDERED.

2006 U.S. Dist. LEXIS 14130, *; 179 L.R.R.M. 2546

**Nina Gershon**                               **Brooklyn, New York**

**United States District Judge**

**Dated: March 28, 2006**