**TAB F**

**Westlaw.**

Not Reported in F.Supp.2d                                                                                                           Page 1
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
**(Cite as: Not Reported in F.Supp.2d)**

C

Briefs and Other Related Documents

United States District Court,S.D. New York.
LINENS OF EUROPE, INC., Plaintiff,
v.
BEST MANUFACTURING, INC., Best Metropolitan Towel and Linen Supply, Inc., Best Textiles LLC, B & M Linen Corp. d/b/a Miron & Sons Laundry, Cascade Linen Supply, Co., Inc., Central Laundry Service Corp. d/b/a Sea Crest Linen, Inc., Stanley Olan, White Plains Coat and Apron, Co., Inc. and Bruce Botchman, Defendants.
No. 03 Civ. 9612(GEL).

Sept. 16, 2004.

Kenneth I. Wirfel, New York, NY, for Plaintiff.
Gerard E. Harper, Paul, Weiss, Rifkind, Wharton & Garrison LLP (Randi D. Adelstein, on the brief), New York, NY, for defendant Best Manufacturing, Inc.
Mark D. Herman, Herman & Beinin, New York, NY, for defendant Best Metropolitan Towel and Linen Supply, Inc.
John Linville, Manatt, Phelps & Phillips, LLP, New York, NY, for defendant Best Textiles LLC.
Joshua Zuckerberg, Pryor Cashman Sherman & Flynn LLP (Ronald H. Schectman, on the brief), New York, NY, for defendant B & M Linen Corp. d/b/a Miron & Sons Linen Service.
L. Donald Prutzman, Tannenbaum Helpern Syracuse & Hirschtritt LLP, New York, NY, for defendants Central Laundry Service Corp. d/b/a Sea Crest Linen Supply and Stanley Olan.
Barry J. Friedberg, Trachtenberg Rodes & Friedberg LLP, New York, NY, for defendant Cascade Linen Supply Co.
Nick S. Williams, Mayer, Brown, Rowe & Maw LLP (Lee H. Rubin, William L. Olsen, on the brief), New York, NY, for defendants White Plains Coat & Apron Co., Inc. and Bruce Botchman.

OPINION AND ORDER

LYNCH, J.

*1 Linens of Europe, Inc. ("LOE") brought this action on December 3, 2003. The complaint alleged that defendants had monopolized the business of supplying and laundering fine linens for upscale restaurants in the Manhattan area in violation of section 2 of the Sherman Act, 15 U.S.C. § 2, and engaged in a pattern of bribery, extortion, assault, intimidation, and other harassment in an effort to exclude LOE from that market in violation of the Racketeer Influenced and Corrupt Organizations Act, Pub.L. No. 91-452, 84 Stat. 941 ("RICO"). Also on December 3, defendants White Plains Coat and Apron Co., Inc. ("White Plains") and Bruce Botchman, its principal, pled guilty to a violation of section 1 of the Sherman Act, 15 U.S.C. § 1. *United States v. Botchman,* No. 03 Cr. 1427 (S.D.N.Y. Dec. 3, 2004). Defendants subsequently moved to dismiss, arguing, inter alia, that section 2 of the Sherman Act does not forbid "shared monopolies." [FN1]

FN1. District courts in this and other districts have uniformly held or approved the view that allegations of a "shared monopoly" do not state a claim under section 2 of the Sherman Act, *Crimpers Promotions, Inc. v. Home Box Office, Inc.,* 554 F.Supp. 838, 841 n .2 (S.D.N.Y.1982); *Consol. Terminal Sys., Inc. v. ITT World Communications, Inc.,* 535 F.Supp. 225, 228-29 (S.D.N.Y.1982); accord *Flash Elecs., Inc. v. Universal Music & Video Distrib. Corp.,* 312 F.Supp.2d 379, 396-97 (E.D.N.Y.2004); *Santana Prods., Inc. v. Sylvester & Assocs. Ltd.,* 121 F.Supp.2d 729, 737-38 (E.D.N.Y.1999); *Phoenix Elec. Co. v. Nat'l Elec. Contractors Ass'n, Inc.,* 867 F.Supp. 925, 941 (D. Or 1994); *Sun Dun. Inc. v. Coca-Cola Co.,* 740 F.Supp. 381, 390-91 (D.Md.1990), but the Second Circuit has not addressed the issue. In *Harkins Amusement Enters., Inc. v. General Cinema Corp.,* 850 F.2d 477 (9th Cir.1988), the only court of appeals decision on point, the Ninth Circuit declined to decide "whether the shared monopoly theory may be viable under some circumstances." Id. at 490. The Supreme Court's decision in *American Tobacco Co. v. United States,* 328 U.S. 781 (1946), affirming the conviction of three major tobacco companies for a section 2 conspiracy, has given some courts pause about reaching a categorical conclusion. E.g., *H.L. Hayden Co. v. Siemens Med. Sys.,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 2
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
**(Cite as: Not Reported in F.Supp.2d)**

> Inc., 672 F.Supp. 724, 741-42 (S.D.N.Y.1987). Since LOE has abandoned its § 2 claim, this Court need not consider the issue.

On March 18, 2004, rather than respond to the motions to dismiss, LOE filed an amended complaint, which substituted a claim under section 1 of the Sherman Act, which prohibits combinations in restraint of trade, for the former complaint's section 2 claim, and augmented the allegations with facts admitted by Botchman and White Plains at their guilty plea allocution. LOE submits that these and other amendments to the complaint render the pending motions to dismiss moot. Defendants vigorously deny this contention and argue that the amended complaint, too, fails to state a claim under either the Sherman Act or RICO. For the reasons that follow, defendants' motions are granted in part and denied in part.

BACKGROUND

The facts set forth below, drawn from the amended complaint, must be taken as true for purposes of defendants' motions to dismiss for failure to state a claim.[FN2] Bolt Elec., Inc. v. City of New York, 53 F.3d 465, 469 (2d Cir.1995). LOE, a Texas corporation authorized to do business in New York, supplies and launders fine linens, such as tablecloths, napkins, and serviettes, for upscale restaurants. (Compl.¶ ¶ 4, 27-28.) The corporate defendants, with the exception of Best Textiles LLC and Best Manufacturing, Inc., also supply or launder fine linens. (Id. ¶ ¶ 5-12, 14.) The individual defendants, Stanley Olan and Bruce Botchman, served, at all times relevant to this action, as the owners and presidents of, respectively, Central Laundry Service Corp. d/b/a Sea Crest Linen ("Sea Crest") and White Plains. (Id. ¶ ¶ 13, 15.)

> FN2. All citations to the complaint refer to LOE's amended complaint dated March 18, 2004.

LOE alleges that defendants combined to constitute a racketeering enterprise to allocate customers among themselves and, by acts of violence, bribery, extortion, assault, intimidation, defamation, and extortion, to exclude non-members, including LOE, from the market in which they operate. (Id. ¶ 17.) LOE denominates defendants' enterprise the "New York Linen Cartel." [FN3] (Id.) Relying on Botchman's plea allocution, LOE alleges that defendants and others formed the New York Linen Cartel in the mid-1990s (id. ¶ 159), though the complaint alleges elsewhere that the combination in restraint of trade began in about 1999. (Id. ¶ 129.)

> FN3. The Court will adopt this label for the sake of convenience and consistency with the language of the complaint, which must be taken as true for purposes of this motion. Its use in this opinion should not, however, be understood to express or imply any substantive legal conclusion about the nature of the defendants or their activities.

*2 According to the complaint, "[t]he relevant market affected by Defendants' illegal actions is the market for high end and up-scale restaurants and eateries in the Southern District of New York, with a significant concentration in Manhattan (the 'Relevant Market')." (Id. ¶ 30.) This market exists because such restaurants use certain expensive, high-quality linens "produced by a limited number of exclusive European companies" (id. ¶ 28), and only a few companies provide laundering services for these linens. (Id. ¶ 30.) LOE alleges that defendant members of the New York Linen Cartel subject these delicate fine linens "to the same harsh laundering methods used for the synthetic linens," causing them to deteriorate rapidly, yet because of the Cartel's control of the market, the restaurants effectively have no choice but "to either lease linens at inflated prices from the New York Linen Cartel or ... to purchase new linens from them on a continuing basis." (Id. ¶ ¶ 34-35.)

LOE allegedly developed a new method to launder fine linens that avoids damaging them and increases their lifespan significantly. (Id. ¶ ¶ 49-52.) In 1999, after successfully marketing its novel laundering method in the Houston market, LOE sought to enter the New York area market, a strategy essential to LOE's long-term national and international business prospects. (Id. ¶ ¶ 53-55 .) Within several months, LOE secured a number of well-known Manhattan restaurants as clients. (Id. ¶ ¶ 56-57.) Observing LOE's attempt to penetrate the Relevant Market, the New York Linen Cartel quickly moved to either drive LOE out of business or force its sale to a member of the Cartel. (Id. ¶ 58.)

LOE alleges that the Cartel fixes prices and allocates customers among its members. (Id. ¶ 38.) At

Not Reported in F.Supp.2d                                                                                                          Page 3
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
**(Cite as: Not Reported in F.Supp.2d)**

periodic meetings, its members, including defendants, share customer information and agree on which of them will receive the exclusive right to the business of each customer. (*Id.* ¶ 39.) Apart from these secretive agreements, the Cartel allegedly also uses bribery, intimidation, violence, extortion, and other illegal means to exclude potential competitors, and it has secured the loyalty and aid of the Union of Needletrades, Industrial and Textile Employees ("UNITE!"), a laundry and dry-cleaning workers' union, to carry out some of these acts. (*Id.* ¶¶ 40-48.) [FN4]

> FN4. Despite this allegation, LOE has not named UNITE! as a defendant.

LOE's problems with the Cartel began shortly after it entered the New York area market. LOE secured a contract to serve the "21" Club, a well-known restaurant, supplanting defendant Cascade Linen Supply Co. ("Cascade") as its launderer. (*Id.* ¶¶ 60-61.) At the instance of the Cartel, however, defendant Best Manufacturing, Inc., the supplier of the "21" Club's signature linens, refused to do business with LOE, advising LOE that it would only deal with Cascade. (*Id.* ¶¶ 61-62.) LOE was thus unable to offer services to the restaurant for eight months and lost the corresponding anticipated revenue. (*Id.* ¶ 63.)

*3 Meanwhile, also at the behest of the Cartel, defendants B & M Linen Corp. d/b/a Miron & Sons Laundry ("Miron") and Sea Crest took other actions to sabotage LOE's operations. At the time, LOE did not have its own laundering facility; it outsourced the work to local companies, including Miron, which, in turn, introduced LOE to Sea Crest. (*Id.* ¶¶ 64-65.) Unbeknownst to LOE at the time, the complaint alleges, Miron and Sea Crest were fixtures of the New York Linen Cartel. (*Id.* ¶¶ 66-67.) Miron destroyed or caused the disappearance of LOE's linens and then lied to LOE about their fate, thus interfering with LOE's inventory and causing it to lose a number of lucrative clients, which defendants subsequently secured. (*Id.* ¶¶ 68-75.) Sea Crest similarly undermined LOE's relationship with another prestigious restaurant by making false statements about LOE and engaging in predatory pricing. (*Id.* ¶¶ 76.) Best Metropolitan Towel and Linen Supply, Inc., another defendant, bribed a client not to contract with LOE. (*Id.* ¶¶ 77.)

Despite the Cartel's continuing interference with LOE's business, LOE persevered, built its own laundering facility, and gradually established a new client base. (*Id.* ¶¶ 78-93.) Because of LOE's success, and the imminent conclusion of several lucrative contracts between LOE and certain prestigious restaurants, the Cartel redoubled its efforts to put LOE out of business. The Cartel allegedly used UNITE! to disrupt LOE's client relationships in the guise of labor protests and picketing. UNITE! spread false information about and directed baseless accusations at LOE-for example, that LOE uses "sweatshop labor"-and harassed clients at restaurants serviced by LOE. (*Id.* ¶¶ 96-100.) LOE lost a number of customers to the Cartel as a consequence. (*Id.* ¶¶ 109-10.) The Cartel also coerced Frette, previously LOE's principal supplier of fine linens, not to deal further with LOE and to sell exclusively to White Plains. (*Id.* ¶¶ 111-12.)

At the same time, an LOE officer began to receive threats of various degrees from a few persons, including defendants Olan and Botchman, telling LOE to sell its business to White Plains. (*Id.* ¶¶ 101-04.) Then, on April 12, 2002, a group of thugs brutally attacked this officer at the location of one of LOE's clients (*id.* ¶ 105); one of them instructed him to "tell [his] boss to sell to White Plains Linen." (*Id.* ¶ 106.) He continued to receive similar threats after his release from the hospital. (*Id.* ¶ 107). Another LOE officer quit her job and left the New York area after having received email threats. (*Id.* ¶ 123.) Moreover, Olan and Botchman implicitly threatened LOE at several meetings, telling LOE that "to survive in New York, it needed to 'cooperate' with the members of the New York Linen Cartel." (*Id.* ¶ 116; *see also id.* ¶¶ 121-22.)

In September 2002, the New York Linen Cartel became aware of a pending federal investigation into its activities and consequently ceased to engage in overt activities against LOE. (*Id.* ¶ 124.) On December 3, 2003, White Plains and Botchman pled guilty to violations of section 1 of the Sherman Act. At his allocution, Botchman admitted that as president of White Plains, he held meetings with other linen suppliers and launderers, and they agreed not to compete with one another and to allocate existing customers among themselves. (*Id.* ¶¶ 23, 126-27.)

DISCUSSION

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                     Page 4
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
**(Cite as: Not Reported in F.Supp.2d)**

I. *Standard on a Motion to Dismiss*

*4 On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the Court must accept as true all well-pleaded factual allegations in the complaint, viewing them in the light most favorable to the plaintiff and drawing all reasonable inferences in its favor, Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir.1996); and applying this standard, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

II. *Preliminary Objections*

Several defendants raise procedural and other objections that do not bear on the merits or sufficiency of LOE's allegations. The Court will address these objections first.

A. *Miron: Colorado River Abstention*

Miron argues that LOE's claims against it should be dismissed pursuant to the abstention doctrine applied by the Supreme Court in Colorado River Water Conservation Dist. v. United States, 424 U.S. 800 (1976). Under this doctrine, to conserve judicial resources, federal courts may abstain in "exceptional circumstances" where "resolution of existing concurrent state-court litigation could result in comprehensive disposition of litigation." Woodford v. Comty. Action Agency, 239 F.3d 517, 522 (2d Cir.2001) (internal quotation marks omitted).

Miron contends that LOE's claims against it simply duplicate claims in a state action that arose out of Miron's alleged destruction of LOE's linens and tortious interference with LOE's business relationship with a hotel client. Linens of Europe, Inc. v. Miron & Sons Linen Service, Inc., No. 20813-02 (N.Y. Sup.Ct., June 11, 2002) (Markus Aff., Ex. C.). LOE initially filed this action in Texas on April 19, 2001 (id., Ex. A), but the Texas state court dismissed for want of personal jurisdiction. LOE then refiled the action in New York Supreme Court, Bronx County. Miron argues that, as against it, LOE's federal action is no more than a vexatious effort to recast the state tort and contract claims as federal antitrust and RICO violations, and accordingly, that the Court should abstain from deciding issues at stake in a parallel state-court action.

Unlike the other abstention doctrines, *Colorado River* does not rest "on considerations of state-federal comity or on avoidance of constitutional decisions." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 14-15 (1983). It applies only in a very narrow category of cases involving concurrent jurisdiction, where "considerations of '[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation,'" Colorado River, 424 U.S. at 817, clearly justify dismissal in deference to a state proceeding. Id. at 817-18; see also Moses Cone, 460 U.S. at 16 ("*Only the clearest of justifications will warrant dismissal.*") (quoting Colorado River, 424 U.S. at 819; emphasis in original).

*5 Bearing in mind the repeatedly emphasized "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them," Colorado River, 424 U.S. at 817; Village of Westfield v. Welch's, 170 F.3d 116, 120 (2d Cir.1999), the Second Circuit has enumerated six factors to be weighed to decide whether a district court should exercise its discretion to abstain under *Colorado River:*
(1) the assumption of jurisdiction by either court over any res or property;
(2) the inconvenience of the federal forum;
(3) the avoidance of piecemeal litigation;
(4) the order in which jurisdiction was obtained;
(5) whether state or federal law supplies the rule of decision; and
(6) whether the state court proceeding will adequately protect the rights of the party seeking to invoke federal jurisdiction.

Id. at 121; see also Woodford, 239 F.3d at 522; Burnett v. Physician's Online, Inc., 99 F.3d 72, 76 (2d Cir.1996).[FN5] "No one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counseling against that exercise is required." Moses Cone, 460 U.S. at 15-16. But "the balance [is] heavily weighted in favor of the exercise of jurisdiction," id. at 16, and therefore, "the facial neutrality of a factor is a basis for retaining jurisdiction, not for yielding it." Woodford, 239 F.3d at 522.

FN5. Miron contends that a seventh factor must be considered: "whether the federal

Case 7:04-cv-08223-KMK     Document 176-6     Filed 08/11/2006     Page 6 of 19

Not Reported in F.Supp.2d                                                                                      Page 5
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
(Cite as: Not Reported in F.Supp.2d)

action is vexatious or reactive." (Miron Br. 5.) The Second Circuit has never formally cited this factor in its enumeration of the relevant considerations under *Colorado River,* but it has observed that in a footnote in *Moses Cone,* "the Supreme Court stated that it found 'considerable merit' in the idea 'that the vexatious or reactive nature of either the federal or the state litigation may influence the decision whether to defer to a parallel state litigation under *Colorado River.*'" *Telesco v. Telesco Fuel and Mason's Materials, Inc.,* 765 F.2d 356, 363 (2d Cir.1985), quoting *Moses Cone,* 460 U.S. at 17 n. 20. Assuming without deciding that under some circumstances "the vexatious or reactive nature" of an action could offer a sound reason for a federal court to abstain pursuant to *Colorado River,* that factor does not, contrary to Miron's contention, weigh in favor of abstention here. (Miron Br. 8-11.) While Miron complains that this is LOE's third suit against it based on the same factual allegations (Miron Reply Br. 2), that characterization is misleading. As noted, LOE simply refiled its state action in New York after the Texas state court dismissed for want of personal jurisdiction; and the federal action, far from being redundant of LOE's state-law tort and contract claims, raises RICO and Sherman Act claims, the latter of which lie within the federal courts' exclusive jurisdiction. As for LOE's alleged "recycling" of factual allegations, taking the complaint's allegations in the light most favorable to the plaintiff, LOE subsequently discovered that Miron's delicts were part of a broader RICO and antitrust conspiracy. That it filed a federal action on this basis, placing Miron's tortious activity in a different context, does not qualify as "vexatious or reactive."

Applying these factors to Miron's circumstances makes abundantly clear that abstention under *Colorado River* would be inappropriate, if not an abuse of discretion. *See Welch's,* 170 F.3d at 120 (emphasizing that because abstention represents a narrowly circumscribed exception to "a court's normal duty to adjudicate a controversy properly before it, ... discretion must be exercised within the narrow and specific limits prescribed by the particular abstention doctrine involved," and "there is little or no discretion to abstain in a case which does not meet traditional abstention requirements") (internal quotation marks omitted).

First, as Miron concedes, this case implicates no res or property. While Miron argues that absence of a res makes this factor inapplicable (Miron Br. 17), the Second Circuit has said to the contrary that "the facial neutrality of a factor is a basis for retaining jurisdiction, not for yielding it." *Woodford,* 239 F.3d at 522; *see also Welch's,* 170 F.3d at 122 (observing that "the absence of a res points toward exercise of federal jurisdiction") (internal quotation marks and alterations omitted); *De Cisneros v. Younger,* 871 F.2d 305, 307 (2d Cir.1989).

Second, as Miron also concedes, the federal forum does not inconvenience it in any way. (Miron Br. 17.) Indeed, Miron is located in the Southern District of New York. (Compl.¶ 10.) This factor, too, therefore weighs against surrendering jurisdiction. *Woodford,* 239 F.3d at 522-23; *Welch's,* 170 F.3d at 122 ("[W]here the federal court is 'just as convenient' as the state court, that factor favors retention of the case in federal court.").

*6 Third, any concern about the prospect of piecemeal litigation weighs in favor of retaining jurisdiction. LOE's state action involves claims against a single defendant for breach of contract, negligence, conversion, and tortious interference with contract; its federal action mainly involves claims against multiple defendants for antitrust and RICO violations, as well as pendent state-law claims. "Such differences in parties and issues are strong factors against invoking exceptional circumstances as the basis for dismissal." *Alliance of Am. Insurers v. Cuomo,* 854 F.2d 591, 603 (2d Cir.1988). Moreover, due "regard to conservation of judicial resources and comprehensive disposition of [this] litigation," *Colorado River,* 424 U.S. at 817, favors the consolidation of the actions before this Court, where all claims, state and federal, may be resolved, not the converse. "Indeed, abstention is clearly improper when," as here, "a federal suit alleges claims within the exclusive jurisdiction of the federal courts." *Andrea Theatres, Inc. v. Theatre Confections, Inc.,* 787 F.2d 59, 62 (2d Cir.1986); *see Johnson v. Nyack Hosp.,* 964 F.2d 116, 122 (2d Cir.1992) (Sherman Act claims within the exclusive jurisdiction of the federal courts). Finally, were Miron to accept LOE's offer to stay the state action (P. Ltr. dated Mar. 19, 2004),[FN6] it could render moot any concern with duplicative litigation. *See Woodford,* 239 F.3d at 524.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                               Page 6
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
**(Cite as: Not Reported in F.Supp.2d)**

Miron refuses to do so "because it believes the only cognizable claims are those that have already been articulated in" state court. (Miron Br. 14). Needless to say, Miron's belief is irrelevant, and if Miron must now "defend on two litigation fronts" (*id.* 11, citing *Arkwright-Boston Mfrs. Mut. Ins. Co. v. City of New York,* 762 F.2d 205, 211 (2d Cir.1985)), that plight is entirely of its own making.

> FN6. Miron's consent may not be necessary. In its reply brief, Miron represents that the state court already has stayed the state action temporarily in response to LOE's application for an order to show cause with a return date of June 2, 2004. (Miron Reply Br. 6.)

The fourth factor, "the order in which the actions were filed, and whether proceedings have advanced more in one forum than in the other," *Woodford,* 239 F.3d at 522 (internal citations omitted), *may* weigh in favor of abstention, but at best only slightly. While LOE filed the state suit first, (1) neither party represents that the state action is anywhere close to a potential resolution, and (2) even if it were, its resolution would not materially advance the disposition of LOE's federal claims.

Fifth, while LOE alleges pendent state-law claims, its federal claims predominate; indeed, as noted, Sherman Act claims lie within the exclusive jurisdiction of the federal courts. *Johnson,* 964 F .2d at 122. In *Woodford,* the Second Circuit emphasized: Even where there are some state-law issues, "the presence of federal law issues must always be a major consideration against surrender.".... And "[i]f there is any substantial doubt" as to whether "complete and prompt" protection of the federal right is available in the sate proceeding, dismissal "would be a serious abuse of discretion."

*7 239 F.3d at 523, quoting *Moses Cone,* 460 U.S. at 26, 28 (brackets in original). To relegate LOE to state court to adjudicate its federal claims against Miron would be impossible, for the Sherman Act claims cannot be brought there,[FN7] as well as inefficient, for LOE would then be required to bring the same RICO and antitrust claims in two forums-one for Miron, the other for all the other defendants-raising the very potential for inconsistent verdicts and piecemeal litigation that the *Colorado River* doctrine seeks to avoid.

> FN7. Miron argues that even though LOE cannot bring its Sherman Act claims in state court, it will not be prejudiced because it can bring claims under the Donnelly Act, the analogous New York statute, which affords the same relief. (Miron Br. 16.) The Court need not decide whether the ability to bring suit under an analogous statute that allegedly affords the same relief qualifies as "complete and prompt protection of the federal rights," *Woodford,* 239 F.3d at 523 (internal quotation marks omitted), for the other *Colorado River* factors overwhelmingly weigh against abstention under the circumstances presented here.

Sixth and finally, for the same reasons, while LOE can, as Miron notes, raise its RICO claims and analogous antitrust claims in state court (Miron Br. 16), the Court cannot conclude that "the state court proceeding will adequately protect the rights of the party seeking to invoke federal jurisdiction." *Welch's,* 170 F.3d at 121.

Because the factors enumerated by the Second Circuit overwhelmingly disfavor *Colorado River* abstention under these circumstances, Miron's motion to dismiss on this ground is denied.

B. *Best Textiles LLC: Successor Liability*

Best Textiles argues the complaint should be dismissed as against it because it is not a proper party. Unlike the other defendants, it is not alleged to be a member of, or affiliated with, the New York Linen Cartel, except insofar as Best Textiles allegedly succeeded to the interests of Best Manufacturing (Com pl.¶ ¶ 7-9), "a linen supply company servicing the restaurant industry," which is another named defendant.[FN8] (*Id.* ¶ 5.) Best Textiles, however, contends that it only purchased Best Manufacturing's assets; it did not assume Best Manufacturing's liabilities.

> FN8. LOE's original complaint named did not name Best Manufacturing as a defendant.

Allegations of successor liability that do not involve fraud need only satisfy the notice-pleading standard of Fed.R.Civ.P. 8, *Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.,* 170 F.R.D. 361, 376

Case 7:04-cv-08223-KMK    Document 176-6    Filed 08/11/2006    Page 8 of 19

Not Reported in F.Supp.2d                                                                                          Page 7
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
(Cite as: Not Reported in F.Supp.2d)

(S.D.N.Y.1997); *Int'l Private Satellite Partners, L.P. v. Lucky Cat Ltd.,* 975 F.Supp. 483, 486 (W.D.N.Y.1997), but as always, conclusory allegations do not meet even that liberal standard. *See Old Republic Ins.,* 170 F.R.D. at 376-77; *see also Papasan v. Allain,* 478 U.S. 265, 286 (1986). In response to Best Textiles's motion to dismiss, LOE thus amended its complaint in an effort to allege facts to demonstrate successor liability. Specifically, LOE quotes language from the Asset Purchase Agreement between Best Textiles and Best Manufacturing dated June 15, 2001 ("Agreement"). The Court may therefore refer to the Agreement in resolving this issue. *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991); *Goldman v. Belden,* 754 F.2d 1059, 1065-66 (2d Cir.1985.)

Under New York common law, "a corporation that merely purchases the assets of another corporation is not liable for the seller's debts and liabilities," *Cargo Partner AG v. Albatrans, Inc.,* 207 F.Supp.2d 86, 93 (S.D.N.Y.2002), aff'd, 352 F.3d 41 (2d Cir.2003) ("*Albatrans II*"); *Schumacher v. Richards Shear Co.,* 59 N.Y.2d 239, 244-45 (1983), except where

*8 (1) [the purchaser] expressly or impliedly assumed the predecessor's tort liability, (2) there was a consolidation or merger of settler and purchaser, (3) the purchasing corporation was a mere continuation of the selling corporation, or (4) the transaction was entered into fraudulently to escape such obligations.

*Id.* at 245; *see also Albatrans II,* 352 F.3d at 45. Only the first and third exceptions conceivably apply to the allegations in the complaint.

LOE's theory of successor liability seems to be that Best Textiles expressly assumed Best Manufacturing's liabilities. The complaint quotes section 1.4(d) of the Agreement ("Assumed Liabilities"), which provides in relevant part that "[Best Textiles] shall assume all liabilities of [Best Manufacturing] arising under any agreements, arrangements, contracts, ... obligations, customer contracts, vendor contracts and purchase and sale orders to which [Best Manufacturing] is a party and which were entered into prior to the Closing Date." (Korman Aff., Ex. 1, § 1.4(d); Compl. ¶ 8.) Viewing the complaint in the light most favorable to LOE, *Leeds,* 85 F.3d at 53, LOE perhaps means to suggest that Best Manufacturing's alleged antitrust agreements with the members of the New York Linen Cartel (for example, not to compete with one another (Compl.¶ 23)) qualify as "agreements" or "arrangements" within the meaning of section 1.4(d)-

or at least, that this is a question of fact that cannot properly be resolved on the pleadings.

This argument fails for two related reasons. First, the complaint does not allege that Best Manufacturing is a member of the New York Linen Cartel whose members allegedly agreed not to compete with one another and to allocate customers among themselves (Compl.¶ ¶ 5, 17); the complaint alleges only that Best Manufacturing "associated" itself with the Cartel. Second, even if such an association could be characterized as an agreement in a colloquial sense, the unambiguous terms of the Agreement make clear that Best Textiles did not agree to assume liabilities arising out of unlawful conspiratorial "agreements" of the sort that LOE has in mind. The Agreement sets out four categories of "Assumed Liabilities" and then expressly excludes other liabilities. (Korman Aff., Ex. 1, § § 1 .4, 1.5.) As Best Textiles points out, each category of Assumed Liabilities refers to routine commercial liability incurred "in the ordinary course of business" (Best Textiles Reply Br. 3-4; Korman Aff., Ex. 1, § § 1.4(b), (c)), not tortious liability arising out of unlawful activity. To hold that the Agreement implicitly includes the latter sort of liabilities, even though it says nothing about them and expressly excludes liabilities not set forth explicitly, would turn New York law's presumption against successor liability on its head. *See Goldman v. Packaging Indus., Inc.,* 534 N.Y.S.2d 388, 391 (2d Dep't 1988).

A second theory of successor liability apparently advanced by the complaint is that Best Textiles is a "mere continuation" of Best Manufacturing. *Schumacher,* 59 N.Y.2d at 245. The complaint quotes an excerpt from a press release issued by Best Manufacturing (Compl.¶ 9), the full text of which Best Textiles provides in its reply brief:

*9 Best Manufacturing, Inc. is pleased to announce that it has sold its business to BEST TEXTILES LLC, a new company formed by the existing Best Manufacturing senior management team and Colt Capital Group, a private equity firm based in Westport, CT.

This transaction completes a process whereby management and ownership of the business has been successfully transitioned from Lester Maslow to an experienced management team led by Glenn S. Palmer, President & Chief Executive Officer. Best Textiles will continue the business of Best Manufacturing from its corporate headquarters in New York and other locations throughout the country.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK   Document 176-6   Filed 08/11/2006   Page 9 of 19

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
(Cite as: Not Reported in F.Supp.2d)

Page 8

(Best Textiles Reply Br. 5.) Construing LOE's quotation of this press release as an allegation of "mere continuation," it nevertheless fails, as a matter of New York law, sufficiently to allege that theory of successor liability.

Courts generally treat the "de-facto-merger" and "mere-continuation" exceptions as one. *Albatrans II,* 352 F.3d at 45 n. 3 (collecting cases); *see also Sands Bros. & Co. v. Ettinger,* No. 03 Civ. 7854, 2004 WL 541846, at *4 n. 5 (S.D.N.Y.2004); *Lumbard v. Maglia, Inc.,* 621 F.Supp. 1529, 1535 (S.D.N.Y.1985) (observing that "no criteria can be identified that distinguish them in any useful manner") (internal quotation marks omitted). *But see Ladjevardian v. Laidlaw-Coggeshall, Inc.,* 431 F.Supp. 834, 839 (S.D.N.Y.1977) (distinguishing the "mere continuation" exception as involving "something in the nature of a corporate reorganization, rather than a mere sale"). For present purposes, it suffices to note that for either exception to apply, it cannot be the case that *two* distinct corporate entities survive the predicate transaction. *See Schumacher,* 59 N.Y.2d at 245 ("mere continuation" exception applies "where only one corporation survives the transaction; the predecessor corporation must be extinguished"); *Ladjevardian,* 431 F.Supp. at 839 ("[T]hat the vendor corporation continued to exist after the sale ... is sufficient to take this case out of the 'mere continuation' exception."); compare *Albatrans II,* 352 F.3d at 46 (seller's dissolution a necessary element of de facto merger); *Ladjevardian,* 431 F.Supp. at 838 (de facto merger "envisions the joining together of the two corporations so that a totally new corporation emerges and the two others cease to exist"). Here, it is undisputed that both Best Manufacturing and Best Textiles continue to exist and operate as separate entities.

Because no exception to New York law's general presumption against successor liability applies to Best Textiles, and the complaint only implicates Best Textiles as the successor to Best Manufacturing,[FN9] Best Textiles's motion to dismiss is granted in its entirety.

> FN9. The complaint alleges that "Best Manufacturing (and its successor corporation Best Textiles) and Mirons & Sons, associated themselves with the New York Linen Cartel and its objectives of restraining interstate trade or commerce, by engaging in anti-competitive activities at the behest of the New York Linen Cartel, actions that the defendants knew were meant to harm LOE and drive it from the Relevant Market." (Compl.¶ 18.) But except for Best Textiles's purported liability as a successor to Best Manufacturing, the complaint fails to state any factual allegations against Best Textiles; LOE's assertions that it "associated" itself with the Cartel and engaged in "anti-competitive activities" fail to state a viable claim against Best Textiles absent facts alleged elsewhere in the complaint substantiating these conclusory assertions.

III. *The Federal Antitrust Claim*

A. *Antitrust Injury*

Citing the familiar maxim that the antitrust laws protect "competition, not competitors," *Brown Shoe Co. v. United States,* 370 U.S. 294, 320 (1962), defendants argue that LOE fails to state a claim under section 1 of the Sherman Act because it focuses solely on the harm to itself, without specifying how defendants' conduct "has had an actual adverse effect on competition as a whole in the relevant market." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.,* 996 F.2d 537, 543 (2d Cir.1993); *see also Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 334 (1990) (antitrust plaintiff must allege an "injury of the type the antitrust laws were intended to prevent," and that injury must be "attributable to an anticompetitive aspect of the practice under scrutiny") (internal quotation marks omitted); *Todd v. Exxon Corp.,* 275 F.3d 191, 213 (2d Cir.2001) ("An antitrust plaintiff must allege not only cognizable harm to herself, but an adverse effect on competition market-wide.").

*10 Defendants make a number of fair points in this regard. LOE relies heavily, for example, on the guilty plea allocution of White Plains and Botchman. Yet these defendants admitted only that they and other linen supply and laundering companies agreed to allocate customers among themselves and to refrain from competing with one another by, inter alia, fixing prices. (Compl.¶ ¶ 22-23.) It is unclear how this conduct-at least, considered in isolation-harmed LOE, for as the Supreme Court has emphasized, such a price-fixing agreement would actually benefit LOE

Not Reported in F.Supp.2d                                                                                    Page 9
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
(Cite as: Not Reported in F.Supp.2d)

by permitting it to undersell the conspirators and coopt their business. Atl. Richfield Co., 495 U.S. at 336-37; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585 n. 8 (1986). Furthermore, defendants contend, LOE's claims focus exclusively on harms to itself not caused by the alleged anticompetitive conduct, for example, breaches of contract, torts, and other acts directed at LOE specifically, without alleging how such conduct harmed competition more generally. See, e. g., Bocobo, M.D. v. Radiology Consultants, 305 F.Supp.2d 422, 425-28 (D.N.J.2004) (exclusion of radiologist from practicing in a certain region insufficient to allege antitrust injury because it had no effect on the relevant markets). Hence, LOE cannot show that its injury "flows from that which makes defendants' acts unlawful." Atl. Richfield, 495 U.S. at 334. Finally, defendants argue, not without some force (e.g., Compl.¶ 133), that LOE alleges antitrust injury in conclusory terms insufficient to withstand a motion to dismiss. See John's Insulation, Inc. v. Siska Constr. Co., 774 F.Supp. 156, 163 (S.D.N.Y.1991) ("[C]onclusory allegations which merely recite the litany of antitrust will not suffice.").

While some of these arguments raise legitimate questions, and LOE may ultimately find itself unable to establish a cognizable antitrust injury, the defendants' motions to dismiss on this ground fail to respect the principle that on a motion to dismiss for failure to state a claim, the complaint must be construed as a whole. Yoder v. Orthomolecular Nutrition Institute Inc., 751 F.2d 555, 562 (2d Cir.1985). LOE alleges an integrated conspiracy to restrain trade in the market for supplying and laundering fine linens. Customer allocation and price-fixing is one element of this conspiracy. The New York Linen Cartel's alleged enlistment of UNITE! to disrupt LOE's business relationships with customers by orchestrating labor strikes is another. Bribery of clients to break contracts or refuse to deal with LOE and to redirect their business to Cartel members is still another. To be sure, considered in isolation, the alleged assault on an LOE principal is "only" a tort, albeit a serious one; in context, however, as LOE alleges, this incident and subsequent threats represented yet another means by which the Cartel sought to restrain competition and control the relevant market.

*11 That LOE fails to specify the names of other competitors harmed by the Cartel's conduct does not necessarily defeat its antitrust claim. First, even if LOE is the only competitor thus far to be damaged by the Cartel's activities, provided that injury flows from anticompetitive conduct generally rather than a particular vendetta against LOE, it suffices to state an antitrust injury; no principle of law requires that more than one competitor be harmed for a harm to competition to exist. Second, discovery may well yield evidence of a more general effect on competition and harm to other competitors. In the antitrust conspiracy context, "where the proof is largely in the hands of the alleged conspirators, dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." Hosp. Bldg. Co. v. Trs. of the Rex Hosp., 425 U.S. 738, 746 (1976) (internal quotation marks and citation omitted); see also Mirage Resorts, Inc. v. Trump, No. 97 Civ. 6693, 1998 WL 898340, at *3 (S.D.N.Y. Dec. 22, 1998) (" 'A motion to dismiss for insufficiency should rarely be granted, especially in antitrust cases, where proof of the conspiracy is usually in the hands of the conspirators.' "), quoting Strobl v. N.Y. Mercantile Exch., 561 F.Supp. 379, 383 (S.D.N.Y.1983). The allegations drawn from the guilty pleas of Botchman and White Plains, coupled with the complaint's factual allegations about actions taken against LOE, sufficiently allege antitrust injury to survive defendants' Rule 12(b)(6) motion.

B. *Market Definition*

Defendants also argue that LOE fails to state a claim under section 1 of the Sherman Act because LOE does not adequately define the Relevant Market, either in terms of the nature of the product or the geographic boundaries in which it allegedly operates. See Brown Shoe Co., 370 U.S. at 324 ("area of effective competition" determined by reference to a product market and a geographic market); Kramer v. Pollock-Krasner Found., 890 F.Supp. 250, 254 (S.D.N.Y.1995) (claim under section 1 of the Sherman Act "must allege a relevant geographic and product market in which trade was unreasonably restrained").

1. *Product Market*

"To survive a motion to dismiss, the alleged product market must (1) include all products reasonably interchangeable, determination of which requires consideration of cross-elasticity of demand; and (2) be plausible." Intellective, Inc. v. Mass. Mut. Life Ins. Co., 190 F.Supp.2d 600, 609 (S.D.N.Y.2002) (internal quotation marks and citations omitted).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Defendants contend that LOE's complaint fails adequately to allege the precise contours of the product market because it does not explain why the Relevant Market includes only "high-end European linens"; fails to mention alternative, interchangeable products; and does not consider that certain restaurants might choose to own and launder their own linens rather than retain one of the participants in the Relevant Market. (White Plains Reply Br. 9.)

*12 This argument goes to the merits of LOE's antitrust claim, not the adequacy of its pleading. The complaint alleges, quite specifically and not implausibly, that certain upscale restaurants in New York use only high-quality linens "produced by a limited number of exclusive European companies" (Compl.¶ 28), because they "seek to convey to the public" a certain image associated with a "luxurious dining experience beyond the simple consumption of fine food and drinks." (*Id.* ¶ 29.) Assuming the truth of these allegations, as the Court must, Leeds, 85 F.3d at 53, no functionally-equivalent alternative to these high-quality European linens exists. Perhaps LOE will be unable to establish that, or defendants will be able to prove the contrary, but that showing must await discovery. See Todd, 275 F.3d at 199-200 ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market.") (collecting cases).

2. *Geographic Market*

Defendants' objection to LOE's definition of the relevant geographic market presents a closer question. LOE defines the geographic market as "the Southern District of New York, with a significant concentration in Manhattan." (Compl.¶ 30.) As defendants rightly emphasize, it is inherently implausible that the relevant geographic market in which LOE competes just happens to correspond precisely to the boundaries of a federal judicial district. (White Plains Br. 13; Best Manufacturing Br. 10.) To maintain that LOE and defendants compete for the linen business of upscale restaurants in Manhattan, the Bronx, and Putnam County, but not in Brooklyn, Queens or northern New Jersey, strains credulity. *Cf. United States v. Ct. Nat'l Bank,* 418 U.S. 656, 666-73 (1974) (holding that the district court erred by finding the boundaries of the relevant market to be coterminous with the borders of the State of Connecticut and remanding for a determination based on "the economically and legally feasible alternative methods of entry" into the relevant market); *Evac, LLC v. Pataki,* 89 F.Supp.2d 250, 261 (N.D.N.Y.2000) (faulting plaintiff's allegation of a relevant geographic market for simply "specif[ying]" a number of counties in Northern New York and Vermont," failing to "define a specific geographic market or explain how the Court should draw geographic boundaries").

Yet however inartful LOE's claim that the relevant geographic market is "the Southern District of New York," at its heart this is no more than a technical pleading error. Construed as a whole, the complaint clearly implies that the relevant geographic market roughly corresponds to Manhattan, which *is* a plausible geographic market, for it makes economic sense that Manhattan constitutes a distinct market in which LOE competes with defendants for the business of certain upscale restaurants. Indeed, the complaint alleges, quite plausibly, that LOE sought to break into the New York market precisely "[b]ecause of the concentration of up-scale dining establishments in New York, and because New York is a city of internationally recognized importance in the dining industry." (Compl.¶ 54.) Moreover, the restaurant customers identified by LOE are all located in Manhattan, and in its brief in opposition to Best Manufacturing's motion to dismiss, LOE effectively makes clear that it means Manhattan, subject to possible expansion based on discovery. (P. Br.10.) Under these circumstances-where the relevant geographic market, albeit inartfully defined, is clear from the complaint as a whole-it would be inappropriate to dismiss LOE's Sherman Act claim based on a mere technicality. See *Arfons v. E.I. Du Pont de Nemours & Co.,* 261 F.2d 434, 435 (2d Cir.1958) ("It is now well established that dismissals for mere technical defects or ambiguities in the pleadings are not favored.").

C. *Best Manufacturing*

*13 Best Manufacturing, which LOE added as a defendant in its amended complaint, makes a number of additional arguments unique to its status as pled by LOE. Best Manufacturing emphasizes that, unlike the other defendants, it does not launder fine linens; it manufactures them.[FN10] (Best Manufacturing Br. 2.) Furthermore, according to an affidavit offered by Neil Cohen, a principal of Best Textiles and former principal of Best Manufacturing, the latter does not manufacture, and never has manufactured, *fine* linens, as defined in the complaint. (Cohen Aff. ¶ ¶

Case 7:04-cv-08223-KMK   Document 176-6   Filed 08/11/2006   Page 12 of 19

Not Reported in F.Supp.2d                                                                                             Page 11
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
(Cite as: Not Reported in F.Supp.2d)

1,6.) Ordinarily, it would be inappropriate for the Court to consider material extraneous to the complaint on a motion to dismiss. *Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir.2000) ("[A] district court errs when it considers affidavits and exhibits submitted by defendants or relies on factual allegations contained in legal briefs or memoranda in ruling on a 12(b)(6) motion to dismiss.") (alterations, internal quotation marks, and citations omitted). But LOE conspicuously declines to challenge the assertion that Best Manufacturing does not manufacture "fine" linens, and far more importantly, the complaint *alleges* that only "a limited number of exclusive European companies" manufacture such linens. (Compl.¶ 28.) Best Manufacturing is a New York corporation with offices in Manhattan. (Compl.¶ 5.)

> FN10. The complaint describes Best Manufacturing as "a linen *supply* company servicing the restaurant industry." (Compl. ¶ 5; emphasis added.) But the allegations make clear that Best Manufacturing does not "supply" fine linens in the same sense as the other defendants, which, according to LOE, rent and launder fine linens for upscale restaurants. Rather, it manufactures and supplies them to entities like the other defendants. (*Id.* ¶¶ 61-63; Best Manufacturing Br. 2.) LOE does not allege otherwise or dispute this fact in its opposition brief.

Best Manufacturing also points out that the complaint does not allege that it is a member of the New York Linen Cartel, but only that it "associated" itself with the Cartel, and moreover, only implicates Best Manufacturing in the Cartel's activities by reference to one, rather vague, incident. (Compl.¶¶ 18, 61-63.) According to the complaint, the "21" Club, formerly a client of Cascade (an alleged member of the Cartel), became dissatisfied with Cascade and thus decided to redirect its business to LOE. (*Id.* ¶ 60.) The Cartel, however, "directed Best Manufacturing, the supplier of '21' Club's signature red and white tablecloths, to refuse to do business with LOE." (*Id.* ¶ 61.) Best Manufacturing then advised LOE that it would only sell the "21" Club's linens to Cascade, and as a consequence, LOE could not fulfill its contractual obligations for eight months. (*Id.* ¶¶ 62-63.)

Given its distinct status relative to the other defendants, and the complaint's very minimal allegations about its conduct, Best Manufacturing advances two arguments. First, it argues that it cannot be liable under the Sherman Act because, by the complaint's own allegations, it is neither a member of the New York Linen Cartel nor a participant in the Relevant Market. This argument fails, however, for those facts cannot exonerate Best Manufacturing if, as the complaint alleges, Best Manufacturing knowingly associated itself with the Cartel and acted at its behest to achieve the conspiracy's objective: to prevent competition in the Relevant Market. *See Spanish Broad. Sys., Inc. v. Clear Channel Communications, Inc.*, 242 F.Supp.2d 1350, 1361 (S.D.Fla.2003) (observing that while a "non-competitor in the relevant market normally cannot be liable for a [Sherman Act] Section One violation," such an entity can be liable "if it enters a conspiracy already existing between two or more competitors") (emphasis omitted).[FN11] Of course, Best Manufacturing denies this allegation, contending that it "had a valid business justification for refusing to sell the '21' Club design to [LOE]"; that Cascade owned the "printing screen" used to design the "21" Club's linens, and "it would have been illegal to use that proprietary screen to supply product to a third party, such as [LOE]." (Best Manufacturing Br. 7; *see also* Cohen Aff. ¶¶ 2-3.) If Best Manufacturing can establish the truth of that business justification, it can move for summary judgment at the appropriate juncture. But for purposes of defendants' motions to dismiss, the Court must assume, as the complaint alleges, that Best Manufacturing withheld the linens from LOE at the behest of the Cartel.[FN12]

> FN11. *See also SmithKline Beecham Corp. v. E. Applicators, Inc.*, No. Civ.A. 99 Cv. 6552, 2002 WL 1197763, at *8 (E.D.Pa. May 24, 2002) ("If ... parties agreed to collude in a manner that adversely affected competition within a relevant market, a non-competitor may be part of that conspiracy."); *Tondas v. Amateur Hockey Ass'n*, 438 F.Supp. 310, 315 (W.D.N.Y.1977) ("Although [defendant] alleges that it does not directly compete with plaintiff, any agreement, contract or conspiracy between it and another party which unreasonably restrained interstate trade or commerce would be violative of section 1 of the Sherman Act."); *Ozdoba v. Verney Brunswick Mills, Inc.*, 152 F.Supp. 136, 138 (S.D.N.Y.1946)

Case 7:04-cv-08223-KMK   Document 176-6   Filed 08/11/2006   Page 13 of 19

Not Reported in F.Supp.2d                                                                                               Page 12
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
(Cite as: Not Reported in F.Supp.2d)

("[N]oncompetitors or members of an affiliated group may conspire illegally to restrain the interstate commerce of others and thereby subject themselves to the prohibitions of the anti-trust laws.").

FN12. Nor does it matter whether the "21" Club's signature linens qualify as "fine linens," as defined by the complaint. The complaint, read a whole, alleges that Best Manufacturing's acts at the behest of the Cartel were one part of a much broader, coordinated effort to prevent LOE from entering the Relevant Market in the first place. (Compl.¶ 58, 61.) At times, those efforts may have taken the form of acts directed against parts of LOE's business not focused on the Relevant Market, such as interference with LOE's relationship with upscale restaurant clients that do not use "fine linens." But if the *objective* of such interference was to drive LOE out of New York so that it could not establish a presence in the Relevant Market, then those acts would be in furtherance of the alleged Sherman Act conspiracy.

*14 Second, Best Manufacturing argues LOE cannot state a claim against it on the basis of its refusal to deal with LOE because LOE does not allege that Best Manufacturing possesses market power or an exclusive ability to supply the good at issue.FN13 That is, LOE could have, and indeed ultimately did, go elsewhere to obtain the linens it required to provide services to the "21" Club. (Compl.¶ 63.) See Floors-N-More, Inc. v. Freight Liquidators, 142 F.Supp.2d 496, 501-502 (S.D.N.Y.2001) (dismissing complaint for failure to state a claim because, inter alia, defendants' refusal to sell to plaintiff, which required it to seek alternative sources for its goods, could not alone suffice to demonstrate an adverse effect on competition under a Sherman Act rule of reason analysis); see also Oreck Corp. v. Whirlpool Corp., 579 F.2d 126, 133-34 (2d Cir.1978); Nat'l Auto Brokers Corp. v. Gen. Motors Corp., 572 F.2d 953, 959-60 (2d Cir.1978). "A manufacturer ... generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761 (1984); see also United States v. Colgate & Co., 250 U.S. 300, 307 (1919) (same).

FN13. Market power is " 'the power to control prices or exclude competition." ' Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 97-98 (2d Cir.1998), quoting United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391 (1956).

This argument, however, misapprehends the import of LOE's allegations. LOE does not contend that the "21" Club incident shows Best Manufacturing's power in the Relevant Market under a rule of reason analysis. It argues that this incident demonstrates that Best Manufacturing knowingly joined in, and took action in furtherance of, an existing conspiracy orchestrated by the New York Linen Cartel. (P. Br.5-6.) According to LOE, "Best Manufacturing voluntarily allied itself with the anti-competitive actions of the New York Linen Cartel." (*Id.* 6.) In other words, the issue is not whether the "21" Club incident, considered in isolation, would suffice to allege a section 1 claim under the rule of reason; it almost certainly would not, given that the "21" Club itself does not even appear to be part of the Relevant Market. The issue is whether the "21" Club incident, considered in context, suffices to allege that Best Manufacturing knowingly associated itself with and acted in furtherance of an existing conspiracy. While LOE may ultimately be unable to show that Best Manufacturing refused to deal with it because of unlawful collusion with the New York Linen Cartel, at this stage, before discovery, the allegations about the "21" Club incident suffice to defeat a motion to dismiss. Best Manufacturing's general "right to deal, or refuse to deal, with whomever it likes" applies only "as long as it does so independently," Monsanto, 465 U.S. at 761, not if it does so at the instance of a Cartel seeking to maintain a stranglehold on the Relevant Market, as LOE alleges.FN14

FN14. Best Manufacturing also argues that the four-year statute of limitations applicable to antitrust claims, 15 U.S.C. § 15b; Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338 (1971), bars LOE's claims against it. (Best Manufacturing Br. 10-11.) This argument fails because LOE alleges that Best Manufacturing associated itself with and acted in furtherance of the New York Linen Cartel's conspiracy, which continued, according to the complaint, until at least September 2002. (Compl.¶ 124.) See, e.g., Thomas v. Petro-Wash, Inc., 429 F.Supp. 808, 812-13 (M.D.N.C.1977); Lektro-Vend

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                         Page 13
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
**(Cite as: Not Reported in F.Supp.2d)**

Corp. v. Vendo Corp., 500 F.Supp. 332, 348 (N.D.Ill.1980).

D. *Conclusion*

Accordingly, with the exception of the motion of Best Textiles, which, for the reasons set forth above, cannot be held liable for Best Manufacturing's alleged conduct, defendants' motions to dismiss LOE's federal antitrust claims are denied.

IV. *The RICO Claim*

*15 LOE's second federal claim is that the New York Linen Cartel constitutes a racketeering enterprise whose members have conspired to violate one or more subdivisions of 18 U.S.C. § 1962 in violation of § 1962(d). (Compl.¶ 158, 163.) Section 1962(d) makes it unlawful "to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." As defendants note, despite having amended the complaint in response to, inter alia, defendants' objection to LOE's failure to specify which subdivision of § 1962 defendants allegedly violated, LOE even in the amended complaint still does not identify which of these subsections defendants allegedly conspired to violate. (Sea Crest Reply Br. 3.) But the Court need not speculate. LOE's RICO claim fails in any event because it does not adequately plead a "pattern of racketeering activity," that is, "at least two acts of racketeering activity," *id.* § 1961(5), as defined in § 1961(1). See Zito v. Leasecomm Corp., No. 02 Civ. 8074, 2003 WL 22251352, at *5 (S.D.N.Y. Sept. 30, 2003).

Salinas v. United States, 522 U.S. 52 (1997), held that to violate § 1962(d), a defendant need not *itself* commit, or agree to commit, two predicate acts; it suffices if he or she conspired with others to do so. *Id.* at 63-66; United States v. Zichettello, 208 F.3d 72, 99-100 & n. 13 (2d Cir.2000); Zito, 2003 WL 22251352, at *13. But the complaint still must allege two predicate acts intended or accomplished by one or more of the conspirators in the course of conducting the unlawful enterprise. LOE's complaint, again despite having been amended in response to, inter alia, this very objection, still fails to allege a pattern of at least two predicate acts with sufficient clarity to survive a motion to dismiss. Here, as in *Zito*, it is "impossible to understand what predicate acts are alleged to have been committed by which defendants, or even clearly to understand what the predicate acts are." *Id.* at *9. The operative paragraphs of LOE's RICO conspiracy charge simply refer back to the remainder of the complaint, leaving it to the Court to divine-with cursory guidance from a letter submitted by LOE in lieu of a brief in opposition to defendants' motions-which of the laundry list of incidents set forth in the complaint are alleged to constitute predicate acts. [FN15] (Compl.¶ ¶ 163-64.)

> FN15. In paragraph 167, the complaint obliquely, and in wholly conclusory terms, alleges: "Whereas White Plains Linen and Botchman each engaged in at least two predicate acts, the other defendants, by their own acts, joined the conspiracy with the intent to make it succeed in destroying LOE and either driving it from the Relevant Market or forcing its sale to a member of the New York Linen Cartel." Botchman and White Plains pled guilty to a violation of section 1 of the Sherman Act, which is not a predicate act under 18 U.S.C. § 1961(1). The complaint does not otherwise identify the predicate acts allegedly committed by Botchman and White Plains.

LOE alleges that the predicate acts included "bribery, extortion, physical violence, fear of injury, wire fraud, illegal allocation of customers, intimidation and harassment." (*Id.* ¶ 164.) In the first place, some of these-"fear of injury," "illegal allocation of customers," "intimidation and harassment"-do not even qualify as predicate acts under § 1961(1). Similarly, in its letter in opposition to defendants' motion, purportedly clarifying "[t]he necessary predicate acts," LOE cites, inter alia, "interstate telephonic communications by White Plains Linen." (P. Ltr. dated Mar. 23, 2004, at 2.) Needless to say, making interstate telephone calls does not inherently violate any criminal law, let alone constitute a predicate act under § 1961(1). Finally, LOE refers to the assault on one of its officers and an alleged "pattern of harassment," again without explaining how these acts, however deplorable, qualify as predicate acts under § 1961(1). (*Id.*)

*16 Second, even for the acts alleged by LOE that might qualify under § 1961(1), the complaint fails to identify which such acts described elsewhere in the complaint LOE intends to reference. LOE cites wire fraud, for example, which qualifies as a predicate act. 18 U.S.C. § 1961(1)(B). Yet the complaint fails to describe any act that would be indictable as wire

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 14
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
(Cite as: Not Reported in F.Supp.2d)

fraud. LOE also cites bribery. (Compl. § 164). Bribery in violation of state law,[FN16] however, only counts as a predicate act if it is "punishable by imprisonment for more than one year." Id. § 1961(1)(A). In its letter in opposition to defendants' motions, LOE refers the Court to four instances of bribery described in the complaint: by White Plains (Compl.¶ ¶ 86, 100), Cascade (id. ¶ 87), Best Metropolitan (id. ¶ ¶ 77, 88), and Sea Crest (id. ¶ 81). (P. Ltr. dated Mar. 23, 2004, at 2.) None of these, however, qualifies as a predicate act because New York law makes commercial bribery a felony only if (1) the amount of the bribe exceeds $1000, and (2) the *employer* of the person bribed suffers damage in excess of $250. N.Y. Penal Law § 180.03; see People v. Wolf, 98 N.Y.2d 105, 109-11 (2002). While LOE avers that the amounts of some of the bribes exceeded $1000 (*e.g.,* Compl. ¶ ¶ 81, 87-88), it alleges no facts that suggest any harm to the employers of the persons allegedly bribed.[FN17]

> FN16. LOE does not allege violations of the federal bribery statutes enumerated in § 1961(1): bribery of public officials, 18 U.S.C. § 201, or bribery to influence sporting contests, id. § 224.
>
> FN17. Indeed, in one instance, LOE alleges that a person whom Sea Crest sought to bribe *was* the owner of the restaurant at issue, and hence was himself the "employer." Moreover, the complaint alleges that this person refused the bribe. (Compl.¶ ¶ 81.)

LOE's description of defendants' extortion efforts comes closest to alleging a cognizable predicate act, but upon closer analysis, the complaint's averments in this regard allege, at best, a single act of attempted extortion, not a pattern of two or more such acts. Violations of the Hobbs Act, which proscribes the obstruction of interstate commerce "by robbery or extortion or ... conspir[acy]" to commit those acts, 18 U.S.C. § 1951, qualify as predicate acts. 18 U.S.C. § 1961(1)(B). The complaint alleges that the New York Linen Cartel sought to extort LOE by forcing it to sell its business to White Plains, and in its letter brief, LOE cites the Cartel's efforts in this regard as a predicate act. (Compl. ¶ ¶ 101-07, 115-20; P. Ltr. dated Mar. 23, 2004, at 2.) The Cartel, according to the complaint, repeatedly threatened an LOE officer, and on one occasion, sent a group of thugs to assault him. Each time, agents of the Cartel threatened LOE with harm if it refused to sell itself to White Plains. (Compl.¶ ¶ 101, 103, 106-07.)

The complaint adequately alleges a Hobbs Act violation insofar as it avers that Cartel members attempted to obstruct interstate commerce by inducing LOE, "through the wrongful use of actual or threatened force," to part with its property. *McLaughlin v. Anderson,* 962 F.2d 187, 194 (2d Cir.1992). But multiple acts in furtherance of a *single* extortion episode constitute only a single predicate act of attempted extortion, not a pattern of two or more predicate acts. *See id.* (subsequent acts showing defendant's efforts to " 'mak[e] good' on his threat" insufficient to qualify as distinct predicate acts); *see also Apparel Art Int'l, Inc. v. Jacobson,* 967 F.2d 720, 723 (1st Cir.1992) (observing that "courts ... have consistently held that a single episode does not constitute a 'pattern,' even if that single episode involves behavior that amounts to several crimes"); *Sever v. Alaska Pulp Corp.,* 978 F.2d 1529, 1535 (9th Cir.1992) ("[A]lthough [plaintiff] alleges a number of 'acts,' [defendant's] collective conduct is in a sense a single episode having [a] singular purpose ..., rather than a series of separate, related acts ."); *Tellis v. United States Fid. & Guar. Co.,* 826 F.2d 477, 478 (7th Cir.1986) ( "[M]ultiple acts of mail fraud in furtherance of a single episode of fraud involving one victim and relating to one basic transaction cannot constitute the necessary pattern."); *Passini v. Falke-Gruppe,* 745 F.Supp. 991, 993 (S.D.N.Y.1990). Hence, the complaint alleges, at best, a single episode of extortion directed at a single victim, not two or more such episodes.

*17 Furthermore, even assuming arguendo that LOE alleges two predicate acts, it nonetheless fails to state a claim under RICO because it does not adequately allege a "pattern of racketeering activity." *See H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239 (1989) (plaintiff "must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity") (emphasis in original); *Cofacredit, S.A. v. Windsor Plumbing Supply Co.,* 187 F.3d 229, 242 (2d Cir.1999). LOE must therefore allege either "closed-ended continuity," meaning "a series of related predicates extending over a substantial period of time," *H.J.,* 492 U.S. at 242, or "open-ended continuity," meaning "a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Cofacredit,* 187 F.3d at 242. The complaint alleges neither.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                               Page 15
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
**(Cite as: Not Reported in F.Supp.2d)**

First, while for good reason the Supreme Court has not attempted to define "substantial period of time" with temporal precision, for "[w]hether the predicates proved establish a threat of continued racketeering activity depends on the specific facts of each case," it has made clear that, in general, "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy [closed-ended continuity]." *H.J.*, 492 U.S. at 242. The Second Circuit has noted in this regard that since *H.J.*, it "has never held a period of less than two years to constitute a 'substantial period of time.'" *DeFalco v. Bernas*, 244 F.3d 286, 321 (2d Cir.2001); *Cofacredit*, 187 F.3d at 242 (same). While this statistic does not, as the Court noted in *Zito*, 2003 WL 22251352, at *16, create a "a pleading requirement" or even necessarily merit much empirical weight, *id.* at *16 n. 5, it does invite skepticism toward allegations of a "pattern" that extends over only a few months. Here, even if the various acts in furtherance of the extortion episode could be deemed two or more predicate acts, those acts all occurred between March and September 2002. (Compl.¶ ¶ 103, 124.) Moreover, taking into consideration the other relevant factors, including "the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes," *Cofacredit*, 187 F.3d at 242, it is clear that LOE alleges, at best, a concerted effort to exclude *it* from the Relevant Market, not a continuous pattern of racketeering activity.

Second, LOE's allegation that the New York Linen Cartel intends "to continue its RICO activities in the future after the government's enforcement interest has waned" (Compl.¶ 166) fails to allege open-ended continuity because the object of the alleged conspiracy-to destroy LOE, drive it out of the Relevant Market or force it to sell itself to a member of the Cartel (*id.* ¶ 167)-is inherently finite. *United States v. Aulicino*, 44 F.3d 1102, 1112-13 (2d Cir.1995) (collecting cases); *see, e.g.*, *GICC Capital Corp. v. Tech. Fin. Group*, 67 F.3d 463, 466 (2d Cir.1995) (finding scheme to loot "*inherently* terminable" because "[i]t defies logic to suggest that a threat of continued looting activity exists when ... there is nothing left to loot") (emphasis in original).

*18 In short, LOE makes no effort to identify particular criminal acts committed by particular defendant members of the Cartel that qualify as predicate acts; and neither does LOE relate any such acts as part of a pattern of racketeering. Ordinarily, the Court would be inclined to give LOE leave to replead in an effort to cure these defects. *See Zito*, 2003 WL 22251352, at *21. But LOE already amended its complaint in response to defendants' objections to these very defects, and indeed, asserts that its "Amended Complaint follows the teachings of this Court as articulated in *Zito*." (P. Ltr. dated Mar. 23, 2004, at 1.) To the contrary, the amended complaint, like the original one, consists of a chaotic tangle of alleged criminal acts, which LOE simply lists, and eventually defines in conclusory terms as "an unlawful pattern" (Compl.¶ 164). It remains impossible to discern "what predicate acts are alleged to have been committed by which defendants, or even clearly to understand what the predicate acts are." *Id.* at *9. Accordingly, the RICO claim is dismissed with prejudice.

V. *State-Law Claims*

LOE brings pendent claims under New York law for violations of the Donnelly Act and N.Y. Gen. Bus. Law § 349, and for tortious interference with contract and prospective economic advantage.

A. *Donnelly Act*

The Donnelly Act, N.Y. Gen. Bus. Law § 340, is New York State's statutory analogue to the Sherman Act, and accordingly, it "should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justify such a result." *X.L.O. Concrete Corp. v. Rivergate Corp.*, 83 N.Y.2d 513, 518 (1994) (internal quotation marks omitted); *Stolow v. Greg Manning Auctions Inc.*, 258 F.Supp.2d 236, 244 n. 8 (S.D.N.Y.2003). Defendants cite no relevant state policies or statutory distinctions between the Sherman and Donnelly Acts that should lead to the Court to analyze LOE's state antitrust claim differently from its federal claim; to the contrary, they urge the Court to dismiss LOE's Donnelly Act claim based on the same objections they raise to the Sherman Act claim. (Sea Crest Br. 19.) For the reasons set forth in connection with the latter claim, the Court declines to do so.

B. *N.Y. Gen. Bus. Law § 349*

To state a claim under N.Y. Gen. Bus. Law § 349, which proscribes "[d]eceptive acts or practices in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 16
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
**(Cite as: Not Reported in F.Supp.2d)**

conduct of any business, trade or commerce or in the furnishing of any service," a plaintiff must allege "that (1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir.2000); *see also S.O.K.F.C., Inc. v. Bell Atl. Tricon Leasing Corp.*, 84 F.3d 629, 636 (2d Cir.1996). LOE avers that defendants disseminated false and misleading descriptions of LOE and its business, which "harmed LOE, its customers[,] and the public interest." (Compl.¶¶ 144-45.)

*19 LOE correctly points out that claims under N.Y. Gen. Bus. Law § 349 need not meet the heightened pleading standard applicable to common-law fraud claims. *Joannou v. Blue Ridge Ins. Co.*, 735 N.Y.S.2d 786, 786-7 (2d Dep't 2001). But while competitors such as LOE can bring § 349 claims, *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir.1995), "the gravamen of the complaint must be consumer injury or harm to the public interest." *Id.* (internal quotation marks omitted); *see also Maurizio*, 230 F.3d at 522. Indeed, to state a claim under this section, a commercial claim "must allege conduct that has significant ramifications for the public at large." *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 277 F.Supp.2d 269, 273 (S.D.N.Y.2003) (internal quotation marks omitted).

LOE's complaint does not remotely meet this standard. The sole allegations relating to false and misleading statements concern the incident in which UNITE!, allegedly at the direction of the New York Linen Cartel, distributed leaflets accusing LOE of employing "sweatshop labor" and of failing to provide insurance to their workers.[FN18] (Compl.¶¶ 96-98, 108.) The complaint does not allege that consumers or the public at large thereby suffered some harm; rather, this incident, like the others described in the complaint, alleges harm principally, if not exclusively, to LOE. *See Gucci Am.*, 277 F.Supp.2d at 273 (emphasizing that "[c]ourts in this District routinely reject claims brought under § 349 where a commercial claimant does not adequately allege harm to the public interest," and that "disputes between competitors where the core of the claim is harm to another business as opposed to consumers ... constitute situations which courts have found to reflect a public harm that is too insubstantial to satisfy the pleading requirements of § 349"); *Northwestern Mut. Life Ins. Co. v. Wender*, 940 F.Supp. 62, 65 (S.D.N.Y.1996) (party alleging § 349 claim must "charge conduct that is consumer oriented," that is, "acts or practices [that] have broad impact on consumers at large").[FN19] Because LOE's allegations do not adequately allege fraudulent conduct that caused harm to consumers or the public at large, its § 349 claim must be dismissed.

FN18. LOE also alleges that Sea Crest and Olan "sought to undermine LOE's relationship with Gustavino," a restaurant client, through "false statements, predatory pricing, improper special deals and other means." (Compl.¶ 76.) But the only alleged consequence of these false statements was that "Gustavino broke its contract with LOE" (*id.*); LOE does not allege any consumer harm in connection with this incident. Curiously, in defending its § 349 claim, LOE refers the Court to multiple paragraphs in its complaint describing "activities involving anti-competitive actions." (P. Br.12.) Section 349 concerns *deceptive* acts and practices directed at consumers, not anti-competitive conduct generally.

FN19. *Morgan Services, Inc. v. Episcopal Church Home & Affiliates Life Care Comty., Inc.*, 757 N.Y.S.2d 917 (4th Dep't 2003), on which LOE relies (P. Br.12), involved a counterclaim that the plaintiff had engaged in a pattern of fraud over a period of two years against itself and at least fifteen other customers, whereby "plaintiff enters into contracts knowing that it will eventually fail to supply conforming goods and that, when the customer complains and subsequently attempts to terminate the contract, plaintiff uses the liquidated damages clause of the contract as a threat either to force the customer to accept the nonconforming goods or to settle the lawsuit." *Id.* at 917. The Fourth Department concluded that the defendant adequately alleged "that the acts at issue therein are 'consumer-oriented' and are not unique to the parties." *Id.* The same cannot be said for LOE's allegations that UNITE! distributed leaflets containing false information about LOE's labor practices.

C. *Tortious Interference*

Finally, LOE brings claims for tortious interference with contract and with prospective economic

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                     Page 17
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
**(Cite as: Not Reported in F.Supp.2d)**

advantage.[FN20] (Compl.¶¶ 147-56.) "To state a claim for tortious interference with contractual relations under New York law, a plaintiff must allege (1) the existence of a valid contract between itself and a third party for a specific term; (2) defendant's knowledge of that contract; (3) defendant's intentional procuring of its breach; and (4) damages." *Granite Partners, L.P. v. Bear, Stearns & Co.,* 17 F.Supp.2d 275, 292-93 (S.D.N.Y.1998) (internal quotation marks omitted). The complaint must also allege that "but for" defendant's tortious interference, there would not have been a breach. *Id.* at 293; *see also Sharma v. Skaarup Ship Mgmt. Corp.,* 916 F.2d 820, 828 (2d Cir.1990). "[T]o state a claim for tortious interference with prospective economic advantage, a plaintiff must show (1) business relations with a third party; (2) defendants' interference with those business relations; (3) defendants acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the relationship." *Purgess v. Sharrock,* 33 F.3d 134, 141 (2d Cir.1994). LOE does not specify which defendant allegedly committed which of these torts. The Court will examine each in turn.

> FN20. LOE styles its tortious interference with contract claim a "tortious interference with existing business relations" claim, perhaps to highlight the distinction between this claim and the claim for tortious interference with prospective economic advantage. Research discloses no New York state-court cases that refer to "tortious interference with existing business relations," and the sole federal case that describes the elements of this tort equates it with tortious interference with contract. *Maalouf v. Salomon Smith Barney, Inc.,* No. 02 Civ. 4770, 2003 WL 1858153, at *8 & n. 9 (S.D.N.Y. Apr. 10, 2003).

*20 Best Manufacturing rightly asserts that LOE does not allege that it procured the breach of LOE's contract with the "21" Club. (Best Manufacturing Br. 12.) Hence, LOE cannot maintain a tortious interference with contract claim against Best Manufacturing. On the other hand, taking the complaint's allegations liberally and drawing all inferences in LOE's favor, LOE does state a claim against Best Manufacturing for tortious interference with prospective economic advantage. LOE alleges that it entered into a contract with the "21" Club; that Best Manufacturing interfered with that contract by refusing to supply LOE with the "21" Club's signature linens; that Best Manufacturing refused to deal with LOE at the behest of the New York Linen Cartel, solely to harm LOE; and that, consequently, LOE lost eight months of revenue. (Compl. ¶¶ 60-63 These allegations appear to state a prima facie claim for tortious interference with prospective economic advantage. *See Purgess,* 33 F.3d at 141.

As to White Plains, Botchman, Cascade, and Best Metropolitan, LOE adequately alleges tortious interference with prospective economic advantage, but fails to state a claim for tortious interference with contract. With respect to each of these defendants, LOE alleges that it "had reached agreements *in principle*" with certain restaurants to provide them linen services, but that these defendants interfered with LOE's prospective business relationships with these restaurants through bribery and other improper means, damaging LOE in amounts set forth in the complaint. (Compl. ¶¶ 77, 85-88, 109-10; emphasis added.) At the same time, with regard to these clients, LOE conspicuously does not allege the existence of "a valid contract between itself and a third party for a specific term." *Granite Partners,* 17 F.Supp.2d at 292. Accordingly, based on these facts, LOE cannot maintain claims for tortious interference with contract.

As for Miron, the complaint alleges that it destroyed LOE's linens and prevented LOE from inventorying them properly in an effort to interfere with LOE's business. But LOE fails to specify Miron's specific knowledge of the contract or contracts of which it sought to procure the breach. LOE alleges that "[t]he New York Linen Cartel deployed Miron ... to interfere with and ultimately destroy LOE's business relationship with its customers." But again, it conspicuously does not allege that those customers breached *contracts* with LOE. (Compl.¶¶ 67-75.) Hence, while the allegations, liberally construed, suffice to state a claim for tortious interference with prospective economic advantage, they do not state a claim for tortious interference with contract.

Finally, LOE alleges that Sea Crest and Olan "sought to undermine LOE's relationship with Gustavino," another client, through "false statements, predatory pricing, improper special deals and other means." (*Id.* ¶ 76.) As a consequence, "Gustavino broke its contract with LOE." (*Id.* ¶ 76.) Sea Crest argues that LOE nonetheless fails to state a claim for tortious interference with contract against it and Olan because LOE does not allege that their actions were the "but

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK   Document 176-6   Filed 08/11/2006   Page 19 of 19

Not Reported in F.Supp.2d                                                                Page 18
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761
(Cite as: Not Reported in F.Supp.2d)

for" cause of Gustavino's decision to break its contract with LOE. This is, however, a reasonable inference, which must be drawn in LOE's favor on a motion to dismiss; defendants suggest no other cause for the breach. Accordingly, LOE has stated a viable claim for tortious interference with contract against Sea Crest and Olan. By contrast to the other defendants, however, LOE fails to suggest any way in which Sea Crest and Olan interfered with its prospective economic advantage relative to some client. Paragraph 81, which describes Sea Crest's efforts to bribe the owner of one of LOE's clients, alleges that the bribery efforts failed. Hence, LOE does not allege the necessary actual "injury to the relationship." *Purgess,* 33 F.3d at 141.

CONCLUSION

*21 For the reasons stated, (1) Best Textiles's motion to dismiss the complaint as to it is granted; (2) plaintiff's claims under RICO and N.Y. Gen. Bus. Law § 349 are dismissed with prejudice; (3) plaintiff's claim for tortious interference with contract is dismissed as to all defendants except Sea Crest and Olan; (4) plaintiff's claim for tortious interference with prospective economic advantage is dismissed as to defendants Sea Crest and Olan only; and (5) the motions to dismiss are otherwise denied.

SO ORDERED.

S.D.N.Y.,2004.
Linens of Europe, Inc. v. Best Mfg., Inc.
Not Reported in F.Supp.2d, 2004 WL 2071689 (S.D.N.Y.), 2004-2 Trade Cases P 74,548, RICO Bus.Disp.Guide 10,761

Briefs and Other Related Documents (Back to top)

• 1:03cv09612 (Docket) (Dec. 03, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.