**D.     WWE Cannot Satisfy the Continuity Requirement as to the JAKKS Defendants Based on Alleged Actions by Other Defendants**

It bears emphasis that the vast majority of the alleged predicate acts after August of 1998 do not even involve <u>any</u> of the JAKKS Defendants. (AC ¶¶ 249(b)ix-lxxxviii, 249(c)ii-xviii, 249(e)vi-xiii.) In the Second Circuit it is black letter law that in analyzing continuity, a court must "evaluate the RICO allegations with respect to <u>each defendant individually</u>." <u>First Capital Asset Mgmt.</u>, 385 F.3d at 180 (emphasis added); (<u>see</u> Def. Br. at 14.) WWE makes no attempt to argue – because it cannot – why this settled rule does not foreclose the alleged post-August 1998 violations of the Federal Money Laundering Statute, the Federal Travel Act, the National Stolen Property Act, or the New York Penal Law §180.03, which do not involve any of the JAKKS Defendants.[11]

WWE's assertion that post-1998 acts of mail fraud by other defendants should be attributed to the JAKKS Defendants for purposes of RICO continuity is equally untenable. (Pl. Opp. at 19-20.) Even if acts of mail fraud by other defendants were exempt from the rule affirmed in <u>First Capital</u>, and they are not, the five purported acts of mail fraud involving non-JAKKS defendants after August 4, 1998 merely concern the disposition of commissions under the Licenses which, as described in § I.B. <u>supra</u>, cannot serve to lengthen the RICO scheme.[12] (AC ¶ 249(a)xlix-lv.) Indeed, three of these acts relate to payments <u>made by WWE</u> in connection with the videogame license. (AC ¶ 249(a)xlix-li-liii.) The remaining two alleged predicate acts consist of two wire transfers of SSAI's commissions related to the videogame license to Stanfull, and to Bell Licensing on December 21, 1998 and January 11, 1999, respectively, <u>after the bribery scheme was complete</u>. (AC ¶ 249(a)xlix-l.) As demonstrated in § I.B. <u>supra</u>, such payments cannot serve to elongate a completed RICO

---

[11]     <u>All</u> of the post-1998 alleged violations of the National Stolen Property Act and New York Penal Law § 180.03 involve non-JAKKS Defendants. (AC ¶¶ 249(c)ii-xviii, 249 (e)vi-xiii.)

[12]     WWE also alleges two post-1998 acts of concealment by the JAKKS Defendants (AC ¶ 249(a)liv-lv), which cannot serve to extend RICO continuity. <u>See</u> § I.C., <u>supra</u>.

scheme. See, e.g., Eppolito, 2006 WL 1793536, at *37; Bingham, 683 F. Supp. at 970.

WWE's conclusory depiction of these payments as "mail fraud" does not compel a different result. See United States v. Maze, 414 U.S. 395, 401-02 (1974) (since scheme had reached fruition, mailings after that point were not in furtherance of the scheme); accord United States v. Altman, 48 F.3d 96, 103 (2d Cir. 1995) ("A mailing cannot be said to be in furtherance of a scheme to defraud when it occurs after the scheme has reached fruition."); Price v. Gast, No. 98 CIV. 7769, 2000 WL 369381, at *7 (S.D.N.Y. Apr. 11, 2000) (same); In re Integrated Res. Real Estate Ltd. P'ships Sec. Litig., 850 F. Supp. 1105, 1148 (S.D.N.Y. 1993) (holding that since the offering period was of finite duration, plaintiffs cannot seek to evade the requirement of closed-ended continuity by alleging acts of mail fraud in the years following the offering); Garrick-Aug Assocs. Store Leasing, Inc. v. Hirschfeld, 652 F. Supp. 905, 906 (S.D.N.Y. 1986) (same).

Even attributing SSAI's two predicate acts to the JAKKS Defendants, the scheme would only extend from late 1997 to January 11, 1999 (Def. Br. at 9), far short of the minimum two year closed-ended continuity threshold in the Second Circuit. First Capital, 385 F.3d at 181.

### E.    There is No Open-Ended Continuity

It cannot be seriously argued that the Amended Complaint satisfies open-ended continuity because the alleged scheme of bribery was "inherently terminable," posing no threat of continued criminal activity.  (Def. Br. at 15.)  WWE itself repeatedly describes the alleged scheme as one to defraud WWE to procure the Licenses by corrupting its agents (Pl. Opp. at 9, 15; AC ¶ 1), and admits, as it must, that the last License was obtained (and thus the scheme was completed) by July of 1998. (Def. Br. at 26.)  Accordingly, it cannot be gainsaid that the alleged activity was anything but a clearly defined, discrete and finite occurrence that imported no threat of continuing misconduct. See, e.g., Int'l Bhd. of Teamsters v. Carey, 297 F. Supp. 2d 706, 715-16 (S.D.N.Y. 2004) (scheme

13

to solicit illegal campaign contributions by promising funds of the IBT to donors of illegal contributions inherently terminable), aff'd, 124 Fed. App. 41 (2d Cir. 2005).

Rather than acknowledge reality, WWE advances the preposterous argument that continuity is satisfied if the threat of future misconduct is present at the inception of the alleged scheme. (Pl. Opp. at 26-27.) Of course, if this were sufficient, continuity would always be present because, by definition, RICO requires at least two predicate acts, and the threat of a second predicate act could always be said to exist at the time of the first predicate act.

WWE's cases merely stand for the unexceptional proposition that the "'analysis of the threat of continuity cannot be made solely from hindsight,'" a principle designed to avoid immunizing wrongdoers whose indefinite and ongoing racketeering activities are only interrupted by detection. See United States v. Aulicino, 44 F.3d 1102, 1112 (2d Cir. 1995) (threat of continuity cannot be made solely from hindsight where the scheme ended as result of discovery and conviction); Welch Foods Inc. v. Gilchrist, No. 93-CV-0641, 1996 WL 607059, at *6 (W.D.N.Y. Oct. 18, 1996) (termination of 10-year scheme by discovery did not remove the threat of continuity). Contrary to WWE's misleading contention (Pl. Opp. at 27), the alleged wrongdoing here did not cease as a result of any detection by WWE.[13] Rather, it ended because the Licenses had been procured, and WWE terminated both Shenker and Bell by 2000 (AC ¶¶ 187, 189), for entirely unrelated reasons, precluding any continuation of the scheme, long before 2002 when WWE claims it discovered the alleged wrongdoing. (Pl. Opp. at 40.) And WWE does not allege any unlawful acts by the JAKKS Defendants in furtherance of the alleged scheme after 1998. (Def. Br. at 16.) "Defendants' failure

---

[13]    Unlike here, WWE's cases involved allegations of racketeering activity that was halted as a result of discovery, arrest, indictment or guilty pleas. See, e.g., United States v. Busacca, 936 F.2d 232, 238 (6th Cir. 1991); Cosmos Forms, 113 F.3d at 310; Coiro, 922 F.2d at 1010; United States v. Gelb, 881 F.2d 1155, 1163-64 (2d Cir. 1989); Sumitomo Corp. v. Chase Manhattan Bank, No. 99 Civ. 4004, 2000 WL 1616960, at *2 (S.D.N.Y. Oct. 30, 2000).

to commit any predicate acts of racketeering for nearly a year severely undercuts any claim of a continuity." Wiltshire v. Dhanraj, 421 F. Supp. 2d 544, 551 (E.D.N.Y. 2005).

Seeking to bootstrap continuity from the Court's March 31, 2006 decision holding that an enterprise could solely consist of the predicate acts alleged in the Amended Complaint, WWE contends that the Court's holding constitutes a finding that the "business" of Defendants' association in fact is racketeering activity (Pl. Opp. at 25) so that "open-ended continuity is automatically established." (Id. at 26.) WWE's novel interpretation of the RICO statute proves far too much. Making RICO a federal conspiracy statute, under WWE's logic, an association of two defendants to commit two predicate acts is not only sufficient to constitute a RICO enterprise, but because the sole purpose of that association is to commit the unlawful acts, it "automatically" satisfies continuity too, a result that reads continuity entirely out of the RICO statute.

Contrary to WWE's facile argument, courts look beyond the predicate acts and consider the defendants' underlying business activities to determine whether they are primarily engaged in racketeering activity. See, e.g., Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 244 (2d Cir. 1999) (predicate acts not a regular means by which the defendants conducted their underlying plumbing business); Eastchester Rehab. & Health Care Ctr., L.L.C. v. Eastchester Health Care Ctr., L.L.C., No. 03 Civ. 7786, 2005 WL 887154, at *6 (S.D.N.Y. Apr. 15, 2005) ("[T]his case involves legitimate businesses, which are not alleged to have been engaged solely in the business of racketeering activity."). WWE admits that Defendants here are not in the business of racketeering activity. (See AC ¶ 10 ("JAKKS is primarily in the business of selling action figures and toys.").)

Nor does the misconduct alleged in the Amended Complaint demonstrate "inherently unlawful" criminal conduct sufficient to raise a threat of a future criminal act. See Carey, 297 F. Supp. 2d at 715 (despite several defendants' convictions for racketeering, "the complaint nonetheless

fails to allege facts showing that the scheme is 'inherently unlawful' in the <u>Aulicino</u> sense [murder or obstruction of justice in pursuit of narcotics trafficking or embezzlement]"; the Second Circuit and the Supreme Court "make clear [that] simple unlawfulness of past activity is not sufficient to embody the requisite specific threat of future criminal activity") (citing, <u>e.g.</u>, <u>Aulicino</u>, 44 F.3d at 1112). The garden variety scheme to defraud alleged here is simply not the type of inherently unlawful conduct that may raise a presumption of open-ended continuity for RICO liability.[14] <u>See</u> <u>Carey</u>, 297 F. Supp. 2d at 715 ("[U]nlawful activity . . . undertaken for purposes of self-enrichment [and] depriving IBT and its members of money [and] the honest services of its officers and employees . . . are not themselves unlawful . . . in the RICO continuity context.").

### F. WWE's Single Bribery Scheme Is Insufficient to Establish a Pattern of Racketeering Activity

WWE's attempt to invoke RICO by fragmenting a single alleged bribery scheme to manufacture a "pattern" has been rejected by the Second Circuit. <u>Schlaifer Nance & Co. v. Estate of Andy Warhol</u>, 119 F.3d 91, 98 (2d Cir.1997). (<u>See also</u> Def. Br. at 17-18.) Disregarding the authorities cited in JAKKS Defendants' brief, WWE baldly asserts "there are multiple schemes alleged in the Amended Complaint for continuity purposes." (Pl. Opp. at 22.) In fact, WWE alleges nothing more than a single scheme of alleged bribery directed at a narrow goal of procuring the Licenses, and all of the alleged predicate acts, which WWE touts as numerous, constitute nothing more than integrated steps towards its accomplishment.[15]

WWE erroneously contends that the purported bribery scheme was "multi-faceted" because

---

[14]     WWE's cases are readily distinguishable. <u>See, e.g.</u>, <u>Coiro</u>, 922 F.2d at 1017 (threat of future criminal activity found where predicate acts involved drug trafficking); <u>United States v. Triumph Capital Group, Inc.</u>, 260 F. Supp. 2d 444, 453-54 (D.Conn. 2002) (threat of future harm where alleged acts of bribery and obstruction of justice spanned over two years without any indication of discontinuance).

[15]     Even including the acts predating Bell's involvement in late 1997 would not change the result as WWE contends that virtually all acts since WWE entered into a license agreement with JAKKS in 1995 are "seamlessly interconnected" to the alleged bribery scheme for the WWE Licenses. (Pl. Opp. at 13-14.)

it allegedly concerned both the videogame and toy licenses.[16]  (Pl. Opp. at 21-22.)  Contrary to WWE's contention, predicate acts concerning more than a single agreement or transaction may constitute a single scheme.[17]  Indeed, WWE admits "only a single scheme was alleged" in Jacobson, 882 F.2d at 720 (Pl. Opp. at 23), which involved a scheme to misappropriate plaintiff's investment holdings by engaging in multiple transactions concerning separate properties.  See also, e.g., Roeder v. Alpha Indus., 814 F.2d 22, 31 (1st Cir. 1987) (single scheme involving payment of bribes to obtain multiple defense subcontracts); Meyer Material Co. v. Mooshol, 188 F. Supp. 2d 936, 942 (N.D. Ill. 2002) (single scheme entailing several "cash stripping" and false check issuance transactions); Casio Computer Co. v. Sayo, No. 98CV3722, 2000 WL 1877516, at *4-6, *13 (S.D.N.Y. Oct. 13, 2000) (single scheme involving numerous transactions to misappropriate funds).

As WWE concedes, this action is about the alleged "bribes relating to WWE's licensing program" (Pl. Opp. at 1), which is "not the sort of 'pattern of racketeering activity' contemplated under the [RICO] statute."  Roeder, 814 F.2d at 30.  WWE fails to plead a pattern of racketeering activity because the totality of the alleged predicate acts here involves a single scheme by defendants to allegedly harm a single victim, WWE, for the sole purpose of obtaining the WWE Licenses.  See Dempsey v. Sanders, 132 F. Supp. 2d 222, 226-27 (S.D.N.Y. 2001).[18]

---

[16]    WWE disingenuously asserts that the JAKKS Defendants admitted that WWE sufficiently alleged multiple schemes. (Pl. Opp. 21.) WWE confuses multiple schemes with the multiple events that sufficiently triggered inquiry notice, if not actual knowledge, by WWE of its RICO injury. (Def. Br. at 25.)

[17]    WWE's cases are readily distinguishable because they involved multiple schemes based on a series of distinct and separate illegal activities.  See Panix Promotions, Ltd. v. Lewis, No. 01-Civ. 2709, 2002 WL 72932, at *2-3, *7 (S.D.N.Y. Jan. 17, 2002) (multiple schemes involving fraudulent securing of management fees for four years, running accounting fraud for five years and other numerous frauds for at least four years were neither sporadic or isolated); Hansel 'N Gretel Brand, Inc. v. Savitsky, No. 94 Civ. 4027, 1997 WL 543088, at *1, *6 (S.D.N.Y. Sept. 3, 1997) (racketeering activity involving repeated false invoicing lasting 6 years where each invoice represented a discrete attempt to defraud plaintiffs and had nothing to do with previous or subsequent invoices).

[18]    WWE erroneously contends that dismissal of its RICO claim does not mandate a dismissal of its RICO conspiracy count. (Pl. Opp. at 70.) In advancing this legally discredited argument, WWE ignores not
(continued...)

17

## II.    WWE FAILS TO ALLEGE A COGNIZABLE RICO INJURY

WWE cannot deny that "[c]ivil RICO damages 'are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable.'" First Nationwide Bank, 820 F. Supp. at 95 (citation omitted). (Def. Br. at 19-21.)[19] Instead, WWE contends that its injury was not speculative because it allegedly received "lower than competitive royalty rates" for its Licenses. (Pl. Opp. at 31.) But WWE's theory that it would have received higher royalty rates absent the bribery scheme is itself inherently speculative. (Def. Br. at 19-21.)

Where, as here, there is no alleged concrete financial loss, the claimed injury is inherently speculative, and unrecoverable under RICO. See Imagineering, Inc. v. Kiewit Pac. Co., 976 F.2d 1303, 1310-11 (9th Cir. 1992). In Imagineering, a class of minority and woman-owned businesses ("MWBE's") sued a construction company under RICO for violating regulations that required contracts to be awarded to MWBE's, including plaintiffs. Id. at 1305. Stating that "[a]lthough plaintiffs assert that if specified contracts had not gone to [defendants] those contracts would have been awarded to the plaintiffs' prime contractors, that [assertion could not] be established," the Ninth

---

[18]    (...continued)
only controlling Second Circuit precedent, but the Supreme Court opinion on which it relies. It is axiomatic that WWE must establish that "if the agreed-upon predicate acts had been carried out, they would have constituted a pattern of racketeering activity." Cofacredit, 187 F.3d at 244-45 (2d Cir. 1999) (citing Salinas v. United States, 522 U.S. 52 (1997)). The Supreme Court in Salinas, 522 U.S. at 53, stated in salient part that "a conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense." Having failed to adequately state a pattern of racketeering activity required to state a substantive RICO claim, WWE cannot establish that there was an "agreement to engage in a pattern of racketeering activity." Cofacredit, 187 F.3d at 245. WWE's own cases are in accord. See State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., 375 F. Supp. 2d 141, 151-52 (E.D.N.Y. 2005) (substantive RICO claim not asserted against defendants, and therefore no claim that the alleged predicate acts allegedly agreed to were indeed carried out to sustain RICO violation).

[19]    WWE mischaracterizes the JAKKS Defendants' cases as granting dismissal only when the speculative nature of an injury was due to the possibility of future contingencies, or when the RICO conspiracy was not a proximate cause of the injury. (Pl. Opp. at 32.) To the contrary, JAKKS cited several cases where courts dismissed claims due to the speculative nature of the RICO injury itself. (Def. Br. at 20, n.13.) See, e.g., In re Taxable Mun. Bond Sec. Litig., 51 F.3d 518, 522-23 (5th Cir. 1995), Strates Shows, Inc. v. Amusements of Am., Inc., 379 F. Supp. 2d 817, 825, 829 (E.D.N.C. 2005); Allen v. Berenson Pari-Mutuel, No. 95 Civ. 10289, 1998 WL 80168, at *3 (S.D.N.Y. Feb. 25, 1998).

Circuit Court of Appeals affirmed dismissal of the RICO claim, holding that "the facts alleged do not establish 'proof of concrete financial loss.'" Id. at 1310.[20] Similarly, WWE asserts that it "would have received millions more than it has" if "THQ had chose [sic] to offer what it was prepared to pay." (Pl. Opp. at 31.) On its face, this allegation rests on speculation that THQ would have made a formal offer and that its terms would have been superior. Indeed, according to WWE's own allegations, made after discovery and with knowledge of all the bids WWE actually received, THQ never made any formal proposal, and the terms contained allegedly in a letter to WWE were only "roughly outlined" and not alleged to have been superior to the THQ/JAKKS proposal. (AC ¶ 131.)

WWE also concedes, as it must, that lost profits are not recoverable for fraud under New York law, which applies here. (Pl. Opp. at 30.) WWE's claim for damages really is a claim for lost profits, which is expressly prohibited under New York law. (Def. Br. at 20.) WWE tries to avoid this bar by portraying its claimed damages as "loss of opportunity" damages (Pl. Opp. at 30), contending it lost the opportunity to enter into a license agreement with more favorable terms – i.e., one providing greater profits. Contrary to WWE's assertions, such a claim is inherently speculative and fails as a matter of well-settled law. See Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 422 (1996) ("[T]he loss of an alternative contractual bargain . . . cannot serve as a basis for fraud or misrepresentation damages because the loss of the bargain was 'undeterminable and speculative.'") (citation omitted); accord Beznicki v. Fetaya, No. 8230/05, 2006 WL 1132351, at *2 (N.Y. Sup. Ct. Queens County Apr. 18, 2006) (in action alleging that defendants fraudulently concealed better purchase offers, "'[t]he damages plaintiff seeks are not recoverable under the out-of-pocket rule, which bars recovery of profits that would have been realized in the absence of fraud,

---

[20]    Cf. Anza v. Ideal Steel Supply Corp., 126 S. Ct. 1991, 1997 (2006) (noting that since plaintiff's injury was its own loss of sales, it could have occurred for a variety of reasons, apart from fraud); accord James Cape & Sons Co. v. PCC Construction Co., No. 05-3894, 2006 WL 1751886 (7th Cir. June 28, 2006).

19

including the <u>loss of an alternative bargain overlooked in favor of the fraudulent one</u>, as inherently speculative and undeterminable'") (emphasis added; citation omitted.)[21]

In the same vein, even if WWE could recover on a claim for a "lost opportunity," which it cannot, it has not alleged facts to support such a claim because it has not alleged any <u>specific superior</u> offers it eschewed due to the alleged fraud. See <u>A.I.A. Holdings, S.A. v. Lehman Bros., Inc.</u>, No. 97 Civ. 4978, 2002 WL 1334809, at *2-3 (S.D.N.Y. June 17, 2002) (distinguishing <u>I.M. Oberman</u> (cited by WWE) and holding that where plaintiffs did not pass up other actual and "specific opportunities," they were not entitled to recover for lost opportunity damages). With respect to the six toy licenses, WWE fails to identify <u>any</u> potential business opportunity whatsoever that it passed up in favor of JAKKS, and with respect to the videogame license, WWE does not identify any specific superior bids it allegedly lost.

WWE's cases, only one of which even involved RICO, are inapposite because they do not involve lost profits incurred as a result of entering a less lucrative deal, but rather the loss of an opportunity to engage in any transaction at all.[22] WWE cannot allege it lost the chance to acquire a licensee, but merely that it received lower royalty rates than it might have gotten had it entered into

---

[21]    WWE's assertion that it need not plead the exact dollar amount of damages (Pl. Opp. at 31), is beside the point, as on the face of the complaint, WWE alleges a speculative injury that cannot be quantified. (Def. Br. at 20.) WWE's reliance on <u>Trustees of Plumbers & Pipefitters National Pension Fund v. Transworld Mechanical, Inc.</u>, 886 F. Supp. 1134 (S.D.N.Y. 1995), is misplaced because there the information to calculate damages was "peculiarly within defendants' knowledge." <u>Id.</u> at 1146.  Here, WWE has access to the terms of the other offers, yet it <u>still failed to allege those terms</u>. See <u>Cougar Audio, Inc. v. Reich</u>, No. 99 Civ. 4498, 2000 WL 420546, at * 5 (S.D.N.Y. Apr. 18, 2000) (noting that "there are factual allegations necessary to substantiate Plaintiff's claim that are not peculiarly within the Defendants' control.").

[22]    See <u>I.M. Oberman Assocs., Inc. v. Republic Fin. Servs., Inc.</u>, No. 92 Civ. 1843, 1993 WL 88209, at *5 (S.D.N.Y. Mar. 25, 1993) (plaintiff alleged that its former clients <u>refused to do business with them</u> as a result of defendant's fraud); <u>Schonfeld v. Hilliard</u>, 218 F.3d 164, 183 (2d Cir. 2000) (plaintiff may seek to recover the market value of an actual and specific agreement which was <u>abandoned</u> in reliance on Defendant's promises); <u>Academic Indus., Inc. v. Untermeyer Mace Partners, Ltd.</u>, No. 90 Civ. 1052, 1992 WL 73473, at *2 (S.D.N.Y. Apr. 1, 1992) (plaintiffs alleged a RICO injury where, as a result of defendants' misrepresentation that plaintiffs would receive capital, plaintiffs <u>did not use an outside business</u> to produce its books, and noting that "[t]o be distinguished, however, are any profits plaintiffs would have earned").

a "competitive" agreement with other bidders.  (Pl. Opp. at 31.)  Thus, WWE alleges the

quintessential speculative claim for lost profits, which is barred under New York law and RICO.[23]

## III.    WWE'S RICO CLAIMS ARE TIME-BARRED

### A.    WWE Was on Inquiry Notice of its Injury

A review of WWE's opposition brief dispels any doubt that WWE was on inquiry notice of

its alleged RICO injuries by 1998, more than four years before commencing this lawsuit, and that

its RICO claims are time-barred.  (Def. Br. at 23-32.)  WWE's conclusory attempt to create a "fact

issue" by asserting that it "disputes" inquiry notice fails, as a matter of law, because the inquiry

notice here clearly derives from the face of WWE's Amended Complaint, the allegations of which

are assumed to be true.  See Fakhoury Enters., Inc. v. J.T. Distribs., No. 94 Civ. 2729, 1997 WL

291961, at *1 n.4 (S.D.N.Y. June 2, 1997) ("[P]laintiff's conclusory averment that there is [a] dispute

does not create a genuine dispute as to this issue."); accord, e.g., United States v. Wallace, No. 97

CR. 975, 1998 WL 401534, at *10 (S.D.N.Y. July 17, 1998); Simpson v. Metro-North Commuter

R.R., No. 04 Civ. 2565, 2006 WL 2056366, at *6 (S.D.N.Y. July 20, 2006).  WWE makes no

attempt whatsoever to deny receiving the multiple storm warnings that would alert any reasonable

person to its RICO injury, including (1) the alleged issuance of seven licenses at allegedly below

market rates (Def. Br. at 25-27), (2) the financially detrimental Playmates deal in which WWE

forewent an almost $400,000 guarantee (id. at 27), (3) direct complaints to WWE by Playmates and

Acclaim about the precise competitive process WWE now belatedly challenges (id. at 28), (4) the

---

[23]     JAKKS Defendants never conceded, as WWE now asserts (Pl. Opp. at 33-34), that any injury was
inflicted on WWE.  The JAKKS Defendants merely demonstrated that the alleged injury here flowed from
the purported bribes and not from any reduction in market competition as required to state a claim under the
antitrust laws. (JAKKS Defendants' Sherman Act Br. at 20.)  Moreover, contrary to WWE's misreading of
Federal Paper Board Co. v. Amata, 693 F. Supp. 1376 (D. Conn. 1988), the court's finding of sufficiently
pled RICO claim was based on plaintiffs' adequate pleading of a non-speculative RICO injury.  See id. at
1391-93.  Amata did not involve, much less resolve, any challenge to RICO injury.  Here, WWE's alleged
RICO injury is, as WWE itself has admitted to this Court, "wholly speculative." (WWE Mem. of Law in
Opp. to Defs. Mot. to Dismiss the Sherman Act Claim at 28-29.)

initial approval of the proposal to grant of the videogame license to JAKKS – which allegedly lacked any experience in videogames – without awaiting Acclaim's proposal (id. at 29), and (5) the sudden emergence of the dramatically superior JAKKS/THQ Joint Bid (id. at 30). Given the plethora of storm warnings pled by WWE itself and undisputed in its Opposition Brief, WWE was indisputably on inquiry notice of its alleged RICO injury no later than 1998.

WWE also does not, and cannot, dispute that it made no inquiry in 1998, or any other attempt to investigate its injury at that time, despite the unequivocal storm warnings. WWE's subsequent alleged inquiry, years later (after the statute had run), is unavailing because it is settled that "[i]f the [plaintiff] makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose." LC Capital Partners, 318 F.3d at 154 (emphasis added); accord, e.g., In re Salomon Analyst Winstar Litig., No. 02 Civ. 6171, 2006 WL 510526, at *5 (S.D.N.Y. Feb. 28, 2006).

To try to stave off dismissal, WWE claims that "knowledge and notice are peculiarly factual issues" that are "inappropriate" for resolution on a motion to dismiss. (Pl. Opp. at 35.) But this contention provides no safe harbor for WWE amid the unrefuted storm warnings. It collides with controlling legal authority that where – as here – the facts alleged in the complaint establish inquiry notice and a lack of diligence, "resolution of the issue on a motion to dismiss is appropriate." Dodds v. Cigna Sec., Inc., 12 F.3d 346, 350, 352 n.3 (2d Cir. 1993). Indeed, the Court of Appeals has decisively held that where, as here, the facts needed to determine whether a plaintiff is on inquiry notice "'can be gleaned from the complaint and papers . . . integral to the complaint,'" we can readily resolve the issue on a motion to dismiss, and have done so in "'a vast number of cases.'" LC Capital Partners, 318 F.3d at 156 (emphasis added) (quoting Dodds, 12 F.3d at 352 n.3).[24] Contrary to

---

[24]    WWE ignores not only Dodds, but all of the cases cited by Defendants dismissing time-barred RICO claims where, as here, notice is apparent from the complaint. See, e.g., LC Capital Partners, 318 F.3d at 156; Apollon Waterproofing & Restoration, Inc. v. Bergassi, No. 01 Civ. 8388, 2003 WL 1397394, at *3
(continued...)

WWE's bald assertion, the allegations in the Amended Complaint clearly plead inquiry notice and there are simply no conflicting inferences to be drawn from the Amended Complaint on the issue of when WWE should have been on inquiry notice of its RICO injury.[25]  Indeed, WWE hit our nail on the head – in concessions <u>fatal</u> to its claims – by admitting that facts alleged in the Amended Complaint **"would lead anyone . . . to suspect that the videogame license was being obtained by fraud"** (Pl. Opp. at 54) and that the bidding process for the WWE videogame license was **"obviously irregular and corrupt."**  (<u>Id.</u> at 67 (bold added).)

Ignoring the veritable blizzard of storm warnings identified by Defendants, WWE responds that the seven toy and videogame licenses alleged by WWE to be at below market prices were not enough to provide inquiry notice of all of the details of Defendants' scheme.  (<u>Id.</u> at 36.)  Such a contention is both factually and legally misplaced.  Not surprisingly, WWE does not even acknowledge the controlling Supreme Court case of <u>Rotella v. Wood</u>, 528 U.S. 549 (2000) (Def. Br. at 21-22), which is fatal to WWE's RICO claim.  It establishes that a RICO claim accrues when the plaintiff discovers, or should have discovered, <u>its RICO injury</u>, not the RICO pattern, much less the details of that pattern.  <u>Rotella</u>, 528 U.S. at 555.  (<u>See also</u> cases in Def. Br. at 24-25.)  Based on WWE's own allegations, it is undisputed that WWE's RICO injury was its execution of license agreements at allegedly below market rates (AC ¶ 58), pursuant to a process WWE claims was "obviously irregular and corrupt" (Pl. Opp. at 67), all of which occurred by 1998.

---

[24]     (...continued)
(S.D.N.Y. Mar. 20, 2003), <u>aff'd</u>, 87 Fed. App. 757 (2d Cir. 2004); <u>In re Ultrafem Inc. Sec. Litig.</u>, 91 F. Supp. 2d 678, 692 (S.D.N.Y. 2000); <u>In re Merrill Lynch Ltd. P'ships Litig.</u>, 7 F. Supp. 2d 256, 266 (S.D.N.Y. 1997), <u>aff'd</u>, 154 F.3d 56 (2d Cir. 1998); <u>Butala v. Agashiwala</u>, 916 F. Supp. 314, 318 (S.D.N.Y. 1996).  (<u>See also</u> cases in Def. Br. at 23-25.)  <u>See also</u> <u>In re Salomon Analyst Winstar Litig.</u>, 2006 WL 510526, at *4.

[25]     WWE's cases, most of which do not even address RICO, are inapposite because inquiry notice did not spring from the <u>complaint</u>, as it does here.  <u>See, e.g.</u>, <u>In re Prudential Sec. Inc. Ltd. P'ships Litig.</u>, 930 F. Supp. 68, 76 (S.D.N.Y. 1996) (prospectuses did not give rise to inquiry notice when certain details of the scheme were uncovered in the weeks prior to oral argument on the motion).

Ignoring controlling Second Circuit authority and relying on a hodge-podge of cases from other jurisdictions, WWE argues that higher standards apply when inquiry notice relates to the corruption of insiders.[26] This simply is not the case. See, e.g., Addeo v. Braver, 956 F. Supp. 443, 451-52 (S.D.N.Y. 1997) ("Plaintiffs were entitled to rely upon their 'confidential relationship' with defendant only until events transpired 'which would normally awaken suspicion in the[m]'" and holding that plaintiffs were on inquiry notice) (emphasis added; citations omitted); Zola v. Gordon, 685 F. Supp. 354, 365 (S.D.N.Y. 1988) ("[I]n cases involving fiduciary relationships, tolling ceases to work to a plaintiff's benefit when the plaintiff possesses sufficient facts that he must engage in some inquiry, and he fails to live up to that obligation."). Contrary to WWE's contention (Pl. Opp. at 37), JAKKS' moving brief cited numerous cases in which inquiry notice triggered the statute of limitations, even though the fraud was perpetrated by individuals in positions of trust. (Def. Br. at 22, 32, 33.) See, e.g., DLT Res., Inc. v. Credit Lyonnais Rouse, Ltd., No. 00 Civ. 3560, 2001 WL 25695, at *1 (S.D.N.Y. Jan. 10, 2001) (plaintiff alleged that defendants infiltrated plaintiff and corrupted its employees); Moll v. U.S. Life Title Ins. Co., 700 F. Supp. 1284, 1292 (S.D.N.Y. 1988) (plaintiff accused his attorney of fraud); Town of Poughkeepsie v. Espie, 402 F. Supp. 2d 443 (S.D.N.Y. 2005) (town brought action to recover public funds it alleged were procured through bribes). Given the multiple storm warnings that put WWE on inquiry notice of its RICO injury, including the "irregular" manner in which Bell and/or Shenker were conducting the bidding process which WWE belatedly seeks to challenge, WWE's admitted failure to take any steps, or ask any basic questions, to diligently discover the source of its alleged RICO injury (Def. Br. 25-29), cannot be

---

[26]    WWE's foreign cases are also plainly inapposite. See Strock v. USA Cycling, Inc., Nos. 00-CV-2285, 01-CV-2444, 2006 WL 1223151, at *4 (D. Colo. May 8, 2006) (the fiduciary, a coach of a sports team, was "'in a position of trust, if not absolute power'" over members of the team) (citation omitted); Knapp v. Knapp, 100 P.2d 759, 761 (Cal. 1940) (family connection can be considered when assessing reliance on a fiduciary); Frederick Rd. Ltd. P'ship v. Brown & Sturm, 756 A.2d 963, 975 (Md. 2000) (tolling the statute of limitations for malpractice claims under "continuation of services" theory); Kurtz v. Trepp, 375 N.W.2d 280, 284 (Iowa Ct. App. 1985) (given lack of storm warnings, plaintiff had no reason to inquire).

excused by the incantation of "fiduciary duty."[27]

Even if WWE were entitled to rely on a fiduciary relationship to overcome its own lack of diligence, which it is not, it would be of no help to WWE. Despite WWE's bald assertion in its brief (Pl. Opp. at 36), the Amended Complaint conspicuously lacks any allegations that Bell and Shenker engaged in any "vouching . . . on behalf of their partners in crime, the Jakks Defendants and the THQ Defendants." Also lacking is any allegation of any complicity between Bell or Shenker with respect to the first three licenses, or that Bell was in any way compromised at that time when the first storm warnings arose and inquiry notice was triggered. (Def. Br. at 9.) WWE's contention that Bell and Shenker "worked together," using their expertise and reputation to misrepresent "all the deals and mislead WWE" (Pl. Opp. at 38) lacks any factual foundation in the Amended Complaint. Given the multiple storm warnings alerting WWE to its alleged RICO injury, and WWE's admitted failure to make any inquiry, its RICO claims are time-barred. See Dodds, 12 F.3d at 350.

## B.    WWE Has Not Alleged Fraudulent Concealment

Similarly, WWE's attempt to toll the statute of limitations based on "fraudulent concealment" also fails as a matter of law.[28]  In particular, WWE fails to plead a crucial element of fraudulent concealment: due diligence in pursuing the discovery of its claim. (Def. Br. at 32-33.) This element is routinely decided on a motion to dismiss where the "[c]ourt concludes that the [plaintiff] has not adequately alleged or shown that it exercised the requisite due diligence to toll the running of the RICO limitations period." Town of Poughkeepsie, 402 F. Supp. 2d at 452 (dismissing plaintiff's RICO claim and noting that "[t]he Supreme Court has deliberately emphasized that in the context of a civil RICO case, the bar is raised in terms of a Plaintiff's obligation to act swiftly and with

---

[27]    WWE's reliance on In re Prudential Securities Inc. Ltd. Partnerships Litigation, 930 F. Supp. 68, 76-77 (S.D.N.Y. 1996), is misplaced, as that case did not even involve the corruption of insiders.

[28]    WWE misleadingly claims that the JAKKS Defendants did not contest the adequacy of WWE's fraudulent concealment allegations. (Pl. Opp. at 39.)  This is simply not true. (Def. Br. at 32.)

diligence to ascertain and act on a RICO injury") (Def. Br. at 32-33); <u>see also</u> <u>In re Merrill Lynch</u>, 154 F.3d at 60 (affirming the dismissal of a RICO claim as time-barred, and holding that plaintiffs failed to plead due diligence). This necessary element "requires due diligence by plaintiff <u>throughout the period to be equitably tolled</u>." <u>Nat'l Group for Commc'ns & Computers Ltd. v. Lucent Tech. Inc.</u> ("<u>NGCC</u>"), 420 F. Supp. 2d 253, 268 (S.D.N.Y. 2006) (rejecting plaintiff's fraudulent concealment argument and dismissing the RICO claim) (emphasis added).[29] WWE concedes its failure to meet this test by stating that "at the earliest December 2002" "WWE began diligently pursuing the evidence in an effort to determine what had occurred." (Pl. Opp. at 40-41.) By this time, the statute of limitations already had expired, and such purported diligence was far too late to save WWE's RICO claim.

### C.    A Separate Accrual Theory Cannot Revive WWE's Stale RICO Claim

In a last ditch effort, WWE argues that under the principle of "separate accrual," it still has timely claims for "new" injuries it supposedly incurred from October 19, 2000 onward. The obvious flaw in this argument is that its purported new "injuries" consist entirely of "artificially low payments made under the licenses," (Pl. Opp. at 42), which are simply payments made pursuant to a preexisting contract. As a matter of law, these are <u>not</u> "separate and distinct fraudulent acts resulting in new and independent injuries." <u>In re Merrill Lynch</u>, 154 F.3d at 60 (finding that plaintiffs' injury occurred when the investment was made and subsequent collection of annual fees "cannot be viewed as a separate and distinct fraud creating new injuries").[30] Any future payments to be made pursuant

---

[29]    WWE glibly asserts that JAKKS' cases are inapposite because the plaintiffs in those cases had constructive knowledge of the claim during the initial period. <u>See</u> <u>Tho Dinh Tran v. Alphonse Hotel Corp.</u>, 281 F. 3d 23, 37 (2d Cir. 2002); <u>NGCC</u>, 420 F. Supp. 2d at 268. In fact, these cases are <u>directly on point</u>, because WWE's allegations that the toy and videogame licenses were entered into by 1998, at what WWE says were obviously below market rates resulting from a clearly irregular bidding process, means that it was on inquiry notice, and thus had constructive knowledge of its injuries. (Pl. Opp. at 31; AC ¶ 58; <u>see</u> § III. A.)

[30]    <u>Accord</u> <u>NGCC</u>, 420 F. Supp. 2d at 266 (payments made pursuant to agreements were not new and
(continued...)

to the terms of those agreements were known to WWE at the time the agreements were entered into, when they were on inquiry notice of their injury.[31]  Accordingly, the doctrine of separate accrual cannot save WWE's time-barred RICO claim.

## IV.    WWE'S CLAIMS ARE BARRED BY THE 2004 RELEASE

Even if WWE could transform its state law claim into a valid RICO violation, which it cannot, and even if it had adequately alleged injury, which it has not, and even if its claims were not time-barred, which they are, dismissal of this action still would be mandated because the 2004 Release unconditionally released JAKKS from any liability for the claims asserted in the Amended Complaint.[32]  (Def. Br. at 33-36.)

_____

[30]    (...continued)
independent injuries because "this is a case where plaintiff discovered, or could have discovered, the full extent of related, future injuries at the outset of a single, unlawful scheme."); Pharr v. Evergreen Gardens, Inc., No. 03 Civ. 5520, 2004 WL 42262, at *2 (S.D.N.Y. Jan. 7, 2004) (new rental bills sent four years after fraudulent rent increase did not trigger the separate accrual rule because "[t]he injury the plaintiffs allegedly suffered due to the rent bills mailed within the four-year statute of limitations is identical to the injury they suffered when the defendants allegedly unlawfully increased the [rent]"). Cf. Ciprofloxacin Hydrochloride, 261 F. Supp. 2d at 229 (payments made pursuant to fixed terms of an anticompetitive agreement "are not sufficient to extend or restart the limitations period").

[31]    WWE's cases are inapposite because they involved new and independent alleged wrongs and not payments under a legitimate preexisting contract.  See Bingham v. Zolt, 66 F.3d 553, 561 (2d Cir. 1995) (holding that illegal diversions of funds constituted new and independent injuries); Local 851 of Int'l Bhd. of Teamsters v. Kuehne & Nagle Air Freight Inc., No. 97 CV 0378, 1998 WL 178873, at *4 (E.D.N.Y. Mar. 6, 1998) (payments made pursuant to a "sham consulting agreement" designed to disguise payments constituted a new and separate injury); Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 502 n.15 (1968) (holding that defendant's continuing illegal lease-only policy constituted a Sherman Act violation that caused continuous harm).

[32]    Contrary to WWE's assertion, a release defense can properly be raised on a Rule 12(b)(6) motion. (Def. Br. at 33-34 (citing cases)); see also Matusovsky v. Merrill Lynch, 186 F. Supp. 2d 397, 401 (S.D.N.Y. 2002) (dismissing claims precluded by a release); Laramee v. Jewish Guild for Blind, 72 F. Supp. 2d 357, 361 (S.D.N.Y. 1999) (dismissing complaint barred by a valid release).  In contrast, WWE cites cases where the validity of the release was found to be sufficiently challenged to prevent disposition on a motion to dismiss.  See Livingston v. Adirondack Beverage Co., 141 F.3d 434, 437 (2d Cir. 1998) (the release in question challenged by plaintiff who contended he was forced to sign the release); DePalma v. Realty IQ Corp., No. 01 Civ. 446, 2002 WL 461647, at *3 (S.D.N.Y. Mar. 25, 2002) (complaint sufficiently challenged the validity of the release); Kuhn v. Pacific Mut. Life Ins. Co., 37 F. Supp. 102, 104-05 (S.D.N.Y. 1941) (application of release unresolved on motion to dismiss where the proponent of the release was not a party to the release).

**A.    The Court Should Consider the 2004 Release in Deciding This Motion**

WWE's attempt to preclude this Court from considering the Release (WWE's Motion to Strike ("MTS") at 5-7) must be rejected on two separate and independent grounds: (1) the Release is deemed to be incorporated by reference, and (2) it is integral to the Amended Complaint.[33] This Court has repeatedly held that a document, such as the Release, which is <u>implicitly</u> referenced by a pleading, can be deemed incorporated by reference into the complaint for purposes of a motion to dismiss.  See <u>Marshall v. Nat'l Ass'n of Letter Carriers Branch 36</u>, No. 00 Civ. 3167, 2003 WL 223563, at *8 n.3 (S.D.N.Y. Feb. 3, 2003) (where plaintiff did not attach certain EEOC documents, the court could still consider them since "they are implicitly referenced in and are integral to the Complaint").  The Audit, which WWE seeks to exploit in its Amended Complaint, culminated in the Release.  Indeed, it is a misleading half-truth to advance the Audit in aid of a claim while concealing that the very claim is foreclosed by the result of the Audit!  Having affirmatively made allegations concerning the Audit, which is inextricably intertwined with the Release, that was the culmination of the Audit, WWE cannot avoid the application of the incorporation by reference doctrine by simply banishing the magic words – "the Release."  Such artful pleading cannot forestall the fatal effects of the Release.  See <u>Warden v. Crown Am. Realty Trust</u>, No. Civ. A. 96-25J, 1999 WL 476996, at *2 n.3 (W.D. Pa. July 6, 1999) (considering proxy statements as implicitly referenced, because plaintiffs specifically pled reliance upon "all documents filed with the SEC"), <u>aff'd</u>, 229 F.3d 1140 (3d Cir. 2000); <u>In re Silicon Graphics, Inc. Sec. Litig.</u>, 970 F. Supp. 746, 758-59 (N.D. Cal. 1997) (considering documents under the incorporation by reference doctrine because "[a]lthough plaintiffs do not cite to defendants' SEC forms in framing their insider trading

---

[33]    It is well settled that a court can review documents extraneous to the complaint on a motion to dismiss, where, as here, the document is incorporated by reference or integral to the complaint.  <u>Salichs v. Tortorelli</u>, No. 01 Civ. 7288, 2004 WL 602784, at *2 (S.D.N.Y. Mar. 29, 2004).

allegations, the allegations can be derived only from those publicly-filed documents. Plaintiffs cannot preclude consideration of defendants' SEC forms by artful pleading.")

As a separate and independent legal matter, the Release is appropriately considered because it is integral to the Audit which is featured in WWE's Amended Complaint.[34] WWE argues that because the Amended Complaint does not rely upon the terms of the Release, the Court cannot consider it. (Pl. MTS at 6-7.) In devising and filing the Amended Complaint, including its explicit Audit allegations, WWE <u>necessarily</u> had to consider the Release, and had to rely on its own self-serving exculpatory interpretation of its terms and effect – that the Release does not apply to WWE's claims asserted in this action. Under these circumstances, courts have squarely held release agreements to be integral to a complaint because the liability of the proponent of the Release is directly predicated upon whether the claims are interpreted to have been released under the agreement. <u>See, e.g.</u>, <u>Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.</u>, 267 F.3d 30, 33 (1st Cir. 2001) ("Since the appellants' complaint fails to state a claim unless appellee retains some measure of liability, which depends upon the interpretation of the 1998 Settlement Agreement, the district court properly considered the agreement in granting defendant's motion to dismiss."); <u>accord</u> <u>Chambers v. Time Warner, Inchambers</u>August 11, 2006c., 282 F.3d 147, 153, n.3 (2d Cir. 2002) (cited by WWE) (citing <u>Alternative Energy</u> as "congruent" with standard in Second Circuit); <u>Ficke</u> <u>v. Johns</u>, No. 95 C 939, 1996 WL 99424, at *3 (N.D. Ill. Mar. 4, 1996) (considering a Release not

---

[34]    Contrary to WWE's incorrect assertion, consideration of the Release does not obligate the Court to convert the JAKKS Defendants' Motion to Dismiss into a motion for summary judgment (Pl. MTS at 4, n.2) because WWE has actual notice of the Release and in the Amended Complaint has relied on the Audit, to which the Release is inextricably connected. <u>See</u> <u>Cortec Indus., Inc. v. Sum Holding L.P.</u>, 949 F.2d 42, 48 (2d Cir. 1991); <u>see also</u> <u>Holowecki v. Fed. Express Corp.</u>, 440 F.3d 558, 565-66 (2d Cir. 2006) ("'[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment.'"). <u>Courtenay Communications Corp. v. Hall</u>, 334 F.3d 210, 213, 215 (2d Cir. 2003), which WWE cites, is inapposite because it involved improper fact-finding on whether a trademark was generic.

attached to the complaint and noting that "the Release is clearly central to plaintiff's allegations in that a determination of the Release's validity affects whether or not this action may proceed").[35] <u>See also</u> <u>In re Global Crossing, Ltd. Sec. Litig.</u>, No. 02 Civ. 910, 2006 U.S. Dist. LEXIS 39030, at *19 (S.D.N.Y. June 13, 2006) (considering whether defendants waived release defense by failing "to raise the release defense in the course of briefing their prior motion to dismiss the Second Amended Complaint"; and admonishing defendants for not raising release defense earlier because "time and resources have been wasted by the belated assertion of this defense").

The Release is central to WWE's allegations relating to the Audit, and crucial to WWE's ability to <u>proceed at all</u>. WWE's strategic decision not to attach it does not allow it to escape the consequence of the Release. The Second Circuit has held that "when a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint, the defendant may produce the [document] when attacking the complaint for its failure to state a claim, <u>because plaintiff should not so easily be allowed to escape the consequences of its own failure</u>." <u>Cortec</u>, 949 F.2d at 47 (emphasis added). JAKKS "should not lose on a motion to dismiss – or be forced to convert its motion to one for summary judgment – because of [WWE's self-serving] failure to attach [an] integral document[] to the complaint." <u>Ricioppo v. County of Suffolk</u>, No. 04 Civ. 3630, at n.1 (E.D.N.Y. Mar. 29, 2006).[36] Because the Release is

---

[35]    <u>See also</u> <u>Pouliot v. Town of Fairfield</u>, 184 F. Supp. 2d 38, 47 (D. Me. 2002) ("[A] prior settlement agreement by which the plaintiff releases defendants from all future claims [is] central to the plaintiff's subsequent complaint."); <u>Willis Corroon Corp. of Utah Inc. v. United Capitol Ins. Co.</u>, No. 97-2208, 1998 WL 30069, at *3 (N.D. Cal. Jan. 5, 1998) (considering a Settlement Agreement, not attached to plaintiff's complaint: "while the interim settlement agreement may not be 'central' to the substantive issues in [plaintiff's] complaint, it clearly is central to [plaintiff's] ability to bring this action since the agreement is a binding contract which allegedly limits the parties' right to sue").

[36]    As stated in <u>MHI Shipbuilding, LLC v. National Fire Insurance Co.</u>, 286 B.R. 16, 21 (D. Mass. 2002) (citing <u>Cortec Indus.</u>, 949 F.2d at 48), "[t]he primary reason for not considering documents outside the complaint is to protect the plaintiff from unfair surprise." <u>See also</u> <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 153 (2d Cir. 2002) ("[T]he harm to the plaintiff when a court considers material extraneous to a complaint is the lack of notice that the material may be considered."). Here, WWE was a party to the Release

(continued...)

both incorporated by reference in, and integral to, the Amended Complaint, it is appropriate to consider the Release in deciding this motion.[37]

### B.    The Lerner Declaration Was A Proper Way to Transmit the Release

In an extraordinary act of gamesmanship, even for WWE, it challenges the transmittal of the Release through the Lerner Declaration claiming that Mr. Lerner is not competent to introduce or testify about the 2004 Release.  WWE advances this disingenuous contention even though WWE executed the Release and has equal knowledge about its authenticity.  It bears emphasis that WWE does not even hint that there is any issue about the bona fides of the Release transmitted, much less challenge the authenticity of the Release.  WWE's challenge to the transmission of the Release is completely improper when the authenticity of the document itself is not at issue.  See Commercial Data Servers, 262 F. Supp. 2d at 59-60 (rejecting motion to strike where movant did not object "that the exhibits are not authentic, just that they are not authenticated" and noting that motion is "disingenuous and wasteful" where, as here, the "plaintiff is in the best position to know if [documents] are authentic" and does not claim they are not).[38]

_____

[36]    (...continued)
and had possession and notice of the Release. In addition, on February 28, 2005, JAKKS submitted the Release with its Motion to Dismiss WWE's original complaint. The issues concerning the Release were also discussed at the scheduled court hearings. (1/11/06 Tr. at 158, 163-64; 4/26/06 Tr. at 5-6.) WWE has never raised any challenge to the authenticity of that document.

[37]    WWE's release cases are not applicable here because there was no indication that plaintiffs had knowledge of, or were parties to, the release, see Donahue v. Uno Rests., LLC, No. 3:06-CV-53, 2006 WL 1373094, at *1 (N.D.N.Y. May 16, 2006) (noting that "[p]laintiff never signed the settlement documents"); Calcutti v. SBU, Inc., 273 F. Supp. 2d 488, 498 (S.D.N.Y. 2003) (refusing to consider release, raised for the first time in a reply brief, and of which the plaintiff was potentially unaware); Zimmerman v. Prime Med. Servs., Inc., 729 F. Supp. 23, 25-26 (S.D.N.Y. 1990) (holding that plaintiffs were first entitled to discovery of a release, to which they were not a party).  In WWE's other cases, the release was not explicitly or implicitly incorporated by reference or integral to the complaint.  See Levine v. Columbia Labs., Inc., No. 03 Civ. 8943, 2004 WL 1392372, at *1 (S.D.N.Y. June 22, 2004); Holmes v. Long Island R.R., No. 96 CV 6196, 1998 WL 960299, at *3 (E.D.N.Y. Dec. 10, 1998); Aquilio v. Manaker, Nos. 90-CV-45, 91-CV-93, 1991 WL 207473, at *5 (N.D.N.Y. Oct. 10, 1991); Kuhn v. Pac. Mut. Life Ins. Co., 37 F. Supp. 102, 104-05 (S.D.N.Y. 1941).

[38]    See also Sa'Buttar Health & Med., P.C. v. TAP Pharms., Inc., No. 03 C 4074, 2004 WL 1510023,
(continued...)

WWE's makeweight argument – invoked to bolster WWE's bizarre speculation that this procedure was designed to avoid testimony by JAKKS (Pl. Opp. at 12) – is unprecedented,[39] and lacks any conceivable legal basis. The Lerner Declaration does not purport to give testimony about any underlying facts concerning the Release, and none is required, whether it is transmitted by an officer or attorney. WWE's cases purportedly supporting its challenge are wholly inapposite because they do not involve Rule 12(b)(6) motions and merely rejected <u>fact testimony</u> by individuals without personal knowledge on motions requiring that factual assertions be made on personal knowledge.[40]

The Lerner Declaration merely transmits the 2004 Release as a true and correct copy. <u>See</u> <u>In re Parmalat Sec. Litig.</u>, 375 F. Supp. 2d 278, 301 n.144 (S.D.N.Y. 2005) (noting that when attaching exhibits to a motion to dismiss, it is appropriate to attach them to a declaration or affidavit that identifies them as "the true and correct copies of what they are supposed to be.").

---

[38]    (...continued)
at *3 (N.D. Ill. July 2, 2004) ("Here, [plaintiff] claims the contract attached by [defendant] is unauthenticated but does not suggest that the document is inauthentic. . . . Unless the [plaintiff] has good faith grounds to dispute its authenticity, the court may consider it [on a motion to dismiss]."); <u>Fin. Co. of Am. v. BankAmerica Corp.</u>, 493 F. Supp. 895, 900-01 (D. Md. 1980) (requirement of authentication was "satisfied by defendants' failure to challenge the documents' authenticity and by the affidavit of [plaintiff's] attorney").

[39]    Given WWE's knowledge of the Release, Judge McMahon's response to a challenge to an attorney's transmittal affidavit applies equally here: "[i]n this Court's experience, it is unprecedented to have reputable counsel (or any counsel, for that matter) challenge the authenticity of . . . documents produced from his client's files." <u>Commercial Data Servers, Inc. v. Int'l Bus. Machs. Corp.</u>, 262 F. Supp. 2d 50, 58 n.3 (S.D.N.Y. 2003); <u>see</u> <u>id.</u> at 59-60 (denying motion to strike exhibits submitted by attorney).

[40]    <u>See, e.g.</u>, <u>Kamen v. American Tel. & Tel. Co.</u>, 791 F.2d 1006, 1011 (2d Cir. 1986) (Rule 12(b)(1) affidavit addressing jurisdictional facts must be made with personal knowledge); <u>United States v. Private Sanitation Indus. Ass'n</u>, 44 F.3d 1082, 1084 (2d Cir. 1995) (affiant submitted factual affidavit of which he had no personal knowledge); <u>Neewra, Inc. v. Manakh Al Khaleej Gen. Trading & Contracting Co.</u>, No. 03 Civ. 2936, 2004 WL 1620874, at *2 n.3 (S.D.N.Y. July 20, 2004) (attorney declaration related to personal jurisdiction over defendant); <u>Zurich Am. Ins. Co. v. Dah Sing Bank, Ltd.</u>, No. 03 Civ.7778, 2004 WL 1328215, at *1 n.2 (S.D.N.Y. June 15, 2004) (same); <u>Carnrite v. Granada Hosp. Group, Inc.</u>, 175 F.R.D. 439, 448-49 (W.D.N.Y. 1997) (attorney submitted factual affidavit without personal knowledge); <u>United States v. Bosurgi</u>, 530 F.2d 1105, 1111 (2d Cir. 1976) (same); <u>Wing Hing (Tang) Fabrics Mfg., Co. v. Rafaella Sportswear, Inc.</u>, No. 84 Civ. 9024, 1986 WL 9688, at *2 (S.D.N.Y. Aug. 26, 1986) (same).

## C.    The Release Indisputably Bars WWE's Claims Here

Finally, WWE advances the conclusory contention that the claims in the Amended Complaint are beyond the intent and scope of the 2004 Release based on the language used and the circumstances surrounding the transaction. (Pl. MTS at 12-13.)  In fact, WWE's own allegations about the Audit, which culminated in the execution of the Release, and the <u>unambiguous language of the Release itself</u>, demonstrate that the claims asserted in this action are released.

On its face, the Release is unambiguously broad, precluding "any and all claims" "of every kind and nature whatsoever, whether known or unknown" "arising from or relating to the Audit." (Ex. B.)  <u>Cf</u>. <u>Collins & Aikman Prod. Co. v. Bldg. Sys., Inc.</u>, 58 F.3d 16, 20 (2d Cir.1995) (clause "submitting to arbitration '[a]ny claim or controversy <u>arising out of or relating to</u> th[e] agreement,' is the <u>paradigm of a broad clause</u>") (emphasis added).  If that were not dispositive standing alone, and it is, WWE neglects to mention that the Release forecloses it from bringing any action against JAKKS "<u>arising out of or relating in any way to the Audit</u>, including but not limited to the matters released in [the Release]." (<u>Id.</u> (emphasis added).)[41]

Straining to eviscerate the Release, WWE selectively cites two precatory "whereas" clauses to argue that the Release only covers claims arising out of a certain royalty dispute concerning the toy license. (Pl. MTS at 14.)  As a threshold legal matter, such precatory recitals cannot, and do not, limit the substantive provisions of the Release. <u>See</u> <u>Demorais</u>, 841 A.2d at 610 ("As a general rule, '[r]ecitals in a contract, such as "whereas" clauses, are merely explanations of the circumstances

---

[41]    According to WWE's own fatal admissions, the Audit specifically targeted "all payments made by Jakks to Shenker, SSAI, Bell and/or Stanfull," seeking "complete information regarding [the alleged] payments." (AC ¶¶ 200, 204, 227.)  WWE alleges that during the Audit, it vigorously sought documents from JAKKS concerning any payments JAKKS made to Shenker or Bell, but that JAKKS repeatedly evaded its request and concealed the documents evidencing the alleged payments. (Def. Br. at 34.)  WWE then alleges that, despite the purported concealment by JAKKS, it discovered the very payments it now complains about in this action. (<u>Id.</u>)  Thus, WWE's own pleading demonstrates the <u>centrality</u> of the Audit to its claims, and, therefore, the applicability of the Release as a bar to these claims.

surrounding the execution of the contract, and are not binding obligations unless referred to in the operative provisions of the contract . . . .'") (alteration in original) (quoting 17A C.J.S. Contracts § 317 (1999)).  A whereas clause "cannot remove or limit rights that are plainly given by the terms of an agreement." Brown v. Miguens, No. 02 Civ.5278, 2003 WL 1090304, at *3 (S.D.N.Y. Mar. 11, 2003); Miss. Power & Light Co. v. United Gas Pipe Line Co., 729 F. Supp. 504, 509 (S.D. Miss. 1989) (broad language of release precluded plaintiff's claims despite whereas clause purporting to narrow the scope of the release).

In all events, the "whereas clauses" merely recite historical facts leading up to the execution of the Release – that WWE exercised its right to Audit pursuant to the toy license and that a dispute concerning royalty payments existed.  (AC ¶ 199; see also Ex. B, "Whereas" clauses 1 & 2.)  WWE disingenuously omits to mention that the immediately following whereas clause acknowledges that the parties "desire to resolve any and all disputes that may exist between them concerning the Audit," not just the royalty dispute as WWE contends.  (Ex. B.)[42]

WWE's argument that the Release does not explicitly release the claims arising out of the alleged payments to Shenker and Bell fares no better.  (Pl. MTS at 15.)  On its face, the Release is a "General Release" and its preclusive effect is as broad as possible.  Given WWE's admitted knowledge of all the claims it asserts now when it executed the Release (AC ¶¶ 201-06, 209-11, 215-20, 222, 226, 228, 230, 234), its failure to carve out such claims from the Release precludes any such exclusion now.  See Sibersky v. Borah, Goldstein, Altschuler & Schwartz, P.C., No. 99 CIV. 3227, 2002 WL 1610923, at *5 (S.D.N.Y. July 22, 2002) ("If the release were intended to exclude any

---

[42]    WWE's own pleading establishes that the subject of the Audit was not limited to the toy license but targeted alleged payments pertaining to the videogame license. (AC ¶¶ 219-20, 226-227.)  Here the Release unambiguously covers all claims "relating to" the Audit, not just a dispute about the toy license royalties.  WWE also ignores that its new RICO complaint claims that Defendants fraudulently obtained six separate toy licenses as part of a single scheme inexorably intertwined with JAKKS' acquisition of the videogame license, and that the associated royalty rates were artificially low.  (Pl. Opp. at 31.)

particular kinds of claims or disputes . . . , it could easily have done so, but it did not."); Constr. Interior Sys., Inc. v. Donohoe Cos., 813 F. Supp. 29, 32-33 (D.D.C. 1992) (releases barred plaintiff's claims where they "clearly and unambiguously state[d] that [plaintiff] waives 'any and all claims,'" and plaintiff "did not make any written exceptions to the clear language of these releases").[43]

## CONCLUSION

For all the reasons set forth herein, and in its opening memorandum, the JAKKS Defendants' motion to dismiss the Amended Complaint should be granted in all respects.

Dated: August 11, 2006

Respectfully submitted,

FEDER, KASZOVITZ, ISAACSON,
WEBER, SKALA, BASS & RHINE LLP
Murray L. Skala (MS 9354)
Jonathan D. Honig (JH 7577)
750 Lexington Avenue
New York, New York 10022
(212) 888-8200

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

By: /s/ Jonathan J. Lerner
    Jonathan J. Lerner (JL 7117)
    Michael H. Gruenglas (MG 8705)
    Maura B. Grinalds (MG 2836)
    Shannon R. Frankel (SF 8693)
    Four Times Square
    New York, New York  10036
    (212) 735-3000

Attorneys for the JAKKS Defendants

---

[43]     Grasping at straws, WWE frivolously contends that JAKKS' failure to publicly discuss the Release until after filing its original motion to dismiss proves it did not intend the Release to encompass the claims asserted in this action.  (Pl. MTS. at 15-17.)  The timing of JAKKS' public disclosure about its release defense proves nothing, as there is no requirement, and WWE cites none, that public companies disclose every substantive defense they possess before filing dispositive motions with the court.