4

Westlaw.

Not Reported in F.Supp.                                                Page 1
Not Reported in F.Supp., 1991 WL 207473 (N.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

H

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.
Daria AQUILIO, as Trustee of the Mae H. Vance Trust, Jeffrey Meltzer, William Vance and Donald J. Aquilio, Plaintiffs.
v.
Ralph MANAKER, Peter Sontag, James Dullum, Leslie Meil and Corves Consulting, Inc., Defendants.
Daria AQUILIO, as Trustee of the Mae H. Vance Trust, Jeffrey Meltzer, William Vance and Donald J. Aquilio, Plaintiffs,
v.
Steve LEUPKE, Defendant.
Nos. 90-CV-45, 91-CV-93.

Oct. 10, 1991.

Donald J. Aquilio, Roswell, Ga., for plaintiff.
Ali Pappas Paltz & Cox Syracuse, N.Y. (C. Andrew Pappas, of counsel), Ginsburg Feldman & Bress Washington, D.C. (Jonathan Ginsburg, of counsel), for defendants.

MEMORANDUM-DECISION AND ORDER
McCURN, Chief Judge.

I. OVERVIEW

*1 This obviously bitter litigation has arisen out of the strained corporate relationship between four shareholders (plaintiffs) and directors and officers (defendants) of the now-defunct corporation, Sontag, Annis & Associates ("SAA"). Among the plaintiffs is Donald Aquilio ("Aquilio"). FN1 Aquilio has represented all of the plaintiff shareholders' interests throughout the corporate relationship and into this litigation.

SAA was a close corporation incorporated in Delaware with its principal place of business in Maryland. The name SAA was changed to Corves Consulting, Inc. ("Corves") in early 1987. All parties agree that the corporate entity essentially remained the same despite the name change; Corves was the successor-in-interest to SAA. Corves dissolved in 1988. Now-defunct Corves is a defendant in this action.

The four plaintiffs originally filed suit against all of the named defendants plus others in January, 1990. After various procedural battles in this Court, two defendants were dismissed from the litigation, and the remaining case is now driven by plaintiffs' second amended complaint. The remaining defendants have filed a counterclaim against Aquilio for indemnity and/or contribution.

The case against one of the two "dismissed" defendants, Steve Leupke, was dismissed by this Court for want of proper service. The plaintiffs subsequently refiled their suit against Leupke in early 1991. *Aquilio v. Leupke,* 91-CV-0093. Leupke also counterclaimed against Aquilio for indemnity and/or contribution. By all parties' submissions, the allegations and causes of action in the Leupke claim are virtually identical to those appearing in the original claim. Therefore, the parties have incorporated both cases into the motions currently before the Court.

Jurisdiction is based upon complete diversity of citizenship, 28 U.S.C. § 1332 (1988), as well as upon 28 U.S.C. § 1331 (1988) (federal question jurisdiction) in conjunction with section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa (1988), and section 1964 of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964 (1988).

The parties, especially the plaintiffs, have exhaustively discussed all of the issues now before the Court with countless pages of briefs, letters, and supplemental memoranda. While the Court appreciates being well-informed, it directs that in the future the parties limit their submissions to a maximum of twenty (20) pages each and include a table of contents as to points made and exhibits referenced to. Also, this Court reminds both parties of Local Rule 10(E), which states that "[r]eply papers may be filed with leave of the court upon a showing of necessity therefor." Reply briefs are usually warranted only to bring to the Court's attention new developments not previously discussed. Many of the papers in the present case simply reiterate points already before the Court, and do not raise new arguments. This Court will not be so liberal in allowing such paper wars in the future.

II. STATEMENT OF FACTS FN2

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.


Not Reported in F.Supp.                                                      Page 2
Not Reported in F.Supp., 1991 WL 207473 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

**\*2** Aquilio and defendant Ralph Manaker were partners in the former Syracuse law firm of Birnbaum, Manaker & Aquilio. In 1983, co-defendant Peter Sontag sought the law firm's assistance in the formation of SAA, a proposed closely-held corporation in the travel management consultation business. Manaker was allegedly responsible for bringing Sontag's business to the firm. Complaint ¶ 15. Aquilio and the firm performed the necessary legal work, including preparation of a Private Placement Memorandum. *Id.*

SAA required $600,000 capitalization in order to commence business operations. The plaintiffs, including Aquilio, invested various sums of money to help form the needed capital. The parties sharply dispute what motivated the plaintiffs to invest in SAA. Aquilio alleges that Manaker and Sontag influenced Aquilio to personally invest $70,000 and further convinced him to solicit clients, friends and family to invest another $180,000 in SAA. Complaint ¶ 18. Aquilio further alleges that Sontag and Manaker made a series of oral representations and assurances to him in order to induce plaintiffs' investments. Most notably, Aquilio alleges that:

(a) Sontag promised that he would not use his controlling share to act oppressively in dealing with the minority shareholders;

(b) Sontag promised he would observe his fiduciary duties to shareholders and "make full disclosure of SAA business in reports" sent to shareholders; and

(c) Manaker promised he would use his pre-agreed Officer and Director positions to monitor Sontag's compliance with his representations, and to otherwise protect the minority shareholders.

*Id.*[FN3]

As a result of these alleged representations, in 1983 Aquilio and the other plaintiff/shareholders entered into a subscription agreement to become minority shareholders of SAA.[FN4] Sontag served on the board of directors ("board") and as President,[FN5] and Manaker served as board member, General Counsel, and Secretary-Treasurer. The remaining defendants, *i.e.* James Dullum, Leslie Meil, and Peter Leupke, served as either members of the board of directors or

else as "advisory attendees" to the board at various times from the inception of SAA until Corves' dissolution. The plaintiffs were neither directors nor officers of the corporation. By virtue of the subscription agreement (executed by the initial SAA investors at the time of formation), SAA shares could not be sold without the approval of the board of directors. Plaintiffs Aquilio and Vance were among the signatories to the agreement.

The new corporate relationship was by all accounts stable through 1984. Manaker and Sontag complied with the alleged oral representations upon which Aquilio and the other plaintiffs relied when they purchased their stock. In early 1985, however, unrelated internal hostilities and malevolence within the Birnbaum, Manaker & Aquilio lawfirm jolted the stability of the corporate relationship. The antagonism apparently caused a "falling-out" between Manaker and Aquilio.[FN6] Aquilio and the co-plaintiffs subsequently sought to sell their SAA shares and, pursuant to the subscription agreement, requested SAA approval. SAA assigned Manaker to represent the board of directors in the necessary transactions.

**\*3** The parties' actions during the next thirty months relating to Aquilio's efforts to sell the plaintiffs' shares gave rise to a substantial portion of the plaintiffs' causes of action. Manaker, in his capacity as SAA representative, notified Aquilio on December 7, 1985 that SAA would purchase Aquilio's interest for $150,000, and gave Aquilio ten days to accept (*i.e.* by December 17, 1985). Aquilio responded in a timely manner, but stated that (1) the sale price for his entire interest was $200,000, and (2) plaintiff Vance's shares would have to be simultaneously purchased at the same value per share.

The SAA board held a meeting on December 17, 1985 ("December 17, 1985 meeting") at which it adopted a resolution to accept Aquilio's proposal. Aquilio alleges that Manaker never disclosed the board's resolution to him, despite negotiating on the sale with Aquilio on at least three occasions after its adoption. Aquilio contends that he remained unaware of the board's resolution until late 1989, when he came across the information during the discovery phase of unrelated litigation.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                                          Page 3
Not Reported in F.Supp., 1991 WL 207473 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Two months after the board's meeting, in February, 1986, Aquilio learned from Manaker that SAA was engaged in negotiations with a third party concerning the third party's acquisition of SAA. Though the negotiations proved fruitless, Aquilio alleges that he and his co-plaintiffs would have sold their SAA shares for the board's offering price had they known about the resolution. Write the plaintiffs, "[b]ut for Manaker's nondisclosure and concealment [of the December 17, 1985 resolution], Plaintiffs would have entered into a contract per the 12/17/85 resolution no later than 1/31/86 and obtained their asking price" for their shares. Plaintiffs' Complaint, at ¶ 42. Instead, plaintiffs continued to hold their respective shares in SAA.

The next month (March, 1986), Manaker and Aquilio met yet again to negotiate the sale of the plaintiff's SAA shares. According to Aquilio, "Manaker informed Aquilio that he [Manaker] would use his influence and position on the Board to block any such transaction and he would acquire the shares personally or there would be no transaction." Plaintiffs' Complaint, at ¶ 43.[FN7] The negotiations concerning the sale of plaintiffs' shares of SAA thereafter ceased. Aquilio alleges that in the all subsequent communication with SAA he was informed that the plaintiffs' shares were worth less than Aquilio's $200,000 offer. The plaintiffs essentially contend that the defendants down-played the value of SAA to Aquilio.

In January, 1987, Aquilio and his co-plaintiffs finally sold their respective SAA interests at their original cost, *i.e.* below the $200,000 approved at the December 17, 1985 board meeting. Some of the defendants (identities unknown) purchased the plaintiffs shares. Just seven months later, in July, 1987, Citicorp Information Management Services ("CIMS") initiated its acquisition of SAA (then renamed Corves), and purchased the defendants' shares. The plaintiffs allege that the defendants ("Manaker and other individual Defendants") sold their SAA shares to CIMS at a 400% profit. Plaintiffs' Complaint, at ¶ 50.

*4 Three years after selling their shares, in January 1990, the plaintiffs brought this action against Manaker, Sontag, and other members of the SAA/Corves board. The complaint set forth the following causes of action:

1. Intentional Interference with Economic Prospect, through fraud and breach of fiduciary obligations (asserted against Manaker only, and only by Aquilio, the Trust, and Vance), Complaint ¶¶ 28-51;

2. Conspiracy and Aiding and Abetting Manaker in the matters set forth in the first count (against Sontag only, and only by Aquilio, the Trust, and Vance), Complaint ¶¶ 52-58;

3. Violations of Securities Exchange Act of 1934 § 10(b) and SEC Rule 10b-5 (against all defendants, but only on behalf of Aquilio, Trust, and Vance), Complaint ¶¶ 59-67;

4. Violations of Securities Exchange Act of 1934 § 10(b) and SEC Rule 10b-5 (against all defendants, but only on behalf of Meltzer), Complaint ¶¶ 68-75;

5. Common law fraud, deceit, and breach of fiduciary obligations (on behalf of all plaintiffs against all defendants), Complaint ¶¶ 76-79; and

6. Violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964 (1988) (on behalf of all plaintiffs, against Manaker and Sontag only), Complaint ¶¶ 80-88.

The defendants have moved to dismiss each cause of action for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), and on grounds that certain plaintiffs contractually released the defendants from liability arising out of the corporate relationship. Also, the defendants moved to dismiss counts three and four (Securities Exchange Act § 10(b) and SEC Rule 10b-5) pursuant to the applicable statute of limitations. The defendants have filed a counterclaim against Aquilio for contribution and indemnification.

The plaintiffs, in turn, move for leave of the Court to pursue the following actions:

-file a third amended complaint (in the event that the Court grants the motions to dismiss);

-file a consolidated amended complaint combining the *Manaker* and *Leupke* actions;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                                                          Page 4
Not Reported in F.Supp., 1991 WL 207473 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

-amend their complaint to add more particular allegations of fraud;

-amend complaint to add a Florida RICO count on behalf of plaintiff Vance; and

-join new plaintiffs.

Plaintiffs also move for an order to compel certain discovery. Finally, Aquilio moves for dismissal of all defendants' counterclaims.

For the reasons discussed herein, defendants' motions to dismiss counts one, two, and six are denied in their entirety. Defendants' motions to dismiss counts three and four are granted in their entirety. Defendants' motions to dismiss count five is granted only as it relates to defendant Corves; the motion is denied in all other respects. Aquilio's motion to dismiss defendants' counterclaims is granted. Plaintiffs' motions to amend and/or consolidate their complaints, add new parties, and compel discovery are denied in accordance with the terms of this decision.

**\*5** Each motion will be addressed *seriatim.* All parties agree that the facts and arguments in the *Leupke* action are sufficiently similar to those in the *Manaker* action to justify consolidating them for purposes of this motion. This Court will draw the necessary distinctions when necessary.

### III. DISCUSSION

#### A. Defendants' Motions to Dismiss

Although there are others, the predominant issue now before the Court is limited to whether plaintiffs in their complaints have stated claims upon which relief can be granted. The standard which this Court must apply is set forth most clearly in *Fry v. Trump,* 681 F.Supp. 252, 255 (D.N.J.1988):

The scrutiny employed when deciding a motion to dismiss a complaint for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure is significantly circumscribed. The complaint must be liberally construed in favor of the plaintiffs, and it should not be dismissed unless plaintiffs could prove *no* set of facts in support of their claim which would entitle them

to relief.... All facts pleaded by the plaintiffs must be taken as true and all reasonable inferences must be drawn in their favor.... Furthermore, the complaint will not be dismissed unless some insuperable bar to relief is apparent *on its face.*

(emphasis added).

The defendants initially move to dismiss all of the counts of the complaint brought by Aquilio, Daria Aquilio, and Vance, on grounds that those plaintiffs signed a release of liability for claims against all defendants. Since this Court's determination of defendants' motions to dismiss is based solely on examination of the face of plaintiffs' complaint, *see Fry,* 681 F.Supp. at 255, the question of whether the alleged contractual releases serve to bar plaintiffs' claims is not properly before this Court at this time. If the facts so warrant, the defendants may consider raising that affirmative defense in a motion for summary judgment.

*1. Defendants' Motion to Dismiss Counts One and Two (Intentional Interference with Economic Prospects)*

Although the Second Circuit case law is somewhat disjointed with respect to this tort, this Court holds, without passing judgment on the merits of their claim, that the plaintiffs have stated in counts one and two claims for intentional interference with economic prospects upon which relief can be granted.

Two preliminary matters must be addressed before discussing the substance of defendants' motion. First, the wording of plaintiffs' complaint in count one. The language is ambiguous, rendering analysis of this cause of action difficult. The first count states:

28. This count is against Manaker by Aquilio/Trust and Vance for intentional interference in economic prospect through fraud and breach of fiduciary obligations.

Complaint ¶ 28. This charge lends itself to two interpretations. The plaintiffs are alleging either (1) intentional interference in economic prospect, *by means of either* fraud *or* breach of fiduciary obligations; or (2) intentional interference in economic prospect through fraud, *and* (as a separate claim) breach of fiduciary obligations.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                      Page 5
Not Reported in F.Supp., 1991 WL 207473 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

**\*6** Either method of pleading might be permissible. *See,
e.g., Avnet v. American Motorists Ins.,* 115 F.R.D. 588, 592
(S.D.N.Y.1987). Regardless of which interpretation this
Court adopts, the plaintiffs can withstand the defendants'
motion to dismiss counts one and two. This is because with
respect to breach of fiduciary duty, the allegations in counts
one and two against Manaker and Sontag are seemingly the
same as those raised against all defendants (including Mana-
ker and Sontag) in count five. Without passing judgment on
whether the complaint is therefore duplicious, this Court
finds that the plaintiffs have stated in count five a claim for
breach of fiduciary duty. *See* Discussion *infra* pp. 29-31.
Since counts one, two and five really state the same cause of
action for breach of fiduciary duty against Manaker and
Sontag, defendants motions to dismiss claims of breach of
fiduciary duty for failure to state a claim upon which relief
can be granted are denied. Moreover, for the reasons stated
herein, the plaintiffs have stated claims for all of their fraud-
based accusations. The defendants have not raised the ques-
tion of whether the complaint is duplicious; therefore, this
Court will not address that issue today.

The second preliminary issue concerns choice of law. At
first blush, the parties appear to agree that New York law is
applicable, *see* Memoranda of Law, *passim* (both parties ap-
ply New York law to discussion of this issue), and this
Court generally agrees with that analysis. There is some
suggestion that Delaware law might apply to analysis of the
plaintiffs' underlying breach of fiduciary duty allegation, be-
cause Corves-SAA's successor-was a Delaware corporation.
*See* Defendants' Memorandum of Law in Support, at 7 n. 3
(citing *Caballero v. Anselmo,* 720 F.Supp. 1088, 1099
(S.D.N.Y.1989)). At oral argument, the defense clarified its
position, suggesting that New York law should apply to the
tort of intentional interference, but Delaware law should ap-
ply to the element thereof relating to breach of fiduciary
duty. As the defendants properly noted, *Caballero* stands for
the proposition that the law of the state of incorporation
governs actions arising from corporate relationships and ob-
ligations. *Caballero,* 720 F.Supp. at 1099. *But see Cavalier
Label Co. v. Polytam,* 687 F.Supp. 872, 879 (S.D.N.Y.1988)
("The tort of fraud is considered to be committed where the
misrepresentation is uttered"). Generally, however, the
parties offer independent views on the question of choice of

law.

The controversy, as a practical matter, is inconsequential.
This is because, as previewed above and discussed below,
this Court is able to find that plaintiffs have stated a claim of
breach of fiduciary duty even under Delaware law. As for
the overriding claim of tortious interference, cursory com-
parison of New York versus Delaware law suggests that the
elements necessary to satisfy this tort under New York State
law are more stringent and expansive than those under
Delaware law. *Compare, e.g., PPX Enterpr. v. Audio Fidel-
ity Enterpr.,* 818 F.2d 266, 269 (2d Cir.1987) *with De-
Bonaventura v. Nationwide Ins.,* 428 A.2d 1151, 1153
(Del.1981). To state a claim for intentional interference with
business opportunities under Delaware law, the plaintiff
would have to allege facts indicating that (1) the plaintiff
had a reasonable probability of a business opportunity, (2)
defendant intentionally interfered with that opportunity, (3)
proximate causation, and (4) damages. *DeBonaventura,* 428
A.2d at 1153. The New York standard is more stringent be-
cause it requires the plaintiff to allege each of these ele-
ments *plus* improper motive on the part of the defendant.
*See PPX,* 818 F.2d at 269.

**\*7** As a matter of common logic, if plaintiffs have stated a
claim for tortious interference under New York law, then *a
fortiori* they have stated a claim for tortious interference un-
der Delaware law. For reasons discussed below, the
plaintiffs have stated a claim even under the more stringent
New York standard. Since the parties have not sufficiently
briefed the Court on this issue and application of Delaware
law would apparently not affect this Court's ruling, the
Court will not resolve the choice of law issue today.

The rule in New York State governing claims for intentional
interference with economic advantage was set forth by the
Second Circuit in *PBX Enterpr. v. Audio Fidelity Enterpr.,*
818 F.2d 266, 269 (2d Cir.1987):

In order to prevail on a claim of tortious interference with
prospective economic advantage, a plaintiff is required to
show "the defendant's interference with business relations
existing between the plaintiff and a third party, *either* with
the sole purpose of harming the plaintiff *or* by means that
are 'dishonest, unfair or in any other way improper.' " ... If

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                              Page 6
Not Reported in F.Supp., 1991 WL 207473 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

the defendant's interference is intended, at least in part, to advance its own competing interest, then the claim will fail unless the means employed include criminal or fraudulent conduct.

(citations omitted) (emphasis in original). The defendants in the present case do not focus on whether plaintiffs have alleged "intentional interference." *See* Defendants' Memorandum of Law in Support, at 5-6. Rather, the gravamen of the defendants' argument is that plaintiffs have not alleged the requisite improper purpose for the defendants' actions. *See id.; PBX,* 818 F.2d at 269 (defendants' improper purpose is an element of the tort). With respect to improper purpose under the *PBX* standard, the plaintiffs can withstand defendants' motion to dismiss if they have alleged facts showing that Manaker's and Sontag's sole motivation in acting was to harm the plaintiffs, *i.e.* Manaker and Sontag had no personal interest in acting, *or* that Manaker's and Sontag's conduct in (interfering with Aquilio) was criminal or fraudulent in nature. *PBX,* 818 F.2d at 269; *see also, e.g., Volvo North Amer. v. Mens Int'l Prof. Tennis Council,* 857 F.2d 55, 74 (2d Cir.1988); *Automotive Elec. Serv. v. Association of Auto. Distr.,* 747 F.Supp. 1483, 1509 (E.D.N.Y.1990).

Here the plaintiffs have satisfied the "alternative" requirement, alleging facts indicating that Manaker and Sontag acted by fraud. To state a claim for fraud, the plaintiffs must allege that the defendants uttered a material, false representation with an intent to defraud the plaintiffs, and that the plaintiffs reasonably relied thereon and suffered damage as a result. *E.g. Katara v. D.E. Jones Commodities,* 835 F.2d 966, 970-71 (2d Cir.1987). The plaintiffs have done so. For example, the complaint alleges that Manaker and Sontag "induced Aquilio to personally invest $70,000 and further induced him to solicit clients of the Lawfirm, friends and family to invest another $180,000 in SAA by their joint verbal representations and assurances...." Complaint ¶ 18. Here the plaintiffs have indeed alleged material false representations upon which plaintiffs reasonably relied. *See also* Complaint ¶¶ 38-42 & *passim* (defendants intentionally undervalued SAA stock in statements to plaintiffs).

**\*8** Sontag and Manaker raise three principle points supporting their motion to dismiss. They argue first that the facts alleged constitute strong business tactics but not fraud. That

argument is more appropriate at a motion for summary judgment; whether the acts alleged actually constitute fraud is not for the Court to decide during the present motion. *See, e.g., Cruz v. Beto,* 405 U.S. 319, 322 (1972) (court accepts as true plaintiffs' allegations for purposes of resolving motion to dismiss). The plaintiffs here have sufficiently alleged facts which, if true, a reasonable jury might be able to find fraudulent.

Second, and more persuasively, Manaker and Sontag submit that the more proper standard for tortious interference with prospective economic advantage was set forth by the Second Circuit in *Nifty Foods v. Great Atlantic & Pacific Tea,* 614 F.2d 832, 838 (2d Cir.1980). There the Second Circuit held that the tort requires proof that the defendant's *sole* motive was to inflict injury and that the defendant used unlawful means to do so. *Nifty,* 614 F.2d at 838. In other words, under *Nifty* a defendant cannot be held liable for tortious interference if s/he was motivated at least in part by personal gain. *Id.; see also United States Football League v. National Football League,* 634 F.Supp. 1155, 1189 (S.D.N.Y.1986). Indeed, if *Nifty* were controlling then defendants would prevail on their motion to dismiss counts one and two because, by plaintiffs' own admissions in their complaints, Manaker and Sontag were motivated in large part by their own personal interests. *See* Complaint ¶¶ 46, 50.

In this Court's view, however, *Nifty* was an aberration that has since been abandoned by the Second Circuit; the current standard was set forth by the Second Circuit six years later in *PBX,* 818 F.2d at 269. Certainly the two standards (*Nifty* and *PBX* ) are inconsistent. The former requires that the defendant's *sole* motive be to injure the plaintiff; the latter allows that the defendant can be motivated by self-interest if s/he acted criminally or fraudulently. This Court is left to determine which of these inconsistent standards applies.

The Second Circuit has apparently chosen the *PBX* standard over *Nifty Foods.* In the single tortious interference case it has faced since deciding *PBX* in 1987, the court applied the *PBX* standard instead of the *Nifty* standard. *Volvo North Amer.,* 857 F.2d at 75. Furthermore, to this Court's knowledge every district court within the circuit that has confronted a tortious interference case since *PBX* was decided in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 7
Not Reported in F.Supp., 1991 WL 207473 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

1987 has applied the *PBX* standard; none has applied *Nifty*. See *Sutton Import-Export v. Starcrest of Calif.*, 762 F.Supp. 68, 71 (S.D.N.Y.1991); *Automotive Elec. Serv.*, 747 F.Supp. at 1508; *Paper Corp. of the United States v. Schoeller Tech. Papers*, 724 F.Supp. 110, 119 (S.D.N.Y.1989); *Northwestern Nat'l Ins. v. Alberts*, 717 F.Supp. 148, 155 (S.D.N.Y.1989); *Pennsylvania Engineering v. Islip Resource Recov. Agency*, 710 F.Supp. 456, 464 (E.D.N.Y.1989). Most of these district courts simply ignored the *Nifty* standard. In sum, the case precedent overwhelmingly compels this Court to apply the *PBX* standard and not the *Nifty* standard to plaintiffs' tortious interference claims.

**\*9** If the case precedent were not enough, this Court is also persuaded by the fact that the authority upon which the court in *Nifty* relied does not support the "sole motivation" requirement that *Nifty* articulated. See *Nifty*, 614 F.2d at 838 (citing *Beardsley v. Kilmer*, 236 N.Y. 80, 140 N.E. 203 (1923)). The plaintiffs correctly note that *Beardsley* actually set forth the exact standard the court later adopted in *PBX* (defendant can be liable for tortious interference even if motivated by self-interest, so long as plaintiff proves that defendant acted by crime or fraud). This Court declines to apply the *Nifty* standard understandably proposed by the defendants, and instead adopts the widely-accepted *PBX* standard for analyzing the sufficiency of plaintiffs' tortious interference cause of action. For the reasons stated above, the plaintiffs have sufficiently stated a cause of action for tortious interference with economic prospects pursuant to the *PBX* standard.

Finally, defendants argue that the plaintiffs have not stated a claim upon which relief can be granted because they have failed to plead fraud with sufficient particularity. Federal R.Civ. P. 9(b) requires that "in all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity." Fed.R.Civ. P. 9(b); see, e.g., *DiVittorio v. Equidyne Extractive Indus.*, 822 F.2d 1242, 1247 (2d Cir.1987) (and cases cited therein). Rule 9(b) presents two open-ended variables with which courts have struggled: "circumstances" and "particularity." As illustrated by the parties' extensive briefs on this issue, this Court is faced with a myriad of authority purporting to instruct on what constitutes adequate

pleading of fraudulent "circumstances" stated with "particularity." This is because the word "circumstances," by its very definition, will vary with each situation. See, e.g., *The Limited v. McCrory*, 683 F.Supp. 387, 393 (S.D.N.Y.1988) (circumstances of fraud for Rule 9(b) purposes vary with each case).

This Court has heretofore set forth guidelines for determining whether claims of fraud have been sufficiently pleaded.

"Circumstances" have been defined to include such matters as the time, place and contents of false representations, as well as the identity of the persons making the representation and what was obtained or given up thereby.... In requiring such "circumstances" to be pleaded, this court recognizes that Rule 9(b) requires only sufficient particularity to permit a defendant to frame a responsive pleading.... Moreover, this court should require less specificity when many of the relevant facts are solely within the defendants' knowledge.

*Jim Forno's Continental Motors v. Subaru*, 649 F.Supp. 746, 753 (N.D.N.Y.1986) (McCurn, J.); see also *Klein v. Goetzman*, 1991 WESTLAW 127393, at \*2-3 (July 12, 1991) (McCurn, C.J.).

The plaintiffs have satisfied the particularity of fraudulent circumstances requirement. Specifically, the plaintiffs have alleged that Manaker and Sontag fraudulently induced them in May, 1983 to invest in SAA by making false oral representations. Complaint ¶ 18. Aquilio has indicated in very clear terms the specific representations made by the defendants. See id. The plaintiffs further allege that throughout 1986 Manaker and Sontag then continuously and fraudulently concealed the substance of the December 17, 1985 meeting and resolution regarding sale of the shares from Aquilio, who was acting on his own behalf and on behalf of the remaining co-plaintiffs. Complaint ¶¶ 38-42. As a result of these alleged fraudulent activities, the plaintiffs purchased and then were unable to sell their shares of stock in SAA. When the plaintiffs finally sold their shares, they did so "for cost," *i.e.* without the return they allegedly could have enjoyed had Manaker and Sontag acted without fraud. In so alleging, the plaintiffs have proffered the time, place and contents of false representations, as well as the identity of the persons making the representation and what was ob-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



tained or given up thereby. *Cf. Jim Forno's*, 649 F.Supp. at 753. Moreover, the charges are set forth with such particularity that the defendants, regardless of whether they agree with plaintiffs' allegations, have sufficient information to frame a responsive pleading. *See id.*

**\*10** To reiterate, this Court's ruling concerning the adequacy of the plaintiffs' complaint in no manner speaks to the merit of plaintiffs' claims. *E.g. Cruz*, 405 U.S. at 322. Defendants can take up that issue, if warranted, on a motion for summary judgment. Today this Court merely holds that in Counts one and two plaintiffs have stated a claim upon which, if true, relief can be granted. *See* Fed.R.Civ.P. 12(b)(6).

### *2. Defendants' Motions to Dismiss Counts 3 and 4 (Securities Exchange Act of 1934 § 10(b) and Rule 10b-5)*

Defendants move to dismiss plaintiffs' federal securities claims (counts three and four) on grounds of (1) statute of limitations, and (2) failure to state a claim upon which relief can be granted. Since this Court holds that these claims are barred by the statute of limitations, it need not reach the issue of whether plaintiffs have stated a cognizable claim.

This past spring's Supreme Court ruling in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 111 S.Ct. 2773 (June 20, 1991) is binding on the present case. There the Court held, "[l]itigation instituted pursuant to § 10(b) and Rule 10b-5 ... must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation." *Lampf*, 111 S.Ct. at 2782. There is therefore a three year statute of repose; regardless of when the plaintiff discovers the fraud, a suit is time barred if it is not brought within three years of the actual violation. *Id.* at 2781-82. Significantly, the Court applied its new time barr retroactively to hold that the plaintiff's action in that case was untimely and therefore dismissed. *Id.* at 2782; *see also James B. Beam Distilling v. Georgia*, 111 S.Ct. 2439 (1991).

The parties in the instant case disagree on exactly when plaintiffs first discovered the alleged fraud, as well as when the violations actually occurred. A review of the complaint, however, shows that the latest possible date on which

plaintiffs discovered the alleged fraud was in August, 1987. By their own admission, "[p]laintiffs first learned of the CIMS-SAA transaction in August of 1987." Complaint ¶ 66. That this was a "discovery" of fraud is evidenced by the very next line of plaintiffs' complaint: plaintiffs "made demand for information on the same, were given misleading and incomplete explanation by Manaker in response, *continued to investigate until November 1989....*" *Id.* (emphasis added). Plaintiffs admitted at oral argument that the investigation was warranted because they grew suspicious of the transaction from the moment they learned of it in August, 1987; after all, the sale was just months after plaintiffs sold their shares to the defendants. That plaintiffs felt the need to conduct an investigation lasting over two years after learning of the transaction suggests that their knowledge constituted more than a mere "storm warning," as plaintiffs suggested at oral argument. Based on plaintiffs' own complaint, this Court is convinced that the plaintiffs were put on adequate notice of the alleged fraud, at least enough to begin their own investigation, in August, 1987.

**\*11** Based on their August, 1987 discovery date, suit under Rule 10b-5 must have been filed within one year thereafter, in August, 1990. Since plaintiffs failed to file this suit until January, 1990, they missed the statute of limitations. The *Lampf* and *James B. Beam Distilling* holdings directly reject plaintiffs's argument that the newly defined statute of limitations should not be applied retroactively to his case; *Lampf* also rejects plaintiffs' suggestion that the doctrine of equitable tolling should apply to the one year statute of limitations. *Lampf*, 111 S.Ct. at 2782.[FN8] Accordingly, counts three and four of plaintiffs' complaints, alleging violations of the federal securities statutes, are dismissed with prejudice.

### *3. Defendants' Motion to Dismiss Count Five (Common law fraud, deceit, and breach of fiduciary duty)*

#### *a. Common law fraud and deceit*

Defendants' motion to dismiss the fifth count with respect to the fraud and deceit theories is supported in large part by their argument that the plaintiffs failed to plead fraud and/or deceit with sufficient particularity as required by Fed.R.Civ.P. 9(b). For the reasons discussed above with re-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                    Page 9
Not Reported in F.Supp., 1991 WL 207473 (N.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

spect to the identical challenge to counts one and two, this Court finds that the plaintiffs have stated a claim of fraud as against Manaker and Sontag with sufficient particularity to satisfy Rule 9(b). *See supra* p. 21 (citing *Jim Forno's, 649 F.Supp. at 753*).

This Court also finds that the plaintiffs have stated a claim of fraud or deceit as against the remaining defendants with sufficient particularity, with the exception of Corves. *See Katara, 835 F.2d at 970-71* (elements of fraud: material misrepresentation with intent to defraud, plus reasonable reliance thereon and resulting damages). The defendants correctly note that there is not one particular allegation of fraud against Corves or its predecessor (SAA) in plaintiffs' complaint. Since count five states no claim against Corves, let alone a claim with particular allegations of fraud, count five of the complaint is dismissed as against Corves.

With respect to the remaining defendants, the plaintiffs have stated the circumstances, *i.e.* such matters as the time, place and contents of false representations, as well as the identity of the persons making the representation, with the requisite particularity. *See, e.g., Jim Forno's, 649 F.Supp. at 753*. Most notably, the plaintiffs allege that during Aquilio's sale negotiations the defendants knowingly circulated two letters to the plaintiffs which intentionally and deceptively misstated (1) the value of SAA, and (2) the nature of CIMS's acquisition bid (which ultimately succeeded). Complaint ¶ 61. The plaintiffs have provided copies of the letters in the Appendix to their complaint, and have specifically alleged how the defendants (except for Corves) were involved in its fraudulent effect. *Id.*

*12 The defendants argue that the Rule 9(b) particularity requirement is not satisfied because the complaint improperly accuses the defendants of acting collectively, instead of apprising of the circumstances surrounding each individual defendant's fraud. *See* Defendants' Memorandum of Law in Support, at 16 (citing, *e.g., Lou v. Belzberg, 728 F.Supp. 1010, 1022 (S.D.N.Y.1990); Gonzalez v. Paine, Webber, Jackson & Curtis*, Fed.Sec.L.Rep. (CCH) ¶ 98, 867, at 94,513 (S.D.N.Y.1982)). The controlling Second Circuit case appears to be *Zerman v. Ball, 735 F.2d 15, 22-23 (2d Cir.1984)*, in which a fraud complaint failed because it did not particularize the circumstances constituting fraud with

respect to particular defendants. Indeed, as a general rule, "when more than one defendant is charged with fraud, the complaint must particularize each defendant's alleged participation in the fraud." *Lou, 728 F.Supp. at 1022. See also* this Court's decision in *Klein v. Goetzman, 1991 WEST-LAW 127393, at *2-3 (July 12, 1991)* (McCurn, C.J.).

In *Zerman* as well as each of the cases cited by the defendants, however, the Court had a genuine question as to which allegations of fraud involved which of the named defendants. *See, e.g., Zerman, 753 F.2d at 22; Lou, 728 F.Supp. at 1022* (complaint contained "nothing beyond conclusory allegations"); *Leslie v. Minson, 679 F.Supp. 280, 285 (S.D.N.Y.1988)* ("It is not at all clear [from the complaint] who told what to whom and when"). In other words, the defendants were not put on notice as to the particular acts of fraud alleged against them so as to be able to prepare a defense. *See DiVittorio, 822 F.2d at 1247*. That plainly is not the situation in the case at bar. The plaintiff certainly would have been wiser to list each defendant individually, but there is no doubt from reading the complaint as to which defendant is accused of what act of fraud. *E.g.* Complaint ¶ 61 (letters condoned by all defendants in their capacities members of the SAA board). *Cf. Banowitz v. State Exchange Bank, 600 F.Supp. 1466, 1469 (N.D.Ill.1985)* ( "group pleading" permitted).

The purpose of Rule 9(b) is, in large part, to notify co-defendants of the particular act of fraud alleged. *DiVittorio, 822 F.2d at 1247* (three purposes behind Rule 9(b)). In light of its purpose, the group pleading proscription cannot be read so literally as to justify dismissal of a complaint simply because the plaintiffs did not list the defendants by name, when the activities in which the individual defendants were allegedly involved are made abundantly clear from the face of the complaint. This Court's decision today is consistent with its July decision in *Klein*, in which this Court held that group pleading of fraud against outside directors of a corporation was impermissible. There the complaint plainly did not inform the individual defendants of their particular acts of alleged wrongdoing. *Klein, 1991 WESTLAW 127393, at *3-4*. Significantly, this Court explicitly noted in *Klein* that group pleading alleging against defendants is at times permissible, for instance when "the defendants are 'insiders or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                                                           Page 10
Not Reported in F.Supp., 1991 WL 207473 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

affiliates participating in the offer of the securities in question.' " *Id.* at \*2 (quoting *Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986)).

\*13 While this Court does not hesitate to state that it seriously questions whether the plaintiffs will be able to withstand a motion for summary judgment on these claims, the fact remains that the plaintiffs here, unlike those in *Klein,* have stated with sufficient particularity the circumstances surrounding each defendant's alleged fraud. *See DiVittorio, 822 F.2d at 1247* (the complaint provides defendants with sufficient notice to enable them to prepare a defense). Accordingly, this Court rejects defendants' motions to dismiss for want of particularity, with the exception of the claim against Corves, which is dismissed for failure to state a claim upon which relief can be granted.

### b. Breach of fiduciary duty

The plaintiffs have also stated a cognizable cause of action for breach of fiduciary duty. Once again, the parties do not agree on the applicable choice of law. Unlike the discussion *supra* concerning tortious interference with economic prospects, however, the laws in Delaware and New York governing breach of fiduciary duty are markedly different, at least enough to require this Court to decide and apply the correct choice of law. Plaintiffs' contentions notwithstanding, "New York follows the rule that the law of the state of incorporation governs the existence and extent of corporate fiduciary obligations as well as the liability for violations of such obligations." *Caballero,* 720 F.Supp. at 1098-99. Since SAA (and later as Corves) was a Delaware corporation and the plaintiffs allege the existence of a fiduciary duty arising from the defendants' corporate positions, Delaware law governs consideration of the fifth count.

To state a claim for breach of fiduciary duty under Delaware law, a plaintiff must satisfy a three-pronged test. The plaintiff must allege:

1. the existence of a fiduciary duty;

2. a breach of that duty;

3. knowing participation in the breach by the defendants.

*Rabkin v. Phillip A. Hunt Chem., 547 A.2d 963, 967 (Del.Ch.1986).* With respect to the first element of the test, requiring plaintiff to allege the existence of a fiduciary duty, plaintiffs indeed assert in their complaint that a fiduciary duty exists, Complaint ¶ 76. The plaintiffs, however, do not elaborate on the particular fiduciary duty to which they are referring nor suggest the scope of the duty implicated. *See id.* This Court is once again obligated to liberally construe the complaint in favor of the plaintiffs, draw all reasonable inferences therefrom, and refuse to dismiss a count unless plaintiff could prove no set of facts in support of their claim which would entitle them to relief. *E.g. Fry, 681 F.Supp. at 255.* From that perspective this Court finds that plaintiffs' allegations implicate defendants' fiduciary duties under Delaware law.

The Southern District of New York discussed directors' fiduciary duties to shareholders under Delaware corporations law in *Caballero,* 720 F.2d at 1099. That court observed:

\*14 Delaware corporations law provides that although directors generally do not occupy a fiduciary position with respect to stockholders in direct personal dealing as opposed to dealings with stockholders as a class, Delaware does create a duty in special circumstances where advantage is taken of inside information by a corporate insider who deliberately misleads an ignorant stockholder, when the latter relies on the misrepresentation or omission.

*Id.* (citing, *e.g., Kors v. Carey, 158 A.2d 136, 143 (Del.Ch.1960); Lank v. Steiner, 224 A.2d 242, 245 (Del.Ch.1966)).* With the exception of their cause of action against Corves, the plaintiffs certainly allege throughout their papers that the defendants withheld information for their personal gain; to be sure, that is the thrust of plaintiffs' complaint. Complaint ¶¶ 61-62, 77-78 (defendants circulated letters to mislead plaintiffs in valuing the business of SAA and omitting other material information). Without yet again discussing *ad nauseam* the substance of plaintiffs' complaint, this Court finds the plaintiffs' allegation that they relied on defendants' endorsement of letters which misrepresented SAA's value sufficiently states a claim of breach of fiduciary duty under Delaware law. *See Caballero,* 720 F.2d at 1099.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Defendants' motion to dismiss the fifth count of plaintiffs' complaint is denied, except as it relates to Corves; plaintiffs' cause of action against Corves is dismissed for failure to state a claim upon which relief can be granted.

### 4. Defendants' Motion to Dismiss Count Six (RICO against Sontag and Manaker)

Plaintiffs allege that Manaker and Sontag began, in 1983, to engage in a pattern of fraud "for the purpose of extricating Manaker from his financial problems and enriching Sontag," Complaint ¶ 83, in violation of RICO §§ 1962(c), (d), 18 U.S.C. §§ 1962(c), (d). Plaintiffs then list various activities which they allege constituted the fraudulent conduct and the period of time over which it occurred.

To state a cause of action under the claimed sections of RICO, plaintiffs must allege that the defendants conducted or participated in the affairs of an enterprise "through a pattern of racketeering activity" while employed by or associated with that enterprise, § 1962(c), or conspired to violate one of the RICO sections, § 1962(d). The defendants' motion to dismiss is grounded on the theory that the plaintiffs have failed to sufficiently allege the existence of "a pattern of racketeering activity." Specifically, defendants contend that plaintiffs failed to properly allege (1) the predicate acts of fraud with the specificity required by Rule 9(b), and (2) a "pattern of racketeering activity." Since this is the limit of defendants' argument, this Court will not venture into unchallenged areas of plaintiffs' RICO claims, and instead will confine its discussion to those arguments raised by the defendants.

The Court will not spend any more time addressing defendants' Rule 9(b) lack of specificity challenge. If anything, the allegations within plaintiffs' Count # 6 are more explicit than those articulated earlier in the complaint which this Court has found to be sufficiently particular. See, e.g., Complaint ¶ 85 (listing specific allegations of Manaker's and Sontag's fraudulent activity). Since plaintiffs' claims place defendants on sufficient notice of the specific incidents of fraud alleged, see DiVittorio, 822 F.2d at 1247, this Court again finds that plaintiffs have alleged the predicate acts with sufficient particularity.

*15 More pressing is the defendants' argument that plaintiffs have failed to allege a "pattern of racketeering activity." Indeed, RICO requires plaintiff to prove such a pattern, see § 1962(c), and the Supreme Court recently set forth the standard this Court must apply in determining whether a pattern has been sufficiently alleged to withstand a Rule 12(b)(6) motion. H.J. v. Northwestern Bell Tele., 109 S.Ct. 2893 (1989). To state a claim of a pattern of racketeering activity, the plaintiff must allege the existence of two or more racketeering predicates, and that (1) the predicates are related and (2) they amount to or pose a threat of continued criminal activity. H.J. 109 S.Ct. at 2900; United States v. Long, 917 F.2d 691, 697 (2d Cir.1990).

In light of the foregoing analysis, it is clear that the plaintiffs have sufficiently alleged the existence of two or more predicate acts. In paragraph 85 alone, the plaintiffs alleged multiple incidents of fraud, the validity of which is not now before this Court. Furthermore, the plaintiffs have alleged that the predicates are related. From the start plaintiffs alleged that Manaker and Sontag acted to bolster their personal financial standing at the expense of the plaintiffs. According to the Supreme Court, that allegation of common purpose, result, participants, victims, and method is sufficient to show that the predicate acts were related. See H.J. 109 S.Ct. at 2901.

The more difficult element of "pattern of racketeering activity" is that which requires proof of continuous criminal activity. Fortunately, the Supreme Court's H.J. decision gives this Court some guidance, because that case dealt directly with construing the uncertain term "continuous activity." See generally H.J. 109 S.Ct. 2893. While acknowledging that defining "continuity" requires a case-specific analysis, the Court has made clear that it is not enough that the predicates be related; they must relate in a manner that signifies continuous conduct, an ongoing scheme with long-term goals. Id. at 2902. See id. Hence, the crux of the continuity requirement appears to be the manner by which the related acts are performed; the series of predicate acts, each by itself illegal, must be committed in furtherance of a larger, ongoing scheme. The idea that the underlying scheme be "ongoing" satisfies RICO's "continuity" requirement. See id.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                          Page 12
Not Reported in F.Supp., 1991 WL 207473 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

In this Court's view the plaintiffs have satisfied the continuity requirement. As stated *supra*, discerning this requirement is the most difficult because it requires a case-specific analysis, *see H.J., 109 S.Ct. at 2902* ("the development of these concepts [of continuity] must await future cases"). The parties' arguments notwithstanding, not much case law addressing continuity in this type of unique fact pattern has surfaced since the Supreme Court announced the *H.J.* standard in 1989. *See, e.g., Farberware v. Groben, 764 F.Supp. 296, 305-07 (S.D.N.Y.1990); Azurite v. Amster & Co., 730 F.Supp. 571, 581 (S.D.N.Y.1990), cited in* Defendants' Response to Plaintiffs' Supplemental Memorandum of Law, at 5-6 (stating "continuity" standards in light of *H.J.*, but applying case-specific analysis). Despite the lack of helpful precedent, this Court is convinced that each of the predicate acts alleged in paragraph 85 are not merely related, but are also connected in such a way which, if true, can be considered "continuous." They mark a series of events, *to wit* intentional issuance of misleading statements communications or omissions of material information, which were committed in an *ongoing* manner in furtherance of Manaker's and Sontag's alleged scheme for personal wealth. Since the existence of "ongoing activity" as an indicator of continuity has been sufficiently pleaded by the plaintiffs, along with the other requirements of "pattern of racketeering," this Court finds that the plaintiffs have stated a claim for RICO upon which relief can be granted.

### B. Aquilio's Motion to Dismiss Defendants' Counterclaims

**\*16** Aquilio moves to dismiss defendants' counterclaims for indemnity and/or contribution from him on grounds that the plaintiffs' underlying complaint alleges intentional torts, and indemnity and/or contribution are not available from one who was allegedly negligent in preventing an intentional tort. Plaintiffs' Memorandum of Law in Opposition, at 116 (citations omitted). At oral argument, defendants agreed that an intentional tortfeasor is not entitled to indemnification or contribution from a negligent third party. Defendants submitted that they included this cause of action in anticipation of the unlikely event that any of the defendants is found liable for negligent behavior.

Upon thorough review of plaintiffs' complaint, this Court can glean no allegation of negligent conduct for which de-

fendants might be held liable. Every one of plaintiffs' causes of action alleges intentional conduct; to be sure, evidence of negligence at trial would likely be inadmissible as irrelevent. Furthermore, defendants are unable to point to any allegation of negligence in the plaintiffs' complaint. Given defendants' failure to allege any facts under which they may be entitled to indemnity and/or contribution, their counterclaim is dismissed for failure to state a claim upon which relief could be granted, pursuant to *Rule 12(b)(6)*.

### C. Plaintiffs' Motions for Leave to Amend Complaint

To review, plaintiffs seek leave to amend their second-amended complaint for the following purposes: (1) correct defects to the extent that they result in dismissal today; (2) file a consolidated amended complaint combining the *Manaker* and *Leupke* actions; (3) amend their complaint to add more particular allegations of fraud; (4) amend complaint to add a Florida RICO count against on behalf of plaintiff Vance; and (5) join new plaintiffs.

Plaintiffs' success in most of today's motions renders further clarificaiton of their complaints uneccessary. Also, at the conclusion of oral argument, this Court ordered that the *Manaker* and *Leupke* actions be consolidated for joint trial. Accordingly, the motions for leave to correct defects, file a consolidated amended complaint combining the *Manaker* and *Leupke* actions, and add more particular allegations of fraud, are all denied with prejudice as moot or otherwise uneccesary.

As for the remaining motions (to add a Florida RICO count on behalf of plaintiff Vance and join new plaintiffs), the Court notes that leave to amend a complaint "shall be freely given when justice so requires." *Fed.R.Civ.P. 15(a)*. This Court has addressed motions for leave to amend on numerous occasions in the past year alone. *See, e.g., Davis Acoustical v. Carolina Freight, 765 F.Supp. 1142, 1143 (N.D.N.Y.1991)* (McCurn, *C.J.*); *Fox v. Board of Trustees, 764 F.Supp. 747, 757-58 (N.D.N.Y.1991)* (McCurn, C.J.); *Duffy v. Anitec Image, 1991 WESTLAW 44834 (N.D.N.Y.1991)* (McCurn, C.J.). In many past instances this Court has referred to *Foman v. Davis, 371 U.S. 178, 182 (1962)*, as the controlling authority governing leave to amend complaints. In *Foman*, the Supreme Court instructed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                                                    Page 13
Not Reported in F.Supp., 1991 WL 207473 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

that leave to amend should be granted in the absence of an apparent or declared reason, such as undue delay, bad faith, or undue influence. *Foman,* 371 U.S. at 182.

*17 In considering plaintiffs' motions for leave to amend, this Court also remains cognizant of the Second Circuit's statement that a "[p]laintiff clearly has no right to a second amendment." *Denny v. Barber,* 576 F.2d 465, 471 (2d Cir.1978). The plaintiffs still carry some burden, however minimal, of showing that "justice so requires" leave to amend. Fed.R.Civ. P. 15(a); *see Denny,* 576 F.2d at 471. In the case at bar, the plaintiffs' papers are simply devoid of any reason stating why this court *should* grant leave to amend. Instead, plaintiffs argue simply that, *e.g.,* "[d]efense advances no reason ... to deny the relief." Plaintiffs' Supplemental Memorandum of Law (7/29/91), at 4.

Plaintiffs' statement is not only inaccurate but beside the point; the fact is that plaintiffs still carry the burden to inform the Court *why* leave to amend is warranted. Since plaintiffs simply have not convinced this Court, from even the most liberal construction of their papers, that "justice so requires" granting leave to amend, plaintiffs' motions to amend their complaint are denied in their entirety without prejudice to renew.

### D. Plaintiffs' Motion to Compel Production

Through their motion to compel, plaintiffs seek production of (1) cassettes containing tape recordings of SAA's October 2, 1986 shareholders' meeting, and (2) every contract, agreement or memoranda thereof between Corves and CIMS. Plaintiffs also seek to recover costs incurred in pursuing this motion, pursuant to Fed.R.Civ.P. 37(a)(4). At oral argument, the parties agreed that plaintiffs' demands have been satisfied. This motion is therefore denied as moot. If plaintiffs wish to pursue recovery of costs for this motion, they should file a separate motion with this Court, specifically informing the Court as to why, in light of today's decision, they fall within the scope of Rule 37(a)(4).

### IV. CONCLUSION

Defendants' motions to dismiss counts one, two, and six are denied in their entirety. Defendants' motions to dismiss

counts three and four are granted in their entirety. Defendants' motions to dismiss count five is granted only as it relates to defendant Corves; the motion is denied in all other respects. Defendants' motions to dismiss on grounds of contracutal releases is denied without prejudice to renew in the form of a motion for summary judgment. Plaintiff Aquilio's motion to dismiss defendants' counterclaims is granted. Plaintiffs' motions to amend and/or consolidate their complaints, add new parties, and compel discovery are denied in accordance with the terms of this decision. This Court orders consolidation of the *Manaker* and *Leupke* actions for joint trial. The motions in the *Leupke* action are treated in the same manner as their respective motions in *Manaker,* as discussed herein.

IT IS SO ORDERED.

FN1. All references to "Aquilio" are to Donald Aquilio. References to co-plaintiff Daria Aquilio will be specifically designated as such.

FN2. In considering defendants' motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) (failure to state a claim upon which relief can be granted), this Court is obliged to accept as true all of the factual allegations set forth in plaintiffs' second-amended complaint. *See, e.g., Capital Imaging Assoc. v. Mohawk Valley Medical Assoc.,* 725 F.Supp. 669, 676 (N.D.N.Y.1989) (McCurn, C.J.). Unless otherwise noted, references throughout this recitation of the facts are to the corresponding paragraphs of plaintiffs' second-amended complaint.

FN3. Sontag and Manaker, by contrast, allege that they accommodated Aquilio's persistent requests that he (Aquilio), his fiends, family and clients be permitted to invest in SAA. *E.g.* Manaker's Answer, at ¶ 18. To be sure, defendants assert that other investors were available, but Aquilio "insistently requested that he and [the other investors] should be permitted to acquire an interest in SAA." *E.g.* Manaker Counterclaim, at ¶ 16.

FN4. Plaintiffs Meltzer, Vance, and Aquilio became shareholders in 1983. Daria Aquilio, as trust-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
Not Reported in F.Supp., 1991 WL 207473 (N.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Page 14

ee of the Mae H. Vance Trust (hereinafter "Trustee" or "Trust"), acquired her interest later through a pledge agreement with Aquilio.

FN5. Sontag was President of SAA until 1984, at which time he became Chief Executive Officer until 1987; he was a member of the Board of Directors from inception until 1987.

FN6. The parties spend undue time offering vastly divergent accounts of the source of the antagonism. *Cf.* Plaintiffs' Complaint, at ¶ 27; Manaker's Answer, at ¶ 27. Fortunately, the same is not relevant to the motions before the Court.

FN7. Although Manaker acknowledges that the meeting occurred and that sale of plaintiffs' shares was discuss, he unequivocally denies uttering the alleged statements. *E.g.* Manaker Response, at ¶ 43.

FN8. Plaintiffs suggested for the first time at oral argument that *Lampf* 's rejection of equitable tolling applies only to the three-year statute of repose; equitable tolling, according to plaintiffs, may still be applied to the one-year discovery statute of limitations. The Court rejected that distinction outright, stating that "the equitable tolling doctrine is fundamentally inconsistent with the 1-and-3-year structure." *Lampf,* 111 S.Ct. at 2782 (three year maximum was intended to *replace* equitable tolling in securities actions). The plaintiffs' purported distinction, while creative, is without merit in light of *Lampf.*

N.D.N.Y.,1991.
Aquilio v. Manaker
Not Reported in F.Supp., 1991 WL 207473 (N.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 5:91cv00093 (Docket) (Jan. 24, 1991)
• 5:90cv00045 (Docket) (Jan. 11, 1990)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

5

Westlaw.

2006 N.Y. Slip Op. 50755(u)                                                    Page 1
Slip Copy, 11 Misc.3d 1087(A), 2006 WL 1132351 (N.Y.Sup.), 2006 N.Y. Slip Op. 50755(U) (Table)
**Unpublished Disposition**
**(Cite as: 2006 WL 1132351 (N.Y.Sup.), 2006 N.Y. Slip Op. 50755(U))**

<u>**Motions, Pleadings and Filings**</u>

This opinion is uncorrected and will not be published in the printed Official Reports.

**1 MARC BEZNICKI, etc., Plaintiff,
v.
ANDRE FETAYA, et al, Defendant.
8230/05

Supreme Court, Queens County

Decided on April 18, 2006
CITE TITLE AS: Beznicki v Fetaya

ABSTRACT
Religious Corporations and Associations

Sale of Church Property

Fraud

*Beznicki v Fetaya*, 2006 NY Slip Op 50755(U). Religious Corporations and Associations--Sale of Church Property--Fraud. (Sup Ct, Queens County, Apr. 18, 2006, Weiss, J.)

OPINION OF THE COURT
Allan B. Weiss, J.

Defendant Andre Fetaya, defendant Jay Parker, and defendant Norman Dicker have moved for summary judgment dismissing the complaint against them.

The complaint alleges the following: Plaintiff Marc Beznicki, defendant Jay Parker, and defendant Andre Fetaya served as members of the Board of Trustees of the Rego Park Jewish Center, Inc. ("RPJC"), a not-for-profit religious corporation located at 97-30 Queens Boulevard, Rego Park, New York. Defendant Norman Dicker served as the executive director of RPJC. In or about December 2003, defendant Fetaya and defendant Parker informed the Board of Trustees that they had received an offer from Ilya Mikhailov to purchase the real property owned by RPJC for approximately $8,000,000. Mikhailov proposed to pay $50,000 as a down payment upon the signing of a contract of sale, $3,000,000 at the closing, $1,000,000 plus 5% interest one year after the

closing, and $4,000,000 without interest ten years after the closing or at such earlier time as the congregation vacated the premises. Fetaya and Parker urged Board members to vote in favor of accepting the offer. However, the plaintiff objected to the offer at the Board meeting, and defendants Fetaya and Parker gave him twenty-four hours to produce a better offer from another party. The plaintiff arranged a meeting attended by Board members, including himself, Fetaya, and Parker, and a prospective purchaser, Moshe Aksholomo, who made an offer of $8,500,000. At a meeting of the Board of Trustees held in January 2004, Fetaya and Parker induced the other trustees to vote against the sale to Aksholomo and in favor of a sale to Mikhailov. In or about January 2004, defendant Fetaya and another board member met with Ramin Zakarya and Elizabeth Zarkarya, principals of Best Homes Realty Company, and they offered to buy the real property of RPJC on substantially similar terms to the Mikhailov proposal, but at a price of $8,500,000 to $10,000,000. On December 26, 2003, Marvin Kagen and Rolen Sabat, owners of R.S. Property Company, made an offer to Fetaya and Parker for the purchase of the real property at a price of $10,000,000. Defendant Fetaya and defendant Parker did not inform other members of the Board of Trustees of the higher offers from Best Homes Realty Company and R.S. Property Company. Defendants Fetaya **2 and Parker stated to other board members that the Mikhailov offer was the best deal that could be hoped for. The trustees voted to accept Mikhailov's offer at a meeting held in May 2004. However, in or about July, 2004, the congregation of RPJC voted to reject Mikhailov's offer by a three to one margin.

Defendant Fetaya and defendant Parker allege that for many years they have volunteered to serve as trustees of RPJC, and defendant Dicker alleges that RPJC has employed him for over 45 years. By 2003, the congregation faced problems of declining membership and rising expenses. The minutes of the Board of Trustees meeting for November 24, 2003 read in relevant part: "Andre [Fetaya] has found a Bucharian gentleman who would buy both buildings that is the only solution. *** The deal that Andre A. Fetaya & Jay Parker worked out [is] that we can remain in the front building (that is, sanctuary, ballroom, etc.) for ten years, rent free. ***" A motion to authorize the Chairman of the Board and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2006 N.Y. Slip Op. 50755(u)                                                                 Page 2
Slip Copy, 11 Misc.3d 1087(A), 2006 WL 1132351 (N.Y.Sup.), 2006 N.Y. Slip Op. 50755(U) (Table)
**Unpublished Disposition**
**(Cite as: 2006 WL 1132351 (N.Y.Sup.), 2006 N.Y. Slip Op. 50755(U))**

the President "to go ahead with the proposed sale" carried twelve to three with one abstention. The minutes of the Board of Trustees meeting for January 6, 2004 read in relevant part: "Mr. Fetaya then apprised the board that he receive[d] another proposal from a Russian man who is interested in both buildings offered $10 million and same conditions as Ilya [Mikhailov] ( the first buyer) as outlined in last month's minutes. However, Mr. Fetaya was not quite sure that he would honor the agreement and allow us to remain for 10 years. *** We went around the table and the majority consensus was to go with the first proposal from Ilya ***."

Defendant Dicker swears: "[A]ll written proposals to purchase the RPJC property were presented to the Board for consideration. I personally brought the $10 million proposal of R.S. Property Company ( RS Property') to the Board. The Board rejected this offer because, among other reasons, RS Property intended to take over the first floor of the main building for its own use and require the membership to relocate to the second floor of the building. This was deemed unacceptable, given the age and infirmity of several RPJC members. As for the alleged January 2004 offer by Best Homes Realty Company to purchase the RPJC property for a price of between $8,500,000 and $10,000,000,' while informal offers were discussed verbally over time, no written proposal was ever received from Best Homes, its purported principals, or a Mr. Zar' ***." (Emphasis in original.)

Despite the rejection of Mikhailov's offer by the congregation, plaintiff Beznicki brought this action against Fetaya, Parker, Dicker, and the Attorney General of the State of New York on April 13, 2005. The first cause of action is for actual and constructive fraud based on, *inter alia,* the alleged failure of Fetaya and Parker to disclose the offers of Best Homes Realty Company and R. S. Property Company to the Board of Trustees and the congregation of RPJC. The second, third, fourth, fifth, and sixth causes of action are for breach of fiduciary duty based on, *inter alia,* the alleged failure of Fetaya, Parker, and Dicker to disclose the allegedly better offers to the Board of Trustees and congregation of RPJC.

On August 10, 2005, the defendants submitted a motion for an order pursuant to CPLR 3211(a)(1), (3), and (7) dismissing the complaint against them. By order dated September

30, 2005, this court directed that the motion would be treated as one for summary judgment.

"[T]he proponent of a summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact ***." (*Alvarez v Prospect Hospital,* 68 NY2d 320, 324.) In the case at bar, the defendants successfully carried this burden.

In the first place, plaintiff Beznicki did not comply with **3Not For Profit Corporation Law § 623 which controls derivative actions brought against not for profit corporations. (See, *Tomczak v Trepel,* 283 AD2d 229.) This action was not brought by five percent or more of any class of members of RPJC (see, NFPCL §623[a]; *Segal v Powers,* 180 Misc 2d 57), and the complaint does not "set forth with particularity the efforts of the plaintiff or plaintiffs to secure the initiation of [legal] action by the board of [sic: or] the reason for not making such effort." (NFPCL §623[c]; see, *Segal v Powers, supra.*) In any event, the defendants otherwise made a prima facie showing of entitlement to judgment as a matter of law.

The first cause of action, which asserts fraud, rests on allegations that the defendants concealed from other board members and the congregation better purchase offers made by Best Homes Realty Company and R.S. Property Company. In order to prove a cause of action for fraud, a plaintiff must show (1) that the defendant made material representations that were false or concealed a material existing fact, (2) that the defendant knew the representations were false and made them with the intent to deceive the plaintiff, (3) that the plaintiff was deceived, (4) that the plaintiff justifiably relied on the defendant's representations, and (5) that the plaintiff was injured as a result of the defendant's representations. (See, *Lama Holding Co. v Smith Barney,* 88 NY2d 413; *New York Univ. v Continental Ins. Co.,* 87 NY2d 308; *Watson v Pascal,* - AD3d-, -NYS2d-, 2006WL 548048; *Cerabono v Price,* 7 AD3d 479; *New York City Transit Authority v Morris J. Eisen, P.C.,* 276 AD2d 78; *American Home Assur. Co. v Gemma Const. Co., Inc.,* 275 AD2d 616; *Swersky v. Dreyer & Traub,* 219 AD2d 321.) In regard to the $10,000,000 offer from R.S. Property Company, the affidavit of defendant Norman Dicker and the minutes of the

Westlaw.

2006 N.Y. Slip Op. 50755(u)                                                    Page 3
Slip Copy, 11 Misc.3d 1087(A), 2006 WL 1132351 (N.Y.Sup.), 2006 N.Y. Slip Op. 50755(U) (Table)
**Unpublished Disposition**
**(Cite as: 2006 WL 1132351 (N.Y.Sup.), 2006 N.Y. Slip Op. 50755(U))**

Board of Trustees meeting for January 6, 2004 show that the offer was made known to the Board. The defendants showed prima facie that the plaintiff cannot establish the first element of fraud in regard to the offer from R.S. Property Company. Concerning the alleged offer from Best Homes Realty Company, the defendants asserted that they did not present the offer to the Board because it was not in writing. The defendants thereby showed prima facie that they did not have the intent to deceive other members of the Board, intent being a requisite element of a cause of action for fraud. (See, *Watson v Pascal, supra*; *Cerabono v Price, supra*.) The defendants have also shown that the plaintiff cannot prove injury, the fifth element, in this case based on the alleged loss of possible sales to R.S. Property Company and Best Homes Realty Company. "The damages plaintiff seeks are not recoverable under the out-of-pocket rule, which bars recovery of profits that would have been realized in the absence of fraud, including the loss of an alternative bargain overlooked in favor of the fraudulent one, as inherently speculative and undeterminable ***." (*Geary v Hunton & Williams*, 257 AD2d 482; see, *Barrett v Huff*, 6 AD3d 1164; *Bernstein v Kelso & Co., Inc.*, 231 AD2d 314.)

The second, third, fourth, fifth, and sixth causes of action are for breach of fiduciary duty based on, *inter alia*, the alleged failure of Fetaya, Parker, and Dicker to disclose the allegedly better offers to the Board of Trustees and congregation of RPJC. A fiduciary must disclose to his principal information that is material and germane to a contemplated transaction. (See, *Botti v Russell*, 180 AD2d 947.) In the case at bar, the $10,000,000 offer from R.S. Property Company was made known to the Board. In regard to the alleged offer from Best Homes Realty Company, the defendants assert that they did not present the matter to the Board because there was no offer in writing. Since Best Homes did not offer a specific sum for the property, but merely expressed an interest in the broad range of $8,500,000 to $10,000,000 and did not make a binding offer in writing, the defendants showed prima facie that they did not conceal material facts from the Board. The **4 defendants also showed prima facie that the business judgment rule protects their actions in this matter. The business judgment rule limits judicial review of actions of corporate directors "taken in good faith and in the exercise of honest judgment in the lawful and le-

gitimate furtherance of corporate purposes." (*Auerbach v Bennett*, 47 NY2d 619, 629; see, *Levandusky v One Fifth Ave. Apartment Corp.*, 75 NY2d 530.) Absent claims of fraud, self-dealing, unconscionability or other misconduct, the business judgment rule limits judicial inquiry into the actions of corporate managers to whether the action was authorized and whether it was taken in good faith and in furtherance of the legitimate interests of the corporation. (See, *Shapiro v Rockville Country Club, Inc.*, 22 AD3d 657; *Gillman v Pebble Cove Home Owners Assn.*, 154 AD2d 508.) In the case at bar, the defendants showed prima facie that they acted in good faith and in furtherance of the legitimate interests of the congregation.

The burden on this motion shifted to plaintiff Beznicki to produce evidence showing that there is an issue of fact which must be tried. (See, *Alvarez v Prospect Hospital*, *supra*.) The plaintiff failed to carry this burden. The plaintiff expressed a hope that discovery might reveal a written offer from Best Homes. A party cannot have the determination of a summary judgment motion postponed upon the mere speculation and hope that discovery will reveal facts supporting a cause of action or defense. (See, *Keeley v Tracy*, 301 AD2d 502; *Baron v Newman*, 300 AD2d 267; *Hampton Living, Inc. v Carlton on the Park, Ltd.*, 286 AD2d 664; *Romeo v City of New York*, 261 AD2d 379.) In order to successfully oppose a motion for summary judgment on the ground that further discovery is needed, "a party claiming ignorance of critical facts must first demonstrate that his or her ignorance is unavoidable, and that reasonable attempts were made to discover facts which would give rise to a triable issue ***." (*Lumbsy v Gershwin Theater*, 282 AD2d 578; see, *Gillinder v Hemmes*, 298 AD2d 493; *Cruz v Otis Elevator Co.*, 238 AD2d 540; *Rothbort v S.L.S. Mgt. Corp.*, 185 AD2d 806.) This action has been pending for over one year. The court notes that there is no evidence in this case of self-dealing which would prevent the application of the business judgment rule.

Accordingly, the motion is granted.

Short form order signed herewith.

J.S.C.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2006 N.Y. Slip Op. 50755(u)                                                                                Page 4
Slip Copy, 11 Misc.3d 1087(A), 2006 WL 1132351 (N.Y.Sup.), 2006 N.Y. Slip Op. 50755(U) (Table)
**Unpublished Disposition**
**(Cite as: 2006 WL 1132351 (N.Y.Sup.), 2006 N.Y. Slip Op. 50755(U))**


    Copr. (c) 2006, Secretary of State, State of New York


N.Y.Sup. 2006.


Beznicki v Fetaya


        **Motions, Pleadings and Filings (Back to top)**


• 0008230/2005 (Docket) (Jul. 22, 2005)


END OF DOCUMENT


© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

6

**Westlaw.**

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 1139908 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,E.D. New York.
Christopher BRODEUR, Plaintiff,
v.
THE CITY OF NEW YORK, Defendant.
No. 04-CV-1859 (JG).

May 13, 2005.

Corey Stark, Michael G. O'Neill, New York, New York, for Plaintiff.
Michael A. Cardozo, Corporation Counsel of the City of New York, New York, New York, By: Sheryl A. Bruzzese, Assistant Corporation Counsel, for Defendant.

*MEMORANDUM AND ORDER*
GLEESON, J.
*1 Plaintiff Christopher Brodeur brings this action pursuant to 42 U .S.C. § 1983 alleging that after he was arrested in March and June of 1997 he was unlawfully strip-searched while incarcerated at Riker's Island. The City of New York (the "City") moves for judgment on the pleadings, arguing that Brodeur's claims are (1) barred by a settlement agreement from a prior action; (2) precluded under the doctrine of *res judicata;* and (3) time barred. For the reasons set forth below, the motion is granted.FN1

> FN1. By letter dated November 16, 2004, Brodeur withdrew his claim concerning strip searches that took place in March 1997. *See* letter dated November 16, 2004 from Michael G. O'Neill to the Court, attached as Ex. F. to the Bruzzese Declaration.

*BACKGROUND*

A. *General Background and Procedural History* FN2

> FN2. This background information is based on Brodeur's complaint and opposition brief; his complaint in a prior action-*Brodeur v. City of New York,* 99 CV 0651 (S.D.N.Y.) (*"Brodeur II"* )-the settlement of which is the basis of the City's motion; the *Brodeur II* settlement agreement and gen-

eral release; and filings and docket entries in *Tyson v. City of New York,* 97-CV-03762 (S.D.N.Y.).

On January 29, 1999, Brodeur brought an action under 42 U.S.C. § 1983 alleging violations of his due process rights under the Fifth and Fourteenth Amendments against, among others, The City of New York and Mayor Rudolph Giuliani. *See* Bruzzese Decl. Ex B., Third Amended Complaint, *Brodeur II.* FN3 That action was grounded, in part, on an assertion that Brodeur was falsely arrested on June 12, 1997. On that day, Brodeur attempted to hold a press conference on the steps of City Hall announcing his decision to run for Mayor as a candidate named "John Doe." Although he was wearing a paper bag over his head to disguise his identity, Brodeur was arrested for violating an order of protection (failing to stay away from the "place of business" of Colleen Roche, Giuliani's press secretary). Brodeur asserted that the arrest was pretextual, and that he was being retaliated against for being a "relentless" critic of the Giuliani administration.

> FN3. *Brodeur II* was the second case Brodeur brought against the City alleging that he was being retaliated against for criticizing Mayor Giuliani and his administration. On June 3, 1996, Brodeur filed a complaint in the Southern District of New York. *See Brodeur v. City of New York,* 1998 WL 557599, at *1 (S.D.N.Y. Sept. 2, 1998) (*"Brodeur I"* ). On April 22, 1997, the district court dismissed the complaint against most defendants. *Id.* On October 1, 1997, "the Second Circuit dismissed plaintiff's appeal of [the April 22, 1997 ruling] as 'so indisputably lacking in merit as to be frivolous.' " *Id.* (quoting *Brodeur v. City of New York,* No. 97-7698 (2d Cir.1997)). The amended complaint in *Brodeur I* included allegations concerning Brodeur's March 5, 1997 arrest. *Id .* On September 2, 1998, the *Brodeur I* action was dismissed as to all defendants with prejudice. *Id.* at *9.

After Brodeur's arrest, he was taken to Riker's Island, where he was subjected to one or more strip searches "pursuant to an official policy of the New York City Department of Corrections." FN4 Opp'n Br. at 4. In the *Brodeur II* complaint, in addition to describing the circumstances surrounding the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 2
Not Reported in F.Supp.2d, 2005 WL 1139908 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

June 12, 1997 arrest, Brodeur asserted that:

> FN4. The number of strip searches alleged by Brodeur is immaterial to the disposition of this motion. Accordingly, for the purposes of this motion only, I assume that Brodeur was subject to a single strip search following his June 12, 1997 arrest.

In plaintiff's criminal proceedings, the Assistant District Attorney assigned to prosecute plaintiff informed the Criminal Court that [Mayor Giuliani] had taken a strong personal interest in the case, or words to that effect....

Giuliani's personal interest in plaintiff's criminal proceedings had a substantial influence on the course of those proceedings from the time of plaintiff's arrest until his acquittal....

Giuliani's strong personal interest in plaintiff's criminal charges caused him to be processed through the jail system, when he would otherwise have been released on a desk appearance ticket, caused the criminal court to set an absurdly high bail, and influenced the criminal court not to dismiss criminal charges against plaintiff that were defective on their face.

All of the foregoing caused plaintiff to spend unwarranted time in jail and in baseless criminal proceedings, in effect punishing the plaintiff without ever having been convicted of a crime.

*Brodeur II,* Third Am. Compl. ¶¶ 45-48.

On January 3, 2003, Brodeur and the City settled *Brodeur II,* executing a Stipulation and Order of Settlement and Dismissal. Bruzzese Decl. Ex. D. The City agreed to pay Brodeur $35,000, the action was dismissed with prejudice, and Brodeur released the defendants, including the City of New York, "from any and all liability, claims, or rights of action arising from and contained in the complaint in this action." *Id.* Brodeur signed a general release in connection with the settlement, which reads in its entirety as follows:

*2 Know that I, Christopher Brodeur, the plaintiff in the action entitled *Brodeur v. City of New York, et al.,* 99 Civ. 0651(WHP) (KNF), in consideration of the payment of Thirty-Five Thousand Dollars ($35,000.00) by the City of New York, do hereby release and discharge the defendants Donald Costello and Richard Dowd; their successors or as-

signs; all past and present officials, employees, representatives and agents of the New York City Police Department and the City of New York; and the City of New York from any and all claims which were or could have been alleged by me in the aforementioned action arising out of the events alleged in the complaint in said action, including all claims for attorney's fees and costs. This Release may not be changed orally.

Bruzzese Decl. Ex. E.

In this action, Brodeur asserts that the reason he did not allege an unlawful strip search in *Brodeur II* was because he believed that he was a class member in *Tyson v. City of New York,* 97-CV-03762 (S.D.N.Y.), and relied on that action to vindicate such a claim.

### 1. *The* Tyson *Class Action*

On May 22, 1997, a class action was filed alleging that the City of New York unconstitutionally subjected all pre-trial arrestees in Manhattan to strip searches without reasonable cause. O'Neill Decl. Ex. A, Compl., *Tyson v. City of New York,* 97-CV-03762 (S.D.N.Y.). The proposed class consisted of "all persons who had been or will be arrested for misdemeanor or lesser offenses in New York County and then were or will be strip searched pursuant to City, DOC, and NYPD policy, practice and custom." *Id.* ¶ 17. The class was certified on April 13, 1998, and included persons alleging unlawful strip searches between July 1, 1996 and June 13, 1997. O'Neill Decl. Ex. C, *Tyson* Docket Report. When Brodeur filed *Brodeur II* in 1999, he was "aware of the pendency of the [*Tyson* ] class action and relied on it for the vindication [sic] of his illegal strip searches." Opp'n Br. at 4. On January 9, 2001, a proposed stipulation of settlement was filed in *Tyson.* The stipulation stated that "[t]he Settlement Class shall not include any individual who has previously commenced any civil litigation challenging any arrest(s) which resulted in his/her detention in Central Booking in Manhattan and Queens during the class period and has prevailed, settled, or had his/her complaint dismissed on the merits." O'Neill Decl. Ex. B, Stipulation of Settlement, *Tyson v. City of New York,* ¶ 1. On July 5, 2001, the district court entered final judgment approving the *Tyson* settlement. On November 18, 2002, Brodeur was notified

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                   Page 3
Not Reported in F.Supp.2d, 2005 WL 1139908 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

that he was not a member of the *Tyson* class and may not be eligible for any damages from the *Tyson* case. On May 5, 2004, Brodeur filed this action seeking money damages for the strip search following his June 12, 1997 arrest.

### DISCUSSION

#### A. *The Standard for a Rule 12(c) Motion*

Under Rule 12(c) of the Federal Rules of Civil Procedure, a party may move for judgment on the pleadings "[a]fter the pleadings are closed but within such time as not to delay the trial." In deciding a Rule 12(c) motion, a court applies the same standard that applies to a motion under Rule 12(b)(6). *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). A court must accept as true the factual allegations in the complaint, and draw all reasonable inferences in favor of the plaintiff. *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). Dismissal may be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Walker v.. City of New York,* 974 F.2d 293, 298 (2d Cir.1992) (internal quotation omitted); *see also Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002) ("a court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.") (internal quotation and brackets omitted).

**\*3** When considering a 12(b)(6) motion, a court must generally limit itself to facts stated in the complaint, documents attached to the complaint, and documents incorporated by reference. *Newman & Schwartz v. Asplundh Tree Expert Co., Inc.,* 102 F.3d 660, 662 (2d Cir.1996). A court may also consider documents a plaintiff relies on that are integral to the complaint, as well as public documents of which the plaintiff has notice. *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47-48 (2d Cir.1991). Here, both parties have provided public documents integral to Brodeur's complaint. These documents are: (1) the complaint, settlement agreement, and general release in *Brodeur II, see* Bruzzese Decl. Exs. B, D, and E, respectively; and (2) the complaint, stipulation of settlement, and docket sheet in the *Tyson* class action, *see* O'Neill Decl. Exs. A-C, respectively. Neither party has suggested that these documents are not properly before

the court on this motion, and I have considered them in deciding this motion. *See Cortec,* 949 F.2d at 48 ("Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated.").

#### B. *The Settlement Agreement and General Release*

The City argues that the *Brodeur II* settlement agreement and general release preclude Brodeur from bringing the claim in this case-that he was subjected to an unconstitutional strip search following his June 12, 1997 arrest. I agree.

Settlement agreements and general releases are contracts construed according to general principles of contract law. *Collins v. Harrison-Bode,* 303 F.3d 429, 433 (2d Cir.2002) (settlement agreements); *Albany Sav. Bank, F.S.B. v. Halpin,* 117 F.3d 669, 672 (2d Cir.1997) (general releases). A court's primary objective in interpreting contracts is "to give effect to the intent of the parties as revealed by the language of their agreement." *Compagnie Financiere de Cic et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.,* 232 F.3d 153, 157 (2d Cir.2000). The threshold determination is whether the contract language is unambiguous; if it is, "courts must take care not to alter or go beyond the express terms of the agreement." *Red Ball Interior Demolition Corp. v. Palmadessa,* 173 F.2d 481, 484 (2d Cir.1999); *see also Shklovskiy v. Khan,* 273 A.D.2d 371, 372 (2d Dep't 2000) ("[w]here the language of the release is clear, effect must be given to the intent of the parties as indicated by the language employed."). Also, where a contract is unambiguous, a party's subjective intent is irrelevant. *See Retrofit Partners I, L.P. v. Lucas Indus., Inc.* 201 F.3d 155, 161 (2d Cir.2000) ( "extrinsic evidence may not be used to create ambiguity in an otherwise unambiguous agreement;" and thus, what a party thinks an agreement means is irrelevant.) (internal quotation omitted); *see also Strumlauf v. Sandine Originals, Inc.,* 55 N.Y.2d 976, 978 (1982) (Fuchsberg, J., dissenting) ("it is almost hornbook law that the intent of the parties to a written agreement is to be found primarily in their 'expressed words' rather than their 'subjective intent.' ").

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 4
Not Reported in F.Supp.2d, 2005 WL 1139908 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

**\*4** Determining whether the contract language is ambiguous is a question of law to be decided from the face of the agreement itself, without reference to extrinsic evidence. _Collins, 303 F.3d at 433_. Contract language is ambiguous if "it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." _Compagnie Financiere, 232 F.3d at 158_ (internal quotation omitted). The words of a contract "should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance and a sensible meaning of words should be sought." _Collins, 303 F.3d at 433 (2d Cir.2002)_ (quoting _Kass v. Kass, 91 N.Y.2d 554, 566 (1998)_). A contract is not made ambiguous "simply because the parties urge different interpretations." _Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir.1992)_; _see also Blackie v. State of Me., 75 F.3d 716, 721 (1st Cir.1996)_ ("a contract is not ambiguous merely because a party to it, often with a rearward glance colored by self-interest, disputes an interpretation that is logically compelled.").

Here, both parties contend that the release is unambiguous-Brodeur is barred from bringing "any and all claims which were or could have been alleged by [him] ... arising out of the events alleged in the complaint"-but dispute whether the post-arrest strip search falls within the ambit of "events alleged in the complaint." Brodeur argues that the release excludes the strip search claim because the complaint "contained no allegations concerning strip searches or any part of his incarceration at Riker's Island.... The 1999 complaint limited itself to the manner and motivation of plaintiff's arrest, his prosecution and a search of his home." Opp'n Br. at 6. The City argues that the release includes any claim for an unlawful strip search because such a claim was a result of the arrest: "whether plaintiff limited his complaint to unlawful arrest, malicious prosecution, or the illegal search of plaintiff's apartment is not significant. Likewise, it simply does not matter if the 1999 action did not allege any facts relating to plaintiff's alleged strip searches because it is clear that any claim pertaining to an unlawful strip search on March 5, 1997 or June 12, 1997 stems directly from plaintiff's arrests on March 5, 1997 and June 12, 1997.

As such, these claims _could have been brought_ in plaintiff's prior action and are, therefore, precluded under the unambiguous terms of the settlement agreement." Br. at 11 (emphasis in original).

I agree with the City that the unlawful strip search claim arises out of the events alleged in the complaint.[FN5] In addition to the circumstances surrounding the June 12, 1997 arrest, the complaint states that Giuliani's interest in Brodeur's criminal proceedings "had a substantial influence from the course of those proceedings _from the time of plaintiff's arrest until his acquittal;_" that Giuliani's interest "caused him to be _processed through the jail system;_" and that because of this, Brodeur "spen[t] _unwarranted time in jail_ and in baseless criminal proceedings, in effect punishing the plaintiff without ever having been convicted of a crime." _Brodeur II,_ Third Am. Com pl. ¶ 45-48 (emphases added). While not specifically describing strip searches, the complaint includes injuries that occurred post-arrest, while Brodeur was being "processed through the jail system." An objective reading of the settlement, release and complaint require the conclusion that the settlement and release unambiguously express an intent of the parties to resolve Brodeur's claims of false arrest and post-arrest mistreatment, including the alleged strip search. Accordingly, I find that, in exchange for $35,000, Brodeur released the city of any such claim arising out of his June 12, 1997.[FN6]

> FN5. I do not agree with the City's suggestion that Brodeur's allegations in the _Brodeur II_ complaint, other than that he was falsely arrested on June 12, 1997, are irrelevant. The question is not, as the City would have it, whether in addition to the false arrest claim, Brodeur could have brought a claim for the unlawful search in _Brodeur II,_ which he certainly could have done. _See_ Fed.R.Civ.P. 18 (a plaintiff asserting a claim _may_ join as many claims as he has against an opposing party). The question under the release is different; it is whether the claim at issue arises out of _the events alleged in the complaint._ The City argues that because Brodeur would not have been subject to an unconstitutional search but for his arrest, the search is a necessary part of the false arrest "event." The City makes this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                     Page 5
Not Reported in F.Supp.2d, 2005 WL 1139908 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

same claim in *res judicata* terminology, that the arrest and the search arise from the same operative nucleus of fact. Br. at 15. But Brodeur's false arrest claim is that members of the New York police force retaliated against him for his criticisms of Mayor Giuliani. His strip search claim is that there was an unconstitutional municipal policy targeting all pre-trial detainees, and Brodeur was but one victim. While it usually makes sense for a plaintiff to bring the two claims together, a false arrest and subsequent unlawful strip search do not necessarily form a single legal transaction. *Cf. Mary Beth G. v. City of Chicago, 723 F.2d 1263, 1279-80 (7th Cir.1984)* (explaining, in the context of whether attorney fees should be awarded, that false arrest and a subsequent unlawful strip search are distinct claims).

FN6. At oral argument, Brodeur's counsel made the strained argument that the references to jail in the *Brodeur II* complaint-"being processed through the *jail* system"; "spending unwarranted time in *jail*"-did not refer to Riker's Island, where Brodeur allegedly was strip-searched following his arrest. Instead, counsel asserts that "jail" in the complaint meant only "Central Booking." Thus, according to counsel's definition, a strip search on Riker's Island would not arise from Brodeur's allegations of post-arrest mistreatment in "jail." Where one party to a contract intends that a word used in (or referred to by) a contract (such as "jail") have an improbably narrow meaning (such as "Central Booking"), he should make sure that the contract defines the word accordingly. An objective reading of the word "jail" in the context of the settlement and release is that it encompasses Riker's Island. *Cf.* New York City Department of Corrections History, *at* http://www.ci.nyc.ny.us/html/doc/html/history.html (referring to the ten "jails" that comprise Riker's Island).

**\*5** The subjective intent that Brodeur implicitly asserts he had while signing the release reinforces why courts focus on the objective language of contracts. Brodeur asserts that

when he filed the *Brodeur II* complaint, he relied on the *Tyson* class action to vindicate his claim of an unlawful strip search following his June 12, 1997 arrest. He further asserts, however, that on November 18, 2002, six weeks before he signed the release in *Brodeur II,* he was told that he was not included in the *Tyson* class. Brodeur thus implicitly asserts that when signing the *Brodeur II* release, he actually intended, notwithstanding the broad terms of the release, to preserve his right to sue the City for the strip search. That undisclosed intent would hardly be apparent to the City as they executed a broad settlement of all claims that could have arisen from allegations in the *Brodeur II* complaint, including allegations concerning Brodeur's post-arrest treatment. If Brodeur wanted to carve out of the settlement his strip search claim in light of his exclusion from the *Tyson class,* all he had to do was say so, and insist on a release that did not bargain such a claim away. He did not do so then, and is thus precluded from bringing this action now.FN7

> FN7. Because of my decision on the merits, I need not address the City's *res judicata* or timeliness arguments.

### CONCLUSION

For the reasons set forth above, the motion to dismiss is granted and the case is dismissed. The Clerk of the Court is respectfully directed to close the case.
So Ordered.

E.D.N.Y.,2005.
Brodeur v. City of New York
Not Reported in F.Supp.2d, 2005 WL 1139908 (E.D.N.Y.)

Briefs and Other Related Documents (Back to top)

- 2004 WL 2410338 (Trial Pleading) Answer (Aug. 6, 2004)
- 2004 WL 2410328 (Trial Pleading) Complaint and Jury Demand (May 5, 2004)
- 1:04cv01859 (Docket) (May. 05, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.