9

Westlaw.

Slip Copy                                                                                                    Page 1
Slip Copy, 2005 WL 2387573 (E.D.N.Y.)
**(Cite as: Slip Copy)**

C

Only the Westlaw citation is currently available.
United States District Court,E.D. New York.
Judy CHEUNG and Beverly Ramsook, Plaintiffs,
v.
NEW YORK PALACE HOTEL, Defendants.
No. 03-CV-0091 DLI WDW.

Sept. 28, 2005.

Sima Asad Ali, Law Office of Sima Asad Ali, Hempstead,
NY, Robert M. Rosen, Rosen, Leff, Esqs., Hempstead, NY,
for Plaintiffs.
Kevin B. Leblang, Llen T. Pomeroy, Robert Neil Holtzman,
Kramer Levin Naftalis & Frankel LLP, Robert Steven Whit-
man, Orrick, Herrington & Sutcliffe, LLP, Dina R. Jansen-
son, Flemming, Zulack & Williamson, LLP, New York,
NY, for Defendants.

*MEMORANDUM & ORDER*
IRIZARRY, J.
**\*1** Plaintiff Beverly Ramsook ("plaintiff" or "Ramsook")
brings this action against the New York Palace ("defendant"
or "Palace") asserting race based discrimination claims in
violation of Title VII of the Civil Rights Act of 1964, 42
U.S.C. § 2000e *et seq.* ("Title VII"); the New York State
Human Rights Law, N.Y. Exec. Law § 290 *et seq.*
("NYSHR"); and the New York City Human Rights Law,
N.Y.C. Admin. Code New § 8-101 *et seq.* ("NYCHR").

Pursuant to Fed. R. Civ. P. 12(c), defendant moves to dis-
miss all claims. The Palace argues that Ramsook is barred
from asserting the instant claims because she signed a sever-
ance agreement specifically releasing any Title VII, NY-
SHR, and NYCHR claims. Plaintiff responds that the sever-
ance agreement is invalid because she did not knowingly
and voluntarily release her claims: she signed the severance
agreement while under duress, and her signature was fraud-
ulently induced. However, defendant asserts that, even if the
severance agreement is found to be voidable, Ramsook rati-
fied the severance agreement by failing to tender back the
consideration she received in exchange for the release of her
claims. With respect to her state discrimination claims, de-
fendant argues that under basic principles of New York
State contract law, the release serves to bar plaintiff's NY-

SHR and NYCHR claims. Finally, defendant contends that
plaintiff has failed to timely exhaust her administrative rem-
edies because she filed her complaint with the Equal Em-
ployment Opportunity Commission ("EEOC") one day late
and therefore cannot now assert a Title VII claim. For the
reasons that follow, defendant's motion is granted.

Background

On September 28, 2001, Ramsook, an African-American
woman, was terminated from her position with the Palace
after sixteen years of service. (Compl.¶¶ 32, 36.) At the time
of her termination, she was the Director of Revenue Man-
agement and therefore a member of the Executive Commit-
tee. (Compl.¶¶ 33, 35, 46.) Although the Palace claims to
have terminated her because they were eliminating her posi-
tion, her job duties were transferred to three other individu-
als. (Compl.¶ 36.) Two of these individuals are white.
(Compl.¶ 46.)

After her termination, Ramsook signed a severance agree-
ment ("Agreement") on November 12, 2001. According to
its terms, plaintiff agreed to release any and all potential
claims against the defendant in exchange for $80,096.15.
Under a section entitled "COMPLETE RELEASE," in addi-
tion to waiving a variety of general claims, plaintiff spe-
cifically agreed to waive Title VII, NYSHR, and NYCHR
statutory claims relating to her termination. The Agreement
included, *inter alia,* a provision advising plaintiff to "seek
the advice of a lawyer."

Three hundred and one days after signing the Agreement,
Ramsook filed a charge of discrimination with the Equal
Employment Opportunity Commission against the Palace
claiming race-based discrimination in the Palace's decision
to terminate her employment. (Holtzman Aff. Ex. C.) On
January 8, 2003, she commenced the instant action. Defend-
ant now moves to dismiss the complaint.

Discussion

Standard under Fed. R. Civ. P. 12(c)

**\*2** A motion for judgment on the pleadings pursuant to Fed.
R. Civ. P. 12(c) is analyzed by the same standard as one
made under Fed. R. Civ. P. 12(b)(6). *See Burnette v.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

*Carothers, 192 F.3d 52, 56 (2d Cir.1999).* Thus the court accepts as true the allegations set forth in the complaint "and draw[s] all reasonable inferences in favor of the non-moving party." *Id.* (citing *Conley v. Gibson,* 355 U.S. 41, 45-46, 79 S.Ct. 99, 2 L.Ed.2d 80 (1957)). A complaint need only provide fair notice of the grounds upon which a claim is based. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 508, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Moreover, "[t]hese liberal pleading rules apply with particular stringency to complaints of civil rights violations." *Phillip v. Univ. of Rochester,* 316 F.3d 291, 293-294 (2d Cir.2003) (internal citation omitted). However, the court will dismiss the action if plaintiff can prove no set of facts in support of the allegations in the complaint. *See Burnette,* 192 F.3d at 56.

For purposes of this motion, both the severance agreement and the EEOC charge are deemed incorporated by reference. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002). All other materials outside of the pleadings are excluded.

## Analysis

Plaintiff concedes that she signed an Agreement containing a provision releasing any potential discriminatory termination claims against the Palace. (Compl.¶ 40.) Therefore, the central issue before the court is whether that release is valid.

The validity of a release of Title VII claims is determined by examining the "totality of the circumstances." *See Livingston v. Adirondack Beverage Co.,* 141 F.3d 434, 438 (2d Cir.1998) (citing *Bormann v. AT & T Commc's., Inc.,* 875 F.2d 399, 403 (2d Cir.1989), *cert. denied,* 493 U.S. 924, 110 S.Ct. 292, 107 L.Ed.2d 272 (1989)). Relevant factors include the following:
1) the plaintiff's education and business experience, 2) the amount of time the plaintiff had possession of or access to the agreement before signing it, 3) the role of plaintiff in deciding the terms of the agreement, 4) the clarity of the agreement, 5) whether the plaintiff was represented by or consulted with an attorney, and 6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or

law.
*Id.*

Whether a release contained a provision advising an employee to consult an attorney is considered an additional relevant factor. *Id.*

Applying this standard, the court finds that the release in the instant case is valid. In her complaint, Ramsook states that she worked for the Palace for sixteen years rising through the ranks to become a member of the Executive Committee. (Compl.¶ 32.) At the time of her termination, she was the Director of Revenue Management. (Compl.¶ 46.) A finding that Ramsook is an experienced executive thus is warranted. Second, the Agreement is styled as a letter from the Palace to the plaintiff dated October 1, 2001. It is signed by Ramsook and dated November 12, 2001. Based upon these dates, Ramsook appears to have had the Agreement for approximately forty-two days-ample time to consider the release. *See e.g., Cordoba v. Beau Deitl & Assocs.,* No. 02 Civ. 4951, 2003 WL 22902266, at *5 (S.D.N.Y. Dec.8, 2003) (four days to sign and return release is sufficient to make a considered decision). Third, the language of the release is clear and unambiguous:

*3 The release matters include, without limitation:
(a) ... discrimination on the basis of sex, age, race, religion, color, national origin, sexual orientation or actual or perceived disability; retaliation; and harassment or hostile work environment;
(b) discrimination or retaliation based on any other ground including, but not limited to those arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.; ... the New York State Human Rights Law, N.Y. Exec. Law §§ 290 et seq.; ... the New York City Human Rights Law, N.Y. Admin. Code §§ 8-101 et seq.

(Holtzman Aff. Ex. B pp. 3-4.)

Fourth, defendant clearly advised Ramsook to consult an attorney:
In order to receive this Severance Package you will be required to sign and return this Agreement which is a legally binding document and includes a general release. You

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                                    Page 3
Slip Copy, 2005 WL 2387573 (E.D.N.Y.)
**(Cite as: Slip Copy)**

should review this agreement thoroughly and you are ad-
vised to seek the advice of a lawyer.

(Holtzman Aff. Ex. B. p. 3.)

Finally, plaintiff does not dispute that she received consider-
ation for the release. Indeed the release plainly states "[y]ou
acknowledge that the Severance Package described in this
Agreement provides you with valuable benefits to which
you would not otherwise be entitled." *Id.* This factor thus in-
ures to the benefit of defendant.

Ramsook's lack of input in negotiating the terms of the
Agreement fails to tip the balance in her favor, since the to-
tality of the circumstances suggests that the release of her
claims was knowing, voluntary, and therefore valid. *See
e.g., Nicholas v. NYNEX., Inc.,* 929 F.Supp. 727, 731
(S.D.N.Y.1996) ("Even if we were certain that plaintiff
could not have negotiated the terms of the release, we would
conclude that plaintiff chose to sign the release knowingly
and voluntarily because the other *Bormann* factors over-
whelmingly favor defendant").

Plaintiff argues that the release is invalid for two reasons:
(1) her signature was fraudulently induced, and (2) she
signed the Agreement while under duress.

Her claim of fraudulent inducement is based upon defend-
ant's representation that Ramsook's position was being elim-
inated due to the events of September 11, 2001. (Compl.¶
36, 38.) Plaintiff alleges that rather than eliminating her pos-
ition, the Palace assigned her duties to three other employ-
ees, two of whom are white. (Compl.¶ 36.)

To claim fraudulent inducement, plaintiff must allege
"misrepresentation, concealment or nondisclosure of a ma-
terial fact; an intent to deceive; and an injury resulting from
justifiable reliance by the aggrieved party." *Aetna Cas. and
Surety Co. v. Aniero Concrete Co., Inc.,* 404 F.3d 566, 585
(2d Cir.2005) (quoting *Allen v. Westpoint-Pepperell, Inc.,*
945 F.2d 40, 44 (2d Cir.1991)).

Here, plaintiff asserts a misrepresentation where there is
none: noticeably absent from her complaint is the assertion
that her position still exists. Additionally, Ramsook fails to
specify the particulars of the alleged misrepresentation, for

example, the who, when, where, and how. "Fed.R.Civ.P.
9(b) requires that fraud claims be pleaded with particularity,
and mere general allegations that there was fraud, corruption
or conspiracy or characterizations of acts or conduct in these
terms are not enough to survive a Rule 12(b)(6) motion."
*Allen,* 945 F.2d at 44 (quoting *Segal v. Gordon,* 467 F.2d
602, 607 (2d Cir.1972)) (alterations omitted). Plaintiff's ef-
forts to invalidate the release on this ground fails.

**\*4** Plaintiff next argues that she did not sign the Agreement
knowingly and voluntarily because she signed it while under
duress. (Compl. ¶¶ 40, 42-43.) In her complaint, plaintiff
alleges that defendant was aware that "she is a single parent
responsible for the support of her 2 children, ages 11 and
13," (Compl.¶ 40), and that she had "no alternative but to
sign that agreement if [she] wanted to continue to obtain
money to support her family." (Compl.¶ 42.)

A release is rendered voidable for duress when a plaintiff
can show that the release was procured by (1) threat(s)
"precluding the exercise of free will; (2) under the press of
financial circumstances; (3) where circumstances permitted
no other alternative." *Nicholas,* 929 F.Supp. at 732 (citing
*Bormann,* 875 F.2d at 403 n. 1; *Frumkin v. Int'l Bus. Mach.
Corp.,* 801 F.Supp. 1029, 1043 (S.D.N.Y.1992)). Although
Ramsook fails to allege that defendant made a wrongful
threat, and states, in a conclusory manner, that she had no
other financial alternative to signing the release, these asser-
tions are enough to cast some doubt on the validity of the re-
lease and raise a "viable claim of duress." *Livingston,* 141
F.3d at 438 (finding plaintiff's conclusory assertions that he
was threatened and forced to sign a release sufficient to
raise a "viable claim of duress" allowing his Title VII
claims to survive a motion to dismiss).

Defendant argues that even if the release is voidable,
plaintiff has ratified the Agreement by her failure to tender
back the consideration she received in exchange for the
release of her claims. Some courts, applying basic principles
of contract law to Title VII cases, require the return of con-
sideration where a plaintiff seeks to rescind a contractual re-
lease of those claims. *See Fleming v. United States Postal
Service,* 27 F.3d 259, 260-261 (7th Cir.1994), *cert. denied,*
506 U.S. 955, 113 S.Ct. 412, 121 L.Ed.2d 336 (1992); *Reid
v. IBM Corp.,* No. 95 Civ. 1755, 1997 WL 357969, at *11

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                          Page 4
Slip Copy, 2005 WL 2387573 (E.D.N.Y.)
**(Cite as: Slip Copy)**

(S.D.N.Y. June 26, 1997) (listing cases). In this Circuit, the Court of Appeals, in *Tung v. Texaco, Inc.,* affirmed the district court's dismissal of plaintiff's Title VII claims while explicitly noting plaintiff's failure to tender back the consideration received for executing a release. 150 F.3d 206, 208 (2d Cir.1998). And, as recently as 2004, the Second Circuit adopted this approach in *Brown v. City of S. Burlington, Vt.,* a false claims act case, wherein the court cited *Fleming, supra,* with approval: "In order to avoid a finding of ratification where consideration has been paid, it is essential that the releasor tender back the sum received." 393 F.3d 337, 344 (2d Cir.2004). Thus, the rule requiring the return of consideration before a contractual release may be rescinded is controlling.

In the instant case, it is undisputed that plaintiff has failed to tender back the consideration she received for releasing her claims nor has she made such an offer. Therefore, plaintiff cannot rescind the Agreement and her Title VII claims are consequently barred. Accordingly, Ramsook's Title VII claims are dismissed.

**\*5** With respect to the remaining state claims, "[i]t is well settled that the totality-of-the-circumstances standard is stricter than the ordinary contract law principles for determining whether a release is knowing and voluntary." *Cordoba,* 2003 WL 22902266, at \*6 (citing *Bormann,* 875 F.2d at 403; *Laramee v. Jewish Guild for the Blind,* 72 F.Supp.2d 357, 359 (S.D.N.Y.1999); *Nicholas,* 929 F.Supp. At 730). Given that this court has found Ramsook's Title VII release to be knowing and voluntary and given that she raised no additional arguments concerning its enforceability as to her NYSHRL and NYCHRL claims, those claims are dismissed as well.

In view of the foregoing, there is no need to pass on defendant's contention that plaintiff's complaint is untimely.

Conclusion

Plaintiff's Title VII, NYSHRL, and NYCHRL claims are barred by Ramsook's contractual release of those claims and her subsequent ratification of the Agreement. Accordingly, defendant's motion to dismiss is granted.

E.D.N.Y.,2005.
Cheung v. New York Palace Hotel
Slip Copy, 2005 WL 2387573 (E.D.N.Y.)

END OF DOCUMENT

10

Westlaw.

Not Reported in F.Supp.2d                                                                                         Page 1
Not Reported in F.Supp.2d, 2004 WL 339650 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,E.D. New York.
Elva CRIVERA, Plaintiff,
v.
THE CITY OF NEW YORK, Dino Russo, Frank Albergo,
Kevin Farrel, and Joseph Crivera, Defendants.
**No. 03 CV 447(JG).**

Feb. 23, 2004.

**Background:** City employee brought civil rights action
against city, her supervisor, and her former husband, al-
leging claims under § 1983, § 1985, and state law. Super-
visor and husband moved to dismiss.

**Holdings:** The District Court, Gleeson, J., held that:

1(1) supervisor's alleged conduct toward employee suppor-
ted her claims against him;

2(2) employee released any civil rights claims she might
have had against her former husband via parties' stipulation
of settlement in divorce action; and

3(3) husband was entitled to award of attorney fees, pursu-
ant to stipulation of settlement.

Motion granted in part, and denied in part.

West Headnotes

**[1] Civil Rights 78 ⟲1169**

78 Civil Rights
78II Employment Practices
78k1164 Sex Discrimination in General
78k1169 k. Public Employment. Most Cited Cases

**Civil Rights 78 ⟲1249(1)**

78 Civil Rights
78II Employment Practices
78k1241 Retaliation for Exercise of Rights
78k1249 Public Employment

78k1249(1) k. In General. Most Cited Cases

**Conspiracy 91 ⟲7.5(1)**

91 Conspiracy
91I Civil Liability
91I(A) Acts Constituting Conspiracy and Liability Therefor
91k7.5 Conspiracy to Interfere with Civil Rights
91k7.5(1) k. In General. Most Cited Cases

**Municipal Corporations 268 ⟲218(3)**

268 Municipal Corporations
268V Officers, Agents, and Employees
268V(C) Agents and Employees
268k218 Removal, Discharge, Transfer or Demotion
268k218(3) k. Grounds. Most Cited Cases
Conduct of city employee's supervisor in allegedly demand-
ing that employee develop an intimate relationship with him
or he would fire or demote her, assaulting employee to con-
vince her to stop associating with her boyfriend, converting
women's locker room into an office, failing to provide em-
ployee with suitable equipment, thereby placing her in
harm's way, and retaliating against her for filing an internal
discrimination complaint supported employee's civil rights
claims under § 1983, § 1985, and state law. 42 U.S.C.A. §§
1983, 1985.

**[2] Husband and Wife 205 ⟲279(1)**

205 Husband and Wife
205VIII Separation and Separate Maintenance
205k277 Separation Agreements
205k279 Construction and Operation
205k279(1) k. In General. Most Cited Cases
Under New York law, former wife released any civil rights
claims she might have had against her former husband via
parties' stipulation of settlement in divorce action; release
was not limited to claims arising from divorce, but rather,
discharged both parties of any and all claims they had
against one another.

**[3] Husband and Wife 205 ⟲279(6)**

205 Husband and Wife
205VIII Separation and Separate Maintenance

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2004 WL 339650 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

205k277 Separation Agreements
205k279 Construction and Operation
205k279(6) k. Performance or Breach. Most Cited Cases
Former husband, whose former wife sued him for certain alleged violations of her civil rights, was entitled to award of attorney fees pursuant to parties' stipulation of settlement in divorce action, which released any civil rights claim wife might have against husband and provided for an award of attorney fees should either party wilfully default in performing any obligation under the stipulation. 42 U.S.C.A. § 1985.

Gregory Kuczinski, Kuczinski Vila & Associates, P.C., Elmsford, NY, for plaintiff.
Ann Devine Kerri, New York, NY, George W. Clarke, Tierney & Tierney, Esqs., Port Jefferson Station, NY, for defendants.

*MEMORANDUM AND ORDER*
GLEESON, J.

*1 Plaintiff Elva Crivera ("E.Crivera") brings this action alleging sexual harassment, hostile work environment, discrimination on the basis of gender, and retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.,FN1 and New York Executive Law section 296. She also alleges violations of 42 U.S.C. § 1983 predicated on rights protected by the First and Fourth Amendments, and a conspiracy to violate her civil rights pursuant to 42 U.S.C. § 1985. Finally, E. Crivera alleges a breach of an express and implied covenant of good faith and fair dealing under New York law. Defendants Dino Russo and Joseph Crivera ("J.Crivera") move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

> FN1. E. Crivera concedes that under *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir.1995), the individual defendants cannot be held individually liable under Title VII. (Pl.'s Mem. Law Opp'n Mot. Dismiss point II.) The Title VII claims are therefore dismissed as to defendants Dino Russo, Frank Albergo, Kevin Farrel, and Joseph Crivera.

BACKGROUND FN2

> FN2. I set out only those facts pertaining to Russo

and J. Crivera, in the light most favorable to E. Crivera. The facts set forth pertain to the relevant period, unless otherwise noted.

E. Crivera was first employed as a sanitation worker by New York City (the "City") on October 18, 1999. (Compl.¶ 18.) On March 1, 2000, she was appointed to the position of Sanitation Police Officer after completing the required peace officer and firearms training. (*Id.*) E. Crivera was thereupon transferred to the City's sanitation police squad in Brooklyn. (*Id.*) All matters complained of in this action occurred in Brooklyn in the course of E. Crivera's employment. (*Id.* ¶ 22.) In March 2001, E. Crivera was promoted to Sanitation Police Sergeant; she was the first woman to ever hold that position and the only female sanitation police sergeant in the City. (*Id.* ¶ 20.) E. Crivera performed her duties in an acceptable, professional, and highly competent manner. (*Id.* ¶ 21.)

J. Crivera was the then-estranged husband of E. Crivera; though married, the two were separated. (*Id.* ¶ 24.) Russo was one of E. Crivera's supervisors, who had the authority to transfer, demote, and terminate E. Crivera's employment. (*Id.* ¶ 25.) E. Crivera had, and continues to have, as of the date of the complaint, an intimate relationship with nonparty John Leddy, a male sanitation police sergeant employed by the City. (*Id.* ¶ 27.)

From May 2001 through April 2002, in the course of his employment with the City, Russo on an almost daily basis-threatened to either terminate E. Crivera's employment or demote or transfer her out of the sanitation police force unless E. Crivera ended her relationship with Leddy. (*Id.* ¶ 29.) At times, Russo demanded not only that E. Crivera end her relationship with Leddy, but that she develop an intimate relationship with Russo himself. (*See id.* ¶¶ 30, 40.)

On May 29, 2001, while E. Crivera was in the field on a job-related assignment, Russo visited her in his official vehicle. (*Id.* ¶ 31.) Russo called E. Crivera over to his vehicle, and when she approached, Russo pulled her toward the vehicle's window by her hair. (*Id.*) Twice in 2001, once in July and once in August, Russo summoned E. Crivera into a City role-call room where he yelled at her to end her relationship and association with Leddy. (*Id.* ¶ 32; *see also id.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                      Page 3
Not Reported in F.Supp.2d, 2004 WL 339650 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

¶ 36 (describing a similar incident).) When E. Crivera tried to leave the room, Russo pushed her back inside and kept her there against her will. (*Id.*) E. Crivera alleges other instances of Russo demanding that she end her relationship with Leddy. (*E.g., id.* ¶¶ 33-34, 38, 45.)

**\*2** Sometime in July 2001, in the outer office of a Lieutenant Cunningham, Russo kicked E. Crivera and pushed her onto a desk while demanding that she end her relationship with Leddy. (*Id.* ¶ 35.) One Sunday that same July, Russo followed E. Crivera on her day off. (*Id.* ¶ 37.) On that day, E. Crivera was biking with Leddy when she saw Russo sitting in his car in the same parking lot where E. Crivera had parked her own car. (*Id.*) When Russo saw that E. Crivera was with Leddy, he told her that he had been waiting to see who she was with, and then drove away. (*Id.*) The next day at work, Russo again told E. Crivera that she would be giving up her career as a sanitation police officer because Russo was in charge and would not permit her to associate with Leddy. (*Id.*)

In August 2001, Russo physically forced E. Crivera into the chief's office (the chief was apparently not inside at the time) where he threatened to choke her. (*Id.* ¶ 39.) He again demanded that E. Crivera end her relationship with Leddy or quit the sanitation police force. (*Id.*)

On September 2, 2001, J. Crivera filed a written complaint with the New York City Police Department alleging that E. Crivera had harassed him. (*Id.* ¶ 41.) When he filed the complaint, however, J. Crivera told the officer preparing the complaint that he did not want to pursue it any further. (*Id.* ¶ 41.) The next day, September 3, Russo went to E. Crivera's brother's home and told her brother to tell E. Crivera that, in light of the harassment complaint filed by J. Crivera, E. Crivera had to surrender her firearm. (*Id.* ¶ 42.) Later that day, Russo told E. Crivera that he would allow her to continue working as a sanitation police officer, albeit without a gun, if she ended her relationship with Leddy. (*Id.* ¶ 43.)

Also on September 3, 2001, Russo forced E. Crivera to take vacation so that she could think about whether or not to end her relationship with Leddy. (*Id.* ¶ 45.) E. Crivera therefore took vacation from September 3, 2001 through September 17, 2001. (*Id.* ¶ 46.) During this vacation, Russo paged E.

Crivera every day and left messages telling her that she could continue as a sanitation police officer only if she ended any association with Leddy. (*Id.*) On September 5, 2001, Russo went to E. Crivera's home and harassed her. (*Id.* ¶ 47.) E. Crivera therefore left her home with her niece and went to her niece's home. (*Id.*) Russo followed E. Crivera to her niece's home and continued to harass her there by telling her to end her relationship with Leddy. (*Id.; see also id.* ¶ 46.)

On September 6, 2001, the City placed E. Crivera on "modified duty" until such time as the New York Police Department and Sanitation Police investigated J. Crivera's complaint. (*Id.* ¶ 48.) On September 24, 2001, the defendants demoted E. Crivera from the Sanitation Police Enforcement Unit to the Auxiliary Field Force to work as a garbage collector. (*Id.* ¶ 49.) Two days later, on September 26, Russo converted E. Crivera's locker room-the only locker room available for female employees-into an office, while locker rooms for male employees remained unaffected. (*Id.* ¶ 50 .) E. Crivera therefore had nowhere to change into and out of her uniform and store her property, a benefit the male employees continued to enjoy. (*Id.*)

**\*3** On December 3, 2001, E. Crivera reported Russo's conduct "to the EEO for City of New York Department of Sanitation" alleging harassment and discrimination on the basis of gender. (*Id.* ¶ 51.) E. Crivera filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on March 6, 2002, alleging sex discrimination and harassment. (*Id.* ¶ 52.) In early April 2002, E. Crivera was transferred back to the sanitation police, where the defendants retaliated against her for filing these complaints. (*Id.* ¶ 53.) Specifically, the defendants created "an intimidating, abusive, and hostile work environment in that they incited, promoted, maintained, and permitted the ostracism and verbal abuse of the plaintiff by her co-workers, including supervisors, all of which are men." (*Id.*) The defendants also refused to return to E. Crivera her bulletproof vest, which had been taken from her prior to her transfer. (*Id.*) Instead, the defendants forced E. Crivera to wear an ill-fitting bulletproof vest designed for a man. Furthermore, when the defendants returned E. Crivera's firearm to her, they issued her only sixteen rounds of ammunition, refusing to provide her with the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 339650 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

full forty-six rounds that she is required to have pursuant to a New York City Police Firearms directive. (*Id.*) In these ways-providing her with an ill-fitting bulletproof vest and too little ammunition-the defendants exposed E. Crivera to serious harm or death. (*Id.* ¶ 53.)

Finally, E. Crivera alleges that, by these acts, Russo and J. Crivera forced her to resign from her employment with the City on April 17, 2002.

## DISCUSSION

### A. *The Rule 12(b)(6) Standard*

Dismissal under Rule 12(b)(6) may be granted only if "it appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Walker v. City of New York,* 974 F.2d 293, 298 (2d Cir.1992). A federal court's task in determining the sufficiency of a complaint is "necessarily a limited one." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The appropriate inquiry is not whether E. Crivera might ultimately prevail on her claims, but whether she is entitled to offer any evidence in support of the allegations in the complaint. *Id.* In this inquiry, I may consider "documents attached to the complaint as an exhibit or incorporated in it by reference, ... matters of which judicial notice may be taken, or ... documents either in plaintiff[']s[ ] possession or of which plaintiff[ ] had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993).

### B. *E. Crivera's Claims*

#### 1. *Claims Regarding Russo*

[1] Beyond the Title VII claims, which E. Crivera voluntarily withdraws, *see supra* note 1, Russo's motion is denied. E. Crivera alleges that Russo, acting in a supervisory capacity on behalf of the City, demanded that unless she stopped associating with Leddy and instead developed an intimate relationship with Russo, he would fire or demote her. She further alleges that Russo assaulted her in order to convince her to stop associating with Leddy. According to the complaint, Russo converted the women's locker room into an office, leaving E. Crivera with nowhere to change into and out of

her uniform, but left the men's locker room untouched. Russo also allegedly failed to provide E. Crivera with a suitable bulletproof vest and the required amount of ammunition for her firearm, thereby placing her in harm's way. E. Crivera alleges that Russo retaliated against her for filing an internal complaint and a complaint with the EEOC. Finally, E. Crivera claims that Russo's acts forced her to resign from her position. E. Crivera is entitled to offer evidence in support of these allegations. *See Scheuer,* 416 U.S. at 236.

#### 2. *Claims Regarding J. Crivera*

##### a. *Motion to Dismiss*

*4 [2] J. Crivera argues that E. Crivera released any claims she might have had against him in the Stipulation of Settlement that the Criveras executed to resolve and end their marriage. For the reasons that follow, I agree.

On October 31, 2001, E. Crivera commenced an action for divorce in the Supreme Court of the State of New York, Richmond County, against J. Crivera. (*See* Defs.' Notice Mot. Dismiss Ex. C ("Def.Mot.Dismiss").) On January 10, 2003,[FN3] the Criveras executed a Stipulation of Settlement resolving that case. In that document, which bears the caption of the divorce case, E. Crivera and J. Crivera agreed that the "issues of alimony/maintenance, support of the infant issue, division of the property, *among other things,*" were resolved as further specified in the agreement. (*Id.* Ex. D at 1 (emphasis added).) Article IV of the Stipulation of Settlement, entitled "Mutual Release," states that "each party hereby remises, releases and forever discharges the other of and from all cause or causes of action, claims, rights or demands whatsoever, in law or in equity, which either of the parties heretofore ever had, or now has, against the other."[FN4] (*Id.* at 5.)

> FN3. E. Crivera's complaint in this case is dated January 27, 2003 and was filed on January 29, 2003, less than three weeks after the settlement agreement in the divorce action was signed.

> FN4. The only exception to the release is for "any or all causes ... of action for divorce, annulment or separation, and any defenses either may have to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 339650 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

any divorce, annulment or separation action now pending or hereafter brought by the other." (Def. Mot. Dismiss Ex. D at 5.)

"Under New York law, a release-like any contract-must be construed in accordance with the intent of the parties who executed it." *Golden Pac. Bancorp. v. Fed. Deposit Ins. Corp.*, 273 F.3d 509, 515 (2d Cir.2001); *see also Nat'l Helicopter of Am. v. City of New York*, 137 F.3d 81, 87 (2d Cir.1998) ( "[A] release should not be read to include matters of which the parties had no intention to dispose."). Because J. Crivera argues that the release should absolve him of his alleged wrongdoing, it "is subject to the closest of judicial scrutiny." *Golden Pac. Bancorp*, 273 F.3d at 515 (quotation marks omitted). However, "[a] release freely entered into that clearly waives a right to pursue a cause of action is binding." *Nat'l Helicopter of Am.*, 137 F.3d at 87; *see also Reidy v. Runyon*, 971 F.Supp. 760, 764 (E.D.N.Y.1997) ("Once an individual executes a valid settlement agreement, he cannot subsequently seek both the benefit of the agreement and the opportunity to pursue the claim he agreed to settle."); *Boden v. Boden*, 42 N.Y.2d 210, 212, 397 N.Y.S.2d 701, 366 N.E.2d 791 (1977) ("The terms [of a separation agreement], like any other contract clauses, are binding on the parties to the agreement.").

I find that the extensive breadth of the release evinces the parties' intent to preclude the claims brought by E. Crivera against J. Crivera in this action. As noted above, the settlement, on its face, is not limited to claims arising from the divorce. The inclusion of "among other things" demonstrates that the Criveras contemplated issues arising outside the marriage when they executed the settlement. Moreover, even if the settlement dealt exclusively with the divorce, there is no reason that E. Crivera could not have bargained away other claims, such as the work-related claims alleged here, in order to secure more favorable concessions from J. Crivera in the settlement.

**\*5** Further, the release is unambiguously broad, unlike the releases in cases such as *Golden Pacific Bancorp*, 273 F.3d at 515 (release expressly covered only "claims which Bancorp ... has or may have arising from or with respect to the decision of the [OCC] to close the Bank on June 21, 1985" (quotation marks omitted) (ellipsis and alteration in origin-

al)), and *National Helicopter Corp. of America*, 137 F.3d at 87 (release expressly covered only claims "with respect to the Economic Development Corporation's acts or omissions regarding the EIS ..., the [land use review] application, or any conditions relating to the special permit required under the City's Zoning Resolution" (quotations marks omitted) (ellipsis and alteration in original)). Nor is there any concern of fraud in the procurement of the release, as both parties had the benefit of an attorney throughout the settlement negotiations.

Finally, nowhere in the settlement did E. Crivera reserve the right to sue J. Crivera for work-related conduct or anything else. *See International Union of Operating Engineers-Employers Construction Industry Pension, Welfare & Training Trust Funds v. Karr*, 994 F.2d 1426, 1432 (9th Cir.1993) ("[A party] that wishes to preclude the application of res judicata to a future action ... can reserve that right [in an agreement]...."); *Keith v. Aldridge*, 900 F.2d 736, 742 (4th Cir.1990) ("Rather than expressly reserving Keith's right to bring a due process claim, or any other claim that might enable him to obtain reemployment with the Air Force, the agreement precludes Keith from applying for further employment."); *cf. Siegel v. Nat'l Periodical Publ'ns, Inc.*, 508 F.2d 909, 913 (2d Cir.1974) ("[T]here is no limiting language in the judgment which would support the present contention that renewal rights were preserved."). This is especially significant where, as here, *see supra* note 3, E. Crivera's complaint in this action was filed less than three weeks after the divorce settlement was signed; she was therefore clearly contemplating this action while negotiating the divorce settlement with J. Crivera.[FN5]

> FN5. At oral argument, E. Crivera's counsel professed to have no knowledge of the settlement agreement negotiations at the time he was preparing E. Crivera's complaint here. (*See* Jan. 9, 2004 Hr'g Tr. at 2-4.) E. Crivera appears to have had different counsel in the divorce action.

Based on the foregoing, I find that the release in the divorce settlement "contains an explicit, unequivocal statement of a present promise to release [a party] from liability." *Golden Pac. Bancorp*, 273 F.3d at 515 (quotation marks omitted). Dismissal under Rule 12(b)(6) is therefore appropriate. *See*

Westlaw.

Not Reported in F.Supp.2d                                                    Page 6
Not Reported in F.Supp.2d, 2004 WL 339650 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

_Conopco, Inc. v. Roll Int'l,_ 231 F.3d 82, 86 (2d Cir.2000).

### b. _Attorney's Fees_

[3] The Stipulation of Settlement contains a provision for attorney's fees:
A. Should either party wilfully default in performing any obligation which such party is required to perform hereunder, and should such default continue for a period of 30 <u>FN6</u> days or more after written notice of the default is sent to him or her, then in any action, litigation or proceeding commenced by either party in which it is judicially determined that the defaulting party failed to perform such obligation, the defaulting party shall pay to the other party the counsel fees reasonabl[y] incurred by such other party in connection with the action.

> <u>FN6.</u> The number of days the default must continue is handwritten onto the agreement in the margin, and appears to be "30." In Russo and J. Rivera's memorandum of law, however, this provision is quoted as reading "10 days or more." (_See_ Defs.' Mem. Law Supp. Mot. Dismiss point III.) Though the number might be something besides "30" (e.g., "80" with half of the "8" cut off), it is clearly not "10." In any event, the discrepancy has no effect on the outcome of this motion.

*6 (Def. Mot. Dismiss Ex. D at 16.) By letter dated September 4, 2003, counsel for J. Crivera notified E. Crivera's attorney that "[i]n the event that voluntary dismissal of the complaint is not forthcoming in favor of Mr. Crivera, we reserve ou[r] right to claim recovery from your client of all attorneys fees incurred in enforcing the express terms of the Stipulation of Settlement of the prior [divorce] action." (_Id._ Ex. G.)

The release created an obligation on both parties to the Stipulation of Settlement not to sue on the covered causes of action. I conclude that the commencement of this action against J. Crivera constituted a violation of that obligation, and that the other prerequisites to the recovery of reasonable attorney's fees have been satisfied. Accordingly, E. Crivera is hereby ordered to pay to J. Crivera such reasonable fees.

### CONCLUSION

For the foregoing reasons, Russo's motion is denied, and J. Crivera's motion is granted. Counsel are encouraged to resolve the attorney's fees issue without the intervention of the Court. If they cannot, counsel for J. Crivera shall submit a fee application by no later than March 5, 2004. The Title VII claims are dismissed as against defendants Russo, Frank Albergo, and Kevin Farrel.
So Ordered.

E.D.N.Y.,2004.
Crivera v. City of New York
Not Reported in F.Supp.2d, 2004 WL 339650 (E.D.N.Y.)

Briefs and Other Related Documents <u>(Back to top)</u>

• <u>1:03cv00447</u> (Docket) (Jan. 28, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11

Westlaw.

Not Reported in F.Supp.2d                                                          Page 1
Not Reported in F.Supp.2d, 2001 WL 25695 (S.D.N.Y.), RICO Bus.Disp.Guide 9996, Comm. Fut. L. Rep. P 28,444
**(Cite as: Not Reported in F.Supp.2d)**

c
Briefs and Other Related Documents

United States District Court, S.D. New York.
DLT RESOURCES, INC., Plaintiff,
v.
CREDIT LYONNAIS ROUSE, LTD., Defendants.
**No. 00 Civ. 3560(HB).**

Jan. 10, 2001.

*OPINION & ORDER*

BAER, J.
**\*1** Plaintiff DLT Resources Inc. (hereinafter "DLT-USA"),
by its complaint dated May 8, 2000, alleges claims under
the Racketeer Influenced and Corrupt Organizations Act, 18
U.S.C. § 1961 *et seq.* ("RICO"), and under New York state
common law for CLR's "conspiracy to defraud, fraud, tor-
tious interference with plaintiff's employees' fiduciary du-
ties, accounting and the imposition of a constructive trust
over the profits of the venture" against defendant Credit Ly-
onnais Rouse Limited (hereinafter "CLR"). (Compl.¶ 5.) As
such, DLT-USA claims that this Court has both federal
question and diversity jurisdiction over this action. The
Complaint alleges that CLR and its co-conspirators infilt-
rated plaintiff, a metals trading company doing business on
the COMEX and London Metals Exchange, and corrupted
its employees and the employees of its affiliated overseas
corporations for the purpose of obtaining control of the
business of the Sumitomo Corporation ("Sumitomo"),
which at the time perhaps was the largest copper merchant
in the world. CLR has filed two motions: (1) pursuant to
Fed.R.Civ.P. 12(b)(1) and 12(b)(3), seeking an order dis-
missing the Complaint for lack of subject matter jurisdic-
tion, or on forum non conveniens grounds; and (2) pursuant
to Fed.R.Civ.P. 12(b)(6) and 9(b) dismissing the complaint
on the grounds that plaintiff's RICO claims [FN1] must fail as
a matter of law and that plaintiff's common law claims are
barred under New York law and English law. For the reas-
ons set forth below, CLR's motion to dismiss the Complaint
as a matter of law is hereby GRANTED.

       FN1. Plaintiff's only federal claims herein are
       RICO claims.

*I. BACKGROUND*

I take the facts as pled to be true on this motion to dismiss
pursuant to Fed.R.Civ.P. 12(b)(6). CLR is an English cor-
poration and its principal place of business is located in
London, England. CLR also does business in the United
States. (Compl.¶ 4.) David L. Threlkeld & Co., Inc. ("DLT
& Co.") was formed on December 30, 1995 in the state of
Vermont by David L. Threlkeld ("Threlkeld"). (Compl.¶
14.) "DLT & Co.'s principal business was proprietary trad-
ing and developing counter party commercial business."
(*Id.*) Plaintiff DLT-USA was incorporated in the state of
Vermont on or about March 20, 1990. (Compl.¶ 15.)
Plaintiff concedes that DLT-USA was "inactive" from 1997
until 2000, when DLT-USA was "revived for the purpose of
bringing this action...." (Plaintiff's Memorandum in Opposi-
tion to Defendant's Motion to Dismiss for Lack of Subject
Matter Jurisdiction and on Forum Non Conveniens Grounds
("Pl. First Mem.") at 1, n. 1). The Complaint alleges that
CLR interfered with DLT-USA's business relations with
three overseas corporations: DLT Commodities Ltd.
(created in 1988); DLT Trading Ltd. (created in 1990); and
DLT Commodities (Tokyo) Ltd. (created in late 1988)
(collectively, the "DLT Foreign Corporations"). David L.
Threlkeld was 100% stockholder of DLT Trading and DLT
Commodities and was also the president of DLT-USA as
well as director of both DLT Trading and DLT Commodit-
ies. (Compl.¶ 16.) "DLT & Co. was listed as 90% stock-
holder of DLT Commodities Tokyo." (Compl.¶ 19.)
Threlkeld established a relationship with Yasuo Hamanaka,
the chief copper trader of Sumitomo Corporation during a
1989 visit to DLT Commodities Tokyo. (Compl.¶ 24.) Ac-
cording to the Complaint, "Threlkeld proposed various trad-
ing (option) strategies to Hamanaka which lead to an in-
creasingly expansive business relationship." (*Id.*) The DLT
entities in London serviced Hamanaka's business, and thus
Charles Vincent, "DLT's London office director", developed
a close relationship with Hamanaka. (*Id.* ¶ 24, 30.) "As the
relationship progressed, Vincent was offering ideas directly
to Hamanaka without obtaining prior approval from DLT-
USA, in violation of Threlkeld's direct orders." (*Id.* ¶ 24.)

**\*2** Plaintiff alleges that in May 1990, Roy Leighton, the
deputy chairman of CLR in London, "contacted DLT's Lon-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                Page 2
Not Reported in F.Supp.2d, 2001 WL 25695 (S.D.N.Y.), RICO Bus.Disp.Guide 9996, Comm. Fut. L. Rep. P 28,444
(Cite as: Not Reported in F.Supp.2d)

don office to solicit DLT's business. Subsequently Leighton visited Threlkeld at DLT's office in Vermont to discuss further CLR's business relationship with DLT." (Compl.¶ 25.) As a result of the visit to Vermont, DLT Commodities Ltd. (London) and CLR entered into a business relationship that was embodied, in part, in an agreement dated June 22, 1990. (Compl., Exh. B.) By that agreement, CLR became DLT Commodities' exclusive clearing agent for trades conducted on the world commodities markets. (Id.) DLT Commodities and CLR agreed to divide commissions from clients for trades on the London Metal Exchange (the "LME") and the COMEX. (Compl.¶ 26, Exh. B.) Paragraph 16 of the agreement between CLR and DLT Commodities provides that it "shall be governed by and construed in accordance with the Laws of England and to the exclusive jurisdiction of whose Courts the parties hereby submit." (Compl., Exh. B.¶ 16.) The agreement also provided that after the termination of the business relationship between CLR and DLT, neither party could employ the employees of the other for a period of six months. (Compl., Exh. B.¶ 9(B).)

In December 1989, Ashley Levett, one of the original employees and the initial "director" of the DLT Foreign Corporations London office, resigned and joined another English metals-trading company called Hayden Trading Ltd. (Compl.¶ 23.) In January 1990, Levett, with the assistance of Vincent,[FN2] started to compete with the DLT Foreign Corporations for Sumitomo's business by "engaging in 'mysterious' options trades involving Sumitomo." (Compl.¶ 30.) According to the Complaint

   FN2. Charles Vincent apparently succeeded Levett as director of the London office. (See Compl. ¶ 30.)

In August 1990, Paul Scully, a trader in DLT's Vermont office, noticed trades going through the system which had not been cleared by Threlkeld. In fact, Scully's analysis revealed that these transaction not only had no economic justification but that they were actually guaranteed to cause Sumitomo losses. (Compt.¶ 31.)

At an annual gathering of all DLT-USA and DLT Foreign Corporations employees on Martha's Vineyard in September 1990, Threlkeld confronted Vincent with the information

Scully had provided regarding the irrational options trades. (Compl.¶ 33.) Vincent "denied any wrongdoing" and "assured Threlkeld that he was a loyal employee of DLT." (Id.) In September 1990, Threlkeld met with Leighton and William Bradwell, the managing director at CLR to discuss the uneconomic trades. (Compl.¶ 35.) "Threlkeld explained that it looked like Hamanaka, Vincent and Levett were involved in what looked like fraudulent trades." (Id.)

Thereafter, in or about January 1991, Levett and Vincent (while still an employee of the DLT Foreign Corporations) formed an entity named Winchester Commodities Group, Ltd. ("Winchester") (Compl.¶ 40.) One by one, the employees of the DLT Foreign Corporations resigned to join Winchester during the period of January 1991 to July 1991. (Compl.¶¶ 41-61.) Threlkeld met with Leighton and Bradwell in or about May 1991 to discuss the fact that Vincent (still employed by the DLT Foreign Corporations) and Hamanaka "were doing business in violation of direct orders from Threlkeld." (Compl.¶ 45.) Plaintiff alleges upon information and belief that "on or before May 20, 1991, Levett, Vincent, still at DLT's London office, and CLR entered into a secret and very lucrative profit sharing agreement whereby CLR would extend additional credit to allow Sumitomo to trade LME futures. In return, CLR got 20% of the profits, as well as an option on 20% of Vincent and Levett's new company's stock." (Compl.¶ 47.) Simultaneously, a letter from plaintiff, dated May 17, 1991 was "hand-delivered to Vincent's home [on] the evening of May 20, 1991" and "[u]pon receipt of the termination letter, Vincent immediately joined Winchester, taking Sumitomo's business with him." (Compl.¶ 50.)

*3 The Complaint alleges that Vincent, Levett, and Hamanaka, assisted by CLR's credit line, concealed from Sumitomo that Sumitomo was dealing with a new company, Winchester. (Compl.¶ 55.) The Complaint also alleges that CLR interviewed and approved all of Winchester's staff and approved and/or reviewed every transaction entered into by Winchester. (Compl.¶¶ 69, 71-72.)

According to the Complaint, Shinichi Nishi, who ran the DLT Commodities Tokyo office, directed Sumitomo's business to Winchester while still working for DLT Commodities Tokyo. Nishi resigned to work for Winchester in July

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2001 WL 25695 (S.D.N.Y.), RICO Bus.Disp.Guide 9996, Comm. Fut. L. Rep. P 28,444
**(Cite as: Not Reported in F.Supp.2d)**

1991 "forcing DLT to sell the DLT Tokyo office to Winchester." (Compl.¶ 61.) The plaintiff has alleged that One of the written conditions for the sale, was an agreement that Nishi was to provide a full accounting so that DLT could close its books. Nishi, however, refused to comply with the agreement and advised DLT that Levett had instructed him to refer all requests for an accounting directly to Levett. Similar requests made to Levett were also ignored. When Threlkeld turned to CLR for assistance, CLR informed him that its relationship with Winchester was solely as a clearing house and that it had absolutely no influence over Winchester's operations.

On or about 1992, the United Kingdom tax authorities contacted DLT's London office accountants, and asked them to provide the back-up documentation for the expenses it had paid to operate the Tokyo office. However, due to Winchester's utter and abject failure to cooperate with DLT, DLT was unable to do so.

Because DLT was not able to pay the back taxes and because of its inability to document and deduct the expenses incurred by DLT's Tokyo office, DLT Trading and DLT Commodities were forced to file for bankruptcy.

(Compl.¶¶ 62-64.)

Finally, on or about October 1991, "Hamanaka sent a fax to Threlkeld at DLT in Vermont requesting that he create and backdate fictitious trades, which Threlkeld refused to do." (Compl.¶ 65, Exh. C.) Threlkeld notified officials at the LME, but no action was taken.

Thereafter, according to the Complaint, CLR, Winchester and Hamanaka began in June 1993 to engage in a scheme to corner the world copper market. The world copper market collapsed when the LME began an investigation into the Sumitomo copper trades. Regulators in the United Kingdom and United States began to conduct investigations into price volatility in the copper markets in the fall of 1995 (Compl.¶ 92, 93) and on May 11, 1998, the Commodity Futures Trading Commission ("CFTC") issued an opinion and order finding that Sumitomo had violated the Commodity Exchange Act by manipulating upward the price of copper and copper futures. Several days later, "[b]etween May 13 and May 22, 1998, Threlkeld learned that CLR had an interest in Winchester and that CLR negotiated its participation in

Winchester while its principles [sic] and staff were still employed at DLT." (Compl.¶ 99.) Then, "[o]n or about December 1998, Threlkeld called Leighton at CLR regarding CLR's interest in Winchester. Once again, Leighton denied CLR's interest in Winchester." (Compl.¶ 100.)

**\*4** The plaintiff states that it has not named Winchester and its affiliated companies as parties to this suit "due to pending bankruptcy proceedings in the United Kingdom." (Compl.¶ 2, n. 2.)

*II. DISCUSSION*

Civil RICO claims are subject to a four-year statute of limitations, which begins to run when a plaintiff knew or should have known of his injury. *Rotella v. Wood,* 528 U.S. 549, , 120 S.Ct. 1075, 1080 (2000); *Agency Holding Corp. v. Malley-Duff & Assoc., Inc.,* 483 U.S. 143, 156 (1987). In *Rotella,* the Supreme Court eliminated the injury and pattern discovery rule, while recognizing that "where a pattern remains obscure in the face of a plaintiff's diligence in seeking to identify it, equitable tolling may be one answer to the plaintiff's difficulty." 528 U.S. at , 120 S.Ct. at 1084.

The first step in the statute of limitations analysis is to determine when DLT-USA sustained the alleged injury for which it seeks redress. *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1102 (2d Cir.1988). The Complaint alleges that DLT-USA was defrauded by a conspiracy between CLR, disloyal employees of the DLT Foreign Corporations, and others during a period of time from 1990 until July 1991, when the alleged scheme succeeded in Winchester's creation and Sumitomo's cessation of business with the DLT Foreign Corporations.

This Court must next determine when DLT-USA discovered or should have discovered the injury, and begin the four-year statute of limitations period at that point. *In re Sumitomo Copper Litig.,* 120 F.Supp.2d 328, 345 (S.D.N.Y.2000) (citation omitted). DLT-USA alleges that "it did not know, nor with reasonable diligence could have known that CLR was a participant in the fraudulent scheme at the time it suffered an injury." (Pl. Second Mem. at 12.) Plaintiff claims that it did not learn of CLR's pre-May 20, 1991 involvement with Winchester until May 1998.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                      Page 4
Not Reported in F.Supp.2d, 2001 WL 25695 (S.D.N.Y.), RICO Bus.Disp.Guide 9996, Comm. Fut. L. Rep. P 28,444
**(Cite as: Not Reported in F.Supp.2d)**

Plaintiff also contends that the doctrine of fraudulent concealment is available to toll the statute of limitations in this case. The doctrine of fraudulent concealment was designed to prevent a party from "concealing a fraud, or ... committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it." *New York v. Hendrickson Brothers, Inc., 840 F.2d 1065, 1083 (2d Cir.) cert. denied, 488 U.S. 848 (1988) (quoting Bailey v. Glover, 88 U.S. (21 Wall.) 342, 349, 22 L .Ed. 636 (1874)).* A "plaintiff may prove fraudulent concealment sufficient to toll the running of the statute of limitations if he establishes (1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part." *Hendrickson Brothers, Inc., 840 F.2d at 1083.*

*\*5 Here, I need not determine whether plaintiff has demonstrated fraudulent concealment, as the defendants, by letter of January 3, 2001, have submitted for the Court's review a document which demonstrates that plaintiff was aware of the conduct alleged in the Complaint from as early as November 1992-almost eight years before the Complaint was filed. The document, which was uncovered in plaintiff's document production, is a letter from plaintiff DLT Resources to the Securities and Futures Authority (one of the regulatory bodies in England responsible for oversight of the English markets) and is dated November 25, 1992 and is signed by David L. Threlkeld, the president of DLT Resources (the "November 1992 letter"). It is well established that this Court may consider such a document. *See Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir.2000)* ("For purposes of a motion to dismiss, we have deemed a complaint to include ... documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit.") (citing *Cortec Industries, Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir.1991)*).

In the November 1992 letter, plaintiff sets forth charges that are the essence of the Complaint at bar:
It was after I confronted [Charles] Vincent that he made arrangements with Ashley Levett of Hayden and conspired

with Rouse [Credit Lyonnais Rouse, the defendant] to elegantly create Winchester in such away [sic] as to take over the DLT business and personnel without the restriction of an honest owner.

As CLR points out, these allegations mirror the summary of plaintiff's claims set forth in paragraph 12 of its Complaint:
Upon information and belief, from between on or about December 1989 and September 1990, through at least June 1996, CLR conspired with DLT's disloyal employees [including Charles Vincent] and Hamanaka to divert Sumitomo's business from DLT. CLR accomplished this by secretly providing financing to DLT's disloyal employees to enable them to form a new company, Winchester. As part of the scheme, CLR obtained 20% interest in Winchester, which, upon information and belief, CLR concealed from not only DLT but also the LME and the Securities and Futures Authority ("SFA"). This scheme was only a small part of an overall conspiracy to manipulate the copper market which continued until at least 1996.

(Compl.¶ 12.)

CLR acknowledges that plaintiff has steadfastly maintained, both in its Complaint and its opposition to CLR's motion, that it did not know until May 1998 that CLR had an interest in Winchester. However, CLR argues that whether or not that is true "is irrelevant for purposes of the instant analysis because it is clear that as early as November 1992, plaintiff knew that its employees allegedly had 'conspired' with CLR 'to take over the DLT business and personnel'-the gravamen of plaintiff's Complaint. This Court agrees. The essence of plaintiff's RICO claims is not CLR's "concealed" interest in Winchester, but is CLR's alleged conspiracy to scheme with disloyal employees of the DLT Foreign Companies to create Winchester and secure Sumitomo as a client.

*\*6 As the Supreme Court explained in *Rotella*, just as the statute of limitations for a medical malpractice case begins to toll when the plaintiff becomes cognizant of his injury, rather than when plaintiff recognizes that his suit is cognizable at law, likewise courts have "no good reason for accepting a lesser degree of responsibility on the part of a RICO plaintiff." *528 U.S. 549, , 120 S.Ct. 1075, 1081 (2000).*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 5
Not Reported in F.Supp.2d, 2001 WL 25695 (S.D.N.Y.), RICO Bus.Disp.Guide 9996, Comm. Fut. L. Rep. P 28,444
**(Cite as: Not Reported in F.Supp.2d)**

We are unconvinced that for statute of limitations purposes a plaintiff's ignorance of his legal rights and his ignorance of the fact of his injury or its cause should receive identical treatment. That he has been injured in fact may be unknown or unknowable until the injury manifests itself; and the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain. The prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury. He is no longer at the mercy of the latter. There are others who can tell him if he has been wronged, and he need only ask.

*Id.* (*citing United States v. Kubrick,* 444 U.S. 111, 122 (1979)).

Likewise, it was incumbent upon plaintiff to consult a lawyer after he became aware of the alleged conspiracy between CLR and the employees of the DLT Foreign Corporations to determine whether he had been wronged, and whether he should commence litigation.

As a consequence of this determination, plaintiff's federal RICO claims must be dismissed. Moreover, the Court declines to exercise supplemental jurisdiction over plaintiff's remaining State and City claims, and accordingly, such claims are dismissed without prejudice .[FN3] *See Lanza v. Merrill Lynch & Co. (In re Merrill Lynch Ltd. Partnerships Litig.),* 154 F.3d 56, 61 (2d Cir.1998) (per curiam) (" 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness and comity-will point toward declining jurisdiction over the remaining state-law claims.' ") (*quoting Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7 (1988)).

> FN3. Having found that plaintiff's RICO claims are time-barred, I need not reach defendant's additional arguments for dismissal of the RICO claims: specifically, defendant's argument that plaintiff has failed to allege a pattern of racketeering, failed to plead any predicate acts of mail or wire fraud, lacks statutory standing to bring the RICO claims, and failed to plead a violation of any subdivision of

§ 1962. Similarly, I need not reach defendant's motion seeking an order dismissing the Complaint for lack of subject matter jurisdiction on standing grounds, or on forum non conveniens grounds. If this action is filed in state court, such issues will be addressed in that forum.

*III. CONCLUSION*

For the reasons set forth above, the defendants' motions to dismiss is GRANTED without prejudice. The Clerk of the Court is instructed to close the case.

SO ORDERED.

S.D.N.Y.,2001.
DLT Resources, Inc. v. Credit Lyonnais Rouse, Ltd.
Not Reported in F.Supp.2d, 2001 WL 25695 (S.D.N.Y.), RICO Bus.Disp.Guide 9996, Comm. Fut. L. Rep. P 28,444

Briefs and Other Related Documents (Back to top)

• 2002 WL 33030845 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction and on Forum Non Conveniens Grounds (Sep. 15, 2002) Original Image of this Document (PDF)
• 2000 WL 34635110 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss Pursuant to Rules 12(b)(6) and 9(b) (Oct. 30, 2000) Original Image of this Document (PDF)
• 2000 WL 34635111 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction and on Forum Non Conveniens Grounds (Oct. 30, 2000) Original Image of this Document (PDF)
• 2000 WL 34635112 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Further Support of Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction and on Forum Non Conveniens Grounds (Oct. 27, 2000) Original Image of this Document (PDF)
• 2000 WL 34635143 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Further Support of Defendant's Motion to Dismiss Pursuant to Rules 12(b)(6)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                              Page 6
Not Reported in F.Supp.2d, 2001 WL 25695 (S.D.N.Y.), RICO Bus.Disp.Guide 9996, Comm. Fut. L. Rep. P 28,444
**(Cite as: Not Reported in F.Supp.2d)**

and 9(b) (Oct. 27, 2000) Original Image of this Document
(PDF)

• 2000 WL 34635109 (Trial Motion, Memorandum and Af-
fidavit) Memorandum of Law in Support of Defendant's
Motion to Dismiss Pursuant to Rules 12(b)(6) and 9(b) (Sep.
15, 2000) Original Image of this Document (PDF)

• 2000 WL 34630345 () (Report or Affidavit) (May 31,
2000) Original Image of this Document (PDF)

• 1:00cv03560 (Docket) (May. 10, 2000)

• 2000 WL 34635108 (Trial Pleading) Complaint (May 8,
2000) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

12

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 461647 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

C

Briefs and Other Related Documents

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Anthony DEPALMA, Deena Cabrera, Sherby Jean-Leger, Stefanie Gordon, Jamal Waldron, Eric Posner, Keith Wolff, Dwayne Stowe, Douglas Castoldi, Natasha Tatum, Douglas Gold, Daniel Deblasio, Vincent Desantis, Alissa Brevic, Michael Yockman, D'Ann Brown, Carlos Morales, Renna Hunte and Sherree Hunte, individually and on behalf of all others similarly situated, Plaintiffs,

v.

REALTY IQ CORP. and Frontline Capital Group, Inc., Defendants.

No. 01 CIV 446 RMB.

March 25, 2002.

DECISION AND ORDER

BERMAN, J.

*1 (Nineteen) Plaintiffs, Anthony Depalma ("DePalma"), Deena Cabrera, Sherby Jean-Leger, Stefanie Gordon, Jamal Waldron, Eric Posner, Keith Wolff, Dwayne Stowe, Douglas Castoldi, Natasha Tatum, Douglas Gold, Daniel Deblasio, Vincent Desantis, Alissa Brevic, Michael Yockman, D'ann Brown, Carlos Morales, Renna Hunte and Sherree Hunte, (collectively, "Plaintiffs"), who are former employees of Defendant Reality IQ Corp. ("RIQ" or "Realty IQ"), individually and on behalf of all other similarly situated former employees of RIQ, filed the instant action on January 19, 2001 ("Complaint"), and filed an amended complaint on April 11, 2001 ("Amended Complaint"), against RIQ and its parent company, Frontline Capital Group, Inc. ("Frontline"), (RIQ and Frontline are, collectively, "Defendants"). Plaintiffs allege that Defendants violated the Worker Adjustment and Retraining Notification Act of 1988 ("WARN Act"), 29 U.S.C. § 2101 et seq., when they terminated Plaintiffs in a "mass layoff" without providing sixty (60) days advance notice. Plaintiffs seek, among other things, back pay and benefits. Amended Compl. ¶ 2. On or about April 23, 2001, Defendants moved, pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ.P.") 12(c), for judgment on the pleadings ("Defs.' Mem.") with respect to the claims of all of the Plaintiffs who executed releases in

connection with their terminations ("Release Plaintiffs"), i.e. every Plaintiff except plaintiff DePalma. On June 1, 2001, Plaintiffs opposed the instant motion ("Pls.' Mem.") and, on June 15, 2001, Defendants submitted a reply memorandum ("Defs.' Reply Mem."). For the reasons set forth below, Defendants' motion is denied.[FN1]

FN1. The Court is not here ruling on the ultimate merit of Plaintiffs' claims.

I. Background

Plaintiffs allege that they are former employees of both Frontline and RIQ because RIQ and Frontline were an "integrated enterprise" and Frontline exercised "de facto control" over RIQ.[FN2] Amended Compl. ¶¶ 25-26. On December 20, 2000, RIQ allegedly canceled the company Christmas party and fired approximately 120 of its approximately 150 New York Office employees ("Terminated Employees"), including Plaintiffs. Id. ¶¶ 29, 53. RIQ allegedly "herd[ed]" Terminated Employees into "large group meetings" where they each received a termination letter ("Termination Letter") and notice of lay-off ("Notice of Lay-off"), dated December 20, 2000, and a document entitled "Agreement and General Release" ("Release"). Id. ¶ 53(a). The Termination Letter advised, among other things: (i) that the Terminated Employees' jobs were being eliminated effective that day, i.e. December 20, 2000; (ii) that "benefits, including medical, dental and group term life insurance," would terminate effective December 31, 2000; and (iii) that, if a Terminated Employee signed and returned the Release, he or she would receive "two weeks of severance pay."[FN3] Id., Ex. A.

FN2. "[S]ubsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as a part of the parent ... company depending upon the degree of their independence from the parent." 20 C.F.R. § 639.3(a)(2).

FN3. "[E]mployees who had longer tenure with the company [RIQ] received three weeks wages ... or four weeks wages." Amended Compl. ¶ 45.

The Notice of Lay-off stated, among other things, the fol-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2002 WL 461647 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

lowing: "Please consider this notice pursuant to the Worker Adjustment and Retraining Notification Act that RealtyIQ will shut down [ ] operations on December 21, 2000. We anticipate the shut down will be permanent.... Notice could not be given earlier because ... it is only now apparent that RealtyIQ cannot obtain the necessary working capital to continue operations. Earlier notice would have closed off potential funding channels." *Id.*

**\*2** Plaintiffs allege that, at the "group meeting[ (s) ]," on December 20, 2000, they were told that "if they signed the general release that same day, they would receive approximately two weeks wages on their regular pay date and continue to receive benefits [until] the end of the calendar year (11 days), but, if they waited to sign the general release, or failed to sign it, they would receive nothing." Amended Compl. ¶ 53(a) (emphasis added). Bruce Gilman, Vice President Human Resources ("Gilman"), allegedly stated that "the company does not have any money and if you wait any longer, even until after Christmas, the company might not have the money to give you a package." *Id.* Mr. Gilman allegedly also stated that "in these type of situations you don't sue the company." *Id.* ¶ 53(c). The December 20, 2000 meetings were allegedly planned in advance so that "the sight of some aggrieved employees signing and returning general releases at those very same meetings would motivate others to do so as well." *Id.* ¶ 53(e).

On December 20, 2000, i.e. the same day they were terminated, most of the Release Plaintiffs signed the Release.[FN4] *Id.* ¶ 53(g). Also on December 20, 2000, "at least twelve" (*id.*) of the Release Plaintiffs signed letters acknowledging (presumably incorrectly) that "[a]t least seven days have passed" since they signed the Release and that they "have not revoked and do not desire to revoke" the Release. *Id.,* Ex. A.

> FN4. The Release also provides: "This Agreement will not become effective until the eighth (8th) day after the Company [RIQ] has received my signed copy [ ]. During that period, I may revoke this Agreement." Amended Compl., Ex. A (emphasis omitted).

### II. Standard of Review

"Judgment on the pleadings is appropriate if, from the pleadings, the moving party is entitled to judgment as a matter of law." *Burns Int'l Security Services, Inc. v. International Union, United Plant Guard Workers of America,* 47 F.3d 14, 16 (2d Cir.1995). "In deciding a Rule 12(c) motion, we apply the same standard as that applicable to a motion under Rule 12(b)(6), accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party." *Burnette v. Carothers,* 192 F.3d 52, 56 (2d Cir.1999). A complaint may be dismissed only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). In sum, "[t]he motion to dismiss for failure to state a claim is disfavored and is seldom granted." *Bower v. Weisman,* 639 F.Supp. 532, 539 (S.D.N.Y.1986) (citing *Arfons v. E.I. DuPont de Nemours & Co.,* 261 F.2d 434, 435 (2d Cir.1958)).

### III. Analysis

The WARN Act requires, among other things, that employers "shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order." 29 U.S.C. § 2102(a). The 60 day notification period may be reduced in some instances, such as the case of a "faltering company." 29 U.S.C. § 2102(b). Defendants contend that the Release Plaintiffs' WARN Act claims "are barred by the release they each executed." Defs.' Mem. at 1. Defendants argue, alternatively, that the Release Plaintiffs "ratified the Releases by failing to tender back" (*id.* at 17) "the additional termination benefit ... of 2 weeks[ ] salary." Amended Compl., Ex. A. The Release Plaintiffs contend: (i) that "the Releases were not signed knowingly, voluntarily, and free from coercion" (Pls.' Mem. at 6); (ii) that they "are not required to 'tender back' wages and benefits" (*id.* at 12); and (iii) that "the Releases are void as a matter of public policy." *Id.* at 15.

#### *Knowing and Voluntary*

**\*3** "Federal law decides whether the release of a federal statutory claim is valid." *Reid v. IBM Corp.,* No. 95 Civ. 1755, 1997 WL 357969, at 5 (S.D.N.Y. June 26, 1997) (release of Title VII of the Civil Rights Act of 1964, 42

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2002 WL 461647 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

U.S.C. § 2000e *et seq* and Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADA") claims); *Williams v. Phillips Petroleum Company,* 23 F.3d 930, 935 (5th Cir.1994) (release of WARN Act claims), *cert. denied,* 513 U.S. 1019 (1994). "[T]he validity of a release is a peculiarly fact-sensitive inquiry." *Livingston v. Adirondack Beverage Company,* 141 F.3d 434, 437-38 (2d Cir.1998) (emphasis added). The "totality of the circumstances" test is used to determine whether a release of Federal claims is knowing and voluntary. *Reid,* 1997 WL 357969, at *5. "Several factors are relevant to this inquiry, including: 1) the plaintiff's education and business experience, 2) the amount of time the plaintiff had possession of or access to the agreement before signing it, 3) the role of plaintiff in deciding the terms of the agreement, 4) the clarity of the agreement, 5) whether the plaintiff was represented by or consulted with an attorney, 6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract law." *Id.* (quoting *Bormann v. AT & T Communications,* 875 F.2d 399, 403 (2d Cir.1989)). "In addition, courts have considered a seventh factor-whether an employer encouraged an employee to consult an attorney and whether the employee had a fair opportunity to do so." *Id.*

The allegations of the Amended Complaint "sufficiently challenge the validity of the release to preclude a finding that the complaint clearly establishes a dispositive defense." *Livingston,* 141 F.3d at 437. Several of the *Bormann* factors appear to be in dispute here. For example, although the Release provided that Plaintiffs would have "a period of at least twenty-one (21) days" to consider its terms (Amended Compl., Ex. A), "defendants [allegedly] manipulated [the Release Plaintiffs] into signing them on the spot." Pls.' Mem. at 7; *see* Amended Compl. ¶ 53(g) ("[M]ost" of the Release Plaintiffs signed the Release on December 20, 2000.). On December 20, 2000, "at least twelve" of the Release Plaintiffs also signed letters acknowledging that "[a]t least seven days have passed" since signing the Release. It does not appear, at the motion to dismiss stage, that the Release Plaintiffs had any role in deciding the terms of the Release and, it would be premature, similarly, to assess fully the clarity of the Release. Nor does it appear that any of the Release Plaintiffs were represented by or consulted with an

attorney prior to (or at the time of) signing the Release. And, it is unclear, at this stage, whether the "2 weeks [ ] salary" (Amended Compl., Ex. A) constitutes "consideration." [FN5] *Zveiter v. Brazilian National Superintendency of Merchant Marine,* 833 F.Supp. 1089, 1097 (S.D.N.Y.1993) ("there is some dispute as to the extent to which [the severance pay] exceeded the pay that she was owed"); *Gorman v. Earmark, Inc.,* 968 F.Supp. 58, 62 (D.Conn.1997) (denying defendant's motion for partial summary judgment where "primary controversy focused on by the parties concern[ed] ... whether the consideration given in exchange for the waiver exceeds remuneration to which the employee was already entitled by contract or law."). [FN6]

> FN5. Defendants contend that the "additional termination benefit ... of 2 weeks[ ] salary" is consideration because "[w]ages and benefits under WARN are, [ ] merely damages to which claimants are entitled *only if* a district court rules in their favor that the proper statutory notice was not given." Defs.' Mem. at 16 (emphasis in original). Plaintiffs contend that the Release Plaintiffs are entitled by law to more than "2 weeks' salary." Pls .' Mem. at 9.

> FN6. Having decided that discovery is needed, the Court need not assess the issues of "duress" or "fraud" other than as follows: To sustain a duress claim, a party must show, among other things, that the agreement was obtained "where circumstances permitted no other alternative." *Nicholas v. NYNEX, Inc.,* 929 F.Supp. 727, 732 (S.D.N.Y.1996)). It appears the Release Plaintiffs "could have rejected the Release and pursued [their] legal remedies. Courts have found this option-turning down the additional severance and pursuing legal claims-to be a reasonable alternative, even if a hefty financial incentive is offered for signing the Release." *Reid,* 1997 WL 357969, at *7; *see, e.g., Nicholas,* 929 F.Supp. at 733.

> In order to prevail on a fraud claim, the Release Plaintiffs would have to show "(1) that [the Defendants] made a misrepresentation (2) as to a material fact (3) which was false (4) and known to be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                     Page 4
Not Reported in F.Supp.2d, 2002 WL 461647 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

false by [the Defendants] (5) that was made for the purpose of inducing [the Release Plaintiffs] to rely on it (6) that [the Release Plaintiffs] rightfully did so rely (7) in ignorance of its falsity (8) to his injury." *Cohen v. Koenig,* 25 F.3d 1168 (2d Cir.1994) (quoting *Murray v. Xerox Corp.,* 811 F.2d 118, 121 (2d Cir.1987)). Defendants contend that "Plaintiffs fail to allege any misrepresentations of existing fact." Defs.' Mem. at 14. But Plaintiffs do allege that Defendants "falsely and in bad faith asserted an inapplicable exception to proper WARN Act notice" and did not shut down operations on December 21, 2000. Amended Compl. ¶ 44; *see* Amended Compl., Ex. A; *see Sanitoy, Inc. v. Shapiro,* 705 F.Supp. 152 (S.D.N.Y.1989) ( "statements of future intent and prediction,[ ] are nevertheless actionable if defendant made them with the present intent to deceive"). Defendants allegedly engaged in such acts "so that the aggrieved employees would rely upon their actions and sign general releases" (*id.* at ¶ 53(f)) and "most of the plaintiffs" "did in fact rely upon the defendants' false representations ... to their detriment." *Id* . at ¶ 53(g).

*Ratification*

**\*4** Defendants contend that the Release Plaintiffs ratified Release(s) as a matter of law "by failing to tender back [the consideration]." Defs.' Mem. at 17. The Release Plaintiffs counter that, since the "additional termination benefit of ... two weeks[ ] salary" is not consideration, "[t]ender is excused." Pls.' Mem. at 13. Plaintiff argues, alternatively, that "[n]othing in the WARN Act requires that aggrieved employees 'tender back' wages or benefits" because such payments "are *setoff* against the employer's WARN Act liability." *Id.* at 12 (emphasis in original).

"Under the doctrine of ratification, a party loses the power to avoid a voidable contract." *Landau v. American International Group, Inc.,* No. 97 Civ. 3465, 1997 WL 590854, at \*3 (S.D.N.Y. Sept. 23, 1997). Generally, "retaining consideration after learning that a release is voidable operates to ratify that release." *Reid,* 1997 WL 357969, at \*10; *see Landau,* 1997 WL 590854, at \*3 ("[a]lthough ratification is

an affirmative defense, it is properly considered on a motion to dismiss when ... the issue is obvious from the pleadings and the papers before the court.").

Here, the issue of ratification is inextricably tied in with the (unresolved) issue of whether the Release Plaintiffs received "consideration." Tender is excused where the releasor did not receive any consideration and, in those instances, "the amount that the plaintiff had received in exchange for the release would simply be set off against any recovery that he might obtain in the suit." *Fleming v. United States Postal Service,* 27 F.3d 259, 260 (7th Cir.1994).

*Public Policy*

The Release Plaintiffs contend that enforcing the Releases would violate "[t]he declared public policy of the WARN Act [which] is to protect workers, their families, and their communities." Pls.' Mem. at 16 (citing 20 C.F.R. § 639.1); *see* Pls.' Mem. at 15 ("The purpose of WARN ... is ... to alleviate the distress associated with job loss for both the workers and the community in which they live.") (quoting *United Paperworkers Int'l Union v. Specialty Paperboard, Inc.,* 999 F.2d 51, 54 (2d Cir.1993)). Defendants argue that courts have found releases of WARN Act claims to be valid even where the releases did not specifically mention the WARN Act. Defs.' Mem. at 16; *see Williams,* 23 F.3d 930; *Joe v. First Bank Sys., Inc.,* 202 F.3d 1067 (8th Cir.2000). "A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms." Restatement (Second) of Contracts § 178 (1981). "A public policy against the enforcement of promises ... may be derived by the court from (a) legislation relevant to such a policy, or (b) the need to protect some aspect of the public welfare." *Id.* § 179.

**\*5** There is no reason to reach the issue of whether the Releases are (un)enforceable on the ground of public policy, at this time, since the Releases may, as noted, be invalid for other reasons. *See Williams,* 23 F.3d at 935 ("Public policy favors voluntary settlement of claims and enforcement of releases, but a release of employment or employment discrimination claim is valid only if it is 'knowing' and 'voluntary."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 5
Not Reported in F.Supp.2d, 2002 WL 461647 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

’) (citation omitted) (quoting *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 52, n. 15 (1974)).

IV. Conclusion

For the foregoing reasons, Defendants' motion for judgment on the pleadings [15] is denied. The parties are directed to appear at a scheduling/settlement conference with the Court on Tuesday, April 23, 2002, at 3:15 p.m., in Courtroom 706 of the United States District Courthouse, 40 Centre Street, New York, New York. The parties are further directed to engage in good faith settlement negotiations prior to the conference.

S.D.N.Y.,2002.
DePalma v. Realty IQ Corp.
Not Reported in F.Supp.2d, 2002 WL 461647 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1:01cv00446 (Docket) (Jan. 19, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.