13

Westlaw.

Slip Copy                                                                                    Page 1
Slip Copy, 2006 WL 1373094 (N.D.N.Y.)
**(Cite as: Slip Copy)**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,N.D. New York.
Douglas E. DONAHUE, Plaintiff

v.

UNO RESTAURANTS, LLC, Defendant.
**No. 3:06-CV-53.**

May 16, 2006.

Mary A. Felasco, Office of Mary A. Felasco, Fulton, NY, for Plaintiff.
Leslie Prechtl Guy, Hinman, Howard Law Firm, Binghamton, NY, for Defendant.

### DECISION and ORDER

THOMAS J. McAVOY, Senior United States District Judge.

*1 Plaintiff commenced the instant action pursuant to 42 U.S.C. § 2000e, et seq., claiming discrimination on account of his race, color, and having opposed certain other discriminatory practices. Presently before the Court is Defendant's motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6) on the ground that Plaintiff's claims are barred by the terms of a release entered into between the parties.[FN1]

> FN1. Plaintiff's opposition papers were signed by an attorney Matthew Bell. Attorney Bell has not filed an appearance in this case. This is a violation of N.D.N.Y.L.R. 83.2(a). Moreover, Plaintiff's opposition papers consist of an "Answering Affirmation" prepared by Attorney Bell. This, too, is a violation of the local rules of practice. Local Rule 7.1(a) provides that "all ... opposition to motions require a memorandum of law." Plaintiff failed to submit a memorandum of law. Local Rule 7.1(a)(2) further provides that "[a]n affidavit must not contain legal arguments...." Attorney Bell's affirmation (which is the functional equivalent of an affidavit) contains legal arguments. In fact, on a Rule 12(b)(6) motion, an affidavit is not required because the Court cannot consider materials submitted outside of the pleadings. N.D.N.Y.L.R. 7.1(a)(2) ("An affidavit is required for all motions

except ... a motion pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted."). Plaintiff is directed to strictly comply with the requirements of this Court's Local Rules.

### I. FACTS

Plaintiff was employed by Defendant from December 26, 2000 to February 7, 2004, at which time Defendant terminated Plaintiff's employment. Plaintiff claims that, during his period of employment, he was subjected to a hostile work environment. Plaintiff also claims that the termination of his employment was motivated by Plaintiff having opposed certain discriminatory practices by Defendant.

In its motion to dismiss, Defendant contends that Plaintiff filed a charge of discrimination with the New York State Division of Human Rights ("NYSDHR") and that, during the course of those proceedings, the parties had expressed a desire to settle the matter. Defendant further claims that the parties came to terms on a proposed settlement negotiated through the NYSDHR. The settlement is purported to have included an agreement that Plaintiff would not sue Defendant. Defendant claims that it executed the settlement documents, and that, in reasonable reliance upon Plaintiff's representation that he would execute the settlement agreement, it performed its obligations under the terms of the settlement agreement. Plaintiff never signed the settlement documents. Defendant maintains that the release precludes the instant litigation.

### II. STANDARD OF REVIEW

A motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6) for "failure to state a claim upon which relief can be granted" must be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim [that] would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). A complaint should not be dismissed unless it appears that no construction of the facts would permit the plaintiff to prevail. *See Hughes v. Rowe*, 449 U.S. 5, 10 (1980); *Bass v. Jackson*, 790 F.2d 260, 262 (2d Cir.1986).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                    Page 2
Slip Copy, 2006 WL 1373094 (N.D.N.Y.)
**(Cite as: Slip Copy)**

When considering a Rule 12(b)(6) motion, the court may consider the allegations in the complaint and "all papers and exhibits appended to the complaint, as well as any matters of which judicial notice may be taken." *Hirsch v. Arthur Anderson & Co., 72 F.3d 1085, 1092 (2d Cir.1995).* The court also may consider "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir.1993).*

### III. DISCUSSION

Defendant moves to dismiss based upon the defense of a release. That issue may not, however, be properly resolved on a motion to dismiss. Plaintiff's Complaint makes no mention of a release and any such release does not form the basis of Plaintiff's suit. Further, there is no basis upon which the Court may take judicial notice of any release. Accordingly, the documents submitted by Defendants in support of their motion to dismiss may not be considered by the Court on a Rule 12 motion. The validity of any contract may properly be determined upon a motion for summary judgment or at trial.

**\*2** Defendant also argues that N.Y.C.P.L.R. § 2104 would not be a bar to any alleged agreement. The Court agrees. Section 2104 provides that:
An agreement between parties or their attorneys relating to any matter in an action, other than one made between counsel in open court, is not binding upon a party unless it is in a writing subscribed by him or his attorney or reduced to the form of an order and entered. With respect to stipulations of settlement and notwithstanding the form of the stipulation of settlement, the terms of such stipulation shall be filed by the defendant with the county clerk.

As the statute itself makes clear, it only applies "to any matter in an action." The statute does not apply to the instant case because at the time of any alleged agreement, there was no "action." The Complaint alleges that Plaintiff filed a charge of discrimination with the NYSDHR and that he received a dismissal of those proceedings in November 2005. The Complaint in this action was filed in January 2006. Plaintiff concedes that any settlement negotiations with Defendant occurred in 2004, long before the instant action was

commenced. *See* Bell Affirmation at ¶ 4. Thus, at the time of any alleged agreement, this action was not pending. Furthermore, although there may have been ongoing proceedings before the NYSDHR, the New York Court of Appeals has held that "an administrative proceeding is not an action." *Matter of Fiedelman v. New York State Dept. of Health, 58 N.Y.2d 80, 82, 459 N.Y.S.2d 420, 445 N.E.2d 1099 (1983);* see N.Y.C.P.L.R. § 105(b). Because there was no "action" at the time of any alleged agreement, CPLR § 2104 is inapplicable.[FN2]

> FN2. Because it is clear that § 2104 is inapplicable to the facts and circumstances of this case, the Court need not address whether § 2104 applies to federal court proceedings.

### IV. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss based on the affirmative defense of a release is DENIED with leave to renew upon a properly supported motion for summary judgment or at trial.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Donahue v. Uno Restaurants, LLC
Slip Copy, 2006 WL 1373094 (N.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1330594 (Trial Motion, Memorandum and Affidavit) Defendant, Uno Restaurants, LLC's Memorandum of Law in Support of Motion to Dismiss (Mar. 24, 2006) Original Image of this Document (PDF)
• 2006 WL 478262 (Trial Pleading) Complaint (Jan. 13, 2006)
• 3:06cv00053 (Docket) (Jan. 13, 2006)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14

Westlaw.

Not Reported in F.Supp.2d                                                                                          Page 1
Not Reported in F.Supp.2d, 2005 WL 887154 (S.D.N.Y.), RICO Bus.Disp.Guide 10,877
**(Cite as: Not Reported in F.Supp.2d)**

C

Briefs and Other Related Documents

United States District Court,S.D. New York.
EASTCHESTER REHABILITATION AND HEALTH
CARE CENTER, L.L.C., Eastchester Realty Associates,
L.L.C., Split Rock Rehabilitation and Health Care Center,
L.L.C. and Eastrock Realty Associates, L.L.C., Plaintiffs,
v.
EASTCHESTER HEALTH CARE CENTER, L.L.C., Split
Rock Multicare Center, L.L.C., Emzel Realty Corp., Zelma
Properties, Inc. and ABE Zelmanowicz, Defendants.
No. 03Civ.7786(LTS)(FM).

April 15, 2005.

Jeffrey L. Rosenberg & Associates, L.L.C., By: Jeffrey L.
Rosenberg, New York, New York, for Plaintiffs.
The Law Offices of David B. Bernfeld, By: David B. Bern-
feld, New York, New York, Dematteo Bernfeld, LLP, By:
Jeffrey L. Bernfeld, New York, New York, for Defendants.

*OPINION AND ORDER*
SWAIN, J.
**\*1** This litigation arises from the purchase of two nursing
facilities and the real estate on which the facilities are loc-
ated. The Complaint in this action asserts that Eastchester
Rehabilitation and Health Care Center, L.L.C., Eastchester
Realty Associates, L.L.C ., Split Rock Rehabilitation and
Health Care Center, L.L.C., and Eastrock Realty Associates,
L.L.C. (referred to herein collectively as "Plaintiffs") were
fraudulently induced to purchase the nursing facilities and
real estate at an inflated price, in excess of the actual fair
market value. Plaintiffs have asserted claims under the fed-
eral Racketeer Influenced and Corrupt Organizations Act
("RICO"), 18 U.S.C. § 1961, *et seq.,* and under state law for
common law fraud and breach of contract. Eastchester
Health Care Center, L.L.C. ("Eastchester"), Split Rock Mul-
ticare Center, L.L.C. ("Split Rock"), Emzel Realty Corp.
("Emzel Realty"), Zelma Properties, Inc. ("Zelma Proper-
ties"), and individual defendant Abe Zelmanowicz
("Defendant Zelmanowicz") (together, "Defendants") have
moved pursuant to Rules 12(b)(6) and 9(b) of the Federal
Rules of Civil Procedure to dismiss the Complaint. For the
reasons set forth below, Defendants' motion is granted.

*BACKGROUND* [FN1]

> FN1. The following facts are taken from the Com-
> plaint and Plaintiffs' RICO statement, the allega-
> tions of which are accepted as true for purposes of
> this motion.

In June 2001, Plaintiffs' organizers entered into an agree-
ment to purchase two nursing facilities (the "Facilities")
from Defendants along with the property on which each of
the Facilities was located. (Complaint, ¶ 16.) Plaintiffs are
four limited liability companies created pursuant to the pur-
chase agreement for the purpose of owning and operating
the two Facilities and the two associated parcels of land.
(*Id.,* ¶ 21.) Defendants are four legal entities that formerly
owned and operated these assets and an individual, Defend-
ant Zelmanowicz, who is and was the president of each of
the Defendant entities. (*Id.,* ¶¶ 6-10.)

Through a fraudulent scheme, Defendants induced Plaintiffs
to purchase the assets for about $16,000,000.00 above their
fair market value. The key element of the scheme involved
Defendants' repeated submissions of false patient data to
Medicaid and Medicare (the "False Filings") in order to re-
ceive excess reimbursement payments and an inflated in-
come stream that was used to misrepresent the financial
status and operating conditions of the Facilities in connec-
tion with Defendants' efforts to sell the Facilities. (*Id.,* ¶ 12.)
Plaintiffs purchased the assets for approximately
$37,000,000.00. (*Id.,* ¶ 19.)

The scheme occurred from about 1997 onward and involved
false claims regarding the Facilities' "Bed Hold Days" and
"Vent Bed Patients." Defendant Eastchester and Defendant
Split Rock (the "Prior Operators") misrepresented the occu-
pancy rates of their respective facilities and filed claims for
ineligible patients in order to receive excess "Bed Hold"
payments. Similarly, the Prior Operators filed claims that in-
cluded inaccurate census data regarding certain ventilator
beds and ventilator patients in order to receive excess "Vent
Bed" payments. Defendant Zelmanowicz knew of these in-
tentional false filings. (*Id.,* ¶ 35(a).)

**\*2** The False Filings continued from about the middle of
1999 through September 2002, the period for which

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                                          Page 2
Not Reported in F.Supp.2d, 2005 WL 887154 (S.D.N.Y.), RICO Bus.Disp.Guide 10,877
**(Cite as: Not Reported in F.Supp.2d)**

Plaintiffs had access to Defendants' financial statements. (*Id.*) The resulting excess reimbursements enabled Defendants to overstate their income and understate their operating losses, and thereby grossly to inflate the apparent value of the Facilities. (*Id.*, ¶ 12.) Defendants failed to disclose the true nature of the Facilities' losses to Plaintiffs. These non-disclosures also created the false appearance that the Facilities would be able to maintain a certain average occupancy rate. Had that expected occupancy rate been achieved, Plaintiffs would have been eligible to obtain certain reimbursements from Medicaid that would have increased the Facilities' income and profitability. (*Id.*, ¶ 35(b).) Absent such fraud, Plaintiffs would have refused the transaction unless the agreement had been substantially modified and the price had been significantly lowered. (*Id.*, ¶ 12.) As a result of these misleading financial reports and non-disclosures, Plaintiffs have suffered damages in the amount of approximately $16,000,000.00, for which they seek compensation. (*Id.*, ¶ 14.)

## DISCUSSION

Defendants have moved to dismiss the Complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Rule 9(b) requires the complaint to "[1] specify the statements it claims were false or misleading, [2] give particulars as to the respect in which plaintiffs contend the statements were fraudulent, [3] state when and where the statements were made, and [4] identify those responsible for the statements." *Moore v. PaineWebber, Inc.,* 189 F.3d 165, 172 (2d Cir.1999); *McLaughlin v. Anderson,* 962 F.2d 187, 191 (2d Cir.1992). Plaintiffs must also "allege facts that give rise to a strong inference of fraudulent intent." *Moore,* 189 F.3d at 173 (quoting *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 812 (2d Cir.1996)). Furthermore, fraud must be alleged with particularity as to each defendant. *U.S. Fire Ins. Co. v. United Limousine Service, Inc.,* 303 F.Supp.2d 432, 444 (S.D.N.Y.2004).

In reviewing a motion to dismiss a complaint pursuant to Rule 12(b)(6) for failure to state a claim, a court must accept as true the facts alleged in the complaint and draw all inferences in favor of the nonmoving party. *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). A court should dismiss the complaint only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Id.* When deciding a motion to dismiss under Rule 12(b)(6), the court generally limits itself to the facts stated in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint. *See Dangler v. New York City Off Track Betting Corp.,* 193 F.3d 130, 138 (2d Cir.1999). For the purposes of this motion, the Court has limited its examination to the Complaint and Plaintiffs' RICO Statement.

### A. *The RICO Claims*

*3 Plaintiffs assert civil RICO claims against all Defendants for violations of 18 U.S.C.A. § 1962(a)-(d) (West 2004). In order to plead properly a violation of the substantive RICO provisions, 18 U.S.C.A. § 1962(a)-(c), plaintiffs must allege "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan Stanley Inc.,* 719 F.2d 5, 17 (2d Cir.1983). Under § 1962(d), plaintiffs must demonstrate that the defendants conspired to violate one or more of the substantive RICO provisions.

Defendants move to dismiss the RICO claims, arguing, among other things, that Plaintiffs have failed to plead their RICO claims with the requisite particularity and that, because of the lack of detail as to the alleged predicate acts underlying the RICO claims, the Complaint fails to state a claim upon which relief can be granted because it fails to depict a "pattern of racketeering activity."

### 1. *Pleading Fraud with Particularity*

Rule 9(b) of the Federal Rules of Civil Procedure applies to RICO claims based on allegations of fraud. *Moore,* 189 F.3d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                      Page 3
Not Reported in F.Supp.2d, 2005 WL 887154 (S.D.N.Y.), RICO Bus.Disp.Guide 10,877
**(Cite as: Not Reported in F.Supp.2d)**

at 172.

In their Complaint, Plaintiffs allege that Defendants committed numerous predicate acts of mail and wire fraud in furtherance of their scheme to induce Plaintiffs to purchase the two nursing facilities. Mail and wire fraud constitute predicate illegal acts under RICO. *See* 18 U.S.C.A. § 1961(1) (West 2004). The mail and wire fraud statutes are similar in all material respects, each requiring two essential elements: (1) a "scheme or artifice to defraud" and (2) a mailing or transmission in furtherance of the scheme. 18 U.S.C.A. §§ 1341 and 1343 (West 2004); *Spira v. Nick*, 876 F.Supp. 553, 558-59 (S.D.N.Y.1995). Allegations regarding the "scheme or artifice to defraud" must satisfy the particularity requirements of Rule 9(b), as must Plaintiffs' allegations concerning any specific mailing that they claim was fraudulent. *See Spira*, 876 F.Supp. at 559.[FN2]

> FN2. Plaintiffs' allegations concerning non-fraudulent mailings used merely to establish the jurisdictional element of the predicate acts need not be pleaded with particularity, as long as their purpose in light of the fraudulent scheme that is pleaded with particularity can be reasonably inferred from the complaint. *See Spira*, 876 F.Supp. at 559-60.

Plaintiffs allege that Defendants fraudulently obtained excess reimbursement payments from Medicaid and Medicare from the middle of 1999 through September 2002 in order to manipulate the Facilities' financial condition and for the purpose of fraudulently inducing a prospective purchaser, i.e., Plaintiffs, to buy the Facilities at an inflated price. The predicate acts of mail and wire fraud on which Plaintiffs base their claim thus include Defendants' transmission of a series of allegedly false reimbursement claims to Medicaid and Medicare (the "False Filings") and a number of communications in which Defendants allegedly made material misrepresentations to the Plaintiffs regarding the Facilities' financial status and operating conditions.

The Complaint contains only the most general allegations surrounding the False Filings element of the alleged scheme. (Complaint, ¶¶ 12-13, 35.) For example, paragraphs 12 and 13, contained in the section describing the "nature of the action," merely provide a summary overview of the fraudulent scheme involving the False Filings without providing any particulars. Paragraph 35 and its relevant subsections also fail to provide specifics. The paragraph does not identify a single specific filing. The paragraph provides no dates, approximate or otherwise, apart from the general claim that the pattern of False Filings stretched from the middle of 1999 through September 2002.

*4 Paragraph 35 does explain, in a general way, why the filings were false. (Complaint, ¶ 35(a)(i)-(iii).) According to the Complaint, the filings overstated the Facilities' occupancy rates and included false data with respect to patients in order to receive excess "Bed Hold" payments. (*Id.*, ¶ 35(a)(i)-(ii).) In addition, the filings for "Vent Bed" payments included inaccurate information regarding ventilator beds and ventilator patients. (*Id.*, ¶ 35(a)(iii).) However, this part of the Complaint simply identifies the general content of the filings that Defendants routinely submitted to Medicare and Medicaid and then concludes that such filings were false without identifying any specific filings or data to support this conclusion. These general and conclusory allegations are insufficient to satisfy Rule 9(b).

The Complaint identifies specific amounts by which Defendants Eastchester and Split Rock were allegedly overpaid during this time period, and provides an estimate of the impact those payments had on the Facilities' operating losses. (Complaint, ¶ 35(a).) However, the Complaint offers no details as to how Plaintiffs reached their conclusions regarding these figures. Also, the claim that the Facilities received "overpayments" assumes that the Defendants engaged in the False Filings, which filings Plaintiffs' allegations are inadequate to identify. Plaintiffs cannot avoid the strictures of Rule 9(b) by layering conclusory statements regarding the impact of a scheme, no matter how specifically those statements are phrased, on top of inadequate allegations of a fraudulent scheme.

Plaintiffs are correct in arguing that Rule 9(b) does not require them to plead detailed evidentiary matter. *See Hollin v. Scholastic Corp. (In re Scholastic Corp. Sec. Litig.)*, 252 F.3d 63, 72 (2d Cir.2001). As the Second Circuit has explained, Rule 9(b) must be harmonized with the general directives of Rule 8, which requires that the pleadings contain

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 4
Not Reported in F.Supp.2d, 2005 WL 887154 (S.D.N.Y.), RICO Bus.Disp.Guide 10,877
**(Cite as: Not Reported in F.Supp.2d)**

a "short and plain statement" of the claim, Fed.R.Civ.P. 8(a)(2), and that each averment be "simple, concise, and direct," Fed.R.Civ. 8(e)(1). *Ross v. A.H. Robins Co., Inc.*, 607 F.2d 545, 557 n. 20 (2d Cir.1979). However, under Rule 9(b), Plaintiffs are still required to plead facts with particularity in support of their general fraud allegations. Plaintiffs must identify the particular filings they claim were fraudulent and explain why the contents of those filings were false or misleading. Further, Plaintiffs must identify who was responsible for the filings and state approximately when the submissions occurred.[FN2]

> FN2. The Court notes that Plaintiffs have failed to plead any connection between the prior real estate owning entities (Defendants Emzel Realty and Zelma Properties) and the False Filings. While the Complaint occasionally refers generally to the Defendants (Complaint, ¶ 12) or the "Sellers" (*Id.*, ¶ 35(a)) in connection with the False Filings, only the "Prior Operators" (i.e ., Defendants Eastchester and Split Rock) and Defendant Zelmanowicz are identified as having any knowledge of or involvement with the False Filings (*Id.*, ¶ 35(a)(i)-(iii)). Plaintiffs' RICO Statement likewise refers only to Defendants Eastchester and Split Rock in relation to the False Filings. (RICO Statement, at 3-5.) Thus, even assuming the pleading was not infirm as to the False Filings, the predicate acts arising from the False Filings cannot be attributed to Defendants Emzel Realty and Zelma Properties. *See Dietrich v. Bauer*, 76 F.Supp.2d 312, 329 (S.D.N.Y.1999) ("Rule 9(b) is not satisfied by a complaint in which defendants are clumped together in vague allegations.").

Plaintiffs have thus failed to plead the alleged False Filings fraud scheme with sufficient particularity to meet the requirements of Rule 9(b). As explained in the following section, Plaintiffs' failure to specify the identity and content of the False Filings precludes the use of those filings to demonstrate the existence of a "pattern of racketeering" for RICO purposes. *See GICC Capital Corp. v. Technology Finance Group, Inc.*, 67 F.3d 463, 467 (2d Cir.1995); *First Capital Asset Managment, Inc. v. Bricklebush*, 150

F.Supp.2d 624, 633 (S.D.N.Y.2001), *aff'd*, 835 F.3d 159 (2d Cir.2004). Plaintiffs' RICO allegations thus fail to state a claim upon which relief can be granted and must be dismissed pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).

### 2. *Pattern of Racketeering Activity*

**\*5** Proving a "pattern of racketeering activity" requires at the very least a showing that defendants committed two acts of racketeering activity within a ten-year period. 18 U.S.C.A. § 1961(5) (West 2004); *First Capital Asset Management, Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir.2004). Besides this baseline showing, plaintiffs must demonstrate that "the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989). In order to establish the requisite threat of continuing criminal activity, plaintiffs must show either a "closed-ended" or an "open-ended" pattern of racketeering activity. *See id.* at 239; *GICC Capital Corp.*, 67 F.3d at 466. Because the allegedly fraudulent statements, other than the False Filings, on which Plaintiffs rely were all made within a relatively brief period of time, Plaintiffs' failure to proffer sufficient allegations regarding the False Filings is fatal to Plaintiffs' ability to allege a pattern of racketeering activity under either of these theories.

#### (a) *Closed-Ended Continuity*

Closed-ended continuity is demonstrated by showing "a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months ... do not satisfy the requirement." *H.J. Inc.*, 492 U.S. at 242; *DeFalco v. Bernas*, 244 F.3d 286, 321 (2d Cir.2001). Closed-ended continuity is primarily a temporal concept, although other factors such as "the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists." *DeFalco*, 244 F.3d at 321; *Cofacredit S.A. v. Windsor Plumbing Supply Co. Inc.*, 187 F.3d 229, 242 (2d Cir.1999). Notably, however, since the Supreme Court decided *H.J., Inc.*, the Second Circuit has never found a "substantial period" of time where the predicate acts occurred over a period

Westlaw.

Not Reported in F.Supp.2d                                                                                      Page 5
Not Reported in F.Supp.2d, 2005 WL 887154 (S.D.N.Y.), RICO Bus.Disp.Guide 10,877
**(Cite as: Not Reported in F.Supp.2d)**

of less than two years. *DeFalco*, 244 F.3d at 321 (collecting cases). *But see* Zito v. Leasecomm Corp., No. 02 Civ. 8074, 2003 WL 22251352, at *17 (S.D.N.Y. Sep. 30, 2003) (suggesting that an 18 month period may satisfy closed-ended continuity).

Other than the False Filings (which, as explained above, are described too generally to be taken into account as predicate acts for purposes of analyzing Plaintiffs' RICO claims), Plaintiffs rely on a series of mailings that occurred between April 2001 (Complaint, ¶ 39(a)) and June 2002 (Complaint, ¶ 40(u)) to frame their allegation of a "pattern of racketeering activity." The duration of these mailings spans a mere 14 months. Even assuming that these mailings can be used to satisfy the requirement of predicate acts of mail and wire fraud, an issue the Court does not reach, the acts span far less time than the two-year period that the Second Circuit has recognized as constituting a "substantial period." The Court finds no basis for departing from the general rule that a period of at least two years is required to establish a closed-ended pattern. Therefore, Plaintiffs allegations are insufficient to state a claim of a closed-ended pattern of racketeering.

(b) *Open-Ended Continuity*

***6** A claim of open-ended continuity is made out on the basis of past criminal conduct coupled with a threat of future criminal conduct. *GICC Capital Corp.*, 67 F.3d at 466. The nature of the RICO enterprise and of the predicate acts is relevant to determining whether open-ended continuity exists. *DeFalco*, 244 F.3d at 323; *Cofacredit*, 187 F.3d at 242. Inherently unlawful acts conducted for an enterprise in the business of racketeering activity constitute a threat of future criminal activity and are thus sufficient to form the basis of a claim of open-ended continuity. *DeFalco*, 244 F.3d at 323. However, open-ended continuity may also be established with respect to an enterprise that primarily conducts a legitimate business where the predicate acts are part of the regular way of operating the business and the acts imply a threat of future criminal conduct. *Cofacredit*, 187 F.3d at 243. Finally, a scheme that is "inherently terminable" creates no threat of continued criminal conduct and thus cannot support a finding of open-ended continuity. *GICC Capital Corp.*, 67 F.3d at 466 ("[I]t is clear that the scheme was *in-*

*herently* terminable. It defies logic to suggest that a threat of continued looting activity exists when, as plaintiffs admit, there is nothing left to loot.").

Plaintiffs' allegations are insufficient to support open-ended continuity. First, this case involves legitimate businesses, which are not alleged to have been engaged solely in the business of racketeering activity. Second, the scheme here was inherently terminable. The scheme of fraudulently inducing a victim to purchase the Facilities could not continue after the Facilities and properties were sold. In addition, since the Plaintiffs have not pleaded the False Filings scheme with particularity, any argument that the False Filings scheme demonstrated a threat of future criminal activity cannot be considered. Plaintiffs have failed to allege facts sufficient to demonstrate an open-ended pattern and thus have not adequately pleaded a "pattern of racketeering activities."

For all of these reasons, the RICO claims against Defendants under 18 U.S.C. § 1962(a)-(c) must be dismissed.

3. *Section 1962(d)*

Plaintiffs' section 1962(d) RICO claims must also be dismissed. Section 1962(d) prohibits any person from conspiring to violate any of the substantive provisions of § 1962(a)-(c). To state a claim thereunder, a plaintiff must allege that "each defendant, by words or actions, manifested an agreement to commit two predicate acts in furtherance of the common purpose of the RICO enterprise." *Colony at Holbrook, Inc. v. Strata, G.C., Inc.*, 928 F.Supp. 1224, 1238 (E.D.N.Y.1996).

There can be no RICO conspiracy without a substantive RICO violation. *See* Schmidt v. Fleet Bank, 16 F.Supp.2d 340, 353 (S.D.N.Y.1998). "Thus, if the prior claims do not state a cause of action for substantive violations of RICO, then a RICO conspiracy claim necessarily does not set forth a conspiracy to commit such violations." *Id.* (quoting *Discon v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir.1996), rev'd on other grounds, 525 U.S. 128 (1998)); *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 658 (S.D.N.Y.1996) ( "failure to adequately plead facts that would satisfy the pleading requirements of 1962(a), 1962(b)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                        Page 6
Not Reported in F.Supp.2d, 2005 WL 887154 (S.D.N.Y.), RICO Bus.Disp.Guide 10,877
**(Cite as: Not Reported in F.Supp.2d)**

or 1962(c) necessarily dooms any claims that the [plaintiff] might assert arising under 1962(d)"). Accordingly, because Plaintiffs have failed to assert a substantive RICO claim against any of the Defendants, Plaintiffs' claims under § 1962(d) must also be dismissed.

### B. *Supplemental Jurisdiction*

**\*7** The Complaint asserts claims under state law for common law fraud and breach of contract. Since the federal RICO claims have been dismissed, the Court declines to exercise its supplemental jurisdiction over the remaining state law claims. *See, e.g., Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7 (1988) (recognizing that federal courts should ordinarily decline to exercise supplemental jurisdiction over state claims when the federal claims have been dismissed before trial); *DiLaura v. Power Auth.,* 982 F.2d 73, 80 (2d Cir.1992) (same); *First Capital Asset Management, Inc. v. Bricklebush, Inc.,* 150 F.Supp.2d at 636. Therefore, the state law claims will be dismissed without prejudice to renewal in connection with the repleading of Plaintiffs' federal claims.

### CONCLUSION

Defendants' motion to dismiss Plaintiffs' RICO claims pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure is granted. The Court declines to exercise supplemental jurisdiction over the remaining state law claims.

Plaintiffs shall have 21 days from the date of this Opinion and Order to file and serve an amended complaint. If no such amended pleading is timely filed and served, the Court may dismiss this action with prejudice and without further advance notice to Plaintiffs.

IT IS SO ORDERED.

S.D.N.Y.,2005.
Eastchester Rehabilitation and Health Care Center, L.L.C. v. Eastchester Health Care Center, L.L.C.
Not Reported in F.Supp.2d, 2005 WL 887154 (S.D.N.Y.), RICO Bus.Disp.Guide 10,877

Briefs and Other Related Documents (Back to top)

• 1:03cv07786 (Docket) (Oct. 02, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

15

Westlaw.

Not Reported in F.Supp.                                                                          Page 1
Not Reported in F.Supp., 1997 WL 291961 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
FAKHOURY ENTERPRISES, INC., Plaintiff,
v.
J.T. DISTRIBUTORS, Defendant.
**No. 94 Civ. 2729 (PKL).**

June 2, 1997.

John G. Ward, Jr., New York City.
Frankie H. Chu, New York City.

*MEMORANDUM ORDER*

LEISURE, District Judge.

**\*1** This breach of contract action arises out of an alleged distribution agreement between plaintiff Fakhoury Enterprises ("Enterprises") and defendant J.T. Crown Trading Corporation ("J.T."), sued herein as J.T. Distributors. Plaintiff alleges that the agreement made it an exclusive distributor, for Illinois and Ohio, of a product imported by J.T. Enterprises further alleges that defendant breached the contract by selling the product to customers other than plaintiff in those states. The complaint also stated a fraudulent misrepresentation claim against J.T.'s principal, Jack Tang, based on his allegedly fraudulent misrepresentation that Enterprises would be an exclusive dealer. Tang, however, was dismissed as a defendant. Before the Court is defendant J.T.'s motion for summary judgment. For the reasons stated below, the motion is granted.

BACKGROUND

In 1992, Jack Fakhoury, president of plaintiff Enterprises, learned of a product-an air freshener in the shape of a crown for use in cars-called Crown Air Fresheners. A car wash business owned by Fakhoury purchased a number of the Crown Air Fresheners from a Michigan company, Vaughn & Associates ("Vaughn"), and Fakhoury learned from Vaughn that J.T. imported the products from Taiwan. Fakhoury then contacted J.T. by letter, expressing his interest in becoming a distributor of the product. Through several telephone discussions, certain terms of a distribution agreement were negotiated, and it was arranged that Fakhoury would

go to New York to present a contract prepared by Fakhoury's attorney.

On September 15, 1992, Fakhoury met with Tang in New York City. The parties signed a document, captioned an "Executive Distributorship Agreement" and dated September 15, 1992 (the "Agreement"). The Agreement recited that "[i]t is the desire of the Importer [J.T.] to establish the Distributor [Enterprises] as the sole distributor for this product," and designated certain terms for a distributorship. The terms provided that: (1) J.T. granted Enterprises "the sole and exclusive right to sell" the product in Illinois and Ohio; (2) the agreement would last for one year; [FN1] and (3) Enterprises would pay $3.25 per unit "if delivery is at New York City." [FN2] Def.'s Ex. 9. In addition, the Agreement included a term providing that Enterprises "shall give the Importer _____ weeks written notice" of required shipments, but the term was left blank because "[t]hat part of the contract couldn't be answered until [Fakhoury] had made up [his] mind exactly what [he] was doing"-that is, until Fakhoury decided what quantity he would buy and whether he would pick up the items in New York. Fakhoury Dep. at 25.

> FN1. The draft agreement provided for a five-year term, but the Tang and Fakhoury negotiated in New York to change the duration, and wrote in the change on the draft.

> FN2. The draft included two prices, "2.75 per unit, F.O.B., or $3.25 per unit if delivery is at New York City." Def.'s Ex. 9 ¶ 3. The first price, however, was stricken out.

After returning from New York, Fakhoury allegedly took steps in preparation for the promotion of the Crown Air Freshener. He "informed the sales people from Ohio and Illinois which direction we were headed"; hired a photographer to take pictures of the product for advertisement fliers; and took steps to incorporate an Illinois corporation, allegedly at Tang's direction. Fakhoury Dep. at 32-33. After a few days, Fakhoury learned from Vaughn-the merchant from whom Fakhoury originally learned of the product-that another Michigan merchant, Mike Harajli, Inc. ("Harajli"), was selling the product in Michigan. For reasons that are not



quite clear, this discovery caused plaintiff to halt its prepara-
tions.[FN3] Plaintiff never bought any Crown Air Fresheners
from J.T.[FN4]

> FN3. It appears that Fakhoury had understood that
> J.T. was the sole importer of the goods from
> Taiwan to the United States. He discovered that the
> same products were being shipped from Taiwan to
> Canada and brought to the United States by Harajli.
> Apparently, this discovery led plaintiff to halt pre-
> parations because it cast doubt in Fakhoury's mind
> about the exclusivity of his territory.

> FN4. Plaintiff summarily denies defendant's asser-
> tion, contained in its statement pursuant to Rule
> 3(g) of the Local Civil Rules of this Court, that
> plaintiff never bought any of the product from J.T.
> *See* Pl.'s Rule 3(g) Statement ¶ 6. However,
> plaintiff's position is entirely unsupported by the
> evidence. Plaintiff fails to submit any evidence of
> any purchase of the product, and Fakhoury testified
> that Enterprises never purchased any of the goods.
> *See* Fakhoury Dep. at 63-67. There could be no
> basis for a rational trier of fact to conclude that En-
> terprises purchased any Crown Air Fresheners pur-
> suant to the Agreement, and plaintiff's conclusory
> averment that there is dispute does not create a
> genuine dispute as to this issue. *See* *Western World*
> *Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d
> Cir.1990) (quoting *Borthwick v. First Georgetown*
> *Securities, Inc.,* 892 F.2d 178, 181 (2d Cir.1989);
> *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d
> Cir.1986)) (internal quotation marks and citations
> omitted).

**\*2** Plaintiff alleges that defendant subsequently sold the
products in Illinois and Ohio, thereby breaching its promise
that plaintiff would have the exclusive right to sell in those
states. Plaintiff also alleges that Tang made false representa-
tions to Fakhoury that no other distributors existed in the
territory and that plaintiff would have an exclusive distribu-
tion there. The action was brought originally in the United
States District Court for the Eastern District of Michigan,
but was transferred to this Court under 28 U.S.C. § 1404(a).
*See Fakhoury Enters. v. J.T. Distribs.,* No.

93-CV-74896-DT, op. at 8-9 (E.D.Mich. March 8, 1994). In
the same opinion, the Michigan court denied a motion to
dismiss for lack of subject matter jurisdiction, finding that
defendants had not shown "to a legal certainty" that the jur-
isdictional amount was not met. *Id.* at 7. Finally, defendant
Tang was dismissed from the action on grounds of lack of
personal jurisdiction.[FN5]

> FN5. After Tang was dismissed by the Michigan
> court for lack of personal jurisdiction, the remain-
> ing claim was transferred to this Court, which
> would have personal jurisdiction over Tang.
> Plaintiff never revived this claim, however, and
> Tang has never made any appearance personally or
> through counsel before this Court. Therefore the
> Court must treat Enterprises as the sole defendant
> and the breach of contract claim as the sole claim
> in this action.

## DISCUSSION

To grant summary judgment, the movant must show that no
genuine issues of material fact remain and that it is entitled
to judgment as a matter of law. See Fed. R. Civ. Proc. 56(c);
*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548,
91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.,* 398
U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *La-*
*Fond v. General Physics Servs. Corp.,* 50 F.3d 165, 171 (2d
Cir.1995). With respect to issues as to which the nonmovant
would bear the burden of proof at trial, the moving party's
burden of proof will be satisfied if it can either (1) present
competent affirmative evidence negating an essential ele-
ment of the nonmoving party's claim; or (2) point to a
"complete failure of proof" concerning an essential element
of the nonmoving party's claim. *Celotex,* 477 U.S. at
322-23; *Goenaga v. March of Dimes Birth Defects Found.,*
51 F.3d 14, 18 (2d Cir.1995). If the movant satisfies its bur-
den under Rule 56(c), the nonmoving party must then "set
forth specific facts showing that there is a genuine issue for
trial." Fed.R.Civ.P. 56(e); *see Celotex,* 477 U.S. at 321 & n.
3.

In assessing the record to determine whether there is a genu-
ine issue as to any material fact, the nonmovant's evidence
is to be believed, and all reasonable inferences are to be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 3
Not Reported in F.Supp., 1997 WL 291961 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

drawn in its favor. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986);* La-*Fond,* 165 F.3d at 171. The court's function at this stage is not to weigh the evidence and determine the truth of the matter, but rather to ascertain whether a genuine issue exists to be tried. *See Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir.1994).* However, "[t]he non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." *Western World Ins. Co., 922 F.2d at 121.*

Defendant argues for summary judgment on five grounds, the first of which is that the Agreement is unenforceable for lack of mutuality or consideration. The Court finds that the first ground is sufficient to warrant summary judgment, and thus consideration of the other arguments is not necessary. The Court reaches this conclusion by first considering whether the Agreement can be deemed a contract for sale and thus, under section 2-306(2) of the Uniform Commercial Code (the "UCC"), must be deemed to contain an implied promise by Enterprises to exert its "best efforts" to promote the Crown Air Freshener. Such an implied promise would constitute Enterprises's consideration and the Agreement thus would not fail for lack of mutuality. However, the Agreement does not contain the essential elements of a contract for sale, and thus section 2-306(2) does not apply. The opinion next considers whether, under common law principles, an implied promise could be found to supply the missing consideration. The Court concludes that no such implication is warranted. Therefore, the Agreement contains no express or implied consideration on Enterprises's part and must fail for lack of mutuality.

**\*3** "It is hornbook law that a contract which does not require performance by each party is unenforceable for lack of consideration." *Baker's Aid, a Div. of M. Raubvogel Co. v. Hussman Foodservice Co., 730 F.Supp. 1209, 1219 (E.D.N.Y.1990)* (citing *Joneil Fifth Ave. Ltd. v. Ebeling & Reuss Co., 458 F.Supp. 1197, 1200 (S.D.N.Y.1978)* (Weinfeld, J.)). Even if a writing does not expressly obligate each party, consideration may still be found by implication, because "[a] promise may be lacking and yet the whole

writing may be 'instinct with an obligation' imperfectly expressed." *Wood v. Lucy, Lady Duff-Gordon, 222 N.Y. 88, 91, 118 N.E. 214, 214 (1917)* (Cardozo, J.). Thus, even if a writing contains no express obligation to promote the sales of the product, where the instrument is "instinct with an obligation," a good-faith promise to use one's best efforts to promote the product is properly implied. *See Baker's Aid, 730 F.Supp. at 1219.*

The UCC expands the *Wood* doctrine in the context of contracts for sale: "A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale." N.Y. U.C.C. § 2-306(2) (McKinney 1993). Thus, unlike the Wood case itself, which relied on a number of circumstances to support an inference of an implied promise, under the UCC, an obligation is implied by the existence of an exclusivity term alone. However, section 2-306(2) applies to the instant action only if the Agreement can be called a contract for sale-that is, an implied promise of "best efforts" by the buyer applies to Enterprises only if it can be seen as a buyer under the Agreement.

As a contract for sale, the Agreement would fail for indefiniteness. Generally, a contract must be definite with respect to essential terms in order to be enforceable. *See, e.g.,* John D. Calamari & Joseph M. Perillo, *Contracts* § 2-13, at 43 (2d ed.1977). "In a contract for the sale of goods, the essential terms are quantity, price, and time and manner of delivery." *Judal Indus. v. Welsbach Elec. Corp., 138 A.D.2d 573, 574, 526 N.Y.S.2d 154, 156 (1988)* (citing *Lubrication & Maintenance, Inc. v. Union Resources Co., 522 F.Supp. 1078 (1981); City Univ. of N.Y. v. Finalco, Inc., 129 A.D.2d 494, 514 N.Y.S.2d 244 (1987)).* The fact that one or more terms are left open is not fatal, because "a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." N.Y. U.C.C. § 2-204(3) (McKinney 1993). However, when a dispute as to a material term manifests a lack of intention to form a contract, no enforceable contract results. *See Kleinschmidt Div. of SCM Corp. v. Futuronics Corp. 41 N.Y.2d 972, 973, 395*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                                    Page 4
Not Reported in F.Supp., 1997 WL 291961 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

N.Y.S.2d 151, 152, 363 N.E.2d 701, 702 (1977).

**\*4** The Agreement does not specify any quantity [FN6] or any time or place of delivery. The only essential term it arguably contains is the price, although the price quoted is explicitly contingent upon the place of delivery. Because the writing reflects no agreement as to the place of delivery, the term stating the price "if delivery is at New York City" is ambiguous at best as to any agreement on price. The fact that the parties did not commit to a material term, the delivery term relating to notice, manifests a lack of intent to form a contract for sale. [FN7] There is no evidence of any intent to make a contract binding Enterprises to buy anything. [FN8] Thus, the Agreement would be unenforceable as a sales contract, and UCC section 2-306(2) does not apply to supply the missing consideration.

> FN6. The Agreement cannot be deemed to include an implicit term requiring Enterprises to buy its good-faith requirements of the product, because it literally contains no quantity provision. Cf. N.Y. U.C.C. § 2-306(1) (McKinney 1993) ("A term which *measures the quantity* by ... the requirements of the buyer means such actual ... requirements as may occur in good faith." (emphasis added)).

> FN7. Indeed, Fakhoury's testimony supports such a conclusion. He testifies that his intent in entering the Agreement was merely to "protect" the exclusivity of the territory before committing any investment, and that he could not agree to the delivery terms until he "had made up [his] mind exactly what [he] was doing." Fakhoury Dep. at 25, 29.

> FN8. The fact that Enterprises allegedly took certain steps, apparently in preparation for promoting the product-including talking to sales personnel, preparing to produce advertisements, and starting the incorporation of an Illinois company-does not change this conclusion. The actions alleged do not evidence an understanding of the Agreement as a sales contract because they do not suggest that the parties intended or reached any agreement as to price, delivery, or quantity.

The Court must consider instead whether, under common law principles, an implied promise by Enterprises to use its best efforts can fairly be implied, and thus supply the missing consideration necessary to deem the Agreement an enforceable contract. The purported contract at issue here, like the contract in *Wood,* provided that one party would be the exclusive dealer. However, none of the other circumstances that led the Wood court to find that the writing was "instinct with an obligation" are present in this case.

In the famous *Wood* case, the plaintiff had entered a contract with the defendant whereby the plaintiff was given the exclusive right to use the defendant's endorsement on women's apparel. The contract contained "a wealth of recitals," including a recital that the plaintiff's business was "adapted to the placing of such indorsements." Wood, 222 N.Y. at 91, 118 N.E. at 214. Further, the agreement provided that the defendant's sole payment would be half of the profits, and required the plaintiff to apply for copyrights, trademarks, and patents as necessary, and to make monthly accounts of earnings. The defendant argued that the contract nowhere expressly required the plaintiff to promote products bearing her endorsement, and therefore was unenforceable for lack of mutuality. The court, however, found that the writing as a whole, and the surrounding circumstances, indicated that the plaintiff implicitly promised to use his best efforts to promote such products. See id.

The court found that "many circumstances" supported the implication of such an obligation. First, the defendant's granting of an exclusive license supported that inference because to read the agreement without such an implied promise would be "to suppose that one party was to be placed at the mercy of the other." Id. Other terms of the writing also "point[ed] the same way." Id. The recital that the plaintiff's business was "adapted" to the placing of endorsements implied that the business "will be used for the purpose for which it is adapted." Id. Furthermore, the plaintiff's "promise to pay the defendant one-half of the profits and revenues resulting from the exclusive agency and to render accounts monthly was a promise to use reasonable efforts to bring profits and revenues into existence." Id. at 92, 118 N.E. 214, 118 N.E. at 215.

**\*5** In this case, there is no recital that Enterprises was in the

Westlaw.

Not Reported in F.Supp.                                                                                    Page 5
Not Reported in F.Supp., 1997 WL 291961 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

business of distribution of products, and no provision for the sharing of profits or the accounting by plaintiff for its sales of any products. The writing as a whole is not " 'instinct with obligation,' imperfectly expressed," and in light of all the circumstances, the Court does not find that a promise on plaintiff's part is "fairly to be implied." *Wood, 222 N.Y. at 91, 118 N.E. at 214.* Thus, the Agreement is unenforceable for lack of consideration. Defendant has carried its burden on summary judgment by negating an essential element of plaintiff's breach of contract claim, the existence of an enforceable contract. Accordingly the motion must be granted.

CONCLUSION

For the reasons stated above, defendant's motion for summary judgment is HEREBY GRANTED and the action is HEREBY DISMISSED.

SO ORDERED.

S.D.N.Y.,1997.
Fakhoury Enterprises, Inc. v. J.T. Distributors
Not Reported in F.Supp., 1997 WL 291961 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1:94cv02729 (Docket) (Apr. 15, 1994)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

16

Not Reported in F.Supp.                                                                      Page 1
Not Reported in F.Supp., 1996 WL 99424 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

**C**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.
Stephen Michael FICKE, Plaintiff,
v.
Jeff JOHNS, an individual; American National Bank &
Trust Company of Chicago, an Illinois Corporation, Defendants.
**No. 95 C 939.**

March 4, 1996.

*MEMORANDUM OPINION AND ORDER*
HOLDERMAN, District Judge:
**\*1** Defendants Jeff Johns ("Johns") and American National
Bank & Trust Company of Chicago ("American National")
have moved for dismissal of plaintiff's complaint pursuant
to Rule 12(b)(6) of the Federal Rules of Civil Procedure.
For the following reasons, defendants' motion is denied.

*BACKGROUND*

Plaintiff, Stephen Michael Ficke, alleges the following facts
which, for the purposes of this motion, are taken as true.
*Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).* On or
about March 23, 1989, Eugene Ficke ("Settlor"), who is
plaintiff's father, created a living trust called the "Eugene
Ficke Living Trust Agreement." The trust agreement named
American National as trustee and plaintiff as beneficiary.
Johns was American National's administrator of the trust.

The sections of the trust agreement germane to this dispute
read as follows:
*THIRD:* Upon the death of the settlor, the trustee shall hold
and dispose of the entire trust estate as a separate trust as
follows:
SECTION 1: If the settlor's son, STEPHEN M. FICKE, sur-
vives the settlor, then commencing with the settlor's death,
the income shall be paid in convenient installments, at least
quarterly, to settlor's son until complete distribution of the
trust estate or his prior death.
The trustee may also pay to the settlor's son such sums from
the principal of the trust estate as the trustee deems neces-
sary or advisable from time to time for his health, mainten-

ance in reasonable comfort, education (including postgradu-
ate) and best interests, considering his income from all
sources known to trustee.
In addition, settlor's son may withdraw at any time or times
from the principal of the trust estate not to exceed in the ag-
gregate during any calendar year 5% of the value of the
principal of the trust estate. The trustee shall make payment
without question upon his written request....

In late 1992 Settlor died which left plaintiff as the sole be-
neficiary of the trust. At the time of Settlor's death, plaintiff,
a white male, was fifty years old, homeless, and married to a
black woman, Anita Ficke ("Anita"); the corpus of the trust
was worth in excess of one million dollars.

In 1993, plaintiff repeatedly asked Johns to release funds
from the trust to plaintiff. Johns repeatedly refused to re-
lease such funds. In addition, Johns exhibited prejudice
against plaintiff and Anita because of their homeless state
and desperate need for disbursement from the trust fund.
Johns made a number of abusive comments to plaintiff
which included derogatory remarks about interracial mar-
riages. Specifically, Johns called plaintiff a "lazy, worthless,
drug-addicted bum," told him that he "do[es]n't deserve this
money," and commented to plaintiff "I don't know why
you're married to that nigger."

In August of 1993, plaintiff hired Clough & Sires as his leg-
al counsel. Acting on plaintiff's behalf, Ronald L. Sires
("Sires") contacted Johns. Sires explained to Johns that An-
ita had been diagnosed with cancer and that plaintiff needed
immediate release of funds from the trust in order to pay for
medical treatment for Anita. Sires requested this immediate
release and Johns refused.

**\*2** Throughout August, September and October of 1993
Sires repeatedly sought the assistance of American National
and Johns for the release of the funds for plaintiff. In Octo-
ber of 1993, American National Vice President Ann Freund
dispersed funds to plaintiff. In early December 1993,
plaintiff sent a written request which asked American Na-
tional to withdraw as trustee. Johns refused. On January 4,
1994, plaintiff faxed a letter to American National. In this
letter, he requested American National to disburse 5% of the
trust's principal pursuant to THIRD, Section 1.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                                                                    Page 2
Not Reported in F.Supp., 1996 WL 99424 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

Defendants did not disburse these funds; rather, late in January, 1994, American National's attorney, Dan Luther ("Luther") wrote Sires and informed him that American National had received plaintiff's request that American National withdraw as trustee. Luther sent a document entitled "Approval of Accounts and Release" ("Release"). He informed Sires and plaintiff that American National was not committed to any course of action; however, American National was willing to consider resigning as trustee. Johns discussed the Release with Sires and told him that American National required that plaintiff sign the Release without any revisions.

On January 28, 1994, Sires faxed a letter to Luther which stated that although both American National and plaintiff desired to terminate the relationship, the Release was unacceptable to plaintiff. The letter stated that Bank of America in Pasadena, California, had agreed to replace American National as trustee. Sires also requested defendants to make an inquiry into plaintiff's December, 1993 request that American National resign as trustee. Finally, Sires again demanded the disbursement that plaintiff had previously demanded on January 4, 1994.

In late January and early February, 1994, Sires told Johns that plaintiff would not sign the Release as written. Sires requested modifications to the Release. Johns responded by threatening to go federal court and "tie up the money for two to three years" if plaintiff did not sign the Release as drafted. Further, Johns told Sires that if plaintiff pursued legal action against American National, the trust fund would provide funds to pay for defendants' legal fees. He stated that "the entire Trust could be used up paying both side's legal fees" and, thus, there would be no money for plaintiff. Plaintiff signed the Release and the trust accounts were transferred to the Bank of America in Pasadena, California.

On February 14, 1995, plaintiff filed this lawsuit against American National and Johns. Plaintiff's complaint consists of three counts. Count I alleges breach of contract, Count II alleges breach of fiduciary duty, and Count III alleges intentional infliction of emotional distress. Defendants have moved this court to dismiss plaintiff's complaint. The court will address defendants' arguments individually.

*ANALYSIS*

In ruling on a motion for dismissal, the court must presume all of the well-pleaded allegations of the complaint to be true. *Miree v. DeKalb County,* 433 U.S. 25, 27 n.2, 97 S. Ct. 2490, 2492 n.2 (1977). In addition, the court must view those allegations in the light most favorable to the plaintiff. *Gomez v. Illinois State Bd. of Educ.,* 811 F.2d 1030, 1039 (7th Cir. 1987). Dismissal is proper only if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S. Ct. 99, 102 (1957).

*I. The Alleged Release*

**\*3** Defendants initially contend that the Release plaintiff signed bars plaintiff from pursuing any claims against the defendants. As a preliminary matter, this court notes that plaintiff did not attach a copy of the Release to his complaint; however, defendants attached it to their motion to dismiss. Thus, the question is whether this court can consider the Release when ruling on the motion to dismiss or whether the court, pursuant to Rule 12(b)(6),[FN1] must convert this motion into a motion for summary judgment.

The United States Supreme Court has long held that the conversion provision of Rule 12(b)(6) from a motion to dismiss to a summary judgment motion is mandatory when a federal court considers matters outside of the complaint. *See, e.g., Carter v. Stanton,* 405 U.S. 669, 671 (1972) (per curiam). The Seventh Circuit has established a narrow exception to the "four corners of the complaint" doctrine regarding Rule 12(b)(6) motions. In *Venture Assocs. Corp. v. Zenith Data Sys. Corp.,* 987 F.2d 429 (7th Cir. 1993), the Seventh Circuit determined that district courts may in limited circumstances examine documents that the plaintiff failed to attach to the complaint and the defendant attached to his motion to dismiss. *Id.* at 431. The Seventh Circuit explained that a "plaintiff is under no obligation to attach to her complaint documents upon which her action is based, but a defendant may introduce certain documents if the plaintiff failed to do so." *Id.* at 431. Accordingly, the Seventh Circuit held that "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 3
Not Reported in F.Supp., 1996 WL 99424 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

they are referred to in the plaintiff's complaint and are central to her claim." *Id.* ; *see Wright v. Associated Ins. Co., Inc.*, 29 F.3d 1244 (7th Cir. 1994) (affirming district court's considering an agreement which was not contained or incorporated into the complaint because the document was central to the plaintiff's claims and the plaintiff referred to the document in the complaint).

The Release attached to defendants' Motion to Dismiss satisfies the test set out by *Venture Associates.* Plaintiff referred to the Release in several places in the complaint. Additionally, the Release is clearly central to plaintiff's allegations in that a determination of the Release's validity affects whether or not this action may proceed. Moreover, plaintiff does not challenge the court's consideration of the Release in this motion; rather, plaintiff asserts that it is void because he signed the Release while under duress. Thus, the court will consider the Release as part of the plaintiff's complaint and will not convert this motion into a motion for summary judgment.

Defendants argue that the court must enforce this Release because plaintiff admitted that he signed the Release and the Release is clear and explicit. Plaintiff admits that he signed the Release; however, he contends that the Release is void because he signed it under duress. Defendants' response is that there can be no duress both because defendants were simply pursuing a legal right and because plaintiff was represented by counsel when he signed the Release.

**\*4** It is well-settled that economic duress is a recognized affirmative defense to an action on a contract. *E.g.*, *Resolution Trust Corp. v. Ruggiero*, 977 F.2d 309, 313 (7th Cir. 1992); *Guenther v. Snap-On Tools Corp.*, 1995 WL 137061, at \*13-14 (N.D. Ill. 1995); *Eastern Steel Corp. v. Edward Gray Corp.*, 1993 WL 57541, at \*4 (N.D. Ill. 1993). Economic duress is present where one is induced by a wrongful act of another to make a contract under circumstances which deprive him of the exercise of free will. *Ruggiero*, 977 F.2d at 314. A contract executed under economic duress is voidable. *Id.* To sustain a claim for economic duress, a plaintiff must establish the following: (1) wrongful acts or threats by the defendant; (2) financial distress caused by the defendant's wrongful acts or threats; and (3) the absence of reasonable alternatives to the defendant's terms. *Eastern Steel*

*Corp.*, 1995 WL 57541, at \*4.

The wrongful acts sufficient to constitute duress include not only acts that are criminal, tortious, or violate a contractual duty, but also those that are wrongful in the moral sense. *Guenther*, 1995 WL 137061, at \*13 (citing *Fontaine v. Passalino*, 222 Ill. App. 3d 1018, 1029-30, 584 N.E.2d 933, 940-41 (2d Dist. 1991)). Mere annoyance, vexation, embarrassment, a difficult bargaining position, or the pressure of financial circumstances, however, is not enough to establish duress. *Id.* Rather, there must be some imposition, oppression, undue influence, or the taking of undue advantage of the business or financial stress or extreme necessities or weakness of another. *Id.* (citing *Ruggiero*, 977 F.2d at 313-314; *Butitta v. First Mortgage Corp.*, 218 Ill. App. 3d 12, 17-18, 578 N.E.2d 116, 120 (1st Dist.), *app. denied*, 142 Ill. 2d 652, 584 N.E.2d 127 (1991)).

Here, plaintiff has alleged sufficient facts to claim adequately that defendants have committed a wrongful act. First, defendants allegedly refused to disburse funds to plaintiff even though the defendants were aware that plaintiff was in desperate need of the money to pay for medical treatment for his wife who had been diagnosed with cancer. Secondly, defendants allegedly did not disburse the 5% of the trust principal that plaintiff requested in writing even though the trust agreement required that defendants disburse this money without question upon plaintiff's written request. According to plaintiff, defendants were informed that plaintiff needed this money to pay for his wife's burial costs and other overdue bills.

With regard to the Release itself, plaintiff alleges that defendants told plaintiff that plaintiff could not make changes to the Release before signing it. Plaintiff also alleges that defendants threatened plaintiff and thereby forced him to sign the Release as drafted.[FN2] These allegations sufficiently articulate a wrongful act or threat on the part of defendants.[FN3]

Defendants argue that the threat to go to court did not constitute a wrongful act because the defendants had a legal right to go to court if plaintiff did not approve the accounts. It, however, has long been the law in Illinois that a threat to pursue an action to which one is legally entitled may consti-

Westlaw.

Not Reported in F.Supp.                                                                          Page 4
Not Reported in F.Supp., 1996 WL 99424 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

tute duress if the undoubted effect of the threat was to un-
dermine the ability of another to refuse to execute an agree-
ment. *See Laemmar v. J. Walter Thompson Co.*, 435 F.2d
680, 682 (7th Cir. 1970) (citing *Rees v. Schmits*, 164 Ill.
App. 250 (3d Dist. 1916); *Pemberton v. Williams*, 87 Ill. 15
(1877); *Vermilion & Wilmington Coal Co.*, 79 Ill. 121
(1875)). In order for pursuit of a legal right to be a defense,
the threatened action must have been "made in the honest
belief that a good cause of action exists, and does not in-
volve some actual or threatened abuse of process." *Enslen v.
Village of Lombard*, 128 Ill. App. 3d 531, 533, 470 N.E.2d
1188, 1190 (2d Dist. 1984).

*5 Defendants cannot rely solely on the fact that they had
the legal right to pursue a judicial accounting; rather, the
threats must have been made in good faith. The allegations
of plaintiff's complaint support the inferences that defend-
ants' threats were made in bad faith and for the purpose of
preventing plaintiff from pursuing legal action against de-
fendants. Thus, drawing the inferences in plaintiff's favor, as
the court must in ruling on defendants' motion, the court
finds that plaintiff has alleged sufficient facts to find that de-
fendants committed a wrongful act.

The second requirement of economic duress is that the
plaintiff suffered financial distress which was caused by the
defendant's wrongful act. *Eastern Steel Corp.*, 1993 WL
57541, at *4. The following allegations from plaintiff's com-
plaint demonstrate that plaintiff suffered financial distress as
a result of defendants' actions. On January 4, 1993, plaintiff
requested in writing for defendants to disburse 5% of the
trust's principal to him as required by the trust
agreement.FN4 The trust agreement provides that defend-
ants must disburse such funds without question.FN5
Plaintiff informed defendants that the funds were needed to
pay for his wife's burial costs and for overdue bills.FN6 De-
fendants did not disburse the funds; rather, they insisted that
plaintiff sign the Release as drafted by them.FN7 Defend-
ants' refusal to disburse the money owed to plaintiff caused
plaintiff to suffer financial hardship and distress. Thus, for
the purposes of this motion, these allegations are sufficient
to satisfy the second requirement of economic duress.

The third, and final, requirement of economic duress that
the plaintiff must allege is that he had no reasonable altern-

atives to the defendant's terms. *Eastern Steel Corp.*, 1993
WL 57541, at *4. The allegations in plaintiff's complaint
also satisfy this requirement. First, plaintiff and his attorney
repeatedly attempted to negotiate for modifications to the
Release. Defendants refused to allow such modifications.
Second, defendants threatened that they would be forced to
go to federal court and "tie up the money for two to three
years" if plaintiff did not sign the Release as drafted.
Moreover, defendants warned that if plaintiff pursued legal
action against defendants, the trust funds would pay for de-
fendants' legal fees and "the entire trust could be used up
paying both side's legal fees." Moreover, paragraph 25 of
the complaint explicitly states that plaintiff "has no recourse
but to sign the Release." Plaintiff has sufficiently alleged
that he had no recourse but to sign the Release as drafted.

Defendants contend that plaintiff could not have been under
duress because he was represented by counsel. The issue of
duress is a factual inquiry which involves a consideration of
all of the circumstances surrounding a given transaction.
*Laemmar*, 435 F.2d at 682. Defendants have failed to
demonstrate that as a matter of law plaintiff cannot assert an
affirmative defense of economic duress solely because he
was represented by counsel. Therefore, the fact that plaintiff
was represented, by itself, does not bar the defense of eco-
nomic duress. Plaintiff's allegations, when taken as true as
they must be in a motion to dismiss, sufficiently set forth a
claim of economic duress regarding plaintiff's signing the
Release so as to allow this case to proceed.

*II. The Breach of Contract Claim*

*6 Defendants argue that Count I (plaintiff's breach of con-
tract claim) should be dismissed because it is based on the
same set of facts as Count II (plaintiff's breach of fiduciary
duty claim). Under the rules of alternative pleading, Count I
should not be dismissed simply because it is based on the
same set of facts as Count II's claim for breach of fiduciary
duty. In addition, there is no basis for defendants' contention
that a trust beneficiary does not have a claim against a trust-
ee for breach of contract.

This court will not dismiss plaintiff's breach of contract
claim simply because plaintiff has also alleged breach of fi-
duciary duty. Under Federal Rule of Civil Procedure 8(a), a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                    Page 5
Not Reported in F.Supp., 1996 WL 99424 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

complaint need only set out a "generalized statement of facts from which the defendant can craft a responsive pleading." *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund,* 25 F.3d 417, 421 (7th Cir. 1994). A complaint need not support a viable claim only under the particular legal theory alleged by the plaintiff. *Id.* Rather, it is the district court's duty to consider whether a plaintiff's allegations could provide relief under any legal theory. *Id.*

In the present case, plaintiff has alleged both breach of contract and breach of fiduciary duty. Both of these causes of action are based upon the same set of facts. Plaintiff's complaint is sufficiently pled to allow defendants to craft a responsive pleading to both claims. Further, the court finds that the allegations in plaintiff's complaint could possibly provide relief under either legal theory. Thus, the court will not dismiss plaintiff's complaint simply because he pled alternative legal theories based on the same set of facts.

### III. The Intentional Infliction of Emotional Distress Claim

Finally, the court finds that Count III of plaintiff's complaint has alleged sufficient facts to establish the necessary elements for a claim of intentional infliction of emotional distress. To sustain a Rule 12(b)(6) challenge to a cause of action for intentional infliction of emotional distress, a plaintiff must plead that: (1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended to inflict severe emotional distress, or knew that there was a high probability that his conduct would cause such distress; and (3) the defendant's conduct actually caused severe emotional distress. *McGrath v. Fahey,* 126 Ill. 2d 78, 86, 533 N.E.2d 806, 809 (1988); *Public Service Corp. v. Davis,* 66 Ill. 2d 85, 90, 360 N.E.2d 765, 767 (1976). Defendants argue that plaintiff has failed to allege sufficient facts to establish that defendants' conduct was extreme and outrageous and that plaintiff actually suffered severe emotional distress. The court disagrees.

First, the facts in the plaintiff's complaint, and the reasonable inference therefrom, are sufficient to establish that defendants' conduct was extreme and outrageous. Illinois courts have identified several factors which may be considered extreme and outrageous. *See Kolegas v. Heftel Broadcasting Corp.,* 154 Ill. 2d 1, 21, 607 N.E.2d 201, 211

(1992). First, the court should consider whether the nature of the conduct itself was so extreme and outrageous as to go beyond all possible bounds of decency. *E.g., Public Service Corp.,* 66 Ill. 2d at 89, 360 N.E.2d at 767. Next, the court should consider whether there were other factors which aggravated the nature of the conduct so that it could be considered extreme and outrageous when the conduct otherwise would not be. *See Kolegas,* 154 Ill. 2d at 21, 607 N.E.2d at 211. Two such factors are (1) whether the defendant abused some position of power that the defendant had over the plaintiff or (2) whether the defendant knew of the plaintiff's peculiar susceptibility to emotional distress. *Id.* at 22, 607 N.E.2d at 212. In the case at bar, plaintiff's complaint is sufficient to allege that defendants' conduct was extreme and outrageous because defendant abused a position of power over plaintiff and because defendants were aware of plaintiff's peculiar susceptibility to emotional distress.

*7 Extreme and outrageous conduct may arise from an abuse of a position or relation with another that gives the actor actual or apparent authority over the other or power to affect his interest. *E.g., Davis,* 66 Ill. 2d at 90, 360 N.E.2d at 767. Conduct that otherwise amounts to no more than insults or indignities, however, will not be deemed to be extreme and outrageous simply by virtue of some special relationship which exists between the parties. *Gibson v. Chemical Card Servs., Corp.,* 157 Ill. App. 3d 211, 221, 510 N.E.2d 37, 43 (1st Dist. 1987). Therefore, when abuse of position of power is the basis for the claim, abusive or coercive conduct is still necessary. *See id.* at 221, 510 N.E.2d at 43.

The following allegations show that defendants abused a position of power over plaintiff. As trustee of the trust fund, defendants had a substantial amount of control over plaintiff's pecuniary interest. Defendants repeatedly refused to disburse such funds even though required to do so by the agreement.[FN8] Moreover, defendants refused to disburse such funds even though they were aware that plaintiff needed the money to pay for his wife's medical treatment. [FN9] In addition, defendant Johns made a number of racial and derogatory remarks to plaintiff about his interracial marriage and his life-style. [FN10] Finally, as a result of plaintiff's attempt to negotiate modifications to the Release, defendant Johns threatened plaintiff that Johns would go to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                                    Page 6
Not Reported in F.Supp., 1996 WL 99424 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

federal court and "tie up the money for two to three years." FN11 Johns also informed plaintiff that if he chose to pursue legal action, the trust funds would pay for defendants' legal fees and that "the entire trust could be used up paying for both side's legal fees." FN12 Thus, viewing the facts alleged as true, defendants' abusive conduct coupled with the position of power that defendants exercised over plaintiff was sufficiently egregious to rise to the level of extreme and outrageous.

In addition to abusing a position of power over plaintiff, the allegations sufficiently show that defendants were aware of plaintiff's peculiar susceptibility to emotional distress due to plaintiff's wife's medical condition. Knowledge that another is peculiarly susceptible to emotional distress may make a person's conduct actionable when it otherwise would not be. E.g., McGrath, 126 Ill. 2d at 92-93, 533 N.E.2d at 812 (finding that the defendants' conduct was extreme and outrageous where defendant continued to harass the plaintiff even though defendant was aware that plaintiff was susceptible to heart problems, that plaintiff had suffered a severe heart attack, and that he had undergone open heart surgery).

In the case at bar, plaintiff allegedly informed defendants that he needed money from the trust funds because his wife had been diagnosed with cancer. Therefore, defendants were aware of plaintiff's emotional state due to his spouse's deadly disease. Defendants, however, continued to withhold the funds even though they were aware that plaintiff's wife had cancer and that plaintiff would not be able to pay for the medical treatment because he was homeless. Finally, defendants continued to threaten and harass plaintiff even after his wife died due to lack of medical treatment. Thus, defendants' knowledge of plaintiff's fragile emotional state coupled with defendants' continuous abusive and harassing conduct was sufficiently egregious to rise to a level of extreme and outrageous.

**\*8** The second requirement of emotional distress is that the defendant either must have intended to inflict severe emotional distress or must have known that there was a high probability that his conduct would cause such distress. McGrath, 126 Ill. 2d at 86, 533 N.E.2d at 809. Defendants do not argue that plaintiff has failed to meet this requirement. Defendants do argue, however, that plaintiff has not estab-

lished the third requirement, which is that the plaintiff suffered severe emotional distress as a result of the defendants' conduct.

Plaintiff's complaint sufficiently establishes that plaintiff suffered severe emotional distress as a result of the defendants' conduct. Infliction of emotional distress alone is not enough; rather, the distress must be severe. Davis, 66 Ill. 2d at 90, 360 N.E.2d at 767. In fact the law intervenes only where the distress inflicted is so severe that no reasonable person could be expected to endure it. Id. However, while severe emotional distress must be proved, in many cases the outrageous character of the defendant's conduct is itself evidence that the distress existed. Kolegas, 154 Ill. 2d at 25, 607 N.E.2d at 213; Wall v. Pecaro, 204 Ill. App. 3d 362, 368, 561 N.E.2d 1084, 1088 (1st Dist. 1990), cert. denied, 136 Ill. 2d 355, 567 N.E.2d 343 (1991).

In this case, plaintiff has sufficiently alleged that he suffered severe emotional distress and has also alleged facts sufficient to show defendants' extreme and outrageous behavior resulted in severe emotional distress. See Kolegas, 154 Ill. 2d at 25, 607 N.E.2d at 213 (holding that although plaintiffs did not allege any facts as to the extent of their emotional distress, the facts that they alleged in support of the outrageous conduct were sufficient to support the additional allegation that the plaintiffs' suffered severe emotional distress as a result of the conduct); Wall, 204 Ill. App. 3d 362 at 368-69, 561 N.E.2d at 1088 (finding that defendant's conduct was "in itself evidence that [the plaintiff] suffered severe emotional distress").

### IV. Subject Matter Jurisdiction

Pursuant to 28 U.S.C. § 1332, the district court has original jurisdiction in civil actions where the amount in controversy exceeds $50,000, exclusive of interest and costs, and the action is between citizens of different states. A corporation is deemed a citizen "of any State by which it has been incorporated and the State where it has its principal place of business." 28 U.S.C. § 1332(c)(1). Because "jurisdiction cannot be based on surmise or guesswork," a plaintiff must allege both sources of a corporation's citizenship. Salzstein v. Bekins Van Lines, Inc., 747 F. Supp. 1281, 1282-83 (N.D. Ill. 1990).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                 Page 7
Not Reported in F.Supp., 1996 WL 99424 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

In this case, plaintiff, a California citizen, has alleged that American National was incorporated in Illinois. Plaintiff, however, has not stated American National's principal place of business and, therefore, has not provided the requisite complete picture of its citizenship. Therefore, plaintiff has failed to properly allege diversity jurisdiction.

**\*9** Plaintiff will be allowed two weeks to file an amended complaint that properly alleges subject matter jurisdiction. If plaintiff fails to properly plead jurisdiction in his amended complaint, plaintiff's complaint will be dismissed *sua sponte.*

### CONCLUSION

For these reasons, defendants' motion to dismiss is DENIED. Plaintiff has until March 15, 1996 to file an amended complaint properly alleging diversity jurisdiction. Defendants have until March 29, 1996 to answer. Parties are strongly urged to discuss the settlement of this case and to report on the status thereof on April 3, 1996 at 10:00 a.m.

FN1. Rule 12(b) states in pertinent part:
If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

FN2. Specifically, plaintiff alleges that defendants told plaintiff that if he did not sign the Release as drafted, defendants would go to federal court and "tie up the money for two to three years." Plaintiff also alleges that defendants further warned plaintiff that if he chose to pursue legal action against defendants, "the entire Trust could be used up paying both side's legal fees." *Plaintiff's Complaint,* ¶ 24.

FN3. This court recognizes the general rule that a plaintiff cannot show duress merely by demonstrating that he was in a difficult bargaining position or

under financial pressure. *Ruggiero,* 977 F.3d at 313; *Guenther, 1995 WL 137061, at \*14.* However, an exception to this rule arises in cases where "the defendant is responsible for putting the plaintiff into that desperate situation by some measure of ... wrongdoing." *Guenther, 1995 WL 137061, at \*14.*

In the present case, defendants did not originally create plaintiff's desperate financial position. However, once plaintiff inherited the trust fund, defendants had an obligation to disburse the funds as dictated by the agreement. Plaintiff alleges that defendants failed to do this. Their alleged failure resulted in plaintiff's desperate need for the money that was legally his; thus, defendants wrongful withholding of the funds put plaintiff in his desperate financial position.

FN4. *Plaintiff's Complaint,* ¶ 20.

FN5. *Plaintiff's Complaint,* Exhibit A.

FN6. *Plaintiff's Complaint,* ¶ 20.

FN7. *Plaintiff's Complaint,* ¶ 24.

FN8. *Plaintiff's Complaint,* ¶¶ 11, 13, 14.

FN9. *Plaintiff's Complaint,* ¶ 14.

FN10. *Plaintiff's Complaint,* ¶ 12.

FN11. *Plaintiff's Complaint,* ¶ 24.

FN12. *Plaintiff's Complaint,* ¶ 24.
N.D.Ill.,1996.
Ficke v. Johns
Not Reported in F.Supp., 1996 WL 99424 (N.D.Ill.)

Briefs and Other Related Documents (Back to top)

• 1:95CV00939 (Docket) (Feb. 14, 1995)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.