17

LEXSEE 2006 U.S. DIST. LEXIS 39030

**In re GLOBAL CROSSING, LTD. SECURITIES LITIGATION**

**02 Civ. 910 (GEL)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2006 U.S. Dist. LEXIS 39030*

**June 13, 2006, Decided**
**June 13, 2006, Filed**

**PRIOR HISTORY:** *In re Global Crossing, Ltd. Sec. Litig., 2005 U.S. Dist. LEXIS 26942 (S.D.N.Y., Nov. 4, 2005)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff investors filed a class action lawsuit, alleging violations of federal securities laws based on claimed accounting improprieties and other fraud at a certain company and its affiliate, which was a wholly-owned subsidiary of a joint venture among defendant companies. The court previously dismissed the investors' claims against two companies. The investors moved to file an amended class complaint. The companies contested the motion.

**OVERVIEW:** The companies each appointed one of the affiliate's directors, invested in it, and committed to purchase $100 million in telecommunications capacity from it over a three-year period. The court denied the amendment as to the investors' respondeat superior claims, finding that a partial settlement that fully released these companies' board designees was necessarily a release of the companies. However, the court otherwise granted leave to amend. The court found that the investors adequately pleaded the loss causation for their false statements and control person liability claims as they averred reliance on the companies' misrepresentations that they had contracted to purchase $200 million in capacity from the affiliate, which caused progressive declines in the affiliate's stock value. Whether or not there were secret agreements in this respect could not be determined at this stage of the case. The court also found that the investors adequately alleged attribution, scienter, culpable participation, and control to state these securities fraud claims. Additionally, the court rejected the companies' argument that these claims were time-barred until further development of the record.

**OUTCOME:** The court denied the investors' motion to amend the complaint with respect to the investors' respondeat superior claims, but the court granted the investors' motion to amend the complaint in all other respects.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > General Overview*
[HN1] Objections to proposed amendments to a complaint as legally inadequate are reviewed similarly to a motion to dismiss for failure state a claim under *Fed. R. Civ. P. 12(b)(6)*. When reviewing a 12(b)(6) motion to dismiss, a court must accept as true the facts alleged in the complaint, and may grant the motion only if it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. A court may consider any written instrument attached to a complaint as an exhibit, any statements or documents incorporated in it by reference, and any document not incorporated but that is, nevertheless, "integral" to the complaint because the complaint relies heavily upon its terms and effect. A court may also take judicial notice of matters of public record, including the contents of documents required to be filed with the SEC. All reasonable inferences are to be drawn in plaintiff's favor.

*Business & Corporate Law > Agency Relationships > Terminations > General Overview*
[HN2] Settlement with an employee extinguishes the liability of an employer where the employer's liability is based on respondeat superior. This rule has been held to apply even where claims against the employer are expressly reserved in a settlement agreement.

*Securities Law > Liability > Private Securities Litigation > General Overview*

[HN3] Under the Private Securities Litigation Reform Act of 1995, in certain circumstances, settlement with an employee, no matter the amount of the settlement, reduces any subsequent judgment against non-settling defendants by the amount corresponding to the share of responsibility of the employee, and thus also of the employer. *15 U.S.C.S. § 78u–4(f)(7)(B)*. Because the employee's share of responsibility is wiped out, there is no responsibility remaining to be assigned to the employer, and the employer's release is not only warranted as a policy matter, but demanded as "logically required."

*Business & Corporate Law > Agency Relationships > Causes of Action & Remedies > General Overview*
[HN4] Doctrines of agency and respondeat superior are common law doctrines used to establish vicarious liability under both common law and statutory causes of action. As such, common law principles apply to the liability of a principal regardless of the underlying substantive basis of legal liability of the agent.

*Civil Procedure > Settlements > Settlement Agreements > General Overview*
[HN5] A settlement payment, made when the law was uncertain, cannot be successfully attacked on the basis of any subsequent resolution of the uncertainty. Uncertainty of a legal position and the desire to avoid the risk of a lawsuit are the impetus for many out-of-court settlements. It simply is inappropriate to equate these settlement agreements with agreements premised upon the misapplication of settled legal principles.

*Civil Procedure > Justiciability > Standing > General Overview*
*Civil Procedure > Settlements > Settlement Agreements > Effects*
*Constitutional Law > The Judiciary > Case or Controversy > Standing > General Overview*
[HN6] Generally, non-settling defendants lack standing to object to a partial settlement, because their rights are usually not affected by the settlement, and non-settling defendants have standing only where they can demonstrate formal legal prejudice as a result of the settlement.

*Securities Law > Liability > Secondary Liability > Controlling Persons > General Overview*
*Securities Law > Liability > Secondary Liability > Controlling Persons > Defenses*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Causation*
[HN7] Plaintiffs must plead and prove loss causation— that defendants' alleged misconduct caused the economic harm suffered by plaintiffs—to make out claims under *15*

*U.S.C.S. § 78j(b)*, and *15 U.S.C.S. § 78t*, and that lack of loss causation is an affirmative defense.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof > Scienter > General Overview*
[HN8] A *15 U.S.C.S. § 78j(b)* claim requires that plaintiff plead the element of scienter, defined as a mental state embracing intent to deceive, manipulate, or defraud.

*Securities Law > Liability > Secondary Liability > Controlling Persons > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Heightened Pleading Requirements*
[HN9] Similar to the scienter requirement of *15 U.S.C.S. § 78j(b)*, *15 U.S.C.S. § 78t* requires that plaintiffs plead with particularity facts giving rise to a strong inference that the controlling person knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
[HN10] Where *Fed. R. Civ. P. 8(a)*'s pleading standard governs, dismissal is improper as long as the compliant furnishes adequate notice of the basis of plaintiff's claim and relief could be granted under some set of facts consistent with the allegations.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Relation Back*
[HN11] See *Fed. R. Civ. P. 15(c)(2)*.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Relation Back*
[HN12] Under *Fed. R. Civ. P. 15(c)*, the central inquiry is whether adequate notice of the matters raised in an amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading.

*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Time Limitations*
[HN13] The applicable statute of limitations for securities fraud claims is one year after the discovery of the untrue statement or omission, or after such discovery should have been made by the exercise of reasonable diligence. *15 U.S.C.S. § 77m*.

*Securities Law > Liability > Securities Exchange Act of*

2006 U.S. Dist. LEXIS 39030, *

*1934 Actions > Implied Private Rights of Action > Time Limitations*

[HN14] The one-year limitations period begins to run after plaintiff obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge. When the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises. The circumstances that give rise to a duty of inquiry are often referred to as "storm warnings." Once a plaintiff receives these "storm warnings" and a duty of inquiry arises, knowledge will be imputed to the investor who does not make such an inquiry. Whether the securities fraud claim of a person who receives "storm warnings" is time barred turns on when, after obtaining inquiry notice, plaintiff in the exercise of reasonable diligence, should have discovered the facts underlying defendant's alleged fraud.

*Civil Procedure > Summary Judgment > General Overview*
*Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Time Limitations*

[HN15] Issues of due diligence and constructive knowledge depend on inferences drawn from the facts of each particular case—similar to the type of inferences which must be drawn in determining intent and good faith, and when conflicting inferences can be drawn from the facts, summary judgment is inappropriate.

**COUNSEL:** [*1] Grant & Eisenhofer, P.A., Wilmington, DE (Jay W. Eisenhofer, Sidney S. Liebesman, Michael J. Barry, Michelle T. Wirtner, Sharan Nirmul), for Lead Plaintiffs Public Employees Retirement System of Ohio and State Teachers Retirement System of Ohio.

Sidley Austin Brown & Wood LLP, New York, NY & Chicago, IL (Daniel A. McLaughlin, Charles W. Douglas, David F. Graham, James W. Ducayet), for Defendant Microsoft Corporation.

Sullivan & Cromwell LLP, New York, NY & Los Angeles, CA (Robert A. Sacks, Bradley A. Harsch, Stephen J. Shin), for Defendant Softbank Corporation.

**JUDGES:** GERARD R. LYNCH, United States District Judge.

**OPINIONBY:** GERARD E. LYNCH

**OPINION:**

**OPINION AND ORDER**

GERARD E. LYNCH, District Judge:

In yet another chapter of this litigation concerning alleged accounting improprieties and other fraud at Global Crossing, Ltd. ("GC") and its affiliate Asia Global Crossing Ltd. ("AGC"), Lead Plaintiffs seek to amend the Second Amended Consolidated Class Action Complaint ("Complaint" or "Second Amended Complaint") as to defendants Microsoft Corporation and Softbank Corporation, contending that newly discovered information (further) shows the companies' involvement in the fraud [*2] at AGC. Defendants oppose the proposed amendments, contending that they are futile, and specifically that they fail to address the deficiencies that led this Court to previously dismiss all claims against Microsoft and Softbank. See *In re Global Crossing Ltd. Secs. Litig. (Microsoft/Softbank Ruling), 2005 U.S. Dist. LEXIS 16232, No. 02 Civ. 910, 2005 WL 1907005 (S.D.N.Y. Aug. 8, 2005)*. For the following reasons, plaintiffs' motion to amend the complaint will be granted in part and denied in part. n1

> n1 Plaintiffs also moved to amend the Complaint as to defendants Canadian Imperial Bank of Commerce ("CIBC") and CIBC World Markets Corp. See *In re Global Crossing Ltd. Secs. Litig. (CIBC Ruling), 2005 U.S. Dist. LEXIS 26942, 02 Civ. 910, 2005 WL 2990646 (S.D.N.Y. Nov. 7, 2005)*. However, the Court has been informed that Lead Plaintiffs and the CIBC defendants have reached a settlement in principle resolving all potential claims against these defendants. The portion of plaintiffs' motion that applies to the CIBC defendants is therefore deemed withdrawn, without prejudice to its reinstatement if the settlement is ultimately not consummated.

[*3]

**BACKGROUND**

The allegations of fraud at GC and AGC are described in detail in the Court's prior opinions and need not be repeated here. See, e.g., *Microsoft/Softbank Ruling, 2005 U.S. Dist. LEXIS 16232, 2005 WL 1907005; In re Global Crossing Ltd. Secs. Litig. (Andersen Ruling), 322 F. Supp. 2d 319 (S.D.N.Y. 2004); In re Global Crossing Ltd. Secs. Litig. (GC Underwriters Ruling), 313 F. Supp. 2d 189 (S.D.N.Y. 2003)*. Facts particular to the claims against Microsoft and Softbank are set forth below, taken primarily from allegations in the complaint, and are accepted as true for the purposes of this motion. See *Bolt Elec., Inc. v. City of New York, 53 F.3d 465, 469 (2d Cir. 1995)*.

On September 24, 1999, AGC was formed as a hold-

ing company for GC's Asian operations, and two months later, on November 24, it became a wholly-owned subsidiary of a joint venture among GC, Microsoft, and Softbank. (Id. P200.) As part of this deal, GC, Microsoft, and Softbank entered into a Shareholder Agreement that gave each company the right to appoint one of AGC's directors. (Id. P205.) Microsoft and Softbank in turn invested $175 million and [*4] committed to purchase $100 million in telecommunications capacity from AGC over a three-year period. (Id. P206.) Following AGC's October 2000 IPO, Microsoft and Softbank each became owners of 15.8% of AGC's common stock. (Id. P207.)

Pursuant to the Shareholder Agreement, in November 1999, Softbank designated Eric Hippeau, President and Executive Managing Director of Softbank International Ventures (as well as a member of the GC board of directors from September 1999 to November 2001) to serve on the AGC board of directors, which he did until November 2001 (Compl. P53); in April 2000, Microsoft designated Thomas U. Koll, Vice President of Network Solutions at Microsoft, to serve on the board (id. P67); and in February 2001, Microsoft appointed Peter Knook, also a Microsoft Vice President, to take Koll's place (id. P59). During the relevant period, AGC's board was comprised of twelve directors. *Microsoft/Softbank Ruling, 2005 U.S. Dist. LEXIS 16232, 2005 WL 1907005, at *13.*

Prior to the current proposed amendment to the Complaint, plaintiffs' theory of Microsoft's and Softbank's liability was not that these companies committed any fraudulent acts themselves, but rather that they [*5] are liable for the fraudulent actions of their board designees, and of AGC itself, under the agency principle of respondeat superior, and as "controlling entities" under certain federal securities statutes. The underlying liability of the board designees and AGC related to alleged accounting improprieties concerning sales and exchanges of bandwidth by AGC. This Court dismissed claims based on these theories, holding that plaintiffs failed to allege facts from which it could be inferred that either Microsoft or Softbank controlled their respective board designees or AGC itself, and thus failed to properly allege either agency or control-person status. See *id. 2005 U.S. Dist. LEXIS 16232, [WL] at *9-*11, *13-*14.* The Court's rulings were grounded in the view that minority shareholder status and the power to appoint a director (even where a high-level employee is appointed who has the power to veto certain extraordinary corporate actions under the governing shareholder agreement) are insufficient to plead control, absent "concrete factual allegations" as to how control was actually exercised over the director or alleged fraudulent enterprise. The Court emphasized that "when acting as directors of AGC, Koll, Knook, [*6] and Hippeau had fiduciary duties to act on behalf of the

shareholders of AGC itself, not on behalf of the entities that appointed them. Thus, when they acted as directors of AGC, they were not acting within the scope of their employment with Microsoft and Softbank." *Id. 2005 U.S. Dist. LEXIS 16232, [WL] at *3.* In a subsequent ruling addressing similar allegations as to the CIBC defendants, see supra note 1, the Court reaffirmed its ruling on agency liability, noting specifically the misfit between common-law agency principles and the federal securities laws, see *CIBC Ruling, 2005 U.S. Dist. LEXIS 26942, 2005 WL 2990646, at *6.* However, the Court retreated on the issue of control-person liability, because an intervening Second Circuit decision clarifying the burden of pleading imposed by *Fed. R. Civ. P. 8(a)* precluded dismissal. *Id. 2005 U.S. Dist. LEXIS 26942, [WL] at *8.*

Plaintiffs did not move the Court to reconsider its prior holding as to Microsoft and Softbank in light of the CIBC Ruling, but instead moved forward on an already-pending motion to amend the Complaint on the basis of new information obtained in course of further investigation into the affairs of GC and AGC. The fruits of that investigation [*7] are contained in what is denominated the Proposed Third Amended Consolidated Class Action Complaint ("TAC"). In a nutshell, the proposed amendments in the TAC concern a publicized purported agreement among Microsoft, Softbank, and AGC in connection with the AGC IPO, whereby Microsoft and Softbank each agreed to purchase $100 million of bandwidth on the not-yet completed AGC network (the "November 24, 1999, Capacity Commitment Agreement" or "CCA"). (TAC P1215; Liebesman Decl. Ex. 4.) Plaintiffs allege that neither Microsoft nor Softbank had any intention of honoring their obligations under the CCA (TAC PP1206-1209, 1220-23, 1257-69), and that directly and through their agents on AGC's board, they negotiated under the table to avoid those obligations, keeping the negotiations secret in order to maintain the attractiveness of AGC stock to potential investors. (Pl. Mem. 12-16; TAC PP1206-08, 1210, 1224, 1243, 1246, 1248, 1252-54, 1257-69, 1278-80.)

Based on these actions, plaintiffs allege that Microsoft and Softbank intentionally led AGC investors to believe that their investments were backed by a guaranteed $200 million revenue stream for AGC. This revenue stream was important because [*8] AGC had reported only $130 million in sales for the nine months preceding its IPO. (TAC P1206.) Plaintiffs allege that Softbank ultimately "purchased only $14.5 million of the $100 million in capacity that Asia Global Crossing and Softbank had touted to Asia Global Crossing investors" (id. P1225), that Microsoft purchased only $20 million of the $100 million in capacity it had pledged to buy (id. P1269), and that the crash of AGC's stock during 2001 and 2002 is directly

"attributable to Microsoft and Softbank's failure to pro-
vide the promised revenue stream." (E.g., id. P1306.) On
the strength of these new allegations, plaintiffs propose to
add the following claims for relief against Microsoft and
Softbank:

> Claims under Section 10(b) (*15 U.S.C. §
> 78j(b)*), based on false statements and the
> alleged scheme relating to the CCA (Counts
> XXXVII to XL; TAC PP1601-1648);

> Respondeat superior claims under *Section
> 10(b)*, *Rule 10b-5*, and *Section 11* (*15 U.S.C.
> § 77k*) based on the primary violations of
> these statutes by Hippeau (Softbank) and
> Koll (Microsoft) (Counts XLI, XLII, XLVII,
> XLVIII; TAC PP1649-1668, 1697-1708);
> [*9] and

> Control-person claims under Section 20(a)
> (*15 U.S.C. § 78t*) and Section 15 (*15 U.S.C.
> § 77o*) based on primary violations of *Section
> 10(b)* and *Section 11* by Hippeau, Koll, and
> AGC itself (Counts XLIII to XLVI; TAC
> PP1669-1696).

## DISCUSSION

Microsoft and Softbank vigorously object to plain-
tiffs' proposed amendments to the complaint, primarily
on the ground that they are "futile," that is, that the pro-
posed additional claims are still legally inadequate. n2
*Ellis v. Chao, 336 F.3d 114, 127 (2d Cir. 2003)*. [HN1]
Such objections are reviewed similarly to a motion to dis-
miss for failure state a claim under *Fed. R. Civ. P. 12(b)(6)*.
See, e.g., *Aetna Casualty & Surety Co. v. Aniero Concrete
Co., Inc., 404 F.3d 566, 604 (2005)*. When reviewing a
12(b)(6) motion to dismiss, the Court must accept "as true
the facts alleged in the complaint," *Jackson Nat'l Life Ins.
Co. v. Merrill, Lynch & Co., 32 F.3d 697, 699-700 (2d
Cir. 1994)*, and may grant the motion only if "it appears
beyond doubt that the plaintiff can prove no set of facts
in support of his [*10] claim which would entitle him to
relief." *Thomas v. City of New York, 143 F.3d 31, 36 (2d
Cir. 1998)* (citations omitted). The Court may consider
"'any written instrument attached to [the complaint] as
an exhibit,' 'any statements or documents incorporated in
it by reference,' and any document not incorporated but
that is, nevertheless, 'integral' to the complaint because
the complaint 'relies heavily upon its terms and effect.'"
*Yung v. Lee, 432 F.3d 142, 147 (2d Cir. 2005)*, quoting
*Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53
(2d Cir. 2002)*. The Court may also take judicial notice of
matters of public record, including the contents of docu-
ments required to be filed with the SEC. *Kramer v. Time-*

*Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991)*. All rea-
sonable inferences are to be drawn in the plaintiff's favor.
See *In re Indep. Energy Holdings PLC, 154 F. Supp. 2d
741, 747 (S.D.N.Y. 2001)*.

> n2 Defendants also argue that the Court should
> deny leave to amend without regard to the merit of
> the proposed amended claims, based on statements
> in certain cases to the effect that liberally allowing
> amendment may be inappropriate in the securities
> fraud context. See, e.g., *In re Merrill Lynch & Co.,
> Inc. Research Reports Sec. Litig., 273 F. Supp. 2d
> 351, 393 (S.D.N.Y. 2003)*. It is enough to say that the
> Court is not convinced that a "heightened" standard
> for amendment should apply in this case, and that if
> the proposed amended claims have merit, the Court
> is prepared to entertain them. See *Foman v. Davis,
> 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222
> (1962)* ("If the underlying facts or circumstances
> relied upon by the plaintiff may be a proper subject
> of relief, he ought to be afforded an opportunity to
> test his claim on the merits.").

[*11]

## I. Plaintiff's Respondeat Superior Claims

Microsoft and Softbank argue that the respondeat su-
perior claims fail because of a partial settlement that fully
releases the Microsoft and Softbank board designees, Koll
and Hippeau, from liability. The theory is that because
Microsoft's and Softbank's liability on the respondeat su-
perior claims is entirely derivative of Koll and Hippeau,
n3 the release of these employees is necessarily a release
of their employers. (Microsoft Mem. 17-19; Softbank
Mem. 20-21.) This is so, it is argued, despite language in
the settlement agreement that expressly reserves all rights
against non-settling defendants including Microsoft and
Softbank. March 19, 2004, Stip. of Stlmt. P1.E.nnnnnnnn.
The Court agrees, and will deny leave to amend as to the
respondeat superior claims.

> n3 The TAC does not implicate Koll's successor
> on the AGC board, Peter Knook, in the respondeat
> superior or control claims.

The parties point to no federal statute or federal com-
mon-law ruling addressing [*12] this issue, and the Court
has found none. However, Microsoft and Softbank note
that the majority state common-law rule, n4 and the rule
adopted by the most recent Restatement, n5 is that [HN2]
settlement with an employee extinguishes the liability of
the employer where the employer's liability is based on

respondeat superior. This rule has been held to apply even where claims against the employer are expressly reserved in the settlement agreement. n6 The primary (though not only) rationale for Restatement rule is that where an employer is "liable solely on the basis of [an employee's] tortious conduct," such as in the case of a respondeat superior claim, "there is no direct responsibility to assign to the party to whom liability is imputed," that is, the employer. *Restatement § 7 cmt. j.* Instead, the employee and employer "are treated as a single unit for the assignment of responsibility" among the alleged tortfeasors, id., with the employee's share of responsibility constituting the entire share of both the employee and employer.

> n4 See 2A C.J.S. Agency § 436; 10 William Meade Fletcher, Fletcher Cyclopedia of Private Corporations § 4898; *Williams v. Vandeberg, 2000 SD 155, 620 N.W.2d 187, 189 (S.D. 2000); Horejsi v. Anderson, 353 N.W.2d 316, 317 (N.D. 1984); Dickey v. Meier's Estate, 188 Neb. 420, 197 N.W.2d 385, 388 (Neb. 1972)*

[*13]

> n5 See *Restatement (Third) of Torts: Apportionment of Liability §§ 7 cmt. j, 16 cmt. d &* Reporter's Note cmt. d (2000).

> n6 See Fletcher, supra, § 4898; see also, e.g., *Williams, 620 N.W.2d at 189–91; Biddle v. Sartori Mem. Hosp., 518 N.W.2d 795, 798 (Iowa 1994); Theophelis v. Lansing Gen. Hosp., 430 Mich. 473, 424 N.W.2d 478, 480 (Mich. 1988)* (plurality opinion); *Dickey, 197 N.W.2d at 388; Bacon v. United States, 321 F.2d 880, 884 (8th Cir. 1963)* (interpreting Missouri law).

This rationale takes on additional significance in the context of federal securities law: [HN3] Under the PSLRA, in certain circumstances (including this one), settlement with the employee, no matter the amount of the settlement, reduces any subsequent judgment against the non-settling defendants by the amount corresponding to the share of responsibility of the employee, and thus also of the employer. See *15 U.S.C. § 78u–4(f)(7)(B).* Because the employee's share [*14] of responsibility is wiped out, "there is no responsibility remaining to be assigned" to the employer, and the Restatement posits that the employer's release is not only warranted as a policy matter, but demanded as "logically required." Id. *§ 16* Reporter's Note cmt. d.

None of plaintiffs' arguments undermine defendants' claim that this rule is "logically required," as the

Restatement posits, or suggests that application of the rule would be undesirable as a policy matter. The arguments that plaintiffs *do* make are unsound even on their own terms.

Plaintiffs first argue, without explanation or authority, that "state common law, non-securities cases from other jurisdictions involving a principal's right to recover for the torts of its released agent . . . simply do[] not apply to securities class action lawsuits." (Softbank Reply 14.) However, as Microsoft correctly points out, that plaintiffs' claims happen to arise under the federal securities laws, and are part of a class action, is irrelevant:[HN4] "[D]octrines of agency and respondeat superior are common law doctrines used to establish vicarious liability under both common law and statutory causes of action. As such, [*15] the common law principles . . . apply to the liability of a principal regardless of the underlying substantive basis of legal liability of the agent." (Microsoft Mem. 18.) As for the reference to "state" common law, there does not appear to be any relevant federal statutory or common–law authority on point, and for this reason the Court must by necessity refer to state common–law rulings as persuasive authority in analyzing the respondeat superior issue. Ultimately, this argument is nothing but a subtle attempt by plaintiffs to take the sweet without the bitter, to import common-law principles like respondeat superior into the federal securities context (which the Court previously expressed hesitation about doing, see *Microsoft/Softbank Ruling, 2005 U.S. Dist. LEXIS 16232, 2005 WL 1907005, at *3; CIBC Ruling, 2005 U.S. Dist. LEXIS 26942, 2005 WL 2990646, at *5–*6)*, while at the same time demanding that traditional limitations on those doctrines be ignored. Such selective adoption of common law principles cannot be justified.

Second, plaintiffs appear to suggest that adopting the Restatement rule in this context, and denying leave to amend as to the respondeat superior claims, would constitute judicial "rewriting" [*16] of the settlement agreement. (Softbank Reply 14.) That argument is without merit. Judicial resolution of uncertain legal issues regarding the effect of a settlement agreement does not rewrite the parties' agreement. Plaintiffs respond that even if that is so, nullification of the purported "reservation" of claims against Microsoft and Softbank in the settlement agreement warrants rescission of that agreement. (Microsoft Reply 11.) While a mistake of fact or law by the parties may under certain circumstances warrant rescission of a contract, see *Restatement (Second) of Contracts §§ 151–58,* that doctrine is inapplicable where, as here, there is no mistake, but rather subsequent resolution of an undetermined point of law. As the Second Circuit has pointed out, "[s]uccinctly put, [HN5] a settlement payment, made when the law was uncertain, cannot be suc-

cessfully attacked on the basis of any subsequent resolution of the uncertainty." *Anita Foundations, Inc. v. ILGWU Nat. Retirement Fund, 902 F.2d 185, 189 (2d Cir. 1990)* (quotation marks omitted) (noting also that "uncertainty of a legal position and the desire to avoid the risk of [*17] a lawsuit are the impetus for many out-of-court settlements. It simply is inappropriate to equate these settlement agreements with agreements premised upon the misapplication of settled legal principles").

Finally, there is some suggestion in plaintiffs' papers, though the argument is never made expressly, that the release defense advanced by Microsoft and Softbank should be deemed waived. (Softbank Reply 13; Microsoft Reply 10-11.) True enough, neither Microsoft nor Softbank raised this defense at any prior stage of this litigation, including in connection with their motion to dismiss the Second Amended Complaint. n7 This has forced the court to write twice, unnecessarily, on the application of respondeat superior in the federal securities law context, and has wasted tens if not hundreds of hours of the parties' time on briefing the issue.

> n7 While defendants claim that the settlement was ratified after briefing was complete on the prior motion to dismiss (Microsoft Mem. 17), they could easily have sought leave to file a sur-reply in order to bring this argument to the Court's attention, and such leave would certainly have been granted.

[*18]

Nevertheless, for the following reasons, the Court will exercise its discretion to address the merits of the defense. As an initial matter, plaintiffs suggest that defendants' failure to object to the settlement agreement at the time it was ratified by the Court waived the release defense. (Softbank Reply 13; Microsoft Reply 11.) However, it is not clear that defendants would have had standing to make such an objection at that time, especially for the sole purpose of obtaining an advance ruling as to what implications a particular provision in the settlement agreement had for them. See Joseph M. McLaughlin, McLaughlin on Class Actions, at 6-31 to 6-32 (2004) (noting [HN6] "[g]enerally, non-settling defendants lack standing to object to a partial settlement, because their rights are usually not affected by the settlement," and citing cases holding non-settling defendants have standing only where they can demonstrate formal legal prejudice as a result of the settlement). Moreover, the Court would likely not have resolved the issue at that stage of the proceedings in any event, see id. at 6-39; *Carson v. Am. Brands, Inc., 450 U.S. 79, 88 n.14, 101 S. Ct. 993, 67 L. Ed. 2d 59 (1981)* [*19] (noting court need not "decide the merits of the case or resolve unsettled legal questions" in determining litigation

risks for purpose of determining fairness of settlement). In any event, if anyone should be charged for not having raised issues concerning the legal import of the release provisions in the agreement at the time of ratification, it is the parties to the agreement, that is, the plaintiffs, not non-parties such as Microsoft and Softbank.

More relevant is defendants' failure to raise the release defense in the course of briefing their prior motion to dismiss the Second Amended Complaint. On this score, aside from pointing out in an off-hand matter that Softbank did not previously raise this defense (Softbank Reply 13), plaintiffs make no effort to advance any waiver argument against defendants based on the failure to raise the defense in the course of briefing that motion. For this reason, there is a real issue as to whether plaintiffs have "waived" the waiver argument. More importantly, while the Court acknowledges that time and resources have been wasted by the belated assertion of this defense, dismissal of an argument on the basis of waiver is disfavored where there [*20] is no attempt to show that the argument also lacks substantive merit. As previously discussed, while plaintiffs make a number of arguments, they do not address, let alone dispute, the merit of the Restatement rule. For this reason, the Court declines to deem the defense waived, and leave to amend the complaint as to the respondeat superior claims is denied.

However, the Court emphasizes that this defense is inapplicable to any claim in which Microsoft's and Softbank's alleged liability is not entirely derivative of Koll's and Hippeau's, but rather where the companies are alleged to be independently liable for harm caused to plaintiffs. That includes the statutory control-person claims under *Section 15* and *20(a)*, as Microsoft expressly concedes (Microsoft Mem. 18). See *Restatement § 7 cmt. j*. Those claims, if proved, provide a mechanism for plaintiffs to hold Microsoft and Softbank liable for the primary conduct of Koll and Hippeau.

## II. Section 10(b), 15, and 20(a) Claims

In addition to respondeat superior claims, plaintiffs assert *Section 10(b)* claims based on allegations of Microsoft's and Softbank's primary fraudulent conduct, n8 and control-person claims under *section* [*21] *15* and *section 20(a)*, based on alleged primary violations of *Section 11* and *Section 10(b)* by Hippeau, Koll, and AGC itself.

> n8 Microsoft suggests that the *Section 10(b)* claims rely solely on the primary conduct of Koll and Hippeau. (Microsoft Mem. 16 n.8.) If so, the claims would either be futile in light of the rejection of plaintiffs' respondeat superior claims above,

or subsumed by the *Section 20(a)* control-person claims. It is not so, however: The TAC expressly bases the *Section 10(b)* claims on Microsoft's and Softbank's direct involvement in fraud at AGC. (TAC PP1601-48.)

A. Scope of Plaintiffs' Claims

At the outset, it is necessary to determine the intended scope of the claims asserted against Microsoft and Softbank in the TAC. Microsoft and Softbank were charged in the Second Amended Complaint with responsibility for certain accounting improprieties, relating to the sale and exchange of bandwidth in so-called "IRUs." That alleged conduct still constitutes the primary basis of plaintiffs' case against [*22] the remaining defendants. However, the factual predicate of the allegations against Microsoft and Softbank in the TAC center on a separate and distinct matter: Microsoft's and Softbank's secret negotiations with AGC concerning their capacity purchase commitments under the CCA. This change in focus raises the question as to whether plaintiffs still intend to advance any theory of liability against defendants related to accounting issues, or whether the sole issue for the Court is misconduct relating to the CCA. The Court takes the latter view.

The specification of the claims against Microsoft and Softbank in the TAC, while ambiguous, supports the view that plaintiffs' claims are limited to the CCA. Those claims make specific mention only of misconduct relating to the CCA, and do not discuss accounting fraud or IRU swaps. And notably, while the description of the respondeat superior claims in a black-lined version of the TAC supplied by plaintiffs makes reference to parts of the TAC discussing IRU swaps (Liebesman Aff. Ex. 2 PP1699, 1705), the final version omits those references (id. Ex. 1 PP1699, 1705.) n9

> n9 Both versions of the TAC reference paragraphs 640-48 as describing fraudulent statements that can be attributed to Softbank (TAC P1653), in support of plaintiffs' Section 11 claim against Softbank. The Court assumes that this reference is a typographic error, considering that paragraphs 640-48 relate to fraudulent statements concerning Global Crossing, and not *Asia* Global Crossing.

[*23]

More importantly, defendants' memoranda in opposition to the proposed amendments explicitly point out that none of the new factual allegations relate to the accounting issues that characterized the Second Amended Complaint (e.g., Microsoft Mem. 22; Softbank Mem. 2),

but plaintiffs' responsive memoranda make no specific mention of any matter other than the CCA. In fact, in reply to Softbank's argument that plaintiffs fail to adequately allege scienter in support of their *Section 10(b)* and *Section 20(a)* claims, to the extent that the claims arise out of allegedly fraudulent IRU-swap transactions (Softbank Mem. at 18), plaintiffs state that "[t]he Court should simply disregard Softbank's argument that plaintiffs have not pled scienter in connection with the accounting issues which form the basis of plaintiffs' claims concerning swap transactions in the SAC and TAC" because "this is not the theory advanced against Softbank in the TAC." (Softbank Reply 9 n.4; see also id. at 12-13 (characterizing as "Softbank's violation of the federal securities laws" solely concealment of secret agreement and participation in CCA scheme).

Plaintiffs cannot stay mum on additional theories of [*24] liability (and indeed disclaim reliance on such theories as to certain claims) and expect the Court to evaluate and rule on them, especially where there is a serious question as to whether plaintiffs' new allegations adequately support those theories. Accordingly, the Court grants plaintiffs' request to "disregard" arguments relating to accounting fraud and to focus instead on the CCA. Any theory of Microsoft's and Softbank's liability not relating to those companies' capacity purchase obligations under the CCA is deemed abandoned.

B. Loss Causation

It is undisputed that[HN7] plaintiffs must plead and prove loss causation – that defendants' alleged misconduct caused the economic harm suffered by plaintiffs – to make out their claims under *Section 10(b)* and *20(a)*, see *Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 125 S. Ct. 1627, 1631–33, 161 L. Ed. 2d 577 (2005); Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 173 (2d Cir. 2005)*, and that lack of loss causation is an affirmative defense to a claim under *Section 11* and *Section 15* (but can be considered on a motion to dismiss to the extent that it is claimed that lack of loss causation is apparent [*25] on the face of the complaint), see *In re Merrill Lynch Secs. Litig., 272 F. Supp. 2d 243, 253–54 (S.D.N.Y. 2003)*. n10 As applied to this case, the elements of loss causation are (1) that the market reacted negatively to a corrective disclosure regarding the falsity of prior statements relating to Microsoft's and Softbank's obligations under the CCA; or (2) that risks that were concealed by the alleged misrepresentations or omissions materialized and proximately caused plaintiffs' loss. *Lentell, 396 F.3d at 175.*

> n10 The control-person claims under *Section 15* and *20(a)* require a primary violation of *Section*

*11* and *10(b)*, respectively. The loss causation requirements for claims under the primary statutes, therefore, also apply to claims under the control-person statutes.

Plaintiffs' theory of loss causation is that AGC's stock price was "massively inflated" during the relevant period "as the result of Microsoft's and Softbank's long-standing, comprehensive scheme to misrepresent [*26] Asia Global Crossing's current and anticipated future revenues through published representations that both companies had contracted to supply AGC - a new company which had reported only $130,455,000 in sales for the nine months preceding its IPO - with an aggregate $200 million revenue stream when, in fact, Softbank and Microsoft never intended to honor their respective contracts and never did so." (TAC P1297.) Plaintiffs claim that "[b]ut for Microsoft and Softbank's misrepresentations that they had contracted to purchase $200 million in capacity from Asia Global Crossing, plaintiffs would not have purchased shares of Asia Global Crossing, or would not have purchased them at the artificially inflated prices at which they were offered." (Id. P1298.) Plaintiffs allege that this "fraudulent scheme" "was gradually revealed to the market through [AGC's] release of financial information, which disclosed that the promised revenues from Microsoft and Softbank were not being received" and that the "receipt of this information caused progressive declines in the price of Asia Global Crossing stock." (Id. P1299.) While AGC's financial statements from February 12, 2001 to October 24, 2002, "did [*27] not admit to the missing Microsoft and Softbank revenues," those revenues were missing nonetheless and the market absorbed the failure of expected revenues from Microsoft and Softbank to materialize. (Id. PP1299, 1300, 1301, 1302, 1303, 1304.) It is alleged that "[o]n November 17, 2002, Asia Global Crossing filed for bankruptcy, in substantial part because of the missing Softbank–Microsoft revenues." (Id. P1305.) Plaintiffs thus claim that "the declines in the Company's stock price [between February 12, 2001 and October 24, 2002] are attributable to Microsoft and Softbank's failure to provide the promised revenue stream." (Id. P1306.)

Plaintiffs have properly alleged loss causation as to both defendants, if just barely. Microsoft argues, based on the text of the CCA and other public CCA disclosures, that under the CCA, it was committed to purchase $100 million in network capacity in three separate "tranches," the final $80 million payment being due on December 31, 2002, which was *after* the stock price declines that plaintiffs blame on Microsoft's and Softbank's misdealings. (Microsoft Mem. 6, citing CCA §§ 1, 2(b)(iii), Liebesman Decl. Ex. 4; AGC IPO Prospectus [*28] at 35, Liebesman

Decl. Ex. 1). And it is undisputed that Microsoft fulfilled its $20 million in commitments under the first two tranches. (TAC P1269; Microsoft Mem. 7.)

Microsoft argues that plaintiffs cannot plead loss causation as to it. It points out that plaintiffs' theory - that from February 12, 2001, to October 24, 2002, the market began to respond to the absent revenue owing from Microsoft on the CCA - is fatally flawed, because the $80 million payment that Microsoft did not make was, by the very terms of the CCA, not due until December 31, 2002. Therefore, nothing was "owing" from Microsoft when the stock declines that plaintiffs complain about occurred, and thus those declines, and AGC's bankruptcy, cannot have been due to any wrongful conduct of Microsoft or its agents. (Microsoft Mem. 9–10.) This argument is, at least on its surface, appealing.

Plaintiffs, however, point to language in certain public documents - the September 1999 press release, the CCA, and the AGC IPO Prospectus - that they argue reflect that "Microsoft assured AG[C]'s public investors of its commitment to purchase $100 million in capacity *during the course of a three year period following December* [*29] *1999*," by which plaintiffs appear to mean that Microsoft gave the public to understand that it would periodically make capacity purchases throughout the period in question, not that it would make one $80 million purchase at the end of December 2002. (Microsoft Reply 3–4.) It is alleged that Microsoft's failure to provide the promised revenue stream during AGC's first few years ultimately caused AGC's stock to crater and its ultimate filing for bankruptcy relief.

The Court finds it dubious, based on the evidence cited by plaintiff, that the investing public understood that Microsoft had committed to provide a steady stream of cash to AGC throughout the period at issue; however the Court's responsibility at this stage is not to evaluate the sufficiency of plaintiffs' evidence, but only to determine whether "'relief could be granted under some set of facts consistent with the allegations,'" that is, to determine whether it is "at least plausible that plaintiff[s] could *develop* some set of facts that would pass muster." *CIBC Ruling*, 2005 U.S. Dist. LEXIS 26942, 2005 WL 2990646, at *8, quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512–14, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002). *n11* [*30]

n11 If Microsoft's loss causation argument ultimately prevails, it is unlikely that plaintiffs will be able to establish loss causation as to Softbank either. Softbank paid all but $5.5 million of its first two tranche payments (Softbank Mem. at 9; TAC P1225), and it is unclear that plaintiffs can establish that $5.5 million of missing revenue during the

Class Period was a substantial factor in causing the billion–dollar stock losses at issue in the TAC.

Microsoft's and Softbank's remaining arguments relate to legal proceedings subsequent to AGC's bankruptcy. Microsoft argues that in those proceedings, "AGC never suggested" that "Microsoft's failure to perform under the CCA proximately caused AGC's bankruptcy," but rather AGC attributed its collapse to GC's inabililty to provide $400 million in necessary capital to AGC, a downturn in the telecommunications sector, and a diminished demand for bandwidth. (Microsoft Mem. 10.) Evidence that AGC, in bankruptcy, attributed its demise to factors other than Microsoft's [*31] and Softbank's alleged failure to satisfy their obligations under the CCA will undoubtedly be relevant to the ultimate determination of whether plaintiffs have proved the element of loss causation. However, such evidence is irrelevant to the issue before the Court now, which is solely whether the plaintiffs have pled a cognizable theory of loss causation in the TAC.

As for Softbank, its sole argument is that, some time after the close of the period at issue, an arbitration panel actually enforced the terms of the CCA against Softbank and ordered payment to AGC of certain amounts due under it, and that this renders loss causation impossible to prove. (Softbank Mem. at 17–18.) However, plaintiffs' argument is not that Softbank owes AGC money *due under the CCA*, in which case the judgment of the arbitration panel would be relevant, but rather that the failure to disclose Softbank's intent to not to adhere to its obligations under the CCA, and its resulting failure to timely make payments pursuant to that agreement, caused stock declines during the period at issue, an issue which Softbank does not claim was a subject of the arbitration. (Pl. Mem. 9–11.)

For the foregoing reasons, [*32] defendants' loss causation arguments do not pose an obstacle to the proposed amendment of the Complaint.

C. Existence of the Secret Agreements

Microsoft and Softbank next contend that there were no secret negotiations or agreements to avoid the companies' capacity purchase obligations under the CCA. (Microsoft Mem. 11–14; Softbank Mem. 14–17.) Both argue that plaintiffs misinterpret the documentary evidence cited in the TAC. For instance, Softbank argues that the evidence only confirms what was already publicly known about AGC's capacity purchase: that Softbank might not need the capacity it contracted for, in which case AGC was required to use "commercially reasonable" efforts to remarket any previously–sold and unused capacity. Plaintiffs respond that the evidence supports the broad

allegations of the TAC that Softbank "already had determined that it did not need, and would not purchase $100 million in capacity" and that AGC "had agreed orally to not hold Softbank accountable to the $100 million commitment." (Softbank Reply 2.)

The Court need to decide which party's view of the evidence is more persuasive. Prior to discovery, plaintiffs' burden is not to produce evidence [*33] from which a trier of fact could infer the existence of any secret agreement. At this stage of the proceedings, the Court's obligation is only to determine whether or not it "appears beyond doubt" that plaintiffs "*can prove no* set of facts in support of [their] claim[s]." *Conley v. Gibson, 355 U.S. 41, 45–46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)* (emphasis added). At this point, plaintiffs' allegations permit the inference, at the very least, that Softbank and AGC entered into the CCA with the knowledge that Softbank had neither the need for nor the intention to use any of the capacity it contracted for, and that AGC had agreed not only to use commercially reasonable efforts to remarket Softbank's unused capacity, but also to remarket any of Softbank's unused capacity ahead of its own, essentially negating Softbank's $100 million obligation. At this stage, that is enough. (TAC PP1192–1248; Softbank Reply 3.) Microsoft makes essentially the same argument, and for the same reason, that argument is rejected. n12

n12 The parties' additional arguments are unavailing. Softbank claims that during the subsequent arbitration concerning the CCA, there was no mention of a secret agreement. (Softbank Mem. at 16–17.) There are a number of reasons why such an agreement would not have been raised at that time, including the desire to avoid a potential lawsuit from jilted investors, which is exactly what has now occurred. The same applies to Microsoft's argument concerning AGC's bankruptcy proceeding (where, in fact, Microsoft did attempt to excuse itself from any obligations under the CCA). (Microsoft Mem. 14.) These arguments, while they may prove significant at a later stage of this case, do not render plaintiffs' allegations deficient.

[*34]

D. Attribution, Scienter, and Culpable Participation

Softbank argues in passing that plaintiffs' allegations as to its *Section 10(b)* claims are further deficient because plaintiffs fail to allege false statements that can be "attributed" to Softbank, a requirement of its "false statement" Rule 10b–5(b) claims and scienter, a prerequisite for each of plaintiffs' 10(b) claims. (Softbank Mem. at 13–14; 18–19.) Both Microsoft and Softbank argue that

plaintiffs have failed to allege "culpable participation," an element of plaintiffs' Section 20(a) control-person claims related to scienter.

This Court has previously pointed out, with respect to the allegations of the Second Amended Complaint, that plaintiffs failed to "substantiate their assertions of attribution with any concrete factual allegations. Although AGC's public materials touted general synergy between Microsoft and Softbank, nothing plaintiffs point to suggests that Microsoft or Softbank guaranteed any particular decision by or information about AGC, such that the public could reasonably rely on it." *Microsoft/Softbank Ruling, 2005 U.S. Dist. LEXIS 16232, 2005 WL 1881514, at *10*. The TAC rectifies these concerns as to statements relating [*35] to the CCA, which unlike statements relating to accounting improprieties concerning IRU transactions, directly implicate Softbank. As plaintiffs point out, the TAC alleges that the September 8, 1999, press release touting Softbank's capacity purchase, the CCA, and the Shareholder Agreement, all were directly issued and/or signed by Softbank, and that the CCA and Shareholder Agreement were described in and/or attached to AGC's SEC filings, which were also signed by Softbank's board designee Hippeau. (TAC P1212.) At this stage of the proceedings, plaintiffs have sufficiently pled attribution as to statements directly relating to the Softbank capacity transaction.

The scienter requirement is quite clearly satisfied. See *Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12, 214, 96 S. Ct. 1375, 47 L. Ed. 2d 668 (1976)* (noting that [HN8] 10(b) claim requires that plaintiff plead the element of scienter, defined as "a mental state embracing intent to deceive, manipulate, or defraud"). The TAC specifically alleges that Softbank attempted to conceal the secret agreement from the public in order to artificially inflate the price of AGC stock, of which Softbank owned a substantial chunk. (TAC PP1206–26, 1252–54.) [*36] "Such express allegations of deliberate misconduct easily satisfy the standard for pleading scienter." *In re Philip Servs. Corp. Sec. Litig., 383 F. Supp. 2d 463, 472 (S.D.N.Y. 2004)*.

For essentially the same reason, any argument that plaintiffs fail to satisfy the "culpable participation" pleading requirement, as to either Microsoft or Softbank, fails. [HN9] Similar to the scienter requirement of *Section 10(b)*, section 20(a) requires that plaintiffs "plead *with particularity* facts giving rise to *a strong inference* that the controlling person knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct." *Andersen Ruling, 322 F. Supp. 2d at 349* (quotation marks omitted and emphases added). Plaintiffs' particularized allegations concerning

Microsoft's and Softbank's direction of the board designees, with respect to the secret CCA negotiations, and their allegations of scienter with respect to the CCA (TAC PP1252–54, 1278–80), are surely sufficient for pleading purposes. n13

n13 In a footnote, Softbank argues that plaintiffs' *Rule 10b-5(a)* and *(c)* "scheme" claims are duplicative of the *Rule 10b-5(b)* "false statement" claims because the schemes complained of in the former claims consist solely of false statements charged in the latter claims. See *Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 177–78 (2d Cir. 2005)* (declining to analyze claims as scheme claims where "the sole basis for such claims is alleged misrepresentations or omissions"). (Softbank Mem. 20 n.9). This point, through it might have merit, is not adequately presented for consideration at this stage. See, e.g., *Diesel v. Town of Lewisboro, 232 F.3d 92, 110 (2d Cir. 2000)* ("We do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review."), quoting *United States v. Restrepo, 986 F.2d 1462, 1463 (2d Cir. 1993)*.

[*37]

E. Control

Defendants next argue that plaintiffs have not adequately pled control, an element of both the *Section 20(a)* and *Section 15* control-person claims. In the Microsoft/Softbank Ruling, the Court held that the fact that "Koll . . . and Hippeau were Microsoft's and Softbank's employees, and that Microsoft and Softbank exercised their power to appoint directors to AGC to appoint those employees" was insufficient to "create an inference that Microsoft and/or Softbank controlled Koll . . .and/or Hippeau in their capacities as AGC's directors." *2005 U.S. Dist. LEXIS 16232, 2005 WL 1881514, at *9*. The Court also held that Microsoft's and Softbank's minority stake in AGC, authority to veto certain extraordinary corporate actions by AGC, and power to appoint one director each to AGC's board, were insufficient to allege control of AGC itself. *Id. 2005 U.S. Dist. LEXIS 16232, [WL] at *13*.

However, in the CIBC Ruling, the Court retreated from these holdings. After observing that the relaxed notice-pleading standard of *Rule 8(a)* applies to allegations of control, *2005 U.S. Dist. LEXIS 26942, 2005 WL 2990646, at *7*, the Court stated that "recent decisions, most notably the Second Circuit's ruling in Twombly v. Bell Atlantic Corp. [*38] . . . emphasize that [HN10] where *Rule 8(a)*'s pleading standard governs, dismissal is

improper as long as the compliant furnishes adequate notice of the basis of the plaintiff's claim . . . and 'relief could be granted under [some] set of facts consistent with the allegations.'" *Id. at *8*, quoting *Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512–14, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)* (quotation marks omitted). That is, even if the facts alleged do not, by themselves, permit an inference of control, "dismissal is improper as long as it is at least plausible that plaintiff could develop some set of facts that would pass muster." Id. The Court held, on similar allegations made by plaintiffs against the CIBC defendants, see supra note 1, that the allegations of control were sufficient. *CIBC Ruling, 2005 U.S. Dist. LEXIS 26942, 2005 WL 2990646, at *8*. The rationale of the CIBC Ruling applies here a fortiori, and for the reasons stated in that opinion, plaintiffs have adequately alleged the element of control.

However, even if the standard were more rigorous than it is, the TAC indeed supplies the concrete factual allegations of control that the Court found lacking in the Microsoft/Softbank [*39] Ruling. For instance, plaintiffs allege that Hippeau was not only aware of the secret agreement struck between Softbank and AGC, but that he acted on Softbank's behalf in connection with those dealings, dealings which plaintiffs allege were contrary to the interests of AGC's shareholders. (TAC PP1188, 1210–11, 1224, 1244–46.) As for Koll, plaintiffs specifically allege that he was aware of the alleged misdealings between Microsoft and AGC, and that he specifically "negotiated against Asia Global Crossing on Microsoft's behalf to obtain relief from Microsoft's $100 million commitment to purchase capacity." (TAC PP1190–91, 1264–69.) In the Microsoft/Softbank Ruling, the Court noted that actions taken by Koll and Hippeau, qua directors of AGC, could not be attributed to Microsoft and Softbank, because they did not act on behalf of Microsoft and Softbank, but rather as fiduciaries of AGC. In the TAC, however, plaintiffs specifically allege actions taken by Koll and Hippeau on behalf of Microsoft and Softbank, and against the interests of AGC.

Microsoft and Softbank respond by attempting to turn this distinction to their advantage. They respond that if Koll and Hippeau did work [*40] against the interests of AGC, they did so not only on behalf of Microsoft and Softbank, but as formal Microsoft and Softbank employees, and not in their capacities as AGC directors. Because Koll and Hippeau were not formally acting as AGC directors when they engaged in the charged conduct, defendants argue, that conduct cannot serve as the basis for plaintiffs' claims. (Microsoft Mem. 14–16; Softbank Mem. 12–13.) This argument is a non-starter. Whatever hat they were wearing at the time, if during the time Koll and Hippeau were AGC directors, they did not act as fidu-

ciaries of AGC, but instead flipped back to representing the interests of Microsoft and Softbank against AGC's interests when that would help their employers, that would only serve to bolster plaintiffs' claims. In any event, the capacity (formal or actual) in which Koll and Hippeau were acting when performing any acts at the behest of their employers is a quintessential fact question.

The allegations of the TAC are sufficient to allow plaintiffs to proceed with respect to the control-person claims.

F. Statute of Limitations

Finally, Microsoft and Softbank argue, in passing, that plaintiffs' claims are time-barred. [*41] (Microsoft Mem. 23; Softbank Mem. 19–20.) Softbank's first argument is that any *Section 10(b)* or 20(a) claim relating to the CCA is untimely because "more than five years have passed since the September 1999 press release was issued and since Softbank signed the Shareholders Agreement and CCA." See *GC Underwriters Ruling, 313 F. Supp. 2d at 196* (observing that statute of limitations for fraud-based claims is, inter alia, five years after violation). Plaintiffs respond that the violations at issue do not arise from the September 1999 press release, CCA, or Shareholder Agreement alone, but rather from the scheme to conceal Softbank's secret agreement when AGC was a public company, including the approval and issuance of numerous allegedly false and misleading SEC filings in 2000–2001. (Softbank Reply 12–13.)

Whether or not this suffices, this particular timeliness issue appears to be controlled by the relation-back provision of *Fed. R. Civ. P. 15(c)(2)*. It is undisputed that Softbank was brought into this litigation upon the filing of the Amended Consolidated Class Action Complaint on August 11, 2003, well within the five-year [*42] statute of limitations on either party's view of the facts. *Rule 15(c)(2)* states that [HN11] "[a]n amendment of a pleading relates back to the date of the original pleading when . . . the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." See also *Stevelman v. Alias Research Inc., 174 F.3d 79, 86–87 (2d Cir. 1999)* ([HN12] "Under *Fed. R. Civ. P. 15(c)*, the central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations by the general fact situation alleged in the original pleading." (quotation omitted)). While fraud related to Microsoft's and Softbank's purchase commitments under the CCA is a different matter from accounting improprieties relating to IRUs, the focus of all prior versions of the complaint, at base what is at issue is Microsoft's and Softbank's involvement, direct or indirect, in the misrepresentation of

AGC's financial picture during the years leading up to its bankruptcy and ultimate collapse. While it might turn [*43] out, upon development of the factual record, that these two fraudulent schemes are so distinct as to render the relation back doctrine inapplicable, the Court is not convinced at this early stage that such is the case.

Defendants also contend that plaintiffs' Section 15 claims are time-barred. (Microsoft Mem. 23; Softbank Mem. at 19-20.) [HN13] The applicable statute of limitations for these claims is, inter alia, "one year after the discovery of the untrue statement or omission, or after such discovery should have been made by the exercise of reasonable dilligence." *15 U.S.C. § 77m*; see also *GC Underwriters Ruling, 313 F. Supp. 2d at 196*. The argument is that plaintiffs had notice of the facts underlying their claims against Microsoft and Softbank more than a year prior to August 11, 2003, the date on which the Amended Consolidated Class Action Complaint, which added Microsoft and Softbank as defendants, was filed. n14 The Second Circuit has summarized the one-year time limitations period as follows:

> [HN14] The one-year limitations period begins to run after the plaintiff "obtains actual knowledge of the facts giving rise to the action or notice [*44] of the facts, which in the exercise of reasonable diligence, would have led to actual knowledge." *Kahn v. Kohlberg, Kravis, Roberts & Co., 970 F.2d 1030, 1042 (2d Cir. 1992)*. Furthermore, "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises." *Dodds v. Cigna Secs., Inc., 12 F.3d 346, 350 (2d Cir. 1993)*. The circumstances that give rise to a duty of inquiry are often referred to as "storm warnings." Id. Once a plaintiff receives these "storm warnings" and a duty of inquiry arises, "knowledge will be imputed to the investor who does not make such an inquiry." Id. Moreover, whether the securities fraud claim of a person who receives "storm warnings" is time barred "turns on *when*, after obtaining inquiry notice," the plaintiff "in the exercise of reasonable diligence, should have discovered the facts underlying the [defendant's] alleged fraud." *Rothman v. Gregor, 220 F.3d 81, 97 (2d Cir. 2000)*.

*Levitt v. Bear, Stearns & Co., 340 F.3d 94, 101 (2d Cir. 2003)*.

n14 This Court previously indicated that under certain circumstances, claims against new defendants in an amended pleading may be deemed asserted as of the date of the original pleading, pursuant to *Fed. R. Civ. P. 15(c)(2)*. *CIBC Ruling, 2005 U.S. Dist. LEXIS 26942, 2005 WL 2990646, at *3*. However, the Second Circuit has held that "when a plaintiff seeks to add a new defendant in an existing action, the date of the filing of the motion to amend constitutes the date the action was commenced for statute of limitations purposes." *Rothman v. Gregor, 220 F.3d 81, 96 (2d Cir. 2000)*.

[*45]

Neither Microsoft nor Softbank argues that plaintiffs had actual notice of the facts underlying the CCA-related claims more than one year before the Amended Consolidated Class Action Complaint was filed. n15 As to the question of inquiry notice, in the GC Underwriters Ruling, this Court observed, as to claims relating to GC, that "[p]laintiffs' claim that reasonable investors were not at least on inquiry notice of GC's fraudulent accounting practices before the bankruptcy filing [in January 2002] is preposterous." *313 F. Supp. 2d at 200* (emphasis added). Based on press releases, public statements by company executives, and examination of publicly-available financial data, the Court noted that "[w]hen a company that has touted its rosy financial picture sees its stock prices plummet by over 90%, suddenly finds itself in danger of bankruptcy, and refers through its CEO to a principal source of its reported profitability as a 'mystery' and a 'charade,' it is fatuous to claim that the circumstances would not suggest to an investor of ordinary intelligence the probability that she has been defrauded." *Id. at 202*. Thus, the Court held that plaintiffs [*46] were on inquiry notice, at the latest, by December 2001. *Id. at 200*.

n15 In briefing the statute of limitations issue on the prior motion to dismiss the Second Amended Complaint, Microsoft and Softbank did claim that plaintiffs had actual notice of the facts underlying the *IRU-related* claims in the Second Amended Complaint more than a year prior to the filing of the Amended Consolidated Class Action Complaint. (Microsoft Mem. Mot. DISMISS 24-25; Softbank Mem. Mot. Dismiss 23-25.)

It is all but certain that the same date applies to claims relating to AGC. GC and AGC were involved in the same business, the sale of bandwidth; after the AGC IPO, the company continued to be controlled by GC, which retained a 57% ownership stake in AGC (AGC IPO Prospectus, Liebesman Decl. Ex. 1, at 72); the two com-

panies had overlapping directors and officers, a common Chairman, a common co–Chairman, and similar business plans (Compl. PP29, 34–35, 40, 53, 56, 58, 60–62, 64, 66); and beginning in early October [*47] 2001, Asia Global Crossing and Global Crossing also shared a common CEO (id. P684). In addition, like GC, AGC experienced serious stock declines during 2001. (TAC PP1300–06.) By October of that year, AGC stock had lost 90% of its value and never recovered (AGC Underwriters' Mot. Dismiss, Simmons Decl. Ex. 10.) See *GC Underwriters Ruling, 313 F. Supp. 2d at 201* ("While a decline in stock value is not in itself proof of fraud, the Second Circuit has noted that such declines "should have put [a reasonable investor] on notice of fraud.").

Moreover, through neither Microsoft nor Softbank raises the point, the TAC itself alleges that throughout 2001 and 2002, "Microsoft and Softbank's fraudulent scheme was gradually revealed to the market" through AGC's release of financial information, "which disclosed that the promised revenues from Microsoft and Softbank were not being received," and that the stock declines at issue in this case "are directly attributable to the market's absorption of information regarding the failure of expected revenues from Microsoft and Softbank to materialize." (TAC P1299.) If, throughout 2001, the market was "absorbing" information to the [*48] effect that expected revenues from Microsoft and Softbank under the CCA were not being received, plaintiffs are hard-pressed to argue that they were not on inquiry notice of fraud (at the very least) by December 2001.

In any event, press releases and financial documents filed in early 2002, more than a year before Microsoft and Softbank entered this case, expressly alerted AGC shareholders that its largest shareholder and former corporate parent, GC, was under investigation for fraud, and made clear that these allegations had implications for AGC, specifically that AGC had "engaged external counsel for the purpose of investigating issues raised by these allegations so far as they concern" AGC, and that the company could not release financial reports until the pending investigations had concluded. (AGC Feb. 26, 2002, Press Release, AGC Und. Mot. Dismiss, Liebesman Decl. Ex. B; AGC Form 12b–25, dated April 2, 2002, AGC Und. Mot. Dismiss; Simmons Decl. Ex. 10.) Thus, more than a year before Microsoft and Softbank were ultimately sued, plaintiffs were unquestionably on inquiry notice that they had been defrauded. However, that does not end the inquiry.

In the GC Underwriters Ruling [*49] , the Court did not ultimately dismiss any claims on statute of limitations grounds, although it held that more than a year had run from the commencement of the inquiry notice period to the filing of the claims at issue in that case. Because the Court determined that plaintiffs had conducted some inquiry into the allegations underlying the complaint shortly after the start of the inquiry notice period, it noted that the limitations period would have started only when an investor, acting with reasonable diligence, would have turned up the facts underlying their claims, *313 F. Supp. 2d at 203–04*, and that such a fact-based determination could not be made at the pleadings stage.

Defendants make no mention of this "due–diligence" aspect of the statute of limitations inquiry, let alone address the change in focus of the TAC from allegations of accounting improprieties to allegations about the failure to purchase bandwidth under the CCA, a distinction highly relevant to resolution of the due diligence question. Under the circumstances, the Court declines to hold, with no briefing on the issue, and with an ill–developed factual record, that as a matter of law plaintiffs should [*50] have discovered the facts underlying their allegations prior to August 11, 2002, one year before they filed suit against Microsoft and Softbank. See *Robertson v. Seidman & Seidman, 609 F.2d 583, 591 (2d Cir. 1979)* ([HN15] "Issues of due diligence and constructive knowledge depend on inferences drawn from the facts of each particular case – similar to the type of inferences which must be drawn in determining intent and good faith, [and w]hen conflicting inferences can be drawn from the facts, . . . summary judgment is inappropriate." (citations omitted)). Therefore, while this objection may ultimately prove to have merit, as of now, the Court declines to hold that plaintiffs' Section 15 claims are time–barred.

## CONCLUSION

For the foregoing reasons, the motion to amend the Second Amended Consolidated Class Action Complaint ( # 574) is denied as to plaintiffs' respondeat superior claims, but granted in all other respects.

SO ORDERED.

Dated: New York, New York

   June 13, 2006

   /s/

   GERARD E. LYNCH

   United States District Judge

18

Westlaw.

Not Reported in F.Supp.                                                                                                    Page 1
Not Reported in F.Supp., 1998 WL 960299 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

**H**

Briefs and Other Related Documents

Only the Westlaw citation is currently available.

United States District Court, E.D. New York.

Kimberly HOLMES Plaintiff,

v.

THE LONG ISLAND RAILROAD, Michael Goonan, Barbara Nicholes, John Cimperman, A.F. Norrby, Robert E. Carbaugh, Eileen Stocker, and the Metropolitan Transit Authority (MTA) of the State of New York Defendants.

**No. 96 CV 6196(NG).**

Dec. 10, 1998.

MEMORANDUM AND ORDER

GERSHON, J.

*1 Plaintiff Kimberly Holmes alleges that she was terminated from her employment with defendant Long Island Railroad ("LIRR") in violation of Title VII of the Civil Rights Act of 1964, §§ 701 *et seq.,* 42 U.S.C. §§ 2000e *et seq.,* ("Title VII"), the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.,* ("ADA"), and 42 U.S.C. § 1983. Plaintiff also asserts a claim for intentional infliction of emotional distress. Defendants now move to dismiss the Second Amended Complaint ("the complaint") pursuant to Federal Rules of Civil Procedure 12(b)(1), (2), (4) & (6). For the reasons set forth below, defendants' motion will be granted in part and denied in part.

FACTS

The complaint alleges the following: On May 21, 1982, the LIRR hired plaintiff Kimberly Holmes as an "Extra Special Service Attendant." (¶ 7).[FN1] On an unspecified date prior to her 1994 termination, plaintiff was promoted to the position of "Trainman-Passenger" or "Assistant Conductor," which was the position she held at the time of her termination. (¶ 7). During her employment with the LIRR, plaintiff was severely injured in several work-related accidents and subjected to unsolicited and inappropriate remarks and sexual advances during a physical examination by defendant Goonan, the physical therapist for the LIRR. (¶¶ 8, 11). Plaintiff reported these claims of sexual harassment to defendants Nicholes and Stocker, LIRR officials. (¶ 11). De-

fendant Nicholes forced plaintiff to return to Goonan for additional examinations. (¶ 12). Although plaintiff was not on duty during 1994, she was placed on active duty, or "in service" for one day so that she could be subjected to a mandatory physical examination, including an urine test. (¶ 13). On or about May 25, 1994, plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR") alleging that defendants LIRR and Goonan unlawfully discriminated against her on the basis of her sex. On August 20, 1994, plaintiff was terminated from her employment with the LIRR. (¶ 7). On or about March 14, 1996, plaintiff amended her complaint with the NYSDHR to allege that her employment was terminated on the basis of the prior incidents of sexual harassment. The Equal Employment Opportunity Commission ("EEOC") issued a right to sue letter on September 19, 1996. On December 19, 1996, plaintiff filed the instant action.

FN1. References to "¶ _" are to paragraphs of the Second Amended Complaint, dated May 5, 1997.

DISCUSSION

"A complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). When considering a motion to dismiss, the court "must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Gant v. Wallingford Bd. of Education,* 69 F.3d 669, 673 (2d Cir.1995) (quoting *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994)).

A. Intentional Infliction of Emotional Distress

*2 As plaintiff's counsel acknowledged at oral argument, a one-year statute of limitations applies to claims for intentional infliction of emotional distress under New York law. See *Chacko v. Dynair Services, Inc.,* No. 96CV2220, 1998 WL 199866, 3 (E.D.N.Y. March 15, 1998). Plaintiff's claim for intentional infliction of emotional distress is time-barred because plaintiff filed her original complaint more than two years after the incidents giving rise to her claim. Accordingly, plaintiff's intentional infliction of emotional distress

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                    Page 2
Not Reported in F.Supp., 1998 WL 960299 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

claim is dismissed.

### B. Conspiracy Under 42 U.S.C. § 1983

Plaintiff alleges that defendants conspired to deny her civil rights in violation of 42 U.S.C. § 1983. In order to state a claim of conspiracy under 42 U.S.C. § 1983 the complaint must contain more than "mere conclusory allegations." See Dwares v. City of New York, 985 F.2d 94, 99 (2d Cir.1993). Indeed, "[a] complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." Sommer v. Dixon, 709 F.2d 173, 174 (2d Cir.1983). Moreover, a private party cannot be sued under Section 1983 for conspiracy unless the complaint "allege[s] facts demonstrating that the private entity acted in concert with the state to commit an unconstitutional act." Spear v. Town of West Hartford, 954 F.2d 63, 68 (2d Cir.1992). In the present action, plaintiff merely asserts that defendants "did conspire, plan, and purposefully deny the plaintiff civil right to employment." The complaint contains no specific allegations which, if true, would support plaintiff's theory that a conspiracy existed. Thus, plaintiff's conspiracy claim under 42 U.S.C. § 1983 is dismissed.

### C. ADA

It is well-established that "[a] district court only has jurisdiction to hear Title VII claims that either are included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is 'reasonably related' to that alleged in the EEOC charge." See Butts v. City of New York Dept. of Housing, 990 F.2d 1397, 1401 (2d Cir.1993) (quoting Stewart v. I.N.S, 762 F.2d 193, 198 (2d Cir.1985)). The ADA has the same exhaustion requirement. See 42 U.S.C. § 12101 et seq. (incorporating the administrative procedures of Title VII for enforcement of claims of employment discrimination under the ADA). Here, plaintiff's ADA claim is not reasonably related to the sexual harassment claim alleged in the EEOC charge. See, e.g., Gallegos v. New York City Health & Hospital Corp., No. 98 Civ. 0435, 1998 WL 726025 (S.D.N.Y. Oct. 14, 1998) (holding that plaintiff's ADA claims were not reasonably related to her claims of sex-based discrimination alleged in her EEOC complaint). Therefore, plaintiff's ADA claim is dismissed.

### D. Title VII

The complaint alleges that "all defendants" subjected plaintiff to sexual harassment or failed to take action to remedy complaints of sexual harassment. (¶ 20). Read liberally, this claim is based on Title VII. Defendants argue that plaintiff's Title VII claim is procedurally barred and that the claim against the individual defendants must be dismissed because there is no individual liability under Title VII.

#### 1. Procedural Bar

**\*3** Title VII provides that "a civil action may be brought against the respondent named in the charge ... by the person claiming to be aggrieved" within 90 days of receipt of a "right to sue" letter from the EEOC. 42 U.S.C. § 2000e-5(f)(1). The timely receipt of a right to sue letter is a statutory requirement that is subject to waiver, estoppel, or tolling, but "only upon a showing by plaintiff of a sufficient reason for such equitable modification." Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 392 (1982); Hladki v. Jeffrey's Consol. Ltd., 652 F.Supp. 388, 392 (E.D.N.Y.1987).

Here, plaintiff's counsel originally stated that plaintiff had lost the right to sue letter that she had received from the EEOC. However, after filing this action and after oral argument, plaintiff submitted to the court a right to sue letter from the EEOC dated September 19, 1996. Because it now appears that the statutory prerequisite was satisfied, plaintiff's Title VII claim is not procedurally barred. The complaint will be deemed amended to plead receipt of the right to sue letter.

#### 2. Individual Liability Under Title VII

Individual defendants-even those with supervisory control-may not be held personally liable for alleged violations of Title VII. See Tomka v. Seiler Corp., 66 F.3d 1295, 1313 (2d Cir.1995). Accordingly, plaintiff's Title VII claim against the individual defendants is dismissed.

### E. Sexual Harassment Under 42 U.S.C. § 1983

Although it is not clear from the face of the complaint, plaintiff also appears to raise a sexual harassment claim

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                                        Page 3
Not Reported in F.Supp., 1998 WL 960299 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

against the MTA and the LIRR pursuant to 42 U.S.C. § 1983. It is well-established that a "plaintiff cannot use § 1983 to gain perceived advantages not available to a Title VII claimant, but a plaintiff can assert a claim under § 1983 *if some other law* than Title VII is the source of the right alleged to have been denied." *Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 142 (2d Cir.1993) (citations omitted) (emphasis added); *Carrero v. New York City Housing Auth.*, 890 F.2d 569, 576 (2d Cir.1989). During oral argument, plaintiff's counsel clarified that plaintiff's Section 1983 claim essentially tracks the Title VII claim and acknowledged that he had no authority for bringing a separate Section 1983 action. (10/8/98 Tr. at 14). Because plaintiff's Section 1983 sexual harassment claim is based on Title VII and not "some other law," plaintiff's Section 1983 claim is dismissed.

### F. Release Form

Defendants contend that the complaint should be dismissed against the LIRR because plaintiff released the LIRR with respect to these claims. Because the release form in question is not attached to the complaint as an exhibit or incorporated by reference, its interpretation is not a proper subject for defendants' motion to dismiss. *See Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 662 (2d Cir.1996). Thus, defendants' motion to dismiss claims against the LIRR pursuant to the release is denied.

### G. The MTA

*4 Plaintiff failed to serve defendant MTA within 120 days, and plaintiff's counsel has offered no excuse for the failure. Fed.R.Civ.P. 4(m). In addition, while the court has construed the complaint liberally to include a Title VII claim against defendant LIRR, which was plaintiff's employer and was named in plaintiff's EEOC charge, it does not read the complaint to include a Title VII claim against the MTA, which was not named in the EEOC charge. *See, e.g., Mann v. Sunshine Biscuit*, No. 97CV8562, 1998 WL 352534 (S.D.N.Y. April 23, 1998). Accordingly, the complaint is dismissed in its entirety as against defendant MTA.

### H. Punitive Damages

Finally, on consent of plaintiff, all claims for punitive damages are dismissed.

### CONCLUSION

The motion to dismiss is GRANTED to the extent that the Second Amended Complaint is dismissed in its entirety as against defendants Goonan, Nicholes, Cimperman, Norrby, Carbaugh, Stocker and the MTA; as against the LIRR, plaintiff's intentional infliction of emotional distress, Section 1983 and ADA claims are dismissed, as is her demand for punitive damages.

The motion to dismiss is DENIED as to plaintiff's Title VII claim against the LIRR, which is the only remaining claim.

E.D.N.Y.,1998.
Holmes v. Long Island R.R.
Not Reported in F.Supp., 1998 WL 960299 (E.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1:96cv06196 (Docket) (Dec. 19, 1996)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

19

Westlaw.

453 F.3d 396                                                                                                Page 1
453 F.3d 396, 2006-2 Trade Cases P 75,337
**(Cite as: 453 F.3d 396)**

**H**
Briefs and Other Related Documents

United States Court of Appeals,Seventh Circuit.
JAMES CAPE & SONS COMPANY, Plaintiff-Appellant,
v.
PCC CONSTRUCTION COMPANY (f/k/a Streu Construc-
tion Company), Vinton Construction Company, John Streu,
Ernest J. Streu, James J. Maples, Michael J. Maples and
Daniel Beaudoin, Defendants-Appellees.
No. 05-3894.

Argued June 1, 2006.
Decided June 28, 2006.

**Background:** Construction company brought action under
federal antitrust laws and Racketeer Influenced and Corrupt
Organizations Act (RICO) alleging that former employee
and competitors conspired to rig bids for state construction
contracts. The United States District Court for the Eastern
District of Wisconsin, William C. Griesbach, J., 2005 WL
2176965, entered judgment on pleadings in favor of defend-
ants, and plaintiff appealed.

**Holdings:** The Court of Appeals, Flaum, Chief Judge, held
that:

2(1) plaintiff did not suffer antitrust injury as result of con-
spiracy;

5(2) defendants did not manage or control agency that awar-
ded contracts; and

6(3) plaintiff's damages were not proximately caused by de-
fendants' RICO violations.

Affirmed.

West Headnotes

[1] Antitrust and Trade Regulation 29T ☜963(1)

29T Antitrust and Trade Regulation
29TXVII Antitrust Actions, Proceedings, and Enforcement
29TXVII(B) Actions
29Tk959 Right of Action; Persons Entitled to Sue; Stand-

ing; Parties
29Tk963 Injury to Business or Property
29Tk963(1) k. In General. Most Cited Cases
For civil litigant to show antitrust injury, it must show injur-
ies that reflect anticompetitive effect of either violation or
anticompetitive acts made possible by violation.

[2] Antitrust and Trade Regulation 29T ☜963(3)

29T Antitrust and Trade Regulation
29TXVII Antitrust Actions, Proceedings, and Enforcement
29TXVII(B) Actions
29Tk959 Right of Action; Persons Entitled to Sue; Stand-
ing; Parties
29Tk963 Injury to Business or Property
29Tk963(3) k. Particular Cases. Most Cited Cases
Construction company did not suffer antitrust injury as res-
ult of conspiracy between its former employee and compet-
itors to rig bids for state construction contracts, where con-
spiracy resulted in state paying price below company's bid,
and there was no evidence that employee artificially inflated
company's bids in order to permit competitors to take con-
tracts.

[3] Federal Civil Procedure 170A ☜1838

170A Federal Civil Procedure
170AXI Dismissal
170AXI(B) Involuntary Dismissal
170AXI(B)5 Proceedings
170Ak1837 Effect
170Ak1838 k. Pleading Over. Most Cited Cases
District court is not required to dismiss complaint without
prejudice and/or sua sponte grant leave to amend complaint
if plaintiff does not properly request leave to amend its com-
plaint. Fed.Rules Civ.Proc.Rule 15, 28 U.S.C.A.

[4] Racketeer Influenced and Corrupt Organizations
319H ☜50

319H Racketeer Influenced and Corrupt Organizations
319HI Federal Regulation
319HI(A) In General
319Hk50 k. Association with or Participation in Enterprise;
Control or Intent. Most Cited Cases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

453 F.3d 396                                                                                   Page 2
453 F.3d 396, 2006-2 Trade Cases P 75,337
**(Cite as: 453 F.3d 396)**

In order to "participate in the conduct" of criminal enterprise for purposes of liability under Racketeer Influenced and Corrupt Organizations Act (RICO), defendant must exercise some role in direction of enterprise. 18 U.S.C.A. § 1964(c).

**[5] Racketeer Influenced and Corrupt Organizations**
**319H ⊂⊐50**

319H Racketeer Influenced and Corrupt Organizations
319HI Federal Regulation
319HI(A) In General
319Hk50 k. Association with or Participation in Enterprise; Control or Intent. Most Cited Cases
Construction companies that conspired to rig bidding for state contracts did not manage or control agency that awarded contracts, and thus did not participate in conduct of criminal enterprise for purposes of Racketeer Influenced and Corrupt Organizations Act (RICO), even though agency awarded projects by computer program designed to accept lowest bid, where companies had no control over manner in which agency went about awarding contract. 18 U.S.C.A. § 1964(c).

**[6] Racketeer Influenced and Corrupt Organizations**
**319H ⊂⊐62**

319H Racketeer Influenced and Corrupt Organizations
319HI Federal Regulation
319HI(B) Civil Remedies and Proceedings
319Hk56 Persons Entitled to Sue or Recover
319Hk62 k. Causal Relationship; Direct or Indirect Injury. Most Cited Cases
Damages to construction company due to competitors' conspiracy to rig bids for state construction contracts were not proximately caused by competitors' violations of Racketeer Influenced and Corrupt Organizations Act (RICO), where it was possible that competitors would have won contracts absent bid-rigging scheme, and state was fully capable of pursuing appropriate remedies. 18 U.S.C.A. § 1964(c).

**\*397** Matthew J. Flynn (argued), Quarles & Brady, Milwaukee, WI, for Plaintiff-Appellant.
**\*398** Andrew W. Erlandson (argued), Hurley, Burish & Milliken, Madison, WI, Michael B. Apfeld (argued), Daniel

T. Flaherty, Godfrey & Kahn, Kathryn A. Keppel, Gimbel, Reilly, Guerin & Brown, Milwaukee, WI, for Defendants-Appellees.

Before FLAUM, Chief Judge, and MANION and WILLIAMS, Circuit Judges.
FLAUM, Chief Judge.
Defendants pleaded guilty to rigging bids for State of Wisconsin Department of Transportation construction projects. One of the defendants, Daniel Beaudoin, is a former employee of James Cape & Sons ("Cape"), the plaintiff construction company. Plaintiff alleges that with Beaudoin's help, the defendant construction companies learned of Cape's bids for various construction projects, which is forbidden in Wisconsin's blind bidding process. This knowledge allegedly allowed them to unfairly manipulate the bidding process by underbidding Cape by small increments. Cape filed an antitrust and a civil RICO suit against the defendants. The district court dismissed the case on the pleadings. Cape appeals. For the following reasons, we now affirm.

**I. Background**

PCC Construction Co., f/k/a Streu Construction Co. ("Streu"), Vinton Construction Co. ("Vinton"), the owners of those companies, and Daniel Beaudoin are the defendants in this action. They have plead guilty to collaborating to rig bids for construction projects for, among others, the State of Wisconsin Department of Transportation ("WisDOT"). WisDOT allocates construction projects through a closed bidding system. WisDOT is required by law to accept the lowest bid from a "competent and eligible bidder." In order to be "eligible," a bidder must submit a sworn statement that the bidder did not collude with competitors or otherwise restrain free bidding.

Beginning in approximately 1997 and continuing until 2004, the defendants began to unfairly rig the WisDOT bidding process. The owners of Streu and Vinton would meet to discuss projects that would soon be up for bid. They would share their companies' bid information, discuss potential competitors, and set bids amongst themselves in an attempt to allocate projects between them.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

453 F.3d 396
453 F.3d 396, 2006-2 Trade Cases P 75,337
**(Cite as: 453 F.3d 396)**

In late 1996, John Streu of Streu Construction Co. approached defendant Beaudoin and asked him to become part of the bid-rigging scheme. At that time, Beaudoin was an area manager for Cape, and as part of his job, he worked on Cape's bids before they were submitted to WisDOT. Through a series of in-person and telephonic meetings, Beaudoin shared Cape's confidential information with the other defendants, sometimes mere minutes before the companies submitted their bids. This allowed the conspirators to lower or raise their bids to just under the amount that Cape was going to bid.

In 2003, another Cape employee began to suspect that Beaudoin might be revealing confidential bid information to competitors. In March 2003, Plaintiff reported its suspicions about Beaudoin to the United State's Attorney's Office for the Eastern District of Wisconsin. Beaudoin eventually cooperated with the government in its investigation of the bid-rigging scheme.

Cape alleges that because Streu and Vinton were able to inflate their bids on contracts that they were sure they would receive, WisDOT was overcharged by almost two million dollars over the life of the scheme. Cape also alleges that it lost millions of dollars of business because its share of the market was reduced and it *399 was awarded fewer contracts than it otherwise would have been.

Defendants Ernest Streu, John Streu, James Maples, and Michael Maples all pleaded guilty to antitrust violations, and admitted that they met in person and "allocate[d] upcoming construction projects among themselves and [ ] arrange[d] for each other to submit complementary bids for or refrain from bidding on particular projects." Beaudoin also pleaded guilty, stating that he and his co-conspirators "would cause rigged bids to be submitted from the offices of Vinton and Streu ... and from Cape's offices in Racine County to WisDOT and other entities," and that, "[d]uring [his] participation in these activities, his employer received contracts totaling in excess of $17.1 million for projects which had been the subject of the conspiracy."

Cape filed a civil antitrust action under 15 U.S.C. § 15, a civil RICO action under 18 U.S.C. § 1964(c), and various state claims against the defendants. The district court gran-

ted the defendants' motion to dismiss, finding that Cape had failed to state a claim upon which relief could be granted. The court dismissed the federal counts with prejudice, and the pendant state law claims without prejudice. Cape now appeals that ruling.

## II. Discussion

### A. Antitrust Claim

[1] The district court dismissed Cape's antitrust claim because it found that Cape had not properly alleged an antitrust injury. The court noted that for a civil litigant to show antitrust injury, it must show injuries that reflect the anticompetitive effect of either the violation or the anticompetitive acts made possible by the violation. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). The court further elaborated that such injury must involve "loss [that] comes from acts that reduce output or raise prices to consumers." *Chi. Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n,* 961 F.2d 667, 670 (7th Cir.1992). The court believed that Cape had not shown such injury, because "by undercutting James Cape & Sons[, Defendants] actually provided *lower* bids to the consumer. That is, their bid-rigging activities actually *increased,* rather than restricted, competition, albeit in an illegal manner." The court noted that Cape's damages resulted only because its bids were higher than Defendants' bids.

[2] We agree with the district court that consumer injury is not necessarily related to Cape's injury. While Cape may have been injured because, absent a conspiracy, the defendants might have inflated their prices in hopes of receiving more profit from the project and therefore not received the bid, the conspiracy still would have resulted in the consumer paying a price below Cape's bid. Such a loss would not "come[ ] from acts that reduce output or raise prices to consumers." *Chi. Prof'l Sports,* 961 F.2d at 670.

On appeal, Cape argues that the district court overlooked one form of antitrust injury mentioned in the complaint. Cape claims that it properly alleged that Beaudoin, as a member of the conspiracy, not only shared Cape's bids with the rest of the defendants, but also *falsely inflated* Cape's bids to allow Streu and Vinton to win the project. Thus, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

453 F.3d 396                                                                    Page 4
453 F.3d 396, 2006-2 Trade Cases P 75,337
(Cite as: 453 F.3d 396)

other defendants' "undercutting" did not necessarily result in lower prices for the state, Cape claims. Defendants respond that Cape did not raise any such allegation in the pleadings that were before the district court.

Cape believes that it did raise this theory in its pleadings below. First, Cape alleged that Beaudoin had the authority to **400** prepare cost estimates that the company would use to prepare its bids.[FN1] The rest of the theory, Cape submits, can be inferred from Cape's allegations that "Defendants" "rigged" bids. Cape argues that "rigged," since it is used in reference to "Defendants" (which would include Beaudoin), should encompass the inflated estimate scheme alleged on appeal. The language in the complaint that best supports this theory is found in paragraph 85, wherein Cape alleges, "[D]efendants [presumably including Beaudoin] took various actions, including ... designating which coconspirator [sic] would submit the low bid for the project and which of the co-conspirators [again, presumably including Beaudoin] would submit higher, complementary bids for the project."

> FN1. This contention was not made as articulately in the pleadings, which alleged instead that Beaudoin "as part of his job worked on estimates for some bids submitted to WisDOT."

After reading the complaint, we conclude that the issue was not adequately plead to the district court. Most of the complaint alleges that Streu and Vinton unfairly underbid Cape, and mentions Beaudoin only in the context of accusing him of sharing information with the other defendants so as to allow them to adjust their bids.

Plaintiff's argument that it properly plead its theory that Beaudoin inflated Cape's bids merely by alleging that the "defendants" "rigged" bids is weakened by the way in which Cape uses the word "defendants" throughout its complaint. For example, almost immediately following paragraph 85 is an accusation that "defendants" "[a]ccept[ed]" payment from the State of Wisconsin." Including Beaudoin in this group of "defendants" is arguably inconsistent with Cape's own claim for damages. Throughout the complaint, Cape repeatedly refers to "defendants" allocating contracts amongst "themselves," with the clear implication that only Streu and Vinton received the contracts and Cape was ex-

cluded. We believe it unfair to expect Defendants to completely ignore the context of the complaint and read the term "defendants" to mean "defendants [including Beaudoin]," as Cape encourages us to do in its brief, when throughout most of the complaint, the allegations make sense only if "defendants" is read to mean "defendants [excluding Beaudoin]."

Therefore, we hold that the district court had no basis from which to reasonably find that the claim that Beaudoin artificially raised Cape's bids was included in the complaint, and was justified in not considering it.

Cape argues that even if it did not properly allege its claim, the district court should have allowed it to amend its complaint before dismissing it with prejudice. Defendants counter that Cape never requested leave to amend its complaint. Cape arguably states its desire to amend its complaint, if necessary, in the next-to-last paragraph in its response to the defendants' motion to dismiss;[FN2] however, neither the caption nor the conclusion of the motion formally requests leave to amend.

> FN2. That paragraph reads, "If there is any question as to the sufficiency of the allegations as to the federal and state claims (which Cape contends there is not), the claims certainly should not be dismissed with prejudice as defendants request. Cape should be afforded the opportunity to amend its complaint so as to describe in even greater detail the damages it suffered as a result of defendants' Sherman Act violations and how another enterprise ... existed and was utilized by defendants to perpetrate their scheme."

[3] Under Federal Rule of Civil Procedure 15, leave to amend "shall be freely given when justice so requires." Cape seems to argue that, even though it did not properly request leave to amend its complaint,**401** the district court was *required* by Rule 15 to dismiss without prejudice and/or *sua sponte* grant leave to amend the complaint. It does not cite any case law to support this proposition. In *Coates v. Illinois State Board of Education, 559 F.2d 445 (7th Cir.1977)*, the plaintiff made a Rule 15-based argument similar to the one Cape presses here. We ruled, "We agree that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



[the district judge] correctly held the complaint insufficient. He did not abuse his discretion in denying leave to amend the complaint, because such leave was never sought. Under these circumstances, we can find no basis for disturbing his judgment in any way." *Coates,* 559 F.2d at 451 (citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)) (footnote omitted).

Furthermore, the only time Cape even arguably requested leave to amend, in the penultimate paragraph of its response to defendants' motion to dismiss, it expressed its intention to "describe in even greater detail the damages it suffered." The district court could have quite reasonably believed that an amended complaint would suffer the same fatal flaws as the one before it, and that the "interests of justice" did not require permission to amend. *See* Fed. R. Civ. P. 15. District judges are not mind readers, and should not be required to explain to parties whether or how their complaints could be drafted to survive a motion to dismiss. Even assuming that Cape properly moved to amend, the district court did not abuse its discretion in dismissing with prejudice, since it had no way of knowing what the proposed amendment entailed.

Cape's final argument against dismissal of its antitrust claim is that it has stated a claim under our precedent in *Hammes v. AAMCO Transmissions, Inc.,* 33 F.3d 774, 783 (7th Cir.1994). That case holds that antitrust damages may result if a cartel inflicts damage on one of its own members in retaliation for that member's attempt to undercut the cartel's prices and therefore lower consumer prices. *Id.* The heart of Cape's claim, however, is that it was never a member of the cartel in the first place, which is what allowed it to be underbid by the members of the conspiracy. The *Hammes* case is therefore inapplicable here.

For these reasons, we affirm the district court's dismissal of Cape's antitrust claim.

### B. RICO Claim

[4] Cape also protests the district court's dismissal of its civil RICO claim. The district court found that Cape had failed to allege that the defendants had managed or controlled WisDOT, thus creating an incomplete civil RICO claim under 18 U.S.C. § 1964(c). In *Reves v. Ernst &*

*Young,* 507 U.S. 170, 178-79, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), the Court clarified that in order to "participate in the conduct" of a criminal enterprise for the purposes of RICO liability, a defendant must exercise some role in the direction of the enterprise. *See also* Goren v. New Vision Int'l, Inc., 156 F.3d 721, 727 (7th Cir.1998) ("[M]ere participation in the activities of the enterprise is insufficient; the defendant must participate in the operation or management of the enterprise.").

Cape argues that it has alleged the requisite control because WisDOT awarded the projects by a computer program designed to accept the lowest bid; therefore the bid-rigging scheme effectively controlled a "core function" of WisDOT, selecting who would receive construction projects. Cape argues that this meets the control element of a civil RICO claim.

Cape relies principally on a recent case from the Middle District of Florida, *Lockheed Martin Corp. v. Boeing Co.,* 357 F.Supp.2d 1350 (M.D.Fla.2005), in which the district court ruled that by creating its bid estimates based on Lockheed Martin's *402 confidential information, which was stolen from an ex-Lockheed employee, Boeing had "controlled" the government's bid process within the meaning of the civil RICO statute.

The *Lockheed Martin* court relied in part on *United States v. Castro,* 89 F.3d 1443 (11th Cir.1996). In *Castro,* a group of lawyers paid a judge to assign them contract public defender cases. The Eleventh Circuit ruled that although the lawyers had no actual control over who received the public defender appointments, their kickbacks to the judge gave them sufficient "control" over the court that they could be held liable for RICO violations. The *Lockheed Martin* court analogized Boeing's scheme to *Castro,* stating:

[I]n this case, the Boeing defendants were not primarily responsible for determining which companies received ... contracts. Yet, like the defendants in *Castro,* they are alleged to have engaged in illegal activity which substantially impacted the decisions of those who did have principal decision-making authority. The only difference in this case is that the decision-makers were neither aware of, nor complicit in, the alleged scheme. This is a distinction, however, that is irrelevant to the question of whether the Boeing De-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

453 F.3d 396                                                                                   Page 6
453 F.3d 396, 2006-2 Trade Cases P 75,337
**(Cite as: 453 F.3d 396)**

fendants controlled the alleged legitimate enterprise through their illegal conduct.

*Lockheed Martin,* 357 F.Supp.2d at 1359-60.

The district court rejected Cape's analogy to *Lockheed Martin.* Judge Griesbach wrote that he believed that the *Lockheed Martin* court had confused controlling the *outcome* of a given situation with controlling the *enterprise itself.* The court believed that the only affairs controlled here were the defendants' own. The district court stated that the defendants were basically cheaters, who had no more "control" over WisDOT than an illegal steroid user has over Major League Baseball. Although the district court acknowledged that an outsider can "direct" an organization through, for example, bribery, the district court found these situations distinguishable from the instant case-in bribery situations, the outsider directs the enterprise by proxy.

Cape attempts to refute this logic by relying on this court's analysis in *United States v. Cummings,* 395 F.3d 392 (7th Cir.2005). In that case, a "skip tracer," or person employed by a credit agency to find debtors who can no longer be located, was accused of paying certain employees of the State of Illinois for confidential personal information available in a state database. We ruled that this bribery did not constitute the requisite control of the agency to maintain a RICO conviction, because the skip tracer "did not pay bribes in order to exert control over [the agency's] core functions [.]" *Cummings,* 395 F.3d at 399. Cape argues that the logical extension of this case is that Defendants exercised sufficient control over WisDOT to create a valid civil RICO claim, since they exercised control over the allocation of construction contracts, a "core function" of the agency.

[5] This argument presents a classic logical fallacy. *Cummings* stands for the proposition that control over an agency *requires* control over one of the agency's "core functions." In other words, control over an agency's core functions is necessary, but potentially insufficient, to create the appropriate level of control required for a RICO claim. In this case, Defendants controlled the *outcome* of WisDOT's bidding process, but not the manner in which the department went about awarding the contract. That is not enough for civil RICO purposes. If the defendants had bribed a Wis-

DOT employee to override the computer's recommendation, or enter a false bid into the computer, they would have controlled the enterprise. **\*403** That is not the case here. Cape has failed to demonstrate that the defendants controlled WisDOT for civil RICO purposes.

[6] Even assuming that Cape had shown that defendants "managed or controlled" WisDOT, its claim would still fail because it has not properly alleged that the RICO violation was the proximate cause of its damages. The Supreme Court recently made clear that a civil RICO claim cannot survive unless the plaintiff properly alleges that the RICO violation was the proximate cause of his or her damages. *Anza v. Ideal Steel Supply Corp.,* --- U.S. ----, 126 S.Ct. 1991, 164 L.Ed.2d 720, 2006 WL 1519365 (2006). In *Anza,* the plaintiff, Ideal Steel Supply Corp., alleged that the defendants' company, National, had not paid New York sales tax, which allowed National to unfairly undercut Ideal's prices. *Anza,* 126 S.Ct. at 1994. Plaintiff alleged that defendants committed mail fraud and wire fraud when they submitted false tax returns to the New York State Department of Taxation and Finance. *Id.* at 1995. The Second Circuit ruled that "even where the [racketeering] scheme depended on fraudulent communications directed to and relied on by a third party rather than the plaintiff," the plaintiff has adequately plead proximate cause if the complaint alleges a pattern of racketeering activity "that was intended to and did give the defendant a competitive advantage over the plaintiff". *Id.* (citing *Ideal Supply Corp. v. Anza,* 373 F.3d 251 (2d Cir.2004)).

The Supreme Court disagreed, holding that the relevant inquiry to determine proximate cause is "whether the alleged violation led directly to the plaintiff's injuries." *Anza,* 126 S.Ct. at 1998. The Court wrote, "The RICO violation alleged by Ideal is that the Anzas conducted National's affairs through a pattern of mail fraud and wire fraud. The direct victim of the conduct was the State of New York, not Ideal. It was the state that was being defrauded and the State that lost tax revenue as a result." *Id.* at 1997. The Court explained that civil RICO plaintiffs must show that the alleged fraud directly harmed them, lest damages become too difficult to ascertain.

The injury Ideal alleges is its own loss of sales resulting

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

453 F.3d 396                                                                                      Page 7
453 F.3d 396, 2006-2 Trade Cases P 75,337
**(Cite as: 453 F.3d 396)**

from National's decreased prices for cash-paying customers. National, however, could have lowered its prices for any number of reasons unconnected to the asserted pattern of fraud. It may have received a cash inflow from some other source or concluded that the additional sales would justify a smaller profit margin. Its lowering of prices in no sense required it to defraud the state tax authority. Likewise, the fact that a company commits tax fraud does not mean the company will lower its prices; the additional cash could go anywhere from asset acquisition to research and development to dividend payouts.

*Id.*

This case poses similar concerns. A court could never be certain whether Cape would have won any of the contracts that were the subject of the conspiracy "for any number of reasons unconnected to the asserted pattern of fraud." *See Anza,* 126 S.Ct. at 1997. It is entirely possible that Defendants would have won some bids absent the bid-rigging scheme, even if making less profits in the meantime. Furthermore, Cape cannot show what portion of its "lost market share" is attributable to the bids lost to the bid-rigging scheme. As the Court stated in *Anza,* "Businesses lose and gain customers for many reasons, and it would require a complex assessment to establish what portion of Ideal's lost sales were the product of National's decreased prices.... A RICO plaintiff cannot circumvent the proximate-cause requirement simply by claiming that the defendant's aim was to increase market **\*404** share at a competitor's expense." *Anza,* 126 S.Ct. at 1997-98.

Also compelling is the Court's holding that a direct causal connection is "especially warranted where the immediate victims of an alleged RICO violation can be expected to vindicate the laws by pursuing their own claims." *Id.* at 1998. Here, WisDOT is fully capable of pursuing appropriate remedies, much like the State of New York in *Anza.*

Therefore, both because Cape has not shown that Defendants "managed or controlled" WisDOT, and because it has not shown that its injuries were proximately caused by the bid-rigging scheme, we affirm the district court's dismissal of the civil RICO claim.

## III. Conclusion

For the foregoing reasons, the judgment of the district court is Affirmed.

C.A.7 (Wis.),2006.
James Cape & Sons Co. v. PCC Const. Co.
453 F.3d 396, 2006-2 Trade Cases P 75,337

Briefs and Other Related Documents (Back to top)

• 2006 WL 304833 (Appellate Brief) Reply Brief of Plaintiff-Appellant James Cape & Sons Company (Jan. 17, 2006) Original Image of this Document (PDF)
• 05-3894 (Docket) (Oct. 3, 2005)
• 2005 WL 3749791 (Appellate Brief) Brief and Appendix of Defendant-Appellee Daniel Beaudoin (Jan. 3, 2005) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.