Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1858153 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Emile B. MAALOUF, individually d/b/a Chicago International Network, Plaintiff,
v.
SALOMON SMITH BARNEY, INC., Defendant.
No. 02 Civ. 4770(SAS).

April 10, 2003.

Entrepreneur brought action against investment banker alleging breach of contract, negligent misrepresentation, breach of fiduciary duty, tortious interference with prospective business transactions, unjust enrichment, breach of the covenant of good faith and fair dealing, and tortious interference with a business relationship. On defendant's motion to dismiss, the District Court, Scheindlin, J., held that: (1) entrepreneur failed to state negligent misrepresentation claim; (2) entrepreneur failed to state breach of fiduciary duty claim; (3) entrepreneur stated claim for tortious interference with prospective business transactions; (4) fact that entrepreneur could recover only on contract or quasi-contract, but not both, did not preclude entrepreneur from pleading unjust enrichment in the alternative; (5) entrepreneur stated claim for breach of covenant of good faith and fair dealing; and (6) entrepreneur was required to identify existing third party contract he claimed was breached as result of investment banker's conduct.

Motion granted in part and denied in part.

West Headnotes

**[1] Brokers 65 €══34**

65 Brokers
65IV Duties and Liability to Principal
65k34 k. Fraud of Broker or His Agent. Most Cited Cases
Entrepreneur, who was in business of developing opportunities in emerging markets, failed to state negligent misrepresentation claim under New York law against investment banker, who entered into consulting contract with entrepreneur, on allegations that banker stated that it "was able and

ready to raise capital on the International market for the oil company Rosneft through debt financing guaranteed by [Rosneft's] oil reserves and assets," since entrepreneur did not identify allegedly false representations made by corporation, which person made them, where and when were they made, and why they were considered fraudulent. Fed.Rules Civ.Proc.Rule 9, 28 U.S.C.A.

**[2] Brokers 65 €══22**

65 Brokers
65IV Duties and Liability to Principal
65k22 k. Skill and Care Required. Most Cited Cases
Entrepreneur, who was in business of developing opportunities in emerging markets, failed to state breach of fiduciary duty claim under New York law against investment banker, who entered into consulting contract with entrepreneur, on allegations that banker "was in a dominant position as it possessed knowledge and expertise" and that a "relationship of trust and confidence" existed between entrepreneur and banker, since parties were involved in garden variety business transaction.

**[3] Torts 379 €══241**

379 Torts
379III Tortious Interference
379III(B) Business or Contractual Relations
379III(B)2 Particular Cases
379k241 k. Business Relations or Economic Advantage, in General. Most Cited Cases
    (Formerly 379k10(3))
Entrepreneur, who was in business of developing opportunities in emerging markets, stated claim for tortious interference with prospective business transactions under New York law against investment banker, who entered into consulting contract with entrepreneur, on allegations that banker was aware that entrepreneur had "substantial opportunities and prospective advantage" with companies in Russia, that banker intentionally interfered with those opportunities, and entrepreneur's business was severely damaged as to past, present, and future engagements and prospects.

**[4] Federal Civil Procedure 170A €══675.1**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2003 WL 1858153 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

170A Federal Civil Procedure
170AVII Pleadings and Motions
170AVII(B) Complaint
170AVII(B)1 In General
170Ak675 Alternate, Hypothetical and Inconsistent Claims
170Ak675.1 k. In General. Most Cited Cases
Fact that plaintiff could recover only on contract or quasi-contract under New York law, but not both, did not preclude plaintiff from pleading unjust enrichment in the alternative. Fed.Rules Civ.Proc.Rule 8(e)(2), 28 U.S.C.A.

[5] Contracts 95 ⚖➔332(2)

95 Contracts
95VI Actions for Breach
95k331 Pleading
95k332 Declaration, Complaint, or Petition in General
95k332(2) k. Sufficiency of Statement of Cause of Action in General. Most Cited Cases
Entrepreneur, who was in business of developing opportunities in emerging markets, stated claim under New York law for breach of covenant of good faith and fair dealing against investment banker, who entered into consulting contract with entrepreneur, which could not be dismissed at pleading stage, where entrepreneur otherwise stated claim under quasi-contract theory, and alleged that banker engaged in unauthorized communications and direct transactions with entrepreneur's clients.

[6] Torts 379 ⚖➔255

379 Torts
379III Tortious Interference
379III(B) Business or Contractual Relations
379III(B)3 Actions in General
379k255 k. Pleading. Most Cited Cases
      (Formerly 379k26(1))
Although a plaintiff does not need to describe a defendant's motivation at the pleading stage, a plaintiff claiming tortious interference with a business relationship under New York law must identify the existing third party contract he claims was breached as a result of defendant's conduct.

Emile B. Maalouf, Marshall, Virginia, Plaintiff pro se.
Thomas J. Moloney, Boaz S. Morag, Cleary, Gottlieb, Steen

& Hamilton, New York, New York, for Defendant.

*OPINION AND ORDER*

SCHEINDLIN, J.
*1 Emile B. Maalouf, doing business as Chicago International Network ("CIN") and appearing pro se, is suing Salomon Smith Barney, Inc. ("Smith Barney") for, *inter alia*, breach of contract. In addition to breach of contract, Maalouf brings the following claims: negligent misrepresentation; breach of fiduciary duty; tortious interference with prospective business transactions; unjust enrichment; breach of the covenant of good faith and fair dealing; and tortious interference with a business relationship. Smith Barney is moving to dismiss all claims other than the breach of contract claim. For the following reasons, defendant's motion is granted in part and denied in part.

I. THE COMPLAINT

The following allegations, as pled in Maalouf's Second Amended Complaint ("Complaint") are assumed to be true for purposes of this motion.

A. Introduction

CIN was established to develop opportunities in emerging markets, especially those in the countries of the former Soviet Union. *See* Complaint ¶¶ 7-8. Recognizing that large amounts of capital would be needed to develop these markets, CIN approached Smith Barney with a proposition intended to improve the overseas position of Smith Barney's investment banking division. *See id.* ¶¶ 9, 11-12. In other words, CIN acted as an intermediary between Smith Barney and certain Russian companies. CIN would introduce Smith Barney to these companies and, in return, would receive fees in the form of cash and equity ownership once a deal was consummated. The rights and obligations of the parties were memorialized in the following two letter agreements.

B. May 1995 Agreement

On May 10, 1995, CIN and Smith Barney entered into a Non-Disclosure and Non-Circumvention Agreement (the "May 1995 Agreement") whereby CIN was to act as representative for three Russian companies, referred to as "Listed Parties" in the Addendum attached to the May 1995 Agree-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                                  Page 3
Not Reported in F.Supp.2d, 2003 WL 1858153 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

ment.[FN1] *See* Addendum to May 1995 Agreement, Ex. A to Complaint. Pursuant to the May 1995 Agreement, CIN agreed to provide Smith Barney with certain "Confidential Information" relating to the Listed Parties who, according to CIN, were "seeking advice and assistance with regard to the potential sale of their securities in the United States and elsewhere." May 1995 Agreement at 1. The May 1995 Agreement provided that Smith Barney would not disclose the Confidential Information provided by CIN to any outside party. *See id.* at 2. In addition, Smith Barney agreed not to make any separate contract or deal, or enter into any transaction, with the Listed Parties or their affiliates without CIN's express written permission. *See id.* The May 1995 Agreement did not include any provisions relating to CIN's compensation; the only duties it imposed on Smith Barney were to maintain the confidentiality of information provided by CIN and to obtain CIN's written consent before dealing with the Listed Parties. Compensation was addressed in a subsequent agreement.[FN2]

> FN1. The three companies were Rosneft Joint-Stock Company ("Rosneft"), Almazy Yakutii Joint-Stock Company ("Yakutii") and Almazy Rossii-Sakha Joint-Stock Company ("Rossii-Sakha"). *See* Addendum to May 1995 Agreement.

> FN2. Maalouf annexed an "Agreement on the Implementation of a Capital Market Strategy," dated December 1, 1995, to his Complaint. *See* Ex. A1 to Complaint. Although this agreement contains provisions regarding the payment of compensation to CIN, it is not signed by either party and therefore not a contract.

### C. June 24, 1996 Agreement

**\*2** On June 24, 1996, the parties entered into a supplemental agreement (the "June 1996 Agreement") which sets forth specific terms and conditions governing CIN's arrangement with Smith Barney. *See* Ex. B to Complaint. The June 1996 Agreement describes the scope of services to be provided by CIN to Smith Barney as follows:
The Company [CIN] agrees to provide consulting services to Smith Barney on an exclusive basis with regard to busi-

ness opportunities, including the potential offering of securities in the United States (collectively, "Business Opportunities") for the Russian companies identified as "Listed Parties" in a letter agreement between the Company and Smith Barney, dated May 10, 1995.

June 1996 Agreement at 1.

With regard to compensation, the June 1996 Agreement provides for the payment of a $25,000 consulting fee, payable in two installments of $12,500-the first upon execution of the June 1996 Agreement and the second upon its expiration. This consultation fee was not intended to be CIN's only compensation as the 1996 Agreement states:
The parties acknowledge that the compensation described in the preceding paragraph shall not constitute compensation for closing any transaction with one or more Listed Parties, and the parties agree to negotiate a reasonable compensation to be paid by Smith Barney to [CIN] in the event such a transaction is completed on terms customary for Smith Barney for similar services (unless otherwise agreed to in writing by both parties).

June 1996 Agreement at 2. The June 1996 Agreement further provides that CIN is to function as an independent contractor with regard to the above services, not as an employee or agent of Smith Barney. *See id.* In addition, the June 1996 Agreement "does not create a partnership or joint venture between [CIN] and Smith Barney." *Id.* Nor does the June 1996 Agreement constitute CIN's " 'express written permission,' as detailed in the letter agreement dated May 10, 1995, between [CIN] and Smith Barney, to make a separate contract or enter into a transaction with any of the Listed Parties, and that Smith Barney shall continue to require [CIN's] express written permission to consummate such a transaction with any of the Listed Parties or their affiliates." *Id.*

### D. The Alleged Breaches

Maalouf alleges that Smith Barney and its affiliates made repetitive contacts, dealings and transactions with Listed Parties without the express written permission of CIN. *See* Complaint ¶ 25. For example, Smith Barney allegedly breached the May 1995 Agreement by concluding a $62

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1858153 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

million transaction with Rossii-Sakha in mid 1996. *See id.* ¶ 26. Maalouf also alleges that Smith Barney dealt directly with Gazprom, an affiliate of Rosneft, without CIN's express permission. *See id.* ¶¶ 31, 33 and 40. Smith Barney allegedly consummated three Eurobond transactions in 2002 with Gazprom, two for $500 million and one for $200 million, without paying CIN any fees. *See id.* ¶¶ 45-47. For this and other conduct, plaintiff seeks, *inter alia,* damages in the amount of $30 million.

## II. MOTION TO DISMISS STANDARD

**\*3** "Given the Federal Rules' simplified standard for pleading, '[a] court may dismiss a complaint *only* if it is clear that no relief could be granted under *any* set of facts that could be proved consistent with the allegations." ' *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (emphasis added) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)). A complaint need not state the legal theory, facts, or elements underlying the claim, except in certain instances. *Compare* Fed.R.Civ.P. 8 *with* Fed.R.Civ.P. 9.[FN3] Pursuant to the simplified pleading standard of Rule 8(a), a complaint need only include " 'a short and plain statement of the claim showing that the pleader is entitled to relief." ' FN4 *Swierkiewicz,* 534 U.S. at 512 (quoting Rule 8(a)(2)). A plaintiff need not, in other words, plead the elements of a claim. *See In re Initial Public Offering Sec. Litig.,* 241 F.Supp.2d 281, 323 (S.D.N.Y.2003) ("Rule 8(a) does not require plaintiffs to plead the legal theory, facts or elements underlying their claim.").

> FN3. The heightened pleading standard of Rule 9(b) requires that in claims of fraud or mistake "the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b).

> FN4. Although New York substantive law governs the claims in issue here, federal procedural law is applied. *See generally Hanna v. Plumer,* 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965) (explaining that procedural requirements in federal court are governed by federal, not state, procedural law). A federal court may not impose a heightened pleading standard-under any circumstance-unless

that heightened standard is embodied in the Rules or enacted by Congress. *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 168-69, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in plaintiff's favor. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002). Courts may not consider matters outside the pleadings but may consider documents attached to the pleadings, documents referenced in the pleadings, or documents that are integral to the pleadings. *See id.* at 152-53.

At the motion to dismiss stage, the issue " 'is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test." ' *Phelps v. Kapnolas,* 308 F.3d 180, 184-85 (2d Cir.2002) (per curiam) (quoting *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998)). Therefore, the task of the court in ruling on a Rule 12(b)(6) motion is " 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." ' *Pierce v. Marano,* No. 01 Civ. 3410, 2002 WL 1858772, at \*3 (S.D.N.Y. Aug.13, 2002) (quoting *Saunders v. Coughlin,* No. 92 Civ. 4289, 1994 WL 98108, at \*2 (S.D.N.Y. Mar. 15, 1994)).

## III. DISCUSSION

### A. Negligent Misrepresentation

[1] In his second cause of action, Maalouf claims that Smith Barney made negligent misrepresentations upon which CIN relied. Examples of such misrepresentations include statements by Smith Barney that it would engage in multi-billion dollar transactions with Listed Parties through CIN, *see* Complaint ¶ 50, and that Smith Barney was able and ready to raise capital for Rosneft through debt financing on the international market, *see id.* ¶ 51.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 5
Not Reported in F.Supp.2d, 2003 WL 1858153 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Smith Barney seeks to dismiss plaintiff's negligent misrepresentation claim as " 'so broad and conclusory as to be meaningless." ' Memorandum of Law in Support of Defendant's Motion to Dismiss the Second Through Seventh Causes of Action in the Second Amended Complaint at 8 ("Def.Mem.") (quoting *In re Livent, Inc. Noteholders Sec. Litig.,* 151 F.Supp.2d 371, 405 (S.D.N.Y.2001)). Smith Barney also seeks dismissal of this claim on the ground that Maalouf failed to plead the required elements of a negligent misrepresentation claim. [FN5]

> FN5. These elements are as follows: (1) defendant had a duty, by virtue of a special relationship with plaintiff, to give plaintiff correct information; (2) defendant made a false representation that it should have known was incorrect; (3) defendant knew that plaintiff desired the information supplied in the representation for a serious purpose; (4) plaintiff intended to rely and act upon such information; and (5) plaintiff reasonably relied on such information to its detriment. *See Hydro Investors, Inc. v. Trafalgar Power Inc.,,* 227 F.3d 8, 20 (2d Cir.2000).

**\*4** Negligent misrepresentation is a type of fraud and, as such, is subject to Rule 9(b)'s heightened pleading standard. *See Simon v. Castello,* 172 F.R.D. 103, 105 (S.D.N.Y.1997) ("The particularity requirements of Rule 9(b) have also been found to apply to claims for negligent misrepresentation."). Nonetheless, it does not necessarily follow that a plaintiff must plead all elements of a negligent misrepresentation claim with particularity. Rule 9(b) merely states that "the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). Accordingly, Rule 9(b)' s particularity requirement demands that the complaint contain specific factual allegations demonstrating that a statement was false or misleading when made. *See In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 69-70 (2d Cir.) ("The complaint must identify the statements plaintiff asserts were fraudulent and why, in plaintiff's view, they were fraudulent, specifying who made them, and where and when they were made."), *cert. denied sub nom., Scholastic Corp. v. Truncellito,* 534 U.S. 1071, 122 S.Ct. 678, 151 L.Ed.2d 590 (2001).

Here, plaintiff's generalized averments of negligent misrepresentations allegedly made by Smith Barney do not meet the particularity requirements of Rule 9. To do so, Maalouf would have to identify, at a minimum, the allegedly false representations made by Smith Barney, who at Smith Barney made them, where and when were they made, and why they are considered fraudulent. [FN6] For example, Maalouf claims that Smith Barney made representations "that it was able and ready to raise capital on the International market for the oil company Rosneft through debt financing guaranteed by [Rosneft's] oil reserves and assets...." Complaint ¶ 51. Such a vague and generic allegation does not satisfy Rule 9(b) because it does not put the defendant on sufficient notice of the claim, *i.e.,* the who, what, why, where and when. *See In re Scholastic Corp.,* 252 F.3d at 69-70. Having failed to provide this level of detail, plaintiff's negligent misrepresentation claim is dismissed without prejudice.

> FN6. In the context of securities fraud case, the Second Circuit has interpreted Rule 9(b) as follows:
> To pass muster under rule 9(b), the complaint must allege the time, place, speaker, and sometimes even the content of the alleged misrepresentation. Although scienter need not be alleged with great specificity, there must be some factual basis for conclusory allegations of intent.
> *Quaknine v. MacFarlane,* 897 F.2d 75, 79-80 (2d Cir.1990) (citations omitted).

**B. Breach of Fiduciary Duty**

**[2]** Maalouf's third claim against Smith Barney is for breach of fiduciary duty. Maalouf alleges that Smith Barney owed a duty to CIN not to conceal critical and detrimental facts regarding Smith Barney's direct dealings with Rossii-Sakha. *See* Complaint ¶¶ 66-67, 70. Specifically, plaintiff claims that "CIN was justified in believing that Smith Barney, Inc., would not act in a manner adverse to CIN's interest. Smith Barney, Inc., was in a dominant position as it possessed knowledge and expertise and Smith Barney's involvement could lead to a contract binding CIN." *Id.* ¶ 65.

In order to pursue a breach of fiduciary duty claim, there must be a fiduciary relationship between the parties. *See*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1858153 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

*Whitney v. Citibank, N.A.,* 782 F.2d 1106, 1115 (2d Cir.1986) (describing the elements of a breach of fiduciary duty claim as: (1) a breach by a fiduciary in its obligations to another; (2) defendant's knowing participation in the breach, and (3) damages as a result of the breach). Requiring Maalouf to plead all of these elements would clearly contradict *Swierkiewicz.* However, dismissal is nonetheless appropriate where a plaintiff has not, and cannot as a matter of law, plead a fiduciary relationship.

**\*5** Entering into a conventional business relationship generally does not create a fiduciary relationship. *See Reuben H. Donnelley Corp. v. Mark I Mktg. Corp.,* 893 F.Supp. 285, 289 (S.D.N.Y.1995). *See also In Re Kressner,* 206 B.R. 303, 312 (Bankr.S.D.N.Y.1997) ("A substantial factor to be considered in determining the existence of a fiduciary relationship is the intent to create a trust relationship, rather than a contractual relationship."). As stated by the Sixth Circuit,
To make out a claim that a fiduciary relationship existed, the party claiming the fiduciary relationship must first show the relationship existed before the transaction that is the subject of the action. Second, the party claiming a fiduciary relationship must show that reliance was not merely subjective. Third, the party claiming a fiduciary relationship must show that the nature of the relationship imposed a duty upon the fiduciary to act in the principal's interest, even if such action were to the detriment of the fiduciary.

*In re Sallee,* 286 F.3d 878, 892 (6th Cir.) (citations omitted), *cert. denied,* 537 U.S. 949, 123 S.Ct. 415, 154 L.Ed.2d 294 (2002).

In attempting to plead a fiduciary relationship, Maalouf has alleged that Smith Barney "was in a dominant position as it possessed knowledge and expertise" and that a "relationship of trust and confidence between CIN and Smith Barney Inc" existed. Complaint ¶¶ 65-66. However, "[t]he fact that one businessman trusts another, and relies upon his promise to perform a contract, does not rise to a confidential relationship." *In re Sallee,* 286 F.3d at 891. Moreover, "an arm's length business transaction, even those where one party has superior bargaining power[,] is not enough to give rise to a fiduciary relationship." *Sony Music Entm't Inc. v. Robison,* No. 01 Civ. 6415, 2002 WL 272406, at *3 (S.D.N.Y. Feb.25, 2002) (quotation marks and citation omitted). Given

that Maalouf alleges that CIN and Smith Barney were parties to a garden variety business transaction, there can be no fiduciary relationship between the two parties. Nonetheless, if plaintiff can allege that Smith Barney was a fiduciary with respect to CIN, then his claim might be able to proceed. *See Sony Music,* 2002 WL 272406, at *3. Accordingly, plaintiff's breach of fiduciary duty claim is dismissed without prejudice.

### C. Tortious Interference with Prospective Business Transactions

**[3]** Maalouf's fourth claim against Smith Barney is for tortious interference with prospective business transactions. According to Maalouf, Smith Barney was aware that CIN had "substantial opportunities and prospective advantage" with the Listed Parties. Complaint ¶ 73. Maalouf claims that Smith Barney intentionally interfered with CIN's prospective business opportunities and, as a result, CIN's business was severely damaged as to past, present and future engagements and prospects. *See id.* ¶¶ 74, 76. Although it is not entirely clear from the Complaint as to how Smith Barney interfered, Maalouf alleges that CIN "incurred reasonably foreseeable losses as a result of the *omissions and statements* of Smith Barney Inc." *Id.* ¶ 76 (emphasis added).

**\*6** Smith Barney seeks to dismiss this claim because Maalouf "does not identify the nature of CIN's business opportunities with the Listed Parties, nor does he explain how Smith Barney interfered with those opportunities." Def. Mem. at 12. In addition, defendant argues that plaintiff has failed to allege that any purported interference was done either with malicious motive or through wrongful means.[FN7] Defendant's argument may have succeeded before *Swierkiewicz.* However, the Supreme Court has emphatically reiterated that the purpose of pleadings is merely to put the adverse party on notice of the claims against it. *See Swierkiewicz,* 534 U.S. at 512 (the "short and plain statement" required by Rule 8(a)(2) must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests' ") (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). A plaintiff need not plead his claim in exhaustive detail, nor must he plead the elements of a particular claim. *See id.* ("Rule 8(a)'s simplified pleading standard applies to all civil

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1858153 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

actions, with limited exceptions."). Here, the Complaint sufficiently puts Smith Barney on notice of plaintiff's claim for tortious interference with prospective business transactions. The specifics of that claim, as well as defendant's motives and methods, will be explored through discovery. Defendant's motion to dismiss this claim is therefore denied.

> FN7. Under New York law, the elements of a claim for tortious interference with prospective business relations are: (1) a business relationship between plaintiff and a third party; (2) defendant's knowledge of such relationship; (3) intent to interfere; (4) defendant acted with the sole purpose of harming plaintiff or used dishonest, unfair or improper means; and (5) the relationship is injured. *See Nadel v. Play-by-Play Toys & Novelties, Inc., 208 F.3d 368, 382 (2d Cir.2000).* According to Smith Barney, plaintiff's claim fails because he has completely failed to allege malicious motive or wrongful means as required by the fourth element.

### D. Unjust Enrichment

[4] In his fifth claim against Smith Barney, Maalouf alleges that services rendered by CIN, as well as its disclosure of Confidential Information to Smith Barney, unjustly enriched Smith Barney to CIN's detriment. *See* Complaint ¶ 78. Maalouf goes on to state that Smith Barney has not compensated CIN for its services or "for damages resulting from its breaches of the specific written Agreements." *Id.* ¶ 79. Smith Barney seeks to dismiss this claim on the ground that a breach of contract claim and a claim for unjust enrichment are mutually exclusive. *See* Def. Mem. at 16.

Unjust enrichment is "an amorphous cause of action, but one which falls under the umbrella of quasi-contract, or contract implied-in-law." *Michele Pommier Models, Inc. v. Men Women N.Y. Model Mgmt., Inc., 14 F.Supp.2d 331, 338 (S.D.N.Y.1998), aff'd, 173 F.3d 845 (2d Cir.1999).* Unjust enrichment is premised on the notion that where principles of contract law are inadequate to compensate an unjustly deprived party, a court should resort to principles of equity. *See Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir.2000)* (noting that under New York law, the "essence" of an unjust enrichment claim "is that one party has received money or a

benefit at the expense of another") (quotation marks and citations omitted). Accordingly, under New York law, the existence of a valid contract generally preempts a quasi-contract claim for unjust enrichment. *See Ohio Players, Inc. v. Polygram Records, Inc., No. 99 Civ. 33, 2000 WL 1616999, at *4 (S.D.N.Y. Oct. 25, 2000)* ("Under New York law, unjust enrichment is a quasicontractual claim that ordinarily can be maintained only in the absence of a valid, enforceable contract.").

*7 "Here, Maalouf does not allege that the CIN Agreements are either unenforceable or that the dispute between CIN and Smith Barney falls outside the scope of those agreements." Def. Mem. at 17. In defense of the action, however, Smith Barney intends to argue that the transactions in dispute: (1) did not involve Smith Barney; (2) occurred after the CIN-Smith Barney Agreements terminated; and/or (3) were with Russian companies not covered under the Agreements. *See id.* at 2. It is the second defense that could conceivably re-characterize plaintiff's breach of contract claim into a claim for unjust enrichment. If the services rendered by CIN to Smith Barney are found to be outside the scope of the Agreements, Maalouf's breach of contract claim would necessarily fail. But Maalouf may still have a claim for unjust enrichment in the absence of a governing contract. The fact that Maalouf may only *recover* on one claim, either contract or quasi-contract, certainly does not preclude him from *pleading* unjust enrichment in the alternative.[FN8] *See* Fed.R.Civ.P. 8(e)(2); *see also MDCM Holdings, Inc. v. Credit Suisse First Boston Corp., 216 F.Supp.2d 251, 261 (S.D.N.Y.2002).* Accordingly, Smith Barney's motion to dismiss Maalouf's claim for unjust enrichment is denied.

> FN8. To plead a claim of unjust enrichment, a plaintiff must merely allege: "(1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff." *Golden Pac. Bancorp v. FDIC, 273 F.3d 509, 519 (2d Cir.2001).* Maalouf has met this minimal burden. *See* Complaint ¶¶ 77-83.

### E. Breach of Covenant of Good Faith and Fair Dealing

Not Reported in F.Supp.2d                                                                Page 8
Not Reported in F.Supp.2d, 2003 WL 1858153 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

[5] Maalouf's sixth claim against Smith Barney is for breach of the covenant of good faith and fair dealing. In short, Maalouf argues that Smith Barney's alleged unauthorized communications and direct transactions with the Listed Parties constituted breaches of the duty of good faith and fair dealing implicit in the Agreements. *See* Complaint ¶¶ 84-90. Smith Barney seeks to dismiss this claim as duplicative of plaintiff's breach of contract claim. *See* Def. Mem. at 18.

"Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance.... This embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton v. Educational Testing Serv.,* 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 663 N.E.2d 289 (1995) (quotation marks and citations omitted). *See also Renner v. Chase Manhattan Bank,* No. 98 Civ. 926, 2000 WL 781081, at *19 (S.D.N.Y. June 14, 2000) ("[T]he covenant of good faith arises out of and is inherent in a contract."). Because Maalouf could conceivably recover under a quasi-contract theory, as discussed with respect to his claim of unjust enrichment, his claim for breach of the covenant of good faith and fair dealing cannot be dismissed at this time.

### F. Tortious Interference with a Business Relationship

[6] Maalouf's final claim alleges that Smith Barney unlawfully interfered with "existing written agreements for joint ventures, representation and business development" with the Listed Parties and that Smith Barney's "tort [i]ous interference with CIN's business relationships caused a detriment to CIN and its contractual relations with Listed Parties." Complaint ¶¶ 92, 94. According to Maalouf, "[h]ad Smith Barney Inc. honored the terms of the Agreements with CIN[,] CIN would have been compensated for its years of work, and would have realized its planned joint ventures and stock ownership with Listed Parties." *Id.* ¶ 96.

*8 Smith Barney first argues that Maalouf's allegations based on CIN's purported *future* relations with the Listed Parties are virtually identical to those underlying his tortious interference with prospective business transactions claim. Defendant argues that the instant claim should be dismissed

for the same reasons. *See* Def. Mem. at 14. These arguments have already been addressed. Secondly, Smith Barney argues that Maalouf has failed to state a claim for tortious interference with *existing* business relations as he has failed to assert that Smith Barney induced any of the Listed Parties to breach any contractual duties owed CIN.[FN9] *See id.* at 15. Defendant also argues that Maalouf has failed to sufficiently plead Smith Barney's intent to interfere with contracts between CIN and the Listed Parties. *See id.* at 16.

> FN9. The elements of a claim for tortious interference with existing business relationships under New York law are as follows: (1) the existence of a valid contract; (2) defendant's knowledge of the contract; (3) defendant's intentional procurement of the breach of that contract; and (4) damages. *See Yucyco, Ltd. v. Republic of Slovenia,* 984 F.Supp. 209, 224 (S.D.N.Y.1997).

A plaintiff does not need to describe a defendant's motivation at the pleading stage. The question of intent is highly fact-based and often involves sifting through circumstantial evidence. Such evidence generally becomes available through the course of discovery. *See Swierkiewicz,* 534 U.S. at 512 ("Before discovery has unearthed relevant facts and evidence, it may be difficult to define the precise formulation of the required prima facie case in a particular case."). However, a plaintiff claiming tortious interference with a business relationship must at least identify the existing third party contract he claims was breached as a result of defendant's conduct. *See Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.,* No. 96 Civ. 1103, 1996 WL 724734, at *3 (S.D.N.Y. Dec. 17, 1996) (stating that courts have dismissed claims for tortious interference with contractual relations for failing to identify specific contracts that were breached by a defendant's actions). The instant claim is therefore dismissed without prejudice.

### IV. LEAVE TO AMEND

When a cause of action is dismissed because of pleading deficiencies, the usual remedy is to permit a plaintiff to amend his complaint. *See* Fed.R.Civ.P. 15(a) ("[L]eave [to amend] shall be freely given when justice so requires."); *see also Foman v. Davis,* 371 U.S. 178, 183, 83 S.Ct. 227, 9 L.Ed.2d

Westlaw.

Not Reported in F.Supp.2d

Page 9

Not Reported in F.Supp.2d, 2003 WL 1858153 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

222 (1962) (stating that refusal to grant leave to amend without reason is an abuse of discretion and inconsistent with the spirit of the Federal Rules). Leave to amend is especially appropriate here given plaintiff's pro se status.

Accordingly, plaintiff is hereby given one final opportunity to amend his complaint to properly plead his claims of negligent misrepresentation, FN10 breach of fiduciary duty, and tortious interference with a business relationship. Any such amended complaint must be served within thirty (30) days of receipt of this Opinion.

> FN10. The policy of granting free leave to amend is especially appropriate in the context of claims dismissed under Rule 9(b) because the law favors resolving disputes on their merits. *See Acito v. IMCERA Group, Inc., 47 F.3d 47, 54-55 (2d Cir.1995); Luce v. Edelstein, 802 F.2d 49, 56-57 (2d Cir.1986).*

## V. CONCLUSION

For the reasons stated above, defendant's motion is granted in part and denied in part. In sum, Maalouf's claims for negligent misrepresentation, breach of fiduciary duty, and tortious interference with a business relationship are dismissed without prejudice with possible leave to re-plead. Plaintiff's claims of tortious interference with prospective business transactions, unjust enrichment, and breach of the covenant of good faith and fair dealing remain. A status conference is scheduled for Monday April 14, 2003, at 1:00 p.m. The Clerk of the Court is directed to close this motion.

S.D.N.Y.,2003.
Maalouf v. Salomon Smith Barney, Inc.
Not Reported in F.Supp.2d, 2003 WL 1858153 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1:02cv04770 (Docket) (Jun. 20, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw.**

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2003 WL 223563 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Guy MARSHALL, Plaintiff,
v.
NATIONAL ASSOC. OF LETTER CARRIERS BR. 36, et.
al, Defendants.
**Nos. 00 Civ. 3167(LTS), 01 Civ. 3086(LTS).**

Feb. 3, 2003.

African-American former Postal Service (USPS) employee
brought hybrid duty of fair representation/breach of collect-
ive bargaining agreement action against USPS and letter
carriers' union local under Postal Reorganization Act (PRA),
and brought separate action alleging employment discrimin-
ation and retaliation under Title VII. On defendants' motions
to dismiss both actions, the District Court, Swain, J., held
that: (1) limitations periods for PRA claims against union
local began to run at time employee became aware of uni-
on's improper conduct; (2) race discrimination-based state-
law claims against USPS and individual officials were pree-
mpted by Title VII; (3) employee failed to state Title VII
claim against USPS; and (4) previous union grievances not
directed at enforcement of rights protected by Title VII were
not protected activity under Title VII retaliation provision.

Motions granted.

West Headnotes

**[1] Limitation of Actions 241 ⟜95(14)**

241 Limitation of Actions
241III Computation of Period of Limitation
241III(F) Ignorance, Mistake, Trust, Fraud, and Concealment
or Discovery of Cause of Action
241k95 Ignorance of Cause of Action
241k95(14) k. Labor and Employment. Most Cited Cases
Limitations periods for former Postal Service employee's
Postal Reorganization Act (PRA) breach of duty of fair rep-
resentation claims against letter carriers' union, part of hy-
brid action under PRA, began to run at point when employ-
ee became aware of union conduct giving rise to claims, i.e.

at time of grievance proceedings that he was allegedly not
permitted to attend, at time he became aware that union rep-
resentative had failed to present favorable witness statement
in proceedings, and at time employee became aware of uni-
on's alleged failure to follow up on his allegations of union
and employer fraud and corruption. 39 U.S.C.A. §
1208(b-c).

**[2] United States 393 ⟜127(2)**

393 United States
393IX Actions
393k127 Rights of Action Against United States or United
States Officers
393k127(2) k. Prior Administrative Claim. Most Cited
Cases
Under Federal Tort Claims Act (FTCA), former Postal Ser-
vice (USPS) employee's state law-based damages claims
against USPS, including defamation, were required to be
presented to and disposed of by USPS prior to being
brought in federal district court. 28 U.S.C.A. § 2675; 39
U.S.C.A. § 409(c).

**[3] United States 393 ⟜78(5.1)**

393 United States
393V Liabilities
393k78 Torts
393k78(5) Nature of Act or Claim
393k78(5.1) k. In General. Most Cited Cases
(Formerly 393k125(23))
Former Postal Service (USPS) employee's causes of action
against USPS and individual officials in their official capa-
city alleging constitutional torts, e.g., conspiracy to violate
equal protection rights, were outside scope of any applicable
waiver of sovereign immunity. 28 U.S.C.A. § 1346.

**[4] Civil Rights 78 ⟜1502**

78 Civil Rights
78IV Remedies Under Federal Employment Discrimination
Statutes
78k1502 k. Existence of Other Remedies; Exclusivity. Most
Cited Cases
(Formerly 78k332)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 223563 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

**Conspiracy 91 ☞7.5(1)**

91 Conspiracy
91I Civil Liability
91I(A) Acts Constituting Conspiracy and Liability Therefor
91k7.5 Conspiracy to Interfere with Civil Rights
91k7.5(1) k. In General. Most Cited Cases

**Libel and Slander 237 ☞1**

237 Libel and Slander
237I Words and Acts Actionable, and Liability Therefor
237k1 k. Nature and Elements of Defamation in General. Most Cited Cases
African-American former Postal Service (USPS) employee's non-Title VII statutory and common law claims against USPS and individual officials in their official capacity, including conspiracy to violate civil rights and defamation, to extent they were premised on claim of race discrimination, were precluded by the exclusivity of the Title VII remedy. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[5] Civil Rights 78 ☞1531**

78 Civil Rights
78IV Remedies Under Federal Employment Discrimination Statutes
78k1531 k. Parties. Most Cited Cases
   (Formerly 78k374)
District court lacked jurisdiction over Title VII race discrimination complaint filed by former Postal Service (USPS) employee that failed to name Postmaster General in his official capacity as defendant; complaint instead named USPS and different official. Civil Rights Act of 1964, § 717(a), 42 U.S.C.A. § 2000e-16(a).

**[6] Civil Rights 78 ☞1126**

78 Civil Rights
78II Employment Practices
78k1124 Public Employment
78k1126 k. Particular Cases. Most Cited Cases
   (Formerly 78k146)
African-American former Postal Service (USPS) letter carrier failed to state Title VII race discrimination claim against

USPS by failing to draw connection between disciplinary suspension, which had followed employee's motor vehicle accident, and his race. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[7] Civil Rights 78 ☞1244**

78 Civil Rights
78II Employment Practices
78k1241 Retaliation for Exercise of Rights
78k1244 k. Activities Protected. Most Cited Cases

**Postal Service 306 ☞5**

306 Postal Service
306I Postal Service in General
306k3 The Postal Service
306k5 k. Officers, Clerks, and Employees. Most Cited Cases
Postal Service (USPS) employee's previous grievances filed with letter carriers' union, not directed at enforcement of rights protected by Title VII, did not constitute protected activity for purposes of employee's Title VII retaliation claim against USPS. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

Guy Marshall, Gouldsboro, PA, Plaintiff pro se.
Cohen, Weiss and Simon, By: Peter D. DeChiara, New York, NY, for Defendants National Association of Letter Carriers and Branch 36.
James B. Comey, United States Attorney for the Southern District of New York, By: Rebecca C. Martin, AUSA, New York, NY, for Defendants Kenneth Wavpotich and Desmond Bailey.

*ORDER*

SWAIN, J.
**\*1** Plaintiff, appearing *pro se*, is an African-American male and former letter carrier for the United States Postal Service ("USPS"). He has commenced a number of actions against the USPS, certain of its employees, and/or the National Association of Letter Carriers and certain of its officers or representatives, all relating to Plaintiff's employment by the USPS and/or the termination of that employment. This Order deals with the first two such cases. The first of these

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 3
Not Reported in F.Supp.2d, 2003 WL 223563 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

lawsuits, which has been assigned docket number 00 Civ. 3167 ("*Marshal I*") names as defendants the USPS, the National Association of Letter Carriers ("NALC"), NALC Branch 36 (apparently a union local) ("Branch 36"), and individual defendants Desmond Bailey and Kenneth Wavpotich. In *Marshall I*, Plaintiff principally asserts claims for breach of duty of fair representation and violations of a collective bargaining agreement. He also claims that defendants defamed him and conspired to violate his constitutional rights. The Court has previously held that the complaint in *Marshall I* will be construed as a hybrid duty of fair representation/breach of collective bargaining agreement action under the Postal Reorganization Act ("PRA"), 39 U.S.C. section 1208(b), (c). *See Marshall v. NALC, et. al,* No. 00 Civ. 3167, Order at 4-5 (J. Mukasey, April 26, 2000). Plaintiff's second suit, which has been assigned docket number 01 Civ. 3086 ("*Marshall II*"), refers to the *Marshall I* complaint and asserts employment discrimination, harassment and retaliation claims under Title VII of the Civil Rights Act of 1964, naming as defendants Kenneth Wavpotich, USPS and Branch 36.

Defendants have moved to dismiss both complaints. Plaintiff has made several motions, including a motion to consolidate *Marshall I* and *Marshall II,* a motion to amend the pleadings, a motion for reconsideration, and an "urgent" motion for vacatur of Judge Mukasey's April 26, 2000 decision in *Marshall I,* which dismissed the complaint in that action without leave to replead to the extent that complaint sought to assert a variety of tort and conspiracy causes of action pursuant to 42 U.S.C. section 1983.

The Court has considered thoroughly all submissions related to these motions and the decision to be rendered reflects such consideration. For the following reasons, Defendants' motions are granted. Plaintiff's motions are denied, and each case is dismissed in its entirety.

*Procedural History and Summary of Allegations*

Plaintiff's *Marshall I* complaint was submitted to the *Pro Se* office of this Court in December 1999. The complaint contained conclusory allegations of violations of 42 U.S.C. sections 1983, 1985, 1986, and rights violations in connection with the handling of certain grievances and disciplinary proceedings relating to Plaintiff's employment with USPS, and sought criminal prosecution of some of the defendants. By Memorandum Order dated April 26, 2000, Chief Judge Mukasey dismissed the civil rights claims without leave to replead, dismissed the request for criminal prosecutions as inappropriate, and construed the remaining claims liberally as ones for breach of a collective bargaining agreement and duty of fair representation under the Postal Reorganization Act. Judge Mukasey granted Plaintiff leave to replead in detail the latter claims only instructing Plaintiff that the amended complaint must demonstrate exhaustion of administrative remedies with respect to the remaining claims and that Plaintiff's action was timely.

**\*2** Plaintiff filed an amended complaint, naming the same Defendants as in the original *Marshall I* complaint. The Amended Complaint in *Marshall I* details 1993 "delaying mail" and 1998 "late lunch" disciplinary proceedings and related grievances, and allegations of irregularities in connection therewith. In the amended *Marshall I* complaint, Plaintiff further alleged conspiracy and, contrary to Judge Mukasey's direction in the April 2000 order, reiterated civil rights claims and asserted a Title VII claim as well. Plaintiff did not allege receipt of, or attach, a right to sue letter. The case was thereafter reassigned from Judge Mukasey to the undersigned.

The *Marshall I* complaint generally alleges breaches of duty of fair representation and of a collective bargaining agreement in connection with disciplinary actions, grievances and related proceedings arising in the course of Plaintiff's employment with USPS. The complaint further alleges that all of the disciplinary actions and alleged procedural irregularities were part of a conspiracy to deprive Plaintiff of civil rights in violation of 42 U.S.C. sections 1983, 1985 and 1986. The complaint alleges a conspiracy which began with the 1993 disciplinary actions and continued through the October 15, 1999, termination of Plaintiff from USPS employment. Plaintiff details the following specific incidents:
(1) Plaintiff describes a "delaying the mail" charge arising from an incident in November 1993. Plaintiff alleges that the union representative did not represent him adequately and that the grievance procedure under the relevant collective bargaining agreement was not followed properly, includ-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 223563 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

ing exclusion of Plaintiff from a "Step One" grievance proceeding. Plaintiff claims that his supervisor pressed charges to cover up his own misconduct as revealed in Plaintiff's grievances. Plaintiff further claims that a co-worker who was more culpable than Plaintiff was treated more favorably. Plaintiff further alleges a union coverup of the union's misconduct in connection with the charges. Plaintiff alleges concealment of evidence. Plaintiff generally charges conspiracy to deprive him of civil rights. Plaintiff refers to the Due Process and Equal Protection clauses of the Constitution, denial of "equal treatment in disciplinary action," and unspecified "invidious discrimination and violation of rights by discriminatory purposes" in violation of the civil rights statutes. The complaint further describes disciplinary actions taken in March 1994, September 1995, October 1996 and March 1998 with respect to automobile accidents.

(2) Plaintiff describes in detail a "late lunch" charge arising from a April 1998 incident. Plaintiff filed grievances regarding a July 1998 charge. Plaintiff again alleges improper procedures and suppression of evidence in connection with disciplinary and grievance proceedings. Plaintiff asserts a pattern of behavior in a "master plan" to fire an innocent person instead of a co-worker whom the union wanted to keep because the co-worker would have had a hard time finding another job. Plaintiff makes conclusory allegations of discrimination and civil rights violations and conspiracy to commit such violations. Plaintiff further alleges that he filed a complaint regarding his supervisor, Bailey, in August 1998, and filed a grievance regarding union delegates in March 1999.

*3 In January 2001, Plaintiff filed an additional complaint, naming USPS, Wavpotich and Branch 36 as defendants. At Judge Mukasey's direction, the Court docketed the new complaint as number 01 Civ. 3086, and assigned the matter to the undersigned for further proceedings as appropriate. This matter was docketed in April 13, 2001 and is referred to herein as *Marshall II.* The *Marshall II* complaint alleges discriminatory conduct on the basis of race consisting of unequal terms and conditions of employment in violation of Title VII, as well as harassment and retaliation. This complaint contains no new factual allegations, referring to the *Marshall I* complaint for the relevant facts. Plaintiff also attaches an Equal Employment Opportunity Commission

("EEOC") right to sue letter, apparently arising from a 1995 administrative complaint against the USPS. Plaintiff alleges that he was disciplined for delaying the mail and for being involved in two motor vehicle accidents. Plaintiff specifies three incidents: issuance of a 1993 letter of warning, dated December 6, 1993, signed by defendant Wavpotich, (Compl. at A-1,) following an incident of delaying the mail; a 1994 notice of suspension issued on March 10, 1994 following a motor vehicle accident (*id.* at A-57); and a September 7, 1995 notice of suspension following a motor vehicle accident in 1995 (*id.* at A-59). Plaintiff argues that these disciplinary measures were acts of discrimination and retaliation for filing a grievance against defendant Wavpotich.

### Discussion

### Plaintiff's Motions for Reconsideration and Vacatur of April 20, 2000 Decision in Marshall I

Plaintiff seeks reconsideration or vacatur of the April 20, 2000 Order entered by Judge Mukasey in *Marshall I,* to the extent it dismissed his conspiracy, defamation and slander claims. Plaintiff argues, in essence, that the Court somehow lost subject matter jurisdiction of these claims (and therefore lacked the power to dismiss them with prejudice) when it failed to agree with Plaintiff that he had stated viable claims for constitutional violations, and that he had intended to assert the defamation and slander claims pursuant to state common law rather than <u>42 U.S.C. section 1983</u>. (*See* Pl.'s Oct. 1, 2002 "Urgent Motion").

A motion for reconsideration can be granted if there is an intervening change of controlling law, new evidence becomes available, or there is a need to correct a clear error or prevent manifest injustice. *Virgin Atlantic Airways v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir.1992)* (citation omitted). Plaintiff's arguments reveal his frustration with the Court's analysis but fail to identify any valid ground for reconsideration. His requests for reconsideration and/or vacatur of the decision are also untimely, having been raised well after entry of the April 20, 2000 decision in a May 31, 2001 "Notice of Motion" and an October 1, 2002 "Urgent Motion".

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 223563 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Furthermore, Plaintiff's efforts to replead and reargue these claims, as detailed in the Amended Complaint in *Marshall I* and in his papers opposing the dispositive motions, reveal that he is unable to state viable claims of which the Court would have jurisdiction. (*See* discussion *infra*.)

### Plaintiff's Motion for Consolidation

**\*4** Plaintiff moves to consolidate *Marshall I* and *Marshall II* as well as two later-filed actions. Plaintiff's motion is denied. Although it appears that Plaintiff originally intended the complaint that was docketed as 01 Civ. 3068 merely to modify and supplement the amended complaint in 00 Civ. 3167, the parties have briefed the motions to dismiss separately, and Plaintiff in his papers has treated them separately as well. Plaintiff's papers treat *Marshall I* (00 Civ. 3167) as raising civil rights, common law and "hybrid" labor law claims only, disclaiming any Title VII aspect of that complaint as premature, and he treats *Marshall II* (01 Civ. 3068) as raising his Title VII claim. The Court will deal with the complaints, and the motions directed to them, in like fashion for purposes of this decision. The Court acknowledges that the 01 Civ. 3068 complaint seeks to incorporate by reference the entire factual content of the amended complaint in 01 Civ. 3167 and has construed the complaints in that fashion, considering all of the relevant allegations and attachments in the *Marshall I* complaint with respect to the issues posed in the pending motions.

The Court further denies the motion insofar as it seeks the consolidation of the above two cases with two related, later-filed complaints (02 Civ. 1754 and 02 Civ. 1756). Those actions, docketed in 2002, were stayed pending the outcome of the dispositive motion practice in the earlier cases. Plaintiff subsequently withdrew case No. 02 Civ. 1746 and that action is therefore closed. Although the Court has the power to consolidate actions involving common questions of law and fact (Fed.R.Civ.P. 42(a)), such consolidation would not here serve the interests of justice in light of the pendency of the instant motion practice. Nor will the Court consider the two newest complaints "as evidence" in connection with the merits of the pending motions or otherwise, as the instant motions are directed to the content of the pleadings in *Marshall I* and *Marshall II*, and the Federal Rules of Evidence make no general provision for the use of

pleadings as substantive evidence of liability.

### Plaintiff's Motion for Amended Pleadings

The Court further denies Plaintiff's January 9, 2001 "motion for amended pleadings," which sought amendment of the *Marshall I* complaint to incorporate the EEOC right to sue letter, in light of the Court's decision to treat the 00 Civ. 3167 and 01 Civ. 3068 complaints as set forth above.

### Motions to Dismiss the Marshall I Complaint

### Union Defendants

[1] NALC and Branch 36 (collectively, the "Union Defendants"), move pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the pleadings in *Marshall I*, arguing that Plaintiff's duty of fair representation claim is barred by a six-month statute of limitations. *See DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 169, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983) (six-month statute of limitations applicable to duty of fair representation claims). In reviewing Union Defendants' Rule 12(c) motion, the Court applies the same standards as on a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss. *See New York Marine & General Insurance Co. v. M/V Admiralengracht*, No. 97 Civ. 7402(JGK), 1999 WL 253628, at \*1 (S.D.N.Y. April 28, 1999). The Court thus views the allegations of the complaint in the light most favorable to Plaintiff and draws all reasonable inferences in Plaintiff's favor. *Id.*

**\*5** The limitations period on a hybrid suit where a plaintiff sues the employer and the union is six (6) months from the date the Plaintiff knew or should have known of the breach of the duty of fair representation. *See White v. White Rose Food*, 128 F.3d 110, 114 (2d Cir.1997). Plaintiff has alleged that his duty of fair representation rights were severely and consistently violated by numerous persons identified as agents of the Union Defendants with respect to the "delaying the mail" incident in 1993 and the "late lunch" charge in 1998. With respect to the 1993 incident, Plaintiff alleges that "supervisor Mr. Walters present[ed] to [him] a[S]tep [O]ne A form written on February 9, 1994, the same day when they issued a memo for failure to drive in a safe manner on 3/24/94." Am. Compl. ¶ 19. Thus, Plaintiff was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                      Page 6
Not Reported in F.Supp.2d, 2003 WL 223563 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

aware of the union conduct of which he complains no later than March of 1994, over five years before he first filed this action. With respect to the 1998 incident, Plaintiff alleges that he was discriminated against by Shop Steward Benito Bonano at the Step One phase of the grievance procedure, by union Hearing Officer Patrick McNally at the Step One-A phase of that process, and by defendant Desmond Bailey at the subsequent arbitration in which the removal notice was rescinded. Plaintiff argues that Mr. Bonano failed to "prevent [ ] the employment discrimination and collective bargaining discrimination by unequal treatment by supervisor Desmond Bailey" in that he failed to introduce the statement of Ramon Diaz (which Plaintiff claims was favorable to his case) at the September 5, 1994 Step One. Am. Compl. ¶ 31. With respect to union Hearing Officer Patrick McNally, Plaintiff asserts that he should have presented the Diaz statement at the Step One-A on September 14, 1998. *Id.* ¶ 33. Plaintiff was aware that the statement had not been presented at Step One by March 2, 1999 or before then. *See id.* at A-64, A-65. Indeed, Plaintiff's filing of grievances regarding all of the matters complained of here (*e.g.*, failure to permit him to attend proceedings, inadequate representation in connection with the same, failure to follow up to his satisfaction on his allegations of union and employer fraud and corruption) more than 6 months prior to the filing of the *Marshall I* complaint with the *Pro Se* office, demonstrates that Plaintiff was well aware of the claimed violations in time to bring timely complaints and failed to do so. The Court finds that the *Marshall I* PRA claims against the Union Defendants are time-barred.

For this reason, and because Plaintiff's civil rights claims were dismissed by the April 20, 2000 Order, *Marshall I* is dismissed in its entirety as against the Union Defendants.FN1

      FN1. To the extent Plaintiff's libel, slander and defamation claims could be construed to have been asserted, as Plaintiff argues, pursuant to state common law, the Court would not exercise jurisdiction of them in light of the lack of any viable federal claim against these defendants. *See* 28 U.S.C.A. § 1367(c)(3) (West 1993).

*Government Defendants*

Defendants USPS, Bailey and Wavpotich, (collectively, "Government Defendants") move to dismiss Plaintiff's complaint in *Marshall I* pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) or, in the alternative, for summary judgment pursuant to Federal Rule of Civil Procedure 56. Government Defendants argue that Plaintiff's hybrid PRA claims should be dismissed for untimeliness and for failure to state a claim. Government Defendants further assert that Plaintiff's remaining claims for conspiracy to violate his civil rights, violation of his equal protection rights, libel, defamation, and slander are precluded on various grounds including, *inter alia*, sovereign immunity and failure to state a claim. Finally, Government Defendants argue that Plaintiff has failed properly to serve defendants Bailey and Wavpotich.

*6 As explained above, Plaintiff is required to bring any hybrid claims no more than six months from the date Plaintiff knew or should have known that the union breached its duty of fair representation. *See* White v. White Rose Food, 128 F.3d at 114. Here, Plaintiff's pleadings make it clear that Plaintiff knew of all the conduct complained more than six months prior to filing his first complaint with the *Pro Se* office. (*See supra,* page 7.) Plaintiff's hybrid duty of fair representation/collective bargaining agreement breach claim is therefore dismissed as untimely as against Government Defendants.

Government Defendants further argue that Plaintiff's claims of conspiracy, violation of equal protection rights, and libel, defamation and slander are barred by sovereign immunity and should be dismissed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it. *See* Makarova v. United States, 201 F.3d 110, 113 (2d Cir.2000). A plaintiff asserting subject matter jurisdiction generally has the burden, once challenged, of proving by a preponderance of the evidence that jurisdiction exists. *See id.*

The United States is immune from suit absent an express waiver of sovereign immunity. *United States v. Testan, 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976).* Suits against federal agencies or federal officials in their official

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 7
Not Reported in F.Supp.2d, 2003 WL 223563 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

capacities are suits against the United States and are similarly barred absent an applicable waiver. *Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 510 (2d Cir.1994).*

[2][3] Damages claims against the USPS are governed by the Federal Tort Claims Act ("FTCA"), 39 U.S.C. § 409(c). Here, the Court lacks jurisdiction of Plaintiff's claim because Plaintiff "failed to allege the presentation of the claim to the appropriate federal agency and a final disposition of the claim by the agency, as required by 28 U.S.C. section 2675." *Altman v. Connally, 456 F.2d 1114, 1116 (2d Cir.1975)* (per curiam). Furthermore, Plaintiff's causes of action for constitutional torts, to the extent asserted against the USPS and/or the individual defendants in their official capacity, are outside the scope of any applicable waiver of sovereign immunity. *See* 28 U.S.C.A. § 1346 (West 2002). Plaintiff further fails to state a claim under 42 U.S.C. section 1983 because that statute only provides redress for federal statutory and constitutional violations under color of state law. *John's Insulation, Inc. v. Siska Construction Co., Inc., 774 F.Supp. 156, 161 (S.D.N.Y.1991).* Plaintiff's claims against the USPS and the individual government Defendants in their official capacity are therefore dismissed for lack of subject matter jurisdiction.

[4] Dismissal of Plaintiff's non-Title VII statutory and common law claims for conspiracy violations of his civil rights and employment-related torts to the extent they are premised on a claim of race discrimination is appropriate for the further reason that they are precluded by Title VII.[FN2] "Title VII is the exclusive remedy for [employment] discrimination by the federal government on the basis of race, religion, sex or national origin." *Briones v. Runyon, 101 F.3d 287, 289 (2d Cir.1996).* Plaintiff's claims against the Government Defendants all arise from and relate to alleged discrimination in federal employment, for which Title VII is the exclusive remedy. Title VII was intended as the "exclusive, pre-emptive administrative and judicial scheme for the redress of federal employment discrimination." *Brown v. General Services Admin., 425 U.S. 820, 829, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976).* Such claims, as well as constitutional tort claims asserted on the same basis, against the individual defendants are also precluded by the exclusivity of the Title VII remedy. *See Rivera v. Heyman, 157 F.3d*

101, 105 (2d Cir.1998); *Schweiker v. Chilicky, 487 U.S. 412, 422-423, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988).*

> FN2. The Court notes that Plaintiff has abandoned his Title VII claim against Defendant Bailey. *See* Pl. Mem. at 2 and 11 ("Plaintiff asserts that there is no Title VII claim against Desmond Bailey in this instant action. Therefore, this court has no jurisdiction regarding a Title VII claim against Desmond Bailey.")

*\*7* The complaint in *Marshall I* is dismissed in its entirety. As the claims in *Marshall I* are dismissed for the foregoing reasons, Defendants' other arguments in support of their motion will not be addressed here.

*Motions to Dismiss the Marshall II Complaint*

*Government Defendants*

[5] Government Defendants argue that Plaintiff's Title VII claim against them should be dismissed pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction because Plaintiff did not name the proper party defendant. Under Title VII, a federal employee may bring a suit in which "the head of the department, agency, or unit, as appropriate, shall be the defendant." 42 U.S.C.A. § 2000e-16(a) (West 2002). Subsection (a) of 42 U.S.C. section 2000e-16 identifies the USPS as one such "department, agency or unit." Indeed, the right to sue letter issued by the EEOC to Plaintiff specifically instructed him to "name as the defendant in the complaint [in any subsequent lawsuit] the person who is the official head or department, identifying that person by his or her full name and official title." Thus, on the plaintiff's Title VII claim, the only appropriate defendant is the Postmaster General, in his official capacity. The *Marshall II* complaint does not name the Postmaster General, the head of the USPS, as a defendant. Accordingly, the plaintiff's Title VII claim, as it relates to the employee defendant Wavpotich and the USPS as an entity, is dismissed for lack subject matter jurisdiction.

Government Defendants also move to dismiss the complaint in *Marshall II* pursuant to Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment pursuant to Federal Rule of Civil Procedure 56.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 8
Not Reported in F.Supp.2d, 2003 WL 223563 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

A court must not dismiss an action unless pursuant to Rule 12(b)(6) " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). In evaluating a motion to dismiss, the Court is obliged to take as true the facts as alleged in the complaint and draw all reasonable inferences in favor of the plaintiff. *Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 188 (2d Cir.1998). The Court is also permitted to take into account the contents of documents attached to or incorporated in the complaint, *Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989), as well as those documents which are "integral" to the complaint. *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 808 (2d Cir.1996).

An employee suing the federal government must exhaust certain administrative remedies before initiating a lawsuit in federal court. The first step is to "initiate contact with a[n][EEO] Counselor within 45 days of the date of the matter alleged to be discriminatory." 29 C.F.R. § 1614.105(a)(1); *see Boos v. Runyon,* 201 F.3d 178, 181 (2d Cir.2000). The timeliness requirement is not jurisdictional, and the filing deadline is subject to waiver, estoppel and equitable tolling. *See Briones v. Runyon,* 101 F.3d at 290. The burden is on the plaintiff to demonstrate that any of these exceptions applies. Plaintiff does not argue that any of these exceptions apply.

**\*8** Defendants argue, proffering documentation of Plaintiff's initial complaint regarding these incidents,[FN3] that Plaintiff's claims concerning the 1993 letter of warning and 1994 notice of suspension are untimely because Plaintiff did not contact an Equal Employment Opportunity ("EEO") Counselor in a timely fashion are required by Title VII. Here, Plaintiff contacted an EEO Counselor regarding the allegedly discriminatory treatment on October 13, 1995. Applying the 45-day requirement, the only timely allegations in the Complaint would be those relating to events alleged to have occurred on or after August 29, 1995. Because the claims arising from the 1993 letter of warning and 1994 notice of suspension incidents predate the August 29, 1995

cutoff in relation to the EEO complaint (*i.e.,* 45 days before the EEO complaint), they are dismissed as untimely.

> FN3. While Plaintiff attaches the EEOC Denial of Request for Reconsideration to his pleading, he does not attach other EEO documents, such as the Precomplaint Counseling Form, the EEO Complaint, the agency's Final Decision or the EEOC Decision. The Court may nonetheless consider these on a motion to dismiss under Rule 12(b)(1) and/or 12(b)(6) as they are implicitly referenced in and are integral to the Complaint.

[6] Government Defendants further argue that Plaintiff has failed to allege facts giving rise to an inference of discrimination concerning his 1995 notice of suspension. In *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), the Supreme Court overturned Second Circuit authority requiring Title VII plaintiffs to plead facts establishing a prima facie case of discrimination under the framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 805-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The Supreme Court held that plaintiffs must merely give defendants "fair notice of what [their] claims are and the grounds upon which they rest," *Swierkiewicz,* 122 S.Ct. at 999, and need not plead facts sufficient to make out a prima facie case of discrimination. *Id;* *see also, Sparrow v. United Airlines, Inc.,* 216 F.3d 1111, 1114 (D.C.Cir.2000); *Bennett v. Schmidt,* 153 F.3d 516, 518 (7th Cir.1998). Under this standard, to survive a Rule 12(b)(6) motion to dismiss, a complaint need only provide a short and plain statement of the claim and the grounds on which it rests. *See* Fed.R.Civ.P. 8(a)(2); *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Even under this liberal standard, Plaintiff pleads insufficient facts to support a racial discrimination claim. The Court takes notice of the facts alleged in *Marshall I* and the documents attached to and integral to the *Marshall II* complaint. *See Cosmas v. Hassett,* 886 F.2d at 13. While Plaintiff alleges that he is Black, describes Defendant's actions, and asserts that he was subject to harassment in connection with the 1995 notice of suspension incident, Plaintiff fails to tie the alleged discrimination surrounding the notice of suspension to his race. Nowhere in the complaint does Plaintiff al-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                                                         Page 9
Not Reported in F.Supp.2d, 2003 WL 223563 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

lege that this discipline was a result of discrimination against him on the basis of race. Plaintiff's complaint therefore does not allege sufficient facts to give rise to an inference of discrimination. *Cf. Phillip v. University of Rochester,* No. 01 Civ. 7582, 2003 WL 139522, at *7 (2d Cir. Jan.21, 2003).

**\*9** [7] Moreover, Plaintiff has failed to state a viable retaliation claim. To establish a case of retaliation violative of Title VII, a plaintiff must show that: (1) he or she was engaged in protected activity; (2) the employer was aware of the activity; (3) the employee suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *See Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 713 (2d Cir.1996). Even under the more flexible pleading standard set out in *Swierkiewicz,* Plaintiff fails to set forth a cognizable claim. Plaintiff does not assert any prior Equal Employment Opportunity-type protected activity, but simply asserts claims related to prior grievances that Plaintiff had filed with his union. The complaint thus fails to connect the alleged retaliation to any activity directed at the enforcement of rights protected by Title VII. For all of the foregoing reasons, Plaintiff's remaining claims against Government Defendants are therefore dismissed.

*Branch 36* ____

Branch 36 also moves for judgment on the pleadings as to *Marshall II,* arguing failure to pursue Title VII administrative proceedings as against Branch 36. Branch 36 alleges that the Plaintiff's claim is barred because he nowhere alleges that he filed a charge with the EEOC or received a right to sue letter regarding Branch 36. The filling of a timely charge with the EEOC is a statutory prerequisite to Title VII claims. "A complainant must file a charge against a party with the EEOC or an authorized state agency before the complainant can sue that party in federal court under Title VII." *Vital v. Interfaith Medical Ctr.,* 168 F.3d 615, 619 (2d Cir.1999). Plaintiff attaches to the *Marshall II* complaint a right to sue letter that names only USPS as the respondent, and makes no mention of Branch 36. There is no indication that Plaintiff ever commenced an administrative proceeding against Branch 36. Thus, Plaintiff's claim against Branch 36 in *Marshall II* is barred because he nowhere alleges that he

filed a charge with the EEOC or received a right to sue letter regarding Branch 36. *See Vital,* 168 F.3d at 620 (employer and union did not have clear identity of interest and thus employee could not maintain claims under Title VII against union because the plaintiff had named only his employer in the EEOC charge). Plaintiff's claims against Branch 36 in *Marshall II* are therefore dismissed.

For all the foregoing reasons, Plaintiff's complaint in *Marshall II* is dismissed.

*CONCLUSION*

Defendants' motions to dismiss the complaints in *Marshall I* and *Marshall II* are granted. Plaintiff's pending motions are denied in their entirety. Both cases, 00 Civ. 3167 and 01 Civ. 3068, are dismissed in their entirety.

IT IS SO ORDERED.

S.D.N.Y.,2003.
Marshall v. National Assoc. of Letter Carriers Br. 36
Not Reported in F.Supp.2d, 2003 WL 223563 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1:01cv03086 (Docket) (Apr. 13, 2001)
• 1:00cv03167 (Docket) (Apr. 26, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                          Page 1
Not Reported in F.Supp.2d, 2003 WL 22801429 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

C
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
MEZZACAPPA BROTHERS, INC., Plaintiff,
v.
CITY OF NEW YORK, Defendant.
**No. 03 Civ.0223 NRB.**

Nov. 24, 2003.

Public contractor sued city under § 1983, alleging that the city violated its First Amendment rights and injured it with a defamatory "stigma-plus" unconstitutional taking of liberty rights, and also asserted a common law claim of libel. On the city's motion to dismiss, the District Court, Buchwald, J., held that: (1) release in favor of city executed by a third party acting as attorney-in-fact for the contractor in prior litigation unambiguously precluded the contractor's instant claims, and (2) the action was also barred by claim preclusion.

Motion granted.

West Headnotes

**[1] Municipal Corporations 268 ⟜1018**

268 Municipal Corporations
268XVI Actions
268k1018 k. Compromise and Settlement of Litigation. Most Cited Cases
Release in favor of city executed by a third party acting as attorney-in-fact for a public contractor in prior litigation unambiguously precluded the contractor's instant claims against city for defamation and violation of its First Amendment rights, despite the contractor's claim that the release was limited to contract issues relating to the prior litigation and the public works contracts at issue in such litigation; projects underlying the instant suit were specifically and expressly enumerated in the release. U.S.C.A. Const. Amend. 1.

**[2] Judgment 228 ⟜585(2)**

228 Judgment

228XIII Merger and Bar of Causes of Action and Defenses
228XIII(B) Causes of Action and Defenses Merged, Barred, or Concluded
228k585 Identity of Cause of Action in General
228k585(2) k. What Constitutes Identical Causes. Most Cited Cases
Public contractor's action against city for defamation and violation of its First Amendment rights could have been raised in prior litigation when the contractor initiated a third-party complaint against the city, and thus, the action was barred by claim preclusion. U.S.C.A. Const. Amend. 1.

Vincent Toma, New York, NY, for Plaintiff.
Richard Schulsohn, Assistant Corporation Counsel, City of New York Law Department, New York, NY, for Defendant.

MEMORANDUM and ORDER
BUCHWALD, J.
*1 Plaintiff Mezzacappa Brothers, Inc. ("Mezzacappa" or "MBI" or "plaintiff") brought this action on January 10, 2003, and, as framed in an amended complaint filed on June 18, 2003, alleges the City of New York ("defendant" or "the City") has violated plaintiff's civil rights under 28 U.S.C. § 1983 by abridging plaintiff's First Amendment rights and injuring plaintiff with a defamatory "stigma-plus" unconstitutional taking of liberty rights. Plaintiff also asserts a common law claim of libel against the City. The City seeks dismissal of plaintiff's amended complaint pursuant to Fed. Rule of Civ. P. 12(b)(6). In its motion, the City argues that plaintiff's § 1983 claims are time-barred (Mem. at 7); plaintiff's claims are barred by a release (Mem. at 12); plaintiff's claims are barred by res judicata (Mem. at 14); plaintiff's liberty interests were not implicated by defendant's actions (Mem. at 17); even if plaintiff has been deprived of a liberty interest, plaintiff has been afforded due process (Mem. at 22); and plaintiff's libel claim is time-barred (Mem. at 24).

Oral argument on the City's motion to dismiss was heard on November 18, 2003.

For the reasons set forth below, the City's motion to dismiss is granted. Plaintiff's claims are unequivocally barred by a previously entered release, as well as by res judicata. Because the release and res judicata (either individually or to-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2003 WL 22801429 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

gether) provide ample bases for dismissing this entire action with prejudice, the City's other grounds for dismissal need not be evaluated.

## II. BACKGROUND

### A. *Factual Background Common to All of MBI's Claims*

The following facts are drawn from plaintiff's amended complaint, and are taken as true for purposes of defendant's motion.

In or about July 1992, MBI and Insurance Company of America [FN1] ("INA") entered into a written contract for completion of a public works project called HWQ 274, Brookville (the "Brookville Project") for the City's Department of Design and Construction ("DDC"). (Am.Compl.¶ 8). In or about July 1992, MBI and the City entered into a written contract for a project called RED 328, Water Main in area of Richmond Avenue, Staten Island (the "Richmond Avenue Project"). (Am. Compl. at ¶ 13). In or about August 1994, MBI and INA entered into a written contract for the completion of a project called BED 747, Crescent Street (the "Crescent Street Project") for the DDC. (Am.Compl.¶ 7). For each public works project, MBI agreed to provide certain work, materials and equipment subject to certain plans, drawings, specifications and schedules prepared and published by the City. (Am.Compl.¶¶ 7, 8, 10, 13, 14).

> FN1. Other case papers refer to this company as Insurance Company of North America. INA is used to signify either.

MBI did not perform work on the Crescent Street Project in the time and manner reasonably anticipated. MBI blames the City for this failure, asserting the following specifications. First, City-specified suppliers could not supply materials in a timely manner, or in a proper sequence, or in accord with contract specifications. Second, the City failed to provide MBI with proper access to work areas. Third, the City interfered with and delayed work by allowing other water main projects to proceed. Fourth, City-ordered water restrictions caused delays. And fifth, the City's untimely resolution of quality assurance and street sign issues caused delays. (Am.Compl.¶ 11). Despite the City's obstruction of

MBI's work, substantial completion of the Crescent Street Project was achieved. [FN2] (Am.Compl.¶ 12).

> FN2. The Amended Complaint does not indicate when this "substantial completion" was achieved.

*2 MBI claims that it fulfilled all conditions required by the Richmond Avenue Project contract. (Am.Compl.¶ 15). Somewhat contradictorily, MBI alleges the City prevented MBI from performing its work on the Richmond Avenue Project in the time and manner which MBI reasonably anticipated. (Am.Compl.¶ 17, 20). First, MBI recounts that in the course of its work on the Richmond Avenue Project, MBI discovered improper preparation of and numerous errors and omissions in the plans, drawings, specifications and schedules published by the City and upon which MBI relied in submitting its bid. (Am.Compl.¶ 16, 21). Second, as with the Crescent Street Project, City-specified suppliers could not supply materials such as water main pipe in a timely manner or proper sequence. Third, MBI discovered subsurface conditions and telephone lines that were not shown on the City plans, or otherwise anticipated. (Am.Compl.¶ 17). Fourth, the City did not issue timely approvals for and payment on change orders required by the City's defective plans. (Am.Compl.¶ 18, 22). Fifth, the City failed to make timely payments to MBI during the course of MBI's work on the Richmond Avenue Project. (Am.Compl. ¶ 19). Throughout the Richmond Avenue Project, MBI complained to the City about these acts and omissions (Am.Compl.¶ 21), such as a specific criticism of the City's practice of requiring contractors to perform change order work prior to approval and issuance of written change orders (Am.Compl.¶ 23), and threatened the City to not perform certain change order work until money owed to MBI was paid, and the change order practice was changed. (Am.Compl.¶ 22).

On or about April 10, 1997, MBI submitted the lowest bid for the DDC-advertised Bay Ridge Contract. [FN3] (Am.Compl.¶ 24, 25). In a letter dated May 30, 1997, DDC refused to award MBI the Bay Ridge Contract because DDC found MBI to be a non-responsible vendor. DDC communicated its non-responsible vendor finding to the City's Office of Comptroller, the Mayor's Office of Contracts ("MOC"), the City Procurement Policy Board, the City's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                            Page 3
Not Reported in F.Supp.2d, 2003 WL 22801429 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Department of Investigation, INA (the surety on the Cres-
cent Street Project) and INA/Cigna (the Brookville Project
surety). (Am.Compl.¶ 26). The City told these entities that
its "pre-final" performance evaluation on the Crescent Street
Project resulted in MBI receiving an overall rating of unsat-
isfactory, and DDC explained its finding: first, there was a
problem with "closure pieces" MBI used; second, MBI
failed to follow City orders to cease resurfacing work in the
rain; third, MBI mislayed steel pipe which subsequently re-
quired significant remedial work (Am.Compl.¶ 27); and
fourth, the project revealed MBI's poor workmanship in the
form of numerous leaks. (Am.Compl.¶ 28). Regarding the
Brookville Project, DDC stated that MBI, despite having re-
ceived three time extensions, could not coordinate with the
paving subcontractor to complete the project on time, and
that DDC assessed $306,000 in liquidated damages against
MBI. (Am.Compl.¶ 29) These problems, DDC concluded,
demonstrated MBI's lack of fitness for the Bay Ridge Con-
tract, (Am.Compl.¶ 28) and cast doubt on whether MBI had
the ability to schedule and perform the required work.
(Am.Compl.¶ 30).

> FN3. The project's official name was "Contract
> Number BED-756, Installation of 48", 20" and 12"
> Water Mains in Bay Ridge Parkway and 21st Av-
> enue, Brooklyn, New York."

**\*3** MBI alleges that DDC's statements regarding the Cres-
cent Street and Brookville projects were false and mali-
cious, failed to account for the delays and disruptions
caused by DDC, and motivated by MBI's refusal to perform
extra work on the Richmond Avenue Project before change
orders were approved and executed and by MBI's general
criticism of the City's change order practices. (Am.Compl.¶
31). MBI alleges that they were denied the Bay Ridge Con-
tract and made ineligible to receive other City contracts[FN4]
because of DDC's misrepresentations. (Am.Compl.¶ 32).
The City, MBI alleges, denied MBI due process in issuing
its non-responsible vendor finding, and in specifically deny-
ing MBI an appeal of that decision.[FN5] (Am.Compl.¶ 34).
Last, MBI states that it presented the City a written verified
notice of claim, more than thirty days have elapsed since
said notice, and the City has not made any adjustment or
payment on the amount MBI claimed. (Am.Compl.¶ 35).

> FN4. MBI alleges that DDC threatened to default
> INA if INA used MBI to complete a project known
> as QED 941, 37th Avenue, Queens ("Queens
> Project"), despite INA's protestations that MBI was
> a responsible and well-respected contractor.
> (Am.Compl.¶ 33).

> FN5. MBI states that they filed appeals to the DDC
> agency head, and the MOC, but the MOC did not
> issue a decision despite MBI's numerous demands
> for a decision. (Am.Compl.¶ 34). We infer from
> this allegation that the DDC agency head ruled on
> (and denied) MBI's appeal.

*B. MBI's Claims as Framed in Amended Complaint (and
Additional Relevant Facts)*

*1. Defamation "Stigma-Plus" Unconstitutional Taking of
Liberty Rights*

MBI states that it has a constitutionally protected liberty in-
terest in its reputation for integrity and responsibility, as
well as its continued right to City contracts. (Am.Compl.¶
37). Prior to the City's wrongful and malicious acts, MBI
benefitted from an excellent reputation, was deemed a re-
sponsible and eligible bidder, and, as a result, enjoyed nu-
merous City contracts. (Am.Compl.¶ 38). The City knew
MBI was the lowest Bay Ridge Contract bidder, and knew
of MBI's excellent reputation and responsibility
(Am.Compl.¶ 39), yet DDC made and published false and
defamatory statements regarding MBI to other City agencies
and MBI's sureties. (Am.Compl.¶ 40). The City deliberately
and maliciously made these statements with intent to injure
and deprive MBI of constitutionally protected liberty in-
terests. (Am.Compl.¶ 40). MBI suffered de facto debarment
from City contracts, and was effectively blacklisted. After
the DDC non-responsibility finding, MBI refrained from
submitting further bids until a decision on MBI's appeal was
rendered by the MOC,[FN6] and did not bid on other con-
tracts during the appeal's pendency for fear of other non-
responsibility findings. (Am.Compl.¶ 41). Further, as a res-
ult of DDC's false, malicious and defamatory statements,
MBI has been defamed and stigmatized in its business and
professional relationships, its good reputation has been
severely injured and damaged, and MBI has suffered a loss

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 2003 WL 22801429 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

in employment which has detrimentally impacted its financial vitality. Indeed, MBI has gone out of business. (Am.Compl.¶ 42).

> FN6. Plaintiff alleges elsewhere in its amended complaint that MOC never issued a decision on plaintiff's appeal. *See* Am. Compl. ¶ 34.

MBI alleges that it is the policy, practice and custom of the City to retaliate against contractors critical of City policy, such as MBI, and the City's statements on May 30, 1997, are reflective of such policy. (Am.Compl.¶ 44). MBI claims it first became aware of the retaliatory policy in or about July 2000. (Am.Compl.¶ 45). The City's actions are a continuing practice of retaliatory discrimination affecting MBI and other similarly situated contractors,^FN7 (Am.Compl.¶ 46) and have been conducted under the color of state law, pursuant to the City's practices at all times. (Am.Compl.¶ 47).

> FN7. MBI refers to Promatech, Inc., who, on information and belief, incurred injury, including wrongful termination of contract and unsatisfactory evaluations in November 2000 as a result of the City's retaliatory policy. Promatech initiated a lawsuit against the city on these grounds. *See Promatech, Inc. v. Holden and City of New York,* 01 Civ.1910(RO) (filed March 7, 2001, S.D.N.Y., related to *Promatech, Inc. v. Holden and City of New York,* 00 Civ. 7679(RO) (filed October 11, 2000, S.D.N.Y.)).

**\*4** MBI thus alleges it has been deprived of its property and liberty interests without due process of law, a violation of the Fifth and Fourteenth Amendments actionable under 42 U.S.C. § 1983. (Am.Compl.¶ 1, 47).

### 2. *Libel*

MBI has performed construction for the City and other public entities since 1963. MBI was never once denied a contract for any reason until the Bay Ridge Contract of 1997. (Am.Compl.¶ 50). Prior to the City's false and defamatory utterances, MBI maintained a good reputation for integrity, honesty and competence in front of the City and elsewhere. (Am.Compl.¶ 51). It is well and long established that a con

tractor such as MBI depends on its reputation for integrity and competence in order to succeed. (Am.Compl.¶ 52). DDC's statements regarding MBI on May 30, 1997, falsely, maliciously, unjustifiably and intentionally denigrated MBI's integrity and its ability to conduct business. (Am.Compl.¶ 54, 56, 60). At the time of publication, DDC knew or should have known its statements were false and malicious. (Am.Compl.¶ 55-57). MBI's actions were willful and wanton or done in reckless disregard of the truth, and with intent to injure MBI. (Am.Compl.¶ 61). As a result of this, MBI suffered economic loss and damage to its business and reputation. (Am.Compl.¶ 62).

### 3. *Violation of First Amendment Rights*

Consistent with its practice and policy, the City retaliated against MBI for MBI's criticism of the City's business and construction practices, particularly the City's policy of requiring contractors to perform extra work and charge order work prior to approval and issuance of formal change orders. (Am.Com pl.¶ 65-66). MBI became aware of the City's retaliatory practice in July 2000 "when MBI became aware that its injuries, and continuing injuries, were the consequence of City policies, practices and customs."^FN8 (Am.Compl.¶ 67). MBI's criticisms-that the City's poor planning and contract administration were responsible for delays and cost overruns to public works projects-referred to matters of public concern. (Am.Compl.¶ 68). The City's retaliatory response reflected its continued practice and policy of retaliatory discrimination. (Am.Compl.¶ 69).^FN9 The City's retaliation violated MBI's First Amendment rights to free speech and assembly. (Am.Compl.¶ 70).

> FN8. This is an entirely conclusory and circular allegation, asserting nothing more than MBI became aware of the City's retaliatory policy when MBI became aware that it was injured by the City's retaliatory policy.

> FN9. Again, Promatach is referred to. (Am.Compl.¶ 69).

### 4. *Damages*

MBI claims it is entitled to recover damages to be proven at

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                Page 5
Not Reported in F.Supp.2d, 2003 WL 22801429 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

trial, but no less than $44 million for each cause of action, plus reasonable attorney's fees and interest and costs. (Am.Compl.¶ 48, 63, 74).

### III. DISCUSSION

#### A. Prior Litigation Between the Parties

Defendant argues that plaintiff has previously released the City from the claims which are asserted in the instant action, and that the application of the doctrine of res judicata operates as an additional (and independent) bar on this action.

This is not the first lawsuit related to these public works projects. Indeed, this is at least the third lawsuit, and the second in which MBI has asserted claims against the City. In order to discuss defendant's release defense, a detour into some prior judicial history is required.

**\*5** In or around 1994, MBI entered into an agreement with Thompson Pipe and Steel Company ("Thompson") whereby Thompson would manufacture the pipes needed on the Brookville, Crescent Street and Queens projects. *See* Affidavit of Richard Schulsohn, Aug. 18, 2003 ("Schulsohn Aff.") at ¶¶ 3, 7.[FN10] Disputes arose as to the specifications of these pipes on the Queens project. *Id.* at ¶ 7. On April 29, 1997, the City rescinded its approval of MBI as completion contractor for the Queens project because, according to defendant, MBI failed to complete that project on time and had exhibited poor workmanship on the Brookville and Crescent Street projects. *Id.* at ¶ 8. INA was the surety for each of these projects, and was obligated to complete each project as per performance bonds issued in August 1991. *Id.* at ¶¶ 3, 8. According to the City, INA refused to acquire another completion contractor, as was its obligation, and the City therefore defaulted INA on the Queens project on September 28, 1998. *Id.* at ¶ 8.

> FN10. Courts in the Second Circuit limit what may be considered on a 12(b)(6) motion to dismiss to: (1) the factual allegations in the complaint, which are accepted as true; (2) documents attached to the complaint as an exhibit or incorporated in it by reference; (3) matters of which judicial notice may be taken; and (4) documents upon whose terms and

effect the complaint relies heavily, i.e., documents that are "integral" to the complaint. *See Calcutti v. SBU, Inc., 273 F.Supp.2d 488, 498 (S.D.N.Y.2003)* (citations omitted). The contents of defendant's affidavit considered herein constitute either or both matters open to judicial notice and/or documents relied upon by the complaint.

Shortly before the City defaulted INA, Thompson had filed suit in the Eastern District of New York against MBI and its surety, General Insurance Company of America ("General").[FN11] Thompson sought recovery for alleged non-payment for pipes. *See Thompson Pipe & Steel Co. v. Mezzacappa Brothers, Inc. and General Insurance Company of America*, 98 CV. 3709 (FB/ASC) (filed May 30, 1998, E.D.N.Y.) (the "Thompson Action"). On July 24, 1998, MBI and General impleaded the City into that action through a third-party complaint. *See* Schulsohn Aff. Ex. L. That complaint alleged in part that "[t]he City has refused to permit Mezzacappa to complete [the Queens Project]". Thompson Action Third-Party Compl. at ¶ 25, and "[u]nder these circumstances, in the event Thompson recovers judgment against MBI and/or General in respect of [the Queens Project], the MBI and/or General are entitled to judgment over against the City." *Id.* at ¶ 26. In that complaint, General, as MBI's surety and assignee, sought money allegedly owed to it by the City arising out of the Richmond Avenue Project.[FN12] *Id.* at ¶¶ 27-30.

> FN11. Before MBI arrived on these projects, the City had awarded the contracts to another contractor, Trevus Construction Corporation. Trevus's surety was Insurance Company of America, or INA. Trevus defaulted on the projects, but Insurance Company of America was bound to see the projects through to completion. Evidently, General Insurance Company of America, MBI's surety, is not to be confused with Insurance Company of America, the initial surety for these projects.

> FN12. MBI had assigned to General "all monies due or to become due ... in respect of the [Queens Project, Richmond Avenue Project, and three other projects]". *Id.* at ¶ 18.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d, 2003 WL 22801429 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

On March 26, 1999, INA sued the City. *See Insurance Company of North America v. City of New York*, 99 CV 1720 (E.D.N.Y.) (FB/ASC) (the "INA Action"). In the INA Action, INA sought restitution for costs expended by INA and MBI in performing the Queens Project, and injunctive relief related to the City deeming INA a non-responsible bidder. Like MBI's amended complaint in the instant action, INA demanded recovery for allegedly false, defamatory, and disparaging statements made by the City in connection with finding INA non-responsible. *See* INA Action at ¶¶ 33-39.

MBI was not a named party in the INA Action; however, the INA Action was consolidated with the Thompson Action on July 26, 1999. On June 14, 2000, the Honorable Frederic Block so ordered a Stipulation of Settlement entered into by the parties. *See* Schulsohn Aff. Ex. P. The Settlement was executed in part "to resolve all disputes and matters at issue between and among [the parties] relating to or arising out of the contracts, agreements, transactions, or occurrences set for in the [Thompson Action] and INA Action." *Id.* at 2-3. In addition to this Stipulation of Settlement, the parties filed with the court Stipulations of Dismissal, dismissing both actions against the City with "prejudice and on the merits." *See* Schulsohn Aff. Ex. Q at 1, and Ex. R at 1. Said Dismissals were so ordered by Judge Block on August 3, 2000. Last, MBI, fulfilling a Settlement provision, executed a release ("the Release") in favor of the City on May 11, 2000 through its attorney-in-fact, General. *See id.* Ex. S and Ex. P at ¶ 6.

*B. MBI Released the City From the Claims Asserted in this Action*

\*6 [1] The Release entered by MBI for the City unambiguously precludes this action. Where "a release is signed in a commercial context by parties in a roughly equivalent bargaining position and with ready access to counsel, the general rule is that, if the language of the release is clear ... the intent of the parties [is] indicated by the language employed ... When the words of the release are of general effect the release is to be construed most strongly against the releasor, and the burden is on the releasor to establish that the release should be limited. *Middle East Banking Co. v. State Street Bank Int'l*, 821 F.2d 897 (2d Cir.1987)* (citations omitted).

Plaintiff argues that the instant action is not covered by the release. According to plaintiff, "the release is limited to contract issues relating to [the Thompson and INA Actions] and [the public works contracts at issue in those actions] and does not extend to the claims asserted in this case." Opp. Mem. at 29. Plaintiff avers that "the last sentence of the release expressly limits the release to":

[Claims] arising out of ... the action commenced by Thompson Pipe ... the action commenced by Insurance Company of North America ... the City of New York contracts at issue in said two actions, namely BED 742, RED 328, HWQ 274/411, BED 747, and QED 941.

Plaintiff's Opp. Mem. at 29, quoting from the Release.

Plaintiff counsel's abbreviated rendition of the release's language is wholly inappropriate. The first ellipses is used in place of the highly expansive phrase "or in any way connected with". The language plaintiff's counsel excises with the first ellipses is as "limiting" as it is redundant or irrelevant or not worthy of the Court's attention.

The projects underlying this suit-the Brookville Project (HWQ) and the Crescent Street Project (BED 747)-are specifically and expressly enumerated in the release. The instant action is based on facts and events related to these contracts as DDC said it was MBI's performance on these contracts which motivated the non-responsible bidder determination. Plaintiff's claims, though framed as civil rights allegations and not contract claims, sufficiently "aris[e] out of" or are "connected with" the contracts named in the release, and thus the instant action is precluded.

Moreover, it is irrelevant that plaintiff did not possess its *Monell*-based causes of action [FN13] until after the release's execution because the release expressly forecloses "all actions, causes of action [and] suits ... [MBI] ever had, now ha[s] or *hereafter can, shall or may have."* (emphasis added) Thus, the Release is prospective in its language and effect. In any event, the actions taken by the City which plaintiff now alleges were unconstitutional and libelous took place nearly two years prior to MBI entering into the Release. Certainly MBI was aware at that time that they possessed at least the underpinnings of the claims in the current action.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                            Page 7
Not Reported in F.Supp.2d, 2003 WL 22801429 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

FN13. Because plaintiff brings this § 1983 action against a municipal defendant, plaintiff must plead and prove that the City acted against MBI as part of a policy, custom or practice. *See Monell v. Dept. of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

**\*7** Plaintiff, alternatively but equally unpersuasively, argues that it is not bound to the release because the release was executed by General, not MBI, and a "party has authority to release only those claims belonging to the party either in its individual or representative capacity." Opp. Mem. at 30. General, plaintiff concludes, "cannot have released MBI's present claims." *Id.*

Plaintiff, however, offers no valid support for differentiating a release in the name of a party executed solely by that party from one in the name of a party exercised by another party acting as attorney-in-fact.FN14 And the indemnity agreement between General and MBI certainly does not provide any support for this proposition. Under the indemnity agreement, General had plain and manifest authority to execute the release. *See* Schulsohn Aff., Ex. D at 2;FN15 *see, e.g., Hutton Construction Co. v. County of Rockland, et al.,* 52 F.3d 1191, 1192 (2d Cir.1995) (agreeing with District Court that unambiguous assignment and attorney-in-fact clauses of indemnity agreement gave a surety "the authority to settle all claims on behalf of [the assigning contractor]"). Furthermore, plaintiff cannot escape the fact that the release specifically names "Mezzacappa Brothers, Inc." as the releasor.FN16

FN14. The lone case cited by plaintiff, *Allstate Inc. Co. v. Horowitz,* 118 Misc.2d 787, 461 N.Y.S.2d 218 (Civ.Ct. N.Y.1983), is not on point. The court in that case merely held that an individual doctor could not bind his professional services corporation to a release signed by, and naming only, the doctor (in an individual capacity) because the doctor could not be considered representative or derivative of the corporation.

FN15. The indemnity agreement states: "[MBI] assigns to [General] ... [a]ny actions, causes of action, claims or demands whatsoever which [MBI]

*may have or acquire* against any party to the Contract, or arising out of or in connection with any Contract ... and [General] shall have the full and exclusive right, in its name or in the name of [MBI] ... to prosecute, compromise, *release* or otherwise resolve such actions, causes of action, claims or demands." Schulsohn Aff., Ex. D at 2 (emphasis added).

FN16. We are mindful that a release may sometimes be a "matter [ ] outside the pleadings" for purposes of Fed.R.Civ.P. 12(b)(6) and what a court may consider when deciding a motion to dismiss pursuant to that rule. *See Calcutti,* 273 F.Supp.2d at 498 (S.D.N.Y.2003) (enumerating what a court may consider when deciding a 12(b)(6) motion to dismiss). In the event it was determined that in order to permissibly consider the Release at this juncture defendant's motion should be treated as a motion for summary judgment, *see* Fed.R.Civ.P. 12(b), the foregoing analysis and conclusion reached therefrom would not change. We confirmed with plaintiff's counsel at oral argument that the Release creates no genuine issue of material fact such as to withstand a judgment as a matter of law. *See* Transcript of Oral Argument, Nov. 18, 2003, at p. 9, lines 13-24.

Accordingly, having previously released the claims plaintiff seeks to advance in this action, plaintiff's complaint must be dismissed.

*C. Res Judicata is an Additional Bar to this Action*

**[2]** Res judicata poses an additional bar to this action. Specifically, claim preclusion forecloses this action which could have been raised previously when plaintiff initiated its third-party complaint against defendant in the Thompson Action.

Claim preclusion "prevents a plaintiff from relitigating claims that were or could have been raised in a prior action against the same defendant where that action has reached a final judgment on the merits." *Brown v. Quiniou,* [cite] 2003 WL 1888743 at \*2 (S.D.N.Y. Apr.16, 2003); *see also Greenberg v. Bd. of Governors of the Fed. Reserve Sys.,* 968

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 8
Not Reported in F.Supp.2d, 2003 WL 22801429 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

F.2d 164, 168 (2d Cir.1992) (stating that res judicata bars both "issues actually decided in determining the claim in the first action and ... issues that could have been raised in the adjudication of that claim").

The preclusive extent of a federal court's judgment is a matter of federal law. *See Pentagon Techs. Int'l, Ltd. V. Caci Intern. Inc.,* 93 Civ. 8512, 1996 WL 435157 at *7 (S.D.N.Y. Aug.2, 1996) (citing *PRC Harris, Inc. v. Boeing Co.,* 700 F.2d 894, 896 n. 2 (2d Cir.1982)).

The Second Circuit has a well-established test to ascertain the existence of claim preclusion. A defendant invoking the doctrine must show that: (1) the previous action involved an adjudication on the merits; (2) the previous action involved the same defendants or those in privity with them; and (3) the claims asserted in the subsequent action actually were or could have been raised in the prior action. *See Pike v. Freeman,* 266 F.3d 78, 91 (2d Cir.2001).

*8 As documented *supra,* there exists a previous action involving the same exact parties (and/or those in privity with them). On July 24, 1998, MBI and its surety, General, defendants in an action brought by Thompson, impleaded the City in a third-party complaint. The third-party complaint effectively sought indemnity from the City for any damages MBI and/or General might be found to owe to Thompson related to the Queens Project. Moreover, General, as surety and assignee of MBI, sought damages from the City arising out of the Richmond Avenue Project, the Crescent Street Project, and the Brookville Project. MBI asserts that the previous action did not involve the same parties because MBI was a party only through its surety and MBI did not have independent counsel. MBI offers no explanation as to why these facts are significant, nor can we deduce any. The irrefutable fact is MBI was previously a party in an action against the City.

MBI's third-party complaint was adjudicated on the merits by Stipulation of Dismissal which was entered by Judge Block of the Eastern District of New York on August 3, 2000. The Dismissal specifically and clearly encompassed "all third-party claims against the City", dismissing them "with prejudice and on the merits." Schulsohn Aff., Ex. Q.

Finally, the claims asserted in the instant action either were or could have been raised in MBI's third-party complaint against the City. Whether a claim could have been raised "depends in part on whether the same transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second [action] were present in the first [action]." *Prime Management Co. v. Steinegger,* 904 F.2d 811, 815 (2d Cir.1990). *See also Brown,* 2003 WL 1888743 at *2 (noting that claim preclusion acts in two ways, barring "claims that were brought and decided in the prior litigation, and [barring] all other claims relating to the same transaction against the same defendant that could have been brought at the same time.")

MBI or its surety and assignee have already asserted claims against the City arising out of the Queens Project, the Richmond Avenue Project, the Crescent Street Project and the Brookville Project. The instant action concerns these very same projects. MBI argues that the previous actions were breach of contract claims, or involved the wrongful termination of MBI's surety by the City, and that none included the § 1983 allegations raised here. While this might be true, MBI misapprehends the relevant legal inquiry. Claim preclusion is enforced "even if [the second action is] based upon different legal theories or [is] seeking different relief on issues which might have been litigated in the prior action but were not." *Northern Ins. Co. of Am. v. Square D. Co.,* 201 F.3d 84, 87 (2d. Cir.2000). Res judicata precludes a plaintiff from recasting an adjudicated complaint along a different legal theory or by adding some previously unalleged facts. *See, e.g., Ansley v. Green Bus Lines, Inc.,* 99 Civ. 10140, 2000 WL 12120 (S.D.N.Y. Jan.7, 2000) (holding that a plaintiff's dismissed suit claiming various violations of the law were committed when his employment was terminated precluded a second defamation claim based on the same alleged statements that were made in connection with his termination); *Bryant v. United States,* 71 F.Supp.2d 233 (S.D.N.Y.1999) (precluding plaintiff from bringing a second suit against the IRS which merely added a few facts to a previously dismissed action). No matter what legal theory drives MBI's present action, the facts essential to MBI's previous action against the City-MBI's performance on certain municipal contracts-would sit at the core.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 9
Not Reported in F.Supp.2d, 2003 WL 22801429 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Though the City's allegedly libelous statements were made in the context of denying MBI the Bay Ridge Project, all the evidence, witness testimony and argument related to that decision would involve the underlying municipal projects which have already been litigated, dismissed with prejudice, and released between MBI and the City.

**\*9** Plaintiff does not argue that res judicata should be withheld to the extent his causes of action against the City are *Monell*-dependent. However, even if plaintiff did such an argument would fail.

Claim preclusion is not enforced against "new rights acquired during [a first] action which might have been, but were not, litigated." *Computer Associates Int'l v. Altai, 126 F.3d 365, 370 (2d Cir.1997)*. This is an exception to the "general rule" that "newly discovered evidence does not preclude the application of res judicata." *Well-Made Toy Mfg. Corp. v. Lotus Onda Industrial Co., 02 Civ. 1151, 2003 WL 42001 at \*10 (S.D.N.Y. Jan.6, 2003); see also L-Tec Electronics Corp. v. Cougar Electronic Org., 198 F.3d 85, 88 (2d Cir.1999)* (holding that plaintiff's discovery of additional facts following entry of summary judgment does not block the application of res judicata). The term "acquired", however, is understood very literally: "If the rights in question had already attached, and plaintiff merely came upon new evidence which might support another claim in the first action, then res judicata might properly apply." *Well-Made Toy Mfg. Corp., 2003 WL 42001 at \*10* (citations omitted). "When the evidence was either fraudulently concealed or when it could not have been discovered with due diligence," a claim might not face preclusion. *Id.*

Thus, to be permitted to bring its § 1983 claim, MBI would have to establish that the evidence it would need to support the claim was either fraudulently concealed, or it could not have been discovered with due diligence prior to bringing its third-party complaint against the City in the Thompson Action. MBI makes no such argument in its opposition motion, nor does its complaint include any allegation to this effect. At the time MBI filed its third-party complaint, the City actions which plaintiff claims constitute civil rights violations already occurred. Yet plaintiff undertook no effort to then undercover the alleged harmful City practice or policy about which plaintiff now avers to have knowledge.

If plaintiff was in fact a victim of a retaliatory City practice or policy, due diligence (e.g., pursuing action on these claims, seeking document, written and oral discovery)[FN17] could have so informed plaintiff.

> [FN17.] Indeed, concurrent with MBI's third-party complaint against the City, INA pressed claims against the City similar to those raised here by MBI. *See* INA Action at ¶¶ 33-39.

CONCLUSION

Based on the foregoing, plaintiff's amended complaint is dismissed with prejudice.

IT IS SO ORDERED.

S.D.N.Y.,2003.
Mezzacappa Brothers, Inc. v. City of New York
Not Reported in F.Supp.2d, 2003 WL 22801429 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1:03cv00223 (Docket) (Jan. 10, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.