27

RECYCLED

Westlaw.

Not Reported in F.Supp.2d                                                                     Page 1
Not Reported in F.Supp.2d, 2004 WL 42262 (S.D.N.Y.), RICO Bus.Disp.Guide 10,603
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents

United States District Court,S.D. New York.
Yvette PHARR, et al., Plaintiffs
v.
EVERGREEN GARDENS, INC., and Grenadier Realty
Corp., Defendants.
**No. 03 Civ. 5520(HB).**

Jan. 7, 2004.

**Background:** Past and current tenants sued landlord and
landlord's licensed real estate broker and managing agent,
asserting claims for mail fraud, violation of Racketeer Influ-
enced and Corrupt Organizations Act (RICO), conspiracy to
violate RICO, and unfair and deceptive business practices.
Defendants moved to dismiss.

**Holdings:** The District Court, Baer, J., held that:

1(1) there is no private right of action for violations of fed-
eral mail fraud statute;

2(2) RICO claims were time-barred; and

3(3) separate accrual rule did not apply to tenants' RICO
claims.

Motion granted.

West Headnotes

**[1] Action 13 ⟜5**

13 Action
13I Grounds and Conditions Precedent
13k5 k. Criminal Acts. Most Cited Cases
There is no private right of action for violations of federal
mail fraud statute. 18 U.S.C.A. § 1341.

**[2] Limitation of Actions 241 ⟜95(3)**

241 Limitation of Actions
241II Computation of Period of Limitation
241II(F) Ignorance, Mistake, Trust, Fraud, and Concealment

or Discovery of Cause of Action
241k95 Ignorance of Cause of Action
241k95(3) k. Nature of Harm or Damage, in General. Most
Cited Cases
Statute of limitations on tenants' claims against landlord and
its real estate broker-managing agent for alleged violations
of Racketeer Influenced and Corrupt Organizations Act
(RICO) began to run when at least some of tenants knew, or
should have known, of alleged discrepancy between number
of rooms for which they were billed for rent and number of
rooms noted on certificate of occupancy, even if they did
not know details of such discrepancies, and therefore
claims, which were filed more than four years after tenants
became aware of such injury, were barred on limitations
grounds. 18 U.S.C.A. § 1961 et seq.

**[3] Limitation of Actions 241 ⟜95(3)**

241 Limitation of Actions
241II Computation of Period of Limitation
241II(F) Ignorance, Mistake, Trust, Fraud, and Concealment
or Discovery of Cause of Action
241k95 Ignorance of Cause of Action
241k95(3) k. Nature of Harm or Damage, in General. Most
Cited Cases
Injury allegedly suffered by tenants due to rent bills mailed
within four-year limitations period for civil claims under
Racketeer Influenced and Corrupt Organizations Act
(RICO) was identical to injury suffered when landlord and
its real estate broker-managing agent allegedly unlawfully
increased room counts and tenants' rent, and therefore con-
tinued mailing of purportedly unlawful rent bills did not
trigger separate accrual rule for RICO claims, which
provided for accrual of new claim, and new limitations peri-
od, each time plaintiff discovered or should have discovered
new injury caused by predicate RICO violations, so as to
make timely tenants' otherwise time-barred RICO claims
against landlord and broker-managing agent. 18 U.S.C.A. §
1961 et seq.

*OPINION & ORDER*

BAER, J.
*1 Defendants Evergreen Gardens, Inc. and Grenadier Re-
alty Corp. move to dismiss plaintiffs' complaint. For the fol-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2004 WL 42262 (S.D.N.Y.), RICO Bus.Disp.Guide 10,603
(Cite as: Not Reported in F.Supp.2d)

lowing reasons, defendants' motion is granted.

## I. FACTS

[1] Defendant Evergreen Gardens, Inc. ("Evergreen") is the landlord of buildings located at 950 and 955 Evergreen Avenue in the Bronx, New York; defendant Grenadier Realty Corp. ("Grenadier") is Evergreen's licensed real estate broker and managing agent;<sup>FN1</sup> and plaintiffs are present and former tenants of Evergreen residing in the buildings. Plaintiffs allege that Grenadier, on behalf of Evergreen, sent monthly invoices for rent which both Evergreen and Grenadier knew were false, in that they contained hidden and illegal charges. These hidden and illegal charges consisted of billing bathrooms as habitable rental rooms and terraces as one-half of a habitable rental room, even though the rules and regulations promulgated by Evergreen and agreed to by plaintiffs define bathrooms as water closets and prohibit tenants from making any other use of them. Plaintiffs allege that these acts constitute 1) mail fraud, in violation of 18 U.S.C. § 1341;<sup>FN2</sup> 2) participating in the affairs of an enterprise through a pattern of racketeering activity-namely, mail fraud-in violation of 18 U.S.C. § 1962(c); 3) conspiracy to engage in a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d); and 4) unfair and deceptive business practices, in violation of N.Y. General Business Law § 349. Defendants move to dismiss the complaint on the basis of 1) res judicata, 2) statute of limitations, and 3) lack of injury and standing.

> FN1. Plaintiffs also allege that Evergreen is an enterprise affecting interstate commerce, within 18 U.S.C. § 1692, and that defendants agreed to make use of the U.S. mails to make other false representations.

> FN2. Although not raised by defendants, this claim should be dismissed because there is no private right of action for violations of the federal mail-fraud statute. See *Raffaele v. Designers Break, Inc.,* 750 F.Supp. 611, 613 (S.D.N.Y.1990); *Milburn v. Blackfrica Promotions, Inc.,* 392 F.Supp. 434, 435 (S.D.N.Y.1974) ("Private litigants cannot sue to redress the offenses defined in [18 U.S.C. § 1341]."); *Delta Education, Inc. v. Langlois,* 719 F.Supp. 42,

50 (D.N.H.1989) ("The plaintiff may allege mail fraud as the predicate acts for its RICO claim, but the mail fraud allegations themselves do not state a separate cause of action.").

The history of the legal battle between the parties is as follows: In December 1996, defendants applied for a rent increase pursuant to the Private Housing Finance Law and regulations promulgated by the New York City Department of Housing Preservation and Development ("HPD"). Plaintiffs with counsel participated in this process. On July 16, 1998, HPD granted this request for a rent increase. In November 1998, Plaintiffs brought an Article 78 challenge to HPD's decision in which they claimed, *inter alia,* that "the actual number of rooms as determined by the Commissioner deviates significantly from the Certificate of Occupancy." Justice Suarez of the New York State Supreme Court dismissed this challenge as untimely and the appellate division affirmed.<sup>FN3</sup> Plaintiffs filed another claim in Bronx County Supreme Court in October 2001 based on rent overcharges, including the inflated room count, and breach of the warranty of habitability. The court initially rejected defendants' claim of *issue* preclusion with respect to the room-count claim but subsequently dismissed the claim on the basis, it appears, of *claim* preclusion.<sup>FN4</sup>

> FN3. The appellate division noted that "in light of petitioners' active participation in the application process itself and its subsequent failure to attend meetings at which they could comment on HPD's findings, there appears to be no likelihood that this petition, even if timely filed, would result in a favorable result for petitioners."

> FN4. The court stated:
> The Court's observation in its Order dated April 30, 2002, that 'the issue of the number of rooms does not appear to have been presented to or considered by the Department of Housing Preservation and Development,' is of no consequence. The proper way to contest the decision of HPD dated May 7, 1998 was by way of an Article 78 proceeding, in which plaintiffs would have the opportunity to raise all issues regarding the decision, including the number of rooms and the amount of rent increases

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2004 WL 42262 (S.D.N.Y.), RICO Bus.Disp.Guide 10,603
**(Cite as: Not Reported in F.Supp.2d)**

allowed. *Whether or not the issue was raised is ir-relevant. It could have and should have been raised. The failure to do so precludes any further litigation on this issue.* [emphasis added]

## II. DISCUSSION

Defendants raise several grounds for dismissal, including that the claim is time-barred because it was brought more than four years [FN5] after the discovery of the alleged *injury,* regardless of when the fraud was discovered. Since this ground is dispositive, I need not discuss the others.

> FN5. *Rotella v. Wood,* 528 U.S. 549, 552, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000) (*"Agency Holding Corp. v. Malley-Duff & Associates, Inc.,* 483 U.S. 143, 156, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987), established a 4-year limitations period for civil RICO claims.").

***2 [2]** As defendants note, the Supreme Court rejected a rule whereby a civil RICO claim accrues when the plaintiff discovers (or should have discovered) the injury *and the pattern* of racketeering activity. *See Rotella v. Wood,* 528 U.S. 549, 553, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000); the Court preferred [FN6] a rule where the statute begins when the plaintiff discovers the injury. *See id.* Defendants contend that the fraud and the injury alleged by plaintiff occurred in 1998, when the rent increase went into effect and when plaintiffs filed a similar lawsuit. Plaintiffs contend that defendants have not shown that any of the plaintiffs knew or should have known about the injury in 1998. However, it is clear that some of the same people named as plaintiffs in this action were aware as early as November 1998 that the number of rooms was allegedly more than the number noted on the certificate of occupancy. It was then or earlier that they attempted to challenge HPD's rent increase. Thus, even if they did not know the details of the room-count discrepancy, the plaintiffs-or some of them-knew of the discrepancy no later than November 1998. Since this suit was instituted some four and a half years later, it is beyond the statute of limitations and must be dismissed.

> FN6. After eliminating one of two options for when a civil RICO action accrues, the Court noted

that it did not "settle upon a final rule." *Rotella,* 528 U.S. at 554 n. 2. It left open the possibility of "an 'injury occurrence' rule, under which discovery would be irrelevant." *Id.* (citing *Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 198, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997) (Scalia, J., concurring in part and concurring in judgment)).

**[3]** Plaintiffs contended at oral argument that the four-year statute of limitations does not preclude this suit, because this is a continuing violation and there is a violation each time the rent bills are sent out. The Second Circuit recognizes a "separate accrual" rule for RICO claims "under which a new claim accrues, triggering a new four-year limitations period, each time plaintiff discovers, or should have discovered, a new injury caused by the predicate RICO violations." *Bingham v. Zolt,* 66 F.3d 553, 559 (2d Cir.1995). Contrary to plaintiffs' contention, the fact that defendants allegedly unlawful rent bills each month up to the present does not make plaintiffs' claim timely. As the Circuit has stated, "non-independent injuries will not cause a new limitations period to accrue." *Id.* at 560; *see also In re Merrill Lynch Ltd. Pshps. Litig.,* 7 F.Supp.2d 256, 265 (S.D.N.Y.1997) ("[F]or an injury to trigger the accrual of a new RICO claim, the injury must be new and independent."). It is beyond peradventure that the plaintiffs' injury from the rent checks mailed within the past four years is not "a new and independent injury." The injury the plaintiffs allegedly suffered due to the rent bills mailed within the four-year statute of limitations is identical to the injury they suffered when the defendants allegedly unlawfully increased the room count. Thus, the fact that defendants continued to mail allegedly unlawful rent bills does not make plaintiffs' claim timely, as they knew or should have known about the illegal room count more than four years prior to the commencement of this lawsuit.

## III. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted. The Clerk of the Court is instructed to close this and any open motions and remove the case from my docket.

***3** IT IS SO ORDERED.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                Page 4
Not Reported in F.Supp.2d, 2004 WL 42262 (S.D.N.Y.), RICO Bus.Disp.Guide 10,603
**(Cite as: Not Reported in F.Supp.2d)**

S.D.N.Y.,2004.
Pharr v. Evergreen Gardens, Inc.
Not Reported in F.Supp.2d, 2004 WL 42262 (S.D.N.Y.),
RICO Bus.Disp.Guide 10,603

Briefs and Other Related Documents (Back to top)

• 1:03cv05520 (Docket) (Jul. 25, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

28

Westlaw.

Not Reported in F.Supp.                                    Page 1
Not Reported in F.Supp., 1998 WL 67545 (E.D.Pa.), RICO Bus.Disp.Guide 9443
**(Cite as: Not Reported in F.Supp.)**

**H**

Briefs and Other Related Documents

United States District Court, E.D. Pennsylvania.
J. PLATER-ZYBERK, Jr. PH.D.
v.
Charles ABRAHAM, Robert Vito, Arthur Werner, Lee Schwartz, Elcom Technologies Corp., and VideoCom, Inc.
**Civ. A. No. 97-3322.**

Feb. 17, 1998.

*MEMORANDUM AND FINAL JUDGMENT*
HERBERT J. HUTTON, J.
**\*1** Presently before the Court are the Motions of Defendants Robert Vito, Arthur Werner, Lee Schwartz, VideoCom, Inc., and Elcom Technologies Corp. to Dismiss Plaintiff's Complaint, Plaintiff J. Plater-Zyberk, Jr.'s Memoranda in Opposition, and the parties' various supplementary memoranda and replies. For the foregoing reasons, the Defendants' Motions are granted.

## I. BACKGROUND

In this action, J. Plater-Zyberk ("Plaintiff") claims his former business partner Charles Abraham ("Abraham") and Arthur Werner ("Werner"), Lee Schwartz ("Schwartz") and Robert Vito ("Vito")-Abraham's lawyers and accountant-conspired to defraud him of a 50% interest in a corporation and its intellectual property. According to the Complaint, the defendants manufactured a fraudulent basis on which to exclude him, and then misappropriated the intellectual property to a corporation they formed among themselves. This conduct, he claims, constitutes a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) & (d) (1994), and gives rise to liability for conversion, breach of contract, and intentional interference with contractual relations under Pennsylvania law.

According to his Complaint, plaintiff is an expert in management and economics, and joined with Abraham to form a start-up company based on Abraham's proprietary technology. At the time of the negotiations, Abraham had several patents and patents pending for technology that would enable communication over local powerlines (the "Powerline

Technology"). In April 1992, the parties began working together without a formal agreement to govern their relationship. On August 3, 1992, they entered into a written contract to form a new corporation in which each would have a 50% interest. As consideration, Abraham was to assign the corporation his rights in the Powerline Technology and plaintiff was to provide it with management and fundraising services. On September 7, 1992, the parties entered into a written modification in which they agreed that, instead of forming a new corporation, plaintiff would take a 50% interest and several officer and director positions in Abraham's pre-existing corporation, Abraham Communication, Inc. ("Abcom"). Plaintiff claims he worked diligently to create a business organization capable of reducing Abraham's ideas into a sellable product. Abraham, however, failed to assign the Powerline Technology over to Abcom. The parties also never executed a proposed shareholders agreement.

Abraham first retained lawyers Werner and Schwartz in early 1993. They were friends and associates of accountant Vito. According to the Complaint:
Beginning in approximately April 1993 and continuing until today, Defendants Abraham, Werner, Schwartz and Vito entered into a scheme, plan, and conspiracy and engaged in a course of conduct to deprive Plaintiff of his rightful ownership of Abcom and the financial benefits flowing from the development of its concepts, technology, trade secrets and business and to divert such ownership and financial rewards to themselves and others affiliated with them.

**\*2** (Compl. at ¶ 20). Under the alleged scheme, Werner and Schwartz advised Abraham that he could oust plaintiff and form a new and separate business based on the unassigned Powerline Technology. This scheme was carried out between July and December, 1993 in the following manner.

In July 26, 1993, Werner informed plaintiff by letter and fax that Abraham was concerned about plaintiff's inability to raise funds. In the letter Werner imposed an ultimatum: unless plaintiff raised $1,000,000.00 dollars for Abcom by September 1, 1993, on terms favorable to Abraham, Abraham would terminate his relationship with plaintiff. Plaintiff claims that this was an unfair extra-contractual requirement, designed as a pretext to support his later "termination." In subsequent letters to plaintiff, dated August 2, 3, 6, and 10,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                        Page 2
Not Reported in F.Supp., 1998 WL 67545 (E.D.Pa.), RICO Bus.Disp.Guide 9443
**(Cite as: Not Reported in F.Supp.)**

Werner restated this position. Finally, according to the Complaint, on September 17, 1993, Abraham "wrote to Plaintiff purporting to relieve Plaintiff of certain of his positions with Abcom based on an alleged special meeting of shareholders and directors on September 17, 1993." (Compl. at ¶ 34). In fact, the letter stated:

In my capacity as the President of ABCOM, I hereby relieve you of all duties with regard to ABCOM. Effective immediately, your services to ABCOM are no longer desired.

*YOU ARE HEREBY INSTRUCTED THAT YOU ARE TO NO LONGER HOLD YOURSELF OUT TO THE PUBLIC AS BEING ASSOCIATED WITH ABCOM. IF YOU CONTINUE TO DO SO, APPROPRIATE LEGAL ACTION WILL BE TAKEN.*

*YOU ARE FURTHER HEREBY INSTRUCTED NOT TO COMMUNICATE WITH ANY INDIVIDUAL OR CORPORATE ENTITY ASSOCIATED WITH ABCOM. IF YOU DO SO, APPROPRIATE LEGAL ACTION WILL BE TAKEN.*

(Def. Robert Vito's Mot. to Dismiss at Ex. 8). In his Complaint, plaintiff argues that Abraham lacked authority to "terminate" him under Pennsylvania corporation law, because plaintiff was a 50% shareholder, officer, and director. Nevertheless, this letter gave plaintiff notice of Abraham's intention to do so.

According to the Complaint, two weeks before issuing the termination letter, on September 3, 1993, Abraham entered into a shareholders agreement with Vito under which the parties became joint shareholders of a newly organized entity called Elcom Technologies, Inc. ("Elcom"). According to the Complaint, Vito soon transferred substantial stakes in Elcom to Werner and Schwartz. The defendants never notified plaintiff of Elcom's existence, and plaintiff asserts that they took affirmative steps to keep others with knowledge about the new entity from disclosing it to him. Apparently to avoid contact with plaintiff, Abraham abruptly moved to Virginia without a forwarding address. Finally, pursuant to a December 23, 1993 Employment Contract, Abraham assigned Elcom his "entire interests in all of his patents and all of his patent pendings." Thus, the defendants achieved the aim of the alleged RICO conspiracy-the usurpation of the Powerline Technology-seven to nine months after allegedly hatching the plan in April, 1993.

**\*3** Since the events of late 1993, the Complaint states, Elcom has obtained financing through private securities offerings, and pursued the development and marketing of products based on the Powerline Technology. According to the Complaint, Elcom solicited private investors through private placement memoranda dated February 22, 1994, December 22, 1994, July 28, 1995, and December 23, 1996. According to these documents, Elcom has acquired all of the assets and liabilities of Abcom. The documents also state that Abcom was in negotiations with a "consultant," and deny that it had any enforceable obligations to him. Finally, Elcom has had some success in its development and marketing of products based on the Powerline Technology. According to Elcom's December 23, 1996 Private Placement Memorandum, the company had a net sales of over $500,000 for the nine month period ending September 10, 1996.

Plaintiff filed his Complaint on May 9, 1997. In it he charges the defendants with violating RICO §§ 1964(c) and (d) (Count I). In addition, he charges the defendants variously with conversion (Count II), breach of contract (Count III), and intentional interference with contractual relationship (Count IV). All of the individual parties are Pennsylvania residents and all of the corporate defendants are Pennsylvania corporations. (Compl. ¶ 3-8). Therefore, the only basis for federal jurisdiction is 28 U.S.C. § 1332 (1994) and 28 U.S.C. § 1367 (1994).

## II. *DISCUSSION*

### A. *Standard of Review*

The defendants move to dismiss plaintiff's Complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The purpose of a motion to dismiss is to test the legal sufficiency of the complaint. *See Sturm v. Clark, 835 F.2d 1009, 1011 (3d Cir.1987).* When deciding a motion to dismiss, the Court must accept all of the plaintiff's factual allegations as true and draw all reasonable inferences in its favor. *See Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir.1994).* This indulgence is not absolute, however, and "legal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness." *Government*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                    Page 3
Not Reported in F.Supp., 1998 WL 67545 (E.D.Pa.), RICO Bus.Disp.Guide 9443
(Cite as: Not Reported in F.Supp.)

*Guarantee Fund v. Hyatt Corp.*, 955 F.Supp. 441, 448 (D.Vi.1997) (citing *Fleming v. Lind-Waldock & Co.*, 922 F.2d 20, 23 (1st Cir.1990)). The Court may only grant the motion if, after viewing the complaint in the light most favorable to the plaintiff, "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief" under the applicable law. *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir.1994).

Because a motion to dismiss is meant to test a complaint's legal sufficiency, as opposed to its basis in fact, courts generally limit their consideration to the complaint, exhibits attached to the complaint, and matters of public record. *See Foust v. FMC Corp.*, 962 F.Supp. 650, 651-52 (E.D.Pa.1997). To prevent abuse of the Rule 12(b)(6) standard, however, the Third Circuit established an exception for certain important documents:

*4 a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document. Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document on which it relied.

*Pension Guaranty Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir.1993), *cert. denied*, 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994) (citation omitted). It is fair to consider the extrinsic document without converting the motion into one for summary judgment, the Court reasoned, because a plaintiff who has relied on a document in his complaint is on notice that it might be used against him. *See id.*

Courts have relied on *Pension Guaranty* in many cases to consider material that a plaintiff has referenced in the complaint but neglected to provide. For example, in *Dykes v. South Eastern Pennsylvania Transp. Auth.*, 68 F.3d 1564, 1567 n. 3 (3d Cir.1995), *cert. denied*, 116 S.Ct. 1343 (1996), the Third Circuit considered a SEPTA collective bargaining agreement-omitted from the plaintiff's complaint-in determining whether it had reasonable suspicion to support a mandatory body fluids test. Similarly, in *Foust*, 962 F.Supp. at 652, the Court considered the civil rights

plaintiff's right-to-sue letter, noting that she relied on it to prove her case and did not question its authenticity. *See also Klein v. Boyd*, 1996 WL 230012, *7 (E.D.Pa. May 3, 1996); *Johnakin v. City of Philadelphia*, 1996 WL 18821, *7 (E.D.Pa. January 18, 1996); *J/H Real Estate, Inc. v. Abramson*, 901 F.Supp. 952, 954 (E.D.Pa.1995). It is therefore well established that a court may consider omitted documents where their content and meaning are central to the plaintiff's complaint.

In this case, the Complaint refers to, and describes without appending, a number of documents, including: (1) the August 3, 1992 contract between plaintiff and Abraham, (Compl. at ¶ 12), (2) the letters from Werner to Plaintiff dated July 26, 1993, and August 2, 3, 6, and 10, (*id.* ¶¶ 21-23), and (3) the September 17, 1993 termination letter from Abraham to plaintiff, (*id.* ¶ 34). Defendants Vito, Werner, and Schwartz have appended these documents as exhibits to their motions, and rely on them in their arguments. Plaintiff has not questioned their authenticity. Also, the content of the documents is integral to PA's claims. As noted above, the August 3, 1992 contract is the very basis of plaintiff's claim to ownership of Abcom and the Powerline Technology. Likewise, plaintiff relies on the August and September 1993 letters noted above to establish predicate acts of mail fraud for his RICO claim. (*Id.* ¶¶ 21-24, 46). The Court finds that these documents are integral to the Complaint, and therefore fall within the *Pension Guaranty* exception. *See In re Donald Trump Secs. Litig.*, 7 F.3d 357, 368 n. 9 (3d Cir.1993), *cert. denied*, 510 U.S. 1178, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994) (finding that the district court properly considered the prospectus that formed the basis of the plaintiffs' complaint).[FN1]

> FN1. In any case, plaintiff assents to the Court's use of these documents for the purpose of the defendants' Motions to Dismiss. (*See* Pl.'s Mem. in Opp. to Def. Vito's Mot. to Dismiss at 4 n. 5).

### B. The RICO Claim

*5 Plaintiff premises federal jurisdiction on Count I of his complaint, the RICO count. Under RICO, "[a]ny person injured in his business or property by reason of a violation of [RICO] section 1962" may bring a civil action for treble

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                              Page 4
Not Reported in F.Supp., 1998 WL 67545 (E.D.Pa.), RICO Bus.Disp.Guide 9443
**(Cite as: Not Reported in F.Supp.)**

damages. Section 1962 sets forth four types of prohibited activities that give rise to RICO liability. Subsection (a) outlaws the use of funds obtained through a pattern of racketeering activity or by the collection of an unlawful debt to acquire an interest in, or operate, a legitimate business enterprise affecting interstate commerce. Subsection (b) outlaws the employment of such racketeering conduct or proceeds to "acquire or maintain, directly or indirectly, any interest in or control of any enterprise" affecting interstate commerce. *Id.* § 1962(b). Subsection (c) outlaws "any person employed by or associated with any enterprise" affecting interstate commerce from "conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or the collection of an unlawful debt." Finally, subsection (d) makes it unlawful for any person to conspire to violate any of provisions of subsections (a), (b), or (c). *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1411 (3d Cir.), *cert. denied*, 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991).

To make out a claim under any of these theories, a plaintiff must also prove that the defendants conducted the affairs of a RICO enterprise through a "pattern of racketeering activity." 18 U.S.C. § 1962. Section 1961(1) enumerates a number of predicate acts that may constitute "racketeering activity" for RICO purposes, including any act indictable as mail or wire fraud under 18 U.S.C. §§ 1341, 1343 (1994). Section 1961(5) states that a pattern of racketeering activity "requires at least two acts of racketeering activity, one of which occurred after the effective date of the chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." But the courts have held that the mere allegation of two predicate acts is not enough. *See H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 236-39, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). To prove a pattern of racketeering activity, a plaintiff "must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Id.* at 239 (emphasis in original); *see Tabas v. Tabas*, 47 F.3d 1280, 1292 (3d Cir.), *cert. denied*, 515 U.S. 1118, 115 S.Ct. 2269, 132 L.Ed.2d 275 (1995). Thus, "a short-term scheme threatening no future criminal activity will not suffice." *Kehr*, 926 F.2d at 1412.

### 1. *Predicate Acts*

**\*6** In determining the sufficiency of a RICO claim, the Court must first look to the predicate acts of racketeering activity. *See Kehr*, 926 F.2d 1414. In this case, Plaintiff alleges a number of violations of the mail and wire fraud statutes. 18 U.S.C. §§ 1341, 1343. To prove a violation of the mail fraud statute, a plaintiff must show that the defendant employed the U.S. mails in furtherance of a scheme or artifice to defraud. *See Schmuck v. United States*, 489 U.S. 705, 715, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989); *F/V Robins Nest, Inc. v. Atlantic Marine Diesel, Inc.*, 1994 WL 5945932, \*6 (D.N.J. October 24, 1994). The mailing itself need not be fraudulent. A so-called "innocent mailing" will suffice if "incident to an essential part of the scheme." *Schmuck*, 489 U.S. at 711. But while the mailing need not be fraudulent itself, the overall scheme "must involve some sort of fraudulent misrepresentation or omission reasonably calculated to deceive persons of ordinary prudence and comprehension." *Kehr*, 926 F.2d at 1415 (quoting *United States v. Pearlstein*, 576 F.2d 531, 535 (3d Cir.1978)). The same standards apply to the wire fraud statute, which is essentially identical. *See Leonard A. Feinberg, Inc. v. Central Asia Capital*, 974 F.Supp. 822, 849 (E.D.Pa.1997).

In his Complaint, plaintiff alleges that the defendants carried out a scheme to deprive him of his interest in Abcom and the Powerline Technology. But nowhere does he allege that the defendants fraudulently induced him to change his position, or that he reasonably relied on any such fraud. Plaintiff alleges that in August-September 1992 he and Abraham contracted that plaintiff would own a 50% share of Abcom and that Abraham would assign his patents to Abcom, in exchange for plaintiff's services. (*See* Compl. at ¶ 13). He does not allege that Abraham fraudulently misrepresented his intentions at that time to induce plaintiff to perform work for Abcom. Rather, plaintiff alleges that several months later, in April 1993, the defendants developed a scheme to deprive him of his contractual and property rights-essentially to break the contract. (*Id.* at ¶ 20). Next, plaintiff alleges that various defendants mailed and wired him the series of letters that culminated in his September 17, 1993 "termination." Although the Complaint characterizes these letters as "fraudulent," the Court cannot credit this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

conclusory allegation as true. *See Government Guarantee Fund,* 955 F.Supp. at 448. While the letters do demand that plaintiff meet certain requirements to avoid termination, they are not *deceptive.* Instead they baldly assert an ultimatum: that he would be excluded unless he produced $1 million by September 1st. (*See* Compl. at ¶ 23). Indeed the entire scheme, while possibly treacherous, lacks *fraudulence* entirely. Abraham's September 17 letter was the clearest possible statement of his intention to break his relationship with plaintiff. The only deception Plaintiff can point to is the defendants' secret formation of Elcom and assignment of Abraham's patents to it on December 23, 1993, but plaintiff does not claim the defendants had a duty to disclose the formation of Elcom, and the assignment occurred after the defendants had already achieved their goal of forcing plaintiff out of the business.

*7 Finally, even if the alleged scheme and the series of 1993 letters amounted to mail or wire fraud, the subsequent Elcom private placement memoranda would not fall within the scheme because they occurred after the scheme had reached fruition, *see United States v. Cross,* 128 F.3d 145, 150 (3d Cir.1997) (quoting *United States v. Tarnopol,* 561 F.2d 466, 471-72 (3d Cir.1977)) and did not operate to lull plaintiff, *see United States v. Coyle,* 63 F.3d 1239, 1245 (3d Cir.1995). "[M]ailings taking place after the object of the scheme has been accomplished, or before its accomplishment has begun, are not sufficiently closely related to the scheme to support a mail fraud prosecution." *Cross,* 128 F.3d at 150 (quoting *Tarnopol,* 561 F.2d at 471). Here, the scheme's object was accomplished when Abraham sent his September 17 letter, or at the very latest when he assigned the Powerline Technology to Elcom on December 23. Abraham's letter gave Plaintiff clear notice of Abraham's intention to exclude him from the business. Plaintiff's harm was the loss of his contractual and property rights in Abcom, which occurred in advance of the first private placement memorandum, issued February 22, 1994. (*See* Compl. at ¶ 38). Because the defendants had already achieved their object before the private placements, the scheme's completion did not depend on these mailings. *See Raymond v. Borken Truckorama,* 1990 WL 112103, *2 (E.D.Pa. August 3, 1990)* (plaintiff's post sale mailing of checks to defendant not essential to scheme because mailings occurred after

fraudulent transaction was consummated).

In some cases

Even mailings made after the fruits of the scheme have been received may come within the statute when they are designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place.

*Coyle,* 63 F.3d at 1244-45 (quoting *United States v. Otto,* 742 F.2d 104, 108 (3d Cir.1984), *cert. denied,* 469 U.S. 1196, 105 S.Ct. 978, 83 L.Ed.2d 980 (1985). Plaintiff argues that the private placement memoranda fit this description. But plaintiff also acknowledges that he never received or knew about the offending private placement memoranda. (*See* Compl. at ¶ 38; Pl.'s Mem. in Opposition at 11-12). Therefore, he cannot possibly maintain that the memoranda lulled him into believing that things were not amiss, as the lulling theory assumes that the plaintiff actually see or know about the letter. *See, e.g., Coyle,* 63 F.3d at 1245 (defendant executive lulled health care benefits fund by mailing false financial schedules); *United States v. Ruuska,* 883 F.2d 262, 264-65 (3d Cir.1989) (defendant sent investors explanatory letter to prevent suspicion about his use of their funds). In any case, plaintiff cannot claim that these private placement memoranda made discovery of the alleged scheme less likely than if no mailings had been made at all. If anything the mailings increased the odds that Plaintiff would discover Elcom eventually.[FN2]

> FN2. Plaintiff mistakenly relies on *Tabas,* 47 F.3d at 1294 n. 18, in support of his argument that the private placements were lulling letters. In *Tabas,* the mailings were monthly distribution checks paid from Tabas Enterprises to the plaintiffs during the period that the defendants were misappropriating partnership funds. *See id.* at 1282-83. The Court found that the mailing of the checks was an essential part of the scheme because "[h]ad the defendants failed to mail disbursement checks to plaintiffs, plaintiffs would have immediately been alerted to defendants' alleged scheme." *Id.* at 1294 n. 18.

> Plaintiff's case is entirely different. First, like clas-

Not Reported in F.Supp.                                                    Page 6
Not Reported in F.Supp., 1998 WL 67545 (E.D.Pa.), RICO Bus.Disp.Guide 9443
**(Cite as: Not Reported in F.Supp.)**

sic lulling letters, the *Tabas* checks were mailed to the plaintiffs themselves. In this case, however, Plaintiff never received the mailings and argues that his failure to receive them was somehow lulling. Second, the *Tabas* mailings occurred on an ongoing basis as the defendants continued to misappropriate funds, and therefore were not even post-fraud mailings. In this case, the private placements are clearly different because they occurred after completion of the claimed fraud.

**\*8** Given the above, the Court finds that plaintiff fails to state any valid predicate acts of mail fraud to support his RICO claim. *See Ideal Dairy Farms, Inc. v. John Labatt, LTD.*, 90 F.3d 737, 747 (3d Cir.1996) (upholding dismissal of RICO claim where alleged predicate acts lacked element of fraudulence).

### 2. Relatedness

To establish a pattern of racketeering activity, a RICO plaintiff must show that his alleged predicate acts are related. Given RICO's liberal relatedness requirement the Court finds that Plaintiff's alleged predicate acts bear a sufficient relationship to one another.

For RICO purposes, acts are related if they have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J., 492 U.S. at 240; see Banks v. Wolk*, 918 F.2d 418, 422 (3d Cir.1990). Although this standard is amorphous, and to some degree unhelpful, predicate acts clearly satisfy the relatedness requirement when they all concern the same participants in a single transactional event. *See id.* at 422 (mailings and telephone use related to common goal of obtaining artificially low price in real estate deal). Plaintiff's RICO claim meets this minimal standard because, as alleged, all of the mailings concerned the same Defendants and their alleged scheme to usurp ownership of Abcom and the Powerline Technology, or cover it up.

### 3. Continuity

The final aspect of a pattern of racketeering activity is con-

tinuity. A RICO complaint will not survive a motion to dismiss unless the plaintiff can show that the alleged scheme presented the kind of threat of continuing harm that RICO's drafters were concerned with. *See H.J., 492 U.S. at 240.*[FN3] The offense is something greater than the sum of its predicate acts, it is an intangible underlying criminality manifested by those acts. To constitute a RICO offense, the scheme and acts must not be merely transactional in nature, but must involve ingrained ongoing criminal conduct. *See id.* at 242; *Kehr*, 926 F.2d at 1412-13; *Marshall-Silver*, 894 F.2d at 597 (noting that Congress directed RICO's draconian penalties at a societal threat greater than ordinary "single injury" fraud).

FN3. In response to Plaintiff's suggestion that it is improper to dismiss a RICO claim for lack of sufficient continuity, the Court notes that there is overwhelming authority for dismissing a RICO claim on this ground. In fact, many of the Third Circuit's leading RICO cases, including *Hindes v. Castle*, 937 F.2d 868, 876 (3d Cir.1991), *Kehr*, 926 F.2d at 1419, *Banks*, 918 F.2d at 422-23, and *Marshall-Silver Const. Co., Inc. v. Mendel*, 894 F.2d 593, 598 (3d Cir.1990), upheld district courts that dismissed RICO complaints on precisely this ground. Plaintiff cites three cases in support of his contention that the "fact-intensive" nature of the continuity inquiry renders dismissal inappropriate. As noted above, the Court in *Kehr*, the Plaintiff's first case, actually upheld the district court's dismissal of a RICO claim. *Kehr Packages*, 926 F.2d at 1419. In the Plaintiff's second case, *Tabas*, 47 F.3d at 1296, the Third Circuit reviewed a grant of summary judgment against the plaintiff, a posture in which the complaint's adequacy was no longer at issue. The *Tabas* Court reversed summary judgment not because continuity may only be decided by a jury, but because the plaintiff had demonstrated a triable issue of fact on the question. *See id.* In Plaintiff's third case, *United States v. Pelullo*, 964 F.2d 193, 210 (3d Cir.1992)-a criminal matter-the Third Circuit granted the defendant a new trial on, *inter alia,* the ground that the jury instructions did not adequately apprise the jury of the continuity requirement. When the Court noted that "[u]ltimately,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 7
Not Reported in F.Supp., 1998 WL 67545 (E.D.Pa.), RICO Bus.Disp.Guide 9443
**(Cite as: Not Reported in F.Supp.)**

continuity is a factual issue for the jury," *id.,* the Court meant not that continuity must always be determined by a jury, but that although it was convinced that the government had made a sufficient showing of continuity, only a jury could find against the defendant on this issue in a criminal case. Finally, the Court notes that a rule precluding dismissal for failure to plead sufficient continuity would be entirely at odds with Rule 12(b)(6)'s purpose of freeing defendants from the burden of litigating a facially meritless claim. In sum, there is ample authority for this Court to grant a motion to dismiss on the pattern of racketeering element, and the Plaintiff has offered no pertinent authority to the contrary.

The Supreme Court established the general framework for analyzing continuity in *H.J.:*
Continuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.... A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated.

**\*9** *H.J.,* 492 U.S. at 241 (emphasis in original) (citations omitted). The Court now turns to a specific application of these concepts to the facts alleged in this case.

The *H.J.* Court declined to specify what might constitute a "substantial" period of time for purposes of establishing closed-ended continuity. Since then, however, the Third Circuit has developed a durational requirement of at least twelve months. See *Tabas,* 47 F.3d at 1293. Although this time period is ordinarily measured between the first and last predicate acts alleged, in a case where the predicates are acts of mail or wire fraud "the continuity test requires us to look beyond the mailings and examine the underlying scheme or

artifice." *See id.* (quoting *Kehr,* 926 F.2d at 1414). One implication of this focus on the underlying scheme, however, is that the Court must not count the period after the scheme has reached fruition towards the durational requirement. *See id.* But even if the Court looked to the predicate mailings themselves, it could not consider post-scheme innocent mailings or mailings alleged only to have concealed a single transactional fraud. *See Kehr,* 926 F.2d at 1418 (excluding post-fraud innocent mailings from consideration); *Barsam v. Pure Tech Intern., Inc.,* 864 F.Supp. 1440, 1451 (S.D.N.Y.1994) (excluding consideration of post-fraud SEC filings as predicate mailings). *Cf. Davis v. Grusemeyer,* 996 F.2d 617, 627 (3d Cir.1993) (finding plaintiff's true injury was the loss of his trucks, and the defendant's subsequent disposition of the trucks within the limitations period was a mere continuation of the same injury).

In his Complaint, plaintiff alleges that the defendant's scheme ran from April 1993 until the present. (*See* Compl. at 20). However, the Court has already determined that for mail and wire fraud purposes the alleged scheme reached fruition either when Plaintiff received Abraham's September 17 letter or when Abraham assigned the Powerline Technology to Elcom on December 23rd. Therefore, even accepting as true plaintiff's allegation that the scheme began in April, the scheme did not continue for RICO purposes for more than seven to nine months. This duration does not suffice to establish closed-ended continuity under Third Circuit precedent. *See Tabas,* 47 F.3d at 1293; *Hughes v. Consol-Pennsylvania Coal Co.,* 945 F.2d 594, 610-11 (3d Cir.1991), *cert. denied,* 504 U.S. 955 (1992) (twelve month scheme insufficient); *Hindes,* 937 F.2d at 875 (eight months insufficient); *Kehr,* 926 F.2d at 1413 (same); *Banks,* 918 F.2d at 422-23 (same); *Marshall-Silver,* 894 F.2d at 597 (same). Furthermore, plaintiff alleges no more than a single transactional fraud. The alleged continuing nature of his loss-that is, his loss of potential future earnings-cannot extend such a single episodic event into a pattern of racketeering activity. *See, e.g., Hughes,* 945 F.2d at 611 (finding no closed-ended continuity in short-term, single object fraudulent scheme to acquire real estate, although defendants continued to hold property-and presumably derive income from it-after it changed hands). Accordingly, plaintiff does not state an adequate claim of closed-ended continuity.[FN4]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 67545 (E.D.Pa.), RICO Bus.Disp.Guide 9443
**(Cite as: Not Reported in F.Supp.)**

FN4. Computing duration from the predicates themselves produces the same result. Plaintiff alleges a series of mailings spanning between July 26, 1993 and December 23, 1995-a period of almost two and one half years. Upon closer inspection, these fall into two distinct groups. The first group consists of all mailings aimed at forcing Plaintiff out of Abcom. These include Werner's July 26 and August 2, 3, 6, and 10 letters, and Abraham's September 17 letter. The second group of alleged mail frauds consists of the four Elcom private placement memoranda, dated February 22, 1994, December 22, 1994, July 28, 1995, and December 23, 1996. As this second group is alleged to have done no more than conceal the original fraud, it does not count towards the durational requirement. *See Barsam,* 864 F.Supp. at 1451. Therefore, computing duration from the acts themselves results in a period of less than two months.

**\*10** Likewise, plaintiff fails to allege adequate open-ended continuity. The term open-ended continuity describes conduct that threatens to be a continuous danger to society, but has been intercepted at an earlier stage of its development. *See H.J.,* 492 U.S. at 242. The alleged illegal activity must pose a "threat of *additional* repeated criminal conduct over a significant period." *Banks,* 918 F.2d at 423 (quoting *Marshall-Silver,* 894 F.2d at 597) (emphasis in original). In *H.J.,* the Supreme Court offered the example of a hoodlum selling "insurance" to neighborhood storekeepers against window breakage, and telling his victims he would return each month to collect the "premium" for their "coverage." *H.J.,* 492 U.S. at 242. Such conduct threatens that the defendant will continue a pattern of additional criminal activity. Another method of demonstrating open-ended continuity is to show that committing illegal acts is part of an ongoing entity's way of doing business. *See id.*

Here, plaintiff argues that open-ended continuity is present because Elcom's ongoing business "is dependent on raising funds to develop the Powerline Products." (Pl.'s Mem. at 12). Essentially, Plaintiff argues that the continuing effects of one transactional fraud may establish open-ended continuity. The Court cannot agree. Once an allegedly fraudu-

lent transaction is complete, a plaintiff may not rely on the defendants' retention or use of his assets to establish open-ended continuity. *See Blue Line Coal Co., Inc. v. Equibank,* 769 F.Supp. 891, 897 (E.D.Pa.1991). Open-ended continuity is meant to insure RICO liability for conduct like the bribery in H.J., which although intercepted and prosecuted, threatens to meet the closed-ended durational standard. Plaintiff's interpretation of open-ended continuity would permit any plaintiff once defrauded to state a RICO claim if the defendants continued to derive a benefit from the property they obtained. This would be true in nearly every case. Therefore, it must be insufficient to constitute open-ended continuity.

In sum, the Court finds plaintiff has failed to establish that the Defendants engaged in a pattern of racketeering activity. Accordingly, plaintiff has failed to state a claim for RICO liability.

### C. *State Claims*

As noted before, plaintiff's sole basis for federal jurisdiction is his RICO claim in Count I. For the remaining state claims (Counts II through V) he relies on pendant jurisdiction, supplied by 28 U.S.C. § 1367. As the Court has dismissed Plaintiff's RICO claim and lacks any independent basis of jurisdiction over the remaining claims, it declines jurisdiction over them pursuant to § 1367(c)(3). *See Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 1002 (E.D.N.Y.1995); *Blue Line Coal,* 769 F.Supp. at 898.

### III. *CONCLUSION*

**\*11** Because plaintiff has failed to plead an adequate fraudulent scheme or pattern of racketeering activity, plaintiff's RICO claim is dismissed. Without a jurisdictional basis to proceed with plaintiff's pendent state law claims, they are dismissed as well.

### FINAL JUDGMENT

AND NOW, this 17th day of February, 1998, upon consideration of the Motion of Defendants Robert Vito, Arthur Werner, Lee Schwartz, VideoCom, Inc., and Elcom Technologies Corp. to Dismiss, Plaintiff J. Plater-Zyberk, Jr.'s Memoranda in Opposition thereto, and the parties' various

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                    Page 9
Not Reported in F.Supp., 1998 WL 67545 (E.D.Pa.), RICO Bus.Disp.Guide 9443
**(Cite as: Not Reported in F.Supp.)**

supplementary memoranda and replies, IT IS HEREBY
ORDERED that Defendants' Motions are GRANTED.

IT IS FURTHER ORDERED that Judgment is entered in fa-
vor of Defendants and against Plaintiff.

E.D.Pa.,1998.
Plater-Zyberk v. Abraham
Not Reported in F.Supp., 1998 WL 67545 (E.D.Pa.), RICO
Bus.Disp.Guide 9443

Briefs and Other Related Documents (Back to top)

• 2:97cv03322 (Docket) (May. 09, 1997)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2000 WL 369381 (S.D.N.Y.), RICO Bus.Disp.Guide 9909
**(Cite as: Not Reported in F.Supp.2d)**

C

Briefs and Other Related Documents

United States District Court, S.D. New York.
Lloyd PRICE, Henry A. Schwartz, the Festival in Zaire,
Inc., Plaintiffs,
v.
Leon GAST, David A. Sonenberg, Polygram Filmed Enter-
tainment, Inc., Polygram Filmed Entertainment Distribution,
Inc. D/B/A Gramercy Pictures, Polygram Records, Inc. D/
B/A Polygram Video, Mercury Records, DAS Films, Ltd.,
DAS Communications, Ltd., DAS Records, Ltd., Monster
Communications, Inc., and John Doe Corporations 1-10,
Defendants.
**No. 98 CIV. 7769.**

April 11, 2000.

MEMORANDUM AND ORDER

SAND, District J.
**\*1** Plaintiffs The Festival in Zaire, Inc. ("FIZ"), Lloyd
Price, and Henry A. Schwartz (collectively, "Plaintiffs")
bring this action against Defendants Leon Gast, David A.
Sonenberg, Polygram Filmed Entertainment, Inc., Polygram
Filmed Entertainment Distribution, Inc. d/b/a Gramercy Pic-
tures, Polygram Records, Inc. d/b/a Polygram Video, Mer-
cury Records, DAS Films, Ltd., DAS Communications,
Ltd., DAS Records, Ltd., Monster Communications, Inc .,
and John Doe Corporations 1-10 (collectively,
"Defendants"), asserting violations of the Racketeer Influ-
enced and Corrupt Organizations Act, 18 U.S.C. § 1961, as
well as numerous causes of action under New York State
law. Presently before the Court is Defendants' Motion to
Dismiss Plaintiffs' Amended Complaint in Its Entirety, pur-
suant to Federal Rule of Civil Procedure 12(b)(6).

Background

The following facts are drawn from Plaintiffs' Amended
Complaint and documents explicitly referenced therein, *see*
Koppel v. 4987 Corp., 167 F.3d 125, 128 (2d Cir.1999);
Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48
(2d Cir.1991), and are assumed to be true for purposes of
considering Defendants' Motion.

Plaintiffs Price and Schwartz are residents of New York,
and Plaintiff FIZ was a New York corporation doing busi-
ness in New York. Plaintiffs Price and Schwartz are joint
successors in interest to ownership of all assets of FIZ, in-
cluding all personal and intangible rights owned by FIZ. De-
fendants Gast and Sonenberg are residents of New York. De-
fendants Polygram Filmed Entertainment, Inc .; Poly-
gram Filmed Entertainment Distribution, Inc. d/b/a
Gramercy Pictures; Polygram Records, Inc. d/b/a Polygram
Video; DAS Films, Ltd.; DAS Communications, Ltd.; DAS
Records Ltd.; Mercury Records; and Monster Communica-
tions, Inc. are (or were) New York corporations and/or cor-
porations doing business in New York. *See* Am. Compl. ¶¶
3-13.

Plaintiffs' suit is predicated on a series of events dating back
to 1974. In an Agreement dated July 8, 1974, FIZ acquired
from the Republic of Zaire
the exclusive rights to stage concerts of performing artists in
Kinshasa, Zaire as a preliminary event to the Foreman/Ali
heavyweight title fight scheduled in Kinshasa, Zaire for
September 24, 1974, as well as to simultaneously produce a
film and other recordings of the concert and associated ma-
terial embodying the scenic and cultural values of Zaire to-
gether with events surrounding said fight ...

Lepera Aff. Ex. H, at 1. (The film footage and sound record-
ings ultimately became the 1997 Academy Award winning
film entitled "When We Were Kings." Am. Compl. ¶ 15.) In
an agreement dated July 23, 1974 (the "7/23/74 Agree-
ment"), FIZ transferred these exclusive rights, which in-
cluded "the right to full ownership of the Film and Record-
ings including without limitation all rights to the worldwide
exploitation of the Film and Recordings," to International
Film and Record Productions, Ltd. ("International"). Lepera
Aff. Ex. H. ¶¶ 1(a), 2(a). In consideration for this transfer,
International agreed (i) to provide up to $1,500,000 in finan-
cing for the staging of the concerts and production of the
film and recordings; (ii) to pay FIZ $200,000 by October 24,
1974; and (iii) to pay FIZ one third of the net receipts de-
rived from the distribution of the film and recordings. *Id.* ¶¶
6, 8, 9.

**\*2** In or about January 1975, FIZ filed suit in the Supreme
Court of the State of New York against International for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d, 2000 WL 369381 (S.D.N.Y.), RICO Bus.Disp.Guide 9909
**(Cite as: Not Reported in F.Supp.2d)**

breach of the 7/23/74 Agreement and for an accounting, demanding that the film footage and sound recordings be turned over by International to FIZ, and that International pay to FIZ the $200,000 owed to FIZ under the 7/23/74 Agreement. Am. Compl. ¶¶ 25, 27. FIZ also moved for and was granted an order of attachment as to the film footage. *Id.* On January 22, 1975, the action was removed to the United States District Court, Southern District of New York, at which time the order of attachment became a Federal Order of Attachment. *Id.*

At an unspecified date subsequent to FIZ's filing of its suit against International-but prior to November 11, 1975, Steve Tolbert, one of International's principles, allegedly
told Plaintiff Price that International would pay the outstanding monies owed to FIZ pursuant to the [7/23/74 Agreement], but it would take time. Price told Tolbert that FIZ needed security and Price and Tolbert ... agreed that FIZ would have equal rights to the film with International; that FIZ and International would jointly control the film, including its editing and post-production work and exploitation.

*Id.* ¶ 29 [hereinafter, "the Oral Agreement"]. Plaintiffs further allege that the Oral Agreement created a partnership between FIZ and International:The International-FIZ lawsuit ... resulted in a modification of the [7/23/74 Agreement] so that FIZ gained property rights it had not had prior to said modification, to wit; the footage, its editing, creating and exploitation was agreed to be jointly controlled by FIZ and International. Thus, FIZ and International were joint partners in a joint venture ... over which both parties had joint control. International and FIZ were equal partners in fact and in law relating to all aspects of the control of the film footage, creation of a finished film and the exploitation thereof under New York statutory partnership law. The partnership here was an association between FIZ and International to carry on the business of the completion of the finished film and sound recordings of the 1974 Festival in Zaire for release and sale to the general public for profit, together with the exploitation of all rights thereto.

*Id.* ¶ 32.

In an agreement dated September 19, 1975 (the "9/19/75 Agreement"), International and Don King Productions, Inc.

("King Productions") agreed that FIZ would discontinue its suit against International and release the negative of the film to the director contracted by International in exchange for a restructuring of the 7/23/74 Agreement. *See* Kalina Aff. Ex. C, at 3 & ¶ 6. Under this restructuring, International granted to King Productions "complete control over the completion of the film and recordings," as well as one half of the two thirds of the net receipts from the distribution of the film to which International was entitled pursuant to the 7/23/74 Agreement. *Id.* ¶¶ 1, 3. King Productions, in turn, covenanted to secure $1,750,000 in additional financing for the project. *Id.* ¶ 5.

**\*3** In a stipulation dated November 6, 1975 (the "11/6/75 Stipulation"), FIZ and International, "in furtherance of an agreement made as of the 19th day of September, 1974," agreed (i) that FIZ's lawsuit against International would be discontinued, and (ii) that the negative of the film "may be delivered to or at the direction of and shall remain under the joint control of both of the parties." Kalina Aff. Ex. F, at 2. In an order dated November 17, 1975 (the "11/17/75 Order"), Judge Motley ordered (i) that FIZ's suit against International be discontinued, and (ii) that, upon payment of any outstanding attachment fees, the Sheriff of the City of New York shall inform FIZ and International that the attachment has been vacated and that the negative of the film "may be delivered to or at the direction of and shall remain under the joint control of the parties." Kalina Aff. Ex. G, at 2.

On an unspecified date subsequent to the 11/6/75 Stipulation,
FIZ, International, and [Defendant Gast [allegedly] agreed [ (i) ] that Gast would complete the process of editing the footage and sound recordings for the benefit of the FIZ and International's joint venture/partnership.... [and (ii) ] to allow Gast to hold the footage as the partnership's bailee and fiduciary ....

Am. Compl. ¶ 33 [hereinafter, "the Fiduciary Agreement"].

On or about June 15, 1997, Gast commenced a breach of contract action against International, alleging that International owed him over $44,000. *Id.* ¶ 40. Plaintiffs allege that this ostensibly legal act was the first step in "an unlawful plot" ("the Plot") hatched by Gast and the other Defendants,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2000 WL 369381 (S.D.N.Y.), RICO Bus.Disp.Guide 9909
**(Cite as: Not Reported in F.Supp.2d)**

the goal of which was "to unlawfully obtain ownership of the footage and extinguish the rights of Plaintiffs" under the FIZ-International partnership/joint venture. *Id.* ¶ 42. Through his participation in this initial step and subsequent steps of the Plot, Gast allegedly violated his "fiduciary relationship with Plaintiffs and [his] role as bailee of the film and materials for the benefit of Plaintiffs." *Id.* ¶ 44.

Among the numerous subsequent steps of the Plot are the following. After obtaining a default judgment against International, Gast allegedly defrauded the Supreme Court of New York County by intentionally and falsely representing to that Court that Plaintiffs were represented by a law firm that in fact did not represent them. *Id.* ¶ 46. As a result of this misrepresentation, Plaintiffs received neither actual nor constructive notice of a public auction of the film footage on or about September 5, 1979, which auction was ordered by the state court to satisfy the default judgment Gast had obtained against International. *Id.* ¶ 47. Gast purchased the film footage at the auction for $1000. *Id.* ¶ 48. Similarly, on December 6, 1989, Gast petitioned the state court for a second sheriff's sale of the intellectual property rights in the film and sound recordings to Defendant Sonenberg-again without giving Plaintiffs either actual or constructive notice thereof, and without informing the Court of Plaintiffs' rights in the film. *Id.* ¶¶ 57, 58. Finally, during the 1990s, various acquisition, sale, transfer, conveyance, production, and distribution agreements were entered into by and among Gast, Sonenberg, and the remaining defendants. *Id.* ¶¶ 67, 73. All of these transactions were allegedly fraudulent because they were executed with intentional or at least negligent disregard of Plaintiffs' rights in the film. *Id.* ¶ 72.

**\*4** Plaintiffs commenced the present action in the Supreme Court of the State of New York on August 31, 1998. On October 30, 1998, Defendants removed the action to this Court, and moved to dismiss the original complaint on December 7, 1998. Following a hearing on that motion, this Court, in a Memorandum and Order dated May 27, 1999, (i) found that the original complaint was defective, and (ii) admonished Plaintiffs, in their Amended Complaint, to "endeavor to insure that each claim asserted is well-supported in fact and law as to each Defendant against whom liability is asserted.... [and] to articulate in plain terms the nature and

sources of the alleged property rights asserted, as well as to whom those rights belonged." Plaintiffs filed their Amended Complaint on July 30, 1999. Defendants moved to dismiss on October 12, 1999, and oral argument was heard thereon on January 20, 2000.

Plaintiffs assert the following eleven causes of action: (1) an accounting against all Defendants under New York State law; <u>FN1</u> (2) civil RICO against Defendants Gast, Sonenberg, Sonenberg Corporations, and John Doe Corporations 1-5, under <u>18 U.S.C. § 1961</u> et seq.; (3) conversion against all Defendants, under New York State law; (4) fraudulent inducement against Defendants Gast and Sonenberg, under New York State law; (5) fraudulent concealment against Defendants Gast, Sonenberg, Sonenberg Corporations, and John Doe Corporations 1-5, under New York State law; (6) common law fraud against Defendants Gast and Sonenberg, under New York State law; (7) negligent misrepresentation against Defendants Gast and Sonenberg, under New York State law; (8) unjust enrichment against Defendants Gast, Sonenberg, Sonenberg Corporations, and John Doe Corporations 1-5, under New York State law; (9) breach of bailment against Defendants Gast and Sonenberg, under New York State law; (10) negligence against all Defendants, under New York State law; and (11) breach of constructive trust against Defendants Gast, Sonenberg, Sonenberg Corporations, and John Doe Corporations 1-5, under New York State law.

> <u>FN1.</u> In their Memorandum in Opposition, Plaintiffs request withdrawal of their claim for an accounting as against Polygram Filmed Entertainment, Inc., Polygram Filmed Entertainment Distribution, Inc. d/b/a Gramercy Pictures, and Polygram Records, Inc., d/b/a Polygram Video.2d Memo. Opp. at 40.

Plaintiffs assert that the Court has original jurisdiction over their civil RICO claim, pursuant to <u>28 U.S.C. § 1331</u>, and supplemental jurisdiction over their New York State law claims, pursuant to <u>28 U.S.C. § 1367</u>.

For the reasons given below, we dismiss Plaintiffs' RICO claim; decline to exercise supplemental jurisdiction over Plaintiffs' state law claims; and therefore dismiss Plaintiffs'

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2000 WL 369381 (S.D.N.Y.), RICO Bus.Disp.Guide 9909
(Cite as: Not Reported in F.Supp.2d)

amended complaint in its entirety.

### Legal Standard

On a motion to dismiss for failure to state a claim upon which relief may be granted, *see* FRCP 12(b)(6), we must "construe in plaintiff['s] favor factual allegations in the complaint.... Dismissal of the complaint is proper only where 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." ' *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.,* 155 F.3d 59, 67 (2d Cir.1998) (*quoting Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)) (footnote omitted) (citation omitted).

### Discussion

### I. The Civil RICO Claim

### A. Statute of Limitations

**\*5** The statute of limitations for civil RICO claims is four years. *See Agency Holding Corp. v. Malley-Duff & Assoc., Inc.,* 483 U.S. 143, 156 (1987). The claim accrues "at the time [the plaintiff] discovered or should have discovered the injury." *Bankers Trust Co. v. Rhodes,* 859 F.2d 1096, 1102 (2d Cir.1988), *cert. denied,* 490 U.S. 1007 (1989).

Plaintiffs contend that their injury consists of the "extinguish[ment] [of their] "valuable rights in the subject film footage, film, sound recordings, intellectual property rights and ancillary rights." Pl's RICO Statement ¶ 15. Plaintiffs allege that this extinguishment of their rights was caused by a fraudulent scheme organized and carried out by Gast and Sonenberg, the chief steps of which were the 1979 and 1990 court actions resulting in Gast's and/or Sonenberg's purchase of the rights to the film and recordings at sheriff's sales. *Id.* ¶ 16. Plaintiffs also allege that their rights in the film were injured by Gast's and Sonenberg's 1987 sale of certain intangible rights in the film to a third party, and by Gast's and Sonenberg's 1996 sale of the distribution rights to the film. Am. Compl. ¶¶ 88, 89.

Defendants respond that, at most, Plaintiffs were injured only by Gast's purchase of the film negative at the 1979

sheriff's sale.2d Memo. at 28-29. We agree, for the following two reasons. First, despite Plaintiffs' repeated suggestions that they reacquired intellectual property rights to the film by means of the Oral Agreement, *see* Pl's Rico Statement, at 25-28, 35, Plaintiffs' counsel stated emphatically, at the end of the second oral argument, that Plaintiffs "ha[ve] never claimed that ... they have copyright interests in this film .... [o]r proprietary interest[s]." Transcript of Oral Argument, Jan. 20, 2000 ("2d Tr."), at 47 (statement of Mr. Kalina); *see also* 2d Memo. Opp. at 40 (stating that "Plaintiffs ... were not and are not now the owners of the copyright"); 1st Memo. Opp. at 64 ("Plaintiffs do not allege any ownership in the copyright rights to the film, nor have they asserted a claim for violation of any intangible copyright interest in the film.").[FN2] Hence, given that-according to Plaintiffs-Gast and Sonenberg purchased the "intellectual property rights of the film footage and sound recordings,"Am. Comp. ¶ 57, at the 1990 sheriff's sale-rights to which Plaintiffs lay no claim-it follows that Gast's and Sonenberg's acquisition of these rights could not have caused an injury to Plaintiffs.

> FN2. It was precisely this sort of double-speak in Plaintiffs' original complaint that compelled the Court, in our Memorandum and Order of May 27, 1999, to order Plaintiffs, in their amended complaint, "to articulate in plain terms the nature and sources of the alleged property rights asserted ...." Were Plaintiffs to allege that they reacquired copyright rights by means of the Oral Agreement, such allegation would only be adequate if Plaintiffs also alleged the existence of a writing memorializing this reacquisition. Section 204 of The Copyright Act of 1976 provides in relevant part that "[a] transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a). Plaintiffs have not alleged the existence of such a writing.

Second, Gast's and Sonenberg's receipt of the proceeds from the 1987 sale of intangible property rights in the film, and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                         Page 5
Not Reported in F.Supp.2d, 2000 WL 369381 (S.D.N.Y.), RICO Bus.Disp.Guide 9909
**(Cite as: Not Reported in F.Supp.2d)**

their receipt of the proceeds from the 1996 sale of the film's distribution rights do not amount to "new and independent" injuries to Plaintiffs. _Bankers Trust,_859 F.2d at 1103. And only a new and independent injury can serve as the basis for a new and independent limitations period. _See Bingham v. Zolt,_ 66 F.3d 553, 560 (2d Cir.1995). The fact that Gast and Sonenberg later sold the rights they allegedly pilfered from Plaintiffs for certain sums of money goes merely to the measurement of Plaintiffs' damages. _See Management Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.,_ 883 F.2d 48, 51 (7th Cir.1989) (noting that defendant's "subsequent use of the allegedly stolen software cannot be characterized as subsequent thefts .... but would go only to the issue of damages").

**\*6** This brings us to Plaintiffs' allegation concerning the date of their discovery of their injury. Plaintiffs allege that they did not become aware of Gast's 1979 lawsuit against International until 1997. _See_ Am. Compl. ¶ 40. Plaintiffs disclaim actual or constructive notice of the suit, alleging that they were not in fact represented by the law firm appearing on their behalf. _See_ Am. Comp. ¶ 46. Accepting this allegation for the purposes of this motion, Plaintiffs entire claim is predicated on the theory that, since 1975, FIZ had a partnership relationship with International. International clearly had notice of the suit and no claim is made that International engaged in or consented to fraud against the partnership. FIZ therefore had constructive notice by means of notice to their partner, International. _See_ N.Y. Partnership Law § 23 (McKinney 1988).[FN3]

> [FN3]. In response to this argument, it could be argued that Section 23 must be read in conjunction with Section 51(2)(c) of the New York Partnership Law, which provides in relevant part that "[a] partner's right in specific partnership property is not subject to attachment or execution, except on a claim against the partnership." N.Y. Partnership Law § 51(2)(c) (McKinney 1988). Given that Gast's lawsuit was predicated on International's failure to pay him money owed to him under a contract between Gast and International-i.e., given that Gast's claim was not against the FIZ-International partnership-it would follow that Gast's execution

on the partnership's property, viz., the film negative, was illegal. There is a fatal flaw in this argument, however. Given (i) that Gast was presumably hired by International sometime after it acquired the rights to the film pursuant to the 7/23/74 Agreement, (ii) that the partnership was formed sometime in 1975, and (iii) that Gast did not file his suit against International until June 15, 1977, it follows that Gast worked for the partnership far longer than he worked for International alone, and, accordingly, that-assuming that the FIZ-International partnership existed-a large percentage of his claim was, _de facto,_ against that partnership.

In light of the foregoing, we conclude that Plaintiffs constructively discovered the injury allegedly caused by Gast's and Sonenberg's 1979 execution on the film negative in 1979. As Plaintiffs did not bring their civil RICO action until October 30, 1998, it follows that this claim is time-barred by the applicable four-year statute of limitations.

### B. The Elements of a RICO Claim

Assuming _arguendo_ the Plaintiffs' RICO claim is not time-barred, we address other issues raised by the motion. In order to state a RICO claim, a plaintiff must allege (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962. _See Pinnacle Consultants v. Leucadia Nat'l Corp.,_ 102 F.3d 900, 903 (2d. Cir.1996). Plaintiffs allege that Defendants violated 18 U.S.C. § 1962(c). _See_ Pl's RICO Statement ¶ 1. To state a valid claim under Section 1962(c), a plaintiff must adequately allege (1) that the defendant (2) through the commission of two or more predicate acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce. _See Moss v. Morgan Stanley, Inc.,_ 719 F.2d 5, 17 (2d Cir.1983), _cert. denied,_ 465 U.S. 1025 (1984). For the reasons given below, we find that Plaintiffs have failed adequately to allege (i) a pattern of racketeering activity, and (ii) an injury to their business or property.

#### 1. Pattern of Racketeering Activity

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 6
Not Reported in F.Supp.2d, 2000 WL 369381 (S.D.N.Y.), RICO Bus.Disp.Guide 9909
**(Cite as: Not Reported in F.Supp.2d)**

To adequately allege a pattern of racketeering activity, a plaintiff must allege (1) at least two predicate acts of racketeering occurring within a ten-year period; (2) that these predicate acts are related to each other; and (3) that these predicate acts amount to or pose a threat of continuing criminal activity. *See H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989); GICC Capital Corp. v. Technology Fin. Group, Inc., 67 F.3d 463, 465 (2d Cir.1995), cert. denied, 518 U.S. 1017 (1996).*

**\*7** We begin with the "two predicate acts" requirement. Plaintiffs attempt to satisfy this requirement by alleging 27 violations of the Federal mail fraud statute, 18 U.S.C. § 1341, and six violations of the Federal wire fraud statute, 18 U.S.C. § 1343. *See* Pl's RICO Statement ¶ 5. To state a valid claim of mail or wire fraud, a plaintiff must adequately allege (1) the existence of a scheme to defraud, (2) the defendant's knowing participation in the scheme, and (3) the use of wire or mail communications in interstate commerce in furtherance of the scheme. *See Chanayil v. Gulati, 169 F.3d 168, 170-71 (1999)* (citations omitted). In light of our finding that Plaintiffs were injured, at most, only by the acts constituting Gast's and Sonenberg's acquisition of the film negative in 1979, it follows that only those allegations of mail and wire fraud in furtherance of this acquisition can qualify as predicate acts. It turns out that all six of Plaintiffs' wire fraud allegations concern acts performed in or after January 1990; of course, none of these acts can be viewed as in furtherance of this acquisition. *See United States v. Altman, 48 F.3d 96, 103 (2d Cir.1995)* ("A mailing cannot be said to be in furtherance of a scheme to defraud when it occurs after the scheme has reached fruition.") (citing *Kann v. United States, 323 U.S. 88, 94 (1944)*). Similarly, 24 of Plaintiffs' 26 mail fraud allegations concern acts performed in or after November 1987; neither can these acts be viewed as in furtherance of Gast's and Sonenberg's 1979 acquisition of the film negative.

The remaining two allegations concern Gast's mailings-through his attorneys-of two executions to the Sheriff of New York County. Specifically, one concerns the mailing of "an Execution with Notice to Garnishee to the Sheriff of New York County," on November 22, 1978. Pl's RICO Statement, at 24. The other concerns the mailing of a " 'new

Execution with Notice to Garnishee and a copy of the stipulation of discontinuance of the prior action," ' on April 4, 1979. *Id.* at 25. Plaintiffs contend that these "mailing[s] [were] in furtherance of Gast and Sonenberg's scheme to defraud Plaintiffs, as the subsequent execution on the subject film footage in this case was the primary means by which Gast and Sonenberg fraudulently obtained the rights to the film footage and deprived Plaintiffs of their partnership and joint control rights and ancillary intellectual property rights to the film footage ...." *Id.* The close similarity between these two mailings raises the question whether both can be in furtherance of Gast's and Sonenberg's alleged fraudulent scheme. Given that the sheriff's sale only took place after the second mailing, it could be argued that the first mailing was ineffectual, i.e., not in furtherance of the fraudulent scheme. We will assume without deciding, however, that Plaintiffs' allegations of these two mailings satisfy the "two predicate acts" requirement.

**\*8** This brings us to the "relatedness" requirement. To satisfy this requirement, a plaintiff must merely allege that the predicate acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc., 492 U.S. at 240.* Given that the two mailings have the same purpose, viz., the acquisition of the film negative, the same participants, viz., Gast and Sonenberg, the same victim, viz., FIZ, and the same method of commission, there can be little doubt that these two predicate acts are sufficiently related to satisfy this second requirement.

We come, finally, to the "continuity" requirement. A plaintiff may satisfy this requirement by alleging either a closed-ended pattern of racketeering activity (i.e., past criminal conduct extending over a substantial period of time), or an open-ended pattern of racketeering activity (i.e., past criminal conduct coupled with a threat of future criminal conduct). *See id., 492 U.S. at 241-42; GICC Capital, 67 F.3d at 466.* In determining whether closed-ended continuity has been adequately pleaded, courts should "weigh[ ] a variety of non-dispositive factors, including, inter alia, the length of time over which the alleged predicate acts took place, the number and variety of acts, the number of participants, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 7
Not Reported in F.Supp.2d, 2000 WL 369381 (S.D.N.Y.), RICO Bus.Disp.Guide 9909
**(Cite as: Not Reported in F.Supp.2d)**

number of victims, and the presence of separate schemes." *GICC Capital,* 67 F.3d at 467 (citations omitted).

We consider first the length of time over which the alleged predicate acts took place. As noted, Plaintiffs allege that the first Execution and Notice was mailed on November 22, 1978, while the second was mailed on April 4, 1979. Plaintiffs thus allege a period of racketeering activity extending approximately five months. In *GICC Capital,* the Second Circuit held that an allegation of an 11-month period of racketeering activity was insufficient to satisfy the pleading requirements of closed-ended continuity. *See id.* at 468. Accordingly, we hold that Plaintiffs' allegation of a five-month period of racketeering activity is insufficient to allege closed-ended continuity.

As for the other non-dispositive factors, Plaintiffs' failure adequately to plead closed-ended continuity is strongly suggested by the facts that Plaintiffs adequately allege (i) only two predicate acts, (ii) only two perpetrators of these acts, viz., Gast and Sonenberg, (iii) only one victim, viz., FIZ, and only one fraudulent scheme, viz., the scheme to obtain ownership of the film negative. *See, e.g., Giannacopolous v. Credit Suisse,* 965 F.Supp. 549, 552 (S.D.N.Y.1997) (finding no closed-ended continuity where there was "a single perpetrator, ... a single victim, ... and a single, discrete scheme"); *D'Orange v. Feely,* 877 F.Supp. 152, 158 (S.D.N.Y.1995) (finding no closed-ended continuity where there was "a single victim ... [and] a single criminal scheme that resulted in a single injury").

**\*9** There remains the question whether Plaintiffs have adequately pleaded open-ended continuity. In "assessing whether a threat of continuity exists," Second Circuit courts are to "look[ ] first to the nature of the predicate acts alleged or to the nature of the enterprise at whose behest the predicate acts were performed." *GICC Capital,* 67 F.3d at 466 (citations omitted). More specifically,
in cases where the acts of the defendant or the enterprise were inherently unlawful, such as murder or obstruction of justice, and were in pursuit of inherently unlawful goals, such as narcotics trafficking or embezzlement, the courts generally have concluded that the requisite threat of continuity was adequately established by the nature of the activity, even though the period spanned by the racketeering acts

was short.

*United States v. Aulicino,* 44 F.3d 1102, 1111 (2d Cir.1995). On the other hand, "[w]here the nature of the conduct or the enterprise does not by itself suggest that the racketeering acts will continue, courts must look to other external factors." *GICC Capital,* 67 F.3d at 466.

Plaintiffs do not contend that Gast's two mailings of an "Execution with Notice to Garnishee" were inherently unlawful acts. *See* Am. Compl. ¶ 42. Rather, Plaintiffs appear to rest their allegation of open-ended continuity on their allegation that Defendants' fraudulent scheme "has lasted for over 20 years to date ." 2d Memo. Opp. at 16. This allegation is of course entirely undermined by our finding that, at most, Plaintiffs have adequately alleged a fraudulent scheme that began in November 1974 and ended in April 1975. Furthermore, the reasons underlying the immediately preceding determination that Plaintiffs have failed adequately to allege close-ended continuity strongly support a finding that they have likewise failed adequately to allege open-ended continuity. "The Courts of this Circuit have repeatedly found that ... short-lived, inherently terminable schemes with few criminal acts and few victims do not show a threat of continuity sufficient to plead a RICO pattern." *Cucina Classica Italiana, Inc. v. Banca Nazionale Del Lavoro,* No. 96 Civ. 1144, 1997 WL 2516, at *7 (S.D.N .Y. Jan. 3, 1997) (citing cases). Given (i) that Gast's and Sonenberg's alleged fraudulent scheme had the quite narrow purpose of extinguishing FIZ's rights in the film negative, and (ii) that this purpose was achieved with Gast's purchase of the film at the June 1979 sheriff's sale, we conclude that Plaintiffs have failed to allege that Defendants' conduct poses a threat of continuing criminal activity.

In light of the foregoing, we find (i) that Plaintiffs have failed adequately to allege a pattern of racketeering activity, and, accordingly, (ii) that Plaintiffs have failed adequately to allege a violation of 18 U.S.C. § 1962(c).

### 2. Injury to Business or Property

A civil RICO "plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 8
Not Reported in F.Supp.2d, 2000 WL 369381 (S.D.N.Y.), RICO Bus.Disp.Guide 9909
(Cite as: Not Reported in F.Supp.2d)

_Sedima, S.P.R.L. v. Imrex Co., Inc.,_ 473 U.S. 479, 496 (1985); _see also_ 18 U.S.C. § 1964(c) ("Any person injured in his business or property by reason of a violation of Section 1962 of this chapter may sue therefor ...."). In short, a plaintiff must allege (1) that he has suffered an injury to his business or property, and (2) that this injury was proximately caused by the defendant's violation of Section 1962.

*10 Plaintiffs purport to satisfy the first of these two requirements by alleging that the "valuable rights in the ... film footage, film, sound recordings, intellectually property rights and ancillary rights" that Plaintiffs obtained pursuant to the Oral Agreement have been extinguished. Pl's RICO Statement ¶ 15. In support of this allegation, Plaintiffs place substantial weight on the following language from the 11/6/75 Stipulation: "the film heretofore attached may be delivered to or at the direction and shall remain under the _joint control_ of both of the parties." Kalina Aff. Ex. F (emphasis added). Plaintiffs contend that this "joint control" language derives from the Oral Agreement.2d Memo. Opp. at 8.

There is a problem, however, with this contention that the "joint control" language in the 11/6/75 Stipulation refers to the Oral Agreement, to wit: the 11/6/75 Stipulation explicitly states that the placing of the film under the joint control of the parties is "in furtherance of an agreement made as of the 19th day of September, 1975." Kalina Aff. Ex. F. This would appear to be an explicit reference to the 9/19/75 Agreement. And this apparent reference is confirmed by references in the 9/19/75 Agreement to the 7/23/74 Agreement and to FIZ's lawsuit against International for breach of that Agreement. Specifically, the 9/19/75 Agreement begins with a recitation of the key terms of the 7/23/74 Agreement, viz., (1) FIZ's assignment of the exclusive rights to film and record the festival in Zaire to International in consideration of $200,000 and a commitment to provide $1,500,000 for the production of the festival; and (2) FIZ's entitlement to 1/3 of the net receipts from the completed film and recordings and International's entitlement to 2/3 of the net receipts. Kalina Aff. Ex. C, at 2. The Agreement then describes the status of the project as of September 1975:(1) International had expended $2,250,987; (2) an additional $150,000 was needed to complete the film and recordings; and (3) FIZ had

received none of the $200,000 owed to it by International. _Id._ at 2-3. (It was the third of these facts that led FIZ to sue International for breach of the 7/23/74 Agreement.) In view of these circumstances, the Agreement then states that "the parties hereto desire and are willing to amicably resolve their differences by restructuring the original arrangement and to work together to complete said film and recordings for their mutual benefit." _Id._ at 3. This restructuring had the following four components: (1) "International ... grant[ed] to King Productions complete control over the completion and distribution rights arrangement of the film and recordings," _id._ ¶ 1; (2) "King Productions ... assume[d] the obligation to complete [the] film and recordings in conjunction with the director contracted by International ... as well as to secure distribution [thereof]," _id._ ¶ 2; (3) "International .... assigned to King Productions fifty percent of the sixty-six and two thirds percent of the 'net receipts' derived from the distribution of the film and recordings to which International [was] entitled" pursuant to the 7/23/74 Agreement, _id._ ¶ 3; and (4) "[a]s consideration for the rights granted [under the Agreement], King productions [agreed to] use its best efforts to secure from others the sum of $1,750,000, [of which] $100,000 [was to] be paid to FIZ[,] $150,000 [was to] be utilized to complete the film and $1,500,000 [was to] be considered and deemed a partial recoupment of International's investment," _id._ ¶ 5. Finally, the Agreement provides that, "[i]mmediately upon the signing of this agreement, the action filed by FIZ against International in the United States Court, Southern District of New York, shall be discontinued without costs to either party and the negative of the film released to the Director to be utilized in the completion of the film." _Id._ ¶ 6.

*11 Confronted with the preceding evidence that the 11/6/75 Stipulation is "in furtherance of" the 9/19/75 Agreement, Plaintiffs contend that the latter "had no effect" upon the former.2d Memo. Opp. at 3. In support of this contention, Plaintiffs advance the following three arguments. Plaintiffs argue, first, that "in furtherance of" should be interpreted to mean that the 11/6/75 Stipulation "furthered a goal of International in getting some modicum of control over a project it invested a lot of money in; and it furthered FIZ's aim of 'joint control,' i.e; [sic] a partnership (under New York law)." _Id._ at 7. We find this proposed reading of

Westlaw.

Not Reported in F.Supp.2d                                                                                           Page 9
Not Reported in F.Supp.2d, 2000 WL 369381 (S.D.N.Y.), RICO Bus.Disp.Guide 9909
(Cite as: Not Reported in F.Supp.2d)

the "in furtherance of" language highly implausible. The 11/6/75 Stipulation explicitly states that the provision of joint control over the film is "in furtherance of *an agreement made as of the 19th day of September, 1975.*" Hence, any reading of "in furtherance of" must make reference to such an agreement. Plaintiffs' proposed reading makes no such reference; their reading speaks instead of International's "goal" and FIZ's "aim."

Plaintiffs argue, second, that "no 'joint control' [i.e; [sic] partnership (property) ] language is present in the [9/19/75 Agreement], and the [9/19/75 Agreement] did not provide for *joint* control between King and International." *Id.* Rather, it provided for "full control over the film, which is totally inconsistent with the joint control agreement." 2d Tr. at 18. We find this argument unpersuasive because joint control over the negative is not in the least inconsistent with complete control over the "completion and distribution rights arrangement of the film." Kalina Aff. Ex. C ¶ 1. Control over the negative is clearly different than control over completion and distribution of the completed film. Furthermore, given that the 9/19/75 Agreement provided, in part, for the release of the negative of the film to the "director contracted by International," who was to complete the film "in conjunction with" King Productions, *see id.* ¶¶ 6, 2, the 11/6/75 Stipulation's provision of joint control over the negative makes perfect sense.

This said, the question remains why the 11/6/75 Stipulation did not call for joint control over the negative by International and King Productions-as opposed to joint control by International and FIZ. The most obvious answer is that the 11/6/75 Stipulation was designed to discontinue a lawsuit between International and FIZ-as opposed to one between International and King Productions.

This brings us to Plaintiffs' third argument, viz., that the 9/19/75 Agreement is irrelevant because "Don King Productions, Inc. is not a party to the instant lawsuit nor was it a party to the FIZ-International lawsuit .... [nor was it] a party to the [11/6/75 Stipulation]." 2d Memo. Opp. at 5. We find this argument unpersuasive for several reasons. First, Don King, along with Plaintiffs Price and Schwartz, is listed as one of FIZ's representatives in the 7/23/74 Agreement. *See* Lepera Aff. Ex. H, at 1. Second, it appears that Defendant

Price signed the 9/19/75 Agreement as a witness. *See id.*FN4 Third, as noted, the 11/6/75 Stipulation clearly refers to the 9/19/75 Agreement, and the 9/19/75 Agreement clearly anticipates the 11/6/75 Stipulation.

> FN4. When questioned about this signature at oral argument, Plaintiffs' counsel responded as follows: "Judge, that is a signature saying the word "Lloyd Price" on it Judge. I'm not sure that's Lloyd Price's signature now. It could be. It looks similar to the signature, as far as I'm concerned ...." 2d Tr. at 21.

*12 In light of the foregoing, we find that the reference in the 11/6/75 Stipulation to "an agreement made as of the 19th day of September, 1975" is to the 9/19/75 Agreement-as opposed to the Oral Agreement. In light of this finding, Plaintiffs' allegation that, at about the same time that International and King Productions signed the 9/19/75 Agreement, FIZ and International struck the Oral Agreement-an agreement concerning basically the same matters dealt with by the 9/19/75 Agreement-strains credulity to the breaking point. The Oral Agreement had to be made either prior to the signing of the 9/19/75 Agreement or after it. If the Oral Agreement were made after the signing of the 9/19/75 Agreement-thereby superceding the 9/19/75 Agreement-then one wonders why *it*-rather than the 9/19/75 Agreement-was not referred to in the 11/6/75 Stipulation. Alternatively, if the Oral Agreement were made prior to the signing of the 9/19/75 Agreement, its grant to FIZ of joint control over the completion of the film would have been superceded by the 9/19/75 Agreement's grant of complete control over the completion of the film to King Productions. FN5

> FN5. We note parenthetically that the 9/19/75 Agreement provided FIZ with greater incentives to discontinue its lawsuit against International than did the alleged Oral Agreement. As noted, the lawsuit was brought because International had not paid to FIZ the $200,000 to which FIZ was entitled under the 7/23/74 Agreement. Furthermore, according to 9/19/75 Agreement, International needed an additional $150,000 to complete the film. And of course FIZ could not begin collecting the 2/3 of the net receipts derived from distribution of the film until the film was completed. According to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                            Page 10
Not Reported in F.Supp.2d, 2000 WL 369381 (S.D.N.Y.), RICO Bus.Disp.Guide 9909
**(Cite as: Not Reported in F.Supp.2d)**

terms of the alleged Oral Agreement, FIZ, in exchange for discontinuing its lawsuit against International, was merely granted joint control over the completion and distribution of the film. The Oral Agreement is silent on the issues of the outstanding $200,000 and additional financing for completion of the film. The 9/19/75 Agreement, in contrast, addressed both of these concerns. It provided for a means through which FIZ would obtain $100,000 of the outstanding $200,000 in the near term, and additional financing for the completion of the film. Furthermore, it is noteworthy that Plaintiffs do not allege that FIZ was a production company. It was presumably because FIZ was not a production company that it contracted with International to produce the film in the first place. Similarly, when International proved to be incapable of producing the film, it made sense that a second production company, viz., King Productions, Inc., was brought in to produce the film. The Amended Complaint is devoid of any explanation as to how *FIZ* was to facilitate the production of the film subsequent to the making of the Oral Agreement.

Similarly, in light of our finding that the 11/6/75 Stipulation was predicated on the 9/19/75 Agreement-as opposed to the Oral Agreement, we find it highly doubtful that, on the heels of the 11/6/75 Stipulation, "FIZ, International and Gast [orally] agreed that Gast would complete the process of editing the footage and the sound recordings *for the benefit of FIZ and International's joint venture/partnership*." Am. Compl. ¶ 33 (emphasis added). As noted, the 9/19/75 Agreement explicitly provides that "the negative of the film [shall be] released to the Director [viz., Gast] to be utilized in the completion of the film ...." Kalina Aff. Ex. C. ¶ 6.

Furthermore, even if it is assumed that the Oral Agreement was made, it is doubtful that it formed a joint venture. In New York, in order to form a joint venture, all of the following requirements must be met: (1) two or more persons must enter into a specific agreement to carry on an enterprise for profit; (2) their agreement must evidence their intent to be joint venturers; (3) each must make a contribution of property, financing, skill, knowledge, or effort; (4) each

must have some degree of joint control over the venture; and (5) there must be a provision for the sharing of both profits and losses. *See Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.*, 909 F.2d 698, 701 (2d Cir.1990) (citations omitted). As to requirement (3), FIZ's contribution to the venture is far from evident. The only thing FIZ appears to have "contributed" to the venture was the discontinuance of its breach of contract suit against International. Although forbearance of the enforcement of a right qualifies as consideration under contract law, *see Joab Commercial Laundries Inc. v. Reeder*, 552 N.Y.S.2d 361, 362 (2d Dept.1990) ("It is well established that promises to ... forebear from enforcing legal rights constitute[s] valid consideration.") (citations omitted), it is much less clear how FIZ's discontinuance of its suit contributed to the goal of the venture, viz., the completion and marketing of the film. Indeed, Plaintiffs' own account of the Oral Agreement undermines their contention that a joint venture was formed. As noted, Plaintiffs allege that the rights acquired by FIZ in the Oral Agreement were "security" for International's promise to "pay the outstanding monies owed to FIZ pursuant to the [7/23/74 Agreement]." Am. Compl. ¶ 29; *see also* 2d Memo. Opp. at 39-40 ("The 'joint control' order of Judge Motley related to control of the physical property (the footage and sound recordings) and *insured* income participation rights (derived from the [7/23/74 Agreement] and as a result of the later partnership between FIZ and International) so that Plaintiffs could participate in any income derived from the exploitation of the film footage and exploitation of the intangible copyright interests by copyright owners whomever the owners might be (other than Plaintiffs, who were not and are not now owners of the copyright).") (emphasis added). We doubt that one party's acquisition of control rights in a project-a project theretofore controlled solely by a second party-as security for a debt owed by the second party to the first party qualifies as a "contribution" to a joint venture.

**\*13** As to requirement (5), Plaintiffs have not alleged that the Oral Agreement included a provision for the sharing of profits, let alone losses. To be sure, FIZ was entitled to 1/3 of the net receipts from the marketing of the film, but this was a right FIZ acquired through the 7/23/74 Agreement.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                          Page 11
Not Reported in F.Supp.2d, 2000 WL 369381 (S.D.N.Y.), RICO Bus.Disp.Guide 9909
(Cite as: Not Reported in F.Supp.2d)

An additional problem with Plaintiffs' allegation that the Oral Agreement formed a partnership has to do with Section 51(1) of the New York Partnership Law, which provides that "[a] partner is a co-owner with his partners of specific partnership property holding as a tenant in partnership." N.Y. Partnership Law § 51(1) (McKinney 1988). If the Oral Agreement had created a partnership, one would have thought that it would have given FIZ co-ownership of the film negative. Yet, as noted, Plaintiffs insist that they "ha[ve] never claimed that ... they have .... [a] proprietary interest" in the film.2d Tr. at 47 (statement of Mr. Kalina).

There remains the question of precisely what FIZ gained pursuant to the "joint control" provision of the 11/6/75 Stipulation. On its face, the Stipulation affords FIZ nothing more than control over the negative of the film. The question, then, is what is the precise nature of this right. Viewed through the lens of the 9/19/75 Agreement, this right of control is tied to King Production's right of "complete control over the completion and distribution rights arrangement of the film and recordings." Kalina Aff. Ex. C ¶ 1. Given that King Productions' right appears to be a contractual right against International, it follows that FIZ's alleged right is likewise a contractual right against International. It is well-established in New York, that a purchaser of personal property at a sheriff's sale does not acquire the contractual obligations of the judgment debtor. See Spivak v. Madison-54th Realty Co., 303 N.Y.S.2d 128, 130-33 (N.Y.Sup.Ct.1969). Hence, to the extent that Gast's purchase of the film negative at the 1979 sheriff's sale extinguished these contractual rights, King Productions' and FIZ's remedy would lie against International for breach of contract. Neither King Productions nor FIZ would have a claim against Gast.[FN6]

> FN6. We note parenthetically that, even assuming that a partnership or joint venture was formed by the alleged Oral Agreement, FIZ's remedy would still be for breach of contract against International. Under New York statutory law, "[a] partner is a co-owner with his partners of specific partnership property holding as a tenant in partnership." New York Partnership Law § 51(1) (McKinney 1988). A partner's sale of specific partnership property without the consent of the other partners gives rise

to an action for damages. See Ganiaris v. Gonzalez, 271 N.Y.S.2d 383, 383 (1st Dept.1966) (citing Burnstine v. Geist, 15 N.Y.S.2d 48, 50-51 (1st Dept.1939).

Plaintiffs vigorously contest this reading of the "joint control" provision, contending instead that it grants to FIZ a property interest-albeit one that is neither a copyright interest nor a proprietary interest of some other type.2d Tr. at 57 (statement of Mr. Kalina). To be sure, had the 11/6/75 Stipulation granted to FIZ joint ownership of the negative, such a proprietary interest may well have survived Gast's purchase of the negative at the 1979 sheriff's sale; i.e., Gast would have acquired merely International's co-ownership of the negative. Control, however, is not ownership. And Plaintiffs have cited no authority for the proposition that a mere right to control a piece of personal property "runs with" the property upon its sale at a sheriff's sale.

*14 In sum, we conclude that Plaintiffs have failed adequately to allege a RICO injury.

Having concluded that Plaintiffs' RICO claim is (i) time-barred, and (ii) that Plaintiffs have adequately alleged neither (a) a pattern of racketeering activity, nor (b) a RICO injury, we grant Defendants' motion to dismiss Plaintiffs' civil RICO claim.

## II. The State Law Claims

Having dismissed Plaintiffs' civil RICO claim, we decline to exercise supplemental jurisdiction over Plaintiffs' numerous claims under New York State law. See 18 U.S.C. § 1367(c)(3).

## Conclusion

In light of the foregoing, Defendants' motion to dismiss Plaintiffs' amended complaint in its entirety is granted. Plaintiffs' Amended Complaint is dismissed in its entirety.

SO ORDERED

S.D.N.Y.,2000.
Price v. Gast
Not Reported in F.Supp.2d, 2000 WL 369381 (S.D.N.Y.),

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                      Page 12
Not Reported in F.Supp.2d, 2000 WL 369381 (S.D.N.Y.), RICO Bus.Disp.Guide 9909
**(Cite as: Not Reported in F.Supp.2d)**


RICO Bus.Disp.Guide 9909

Briefs and Other Related Documents (Back to top)

• 1:98cv07769 (Docket) (Oct. 30, 1998)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.