35

Not Reported in F.Supp.                                                                                                   Page 1
Not Reported in F.Supp., 1997 WL 473577 (S.D.N.Y.), RICO Bus.Disp.Guide 9344
(Cite as: Not Reported in F.Supp.)

H
Briefs and Other Related Documents

United States District Court, S.D. New York.
Robert SHAMIS, as Assignee of WISHBONE TRADING COMPANY, LIMITED, a Hong Kong corporation, and Robert SHAMIS, Individually, Plaintiff,
v.
AMBASSADOR FACTORS CORPORATION, d/b/a AMBASSADOR FACTORS, A DIVISION OF FLEET FACTORS CORP., A Rhode Island corporation, S. ROBERTS, INC., a New York corporation, Christy LYNN, a New York corporation, ABC COMPANIES (fictitious names of corporate affiliates of defendants S. Roberts, Inc. and Jay Vee, Inc. whose identities are presently unknown), Nathan KORMAN, a/k/a Lawrence KORMAN, Steven PESNER, as Executor of the Estate of LEONARD KAYE, and MAHONEY COHEN & COMPANY, P.C., a New York professional corporation, Defendants.
No. 95 CIV. 9818(RWS).

Aug. 18, 1997.

STORCH AMINI & MUNVES, P.C., Attorney for Plaintiff, New York, NY, By: STEVEN G. STORCH, ESQ. Of Counsel.
RUSKIN, MOSCOU, EVANS & FALTISCHEK, P.C., Attorney for Defendant Ambassador Factors Corp., Mineola, NY, By: DOUGLAS J. GOOD, ESQ. Of Counsel.
SCHAEFFER & ZAPSON LLP, Attorney for Defendants S. Roberts, Inc., Jay Vee, Inc. Christy Lynn and Nathan Korman, New York, NY, By: ELLIOTT L. SCHAEFFER, ESQ. LANCE N. OLITT, ESQ. Of Counsel.
STRASSBERG & STRASSBERG, P.C., Attorney for Defendant Mahoney Cohen & Co., P.C., New York, NY, By: LOUIS STRASSBERG, ESQ. Of Counsel.

*OPINION*
SWEET, District Judge.
*1 Plaintiff Robert Shamis ("Shamis"), both in his individual capacity and as an assignee of the Wishbone Trading Company, Ltd. ("Wishbone"), has moved for leave to file a second amended complaint adding both alleged violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO") as well as additional state law claims against Defendant Mahoney Cohen & Company, P.C. ("Mahoney Cohen"), to its action against Defendants S. Roberts, Inc. ("Roberts"), Ambassador Factors Corporation ("Ambassador"), Jay Vee, Inc. ("Jay Vee"), Christy Lynn, Angela, ABC Companies ("ABC"), Steven Pesner ("Pesner") and Nathan Korman ("Korman"). Roberts, Jay Vee, Christy Lynn and Korman, (collectively, the "Roberts Defendants") have cross-moved to dismiss the action in its entirety for lack of jurisdiction.

For the reasons herein discussed, the Roberts Defendants' motion to dismiss the state claims is granted, and Plaintiff's motion to amend is denied.

*The Parties*

Plaintiff Shamis is a citizen of Israel and a British national and, at all times pertinent to the matters concerning this action, was a shareholder, officer and director of Wishbone. (Pl's Am. Comp. ¶ 2.) Wishbone was a Hong Kong-based apparel exporter that shipped goods primarily to the United States. (*Id.* at ¶ 1.) In December 1993, Wishbone was placed in receivership and ultimately liquidated in accordance with Hong Kong law. (Shamis Decl. ¶ 2.)

Defendant Roberts is a New York-based wholesale distributor of women's dresses, (Pl's Am. Comp. ¶ 4.), and Jay Vee and the other corporate entities (Angela, Christy Lynn and ABC) are the successor entities of Roberts. (*Id.* at ¶¶ 5, 6.) Defendant Korman was an officer and 60% stockholder of Roberts. Leonard Kaye ("Kaye") was an officer and 40% stockholder of Roberts. (*Id.* at ¶ 9.) Kaye died in 1995, (*Id.*), and Defendant Pesner was appointed executor of his estate by the Surrogate's Court of New York County on or about March 30, 1995. (*Id.* at ¶ 10.)

Defendant Ambassador is a Rhode Island corporation that provides account receivable factoring services between importers and distributors in the garment industry in and around New York City. (*Id.* at ¶ 3.)

Defendant Mahoney Cohen is a New York-based accounting company that performs private and public accounting, as well as related consulting and auditing services. (*Id.* at ¶ 11.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp. Page 2
Not Reported in F.Supp., 1997 WL 473577 (S.D.N.Y.), RICO Bus.Disp.Guide 9344
(Cite as: Not Reported in F.Supp.)

*Prior Proceedings*

On November 20, 1995, Shamis filed his initial complaint (the "Complaint") which alleged eleven causes of action against the above named Defendants. On February 28, 1996, Shamis filed an amended complaint (the "Amended Complaint") pursuant to Fed.R.Civ.P. 15(a), which substituted Pesner as a defendant for Kaye in the one claim that had originally been lodged against Kaye.

By opinion and order dated August 12, 1996, Ambassador's motion to dismiss for failure to state a claim and failure to plead fraud with particularity were dismissed. *Shamis v. Ambassador Factors Corp., No. 95 Civ. 9818, 1996 WL 457320 (S.D.N.Y. August 14, 1996).*

*2 On May 13, 1997, Shamis filed this motion for leave to file a second amended complaint (the "Proposed Complaint"). The Proposed Complaint, *inter alia,* adds a fraud claim against Mahoney Cohen and two separate RICO claims against Roberts, Ambassador, Korman, Jay Vee, and Mahoney Cohen. The Roberts Defendants cross-moved to dismiss the entire action as it appears in the Amended Complaint on May 29, 1997. Argument was heard on June 18, 1997. The court received additional submissions through July 2, 1997, at which time these motions were considered submitted.

*Facts*

I. *Historical Background*

In 1986, Korman controlled and operated a garment wholesaler known as El Jay. (Pl's Prop. Comp. ¶ 29.) Shamis alleges that Korman, on behalf of El Jay, received financing from Manufacturers Hanover Bank (the "Bank"), which was secured by El Jay's receivables and inventory. (*Id.*) According to Shamis, although the financing arrangement allowed El Jay to borrow against receivables only when it had already shipped the ordered garments to a specific purchaser, El Jay nevertheless submitted invoices to the Bank for goods that had not been ordered and/or shipped to customers. (*Id.* at ¶ 31.) Shamis claims that once the Bank got wind of this fraudulent practice, it began recouping, or "charging back" the advances it had paid to El Jay, a practice which, in part led El Jay to file a Chapter 11 bankruptcy petition in early 1987. (*Id.* at ¶ 32-33.) Pursuant to a court order, Ambassador became the factor for El Jay as debtor-in-possession. (*Id.* at ¶ 34.) Shamis alleges that when Ambassador undertook to factor El Jay, it received word from the Bank that this fraudulent practice of "pre-invoicing" had occurred. (*Id.* at ¶ 34.) In 1988, Korman was introduced to Shamis and the two began discussions about a business arrangement pursuant to which Wishbone would manufacture clothing for Roberts, Korman's then-recently formed company. (*Id.* at ¶ 35.)

II. *The Underlying Transactions*

On August 26, 1988, Roberts and Ambassador entered into a written agreement (the "Factoring Agreement") in which Roberts appointed Ambassador as its exclusive factor of all accounts receivable that resulted from Roberts's sales of finished goods to various retailers. (Pl's Am. Comp. ¶ 14) [FN1] In exchange, Ambassador received, *inter alia,* a percentage commission, and security interests in both Roberts's accounts receivable and some of Roberts's inventory. (*Id.*)

> FN1. "Factoring" is the sale of a firm's accounts receivable to a "factor," usually at a price discounted to reflect the factor's assumption of the risk of non-collection. *See Black's Law Dictionary* 532 (5th Ed.1979).

On October 27, 1989, Roberts and Wishbone entered into a three-year agreement (the "Master Agreement"), in which Roberts appointed Wishbone as its exclusive purchasing agent for all of its finished goods manufactured in the Far East, Turkey, India and elsewhere. (*Id.* at ¶ 15.) The Master Agreement established that Wishbone would finance Roberts's inventory purchases by extending letters of credit to merchandise suppliers from those countries specified in the Master Agreement. (*Id.*) Wishbone also agreed to provide certain support services with those suppliers on Roberts' behalf. (*Id.*) In return, Roberts granted Wishbone (I) security interests in Roberts's inventory, accounts receivable stemming from its sale, as well as in a myriad of Roberts' possessions; (ii) a six percent commission on the value of all goods imported through Wishbone and a three percent commission on all sums which it financed on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 473577 (S.D.N.Y.), RICO Bus.Disp.Guide 9344
(Cite as: Not Reported in F.Supp.)

Roberts's behalf; and (iii) an assignment of 50% of the payments made by Ambassador to Roberts under the Factoring Agreement. (*Id.*)

*3 To establish a payment mechanism for Roberts's obligations to Wishbone under the Master Agreement, Ambassador and Roberts then entered into a written agreement dated November 20, 1989 (the "Assignment of Factoring Proceeds"), which provided (1) that Ambassador would pay directly to Wishbone one-half of the 80% of the accounts receivable payments which otherwise would have been paid to Roberts under the Factoring Agreement and (2) that Ambassador would subordinate its prior security interest under the Factoring Agreement to Wishbone's security interest under the Master Agreement with respect to inventory and resulting receivables that would arise from the sale of the inventory that Wishbone had supplied and/or financed. (*Id.* at ¶ 16.)

Shamis claims that at the time Ambassador entered into the Assignment of Factoring Proceeds, it was aware of Korman's involvement with El Jay, and was therefore aware of the allegations that Korman had previously engaged in fraudulent invoicing practices. (Pl's Prop. Comp. ¶ 40.) Shamis further alleges that because the Factoring Agreement specifically provided that any receivable sold to Ambassador had to be accompanied by proof of delivery of the underlying goods to the customer, Ambassador knew that having to supply such proofs would eliminate the possibility of Korman and Roberts again engaging in a fraudulent invoicing scheme akin to the one allegedly perpetrated by El Jay. (*Id.* at ¶ 41.)

According to Shamis, Wishbone supplied Roberts with finished goods up until approximately June, 1991, and that at some time in that period, Roberts' debt to Wishbone had reached $20,000,000.00. (Pl's Am. Comp. ¶ 18.)

### III. *The Alleged Fraud*

Shamis alleges that, in April, 1992, ten months after its final shipment of goods to Roberts, Wishbone discovered that during the course of the Master Agreement, Roberts had, in fact, engaged in "pre-invoicing," whereby Roberts drew up invoices for goods and sent them to Ambassador, presumably hoping to collect on the invoices before the goods were actually sold and shipped to Roberts's customers. (*Id.* at ¶ 19.) Shamis further alleges that the effectuation of this practice violated certain provisions of the Factoring Agreement, which required Roberts to provide Ambassador with proof of the goods' actual shipment and delivery. (*Id.* at ¶ 20.) Regardless, according to Shamis, although Ambassador had become fully aware of Roberts's deceptive practices by early 1991, Ambassador for some time continued to purchase and pay for all receivables without demanding that Roberts provide the required proof of shipment and delivery. (*Id.;* Pl's Prop. Comp. ¶ 65.)

In April, 1991, after allegedly growing tired of receiving late payments for the receivables, Ambassador charged back to Robert's account approximately 1.7 million dollars in receivables. (Pl's Prop. Comp. ¶ 66.) Subsequently, Ambassador substituted a "cash basis" manner of payment for the receivables, whereby it withheld payment of funds to Roberts until it had proof that a retail customer had actually paid a given invoice. (Pl's Am. Comp. ¶ 23.)

*4 According to Shamis, Ambassador never notified Wishbone of any of the problems connected with the Factoring Agreement. (*Id.* at ¶ 24.) Had it done so, Shamis claims it would have ceased shipping goods to Roberts on credit and would have exercised its rights under both the Master Agreement and the Assignment of Factoring Proceeds to foreclose on its security interests. (*Id.* at ¶ 25.) Essentially, Shamis alleges that Ambassador gave implicit approval of Roberts' delinquencies and "lulled Wishbone into a false sense of security" by continuing to pay Wishbone its 50% share of the receivables pursuant to the Assignment of Factoring Proceeds. (*Id.* at ¶ 26.) Shamis claims that Ambassador remained silent because it realized that, had it notified Wishbone of the alleged defaults on the part of Roberts, Ambassador would have been unable to recoup certain advances it paid to Roberts, because Wishbone would have stopped shipping goods and taken control of and liquidated Roberts's inventory. (*Id.* at ¶ 26.)

### IV. *Mahoney Cohen's Audit*

Shamis alleges that in September 1990, Wishbone determined that it needed independent accountants to audit

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK   Document 180-8   Filed 08/11/2006   Page 5 of 15

Westlaw.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1997 WL 473577 (S.D.N.Y.), RICO Bus.Disp.Guide 9344  
(Cite as: Not Reported in F.Supp.)

Page 4

Roberts's books. (Pl's Prop. Comp. ¶ 46.) Shamis recommended to Roberts that it engage the accounting firm of Mahoney Cohen to conduct an audit of Roberts's books and records. (*Id.*)

Shortly thereafter, Roberts retained Mahoney Cohen, and Mahoney Cohen proceeded to perform an audit for the nine-month period ending September 30, 1990. (*Id.* at ¶ 47.) Shamis claims that in the course of performing its pre-audit "due diligence inquiry," Mahoney Cohen became apprised of Korman's alleged prior experiences at El Jay. (*Id.*)

Shamis further alleges that Mahoney Cohen found a large quantity of inventory in a warehouse for which invoices had been written up. (*Id.* at ¶ 48.) Funds allegedly had been advanced against this inventory without proof of shipment. (*Id.*) According to Shamis, Mahoney Cohen realized at this point that fraudulent activity was going on and met with Korman to discuss it. (*Id.* at ¶¶ 49-50 .) Although Korman immediately shipped the goods, further examination of Roberts's books and records by Mahoney Cohen revealed that Roberts had incorrectly recorded the completed sales in its books. (*Id.* at ¶ 51.)

Shamis asserts that Mahoney Cohen, at this point, failed to take proper action upon discovering the fraudulent activity. (*Id.* at ¶ 52.) Mahoney Cohen did not "resign" the account, nor did it alert Wishbone to the existence of the allegedly fraudulent practices. (*Id.*) In addition, according to Shamis, Mahoney Cohen did not recommend that Roberts make certain generally accepted accounting adjustments which would have accurately reflected that Roberts lost money in 1990. (*Id.* at ¶ 54.) Shamis claims that Mahoney Cohen then mailed the financial statement to Wishbone in Hong Kong, in order to "defraud Wishbone into extending further credit to Roberts and forbearing from foreclosing on its various security interests." (*Id.* at ¶ 56.) Shamis contends that, in reliance upon the statement prepared by Mahoney Cohen, it thereafter extended additional credit to Roberts. (*Id.* at ¶ 57 .)

*5 Shamis claims that Mahoney Cohen conducted the audit in a fraudulent manner because Korman and Mahoney Cohen had discussed creating a separate company, Jay Vee, which would be formed for the purpose of avoiding the debt to Wishbone by taking over Roberts's business and entering into a new factoring agreement with Ambassador. (*Id.* at ¶ 62.) Such agreement would ignore the Assignment of Factoring Proceeds that had been entered into with Wishbone. (*Id.*)

V. *The Creation of Jay Vee*

Jay Vee was formed in or shortly before July 1991. Shamis asserts that Jay Vee acted as the "alter ego" of Roberts and that Ambassador began factoring for it shortly after its inception. (*Id .* at ¶ 71.) Shamis also asserts that, at about this time, Korman made assurances to Wishbone that Roberts's debt to Wishbone would be fully repaid. (*Id.* at ¶ 75.) Shamis alleges that Roberts thereafter sent more false statements to Wishbone. (*Id.* at ¶ 75.)

Shamis contends that Korman, Jay Vee, and Ambassador all benefitted from this new arrangement, while Wishbone suffered. For Korman and Jay Vee, funds that previously would have been sent from Ambassador to Wishbone could now be paid directly to them. Ambassador benefitted because the likelihood increased that Roberts would be able to pay any charge backs that Ambassador might ultimately have to make. (*Id.* at ¶ 72.) Shamis claims that Ambassador, Korman and Mahoney Cohen all understood the implications of this new arrangement and went along with the fraud. (*Id.* at ¶¶ 73, 75-79.) Shamis also claims that Korman and others continued to fraudulently assure Wishbone that the balance of the debts would be paid. (*Id.* at ¶ 74.) In actuality, according to Shamis, Wishbone continued to receive partial but insufficient payments from Ambassador until October, 1992, the purpose of which was to keep Wishbone's suspicions at bay. (*Id.* at ¶ 79.)

VI. *The Alleged Continuing Pattern of Fraud*

According to Shamis, by the summer of 1992, Jay Vee had disposed of most of Wishbone's inventory and was in need of new sources of goods and, therefore, financing. To acheive these ends, Korman allegedly targeted an individual named Lampert, and persuaded Lampert to invest $4.1 million in Jay Vee. (*Id.* at ¶¶ 83-87.) Shamis asserts that Jay Vee once again engaged in phony invoicing and never repaid Lambert. Ultimately, Jay Vee splintered into entities named

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1997 WL 473577 (S.D.N.Y.), RICO Bus.Disp.Guide 9344  
(Cite as: Not Reported in F.Supp.)

Page 5

Angela, Christy Lynn, and ABC. (*Id.* at ¶ 88.)

VII. *The Assignment of Claims*

The Roberts Defendants claim that in or around December 1993, the then-counsel for Wishbone prepared a complaint (the "Wishbone Complaint") which is virtually identical to the Complaint and Amended Complaint, the lone exception being that the named plaintiff is Wishbone, not Shamis. According to the Roberts Defendants, after attempted settlement negotiations failed, Wishbone tried to persuade various creditors to pursue the claims. When these creditors refused, Wishbone attempted to persuade Wishbone's receivers to pursue the claims. The receivers also refused, and in a document dated November 20, 1995, the same day the Complaint was filed, Wishbone assigned the claims to Shamis.

*Discussion*

The Issues

*6 Shamis has asserted numerous claims against the Defendants and now seeks to amend his complaint to add further causes of action. He has sued Ambassador, Roberts, Korman, Mahoney Cohen and Pesner for fraud; Ambassador and Roberts for both breach of implied covenant of good faith and breach of contract; and requests relief against Jay Vee, Christy Lynn, and Angela in successor liability. Shamis also claims Roberts fraudulently conveyed to Jay Vee, Christy Lynn and others the inventory that these parties acquired on credit from Wishbone and claims Roberts has an outstanding balance for goods and services provided by Wishbone. Finally, Shamis seeks to sue Ambassador, Korman, Roberts, Jay Vee, and Mahoney Cohen for violating certain provisions of RICO, namely 18 U.S.C. §§ 1962© and (d). Although he claims to have not yet determined the full amount of the damages, he estimates it to be well over $20,000,000.0o.

The Roberts Defendants have cross-moved to dismiss the action in its entirety. They claim that federal diversity jurisdiction is lacking over the state law claims, because Wishbone, a Hong Kong corporation, collusively assigned is claims for the purpose of invoking the jurisdiction of this court, in violation of 28 U.S.C. § 1359. The Roberts Defendants also argue that Shamis should not be permitted to add the proposed federal RICO claims, as they would not withstand a motion to dismiss. They contend, *inter alia,* that the RICO claims are time-barred, have not been asserted with the requisite particularity, and fail to plead adequately a pattern of racketeering activity. The Roberts Defendants also claim that the common-law fraud claims have not been pleaded with sufficient particularity.

Ambassador similarly argues against Shamis' motion to amend, asserting the RICO claims are time-barred; that Shamis lacks standing to bring a RICO claim; that the pleadings fail to allege the essential elements of the asserted predicate acts; that the complaint fails to allege that Ambassador agreed to participate in a RICO enterprise or acted with scienter; and that the pleadings are not sufficiently particular. Mahoney Cohen argues that Shamis lacks standing and that the fraud and RICO claims are deficient.

I. *There Is No Diversity Jurisdiction Over the State Claims*

The Roberts Defendants contend that the November 20, 1995 assignment of claims from Wishbone to Shamis took place in order to invoke federal diversity jurisdiction and thus, under 28 U.S.C. § 1359, is ineffective to confer subject matter jurisdiction on this court. They assert that Wishbone, as a Hong Kong entity, was not a citizen of a recognized foreign state and thus could not invoke diversity jurisdiction in the United States courts. See *Matimak Trading Co. v. Khalily,* 118 F.3d 76, 1997 WL 353473 (2d Cir. June 27, 1997) (Hong Kong corporation not a "citizen or subject" of a "foreign state" under either Article I, § 3 of Constitution or 28 U.S.C. § 1332(a)(2), and therefore cannot bring diversity suit in federal courts). FN2 As a result, they argue, all non-federal claims must be dismissed.

> FN2. Although *Matimak* makes clear that Wishbone would not have diversity jurisdiction without the challenged assignment, the case provides little evidence as to whether the assignment to Shamis was effected to circumvent the rule that Hong Kong corporations are barred from bringing diversity actions. To determine whether such an inference of collusive joinder can be drawn, the court

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK   Document 180-8   Filed 08/11/2006   Page 7 of 15

Westlaw.

Not Reported in F.Supp.                                                                                               Page 6
Not Reported in F.Supp., 1997 WL 473577 (S.D.N.Y.), RICO Bus.Disp.Guide 9344
(Cite as: Not Reported in F.Supp.)

looks to the state of the law as it existed when Wishbone and Shamis decided to enter into the assignment. While the issue may not have been conclusively settled prior to the Circuit's decision in *Matimak Trading,* at the time of the assignment there existed enough authority to suggest to any Hong Kong-based party that it might be unable to establish diversity jurisdiction. See *Land Oberoesterrich v. Gude,* 109 F.2d 635, 637 (2d Cir.), cert. denied, 311 U.S. 670, 61 S.Ct. 30, 85 L.Ed. 431 (1940); *Iran Handicraft & Carpet Export Center v. Marjan Int'l Corp.,* 655 F.Supp. 1275, 1277 (S.D.N.Y.1987), aff'd, 868 F.2d 1267 (2d Cir.1988). As a result, it is at least permissible to infer that the desire to secure a federal forum motivated the assignment.

*7 Shamis contends that the assignment was entered into for valid business reasons and is therefore adequate to establish jurisdiction.

Section 1359 of 28 U.S.C. states:
A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of the court.

The Supreme Court has held that § 1359 should be interpreted broadly to prevent parties from concocting jurisdiction through the simple mechanism of assignment. In *Kramer v. Caribbean Mills, Inc.,* 394 U.S. 823, 89 S.Ct. 1487, 23 L.Ed.2d 9 (1969), a Panamanian company effectively sold its contract claim against a Haitian company to a Texas attorney who agreed to give back any net recovery minus 5%. The Court found the assignment collusive, holding that "[i]f federal jurisdiction could be created by assignments of this kind, which are easy to arrange and involve few disadvantages for the assignor, then a vast quantity of ordinary contract and tort litigation could be channeled into the federal courts at the will of one of the parties." *Id.* at 828-29. In regard to the statute, the Court stated: "[the] 'manufactur[ing] of federal jurisdiction' [is] the very thing which Congress intended to prevent when it enacted § 1359 and its predecessors." *Id.* at 829.

The Second Circuit has followed the Supreme Court's lead, holding that § 1359 should be applied rigorously. In *Airlines Reporting Corp. v. S & N Travel, Inc.,* 58 F.3d 857, 862 (2d Cir.1995), the Court stated: "[w]e give careful scrutiny to assignments which might operate to manufacture diversity jurisdiction, the reasons for which we have made abundantly clear: 'such devices, unless controlled, can provide a simple means of expanding federal diversity jurisdiction far beyond [its] purpose."DDDDDD' (citing *Prudential Oil Corp. v. Phillips Petroleum Co.,* 546 F.2d 469, 474 (2d Cir.1976)). The Court went on to declare that § 1359 should therefore be "construe[d]... broadly to bar any agreement whose 'primary aim' is to concoct federal diversity jurisdiction." *Airlines Reporting,* 58 F.3d at 862 (citing *O'Brien v. Avco Corp.,* 425 F.2d 1030, 1034 (2d Cir.1969)).

Prior to its decision in *Airlines Reporting,* the Second Circuit, in *Prudential Oil,* 568 F.2d at 476, established that assignments between parent companies and their subsidiaries are "presumptively improper." In doing so, the Court stated: The scrutiny normally applied to transfers or assignments of claims which have the effect of creating diversity must be doubled in the case of assignments between related or affiliated corporations since common ownership... only serves to increase the possibility of collusion and compound the difficulty encountered in detecting the real purpose of the assignment.

*Id.* at 475. The Court went on:"'[w]hen a wholly-owned subsidiary assigns a claim to its parent, just as in the reverse situation, the same set of stockholders running both corporate forms can transfer title to that claim freely between them. In each case the transferor... realistically retains a substantial pecuniary interest in the outcome of the litigation....'"

*8 *Id.* at 475-76 (citing *Green and White Construction Co. v. Cormat Construction Co.,* 361 F.Supp. 125, 128 (N.D.Ill.1973)); see also *Airlines Reporting Co.,* 58 F.3d at 862-863 (espousing similar application of presumption); *Toste Farm Corp. v. Hadbury, Inc.,* 70 F.3d 640, 644 (1st Cir.1995)(same); *Dweck v. Japan CBM Corp.,* 877 F.2d 790, 792 (9th Cir.1989)(same); *Western Farm Credit Bank v. Hamakua Sugar Co.,* 841 F.Supp. 976, 981 (D.Haw.1994), aff'd, 87 F.3d 1326 (1996).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK    Document 180-8    Filed 08/11/2006    Page 8 of 15

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 473577 (S.D.N.Y.), RICO Bus.Disp.Guide 9344
(Cite as: Not Reported in F.Supp.)

Page 7

The Court in *Prudential Oil* found that the presumption was triggered when Prudential Equities, a Delaware corporation, assigned its claim to Prudential Oil Corporation, a New York-based, wholly-owned subsidiary of Prudential Equities. *Id.* at 475. Similarly, in *Airlines Reporting* the Second Circuit held that the relationship between a group of airlines and the Airlines Reporting Co.-"a clearinghouse and collection agent for transactions between the air carriers and travel agents," on whose board of directors several representative of the assignor air carriers served-was sufficiently close to trigger the presumption when the airlines assigned their claims to the company. *Id.* at 859, 863.

The presumption of collusion also applies to this case, because the relationship between Wishbone and Shamis is so close it "increase[s] the possibility of collusion and compound[s] the difficulty encountered in detecting the real purpose of the assignment." *Prudential Oil,* 546 F.2d at 475. In *Dweck,* the Ninth Circuit invoked the presumption in a case that, like the case at bar, involved an assignment between a corporation and one of its officers. *Dweck,* 877 F.2d at 792. Accordingly, the assignment of claims from Wishbone to Shamis is presumptively collusive.

Once the presumption of collusion is established, "the assignee-plaintiff may rebut or meet th[at] presumption [only] by offering evidence that the transfer was made for a legitimate business purpose unconnected with the creation of diversity jurisdiction." *Prudential Oil Corp.,* 546 F.2d at 476; *Airlines Reporting Corp.,* 58 F.3d at 863; *Yokeno v. Mafnas,* 973 F.2d 803, 810 (9th Cir.1992). "[S]imply offering evidence of a business reason will be insufficient to rebut the presumption. Instead, the burden falls on the party asserting diversity to demonstrate that the reason given for the assignment is legitimate, not pretextual." *Airlines Reporting Co.,* 58 F.3d at 863; *see also Nike, Inc. v. Comercial Iberica de Exclusivas Deportivas, S.A.,* 20 F.3d 987, 992 (9th Cir.1994)(stating business reason asserted "must be sufficiently compelling that the assignment would have been made absent the purpose of gaining federal forum").

Shamis asserts that at the time of the assignment Wishbone was an insolvent and defunct entity whose affairs were in the process of being wound up by its receivers, who had allegedly been appointed in accordance with Hong Kong bankruptcy law. According to Shamis, these receivers therefore retained control of Wishbone's claims and possessed the accompanying ability to pursue them. Shamis claims the assignment was made because these receivers were unwilling or unable to use other Wishbone assets to prosecute the assigned claims. In part because two of Wishbone's main creditors, BankBoston and Bank of America, did not want to fund the litigation, the claims were assigned to Shamis, the individual who supposedly possessed the most intimate understanding of the claims.[FN3]

> FN3. It should be noted that a certain factual issue that may bear on the jurisdictional question cannot be conclusively resolved on this record. Shamis contends that the relevant citizenship for determining subject matter jurisdiction is that of the liquidators. *Hong Kong Deposit & Guar. Co. v. Hibdon,* 602 F.Supp. 1378, 1380 (S.D.N.Y.1985)(citing *Clarkson Co., Ltd. v. Shaheen,* 544 F.2d 624, 628 (2d Cir.1976)). Thus, the citizenship of the liquidators is central to the issue of whether the assignment was collusive. If the liquidators are citizens of a recognized foreign state, then this court would have diversity jurisdiction over an action between the assignor and the defendants. Because the assignment would not have been necessary to invoke jurisdiction, it would not be collusive, and Shamis could prosecute this action. On the other hand, if the liquidators are Hong Kong citizens, the conclusion below that the assignment was collusive stands.
>
> Although no evidence pertaining to the liquidators' citizenship had been presented, in light of the broad construction of § 1359 and the presumption of collusion arising from an assignment from a non-diverse entity to a diverse insider such as Shamis, it is assumed that the liquidators are Hong Kong citizens. Shamis will, however, be granted leave to replead upon a showing that the liquidators are citizens of a nation officially recognized by the U.S. Department of State as a "foreign state."

*9 Although Shamis asserts the receivers assigned the claims to him because they could not afford to pursue them,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1997 WL 473577 (S.D.N.Y.), RICO Bus.Disp.Guide 9344  
(Cite as: Not Reported in F.Supp.)

Page 8

no evidence has been presented to explain why receivers unwilling to pursue Wishbone's claims were appointed in the first place or to demonstrate that the receivers were in particularly dire financial straits. Moreover, given Shamis's concession that his counsel agreed prior to the assignment to take the case on a contingency basis and thus impose no litigation costs or risks on the party prosecuting it, it is difficult to see what particular costs and inherent risks the receivers were seeking to avoid, other than the risk of being denied access to a federal court. In the face of the presumption of collusiveness, the "party asserting diversity must show more than simply a colorable or plausible business reason." Yokeno, 973 F.2d at 811.

"Several factors may be relevant in evaluating the reasons given for an assignment." Airlines Reporting, 58 F.3d at 863 (citing 14 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3639 (2d ed.1984)). "Courts consider, inter alia, the assignee's lack of a previous connection with the claim assigned; the remittance by the assignee to the assignor of any recovery; whether the assignor actually controls the conduct of the litigation; the timing of the assignment; the lack of any meaningful consideration for the assignment; and the underlying purpose of the as signment...." Airlines Reporting, 58 F.3d at 863 (internal citations omitted); see also Yokeno, 973 F.2d at 810; Western Farm Credit Bank, 841 F.Supp. at 982. These factors will be considered in turn.

*1. Pre-existing Interest*

Shamis claims that he had a pre-existing connection to the claims that were assigned in that he had been personal guarantor of Wishbone's obligations and, as a result of the same "complex of events" that gave rise to Wishbone's claims, had himself suffered financial loss. As proof, Shamis points to the affidavit of Thomas McGrath, a vice-president of BankBoston, who states that Shamis did guarantee loans that Wishbone received from BankBoston. Shamis also points to his deposition, in which he, at one point, claimed that "he had personal guarantees with various banks supporting Wishbone's facility" and goes on to provide some details regarding the purported guarantees.

However, because "[t]he court, not a jury, must weigh the merits of what is presented on a 12(b)(1) motion" and because the plaintiff bears the burden of establishing federal subject matter jurisdiction, this court need not accept as determinative what is presented in an affidavit or deposition or assess the allegations in the light most favorable to the plaintiff. 5 Wright, Miller & Cooper, Federal Practice and Procedure, § 1350. Other matters will therefore be considered.

Shamis testified at his deposition that all actions taken by him in this matter, including the guarantees, were on behalf of Wishbone. In addition, Shamis has failed to provide any documentary evidence that he made such guarantees. He presents no written documents showing that he guaranteed any loans to Wishbone, and testified in his deposition that he possessed no documents that might reflect his losses. The lack of documentary evidence is particularly significant here, because proof of an oral guarantee would ordinarily be barred by the statute of frauds. See N.Y. Gen. Obl. Law § 5-107a-2 ("promise to answer for the debt ... of another" must be in writing). Furthermore, Shamis did not allege any relationship between these guarantees and Wishbone's transactions with Roberts, nor did he allege any theory of liability under which any defendants are liable to him individually. In sum, Shamis does not appear to have claims separate from those asserted by Wishbone.

*2. The Remittance of a Recovery*

*10 The Assignment purports to transfer to Shamis "all of [Wishbone's] right, title, and interest in and to all claims and causes of action (together with all proceeds therefrom)...." In addition, Shamis claims that "unlike in the typical collusive case, the assignor here is to receive *none* of the proceeds of a recovery," but that "[t]he only ones who would share with Shamis are the Banks...."

Technically, Wishbone will not receive any proceeds from successful litigation, because it has filed for bankruptcy. However, the fundamental reason courts inquire as to whether an assignee's recovery inures to the benefit of the assignor is to determine if the assignee is in fact pursuing the claim on his own behalf and for his own benefit. In this case, a "Deed of Acknowledgment" (the "Deed") and an "Escrow Agreement," each completed the same day as the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  Page 9
Not Reported in F.Supp., 1997 WL 473577 (S.D.N.Y.), RICO Bus.Disp.Guide 9344
(Cite as: Not Reported in F.Supp.)

Assignment, make clear that the substantial majority of the proceeds from the claims will go to the creditor banks, to be applied toward the payment and discharge of Wishbone's defaulted obligations. While Shamis may ultimately recover a small amount of any damage award, such recovery is contingent and will occur only after the creditor banks and legal fees are paid in full. As such, most of the benefit of any potential recovery would go to Wishbone's creditors, who now stand in Wishbone's shoes. Shamis' slight prospect of a personal recovery under the circumstances does little to overcome the presumption of collusive assignment.

### 3. Control of the Litigation

Shamis is not financing this litigation. He has arranged for representation on a contingency-fee basis, payment for which will come out of any recovery prior to any payment to creditors. Inasmuch as Shamis' counsel is absorbing the risk of litigation and being paid ultimately from assets that originally belonged not to Shamis but to Wishbone, Shamis does not have the customary control over the litigation that accompanies an hourly fee arrangement.

Moreover, the Deed contains provisions that ensure that the creditors retain significant power to influence the litigation, and perhaps override any litigation decision Shamis makes. Paragraph 3.01 of the Deed states:
[Shamis] covenants at any time, if and when required by the [Banks], to execute or do... such deeds... acts and things as the [Banks] shall reasonably require to facilitate, perfect or improve the exercise... of any of their respective rights under the Deed.

Under paragraph 4.01 of the Deed, Shamis agrees to:[I]nstruct any lawyer or other attorney appointed by Shamis in such form and manner as may be reasonably satisfactory to [the Banks],

and further agrees:not to change or dismiss any lawyer or attorney appointed by [Shamis] without first procuring the appointment of a new lawyer or attorney satisfactory to the [Banks].

Thus, while Shamis may "control" the day-to-day prosecution of the litigation, the assignment documents provide that the creditors can, at any time, drastically shape the course of the litigation as they see fit. See *Yokeno, 973 F.2d at 811* (the fact that an assignor-corporation had given "no indication" that it had "expressly disavowed any continuing interest in the litigation" permitted the inference that the litigation was proceeding largely on its behalf); *Prudential Oil, 546 F.2d at 476* (a "prosecution by the subsidiary [that] would [have been] conducted wholly in the parent's interest" was evidence that the assignment was collusive). The existence of such control, both financial and strategic, on the part of Wishbone's creditors, who now stand in Wishbone's shoes, seriously vitiates Shamis' claim that he is in control of the litigation and that the Assignment was not made in order to obtain jurisdiction.

### 4. The Timing of the Assignment

*11 Courts have held that the making of an assignment on or near the day a complaint is filed serves as an indication that the assignment was entered into for the purpose of manufacturing jurisdiction. For example, in *Airlines Reporting,* the fact that the assignment took place after the suit had been initiated and federal jurisdiction challenged played a substantial role in the Court's conclusion that the assignment was collusive. 58 F.3d at 864. The Court, in so holding, relied on *Nike,* in which the Ninth Circuit stated:
If we had any remaining doubts whether NIL and Nike acted at least in part to obtain a federal forum, the timing of the assignment, only three days before Nike filed the complaint in the action, dispels them.

20 F.3d at 992. If an assignment is made on the eve of a suit's filing, it increases the likelihood that the assignor actually prepared the filing, and is thus the motivating force behind the litigation. When the assigning party has invested resources of this kind in initiating the litigation, it is more difficult to find legitimate business justifications for the assignment, since most such justifications would be present long before the complaint is filed.

In the instant case, the Complaint was filed the same day the Assignment was made. Moreover, the Complaint was drafted nearly two years earlier, while the claims were still owned by Wishbone, and sent to the defendants in an attempt to induce settlement. Such a settlement would have

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                      Page 10
Not Reported in F.Supp., 1997 WL 473577 (S.D.N.Y.), RICO Bus.Disp.Guide 9344
(Cite as: Not Reported in F.Supp.)

inured to the benefit of Wishbone and/or its creditors.

Shamis contends that the timing of the assignment and filing of the action resulted from the unwillingness of other parties to prosecute the claims and from the fact that impending statutes of limitations forced him to file quickly. The inference nevertheless remains that the last-minute Assignment was completed only after it became clear to Wishbone, Wishbone's receivers, and/or Shamis that federal jurisdiction was lacking and only after Wishbone had prepared the Complaint and was directing the litigation. In short, the "timing" of the Assignment, if nothing else, "emit[ted] an odor of collusion" that has been unsatisfactorily explained. *Herzog Contracting Corp. v. McGowen Corp., 976 F.2d 1062, 1067 (7th Cir.1992).*

### 6. Consideration

Whether a party gave "meaningful" consideration for an assignment reflects on whether an assignee has established himself as independent from and not acting in concert with the assignor. See *Airlines Reporting Co., 58 F.3d at 864* (holding that a promise to perform a pre-existing duty was not consideration); see also *Dweck, 877 F.2d at 793*.

Shamis concedes he did not give any monetary consideration to Wishbone or Wishbone's receivers as payment for the claims. In his deposition, Shamis flatly admits that he did not pay anything for the claims.

Shamis, however, contends that "the consideration to him is not only the right to pursue the lawsuit but to share in a portion of the recovery ..." and that "[b]y assigning the claims the receivers were discharged of their obligation to transfer them to the security-holder Banks." It may be that Shamis has demonstrated that Wishbone gave valuable consideration and perhaps received a benefit, but there does not appear to be any legal detriment incurred by Shamis as part of the transaction. He did not pay Wishbone or the receivers in cash or in kind for the rights to the claim. He assumed no litigation risk or costs, since the attorneys had agreed to take the case on a contingency basis. The only thing Shamis appears to have given to this litigation is diversity of citizenship, a form of consideration section 1359 precludes this court from considering.

*12 After evaluating all of the foregoing factors, it is concluded that Shamis has failed to overcome the presumption that the assignment from Wishbone was an effort to collusively obtain federal jurisdiction. As such, the Assignment is invalid to confer diversity jurisdiction, see 28 U.S.C. § 1359, and all of the state law claims are dismissed. Plaintiff is, however, granted leave to replead upon a showing that the receivers were citizens of a recognized foreign nation.FN4

> FN4. In view of this disposition, it is unfortunate that so many resources have been expended in discovery and pre-trial litigation of these state claims in an inappropriate forum. However, because jurisdictional disputes such as this one sometimes depend on the development of facts in discovery, such a result is inevitable from time to time. See *Airlines Reporting, 58 F.3d at 860* (noting that district court had denied earlier motion to dismiss because of existence of assignments, but dismissed after discovery based on § 1359).

### II. The Motion to Amend Will Be Denied

Although the state law claims are dismissed because the assignment was ineffective to invoke this court's diversity jurisdiction, that does not mean that the assignment of claims is invalid for other purposes. Thus Shamis has authority to assert any valid federal claims assigned to him by Wishbone. However, because the proposed federal RICO claims would be dismissed, amendment would be futile and will not be permitted.

Rule 15(a) provides that leave to amend a complaint "shall be freely given when justice so requires." The federal courts, however, have interpreted Rule 15 to permit such amendments only when (1) the party seeking the amendment has not unduly delayed, (2) when that party is not acting in bad faith or with a dilatory motive, (3) when the opposing party will not be unduly prejudiced by the amendment, and (4) when the amendment is not futile. *Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962);* see *Mackensworth v. S.S. Am. Merchant, 28 F.3d 246, 251 (2d Cir.1994); Prudential Ins. Co. v. BMC Indus., Inc., 655 F.Supp. 710, 711 (S.D.N.Y.1987).*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp. Page 11
Not Reported in F.Supp., 1997 WL 473577 (S.D.N.Y.), RICO Bus.Disp.Guide 9344
(Cite as: Not Reported in F.Supp.)

An amendment is considered futile if the amended pleading fails to state a claim or would be subject to a successful motion to dismiss on some other basis. *See, e.g., S.S. Silberblatt, Inc. v. East Harlem Pilot Block,* 608 F.2d 28, 42 (2d Cir.1979); *Freeman v. Marine Midland Bank-New York,* 494 F.2d 1334, 1338 (2d Cir.1974).

Section 1962(c) of RICO prohibits "any person employed by or associated with any enterprise... to conduct or participate... in the conduct of such enterprise's affairs through a pattern of racketeering activity...." 18 U.S.C. § 1962(c). Section 1962(d) of RICO mandates that it is "unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). Shamis alleges that Defendants Ambassador, Korman, Roberts, Jay Vee, and Mahoney Cohen (the "RICO Defendants") are liable for violations of both sections.

The RICO Defendants advance several bases upon which Shamis's causes of action under RICO would be subject to dismissal. Because Shamis has not pleaded a cognizable continuous "pattern of racketeering activity," the motion to amend will be denied and the other asserted grounds for dismissal need not be addressed.

In order to successfully show a "pattern of racketeering activity," a plaintiff "must plead at least two predicate acts... and must show that the predicate acts are related and that they amount to, or pose a threat of, continuing criminal activity." *Schlaifer Nance & Company v. Warhol,* 119F.3d 91, 1997 WL 378986, at *5 (2d Cir. July 10, 1997)(citing *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989)).

*13 In *H.J. Inc.,* the Supreme Court broke the continuity requirement into two basic components. The Court stated:
"Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.... A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time... Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the threat of continuity is demonstrated.

492 U.S. at 241-42 (citations omitted).

Therefore, as recapitulated by the Second Circuit, "a plaintiff in a RICO action must allege either an 'open-ended' pattern of racketeering activity (*i.e.,* past criminal conduct coupled with a threat of future criminal conduct) or a 'closed-ended' pattern of racketeering activity (*i.e.,* past criminal conduct 'extending over a substantial period of time').'DDDDDD' *GICC Capital Corp. v. Technology Finance Group,* 67 F.3d 463, 466 (2d Cir.1995), *cert. denied,* 518 U.S. 1017, 116 S.Ct. 2547, 135 L.Ed.2d 1067 (1996).

Shamis asserts that his Proposed Complaint adequately alleges that the RICO Defendants perpetrated past conduct that raises an inference that future criminal activity will occur as well as repeated conduct over a "closed" period of time. These assertions will be considered in turn.

A. *Open-Ended Continuity*

A determination of whether "open-ended continuity" exists requires an assessment of "the nature of the predicate acts alleged or ... the nature of the enterprise at whose behest the predicate acts were performed." *GICC Capital,* 67 F.3d at 466; *United States v. Aulicino,* 44 F.3d 1102, 1111 (2d Cir.1995); *Giannacopolous v. Credit Suisse,* 965 F.Supp. 549, 552 (S.D.N.Y.1997). Therefore, "in cases where the act of the defendant or the enterprise were inherently unlawful, such as murder or obstruction of justice, and were in pursuit of inherently unlawful goals, such as narcotics trafficking or embezzlement, the courts generally have concluded that the requisite threat of continuity was adequately established by the nature of the activity...." *Aulicino,* 44 F.3d at 1111. Thus, in *Aulicino,* the court found that because "[i]t is not uncommon for a kidnaping to result in the kidnapers' killing their victim," "the kidnapings [in these instances] were especially likely to involve further criminal activity." *Id.* at 1113. Similarly, in *United States v. Indelicato,* 865 F.2d 1370, 1384 (2d Cir.)(en banc), *cert. denied,* 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989), the court placed great weight on the "nature of the Commission," a well-known

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp. Page 12
Not Reported in F.Supp., 1997 WL 473577 (S.D.N.Y.), RICO Bus.Disp.Guide 9344
(Cite as: Not Reported in F.Supp.)

governing body of organized crime families, and "the criminal nature of the Bonanno family," in concluding that "a threat of continuing racketeering activity" existed.

*14 Here, in contrast, the underlying business activities of the parties-distributing finished women's garments, factoring and accounting-are not inherently illegal enterprises. *See Giannacopolous, 965 F.Supp. at 552* (in alleged RICO scheme, banking and "issuing [of] a letter of credit" are not inherently unlawful enterprises). There is no "allegation of mob-relatedness." *Mead v. Schaub, 757 F.Supp. 319, 323 (S.D.N.Y.1991)*. Thus, the nature of the predicate acts and the enterprises alone do not support a finding of an "open ended" pattern of continuous racketeering.

When the nature of the conduct or the enterprise is not inherently unlawful, courts look to more general factors to determine whether the threat of continuing activity exists. *See Schlaifer Nance, 1997 WL 378896, at *5; Giannacopolous, 965 F.Supp. at 552; Mead, 757 F.Supp. at 323.*

In *Mead*, the court held that "[a] critical factor in determining whether the predicates are 'continuing' under RICO is the terminable quality of the goal or purpose of the enterprise." *Id.* at 323. For instance, in *Schlaifer Nance*, because it was clear that fraud had allegedly surrounded a single fraudulent licensing agreement, the court found there to be "no threat that the alleged fraud involved in the execution of the Agreement would continue in the future." *Schlaifer Nance, 1997 WL 378986, at *5*. Similarly, in *Mead*, where plaintiff alleged that he had been recruited to a new management consulting position under false pretenses, the court held that "[a]lthough the alleged scheme to defraud may have required a number of steps over a determinate period of time, nevertheless because of its terminable nature and single goal it does not meet the requirement of continuity." *Mead, 757 F.Supp. at 323* (citing *Cullen v. Paine Webber Grp., Inc., 689 F.Supp. 269, 269 (S.D.N.Y.1988)); see also Ray Larsen Associates, Inc. v. Nikko America, Inc., No. 89 Civ. 2809, 1996 WL 442799, at *7 (S.D.N.Y. Aug.6, 1996)*(no open-ended continuity when alleged fraud arose out of one agreement); *compare Beauford v. Helmsley, 865 F.2d 1386, 1392 (2d Cir.1989)*(open-ended continuity established when defendants engaged in a one-time mailing of 8,000 copies of fraudulent documents in connection with a condominium conversion plan and there existed evidence that a similar mailing might occur in the future), *vacated, 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989); Azrielli v. Cohen Law Offices, 21 F.3d 512, 521 (2d Cir.1994)* (series of fraudulent security sales coupled with an attempt to continue to sell such securities in the future established open-ended continuity .)

According to Shamis, the RICO Defendants' actions are "continuing in nature" and therefore satisfy the test for open-ended continuity. However, the scheme as alleged had a "clear terminating goal"-to fraudulently perpetrate the Master Agreement for its duration, three years dating from October 1989. *Mead, 757 F.Supp. at 323* (citing *Cullen, 689 F.Supp. at 274)*. All of the specific acts of racketeering alleged against Roberts in the Proposed Complaint pertain to the purported fraud that arose out of the Master Agreement. In addition, there is no likelihood that the fraud against Wishbone will continue, since Wishbone stopped sending finished goods and terminated extending credit to Roberts in June 1991. Wishbone is currently in receivership.

*15 Shamis has sought to bolster his open-ended continuity claim by alleging that Korman-run companies have perpetrated similar fraudulent "pre-invoicing" schemes both prior to and after Roberts' dealings with Wishbone. He claims that El Jay committed "fraud" against Manufacturers Hanover Bank as early as 1986 and that Jay Vee committed similar fraud against an individual named "Lampert" in 1992. However, the use of these claims of earlier fraudulent activity to establish closed-ended continuity is problematic.

First, "acts... [that] are unrelated to the predicate acts which allegedly injured plaintiff... cannot be considered as part of the activity to extend the scope of the pattern." *Ray Larsen Associates, 1996 WL 442799, at *7* (citing *Burdick v. American Express Co., 865 F.2d 527, 529 (2d Cir.1989)*(where plaintiff employee sued defendant bank employer for termination as result of his complaints about fraud on customers, plaintiff could not assert RICO violation because harm to defendant's customers resulting from defendant's fraudulent practices was "too remotely related" to predicate acts alleged); *Vidi v. Visconsi, 956 F.2d 560, 566 (6th Cir.)* (plaintiff "cannot complain about harm to other entities"), *cert. denied, 506 U.S. 832, 113 S.Ct. 99, 121 L.Ed.2d 59*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 473577 (S.D.N.Y.), RICO Bus.Disp.Guide 9344
(Cite as: Not Reported in F.Supp.)

Page 13

(1992); *Committee to Defend the United States Constitution v. Moon,* 776 F.Supp. 568, 572 (D.D.C.)(court would "only consider those acts which have resulted in business or property harm to the [plaintiff]" for RICO purposes.)

Second, neither of these allegations comports with Fed R. Civ. P. 9(b)'s requirement that pleadings alleging fraud be stated with specificity. *See Continental Realty Corp. v. J.C. Penney Co., Inc.* 729 F.Supp. 1452, 1455 (S.D.N.Y.1990)(plaintiff's "conclusory allegations" that defendants might have "future opportunities to commit fraud" found insufficient.) Shamis points to newspaper articles to support his assertions against El Jay, but these articles state only that Korman and El Jay were investigated for fraud, not that they were convicted or even indicted. A handful of other articles refer solely to El Jay's bankruptcy and do not mention fraud.

Shamis's allegations in regard to the purported fraud on Lampert are similarly deficient. Shamis does not specifically identify the allegedly fraudulent mail or wire communications made by Jay Vee. The Court of Appeals has required that allegations of fraud adequately specify the statements made that were false or misleading, give particulars as to the respect in which it is contended that the statements were fraudulent, and state the time and place the statements were made and the identity of the person who made them. *See McLaughlin v. Anderson,* 962 F.2d 187, 191 (2d Cir.1992); *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989). The allegations here do not meet this standard and are thus fail to support an inference of ongoing and repeated racketeering activity on the part of the defendants. *See Deem v. Lockheed Corp.,* 1991 WL 196171, at *9 (S.D.N.Y. Sept.25, 1991)("[a] single vague RICO allegation brought under completely different circumstances is insufficient to create a genuine issue as to whether [defendant] engaged in the predicate acts as a regular way of conducting its business").

B. *Closed-End Continuity*

**\*16** "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *H.J. Inc.,* 492 U.S. at 242. The alleged activities of the defendants, which span a period of nearly three years, took place over a sufficient period of time under a "closed-ended" continuity analysis. *See Metromedia v. Fugazy,* 983 F.2d 350 (2d Cir.1992)(predicate acts occurring over two years found to be sufficient), *cert. denied,* 508 U.S. 952, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993). However, because the alleged ongoing activity was based upon a single "scheme," separate and distinct predicate acts are not adequately pleaded.

In *Schlaifer Nance,* plaintiff, a licensing company, sued the estate of the artist Andy Warhol under RICO for fraudulent activities that allegedly stemmed out of a single licensing agreement. 1997 WL 378986, at *3. The Second Circuit upheld the district court's dismissal of the RICO claims. The Court stated:

Judge Stanton ruled that the allegedly fraudulent acts, although they spanned over three years, were not continuous for RICO purposes because they were acts related to a single contract and single scheme to defraud. At first glance, Judge Stanton's reasoning might seem flawed given this Court's clear holding that Congress did not mean "to exclude from the reach of RICO multiple acts of racketeering because... they further but a single scheme." However, courts must take care to ensure that the plaintiff is not artificially fragmenting a singular act into multiple acts simply to invoke RICO. Here, that is exactly what [plaintiff] is attempting to do.

*Id.* at *6 (citing *Indelicato,* 865 F.2d at 1383). The court held that although plaintiffs alleged numerous acts, all of which allegedly violated the agreement, the real fraudulent act was the "negotiation of the [a]greement," and that "[other] acts complained of... are subparts of the singular act, and not a "pattern" of separate acts with an underlying purpose." *Id.* at *6. Thus, the court held, closed-ended continuity did not exist.

Similarly, in *Ray Larsen Associates,* 1996 WL 442799, at *7, plaintiff, a toy manufacturer's representative, brought a RICO claim against a toy manufacturer in conjunction with a breach of contract claim. Although the plaintiff lodged various claims of fraud against the defendant, the court dismissed the RICO claim. The court held: "although continuity is a temporal concept, a determination of whether the continuity element is satisfied also involves consideration of factors such as type of acts, number of perpetrators, number

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 473577 (S.D.N.Y.), RICO Bus.Disp.Guide 9344
**(Cite as: Not Reported in F.Supp.)**

Page 14

of victims, and character of the goal." *Id.* at *7 (internal citations omitted). The court went on: "[c]ourts in this Circuit generally hold that where the conduct involves a limited number of perpetrators, a limited number of victims, and a limited goal, the conduct is lacking in closed continuity." *Id.* at 7 (citing *Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 998-999 (E.D.N.Y.1995)("when a RICO claim is based on a defendant's narrowly directed actions toward a single fraudulent end with a limited goal, lasting over a limited period of time, the claim usually fails")(internal quotations omitted)).

*17 In the present case, Shamis has not adequately alleged "closed continuity." As in *Schlaifer Nance,* the so-called "predicate acts" all arise out of a single arrangement for sale and distribution of women's apparel, and, as such, are not separate and distinct acts for RICO purposes. The wrongdoing alleged by Shamis revolves essentially around a single "act," that of the fraudulent negotiation and/or effectuation of the Master Agreement. In addition, a limited number of perpetrators are alleged to have been involved (chiefly Roberts, Ambassador, and Mahoney Cohen), and there existed only one target of the alleged scheme, Wishbone. As discussed above, the scheme, as dictated by the terms of the Agreement, had a three-year duration and a discreet, limited goal. In short, "[t]he scheme in the instant case involves only one group of perpetrators, the defendants, who directed their acts toward one victim... with the singular goal of defrauding [plaintiff]... under a single... contract." *Ray Larsen,* 1996 WL 442799, at *9. Accordingly Shamis's RICO claims under 18 U.S.C. § 1962(c) will be dismissed for failure to plead a continuous pattern of racketeering.

### C. *Claims Under 18 U.S.C. § 1962(d)*

Because the predicate acts alleged by Shamis do not amount to a "pattern of racketeering activity" under RICO, Shamis's claim of conspiracy to commit a RICO violation, under 18 U.S.C. § 1962(d) must also be dismissed. *See Ray Larsen,* 1996 WL 442799, at *9; *Purgess v. Sharrock,* 806 F.Supp. 1102, 1110 n. 9 (S.D.N.Y.1992).

### Conclusion

Because the assignment of claims to Shamis was made to obtain federal jurisdiction, Shamis' existing state claims are hereby dismissed in their entirety. Similarly, leave to amend to add further state claims is denied as futile. Shamis is granted leave to replead his state law claims upon a showing that the receivers were citizens of a foreign state recognized by the United States Department of State. Shamis's motion to amend to add RICO claims is denied because such claims would not withstand a motion to dismiss.

It is so ordered.

S.D.N.Y.,1997.
Shamis v. Ambassador Factors Corp.
Not Reported in F.Supp., 1997 WL 473577 (S.D.N.Y.), RICO Bus.Disp.Guide 9344

Briefs and Other Related Documents (Back to top)

• 1:95cv09818 (Docket) (Nov. 20, 1995)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.