36

RECYCLED

ALL-STATE® LEGAL 800-222-0510   ©D11

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2002 WL 1610923 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Anita (Phocas) SIBERSKY and Alex Sibersky, Plaintiffs,
v.
BORAH, GOLDSTEIN, ALTSCHULER & SCHWARTZ,
P.C., Stephen C. Shulman, Felds Realty, L.L.C., Doris Feld-
stein, Zev M. Feldstein, David J. Feldstein, Mala Feldstein
and the Estate of Abraham Feldstein, Doris Feldstein Exec-
utrix, Defendants.
No. 99 CIV.3227 JGK.

July 22, 2002.

Former tenants brought action against landlord and its law
firm for violations of Fair Housing Act, Fair Debt Collec-
tion Practice Act (FDCPA), and state law. On defendants'
motion to dismiss and tenants' cross-motion for partial sum-
mary judgment, the District Court, Koeltl, J., held that: (1)
tenant waived all claims against landlord, and (2) tenant's at-
torney had apparent authority to execute release on her be-
half.

Defendants' motion granted.

West Headnotes

**[1] Compromise and Settlement 89 ☞16(1)**

89 Compromise and Settlement
89I In General
89k14 Operation and Effect
89k16 Discharge from Liability
89k16(1) k. Causes of Action Merged or Barred in General.
Most Cited Cases

**Release 331 ☞33**

331 Release
331II Construction and Operation
331k33 k. Release of Specific Indebtedness or Liability in
General. Most Cited Cases
Under New York law, tenant's release, in stipulation of set-
tlement entered into in holdover proceedings, of "all claims"
against landlord "arising from the beginning of time to date"

waived tenant's claims against landlord for violations of Fair
Housing Act, Fair Debt Collection Practice Act (FDCPA),
and state law, where claims arose from acts that took place
before release was signed, tenant had raised same claims as
defenses in holdover proceedings, and holdover proceedings
were dismissed with prejudice. Consumer Credit Protection
Act, § 802, as amended, 15 U.S.C.A. § 1692; 42 U.S.C.A. §
3604.

**[2] Attorney and Client 45 ☞101(1)**

45 Attorney and Client
45II Retainer and Authority
45k101 Settlements, Compromises, and Releases
45k101(1) k. In General. Most Cited Cases
Under New York law, tenant's attorney had apparent author-
ity to execute stipulation on her behalf in connection with
settlement of landlord's holdover proceedings against tenant,
and thus release contained in stipulation was binding on ten-
ant in subsequent litigation against landlord, where settle-
ment was executed in open court, tenant had retained attor-
ney to represent her during litigation, and tenant never rep-
resented to landlord or to court that attorney did not have
authority to enter into settlement on her behalf.

OPINION AND ORDER

KOELTL, District J.
**\*1** The plaintiffs, Anita Phocas Sibersky and Alex Sibersky,
bring this action against their former landlord, Felds Realty,
L.L.C. ("Felds Realty"), their former landlord's law firm and
one of its lawyers, Borah, Goldstein, Altschuler &
Schwartz, P.C. ("Borah Goldstein") and Stephen C. Shul-
man, Esq., respectively, and a number of individual defend-
ants associated with Felds Realty: Doris Feldstein, Zev M.
Feldstein, Jack M. Feldstein, David J. Feldstein, Mala E.
Feldstein, and the Estate of Abraham Feldstein, Doris Feld-
stein Executrix (collectively, the "individual Feldstein de-
fendants"). The plaintiffs allege five causes of action: (i)
that Felds Realty discriminated against Mrs. Sibersky be-
cause of her race, sex, and familial status in violation of the
Fair Housing Act, 42 U.S.C. § 3604(a)-(c), by denying her
basic living accommodations at her rental apartment, refus-
ing to repair the apartment, and forcing her to sign a release
rider making her the sole tenant on the lease; (ii) that Felds
Realty breached the implied warranty of habitability, har-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2002 WL 1610923 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

assed her and her family in order to induce her to leave the apartment, placed unlawful occupancy restrictions on her apartment, and restricted her ability to name her children as assignees on her lease in the event of her death, because of her race, sex and familial status in violation of the same provisions of the Fair Housing Act; [FN1] (iii) that Felds Realty defrauded the plaintiffs by intentionally making a number of false promises that it would make certain repairs to the apartment, which Felds Realty knew it never intended to fulfill; (iv) that Felds Realty unlawfully converted Mrs. Sibersky's security deposit by refusing to return it to her in violation of New York General Obligations Law § 7-105; and (v) that Borah Goldstein engaged in a number of abusive debt collection practices in violation of the Fair Debt Collection Practices Act ("FDCPA"), 18 U.S.C. § 1692 et seq., in order to collect debts allegedly owed by Mrs. Sibersky to Felds Realty.

> FN1. The plaintiffs allege that each of these acts are unlawful under New York State Real Property Law, even without discrimination, but their second cause of action states a claim for discrimination under the Fair Housing Act, not for violation of these underlying state laws. See, e.g., N.Y. Real Prop. § 235-b (implied warrant of habitability); N.Y. Real Prop. § 235-d (prohibiting harassment to induce a tenant to leave a rental situation); N.Y. Real Prop. § 235-f (prohibiting certain restrictions on the occupancy of apartments); N.Y. Real Prop. § 236 (requiring that tenants be allowed to assign their leases to family members in certain circumstances).

Felds Realty and the individual Feldstein defendants move to dismiss all of the claims against them pursuant to Rules 8 and 12(b)(6) for failure to state a claim upon which relief can be granted, or, in the alternative, for summary judgment dismissing these claims pursuant to Rule 56 of the Federal Rules of Civil Procedure. The plaintiffs purport to cross-move for partial summary judgment on a number of their claims.

## I.

On a motion to dismiss, the allegations in the Third Amended Complaint are accepted as true. See Grandon v.

Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir.1998); VTech Holdings Ltd v. Lucent Techs. Inc., 172 F.Supp.2d 435, 437 (S.D.N.Y.2001). In deciding a motion to dismiss, all reasonable inferences must be drawn in the plaintiff's favor. See Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir.1995); Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir.1989). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir.1985). Therefore, a motion to dismiss should only be granted if it appears that the plaintiffs can prove no set of facts in support of their claims that would entitle them to entitle them to relief. See Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); Grandon, 147 F.3d at 188; see also Goldman, 754 F.2d at 1065.

*2 In deciding a motion to dismiss, the Court may consider documents referred to in the Third Amended Complaint and documents that the plaintiffs relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of in bringing suit. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir.2002); Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir.1993); Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir.1991); I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co., Inc., 936 F.2d 759, 762 (2d Cir.1991); Skeete v. IVF America, Inc., 972 F.Supp. 206, 208. The Court may also consider "matters of which judicial notice may be taken." See Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir.1991). Thus, it is appropriate to consider public documents on a motion to dismiss. See, e.g., Day v. Moscow, 955 F.2d 807, 811 (2d Cir.1992); Bal v. New York City Loft Board, No. 00 Civ. 1112, 2000 WL 890199, at *2 (S.D.N.Y. July 5, 2000).

If, however, the defendants' arguments depend upon an evaluation of documents that cannot be considered on a motion to dismiss, then the motion is converted into a motion for summary judgment. See Fed.R.Civ.P. 12(b). The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1610923 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see generally Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219 (2d Cir.1994); Shaw v. Rizzoli Int'l Publ'ns, Inc., No. 96 Civ. 4259, 1999 WL 160084, at *1, (S.D.N.Y. Mar.23, 1999). "The trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.

The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The substantive law governing the case will determine those facts that are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether summary judgment is appropriate, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing United States v. Diebold, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); Gallo, 22 F.3d at 1223. If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). With respect to the issues on which summary judgment is sought, if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper. See Chambers v. TRM Copy Ctrs., 43 F.3d 29, 37 (2d Cir.1994).

*3 Where, as here, both parties seek summary judgment, the Court must " 'evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.' " Abrams v. United States, 797 F.2d 100, 103 (2d

Cir.1986) (quoting Schwabenbauer v. Bd. of Educ., 667 F.2d 304, 314 (2d Cir.1981)).

II.

The Court has already set forth a number of the relevant factual allegations in this case in a previous Opinion and Order, familiarity with which is assumed. See Sibersky v. Borah, Goldstein, Altschuler & Schwartz, P.C., No. 99 Civ. 3227, 2000 WL 1448635, at *1-3 (S.D.N.Y. Sep. 28, 2000) [hereinafter Sibersky I]. Unless otherwise indicated, the following facts are either undisputed, are matters of public record, or are alleged in the Third Amended Complaint (the "Complaint") and are accepted as true for the purpose of the motion to dismiss.

Mrs. Sibersky is a Hispanic woman. Compl. ¶ 1. In or about January 26, 1979, she began renting an apartment at 301 West 22nd Street in New York, New York from the defendant Felds Realty. Compl. ¶ 3. Mrs. Sibersky subsequently married Alex Sibersky, who moved into the apartment with her. All of the allegedly wrongful conduct alleged in the Complaint purportedly occurred in the context of this landlord-tenant relationship between January 26, 1979 and in or about June 1999, when the plaintiffs ultimately moved out of the apartment. See Affidavit of Edward R. Adams dated December 2, 2001 ("Adams Aff."), at ¶¶ 3, 10; see generally Adams Aff. ¶¶ 1-11; Compl. ¶¶ 4-20 22.

The Complaint alleges that beginning in 1995, a number of problems began to arise in the apartment, which were not adequately repaired. Compl. ¶¶ 4-7. After repeated complaints to Felds Realty, and Felds Realty's repeated failures to fulfill promises to make the needed repairs, the plaintiffs, on or about July 10, 1998, filed an action against Felds Realty in the New York State Civil Court and began making their rent payments into an escrow account with that Court. Compl. ¶ 13. On or about July 30, 1998, the New York City Department of Housing Preservation and Development issued a report of twelve violations against Felds relating to the apartment, and the New York State Civil Court subsequently issued an order to Felds Realty to make repairs. Compl. ¶ 15. The parties dispute the ensuing events, and who exactly was responsible for any continuing problems and conditions with the apartment, but it is clear that prob-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 4
Not Reported in F.Supp.2d, 2002 WL 1610923 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

lems continued, payments were not made, and relations between the parties deteriorated.

In September 1998, Borah Goldstein, the law firm for the plaintiff, allegedly served the plaintiffs with two three-day notices, which demanded that the plaintiffs make certain rental payments or surrender their premises to Felds Realty within three days or Felds Realty would commence summary proceedings against the plaintiffs to recover the premises. Compl. ¶ 16. On October 8, 1998, Felds filed an action to dispossess the plaintiffs of the apartment for non-payment of rent. *Id.*

**\*4** On May 18, 1999, Borah Goldstein commenced a separate holdover proceeding on behalf of Felds Realty against Mrs. Sibersky, as the tenant at 301 West 22nd Street, and Mr. Sibersky, as an occupant, on the grounds that they were allegedly (1) violating housing code regulations by refusing access to the apartment to make repairs; and (2) breaching the lease by maintaining the apartment in an unsanitary condition. *See Sibersky I, 2000 WL 1448635, at \*3.* As defenses to these charges, the plaintiffs alleged that Felds Realty unlawfully discriminated against them on the basis of race, national origin, sex, age and marital status, *see* Answer to Holdover Complaint ("Ans."), at ¶ 13, attached as Ex. C to Weil Aff.; that Felds Realty retaliated against them for asserting their rights as tenants or occupants, *id* at ¶ 14; that Felds Realty consistently failed to make needed repairs, *id.* at §§ XV-XVIII, XVI; and consistently failed to make promised repairs, even when under court orders, *id.* at §§ IX-X; that Felds Realty engaged in a number of deliberate, affirmative and destructive acts and negligent acts, *id.* at § XIII; and that Felds Realty breached the implied warrant of habitability relating to the apartment, *id.* at ¶ 16 & § XVII.

On June 23, 1999, Mrs. Sibersky entered into a stipulation of settlement with Felds Realty in these holdover proceedings, in which she consented to an entry of judgment of possession against her in exchange for which the landlord waived all claims to back rent and paid her a sum of $7,000. *See* Stipulation of Settlement dated June 23, 1999 ("Stipulation"), attached as Ex. A to Affirmation of Judith H. Weil dated October 17, 2001 ("Weil Aff."). Paragraph Seven of the Stipulation reads: The plaintiff Mrs. Sibersky "hereby grants [Felds Realty] its agents and employees a complete and general release of all claims arising from the beginning of time to date." Stipulation ¶ 7. The Stipulation was signed by Mr. John DeMaio, who was Mrs. Sibersky's attorney at the time. *See Sibersky I, 2000 WL 1448635, at \*3.* On June 25, 1999, Mr. Sibersky signed a Mutual General Release with Felds Realty, which specifically did "not include a Release of Attorneys for Felds Realty Co., LLC, notwithstanding Paragraph 7 of the Stipulation." *See* Mutual General Release ("Mutual Release"), attached as Ex. B to Weil Aff.

The plaintiffs filed their initial Complaint in this action before these settlements had been executed, and the original Complaint raised claims only against Borah Goldstein and Stephen C. Shulman. However, on August 17, 2001, after their Second Amended Complaint was dismissed without prejudice, and after several other repleadings, the plaintiffs filed the currently-dubbed "Third Amended Complaint," which adds claims against Felds Realty and the individual Feldstein defendants. These defendants (collectively, the "Feld defendants") are the sole moving parties with respect to the current motions.

III.

**\*5** The individual Feldstein defendants argue that all of the claims against them should be dismissed pursuant to Rule 8(a) of the Federal Rules of Civil Procedure. Rule 8(a) states, in relevant part, that any pleading that sets forth a claim for relief "shall contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The rule requires simply that plaintiffs provide defendants with fair notice of what their claims are and the grounds upon which they rest. *See generally Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S.Ct. 992, 998, 152 L.Ed.2d 1 (2002).*

In this case, the Third Amended Complaint names the individual Feldstein defendants only in the caption, and it does not mention them at all in the body of the Complaint. The Complaint does not attribute any wrongful actions to them, and does not identify any theory under which they might be liable for the acts of any of the other defendants. Indeed, the Complaint specifies that the first four causes of action are against Felds Realty, and the last is against Borah Goldstein,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 2002 WL 1610923 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

and the plaintiffs have not even responded to the defendants' arguments that the claims against the individual Feldstein defendants should be dismissed under Rule 8(a).

In these circumstances, the plaintiffs have not met the minimal standards for notice pleading with regard to their purported claims against the individual Feldstein defendants. Any such claims are dismissed under Rule 8(a).

IV.

The Feld Defendants argue that Mrs. Sibersky waived all of the claims she seeks to raise against them in this case by executing the general release in the Stipulation. To the extent that Mrs. Sibersky is raising federal claims, the validity of the release with respect to these claims is a matter of federal law. *See, e.g., Dice v. Akron, Canton & Youngstown R. Co., 342 U.S. 359, 361, 72 S.Ct. 312, 96 L.Ed. 398 (1952); Olin Corp. v. Consolidated Aluminum Corp., 5 F.3d 10, 15 (2d Cir.1993); Prunella v. Carlshire Tenants, Inc., 94 F.Supp.2d 512, 517 (S.D.N.Y.2000).* Under federal law, courts should, however, look to state law to provide the content of the relevant federal law. *See Olin Corp., 5 F.3d at 15; Prunella, 94 F.Supp.2d at 517; Leonzo v. First Unum Life Ins. Co., No. 93 Civ. 535, 1995 WL 505551, at *3 (S.D.N.Y. Aug.23, 1995).* The scope and validity of the general release with respect to the state law claims that Mrs. Sibersky raises is similarly governed by state law, which is New York law in this case, there being no other state with any connection to the release. *See, e.g., Calabrese v. McHugh, 170 F.Supp.2d 243, 253 (D.Conn.2001).*

Under New York law, courts must "discern the intent of the parties to the extent that their intent is evidenced by their written agreement." *Olin Corp., 5 F.3d at 15* (internal quotation marks omitted). The meaning and coverage of a general release also necessarily depends upon the controversy being settled and the purpose for which the release was given; a release may not be read to cover matters that the parties did not intend to cover. *Cahill v. Regan, 5 N.Y.2d 292, 184 N.Y.S.2d 348, 157 N.E.2d 505, 510 (N.Y.1959); Lefrak SBN Assocs. v. Kennedy Galleries, Inc., 203 A.D.2d 256, 609 N.Y.S.2d 651 (App.Div.1994).* In this case, Mrs. Sibersky executed a general release with very broad language, stating that she "hereby grants [Felds Realty] its agents and

employees a complete and general release of *all claims arising from the beginning of time to date.*" Stipulation ¶ 7 (emphasis added). The purpose of the release was to settle a number of disputes between her and Felds Realty that had arisen out of their landlord-tenant relationship, including not only the holdover proceedings but also a number of other litigations that had arisen between the parties as part of the same landlord-tenant relationship and any other disputes relating to these events to date between them. The claims that Mrs. Sibersky had asserted against Felds Realty were very broad. If the release were intended to exclude any particular kinds of claims or disputes arising out of this relationship or events, it could have easily done so, but it did not. *See, e.g., Goldberg v. Mfrs. Life Ins. Co., 242 A.D.2d 175, 672 N.Y.S.2d 39, 43-44 (App.Div.1998); see also Matter of Schaefer, 18 N.Y.2d 314, 274 N.Y.S.2d 869, 221 N.E.2d 538, 540 (N.Y.1966).*

*6 [1] By executing a general release with this broad language, Mrs. Sibersky released not only the claims that were specifically in dispute in that action, and in the other actions referenced explicitly in the Stipulation, but also any claims that could have been raised against Felds Realty or its agents or employees at that time. *Williamson Cent. Sch. Dist. v. E & L Piping, Inc., 261 A.D.2d 937, 690 N.Y.S.2d 352, 353 (App.Div.1999); Mar Co. Export, Inc. v. Banco De Santander-Puerto Rico, 99 A.D.2d 403, 470 N.Y.S.2d 4, 5-6 (App.Div.1984); Skylon v. Guildford Mills, Inc., 864 F.Supp. 353, 358 (S.D.N.Y.1994).* Mrs. Sibersky raised the exact same claims that she now raises in Counts One and Two as defenses in her holdover proceedings, because she raised defenses based on discrimination, violations of the implied warranty of habitability, and denial of repairs and basic living accommodations. These claims are therefore waived by the general release. Mrs. Sibersky also could have raised her claims for fraud based on the allegation that Felds Realty had made a series of promises to make repairs that it never intended to keep, and could have raised her claims under the FDPCA (Count Five), all of which arise out of facts that were known to her at the time and that were integrally related to her disputes with Felds Realty. Indeed, Mrs. Sibersky had already raised FDPCA claims against Borah Goldstein, and had raised claims for failure to fulfill promised repairs against Felds Realty. These claims against

Not Reported in F.Supp.2d                                                                              Page 6
Not Reported in F.Supp.2d, 2002 WL 1610923 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Felds Realty are therefore also waived by the general release. *See, e.g., Krumme v. Westpoint Stevens Inc., 238 F.3d 133, 144-45 (2d Cir.2000)* (an unambiguous release must be enforced according to its terms).[FN2]

> FN2. In any event, the claim in Count Five does not specifically identify any of the Feld defendants as defendants, and instead identifies Borah Goldstein as the relevant defendant.

Mrs. Sibersky's only remaining claim against the Feld defendants is for return of her security deposit (Count Three), which she argues did not arise until after the settlement had been executed. However, Mrs. Sibersky could have raised the issue of return of her security deposit as part of her negotiations of the Stipulation, and the Stipulation was plainly intended to be a global settlement of the entire range of disputes that had arisen between the parties, which would allow Felds Realty to obtain full possession of the premises in return for $7,000, and for both parties to thereby terminate their prior landlord-tenant relation, along with any further obligations under the lease. The Stipulation contained a number of detailed provisions concerning the parties' obligations going forward, and these provisions were clearly intended to supplant those of the prior lease, except in the event of a default under the Stipulation. *See, e.g.,* Stipulation ¶¶ 10-12. The Stipulation did not give Mrs. Sibersky the right to return of her security deposit as part of this global settlement, and there is no basis for the assertion that such a right survived the Stipulation.

Moreover, the Stipulation also stated that "claims and counterclaims and defenses in all proceedings, including holdover proceedings index # 75303/99 and HP action 5332/98, 5002/99 and Supreme Ct # 121638/98 action are dismissed with prejudice." Mrs. Sibersky had raised the same claims she raises in Counts One and Two of this action for discrimination relating to her treatment as a tenant and the living conditions in her apartment in those holdover proceedings. Under New York law, a stipulation of discontinuance with prejudice has the same preclusive effect as a judgment on the merits under New York law, and these counts are therefore barred by the doctrine of res judicata. *See Elias v. Albanese,* No. 00 Civ. 2219, 2000 WL 1182803, at *4 (S.D.N.Y. Aug.21, 2000). Mrs. Sibersky also raised de-

fenses in those holdover proceedings relating to Felds Realty's failure to fulfill promises to make repairs, and these claims were also discontinued with prejudice. Mrs. Sibersky's claims for fraud in Count Four of this case, which are all predicated on allegations that these very same promises went unfulfilled, are thus also barred by res judicata. *See, e.g., Schwartzreich v. E.P.C. Carting Co., Inc.,* 246 A.D.2d 439, 668 N.Y.S.2d 370, 370 (App.Div.1998). Finally, "New York law analyzes res judicata questions using a transactional approach. Once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred even if based upon different theories or if seeking a different remedy." *Id.* (internal quotation marks and alteration marks omitted). All of the claims Mrs. Sibersky raises against Felds Realty arise out of the same transaction or series of transactions as the ones she discontinued with prejudice in the Stipulation, and all of her present claims against Felds Realty are thus barred by res judicata.

*7 [2] Mrs. Sibersky tries to create a material issue of fact by arguing that the Stipulation was invalid because it was signed only by her attorney, who allegedly lacked the authority to sign on her behalf. It is unnecessary to reach this issue in this case, however, because the settlement was indisputably executed in open court by an attorney who Mrs. Sibersky had retained to represent her during these litigation and settlement proceedings, and Mrs. Sibersky has not pointed to any evidence indicating that she ever represented to Felds Realty or to the court that oversaw those proceedings that her attorney lacked the authority to enter into a settlement on her behalf. Mrs. Sibersky thus cloaked her attorney with apparent authority to execute the Stipulation as a matter of law. *See generally Hallock v. State,* 64 N.Y.2d 224, 485 N.Y.S.2d 510, 474 N.E.2d 1178, 1181-82 (N.Y.1984). Mrs. Sibersky also never sought to repudiate the agreement until at least April 16, 2001, when she raised claims in this action for the first time against the Feld defendants, and, instead, indisputably accepted the benefits of the $7,000 payment and left the apartment in accordance with the Stipulation. In these circumstances, the Stipulation need only have been signed by someone with apparent authority to have been binding. *See id.* at 1181. In any event, Mrs. Sibersky ratified the Stipulation through her subsequent actions. *See,*

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 7
Not Reported in F.Supp.2d, 2002 WL 1610923 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

*e.g., Johnson v. Johnson, 191 A.D.2d 257, 594 N.Y.S.2d 259, 260-61 (App.Div.1993).*

In sum, Mrs. Sibersky is bound by the general release in the Stipulation, and, in it, she waived all of the claims she presently seeks to raise against Felds Realty. In addition, all of her claims against Felds Realty are barred by the doctrine of res judicata because of her Stipulation to a discontinuance with prejudice of her prior claims and defenses. To the extent that Mrs. Sibersky sought to raise any claims against the Feldstein defendants as agents or employees of Felds Realty, these claims are also barred by the general release because this release explicitly extends to "agents and employees" of Felds Realty.

                                    V.

With regard to the claims raised by Alex Sibersky, Mr. Sibersky entered into a general release with Felds Realty that stated that "ALEX SIBERSKY and FELDS REALTY CO., LLC, hereby mutually release each other, their agents, employees, and servants from all claims that they have had against the other or could have brought against the other from the beginning of time through the date of this execution of this agreement." General Release, attached as Ex. B to Weil Aff. The release made a specific exception for the "Attorneys for Felds Realty Co., LLC, notwithstanding Paragraph 7 of the Stipulation" entered into by Mrs. Sibersky. However, none of the attorneys for Felds Realty are parties to this motion, and Mr. Sibersky's release has the same broad scope as Mrs. Siberksy's in relation to his claims against the Feld defendants in this case. These claims by Mr. Sibersky are therefore also dismissed.

                                    VI.

**\*8** The plaintiffs purport to cross-move for partial summary judgment on a number of their claims. However, the plaintiffs were represented by counsel at the time of this filing, and the filing is signed by them, rather than by their counsel. When parties are represented by counsel, all papers must be submitted through their attorneys and signed under Rule 11 of the Federal Rules of Civil Procedure, unless the Court otherwise determines. *See* Fed.R.Civ.P. 11. The plaintiffs' cross-motion is stricken because it fails to meet those Rule 11 requirements.

In any event, the purported cross-motion is nearly incomprehensible. To the extent that it seeks partial summary judgment on any of the claims against the Feld defendants, the motion is denied because, for the reasons discussed above, it is the Feld defendants who are entitled to either summary judgment or dismissal of all these claims against them. To the extent that the motion was intended to have any bearing on the claims against Borah Goldstein or Stephen C. Shulman (the "Borah defendants"), the plaintiffs have recently substituted new counsel, who can raise any arguments or motions on their behalf against the Borah defendants.

                            CONCLUSION

For the foregoing reasons, the Feld defendants' motion to dismiss or for summary judgment dismissing all the claims against them is granted in its entirety.

SO ORDERED.

S.D.N.Y.,2002.
Sibersky v. Borah, Goldstein, Altschuler & Schwartz, P.C.
Not Reported in F.Supp.2d, 2002 WL 1610923 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1:99cv03227 (Docket) (May. 04, 1999)

END OF DOCUMENT

37

Westlaw.

Slip Copy                                                        Page 1
Slip Copy, 2006 WL 2056366 (S.D.N.Y.)
**(Cite as: Slip Copy)**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Darryll SIMPSON, Plaintiff,
v.
METRO-NORTH COMMUTER RAILROAD, Moe Kiniry,
Sherry Herrington, and Gus Meyers, in their official and
personal capacities, Defendants.
No. 04 Civ. 2565(PAC).

July 20, 2006.

Becky Tung, Robert John Valli, Jr., Rick Ostrove, Leeds
Morelli & Brown, P.C., Carle Place, NY, for Plaintiff.
Sheryl Beth Galler, Hoguet, Newman and Regal, New York,
NY, for Defendants.

*OPINION & ORDER*
Honorable PAUL A. CROTTY, District Judge.
*1 Plaintiff Darryll Simpson, an African-American male,
sues his former employer Metro North Commuter Railroad
and three of its employees, alleging that Defendants dis-
criminated against him because of his race and then retali-
ated against him when he complained of race discrimina-
tion, in violation of Title VII and 28 U.S.C. § 1983.[FN1]
Specifically, Simpson alleges disparate treatment with re-
gards to pay, hostile work environment, and retaliation in
violation of Title VII, and denial of equal protection in vi-
olation of § 1983.

> FN1. Plaintiff also brings claims under N.Y. Exec-
> utive Law § 296 and the New York City Human
> Rights Law, both of which are subject to the same
> substantive analysis as Plaintiff's federal claims.
> See Cruz v. Coach Stores, Inc., 202 F.3d 560, 565
> n. 1 (2d Cir.2000).

Defendants now move for summary judgment pursuant to
Rule 56(c) of the Federal Rules of Civil Procedure on two
grounds: (1) Simpson fails to make out the *prima facie* case
of disparate treatment with regard to pay, hostile work en-
vironment, and retaliation and therefore all of Simpson's
discrimination claims must be dismissed as a matter of law;
and (2) Defendants are entitled to qualified immunity on

Simpson's § 1983 claims. For the reasons discussed below,
the Court grants Defendants' motion for summary judgment
on the first ground, and does not rule on Defendants' claim
of qualified immunity.

**BACKGROUND**

Plaintiff Darryll Simpson ("Simpson"), an African-Amer-
ican male, began working for Defendant Metro North Rail-
road ("Metro North") in March 1988 as an Assistant Con-
ductor. (Compl. ¶ 12; Dep. of Pl. Darryll Simpson, Mar. 8,
2005 ("Simpson Dep.") 10:18-20.) He was promoted to the
position of Conductor in March 1989 and Special Duty
Trainmaster sometime in the late 1990s. (Simpson Dep.
22:6-24.) In August 1999, Simpson was promoted to the
management position of Trainmaster at Grand Central Ter-
minal ("Grand Central"). (Compl. ¶ 15; Simpson Dep.
23:3-9, 25:2-3.)

**STATEMENT OF CLAIMS**

*Disparate Pay Claim*

Simpson's salary as a Trainmaster was approximately
$71,000 or $72,000 per year (Simpson Dep. 55:10-13.), but
less than that of other Trainmasters, who started at around
$83,000.[FN2] (Id. 57:8-19.) Simpson complained to David
Schanoes, his supervisor, and to Sherry Herrington, Metro
North's Chief of Operations services, about this disparity in
salary and requested a raise to bring his salary "up to par"
with the salary of other Trainmasters. (Id. 53:4-7, 57:20-24,
62:10-17) Despite these complaints, Simpson did not get the
salary increase he wanted.[FN3] (Id.)

> FN2. Simpson provides no evidence, apart from his
> own self-serving deposition testimony, to prove
> that other Trainmasters actually received salaries as
> high as $83,000. When asked during his deposition
> how he knew other Trainmasters were making
> more than he was, he merely stated: "Because one
> or two may have told me what they were making,"
> and referred to one colleague, Mr. Schiefelbein, as
> a potential example. (Simpson Dep. 53:20-23,
> 56:15-22, 57:12-16.)

> FN3. Simpson admits that he did receive annual

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                          Page 2
Slip Copy, 2006 WL 2056366 (S.D.N.Y.)
**(Cite as: Slip Copy)**

cost of living and merit increases, but claims that these increases were not sufficient to bring his salary in line with his non-African-American colleagues. (Simpson Dep. 55:14-25.) The only non-African-American colleagues to which Plaintiff refers are Paul Hirsch and Bill Schilling, both of whom had worked for Metro North longer than Simpson and held different and higher titles. *See infra* n. 6.

Metro North's restructured its job titles in 2000,[FN4] and Simpson's title changed from Trainmaster to Operations Manager/Capital Projects. (Simpson Dep. 70:13-24; Herrington Aff. ¶ 7; Herrington Dep. 76:20-23.) In this capacity, Simpson coordinated capital projects in and around Metro North, which included up to 17 different capital projects at any given time. (Simpson Aff. ¶ 5; Simpson Dep. 86:18-19; Herrington Dep. 17:2-8.) While Simpson thought the new title included an increase in salary, it did not. (Simpson Dep. 5-11.) First, Simpson claims that all of the individuals who performed the Capital Projects job before him were Lead Trainmasters,[FN5] and therefore received a higher salary for performing comparable work. (Simpson Dep. 72:14-73:19.) Second, Simpson claims that Paul Hirsh and Bill Schilling, the two employees who assumed the Capital Projects positions at Harmon and New Haven (Metro North's other major terminals), received higher salaries.[FN6] (Simpson Dep. 74:24-75:5.)

> FN4. In January 2000, Metro North created the Operations Services Department, which combined Metro North's Transportation Department with other departments that handled fleet management, stations, car cleaning, and mechanicals functions of the railroad. (Compl. ¶ 17; Herrington Aff. ¶¶ 2-4; Herrington Dep. 66:9-25.) A number of positions within the merged departments were renamed after the reorganization. (Herrington Aff. ¶ 2.)

> FN5. The position of Lead Trainmaster is at least one pay grade above the position of Trainmaster.

> FN6. Simpson alleges that his job is identical to the job performed by Hirsh and Schilling, and therefore Hirsh and Schilling are "similarly situated"

employees for purposes of determining salary. (Simpson Dep. 76:17-21.) The evidence suggests that Simpson's job is comparable to the job performed by Hirsh and Schilling. Both the Harmon and the New Haven terminals, where Hirsh and Schilling work, have positions titled Assistant Director of Capital Projects (the positions held by Hirsh and Schilling). Grand Central, where Simpson works, does not have such a position. Instead, Simpson's position (Operations Manager/Capital Projects) is the closest thing to the Assistant Director position. Defendants could not explain why Harmon and New Haven have such a position, while Grand Central does not, except to suggest that because Hirsh and Schilling had higher titles than Simpson prior to the reorganization, they took higher titles after the reorganization. (Kiniry Dep. 87:13-22.)

The evidence also reveals, however, that both Hirsh and Schilling are far more senior than Simpson, both in number of years on the job and job title. Hirsh began working for Metro North in the 1960s and Schilling began working for Metro North in 1971. Simpson started more than two decades after Hirsh and 17 years after Schilling. (Herrington Aff. ¶ 6.) Moreover, Hirsh and Schilling were both Lead Trainmasters at the time of the reorganization; Simpson, by contrast, was still only a Trainmaster, which is a lower position at a lower pay grade. (*Id.*) Upon reorganization, Hirsh and Schilling became Assistant Directors for Capital Projects; Simpson took on the position of Operations Manager/Capital Projects. Simpson does not challenge these facts, but instead dismisses them as irrelevant, arguing that because all three employees performed comparable job tasks, they should be paid comparable salaries.

**\*2** Simpson complained to his supervisors, Moe Kiniry and Shelly Herrington, about his failure to receive a salary increase, but to no avail. Kiniry approved a salary increase, and convinced his boss, George Walker, to approve the increase, but someone else in the chain of command vetoed the request. (Kiniry Dep. 22:4-23:24.) Simpson also com-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                         Page 3
Slip Copy, 2006 WL 2056366 (S.D.N.Y.)
**(Cite as: Slip Copy)**

plained to Gregory Bradley, Metro North's Director of Workplace Diversity, about this unequal pay. Bradley never investigated or filed a complaint on Simpson's behalf.

### Other Allegations of Discrimination

Simpson alleges other instances of discrimination during his employment with Metro North.[FN7] Particularly, Simpson alleges that in the early 1990s Metro North denied his request for tuition reimbursement to attend courses in transportation management, even though around the same time a white employee was granted tuition reimbursement for much less relevant course work. (Simpson Dep. 31:20-48:23.) Simpson does not provide any concrete evidence documenting his request for tuition reimbursement or Metro North's denial, however; and none of the Defendants had any knowledge of this. Simpson also claims that he was denied lateral promotions to the training department on two separate occasions, and both times less qualified white applicants were hired for the job. (*Id.*) Again, Simpson does not provide any concrete evidence to support this claim. Simpson complained to Stephen Mitchell, who appears to have been an EEOC employee and to Bradley, in his capacity as Director of Workplace Diversity, about these incidents, but neither Mitchell nor Bradley ever investigated or filed a complaint on Simpson's behalf. *(Id.)*

> FN7. All of these allegations of discrimination occurred more than three years prior to the filing of the complaint in this action, and are therefore time-barred under Title VII, § 1983, the New York Executive Law, and the New York City Human Rights Law. None of these allegations of discrimination are mentioned in the complaint. Apparently, they are presented only to provide additional support for his claim that Defendants' discriminated against him with respect to pay.

### Simpson's Problems with Supervisors (Hostile Work Environment)

Simpson had a history of strained relations with senior supervisors. First, while working as a Conductor, Simpson had problems with Dave Schanoes ("Schanoes"), his direct supervisor. Their disagreements appear to have been about

train operations. (Simpson Dep. 25:13-15, 26:21-24.) Simpson's relationship with Schanoes got so bad that the two men got into an argument in front of other employees on the Grand Central platform. (*Id.* 14:4-25-18:23.) Simpson criticized Schanoes to Defendant Moe Kiniry on multiple occasions. (Kiniry Dep. 34:7-22.) Kiniry admits, however, that Simpson was not the only employee that had troubles with Schanoes. (Kiniry Dep. 34:15-18.) Many employees complained about Schanoes's people skills, to the point that Schanoes was eventually removed from his supervisory position due to his inability to work with others. (Kiniry Dep. 34:23-35:3.)

Notwithstanding the dispute, Simpson was promoted to Operations Manager/Capital Projects in 2000. Thereafter, Simpson had problems with two different supervisors. Shortly after he assumed the position, Simpson complained that Fred Sterman gave him so much operations work that he could not adequately perform his duties for capital projects[FN8] (Simpson Dep. 88:16-93:2.) Simpson complained to Sherry Herrington about it, and she went to speak with Sterman. (*Id.*) Simpson admits that his complaints about Fred Sterman did not involve race discrimination.

> FN8. Sherry Herrington explains that "the basic operations of the railroad take priority over capital projects," and therefore "the Operations Manager/ Capital Projects is expected to be on-call to assist with Field Operations when needed." (Herrington Aff. ¶ 9.) Field Operations means running the railroad. Simpson, Herrington's subordinate, disagreed. He preferred not to have Field Operations jobs. (Simpson Dep. 88:16-93:2.)

**\*3** In April 2002, Gus Meyers transferred into Grand Central and became Simpson's direct supervisor. (Meyers Dep. 5-6.) Simpson and Meyers clashed from the start. According to Simpson, Meyers micromanaged his work, spoke to him in a demeaning tone, and yelled at him over insignificant things like answering the telephone during a conversation. (Simpson Dep. 123:15-126:13, 128:4-25, 134:15-20.)

Again, Simpson complained to Kiniry. (Simpson Dep. 19-23.) As Meyers was the third supervisor that Simpson griped about to Kiniry, Kiniry began to get annoyed. (Kiniry

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                        Page 4
Slip Copy, 2006 WL 2056366 (S.D.N.Y.)
**(Cite as: Slip Copy)**

Dep. 33:11-34:6, 40:5-10, 41:11-23.) Kiniry explained:
At first I took [Simpson's complaints] as off the record friendly, but then [Meyers] was kind of like strike three, in my mind. Why is it ... this is the third person [Simpson's] working for that he finds or feels compelled to bring some issue, what he feels may be shortcomings to my attention.
... I would call it complaining.

(Kiniry Dep. 41:11-23.) "I questioned in my mind at that point whether the real issue was that Darryll had a problem with authority ." (Kiniry Dep. 40:8-10.) Simpson's complaints to Kiniry focused on Meyers's behavior; Simpson never complained that Meyers used racial epithets or raised concerns that Meyers's treatment of Simpson was racially motivated. (Kiniry Dep. 46:16-47:6.)

Simpson also asked Herrington to intervene. As with Fred Sterman, Simpson believed that Meyers was unfairly demanding that he handle Field Operations tasks, even though his primary obligation was capital projects, and therefore Simpson thought that Herrington could speak to Meyers, as she had done previously with Fred Sterman. (Simpson Dep. 132:9-23.) This time Herrington refused to get involved and told Simpson that he should do whatever Meyers told him to do. (*Id.*) Herrington explains:
At no time did Simpson ever tell me that he believed that Meyers or any of his other supervisors harrassed him or discriminated against him due to his race.... Thus, as far as I was concerned, the trouble between Simpson and Meyers was a basic conflict over the scope of Simpson's responsibilities and his willingness to follow Meyers' directives.

(Herrington Aff. ¶ 12.)

Upset at Herrington's response, Simpson went to Gregory Bradley. According to Simpson, Bradley did not take his complaint seriously, nor did he ask Simpson to write it up. (Simpson Dep. 142: 18-20, 146:7-9.) Instead, Bradley told Simpson that he was being "cantankerous" and told Simpson that he would speak with Herrington and sort it out. (Simpson 142:22-23, 146:7-16.) Again, Simpson's complaints never referred to race, but instead focused on the unfairness of both Meyers's and Herrington's actions. (Bradley Dep. 32:10-23, 34:4-25.)

*Simpson's Transfer to Harmon and Resulting Retaliation Claim*

Sometime in July 2002, not long after Simpson's conversation with Bradley, Sherry Herrington told Simpson that she was reassigning him to the position of Operations Manager/ Field Operations at Harmon station. (Herrington Dep. 103:18-105:25; Simpson Dep. 141:16-142:3.) While Simpson refers to this lateral transfer as a "demotion," there was no reduction in pay, benefits, or seniority.[FN9] (Simpson Dep. 169:6-10, 175:18-22.)

> FN9. Simpson claims that the new position was a demotion because it was less prestigious and the work was less interesting. Simpson also claims that the transfer was burdensome, and the longer commute from his home in the Bronx would make caring for his ailing mother more difficult. The latter reasons are surely personal and cannot be the basis for any legal redress.

**\*4** When Simpson inquired about why he was being transferred, Herrington explained that Simpson needed to work on his team-building skills and thought that the position at Harmon was more team-oriented. (Simpson Dep. 142:2-10; 144:2-6.) Herrington also told Simpson that he needed to learn not "to talk to Greg Bradley all the time."[FN10] (Simpson Dep. 142:8-10.) Herrington explained during her deposition:

> FN10. Simpson contends that this comment is direct evidence of race discrimination. Herrington argues, however, that Simpson is now taking the comment out of context. Herrington explained during her deposition:
> I had a conversation with [Simpson] explaining to [him] that he should feel comfortable to come to me if he has a problem, that I have an open door policy and I'm more than willing to resolve issues he has, that he does not have to go to [Bradley] because the process is that [Bradley] will got to [Kiniry] and [Kiniry] will come to me and I will be sitting across from [Simpson] discussing the issue any way so he should feel free to come on up and talk to me. (Herrington Dep. 98:14-24.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy, 2006 WL 2056366 (S.D.N.Y.)
**(Cite as: Slip Copy)**

This was a request for direct communication. It certainly was not a direction that Simpson not use the existing EEO procedures. Simpson never filed an EEO complaint, or sought to make use of any of the EEO procedures available at Metro North.

I felt that [Simpson] had problems with his communication and team building skills and I felt putting him in a less autonomous position, where he would have to work with other team members and communicate effectively with them, to be successful in his position would help improve his skills in that area.
(Herrington Dep. 105:12-21.) Herrington viewed the transfer as a lateral shift, not a demotion.

Simpson's transfer was not out of the ordinary. As part of the Metro North reorganization started in 2000, Herrington and Kiniry made many reassignments in the Operations Services Department. Herrington explained:
[A]fter the reorganization there was constant movement of positions where I was trying to put teams together that could work effectively together in terms of skills, personality types, management skills.
So many, many managers were moved. [Simpson] was involved in the move with two other individuals that I had other reasons for moving ... and Harmon became the position and I thought [Simpson] would be a good fit in Harmon.

(Herrington Dep. 104:20-105:7; Herrington Aff. ¶ 13.) Overall, at least twelve different managers and superintendents-of all races-were transferred to different district locations between 2001 and 2002. (Herrington Aff. ¶ 14.)

Simpson challenged Herrington about the transfer. When this did not work, he escalated his objections to Kiniry and Walker. (Simpson Dep. 144:15-19; Herrington Aff. ¶ 22.) In one memorandum to Kiniry, Simpson wrote: "Ms. Herrington's actions are bias, unwarranted, and retaliatory.... [T]he fact remains that I have been singled out and treated different than my counterparts." (Simpson Aff., Ex. B.) Despite his objections, Simpson was told that he had to transfer to Harmon.<u>FN11</u>

<u>FN11</u>. When Simpson was transferred to Harmon,

his position as Operations Manager/Capital Projects at Grand Central was filled by Trevor Forde, an African-American employee. (Herrington Dep. 123:2-14.)

Simpson was originally scheduled to start at Harmon on approximately September 3, 2002. (Simpson Dep. 175:2-14; Herrington Aff. ¶ 23.) He postponed his start date twice, and finally reported to Harmon on September 10, 2002. (Simpson Dep. 175:23-25, 186:3-5; Herrington Aff. ¶ 23.) Paul Hirsh, Assistant Director for Capital Projects at Harmon, gave Simpson a tour of the station and gave Simpson his telephone number in case is needed assistance during his first shift. (Simpson Dep. 176:3-18.) Simpson never attempted to call, but later complained that he was unable to properly perform at Harmon due to lack of adequate training. (Simpson Aff., Ex. C.)

After his first shift, Simpson wrote to Walker, complaining that Herrington "has not assigned anyone to guide [him] through Harmon's work process," in contrast to other reassigned employees, to whom other employees were assigned to ensure proper training. (Simpson Aff., Ex. C.) Simpson suggested that this disparate training was just another instances in a long history of disparate treatment. Again he did not refer to race. He wrote: "How else I'm supposed to understand or look at this situation other than as a bias and harassing action by Ms. Herrington.... [T]his is another example of the continuing bias and harassing actions towards me." (*Id.*)

**\*5** September 10, 2002 was Simpson's one and only work day at Harmon. For the next three days, he called in sick (Simpson Dep. 186:21-187:12; Simpson Aff., Ex. D.); but never identified a physical illness or provided a doctor's note. Instead, he said that he had "personal reasons" for failing to come to work. (Herrington Dep. 112:18-23; Simpson Dep. 195:12-13; Simpson Aff., Exs. D & E.) During this period, Herrington met with Walker, Bradley, and Shirley Joshua, Metro North's Director of Human Resources, to discuss Simpson's complaints about transferring to Harmon. On September 16, 2002, Bradley and Joshua met with Simpson and instructed him to tell them whether there was anything preventing him from going to work at Harmon. Simpson denied that any particular reason for not returning

Westlaw.

Slip Copy                                                                                      Page 6
Slip Copy, 2006 WL 2056366 (S.D.N.Y.)
**(Cite as: Slip Copy)**

to Harmon, though he complained that they did not train him there. Simpson did not mention harassment or discrimination at any time during the meeting.

After this meeting, Bradley took Simpson to another meeting with Walker and Herrington. Walker gave Simpson two options: either accept the position at Harmon or give up his management position and "exercise his rights" with the union. Simpson refused to work at Harmon, so Walker removed Simpson from his position and advised him to exercise his union rights. (Simpson Aff., Ex. E.) Simpson opted not to contact the union, thereby terminating his employment with Metro North. (*Id.*)

## DISCUSSION

### I. STANDARD ON MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate if "the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact ..." Fed.R.Civ.P. 56(c). An issue of fact is "material" when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).* An issue of fact is "genuine" when the evidence permits a reasonable jury to find in favor of the nonmoving party. *Id.*

The burden of demonstrating that no genuine issue of material fact exists falls on the party seeking summary judgment. *Powell v. Nat'l Bd. of Med. Exam'rs. 364 F.3d 79, 84 (2d Cir.2004)* (quoting *Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)).* If the moving party establishes the absence of a genuine issue of material fact, "a limited burden of production shifts to the nonmovant, who must ... come forward with 'specific facts showing that there is a genuine issue for trial.' " *Id.* (quoting *Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir.1993)).* If the nonmoving party fails to establish a genuine issue of material fact, summary judgment should be granted. *Id.*

In determining whether a genuine issue of material fact exists, the Court must examine all evidence in the light most favorable to the nonmoving party. *Anderson, 477 U.S. at*

255; *Make the Road by Walking, Inc. v. Turner, 378 F.3d 133, 142 (2d Cir.2004).* "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York, No. 03-257, 426 F.3d 549, 553 (2d Cir.2005).* Consequently, summary judgment on an issue of fact is not appropriate "if there is *any* evidence in the record that could reasonably support a jury's verdict for the nonmoving party." *Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 254 (2d Cir.2002)* (emphasis added).

**\*6** Despite the Court's obligation to review all evidence in favor of the nonmoving party, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Jeffreys, 426 F.3d at 554* (quoting *Anderson, 477 U.S. at 252).* Mere "[c]onclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." *Niagara Mohawk Power Corp. v. Jones Chemical, Inc., 315 F.3d 171, 175 (2d Cir.2003).* The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986),* he "must offer some *hard evidence* showing that [his] version of the events is not wholly fanciful." *D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir.1998)* (emphasis added). The Court must grant summary judgment for defendant where plaintiff's evidence is "merely colorable, conclusory, speculative, or not significantly probative." *Anderson, 477 U.S. at 249-50.* Plaintiff cannot create a disputed issue of fact by offering "conclusory allegations, conjecture, and speculation." *Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir.2003).* Instead, to survive summary judgment, Plaintiff's facts "must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions." *Contemporary Mission v. U.S. Postal Serv., 648 F.2d 97, 107 n. 14 (2d Cir.1981)* (internal citations and quotation marks omitted).

### II. PLAINTIFF'S CLAIMS OF DISCRIMINATION ON THE BASIS OF HIS RACE

The Court analyzes Simpson's discrimination claims under

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the three-part burden-shifting test set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973); *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir.1995). First, plaintiff must establish a *prima facie* case that he suffered from a discriminatory employment action on the basis of his race, "by either direct, statistical or circumstantial evidence." *Bickerstaff v. Vassar Coll.,* 196 F.3d 435 (2d Cir.1999); *McDonnell-Douglas,* 411 U.S. at 802. This burden is minimal. *Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 134 (2d Cir.2000). The burden then shifts to defendant to provide a legitimate, nondiscriminatory reason for its actions. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506 (1993); *McDonnell Douglas,* 411 U.S. at 802; *Dawson v. Bumble & Bumble,* 398 F.3d 211, 216 (2d Cir.2005).[FN12] If an employer articulates a nondiscriminatory reason for its conduct, the inference of discrimination raised by plaintiff's *prima facie* case "simply drops out of the picture," and the burden shifts back to plaintiff to prove that the employer's nondiscriminatory explanation is pretextual. *St. Mary's Honor Ctr.,* 509 U.S. at 507-08, 511.

> FN12. The defendant's burden of production also is not a demanding one; defendant need only offer such an explanation for the employment decision. Although the burden of production shifts to the defendant, the ultimate burden of persuasion remains always with plaintiff. *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 447 (2d Cir.1999).

**\*7** The *McDonnell Douglas* framework applies to both employment discrimination claims brought under Title VII and equal protection claims arising out of the same conduct brought under 42 U.S.C. § 1983. *See Demoret v. Zegarelli,* No. 05-1831, slip op. at 13 (2d Cir. June 8, 2006); *Feingold v. New York,* 366 F.3d 138, 159 & n. 20 (2d Cir.2004). "The elements of one are generally the same as the elements of the other and the two must stand or fall together ." *Feingold,* 366 F.3d at 159. Therefore, the Court will review both Plaintiff's discrimination claims under Title VII and his equal protection claims under § 1983 simultaneously.

### A. Plaintiff's Claim of Disparate Treatment with Respect to Pay

To establish a *prima facie* case of discrimination based on

disparate pay, a plaintiff must show: (1) that he was a member of protected class; (2) that he was paid less than similarly situated employees who are not members of the plaintiff's protected class; and (3) evidence of discriminatory animus. *See Belfi v. Prendergast,* 191 F.3d 129, 139-40 (2d Cir.1999); *Quarless v. Bronx-Lebanon Hosp. Ctr.,* 228 F.Supp.2d 377 (S.D.N.Y.2002).

Defendants concede that, as an African American, Simpson is a member of a protected class. They also concede that Simpson was paid less than Hirsh and Schilling, white employees who performed comparable duties at other stations. Plaintiff erroneously argues that his racial status and the pay discrepancy is sufficient to establish a *prima facie* case of disparate pay.

To make out a claims for disparate pay, a plaintiff must establish that the individuals with whom he attempts to compare himself are "similarly situated" in all material respects. *See DeJesus v. Starr Technical Risks Agency, Inc.,* No. 03 Civ. 1298, 2004 WL 2181403, at \*9 (S.D.N.Y. Sept. 27, 2004). "Employees are not 'similarly situated' merely because their [job responsibilities] might be analogized." *Quarless v. Bronx-Lebanon Hosp. Ctr.,* 228 F.Supp.2d 377, 383 (S.D.N.Y.2002). Instead, to be "similarly situated," employees must be substantially similar as to specific work duties, education, seniority, and performance history, all of which affect an employee's rate of pay. *See DeJesus,* 2004 WL 2181403, at \*9; *Quarless,* 228 F.Supp.2d at 383-84. Plaintiff does not have to be identical to the employees with whom he compares himself, but "a valid comparison between employees can only be made if they shared 'sufficient employment characteristics ... so that they could be considered similarly situated.' " *Quarless,* 228 F.Supp.2d at 383 (quoting *McGuinness v. Lincoln Hall,* 263 F.3d 49, 53 (2d Cir.2001)).

Here, Simpson's similarity with Hirsch and Schilling is that all three had comparable job responsibilities, but that is not sufficient. To be "similarly situated," however, Hirsch and Schilling would also have to be similar to Plaintiff with regard to such factors as seniority and performance history. Both Hirsch and Schilling have far greater seniority and higher titles than Simpson. Hirsh joined Metro North in the 1960s and was promoted to Lead Trainmaster in 1989. Shil-

Slip Copy                                                    Page 8
Slip Copy, 2006 WL 2056366 (S.D.N.Y.)
**(Cite as: Slip Copy)**

ling joined Metro North in 1971 and was promoted to Lead Trainmaster in 1989. By way of contrast, Simpson began his career with Metro North in 1988, and was not promoted to Trainmaster (at least one level below Lead Trainmaster) until ten years later in 1999. As part of the 2000 Reorganization, Lead Trainmasters were retitled Assistant Directors, while Trainmasters were retitled Operations Managers. Simpson was never "similarly situated" to Hirsh or Schilling; he was employed at Metro North for a far shorter period than both Hirsh (at least two decades) and Schilling (seventeen years) and never reached the same job title as they held. Thus, Plaintiff's disparate pay claim fails as a matter of law.

**\*8** Further, there is no proof of animus. In order to prevail on a claim of disparate pay in violation of Title VII, Plaintiff bears the burden of proving that defendant acted with an intent to discriminate against plaintiff on the basis of his protected status. *Belfi v. Prendergast,* 191 F.3d at 140. Thus, Plaintiff must provide some evidence from which a reasonable jury could find that the reason for this discrepancy in pay was plaintiff's race. Simpson provides no such evidence.

In fact, Defendants offer a legitimate, nondiscriminatory explanation for the discrepancy in pay. Each position at Metro North is assigned a grade level that determines the applicable salary range. (Herrington Aff. ¶ 5.) Employee salaries increase with seniority, cost of living increases, and promotions to positions at higher grade levels with corresponding higher salaries. (*Id.*) Under such a seniority/title driven system, one would expect that both Hirsch and Schilling, who served far longer and with higher titles than Simpson, would have higher salaries.

Given this legitimate, nondiscriminatory explanation for the disparity in pay between Plaintiff and his non-African-American colleagues, Plaintiff had the burden to establish that Herrington's explanation was pretextual. Plaintiff fails to provide any evidence from which a reasonable jury could find that Herrington's explanation is false, or that the disparity in pay between Plaintiff and his non-African-American colleagues was, even in part, motivated by race discrimination. Accordingly, the Court dismisses Plaintiff's claim for disparate treatment with respect to unequal pay as a matter of law.

### B. Hostile Work Environment

To establish a *prima facie* case of hostile work environment, plaintiff must demonstrate that: (1) his workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his work environment, and (2) a specific basis exists for imputing the conduct that created the hostile work environment to the employer. *Schwap v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (quoting *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 715 (2d Cir.1996) (internal quotation marks omitted)). "The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [his] employment were thereby altered." *Alfano v. Costello,* 294 F.3d 365, 373 (2d Cir.2002). The conduct alleged must be sufficiently severe and pervasive "to create an environment that 'would be perceived, and is perceived, as hostile or abusive.' " *Schwapp,* 118 F.3d at 110 (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 22 (1993)). "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.' Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness ." *Alfano,* 294 F.3d at 374 (internal citations omitted). The inquiry is fact specific and must be determined on a case-by-case basis. *Schwapp,* 118 F.3d at 110.

**\*9** Simpson does not allege that any of his supervisors used racial slurs or epithets or even referred to his race at any point during his employment; nor does Simpson allege that his supervisors subjected him to "discriminatory intimidation, ridicule, and insult ." Instead, Simpson merely alleges that his supervisors yelled at him unnecessarily, spoke to him in a disrespectful tone, and "micromanaged" his work. Even if the alleged incidents could be connected to Simpson's race (a conclusion wholly unsupported by the current record), these incidents were neither severe enough nor pervasive enough to alter the conditions of Simpson's employment, and therefore they are insufficient to support a claim for hostile work environment under existing case law.

This record is barren of any evidence from which a reasonable jury could find that the allegedly hostile incidents were connected to Simpson's race. In each case, a supervisor

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2006 WL 2056366 (S.D.N.Y.)
**(Cite as: Slip Copy)**

"yelled" or "talked down" to Simpson about the way he performed his work. Simpson does not allege that any of his supervisors made racially-suggestive comments, nor does he provide any evidence that the allegedly offending supervisors spoke to non-African-American employees differently. Instead, Plaintiff appears to suggest that the mere fact of the racial difference between him and his supervisors is sufficient to create a genuine issue of fact as to whether Plaintiff was criticized because of his race. This is an impermissible inference. Simply because (1) supervisors criticized Plaintiff's work, and (2) Plaintiff is African American, does not add up to the conclusion that (3) supervisors criticized Plaintiff because he is African American. "This is exactly the type of groundless speculation that summary judgment is designed to root out ." *Richardson v. Newburgh Enlarged City Sch. Dist., 984 F.Supp. 735, 744 (S.D.N.Y.1997).* Plaintiff must provide some evidence from which a reasonable jury could find that Defendants targeted Plaintiffs on account of his race. Such evidence is lacking in this case.

### C. Retaliation

Along with the disparate pay and hostile work environment claims, Plaintiff's complaint alleges that Defendants retaliated against him for lodging complaints of race discrimination. To make out a *prima facie* case of retaliation, plaintiff must establish three elements: (1) that he participated in a protected activity known to defendants; (2) defendants subjected plaintiff to an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action. *Cruz, 202 F.3d at 566; Tomka, 66 F.3d at 1308.*

Plaintiff alleges retaliation in two forms: (1) his transfer to Harmon Terminal in retaliation for complaints about race discrimination; and (2) his termination in September 2002 in retaliation for complaining that his transfer to Harmon Terminal was racially discriminatory. The Court will address these two claims separately because the proof supporting each of these claims is slightly different.

*1. Retaliatory transfer*

*(a) Plaintiff's prima facie case*

*10 The first element that Plaintiff must prove in order to establish a claim for retaliatory transfer is that Plaintiff participated in a protected activity that was known to Defendants. "The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz, 202 F.3d at 566* (citing *42 U.S.C. § 2000e-3*). As the Second Circuit explained in *Cruz*, "opposition to a Title VII violation need not rise to the level of a formal complaint in order to receive statutory protection," and may include " 'making complaints to management' " or reporting a Title VII violation to human resources personnel. *Id.* (quoting *Sumner v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir.1990)*).

Plaintiff alleges that he participated in the protected activity of complaining to supervisors about race discrimination in this workplace. Evidence submitted by both parties reveals that Plaintiff spoke with Gregory Bradley on a number of occasions about unfair treatment in the workplace, including complaining about unequal pay and about being treated poorly by Sterman and Meyers. Bradley is the Director of Workplace Diversity, which included monitoring compliance of equal employment opportunity ("EEO") laws. Bradley often spoke to Herrington or Kiniry about the things that Simpson said, so they had knowledge of Simpson's complaints. Simpson also complained to Herrington, Kiniry, and Walker about unequal pay and about inappropriate behavior by his supervisors, Schanoes, Sterman and Meyers.

There are two problems with Plaintiff's proof. First, while Simpson complained on a number of occasions to Bradley, the Director of Workplace Diversity, about unfair treatment, none of Plaintiff's complaints actually referred to race. Regardless, Plaintiff alleges that a reasonable jury could find that Plaintiff's complaints to Bradley were complaints about race discrimination simply because Bradley worked in the capacity of Director of Workplace Diversity, which included acted as an EEO compliance officer.

This inference is complicated, however, by the fact that Plaintiff and Bradley were more than work associates, they were friends. As Bradley explained during his deposition: "Darryll Simpson was an employee that I knew, I met at work, and he would often ask me his opinion-my opinion on various issues. And when Darryll spoke to me ... he was

Slip Copy                                                                                           Page 10
Slip Copy, 2006 WL 2056366 (S.D.N.Y.)
(Cite as: Slip Copy)

asking me as a friend." (Bradley Dep. 6:19-24.) Bradley further elaborated that while the two did not socialize regularly outside of work, Plaintiff came to speak with Bradley "about four times a week." (*Id.* 8:23-9:11.) Plaintiff would often discuss his personal problems with Bradley, such as how he got "a fellow Metro-North employee pregnant" and about "his mother being sick," and the two employees "talked about music a lot," since they were both music collectors. (*Id.* 7:24-8:18.) Thus, when Plaintiff complained to Bradley about unfair treatment in the workplace, there is no reason to believe that Plaintiff complained to Bradley in his capacity as an EEO compliance officer. Certainly, Simpson never filed an official complaint, and Bradley never thought Simpson was complaining about racial discrimination.

**\*11** In fact, Bradley believed that Simpson's complaints were raised "as a friend," not "as an employee" (*id.* 6:16-24). This understanding was furthered by the fact that Plaintiff's complaints to Bradley were done in an informal manner: Plaintiff did not submit his complaint in writing or follow the proper procedure for filing an EEO complaint, though he had utilized the procedure in the past and knew how to do so. (Bradley Dep. 21:18-23:19.) In many instances Plaintiff did not even approach Bradley in his office, instead voicing his dissatisfaction with supervisors during friendly discussions in the terminal. (*Id.*) Bradley stated:

If someone walks into the office and they have a complaint ... They will be asked to put their complaint in writing. [Someone then investigates.] [Simpson] never did that at all ....

[Simpson] has utilized workforce diversity before. So he knows, if he wanted to complain about something officially, he could do that. I believe that Darryll now is using the fact that we were friends to allege that he complained to me, and he knows that he did not complain.

(Bradley Dep. 22:4-17 and 23:13-19.) Thus, no reasonable jury could find, on the record provided, that Simpson complained about a protected activity, *i.e.,* race discrimination, just because he talked with Bradley.

Nor did Plaintiff's memos to Herrington, Kiniry, and Walker ever expressly refer to race. Simpson claimed that Meyers micromanaged his work, spoke to him in a demeaning tone, and yelled at him over insignificant things. Simpson's com-

plaint was that Meyers was being unfair, not that he was racially discriminatory. Further, Plaintiff's complaints about Meyers were similar in form and content to his earlier comments about Sterman, which Plaintiff admits were not race-related complaints. Thus, it was reasonable for Defendants to believe that Plaintiff's nearly identical complaints about Meyers were also unrelated to race. Plaintiff's conclusory allegations, after the fact, that Plaintiffs must have known that his complaint were race-based, even though these complaints never mentioned race and were substantially similar to the non-race-related complaints about a prior supervisor, are unconvincing. Thus, even when examining all the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff's evidence insufficient to establish a genuine issue of fact.

Plaintiff also fails to establish that his transfer amounted to an adverse employment action. While Plaintiff characterizes his transfer to Harmon as a demotion, he provides no evidence to support this characterization. Plaintiff's move from Grand Central Terminal to Harmon Terminal was nothing more than a lateral shift in position, which does not amount to an adverse employment action under the current law.

"An 'adverse employment action' is one which is 'more disruptive than a mere inconvenience or an alteration of job responsibilities." *Terry v. Ashcroft,* 336 F.3d 128, 138 (2d Cir.2003) (quoting *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000)). Examples of an adverse employment action include " 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation.' " *Id.* (quoting *Galabya,* 202 F.3d at 640). Plaintiff admits that his transfer from Grand Central Terminal to Harmon Terminal did not entail a reduction in pay, benefits or seniority; and Simpson retained his title as "Operations Manager."

**\*12** Regardless, Plaintiff contends that the transfer was a demotion, and therefore an adverse employment action, because the work at Harmon Terminal was less prestigious and less interesting than the work at Grand Central. But Plaintiff bare assertions that the work at Harmon Terminal was "less interesting," without any evidence that the transfer

Westlaw.

Slip Copy                                                                                           Page 11
Slip Copy, 2006 WL 2056366 (S.D.N.Y.)
(Cite as: Slip Copy)

resulted in "significantly diminished material responsibilities," cannot turn an otherwise legitimate transfer into an adverse employment action. Thus, the Court finds that Plaintiff fails to make out a *prima facie* case of retaliation based on his transfer to Harmon Terminal.

*(b) Defendants' legitimate, nondiscriminatory explanation*

Defendants proffer a legitimate, nondiscriminatory reason for transferring Plaintiff, namely, Plaintiff's inability to get along with his supervisors, which Plaintiff fails to rebut. Therefore, Plaintiff's claim of retaliatory transfer would fail even if Plaintiff made out a *prima facie* case.

Defendants decided to transfer Plaintiff after he complained about Gus Meyers, the third supervisor in two years with whom Plaintiff was having trouble. As Defendants explained, Plaintiff's problem with Meyers "was kind of like strike three," making Defendants realize that Plaintiff "had problems with his communication and team-building skills." (Kiniry Dep. 41:11-23; Herrington Dep.:12-21.) Defendants decided to place Plaintifff in a comparable position, "where he would have to work with other teams members and communicate effectively with them," hoping that such a transfer "would help improve [Plaintiff's] skills in that area." (Herrington Dep. 105:12-21.) Herrington believed the Operations Manager position at Croton Harmon was a good fit, and therefore decided to send Plaintiff there.

Defendants also explained that after the reorganization in 2000, "many managers were moved." (Herrington Dep. 104:20-105:7.) In fact, two other individuals were moved around the same time Plaintiff was transferred. (*Id.*) Thus, there was nothing suspicious or unique about Plaintiff's transfer; transferring Plaintiff to Harmon seemed like a good way to both solve Plaintiff's teambuilding and communication problems and meet the staffing needs arising out of the reorganization.

Metro North is charged with the responsibility of running a large, complex commuter rail system; and providing prompt, efficient and effective service to the riding public. All of its employees must cooperate in this venture. Title VII does not strip an employer of its right to transfer an employee to further a legitimate business purpose. Here, De-

fendants had a number of legitimate reasons for transferring Plaintiff: not only to run the railroad but also to remedy the strained working relationship between Plaintiff and his supervisor; to move Plaintiff to a position that Defendants believed was better suited to provide the teambuilding and communication skills that Plaintiff needed in order to become a more effective manager; and, to meet the staffing needs of Metro North's recent reorganization.

*13 It is not the Court's role to question the propriety of these reasons, even if Plaintiff is a member of a protected class. The courts have explained:
Federal courts "do not sit as a super-personnel department that reexamines an entity's business decision. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firms managers, [Title VII] will not interfere. Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior."

*Das v. Our Lady of Mercy Med. Ctr.*, No. 00 Civ. 2574, 2002 WL 826877, at *12 (S.D.N.Y. Apr. 30, 2002) (quoting *Elrod Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991)). Defendants' explanation is both legitimate and nondiscriminatory, and therefore Defendant has met its burden.

*(c) Pretext*

Plaintiff fails to provide proof sufficient to rebut Defendants' explanation. Once a defendant profers a legitimate, nondiscriminatory explanation for its actions, plaintiff must "point to evidence that reasonably supports a finding of prohibited discrimination" in order to withstand summary judgment. *Das v. Our Lady of Mercy Med. Ctr.*, No. 00 Civ. 2574, 2002 WL 826877 (S.D.N.Y. Apr. 30, 2002) (quoting *Ogbo v. New York State Dep't of Fin.*, No. 99 Civ 9387, 2001 Dist. LEXIS 12920, at *14 (S.D.N.Y. Aug. 24, 2001) (internal quotation marks omitted). "[T]he factual inquiry [at this stage] proceeds to a new level of specificity," *St. Mary's Honors Ctr.*, 509 U.S. at 51, and Plaintiff's "initially vague allegations of discrimination" must be "increasingly sharpened and focused." *Meiri*, 759 F.2d at 995.

Plaintiff points to only one piece of evidence to support his

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                    Page 12
Slip Copy, 2006 WL 2056366 (S.D.N.Y.)
**(Cite as: Slip Copy)**

argument that Defendants' explanations-Plaintiff's weak te-ambuilding and communication skills and the staffing needs of the Department-are pretextual: Plaintiff's satisfactory performance evaluation in April 2000, more than two full years prior to his transfer. But this evidence does nothing to rebut Defendants' explanation. Subsequent to the evaluation, Simpson's difficulties with his interacting with his superiors began to manifest themselves. Further, the reorganization of the Operations Division at Metro North commencing in 2000, (and on-going thereafter), changed the staffing needs of the organization, requiring employees to be transferred between terminals. Thus, the earlier evaluation to which Plaintiff refers does nothing to rebut Defendants' explanation for the transfer. On the facts of this case, the Court cannot find any evidence from which a reasonable jury could find that Defendants' presumptively valid reasons for transferring Plaintiff were pretextual, masking discrimination on the basis of race.

### 2. Retaliatory termination

#### (a) plaintiff's prima facie case

As to a *prima facie* case for retaliatory termination, Plaintiff aggressively protested his transfer to Harmon, and complained on multiple occasions about the transfer to the individual Defendants. There is no doubt that Defendants knew of Plaintiffs' activities. But similar to Plaintiff's complaints about supervisors prior to his transfer, Plaintiff's complaints about the transfer never referred to race, so the question here is whether Plaintiff's complaints can reasonably be viewed as complaints about race discrimination, and therefore a "protected activity" for purposes of Plaintiff's retaliation claim.

**\*14** In two separate e-mails to the individual Defendants, Plaintiff referred to the transfer as "bias," "harassing," and "retaliatory," and alleged that he was being "singled out and treated different from [his] counterparts." (Simpson Dep., Ex. B & C.) While Plaintiff never referred to his status as an African American or alleged that the "bias" he referred to was race discrimination, there is some evidence-however minimal-from which a reasonable jury could infer that Plaintiff complained about race discrimination, and therefore that Plaintiff engaged in a "protected activity" for pur-

poses of establish a *prima facie* case. Plaintiff also establishes that Defendants subjected him to an adverse employment action, as it is undisputed that termination of employment is an adverse employment action for purposes of a Title VII retaliation claim. See *Terry v. Ashcroft,* 336 F.3d at 138.

Finally, there is sufficient evidence from which a reasonable jury could find a causal connection between the Plaintiff's complaints and his termination. Initially, a plaintiff's burden to demonstrate a causal connection between the protected activity and the adverse employment action is de minimis. For purposes of establishing a *prima facie* case, a plaintiff ordinarily need demonstrate only that "the protected activity preceded the adverse action in order to satisfy the causation requirement," *Raniola v. Bratton,* 243 F.3d 610, 624 (2d Cir.2001), and short intervals of time between the protected activity and the adverse employment action may be used as "indirect evidence from which causation could be found." *Cifra v. Gen. Elec. Co.,* 252 F.3d 205, 217 (2d Cir.2001).

Plaintiff complained about the transfer repeatedly throughout July, August and September 2002. He sent a memorandum to Kiniry complaining of the transfer on August 22, 2002, and a similar memorandum to George Walker on September 10, 2002. Plaintiff was terminated on September 17, 2002. Thus, there is a clear temporal proximity between Plaintiff's complaints and his termination. This is sufficient to make out a *prima facie* case.

#### (b) Defendants legitimate nondiscriminatory explanation

Plaintiff's claim of retaliatory termination fails despite his *prima facie* case, as Defendants provide a legitimate nondiscriminatory reason for firing Plaintiff on September 17, 2002. After spending one day at Harmon Terminal on September 10, 2002, Plaintiff called in sick for three days in a row. When Herrington asked Plaintiff about his sickness, Plaintiff told her "he wasn't going to Harmon because two reasons ... he wasn't trained properly and second because personal reasons." (Herrington Dep. 112:18-23.) He did not cite any physical illness that would prevent him from returning to Harmon and never provided a doctor's note confirming that he was ill. (*Id.* 112:18-113:23, 115:23-116:5.) When asked if his "personal reasons" would prevent him from

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 13
Slip Copy, 2006 WL 2056366 (S.D.N.Y.)
**(Cite as: Slip Copy)**

coming to work, Plaintiff said "no." (*Id.* 116:5-7, 15-18.) Finally, Defendants gave Plaintiff the option to accept the position at Harmon and return to work, or exercise his rights with the union to find a non-management position. (*Id.* 145:14-24.) Plaintiff chose not to return to Harmon, so his position was terminated. (*Id.* 146:10-21; Simpson Aff., Ex. E.) Clearly, Defendants did not want to fire Simpson. Indeed, they asked him to return to work. He refused. Moreover, Simpson could have stayed on the job, and filed a complaint about his transfer, as both discriminatory and retaliatory. He rejected that plain and obvious option and refused to return to work. He even rejected his option of returning to his underlying union position. On this record, Simpson appears to be the architect of his own termination.

*(c) Pretext*

**\*15** Again, Plaintiff claims that Defendants' explanation is pretextual, and that Plaintiff's termination was really motivated by a desire to punish Plaintiff for complaining about race discrimination. To support his position, Plaintiff points to four facts: (1) Plaintiff specifically stated that he would return to Harmon when he recovered from his unidentified illness; (2) Plaintiff had already commenced work at Harmon at the time he was fired; (3) Plaintiff had relocated to live within Harmon's district; and (4) Plaintiff stated in writing the Defendants that he would continue to work hard for Metro North. (Pl.'s Mem. Law Opp'n Mot'n Summ. J. 21.) Despite Plaintiff's urgings to the contrary, however, these "facts" do not save Plaintiff's case from summary judgment.

Plaintiff must prove not only that Defendants' "presumptively valid reasons" for its conduct were pretextual, but must also prove that "a motivating reason was discrimination." *McDonnell Douglas*, 411 U.S. at 805; *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 447 (2d Cir.1999) (internal quotation marks and citations omitted). "The evidence as a whole must be sufficient to sustain an 'ultimate finding' of intentional discrimination." *Peterson*, 32 F.Supp.2d at 684 (citing *Fisher*, 114 F.3d 1338). Even if the Court believed that Plaintiff's evidence was sufficient to raise doubt about the truth of Defendant's explanation (and it does not), none of Plaintiff's evidence points to racial animus as the real reason for Defendants' conduct. Thus, no reasonable jury could find from Plaintiff's evidence that De-

fendant's explanation for its conduct was "in fact a coverup for a racially discriminatory decision." *St. Mary's Honor Ctr.* 509 U.S. at 518 (quoting *McDonnell Douglas*, 411 U.S. at 805). Accordingly, Plaintiff's claim of retaliatory transfer fails as a matter of law.

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is GRANTED. There are no genuine disputed issues of fact as to disparate treatment, hostile work environment or retaliation on the basis of race. Accordingly, Plaintiffs claims of discrimination in violation of Title VII and § 1983 are hereby DISMISSED with prejudice. The Clerk of the Court is directed to enter judgment and close out this case.

S.D.N.Y.,2006.
Simpson v. Metro-North Commuter R.R.
Slip Copy, 2006 WL 2056366 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1:04cv02565 (Docket) (Apr. 2, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

38

RECYCLED

**Westlaw.**

Not Reported in F.Supp.                                                      Page 1
Not Reported in F.Supp., 1997 WL 88894 (S.D.N.Y.), RICO Bus.Disp.Guide 9275
**(Cite as: Not Reported in F.Supp.)**

**H**
Briefs and Other Related Documents

United States District Court,S.D. New York.
SKYLON CORPORATION, Plaintiff,
v.
GUILFORD MILLS, INC. and George Greenberg, Defendants.
**No. 93 Civ. 5581 (LAP).**

March 3, 1997.

*MEMORANDUM & ORDER*

PRESKA, District Judge:
**\*1** This action arises out of Guilford Mills, Inc.'s ("Guilford") and George Greenberg's ("Greenberg") alleged conspiracy to fraudulently induce Skylon Corporation ("Skylon") to enter into a business arrangement with Northfield Creations and Designs Ltd. ("Northfield"). Plaintiff has moved to amend its complaint to include a claim under the Racketeering Influenced and Corrupt Organizations Act ("RICO"). Defendants oppose plaintiff's motion and cross-move to dismiss plaintiff's amended complaint in its entirety. For the reasons that follow plaintiff's motion to amend is granted and defendants' cross-motion to dismiss the amended complaint is granted in part.

*BACKGROUND*

A full recitation of the facts is contained in a prior decision concerning a release executed between Skylon and Guilford, *Skylon Corporation v. Guilford Mills, Inc.,* 864 F.Supp. 353 (S.D.N.Y.1994), and will not be repeated.

*DISCUSSION*

I. Plaintiff's Motion to Amend

Plaintiff seeks leave to amend its complaint to add a claim under the RICO Act. The Federal Rules of Civil Procedure permit a party to amend its pleadings by leave of the court. Fed.R.Civ.P. 15(a). Leave of the court "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a); *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). The decision whether to grant such a motion rests within the discretion of the district court. *Foman,* 371 U.S.

at 182. However, "outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely an abuse of that discretion." *Id.* Among the reasons that justify denying leave to amend are:
undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment....

*Id.; Evans v. Syracuse City Sch. Dist.,* 704 F.2d 44, 46 (2d Cir.1983); *S.S. Silberblatt, Inc. v. East Harlem Pilot Block Bldg. 1 Hous. Dev. Fund Co.,* 608 F.2d 28, 42 (2d Cir.1979); *State of New York v. Cedar Park Concrete Corp.,* 741 F.Supp. 494, 496 (S.D.N.Y.1990). Defendants oppose plaintiff's motion on the grounds of undue delay, prejudice and futility. In light of the record, I do not find that plaintiff's delay was unreasonable or that granting plaintiff leave to amend prejudices defendants. Rather than address the futility of each portion of plaintiff's proposed amended complaint, I grant plaintiff's motion to amend and address the amended complaint under the standard governing defendants' cross-motion to dismiss the amended complaint in its entirety, a standard substantially the same as the standard for futility under a motion to amend.

II. Defendants'-Cross Notion to Dismiss the Amended Complaint

Defendants move to dismiss plaintiff's amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim. Defendants argue that plaintiff's complaint is defective for several reasons. First, defendants assert that plaintiff's common law fraud claim must be dismissed for failure to plead the requisite particularity required under Rule 9(b) of the Federal Rules of Civil Procedure. With respect to plaintiff's RICO claim, defendants assert that because plaintiff has failed to plead its fraud claim according to Rule 9(b), plaintiff's RICO claim necessarily fails. Defendants also argue that plaintiff's failure to satisfy the "pattern" requirement necessary to state a RICO claim compels dismissal. Defendants further contend that plaintiff has failed to allege the predicate acts with particularity as required by Rule 9(b) of the Federal Rules of Civil

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp., 1997 WL 88894 (S.D.N.Y.), RICO Bus.Disp.Guide 9275
**(Cite as: Not Reported in F.Supp.)**

Procedure. In addition, defendants contend that plaintiff has failed properly to allege a RICO conspiracy. Finally, defendants argue that plaintiff's putative RICO claim is barred by the statute of limitations.

### A. Plaintiff's Common Law Fraud Claim

#### 1. *Pleading Circumstances of Fraud*

**\*2** In order to plead successfully its fraud claim, Skylon must specify the circumstances constituting fraud with particularity. Fed.R.Civ.P. 9(b). Where the alleged fraud is based on a material misrepresentation made verbally, the particularity standard requires plaintiff to (1) specify the allegedly fraudulent statement, (2) identify the speaker, (3) state when and where the statement was made, and (4) explain how the statement is fraudulent. *Glickman v. Alexander & Alexander Services, Inc.,* 1996 WL 88570 (S.D.N.Y. Feb.27, 1996) (citing *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 51 (2d Cir.1995) (citing *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993))).

In plaintiff's amended complaint, plaintiff identifies five material misrepresentations forming the basis of its common law fraud claim:
(1) McGarr, on behalf of the Conspirators, represented that Guilford would provide continuous financing to Northfield subsequent to Skylon's involvement.
(2) Greenberg represented that he intended to participate personally in the arrangement with Northfield upon his retirement from Guilford, which he represented would be in a few months, and that his initial investment in the arrangement would be at least $500,000, up to $1,000,000.
(3) Greenberg represented that he would obtain financing for the proposed arrangement between Northfield and Skylon from other sources.
(4) Greenberg represented that, in addition to Rosenthal, a Guilford employee was carefully monitoring Northfield and that Northfield's financial affairs were in order.
(5) Greenberg represented that there was no risk that Northfield could misappropriate funds paid by retailers for finished garments because all such funds were paid, and would continue to be paid, directly to Rosenthal.

(Amended Complaint ¶¶ 24-29). For each material misrep-

resentation, the complaint specifies the speaker and why the misrepresentation is fraudulent. The complaint fails to identify with any particularity, however, the statement made and when and where such statement was made. When the facts upon which plaintiff bases its fraud claim are peculiarly within the defendants' knowledge, a plaintiff may base its allegations on information and belief. *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990). Because plaintiff alleges misrepresentations made to Skylon, however, the date, place and content of the statement are not facts peculiarly within the knowledge of the defendants, but facts shared by both parties. Although plaintiff outlines a four-month window during which all of the misrepresentations occurred, this does not satisfy the pleading standard of Rule 9(b). Therefore, plaintiff has failed to allege with particularity the representations giving rise to plaintiff's common law fraud claim.

#### 2. *Pleading Fraudulent Intent*

In addition to specifying circumstances constituting fraud "with particularity," plaintiff must allege facts giving rise to a strong inference of fraudulent intent. *S.Q.K.F.C., Inc. v. Bell Atlantic Tricon Leasing Corp.,* 84 F.3d 629, 634 (2d Cir.1996) (citing *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994)). The scienter requirement, however, is not subject to the rigorous standard of Rule 9(b). Instead, Rule 9(b) allows plaintiff "to allege fraudulent intent generally." *Powers,* 57 F.3d at 184. Despite a more liberal pleading standard, plaintiff must still " 'provide some minimal factual basis for conclusory allegations of scienter that give rise to a strong inference' of fraudulent intent." *Id.* (citing *Polycast Technology Corp. v. Uniroyal, Inc.,* 728 F.Supp. 926, 935 (S.D.N.Y.1989) (citation omitted)).

**\*3** A plaintiff may satisfy the scienter requirement either by (1) alleging facts demonstrating that defendants had both the motive and a clear opportunity to commit the fraud, or (2) alleging facts constituting strong circumstantial evidence of conscious behavior or recklessness on behalf of defendants. *Id.; Powers v. British Vita, P.L.C.,* 57 F.3d 176, 184 (2d Cir.1995) (citations omitted). Plaintiffs have successfully alleged facts tending to show that defendants possessed the requisite motive and opportunity to commit fraud.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                              Page 3
Not Reported in F.Supp., 1997 WL 88894 (S.D.N.Y.), RICO Bus.Disp.Guide 9275
**(Cite as: Not Reported in F.Supp.)**

#### a. Motive

The Court of Appeals has defined the motive prong of the scienter requirement in the following terms:
Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.

_Glickman,_ 1996 WL 88570, *6 (quoting _Shields,_ 25 F.3d at 1130). In assessing the sufficiency of an allegation of motive, I "assume that the defendant is acting in his or her informed economic self-interest." _Id._ The Court of Appeals has cautioned against basing an allegation of motive, however, on an executive's desire to improve the financial health of a company, his or her desire to secure incentive compensation, or a desire for continued employment. _Id._ (citations omitted). The motive alleged in the instant case clearly falls outside of the scope of this cautionary warning. Plaintiff does not allege Greenberg's desire for the continued financial success of Guilford, but rather his desire to eschew the disastrous financial consequences of Northfield's fraudulent factoring scheme. To compensate for the losses sustained by Guilford because of Northfield's fraud and to guarantee Northfield's ability to compensate Guilford, plaintiff alleges, Greenberg ensured that Northfield would stay in business through Skylon's replacement of Guilford in the Guilford-Northfield factoring arrangement.

#### b. Opportunity

A "clear opportunity" to commit fraud implies that defendants are "well positioned to carry out the fraudulent transaction." _Powers,_ 57 F.3d at 185; _see also Shields,_ 25 F.3d at 1130 (stating that "[o]pportunity entails the means and likely prosect of achieving concrete benefits by the means alleged"). A defendant who possesses the "necessary trust and authority" to commit fraud is well positioned. _Id._ (citing _Turkish v. Kasenetz,_ 27 F.3d 23, 28 (2d Cir.1994)) (holding that, as fiduciaries of the plaintiff trust, defendants had a clear opportunity to commit fraud). In the instant case, it is hardly imaginable that anyone but Guilford and Greenberg were better positioned to carry out the fraudulent transaction. Having previously entered into a contractual relationship with Northfield, Guilford, through Greenberg, was in the best position to vouch for Northfield's financial security

and business integrity. Thus, because plaintiff has adequately alleged both motive and opportunity to commit fraud, plaintiff has successfully alleged fraudulent intent. Nevertheless, pleading fraudulent intent does not cure the deficiencies of factual allegations giving rise to plaintiff's fraud claim.

#### 3. _Leave to Replead_

**\*4** Repleading its fraud claim would yield plaintiff's third complaint. Plaintiff commenced this action in August of 1993. Plaintiff moved to amend its complaint in April of 1996. The facts alleged to sustain plaintiff's fraud claim are virtually identical to those in the original complaint. Although plaintiff contends that discovery has yet to occur and thus can plead with no more particularity than it already has, I disagree. Because the facts upon which plaintiff bases its fraud claim are not peculiarly within the knowledge of the defendants, discovery should have no effect on plaintiff's ability to plead the circumstances of fraud with particularity. However, because plaintiff has not been made aware either in conferences or in previous orders of the deficiency of its allegations, I will grant leave to replead its fraud claim in conformity with the requirements of Rule 9(b).

#### B. Plaintiff's RICO Claim

Plaintiff's Amended Complaint adds a cause of action under the RICO Act. Defendants move to dismiss plaintiff's RICO claim on the grounds that (1) plaintiff's failure to allege properly a common law fraud claim necessitates the dismissal of plaintiff's RICO claim; (2) plaintiff has failed to allege properly a pattern of racketeering activity; (3) plaintiff has failed to allege properly a conspiracy; and (4) plaintiff's RICO claim is time-barred under the appropriate statute of limitations.

#### 1. _Effect of Fraud Claim on Plaintiff's RICO Claim_

Because I have not dismissed plaintiff's common law fraud claim, I need not consider the effect of the failure of plaintiff's fraud claim on its RICO claim.

#### 2. _The RICO "Pattern" Requirement_

To state a claim for damages under RICO, plaintiff must allege that the defendants, through two or more predicate acts

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 4
Not Reported in F.Supp., 1997 WL 88894 (S.D.N.Y.), RICO Bus.Disp.Guide 9275
**(Cite as: Not Reported in F.Supp.)**

constituting a pattern of racketeering activity, directly or indirectly invest in, or maintain an interest in, or participate in an enterprise affecting interstate or foreign commerce. 18 U.S.C. § 1962; *H.J.Inc. v. Northwestern Bell Telephone,* 492 U.S. 229, 232, 109 S.Ct. 2893, 2897, 106 L.Ed.2d 195 (1989); *Moss v. Morgan Stanley, Inc.,* 719 F.2d 5, 17 (2d Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684. Defendants assert that plaintiff's claim fails to allege properly the pattern requirement necessary to sustain a RICO claim.

To satisfy the pattern requirement, plaintiff must allege two predicate acts that are related and must allege "that they amount to, or pose a threat of, continuing criminal activity." *GICC Capital Corp. v. Technology Finance Group, Inc.,* 67 F.3d 463, 465 (2d Cir.1995) (citing *H.J.,* 492 U.S. at 239, 109 S.Ct. at 2900 (1989)). Assuming plaintiff has alleged two related predicate acts, I must determine whether plaintiff has satisfied the continuity aspect of the pattern requirement. The "continuity" requirement reflects Congress' intention to target long-term criminal conduct in enacting RICO. *H.J.,* 492 U.S. at 242, 109 S.Ct. at 2902. The Supreme Court has identified two ways in which a RICO claim might properly allege continuity.

**\*5** A plaintiff may allege either closed-ended continuity or open-ended continuity. Closed-ended continuity consists of a closed-ended pattern of racketeering, *i.e.,* past criminal conduct "extending over a substantial period of time." *GICC,* 67 F.3d at 465. On the other hand, open-ended continuity refers to past criminal conduct coupled with a threat of future criminal conduct. Plaintiff attempts to assert closed-ended continuity to satisfy the pattern requirement of its RICO claim.

"[C]losed-ended continuity can only be shown through conduct occurring over a 'substantial period of time.' " *GICC,* 67 F.3d at 467 (citing *H.J. Inc.,* 492 U.S. at 242, 109 S.Ct. at 2902); *see Thai Airways International Ltd. v. United Aviation Leasing B.V.,* 891 F.Supp. 113, 119 (S.D.N.Y.1994). Rather than review the myriad cases [FN1] in which courts in this circuit have found that a claim fails to allege properly closed-ended continuity, I focus on the rare instances in which a claim has succeeded to allege closed-ended continuity. *See Metromedia v. Fugazy,* 983 F.2d 350 (2d

Cir.1992), *cert. denied,* 508 U.S. 952, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993) (finding erroneous jury instruction stating that a few weeks or months might constitute a "substantial period of time" but upholding verdict because predicate acts spanned period of at least two years); *Jacobson v. Cooper,* 882 F.2d 717 (2d Cir.1989) (predicate acts occurring from 1980 to 1988 satisfied closed-ended continuity requirement).

> FN1. *Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986 (S.D.N.Y.1995) (fourteen to fifteen month period insufficient to constitute substantial period of time); *Three Crown Ltd. Partnership v. Caxton Corp.,* 817 F.Supp. 1033, 1044 (S.D.N.Y.1993) (six-month scheme of racketeering "inadequate to establish closed-ended continuity"); *Azurite Corp. Ltd. v. Amster & Co.,* 730 F.Supp. 571, 581 (S.D.N.Y.1990) (seven months insufficient); *Continental Realty Corp. v. J.C. Penney Co., Inc.,* 729 F.Supp. 1452 (S.D.N.Y.1990) (period slightly in excess of one year insufficient); *Airlines Reporting Corporation v. Aero Voyagers, Inc.,* 721 F.Supp. 579 (S.D.N.Y.1989) (thirteen months insufficient); *see also Vemco, Inc. v. Camardella,* 23 F.3d 129 (6th Cir.1994), *cert. denied,* 513 U.S. 1017, 115 S.Ct. 579, 130 L.Ed.2d 495 (1994) (no threat of continuity where the alleged construction-contract fraud spanned seventeen months); *Vicom v. Harbridge,* 20 F.3d 771 (7th Cir.1994) (nine months insufficient).

In imposing a time requirement, Congress did not mean "to exclude from the reach of RICO multiple acts of racketeering simply because they achieve their objective quickly or because they further but a single scheme," *United States v. Indelicato,* 865 F.2d 1370, 1383 (2d Cir.) (en banc), *cert. denied,* 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989); however, a "plaintiff must provide some basis for a court to conclude that defendants' activities were 'neither isolated nor sporadic.' " *GICC,* 67 F.3d at 467 (quoting *Beauford v. Helmsley,* 865 F.2d 1386, 1391 (2d Cir.1989)). Thus, in determining whether a RICO pattern has been adequately alleged, courts must analyze each claim on a case-by-case basis.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                     Page 5
Not Reported in F.Supp., 1997 WL 88894 (S.D.N.Y.), RICO Bus.Disp.Guide 9275
**(Cite as: Not Reported in F.Supp.)**

To determine whether closed-ended continuity exists, therefore, courts have relied on a number of non-dispositive factors: (1) the length of time over which the alleged predicate acts took place; (2) the number of predicate acts; (3) the nature and variety of acts; (4) the number of participants; (4) the number of victims; and (5) the complexity of the scheme alleged. *GICC,* 67 F.3d at 467 (citations omitted). Analyzing the RICO pattern alleged in light of the factors listed above, I conclude that plaintiff has failed properly to allege a RICO pattern.

### (1) Length of Time

Plaintiff alleges that the scheme to defraud Skylon was initiated in August of 1988. (Plaintiff's Amended Complaint ("Am. Compl." ¶¶ 21-22)). At this time, Greenberg and his co-conspirators allegedly sought a company to take over Guilford's position in its factoring arrangement with Northfield. (*Id.* ¶ 22). Between August and December 1988 Greenberg and his co-conspirators allegedly made five different material misrepresentations to induce Skylon to contract with Northfield. (*Id.* ¶¶ 25-29). As a result of these misrepresentations, Skylon entered into an agreement with Northfield in the fall of 1988. (*Id.* ¶ 33). Thus, by the fall of 1988, the goal of Greenberg's alleged scheme was effectively accomplished. On December 3, 1988, Skylon entered into an agreement with Guilford, agreeing to indemnify Guilford pursuant to a written agreement. (*Id.* ¶ 38). Even considering this as one of the predicate acts necessary to effectuate the scheme to defraud, the scheme took no longer than four months to accomplish.

**\*6** Plaintiffs urge me to consider subsequent attempts by Guilford to conceal their knowledge of Northfield's fraudulent conduct as part of the purported scheme. I decline to consider their alleged "cover-up" as part of an on-going scheme, because the goal of the scheme, as alleged by plaintiff, was effectively accomplished by December of 1988. *See Barsam v. Pure Tech Int., Inc.,* 864 F.Supp. 1440, 1450 (stating that "efforts at covering up the initial fraudulent act are inadequate to satisfy the continuity requirement of the RICO statute") (citing *Midwest Grinding Co. v. Spitz,* 976 F.2d 1016, 1024 (7th Cir.1992)). In light of the fact that the predicate acts, as discussed *infra,* were not inherently unlawful, this span of time is clearly too short to be con-

sidered a "substantial period of time," as required to allege closed-ended continuity.

### (2) Number of Predicate Acts

Plaintiff alleges essentially a total of five predicate acts in the form of material misrepresentations made by Greenberg and his co-conspirators in addition to numerous instances of wire and mail fraud. Plaintiff attempts to expand both the number of acts and length of the scheme by alleging various omissions by Guilford. I decline to consider those acts committed after the goal of the purported scheme was effectively accomplished, in December of 1988.

### (3) Nature and Variety of Predicate Acts

The nature and variety of the predicate acts alleged is another non-dispositive factor a court may consider in determining whether a RICO claim satisfies the continuity requirement. Where the predicate acts committed in furtherance of the goal of the scheme are inherently unlawful, such as murder or obstruction of justice, a shorter period of time suffices to establish continuity, because the "threat of continuity [is] adequately established by the nature of the activity." *United States v. Aulicino,* 44 F.3d 1102, 1111 (2d Cir.1995). Conversely, where the predicate acts alleged are not inherently unlawful, courts will usually require a longer span of time to satisfy the continuity requirement. *Metromedia Co.,* 983 F.2d at 368-69; *Mathon,* 875 F.Supp. at 999-1000.

Plaintiff does not allege inherently unlawful acts, such as murder or obstruction of justice. Plaintiff alleges a number of predicate acts typical of a run-of-the-mill fraud. Plaintiff alleges, *inter alia,* verbal and written misrepresentations made over the telephone and in letters, constituting wire and mail fraud. None of these acts are inherently unlawful, but rather are typical of garden-variety fraud claims. *Barsam,* 864 F.Supp. at 1451.

### (4) Number of Participants

Plaintiff alleges that various employees of Guilford participated in the purported scheme. Plaintiff names the following Guilford employees: defendant George Greenberg, Paul McGarr, Douglas Knowlton, Charles Dameron, and William C.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 88894 (S.D.N.Y.), RICO Bus.Disp.Guide 9275
**(Cite as: Not Reported in F.Supp.)**

Ray. However, where plaintiff alleges acts committed by agents of a corporation, which acts are within the scope of their employment and in furtherance of the corporation's business, plaintiff cannot succeed in alleging multiple participants merely by naming the agents of the corporation instead of the corporation itself. See _R.C.M. Executive Gallery Corp. v. Rols Capital Co., 901 F.Supp. 630, 639-41 (S.D.N.Y.1995)._

### (5) Complexity of Scheme Alleged

**\*7** Courts have repeatedly dismissed RICO claims based on the limited nature of the scheme alleged. _Thai, 891 F.Supp. at 119; Barrett v. United States Banknote Corp., 806 F.Supp. 1094, 1100 (S.D.N.Y.1992)_ (dismissing RICO claim based on single act of fraud committed over several months); _Mead v. Schaub, 757 F.Supp. 319, 322 (S.D.N.Y.1991)_ (dismissing alleged five year fraud to further a single scheme); _Airlines Reporting Corp., 721 F.Supp. at 584_ (considering complexity of scheme in determining whether continuity established); _see also Vemco, 23 F.3d at 134-35_ (claim dismissed where fraud aimed at obtaining payment for "one paint system," and then "its scheme would be over"); _Vicom, 20 F.3d at 783_ (sales and lease scheme constituted "a clearly defined discrete, and finite" project that represented "no inherent threat of continuity misconduct"). Where plaintiff alleges a "complex, multifaceted conspiracy," a court may consider this fact in determining whether the complaint satisfies the continuity requirement. _GICC, 67 F.3d at 468-69_ (citing _Polycast Technology Corp. v. Uniroyal, Inc., 728 F.Supp. 926, 948 (S.D.N.Y.1989)_); however, where a RICO claim is based on acts "narrowly directed toward a single fraudulent end with a limited goal," the claim will usually fail. _Continental Realty Corp.; Barsam v. Pure Tech Int. Inc., 864 F.Supp. 1440, 1450 (S.D.N.Y.1994)_ (citation omitted) (insufficient threat of continuity where closed-ended continuity scheme alleges limited goal and single transaction). Because the scheme alleged by Skylon is extremely simple-to fraudulently induce Skylon into entering a business arrangement with Northfield, I conclude that the racketeering activities alleged in this case do not constitute the type of long-term criminal conduct Congress sought to prohibit through RICO.

### 3. _Alleging a Conspiracy Under RICO_

Defendants contend that plaintiff has failed to allege properly a RICO conspiracy under § 1962(d). Although defendants persuasively argue the insufficiency of the factual allegations pled to support the existence of an agreement, I also note that plaintiff's conspiracy allegation fails because of plaintiff's failure to plead adequately the existence of a RICO enterprise.

Under § 1962(c), the "enterprise" and the "persons" plaintiff alleges to have conspired must be separate and distinct. _See Discon, Inc. v. Nynex Corp., 93 F.3d 1055, 1063 (2d Cir.1996); Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256, 263 (2d Cir.1995); Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A., 30 F.3d 339, 344 (2d Cir.1994); R.C.M. Executive Gallery Corp. v. Rols Capital Co., 901 F.Supp. 630, 639 (S.D.N.Y.1995)_ (stating that a "corporate entity cannot be both the RICO person and the RICO enterprise under § 1962(c)"). Plaintiff may not circumvent the distinctness requirement by "alleging a RICO enterprise that 'consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant....' " _Discon, Inc., 93 F.3d at 1055;_ (quoting _Riverwoods, 30 F.3d at 344_ (citations omitted)). The Court of Appeals has offered the following explanation for the impossibility of an intracorporate conspiracy in the context of a RICO claim:

**\*8** Because a corporation can only function through its employees and agents, any act of the corporation can be viewed as an act of such an enterprise, and the enterprise is in reality no more than the defendant itself. Thus, where employees of a corporation associate together to commit a pattern of predicate acts in the course of their employment and on behalf of the corporation, the employees in association with the corporation do not form an enterprise distinct from the corporation.

_Riverwoods, 30 F.3d at 344_ (citations omitted); _accord Discon, Inc., 93 F.3d at 1064_ (noting that it is especially inappropriate to hold that a person and enterprise are distinct where "the individual defendants were acting on behalf of the enterprise-corporation"). The conspiracy allegation set forth in plaintiff's complaint does not establish that the alleged activities amount to anything more than the employ-

Westlaw.

Not Reported in F.Supp.                                                                                    Page 7
Not Reported in F.Supp., 1997 WL 88894 (S.D.N.Y.), RICO Bus.Disp.Guide 9275
**(Cite as: Not Reported in F.Supp.)**

ees of Guilford carrying out the business of the corporation through acts within the apparent scope of their authority as employees and agents of the corporation. Therefore, plaintiff has failed to allege properly a RICO conspiracy.

#### 4. *Effect of Statute of Limitations on RICO Claim*

Because plaintiff's allegations fail to meet the requirement of a RICO claim and because leave to replead plaintiff's RICO claim is denied, I need not address whether plaintiff's RICO claim is time barred.

### CONCLUSION

For the reasons set forth above, defendants' cross-motion to dismiss plaintiff's amended complaint is denied with respect to plaintiff's fraud claim and granted with respect to plaintiff's RICO claim. Furthermore, plaintiff is granted leave to replead its common law fraud claim with particularity, pursuant to Rule 9(b) of the Federal Rules of Civil Procedure, within thirty days of the date hereof.

S.D.N.Y.,1997.
Skylon Corp. v. Guilford Mills, Inc.
Not Reported in F.Supp., 1997 WL 88894 (S.D.N.Y.), RICO Bus.Disp.Guide 9275

Briefs and Other Related Documents (Back to top)

• 1:93cv05581 (Docket) (Aug. 10, 1993)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.