39

Westlaw.

Slip Copy
Slip Copy, 2006 WL 319300 (E.D.N.Y.)
(Cite as: Slip Copy)

Page 1

▷
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,E.D. New York.
Richard STEIN, Plaintiff,
v.
NEW YORK STAIR CUSHION COMPANY, INC., Frederick H. Stumpf, Sandra Stumpf, Nicole Stumpf, NSR Carpet Company, Inc., T.F.S. Company, Inc ., Wholesale Floors, Inc., Wholesale Floors Too, Ltd., Stumpf Family Limited Partnership and Frederick H. Stumpf and Sandra Stumpf Family Limited Partnership, Defendants.
No. 04-CV-4741DRHETB.

Feb. 10, 2006.

Dollinger, Gonski & Grossman, Carle Place, New York, By: Matthew Dollinger, for the Plaintiff.
Silverstein Perlstein & Acampora LLP, Jericho, New York, By: Robert J. Ansell, for the Defendants.

MEMORANDUM OF DECISION AND ORDER
HURLEY, District Judge:
*1 Plaintiff Richard Stein ("Plaintiff") filed the instant action alleging that defendants New York Stair Cushion Company, Inc. ("New York Stair"), Frederick H. Stumpf ("Frederick"), Sandra Stumpf ("Sandra"), Nicole Stumpf ("Nicole"), NSR Carpet Company, Inc. ("NSR"), T.F.S. Company, Inc. ("TFS"), Wholesale Floors, Inc. ("Wholesale"), Wholesale Floors Too, Ltd. ("Floors Too"), Stumpf Family Limited Partnership ("Stumpf LP"), and Frederick H. Stumpf and Sandra Stumpf Family Limited Partnership ("Stumpf LP2") (collectively, "Defendants") engaged in a civil RICO conspiracy involving fraudulent conveyances effectuated through the wires and mails to prevent Plaintiff from satisfying an outstanding state court judgment. Defendants have moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). For the reasons that follow, Defendants' motion is granted and this case is dismissed in its entirety.

BACKGROUND

Plaintiff is the owner of a judgment in the amount of $348,951.68, together with interest thereon to be computed at the rate of 9% per annum from December 21, 2000, against defendants New York Stair and Frederick. (Compl.¶ 1.) Plaintiff alleges that he has been unable to enforce his judgment because both New York Stair and Frederick have fraudulently transferred all of their assets to the other defendants. (Id. ¶ 46.)

More specifically, Plaintiff alleges that sometime in 1994, he sold all of the shares of stock in New York Stair to Frederick. (Id. ¶ 9.) In exchange, Frederick executed a promissory note by which he agreed to pay Plaintiff a total of $554,730.20. (Id. ¶¶ 10-11.) Pursuant to the terms of the note, Frederick was to make monthly payments of $6,000.00 to Plaintiff, (id. ¶ 12), and in fact did so until about May 2000. (Id. ¶ 13.)

After Frederick's default, Plaintiff initiated an action in the New York State Supreme Court, Nassau County against Frederick and New York Stair, (id. ¶ 16), and obtained judgment against both defendants on December 21, 2000. (Id. ¶¶ 1, 19.) To date, no part of the judgment has been paid. (Id. ¶ 20.) In this action, Plaintiff claims that after Frederick purchased the entire stock of New York Stair, he formed defendants NSR, TFS, and Wholesale, all having the same principal place of business as New York Stair. (Id. ¶ 21.) Similarly, on or about November 3, 2000, and within days of the Order by the Nassau County Supreme Court granting Plaintiff summary judgment in lieu of Complaint, Frederick allegedly formed Stumpf LP and Stumpf LP2, both having as their principal place of business Frederick's personal residence. (Id. ¶ 22.) Finally, on October 17, 2000, Frederick allegedly formed Floors Too, also having Frederick's personal residence as its principal place of business. (Id. ¶ 24.) Plaintiff claims that Frederick formed these six companies "with the unconditional and full knowledge, approval, consent and agreement of his wife, SANDRA and his daughter, NICOLE, [and] proceeded to use SANDRA and NICOLE as straw-persons and nominees to purportedly hold ownership of these entities in their names either jointly or separately or in the names of the numerous defendant business entities wh[en], in fact, FREDERICK is the true owner of" these companies. (Id. ¶ 25.) Subsequent to the formation of these companies, Frederick allegedly transferred his assets, including his shares of New York Stair, to these companies

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK   Document 180-10   Filed 08/11/2006   Page 3 of 16

Westlaw.

Slip Copy
Slip Copy, 2006 WL 319300 (E.D.N.Y.)
(Cite as: Slip Copy)

Page 2

without consideration. (*Id.* ¶¶ 32, 36.) He further allegedly commingled assets, (*id.* ¶ 35), and used these companies' funds and assets to pay off his own personal expenses. (*Id.* ¶ 37.)

**\*2** On or about August 5, 2002, Plaintiff filed a motion in the Nassau County Supreme Court requesting, inter alia, that a receiver be appointed to administer the assets of NSR, TFS, Wholesale, Floors Too, Stumpf LP, Stumpf LP2, Sandra and Nicole. (*Id.* ¶ 47.) The court denied Plaintiff's motion with leave to renew based upon Plaintiff's failure to establish that Frederick and/or New York Stair had any ownership interest in any of the subject entities. (*Id.* ¶ 49.) After further discovery proceedings, Plaintiff renewed his motion which was thereafter granted in part. As a result, on March 12, 2004, the Nassau County Supreme Court appointed a receiver as to the assets of New York Stair, NSR, Stumpf LP, and Stumpf LP2. (*Id.* ¶ 52.) Plaintiff alleges that the appointed receiver has been unable to seize any assets in satisfaction of Plaintiff's judgment as the Defendants have fraudulently secreted all of the assets of the two judgment debtors. (*Id.* ¶ 53.)

Plaintiff asserts four causes of action against all Defendants, to wit, violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq. ("RICO") and state law claims based upon fraudulent conveyances, conversion, and commercial bad faith. Defendants move to dismiss the Complaint in its entirety, arguing that Plaintiff has failed to adequately allege the elements of a RICO claim and that the Court should refrain from exercising jurisdiction over the remaining state-law claims. Plaintiff opposes the motion. Because the Court finds that Plaintiff has failed plead a RICO claim, and declines to exercise jurisdiction over Plaintiff's state-law claims, Defendants' motion is granted and the Complaint is dismissed in its entirety.

DISCUSSION

*I. Standard of Review*

The court may not dismiss a complaint under Rule 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *King v. Simpson,* 189 F.3d 284, 286 (2d Cir.1999); *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996). The Court must accept all factual allegations in the proposed complaint as true and draw all reasonable inferences in favor of the plaintiff. *King,* 189 F.3d at 287; *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997).

*II. Plaintiff's RICO Claim*

"RICO is a broadly worded statute that 'has as its purpose the elimination of the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce.' " *Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.,* 268 F.3d 103, 107 (2d Cir.2001) (quoting S.Rep. No. 91-617, at 76 (1969)). "To establish a RICO claim, a plaintiff must show: (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962." *DeFalco v. Bernas,* 244 F.3d 286, 305 (2d Cir.2001) (citations and internal quotation marks omitted). In this case, Plaintiff asserts claims pursuant to sections 1962(b), (c), and (d). Following the order of argument set forth in the parties' briefs, the Court begins with an analysis of subsection (c).

*A. Section 1962(c)*

**\*3** Section 1962(c) makes it unlawful
for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

18 U.S.C. § 1962(c). "To establish a violation of 18 U.S.C. § 1962(c) then, a plaintiff must show (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *DeFalco,* 244 F.2d at 306 (citations and internal quotation marks omitted). Here, Defendants move to dismiss the Complaint on the grounds that Plaintiff fails to adequately allege: (1) the existence of an enterprise, (2) the predicate acts of mail or wire fraud, (3) the existence of a pattern of racketeering activity, and (4) that Defendants' alleged conduct was the proximate cause of Plaintiff's injury. The Court will address each of Defendants' arguments in turn.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 319300 (E.D.N.Y.)
(Cite as: Slip Copy)

Page 3

*1. RICO Enterprise*

The RICO statute defines an "enterprise" as "includ[ing] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Supreme Court has explained that a RICO enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct," the existence of which is proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette,* 452 U.S. 576, 583 (1981); *see also First Capital,* 385 F.3d at 174 ("For an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes.") (citation and internal quotation marks omitted). The Second Circuit has further instructed that courts should look to the "hierarchy, organization, and activities" of an association-in-fact enterprise to determine whether its "members functioned as a unit." *Id.* (citations and internal quotation marks omitted). "In addition to individuals associated in fact, any legal entity may qualify as a RICO enterprise." *First Capital,* 385 F.3d at 173 (citing 18 U.S.C. §§ 1961(4), 1962(c)).

"The enterprise must be separate from the pattern of racketeering activity, and distinct from the person conducting the affairs of the enterprise." *Id.* at 73 (citing *Turkette,* 452 U.S. at 583); *see also DeFalco,* 244 F.3d at 307 ("Under section 1962(c), a defendant and the enterprise must be distinct."). This distinction between the elements of an enterprise and the elements of a pattern was recognized as fundamental by the Supreme Court in *Turkette:*
In order to secure a conviction under RICO, the Government must prove both the existence of an enterprise and the connected pattern of racketeering activity. The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The enterprise is not the pattern of racketeering activity; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the Government.

*4 452 U.S. at 583 (citation omitted).

In the instant case, Plaintiff alleges that Defendants constitute an association-in-fact enterprise, the purpose of which is "to accomplish the fraudulent transfer and continuing custodianship of FREDERICK's and [NEW YORK] STAIR's assets to shield those assets from the claims of Plaintiff." (Compl. ¶ 66; *see also* Pl.'s Mem. at 14.) Pursuant to *Turkette,* the fatal flaw in Plaintiff's allegations is that they fail to articulate an enterprise that exists as an association independent of the alleged pattern of racketeering activity. In this regard, Plaintiff does not allege that the association-in-fact enterprise has any purpose other than the execution of Frederick's scheme to conceal assets from Plaintiff.

In *First Capital,* the plaintiffs alleged an enterprise that existed for the purpose of concealing a defendant's assets from his creditors and the bankruptcy court. 385 F.3d at 174. The plaintiffs alleged predicate acts by the defendants that largely consisted of making false statements in connection with a bankruptcy proceeding and engaging in fraudulent transactions with each other aimed at preventing creditors from reaching the defendant's assets. *Id.* at 165-66. The Second Circuit found that the plaintiffs had not sufficiently alleged the existence of a RICO enterprise, noting that the complaint failed "to detail any *course* of fraudulent or illegal conduct separate and distinct from the alleged predicate racketeering acts themselves-a requirement in this Circuit." *Id.* at 174. The court further noted that the plaintiffs "failed to provide us with any solid information regarding the 'hierarchy, organization, and activities' of this alleged association-in-fact enterprise from which we could fairly conclude that its 'members functioned together as a unit.' " *Id.* (internal quotation marks and citations omitted).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK   Document 180-10   Filed 08/11/2006   Page 5 of 16

Westlaw.

Slip Copy
Slip Copy, 2006 WL 319300 (E.D.N.Y.)
(Cite as: Slip Copy)

Page 4

Similarly, in this case, Plaintiff alleges an enterprise whose purpose is to conceal assets from Plaintiff and the predicate acts involve alleged fraudulent conveyances aimed at accomplishing that goal. As in *First Capital,* Plaintiff fails to allege any fraudulent conduct by Defendants that is separate and distinct from the alleged act of racketeering-in essence, the enterprise alleged *is* the pattern of racketeering activity. Accordingly, because the Complaint fails to sufficiently allege the existence of an enterprise, Plaintiff's RICO claim fails.

2. Predicate Acts

(a) Mail and Wire Fraud

Section 1961(1) defines "racketeering activity" as certain criminal acts under state and federal law including mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343. *See* 18 U.S.C. § 1961(1)(B). The statute requires a plaintiff to plead at least two predicate acts of racketeering activity. *Id.* § 1961(5) "A complaint alleging mail and wire fraud must show (1) the existence of a scheme to defraud, (2) defendant's knowing and intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme." *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.,* 84 F.3d 629, 633 (2d Cir.1996) (citation omitted); *see also U.S. v. Zichettello,* 208 F.3d 72, 105 (2d Cir.2000) (wire fraud); *McLaughlin v. Anderson,* 962 F.2d 187, 190-91 (2d Cir.1992) (mail fraud).

*5 Here, Plaintiff alleges the predicate acts of mail and wire fraud. (*See* Compl. ¶¶ 63-64.) [FN1] Rule 9(b) states that in averments of fraud, "the circumstances constituting fraud ... shall be stated with particularity." Fed.R.Civ.P. 9(b). This provision applies to RICO claims for which fraud is the predicate illegal act. *See Moore v. PaineWebber, Inc.,* 189 F.3d 165, 172 (2d Cir.1999). Defendants challenge the sufficiency of the mail and wire fraud allegations on the ground that the Complaint fails to plead fraud with the required specificity. (Defs.' Mem. at 10.)

> FN1. The Court notes that a fraudulent conveyance does not constitute an act of racketeering. *See* 18 U.S.C. § 1961(1); *see also Appollon Waterproofing & Restoration, Inc. v. Bergassi,* No. 01 Civ. 8388,

2003 WL 1397394, at * (S.D.N.Y. Mar. 20, 2003) (stating that enumerated crimes under RICO statute do not include fraudulent conveyance and conversion).

In *Mills v. Polar Molecular Corp.,* 12 F.3d 1170 (2d Cir.1993), the Second Circuit stated that "allegations of predicate mail and wire fraud acts should state the contents of the communications, who was involved, where and when they took place, and explain why they were fraudulent." *Id.* at 1176. Contrary to Defendants' argument, however, *Mills* does not require that allegations of mail and wire fraud be pled with such specificity in all instances. Rather, in cases where the plaintiff claims that mail and wire fraud took place in furtherance of a larger scheme to defraud, the communications themselves need not have contained false or misleading information. *See, e.g., Breslin Realty Dev. Corp. v. Schackner,* 397 F.Supp.2d 390, 398 (E.D.N.Y.2005); *Jerome M. Sobel & Co. v. Fleck,* No. 03 Civ. 1041, 2003 WL 22839799, at *5 (S.D.N.Y. Dec. 1, 2003), *report and recommendation adopted,* 2004 WL 48877 (S.D.N.Y. Jan. 8, 2004). Instead, Rule 9(b) is satisfied so long as the alleged mailings and wire transfers "further an underlying scheme that itself has a fraudulent, deceptive purpose." *Jerome M. Sobel,* 2003 WL 22839799, at *5 (citing *Schmuck v. United States,* 489 U.S. 705, 715 (1989). Thus, even "innocent" mailings or wire transfers may constitute predicate acts so long as they are part of the execution of the scheme. *Id.* (citation omitted).

Here, the Complaint details several alleged fraudulent transfers accomplished through the wires and provides dates, content of the transfer, and the identity of the transferor and transferee. (*See* Compl. ¶¶ 32-38.) To the extent other examples of mail and/or wire fraud lack such specificity, dismissal is not required. To the contrary, the overall scheme to defraud has been described in detail and the Complaint clearly explains the relationship between the mailings and/or wire communications and the scheme to defraud. For example, the Complaint alleges that Defendants used the United States Postal Service (filing fraudulent tax returns) as well as the interstate wires (transferring cash and assets between Defendants) to execute portions of their fraudulent scheme to prevent Plaintiff from enforcing his judgment. As

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK   Document 180-10   Filed 08/11/2006   Page 6 of 16

Westlaw.

Slip Copy
Slip Copy, 2006 WL 319300 (E.D.N.Y.)
(Cite as: Slip Copy)

Page 5

noted above, under these circumstances, such allegations are sufficient. Accordingly, the Court finds that the Complaint satisfies Rule 9(b).

### (b) Attributing Acts to Each Defendant

*6 Defendants argue that the Complaint should be dismissed because it fails to specify the identity of the persons who allegedly committed the predicate acts. The Court disagrees. Although a complaint sounding in fraud should inform each defendant of the nature of his alleged participation, " 'it is not necessary to allege ... that the defendants have personally used the mails or wires; it is sufficient that a defendant "causes" the use of the mails or wires." ' *Breslin Realty,* 397 F.Supp.2d at 399 (quoting *Jerome M. Sobel,* 2003 WL 22839799, at *5). Thus, "it is not significant for purposes of the mail fraud statute that a third-party, rather than the defendant, wrote and sent the letter at issue, provid[ed] ... the defendants could reasonably have foreseen that the third-party would use the mail in the ordinary course of business as a result of defendants' act." *United States v. Bortnovsky,* 879 F.2d 30, 36 (2d Cir.1989).

Here, the Complaint alleges that each of the Defendants are directly connected to the scheme to defraud such that each defendant could have reasonably foreseen that the mail or wires would be used in the ordinary course of business as a result of their acts. Accordingly, to the extent Defendants seek dismissal on this ground, their motion is denied.

### 3. Pattern of Racketeering Activity

Defendants assert that Plaintiff has failed to allege a "pattern of racketeering activity." RICO defines a "pattern of racketeering activity" as requiring "at least two predicate acts of racketeering activity" committed within a ten-year period. 18 U.S.C. § 1961(5). "To establish a pattern, a plaintiff must also make a showing that the predicate acts of racketeering activity by a defendant are 'related, and that they amount to or pose a threat of continued criminal activity." ' *DeFalco,* 244 F.3d at 321 (quoting *H.J. Inc.,* 492 U.S. at 239 (1989)). The continuity can be either " 'close-ended continuity" ' or " 'open-ended continuity." ' *Id.* (quoting *H.J. Inc.,* 492 U.S. at 239).

Without specifying whether the Complaint alleges a close- or open-ended continuity, Plaintiff argues generally that the Complaint alleges a *"continuing* custodianship of Frederick's assets" by Defendants "who continue to disperse the secreted assets for Frederick's benefit, but always out of plaintiff's reach." (Pl.'s Mem. at 16; *see also* Compl. ¶ 65.) Defendants counter that Plaintiff fails to allege a pattern because the predicate acts alleged "result from [Plaintiff's] meritless and impermissible fragmentation of a single predicate act into multiple acts for the mere purpose of pursuing his RICO claim." (Defs.' Mem. at 11.) Thus, Defendants argue, even accepting Plaintiff's claim that the goal of Defendants' alleged scheme was to avoid payment of Plaintiff's judgment, the alleged predicate acts were "in furtherance of a single episode of alleged fraud involving one victim and relating to one basic transaction." (*Id.*)

### (a) Close-Ended Continuity

*7 "A closed-ended pattern of racketeering activity involves predicate acts 'extending over a substantial period of time." ' *First Capital,* 385 F.3d at 181 (quoting *GICC Capital Corp. v. Technology Fin. Group, Inc.,* 67 F.3d 463, 466 (2d Cir.1995)). While this Circuit has not found acts spanning less than two years to be a close-ended pattern, acts that occurred over a longer period of time do not necessarily form a pattern. *Id.* ("[W]hile two years may be the *minimum* duration necessary to find closed-ended continuity, the mere fact that predicate acts span two years is insufficient, without more, to support a finding of a closed-ended pattern."). "Although continuity is 'primarily a temporal concept, other factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists." ' *Id.* (quoting *DeFalco,* 244 F.3d at 321).

Although multiple schemes are not required, *see Schlaifer Nance & Co. v. Estate of Andy Warhol,* 119 F.3d 91, 98 (2d Cir.1997) ("Congress did not mean 'to exclude from the reach of RICO multiple acts of racketeering simply because ... they further but a single scheme' ") (quoting *United States v. Indelicato,* 865 F.2d 1370, 1383 (2d Cir.1989) (en banc)), the Second Circuit has cautioned that "courts must take care to ensure that the plaintiff is not artificially frag-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 7:04-cv-08223-KMK   Document 180-10   Filed 08/11/2006   Page 7 of 16

Westlaw.

Slip Copy
Slip Copy, 2006 WL 319300 (E.D.N.Y.)
(Cite as: Slip Copy)

Page 6

menting a singular act into multiple acts simply to invoke RICO." *Id.; see also* GICC, 67 F.3d at 467 ("That multiple schemes are not required in all circumstances does not mean that the number and nature of the schemes alleged by a plaintiff in a given case are entirely irrelevant. Rather, a plaintiff must provide some basis for a court to conclude that defendants' activities were neither isolated nor sporadic.")

In *Schlaifer Nance,* the plaintiff alleged that it was fraudulently induced into entering a licensing agreement with the defendant Estate of Andy Warhol by defendants' false representations that the Estate owned all the copyrights to all of Warhol's works of art, while in fact, many of Warhol's works had fallen into the public domain. *Id.* at 93. Plaintiff complained that the Estate committed a RICO violation by repeatedly defrauding plaintiff to maximize the value of the Estate. *Id.* at 96. The plaintiff alleged various acts that it claimed constituted a pattern of racketeering activity, including "fraudulently transferring [plaintiff's] rights under the Agreement to others," "accepting advance payments from sublicensees knowing [plaintiff] would not approve," "fabricating bases for the disapproval of the licensing of many products," "threatening to allege a known false claim of fraud against [plaintiff]," and "revising history through misrepresentation, deceit, and perjury, to cover up a pattern of racketeering activity." *Id.* at 96-97.

*8 In finding that plaintiff had failed to allege close-ended continuity, the court noted that there was only "one purportedly fraudulent act: the negotiation of the Agreement. The acts complained of ... are subparts of the singular act, and not a 'pattern' of separate acts with an underlying purpose." *Id.* at 98.

Here, Plaintiff has alleged several predicate acts, all involving Defendants' transfers of cash or assets to companies formed for that purpose, in furtherance of Defendants' alleged scheme to avoid payment of Plaintiff's judgment, spanning over at least four years. As noted above, however, that fact alone is not sufficient.

In *First National,* the Second Circuit was faced with similar allegations and held that the lower court properly dismissed the pleading. In that case, plaintiffs alleged that defendants' RICO violations and state-law fraudulent conveyance violations prevented plaintiffs from satisfying outstanding judgments. 385 F.3d at 165. Plaintiffs alleged various predicate acts, primarily bankruptcy and mail frauds. *Id.* Finding that plaintiffs had properly pled several predicate acts extending over two and one-half years with regard to one of the defendants, the court nonetheless found:

[W]e agree with the District Court that every factor other than duration cuts against a finding of closed-ended continuity in this case. At bottom, Plaintiffs have alleged that [defendant] engaged in a single scheme to defraud two creditors by quickly moving his assets to his relatives and then concealing the existence of those assets during his bankruptcy proceeding. But however egregious [defendant's] fraud on Plaintiffs may have been, they have failed to allege that he engaged in a pattern of racketeering activity. Accordingly, Count Five was properly dismissed as alleged against him.

*Id.*

Similarly, in this case, accepting all of Plaintiff's allegations as true, Plaintiff alleges a pattern involving a single scheme of narrow scope, including one victim [FN2] and a limited number of related participants. As in *Schlaifer Nance,* there is "one purportedly fraudulent act": the transferring of Frederick's and New York Stair's assets. Accordingly, the Court finds that the racketeering activity alleged here does not constitute the sort of "long-term criminal conduct" that Congress sought to target in RICO. *See* GICC Capital Corp., 67 F.3d at 469; *see also* FD Prop. Holding, Inc. v. U.S. Traffic Corp., 206 F.Supp.2d 362, 372 (E.D.N.Y.2002) ("Courts in the Second Circuit have generally held that where the conduct at issue involves a limited number of perpetrators and victims and a limited goal, the conduct is lacking in closed-ended continuity. This is the case even when the scheme's duration exceeds one year.") (collecting cases).

> FN2. *See* Jerome M. Sobel, 2003 WL 22839799, at *12 ("[M]any cases finding no closed-ended continuity have pointed to the existence of only one ... victim.") (collecting cases).

*(b) Open-Ended Continuity*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"To satisfy open-ended continuity, the plaintiff need not show that the predicates extended over a substantial period of time but must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *First Capital,* 385 F.3d at 180. In this Circuit, the "cases assessing whether a threat of continuity exists have looked first to the nature of the predicate acts alleged or to the nature of the enterprise at whose behest the predicate acts were performed." *GICC Capital Corp., 67 F.3d at 466* (collecting cases).

*9 Here, Plaintiff argues that because the purpose of the alleged RICO scheme is to "hide and shield the custodianship of Frederick's assets and cash, it is both reasonable and realistic to conclude that the continuing custodianship of Frederick's assets poses a distinct threat of repetitive illegal use of the mails and 'wire' indefinitely into the future." (Pl.'s Mem. at 16.) Defendants do not address this contention.

The nature of the predicate acts alleged weighs in favor of a finding of open-ended continuity as they suggest a threat of repetition continuing into the future. This is borne out by the receiver's alleged inability to seize any assets in satisfaction of Plaintiff's judgment. (Compl.¶ 53.) However, insofar as dates are provided in the Complaint, which itself is dated October 1, 2004, the last predicate act is alleged to have occurred on January 22, 2001. (Compl. ¶ 32(d).) This cuts against a finding of a current or future threat. *See First Capital,* 385 F.2d at 181 ("[N]o predicate acts have occurred since December 1999 [amended complaint filed in September 2001], which suggests that the scheme has wound to a close.").

In sum, the Court finds that whether there is open-ended continuity is a close call. Nonetheless, even assuming Plaintiff sufficiently alleged a threat of future criminal conduct, as noted *supra,* the pleading still fails. Accordingly, the Court need not and does not resolve this issue.

*4. Proximate Cause*

A RICO plaintiff "only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985).* This injury must be proximately caused by the predicate acts of the RICO violation. *See, e.g., Lerner v. Fleet Bank, N.A., 318 F.3d 113, 120 (2d Cir.2003).*

Here, Defendants assert that Plaintiff cannot meet this requirement because his injury arises solely out of the breach of contract claim that was adjudicated in state court and resulted in a judgment in Plaintiff's favor. (Defs.' Mem. at 12.) Defendants argue that the only injury alleged in this case is that Defendants' alleged conduct has obstructed Plaintiff's ability to collect upon this judgment. (*Id.*) Defendants cite no authority for this proposition. Because Defendants have not cited any controlling authority for their application, and because Plaintiff has also failed to address this specific issue, the Court declines to grant Defendants' motion on this point.

*III. Section 1962(b)*

Section 1962(b) provides as follows:
It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

"Under any prong of § 1962 a plaintiff in a civil RICO suit must establish a pattern of racketeering activity." *GICC, 67 F.3d at 465.* Here, the Court has already determined that Plaintiff has failed to plead a pattern of racketeering activity. Accordingly, Plaintiff's claim under subsection (b) is dismissed.

*IV. Section 1962(d)*

*10 The Complaint asserts a claim for RICO conspiracy under 18 U.S.C. § 1962(d). That section provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). A claim under section 1962(d) fails as a matter of law if the substantive claims based on the other subsections are defective. *See First Capital,* 385 F.3d at 182; *see also Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 244 (2d Cir.1999).* Accordingly, because Plaintiff fails to state a viable RICO claim, his con-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                      Page 8
Slip Copy, 2006 WL 319300 (E.D.N.Y.)
(Cite as: Slip Copy)

spiracy claim fails as well.

V. Plaintiff's Remaining Claims are Dismissed

Having found that the allegations in the Complaint do not support federal jurisdiction, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining claims. See 28 U.S.C. § 1367(c)(3). Accordingly, Plaintiff's state law claims are dismissed without prejudice.

*VI. Leave to Amend*

Plaintiff does not move for leave to amend. Instead, in his memorandum of law in opposition to the instant motion, Plaintiff cursorily states "should the Court deem the plaintiff's Complaint to be insufficiently particular in its pleading, plaintiff requests Court leave to amend the Complaint under F.R.C.P. [ ] 15(a) so as to correct any deficiency in pleading." (Pls.' Mem. at 6.) Assuming arguendo that Plaintiff's succinct statement could be deemed the equivalent of a motion to amend, it would nevertheless fail.

Rule 15(a) of the Federal Rules of Civil Procedure provides in pertinent part that leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). A motion to amend should be denied, however, "if there is an 'apparent or declared reason-such as undue delay, bad faith or dilatory motive ..., repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, [or] futility of amendment.' " *Dluhos v. Floating and Abandoned Vessel, Known as "New York", 162 F.3d 63, 69 (2d Cir.1998)* (quoting *Foman v. Davis, 371 U.S. 178, 182 (1962))*.

In determining whether proposed claims are futile, the Court is required to adopt the same analysis as that applied on a motion to dismiss pursuant to Rule 12(b)(6). *Aetna Cas. and Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 604 (2d Cir.2005)*. Here, Plaintiff has not provided the Court with, or suggested the existence of, any new facts which might support an amendment. See *Leung v. Law, 387 F.Supp.2d 105, 112-13 (E.D.N.Y.2005)* ("[T]he courts of this Circuit have frequently noted that alleged RICO violations must be reviewed with appreciation of the extreme sanctions it provides, so that actions traditionally brought in state courts do not gain access to treble damages and attorneys fees in federal court simply because they are cast in terms of RICO violations.") (citation and internal quotation marks omitted). Accordingly, to the extent Plaintiff moves for leave to amend, that request is denied. See *In re Tamoxifen Citrate Antitrust Litig., 429 F.3d 370, 404 (2d Cir.2005)* ( "It is within the court's discretion to deny leave to amend implicitly by not addressing the request when leave is requested informally in a brief filed in opposition to a motion to dismiss.... Furthermore, where amendment would be futile, denial of leave to amend is proper.") (citation omitted).

CONCLUSION

*11 For the foregoing reasons, Defendants' motion to dismiss the Complaint is GRANTED in its entirety. The Clerk of the Court is directed to close this case.

SO ORDERED

E.D.N.Y.,2006.
Stein v. New York Stair Cushion Co., Inc.
Slip Copy, 2006 WL 319300 (E.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 2004 WL 2992051 (Trial Pleading) Complaint and Jury Demand (Nov. 2, 2004)
• 2:04cv04741 (Docket) (Nov. 02, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

40

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1530637 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

C

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
STRAIGHT ARROW PRODUCTS
v.
CONVERSION CONCEPTS, INC.; MA, Inc.; Manufacturers Assortments; All These Brand Names, Inc., Individually and trading as All These Brand Names; and Howard Martin.
No. 01-221.

Dec. 3, 2001.

MEMORANDUM

WALDMAN, J.

*Introduction*

*1 This case arises out of a Sales Agreement and subsequent Notice of Cancellation & Mutual Release entered into by the parties.

Plaintiff is a New Jersey corporation with its principal place of business in Pennsylvania. It manufactures personal care products. Its primary products are a shampoo and a hair conditioner for use on horses and by humans sold under the name "Mane 'n Tail." Defendants are interrelated companies operated from a joint location in White Plains, New York and their owner-president. They are engaged in direct marketing of consumer products under the name of All These Brand Names ("ATBN").

Plaintiff has asserted claims for breach of contract, fraudulent misrepresentation, an accounting and other equitable relief related to defendants' alleged resale in a prohibited manner of products acquired from plaintiff under the Sales Agreement. Defendants have moved to dismiss plaintiff's action on the grounds that it is subject to a binding general release and covenant not to sue and otherwise fails to set forth cognizable claims.

*Legal Standard*

Dismissal for failure to state a claim is appropriate when it clearly appears that plaintiff can prove no set of facts in support of the claim which would entitle him to relief. *See Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Robb v. City of Philadelphia,* 733 F.2d 286, 290 (3d Cir.1984). Such a motion tests the legal sufficiency of a claim while accepting the veracity of the claimant's allegations. *See Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990); *Sturm v. Clark,* 835 F.2d 1009, 1011 (3d Cir.1987); *Winterberg v. CNA Ins. Co.,* 868 F.Supp. 713, 718 (E.D.Pa.1994), *aff'd,* 72 F.3d 318 (3d Cir.1995). A court may also consider any document appended to and referenced in the complaint on which plaintiff's claim is based. *See* Fed.R.Civ.P. 10(c); *In re Burlington Coat Factory Securities Litigation,* 114 F.3d 1426 (3d Cir.1997); *In re Westinghouse Securities Litigation,* 90 F.3d 696, 707 (3d Cir.1996).[FN1] A complaint may be dismissed when the facts alleged and the reasonable inferences therefrom are legally insufficient to support the relief sought. *See Pennsylvania ex rel. Zimmerman v. PepsiCo., Inc.,* 836 F.2d 173, 179 (3d Cir.1988).

FN1. The Sales Agreement and Notice of Cancellation & Mutual Release are appended to and referenced in plaintiff's complaint, and indeed plaintiff seeks a declaration that the Release is void and its claims are thus viable.

*Factual Background*

The pertinent facts as alleged by plaintiff are as follow.

Straight Arrow Products, Inc. ("SAPI") and All These Brand Names ("ATBN") entered into a Sales Agreement on July 28, 1999 whereby SAPI agreed to sell and ATBN agreed to purchase 300,000 units of Mane 'n Tail Shampoo and 300,000 units of Mane 'n Tail Conditioner. The products were sold to ATBN for less than 50% of the lowest wholesale price charged to retail stores.[FN2] The shampoo and conditioner were to be shipped to ATBN in twelve equal monthly shipments from August 16, 1999 through July 17, 2000.

FN2. The shampoo and conditioner were sold to ATBN for $1.44 per unit or $17.28 for a case of twelve units. SAPI's "customary national average retail price" of Mane 'n Tail is $83.88 per case.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2001 WL 1530637 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

ATBN was to sell these items for "consumer trial" as part of an assortment of household products manufactured by other companies. The Sales Agreement prohibited distribution outside of ATBN's sample and marketing program.

*2 In early 1999, SAPI suspected that another corporation with which SAPI had entered into a similar marketing agreement might be diverting products to parties other than the intended consumers in violation of the parties' sales agreement.[FN3] While involved in litigation with this corporation, SAPI "obtained information suggesting that ATBN might also be involved in similar improper diversion activities regarding Mane 'n Tail products."

> FN3. This agreement was with Selective Marketing, Inc. and was entered into on December 4, 1998.

In November 1999 SAPI's vice-president of sales, Edward Kline, sought assurances from the president of ATBN, Howard Martin, that ATBN was not involved in diversion. Mr. Martin assured Mr. Kline that ATBN was not engaged in any type of diversion. Mr. Martin also stated that nearly all units of the product in ATBN's possession had been distributed and that the remaining units were allocated to marketing programs directed to consumers.[FN4]

> FN4. Pursuant to the Sales Agreement, SAPI had shipped to ATBN 50,016 units each of Mane 'n Tail shampoo and conditioner.

On December 14, 1999 SAPI and ATBN executed a "Notice of Cancellation & Mutual Release" by which "all agreements between the parties" were terminated and all claims relating in any way to the now cancelled agreement were mutually released. The parties also expressly agreed not to sue on any claims arising out of the cancelled agreement.

At a time identified by plaintiff only as "more than six months later," SAPI found twenty bottles of Mane 'n Tail shampoo and nineteen bottles of conditioner previously sold to ATBN on retail drug store shelves.[FN5]

> FN5. SAPI identified these as units sold to ATBN from a manufacturer product code on the bottles.

*Discussion*

Plaintiff's breach of contract claim is predicated on ATBN's alleged sales of Mane 'n Tail to individuals outside of its marketing program. Plaintiff's fraud claim is based upon the alleged false assurances of Mr. Martin regarding ATBN's sales activities which SAPI states induced it to permit ATBN to continue distributing Mane 'n Tail. SAPI also alleges it would not have entered into the Release but for these misrepresentations.[FN6]

> FN6. Defendants conclude that Pennsylvania law governs these claims and plaintiff does not contest the issue. It appears that the Sales Agreement and Release were negotiated respectively in both New York and Pennsylvania, and the Sales Agreement was performed respectively in these states. The Sales Agreement contains a Pennsylvania forum selection provision. The court will apply Pennsylvania law.

Release is an affirmative defense. *See* Fed.R.Civ.P. 8(c). It is thus generally asserted by motion for judgment on the pleadings or summary judgment. As plaintiff, however, has incorporated the Release into the complaint and set forth allegations making its invalidity a *sine qua non* for its other claims, it is a matter properly addressed by the instant motion. The court has before it the terms of the pertinent documents and plaintiff's factual allegations, presumed to be true, as to why the Release is ineffective or void.

Plaintiff asserts that the Release should not bar the present suit because of a lack of identity between the parties who signed the Sales Agreement and those who signed the Release, a lack of consideration and inducement of the Release through fraud.

Plaintiff argues that because the liability clause of the Sales Agreement holds Conversion Concepts, Inc. liable for any monetary damages to SAPI if Mane 'n Tail were sold in an unauthorized way, Conversion Concepts is the true party to the contract. Plaintiff then argues that ATBN and MA, Inc. were the parties to the Release and Conversion Concepts thus was never released from any claims relating to the Sales Agreement.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1530637 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

If plaintiff really means what it argues, that "the Agreement was entered into between [SAPI] on the one hand and Conversion Concepts, Inc. trading as [ATBN] on the other," then plaintiff has no viable claim for breach of contract against the other defendants as they would not have been bound by the Agreement. Yet, they were specifically mentioned in the Release. All invoices regarding shipments of Mane 'n Tail show the products were sold to "All These Brand Names, Inc." and shipped to ATBN warehouses. The Sales Agreement itself is on letterhead with the insignia of ATBN and Conversion Concepts.

*3 Plaintiff does not explain why it would enter an agreement to cancel a contract with entities which were not parties to the contract. Plaintiff does not explain why if SAPI and Conversion Concepts were the only true parties to the Sales Agreement and the latter was not discharged and released under the terms of the Cancellation & Mutual Release, all performance ceased upon execution of that document. Plaintiff also does not explain why entities which were not parties to the Sales Agreement would be released from all obligations and claims relating to the Agreement while the entity which was a party would not be released. Plaintiff's argument in this regard defies reason. It is also inconsistent with its own pleadings. Plaintiff alleges in its complaint that it contracted with ATBN and that the other defendants are interrelated corporations "comprising ATBN" and doing business under the ATBN name, and the owner-president of those corporations who operates them from the same New York business address.

Plaintiff correctly notes that to apply a release to parties not specifically named, the terms of the release must clearly extend to them. See _Crestar Mortgage Corporation v. Shapiro, 937 F.Supp. 453, 456 (E.D.Pa.1996)_. The instant Release, however, clearly includes "each party and its subsidiaries, divisions and corporate affiliates and their respective directors, officers, employees, servants, agents" in the covenant not to initiate or maintain any legal action "relating to or in any way connected with" the cancelled agreement. Plaintiff does not cogently explain how Conversion Concepts trading as and in part "comprising" ATBN could be the one true party to the Sales Agreement but not covered by a discharge and release of ATBN. It also appears from the pleadings that Conversion Concepts is at least a corporate affiliate of ATBN, and plaintiff acknowledges that such affiliates are encompassed by the covenant not to sue.

An agreement must be construed as a whole and the various provisions read in context. See _Williams v. Metzler, 132 F.3d 937, 947 (3d Cir.1997); Tuthill v. Tuthill, 763 A.2d 417, 419 (Pa.Super.2000); Meeting House Lane, Ltd. v. Melso, 427 Pa.Super. 118, 628 A.2d 854, 857-58 (Pa.Super.1993), app. denied, 537 Pa. 633, 642 A.2d 486 (Pa.1994)_. In so doing, a court must adopt an interpretation which is "most reasonable" in view of the object of the agreement. _Wrenfield Homeowners Ass'n. v. DeYoung, 410 Pa.Super. 621, 600 A.2d 960, 963 (Pa.Super.1991)_. The release and covenant not to sue cannot logically be divorced. It defies reason to suggest that the parties would not intend to release from liability on claims an entity which could not sue or be sued on those claims.

Under Pennsylvania law, a contract must be supported by consideration on both sides. See _Peoples Mortgage Co. v. Federal Nat'l Mortgage Ass'n, 856 F.Supp. 910, 922 (E.D.Pa.1994)_. Consideration is sufficient when it confers some benefit upon the promisor or causes some detriment to the promisee. See _Eighth North-Val, Inc. v. William L. Parkinson, D.D.S., P.C., Pension Trust, 773 A.2d 1248, 1253 (Pa.Super.2001); Pyle v. Department of Pub. Welfare, 730 A.2d 1046, 1050 n. 5 (Pa.Commw.1999)_. Valid consideration includes any act, forbearance or return promise, bargained for and given in exchange for the original promise. See _Cardamone v. University of Pittsburgh, 253 Pa.Super. 65, 384 A.2d 1228, 1232 n. 6 (Pa.Super.1978)_.

*4 Plaintiff argues that the only consideration for the Release was payment of $144,046.08 ATBN already owed SAPI for the units of Mane 'n Tail which were shipped. It appears from the face of the Release, however, payment of that money is not the only consideration. The Release provides that it is executed "in consideration of" payment of the sum of $144,046.08 to plaintiff by ATBN *and* the release of commitments under the cancelled Agreement. The Release expressly provides that each party is discharged from all of their respective obligations, agreements and contracts. The mutual agreement to cancel the parties' respective obligations under the Sales Agreement was sufficient

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1530637 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Page 4

consideration for the Release. See Restatement 2d, Contracts § 283 ("[c]onsideration is provided by each party's discharge of the duties of the other").

The third paragraph of the Release reads:
"In consideration for this release agreement, each party ... hereby covenants and agrees that it will forever refrain from institut[ing], prosecuting, maintaining, or otherwise participating in any way in any suit, action or proceeding against the other party or its parent or subsidiary companies, their past and present officers, employees, servants, agents and their receptive heirs, successors, administrators, and assigns, concerning all present, past or future debts, obligations, endorsements, bonds, specialties, controversies, disputes, suits, actions, cause of action, trespasses, variances, judgments, extents, executions, damages, claims or demands, in law or in equity, which either party ever had, now has or hereafter can have, relating to or in any way connected with the agreements between the parties which are canceled by this instrument."

The parties' mutual releases also are valid consideration. See General Mills, Inc. v. Snavely, 203 Pa.Super. 162, 199 A.2d 540, 543 (Pa.Super.1964) (promise to forbear from prosecuting claim is sufficient consideration).

Plaintiff finally argues that the Release is void because it was fraudulently induced into signing it.[FN7] Plaintiff alleges it would not have signed the Release but for Mr. Martin's fraudulent misrepresention that ATBN had not engaged in diversion and that the few remaining units in its possession were allocated to direct marketing programs aimed at consumers.

> FN7. In a footnote in its brief, plaintiff suggests that the fraudulent misrepresentation may also constitute fraud in the execution because they "presented a false picture that no significant diversion could take place in the future since little inventory remained in ATBN's possession" and "caused the omission of any language concerning diversion by falsely presenting diversion as a moot issue." Plaintiff misperceives the distinction between fraud in the inducement and fraud in the execution. Fraud in the execution occurs when a party executes an the agreement because he was led to believe that the document being signed contained terms that were actually omitted therefrom. See 1726 Cherry Street Partnership v. Bell Atlantic Properties, Inc., 439 Pa.Super. 141, 653 A.2d 663, 666 (Pa.Super.1995). Plaintiff's claim is solely one of fraud in the inducement whereby "the party proffering evidence of additional prior representations does not contend that the parties agreed that the additional representations would be in the written agreement, but rather claims that the representations were fraudulently made and that but for them, he or she never would have entered into the agreement." Id.

Defendants assert that it is plain from plaintiff's amended complaint that evidence necessary to show the alleged fraud would be barred by the parol evidence rule.

*5 In Pennsylvania, the parol evidence rule bars evidence of a prior misrepresentation to establish fraud in the inducement of a fully integrated written agreement. See HCB Contractors v. Liberty Place Hotel Assocs., 539 Pa. 395, 652 A.2d 1278, 1279 (Pa.1995). This rule applies not only when the alleged misrepresentation contradicts or conflicts with a term of the contract, but also when it would add to, modify or vary the terms of the agreement. See Resolution Trust Corp. v. Urban Redevelopment Authority, 536 Pa. 219, 638 A.2d 972, 975 (Pa.1994); Lenzi v. Hahnemann Univ., 445 Pa.Super. 187, 664 A.2d 1375, 1379 (Pa.Super.1995); 1726 Cherry Street, 653 A.2d at 670; Iron Worker's S & L v. IWS, Inc., 424 Pa.Super. 255, 622 A.2d 367, 373 (Pa.Super.1993).

Although a formal integration clause clearly evinces an integrated understanding, such a clause is not necessary to show that an agreement represents the final and complete expression of the parties' agreement. See Mellon Bank Corp. v. First Union Real Estate, 951 F.2d 1399, 1406 n. 6 (3rd Cir.1991) ("[w]hile the effect of an integration clause is to make the parol evidence rule clearly applicable, it is not required"); Kehr Packages, Inc. v. Fidelity Bank, Nat. Ass'n, 710 A.2d 1169, 1174 (Pa.Super.1998) (finding contract fully integrated in absence of an integration clause). See also Sanderson v. H.I.G. P-XI Holding, Inc., 2001 WL

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1530637 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Page 5

238138, *5 (E.D.La. Mar.7, 2001) (finding release agreement fully integrated in absence of integration clause in case governed by Pennsylvania parol evidence rule).

A written contract is integrated if it represents a final and complete expression of the parties' agreement. *Kehr Packages, 710 A.2d at 1173*. No particular form is required for an integrated contract. *See* E. Allan Farnsworth, Contracts § 7.3 (2d ed.2000). In the absence of a formal integration clause, a court "must examine the text [of the agreement] to determine its completeness." *See Kehr Packages, 710 A.2d at 1173* (quoting *Henry v. First Federal Savings & Loan Assoc., 313 Pa.Super. 128, 459 A.2d 772, 776 (Pa.Super.1983)*).

A court must look at the writing and "if it appears to be a contract complete within itself 'couched in such terms as [to] import a complete legal obligation without any uncertainty as to the object or extent of the engagement, it is conclusively presumed that the whole engagement of the parties [was] reduced to writing.' " *Gianni v. R. Russell & Co., 281 Pa. 320, 126 A. 791, 792 (Pa.1924)* (citation omitted).

When the cause of action depends upon an alleged oral understanding concerning a subject dealt with in a written contract, it is presumed that the writing was intended to embody the entire understanding of the parties regarding that subject. *See Kehr Packages, 710 A.2d at 1174*. This is because when a party executes a written agreement in reliance upon an oral representation, it is only natural that he would insist that such representation be incorporated into the writing. *See Coram Healthcare Corp. v. Aetna U.S. Healthcare, Inc., 94 F.Supp.2d 589, 592 (E.D.Pa.1999); Kehr Packages, 710 A.2d at 1174* ("if the written agreement and the alleged oral agreement 'relate to the same subject-matter and are so interrelated that both would be executed at the same time, and in the same contract, the scope of the [oral] agreement must be taken to be covered by the writing' ") (quoting *Gianni, 126 A. at 792); 1724 Cherry Street, 653 A.2d at 670* ("[i]f the [plaintiffs] intended to rely on what they now contend to be a centrally important representation conveyed by [defendant], then the [plaintiffs] should have insisted that the representations be set forth in their integrated written agreement").

*6 The Cancellation & Mutual Release agreement appears to be a contract complete within itself and importing a complete expression of legal rights without any uncertainty as to the object or scope of the engagement. If, as plaintiff alleges, Mr. Martin's representations about diversion and disposition of remaining inventory were critical to its decision to execute a general release, it is only natural that plaintiff would insist on incorporating such representations or warranties in the written release agreement.[FN8]

FN8. The parties' provision that "[t]his Mutual Release and Covenant Not to Sue may not be altered or Modified in any respect by either party except in writing" also demonstrates their intent to embody all understandings between them regarding the subject matter in writing.

Plaintiff's claims are precluded by the broad general release and concomitant covenant not to sue.

As plaintiff's claims are precluded, the court will not address all of defendants' various contentions regarding plaintiff's failure otherwise to plead substantively cognizable claims. Defendant has forcefully argued that the fraud claim cannot be sustained in view of the economic loss doctrine and gist of the action rule, and that the consequential damages plaintiff seeks for breach of contract are precluded by the express terms of the Sales Agreement. The court notes at least one other deficiency.

Although characterizing it as a misrepresentation, plaintiff does not specifically aver that Mr. Martin's statement that ATBN was not diverting and that only a few units remained in inventory which had been allocated to direct marketing programs was knowingly false when made. Plaintiff acknowledges that it "assumes" from the later discovery of 39 bottles on retail shelves that "all of the bottles of Mane 'n Tail shipped by SAPI to ATBN were improperly diverted."

The supposedly diverted products were found more than six months after the Release was executed and defendants' obligations under the Sales Agreement were discharged. Plaintiff's breach of contract and fraud claims depend upon the assumed diversion of plaintiff's product prior to the execution of the Cancellation & Mutual Release. That a handful

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1530637 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 6

of units appeared on retail shelves about six months after Mr. Martin's statement and the cancellation of the contract does not give rise to a reasonable inference that defendants diverted tens of thousands of units in the intervening eleven months since the first shipment in August 1999. To the contrary, it is virtually inconceivable that substantially more units would not have been found in plaintiff's canvass of retail outlets if the assumed mass diversion had occurred.[FN9]

> FN9. In responding to other defense arguments, plaintiff acknowledges that it "saw no evidence of improperly diverted product on store shelves many months after the Release was signed" and that "[n]o diversion appeared to be taking place in the marketplace."

### CONCLUSION

*7 Consistent with the foregoing, plaintiff's motion will be granted. An appropriate order will be entered.

E.D.Pa.,2001.
Straight Arrow Products v. Conversion Concepts, Inc.
Not Reported in F.Supp.2d, 2001 WL 1530637 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:01CV00221 (Docket) (Jan. 16, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.