41

Westlaw.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,E.D. New York.
UNITED STATES
v.
Louis EPPOLITO and Stephen Caracappa.
**No. 05-CR-192.**

June 30, 2006.

**Background:** Following their conviction on charges of participating in a racketeering conspiracy, money laundering, and conspiracy to distribute and distribution of methamphetamine, defendants, two former New York City police detectives, moved for judgment of acquittal and for a new trial.

**Holdings:** The District Court, Weinstein, Senior District Judge, held that:

6(1) new trial was not warranted by government's alleged delay in disclosure of two letters sent by an imprisoned organized crime figure;

13(2) defendants were not denied effective assistance of counsel;

33(3) racketeering conspiracy ended, for purposes of the statute of limitations, when detectives retired from the police force and moved to Las Vegas; and

42(4) high potential for prejudicial spillover, following dismissal of racketeering conspiracy charges, warranted grant of new trial as to money laundering and narcotics offenses.

Motion granted in part and denied in part.

**[1] Criminal Law 110 ⚖️911**

110 Criminal Law
    110XXI Motions for New Trial
        110k911 k. Discretion of Court as to New Trial. Most Cited Cases
Criminal procedure rule governing new trial motions gives the trial court broad discretion to set aside a jury verdict and order a new trial to avert a perceived

miscarriage of justice. Fed.Rules Cr.Proc.Rule 33, 18 U.S.C.A.

**[2] Criminal Law 110 ⚖️905**

110 Criminal Law
    110XXI Motions for New Trial
        110k905 k. Nature and Scope of Remedy of New Trial in General. Most Cited Cases
District courts should use their discretion to grant a new trial sparingly, reserving new trials for instances in which letting a guilty verdict stand would be manifest injustice, meaning that there would be a real concern that an innocent person may have been convicted. Fed.Rules Cr.Proc.Rule 33, 18 U.S.C.A.

**[3] Criminal Law 110 ⚖️919(1)**

110 Criminal Law
    110XXI Motions for New Trial
        110k919 Misconduct of Counsel for Prosecution
            110k919(1) k. In General. Most Cited Cases
New trial is warranted when the defendant shows (1) government suppression of (2) evidence favorable to defendant, and (3) that the evidence is material. Fed.Rules Cr.Proc.Rule 33, 18 U.S.C.A.

**[4] Criminal Law 110 ⚖️919(1)**

110 Criminal Law
    110XXI Motions for New Trial
        110k919 Misconduct of Counsel for Prosecution
            110k919(1) k. In General. Most Cited Cases
There is no distinction between exculpatory evidence and impeachment evidence for purposes of a motion for new trial on basis of an alleged *Brady* violation; failure to disclose either may constitute a violation. Fed.Rules Cr.Proc.Rule 33, 18 U.S.C.A.

**[5] Criminal Law 110 ⚖️700(5)**

110 Criminal Law
    110XX Trial
        110XX(E) Arguments and Conduct of Counsel
            110k700 Rights and Duties of Prosecuting Attorney
                110k700(2) Disclosure or Suppression of Information
                    110k700(5) k. Time and Manner of

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

Disclosure. Most Cited Cases
Prosecutor must disclose material exculpatory and impeachment information no later than the point at which a reasonable probability will exist that the outcome would have been different if an earlier disclosure had been made.

**[6] Criminal Law 110 ☞919(1)**

110 Criminal Law
   110XXI Motions for New Trial
      110k919 Misconduct of Counsel for Prosecution
         110k919(1) k. In General. Most Cited Cases
New trial was not warranted, in prosecution of two former New York City police detectives for, inter alia, racketeering conspiracy, by government's alleged delay in disclosure of two letters sent by an imprisoned organized crime figure; first letter, reporting that a government witness knew nothing about the defendants, was consistent with the witness's testimony, and defendants were not harmed by three-day delay in disclosing second letter since it contained inadmissible hearsay and its author was already known to defense counsel. Fed.Rules Cr.Proc.Rule 33, 18 U.S.C.A.

**[7] Criminal Law 110 ☞919(1)**

110 Criminal Law
   110XXI Motions for New Trial
      110k919 Misconduct of Counsel for Prosecution
         110k919(1) k. In General. Most Cited Cases
No suppression of exculpatory evidence occurs, for purposes of a motion for new trial on basis of a *Brady* violation, where defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of the evidence. Fed.Rules Cr.Proc.Rule 33, 18 U.S.C.A.

**[8] Criminal Law 110 ☞920**

110 Criminal Law
   110XXI Motions for New Trial
      110k920 k. Incompetency or Neglect of Counsel for Defense. Most Cited Cases
A defendant will be granted a new trial upon a claim of ineffective assistance of counsel only where counsel's conduct (1) fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. U.S.C.A. Const.Amend. 6; Fed.Rules

Cr.Proc.Rule 33, 18 U.S.C.A.

**[9] Criminal Law 110 ☞956(1)**

110 Criminal Law
   110XXI Motions for New Trial
      110k948 Application for New Trial
         110k956 Affidavits and Other Proofs in General
            110k956(1) k. In General. Most Cited Cases
When evaluating counsel's performance for purposes of a motion for new trial based on alleged ineffectiveness of counsel, court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance- that is, defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. U.S.C.A. Const.Amend. 6; Fed.Rules Cr.Proc.Rule 33, 18 U.S.C.A.

**[10] Criminal Law 110 ☞641.13(6)**

110 Criminal Law
   110XX Trial
      110XX(B) Course and Conduct of Trial in General
         110k641 Counsel for Accused
            110k641.13 Adequacy of Representation
               110k641.13(2) Particular Cases and Problems
                  110k641.13(6) k. Evidence; Procurement, Presentation and Objections. Most Cited Cases
Duty to investigate requires defense counsel either to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary, but does not compel counsel to conduct a comprehensive investigation of every possible lead or defense, or to scour the globe on the off-chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste.

**[11] Witnesses 410 ☞88**

410 Witnesses
   410II Competency
      410II(B) Parties and Persons Interested in Event
         410k87 Defendants in Criminal Prosecutions

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)    Page 3
**(Cite as: --- F.Supp.2d ----)**

410k88 k. In General. Most Cited Cases
A defendant's right to testify in his own defense is personal and may not be waived by his attorney over the defendant's opposition.

**[12] Criminal Law 110 ☞641.13(6)**

110 Criminal Law
  110XX Trial
    110XX(B) Course and Conduct of Trial in General
      110k641 Counsel for Accused
        110k641.13 Adequacy of Representation
          110k641.13(2) Particular Cases and Problems
            110k641.13(6) k. Evidence; Procurement, Presentation and Objections. Most Cited Cases
Trial counsel's duty of effective assistance includes the responsibility to advise the defendant concerning the exercise of his constitutional right to testify in his own defense. U.S.C.A. Const.Amend. 6.

**[13] Criminal Law 110 ☞641.13(2.1)**

110 Criminal Law
  110XX Trial
    110XX(B) Course and Conduct of Trial in General
      110k641 Counsel for Accused
        110k641.13 Adequacy of Representation
          110k641.13(2) Particular Cases and Problems
            110k641.13(2.1) k. In General. Most Cited Cases

**Criminal Law 110 ☞641.13(6)**

110 Criminal Law
  110XX Trial
    110XX(B) Course and Conduct of Trial in General
      110k641 Counsel for Accused
        110k641.13 Adequacy of Representation
          110k641.13(2) Particular Cases and Problems
            110k641.13(6) k. Evidence; Procurement, Presentation and Objections. Most Cited Cases
Defendants, two New York City police detectives, were not denied effective assistance of counsel in their prosecution for, inter alia, a racketeering conspiracy; counsel obtained the assistance of excellent investigators and put a great deal of work

into analyzing information and deciding what to use, decisions not to call certain witnesses were wise strategic decisions, cross-examinations of government witnesses were conducted with energy and skill, and argument concerning the statute of limitations issue was presented at length and in detail. U.S.C.A. Const.Amend. 6.

**[14] Criminal Law 110 ☞641.13(6)**

110 Criminal Law
  110XX Trial
    110XX(B) Course and Conduct of Trial in General
      110k641 Counsel for Accused
        110k641.13 Adequacy of Representation
          110k641.13(2) Particular Cases and Problems
            110k641.13(6) k. Evidence; Procurement, Presentation and Objections. Most Cited Cases
Defendant, a New York City police detective, was not deprived of his right to testify in his own defense, in prosecution for, inter alia, a racketeering conspiracy, by any ineffectiveness of counsel; defendant was not credible in his testimony that he was not aware of his right to testify and that his counsel refused to allow him to do so, and in any case defendant was not prejudiced by his failure to testify. U.S.C.A. Const.Amend. 6.

**[15] Witnesses 410 ☞286(2)**

410 Witnesses
  410III Examination
    410III(C) Re-Examination
      410k285 Redirect Examination
        410k286 Scope and Extent
          410k286(2) k. Discretion of Court. Most Cited Cases
The scope of redirect examination is a matter entrusted to a trial judge's broad discretion.

**[16] Witnesses 410 ☞287(1)**

410 Witnesses
  410III Examination
    410III(C) Re-Examination
      410k285 Redirect Examination
        410k287 Explanation of Testimony on Cross-Examination
          410k287(1) k. In General. Most Cited Cases
Redirect examination, including otherwise

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

inadmissible testimony, may be used to rebut false impressions arising from cross-examination; trial judge is in the best position to determine whether a false impression requiring a particular line of redirect examination was created.

**[17] Criminal Law 110 ⟷918(2)**

110 Criminal Law
    110XXI Motions for New Trial
        110k918 Errors and Irregularities in Conduct of Trial
            110k918(2)  k.  Irregularities Affecting Witnesses. Most Cited Cases
Government's redirect examination of witness, in prosecution for, inter alia, drug distribution, which asked the witness if he had ever had conversations with the defendants about drug quality and price, was not misleading and did not merit grant of new trial; questions on redirect were necessary to correct false impression, created on cross-examination, that defendants were generally unknowledgeable about drugs and drug dealing. Fed.Rules Cr.Proc.Rule 33, 18 U.S.C.A.

**[18] Witnesses 410 ⟷291**

410 Witnesses
    410III Examination
        410III(C) Re-Examination
            410k291  k.  Recross-Examination.  Most Cited Cases
District court had discretion, in prosecution for, inter alia, drug distribution, to agree with defense counsel that it would be wise, on re-cross-examination of a government witness, to avoid opening the door to testimony about defendants' prior involvement with drugs.

**[19] Criminal Law 110 ⟷661**

110 Criminal Law
    110XX Trial
        110XX(C) Reception of Evidence
            110k661  k. Necessity and Scope of Proof. Most Cited Cases
District court has discretion to manage trials so that evidence is effectively presented. Fed.Rules Evid.Rule 611(a), 28 U.S.C.A.

**[20] Criminal Law 110 ⟷661**

110 Criminal Law
    110XX Trial

        110XX(C) Reception of Evidence
            110k661  k. Necessity and Scope of Proof. Most Cited Cases
The trial-management authority entrusted to district courts includes the discretion to place reasonable limits on the presentation of evidence. Fed.Rules Evid.Rule 611(a), 28 U.S.C.A.

**[21] Criminal Law 110 ⟷753.2(6)**

110 Criminal Law
    110XX Trial
        110XX(F) Province of Court and Jury in General
            110k753 Direction of Verdict
                110k753.2 Of Acquittal
                    110k753.2(3)  Insufficiency of Evidence
                        110k753.2(6)  k.  Suspicion or Conjecture; Reasonable Doubt. Most Cited Cases
When evaluating a motion for a judgment of acquittal, court must determine whether a rational jury could conclude beyond a reasonable doubt that a defendant is guilty of the crime charged; conviction must stand if any rational trier of fact could have found the essential elements of the crime established beyond a reasonable doubt. Fed.Rules Cr.Proc.Rule 29, 18 U.S.C.A.

**[22] Criminal Law 110 ⟷753.2(8)**

110 Criminal Law
    110XX Trial
        110XX(F) Province of Court and Jury in General
            110k753 Direction of Verdict
                110k753.2 Of Acquittal
                    110k753.2(8)  k.  Hearing and Determination. Most Cited Cases
When evaluating the evidence against a particular defendant, a motion for judgment of acquittal must be viewed in a light that is most favorable to the government, and all reasonable inferences must be resolved in favor of the government. Fed.Rules Cr.Proc.Rule 29, 18 U.S.C.A.

**[23] Criminal Law 110 ⟷1024(5)**

110 Criminal Law
    110XXIV Review
        110XXIV(D) Right of Review
            110k1024 Right of Prosecution to Review
                110k1024(5)  k.  Verdict or Judgment of Acquittal. Most Cited Cases

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

Under the double jeopardy clause, the government may appeal the granting of a motion for judgment of acquittal only if there would be no necessity for another trial. U.S.C.A. Const.Amend. 5; Fed.Rules Cr.Proc.Rule 29, 18 U.S.C.A.

**[24] Criminal Law 110 ☞1024(5)**

110 Criminal Law
 110XXIV Review
  110XXIV(D) Right of Review
   110k1024 Right of Prosecution to Review
    110k1024(5) k. Verdict or Judgment of Acquittal. Most Cited Cases
Government's right to appeal from an adverse decision on a motion for judgment of acquittal is only preserved where the ruling is reserved until after the verdict. Fed.Rules Cr.Proc.Rule 29, 18 U.S.C.A.

**[25] Criminal Law 110 ☞149**

110 Criminal Law
 110X Limitation of Prosecutions
  110k148 Commencement of Period of Limitation
   110k149 k. Commission of Offense in General. Most Cited Cases
Limitations period begins to run from the point at which the crime is complete.

**[26] Criminal Law 110 ☞150**

110 Criminal Law
 110X Limitation of Prosecutions
  110k148 Commencement of Period of Limitation
   110k150 k. Continuing Offenses. Most Cited Cases
A Racketeer Influenced and Corrupt Organizations Act (RICO) conspiracy offense is complete, commencing the running of the statute of limitations, when the purposes of the conspiracy have been accomplished or abandoned. 18 U.S.C.A. § 1962(d).

**[27] Conspiracy 91 ☞27**

91 Conspiracy
 91II Criminal Responsibility
  91II(A) Offenses
   91k23 Nature and Elements of Criminal Conspiracy in General
    91k27 k. Overt Act. Most Cited Cases

**Criminal Law 110 ☞150**

110 Criminal Law
 110X Limitation of Prosecutions
  110k148 Commencement of Period of Limitation
   110k150 k. Continuing Offenses. Most Cited Cases
For purposes of determination of whether the statute of limitations has run in a Racketeer Influenced and Corrupt Organizations Act (RICO) conspiracy offense, there is no requirement that an overt act be performed within the limitations period; proof of a racketeering conspiracy does not require proof of an overt act in furtherance of the conspiracy. 18 U.S.C.A. § 1962(d).

For purposes of determination of whether the statute of limitations has run in a Racketeer Influenced and Corrupt Organizations Act (RICO) conspiracy offense, there is no requirement that an overt act be performed within the limitations period; proof of a racketeering conspiracy does not require proof of an overt act in furtherance of the conspiracy. 18 U.S.C.A. § 1962(d).

**[28] Racketeer Influenced and Corrupt Organizations 319H ☞35**

319H Racketeer Influenced and Corrupt Organizations
 319HI Federal Regulation
  319HI(A) In General
   319Hk33 Enterprise
    319Hk35 k. What Constitutes Enterprise in General. Most Cited Cases

**Racketeer Influenced and Corrupt Organizations 319H ☞36**

319H Racketeer Influenced and Corrupt Organizations
 319HI Federal Regulation
  319HI(A) In General
   319Hk33 Enterprise
    319Hk36 k. Informal Entities; Associations-In-Fact. Most Cited Cases
The existence of an enterprise, as required in a prosecution under Racketeer Influenced and Corrupt Organizations Act (RICO), is proven by evidence of an ongoing organization, formal or informal, and by evidence that various associates function as a continuing unit; the enterprise proven need not have any particular structure, and an association-in-fact enterprise may change its membership during the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

course of its activity. 18 U.S.C.A. § 1961(4).

**[29]** **Racketeer Influenced and Corrupt Organizations 319H** 28

319H    Racketeer    Influenced    and    Corrupt Organizations
    319HI Federal Regulation
       319HI(A) In General
          319Hk24 Pattern of Activity
             319Hk28 k. Continuity or Relatedness; Ongoing Activity. Most Cited Cases
To prove pattern of Racketeer Influenced and Corrupt Organizations Act (RICO) activity, a plaintiff or prosecutor must show that racketeering predicates are related and that they amount to or pose threat of continued criminal activity.

**[30]** **Racketeer Influenced and Corrupt Organizations 319H** 28

319H    Racketeer    Influenced    and    Corrupt Organizations
    319HI Federal Regulation
       319HI(A) In General
          319Hk24 Pattern of Activity
             319Hk28 k. Continuity or Relatedness; Ongoing Activity. Most Cited Cases
Criminal conduct does not form a pattern of Racketeer Influenced and Corrupt Organizations Act (RICO) activity until it embraces acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated acts; the individual predicate acts proved need not be directly related, but must at the very least be related to the enterprise in a way that makes them indirectly connected to each other.

**[31]** **Racketeer Influenced and Corrupt Organizations 319H** 28

319H    Racketeer    Influenced    and    Corrupt Organizations
    319HI Federal Regulation
       319HI(A) In General
          319Hk24 Pattern of Activity
             319Hk28 k. Continuity or Relatedness; Ongoing Activity. Most Cited Cases
A threat of continued criminal activity may be established, for purposes of proving the existence of a pattern of Racketeer Influenced and Corrupt Organizations Act (RICO) activity, where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes.

**[32]** **Racketeer Influenced and Corrupt Organizations 319H** 28

319H    Racketeer    Influenced    and    Corrupt Organizations
    319HI Federal Regulation
       319HI(A) In General
          319Hk24 Pattern of Activity
             319Hk28 k. Continuity or Relatedness; Ongoing Activity. Most Cited Cases
For purposes of proving the existence of a pattern of Racketeer Influenced and Corrupt Organizations Act (RICO) activity, where the enterprise is an entity whose business is racketeering activity, an act performed in furtherance of that business automatically carries with it the threat of continued racketeering activity.

**[33] Criminal Law 110** 148.1

110 Criminal Law
    110X Limitation of Prosecutions
       110k148 Commencement of Period of Limitation
          110k148.1 k. In General. Most Cited Cases
Racketeering conspiracy involving two New York City police detectives and several organized crime figures ended, for purposes of running of the statute of limitations in detectives' prosecution for Racketeer Influenced and Corrupt Organizations Act (RICO) conspiracy activity, when two of the crime figures had been arrested and the detectives had retired from the police force and moved to Las Vegas, regardless of further criminal activities by the former detectives in Las Vegas; detectives no longer had access to the confidential law enforcement information they had been selling and were no longer in contact with their old associates in crime family. 18 U.S.C.A. § 1962(d).

**[34] Criminal Law 110** 150

110 Criminal Law
    110X Limitation of Prosecutions
       110k148 Commencement of Period of Limitation
          110k150 k. Continuing Offenses. Most Cited Cases

**Criminal Law 110** 154

110 Criminal Law
   110X Limitation of Prosecutions
     110k151 Exceptions and Suspension
      110k154 k. Concealed or Unknown Offense. Most Cited Cases

The duration of a conspiracy cannot be indefinitely lengthened merely because the conspiracy is kept a secret, and merely because the conspirators take steps to bury their traces, in order to avoid detection and punishment after the central criminal purpose has been accomplished; acts of concealment may have significance in lengthening the life of a criminal conspiracy only when they are done in furtherance of the main criminal objectives of the conspiracy.

**[35] Conspiracy 91 ⟜28(3)**

91 Conspiracy
   91II Criminal Responsibility
     91II(A) Offenses
      91k28 Conspiracy to Commit Crime
        91k28(3) k. Particular Crimes. Most Cited Cases

In order to sustain a conviction for conspiracy with the intent to distribute methamphetamine, the evidence must demonstrate that there existed an agreement or understanding between or among two or more persons to possess methamphetamine with the intent to distribute it, and that a particular defendant knowingly became a member of the conspiracy. Comprehensive Drug Abuse Prevention and Control Act of 1970, § § 401(a)(1), 406, 21 U.S.C.A. § § 841(a)(1), 846.

**[36] Conspiracy 91 ⟜24(1)**

91 Conspiracy
   91II Criminal Responsibility
     91II(A) Offenses
      91k23 Nature and Elements of Criminal Conspiracy in General
        91k24 Combination or Agreement
          91k24(1) k. In General. Most Cited Cases

In prosecution for conspiracy, it is the unlawful agreement itself which constitutes the crime.

**[37] Conspiracy 91 ⟜47(2)**

91 Conspiracy
   91II Criminal Responsibility
     91II(B) Prosecution
      91k44 Evidence
        91k47 Weight and Sufficiency
          91k47(2) k. Circumstantial Evidence. Most Cited Cases

The elements of the crime of conspiracy and a particular defendant's membership in the conspiracy may be proved entirely by circumstantial evidence.

**[38] Criminal Law 110 ⟜1159.6**

110 Criminal Law
   110XXIV Review
     110XXIV(P) Verdicts
      110k1159 Conclusiveness of Verdict
        110k1159.6 k. Circumstantial Evidence. Most Cited Cases

The evidence proffered in a prosecution for conspiracy need not have excluded every possible hypothesis of innocence to be sufficient to sustain a conviction.

**[39] Criminal Law 110 ⟜59(5)**

110 Criminal Law
   110VII Parties to Offenses
     110k59 Principals, Aiders, Abettors, and Accomplices in General
      110k59(5) k. Aiding, Abetting, or Other Participation in Offense. Most Cited Cases

To convict a defendant on a theory of aiding and abetting, the government must prove that the underlying crime was committed by a person other than the defendant and that the defendant acted, or failed to act in a way that the law required him to act, with the specific purpose of bringing about the underlying crime; to prove that the defendant acted with that specific intent, government must show that he knew of the proposed crime.

**[40] Conspiracy 91 ⟜47(12)**

91 Conspiracy
   91II Criminal Responsibility
     91II(B) Prosecution
      91k44 Evidence
        91k47 Weight and Sufficiency
          91k47(3) Particular Conspiracies
            91k47(12) k. Narcotics and Dangerous Drugs. Most Cited Cases

**Controlled Substances 96H ⟜82**

96H Controlled Substances
   96HIII Prosecutions
     96Hk70 Weight and Sufficiency of Evidence
      96Hk82 k. Sale, Distribution, Delivery,

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
(Cite as: --- F.Supp.2d -----)

Transfer or Trafficking. Most Cited Cases
Evidence was sufficient to support convictions for conspiracy to distribute and distribution of methamphetamine on an aiding and abetting theory; when told that undercover agent's investors desired drugs, defendants directed him to a third person, whom both of them knew, as someone who could "handle" the request, and one defendant later called the agent to provide him with the third person's telephone number. Comprehensive Drug Abuse Prevention and Control Act of 1970, § § 401(a)(1), 406, 21 U.S.C.A. § § 841(a)(1), 846.

Evidence was sufficient to support convictions for conspiracy to distribute and distribution of methamphetamine on an aiding and abetting theory; when told that undercover agent's investors desired drugs, defendants directed him to a third person, whom both of them knew, as someone who could "handle" the request, and one defendant later called the agent to provide him with the third person's telephone number. Comprehensive Drug Abuse Prevention and Control Act of 1970, § § 401(a)(1), 406, 21 U.S.C.A. § § 841(a)(1), 846.

**[41] Criminal Law 110 ☜1186.1**

110 Criminal Law
   110XXIV Review
      110XXIV(U) Determination and Disposition of Cause
         110k1185 Reversal
            110k1186.1 k. Grounds in General. Most Cited Cases
In assessing a claim of prejudicial spillover from dismissed counts to determine whether reversal of remaining counts is required, court examines (1) whether the evidence on the vacated counts was inflammatory and tended to incite or arouse the jury into convicting on the remaining counts, (2) whether the evidence on the vacated counts was similar to or distinct from that required to prove the remaining counts, and (3) the strength of the government's case on the remaining counts.

**[42] Criminal Law 110 ☜1186.1**

110 Criminal Law
   110XXIV Review
      110XXIV(U) Determination and Disposition of Cause
         110k1185 Reversal
            110k1186.1 k. Grounds in General. Most Cited Cases
High potential for prejudicial spillover, following dismissal of Racketeer Influenced and Corrupt Organizations Act (RICO) conspiracy charges, warranted grant of new trial in prosecution of two former New York City police detectives for money laundering and narcotics offenses; government's case on the racketeering count was extremely inflammatory, including strong evidence of defendants' involvement in two kidnappings and eight murders, whereas the evidence on the other charges, while sufficient to sustain the verdicts, was relatively weak.

Daniel Nobel, New York, NY, for Defendant Stephen Caracappa.
The Law Offices of Joseph A. Bondy, by Joseph Aaron Bondy, Beth Hailey Citron, New York, NY, for Defendant Louis Eppolito.
United States Attorney's Office, Eastern District of New York, by Robert W. Henoch, Mitra Hormozi, Daniel E. Wenner, Brooklyn, NY, for the United States.

MEMORANDUM, ORDER & JUDGMENT
WEINSTEIN, Senior District Judge.

## Table of Contents

I.   Introduction.    .----

II.   Facts and Procedural History.    .----

    A.   Arrest and Indictment.    .----
    B.   Pre-Trial Discussion of the Statute of Limitations.    .----

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

C.    Trial.                                                     .----

1.    Government's Evidence at Trial.                       .----

a.    Evidence of the New York Acts.                  .----

i     Testimony of Burton Kaplan.                .----
.
i     Testimony of Peter Franzone.                .----
i
.
i     Testimony of Betty Hydell.                   .----
i
i
.
i     Other Evidence of the New York Acts.     .----
v
.


b.    Evidence of the Nevada Acts and the Continuation of    .----
      the Conspiracy.

i     Testimony of Burton Kaplan Concerning the       .----
.     Defendants' Move to Las Vegas.
i     Testimony of Burton Kaplan Concerning          .----
i     Racketeering Act Fourteen.
.
i     Testimony of Steven Corso Concerning            .----
i     Racketeering Acts Fifteen, Sixteen and Seventeen.
i
.
i     Other Evidence of the Continuation of the        .----
v     Conspiracy.
.


c.    Hearsay Declarant Anthony Casso.               .----


2.    Defense.                                       .----
3.    Defendants' Motion for a Mistrial.             .----
4.    Summation on Statute of Limitations.           .----
5.    Jury Charge.                                    .----
6.    Verdict.                                        .----

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

| | | |
|---|---|---|
| D. | Defendants' Post-Trial Motions. | .---- |
| E. | June 5, 2006 Sentencing Hearing. | .---- |
| F. | June 23, 2006 Evidentiary Hearing. | .---- |
| | 1.    Defendant Eppolito's Witnesses. | .---- |
| | 2.    Defendant Caracappa's Witnesses. | .---- |

| | | |
|---|---|---|
| III | Defendants' Rule 33 Motions. | .---- |
| A. | Standard of Review. | .---- |
| B. | Defendants' Brady Claim. | .---- |
| | 1.    Law. | .---- |
| | 2.    Application of Law to Facts. | .---- |
| C. | Defendants' Claims of Ineffective Assistance of Trial Counsel. | .---- |
| | 1.    Law. | .---- |
| |    a.    Failure to Investigate, Call Favorable Witnesses, and Admit or Marshal Favorable Evidence. | .---- |
| |    b.    The Right to Testify. | .---- |
| | 2.    Application of Law to Facts. | .---- |
| |    a.    Failure to Investigate, Call Favorable Witnesses, and Admit or Marshal Favorable Evidence. | .---- |
| |    b.    The Right to Testify. | .---- |
| D. | Allegedly "Misleading" Redirect of Government Witness Steven Corso. | .---- |
| | 1.    Law. | .---- |
| | 2.    Application of Law to Facts. | .---- |

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

Page 11

IV    Defendants' Rule 29 Motions.    .----

    A.    Rule 29.    .----

        1.    Standard of Review.    .----
        2.    Timing of Motion.    .----

    B.    Racketeering Conspiracy.    .----

        1.    Law.    .----

            a.    Statute of Limitations.    .----
            b.    Enterprise.    .----
            c.    Pattern of Racketeering Activity.    .----
            d.    Special Dangers Associated with Conspiracy and    .----
                Racketeering Prosecutions.

        2.    Application of Law to Facts.    .----

    C.    Narcotics Conspiracy and Distribution.    .----

        1.    Law.    .----
        2.    Application of Law to Facts.    .----

V.    Spillover Prejudice.    .----

VI    The Rule of Law.    .----

VI I.    Conclusion.    .----

Appendix A:  Final Superseding Indictment.    .----

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                    Page 12
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

## I. Introduction

**\*1** The evidence presented at trial overwhelmingly established the defendants' participation in a large number of heinous and violent crimes, including eight murders. While serving as New York City police detectives, the defendants used their badges not in service of the public, but in aid of organized crime. They kidnapped, murdered, and assisted kidnappers and murderers, all the while sworn to protect the public against such crimes.

Nevertheless, an extended trial, evidentiary hearings, briefings and argument establishes that the five-year statute of limitations mandates granting the defendants a judgment of acquittal on the key charge against them-racketeering conspiracy. As a result of spillover prejudice resulting from the trial of that charge with other crimes charged in the indictment, defendants are entitled to a new trial on the remaining charges.

## II. Facts and Procedural History

### A. Arrest and Indictment

After a lengthy investigation, defendants Louis Eppolito and Stephen Caracappa were indicted on March 9, 2005 and arrested in Las Vegas, Nevada. In a series of superseding indictments, they were charged with participating in a racketeering conspiracy in violation of section 1962(d) of Title 18 of the United States Code ("RICO"). The wide-ranging conspiracy described in the final superseding indictment was alleged to have begun in New York City in the early 1980s and continued in Las Vegas until the date of the defendants' arrest in 2005.

The charged enterprise consisted of the two defendants, three members and associates of organized crime-Frank Santoro, Jr.; Burton Kaplan; and Anthony Casso-and unnamed others. Its purpose was to generate money for its members and associates through legal and illegal means. According to the allegations in the final superseding indictment, the members and associates of the enterprise sought to:
a. Enrich members and associates of the Enterprise through assisting La Cosa Nostra ("LCN"), a nationwide criminal organization that engaged in, and the activities of which affected, interstate and foreign commerce;
b. Preserve and protect the ability of the Enterprise to enrich its members and associates through the use and abuse of the facilities of the New York City Police Department;
c. Promote and enhance the criminal activities of the

Enterprise and its members and associates; and
d. Keep victims and others in fear of the Enterprise and its members and associates through violence, intimidation, abuse of positions of trust and threats of violence.

Alleged were seventeen predicate acts creating a pattern of racketeering activity. Fourteen of the racketeering acts-charges of murder, murder for hire, kidnaping, bribery, criminal facilitation, tampering with and retaliating against informants, and obstruction of justice-occurred in New York City between 1986 and 1991, while one or both of the defendants were members of the New York City police department ("the New York acts"). Of the remainder ("the Nevada acts"), one act-conspiracy to engage in unlawful monetary transactions, charged against defendant Eppolito alone-took place in Las Vegas between 1994 and 1996. The final three racketeering acts-money laundering, conspiracy to distribute narcotics, and distribution of narcotics-occurred in Las Vegas in 2004 and 2005.

**\*2** The last three Nevada acts were duplicated as substantive counts. Defendant Eppolito was charged with money laundering in violation of section 1956(a)(3)(B) of Title 18 of the United States Code. Both defendants were charged with conspiracy to distribute and distribution of methamphetamine in violation of sections 846 and 841(a) of Title 21 of the United States Code.

A copy of the final superseding indictment is included as an appendix to this memorandum, order and judgment.

### B. Pre-Trial Discussion of the Statute of Limitations

Concerns about the statute of limitations were raised by the court at the outset of these proceedings. At the defendants' bail hearing on July 7, 2005, and again at an August 9, 2005 status conference, the court pressed the government on the statute of limitations issue, emphasizing the apparently "thin" connection between the New York and Nevada acts. Tr. of July 7, 2005 bail hearing 65-69; Tr. of Aug. 9, 2005 status conf. 4-7. At the August 9 conference, the court also enquired why the government had chosen not to charge the murders directly under section 1958 of Title 18 of the United States Code or similar statutes that might apply without a statute of limitations bar.

At both the bail hearing and the August 9 conference, the government maintained that it would be able to establish that the New York and Nevada acts were part of a pattern of racketeering activity and that, even if it were not able to establish such a pattern, it could avoid a statute of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

Page 13

limitations problem by proving that the defendants' involvement in the underlying conspiracy had continued to beyond the statute of limitations bar.

At the August 9 conference, the government stated that it was looking into a possible charge of murder under section 1958. No such charge was ever brought, despite repeated superseding indictments.

In papers filed on October 25, 2005, defendants moved to dismiss the racketeering conspiracy charge under Rule 12(b) of the Federal Rules of Criminal Procedure on the grounds that the government had failed to sufficiently allege either the pattern or enterprise elements required by section 1962 and that the government's failure to sufficiently allege the pattern element implicated the five-year statute of limitations.

Although the court again emphasized the possibility of a statute of limitations problem if the government's proof at trial failed to establish the continuation of the conspiracy after the time of the New York acts, it denied the defendants' motion to dismiss the charge. Recognizing the limitations of a criminal Rule 12 test of the facial sufficiency of an indictment, the court noted that a validly composed grand jury had handed down a valid indictment in the case and concluded that the case had to proceed to trial to permit the government to attempt to support its factual theory. Tr. of Dec. 1, 2005 mot. hearing 37, 39-40. Given the nature of the charges-which, as the court noted, raised "serious doubts about the Police Department and its fiduciary relationship to the public"-a full and fair trial was necessary not only for the defendants, who were entitled to put the government to its proof in order to protect their reputations against such "grave" insinuations, but for the public itself. *Id.* at 40.

*3 The defendants also moved to dismiss the substantive Nevada charges on the grounds that they could not be tried in this district because of improper venue. Defendants waived their venue objection once the court indicated that it was denying their motion to dismiss the racketeering charge.

### C. Trial

Trial began with jury selection on March 8, 2006. Opening arguments took place on March 13 and 14, 2006. The trial lasted three weeks, with closing arguments on April 3 and 4.

### 1. Government's Evidence at Trial

The government's evidence at trial consisted of the testimony of thirty-four witnesses, many documents, and several audio and video recordings. The government's overwhelming case was skillfully presented with credible witnesses and supporting interlocking documents and other proof of each of the racketeering acts charged.

A summary of some of the key testimony and other evidence against the defendants is outlined below.

### a. Evidence of the New York Acts

### i. Testimony of Burton Kaplan

The government's key witness was Burton Kaplan, a career criminal and former associate of the Lucchese crime family. Having pled guilty to participation in the charged racketeering conspiracy, Kaplan testified convincingly and methodically about the formation of the conspiracy and the New York acts.

Kaplan testified that his criminal relationship with Eppolito and Caracappa began when Frank Santoro Jr., Eppolito's cousin and a former fellow inmate of Kaplan's at Allenwood federal prison, offered to sell Kaplan confidential law enforcement information to be obtained by the two defendants. Kaplan initially turned down this offer, but he later contacted Santoro and asked for help when, in 1986, he desired to have a criminal associate killed.

Santoro told Kaplan that he, Eppolito and Caracappa could carry out the murder contract. Kaplan agreed to pay 25,000 dollars. He gave Santoro all of the information he had on the man he wanted killed, a jeweler named Israel Greenwald. Because Kaplan could not remember Greenwald's name, throughout his testimony he referred to Greenwald as "jeweler number two."

A short time after Santoro made the deal, he reported to Kaplan that Greenwald had been killed. According to Santoro's account to Kaplan, Santoro, Eppolito and Caracappa drove up behind Greenwald's car, turned on a flashing light and pulled Greenwald over, telling him that they had to take him in for questioning regarding a hit and run accident. After Greenwald agreed to accompany them, they took him to a garage in Brooklyn, where Santoro shot him. Santoro told Kaplan that he had disposed of the body and that neither Eppolito nor Caracappa knew where the body was. Although Kaplan did not know Eppolito or Caracappa at the time of Greenwald's murder, he testified that a few years later, after he began dealing directly with the defendants, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)

**(Cite as: --- F.Supp.2d ----)**

three of them discussed the murder and Kaplan's payment.

The defendants' entry into a criminal enterprise with Kaplan and Santoro was solidified when, in the fall of 1986, Anthony "Gaspipe" Casso, a "made" member of the Lucchese crime family, was shot while sitting in a car in Brooklyn, eating an ice cream cone. Casso, a close associate of Kaplan's in a variety of criminal activities, survived the shooting. He wanted revenge. Kaplan told Casso about Santoro's law enforcement source and then, at Casso's request, asked Santoro if Eppolito and Caracappa could obtain any information about who was responsible for the shooting. At the time, Eppolito worked in the Sixty-Third Precinct, where Casso was shot.

*4 Santoro subsequently delivered a packet of information to Kaplan for Casso, stating that it was a "gift," and that Eppolito and Caracappa would take no money for it. Kaplan testified that he opened the packet and saw information on, and a picture of, James Hydell; the names of Nicholas Guido and others; and law enforcement documents regarding Casso's attempted murder.

Kaplan gave the packet to Casso, who declared that he would try to kill the men who had been involved in the shooting. Casso also said that he wanted to question James Hydell before he was killed, so that he could find out who had ordered the attempt on his life. Kaplan informed Casso of the Greenwald murder. Then, at Casso's request, Kaplan asked Santoro if he, Eppolito and Caracappa would take a contract to kidnap Hydell and deliver him to Casso. Santoro accepted on behalf of all three men. Casso agreed to pay 35,000 dollars for the crime.

After driving around Staten Island and Brooklyn looking for Hydell, the defendants found him in a Brooklyn laundromat and told him he was under arrest. Hydell was bound, placed in the trunk of a car, and delivered by Santoro to the parking lot of a Toys "R" Us store on Flatbush Avenue, where Casso and Kaplan were waiting. Santoro gave the car keys to Kaplan, who gave them to Casso. Casso later reported to Kaplan that he interrogated and killed Hydell, hiding his body in order to deny his family the benefit of his life insurance.

Both Eppolito and Caracappa followed Santoro to the Toys "R" Us on the day of Hydell's kidnaping and waited for him at the end of a driveway, about 200 to 250 feet from where Casso, Kaplan and Santoro were standing. Kaplan testified that he remembered seeing them there. As with Greenwald's murder, Kaplan did not know the defendants. At the time, all of his information about the Hydell abduction came through Santoro. Kaplan testified

that he later had a conversation with the defendants in which they discussed the details of Hydell's kidnaping and Casso's payment for the crime.

Having killed Hydell, Casso asked Kaplan if he could get more information on Nicholas Guido, another of the names included in the packet Santoro had given to Kaplan. Kaplan talked to Santoro, who said that Eppolito could do it, but that he wanted 4,000 dollars for the job. Because he thought the request was greedy, Casso refused the deal, obtaining information on Guido from other sources.

On December 25, 1986, on orders from Casso, a man named "Nicholas Guido" was killed outside of his house. The Nicholas Guido who was killed was not, however, the Nicholas Guido who had helped carry out the attempt on Casso's life. He was an innocent twenty-five year old with no connection to organized crime. Kaplan testified that he later had a conversation with Eppolito about Guido's murder, during which Eppolito told him that if Casso had chosen to pay the 4,000 dollars he would have gotten the "right" Nicholas Guido.

*5 Casso later tried to kill the rest of the people he believed were involved in his attempted murder, including Gambino family members Bobby Boriello, "Mickey Boy" Paradisio and Eddie Lino. Casso obtained these names through his interrogation of James Hydell. Kaplan testified that the defendants were initially given a contract to kill Boriello, but that it was taken away from them after they were observed by another detective while surveilling Boriello. At the same time, the defendants took a contract to kill Sammy Gravano, who Casso believed had authorized the shooting, but that contract was cancelled when the defendants were unable to fulfill it.

In September of 1987, Santoro was killed. Kaplan then began to deal directly with Eppolito and Caracappa. In response to a phone call from Santoro's widow, Kaplan met Eppolito at Santoro's house, where Eppolito introduced himself and then proposed a deal: he and Caracappa would provide law enforcement information to Kaplan in exchange for a retainer, payable at the rate of 4,000 dollars each month. Eppolito told Kaplan that Caracappa worked in an organized crime task force and that he had access to a significant amount of information about investigations into organized crime. Kaplan testified that when he left Santoro's house after this meeting, he saw Caracappa sitting in a car in the driveway, watching the house.

Kaplan discussed Eppolito's proposal with Casso and then accepted on Casso's behalf. Although the deal was made with Kaplan rather than with Casso-according to Kaplan,

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

the defendants never even met Casso-Kaplan testified that the defendants knew that he would pass their information to Casso. Kaplan described Casso's reputation at the time as that of a "homicidal maniac."

Kaplan testified that from 1987 until roughly 1993, when Casso had been arrested and Caracappa had retired, Eppolito and Caracappa were paid 4,000 dollars a month to supply law enforcement information regarding ongoing investigations, informants, wiretaps and impending arrests. Information provided by the defendants pursuant to this arrangement included information about a number of government informants, including Peter Savino, John "Otto" Heidel, and Dominic Costa. As a result of this information, Casso ordered both Heidel and Costa murdered. Heidel was killed on October 8, 1987. Costa was shot in the head, but survived.

Throughout the course of his "employment" of the defendants, Casso, through Kaplan, requested information from them regarding the locations of various Lucchese family members he wanted killed but could not find, including Anthony Dilapi and Anthony Acceturo. Kaplan testified that Eppolito and Caracappa supplied two addresses in Los Angeles for Dilapi, allowing the Lucchese family to locate and murder him. The defendants supplied three addresses for Accetturo, but Casso's "hit squads" were never able to kill him. Casso also requested a copy of the prison visiting list for Lucchese boss Chris Furnari, which the defendants provided. According to Kaplan, Casso, who had by that time been "promoted" to acting underboss, wanted to know if anyone from any other part of the Lucchese family was trying to gain power in Furnari's absence.

*6 Kaplan testified about two instances in the late 1980s where the defendants provided him with information about listening devices placed on the phone line of a business run by associates of organized crime and a restaurant frequented by associates of organized crime. In both cases Kaplan passed the information on to Casso, who informed the relevant persons. According to Kaplan, Eppolito later came back and told him that the people at the business had acted too fast to remove the wiretap, because law enforcement had gotten a picture of a man climbing the telephone pole to remove it. Eppolito advised that it would have been better for the targets of the wiretap to continue to talk on the phone line, but only about legitimate topics.

Sometime early in 1990, Eppolito retired from the New York City police department. Nevertheless, he and Caracappa continued to work with Kaplan and, through Kaplan, Casso. Kaplan testified about a number of acts committed by the defendants after Eppolito's retirement.

In May of 1990, Eppolito called Kaplan and said he needed to see him immediately. Kaplan met with Eppolito, who told him that a number of organized crime figures-including Anthony Casso and Vic Amuso, the acting boss of the Lucchese family-were about to be arrested in connection with an investigation into corruption in the window industry. Eppolito said he had gotten this information from Caracappa. Kaplan informed Amuso and Amuso contacted Casso to inform him of the impending arrest. Both Amuso and Casso then fled. Kaplan testified that even after Casso "went on the lam," Kaplan maintained contact with him and continued to pass law enforcement information to him from the defendants.

In August of 1990, the defendants told Kaplan that Bruno Facciola, a loanshark and Lucchese capo from the Canarsie section of Brooklyn, was cooperating with the government. On Casso's orders, members of the Lucchese family murdered Facciola. Soon after Facciola's murder, Eppolito reported to Kaplan that word was going around that Facciola's associates, including Al Visconti and Larry Taylor, wanted revenge for his murder and had discussed murdering Amuso and Casso, among others, as retribution. Kaplan passed this information on to Casso. Visconti and Taylor were killed.

Kaplan testified that this was not the first time he had discussed Facciola with Eppolito. Earlier in their relationship, Eppolito had told Kaplan that a friend of his who had an auto repair business owed Facciola money and was having some problems. Eppolito asked if Kaplan could have Casso speak with Facciola and take some of the pressure off of his friend. Kaplan said that he had talked to Casso about the matter and that Facciola had agreed to do what Casso asked.

According to Kaplan, the defendants took two murder contracts after Eppolito retired from the police department, one on behalf of Anthony Casso and one on behalf of Kaplan himself.

In November of 1990, the defendants carried out a 65,000 dollar contract to kill Gambino family capo Eddie Lino, who Casso believed had been involved in the attempt on his life four years earlier. Kaplan was in the hospital at the time of the shooting. He testified that Eppolito came to him late one night during his hospital stay, woke him up, and told him that he had "good news." Allowing Lino to believe that they were acting as police officers, the defendants had pulled him over while he was driving along the Shore Parkway, walked over to his car, and shot him in the head several times. Eppolito told Kaplan that Caracappa had been the shooter, because he was "a much

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

better shot."

**\*7** The contract that the defendants took for Kaplan involved Herman Tabek, a man who had been involved with Kaplan in schemes involving stolen treasury bonds and stolen checks. When Tabek reportedly began cooperating with the authorities regarding the stolen checks, Kaplan contracted with the defendants to have him killed. According to Kaplan, the defendants attempted to kill Tabek-using the same pretense of "arrest" that had worked in the past-but failed when Tabek realized what was going on and broke free. Because the murder attempt apparently frightened Tabek, leading him to stop cooperating with law enforcement, Kaplan did not try to have Tabek killed again. As with Israel Greenwald, Kaplan could not recall Tabek's name, and referred to him as "jeweler number one" throughout his testimony.

Kaplan provided convincing details about his methods of communicating and meeting with the defendants throughout his acquaintance with them. In the years after Santoro's death, when Kaplan began working directly with the defendants, Kaplan met primarily with Eppolito, although he met occasionally with both men together. Kaplan described the men's various meeting places as including rest stops on the Southern State Parkway and Long Island Expressway, a cemetery near Caracappa's mother's home on Staten Island, Kaplan's house in Brooklyn, and, on one occasion, the apartment of Eppolito's mistress.

At some point in late 1988 or 1989, Kaplan and Eppolito had a falling out because Eppolito wanted more money and thought that he should meet Anthony Casso. About a month after this argument, Caracappa came to Kaplan's house with a box of cookies and suggested that the two of them talk about continuing their arrangement. Caracappa then became the defendants' main contact with Kaplan until Kaplan and Eppolito's relationship was repaired. Kaplan testified that the two men met more than once at Caracappa's apartment on East 22nd Street in Manhattan.

According to Kaplan, he and the two defendants disguised their communications with each other through the use of pagers and code numbers. They also referred to each other by a code name, "Marco." A copy of Kaplan's address book with three entries under the name "Marco" was admitted. One of the numbers listed-"981-3235"-matched a number given for "Lou" in Frank Santoro's address book. The government introduced a letter from the telephone company, dated December 8, 1993, stating that "516-981-3235" was Louis Eppolito's phone number. Another number listed-"917-616-0631"-was one of three pager numbers for the 14th Street Union Square Local

Development Corporation, where Caracappa worked for a time after retiring from the police department. The final number listed-"420-0150"-matched a number given by Caracappa on his police department information card and his application for a pistol permit. The government also admitted Caracappa's phone list, which included numbers for an "Uncle Lou," an "Uncle Frank" and an "Uncle Marco."

**\*8** Kaplan also provided details about the methods used by the co-conspirators to carry out their crimes. For example, Kaplan testified that he provided the defendants with cars that resembled unmarked police cars on a few occasions in order to avoid their having to use vehicles that could be traced to them. He also testified that Caracappa admitted to him that, to avoid inquiry or investigation by his supervisors at the police department, he would surreptitiously run the names of individuals whose information he was going to provide to Kaplan together with the names of legitimate targets of police investigations. According to Kaplan, Caracappa reported to Kaplan that he did the same thing when requesting Chris Furnari's prison visiting list.

### ii. Testimony of Peter Franzone

Government witness Peter Franzone, the former owner of the Brooklyn garage where Israel Greenwald's body was found, testified about Greenwald's murder and about racketeering act five, the murder of an unidentified man. Franzone's connection to these crimes arose through his acquaintance with Frank Santoro, Jr., who frequented his garage, towing and auto body shop. Through Santoro, Franzone was also acquainted with defendant Eppolito, who rented a parking spot in Franzone's lot.

With regard to the murder of Israel Greenwald, Franzone testified that one afternoon in 1985 or 1986, Eppolito pulled into an open parking spot in the lot and parked his car. At the same time, Santoro walked into the lot with two men that Franzone did not know. The three men walked into one of the empty individual parking garages in the lot and closed the door. Twenty minutes to a half an hour later, the garage door opened and Santoro and one of the men walked out. As the two men exited the lot, Eppolito, who had been sitting in his car in a position where he could observe the parking garage, pulled his car out of the parking space and drove away.

Franzone testified at length about the layout of the lot and his ability to observe the events he was describing. The lighting was good and Franzone's view of the three men was unobstructed as they walked to and from the parking garage. According to Franzone, the man who did not

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

come back out of the garage had a beard and a skull cap. The man who did was wearing a trench coat and had his collar pulled up to cover part of his face; Franzone described him as a white man with dark hair, a moustache, and a pockmarked face. He said that he later saw this man again, standing next to Eppolito at a "Sweet Sixteen" party for Santoro's daughter.

Shortly after Santoro, Eppolito, and the man in the trench coat left the lot, Santoro came back and took Franzone into the parking garage he had just exited. There, Franzone saw the body of the man in the skull cap laying against the wall. Santoro told Franzone that he had to help bury the body, and that if he didn't, Santoro would kill him and his family. Franzone described the burial in great detail. Although there were inconsistencies between Franzone's testimony and the testimony of other witnesses regarding the state of Greenwald's body–such as the fact that Franzone did not remember that the man's hands were bound and that plastic bags had been put over his head–much of Franzone's testimony about the manner in which Greenwald was buried was corroborated by Dr. Bradley Adams, a forensic anthropologist involved in exhuming the body.

*9  Franzone also testified about another murder committed by Santoro and three associates in his collision shop. After entering the collision shop to help Santoro adjust the heat, Franzone saw two of Santoro's associates wrapping up the victim's body in a light colored cloth and helped them place it in the trunk of a car. As in the case of Greenwald's murder, Eppolito pulled into Franzone's lot, sat in his car outside the collision shop during the course of the murder, and left when Santoro did, after the body had been wrapped and placed in the trunk. This murder was charged against Eppolito as racketeering act five.

During the course of his testimony about racketeering act five, Franzone was shown a photograph of an unidentified body found in front of a church in Brooklyn in 1987 and testified that the body shown there resembled the body he had seen that day. The body in the photograph was wrapped in a white sheet and plastic bag and was tied in a manner matching Franzone's description. Retired New York City police detective Sylvia Cantwell testified about the discovery of this body.

In March of 2005, Franzone was approached by federal agents investigating the murder of Frank Santoro, Jr. After contacting a lawyer–Alan Aberson, chosen from the yellow pages–Franzone told the agents about Greenwald's murder. On April 1, 2005, investigators acting on information provided by Franzone found Greenwald's body in one of the garages on Franzone's lot. Franzone testified that he did not go to the police before March of

2005 because he was frightened of Santoro, and especially of Eppolito, who he knew to be a police officer.

Franzone's testimony concerning the layout of his lot and his acquaintance with Santoro and Eppolito was corroborated by one of his former employees, Joseph Pagnotta, and by the man who purchased his towing business, Thomas Licata. Santoro's daughter, Tammy Ahmed, testified that Eppolito, Caracappa, and Franzone had all been present at her Sweet Sixteen party. Ahmed's testimony was backed up by photographs of the party showing the two defendants in close proximity.

Both Franzone and Licata testified that Licata had at one point owed money to a loanshark in Canarsie. Franzone stated that the loanshark was named "Bruno," while Licata testified that he was Bruno Facciola's brother, Nicky "No Socks" Facciola. According to Franzone, when he learned of Licata's problems with the loan shark, he went to Eppolito and asked if he could talk to Licata about it. Eppolito agreed to do so, but Franzone testified that he did not know what ever came of any conversation between Eppolito and Licata.

### iii. Testimony of Betty Hydell

James Hydell's mother, Betty Hydell, testified about events on October 18, 1986, the day her son disappeared. According to Ms. Hydell, James Hydell left the family's home in Staten Island about 10:00 in the morning with a friend of his; he planned to spend the day in Brooklyn. After James left, Ms. Hydell's other son, Frankie Hydell, who was borrowing James' car that day, went outside and then came back into the house to tell his mother that there was a suspicious car driving past their house. When Ms. Hydell went outside, she saw a powder blue car driving slowly down the block; the driver was looking in the direction of the Hydells' home.

*10  Ms. Hydell testified that she told Frankie to get into James' car and drive around the block to see if the blue car would follow him. As James drove one way around the block, she drove in the opposite direction; after James passed her with the blue car behind him, Ms. Hydell pulled up beside the car so that her window was lined up with its driver's side window. Ms. Hydell stated that there were two men inside the car, a "big one" wearing a gold chain and a "little one" with a thin face. She described both men as Italian, with dark hair. This description, including the gold chain, matched other witnesses' descriptions of the defendants during the same period.

When Ms. Hydell pulled up beside the car, the driver showed her a badge. The car then drove away. Although

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

James Hydell called his family later that day to say that he would be home for dinner, he did not return home that night and his mother never saw him again.

#### iv. Other Evidence of the New York Acts

A number of law enforcement witnesses testified about the murders charged against the defendants, establishing the dates on which the victims were murdered and the locations at which their bodies were found. Of particular interest is the testimony of retired New York City police detective Mary Dugan. Dugan testified that on November 6, 1990, she was called to the scene of the Eddie Lino homicide. According to Dugan, Lino's body was found slumped over in the driver's seat of his car, off the side of the Shore Parkway. Dugan stated that Lino had been shot from the driver's side and that the driver's side window of the car appeared to have been rolled down rather than shattered, consistent with Kaplan's testimony that the defendants had pulled Lino over in their roles as police officers before shooting him. Detective Dugan also testified to other corroborating details.

The government also presented law enforcement testimony establishing that John "Otto" Heidel, Dominic Costa, and other victims who were allegedly targeted because of their status as informants were in fact cooperating with various law enforcement agencies.

There was substantial confirming evidence regarding the defendants' access to information and ability to carry out the various crimes of which they were accused. For example, Joseph Piriano, a former detective sergeant with the New York City police department's major case squad, and Michael Howard, a detective with the Los Angeles police department, testified about information sharing between the major case squad and other law enforcement agencies, including the FBI and the Los Angeles police department. Howard testified that when he was working in the Los Angeles police department's organized crime section, defendant Caracappa was one of his primary contacts with the New York City police department.

Piriano also testified about the operation of the major case squad's organized crime homicide unit, where Caracappa worked beginning in 1987. According to Piriano, while the organized crime homicide unit was a "confidential" unit, information was freely shared within the unit. The unit was a "clearinghouse for organized crime information" from throughout the New York City police department. Because Caracappa was especially close to the unit's supervisor, Sergeant Jack Hart, and served as Hart's liaison to the rest of the unit, Piriano stated that Caracappa had an even higher level of access to

information than his colleagues.

**\*11** In addition to this more general evidence, the government relied upon documents and testimony showing, among other things: that Caracappa took a day off on February 10, 1986, the date that Israel Greenwald disappeared; that in response to a 1987 request, the Federal Bureau of Prisons sent Chris Furnari's visiting records to the captain of the major case squad; that in the late 1980s, Caracappa ran criminal history checks on the "right" and "wrong" Nicholas Guido, Peter Savino, and others; that Caracappa included notes regarding the Los Angeles addresses of Anthony Dilapi in the major case squad's "Lucchese family" folder; that in 1991, a major case squad memo was circulated stating that Lawrence Taylor and Al Visconti planned to avenge the murder of Bruno Facciola; and that the investigation of an allegedly mob-run business in New Jersey was disrupted when a man climbed a telephone pole and removed a wiretap placed on the business' phone line. A videotape of this final event was played for the jury.

A number of witnesses gave testimony corroborating details provided by Kaplan. Thomas Galpine, a criminal associate of Kaplan's, testified that Kaplan told him at the time that he was receiving information from two New York City police detectives-one of whom Galpine knew to be defendant Eppolito-and that he passed the information he received on to Anthony Casso. Galpine also testified that Kaplan had him make various deliveries to Eppolito, Casso, and Frank Santoro, including cash and a car he described as resembling an unmarked police car. Both Kaplan and Galpine testified about a loan that Kaplan provided to Eppolito while Eppolito was on vacation in St. Maarten: Kaplan testified that he asked Galpine to take the money to Eppolito in St. Maarten, and Galpine testified that he went to "either St. Maarten or Martinique" to deliver the money. The government produced flight records and customs documents confirming this trip.

The government introduced records from the New York Eye and Ear Hospital showing that Kaplan was in the hospital on the night of November 6, 1990, when Eddie Lino was killed.

Eppolito's mistress testified that Eppolito met with Kaplan in her apartment on one occasion.

Multiple witnesses, including Roldolfo Wazlawik, the superintendent of defendant Caracappa's former residence on East 22nd Street, corroborated Kaplan's description of Caracappa's apartment and his pet cat.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

### b. Evidence of the Nevada Acts and the Continuation of the Conspiracy

#### i. Testimony of Burton Kaplan Concerning the Defendants' Move to Las Vegas

In the early 1990s, a few years after he retired from the New York City police department, defendant Eppolito moved to Las Vegas, Nevada. Government witness Burton Kaplan, the defendants' co-conspirator, testified that he continued to communicate with defendant Caracappa even after Eppolito left New York. Caracappa retired from the police force in 1992 and began working at the 14th Street Union Square Local Development Corporation; as was noted above, a beeper number registered to this company was listed in Kaplan's phone book under the name "Marco."

*12 In 1993, Anthony Casso was arrested. The next year, in March of 1994, Kaplan testified that he received a phone call from his lawyer, Judd Burstein, informing him that Casso had begun cooperating with the government. Judd Burstein corroborated Kaplan's testimony on this point, describing the phone call to Kaplan and Kaplan's later statement to him that he was worried because he had been the "go-between" for Casso and the defendants.

Because he knew that Casso could implicate him in a number of serious crimes, Kaplan decided to "go on the lam" to avoid arrest. Before he left, Kaplan had an associate drive him to Caracappa's apartment, where he warned Caracappa about Casso. According to Kaplan, he expressed concern about Eppolito to Caracappa, stating that Eppolito was far away, in Las Vegas, and that he had always been "a little flamboyant." Kaplan asked Caracappa if he could "control" Eppolito and Caracappa assured him that everything would be okay.

When asked about his concerns regarding Casso's cooperation, Kaplan explained that, although he had never introduced Casso to the defendants, Casso had figured out who they were. According to Kaplan, while Casso was on the lam, he bought a copy of Eppolito's 1992 autobiography, "Mafia Cop." Casso then asked Kaplan if the two men pictured in the book-Louis Eppolito and his partner, Stephen Caracappa-were Kaplan's law enforcement source. Casso said that these men looked like the two men he had seen in the Toys "R" Us parking lot on the day of James Hydell's kidnaping. Kaplan testified that he refused to confirm Casso's suspicion about the defendants.

After his meeting with Caracappa, Kaplan flew to San Diego and then went to Mexico, where he stayed for about five months. After Mexico, Kaplan went to Las Vegas for a week and then to Oregon, where he established a false identity, "Barry Mayers." At the end of 1994, Kaplan moved to Las Vegas and then, in the summer of 1996, he returned to New York. By that time, Casso had been "dropped" as a cooperating witness and Kaplan thought he no longer posed a threat.

Between 1994 and 1996, Kaplan met with the defendants in Las Vegas repeatedly, discussing with them both Casso's cooperation and their concerns about the publicity surrounding his cooperation. According to Kaplan, when he first arrived in Las Vegas, he looked defendant Eppolito up in the phone book and had a female associate call him to set up a meeting the next day. The two men met in the fruit department of a local supermarket. At this meeting, Eppolito told Kaplan that Caracappa had decided to move to Las Vegas. Kaplan later met with Caracappa, who confirmed that he was negotiating to build a house in Las Vegas. The house that Caracappa eventually moved into in the latter half of 1996 was positioned diagonally across the street from Eppolito's home.

Kaplan described attending a number of meetings with Eppolito and at least three or four additional meetings with Caracappa during his stay in Las Vegas. All of these meetings occurred before Caracappa permanently relocated to Las Vegas from New York. Among other things, Kaplan testified that Caracappa at one point attempted to help him set up a business deal for an associate of his with executives at the home shopping channel "QVC."

*13 Kaplan's description of the interior of Eppolito's house in Las Vegas was corroborated by photographs and the testimony of law enforcement witnesses who searched the house after the defendants' arrest.

In September 1996, soon after his return to New York, Kaplan was arrested on charges of marijuana trafficking. Although law enforcement agents attempted to convince him to cooperate with them at that time, asking him if he knew anything about "two dirty cops," he refused. Kaplan was convicted of marijuana trafficking and sentenced in federal court to twenty-seven years in prison. Despite repeated entreaties by representatives of various law enforcement agencies, he did not agree to assist the government in their investigation until the summer of 2004.

#### ii. Testimony of Burton Kaplan Concerning Racketeering Act Fourteen

Kaplan testified about defendant Eppolito's commission

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

of racketeering act fourteen, a conspiracy to engage in unlawful monetary transactions. According to Kaplan, sometime in the fall of 1994, Eppolito asked Kaplan for a 75,000 dollar "bridge loan" to help him purchase a home in Las Vegas. Kaplan told Eppolito that he would make some calls and see if he could borrow the money from someone with whom he trafficked marijuana.

Kaplan obtained the drug money in the beginning of 1995, around the time of the Super Bowl; he testified that he remembered the timing because he used 10,000 of the 75,000 dollars to place a bet on the outcome of the football game and only delivered 65,000 to Eppolito. Thomas Galpine, who worked with Kaplan in the marijuana trafficking business, corroborated this testimony, stating that Kaplan asked him for 75,000 dollars from the marijuana business to loan to Eppolito. Eppolito repaid 55,000 dollars of the loan in the spring of 1996. Kaplan forgave the rest.

When asked about the defendants' prior knowledge of, and involvement in, his marijuana trafficking business, Kaplan stated that both Eppolito and Caracappa had been aware of his drug trafficking throughout their relationship. According to Kaplan, the defendants had offered to assist him in the past, either by following him when he went to meet associates or by surveilling his warehouses to make sure that he was not being investigated. Kaplan said that he turned down these offers because, while he and the defendants were "doing certain things together," his marijuana business had "nothing to do with that" and he did not want to get the defendants involved in it.

### iii. Testimony of Steven Corso Concerning Racketeering Acts Fifteen, Sixteen and Seventeen

The government's key witness regarding the final three Nevada acts was Steven Corso, a defrocked accountant turned cooperating undercover for the FBI. In 2004, Corso, who had begun meeting with various organized crime figures in Las Vegas at the behest of the FBI, was introduced to Eppolito by Bonanno family associate John Frate and Gambino family member Michael Dibari. Eppolito requested Corso's assistance with his income tax returns and asked Corso to help him find investors for a movie he was writing. Corso agreed to both requests and a business relationship developed between the two men. Subsequently, Eppolito introduced Corso to Caracappa.

*14 Corso testified that from the beginning of their relationship, Eppolito expressed a lack of concern about the source of any money invested in his movie. In recorded conversations with Corso, Eppolito stated that he did not care if the money was drug proceeds and that he

would accept money from members and associates of the Gambino family if they wanted to invest. Recordings of both of these statements were played for the jury.

Eventually, Corso suggested to Eppolito that he might be able to get 75,000 dollars from an individual who wanted to invest in his movie. On December 7, 2004, Corso had a meeting with Eppolito at which the two men discussed the prospective investment. Corso told Eppolito that the money would arrive in cash or by wire during the next week and then asked if Eppolito cared what the investor "did for a living." Eppolito responded that he didn't, adding that he "didn't give a [expletive deleted]" if this was the "biggest drug dealer in the United States." Eppolito then described an occasion on which he had taken a shoe box full of money from associates of the Bonanno family. He also related that a member of the Gambino family had tried to invest in the movie and that he had turned him down because the amount of money offered was too small. Recordings of all of these statements were played for the jury.

Eppolito received no money from Corso's "investor" in 2004. On February 7, 2005, Corso had another meeting with Eppolito to discuss the 75,000 dollars. At this meeting, Corso told Eppolito that at least some part of the money would be coming soon. He also informed Eppolito that the money that was coming was "drug money" and that it would be structured to avoid reporting requirements for deposits over 10,000 dollars. When Corso told Eppolito that the money was "drug money," Eppolito said "yeah," and, according to Corso, nodded his head affirmatively. A recording of this conversation was played for the jury.

After a few more meetings during which Eppolito expressed frustration at the slow speed with which the money was being delivered, approximately 14,000 dollars was wired to Eppolito's bank account by federal agents working with Corso. Eppolito received the money in three separate deposits, each under 10,000 dollars. Corso testified that he had represented to Eppolito that the 14,000 dollars had come from a "mob guy in Florida involved in a drug deal."

Sometime in December of 2004, Corso's FBI handlers directed him to "throw out" the idea of drugs to Eppolito and Caracappa, to see if the two men would be willing to obtain drugs at Corso's request. Subsequently, at a dinner on February 15, 2005, Corso told Eppolito and Caracappa that some prospective investors were coming to Las Vegas to "party" and wanted to purchase some designer drugs, such as speed and ecstasy. The conversation was recorded. The government played the following exchange for the jury:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

Page 21

Corso: So ... it's not my problem, but it's my, my thing is that ... these guys bein' young like to party. And they do things that ... I have no knowledge about. And basically that's designer shit, designer drugs.

*15 Eppolito: Tony can take care of that for you.

Corso: Who's, who's?

Eppolito: My son can bring 'em to all the places, the top places [unintelligible]....

Corso: Well, they want ... and I don't, this is why I was thinkin' about Guido ... they don't wanna go to the, the places ... they want me to get 'em either ecstacy or speed. I don't know what that is ...

Eppolito: 'Ya gotta ask Guido.

Corso: Guido's the guy?

Eppolito: Those kids ...

Caracappa: Guido, Guido can handle it ...

Corso: Guido can handle it?

Eppolito: All those places, yeah.

Corso: Okay, so I just gotta get in touch with this guy....

Later that night, Eppolito called Corso and gave him Guido Bravatti's phone number.

On February 16, 2005, Corso had dinner with Bravatti and Eppolito's son, Anthony Eppolito. During that dinner, Corso stated that he had spoken with Eppolito and Caracappa about obtaining help from Bravatti to obtain drugs for the visiting investors. Corso told Anthony Eppolito and Bravatti that he wanted to purchase an ounce of methamphetamine, also known as "crystal meth" and "speed," and about six to eight pills of ecstasy. Anthony Eppolito and Bravatti assured Corso they could obtain the drugs for him and Corso told them to bring the drugs to his office. A recording of this conversation was played for the jury.

On February 17, 2005, Bravatti and Anthony Eppolito visited Corso at his office. During a conversation that was videotaped and played for the jury, Anthony Eppolito gave Corso an ounce of methamphetamine, for which Corso paid him. During this conversation, Bravatti and Anthony Eppolito discussed obtaining ecstasy for Corso in the coming days. Because of scheduling problems, these additional transactions never occurred.

On March 3, 2005, Corso had another dinner with defendant Louis Eppolito. Eppolito, visibly upset, told Corso that he had received a "panicky" call from his son. Eppolito instructed Corso not to contact Bravatti or Anthony Eppolito again. A recording of this conversation was played for the jury.

On cross-examination, defense counsel asked Corso a series of questions about the subject of drugs and the scope of his conversations with the defendants. In response to these questions, Corso acknowledged that he had not discussed drugs with Caracappa the first time he met him, that he had never seen either defendant handle drugs, and that neither defendant had discussed the quantity, quality, or price of drugs with Corso at the February 15, 2005 dinner.

On redirect, the government asked whether Corso had *ever* discussed the subjects of drug quality or price with Eppolito and Caracappa. Corso responded that he had. This testimony was received over the objection of defense counsel.

### iv. Other Evidence of the Continuation of the Conspiracy

In addition to the testimony of Kaplan and Corso regarding the four Las Vegas acts, which the government maintained established the continuation of the charged conspiracy into the twenty-first century, the government relied on various pieces of evidence to establish the defendants' continued association after their retirement and relocation. Examples include testimony concerning both defendants' involvement in a security business run by defendant Caracappa; a video showing the defendants walking out of a Las Vegas restaurant arm-in-arm after a meeting with Corso, whispering to each other; Caracappa's January 15, 2005 statement to Corso that if Caracappa didn't trust him, Corso wouldn't be meeting with either Eppolito or Caracappa; and Caracappa's involvement in Eppolito's screenwriting business, "DeAntone Productions." Caracappa was listed as DeAntone Productions' vice president of "research and development"-Eppolito was its president-and, according to Corso, Caracappa read everything Eppolito wrote.

*16 The government also introduced evidence to show that defendant Eppolito continued to associate with members and associates of organized crime after his move to Las Vegas. According to Corso, when he was first introduced to Eppolito, Bonanno family associate Mike Frate attempted to allay Corso's concerns about working with a police officer by assuring him that Eppolito was "one of us."

### c. Hearsay Declarant Anthony Casso

Although co-conspirator Anthony Casso did not testify at the trial, he was a constant ethereal presence.

Casso was arrested in 1993 and began cooperating with law enforcement in 1994. During his debriefings, Casso admitted to having used two New York City police

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

department detectives, via Burton Kaplan, to commit various crimes, including obstruction of justice and murder. Casso identified the defendants as the detectives who were Kaplan's source. This information was reported, in part, in various news articles in late March 1994.

Casso subsequently violated his cooperation agreement by committing additional crimes and by making false statements unrelated to the present case. In 1997, he was disqualified as a cooperating witness and sentenced to multiple life sentences. Despite this disqualification, Casso continued to publicly implicate the defendants, even giving an inculpating interview to the television news show "60 Minutes." He also repeatedly contacted the government in an attempt to be reinstated as a cooperating witness.

Casso's attempts to ingratiate himself with the government continued until the eve of trial in this case. Throughout the months preceding the beginning of trial, Casso contacted the government to offer his input on the government's expected witnesses and to volunteer himself as a witness for the government. On March 1, 2006-seven days before the first day of jury selection-Casso offered to reveal the location of James Hydell's body in exchange for a new plea agreement with a twenty-year cap, coverage for his involvement in the Hydell homicide and relocation to a witness security facility. The government declined this offer.

The fact of Casso's existence and his knowledge about the events at issue in the case were discussed at numerous pre-trial conferences. At no time did either party indicate that it desired to call Casso. His unreliability, capriciousness, and potential danger as a witness who could turn toward either side as quickly as a weathervane on a blustery day was well-known to all.

Throughout the trial, defense counsel made Casso's reputation an issue, attempting to discredit him and those government witnesses who had, at one point or another, associated with him. Counsel for defendant Eppolito repeatedly referred to Casso as a "homicidal maniac," echoing Burton Kaplan's description of Casso's reputation in the late 1980s and early 1990s.

## 2. Defense

Both defense counsel engaged in vigorous-and at times colorful-cross-examination of the government's witnesses, focusing primarily on their characters and their motives to lie.

\*17 Defendant Caracappa called two witnesses in his

defense. James Harris, a private investigator and former agent with the federal Drug Enforcement Agency, testified about a variety of matters, including the existence of publicly accessible databases that might provide access to an individual's address, suggesting that Casso did not need the defendants to locate his prey. Lester Shanahan, Caracappa's former partner in the New York City police department, testified that Caracappa had been awake and working for around thirty hours straight the night before and morning of the day on which Eddie Lino was killed. Although this testimony was relevant, it did not constitute an alibi because Lino was murdered in the evening, allowing Caracappa time to take a nap and freshen up before assuming the role of Casso's hired gun.

Defendant Eppolito called no witnesses in his defense, but produced a number of exhibits, consisting primarily of various commendations and awards earned during his career as a police officer.

Neither defendant took the stand to testify in his own defense.

## 3. Defendants' Motion for a Mistrial

As the trial was winding to an end, on March 27, 2006, the government received a letter from Anthony Casso alleging that the defendants were innocent of at least some of the crimes charged against them. The government notified defense counsel of this letter on March 28. At the court's direction, the government helped defense counsel set up a conference call with Casso at the federal prison in Colorado where he is currently serving a life sentence.

Defense counsel's interview with Casso took place on March 30, 2006, the day before the government rested its case. It was recorded by a court reporter. At this interview, Casso asserted that the defendants were at least in part innocent. He specifically denied that the defendants had been involved in either the Eddie Lino or Bruno Facciola homicides, and generally denied that the defendants were his source for confidential law enforcement information, pointing to an "agent" and two detectives on Long Island instead. According to Casso, he had only implicated the defendants in 1994 because the government had told him to do so.

When asked about Burton Kaplan, Casso stated that Kaplan was "saying on the stand what [Casso] want[ed] him to say on the stand." Casso alleged that he and Kaplan had conspired to frame the defendants in order to gain sentence reductions for themselves. This conspiracy was allegedly formed using Casso's and Kaplan's wives,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

who visited Kaplan in prison and passed messages to him from Casso. Insofar as Casso asserted that the meeting between the two women and Kaplan had occurred no earlier than 2001, this claim of a conspiracy to frame the defendants was contradicted by the testimony at trial of Kaplan's former lawyer, Judd Burstein, who described Kaplan's statement to him in 1994 that Kaplan had been the go-between for Casso and the defendants.

**\*18** Casso expressed disappointment that none of the parties had spoken to him or called him to the stand. He claimed that he had previously attempted to contact defendant Caracappa's lawyer directly, but that his phone calls had not been returned, and that he had sent an earlier letter to the government regarding the case.

Although the government argued that the earlier letter, which it received in July of 2005, did not contain any exculpatory information, it was ordered to, and did, disclose that letter to the defense on March 31, the day after the phone call. At that time the government also turned over a copy of Casso's March 27 letter.

On March 31, after both defendants had provisionally rested their cases, the defendants moved for a mistrial or for a continuance to determine if either of them should call Casso to the stand. Finding that the two letters from Casso changed nothing, the court denied the defendants' motion for a mistrial. All parties had known about Casso's availability since the beginning of the case. They had had ample opportunity to interview him for purposes of assisting in their cross-examinations or to call him to the stand.

The court did not grant the defendants a continuance. It did offer them an opportunity to recall any witness or to reopen their cases and call Casso to the stand. After a recess during which defendant Caracappa's counsel investigated the possibility of calling Casso as a witness, the defendants informed the court that they would not call him. Defendant Caracappa initially indicated that he desired to recall government witnesses Burton Kaplan and Thomas Campanella for further cross-examination, but withdrew this request on April 3, 2006.

### 4. Summation on Statute of Limitations

As part of defendant Caracappa's summation, his co-counsel presented a thorough argument to the jury regarding the critical statute of limitations issues in the case. Although counsel for Eppolito did not make a similar argument, defendant Caracappa's summation on this issue in effect applied to both defendants, since the statute of limitations theory was necessarily the same for

both; acquittal of one on this ground would require acquittal of the other.

### 5. Jury Charge

The jury charge had been hammered out after extensive conferences among counsel and the court with particular attention to the critical issue of the statute of limitations.

### 6. Verdict

On April 6, 2006, after a day and a half of deliberations and a number of requests for testimony, exhibits, and stipulations, the jury returned a verdict of guilty on all counts. Responding to a detailed verdict form, the jury also indicated that it found (1) that both defendants had entered into the charged conspiracy; (2) that each of the seventeen racketeering acts had been proven beyond a reasonable doubt; and (3) that the conspiracy had not ended before March 9, 2000, the applicable date for statute of limitations purposes.

**\*19** This was an excellent jury. It was diligent in its attendance and attention to the evidence. It exercised its powers only after a careful review of the evidence and a sincere attempt to apply the law.

### D. Defendants' Post-Trial Motions

At the close of the evidence and again after the jury was discharged, the defendants orally moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. The court set the motion for argument on April 21, 2006, granting the defendants until that date to file written motions and briefs in support. On request of the defendants, the court later adjourned the hearing until May 3, 2006 and extended the date for submission of briefs.

At the hearing and in their papers, defendants argued that they were entitled to a judgment of acquittal under Rule 29 because: (1) the government's proof on the enterprise and pattern elements of the racketeering conspiracy charge was insufficient to bring the charged conspiracy within the five-year statute of limitations applicable to that crime; and (2) the evidence was insufficient to support a conviction on the charges of narcotics conspiracy and narcotics distribution.

Defendants also moved for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. Defendant Caracappa maintained that a new trial was warranted (1)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

because of the government's failure to timely disclose favorable and exculpatory evidence; and (2) because of a "misleading" redirect examination of government witness Steven Corso. Defendant Eppolito joined in these arguments and further contended that a new trial was warranted because he did not have effective assistance of trial counsel. Eppolito moved for an evidentiary hearing on the issue of the effectiveness of his trial counsel.

The court reserved decision on defendants' Rule 29 and Rule 33 motions. It granted defendant Eppolito's motion for an evidentiary hearing and permitted the defendants to file supplemental briefs up until the date of the sentencing hearing. In a supplemental brief filed on the morning of the sentencing hearing, defendant Caracappa raised an ineffectiveness claim regarding his trial counsel as well.

### E. June 5, 2006 Sentencing Hearing

Although sentence could not be formally imposed upon the defendants while defendants' motions were pending, the court held a sentencing hearing on June 5, 2006, at which it heard testimony and argument. The court chose to state the sentence that would be applicable before it decided the defendants' post-trial motions in order to permit the Court of Appeals for the Second Circuit to consider on any appeal all issues-including any questions of the sentencing criteria applied-so that it could, if possible, finally decide the matter without repeated appeals and reappeals.

Five family members of the defendants' victims spoke eloquently and passionately at the hearing. They were Leah Greenwald and Michal Greenwald Weinstein, the wife and daughter of Israel Greenwald; Tina Morris, the daughter of John "Otto" Heidel; Betty Hydell, the mother of James Hydell; and Danielle Lino, the daughter of Eddie Lino.

**\*20** Defendant Eppolito also spoke at the hearing. In a short statement, he proclaimed his innocence of the charged crimes and denied any involvement whatsoever with associates or members of organized crime.

At the conclusion of the hearing, after considering the sentences recommended by the federal sentencing guidelines and the factors to be considered under section 3553(a) of Title 18 of the United States Code, the court stated the sentences it would impose if the present motions were denied. Declaring that the defendants' crimes were "probably the most heinous ... ever tried in this courthouse," Tr. of June 5, 2006 sentencing hearing 23, 40, the court declared that the sentences, if imposed, would be: for defendant Eppolito, life on the racketeering

conspiracy charge, 20 years on the money laundering charge, and two counts of 40 years each on the narcotics charges, all to run concurrently; for defendant Caracappa, life on the racketeering conspiracy charge and two counts of 40 years each on the narcotics charges, all to run concurrently. Each defendant would be fined one million dollars and appropriate supervised release and other terms were specified.

### F. June 23, 2006 Evidentiary Hearing

On motion of the defendants' new counsel, the court granted an evidentiary hearing regarding the defendants' allegations that they were denied effective assistance of trial counsel. This hearing commenced on June 23, 2006 and lasted two and a half days.

A brief summary of the testimony at the evidentiary hearing follows. More details of the witnesses' testimony and of the defense tactics throughout the trial will be described where relevant to the court's discussion of the defendants' Rule 33 motions.

### 1. Defendant Eppolito's Witnesses

Defendant Eppolito testified at great length about the preparation of his defense and his relationship with his trial counsel, Bruce Cutler. He declared that he was involved in the investigation of his defense case, assisting the investigators in going through discovery materials; during this time, Eppolito said, he saw Cutler take notes and discovery materials from the investigators. Although Eppolito conceded that he had frequent meetings with Cutler prior to trial, he testified that he was completely prevented from communicating with him during the trial. Eppolito stated that Cutler told Eppolito not to speak to him about the case and refused to call the witnesses Eppolito wanted called, including Anthony Casso. Eppolito also asserted that he had repeatedly told Cutler that he wanted to testify and that Cutler told him that he would not take the stand while Cutler was his lawyer. According to Eppolito, he was so angered by Cutler's refusal to call witnesses in his defense that he hit the table with both fists when Cutler informed the court that he was not going to call any witnesses; the court did not observe this occurrence.

On cross-examination, Eppolito described himself as a man who would lie in order to get what he wanted and admitted to numerous times that he had lied in order to further his career or image. He repeatedly contradicted his own prior recorded statements and written accounts and gave inconsistent answers to the same questions at

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.