--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

different times during his testimony. He told wild tales of alleged government corruption, admitted to making favorable statements about organized crime on a television interview show, confessed that he had removed at least one homicide and one missing persons file from the police department without permission, and described his own racism at great length. After admitting that he had once stuck a sawed-off shotgun in the mouth of a man who had insulted his mother, Eppolito seemed shocked when the prosecutor asked him whether he knew that he was not allowed to do that, responding that: "It was the seventies. That is what the procedures were." Conceding that he had threatened a construction worker in Las Vegas with a hatchet, Eppolito told the prosecutor that he was willing to die "right here now with you," then asserted that he was "not a violent guy."

*21 Eppolito's trial counsel, Bruce Cutler, testified about his preparation of the defense and his choices regarding trial strategy. According to Cutler, he primarily focused on attempting to show that Kaplan and the other government witnesses were lying in order to benefit themselves. When asked about the various strategic choices challenged by defendant Eppolito, Cutler gave thorough and credible explanations for making the choices he made, including his decision not to call Eppolito's brother-in-law, Al Guaneri; his decision not to admit additional portions of the recordings made by government witness Steven Corso; his decision not to cross-examine the mother of murder victim James Hydell; and his decision not to interview or call Anthony Casso.

Cutler also testified about his extensive preparation for the trial and his communication with Eppolito. According to Cutler, he had frequent pre-trial meetings with Eppolito and spoke with him on a regular basis during the three-week trial, although he was strongly resistant to Eppolito's attempts to make comments to him during the proceedings, when he was listening to testimony or the government's arguments. Cutler described his communication with Eppolito as "not always healthy," but always "open." He stated that he and Eppolito had not argued over the issue of Eppolito testifying and that Eppolito had only mentioned it to him once before trial, asking Cutler if Cutler thought that he would have to testify. Had Eppolito asked to testify, Cutler said, he would have tried to talk him out of it-even going so far as to "tackle him"-but that he would ultimately have assisted Eppolito in exercising his right, after asking the court for a continuance to prepare.

Cutler's co-counsel, Bettina Schein, corroborated Cutler's description of his extensive preparation for the trial. Schein also stated that there were times when Cutler asked Eppolito to stop commenting to him or passing

notes during witnesses' testimony. She did not recall Eppolito hitting the table when Cutler stated that there would be no witnesses called in his defense. According to Schein, she also discussed the possibility of testifying with Eppolito once prior to trial; at that time, she told him that it was her opinion that the dangers of his testifying would outweigh the benefits. She said that she did not specifically tell him that the decision whether to testify was his decision alone, but that she thought he knew he had a right to testify if he wanted to do so.

Trial counsel for defendant Caracappa, Edward Hayes, testified about Cutler's relationship with Eppolito, stating that the two men argued at times because Cutler did not want Eppolito to interrupt when he was listening to witness testimony. Hayes said that he never heard Eppolito discuss the issue of testifying with Cutler. Hayes also testified about communication between trial counsel and their clients during the course of the trial, indicating that they all spoke frequently with one another, although formal meetings were not held.

*22 Hayes' co-counsel, Rae Koshetz, testified about pre-trial preparation and communication during the course of the trial, corroborating the accounts given by Cutler, Schein, and Hayes. She also indicated that she never heard Eppolito and Cutler discuss the issue of Eppolito testifying. Koshetz was questioned at length about her prior employment as a deputy commissioner of the New York City police department and gave credible testimony that this association had not affected her work on the case in any way.

Defendant Eppolito's daughter, Andrea Eppolito, testified passionately about the conflicts that arose between her father and Cutler. According to Ms. Eppolito, her father was extremely frustrated with Cutler, did not understand why he made the choices he made regarding trial strategy, and felt that he was not being listened to. Ms. Eppolito testified to a few occasions that she saw Cutler cut off conversations with her father during the trial and described her father's desire to call Anthony Casso.

### 2. Defendant Caracappa's Witnesses

Domenick Caracappa, defendant Caracappa's brother and a retired officer with the New York City housing police department, testified about his brother's activities in Las Vegas and about his own involvement in the investigation of his brother's case. Although Domenick Caracappa helped investigate his brother's defense whenever he was in town; he went through some discovery materials with the investigators and was present at some strategy meetings with them. Domenick Caracappa testified that

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

he was disappointed in Hayes' failure to call him as a witness. He also testified that he shared information with Hayes and that Hayes listened, although he felt that Hayes was insufficiently focused on elements of the investigation that seemed important.

Jack Ryan, an investigator hired by Hayes, testified about his involvement in the investigation of the defendants' cases, focusing on his interactions with Hayes. Ryan testified that he had frequent and easy access to Hayes and that he provided him with a great deal of information, including information about "paper flow" in the New York City police department. According to Ryan, Hayes was generally attentive, although he sometimes seemed uninterested in particular pieces of information. He accepted and used some suggestions provided by the investigators and disregarded others; Ryan testified that he would have made different choices regarding strategy.

Edward Hayes testified about his preparation of the defense and his choices regarding trial strategy. Hayes was questioned about the various strategic choices challenged by defendant Caracappa and gave thorough and credible explanations for making the choices he made in the presentation of the case. For example, when asked about his choice to have his co-counsel, Rae Koshetz, argue the statute of limitations in summation, Hayes explained that he chose not to make this argument himself because he wanted to retain credibility when arguing the facts to the jury; in Hayes' assessment, while the statute of limitations argument was important, it could also prove alienating to the jury and had to be approached with caution. Hayes also stated that he had considered calling Domenick Caracappa, but decided not to do so because he thought that this would draw negative attention to defendant Caracappa's failure to testify in his own defense.

**\*23** Defendant Caracappa also submitted affidavits from Domenick Caracappa and Jack Ryan, in which the affiants gave additional details about the investigation of the defense case. These affidavits were deemed part of the record of the evidentiary hearing.

### III. Defendants' Rule 33 Motions

### A. Standard of Review

[1][2] Rule 33 of the Federal Rules of Criminal Procedure directs a trial court to grant a new trial "if the interest of justice so requires." Fed.R.Crim.P. 33. "The rule by its terms gives the trial court broad discretion ... to set aside a jury verdict and order a new trial to avert a perceived

miscarriage of justice." United States v. Ferguson, 246 F.3d 129, 133 (2d Cir.2001). "The ultimate test is whether letting a guilty verdict stand would be a manifest injustice.... There must be a real concern that an innocent person may have been convicted." United States v. Canova, 412 F.3d 331, 349 (2d Cir.2005) (internal quotations and citations omitted).

"Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances." Ferguson, 246 F.3d at 134. See also United States v. Perez, No. 01-CR-848, 2003 WL 721568, at \*3 (S.D.N.Y., Feb.28, 2003) ("It is well settled ... that 'motions for new trials are not favored and should be granted only with great caution.' ") (quoting United States v. Costello, 255 F.2d 876, 879 (2d Cir.1958)).

Because defendants have made no showing that the jury's verdict was the result of a "manifest injustice," Canova, 412 F.3d at 349, or that this case presents any "extraordinary circumstances," Ferguson, 246 F.3d at 134, their Rule 33 motions are denied on all grounds. The defendants were well represented and had a full and fair trial.

Defendants' specific arguments in support of their Rule 33 motions are addressed below.

### B. Defendants' Brady Claim

### 1. Law

[3] Under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), a new trial is warranted when the defendant shows (1) government "suppression" of (2) evidence favorable to defendant, and (3) that the evidence is material. Moore v. Illinois, 408 U.S. 786, 794-95, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972); United States v. Payne, 63 F.3d 1200, 1208 (2d. Cir.1995).

[4] There is no distinction between exculpatory evidence and impeachment either evidence for Brady purposes. Failure to disclose either may constitute a violation. United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

[5] "The prosecutor must disclose 'material' exculpatory and impeachment information no later than the point at which a reasonable probability will exist that the outcome would have been different if an earlier disclosure had

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

been made." *United States v. Coppa,* 267 F.3d 132, 142 (2d Cir.2001). *See also Leka v. Portuondo,* 257 F.3d 89, 100 (2d Cir.2001).

### 2. Application of Law to Facts

**\*24** Defendants argue that a new trial is warranted because of the government's late disclosure of two letters sent to it by Anthony Casso. The first of these letters was received by the government in July 2005 and asserted in part that government witness Alphonse D'Arco did not know anything about either of the defendants. The second was received by the government on March 27, 2006. In this letter, Casso alleged that the defendants were innocent of at least some of the crimes charged against them.

The day after it received the second letter, the government informed defense counsel that it was in possession of exculpatory information and agreed to set up a telephone call between the defense and Casso. This call took place on March 30, 2006, at which time Casso stated that he had been trying to contact defense counsel directly but had received no response. Following the telephone conversation, the defense received copies of both letters.

[6] On the record before it, the court concludes that the government's alleged delay in disclosure of these two letters does not warrant the granting of a new trial. Aside from being generally unreliable and inadmissible as hearsay, the first letter was not favorable to defendants or exculpatory. *See, e.g., United States v. Kohlman,* 469 F.2d 247, 252 (2d Cir.1972) (value of statement was "so tenuous at best that it could hardly be classified as material favorable to the defendant under *Brady* "). Casso's claims about D'Arco in that letter were consistent with D'Arco's own testimony at trial; D'Arco himself stated that he had not met and did not know anything about either of the defendants.

[7] After receipt of the second letter, the government informed the defense about Casso's claims and assisted the defense in contacting him. It is unclear how the three-day delay in disclosure of the letter itself could have harmed the defendants. The information in the letter was less specific than the information offered during the phone call, and the letter itself consisted of inadmissible hearsay. Furthermore, defense counsel knew from before the beginning of the trial that Casso was a potential source of information or a potential witness, and, given his questionable reliability, had made the decision not to rely on him in any way. There is no "suppression" where defendant or his attorney "either knew, or should have known, of the essential facts permitting him to take

advantage of [the] evidence." *United States v. Zackson,* 6 F.3d 911, 918 (2d Cir.1993) (internal quotations omitted).

### C. Defendants' Claims of Ineffective Assistance of Trial Counsel

### 1. Law

[8] Under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a defendant will be granted a new trial upon a claim of ineffective assistance of counsel only where counsel's conduct: (1) fell below "an objective standard of reasonableness"; and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694, 104 S.Ct. 2052. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

**\*25** [9] When evaluating counsel's performance, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 (internal quotations omitted). As the Court emphasized, "there are countless ways to provide effective assistance in any given case" and "even the best criminal defense attorneys would not defend a particular client in the same way." *Id.*

### a. Failure to Investigate, Call Favorable Witnesses, and Admit or Marshal Favorable Evidence

[10] "The duty to investigate is essential to the adversarial testing process 'because the testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies.' " *Greiner v. Wells,* 417 F.3d 305, 320 (2d Cir.2005) (quoting *Kimmelman v. Morrison,* 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986)). This duty requires defense counsel either "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052; *see also Williams v. Taylor,* 529 U.S. 362, 395-96, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Lindstadt v. Keane,* 239 F.3d 191, 200 (2d Cir.2001). It does not, however, compel counsel to conduct a comprehensive investigation of every possible lead or defense, *see, e.g., Strickland,* 466 U.S. at 699, 104 S.Ct. 2052; *Wells,* 417

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

F.3d at 321, or "to scour the globe on the off-chance something will turn up." *Rompilla v. Beard,* 545 U.S. 374, ----, 125 S.Ct. 2456, 2463, 162 L.Ed.2d 360 (2005). "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Id.*

### b. The Right to Testify

[11][12] A defendant's right to testify in his own defense is personal and may not be waived by his attorney over the defendant's opposition. *Brown v. Artuz,* 124 F.3d 73 (2d Cir.1997); *Campos v. United States,* 930 F.Supp. 787, 789 (S.D.N.Y.1996). Trial counsel's duty of effective assistance includes the responsibility to advise the defendant concerning the exercise of this constitutional right. *Brown,* 124 F.3d at 79.

"[A]ny claim by [a] defendant that defense counsel has not discharged this responsibility-either by failing to inform the defendant of the right to testify or by overriding the defendant's desire to testify-must satisfy the two-prong test established in *Strickland v. Washington* for assessing whether counsel has rendered constitutionally ineffective assistance": objectively unreasonable performance and prejudice. *Id.* (internal citations omitted).

### 2. Application of Law to Facts

### a. Failure to Investigate, Call Favorable Witnesses, and Admit or Marshal Favorable Evidence

Both defendants maintain that a new trial is warranted because they did not receive the effective assistance of trial counsel guaranteed by the Constitution. In support of these claims, both defendants contend that their counsel failed to investigate thoroughly or follow up on inquiries made by the investigators and that they neglected to call witnesses or proffer other evidence that could have provided a credible defense to the crimes charged.

**\*26** [13] The performance of both attorneys was far from constitutionally ineffective. Counsel were assisted by excellent investigators who, with the help of both defendants and Caracappa's brother, Domenick Caracappa, thoroughly investigated the case, studying vast amounts of discovery material and following up on leads. Multiple witnesses testified that Eppolito's counsel, Bruce Cutler, personally analyzed hundreds of hours of audio recorded by key government witness Steven Corso. Investigator Jack Ryan-called by Eppolito to testify on his

behalf at the hearing-stated that Cutler was open and approachable regarding investigative leads. Caracappa's trial counsel, Edward Hayes, was given numerous reports by Ryan and others; according to Ryan, Hayes used part of the material given to him and disregarded part of it. That Hayes occasionally appeared uninterested in what Ryan had to say and that his approach to the case did not always conform with that of the investigators may have frustrated the investigators, but it did not reflect any professional failure on his part. The perspective of an attorney in charge of a case is often different from that of an investigator, and it is the attorney's role to make strategic and tactical decisions. *See, e.g., Brown,* 124 F.3d at 77; *Rompilla,* 125 S.Ct. at 2463. In each instance where investigators and others disagreed with counsel's decisions, the determination of the attorney was defensible and sound on strategic and tactical grounds.

Eppolito maintains that his trial counsel was ineffective because he refused to call witnesses that Eppolito thought could assist him, including Lizzie Hydell, the sister of murder victim James Hydell; Al Guaneri, Eppolito's brother-in-law and fellow retired New York City police detective; and Anthony Casso, the defendants' prevaricating co-conspirator. Cutler's choice not to call these witnesses, however misunderstood by his client, was not only a reasonable strategic decision, but an eminently wise one. As Cutler explained, the value of Guaneri's testimony was debatable and Guaneri indicated that he had mixed feelings about Eppolito and was reluctant to testify. Lizzie Hydell was understandably hostile to Eppolito, casting doubt on the value of any testimony she might have been able to give on his behalf. Calling Casso would have been an unmitigated disaster; up until the final days of the trial, Casso had done nothing but implicate the defendants, even making eleventh-hour attempts to assist the government.

Given the strong evidence presented by the government, the primary strategy left to defense counsel was, as Cutler testified, to "pulverize" the government's witnesses on crossexamination, which Cutler and Hayes both attempted with gusto. Cutler repeatedly and strenuously challenged the credibility of the witnesses, pointing out their motives to lie and the inconsistencies and weaknesses in their testimony. That his attempts to shake these witnesses was ultimately unsuccessful is not an indication of any failing on Cutler's part, but rather resulted from the overwhelming strength of the government's case and its witnesses.

**\*27** Hayes' cross-examination was more restrained than Cutler's but equally forceful. During his cross-examinations of both Burton Kaplan and Thomas Galpine, Hayes-as a result of his research and thorough

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

grasp of the case-elicited evidence of additional bad acts committed by the witnesses. In his cross-examination of Peter Franzone, he emphasized the inconsistencies between Franzone's testimony and the physical evidence described by forensic anthropologist Bradley Adams. Hayes also effectively cross-examined the government's law enforcement witnesses, knowledgeably attacking the government's theories regarding the flow of information from New York City police department files through Caracappa to Kaplan and Casso.

While other counsel might have taken a different approach to summation in this case, the court cannot conclude that trial counsel's attempt to blow dust in the jury's eyes was a constitutionally ineffective strategy. Despite the somewhat superfluous comments challenged by Eppolito, Cutler forcefully continued his attack on the government's witnesses in his summation, calling attention to their motives to falsely implicate the defendants in exchange for reduced sentences or entry into the witness protection program. Hayes used his summation to point to inconsistencies and holes in the government's case and re-iterated his attack on the credibility of the government's key witness, Burton Kaplan. He also developed the differences between his client and Eppolito, pointing to Caracappa's comparative lack of motive to commit the charged crimes in exchange for monetary gain.

Hayes' co-counsel, Rae Koshetz, argued the statute of limitations issue at length and in detail. Although Koshetz's argument was ostensibly made solely on behalf of Caracappa, it should, for the purposes of determining prejudice, be deemed to have been made for both defendants, since the argument applied equally to both. Thus, even if it was error for Cutler not to have raised the statute of limitations argument in his own summation, Eppolito could not have been prejudiced by this failure on the part of his counsel.

The court has considered the additional allegations of error relied upon by the defendants and concludes that none of these contentions supports the conclusion that the defendants were denied the effective assistance of counsel guaranteed by the Constitution. While there may be disagreement as to the value of the sometimes baroque style of these two attorneys, they were clearly skilled, dedicated to their clients, and enormously hardworking. Monday-morning quarterbacking is not a sport encouraged by the laws governing ineffective assistance claims. *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 ("there are countless ways to provide effective assistance in any given case" and "even the best criminal defense attorneys would not defend a particular client in the same way").

### b. The Right to Testify

[14] Defendant Eppolito maintains that he was denied effective assistance of trial counsel because his counsel failed to inform him that he had a constitutional right to testify and prevented him from testifying in his own defense.

*28 At the June 23, 2006 evidentiary hearing, Eppolito testified that his trial counsel, Bruce Cutler, had not informed him that he had a constitutional right to testify and had repeatedly refused his requests to take the stand, telling him that he would never take the stand so long as Cutler was his attorney. Eppolito also asserted that, despite his over twenty years of work in law enforcement, he was unaware of his right to testify. Although both Cutler and his co-counsel, Bettina Schein, conceded that neither of them had specifically informed Eppolito that he had a constitutional right to testify, both refuted Eppolito's claim that he had repeatedly insisted that he should testify. Cutler and Schein testified that they had each discussed the issue of Eppolito testifying with him once before the trial, advising him that his testimony would do little to help and much to hurt him, given the court's exclusion of bad acts evidence the government wanted to introduce. Schein also testified that her discussion with Eppolito led her to believe that Eppolito was well aware of his right to testify if he chose to do so over counsel's advice.

Because Eppolito's testimony at the hearing made it clear that he was not a credible witness-he admitted to being an inveterate liar, repeatedly contradicted his own prior recorded statements and written accounts, and gave inconsistent answers to the same questions at different times during his testimony-the court does not credit his assertions regarding his lack of knowledge of his right to testify and Cutler's refusal to allow him to testify.

As for Cutler's failure to inform Eppolito of his right, the law is unclear regarding whether he was required to give Eppolito a prophylactic, Miranda-like warning or merely to determine that Eppolito was aware of, and could make an intelligent decision regarding, his right to testify. *Compare Brown,* 124 F.3d at 79 ("counsel must inform the defendant that the ultimate decision whether to take the stand belongs to the defendant") with *DeLuca v. Lord,* 858 F.Supp. 1330, 1358 (S.D.N.Y.1994) ("There is no blanket requirement that counsel must explicitly warn all of their clients that they have the ultimate right to decide whether or not to testify."). Cutler admitted that he did not, in so many words, tell Eppolito that he had an absolute right to testify, but both he and Schein discussed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

Page 30

the issue of testifying with Eppolito, and Schein believed Eppolito knew of his right.

Regardless of the relevant standard-and regardless of whether Cutler did or did not fulfill it-Eppolito's claim must fail. Even if Cutler was required to explicitly inform Eppolito of his right to testify, Eppolito did not establish that the outcome of the trial could have been different had he testified. _Strickland, 466 U.S. at 694, 104 S.Ct. 2052_ (even if counsel's performance was objectively unreasonable, defendant must show that there is a "reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different"). On the contrary, Eppolito's testimony at the hearing made it overwhelmingly clear that his testimony at the trial would have proven a disaster to himself and his co-defendant.

**\*29** In addition to describing himself, under oath, as a man who would lie in order to get what he wanted, Eppolito gave numerous examples of times when he had lied or embellished in order to further his career or his image. He discussed his own racism at great length, volunteering a long list of racial slurs that he said he often used; admitted to having placed a sawed-off shotgun in the mouth of a man who had insulted his mother, expressing disbelief when the prosecutor asked him whether he knew that such an act was illegal; and confessed to having removed files from the police department without permission. On cross-examination, he repeatedly volunteered more self-damaging information than was necessary to answer the prosecution's questions. As for his testimony regarding the crimes with which he was charged, it appears that, aside from a general denial of involvement, Eppolito had little to say. Although Eppolito claimed that he had told his counsel that he could refute the charges against him, his testimony at the hearing gave no indication that this was the case. His testimony about the critical issue of his association with Burton Kaplan-namely, that he knew Kaplan as a merchant of clothing-would not have added anything that had not been brought out on his counsel's cross-examination of Kaplan.

### D. Allegedly "Misleading" Redirect of Government Witness Steven Corso

#### 1. Law

**[15][16]** The scope of redirect examination is "a matter entrusted to a trial judge's broad discretion." _United States v. Diaz, 176 F.3d 52, 80 (2d Cir.1999)_ (citing _United States v. Wiley, 846 F.2d 150, 156 (2d Cir.1988)_).

Redirect may be "used to rebut false impressions arising from cross-examination." _United States v. Bilzerian, 926 F.2d 1285, 1296 (2d Cir.1991)_ (citing _United States v. Mang Sun Wong, 884 F.2d 1537, 1544 (2d Cir.1989)_). _See also United States v. Gambino, 59 F.3d 353, 368 (2d Cir.1995)_ ("Otherwise inadmissible testimony may be received on re-direct in order to rebut a false impression created by an opposing party during crossexamination.") (citing _United States v. Rosa, 11 F.3d 315, 335 (2d Cir.1993)_; _Wiley, 846 F.2d at 156_). The trial judge is in the best position to determine whether a false impression requiring a particular line of redirect examination was created. _Diaz, 176 F.3d at 80._

#### 2. Application of Law to Facts

**[17]** Defendants contend that they must be granted a new trial because the evidence on the two drug counts was "irrevocably tainted" by the government's "misleading" redirect examination of witness Steven Corso. According to the defendants, this redirect examination "left [the jury] with a false impression that itself constituted the principal evidence supporting the convictions on these charges." Caracappa Br. in Supp. of Rule 29 and 33 Mot. 20-21. This contention misapprehends the content of the cross-examination and of the government's redirect examination. Moreover, it attributes inflated importance to a short colloquy during the redirect examination of Corso, when taken together with the other evidence of the drug transaction.

**\*30** During its direct examination of Corso, the government introduced evidence of the February 15, 2005 conversation between the defendants and Corso. At this conversation, Corso told the defendants that he needed to obtain some "designer drugs" for his potential investors, and the defendants responded that Corso should contact Guido Bravatti.

On cross-examination, co-counsel for defendant Caracappa engaged in the following exchange with Corso:
Q: When you first met Mr. Carcacappa on January 31, 2005, did you or anyone else bring up the subject of drugs, of selling drugs?
A: I don't recall, no. I don't recall that we did, no.

Q: Now, the second time you see Steve Caracappa is February 8, 2005, isn't that right; does that sound right to you?
A: I could be mistaken. I believe it was February 8th, but it was in February. Q: Did anybody ... Did you drop the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

subject into the conversation of a sale of designer drugs at that point?
A: I think-
Q: Sir, just yes or no.
A: I don't believe so, no.
Q: On February 15, when you introduced the subject of designer drugs, did either Stephen Caracappa or Louis Eppolito ever discuss quality of particular drugs with you during that dinner?
A: No, I don't believe at dinner they discussed the quality of particular drugs.
Q: Did they ever discuss a quantity of drugs with you?
A: No.
Q: Did they ever say anything about the price of drugs to you?
A: No.
Q: Did either of these men ever handle any drugs in your presence?
A: I never saw-
Q: Physically handle any drugs in your presence?
A: No.

In response to this cross-examination, the government on redirect asked Corso if, aside from the exchange on February 15, he had *ever* had conversations with the defendants about drug quality and price. The government's questions were carefully circumscribed to evoke only "yes" or "no" answers, in order to avoid running afoul of the court's pre-trial ruling-favorable to the defense-excluding the defendants' statements to Corso concerning their prior involvement with drugs. Corso answered the government's questions in the affirmative, agreeing that he had discussed both drug quality and drug price with the defendants on other occasions. This testimony was received over the objection of defense counsel.

Defendants maintain that the import of the cross-examination was that they did not negotiate the particulars of the drug transaction during the February 15 conversation and that, as a result, the government's redirect created the false impression that the defendants had in fact negotiated these particulars at some other time. The overall thrust of defense counsel's line of questioning, however, was not directed simply at defendants' degree of involvement in the charged narcotics transaction. Rather, the exchange incorrectly implied that the defendants had never before discussed drugs with Corso and portrayed them as generally unknowledgeable about the subject of drugs and drug dealing. The government's questions on redirect were necessary to clear up this false impression. *Bilzerian, 926 F.2d at 1296; Diaz, 176 F.3d at 80.* Far from "leaving the jury with the unmistakable and totally false impression that [the] defendants had negotiated the

sale of drugs at issue," Caracappa Br. 22-23, the government's redirect examination of Corso properly adduced evidence that, aside from the conversation on February 15, the defendants had spoken with Corso about drugs on other occasions.

*31 [18] Defendants also argue that, after a colloquy during which defense counsel asked the court for a curative instruction, "[t]he court then abruptly shut down the re-cross-examination on this issue." Caracappa Br. 22. That claim is belied by the record.

After counsel for Caracappa began re-cross-examination, the government interrupted to explain that the redirect had focused on issues that were the subject of the court's pre-trial ruling. The court then dismissed the jury, at which time defense counsel explained that he had no intention of opening the door to testimony about the defendants' prior involvement with drugs and that he would move on to another subject. Contrary to the defendants' contention, the court never precluded further questioning on this subject; rather, defense counsel, recognizing the peril of continuing in that line of inquiry, voluntarily abandoned it, which the court indicated was probably a sound choice.

[19][20] The district court has "discretion to manage trials so that evidence is effectively presented." *United States v. Quattrone,* 441 F.3d 153, 183 (2d Cir.2006) (citing Fed.R.Evid. 611(a)). "The trial-management authority entrusted to district courts includes the discretion to place reasonable limits on the presentation of evidence." *Id.* (internal quotation and citation omitted). Here, the court acted well within the bounds of its discretion in its agreement that defense counsel would be wise to move from the minefield of the defendants' statements regarding drug quality, quantity and price to a new topic for re-cross-examination.

### IV. Defendants' Rule 29 Motions

Both defendants move for a judgment of acquittal under Federal Rule of Criminal Procedure 29 on the racketeering conspiracy and substantive narcotics charges. Defendant Eppolito does not challenge the jury's finding of guilt on the money laundering charge.

For the reasons explained below, the court grants the defendants' motions and enters a judgment of acquittal on the racketeering conspiracy charge. It denies the defendants' motions on the narcotics charges.

### A. Rule 29

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

Page 32

## 1. Standard of Review

[21] Under Federal Rule of Criminal Procedure 29, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." When evaluating a motion for a judgment of acquittal, the court must determine whether a rational jury could conclude beyond a reasonable doubt that a defendant is guilty of the crime charged. United States v. Strauss, 999 F.2d 692, 696 (2d Cir.1993); United States v. Pitre, 960 F.2d 1112, 1120 (2d Cir.1992) (citing Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). The conviction must stand "if any rational trier of fact could have found the essential elements of the crime established beyond a reasonable doubt." United States v. Moore, 54 F.3d 92, 100 (2d Cir.1995).

[22] The burden on the defendant to meet this standard is "very heavy." Strauss, 999 F.2d at 696; United States v. Nersesian, 824 F.2d 1294, 1324 (2d Cir.1987). When evaluating the evidence against a particular defendant, it must be viewed in a light that is most favorable to the government, Moore, 54 F.3d at 100, and all reasonable inferences must be resolved in favor of the government. United States v. Mariani, 725 F.2d 862, 865 (2d Cir.1984). The jury may reach its verdict based upon inferences drawn from circumstantial evidence, and the evidence must be viewed in conjunction, not in isolation. Moore, 54 F.3d at 100.

## 2. Timing of Motion

*32 A defendant may make a motion for a judgment of acquittal pursuant to Rule 29 at the close of the government's evidence, at the close of all the evidence, or after the jury has returned with a verdict of guilty. Fed.R.Crim.P. 29(a)-(c). If the defendant makes the motion before submission of the case to the jury, the district court may decide the motion at that time or reserve decision until after the jury has pronounced its verdict. Fed.R.Crim.P. 29(b). See also, e.g., United States v. Reyes, 302 F.3d 48, 50 (2d Cir.2002) (a district court may reserve decision on a motion for judgment of acquittal).

[23][24] The option to reserve allows the court "to balance the defendant's interest in an immediate resolution of the motion against the interest of the government in proceeding to a verdict thereby preserving its right to appeal in the event a verdict of guilty is returned but is then set aside by the granting of a judgment of acquittal." Fed.R.Crim.P. 29 advisory

committee's note (1994 amendments). "Under the double jeopardy clause, the government may appeal the granting of a motion for judgment of acquittal only if there would be no necessity for another trial." Id. (citing United States v. Martin Linen Supply Co., 430 U.S. 564, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977)). The government's right to appeal from an adverse decision on a Rule 29 motion is only preserved where the ruling is reserved until after the verdict. See, e.g., Smith v. Massachusetts, 543 U.S. 462, 467, 125 S.Ct. 1129, 160 L.Ed.2d 914 (2005) ("Our cases have made a single exception to the principle that acquittal by judge precludes reexamination of guilt no less than acquittal by jury: When a jury returns a verdict of guilty and a trial judge (or an appellate court) sets aside that verdict and enters a judgment of acquittal, the Double Jeopardy Clause does not preclude a prosecution appeal to reinstate the jury verdict of guilty.").

Defendants first moved for a judgment of acquittal in this case at the close of the evidence. Because of the complicated and important legal issues involved, the court chose to reserve decision in order to preserve the government's right to appeal if, after a verdict of guilty, the court determined that the verdict had to be set aside.

## B. Racketeering Conspiracy

### 1. Law

The defendants were found guilty of conspiring to conduct the affairs of an enterprise through a pattern of racketeering activity in violation of section 1962(d) of Title 18 of the United States Code. They maintain that they are entitled to a judgment of acquittal on this charge because the government's evidence on the enterprise and pattern elements was insufficient to bring the charged conspiracy within the applicable statute of limitations.

#### a. Statute of Limitations

[25] The statute of limitations applicable to violations of section 1962(d) of Title 18 of the United States Code provides that "[n]o person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found ... within five years next after such offense shall have been committed." 18 U.S.C. § 3282(a). The limitations period is measured from the point at which the crime is complete. United States v. Persico, 832 F.2d 705, 713 (2d Cir.1987).

*33 [26] A racketeering conspiracy offense is complete, commencing the running of the statute of limitations,

when the purposes of the conspiracy have been accomplished or abandoned. _Id. See also United States v. Salerno,_ 868 F.2d 524, 534 (2d Cir.1989). Hence, the "crucial question" in determining whether the statute of limitations has run on a charge of racketeering conspiracy "is the scope of the conspiratorial agreement, for it is that which determines ... the duration of the conspiracy." _Grunewald v. United States,_ 353 U.S. 391, 397, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957). The scope of the conspiratorial agreement is, in turn, dependent on the nature of the charged enterprise and the pattern of racketeering activity through which it is to be conducted.

[27] Because proof of a racketeering conspiracy does not require proof of an overt act in furtherance of the conspiracy, _Persico,_ 832 F.2d at 713, there is no requirement that an overt act be performed within the limitations period. _Id. See also United States v. Spero,_ 331 F.3d 57, 60 (2d Cir.2003).

### b. Enterprise

[28] An enterprise includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The existence of an enterprise is proven "by evidence of an ongoing organization, formal or informal, and by evidence that various associates function as a continuing unit." _United States v. Turkette,_ 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). _See also United States v. Minicone,_ 960 F.2d 1099, 1106 (2d Cir.1992). The enterprise proven need not have any particular structure, and an association in fact enterprise may change its membership during the course of its activity. _See, e.g., United States v. Bagaric,_ 706 F.2d 42, 56 (2d Cir.1983) ("it is logical to characterize any associative group in terms of what it _does,_ rather than by abstract analysis of its structure") (emphasis in original); _United States v. Coonan,_ 938 F.2d 1553, 1560-61 (2d Cir.1991) (an association in fact enterprise may continue to exist even though it undergoes changes in membership).

### c. Pattern of Racketeering Activity

[29][30] In order "to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." _H.J. Inc. v. Northwestern Bell Telephone Co.,_ 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Criminal conduct does not form a pattern until it embraces acts that have "the same or similar purposes, results, participants,

victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated acts." _Id._ at 240, 109 S.Ct. 2893. The individual predicate acts proved need not be directly related, but must at the very least be related to the enterprise in a way that makes them "indirectly connected to each other." _United States v. Locascio,_ 6 F.3d 924, 943 (2d Cir.1993). _See also, e.g., United States v. Indelicato,_ 865 F.2d 1370, 1383 (2d Cir.1989) (two racketeering acts that "are not directly related to each other may nevertheless be related indirectly because each is related to the RICO enterprise").

*34 [31][32] A "threat of continued criminal activity" may be established where "the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." _H.J. Inc.,_ 492 U.S. at 243, 109 S.Ct. 2893. "Where the enterprise is an entity whose business is racketeering activity, an act performed in furtherance of that business automatically carries with it the threat of continued racketeering activity." _Indelicato,_ 865 F.2d at 1383-84.

### d. Special Dangers Associated With Conspiracy and Racketeering Prosecutions

"Conspiracy theory provides federal prosecutors with a powerful flail to unseat criminals, a weapon so effective that many potential state prosecutions are shifted to the federal court by frustrated state district attorneys. Yet, its very effectiveness requires care that it is not utilized to commit injustice." _United States v. Gigante,_ 982 F.Supp. 140, 169 (E.D.N.Y.1997). The "looseness and pliability" of the doctrine of conspiracy "present inherent dangers which should be in the background of judicial thought wherever it is sought to extend the doctrine to meet the exigencies of a particular case." _Krulewitch v. United States,_ 336 U.S. 440, 449, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (Jackson, J., concurring).

The "temporal flexibility" of the doctrine of conspiracy "is particularly dangerous to defendants seeking to rely on [the] statute of limitations." _Gigante,_ 982 F.Supp. at 169. "Conspiracies came to be understood as crimes different from most others because of their continuing nature, extending over time." _Id. See also_ Rollin M. Perkins, Perkins on Criminal Law 635 (1969) (a "conspiracy always endures for some period of time although this may vary anywhere from a few seconds to a few years").

Federal laws against racketeering are similarly useful to prosecutors, and similarly malleable. _See, e.g.,_ Barry Tarlow, _RICO: The New Darling of the Prosecutor's Nursery,_ 49 Fordham L.Rev. 165 (1981) (describing the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

various prosecutorial advantages to charging a violation of federal racketeering law). The Court of Appeals for the Second Circuit has repeatedly cautioned against "undue prosecutorial zeal" in the invocation of racketeering law and emphasized that when it is invoked, district judges must evaluate each set of facts "independently." _United States v. Huber, 603 F.2d 387, 396 (2d Cir.1979). See also United States v. Weisman, 624 F.2d 1118, 1123 (2d Cir.1980); United States v. Bagaric, 706 F.2d 42, 58 (2d Cir.1983)._

## 2. Application of Law to Facts

In the present case, the government proved beyond a reasonable doubt that the defendants conspired to conduct the affairs of an enterprise through a pattern of racketeering activity. Moreover, although it was not required by the charges in the indictment, the government proved that the defendants in fact engaged in a pattern of racketeering activity through their involvement in at least eight murders, two kidnapings, and various acts of bribery, tampering, retaliation, and obstruction of justice. The defendants, together with Frank Santoro, Jr. and Burton Kaplan, established a "subcontracting" arrangement with members of organized crime, represented primarily by co-conspirator Anthony Casso. Through this enterprise, the defendants exploited their positions as present or past officers of the New York City police department in order to supply confidential law enforcement information to Casso and to carry out murders and kidnapings under color of law. In exchange for their services, the defendants were highly compensated, receiving a retainer of 4,000 dollars a month for years and an additional 25,000 to 65,000 dollars per murder contract.

**\*35** It is unclear precisely when this conspiracy came to an end. It could be seen as having ended when defendant Caracappa retired from the police department in 1992, or when Casso, the defendants' primary "client," was arrested in 1993. It may have lasted until Kaplan moved back to New York and was arrested in 1996. Up until that point, some remnant of the original enterprise arguably remained, and there was a possible-although minuscule-threat of continued racketeering activity connected to that enterprise.

[33] But once Anthony Casso and Burton Kaplan had both been arrested, once the two defendants had both retired from the police force and re-established themselves on the opposite side of the country, the conspiracy that began in New York in the 1980s had come to a definite close. The defendants no longer had access to confidential law enforcement information and

were no longer in contact with their old associates in the Lucchese crime family. Their enterprise had effectively been put out of business by their own retirements and their compatriots' arrests. _Compare, e.g., United States v. Maloney, 71 F.3d 645, 656 (7th Cir.1995)_ ("central criminal purpose" of a conspiracy to "fix cases whenever feasible" had not ended or been accomplished despite a period of inactivity where the judge involved was still on the bench, the lawyer involved was still practicing before him, and the conspirators continued to meet).

The government's inclusion of the four Nevada acts does not serve to lengthen the life of this conspiracy to within the five-year statute of limitations. The government maintains that the jury could have determined that these four acts were evidence of a continuing business venture on the part of the defendants-a sort of "mom and pop" general store of crime-through which they sold members of organized crime whatever services they were in a position to provide from 1986 until their arrests in 2005. This theory was not supported by the evidence at trial.

While the 1994-1996 monetary transaction involved two members of the earlier racketeering conspiracy-namely, Burton Kaplan and defendant Eppolito-this act was essentially a personal loan from Kaplan to Eppolito, unconnected to the original enterprise or to any other enterprise with which the defendants had been associated. _See, e.g., United States v. Diaz, 176 F.3d 52, 93 (2d Cir.1999)_ ("The requirements of relatedness and continuity prevent the application of RICO to isolated or sporadic criminal acts."); _Indelicato, 865 F.2d at 1375_ ("RICO was not intended to apply to sporadic and unrelated criminal acts."). The proceeds for this loan came from Kaplan's marijuana trafficking business, in which neither of the defendants had ever participated. Kaplan himself explicitly testified that, while the defendants had on occasion volunteered their "law enforcement" services in aid of this business, he had turned them down because it "had nothing to do with" the other crimes he was committing with them during the late 1980s and early 1990s. Eppolito's agreement to take marijuana proceeds from Kaplan was in no way a sale of his or Caracappa's "services" to Kaplan. Rather, it was a favor performed by Kaplan for Eppolito, tinged, as favors between criminals often are, by an acceptance of complicity on the part of the one receiving the favor.

**\*36** As for the 2004-2005 money laundering and narcotics charges, these crimes are also most accurately characterized as singular, "sporadic" acts of criminality-precisely the sort of criminal activity not covered by the laws against racketeering. _See, e.g., U.S. v. Diaz, 176 F.3d 52, 93 (2d Cir.1999); Indelicato, 865 F.2d at 1375._ Drawing every inference in favor of the government,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

Page 35

*Mariani,* 725 F.2d at 865, these acts could *at best* be seen as having been performed in furtherance of a new enterprise, unconnected to the original one and conducted through an entirely different type of activity. *See, e.g., United States v. Russotti,* 717 F.2d 27 (2d Cir.1983) (two separate enterprises established despite temporal overlap and overlap in membership because the conduct of each enterprise was distinct); *Bagaric,* 706 F.2d at 55 ("the nature of the misconduct often provides the best clue toward defining the enterprise").

After Eppolito retired from the New York City police department and moved to Las Vegas, he attempted a transition from the world of law enforcement to the world of entertainment. In pursuit of this goal, Eppolito established an ostensibly legitimate enterprise, "DeAntone Productions," and began seeking investors in his screenplays, many of which were about the world of organized crime. According to documents admitted by the government, Eppolito was the president of this company and Caracappa a vice president.

The final three racketeering acts were committed as a result of Eppolito's attempts to find investors for a particular film project: the money laundering grew out of Eppolito's agreement to accept funds from an investor described by government informant Steven Corso as a "mob guy in Florida involved in a drug deal," and the narcotics charges arose from both defendants' arguable willingness to help Corso obtain drugs that would keep prospective investors happy. None of these acts displayed the sort of fee-for-services arrangement typified by the New York acts and alleged by the government to be the essence of the defendants' continuing enterprise.

The government's attempts to rely on the nexus of organized crime to connect the New York and Nevada acts are unavailing, considering the significant differences between them. That Eppolito tangentially relied on his knowledge of, and prior association with, organized crime in his attempts to find investors for his new screenwriting endeavor is not surprising, nor is it in and of itself evidence that this enterprise was the same as the original one. A retired contractor who opens a delicatessen in his retirement may encourage his old employees and clients to buy their lunches at his new store, and time on job sites may have taught him what brand of pastrami those customers will prefer; that does not mean that he remains in the construction business.

The government maintains that even if the Nevada acts may not be seen as part of the same pattern of racketeering activity as those in New York, the continuation of the original enterprise-and thereby, the original conspiracy-may be established by means of the

defendants' continuing association and their efforts to conceal their prior crimes, both of which continued until the date of their arrest. The government's arguments on this point fail to persuade.

*37 [34] The duration of a conspiracy cannot be "indefinitely lengthened merely because the conspiracy is kept a secret, and merely because the conspirators take steps to bury their traces, in order to avoid detection and punishment after the central criminal purpose has been accomplished." *Grunewald v. United States,* 353 U.S. 391, 405, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957). Rather, acts of concealment may have significance in lengthening the life of a criminal conspiracy only when these acts are done "in furtherance of the main criminal objectives of the conspiracy"-such as when the conspirators in a kidnaping conspiracy hide while waiting for the delivery of ransom. *Id.* at 405-406, 77 S.Ct. 963. Because "every conspiracy will inevitably be followed by actions taken to cover the conspirators' traces," *id.* at 402, 77 S.Ct. 963, allowing evidence of such actions to extend the life of a conspiracy would "for all practical purposes wipe out the statute of limitations in conspiracy cases." *Id. See also Krulewitch,* 336 U.S. at 456, 69 S.Ct. 716 (Jackson, J., concurring) ("[T]he assumption of an indefinitely continuing offense would result in an indeterminate extension of the statute of limitations. If the law implies an agreement to cooperate in defeating prosecution, it must imply that it continues as long as prosecution is a possibility, and prosecution is a possibility as long as the conspiracy to defeat it is implied to continue.").

The acts of concealment that the government points to-that the defendants, while living in Las Vegas years after the completion of the New York acts, continued to keep an eye on each other in order to avoid detection and punishment for their prior crimes-were not taken in furtherance of the main criminal objectives of the conspiracy. As was demonstrated above, the main criminal objectives of the conspiracy were all accomplished by the time that the defendants had re-established themselves in Las Vegas. Even accepting all inferences in favor of the government on this point, *Mariani,* 725 F.2d at 865, and assuming that the defendants continued to associate with each other not because of friendship but solely for the purpose of concealment, these acts of covering up "can by themselves indicate nothing more than that the conspirators [did] not wish to be apprehended-a concomitant, certainly, of every crime since Cain attempted to conceal the murder of Abel from the Lord." *Grunewald,* 353 U.S. at 406, 77 S.Ct. 963.

**C. Narcotics Conspiracy and Distribution**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## 1. Law

[35][36] The defendants were found guilty of engaging in a conspiracy with the intent to distribute methamphetamine pursuant to sections 846 and 841(a)(1) of Title 21 of the United States Code. In order to sustain a conviction for conspiracy under these sections, the evidence must demonstrate that there existed an agreement or understanding between or among two or more persons to possess methamphetamine with the intent to distribute it and that a particular defendant knowingly became a member of the conspiracy. United States v. Martino, 759 F.2d 998, 1002-04 (2d Cir.1985); U.S. v. Murgas, 177 F.R.D. 97, 101 (N.D.N.Y.1998). "It is the unlawful agreement itself which constitutes the crime." Martino, 759 F.2d at 1004.

*38 [37][38] Because a conspiracy is "by its very nature ... a secretive operation," United States v. Provenzano, 615 F.2d 37, 45 (2d Cir.1980), the elements of the crime of conspiracy and a particular defendant's membership in the conspiracy may be proved entirely by circumstantial evidence. See, e.g., United States v. Tutino, 883 F.2d 1125, 1129 (2d Cir.1989). The evidence proffered "need not have excluded every possible hypothesis of innocence" to be sufficient to sustain a conviction. United States v. Soto, 716 F.2d 989, 993 (2d Cir.1983).

[39] Defendants also were found guilty of aiding and abetting the distribution of methamphetamine in violation of section 841(a)(1) of Title 21 of the United States Code. "An aiding and abetting conviction must be premised on 'more than evidence of a general cognizance of criminal activity' or 'suspicious circumstances.' " United States v. Cruz, 363 F.3d 187, 197 (2d Cir.2004) (quoting United States v. Samaria, 239 F.3d 228, 233 (2d Cir.2001)). To convict a defendant on a theory of aiding and abetting, the government must prove that the underlying crime-here, distribution of methamphetamine-"was committed by a person other than the defendant" and that "the defendant acted, or failed to act in a way that the law required him to act, with the specific purpose of bringing about the underlying crime." United States v. Labat, 905 F.2d 18, 23 (2d Cir.1990). "To prove that the defendant acted with that specific intent, the government must show that he knew of the proposed crime." Cruz, 363 F.3d at 198; Labat, 905 F.2d at 23.

## 2. Application of Law to Facts

[40] Although the evidence on the two narcotics counts was not as overwhelming as the evidence of the

defendants' involvement in the New York acts, it was sufficient to support the jury verdict of guilty on both charges.

At the dinner on February 15, 2005, government cooperator Steven Corso explicitly told the defendants that he needed help obtaining "designer drugs" for prospective investors in defendant Eppolito's film project. The ensuing conversation, during which both defendants instructed Corso to contact Guido Bravatti, was somewhat ambiguous, as drug transactions often are. See, e.g., United States v. Garcia, 291 F.3d 127, 139 (2d Cir.2002) ("We long have recognized that drug dealers seldom negotiate the terms of their transactions with the same clarity as business persons engaged in legitimate transactions."); United States v. Cancelmo, 64 F.3d 804, 808 (2d Cir.1995). When defendant Eppolito first responded to Corso's request, he told Corso to contact his son, Anthony Eppolito, and added that his son could take the investors "to all the places," possibly indicating that he thought he was simply helping Corso find good spots for the investors to party. Immediately after this response, however, Corso clarified his question, explaining again that the investors wanted drugs. Eppolito then responded that Corso should ask Guido Bravatti, and Caracappa agreed, telling Corso that "Guido could handle it."

*39 Applying every reasonable inference in favor of the government, Mariani, 725 F.2d at 865, the agreement evidenced in this conversation was sufficient to substantiate both the narcotics conspiracy charge and the charge that the defendants aided and abetted the February 17, 2005 drug transaction between Corso, Bravatti, and Anthony Eppolito. See, e.g., Martino, 759 F.2d at 1002-04; Labat; 905 F.2d at 23; Cruz, 363 F.3d at 198. When told that Corso's investors desired drugs, the defendants did not tell Corso that they could not help him, nor that they did not want anything to do with drugs. Rather, each of them directed him to Bravatti, whom both of them knew, as someone who could "handle" Corso's request. Eppolito then called Corso shortly after dinner to provide him with Bravatti's telephone number.

The evidence showed not only that the defendants never refused Corso's request for assistance, instead directing him to Bravatti, but also that Bravatti and Anthony Eppolito were more than eager to accommodate him. The young men's reaction undercuts the defendants' contention that they thought Corso was speaking to them about taking potential investors to clubs. Far from being taken aback by Corso's request for drugs on February 16 or from conveying their understanding that Corso merely wanted help taking the investors to clubs, both Anthony Eppolito and Bravatti immediately told him it was "no problem" for them to get him drugs. They also sought to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)

(Cite as: --- F.Supp.2d ----)

sell him more drugs than he requested, asking whether he only wanted one ounce of methamphetamine. Their reaction to Corso's request supports the reasonable inference that one or both of the defendants had spoken with either Bravatti or Anthony Eppolito prior to their meeting with Corso about Corso's interest in obtaining drugs.

Defendant Eppolito claims that the March 3, 2005 conversation he had with Corso evinces his lack of knowledge about the drug transaction. That contention is not persuasive. While Eppolito's order to Corso that he stop contacting Anthony Eppolito and Bravatti could be taken to indicate that he was angry that Corso had, contrary to Eppolito's expectations, involved the two young men in drugs, it could instead be construed as an indication of his unhappiness about the fact that his son was the one who personally delivered the drugs to Corso. As the government argued in its summation, Eppolito, a well trained and experienced detective, could be expected to know the dangers of personally handling drugs as opposed to merely directing others to do so. This inference, which the jury apparently drew, was supported by Eppolito's statement to Corso in the context of accepting money from an illegal source, in which Eppolito said that he would accept money from a drug dealer, but he would not personally transport drugs. *See, e.g., Soto*, 716 F.2d at 993 (the evidence proffered "need not have excluded every possible hypothesis of innocence").

## V. Spillover Prejudice

*40 [41] A court must "look to the totality of the circumstances to assess prejudicial spillover of evidence from dismissed counts." *United States v. Naiman*, 211 F.3d 40, 50 (2d Cir.2000). Specifically, the court must examine: "1) whether the evidence on the vacated counts was inflammatory and tended to incite or arouse the jury to convict the defendant on the remaining counts; 2) whether the evidence on the vacated counts was similar to or distinct from that required to prove the remaining counts; and 3) the strength of the government's case on the remaining counts." *Id. See also United States v. Morales*, 185 F.3d 74, 82 (2d Cir.1999) (same); *United States v. Wapnick*, 60 F.3d 948, 953-54 (2d Cir.1995) (same); *United States v. Henry*, 325 F.3d 93, 109 (2d Cir.2003) ("a defendant is only likely to succeed on a claim of prejudicial spillover when evidence is introduced on the invalidated count that would otherwise be inadmissible ... and this evidence is presented in such a manner that tends to indicate that the jury probably utilized this evidence in reaching a verdict on the remaining counts").

[42] Here, there was undoubtedly spillover prejudice affecting the defendants' right to a fair trial on the final three counts of the indictment-a charge of money laundering against defendant Eppolito and two narcotics charges against both defendants. The government's case on the racketeering count was extremely inflammatory, including strong evidence of the defendants' involvement in two kidnapings and eight murders. The evidence of the two drug charges, while sufficient to sustain the verdicts, was relatively weak. The evidence of the money laundering charges was stronger, but on that count too, the government's case was far from overwhelming. It would have been all but impossible for even this most attentive and responsible of juries to have evaluated these charges completely independent of the evidence of the main racketeering charge. The defendants must be granted a new trial on both the money laundering and narcotics charges upon dismissal of the racketeering conspiracy count.

## VI. The Rule of Law

It will undoubtedly appear peculiar to many people that heinous criminals such as the defendants, having been found guilty on overwhelming evidence of the most despicable crimes of violence and treachery, should go unwhipped of justice. Yet our Constitution, statutes, and morality require that we be ruled by the law, not by vindictiveness or the advantages of the moment. If we are to be ruled by the law, we must be limited by its protections. As Justice Holmes reminded us, it is "a less evil that some criminals should escape than that the government should play an ignoble part." *Olmstead v. United States*, 277 U.S. 438, 470, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Holmes, J., dissenting). Even during the great emergency of the Civil War, the courts rejected the theory that the rule of law could be twisted to meet the exigencies of the moment. In *Ex Parte Milligan*, 71 U.S. 2, 120-121, 4 Wall. 2, 18 L.Ed. 281 (1866), the Court wrote: "The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances. No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government." And, as John Locke declared in his Second Treatise of Government-and as the events of the last century have demonstrated-"[w]herever Law ends, Tyranny begins." Second Treatise on Government § 202 (1690).

*41 The government's case against these defendants

stretches federal racketeering and conspiracy law to the breaking point, alleging that they may be convicted for a decade-old series of crimes on the basis of three completely unrelated criminal acts committed years later in an entirely different geographical area and milieu and under different circumstances. The evidence at trial was not sufficient for a finding of guilt beyond a reasonable doubt regarding the over twenty-year-long racketeering conspiracy alleged. The five-year statute of limitations bars conviction on the shorter conspiracy proven.

The court cannot, despite its reluctance, abjure its obligation to enforce the law because of a concern that these two men might go unpunished. To allow this verdict to stand would turn an already "elastic" and "sprawling" set of laws into an inescapable trap. *Cf. Krulewitch, 336 U.S. at 445-46, 69 S.Ct. 716* (Jackson, J., concurring) ("This case illustrates a present drift in the federal law of conspiracy which warrants some further comment because it is characteristic of the long evolution of that elastic, sprawling and pervasive offense. Its history exemplifies the tendency of a principle to expand itself to the limit of its logic. The unavailing protest of courts against the growing habit to indict for conspiracy in lieu of prosecuting for the substantive offense itself, or in addition thereto, suggests that loose practice as to this offense constitutes a serious threat to fairness in our administration of justice.") (internal quotations omitted).

The decision to enter a judgment of acquittal on the charge of racketeering conspiracy is required by the very essence of the rule of law. That rule cannot be manipulated in order to punish the guilty who under the law are immune. In Robert Bolt's play, "A Man for All Seasons," Sir Thomas More declaims what is the essence of the American credo, explaining why even the devil himself must be given the benefit of the law:
More: ... What would you do? Cut a great road through the law to get after the Devil?
Roper: I'd cut down every law in England to do that!
More: Oh? And when the last law was down, and the Devil turned round on you, where would you hide, Roper, the laws all being flat? This country's planted thick with laws from coast to coast-man's laws, not God's-and if you cut them down-and you're just the man to do it-do you really think you could stand upright in the winds that would blow then? Yes, I'd give the Devil benefit of law, for my own safety's sake.

Robert Bolt, A Man for All Seasons, act I, scene seven (1967).

## VII. Conclusion

Defendants' motions for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 are granted as to the racketeering conspiracy charge and denied as to the narcotics charges. Although defendants' motions for a new trial pursuant to Federal Rule of Criminal Procedure 33 are denied, spillover prejudice from the dismissed racketeering charge requires retrial on both the money laundering and narcotics charges.

**\*42** If the Court of Appeals for the Second Circuit reinstates the jury verdict on the racketeering conspiracy charge, a new trial should be denied on all counts as to both defendants. For the reasons announced on June 5, 2006, the sentence of defendant Eppolito will then be: life on count one, 20 years on count two, 40 years on count three, and 40 years on count four, all to be served concurrently; five years of supervised release; a special assessment of 400 dollars; and a fine of 1,000,000 dollars; with detailed conditions and terms as stated on the record. The sentence of defendant Caracappa will be: life on count one, 40 years on count three, and 40 years on count four, all to be served concurrently; five years of supervised release; a special assessment of 300 dollars; and a fine of 1,000,000 dollars; with detailed conditions and terms as stated on the record.

SO ORDERED.

Appendix A: Final Superseding Indictment

*SUPERSEDING INDICTMENT*

Cr. No. 05 0192(JBW)(S-3) (T. 18, U.S.C., § § 1956(a)(3)(B), 1957, 1958, 1962(d),1963, 2 and 3551 *et seq.*; T. 21, U.S.C., § § 841(a)(1), 841(b)(1)(B)(viii) and 846)

THE GRAND JURY CHARGES:

*INTRODUCTION TO ALL COUNTS*

At all times relevant to this Superseding Indictment, unless otherwise indicated:

*The Enterprise*

1 The defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, were leaders of a criminal organization, hereafter referred to as "the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

Enterprise." The Enterprise operated in the Eastern District of New York, the Southern District of New York, the District of Nevada and elsewhere. The Enterprise engaged in, and its activities affected, interstate and foreign commerce.

2 The Enterprise, including its members and associates, constituted an "enterprise" as that term is defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact. The Enterprise constituted an ongoing organization whose members and associates functioned as a continuing unit for the common purpose of achieving the objectives of the Enterprise.

*The Purposes, Methods and Means of the Enterprise*

3 The principal purpose of the Enterprise was to generate money for its members and associates. This purpose was implemented by members and associates of the Enterprise through various legal and illegal activities, including murder, attempted murder, assault, kidnaping, criminal facilitation, bribery, obstruction of justice, extortion, fraud, money laundering, tax evasion and narcotics trafficking.

4 The members and associates of the Enterprise sought, among other things, to:

a. Enrich members and associates of the Enterprise through assisting La Cosa Nostra ("LCN"), a nationwide criminal organization that engaged in, and the activities of which affected, interstate and foreign commerce;

*43 b. Preserve and protect the ability of the Enterprise to enrich its members and associates through the use and abuse of the facilities of the New York City Police Department;

c. Promote and enhance the criminal activities of the Enterprise and its members and associates; and

d. Keep victims and others in fear of the Enterprise and its members and associates through violence, intimidation, abuse of positions of trust and threats of violence.

5 The defendants STEPHEN CARACAPPA and LOUIS EPPOLITO and other members and associates of the Enterprise participated in the conduct of the affairs of the enterprise by the following means and methods:

a. Selling information obtained from sensitive law enforcement records, witnesses, files and facilities;

b. Committing, attempting to commit and threatening to

commit crimes, including murder, attempted murder, assault, kidnapping, criminal facilitation, bribery, obstruction of justice, extortion, fraud, money laundering, tax evasion and narcotics trafficking to protect and expand the Enterprise's criminal operations; and

c. Using and threatening to use physical violence against various individuals, including witnesses, rivals and associates of other criminal organizations.

*Roles of the Defendants*

6 At various times relevant to this Superseding Indictment, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO participated in the leadership, management and operation of the Enterprise. At various times relevant to the Superseding Indictment, Frank Santoro, Jr., Burton Kaplan, Anthony Casso, and others known and unknown to the Grand Jury were members and associates of the Enterprise.

7 The defendant LOUIS EPPOLITO participated in the leadership, management and operation of the Enterprise by, among other things, (i) identifying both legitimate and illegitimate money making opportunities for the Enterprise; (ii) using other individuals to assist the Enterprise in its operations and activities; (iii) acting as a liaison between the Enterprise and criminals, criminal organizations and others; (iv) accessing law enforcement information for use by the Enterprise; and (v) participating in the commission of various criminal acts of the Enterprise.

8 The defendant STEPHEN CARACAPPA participated in the leadership, management and operation of the Enterprise by, among other things, (i) using other individuals to assist the Enterprise in its operations and activities; (ii) acting as a liaison between the Enterprise and criminals and others; (iii) accessing law enforcement information for use by the Enterprise; and (iv) participating in the commission of various criminal acts of the Enterprise.

*COUNT ONE*

(Racketeering Conspiracy)

9 The allegations contained in paragraphs 1 through 8 are realleged and incorporated as if fully set forth in this paragraph.

10 On or about and between May 18, 1979 and March 9,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

2005, both dates being approximate and inclusive, within the Eastern District of New York, the Southern District of New York, the District of Nevada and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, being persons employed by and associated with the Enterprise, an enterprise that engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally conspired to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and (5).

**\*44** 11 The pattern of racketeering activity through which the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, agreed to conduct the affairs of the Enterprise consisted of the racketeering acts set forth below as racketeering acts one through twenty-four of this Superseding Indictment. The defendants STEPHEN CARACAPPA and LOUIS EPPOLITO agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the Enterprise.

### RACKETEERING ACT ONE

(Kidnapping Conspiracy/Kidnapping/Murder Conspiracy/Murder/Murder for Hire)

12 The defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, committed the following acts, any one of which alone constitutes racketeering act one:

#### A. *Kidnapping Conspiracy*

13 On or about and between January 10, 1986 and February 10, 1986, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, knowingly and intentionally conspired to abduct Israel Greenwald, in violation of New York Penal Law Sections 135.20 and 105.15.

#### B. *Kidnapping*

14 On or about and between January 10, 1986 and February 10, 1986, both dates being approximate and

inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, knowingly and intentionally abducted Israel Greenwald, in violation of New York Penal Law Sections 135.20 and 20.00.

#### C. *Murder Conspiracy*

15 On or about and between January 10, 1986 and February 10, 1986, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, knowingly and intentionally conspired to cause the death of Israel Greenwald, in violation of New York Penal Law Sections 125.25(1) and 105.15.

#### D. *Murder*

16 On or about and between January 10, 1986 and February 10, 1986, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, with intent to cause the death of Israel Greenwald, caused his death, in violation of New York Penal Law Sections 125.25(1) and 20.00.

#### E. *Murder for Hire*

17 On or about and between January 10, 1986 and February 10, 1986, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, did knowingly and intentionally conspire to use and cause another to use a facility in interstate commerce and to cause another to travel in interstate commerce, with intent that the murder of Israel Greenwald be committed in violation of Section 125.25(1) of the New York State Penal Law as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value, and the death of Israel Greenwald did result, in violation of Title 18, United States Code, Section 1952(a)(2)(1986).

### RACKETEERING ACT TWO

(Kidnapping Conspiracy/Kidnapping/Murder Conspiracy/Murder)

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

Page 41

**\*45** 18 The defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, committed the following acts, any one of which alone constitutes racketeering act two:

### A. *Kidnapping Conspiracy*

19 On or about and between September 14, 1986 and October 31, 1986, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, knowingly and intentionally conspired to abduct James Hydell, in violation of New York Penal Law Sections 135.20 and 105.15.

### B. *Kidnapping*

20 On or about and between September 14, 1986 and October 31, 1986, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, knowingly and intentionally abducted James Hydell, in violation of New York Penal Law Sections 135.20 and 20.00.

### C. *Murder Conspiracy*

21 On or about and between September 14, 1986 and October 31, 1986, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, knowingly and intentionally conspired to cause the death of James Hydell, in violation of New York Penal Law Sections 125.25(1) and 105.15.

### D. *Murder*

22 On or about and between September 14, 1986 and October 31, 1986, both dates being approximate and inclusive, within the Eastern District of New York, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, with intent to cause the death of James Hydell, caused his death, in violation of New York Penal Law Sections 125.25(1) and 20.00.

### *RACKETEERING ACT THREE*

(Criminal Facilitation/Murder)

23 The defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, committed the following acts, either one of which alone constitutes racketeering act three:

### A. *Criminal Facilitation*

24 On or about and between September 14, 1986 and December 25, 1986, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, believing it probable that they were rendering aid to a person who intended to commit murder, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, knowingly and intentionally engaged in conduct which provided such person with means and opportunity for the commission of that crime, to wit: information regarding Nicholas Guido, date of birth December 2, 1960, and which in fact aided in the commission of that crime, to wit: the December 25, 1986 murder of Nicholas Guido, date of birth February 2, 1960, in violation of New York Penal Law Sections 115.05 and 20.00.

### B. *Murder*

25 On or about and between September 14, 1986 and December 25, 1986, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, under circumstances evincing a depraved indifference to human life, recklessly engaged in conduct which created a grave risk of death to Nicholas Guido, date of birth February 2, 1960, and thereby caused his death, in violation of New York Penal Law Sections 125.25(2) and 20.00.

### *RACKETEERING ACT FOUR*

(Bribery)

**\*46** 26 On or about and between September 4, 1987 and January 19, 1993, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, being public servants, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, did knowingly and intentionally solicit, accept and agree to accept benefits from another person upon an agreement and understanding that their

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

opinion, judgment, action, decision and exercise of discretion as public servants would thereby be influenced, in violation of New York Penal Law Sections 200.10, 20.00 and 10.00(15).

### RACKETEERING ACT FIVE

#### (Murder Conspiracy/Murder)

27 The defendant LOUIS EPPOLITO, together with others, committed the following acts, either one of which alone constitutes racketeering act five:

#### A. *Murder Conspiracy*

28 On or about and between January 1, 1987 and February 14, 1987, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant LOUIS EPPOLITO, together with others, knowingly and intentionally conspired to cause the death of an individual, in violation of New York Penal Law Sections 125.25(1) and 105.15.

#### B. *Murder*

29 On or about and between January 1, 1987 and February 14, 1987, both dates being approximate and inclusive, within the Eastern District of New York, the defendant LOUIS EPPOLITO, together with others, with intent to cause the death of an individual, caused his death, in violation of New York Penal Law Sections 125.25(1) and 20.00.

### RACKETEERING ACT SIX

#### (Tampering with a Witness, Victim or Informant/Retaliating Against a Witness, Victim or Informant/Criminal Facilitation/Murder)

30 The defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, committed the following acts, any one of which alone constitutes racketeering act six:

#### A. *Tampering with a Witness, Victim or Informant*

31 On or about and between May 1, 1987 and October 8, 1987, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, did knowingly and intentionally use intimidation and physical force, threaten and attempt to threaten and engage in misleading conduct toward another person, to wit: John "Otto" Heidel, with intent to hinder, delay and prevent the communication to a law enforcement officer of the United States of information given by John "Otto" Heidel, relating to the commission and possible commission of a federal offense, in violation of Title 18, United States Code, Sections 1512(a)(3)(1982) and 2.

#### B. *Retaliating Against a Witness, Victim or Informant*

32 On or about and between May 1, 1987 and October 8, 1987, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, did knowingly and intentionally engage in conduct and thereby cause bodily injury to another person, to wit: John "Otto" Heidel, with intent to retaliate against John "Otto" Heidel for information relating to the commission and possible commission of a federal offense, to wit: information given by John "Otto" Heidel to a federal law enforcement officer, in violation of Title 18, United States Code, Sections 1513(a)(2)(1982) and 2.

#### C. *Criminal Facilitation*

*47 33 On or about and between May 1, 1987 and October 8, 1987, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, believing it probable that they were rendering aid to a person who intended to commit murder, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, knowingly and intentionally engaged in conduct which provided such person with means and opportunity for the commission of that crime, to wit: information regarding John "Otto" Heidel, and which in fact aided in the commission of that crime, to wit: the October 8, 1987 murder of John "Otto" Heidel, in violation of New York Penal Law Sections 115.05 and 20.00.

#### D. *Murder*

34 On or about and between May 1, 1987 and October 8, 1987, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

EPPOLITO, together with others, under circumstances evincing a depraved indifference to human life, recklessly engaged in conduct which created a grave risk of death to John "Otto" Heidel, and thereby caused his death, in violation of New York Penal Law Sections 125.25(2) and 20.00.

## RACKETEERING ACT SEVEN

### (Obstruction of Justice)

35 On or about and between October 8, 1987 and October 31, 1987, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, did knowingly, intentionally and corruptly obstruct, influence and impede the due administration of justice, to wit: by disclosing sensitive law enforcement information regarding John "Otto" Heidel, in violation of Title 18, United States Code, Sections 1503 and 2.

## RACKETEERING ACT EIGHT

### (Obstruction of Justice)

36 On or about and between November 1, 1987 and March 1, 1988, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, did knowingly, intentionally and corruptly obstruct, influence and impede the due administration of justice, to wit: by disclosing sensitive law enforcement information regarding Peter Savino in violation of Title 18, United States Code, Sections 1503 and 2.

## RACKETEERING ACT NINE

### (Retaliating Against a Witness, Victim or Informant/Tampering with a Witness, Victim or Informant)

37 The defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, committed the following acts, either one of which alone constitutes racketeering act nine:

### A. *Retaliating Against a Witness, Victim or Informant*

38 On or about and between February 1, 1988 and October 12, 1988, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, did knowingly and intentionally engage in conduct and thereby cause bodily injury to another person, to wit: Dominic Costa with intent to retaliate against Dominic Costa for information relating to the commission and possible commission of a federal offense, to wit: information given by Dominic Costa to a federal law enforcement officer, in violation of Title 18, United States Code, Sections 1513(a)(2)(1982) and 2.

### B. *Tampering with a Witness, Victim or Informant*

**48** 39 On or about and between February 1, 1988 and October 12, 1988, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, did knowingly and intentionally attempt to kill another person, to wit: Dominic Costa, with intent to prevent the communication by such person to a law enforcement officer of information relating to the commission and possible commission of federal offenses, in violation of Title 18, United States Code, Sections 1512(a)(1)(C) and 2.

## RACKETEERING ACT TEN

### (Criminal Facilitation/Murder)

40 The defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, committed the following acts, either one of which alone constitutes racketeering act ten:

### A. *Criminal Facilitation*

41 On or about and between February 1, 1989 and February 4, 1990, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, believing it probable that they were rendering aid to a person who intended to commit murder, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, knowingly and intentionally engaged in conduct which provided such person with means and opportunity for the commission of that crime, to wit: information regarding Anthony Dilapi,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

and which in fact aided in the commission of that crime, to wit: the February 4, 1990 murder of Anthony Dilapi, in violation of <u>New York Penal Law Sections 115.05</u> and <u>20.00</u>.

### B. *Murder*

42 On or about and between February 1, 1989 and February 4, 1990, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, under circumstances evincing a depraved indifference to human life, recklessly engaged in conduct which created a grave risk of death to Anthony Dilapi, and thereby caused his death, in violation of <u>New York Penal Law Sections 125.25(2)</u> and <u>20.00</u>.

### RACKETEERING ACT ELEVEN

(Obstruction of Justice)

43 The defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, committed the following acts, either one of which alone constitutes racketeering act eleven:

### A. *Obstruction of Justice regarding Vittorio "Vic" Amuso's arrest*

44 On or about and between May 1, 1990 and May 30, 1990, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, did knowingly, intentionally and corruptly endeavor to influence, obstruct and impede the due administration of justice, to wit: by disclosing sensitive law enforcement information regarding the imminent arrest of Vittorio "Vic" Amuso in violation of <u>Title 18, United States Code, Sections 1503</u> and <u>2</u>.

### B. *Obstruction of Justice regarding Anthony Casso's arrest*

45 On or about and between May 1, 1990 and May 30, 1990, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, did knowingly, intentionally and corruptly endeavor to influence, obstruct and impede the due administration of justice, to wit: by disclosing sensitive law enforcement information regarding the imminent arrest of Anthony Casso in violation of <u>Title 18, United States Code, Sections 1503</u> and <u>2</u>.

### RACKETEERING ACT TWELVE

(Criminal Facilitation/Murder)

**\*49** 46 The defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, committed the following acts, either one of which alone constitutes racketeering act twelve:

### A. *Criminal Facilitation*

47 On or about and between February 1, 1990 and August 30, 1990, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, believing it probable that they were rendering aid to a person who intended to commit murder, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, knowingly and intentionally engaged in conduct which provided such person with means and opportunity for the commission of that crime, to wit: information regarding Bruno Facciola, and which in fact aided in the commission of that crime, to wit: the August 30, 1990 murder of Bruno Facciola, in violation of <u>New York Penal Law Sections 115.05</u> and <u>20.00</u>. B. *Murder*

48 On or about and between February 1, 1990 and August 30, 1990, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, under circumstances evincing a depraved indifference to human life, recklessly engaged in conduct which created a grave risk of death to Bruno Facciola, and thereby caused his death, in violation of <u>New York Penal Law Sections 125.25(2)</u> and <u>20.00</u>.

### RACKETEERING ACT THIRTEEN

(Murder Conspiracy/Murder/Murder for Hire)

49 The defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, committed the following acts, any one of which alone constitutes racketeering act thirteen:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

### A. *Murder Conspiracy*

50 On or about and between April 6, 1990 and November 6, 1990, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, knowingly and intentionally conspired to cause the death of Edward Lino, in violation of New York Penal Law Sections 125.25(1) and 105.15.

### B. *Murder*

51 On or about and between April 6, 1990 and November 6, 1990, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, with intent to cause the death of Edward Lino, caused his death, in violation of New York Penal Law Sections 125.25(1) and 20.00.

### C. *Murder for Hire*

52 On or about and between April 6, 1990 and November 6, 1990, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, did knowingly and intentionally conspire to use and cause another to use a facility in interstate commerce and to cause another to travel in interstate commerce, with intent that the murder of Edward Lino be committed in violation of Section 125.25(1) of the New York State Penal Law as consideration for the receipt of, and as consideration for a promise and agreement to pay, something of pecuniary value, and the death of Edward Lino did result, in violation of Title 18, United States Code, Section 1958 (1988).

### RACKETEERING ACT FOURTEEN

(Murder Conspiracy/Tampering with a Witness, Victim or Informant)

**\*50** 53 The defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, committed the following acts, either one of which alone constitutes racketeering act fourteen:

### A. *Murder Conspiracy*

54 On or about and between March 1, 1991 and April 15, 1991, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, knowingly and intentionally conspired to cause the death of Herman Tabak in violation of New York Penal Law Sections 125.25(1) and 105.15.

### B. *Tampering with a Witness, Victim or Informant*

55 On or about and between March 1, 1991 and April 15, 1991, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, did knowingly and intentionally attempt to kill another person, to wit: Herman Tabak, with intent to prevent the communication by such person to a law enforcement officer of information relating to the commission and possible commission of federal offenses, in violation of Title 18, United States Code, Sections 1512(a)(1)(C) and 2.

### RACKETEERING ACT FIFTEEN

(Conspiracy to Engage in Unlawful Monetary Transactions)

56 On or about and between December 1, 1994 and December 31, 1996, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant LOUIS EPPOLITO, together with others, did knowingly and intentionally conspire to engage in monetary transactions, in and affecting interstate and foreign commerce, in criminally derived property that was of a value of greater than $10,000 and was derived from specified unlawful activity, to wit: narcotics trafficking, in violation of Title 21, United States Code, Sections 846 and 841(a), in violation of Title 18, United States Code, Section 1957, all in violation of Title 18, United States Code, Section 1956(h).

### RACKETEERING ACT SIXTEEN

(Money Laundering)

57 On or about and between October 25, 2004 and March

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

9, 2005, both dates being approximate and inclusive, within the District of Nevada and elsewhere, the defendant LOUIS EPPOLITO, together with others, did knowingly and intentionally conduct and attempt to conduct financial transactions affecting interstate and foreign commerce involving property, to wit: approximately $14,000 in U.S. currency, represented by another person at the direction of, and with the approval of, a Federal official authorized to investigate violations of Title 18, United States Code, Section 1956, to be the proceeds of specified unlawful activity, to wit: narcotics trafficking, in violation of Title 21, United States Code, Section 841(a)(1), with the intent to conceal and disguise the nature, location, source, ownership and control of the property believed to be the proceeds of such specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(3)(B).

### RACKETEERING ACT SEVENTEEN

(Narcotics Conspiracy/Narcotics Distribution)

**\*51 58** The defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, committed the following acts, any one of which alone constitutes racketeering act seventeen:

#### A. *Narcotics Conspiracy*

59 On or about and between October 25, 2004 and March 9, 2005, both dates being approximate and inclusive, within the District of Nevada and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, did knowingly and intentionally conspire to distribute and possess with intent to distribute a controlled substance, which offense involved five grams or more of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a), all in violation of Title 21, United States Code, Section 846.

#### B. *Narcotics Distribution*

67. On or about and between October 25, 2004 and March 9, 2005, both dates being approximate and inclusive, within the District of Nevada and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, did knowingly and intentionally distribute and possess with intent to distribute a controlled substance, which offense involved five grams or more of methamphetamine, a Schedule II

controlled substance, in violation of Title 21, United States Code, Section 841(a) and Title 18, United States Code, Section 2.

(Title 18, United States Code, Sections 1962(d), 1963 and 3551 *et seq.*)

### COUNT TWO

(Money Laundering)

60 The allegations contained in paragraphs 1 through 8 are realleged and incorporated as if fully set forth in this paragraph.

61 On or about and between October 25, 2004 and March 9, 2005, both dates being approximate and inclusive, within the District of Nevada and elsewhere, the defendant LOUIS EPPOLITO, together with others, did knowingly and intentionally conduct and attempt to conduct financial transactions affecting interstate and foreign commerce involving property, to wit: approximately $14,000 in U.S. currency, represented by another person at the direction of, and with the approval of, a Federal official authorized to investigate violations of Title 18, United States Code, Section 1956, to be the proceeds of specified unlawful activity, to wit: narcotics trafficking, in violation of Title 21, United States Code, Section 841(a)(1), with the intent to conceal and disguise the nature, location, source, ownership and control of the property believed to be the proceeds of such specified unlawful activity.

(Title 18, United States Code, Sections 1956(a)(3)(B) and 3551 *et seq.*)

### COUNT THREE

(Narcotics Conspiracy)

62 The allegations contained in paragraphs 1 through 8 are realleged and incorporated as if fully set forth in this paragraph.

63 On or about and between October 25, 2004 and March 9, 2005, both dates being approximate and inclusive, within the District of Nevada and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, did knowingly and intentionally conspire to distribute and possess with intent to distribute a controlled substance, which offense

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

involved five grams or more of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a).

**\*52** Title 21, United States Code, Sections 846 and 841(b)(1)(B)(viii); Title 18, United States Code, Sections 3551 *et seq.*)

### COUNT FOUR

(Narcotics Distribution)

64 The allegations contained in paragraphs 1 through 8 are realleged and incorporated as if fully set forth in this paragraph.

65 On or about and between October 25, 2004 and March 9, 2005, both dates being approximate and inclusive, within the District of Nevada and elsewhere, the defendants STEPHEN CARACAPPA and LOUIS EPPOLITO, together with others, did knowingly and intentionally distribute and possess with intent to distribute a controlled substance, which offense involved five grams or more of methamphetamine, a Schedule II controlled substance.

(Title 21, United States Code, Sections 841(a) and 841(b)(1)(B)(viii); Title 18, United States Code, Sections 2 and 3551 *et seq.*)

E.D.N.Y.,2006.
U.S. v. Eppolito
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 2091758 () Affidavit in Support of Supplemental Rule 33 Motion (Jun. 22, 2006) Original Image of this Document (PDF)
• 2006 WL 2091759 () Affidavit (Jun. 22, 2006) Original Image of this Document (PDF)
• 2006 WL 2091808 (Trial Motion, Memorandum and Affidavit) Supplemental Memorandum of Law in Support of Defendant's Motions Pursuant to Rules 29 and 33 (Jun. 5, 2006) Original Image of this Document (PDF)
• 2006 WL 2091809 (Trial Motion, Memorandum and Affidavit) Government's Memorandum in Response to Defendants' Post-Trial Motions (Jun. 5, 2006) Original Image of this Document (PDF)
• 2006 WL 2091807 (Trial Motion, Memorandum and Affidavit) Government's Memorandum in Response to Defendants' Post-Trial Motions (Jun. 2, 2006) Original Image of this Document (PDF)

• 2006 WL 2091805 (Trial Motion, Memorandum and Affidavit) Memorandum of Law on Behalf of Louis Eppolito and Stephen Caracappa Requesting Dismissal of the Indictment on the Basis of Prosecutorial Misconduct Concerning Brady Violations or in the Alternative A mistrial; or A Continuance to Call Anthony Casso a s A Witness for the Defendants. (Mar. 20, 2006) Original Image of this Document (PDF)
• 2006 WL 2091804 (Trial Motion, Memorandum and Affidavit) Memorandum of Law on Behalf of Louis Eppolito and Stephen Caracappa Requesting an Order to Compel the Government to Immediately Disclose Material Discovery and to Permit Party-Opponent Admissions in Evidence (Feb. 8, 2006) Original Image of this Document (PDF)
• 2006 WL 2091803 (Trial Motion, Memorandum and Affidavit) The Government's Motion in Limine to Admit Certain Evidence (Feb. 3, 2006) Original Image of this Document (PDF)
• 2006 WL 2091801 (Trial Motion, Memorandum and Affidavit) Memorandum of Law on Behalf of Louis Eppolito and Stephen Caracappa in Opposition to the Government's Motion for an Anonymous and Escorted Jury (Jan. 26, 2006) Original Image of this Document (PDF)
• 2006 WL 2091802 (Trial Pleading) Superseding Indictment (Jan. 26, 2006)
• 2005 WL 4449209 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Support of Louis Eppolito and Stephen Caracappa's Pretrial Motion (Nov. 22, 2005) Original Image of this Document (PDF)
• 2005 WL 4449214 (Trial Motion, Memorandum and Affidavit) Defendant Stephen Caracappa's Memorandum in Reply to Government's Response Concerning Defendant's New York Pistol Permit (Nov. 22, 2005) Original Image of this Document (PDF)
• 2005 WL 4156755 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Louis Eppolito, and Stephen Caracappa's Pre-Trial Motion (Oct. 25, 2005) Original Image of this Document (PDF)
• 2005 WL 4449213 (Trial Pleading) Superseding Indictment (Sep. 15, 2005)
• 2005 WL 4449211 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of the Government's Motion for A Permanent Order of Detention (Mar. 10, 2005)
• 2005 WL 4449210 (Trial Pleading) Indictment (Mar. 9, 2005)
• 2005 WL 4156756 (Trial Motion, Memorandum and Affidavit) Government's Memorandum in Response to Defendants' Pretrial Motions (2005) Original Image of this Document (PDF)
• 2005 WL 4449212 (Trial Pleading) Superseding Indictment (2005)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 1793536 (E.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.