42

ALL-STATE™ LEGAL   800-222-0510   E011   RECYCLED

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 401534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
UNITED STATES of America, Plaintiff,
v.
Jerome WALLACE, Defendant.
**No. 97 CR. 975(RWS).**

July 17, 1998.

Honorable Mary Jo White, United States Attorney for the Southern District of New York, New York, By Louise M. Aponte, AUSA, Of Counsel, for United States of America. Lawrence K. Feitell, Esq., New York, for Defendant.

OPINION

SWEET, D.J.

*1 Defendant Jerome Wallace ("Wallace") has moved (1) to suppress the physical evidence seized at the time of his arrest on December 1, 1992, all written or oral statements Wallace made in connection with this case, and government analyses of handwriting exemplars given by Wallace after his arrest, and (2) for dismissal of the indictment against him on the ground that preindictment delay in bringing the prosecution violated his right to due process under the Fifth Amendment of the United States Constitution. For the reasons set forth below, the motions to suppress and to dismiss are denied.

*Prior Proceedings*

On September 24, 1997, Wallace was indicted on one count of credit card fraud in violation of 18 U.S.C. §§ 1029(a)(2) and 2. He was arraigned on October 9, 1997, and entered a plea of not guilty. The instant motions were heard on June 17, 1998, and deemed fully submitted at that time.

*Facts*

In November 1992, Postal Inspector Matt Morrison ("Morrison" or the "Postal Inspector") and other members of the United States Postal Inspection Service were conducting an investigation in the Tremont section of Bronx, New York, in response to ongoing mail theft activity in that

FN1

FN1. The statement of facts is largely drawn from the complaint ( the "Complaint") that had been filed against Wallace, alleging mail theft in violation of 18 U.S.C. § 371, which contained the affidavit of Morrison and was dated December 2, 1992.

In connection with the investigation, a confidential informant ("CI-1"), who had previously provided Morrison with accurate information regarding an unrelated robbery in the area, informed Morrison that he/she had witnessed a mail theft from a mail carrier cart on September 18, 1992. CI-1 described the mail thief to Morrison and later pointed out this person to Morrison on a street in the Tremont section of the Bronx. This person was identified as Dwayne Register ("Register"). CI-1 told Morrison that Register was associated with Wallace and his brother, Bruce Wallace ("Bruce"), whom CI-1 stated were responsible for stealing checks from the United States mail. At the time, CI-1 was living in the Tremont section of the Bronx and was familiar with Register, Wallace, and Bruce. CI-1 also informed Morrison that Wallace and Bruce were living in the Tremont section of the Bronx and that CI-1 had seen Wallace driving a black Lexus automobile.

Based on this information, Morrison obtained photographs of Wallace and Bruce from the New York City Police Department ("NYPD"), as well as a surveillance photograph of Register.

In November 1992, another confidential informant ("CI-2") advised Morrison that he/she had obtained checks from Wallace with the understanding that CI-2 would deposit those checks into his/her account and remit the funds to Wallace. Upon review of the copies of those checks, Morrison determined that they were stolen from the United States mail.

On December 1, 1992, a mail carrier was delivering mail to a residence on Arthur Avenue in the Tremont section of the Bronx. While the mail carrier was inside the residence, a witness (the "Witness") observed a black male, wearing a dark hooded jacket, remove two bundles of letters from the

Westlaw.

Not Reported in F.Supp.                                                              Page 2
Not Reported in F.Supp., 1998 WL 401534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

mail carrier cart. The Witness followed this person and watched him enter the back seat of a black late-model automobile with a license plate number including the digits L8P, in which two other black males sat.

*2 Shortly thereafter, on December 1, 1992, Morrison received a call regarding the mail theft. He then proceeded to Arthur Avenue and interviewed the Witness who had provided a description of the mail thief and of the car into which the mail thief entered. Morrison also interviewed the mail carrier who informed him of the addresses of the stolen mail. Morrison then went to Belmont Avenue, located several blocks away, which was the scene of a prior incident involving mail theft.

Upon arriving at Belmont Avenue, Morrison noticed a black late-model Lexus automobile which bore the license plate number L8P 889 and in which three black men were sitting. As Morrison drove by the car, he was able to identify the individual in the passenger seat as Bruce, based on the NYPD photograph in his possession. Morrison then called backup and approached the Lexus automobile with his gun in hand. He ordered the three occupants of the car to step out. At that point, based on the NYPD photograph in his possession, he was able to identify the male in the driver seat of the car as Wallace. He was also able to identify the individual sitting in the back seat as the person CI-1 had identified as the perpetrator of the September 18, 1992, mail theft, based on the surveillance photograph in his possession. This individual was later identified as Register. Register, who was wearing a dark hooded jacket fitting the Witness's description, had been sitting alone in the back seat of the car. Bruce was wearing a bright green hooded jacket. Wallace was not wearing a hooded coat.

After the three individuals exited the car, Morrison authorized other Postal Inspectors, with the assistance of NYPD officers, to arrest Wallace, Bruce, and Register. A search of the car was then conducted, and mail from the December 1, 1992, mail theft, as well as prior mail thefts, was recovered. The car search also revealed two briefcases containing blank birth certificates, stolen checks, stolen United States savings bonds, and at least one stolen credit card. A search of Wallace's person recovered several stolen credit cards, telephone cards, and business cards.

On December 1, 1992, Wallace was arraigned on mail theft charges in the Southern District of New York. Plea negotiations were entered into and continued in March 1993, but no agreement had been reached. The Assistant United States Attorney ("AUSA") handling the case was assigned to work on the World Trade Center bombing case. According to the Government, given the time and resource demands associated with the bombing case, the complaint against Wallace was dismissed on April 5, 1993.

Despite the dismissal, the Government asserts that the investigation of Wallace remained ongoing. On April 14, 1993, Wallace submitted handwriting exemplars in connection with the credit cards found in his possession at the time of his arrest on December 1, 1992. On April 16, 1993, the Crime Laboratory of the United States Postal Inspection Service conducted an examination of the handwriting exemplars and issued a report of its findings.

*3 On July 20, 1993, Wallace, Bruce, and Register were indicted on bank fraud and extortion charges unrelated to the instant charges.[FN2] AUSA Celeste L. Koeleveld ("Koeleveld") was assigned to handle the case. The bank fraud and extortion case against Wallace and Bruce went to trial before the Honorable Whitman Knapp on January 10, 1994. During the course of the trial, an issue arose concerning the December 1, 1992, arrest of Wallace and Bruce on mail theft charges. In response to Judge Knapp's inquiry as to what had happened to the mail theft case, Koeleveld, in the presence of Wallace's present counsel, stated that the complaint was dismissed without prejudice, that the case was still under investigation, and was pending in the U.S. Attorney's Office. (Koeleveld Affirmation ¶ 4.)

   FN2. *United States v. Jerome Wallace,* 93 Cr. 599(WK).

Wallace was found guilty by the jury in the case before Judge Knapp. Judge Knapp, however, vacated and set aside the jury verdict. The Second Circuit affirmed the vacatur of the jury verdict for extortion and reversed the judgment of acquittal as to the bank fraud conspiracy charge and remanded the case for sentencing. On December 15, 1995, Judge Knapp sentenced Wallace to twenty-one months of imprisonment.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                    Page 3
Not Reported in F.Supp., 1998 WL 401534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

From June 1993 through September 1996, AUSA Daniel Fetterman was assigned to the instant credit card fraud case. The Government maintains that the investigation remained ongoing. Morrison continued to investigate the evidence of credit card fraud and attempted to located the Witness to the December 1, 1992, mail theft. From October 1996 through July 1997, the case was reassigned to another AUSA. It was again reassigned to AUSA Paul Radvany who, upon reassessment of the evidence, indicted Wallace on the instant charge of credit card fraud on September 24, 1997.

*Discussion*

*I. Wallace's Motion to Suppress Is Denied*

Wallace seeks to suppress evidence that was found on his person and in his car, claiming that he was arrested without probable cause. He also maintains that the warrantless search of the car's trunk was unconstitutional. Finally, Wallace seeks suppression of a post-arrest statement and government analyses of his handwriting exemplars, asserting that they were the "poisonous fruit" of an illegal search and seizure. Because the stop of the car in which Wallace was seated, his subsequent arrest, the search of Wallace and the passenger area of the car incident to arrest, and the warrantless search of the trunk of the car were legal, the suppression motion is denied.

*A. The Car Stop Did Not Violate Wallace's Fourth Amendment Rights*

A law enforcement officer may stop a person in order to investigate possible criminal behavior, whether or not probable cause to arrest exists, for purposes of either crime prevention or crime detection. *See United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *United States v. Hensley,* 469 U.S. 221, 227-29, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

The Fourth Amendment does not require that a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response.... A brief stop of a suspicious individual, in order to determine his identity or maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

*\*4 United States v. Tehrani,* 49 F.3d 54, 60-61 (2d Cir.1995) (citations omitted) (quoting *Adams v. Williams,* 407 U.S. 143, 145-46, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)). In assessing whether an investigative stop is reasonable under the Fourth Amendment, a court must determine "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* 392 U.S. at 20; *see United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *United States v. Alexander,* 907 F.2d 269, 272 (2d Cir.1990).

Under the first inquiry, an investigative stop comports with the requirements of the Fourth Amendment if the law enforcement officer has "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.' " *Sokolow,* 490 U.S. at 7 (quoting *Terry,* 392 U.S. at 30); *see United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1991) ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."). The law enforcement officer must be able to articulate more than an " 'inchoate and unparticularized suspicion or "hunch." ' " *Sokolow,* 490 U.S. at 7 (quoting *Terry,* 392 U.S. at 27). A "minimal level of objective justification" for making the stop is required. *INS v. Delgado,* 466 U.S. 210, 217, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984); *see Cortez,* 449 U.S. at 417; *United States v. Glover,* 957 F.2d 1004, 1010 (2d Cir.1992).

In determining the validity of the stop, surrounding circumstances are viewed " 'as a whole, not as discrete separate facts,' and ... 'through the eyes of a reasonable and cautious police officer on the scene guided by his experience and training." ' *United States v. Barlin,* 686 F.2d 81, 86 (2d Cir.1982) (quoting *United States v. Delos-Rios,* 642 F.2d 42, 45 (2d Cir.1981)). Such a stop may be upheld even though there is no probable cause to make an arrest. *See Terry,* 392 U.S. at 22; *see also Sokolow,* 490 U.S. at 7

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                                Page 4
Not Reported in F.Supp., 1998 WL 401534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

(stating that the reasonable suspicion test is "obviously less demanding than [the test] for probable cause"); _Tehrani,_ 49 F.3d at 58 (noting that the test requires "considerably less than proof of wrongdoing by a preponderance of the evidence" (citations and internal quotations omitted)); _United States v. Santana,_ 485 F.2d 365, 368 (2d Cir.1973) (observing that the test of reasonable suspicion is "rather lenient").

Courts have long held that these limits of the Fourth Amendment apply equally to investigatory stops of cars. _See Cortez,_ 449 U.S. at 417; _Sharpe,_ 470 U.S. at 682; _Pennsylvania v. Mimms,_ 434 U.S. 106, 109-11, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); _Alexander,_ 907 F.2d at 272.

Here, despite Wallace's claim that he was seated lawfully in a licensed car, which was properly tagged and not involved in any ongoing unlawful activity, the Postal Inspector had reasonable suspicion to believe that criminal activity "may be afoot." _Terry,_ 392 U.S. at 30. At the time of the stop, Morrison was aware of an ongoing mail theft operation in the Tremont section of the Bronx, that the perpetrators were believed to be Wallace, Bruce, and Register, and that Wallace had been seen driving a black Lexus automobile. Morrison had also just received a radio call reporting that, on Arthur Avenue in the Bronx, an individual was seen removing two bundles of mail from a mail carrier cart and entering the back seat of a black late-model car with a license plate number that included the digits L8P. Upon investigation of the tip, when Morrison arrived at Belmont Avenue in the Bronx, he observed a black late-model Lexus, license plate number L8P 889, with three black males sitting inside the car. He drove by the car, and observed an individual sitting in the passenger seat who he knew to be Bruce. "Perhaps none of these facts, standing alone, would give rise to a reasonable suspicion; but taken together as appraised by an experienced law enforcement officer, they provided clear justification [for the] stop." _Sharpe,_ 470 U.S. at 683 n. 3; _see e.g., United States v. Jackson,_ 652 F.2d 244, 249 n. 3 (2d Cir.1981) (finding that reasonable suspicion for car stop existed where the car was coming from the direction of a bank robbery, and the driver matched the description of the bank robber who had fled on foot less than five minutes before).

\*5 Because Morrison's stop was properly premised upon articulable suspicion, the next inquiry is whether the scope of the stop was reasonably related to the circumstances which justified the stop in the first place. _See Terry,_ 392 U.S. at 20. According to Wallace, Morrison acted improperly by approaching the car with a gun in hand and ordering Wallace to exit the car, before placing him under arrest. These actions, however, were reasonable under the circumstances.

Although no "hard and fast rules" exist for evaluating the conduct of law enforcement officers conducting investigatory stops, it is well settled that an officer, faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to ensure the safety of innocent bystanders, whether or not probable cause to arrest exists. _See Alexander,_ 907 F.2d at 272. In the instant case, the individuals subject to the stop were seated in a car. A car-stop situation "is especially hazardous and supports the need for additional safeguards." _Id._ at 273. The United States Supreme Court has emphasized that "investigative detentions involving suspects in vehicles are especially fraught with danger to police officers." _Michigan v. Long,_ 463 U.S. 1032, 1047, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). Thus, an officer who decides to draw his gun " 'need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent [person] in the circumstances would be warranted in the belief that his safety or that of others was in danger." ' _Alexander,_ 907 F.2d at 272 (quoting _Terry,_ 392 U.S. at 27).

Morrison was justified in approaching the car with his gun drawn. He was investigating a reported mail theft and faced with three potential suspects who were seated inside a car. In similar circumstances, courts have held that officers may draw their guns while making a stop. Moreover, this act does not transform a stop into an arrest. _See id.; United States v. Perea,_ 986 F.2d 633, 644-45 (2d Cir.1993); _United States v. Nargi,_ 732 F.2d 1102, 1106-07 (2d Cir.1984).

Morrison was also fully justified in directing Wallace, Bruce, and Register out of the car. _See e.g., Alexander,_ 907 F.2d at 272-73 (stating that officers were permitted to order defendant out of the car to frisk him). As the Supreme Court noted in _Mimms,_ because of the "inordinate risk confronting an officer as he approaches a person seated in an auto-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                           Page 5
Not Reported in F.Supp., 1998 WL 401534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

mobile," intrusion to the car driver and passengers by being ordered to exit the car is *"de minimus."* 434 U.S. at 110-11.

Thus, the car stop did not contravene Wallace's Fourth Amendment rights.

### B. *There Existed Probable Cause To Arrest Wallace*

Probable cause to arrest exists "if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." *United States v. Patrick*, 899 F.2d 169, 171 (2d Cir.1990); *see United States v. Cruz*, 834 F.2d 47, 50 (2d Cir.1987) ("A warrantless arrest is justified if the police have probable cause when the defendant is put under arrest to believe that an offense has been or is being committed."). To find that probable cause existed for an arrest, the law enforcement officer need not demonstrate that it is more probable than not that a crime has been or is being committed. *See id.*; *United States v. Ginsberg*, 758 F.2d 823 (2d Cir.1985); *Miloslavsky v. AES Engineering Society, Inc.*, 808 F.Supp. 351, 354 (S.D.N.Y.1992), *aff'd*, 993 F.2d 1534 (2d Cir.1993). Rather, the standard of probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *United States v. Bakhtiari*, 913 F.2d 1053, 1062 (2d Cir.1990) (quoting *Illinois v. Gates*, 462 U.S. 213, 243 n. 13, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). Additionally, while probable cause requires a showing that a person "of reasonable caution" would be warranted in the belief that a crime has been committed, "it does not demand any showing that such a belief be correct or more likely true than false." *Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983).

**\*6** The record indicates that Wallace was placed under arrest after he exited the car. At the time of the arrest on December 1, 1992, Morrison was aware of the following facts and circumstances: he knew from CI-1, a reliable confidential informant, that Wallace was responsible for stealing checks from the mail; he knew from CI-2 that Wallace had given CI-2 checks to deposit and cash for him; he knew that Wallace drove a black Lexus and associated with two

other individuals suspected of mail theft; and he knew that the Witness had just reported a mail theft involving a black car matching the description of the car Wallace was known to drive and involving a perpetrator matching the description of the individual located in the back seat of Wallace's car. Given these facts of which Morrison was aware and the situation which he faced upon ordering Wallace out of the car, he was justified in concluding that there was a "substantial chance" that Wallace was involved with the commission of a crime.

As is most often the case, probable cause lay not in one factor but in a combination of factors. First, Wallace was known to Morrison and was identified as someone who was responsible for stealing checks from the mail. *See Raffone v. Adams*, 468 F.2d 860, 863-67 (2d Cir.1972) (finding probable cause to arrest where, among other things, officer recognized defendant as he exited car and knew of his criminal history). Second, Wallace was seated in the same car as Register, who was suspected in the September 18, 1992, mail theft. Register also fit the description of the individual wearing a dark hooded jacket that the Witness saw remove two bundles of mail from a mail carrier cart and who was followed to a black late-model car bearing license plate digits L8P, into which Register entered. *See United States v. Brooks*, 838 F.Supp. 58, 61 (W.D.N.Y.1993) (stating that "the presence of defendant at a cocaine transaction may not in itself be sufficient to create probable cause, but because the agents knew defendant, they had probable cause to conclude his presence went beyond mere happenstance"); *United States v. Almanzar*, 749 F.Supp. 538, 541 (S.D.N.Y.1990) (finding probable cause to arrest based in part on the fact that defendant was present when the drug transaction went forward and coordination of activity, including defendant's conduct, appeared to be more than coincidental). Third, the fact that Wallace was sitting in the driver's seat of the car that Register was seen entering into with two bundles of stolen mail gives rise to a permissible inference that he was more than merely present. *See Brooks*, 838 F.Supp. at 61 (citing *Bailey v. United States*, 389 F.2d 305, 310 (D.C.Cir.1967)) (concluding that fact that defendant was the driver indicated his involvement and refuted the notion that he was merely an innocent passenger).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                 Page 6
Not Reported in F.Supp., 1998 WL 401534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

According to Wallace, the facts at bar undermine a showing of probable cause. Wallace urges that he was arrested simply for being in the presence of Register, the individual pointed out by an informant as a mail thief. Wallace asserts that he was not named or described by the Witness to the December 1, 1992, mail theft. However, the Witness did describe the mail thief as an individual matching Register's description who, upon stealing two bundles of mail, got into the back seat of a car matching a description of Wallace's car. Wallace was found in the driver's seat. Wallace also points to the fact that CI-1 identified Register, not Wallace, as the person who was stealing mail on September 18, 1992. Yet Wallace ignores the fact that CI-1 identified Wallace as someone who was responsible for stealing checks from the mail and was associated with Register. Wallace additionally overlooks that CI-2 identified Wallace as the individual who gave CI-2 checks to deposit and cash for him. Those checks were later determined to be stolen.

**\*7** Wallace correctly contends that near presence of a person who may be guilty of a criminal act is not a basis for the arrest, and/or search, of other persons into whose company the thief may later drift. Yet the instant case is distinguishable from the cases to which Wallace cites, where an individual is merely present when a crime is taking place but whose conduct does not indicate participation in a conspiracy or performance of an expected task. *Cf. Ybarra v. Illinois,* 444 U.S. 85, 90-91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) (finding pat down search of and seizure from tavern patron impermissible because police did not recognize defendant and had no reason to believe that he had committed or was committing an offense); *Sibron v. New York,* 392, U.S. 40, 62-63 (1968) (stating probable cause did not exist for a search where the officer observed defendant talking to narcotics addicts but did not know him or have information about him). Morrison, operating upon the information he received from CI-1, CI-2, and the scene that he confronted in investigating the Witness's tip, had reason to believe that Wallace had been, or was, involved in the commission of a crime.

Furthermore, Wallace's contention that the vehicle used in connection with the September 18, 1992, mail theft does not match the vehicle in which he was arrested is unsupported.

The complaint does not mention a vehicle in connection with the September 18, 1992, mail theft. It does, however, refer to a "black Lexus automobile" that CI-1 had seen Wallace driving, a "black late-model automobile with a license plate number that included the digits L8P" that the Witness saw the mail thief enter, and a "black late-model Lexus automobile, license plate number L8P 889" that Morrison stopped. The three descriptions are consistent with the same vehicle.

Finally, Wallace maintains that the "civilian informant" to the December 1, 1992, mail theft was not known to be reliable and therefore cannot support a finding of probable cause. However, the person who observed the mail theft was an eyewitness, not an informant. It has been established that "a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, who it seems reasonable to believe is telling the truth." *Miloslavsky,* 808 F.Supp. at 355. While an eyewitness allegation does not, standing alone, necessarily establish probable cause, if there is independent corroborative evidence to support the eyewitness's assertions, a person of reasonable caution is warranted in believing that an offense has been committed. *See Wu v. City of New York,* 934 F.Supp. 581, 587 (S.D.N.Y.1996). In this case, the Witness provided Morrison with reasonable suspicion to make the stop. Moreover, given, for example, that Register fit the description of the mail thief provided by the Witness, and that Wallace was known to Morrison as a person responsible for stealing checks who associated with Register, the probable cause to arrest was not grounded solely upon the Witness's account.

**\*8** Despite Wallace's efforts to contest the arrest, the totality of circumstances was sufficient to support probable cause.

*C. The Search of Wallace's Person and Car, Incident to Arrest, Was Proper*

Having established that Wallace's arrest was valid, Wallace may not complain of the search and seizure of evidence from his person and from the passenger and glove compartment of the car. A law enforcement officer may conduct a full warrantless search of an arrestee without having probable cause or reasonable suspicion to believe that the ar-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 7
Not Reported in F.Supp., 1998 WL 401534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

restee possesses weapons or evidence of criminal activity. See <u>Michigan v. DeFillippo, 443 U.S. 31, 35-36, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979)</u>; <u>United States v. Robinson, 414 U.S. 218, 235 (1973)</u>. "The fact of a lawful arrest, standing alone, authorizes a search." <u>DeFillippo, 443 U.S. at 35.</u> "[I]n the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment." <u>Robinson,</u> 414 U.S. at 235.

Similarly, where a law enforcement officer has lawfully arrested an occupant of an automobile, he may search, incident to the arrest, the passenger compartment of the automobile. See <u>New York v. Belton, 453 U.S. 454, 460, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981)</u>. Moreover, contents of containers found within the passenger compartment may also be searched. *Id.* According to the Supreme Court, "container" includes "closed or open glove compartments, consoles, or other receptacles located anywhere within the passenger compartment, as well as luggage, boxes, bags, clothing, and the like." *Id.* at 460 n. 4.

Therefore, the evidence recovered from Wallace's person, and passenger and glove compartments of his car, incident to the arrest, will not be suppressed.

### D. There Existed Probable Cause To Search the Car and Trunk, Independent of Wallace's Arrest

The search of Wallace's car trunk was conducted without a warrant. Nonetheless, under the "automobile exception" to the Fourth Amendment, when "supported by probable cause ... a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not actually been obtained." <u>United States v. Ross, 456 U.S. 798, 809, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982)</u> (footnote omitted). Furthermore, "if probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." <u>Id. at 825.</u>

This automobile exception has been applied flexibly, even when the vehicle is not immediately mobile. See <u>California v. Carney, 471 U.S. 386, 391, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985)</u> (concluding "lesser expectation of privacy war-

rants application for exception"). For example, the exception has been applied to locked car trunks, sealed packages within car trunks, closed compartments under the dashboard, the interior of the vehicle's upholstery, to sealed packages inside a trunk, and to parked mobile homes. *Id. at 391-93.* In addition to the ready mobility of automobiles, the exception has been justified on the rationale that there is a lesser expectation of privacy for an automobile subject to "pervasive schemes" of regulation on the roads.

**\*9** The automobile exception to the Fourth Amendment is well-established in this circuit. "When police officers have probable cause to search an entire vehicle, they may conduct a warrantless search of every part of the vehicle and its contents, including all containers and packages in the vehicle." <u>Cruz, 834 F.2d at 51;</u> *see also* <u>United States v. Harwood, 998 F.2d 91, 96 (2d Cir.1993)</u> (stating that Fourth Amendment does not require the issuance of a warrant to search a car when there is probable cause to believe it contains evidence of criminal activity); <u>United States v. Paulino, 850 F.2d 93, 95 (2d Cir.1988)</u> (recognizing automobile exception); <u>United States v. Vassilou, 820 F.2d 28, 30 (2d Cir.1987)</u> (stating that "law enforcement officials may conduct a warrantless search of a movable vehicle when they have probable cause to believe it contains contraband or evidence of a crime" (citing <u>Carroll v. United States,</u> 237 U.S. 132 (1925))); <u>United States v. Benevento, 836 F.2d 60, 67 (2d Cir.1987)</u> (observing that even where no formal arrest has been made, if the officer could have arrested and probable cause existed to search the automobile, the search is valid); <u>United States v. Monslave, 728 F.Supp. 212, 218 (S.D.N.Y.1990)</u> (recognizing automobile exception).

Morrison had probable cause to search the trunk and any containers found in the car and trunk that might contain stolen mail. First, Wallace's car matched the description given by the Witness to the mail theft and was found in the vicinity of the mail theft shortly after it took place. See <u>Chambers v. Maroney, 399 U.S. 42, 44, 47-48, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970)</u> (finding warrantless search of vehicle valid when police had probable cause to believe it contained evidence of robbery because vehicle matched description given by eyewitness). Second, the individual located in the back seat of the car, Register, matched the description given

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                    Page 8
Not Reported in F.Supp., 1998 WL 401534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

by the Witness of the mail thief seen getting into a car with two bundles of mail. Finally, the individuals sitting in the driver and passenger seats matched the photographs of Wallace and Bruce, known to Morrison as persons responsible for stealing checks from the mail. Given these facts, Morrison was justified in believing that Wallace's car, including the trunk, contained stolen mail. Accordingly, the evidence recovered from the car and trunk will not be suppressed.FN3

> FN3. Assuming arguendo that probable cause to search Wallace's car and trunk did not exist, the evidence would inevitably have been recovered pursuant to proper inventory procedures of the United States Postal Inspection Service. See *Colorado v. Bertine,* 479 U.S. 367, 371-72, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987); *South Dakota v. Opperman,* 428 U.S. 364, 373, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *United States v. Arango-Correa,* 851 F.2d 54, 59 (2d Cir.1988).

**E. *Wallace's Handwriting Exemplars and Post-Arrest Statement Will Not Be Suppressed***

Some time after his arrest, Wallace gave handwriting exemplars which he now seeks to suppress as tainted fruit of an unlawful search and seizure. Because the stop, arrest, and search and seizure were not illegal, suppression is not warranted. The same holds true for any post-arrest statement Wallace may have given, although the Government asserts it is unaware of any such statement.FN4

> FN4. As Wallace has grounded his suppression claim solely on the theory of "tainted fruit," further analysis is not required.

**II. *An Evidentiary Hearing Is Not Necessary***

An evidentiary hearing on a motion to suppress "ordinarily is required 'if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable a court to conclude that contested issues of fact going to the validity of the search are in question.' " *United States v. Pena,* 961 F.2d 333, 339 (2d Cir.1992) (citations omitted); *see United States v. Munoz,* 738 F.Supp. 800, 801 (S.D.N.Y.1990);

*United States v. Castellano,* 610 F.Supp. 1359, 1439 (S.D.N.Y.1985). A defendant seeking to suppress evidence bears the burden of showing the existence of disputed issues of material fact. *See id.; see also United States v. Culotta,* 413 F.2d 1343, 1345 (2d Cir.1969) (stating that the district court was "not required as a matter of law to hold an evidentiary hearing if [defendant's] moving papers did not state sufficient facts which, if proven, would have required the granting of the relief requested by [defendant]"). Moreover, an evidentiary hearing need not be held where "a defendant's allegations are general and conclusory or are based upon suspicion and conjecture." *Castellano,* 610 F.Supp. at 1439; *see Grant v. United States,* 282 F.2d 165, 170 (2d Cir.1970).

*****10** Even if a defendant has met his burden of alleging facts "sufficiently definite, specific, detailed, and nonconjectural," *Pena,* 961 F.2d at 339, it has been established that a court need not resolve factual disputes presented by the moving papers absent a supporting affidavit of someone with personal knowledge of the underlying facts. *See United States v. Caruso,* 684 F.Supp. 84, 87 (S.D.N.Y.1988).

Here, an evidentiary hearing is unnecessary to resolve the suppression motion because there exist no disputed facts sufficient to warrant such a hearing. In an effort to create the illusion of disputed facts, Wallace takes issue with certain inferences the Government has drawn from the facts set forth in the complaint. He asserts that the Government has misstated certain facts to bolster a finding of probable cause. The inferences drawn by the Government from the facts stated in the complaint, however, are reasonable.

Wallace, for example, contests the Government's assertions that Wallace "was involved in stealing checks from the mail," that he "was identified as someone who steals checks from the mail," and that he "was known to Postal Inspector Morrison as a check thief." These assertions, however, are based on, and reasonably drawn from, paragraph 3 of Morrison's affidavit in the complaint, which states that the "CI informed [Morrison] that Dwayne Register was associated with a group of individuals, including Jerome Wallace and Bruce Wallace, responsible for stealing checks from the United States mail."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 9
Not Reported in F.Supp., 1998 WL 401534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Moreover, even if the inferences drawn were unreasonable and the facts as stated by the Government stretched those in record beyond recognition, probable cause would nonetheless lie. It should be noted that any "unreasonable" inferences or misstatements of fact were not considered in deciding the instant motion.

Most importantly, although Wallace contests the inferences made by the Government, he does not dispute the underlying facts themselves. Thus a hearing is not necessary.

Wallace, however, claims in his reply papers that, independent from the misstatements made by the Government, a disputed fact *does* exist: the existence of the Witness. He asserts that because the Witness has not been located, the Witness "very likely never existed; and in any event did not supply information against [Wallace]." (Def's Reply Mem. Supp. Mot. to Suppress at 6.) Because this is a conclusory allegation unsupported by any facts and based solely upon suspicion and conjecture, it is insufficient to warrant a hearing. *See* Castellano, 610 F.Supp. at 1439.

Wallace nonetheless contends that, at the very least, the identity of the Witness must be revealed. However, the Government need not identify the Witness unless Wallace can demonstrate that the identification is essential and material to his defense. *See* United States v. Russotti, 746 F.2d 945, 950 (2d Cir.1984); *see also* United States v. Saa, 859 F.2d 1067, 1073 (2d Cir.1988). The burden is on the defendant to show the need for disclosure. *See* United States v. Jiles, 658 F.2d 194, 197 (3d Cir.1981). Identification has been required when the witness is a key witness to the alleged offense or a participant in the offense. *See* Russotti, 746 F.2d at 951.

**\*11** In the instant situation, the Witness observed a mail theft. The tip about the theft and the license plate number of the car in which the bundles of mail stolen from the mail carrier cart were placed provided Morrison with reasonable suspicion to stop the car. Wallace offers no facts to show that disclosure of the Witness's identity would be essential or material to his defense. It is important to bear in mind that the offense the Witness saw occurring was mail theft, an offense for which Wallace is not charged. He is only charged with credit card fraud. Additionally, the individual

the Witness observed was not Wallace but Register. Wallace admits that the Witness's information deals only with the probable cause issue.

As to probable cause, as noted above, no hearing is required because no disputed facts-at least that are not mere conjecture-have been demonstrated by Wallace. Even if a hearing were to be held, disclosure of the Witness's identity would not be required. Instead, Morrison would presumably testify regarding the information he received and would be subject to cross-examination. After all, Wallace's contention regarding the existence of the Witness is little more than an attack on Morrison's credibility. According to Wallace, Morrison's statement that he has been unable to locate the Witness since the time of Wallace's arrest "throws a deep shadow over Morrison's claim that his source of information against the thief ever existed." (Def's Reply Mem. Supp. Mot. to Suppress at 7.) However, Wallace again fails to provide a sufficient basis for concluding that the Witness did not exist. Because this "disputed fact" is based upon suspicion and conjecture, no hearing is warranted, and because Wallace cannot show that the Witness is material to his defense, disclosure of the Witness's identity will not be required.

### III. *Wallace's Motion To Dismiss the Indictment for Fifth Amendment Violation Due to Preindictment Delay in Prosecution Is Denied*

Wallace contends that by April 1993 the Government had sufficient information to bring against him charges in the instant indictment, which was filed on September 24, 1997. Wallace thus concludes that the delay in filing the indictment was both undue and prejudicial, thereby violating his Fifth Amendment right to due process. Accordingly, Wallace moves for dismissal of the indictment.

The Supreme Court has recognized that excessive preindictment delay may, in some situations, deny a defendant his right to due process under the Fifth Amendment. *See* United States v. Lovasco, 431 U.S. 783, 788, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); United States v. Marion, 404 U.S. 307, 324, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). Notwithstanding this limited right, the "applicable statute of limitations ... is ... the primary guarantee against bringing overly stale criminal charges." Marion, 404 U.S. at 322 (quoting United

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                            Page 10
Not Reported in F.Supp., 1998 WL 401534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

_States v. Ewell,_ 383 U.S. 116, 122, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966)). As a result, to establish a due process violation stemming from preindictment delay, a defendant bears a heavy burden of demonstrating "actual prejudice to the defendant's right to a fair trial _and_ unjustifiable Government conduct." _United States v. Elsbery,_ 602 F.2d 1054, 1059 (2d Cir.1979); _see Lovasco,_ 431 U.S. at 789-90; _Marion,_ 404 U.S. at 324-25; _United States v. Rubin,_ 609 F.2d 51, 66 (2d Cir.1979), _aff'd,_ 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981); _see also United States v. Romero,_ 54 F.3d 56, 62 (2d Cir.1995) (stating that a defendant must show "that the delay violated 'fundamental conceptions of justice' '' (quoting _Lovasco,_ 431 U.S. at 790)).

**\*12** Claiming actual prejudice due to preindictment delay requires a defendant to particularize his allegations in order to "overcome the presumption of legitimacy that attaches to an indictment brought within the applicable statute of limitations period." [FN5] _Beverly v. Walker,_ 899 F.Supp. 900, 909 (N.D.N.Y.1995), _aff'd,_ 118 F.3d 900 (2d Cir.), _cert. denied,_ 522 U.S. 883, 118 S.Ct. 211, 139 L.Ed.2d 147 (1997); _see Castellano,_ 610 F.Supp. at 1385. Unjustifiable Government conduct has typically meant that the Government delayed the indictment in question to gain an unfair tactical advantage over the accused. _See Marion,_ 404 U.S. at 324; _see also Lovasco,_ 431 U.S. at 790; _Castellano,_ 610 F.Supp. at 1386.

> FN5. Wallace asserts that he was indicted more than five years after the mail theft of September 18, 1992, and that this raises a "serious Statute of Limitations issue." (Def's Mem. Supp. Mot. to Suppress at 6.) However, Wallace was not indicted for mail theft, but for credit card fraud. He was indicted on September 24, 1997, for credit card fraud arising from purchases made by him no earlier than September 28, 1992. Accordingly, the indictment was returned within the five-year statute of limitations period.

### A. Actual Prejudice

The standard for actual prejudice is "fairly stringent." _Castellano,_ 610 F.Supp. at 1385; _cf. Lovasco,_ 431 U.S. at 796-97 (noting that in the five years between _Marion_ and

_Lovasco,_ "so few defendants have established that they were prejudiced by delay that neither this Court nor any lower court has had a sustained opportunity to consider the constitutional significance of various reasons for delay"). "The passage of time, and the attendant loss of evidence and dimming of witnesses' memories, is insufficient by itself to show prejudice." _Castellano,_ 610 F.Supp. at 1385 (citing _Elsbery,_ 602 F.2d at 1059); _see Marion,_ 404 U.S. at 326 (stating that dimming of witnesses' memories is not adequate to sustain a claim that preindictment delay violated due process); _United States v. Harrison,_ 764 F.Supp. 29, 32 (S.D.N.Y.1991) (same). "Faded memories or unavailable witnesses are inherent in any delay, even if justifiable. To merit dismissal a defendant must demonstrate a substantial, actual prejudice to his ability to defend himself." _United States v. Long,_ 697 F.Supp. 651, 657 (S.D.N.Y.1988). Such a showing has not been made.

According to Wallace, as a result of preindictment delay, the persons who could have exculpated [him] are no longer available; the retail outlets in question may be no longer operational; and memories have undoubtedly faded to the point of extinction. Neither is [Wallace] now able to reconstruct his whereabouts on the 1992 dates of alleged criminal use of credit cards; thereby destroying any possibility of his invoking an alibi.

(Def's Mem. Supp. Mot. to Suppress at 8-9.) As the Supreme Court stated in _Marion,_ however, such possibilities "are not in themselves enough to demonstrate that [defendant] cannot receive a fair trial and to therefore justify the dismissal of the indictment." 404 U.S. at 326 (referring to a claim that memories will dim, witnesses will become inaccessible, and evidence will be lost). Rather, Wallace must "particularize his claims," _Beverly,_ 899 F.Supp. at 909, with proof of prejudice that is "definite and not speculative." _United States v. Birney,_ 686 F.2d 102, 106 (2d Cir.1982).

Wallace's naked assertion that the delay made certain exculpatory witnesses (shopkeepers and clerks) unavailable is conjecture. He has not named a single exculpatory witness that is now unavailable; nor has he revealed the efforts made by him to locate the missing witnesses and to determine whether the retail outlets in question are still in operation.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                     Page 11
Not Reported in F.Supp., 1998 WL 401534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

*Cf. Beverly,* 899 F.Supp. at 910 (finding no actual prejudice where the defendant failed to reveal the substance of missing testimony and efforts made to find unavailable witnesses).

*13 Wallace's contention that he is certain that none of the shopkeepers and clerks "would have-or could have-identified [Wallace] as the person who had used stolen credit cards to gain merchandise or services from them," (Def's Mem. Supp. Mot. to Suppress at 8), is similarly speculative. Wallace does not know whether the presence of these witnesses would have helped or hindered his case, and he has no way of knowing what their testimony might have been. The court in *Long,* in holding that a five-year preindictment delay did not violate defendant's constitutional rights, stated that perceived prejudice was speculative and failed to justify dismissal where the defendant did not know what the deceased witness's testimony would have been. 697 F.Supp. at 657.

Moreover, Wallace's assertion that his own memory has faded as to his whereabouts on the dates specified in the indictment does not create actual prejudice. *See e.g., Harrison,* 764 F.Supp. at 32; *see also Marion,* 404 U.S. at 326; *Elsbery,* 602 F.2d at 1059; *Castellano,* 610 F.Supp. at 1385.

Wallace further contends that he was disabled from checking out the existence and availability of witnesses, and that having been discharged from the complaint in 1993, he had every right to assume that the case was dismissed with prejudice. However, according to the Government, Wallace and his attorney were aware, throughout the time between the bank fraud and extortion trial in January 1994 and the indictment in 1997, that Wallace continued to be a suspect, that his case was still active, and that the Government's investigation concerned a specific time period. *See Harrison,* 764 F.Supp. at 32.

Although Wallace claims that he believed the case against him was over when it was initially dismissed on April 5, 1993, as evidence that the Government never considered the investigation to be over it has submitted an affirmation that states that the Government put Wallace and his counsel on notice in January 1994, during the bank fraud and extortion trial before Judge Knapp, and in February 1994 when

AUSA Koeleveld offered to accept a combined plea from Wallace in both case, that this case remained open and active. During the trial before Judge Knapp, upon inquiry as to the status of the mail theft case, Koeleveld stated, in the presence of Wallace's current counsel, that the complaint had been dismissed without prejudice and that the case continued to be under investigation. (*See* Koeleveld Affirmation ¶¶ 4, 6.)

Furthermore, regarding the search for alibi witnesses, as the Government points out, the credit card fraud case is not premised on Wallace having been in a particular place at a particular time, but rather on expert testimony concerning handwriting analyses of credit card receipts. It is therefore unclear that an alibi would exonerate Wallace.

Because the indictment was filed within the applicable statute of limitations and Wallace has failed to show prejudice other than unavailable witnesses, faded memories, and the expectation of "being free and clear," actual prejudice has not been established.

### B. *Unjustifiable Government Conduct*

*14 Wallace states that the Government deliberately and vindictively delayed his indictment until 1997 as a result of losing its appeal in 1995 to reinstate his conviction in another case. Because Wallace has failed to show actual prejudice, it is not necessary to address the unjustifiable conduct claim to dispose of the motion.

Regardless, there is no evidence demonstrating that the Government sought to, or did, gain any tactical advantage through a deliberate delay. The Government maintains that it did not engage in any impropriety, and that no communication ever transpired between or among members of the prosecution to delay Wallace's indictment. The Government further asserts that it was not "frustrated in its objective to deal [Wallace] a heavy jail sentence," as Wallace contends, (Def's Mem. Supp. Mot. to Suppress at 10), and that in fact the Government won its 1995 appeal in part, as Wallace, upon remand, was sentenced to 21 months of imprisonment.

Granted, waiting until the eve of the expiration of the statute of limitations is not the preferred approach in commencing a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 401534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

case, the most that can be asserted against the Government is negligence for failure to move Wallace's case more expeditiously. In this circuit, courts have held that prosecutorial negligence is not sufficient to establish a due process violation.[FN6] *See Harrison, 764 F.Supp. at 33* (stating that "[b]ureaucratic oversight and lack of proper case administration does not rise to the level of conduct which justifies dismissing a criminal indictment"); *United States v. Oliver, 683 F.Supp. 35, 41 (E.D.N.Y.1988)* (finding that while prosecution of the case was "anything but diligent," the court could not find that the Government's conduct violated due process); *United States v. Hodge, 556 F.Supp. 139, 142 n. 8 (S.D.N.Y.1983)* (noting that Government negligence furnishes no basis for dismissal of an indictment absent showing that the defendant will be deprived of a right to a fair trial).

> FN6. There is no Second Circuit case holding that prosecutorial negligence is cause to dismiss an indictment. *See Birney, 686 F.2d at 105 n. 1.*

In *Oliver,* the defendants were arrested in December 1982. 683 F.Supp. at 36. Eight months later, in August 1983, one of the defendants moved to dismiss the complaint on both speedy trial and due process grounds, citing the Government's failure to timely indict. *Id. at 37.* While the court ordered the Government to respond to the motion, the Government failed to do so despite the issuance of two court orders. *Id.* No responsive memorandum was ever submitted, and the case lay dormant for four years until November 1987, when an indictment was returned just prior to the running of the applicable statute of limitations. *Id.* Nevertheless, the court denied the motions to dismiss the indictment, holding that the defendants "failed to show the unfair governmental conduct that is indicative of a due process violation." *Id.* at 41. More specifically, the court stated that although "it is unfortunate that [the AUSA] was guilty of ignoring the case, the Court cannot find that this type of conduct violates the due process clause of the Fifth Amendment." *Id.*

*15 Finally, Wallace requests disclosure of all internal case file notes and memoranda regarding the Government's decision "not to reinstate, or to delay, the reprosecution of, this case." (Def's Mem. Supp. Mot. to Suppress at 12.) Given the

affirmations submitted by the Government rebutting Wallace's claim of prosecutorial misconduct and that actual prejudice, a necessary prong of a due process violation, has not been established by Wallace, neither a hearing nor the disclosure of internal documents is required.

### IV. *Wallace's Assertion of Vindictive Prosecution Is Without Merit*

Prosecutorial vindictiveness has not been suggested by any specific facts in this case and can only be presumed in narrow circumstances, none of which are presented here. *See generally, United States v. Hinton, 703 F.2d 672, 678 (2d Cir.1983).* Wallace's allegation of vindictive prosecution is not
based on any invidious grounds such as race, creed, color, national origin, on some reason for personal dislike, or on any other such reason. Nor does he suggest that an increased sentence or other penalty is being sought because the defendant obtained an acquittal at his earlier trial.

*United States v. Stevenson, 803 F.Supp. 825, 827 (S.D.N.Y.1992); see Lane v. Lord, 815 F.2d 876, 878 (2d Cir.1987)* (noting that presumption of prosecutorial vindictiveness has been restricted primarily to a situation where the prosecutor lodges more severe charges following a defendant's post-conviction exercise of his right to appeal).

Wallace's mere assertion that he is being prosecuted for credit card fraud because the Government lost its appeal to reinstate Wallace's extortion conviction in an unrelated case does not rise to the level of prosecutorial misconduct. *Cf. Stevenson, 803 F.Supp. at 826-27* (denying motion to dismiss indictment on grounds of prosecutorial vindictiveness where forfeiture action was brought against the defendant four months after his acquittal from bank robbery charges). Were Wallace to be immunized from prosecution in one case merely because he was acquitted of charges in a separate case, "criminal behavior would be shielded with no benefit to the innocent or to the public. No authority supports such a proposition." *Id. at 827.*

As Wallace has failed to establish a claim of vindictive prosecution, no discovery or hearing is warranted. Wallace has failed to present "some evidence tending to show the exist-

Westlaw.

Not Reported in F.Supp.                                                        Page 13
Not Reported in F.Supp., 1998 WL 401534 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

ence of the essential elements of the defense and that the documents in the government's possession would indeed be probative of these elements." *United States v. Fares,* 978 F.2d 52, 59 (2d Cir.1992) (quoting *United States v. Berrios,* 501 F.2d 1207, 1211-12 (2d Cir.1974)) (finding no abuse of discretion in district court's denial of discovery and evidentiary hearing where defendant did not produce evidence tending to show that the decision to prosecute was invidious or in bad faith). Wallace's bald assertions on information and belief are insufficient.

*Conclusion*

**\*16** For the reasons set forth above, Wallace's motions to suppress and for dismissal of the indictment are denied. The parties are directed to set a trial date by appropriate stipulation.

It is so ordered.

S.D.N.Y.,1998.
U.S. v. Wallace
Not Reported in F.Supp., 1998 WL 401534 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1:97cr00975 (Docket) (Sep. 24, 1997)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



ALL-STATE® LEGAL  800-222-0510    ED11    RECYCLED

43

Westlaw.

Not Reported in F.Supp.2d                                                                                          Page 1
Not Reported in F.Supp.2d, 1999 WL 476996 (W.D.Pa.), Fed. Sec. L. Rep. P 90,525
(Cite as: Not Reported in F.Supp.2d)

▷

United States District Court, W.D. Pennsylvania.
John B. WARDEN, III, on behalf of himself and all others
similarly situated, Plaintiff,
v.
CROWN AMERICAN REALTY TRUST, Mark E.
Pasquerilla, Frank J. Pasquerilla, Patrick M. Miniutti, De-
fendants.
No. Civ.A. 96-25J.

July 6, 1999.

David J. Manogue, Howard A. Specter, Specter, Specter,
Evans & Manogue, Pittsburgh, PA, Donald P. Alexander,
Richard D. Greenfield, Ann M. Caldwell, Greenfield & Ri-
fkin, Ardmore, PA, for John B. Warden, III, on behalf of
Himself and All Others Similarly Situated, plaintiff.
Gregory B. Jordan, Jack B. Cobetto, Roy W. Arnold, Reed,
Smith, Shaw & McClay, Pittsburgh, PA, for Crown Americ-
an Realty Trust, defendant.
Gregory B. Jordan, Jack B. Cobetto, Roy W. Arnold, (See
above), for Mark E. Pasquerilla, defendant.
Gregory B. Jordan, Jack B. Cobetto, Roy W. Arnold, (See
above), for Frank J. Pasquerilla, defendant.
Gregory B. Jordan, Jack B. Cobetto, Roy W. Arnold, (See
above), for Patrick M. Miniutti, defendant.
David J. Manogue, Howard A. Specter, Joseph N. Kravec,
Specter, Specter, Evans & Manogue, Pittsburgh, PA,
Richard D. Greenfield, Ann M. Caldwell, Greenfield & Ri-
fkin, Ardmore, PA, for David S. Stein, on Behalf of Himself
and All Others Similarly Situated, plaintiff.
David J. Manogue, Howard A. Specter, Joseph N. Kravec,
Specter, Specter, Evans & Manogue, Pittsburgh, PA,
Richard D. Greenfield, Ann M. Caldwell, Greenfield & Ri-
fkin, Ardmore, PA, for Robert Parsons, on Behalf of Them-
selves And All Others Similarly Situated, plaintiff.

**MEMORANDUM OPINION AND ORDER**
SMITH, J.
**\*1** In this second round of motions to dismiss, defendants
contend that plaintiffs have again failed to plead viable
causes of action under section 10(b) of the 1934 Exchange
Act and state common law in their Third Amended Com-
plaint. After careful consideration, I am constrained to

agree. Moreover, because any attempt to cure the com-
plaint's deficiencies by amendment would be futile, I will
dismiss the complaint with prejudice.

I.

The factual and legal background of this litigation and its
companion action have already been stated at length, and it
would be redundant to restate it here. *See Warden v. Crown
Am. Realty Trust,* No. 96-25J, 1998 WL 725946 (W.D.Pa.
Oct.15, 1998); *In re Crown Am. Realty Trust Sec. Litig.,* No.
95-202J, 1997 WL 599299 (W.D.Pa. Sept.15, 1997). This is
a purported securities fraud class action filed on behalf of
persons who purchased Crown shares between the August
17, 1993 IPO and February 28, 1995. Plaintiffs asserted
claims under sections 11 and 12(a)(2) of the Securities Act,
section 10(b) of the Exchange Act, as well as claims for
common law fraudulent and negligent misrepresentation.
*Warden,* 1998 WL 725946, \*1. On October 15, 1998, I dis-
missed all of plaintiffs' claims under the Securities Act with
prejudice, *id.,* \*2-\*3, but granted leave to amend as to their
remaining causes of action, which I found to include matters
already dismissed with prejudice in the *Crown* action, *id.,*
\*3.[FN1] I also denied the putative intervenor-plaintiff leave
to intervene on behalf of the class. *Id.,* \*4-\*7.[FN2]

> FN1. Early on in this litigation, the parties in the
> instant action agreed to be bound by my rulings in
> the *Crown* litigation.

> FN2. I held, however, that Stein was entitled to
> bring his claims on an individual basis, which he
> attempted to do in the Third Amended Complaint.
> By stipulation of the parties, however, he has dis-
> missed those claims without prejudice. Dkt. no. 39.

Plaintiffs have filed a Third Amended Complaint, in which
they continue to assert a number of factual averments and
theories that I have already dismissed. Defendants seek dis-
missal of the complaint to the extent these allegations con-
tinue to be pleaded, and also challenge plaintiffs factual
averments that are unique to this case and not present in
*Crown.* I will address these issues *seriatim* .

II.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 1999 WL 476996 (W.D.Pa.), Fed. Sec. L. Rep. P 90,525
**(Cite as: Not Reported in F.Supp.2d)**

Plaintiffs have pleaded that, because of defendants' misrepresentations and omissions, they "purchased Crown shares at artificially inflated prices throughout the Class Period." Dkt. 35, ¶ 123. It is axiomatic, however, that statements made after a person purchases shares cannot possibly have influenced the decision to buy. *Gross v. Summa Four, Inc.,* 93 F.3d 987, 993 (1st Cir.1996) (citing *Roots Partnership v. Lands End, Inc.,* 965 F.2d 1411, 1420 n. 6 (7th Cir.1992)). Plaintiffs, that is, Messrs. Warden and Parsons, have failed to plead the dates on which they purchased their shares, but they do not dispute that Parsons made his purchase on April 6, 1994 and Warden purchased his sometime in the Fall of that year. Because Stein was dismissed in my earlier memorandum, there is no plaintiff who purchased his shares directly in the IPO. The import of this is that all alleged misrepresentations and omissions that took place after the Fall of 1994 are not actionable. This includes: (1) defendants' failure to disclose a downward occupancy trend at the "Trust's mall" between June 1995 and June 1996, Dkt. no. 35, ¶ 41; (2) defendants' statement that the damage arising from the Logan Valley Mall fire was covered by insurance, *id.,* ¶¶ 54, 73-75; (3) Frank Pasquerilla's statement on February 6, 1995 concerning the May Company's investment in Crown real estate and Crown's "great growth potential," *id.* ¶ 71; (4) Emerald Research's subsequent analyst report, *id.;* (5) the NatWest and Dow Jones analyst reports of August 8-9, 1995, which were issued after the dividend cut, *id.,* ¶¶ 88-90; and (6) the John Kriak letter of December 30, 1994, *id.,* ¶¶ 101-02, 105.

*2 Plaintiffs also cite defendants' failure to disclose "that two of Crown's anchor locations (former Hess locations at the Franklin and Schuykill Malls) totaling 159,700 square feet of combined gross leasable area had been leased to Bon Ton Stores at an average rent of only $5.00 per square foot on a *temporary basis,* which meager rental income was to be lost when the tenants vacated in January 1997." *Id.,* ¶ 42. According to the complaint, had this disclosure been made, the IPO would either not have taken place or would have had a substantially lower offering price. *Id.* These leases, however, were not executed until after September 1994, when they were approved at Crown's shareholders' meeting. Dkt. no. 38, Exh. 24, 25.[FN3] Accordingly, this alleged nondisclosure could not have affected the IPO it is alleged

to have influenced.

> FN3. These exhibits may be considered on a motion to dismiss. Plaintiffs specifically plead reliance upon all documents filed with the SEC during the class period. Dkt. no. 35, ¶ 9(e). Proxy statements are filed with the SEC. *See* 15 U.S.C. § 78n, *United States v. Natelli,* 527 F.2d 311, 314 (2d Cir.1975). Thus, the proxy statement is a document implicitly referenced by the complaint on which plaintiffs base their claim; hence, it may be considered at this time. *See In re Crown Am. Realty Trust Sec. Litig.,* No. 95-202J, 1997 WL 599299, *7 (W.D.Pa. Sept.15, 1997).

Plaintiffs continue to assert their contentions that defendants omitted to disclose that: (1) significant capital expenditures would be necessary to upgrade the malls to make them competitive; (2) the fair market value of the malls was $35 million below their stated value, negatively affecting Crown's ability to leverage its assets through borrowing; (3) Crown had limited access to capital markets and would have to finance internally; (4) Crown planned to purchase the Pasquerilla-owned interests in the Wyoming Valley and Middletown Malls; and (5) the costs of rebuilding the Logan Valley Mall would not all be covered by insurance, and that anchor tenants were demanding major renovations as a condition of lease renewal. Dkt. no. 35, ¶¶ 47, 54, 61-63, 81; *see also id.* ¶¶ 73-75, 77, 84-87. All of these nondisclosures were rejected as bases for liability in *Crown,* 1997 WL 599299, *23-*24 (Logan Valley Mall, with prejudice), *24-*25 (capital expenditures, with prejudice); *25 (Wyoming Valley and Middletown Malls, with prejudice); *25-*27 (fair market value, access to capital markets, ability to borrow, with leave to amend). Hence, these allegations will be dismissed here as well, with prejudice, as plaintiffs were either bound by *Crown* 's dismissals with prejudice or were aware of its holding have been unable to state their proposed basis for liability any differently.

Likewise, plaintiffs again contend that certain statements made in the published media are actionable under the Exchange Act, although some of the statements and reports are different from those asserted in *Crown.* Most of these, however, are statements predicting Crown's 1994 earnings

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 3
Not Reported in F.Supp.2d, 1999 WL 476996 (W.D.Pa.), Fed. Sec. L. Rep. P 90,525
**(Cite as: Not Reported in F.Supp.2d)**

and dividend. *See id.,* ¶ 45 (April 1994 Alex Brown report) FN4; ¶ 49 (Mark Pasquerilla predicting $1.54 1994 FFO); ¶ 53 (August 3, 1994 press release from Frank Pasquerilla stating that Crown is "on target" for meeting its 1994 FFO goals). It is undisputed, however, that Crown in fact earned $1.60 per share in funds from operations in 1994. Accordingly, the predictions were true, and as such, not actionable.FN5 Moreover, claims based on Frank Pasquerilla's April 6, 1994 statement in the *Pittsburgh Post-Gazette* projecting 1995 funds from operations of $1.70 per share also fail. *Id.,* ¶ 52. The actionability of this remark was rejected with prejudice in *Crown,* 1998 WL 777984, *2.

> FN4. The Alex Brown report is not actionable for the additional reason that plaintiffs, while half-heartedly making a vague, global allegation of entanglement between management and market analysts, *id.,* ¶ 20, have made no effort to plead the three-part, "adopt or endorse" test which is a requisite to imputing a third-party statement to a securities fraud defendant. *See Crown,* 1997 WL 599299, *19.

> FN5. The same conclusion-that is, that the prediction was achieved and hence not actionable-applies to the statement in the 1993 IPO prospectus that the REIT "intends" to pay a 1.40 annual dividend. *See id.,* ¶ 37. There was no indication from this document that such dividends would, or even could, be paid in 1995. In all prior years, they were in fact paid.

*3 One published statement, however, bears closer examination. On July 3, 1994, in the business section of the *Pittsburgh Post-Gazette,* Douglas S. Thomas, an analyst with Emerald Research, offered a favorable opinion of Crown. The article then continued:

Thomas projects Crown will generate funds from operations-a benchmark of REIT performance-of $1.66 per share in 1994. That's well above the company's estimate of $1.54 per share, though [Frank] Pasquerilla expects "that we'll exceed that."

Dkt. no. 38, Exh. 8. This remark is ambiguous: does "we'll exceed that" refer to $1.54 or $1.66? This is critical, because

if it refers to the former, the statement is plainly not actionable because it turned out to be true. If the pronouncement was meant to say that Crown's earnings would exceed even the analyst's projection of $1.66 per share, then it proved ultimately to have been inaccurate, and further analysis is required to determine whether it could have violated section 10(b).

To assert a section 10(b) claim, plaintiff must have relied on the misrepresentation in question, and that reliance must have been reasonable. *E.g., Kline v. First W. Gov't Sec., Inc.,* 24 F.3d 480, 487-88 (3d Cir.1994); *In re Prudential Inc. Co. Sales Practices Litig.,* 975 F.Supp. 584, 598 (D.N.J.1996). "An action for securities fraud cannot lie if a plaintiff fails to plead, much less prove, reasonable and justifiable reliance on alleged omissions or misstatements." *EP Medsystems, Inc. v. Echocath, Inc.,* 30 F.Supp.2d 726, 757 (D.N.J.1998). An important factor in determining whether plaintiffs' reliance was reasonable is whether they had access to information that would have revealed the alleged fraud. *Id.; Kline,* 24 F.3d at 488; *Prudential,* 975 F.Supp. at 612. Another is the generality or specificity of the alleged misrepresentation. *Molecular Tech. Corp. v. Valentine,* 925 F.2d 910, 918 (6th Cir.1991). Failure to read available documents issued by the defendant that contradict the alleged misrepresentation negates plaintiffs' reliance. *EP,* 30 F.Supp.2d at 757. Moreover, the allegedly false or misleading statement must be clear. *Cf. Leila Hosp. & Health Ctr. v. Xonics Med. Sys., Inc.,* 948 F.2d 271, 275 (6th Cir.1991) (in analogous situation of promissory estoppel, promise relied upon must be "definite and clear"); *Clausen v. Smith,* 823 F.2d 660, 663 (1st Cir.1987) (similar).

Here, Frank Pasquerilla's prediction of earnings was, at best, ambiguous: it was neither clear nor specific as to what level of FFO-$1.54 or $1.66-he believed Crown would exceed. Further, all of Crown's contemporaneous predictions of 1994 FFO stated an amount of $1.54, a level significantly less than $1.66, and which was exceeded by six cents per share when Crown actually earned $1.60. To suppose, under these circumstances and without further inquiry, that Pasquerilla expected to not only exceed Crown's predicted FFO, but the analyst's figure as well, is simply not reasonable as a matter of law. No prudent investor would purchase

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



shares based on such a slender reed of information. Accordingly, this statement is not actionable because any reliance upon it would have been unreasonable .[FN6]

> [FN6.] With respect to plaintiff Parsons, Pasquerilla's July 3 statement is post-purchase as well, and thus not actionable for that additional reason. I also note that plaintiffs have failed to plead or argue, given that the actual 1994 FFO was $1.60, specifically how the alleged $1.66 projection was made without a reasonable basis, either by inadequately considering the available data or by use of unsound forecasting methodology. Such an averment is necessary in order to plead securities fraud related to a forward-looking statement with sufficient particularity. See _Crown, 1997 WL 599299, *16_. Thus, a claim based upon this statement would have to be dismissed under _Fed.R.Civ.P. 9(b)_ in any event.

*4 Finally, plaintiffs rely upon a June 6, 1993 statement made by Paul Pearson, managing director of Kidder Peabody Mortgage Capital Corporation, in which he related:
[The EPO is] not a bailout. The purpose is to improve the balance sheet with equity and by retiring debt to then have a company with a lower capital-to-debt ratio.

Dkt. no. 35, ¶ 36; Dkt. no. 38, Exh. 2. Plaintiffs argue that this statement was made by Kidder Peabody acting in the capacity of Crown's agent, and, alternatively, in the capacity of an analyst with sufficient entanglement to the REIT that the alleged falsehood should be attributed to Crown. I conclude, for several reasons, that this statement is not actionable.

First, Crown itself has already been dismissed as a defendant because it lacked motive and opportunity to commit securities fraud. See _Crown, 1998 WL 777984, *3, *5_. In the Third Amended Complaint in this action, plaintiffs have not made any new motive and opportunity allegations with respect to Crown, although they do argue incentive compensation as a motive for the Pasquerilla defendants. Moreover, it is not alleged that any of the Pasquerilla defendants had any entanglement with Pearson so that his statement could be attributed to them individually.[FN7] Accordingly, to the extent Pearson's statement was that of an analyst, there is no de-

fendant to whom it can be imputed.

> [FN7.] Plaintiffs allege only that the individual defendants did not deny or correct the statements of analysts. This is clearly an insufficient allegation of entanglement. See _Crown, 1997 WL 599299, *19_.

Second, to the extent plaintiffs are relying upon an agency theory, the Third Circuit rejected such an approach almost twenty-five years ago, except in the broker-dealer context, a situation not presented here. See _Rochez Bros., Inc. v. Rhoades, 527 F.2d 880, 886 (3d Cir.1975)_. My conclusion is further strengthened by the Supreme Court's rejection, in an analogous context, of aiding and abetting as a basis for liability under section 10(b). _Central Bank v. First Interstate Bank, 511 U.S. 164, 191, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994)_. There seems little reason why the same result should not obtain under either an agency or an aiding and abetting theory. Thus, I conclude that Pearson's statement is not actionable under _respondeat superior_ principles. See _Prudential, 975 F.Supp. at 612-13_.

### III.

Accordingly, because there are no actionable misrepresentations or omissions pleaded in plaintiffs' Third Amended Complaint, further amendment would be futile. I will therefore dismiss plaintiffs' section 10(b) claims with prejudice. Given the absence of primary liability, their secondary liability claims under section 20(a) suffer the same fate. See _Crown, 1997 WL 599299, *27_. Likewise, because of the lack of any false statement or justifiable reliance, plaintiffs common law misrepresentation claims fall as well and will be dismissed with prejudice.

An appropriate order will be entered.

### ORDER

AND NOW, this 6th day of June 1999, upon consideration of defendants' motion to dismiss the third amended complaint, dkt. no. 36, and plaintiffs' motion for oral argument on the same, dkt. no. 41, and the responses thereto, it is hereby

*5 ORDERED AND DIRECTED that:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                      Page 5
Not Reported in F.Supp.2d, 1999 WL 476996 (W.D.Pa.), Fed. Sec. L. Rep. P 90,525
**(Cite as: Not Reported in F.Supp.2d)**

1. defendants' motion to dismiss the complaint, dkt. no. 17, is GRANTED;

2. plaintiffs' claims are DISMISSED WITH PREJUDICE;

3. plaintiffs' motion for oral argument, dkt. no. 41, is DENIED;

4. the Clerk of Court shall mark this case CLOSED.

W.D.Pa.,1999.

Warden v. Crown American Realty Trust

Not Reported in F.Supp.2d, 1999 WL 476996 (W.D.Pa.), Fed. Sec. L. Rep. P 90,525

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

44

Westlaw.

Not Reported in F.Supp.                                                    Page 1
Not Reported in F.Supp., 1998 WL 30069 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

H
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, N.D. California.
WILLIS CORROON CORPORATION OF UTAH, INC.,
Plaintiff(s),
v.
UNITED CAPITOL INSURANCE COMPANY, and Does
1 through 20, inclusive, Defendant(s).
No. 97-2208 MHP.

Jan. 5, 1998.

**MEMORANDUM AND ORDER**

PATEL, J.
**\*1** Plaintiff William Corroon Corporation of Utah, Inc.
("Corroon") brought this action against defendants United
Capitol Insurance Company ("United Capitol") and Does 1
through 20 alleging breach of contract and seeking indem-
nity and declaratory relief.

United Capitol filed a motion to dismiss for failure to state a
claim, alleging that Corroon's complaint was filed prema-
turely in violation of a "standstill" provision contained in an
interim settlement agreement between the two parties.
United Capitol alleges that because Corroon violated the
standstill provision, Corroon cannot maintain the instant ac-
tion against United Capitol, and therefore has not stated a
claim upon which relief can be granted. Now before the
court is United Capitol's motion to dismiss Corroon's com-
plaint.

Having considered the parties' arguments and submissions,
and for the reasons set forth below, the court enters the fol-
lowing memorandum and order.

*BACKGROUND*[FN1]

> FN1. Unless otherwise indicated, the following
> facts are taken from plaintiff Corroon's complaint.

This is an insurance coverage dispute arising out of a per-
sonal injury lawsuit seeking damages for injuries sustained
by John Smith, an employee of SME Corporation ("SME"),
while working on a hospital construction project near Stock-
ton, California. Plaintiff Corroon acted as an insurance

broker for SME by placing an insurance contract with
United Capitol for SME's construction project. Smith
brought suit in San Francisco Superior Court against the
general contractor, Perini Corporation ("Perini") and the
project owner, San Joaquin County, in an action entitled
*Smith v. Perini, et al.* ("the *Smith* action"). Perini cross-
complained against SME, and sought indemnity and defense
from insurer United Capitol as an additional insured under
the liability insurance contract between United Capitol and
SME. United Capitol contested, asserting that the insurance
contract did not provide coverage for the *Smith* action and
that it had no duty to defend or indemnify Perini.

After United Capitol refused to defend or indemnify Perini,
SME, Corroon and Perini entered into a contractual agree-
ment whereby (1) Perini dismissed its cross-complaint
against SME; (2) Perini and SME assigned their rights
against United Capitol to Corroon; and, (3) Corroon agreed
to fund the defense and settlement of the Smith action. Cor-
roon then engaged legal counsel to defend the *Smith* action.
Thereafter, on or about August 6, 1996, Corroon and United
Capitol entered into an interim settlement agreement with
regard to United Capitol's alleged obligation to indemnify
damages arising form the construction accident. The agree-
ment stated that to settle the Smith action, Corroon and
United Capitol would each contribute 50% of the first $1
million of the *Smith* settlement and attorneys' fees. The
parties agreed that the coverage dispute would be mediated
in this district, and in the event mediation was unsuccessful,
Corroon could seek reimbursement from United Capitol of
the $500,000 it paid to settle the *Smith* action and the
$130,000 in attorney's fees and costs it paid to defend that
action.

**\*2** The interim settlement agreement included a "standstill"
or "private stay" provision which governed the parties' right
to assert coverage arguments and seek reimbursement in a
subsequent proceeding. The provision is as follows:
In the event the mediation is unsuccessful, either [Corroon]
or United Capitol may file a judicial proceeding seeking ad-
judication of any issues except those specifically released
herein, including, but not limited to reimbursement of any
sums paid for defense costs or indemnity related to the
Smith action. Such an *action may not be filed, however, un-*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                    Page 2
Not Reported in F.Supp., 1998 WL 30069 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.)

*til 30 days have elapsed since the unsuccessful conclusion of the non-binding mediation between the parties of the coverage dispute.*

Interim Settlement Agreement, Exh. A, ¶ 6 (emphasis added). The parties attended mediation of the coverage dispute on May 14, 1997 but were unable to resolve the matter. On June 13, 1997 Corroon filed the instant action seeking declaratory relief regarding the rights of the parties under the insurance policy and reimbursement of the $630,000 it expended in defending and settling the *Smith* action.

United Capitol now asks the court to dismiss Corroon's complaint on the ground that Corroon violated the above standstill provision. The parties dispute the interpretation and computation of "until 30 days have elapsed since the unsuccessful conclusion of ... mediation." The parties also dispute whether Corroon's allegedly premature filing is proper grounds for dismissal of this action.

## LEGAL STANDARD

A motion to dismiss for failure to state a claim will be denied unless it appears that the plaintiff can prove no set of facts which would entitle him or her to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Fidelity Financial Corp. v. Federal Loan Bank of San Francisco,* 792 F.2d 1432, 1435 (9th Cir.1986), *cert. denied,* 479 U.S. 1064, 107 S.Ct. 949, 93 L.Ed.2d 998 (1987). All material allegations in the complaint will be taken as true and construed in the light most favorable to the plaintiff. *NL Industries, Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir.1986). Although the court is generally confined to consideration of the allegations in the pleadings, when the complaint is accompanied by attached documents, such documents are deemed part of the complaint and may be considered in evaluating the merits of a Rule 12(b)(6) motion. *Durning v. First Boston Corp.,* 815 F.2d 1265, 1267 (9th Cir.1987), *cert. denied sub. nom. Wyoming Community Dev. Auth. v. Durning,* 484 U.S. 944, 108 S.Ct. 330, 98 L.Ed.2d 358 (1987). In addition, documents specifically referred to in the complaint whose authenticity no party questions, but which are not physically attached to the pleadings, may be considered in ruling on a Rule 12(b)(6) motion. *Branch v. Tunnell,* 14 F.3d 449, 453-454 (9th Cir.), *cert. denied* 512 U.S.

1219, 114 S.Ct. 2704, 129 L.Ed.2d 832 (1994). Consideration of such documents does not convert the motion to dismiss into a motion for summary judgment. *Id.* at 454.

## ANALYSIS

### I. *Propriety of the motion to dismiss and the court's consideration of the standstill provision*

*3 Preliminarily, Corroon asserts that the motion to dismiss is inappropriate because (1) the standstill provision may not be considered by the court because it is never mentioned in the complaint; (2) the interim settlement agreement should not be considered because it is not central to plaintiff's claim; (3) the alleged affirmative defense does not clearly appear on the face of the complaint; (4) the defense requires that the court adopt United Capitol's assertion that the standstill provision is a condition precedent rather than a covenant, therefore making it necessary to go outside the pleadings to decide the motion; and, (5) the computation of the 30 days is a purely procedural matter which does not go to the existence of a cognizable claim, and thus does not afford grounds for a dismissal. None of these contentions has merit.

First, the court may consider the standstill provision because Corroon clearly refers to the interim settlement agreement in the complaint. Corroon states that the parties "entered into an interim settlement agreement" regarding the *Smith* action, and "further agreed, among other things, that the coverage dispute would be mediated in this district, and that in the event that the mediation was unsuccessful, [ ] Corroon could seek reimbursement from United Capitol...." Compl., ¶ 18. Thus not only does Corroon refer to the agreement, it also refers to the mediation process and the right to seek reimbursement if mediation failed. Corroon's assertion that its own failure to mention the 30-day standstill limitation found within this provision precludes the court from considering the provision as a whole is without merit. Because Corroon refers to and relies upon the interim settlement agreement in the complaint and there is no dispute as to the document's authenticity, the court may consider the document-and the standstill provision contained therein-without converting the motion to dismiss into a motion for summary judgment. *See Branch,* 14 F.3d at 453-454.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                    Page 3
Not Reported in F.Supp., 1998 WL 30069 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

Second, while the interim settlement agreement may not be "central" to the substantive issues in Corroon's complaint, it clearly is central to Corroon's ability to bring this action since the agreement is a binding contract which allegedly limits the parties' right to sue. The agreement is therefore centrally relevant-and potentially dispositive-in the same way that facts indicating the existence of a statute of limitations or res judicata defense would be.

Third, because the court may consider the interim settlement agreement and the standstill provision incorporated therein, the existence of the alleged affirmative defense does appear on the face of the complaint. When the complaint itself discloses an undisputed fact which will defeat plaintiff's claims, the complaint need only refer to the fact which gives rise to the defense for the defense to 'clearly appear on the face' of the pleading; in other words, the complaint need only contain an undisputed fact which clearly reveals the existence of a meritorious affirmative defense for dismissal to be appropriate. *See e.g., Scott v. Kuhlman,* 746 F.2d 1377, 1378 (9th Cir.1984) (facts indicated bar of res judicata); *Jablon v. Dean Whitter & Co.,* 614 F.2d 677, 682-83 (9th Cir.1980) (facts indicated running of statute of limitations). On the other hand, dismissal is inappropriate if factual elements of the defense are in dispute. *See e.g., Jablon,* 614 F.2d at 682 (running of statute of limitations not apparent on face of complaint if facts pled would permit plaintiff to prove that statute was tolled); *McCalden v. California Library Association,* 955 F.2d 1214, 1219 (9th Cir.1990), *cert. denied, sub nom. Simon Wiesenthal Center for Holocaust Studies v. McCalden,* 504 U.S. 957, 112 S.Ct. 2306, 119 L.Ed.2d 227 (1992) (in contract dispute, affirmative defense of impossibility incomplete and thus dismissal inappropriate where complaint did not state that reasonable measures were taken to surmount obstacles to performance).

**\*4** The motion to dismiss procedure may be used to enforce settlement agreement terms which prescribe procedures for or limitations on further litigation, and courts have interpreted such agreements to establish bars to the maintenance of a civil action. *See e.g., Federal Deposit Insurance Corporation v. Philadelphia Authority for Industrial Development, et al.* ("PAID"), 1995 WL 602898, 1 (E.D.Pa.1995) (dismissing deficiency action as precluded by settlement

agreement's limitations on right to bring suit). In *PAID,* defendants entered into a settlement agreement with the FDIC fixing the amount to be paid in satisfaction of a debt, the date by which the debt was to be satisfied, and the procedure to be followed in the event that defendants defaulted on the settlement agreement. *Id.* Both parties agreed that any and all action in the case would be limited to an in rem foreclosure action by the FDIC against the mortgaged property. The FDIC agreed not to pursue any other action ordinarily available to it against any of the defendants, and defendants agreed to the same with regard to the FDIC. *Id.*

When defendants defaulted on the settlement agreement, the FDIC filed not only a foreclosure action, but also a deficiency action against the defendants. *Id.* at 2. Defendants counterclaimed for declaratory judgment establishing the validity of the settlement agreement, and moved to dismiss the FDIC's deficiency action based on the affirmative defense that the settlement agreement precluded the FDIC from any remedy other than an in rem foreclosure. *Id.* The court found, in pertinent part, that "one of the 'bargained-for exchanges' made in the contract ... [was] to limit the remedies available to both sides in the event that defendants defaulted...." *Id.* at 5. The court found the settlement agreement to be valid and enforceable and granted the motion to dismiss, stating that "plaintiff is limited to the remedy described in the Settlement Agreement." *Id.*

Here, United Capitol asks this court to interpret and give effect to a binding agreement which allegedly establishes a limitation on the remedies available to either party should mediation fail: namely, that as precondition to filing suit, 30 days must elapse following the conclusion of mediation. If the court finds that the agreement established this precondition and that it is valid, then the interpretation and enforcement of the agreement via the procedures available under Rule 12(b)(6) is entirely consistent with the purpose of the Rule-to eliminate at an early stage those cases in which a valid affirmative defense is disclosed on the face of the complaint. Therefore this court properly may consider the standstill provision defense asserted by United Capitol on its motion to dismiss.

Fourth, Corroon asserts that it is improper for the court to dismiss based on the standstill provision because such dis-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 30069 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

position requires the resolution of factual matters and adoption of the moving party's own interpretation of the affirmative defense-i.e., that the standstill provision is a condition precedent and not a covenant. This contention is without merit. The parties signed the interim settlement agreement, which contains provisions stating that the binding agreement constitutes the entire agreement of the parties, that all disputes over the interpretation of the agreement shall be resolved according to California law and that neither party is to be considered the drafting party for purposes of the contract. Exh. A at ¶¶ 12, 14, 15. Under California law, the express written terms of a contract govern, and words of a contract are to be given their ordinary and popular meaning. Cal.Civ.Code §§ 1625, 1638, 1639, 1644. Here, the parties clearly agreed to a time period of thirty days following the unsuccessful conclusion of mediation during which no action could be filed. See Exh. A at ¶ 6 ("an action may not be filed, however, until 30 days have elapsed since the unsuccessful conclusion of the non-binding mediation ..."). It is impossible to read the provision as anything other than a condition; to interpret the provision to be a covenant would require a contorted interpretation of otherwise clear language. Further, such an interpretation likely would render the provision a nullity: Corroon itself asserts that the only remedy for violation of a covenant is damages, which United Capitol likely would be unable to prove. Thus, the only available remedy for violation of the provision is that sought by United Capitol: dismissal of the action based on premature filing in violation of the standstill provision.

*5 Corroon refers to the declaration of its attorney, Denise Rogan, to show that the provision was not intended to be a condition precedent to filing suit. Yet Rogan clearly states that she understood the provision to mean that "Corroon's suit *could be refiled* on June 13," according to her calculation of the 30-day period. Decl. of Denise Rogan in Opp. to Def.'s Motion to Dismiss, ¶ 5 (emphasis added). While Rogan disputes United Capitol's calculation of the 30-day period, she states that "after the *requisite* period had passed, [ ] Corroon refiled this action ." *Id.* at ¶ 8 (emphasis added). While Rogan states that "[t]here was never any suggestion during negotiation of the [agreement] that [the standstill] provision meant that no suit could be filed until the 31st day after the unsuccessful conclusion of the mediation," *id.* at ¶

6, this statement goes to the calculation of the standstill period, not its effect. While the parties may not have specifically addressed whether the standstill provision was a condition precedent or a covenant, it is clear from the language of the agreement that both parties intended that no suit could be filed until the standstill period had elapsed. Rogan's declaration fails to demonstrate that the parties had an understanding different from the plain meaning of the agreement.

Rogan also states that United Capitol requested insertion of the standstill provision, and that the complaint does not allege that the provision was a condition to refiling suit because the 30-day period was never intended to be a condition precedent to filing suit. *Id.* at ¶¶ 5, 10. However, these statements cannot overcome the clear language of the interim settlement agreement and its stipulations that neither party would be considered the drafter and that California law would govern its interpretation. Further, Corroon's statement that the standstill provision was never intended to be a condition precedent to its right to recover misses the point: the standstill provision does not affect Corroon's right to recover. Rather, it establishes a time period during which Corroon may not file suit to enforce its right. Dismissal of a premature filing does not rob Corroon of this right; it merely requires that Corroon seek enforcement of his right to recover according to the express terms of the interim settlement agreement.

Fifth, Corroon asserts that to dismiss would be an impermissible use of Rule 12(b)(6) to sanction Corroon for its alleged failure to abide by a purely procedural matter. Citing *Cahela v. Bernard,* 155 F.R.D. 221, 223 (N.D.Ga.1994), Corroon asserts that procedural matters which do not go to the existence of a cognizable claim do not afford grounds for a Rule 12(b)(6) motion to dismiss. However, *Cahela* does not stand for this proposition. In *Cahela,* the court denied a motion to strike an affirmative defense based on noncompliance with a state pre-lawsuit filing requirement because the court found that the law was unsettled as to whether the state statute applied in federal court. The court did not, as Corroon asserts, find that the filing requirement did not constitute grounds to dismiss because it was purely procedural in nature. *See id.* at 223-24. Rather, the issue of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                 Page 5
Not Reported in F.Supp., 1998 WL 30069 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

being "procedural in nature" went to the question of whether the filing requirement applied in federal court. *See id.*

**\*6** Furthermore, the court in *Cahela* found that defendants provided an adequate basis in law or fact for their laches and statute of limitations defenses by asserting that plaintiffs *may have failed to properly initiate the lawsuit* under the state procedural filing statute, and thus the court denied plaintiff's motion to strike these defenses. *Id.* at 224 (emphasis added). Therefore *Cahela* actually undermines Corroon's assertion that procedural matters which go to plaintiff's ability to state a claim may not properly be considered in the context of an affirmative defense. *See id.* at 223-24. Moreover, it is elementary that procedural matters which establish a bar to the maintenance of a civil action (such as statutes of limitations, exhaustion, government tort claims filing requirements, etc.) are precisely the type of affirmative defenses meant to be addressed by Rule 12(b)(6).

In sum, dismissal of this action for failure to properly initiate the lawsuit does not, as plaintiff asserts, convert the procedure into a "sanction motion" thus requiring that the conduct in question be sanctionable. Nor is dismissal an extreme or inappropriate measure. Dismissal does not eliminate Corroon's right to recover as contained in the interim settlement agreement. Rather, dismissal means only that the court will enforce a valid contract which limits the manner in which Corroon may bring suit. *See PAID,* 1995 WL 602898 at 1-2, 5. Dismissal without prejudice of a premature action gives force to the binding agreement, and does not alter the parties' ultimate right to recover. Rather, under the agreement, Corroon could refile its complaint after the standstill period had passed. Corroon still could do so, if not for the fact that United Capitol already filed suit against Corroon in Utah. However, this fact is irrelevant to the propriety of dismissal. Dismissal will not unduly prejudice Corroon, who retains its right to seek recovery and still will have its day in court.

### II. *The 30-day standstill provision*

Corroon asserts that this action was filed in accordance with the standstill provision. Pursuant to California Rules of Civil Procedure section 12 ("section 12"), "[t]he time in which any act provided by law is to be done is computed by

excluding the first day, and including the last...." Cal.Code.Civ.P. § 12; *see also* Fed.R.Civ.P. 6 (prescribing identical method of computation). The parties agree that section 12 provides the appropriate rule of computation, but they dispute its application to the present facts. Corroon contends that since the mediation was completed on May 14th, if one excludes that day, and counts 30 days, then the thirtieth day is June 13, inclusive-the day on which Corroon filed this action. Thus Corroon interprets the phrase "until 30 days have elapsed" to mean that once 30 days "elapsed" after 30 days, Corroon could file suit on *the 30th day.* On the other hand, United Capitol agrees that June 13 was the thirtieth day subsequent to the mediation, but asserts that the standstill provision precluded the filing of suit until the thirtieth day had "elapsed"-thus, until *the 31st day.*

**\*7** Corroon cites two cases in support of its interpretation. However, neither case is good law. In *Overby v. Overby,* 154 Cal.App.2d 813, 317 P.2d 91, the court, applying section 12, found that one year had "expired" after entry of a judgment on the 365th day after the judgment. Similarly, Corroon asserts that the 30-day standstill period "expired" or "lapsed" on June 13, the 30th day after the completion of mediation. However, the analysis in *Overby* is questionable. It was rejected in a case in which review has been granted and it remains to be seen whether upon review this aspect of the California Court of Appeals will be upheld. *See Adoption of Haley A. v. Elizabeth L.,* 49 Cal.App.4th 1351, 57 Cal.Rptr.2d 361 (1996), *rev. granted* 60 Cal.Rptr.2d 608, 930 P.2d 401 (1997) (stating that court in *Overby* correctly calculated 365th day, but that since the relevant restriction was the decree could be entered after expiration of one year, filing on the 365th day was one day premature).

Corroon next cites *Municipal Ins. Co. v. Thompson,* 201 Cal. 629, 631, 258 P. 955 (1927), which held that under a statute providing a Board of Supervisors could hold particular hearings "after 20 days have elapsed since" the date of posting notice, 20 days had elapsed on the 20th day after the date of notice, and thus an act on the 20th day was not premature. Because of the unusual wording of the statute, the court found section 12 inapplicable, and included the first day in its computation. *Id.* Here, Corroon agrees that section 12 applies while simultaneously citing a case which makes

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 30069 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.)

an exception to section 12. Thus, this case does not even support Corroon's interpretation, but rather includes the first day in its computation of the relevant time period.

Moreover, the analysis in *Municipal Ins.* has been soundly criticized and has not been followed by subsequent courts. See *Ley v. Dominguez,* 212 Cal. 587, 594, 299 P. 713 (1931) (refusing to follow *Municipal Ins.* analysis); *SCT, U.S.A., Inc. v. Mitsui Manufacturers Bank,* 155 Cal.App.3d 1059, 1064, 202 Cal.Rptr. 547 (1984) ("*SCT* ") (noting general rejection of *Municipal Ins.* analysis); *Reichardt v. Reichardt,* 186 Cal.App.2d 808, 810, 9 Cal.Rptr. 225 (1960) (criticizing the *Municipal Ins.* computation method as an ancient English rule which is inconsistent with California rules and should be applied only in exceptional cases where the intention to provide a different method of computation is clearly expressed).

In *Reichardt,* the court cites authority for the proposition that it is the generally accepted rule that "in computing a period of time 'from' or 'after' a day, date, act, or event, the terminus a quo [the starting point] is excluded and the terminus ad quem [the expiration point] is included." *Reichardt,* 186 Cal.App.2d at 811, 9 Cal.Rptr. 225 (citation omitted); *accord, People v. Clayton,* 18 Cal.App.4th 440, 443-45, 22 Cal.Rptr.2d 371 (1993) (applying section 12). Thus the word 'since' in the phrase, "until 30 days have elapsed *since* the completion" of mediation, is interchangeable with the words 'from' or 'after'; that is, the agreement required that "30 days have passed since/from/after the completion of mediation" before any party could file suit.

**\*8** United Capitol correctly cites numerous cases (including the above) which hold that when applying section 12 to compute a time period, the last day is *included within that period;* thus, if an act may be taken only *during* that period, it may be taken *on* the last day-and conversely, if an act can be taken only *after* that period, it cannot be taken until *after* the last day. For example, in *SCT,* 155 Cal.App.3d at 1065-66, 202 Cal.Rptr. 547, the court held that the filing of a continuation on the last day of a time period was timely as it was "prior to" the lapse of that period. Conversely, in *Lamanna v. Vognar,* 22 Cal.Rptr.2d 501, 17 Cal.App.4th Supp. 4, 8 (1993), the court applied section 12 and reversed an unlawful detainer judgment entered in favor of a landlord

because the complaint had been filed prematurely. Under the applicable statute, there was a condition precedent to the landlord filing the complaint: the tenant was to be given three days notice to enable the tenant to cure the default. The court thus concluded that the complaint could not be filed until *after* the third day had elapsed, i.e. on the fourth day. Accordingly, the court held that the complaint was premature because it was filed on the last day of the three-day standstill period. *See id.*

Contrary to Corroon's lame attempt to distinguish Lamanna on the grounds that it is an unlawful detainer case involving an "after *n* days" analysis instead of an "until *n* days have elapsed since" analysis, the method of computation in *Lamanna* is directly on point because these two phrases have the same effect. The interim settlement agreement provided a 30-day period which was required to have elapsed before either party could file suit. The first day "after" the 30-day period was the 31st day. Likewise, the 30-day period did not "elapse" until the end of the 30th day, and thus Corroon could not file its complaint until the 31st day. Consequently, Corroon filed its complaint one day prematurely, in violation of the interim settlement agreement. Thus this court dismisses Corroon's complaint.[FN2]

> FN2. In light of the court's decision to dismiss Corroon's complaint, Corroon's motion for preliminary injunction is moot and will not be addressed.

### *CONCLUSION*

For the foregoing reasons, the court hereby GRANTS United Capitol's motion to dismiss for failure to state a claim. In view of the above holding which makes it clear that the complaint cannot be cured by amendment, leave to amend is denied. This order is without prejudice to the merits of the dispute.

The Clerk of Court shall close the file.

IT IS SO ORDERED.

N.D.Cal.,1998.
Willis Corroon Corp. of Utah, Inc. v. United Capitol Ins. Co.
Not Reported in F.Supp., 1998 WL 30069 (N.D.Cal.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                              Page 7
Not Reported in F.Supp., 1998 WL 30069 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**


Briefs and Other Related Documents (Back to top)

• 3:97CV02208 (Docket) (Jun. 13, 1997)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.