Case 7:04-cv-08223-KMK   Document 181-7   Filed 08/11/2006   Page 1 of 19

Westlaw.

425 F.Supp.2d 484
425 F.Supp.2d 484, RICO Bus.Disp.Guide 11,065
**(Cite as: 425 F.Supp.2d 484)**

Page 18

price concession was by setting up 'dummy' brokers who were employed by the buyer and who, in many cases, rendered no services. The large buyers demanded that the seller pay 'brokerage' to these fictitious brokers who then turned it over to their employer." *Id.* at 169, 80 S.Ct. 1158. It was primarily in response to this harsh business practice that Congress enacted the Robinson-Patman Act. *See Volvo Trucks,* 126 S.Ct. at 869 ("Augmenting that provision in 1936 with the Robinson-Patman Act, Congress sought to target the perceived harm to competition occasioned by powerful buyers, rather than sellers; specifically, Congress responded to the advent of large chain stores, enterprises with the clout to obtain lower prices for goods than smaller buyers."); *see also Philip Morris, Inc. v. Grinnell Lithographic Co.,* 67 F.Supp.2d 126, 130 (E.D.N.Y.1999) ("Section 2(c) was enacted primarily to prevent large buyers from obtaining indirect price discrimination by demanding that the suppliers pay fees to bogus brokers, which fees would then be returned to the buyers."). However, while motivated principally to eliminate the use of dummy brokers, "Congress in its wisdom phrased § 2(c) broadly, not only to cover the other methods then in existence but all other means by which brokerage could be used to effect price discrimination." *Broch,* 363 U.S. at 169, 80 S.Ct. 1158. Or, as Chief Judge Walker recently noted, "[t]he *sine qua non* of a § 2(c) violation ... is an improper payment, *i.e.,* a payment of a commission, brokerage, or discount other than for services actually rendered." *Blue Tree Hotels Inv. (Canada), Ltd.,* 369 F.3d at 223. Thus, as the Supreme Court and the Second Circuit have made clear, the RPA seeks to proscribe the payment of any kind to brokers or their equivalents for services not rendered.

[3] Notwithstanding this history, Plaintiff claims that § 2(c) applies to "services" such as the licenses at issue in this action. First, Plaintiff cites to a "diagram" of § 2(c) in *Blue Tree.* (WWE Mem. 28-29).[FN10] However, nothing about this diagram, or the holding in *Blue Tree,* supports Plaintiff's claim. Indeed, the court in *Blue Tree* merely held that plaintiffs had failed to state an RPA claim because they had not alleged that the payments to defendants were improper. 369 F.3d at 224. The court was not asked to decide, and obviously did not decide, the question presented here.[FN11] In this context, then, the "diagram" does not shed any light on § 2(c). Moreover, there is nothing in the *503 structure of the "diagram" that requires this Court to adopt Plaintiff's reading of the statute. Instead, the diagram begs the question of whether the "services rendered" are an exception to the proscribed payment to brokers (or their equivalents), or if the "services rendered" language is modified by the sale or purchase of goods. Thus, the diagram can hardly be viewed as binding precedent from the Second Circuit on whether § 2(c) applies to services or other intangible products.

> FN10. The diagram breaks down § 2(c) as follows:
> It is unlawful for any person to
> (1) pay (or receive)-
> a. anything of value as a commission, brokerage, or other compensation, *or*
> b. any allowance or discount in lieu of brokerage, *except* for services rendered in connection with a sale or purchase of goods,
> (2) when the payment is made to (or by)
> a. the other party to the transaction, or
> b. an agent, representative or other intermediary where the intermediary is
> (i) acting for or in behalf of, or
> (ii) subject to the direct or indirect control of any party to the transaction other than the person by whom compensation is paid.
> *Blue Tree Hotels Inv. (Canada), Ltd.,* 369 F.3d at 218.

> FN11. In *Blue Tree,* the district court dismissed the complaint on the grounds that plaintiffs had failed to allege any competitive injury from defendants' alleged conduct. 369 F.3d at 214. Though affirming dismissal of the complaint on the ground identified above, the *Blue Tree* court noted that the district court had erred in this conclusion, noting that to prevail on a claim under § 2(c), a plaintiff need only plead an antitrust injury. *Id.* at 219.

Second, Plaintiff cites language (but not the holding) in a seventy-year-old Second Circuit decision that is not on point. Specifically, Plaintiff quotes from a portion of *Biddle Purchasing Co. v. FTC,* 96 F.2d 687 (2d Cir.1938), to claim that the phrase "in connection with the sale or purchase of goods, wares, or merchandise" is only a part of the "services

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

425 F.Supp.2d 484
425 F.Supp.2d 484, RICO Bus.Disp.Guide 11,065
**(Cite as: 425 F.Supp.2d 484)**

Page 19

rendered" exception. The quote is as follows:

The report of the House and Senate Conference Committee, submitted in referring to the bill in its present form, interprets the section as having this meaning[:]

'This subsection permits the payment of compensation by a seller to his broker or agent for services actually rendered in his behalf; likewise by a buyer to his broker or agent for services in connection with the purchase of goods actually rendered in his behalf; but it prohibits direct or indirect payment of brokerage except for such services rendered....'
House Rep., 2951, 74th Congress, 2d Session.

(WWE Resp. 29) (quoting *Biddle, 96 F.2d at 691 n. 1*). Plaintiff's selective quotation from *Biddle,* however, is far off the mark.

As with *Blue Tree,* the quote should be put into context. Biddle Purchasing Co. supplied market information, for a monthly fee, to subscribers who were in turn wholesalers and distributors. *Id. at 689.* Biddle also acted as a broker, selling goods on behalf of "numerous manufacturers, canners, and packers," to Biddle's subscribers. *Id.* For brokering these sales, Biddle received commissions from the sellers. *Id.* The buyers (subscribers) would receive back the commissions paid to Biddle by the sellers. In the vast majority of these sales, the commissions refunded to the buyers were no more than they had paid for the subscription services they received from Biddle. *Id.* However, in some instances, the commissions paid to Biddle exceeded the subscription fees and the excess was given to the buyers, thus in effect giving these buyers a discount. *Id.* It was this practice that the FTC found objectionable, and which led to the appeal. *Id.*

In upholding the FTC's order, the Second Circuit noted that "the statute prohibits payment of brokerage by the seller to the buyer or his agent or representative or controlled intermediary, except for services rendered." *Id.* at 691. It was after this comment that the court then cited the House and Senate Report (as quoted above in Plaintiff's brief). The purpose of quoting this part of the legislative history was not, as Plaintiff suggests, to define the "services rendered" exception, but to make clear that the exception "prohibit[ed] payments which were made here to the buyers." *Id.* Indeed, the court went on to note that based on this legislative history, it was fair to conclude that "Congress must have intended that payments by sellers should not be made to buyers through any one acting as agent for the buyer." *Id.* at 691. This all led to the bottom line in *Biddle:* "[T]he brokerage fees by the sellers to the Biddle Company could not be made in good faith as compensation for services rendered, since the fees are intended for the buyers and are immediately transmitted to them." *Id.* at 691-92.

As should be clear from this description of the background and holding in *Biddle,* *504 the question presented before the court in that case bore no resemblance to the question presented here. Therefore, the quotation from the legislative history, either standing alone or in the context in which it was quoted, does not support Plaintiff's cause.

Finally, Plaintiff points to a footnote in the Eight Circuit's decision in *Ideal Plumbing Co., v. Benco, Inc., 529 F.2d 972 (8th Cir.1976).* (WWE Resp. 29) In this footnote, the court observed that:

It is also apparent that the terminology "goods, wares, or merchandise" in the statute may merely modify the "services rendered" exception and therefore constitute only an element to be determined when a defendant contends that the concession was made in exchange for services rendered.

*529 F.2d at 978 n. 6.* As with the other threads, Plaintiff is unable to weave this footnote into a winning argument. First, Plaintiff's quotation leaves out the earlier part of the footnote, where the court noted that "[s]ince the evidence was such that the District Court could hold as a matter of law that the price reduction extracted from [defendant] ... was not compensation in lieu of brokerage, it is unnecessary to examine at length the District Court's alternative findings," which included a finding that § 2(c) did not apply since the contract was for services. *Id.* In other words, the court's comment on the "services rendered" exception was pure dicta. Second, Plaintiff also left out the next portion of the footnote, where the court noted that there were decisions in other circuits holding that § 2(c) applied only to "goods, wares, or merchandise," and not to services. *Id.* It was after recognizing this line of authority, that the court offered, but did not adopt, the counter-argument, quoted by Plaintiff, that the reference to goods, wares, or merchandise *"may merely modify the 'services rendered' exception...." Id.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(emphasis added).[FN12] Thus, this footnote does not constitute the holding of the court and, therefore, is insufficient to carry the day.

> FN12. In support of this point, the court cited to the *Biddle* court's quote from the legislative history, which Plaintiff relies upon as well. As discussed above, relying on that quote is misguided. Also, it bears noting that no other court has adopted the *Ideal Plumbing* court's interpretation of the quote from *Biddle*.

In the end, Plaintiff is not able to cite a single holding that supports its reading of the statute. Instead, in its quiver, Plaintiff only has a "diagram," one out-of-context quotation from two Second Circuit decisions that do not remotely deal with the issue presented, and, at best, equivocal dicta from another circuit.

Plaintiff's offering is paltry compared to the scores of cases that line up squarely with Defendants' view of the statute, which is that it simply does not, by its terms and consistent with its legislative history, cover services or other intangible items such as licenses. This authority spans each decade since enactment of the RPA, and includes jurisdictions covering virtually every time zone in the continental United States. *See Union City Barge Line, Inc. v. Union Carbide Corp.*, 823 F.2d 129, 141 (5th Cir.1987) ("[T]he dominant nature of redelivery is a service, not a good. Thus, Gulf Coast's admittedly unlawful actions fall outside the statute's commercial bribery reach."); *May Dep't Store v. Graphic Process Co.*, 637 F.2d 1211, 1214 (9th Cir.1980) ( "It is necessary for an action under section 2(c) of the Robinson-Patman Act that the transactions between the parties constitute a sale of 'goods, wares, or merchandise....' "); *Freeman v. Chicago Title and Trust Co.*, 505 F.2d 527, 529-30 (7th Cir.1974) ("[W]e find no affirmative evidence that Congress intended section *505 2(c) to be the only Robinson-Patman provision applicable to intangibles...."); *Webb-Crawford Co. v. FTC*, 109 F.2d 268, 270 (5th Cir.1940) (noting that "services rendered" only modifies the preceding phrase relating to brokerage fees); *Yeager v. Waste Mgmt, Inc.*, 3:89 Civ. 7248, 1994 WL 761959, at *1 (N.D.Ohio Sept. 30, 1994) (granting defendant's summary judgment motion because complaint related only to landfill services); *Miyano Mach. USA, Inc. v. Zonar*, No. 92 Civ. 2385, 1993 WL 23758, at *6 (N.D.Ill. Jan. 29, 1993) (granting motion to dismiss where payments related to "sale of a business opportunity, even the opportunity to sell goods"); *Empire State Pharm. Soc.*, 778 F.Supp. at 1258 (imposing Rule 11 sanctions on plaintiff for claiming in a complaint that § 2(c) applies to services); *Callahan v. Commonwealth Land Title Ins. Co.*, Civ. A. Nos. 88-7656, 88-8319, 1990 WL 168273, at *10 (E.D.Pa. Oct. 29, 1990) (Section 2(c) "is restricted to transactions for the sale and purchase of goods, wares or merchandise."); *Fiore v. Kelly Run Sanitation, Inc.*, 609 F.Supp. 909, 916 (W.D.Pa.1985) ("In order to allege an action under Section 2(c) of the Robinson-Patman Act, ... the complaint must state that the transactions between the parties constitute a sale of goods, wares, or merchandise and not merely a contract for services." (quotations omitted)); *Rodman v. Haines*, No. 75 Civ. 471, 1976 WL 1315, at *6 (S.D.N.Y. Sept. 14, 1976) ("Whatever else might be encompassed by § 2(c), bribes paid to employees of a potential lessee of real property are not covered by that section, since they do not involve abuses of the brokerage function in a transaction involving the sale of goods."); *County Theatre Co. v. Paramount Film Distrib. Corp.*, 146 F.Supp. 933, 934 (E.D.Pa.1956) (noting that "licensing of motion picture films" is not covered by § 2(c)).

Furthermore, while neither the Supreme Court nor the Second Circuit has squarely addressed the issue, there is dicta or language in decisions from both courts that is consistent with Defendants' interpretation. For example, in a footnote declining to address plaintiff's argument, raised for the first time on appeal, that providing surcharges and discounts not in connection with services rendered violates § 2(c) of the RPA, the Second Circuit, in addition to rejecting the claim as waived, noted that § 2(c) proscribes such practices "only 'in connection with the sale or purchase of goods, wares, or merchandise....' " *Gordon v. N.Y. Stock Exchange Inc.*, 498 F.2d 1303, 1305 n. 7 (2d Cir.1974) (quoting 15 U.S.C. § 13(c)). And, in at least two cases, the Supreme Court has described § 2(c) as relating to transactions involving "goods." *See Volvo Trucks*, 126 S.Ct. at 869 (discussing Congress's intent in enacting the RPA to address "enterprises with the clout to obtain lower prices for *goods* than smaller buyers could demand" (emphasis added));

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Broch,* 363 U.S. at 174, 80 S.Ct. 1158 ("Congress enacted the Robinson-Patman Act to prevent sellers and sellers' brokers from yielding to pressures of large buying organization by granting unfair preferences in connection with the sale of *goods.*" (emphasis added)).[FN13]

> FN13. This interpretation of § 2(c) is consistent with the common interpretation of other provisions of the RPA. For example, like § 2(c), § 2(a) has also been interpreted to apply only to tangible goods. See *Innomed Labs, LLC v. ALZA Corp.,* 368 F.3d 148, 156 (2d Cir.2004) (construing "commodities" in § 2(a) strictly to mean only "tangible products of trade"); *Empire State Pharm. Soc., Inc.,* 778 F.Supp. at 1258 (declining to apply § 2(a) to insurance services contract).

Plaintiff attempts to escape the weight of this vast authority through two arguments. First, Plaintiff claims that many of these cases should be ignored because *506 they pre-date the Supreme Court's thirty-year-old decision in *Abbott Labs. v. Portland Retail Druggists Ass'n,* 425 U.S. 1, 12, 96 S.Ct. 1305, 47 L.Ed.2d 537 (1976), which held that the RPA is to be construed liberally, and that exceptions to its application should be strictly construed. Yet, in making that rather unremarkable statement, the Court cited to cases dating back to the 1950s. *Id.* In any event, there is nothing about that unsurprising comment that should undo seven decades of jurisprudence, particularly when not a single court has expressed a different view since *Abbott Labs* was decided. In fact, the Second Circuit only two years ago reaffirmed the view that the courts "have strictly construed" the term "commodities" in § 2(a) of the RPA to include "only 'tangible products of trade.' " *Innomed Labs,* 368 F.3d at 156 (quoting *May Dep't Store,* 637 F.2d at 1214).[FN14] While this Court recognizes that §§ 2(a) and 2(c) should be independently interpreted, the fact that the Second Circuit (and other circuits) continue to strictly construe the meaning of "commodities" in § 2(a), even in the distant wake of *Abbott Labs,* is instructive.

> FN14. In 1979, three years after *Abbott Labs,* the Second Circuit, noting the "strict view of the meaning of the term 'commodities' " taken by other circuits, held that the sale of advertising was not a transaction involving "commodities" under § 2(a)

of the RPA. *Ambook Enters. v. Time Inc.,* 612 F.2d 604, 609-10 (2d Cir.1979).

Finally, Plaintiff criticizes at least one of the decisions cited above (the Seventh Circuit's decision in *Freeman*), because in that case the court "admit[ted] that it actually had to repunctuate the statute to achieve its interpretation of the statute." (WWE Resp. 31) Even if true, however, the Seventh Circuit's view is not wrong. The Supreme Court long ago observed that:

Punctuation marks are not part of an act. To determine the intent of the law, the court, in construing the statute, will disregard the punctuation, or will repunctuate, if that be necessary, in order to arrive at the natural meaning of the words employed.

*United States v. Shreveport Grain & Elevator Co.,* 287 U.S. 77, 82-83, 53 S.Ct. 42, 77 L.Ed. 175 (1932); *see also Hammock v. Loan & Trust Co.,* 105 U.S. 77, 84-85, 26 L.Ed. 1111 (1881) (noting that courts "should disregard the punctuation, or repunctuate, if need be, to render the true meaning of the statute"). More recently, the Supreme Court unanimously observed that while "the meaning of a statute will typically heed the commands of its punctuation," a "purported plain meaning analysis based only on punctuation is necessarily incomplete and runs the risk of distorting a statute's true meaning." *United States Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.,* 508 U.S. 439, 454, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993).

The pertinent part of the statute proscribes the payment or receipt of payment "of anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise." In *Freeman,* the Seventh Circuit suggested that a comma should have been inserted between "rendered" and "in connection." 505 F.2d at 529-30.[FN15] By doing this, the punctuation *507 would better reflect the statute's meaning, as well as reflect Congress's intent in enacting the RPA. As noted above, the primary practice that Congress was seeking to eliminate in the RPA was the use of dummy brokers, i.e., fictitious entities that were receiving payments for no services rendered. Thus, § 2(c) should be viewed accordingly, as barring only those payments made where there

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

is no consideration given for the fee, i.e., no brokerage services rendered. Viewed as such, the "services rendered" exception relates to the brokerage fees, or their equivalents, and is not further limited by reference to "the sale or purchase of goods, wares, or merchandise." Indeed, if the statute were to be read as suggested by Plaintiff, by leaving out the comma, § 2(c) "would apparently prohibit the payment of a commission in connection with the purchase or sale of intangibles even if 'services' had been rendered." *Freeman, 505 F.2d at 530 n. 5*. Plainly, this is not what Congress enacted, or intended to enact. Therefore, Plaintiff's concern about grammatical anarchy is unfounded.

> FN15. For different reasons, the Fifth Circuit came to the same conclusion over sixty years ago. *See Webb-Crawford, 109 F.2d at 270* ("The punctuation as published is confusing. We think the true meaning is better indicated by taking the comma out after 'thereof,' and inserting it after 'rendered.' Commas are not to be suffered to defeat the legislative meaning.").

Ultimately, this issue ends where it started, with Judge Sprizzo's admonition to a plaintiff who appeared to ignore the "abundance of authority establishing that the Robinson-Patman Act applies only to goods and commodities and does not apply to services." *Empire State Pharm. Co., 778 F.Supp. at 1258*. Accordingly, because the alleged bribes here related only to licenses, and not to any goods, Defendants' Motion to Dismiss Count VI is granted.

### D. Duplicative Litigation

The next question is whether Plaintiff can maintain an action against the Shenker Defendants in federal court. The Shenker Defendants argue that Plaintiff should be estopped from pursuing a civil RICO action against them in federal court because it is duplicative of litigation in Connecticut state court arising out of the same events.

In October 2000, SSAI brought a breach of contract claim against WWE in Connecticut state court seeking license commissions it was allegedly due. (Am.Compl.¶ 190) WWE filed counterclaims against SSAI and discovery ensued. On October 16, 2003, the Connecticut Superior Court entered an Order dismissing SSAI's claims with prejudice and granting a default judgment in favor of WWE on its counterclaims. *See Stanley Shenker and Assocs., Inc. 844 A.2d at 974, 977* ("Shenker's recantations and his postrecantations deposition testimony provide uncontroverted and irrefutable evidence of conduct so violative of the judicial process that dismissal with prejudice of the present case is the only appropriate sanction.... Based on ... the record of egregious discovery abuse in the present case, the court hereby enters a default judgment against [SSAI] and in favor of [WWE] on each of [WWE's] counterclaims.") The Shenker Defendants argue that the Connecticut Order constitutes a sufficiently final judgment such that Plaintiff should be estopped from pursuing its current RICO claim against them in federal court.

The Shenker Defendants assert three different grounds for their estoppel claim: (1) res judicata; (2) the prior pending action doctrine; and (3) the "one satisfaction" rule. The Court will address each one in turn.

#### 1. Res Judicata

[4] " 'Where there is a final state court judgment, a federal court looks to that state's rules of res judicata to determine the preclusive effect of that judgment.' " *AmBase Corp. v. City Investing Co. Liquidating Trust, 326 F.3d 63, 72 (2d Cir.2003)* (quoting *Town of Deerfield, N.Y. v. FCC, 992 F.2d 420, 429 (2d Cir.1993)* and *28 U.S.C. § 1738*). Here, the Court must *508 look to the state laws of Connecticut to determine if res judicata applies.[FN16]

> FN16. Plaintiff argues that the affirmative defense of res judicata cannot be raised in a Rule 12(b)(6) motion unless all relevant facts are shown in the court's own record, of which the court can take judicial notice. (WWE Resp. 2) *See Day v. Moscow, 955 F.2d 807, 811 (2d Cir.1992)* ("Generally res judicata is an affirmative defense to be pleaded in the defendant's answer.") (citing Fed.R.Civ.P. 8(c)). Plaintiff asserts that the Shenker Defendants' submission of WWE's counterclaims in the Connecticut action and the Connecticut Order do not contain all relevant facts and are not in this Court's own record. (WWE Resp. 2; Tr. 125) However, the

issue of res judicata is raised by the Amended Complaint because Plaintiff seeks to recover against the Shenker Defendants damages arising out of the same transaction alleged in Plaintiff's Connecticut cross-complaint. Cf. *IHS Acquisition XV, Inc. v. Kings Harbor Care Center,* No. 98 Civ. 7621, 1999 WL 223152, at *2 (S.D.N.Y. April 16, 1999) (denying motion to dismiss based on affirmative defense of illegality where complaint did not raise the issue of illegality). Moreover, the Court properly can take judicial notice of the filings and the October 16, 2003 Order in the Connecticut state court action. See *Green v. Warden, U.S. Penitentiary,* 699 F.2d 364, 369 (7th Cir.1983) ("[F]ederal courts may also take notice of proceedings in other courts, both within and outside of the federal judicial system, if the proceedings have a direct relation to matters at issue."). The Connecticut filings present the allegations and the Connecticut Order outlines the judgement and the basis for the judgment in state court. Therefore, the Motion to Dismiss is appropriate at this stage. See *AmBase Corp.,* 326 F.3d at 72 (finding res judicata properly raised on a motion to dismiss where court took judicial notice of relevant facts in the record); *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 74 (2d Cir.1998) ("An affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint."); *Day,* 955 F.2d at 811 (holding that res judicata may be raised in a pre-answer motion to dismiss).

[5][6][7] In Connecticut, the elements of res judicata are: (1) identity of the parties to the actions; (2) the same claim, demand, or cause of action at issue; (3) a final judgment on the merits by a court of competent jurisdiction in the first matter; and (4) the parties had a full opportunity to litigate the matter. See *Tirozzi v. Shelby Ins. Co.,* 50 Conn.App. 680, 719 A.2d 62, 65 (1998). Where the elements are met, res judicata raises an "absolute bar to a subsequent action on the same claim." *Joe's Pizza, Inc. v. Aetna Life and Cas. Co.,* 236 Conn. 863, 675 A.2d 441, 448 (1996). Claims which could have been brought in the prior action are also barred. See *Rivet v. Regions Bank of Louisiana,* 522 U.S. 470, 476, 118 S.Ct. 921, 139 L.Ed.2d 912 (1998) (noting that res judicata prohibits relitigation of issues that either "were or could have been raised" (quotations omitted)).

[8] In order to determine if res judicata applies, the Court must compare "the complaint in this action with the pleadings and the judgment in the earlier action." *Joe's Pizza, Inc.,* 675 A.2d at 447. Here, the Court has the Amended Complaint, the October 16, 2003 Order from the Connecticut court, WWE's answer and counterclaim in Connecticut, and the stipulated pre-judgment remedy in the Connecticut action. Therefore, the Court has a sufficient basis for determining the application of res judicata.

Because the Defendants chose to raise the affirmative defense of res judicata in a Rule 12(b)(6) motion, Defendants must accept the more stringent standard of review for a motion to dismiss. The defense must be supported by facts appearing on the face of the complaint and the motion may be granted only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Citibank, N.A. v. K-H Corp.,* 968 F.2d 1489, 1494 (2d Cir.1992).

*509 a. Identity of Parties

Here, the first requirement for res judicata is met-the parties in the state and federal actions are the same or in privity. Although Shenker is not presently a party in his personal capacity in the Connecticut action, he is in privity with SSAI because he is the President and sole shareholder of SSAI. See *Joe's Pizza, Inc.,* 675 A.2d at 445 (adopting § 59 of the Restatement (Second) of Judgments in holding that a judgment against the shareholders of a closely held corporation is binding upon the corporation). SSAI and WWE are parties in both this action and the Connecticut action.

b. Identity of Claims

As to the second requirement, Connecticut takes a transactional approach in determining whether claims are the same. See *AmBase,* 326 F.3d at 73 (" 'The determination, therefore, whether the doctrine shall be invoked is now based on

the underlying transaction and not on substantive legal theories or types of relief which are sought.' ") (quoting *Maldonado v. Flynn,* 417 A.2d 378, 381-82 (Del.Ch.1980)). Transaction refers to a " 'common nucleus of operative facts.' " *Id.* (quoting *Schnell v. Porta Sys. Corp.,* No. Civ. 12,948, 1994 WL 148276, at *4 (De. Ch. Apr. 12, 1994)). " '[I]f the pleadings framing the issues in the first action would have permitted the raising of the issue sought to be raised in the second action, and if the facts were known, or could have been known to the plaintiff in the second action at the time of the first action,' then the claims in the second action are precluded." *Id.* (quoting *Ezzes v. Ackerman,* 234 A.2d 444, 445-46 (De.1967)).

A comparison of the pleadings and the Order in the Connecticut case reveals that this action arises out of a common nucleus of operative facts as the Connecticut action. WWE's counterclaims in the Connecticut action consist of allegations that Shenker and Bell received kickbacks from WWE's licensees, including Jakks, in exchange for licenses. (Freeman Decl. Exs. C, E; Gruenglas Decl. Exs. C, E) These same facts-that potential licensees, including Jakks, made improper payments to Shenker, SSAI and/or Bell in order to obtain favorable licensing agreements-form the core of WWE's RICO allegations in this action. *See Tafflin v. Levitt,* 493 U.S. 455, 458, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990) (holding that state and federal courts have concurrent jurisdiction over civil RICO claims).

Despite Shenker's perjury and Shenker's and Bell's destruction of evidence, WWE knew about Stanfull and Jakks's role in the bribery scheme during the pendency of the Connecticut action and could have added a RICO claim in that action. In the October 16, 2003 Order dismissing Shenker's complaint and entering a default judgment in favor of WWE, the court noted that Shenker had perjured himself about the existence of Stanfull and about improper payments made by licensees, including Jakks. *Stanley Shenker and Assocs., Inc.,* 844 A.2d at 970. WWE, therefore, knew before the entry of the Order about Stanfull and the payments by Jakks to Shenker. Indeed, WWE had obtained copies of invoices revealing the payment scheme between Bell and Shenker as early as September 26, 2002. (Freeman Decl. Ex. B) Moreover, in February 2003, WWE alleged a RICO violation against Bell in an action in Connecticut court. (Gruenglas Decl. Ex. C) WWE filed its motion for sanctions in the Shenker action, upon which the October 16, 2003 Order was based, on May 23, 2003. (WWE Resp. 7) Thus, even if WWE did not know the full extent of the facts supporting a RICO claim, WWE knew enough to plead a RICO violation in Connecticut state *510 court.[FN17] *See Rivet,* 522 U.S. at 474, 118 S.Ct. 921 (res judicata bars relitigation of "issues that were or could have been raised" in previous action).

> FN17. Plaintiff argues that Shenker cannot rely upon the doctrine of res judicata because he perjured himself and destroyed evidence in the Connecticut action, which precluded Plaintiff from pleading the RICO claim in that action. (WWE Resp. 3) The discussion above reveals that, despite Shenker's initial perjury, he was forced to "come clean" before the action was over and with sufficient time for WWE to add a RICO claim in that action.

*c. Final Judgment on the Merits*

[9] The third requirement is that the judgment be both on the merits and final. However, this requirement cannot be met here. Connecticut Justice Roberts explicitly stated in the 2003 Order that the court's "findings do not constitute findings regarding the merits of the underlying case." *Stanley Shenker and Assocs., Inc.,* 844 A.2d at 966 n. 1. The court's basis for dismissing the action and entering a default judgment in favor of WWE was Shenker's "own admissions of [discovery] misconduct," not the underlying merits. *Id.*

[10][11] Furthermore, the October 16, 2003 Order is not a final judgment. In Connecticut, a default judgment ordinarily "admits the material facts constituting a cause of action." *Kloter v. Carabetta Enters., Inc.,* 186 Conn. 460, 442 A.2d 63, 64 (1982). The party against whom the default judgment was entered, however, "may still contest liability at a hearing in damages, provided that he has given notice ... of his intention to do so." *Id.* Where timely notice is given pursuant to Connecticut Practice Book § 17-34, a defaulting party may still "contradict the allegations of the complaint and prove matters of defense in addition to contesting the amount of damages." *Whalen v. Ives,* 37 Conn.App. 7, 654

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A.2d 798, 804 (1995); cf. *Lawton v. Weiner*, 91 Conn.App. 698, 882 A.2d 151, 162-63 (2005) (precluding defaulted party from challenging allegations in the complaint because he failed to file a timely notice of defenses).

The Shenker Defendants have served notice in Connecticut court pursuant to Connecticut Practice Book § 17-34 that "they intend to challenge certain material allegations of WWE's counterclaims and to assert various defenses at the damages hearing." (Letter from Michael A. Freeman to the Court 2, Jan. 19, 2006) The provisions of § 17-34 essentially give the Shenker Defendants an opportunity to re-open the default judgment that was entered against them. *See Schwartz v. Milazzo*, 84 Conn.App. 175, 852 A.2d 847, 850 (2004) ("This approximates what the defendant[s] would have been able to do if [they] had filed an answer and special defenses." (quotations omitted)). Therefore, there is nothing to suggest that the dismissal and default entered on October 16, 2003 was final.

*d. Full and Fair Opportunity to Litigate*

As to the fourth and final element, WWE did not have an opportunity to fully and fairly litigate its RICO claim in the Connecticut action. Even though WWE had sufficient facts to plead a RICO violation against the Shenker Defendants in the Connecticut action, because of Shenker's persistent and pervasive abuse of the discovery process, WWE never had an opportunity to actually litigate its counterclaims. The October 16, 2003 Order dismissed SSAI's suit against WWE and entered a default judgment in favor of WWE as a sanction for Shenker's perjury and abuse of the discovery process. The Connecticut court did not reach any conclusions regarding *511 WWE's allegations against SSAI or SSAI's defenses to those allegations. As such, WWE's counterclaims were not litigated in the Connecticut action.

The Shenker Defendants cannot meet the third and fourth requirements for res judicata according to Connecticut law. Therefore, the Shenker Defendants' Motion to preclude Plaintiff's RICO claim on the ground of res judicata is denied without prejudice. If circumstances change such that the requirements for res judicata are met, the Shenker Defendants may inform the Court at that time, and, if appropriate, seek leave to refile the Motion.

*2. Prior Pending Action Doctrine*

Alternatively, Defendants argue that the Court should dismiss or stay this action under its inherent power as articulated in the prior pending action doctrine. *See Cont'l Time Corp. v. Swiss Credit Bank*, 543 F.Supp. 408, 410 (S.D.N.Y.1982). If the Court finds that there has not been a final adjudication on the merits in the Connecticut actions, the Court can abstain from exercising its jurisdiction by dismissing the federal action in favor of the prior pending state proceedings. But, as Plaintiff points out, the Court is to exercise its power to abstain only in extraordinary circumstances. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) ("Abstention from the exercise of federal jurisdiction is the exception, not the rule.")

[12] Where subject matter jurisdiction is proper, federal courts have a " 'virtually unflagging obligation' " to exercise that jurisdiction. *Bethlehem Contracting Co. v. Lehrer/McGovern, Inc.*, 800 F.2d 325, 327 (2d Cir.1986) (quoting *Colorado River*, 424 U.S. at 817-18, 96 S.Ct. 1236) "[T]he decision whether to dismiss a federal action because of parallel state-court litigation does not rest on a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 16, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

[13] The factors the court should consider include: (1) the assumption of jurisdiction by either court over any res or property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained by the concurrent forums; (5) whether state or federal law supplies the rule of decision; and (6) whether the state court proceeding will adequately protect the rights of the party seeking to invoke federal jurisdiction. *See id.* at 19, 23-27, 103 S.Ct. 927; *see also Linens of Europe, Inc. v. Best Mfg., Inc.*, No. 03 Civ. 9612, 2004 WL 2071689, at *5 (S.D.N.Y. Sept. 16, 2004) (citing *Vill. of Westfield v. Welch's*, 170 F.3d 116, 120 (2d Cir.1999)). "The weight to be given to any one factor may vary greatly from case to case, depending on the particular setting of the case." *Moses H. Cone Mem'l Hosp.*, 460 U.S.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

425 F.Supp.2d 484
425 F.Supp.2d 484, RICO Bus.Disp.Guide 11,065
(Cite as: 425 F.Supp.2d 484)

Page 26

at 16, 103 S.Ct. 927.

### a. Jurisdiction Over the Res

The first factor is the Court's assumption of jurisdiction over the res or any property. This factor weighs against abstention here because there is neither res nor property at stake in either jurisdiction. " '[T]he facial neutrality of a factor is a basis for retaining jurisdiction, not for yielding it.' " *Linens of Europe, Inc.*, 2004 WL 2071689, at *5 (quoting *Woodford v. Community Action Agency of Greene County, Inc.*, 239 F.3d 517, 522 (2d Cir.2001)).

### b. Inconvenience of the Federal Forum

The next factor is the inconvenience of the federal forum. This factor also weighs *512 against abstention. One consideration in determining this factor is the distance between the state and federal fora. Here, the distance is not far from Connecticut to New York. See *SST Global Tech., LLC v. Chapman*, 270 F.Supp.2d 444, 465 (S.D.N.Y.2003) (holding that the distance between the federal forum in New York and the state forum in Delaware was not sufficiently far to find the federal forum inconvenient).

### c. Avoidance of Piecemeal Litigation

The next factor invokes the obvious desire to avoid piecemeal litigation. This factor also weighs against abstention. WWE did not bring a RICO cause of action against the Shenker Defendants in Connecticut state court. For the reasons discussed above, WWE is not precluded under res judicata from now bringing a RICO claim against the Shenker Defendants in federal court. However, if the Court were to abstain as to the Shenker Defendants on the RICO claim, WWE would still be required to litigate its RICO action against the remaining Defendants now, and then return to federal court after the completion of the state court action, and potentially litigate the same RICO claim against the Shenker Defendants. Thus, if anything, abstention here would be more likely to result in piecemeal litigation.

Furthermore, because of the procedural posture of the case, all claims against all parties cannot be resolved in one forum. See *SST Global Tech., LLC*, 270 F.Supp.2d at 465 ("A related aspect of piecemeal litigation ... is whether resolution in one forum will resolve the claims as to all parties."). SSAI sued WWE in state court. WWE cross-claimed against SSAI, but asserted neither a RICO violation nor an RPA or Sherman Act violation. WWE's federal action against SSAI includes those claims. Even if the Court abstained on the RICO claim, SSAI would be required to litigate the RPA and Sherman Act claims in federal court. Therefore, piecemeal litigation would not be avoided by abstaining. *Linens of Europe, Inc.*, 2004 WL 2071689, at *6 (" 'Indeed, abstention is clearly improper when,' as here, 'a federal suit alleges claims within the exclusive jurisdiction of the federal courts.' ") (quoting *Andrea Theatres, Inc. v. Theatre Confections, Inc.*, 787 F.2d 59, 62 (2d Cir.1986)); *SST Global Tech., LLC*, 270 F.Supp.2d at 465; *Johnson v. Nyack Hosp.*, 964 F.2d 116, 122 (2d Cir.1992) (finding that Sherman Act claims are within the exclusive jurisdiction of the federal courts).[FN18]

> FN18. While the Court dismisses the RPA and Sherman Act claims, Plaintiff still may pursue the anti-trust claims, either through an appeal or by seeking leave to amend the Amended Complaint.

### d. Order in Which Actions Were Filed

The next factor-the order in which the actions were filed-clearly weighs in favor of abstention. SSAI filed its action in state court in October 2000. (Am.Compl.¶ 190) The federal court action was filed in October 2004, four years later. However, "priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made on the two actions." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 21, 103 S.Ct. 927. In the state court action, extensive discovery has been conducted consisting of "the production of more than 92,000 pages of documents, the taking of more than twenty-five depositions, and the filing of more than 150 motions, briefs and other pleadings." *Stanley Shenker and Assocs., Inc.*, 844 A.2d at 966. The Connecticut court has rendered several judgments in the case and a hearing on damages is scheduled.[FN19] *513 In the federal action, on the other hand, no discovery has occurred and the court has not rendered any substantive judgments.

> FN19. As discussed above, the Shenker Defendants

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

intend to challenge WWE's claims at the damages hearing pursuant to Connecticut Practice Book § 17-34. Consequently, the damages hearing is not in the posture of an ordinary damages hearing. That said, the Connecticut case is significantly closer to conclusion than the federal case.

*e. Law Which Supplies the Rule of Decision*

The next factor involves consideration of which law governs. This factor weighs heavily against abstention because federal law supplies the rule of decision on the RICO, RPA, and Sherman Act claims. See *Johnson,* 964 F.2d at 122.

*f. Adequate Protection of Rights*

Finally, the Court is to consider whether the state court will adequately protect WWE's rights. This factor also weighs against abstention. The claims asserted against the Shenker Defendants in the federal action are not the same as the cross-claims asserted by WWE against SSAI in the Connecticut action. Compare *Radioactive, J.V. v. Manson,* 153 F.Supp.2d 462, 476 (S.D.N.Y.2001) (finding that state court could adequately protect plaintiff's rights because all claims were raised in both the federal and state actions). Although WWE has the potential to recover treble damages in both the state and federal actions, *see* 18 U.S.C. § 1964(c); Conn. Stat. Gen. § 52-564, WWE cannot amend its Connecticut complaint to include a Sherman Act claim because the federal courts have exclusive jurisdiction over such claims. Because its claims against the Shenker Defendants include a cause of action over which the federal courts have exclusive jurisdiction, WWE's rights cannot be adequately protected in state court. *Andrea Theatres, Inc.,* 787 F.2d at 62 ("[A]bstention is clearly improper when a federal suit alleges claims within the exclusive jurisdiction of the federal courts."). Moreover, as noted above, while WWE could pursue its RICO claims against the Shenker Defendants in Connecticut, it is unclear that it could also pursue those claims in Connecticut against the remaining Defendants. Thus, it is optimal for WWE to bring the RICO claims against all Defendants here in federal court.

*g. Balancing the Factors*

[14] In balancing the factors outlined above, the Court must keep in mind that the "balance [is] heavily weighted in favor of the exercise of jurisdiction," *Moses H. Cone Mem'l Hosp.,* 460 U.S. at 16, 103 S.Ct. 927, and that "no single factor is necessarily decisive." [FN20] *514DeCisneros v. Younger,* 871 F.2d 305, 307 (2d Cir.1989). The first, second, third, fifth, and sixth factors all weigh against abstention. Only the fourth factor-the order in which the actions were filed-weighs in favor of abstention. Even though the Connecticut action is nearly complete, abstaining would not avoid piecemeal litigation because WWE would be required to litigate the RICO claims in federal court against the remaining Defendants and there is a possibility of further litigation of the RPA and Sherman Act claims. The law of decision on both the RICO, RPA, and Sherman Act claims is federal law and the federal forum is not inconvenient for any Party. Accordingly, the Court finds that this case does not fall into one of the narrow exceptions to the mandate that it exercise its proper jurisdiction.[FN21]

> FN20. The Shenker Defendants urge the Court to also consider whether WWE's federal claims are "vexatious or reactive." (Shenker Reply 8) The Supreme Court credited the suggestion that the purpose behind filing a second lawsuit could be useful in deciding whether to abstain. However, the Court did not adopt it as a factor. *See Moses H. Cone,* 460 U.S. at 17 n. 20, 103 S.Ct. 927.
> In any event, the Shenker Defendants argue that, because WWE has already obtained a default judgment in Connecticut, which entitles them to damages commensurate to what they could recover in federal court, WWE's subsequent federal suit must have been filed with a vexatious purpose. However, the default judgment in favor of WWE appears to have entitled WWE to little more than a delayed trial on the merits in the form of a damages hearing. *See supra* Part II.D.1. Additionally, although the RICO claim arose out of the same facts as WWE's cross-claims in Connecticut court, WWE has obtained additional facts (despite the Shenker Defendants' alleged attempts to conceal them), named additional Defendants, and added federal causes of action. Thus, there is nothing to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



suggest that WWE's federal suit was a "reactive defensive maneuver ... to delay the state proceeding and postpone final resolution of its dispute" with the Shenker Defendants. *Calvert Fire Ins. Co. v. Am. Mut. Reinsurance Co., 600 F.2d 1228, 1234 (7th Cir.1979).*

FN21. A comparison with a case where the court found that the balance of factors weighed in favor of abstention illustrates why abstention is inappropriate here. In *Radioactive, J.V., 153 F.Supp.2d at 476,* the court noted, among other things, that California (where the state action was commenced) and New York (where the federal action was commenced) were sufficiently far from one another to render the federal forum inconvenient, that plaintiff's complaint in the federal action was identical to its cross-complaint in the state action and the state court had refused to dismiss the state action, that all of the claims in both actions were governed by state law, and that there was no reason to believe the state court could not adequately protect the plaintiff's interest. 153 F.Supp. at 477-78. None of those considerations is present here. Thus, abstention is not appropriate here.

### 3. "One Satisfaction Rule"

[15] Finally, the Shenker Defendants contend that the "one satisfaction rule" bars Plaintiff from pursuing its RICO claim against them in federal court. The "one satisfaction rule" states that "[a] plaintiff may not recover twice for the same injury." *Phelan v. Local 305 of the United Assoc. of Journeymen, 973 F.2d 1050, 1063 (2d Cir.1992).* The key inquiry here is whether the injury for which WWE sued in state court is the same as that for which it is suing under RICO in the federal court. "To the extent that the damages that may be established in the two actions may prove identical, there can be but one satisfaction." *Continuous Zinc Furnace Co. v. Am. Smelting & Refining Co., 61 F.2d 958, 959 (2d Cir.1932).*

[16] As discussed in the context of the application of res judicata above, it appears that Plaintiff's state and federal claims against the Shenker Defendants are based on the same injury. Plaintiff's counterclaims in the Connecticut action allege, in sum and substance, that SSAI, through Shenker, conspired with Bell to provide favorable licensing terms to Plaintiff's licensees in exchange for unlawful payments from those licensees. In addition, Shenker allegedly conspired with Bell to defraud Plaintiff into paying SSAI license commissions to which it was not entitled. (Am.Compl.¶¶ 151, 186) Plaintiff's RICO claim in federal court includes the same factual allegations. (Am.Compl.¶¶ 249-58)

To the extent that Plaintiff recovers on its counterclaims in the Connecticut action, and to the extent that Plaintiff cannot show that the Connecticut claims arose from different facts or that the injury suffered was different, WWE's state court recovery should be set off against any recovery Plaintiff receives on its federal civil RICO claim. *See Phelan, 973 F.2d at 1063* (holding that damages recovered in federal court action should be reduced by amount recovered in NLRB proceeding); *United States v. Zan Mach. Co., Inc., 803 F.Supp. 620, 624 (E.D.N.Y.1992)* (reducing government's set off against one tortfeasor by the amount recovered in settlement with another tortfeasor where claims arose *515 out of same allegations and injury to the government was the same).

### E. Sherman Act Claim

#### 1. The Antitrust Allegations

In Count III of the Amended Complaint, Plaintiff alleges that all Defendants, other than Jakks Pacific and Road Champs, conspired to unreasonably restrain trade, in violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Defendants seek dismissal of this Count, claiming that Plaintiff: (i) has not alleged the requisite antitrust injury from Defendants' conduct; (ii) has not pled a substantive antitrust violation under § 1; and (iii) cannot prevail because the four-year statute of limitations ran before the Complaint was filed. The Court finds the first argument persuasive and dismisses Count III on that basis.

To put Defendants' Motion in the proper perspective, it is important to review Plaintiff's allegations regarding the purported antitrust violation. In Count III, Plaintiff alleges that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Defendants conspired to unreasonably restrain trade by "agreeing and conspiring to rig the terms of the bid that would be offered by the conspiring competitors to [Plaintiff] for the videogame license," including the royalty rate ultimately accepted by Plaintiff. (Am.Compl.¶ 267) According to the Amended Complaint, the "bid rigging" conspiracy "foreclos[ed] competition" for the video game license. (Am.Compl.¶ 267) As a result, Plaintiff "received less favorable license terms (including, but not limited to, a lower than market royalty rate) than WWE would have received if the conspiracy had not foreclosed the competitive operation of the market." (Am.Compl.¶ 270)

The factual allegations, however, tell a different story. In early 1997, Defendant Jakks was allegedly concerned about intense competition in the market for WWE toys from a company known as Playmates. (Am.Compl.¶¶ 57-62) In particular, Jakks was concerned that Playmates could get WWE's first international toy license, as well as other domestic toy licenses. To eliminate this competitive threat, Jakks allegedly directed the Shenker Defendants to use their influence with WWE to obtain licensing rights for Jakks that would conflict with the domestic licensing rights previously given to Playmates, which the Shenker Defendants purportedly did. (Am.Compl.¶¶ 63-66) Also, through the supposedly corrupt influence of Shenker, Jakks obtained an amendment to its original toy license agreement and an agreement procuring WWE's international toy license. (Am.Compl.¶¶ 67-68, 71) As might be expected, Playmates did not react favorably to being squeezed out, and complained to WWE about not acting in good faith by not permitting Playmates to submit a competing bid to WWE. (Am.Compl.¶ 70)

In reaction, Shenker, who by then had been retained by WWE as its exclusive licensing agent (allegedly without WWE's knowledge of the corrupt arrangement between Jakks and the Shenker Defendants), approached Bell about having Jakks buy Playmates out in order to eliminate them as a competitor. (Am.Compl.¶ 79) It was also around this time that Shenker allegedly first proposed to Bell, who was going through marital difficulties, the possibility of accepting payments in return for favorable treatment of Jakks's licensing rights, including those rights that WWE might sell in connection with video games. (Am.Compl.¶ 80) Bell is alleged to have agreed "to the corrupt plan to give favorable treatment to Jakks on licensing matters and to violate his fiduciary duties and duty of honest services to WWE in order to do so." (Am.Compl.¶ 82) In November 1997, as part of this plan, Bell persuaded Playmates to give up its licensing rights, thus allegedly denying WWE $376,391.64 left to be paid by Playmates to WWE on its *516 licensing guarantee. (Am.Compl.¶¶ 83, 92-93) According to the Complaint, Shenker and Bell were paid for these allegedly corrupt services in January 1998. (Am.Compl.¶¶ 84-91, 94-99)

Fresh from this success, Jakks is said to have turned its attention to the WWE video game license, which was up for renewal and was held at that time by a company known as Acclaim. (Am.Compl.¶¶ 100-01) Bell was in charge of the video game license renewal, and, therefore as part of the allegedly corrupt plan to assist Jakks, Bell and Shenker were to ensure that Acclaim would not get to renew that license. (Am.Compl.¶ 104) Indeed, the Amended Complaint alleges that Bell was expecting to receive a sum of money when he "formally recommend[ed] to WWE that Jakks be awarded the video game license." (Am.Compl. ¶ 106) Doing as he was paid to do, Bell allegedly advised Acclaim that he would not even review any application for a license renewal, and Bell and Shenker made no effort to contact any other potential bidder for the video game license. (Am.Compl.¶¶ 108-09) As had Playmates, Acclaim complained to WWE management about being boxed out of a competitive process. (Am.Compl.¶ 109) Nonetheless, Bell recommended to WWE management that it grant the video game license to Jakks. (Am.Compl.¶ 111) For this deed, Bell allegedly received $20,000 a few days thereafter. (Am.Compl.¶ 113) Unaware of the payments to Bell or Shenker, on April 8, 1998, WWE management approved Jakks as the video game licensee, and advised Acclaim that it would not renew its license. (Am.Compl.¶ 114)

However, things did not go as smoothly with the video game license as it had with the toy license. According to the Amended Complaint, "a series of events occurred *which threatened to expose the illegal plan to obtain the video game license at below-market rates by corruption of WWE's agents.*" (Am.Compl.¶ 117) (emphasis added) Soon after

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Bell and Shenker had recommended to WWE that it grant Jakks the video game license, two other companies, Activision and Defendant THQ contacted Bell and/or Shenker to express an interest in bidding for the video game license, and Activision even went so far as to submit informal proposals for the license. (Am.Compl.¶¶ 127-29, 131-32) According to the Amended Complaint, the specter of these two competitors "jeopardized Jakks' illicit plan to obtain valuable licensing rights at below-market rates by corrupting Shenker and Bell since questions would be raised if WWE went forward with the Jakks proposed license and later learned that WWE agents, [Shenker] and Bell, had been told that clearly superior offers from THQ and Activision would be forthcoming." (Am.Compl.¶ 133)

According to the Amended Complaint, Bell, Shenker, and Jakks acted quickly to conceal their ongoing bribery scheme to corruptly influence the licensing of WWE's intellectual property rights. For example, *"[i]n order to conceal the illicit plan and see it to fruition,* SSAI and Bell did not provide WWE management with copies of the April 23, 1998 letter from THQ or the April 27, 1998 Activision informal proposal." (Am.Compl.¶ 134) (emphasis added) Furthermore, "[i]n direct response to the threat of competition, *and in order to maintain control over the videogame licensing process it had acquired by the corruption of WWE licensing agents,* Jakks ... secured the agreement of THQ ... not to make an independent bid to secure the video game license in its own right." (Am.Compl.¶ 137) (emphasis added) Indeed, to bring THQ into the fold, Defendant Friedman allegedly told Defendant Farrell "that Jakks was in control of the videogame license, had access to the terms Activision had informally proposed, and that THQ could participate in the revenue stream from the videogame license at *517 a lower-than-market royalty rate if THQ did not independently bid but instead joined Jakks to make a proposal...." (Am.Compl.¶ 137) THQ agreed, and became part of a joint venture with Jakks that submitted a bid to WWE. (Am.Compl.¶¶ 144, 146, 154)

Based on the allegedly corrupt recommendation of Bell and Shenker, on June 10, 1998, WWE executed a licensing agreement with the Jakks/THQ joint venture, after having earlier accepted their joint bid. (Am.Compl.¶¶ 146-49, 151)

It is important to note, however, that according to the Complaint, WWE management never knew about Activision's interest in submitting a bid. In fact, Shenker and Bell ignored, and did not forward to WWE management, a formal proposal later prepared by Activision. They also did not solicit an increased bid from Activision. (Am.Compl.¶ 153) Moreover, Bell and Shenker allegedly shared Activision's earlier informal bid with Jakks and THQ officials so they could make their bid slightly more comparable to Activision's informal offer. (Am.Compl.¶ 145) As a result, according to the Amended Complaint, the joint bid ultimately accepted by WWE was allegedly fifty to sixty percent lower than what WWE could have earned from a competitive bid, thus costing WWE millions of dollars of lost royalties. (Am.Compl.¶¶ 163-64)

After Jakks secured the video game license, its allegedly corrupt relationship with Shenker and Bell continued. On June 24, 1998, "as a necessary and essential part of the commercial bribery scheme," Shenker and Bell secured an extension of the terms of Jakks's domestic and international toy licenses to coincide with the term of the video game license. (Am.Compl.¶ 165) When the commercial bribery scheme was once again threatened with exposure during discovery associated with SSAI's suit against WWE in Connecticut state court, Jakks allegedly took steps to conceal the scheme. For example, in response to a subpoena dated June 11, 2002, Jakks reportedly failed to produce any documents reflecting payments made to Shenker or revealing the fact that Shenker had acted as Jakks's agent. (Am.Compl.¶ 198) In response to WWE's repeated requests, Jakks allegedly continued to deny having made payments to Shenker. (Am.Compl.¶¶ 201-07) It was not until November 11, 2003, after Shenker had recanted his perjured testimony in the Connecticut action and the Connecticut Order was issued in which Jakks was specifically identified as one of WWE's licensees that had made improper payments to Shenker, that Jakks "found" evidence of payments to Shenker in its files and turned them over to WWE. (Am.Compl.¶¶ 214-20, 222, 228, 230)

*2. Discussion*

[17][18] Before discovery, courts should dismiss antitrust complaints "sparingly" where the proof of the alleged anti-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Westlaw.**

425 F.Supp.2d 484                                                                                                                                    Page 31
425 F.Supp.2d 484, RICO Bus.Disp.Guide 11,065
**(Cite as: 425 F.Supp.2d 484)**

trust violation is largely in the hands of the defendants. *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746-47, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976) (characterizing the standard for dismissal of antitrust allegations as "concededly rigorous"); *see also Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll.*, 128 F.3d 59, 63 (2d Cir.1997) (finding allegations of interstate commerce sufficient to plead interstate commerce component of antitrust violations). "Nevertheless, an antitrust complaint is insufficient if it simply contains 'conclusory allegations which merely recite the litany of antitrust.' " *Rock TV v. Time Warner, Inc.*, No. 97 Civ. 0161, 1998 WL 37498, at *2 (S.D.N.Y. Jan. 30, 1998) (quoting *Sage Realty Corp. v. ISS Cleaning Servs. Group, Inc.*, 936 F.Supp. 130, 135 (S.D.N.Y.1996)). "Rather, an antitrust complaint must adequately ... define the relevant product market, ... allege antitrust*518 injury, [and] ... allege conduct in violation of the antitrust laws." *Rock TV*, 1998 WL 37498, at *2 (quotations and citations omitted) (ellipses in original).

Plaintiff claims that the conduct described above in detail violates § 1 of the Sherman Antitrust Act. However, that provision does not provide for a private right of action. Instead, a plaintiff alleging injury from an antitrust violation may seek damages only under § 4 of the Clayton Act, which authorizes private lawsuits by "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15(a). "It is a well-established principle that, while the United States is authorized to sue anyone violating the federal antitrust laws, a private plaintiff must demonstrate 'standing.' " *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 436 (2d Cir.2005). "This standing requirement originates in the Supreme Court's recognition that, although § 4 of the Clayton Act appears to confer a broad private right of action for antitrust damages, 'Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.' " *Daniel*, 428 F.3d at 436-37 (quoting *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 534, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)); *see also HyPoint Tech. Inc. v. Hewlett-Packard Co.*, 949 F.2d 874, 877 (6th Cir.1991) ("Antitrust standing to sue is at the center of all antitrust law and policy. It is not a mere technicality. It is the glue that cements each suit with the purposes of the antitrust laws, and prevents abuses of these laws."). In part, this is in recognition of the oft-quoted observation that "the antitrust laws ... were enacted 'for the protection of *competition*, not *competitors*.' " *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (quoting *Brown Shoe v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)).

[19] "In order to have standing to bring a private antitrust action, a plaintiff must allege both antitrust injury and antitrust standing." *Arnold Chevrolet LLC v. Tribune Co.*, 418 F.Supp.2d 172, 180 (E.D.N.Y.2006); *see also Balaklaw v. Lovell*, 14 F.3d 793, 798 n. 2 (2d Cir.1994). Based on several Supreme Court decisions, the Second Circuit recently articulated the following factors to consider when determining antitrust standing:

[A]n injury in fact (1) to plaintiffs' business or property, (2) that is not remote from or duplicative of that sustained by a more directly injured party, (3) that qualifies as an "antitrust injury," and (4) that translates into reasonably quantifiable damages.

*Daniel*, 428 F.3d at 437-38 (citations omitted).[FN22]

> FN22. Accord *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165-66 (3rd Cir.1993) (noting that the factors include: " '(1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addressed the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.' ") (quoting *Associated Gen. Contractors of California, Inc.*, 459 U.S. at 545, 103 S.Ct. 897); 2 Phillip E. Areeda, Herbert Hovenkamp & Roger D. Blair, *Antitrust Law* ¶ 335a (2d ed. 2000) ("In addi-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tion to proving everything that would entitle the government to relief, the private plaintiff must also show (1) that the acts violating the antitrust laws caused ... the private party plaintiff injury in fact to its business or property; (2) that this injury is not too remote or duplicative of the recovery of a more directly injured person; (3) that such injury is 'antitrust injury,' which is defined as the kind of injury that the antitrust laws were intended to prevent and flows from that which makes defendants' acts unlawful; and, in a damage case, (4) that the damages claimed or awarded measure such injury in a reasonably quantifiable way." (quotations omitted)).

*519 [20][21] The usual starting point for any standing inquiry is whether plaintiff has alleged an antitrust injury. See Balaklaw, 14 F.3d at 797 n. 9 (describing "two-pronged analysis" beginning with question of whether plaintiff suffered from antitrust injury); Greater Rockford Energy & Tech. Corp. v. Shell Oil Co., 998 F.2d 391, 395 (7th Cir.1993) (noting that antitrust injury and causation are determined before evaluating other factors). Antitrust injury is more than just a personal injury. See Arnold Chevrolet, at 180. Rather, "[a]ntitrust injury involves a causation requirement in order to define the class of potential plaintiffs eligible to bring suit-those 'injured ... by anything forbidden in the antitrust laws.'" Greater Rockford, 998 F.2d at 395 (quoting In re Indus. Gas Antitrust Litig., 681 F.2d 514, 516 (7th Cir.1982) (ellipses in original)); see also Brunswick Corp., 429 U.S. at 487, 97 S.Ct. 690. "In establishing antitrust injury, courts must first delineate the *type* of interests protected by the antitrust laws, and second, must determine whether the violation was the cause-in-fact of the injury: that 'but for' the violation, the injury would not have occurred." Greater Rockford Energy, 998 F.2d at 395 (citations and quotations omitted).

In conducting this inquiry, "it is useful to distinguish the question of whether an antitrust violation occurred from whether plaintiffs have standing to pursue it. To avoid confusing these issues, some courts and commentators have suggested assuming the existence of a violation in addressing the issue of standing." Daniel, 428 F.3d at 437. Here, while it "is by no means clear" that Plaintiff has sufficiently alleged an antitrust violation, *id.*, for purposes of this Motion the Court will presume that Plaintiff has pled a *per se* violation of § 1.[FN23]

FN23. The Parties have sacrificed a great number of trees in briefing the question of whether the alleged joint bid by THQ/Jacks is governed by the rule of reason or *per se* analysis (Jakks Sherman Act Mem. 21-27; WWE Sherman Act Resp. 17-24; Jakks Sherman Act Reply 3-8). Plaintiff argues strenuously that the joint bid by Jakks/THQ was part of a textbook bid-rigging scheme, which is a *per se* violation, while Jakks insists that the joint bid was lawful, under the rule of reason, as it was accepted by WWE knowing that it was a joint bid submitted by competitors. (Jakks Sherman Act Mem. 22-24; WWE Sherman Act Resp. 21-24; Jakks Sherman Act Reply 3-8) Resolution of this dispute, while potentially interesting, is unnecessary. See Sage Realty, 936 F.Supp. at 135 n. 4 (granting motion to dismiss for failure to allege antitrust injury, even assuming plaintiffs' substantive antitrust allegations to be true).

Plaintiff suggests that merely by asserting a *per se* violation, in this case the allegedly corrupt agreement between Jakks and THQ to submit a joint bid, Plaintiff has established antitrust injury. (WWE Sherman Act Resp. 20-21) This is a curious claim since the Supreme Court has expressly rejected the idea that "no antitrust injury need be shown where a *per se* violation is involved." Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 341, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990). "The *per se* rule is a method of determining whether § 1 of the Sherman Act has been violated, but it does not indicate whether a private plaintiff has suffered antitrust injury and thus may recover damages under § 4 of the Clayton Act." Atl. Richfield, 495 U.S. at 341-42, 110 S.Ct. 1884; see also Areeda, *supra*, ¶ 337 ("Just as harm to competition is thus presumed in finding a *520 substantive violation, an occasional court presumed antitrust injury as well. However, such a presumption confuses the violation with the remedy. No matter how clear the violation, the private plaintiff must still prove that it was actually injured in order

Case 7:04-cv-08223-KMK  Document 181-7  Filed 08/11/2006  Page 16 of 19

Westlaw.

425 F.Supp.2d 484  
425 F.Supp.2d 484, RICO Bus.Disp.Guide 11,065  
**(Cite as: 425 F.Supp.2d 484)**

Page 33

to recover damages."). Thus, while a *per se* violation may relieve Plaintiff from demonstrating that a particular restraint on trade is unreasonably anti-competitive under § 1 of the Sherman Act, *Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 723, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988)*, it says nothing about whether that unreasonable restraint resulted in an antitrust injury to Plaintiff under the Clayton Act. *See In Town Hotels Ltd. P'ship. v. Marriott Int'l, Inc., 246 F.Supp.2d 469, 475 (S.D.W.Va.2003)* ( "Even when the defendant's conduct is presumed to injure competition, the question remains whether this particular plaintiff's injury was caused by the competition-reducing aspect of the defendant's conduct."). "To recover under the Clayton Act private plaintiffs must demonstrate that the injuries they suffered were caused by acts that had a competition-reducing effect." *Volmar Distribs., Inc. v. New York Post Co., 825 F.Supp. 1153, 1159 (S.D.N.Y.1993)*; *see also Daniel, 428 F.3d at 438* ("The fact that private plaintiffs have been injured by acts that violate the antitrust laws is not enough to confer standing to sue.").[FN24]

> FN24. There even is authority for the proposition, contrary to Plaintiff's suggestion, that "to satisfy the antitrust injury requirement, a plaintiff must show that 'the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice.'" *Sage Realty, 936 F.Supp. at 135* (quoting *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., 996 F.2d 537, 543 (2d Cir.1993)*). Plaintiff attempts to distinguish *Capital Imaging* as a case involving an antitrust allegation governed by the rule of reason, however, the Supreme Court has made clear that "[t]he need for ... showing [antitrust injury] is at least as great under the *per se* rule as under the rule of reason." *Atl. Richfield, 495 U.S. at 344, 110 S.Ct. 1884*. In any event, even if the Court assumes that Defendants' conduct had an actual adverse effect on competition, Plaintiff has failed to allege an antitrust injury from that adversely affected competition, or that Defendants' conduct was the cause of any antitrust injuries.

[22] Under these standards, Plaintiff's Amended Complaint fails to allege an antitrust injury and fails to allege that but for Defendants' joint bid, Plaintiff would not have suffered any such injury. Fairly read, the Amended Complaint describes in impressive detail an extensive and, if true, astounding commercial bribery scheme. The scheme initially only involved Jakks allegedly making improper payments to the Shenker Defendants to ensure that they steered whatever WWE licensing business they could to Jakks. After a while, however, it became apparent to Jakks and the Shenker Defendants that coopting Bell would be essential not only to the continuation of the toy licenses, but to the future acquisition of the lucrative video game license. What initially made Bell indispensable was Playmates's effort to circumvent Shenker and make an appeal directly to WWE for a fair opportunity to bid on WWE's licenses. Thus, Bell was brought into the bribery scheme and allegedly did what he was paid to do-get Playmates to agree to a buy-out.

Soon after the Playmates buy-out, Jakks and Shenker made a corrupt play for the video game license. The first phase involved using Bell to scare off the current license-holder, Acclaim, from seeking to put in a renewal bid. That apparently worked because Acclaim faded from the picture before there was any Jakks/THQ joint bid. The next phase involved Shenker and Bell making a concerted effort to *521 not solicit any bids for the video game license from any company other than Jakks. Initially, this also worked as WWE, based on the recommendations of the allegedly crooked Bell and Shenker, accepted the Jakks bid. However, the alleged schemers did not anticipate two unsolicited bidders (Activision and THQ), who appeared determined to get their potential bids to WWE management. Specifically, concerned that any such end-run to WWE management would expose the bribery scheme, (Am.Compl.¶ 137) Jakks approached THQ, told it that the bid was fixed, and convinced THQ to join in the scheme or face certain defeat in the bidding process. The Amended Complaint says nothing of what happened to Activision, other than that its formal bid, which the Amended Complaint acknowledges was more lucrative than what WWE accepted, was blocked by Bell and Shenker from getting to WWE management. Because this bid never made its way to WWE management, according to the Amended Complaint, WWE suffered the loss of millions of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

dollars of royalties.

As alleged, it is clear that Plaintiff has not suffered from an antitrust injury. Even if Defendants intended to engage in a bid-rigging scheme, and that scheme had a "competition-reducing effect"-both dubious assumptions-nothing about Jakks's cooptation of THQ, even in combination with the bribery scheme, prevented WWE from negotiating licensing agreements with other vendors. As such this case is virtually identical to *Fed. Paper Bd. Co. v. Amata,* 693 F.Supp. 1376 (D.Conn.1988).

In *Amata,* plaintiff's employee, Amata, took bribes from suppliers in return for him recommending sales to plaintiff. *Id.* at 1380. The price at which plaintiff purchased its supplies concededly was inflated as a result of the bribes, thus plainly causing plaintiff economic injury. *Id.* Yet, the *Amata* court, in granting the motion to dismiss, held that there was no *antitrust* injury because there was no allegation that non-bribing suppliers could not compete, or that plaintiff could not purchase from non-bribing suppliers. *Id.* at 1383-84 (finding no claim in the complaint to suggest that suppliers who refused to pay bribes to Amata were "precluded from taking competitive actions in order to secure sales with Federal" or that "Amata and the suppliers paying him bribes could have prevented any other supplier from dealing with Federal"). The court recognized (as does this Court) that the bribes were unfair competition, but that alone did not make them an actionable restraint on trade under § 4 of the Clayton Act. *Id.* at 1383; *see also Calnetics Corp. v. Volkswagen,* 532 F.2d 674, 687 (9th Cir.1976) (finding no antitrust injury where there were allegations of commercial bribery without allegations of other acts tending to restrain trade); *Sterling Nelson & Sons, Inc. v. Rangen, Inc.,* 235 F.Supp. 393 (D.Idaho 1964) (finding no antitrust injury where influential state employee was bribed to steer contracts to a particular company).

Plaintiff's allegation that Jakks and THQ engaged in bid rigging and price fixing does not change the analysis, because THQ and Jakks were only two of several competitors for the video game license. As in *Amata,* WWE failed to demonstrate how the joint bid, even combined with the bribery of Shenker and Bell, prevented competitive bids from being offered to, or accepted by, WWE's management. Indeed, the allegations in the Amended Complaint are even more problematic for Plaintiff here than in *Amata* because the Amended Complaint identifies competitors that were active in the bidding process for the video game licenses. Acclaim and Activision submitted proposed bids to Plaintiff despite Bell's and Shenker's attempts to discourage them *522 from bidding. Given these allegations, the Amended Complaint fails to allege how the mere submission of the joint bid, by itself, caused antitrust harm to WWE. Put another way, even if the joint bid was artificially low, there is no allegation that WWE was forced to accept that bid.

Plaintiff counters by asserting that it suffered an antitrust injury because it was the victim of a bid-rigging conspiracy. Implicit in Plaintiff's argument is that all bid-rigging schemes necessarily deprive the "other party to the transaction of a fair price." (WWE Sherman Act Resp. 22) Yet, that is not at all true here. Plaintiff is really a victim of its own choice, albeit a choice allegedly influenced by its corrupt employee, to accept Defendants' joint (lower) bid in lieu of other higher bids.[FN25] Thus, there is no cognizable antitrust injury from the alleged joint bid or the bribery scheme.

> FN25. Because Defendants did not rig all, or even close to all, of the bids available to WWE, this case is different from *Philip Morris Inc. v. Heinrich,* No. 95 Civ. 0328, 1996 WL 363156 (S.D.N.Y. June 28, 1996). In that case, Philip Morris employed a formal bidding process where the purchasing department would secure one written bid and at least one alternative verbal price quotation. *Id.* at *2. The defendants' scheme took advantage of this by ensuring that all competitors for contracts agreed to submit inflated bids to plaintiff, further agreeing that one company would be the lowest bidder and would subcontract the work out to the losing bidders. *Id.* at *3. The winning bidder kept the difference between the legitimate bids and the inflated bids as a "commission" for its services, and paid some of the proceeds as kickbacks to two of the plaintiff's employees. *Id.*
> Unlike in *Philip Morris,* the Defendants here did not engage in the same type of bid-rigging scheme, nor did they seek to include all would-be bidders in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

any such scheme. Therefore, the injury to Plaintiff here from any joint bid is far different from what it was there. Moreover, in this case, contrary to Plaintiff's efforts to spin otherwise, the crux of the Defendants' anti-competitive conduct is the bribery of the licensing agents and purchasers, with the joint bid being a means of promoting the success of that scheme. In *Philip Morris,* however, the bribery was the means of insuring success of the bid-rigging scheme.

[23] Aside from failing to allege an antitrust injury, Plaintiff fails to adequately allege that any anti-competitive conduct was the cause of Plaintiff's injuries. As noted, to "satisfy the antitrust injury requirement, a § 4 plaintiff must show that its injury 'flows from that which makes defendants' acts unlawful,' that 'but for' the alleged violation, the injuries would not have occurred." *Greater Rockford Energy,* 998 F.2d at 401 (quoting *Brunswick,* 429 U.S. at 489, 97 S.Ct. 690 and *MCI Commc'ns. Corp. v. Am. Tel. & Tel. Co.,* 708 F.2d 1081, 1161 (7th Cir.1983)); *see also Argus Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 41 (2d Cir.1986) ("[A]n essential element in plaintiff[']s claim is that the injuries alleged would not have occurred but for [defendants'] antitrust violation."); *Cont'l Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater N.Y., Inc.,* 198 F.R.D. 41, 46 (E.D.N.Y.2000) ("In order to satisfy the antitrust injury requirement, the plaintiff[ ] must establish that the injuries would not have occurred but for the defendants' antitrust violations." (quotations omitted)). "An antitrust violation need not be the sole cause of the alleged injuries, but the plaintiff must establish, with a fair degree of certainty, that the violation was a material element of, and substantial factor in producing, the injury." *Greater Rockford Energy,* 998 F.2d at 401; *accord Amerinet, Inc. v. Xerox Corp.,* 972 F.2d 1483, 1494 (8th Cir.1992) ("The case law is clear ... that the treble-damage plaintiff may not recover for losses due to factors other than the defendant's anticompetitive violations.").

*523 Here, the defect in the Amended Complaint is neither a lack of evidence, for the Court does not at this stage weigh the evidence, nor a failure to explain the cause of the lost royalties. On the contrary, the Amended Complaint provides detailed allegations regarding the true cause of WWE's lost earnings, but that cause is not the purportedly illegal joint bid. Instead, it is clear from the Amended Complaint that the reason WWE never took a higher bid, and therefore never made more money, is because it was prevented from learning about any such bids by Shenker and Bell, who supposedly acted as they did because of substantial bribes from Jakks. In other words, it cannot be said, based on the Amended Complaint's allegations regarding the bribery scheme, that but for the joint bid, WWE would not have foregone the millions in royalties it did. *See Valley Prods. Co., Inc. v. Landmark,* 128 F.3d 398, 404 (6th Cir.1997) (affirming dismissal: "The loss of logoed amenity sales suffered by Valley upon cancellation of its vendor agreement flowed directly from the cancellation, as we see it; the sales losses would have been suffered as a result of the cancellation whether or not HFS had entered into the alleged tying arrangements with the franchisees."); *Greater Rockford Energy,* 998 F.2d at 402 ("We ... find that as a matter of law, plaintiffs have failed to show with a fair degree of certainty that the antitrust violation was a material and substantial factor causing their alleged injuries."). Thus, the alleged antitrust violation, which does not include the bribes, is not alleged to have caused WWE's injuries. Dismissal of this cause of action is therefore appropriate. *See Hodges v. WSM, Inc.,* 26 F.3d 36, 39 (6th Cir.1994) (affirming dismissal of complaint: "Because plaintiffs did not allege, nor could they, that the illegal antitrust conduct was a necessary predicate of their injury or that defendants could exclude plaintiffs only by engaging in the antitrust violation, it was appropriate to dismiss the case pursuant to [Fed.R.Civ.P.] 12(b)(6)."); *Indium Corp. of Am. v. Semi-Alloys, Inc.,* 566 F.Supp. 1344, 1354 (N.D.N.Y.1983) (granting motion to dismiss because complaint is "deficient in its statement of injury, and in its statement of the relationship between the alleged antitrust violation and its alleged injury").

### III. Conclusion

For the reasons stated above, Defendants' Motion to Dismiss Counts I and II for failure to properly plead an enterprise pursuant to § 1962(c) is DENIED; Defendants' Motion to Dismiss Count III is GRANTED; the Shenker Defendants' Motion to Dismiss based on res judicata abstention prin-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ciples is DENIED; and Defendants' Motion to Dismiss Count VI is GRANTED.

SO ORDERED.

S.D.N.Y.,2006.
World Wrestling Entertainment, Inc. v. Jakks Pacific, Inc.
425 F.Supp.2d 484, RICO Bus.Disp.Guide 11,065

Briefs and Other Related Documents (Back to top)

• 2005 WL 3281583 (Trial Motion, Memorandum and Affidavit) World Wrestling Entertainment, inc.'s Sur-Reply Memorandum of Law in Opposition to Defendants' Motions to Dismiss (Oct. 19, 2005)
• 2005 WL 3281580 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Support of the JAKKS Defendants' Motion to Dismiss the Sherman Act Claim in the Amended Complaint (Oct. 18, 2005)
• 2005 WL 3281571 (Trial Motion, Memorandum and Affidavit) World Wrestling Entertainment, Inc.'s Memorandum of Law in Opposition to Defendants' Motions to Dismiss Sherman Act Claim in the Amended Complaint (Oct. 4, 2005)
• 2005 WL 3281575 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Support of the Jakks Defendants' Motion to Dismiss the Rico and Robinson Patman Act Claims in the Amended Complaint (Oct. 4, 2005) Original Image of this Document (PDF)
• 2005 WL 3281577 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Support of THQ Inc. and Brian Farrell's Motion to Dismiss the Rico and Robinson-Patman Act Claims in the Amended Complaint (Oct. 4, 2005)
• 2005 WL 3281567 (Trial Motion, Memorandum and Affidavit) The Shenker Defendants' Reply Memorandum of Law in Further Support of Their Motion to Dismiss or Stay the Rico Claims (Oct. 3, 2005)
• 2005 WL 2872389 (Trial Motion, Memorandum and Affidavit) World Wrestling Entertainment, Inc.'s Memorandum of Law in Opposition to Defendants' Motions to Dismiss (Sep. 19, 2005) Original Image of this Document (PDF)
• 2005 WL 2872403 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of the Jakks Defendants' Motion to Dismiss the Sherman Act Claim in the Amended Complaint (Sep. 19, 2005) Original Image of this Document (PDF)
• 2005 WL 2872407 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of the Jakks Defendants' Motion to Dismiss the Sherman Act Claim in the Amended Complaint (Sep. 19, 2005) Original Image of this Document (PDF)
• 1:04cv08223 (Docket) (Oct. 19, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.