47

Westlaw.

Not Reported in F.Supp.                                                                                  Page 1
Not Reported in F.Supp., 1995 WL 764236 (S.D.N.Y.), RICO Bus.Disp.Guide 9010
**(Cite as: Not Reported in F.Supp.)**

H
Briefs and Other Related Documents

United States District Court, S.D. New York.
Arthur V. WYNNE, Jr., Frederick J. Wynne, and Robert C.
Waggoner, suing on behalf of themselves and all others sim-
ilarly situated, Plaintiffs,
v.
EQUILEASE CORPORATION, a New York corporation;
Bunker Ramo-Eltra Corporation, a Delaware corporation;
Allied Signal Corporation, a New Jersey corporation; and
Ronald Nussbaum, Defendants.
**No. 94 CIV. 4992 (LMM).**

Dec. 27, 1995.

*MEMORANDUM AND ORDER*
McKENNA, District Judge.
*1 Plaintiffs Arthur V. Wynne, Jr., Frederick J. Wynne and
Robert C. Waggoner (collectively, "Wynne") are dis-
gruntled investors who purchased "units" in a "Trust" which
held title to a Boeing 747 aircraft. They had hoped that the
investment would secure them tax advantages. Instead, they
sustained financial losses when the aircraft was eventually
foreclosed. They now claim that Defendants Equilease Cor-
poration ("Equilease"), Bunker Ramo-Eltra Corporation
("Bunker"), AlliedSignal Corporation ("AlliedSignal") and
Ronald Nussbaum ("Nussbaum") defrauded them with re-
spect to their purchase of "beneficial interests" in the Trust.
On October 28, 1994, Plaintiffs filed a class action com-
plaint on their own behalf and on behalf of other similarly
situated investors who purchased interests in the Trust pur-
suant to Defendants' Offering Memorandum. The Complaint
originally alleged four counts: (1) a civil Racketeer Influ-
enced and Corrupt Organizations Act ("RICO") claim
against all Defendants, 18 U.S.C. §§ 1961-65, alleging pre-
dicate acts of securities fraud under sections 10(b) and 20(a)
of the Securities Exchange Act of 1934 (the "1934 Act"), 15
U.S.C. §§ 78j(b), 78(t)a, and Rule 10b-5 promulgated there-
under, 17 C.F.R. § 240.10b-5, as well as wire fraud and mail
fraud. 18 U.S.C. §§ 1341, 1343; (2) a "controlling person"
claim under § 20(a) of the 1934 Act against Allied Signal
and Bunker; (3) a breach of contract claim against
Equilease; and (4) a common law fraud claim against each
of the Defendants. Plaintiffs later voluntarily dismissed

Count IV, the fraud claim, acknowledging that it was time-
barred. Defendants now move to dismiss the remaining
counts pursuant to Fed. R. Civ. P. 12(b)(6) and 12(c). They
argue alternatively that the RICO and securities counts are
time-barred, and that there is no subject matter jurisdiction
for the contract claim. For the following reasons, Defend-
ants' motion to dismiss is granted as to all counts.

I. Background

The facts, as stated in the Complaint, Offering Memor-
andum and parties' briefs, are as follows. Defendant
Equilease is a New York corporation in the business of
equipment lease financing. (Compl. at ¶¶ 4, 18.) Plaintiffs
allege Bunker and AlliedSignal to be Equilease's parent cor-
porations.[FN1] Defendant Ronald Nussbaum is a New York
citizen who, during the period of the transaction in question,
worked as house counsel for the corporate defendants'
private placement agent Thomson McKinnon Securities,
Inc. ("Thompson McKinnon") (Compl. at ¶ 7.)

In November of 1985, Defendants created the TM People
Express 747-200 Trust ("the Trust") for the purpose of hold-
ing, protecting and conserving a used Boeing 747-238B air-
craft ("the Aircraft"). (Compl. at ¶ 20.) In an Offering
Memorandum prepared at the same time, Defendants ex-
plained the details of their purchase and leaseback of such
an aircraft with People Express, Inc. ("People Express") and
offered for sale "units," or "beneficial interests" in the Trust.
The named Plaintiffs are all individual investors who pur-
chased such interests. Defendants' representations in the Of-
fering Memorandum as to the nature and potential risks of
the investment form the basis of this dispute. The claims
themselves, rooted in fraud, are straightforward. The under-
lying transaction is more complex and requires further ex-
planation.

A. The Transaction

*2 Equilease, through its wholly-owned subsidiary,
Equilease Marketing Corporation ("Equilease Marketing"),
purchased the Aircraft from People Express for $29 million
($29,000,000). (Compl. at ¶ 23.) Equilease Marketing then
leased the plane back to People Express pursuant to a "User
Lease." (*Id.*) Equilease Marketing financed the purchase by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                    Page 2
Not Reported in F.Supp., 1995 WL 764236 (S.D.N.Y.), RICO Bus.Disp.Guide 9010
**(Cite as: Not Reported in F.Supp.)**

obtaining a non-recourse loan, secured by the User Lease and the Aircraft. (Compl. at ¶ 24.) The terms of the User Lease and the non-recourse loan were such that People Express' lease payments would be sufficient to pay off the non-recourse note by the Lease's termination date. (Compl. at ¶ 25.) In fact, People Express' quarterly rent payments on the User Lease were structured so that they would increase or decrease to correspond with similar fluctuations in the non-recourse loan's payment schedule. (Equilease Br. at p. 6.) Defendants contend that due to the loan's non-recourse nature, the lender's sole recourse in the event of default was foreclosure; the bank could not look to Plaintiffs or Equilease for payment. (Equilease Br. at p.6-7.)

On the date that it created the Trust, Defendant Equilease arranged for Equilease Marketing to sell the Aircraft and assign the User Lease to another of its wholly-owned subsidiaries, Equilease Credit Corporation ("Equilease Credit"). (Compl. at ¶ 26.) In return for payment, partially in cash and partially by promissory note, Equilease Marketing agreed to pay the non-recourse loan when due. (Off. Mem. at p. 10; Compl. at ¶ 27.)

Equilease Credit then leased the Aircraft to Equilease Associates IX Limited Partnership ("Equilease IX"), another Equilease subsidiary, under a lease called the "Master Lease," the terms of which assigned to Equilease IX all rights under the User Lease. (*Id.;* Compl. at ¶¶ 30-31.) Equilease Marketing endorsed Equilease Credit's promissory note to Equilease IX, releasing itself from the obligation to repay the non-recourse loan. (Off. Mem. at p. 10.) Under the terms of this "Note Assignment," Equilease IX assumed the obligation to repay. (*Id.*) The Offering Memorandum apparently limited this obligation:
To induce the Lessee [Equilease IX] to lease the Equipment [Aircraft], the Second Vendor [Equilease Credit] will agree that the Lessee's obligation to repay the Aircraft loan will be limited to the amount of net rental and foreclosure proceeds the Lessee actually derives from the Equipment. (*Id.*)

To secure Equilease IX's obligations under the Master Lease, the rights to the User Lease were reassigned to Equilease Credit pursuant to a "Collateral Assignment." (Compl. at ¶ 32.) Equilease IX's obligation to pay rent was to be a recourse obligation. Equilease promised, however, to

capitalize Equilease IX's general partner "to the extent necessary to enable it to satisfy its obligations to the Lessee." (Off. Mem. at p. 11.) Plaintiffs point to this language as evidence that Equilease promised to make up any shortfalls in the User Lease rentals which might impact payment of the Master Lease.

**\*3** Equilease Credit, having purchased the Aircraft from Equilease Marketing and having leased it to Equilease IX, in turn sold it to Independent Resources, Inc. ("Independent"). (Off. Mem. at p.11.) Independent was assigned rights under the Master Lease and gave Equilease Credit a lien on the Aircraft and its rights under the Master Lease. (*Id.*) It then created the Trust pursuant to Connecticut law and contributed the Aircraft to it for $29 million ($29,000,000.00), subject to all preceding liens and rights. (*Id.*) Equilease then entered into a "Capitalization Agreement" on December 31, 1985, whereby it undertook:
to make such loans, advances or other capital contributions to the General Partner as are necessary to ensure the prompt and full performance and observance of all of the covenants, conditions, and agreements of the Partnership contained in the Master Lease, the Master Collateral Assignment and the Endorsement Agreement ... for which the Partnership's failure to perform or observe would create or result in personal liability to the General Partner. (Compl. at ¶ 38.)

### B. The Offering Memorandum

Defendant Equilease divided the Trust into 98 units, drew up the Offering Memorandum dated November, 1985 and offered the units for sale as securities. Defendant Nussbaum allegedly played a role in authorizing the Offering Memorandum and selling the units, in his capacity as house counsel to Equilease's private placement agent Thomson McKinnon.FN2 More than 75 units were allegedly sold, purchased with a partial down payment and a "Beneficiary Note." (Compl. at ¶ 13.) As a practical matter, payments on the Master Lease exceeded the investors' installment debts on the Beneficiary Notes by a small amount, yielding the investors a "Retained Rent" each pay period. (Off. Mem. at p.12.) This relationship between the Master Lease and Beneficiary Note payments dictated the investors' financial obligations, independent of fluctuations in User Lease pay-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                               Page 3
Not Reported in F.Supp., 1995 WL 764236 (S.D.N.Y.), RICO Bus.Disp.Guide 9010
**(Cite as: Not Reported in F.Supp.)**

ments. If User Lease rents changed, the investors' Retained Rent simply reflected the adjustment. *Id.*

Plaintiffs assert that the Offering Memorandum is misleading in that it is designed to provide potential purchasers with the impression that if the rents due to be paid for use of the Aircraft are not paid, then Equilease will pay any difference. (Compl. at ¶ 42.) They point, in particular, to the following language in the Offering Memorandum:
Equilease Corporation has agreed unconditionally to contribute sufficient capital to the general partner of the Lessee [Equilease IX] to enable the Lessee to meet its obligations under the Master Lease, including the obligation to pay fixed rent, rather than guaranteeing any specific obligation of the Lessee, or any of its affiliates, described in this Memorandum. (*Id.;* Off. Mem. at p.40.)

Continental Airlines eventually succeeded People Express and ultimately went bankrupt. The User Lease terminated in the course of the bankruptcy and, in early 1991, payments on the User Lease ceased. (Compl. at ¶ 40.) Equilease failed to pay the rent on the User Lease when it next came due in January, 1992. (Compl. at ¶ 40.) Plaintiffs claim that this breached Equilease's agreement with the Trustee, as well as its representations in the Offering Memorandum. (*Id.*) Defendants argue that Equilease never guaranteed payments on the User Lease, promising only to pay rent on the Master Lease. (Equilease Br. at p.2.) In February of 1994, lender foreclosed upon the Aircraft, valuing it at only $8 million ($8,000,000.00). (Compl. at ¶ 40.) Plaintiffs subsequently brought the aforementioned claims against Defendants, who now move to dismiss.

### II. Discussion

### A. Civil RICO

**\*4** Defendants initially move to dismiss the RICO claim for failure to satisfy the statute of limitations. The Court grants Defendants' motion based on the statute of limitations defense.

### 1. Statute of Limitations

Civil RICO claims have a four-year statute of limitations period regardless of the predicate acts upon which they are based. *Agency Holding Corp. v. Malley-Duff & Assocs.,* 483 U.S. 143, 156 (1987). While the Circuits have split on the question of when this limitations period begins to run, the Second Circuit has firmly adopted an "accrual discovery" rule for determining when civil RICO's four year period commences. *In re Integrated Resources Real Estate,* 850 F. Supp. 1105, 1116-17 (S.D.N.Y. 1993) (Sweet, J). Under this rule, a new cause of action accrues when the defendant commits a violation injuring the plaintiff, and is not necessarily determined by the plaintiff's discovery of that violation. *Id.* at 1117. An action will accrue against a defendant for a specific injury on the date that plaintiff discovers or should have discovered that injury. *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1103 (2d Cir. 1988), *cert. denied,* 490 U.S. 1007 (1989). This is an objective test, focusing upon when a reasonable person should have discovered the RICO injury. *Integrated Resources,* 850 F. Supp. at 1118.

In the securities context, reasonable discovery may be found when there is "notice." Plaintiffs are adjudged to have discovered their RICO injury when they were placed on inquiry notice by actual or constructive knowledge of facts or circumstances indicating an investment may have gone awry. *Id.* On a motion to dismiss, when the facts alleged in the complaint indicate that, with reasonable diligence, plaintiffs should have uncovered the alleged fraud prior to the limitations period, the claim is time-barred. *Id.; Griffin v. McNiff,* 744 F. Supp. 1237, 1255 (S.D.N.Y. 1990), *aff'd,* 996 F.2d 303 (2d Cir. 1993); *see Armstrong v. McAlpin,* 699 F.2d 79, 88 (2d Cir. 1983). When the facts, transactions and events set out in the complaint as creating the cause of action are disclosed in the Offering Memorandum, as a matter of law, plaintiff reasonably discovers what he alleges as fraud at the time of investment. *Dolan v. Rothschild Reserve Int'l, Inc.,* No. 90-CIV-1003, 1991 WL 155770 at *1 (S.D.N.Y. Aug. 8, 1991) (Pollack, J.). This is particularly true when the offering materials themselves "contain considerable warnings and disclaimers" and "cautionary language" such that a reasonable investor might suspect fraud. *Ackerman v. National Property Analysts, Inc.,* 887 F. Supp. 494, 503-04 (S.D.N.Y. 1992) (plaintiffs who acquired an interest in a limited partnership in reliance on allegedly fraudulent offering material were injured at the time of purchase, rather than when they suffered resulting economic harm).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                      Page 4
Not Reported in F.Supp., 1995 WL 764236 (S.D.N.Y.), RICO Bus.Disp.Guide 9010
**(Cite as: Not Reported in F.Supp.)**

Consequently, in such circumstances, RICO claims accrue at the time of purchase. *See also Marlow v. Gold,* No. 89-CIV-8589, 1991 WL 107268 at *7-*9 (S.D.N.Y. June 13, 1991) (Martin, J.) (given extensive warnings in Private Placement Memorandum, plaintiff should have known that he was injured at the time he invested and therefore RICO claims accrued at date of purchase).

*5 Investors may not simply hide behind conclusory assertions that they were unable to discover the alleged fraud in the Offering Memorandum. Even if they did not know at the time that the facts and circumstances in the offering materials would operate together as fraud, the Court will hold that they should have reasonably discovered the fraud if they were on notice that there were matters that should be investigated. *Dolan,* 1991 WL 155770 at *2. The sophistication of the investors is relevant in determining whether or not they were on notice that further investigation was required. *See Integrated Resources,* 850 F. Supp. at 1123 (sophisticated investors on inquiry notice obliged to learn more about alleged market conditions or file suit within statute of limitations); *Marlow,* 1991 WL 107268 at *9 (sophistication of investor, an attorney, taken into account in assessing notice); *Treacy v. Simmons,* No. 89-CIV-7052, 1991 WL 67474 at *4 (S.D.N.Y. Apr. 23, 1991) (investor's failure to read risks disclosed in prospectus in reliance on broker's oral statements "unjustifiable"; plaintiff's assertion that he is unsophisticated investor rejected given his business background); *cf. McCoy v. Goldberg,* 748 F. Supp. 146, 158 (S.D.N.Y. 1990) (no notice where plaintiff is a widowed, part-time nurse lacking any knowledge or experience with financial matters and hoping to provide for two minor children).

In the case at hand, all of the facts, transactions and events Plaintiffs allege in the Complaint as creating a RICO cause of action are fully disclosed in the Offering Memorandum. The Court, therefore, concludes that, as a matter of law, Plaintiffs reasonably discovered what they allege as fraud at the time of their investment. *See Dolan,* 1991 WL 155770 at *1. The case depends entirely upon how one interprets the language of the Offering Memorandum. Plaintiffs claim that the Offering Memorandum was misleading, fraudulent and failed to adequately disclose the risks and contingent liabil-

ities involved in the investment. They further assert that they relied upon the allegedly fraudulent Offering Memorandum and suffered RICO injury as a consequence of this reliance. In order to make this case, Plaintiffs have relied heavily upon the language of the Offering Memorandum, referring to it liberally throughout their Complaint and opposition papers. In particular, they point to a passage from page 40 which states that "Equilease has agreed unconditionally to contribute sufficient capital to the general partner of the Lessee to enable the Lessee to meet its obligations under the Master Lease." (Compl. at ¶ 42.)

While Plaintiffs seize upon such language to argue that Defendants guaranteed the User Lease, a careful reading of the Offering Memorandum confirms the opposite. In the same passage which Plaintiffs cite, indicating that Equilease agreed to unconditionally capitalize the Lessee, the Offering Memorandum explicitly states that Equilease did so "*rather than guaranteeing* any specific obligation of the Lessee, or any of its affiliates." (Emphasis added.)

*6 In fact, the Offering Memorandum explains in several places that Equilease is *not* responsible for User Lease rent defaults. At page 24, paragraph 5, in a section entitled "Default By The Lessee And The User In Performance Of Their Obligations," the Offering Memorandum states:
Neither the Grantor nor the Sponsor makes any representations, or gives any assurances, with respect to the ability of the Lessee to meet its obligations under the Master Lease, or the ability of the User or any other sublessee of the Equipment to meet its obligations under the User Lease or other sublease of such Equipment.

If the User is unable to meet its obligations under the User Lease, neither the Lessee, the Sponsor, the Guarantor or any other person will be personally liable to the lender to pay the Aircraft Loan. If the User fails to make a payment under the User Lease, and the Lessee does not make the corresponding Aircraft Loan payments, the Lender will have the rights and remedies with respect to the Equipment and the User Lease of a secured party unde the Uniform Commercial Code, and the right to sell, transfer, assign or otherwise dispose of the Equipment ....

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                                  Page 5
Not Reported in F.Supp., 1995 WL 764236 (S.D.N.Y.), RICO Bus.Disp.Guide 9010
**(Cite as: Not Reported in F.Supp.)**

These statements are consistent with the fact that the Aircraft loan was non-recourse. In other words, the lender's only remedy in the event of default was foreclosure.

The Offering Memorandum is rife with other warnings, disclaimers and cautionary language, alerting potential investors to the risks inherent in the transaction. In particular, Beneficiaries are advised that the User's ability to pay rentals is a risk factor. Paragraph 5 at page xvi, under the heading "Certain Risk Factors," states:
Each beneficiary's ability to realize a return on his investment depends on factors over which neither such beneficiary nor the trust has control, including (i) the ability of the lessee to perform its obligations under the net lease (the "Master Lease") of the equipment held by the trust between the trust (as assignee of the second vendor) and the lessee, (ii) the ability of the User to perform its obligations under the net lease of the equipment (the "User Lease") between the lessee (as assignee of the first vendor) and the User ....

Beneficiaries are also warned that they will be held personally liable for payment of Beneficiary notes:Beneficiaries will be personally liable to the holders of their Beneficiary Notes ... for payment of principal and interest and expenses of collection, including attorneys' fees, notwithstanding default by the User, the Lessee, the First Vendor, the Second Vendor, the Grantor or any others and regardless of the economic and tax consequences of their investment. (Off. Mem. at p.23, ¶ 3.)

The Offering Memorandum alerts potential investors in explicit terms of the possibility of foreclosure, with all its attendant economic consequences:
If the Lender, the Second Vendor, the Grantor or any other party has caused the disposition of Equipment as described under items 5, 6 or 7 [i.e. default by Lessee and User], above, or otherwise, each of the Beneficiaries ... could lose all or a substantial portion of his investment in the Equipment, would remain liable for the balance of principal and interest under his Beneficiary Note ... and would most likely incur substantial tax liabilities without receiving any cash distributions. (Off. Mem. at p.26, ¶ 8.)

*7 It is difficult to imagine a more clear and direct warning. Potential investors are advised in general terms of the in-

vestment's risky nature at other points in the Offering Memorandum: "Acquisition of a Unit involves substantial tax, economic and commercial risks, and should not be made unless a subscriber is prepared and can afford to lose the entire investment amount of his Beneficiary Note." (Off. Mem. at p.8.) Additionally, the Offering Memorandum at page 36 specifically asks investors to independently investigate a variety of important factors pertaining to the offering, including factors relating to payment of the User Lease:Each investor should undertake an independent investigation through his own advisers regarding the desirability and practicality of an investment by him in the Trust, considering the following factors, among others: ... the terms and conditions of the User Lease and the Master Lease, and the ability of the Lessee and the User to perform their respective obligations thereunder.

The Offering Memorandum, thus, more than adequately advises investors of the transaction's complexity, pointing out the particular pitfalls which might accompany a default in payments on the User Lease.

Plaintiffs now admit that their "impression" of Equilease's obligation was wrong if one accepts Equilease's construction of the transaction. (Pl. Br. at p.3.) Their argument, however, is that a reasonable investor reading the Offering Memorandum with reasonable care could have been misled. There is no question that the transaction at issue was complex. Even a sophisticated investor reading complicated material for the first time may be initially confused. Nevertheless, the Court cannot comprehend how even a cursory review of the above-referenced warnings and disclaimers would not have raised "red flags" for investors. The Court can conceive of no way in which Plaintiffs could have reconciled their notion that Equilease would pay User rental shortfalls with the numerous indications in the Offering Memorandum to the contrary. Even if Plaintiffs can argue that the Offering Memorandum, in its totality, was confusing, they cannot avoid responsibility for having failed to adequately investigate its terms. There is ample evidence in the plain language of the Offering Memorandum that Plaintiffs should not have been secure in their assumption that Equilease would make up shortfalls in User rents. At the very least, they should have investigated further.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                          Page 6
Not Reported in F.Supp., 1995 WL 764236 (S.D.N.Y.), RICO Bus.Disp.Guide 9010
**(Cite as: Not Reported in F.Supp.)**

This conclusion is buttressed by the fact that Plaintiffs are sophisticated investors. The offer limited itself to particularly wealthy, experienced investors:

Only a person or entity which (i) has substantial taxable income, a portion of which is investment income, (ii) expects to report income which ... would be subject to federal income tax at a rate of at least 44%, ... and (iv) is ... either an "accredited investor" ... or ... has such knowledge or experience in financial and business matters that he is capable of evaluating the merits and risks of an investment in Units, will be permitted to purchase Units offered hereby. (Off. Mem. at p.iii.)

**\*8** The Offering Memorandum repeats this requirement on the next page, adding that "[e]ach investor must have such financial resources that he is able to bear the economic risk of a complete loss of this investment." (Off. Mem. at p.iv.) The subsequent "Suitability Standards" require that each investor represent in writing that he have a net worth of "not less than the greater of $250,000 or five times the Cash Payment required in connection with the purchase of the Units subscribed for." (Off. Mem. at p.1) Plaintiffs are not financial rubes easily swayed by the fast-talk of investment hucksters. Given their level of financial sophistication, the case is even stronger that they should have known, or should have inquired about, the alleged fraud based upon the Offering Memorandum.

The Court concludes that the Offering Memorandum placed Plaintiffs on constructive notice at the time of purchase of the fraud which they now allege in their complaint. Consequently, this is when their RICO injuries accrued. As all members of the Plaintiff class had purchased their beneficial interests by October 8, 1987, no RICO claims accrued later than this date. Plaintiffs filed their action in July of 1994. Thus, since all RICO injuries accrued prior to July of 1990, they are time-barred. Count I is therefore dismissed.

### 2. 12(b)(6)

Alternatively, the Court grants the Defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), on the ground that Plaintiffs have failed to adequately allege predicate acts of securities fraud, mail fraud and wire fraud. Rule 12(b)(6) provides that a complaint will be dismissed if there is a

"failure to state a claim upon which relief can be granted." In the course of resolving a motion to dismiss pursuant to Rule 12(b)(6), the Court reads the complaint generously, accepting the truth of, and drawing all reasonable inferences from, the well-pleaded factual allegations. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir. 1993); *accord California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 515 (1972); *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir. 1993); *Allen v. Westpoint-Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir. 1991); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47-48 (2d Cir. 1991), *cert. denied,* 112 S. Ct. 1561 (1992); *Frasier v. General Elec. Co.,* 930 F.2d 1004, 1007 (2d Cir. 1991). When determining the sufficiency of plaintiff[s] claim for Rule 12(b)(6) purposes, consideration is limited to the factual allegations in ... [the] complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiff['s] possession or of which plaintiff[] had knowledge and relied on in bringing suit. *Brass,* 987 F.2d at 150 (citing *Cortec,* 949 F.2d at 47-48).

The Court will only dismiss a Complaint for failure to state a claim when the Court finds beyond a reasonable doubt that Plaintiff "can prove no set of facts" to support the claim that Plaintiff is entitled to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

**\*9** The Court is required to draw all reasonable inferences in Plaintiff's favor, but not all possible inferences. *See Correa-Martinez v. Arrillaga-Belendez,* 903 F.2d 49, 58 (1st Cir. 1990). Only when "the suggested inference rises to what experience indicates is an acceptable level of probability," must the Court accept it as fact for pleading purposes. *Id.* at 52.

To state a claim for damages under RICO, a plaintiff must allege that the defendant has violated the substantive RICO statute, 18 U.S.C. 1962. *Moss v. Morgan Stanley, Inc.,* 719 F.2d 5, 17 (2d Cir. 1983), *cert. denied, Moss v. Newman,* 465 U.S. 1025 (1984). This requires alleging seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                    Page 7
Not Reported in F.Supp., 1995 WL 764236 (S.D.N.Y.), RICO Bus.Disp.Guide 9010
**(Cite as: Not Reported in F.Supp.)**

or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce. *Id.* "Racketeering activity" includes acts of mail fraud, wire fraud and "fraud in the sale of securities." 18 U.S.C. § 1961(1)(B), (D). Plaintiffs have failed to adequately allege that Defendants committed these predicate racketeering acts.

Plaintiffs frame their "fraud in the sale of securities" allegation as a violation of § 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder. To state a cause of action under § 10(b) and Rule 10b-5, the complaint must allege with particularity (1) a misstatement or omission by the defendant; (2) as to a material fact; (3) upon which plaintiff relied; (4) and which caused plaintiff to suffer damages. In addition, plaintiff must show that defendant acted with scienter and that the statement or omission was made in connection with the purchase or sale of securities. *Morin v. Trupin,* 778 F. Supp. 711, 717 (S.D.N.Y. 1991); *see also Basic Inc. v. Levinson,* 485 U.S. 224, 231 (1988); *In re Time Warner, Inc., Sec. Lit.,* 9 F.3d 259, 264 (2d Cir. 1993); *Gruntal & Co. v. San Diego Bancorp,* No. 94-Civ-5366, 1995 WL 561878 at *2 (S.D.N.Y. Sept. 15, 1995).

For the reasons stated above, the Court finds that Plaintiffs have failed to allege a misstatement or omission by Defendants. "The fundamental purpose of the 1934 Act is to implement a 'philosophy of full disclosure,' in order 'to make sure that buyers of securities get what they think they are getting.'" *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 517 (2d Cir. 1994) (citations omitted). The Second Circuit's standard for disclosure is whether the reasonable investor, in the exercise of due care, would have been misled. *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 862 (2d Cir. 1968), *cert. denied, Coates v. SEC,* 394 U.S. 976 (1969). Given the numerous statements in the Offering Memorandum detailing the investment's structure and risks, the Court concludes that the reasonable investor should not have been misled.[FN3]

Since the mail fraud and wire fraud claims are based upon the same unfounded allegations of fraud, they too are without merit. As there are no adequately pled predicate RICO acts, the RICO claim is dismissed.

### 3. Pattern of Racketeering

*10 Since the court dismisses the RICO claims as time-barred or, alternatively, for failing to plead the required predicate acts, it need not reach the question of whether Plaintiffs have alleged the continuity necessary to establish a pattern of racketeering activity.

### C. § 20(a) Controlling Persons' Liability

The Complaint charges Defendants AlliedSignal and Bunker with controlling persons' RICO liability under § 20 of the 1934 Act. The section creates joint and several liability for any person who, directly or indirectly, controls any person liable under a securities fraud provision. 15 U.S.C. § 78t. As the Court does not find an underlying securities fraud violation, and such a claim, if it existed, would be time-barred, the § 20(a) claim is dismissed.

### D. State Contract Claim

As the Court has dismissed Plaintiffs' RICO and securities fraud counts, there is no federal claim upon which to base jurisdiction for Plaintiffs' third-party beneficiary contract claim against Equilease. Since AlliedSignal is a citizen of New Jersey, as are two of the Plaintiffs, there is also no basis for diversity jurisdiction. The contract claim is therefore dismissed for lack of supplemental jurisdiction under 28 U.S.C. § 1367.

Had Plaintiffs dropped non-diverse parties from the suit and brought the contract claim against Equilease in diversity, the Court, in any event, would presumably have dismissed the count as rooted in a misunderstanding of Equilease's obligations under the Offering Memorandum, as described above.

### Conclusion

Plaintiffs' RICO claim is time-barred. Alternatively, Plaintiffs have failed to plead the elements required to make out a claim for the securities fraud, mail fraud and wire fraud which they allege as the RICO claim's predicate acts. This flaw is also fatal to their controlling person claim, and would be fatal to their contract claim, if this Court had jurisdiction to entertain it. The Defendants' motion to dismiss is therefore granted as to all claims, and the Complaint is dismissed.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                            Page 8
Not Reported in F.Supp., 1995 WL 764236 (S.D.N.Y.), RICO Bus.Disp.Guide 9010
**(Cite as: Not Reported in F.Supp.)**

SO ORDERED

> FN1. The Complaint states that Bunker, a
> Delaware corporation, is Equilease's sole share-
> holder, while AlliedSignal, a New Jersey corpora-
> tion, is Bunker's sole shareholder. (Compl. at ¶¶
> 5-6.) Defendants contend, however, that Bunker
> ceased to exist on January 16, 1986 (Ans. at ¶6; Al-
> liedSignal Br. at p.2, n.1), while AlliedSignal
> ceased to own Equilease's shares, directly or indir-
> ectly, on May 27, 1986. (Ans. at ¶ 5; *Id.* at p.2,
> n.1.)

> FN2. Plaintiffs have acknowledged that Nuss-
> baum's role in the relevant proceedings may have
> been minor and offered to dismiss him from the
> suit upon receipt of an affidavit from him confirm-
> ing as much. (Pl. Supp. Br. at p.3, n.3.) The Court
> has no indication that Nussbaum ever responded to
> this offer, or that Plaintiffs ever sought his dis-
> missal.

> FN3. While the Plaintiffs have not asserted separ-
> ate fraud claims under § 10(b) and Rule 10b-5, de-
> nominated as such, they would also be dismissed
> according to the same rationale. Furthermore, such
> independent securities fraud claims would be time
> barred pursuant to the Supreme Court's holding in
> *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gil-*
> *bertson,* 501 U.S. 350 (1991).

S.D.N.Y.,1995.
Wynne v. Equilease Corp.
Not Reported in F.Supp., 1995 WL 764236 (S.D.N.Y.),
RICO Bus.Disp.Guide 9010

Briefs and Other Related Documents (Back to top)

• 1:94cv04992 (Docket) (Jul. 08, 1994)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                Page 1
Not Reported in F.Supp.2d, 2004 WL 1328215 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

C

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
ZURICH AMERICAN INSURANCE COMPANY,
Plaintiff,

v.

DAH SING BANK, LIMITED, Union Bank of California,
The Bank of East Asia Limited, and Wan Kwok Ping, De-
fendants.
**No. 03 Civ.7778(DLC).**

June 15, 2004.

Mary Doherty, Cullen and Dykman Bleakley Platt LLP,
New York, New York, for the Plaintiff.
Charles L. Kerr, Jun Tsutsumi, Morrison & Forrester LLP,
New York, New York, for the Defendant Dah Sing Bank,
Limited.
Kerry A. Brennan, Laura L. Smith, Pillsbury Winthrop LLP,
New York, New York, for the Defendant Union Bank of
California.

*OPINION AND ORDER*

COTE, J.

**\*1** This Opinion addresses whether there is personal juris-
diction in New York over a Hong Kong bank for accepting
fraudulently endorsed checks for deposit, and whether the
plaintiff has stated a claim against the American bank that
assisted in the clearance of these checks. On December 18,
2003, defendant Dah Sing Bank, Limited ("Dah Sing")
moved to dismiss the claims against it for lack of personal
jurisdiction. On January 12, 2004, defendant Union Bank of
California ("Union Bank") moved to dismiss the claims
against it because (i) Dah Sing is an indispensable party
with respect to the claims against Union Bank; (ii) Hong
Kong is the most convenient forum for those claims and
New York has no meaningful nexus to them; and (iii)
plaintiff Zurich American Insurance Company ("Zurich")
has failed to state a claim against Union Bank. For the rea-
sons set forth below, the motions by Dah Sing and Union
Bank for lack of personal jurisdiction and for failure to state
a claim, respectively, are granted.

*Background*

The plaintiff, Dah Sing, and Union Bank have each submit-
ted affidavits, declarations, and documents in connection
with these motions.[FN1] The following is taken from the
complaint and these submissions.[FN2]

> FN1. Zurich was permitted to file an untimely, sup-
> plemental opposition to Dah Sing's motion to dis-
> miss in order to assert an additional basis for juris-
> diction under New York's Civil Practice Law and
> Rules ("CPLR") 302(a)(3)(ii), over Dah Sing.

> FN2. Zurich's counsel submitted affidavits contain-
> ing allegations relevant to personal jurisdiction
> over Dah Sing (the "Doherty Affidavit") and its
> claims against Union Bank. An affidavit from an
> attorney without personal knowledge of the facts
> asserted within the affidavit is insufficient to raise
> an issue of fact. *United States v. Private Sanitation
> Industry Ass'n of Nassau/Suffolk, Inc., 44 F .3d
> 1082, 1084 (2d Cir.1995).*

*Complaint*

Zurich filed the original complaint in this diversity action
[FN3] on October 2, 2003, and an amended complaint on
November 25.[FN4] The amended complaint states that de-
fendant Wan Kwok Ping ("Wan")[FN5] was an employee of
Putnam, a New York corporation with its corporate offices
in New York City. While Wan did not have check writing
privileges and he was not a corporate officer of Putnam, he
did deposit checks for Putnam, and he created account re-
ceivable folders for Putnam's customers. The amended com-
plaint alleges that Wan fraudulently altered checks that he
stole in New York that were made payable to Putnam by
either (i) adding his own name to the payee line on a check,
endorsing it, and depositing the check in his personal ac-
count maintained at The Bank of East Asia Limited
("BEA")[FN6] in New York, or (ii) endorsing the check in
Putnam's name and depositing it in an "unauthorized corpor-
ate account" at Dah Sing in Hong Kong.[FN7] Beginning on
or about March 2001 and continuing through March 2002,
Wan allegedly converted approximately $175,000.[FN8]

> FN3. The parties concede that there is subject mat-
> ter jurisdiction in this matter under 28 U.S.C. §

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                              Page 2
Not Reported in F.Supp.2d, 2004 WL 1328215 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

1332(a)(2). While the Second Circuit has not yet addressed whether corporations organized under the laws of the Hong Kong Special Administrative Region are "citizens or subjects" of China for purposes of diversity jurisdiction under 28 U.S.C. § 1332(a)(2), Hong Kong corporations appear to be citizens of China under the principles set forth in *JPMorgan Chase Bank v. Traffic Stream (BVI) Infrastructure Ltd.,* 536 U.S. 88 (2002). *See Smoothline Ltd. v. North Am. Foreign Trading Corp.,* No. 00 Civ. 2798(DLC), 2002 WL 273301, at *3 n.3 (S.D.N.Y. Feb. 27, 2002); *Favour Mind Ltd. v. Pacific Shores, Inc.,* No. 98 Civ. 7038(SAS), 1999 WL 1115217, at *7 (S.D.N.Y. Dec. 7, 1999) (same).

FN4. The original complaint named both Zurich and Putnam Rolling Ladder Co., Inc. ("Putnam") as plaintiffs.

FN5. According to the docket sheet, Wan has not been served with the summons and complaint or appeared in this action. Zurich has expressed no intent serve Wan.

FN6. On May 10, 2005, a stipulation of settlement resulted in the dismissal of BEA from this action.

FN7. In opposition to these motions, the plaintiff submitted evidence that of 268 altered or fraudulently endorsed checks, (i) 262 checks were drawn upon banks located in the United States, and (ii) 100 were from Putnam's New York resident customers, drawn on various New York bank branches. Plaintiff's opposition papers do not state how many checks were deposited at Dah Sing.

FN8. According to an affidavit submitted by Putnam's president, Putnam has actually suffered at least $300,000 in losses as a result of this alleged scheme. This affidavit also states that Putnam informed Zurich that an employee theft had occurred and filed a Proof of Loss claim with Zurich on or about May 20, 2002. Zurich has reimbursed Putnam for $175,000.00 of its loss.

The amended complaint asserts claims for conversion, money had and received, fraud, and unjust enrichment against Wan. The amended complaint asserts that Dah Sing, Union Bank, and BEA are each liable for conversion, money had and received, and negligence. The pleading does not identify the role played by Union Bank in the fraud. It merely asserts in conclusory fashion that the three bank defendants "accepted for deposit, forwarded for collection, cleared, collected and credited" the checks.

*Hong Kong Account*

Dah Sing has submitted evidence to show that Putnam does not and has never maintained an account at Dah Sing. The "corporate account" at Dah Sing to which the Amended Complaint refers is Account No. 11-303-1161-9 ("the Hong Kong Account"), a checking account opened at Dah Sing's Johnston Road Branch in Hong Kong by Mr. Chui Man Kuen Fozwagz ("Chui") on or about April 25, 2001. The Hong Kong Account was opened in the name of Putnam Rolling Ladder Co. ("Putnam Co."), a sole proprietorship with its place of business in Hong Kong. The Company Account Opening Form submitted to Dah Sing to open the Hong Kong Account indicates that Chui is the sole proprietor of the company and the principal contact person for the Hong Kong Account.

*2 As part of the Hong Kong Account opening papers, Chui submitted to Dah Sing a Business Registration Certificate for his company showing the company to be registered to do business in Hong Kong with a Hong Kong business address. Dah Sing mailed monthly account statements for the Hong Kong Account to this address. These account statements were the only form of communication sent by Dah Sing regarding the Hong Kong Account. All deposits to the Hong Kong Account were made in person at Dah Sing's office in Hong Kong. Determination of the validity of the deposits at issue-i.e., that each check deposited was payable to Dah Sing's customer and properly endorsed-was made in Hong Kong. Only after the checks were accepted for deposit in accordance with Hong Kong banking laws were the checks forwarded to the United States for clearing and collection.

On November 13, 2001, Chui submitted a Notification of Change of Signing Instructions form to Dah Sing authoriz-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2004 WL 1328215 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

ing either Chui or the individual defendant Wan to sign for the Hong Kong Account. Chui also submitted photocopies of Chui's and Wan's respective Hong Kong photo identification cards.

*Dah Sing*

Dah Sing has also submitted evidence to support the following. Dah Sing is a foreign corporation organized under the laws of Hong Kong and provides banking and financial services. Dah Sing operates through a series of branch offices located in Hong Kong, Kowloon and the New Territories and through a representative office in People's Republic of China. Dah Sing is not a state-owned bank. Neither Dah Sing nor its parent company, Dah Sing Financial Holdings Limited ("DSFH") is or represents itself to be an agency of a foreign state.

Dah Sing is not registered or licensed to conduct business in the State of New York. It does not own any real property, lease property, or maintain any office or telephone number in New York. Dah Sing has no employees, representatives, directors or officers who live or work in New York, and has no agents located in New York to promote its interests. Neither does it have any subsidiaries or affiliates in New York or anywhere in the United States. Further, Dah Sing conducts no advertising or public relations, does not solicit business, and has no investor relations office in New York.

While Dah Sing maintains correspondent bank relationships with banks in the United States for conducting U.S. dollar transactions on behalf of Dah Sing clients in Hong Kong, Dah Sing does not conduct any business transactions in New York or in the United States on its own behalf. With respect to U.S. checks that are deposited by its customers in Hong Kong, Dah Sing forwards the deposited checks to Union Bank in California for clearing and collection via the U.S. clearing system.

Dah Sing has a website that provides information to potential customers and offers current customers the ability to conduct certain banking transactions over the internet. Part of Dah Sing's internet services includes the issuance of a PIN (Personal Identification Number) that provides online access to those services and provides existing customers

with the ability to perform limited banking transactions over the Internet. A Dah Sing savings, checking, or deposit bank account can only be opened by visiting one of the bank's branches in Hong Kong. While customers may obtain information about, and download certain loan and credit card application forms from Dah Sing's website, such applications cannot be processed without the customer visiting one of Dah Sing's branches in Hong Kong. Dah Sing asserts that it has only issued credit cards to Hong Kong-based customers.

**\*3** The "iBanking" feature on Dah Sing's website only allows the bank's corporate customers based in Hong Kong to perform limited banking services over the internet. To date, no U.S.-based customer has made use of Dah Sing's iBanking services. Dah Sing has never mailed any software or materials relating to its iBanking service to any U.S.-based customer.

The Doherty Affidavit asserts that Dah Sing offers corporate credit cards to multinational customers of the General Electric Company ("GE"). Under this agreement with GE, Dah Sing acts as a local issuer of corporate credit cards for companies operating in Hong Kong. According to an affidavit submitted by the Head of Bank Services for Dah Sing, however, the bank has only issued corporate credit cards to Hong Kong staff of seven companies based in Hong Kong.

The Doherty Affidavit also states that Dah Sing has an agreement to provide trade financing with TradeCard, Inc., a global online trade transaction settlement company for importers and exporters, to provide TradeCard members with access to export financing, a partnership that gives Hong Kong traders the ability to conduct international trade online.

Finally, the Doherty Affidavit states that Dah Sing's parent company, DSFH, has joint ventures with SG Hambros Bank, and Aviva (f/k/a CGNU), which provide offshore private banking services and general insurance services, respectively. The Doherty Affidavit also states that Aviva has a subsidiary which is licensed and offers products in New York and that UFJ Bank Limited is a major shareholder of DSFH and has offices in New York City.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                                Page 4
Not Reported in F.Supp.2d, 2004 WL 1328215 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

*Union Bank*

The Amended Complaint states that Union Bank maintains branch offices in New York City. Zurich supplements these jurisdictional allegations with claims that Union Bank markets itself as an international bank with 282 branches.

Union Bank has submitted evidence that it has one Trust office in New York, but no branches in the state. In addition, a California branch of Union Bank, and not the New York Trust office of Union Bank, cleared the relevant checks transferred to Union Bank by Dah Sing. There is no allegation that Wan, Putnam, or Putnam Co. ever opened or maintained an account at Union Bank. Union Bank's sole connection with this dispute is its role as a clearinghouse bank for U.S. checks forwarded to it by Dah Sing from Hong Kong. When Union Bank acts a clearinghouse bank for Dah Sing, under the Uniform Commercial Code ("UCC"), Dah Sing is the "depositary bank" because it is the first bank to take the item from the customer, and Union Bank is an "intermediary bank." [FN9] *See* UCC § 4-105. Union Bank credited Dah Sing's account with the face amount of the checks and forwarded the checks to the drawee bank for payment. Thus, Union Bank does not retain the proceeds of any checks received from Dah Sing. Union Bank had no contact or communication with any customer of Dah Sing in the course of clearing the customer's checks for Dah Sing.

> FN9. A check typically involves three parties, (1) the "drawer" who writes the check, (2) the "payee", to whose order the check is made out, and (3) the "drawee" or "payor bank", the bank which has the drawer's checking account from which the check is to be paid. In form, a check is an order to the drawee bank to pay the face amount of the check to the payee. After receiving the check, the payee typically endorses it on the back with the payee's own name, and then deposits it in the payee's account in a different bank, the "depositary bank". The depositary bank credits the check to the payee's account, and sends the check through the check clearing system to the payor bank for ultimate payment from the drawer's account. Any bank through which the check passes in the clearing process is an "intermediary bank". Any bank handling

the check for collection, including the depositary bank but excluding the payor bank, is referred to as a "collecting bank." *See, e.g.*, UCC § 4-105.

*Discussion*

**\*4** Dah Sing has moved to dismiss the claim against it for lack of personal jurisdiction. Union Bank has pressed multiple grounds for dismissal. Dah Sing's motion will be addressed first.

*I. Dah Sing*

Zurich argues that there is personal jurisdiction over Dah Sing pursuant to CPLR 302(a)(1) and 302(a)(3)(ii). [FN10] Zurich also argues that Dah Sing is subject to personal jurisdiction pursuant to the Foreign Sovereign Immunities Act of 1976 (the "FSIA"), 28 U.S.C. §§ 1602-1611.

> FN10. Zurich originally argued that Dah Sing transacted business in New York. It was later permitted to supplement its assertion of jurisdiction with the argument that Dah Sing had committed a tort in New York.

In a diversity case, the issue of personal jurisdiction must be determined according to the law of the forum state. *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 305 F.3d 120, 124 (2d Cir.2002)*. "If the exercise of jurisdiction is appropriate under [the state's statutes], the court then must decide whether such exercise comports with the requisites of due process." *Bensusan Restaurant Corp. v. King, 126 F.3d 25, 27 (2d Cir.1997)*. It is well established that on a motion to dismiss for lack of personal jurisdiction, the "plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 206 (2d Cir.2003)* (per curiam). Where, as here, there has been no discovery, the plaintiff need only make a prima facie showing through its pleading and affidavits that jurisdiction exists. The pleading and affidavits are construed in the light most favorable to the plaintiff. *See, e.g., DiStefano v. Carozzi North Am., Inc., 286 F.3d 81, 84 (2d Cir.2001)*.

*Personal Jurisdiction Under CPLR 302(a)(1)*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 5
Not Reported in F.Supp.2d, 2004 WL 1328215 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

CPLR 302(a)(1) allows the exercise of personal jurisdiction if the defendant "transacts any business within the state" and the cause of action "arises from" that business activity.FN11 *Sunward Electronics, Inc. v. McDonald,* 362 F.3d 17, 22 (2d Cir.2004). A claim arises out of a party's transaction of business in New York if there exists an " 'articulable nexus' or a 'substantial relationship' between transactions occurring within the state and the cause of action sued upon." *McDonald,* 362 F.3d at 23. *See also Agency Rent A Car Sys., Inc. v. Grant Rent A Car Corp.,* 98 F.3d 25, 31 (2d Cir.1996).

> FN11. Section 302(a) states, in pertinent part:
> As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary who in person or through an agent:
> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state.
> CPLR 302(a)(1).

Zurich's claims against Dah Sing do not arise out of any Dah Sing business transaction in New York. There is no prima facie showing of an articulable nexus or substantial relationship between Dah Sing's alleged business contacts with New York-its website, issuance of credit cards, and/or practice of clearing United State checks through a California bank-and the allegations that the bank failed to act properly in Hong Kong in accepting a check for deposit into the Hong Kong Account. *See In re Ski Train Fire in Kaprun, Austria on November 11, 2003,* No. 01 MDL 1428(SAS), 2003 WL 22909153, at *4 (S.D.N.Y. Dec. 8, 2003) (no personal jurisdiction under CPLR 302(a)(1) based on defendant's website where plaintiffs failed to allege they ever visited the website, let alone used it in connection with the events that were the subject of the litigation).

*Personal Jurisdiction under CPLR 302(a)(3)*

*5 Zurich argues that CPLR 302(a)(3)(ii) allows for personal jurisdiction over Dah Sing. CPLR 302(a)(3)(ii) states that personal jurisdiction is proper where the defendant commits a tortious act without the state *causing injury* to person or property *within the state* ... if he (ii) expects or

should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce.

CPLR 302(a)(3) (emphasis supplied). As a general rule, for long-arm purposes an injury occurs at the location of the events that caused the injury, not the location where the damages are felt later by the plaintiff. *McGowan v. Smith,* 52 N.Y.2d 268, 274-75 (1981). In determining whether an injury occurs "within the state," courts applya situs-of-injury test, which asks them to locate the 'original event which caused the injury.' This 'original event' is, however, generally distinguished not only from the initial tort but from the final economic injury and the felt consequences of the tort.... [T]he 'original event' occurs 'where the first effect of the tort ... that ultimately produced the final economic injury' is located.

*DiStefano,* 286 F.3d at 84-85 (citation omitted). As the Second Circuit has summarized more recently, "[t]he occurrence of financial consequences in New York due to the fortuitous location of plaintiffs in New York is not a sufficient basis for jurisdiction under CPLR § 302(a)(3) where the underlying events took place outside New York." *Whitaker v. Am. Telecasting, Inc.,* 261 F.3d 196, 209 (2d Cir.2001) (citation omitted).

With respect to the claims against Dah Sing, the events that caused the injury did not occur in New York.FN12 Dah Sing is accused of conversion, money had and received, and negligence. The critical events surrounding Dah Sing's role in each of these claims occurred in Hong Kong.

> FN12. Plaintiff argues that *Citigroup Inc. v. City Holding Co.,* 97 F.Supp.2d 549, 568 (S.D.N.Y.2000), and *Thomas Pub. Co. v. Industrial Quick Search, Inc.,* 237 F.Supp.2d 489, 492 (S.D.N.Y.2002), compel a different result because they relied on the proposition that if a business lost sales or customers in New York as a result of defendants' websites, then there was an "injury" within New York. Plaintiff's argument fails. Zurich has not alleged that it lost sales or customers in New York as a result of Dah Sing's website. Plaintiff in *Citigroup* claimed that its actual and potential New

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 6
Not Reported in F.Supp.2d, 2004 WL 1328215 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

York customers were confused and deceived when they viewed and interacted with defendant's website. *Citigroup,* 97 F.Supp.2d at 568. Thus, there was a causal connection between plaintiff's New York injuries and defendant's allegedly infringing website. In *Thomas Publishing,* the court found the injury occurred in New York because defendant had a high number of New York companies advertise or list themselves on its allegedly infringing website. *ThomasPublishing,* 237 F.Supp.2d at 492. There is no such allegation here.

### FSIA

Zurich argues in the alternative that the FSIA provides personal jurisdiction over Dah Sing. It does not.

The FSIA provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States" unless the circumstances of the suit fall into a specific statutory exception, such as a defendant engaging in "commercial activity" in the United States. *See* 28 U.S.C. §§ 1604, 1605(a). The FSIA defines a "foreign state" to include an "agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a).

Dah Sing is not a "foreign state" as no state entity owns a majority of Dah Sing's shares. Dah Sing is a subsidiary of DSFH, which is publicly traded on the Hong Kong stock exchange.

### Discovery

Zurich argues that Dah Sing's motion to dismiss is premature given the lack of discovery in this action. Zurich asks for discovery to obtain information about Dah Sing's website and its relationship with, among others, DSFH and Union Bank beyond that presented in the affidavits and declarations accompanying this motion. Because Zurich has failed to make a prima facie showing of personal jurisdiction, Zurich's request for discovery is denied.

### II. *Union Bank*

**\*6** Union Bank moves to dismiss the claims against it on the ground that Zurich has failed to state a claim against it.

Zurich has failed properly to allege the elements of any of its three claims-negligence, money had and received, and conversion-against Union Bank.[FN13] The Amended Complaint does not include a single factual allegation against Union Bank in support of any of these claims. Instead, it lumps the three bank defendants together and asserts that they collectively processed the checks. This type of group pleading is inadequate to state a claim against Union Bank. *See Yucyco, Ltd. v. Republic of Slovenia,* 984 F.Supp. 209, 219 (S.D.N.Y.1997); *United States v. Private Sanitation Indus. Assoc. of Nassau/Suffolk, Inc.,* 793 F.Supp. 1114, 1146 (E.D.N.Y.1992).

> FN13. Given this conclusion, it is unnecessary to address Union Bank's alternative grounds for dismissal.

Zurich has not requested an opportunity to amend its pleading, and the parties' submissions on this motion demonstrate that any amendment attempt would be futile. In support of its motion to dismiss, Union Bank offered evidence that it operated in these transactions as an intermediary bank, clearing the checks accepted by Dah Sing. Accepting this characterization, Zurich argues that Union Bank nonetheless owed it a duty of care.

As adopted in New York, UCC § 4-102(2) determines which forum's law governs the dispute between Zurich and Union Bank. Section 4-102(2) provides:
The liability of a bank for action or non-action with respect to any item handled by it for purposes of presentment, payment or collection is governed *by the law of the place where the bank is located.* In the case of action or non-action by or at a branch or separate office of a bank, its liability is governed by the law of the place where the branch or separate office is located.

UCC § 4-102(2) (emphasis supplied). Because it is undisputed that the Union Bank "branch or separate office" responsible for clearing the checks at issue was located in California, California law governs the dispute between Zurich and Union Bank.[FN14]

> FN14. There is only one difference between New York and California law that the parties describe in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 7
Not Reported in F.Supp.2d, 2004 WL 1328215 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

their papers. As described below, this difference relates to the parameters of a defense to a claim of conversion under the UCC.

### Negligence

Under California law, there are three elements to a negligence claim: (1) a legal duty to use due care; (2) a breach of the legal duty; and (3) a resulting injury for which the breach is the proximate or legal cause. *See Artiglio v. Corning*, 957 P.2d 1313, 1318 (Cal.1998). Absent a duty of care, there can be no cause of action for negligence. *Id.* It is well settled that a bank does not owe a duty of care to non-customers, absent extraordinary and specific facts. *See In re McMullen Oil Co.*, 251 B.R. 558, 571 (Bankr.C.D.Cal.2000); *Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.*, 56 Cal.Rptr.2d 756, 760 (Cal.1996). For example, where an endorsement on a check is forged, no duty of care is owed to a non-customer. *See, e.g., In re McMullen Oil Co.*, 251 B.R. at 572-73. Even if an intermediary bank is alleged to have processed checks that lacked all required endorsements, UCC § 3-206(2), Official Comment 3, provides that intermediary banks may "disregard restrictive endorsements" because they "handle checks in bulk and have no practicable opportunity to consider the effects of restrictive endorsements." UCC § 3-206(2), Official Comment 3.[FN15]

> FN15. UCC § 4-103(c) also provides that "in the absence of special instructions, action or nonaction consistent with clearing-house rules and the like ... is prima facie the exercise of ordinary care." UCC § 4-103(c).

\*7 Union Bank, as an intermediary bank in the disputed transactions, owed no duty of care to non-customer Zurich. The Amended Complaint does not even allege that the checks deposited in the corporate account at Dah Sing lacked endorsements; rather Zurich alleges these checks were fraudulently endorsed via an unauthorized stamp. The plaintiff has failed to identify any extraordinary facts that would give rise to a duty to Zurich. Plaintiff's unusual suggestion that intermediary banks are negligent if they do not contact the drawer of each check they clear to insure the check's validity does not comport with UCC § 3-206(2).

Such a duty would "bring check processing to a screeching halt," and Union Bank "cannot be faulted for not making those efforts." *United States Fid. & Guar. v. Federal Reserve Bank*, 590 F.Supp. 486, 499 (S.D.N.Y.1984).

### Money Had and Received

The elements of a claim for money had and received under California law [FN16] are: "(1) a statement of indebtedness of a certain sum, (2) the consideration made by the plaintiff, and (3) nonpayment of the debt." *First Interstate Bank v. State*, 197 Cal.App.3d 627, 635 (Cal.Ct.App.1987). "[N]o recovery for money had and received can be had against a defendant who never received any part of the money or equivalent thing sued for." *Id.* (citation omitted). Zurich does not contend that it has alleged or can allege the elements of this claim against Union Bank. Nor does it oppose the dismissal of this claim.

> FN16. Under New York law, to maintain an action for money had and received, plaintiff must plead: "(1) defendant received money belonging to plaintiff; (2) defendant benefitted from the receipt of money; and (3) under the principles of equity and good conscience, defendant should not be permitted to keep the money." *Middle East Banking Co. v. State Street Bank Int'l*, 821 F.2d 897, 906 (2d Cir.1987) (citation omitted). Zurich failed to allege these elements as to Union Bank.

### Conversion

UCC § 3-420 governs the law of conversion for negotiable instruments in California. UCC § 3-420 provides in pertinent part that "the law applicable to conversion of personal property applies to instruments." UCC § 3-420(a). [FN17] Accordingly, UCC § 3-420 does not displace common law conversion principles; rather, the first sentence of UCC § 3-420(a) explicitly incorporates these principles. *See In re Bartoni-Corsi Produce, Inc.*, 130 F.3d 857, 860 (9th Cir.1997). Conversion of personal property in California requires proof of "the *wrongful exercise of dominion* over another's personal property in denial of or inconsistent with his rights in the property." *In re Emery*, 317 F.3d 1064, 1069 (9th Cir.2003) (emphasis supplied). The elements of such a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 8
Not Reported in F.Supp.2d, 2004 WL 1328215 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

claim are: "(1) the plaintiff's ownership or right to posses-sion of the property; (2) the defendant's conversion by wrongful act inconsistent with the property rights of the plaintiff; and (3) damages." *Id.*

> FN17. UCC § 3-420 provides in full:
> (a) The law applicable to conversion of personal property applies to instruments. An instrument is also converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with respect to the instrument for a person not en-titled to enforce the instrument or receive payment. An action for conversion of an instrument may not be brought by (i) the issuer or acceptor of the in-strument or (ii) a payee or endorsee who did not re-ceive delivery of the instrument either directly or through delivery to an agent or a co-payee.
> (b) In an action under subsection (a), the measure of liability is presumed to be the amount payable on the instrument, but recovery may not exceed the amount of the plaintiff's interest in the instrument.
> (c) A representative, other than a depositary bank, who has in good faith dealt with an instrument or its proceeds on behalf of one who was not the per-son entitled to enforce the instrument is not liable in conversion to that person beyond the amount of any proceeds that it has not paid out.
> *Id.*

As stated previously, as an intermediary bank and clearing-house, Union Bank would not "apply" the checks forwarded by Dah Sing to its own use, and would never assume "control" over or "ownership" of the money represented by the checks. Zurich has not alleged such application, control or ownership.

In its opposition to this motion, Zurich implicitly concedes that Union Bank is not liable for conversion under UCC § 3-420(a), and the California law of conversion. Zurich ar-gues that New York law should apply and that such law compels a different result. As discussed above, however, New York's choice of law rules require the application of California law to the claims against Union Bank. In any event, New York law would be of no assistance to Zurich.

The distinction between New York and California law to which Zurich alludes relates to a *defense* to a claim of con-version under the UCC.<sup>FN18</sup>

> FN18. California has adopted the 1990 revisions to the UCC with regard to the liability of a bank for conversion of checks, *see* UCC § 3-420, and New York has not, *see* UCC § 3-419. UCC § 3-419(3), which governs in New York, limits liability for conversion for banks, *including depositary banks,* which act "in good faith and *in accordance with the reasonable commercial standards* applicable to [their] business." *Id.* (emphasis supplied). UCC § 3-420(c), which governs in California, restricts this defense to non-depository banks like Zurich and does not require these banks to show they acted in accordance with reasonable commercial standards. *See* UCC § 3-420(c).

*Additional Discovery*

**\*8** As noted, Zurich does not request leave to amend its complaint a second time to assert claims against Union Bank, and does not argue that it can plead a cause of action against Union Bank as an intermediary bank. Instead, Zurich argues that Union Bank's motion to dismiss is pre-mature because discovery is needed on the issue of whether Union Bank is in fact an intermediary bank and whether Union Bank retained proceeds from checks forwarded by Dah Sing. Zurich seeks the collection agreement between Union Bank and Dah Sing.

Additional discovery is not warranted. The burden is on the plaintiff to plead adequately its causes of action in compli-ance with the dictates of the Federal Rules of Civil Procedure. In its pleadings, Zurich failed to allege any role that Union Bank played in the transactions at issue. Similarly, Zurich failed to describe in its opposition to this motion any basis to believe that Union Bank was anything other than an intermediary bank in the relevant transactions or it retained proceeds from the relevant checks. Having shown no ability to state a claim against Union Bank, Zurich is not entitled to discovery.

*Conclusion*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                           Page 9
Not Reported in F.Supp.2d, 2004 WL 1328215 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

The motions to dismiss by Dah Sing and Union Bank for
lack of personal jurisdiction and for failure to state a claim,
respectively, are granted. The plaintiff having failed to serve
Wan, and the claims against the other defendant having
already been resolved, the Clerk of Court shall close the
case.

SO ORDERED:

S.D.N.Y.,2004.
Zurich American Ins. Co. v. Dah Sing Bank, Ltd.
Not Reported in F.Supp.2d, 2004 WL 1328215 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 2003 WL 22850092 (Trial Pleading) Verified Complaint
(Oct. 02, 2003)
• 1:03cv07778 (Docket) (Oct. 02, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.