UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WORLD WRESTLING ENTERTAINMENT, INC.,

                              Plaintiff,

            -v-

JAKKS PACIFIC, INC., JAKKS PACIFIC (H.K.)
LTD., ROAD CHAMPS LTD., THQ, INC.,
THQ/JAKKS PACIFIC LLC, STANLEY
SHENKER & ASSOCS., INC., BELL LICENSING,
L.L.C., JACK FRIEDMAN, STEPHEN BERMAN,
JOEL BENNETT, BRIAN FARRELL, STANLEY
SHENKER, AND JAMES BELL,

                              Defendants.

Case No. 04-CV-8223 (KMK)

OPINION AND ORDER

---

Appearances:

Jerry Scott McDevitt, Esq.
Amy Lyn Barrette, Esq.
Peter Nicholas Flocos, Esq.
William O. Purcell, Esq.
Curtis B. Krasik, Esq.
Kirkpatrick & Lockhart Preston Gates Ellis, LLP
Pittsburgh, PA
*Counsel for Plaintiff*

Jonathan J. Lerner, Esq.
Maura Barry Grinalds, Esq.
Michael Gruenglas, Esq.
Skadden, Arps, Slate, Meagher & Flom, LLP
New York, NY
Jonathan Honig, Esq.
Feder, Kaszovitz, Isaacson, Weber, Skala, Bass & Rhine LLP
New York, NY
*Counsel for Defendants Jakks Pacific, Inc.,*
*Jakks Pacific (H.K.) Limited, Jack Friedman,*
*Stephen Berman, and Joel Bennett*

Steven A. Marenberg, Esq.
Philip M. Kelly, Esq.
Irell & Manella LLP
Los Angeles, CA
*Counsel for Defendant THQ, Inc.*
*and Brian Farrell*

Richard Schaeffer, Esq.
Bruce Handler, Esq.
Dornbush, Mensch, Mandelstam & Schaeffer, L.L.P.
New York, NY
*Counsel for THQ/Jakks Pacific L.L.C.*

Michael Alan Freeman, Esq.
Greenberg Freeman, L.L.P.
New York, NY
*Counsel for Defendants Stanley Shenker*
*and Stanley Shenker & Assocs., Inc.*

KENNETH M. KARAS, District Judge:

Plaintiff World Wrestling Entertainment, Inc. ("WWE") filed this action against

Defendants Jakks Pacific, Inc. ("Jakks"), Jakks Pacific H.K. Ltd. ("Jakks H.K."), Road Champs,

Ltd. ("Road Champs"), THQ, Inc. ("THQ"), THQ/Jakks Pacific LLC ("the LLC"), Stanley

Shenker & Associates, Inc. ("SSAI"), Bell Licensing, LLC ("Bell Licensing"), Stanley Shenker

("Shenker"), James Bell ("Bell"), Jack Friedman ("Friedman"), Stephen Berman ("Berman"),

Joel Bennett ("Bennett"), and Brian Farrell ("Farrell").  In its first Complaint, Plaintiff alleged

violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§

1962(c), (d), the Robinson-Patman Act, 15 U.S.C. § 13(c), and causes of action under New York

state law for commercial bribery, fraudulent inducement, unjust enrichment, breach of fiduciary

duty, inducement of breach of fiduciary duty, tortious interference with contractual relations, and

conspiracy to engage in each of the above acts.  In an Amended Complaint, Plaintiff refined its

factual allegations of wrongdoing by Defendants and also added a Sherman Act cause of action.

Plaintiff seeks compensatory, statutory, and punitive damages, a declaration that the licensing agreements entered into or extended as a result of the alleged bribery are void, an accounting of all revenues and profits obtained by Defendants under the licenses, disgorgement and/or restitution for any improper revenues and/or profits obtained under the agreements, disgorgement and/or restitution of any amounts allegedly paid to Defendants as bribes, and attorneys' fees and costs.

Because of the delayed timing of the filing of Plaintiff's Amended Complaint, the Court ordered bifurcated briefing. In the first stage, the Parties briefed three threshold issues raised in Defendants' motions to dismiss the first Complaint, which remained applicable to the Amended Complaint and were potentially dispositive. Those three issues were: (1) whether Plaintiff has sufficiently alleged the existence of a RICO enterprise pursuant to 18 U.S.C. § 1962(c); (2) whether Plaintiff has pled a cause of action under the Robinson-Patman Act, 15 U.S.C. § 13(c); and (3) whether Plaintiff is estopped from pursuing its RICO claim against Defendants Shenker and SSAI because it is duplicative of litigation commenced in Connecticut state court. The Parties also briefed the Plaintiff's Sherman Act claim, which was included for the first time in the Amended Complaint.

On March 31, 2006, the Court issued an Opinion and Order granting in part and denying in part Defendants' motions to dismiss. *See World Wrestling Entm't, Inc. v. Jakks Pacific, Inc.*, 425 F. Supp. 2d 484 (S.D.N.Y. 2006) ("*WWE I*"). The Court granted Defendants' Motion to Dismiss the Robinson-Patman and Sherman Act claims, but denied the Defendants' motions to dismiss for failure to properly plead an enterprise pursuant to § 1962(c), and denied the Shenker Defendants' Motion to Dismiss based on res judicata and abstention principles.

Now, in the second stage, all Defendants briefed the remaining issues pertaining to Plaintiff's RICO causes of action against them. For the reasons discussed herein, Defendants' motions to dismiss the RICO causes of action are granted.

## I.  Background

For purposes of this Motion, the Court accepts as true the allegations in the Amended Complaint. The salient facts and procedural history are fully discussed in *WWE I*, and familiarity is presumed. *See WWE I*, 425 F. Supp. 2d at 488-93. Further, a detailed recitation of the facts relevant to each issue is discussed below. What follows here is a summary of the basic facts necessary to put Defendants' motions into context.

Plaintiff WWE is principally engaged in the development, promotion, and marketing of television and pay-per-view programming and live arena events related to professional wrestling. (Am. Compl. ¶ 9.) As part of its business, WWE also creates characters whose names and likenesses may be licensed to third parties. (*Id*.) The licenses provide a separate stream of profits for WWE, in the form of royalties, that is a percentage from the sale of the licensed products.

Defendant Jakks principally sells action figures and toys. (*Id*. ¶ 10.) Defendant Jack Friedman is the Chief Executive Officer and Chairman of Jakks. (*Id*. ¶ 13.) He co-founded Jakks with Defendant Berman. (*Id*.) Prior to founding Jakks, Friedman was the CEO of Defendant THQ. (*Id*. ¶ 14.) Jakks and Friedman also own Jakks H.K. and Road Champs, both Hong Kong Corporations. (*Id*. ¶¶ 11-12.) During the times relevant to the Amended Complaint, Defendant Berman was the Executive Vice President of Jakks. (*Id*. ¶ 15.) Berman also served at times as Jakks' President, Secretary, and Chief Operating Officer. (*Id*.)

4

Defendant THQ markets and sells videogames.  (*Id.* ¶ 17.)  Defendant Farrell is the President, the Chief Executive Officer, and a member of the Board of Directors of THQ.  (*Id.* ¶ 18.)

THQ and Jakks formed the LLC as a joint venture on June 10, 1998.  (*Id.* ¶ 19.)  The LLC was formed in order to be the official licensee for WWE's videogame license.  (*Id.*)  Defendant Berman was authorized to act on behalf of the joint venture.  (*Id.*)

Defendant SSAI served as WWE's licensing agent from approximately April 1995 through June 13, 2000.  (*Id.* ¶ 20.)  Defendant Shenker is the sole owner and President of SSAI. (*Id.* ¶ 21.)

Defendant Bell is a former WWE executive and is the President and sole owner of Bell Licensing, a limited liability company allegedly formed to launder bribes paid to Bell while he was an executive at WWE.  (*Id.* ¶¶ 22-23.)  On February 10, 2005, Bell pled guilty in the United States District Court for the District of Connecticut to one count of mail fraud, in violation of 18 U.S.C. § 1342, in connection with his receipt of bribes relating to WWE's licensing program. (*Id.* ¶ 24.)  WWE hired Bell to negotiate and procure licenses for its intellectual property.  (*Id.* ¶ 30.)  From October 1996 to his termination on March 24, 2000, Bell served as WWE's Senior Vice President of Licensing and Merchandising.  (*Id.*)

In 1995, Friedman asked Bell and Shenker about obtaining a license on behalf of Jakks to make WWE toys.  (*Id.* ¶ 35.)  Thereafter, on October 24, 1995, WWE and Jakks entered into a domestic toy license.  (*Id.*)  Nothing improper is alleged as to this license.  However, one month later, in November 1995, Jakks proposed that Shenker act as its agent on a perfumed doll deal that did not involve any WWE licenses.  (*Id.* ¶ 42.)  On January 3, 1996, Jakks and Shenker

5

entered into an agency agreement for the perfumed doll deal. (*Id.* ¶ 46.) At around the same time, Jakks asked Shenker to act on its behalf to seek an amendment to the domestic toy license it originally obtained in October 1995. (*Id.* ¶ 47.) Shenker never told WWE about its efforts on behalf of Jakks. Approximately three months later, Jakks obtained the first amendment to the domestic toy license, which granted Jakks additional rights under the WWE domestic toy license. (*Id.* ¶ 56.)

Later in 1996, Jakks sought Shenker's assistance in driving Playmates, a competitor in the action figure market, from its WWE license. (*Id.* ¶¶ 57-68.) Using his influence, in January 1997, Shenker recommended that WWE grant Jakks a second amendment to its domestic toy license that conflicted with a license previously granted to Playmates. (*Id.* ¶¶ 67-71.) WWE accepted Shenker's recommendation, and granted Jakks a second amendment to the domestic toy license. In February 1997, WWE also granted Jakks an international toy license. (*Id.* ¶ 71.) Before Bell had been brought into the scheme, Playmates complained to him about WWE's bad faith in allowing competition with its products but to no avail. (*Id.* ¶ 70.) Eventually, Playmates was bought out by WWE. (*Id.* ¶ 83.) Shenker's dual role in these negotiations was never disclosed to WWE. On March 17, 1997, WWE hired SSAI as its exclusive outside licensing agent. (*Id.* ¶ 72.)

By November 1997, Bell was induced to join the bribery/fraud scheme based on Shenker's promises of payments. (*Id.* ¶¶ 81-83.) Shenker delivered on these payments, which are alleged to have been provided by the Jakks Defendants[1], using a variety of covert means. (*Id.*

---

[1]The Jakks Defendants are comprised of Jakks, Jakks H.K., Road Champs, Friedman, Berman, and Bennett.

¶¶ 85-90, 94-99.)  With Shenker and Bell in the fold, the Jakks Defendants sought and obtained a third amendment to the domestic toy license in January 1998, granting to Jakks the rights formerly held by Playmates.  (*Id*. ¶ 93.)

Beginning in January 1998, Jakks set its sights on the videogame license.  (*Id*. ¶ 101.) The license was coming up for renewal and was held at the time by a company known as Acclaim.  (*Id*. ¶ 102.)  In March 1998, Bell told Acclaim that WWE "would not even listen to any proposal that Acclaim would make for the renewal of its license." (*Id*. ¶ 109.)  Not surprisingly, Acclaim "went over Bell's head and complained to senior management at WWE that it was not being permitted to submit a renewal proposal." (*Id*.)  WWE told Acclaim that it would be permitted to make such a proposal.  (*Id*.)  Nonetheless, within a week, Bell, without waiting for Acclaim's proposal, recommended that WWE grant the videogame license to Jakks. (*Id*. ¶ 110.)  WWE acted on this recommendation.  Soon thereafter, other companies informally expressed an interest in the license.  (*Id*. ¶¶ 127-29.)  In order to protect the bribery scheme, Shenker and/or Bell concealed the informal proposals from WWE senior management, but advised Jakks of the terms of these other proposals.  (*Id*. ¶ 134-35, 145.)  One of these other bidders was Defendant THQ.

Jakks thereafter approached THQ with an offer to act as joint venture partners in securing the videogame license.  As part of this approach, Defendant Friedman told Defendant Farrell that Jakks was "in control of the videogame license." (*Id*. ¶ 137.)  THQ would be required to pay both Jakks and WWE for the license, while also funding and managing the licensed operations. (*Id*. ¶¶ 137, 178-79, 182-85.)  According to WWE, THQ accepted the offer because it was in desperate financial straits after the cancellation of one of its most lucrative licenses.  (*Id*. ¶¶ 119-

25.)  In early May 1998, Bell submitted a deal memo recommending that the videogame license be granted to THQ and Jakks as a joint venture.  (*Id.* ¶ 152.)  Shortly thereafter, the other potential bidder (Activision) sent a more formalized version of its earlier informal proposal, but Bell and Shenker did not forward the Activision proposal to WWE management.  (*Id.* ¶ 153.)

Jakks and THQ agreed to form a joint venture, the LLC, on June 10, 1998.  (*Id.* ¶ 154.)  Effective that same day, WWE and the LLC executed a videogame licensing agreement, with an "extraordinary length" of ten years and a five-year right of renewal for the LLC.  (*Id.* ¶ 149.)  The terms of the domestic and international toy licenses, which Jakks already had with WWE, were extended to coincide with the length of the videogame license.  (*Id.* ¶ 165.)

On March 24, 2000, WWE terminated Bell's employment for reasons unrelated to the bribery scheme (which, at the time, WWE did not know about).  (*Id.* ¶ 187.)  On June 13, 2000, WWE terminated its contract with SSAI based on a change of business direction.  (*Id.* ¶ 189.)  In October 2000, SSAI brought a breach of contract claim against WWE in Connecticut state court, seeking to be paid commissions on licenses SSAI had allegedly procured for WWE.  (*Id.* ¶ 190.)  Through the litigation in Connecticut, WWE discovered the purportedly unlawful scheme, despite Defendants' alleged attempts to conceal it.  (*Id.* ¶¶ 210-12.)

On October 16, 2003, the Connecticut state court dismissed with prejudice SSAI's action against WWE and entered a default judgment in favor of WWE as a sanction for Shenker's concealment of critical documents and perjured deposition testimony.  (*Id.* ¶ 221.)  *See also Stanley Shenker and Assocs., Inc. v. World Wrestling Fed'n Entm't, Inc.*, 844 A.2d 964, 978 (Conn. Super. Ct. 2003).  WWE alleges that Defendants continued concealing documents and giving perjured testimony even after Shenker was sanctioned.  (Am. Compl. ¶¶ 228-30, 235,

8

239.)

From the summer of 1998 until today, Jakks continues to receive royalties from the various licenses granted to it (or the LLC) by WWE, all as a result of allegedly fraudulent and corrupt conduct by Defendants.  (Am. Compl. ¶¶ 149-64, 173-85, 249(b)(lxvii).)

<u>II.  Discussion</u>

A.  <u>Standard of Review</u>

Defendants seek dismissal of the Amended Complaint under Fed. R. Civ. P. 12(b)(6) on the grounds that it fails to state a claim.  The Supreme Court has recently held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]"  *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (citations omitted and second alteration in original).  In *Bell Atlantic*, the Supreme Court also abandoned reliance on the oft-quoted refrain from *Conley v. Gibson* that, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief[,]"  355 U.S. 41, 45-46 (1957).  *Id.* at 1964-69.  As the Court explained, a literal application of *Conley*'s "no set of facts" rationale is improper because "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery."  *Bell Atl.*, 127 S. Ct. at 1968.  Instead, the Court emphasized that "[f]actual allegations must be enough to raise a right to relief above the speculative level[,]" *id.* at 1965 (citation omitted), and "once a claim has been stated adequately,

it may be supported by showing any set of facts consistent with the allegations in the complaint[,]" *id.* at 1969.  Plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974; *see also Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) ("After careful consideration of the Court's opinion and the conflicting signals from it that we have identified, we believe the Court is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*.").  If Plaintiff "ha[s] not nudged its claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Bell Atl.,* 127 S. Ct. at 1974.

When considering a Rule 12(b)(6) motion, a court must limit itself to facts stated in the complaint, documents attached to the complaint, and documents incorporated into the complaint. *See Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 662 (2d Cir. 1996).  The Court will accept as true Plaintiff's allegations, and draw all inferences in Plaintiff's favor. *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993); *Blimpie Int'l, Inc. v. Blimpie of the Keys*, 371 F. Supp. 2d 469, 470-71 (S.D.N.Y. 2005).  At this stage, the Court is not concerned with weighing the evidence that would be presented at trial. *See Chosun Int'l, Inc. v. Chrisha Creations, Ltd.*, 413 F.3d 324, 327 (2d Cir. 2005).

### B.  Plaintiff's RICO Allegations

The crux of Plaintiff's allegations is that, through a "scheme and artifice to defraud," Defendants "depriv[ed] WWE of the intangible right of honest services from WWE's intellectual property licensing agent [Shenker] and its management supervisor of that licensing agent [Bell], . . . to obtain thereby valuable toy licensing rights and a lucrative videogame license at lower

10

than competitive royalty rates[.]"  (Am. Compl. ¶ 1.)  Plaintiff's substantive RICO cause of

action is brought pursuant to 18 U.S.C. § 1962(c).  Under Section 1962(c), it is "unlawful for any

person employed by or associated with any enterprise engaged in, or the activities of which

affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the

conduct of such enterprise's affairs through a pattern of racketeering activity[.]"  *See* 18 U.S.C. §

1962(c).  "To establish a claim for a civil violation of section 1962(c), 'a plaintiff must show that

he was injured by defendants' (1) conduct (2) of an enterprise (3) through a pattern (4) of

racketeering activity.'"  *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc*., 187 F.3d 229,

242 (2d Cir. 1999) (quoting *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 520 (2d Cir. 1994)).

"Civil RICO is an unusually potent weapon – the litigation equivalent of a thermonuclear

device."  *Bell v. Hubbert*, No. 95-CV-10456, 2007 WL 60513, at *5 (S.D.N.Y. Jan. 8, 2007)

(quoting *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991)) (internal quotation marks

omitted).  "Because the 'mere assertion of a RICO claim . . . has an almost inevitable

stigmatizing effect on those named as defendants, . . . courts should strive to flush out frivolous

RICO allegations at an early stage of the litigation.'"  *Katzman v. Victoria's Secret Catalogue*,

167 F.R.D. 649, 655 (S.D.N.Y. 1996) (quoting *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st

Cir. 1990)).  However, while meritless RICO suits should be weeded out, *see Schlaifer Nance &

Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997), a RICO plaintiff normally need only

satisfy the general notice pleading requirements, *see Spinale v. United States*, No. 03-CV-1704,

2004 WL 50873, at *5 (S.D.N.Y. Jan. 9, 2004) ("Claims for violations of RICO generally need

only meet the notice pleading requirements of Rule 8(a) of the Federal Rules of Civil

Procedure.").

11

In *WWE I*, the Court found that Plaintiff has properly alleged a RICO enterprise. Therefore, the remaining questions are whether Plaintiff has sufficiently alleged that: (i) each Defendant conducted the alleged enterprise through a pattern of racketeering activity; (ii) the THQ Defendants[2] and the LLC directly or vicariously participated in the operation or management of the RICO enterprise; (iii) Plaintiff suffered a cognizable injury as a result of Defendants' alleged RICO violations; (iv) Plaintiff's RICO allegations are timely; (v) Defendants engaged in a conspiracy to violate RICO; and (vi) the 2004 Release does not bar Plaintiff's RICO claims against the Jakks Defendants, (*see* Decl. of Jonathan J. Lerner, Ex. B ("Lerner Decl.")).

"RICO defines 'racketeering activity' to include a host of criminal offenses, which are in turn defined by federal and state law." *Cofacredit*, 187 F.3d at 242 (citing 18 U.S.C. § 1961(1)). Here, Plaintiff charges Defendants with committing mail fraud under 18 U.S.C. § 1341, wire fraud under 18 U.S.C. § 1343, money laundering under 18 U.S.C. §§ 1956, 1957, as well as violating the Travel Act, 18 U.S.C. § 1952, the National Stolen Property Act, 18 U.S.C. §§ 2314, 2315, and New York Penal Law § 180.03, which proscribes commercial bribery. (Am. Compl. ¶ 247.)

C.  Pattern of Racketeering Activity

To plead a pattern of racketeering activity, the RICO statute requires that – at a minimum – a complaint set forth two predicate acts occurring within ten years of each other. *See* 18 U.S.C. § 1961(5); *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 238 (1989).  A RICO plaintiff must show that *each* defendant participated in the RICO enterprise by engaging in at least two

---

[2]The THQ Defendants are comprised of THQ and Farrell.

predicate acts.  *See Hoatson v. N.Y. Archdiocese,* No. 05-CV-10467, 2007 WL 431098, at *4 (S.D.N.Y. Feb. 8, 2007) ("A complaint alleging RICO violations based on mail or wire fraud must allege that the defendant participated in at least two acts of mail or wire fraud."); *USA Certified Merchs., LLC v. Koebel*, 262 F. Supp. 2d 319, 332 (S.D.N.Y. 2003).  The Supreme Court has held that "to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc.*, 492 U.S. at 239.  The Second Circuit has described the pattern requirement as involving "multiple racketeering predicates – which can be part of a single 'scheme' – that are related and that amount to, or threaten the likelihood of, continued criminal activity[.]"  *United States v. Reifler*, 446 F.3d 65, 91 (2d Cir. 2006) (quoting *United States v. Coiro*, 922 F.2d 1008, 1016 (2d Cir. 1991)) (internal quotation marks omitted).

"When seeking to satisfy the continuity requirement, a plaintiff must show that the defendants' activities were 'neither isolated or sporadic.'" *SKS Constructors, Inc. v. Drinkwine*, 458 F. Supp. 2d 68, 77 (E.D.N.Y. 2006) (quoting *GICC Capital Corp. v. Tech. Fin. Group, Inc.*, 67 F.3d 463, 467 (2d Cir. 1995)).  "The continuity necessary to prove a pattern can be either 'closed-ended continuity,' or 'open-ended continuity.'" *Cofacredit*, 187 F.3d at 242.  "In determining whether continuity exists the court should not limit its consideration to the duration of the scheme, but should also look at the overall context in which the acts took place." *Pier Connection, Inc. v. Lakhani*, 907 F. Supp. 72, 75 (S.D.N.Y. 1995) (quoting *Deem v. Lockheed Corp.*, No. 87-CV-7017, 1991 WL 196171, at *9 (S.D.N.Y. Sept. 25, 1991) (internal quotation marks omitted).  At the pleading stage, the hurdle is relatively low.  *See Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.*, 879 F.2d 10, 18 (2d Cir. 1989) ("Whether defendants' actions

are continuing in nature or isolated or sporadic will be the subject of proof at trial.").

       1.  Closed-End Continuity

     "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time."  *H.J. Inc.*, 492 U.S. at 242.  "Predicate acts are 'related' when they 'have the same or similar purposes, results, participants, victims, methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'"  *Weizmann Inst. of Sci. v. Neschis*, 421 F. Supp. 2d 654, 688 (S.D.N.Y. 2005) (quoting *H.J. Inc.*, 492 U.S. at 240) (finding predicate acts unrelated where the only connection was that they involved the same parties); *accord Jacobson v. Cooper*, 882 F.2d 717, 720 (2d Cir. 1989) (finding separate acts related where they involved the same alleged purpose, victim, and effect).  "Although closed-ended continuity is primarily a temporal concept, other factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists."  *Cofacredit*, 187 F.3d at 242.  Since the Supreme Court's 1989 decision in *H.J. Inc.*, however, the Second Circuit "has never found a closed-ended pattern where the predicate acts spanned fewer than two years."  *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 181 (2d Cir. 2004); *see also DeFalco v. Bernas*, 244 F.3d 286, 321-22 (2d Cir. 2001) (declining to find closed-ended continuity where plaintiff alleged predicates committed over a period of less than a year and a half); *Fresh Meadows Food Servs., LLC v. RB 175 Corp.*, No. 04-CV-4767, 2006 WL 2728935, at *6 (E.D.N.Y. Sept. 25, 2006) ("The Second Circuit generally requires a showing that the alleged racketeering activity lasted for over two years.").

Where, as here, a RICO plaintiff alleges mail or wire fraud, the plaintiff "must prove that the defendants engaged in '(i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of the mail or wires.'"  *USA Certified Merchs.*, 262 F. Supp. 2d at 332 (citing *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000)).  "The predicate mail or wire communications need not themselves contain fraudulent communications," but they must be material to a scheme that has a fraudulent and deceptive purpose.  *See id.* at 332 (citing *Schmuck v. United States*, 489 U.S. 705, 711 (1989)).  "Allegations of mail and wire fraud must . . . be pled with particularity in accordance with Rule 9(b)."  *M'Baye v. N.J. Sports Prod., Inc.*, No. 06-CV-3439, 2007 WL 431881, at *7 (S.D.N.Y. Feb. 7, 2007); *see also Hoatson,* 2007 WL 431098, at *4 (noting that mail and wire fraud RICO predicates "must meet the rigorous pleading requirements of Federal Rule of Civil Procedure 9(b)").  "Thus, if plaintiff claims that the mail or wire transmissions 'were themselves fraudulent, i.e., themselves contained false or misleading information, the complaint should specify the fraud involved, identify the parties responsible for the fraud, and where and when the fraud occurred.'"  *M'Baye*, 2007 WL 431881, at *7 (quoting *Evercrete Corp. v. H-Cap Ltd.*, 429 F. Supp. 2d 612, 624 (S.D.N.Y. 2006)).  "If, however, the plaintiff claims that the mail or wire fraud was only used in furtherance of a scheme to defraud, then the complaint does not have to be as specific with respect to each allegation of mail or wire fraud, so long as the RICO scheme is sufficiently pled to give notice to the defendants."  *Id.*

Plaintiff alleges that Defendants committed numerous racketeering acts with the purpose of depriving WWE of the honest services of one or both of its licensing agents – Defendants Shenker/SSAI and Bell – in order to procure valuable licensing rights, and then Defendants covered up their scheme.  These allegations can be broken down into five categories:  (i) initial

efforts by the Jakks Defendants to corrupt Shenker and SSAI, conduct that allegedly took place between November 1995 and November 1997, all to procure toy licenses from WWE and all before the purported corruption of Bell; (ii) conduct by the Jakks Defendants and Shenker/SSAI to corruptly use Bell to procure additional WWE toy licenses between November 1997 and June 1998; (iii) efforts by the Jakks Defendants, the THQ Defendants, the LLC, Shenker, SSAI, and Bell to corruptly procure the license for WWE videogames, conduct that spans from January 1998 through August 1998, just after the LLC obtained the videogame license from WWE and when some Jakks Defendants are alleged to have arranged for bribery payments; (iv) surreptitious payments from Shenker/SSAI to Bell from January 1998 until December 2001, and royalty payments, which arose from various licenses, paid to Jakks Defendants by the THQ Defendants and the LLC from 1999 until at least January 2005 and beyond; and (v) efforts by Shenker, Bell, and some of the THQ and Jakks Defendants, after Bell's termination from WWE in March 2000 and the termination of the WWE/SSAI contract in June 2000, to conceal their purportedly corrupt activities, all of which occurred between October 2000, when SSAI initiated a lawsuit against WWE in Connecticut, and July 2004.

Turning to the first category of alleged misconduct, which the Jakks Defendants have described as the "front end" of the alleged RICO scheme, Plaintiff claims that the scheme began after Jakks secured the domestic toy license from WWE on October 24, 1995 ("the domestic toy license"). (Am. Compl. ¶ 35.) The initial acquisition of the domestic toy license is not alleged to have been the result of any self-dealing by or corruption of Shenker/SSAI. Indeed, as described in the Amended Complaint, the license was granted after Jakks made an approach to Shenker and Bell at a toy convention and merely asked if it could obtain such a license. (*Id.*)

Thereafter, according to Plaintiff, Bell and Shenker presented a "deal memo" to WWE, which resulted in WWE agreeing to grant the license to Jakks. (*Id.*) The absence of any illicit conduct in connection with the domestic toy license is highlighted by the subsequent allegation in the Amended Complaint that "after the domestic toy license was entered into [between WWE and Jakks,]" Jakks "devised a plan to corrupt Shenker by trading on Shenker's lack of ethics and greed." (*Id.* ¶ 37.)

The first step in this corruption plan, according to Plaintiff, was for Jakks to engage Shenker/SSAI to represent its interests in connection with a perfumed doll deal that did not involve any WWE licensing rights. (*Id.* ¶ 42.) These discussions began in November 1995, just one month after Jakks obtained the domestic toy license, and took place at the same time that SSAI was acting as one of WWE's nonexclusive outside licensing agents. (*Id.* ¶¶ 38-40, 42.) According to Plaintiff, Defendant Berman linked the perfumed doll deal with Jakks' interest in using Shenker/SSAI to procure additional licensing rights from WWE. (*Id.* ¶ 42.) On January 3, 1996, Jakks and Shenker entered into an agency agreement for the perfumed doll deal. (*Id.* ¶ 44.) In the cover letter transmitting the contract, Jakks is alleged to have asked Shenker how soon he could get an amended domestic toy license from WWE. (*Id.*) On February 12, 1996, Jakks paid Shenker an advance of $2500 for the perfumed doll deal. (*Id.* ¶¶ 46, 48.)

According to the Amended Complaint, just two days after Jakks advanced the $2500 to SSAI for its work on the perfumed doll deal, Jakks officials discussed their desire to retain SSAI to act as Jakks' agent in obtaining additional WWE licensing rights. (*Id.* ¶ 49.) This allegedly was done against the advice of outside legal counsel for Jakks, who supposedly told Jakks that it would be a conflict of interest for SSAI to simultaneously represent WWE and Jakks in

connection with WWE's licenses and that no such arrangement could be made without notice to WWE.  (*Id*. ¶ 50.)  That notice apparently was never given.  (*Id*. ¶ 51.)  Three months later, SSAI recommended to WWE that it grant Jakks the additional licensing rights sought by Jakks in the domestic toy deal.  (*Id*. ¶ 56.)  According to Plaintiff, "Shenker made no attempt to negotiate better terms for WWE and recommended the additional rights be given to Jakks on the terms offered by Jakks and without determining if competitors of Jakks would pay more for the rights." (*Id*.)[3]  Further, the Amended Complaint alleges that Jakks used its relationship with Shenker/SSAI to obtain a second amendment to the domestic toy license in January 1997 and an international toy license in February 1997.  (*Id*. ¶¶ 62-67, 71.)

SSAI became WWE's exclusive outside licensing agent on March 7, 1997, whereby SSAI would earn a portion of the royalties paid to WWE stemming from licenses SSAI procured. (*Id*. ¶¶ 72, 77)  Thereafter, Jakks' alleged scheme evolved and grew when Shenker approached Bell in or around November 1997 to bring him into the scheme.  (*Id*. ¶¶ 80-82.)  This begins the second category of conduct.  During this time, the Jakks Defendants allegedly made a series of bribery payments to Shenker, some of which Shenker subsequently shared with Bell.  (*Id*. ¶¶ 84-97.)  According to Plaintiff, these payments resulted in a third amendment to the domestic toy license that Jakks originally procured in 1995.   The third amendment was granted in January 1998, and it gave Jakks the rights to certain action figures.  (*Id*. ¶¶ 93, 249(a)(xiv).)

At the same time it was pursuing amendments to the WWE toy licenses in 1997 and early 1998, Jakks was pursuing the lucrative videogame license.  (*Id*. ¶ 104.)  This is the third category

---

[3]This transaction was the first amendment to the domestic toy license that Jakks had negotiated in 1995.

of racketeering conduct.  When the illicit arrangement was threatened with exposure in April

1998, as a result of competition by THQ and Acitivision for the videogame license, Jakks

allegedly secured THQ's agreement not to submit an independent bid.  (*Id.* ¶¶ 136-38.)  Instead,

on June 10, 1998, Jakks and THQ furtively formed the LLC, which obtained the videogame

license from WWE as of that day.  (*Id.* ¶ 154.)  At the same time, Jakks secured an extension of

its domestic and international toy licenses, which were coterminous with the videogame license.

(*Id.* ¶ 165.)

Plaintiff's Amended Complaint alleges that the scheme extended at least until January

2005 (when the Amended Complaint was presumably drafted) and lives on to this day because

Jakks, THQ, and the LLC continue to share the proceeds from the allegedly fraudulently

obtained videogame license.  (*Id.* ¶¶ 149-64, 173-85, 249(b)(lxvii).)  Plaintiff also claims

Shenker/SSAI made covert payments to Bell until December 2001.  (*Id.* ¶ 249(b)(xxvi).)  Both of

these series of payments, according to Plaintiff, qualify as money laundering predicates, and

collectively comprise the fourth category of racketeering acts.[4]  The fifth category involves

allegations that the Jakks Defendants, Shenker, and Bell concealed their fraudulent activities

from late 2000 until at least 2004, all in connection with litigation between SSAI and WWE in

Connecticut.  (*Id.* ¶¶ 186-241.)  Thus, from Plaintiff's vantage point, Defendants' pattern of

racketeering activity began in late 1995 and continues until this day.

Defendants argue that the alleged scheme could not have started in 1995 because Bell did

not receive his first bribe until January 1998.  (Mem. of Law in Supp. of the Jakks Defs.' Mot. to

---

[4]Plaintiff also alleges that the Shenker/SSAI/Bell payments were made in violation of the
National Stolen Property Act, 18 U.S.C. §§ 2314, 2315.

Dismiss the Am. Compl. 8 ("Jakks. Mem.").)  According to Defendants, the alleged efforts by

the Jakks Defendants to deprive WWE of the honest services of Shenker and SSAI prior to the

corruption of Bell are of no import because Bell was the gatekeeper for the licensing process.

(*Id.* at 9.)  Without Bell's corrupt influence, according to Defendants, all the bribery in the world

of Shenker and SSAI would be worthless as Bell was the WWE official responsible for

recommending to WWE which licenses to grant.  For example, the Jakks Defendants argue that

the 1995 perfumed doll deal did not involve any racketeering acts and that even if it did, the deal

was unrelated to the later bribery scheme involving Shenker and Bell.  Thus, in the view of the

Jakks Defendants, the alleged RICO scheme could not have begun until January 1998, when Bell

allegedly was first brought into the scheme.[5]

      Defendants also challenge the two categories that make up the back end of the scheme.

They argue that mere royalty payments on the licensing agreements, even if those agreements

were fraudulently obtained, collectively do not constitute money laundering and, therefore, are

not racketeering acts as a matter of law.  Similarly, Defendants claim that any false statements

given during the Connecticut litigation between WWE and Shenker/SSAI are not racketeering

acts, as they were not intended to cover up an on-going scheme, but instead were made years

after the alleged scheme had been completed and after Bell and Shenker no longer worked for or

---

[5]Defendants argue that Bell's involvement did not begin until he received his first bribe
in January 1998.  There is support for this claim in the Amended Complaint which, citing Bell's
guilty plea to mail fraud, in violation of 18 U.S.C. § 1341, alleges that Bell's involvement began
"in or before January 1998."  (Am. Compl. ¶ 24.)  However, the Amended Complaint also
alleges that even before he received his first bribe, Bell agreed to be a part of Jakks' corrupt
effort to obtain WWE licenses, (*id.* ¶ 82), and that as part of that plan, in November 1997, Bell
sought to buy off Playmates, a competitor of Jakks for certain toy licenses, (*id.* ¶ 83).  Solely for
the purpose of deciding the instant motion, the Court finds that the November 1997 date is the
appropriate starting point for the second category of alleged misconduct.

on behalf of WWE. Thus, from Defendants' standpoint, the alleged RICO scheme lasted at most from January 1998 (when Bell purportedly was brought into the scheme) to June 1998 (when the videogame license was granted to the LLC), far less than the two years normally required in the Second Circuit. For reasons that are explained below, Defendants are correct in their objections to the two back-end categories of alleged racketeering acts. Thus, to survive, Plaintiff must prevail in its claims regarding the first, front-end category of conduct.

Plaintiff insists that although allegedly having Bell in Defendants' pocket made it easier for the Jakks Defendants to obtain the licensing rights they sought, the corruption of Bell was only part of a scheme that involved broader efforts to persuade Shenker/SSAI to corruptly represent Jakks' interests in obtaining WWE licenses. According to Plaintiff, as one of WWE's nonexclusive licensing agents, SSAI had a duty to avoid self-dealing, or at least to disclose its self-dealing. Thus, in Plaintiff's view, when Shenker agreed to have SSAI represent Jakks in the perfumed doll deal while he was being pitched to represent Jakks in its efforts to obtain additional WWE licenses, he breached his duty of loyalty to WWE. And, according to Plaintiff, Jakks' deliberate effort to tie the payments on the perfumed doll deal to its efforts to procure, through SSAI, the additional WWE licenses was a fraud aimed at depriving WWE of the honest services of its agent. In Plaintiff's view, the self-dealing was even more problematic when SSAI agreed to become Jakks' agent in all future deals with WWE without notice to WWE.

In *United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003), the Second Circuit confirmed that a scheme or artifice to defraud under 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud) includes a scheme or artifice to deprive another of the intangible right of honest services under 18 U.S.C. § 1346. 354 F.3d at 134. According to the Second Circuit:

21

> [T]he term "scheme or artifice to deprive another of the intangible right to honest services" in section 1346, when applied to private actors, means a scheme or artifice to use the mails or wires to enable an officer or employee of a private entity (or a person in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers) purporting to act for and in the interests of his or her employer (or of the other person to whom the duty of loyalty is owed) secretly to act in his or her or the defendant's own interests instead, accompanied by a material misrepresentation made or omission of information disclosed to the employer or other person.

*Id.* at 141-42.   The en banc Court further noted that a "scheme or artifice to defraud" in private-sector honest services cases falls into two categories – bribes/kickbacks and self-dealing.  *Id.* at 139.  "In the bribery or kickback cases, a defendant who has or seeks some sort of business relationship or transaction with the victim secretly pays the victim's employee (or causes such a payment to be made) in exchange for favored treatment."  *Id.*  "In the self-dealing cases, the defendant typically causes his or her employer to do business with a corporation or other enterprise in which the defendant has a secret interest, undisclosed to the employer."  *Id*. at 140.  The difference between the two is that in the bribery/kickback case, "the undisclosed bribery itself is sufficient to make out the crime, but in self-dealing cases, the existence of a conflict of interest alone is not sufficient to do so."  *Id.* at 141.  Instead, the self-dealing is actionable only if the defendant's actions "cause, or [are] at least capable of causing, some detriment  – perhaps some economic or pecuniary detriment – to the employer."  *Id.*[6]

---

[6]Defendants dismiss Plaintiff's citation to *Rybicki* as a "red herring," claiming that *Rybicki* "concerned whether the statute extending the mail and wire fraud statutes to cover honest services fraud was unconstitutionally vague."  (Reply Mem. of Law in Further Supp. of the Jakks Defs.' Mot. to Dismiss the Am. Compl. 4 ("Jakks Reply Mem.").)  Defendants are correct that the question in *Rybicki* was whether Section 1346 was unconstitutionally vague.  But, in rejecting the vagueness claim, the Second Circuit construed Section 1346 to cover certain, well-defined misconduct, the description of which in that opinion provided guidance as

Therefore, in order to show that a mail or wire fraud has occurred under Section 1346, a plaintiff must demonstrate at least that there was:  "(1) a scheme or artifice to defraud; (2) for the purpose of knowingly and intentionally depriving another of the intangible right of honest services as thus defined; (3) where the misrepresentations (or omissions) made by the defendants are material in that they have the natural tendency to influence or are capable of influencing the employer to change its behavior; and (4) use of the mails or wires in furtherance of the scheme."  *Id.* at 147.  In self-dealing cases, "there may also be a requirement of proof that the conflict caused, or at least was capable of causing, some detriment" to the entity to which the defendant owed a duty of loyalty on par with what an employee owes an employer.  *Id.* at 142.

In light of *Rybicki*, one pertinent question here is whether, at the time of the perfumed doll deal, SSAI was in a relationship with WWE such that SSAI owed WWE a duty of loyalty comparable to what an employee owes an employer.  The Amended Complaint is stingy with the details regarding the relationship between WWE and SSAI from April 1995 to March 1997.

---

to the elements of a violation of that mail fraud statute.   Thus, for example, the majority in *Rybicki* noted that its holding meant that a panel's decision in *United States v. Handakas*, 286 F.3d 92 (2d Cir. 2002), an earlier case declaring Section 1346 unconstitutionally vague, was neutered because, under the construction of Section 1346 adopted in *Rybicki*, it was "clear that the defendant's conduct in that case was not within the scope of behavior proscribed by section 1346[.]"  *Rybicki*, 354 F.3d at 144.

It also bears noting that in rejecting the vagueness challenge in *Rybicki*, the Second Circuit held that it was proper to consider cases that pre-dated both the enactment of section 1346, and the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350 (1987), in which the Court held that the mail fraud statute (18 U.S.C. § 1341) did not criminalize schemes "designed to deprive individuals, the people, or the government of intangible rights, such as the right to have public officials perform their duties honestly[.]"  *See Rybicki*, 354 F.3d at 134 (citing *McNally*, 483 U.S. at 358).  "Under *McNally*, all schemes or artifices to defraud relating to intangible rights[,]" such as "honest services," were "beyond the mail-fraud proscriptions."  *Id.*

According to the Amended Complaint, WWE retained SSAI as a "nonexclusive outside licensing agent" in or around 1995. (Am. Compl. ¶ 32.) As a nonexclusive licensing agent, SSAI was able to "procure and negotiate licensing contracts[,]" which would then be reviewed by Bell and others at WWE. (*Id*. ¶ 32.) While the Amended Complaint alleges that "[d]uring the course of their relationship with WWE, SSAI and Bell both entered into agreements with WWE reflecting and acknowledging their fiduciary roles and unique positions of trust," it is clear that there is no allegation regarding the execution of any such agreement by SSAI until March 1997, when SSAI signed a contract making it the "exclusive outside licensing agent" for WWE. (*Id*. ¶¶ 33, 72.) This is in contrast to Bell, who in March 1995 executed a Code of Conduct Agreement, wherein he agreed, among other things, that he would not accept fees in connection with any transaction on behalf of WWE.

It is curious that the Amended Complaint provides no specifics about the contract between WWE and SSAI in April 1995. In fact, there is no allegation that there even was a written contract between WWE and SSAI. Nonetheless, it is clear that while SSAI had no power to bind WWE to any licensing agreement, it was authorized to negotiate licensing agreements that it would present to WWE. WWE reviewed and had to approve all licensing deals that SSAI, or any of its other licensing agents, proposed to WWE. Even when SSAI became WWE's exclusive licensing agent in March 1997, the contract did not grant SSAI "any right to accept licensing proposals or to execute particular agreements on behalf of WWE." (*Id*. ¶ 75.) Rather, SSAI "was to present all licensing proposals it procured and negotiated in deal memo format to Bell, who in turn would recommend to WWE whether to accept the proposal." (*Id*.) SSAI only received payments for those deals that were executed by WWE.

Notwithstanding the lack of specific allegations about the contractual relationship

between WWE and SSAI, the Amended Complaint avers that SSAI owed a fiduciary duty to

WWE. A "fiduciary duty arises when one has reposed trust or confidence in the integrity or

fidelity or another who thereby gains a resulting superiority of influence over the first, or when

one assumes control and responsibility over another." *Tex. Liquids Holdings, LLC v. Key Bank*

*Nat'l Ass'n*, No. 05-CV-5070, 2007 WL 950136, at *2 (S.D.N.Y. Mar. 27, 2007) (quoting

*Reuben H. Donnelly Corp. v. Mark I Mktg. Corp.*, 893 F. Supp. 285, 289 (S.D.N.Y. 1995))

(applying New York law); *accord United States v. Chestman*, 947 F.2d 551, 568 (2d Cir. 1991)

(noting that a fiduciary relationship "exists when confidence is reposed on one side and there is

resulting superiority and influence on the other"). In general, a "fiduciary relationship involves

discretionary authority and dependency[,]" and involves "reliance, and de facto control and

dominance." *Chestman*, 947 F.2d at 568-69. "Attorney/client or doctor/patient relationships

'are sufficiently rooted in trust and confidence to trigger super-contractual fiduciary duties.'"

*Ross v. FSG PrivatAir Inc.*, No. 03-CV-7292, 2004 WL 1837366, at *5 (S.D.N.Y. Aug. 17,

2004) (quoting *Reuben H. Donnelly Corp.*, 893 F. Supp. at 289); *see also Wilson-Rich v. Don*

*Aux Assocs., Inc.*, 524 F. Supp. 1226, 1234 (S.D.N.Y. 1981) ("Examples of fiduciary

relationships include the relationships between trustee and beneficiary, guardian and ward,

agent and principal, and attorney and client.").

"[F]iduciary relationships typically do not arise between parties engaging in arms length

business transactions[.]" *Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 274 (S.D.N.Y.

2006); *see also Tex. Liquids Holdings*, 2007 WL 950136, at *2 (noting that a conventional

business relationship normally does not create a fiduciary relationship); *Ross*, 2004 WL

25

1837366, at *5 (same).  In fact, where a contract governs the relationship between two

commercial parties, the assumption is that there is no fiduciary relationship unless the contract

provides otherwise.  *See Calvin Klein Trademark Trust v. Wachner*, 123 F. Supp. 2d 731, 733-

34 (S.D.N.Y. 2000).  Instead, "where the parties' contract forms both the foundation and

boundary of their relationship, fiduciary responsibilities have not attached."  *Ross*, 2004 WL

1837366, at *6.  This is not to say that parties in contract are never in a fiduciary relationship,

*see Fyrdman & Co. v. Credit Suisse First Boston Corp.*, 708 N.Y.S.2d 77, 79 (App. Div. 2000),

but the fact that a plaintiff and defendant "'worked together' is insufficient to establish a

relationship of a 'mutual and confidential nature.'"  *Argent Elec., Inc. v. Cooper Lighting, Inc.*,

No. 03-CV-9794, 2005 WL 2105591, at *9 (S.D.N.Y. Aug. 31, 2005); *see also United States v.

Cassese*, 273 F. Supp. 2d 481, 486 (S.D.N.Y. 2003) (noting fiduciary duty did not exist where

parties were "arms-length business partners").  In fact, even a "slightly dominant business

position does not operate to turn a formal contractual relationship into a confidential or

fiduciary relationship."  *Better Benefits, Inc. v. Protective Life Ins. Co.*, No. 03-CV-2820, 2004

WL 633730, at *3 (S.D.N.Y. Mar. 30, 2004) (internal quotation marks omitted).

    The Court fully recognizes that the existence of a fiduciary relationship "normally

depends on the facts of a particular relationship, [and] therefore a claim alleging the existence

of a fiduciary duty usually is not subject to dismissal under Rule 12(b)(6)."  *Abercrombie*, 438

F. Supp. 2d at 274.  However, the Court is not required to credit mere legal conclusions that are

dressed up as factual allegations that a defendant was in a fiduciary relationship with a plaintiff.

*See Ross*, 2004 WL 1837366, at *1 n.2 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

For example, "the dispositive issue of fiduciary-like duty or no such duty is determined not by

the nomenclature 'finder' or 'broker' or even 'agent,' but instead by the services agreed to under the contract between the parties." *Ne. Gen. Corp. v. Wellington Adver., Inc.*, 624 N.E.2d 129, 132 (N.Y. 1993). "Moreover, the elements of a breach of fiduciary duty based in fraud must be plead with particularity." *Abercrombie*, 438 F. Supp. 2d at 274. Therefore, "[i]n order to survive a motion to dismiss a claim for breach of fiduciary duty, the plaintiff must set forth specific facts constituting the alleged relationship with sufficient particularity to enable the court to determine whether, if true, such facts could give rise to a fiduciary relationship." *Diamond Phoenix Corp. v. Small*, No. 05-CV-79, 2005 WL 1530264, at * 6 (D. Me. June 28, 2005). Finally, even allegations that a plaintiff relied on a defendant's expertise in a particular field are insufficient by themselves to survive dismissal. *See Boley v. Pineloch Assocs., Ltd.*, 700 F. Supp. 673, 681 (S.D.N.Y. 1988); *Mechigian v. Art Capital Corp.*, 612 F. Supp. 1421, 1431 (S.D.N.Y. 1985).

Ultimately, the Amended Complaint fails to allege that SSAI was empowered to act on behalf of WWE, or otherwise dominated or controlled WWE between April 1995 and February 1997. In fact, even after SSAI became WWE's exclusive licensing agent, it was never empowered to bind WWE to a licensing agreement. Instead, between April 1995 and February 1997, SSAI was merely among those businesses with which WWE contracted to find potential licensees and to propose to WWE the terms of a potential agreement between that licensee and WWE.[7] If a deal proposed by SSAI was not in WWE's best interests to execute, WWE was

---

[7]This is not to say that beginning in March 1997, after SSAI contractually agreed to be WWE's *exclusive* licensing agent, a fiduciary relationship was not born. *See Vill. on Canon v. Bankers Trust Co.*, 920 F. Supp. 520, 532 (S.D.N.Y. 1996) ("It is true that an exclusive agency gives rise to a fiduciary duty between principal and agent under New York law.").

under no obligation to accept it.  Indeed, according to the Amended Complaint, the market for these licenses was intensely competitive, (Am. Compl. ¶ 52), so any conflict of interest that allegedly caused SSAI's proposal to be less lucrative presumably would lead WWE to reject it. While SSAI and each of the other nonexclusive agents no doubt had an implicit duty to exercise good faith toward WWE, the contractual relationship described in the Amended Complaint is not alleged to include provisions that suggest the existence of a fiduciary relationship.  *See Vill. on Canon*, 920 F. Supp. at 533 (granting motion to dismiss, court noted: "Bankers Trust had no authority to commit VOC to any proposal or to negotiate on VOC's behalf, as the terms of the agreement make clear.  Bankers Trust could only evaluate the proposals and make recommendations.  For these services Bankers Trust would earn a fee based on a percentage of the value of a deal struck with the investor." (internal citations omitted)); *Ne. Gen. Corp.*, 624 N.E.2d at 132 ("We note . . . that while agents in New York are bound to exercise the utmost good faith toward their principals, the plaintiff finder in this case was also not an agent in the actual or functional meaning of that term and relationship.  This finder had no explicit or implied power to bind Wellington.  This finder did not have the power to negotiate the transaction.  This finder did not have the power to do anything except find and introduce prospects[.]").  Thus, if WWE wanted to sue SSAI for breach of the implied duty of good faith, in addition to for breach of any of the explicit terms of the contract, perhaps it could do so. However, if WWE wanted to make SSAI its fiduciary in 1995, it could have negotiated and paid for that degree of loyalty, as it arguably did in a subsequent contract in March 1997.  *See Ne. Gen. Corp.*, 624 N.E.2d at 132 ("If Wellington wanted fiduciary-like relationships or responsibilities, it could have bargained for and specified for them in the contract.").  Having

28

failed to strike that bargain in 1995, the Court, sympathetic as WWE's plight may be, finds that the Amended Complaint does not contain allegations sufficient to state a claim that a fiduciary relationship existed between SSAI and WWE. *See id.* ("This Court may sense a sympathetic impulse to balance what it may view as the equities of a situation such as this. The hard judicial obligation, however, is to be intellectually disciplined against that tug. Instead, courts must focus on the precise law function reposed in them in such circumstances, which is to construe and enforce the meaning and thrust of the contract of the parties, not to purify their efforts.").

Jakks argues that the absence of a fiduciary relationship between WWE and SSAI between 1995 and 1997 prevents Plaintiff from nudging its case across the goal line. If this case had been filed outside the Second Circuit, Jakks might be right. For example, the Tenth Circuit has noted that the Section 1346 "right to honest services is not violated by every breach of contract, breach of duty, conflict of interest, or misstatement made in the course of dealing." *United States v. Welch*, 327 F.3d 1081, 1107 (10th Cir. 2003); *see also United States v. Cochran*, 109 F.3d 660, 667 (10th Cir. 1997) ("[I]t would give us great pause if a right to honest services is violated by every breach of contract or every misstatement made in the course of dealing."). The Eleventh Circuit has held that "a private sector violation of § 1346 honest services fraud involves a breach of fiduciary duty and reasonably foreseeable economic harm." *United States v. Devegter*, 198 F.3d 1324, 1330 (11th Cir. 1999); *see also United States v. Bradley*, 428 F. Supp. 2d 1365, 1368 (S.D. Ga. 2006) ("This Court simply finds no case upholding a § 1346 intangible right charge in which the alleged 'fiduciary relationship' arises from an arm's length transaction between two sophisticated parties, where the party allegedly owing the duty was *not* an employee or agent of the victim and performed *no services* for the

victim.").

The Second Circuit, however, has not yet adopted the same view. If anything, strong currents run against Defendants' position on this point. Five years before the Second Circuit's en banc decision in *Rybicki*, a panel of the Circuit held in *United States v. Sancho* that Section 1346 "does not require the existence of a fiduciary relationship" and therefore upheld the conviction of a defendant who sought to bribe an undercover agent posing as a consultant to another company. *See* 157 F.3d 918, 921 (2d Cir. 1998). *Sancho*, however, earned a red flag for its rejection of the use of pre-*McNally* caselaw to construe Section 1346. In *Rybicki*, the Court rejected "that *dictum* in *Sancho*," and held that it was proper to consider pre-*McNally* caselaw in determining the contours of Section 1346. 354 F.3d at 144.[8]

Neither *Rybicki* nor its treatment of *Sancho*, however, should be viewed as embracing Defendants' view that Section 1346 applies only where there is a breach of fiduciary duty. This point is made evident by a concurrence in *Rybicki*, and the majority's reaction to that concurrence. In her opinion concurring in the judgment, Judge Raggi observed that, "[w]hile a particular relationship may shed light on whether one person owes another honest services, the language of § 1346 indicates that the critical factor is the type of service at issue, not the relationship of the parties." *Rybicki*, 354 F.3d at 155 (Raggi, J., concurring in judgment) (citing *Sancho*, 157 F.3d at 921). In Judge Raggi's view:

> [A] future case may require us to consider whether there is any principled reason to distinguish between an employee and an arms-length contractor when they engage in identical fraud schemes with the specific intent to deprive a victim of

---

[8] In a footnote, the *Rybicki* majority observed that the dissent "insist[ed] that the statement in *Sancho* that we address was not a dictum. If so, to that extent, *Sancho* is overruled." *Rybicki*, 354 F.3d at 144 n.19.

> services whose value depends upon honest performance – for example, providing a due diligence report, a compliance certification, or an environmental assessment.

*Id.* Judge Raggi therefore elected not to join in the majority's decision to re-affirm the Second Circuit's decision in *Handakas* to the extent it could be "interpreted to foreclose the prosecution of a contractor for fraudulently depriving a person of . . . honest services." *Id.*

Judge Sack, writing for the *Rybicki* majority, limited his comment about *Handakas* to stating that the defendant in that case "was not an employee of a private entity purporting to act for and in the interests of his or her employer; neither was he rendering services in which the relationship between him and the person to whom the service was rendered gave rise to a duty of loyalty comparable to that owed by employees to employers." *Id.* at 144. Thus, "only . . . because of the nature of the services to be rendered in *Handakas*, [did] an intangible right to honest services . . . not arise out of the contract at issue in that case." *Id.* In a footnote, Judge Sack observed that the majority did "not consider the application of section 1346 to the contractual situations discussed by Judge Raggi in her concurrence." *Id.* at 144 n.18. In the wake of *Rybicki*, therefore, Section 1346 may well protect the right of honest services derived from certain arms-length contracts, even if neither party to such a contract owes a fiduciary duty to the other party. As long as it can be said that the services rendered by one party to the other under the contract give "rise to a duty of loyalty comparable to that owed by employees to employers," then Section 1346 may apply. *See id.* at 144.

Applying *Rybicki* to this case, the Court concludes that Plaintiff has made sufficient allegations to state a claim that, as of April 1995, SSAI owed Plaintiff a right of honest services under Section 1346. Even though WWE did not make SSAI its exclusive licensing agent until

March 1997, it did employ SSAI to negotiate licensing agreements that would maximize WWE's profit. In this capacity, SSAI performed a role similar to that of Bell, who was an employee of WWE. *See* RESTATEMENT (THIRD) OF AGENCY § 8.03 (2006) ("An agent has a duty not to deal with the principal as or on behalf of an adverse party in a transaction connected with the agency relationship."). Both were to negotiate and propose to WWE potential licensing deals. While Bell was bound by the terms of his employment contract not to accept fees or payment from any potential licensees, it cannot be said at this stage that SSAI did not owe WWE a similar duty, either to refuse payment by a prospective licensee or to report to WWE the acceptance of any such payments. Moreover, while Plaintiff alleges that economic harm resulted from the corruption of SSAI's honest services (more on that below), it is enough to say at this stage of the case that WWE has sufficiently alleged that there was at least the potential for some economic harm as result of SSAI's double-dealing. *See United States v. Gotti*, 459 F.3d 296, 331 (2d Cir. 2006) ("[I]t is clear that the defendants' commission of this conduct was at least *capable* of causing some detriment (economic and otherwise) to the [allegedly-defrauded labor union] members."); *United States v. Vinyard*, 266 F.3d 320, 329 (4th Cir. 2001) ("[T]he reasonably foreseeable harm test is met whenever, at the time of the fraud[ulent] scheme, the employee could foresee that the scheme potentially might be detrimental to the employer's economic well-being."); *United States v. Coffey*, 361 F. Supp. 2d 102, 117 (E.D.N.Y. 2005) ("Corrupting the process by which this [bond underwriting] recommendation was made poses a reasonably foreseeable risk of economic harm to [the bond issuer] because *the best underwriter might not be recommended.*" (emphasis added)). Thus, the bottom line is that WWE has sufficiently alleged a scheme to deprive it of the honest services of

SSAI as far back as November 1995, when the Jakks Defendants allegedly adopted a scheme to tie the payments on the perfumed doll deal to its efforts to retain SSAI as its agent in future license deals with WWE.

The Jakks Defendants further claim, however, that even if this first category of conduct (encompassing the time between November 1995, the date of the perfumed doll deal, and November 1997, the period during which Bell allegedly joined the corruption scheme) constituted a scheme to deprive WWE of the honest services of its brokers, the conduct involving the perfumed doll deal is insufficiently related to other allegedly unlawful acts to constitute a pattern of racketeering activity. "Relatedness may be established by proof of 'criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Lavian v. Haghnazari*, 884 F. Supp. 670, 682 (E.D.N.Y. 1995) (quoting *H.J. Inc.*, 492 U.S. at 240); *see also City of New York v. Pollock*, No. 03-CV-0253, 2006 WL 522462, at *9 (S.D.N.Y. Mar. 3, 2006) (stating "relatedness is established by the similarity in methods, purposes, participants, results, and victims"). To be related, the alleged predicate acts must be connected, even if indirectly, to each other, as well as to the purported enterprise. *See United States v. Locascio*, 6 F.3d 924, 943 (2d Cir. 1993). The "interrelationship between acts, suggesting the existence of a pattern, may be established in a number of ways. These include proof of their temporal proximity, or common goals, or similarity of methods, or repetitions." *United States v. Indelicato*, 865 F.2d 1370, 1382 (2d Cir. 1989); *see also Azrielli v. Cohen Law Offices*, 21 F.3d 512, 520 (2d Cir. 1994).

Defendants contend that the perfumed doll deal is unrelated because it predates Bell's

involvement in the alleged scheme by two years and does not involve the Jakks Defendants'
efforts to procure WWE licenses. The first claim is irrelevant; the second is inaccurate, at least
under the facts assumed at this stage of the case. As noted, Plaintiff has adequately alleged that
the Jakks Defendants deprived WWE of the honest services of SSAI/Shenker, and that their
efforts predated the corruption of Bell. While the allegedly sordid cooption of Bell may have
significantly improved the chances that the scheme to illegally obtain the WWE licenses would
succeed, the alleged conduct antedating Bell's involvement is enough to support the claim that
the Jakks Defendants contravened Section 1346. This includes the alleged actions of the Jakks
Defendants to convince SSAI to act on their behalf in obtaining WWE licenses, even though
SSAI had contracted to represent WWE's interests. One of the ways the Jakks Defendants
allegedly sought to entice SSAI to represent their interests was to provide SSAI an advance on
the perfumed doll deal at the same time that they expressed their desire to have SSAI help them
obtain certain other WWE licenses. Thus, the perfumed doll deal smells of a RICO violation
precisely because, as alleged, the Jakks Defendants themselves linked that deal to their efforts
to corruptly persuade SSAI/Shenker that it was in their financial interests to act on the Jakks
Defendants' behalf in procuring the WWE licenses without informing WWE of that
relationship. More particularly, the perfumed doll deal properly is deemed a racketeering act
because it involved the same or similar purposes, results, participants, victims, and methods as
the rest of the alleged scheme, all of which purportedly amounted to an effort to corrupt WWE's
agents and thereby to procure the lucrative licenses. It is true, of course, that the scheme had
not been fully developed, either in terms of participants or results, but, as alleged, it adequately
marks the starting point of the efforts by the core members of the alleged enterprise to obtain

those licenses.  *See Procter & Gamble Co.*, 879 F.2d at 19 (holding complaint to sufficiently allege racketeering where predicate acts "had the same purpose, that is, fleecing the same victims . . . and employing similar unlawful methods of commission").

The Jakks Defendants further attack the adequacy of the front-end allegations by stating that Plaintiff has improperly recast a single, narrow scheme into a pattern of racketeering.  It is true, as the Jakks Defendants note, that the temporal life of an alleged pattern of racketeering is only one factor in assessing the validity of a RICO claim.  The continuity requirement also imposes on a RICO plaintiff the obligation of alleging more than a scheme with a "single, narrow purpose" that is "directed toward[] a single victim."  *Lefkowitz v. Bank of N.Y.*, No. 01-CV-6252, 2003 WL 22480049, at *8 (S.D.N.Y. Oct. 31, 2003), *rev'd in part on other grounds*, No. 04-CV-0435, 2007 WL 1839756 (2d Cir. June 28, 2007); *see also Stein v. N.Y. Stair Cushion Co.*, No. 04-CV-4741, 2006 WL 319300, at *8 (E.D.N.Y. Feb. 10, 2006) (finding inadequate a complaint where plaintiff alleged "a pattern involving a single scheme of narrow scope, including one victim and a limited number of related participants" (footnote omitted)).  However, while the courts may look somewhat suspiciously on RICO schemes directed at one victim, the courts have allowed complaints alleging multiple economic injuries to the same victim to survive.  *See, e.g., Sathianathan v. Smith Barney, Inc.*, No. 04-CV-7122, 2007 WL 576097, at *3 (S.D.N.Y. Feb. 21, 2007) ("For a single-victim RICO claim to survive, . . . a plaintiff must allege a pattern of separate economic injuries."); *State Wide Photocopy, Inc. v. Tokai Fin. Servs., Inc.*, 909 F. Supp. 137, 140-41 (S.D.N.Y. 1995) ("While, generally, plaintiff was the only victim of the alleged scheme, defendants' repeated, related and continuous acts during the course of four years formed a RICO pattern."); *accord Uniroyal Goodrich Tire Co.*

*v. Mut. Trading Corp.*, 63 F.3d 516, 523-24 (7th Cir. 1995) (noting RICO complaint was proper where predicate acts related to different economic harms to single victim).  Moreover, the Second Circuit has expressly noted that Congress did not intend "to exclude from the reach of RICO multiple acts of racketeering simply because . . . they further but a single scheme." *Indelicato*, 865 F.2d at 1383; *see also Procter & Gamble Co.*, 879 F.2d at 16 ("We have explicitly eschewed any multiple scheme or episode requirement to demonstrate the continuity of the pattern of racketeering activity.").  This line of authority, however, does not permit a plaintiff to claim cumulative injuries from a single transaction or contract.  *See Schlaifer Nance*, 119 F.3d at 97-98 (affirming dismissal of RICO claim that involved a single contract); *Ray Larsen Assocs. v. Nikko Am., Inc.*, No. 89-CV-2809, 1996 WL 442799, at *9 (S.D.N.Y. Aug. 6, 1996) (finding inadequate an allegation of RICO scheme that "involves only one group of perpetrators . . . who directed their acts toward one victim . . . with the singular goal of defrauding [the victim] out of commissions due under a single distribution contract").

In this case, Plaintiff's Amended Complaint alleges racketeering acts that involve several different contracts – the domestic toy license, the international toy license, and the videogame license – each of which, according to Plaintiff, resulted in cognizable injury.  As alleged, Plaintiff's claim is that there were separate, albeit related, efforts to procure these different licenses between November 1995 and June 1998.  Thus, Defendants fail in their valiant efforts to recast Plaintiff's Amended Complaint as involving only a single scheme that involves one victim suffering from cumulative injuries.  *See Uniroyal*, 63 F.3d at 524 ("Taken in a light most favorable to Uniroyal, proven at trial were the existence of at least four separate schemes all of which were designed to swindle money from Uniroyal and all of which utilized

36

the mails and wires to further their ends."); *Panix Promotions, Ltd. v. Lewis*, No. 01-CV-2709, 2002 WL 72932, at *7 (S.D.N.Y. Jan. 17, 2002) (finding closed-ended continuity where allegations involved "a series of frauds, involving numerous fight contracts").

Further, Plaintiff's allegations establish that, beginning in 1996, the victim, purpose, and methods of commission of the scheme were the same, and the alleged front-end racketeering acts were not isolated. *See Jacobson v. Cooper*, 882 F.2d 717, 720 (2d Cir. 1989) (noting that complaint adequately pled a pattern where the alleged racketeering acts related to a scheme to harm single victim); *Procter & Gamble*, 879 F.2d at 16-17 (same). Without repeating all of the allegations described above, the Court finds that the racketeering acts extend from November 1995, when the Jakks Defendants first linked the perfumed doll deal to SSAI's assistance in Jakks obtaining additional WWE licenses, and continued until August 3, 1998, when Jakks made its last bribery payment to Shenker and Bell. (Am. Compl. ¶ 168.) Thus, Plaintiff barely clears the hurdle, but grazes it on the way down, as Plaintiff's other allegations do not suffice to extend the scheme beyond August 3, 1998.

The back-end of the alleged racketeering acts includes the fourth and fifth categories of conduct described above. The fourth category involves two types of financial transactions: (i) the collection of royalty payments on the licenses involving the LLC, the THQ Defendants, and the Jakks Defendants; and (ii) the secret payments from Shenker/SSAI to Bell until December 2001. Plaintiff claims that each type of payment is an example of money laundering. (*Id.* ¶ 249(b); Pl.'s Mem. of Law. in Opp'n to Defs.' Mots. to Dismiss 18 ("Pl.'s Opp'n").) In particular, Plaintiff asserts that the racketeering acts continue to this day because the LLC still pays royalties to Jakks each quarter. (Am. Compl. ¶ 252.) The fifth category involves the

alleged efforts by Bell and Shenker, well after they were terminated by WWE, to conceal the bribery scheme through perjury and other false statements during the Connecticut state court litigation.

As to the Shenker/SSAI/Bell payments, there can be little dispute that Plaintiff's allegations properly state racketeering acts and thus extend each of Shenker's, SSAI's, and Bell's involvement in the enterprise until December 2001. Simply put, to state a money laundering violation under 18 U.S.C. § 1956(a)(1)(B)(i), a plaintiff need only allege that there are proceeds from specified unlawful activity, known by the accused defendant, and that the defendant conducted or attempted to conduct a financial transaction knowing the transaction was intended to conceal or disguise the nature or source of the funds. *See United States v. Szur*, 289 F.3d 200, 213 (2d Cir. 2002). Here, Plaintiff, tracking the language of Section 1956, explicitly alleges that the various payments from Shenker/SSAI to Bell between January 1998 and December 2001 were the proceeds of specified unlawful conduct and were designed to hide the source of the funds. As alleged, these claims survive. *See Leung v. Law*, 387 F. Supp. 2d 105, 119-20 (E.D.N.Y. 2005) (denying motion to dismiss where plaintiff's complaint tracked language of money laundering statute and holding that plaintiff need not plead money laundering "with any degree of heightened particularity").

While Plaintiff's allegations regarding the Shenker/SSAI/Bell payments extend their racketeering acts until December 2001 (only as to those defendants), the claims regarding the royalty payments fail as a matter of law to extend the predicate acts. Though money laundering is a racketeering act, *see* 18 U.S.C. § 1961(1)(B), Plaintiff's claim that the THQ Defendants, the LLC and the Jakks Defendants engaged in money laundering is wanting. Behind Plaintiff's

38

conclusory claims of money laundering is the simple allegation that, in the years following its acquisition of the WWE videogame license, Jakks was paid millions of dollars in royalties on the license.   (Am. Compl. ¶ 184.)  However, "[o]nce an allegedly fraudulent transaction is complete, a plaintiff may not rely on the defendants' retention or use of his assets to establish open-ended continuity."  *Plater-Zyberk v. Abraham*, No. 97-CV-3322, 1998 WL 67545, at *10 (E.D. Pa. Feb. 17, 1998).  In the instant case, there was nothing illegal about selling videogames or paying (or receiving) royalties pursuant to a contract.  Nor is there a plausible allegation that these royalty payments were intended to conceal or disguise the supposedly corrupt means Defendants used to procure the videogame license.  Indeed, WWE knew what payments the licensees would be entitled to under the licensing agreement, even if it did not know the precise split of the proceeds among the joint venture parties.  Therefore, the post-bribery royalty payments from the LLC to Jakks do not constitute predicate acts and cannot extend the pattern of racketeering activity.  *See Vemco, Inc. v. Camardella*, 23 F.3d 129, 134 (6th Cir. 1994) ("[Defendant's] conduct in sending out billing notices from 1991 through 1992 pursuant to an allegedly fraudulent contract cannot be cited by plaintiffs to extend the duration of the fraudulent scheme."); *Pier Connection, Inc. v. Lakhani*, 907 F. Supp. 72, 76 (S.D.N.Y. 1995) (noting that "continuing to reap . . . benefits [from wire fraud] is not itself a predicate act; it is only an effect of the alleged acts of wire fraud"); *Gotham Print, Inc. v. Am. Speedy Printing Ctrs., Inc.*, 863 F. Supp. 447, 460 (E.D. Mich. 1994) ("When the Supreme Court spoke of the threat of repetition, it was referring to the threat of repeated *victimization* . . . , not merely the retention of the ill-gotten fruits of previous crimes.").  "Plaintiff's interpretation . . . would permit any plaintiff once defrauded to state a RICO claim if the defendants continued to derive

a benefit from the property they obtained." *Plater-Zyberk*, 1998 WL 67545, at \*10; *see also*

*Bingham v. Zolt*, 683 F. Supp. 965, 970 (S.D.N.Y. 1988) ("To say that [defendants'] continuing

control of the music companies constituted ongoing criminal activity would allow plaintiffs to

turn every finite scheme – or at least those involving economic crimes – into an enterprise

simply by characterizing the defendant's subsequent enjoyment of the proceeds of the scheme

as continuous criminal activity.").[9]  Thus, the pattern of racketeering acts for the THQ

Defendants, the LLC, and the Jakks Defendants ends in August 1998, just after the LLC is

formed and the videogame license is granted.

　　　As an additional argument for extending the racketeering acts into this decade, Plaintiff

cites concealment by Shenker, Bell, the Jakks Defendants, and the THQ Defendants in

connection with the civil litigation in Connecticut state court.  (Am. Compl. ¶ 195.)

Specifically, Plaintiff alleges that these defendants destroyed evidence of the bribery, provided

---

　　　[9]After this motion was fully submitted, Shenker pled guilty to a federal charge of
conspiracy to transport money obtained by fraud in interstate commerce and wire fraud.  (Letter
of Jerry S. McDevitt, Esq. to the Ct., January 30, 2007.)  Combined with Bell's earlier guilty
plea, Plaintiff argues that it has conclusively established a conspiracy to deny Plaintiff of the
honest services of Bell and Shenker, that this conspiracy involved money laundering through at
least July 2002, and that this conspiracy involved bribes.  (*Id.*)  Pivoting from there, Plaintiff
contends both that these defendants are estopped from challenging the civil action issues decided
by these guilty pleas, and that, because these pleas establish a conspiracy to deny WWE the
honest services of its agents, Plaintiff needs little more to establish the remaining defendants'
participation in the conspiracy.  (*Id.*)
　　　This argument is unpersuasive.  First, Shenker and Bell did not plead guilty to either a
substantive RICO charge or a RICO conspiracy charge.  Second, neither defendant's plea makes
any mention of the allegedly culpable conduct of the Jakks or the THQ defendants (or the LLC).
In fact, neither plea mentions any illegal conduct before 1998, such as the perfumed doll deal or
the earlier toy licenses granted to Jakks.  Instead, the plea only reflects an illegal arrangement
between Bell and Shenker, and the improper sharing of Shenker's commissions with Bell.  Thus,
the plea, while compelling evidence against Bell and Shenker of the conduct they have admitted
to engaging in, does nothing to extend the life of the racketeering acts as to the remaining
defendants.

perjured testimony, made false statements to auditors, and concealed documents. (*Id*. ¶¶ 191-239.) These allegations, however, fail as a matter of law to extend the pattern of racketeering acts. It is true that acts of concealment may sometimes constitute a predicate act for the purposes of RICO. *See United States v. Coiro*, 922 F.2d 1008, 1017 (2d Cir. 1991) ("[T]he evidence established that . . . [the defendant's] activities designed to prevent detection and prosecution of the organization's illegal activities were part of a consistent pattern that was likely to continue for the indefinite future, absent outside intervention."). The alleged coverup here, however, does not qualify because it post-dates – by a couple of years – the underlying and completed bribery scheme. It is a cardinal rule of criminal law that "acts of concealment may have significance in lengthening the life of a criminal conspiracy only when these acts are done in furtherance of the main criminal objectives of the conspiracy – such as when the conspirators in a kidnaping conspiracy hide while waiting for the delivery of ransom." *United States v. Eppolito*, 436 F. Supp. 2d 532, 573 (E.D.N.Y. 2006) (internal quotation marks omitted); *see also Grunewald v. United States*, 353 U.S. 391, 405-06 (1957) (noting that post-crime concealment "indicate[s] nothing more than that the conspirators do not wish to be apprehended – a concomitant, certainly, of every crime since Cain attempted to conceal the murder of Abel from the Lord").

Here, some defendants allegedly lied to Plaintiff and withheld documents to cover up an already-completed scheme. In fact, these acts were allegedly done long after Bell and Shenker were terminated in 2000, for reasons unrelated to their alleged criminal conduct at issue in this case. Because no bribery activities were alleged to be ongoing by 2000, any alleged coverup could not have been intended or designed to further the still-alive scheme, but instead only to

cover up past misconduct.  Therefore, the alleged obstruction, perjury and false statements in

2000 and beyond – shocking as they may be – do not extend the pattern of racketeering activity.

*See Ray Larsen Assocs.*, 1996 WL 442799, at *7 n.8 ("Plaintiff also alleges acts of obstruction

of justice during the pendency of this lawsuit as predicate acts for the RICO scheme.  These

allegations must be excluded because efforts by a defendant to cover up the underlying conduct

are inadequate to satisfy the continuity requirement of the RICO statute."); *Barsam v. Pure

Tech Int'l, Inc.*, 864 F. Supp. 1440, 1450 (S.D.N.Y. 1994) *vacated in aid of settlement*, 907 F.

Supp. 79 (S.D.N.Y. 1995) ("In 'closed-ended' allegations of RICO violations . . . efforts at

covering up the initial fraudulent act are inadequate to satisfy the continuity requirement of the

RICO statute."); *Phil. Reserve Supply Co. v. Nowalk & Assocs., Inc.*, No. 91-CV-0449, 1992

WL 210590, at *6 (E.D. Pa. Aug. 25, 1992) ("Attempting to hide one's involvement in a

scheme after . . . it has been exposed in order to limit liability should not be confused with

concealing the scheme itself in furtherance of its perpetration.  While the [latter] may be a

predicate act within the meaning of RICO the former is not.").[10]

Accordingly, as to the Jakks Defendants, Shenker, and SSAI, the scheme began in

November 1995, when the Jakks Defendants proposed to Shenker, at the time he was paid for

the perfumed doll deal, that Shenker serve as Jakks' agent in procuring the WWE toy license.

---

[10]Additionally, Shenker's perjury in the Connecticut action does not constitute a predicate act.  *See* 18 U.S.C. § 1961(1); *United States v. Eisen*, 974 F.2d 246, 254 (2d Cir. 1992) ("Congress did not wish to permit instances of federal or state court perjury as such to constitute a pattern of RICO racketeering acts."); *Rand v. Anaconda-Ericsson, Inc*., 623 F. Supp. 176, 182 (E.D.N.Y. 1985) ("Perjury, however, is not a RICO predicate act."), *aff'd*, 794 F.2d 843 (2d Cir. 1986).

(Am. Compl. ¶ 42.)  For Bell, the scheme began in November 1997, and for the THQ

Defendants and the LLC, it began in April 1998.  As discussed above, neither the coverup nor

the continued royalty payments constitute predicate acts in furtherance of the scheme, but the

Shenker/SSAI payments to Bell do qualify as money laundering/stolen property predicates.

Thus, for the Jakks Defendants, the scheme lasted slightly less than three years, ending with the

last bribery payment allegedly from them on August 3, 1998.  For Shenker and SSAI, the

pattern of racketeering conduct lasted for more than six years, from November 1995 until

December 2001, while for Bell, the racketeering conduct extended from November 1997 until

December 2001.  For the LLC and the THQ Defendants, however, the racketeering conduct

lasted approximately four months (at most).  Therefore, the Second Circuit's two-year temporal

guideline is met as to Shenker, SSAI, Bell, and the Jakks Defendants.  *See Lavian v.*

*Haghnazari*, 884 F. Supp. 670, 683 (E.D.N.Y. 1995) (finding closed-ended continuity where

pattern of racketeering activity extended over twenty-nine months).

    The Amended Complaint's failure to allege legally-sufficient racketeering acts lasting

for more than four months by the THQ Defendants and the LLC is fatal to Plaintiff's efforts to

keep them in the substantive RICO cause of action under Section 1962(c) on a claim of closed-

ended continuity.  "The focus of section 1962(c) is on the individual patterns of racketeering

activity engaged in by a defendant, rather than on the collective activities of the members of the

enterprise."  *Jerome M. Sobel & Co. v. Fleck*, No. 03-CV-1041, 2003 WL 22839799, at *6

(S.D.N.Y. Dec. 1, 2003) (quoting *United States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987))

(internal quotation marks omitted).   Thus, "the requirements of section 1962(c) must be

established as to each defendant."  *DeFalco*, 244 F.3d at 322 n.22; *see also First Capital Asset*

*Mgmt.*, 385 F.3d at 180 ("In analyzing the issue of continuity, assuming arguendo that the alleged predicate acts constituting the pattern were adequately pled, we evaluate the RICO allegations with respect to each defendant individually."); *Jones v. Nat'l Commc'n and Surveillance Networks*, 409 F. Supp. 2d 456, 473 (S.D.N.Y. 2006) ("The duration, frequency, and substance of the purported racketeering activity are measured independently for each individual defendant."). "Accordingly, regardless of the point in time at which [P]laintiff[] allege[s] the overall [bribery scheme] began, to determine whether [P]laintiff[] satisfied the requisite period of closed-ended continuity for the [THQ Defendants and the LLC], the duration of the pattern of racketeering activity must be measured by the RICO predicate acts that" Plaintiff has sufficiently alleged. *DeFalco*, 244 F.3d at 322 n.22.

The THQ Defendants allegedly joined the RICO enterprise in or shortly after April 1998, when they agreed to submit a joint bid with the Jakks Defendants for the videogame license. (Am. Compl. ¶ 137.) The LLC joined no earlier than April 1998, and arguably not until June 10, 1998, upon its incorporation in Delaware. (*Id*. ¶ 154.) On August 3, 1998, the last bribe payment was allegedly made in connection with the videogame license. (*Id*. ¶ 168.) And, for reasons explained above, because the royalty payments derived from the videogame license do not qualify as racketeering acts, there is no basis to conclude that the pattern of racketeering activity for either the THQ Defendants or the LLC lasted for more than a few months. Accordingly, their Motion to Dismiss the cause of action under Section 1962(c) should be granted, unless Plaintiff has alleged open-ended continuity as to these defendants. *See Cofacredit*, 187 F.3d at 244 (holding that allegations of a pattern of racketeering activity spanning less than a year reflected "a period of insufficient length to demonstrate closed-ended

continuity under our precedents").

The temporal analysis, however, does not end the story for the remaining defendants, as "the court [also] must examine the overall context in which the acts took place." *Pier Connection, Inc.*, 907 F. Supp. at 78 (internal quotation marks omitted). This includes consideration of factors such as, "the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes[.]" *Cofacredit*, 187 F.3d at 242. Defendants argue that Plaintiff cannot satisfy the continuity requirement because there was only one scheme directed at one narrow goal and one victim. However, as already noted, the Second Circuit has "rejected any need to allege multiple schemes." *Procter & Gamble Co.*, 879 F.2d at 18; *see also USA Certified Merchs.*, 262 F. Supp. 2d at 338-39 (finding plaintiffs sufficiently alleged that defendants engaged in scheme to deprive them of the honest services of their agents). Plaintiff also need not allege that there were multiple victims to satisfy continuity. *See Lavian*, 884 F. Supp. at 684; *Metro. Transp. Auth. v. Contini*, No. 04-CV-0104, 2005 WL 1565524, at *2-3 (E.D.N.Y. July 6, 2005) (finding irrelevant the fact that there was only one victim and a one-year scheme where there were many acts of fraud threatening to continue into the future); *Panix Promotions, Ltd.*, 2002 WL 72932, at *7 (finding continuity established where scheme involved one victim but several contracts). Here, as discussed above, Defendants' goal of obtaining the various licenses from WWE, as alleged by Plaintiff, was finite but not overly narrow. Specifically, Plaintiff alleges multiple economic harms related to the various licenses, so the fact that there is only one victim is not dispositive. Therefore, Plaintiff has sufficiently pled closed-ended continuity as to the Jakks Defendants, Shenker, SSAI, and Bell.

2.  Open-Ended Continuity

A party alleging open-ended continuity must show that "the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future [or] . . . are part of an ongoing entity's regular way of doing business." *H.J. Inc.*, 492 U.S. at 242. "[W]hether or not the plaintiff has shown open-ended continuity, the nature of the RICO enterprise and of the predicate acts are relevant." *DeFalco*, 244 F.3d at 323. For example, "an inherently unlawful act performed at the behest of an enterprise whose business is racketeering activity would automatically give rise to the requisite threat of continuity." *GICC Capital Corp.*, 67 F.3d at 466 (finding no open-ended continuity where scheme was inherently terminable once all assets had been looted) (citation omitted); *accord H.J. Inc.*, 492 U.S. at 242-43 ("[T]he threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes."). But, "where the enterprise primarily conducts a legitimate business, there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." *Cofacredit*, 187 F.3d at 243; *see also United States v. Aulicino*, 44 F.3d 1102, 1111 (2d Cir. 1995) (noting distinction between "cases where the acts of the defendant or the enterprise were inherently unlawful, . . . and were in pursuit of inherently unlawful goals," and cases "concerning alleged racketeering activity in furtherance of endeavors that are not inherently unlawful," and that "the courts generally have found no threat of continuing criminal activity arising from conduct" in the latter category); *Marcoux v. Am. Airlines, Inc.*, No. 04-CV-1376, 2006 WL 842888, at *12 (E.D.N.Y. Mar. 28, 2006) ("Where, as here, defendants are

46

operating legitimate businesses, plaintiffs are required to plead facts indicating that there existed the threat of continued criminal activity in furtherance of defendants' plans."). In the end, the "the Second Circuit advised . . . [that the Court] must consider the 'overall context in which the [racketeering] acts took place' to determine whether sufficient continuity is alleged." *Sumitomo Corp. v. Chase Manhattan Bank*, No. 99-CV-4004, 2000 WL 1616960, at *1 (S.D.N.Y. Oct. 30, 2000) (quoting *United States v. Kaplan*, 886 F.2d 536, 542 (2d Cir. 1989)); *see also United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991) (citing *Kaplan*); *Liberty Mut. Ins. Co. v. Blessinger*, No. 06-CV-391, 2007 WL 951905, at *12 (E.D.N.Y. Mar. 27, 2007).

Plaintiff offers two arguments in support of its claim that it has adequately pled open-ended continuity. Initially, Plaintiff contends that the enterprise's business is racketeering, and therefore it is an inherently unlawful organization. In particular, according to Plaintiff, because "[t]his Court has already held that [Plaintiff] has adequately pleaded that Defendants engaged in an association-in-fact RICO enterprise, which was formed solely for the purpose of committing the predicate acts alleged in [Plaintiff's] Amended Complaint," it has sufficiently alleged that Defendants' business "is clearly 'an enterprise whose business is racketeering activity.'" (Pl.'s Opp'n 25.) This reasoning is circular, as it suggests that once a RICO plaintiff has adequately pled a RICO enterprise, it has automatically pled open-ended continuity.[11] In fact, courts regularly distinguish between "a long-term association that exists for criminal purposes" and a legitimate business that conducts its business through unlawful acts. *See H.J. Inc*, 492 U.S. at

---

[11]Moreover, this argument may only highlight the need to reexamine whether, in fact, RICO should be interpreted to require allegations of an enterprise that is more than just the sum of its racketeering acts.

243; *Aulicino*, 44 F.3d at 1111.  Where the collective business and other entities that comprise

the enterprise "primarily conduct[] a legitimate business," there has to be some allegation that

the predicate acts reflected "the regular way of operating that business."  *Cofacredit*, 187 F.3d

at 243.

In this case, the enterprise is made up of several businesses (among others, Jakks, SSAI,

and THQ), none of which is alleged to conduct itself primarily through racketeering activity.  In

fact, for example, Plaintiff avers that "Jakks is primarily in the business of selling action figures

and toys[,]" (Am. Compl. ¶ 10), while THQ is said to be "in the business of videogame

marketing and sales[,]" (*Id.* ¶ 17).  According to Plaintiff, these businesses and the other

individually-named defendants operated their businesses together to form an enterprise, the

principal goal of which was to procure, through fraud and corruption, certain licenses from

Plaintiff.  But, this is not the same as saying that Jakks, THQ, SSAI and the other components

of the alleged enterprise normally did business via racketeering.  On this point, for example, the

allegations regarding the *legitimate* perfumed doll deal and THQ's initially-*legitimate* efforts to

procure the videogame license critically undermine Plaintiff's position.  Therefore, Plaintiff

must allege, but does not, that the racketeering acts are Defendants' "regular way of conducting

[their otherwise] ongoing legitimate business[es]."  *H.J. Inc.*, 492 U.S. at 242.

Plaintiff has a fall-back position, however, which is that because the enterprise engaged

in bribery and money laundering, which are inherently unlawful acts, it has established open-

ended continuity.  (*See* Pl.'s Opp'n 25-26.)  While embezzlement, extortion, bribery, and money

laundering are in pursuit of inherently unlawful goals, *see United States v. Coiro*, 922 F.2d

1008, 1017 (2d Cir. 1991) (finding bribery and money laundering in context of long-term

organized crime organization to be in pursuant of inherently unlawful goal); *Metro. Transp. Auth.*, 2005 WL 1565524, at *4 (determining money laundering activity to be in pursuit of inherently unlawful goal), fraud is not, *see Aulicino*, 44 F.3d at 1111-13; *Int'l Bhd. of Teamsters v. Carey*, 297 F. Supp. 2d 706, 715 (S.D.N.Y. 2004) (finding fraud committed by union with finite goal not to be in pursuit of inherently unlawful goal); *Boucher v. Sears*, No. 89-CV-1353, 1995 WL 283742, at *7 (N.D.N.Y. May 8, 1995) (finding that frauds, particularly those which are inherently terminable, are not inherently in pursuit of unlawful goals). Additionally, Plaintiff ignores the axiom that "the totality of the circumstances surrounding the commission of the predicate acts are considered to determine whether those acts pose a threat of continuing criminal activity." *Busacca*, 936 F.2d at 238 (citing *Kaplan*, 886 F.2d at 542-43). In other words, a RICO plaintiff does not adequately plead open-ended continuity by simply alleging bribery. Instead, the key issue is the context in which the bribery is alleged to have taken place, with a particular view to whether it can be said that the conduct involved constituted a threat of continuing wrongful activity. *See Watral v. Silvernails Farms, LLC*, 177 F. Supp. 2d 141, 150 (E.D.N.Y. 2001) (noting three ways to establish threat of continuing criminal activity: (i) where the alleged enterprise primarily is engaged in racketeering activity; (ii) where the predicate acts are the "regular way" of conducting business activity; and (iii) where the nature of the predicate acts themselves suggest a threat of continuing racketeering activity).

Here, as noted, the enterprise is comprised of mostly legitimate businesses. Moreover, at oral argument, Plaintiff conceded that Defendants' goal was to obtain a limited number of licenses, and "that's it." In other words, what Plaintiff has alleged, even taking all of its claims

as true, is an inherently terminable scheme that was focused on illegally obtaining two types of licenses: one for action figures and one for videogames. Moreover, Plaintiff's own Amended Complaint makes clear that this scheme came to an end by June 1998, when the videogame license was granted to the LLC by WWE. (Am. Compl. ¶ 149.) The domestic and international toy licenses all had been amended to extend them to the same time frame granted in the videogame license, which was for ten years from June 1998, with a five-year renewal at the option of Jakks. (*Id.* ¶ 165.) Thus, even though the Amended Complaint details Defendants' alleged misconduct for six years after the granting of the videogame license, there is no allegation that Defendants schemed to pursue any other licenses from WWE or any other vendor. This undercuts Plaintiff's attempt to plead open-ended continuity, as the courts have rejected attempts at open-ended claims involving a terminable scheme, such as the one alleged by Plaintiff here. *See, e.g., First Capital Asset Mgmt.*, 385 F.3d at 180-81 (noting that claims of open-ended continuity in case involving terminable scheme of asset conveyance in bankruptcy proceedings "defie[d] logic," even though defendants' mail fraud and perjury continued after filing of bankruptcy petition). This is true, even in cases where bribery is alleged to have been part of the enterprise's arsenal of racketeering acts. *See United States v. Spadoni*, No. 00-CR-217, 2005 WL 2275938, at *11 (D. Conn. Sept. 16, 2005) (holding that there was no open-ended continuity in public corruption cases involving allegations of bribery because scheme was "inherently terminable"); *Watral*, 177 F. Supp. 2d at 147, 150 (rejecting claim of open-ended continuity where plaintiff alleged mail and wire fraud, interstate transportation of stolen goods, obstruction of justice, sale or receipt of stolen goods, money laundering and commercial bribery as racketeering acts, because asset diversion scheme was "limited scheme aimed only at

50

Plaintiff and his horses").[12]  Moreover, Plaintiff's claims of open-ended continuity particularly

fail for the THQ Defendants and the LLC, which are not even alleged to have directly

participated in any bribery of Bell or Shenker.  Thus, even if Plaintiff had sufficiently pled open

ended-continuity as to Bell, Shenker, SSAI, and the Jakks Defendants, it has not come close to

pleading open-ended continuity as to the THQ Defendants and the LLC.  *See First Capital*

*Asset Mgmt.*, 385 F.3d at 180 ("In analyzing the issue of continuity, . . . we evaluate the RICO

allegations with respect to each defendant individually.").[13]  Accordingly, the substantive RICO

---

[12]Plaintiff attempts to avoid this fate by claiming that the threat of continuity from a defendant's alleged racketeering activities is to be viewed at the time the activities are alleged to have occurred.  This effort fails for two reasons.  First, the cases Plaintiff cites do not stand for the proposition tendered by Plaintiff.  In *Welch Foods, Inc. v. Gilchrist*, No. 93-CV-0641, 1996 WL 607059, at *6 (W.D.N.Y. Oct. 18, 1996), the "kickback scheme had been ongoing for years and would have continued but for its discovery[,]" something that cannot be said about the scheme alleged by Plaintiff here.  *Aulicino* is no more helpful, as the quote cited by Plaintiff is not from the *Aulicino* court, but merely that court's discussion of another decision in another circuit, 44 F.3d at 1112 (quoting *Busacca*, 936 F.2d at 238).  Moreover, the circuit quoted by the *Aulicino* court had ruled in another case that there was no threat of continuity from a fraud scheme that lasted 17 months, because the scheme was inherently terminable.  *Id.* (citing *Vemco*, 23 F.3d at 134-35).  Second, while it may be that in certain cases the nature of the racketeering act can be viewed as itself representing a threat of continuing, the allegations *in this case* show that the scheme reached its conclusion by June 1998, particularly given the lack of any allegations that Defendants sought any other licenses from Plaintiff or any other entity.

Plaintiff's claim that the scheme continues today because Defendants receive revenue from the allegedly unlawfully procured licenses is no more persuasive in establishing open-ended continuity than it is in establishing closed-ended continuity.  "Plaintiff[] cannot establish open-ended continuity by alleging that the *effects* of predicate acts extend into the future.  Rather, there must be a threat that the acts themselves will be repeated."  *Pier Connection, Inc.*, 907 F. Supp. at 76 (finding no open-ended continuity where defendants would reap the benefits of defaming plaintiff and stealing customers); *see also Rini v. Zwirn*, 886 F. Supp. 270, 300 (E.D.N.Y. 1995) (holding no open-ended continuity where threat of repercussions from past acts, but not acts themselves, threatened to occur in the future).

[13]Because the Court determines that Plaintiff has not made a case for finding that the THQ Defendants and the LLC have engaged in a pattern of racketeering, it need not, and therefore will not, address their arguments regarding operation and management of the alleged

cause of action against each of the THQ Defendants and the LLC is dismissed.

D.  Injury

Shenker, SSAI, and the Jakks Defendants argue that Plaintiff lacks standing to bring a RICO claim under 18 U.S.C. § 1962(c), because it "fails to allege any pecuniary injury to its 'business or property by reason of a violation of' the RICO statute."  (Jakks Mem. 19 (citing 18 U.S.C. § 1964(c)).)  Specifically, these defendants contend that (i) any lost profits injury suffered by Plaintiff is not cognizable under New York law; and (ii) Plaintiff's alleged injury, even if permissible under New York law, is too speculative under RICO.[14]

Plaintiff alleges that as a proximate result of Defendants' racketeering acts, it was deprived of the intangible right of honest services from Shenker and Bell, and as a further result, it received lower royalty rates from its toy and videogame licenses.  Specifically, Plaintiff claims that because of Defendants' alleged misconduct, Plaintiff was denied the business opportunity of between 50-66% more in royalties from a non-corrupt licensing arrangement.  (Am. Compl. ¶ 163.)[15]  This, Plaintiff claims, is sufficient to plead a RICO injury.

"The RICO civil liability provision confers standing on [a]ny person injured in his business or property by reason of a violation of section 1962." *Hecht v. Commerce Clearing*

---

enterprise.

[14]Plaintiff also seeks disgorgement of revenues earned through the allegedly illegally-obtained licenses.  Plaintiff argues that the receipt of revenues from those licenses constitutes an ongoing injury.  As discussed above, payments under the licenses do not constitute predicate acts.  Therefore, Plaintiff is seeking disgorgement of past ill-gotten gains, which is not permitted under RICO.  *See United States v. Carson*, 52 F.3d 1173, 1182 (2d Cir. 1995) (holding that "we do not see how it serves any civil RICO purpose to order disgorgement of gains ill-gotten long ago").

[15]This estimate relates only to the videogame license.  No such estimate is alleged as to the domestic and international toy licenses.

*House, Inc.*, 897 F.2d 21, 23 (2d Cir. 1990) (internal quotation marks omitted).  Thus, "[i]n

order to bring a civil RICO claim, a plaintiff must allege: (1) a violation of Section 1962; (2) an

injury to business or property; and (3) causation of the injury by the violation."  *Am. Buying Ins.*

*Servs., Inc. v. S. Kornreich & Sons, Inc.*, 944 F. Supp. 240, 243-44 (S.D.N.Y. 1996) (citing

*Hecht*, 897 F.2d at 23).  In other words, a plaintiff must show that its "injury is to its property,

and not, for example, physical, emotional or reputational harm, and that plaintiff's injury is

proximately caused by the acts constituting the RICO violation."  *State Farm Mut. Auto. Ins.*

*Co. v. CPT Med. Servs., P.C.*, 375 F. Supp. 2d 141, 152 (E.D.N.Y. 2005).  Where a plaintiff

bases its RICO claim on predicate acts of fraud, the plaintiff "must allege detrimental reliance

on the fraud."  *Cougar Audio, Inc. v. Reich*, No. 99-CV-4498, 2000 WL 420546, at *4

(S.D.N.Y. Apr. 18, 2000).  In evaluating a RICO injury claim, it bears remembering that "RICO

should be 'liberally construed to effectuate its remedial purposes[.]'"  *Allen v. Berenson Pari-*

*Mutuel of N.Y.*, No. 95-CV-10289, 1998 WL 80168, at *3 (S.D.N.Y. Feb. 25, 1998) (quoting

*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985)).  However, "a RICO plaintiff may not

recover for speculative losses or where the amount of damages is unprovable."  *Trs. of*

*Plumbers and Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc.*, 886 F. Supp. 1134,

1146 (S.D.N.Y. 1995).

As discussed above, Plaintiff alleges violations of section 1962(c), satisfying the first

factor.  As to the second factor, Plaintiff alleges that it suffered an injury to its business or

property in the form of the loss of the honest services of its agents Shenker and Bell due to the

bribes allegedly paid by some defendants, and in the form of lost opportunity to pursue

competitive licensing offers.  The moving defendants contend that if Plaintiff suffered an injury,

it is in the form of lost profits, and that under New York law, a plaintiff cannot recover lost

profits in a fraud action. *See First Nationwide Bank v. Gelt Funding Corp.*, 820 F. Supp. 89, 95

(S.D.N.Y. 1993). However, Plaintiff alleges that it lost the business opportunity to obtain more

lucrative royalties on its licenses because Shenker, Bell, and THQ had been coopted, and

consequently, the competitive bidding process resulted in calculably lower royalties. In

particular, Plaintiff alleges that Shenker and Bell were responsible for seeking competitive bids

and negotiating the terms of each license. (Am. Compl. ¶¶ 30, 75, 110, 148.) Plaintiff further

claims that Activision and THQ expressed concrete interest in the videogame license, which

likely would have resulted in a licensing agreement superior to the one ultimately offered to the

LLC. (*Id.* ¶¶ 131-32, 153.) In other words, Plaintiff relied upon the misrepresentations made

by Shenker and Bell that it was receiving the best offer as determined by a competitive bidding

process. As a result of Defendants' alleged fraud, Plaintiff claims it was denied the opportunity

to consider more favorable bids from other vendors, including THQ (before it was allegedly

coopted). (*Id.* ¶¶ 127-45, 153.)

As pled, Plaintiff alleges a cognizable injury resulting from Defendants' alleged fraud in

the form of lost business opportunities, which New York law recognizes as a remedy for fraud.

It is true that in New York a fraud victim may not recover lost future profits. *See Lama Holding

Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1373 (N.Y. 1996) (holding that "[d]amages are to

be calculated to compensate plaintiffs for what they lost because of the fraud, not to compensate

them for what they might have gained," thus, "there can be no recovery of profits which would

have been realized in the absence of fraud"); *Three Crown Ltd. P'ship v. Salomon Bros., Inc.*,

906 F. Supp. 876, 891 (S.D.N.Y. 1995) ("New York law, however, allows plaintiffs in common

law fraud actions to recover only for actual pecuniary losses (out-of-pocket losses and

consequential damages) and not for future profits."). This includes attempts to "recover the

benefit of an alternative agreement overlooked in favor of the fraudulent one." *Alpert v. Shea*

*Gould Climenko & Casey*, 559 N.Y.S.2d 312, 315 (App. Div. 1990). The basis for this rule is

the view that lost profits are inherently speculative and uncertain. *See Geary v. Hunton &*

*Williams*, 684 N.Y.S.2d 207, 207 (App. Div. 1999) ("The damages plaintiff seeks are not

recoverable under the out-of-pocket rule, which bars recovery of profits that would have been

realized in the absence of fraud, including the loss of an alternative bargain overlooked in favor

of the fraudulent one, as inherently speculative and undeterminable."). However, the Second

Circuit has recognized a distinction between a claim of lost profits and a claim for other

consequential damages, such as lost business opportunities. Thus, "[i]n the Second Circuit,

'damages for fraud include the costs incurred in preparing for, performing, or passing up other

business opportunities,' so long as plaintiff can 'establish the causal nexus with a good deal of

certainty.'" *I.M. Oberman Assocs., Inc. v. Republic Fin. Servs., Inc.*, No. 92-CV-1843, 1993

WL 88209, at *5 (S.D.N.Y. Mar. 25, 1993) (internal citations omitted); *see also Schonfeld v.*

*Hilliard*, 218 F.3d 164, 183 (2d Cir. 2000) (citing *Fort Howard Paper Co. v. William D. Witter,*

*Inc.*, 787 F.2d 784, 793 n.6 (2d Cir. 1986))[16]  "Although the line between lost profits and

---

[16]The lineage of this point is worth noting, only because it does not trace back to any
New York authority. The district court cases cited by Plaintiff (*I.M. Oberman* and *Academic*
*Indus., Inc. v. Untermeyer Mace Partners, Ltd.*, No. 90-CV-1052, 1992 WL 73473, at *2
(S.D.N.Y. Apr. 1, 1992)), rely on the Second Circuit's decision in *Ostano Commerzanstalt v.*
*Telewide Sys.*, 880 F.2d 642, 649 (2d Cir. 1989). That decision, in turn, cites a footnote in *Fort*
*Howard Paper Co.*, 787 F.2d at 793 n.6, as the sole authority regarding the inclusion of "lost
business opportunities" as a form of consequential damages for fraud. *Fort Howard* cites, as the
sole authority for the same point, the district court decision in *Soper v. Simmons, Int'l, Ltd.*, Nos.
84-CV-70, 84-CV-71, 84-CV-72, 1984 WL 426, at *4 (S.D.N.Y. May 30, 1984). In *Soper*, the

consequential damages is sometimes blurry, courts try to limit the recovery of consequential

damages from a fraud 'to that which is necessary to restore a party to the position occupied

before commission of the fraud.'"  *Imaging Int'l. v. Hell Graphic Sys., Inc.*, 2007 WL 3227245,

at *7 (N.Y. Sup. Ct. Oct. 29, 2007) (quoting *Alpert v. Shea Gould Climenko & Casey*, 559

N.Y.S.2d 312, 314 (App. Div. 1990)).  Plaintiff's injury claim is not limited to an assertion of

lost future profits.  Rather, Plaintiff alleges that it already has lost business opportunities, in the

form of licenses that could have been granted to other vendors, and the royalties that would

have accompanied these other licenses.

However, Defendants further argue that even if Plaintiff's injury is of a kind cognizable

under New York law, its claims of injury are legally deficient under RICO because they are

speculative and unquantifiable.  Indeed, as a general matter, even if a plaintiff sufficiently

pleads an injury compensable under New York law, it does not mean that plaintiff has satisfied

its pleading obligations under RICO.  *See Cougar Audio,* 2000 WL 420546, at *8 (holding that

while the "abstract form of harm suffered by one who loses the chance to bargain with all the

facts may be sufficient to sustain a bare allegation of commercial bribery under New York law, .

. . it is not sufficient to sustain a RICO allegation with commercial bribery predicates").  In

particular, "Defendants are correct in asserting that a RICO plaintiff may not recover for

speculative losses or where the amount of damages is unprovable."  *Transworld Mech., Inc.*,

886 F. Supp. at 1146; *accord Imagineering, Inc. v. Keiwit Pac. Co.*, 976 F.2d 1303, 1310 (9th

---

court noted that "the only permissible recovery [for fraudulent representation] is the plaintiff's
'reliance interest' – i.e., the costs incurred by the plaintiff in reliance on the promise by incurring
expenses in preparation or in performance or in passing up other business opportunities."  *Id.*
The only authority cited in support of that proposition is Professor Farnsworth's Contracts
Treatise.  *See id.* (citing FARNSWORTH, CONTRACTS, § 12.1 at 812-14 (1982)).

Cir. 1992) ("A showing of 'injury' requires proof of concrete financial loss."); *Sheperd v. Am. Honda Motor Co.*, 822 F. Supp. 625, 629 (N.D. Cal. 1993) (noting that "the requirement of a concrete financial loss proximately caused by the wrongful conduct of RICO defendants is not easily met"). The remedial purpose of RICO is to put the injured plaintiff in the same financial position it would have been in absent the misconduct. *See Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1106 (2d Cir. 1988). If the damages cannot be ascertained, then there is no lawful way to compensate the plaintiff. Thus, the courts regularly have held that a plaintiff who alleges injuries that are "indefinite and unprovable" does not have standing under, and cannot recover damages pursuant to, RICO. *See First Nationwide Bank*, 27 F.3d at 768; *Allen*, 1998 WL 80168, at *3.

Here, Defendants contend that Plaintiff's allegations involve an unquantifiable "potential opportunity to earn . . . profits." (Jakks Mem. 20.) Plaintiff counters by claiming that based on other competitive licenses, the royalty rates it is receiving under its videogame license are 50% to 66% lower than what it could have earned from a competitive bid, thus costing Plaintiff millions of dollars. (Am. Compl. ¶¶ 163-64.) From this and other allegations, Plaintiff boldly asserts that the "calculation of damages on this branch is remarkably simple." (Pl.'s Opp'n 31.) This is a curious claim, because Plaintiff does not make such a calculation in its Amended Complaint. In fact, it proffers a noticeably wide range of potentially higher royalty rates (50%-66%) it could have earned in a non-corrupt bidding process, and only regarding the videogame license. Nothing substantial is said about the range of lost royalties from the toy licenses. Moreover, Plaintiff's estimate regarding the videogame license, as discussed below, causes Plaintiff all kinds of trouble in rebutting Defendants' statute of limitations claims. In

any event, and to be clear, the problem with Plaintiff's claim of RICO injury is not that it cannot claim lost business opportunities as a result of Defendants' alleged misconduct.  Instead, the legal infirmity derives from the fact that there is no plausible set of facts, consistent with Plaintiff's allegations, that makes the alleged injury sufficiently concrete to state a RICO claim.

The calculation of damages from any lost business opportunities in connection with the licenses will necessarily require some proof as to what a non-corrupt bidding process would have yielded.  Regarding the videogame license, Plaintiff's only argument is that it might be able to establish some quantifiable royalty stream from the preliminary interest expressed in the license by THQ, and that dismissal is inappropriate because the information about what THQ might have done is uniquely in its possession.  However, Plaintiff's own allegations merely suggest that THQ had aspired generally to provide licensors with royalty rates higher than what the LLC paid to WWE (19%-22%).  Indeed, the Amended Complaint provides few details about any proposal that THQ discussed with Plaintiff before being approached by Jakks, including what the terms of that deal would have been, whether that deal would have been superior to the bid given to the LLC, what the length of any deal would have been, or what THQ's capacity was to perform under any such deal.   The capacity to perform is critical because any licensing agreement that THQ (or any other bidder) might have signed would only guarantee royalties on sales made by the licensee.  Thus, a bidder that might have guaranteed less of a royalty rate might still have been better for WWE's bottom line than anything that THQ might have guaranteed, because of superior technology, marketing, and overall business efficiency.  All of these variables, given the allegations in the Amended Complaint, doom Plaintiff's efforts to establish a cognizable RICO injury.

Moreover, in its response to Defendants' Motion, Plaintiff ignores its own allegations that there were other potential bidders for the videogame license. This omission, perhaps done to avoid further damaging Plaintiff's response to the statute of limitations argument, serves only to complicate Plaintiff's efforts to establish RICO standing. For example, in late March 1998, a corrupt Bell is alleged to have told a company called Acclaim that he would not even entertain a proposal to renew the videogame license then in place. (Am. Compl. ¶ 109.) Acclaim appealed this move to WWE senior management, who advised Acclaim that it could submit a bid. However, before the Acclaim bid was submitted, Bell recommended to senior management that the license be given to Jakks. (*Id*. ¶ 110.) Unfortunately, the Amended Complaint says nothing about the terms of the Jakks bid, and, in particular, whether it provided royalty rates that were better than what WWE had been receiving from Acclaim. This omission is inexplicable since WWE presumably has access to that information. Instead of providing this available information, Plaintiff only alleges that the terms of the proposal "were well below then prevailing market rates for a videogame license of the quality of WWE." (*Id*.) Apparently, WWE management ignored the obviously low royalty rates to be paid by Jakks (we still do not know if they were above or below what Acclaim had paid or had offered to pay) and approved the deal. (*Id*. ¶ 114.)

At about the time WWE senior management approved the Jakks proposal, two other bidders (Activision and THQ) entered the scene. Though ignored or stiff-armed by Shenker and/or Bell, both Activision and THQ are alleged to have submitted informal proposals that were "clearly superior" to the deal WWE had already accepted from Jakks (how superior we are not told). (*Id*. ¶¶ 131-32.) These proposals never made it to WWE senior management, though,

59

thanks to the alleged efforts of Bell and Shenker, who instead shared the bid information with Jakks. (*Id.* ¶ 134-35.) Eventually, to hide the bribery scheme and protect its interest in obtaining the bid, Jakks reached out to THQ and persuaded THQ to submit a joint bid for the videogame license, a bid that concededly was "comparable to Activision's initial informal proposal." (*Id.* ¶ 145.) It was this proposal that Bell and Shenker submitted to WWE senior management for approval. (*Id.* ¶¶ 146, 151.) Apparently, while this revised bid was being considered, Activision submitted a "more formalized version of [its] initial informal proposal to Shenker." (*Id.* ¶ 153.) Again, no specifics about the royalties in this proposal are discussed in the Amended Complaint, and, in particular, there is no allegation that this bid was superior, let alone how superior it was, to the joint Jakks-THQ bid. All that is alleged is that, "upon information and belief" the bid "understated the amount Activision would have been willing to pay to obtain the videogame license." (*Id.*)

It bears emphasizing that in its Amended Complaint and in its Memorandum of Law, Plaintiff's only claim regarding the injury from the bidding process for the videogame license is that it was cheated out of a royalty rate that could have been 50% to 66% higher. This is not based not on anything that Activision or Acclaim are alleged to have bid, let alone might have been able to deliver, but instead on what THQ is alleged to have thought it might have to pay, not to WWE, but generally to "licensors." (*Id.* ¶ 160.) It also bears emphasizing that the entirety of Plaintiff's defense of its RICO injury claim focuses on the videogame license. There is nothing described about the bidding process regarding the domestic and international toy licenses that offers any plausible way to quantify the alleged RICO injury to WWE from those deals. While Plaintiff does not make this point, it might have argued that the license granted to,

and later taken from, Playmates could establish a benchmark for lost business opportunities. No such argument is made, however, and no allegation in the Amended Complaint describes either the differences in the royalty rates between the competing Jakks and Playmates deals, or what the bidding process might have brought in for the international toy license or the extensions of the domestic toy licenses.

From the collection of Plaintiff's allegations, voluminous as they may be, the Court finds that Plaintiff has not alleged an injury sufficiently quantifiable to establish standing under RICO. First, essential to Plaintiff's injury claims is some ability to project what would have come out of the bidding processes for the various licenses. Yet, even taking the allegations and all reasonable inferences from them as true, Plaintiff does not have a crystal ball or any plausible way to allege facts that would establish the outcome of the bidding process. While it may be, for example, that Activision had made a preliminary offer, and might have intended to make other offers, there is no way to predict what would have happened if Activision, Acclaim, THQ and even others, had engaged in a full and fair bidding process. *See Imagineering*, 976 F.2d at 1311 (affirming dismissal where complaint did "not allege specific bids submitted by the MWBE plaintiffs that were accepted by the prime contractors"); *Bonavitacola Elec. Contractor, Inc. v. Boro Developers, Inc.*, No. 01-CV-5508, 2003 WL 329145, at *12 (E.D. Pa. Feb. 12, 2003) (holding that plaintiff failed to allege RICO injury from fraudulent bidding process because "it does not necessarily follow that Plaintiff . . . would have been awarded the contract if Defendant . . . had not bid, or had not been the low bidder, just because it was the next lower bidder"), *aff'd* 87 Fed. App'x 227 (3d Cir. 2003).

Second, Plaintiff has no apparent way of assessing the profits any winning licensee

could have produced for Plaintiff, as a more favorable royalty *rate* would only benefit Plaintiff

if the vendor could manufacture and market the videogames and toys on a mass scale equal to

or better than the Jakks/LLC bids.  This is not a situation where the facts necessary to plead

injury are peculiarly within defendants' knowledge.  *See Transworld Mech., Inc.*, 886 F. Supp.

at 1146 (finding injury not speculative where information to ascertain precise amount of

plaintiff's loss was peculiarly within the defendants' knowledge).  Rather, the facts needed to

quantify the actual loss to Plaintiff would not be in the unique possession of any party (or non-

party).  Instead, the net profits to Plaintiff from a corruption-free bidding process would depend

on a number of factors that could not be projected.  *See Anza v. Ideal Steel Supply Corp.*, 126 S.

Ct. 1991, 1997 (2006) (noting that plaintiff's "lost sales could have resulted from factors other

than [defendants'] alleged acts of fraud," as "[b]usinesses lose and gain customers for many

reasons, and it would require a complex assessment to establish what portion of [plaintiff's] lost

sales were the product of [defendant's misconduct]"); *C.B. & D.M. Entm't, Inc. v. Galardi*, No.

03-CV-2112, 2007 WL 4219409, at *3 (N.D. Cal. Nov. 28, 2007) (noting speculative nature of

alleged RICO injury "confirms" the absence of proximate causation).  Here, it is important to

distinguish the likelihood that Plaintiff would have received more favorable licensing terms

from a non-corrupt bidding process (which the Court assumes to be true), and the unlikelihood

that Plaintiff could reasonably quantify how much more favorable the licensing agreements

would have been.  Establishing the former does not mean that Plaintiff can substantiate the

latter.  *See Sheperd*, 822 F. Supp. at 630 (dismissing RICO complaint for failure to allege

injury, even though "[t]here can be no doubt that the alleged diversion tactics and reduced

allocations would have been likely to have some adverse effect on the profitability on the

[Plaintiffs'] dealership, and consequently affect the market value of the dealership"). Thus, the Court finds that there is no plausible set of facts, consistent with the allegations in the Amended Complaint, that would demonstrate that Plaintiff has suffered a quantifiable and cognizable injury under RICO.

### E. Statute of Limitations

Defendants argue that Plaintiff's RICO claim is time-barred. RICO does not provide for a statute of limitations, but the Supreme Court has held that civil RICO claims are subject to a four-year statute of limitations. *See Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987); *accord Bankers Trust Co.*, 859 F.2d at 1101. The statute of limitations begins to run "when the plaintiff discovers or should have discovered the RICO injury." *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 58 (2d Cir. 1998); *see also DLT Res. v. Credit Lyonnais Rouse, Ltd.*, No. 00-CV-3560, 2001 WL 25695, at *4 (S.D.N.Y. Jan. 10, 2001) (noting that the limitations period accrues when plaintiff "knew or should have known of his injury").[17] As a corollary, the Second Circuit also has adopted a "separate accrual rule," under which a "new claim accrues and the four-year limitation period begins anew each time a plaintiff discovers or should have discovered a new and independent injury." *Merrill Lynch*, 154 F.3d at 59. "Pursuant to this rule, a plaintiff who is continuously injured by an underlying RICO violation may only recover for injuries discovered or discoverable within four years of the time suit is brought." *Nat'l Group for Commc'ns and Computers Ltd. v. Lucent Techs. Inc.*, 420 F. Supp. 2d 253, 265 (S.D.N.Y. 2006) (citing *Bingham v. Zolt*, 66 F.3d 553, 560 (2d

---

[17]This is true even if the "amount of the damage is not certain." *In re Merrill Lynch Ltd P'ships Litig.*, 7 F. Supp. 2d 256, 264 (S.D.N.Y. 1997), *aff'd*, 154 F.3d 56 (2d Cir. 1998).

Cir.1995)).  "The Second Circuit, however, has made clear that allegations of 'new and independent' injuries cannot depend on injuries that are derivative of the core injury sustained." *Eno Farms Coop. Assoc., Inc. v. Corp. for Indep. Living*, No. 06-CV-1983, 2007 WL 3308016, at *8 (D. Conn. Nov. 5, 2007); *see also Bankers Trust*, 859 F.2d at 1103 (announcing new and independent injury rule).

The first step in the statute of limitations analysis is to determine when Plaintiff sustained the alleged injuries for which it seeks redress.  *See Merrill Lynch*, 154 F.3d at 59. From there, the Court is to determine when Plaintiff discovered or should have discovered each injury, which establishes when the four-year statute of limitations period begins.  *See id.*  Here, the Complaint was filed on October 19, 2004.  If Plaintiff was or should have been on notice of the injuries it alleges prior to October 19, 2000, then its claims may be time-barred.

Plaintiff alleges that it was injured by the seven licenses granted to Jakks and/or the LLC between April 22, 1996 and June 24, 1998, because they provided for below-market royalty rates and/or profits, all due to the allegedly unlawful activities of Defendants, which denied Plaintiff the honest services of its agents.[18]  Plaintiff claims that, in the absence of the

---

[18]The seven licenses include: (1) the first amendment to the domestic toy license, April 22, 1996, (Am. Compl. ¶¶ 54-56, 249(a)(vii)); (2) the second amendment to the domestic toy license, January 21, 1997, (*id.* ¶¶ 64, 67, 249(a)(x)); (3) the international toy license, February 10, 1997, (*id.* ¶¶ 65, 71, 249(a)(xi)); (4) the third amendment to the domestic toy license, January 12, 1998, (*id.* ¶¶ 93, 249(a)(xiv)); (5) the videogame license, June 10, 1998, (*id.* ¶¶ 136-64); (6) the extension of the domestic toy license, June 24, 1998, (*id.* ¶¶ 149, 165); (7) the extension of the international toy license, June 24, 1998, (*id.* ¶¶ 149, 165).  According to Plaintiff, the last extensions of the domestic and international toy licenses were to be coterminous with the videogame license, which itself is described to be of the "extraordinary length" of ten years, with a five-year renewal right at the option of Jakks.  (*Id.* ¶¶ 149, 165.)

corrupt bidding process, each license invariably would have been more lucrative, as more bidders could and would have participated in the process, thus driving up financial gains for Plaintiff.

Defendant argues that Plaintiff should have discovered the injuries Plaintiff allegedly suffered because of the alleged racketeering acts.  "An injury is 'discoverable' when a plaintiff has constructive notice of facts sufficient to create a duty to investigate further into the matter." *Congregacion de la Mision Provincia de Venezuela v. Curi*, 978 F. Supp. 435, 444 (E.D.N.Y. 1997) (citation and internal quotation marks omitted); *see also Dodds v. Cigna Secs. Inc.*, 12 F.3d 346, 352 (2d Cir. 1993).  "In essence, knowledge of the fraud will be imputed to a plaintiff if there are circumstances sufficient to alert a reasonable person to the probability that he or she has been defrauded." *Curi*, 978 F. Supp. at 444.  "The question of constructive knowledge and inquiry notice may be one for the trier of fact and therefore ill-suited for determination on a motion to dismiss . . . . Nonetheless, the test is an objective one and dismissal is appropriate when the facts from which knowledge may be imputed are clear from the pleadings." *Salinger v. Projectavision, Inc.*, 934 F. Supp. 1402, 1408 (S.D.N.Y. 1996).

Regarding the toy licenses granted to Jakks, Plaintiff alleges the following in its Amended Complaint: (i) as of 1996, the "competitive environment among toy companies seeking intellectual property licenses was intense[,]" (Am. Compl. ¶ 58); (ii) Playmates was one of the three top competitors in this intensely competitive market, (*id*.); (iii) in June 1996, Playmates was granted a license by WWE for certain domestic action figures and a right of first negotiation/last refusal to manufacture and distribute these action figures internationally, (*id*. ¶¶ 59, 61); (iv) on January 21, 1997, approximately seven months after granting certain licensing

rights to Playmates, WWE granted – upon Shenker's allegedly corrupt recommendation – conflicting licensing rights to Jakks, (*id*. ¶¶ 59, 62-69); (v) on January 30, 1997, Playmates complained in a letter to Bell – who Plaintiff alleges had not yet joined the scheme – about the grant of conflicting rights to Jakks, (*id*. ¶¶ 70, 79-80); (vi) on February 10, 1997, WWE and Jakks entered into an agreement granting Jakks an international toy license, with no apparent notice to Playmates to exercise its right to negotiate for such a license, (*id*. ¶ 71); (vii) on November 6, 1997, Bell absolved Playmates of the obligation of its guarantee to WWE, denying WWE the substantial sum still left to be paid on the guarantee, as well as the associated royalties, (*id*. ¶ 83); (viii) on January 12, 1998, Jakks was granted a third amendment to the domestic toy license, which granted Jakks rights to the action figures previously held by Playmates, (*id*. ¶ 93); and (ix) the domestic and international toy licenses were extended to be coterminous with the terms of the videogame license, which itself was described as being "extraordinary" in length, (*id*. ¶¶ 149, 165).

Regarding the videogame license, the Amended Complaint contains the following allegations: (i) as of January 1998, Acclaim was granted the videogame license, which Bell previously told Acclaim would be renewed with "no problem[,]" (*id*. ¶¶ 101, 107); (ii) on March 25, 1998, Bell "advised Acclaim that he would not even listen to any proposal that Acclaim would make for the renewal of its license[,]" (*id*. ¶ 109); (iii) upon hearing this news from Bell, Acclaim "went over Bell's head and complained to senior management at WWE that it was not being permitted to submit a renewal proposal[,]" (*id*.); (iv) WWE senior management advised Acclaim that it could submit a renewal proposal, (*id*.); (v) on March 30, 1998, five days

after Acclaim complained to senior management and was told it could submit a proposal for the videogame license, Bell sent senior management a memorandum recommending that the license be granted to Jakks on terms "well below then prevailing market rates for a videogame license of the quality of WWE[,]" (*id*. ¶ 110); (vi) on April 7, 1998, Activision wrote Bell to express its interest to "move promptly to secure the" license on "the most competitive terms[,]" (*id*. ¶ 128); (vii) on April 8, 1998, WWE senior management approved the deal memo granting the videogame license to Jakks, (*id*. ¶ 114), apparently not asking about Acclaim's bid; (viii) on April 16, 1998, THQ met with Bell and Shenker to express an interest in making a bid for the videogame license, (*id*. ¶ 129); (ix) on April 17, 1998, hoping to dissuade Activision from bidding, Shenker met with Activision representatives, but he refused to give them any terms for the videogame license, (*id*. ¶ 130); (x) Activision and THQ both continued their pursuit of the license, (*id*. ¶¶ 131-32); (xi) to protect its bribery scheme, and ensure that it would get the license, Jakks approached THQ and corruptly persuaded it to join in a bid for the license, (*id*. ¶¶ 133-145); (xii) in another memorandum on May 12, 1998, Bell recommended to WWE senior management that it accept the Jakks/THQ joint bid, which contained terms more favorable to WWE, (*id*. ¶ 152); (xiii) even though WWE management had not been made aware of any other bid, it accepted the revised bid (which still included Jakks), and executed the licensing agreement on June 23, 1998, which was to be in effect as of June 10, 1998, (*id*. ¶ 157); and (xiv) the videogame license WWE approved was of "extraordinary length" (10 years with a five-year right of renewal) and guaranteed "below-market" royalties for 40-60 fiscal quarters, (*id*. ¶ 150).

67

From Plaintiff's own, detailed allegations, the Court has little difficulty in finding that a reasonable person would have been on inquiry notice of the injury Plaintiff is alleged to have suffered by no later than June 1998. The totality of Plaintiff's allegations is that within less than two years, WWE granted to Jakks, a company that apparently had none of WWE's valuable, lucrative and market-rate licenses until 1996, seven toy and videogame licenses, all of which provided grossly unfavorable terms for WWE. In the course of granting these licenses, WWE chased away two incumbent licensees, thereby foregoing hundreds of thousands of dollars of guaranteed payments, and/or sacrificing royalty rates far below what an "intensely competitive" market would bear. WWE gave these licenses to Jakks without even permitting the incumbent bidder to compete with the newcomer. In fact, in both instances, WWE officials received directly from the incumbent licensee a complaint that it was being blocked from the bidding process. In connection with the toy license, Playmates complained to Bell, *before he was brought into the scheme*, and in connection with the videogame license, Acclaim "went over Bell's head" and straight to WWE senior management to complain. Upon hearing the latter complaint from Acclaim, WWE senior management gave that licensee explicit permission to make a bid. Yet, just days later, this same management was advised by Bell to grant the license, on terms that apparently were well below market rates, to who else but Jakks, and senior management did not even ask what happened to Acclaim's invited bid. And, if that were not enough, within a month, WWE management then was advised by Bell, with no mention of any other competing bids, that Jakks (this time teamed with THQ) should be granted the videogame license on terms that were more favorable to WWE than the original Jakks bid, but apparently still well below market royalty rates and for an unusually lengthy period of time.

And, for the dénouement, WWE then agreed to extend the domestic and international toy licenses for the same extraordinarily lengthy period as the videogame license, apparently without any competitive bidding process or precedent. Given these alleged facts, a reasonable person would have been on notice that WWE might have been the victim of a corrupted bidding process.

As Plaintiff makes clear in the opening paragraph of its Amended Complaint, the injury it suffered from the corrupt bidding process was being stuck with licenses that provided "lower than competitive royalty rates." (*Id.* ¶ 1.) Even taking each of the seven licenses as a separate injury, as the Court must under the separate accrual rule, the last three of these corruptly-granted licenses were granted in June 1998, well over six years before Plaintiff initiated this lawsuit. Moreover, while it is true that Plaintiff alleges that it continues to receive the below-market royalties from these licenses to this day, these payments are not the type of "new *and independent*" injury Plaintiff must allege to make its case current. Instead, the receipt of these substandard royalties is linked to the injuries Plaintiff alleges it suffered when it granted these licenses. *See Lucent Techs.*, 420 F. Supp. 2d at 266 (noting that injuries are not "'new and independent' when they are attributable to a common scheme"). Put more succinctly, the courts have refused to extend the life span of a RICO plaintiff's injuries when they merely involve subsequent costs associated with the initial injury. *See Merrill Lynch*, 154 F.3d at 59-60 (holding that because injury occurred when plaintiffs made their investment, action did not accrue later due to subsequent collection of annual fees related to these same investments); *Eno Farms*, 2007 WL 3308016, at *9 (holding that rents collected on a monthly basis after fraud scheme was executed were not new and independent injuries); *Pharr v. Evergreen Gardens,*

69

*Inc.*, No. 03-CV-5520, 2004 WL 42262, at *2 (S.D.N.Y. Jan. 7, 2004) ("The injury the plaintiffs allegedly suffered due to the rent bills mailed within the four-year statute of limitations is identical to the injury they suffered when the defendants allegedly unlawfully increased the room count.").[19]

Plaintiff has three additional responses to Defendants' argument. First, Plaintiff argues that courts rarely grant motions to dismiss on statute of limitations grounds. Second, Plaintiff contends that the Court must apply a heightened standard of inquiry notice because the instant case involves corrupt fiduciaries. Third, Plaintiff asserts that the Amended Complaint adequately pleads fraudulent concealment.

As to Plaintiff's first argument, the case law does not support the argument that the Court cannot dismiss the Amended Complaint on statute of limitations grounds. "Where . . . the facts needed for determination of when a reasonable [person] of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers . . . integral to the complaint, resolution of the issue on a motion to dismiss is appropriate." *LC Capital Partners v. Frontier Ins. Group*, 318 F.3d 148, 156 (2d Cir. 2003) (internal quotation marks omitted) (ellipses in original). Indeed, the Second Circuit has noted that courts have granted motions to dismiss under those circumstances in "a vast number of cases." *Id.* (internal quotation marks omitted); *see also Merrill Lynch*, 154 F.3d at 60 ("We have held that the question of inquiry notice need not be left to a finder of fact.").

Plaintiff's second argument, regarding a heightened standard for fiduciaries, also fails.

---

[19]Plaintiff's reliance on *Bingham v. Zolt*, 66 F.3d 553 (2d Cir. 1995), is misplaced, as the court there held that there were new and independent injuries that resulted from separate fraudulent schemes. *See* 66 F.3d at 561.

Plaintiff cites a series of cases from other circuits in which the courts seemingly articulate a relaxed standard of inquiry notice when insiders or fiduciaries are involved. (*See* Pl.'s Opp'n 37 n.15) In the Second Circuit, however, courts agree that a party has a right to rely upon the representations of its fiduciary, but "only to a point." *Addeo v. Braver*, 956 F. Supp. 443, 451-52 (S.D.N.Y. 1997) ("Once plaintiffs were thereby left with reason to be suspicious of [their fiduciary], it was no longer reasonable for them to defer to his representations."); *see also Butala v. Agashiwala*, 916 F. Supp. 314, 320 (S.D.N.Y. 1996) ("Whatever duties the defendants owed to the plaintiffs, their alleged failure to disclose facts would not excuse the plaintiffs' lack of diligence in investigating the facts of which they were unquestionably aware." (internal citations omitted)). Thus, it is not reasonable to rely on fiduciaries once the plaintiff is aware of facts that would lead a reasonable person to no longer trust its fiduciary. "While the doctrine takes into account the information that a plaintiff did not have as a result of defendants' misconduct, a court must still determine whether the information plaintiff did receive sufficed to trigger a duty to inquire." *Lenz v. Assoc. Inns and Rests. Co.*, 833 F. Supp. 362, 373 (S.D.N.Y. 1993); *see also Town of Poughkeepsie v. Espie*, 402 F. Supp. 2d 443, 455-57 (S.D.N.Y. 2005) (finding RICO claim time-barred where Town Board was on inquiry notice of fraud by board members who owed fiduciary duty to the Town).

Here, as early as January 1997 and as late as April/May 1998, WWE reasonably should have been suspicious of its alleged fiduciaries. Bell, before he was part of the scheme, was told by Playmates of its "concern" about the granting of a competing license to Jakks. Because of Bell's position at WWE and because he was not yet part of the scheme, it is difficult to understand how WWE can claim to not have been on notice of a problem with granting the toy

licenses to Jakks, particularly given Plaintiff's consistent claim that these licenses were all below well-established market rates in an intensely competitive market. Any doubt that WWE management had reason to inquire about the bidding process for its licenses was eliminated when Acclaim complained directly to WWE senior management about being excluded from bidding to extend the videogame license it already had been granted. This, combined with the oddity of Jakks bidding against itself (and not against Acclaim) for the license, and WWE ultimately agreeing to a licensing agreement that supposedly was well below market rates and covered an unusually long period of time, pins WWE's claim that it can evade the limitations period by relying on its fiduciaries. *See DLT Res., Inc.*, 2001 WL 25695, at *6 ("There are others who can tell him if he has been wronged, and he need only ask.").

Finally, Plaintiff argues that it has adequately pled active fraudulent concealment by Defendants, and, therefore, the statute of limitations should be tolled. "The Second Circuit has held that the 'standard tolling exceptions apply' to civil RICO actions." *Merrill Lynch*, 7 F. Supp. 2d at 274 (quoting *Bankers Trust*, 859 F.2d at 1105). Under the doctrine of fraudulent concealment, the statute of limitations will be tolled if the plaintiff proves three elements: "(1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled." *Corcoran v. N.Y. Power Auth.*, 202 F.3d 530, 543 (2d Cir. 1999) (internal quotation marks omitted). "The burden of demonstrating the appropriateness of equitable tolling . . . lies with the plaintiff." *Boos v. Runyon*, 201 F.3d 178, 185 (2d Cir. 2000). Further, a "[p]laintiff must plead each of these elements with particularity

as required by Rule 9(b) of the Federal Rules of Civil Procedure." *Lucent Techs.*, 420 F. Supp. 2d at 265. Thus, "even when a plaintiff pleads active concealment by the defendant, the plaintiff must still demonstrate that he exercised due diligence in trying to discover the fraud." *Merrill Lynch*, 7 F. Supp. 2d at 274. Or, as the Supreme Court has succinctly warned, "a plaintiff who is not reasonably diligent may not assert 'fraudulent concealment.'" *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194 (1997).

Even assuming Plaintiff has adequately pled fraudulent concealment that prevented it from discovering the scheme within the limitations period, which is dubious, it has not pled that it exercised due diligence until well after the statute of limitations had expired. *See Lucent Techs.*, 420 F. Supp. 2d at 268 (granting motion to dismiss and declining to equitably toll statute of limitations where plaintiff pled that it had "aggressively sought out evidence" during later contract litigation but did not plead "any investigative efforts" during the period to be equitably tolled). In fact, Plaintiff fails to cite anything in its lengthy Amended Complaint that remotely demonstrates due diligence at any point during the granting of the licenses, let alone that it exercised due diligence throughout the period to be tolled. *See Lucent Techs.*, 420 F. Supp. 2d at 268. Nor does Plaintiff even attempt to demonstrate that it has met the stringent requirements of Rule 9(b) in pleading this element of fraudulent concealment. In fact, from the Amended Complaint, it is clear that Plaintiff did nothing to inquire of the suspicious bidding process, even though incumbent licensees had complained directly to senior management about being boxed out of the bidding process, even though the royalty rates were well below market rates, even though Jakks made bids against itself, and even though the licensing agreements were extended several times for unusually long periods without any bidding process. And, because the Court

finds that Plaintiff was on inquiry notice as of no later than June 1998, Plaintiff's failure to

plead that it engaged in any due diligence is fatal to its fraudulent concealment claims. *See*

*Klehr*, 521 U.S. at 194; *Butala*, 916 F. Supp. at 320 (rejecting fraudulent concealment claim

where "[c]omplaint is utterly lacking in the details of what steps the plaintiffs took to

investigate the condition of their investment once they were on inquiry notice of the probability

they had been defrauded").[20] Accordingly, Plaintiff's civil RICO claims are time-barred.

### F.  Conspiracy to Violate RICO

Plaintiff also alleges that Defendants formed a conspiracy to violate RICO, in violation

of 18 U.S.C. § 1962(d).  However, this cause of action fails to state a claim, both because

Plaintiff has not adequately alleged a RICO injury, and because Plaintiff's claim is untimely.

*See First Capital Asset Mgmt.*, 385 F.3d at 182 (upholding district court's dismissal of

plaintiff's RICO conspiracy claim on the ground that plaintiff failed to properly allege

substantive RICO violation); *Allen v. New World Coffee, Inc.*, No. 00-CV-2610, 2002 WL

432685, at *6 (S.D.N.Y. March 19, 2002) ("The dismissal of all of plaintiffs' RICO claims

leaves the conspiracy cause of action without a leg to stand on.  'Any claim under § 1962(d)

based on conspiracy to violate the other subsections of section 1962 must fail if the substantive

---

[20]Plaintiff claims that its diligence in uncovering the scheme after the 2000 Connecticut litigation began, and the difficulty it had in overcoming some of the defendants' efforts to conceal the plot, makes the dispute over Plaintiff's diligence a fact question that cannot be resolved through these motions.  However, a plaintiff who fails to adequately allege due diligence throughout the time to be tolled is imputed to be aware of the misconduct at the time of the injury as if he had been reasonably diligent.  *See also Merrill Lynch*, 7 F. Supp. 2d at 265 ("[W]hen a plaintiff is placed on notice of the probability of fraud, he has a duty to inquire, and he will be charged with all knowledge that he would have obtained had he exercised reasonable diligence.").  Here, Plaintiff fails to allege any due diligence between June 1998 and 2000. Thus, this argument misses its mark.

claims are themselves deficient.'" (quoting *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064

(2d Cir. 1996), *vacated on other grounds*, 525 U.S. 128 (1996))). "Like the statute of

limitations under the other civil RICO provisions, the statute of limitations for civil RICO

conspiracy claims is four years." *Bendzak v. Midland Nat'l Life Ins. Co.*, 440 F. Supp. 2d 970,

983 (S.D. Iowa 2006). "Moreover, the [statute of limitations] analysis for civil RICO

conspiracy claims is the same as that for civil RICO claims brought under" the substantive

RICO provision. *Id.* Because the Court already has found that Plaintiff's action accrued no

later than June 1998, over six years before the lawsuit was initiated, Plaintiff's RICO

conspiracy claim is dismissed.

        G.  Release/Motion to Strike

        The Jakks Defendants argue that Plaintiff's claims are precluded by a General Release

and Settlement Agreement ("the Release"), which was executed by WWE in 2004 in association

with the completion of an audit of Jakks' financial records ("the Audit"). The Jakks Defendants

assert that the Release bars "any and all claims" "arising from or relating to the Audit,"

including the present claims which "spring from the very payments [Plaintiff] admits were

targeted in the Audit." (Jakks. Mem. 35.) Plaintiff contests this interpretation of the Release,

arguing that it was intended only to bar claims pertaining to Jakks' accounting records for the

period from the second quarter of 1996 to June 30, 2002. (Mem. of Law in Supp. of Pl.'s Mot.

to Strike Ex. B to Decl. of Jonathan J. Lerner 1-2 ("Pl.'s Mot. to Strike").) Plaintiff also moves

to strike the Lerner Declaration and any of the Jakks' Defendants' arguments relating to the

Release on the grounds that: this Release is not attached to, referenced in, relied upon, or

integral to Plaintiff's Amended Complaint; it is not a document of which the Court may take

judicial notice; and Mr. Lerner does not have first-hand knowledge of the Release.

Where the question is one of contract interpretation, a court must begin by examining the language of the contract. *See Maryland Cas. Co. v. W.R. Grace and Co.*, 23 F.3d 617, 624 (2d Cir. 1993). Here, the Release states that "WWE conducted an Audit of Jakks [sic] accounting records for the accounting period of the second quarter of 1996 through June 30, 2002," because "WWE contends that Jakks failed to report various sales and that Jakks took unsupported deductions and . . . Jakks contends that it overpaid WWE." (Lerner Decl. Ex. B 1.) The Release was signed in order to "resolve any and all disputes that may exist between them concerning the Audit." (*Id.*) Therefore, each Party released the other "from any and all claims . . . of every kind and nature whatsoever, whether known or unknown, . . . arising from or relating to the Audit." (*Id.* 1-2.) The Parties acknowledged that they may "hereafter discover facts different from . . . those it now knows . . . with respect to the Audit." (*Id.* 2.)

It is clear from the language of the Release that the Parties intended to bar claims arising out of the Audit itself. The purpose of the Audit was to determine whether Jakks had reported all of its sales or taken unsupported deductions, and whether Jakks had overpaid WWE. The language of the Release does not remotely suggest that the Audit was intended to investigate potential bribes paid by Jakks to WWE's agents in an effort to procure licenses at below-market rates, or to reach alleged misrepresentations made via mail and wire in an effort to allegedly deprive WWE of the honest services of its agents. Given the clear language of the Release, the Court may not consider outside evidence. *See Chevron TCI, Inc. v. Talleyrand Assocs., LLC*, No. 03-CV-4043, 2003 WL 22977498, at *5 (S.D.N.Y. Dec. 19, 2003) ("Where the terms of an agreement are clear and unambiguous, the Court will not look beyond the 'four corners' of the

agreement, and parol evidence of the parties' intentions is inadmissible."). The instant claims

do not pertain to the Audit. They pertain to an alleged fraud and commercial bribery scheme,

unrelated to any sales payments or deductions, allegedly perpetrated by Defendants. Therefore,

the Release does not bar the claims at issue here.[21]

H.  Supplemental Jurisdiction

In this and the prior opinion and order, the Court has dismissed the federal causes of

action.[22] In addition to the federal causes of action, Plaintiff has brought several causes of

action under state law. Because Plaintiff and at least some of the defendants are citizens of

Connecticut, there is not complete diversity. However, the Court has the authority to hear the

state law claims under its supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a). In

considering whether to maintain supplemental jurisdiction, the Court must exercise its

discretion under 28 U.S.C. § 1367(c) to determine whether to adjudicate such claims.[23]

----

[21]Because the Court rejects Defendants' interpretation of the Release, it need not address
Plaintiff's Motion to Strike the Lerner Declaration used to introduce the Release.

[22]The Court finds that it is appropriate to dismiss the federal causes of action with
prejudice as Plaintiff has had ample time to amend its Complaint, and, in fact, has done so once
already. Moreover, in opposing Defendants' Motion, Plaintiff never suggested or proposed that
it would seek leave to file a second amended complaint to cure any defects in Plaintiff's
pleadings. Accordingly, dismissal here is with prejudice. *See Clark v. County of Nassau*, No.
06-CV-8041, 2007 WL 1988811, at *2 (E.D.N.Y. July 5, 2007) (holding dismissal with
prejudice was appropriate when plaintiff already had two opportunities to state a cause of
action).

[23]Section 1367(c) provides that a district court may decline to exercise supplemental
jurisdiction over a state law claim if:

(1) the claim raises a novel or complex issue of State law,
(2) the claim substantially predominates over the claim or claims over which the
district court has original jurisdiction,
(3) the district court has dismissed all claims over which it has original
jurisdiction, or

In the exercise of a district court's discretion under Section 1367(c)(3), the court is to balance the traditional "values of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). In balancing these values, the Court is mindful of the Supreme Court's guidance that "when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." *Id.* As indicated by the Supreme Court, however, this is not a mandatory rule, but rather recognizes that in the "usual case" in which all federal-law claims have been eliminated prior to trial, the balance of factors will weigh in favor of declining to exercise jurisdiction. *See id.* at 350 n.7.

In this instance, the Court finds that this is the "usual case" where the federal claims have dropped out well before discovery, let alone before any trial of this case. Moreover, the Court is aware that Plaintiff has filed an action against Defendants in Connecticut state court involving similar allegations as those in this case, thus highlighting the efficiency and comity interests that support the Court's non-involvement in the state law causes of action. Accordingly, the Court will exercise its discretion and decline to keep the state law causes of action.

---

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

IV. Conclusion

For the reasons stated herein, Defendants' Motions to Dismiss are GRANTED with prejudice. Additionally, Plaintiff's Motion to Strike is DENIED as moot. The Clerk of Court is respectfully directed to terminate the Motions (Dkt. Nos. 144, 146, 150, 155, 161), enter judgment in favor of Defendants, and close this case.

SO ORDERED.

Dated:    December 21, 2007
          White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

Service List:

Jerry McDevitt, Esq.
Amy Lyn Barrette, Esq.
Peter Nicholas Flocos, Esq.
William Purcell, Esq.
Curtis B. Krasik, Esq.
Kirkpatrick & Lockhart Preston Gates Ellis, LLP
535 Smithfield Street
Pittsburgh, PA 15222

Jonathan Lerner, Esq.
Maura Barry Grinalds, Esq.
Michael Gruenglas, Esq.
Skadden, Arps, Slate, Meacher & Flom LLP
Four Times Square
New York, NY 10036-6522
*Counsel for Jakks Pacific, Inc.*
*Jakks Pacific (H.K.) Limited, Jack Friedman,*
*Stephen Berman, and Joel Bennett*

Jonathan Honig, Esq.
Feder, Kaszovitz, Isaacson, Weber, Skala,Bass & Rhine LLP
750 Lexington Avenue
New York, NY 10022
*Counsel for Jakks Pacific, Inc.,*
*Jakks Pacific (H.K.) Limited, Jack Friedman,*
*Stephen Berman, and Joel Bennett*

Steven A. Marenberg, Esq.
Philip M. Kelly, Esq.
Irell & Manella LLP
1800 Avenue of the Stars
Los Angeles, CA 90067
*Counsel for Defendant THQ, Inc.*
*and Brian Farrell*

Richard Schaeffer, Esq.
Bruce Handler, Esq.
Dornbush, Mensch, Mandelstam & Schaeffer, LLP
747 Third Avenue
New York, NY 10017
*Counsel for THQ/Jakks Pacific LLC*

Michael Alan Freeman, Esq.
Greenberg Freeman, L.L.P.
24 W. 40th St., 17th Floor
New York, NY 10018
*Counsel for Defendants Stanley Shenker
and Stanley Shenker & Assocs., Inc.*