UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
WORLD WRESTLING ENTERTAINMENT, INC.
                             :

                 Plaintiff,       :          04 CV 8223 (KMK)
                v.              :         (ECF CASE)

JAKKS PACIFIC, INC.; JAKKS PACIFIC (H.K.)  :
LIMITED; ROAD CHAMPS LIMITED; THQ,
INC.; THQ/JAKKS PACIFIC LLC; STANLEY    :
SHENKER AND ASSOCIATES, INC.; STANLEY
SHENKER; BELL LICENSING, LLC; JAMES    :
BELL; JACK FRIEDMAN; STEPHEN BERMAN;
JOEL BENNETT; and BRIAN FARRELL,     :

               Defendants.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN SUPPORT OF THE JAKKS DEFENDANTS'
MOTION FOR RECONSIDERATION OF THE PORTION OF THE COURT'S
DECEMBER 21 DISMISSAL ORDER RELATED TO THE RELEASE**

FEDER, KASZOVITZ, ISAACSON,
  WEBER, SKALA, BASS & RHINE LLP
Murray L. Skala (MS 9354)
Jonathan D. Honig (JH 7577)
750 Lexington Avenue
New York, New York 10022
Phone: (212) 888-8200
Fax: (212) 888-5968

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Jonathan J. Lerner (JL 7117)
Michael H. Gruenglas (MG 8705)
Maura B. Grinalds (MG 2836)
Diana Rubin (DR 5477)
Four Times Square
New York, New York 10036
Phone: (212) 735-3000
Fax: (212) 735-2000

Attorneys for the JAKKS Defendants

January 17, 2008

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... ii

PRELIMINARY STATEMENT ................................................................................1

ARGUMENT ...........................................................................................................7

I.      STANDARD OF REVIEW FOR MOTION FOR RECONSIDERATION ......................7

II.     THE COURT'S INTERPRETATION OF THE RELEASE FAILED TO
        CONSIDER ITS ACTUAL TERMS AND WWE'S ADMISSIONS ...............................10

        A.     The Court Ignored Express Provisions of the Release............................10

        B.     WWE's Binding Admissions on the Scope of the Audit Were  Overlooked
               By the Court and Demonstrate WWE Had  Knowledge of the Scope of the
               Audit When It Entered Into the Release ................................................12

        C.     Any Doubt About the Breadth of the Release is Dispelled  by the
               Covenant Not to Sue, Which the Court Overlooked  and Which
               Independently Warrants Reconsideration ...............................................16

        D.     The Court Appears to Have Credited WWE's Unsworn Assertions,
               Erroneously Resorting to Selective Extrinsic Evidence .........................19

CONCLUSION.......................................................................................................22

# TABLE OF AUTHORITIES

## CASES

Amerol Corp. v. American Chemie-Pharma, Inc., No. CV 04-0940, 2006 WL
    721319 (E.D.N.Y. Mar. 17, 2006) ...............................................................12

Bibeault v. Advanced Health Corp., No. 97 Civ. 6026, 2002 WL 24305
    (S.D.N.Y. Jan. 8, 2002)...........................................................................9, 17

In re Bridgeport Jai Alai, Inc., 99 Fed Appx. 254 (2d Cir. 2004).......................18

Brown v. Austin, No. 05 Civ. 9443, 2007 WL 2907313 (S.D.N.Y. Oct. 4, 2007)...........12

Collins & Aikman Products Co. v. Building System, Inc.,
    58 F.3d 16 (2d Cir. 1995)..........................................................................20

Cruz v. United States, No. C 01-00892, 2003 WL 21518119
    (N.D. Cal. June 24, 2003) .........................................................................9, 17

Daniels v. City of New York, No. 99 Civ. 1695, 2007 WL 2077150 (S.D.N.Y.
    July 16, 2007)............................................................................................9

Eisemann v. Greene, 204 F.3d 393 (2d Cir. 2000) ...............................................9

Espinosa v. Delgado Travel Agency, Inc., No. 05 Civ. 6917, 2007 WL 1222858
    (S.D.N.Y. Apr. 24, 2007)..........................................................................10

Green v. Doukas, No. 99-7733, 2000 WL 236471 (2d Cir. Feb. 15, 2000) .....................12

Grigsby & Associates, Inc. v. Rice Derivative Holdings, L.P., No. 00 Civ. 5056,
    2001 WL 1135620 (S.D.N.Y. Sept. 26, 2001)...............................................6

Handschu v. Special Services Division, No. 71 Civ. 2203, 2007 WL 1711775
    (S.D.N.Y. June 13, 2007)..........................................................................10

In re Health Management Systems, Inc. Securities Litigation,
    113 F. Supp. 2d 613 (S.D.N.Y. 2000).........................................................8

Henderson v. Metropolitan Bank & Trust Co., 502 F. Supp. 2d 372
    (S.D.N.Y. 2007)........................................................................................8

Keller v. United States, 58 F.3d 1194 (7th Cir. 1995).......................................15

Lehmuller v. Incorporated Village of Sag Harbor, 982 F. Supp. 132
     (E.D.N.Y. 1997)............................................................................................10

In re Methyl Tertiary Butyl Ether ("MBTE") Products Liability Litigation,
     MDL No. 1358, No. M21-88, 2007 WL 2979642 (S.D.N.Y. Oct. 10, 2007) ..............8

M.K.B. v. Eggleston, No. 05 Civ. 10446, 2006 WL 3230162
     (S.D.N.Y. Nov. 7, 2006) ................................................................................9

McKinney v. Chapman, No. 040833378S, 2006 WL 894924
     (Conn. Super. Ct. Mar. 21, 2006) ...........................................................16, 17

Mellon Bank, N.A. v. United Bank Corp. of New York,
     31 F.3d 113 (2d Cir. 1994)...............................................................................6

Perreca v. Gluck, 295 F.3d 215 (2d Cir. 2002)..............................................................18

Pitchell v. Williams, 55 Conn. App. 571, 739 A.2d 726 (1999)..........................................3

RBS Holdings, Inc. v. Wells Fargo Century, Inc.,
     485 F. Supp. 2d 472 (S.D.N.Y. 2007)..............................................................15, 16

Ravski v. Connecticut State Medical Society, IPA, No. X01CV044000582S,
     2005 WL 647570 (Conn. Super. Ct. Feb. 3, 2005).....................................................20

Robotic Vision Systems, Inc. v. General Scanning, Inc., No. 96- CV-3884, 1997
     WL 1068696 (E.D.N.Y. Sept. 8, 1997) ............................................................21

Rosenfield v. Rogin, Nassau, Caplan, Lassman & Hirtle, LLC, 69 Conn. App.
     151, 795 A.2d 572 (2002) ...............................................................................4

Shrader v. CSX Transportation, Inc., 70 F.3d 255 (2d Cir. 1995)................................9, 18

Travelers Insurance Co. v. Buffalo Reinsurance Co., 739 F. Supp. 209 (S.D.N.Y.
     1990) .......................................................................................................9, 10

Virgin Atlantic Airways, Ltd. v. National Mediation Board,
     956 F.2d 1245 (2d Cir. 1992)...........................................................................9

Walder v. Paramount Publix Corp., 132 F. Supp. 912 (S.D.N.Y. 1955).......................6, 20

Weyerhaeuser Co. v. Israel Discount Bank of New York,
     895 F. Supp. 636 (S.D.N.Y. 1995) ..................................................................14

World Wrestling Entertainment, Inc. v. JAKKS Pacific, Inc., No. 04-CV-8223
     (S.D.N.Y. Dec. 21, 2007)................................................................................8

# STATUTES

28 U.S.C. § 1367(d) ........................................................................................................4

Pursuant to S.D.N.Y. Local Civil Rule 6.3, Defendants JAKKS Pacific, Inc., JAKKS Pacific (H.K.) Limited, Road Champs Limited, Jack Friedman, Stephen Berman and Joel Bennett (collectively, the "JAKKS Defendants") respectfully submit this memorandum of law in support of their motion for clarification and/or reconsideration of the Court's Opinion and Order dated December 21, 2007 (the "Order"),[1] which resulted in a judgment entered on January 3, 2008, insofar as it found that the "Settlement Agreement and General Release of All Claims" (the "Release") did not bar WWE's claims.

## PRELIMINARY STATEMENT

On December 21, 2007, the Court granted the JAKKS Defendants' motion to dismiss World Wrestling Entertainment, Inc.'s ("WWE") RICO claims, holding that WWE's claims were time-barred and that WWE had failed to plead any actionable injury.  (Order at 63, 74.)  Despite already having dismissed all of WWE's federal claims, the Court also addressed the issue of whether the Release barred WWE's claims, stating it "does not bar the claims at issue here."  (Order at 77.)   In this motion, the JAKKS Defendants respectfully seek clarification and/or reconsideration of the Court's Order solely with respect to the Court's apparent determination of factual issues relating to the Release in the context of a motion to dismiss.

In their dismissal motion, the JAKKS Defendants contended that the Release, and an even broader covenant not to sue, incorporated therein ("Covenant Not to Sue") barred WWE's claims as a matter of law.  (2/16/05 Motion to Dismiss at 35-37; 2/6/06 Motion to Dismiss at 33-35.)  The JAKKS Defendants contended that this conclusion flowed ineluctably

---

[1]    For the Court's convenience, the JAKKS Defendants attach hereto copies of the following relevant documents that are already part of the record before the Court and are cited herein:  Exhibit A is a copy of the Order; Exhibit B is a copy of the Release; and Exhibit C is a copy of excerpts from the Transcript of the Oral Argument held before the Court on September 6, 2006.

from (1) the text of the Release, which, on its face, released all claims of any nature arising out of or related to an audit conducted by WWE in 2003 -- an audit that WWE's own Amended Complaint repeatedly admitted specifically targeted the very payments that WWE challenges in this litigation, and (2) the plain language of the Covenant Not to Sue incorporated into the Release, which barred WWE from bringing any claims "arising out of or <u>relating in any way</u> to the Audit," including but <u>not</u> <u>limited</u> to the matters released in the Release.[2] (Release ¶ 3.)

The Audit in the Release is WWE's "audit of Jakks [sic] accounting records for the accounting period of the second quarter of 1996 through June 30, 2002 ("the Audit")." (Release at 1 (second "whereas" clause).)  Accordingly, the scope of the Release is tied to the <u>actual performance of the Audit and the actual accounting records sought in the Audit</u> -- not to the supposed "purpose" ascribed to the Audit by the Court (as apparently limited to the dispute referenced in the third "whereas" clause of the Release).  Even WWE argued that the <u>purpose</u> <u>and scope</u> of the Release were factual issues that turned on the parties' intentions and therefore <u>could not be summarily resolved on a motion to dismiss</u>.  (WWE Motion to Strike at 13-14.) Significantly, WWE did not contend -- because it could not -- that the Court could conclude, as a matter of law, that the Release did <u>not</u> bar WWE's claims (nor did WWE even try to address the impact of the Covenant Not to Sue, which is even broader than the release provision in paragraph two of the Release (the "release provision")[3]).

---

[2] Paragraph 3, <u>COVENANT NOT TO SUE</u>, provides: Releasors agree that it will not make, assert, or maintain against Releasees any claim, demand, action, suit or proceeding **arising out of or relating in any way to the Audit including but not limited to the matters released in this Agreement**." (emphasis added).

[3] Paragraph 2, "<u>RELEASE OF KNOWN AND UNKNOWN CLAIMS</u>" provides, in pertinent part:

The Parties . . . hereby fully and completely releases the other Party, . . . **from any and all claims**, causes of action, rights, obligations, debts, liabilities . . . **of every kind and nature whatsoever, whether known or unknown, foreseen or unforeseen** . . . suspected or unsuspected, fixed or contingent, which Releasors **have or may have** against Releasees, **arising from or relating to the Audit**.  Releasors acknowledge that it is aware and that it may hereafter discover facts different from or in addition to those it now knows or believes to be true *(cont'd)*

2

Nevertheless, the Order could be read to state that the Release only released claims relating to a narrow dispute about royalties that the Order incorrectly treats as the exclusive subject of the Audit regardless of the factual evidence that might be offered concerning the actual scope or purpose of the Audit. (Order at 76-77.)  While the JAKKS Defendants continue to believe that the Release bars WWE's claims as a matter of law, given the definition of the Audit and WWE's admissions.  We submit that, at a minimum, questions of fact abound as to whether, as the Court stated, the scope of the Audit is <u>limited</u> to the dispute "between the Parties . . . that WWE contends Jakks failed to report various sales and that Jakks took unsupported deductions and wherein Jakks contends it overpaid WWE."  (Release at 1 (third "whereas" clause; <u>see</u> Order at 76-77.)  In making this statement, the Court not only would be required to make the apparent factual determination that the scope and purpose of the audit performed was limited to this one narrow dispute, but it also would have been required to make the highly factual determination that the Audit <u>did not</u> seek accounting records concerning the alleged bribery payments to Shenker and Bell.

Because the Court had determined to dismiss the federal claims, a determination that the Release could not bar WWE's claims under any circumstances was unnecessary to the Court's holding.  Although the Court's statement on the Release was not necessary to its dismissal order and thus will not bind or collaterally estop JAKKS in Connecticut state court, <u>see</u>, <u>e.g.</u>, <u>Rosenfield v. Rogin, Nassau, Caplan, Lassman & Hirtle, LLC</u>, 69 Conn. App. 151, 155-56, 795 A.2d 572, 576 (2002); <u>Pitchell v. Williams</u>, 55 Conn. App. 571, 577-78, 739 A. 2d 726 (1999), <u>cert.</u> <u>denied</u>, 252 Conn. 925, 746 A. 2d 789 (2000), the JAKKS Defendants respectfully

---

*(cont'd from previous page)*
    with respect to the Audit and the claims, causes of action, rights, obligations . . . released . . . .  (emphasis added).

request clarification because WWE is already quoting (and we submit mischaracterizing) the Court's determination on the Release by stating, inter alia, that this Court has "now agreed" with WWE that "the Jakks 'Defendants' so-called release defense is, as presented, a fraud on every court in which it has been raised, as no Jakks executive ever has testified, or ever could testify truthfully, that the release was intended to apply to the claims at issue -- which is why they sought to introduce it as evidence through the affidavit of their chief legal counsel." (WWE December 28, 2007 Connecticut court filing: Notice of Re-Filing State Law Claims in Accordance with 28 U.S.C. § 1367(d) at ¶ 12.) Given WWE's attempt to rely on the Court's statement, the JAKKS Defendants respectfully submit that this statement warrants clarification and/or reconsideration, because the Court overlooked the actual terms of the Release and effectively made factual determinations outside the four corners of the Release without the full record before it, also without considering WWE's judicial admissions concerning the purpose of the Audit.[4]

        In this context, any conclusion that the Release is narrow and limited, based on a factual conclusion of what the Audit covered -- artificially limiting the Audit exclusively to the narrow dispute over toy license royalties cited in the third "whereas" clause -- would overlook

---

[4]    It bears emphasis that the Release does not define the Audit to be co-extensive with the dispute on deductions and overpayments, much less limited to the dispute. Indeed, the Audit is expressly defined in the Release to encompass, without limitation, a review of "accounting records for the accounting period of the second quarter of 1996 through June 30, 2002 ("the Audit")." (Release at 1 (second "whereas" clause).) And, the Release is specifically tied to the actual scope of the Audit (that had already been conducted). Accordingly, WWE's admission that the Audit specifically targeted the 1998 transactions that are the specific subject of WWE's Amended Complaint bears heavily on whether its claims are released. The subsequent description of the dispute regarding deductions and overpayments cannot be read as -- and factually does not reflect -- a description of the scope of the Audit.

the express broad terms of the Release which released "any and all" claims "arising from" and "related to" the Audit. (Release ¶¶ 2-3 (emphasis added).)[5]

Additionally, the Court's statement about of the scope of the Audit overlooks the Covenant Not to Sue, which was an integral part of the Release, and is even broader in scope than the release provision. The Covenant Not to Sue expressly barred WWE from suing on any claims whatsoever "related in any way" to the Audit -- the applicability of which was indisputably demonstrated by WWE's own allegations repeatedly asserting that the Audit specifically targeted the alleged license bribes. Given WWE's admissions in its pleadings that it used the Audit, inter alia, to seek information about JAKKS' payments to Shenker, which are the subject of this action, we respectfully submit that it is simply improper to conclude, at this stage, as a matter of law, that WWE's claims do not "relat[e] in any way to the Audit," so as to fall outside the scope of the Covenant Not to Sue. Indeed, even WWE never advanced this claim.

When, in the context of the JAKKS Defendants' motion to dismiss, the Court equated the intended scope of the Release with what it described as the intended "purpose" of the Audit, rather than the scope of the actual Audit conducted by WWE as the text of the Release specifically provides, the Court apparently credited WWE's unsworn and uncorroborated assertions as to the purpose of the Audit and the Release without (a) permitting JAKKS to introduce relevant extrinsic evidence, or (b) acknowledging contradictory admissions by WWE in the Amended Complaint. However, to the extent there is any reasonable factual dispute as to the parties' intentions in executing the Release (as WWE strenuously argued there was), the Court also overlooked legal authority -- cited by WWE itself -- precluding it from resolving such

---

[5]    In fact, the fourth whereas clause, which was also overlooked by the Court, expressly acknowledges that the Release is broader than the singular dispute recited in the third whereas clause by reciting the parties' "desire to resolve any and all disputes that may exist between them concerning the Audit" -- not just the dispute cited in the third whereas clause.  (Release at 1 (fourth "whereas" clause (emphasis added)).)

factual disputes on a motion to dismiss.[6]  Of course, WWE never argued the Release was

unambiguous or that the purpose and scope of the Audit were discernible as a matter of law.  To

the contrary, it repeatedly insisted that the Court could not entertain, much less decide, the issue

without reference to extrinsic evidence that was not fully before the Court. (WWE Motion to

Strike at 14-15 (citing Walder v. Paramount Publix Corp., 132 F. Supp. 912, 916-17 (S.D.N.Y.

1955) (denying summary judgment and holding an apparent conflict between the scope of the

whereas clauses and the provisions of the release rendered the intent of the parties a question of

fact).)  At oral argument on the motion to dismiss, WWE asserted that the Court should not reach

the Release issue where "[c]ontracts don't speak for themselves." (9/6/06 Tr. at 108:17.)

         At a minimum, the Court was faced with the parties' diametrically opposed

interpretations of the intent and purpose of the Release and Covenant Not to Sue.  By ultimately

crediting only WWE's counsel's bald assertions about the purpose and scope of the Audit and the

Release -- and ignoring actual text of the definition of the term "Audit" and the both the release

provision and the Covenant Not to Sue -- the Court effectively converted JAKKS' dismissal

motion into a WWE summary judgment motion, without notice or consideration of the evidence

that the JAKKS Defendants maintain irrefutably demonstrates that the Audit was used as a

---

[6]    To be sure, JAKKS' counsel maintained that the literal terms of the Release unambiguously barred WWE's
claims, and there was no reasonable alternative interpretation of the Release as permitting the claims here.
(9/6/07 Tr. at 50:18-22.)  At most, the Court's alternative interpretation creates a conflict between two different
interpretations, which would require additional fact-finding beyond the scope of a motion to dismiss. See
Mellon Bank, N.A. v. United Bank Corp. of New York, 31 F.3d 113, 115-16 (2d Cir. 1994) ("In reviewing the
two interpretations, 'we need not determine which is the more likely interpretation; we need merely decide
whether [each] . . . is sufficiently reasonable to render the clause ambiguous. Defendants' interpretation gives
'literal effect' to all the words of the clause, and is quite logical when read in the context of all the Loan
Documents . . . . On the other hand . . . [plaintiff's] interpretation [adopted by the district court] is equally
reasonable.  Given the two conflicting reasonable interpretations, we find the contract ambiguous" and "its
interpretation becomes a question of fact and summary judgment is inappropriate.") (citations omitted)
(emphasis added); Grigsby & Assocs., Inc. v. Rice Derivative Holdings, L.P., No. 00 Civ. 5056, 2001 WL
1135620, at *3 (S.D.N.Y. Sept. 26, 2001) (denying in part motion to dismiss because the agreement at issue
"may be subject to more than one reasonable interpretation and is therefore a question of fact that cannot be
resolved at the pleadings stage").

litigation adjunct and specifically included the claims in this action within its scope.  In addition
to the overlooked language of the text of the Release itself, this evidence includes, but is not
limited to:

- WWE's numerous explicit admissions in its pleadings that it used in the Audit to try
to obtain information about the very payments targeted by WWE in its federal
complaint.

- The fact that WWE's so-called Audit requests of accounting records, on their face,
went beyond sales records and included payments to third parties such as Shenker,
Stanfull or SSAI, and covered an entire six-year period.

- The considerable consideration ($200,000) paid by JAKKS for the Settlement
Agreement and General Release.

- The fact that the Release was executed in 2004 after the Audit was completed -- when
the related disputes concerning the production of accounting records pertaining to
Shenker, SSAI and Stanfull were known -- demonstrating that the parties were aware
that the release of all claims of any kind related to the Audit necessarily encompassed
the alleged bribery payments at issue in this action, including those allegedly relating
to the videogame licenses.[7]

The JAKKS Defendants respectfully submit that the Court's statement in its Order
effectively embodied factual issues when it equated the scope of the Audit with the narrow
dispute set forth in the third whereas clause and that the Court's oversight as to the plain
language of the Release warrants reconsideration.

**ARGUMENT**

**I.    STANDARD OF REVIEW FOR MOTION FOR RECONSIDERATION**

The JAKKS Defendants recognize that reconsideration of a previous order "is an
extraordinary remedy to be employed sparingly in the interests of finality and conservation of

---

[7]    The JAKKS Defendants also intend, if necessary, to introduce in the Connecticut action additional evidence
beyond the face of the pleadings that were before this Court, demonstrating that the Release covered the very
claims here.  This includes WWE's litigation counsel's contemporaneous statements in 2003 to JAKKS that the
Audit sought documents reflecting payments to WWE's agents Shenker and Bell.

7

scarce judicial resources." In re Methyl Tertiary Butyl Ether ("MBTE") Products Liability Litig., MDL No. 1358, No. M21-88, 2007 WL 2979642, at *1 (S.D.N.Y. Oct. 10, 2007) (quoting In re Health Mgmt. Sys., Inc. Sec. Litig., 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000)), aff'd, 126 Fed Appx. 45 (2d Cir. 2005). We are cognizant that Local Rule 6.3[8] is designed to "'ensure the finality of decisions and to prevent the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters.'" Henderson v. Metro. Bank and Trust Co., 502 F. Supp. 2d 372, 375-76 (S.D.N.Y. 2007); accord In re MBTE Products Liability Litig., 2007 WL 2979692, at *2 ("Local Rule 6.3 is narrowly construed and strictly applied in order to avoid repetitive arguments already considered by the Court.").

Because the Court's statement about the Release appears to make a factual determination as to the scope of the Audit and the Release, (which the JAKKS Defendants believe is also contrary to the express provisions of the Release), without converting the motion to summary judgment, the JAKKS Defendants did not have an opportunity to raise these concerns before this motion. Accordingly, this is not a proverbial "second bite at the apple," because the JAKKS Defendants had no advance notice that the Court would credit WWE's counsel's uncorroborated assertions as to the intent and purpose of the Release, without at least giving the JAKKS Defendants the opportunity to respond.[9]

---

[8]    "The legal standard governing motions under Local Civil Rule 6.3 is the same as that governing Fed. R. Civ. P. 59(e)." World Wrestling Entertm't, Inc. v. JAKKS Pacific, Inc., 04-CV-8223 (KMK), at 2 n.1 (S.D.N.Y. Dec. 21, 2007) (Order denying reconsideration) (citing cases).

[9]    Indeed, WWE itself did not anticipate such a result, and has contended that any attempt to reach the merits would be in error. (See 12/7/07 WWE filing in the Connecticut action: Objection to the JAKKS Defendants' Motion to Extend the Stay at 8-9 ("[I]t is factually and legally implausible that the November 30 Order was in any way based on the release. . . . Moreover, in the absence of any evidence presented to the Federal Court that the release was intended to apply to the claims at issue, Connecticut law, which expressly governs the Jakks Settlement Agreement, precludes the dismissal of WWE's Amended Complaint based on the release.").)

Under Local Rule 6.3, reconsideration is appropriate where "the moving party can point to controlling decisions or data that the court overlooked -- matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995); accord Eisemann v. Greene, 204 F.3d 393, 395 n.2 (2d Cir. 2000) ("To be entitled to reargument, a party must demonstrate that the Court overlooked controlling decisions or factual matters that were put before it on the underlying motion.") (quotation marks and citation omitted); Daniels v. City of New York, No. 99 Civ. 1695, 2007 WL 2077150, at *3 (S.D.N.Y. July 16, 2007); Travelers Ins. Co. v. Buffalo Reins. Co., 739 F. Supp. 209, 211 (S.D.N.Y. 1990).

A motion for reconsideration is the proper vehicle to "call to the Court's attention dispositive facts or controlling authority that were plainly presented in the prior proceedings but were somehow overlooked in the Court's decision: in other words, an obvious and glaring mistake." M.K.B. v. Eggleston, 05 Civ. 10446, 2006 WL 3230162, at *1 (S.D.N.Y. Nov. 7, 20006); see Virgin Atlantic Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992) ("The major grounds justifying reconsideration are 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.' 18 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 4478 at 790.").

Where, as we respectfully submit occurred here, the Court overlooks contract provisions, the grant of reconsideration is warranted. Bibeault v. Advanced Health Corp., No. 97 Civ. 6026, 2002 WL 24305, at *3 (S.D.N.Y. Jan. 8, 2002) (granting motion for reconsideration "[b]ecause this Court did not take section 5.5 [of the agreement] into account" in its order denying the motion to dismiss); Cruz v. United States, No. C 01-00892, 2003 WL 21518119, at *4 (N.D. Cal. June 24, 2003) (granting motion for reconsideration where "[a]lthough the contract

9

excerpted above was presented to the Court in connection with defendants' motion to dismiss, the Court did not focus upon it in reaching its decision").[10]

 We respectfully submit, reconsideration is warranted because, in its analysis of the purpose of the Audit and scope of the Release, the Court overlooked express contractual text and WWE's judicial admissions, and inserted limitations into the Release that do not exist. The Court's statement that "the Release does not bar the claims at issue here" (Order at 77), was predicated on purported limitations on the scope of the Audit and the Release that are not only nowhere to be found in the Release itself, but contradicted by express provisions of the Release and WWE's own admissions as to the scope of the Audit.

## II.  THE COURT'S INTERPRETATION OF THE RELEASE FAILED TO CONSIDER ITS ACTUAL TERMS AND WWE'S ADMISSIONS

### A.  <u>The Court Ignored Express Provisions of the Release</u>

 The Court appears to state that the Release was unambiguous, and, therefore, its scope and effect could be determined solely by reference to the face of the Release. (Order at 76-77.) The Court stated that "the Release states that 'WWE conducted an Audit of JAKKS accounting records for the accounting period of the second quarter of 1996 through June 30, 2002,' because 'WWE contends that JAKKS failed to report various sales and that JAKKS took unsupported deductions and . . . JAKKS contends that it overpaid WWE.'" (Order at 76.) Therefore, the Court stated, "[t]he purpose of the Audit was to determine whether JAKKS had reported all of its sales or taken unsupported deductions, and whether JAKKS had overpaid

---

[10]  See generally <u>Handschu v. Special Servs. Division</u>, No. 71 Civ. 2203, 2007 WL 1711775, at *7 (S.D.N.Y. June 13, 2007) (partially granting a motion for reconsideration where the court misinterpreted an earlier consent decree); <u>Espinosa v. Delgado Travel Agency, Inc.</u>, No. 05 Civ. 6917, 2007 WL 1222858, at *2 (S.D.N.Y. Apr. 24, 2007) (partially granting a motion for reconsideration where the court misinterpreted the Fair Labor Standards Act and miscalculated hourly rates thereunder); <u>Travelers Ins. Co.</u>, 739 F. Supp. at 211-13 (granting reconsideration and vacating judgment where court overlooked deposition testimony giving rise to factual question); <u>Lehmuller v. Inc. Village of Sag Harbor</u>, 982 F. Supp. 132, 135-36 (E.D.N.Y. 1997) (noting "the Court can grant a motion to reargue for the limited purposes of considering the effect of an overlooked matter").

WWE." (Id. at 76.)  It was this "purpose" that the Court found delineated the scope of the Audit,

and therefore led to the Court's statement that the alleged bribery payments at issue in this action

were not within the scope of the Audit.

In making this statement, we respectfully submit that the Court incorrectly

equated what it concluded was the "purpose" of the Audit with the scope of the Audit.[11]  This

required the Court to effectively make a factual determination -- outside of the four corners of

the Release -- that the Audit only covered the dispute explained in the third whereas clause and

did not include, inter alia, the alleged bribery payments by JAKKS to Shenker and Bell

concerning both the toy and videogame licenses.

Therefore, the Court overlooked the actual provisions of the Release which make

clear that:

- the Audit is defined only in whereas clause two, without any limitation to its purpose.

- the Audit covered far more than a discrete dispute over certain toy license royalties. Indeed, WWE admits it went beyond royalties paid or due to WWE and specifically targeted all payments by JAKKS to Shenker, Bell and SSAI related to either license, see § II.B infra.; and

- the scope of the Release was far broader than the Audit.  The Release and Covenant Not to Sue explicitly release any and all claims "arising from" or "related to" the Audit (Release ¶¶ 2-3).

By reaching beyond the face of the contract to equate the scope of the Audit with

the "dispute" in the third whereas clause -- and effectively making a factual determination that

this was the only subject covered by the Audit -- the Court effectively converted JAKKS' motion

into a summary judgment motion, without considering the language of the contract contradicting

---

[11]    While the JAKKS Defendants continue to maintain that, on its face, the Release does not define the purpose of the Audit as the dispute in the third whereas clause (indeed, the word "purpose" nowhere appears in the language of the Release), even if the purpose of the Audit could be construed to be the narrow royalty dispute described in the third whereas clause, the Court's equation of the scope of the Audit with that purported purpose is reason alone for reconsideration here.

that conclusion, WWE's admissions demonstrating that the Audit was used to target the alleged

bribes in this action, JAKKS' evidence as to what was actually covered in the Audit, or the

Covenant Not to Sue.  It is axiomatic that a court must convert a motion to dismiss to one for

summary judgment if its analysis relies on selective extrinsic evidence.  See Green v. Doukas,

No. 99-7733, 2000 WL 236471, at *2 (2d Cir. Feb. 15, 2000) ("because defendants submitted

extrinsic evidence in support of their motion -- and plaintiff herself went beyond the four corners

of the complaint in responding -- we conclude that the District Court did not err in converting

defendants' motion [to dismiss] to one for summary judgment"); Brown v. Austin, No. 05 Civ.

9443, 2007 WL 2907313, at *1 (S.D.N.Y. Oct. 4, 2007) (refusing to consider extrinsic evidence

and thus declining to convert a motion to dismiss into a motion for summary judgment under Fed.

R. Civ. P. 56); Amerol Corp. v. American Chemie-Pharma, Inc., 2006 WL 721319, at *5

(E.D.N.Y. Mar. 17, 2006) (converting a motion to dismiss to one for summary judgment because

the court considered extrinsic evidence in assessing the viability of plaintiff's contract claims).

This error warrants clarification from the Court that it did not intend to foreclose an adjudication

on a full record to permit the JAKKS Defendants to establish that the scope of the Audit, in fact,

included the very alleged bribery payments at the heart of this case.

### B.    WWE's Binding Admissions on the Scope of the Audit Were Overlooked By the Court and Demonstrate WWE Had Knowledge of the Scope of the Audit When It Entered Into the Release

On January 15, 2004, the date the Release was signed, the parties were fully

aware of the actual scope of the completed Audit.  The Court's statement as to the purpose and

scope of the Audit embodies an apparent factual determination, which overlooks WWE's own

undisputed admissions establishing that WWE's litigation counsel used the Audit as a litigation

adjunct, precisely to investigate bribes allegedly paid by JAKKS to WWE's agents.  (Am. Compl.

¶¶ 200, 209-11, 215-20, 222, 226, 228, 230, 234.)  The Court's resort to selective extrinsic

evidence is improper as a means to determine what was within the parties' contemplation at the

time WWE entered into the Release.

1.    The Court Overlooked WWE's Binding
      Admissions on the Scope of the Audit

The Court ignored WWE's own admissions in its Amended Complaint

establishing that the Audit was central to WWE's Amended Complaint because it specifically

targeted not just royalties, but "all payments made by JAKKS to Shenker, SSAI, Bell and/or

Stanfull" (AC ¶ 200).  WWE's allegations -- which operate as binding admissions against it --

include:

- In its original Complaint, WWE alleged that "[i]n response to the repeated
  requests by WWE, pursuant to . . . audits of both THQ and Jakks' books and
  records . . . all uniformly denied making any payments to Stanfull, SSAI, Shenker
  and/or Bell." (Compl. ¶ 100 (emphasis added)).   To try to avoid the Release,
  WWE altered its complaint to allege, without any context, that "[in] response to
  repeated requests by WWE, all uniformly denied making any payments to
  Stanfull, SSAI, Shenker and/or Bell." (AC ¶ 196 (emphasis added).)

- "On January 14, 2003, WWE's auditors requested, in writing, that Jakks provide
  the auditors with a complete listing of all payments made by Jakks to Shenker,
  SSAI, Bell and/or Stanfull." (AC ¶ 200 (emphasis added).)

- "On January 17, 2003, Jakks provided yet another false and misleading response
  to the auditors' request of January 14, 2003 by stating that they had already
  "provided any documents that may exist" in response to the June 11, 2002
  subpoena. As Jakks knew, it had not produced any documents evidencing
  payments to Shenker, SSAI or Stanfull in response to the June 11, 2002 subpoena
  even though such records existed. Bennett received a copy of Jakks' false
  response to WWE's auditors and did nothing to correct it despite his knowledge of
  the payments at issue, all of which he had personally directed and orchestrated. "
  (AC ¶ 201 (emphasis added).)

- "By email dated February 25, 2003, WWE's auditors responded to Jakks' January
  17, 2003 misleading response by pointing out that Jakks had not provided any
  documents related to payments to Shenker, SSAI or Stanfull in response to the
  June 11, 2002 subpoena and again asked for copies of all invoices or a description
  of each transaction whereby payments were made by Jakks to Shenker, SSAI
  and/or Stanfull." (AC ¶ 202 (emphasis added).)

- "On February 25, 2003, in an email response from employees working under the direct supervision of Bennett, <u>Jakks did not respond and disclose the payments</u> but instead advised that the request had been forwarded to their attorneys, who would advise shortly." (AC ¶ 203 (emphasis added).)

- "By March 14, 2003, <u>no response had been received</u> from Jakks' attorneys to the request for disclosure of payments to SSAI, Shenker and Stanfull. By letter dated March 14, 2003 sent to Jakks' corporate counsel, Mr. Murray Skala, <u>WWE again requested an answer to the question of whether payments had been made to Shenker, SSAI and Stanfull.</u>" (AC ¶ 204 (emphasis added).)

- "On March 19, 2003, Jakks, through its counsel, continued the practice of providing false and misleading information. By letter of that date, Jakks' counsel reiterated the false theme that "<u>the specific information requested [in the Audit] was provided months ago" in response to the subpoena</u>. Such statements were false and known by Jakks to be false, as Jakks had not provided any information on the payments made to Shenker via Stanfull in 1998." (AC ¶ 205 (emphasis added).)

- "On March 25, 2003, WWE once again informed Jakks, through its counsel, that the specific information requested had not been provided and again requested specific disclosure." (AC ¶ 206.)

- "<u>JAKKS' repeated refusals to disclose documents</u> showing the complete nature of its relationship to Shenker or the payments to Stanfull in 1998 were deliberate, in bad faith, and <u>part of a plan to fraudulently conceal the illegal conduct and commercial bribery set forth herein at all costs</u>. The relationship between Shenker and Jakks, and the payments made to Stanfull, were known to and orchestrated by the highest-ranking executives of Jakks, at least one of whom serves in an executive capacity for Jakks/THQ. Instead of disclosing the relationships with Shenker or the payments, JAKKS repeatedly provided false and misleading information to the effect that no such payments had been made and responses which failed to disclose the true nature of the relationship between JAKKS and Shenker." (AC ¶ 208 (emphasis added).)

In light of these admissions, WWE and the JAKKS Defendants are actually in agreement that the Audit included the claims which form the basis of its action here. WWE's unsworn and uncorroborated assertions that are contrary to its own binding admissions -- especially where the JAKKS Defendants have not been provided an opportunity to submit extrinsic evidence regarding the scope of the Audit -- cannot override the undisputed scope of the Audit. <u>See</u> <u>Weyerhaueser Co. v. Israel Discount Bank of New York</u>, 895 F. Supp. 636, 650

14

(S.D.N.Y. 1995) (statements made in a complaint "constitute judicial admissions"); see also

Keller v. United States, 58 F.3d 1194, 1199 n.8 (7th Cir. 1995) ("Judicial admissions are formal

concessions in the pleadings . . . that are binding upon the party making them. They may not be

controverted at trial or on appeal.  Indeed, they are 'not evidence at all but rather have the effect

of withdrawing a fact from contention.'") (quoting Michael H. Graham, Federal Practice and

Procedure: Evidence § 6726 (Interim ed.)).

> 2. The Court's Ex Ante Interpretation of the Scope of the Audit
> Ignores the Undisputed Fact that the Release Was Executed After
> Completion of the Audit, Which Had Targeted the Alleged Bribery
> Payments By JAKKS to Stanfull and Shenker/SSAI

When WWE and JAKKS entered into the Release, the Audit had already occurred

and both sides knew WWE had specifically sought information in the Audit on the alleged

bribery payments relating to the videogame license (and not just the toy license) at the heart of

this action.  Therefore, when WWE agreed to Release JAKKS from "any and all claims, cause of

action, right, obligations, debts, liabilities . . . whether known or unknown, foreseen or

unforeseen, suspected or unsuspected . . . arising from or relating to the Audit," (Release ¶ 2 at 1-

2), it plainly knew that the Audit had included information regarding the payments at issue in

this action.  In RBS Holdings, Inc. v. Wells Fargo Century, Inc., 485 F. Supp. 2d 472, 478

(S.D.N.Y. 2007), where a similar agreement contained a release of all "known or unknown

claims," the district court recognized "that the central events giving rise" to the Plaintiff's claims

occurred before execution of the release.  Id.  Therefore, the court reasoned:

> RBS cannot reasonably contend that its claims were completely outside of
> the parties' contemplation at the time the Release was executed or that its
> injuries were unknown. RBS knew that Wells Fargo's delayed consent had
> worked to RBS's financial detriment. It also knew that Wells Fargo had
> shared allegedly confidential information with Rocawear and CIT to
> RBS's detriment. It appears the only information relevant to these claims
> of which RBS was not fully cognizant was that Wells Fargo would be a
> factor to GFI. Consequently, it cannot be said that these claims were

unknown to RBS at the time the Release was signed. <u>While every detail of the claim may not have surfaced, the gravamen of RBS's alleged injuries were cognizable at the time the Consent and Release was executed.</u>

<u>Id.</u> at 478-79 (emphasis added). Connecticut law, which governs the Release, is in accord with the <u>RBS Holdings</u> conclusion. <u>See, e.g,</u> <u>McKinney v. Chapman</u>, No. 040833378S, 2006 WL 894924, at *1 (Conn. Super. Ct. Mar. 21, 2006), <u>aff'd</u>, 103 Conn. App. 446, 929 A.2d 355 (2007). In <u>McKinney</u>, after the plaintiff had settled her employment discrimination suit, releasing her employer of claims that "in any way related to the incident or circumstances that formed the basis for the [employment discrimination suit]," <u>id.</u> at 1, the court held that her subsequent related state defamation and infliction of emotional distress claims were barred, <u>id.</u>. Specifically, the <u>McKinney</u> court concluded those claims were barred because the plaintiff had signed a general release, with language paralleling the language of the Release here, with full knowledge of the documents at issue in her subsequent state action. <u>See id.</u> at *1.

On its face, the Release, which applies to all claims arising out of the actual <u>Audit</u>, covered <u>all</u> claims arising out of the Audit, including those at the heart of this case. <u>A fortiori</u>, it cannot possibly be concluded, and certainly not at this juncture, that there is no possible set of facts under which the Release could apply to bar WWE's claims.

### C.    Any Doubt About the Breadth of the Release is Dispelled by the Covenant Not to Sue, Which the Court Overlooked and Which Independently Warrants Reconsideration

The Covenant Not to Sue, which is even broader than the release provision, explicitly bars WWE from bringing any action against JAKKS "arising out of <u>or relating in any way to the Audit</u> including <u>but not limited to</u> the matters released in [the Release]." (Release ¶ 3 (emphasis added).)

The Court overlooked this critical provision of the Release, which is an independent ground for granting reconsideration because all provisions of the contract must be

taken into account and given effect. <u>See</u> <u>Bibeault</u>, 2002 WL 24305, at *3 (granting motion for

reconsideration "[b]ecause this Court did not take section 5.5 [of the agreement] into account" in

its order denying the motion to dismiss); <u>Cruz</u>, 2003 WL 21518119, at *4 (granting motion for

reconsideration where "[a]lthough the contract excerpted above was presented to the Court in

connection with defendants' motion to dismiss, the Court did not focus upon it in reaching its

decision").

   The Covenant Not to Sue -- a central provision of the contract for which

consideration was expressly paid (<u>see</u> Release ¶ 1) -- provides that WWE will not bring against

JAKKS "any claims, demand, action, suit or proceedings arising out of or relating <u>in any way to</u>

<u>the Audit</u> including <u>but not limited to the matters released in this Agreement</u>." (Release ¶ 3

(emphasis added).) Even if the Audit could be confined to the "dispute" in whereas clause three

-- and it cannot -- the Covenant Not to Sue necessarily reaches much further by prohibiting

WWE from bringing suit against JAKKS for <u>any</u> matter whatsoever relating <u>in any way</u> to the

Audit, <u>including those not even expressly released in the Release</u>. <u>See, e.g.</u>, <u>McKinney</u>, 2006

WL 894924, at *1 (plaintiff's suit for defamation barred by release signed in settlement of

previous employment discrimination suit because the settlement released claims that "in any way

<u>related to</u> the incident or circumstances that formed the basis for the [employment discrimination

suit]," even though the documents that were the subject of the defamation suit were created only

in the subsequent investigation of the circumstances giving rise to the plaintiff's employment

discrimination suit where plaintiff knew about the documents when she signed the release)

(alteration in original) (emphasis added). Accordingly, if the Court concluded that the Release

only released the dispute described in the third whereas clause, then the Covenant Not to Sue,

which plainly goes much further than addressing that one dispute, would be rendered superfluous

17

and without effect. E.g., In re Bridgeport Jai Alai, Inc., 99 Fed. Appx. 254, 255-56 (2d Cir. 2004) (applying Connecticut law that provisions of a contract must be given effect, read as a whole, and reconciled). [12]

Given WWE's admissions in its pleadings that it actually used the Audit, inter alia, to obtain information about JAKKS' payments to Shenker, which are targeted here, it is impossible to conclude that WWE's claims do not "relat[e] in any way to the Audit" so as to fall outside the scope of the Covenant Not to Sue. Indeed, WWE has never advanced this claim. Had the Court considered the Covenant Not to Sue, it would not have stated that WWE's claims are not barred by the Release agreement. Accordingly, reconsideration is warranted on this basis alone. See Shrader, 70 F.3d at 257 (reconsideration proper where consideration of overlooked matter might reasonably be expected to alter the result).

In fact, in an attempt to toll the statute of limitations on their time-barred claims, WWE specifically cited its allegations relating to the Audit as purportedly demonstrating fraudulent concealment. (WWE July 7, 2006 Opp. Br. at 39 (citing, e.g., ¶¶ 196-208 concerning the Audit as purportedly alleging Defendant's fraudulent concealment).) In other words, WWE has specifically invoked the Audit (albeit in vain and erroneously) as a basis to revive its time-barred claims. Accordingly, it is impossible (and extremely unfair) to say that WWE's claims do not "relate in any way" to the Audit when WWE has directly relied on the Audit as a basis to bring these claims against the JAKKS Defendants at this late date -- despite being an inquiry notice of them since 1998.

---

[12]  See Perreca v. Gluck, 295 F.3d 215, 224 (2d Cir. 2002) (recognizing the "cardinal principle of contract construction[ ] that a document should be read to give effect to all its provisions and to render them consistent with each other.") (Internal quotation marks omitted).

**D.     The Court Appears to Have Credited WWE's Unsworn
        Assertions, Erroneously Resorting to Selective Extrinsic Evidence**

In its motion papers, WWE contended (without any evidentiary support):

> [T]he Jakks Settlement Agreement makes clear that the audit came about
> because "a dispute exist[ed] between the Parties concerning the Audit in
> that WWE contends Jakks failed to report various sales and that Jakks
> took unsupported deductions and wherein Jakks contends that it overpaid
> WWE." [citing the Release.]  It is evident, therefore, that the Jakks
> Settlement Agreement was intended only to release claims relating to that
> toy license royalty dispute -- no more.

(WWE Motion to Strike at 14.)  Likewise, during oral argument on September 6, 2006, in

addition to repeatedly stating that the Release was a factual issue that could not be resolved "at

this juncture," and "without a full understanding of all of the facts" (Tr. at 107:21-22, 108:5-6),

WWE's counsel stated:

> The audit is a defined term. If you look at the second whereas provision, it
> sets up what the whole purpose of this audit was . . . What they're doing is
> they're going through to determine whether contracts with royalties that
> were obligated to be paid under the toy license, not the videogame license,
> were paid. . . . If you work your way down to the second whereas
> provision, it says what dispute is even being resolved.  It says, "Whereas, a
> dispute exists between the parties concerning the audit; and that, 1, WWE
> contends JAKKS failed to report various sales; and 2, that JAKKS took
> unsupported deductions . . . .  That's what the dispute is that's being
> resolved. . . . all the release language is tied to the concept of the audit,
> which is the defined term.  And that's the only release they are getting of
> claims arising with respect to royalties.

(Id. at 110:16-112:17 (emphasis added).)

By crediting the unsworn assertions of WWE as to the purpose of the Audit and

the Release, the Court overlooked that the Audit is explicitly defined only in the second

"whereas" clause, the language of the Release nowhere limits the scope of the Audit and the

broad terms of the provisions of the Release establish that the scope of the Release was far

broader than just the "dispute" in the third "whereas" clause.[13]  To the extent there was any

factual dispute as to the parties' intentions in executing the Release (as WWE strenuously argued

there was), the Court also overlooked authority -- cited by WWE itself -- precluding it from

resolving such disputes on the limited record before it.  (See WWE Motion to Strike at 14-15

(citing Walder, 132 F. Supp. at 916-17).)  In Walder, the court held that:

> Whether the release was limited to the claims relating to equipment and
> repairs or was sufficiently broad to encompass all claims arising out of the
> operation of the theatre including anti-trust violations, is not altogether
> clear from the face of the document. In view of this ambiguity the
> intention of the parties becomes relevant.  Thus a substantial issue of fact
> exists which requires the denial of the motion for summary judgment.

132 F. Supp. at 917.

There is, at a minimum, an issue of fact which warrants the grant of

reconsideration.  In an analogous situation, where Judge Gleeson mistakenly granted summary

judgment by resolving factual issues, instead of merely identifying that there existed a genuine

issue of fact, the court granted a motion for reconsideration from the bench.  See Robotic Vision

Systems, Inc. v. General Scanning, Inc., CV-96-3884(JG) (E.D.N.Y.) (January 23, 1998,

transcript of motion, attached hereto as Exhibit D.)  In concluding he had erroneously found facts

on a motion for summary judgment, Judge Gleeson rectified his mistaken conclusion:

> . . . I think I ran the risk of falling on the deciding facts part of the seesaw
> of deciding facts that identify the factual issues, and I think I made a
> mistake . . . . I'm persuaded in full recognition of the virtue of the finality
> of my prior decision, I am persuaded I got it sufficiently wrong and I

---

[13]   Indeed, both the Release provision and the Covenant Not to Sue must be construed broadly because they
include language, such as "arising from or relating to" that is emblematic of the broadest type of release.  See,
e.g., Ravski v. Conn. State Med. Soc'y, IPA, No. X01CV044000582S, 2005 WL 647570, at *3 (Conn. Super. Ct.
Feb. 3, 2005) (finding release barred plaintiff's claim where "[c]ourts have consistently construed the words
'relate to' expansively" and therefore plaintiff's argument that only claims related to the previous litigation
referenced in the release agreement were released was too narrow a construction); cf. Collins & Aikman Prods.
Co. v. Bldg. Sys., Inc., 58 F.3d 16, 20 (2d Cir. 1995) (clause "submitting to arbitration '[a]ny claim or
controversy arising out of or relating to th[e] agreement,' is the paradigm of a broad clause") (citation omitted)
(alterations in original & emphasis added).

should undue [sic] it, and at this point vacate my granting of summary judgment on the tortious interference claim and revisit it at the close of the plaintiff's case. But I'm afraid I was precipitous in declaring that as an issue as to which the [sic] genuine issue of material fact.

(Gleeson Tr. at 10:20-11:13.)  The JAKKS Defendants respectfully submit that this Court, like Judge Gleeson recognized he had done, necessarily reached its conclusion by deciding an issue of fact, which it cannot have done on a motion to dismiss and without a full record.  For this reason, reconsideration is appropriate to clarify the Court's conclusion.

21

## CONCLUSION

For the foregoing reasons, the JAKKS Defendants respectfully request the Court reconsider and/or clarify its Order insofar as it could be construed to state that the Release does not bar WWE's claims in this action.  Otherwise, as already demonstrated by WWE's filings in the Connecticut court, (and regardless of the absence of any preclusive effect), this Court's holding on the Release issue will inevitably be exploited by WWE to improperly try to block the introduction of factual evidence regarding the Release in other courts or other proceedings.

Dated: January 17, 2008

                                        Respectfully submitted,


FEDER, KASZOVITZ, ISAACSON,               SKADDEN, ARPS, SLATE, MEAGHER &
WEBER, SKALA, BASS & RHINE LLP            FLOM LLP
Murray L. Skala (MS 9354)
Jonathan D. Honig (JH 7577)               By:  /s/ Jonathan J. Lerner
750 Lexington Avenue                      Jonathan J. Lerner (JL 7117)
New York, New York 10022                  Michael H. Gruenglas (MG 8705)
(212) 888-8200                            Maura B. Grinalds (MG 2836)
                                          Diana Rubin (DR 5477)
                                          Four Times Square
                                          New York, New York  10036
                                          (212) 735-3000


                    Attorneys for the JAKKS Defendants