# <u>Exhibit B</u>

*No. 1547 P. 2*

*ORIGINAL*

# SETTLEMENT AGREEMENT
## AND GENERAL RELEASE OF ALL CLAIMS

This Settlement Agreement and General Release of All Claims ("Agreement") is entered into this 15th day of January, 2004, by and between World Wrestling Entertainment, Inc., with its principal place of business at 1241 East Main Street, Stamford, CT 06902 ("WWE") and Jakks Pacific, Inc. with its principal place of business at 22619 Pacific Coast Highway, Malibu, CA 90265 ("Jakks") (hereinafter WWE and Jakks shall be referred to individually as a "Party" and collectively as the "Parties").

WHEREAS, WWE and Jakks entered into a Consumer Product License Agreement dated October 24, 1995 for the territory of the United States and Canada and a Consumer Product License Agreemenet dated February 10, 1999 for the territories of Australia, Bahrain, Cyprus, Egypt, France, Germany, Israel, Italy, Kuwait, Lebanon, Jordan, Morocco, New Zealand, Oman, Qatar, Saudi Arabia, South Africa, Spain, Syria, Tunisia, United Arab Emirates and United Kingdom for the right for Jakks to sell, among other products, WWE action figures (collectively defined as "License Agreements");

WHEREAS, pursuant the License Agreements WWE conducted an Audit of Jakks accounting records for the accounting period of the second quarter of 1996 through June 30, 2002 ("the Audit");

WHEREAS, a dispute exists between the Parties concerning the Audit in that WWE contends Jakks failed to report various sales and that Jakks took unsupported deductions and wherein Jakks contends that it overpaid WWE;

WHEREAS, the Parties, without admitting any liability, desire to resolve any and all disputes that may exist between them concerning the Audit;

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto agree as follows:

1.    **PAYMENT:** Subject to Paragraph 4 below, in exchange for the full and general release of all claims and the covenant not to sue set forth below, Jakks shall pay World Wrestling Entertainment, Inc., Two Hundred Thousand US Dollars, (US$200,000.00) within five (5) days of WWE's execution hereof.

2.    **RELEASE OF KNOWN AND UNKNOWN CLAIMS:** The Parties, their subsidiaries, affiliates, parent companies, employees, officers, directors, licensees, successors, contractors, agents, assigns, and any other person or entity claiming through them (hereinafter collectively referred to as "Releasors"), hereby fully and completely releases the other Party, its parent companies, subsidiaries, successors, assigns and its and their respective employees, officers, directors, licensees, representatives and agents ("Releasees") from any and all claims, causes of action, rights, obligations, debts, liabilities, accounts, liens, damages, losses and expenses of every kind and nature whatsoever, whether known or

unknown, foreseen or unforeseen, patent or latent, suspected or unsuspected, fixed or contingent, which Releasors have or may have against Releasees, arising from or relating to the Audit. Releasors acknowledge that it is aware and that it may hereafter discover facts different from or in addition to those it now knows or believes to be true with respect to the Audit and the claims, causes of action, rights, obligations, debts, liabilities, accounts, liens, damages, losses and expenses herein released, and Releasors agree that the within release shall be and remain in effect in all respects as a complete and general release as to all matters released herein, notwithstanding any such different or additional facts.

3.    **COVENANT NOT TO SUE**: Releasors agree that it will not make, assert, or maintain against Releasees any claim, demand, action, suit or proceeding arising out of or relating in any way to the Audit including but not limited to the matters released in this Agreement.

4.    **CONFIDENTIALITY**: Releasors acknowledge and agree that it shall not divulge the terms and conditions of this Agreement to any third Party other than to its attorneys, financial advisors and employees who have a need to know this information or as required by law.

5.    **INDEMNIFICATION**:    Releasors will indemnify, defend and hold Releasees, its parent and subsidiary companies, and their respective officers, directors, employees, successors, licensees, contractors and assigns harmless from and against all actions, suits, proceedings, judgments, claims, liabilities, losses or expenses whatsoever, including reasonable attorneys' fees (including an allocation for in-house counsel fees and expenses) arising from a breach of any of Releasors' obligations, representations or warranties under this Agreement.

6.    **WAIVER**: The failure at any time of any Party to demand strict performance of the other Party of any of the terms, covenants or conditions set forth in this Agreement shall not be construed as a continuing waiver or relinquishment thereof, and such Party may, at any time, demand full, strict and complete performance by the other Party of such terms, covenants and conditions.

7.    **SEVERABILITY**: If any provision of this Agreement, or any part thereof, is determined to be invalid or unenforceable by any court of competent jurisdiction, it is the intention of the Parties that the same shall be limited only to the minimum extent necessary to permit compliance with the minimum legal requirement and thereby remain in effect, that no other provision of this Agreement shall be affected thereby and that all such other provisions shall continue in full force and effect.

8.    **SURVIVAL**:    All representations, warranties and indemnities contained herein or made by either Party in connection herewith shall survive the execution, delivery, suspension, expiration and/or termination of this Agreement or any provision hereof.

9.     **GOVERNING LAW; JURISDICTION**:

a.     <u>Governing Law</u>: This Agreement shall be governed by, and construed in accordance with, the laws of the State of Connecticut applicable to contracts entered into and to be fully performed therein.

b.     <u>Jurisdiction</u>: In connection with entering an arbitration award as a final judgment only, the Parties hereto agree to submit to the jurisdiction of the United States District Court located in Bridgeport, Connecticut and the Fairfield County Superior Court, located in Stamford, Connecticut. The Parties agree that service of process by mail shall be effective service of same and such service shall have the same effect as personal service within the State of Connecticut and result in personal jurisdiction over the Parties in the forum in the State of Connecticut. The provisions contained in this Paragraph 9 shall survive the termination and/or expiration of this Agreement.

10.     **FURTHER ASSURANCES**: Both Parties agree to execute such other further documents and do such other acts as may be required to effectuate the purposes of this Agreement including the respective rights of the Parties hereunder.

11.     **COMPLETE AGREEMENT**: This Agreement constitutes the entire understanding of the Parties and replaces and supersedes as of the date of execution any and all prior agreements and understandings, whether oral or written, between the Parties relating to the Audit. No change, modification, waiver or discharge of any or all of the terms and provisions of this Agreement shall be effective unless made in writing and executed by both of the Parties hereto.

12.     **SECTION AND OTHER HEADINGS**: The section and other headings contained in this Agreement are for reference purposes only and shall not be deemed to be part of this Agreement or to affect the meaning or interpretation of this Agreement.

13.     **EXECUTION IN COUNTERPARTS**: This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

14.     <u>**ASSIGNMENT**</u>: This Agreement is non-assignable either Party.

15.     <u>**NOTICES**</u>: All notices, statements, and other documents required to be given to each Party shall be given in writing and sent, either by personal delivery, by registered mail postage prepaid, or by facsimile to the following addresses:

If to WWE:

    Edward L. Kaufman
    Executive Vice President, General Counsel
    World Wrestling Entertainment, Inc.
    1241 East Main Street
    Stamford, Connecticut 06902

If to Jakks to:

Stephen Berman
Jakks Pacific Inc.
22619 Pacific Coast Highway
Malibu, CA 90265

or such address as may be designated in writing by either Party in a notice conforming with this Paragraph 15. The date of such mailing, personal delivery or facsimile shall be the date of delivery of such notice.

16. **RELATIONSHIP OF PARTIES:** Nothing contained in this Agreement shall be deemed or construed as creating any joint venture, partnership, employment, agency or other relationship between Jakks and WWE.

17. **RESERVATION OF RIGHTS:** Nothing however, contained herein shall limit any rights or remedies that the Parties may have in contract, by law or otherwise in respect of any claim not related to the Audit.

(Continued on the next page)

# ORIGINAL

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the date first above written.

WORLD WRESTLING
ENTERTAINMENT, INC.
("WWE")

By: _Donna Goldsmith_

Name: _Donna Goldsmith_

Title: _Sr. VP Consumer Products_

Date: _1/15/04_


JAKKS PACIFIC, INC.

By: _[signature]_

Name: _Joel M. Bennett_

Title: _EVP/CFO_

Date: _Jan. 16, 2004_

# Exhibit C

696VWWEA.txt

1

696VWWEA                          Argument
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3    WORLD WRESTLING ENTERTAINMENT,
3    INC.,
4
4                    Plaintiff,
5
5              v.                          04 CV 08223 (KMK)
6
6    JAKKS PACIFIC, INC., ET AL,
7
7                    Defendants.
8
8    ------------------------------x
9                                          New York, N.Y.
9                                          September 6, 2006
10                                         10:40 a.m.
10
11   Before:
11
12                    HON. KENNETH M. KARAS,
12
13                                         District Judge
13
14                    APPEARANCES
14
15   KIRKPATRICK & LOCKHART NICHOLSON GRAHAM LLP
15        Attorneys for Plaintiff
16   JERRY S. MCDEVITT
16   CURTIS B. KRASIK
17   WILLIAM O. PURCELL
17
18   FEDER KASZOVITZ ISAACSON WEBER SKALA BASS & RHINE LLP
18        Attorneys for Jakks Defendants
19   MURRAY L. SKALA
19   JONATHAN HONIG
20
20   SKADDEN ARPS SLATE MEAGHER & FLOM LLP
21        Attorneys for Jakks Defendants
21   JONATHAN J. LERNER
22   MAURA GRINALDS
22   MICHAEL H. GRUENGLAS
23
24
25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

2

696VWWEA                          Argument
                    APPEARANCES (continued)
1
2    IRELL & MANELLA LLP
2        Attorneys for Defendants THQ, Inc. and Brian Farrell
3    STEVEN A. MARENBERG
3
4    DORNBUSH SCHAEFFER STRONGIN & VENAGLIA LLP
4        Attorneys for Defendants THQ/Jakks Pacific, LLC
5    RICHARD J. SCHAEFFER
5    BRUCE HANDLER
6

                              Page 1

696VWWEA.txt

23    Jakks and THQ come up with a higher bid still.  And does
24    anybody ask the question?  There's not a single allegation of
25    any kind of inquiry here.  Nothing.  Yeah, they talk about

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

48

696VWWEA                      Argument
1    litigation way down the road after the statute has already run.
2    But we submit to your Honor that on the face of the complaint,
3    there's no question but that they were on inquiry notice as of
4    1998, and the statute of limitations ran.
5         So I will move now to my last-but-not-least argument,
6    if I may, which is, I know, Mr. McDevitt's favorite argument,
7    the release.
8         And this was not a gift.  This was a settlement
9    agreement for which $200,000 was paid.  And it didn't happen in
10   1997 or 1996, it happened in January of 2004.  And they allege
11   that they used the audit.  The audit itself targeted very
12   specifically the payments that now form the basis of this
13   complaint.
14        THE COURT:  That's where I think maybe we disagree.
15   Because the audit did not have to do with any sort of corrupt
16   payments to WWE's licensing agents, it had to do with other
17   aspects of the licensing arrangement.  I mean there was a
18   pretty specific purpose behind the audit.
19        MR. LERNER:  Well, there were specific purposes, but
20   how it was used is reflected on the right side of this chart in
21   terms of their allegations that they say they specifically
22   requested -- it's the third bullet.  On January 14th of 2004,
23   WWE's auditors requested in writing that Jakks provide the
24   auditors with a complete listing of all payments made by Jakks
25   to Shenker, SSAI, Bell, and Stanfull, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

49

696VWWEA                      Argument
1         THE COURT:  Yes.
2         MR. LERNER:  And they go through this and they talk
3    about the auditors responded, and it's very much imported into
4    this.  And that they use the audit, they targeted these
5    payments in the audit.  They were fishing for Stanfull
6    payments.  That's their allegation.
7         If you look at these allegations, they're saying that
8    they were looking, and Jakks didn't give them.  That's the gist
9    of their concealment allegations.  They say, and I'm quoting
10   them now, I'm quoting paragraph 208, that "Jakks' repeated
11   refusals to disclose documents showing the complete nature of
12   its relationship to Shenker were the payments to Stanfull."
13   The payments to Stanfull.  Those are the payments, your Honor.
14   In 1998 were delivered in bad faith and part of a plan to
15   conceal the illegal conduct.  From whom?  From their auditors,
16   your Honor.  They might have started with royalties, but it
17   wasn't limited to royalties.  And certainly the release is not
18   limited from royalties.
19        Can your Honor truly say, because if you look at the
20   breadth of the language here on the left side of this, the
21   covenant -- and I just look at the covenant not to sue, because
22   the WWE in January of 2004, knowing full well, gave a general
23   release.  Now, a general release is what -- you know, I
24   remember the Blumberg form, which essentially says you released
25   every claim in the world from the beginning of time to the end

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

696VWWEA.txt

696VWWEA                    Argument
1   of man, except what's carved out.  And the only thing that's
2   carved out is things unrelated to the audit.
3              I think we're on very firm ground here, because it
4   says that the releasors agree that it will not make or assert
5   or maintain against releasees any claim, demand, action, suit,
6   or proceeding arising out of or relating in any way to the
7   audit, including, but not limited to, the matters released in
8   this agreement.  In any way to the audit.
9              If you look at the right side, can your Honor really
10  conclude that there was no relationship whatsoever at all
11  between the audit, especially when they found enough of a
12  relationship to embody it over eight or nine paragraphs of
13  their complaint?
14             THE COURT:  But in terms of where we are at this stage
15  of the case, to the extent that there is a reasonable and
16  alternative interpretation of the release, why isn't that a
17  question for a fact-finder?
18             MR. LERNER:  It would be if there were an alternative
19  interpretation.  There cannot be one.  There is no
20  alternative -- on its face.  That's all we -- if you think
21  there's ambiguity, if you think there's another reasonable
22  interpretation, I'll acquiesce.  But there is none, your Honor.
23  If you look at the language, and this language about relating
24  to, much less relating to in any way, if you check out -- and
25  we cited one Second Circuit case on -- it's the prototypical
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

696VWWEA                    Argument
1   arbitration clause.  It covers a wide gamut of things.
2              And they answered the question themselves.  Question:
3   How did it get into eight or nine paragraphs of the complaint?
4   If the audit had nothing whatsoever to do with these claims,
5   why is it here?  There cannot be any explanation.  The audit
6   covered the payments to Stanfull.  The payments to Stanfull are
7   at the heart of their case.  It cannot be excluded that there's
8   some relationship.
9              And the idea that they point to a whereas clause,
10  whereas clauses as a legal matter don't limit anything.  But
11  the next thing says, the release and the covenant not to sue
12  are as broad as possible.  And they come back and say, Look, we
13  don't specifically include these transactions.  But where it's
14  a general release, that flips the burden.
15             They needed a carve-out.  The carve-out of things
16  unrelated to the audit are just way too limited, especially
17  given their allegations.  So I don't think it's possible, under
18  any interpretation, to say it was unrelated to the audit.
19             Thank you very much for indulging my arguments.
20             THE COURT:  Thank you, Mr. Lerner.
21             Who wants to go next for defendants?
22             MR. MARENBERG:  I'll go next.
23             THE COURT:  All right.
24             MR. MARENBERG:  Let me focus on two areas, or at least
25  two areas, that Mr. Lerner didn't focus on.  Maybe I should
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

696VWWEA                    Argument
1   move to the podium.
2              THE COURT:  Hang on.  It's my turn to get a note here.
3              (Pause)

Page 24

696VWWEA.txt

13    you don't, counts against you and you could be charged with it.
14    And the Court went through that, I think, in a very --
15            THE COURT:  Well, a mailing date is either you do
16    what's reasonably foreseeable will be sent by somebody as a
17    result of your conduct.
18            MR. McDEVITT:  Sure.  And what we allege in here are
19    mailings in furtherance of it.  I mean if you think you're
20    going to obtain a license through a bribery or through a fraud,
21    you have to exchange documents to do it.  Those are all acts in
22    furtherance of the -- you know.  So anyway...
23            THE COURT:  Look, I mean I think the defendants have
24    not focused on the time period that's, for example, reflected
25    in the criminal charges brought against Shenker and Bell.  I
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

107

696VWWEA                    Argument
1    think what they are looking at is the temporal extremes.
2            MR. McDEVITT:  I agree with your Honor.  And I know
3    your Honor knows that the fact that they were only charged,
4    that does not limit our proof to go far.  It just proves
5    conclusively they're dishonest servants.  And the only question
6    is when.
7            Keep in mind, what our complaint alleges, and this has
8    to be accepted as truthful where we are now, the very first
9    payment, very first payments that corrupted these agents came
10    from them, Jakks.  And all of this, Jakks started this whole
11    thing with these corruption -- with these payments that they
12    made to these agents.  And then from there they just went
13    crazy.
14            Your Honor, some of the other points that were
15    addressed -- and do you have anymore questions --
16            THE COURT:  No.  This is good.  Just keep going, and
17    I'll come up with the questions as we go along.
18            MR. McDEVITT:  All right.  In no particular order, the
19    other issues that were raised were the release issues.
20            On the release issue, I think your Honor sensed what
21    that release was about.  But, more importantly, at this
22    juncture, your Honor, this can't be raised; it's an affirmative
23    defense.  We'd moved to strike it, with all due respect to
24    Mr. Lerner.
25            THE COURT:  All right.  But humor me.  Tell me why it
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

108

696VWWEA                    Argument
1    doesn't work, assuming I don't grant your motion to strike.
2            MR. McDEVITT:  This is not a procedure over substance
3    argument, your Honor.  The reason that that rule fits, and we
4    talked about it in our brief extensively is because courts
5    aren't supposed to decide any issue without a full
6    understanding of all the facts.  There hasn't been one person
7    from Jakks raised a right hand yet to take an oath that that
8    release was intended to cover anything other than the
9    royalty-based claims that were being audited.  And until they
10    do, it's not really properly before the Court.
11            We have pointed out that under Connecticut law, which
12    governs that, the Court is supposed to take into account the
13    full set of circumstances, intentions of the parties and all
14    the rest of that.  None of that evidence is before the Court.
15            THE COURT:  Well, but if a contract speaks for itself,
16    why do you need to have somebody raise their hand?
17            MR. McDEVITT:  Contracts don't speak for themselves.
                            Page 50

696VWWEA.txt
```
18   They don't.  That's one of the -- your Honor, contracts don't
19   come alive until parties --
20              THE COURT:  What a depressing view of contract law.
21              MR. McDEVITT:  And I'm not being facetious.  People
22   always say it speaks for itself.  It lays on the table; it
23   doesn't say anything.  That's basically a rule of
24   interpretation as to what the contract says it says.  But that
25   has nothing to do with what did the parties intended this
```

109

696VWWEA                    Argument
```
1    document to be.  And there is a whole body of evidence that
2    they're aware of that they know shows, and it's our position
3    it's utter pretext, they know that release wasn't intended to
4    cover any of these claims.
5               THE COURT:  But if the language of the release says
6    otherwise, then I'm surprised to hear you say that.  I thought
7    you were going to tell me that the language doesn't say what --
8               MR. McDEVITT:  It doesn't say that.
9               THE COURT:  Okay.  Then why don't we stick to that.
10              MR. McDEVITT:  Really, the larger point is I mean it's
11   just not before the Court properly right now.
12              THE COURT:  You asked me if I have any questions.  I'm
13   asking you questions.
14              MR. McDEVITT:  And I will try to answer.
15              THE COURT:  Okay.  So assume for the sake of argument
16   the motion to strike is either hasn't been made or I'm not
17   going to grant it, tell me why the release doesn't win the day
18   for defendants.
19              MR. McDEVITT:  Assuming you're going to consider it?
20              THE COURT:  Exactly.
21              MR. McDEVITT:  If I can find it, your Honor.  I have
22   my notes on it here.  Does your Honor have the release with
23   you?
24              THE COURT:  I was just looking for it.  And then you
25   went off and told me that contracts are worthless, so I wasn't
```

110

696VWWEA                    Argument
```
1    going to find it.
2               MR. McDEVITT:  No, your Honor, I'm not saying that.
3               MR. GRUENGLAS:  Look at tab 8.
4               THE COURT:  Well, I want to get the whole shebang
5    here.  It's attached to Mr. Lerner's declaration.  I realize
6    that by saying that I'm saying something incendiary.  I have
7    it.  It's Exhibit 8 of Mr. Lerner's affidavit.
8               MR. McDEVITT:  And I have a couple obvious points to
9    make about this, your Honor.  This doesn't even reference any
10   of the other parties; it references Jakks only, it doesn't
11   reference Shenker and all the rest of them.
12              But, in any event, if you work your way through the
13   document and, again, I want to say, I don't think at this point
14   this is the proper analysis, but I will indulge you with it,
15   your Honor.
16              The audit is a defined term.  If you look at the
17   second whereas provision, it sets up what the whole purpose of
18   this audit was.  Your Honor's sense of what it was is exactly
19   right.  What they're doing is they're going through to
20   determine whether contracts with royalties that were obligated
21   to be paid under the toy license, not the video game license,
22   were paid.  And so they monitored, and they go in and they redo
```
Page 51

696VWWEA.txt

23    that.
24              And it says to audit, okay.  If you work your way down
25    to the second whereas provision, it sets up what dispute is
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

111

696VWWEA                    Argument
1     even being resolved.
2              It says, "Whereas, a dispute exists between the
3     parties concerning the audit; and that, 1, WWE contends Jakks
4     failed to report various sales; and, 2, that Jakks took
5     unsupported deductions."
6              So there's two competing contentions after the audit
7     gets done.  One is we're saying they underpaid; two, they're
8     saying they overpaid.  That's what the dispute is that's being
9     resolved.
10             And then the next whereas says, The parties involved
11    in mitigating desire to resolve any and all disputes
12    that may exist between them concerning the audit.
13             They go through all the releases, not a general
14    release.  If you look at the language, all the release language
15    is tied to the concept of the audit, which is the defined term.
16    And that's the only release that they're getting of claims
17    arising with respect to royalties.
18             In fact, if you look at the very last sentence, the
19    very last paragraph, paragraph 17, there's a specific
20    reservation of rights in there that nothing contained in there
21    shall eliminate rights around these parties may have in
22    contract, by law, or otherwise in respect to any claim not
23    related to the audit.
24             Our claims here are not in any way based on the audit
25    in any way, shape, fashion or form.  They all turn on facts
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

112

696VWWEA                    Argument
1     that occurred prior to the audit, and actions that have nothing
2     to do with the audit.  So I don't think that that is even a
3     proper subject to be raised.  And even if it were to be raised,
4     I think you will see, your Honor, when you get the evidence, I
5     really don't think any corporate executive of Jakks is going to
6     take an oath to that proposition.  In fact, they've already
7     been in large part questioned about things.  I really don't
8     think that's a proposition that anybody wants to take under
9     Rule 11.  But if they do, they do, and then we plead to it and
10    we join on that issue.
11             The other issues that were raised were the statute of
12    limitations.  I'll just talk about storm warnings and
13    lightening clouds and all the rest of that.  I think we have to
14    keep in mind, your Honor, that the complaint alleges, and, in
15    fact, there are circumstantial guarantees that the Court has
16    before it in the form of another judicial opinion, that what we
17    ran into when we did inquire during the limitations period was
18    nothing but stonewalling to the point of perjury, obstruction
19    of justice, manufacturing of evidence.  And that wasn't limited
20    to Shenker, and it wasn't limited to Bell.
21             The complaint alleges the specific acts that Jakks
22    itself did that had been concealing this information from us,
23    the lies that they have told to us, the refusal to originally
24    admit that they made any payment, then lying about the extent
25    of the payment, continually lying about the purpose of the
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300
                        Page 52

# Exhibit D

1

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2
    - - - - - - - - - - - - - - X
3   ROBOTIC VISION SYSTEMS,      :      CV-96-3884
                    Plaintiffs, :
4
        -against-               :
5                               :      United States Courthouse
                                :      Brooklyn, New York
6   GENERAL SCANNING,           :
                    Defendants. :
7                               :      January 23, 1998
    - - - - - - - - - - - - - - X      10:30 a.m.
8
                         TRANSCRIPT OF MOTION
9            BEFORE THE HONORABLE JOHN GLEESON
                  UNITED STATES DISTRICT JUDGE
10
    APPEARANCES:
11
    For the Plaintiffs:     SKADDEN, ARPS, SLATE,
12                          MEAGHER & FLOM LLP
                            By:  JONATHAN LERNER, ESQ.
13

14  For the Defendants:     HANIFY & KING
                            By:  DANIEL J. LYNE, ESQ.
15

16

17

18  Court Reporter:         FREDERICK R. GUERINO C.S.R.
                            225 Cadman Plaza East
19                          Brooklyn, New York
                            718-330-7687
20

21

22

23

24

25  Proceedings recorded by mechanical stenography, transcript
    produced by computer.

         FREDERICK R. GUERINO, C.S.R.     OFFICIAL COURT REPORTER

1          THE COURT CLERK:  Robotic -vs- General Scanning.

2          State your appearances for the record.

3          MR. LERNER:  Jonathan Lerner, L-e-r-n-e-r, for the

4     plaintiff Robotic Vision Systems.

5          MR. LYNE:  Daniel Lyne, L-y-n-e, for the defendant

6     General Scanning, Inc.

7          THE COURT:  All right.  Good morning.

8          MR. LYNE:  Good morning.

9          THE COURT:  I read your papers carefully.  I will

10    give you a chance to argue it orally, if you want, but don't

11    feel compelled to repeat everything in your papers.

12          Tell me as a practical matter what is at stake here?

13    Are there damages recoverable on the tortious interference

14    claim that are not recoverable if the fraud is proved?

15          MR. LERNER:  It's possible, Your Honor, yes, sir, I

16    think.

17          THE COURT:  Just tell me how.

18          MR. LERNER:  I think I anticipate that Mr. Lyne is

19    going to try to limit our damage submission and may attempt to

20    delink our ability to succeed in the merger from our fraud

21    claim, fair competition claim.  So I think there is a

22    reasonable likelihood to have available to us also the

23    tortious interference claim.  It enhances our damages; and I

24    also, as a practical matter, I think we are all better off,

25    frankly, including Mr. Lyne, if we have the jury have the

3

1  tortious interference claim, have the verdict, if Your Honor

2  wishes to set aside later, I'm hopeful that Your Honor would

3  not do that, but at least certainly the logical --

4      THE COURT:  What do you think the jury gets told in

5  terms of how it should measure the damages to be awarded on

6  the fraud?

7      MR. LERNER:  Well, I would argue that the fraud claim

8  would allow us to recover both the out-of-pockets and that

9  which we were defrauded of, which would include the merger.  I

10  believe that Mr. Lyne will make -- I don't want to advance his

11  argument, but I always assume he will make the best argument.

12  He's a very capable advocate.

13      THE COURT:  Then let me ask him.  What do you think

14  they get told with regard to the damages to get awarded if the

15  fraud is proved?

16      MR. LYNE:  Strictly with respect to the fraud, I

17  think that New York law is pretty clear, that the measure of

18  damages is in fact out-of-pockets and, actually, I think

19  Mr. Lerner and I have chatted about that at least on a

20  desultory basis.  I'm not sure that that same limitation

21  applies to Mr. Lerner's unfair competition claim, which he

22  would seek essentially the benefit of that bargain under that

23  particular count.  But with respect to the fraud, I think New

24  York adopts a pretty strict construction with respect to fraud

25  damages, and with respect to fraud, I do believe it is

4

1  out-of-pockets.

2        THE COURT:  Do you think that is clear, too?

3        MR. LERNER:  I'm not prepared to say it is clear, but

4  it certainly, from Mr. Lyne's point of view, I would expect he

5  would make that argument, and I wouldn't be standing before

6  the court saying it's fruitless.  So, I expect to encounter

7  and have to you are surmount which is why we are taking the

8  court's time getting back to you on this issue, otherwise we

9  would not be here if we didn't think it was, you know,

10 reasonably significant and possibly could affect the case as

11 it goes forward.

12       THE COURT:  I figured that.  I figured you weren't

13 wasting your time as well.

14       All right.  Anything you want to add to your papers?

15       MR. LERNER:  Well, as I went over them, I thought

16 they were pretty good papers.  I would only ask that Your

17 Honor give thought to the entirety of the facts and not take

18 any particular one out of isolation.  The gist of our

19 position, Your Honor, is very simply, I think you found facts

20 rather than identify issues, and I think we said that in the

21 papers.

22       The only thing I would add to that is that I think if

23 you look at Your Honor's own conclusions in connection both

24 with the unfair competition, we indicate factual issues with

25 respect to the use and exploitation, and your conclusions with

FREDERICK R. GUERINO, C.S.R.    OFFICIAL COURT REPORTER

1   respect to the fact that the injury and damage to us also

2   raised the question of fact.  I think it follows ipso facto to

3   that the taint on the relationship, after the initial acts, is

4   also a question of fact, and I certainly think that with

5   respect to the impact of the March 22nd acts two of the fraud,

6   that had the effect of forestalling the reasonable expectancy,

7   which Your Honor had found to have occurred on April 26th,

8   that was the purpose and intended fact.  We were in the state

9   of motion.  He interdicted the motion.  But for his act of

10  fraud, there would have been a higher bid would have occurred

11  before the letter.  There would have been no threats and

12  departed the company.  None the rest would have happened.

13          I think for all of those reasons, when you look at

14  the situation and you see a company that has to be sold what

15  looks like it might not be such a good offer on day one -- as

16  your house is up for sale it is pretty good.  As time ticks

17  by, and I would note for Your Honor's benefit while Your Honor

18  said our negotiations were preliminary, we bid in December of

19  1995 '85 percent of the ultimate sale price, and it's

20  undisputed that we were prepared to pay $22 million, when they

21  sold for 23 million, and I think that's pretty close, and

22  absent the fraud, the jury could conclude but for the fraud,

23  which is the more stringent test, we would have acquired this

24  company.  Only one bidder before that and two bidders after,

25  and I think the jury should reach that conclusion.

6

1    THE COURT:  Anything you want to add?

2    MR. LYNE:  Yes, I think so, Your Honor, because as

3  the Court pointed out, the issue -- the linchpin here is

4  whether or not there was - and I will even use the lesser

5  standard - reasonable expectancy at the time of the

6  interference, and if we are going to point to various seminal

7  points, let's start with December of 1995 during the lunch

8  between Costa and Winston.

9        What had happened at that juncture, well, they had

10  had a meeting with the engineering.  They had offered $20

11  million.  That over was rejected.  Mr. Tuerk, a member of the

12  Board of Directors, stated that he considered the $20 million

13  offer to be a reflection that RBSI was not serious in its

14  intent to acquire the company.  So there is no factual

15  predicate to assume that this company RBSI was in such a

16  position at that time in December of 1995 to satisfy what has

17  to be at the very least the reason of expectancy test, and I

18  would suggest that there are a number of cases in New York

19  that apply substantially stringent but for test.

20        But even under the lesser tests, there are no facts

21  upon which a jury could reasonably find that this potential

22  bidder had any type of an inside track at that point in time

23  and, in fact, the subsequent facts belie that because in

24  February of 1996, RB -- View Engineering went out and hired an

25  investment banker.  They hired the investment banker to go out

FREDERICK R. GUERINO, C.S.R.    OFFICIAL COURT REPORTER

7

1    and look for qualified bidder that is epithetical to the

2    concept that RBSI is pushing before the court, that in

3    December of 1995 it was somehow in a position to satisfy even

4    a reasonable expectancy test.

5         What happened thereafter, well, RBSI sent a letter on

6    March 25th repeating its one-time offer.  RBSI had met in

7    early March with View, View's investment banker, without

8    increasing its offer.  View Engineering sent a confidentiality

9    agreement to RBSI.  RBSI was given financials, but the

10   investment banker was going out and qualifying a number of

11   bidders.  It was talking to View Engineering, Dover

12   Technology, Esterline Technologies, ThermoSpectra.  So it was

13   a process that was going on, and it was going on through --

14   beginning in February, when they hired the investment banker,

15   actually through the date of the letter of intent, which was

16   signed on, I think, April 11th.  RBSI had the opportunity to

17   do whatever it chose to do.  What it chose to do was to file

18   an additional patent claim, and the references are replete in

19   the record with respect to the effect of RBSI to file that

20   third patent suit.  It effectively derailed RBSI's bid in the

21   eyes of View Engineering.

22        Well, that's the measure against which the court has

23   to look at the issue of but for the test or reasonable

24   expectancy test, and the linchpin of this entire tort is if

25   there was a but for standard, which could be satisfied at the

8

1   time of the interference -- let's assume there were tortious

2   acts in December and March, the fact of the matter is there

3   was no reasonable expectancy until subsequent to those dates

4   and time.

5          Now, RBSI has fraud claims, and those fraud claims

6   will either rise or fall on the facts that they assert at

7   trial and whatever the jury decides, but the issue of the tort

8   of tortious interference requires not just wrongful acts, but

9   wrongful acts is which have the effect at the time that they

10  were undertaken of derailing what otherwise would have been a

11  completed transaction, and their aren't any facts which would

12  suggest in this record that a jury could reasonably find under

13  that that was the case in any of the instances in which they

14  are pointing to prior to April 26th, when they in fact have a

15  subsequent bid which View Engineering's Board of Directors

16  considers and accepts.

17         Now, subsequent to that point in time, General

18  Scanning asserts what it believes to be contract rights.

19  Well, the assertion of those contract rights is not tortious

20  in and of itself, and to the extent that there is a claim of

21  tortious behavior, all of that predates what is the seminal

22  date for purposes of this, and that seminal date has to be the

23  date in which they could satisfy in some factual fashion their

24  claim that there was a tort, and a tort at a time when they

25  had a reasonable expectancy or they could satisfy a but for.

1        Here they cannot, so I guess I would disagree

2    vigorously with the notion put forth by Mr. Lerner, that it

3    would be appropriate to put this in front of the jury because

4    I don't think it would.  They would have to satisfy their

5    factual burden at this juncture, and I don't believe there's

6    anything in the record which would satisfy that burden at this

7    juncture, ergo go I have a right to have that claim served

8    from this case.

9        MR. LERNER:  I would only say that the argument that

10   my colleague makes is a highly factual one.  These are factual

11   issues, and on a very factual question, but for the reasonable

12   expectancy he talks about, these other bidders, that's an

13   argument he can make to the jury.  I could say none of them

14   ever had any interest, that's the point, only one bidder in

15   December, and there were two bidders after that, and they

16   committed these torts, and the jury can conclude that the

17   negotiations were interdicted.

18       Courts have been pretty clear on saying, Your Honor,

19   that the tort extends to negotiations.  Mr. Lyne says well

20   they didn't have an inside track.  Well, I don't think that's

21   the standard.  I don't think that's what Union Carbide says.

22   I don't think that's what the cases say.  I think you're the

23   screen, if you will, on this highly factual issue to determine

24   were there negotiations, and the jury is entitled under the

25   facts here when we are in the bidding.

FREDERICK R. GUERINO, C.S.R.     OFFICIAL COURT REPORTER

1          This meeting was initiated by View, Your Honor, we

2    were called to the meeting.  There was a two and a half or

3    three-hour meeting.  There's a memoranda in the record, and we

4    made a bid and put it on the table.  Right after that conduct

5    starts, we started getting the chilly treatment, when you look

6    at the other facts, including this categorical imperative, so

7    you are in the land of fact, Your Honor, and a jury could

8    conclude but for their conduct, we would have gotten this

9    company.  So I think summary judgment is terribly appropriate

10   in this issue.

11         THE COURT:  The hardest part of this motion is your

12   procedural part it.  Your briefs, by the way, are both

13   excellent and, you know, I think there's a virtue to the

14   finality of these interlocutory decisions you make.  Even if

15   it turns out they are wrong, even if a judge thinks they are

16   wrong, and I found persuasive your procedural arguments, which

17   you reasonably emphasize here.  On the other hand, I'm a

18   little torn.  I do think in my description of the prospect of

19   an agreement between the plaintiff and View, I do think - not

20   necessarily overlook facts - but I think I ran the risk of

21   falling on the deciding facts part of that seesaw of deciding

22   facts that identify the factual issues, and I think I made a

23   mistake in that --

24         MR. LYNE:  Well --

25         THE COURT:  Let me finish.  I also think it's

FREDERICK R. GUERINO, C.S.R.    OFFICIAL COURT REPORTER

11

1   entirely possible that even though I think I made a mistake on

2   that, on deciding to keep that issue from the jury, that it's

3   possible given -- it's possible, depending upon the facts

4   presented, that I'm revisiting this Rule 50, I might see it

5   your way again.

6           But at this juncture I am persuaded by -- I'm

7   persuaded in full recognition of the virtue of the finality of

8   my prior decision, I am persuaded I got it sufficiently wrong

9   and I should undue it, and at this point vacate my granting of

10  summary judgment on the tortious interference claim and

11  revisit it at the close of the plaintiff's case.  But I'm

12  afraid I was precipitous in declaring that as an issue as to

13  which the genuine issue of material fact.

14          You want to try to take me out of that, you may.

15          MR. LYNE:  I would and I will, at least I will try to

16  attempt to.  I want to respond to one comment by opposing

17  counsel, which is that we got the chilly treatment after the

18  December meeting.

19          There is no evidence in the record to support the

20  notion that RBSI was given any chilly treatment and, in fact,

21  the undisputed evidence in the record from Mr. Swain and from

22  others is that negotiations with General Scanning slowed in

23  March of 1996, with the specific intent of trying to determine

24  whether there were other qualified bidders in place.

25          So, the reference to chilly treatment, I think, is

FREDERICK R. GUERINO, C.S.R.    OFFICIAL COURT REPORTER

1    wholly unsupported by the record.

2           But my argument really is one that focuses on what

3    New York State law says is a requirement under these

4    circumstances, and whether the plaintiff, with the proffer

5    that he has made, would be able to get before a jury on the

6    notion that there was a but for standard which was satisfied.

7    There is no such set of facts which reasonably could be

8    construed by a jury and can -- you know, the courts always

9    asked to look at facts with a critical eye in the context of

10   dispositive motions.  That happens everyday, not only in this

11   courtroom, but in courtrooms all over the country, and courts

12   are asked to make these types of decisions, and have to make

13   these types of decisions in an effort to insure when the facts

14   are placed before jurors at trial, those facts are the only

15   facts which are appropriate, and the only theories which are

16   appropriate under those circumstances, and what the Court has

17   to be aware of, I think you were right in the first instance,

18   is me shower all of these facts against whether there was a

19   sufficient showing at this juncture to satisfy the reasonable

20   expectancy test under circumstances where there was one offer,

21   it was rejected in December, and which after there was no

22   offers made, and there was only a decision made to sue.

23           Can there be a reasonable expectancy under such

24   circumstances?  And the answer has to be no.

25           THE COURT:  I agree with most of what you are

13

1  saying.  But the question really more precisely is:  Could a

2  rational person conclude that, either the but for or the

3  reasonable expectancy, which is the standard I had chose in my

4  summary judgment decision?  You have me persuaded if I were a

5  fact-finder that these facts don't meet that standard, but

6  where I think I went wrong is in determining that it would be

7  irrational for the fact-finder, which would be me, to reach

8  that conclusion on these facts, and I just think I got it

9  wrong.

10          MR. LYNE:  Well, let's --

11          THE COURT:  Your procedural argument is

12  notwithstanding, I don't think I should let pass by an

13  opportunity to correct, so I won't.

14          MR. LERNER:  Thank you.

15          THE COURT:  As persuasive as you are.  You are both

16  very persuasive.

17          MR. LYNE:  Let me try one different spin.  Let's try

18  looking at it from the prospective of post-trial.  Let's

19  assume that just these facts were put in front of a jury and

20  the responses that were put in the record in front of the

21  jury, to wit, they sued us.  We determined their choice to sue

22  us was in our minds a derailing factor.

23          Let's assume if a jury came back and said we find

24  tortious interference, and I come back and ask for JNOV, under

25  those circumstances the Court would be put back in a position

1   of saying to itself, is this a set of facts which would

2   satisfy something which is otherwise an extremely rigorous

3   standard under New York law?  And it is understandable what it

4   is.

5        Remember, this plaintiff starts with a filter of

6   attempting to bring a breach of contract action in this case,

7   had the ability to intillate all of this allegedly

8   confidential information and failed to take the steps

9   necessary to do so.  I mean, leaving aside the Lazard case,

10  which says essentially from the Second Circuit's prospective

11  shame on you who failed to take those steps which are

12  appropriate, that overlay has to be placed on top of these

13  facts and look at the case law in New York which says this is

14  a very difficult standard to satisfy.  It is exactly the type

15  of standard which the New York courts say are appropriate for

16  a trial court judge to make a decision in the first instance

17  because it is an exacting standard.  It does require a

18  substantial showing of facts which would support some type of

19  rational decision-making on the jurors' part and that was the

20  obligation that was placed on RBSI in response to this

21  dispositive motion.

22        Can those facts rationally support a claim under

23  circumstances where there is a substantial universe of

24  rebuttable testimony, which was unrebutted, which was saying I

25  didn't consider them to be a serious buyer in December, a

1 whole panoply of testimony from all of the board members who

2 were deposed from View's prospective saying we consider the

3 decision to sue to be a derailing factor.

4      If that's the case how, then, could a rational jury

5 find under such circumstances that this plaintiff could find

6 -- could satisfy any type of expectancy test, whether it is a

7 but for test, which I think is the appropriate test, or

8 whether it is a reasonable expectancy test.  Under either

9 circumstances, this court has to impose its filter on that

10 decision-making process.

11      THE COURT:  Even if you are right, there are other

12 facts that will be brought to bear on the issue.  Your

13 arguments are very good, very well made.  They won the last

14 time around.  But I am persuaded that I should allow this

15 issue to be tried.

16      How long will it take you to present your case?

17      MR. LERNER:  Our case will go in, I would say, six

18 trial days.

19      MR. LYNE:  I would say probably a lifetime.

20      THE COURT:  A life time.

21      MR. LYNE:  It may sound like a lifetime.

22      MR. LERNER:  It depends, if I'm winning.

23      MR. LYNE:  I would say I would like some time.

24      THE COURT:  Is the case ready for trial?

25      MR. LERNER:  We have a couple of depositions and

16

1  expert discovery and we'll be ready to go.

2       THE COURT:  We'll try it on May 4th, jury selection

3  and trial.

4       THE COURT CLERK:  April 24th at 10:30.

5       MR. LYNE:  Thank you.

6       THE COURT:  My rules call for a joint pretrial

7  order.  I don't know if I need one, I had such expensive

8  briefing on summary judgment.

9       I would like witness lists and advance notice before

10  this April 24th final pretrial conference of any evidentiary

11  disputes we can resolve before trial.

12       I would like proposed jury instructions from you by

13  the date of that final pretrial conference.  I think that's

14  really all I will need from you.

15       Premark your exhibits before the trial, of course.

16       MR. LYNE:  Evidentiary disputes, motions in limine,

17  how long before the final pretrial conference do you want

18  those?

19       THE COURT:  Do you anticipate motions in limine?

20       MR. LYNE:  There's always motions in limine.  Do I

21  anticipate them?  Yes, without knowing what they might be.

22       THE COURT:  Let's pick a date so that you can have

23  something.

24       MR. LYNE:  Say a week before?

25       MR. LERNER:  I would like to respond.

17

1          THE COURT:  Any preliminary motions, any motions in

2    limine, April 3rd.  Response is April 10th.  Reply is April

3    17th.  Deal with the ones we can deal with at the final

4    pretrial conference.  What else do you want? Exhibit lists in

5    addition to the witness list.

6          MR. LYNE:  When do you want those?

7          THE COURT:  Couple of days before your pretrial

8    conference is fine.  Just give me a brief summary, very brief

9    of what you anticipate the witness will testify.  Bear in mind

10   it that I'm sensitive to cumulativeness in testimony.  So if

11   you have multiple people who will testify to the same things,

12   same set of facts, make sure you put your best witness on

13   first, all right.  I mean, obviously if it is a matter of

14   serious credibility dispute and multiple witnesses sometimes

15   help, but if it is not, I will just preclude the testimony on

16   cumulativeness.

17          MR. LERNER:  Thank you.

18          THE COURT:  I look forward to this.  It looks like an

19   interesting trial.

20          MR. LYNE:  It will be.

21          MR. LERNER:  Thank you, Your Honor.

22          THE COURT:  Have a good day.

23          MR. LYNE:  Thank you.

24          (The motion is concluded.)

25