UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

WORLD WRESTLING ENTERTAINMENT, INC.

                              :

                Plaintiff,                :           04 CV 8223 (KMK)

                v.                    :           (ECF CASE)

JAKKS PACIFIC, INC.; JAKKS PACIFIC (H.K.)  :
LIMITED; ROAD CHAMPS LIMITED; THQ,
INC.; THQ/JAKKS PACIFIC LLC; STANLEY    :
SHENKER AND ASSOCIATES, INC.; STANLEY
SHENKER; BELL LICENSING, LLC; JAMES    :
BELL; JACK FRIEDMAN; STEPHEN BERMAN;
JOEL BENNETT; and BRIAN FARRELL,      :

               Defendants.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

COMPENDIUM OF UNREPORTED DECISIONS CITED IN THE
MEMORANDUM OF LAW IN SUPPORT OF THE JAKKS DEFENDANTS'
MOTION FOR RECONSIDERATION OF THE PORTION OF THE COURT'S
DECEMBER 21 DISMISSAL ORDER RELATED TO THE RELEASE

| | |
|---|---|
| FEDER, KASZOVITZ, ISAACSON,<br>   WEBER, SKALA, BASS & RHINE LLP<br>Murray L. Skala (MS 9354)<br>Jonathan D. Honig (JH 7577)<br>750 Lexington Avenue<br>New York, New York 10022<br>Phone: (212) 888 8200<br>Fax: (212) 888 5968 | SKADDEN, ARPS, SLATE,<br>   MEAGHER & FLOM LLP<br>Jonathan J. Lerner (JL 7117)<br>Michael H. Gruenglas (MG 8705)<br>Maura B. Grinalds (MG 2836)<br>Diana Rubin (DR 5477)<br>Four Times Square<br>New York, New York 10036<br>Phone: (212) 735 3000<br>Fax: (212) 735 2000 |

*Attorneys for the JAKKS Defendants*

January 17, 2008

# INDEX

**CASES**                                                                                      **TAB**

Amerol Corp. v. American Chemie-Pharma, Inc., No. CV 04-0940,
2006 WL 721319 (E.D.N.Y. Mar. 17, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Bibeault v. Advanced Health Corp., No. 97 Civ. 6026, 2002 WL 24305
(S.D.N.Y. Jan. 8, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Brown v. Austin, No. 05 Civ. 9443, 2007 WL 2907313 (S.D.N.Y. Oct. 4,
2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Cruz v. United States, No. C 01-00892, 2003 WL 21518119 (N.D. Cal. June 24,
2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Daniels v. City of New York, No. 99 Civ. 695, 2007 WL 2077150
(S.D.N.Y. July 16, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Espinosa v. Delgado Travel Agency, Inc., No. 05 Civ. 6917, 2007 WL 1222858
(S.D.N.Y. Apr. 24, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Green v. Doukas, No. 99-7733, 2000 WL 236471 (2d Cir. Feb. 5, 2000) . . . . . . . . 7

Grigsby & Associates, Inc. v. Rice Derivative Holdings, L.P., No. 00 Civ. 5056,
2001 WL 1135620 (S.D.N.Y. Sept. 26, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Handschu v. Special Services Division, No. 71 Civ. 2203, 2007 WL 1711775
(S.D.N.Y. June 13, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

McKinney v. Chapman, No. 040833378S, 2006 WL 894924 (Conn. Super. Ct. Mar.
21, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

In re Methyl Tertiary Butyl Ether ("MBTE") Products Liability Litig., MDL No.
1358, No. M21-88, 2007 WL 2979692 (S.D.N.Y. Oct. 10, 2007) . . . . . . . . . . . . . 11

M.K.B. v. Eggleston, No. 05 Civ. 10446, 2006 WL 3230162 (S.D.N.Y. Nov. 7,
2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**1**

Westlaw.

Not Reported in F.Supp.2d                                                      Page 1

Not Reported in F.Supp.2d, 2006 WL 721319 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Amerol Corp. v. American Chemie-Pharma, Inc.
E.D.N.Y.,2006.
Only the Westlaw citation is currently available.
       United States District Court,E.D. New York.
             AMEROL CORPORATION, Plaintiff,
                              v.
       AMERICAN CHEMIE-PHARMA, INC., et al.,
                       Defendants.
                   **No. CV 04-0940(JO).**

                       March 17, 2006.

Robert J. Ansell, Silverman, Perlstein & Acampora,
LLP, Jericho, NY, for Plaintiff.
Eric M. Berman, Babylon, NY, for Defendants.


               MEMORANDUM AND ORDER

JAMES ORENSTEIN, Magistrate Judge:
    **\*1** Plaintiff Amerol Corporation ("Amerol")
accuses defendant American Chemie-Pharma, Inc. ("
ACP") of breaching a contract and it further accuses
defendant Atkins, Harris & Brown ("Atkins") of
tortiously interfering with its prospective contracts
and business relations. *See* Docket Entry ("DE") 1 (
"Complaint"). ACP has in turn filed counterclaims
accusing Amerol of breach of contract. *See* DE 8 ("
Answer"). ACP and Atkins seek to dismiss all of
Amerol's claims pursuant to Federal Rule of Civil
Procedure ("Rule") 12(b)(6)-a motion that I deem
instead to seek summary judgment pursuant to Rule
56 because the parties' respective submissions on
the motions rely on matters outside the pleadings.
*See, e.g., Friedl v. City of New York,* 210 F.3d 79,
83 (2d Cir.2000) (quoting *Fonte v. Bd. of Managers
of Control Towers Condo.,* 848 F.2d 24, 25) (2d
Cir.1988)). ACP also seeks summary judgment in
its favor pursuant to Rule 56 on its counterclaims.
*See* DE 23. Finally, in the course of opposing the
defendants' motions, Amerol sought leave to amend
its complaint. For the reasons set forth below, I

grant Amerol leave to amend its complaint, deny the
defendants' motion for summary judgment on each
of Amerol's claims, and grant ACP's motion for
summary judgment on its counterclaims.


I. *Background*


A. *The Parties' Submissions*

    I have reviewed the following submissions in
addition to the pleadings listed above (for ease of
reference, I list them here with the abbreviations I
will use in citing to them):

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                           Page 2

Not Reported in F.Supp.2d, 2006 WL 721319 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

| DE | # Abbreviation | Description |
|---|---|---|
| 8 | "Answer" | Answer Affirmative Defenses and Counterclaims |
| 23 | "Memo." | Motion of Defendants, [ACP and Atkins], to Dismiss Complaint Pursuant to [Rule] 12(b)(6) and in Support Of Motion for Summary Judgment Pursuant to [Rule] 56 and Local Rule 56.1. |
| 24 | "Kamdar Aff." | Affidavit [of Mukesh Kamdar] in Support of Defendant's Motion for Summary Judgment |
| 25 | "Reply" | Reply Memorandum of Law of Defendants [ACP and Atkins], in Further Support of Defendants' Motion to Dismiss Complaint Pursuant to [Rule] 12(b)(6) and in Further Support of Defendant's Motion for Summary Judgment Pursuant to [Rule] 56 and Local Rule 56.1 |
| 27 | "ACP Stmt." | Defendant's Amended Statement of Material Facts on Motion for Summary Judgment Pursuant to Local Civil Rule 56.1 |
| 28-1 | "Sartorio Aff." | Affidavit [of Dominic Sartorio] in Opposition to Defendants' Motion to Dismiss and for Summary Judgment and in Support of Plaintiff's Cross-Motion to Amend, including Exhibits 1-6[DE 28-2 to 28-7, respectively] |
| 28-7 | "Amended Comp." | Amended Complaint [filed as Exhibit 6 to Sartorio Aff.] |
| 28-8 | "Amerol Notice" | Notice of Cross-Motion |

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 3

Not Reported in F.Supp.2d, 2006 WL 721319 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

| 29 | "Opp." | Amerol Corporation's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint and for Summary Judgment on American Chemie-Pharm, Inc.'s Counterclaims and in Support of Amerol's Cross-Motion to Amend the Complaint |
| 30 | "Amerol Stmt." | Rule 56.1 Counter-Statement by Plaintiff Amerol Corporation |

### B. *Factual Background*

**\*2** Amerol is a chemical wholesaler that purchases chemicals from manufacturers such as ACP and then resells them to its end-user customers. DE 1 ("Complaint") ¶ 8; Sartorio Aff. ¶ 10. The parties agree that in late 2003 ACP made a series of shipments to Amerol of two chemical compounds-Tertiary Butyl Hydroquinone ( "TBHQ") and Microcrystalline Cellulose ("MCC" )-that form the basis of their dispute in this case. They further agree that Amerol never paid for any of those shipments. *See* ACP Stmt. ¶¶ 1, 2, 5; Amerol Stmt. ¶¶ 1, 5.

One of those shipments in particular is at the heart of this case. On November 17, 2003, Amerol placed an order with ACP for 500 kilograms of MCC for a total price of $1,200; ACP made delivery two days later. *See* Complaint ¶ 11; Answer ¶ 11; ACP Stmt. ¶ 2; Amerol Stmt. ¶ 2. Four weeks later, Amerol's Chief Executive Officer Dominic Sartorio ("Sartorio") advised ACP that he would provide payment for one of the company's outstanding invoices on December 22, 2003 and two others a week after that. The day after Sartorio made that statement, ACP shipped 5,050 kilograms of TBHQ to Amerol. On January 9, 2004, with neither of the promised December payments having been made, Amerol offered a revised payment schedule proposing one payment to coincide with the shipment of additional goods and payment for

the remainder of the outstanding funds to follow one week later. *See* Kamdar Aff. ¶¶ 18, 20, Exs. 3-4. Amerol ultimately did not make those payments.

After receiving ACP's shipment of MCC on November 19, 2003, Amerol resold the compound to its customer Aquarium Limited ("Aquarium"). On January 23, 2004, Aquarium reported in an email to Amerol that it had found a razor blade in one of the bags of MCC. *See* Sartorio Aff. Ex. 3.

At around this time ACP appears to have engaged Atkins to assist it in seeking payment from Amerol for its outstanding invoices (or at least, I infer as much from the parties' submissions, which do not make explicit the precise relationship between Atkins and ACP).*See id.*Ex. 4 (letters drafted by Amerol's attorneys purportedly in response to letters from ACP and Atkins seeking payment); *id.*Ex. 5 (referring to ACP as Atkins' client). Thus, after receiving Aquarium's complaint about the MCC shipment, Amerol's counsel notified both Atkins and ACP of its contention that the product ACP had manufactured and shipped to Amerol was defective. *See id.*Ex. 4 (letters to Atkins and ACP's counsel dated, respectively, Jan. 29 and Feb. 2, 2004).

The parties disagree about one aspect of Atkins' efforts on behalf of ACP. Amerol asserts that Atkins contacted Amerol's customers in early 2004 to advise them that Amerol was a "deadbeat" customer. *See id.* ¶ 21.Atkins denies having done so. Answer ¶¶ 16-19.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 721319 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

### C. *The Parties' Respective Claims*

Amerol commenced this lawsuit on February 19, 2004, by filing a Complaint that includes three claims. Amerol first asserted that Atkins tortiously interfered with its prospective contracts and business relations. Complaint ¶¶ 22-23. The remaining claims sought damages from ACP as a result of the allegedly defective nature of the MCC shipment: the second claim sought recovery for consequential and incidental damages arising from ACP's alleged breach of contract pursuant to Section 2-715 of the Uniform Commercial Code (" UCC") and the third sought direct damages for the breach itself. *Id.* ¶¶ 24-28.The substance of the latter claims does not match the headings above them in the Complaint: the heading for the single claim against Atkins purported to announce a claim against ACP, and the heading above the final substantive claim against ACP referred instead to Atkins. Amerol corrected these errors in its proposed Amended Complaint.

**\*3** On April 14, 2004, the defendants jointly filed a pleading containing their answer to Amerol's claims, four affirmative defenses, and three counterclaims (one of which has since been withdrawn). The four affirmative defenses-which do not specify the specific claims they are designed to defeat-are: failure to state a cause of action, failure to reject the defective goods within a reasonable time, failure to pay for shipped goods, and unjust enrichment. Answer ¶¶ 29-33. In the two counterclaims still at issue, which seek the same relief under two different legal theories, ACP seeks payment for the five shipments of chemical products that it delivered to Amerol in late 2003. Answer ¶¶ 34-50. Both defendants joined in a third counterclaim, seeking recovery of the costs of defending against Amerol's "baseless claims," *id.* ¶ 52, but later withdrew it on March 7, 2005. *See* DE 26.

### II. *Discussion*

### A. *Preliminary Matters*

### 1. *Choice Of Law*

"Under New York law, 'in the absence of a strong countervailing public policy, the parties to litigation may consent by their conduct to the law to be applied." ' *Mentor Ins. Co. (U.K.) Ltd. v. Brannkasse,* 996 F.2d 506, 513 (2d Cir.1993) (quoting *Walter E. Heller & Co. v. Video Innovations, Inc.,* 730 F.2d 50, 52 (2d Cir.1984)). The parties' reliance on New York law suggests they are in agreement that New York law should apply. *See Premier Mountings, Inc. V. Clyde Duneier,* 2003 WL 21800082, \*2 (S.D.N.Y. Aug.6, 2003). Given the parties' apparent agreement on the matter, the fact that the events at issue occurred in New York, and the absence of any apparent policy consideration to the contrary, I will analyze the issues before me under the law of New York. *See id.*

### 2. *Amerol May File Its Proposed Amended Complaint*

Amerol seeks leave to amend its complaint pursuant to Rule 15(a) to add additional facts regarding the damages it allegedly sustained subsequent to filing suit. In support of that request, Amerol argues that because no discovery has yet been conducted no prejudice will result from the amendment. Opp. at 3. I agree.

Under Rule 15(a), it is within the district court's discretion to grant leave to amend a pleading. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Campo v. 1st Nationwide Bank,* 857 F.Supp. 264, 269 (E.D.N.Y.1994). Such leave is to be freely given "when justice so requires." Rule 15(a). Denial of such a motion is only justified where a court finds " 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment." ' *Foman v. Davis,* 371 U.S. 182.There is no such basis for denying Amerol leave to amend, and by

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 5

Not Reported in F.Supp.2d, 2006 WL 721319 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

granting such relief I can assess the viability of Amerol's claims on the basis of all the allegations it seeks to make rather than simply on those made in the original complaint that Amerol now perceives to be incomplete.

### B. *Legal Standards*

#### 1. *Rule 12(b)(6)*

**\*4** The function of a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) is "to assess the legal feasibility of the complaint."*See Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 779 (2d Cir.1984) (internal quotation omitted). A district court must accept as true all factual allegations in the complaint, and view the pleadings in the light most favorable to the non-moving party, drawing all reasonable inferences in its favor. *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). Such a motion should be denied unless it is beyond doubt that a plaintiff can prove no set of facts entitling him to relief. *Zerilli-Edelglass v. N.Y. City Transit Auth.,* 333 F.3d 74, 79 (2d Cir.2003). The issue is not whether it is likely that the plaintiff will prevail, but simply whether there is a possibility, however remote, that she might. *See Weisman v. LeLandais,* 532 F.2d 308, 311 (2d Cir.1976). In deciding a motion under Rule 12(b)(6) , a district court must limit itself to the facts stated in the complaint. *See Ryder Energy,* 748 F.2d 779.If the court considers materials outside the pleadings, it must treat the motion as one for summary judgment pursuant to Fed.R.Civ.P. 56. *Id.*

Where parties submit extra-pleading material such as affidavits and exhibits in connection with a motion to dismiss, a court has two options: it may either disregard such material or treat the motion as one for summary judgment. The latter option requires notice to the parties and the opportunity to present evidence outside the pleadings. *See Groden v. Random House, Inc.,* 61 F.3d 1045, 1052 (2d Cir.1995). Notice need not be express: "The

essential inquiry is whether the [party] should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings."*Groden,* 61 F.3d 1053 (quoting *In re G. & A. Books, Inc.,* 770 F.2d 288, 294-95 (2d Cir.1985), *cert. denied,*475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986)). Formal notice is not required where both sides have supplied the court with matters outside the pleadings. *See Lennon v. Seaman,* 63 F.Supp.2d 428, 442 (S.D.N.Y.1999) (citing *Cantor v. NYP Holdings, Inc.,* 51 F.Supp.2d 309, 310 (S.D.N.Y.1999)). Where a plaintiff submits an affidavit in connection with his opposition to the defendant's motion to dismiss, the plaintiff has invited the conversion and is deemed to have notice of it. *See Gurary v. Winehouse,* 190 F.3d 37, 43 (2d Cir.1999). Finally, although the decision of whether to disregard extra-pleading materials or convert a dismissal motion into one for summary judgment is committed to the district court's discretion, such conversion may not be appropriate before the parties have completed discovery. *See Lucas v. Planning Bd. of Town of LaGrange,* 7 F.Supp.2d 310, 319 (S.D.N.Y.1998).

#### 2. *The Summary Judgment Standard*

**\*5** "Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Rule 56(c)). In determining whether to grant summary judgment, a court is confined to issue-finding, not issue resolution.*Rasmussen v. Sigma Corp. of America,* 27 F.Supp.2d 388, 391 (E.D.N.Y.1998) (citations omitted). The court does not " 'weigh the evidence and resolve factual issues' " but rather " 'determine[s] as a threshold matter whether there are genuine unresolved issues of material fact to be tried." ' *Owens v. New York City Hous. Auth.,* 934 F.2d 405, 408 (2d Cir.1991)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 6

Not Reported in F.Supp.2d, 2006 WL 721319 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

(quoting *Gibson v. American Broadcasting Cos.,* 892 F.2d 1128, 1132 (2d Cir.1989)); *see*Rule 56(c). A fact is material if it " 'might affect the outcome of the suit under the governing law." ' *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 69 (2d Cir.2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A genuine issue is presented if " 'the evidence is such that a reasonable jury could return a verdict for the non[-]moving party." ' *Id.* In assessing the evidence, "[a]ll factual inferences are to be resolved in favor of the non-movant." *Transco Prods., Inc. v. Performance Contracting, Inc.,* 38 F.3d 551, 555 (Fed.Cir.1994).

C. *ACP's Motion to Dismiss Amerol's Contract Claims*

1. *Conversion To A Motion For Summary Judgment*

In its second and third claims for relief, Amerol seeks recovery for damages it claims to have sustained as a result of ACP's alleged breach of contract with respect to the MCC shipment of November 19, 2003. Specifically, Amerol contends that ACP was responsible for the presence of the razor blade that Aquarium found in its MCC, and that the presence of that razor blade rendered ACP's delivery defective (or to adopt the usage of the UCC, nonconforming). ACP seeks to dismiss these claims.

In litigating the motion, both sides have submitted evidence outside the pleadings about the MCC shipment of November 19, 2003, and also about the other shipments that ACP made to Amerol in late 2003 for which it now seeks payment by means of its counterclaims. *See* Kamdar Aff.; Sartorio Aff. Both sides rely on this evidence in making arguments on the motion to dismiss Amerol's contract claims (and also in making arguments on ACP's motion for summary judgment on its counterclaims). Opp. at 19-20; Reply at 13-14. Given the factual interrelatedness of the various claims at issue-some of which are before me

on a motion to dismiss, and others on a motion for summary judgment-I will convert the dismissal motion to one for summary judgment rather than disregard the evidence in assessing the viability of Amerol's contract claims.

**\*6** Although I have not formally notified the parties of my intent to effect such a conversion, my decision to do so will come as no surprise to any of them in light of their evidentiary submissions and the substantial factual overlap between the dismissal motion and the motion for summary judgment. Moreover, both parties have had the opportunity to submit relevant materials. *See Ahmed v. Gelfand,* 160 F.Supp.2d 408, 412 (E.D.N.Y.2001).

Finally, my decision to convert the dismissal motion and treat it as one seeking summary judgment ultimately has no substantive affect on the outcome or the parties' respective rights. For the reasons discussed below, I conclude that ACP is not entitled to judgment in its favor on Amerol's contract claims at this stage of the proceedings, and I would reach the same conclusion even without converting the motion. By considering the motion as one seeking summary judgment, I merely take into account all of the record rather than part of it; but by doing so I do not preclude the possibility that, at a later stage of the proceeding, ACP may be entitled to seek and obtain dispositive relief on the strength of additional facts that may be established through further discovery.

2. *The Merits Of Amerol's Contract Claims*

Amerol seeks two different forms of relief on the basis of its allegation that ACP delivered a defective shipment of MCC on November 19, 2003. In one claim, which Amerol has designated as its " Third Claim For Relief," it asserts that ACP breached its contract, and therefore seeks direct damages under the contract itself. Amended Complaint ¶¶ 28-30. For reasons not entirely clear to me, Amerol seeks damages on this claim " in an amount to be determined at trial, but in no event less than $1,200,"*id.* ¶ 30, even though the parties agree that Amerol never actually paid the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 7

Not Reported in F.Supp.2d, 2006 WL 721319 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

$1,200 price of that shipment. In the other claim, which Amerol designates its "Second Claim For Relief," Amerol seeks a greater amount of consequential and incidental damages that it claims it sustained as a result of re-selling the defective MCC shipment to its own customer, Aquarium. *See id.* ¶¶ 25-27.ACP argues that it is liable on neither claim because Amerol accepted the MCC shipment (as well as others) without objection and failed to provide any notice of the alleged defect prior to bringing the instant lawsuit. It goes on to assert that Amerol's failures in that regard not only bar its affirmative claims but also render it liable to ACP for the full amount owed on the invoices for all five shipments. *See* Memo. at 14.

In addressing ACP's motion to dispose of these claims as well as its related motion for summary judgment in its favor on the counterclaims seeking payment for the shipments at issue, the parties have discussed-and to some extent conflated-two distinct concepts that affect the respective rights of buyers and sellers under New York's Uniform Commercial Code. As explained below, ACP's counterclaims implicate the statutes relevant to a buyer's acceptance or declination of goods, but the claims for damages in Amerol's complaint implicate the distinct concept of "notice of defect."

*7 New York law allows a buyer to decline to accept defective or nonconforming goods. That declination can take two forms: timely "rejection" or a subsequent "revocation" of an initial acceptance later discovered to be non-conforming. *See*N.Y. UCC § 2-601 (rejection); *id.* § 2-608 (revocation). Either form of declination must be timely communicated to the seller: a rejection must occur within a "reasonable time" after delivery or tender and is "ineffective unless the buyer seasonably notifies the seller,"*id.* § 2-602(1), and revocation must likewise be timely made after discovery of the defect. *Id.* § 2-608. A buyer who accepts nonconforming goods and does not timely revoke that acceptance is liable for payment of the contract price notwithstanding the defect. *Id.* § 2-607(2). A buyer who has timely rejected (or revoked its earlier acceptance of) defective goods has no such obligation to pay. *Id.* § 2-714.

The provisions governing acceptance, rejection, and revocation define the buyer's obligation to pay for goods. However, they do not define the limits of the buyer's right to seek relief for damages caused by a seller's delivery of defective goods. That is, even a buyer who does *not* timely reject or revoke acceptance of a shipment of defective goods may sue the seller for damages caused by the defect. *See id.* §§ 2-607(2) (" acceptance does not of itself impair any other remedy provided by this Article for non-conformity" ), 2-714 ("Buyer's Damages for Breach in Regard to Accepted Goods"), 2-715 ("Buyer's Incidental and Consequential Damages"); *Cliffstar Corp. v. Elmar Indus., Inc.,* 254 A.D.2d 723, 678 N.Y.S.2d 222, 222 (App.Div.1998). To preserve such a claim for damages, "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy[.]"N.Y. UCC § 2-607(3).

The distinction between rejection or revocation on the one hand and notice of defect on the other is an important one. As discussed further below in Part D of this decision, the existence of a factual dispute as to whether Amerol sufficiently rejected or revoked the MCC shipment could preclude summary judgment on ACP's counterclaim for payment, but it would say nothing about the viability of Amerol's Second and Third Claims for Relief. Whether those latter claims can withstand summary judgment turns on the sufficiency of Amerol's notice of defect.

Amerol contends that it provided written notice of the defect at issue to ACP within one week of learning about it in the email from Aquarium. Opp. at 7-10. Specifically, it relies on two letters that its attorneys wrote within a week of receiving Aquarium's complaint about the razor blade it discovered in the MCC shipment. The letters were sent to, respectively, Terry Brown of Atkins and an attorney named Barry Silberzweig who I infer was then representing ACP. *See* Sartorio Aff. Ex. 4 (copies of letter from to Terry Brown dated Jan. 29, 2004 (the "Atkins Letter"), and letter to Barry Silberzweig dated Feb. 2, 2004 (the "ACP Letter")). Neither letter mentions the razor blade (or, for that matter, provides any indication that Amerol

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 8

Not Reported in F.Supp.2d, 2006 WL 721319 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

intended to reject the goods or revoke its prior acceptance, a fact to which I will return later). The Atkins letter seems primarily concerned with expressing dissatisfaction with Atkins' collection efforts and threatening legal action as a result. To the extent it discusses the allegedly defective MCC shipment, it does so without specifying the nature of the defect and solely in terms of a prospective lawsuit: "you may advise your client, that based upon the fact that it forwarded defective microcrystalline powder to Amerol, that it will be sued for, among other things, breach of contract, and for products liability." Atkins Letter. The ACP letter is similar, in that it seems to focus on ACP's debt collection efforts and contains a number of threats and accusations. The only mention of the November 2003 MCC shipment comes in the penultimate paragraph in which the author advises that ACP "manufactured a defective product that was ultimately delivered to our client, and as a result thereof, Amerol has suffered damages." ACP Letter.

**\*8** Whereas a buyer's rejection or revocation must be "unequivocal," *see Sears, Roebuck & Company v. Galloway*, 195 A.D.2d 825, 600 N.Y.S.2d 773, 775 (App.Div.1993), the notice required to preserve its right to sue for damages need only "alert [the prospective defendant] that the transaction [was] troublesome." *See Cliffstar*, 678 N.Y.S.2d at 223 (finding that a buyer's complaints and request for service were sufficient to preserve the right to sue for damages although insufficiently timely or specific to constitute rejection or revocation of acceptance). It is entirely possible that a trier of fact could find that the letters Amerol's attorneys sent to ACP and Atkins satisfy that lesser burden.

Sartorio avers in a sworn affidavit that the November 19 shipment contained a sharp razor blade and that Amerol's customer, upon discovering it, refused to pay Amerol for the shipment. Sartorio Aff. ¶ 15; *but see id.* Ex. 3 (email from Aquarium to Amerol notifying the latter of the blade and inquiring as to safety precautions but saying nothing about Aquarium's refusal to pay for the goods or cessation of business with Amerol). This evidence raises issues of material fact about ACP's delivery

of defective goods and resulting damages to Amerol, and therefore suffices to defeat ACP's motion for summary judgment on the breach of contract claim.

The latter conclusion further compels me to deny summary judgment as to Amerol's claim for consequential and incidental damages. Amerol claims that it lost Aquarium's business as a result of selling it the tainted MCC, and has thereby lost prospective annual profits of $52,210. *See* Amended Comp. ¶¶ 26-27; Sartorio Aff. ¶ 19. ACP argues that Amerol may not recover such consequential or incidental damages because it has failed to state a claim for breach of contract. Memo. at 15. Because I disagree with ACP's premise, I must reject its conclusion.

Under New York law, a breach-of-warranty claimant can recover for the loss of future profits or goodwill. *See Toltec Fabrics, Inc. v. August Inc.*, 29 F.3d 778, 780-782 (2d Cir.1994) (citation omitted). In order to recover for its lost profits, Amerol will have to meet the stringent requirements of proof imposed by New York law. Amerol will have to prove the loss with reasonable certainty, offer objective proof of the amount of loss, and demonstrate that the loss was directly caused by and traceable to ACP's breach. *See id.* at 781 (citations omitted). Although Amerol's submissions suggest that it will have difficulty meeting this heavy burden, I am constrained on the instant record to give it the chance to try.

D. *ACP's Motion For Summary Judgment On Its Counter-Claim*

Because ACP's counterclaims for payment on its shipments to Amerol implicates much of the same contract law discussed above, I turn next to its motion for summary judgment on those counterclaims before returning to an assessment of the viability of Amerol's remaining claim of tortious interference against Atkins. ACP has raised two counterclaims seeking such payment: one for an account stated and the other for breach of contract. In its motion seeking summary judgment, ACP

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 9

Not Reported in F.Supp.2d, 2006 WL 721319 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

addresses only the former. Because, as explained below, I agree that ACP is entitled to summary judgment on that counterclaim, I assume that its remaining counterclaim for breach of contract is moot.

\*9 "An account stated is an agreement between parties to an account based upon prior transactions between them with respect to the correctness of the account items and balance due."*Jim-Mar Corp. v. Aquatic Construction, Ltd.,* 195 A.D.2d 868, 600 N.Y.S.2d 790, 791 (App.Div.1993). Such an agreement can be implied through the parties' course of dealing when invoices are retained without objection. *Id.* Evidence that the defendant received and retained invoices without objection is sufficient to sustain summary judgment for a claim of account stated. *Id.* To defeat a motion for summary judgment for account stated, the defendant must raise specific and genuine factual issues regarding the plaintiff's right to recover. *See Cibro Petroleum Products, Inc. v. Onondago Oil Company, Inc.,* 144 A.D.2d 152, 534 N.Y.S.2d 480, 480 (App.Div.1988). Vague and conclusory denials are insufficient to create a triable issue of fact. *See id.*

ACP contends that it has never received payment for five shipments that Amerol accepted without objection. Kamdar Aff. ¶¶ 4, 6. As evidence of the amounts due it, ACP submitted five numbered invoices for deliveries of TBHQ and MCC that it made to Amerol. *See id.*Ex. 1. Each of the invoices provides a description of the goods including the quantity and price, the total amount due, and a statement that payment is due within thirty days. *Id.* The following is a summary of the invoices submitted:

| Invoice Number: | Invoice Date: | Description: | Amount: |
|---|---|---|---|
| 2031 | 10/16/03 | 3500 Kg TBHQ | $43,750.00 |
| 2034 | 10/24/03 | 2600 Kg TBHQ | $32,500.00 |
| 2046 | 11/19/03 | 500 Kg MCC | $1,200.00 |
| 2062 | 12/01/03 | 400 Kg TBHQ | $5,000.00 |
| 2063 | 12/19/03 | 5050 Kg TBHQ | $63,125.00 |

*Id.* That the invoices were received by Amerol without protest is evidenced by an email from its Chief Executive Officer promising to make payment

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 721319 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

for at least some of those shipments within two weeks. *See id.*Ex. 3 (email from Dominic Sartorio dated December 17, 2003 assuring payment of invoice 2031 on December 22, 2003, and payment of invoices 2034 and 2046 a week later). A subsequent email from Amerol indicates that those payments were not made. *See id.*Ex. 4 (email from Frank Monteleone to ACP dated January 9, 2004).

ACP argues that these invoices, along with invoices from earlier shipments that were submitted by Amerol as exhibits to its Cross Motion, establish that the parties had an ongoing business relationship. Memo. at 4; *see* Sartorio Aff. Ex. 1 (paid invoices from July and August of 2003). ACP argues that Amerol fails to raise a triable issues of fact with regard to its liability for the five shipments at issue. *Id.* at 5, 534 N.Y.S.2d 480. I agree.

Amerol first argues that ACP's motion is procedurally defective because it fails to comply with Local Civil Rule 56.1 and Rule III.D .2 of my individual practice rules. Opp. at 4. Specifically, Amerol alleges that ACP failed to cite the factual source of the statements submitted pursuant to Rule 56.1. *Id.* Because ACP has submitted a revised statement of material facts with the requisite citations to admissible evidence, *see* DE 27, and the evidence upon which ACP relied was all in Amerol's possession at the time the statement was served on it, I find that Amerol was not prejudiced by ACP's failure to cite the relevant sources. Moreover, in light of the fact that Amerol is itself not without sin in this regard, *see* Amerol Stmt. ¶ 2 (lacking a citation to admissible evidence), I prefer to resolve all of the matters before me on the merits rather than delay such resolution while the parties rewrite their supporting papers to achieve technical compliance with a rule that is in any event designed to promote, rather than frustrate, decisions on the merits.

*10 With respect to those merits, Amerol asserts the existence of four disputes of material fact that preclude summary judgment on ACP's counter claims: (1) whether ACP made all of the purported deliveries; (2) whether ACP breached the sales contract by delivering defective goods to Amerol, (3) whether Amerol objected to these nonconforming goods within a commercially reasonable time, and (4) whether Amerol revoked its acceptance to these defective goods. Opp. at 7. I address each in turn.

First, there is no genuine dispute of fact as to whether ACP made the deliveries; there is instead only Amerol's conclusory denial that the October 24, 2003 shipment was made and that the other deliveries were made as ordered. Opp. at 10; Amerol Stmt. ¶ 2. Amerol neither offered nor even identified any evidence in support of this argument. Sartorio's affidavit merely repeats the assertion made in Amerol's memorandum of law that "general factual issues [exist] concerning ... whether ACP made all of the alleged deliveries."Sartorio Aff. ¶ 29; Opp. at 6-7. Given Sartorio's knowledge of other matters, I would expect him to be in a position to have identified with greater specificity what those "genuine factual issues" are if they actually exist. Amerol also claims, without citation to any legal authority, that ACP's invoices are insufficient evidence to support the proposition that the deliveries occurred. Opp. at 10; Sartorio Aff. ¶ 5. This argument is incorrect as a matter of law (or, to the extent stated as a factual assertion in Sartorio's affidavit, insufficient as a matter of logic).*See Jim-Mar Corp.,* 600 N.Y.S.2d at 791-792. Moreover, Amerol concedes that four of the five shipments were received, concurs that there was a course of dealing between the parties, and even introduced as evidence of this course of dealing invoices for shipments predating those currently at issue that are identical to those introduced by ACP. Amerol Stmt. ¶¶ 1, 2, 4; Sartorio Aff. Ex. 1. Amerol's attempt to raise a dispute as to whether the deliveries actually occurred accomplishes no more than to cast a "metaphysical doubt" on this element of ACP's counterclaim (if indeed it accomplishes even that) and is therefore insufficient as a basis for denying summary judgment. *See Matsushita Elec. Indus. Co ., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Amerol's second try at opposing summary judgment makes a more promising start, but ultimately fails as well. As a general rule, summary judgment on a claim for goods sold and delivered is inappropriate where the party opposing summary

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 11

Not Reported in F.Supp.2d, 2006 WL 721319 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

judgment has raised an issue of material fact regarding the defendant's breach of the sales agreement. *See Created Gemstones, Inc. v. Union Carbide Corp. .,* 47 N.Y.2d 250, 255-256, 417 N.Y.S.2d 905, 391 N.E.2d 987 (N.Y.1979); *Flick Lumber Co. v. Breton Indus., Inc.,* 223 A.D.2d 779, 636 N.Y.S.2d 169, 169 (App.Div.1996). However, an important exception bars application of this rule in the present case. "When ... goods are received and accepted by the buyer ... the seller is entitled to recover the contract price for such goods, *even if the goods are defective....*"*Orbis Co. Inc. v. Rivera,* 140 A.D.2d 679, 529 N.Y.S.2d 104, 105 (App.Div.1988) (emphasis added and citations omitted). The buyer's claim arising from the delivery of defective goods is distinct from its obligation on the contract price; it is not a defense to the seller's claim for payment for the accepted goods, and it may proceed even where the seller has won his own claim on summary judgment. *See Avis Rent A Car System, Inc. v. McNamara Buick Pontiac, Inc.,* 90 A.D.2d 783, 455 N.Y.S.2d 643, 643 (App.Div.1982); *Paul Conte Cadillac, Inc. v. C.A.R.S. Purchasing Service, Inc.,* 126 A.D.2d 621, 511 N.Y.S.2d 58, 60 (App.Div.1987).

**\*11** Amerol's third objection to summary judgment-the proposition that there exists a factual dispute as to the timeliness of its objection to nonconforming goods-is simply inapposite. More precisely, it adds nothing to the analysis occasioned by consideration of Amerol's other arguments. To the extent Amerol seeks to escape liability for payment on the ground that the items ACP delivered were nonconforming, its legal theory is unavailing and therefore the matter of when it first described the shipment as nonconforming is immaterial. To the extent that the quality of the notice itself is important, the only material question is that raised by Amerol's fourth argument: namely, that the notice effectively rejected, or revoked an earlier acceptance of, ACP's shipment. I therefore turn to that final issue.

Doing so presents some difficulty, as Amerol tends to blur legally distinct concepts in its discussion. Peppered throughout Amerol's various submissions is its assertion that it *revoked* its acceptance of the November 19 shipment. *See, e.g.,*

Opp. at 7, 9, 22-23; Amerol Stmt. ¶¶ 3-4; Sartorio Aff. ¶ 30. But Amerol does not cite the law relevant to that claim of revocation-instead, it only cites to § 2-602(1) (which provides for a buyer's *rejection* of non-conforming goods) and § 2-607(3) (which provides for an *accepting* buyer's right to damages).*See, e.g.,* Opp. at 9 ("In accordance with [N.Y.] UCC § 2-602(1) and § 2-607(3)(a), Amerol revoked its acceptance of the defective goods."). The statutory provision that is actually germane to Amerol's claim of revocation is one that Amerol does not cite. For the sake of clarity, I provide the pertinent part of its text below.

§ 2-608. Revocation of Acceptance in Whole or in Part

(1) The buyer may revoke his acceptance of a ... commercial unit whose non-conformity substantially impairs its value to him if he has accepted it ...

(b) without discovery of ... non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it.... It is not effective until the buyer notifies the seller of it.

(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

N.Y. UCC § 2-608.

In positing that it made a legally sufficient revocation of ACP's shipment, Amerol seeks to rely on the two letters its attorneys sent to ACP and Atkins, respectively, within a week of receiving Aquarium's complaint. *See* Opp. at 7-10. ACP argues that those letters lacked the specificity required to serve as notice of rejection or revocation under New York law. Reply at 9, 11. I agree. As noted above, neither letter provides any explicit or otherwise clear indication that Amerol intended to reject the goods or revoke its prior acceptance. Although the letters sufficed to preserve Amerol's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 721319 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

claims for damages, neither letter included a sufficiently "clear and unequivocal" statement of rejection or revocation. *See Maggio Importato, Inc. v. Cimitron Inc.,* 189 A.D.2d 654, 592 N.Y.S.2d 325, 326 (App.Div.1993) ("mere complaint about the [nonconforming] goods does not constitute a clear and unequivocal act of rejection").

*12 None of Amerol's arguments raises a genuine dispute about a fact material to the resolution of ACP's counterclaim for account stated. To the contrary, the undisputed facts show that ACP is entitled to summary judgment in its favor on that counterclaim. Having accepted the ACP's shipment without an effective rejection or revocation, Amerol is liable to ACP for the amounts reflected on the invoices. *See*N.Y. UCC § 2-607(1); *Rivera,* 140 A.D.2d at 678, 528 N.Y.S.2d 880.

E. *Atkins' Motion To Dimiss Amerol's Tortious Interference Claim*

1. *Threshold Issues*

As a threshold matter, I pause to clarify the nature of Amerol's first cause of action. The defendants read the Complaint to raise two distinct claims against both defendants: tortious interference with *current* business relations, and tortious interference with *prospective* business relations. *See* Memo. at 7, 9; Reply at 12-19. Although the Complaint is by no means a model of clarity, the defendants' interpretation of it is unduly pessimistic. Amerol has made only one tortious interference claim against Atkins, and none at all against ACP. Referring to the factual allegations in the Complaint's "Background" section, the operative paragraph of the First Claim For Relief alleges that " [b]y reason of the foregoing, Atkins, Harris & Brown has tortiously interfered with Amerol's *prospective* contracts and business relations." Complaint ¶ 22 (emphasis added). The claim makes no mention of ACP (save for the proofreading error in the caption that Amerol proposes to amend) and speaks only of "prospective

" contracts and business relations. Consistent with that plain-language approach to the matter, Amerol's memorandum in opposition to the defendants' motion discusses only the *prospective* interference claim with regard to Atkins. Thus, to the extent the defendants seek to dismiss tortious interference claims against ACP, or to challenge the validity of claims of interference with then-current business relations, their motion is moot.

In its submissions opposing Atkins' motion for dismissal, Amerol again relies on evidence outside of the pleadings to support its theory of liability. *See* Opp. at 22; Sartorio Aff. ¶ 21, Ex. 5. In doing so, it has opened the door for me to convert this part of the dismissal as well into a motion for summary judgment. *See Gurary v. Winehouse,* 190 F.3d 37, 43 (2d Cir.1999). That it has done so suggests that it has "had the opportunity to discover [essential] information" and thus that it will not be prejudiced by the conversion despite the lack of a complete factual record. *Cf. Hellstrom v. U.S. Dept. of Veteran Affairs,* 201 F.3d 94, 97 (2d Cir.2000) (non-moving party must be afforded opportunity for discovery of information essential to its opposition). Moreover, Amerol will not be prejudiced by such a conversion because, as discussed below, I find that the record currently before me raises sufficient questions of fact for the claim to proceed. The conversion also does not prejudice Atkins, as the motion to dismiss would likewise fail and because my decision is without prejudice to any later motion for summary judgment at the close of all discovery.

2. *The Merits Of Amerol's Tortious Interference Claim*

*13 The gravamen of the tortious interference claim that Amerol has actually asserted is that Atkins caused it to lose prospective business by calling it a "deadbeat" in telephone and email communications with Amerol's customers. Amerol alleges that Atkins' statements were false, were made with the purpose of intimidating Amerol into paying for defective merchandise, and caused Amerol to lose the future business of unspecified customers. Complaint ¶¶ 16-23.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                  Page 13

Not Reported in F.Supp.2d, 2006 WL 721319 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Under New York law, a plaintiff complaining of a defendant's tortious inference with prospective business relations must prove the following four elements: "(1) business relations with a third party; (2) the defendant's interference with those business relations; (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the business relationship."*Nadel v. Play-by-Play Toys & Novelties, Inc.,* 208 F.3d 368, 382-383 (2d Cir.2000) (citation omitted). To be actionable, the conduct at issue must have caused the third party not to enter into a contractual relationship with the plaintiff. *Advanced Marine Technologies, Inc. v. Burnham Securities, Inc.,* 16 F.Supp.2d 375, 385-386 (S.D.N.Y.1998). Although these elements are the same as for tortious interference with an existing contract, the action at issue must be "more culpable" to sustain a claim for interference with prospective relations than for interference with an existing contract. *See NBT Bancorp Inc. v. Fleet/Norstar Financial Group, Inc.,* 87 N.Y.2d 614, 621, 641 N.Y.S.2d 581, 664 N.E.2d 492 (1996) (citation omitted).

Amerol seeks to satisfy the elements of this claim by proving that Atkins called it a "deadbeat" in telephone and email communications with Amerol's customers claim, and by further proving that such name-calling caused it to lose prospective business. Amended Comp. ¶¶ 16-22. More specifically, Amerol alleges that Atkins' statements were false, were made with the purpose of intimidating Amerol into paying for defective merchandise, and caused Amerol to lose the future business of a customer named Camlin Limited as well as that of other unnamed customers. *Id.* ¶¶ 20-21, 641 N.Y.S.2d 581, 664 N.E.2d 492.

In seeking to defeat this claim, Atkins first argues that Amerol has failed to identify any specific business relations that were adversely affected. Memo. at 11. As a critique of the original Complaint, the point is a sound one, but Amerol proposes to cure the cited defect in its Amended Complaint. Specifically, Amerol identifies a company called Camlin Limited as a specific customers whose business it claims to have lost as a result of Atkins' conduct. Amended Comp. ¶ 17.

Because I conclude that there is good cause to allow Amerol to file an amended pleading, Atkins' first point is unavailing.

Atkins' next challenge to the viability of the tortious interference claims fares somewhat better. It argues that Amerol has failed to offer any evidence of malicious intent or actionable, wrongful conduct on Atkins' part that caused Amerol to lose any business. As to the latter charge, I agree. Under New York law, wrongful conduct sufficient to sustain a claim for tortious interference with prospective business relations consists of "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure."*NBT Bancorp Inc.,* 87 N.Y.2d at 624, 641 N.Y.S.2d 581, 664 N.E.2d 492 (citation omitted). Amerol seeks to satisfy this standard by alleging that Atkins contacted its customers and described it as a "deadbeat" customer. Amended Comp. ¶¶ 16-17. There is nothing about the alleged statements that suggests they would qualify as "physical violence," "fraud," "civil suits [or] criminal prosecutions," or any degree of "economic pressure." Amerol therefore seeks to satisfy the second element of the tortious interference claim by characterizing the alleged statement as a misrepresentation. *Id.* ¶ 18, 641 N.Y.S.2d 581, 664 N.E.2d 492 (alleging that the statements were "untrue at the time they were made"). But on a motion for summary judgment, a conclusory allegation does not suffice to overcome uncontested facts to the contrary. *See Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980) ("The litigant opposing summary judgment ...'may not rest upon mere conclusory allegations'... as a vehicle for obtaining a trial.") (quoting *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978)).

**\*14** Accordingly, to defeat summary judgment on the basis of this alleged statement, Amerol must be in a position to prove that the statement it attributes to Atkins-namely, that Amerol was "a ' deadbeat' customer that did not pay its bills," Amended Comp. ¶ 16-was a misrepresentation if it was in fact made. Webster's defines the operative word at issue thusly:

deadbeat *n* [prob. fr. [4]*dead + beat* (v.) ] 1

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 14

Not Reported in F.Supp.2d, 2006 WL 721319 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

*chiefly Austral:* a man without financial resources 2: one that habitually fails to pay his debts or to pay his way: SPONGE

*Webster's Third New International Dictionary of the English Language, Unabridged* 579 (2002). As none of the parties appears to be "chiefly Austral [ian]" or given to using the idiom of the Land Down Under, the issue with respect to the second element of the tortious interference claim thus reduces to the task of determining if there is a factual dispute as to whether describing Amerol as a company "that habitually fails to pay [its] debts" would constitute a misrepresentation. As explained below, there is no such genuine issue of disputed fact.

The parties agree that at the time Atkins engaged in the conduct alleged, Amerol owed ACP for multiple shipments and had failed to make payments according to the schedule proposed by its own officer Santorio. Moreover, Amerol's repeated failures to make scheduled payments occurred prior to January 23, 2004 (the date of Aquarium's report that it found a razor blade in the shipment of MCC it received from Amerol); accordingly, there is nothing in the record to undermine the proposition that Amerol did indeed have "debts" that it repeatedly failed to pay. In other words, regardless of whether Atkins actually did call Amerol "a ' deadbeat' customer that did not pay its bills," Amended Comp. ¶ 16, it appears from the undisputed facts in the record that it could accurately-if uncharitably-have done so. The fact that as of January 23, 2004, Amerol might have had a reason to *continue* to fail to pay its bills does nothing to change the fact that the statements Amerol attributes to Atkins appear to have been technically accurate when begun. Nor does it make false any similar statements made after January 23, 2004, as Amerol had arguably already become a " deadbeat" within the dictionary definition of the term and also because the second part of the statement-that Amerol did not pay its "bills" as opposed to "debts" that might have become unenforceable by virtue of Aquarium's complaint-continued to be accurate.

Moreover, the record does not support the assertion that Atkins even made the statements at issue. The only evidence to that effect is a conclusory statement in Sartorio's affidavit that cites in turn to an email from Camlin Limited, the sole identified customer whose business Amerol claims to have lost. *See* Sartorio Aff. ¶¶ 21, 24-27, Ex. 5 (email from G.D. Kalla to Charlie Monteleone). The cited email is more squib than smoking gun. In it, one Terry Brown, who identifies himself as being with Atkins, merely inquires into "the association between Camlin Ltd. and Amerol Corp. out of Farmingdale, New York."*Id.* Ex. 5. The email appears to have been forwarded to Amerol by Camlin Limited. Although this email supports Amerol's allegation that Atkins contacted its customers, it does not indicate that Atkins ever defamed Amerol in the manner alleged. The email and the allegedly defamatory statements, even if they occurred precisely as Amerol claims they did, simply do not rise to the level of actionable, wrongful conduct necessary to sustain a claim for tortious interference with business relations.

**\*15** That Amerol has failed to raise a question of fact regarding Atkins' conduct does not, however, finally dispose of its tortious interference claim. New York law creates an alternate way for a plaintiff to establish liability for the tort if it can establish that the defendant engaged in the conduct at issue with the "sole purpose of harming the plaintiff."*Nadel,* 208 F.3d 382.Atkins contends that Amerol lacks sufficient proof of such malice to allow its claim to proceed. I disagree.

Amerol alleges that Atkins contacted its customers with "the purpose of intimidating Amerol into paying ACP for defective merchandise."*See* Amended Comp. ¶ 20. Although not artfully pleaded, Amerol's Amended Complaint can fairly be interpreted to assert the following theory of liability: Atkins wished to exert economic pressure on Amerol that would prompt it to pay ACP's invoices; by warning others that Amerol did not pay its bills, Atkins hoped to cause those others to cease doing business with Amerol and for Amerol to understand *why* it was losing business, and further to understand that by paying ACP it would forestall further business losses arising from Atkins' communications. If Amerol can establish that proposition, it will be able to show the malice

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 721319 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

necessary to satisfy the third element of a tortious interference claim under New York law.

Amerol's Amended Complaint thus suffices-barely-to withstand a motion to dismiss and the question therefore becomes whether the evidence outside the pleadings shows any prospect that Amerol will be able to prove the claim it has pleaded. The record contains nothing more on this score than the affidavit of Amerol's Chief Executive Officer, who swears that he has personal knowledge that Atkins contacted Amerol's customers for the purpose of intimidating Amerol into paying for goods. Sartorio Aff. ¶ 25. Sartorio's conclusory assertion may suffice to raise a question of fact as to whether Atkins acted with malice in the absence of any evidence of a legitimate purpose. *Cf. Snyder v. Sony Music Entertainment,* 252 A.D.2d 294, 684 N.Y.S.2d 235, 239 (defendants' evidence of legitimate, non-tortious reasons for contacts alleged to constitute tortious interference sufficient to defeat plaintiff's claim). More important, I cannot say that a fuller record after more discovery will preclude a finding of fact in Amerol's favor on this part of its claim.

The remaining elements of a tortious interference claim (interference and damages) combine to require that Amerol show that Atkins' actions caused it to lose prospective business, and that it was damaged as a result. Amerol has made sufficient allegations in this regard: it asserts that Atkins' communications with Amerol's customers caused Camlin Limited and other unnamed customers "to cease to transact business with Amerol" and that its business relations with these clients would have continued "but for" Atkins' conduct. Amended Complaint ¶¶ 19, 21. Amerol claims to have annual profits in an amount not less than $38,192. *Id.* ¶ 22, 684 N.Y.S.2d 235. If true, these allegations would suffice to show that but for Atkins' conduct, a contract would have been executed, and that Amerol has sustained damages. Thus, while conspicuously lacking in factual details, the pleadings sufficiently state a claim for tortious interference with prospective business relations, and dismissal would not be warranted on the pleadings alone. Similarly, Sartorio's affidavit, in which he essentially parrots the allegations in the complaint,

*see* Sartorio Aff. ¶¶ 24, 26-27, suffices to raise a question of fact on this score-at least on the current record. I therefore cannot dispose of Amerol's tortious interference claim at this juncture either by granting dismissal or by granting summary judgment.

### IV. *Conclusion*

**\*16** For the reasons set forth above, I grant Amerol's application to amend its complaint, deny the defendants' motion for summary judgment on Amerol's claims without prejudice to renewal at the close of all discovery, and grant ACP's motion for summary judgment in its favor on the counterclaim for account stated. All counsel for Amerol, Atkins, and ACP are directed to meet and confer and to submit no later than April 11, 2006, a joint proposal for completing all discovery, and to appear before me in Room 456 in the United States Courthouse in Brooklyn for a status conference on April 18, 2006, at 9:30 a.m.

SO ORDERED.

E.D.N.Y.,2006.
Amerol Corp. v. American Chemie-Pharma, Inc.
Not Reported in F.Supp.2d, 2006 WL 721319 (E.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**2**

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1

Not Reported in F.Supp.2d, 2002 WL 24305 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Bibeault v. Advanced Health Corp.
S.D.N.Y.,2002.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Donald B. BIBEAULT, Plaintiff,
v.
ADVANCED HEALTH CORPORATION a/k/a
AHT Corporation, and Steven Hochberg,
Defendants.
**No. 97 Civ. 6026(WHP).**

Jan. 8, 2002.

Michael T. Conway, Lazare Potter Giacovas &
Kranjac, LLP, New York, New York, for Plaintiff.
Jonathan Rosenberg, O'Sullivan Graev & Karabell,
LLP, New York, New York, for Defendants.

*MEMORANDUM AND ORDER*

PAULEY, J.
   **\*1** Presently before the Court is defendants'
motion for reconsideration of this Court's
September 6, 2000 order denying defendants'
motion to dismiss plaintiff's fraudulent inducement
claim.[FN1] For the reasons set forth below, the
motion is granted, and upon reconsideration, the
plaintiff's amended complaint is dismissed as to the
individual defendant Steven Hochberg.

>      FN1. On September 25, 2000, plaintiff
>      advised this Court that Advanced Heath
>      Technologies ("AHT"), formerly
>      Advanced Health Care Corporation, filed
>      for Chapter 11 bankruptcy protection.
>      While AHT's filing stays further
>      proceedings against AHT pursuant to 11
>      U.S.C. § 362(a)(1) pending an from the
>      bankruptcy court, Bibeault's claim against
>      Hochberg is not subject to the automatic

stay. *SeeGray v. Hirsch,* 230 B.R. 239,
241 (S.D.N.Y.1999); *FDIC v. Shea &
Gould,* No. 95 Civ. 5491(JFK), 1997 WL
401822, at \*4 (S .D.N.Y. July 17, 1997).

*BACKGROUND*

   The procedural history and facts of this case
are set forth in greater detail in two prior orders:
*Bibeault v. Advanced Health Corp.,* No. 97 Civ
6026 (RJW), 1999 WL 301691 (S.D.N.Y. May 12,
1999) and *Bibeault v. Advanced Health Corp.,* No
97 Civ. 6026(WHP) (S.D.N.Y. Sept. 6, 2000) ("
Order"). Familiarity with those decisions is
presumed.

   In May 1995, defendant Steven Hochberg ("
Hochberg") offered plaintiff Donald B. Bibeault ("
Bibeault") the opportunity to participate in a private
placement of defendant Advanced Health Care
Corporation's ("AHC") [FN2] common stock.
According to Bibeault, Hochberg stated in May
1995 that he was not aware of the fair value of
AHC's common stock, but that "upon providing
AHC with a prepayment of $100,000, Bibeault
would receive stock at a price no greater than the
fair value of the shares" as soon as that value was
determined. (Am.Compl.¶ 7.) Shortly thereafter,
Hochberg forwarded Bibeault a "Confidential Term
Sheet" ("Term Sheet") and a stock subscription
agreement ("Subscription Agreement") (collectively
the "Offering Documents") disclosing the terms of
the offer.

>      FN2. Advanced Health Corporation is now
>      known as AHT Corporation, but for clarity
>      this order will refer to the former entity.

   The Term Sheet stipulated that AHC's per share
offering price of $13.62 was "arbitrarily determined
and bears no relationship to [AHC's] assets, book

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                          Page 2

Not Reported in F.Supp.2d, 2002 WL 24305 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

value or any other established criteria of value."(*See* Affidavit of James L. Burns, dated Sept. 13, 1999 (" Burns Aff.") Ex. B: Term Sheet at 8.) The Subscription Agreement also contained the following three provisions apprising Bibeault that any other agreements between the parties were not binding:

[E]xcept as set forth in the Offering Documents, no representations or warranties have been made to [Bibeault] by [AHC] or any agent, employee or affiliate of the Company, and in entering into this transaction, [Bibeault] is not relying on any information, other than that contained in the offering documents and the results of independent investigation by Bibeault." (Burns Aff. Ex. E: Subscription Agreement § 1.13) (" Warranty Clause")

This Subscription Agreement sets forth the entire agreement and understanding between the parties as to the subject matter thereof and merges and supersedes all prior discussions, agreements and understandings of any and every nature among them. (Burns Aff. Ex. E: Subscription Agreement § 5.3) ("Merger Clause")

This Subscription Agreement shall not be changed, modified or amended except by a writing signed by the parties to be charged, and this Subscription Agreement may not be discharged except by performance in accordance with its terms or writing signed by the party to be charged. (Burns Aff. Ex. E: Subscription Agreement § 5.3) (" Modification Clause")

**\*2** On June 29, 1995, Bibeault signed the subscription agreements and returned them to defendants with a payment of $100,000. In doing so, Bibeault warranted that he had reviewed all the provisions of the Term Sheet and Subscription Agreement. (Burns Aff. Ex. E: Subscription Agreement § 1.5.)

According to Bibeault, Hochberg orally assured him in September 1995 that a fair market value of $7.50 per share had finally been established, and that Bibeault's share price would be adjusted downward from $13.62 to $7.50. (Am.Compl.¶ 12.) Hochberg then followed these alleged misrepresentations with a letter, dated

September 14, 1995, which confirmed that

the Company recently sold 666,360 shares of Preferred Stock at a per share purchase price of $7.50. As a result, the Company has adjusted the terms of its private placement, as set forth in the Confidential Term Sheet, dated April 21, 1995, so that the per share purchase price of all shares (currently $13.62) equals $7.50....

Your acceptance of the enclosed stock certificate shall act as a confirmation of the revised terms of the private placement. Please indicate such acceptance by signing in the space provided below on the enclosed copy of this letter and returning the copy to the Company as soon as possible.

(Burns Aff. Ex. F: Hochberg Letter.)

On June 11, 1999, Bibeault filed an amended complaint against AHC and Hochberg claiming that Hochberg fraudulently induced his $100,000 purchase of AHC common stock by misrepresenting that he lacked knowledge of a pre-purchase fair share price and that he would adjust the price after the sale. Defendants moved to dismiss Bibeault's complaint arguing in part that the disclaimers of the Subscription Agreement precluded Bibeault from asserting a fraud claim based on his reliance on Hochberg's statements.

In denying the motion to dismiss, this Court concluded that those disclaimers did not meet the " requisite specificity" under New York law. (Order at 8) (citing *Manufacturers Hanover Trust Co. v. Yanakas,* 7 F.3d 310, 316 (2d Cir.1993)). This Court concluded that Bibeault did not intend to disclaim reliance on alleged misrepresentations made by Hochberg in September 1995 because "the agreement itself purported to merge 'all *prior* discussions, agreements and understandings[.]' ' (Order at 8.)

*DISCUSSION*

I. *Standard for a Motion for Reconsideration*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3

Not Reported in F.Supp.2d, 2002 WL 24305 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Local Civil Rule 6.3 provides in relevant part: " There shall be served with the notice of motion a memorandum setting forth concisely the matters or controlling decisions which counsel believes the court has overlooked."Thus, to be entitled to reconsideration, the movant must demonstrate that the Court overlooked controlling decisions or factual matters that were put before it on the underlying motion, which, had they been considered "might reasonably have altered the result reached by the court."*Consolidated Gold Fields v. Anglo Am. Corp.,* 713 F.Supp. 1457, 1476 (S.D.N.Y.1989) ; *seealsoDietrich v. Bauer,* 76 F.Supp.2d 312, 327 (S.D.N.Y.1999); *Ameritrust Co. Nat'l Ass'n v. Dew,* 151 F.R.D. 237, 238 (S.D.N.Y.1993).Rule 6.3"is to be narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the court."*Dietrich,* 76 F.Supp.2d at 327. A court may not allow a party to use a motion for reconsideration as a substitute for appealing from a final judgment. *SeeDietrich,* 76 F.Supp.2d at 327.; *Morser v. AT & T Info. Sys.,* 715 F.Supp. 516, 517 (S.D.N.Y.1989); *Korwek v. Hunt,* 649 F.Supp. 1547, 1548 (S.D.N.Y.1986). The purpose of Rule 6.3 is to "ensure the finality of decisions and to prevent the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters." *Carolco Pictures, Inc. v. Sirota,* 700 F.Supp. 169, 170 (S.D.N.Y.1988). The decision to grant or deny a motion for reconsideration is within the sound discretion of the district court. *SeeDietrich,* 76 F.Supp.2d at 327.

II. *Hochberg's Argument for Reconsideration*

**\*3** Hochberg argues that this Court's September 6, 2000 Order held that the Subscription Agreement's disclaimers precluded Bibeault from offering parol evidence regarding Hochberg's alleged misrepresentations made prior to execution the Subscription Agreement ("pre-execution representations"), but not Hochberg's September 1995 oral and written communications (" post-execution representations"). Hochberg asserts that, in reaching its conclusion, this Court overlooked Section 5.5 of the Subscription

Agreement which contractually bound Bibeault to purchase AHC's common stock when he executed the Subscription Agreement. (*See* Mem. in Supp. of Defs.' Mot. to Reargue Defs.' Mot. to Dismiss the Am. Compl. at 5.) Hochberg contends that in light of that obligation, Bibeault cannot claim reliance on Hochberg's post-execution representations because they did not affect his investment decision. (*See* Mem. in Supp. of Defs.' Mot. to Reargue. at 5.) Because this Court did not take section 5.5 into account in its September 6, 2000 Order and denied the motion to dismiss based on the post-execution representations, Hochberg's motion to reconsider is granted. Moreover, for the reasons set forth below, Bibeault's amended complaint is dismissed as to Hochberg.

III. *Hochberg's Pre-June 29, 1995 Representations*

A. *No Knowledge of AHC's Per Share Value*

Hochberg contends that the Offering Documents' disclaimers preclude Bibeault from arguing that he relied on Hochberg's alleged oral misrepresentations made prior to his signing of the Subscription Agreement. Bibeault argues that the Subscription Agreement's disclaimers do not bar Hochberg's pre-execution representations because they do not "specifically disclaim reliance ." (Pl.'s Mem. of Law in Opp. to Defs.' Mot. to Dismiss (" Mem. in Opp.") at 13.) In the alternative, Bibeault argues that even if the Subscription Agreement's provisions did sufficiently disclaim his reliance, they should not apply because the allegedly misrepresented facts were "peculiarly within the misrepresenting party's knowledge ."(Mem. in Opp. at 15.)

Parol evidence of fraudulent inducement is admissible even when the disputed contract contains a general merger clause stating that the written agreement supersedes all prior agreements and constitutes the sole embodiment of their obligations. *SeeDanann Realty,* 5 N.Y.2d 317, 320-321, 184 N.Y.S.2d 599, 601 (1959); *see alsoYanakas,* 7 F.3d

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 4

Not Reported in F.Supp.2d, 2002 WL 24305 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

at 315;*Gen. Elec. Capital v. Bank Leumi Trust Co. of N.Y.,* No. 95 Civ. 9224(KTD), 1999 WL 33029 (S.D.N.Y. Jan. 21, 1999).

However, parties may also stipulate against reliance on oral representations to render parol evidence inadmissible even when offered to substantiate a claim of fraud. *Danann Realty,* 5 N.Y.2d at 323, 184 N.Y.S.2d at 604. Courts should bar parol evidence of fraudulent inducement whenever "an express contractual provision contradicts a claimed oral statement 'in a meaningful fashion" ' so that the signatories are on notice that they may not rely on prior oral representations. *Lucas v. Oxigene, Inc.,* No. 94 Civ. 1691(MBM), 1995 WL 520752, at *3 (S.D.N.Y. Sept. 1, 1995) (finding that the *Dannan Realty* rule serves to prevent parties from perpetrating a fraud by "deliberately misrepresenting" their true intentions at the time of signing the agreement and to bar evidence of oral statements when a disclaimer put plaintiff on notice that he could not rely on such statements).

**\*4** Disclaimers may provide meaningful notice that a signatory may not rely on a prior oral representations when they specifically encompass the subject matter of the representations. *Danann Realty,* 5 N.Y.2d at 320, 184 N.Y.S.2d at 602 (a disclaimer which "in the plainest language announced and stipulated that [the plaintiff] is not relying on any representations" estopped him from claiming that he entered the contract because of the fraudulent representations); *see also Yanakas,* 7 F.3d at 315-17 (reviewing New York law on specificity of disclaimers). Disclaimers which lack specific language disclaiming reliance may still bar parol evidence so long as the language of the provisions combined with the surrounding circumstances sufficiently alerted the signatory of their intended effect. *Lucas,* 1995 WL 520752, at *5 (sophisticated businessman's offer of parole evidence barred where three of eight provisions in an otherwise terse, two-page document were devoted to warning the signatories that only binding representations were those found on the printed page); *Citibank, N .A. v. Plapinger,* 66 N.Y.2d 90, 94, 495 N.Y.S.2d 309, 312 (1985) (parol evidence barred by a guarantee agreement negotiated

between sophisticated businessmen stating that it was "absolute and unconditional" notwithstanding " any lack of [the agreement's] validity" or "any other circumstances which might otherwise constitute a defense" to the agreement); *Gindi v. Silvershein,* No. 93 Civ. 8679, 1996 WL 194304, at *3 (S.D.N.Y. Apr. 23, 1996) (alleged misrepresentation that signatory "would never ... suffer any financial liability" was barred by provisions imposing liability upon the signatory despite the lack of disclaimers of any specific representation).*Cf.Yanakas,* 7 F.3d at 317 (boilerplate provision reciting that signatory " absolutely and unconditionally" guaranteed payment and lacking any waiver regarding defenses based on the agreement's validity did not bar parol evidence).

The Subscription Agreement specifically provided that Bibeault was "not relying on any information, other than that contained in the Offering Documents and the results of [his] independent investigation."(Burns Aff. Ex. B: Subscription Agreement § 1.13.) This disclaimer is bolstered by the Term Sheet provision stating that the $13.62 offering price was "arbitrarily determined and bears no relationship to [AHC's] assets, book value or any other established criteria of value."(Burns Aff. Ex. B: Term Sheet § xvii.) Further, the general merger clause provided that the Subscription Agreement set forth the parties' full understanding and superseded all prior discussions. The record demonstrates that Bibeault was a sophisticated businessman (*see* Burns Aff. Ex. D: Questionnaire), and he does not allege that he failed to comprehend the disclaimers. Bibeault cannot now claim reliance on Hochberg's alleged lack of knowledge regarding per share value when Bibeault specifically stipulated that he was not relying on any extraneous representations regarding share value and that he was purchasing at an arbitrary price.

**\*5** Bibeault also argues that the disclaimers would not apply because the misrepresented facts were "peculiarly within the misrepresenting party's knowledge."(Mem. in Opp. at 14-15.) However, the peculiar knowledge exception "is designed to address circumstances where a party would face high costs in determining the truth or falsity of an

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 5

Not Reported in F.Supp.2d, 2002 WL 24305 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

oral representation."*Western Intermodal Servs. v. Singamas Container Indus. Co., Ltd.,* No. 98 Civ. 8275(RPP), 2000 WL 343780,*3 (S.D.N.Y. Mar. 31, 2000). The exception does not apply where the plaintiff had a low cost alternative such as " insisting] that the written contract terms reflect any oral undertaking on a deal-breaking issue."*Warner Theatre Assocs. Ltd. P'ship v. Metropolitan Life Ins. Co.,* 149 F.3d 134, 136 (2d Cir.1998). If Hochberg's representation regarding his lack of knowledge of the fair share value had been essential to Bibeault's decision, the parties could have easily included that representation in the Offering Documents. Their failure to take advantage of that inexpensive alternative prevents Bibeault from claiming the peculiar knowledge exception. Accordingly, Bibeault may not state a fraudulent inducement claim based on Hochberg's alleged misrepresentation that he was not aware of AHC's fair share value.

*B. Promise to Adjust Share Price*

   Bibeault claims that Hochberg promised that his share price would be adjusted when the fair value of AHC shares could be determined. In a prior Memorandum and Order, Judge Ward held that this claim duplicated Bibeault's breach of contract claim. *SeeBibeault,* 1999 WL 301691, at *9 n. 9 ("Plaintiff asserts that in representing that his share price would eventually be reduced to reflect fair market value, Hochberg fraudulently induced his investment, thereby engaging in conduct sufficiently collateral to support a separate claim in tort.... To the contrary, Hochberg's representation is merely an additional promise to perform the oral contact that plaintiff would pay no more than fair market value of the shares, and does not constitute fraudulent inducement or conduct outside the alleged oral contract.") Jude Ward then recognized that under *Bridgestone/Firestone Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13 (2d Cir.1996), a duplicative fraud claim may not be brought alongside a breach of contract claim unless the plaintiff distinguishes the two by (1) demonstrating a legal duty separate from the duty to perform under the contract, (2) demonstrating a fraudulent

misrepresentation collateral or extraneous to the contract, or (3) seeking special damages caused by the misrepresentation and unrecoverable as contract damages. *SeeBridgestone,* 98 F.3d at 20;*see also Lehman v. Dow Jones & Co., Inc.,* 783 F.2d 285, 295 (2d Cir.1986) (plaintiff may not recover on a fraudulent inducement claim based on a promise made with no intent to perform that is not distinct from his prior breach of contract action); *Zeising v. Kelly,* No. 99 Civ. 10542(MCC), 2001 WL 310627, at *8 (S.D.N.Y. Mar. 30, 2001) (Under New York law a plaintiff may not circumvent the Statute of Frauds by "dressing up a breach of contract claim by further alleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder...."); *Drexel Burnham Lambert, Inc. v. Saxony Hts. Realty Assoc.,* 777 F.Supp. 228, 235 (S.D.N.Y.1991) (" [A]n attempt to convert a contract claim into a tort claim by the additional naked assertion that the breaching party never intended to perform is doomed to fail."); *Caniglia v. Chicago Tribune-New York News Syndicate, Inc.,* 204 A.D.2d 233, 233, 612 N.Y.S.2d 146, 147 (1st Dep't 1994) ("It is well settled that a cause of action for fraud does not arise, where, as here, the only fraud alleged merely relates to a contracting party's alleged intent to breach a contractual obligation"). Judge Ward dismissed Bibeault's claim based on the promise to adjust shares because he had not satisfied any of the *Bridgestone* conditions, but granted Bibeault leave to replead his fraud claim provided that he could claim the "appropriate measure of damages." *SeeBibeault,* 1999 WL 301691, at *9 n. 10.

   *6 In his amended complaint, Bibeault has not plead special damages, but instead seeks the equitable remedy of rescission and the return of his investment. This does not satisfy the third prong of the *Bridgestone* rule.

   "Special" or "consequential" damages seek to compensate a plaintiff for losses other than the value of the promised performance that are incurred as a result of the defendant's breach. *Schonfeld v. Hilliard,* 218 F.3d 164, 175 (2d Cir2000). Under New York law, the award of special damages is limited to recovery of "those injuries which the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 6

Not Reported in F.Supp.2d, 2002 WL 24305 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

parties could reasonably have anticipated at the time the contract was entered into."*Tevdorachvili v. The Chase Manhattan Bank,* 103 F.Supp.2d 632, 637 (E.D.N.Y.2000) (quoting *Spang Indus., Inc. v. Aetna Casualty and Surety Co.,* 512 F.2d 365, 368 (2d Cir.1975)). Where the damages claimed "do not usually flow from the breach, then it must be established that the special circumstances giving rise to them should reasonably have been anticipated at the time the contract was made." *Tevdorachvili,* 103 F.Supp.2d at 637. Special damages must be plead with particularity. *See,e.g. Nyack Hosp. v. Empire Blue Cross & Blue Shield,* 253 A.D.2d 743, 743, 677 N.Y.S.2d 485, 485-86 (2d Dep't 1998). At no point in his amended complaint does Bibeault allege damages of this nature.

Moreover, rescission "is to be invoked only when there is lacking a complete and adequate remedy at law and where the status quo may be substantially restored."*Rudman v. Cowles Communications, Inc.,* 30 N.Y.2d 1, 13-14, 330 N.Y.S.2d 33, 43 (1972). Rescission is inappropriate " where damages appear adequate and it is impracticable to restore the status quo."*Rudman,* 30 N.Y.2d at 13-14, 330 N.Y.S.2d at 43;*see alsoMina Inv. Holdings Ltd. v. Leftkowitz,* 16 F.Supp.2d 355, 362 (S.D.N.Y.1998); *Faden Bayes Corp. v. Ford Motor Co.,* No. 97 Civ. 1867(MBM), 1997 WL 426100, at * 2 (S.D.N.Y. July 30, 1997). The gravamen of Bibeault's complaint is that he purchased were worth less than what he paid for them. He has asserted no reason why damages would not be an adequate remedy. *Faden Bayes,* 1997 WL 426100, at *2 ("In New York, 'the law awards damages for breach of contract to compensate for injury caused by the breach ....." ') (quoting *Freund v. Washington Square Press, Inc.,* 34 N.Y.2d 379, 382, 357 N.Y.S.2d 857, 859 (1974) ). Accordingly, his claim that Hochberg promised to adjust his shares cannot support a cause of action for fraudulent inducement.

**IV.** *Post-Execution Misrepresentations*

Hochberg further argues that Bibeault cannot

allege reliance on post-execution statements because he was contractually bound to purchase the AHC's common stock. (*See* Mem. in Supp. of Defs.' Mot. to Reargue Defs.' Mot. to Dismiss the Am. Compl. at 5.) To recover under a theory of fraudulent inducement, plaintiff must prove that he reasonably relied on the defendant's misrepresentations.*May Dep't Stores Co. v. Int'l Leasing Corp., Inc.,* 1 F.3d 138, 141 (2d Cir.1993); *Indep. Energy Corp. v. Trigen Energy Corp.,* 944 F.Supp. 1184, 1197 (S.D.N.Y.1996).

*\*7 Section 5.5 of the Subscription Agreement provides:

Upon the execution and delivery of the Subscription Agreement [Bibeault], this Subscription Agreement shall become a binding obligation of the Subscriber with respect to the purchase of Units as herein provided....

(*See* Burns Aff. Ex. E: Subscription Agreement § 5.5.) Bibeault committed to the transaction when he returned the signed Subscription Agreement agreeing to the purchase. *SeeAckerman v. Nat'l Property Analysts, Inc.,* 887 F.Supp. 494, 502 (S.D.N.Y.1992); *see alsoMills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993) ("A statement cannot be fraudulent if it did not affect an investment decision of the plaintiff."); *Pilarczyk v. Morrison Knudsen Corp.,* 965 F.Supp. 311, 320 n. 8 (N.D.N.Y.1997) (alleged misrepresentations and omissions made by defendants after parties entered a purchase agreement were not actionable). Accordingly, Bibeault may not state a fraudulent inducement claim based on statements that Hochberg made after the Subscription Agreement was executed.

*CONCLUSION*

For the reasons set forth above, the motion for reconsideration is granted, and plaintiff's claim for fraudulent inducement is dismissed with respect to the individual defendant Hochberg. The Clerk of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 7

Not Reported in F.Supp.2d, 2002 WL 24305 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

the Court is directed to place this action on the
Court's Suspense Calendar until further notice, and
the parties are directed to apprise the Court by letter
of the status of AHC's bankruptcy proceedings by
January 25, 2002.

S.D.N.Y.,2002.
Bibeault v. Advanced Health Corp.
Not Reported in F.Supp.2d, 2002 WL 24305
(S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**3**

Westlaw.

Slip Copy                                                                    Page 1

Slip Copy, 2007 WL 2907313 (S.D.N.Y.)
**(Cite as: Slip Copy)**

**H**
Brown v. Austin
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Carl BROWN, Plaintiff,
v.
C.O. Greg M. AUSTIN # 11059, C.O. Clifford K.
Gunsett # 13762, C.O. Daniel Huttel # 11141, C.O.
Andrew J. Shambo # 11425, Sgt. David J. Matyas #
10030, C.O. Steven Purcell, Defendants.
No. 05 Civ. 9443(PKC).

Oct. 4, 2007.

### MEMORANDUM AND ORDER

P. KEVIN CASTEL, District Judge.

**\*1** Plaintiff Carl Brown, proceeding *pro se,* brings this action pursuant to 42 U.S.C. § 1983 against Corrections Officers Greg M. Austin, Clifford K. Gunsett, Daniel Huttel, Andrew J. Shambo and Steven Purcell and Sergeant David J. Matyas. Plaintiff Brown, an inmate in the custody of the New York State Department of Corrections ("DOCS") alleges that in retaliation for his filing of an administrative grievance against Purcell, defendants used excessive force against plaintiff in violation of his constitutional rights. Plaintiff also contends that defendant Matyas conspired with others to prevent plaintiff from receiving medical treatment for his injuries. Plaintiff filed an Amended Complaint on January 4, 2007. (Doc. # 37) Defendants Huttel, Shambo, Purcell and Matyas have moved to partially dismiss the Amended Complaint ("AC"). Defendants Austin and Gunsett have filed an Answer to the complaint and do not now seek to dismiss the claims against them. (Doc. # 48)

The Court declines to convert the motion to dismiss into a motion for summary judgment under Rule 56, Fed.R.Civ.P., and accordingly, does not consider the extrinsic evidence submitted by the moving defendants in reaching its decision. The moving defendants assert, among other things, that plaintiff's claims are administratively unexhausted and that the retaliation and conspiracy claims do not state a claim upon which relief may be granted. The motion is granted as to the conspiracy claim, which is dismissed, and the motion is otherwise denied.

### THE COMPLAINT

On July 7, 2005, plaintiff was incarcerated at the Green Haven Correctional Facility ("Green Haven") in the Special Housing Unit ("SHU"). (AC ¶ 10) Plaintiff was removed from his cell by officers Austin and Gunsett who handcuffed him and escorted him to the showers. (AC ¶¶ 11-13) Plaintiff was taken to a different shower than that normally used by SHU inmates. (AC ¶ 14) Once he was in the shower, plaintiff alleges that Gunsett and Austin left his handcuffs on and "brutally and savagely beat" him. (AC ¶ 15) He alleges that they pushed him against a shower wall, knocking him down to the floor where they began to kick him in his back and face. (AC ¶¶ 15-16) In response to the noise from the attack, Huttel, Shambo and Matyas rushed "into the shower area and beg[a]n assaulting Plaintiff by [k]icking, [s]tomping, punching and kneeing Plaintiff, about the face, head, arm's [sic], [and] back ...." (AC ¶ 17) As a result of this attack, plaintiff allegedly suffered a range of injuries, including severe migraines, severe cuts and swelling to various parties of his body, a knife stab wound to his left arm, a finger injury and lower and upper back pain. (AC ¶ 18) Matyas allegedly conspired with other, unnamed individuals to prevent plaintiff from receiving treatment for these injuries. (AC ¶ 19) Plaintiff contends that defendants acted "maliciously and sadistically" and in violation of his constitutional rights. (AC ¶ 21) He further contends that his First Amendment rights

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                    Page 2

Slip Copy, 2007 WL 2907313 (S.D.N.Y.)
(Cite as: Slip Copy)

were violated because the attack was in retaliation for his filing of a grievance against Purcell. (AC ¶ ¶ 20, 22)

*DISCUSSION*

A. *Failure to Exhaust*

**\*2** The Prisoner Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e *et seq.,* was enacted in an effort to address the large number of prisoner complaints filed in federal court. *See Porter v. Nussle,* 534 U.S. 516, 524 (2002) (The PLRA is intended to "reduce the quantity and improve the quality of prisoner suits."). The PLRA does not itself create any substantive rights but "claims covered by the PLRA are typically brought under 42 U.S.C. § 1983...."*Jones v. Bock,* --- U.S. ---, 127 S.Ct. 910, 919 (2007). Under the provisions of the PLRA, "[n]o action shall be brought with respect to prison conditions under [section 1983], or any other Federal law, by a prisoner confined in any ... correctional facility until such administrative remedies as are available are exhausted."42 U.S.C. § 1997e(a). The exhaustion requirement is intended to afford "corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case."*Porter,* 534 U.S. at 524-25. The Supreme Court has made clear that " the PLRA's exhaustion requirement applies to all inmate suits about prison life."*Id.* at 532.The Second Circuit considers the failure to exhaust administrative remedies an affirmative defense and the burden of proving that a plaintiff has failed to exhaust his administrative remedies is therefore on the defendant. *See Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999). Where a complaint contains claims which are exhausted and claims which have not been properly exhausted, the Court must dismiss only the unexhausted claims and not the complaint in its entirety. *Bock,* 127 S.Ct. at 924-26.

DOCS has a well-established, three-step, administrative procedure for inmate grievances called the inmate grievance program ("IGP").N.Y.

Correction Law § 139 (2003). First, an inmate must file a complaint with the Inmate Grievance Resolution Committee ("IGRC") at his facility. 7 N.Y.Codes R. & Reg. ("NYCRR") § 701.5(a)(1) (2007). Absent mitigating circumstances, in order to be timely, a grievance must be filed within 21 days of the alleged incident. § 701.5(a)(1). A grievance that alleges harassment is forwarded to the superintendent on an expedited basis for an initial determination of whether the grievance, if true, would represent a bona fide case of harassment as defined in § 701.2. § 701.8(b)-(c). If it is determined that the grievance does not state a harassment claim, then it is returned to IGRC for normal processing. § 701.8(c). If it is determined that the grievance does present a viable harassment issue, the superintendent arranges for an appropriate investigation. § 701.8(d).

For grievances processed on a non-expedited basis, if the IGRC cannot resolve the dispute informally to the satisfaction of the inmate, it holds a hearing, which must take place within 16 days of the IGRC's receipt of the grievance. § 701.5(b)(2). After receiving a written response from the IGRC, an inmate has seven days in which to appeal to the superintendent of his facility. § 701.5(c) (1). Finally, the inmate may appeal the written decision of the superintendent to the Central Office Review Committee ("CORC") within seven days of receiving the decision. § 701.5(d)(1)(i). The CORC "consists of the deputy commissioner and counsel, deputy commissioner for correctional facilities, deputy commissioner for program services, deputy commissioner for administrative services, and the deputy commissioner and chief medical officer, or their designees expressly authorized to act for them. " § 701.5(d)(2)(i). An inmate may attend a hearing or appeal a grievance unaided or aided by a member of staff or another inmate. § 701.6(a).

**\*3** Here, defendants contend that plaintiff had failed to exhaust his administrative remedies because he failed to appeal any grievance relating to the allegations of the Amended Complaint to CORC. In opposition to defendants' motion, plaintiff has submitted an affirmation in which he asserts that he has "exhausted all of his administrative remedies by way of issuing

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2907313 (S.D.N.Y.)
**(Cite as: Slip Copy)**

grievances to the grievance committee."(Pl.Opp.¶ 6) While plaintiff does not specifically allege that he has received a CORC determination, he does contend that all "grievances [are] exhausted." (*Id.*)

Defendants also allege that any grievance filed by plaintiff applied only to the actions of Austin and Gunsett and failed to allege excessive force on the part of Huttell, Shambo and Matyas. Under the Supreme Court's recent decision in *Jones v. Bock,* the failure to name an individual in an administrative grievance does not necessarily mean that plaintiff has failed to exhaust his administrative remedies in regard to the individual who is later sued. *See Bock,* 127 S.Ct. at 922-23. As in *Bock,* the New York regulation governing inmate grievances does not contain a provision denominating specifically who must be named in an inmate grievance but rather mandates that the grievance " should contain a concise, specific description of the problem and the action requested and indicate what actions the grievant has taken to resolve the complaint...."7 NYCRR § 701.5(a)(2). Therefore, even assuming that plaintiff did fail to name Huttell, Shambo and Matyas in his grievance, the claim against them does not fail as a matter of law and dismissal is inappropriate at this juncture.

Further, the Court must consider the three-part inquiry set forth in *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004), which is to be undertaken whenever a prisoner counters a defendant's argument that he or she failed to exhaust. Under *Hemphill,* the court first considers whether administrative remedies were "available" to the prisoner, then whether the defendants failed to preserve a non-exhaustion argument by failing to raise the issue or preserve it, and finally, whether the defendant's own actions inhibited the inmate's exhaustion of remedies, and if so, whether the actions estopped one or more defendant from raising non-exhaustion. *Id.* Because the Court cannot undertake the *Hemphill* inquiry until the factual record is developed, dismissal of the action at this early stage is premature. *See Ziemba v. Wezner,* 366 F.3d 161, 164 (2d Cir.2004) (directing the district court on remand to wait for the summary judgment stage before engaging in the *Hemphill* inquiry). The circumstances relative to exhaustion

may look quite different on a motion for summary judgment and nothing herein is intended to prejudice defendants' right to seek dismissal after the close of discovery.

*B. Pleading Standards*

On a motion to dismiss, a court must accept the allegations of the complaint as true and draw all reasonable inferences in the non-movant's favor. *See Iqbal v. Hasty,* 490 F.3d 143 (2d Cir.2007).*Pro se* pleadings are to be given a liberal and generous construction and are to be read to "raise the strongest arguments that they suggest."*Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994).

**\*4** Rule 8(a) (2), Fed.R.Civ.P., requires only " ' a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to ' give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp. v. Twombly,* --- U.S. ---, 127 S.Ct. 1955, 1964 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)) (alteration in *Twombly* ). When a defendant tests the sufficiency of a complaint by a motion under Rule 12(b)(6), Fed.R.Civ.P., "[t]o survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns,* 493 F.3d at 98 (quoting *Twombly,* 127 S.Ct. at 1965). The complaint is measured against a flexible " plausibility standard," which obligates the "pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible* ." *Iqbal,* 490 F.3d at 157-58. This "does not require heightened fact pleading of specifics," *In re Elevator Antitrust Litig.,* ---F.3d ---, 2007 WL 2471805, at \*2 (2d Cir. Sept. 4, 2007); *see Erickson v. Pardus,* --- U.S. ---, 127 S.Ct. 2197, 2200 (2007); however, it does " require enough facts to 'nudge [plaintiff's] claims across the line from conceivable to plausible.' " *Elevator Antitrust Litig.,* 2007 WL 2471805, at \*2 (quoting *Twombly,* 127 S.Ct. at 1974) (alteration in *Elevator Antitrust Litig.*).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                          Page 4

**Slip Copy, 2007 WL 2907313 (S.D.N.Y.)**
**(Cite as: Slip Copy)**

### 1. *Retaliation*

In order to prevail on a First Amendment retaliation claim, an inmate must demonstrate "that he engaged in constitutionally protected conduct and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials."*See Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citation omitted). An action by prison officials is "adverse" only where it " would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.... Otherwise, the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection."*Dawes v. Walker,* 239 F.3d 489, 493 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 534 (2002) (internal citations omitted).

Defendants do not dispute that the filing of a grievance against Purcell was a constitutionally protected activity. (Defs.' Mem. Supp. Mot. Dismiss at 12) Rather, defendants contend that plaintiff has failed to allege a causal connection between the filing of a grievance against Purcell and the alleged use of force against plaintiff in the shower. However, plaintiff has alleged that "[d]efendant Purcell provoked this whole incident due to Plaintiff filing a grievance and complaint against him for his abuse of his authority and mis-conduct [sic]." (AC ¶ 20) Taking the allegations of the complaint as true, as I must on this motion, plaintiff has alleged sufficient facts to give defendants "fair notice of the basis of [Brown's] claims" against them. *Swierkiewicz,* 506 U.S. at 514.

### 2. *Conspiracy*

**\*5** "In order to survive a motion to dismiss on his § 1983 conspiracy claim, [a plaintiff] must allege (1) an agreement [between two or more state actors]; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. County of Nassau,* 292 F.3d 307, 324-25 (2d Cir.2002) (citing *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999)). Where

a complaint contains only "conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights," it is properly dismissed. *Ciambriello,* 292 F.3d at 325. Here, plaintiff has failed to allege facts in support of his claim of conspiracy. Plaintiff's sole allegation relating to his conspiracy claim is that "Sgt. Matyas, conspired along with different shift Officer's [sic] to keep Plaintiff inside [Shu] unit to avoid treatment for injuries Plaintiff sustained."(AC ¶ 19) No "overt act [ ] in furtherance of that goal" is alleged. The allegation is conclusory, does not give fair notice of the claim and is insufficient to state a claim of conspiracy.

### *CONCLUSION*

Defendants' motion to dismiss (Doc. # 49) is granted insofar as the conspiracy claim is dismissed. In all other respects, the motion is denied.

**SO ORDERED.**

S.D.N.Y.,2007.
Brown v. Austin
Slip Copy, 2007 WL 2907313 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**4**

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1

Not Reported in F.Supp.2d, 2003 WL 21518119 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Cruz v. U.S.
N.D.Cal.,2003.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
Senorino R. CRUZ. et al., Plaintiffs,
v.
UNITED STATES OF AMERICA, et al.,
Defendants.
**No. C 01-00892 CRB.**

June 24, 2003.

Mexican nationals who worked in the United States during and after World War II brought separate actions, based on alleged failure to pay withheld wages, against government of Mexico, two Mexican banks, the United States, and American bank. After actions were consolidated, the District Court, 219 F.Supp.2d 1027, granted defendants' motion to dismiss. Mexican nationals moved for leave to file amended complaint and for reconsideration. The District Court, Breyer, J., held that: (1) Court of Appeals' intervening *Altmann* decision was not grounds for reconsideration of order dismissing claims against Mexico and Mexican banks; (2) even if reconsideration was warranted, Mexico and Mexican banks were protected by absolute immunity; (3) Mexican nationals were entitled to reconsideration of dismissed claim against United States for breach of fiduciary duty; (4) Mexican nationals could amend breach of contract claim against United States to include allegation of breach of obligation of good faith and fair dealing; and (5) amendment of complaint to add negligence claim against United States would be futile.

Motion granted in part and denied in part.

**[1] Federal Civil Procedure 170A ☞1840**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal

            170AXI(B)5 Proceedings
                170Ak1839 Vacation
                    170Ak1840    k.    Grounds    and
Objections. Most Cited Cases
Court of Appeals' intervening *Altmann* decision, which held that Foreign Sovereign Immunities Act (FSIA) could be applied retroactively under certain limited circumstances did not change law of sovereign immunity nor analysis that district court was required to conduct to determine whether FSIA applied to claims based on alleged failure to pay withheld wages that were asserted against government of Mexico and two Mexican banks by Mexican nationals who worked in the United States during and after World War II, and thus was not grounds for reconsideration of order dismissing such claims based on absolute immunity. 28 U.S.C.A. § 1602 et seq.; U.S.Dist.Ct.Rules N.D.Cal., Civil Rule 7-9.

**[2] International Law 221 ☞10.31**

221 International Law
    221k10.29 Actions Against Sovereign or Instrumentality
        221k10.31 k. Immunity. Most Cited Cases
Internal correspondence among mid-level State Department bureaucrats discussing possibility that bracero program under which Mexican nationals worked in the United States during and after World War II could give rise to lawsuits in United States courts was insufficient to establish that government of Mexico could not have legitimately expected to receive immunity from United States' executive branch for bracero-related lawsuits, and thus did not support retroactive application of Foreign Sovereign Immunities Act (FSIA) to Mexican nationals' claims against Mexico and two Mexican banks arising from alleged failure to pay withheld wages in connection with bracero program. 28 U.S.C.A. § 1602 et seq.

**[3] Federal Civil Procedure 170A ☞1840**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 2

Not Reported in F.Supp.2d, 2003 WL 21518119 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
         170AXI(B)5 Proceedings
            170Ak1839 Vacation
               170Ak1840 k. Grounds and
Objections. Most Cited Cases
Pursuant to local rule providing for reconsideration
when court failed to consider material facts before it
when issuing challenged order, Mexican nationals
who worked in United States during and after
World War II pursuant to bracero program and who
allegedly never received withheld wages were
entitled to reconsideration of their dismissed claim
for breach of fiduciary duty against United States,
based on provision in standard contract between
United States and Mexican nationals participating
in bracero program that described trust arrangement
by which withheld wages were to be handled, given
that Mexican nationals were not aware of such
document until it was appended to government's
motion to dismiss and that court did not focus upon
provision in reaching its decision to dismiss claim.
U.S.Dist.Ct.Rules N.D.Cal., Civil Rule 7-9(b)(1, 3).

**[4] Federal Civil Procedure 170A ☜➤839.1**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(E) Amendments
         170Ak839 Complaint
            170Ak839.1 k. In General. Most Cited
Cases
Mexican nationals who worked in United States
during and after World War II and allegedly never
received withheld wages were entitled to amend
cause of action against United States for breach of
contract to include allegation that United States
breached obligation of good faith and fair dealing.
Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[5] Federal Civil Procedure 170A ☜➤851**

170A Federal Civil Procedure
   170AVII Pleadings and Motions
      170AVII(E) Amendments
         170Ak851 k. Form and Sufficiency of
Amendment. Most Cited Cases
Proposed amendment of complaint by Mexican

nationals who had worked in United States during
and after World War II and allegedly never
received withheld wages, so as to add negligence
claim against United States, was futile in light of
nationals' failure to file administrative claim within
two years of claim's accrual, as required under
Federal Tort Claims Act (FTCA). 28 U.S.C.A. §
2401(b); Fed.Rules Civ.Proc.Rule 15(a), 28
U.S.C.A.


MEMORANDUM AND ORDER

BREYER, J.
  **\*1** THIS DOCUMENT RELATES TO: Case
No. C 02-1942-CRB Case No. C 02-1943-CRB
Case No. C 02-1944-CRB

  Plaintiffs in these cases brought suit against the
United States, Mexico, and Wells Fargo Bank
seeking recovery of wages that they earned as "
braceros" during and immediately after World War
II. On August 23, 2002, this Court issued an order
dismissing the complaint. All of plaintiffs' causes of
action against the Mexican Defendants and Wells
Fargo Bank, as well as their claim against the
United States for breach of fiduciary duty, were
dismissed without leave to amend. All remaining
claims against the United States were found to be
barred by the applicable statutes of limitations, but
leave was granted to file an amended complaint that
set forth a factual basis for equitable tolling of those
claims.

  Now before the Court is plaintiffs' motion for
leave to file a third amended complaint. In addition
to amendments intended to provide a foundation for
equitable tolling, plaintiffs' proposed amended
complaint contains causes of action that the Court
previously dismissed with prejudice as well as new
causes of action against the Mexican Defendants
and the United States. Accordingly, plaintiffs'
motion also seeks reconsideration of the Court's
August 23, 2002 order to the extent that dismissal
of certain claims was without leave to amend.

  The factual setting in which these claims arose
and the procedural background of these cases were

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 3

Not Reported in F.Supp.2d, 2003 WL 21518119 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

set forth in detail in the Court's August 23, 2002 order and will not be repeated here.


## DISCUSSION

Plaintiffs' proposed third amended complaint contains an amended class definition and other amendments intended to establish a basis for equitable tolling. The Court having previously granted leave to make these amendments, they will not be addressed herein. Should the United States wish to challenge the sufficiency of these amendments, it must do so by way of a motion to dismiss.

In addition, the proposed third amended complaint: (1) repleads causes of action against the Mexican Defendants in light of the Ninth Circuit's decision in *Altmann v. Republic of Austria,* 317 F.3d 954 (9th Cir.2002); (2) repleads a cause of action against the United States for breach of fiduciary duty in light of evidence purportedly showing a trust relationship between the United States and the braceros; and (3) adds causes of action for negligence against the United States, Mexico, and the Mexican Bank Defendants.

Because the Court's order of dismissal dismissed the fiduciary-duty claim against the United States and all claims against the Mexican Defendants with prejudice, plaintiffs seek reconsideration of those portions of the order.


I. Reconsideration

Under Civil Local Rule 7-9(b), a party seeking reconsideration of an interlocutory order must show either (1) that "a material difference in fact or law exists from that which was presented to the Court before entry of the interlocutory order ... [and] that in the exercise of reasonable diligence the party ... did not know such fact or law at the time of the interlocutory order," or (2) "[t]he emergence of new material facts or a change of law occurring after the

time of such order."Civ. L.R. 7-9(b)(2).


A. Claims Against the Mexican Defendants

*2 The Court's dismissal of the Mexican Defendants was based on the Court's finding that they were entitled to absolute immunity. In reaching this conclusion, the Court rejected plaintiffs' argument that the more restrictive immunity scheme codified in the Foreign Sovereign Immunities Act (FSIA) can be applied retroactively to events occurring prior to 1952.

[1] Plaintiffs seek reconsideration of the Court's ruling in light of the Ninth Circuit's decision in *Altmann v. Republic of Austria,* 317 F.3d 954 (9th Cir.2003), which was issued four months after this Court dismissed all claims against the Mexican Defendants.[FN1] *Altmann* was a lawsuit brought by the American heir of an Austrian Jew against the Republic of Austria and the state-owned Austrian Gallery to recover paintings that were confiscated by the Nazis in violation of international law. The Ninth Circuit held that the defendants were not entitled to absolute immunity even though the events at issue occurred prior to 1952 because Austria could not have expected such immunity for its complicity in the "pillaging and retention of treasured paintings from the home of a Jewish alien who was forced to flee for his life."*Id.* at 964.Seizing on a statement in *Altmann* that the determination "whether the FSIA may properly be applied [to pre-1952 events] ... turns on the question whether [the sovereign] could legitimately expect to receive immunity from the executive branch of the United States for [the alleged conduct],"*id.* at 965, plaintiffs argue that reconsideration is warranted so that the Court may consider the Mexican Defendants' "settled expectations" regarding immunity for the conduct alleged.

> FN1. Plaintiffs also seek reconsideration on the grounds that the Court erred in finding that plaintiffs' claims accrued before 1952. Plaintiffs contend that their claims did not accrue until their demands

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 21518119 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

for payment were formally repudiated in 2001. This argument was raised in opposition to defendants' motion to dismiss, and the Court considered it at that time. As such, it is not a proper basis for seeking reconsideration.

In order for a subsequently issued circuit decision to justify reconsideration of a district court ruling, the circuit decision must effect a "change of law." Civ. L.R. 7-9(b)(2). Though *Altmann* held that the FSIA could be applied retroactively under certain limited circumstances, it did not thereby change the law. The court in *Altmann* expressly declined, in fact, to hold that "the FSIA may be generally applied to events predating the 1952 Tate Letter."*Altmann,* 317 F.3d at 962. Instead, the court based its conclusion that Austria was not entitled to absolute immunity on the "narrower rationale" espoused by D.C. Circuit Judge Wald in a 1994 dissent. *See id.*(citing *Princz v. Federal Rep. of Germany,* 26 F.3d 1166 (D.C.Cir.1994) (Wald, J., dissenting)). In *Princz,* Judge Wald opined that because congressional intent regarding the retroactivity of the FSIA was unclear, its application in that case turned on the second step of the *Landgraf* retroactivity analysis, viz., whether retroactive application of the statute "would 'impair rights a party possessed when he acted,'*i.e.,* whether in 1942-45 Germany would have been entitled to immunity for imprisoning and enslaving Princz."*Princz,* 26 F.3d at 1178-79 (citing *Landgraf v. USI Film Prods.,* 511 U.S. 244, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)). Judge Wald then characterized the "operative question" as "whether the executive branch would have recommended immunity for perpetrators of the Holocaust."*Id.* at 1179."The intuitive answer," she said, "is no." *Id* .

**\*3** The Ninth Circuit's holding in *Altmann* followed a similar approach. Since the conduct at issue explicitly violated the Hague Convention and Austria formally repudiated all Nazi transactions in 1946, said the court, Austria "could not expect such immunity." *Altmann,* 317 F.3d at 965. Under those specific circumstances, retroactive application of the FSIA did not violate the "presumption against retroactive legislation [that] is deeply rooted in our jurisprudence."*Id.* at 963 (quoting *INS v. St. Cyr,*

533 U.S. 289, 316, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001)).

As such, the *Altmann* decision did not *change* the law that prevailed at the time this Court ruled on the Mexican Defendants' motion to dismiss. Rather, the Ninth Circuit simply applied well-established principles of retroactivity to find that absolute sovereign immunity was not available under the narrow set of facts presented in that case.

In considering whether the FSIA could be applied retroactively in this case, the Court performed precisely the same analysis as the Ninth Circuit in *Altmann.*Acknowledging that the FSIA " does not contain a clear expression of statutory intent in favor of application to events occurring before 1952," the Court, like the court in *Altmann,* based its decision on the second step of the *Landgraf* analysis. *See Cruz,* 219 F.Supp.2d at 1035. Considering whether application of the FSIA would attach "new legal consequences" to past actions, *id.* (citing *Landgraf,* 511 U.S. at 270), the Court found that application of the FSIA under the facts of this case "would have impermissible retroactive effect." *Id.* at 1036.

Since *Altmann* changed neither the law of sovereign immunity nor the analysis that the Court was required to conduct in order to determine whether the FSIA applied to the claims at issue, the Ninth Circuit's decision in *Altmann* is not grounds for reconsideration of the Court's order of dismissal.

**[2]** The Court notes, however, that even if it were to conclude that reconsideration of the immunity issue were warranted in light of *Altmann,* the Court's ruling that the Mexican Defendants are immune from suit would remain undisturbed. As the Ninth Circuit recognized in *Altmann,*"Latin-American nations did not accept the restrictive approach to immunity [until] well into the 1980s."*Altmann,* 317 F.3d at 967. The evidence that plaintiffs have marshaled in order to show that Mexico had no such "settled expectations" of immunity in connection with the bracero program consists primarily of internal correspondence among mid-level State Department bureaucrats discussing the possibility that the bracero program

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 5

Not Reported in F.Supp.2d, 2003 WL 21518119 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

might give rise to lawsuits in U.S. courts. That evidence-which was before the Court when it dismissed these claims with prejudice-is insufficient to establish that Mexico "could [not] legitimately expect to receive immunity from the executive branch of the United States" for bracero-related lawsuits. *Id.* at 965.

## B. Breach of Fiduciary Duty Claim Against the United States

**\*4** [3] Plaintiffs also seek reconsideration of the Court's August 23, 2002 order insofar as it dismissed with prejudice plaintiffs' claim against the United States for breach of fiduciary duty. Plaintiffs' motion is based on an excerpt from the standard contract between the United States and growers who participated in the bracero program. That portion of the contract stated:

The Employer [growers] shall pay to the Administrator [the War Food Administration, i.e., the U.S. government] *in trust* for each such Worker who has been transported by the Administrator from Mexico for employment in the United States, ten percent (10%) of his wages, which portion of his wages such Worker will have assigned to the Administrator in trust, *to be held or controlled and disposed of by the Administrator under the terms of its agreement with the worker....* The Administrator shall make the official audit and transmit [checks covering this payment] to the bank for deposit.

3d Am. Compl. Ex. H (emphasis added). In plaintiffs' view, this document demonstrates that, contrary to the Court's finding, the United States explicitly manifested its intent to act in a fiduciary capacity vis-a-vis the braceros.

Plaintiffs contend that they were unaware of this document until it was appended to the motion to dismiss that the Court adjudicated in August 2002. Plaintiffs therefore concede that their first exposure to this evidence was prior to entry of the Court's order of dismissal. While plaintiffs are thus barred from seeking reconsideration under Local Rule 7-9(b)(1), reconsideration may instead be appropriate under Local Rule 7-9(b)(3), which

provides for reconsideration when a court fails to consider "material facts" that were before the court at the time it issued its order. Although the contract excerpted above was presented to the Court in connection with defendants' motion to dismiss, the Court did not focus upon it in reaching its decision.

Accordingly, plaintiffs' motion for reconsideration of the Court's dismissal of this claim with prejudice will be granted. Plaintiffs may replead this claim in their third amended complaint. Defendants' arguments concerning the merits of the claim should be presented by way of a motion to dismiss.

## II. Leave to Amend

Rule 15(a) of the Federal Rules of Civil Procedure governs the submission of amended pleadings. Although at this stage of the litigation amended pleadings may be filed only "by leave of court or by written consent of the adverse party," Rule 15(a) states that "leave shall be freely given when justice so requires."Four factors govern a court's determination as to whether to grant leave to amend: (1) whether the amendment was made in good faith; (2) whether there was undue delay in making the amendment; (3) whether amendment would prejudice the opposing party; and (4) whether amendment would be futile. *SeeRoth v. Marquez,* 942 F.2d 617, 628 (9th Cir.1991). Leave to file an amended cause of action should *not* be granted "when the movant present[s] no new facts but only 'new theories' and 'provide[s] no satisfactory explanation for [its] failure to fully develop [its] contentions originally.' " *Allen v. City of Beverly Hills,* 911 F.2d 367, 374 (9th Cir.1990) (citation omitted).

## A. Breach of the Implied Covenant of Good Faith

**\*5** [4] Plaintiffs seek leave to amend their first cause of action against the United States for breach of contract to include the allegation that the United States "breached ... the obligation of good faith and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 6

Not Reported in F.Supp.2d, 2003 WL 21518119 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

fair dealing that inheres in every contract." 3d Am. Compl. ¶ 58. Leave to do so will be granted.

**B. Negligence**

[5] Plaintiffs also wish to add a claim for negligence against the United States.[FN2]The United States opposes this amendment on the grounds that plaintiffs have not satisfied the requirements to assert a tort claim against the United States under the Federal Tort Claims Act. These requirements include the filing of a claim with the appropriate federal agency within two years of the claim's accrual, and the filing of any lawsuit within six months of the claim's denial. *See* 28 U.S.C. § 2401(b); *Dyniewicz v. United States,* 742 F.2d 484, 485 (9th Cir.1984). Since plaintiffs concede that no claim was filed with any federal agency prior to initiating this suit, the United States argues that amendment to add a tort claim against it would be futile.

> FN2. Plaintiffs also seek to add claims for negligence against the Mexican Defendants. Since the Court denies plaintiffs' motion to reconsider the Court's order dismissing all claims against the Mexican Defendants with prejudice on grounds of sovereign immunity, leave to add these claims will be denied as well.

Plaintiffs respond that the failure to file an administrative claim should be excused in this case because of the futility of filing such a claim now that the appropriate federal agencies (*e.g* ., the War Manpower Commission and War Food Commission) are defunct. As an initial matter, the Court notes that had plaintiffs filed a claim within two years of its accrual, the appropriate agency might not have been defunct. In any event, "[a] plaintiff's claim that administrative remedies were not pursued because pursuit would have been futile does not excuse this [filing] requirement."*Industrial Constructors Corp. v. United States Bureau of Reclamation,* 15 F.3d 963, 967 (10th Cir.1994).[FN3] Besides, neither plaintiffs' concern about the

potential difficulty of identifying the proper successor agency nor their conjecture that the claim would be forwarded by that agency to a higher " institutional level" is sufficient to show futility. Accordingly, leave to amend to state a claim against the United States for negligence will be denied.

> FN3. Plaintiffs' futility argument is not supported by the caselaw they cite. In *Spawr v. United States,* 796 F.2d 279 (9th Cir.1986), the Ninth Circuit found that the plaintiffs' futility argument "ha[d] no merit" and distinguished the out-of-jurisdiction case that the plaintiffs relied upon for a " futility principle." *Id.* at 281.The Third Circuit case cited by plaintiffs, which involved a prisoner who filed a *Bivens* claim without first exhausting the prison's complaint resolution processes, *seeLyons v. U.S. Marshals,* 840 F.2d 202, 205 (3d Cir.1988), is inapposite.

**CONCLUSION**

For the reasons stated above, plaintiffs' motion for reconsideration of the Court's August 23, 2003 order of dismissal is granted in part and denied in part. Reconsideration of the dismissal with prejudice of all claims against the Mexican Defendants is hereby DENIED. Reconsideration of the dismissal with prejudice of plaintiffs' breach-of-fiduciary claim against the United States is hereby GRANTED.

As stated in the Court's August 23, 2002 order, plaintiffs may amend their complaint to plead such facts as would entitle them to equitable tolling of the statute of limitations. Leave to amend plaintiffs' first cause of action against the United States for breach of contract to include an allegation of breach of the implied covenant of good faith is also GRANTED. In all other respects, plaintiffs' motion for leave to file an amended complaint is hereby DENIED.

*\*6* IT IS SO ORDERED.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 7

Not Reported in F.Supp.2d, 2003 WL 21518119 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**


N.D.Cal.,2003.
Cruz v. U.S.
Not Reported in F.Supp.2d, 2003 WL 21518119
(N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.