**<u>5</u>**

Westlaw.

Slip Copy

Slip Copy, 2007 WL 2077150 (S.D.N.Y.)
(Cite as: Slip Copy)

Page 1

H
Daniels v. City of New York
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Kelvin DANIELS; Poseidon Baskin; Djibril Toure;
Hector Rivera; Raymond Ramirez; Kahil Shkymba;
Bryan Stair; Tiara Bonnner; Theron
McConneyhead; and Horace Rogers, individually
and on behalf of a class of all others similarly
situated, Plaintiffs,
v.
THE CITY OF NEW YORK; and Mayor Rudolph
Giuliani; New York City Police Commissioner
Howard Safir; New York City Police Officers John
Does1-500; New York City Police Officer Anthony
Curtin; New York City Police Sergeant Peter
Mante; and New York City Police Officer Walter
Doyle; in their individual and official capacities,
Defendants.
No. 99 Civ. 1695(SAS).

July 16, 2007.

Jennifer R. Cowan, Vanessa De Simone, Debevoise
& Plimpton, New York, New York, Jonathan C.
Moore, Beldock Levine & Hoffman LLP, New
York, New York, Andrea Costello, Kamau K.
Franklin, New York, New York, William H.
Goodman, Goodman & Hurwitz, P.C., Detroit,
Michigan, for Plaintiffs.
Heidi Grossman, Assistant Corporation Counsel for
the City of New York, New York, New York, for
Defendants.

*MEMORANDUM OPINION AND ORDER*

SCHEINDLIN, J.
    *1 At a conference held on April 16, 2007, I
granted plaintiffs' request or an extension of the
Stipulation of Settlement, ordered by this Court on
January 9, 2004.[FN1] Although defendants' counsel

apprised the Court of certain terms of the
Stipulation of Settlement, I did not review the actual
Stipulation at that time. Since then, defendants have
moved to vacate the Order under Rules 59 and 60
of the Federal Rules of Civil Procedure and for
reconsideration under Local Civil Rule 6.3. For the
following reasons, defendants' motion for
reconsideration is granted and the order issued on
April 16, 2007 is hereby vacated.

> FN1.*See* Transcript of April 16, 2007
> Conference ("Tr.") at 9 ("I'm hereby
> extending the Court supervision for
> another year. I have to do that. You are
> two years late on producing the data. It is a
> very benign thing to do. And you may
> move to terminate it earlier.").

I. BACKGROUND

A. The Stipulation of Settlement

1. Defendants' Obligations

    The parties settled this class action in
September 2003, after vigorously negotiating the
terms of the Stipulation of Settlement over several
months.[FN2] This Court approved the settlement
after a fairness hearing and dismissed the action
with prejudice in January 2004, retaining
jurisdiction "for the purposes of enforcing
compliance with the terms and provisions of the
Class Stipulation."[FN3]The parties agreed that the
Agreement would terminate on December 31, 2007
[FN4] and that upon termination "the Court shall
retain no further jurisdiction over this action."[FN5]
The parties further agreed that the Agreement "can
be modified only on the written consent of all

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                  Page 2

**Slip Copy, 2007 WL 2077150 (S.D.N.Y.)**
**(Cite as: Slip Copy)**

parties."[FN6]

> FN2.*See* Stipulation of Settlement (" Stipulation" or "Agreement"), Ex. A to the 4/30/07 Declaration of Heidi Grossman, Assistant Corporation Counsel ("Grossman Decl.").

> FN3. 1/9/04 Order of Dismissal with Prejudice, Ex. A to the 5/22/07 Declaration of Vanessa De Simone in Opposition to Defendants' Motion to Vacate the Order Extending the Term of the Stipulation of Settlement.

> FN4.*See* Stipulation ¶ O(2).

> FN5.*Id.* ¶ K(5).

> FN6.*Id.* ¶ O(1).

The Agreement obligates defendants to take certain actions, including providing Class Counsel with quarterly data from the New York Police Department ("NYPD") UF-250 Database.[FN7] Pursuant to the Agreement, defendants must provide the UF-250 data within six months after the end of each quarter.[FN8] Defendants have other obligations under the Agreement. For example, defendants are required "to have a written policy regarding racial or ethnic/national origin profiling that complies with the United States Constitution and the New York State Constitution (the 'Racial Profiling Policy')."[FN9] Defendants are further required to supervise, monitor and train officers with regard to the Racial Profiling Policy.[FN10]

> FN7.*See id.* ¶ F. The UF-250 Report is the form used by NYPD officers to record stop and frisk activity. The Stipulation requires the NYPD to continue to compile a database consisting of all of the UF-250 Reports completed by NYPD officers. *See id.* ¶ F(5) ("A CD Rom of the UF-250 Database shall be provided to Class Counsel on a quarterly basis and shall be redacted as to information identifying

civilians and NYPD officers.").

> FN8.*See id.*("A copy of the CD Rom of each quarterly UF-250 Database shall be provided to Class Counsel within six months of the end of the quarter to which the reports correspond.").

> FN9.*Id.* ¶ C(1).

> FN10.*See id.* ¶ C(5).

The Agreement, however, does not include any provisions regarding plaintiffs' use or analysis of the UF-250 data. Nor does the Agreement contain any remedies or obligations regarding any trends or patterns reflected in the UF-250 database. Moreover, the Agreement does not require any specific outcomes and makes no specific assurances with respect to the supervision, monitoring and training of NYPD officers with regard to the Racial Profiling Policy.

2. Agreed Upon Dispute Resolution Procedure

The Agreement includes detailed dispute resolution procedures in the event that defendants are not complying with any of the Agreement's terms.[FN11] The Agreement requires plaintiffs to fulfill certain conditions before seeking court intervention. Moreover, the Agreement limits the type of relief that can be awarded by a court to specific performance of the term in issue. Under the Agreement, defendants can be held in contempt only if they fail to comply with a court order directing such specific performance.

> FN11.*See generally id.* ¶ L.

*2 The dispute resolution procedures found in the Agreement contain several steps that must be followed in the event of noncompliance. *First,* plaintiffs must notify defendants, in writing, that they have failed to comply with the Agreement. [FN12] If, after receiving written notification of noncompliance, defendants agree that they have not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                       Page 3

Slip Copy, 2007 WL 2077150 (S.D.N.Y.)
**(Cite as: Slip Copy)**

complied with a specific term of the Agreement, defendants shall specifically perform that term within a reasonable time period mutually agreed upon by the parties.[FN13]If defendants dispute their noncompliance, plaintiffs may seek a court order directing specific performance if: (1) the parties cannot agree on a reasonable time period for defendants to perform; or (2) defendants fail to specifically perform the term within the agreed upon time frame.[FN14]Upon the happening of any of the these events, plaintiffs:

> FN12.*See id.* ¶ L(1).

> FN13.*See id.* ¶ L(2)(a).

> FN14.*See id.* ¶ L(2)(b).

may apply to the Court for an order directing specific performance of that term or terms. Such application may not be made fewer than thirty days after the initial notification of non-compliance to the NYPD and Office of the Corporation Counsel.[FN15]

> FN15.*Id.*

Defendants can be held in contempt for noncompliance only if they fail to comply with a court order directing specific performance.[FN16]

> FN16.*See id.* ¶ L(2)(c).

In no event shall any of the Municipal Defendants be held in contempt for proven non-compliance with any of the terms or provisions of this Stipulation unless and until the Municipal Defendants fail to comply with an order from the Court directing specific performance of such terms or provisions, obtained by the Class Representatives and/or class members in compliance with the provisions of this paragraph.[FN17]

> FN17.*Id.*

**B. Defendants' Failure to Comply Timely**

In a letter dated January 18, 2007, plaintiffs notified defendants that they had not produced the UF-250 database for quarters dating back from 2003.[FN18] Defendants responded to plaintiffs' January 18th letter in writing, noting that they had not heard from plaintiffs since October 18, 2005.[FN19] Defendants provided the following explanation for the delay in production of the UF-250 database:

> FN18.*See* 1/18/07 Letter from Marc J. Krupanski to Heidi Grossman, Ex. B to the Grossman Decl.

> FN19.*See* 2/1/07 Letter from Grossman to Krupanski, Ex. C to the Grossman Decl.

Originally, the data on the UF-250 forms had been input manually at a centralized location. This procedure proved inadequate and inefficient especially since the number of UF-250 forms increased significantly over time. To improve efficiency of the system, the NYPD created an improved decentralized system, which eliminated the need for manual entry and facilitated timely production of UF-250 data.[FN20]

> FN20.*See id.*Defendants produced all of the 2006 data on March 19, 2007. *See* 3/19/07 Letter from Grossman to William Goodman, Ex. E to the Grossman Decl. ("March 19th Letter") ("While the Agreement obligates us to produce UF250 data for the first half of 2006, we are providing data for the second half of 2006, as well."). Under the Agreement, the last quarter of 2006 would have been due by June 2007.

Defendants further explained that producing the remaining data for the last quarter of 2003, and all of 2004 through 2005, would require more time because it entailed manual compilation.[FN21]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 4

**Slip Copy, 2007 WL 2077150 (S.D.N.Y.)**
**(Cite as: Slip Copy)**

FN21.*See id.*

By letter dated February 16, 2007, plaintiffs sent "official notice of non-compliance with the Stipulation" with regard to the production of the UF-250 database.[FN22]In that letter, plaintiffs expressed their concern that without a date certain for production, the delay, which they described as " unacceptable," "could extend beyond the term of the Stipulation and thereby effectively subvert it."[FN23]By letter dated March 19, 2007, defendants advised plaintiffs that the NYPD was working with an outside vendor to input the data for the outstanding quarters which was expected to be produced "well in advance of the end of the year."[FN24]

FN22.*See* 2/16/07 Letter from Goodman to Grossman and S. Andrew Schaffer, Deputy Commissioner of Legal Affairs for the NYPD, Ex. D to the Grossman Decl.

FN23.*Id.*

FN24. March 19th Letter at 1.

*3 Plaintiffs wrote this Court on April 2, 2007, requesting a conference to address the production date for the UF-250 database.[FN25]Plaintiffs complained that the missing data would not be produced "until some unspecified future date."[FN26] Plaintiffs requested a conference to secure a date certain for the production of the UF-250 data and "ensure that Defendants comply with their obligations under the Stipulation."[FN27]Notably, this was the first time plaintiffs ever sought judicial intervention with regard to any term of the Agreement. In a letter dated April 12, 2007, defendants advised this Court and plaintiffs of the following targeted production dates: 4th Quarter 2003 by June 1, 2007; Full Year 2004 by August 1, 2007; and Full Year 2005 by October 1, 2007.[FN28]

FN25. 4/2/07 Letter from Goodman to this Court, Ex. F to the Grossman Decl.

FN26.*Id.* ("Defendants' vague assurances

are not only insufficient, they also highlight a flagrant continuing violation of the Stipulation.").

FN27.*Id.*

FN28.*See* 4/12/07 Letter from Grossman to this Court, Ex. I to the Grossman Decl.

On April 16, 2007, I held a conference to address plaintiffs' concerns. Although the issue of defendants' noncompliance was certainly on the agenda, neither party provided this Court with a copy of the Agreement. At the conference, plaintiffs did not request an order from this Court directing specific performance. At this Court's invitation, however, plaintiffs did seek to extend the term of the Agreement.[FN29]Citing defendants' two-year delay in producing the UF-250 database, I extended the term of the Agreement one year but allowed defendants to move for early termination once the data was produced.[FN30]One reason for the one-year extension was to avoid prejudice to the plaintiffs, who needed time to review the data provided to them before the Stipulation expired.[FN31]

FN29.*See* Tr. at 5-6.

FN30.*See id.* at 6-7.

FN31.*See id.* at 6 ("The whole point is when you get the data, you may need to do something about [what] you learned. And there is no time left.").

II. STANDARD OF REVIEW

Motions for reconsideration are governed by Local Civil Rule 6.3 and are committed to the sound discretion of the district court.[FN32]"The standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked-matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."[FN33]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 5

Slip Copy, 2007 WL 2077150 (S.D.N.Y.)
**(Cite as: Slip Copy)**

Reconsideration may also be granted "to correct a clear error or to prevent manifest injustice."[FN34] However, reconsideration is an "extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources."[FN35]

> FN32.*See Pattterson v. United States,* No. 04 Civ. 3170, 2006 WL 2067036, at *1 (S.D.N.Y. July 26, 2006) ("The decision to grant or deny a motion for reconsideration is within the sound discretion of the district court."(citing *McCarthy v. Manson,* 714 F.2d 234, 237 (2d Cir.1983)).

> FN33.*Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995).*Accord Eisemann v. Greene,* 204 F.3d 393, 395 n. 2 (2d Cir.2000) ("To be entitled to reargument, a party must demonstrate that the Court overlooked controlling decisions or factual matters that were put before it on the underlying motion.") (quotation marks and citation omitted).

> FN34.*Griffin Indus., Inc. v. Petrojam, Ltd.,* 72 F.Supp.2d 365, 368 (S.D.N.Y.1999).

> FN35.*In re Health Mgmt. Sys., Inc. Sec. Litig.,* 113 F.Supp.2d 613, 614 (S.D.N.Y.2000) (quotation marks and citation omitted).

Local Civil Rule 6.3 is narrowly construed and strictly applied in order to avoid repetitive arguments already considered by the Court.[FN36]A motion for reconsideration is not a substitute for appeal.[FN37]Nor is it "a 'second bite at the apple' for a party dissatisfied with a court's ruling."[FN38] Accordingly, the moving party may not "advance new facts, issues or arguments not previously presented to the Court."[FN39]

> FN36.*See Lichtenberg v. Besicorp Group Inc.,* 204 F.3d 397, 400 (2d Cir.2000).

> FN37.*See RMED Int'l, Inc. v. Sloan's*

> *Supermarkets, Inc.,* 207 F.Supp.2d 292, 296 (S.D.N.Y.2002).

> FN38.*Pannonia Farms, Inc. v. USA Cable,* No. 03 Civ. 7841, 2004 WL 1794504, at *2 (S.D.N.Y. Aug. 10, 2004).

> FN39.*Caribbean Trading and Fidelity Corp. v. Nigerian Nat'l Petroleum Corp.,* 948 F.2d 111, 115 (2d Cir.1991) (quotation marks and citation omitted).

## III. DISCUSSION

At the April 16th conference, defendants' counsel attempted to explain certain relevant portions of the Agreement. For example, she advised the Court that the Agreement contained a dispute resolution procedure.[FN40]Counsel further explained that the Agreement "specifically says no contempt shall be sought until certain procedures are followed" but she did not elaborate on those procedures.[FN41]Finally, counsel noted that the Agreement did not contain any provision for extending the Agreement past December 31, 2007. [FN42]

> FN40.*See* Tr. at 8 ("The terms of the agreement set out the dispute resolution [mechanism] and [the] remedies available to plaintiff[s] if we don't comply with timely production....").

> FN41.*Id.* at 10.

> FN42.*See id.* at 11.

**\*4** A copy of the Agreement has subsequently been provided to this Court as part of defendants' motion. The actual language of the Agreement raises new facts that were obviously overlooked by this Court at the conference. After reading the entire Agreement, I hereby vacate the April 16th Order and order defendants to specifically perform by producing the UF-250 database in accordance with the scheduled proposed in the March 19th Letter, namely: Full Year 2004 by August 1, 2007; and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 6

**Slip Copy, 2007 WL 2077150 (S.D.N.Y.)**
**(Cite as: Slip Copy)**

Full Year 2005 by October 1, 2007.[FN43]If defendants fail to specifically perform on these dates, plaintiffs may then move for contempt. If, and when, plaintiffs so move, this Court will consider extending the term of the Agreement, among other sanctions.[FN44]

> FN43. Presumably, the last quarter of 2003 has already been provided given that its targeted production date was June 1, 2007.

> FN44. Defendants should be forewarned that if they fail to produce the UF-250 database by the dates ordered, the Court will consider all appropriate sanctions given the two-year delay already suffered by plaintiffs.

IV. CONCLUSION

For the foregoing reasons, the April 16th Order is hereby vacated. The Clerk of the Court is directed to close defendants' motion to vacate [Document # 173]. Plaintiffs are directed to notify this Court of any noncompliance on defendants' part as soon as reasonably practicable.
SO ORDERED:

S.D.N.Y.,2007.
Daniels v. City of New York
Slip Copy, 2007 WL 2077150 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**6**

# Westlaw.

Slip Copy                                                              Page 1

Slip Copy, 2007 WL 1222858 (S.D.N.Y.)
**(Cite as: Slip Copy)**

**H**
Espinosa v. Delgado Travel Agency, Inc.
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Nancy Patricia ESPINOSA and Monica Montero,
Plaintiffs,
v.
THE DELGADO TRAVEL AGENCY, INC.,
Defendant.
**No. 05 Civ. 6917(SAS).**

April 24, 2007.

Ronald J. Warfield, The Warfield Group, New York, New York, Peter G. Eikenberry, New York, New York, for Plaintiffs.
Robert N. Holtzman, Kramer Levin Naftalis & Frankel LLP, New York, New York, for Defendant.

*MEMORANDUM OPINION AND ORDER*

SCHEINDLIN, J.
**\*1** On March 2, 2007, this Court issued a Memorandum Opinion and Order (the "March 2nd Order")[FN1] granting defendant's motion for partial summary judgment and dismissing plaintiffs' spread-of-hours claims.[FN2]Plaintiffs now move for reconsideration of the March 2nd Order under Rule 6.3 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Civil Rule 6.3"). For the following reasons, plaintiffs' motion is granted in part and denied in part.

> FN1.*See Espinosa v. Delgado Travel Agency, Inc.,* No. 05 Civ. 6971, 2007 WL 656271 (S.D.N.Y. Mar. 2, 2007).

> FN2. Under New York law, employers must pay "one hour's pay at the basic

minimum hourly wage rate, in addition to the minimum wage required [by New York's minimum wage law], for any day in which (a) the spread of hours exceeds 10 hours; or (b) there is a split shift; or (c) both situations occur."N.Y. Comp.Codes R. & Regs. tit. 12 § 142-2.4.

## I. STANDARD OF REVIEW

Motions for reconsideration are governed by Local Civil Rule 6.3 and are committed to the sound discretion of the district court.[FN3]"The standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked-matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."[FN4] Reconsideration is an "extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources."[FN5]

> FN3.*See Pattterson v. United States,* No. 04 Civ. 3170, 2006 WL 2067036, at \*1 (S.D.N.Y. July 26, 2006) ("The decision to grant or deny a motion for reconsideration is within the sound discretion of the district court."(citing *McCarthy v. Manson,* 714 F.2d 234, 237 (2d Cir.1983)).

> FN4.*Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995).*Accord Eisemann v. Greene,* 204 F.3d 393, 395 n.2 (2d Cir.2000) ("To be entitled to reargument, a party must demonstrate that the Court overlooked controlling decisions or factual matters that were put before it on the underlying motion.") (quotation marks and citation omitted).

> FN5.*In re Health Mgmt. Sys., Inc. Sec.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1222858 (S.D.N.Y.)
**(Cite as: Slip Copy)**

*Litig.,* 113 F.Supp.2d 613, 614 (S.D.N.Y.2000) (quotation marks and citation omitted).

Local Civil Rule 6.3 is narrowly construed and strictly applied in order to avoid repetitive arguments already considered by the Court.[FN6]A motion for reconsideration is not a substitute for appeal.[FN7]Nor is it "a 'second bite at the apple' for a party dissatisfied with a court's ruling."[FN8] Accordingly, the moving party may not "advance new facts, issues or arguments not previously presented to the Court."[FN9]

> FN6.*See Lichtenberg v. Besicorp Group Inc.,* 204 F.3d 397, 400 (2d Cir.2000).

> FN7.*See RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.,* 207 F.Supp.2d 292, 296 (S.D.N.Y.2002).

> FN8.*Pannonia Farms, Inc. v. USA Cable,* No. 03 Civ. 7841, 2004 WL 1794504, at *2 (S.D.N.Y. Aug. 10, 2004).

> FN9.*Caribbean Trading and Fidelity Corp. v. Nigerian Nat'l Petroleum Corp.,* 948 F.2d 111, 115 (2d Cir.1991) (quotation marks and citation omitted).

## II. DISCUSSION

In the March 2nd Order, I held that the spread-of-hours regulation does not apply to employees earning more than the minimum wage required under New York law.[FN10]Plaintiffs do not challenge this holding in their motion for reconsideration.[FN11]In the March 2nd Order, I also calculated the real hourly rates and real overtime rates at which plaintiffs were paid. In applying the formula described in the March 2nd Order, I determined that all of the hourly rates at which plaintiffs were paid were above the applicable minimum wage of $5.15 per hour.[FN12] Accordingly, I held that because plaintiffs were consistently paid at hourly rates which exceeded the minimum wage of $5.15 per hour, they were not

entitled to any spread-of-hours wages.[FN13]

> FN10.*See Espinosa,* 2007 WL 656271, at *2 ("By its plain language, section 142-2.4(a) only provides supplemental wages to workers who are paid the minimum wage required under New York law. It does not ensure additional compensation to employees whose wages sufficiently exceed that floor.").

> FN11.*See* Plaintiffs' Memorandum in Support of Their Motion for Reconsideration ("Recon.Mem.").

> FN12.*See id.* at *3. Under the forty-hour workweek scenario, plaintiffs' lowest real hourly rate was $5.77, which was paid in August 2003 when plaintiffs' gross weekly salaries were $490.00. *See id.* n.20.

> FN13.*See id.*

Plaintiffs challenge this latter holding, claiming that "this Court has misinterpreted the overtime provision of the Fair Labor Standards Act, 29 U.S.C. § 207(a)(1)."[FN14] Plaintiffs point out that under section 207(a)(1), "any hours in excess of 40 per week must be treated as overtime. Thus, plaintiffs worked 30 hours of overtime each week, assuming a 70 hour workweek."[FN15]According to plaintiffs, in determining the "minimum wage required" for purposes of New York's spread-of-hours regulation, overtime hours must be compensated " 'at a rate not less than one and one-half times the regular rate at which [an employee] is employed." ' [FN16] Furthermore, in determining the minimum wage required per week, plaintiffs argue in favor of the following formula, which has been applied by New York's Department of Labor:

> FN14. Recon. Mem. at 2.

> FN15.*Id.* at 3.

> FN16.*Id.* at 4 (quoting 29 U.S.C. §

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 3

Slip Copy, 2007 WL 1222858 (S.D.N.Y.)
**(Cite as: Slip Copy)**

207(a)(1)).

*2 (Number of Overtime Hours times Regular Hours [illegible text] 1 .5) + (6 Spread of Hours times Minimum Wage per Hour) [FN17]

> FN17.*Id.* at 4. This is the formula described in the November 21, 2003 letter from the New York Department of Labor (" Department of Labor's 2003 Opinion Letter "). The example offered by the Department of Labor describes an employee who worked six days a week, not five days a week as recounted by plaintiffs, for twelve hours a day, at a rate equivalent to $8.00 per hour. *See* Department of Labor's 2003 Opinion Letter, Ex. H to the Declaration of Robert N. Holtzman in Support of Defendant's Motion for Partial Summary Judgment.

Upon review, I now conclude that this Court overlooked both controlling law and controlling facts, thereby requiring reconsideration of the March 2nd Order. Upon reconsideration, the Court makes the following findings of fact and conclusions of law. *First,* as noted by defendant, plaintiffs cannot dispute that they were "hourly" employees.[FN18]Both plaintiffs testified at their depositions that they were paid an hourly rate and each recalled what she was paid per hour.[FN19] Once it is clear that plaintiffs were hourly rate employees, the New York City Rules and Regulations provide the formula for determining an employee's "regular rate" of pay. "The term *regular rate* shall mean the amount that the employee is regularly paid for each hour of work."[FN20]*Second,* plaintiffs are correct that the Fair Labor Standards Act requires that "no employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives compensation for [her] employment in excess of [forty hours] at a rate not less than one and one-half times the *regular rate* at which [she] is employed."[FN21]As a result, the Court erred when it calculated a sixty-hour work week with ten hours of overtime.

> FN18.*See* Defendant's Reply Memorandum of Law in Further Support of its Motion for Partial Summary Judgment at 8 (stating that plaintiffs' " disingenuous argument" that they were weekly salaried employees is "belied by Plaintiffs' unequivocal deposition testimony in which they repeatedly stated that they were paid an hourly rate").*See also* 3/30/07 Letter from Robert N. Holtzman, defendant's attorney, to the Court at 2 ("Plaintiffs testified unequivocally at their depositions that they were hourly employees-not weekly salaried employees.").

> FN19. Espinosa testified that she was initially paid $7.50 per hour, which was raised to $8.00 per hour and then to $8.55 per hour. *See*Espinosa Deposition Transcript, Ex. A to the Reply Declaration of Robert N. Holtzman in Further Support of Defendant's Motion for Partial Summary Judgment, at 332-34. Montero testified that she was initially paid either $6.00 or $6.50 per hour which was raised to $7.00 per hour. *See id.*Ex. B, Montero Deposition Transcript at 57-63.

> FN20.N.Y. Comp.Codes R. & Regs. tit. 12 § 142-3.14 (italics in original). This section provides a different formula for calculating the regular hourly wage rate for employees who are paid on any basis other than an hourly wage. *See id.*("When an employee is paid on a piece-rate, salary or *any basis other than hourly rate,* the regular hourly rate shall be determined by dividing the total hours worked during the week into the employees's total earnings.") (emphasis added).

> FN21.29 U.S.C. § 207(a)(1).

When the correct law and facts are considered, this Court adheres to the calculations set forth in footnote 20 of the March 2nd Opinion, with one exception. In that footnote, the Court calculated plaintiffs' real hourly rate based on a forty-hour

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 4

**Slip Copy, 2007 WL 1222858 (S.D.N.Y.)**
**(Cite as: Slip Copy)**

work week with thirty hours of overtime. However, because there is no question that plaintiffs worked more than ten hours a day from start to finish (since they worked seventy hours in six days), an extra hour per day at the minimum wage of $5.15 must be added in order to determine the required minimum wage per week according to the Department of Labor's formula, which plaintiffs urge the Court to apply.[FN22]

> FN22. I note that apart from this Court's calculation of the real hourly rates, plaintiffs have conceded that their hourly rates of pay exceeded the hourly minimum wage. *See supra* note 19 and plaintiffs' Amended Complaint.

Applying that formula to the regularly hourly rates determined by this Court, plaintiffs are entitled to spread-of-hours pay where indicated in the tables below. For those time periods having a zero in the last column, defendant's motion for partial summary judgment is granted because plaintiffs earned more than the minimum wage per week and, therefore, are not entitled to additional spread-of-hours pay.

| Plaintiff | Pay Period | Real Hourly (Regular) Rate [23] | Minimum Wage Per 2003 DOL Op. Ltr.[24] | Gross Amount Paid per Week | Additional Spread-of-Hours Pay |
|---|---|---|---|---|---|
| Espinosa | 8/3/03 - 8/24/03 | $5.77 | $496.55 | $490.00 | $97.85 [25] |
|  | 8/25/03 - 9/07/03 | $5.52 | $485.30 | $469.00 | $61.80 [26] |
|  | 9/8/03 - 9/14/03 | $4.53 | $440.75 | $385.00 | $30.90 [27] |
|  | 9/15/03 - 10/5/03 | $5.77 | $496.55 | $490.00 | $92.70 [28] |
|  | 10/6/03 2/22/04 | $6.59 | $533.45 | $560.00 | $ 0 |
|  | 2/23/04 - | $7.04 | $553.70 | $598.50 | $ 0 |

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                     Page 5

**Slip Copy, 2007 WL 1222858 (S.D.N.Y.)**
**(Cite as: Slip Copy)**

| | | | | |
|---|---|---|---|---|
| 3/7/04 | | | | |
| 3/8/04 - 3/14/04 | $5.53 | $485.75 | $470.25 | $30.90 |
| 3/15/04 - 4/18/04 | $7.04 | $553.70 | $598.50 | $ 0 |
| 4/19/04 - 4/25/04 | $3.04 | $373.70 | $258.50 | $30.90 |
| | | | Total | $ 345.05 |

40X
+ 30 (1.5X)
= Gross
Amount Paid
        40X
+ 45X =
Gross
Amount Paid
        85X
= Gross
Amount Paid
        X =
Gross
Amount
Paid/85

Minimum
Wage for 40
hours = 40 x
$5.15 =
$206.00
        plus
Spread-o
f-Hours Pay
= 6 x $5.15
= $30.90
        plus
Overtime (30
x regular rate
x 1.5) =
    variable

FN23. Plaintiffs' regular hourly rates are determined in accordance with the following formula:

FN24. Minimum wage per week amounts are determined as follows:

FN25. Spread-of-Hours Pay for Nineteen Days = $5.15 x 19 = $97.85.

FN26. Spread-of-Hours Pay for Twelve Days = $5.15 x 12 = $61.80.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                              Page 6

Slip Copy, 2007 WL 1222858 (S.D.N.Y.)
**(Cite as: Slip Copy)**

FN27. Spread-of-Hours Pay for Six Days = $5.15 x 6 = $30.90.

FN28. Spread-of-Hours Pay for Eighteen Days = $5.15 x 18 = $92.70.

| Plaintiff | Pay Period | Real Hourly (Regular) Rate [29] | Minimum Wage Per 2003 DOL Op. Ltr.[30] | Gross Amount Paid per Week | Additional Spread-of-Hours Pay |
|---|---|---|---|---|---|
| Montero | 6/23/03 - 7/13/03 | $5.27 | $474.05 | $447.69 | $92.70 |
| | 7/14/03 - 7/27/03 | $5.67 | $492.05 | $482.13 | $61.80 |
| | 7/28/03 - 8/31/03 | $5.76 | $496.10 | $490.00 | $154.50 [31] |
| | 9/1/03 - 10/5/03 | $6.11 | $511.85 | $519.40 | $ 0 |
| | 10/6/03 - 4/11/04 | $7.06 | $554.60 | $599.90 | $ 0 |
| | 4/12/04 - 4/18/04 | $5.55 | $486.65 | $471.35 | $30.90 |
| | 4/19/04 - 5/2/04 | $7.06 | $554.60 | $599.90 | $ 0 |
| | 5/3/04 - 7/11/04 | $7.64 | $580.70 | $649.60 | $ 0 |
| | 7/12/04 - 7/18/04 | $6.00 | $506.90 | $510.40 | $ 0 |
| | 7/19/04 - 9/12/04 | $7.64 | $580.70 | $649.60 | $ 0 |
| | 9/13/04 - 9/19/04 | $8.00 | $596.90 | $680.40 | $ 0 |
| | 9/20/04 - 10/3/04 | $6.29 | $519.95 | $534.60 | $ 0 |
| | 10/4/04 - 10/17/04 | $8.00 | $596.90 | $680.40 | $ 0 |
| | 10/18/04 - 10/24/04 | $6.29 | $519.95 | $534.60 | $ 0 |
| | 10/25/04 - 11/14/04 | $8.00 | $596.90 | $680.40 | $ 0 |
| | | | | Total | $ 339.90 |

40X
+ 30 (1.5X)
= Gross
Amount Paid

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 7

**Slip Copy, 2007 WL 1222858 (S.D.N.Y.)**
**(Cite as: Slip Copy)**

    40X
+ 45X =
Gross
Amount Paid
    85X
= Gross
Amount Paid
    X =
Gross
Amount
Paid/85

Minimum
Wage for 40
hours = 40 x
$5.15 =
$206.00
    plus
Spread-o
f-Hours Pay
= 6 x $5.15
= $30.90
    plus
Overtime (30
x regular rate
x 1.5) =
    variable

FN29. Plaintiffs' regular hourly rates are determined in accordance with the following formula:

FN30. Minimum wage per week amounts are determined as follows:

FN31. Spread-of-Hours Pay for Thirty Days = $5.15 x 30 = $154.50.

Espinosa v. Delgado Travel Agency, Inc.
Slip Copy, 2007 WL 1222858 (S.D.N.Y.)

**III. CONCLUSION**                                            END OF DOCUMENT

    **\*3** For the foregoing reasons, plaintiffs' motion
for reconsideration of the March 2nd Order is
granted in part and denied in part. The Clerk of the
Court is directed to close this motion [Document #
63].

    SO ORDERED:

S.D.N.Y.,2007.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## <u>7</u>



205 F.3d 1322                                                                 Page 1

205 F.3d 1322, 2000 WL 236471 (C.A.2 (N.Y.))
**(Cite as: 205 F.3d 1322)**

**H**

Green v. Doukas

C.A.2 (N.Y.),2000.

NOTICE: THIS IS AN UNPUBLISHED OPINION.(The Court's decision is referenced in a " Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA2 s 0.23 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals, Second Circuit.
M. Lisa GREEN, Plaintiff-Appellant,
v.
Ruth DOUKAS, Nick Doukas, Claire Fallon, Timothy Fallon, Regina Benevenuti, "George" Benevenuti, Merrill Kelmar, Paul Kelmar, Jonathan Fallon, Hillary Fallon, Lauren Heiman Angle, Melinda Heiman Hart, Defendants-Appellees.
No. 99-7733.

Feb. 15, 2000.

Appeal from a judgment of the United States District Court for the Southern District of New York, Colleen McMahon, Judge.

M. Lisa Green, Ramsey, NJ, pro se.
Ronald Cohen, New York, NY, for appellee.

Present CABRANES, OAKES, and SACK, Circuit Judges.

SUMMARY ORDER

**\*1** UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the judgment of said District Court be and it hereby is VACATED in part and AFFIRMED in part.

Plaintiff M. Lisa Green appeals *pro se* from a judgment, entered April 28, 1999, granting summary judgment to defendants Ruth Doukas, Nick Doukas, Claire Fallon, Timothy Fallon, Regina Benevenuti, "George" Benevenuti, Merrill Kelmar, Paul Kelmar, Jonathan Fallon, Hillary Fallon, Lauren Heiman Angle, Melinda Heiman Hart (collectively, "defendants"), and dismissing her amended complaint. The complaint alleges a variety of misdeeds on the part of defendants-Green's sisters (Ruth Doukas and Claire Fallon), brothers-in-law (Nick Doukas and Timothy Fallon), and other relatives-prior to and after the death in September 1995 of Dorothy S. Green, the mother of plaintiff, Ruth Doukas, and Claire Fallon. For the reasons stated below, we vacate the judgment of the District Court in part and affirm in part.

I.

Plaintiff, represented by counsel in the District Court, filed her initial complaint on November 7, 1997. The complaint, as amended, asserts that defendants (1) subjected plaintiff to harassment and defamation, resulting in humiliation, loss of credibility and reputation, loss of business and finances, and physical and emotional distress; and (2) through a series of *inter vivos* transfers, looted at least $361,000 from Dorothy Green prior to her death, thereby reducing the share of Dorothy Green's Estate (the "Estate") to which plaintiff was entitled under Dorothy Green's will. Although inartfully drafted, the complaint appears to assert claims for: (1) defamation; (2) intentional infliction of emotional harm; (3) unjust enrichment and/or conversion; (4) tortious interference with expectancy or inheritance; and (5) fiduciary fraud and/or breach of fiduciary duty. For relief, the complaint seeks injunctive relief, compensatory damages, and punitive damages.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

205 F.3d 1322                                                                 Page 2

205 F.3d 1322, 2000 WL 236471 (C.A.2 (N.Y.))
**(Cite as: 205 F.3d 1322)**

On July 2, 1998, defendants moved to dismiss the amended complaint pursuant to FED.R.CIV.P. 12(b)(1) or 12(b)(6). They argued that the District Court lacked subject matter jurisdiction over Green's claims because (1) the statutes of limitations had run on several of the claims under New York law, and (2) the claims concerning *inter vivos* transfers and misconduct by Ruth Doukas as executrix of the Estate had been litigated in, and decided by, the Connecticut Probate Court (the "Probate Court"). In addition, defendants asserted that, for one reason or another, plaintiff's complaint failed to state cognizable claims for intentional infliction of emotional harm, defamation, and fraud. In response to defendants' motion, plaintiff argued, *inter alia,* that Connecticut statutes of limitations applied to her claims, making those claims timely, and that the District Court had jurisdiction to hear her claims concerning the *inter vivos* transfers because such claims were outside the jurisdiction of the Probate Court. Plaintiff included with her response several documents from the Probate Court litigation.

**\*2** By Memorandum Decision and Order filed April 20, 1999, and amended April 26, 1999, the District Court converted defendants' motion to dismiss into a motion for summary judgment,[FN1] and dismissed plaintiff's complaint in its entirety. In a two-page opinion lacking citations to any case law or other relevant legal authority, the District Court concluded that plaintiff's defamation claim was time barred and that her other claims either had been litigated or should have been litigated before the Probate Court. The substance of the District Court's analysis states in full:

> FN1. The District Court stated that it was converting defendants' motion into a motion "for summary judgment pursuant to Fed.R.Civ.P. 12(c)." Because summary judgment is governed by Rule 56, we assume that the District Court meant Rule 56 when it stated Rule 12(c). In any event, nothing of consequence flowed from this error.

The matter of the value of Dorothy Green's estate, including allegations of improper *inter vivos* transfers made during a period of decedent's alleged incompetency, improper accountings, and even alleged professional misconduct by the estate's counsel, were fully litigated in the Probate Court, some allegations in a preliminary hearing and some in the context of the final accounting. The time for taking an appeal from those decisions has expired. Plaintiff's accusations have been rejected. That decision is final. I do not sit as an appellate court over the Connecticut Probate Court. This Court has no intention of taking the slightest cognizance of plaintiff's claims. Moreover, even if those claims had not been adjudicated in the Probate Court, they would be barred here, because the final judgment in the Probate matter necessarily comprehended the matters here in suit. Any and all challenges to *inter vivos* transfers and the like had to be adjudicated there, because they affected the amount and distribution of the Estate. If they were not raised in that Court, they cannot be raised here, because any determination by this Court could undermine the final decision of the Probate Court. Basic principles of former adjudication so dictate.

Plaintiff's libel claim (to the extent she alleges one) is dismissed as time-barred.

Plaintiff filed a timely notice of appeal.

II.

We review the judgment of the District Court *de novo. See, e.g., Gummo v. Village of Depew,* 75 F.3d 98, 107 (2d Cir.1996). On appeal, plaintiff contends that the District Court erred in (1) converting defendants' motion to dismiss into a motion for summary judgment; (2) dismissing her claims on the ground that they were, or should have been, litigated in the Probate Court; (3) dismissing her defamation claims as time barred; and (4) failing to address her claims for intentional infliction of emotional harm. With the exception of the first argument, we substantially agree.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

205 F.3d 1322                                                                    Page 3

205 F.3d 1322, 2000 WL 236471 (C.A.2 (N.Y.))
**(Cite as: 205 F.3d 1322)**

A. Conversion to Summary Judgment

With respect to plaintiff's first argument, we conclude that the District Court did not err in converting defendants' motion to dismiss one for summary judgment. In general, a district court should give parties specific notice of its intent to convert a motion to dismiss into a motion for summary judgment. *See, e.g., In re G. & A. Books, Inc.,* 770 F.2d 288, 294-95 (2d Cir.1985). However, we have recognized that a court may, under some circumstances, convert a motion without giving such notice explicitly. *See id.* at 295. "The essential inquiry is whether the appellant should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings."*Id.* If both parties submit extrinsic material-or even if the moving party alone submits extrinsic material-the opposing party may be deemed to have adequate notice that the motion might be converted. *See id.*Here, because defendants submitted extrinsic evidence in support of their motion-and plaintiff herself went beyond the four corners of the complaint in responding-we conclude that the District Court did not err in converting defendants' motion to one for summary judgment.

B. The Effects of the Probate Court Litigation

*3 It is not entirely clear whether the District Court's ruling, insofar as it concerned the parties' prior litigation in the Probate Court, relied on the probate exception to diversity jurisdiction, the doctrine of res judicata, or the doctrine of collateral estoppel. Nevertheless, whatever its basis, we conclude that the ruling was in error.FN2

FN2. On appeal, defendants assert, with little if any legal analysis to support the assertion, that the District Court had discretion to abstain from jurisdiction over plaintiff's claims. We do not perceive that the District Court based its decision in

whole or in part on abstention principles, and we decline defendants' invitation to affirm the judgment of the District Court on this basis. Application of abstention doctrines generally entails fact-finding and the exercise of discretion, both of which are better suited to the District Court as the court of first instance than to this Court. In short, we express no view on whether abstention would be appropriate. We note, however, that application of many abstention doctrines is contingent on the existence of concurrent state proceedings, and here the state proceedings are no longer pending.

Under the probate exception to diversity jurisdiction, "a federal court may not probate a will, administer an estate, or entertain an action that would interfere with pending probate proceedings in a state court or with a state court's control of property in its custody."*Ashton v. Josephine Bay Paul and C. Michael Paul Found., Inc.,* 918 F.2d 1065, 1071 (2d Cir.1990) (citing, *inter alia, Markham v. Allen,* 326 U.S. 490, 494 (1946)). The probate exception, however, does not apply to "a suit to enforce a claim *in personam* against an executor which will not disrupt the probate court's administration of the estate."*Lamberg v. Callahan,* 455 F.2d 1213, 1216 (2d Cir.1972). As we explained in *Lamberg,*"The standard for determining whether federal jurisdiction may be exercised is whether under state law the dispute would be cognizable only by the probate court. If so, the parties will be relegated to that court; but where the suit merely seeks to enforce a claim *inter partes,* enforceable in a state court of general jurisdiction, federal jurisdiction will be assumed." *Lamberg v. Callahan,* 455 F.2d 1213, 1216 (2d Cir.1972); *see also Ashton,* 918 F.2d at 1071; *Giardina v. Fontana,* 733 F.2d 1047, 1050-51 (2d Cir.1984).

In the present case, none of plaintiff's claims is barred by the probate exception to diversity jurisdiction because none of those claims is within the jurisdiction of the Connecticut Probate Court. FN3 By statute, the subject matter jurisdiction of the Connecticut Probate Court is basically limited to "

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

205 F.3d 1322

Page 4

205 F.3d 1322, 2000 WL 236471 (C.A.2 (N.Y.))
**(Cite as: 205 F.3d 1322)**

matters involving the validity of wills and the settlement of estates."*Dunham v. Dunham,* 528 A.2d 1123, 1136 (Conn.1987); *see* CONN.GEN.STAT. §§ 45-98 and 45-98a; *see also Palmer v. Hartford Nat'l Bank & Trust Co.,* 279 A.2d 726, 733-34 (Conn.1971) ("The court of probate has no common-law jurisdiction. It may only act as authorized by statute."(citations omitted)). Most, if not all, of plaintiff's claims, however, are all "essentially ... common law tort action[s]."*Giardina,* 733 F.2d at 1050. Thus, they are "enforceable in a state court of general jurisdiction,"*Lamberg,* 455 F.2d at 1216, and therefore outside the probate exception to federal diversity jurisdiction.[FN4]

> FN3. In addition, it is hard to imagine how plaintiff's action would "interfere with pending probate proceedings in a state court or with a state court's control of property in its custody,"*Ashton,* 918 F.2d at 1071, since the Probate Court issued a final accounting of the Estate in January 1998-at least 14 months before the District Court dismissed plaintiff's complaint.

To the extent plaintiff seeks to interfere with the final accounting of the Probate Court, her claims would presumably be barred-either under the probate exception or preclusion doctrines. However, plaintiff's claims, even if successful, would not necessarily interfere with the Probate Court's final accounting. If plaintiff prevails on the merits of any of her claims, we are confident that the District Court could tailor plaintiff's relief accordingly.

> FN4. We were unable to determine from the relevant statutes and reported decisions of the Connecticut state courts whether the Connecticut Probate Court would have jurisdiction over plaintiff's claims concerning the alleged *inter vivos* transfers from Dorothy Green to defendants. Nevertheless, we need not, and do not, decide this issue of Connecticut law because the Probate Court in this case itself ruled that it lacked jurisdiction over the relevant claims. During the probate

proceedings, plaintiff introduced evidence that the defendants had received *inter vivos* transfers and moved for an order compelling defendants to "return" these funds to the Estate. Notwithstanding their position here, defendants argued before the Probate Court that any such transfers were outside the jurisdiction of that court. By order dated February 21, 1997, the Probate Court agreed, ruling that "[t]he motion to address funds distributed prior to [Dorothy Green's] death to grandchildren are, with the exception of taxability, outside the jurisdiction of this court and therefore DENIED."*Cf. Giardina,* 733 F.2d at 1053 (reversing a district court's decision to abstain in favor of pending probate proceedings in Florida when the defendant had "successfully argued to the district court that [the plaintiff's] claim fell within the probate exception to diversity jurisdiction and then successfully argued to the Florida probate court that it did not have jurisdiction because the claim was not a probate matter"). To be sure, the Probate Court's order referred only to funds distributed "to grandchildren." But based on defendants' arguments before the Probate Court and the rest of that court's order, it appears that the Probate Court found a lack of jurisdiction over all the alleged *inter vivos* transfers.

For similar reasons, neither res judicata nor collateral estoppel bars plaintiff's claims. Under the doctrine of res judicata, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."*Flaherty v. Lang,* ___ F.3d ___, No. 98-9418, 1999 WL 1259256, at *3 (2d Cir. Dec. 21, 1999) (internal quotation marks omitted). Collateral estoppel, on the other hand, " means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated by the same parties in a future lawsuit."*Id.* (internal quotation marks omitted). If, as in this case, the previous court lacked jurisdiction over the plaintiff's claims-or declined to exercise such jurisdiction-it

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

205 F.3d 1322                                                                                    Page 5

205 F.3d 1322, 2000 WL 236471 (C.A.2 (N.Y.))
**(Cite as: 205 F.3d 1322)**

necessarily follows that neither doctrine applies.[FN5] Thus, notwithstanding the fact that plaintiff raised before the Probate Court some of the claims she asserts now, these claims are not barred by "principles of former adjudication" as the District Court asserted.[FN6]

> FN5. The District Court based its conclusion that plaintiff litigated her claims before the Probate Court on the Probate Court's final order. As the District Court stated (in a section of its opinion preceding the section quoted above):

That plaintiff herein litigated these very same matters before the Probate Court is amply demonstrated by the opening sentences of that Court's final order:

'On December 5, 1997, some two years after the death of the decedent, Dorothy S. Green, and following a countless number of objections, motions and allegations of impropriety by Lisa Green, an heir to the estate (hereinafter referred to as ' 'complainant").....

The Probate Court's final order does not, however, specify the nature of plaintiff's "countless number of objections, motions and allegations of impropriety." Moreover, the mere fact that a party has raised claims in prior litigation does not, by itself, preclude "relitigation" of such claims. Where, as here, it appears that the previous court lacked jurisdiction to consider the claims at issue, "relitigation" is not precluded.

> FN6. To the extent that plaintiff premises any of her claims on the alleged misconduct of defendants' attorney during and before the Probate Court litigation, we agree with the District Court that her claims are barred by "principles of former adjudication." Plaintiff moved for sanctions against defendants' attorney before the Probate Court. The Probate Court denied the motion as "without merit," and took judicial notice that a similar complaint was filed with the Connecticut Bar Grievance Committee and dismissed for lack of probable cause. In any event, none of plaintiff's claims appears to be

based substantially on these allegations.

C. Defamation

**\*4** As noted, the District Court dismissed plaintiff's defamation claims in their entirety on the ground that they are time barred. Plaintiff argues on appeal, as she did before the District Court, that Connecticut's two-year statute of limitations applies. *See* CONN.GEN.STAT. § 52-597. Defendants contend, as they did before the District Court, that New York's one-year statute of limitations applies. *See* N.Y. C.P.L.R. § 215(3) (McKinney 1990). The District Court did not address which state's statute of limitations applies.

We need not, and do not, resolve the question of which state's statute of limitations applies to plaintiff's claims, because under either statute the District Court's ruling was correct in part and wrong in part.[FN7] The complaint asserts claims of defamation premised on acts of the defendants occurring as early as September 1995 and as late as February 1997. Under either statute of limitations, the claims premised on acts prior to November 7, 1995 are time barred, while the claims premised on acts after November 7, 1996 are not time barred. Whether plaintiff's claims premised on acts occurring between November 7, 1995 and November 7, 1996 are time barred depends, of course, on which state's law applies.

> FN7. We note that even if we wanted to decide the question of which state's statute of limitations applies, we could not do so. The answer to the question is governed by New York choice-of-law rules, *see Curley v. AMR Corp.,* 153 F.3d 5, 12 (2d Cir.1998) ("In diversity jurisdiction cases .. . a federal court must look to the choice of law rules of the forum state."), and appears to turn in part on whether plaintiff was a resident of Connecticut, New York, or New Jersey at the time the cause of action accrued. *See* N.Y. C.P.L.R. § 202. That information does not appear to be part of the present record.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

205 F.3d 1322                                                                                      Page 6

205 F.3d 1322, 2000 WL 236471 (C.A.2 (N.Y.))
**(Cite as: 205 F.3d 1322)**

Accordingly, we vacate the District Court's judgment dismissing plaintiff's defamation claims, except insofar as that judgment dismissed claims premised on acts occurring prior to November 7, 1995. On remand, if defendants bring a proper motion to dismiss plaintiff's claims of defamation premised on acts occurring between November 7, 1995 and November 7, 1996, the District Court should undertake to determine whether New York's or Connecticut's statute of limitations applies.[FN8]

FN8. Defendants argue on appeal that they enjoy either an absolute or qualified privilege for their allegedly defamatory statements, under both New York and Connecticut law. We leave it to the District Court on remand to consider this argument.

D. Intentional Infliction of Emotional Harm

Finally, plaintiff argues correctly that the District Court failed to consider her claim of intentional infliction of emotional harm. Although the complaint unambiguously states a claim for intentional infliction of emotional harm, the District Court made no mention of the claim in its two-page opinion. Accordingly, meaningful appellate review is unavailable, and remand is warranted so that the District Court can consider the claim in the first instance.

III.

As noted, defendants raised several other arguments in their motion to dismiss before the District Court. Although we are permitted to affirm the judgment of the District Court "on any ground that finds support in the record," *Salute v. Stratford Greens Garden Apartments,* 136 F.3d 293, 297 (2d Cir.1998), we decline to consider whether these arguments-or any other argument not discussed herein-would justify affirming, for two reasons. First, except as noted otherwise above, defendants have not argued in favor of affirming on other

grounds, so the relevant legal issues have not been briefed. Second, notwithstanding that the parties were on notice that the District Court might convert defendants' motion to dismiss into a motion for summary judgment, the record is relatively undeveloped. The District Court, as the court of first instance, is better equipped to develop the record and to consider first whatever other arguments the parties may raise.

*5 On remand, the District Court should seek to determine with greater specificity what plaintiff is asserting and should develop the record with respect to such claims as necessary. Further, in ruling on any motion, the District Court should provide sufficiently detailed explanations for its conclusions (presumably, although not necessarily, including citations to relevant legal authority) to permit meaningful appellate review.

IV.

Finally, both parties have moved for sanctions. It is well established that this court will only impose sanctions in the "highly unusual" case where a party can make "a clear showing of bad faith" on the part of its adversary. *See, e.g., West Virginia v. Chas. Pfizer & Co.,* 440 F.2d 1079, 1092 (2d Cir.1971). Applying this standard here, we find that neither party has made a sufficient showing to warrant imposing sanctions. This case-essentially a protracted family dispute-has involved many rounds of accusations and counter-accusations. Although we detect much ill will on each side, we conclude that neither party has made a showing, let alone a " clear showing," of the bad faith necessary to warrant imposing sanctions.

V.

For the reasons stated above, the judgment of the District Court is vacated, except insofar as the judgment dismissed plaintiff's claims of defamation

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

205 F.3d 1322                                                                              Page 7

205 F.3d 1322, 2000 WL 236471 (C.A.2 (N.Y.))
**(Cite as: 205 F.3d 1322)**

premised on acts occurring prior to November 7, 1995. In addition, the parties' cross-motions for sanctions are denied. Costs of this appeal are granted to plaintiff, who is directed to file, with proof of service, an itemized and verified bill of costs with the Clerk of the Court within 14 days of the entry of this order. *See*FED.R.APP.P. 39(d)(1).
FN9

       FN9. To the extent that plaintiff or defendants seek costs for the litigation in the District Court, we are without jurisdiction to consider the claim. *See, e.g., Discon, Inc. v. NYNEX Corp.,* 4 F .3d 130, 132 (2d Cir.1993).

C.A.2 (N.Y.),2000.
Green v. Doukas
205 F.3d 1322, 2000 WL 236471 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**8**

Westlaw.

Not Reported in F.Supp.2d                                                      Page 1

Not Reported in F.Supp.2d, 2001 WL 1135620 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Grigsby & Associates, Inc. v. Rice Derivative
Holdings, L.P.
S.D.N.Y.,2001.
Only the Westlaw citation is currently available.
    United States District Court, S.D. New York.
    GRIGSBY & ASSOCIATES, INC. and Calvin B.
            Grigsby, Plaintiffs,
                    v.
    RICE DERIVATIVE HOLDINGS, L.P., et al.,
            Defendants.
        **No. 00 CIV. 5056(RO).**

            Sept. 26, 2001.


            MEMORANDUM AND ORDER

OWEN, District J.
    **\*1** Following the souring of a joint venture,
plaintiffs Grigsby & Associates, Inc., and Calvin B.
Grigsby initiated this action against defendants Rice
Derivative Holdings, L.P., *et al.,* in July 2000 to
compel inspection of books and records, for an
accounting and disgorgement of profits allegedly
owed to plaintiffs, for breach of fiduciary duty,
unjust enrichment and to impose a constructive
trust. Three motions are now before me. First,
defendants move to dismiss, or in the alternative,
for summary judgment. Second, defendants move to
quash non-party subpoenas. Third, plaintiffs move
to compel production of documents by non-party
Clifford Chance Rogers & Wells, LLP. For the
reasons that follow, defendants' motion to dismiss is
granted in part and denied in part, defendants'
motion to quash is granted, and plaintiffs' motion to
compel is denied.

    Plaintiff Grigsby and his company, Grigsby &
Associates, are in the business of underwriting
municipal bonds. Defendant Rice is in the
derivative swap transactions business. In 1993, Rice
and Grigsby entered into a series of transactions

whereby they formed a venture to engage in bond
offerings on behalf of municipalities, and interest
rate swaps in connection with these offerings.
Grigsby provided the necessary contacts for the
bond business, and Rice provided his expertise and
business relationships (developed from his career as
a high-ranking banker at Merrill Lynch and Bankers
Trust) to design, implement and execute the interest
rate swap portion of the business. The venture
involved a complex structure of partnerships and
corporations, and related partnership agreements,
through which Grigsby and Rice would share power
and profits equally.

    The venture did quite well until 1996, when
allegations surfaced that Grigsby had bribed a
public official in connection with obtaining
municipal bond work. The probe resulted in two
federal indictments against Grigsby in 1998:(1) for
bribery of a government official, and (2) for money
laundering, bribery, conspiracy, wire fraud, and
defrauding the Port of Miami funds. Grigsby was
acquitted in 1999.[FN1] Grigsby was also sued by
Dade County for allegedly improper use of $1.6
million of the municipality's money for personal
items. That lawsuit is still pending.

> FN1. Defendants put under oath that
> Grigsby was acquitted on the basis of
> entrapment. Plaintiffs' pleadings do not
> clarify whether this is true-they generally
> seek to downplay the indictment issue. It is
> relevant, however, because publicity about
> the indictment soured the venture.

    It seems that from 1996 on, Grigsby was away
from the venture, the venture was falling apart, and
Rice successfully sought out new business ventures
through which he could continue to be in the
municipal derivative swap business. Grigsby now
claims that Rice has failed and refused to distribute
monies earned by the partnership to Grigsby and
has denied Grigsby access to the books of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                     Page 2

Not Reported in F.Supp.2d, 2001 WL 1135620 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

accounting and financial records of the partnership, and so has brought this action (against Rice personally and against all corporations and partnerships involved in the venture) to compel inspection of books and records, for an accounting and disgorgement of profits, breach of fiduciary duty, unjust enrichment and to impose a constructive trust.

**\*2** Defendants argue for dismissal, or, in the alternative, for summary judgment, of all or part of the complaint, on three grounds. First, they argue that plaintiffs lack standing to bring their claims because the claims must be brought as a derivative suit, not a direct one. Second, they argue that plaintiffs' claim based on breach of fiduciary duty should be dismissed because defendants' conduct was permitted by the terms of the limited partnership agreements (thereby making the unjust enrichment and constructive trust claims insufficient). Third, defendants assert that plaintiffs' claim for documents should be dismissed because it is duplicative and unnecessary, and the claim for an accounting should be dismissed because it is deficient as a matter of law. I address each in turn.

"The distinction between direct and derivative claims depends on both the nature of the wrong alleged and the relief, if any, which could result should plaintiff prevail."*In re Cencom Cable Income Partners, L.P.,* 2000 WL 130629, at *3 (Del. Ch. Jan.27, 2000).[FN2] A direct claim seeks relief for injuries that fall distinctly upon the individual participants in the business association or involve the participants' contractual rights. A derivative claim, on the other hand, states injury against and seeks relief for a business association as a whole. The *Cencom* court visited this issue in depth last year, and noted that determining whether a claim is derivative or direct requires application of a "rather subtle test." More importantly, the court said that "[i]n the partnership context, the relationships among the parties may be so simple and the circumstances so clear-cut that the distinction between direct and derivative claims becomes irrelevant...[so that] superimposing derivative pleading requirements upon claims needlessly delays ultimate substantive resolution and serves no useful or meaningful public policy

purpose."*Id.* at *3. *Cencom* applies to the instant situation, which I find to be adequately and fairly pleaded.

> FN2. With the exception of Grigsby & Associates, a California corporation, all of the corporations and partnerships were formed in Delaware.

The second part of the motion to dismiss alleges that plaintiffs cannot properly allege breach of fiduciary duty because Rice's conduct-namely engaging in directly competitive ventures, and an allegation of stealing customers from the Grigsby/Rice venture for Rice's new ventures-was permitted by the terms of the Limited Partnership Agreements. Plaintiffs argue that the agreement did not permit Rice's conduct, and that regardless of the interpretation placed on these agreements, there is no justification for Rice's alleged failure to distribute earnings of the partnership to plaintiffs. The relevant question for this motion is whether there is more than one possible reading of the Permitted Transactions Clause of the relevant partnership agreement, which reads:

[a]ny Partner or any affiliate of a Partner may engage in or possess an interest in other business ventures of any nature or description, independently or with others, and whether presently existing or hereafter created, and neither the Partnership nor the other Partners shall have any rights in or to such independent ventures or the income or profits derived therefrom. This subsection 2.4.1 sets forth the intention of the parties hereto that any Partner or any affiliate of a Partner may enter into business ventures of any nature or description without first offering such business opportunity to the Partnership or the other Partners...

**\*3** (Rice Decl., Ex. A, § 2.4.1). Defendants argue that there is only one reasonable interpretation of this clause, that Rice was free to engage in ventures that competed directly with the Grigsby/Rice venture. Plaintiffs argue that such a reading is unreasonable and contrary to the purpose and function of the agreement. I believe this language, as written and in the context of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3

Not Reported in F.Supp.2d, 2001 WL 1135620 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

purpose of the agreement, may be subject to more than one reasonable interpretation and is therefore a question of fact that cannot be resolved at the pleadings stage. Accordingly, the claim of breach of fiduciary duty should not be dismissed.

Finally, defendants contend that their production thus far of the relevant books and records makes any further claims for access to documents moot, and that plaintiffs' accounting claim is legally insufficient. Plaintiffs contend that defendants have yet to make a complete production of the relevant records and are attempting to thwart plaintiffs' efforts to obtain such information from third parties (referring to defendants' motion to quash). This is essentially a discovery dispute. Therefore, defendants' motion to dismiss plaintiffs' first and second claims in the complaint, compelling defendants to permit inspection and copying of corporate books and records and for an accounting, is granted.

I now turn to defendants' motion to quash non-party subpoenas. Plaintiffs served subpoenas *duces tecum* on eight non-parties that have done business in some way with the Grigsby/Rice venture. [FN3]Defendants assert that much of the subpoenaed material is not relevant to the claims in this lawsuit and disclosure would reveal defendants' sensitive commercial information, and to the extent the subpoenaed material is relevant, it is duplicative of the document requests to which defendants are already responding and as such impose an undue burden on non-parties. Plaintiffs assert that they are seeking documents necessary to determining the transactions in which the Grigsby/Rice venture has an interest (and therefore the distributions which plaintiffs are allegedly owed), documents setting forth the calculation of the fixed and floating rate payments in these transactions, and documents showing the venture's expenses (to compute partnership profits).

FN3. Clifford Chance, Chase Manhattan, General Reinsurance, Metro-Dade County, Veterans' Land Board, Los Angeles Transit Authority, Sonoma County, and Fort Worth.

The information and types of documents that plaintiffs seek seem to fall into two categories. First, documents concerning swap transactions done with the Grigsby/Rice venture, and second, documents concerning later swaps done with Rice's new venture. The former request is duplicative, as the Grigsby/Rice venture would have adequate records of its own business. The latter request goes to the question of whether this new business violated the Permitted Transactions Clause of the Limited Partnership Agreements. Until that question is resolved, discovery to show that some former Grigsby/Rice clients are now clients or partners in Rice's new venture is premature.

The question of whether Rice has protectable trade secrets is a subset of this dispute. Defendants correctly point out that under Fed.R.Civ.P. 45(c)(3)(B), "if a subpoena requires disclosure of a trade secret...the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena..." and argue that the materials subpoenaed would reveal Rice's proprietary financing technology. Though plaintiffs argue that these are not trade secrets since this information has been made available to municipalities and would be available to the public, most municipalities actually exempt trade secrets and confidential financial information from public disclosure. Should future discovery reach this issue, and it seems likely that it will, the parties should first consider entering into a confidentiality agreement.

*4 A final issue on the subpoenas is plaintiffs' assertion that the motion is time-barred with respect to the subpoenas served on non-parties Dade County, Chase, Gen Re, and Clifford Chance. Rule 45(c) permits a person or party served with a subpoena for the production of documents to serve written objection to the subpoena within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service.[FN4]Yet the only authority in our circuit on this issue, *Concord Boat Corp. v. Brunswick Corp.,* 169 F.R.D. 44 (S.D.N.Y.1996), in which the court granted an untimely motion to quash because the subpoena was overbroad, notes that when the court finds a combination of circumstances such as an overbroad subpoena that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 4

Not Reported in F.Supp.2d, 2001 WL 1135620 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

exceeds the bounds of fair discovery, a non-party acting in good faith, and communication between the parties, overlooking the issue of timeliness is appropriate. Here, the non-party subpoenas contain non-specific, overbroad production requests that would surely amount to truckloads of documents from each non-party witness. Given this, in addition to the aforementioned issues regarding these subpoenas, I find it is appropriate to grant defendants' motion to quash the non-party subpoenas.

> FN4. It seems that in calling the motion to quash untimely, plaintiffs are considering this a form of written objection to the subpoena. It is, of course, a form of written objection, but I am not certain that is the kind of written objection that must be made within the 14 days under Rule 45, and if it is, that does not address the fact that Clifford Chance, Dade County, and perhaps other non-parties did serve timely written objections.

From this determination, it follows that plaintiffs' motion to compel production of documents by non-party Clifford Chance is denied. This motion was filed on the same day as defendants' motion to quash but applies only to non-party Clifford Chance, which represented both plaintiffs and defendants in connection with the formation of the Grigsby/Rice venture, and which served written objections to the subpoena on the day before compliance was due. The arguments are largely the same as those in defendants' motion to quash and therefore do not necessitate separation consideration.[FN5]

> FN5. The only way in which the arguments differ is that Clifford Chance, in its objections to the subpoena, raises the additional ground of ethical issues of confidentiality that come into play when there is pending litigation between former clients. Since I am denying the motion to compel on different grounds, though, I need not reach this issue.

Accordingly, defendants' motion to dismiss claims one and two, for production of documents and for an accounting, is granted, and the motion is denied in all other respects. Defendants' motion to quash non-party subpoenas is granted. Plaintiffs' motion to compel production of documents by non-party Clifford Chance is denied.

So ordered.

S.D.N.Y.,2001.
Grigsby & Associates, Inc. v. Rice Derivative Holdings, L.P.
Not Reported in F.Supp.2d, 2001 WL 1135620 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.