# Exhibit A

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK
------------------------------X

WORLD WRESTLING ENTERTAINMENT, INC.

#_____

Plaintiff,

**04 Civ. 8223 (KMK)**

-against-

**JUDGMENT**

JAKKS PACIFIC, INC., JAKKS PACIFIC (H.K.)
LIMITED, ROAD CHANMPS LIMITED, THQ, INC.,
THQ/JAKKS PACIFIC, L.L.C., THE JOINT VENTURE
OF THE THQ, INC., STANLEY SHENKER AND
ASSOCIATES, INC., STANLEY SHENKER, BELL
LICENSING, L.L.C., JAMES BELL, JACK FRIEDMAN,
STEPHEN BERMAN, JOEL BENNETT, BRIAN
FARRELL, QUANTUM EQUITIES, LLC, FRANK
WHITING,

Defendants.

------------------------------X

Whereas the above entitled action having been assigned to the Honorable Kenneth M.
Karas, U.S.D.J., and the Court thereafter on December 21, 2007 having handed down an Opinion
and Order (Docket # 194) granting Defendants' Motions to Dismiss, and denying Plaintiff's
Motion to Strike as moot, it is,

**ORDERED, ADJUDGED AND DECREED:** that Defendants' Motions to Dismiss
are granted with prejudice and Plaintiff's Motion to Strike is Denied as Moot and the case is
hereby closed.

Dated: White Plains, N.Y.
       December 28, 2007

*J. Michael McMahon*

**Clerk of Court  - J. Michael McMahon**

ENTERED AS A JUDGMENT ON: 1-3-08

I:\JUDGMENT\WWE.223.wpd

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WORLD WRESTLING ENTERTAINMENT, INC.,

                Plaintiff,

     -v-

JAKKS PACIFIC, INC., JAKKS PACIFIC (H.K.)
LTD., ROAD CHAMPS LTD., THQ, INC.,
THQ/JAKKS PACIFIC LLC, STANLEY
SHENKER & ASSOCS., INC., BELL LICENSING,
L.L.C., JACK FRIEDMAN, STEPHEN BERMAN,
JOEL BENNETT, BRIAN FARRELL, STANLEY
SHENKER, AND JAMES BELL,

                Defendants.

Case No. 04-CV-8223 (KMK)

OPINION AND ORDER

---

Appearances:

Jerry Scott McDevitt, Esq.
Amy Lyn Barrette, Esq.
Peter Nicholas Flocos, Esq.
William O. Purcell, Esq.
Curtis B. Krasik, Esq.
Kirkpatrick & Lockhart Preston Gates Ellis, LLP
Pittsburgh, PA
*Counsel for Plaintiff*

Jonathan J. Lerner, Esq.
Maura Barry Grinalds, Esq.
Michael Gruenglas, Esq.
Skadden, Arps, Slate, Meagher & Flom, LLP
New York, NY
Jonathan Honig, Esq.
Feder, Kaszovitz, Isaacson, Weber, Skala, Bass & Rhine LLP
New York, NY
*Counsel for Defendants Jakks Pacific, Inc.,*
*Jakks Pacific (H.K.) Limited, Jack Friedman,*
*Stephen Berman, and Joel Bennett*

Steven A. Marenberg, Esq.
Philip M. Kelly, Esq.
Irell & Manella LLP
Los Angeles, CA
*Counsel for Defendant THQ, Inc.*
*and Brian Farrell*

Richard Schaeffer, Esq.
Bruce Handler, Esq.
Dornbush, Mensch, Mandelstam & Schaeffer, L.L.P.
New York, NY
*Counsel for THQ/Jakks Pacific L.L.C.*

Michael Alan Freeman, Esq.
Greenberg Freeman, L.L.P.
New York, NY
*Counsel for Defendants Stanley Shenker*
*and Stanley Shenker & Assocs., Inc.*

KENNETH M. KARAS, District Judge:

Plaintiff World Wrestling Entertainment, Inc. ("WWE") filed this action against

Defendants Jakks Pacific, Inc. ("Jakks"), Jakks Pacific H.K. Ltd. ("Jakks H.K."), Road Champs,

Ltd. ("Road Champs"), THQ, Inc. ("THQ"), THQ/Jakks Pacific LLC ("the LLC"), Stanley

Shenker & Associates, Inc. ("SSAI"), Bell Licensing, LLC ("Bell Licensing"), Stanley Shenker

("Shenker"), James Bell ("Bell"), Jack Friedman ("Friedman"), Stephen Berman ("Berman"),

Joel Bennett ("Bennett"), and Brian Farrell ("Farrell"). In its first Complaint, Plaintiff alleged

violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§

1962(c), (d), the Robinson-Patman Act, 15 U.S.C. § 13(c), and causes of action under New York

state law for commercial bribery, fraudulent inducement, unjust enrichment, breach of fiduciary

duty, inducement of breach of fiduciary duty, tortious interference with contractual relations, and

conspiracy to engage in each of the above acts. In an Amended Complaint, Plaintiff refined its

factual allegations of wrongdoing by Defendants and also added a Sherman Act cause of action.

2

Plaintiff seeks compensatory, statutory, and punitive damages, a declaration that the licensing agreements entered into or extended as a result of the alleged bribery are void, an accounting of all revenues and profits obtained by Defendants under the licenses, disgorgement and/or restitution for any improper revenues and/or profits obtained under the agreements, disgorgement and/or restitution of any amounts allegedly paid to Defendants as bribes, and attorneys' fees and costs.

Because of the delayed timing of the filing of Plaintiff's Amended Complaint, the Court ordered bifurcated briefing. In the first stage, the Parties briefed three threshold issues raised in Defendants' motions to dismiss the first Complaint, which remained applicable to the Amended Complaint and were potentially dispositive. Those three issues were: (1) whether Plaintiff has sufficiently alleged the existence of a RICO enterprise pursuant to 18 U.S.C. § 1962(c); (2) whether Plaintiff has pled a cause of action under the Robinson-Patman Act, 15 U.S.C. § 13(c); and (3) whether Plaintiff is estopped from pursuing its RICO claim against Defendants Shenker and SSAI because it is duplicative of litigation commenced in Connecticut state court. The Parties also briefed the Plaintiff's Sherman Act claim, which was included for the first time in the Amended Complaint.

On March 31, 2006, the Court issued an Opinion and Order granting in part and denying in part Defendants' motions to dismiss. *See World Wrestling Entm't, Inc. v. Jakks Pacific, Inc.*, 425 F. Supp. 2d 484 (S.D.N.Y. 2006) ("*WWE I*"). The Court granted Defendants' Motion to Dismiss the Robinson-Patman and Sherman Act claims, but denied the Defendants' motions to dismiss for failure to properly plead an enterprise pursuant to § 1962(c), and denied the Shenker Defendants' Motion to Dismiss based on res judicata and abstention principles.

3

Now, in the second stage, all Defendants briefed the remaining issues pertaining to Plaintiff's RICO causes of action against them. For the reasons discussed herein, Defendants' motions to dismiss the RICO causes of action are granted.

## I. Background

For purposes of this Motion, the Court accepts as true the allegations in the Amended Complaint. The salient facts and procedural history are fully discussed in *WWE I*, and familiarity is presumed. *See WWE I*, 425 F. Supp. 2d at 488-93. Further, a detailed recitation of the facts relevant to each issue is discussed below. What follows here is a summary of the basic facts necessary to put Defendants' motions into context.

Plaintiff WWE is principally engaged in the development, promotion, and marketing of television and pay-per-view programming and live arena events related to professional wrestling. (Am. Compl. ¶ 9.) As part of its business, WWE also creates characters whose names and likenesses may be licensed to third parties. (*Id.*) The licenses provide a separate stream of profits for WWE, in the form of royalties, that is a percentage from the sale of the licensed products.

Defendant Jakks principally sells action figures and toys. (*Id.* ¶ 10.) Defendant Jack Friedman is the Chief Executive Officer and Chairman of Jakks. (*Id.* ¶ 13.) He co-founded Jakks with Defendant Berman. (*Id.*) Prior to founding Jakks, Friedman was the CEO of Defendant THQ. (*Id.* ¶ 14.) Jakks and Friedman also own Jakks H.K. and Road Champs, both Hong Kong Corporations. (*Id.* ¶¶ 11-12.) During the times relevant to the Amended Complaint, Defendant Berman was the Executive Vice President of Jakks. (*Id.* ¶ 15.) Berman also served at times as Jakks' President, Secretary, and Chief Operating Officer. (*Id.*)

4

Defendant THQ markets and sells videogames. (*Id.* ¶ 17.) Defendant Farrell is the President, the Chief Executive Officer, and a member of the Board of Directors of THQ. (*Id.* ¶ 18.)

THQ and Jakks formed the LLC as a joint venture on June 10, 1998. (*Id.* ¶ 19.) The LLC was formed in order to be the official licensee for WWE's videogame license. (*Id.*) Defendant Berman was authorized to act on behalf of the joint venture. (*Id.*)

Defendant SSAI served as WWE's licensing agent from approximately April 1995 through June 13, 2000. (*Id.* ¶ 20.) Defendant Shenker is the sole owner and President of SSAI. (*Id.* ¶ 21.)

Defendant Bell is a former WWE executive and is the President and sole owner of Bell Licensing, a limited liability company allegedly formed to launder bribes paid to Bell while he was an executive at WWE. (*Id.* ¶¶ 22-23.) On February 10, 2005, Bell pled guilty in the United States District Court for the District of Connecticut to one count of mail fraud, in violation of 18 U.S.C. § 1342, in connection with his receipt of bribes relating to WWE's licensing program. (*Id.* ¶ 24.) WWE hired Bell to negotiate and procure licenses for its intellectual property. (*Id.* ¶ 30.) From October 1996 to his termination on March 24, 2000, Bell served as WWE's Senior Vice President of Licensing and Merchandising. (*Id.*)

In 1995, Friedman asked Bell and Shenker about obtaining a license on behalf of Jakks to make WWE toys. (*Id.* ¶ 35.) Thereafter, on October 24, 1995, WWE and Jakks entered into a domestic toy license. (*Id.*) Nothing improper is alleged as to this license. However, one month later, in November 1995, Jakks proposed that Shenker act as its agent on a perfumed doll deal that did not involve any WWE licenses. (*Id.* ¶ 42.) On January 3, 1996, Jakks and Shenker

5

entered into an agency agreement for the perfumed doll deal. (*Id.* ¶ 46.) At around the same time, Jakks asked Shenker to act on its behalf to seek an amendment to the domestic toy license it originally obtained in October 1995. (*Id.* ¶ 47.) Shenker never told WWE about its efforts on behalf of Jakks. Approximately three months later, Jakks obtained the first amendment to the domestic toy license, which granted Jakks additional rights under the WWE domestic toy license. (*Id.* ¶ 56.)

Later in 1996, Jakks sought Shenker's assistance in driving Playmates, a competitor in the action figure market, from its WWE license. (*Id.* ¶¶ 57-68.) Using his influence, in January 1997, Shenker recommended that WWE grant Jakks a second amendment to its domestic toy license that conflicted with a license previously granted to Playmates. (*Id.* ¶¶ 67-71.) WWE accepted Shenker's recommendation, and granted Jakks a second amendment to the domestic toy license. In February 1997, WWE also granted Jakks an international toy license. (*Id.* ¶ 71.) Before Bell had been brought into the scheme, Playmates complained to him about WWE's bad faith in allowing competition with its products but to no avail. (*Id.* ¶ 70.) Eventually, Playmates was bought out by WWE. (*Id.* ¶ 83.) Shenker's dual role in these negotiations was never disclosed to WWE. On March 17, 1997, WWE hired SSAI as its exclusive outside licensing agent. (*Id.* ¶ 72.)

By November 1997, Bell was induced to join the bribery/fraud scheme based on Shenker's promises of payments. (*Id.* ¶¶ 81-83.) Shenker delivered on these payments, which are alleged to have been provided by the Jakks Defendants[1], using a variety of covert means. (*Id.*

---

[1] The Jakks Defendants are comprised of Jakks, Jakks H.K., Road Champs, Friedman, Berman, and Bennett.

¶¶ 85-90, 94-99.) With Shenker and Bell in the fold, the Jakks Defendants sought and obtained a third amendment to the domestic toy license in January 1998, granting to Jakks the rights formerly held by Playmates. (*Id.* ¶ 93.)

Beginning in January 1998, Jakks set its sights on the videogame license. (*Id.* ¶ 101.) The license was coming up for renewal and was held at the time by a company known as Acclaim. (*Id.* ¶ 102.) In March 1998, Bell told Acclaim that WWE "would not even listen to any proposal that Acclaim would make for the renewal of its license." (*Id.* ¶ 109.) Not surprisingly, Acclaim "went over Bell's head and complained to senior management at WWE that it was not being permitted to submit a renewal proposal." (*Id.*) WWE told Acclaim that it would be permitted to make such a proposal. (*Id.*) Nonetheless, within a week, Bell, without waiting for Acclaim's proposal, recommended that WWE grant the videogame license to Jakks. (*Id.* ¶ 110.) WWE acted on this recommendation. Soon thereafter, other companies informally expressed an interest in the license. (*Id.* ¶¶ 127-29.) In order to protect the bribery scheme, Shenker and/or Bell concealed the informal proposals from WWE senior management, but advised Jakks of the terms of these other proposals. (*Id.* ¶ 134-35, 145.) One of these other bidders was Defendant THQ.

Jakks thereafter approached THQ with an offer to act as joint venture partners in securing the videogame license. As part of this approach, Defendant Friedman told Defendant Farrell that Jakks was "in control of the videogame license." (*Id.* ¶ 137.) THQ would be required to pay both Jakks and WWE for the license, while also funding and managing the licensed operations. (*Id.* ¶¶ 137, 178-79, 182-85.) According to WWE, THQ accepted the offer because it was in desperate financial straits after the cancellation of one of its most lucrative licenses. (*Id.* ¶¶ 119-

7

25.) In early May 1998, Bell submitted a deal memo recommending that the videogame license

be granted to THQ and Jakks as a joint venture. (*Id.* ¶ 152.) Shortly thereafter, the other

potential bidder (Activision) sent a more formalized version of its earlier informal proposal, but

Bell and Shenker did not forward the Activision proposal to WWE management. (*Id.* ¶ 153.)

Jakks and THQ agreed to form a joint venture, the LLC, on June 10, 1998. (*Id.* ¶ 154.)

Effective that same day, WWE and the LLC executed a videogame licensing agreement, with an

"extraordinary length" of ten years and a five-year right of renewal for the LLC. (*Id.* ¶ 149.)

The terms of the domestic and international toy licenses, which Jakks already had with WWE,

were extended to coincide with the length of the videogame license. (*Id.* ¶ 165.)

On March 24, 2000, WWE terminated Bell's employment for reasons unrelated to the

bribery scheme (which, at the time, WWE did not know about). (*Id.* ¶ 187.) On June 13, 2000,

WWE terminated its contract with SSAI based on a change of business direction. (*Id.* ¶ 189.) In

October 2000, SSAI brought a breach of contract claim against WWE in Connecticut state court,

seeking to be paid commissions on licenses SSAI had allegedly procured for WWE. (*Id.* ¶ 190.)

Through the litigation in Connecticut, WWE discovered the purportedly unlawful scheme,

despite Defendants' alleged attempts to conceal it. (*Id.* ¶¶ 210-12.)

On October 16, 2003, the Connecticut state court dismissed with prejudice SSAI's action

against WWE and entered a default judgment in favor of WWE as a sanction for Shenker's

concealment of critical documents and perjured deposition testimony. (*Id.* ¶ 221.) *See also*

*Stanley Shenker and Assocs., Inc. v. World Wrestling Fed'n Entm't, Inc.*, 844 A.2d 964, 978

(Conn. Super. Ct. 2003). WWE alleges that Defendants continued concealing documents and

giving perjured testimony even after Shenker was sanctioned. (Am. Compl. ¶¶ 228-30, 235,

239.)

From the summer of 1998 until today, Jakks continues to receive royalties from the
various licenses granted to it (or the LLC) by WWE, all as a result of allegedly fraudulent and
corrupt conduct by Defendants. (Am. Compl. ¶¶ 149-64, 173-85, 249(b)(lxvii).)

## II. Discussion

### A. Standard of Review

Defendants seek dismissal of the Amended Complaint under Fed. R. Civ. P. 12(b)(6) on
the grounds that it fails to state a claim. The Supreme Court has recently held that "[w]hile a
complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual
allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'
requires more than labels and conclusions, and a formulaic recitation of the elements of a cause
of action will not do[.]" *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (citations
omitted and second alteration in original). In *Bell Atlantic*, the Supreme Court also abandoned
reliance on the oft-quoted refrain from *Conley v. Gibson* that, "a complaint should not be
dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove
no set of facts in support of his claim which would entitle him to relief[,]" 355 U.S. 41, 45-46
(1957). *Id.* at 1964-69. As the Court explained, a literal application of *Conley*'s "no set of facts"
rationale is improper because "a wholly conclusory statement of claim would survive a motion to
dismiss whenever the pleadings left open the possibility that a plaintiff might later establish
some 'set of [undisclosed] facts' to support recovery." *Bell Atl.*, 127 S. Ct. at 1968. Instead, the
Court emphasized that "[f]actual allegations must be enough to raise a right to relief above the
speculative level[,]" *id.* at 1965 (citation omitted), and "once a claim has been stated adequately,

it may be supported by showing any set of facts consistent with the allegations in the complaint[,]" *id.* at 1969. Plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974; *see also Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) ("After careful consideration of the Court's opinion and the conflicting signals from it that we have identified, we believe the Court is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*."). If Plaintiff "ha[s] not nudged its claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Bell Atl.*, 127 S. Ct. at 1974.

When considering a Rule 12(b)(6) motion, a court must limit itself to facts stated in the complaint, documents attached to the complaint, and documents incorporated into the complaint. *See Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 662 (2d Cir. 1996). The Court will accept as true Plaintiff's allegations, and draw all inferences in Plaintiff's favor. *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993); *Blimpie Int'l, Inc. v. Blimpie of the Keys*, 371 F. Supp. 2d 469, 470-71 (S.D.N.Y. 2005). At this stage, the Court is not concerned with weighing the evidence that would be presented at trial. *See Chosun Int'l, Inc. v. Chrisha Creations, Ltd.*, 413 F.3d 324, 327 (2d Cir. 2005).

### B. Plaintiff's RICO Allegations

The crux of Plaintiff's allegations is that, through a "scheme and artifice to defraud," Defendants "depriv[ed] WWE of the intangible right of honest services from WWE's intellectual property licensing agent [Shenker] and its management supervisor of that licensing agent [Bell], . . . to obtain thereby valuable toy licensing rights and a lucrative videogame license at lower

10

than competitive royalty rates[.]" (Am. Compl. ¶ 1.)  Plaintiff's substantive RICO cause of

action is brought pursuant to 18 U.S.C. § 1962(c).  Under Section 1962(c), it is "unlawful for any

person employed by or associated with any enterprise engaged in, or the activities of which

affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the

conduct of such enterprise's affairs through a pattern of racketeering activity[.]"  *See* 18 U.S.C. §

1962(c).  "To establish a claim for a civil violation of section 1962(c), 'a plaintiff must show that

he was injured by defendants' (1) conduct (2) of an enterprise (3) through a pattern (4) of

racketeering activity.'"  *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229,

242 (2d Cir. 1999) (quoting *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 520 (2d Cir. 1994)).

     "Civil RICO is an unusually potent weapon – the litigation equivalent of a thermonuclear

device." *Bell v. Hubbert*, No. 95-CV-10456, 2007 WL 60513, at *5 (S.D.N.Y. Jan. 8, 2007)

(quoting *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991)) (internal quotation marks

omitted).  "Because the 'mere assertion of a RICO claim . . . has an almost inevitable

stigmatizing effect on those named as defendants, . . . courts should strive to flush out frivolous

RICO allegations at an early stage of the litigation.'" *Katzman v. Victoria's Secret Catalogue*,

167 F.R.D. 649, 655 (S.D.N.Y. 1996) (quoting *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st

Cir. 1990)).  However, while meritless RICO suits should be weeded out, *see Schlaifer Nance &*

*Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997), a RICO plaintiff normally need only

satisfy the general notice pleading requirements, *see Spinale v. United States*, No. 03-CV-1704,

2004 WL 50873, at *5 (S.D.N.Y. Jan. 9, 2004) ("Claims for violations of RICO generally need

only meet the notice pleading requirements of Rule 8(a) of the Federal Rules of Civil

Procedure.").

In *WWE I*, the Court found that Plaintiff has properly alleged a RICO enterprise.

Therefore, the remaining questions are whether Plaintiff has sufficiently alleged that: (i) each

Defendant conducted the alleged enterprise through a pattern of racketeering activity; (ii) the

THQ Defendants[2] and the LLC directly or vicariously participated in the operation or

management of the RICO enterprise; (iii) Plaintiff suffered a cognizable injury as a result of

Defendants' alleged RICO violations; (iv) Plaintiff's RICO allegations are timely; (v)

Defendants engaged in a conspiracy to violate RICO; and (vi) the 2004 Release does not bar

Plaintiff's RICO claims against the Jakks Defendants, (*see* Decl. of Jonathan J. Lerner, Ex. B

("Lerner Decl.")).

"RICO defines 'racketeering activity' to include a host of criminal offenses, which are in

turn defined by federal and state law." *Cofacredit*, 187 F.3d at 242 (citing 18 U.S.C. § 1961(1)).

Here, Plaintiff charges Defendants with committing mail fraud under 18 U.S.C. § 1341, wire

fraud under 18 U.S.C. § 1343, money laundering under 18 U.S.C. §§ 1956, 1957, as well as

violating the Travel Act, 18 U.S.C. § 1952, the National Stolen Property Act, 18 U.S.C. §§ 2314,

2315, and New York Penal Law § 180.03, which proscribes commercial bribery. (Am. Compl. ¶

247.)

C. Pattern of Racketeering Activity

To plead a pattern of racketeering activity, the RICO statute requires that – at a minimum

– a complaint set forth two predicate acts occurring within ten years of each other. *See* 18

U.S.C. § 1961(5); *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 238 (1989). A RICO plaintiff

must show that *each* defendant participated in the RICO enterprise by engaging in at least two

---

[2]The THQ Defendants are comprised of THQ and Farrell.

12

predicate acts. *See Hoatson v. N.Y. Archdiocese,* No. 05-CV-10467, 2007 WL 431098, at *4

(S.D.N.Y. Feb. 8, 2007) ("A complaint alleging RICO violations based on mail or wire fraud

must allege that the defendant participated in at least two acts of mail or wire fraud."); *USA*

*Certified Merchs., LLC v. Koebel*, 262 F. Supp. 2d 319, 332 (S.D.N.Y. 2003). The Supreme

Court has held that "to prove a pattern of racketeering activity a plaintiff or prosecutor must

show that the racketeering predicates are related, and that they amount to or pose a threat of

continued criminal activity." *H.J. Inc.*, 492 U.S. at 239. The Second Circuit has described the

pattern requirement as involving "multiple racketeering predicates – which can be part of a

single 'scheme' – that are related and that amount to, or threaten the likelihood of, continued

criminal activity[.]" *United States v. Reifler*, 446 F.3d 65, 91 (2d Cir. 2006) (quoting *United*

*States v. Coiro*, 922 F.2d 1008, 1016 (2d Cir. 1991)) (internal quotation marks omitted).

    "When seeking to satisfy the continuity requirement, a plaintiff must show that the

defendants' activities were 'neither isolated or sporadic.'" *SKS Constructors, Inc. v. Drinkwine*,

458 F. Supp. 2d 68, 77 (E.D.N.Y. 2006) (quoting *GICC Capital Corp. v. Tech. Fin. Group, Inc.*,

67 F.3d 463, 467 (2d Cir. 1995)). "The continuity necessary to prove a pattern can be either

'closed-ended continuity,' or 'open-ended continuity.'" *Cofacredit*, 187 F.3d at 242. "In

determining whether continuity exists the court should not limit its consideration to the duration

of the scheme, but should also look at the overall context in which the acts took place." *Pier*

*Connection, Inc. v. Lakhani*, 907 F. Supp. 72, 75 (S.D.N.Y. 1995) (quoting *Deem v. Lockheed*

*Corp.*, No. 87-CV-7017, 1991 WL 196171, at *9 (S.D.N.Y. Sept. 25, 1991) (internal quotation

marks omitted). At the pleading stage, the hurdle is relatively low. *See Procter & Gamble Co.*

*v. Big Apple Indus. Bldgs., Inc.*, 879 F.2d 10, 18 (2d Cir. 1989) ("Whether defendants' actions

are continuing in nature or isolated or sporadic will be the subject of proof at trial.").

### 1. Closed-End Continuity

"A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *H.J. Inc.*, 492 U.S. at 242. "Predicate acts are 'related' when they 'have the same or similar purposes, results, participants, victims, methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Weizmann Inst. of Sci. v. Neschis*, 421 F. Supp. 2d 654, 688 (S.D.N.Y. 2005) (quoting *H.J. Inc.*, 492 U.S. at 240) (finding predicate acts unrelated where the only connection was that they involved the same parties); *accord Jacobson v. Cooper*, 882 F.2d 717, 720 (2d Cir. 1989) (finding separate acts related where they involved the same alleged purpose, victim, and effect). "Although closed-ended continuity is primarily a temporal concept, other factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists." *Cofacredit*, 187 F.3d at 242. Since the Supreme Court's 1989 decision in *H.J. Inc.*, however, the Second Circuit "has never found a closed-ended pattern where the predicate acts spanned fewer than two years." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 181 (2d Cir. 2004); *see also DeFalco v. Bernas*, 244 F.3d 286, 321-22 (2d Cir. 2001) (declining to find closed-ended continuity where plaintiff alleged predicates committed over a period of less than a year and a half); *Fresh Meadows Food Servs., LLC v. RB 175 Corp.*, No. 04-CV-4767, 2006 WL 2728935, at *6 (E.D.N.Y. Sept. 25, 2006) ("The Second Circuit generally requires a showing that the alleged racketeering activity lasted for over two years.").

Where, as here, a RICO plaintiff alleges mail or wire fraud, the plaintiff "must prove that the defendants engaged in '(i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of the mail or wires.'" *USA Certified Merchs.*, 262 F. Supp. 2d at 332 (citing *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000)). "The predicate mail or wire communications need not themselves contain fraudulent communications," but they must be material to a scheme that has a fraudulent and deceptive purpose. *See id.* at 332 (citing *Schmuck v. United States*, 489 U.S. 705, 711 (1989)). "Allegations of mail and wire fraud must . . . be pled with particularity in accordance with Rule 9(b)." *M'Baye v. N.J. Sports Prod., Inc.*, No. 06-CV-3439, 2007 WL 431881, at *7 (S.D.N.Y. Feb. 7, 2007); *see also Hoatson,* 2007 WL 431098, at *4 (noting that mail and wire fraud RICO predicates "must meet the rigorous pleading requirements of Federal Rule of Civil Procedure 9(b)"). "Thus, if plaintiff claims that the mail or wire transmissions 'were themselves fraudulent, i.e., themselves contained false or misleading information, the complaint should specify the fraud involved, identify the parties responsible for the fraud, and where and when the fraud occurred.'" *M'Baye*, 2007 WL 431881, at *7 (quoting *Evercrete Corp. v. H-Cap Ltd.*, 429 F. Supp. 2d 612, 624 (S.D.N.Y. 2006)). "If, however, the plaintiff claims that the mail or wire fraud was only used in furtherance of a scheme to defraud, then the complaint does not have to be as specific with respect to each allegation of mail or wire fraud, so long as the RICO scheme is sufficiently pled to give notice to the defendants." *Id.*

Plaintiff alleges that Defendants committed numerous racketeering acts with the purpose of depriving WWE of the honest services of one or both of its licensing agents – Defendants Shenker/SSAI and Bell – in order to procure valuable licensing rights, and then Defendants covered up their scheme. These allegations can be broken down into five categories:  (i) initial

15

efforts by the Jakks Defendants to corrupt Shenker and SSAI, conduct that allegedly took place

between November 1995 and November 1997, all to procure toy licenses from WWE and all

before the purported corruption of Bell; (ii) conduct by the Jakks Defendants and Shenker/SSAI

to corruptly use Bell to procure additional WWE toy licenses between November 1997 and June

1998; (iii) efforts by the Jakks Defendants, the THQ Defendants, the LLC, Shenker, SSAI, and

Bell to corruptly procure the license for WWE videogames, conduct that spans from January

1998 through August 1998, just after the LLC obtained the videogame license from WWE and

when some Jakks Defendants are alleged to have arranged for bribery payments; (iv)

surreptitious payments from Shenker/SSAI to Bell from January 1998 until December 2001, and

royalty payments, which arose from various licenses, paid to Jakks Defendants by the THQ

Defendants and the LLC from 1999 until at least January 2005 and beyond; and (v) efforts by

Shenker, Bell, and some of the THQ and Jakks Defendants, after Bell's termination from WWE

in March 2000 and the termination of the WWE/SSAI contract in June 2000, to conceal their

purportedly corrupt activities, all of which occurred between October 2000, when SSAI initiated

a lawsuit against WWE in Connecticut, and July 2004.

      Turning to the first category of alleged misconduct, which the Jakks Defendants have

described as the "front end" of the alleged RICO scheme, Plaintiff claims that the scheme began

after Jakks secured the domestic toy license from WWE on October 24, 1995 ("the domestic toy

license"). (Am. Compl. ¶ 35.) The initial acquisition of the domestic toy license is not alleged

to have been the result of any self-dealing by or corruption of Shenker/SSAI. Indeed, as

described in the Amended Complaint, the license was granted after Jakks made an approach to

Shenker and Bell at a toy convention and merely asked if it could obtain such a license. (*Id.*)

Thereafter, according to Plaintiff, Bell and Shenker presented a "deal memo" to WWE, which resulted in WWE agreeing to grant the license to Jakks. (*Id.*) The absence of any illicit conduct in connection with the domestic toy license is highlighted by the subsequent allegation in the Amended Complaint that "after the domestic toy license was entered into [between WWE and Jakks,]" Jakks "devised a plan to corrupt Shenker by trading on Shenker's lack of ethics and greed." (*Id.* ¶ 37.)

The first step in this corruption plan, according to Plaintiff, was for Jakks to engage Shenker/SSAI to represent its interests in connection with a perfumed doll deal that did not involve any WWE licensing rights. (*Id.* ¶ 42.) These discussions began in November 1995, just one month after Jakks obtained the domestic toy license, and took place at the same time that SSAI was acting as one of WWE's nonexclusive outside licensing agents. (*Id.* ¶¶ 38-40, 42.) According to Plaintiff, Defendant Berman linked the perfumed doll deal with Jakks' interest in using Shenker/SSAI to procure additional licensing rights from WWE. (*Id.* ¶ 42.) On January 3, 1996, Jakks and Shenker entered into an agency agreement for the perfumed doll deal. (*Id.* ¶ 44.) In the cover letter transmitting the contract, Jakks is alleged to have asked Shenker how soon he could get an amended domestic toy license from WWE. (*Id.*) On February 12, 1996, Jakks paid Shenker an advance of $2500 for the perfumed doll deal. (*Id.* ¶¶ 46, 48.)

According to the Amended Complaint, just two days after Jakks advanced the $2500 to SSAI for its work on the perfumed doll deal, Jakks officials discussed their desire to retain SSAI to act as Jakks' agent in obtaining additional WWE licensing rights. (*Id.* ¶ 49.) This allegedly was done against the advice of outside legal counsel for Jakks, who supposedly told Jakks that it would be a conflict of interest for SSAI to simultaneously represent WWE and Jakks in

17

connection with WWE's licenses and that no such arrangement could be made without notice to WWE. (*Id.* ¶ 50.) That notice apparently was never given. (*Id.* ¶ 51.) Three months later, SSAI recommended to WWE that it grant Jakks the additional licensing rights sought by Jakks in the domestic toy deal. (*Id.* ¶ 56.) According to Plaintiff, "Shenker made no attempt to negotiate better terms for WWE and recommended the additional rights be given to Jakks on the terms offered by Jakks and without determining if competitors of Jakks would pay more for the rights." (*Id.*)[3] Further, the Amended Complaint alleges that Jakks used its relationship with Shenker/SSAI to obtain a second amendment to the domestic toy license in January 1997 and an international toy license in February 1997. (*Id.* ¶¶ 62-67, 71.)

SSAI became WWE's exclusive outside licensing agent on March 7, 1997, whereby SSAI would earn a portion of the royalties paid to WWE stemming from licenses SSAI procured. (*Id.* ¶¶ 72, 77) Thereafter, Jakks' alleged scheme evolved and grew when Shenker approached Bell in or around November 1997 to bring him into the scheme. (*Id.* ¶¶ 80-82.) This begins the second category of conduct. During this time, the Jakks Defendants allegedly made a series of bribery payments to Shenker, some of which Shenker subsequently shared with Bell. (*Id.* ¶¶ 84-97.) According to Plaintiff, these payments resulted in a third amendment to the domestic toy license that Jakks originally procured in 1995. The third amendment was granted in January 1998, and it gave Jakks the rights to certain action figures. (*Id.* ¶¶ 93, 249(a)(xiv).)

At the same time it was pursuing amendments to the WWE toy licenses in 1997 and early 1998, Jakks was pursuing the lucrative videogame license. (*Id.* ¶ 104.) This is the third category

---

[3]This transaction was the first amendment to the domestic toy license that Jakks had negotiated in 1995.

18

of racketeering conduct. When the illicit arrangement was threatened with exposure in April

1998, as a result of competition by THQ and Acitivision for the videogame license, Jakks

allegedly secured THQ's agreement not to submit an independent bid. (*Id.* ¶¶ 136-38.) Instead,

on June 10, 1998, Jakks and THQ furtively formed the LLC, which obtained the videogame

license from WWE as of that day. (*Id.* ¶ 154.) At the same time, Jakks secured an extension of

its domestic and international toy licenses, which were coterminous with the videogame license.

(*Id.* ¶ 165.)

Plaintiff's Amended Complaint alleges that the scheme extended at least until January

2005 (when the Amended Complaint was presumably drafted) and lives on to this day because

Jakks, THQ, and the LLC continue to share the proceeds from the allegedly fraudulently

obtained videogame license. (*Id.* ¶¶ 149-64, 173-85, 249(b)(lxvii).) Plaintiff also claims

Shenker/SSAI made covert payments to Bell until December 2001. (*Id.* ¶ 249(b)(xxvi).) Both of

these series of payments, according to Plaintiff, qualify as money laundering predicates, and

collectively comprise the fourth category of racketeering acts.[4] The fifth category involves

allegations that the Jakks Defendants, Shenker, and Bell concealed their fraudulent activities

from late 2000 until at least 2004, all in connection with litigation between SSAI and WWE in

Connecticut. (*Id.* ¶¶ 186-241.) Thus, from Plaintiff's vantage point, Defendants' pattern of

racketeering activity began in late 1995 and continues until this day.

Defendants argue that the alleged scheme could not have started in 1995 because Bell did

not receive his first bribe until January 1998. (Mem. of Law in Supp. of the Jakks Defs.' Mot. to

---

[4]Plaintiff also alleges that the Shenker/SSAI/Bell payments were made in violation of the
National Stolen Property Act, 18 U.S.C. §§ 2314, 2315.

Dismiss the Am. Compl. 8 ("Jakks. Mem.").) According to Defendants, the alleged efforts by

the Jakks Defendants to deprive WWE of the honest services of Shenker and SSAI prior to the

corruption of Bell are of no import because Bell was the gatekeeper for the licensing process.

(*Id.* at 9.) Without Bell's corrupt influence, according to Defendants, all the bribery in the world

of Shenker and SSAI would be worthless as Bell was the WWE official responsible for

recommending to WWE which licenses to grant. For example, the Jakks Defendants argue that

the 1995 perfumed doll deal did not involve any racketeering acts and that even if it did, the deal

was unrelated to the later bribery scheme involving Shenker and Bell. Thus, in the view of the

Jakks Defendants, the alleged RICO scheme could not have begun until January 1998, when Bell

allegedly was first brought into the scheme.[5]

Defendants also challenge the two categories that make up the back end of the scheme.

They argue that mere royalty payments on the licensing agreements, even if those agreements

were fraudulently obtained, collectively do not constitute money laundering and, therefore, are

not racketeering acts as a matter of law. Similarly, Defendants claim that any false statements

given during the Connecticut litigation between WWE and Shenker/SSAI are not racketeering

acts, as they were not intended to cover up an on-going scheme, but instead were made years

after the alleged scheme had been completed and after Bell and Shenker no longer worked for or

_____

[5]Defendants argue that Bell's involvement did not begin until he received his first bribe in January 1998. There is support for this claim in the Amended Complaint which, citing Bell's guilty plea to mail fraud, in violation of 18 U.S.C. § 1341, alleges that Bell's involvement began "in or before January 1998." (Am. Compl. ¶ 24.) However, the Amended Complaint also alleges that even before he received his first bribe, Bell agreed to be a part of Jakks' corrupt effort to obtain WWE licenses, (*id.* ¶ 82), and that as part of that plan, in November 1997, Bell sought to buy off Playmates, a competitor of Jakks for certain toy licenses, (*id.* ¶ 83). Solely for the purpose of deciding the instant motion, the Court finds that the November 1997 date is the appropriate starting point for the second category of alleged misconduct.

on behalf of WWE. Thus, from Defendants' standpoint, the alleged RICO scheme lasted at most

from January 1998 (when Bell purportedly was brought into the scheme) to June 1998 (when the

videogame license was granted to the LLC), far less than the two years normally required in the

Second Circuit. For reasons that are explained below, Defendants are correct in their objections

to the two back-end categories of alleged racketeering acts. Thus, to survive, Plaintiff must

prevail in its claims regarding the first, front-end category of conduct.

Plaintiff insists that although allegedly having Bell in Defendants' pocket made it easier

for the Jakks Defendants to obtain the licensing rights they sought, the corruption of Bell was

only part of a scheme that involved broader efforts to persuade Shenker/SSAI to corruptly

represent Jakks' interests in obtaining WWE licenses. According to Plaintiff, as one of WWE's

nonexclusive licensing agents, SSAI had a duty to avoid self-dealing, or at least to disclose its

self-dealing. Thus, in Plaintiff's view, when Shenker agreed to have SSAI represent Jakks in the

perfumed doll deal while he was being pitched to represent Jakks in its efforts to obtain

additional WWE licenses, he breached his duty of loyalty to WWE. And, according to Plaintiff,

Jakks' deliberate effort to tie the payments on the perfumed doll deal to its efforts to procure,

through SSAI, the additional WWE licenses was a fraud aimed at depriving WWE of the honest

services of its agent. In Plaintiff's view, the self-dealing was even more problematic when SSAI

agreed to become Jakks' agent in all future deals with WWE without notice to WWE.

In *United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003), the Second Circuit confirmed

that a scheme or artifice to defraud under 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud)

includes a scheme or artifice to deprive another of the intangible right of honest services under

18 U.S.C. § 1346. 354 F.3d at 134. According to the Second Circuit:

21

> [T]he term "scheme or artifice to deprive another of the intangible
> right to honest services" in section 1346, when applied to private
> actors, means a scheme or artifice to use the mails or wires to
> enable an officer or employee of a private entity (or a person in a
> relationship that gives rise to a duty of loyalty comparable to that
> owed by employees to employers) purporting to act for and in the
> interests of his or her employer (or of the other person to whom the
> duty of loyalty is owed) secretly to act in his or her or the
> defendant's own interests instead, accompanied by a material
> misrepresentation made or omission of information disclosed to
> the employer or other person.

*Id.* at 141-42. The en banc Court further noted that a "scheme or artifice to defraud" in private-

sector honest services cases falls into two categories – bribes/kickbacks and self-dealing. *Id.* at

139. "In the bribery or kickback cases, a defendant who has or seeks some sort of business

relationship or transaction with the victim secretly pays the victim's employee (or causes such a

payment to be made) in exchange for favored treatment." *Id.* "In the self-dealing cases, the

defendant typically causes his or her employer to do business with a corporation or other

enterprise in which the defendant has a secret interest, undisclosed to the employer." *Id.* at 140.

The difference between the two is that in the bribery/kickback case, "the undisclosed bribery

itself is sufficient to make out the crime, but in self-dealing cases, the existence of a conflict of

interest alone is not sufficient to do so." *Id.* at 141. Instead, the self-dealing is actionable only

if the defendant's actions "cause, or [are] at least capable of causing, some detriment – perhaps

some economic or pecuniary detriment – to the employer." *Id.*[6]

---

[6]Defendants dismiss Plaintiff's citation to *Rybicki* as a "red herring," claiming that
*Rybicki* "concerned whether the statute extending the mail and wire fraud statutes to cover
honest services fraud was unconstitutionally vague." (Reply Mem. of Law in Further Supp. of
the Jakks Defs.' Mot. to Dismiss the Am. Compl. 4 ("Jakks Reply Mem.").) Defendants are
correct that the question in *Rybicki* was whether Section 1346 was unconstitutionally vague.
But, in rejecting the vagueness claim, the Second Circuit construed Section 1346 to cover
certain, well-defined misconduct, the description of which in that opinion provided guidance as

Therefore, in order to show that a mail or wire fraud has occurred under Section 1346, a plaintiff must demonstrate at least that there was: "(1) a scheme or artifice to defraud; (2) for the purpose of knowingly and intentionally depriving another of the intangible right of honest services as thus defined; (3) where the misrepresentations (or omissions) made by the defendants are material in that they have the natural tendency to influence or are capable of influencing the employer to change its behavior; and (4) use of the mails or wires in furtherance of the scheme." *Id.* at 147. In self-dealing cases, "there may also be a requirement of proof that the conflict caused, or at least was capable of causing, some detriment" to the entity to which the defendant owed a duty of loyalty on par with what an employee owes an employer. *Id.* at 142.

In light of *Rybicki*, one pertinent question here is whether, at the time of the perfumed doll deal, SSAI was in a relationship with WWE such that SSAI owed WWE a duty of loyalty comparable to what an employee owes an employer. The Amended Complaint is stingy with the details regarding the relationship between WWE and SSAI from April 1995 to March 1997.

---

to the elements of a violation of that mail fraud statute. Thus, for example, the majority in *Rybicki* noted that its holding meant that a panel's decision in *United States v. Handakas*, 286 F.3d 92 (2d Cir. 2002), an earlier case declaring Section 1346 unconstitutionally vague, was neutered because, under the construction of Section 1346 adopted in *Rybicki*, it was "clear that the defendant's conduct in that case was not within the scope of behavior proscribed by section 1346[.]" *Rybicki*, 354 F.3d at 144.

It also bears noting that in rejecting the vagueness challenge in *Rybicki*, the Second Circuit held that it was proper to consider cases that pre-dated both the enactment of section 1346, and the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350 (1987), in which the Court held that the mail fraud statute (18 U.S.C. § 1341) did not criminalize schemes "designed to deprive individuals, the people, or the government of intangible rights, such as the right to have public officials perform their duties honestly[.]" *See Rybicki*, 354 F.3d at 134 (citing *McNally*, 483 U.S. at 358). "Under *McNally*, all schemes or artifices to defraud relating to intangible rights[,]" such as "honest services," were "beyond the mail-fraud proscriptions." *Id.*

According to the Amended Complaint, WWE retained SSAI as a "nonexclusive outside licensing agent" in or around 1995. (Am. Compl. ¶ 32.) As a nonexclusive licensing agent, SSAI was able to "procure and negotiate licensing contracts[,]" which would then be reviewed by Bell and others at WWE. (*Id.* ¶ 32.) While the Amended Complaint alleges that "[d]uring the course of their relationship with WWE, SSAI and Bell both entered into agreements with WWE reflecting and acknowledging their fiduciary roles and unique positions of trust," it is clear that there is no allegation regarding the execution of any such agreement by SSAI until March 1997, when SSAI signed a contract making it the "exclusive outside licensing agent" for WWE. (*Id.* ¶¶ 33, 72.) This is in contrast to Bell, who in March 1995 executed a Code of Conduct Agreement, wherein he agreed, among other things, that he would not accept fees in connection with any transaction on behalf of WWE.

It is curious that the Amended Complaint provides no specifics about the contract between WWE and SSAI in April 1995. In fact, there is no allegation that there even was a written contract between WWE and SSAI. Nonetheless, it is clear that while SSAI had no power to bind WWE to any licensing agreement, it was authorized to negotiate licensing agreements that it would present to WWE. WWE reviewed and had to approve all licensing deals that SSAI, or any of its other licensing agents, proposed to WWE. Even when SSAI became WWE's exclusive licensing agent in March 1997, the contract did not grant SSAI "any right to accept licensing proposals or to execute particular agreements on behalf of WWE." (*Id.* ¶ 75.) Rather, SSAI "was to present all licensing proposals it procured and negotiated in deal memo format to Bell, who in turn would recommend to WWE whether to accept the proposal." (*Id.*) SSAI only received payments for those deals that were executed by WWE.

Notwithstanding the lack of specific allegations about the contractual relationship between WWE and SSAI, the Amended Complaint avers that SSAI owed a fiduciary duty to WWE. A "fiduciary duty arises when one has reposed trust or confidence in the integrity or fidelity or another who thereby gains a resulting superiority of influence over the first, or when one assumes control and responsibility over another." *Tex. Liquids Holdings, LLC v. Key Bank Nat'l Ass'n*, No. 05-CV-5070, 2007 WL 950136, at *2 (S.D.N.Y. Mar. 27, 2007) (quoting *Reuben H. Donnelly Corp. v. Mark I Mktg. Corp.*, 893 F. Supp. 285, 289 (S.D.N.Y. 1995)) (applying New York law); *accord United States v. Chestman*, 947 F.2d 551, 568 (2d Cir. 1991) (noting that a fiduciary relationship "exists when confidence is reposed on one side and there is resulting superiority and influence on the other"). In general, a "fiduciary relationship involves discretionary authority and dependency[,]" and involves "reliance, and de facto control and dominance." *Chestman*, 947 F.2d at 568-69. "Attorney/client or doctor/patient relationships 'are sufficiently rooted in trust and confidence to trigger super-contractual fiduciary duties.'" *Ross v. FSG PrivatAir Inc.*, No. 03-CV-7292, 2004 WL 1837366, at *5 (S.D.N.Y. Aug. 17, 2004) (quoting *Reuben H. Donnelly Corp.*, 893 F. Supp. at 289); *see also Wilson-Rich v. Don Aux Assocs., Inc.*, 524 F. Supp. 1226, 1234 (S.D.N.Y. 1981) ("Examples of fiduciary relationships include the relationships between trustee and beneficiary, guardian and ward, agent and principal, and attorney and client.").

"[F]iduciary relationships typically do not arise between parties engaging in arms length business transactions[.]" *Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 274 (S.D.N.Y. 2006); *see also Tex. Liquids Holdings*, 2007 WL 950136, at *2 (noting that a conventional business relationship normally does not create a fiduciary relationship); *Ross*, 2004 WL

25

1837366, at *5 (same). In fact, where a contract governs the relationship between two

commercial parties, the assumption is that there is no fiduciary relationship unless the contract

provides otherwise. *See Calvin Klein Trademark Trust v. Wachner*, 123 F. Supp. 2d 731, 733-

34 (S.D.N.Y. 2000). Instead, "where the parties' contract forms both the foundation and

boundary of their relationship, fiduciary responsibilities have not attached." *Ross*, 2004 WL

1837366, at *6. This is not to say that parties in contract are never in a fiduciary relationship,

*see Fyrdman & Co. v. Credit Suisse First Boston Corp.*, 708 N.Y.S.2d 77, 79 (App. Div. 2000),

but the fact that a plaintiff and defendant "'worked together' is insufficient to establish a

relationship of a 'mutual and confidential nature.'" *Argent Elec., Inc. v. Cooper Lighting, Inc.*,

No. 03-CV-9794, 2005 WL 2105591, at *9 (S.D.N.Y. Aug. 31, 2005); *see also United States v.

Cassese*, 273 F. Supp. 2d 481, 486 (S.D.N.Y. 2003) (noting fiduciary duty did not exist where

parties were "arms-length business partners"). In fact, even a "slightly dominant business

position does not operate to turn a formal contractual relationship into a confidential or

fiduciary relationship." *Better Benefits, Inc. v. Protective Life Ins. Co.*, No. 03-CV-2820, 2004

WL 633730, at *3 (S.D.N.Y. Mar. 30, 2004) (internal quotation marks omitted).

     The Court fully recognizes that the existence of a fiduciary relationship "normally

depends on the facts of a particular relationship, [and] therefore a claim alleging the existence

of a fiduciary duty usually is not subject to dismissal under Rule 12(b)(6)." *Abercrombie*, 438

F. Supp. 2d at 274. However, the Court is not required to credit mere legal conclusions that are

dressed up as factual allegations that a defendant was in a fiduciary relationship with a plaintiff.

*See Ross*, 2004 WL 1837366, at *1 n.2 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

For example, "the dispositive issue of fiduciary-like duty or no such duty is determined not by

the nomenclature 'finder' or 'broker' or even 'agent,' but instead by the services agreed to under the contract between the parties." *Ne. Gen. Corp. v. Wellington Adver., Inc.*, 624 N.E.2d 129, 132 (N.Y. 1993). "Moreover, the elements of a breach of fiduciary duty based in fraud must be plead with particularity." *Abercrombie*, 438 F. Supp. 2d at 274. Therefore, "[i]n order to survive a motion to dismiss a claim for breach of fiduciary duty, the plaintiff must set forth specific facts constituting the alleged relationship with sufficient particularity to enable the court to determine whether, if true, such facts could give rise to a fiduciary relationship." *Diamond Phoenix Corp. v. Small*, No. 05-CV-79, 2005 WL 1530264, at * 6 (D. Me. June 28, 2005). Finally, even allegations that a plaintiff relied on a defendant's expertise in a particular field are insufficient by themselves to survive dismissal. *See Boley v. Pineloch Assocs., Ltd.*, 700 F. Supp. 673, 681 (S.D.N.Y. 1988); *Mechigian v. Art Capital Corp.*, 612 F. Supp. 1421, 1431 (S.D.N.Y. 1985).

Ultimately, the Amended Complaint fails to allege that SSAI was empowered to act on behalf of WWE, or otherwise dominated or controlled WWE between April 1995 and February 1997. In fact, even after SSAI became WWE's exclusive licensing agent, it was never empowered to bind WWE to a licensing agreement. Instead, between April 1995 and February 1997, SSAI was merely among those businesses with which WWE contracted to find potential licensees and to propose to WWE the terms of a potential agreement between that licensee and WWE.[7] If a deal proposed by SSAI was not in WWE's best interests to execute, WWE was

---

[7] This is not to say that beginning in March 1997, after SSAI contractually agreed to be WWE's *exclusive* licensing agent, a fiduciary relationship was not born. *See Vill. on Canon v. Bankers Trust Co.*, 920 F. Supp. 520, 532 (S.D.N.Y. 1996) ("It is true that an exclusive agency gives rise to a fiduciary duty between principal and agent under New York law.").

under no obligation to accept it. Indeed, according to the Amended Complaint, the market for

these licenses was intensely competitive, (Am. Compl. ¶ 52), so any conflict of interest that

allegedly caused SSAI's proposal to be less lucrative presumably would lead WWE to reject it.

While SSAI and each of the other nonexclusive agents no doubt had an implicit duty to exercise

good faith toward WWE, the contractual relationship described in the Amended Complaint is

not alleged to include provisions that suggest the existence of a fiduciary relationship. *See Vill.

on Canon*, 920 F. Supp. at 533 (granting motion to dismiss, court noted: "Bankers Trust had no

authority to commit VOC to any proposal or to negotiate on VOC's behalf, as the terms of the

agreement make clear. Bankers Trust could only evaluate the proposals and make

recommendations. For these services Bankers Trust would earn a fee based on a percentage of

the value of a deal struck with the investor." (internal citations omitted)); *Ne. Gen. Corp.*, 624

N.E.2d at 132 ("We note . . . that while agents in New York are bound to exercise the utmost

good faith toward their principals, the plaintiff finder in this case was also not an agent in the

actual or functional meaning of that term and relationship. This finder had no explicit or

implied power to bind Wellington. This finder did not have the power to negotiate the

transaction. This finder did not have the power to do anything except find and introduce

prospects[.]"). Thus, if WWE wanted to sue SSAI for breach of the implied duty of good faith,

in addition to for breach of any of the explicit terms of the contract, perhaps it could do so.

However, if WWE wanted to make SSAI its fiduciary in 1995, it could have negotiated and paid

for that degree of loyalty, as it arguably did in a subsequent contract in March 1997. *See Ne.

Gen. Corp.*, 624 N.E.2d at 132 ("If Wellington wanted fiduciary-like relationships or

responsibilities, it could have bargained for and specified for them in the contract."). Having

28

failed to strike that bargain in 1995, the Court, sympathetic as WWE's plight may be, finds that

the Amended Complaint does not contain allegations sufficient to state a claim that a fiduciary

relationship existed between SSAI and WWE. *See id.* ("This Court may sense a sympathetic

impulse to balance what it may view as the equities of a situation such as this. The hard judicial

obligation, however, is to be intellectually disciplined against that tug. Instead, courts must

focus on the precise law function reposed in them in such circumstances, which is to construe

and enforce the meaning and thrust of the contract of the parties, not to purify their efforts.").

Jakks argues that the absence of a fiduciary relationship between WWE and SSAI

between 1995 and 1997 prevents Plaintiff from nudging its case across the goal line. If this

case had been filed outside the Second Circuit, Jakks might be right. For example, the Tenth

Circuit has noted that the Section 1346 "right to honest services is not violated by every breach

of contract, breach of duty, conflict of interest, or misstatement made in the course of dealing."

*United States v. Welch*, 327 F.3d 1081, 1107 (10th Cir. 2003); *see also United States v.*

*Cochran*, 109 F.3d 660, 667 (10th Cir. 1997) ("[I]t would give us great pause if a right to honest

services is violated by every breach of contract or every misstatement made in the course of

dealing."). The Eleventh Circuit has held that "a private sector violation of § 1346 honest

services fraud involves a breach of fiduciary duty and reasonably foreseeable economic harm."

*United States v. Devegter*, 198 F.3d 1324, 1330 (11th Cir. 1999); *see also United States v.*

*Bradley*, 428 F. Supp. 2d 1365, 1368 (S.D. Ga. 2006) ("This Court simply finds no case

upholding a § 1346 intangible right charge in which the alleged 'fiduciary relationship' arises

from an arm's length transaction between two sophisticated parties, where the party allegedly

owing the duty was *not* an employee or agent of the victim and performed *no services* for the

victim.").

The Second Circuit, however, has not yet adopted the same view. If anything, strong currents run against Defendants' position on this point. Five years before the Second Circuit's en banc decision in *Rybicki*, a panel of the Circuit held in *United States v. Sancho* that Section 1346 "does not require the existence of a fiduciary relationship" and therefore upheld the conviction of a defendant who sought to bribe an undercover agent posing as a consultant to another company. *See* 157 F.3d 918, 921 (2d Cir. 1998). *Sancho*, however, earned a red flag for its rejection of the use of pre-*McNally* caselaw to construe Section 1346. In *Rybicki*, the Court rejected "that *dictum* in *Sancho*," and held that it was proper to consider pre-*McNally* caselaw in determining the contours of Section 1346. 354 F.3d at 144.[8]

Neither *Rybicki* nor its treatment of *Sancho*, however, should be viewed as embracing Defendants' view that Section 1346 applies only where there is a breach of fiduciary duty. This point is made evident by a concurrence in *Rybicki*, and the majority's reaction to that concurrence. In her opinion concurring in the judgment, Judge Raggi observed that, "[w]hile a particular relationship may shed light on whether one person owes another honest services, the language of § 1346 indicates that the critical factor is the type of service at issue, not the relationship of the parties." *Rybicki*, 354 F.3d at 155 (Raggi, J., concurring in judgment) (citing *Sancho*, 157 F.3d at 921). In Judge Raggi's view:

> [A] future case may require us to consider whether there is any principled reason
> to distinguish between an employee and an arms-length contractor when they
> engage in identical fraud schemes with the specific intent to deprive a victim of

---

[8] In a footnote, the *Rybicki* majority observed that the dissent "insist[ed] that the statement in *Sancho* that we address was not a dictum. If so, to that extent, *Sancho* is overruled." *Rybicki*, 354 F.3d at 144 n.19.

services whose value depends upon honest performance – for example, providing
a due diligence report, a compliance certification, or an environmental
assessment.

*Id.* Judge Raggi therefore elected not to join in the majority's decision to re-affirm the Second

Circuit's decision in *Handakas* to the extent it could be "interpreted to foreclose the prosecution

of a contractor for fraudulently depriving a person of . . . honest services." *Id.*

Judge Sack, writing for the *Rybicki* majority, limited his comment about *Handakas* to

stating that the defendant in that case "was not an employee of a private entity purporting to act

for and in the interests of his or her employer; neither was he rendering services in which the

relationship between him and the person to whom the service was rendered gave rise to a duty

of loyalty comparable to that owed by employees to employers." *Id.* at 144. Thus, "only . . .

because of the nature of the services to be rendered in *Handakas,* [did] an intangible right to

honest services . . . not arise out of the contract at issue in that case." *Id.* In a footnote, Judge

Sack observed that the majority did "not consider the application of section 1346 to the

contractual situations discussed by Judge Raggi in her concurrence." *Id.* at 144 n.18. In the

wake of *Rybicki,* therefore, Section 1346 may well protect the right of honest services derived

from certain arms-length contracts, even if neither party to such a contract owes a fiduciary duty

to the other party. As long as it can be said that the services rendered by one party to the other

under the contract give "rise to a duty of loyalty comparable to that owed by employees to

employers," then Section 1346 may apply. *See id.* at 144.

Applying *Rybicki* to this case, the Court concludes that Plaintiff has made sufficient

allegations to state a claim that, as of April 1995, SSAI owed Plaintiff a right of honest services

under Section 1346. Even though WWE did not make SSAI its exclusive licensing agent until

31

March 1997, it did employ SSAI to negotiate licensing agreements that would maximize WWE's profit. In this capacity, SSAI performed a role similar to that of Bell, who was an employee of WWE. *See* RESTATEMENT (THIRD) OF AGENCY § 8.03 (2006) ("An agent has a duty not to deal with the principal as or on behalf of an adverse party in a transaction connected with the agency relationship."). Both were to negotiate and propose to WWE potential licensing deals. While Bell was bound by the terms of his employment contract not to accept fees or payment from any potential licensees, it cannot be said at this stage that SSAI did not owe WWE a similar duty, either to refuse payment by a prospective licensee or to report to WWE the acceptance of any such payments. Moreover, while Plaintiff alleges that economic harm resulted from the corruption of SSAI's honest services (more on that below), it is enough to say at this stage of the case that WWE has sufficiently alleged that there was at least the potential for some economic harm as result of SSAI's double-dealing. *See United States v. Gotti*, 459 F.3d 296, 331 (2d Cir. 2006) ("[I]t is clear that the defendants' commission of this conduct was at least *capable* of causing some detriment (economic and otherwise) to the [allegedly-defrauded labor union] members."); *United States v. Vinyard*, 266 F.3d 320, 329 (4th Cir. 2001) ("[T]he reasonably foreseeable harm test is met whenever, at the time of the fraud[ulent] scheme, the employee could foresee that the scheme potentially might be detrimental to the employer's economic well-being."); *United States v. Coffey*, 361 F. Supp. 2d 102, 117 (E.D.N.Y. 2005) ("Corrupting the process by which this [bond underwriting] recommendation was made poses a reasonably foreseeable risk of economic harm to [the bond issuer] because *the best underwriter might not be recommended.*" (emphasis added)). Thus, the bottom line is that WWE has sufficiently alleged a scheme to deprive it of the honest services of

32

SSAI as far back as November 1995, when the Jakks Defendants allegedly adopted a scheme to

tie the payments on the perfumed doll deal to its efforts to retain SSAI as its agent in future

license deals with WWE.

The Jakks Defendants further claim, however, that even if this first category of conduct

(encompassing the time between November 1995, the date of the perfumed doll deal, and

November 1997, the period during which Bell allegedly joined the corruption scheme)

constituted a scheme to deprive WWE of the honest services of its brokers, the conduct

involving the perfumed doll deal is insufficiently related to other allegedly unlawful acts to

constitute a pattern of racketeering activity.  "Relatedness may be established by proof of

'criminal acts that have the same or similar purposes, results, participants, victims, or methods

of commission, or otherwise are interrelated by distinguishing characteristics and are not

isolated events.'"  *Lavian v. Haghnazari*, 884 F. Supp. 670, 682 (E.D.N.Y. 1995) (quoting *H.J.

Inc.*, 492 U.S. at 240); *see also City of New York v. Pollock*, No. 03-CV-0253, 2006 WL

522462, at *9 (S.D.N.Y. Mar. 3, 2006) (stating "relatedness is established by the similarity in

methods, purposes, participants, results, and victims").  To be related, the alleged predicate acts

must be connected, even if indirectly, to each other, as well as to the purported enterprise.  *See

United States v. Locascio*, 6 F.3d 924, 943 (2d Cir. 1993).  The "interrelationship between acts,

suggesting the existence of a pattern, may be established in a number of ways.  These include

proof of their temporal proximity, or common goals, or similarity of methods, or repetitions."

*United States v. Indelicato*, 865 F.2d 1370, 1382 (2d Cir. 1989); *see also Azrielli v. Cohen Law

Offices*, 21 F.3d 512, 520 (2d Cir. 1994).

Defendants contend that the perfumed doll deal is unrelated because it predates Bell's

involvement in the alleged scheme by two years and does not involve the Jakks Defendants'

efforts to procure WWE licenses. The first claim is irrelevant; the second is inaccurate, at least

under the facts assumed at this stage of the case. As noted, Plaintiff has adequately alleged that

the Jakks Defendants deprived WWE of the honest services of SSAI/Shenker, and that their

efforts predated the corruption of Bell. While the allegedly sordid cooption of Bell may have

significantly improved the chances that the scheme to illegally obtain the WWE licenses would

succeed, the alleged conduct antedating Bell's involvement is enough to support the claim that

the Jakks Defendants contravened Section 1346. This includes the alleged actions of the Jakks

Defendants to convince SSAI to act on their behalf in obtaining WWE licenses, even though

SSAI had contracted to represent WWE's interests. One of the ways the Jakks Defendants

allegedly sought to entice SSAI to represent their interests was to provide SSAI an advance on

the perfumed doll deal at the same time that they expressed their desire to have SSAI help them

obtain certain other WWE licenses. Thus, the perfumed doll deal smells of a RICO violation

precisely because, as alleged, the Jakks Defendants themselves linked that deal to their efforts

to corruptly persuade SSAI/Shenker that it was in their financial interests to act on the Jakks

Defendants' behalf in procuring the WWE licenses without informing WWE of that

relationship. More particularly, the perfumed doll deal properly is deemed a racketeering act

because it involved the same or similar purposes, results, participants, victims, and methods as

the rest of the alleged scheme, all of which purportedly amounted to an effort to corrupt WWE's

agents and thereby to procure the lucrative licenses. It is true, of course, that the scheme had

not been fully developed, either in terms of participants or results, but, as alleged, it adequately

marks the starting point of the efforts by the core members of the alleged enterprise to obtain

34

those licenses. *See Procter & Gamble Co.*, 879 F.2d at 19 (holding complaint to sufficiently allege racketeering where predicate acts "had the same purpose, that is, fleecing the same victims . . . and employing similar unlawful methods of commission").

The Jakks Defendants further attack the adequacy of the front-end allegations by stating that Plaintiff has improperly recast a single, narrow scheme into a pattern of racketeering. It is true, as the Jakks Defendants note, that the temporal life of an alleged pattern of racketeering is only one factor in assessing the validity of a RICO claim. The continuity requirement also imposes on a RICO plaintiff the obligation of alleging more than a scheme with a "single, narrow purpose" that is "directed toward[] a single victim." *Lefkowitz v. Bank of N.Y.*, No. 01-CV-6252, 2003 WL 22480049, at *8 (S.D.N.Y. Oct. 31, 2003), *rev'd in part on other grounds*, No. 04-CV-0435, 2007 WL 1839756 (2d Cir. June 28, 2007); *see also Stein v. N.Y. Stair Cushion Co.*, No. 04-CV-4741, 2006 WL 319300, at *8 (E.D.N.Y. Feb. 10, 2006) (finding inadequate a complaint where plaintiff alleged "a pattern involving a single scheme of narrow scope, including one victim and a limited number of related participants" (footnote omitted)). However, while the courts may look somewhat suspiciously on RICO schemes directed at one victim, the courts have allowed complaints alleging multiple economic injuries to the same victim to survive. *See, e.g., Sathianathan v. Smith Barney, Inc.*, No. 04-CV-7122, 2007 WL 576097, at *3 (S.D.N.Y. Feb. 21, 2007) ("For a single-victim RICO claim to survive, . . . a plaintiff must allege a pattern of separate economic injuries."); *State Wide Photocopy, Inc. v. Tokai Fin. Servs., Inc.*, 909 F. Supp. 137, 140-41 (S.D.N.Y. 1995) ("While, generally, plaintiff was the only victim of the alleged scheme, defendants' repeated, related and continuous acts during the course of four years formed a RICO pattern."); *accord Uniroyal Goodrich Tire Co.*

*v. Mut. Trading Corp.*, 63 F.3d 516, 523-24 (7th Cir. 1995) (noting RICO complaint was proper where predicate acts related to different economic harms to single victim). Moreover, the Second Circuit has expressly noted that Congress did not intend "to exclude from the reach of RICO multiple acts of racketeering simply because . . . they further but a single scheme." *Indelicato*, 865 F.2d at 1383; *see also Procter & Gamble Co.*, 879 F.2d at 16 ("We have explicitly eschewed any multiple scheme or episode requirement to demonstrate the continuity of the pattern of racketeering activity."). This line of authority, however, does not permit a plaintiff to claim cumulative injuries from a single transaction or contract. *See Schlaifer Nance*, 119 F.3d at 97-98 (affirming dismissal of RICO claim that involved a single contract); *Ray Larsen Assocs. v. Nikko Am., Inc.*, No. 89-CV-2809, 1996 WL 442799, at *9 (S.D.N.Y. Aug. 6, 1996) (finding inadequate an allegation of RICO scheme that "involves only one group of perpetrators . . . who directed their acts toward one victim . . . with the singular goal of defrauding [the victim] out of commissions due under a single distribution contract").

In this case, Plaintiff's Amended Complaint alleges racketeering acts that involve several different contracts – the domestic toy license, the international toy license, and the videogame license – each of which, according to Plaintiff, resulted in cognizable injury. As alleged, Plaintiff's claim is that there were separate, albeit related, efforts to procure these different licenses between November 1995 and June 1998. Thus, Defendants fail in their valiant efforts to recast Plaintiff's Amended Complaint as involving only a single scheme that involves one victim suffering from cumulative injuries. *See Uniroyal*, 63 F.3d at 524 ("Taken in a light most favorable to Uniroyal, proven at trial were the existence of at least four separate schemes all of which were designed to swindle money from Uniroyal and all of which utilized

36

the mails and wires to further their ends."); *Panix Promotions, Ltd. v. Lewis*, No. 01-CV-2709, 2002 WL 72932, at *7 (S.D.N.Y. Jan. 17, 2002) (finding closed-ended continuity where allegations involved "a series of frauds, involving numerous fight contracts").

Further, Plaintiff's allegations establish that, beginning in 1996, the victim, purpose, and methods of commission of the scheme were the same, and the alleged front-end racketeering acts were not isolated. *See Jacobson v. Cooper*, 882 F.2d 717, 720 (2d Cir. 1989) (noting that complaint adequately pled a pattern where the alleged racketeering acts related to a scheme to harm single victim); *Procter & Gamble*, 879 F.2d at 16-17 (same). Without repeating all of the allegations described above, the Court finds that the racketeering acts extend from November 1995, when the Jakks Defendants first linked the perfumed doll deal to SSAI's assistance in Jakks obtaining additional WWE licenses, and continued until August 3, 1998, when Jakks made its last bribery payment to Shenker and Bell. (Am. Compl. ¶ 168.) Thus, Plaintiff barely clears the hurdle, but grazes it on the way down, as Plaintiff's other allegations do not suffice to extend the scheme beyond August 3, 1998.

The back-end of the alleged racketeering acts includes the fourth and fifth categories of conduct described above. The fourth category involves two types of financial transactions: (i) the collection of royalty payments on the licenses involving the LLC, the THQ Defendants, and the Jakks Defendants; and (ii) the secret payments from Shenker/SSAI to Bell until December 2001. Plaintiff claims that each type of payment is an example of money laundering. (*Id.* ¶ 249(b); Pl.'s Mem. of Law. in Opp'n to Defs.' Mots. to Dismiss 18 ("Pl.'s Opp'n").) In particular, Plaintiff asserts that the racketeering acts continue to this day because the LLC still pays royalties to Jakks each quarter. (Am. Compl. ¶ 252.) The fifth category involves the

37

alleged efforts by Bell and Shenker, well after they were terminated by WWE, to conceal the bribery scheme through perjury and other false statements during the Connecticut state court litigation.

As to the Shenker/SSAI/Bell payments, there can be little dispute that Plaintiff's allegations properly state racketeering acts and thus extend each of Shenker's, SSAI's, and Bell's involvement in the enterprise until December 2001. Simply put, to state a money laundering violation under 18 U.S.C. § 1956(a)(1)(B)(i), a plaintiff need only allege that there are proceeds from specified unlawful activity, known by the accused defendant, and that the defendant conducted or attempted to conduct a financial transaction knowing the transaction was intended to conceal or disguise the nature or source of the funds. *See United States v. Szur*, 289 F.3d 200, 213 (2d Cir. 2002). Here, Plaintiff, tracking the language of Section 1956, explicitly alleges that the various payments from Shenker/SSAI to Bell between January 1998 and December 2001 were the proceeds of specified unlawful conduct and were designed to hide the source of the funds. As alleged, these claims survive. *See Leung v. Law*, 387 F. Supp. 2d 105, 119-20 (E.D.N.Y. 2005) (denying motion to dismiss where plaintiff's complaint tracked language of money laundering statute and holding that plaintiff need not plead money laundering "with any degree of heightened particularity").

While Plaintiff's allegations regarding the Shenker/SSAI/Bell payments extend their racketeering acts until December 2001 (only as to those defendants), the claims regarding the royalty payments fail as a matter of law to extend the predicate acts. Though money laundering is a racketeering act, *see* 18 U.S.C. § 1961(1)(B), Plaintiff's claim that the THQ Defendants, the LLC and the Jakks Defendants engaged in money laundering is wanting. Behind Plaintiff's

38

conclusory claims of money laundering is the simple allegation that, in the years following its

acquisition of the WWE videogame license, Jakks was paid millions of dollars in royalties on

the license. (Am. Compl. ¶ 184.) However, "[o]nce an allegedly fraudulent transaction is

complete, a plaintiff may not rely on the defendants' retention or use of his assets to establish

open-ended continuity." *Plater-Zyberk v. Abraham*, No. 97-CV-3322, 1998 WL 67545, at *10

(E.D. Pa. Feb. 17, 1998). In the instant case, there was nothing illegal about selling videogames

or paying (or receiving) royalties pursuant to a contract. Nor is there a plausible allegation that

these royalty payments were intended to conceal or disguise the supposedly corrupt means

Defendants used to procure the videogame license. Indeed, WWE knew what payments the

licensees would be entitled to under the licensing agreement, even if it did not know the precise

split of the proceeds among the joint venture parties. Therefore, the post-bribery royalty

payments from the LLC to Jakks do not constitute predicate acts and cannot extend the pattern

of racketeering activity. *See Vemco, Inc. v. Camardella*, 23 F.3d 129, 134 (6th Cir. 1994)

("[Defendant's] conduct in sending out billing notices from 1991 through 1992 pursuant to an

allegedly fraudulent contract cannot be cited by plaintiffs to extend the duration of the

fraudulent scheme."); *Pier Connection, Inc. v. Lakhani*, 907 F. Supp. 72, 76 (S.D.N.Y. 1995)

(noting that "continuing to reap . . . benefits [from wire fraud] is not itself a predicate act; it is

only an effect of the alleged acts of wire fraud"); *Gotham Print, Inc. v. Am. Speedy Printing

Ctrs., Inc.*, 863 F. Supp. 447, 460 (E.D. Mich. 1994) ("When the Supreme Court spoke of the

threat of repetition, it was referring to the threat of repeated *victimization* . . . , not merely the

retention of the ill-gotten fruits of previous crimes."). "Plaintiff's interpretation . . . would

permit any plaintiff once defrauded to state a RICO claim if the defendants continued to derive

39

a benefit from the property they obtained." *Plater-Zyberk*, 1998 WL 67545, at *10; *see also*

*Bingham v. Zolt*, 683 F. Supp. 965, 970 (S.D.N.Y. 1988) ("To say that [defendants'] continuing

control of the music companies constituted ongoing criminal activity would allow plaintiffs to

turn every finite scheme – or at least those involving economic crimes – into an enterprise

simply by characterizing the defendant's subsequent enjoyment of the proceeds of the scheme

as continuous criminal activity.").[9] Thus, the pattern of racketeering acts for the THQ

Defendants, the LLC, and the Jakks Defendants ends in August 1998, just after the LLC is

formed and the videogame license is granted.

    As an additional argument for extending the racketeering acts into this decade, Plaintiff

cites concealment by Shenker, Bell, the Jakks Defendants, and the THQ Defendants in

connection with the civil litigation in Connecticut state court. (Am. Compl. ¶ 195.)

Specifically, Plaintiff alleges that these defendants destroyed evidence of the bribery, provided

---

[9]After this motion was fully submitted, Shenker pled guilty to a federal charge of
conspiracy to transport money obtained by fraud in interstate commerce and wire fraud. (Letter
of Jerry S. McDevitt, Esq. to the Ct., January 30, 2007.) Combined with Bell's earlier guilty
plea, Plaintiff argues that it has conclusively established a conspiracy to deny Plaintiff of the
honest services of Bell and Shenker, that this conspiracy involved money laundering through at
least July 2002, and that this conspiracy involved bribes. (*Id.*) Pivoting from there, Plaintiff
contends both that these defendants are estopped from challenging the civil action issues decided
by these guilty pleas, and that, because these pleas establish a conspiracy to deny WWE the
honest services of its agents, Plaintiff needs little more to establish the remaining defendants'
participation in the conspiracy. (*Id.*)
    This argument is unpersuasive. First, Shenker and Bell did not plead guilty to either a
substantive RICO charge or a RICO conspiracy charge. Second, neither defendant's plea makes
any mention of the allegedly culpable conduct of the Jakks or the THQ defendants (or the LLC).
In fact, neither plea mentions any illegal conduct before 1998, such as the perfumed doll deal or
the earlier toy licenses granted to Jakks. Instead, the plea only reflects an illegal arrangement
between Bell and Shenker, and the improper sharing of Shenker's commissions with Bell. Thus,
the plea, while compelling evidence against Bell and Shenker of the conduct they have admitted
to engaging in, does nothing to extend the life of the racketeering acts as to the remaining
defendants.