perjured testimony, made false statements to auditors, and concealed documents. (*Id.* ¶¶ 191-239.) These allegations, however, fail as a matter of law to extend the pattern of racketeering acts. It is true that acts of concealment may sometimes constitute a predicate act for the purposes of RICO. *See United States v. Coiro*, 922 F.2d 1008, 1017 (2d Cir. 1991) ("[T]he evidence established that . . . [the defendant's] activities designed to prevent detection and prosecution of the organization's illegal activities were part of a consistent pattern that was likely to continue for the indefinite future, absent outside intervention."). The alleged coverup here, however, does not qualify because it post-dates – by a couple of years – the underlying and completed bribery scheme. It is a cardinal rule of criminal law that "acts of concealment may have significance in lengthening the life of a criminal conspiracy only when these acts are done in furtherance of the main criminal objectives of the conspiracy – such as when the conspirators in a kidnaping conspiracy hide while waiting for the delivery of ransom." *United States v. Eppolito*, 436 F. Supp. 2d 532, 573 (E.D.N.Y. 2006) (internal quotation marks omitted); *see also Grunewald v. United States*, 353 U.S. 391, 405-06 (1957) (noting that post-crime concealment "indicate[s] nothing more than that the conspirators do not wish to be apprehended – a concomitant, certainly, of every crime since Cain attempted to conceal the murder of Abel from the Lord").

Here, some defendants allegedly lied to Plaintiff and withheld documents to cover up an already-completed scheme. In fact, these acts were allegedly done long after Bell and Shenker were terminated in 2000, for reasons unrelated to their alleged criminal conduct at issue in this case. Because no bribery activities were alleged to be ongoing by 2000, any alleged coverup could not have been intended or designed to further the still-alive scheme, but instead only to

cover up past misconduct. Therefore, the alleged obstruction, perjury and false statements in

2000 and beyond – shocking as they may be – do not extend the pattern of racketeering activity.

*See Ray Larsen Assocs.*, 1996 WL 442799, at *7 n.8 ("Plaintiff also alleges acts of obstruction

of justice during the pendency of this lawsuit as predicate acts for the RICO scheme. These

allegations must be excluded because efforts by a defendant to cover up the underlying conduct

are inadequate to satisfy the continuity requirement of the RICO statute."); *Barsam v. Pure*

*Tech Int'l, Inc.*, 864 F. Supp. 1440, 1450 (S.D.N.Y. 1994) *vacated in aid of settlement*, 907 F.

Supp. 79 (S.D.N.Y. 1995) ("In 'closed-ended' allegations of RICO violations . . . efforts at

covering up the initial fraudulent act are inadequate to satisfy the continuity requirement of the

RICO statute."); *Phil. Reserve Supply Co. v. Nowalk & Assocs., Inc.*, No. 91-CV-0449, 1992

WL 210590, at *6 (E.D. Pa. Aug. 25, 1992) ("Attempting to hide one's involvement in a

scheme after . . . it has been exposed in order to limit liability should not be confused with

concealing the scheme itself in furtherance of its perpetration. While the [latter] may be a

predicate act within the meaning of RICO the former is not.").[10]

Accordingly, as to the Jakks Defendants, Shenker, and SSAI, the scheme began in

November 1995, when the Jakks Defendants proposed to Shenker, at the time he was paid for

the perfumed doll deal, that Shenker serve as Jakks' agent in procuring the WWE toy license.

---

[10]Additionally, Shenker's perjury in the Connecticut action does not constitute a predicate act. *See* 18 U.S.C. § 1961(1); *United States v. Eisen*, 974 F.2d 246, 254 (2d Cir. 1992) ("Congress did not wish to permit instances of federal or state court perjury as such to constitute a pattern of RICO racketeering acts."); *Rand v. Anaconda-Ericsson, Inc.*, 623 F. Supp. 176, 182 (E.D.N.Y. 1985) ("Perjury, however, is not a RICO predicate act."), *aff'd*, 794 F.2d 843 (2d Cir. 1986).

(Am. Compl. ¶ 42.) For Bell, the scheme began in November 1997, and for the THQ

Defendants and the LLC, it began in April 1998. As discussed above, neither the coverup nor

the continued royalty payments constitute predicate acts in furtherance of the scheme, but the

Shenker/SSAI payments to Bell do qualify as money laundering/stolen property predicates.

Thus, for the Jakks Defendants, the scheme lasted slightly less than three years, ending with the

last bribery payment allegedly from them on August 3, 1998. For Shenker and SSAI, the

pattern of racketeering conduct lasted for more than six years, from November 1995 until

December 2001, while for Bell, the racketeering conduct extended from November 1997 until

December 2001. For the LLC and the THQ Defendants, however, the racketeering conduct

lasted approximately four months (at most). Therefore, the Second Circuit's two-year temporal

guideline is met as to Shenker, SSAI, Bell, and the Jakks Defendants. *See Lavian v.*

*Haghnazari*, 884 F. Supp. 670, 683 (E.D.N.Y. 1995) (finding closed-ended continuity where

pattern of racketeering activity extended over twenty-nine months).

      The Amended Complaint's failure to allege legally-sufficient racketeering acts lasting

for more than four months by the THQ Defendants and the LLC is fatal to Plaintiff's efforts to

keep them in the substantive RICO cause of action under Section 1962(c) on a claim of closed-

ended continuity. "The focus of section 1962(c) is on the individual patterns of racketeering

activity engaged in by a defendant, rather than on the collective activities of the members of the

enterprise." *Jerome M. Sobel & Co. v. Fleck*, No. 03-CV-1041, 2003 WL 22839799, at *6

(S.D.N.Y. Dec. 1, 2003) (quoting *United States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987))

(internal quotation marks omitted). Thus, "the requirements of section 1962(c) must be

established as to each defendant." *DeFalco*, 244 F.3d at 322 n.22; *see also First Capital Asset*

*Mgmt.*, 385 F.3d at 180 ("In analyzing the issue of continuity, assuming arguendo that the alleged predicate acts constituting the pattern were adequately pled, we evaluate the RICO allegations with respect to each defendant individually."); *Jones v. Nat'l Commc'n and Surveillance Networks*, 409 F. Supp. 2d 456, 473 (S.D.N.Y. 2006) ("The duration, frequency, and substance of the purported racketeering activity are measured independently for each individual defendant."). "Accordingly, regardless of the point in time at which [P]laintiff[] allege[s] the overall [bribery scheme] began, to determine whether [P]laintiff[] satisfied the requisite period of closed-ended continuity for the [THQ Defendants and the LLC], the duration of the pattern of racketeering activity must be measured by the RICO predicate acts that" Plaintiff has sufficiently alleged. *DeFalco*, 244 F.3d at 322 n.22.

The THQ Defendants allegedly joined the RICO enterprise in or shortly after April 1998, when they agreed to submit a joint bid with the Jakks Defendants for the videogame license. (Am. Compl. ¶ 137.) The LLC joined no earlier than April 1998, and arguably not until June 10, 1998, upon its incorporation in Delaware. (*Id.* ¶ 154.) On August 3, 1998, the last bribe payment was allegedly made in connection with the videogame license. (*Id.* ¶ 168.) And, for reasons explained above, because the royalty payments derived from the videogame license do not qualify as racketeering acts, there is no basis to conclude that the pattern of racketeering activity for either the THQ Defendants or the LLC lasted for more than a few months. Accordingly, their Motion to Dismiss the cause of action under Section 1962(c) should be granted, unless Plaintiff has alleged open-ended continuity as to these defendants. *See Cofacredit*, 187 F.3d at 244 (holding that allegations of a pattern of racketeering activity spanning less than a year reflected "a period of insufficient length to demonstrate closed-ended

44

continuity under our precedents").

The temporal analysis, however, does not end the story for the remaining defendants, as "the court [also] must examine the overall context in which the acts took place." *Pier Connection, Inc.*, 907 F. Supp. at 78 (internal quotation marks omitted). This includes consideration of factors such as, "the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes[.]" *Cofacredit*, 187 F.3d at 242. Defendants argue that Plaintiff cannot satisfy the continuity requirement because there was only one scheme directed at one narrow goal and one victim. However, as already noted, the Second Circuit has "rejected any need to allege multiple schemes." *Procter & Gamble Co.*, 879 F.2d at 18; *see also USA Certified Merchs.*, 262 F. Supp. 2d at 338-39 (finding plaintiffs sufficiently alleged that defendants engaged in scheme to deprive them of the honest services of their agents). Plaintiff also need not allege that there were multiple victims to satisfy continuity. *See Lavian*, 884 F. Supp. at 684; *Metro. Transp. Auth. v. Contini*, No. 04-CV-0104, 2005 WL 1565524, at *2-3 (E.D.N.Y. July 6, 2005) (finding irrelevant the fact that there was only one victim and a one-year scheme where there were many acts of fraud threatening to continue into the future); *Panix Promotions, Ltd.*, 2002 WL 72932, at *7 (finding continuity established where scheme involved one victim but several contracts). Here, as discussed above, Defendants' goal of obtaining the various licenses from WWE, as alleged by Plaintiff, was finite but not overly narrow. Specifically, Plaintiff alleges multiple economic harms related to the various licenses, so the fact that there is only one victim is not dispositive. Therefore, Plaintiff has sufficiently pled closed-ended continuity as to the Jakks Defendants, Shenker, SSAI, and Bell.

45

### 2.  Open-Ended Continuity

A party alleging open-ended continuity must show that "the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future [or] . . . are part of an ongoing entity's regular way of doing business." *H.J. Inc.*, 492 U.S. at 242. "[W]hether or not the plaintiff has shown open-ended continuity, the nature of the RICO enterprise and of the predicate acts are relevant." *DeFalco*, 244 F.3d at 323.  For example, "an inherently unlawful act performed at the behest of an enterprise whose business is racketeering activity would automatically give rise to the requisite threat of continuity." *GICC Capital Corp.*, 67 F.3d at 466 (finding no open-ended continuity where scheme was inherently terminable once all assets had been looted) (citation omitted); *accord H.J. Inc.*, 492 U.S. at 242-43 ("[T]he threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes."). But, "where the enterprise primarily conducts a legitimate business, there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." *Cofacredit*, 187 F.3d at 243; *see also United States v. Aulicino*, 44 F.3d 1102, 1111 (2d Cir. 1995) (noting distinction between "cases where the acts of the defendant or the enterprise were inherently unlawful, . . . and were in pursuit of inherently unlawful goals," and cases "concerning alleged racketeering activity in furtherance of endeavors that are not inherently unlawful," and that "the courts generally have found no threat of continuing criminal activity arising from conduct" in the latter category); *Marcoux v. Am. Airlines, Inc.*, No. 04-CV-1376, 2006 WL 842888, at *12 (E.D.N.Y. Mar. 28, 2006) ("Where, as here, defendants are

46

operating legitimate businesses, plaintiffs are required to plead facts indicating that there

existed the threat of continued criminal activity in furtherance of defendants' plans."). In the

end, the "the Second Circuit advised . . . [that the Court] must consider the 'overall context in

which the [racketeering] acts took place' to determine whether sufficient continuity is alleged."

*Sumitomo Corp. v. Chase Manhattan Bank*, No. 99-CV-4004, 2000 WL 1616960, at *1

(S.D.N.Y. Oct. 30, 2000) (quoting *United States v. Kaplan*, 886 F.2d 536, 542 (2d Cir. 1989));

*see also United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991) (citing *Kaplan*); *Liberty*

*Mut. Ins. Co. v. Blessinger*, No. 06-CV-391, 2007 WL 951905, at *12 (E.D.N.Y. Mar. 27,

2007).

      Plaintiff offers two arguments in support of its claim that it has adequately pled open-

ended continuity. Initially, Plaintiff contends that the enterprise's business is racketeering, and

therefore it is an inherently unlawful organization. In particular, according to Plaintiff, because

"[t]his Court has already held that [Plaintiff] has adequately pleaded that Defendants engaged in

an association-in-fact RICO enterprise, which was formed solely for the purpose of committing

the predicate acts alleged in [Plaintiff's] Amended Complaint," it has sufficiently alleged that

Defendants' business "is clearly 'an enterprise whose business is racketeering activity.'" (Pl.'s

Opp'n 25.) This reasoning is circular, as it suggests that once a RICO plaintiff has adequately

pled a RICO enterprise, it has automatically pled open-ended continuity.[11] In fact, courts

regularly distinguish between "a long-term association that exists for criminal purposes" and a

legitimate business that conducts its business through unlawful acts. *See H.J. Inc*, 492 U.S. at

---

[11]Moreover, this argument may only highlight the need to reexamine whether, in fact,
RICO should be interpreted to require allegations of an enterprise that is more than just the sum
of its racketeering acts.

243; *Aulicino*, 44 F.3d at 1111. Where the collective business and other entities that comprise

the enterprise "primarily conduct[] a legitimate business," there has to be some allegation that

the predicate acts reflected "the regular way of operating that business." *Cofacredit*, 187 F.3d

at 243.

In this case, the enterprise is made up of several businesses (among others, Jakks, SSAI,

and THQ), none of which is alleged to conduct itself primarily through racketeering activity. In

fact, for example, Plaintiff avers that "Jakks is primarily in the business of selling action figures

and toys[,]" (Am. Compl. ¶ 10), while THQ is said to be "in the business of videogame

marketing and sales[,]" (*Id.* ¶ 17). According to Plaintiff, these businesses and the other

individually-named defendants operated their businesses together to form an enterprise, the

principal goal of which was to procure, through fraud and corruption, certain licenses from

Plaintiff. But, this is not the same as saying that Jakks, THQ, SSAI and the other components

of the alleged enterprise normally did business via racketeering. On this point, for example, the

allegations regarding the *legitimate* perfumed doll deal and THQ's initially-*legitimate* efforts to

procure the videogame license critically undermine Plaintiff's position. Therefore, Plaintiff

must allege, but does not, that the racketeering acts are Defendants' "regular way of conducting

[their otherwise] ongoing legitimate business[es]." *H.J. Inc.*, 492 U.S. at 242.

Plaintiff has a fall-back position, however, which is that because the enterprise engaged

in bribery and money laundering, which are inherently unlawful acts, it has established open-

ended continuity. (*See* Pl.'s Opp'n 25-26.) While embezzlement, extortion, bribery, and money

laundering are in pursuit of inherently unlawful goals, *see United States v. Coiro*, 922 F.2d

1008, 1017 (2d Cir. 1991) (finding bribery and money laundering in context of long-term

48

organized crime organization to be in pursuant of inherently unlawful goal); *Metro. Transp. Auth.*, 2005 WL 1565524, at *4 (determining money laundering activity to be in pursuit of inherently unlawful goal), fraud is not, *see Aulicino*, 44 F.3d at 1111-13; *Int'l Bhd. of Teamsters v. Carey*, 297 F. Supp. 2d 706, 715 (S.D.N.Y. 2004) (finding fraud committed by union with finite goal not to be in pursuit of inherently unlawful goal); *Boucher v. Sears*, No. 89-CV-1353, 1995 WL 283742, at *7 (N.D.N.Y. May 8, 1995) (finding that frauds, particularly those which are inherently terminable, are not inherently in pursuit of unlawful goals). Additionally, Plaintiff ignores the axiom that "the totality of the circumstances surrounding the commission of the predicate acts are considered to determine whether those acts pose a threat of continuing criminal activity." *Busacca*, 936 F.2d at 238 (citing *Kaplan*, 886 F.2d at 542-43). In other words, a RICO plaintiff does not adequately plead open-ended continuity by simply alleging bribery. Instead, the key issue is the context in which the bribery is alleged to have taken place, with a particular view to whether it can be said that the conduct involved constituted a threat of continuing wrongful activity. *See Watral v. Silvernails Farms, LLC*, 177 F. Supp. 2d 141, 150 (E.D.N.Y. 2001) (noting three ways to establish threat of continuing criminal activity: (i) where the alleged enterprise primarily is engaged in racketeering activity; (ii) where the predicate acts are the "regular way" of conducting business activity; and (iii) where the nature of the predicate acts themselves suggest a threat of continuing racketeering activity).

Here, as noted, the enterprise is comprised of mostly legitimate businesses. Moreover, at oral argument, Plaintiff conceded that Defendants' goal was to obtain a limited number of licenses, and "that's it." In other words, what Plaintiff has alleged, even taking all of its claims

as true, is an inherently terminable scheme that was focused on illegally obtaining two types of

licenses: one for action figures and one for videogames. Moreover, Plaintiff's own Amended

Complaint makes clear that this scheme came to an end by June 1998, when the videogame

license was granted to the LLC by WWE. (Am. Compl. ¶ 149.) The domestic and international

toy licenses all had been amended to extend them to the same time frame granted in the

videogame license, which was for ten years from June 1998, with a five-year renewal at the

option of Jakks. (*Id.* ¶ 165.) Thus, even though the Amended Complaint details Defendants'

alleged misconduct for six years after the granting of the videogame license, there is no

allegation that Defendants schemed to pursue any other licenses from WWE or any other

vendor. This undercuts Plaintiff's attempt to plead open-ended continuity, as the courts have

rejected attempts at open-ended claims involving a terminable scheme, such as the one alleged

by Plaintiff here. *See, e.g., First Capital Asset Mgmt.*, 385 F.3d at 180-81 (noting that claims of

open-ended continuity in case involving terminable scheme of asset conveyance in bankruptcy

proceedings "defie[d] logic," even though defendants' mail fraud and perjury continued after

filing of bankruptcy petition). This is true, even in cases where bribery is alleged to have been

part of the enterprise's arsenal of racketeering acts. *See United States v. Spadoni*, No. 00-CR-

217, 2005 WL 2275938, at *11 (D. Conn. Sept. 16, 2005) (holding that there was no open-

ended continuity in public corruption cases involving allegations of bribery because scheme

was "inherently terminable"); *Watral*, 177 F. Supp. 2d at 147, 150 (rejecting claim of open-

ended continuity where plaintiff alleged mail and wire fraud, interstate transportation of stolen

goods, obstruction of justice, sale or receipt of stolen goods, money laundering and commercial

bribery as racketeering acts, because asset diversion scheme was "limited scheme aimed only at

Plaintiff and his horses").[12]  Moreover, Plaintiff's claims of open-ended continuity particularly

fail for the THQ Defendants and the LLC, which are not even alleged to have directly

participated in any bribery of Bell or Shenker.  Thus, even if Plaintiff had sufficiently pled open

ended-continuity as to Bell, Shenker, SSAI, and the Jakks Defendants, it has not come close to

pleading open-ended continuity as to the THQ Defendants and the LLC.  *See First Capital*

*Asset Mgmt.*, 385 F.3d at 180 ("In analyzing the issue of continuity, . . . we evaluate the RICO

allegations with respect to each defendant individually.").[13]  Accordingly, the substantive RICO

---

[12]Plaintiff attempts to avoid this fate by claiming that the threat of continuity from a
defendant's alleged racketeering activities is to be viewed at the time the activities are alleged to
have occurred.  This effort fails for two reasons.  First, the cases Plaintiff cites do not stand for
the proposition tendered by Plaintiff.  In *Welch Foods, Inc. v. Gilchrist*, No. 93-CV-0641, 1996
WL 607059, at *6 (W.D.N.Y. Oct. 18, 1996), the "kickback scheme had been ongoing for years
and would have continued but for its discovery[,]" something that cannot be said about the
scheme alleged by Plaintiff here.  *Aulicino* is no more helpful, as the quote cited by Plaintiff is
not from the *Aulicino* court, but merely that court's discussion of another decision in another
circuit, 44 F.3d at 1112 (quoting *Busacca*, 936 F.2d at 238).  Moreover, the circuit quoted by the
*Aulicino* court had ruled in another case that there was no threat of continuity from a fraud
scheme that lasted 17 months, because the scheme was inherently terminable.  *Id.* (citing *Vemco*,
23 F.3d at 134-35).  Second, while it may be that in certain cases the nature of the racketeering
act can be viewed as itself representing a threat of continuing, the allegations *in this case* show
that the scheme reached its conclusion by June 1998, particularly given the lack of any
allegations that Defendants sought any other licenses from Plaintiff or any other entity.

Plaintiff's claim that the scheme continues today because Defendants receive revenue
from the allegedly unlawfully procured licenses is no more persuasive in establishing open-
ended continuity than it is in establishing closed-ended continuity.  "Plaintiff[] cannot establish
open-ended continuity by alleging that the *effects* of predicate acts extend into the future.
Rather, there must be a threat that the acts themselves will be repeated."  *Pier Connection, Inc.*,
907 F. Supp. at 76 (finding no open-ended continuity where defendants would reap the benefits
of defaming plaintiff and stealing customers); *see also Rini v. Zwirn*, 886 F. Supp. 270, 300
(E.D.N.Y. 1995) (holding no open-ended continuity where threat of repercussions from past acts,
but not acts themselves, threatened to occur in the future).

[13]Because the Court determines that Plaintiff has not made a case for finding that the
THQ Defendants and the LLC have engaged in a pattern of racketeering, it need not, and
therefore will not, address their arguments regarding operation and management of the alleged

cause of action against each of the THQ Defendants and the LLC is dismissed.

D. Injury

Shenker, SSAI, and the Jakks Defendants argue that Plaintiff lacks standing to bring a RICO claim under 18 U.S.C. § 1962(c), because it "fails to allege any pecuniary injury to its 'business or property by reason of a violation of' the RICO statute." (Jakks Mem. 19 (citing 18 U.S.C. § 1964(c)).) Specifically, these defendants contend that (i) any lost profits injury suffered by Plaintiff is not cognizable under New York law; and (ii) Plaintiff's alleged injury, even if permissible under New York law, is too speculative under RICO.[14]

Plaintiff alleges that as a proximate result of Defendants' racketeering acts, it was deprived of the intangible right of honest services from Shenker and Bell, and as a further result, it received lower royalty rates from its toy and videogame licenses. Specifically, Plaintiff claims that because of Defendants' alleged misconduct, Plaintiff was denied the business opportunity of between 50-66% more in royalties from a non-corrupt licensing arrangement. (Am. Compl. ¶ 163.)[15] This, Plaintiff claims, is sufficient to plead a RICO injury.

"The RICO civil liability provision confers standing on [a]ny person injured in his business or property by reason of a violation of section 1962." *Hecht v. Commerce Clearing*

————————————

enterprise.

[14]Plaintiff also seeks disgorgement of revenues earned through the allegedly illegally-obtained licenses. Plaintiff argues that the receipt of revenues from those licenses constitutes an ongoing injury. As discussed above, payments under the licenses do not constitute predicate acts. Therefore, Plaintiff is seeking disgorgement of past ill-gotten gains, which is not permitted under RICO. *See United States v. Carson*, 52 F.3d 1173, 1182 (2d Cir. 1995) (holding that "we do not see how it serves any civil RICO purpose to order disgorgement of gains ill-gotten long ago").

[15]This estimate relates only to the videogame license. No such estimate is alleged as to the domestic and international toy licenses.

*House, Inc.*, 897 F.2d 21, 23 (2d Cir. 1990) (internal quotation marks omitted). Thus, "[i]n

order to bring a civil RICO claim, a plaintiff must allege: (1) a violation of Section 1962; (2) an

injury to business or property; and (3) causation of the injury by the violation." *Am. Buying Ins.*

*Servs., Inc. v. S. Kornreich & Sons, Inc.*, 944 F. Supp. 240, 243-44 (S.D.N.Y. 1996) (citing

*Hecht*, 897 F.2d at 23). In other words, a plaintiff must show that its "injury is to its property,

and not, for example, physical, emotional or reputational harm, and that plaintiff's injury is

proximately caused by the acts constituting the RICO violation." *State Farm Mut. Auto. Ins.*

*Co. v. CPT Med. Servs., P.C.*, 375 F. Supp. 2d 141, 152 (E.D.N.Y. 2005). Where a plaintiff

bases its RICO claim on predicate acts of fraud, the plaintiff "must allege detrimental reliance

on the fraud." *Cougar Audio, Inc. v. Reich*, No. 99-CV-4498, 2000 WL 420546, at *4

(S.D.N.Y. Apr. 18, 2000). In evaluating a RICO injury claim, it bears remembering that "RICO

should be 'liberally construed to effectuate its remedial purposes[.]'" *Allen v. Berenson Pari-*

*Mutuel of N.Y.*, No. 95-CV-10289, 1998 WL 80168, at *3 (S.D.N.Y. Feb. 25, 1998) (quoting

*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985)). However, "a RICO plaintiff may not

recover for speculative losses or where the amount of damages is unprovable." *Trs. of*

*Plumbers and Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc.*, 886 F. Supp. 1134,

1146 (S.D.N.Y. 1995).

　　　As discussed above, Plaintiff alleges violations of section 1962(c), satisfying the first

factor. As to the second factor, Plaintiff alleges that it suffered an injury to its business or

property in the form of the loss of the honest services of its agents Shenker and Bell due to the

bribes allegedly paid by some defendants, and in the form of lost opportunity to pursue

competitive licensing offers. The moving defendants contend that if Plaintiff suffered an injury,

it is in the form of lost profits, and that under New York law, a plaintiff cannot recover lost

profits in a fraud action. *See First Nationwide Bank v. Gelt Funding Corp.*, 820 F. Supp. 89, 95

(S.D.N.Y. 1993). However, Plaintiff alleges that it lost the business opportunity to obtain more

lucrative royalties on its licenses because Shenker, Bell, and THQ had been coopted, and

consequently, the competitive bidding process resulted in calculably lower royalties. In

particular, Plaintiff alleges that Shenker and Bell were responsible for seeking competitive bids

and negotiating the terms of each license. (Am. Compl. ¶¶ 30, 75, 110, 148.) Plaintiff further

claims that Activision and THQ expressed concrete interest in the videogame license, which

likely would have resulted in a licensing agreement superior to the one ultimately offered to the

LLC. (*Id.* ¶¶ 131-32, 153.) In other words, Plaintiff relied upon the misrepresentations made

by Shenker and Bell that it was receiving the best offer as determined by a competitive bidding

process. As a result of Defendants' alleged fraud, Plaintiff claims it was denied the opportunity

to consider more favorable bids from other vendors, including THQ (before it was allegedly

coopted). (*Id.* ¶¶ 127-45, 153.)

As pled, Plaintiff alleges a cognizable injury resulting from Defendants' alleged fraud in

the form of lost business opportunities, which New York law recognizes as a remedy for fraud.

It is true that in New York a fraud victim may not recover lost future profits. *See Lama Holding

Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1373 (N.Y. 1996) (holding that "[d]amages are to

be calculated to compensate plaintiffs for what they lost because of the fraud, not to compensate

them for what they might have gained," thus, "there can be no recovery of profits which would

have been realized in the absence of fraud"); *Three Crown Ltd. P'ship v. Salomon Bros., Inc.*,

906 F. Supp. 876, 891 (S.D.N.Y. 1995) ("New York law, however, allows plaintiffs in common

law fraud actions to recover only for actual pecuniary losses (out-of-pocket losses and

consequential damages) and not for future profits."). This includes attempts to "recover the

benefit of an alternative agreement overlooked in favor of the fraudulent one." *Alpert v. Shea*

*Gould Climenko & Casey*, 559 N.Y.S.2d 312, 315 (App. Div. 1990). The basis for this rule is

the view that lost profits are inherently speculative and uncertain. *See Geary v. Hunton &*

*Williams*, 684 N.Y.S.2d 207, 207 (App. Div. 1999) ("The damages plaintiff seeks are not

recoverable under the out-of-pocket rule, which bars recovery of profits that would have been

realized in the absence of fraud, including the loss of an alternative bargain overlooked in favor

of the fraudulent one, as inherently speculative and undeterminable."). However, the Second

Circuit has recognized a distinction between a claim of lost profits and a claim for other

consequential damages, such as lost business opportunities. Thus, "[i]n the Second Circuit,

'damages for fraud include the costs incurred in preparing for, performing, or passing up other

business opportunities,' so long as plaintiff can 'establish the causal nexus with a good deal of

certainty.'" *I.M. Oberman Assocs., Inc. v. Republic Fin. Servs., Inc.*, No. 92-CV-1843, 1993

WL 88209, at *5 (S.D.N.Y. Mar. 25, 1993) (internal citations omitted); *see also Schonfeld v.*

*Hilliard*, 218 F.3d 164, 183 (2d Cir. 2000) (citing *Fort Howard Paper Co. v. William D. Witter,*

*Inc.*, 787 F.2d 784, 793 n.6 (2d Cir. 1986))[16] "Although the line between lost profits and

_____

[16]The lineage of this point is worth noting, only because it does not trace back to any
New York authority. The district court cases cited by Plaintiff (*I.M. Oberman* and *Academic*
*Indus., Inc. v. Untermeyer Mace Partners, Ltd.*, No. 90-CV-1052, 1992 WL 73473, at *2
(S.D.N.Y. Apr. 1, 1992)), rely on the Second Circuit's decision in *Ostano Commerzanstalt v.*
*Telewide Sys.*, 880 F.2d 642, 649 (2d Cir. 1989). That decision, in turn, cites a footnote in *Fort*
*Howard Paper Co.*, 787 F.2d at 793 n.6, as the sole authority regarding the inclusion of "lost
business opportunities" as a form of consequential damages for fraud. *Fort Howard* cites, as the
sole authority for the same point, the district court decision in *Soper v. Simmons, Int'l, Ltd.*, Nos.
84-CV-70, 84-CV-71, 84-CV-72, 1984 WL 426, at *4 (S.D.N.Y. May 30, 1984). In *Soper*, the

55

consequential damages is sometimes blurry, courts try to limit the recovery of consequential

damages from a fraud 'to that which is necessary to restore a party to the position occupied

before commission of the fraud.'" *Imaging Int'l. v. Hell Graphic Sys., Inc.*, 2007 WL 3227245,

at *7 (N.Y. Sup. Ct. Oct. 29, 2007) (quoting *Alpert v. Shea Gould Climenko & Casey*, 559

N.Y.S.2d 312, 314 (App. Div. 1990)).  Plaintiff's injury claim is not limited to an assertion of

lost future profits.  Rather, Plaintiff alleges that it already has lost business opportunities, in the

form of licenses that could have been granted to other vendors, and the royalties that would

have accompanied these other licenses.

       However, Defendants further argue that even if Plaintiff's injury is of a kind cognizable

under New York law, its claims of injury are legally deficient under RICO because they are

speculative and unquantifiable.  Indeed, as a general matter, even if a plaintiff sufficiently

pleads an injury compensable under New York law, it does not mean that plaintiff has satisfied

its pleading obligations under RICO.  *See Cougar Audio,* 2000 WL 420546, at *8 (holding that

while the "abstract form of harm suffered by one who loses the chance to bargain with all the

facts may be sufficient to sustain a bare allegation of commercial bribery under New York law, .

. . it is not sufficient to sustain a RICO allegation with commercial bribery predicates").  In

particular, "Defendants are correct in asserting that a RICO plaintiff may not recover for

speculative losses or where the amount of damages is unprovable." *Transworld Mech., Inc.*,

886 F. Supp. at 1146; *accord Imagineering, Inc. v. Keiwit Pac. Co.*, 976 F.2d 1303, 1310 (9th

---

court noted that "the only permissible recovery [for fraudulent representation] is the plaintiff's
'reliance interest' – i.e., the costs incurred by the plaintiff in reliance on the promise by incurring
expenses in preparation or in performance or in passing up other business opportunities." *Id.*
The only authority cited in support of that proposition is Professor Farnsworth's Contracts
Treatise. *See id.* (citing FARNSWORTH, CONTRACTS, § 12.1 at 812-14 (1982)).

Cir. 1992) ("A showing of 'injury' requires proof of concrete financial loss."); *Sheperd v. Am. Honda Motor Co.*, 822 F. Supp. 625, 629 (N.D. Cal. 1993) (noting that "the requirement of a concrete financial loss proximately caused by the wrongful conduct of RICO defendants is not easily met"). The remedial purpose of RICO is to put the injured plaintiff in the same financial position it would have been in absent the misconduct. *See Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1106 (2d Cir. 1988). If the damages cannot be ascertained, then there is no lawful way to compensate the plaintiff. Thus, the courts regularly have held that a plaintiff who alleges injuries that are "indefinite and unprovable" does not have standing under, and cannot recover damages pursuant to, RICO. *See First Nationwide Bank*, 27 F.3d at 768; *Allen*, 1998 WL 80168, at *3.

Here, Defendants contend that Plaintiff's allegations involve an unquantifiable "potential opportunity to earn . . . profits." (Jakks Mem. 20.) Plaintiff counters by claiming that based on other competitive licenses, the royalty rates it is receiving under its videogame license are 50% to 66% lower than what it could have earned from a competitive bid, thus costing Plaintiff millions of dollars. (Am. Compl. ¶¶ 163-64.) From this and other allegations, Plaintiff boldly asserts that the "calculation of damages on this branch is remarkably simple." (Pl.'s Opp'n 31.) This is a curious claim, because Plaintiff does not make such a calculation in its Amended Complaint. In fact, it proffers a noticeably wide range of potentially higher royalty rates (50%-66%) it could have earned in a non-corrupt bidding process, and only regarding the videogame license. Nothing substantial is said about the range of lost royalties from the toy licenses. Moreover, Plaintiff's estimate regarding the videogame license, as discussed below, causes Plaintiff all kinds of trouble in rebutting Defendants' statute of limitations claims. In

any event, and to be clear, the problem with Plaintiff's claim of RICO injury is not that it cannot

claim lost business opportunities as a result of Defendants' alleged misconduct. Instead, the

legal infirmity derives from the fact that there is no plausible set of facts, consistent with

Plaintiff's allegations, that makes the alleged injury sufficiently concrete to state a RICO claim.

The calculation of damages from any lost business opportunities in connection with the

licenses will necessarily require some proof as to what a non-corrupt bidding process would

have yielded. Regarding the videogame license, Plaintiff's only argument is that it might be

able to establish some quantifiable royalty stream from the preliminary interest expressed in the

license by THQ, and that dismissal is inappropriate because the information about what THQ

might have done is uniquely in its possession. However, Plaintiff's own allegations merely

suggest that THQ had aspired generally to provide licensors with royalty rates higher than what

the LLC paid to WWE (19%-22%). Indeed, the Amended Complaint provides few details about

any proposal that THQ discussed with Plaintiff before being approached by Jakks, including

what the terms of that deal would have been, whether that deal would have been superior to the

bid given to the LLC, what the length of any deal would have been, or what THQ's capacity

was to perform under any such deal. The capacity to perform is critical because any licensing

agreement that THQ (or any other bidder) might have signed would only guarantee royalties on

sales made by the licensee. Thus, a bidder that might have guaranteed less of a royalty rate

might still have been better for WWE's bottom line than anything that THQ might have

guaranteed, because of superior technology, marketing, and overall business efficiency. All of

these variables, given the allegations in the Amended Complaint, doom Plaintiff's efforts to

establish a cognizable RICO injury.

Moreover, in its response to Defendants' Motion, Plaintiff ignores its own allegations that there were other potential bidders for the videogame license. This omission, perhaps done to avoid further damaging Plaintiff's response to the statute of limitations argument, serves only to complicate Plaintiff's efforts to establish RICO standing. For example, in late March 1998, a corrupt Bell is alleged to have told a company called Acclaim that he would not even entertain a proposal to renew the videogame license then in place. (Am. Compl. ¶ 109.) Acclaim appealed this move to WWE senior management, who advised Acclaim that it could submit a bid. However, before the Acclaim bid was submitted, Bell recommended to senior management that the license be given to Jakks. (*Id.* ¶ 110.) Unfortunately, the Amended Complaint says nothing about the terms of the Jakks bid, and, in particular, whether it provided royalty rates that were better than what WWE had been receiving from Acclaim. This omission is inexplicable since WWE presumably has access to that information. Instead of providing this available information, Plaintiff only alleges that the terms of the proposal "were well below then prevailing market rates for a videogame license of the quality of WWE." (*Id.*) Apparently, WWE management ignored the obviously low royalty rates to be paid by Jakks (we still do not know if they were above or below what Acclaim had paid or had offered to pay) and approved the deal. (*Id.* ¶ 114.)

At about the time WWE senior management approved the Jakks proposal, two other bidders (Activision and THQ) entered the scene. Though ignored or stiff-armed by Shenker and/or Bell, both Activision and THQ are alleged to have submitted informal proposals that were "clearly superior" to the deal WWE had already accepted from Jakks (how superior we are not told). (*Id.* ¶¶ 131-32.) These proposals never made it to WWE senior management, though,

59

thanks to the alleged efforts of Bell and Shenker, who instead shared the bid information with Jakks. (*Id.* ¶ 134-35.) Eventually, to hide the bribery scheme and protect its interest in obtaining the bid, Jakks reached out to THQ and persuaded THQ to submit a joint bid for the videogame license, a bid that concededly was "comparable to Activision's initial informal proposal." (*Id.* ¶ 145.) It was this proposal that Bell and Shenker submitted to WWE senior management for approval. (*Id.* ¶¶ 146, 151.) Apparently, while this revised bid was being considered, Activision submitted a "more formalized version of [its] initial informal proposal to Shenker." (*Id.* ¶ 153.) Again, no specifics about the royalties in this proposal are discussed in the Amended Complaint, and, in particular, there is no allegation that this bid was superior, let alone of how superior it was, to the joint Jakks-THQ bid. All that is alleged is that, "upon information and belief" the bid "understated the amount Activision would have been willing to pay to obtain the videogame license." (*Id.*)

It bears emphasizing that in its Amended Complaint and in its Memorandum of Law, Plaintiff's only claim regarding the injury from the bidding process for the videogame license is that it was cheated out of a royalty rate that could have been 50% to 66% higher. This is not based not on anything that Activision or Acclaim are alleged to have bid, let alone might have been able to deliver, but instead on what THQ is alleged to have thought it might have to pay, not to WWE, but generally to "licensors." (*Id.* ¶ 160.) It also bears emphasizing that the entirety of Plaintiff's defense of its RICO injury claim focuses on the videogame license. There is nothing described about the bidding process regarding the domestic and international toy licenses that offers any plausible way to quantify the alleged RICO injury to WWE from those deals. While Plaintiff does not make this point, it might have argued that the license granted to,

60

and later taken from, Playmates could establish a benchmark for lost business opportunities. No such argument is made, however, and no allegation in the Amended Complaint describes either the differences in the royalty rates between the competing Jakks and Playmates deals, or what the bidding process might have brought in for the international toy license or the extensions of the domestic toy licenses.

From the collection of Plaintiff's allegations, voluminous as they may be, the Court finds that Plaintiff has not alleged an injury sufficiently quantifiable to establish standing under RICO. First, essential to Plaintiff's injury claims is some ability to project what would have come out of the bidding processes for the various licenses. Yet, even taking the allegations and all reasonable inferences from them as true, Plaintiff does not have a crystal ball or any plausible way to allege facts that would establish the outcome of the bidding process. While it may be, for example, that Activision had made a preliminary offer, and might have intended to make other offers, there is no way to predict what would have happened if Activision, Acclaim, THQ and even others, had engaged in a full and fair bidding process. *See Imagineering*, 976 F.2d at 1311 (affirming dismissal where complaint did "not allege specific bids submitted by the MWBE plaintiffs that were accepted by the prime contractors"); *Bonavitacola Elec. Contractor, Inc. v. Boro Developers, Inc.*, No. 01-CV-5508, 2003 WL 329145, at *12 (E.D. Pa. Feb. 12, 2003) (holding that plaintiff failed to allege RICO injury from fraudulent bidding process because "it does not necessarily follow that Plaintiff . . . would have been awarded the contract if Defendant . . . had not bid, or had not been the low bidder, just because it was the next lower bidder"), *aff'd* 87 Fed. App'x 227 (3d Cir. 2003).

Second, Plaintiff has no apparent way of assessing the profits any winning licensee

61

could have produced for Plaintiff, as a more favorable royalty *rate* would only benefit Plaintiff

if the vendor could manufacture and market the videogames and toys on a mass scale equal to

or better than the Jakks/LLC bids.  This is not a situation where the facts necessary to plead

injury are peculiarly within defendants' knowledge.  *See Transworld Mech., Inc.*, 886 F. Supp.

at 1146 (finding injury not speculative where information to ascertain precise amount of

plaintiff's loss was peculiarly within the defendants' knowledge).  Rather, the facts needed to

quantify the actual loss to Plaintiff would not be in the unique possession of any party (or non-

party).  Instead, the net profits to Plaintiff from a corruption-free bidding process would depend

on a number of factors that could not be projected.  *See Anza v. Ideal Steel Supply Corp.*, 126 S.

Ct. 1991, 1997 (2006) (noting that plaintiff's "lost sales could have resulted from factors other

than [defendants'] alleged acts of fraud," as "[b]usinesses lose and gain customers for many

reasons, and it would require a complex assessment to establish what portion of [plaintiff's] lost

sales were the product of [defendant's misconduct]"); *C.B. & D.M. Entm't, Inc. v. Galardi*, No.

03-CV-2112, 2007 WL 4219409, at *3 (N.D. Cal. Nov. 28, 2007) (noting speculative nature of

alleged RICO injury "confirms" the absence of proximate causation).  Here, it is important to

distinguish the likelihood that Plaintiff would have received more favorable licensing terms

from a non-corrupt bidding process (which the Court assumes to be true), and the unlikelihood

that Plaintiff could reasonably quantify how much more favorable the licensing agreements

would have been.  Establishing the former does not mean that Plaintiff can substantiate the

latter.  *See Sheperd*, 822 F. Supp. at 630 (dismissing RICO complaint for failure to allege

injury, even though "[t]here can be no doubt that the alleged diversion tactics and reduced

allocations would have been likely to have some adverse effect on the profitability on the

[Plaintiffs'] dealership, and consequently affect the market value of the dealership"). Thus, the Court finds that there is no plausible set of facts, consistent with the allegations in the Amended Complaint, that would demonstrate that Plaintiff has suffered a quantifiable and cognizable injury under RICO.

### E. Statute of Limitations

Defendants argue that Plaintiff's RICO claim is time-barred. RICO does not provide for a statute of limitations, but the Supreme Court has held that civil RICO claims are subject to a four-year statute of limitations. *See Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987); *accord Bankers Trust Co.*, 859 F.2d at 1101. The statute of limitations begins to run "when the plaintiff discovers or should have discovered the RICO injury." *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 58 (2d Cir. 1998); *see also DLT Res. v. Credit Lyonnais Rouse, Ltd.*, No. 00-CV-3560, 2001 WL 25695, at *4 (S.D.N.Y. Jan. 10, 2001) (noting that the limitations period accrues when plaintiff "knew or should have known of his injury").[17] As a corollary, the Second Circuit also has adopted a "separate accrual rule," under which a "new claim accrues and the four-year limitation period begins anew each time a plaintiff discovers or should have discovered a new and independent injury." *Merrill Lynch*, 154 F.3d at 59. "Pursuant to this rule, a plaintiff who is continuously injured by an underlying RICO violation may only recover for injuries discovered or discoverable within four years of the time suit is brought." *Nat'l Group for Commc'ns and Computers Ltd. v. Lucent Techs. Inc.*, 420 F. Supp. 2d 253, 265 (S.D.N.Y. 2006) (citing *Bingham v. Zolt*, 66 F.3d 553, 560 (2d

---

[17]This is true even if the "amount of the damage is not certain." *In re Merrill Lynch Ltd P'ships Litig.*, 7 F. Supp. 2d 256, 264 (S.D.N.Y. 1997), *aff'd*, 154 F.3d 56 (2d Cir. 1998).

Cir.1995)). "The Second Circuit, however, has made clear that allegations of 'new and independent' injuries cannot depend on injuries that are derivative of the core injury sustained." *Eno Farms Coop. Assoc., Inc. v. Corp. for Indep. Living*, No. 06-CV-1983, 2007 WL 3308016, at *8 (D. Conn. Nov. 5, 2007); *see also Bankers Trust*, 859 F.2d at 1103 (announcing new and independent injury rule).

The first step in the statute of limitations analysis is to determine when Plaintiff sustained the alleged injuries for which it seeks redress. *See Merrill Lynch*, 154 F.3d at 59. From there, the Court is to determine when Plaintiff discovered or should have discovered each injury, which establishes when the four-year statute of limitations period begins. *See id.* Here, the Complaint was filed on October 19, 2004. If Plaintiff was or should have been on notice of the injuries it alleges prior to October 19, 2000, then its claims may be time-barred.

Plaintiff alleges that it was injured by the seven licenses granted to Jakks and/or the LLC between April 22, 1996 and June 24, 1998, because they provided for below-market royalty rates and/or profits, all due to the allegedly unlawful activities of Defendants, which denied Plaintiff the honest services of its agents.[18] Plaintiff claims that, in the absence of the

-------------------

[18]The seven licenses include: (1) the first amendment to the domestic toy license, April 22, 1996, (Am. Compl. ¶¶ 54-56, 249(a)(vii)); (2) the second amendment to the domestic toy license, January 21, 1997, (*id.* ¶¶ 64, 67, 249(a)(x)); (3) the international toy license, February 10, 1997, (*id.* ¶¶ 65, 71, 249(a)(xi)); (4) the third amendment to the domestic toy license, January 12, 1998, (*id.* ¶¶ 93, 249(a)(xiv)); (5) the videogame license, June 10, 1998, (*id.* ¶¶ 136-64); (6) the extension of the domestic toy license, June 24, 1998, (*id.* ¶¶ 149, 165); (7) the extension of the international toy license, June 24, 1998, (*id.* ¶¶ 149, 165). According to Plaintiff, the last extensions of the domestic and international toy licenses were to be coterminous with the videogame license, which itself is described to be of the "extraordinary length" of ten years, with a five-year renewal right at the option of Jakks. (*Id.* ¶¶ 149, 165.)

corrupt bidding process, each license invariably would have been more lucrative, as more

bidders could and would have participated in the process, thus driving up financial gains for

Plaintiff.

Defendant argues that Plaintiff should have discovered the injuries Plaintiff allegedly

suffered because of the alleged racketeering acts.  "An injury is 'discoverable' when a plaintiff

has constructive notice of facts sufficient to create a duty to investigate further into the matter."

*Congregacion de la Mision Provincia de Venezuela v. Curi*, 978 F. Supp. 435, 444 (E.D.N.Y.

1997) (citation and internal quotation marks omitted); *see also Dodds v. Cigna Secs. Inc.*, 12

F.3d 346, 352 (2d Cir. 1993).  "In essence, knowledge of the fraud will be imputed to a plaintiff

if there are circumstances sufficient to alert a reasonable person to the probability that he or she

has been defrauded."  *Curi*, 978 F. Supp. at 444.  "The question of constructive knowledge and

inquiry notice may be one for the trier of fact and therefore ill-suited for determination on a

motion to dismiss . . . . Nonetheless, the test is an objective one and dismissal is appropriate

when the facts from which knowledge may be imputed are clear from the pleadings."  *Salinger*

*v. Projectavision, Inc.*, 934 F. Supp. 1402, 1408 (S.D.N.Y. 1996).

Regarding the toy licenses granted to Jakks, Plaintiff alleges the following in its

Amended Complaint: (i) as of 1996, the "competitive environment among toy companies

seeking intellectual property licenses was intense[,]" (Am. Compl. ¶ 58); (ii) Playmates was

one of the three top competitors in this intensely competitive market, (*id*.); (iii) in June 1996,

Playmates was granted a license by WWE for certain domestic action figures and a right of first

negotiation/last refusal to manufacture and distribute these action figures internationally, (*id*. ¶¶

59, 61); (iv) on January 21, 1997, approximately seven months after granting certain licensing

65

rights to Playmates, WWE granted – upon Shenker's allegedly corrupt recommendation –

conflicting licensing rights to Jakks, (*id.* ¶¶ 59, 62-69); (v) on January 30, 1997, Playmates

complained in a letter to Bell – who Plaintiff alleges had not yet joined the scheme – about the

grant of conflicting rights to Jakks, (*id.* ¶¶ 70, 79-80); (vi) on February 10, 1997, WWE and

Jakks entered into an agreement granting Jakks an international toy license, with no apparent

notice to Playmates to exercise its right to negotiate for such a license, (*id.* ¶ 71); (vii) on

November 6, 1997, Bell absolved Playmates of the obligation of its guarantee to WWE, denying

WWE the substantial sum still left to be paid on the guarantee, as well as the associated

royalties, (*id.* ¶ 83); (viii) on January 12, 1998, Jakks was granted a third amendment to the

domestic toy license, which granted Jakks rights to the action figures previously held by

Playmates, (*id.* ¶ 93); and (ix) the domestic and international toy licenses were extended to be

coterminous with the terms of the videogame license, which itself was described as being

"extraordinary" in length, (*id.* ¶¶ 149, 165).

  Regarding the videogame license, the Amended Complaint contains the following

allegations: (i) as of January 1998, Acclaim was granted the videogame license, which Bell

previously told Acclaim would be renewed with "no problem[,]" (*id.* ¶¶ 101, 107); (ii) on

March 25, 1998, Bell "advised Acclaim that he would not even listen to any proposal that

Acclaim would make for the renewal of its license[,]" (*id.* ¶ 109); (iii) upon hearing this news

from Bell, Acclaim "went over Bell's head and complained to senior management at WWE that

it was not being permitted to submit a renewal proposal[,]" (*id.*); (iv) WWE senior management

advised Acclaim that it could submit a renewal proposal, (*id.*); (v) on March 30, 1998, five days

after Acclaim complained to senior management and was told it could submit a proposal for the videogame license, Bell sent senior management a memorandum recommending that the license be granted to Jakks on terms "well below then prevailing market rates for a videogame license of the quality of WWE[,]" (*id.* ¶ 110); (vi) on April 7, 1998, Activision wrote Bell to express its interest to "move promptly to secure the" license on "the most competitive terms[,]" (*id.* ¶ 128); (vii) on April 8, 1998, WWE senior management approved the deal memo granting the videogame license to Jakks, (*id.* ¶ 114), apparently not asking about Acclaim's bid; (viii) on April 16, 1998, THQ met with Bell and Shenker to express an interest in making a bid for the videogame license, (*id.* ¶ 129); (ix) on April 17, 1998, hoping to dissuade Activision from bidding, Shenker met with Activision representatives, but he refused to give them any terms for the videogame license, (*id.* ¶ 130); (x) Activision and THQ both continued their pursuit of the license, (*id.* ¶¶ 131-32); (xi) to protect its bribery scheme, and ensure that it would get the license, Jakks approached THQ and corruptly persuaded it to join in a bid for the license, (*id.* ¶¶ 133-145); (xii) in another memorandum on May 12, 1998, Bell recommended to WWE senior management that it accept the Jakks/THQ joint bid, which contained terms more favorable to WWE, (*id.* ¶ 152); (xiii) even though WWE management had not been made aware of any other bid, it accepted the revised bid (which still included Jakks), and executed the licensing agreement on June 23, 1998, which was to be in effect as of June 10, 1998, (*id.* ¶ 157); and (xiv) the videogame license WWE approved was of "extraordinary length" (10 years with a five-year right of renewal) and guaranteed "below-market" royalties for 40-60 fiscal quarters, (*id.* ¶ 150).

From Plaintiff's own, detailed allegations, the Court has little difficulty in finding that a reasonable person would have been on inquiry notice of the injury Plaintiff is alleged to have suffered by no later than June 1998. The totality of Plaintiff's allegations is that within less than two years, WWE granted to Jakks, a company that apparently had none of WWE's valuable, lucrative and market-rate licenses until 1996, seven toy and videogame licenses, all of which provided grossly unfavorable terms for WWE. In the course of granting these licenses, WWE chased away two incumbent licensees, thereby foregoing hundreds of thousands of dollars of guaranteed payments, and/or sacrificing royalty rates far below what an "intensely competitive" market would bear. WWE gave these licenses to Jakks without even permitting the incumbent bidder to compete with the newcomer. In fact, in both instances, WWE officials received directly from the incumbent licensee a complaint that it was being blocked from the bidding process. In connection with the toy license, Playmates complained to Bell, *before he was brought into the scheme*, and in connection with the videogame license, Acclaim "went over Bell's head" and straight to WWE senior management to complain. Upon hearing the latter complaint from Acclaim, WWE senior management gave that licensee explicit permission to make a bid. Yet, just days later, this same management was advised by Bell to grant the license, on terms that apparently were well below market rates, to who else but Jakks, and senior management did not even ask what happened to Acclaim's invited bid. And, if that were not enough, within a month, WWE management then was advised by Bell, with no mention of any other competing bids, that Jakks (this time teamed with THQ) should be granted the videogame license on terms that were more favorable to WWE than the original Jakks bid, but apparently still well below market royalty rates and for an unusually lengthy period of time.

68

And, for the dénouement, WWE then agreed to extend the domestic and international toy licenses for the same extraordinarily lengthy period as the videogame license, apparently without any competitive bidding process or precedent.  Given these alleged facts, a reasonable person would have been on notice that WWE might have been the victim of a corrupted bidding process.

As Plaintiff makes clear in the opening paragraph of its Amended Complaint, the injury it suffered from the corrupt bidding process was being stuck with licenses that provided "lower than competitive royalty rates."  (*Id.* ¶ 1.)  Even taking each of the seven licenses as a separate injury, as the Court must under the separate accrual rule, the last three of these corruptly-granted licenses were granted in June 1998, well over six years before Plaintiff initiated this lawsuit.  Moreover, while it is true that Plaintiff alleges that it continues to receive the below-market royalties from these licenses to this day, these payments are not the type of "new *and independent*" injury Plaintiff must allege to make its case current.  Instead, the receipt of these substandard royalties is linked to the injuries Plaintiff alleges it suffered when it granted these licenses.  *See Lucent Techs.*, 420 F. Supp. 2d at 266 (noting that injuries are not "'new and independent' when they are attributable to a common scheme").  Put more succinctly, the courts have refused to extend the life span of a RICO plaintiff's injuries when they merely involve subsequent costs associated with the initial injury.  *See Merrill Lynch*, 154 F.3d at 59-60 (holding that because injury occurred when plaintiffs made their investment, action did not accrue later due to subsequent collection of annual fees related to these same investments); *Eno Farms*, 2007 WL 3308016, at *9 (holding that rents collected on a monthly basis after fraud scheme was executed were not new and independent injuries); *Pharr v. Evergreen Gardens,*

*Inc.*, No. 03-CV-5520, 2004 WL 42262, at *2 (S.D.N.Y. Jan. 7, 2004) ("The injury the plaintiffs

allegedly suffered due to the rent bills mailed within the four-year statute of limitations is

identical to the injury they suffered when the defendants allegedly unlawfully increased the

room count.").[19]

Plaintiff has three additional responses to Defendants' argument. First, Plaintiff argues

that courts rarely grant motions to dismiss on statute of limitations grounds. Second, Plaintiff

contends that the Court must apply a heightened standard of inquiry notice because the instant

case involves corrupt fiduciaries. Third, Plaintiff asserts that the Amended Complaint

adequately pleads fraudulent concealment.

As to Plaintiff's first argument, the case law does not support the argument that the

Court cannot dismiss the Amended Complaint on statute of limitations grounds. "Where . . . the

facts needed for determination of when a reasonable [person] of ordinary intelligence would

have been aware of the existence of fraud can be gleaned from the complaint and papers . . .

integral to the complaint, resolution of the issue on a motion to dismiss is appropriate." *LC*

*Capital Partners v. Frontier Ins. Group*, 318 F.3d 148, 156 (2d Cir. 2003) (internal quotation

marks omitted) (ellipses in original). Indeed, the Second Circuit has noted that courts have

granted motions to dismiss under those circumstances in "a vast number of cases." *Id.* (internal

quotation marks omitted); *see also Merrill Lynch*, 154 F.3d at 60 ("We have held that the

question of inquiry notice need not be left to a finder of fact.").

Plaintiff's second argument, regarding a heightened standard for fiduciaries, also fails.

---

[19]Plaintiff's reliance on *Bingham v. Zolt*, 66 F.3d 553 (2d Cir. 1995), is misplaced, as the
court there held that there were new and independent injuries that resulted from separate
fraudulent schemes. *See* 66 F.3d at 561.

Plaintiff cites a series of cases from other circuits in which the courts seemingly articulate a

relaxed standard of inquiry notice when insiders or fiduciaries are involved. (*See* Pl.'s Opp'n

37 n.15)  In the Second Circuit, however, courts agree that a party has a right to rely upon the

representations of its fiduciary, but "only to a point."  *Addeo v. Braver*, 956 F. Supp. 443, 451-

52 (S.D.N.Y. 1997) ("Once plaintiffs were thereby left with reason to be suspicious of [their

fiduciary], it was no longer reasonable for them to defer to his representations."); *see also*

*Butala v. Agashiwala*, 916 F. Supp. 314, 320 (S.D.N.Y. 1996) ("Whatever duties the defendants

owed to the plaintiffs, their alleged failure to disclose facts would not excuse the plaintiffs' lack

of diligence in investigating the facts of which they were unquestionably aware." (internal

citations omitted)).  Thus, it is not reasonable to rely on fiduciaries once the plaintiff is aware of

facts that would lead a reasonable person to no longer trust its fiduciary.  "While the doctrine

takes into account the information that a plaintiff did not have as a result of defendants'

misconduct, a court must still determine whether the information plaintiff did receive sufficed

to trigger a duty to inquire."  *Lenz v. Assoc. Inns and Rests. Co.*, 833 F. Supp. 362, 373

(S.D.N.Y. 1993); *see also Town of Poughkeepsie v. Espie*, 402 F. Supp. 2d 443, 455-57

(S.D.N.Y. 2005) (finding RICO claim time-barred where Town Board was on inquiry notice of

fraud by board members who owed fiduciary duty to the Town).

    Here, as early as January 1997 and as late as April/May 1998, WWE reasonably should

have been suspicious of its alleged fiduciaries.  Bell, before he was part of the scheme, was told

by Playmates of its "concern" about the granting of a competing license to Jakks.  Because of

Bell's position at WWE and because he was not yet part of the scheme, it is difficult to

understand how WWE can claim to not have been on notice of a problem with granting the toy

licenses to Jakks, particularly given Plaintiff's consistent claim that these licenses were all

below well-established market rates in an intensely competitive market. Any doubt that WWE

management had reason to inquire about the bidding process for its licenses was eliminated

when Acclaim complained directly to WWE senior management about being excluded from

bidding to extend the videogame license it already had been granted. This, combined with the

oddity of Jakks bidding against itself (and not against Acclaim) for the license, and WWE

ultimately agreeing to a licensing agreement that supposedly was well below market rates and

covered an unusually long period of time, pins WWE's claim that it can evade the limitations

period by relying on its fiduciaries. *See DLT Res., Inc.*, 2001 WL 25695, at *6 ("There are

others who can tell him if he has been wronged, and he need only ask.").

Finally, Plaintiff argues that it has adequately pled active fraudulent concealment by

Defendants, and, therefore, the statute of limitations should be tolled. "The Second Circuit has

held that the 'standard tolling exceptions apply' to civil RICO actions." *Merrill Lynch*, 7 F.

Supp. 2d at 274 (quoting *Bankers Trust*, 859 F.2d at 1105). Under the doctrine of fraudulent

concealment, the statute of limitations will be tolled if the plaintiff proves three elements: "(1)

the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the

concealment prevented plaintiff's discovery of the nature of the claim within the limitations

period; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during

the period plaintiff seeks to have tolled." *Corcoran v. N.Y. Power Auth.*, 202 F.3d 530, 543 (2d

Cir. 1999) (internal quotation marks omitted). "The burden of demonstrating the

appropriateness of equitable tolling . . . lies with the plaintiff." *Boos v. Runyon*, 201 F.3d 178,

185 (2d Cir. 2000). Further, a "[p]laintiff must plead each of these elements with particularity

as required by Rule 9(b) of the Federal Rules of Civil Procedure." *Lucent Techs.*, 420 F. Supp. 2d at 265. Thus, "even when a plaintiff pleads active concealment by the defendant, the plaintiff must still demonstrate that he exercised due diligence in trying to discover the fraud." *Merrill Lynch*, 7 F. Supp. 2d at 274. Or, as the Supreme Court has succinctly warned, "a plaintiff who is not reasonably diligent may not assert 'fraudulent concealment.'" *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194 (1997).

Even assuming Plaintiff has adequately pled fraudulent concealment that prevented it from discovering the scheme within the limitations period, which is dubious, it has not pled that it exercised due diligence until well after the statute of limitations had expired. *See Lucent Techs.*, 420 F. Supp. 2d at 268 (granting motion to dismiss and declining to equitably toll statute of limitations where plaintiff pled that it had "aggressively sought out evidence" during later contract litigation but did not plead "any investigative efforts" during the period to be equitably tolled). In fact, Plaintiff fails to cite anything in its lengthy Amended Complaint that remotely demonstrates due diligence at any point during the granting of the licenses, let alone that it exercised due diligence throughout the period to be tolled. *See Lucent Techs.*, 420 F. Supp. 2d at 268. Nor does Plaintiff even attempt to demonstrate that it has met the stringent requirements of Rule 9(b) in pleading this element of fraudulent concealment. In fact, from the Amended Complaint, it is clear that Plaintiff did nothing to inquire of the suspicious bidding process, even though incumbent licensees had complained directly to senior management about being boxed out of the bidding process, even though the royalty rates were well below market rates, even though Jakks made bids against itself, and even though the licensing agreements were extended several times for unusually long periods without any bidding process. And, because the Court

finds that Plaintiff was on inquiry notice as of no later than June 1998, Plaintiff's failure to

plead that it engaged in any due diligence is fatal to its fraudulent concealment claims.  *See*

*Klehr*, 521 U.S. at 194; *Butala*, 916 F. Supp. at 320 (rejecting fraudulent concealment claim

where "[c]omplaint is utterly lacking in the details of what steps the plaintiffs took to

investigate the condition of their investment once they were on inquiry notice of the probability

they had been defrauded").[20] Accordingly, Plaintiff's civil RICO claims are time-barred.

        F.  Conspiracy to Violate RICO

        Plaintiff also alleges that Defendants formed a conspiracy to violate RICO, in violation

of 18 U.S.C. § 1962(d).  However, this cause of action fails to state a claim, both because

Plaintiff has not adequately alleged a RICO injury, and because Plaintiff's claim is untimely.

*See First Capital Asset Mgmt.*, 385 F.3d at 182 (upholding district court's dismissal of

plaintiff's RICO conspiracy claim on the ground that plaintiff failed to properly allege

substantive RICO violation); *Allen v. New World Coffee, Inc.*, No. 00-CV-2610, 2002 WL

432685, at *6 (S.D.N.Y. March 19, 2002) ("The dismissal of all of plaintiffs' RICO claims

leaves the conspiracy cause of action without a leg to stand on.  'Any claim under § 1962(d)

based on conspiracy to violate the other subsections of section 1962 must fail if the substantive

---

        [20]Plaintiff claims that its diligence in uncovering the scheme after the 2000 Connecticut
litigation began, and the difficulty it had in overcoming some of the defendants' efforts to
conceal the plot, makes the dispute over Plaintiff's diligence a fact question that cannot be
resolved through these motions.  However, a plaintiff who fails to adequately allege due
diligence throughout the time to be tolled is imputed to be aware of the misconduct at the time of
the injury as if he had been reasonably diligent.  *See also Merrill Lynch*, 7 F. Supp. 2d at 265
("[W]hen a plaintiff is placed on notice of the probability of fraud, he has a duty to inquire, and
he will be charged with all knowledge that he would have obtained had he exercised reasonable
diligence.").  Here, Plaintiff fails to allege any due diligence between June 1998 and 2000.
Thus, this argument misses its mark.

claims are themselves deficient.'" (quoting *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064

(2d Cir. 1996), *vacated on other grounds*, 525 U.S. 128 (1996))). "Like the statute of

limitations under the other civil RICO provisions, the statute of limitations for civil RICO

conspiracy claims is four years." *Bendzak v. Midland Nat'l Life Ins. Co.*, 440 F. Supp. 2d 970,

983 (S.D. Iowa 2006). "Moreover, the [statute of limitations] analysis for civil RICO

conspiracy claims is the same as that for civil RICO claims brought under" the substantive

RICO provision. *Id.* Because the Court already has found that Plaintiff's action accrued no

later than June 1998, over six years before the lawsuit was initiated, Plaintiff's RICO

conspiracy claim is dismissed.

### G.  Release/Motion to Strike

The Jakks Defendants argue that Plaintiff's claims are precluded by a General Release

and Settlement Agreement ("the Release"), which was executed by WWE in 2004 in association

with the completion of an audit of Jakks' financial records ("the Audit").  The Jakks Defendants

assert that the Release bars "any and all claims" "arising from or relating to the Audit,"

including the present claims which "spring from the very payments [Plaintiff] admits were

targeted in the Audit." (Jakks. Mem. 35.)  Plaintiff contests this interpretation of the Release,

arguing that it was intended only to bar claims pertaining to Jakks' accounting records for the

period from the second quarter of 1996 to June 30, 2002.  (Mem. of Law in Supp. of Pl.'s Mot.

to Strike Ex. B to Decl. of Jonathan J. Lerner 1-2 ("Pl.'s Mot. to Strike").)  Plaintiff also moves

to strike the Lerner Declaration and any of the Jakks' Defendants' arguments relating to the

Release on the grounds that: this Release is not attached to, referenced in, relied upon, or

integral to Plaintiff's Amended Complaint; it is not a document of which the Court may take

judicial notice; and Mr. Lerner does not have first-hand knowledge of the Release.

Where the question is one of contract interpretation, a court must begin by examining the language of the contract. *See Maryland Cas. Co. v. W.R. Grace and Co.*, 23 F.3d 617, 624 (2d Cir. 1993). Here, the Release states that "WWE conducted an Audit of Jakks [sic] accounting records for the accounting period of the second quarter of 1996 through June 30, 2002," because "WWE contends that Jakks failed to report various sales and that Jakks took unsupported deductions and . . . Jakks contends that it overpaid WWE." (Lerner Decl. Ex. B 1.) The Release was signed in order to "resolve any and all disputes that may exist between them concerning the Audit." (*Id.*) Therefore, each Party released the other "from any and all claims . . . of every kind and nature whatsoever, whether known or unknown, . . . arising from or relating to the Audit." (*Id.* 1-2.) The Parties acknowledged that they may "hereafter discover facts different from . . . those it now knows . . . with respect to the Audit." (*Id.* 2.)

It is clear from the language of the Release that the Parties intended to bar claims arising out of the Audit itself. The purpose of the Audit was to determine whether Jakks had reported all of its sales or taken unsupported deductions, and whether Jakks had overpaid WWE. The language of the Release does not remotely suggest that the Audit was intended to investigate potential bribes paid by Jakks to WWE's agents in an effort to procure licenses at below-market rates, or to reach alleged misrepresentations made via mail and wire in an effort to allegedly deprive WWE of the honest services of its agents. Given the clear language of the Release, the Court may not consider outside evidence. *See Chevron TCI, Inc. v. Talleyrand Assocs., LLC*, No. 03-CV-4043, 2003 WL 22977498, at *5 (S.D.N.Y. Dec. 19, 2003) ("Where the terms of an agreement are clear and unambiguous, the Court will not look beyond the 'four corners' of the

76

agreement, and parol evidence of the parties' intentions is inadmissible."). The instant claims

do not pertain to the Audit. They pertain to an alleged fraud and commercial bribery scheme,

unrelated to any sales payments or deductions, allegedly perpetrated by Defendants. Therefore,

the Release does not bar the claims at issue here.[21]

### H. Supplemental Jurisdiction

In this and the prior opinion and order, the Court has dismissed the federal causes of

action.[22] In addition to the federal causes of action, Plaintiff has brought several causes of

action under state law. Because Plaintiff and at least some of the defendants are citizens of

Connecticut, there is not complete diversity. However, the Court has the authority to hear the

state law claims under its supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a). In

considering whether to maintain supplemental jurisdiction, the Court must exercise its

discretion under 28 U.S.C. § 1367(c) to determine whether to adjudicate such claims.[23]

---

[21]Because the Court rejects Defendants' interpretation of the Release, it need not address
Plaintiff's Motion to Strike the Lerner Declaration used to introduce the Release.

[22]The Court finds that it is appropriate to dismiss the federal causes of action with
prejudice as Plaintiff has had ample time to amend its Complaint, and, in fact, has done so once
already. Moreover, in opposing Defendants' Motion, Plaintiff never suggested or proposed that
it would seek leave to file a second amended complaint to cure any defects in Plaintiff's
pleadings. Accordingly, dismissal here is with prejudice. *See Clark v. County of Nassau*, No.
06-CV-8041, 2007 WL 1988811, at *2 (E.D.N.Y. July 5, 2007) (holding dismissal with
prejudice was appropriate when plaintiff already had two opportunities to state a cause of
action).

[23]Section 1367(c) provides that a district court may decline to exercise supplemental
jurisdiction over a state law claim if:

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the
> district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original
> jurisdiction, or

77

In the exercise of a district court's discretion under Section 1367(c)(3), the court is to balance the traditional "values of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). In balancing these values, the Court is mindful of the Supreme Court's guidance that "when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." *Id.* As indicated by the Supreme Court, however, this is not a mandatory rule, but rather recognizes that in the "usual case" in which all federal-law claims have been eliminated prior to trial, the balance of factors will weigh in favor of declining to exercise jurisdiction. *See id.* at 350 n.7.

In this instance, the Court finds that this is the "usual case" where the federal claims have dropped out well before discovery, let alone before any trial of this case. Moreover, the Court is aware that Plaintiff has filed an action against Defendants in Connecticut state court involving similar allegations as those in this case, thus highlighting the efficiency and comity interests that support the Court's non-involvement in the state law causes of action. Accordingly, the Court will exercise its discretion and decline to keep the state law causes of action.

---

> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

IV.  Conclusion

For the reasons stated herein, Defendants' Motions to Dismiss are GRANTED with

prejudice.  Additionally, Plaintiff's Motion to Strike is DENIED as moot.  The Clerk of Court is

respectfully directed to terminate the Motions (Dkt. Nos. 144, 146, 150, 155, 161), enter

judgment in favor of Defendants, and close this case.

SO ORDERED.

Dated:        December 21, 2007
              White Plains, New York

                                        KENNETH M. KARAS
                                        UNITED STATES DISTRICT JUDGE

79

<u>Service List</u>:

Jerry McDevitt, Esq.
Amy Lyn Barrette, Esq.
Peter Nicholas Flocos, Esq.
William Purcell, Esq.
Curtis B. Krasik, Esq.
Kirkpatrick & Lockhart Preston Gates Ellis, LLP
535 Smithfield Street
Pittsburgh, PA 15222

Jonathan Lerner, Esq.
Maura Barry Grinalds, Esq.
Michael Gruenglas, Esq.
Skadden, Arps, Slate, Meacher & Flom LLP
Four Times Square
New York, NY 10036-6522
*Counsel for Jakks Pacific, Inc.*
*Jakks Pacific (H.K.) Limited, Jack Friedman,*
*Stephen Berman, and Joel Bennett*

Jonathan Honig, Esq.
Feder, Kaszovitz, Isaacson, Weber, Skala,Bass & Rhine LLP
750 Lexington Avenue
New York, NY 10022
*Counsel for Jakks Pacific, Inc.,*
*Jakks Pacific (H.K.) Limited, Jack Friedman,*
*Stephen Berman, and Joel Bennett*

Steven A. Marenberg, Esq.
Philip M. Kelly, Esq.
Irell & Manella LLP
1800 Avenue of the Stars
Los Angeles, CA 90067
*Counsel for Defendant THQ, Inc.*
*and Brian Farrell*

Richard Schaeffer, Esq.
Bruce Handler, Esq.
Dornbush, Mensch, Mandelstam & Schaeffer, LLP
747 Third Avenue
New York, NY 10017
*Counsel for THQ/Jakks Pacific LLC*

Michael Alan Freeman, Esq.
Greenberg Freeman, L.L.P.
24 W. 40th St., 17th Floor
New York, NY 10018
*Counsel for Defendants Stanley Shenker*
*and Stanley Shenker & Assocs., Inc.*