grant Defendants' motions to dismiss in their entirety. See Broadway Constr. Inc., 1998 WL 246385, at *2. Because WWE made no effort to comply with the Court's April 6 Order, it is in contempt of this Court and subject to sanctions. N.A. Sales Co., Inc. v. Chapman Indus. Corp., 736 F.2d 854, 857 (2d Cir. 1984) ("A district court has the inherent power to hold a party in civil contempt upon clear and convincing proof of noncompliance with a court order" and has "broad discretion to fashion an appropriate coercive remedy."); see also Lucas v. Miles, 84 F.3d 532, 534-35 (2d Cir. 1996) (Rule 41(b) "authorizes the district court to dismiss an action when a plaintiff fails to comply with "any order of the court."") (citation omitted).

WWE's refusal to comply with this Court's April 6 Order that it explain how its proposed amended pleading responds to the dispositive arguments raised by Defendants is plainly intended to prevent the Court from being able to assess whether leave to amend should be granted, or whether the proposed amendments are futile because they would not prevent the grant of a dismissal motion.[6] "Under Rule 15, leave to amend may be denied 'if the amendment (1) has been delayed unduly, (2) is sought for dilatory purposes or is made in bad faith, (3) the opposing party would be prejudiced, or (4) would be futile.'" Smith v. McGinnis, 2004 WL 350755, at *1 (S.D.N.Y. Feb. 24, 2004) (quotation omitted). The proposed amended pleading fails all of these tests.

The explanation of the proposed amendments and how they addressed the outstanding motions to dismiss required by the Court's April 6 Order also bears directly on the Court's ability to determine whether WWE's amendments were interposed merely as a dilatory measure to stave off dismissal. WWE cannot and does not dispute that courts may properly deny leave to amend a complaint where, as here, "'the motion to amend is filed solely in an attempt to prevent the Court from granting a motion to dismiss or for summary judgment, particularly when the new claim could have been raised earlier.'" Berman v. Parco, 986 F. Supp. 195, 217 (S.D.N.Y. 1997) (emphasis added) (quoting 1 M. Silberberg, Civil Practice in the Southern District of New York § 6.26). Here, the Court unequivocally ordered WWE to identify how its Amended Complaint cured the defects in its original pleading to ensure that WWE was

---

6 Not only is the "summary" of the Amended Complaint that WWE attached to its April 11 Letter entirely unresponsive to the Court's Order, it grossly mischaracterizes its Amended Complaint. For example, as detailed in footnote 2 of our April 4, 2005 Letter, WWE has abandoned the central allegations of its complaint against JAKKS, which is that an $80,000 January 2, 1998 invoice reflected a bribe to obtain videogame and toy licenses from WWE. Instead, the Amended Complaint alleges that the $80,000 invoice was made in connection with a transaction to acquire rights and inventory of wrestling action figures manufactured by a company named Playmates, which is not a party to this action. WWE's conspicuous failure to own up to, much less explain, its retraction of allegations central to its original Complaint demonstrates that those allegations were unsupportable and were filed without any basis and for a vexatious purpose. See generally 28 U.S.C. § 1927.

not merely substituting a new defective Complaint for the previous flawed pleading. WWE's refusal to defend its original Complaint, and its disregard for the Court's April 6 Order that it explain how its proposed amendments cure the original Complaint's fatal defects, represent an inescapable admission that the proposed amendments do not cure these defects, warranting dismissal of this action and the rejection of WWE's new complaint.[7]

Contrary to WWE's Assertion, Leave of the Court Was
Required for WWE to File the Amended and Supplemental Complaint

WWE's gamesmanship is by no means restricted to its ill conceived procedural tactics -- it infects its legal arguments as well. Our April 6 Letter acknowledges a division among courts in this District on the issue of whether Rule 21 mandates leave of the Court to add parties when an amendment would otherwise be allowed as of right. In response, WWE flatly denies any split in authority and claims there exists Second Circuit controlling authority that we did not disclose. WWE's position is frivolous. In our April 6, 2005 Letter, we drew the Court's attention to the most recent decision holding that Rule 21 requires leave of the Court to add a party. See Momentum Luggage & Leisure Bags v. Jansport, Inc., 2001 WL 58000 (S.D.N.Y. Jan 23, 2001). In that case, which was decided after Washington v. New York City Bd. of Estimate, 709 F.2d 792 (2d Cir. 1983), Judge Cote squarely held that "Rule 15(a) generally governs the amendment of complaints, but in the case of proposed amendments where new defendants are to be added, Rule 21 governs." Momentum Luggage & Leisure Bags, 2001 WL 58000, at *1. In so holding, Judge Cote cited to a series of cases in this Circuit reaching the same conclusion and expressly identified Washington as reaching a different result, presumably because it did not "address[] Rule 21." Id.. Judge Cote then went on to explain the "sound reasons why Rule 21 should govern the addition and elimination of parties." Id. at *2. In a statement that is especially fitting here, where the Court took the time to assemble the parties expressly to set a schedule that would aid in its administration of the case, Judge Cote noted:

---

7 Courts routinely deny leave to amend a complaint where the plaintiff has failed to demonstrate that the proposed amendments would not be futile. See Sank v. The City of New York, 2003 WL 21403682, at *11 (S.D.N.Y. June 19, 2003), *aff'd*, 2004 WL 1842866 (2d Cir. Aug. 17, 2004) ("Sank merely summarizes each of her allegations, without any argument as to evidence that was presented and not considered, or controlling authorities that were ignored . . . Moreover, she has failed to demonstrate that such amendments would not be futile."); Makas v. New York State Dep't of Motor Vehicles, 1998 WL 146251, at *4 (S.D.N.Y. Mar. 23, 1998) ("[T]he plaintiff has failed to provide the court with a proposed amended complaint or with a sufficient basis for the court to conclude that the amendment would not be futile.").

> Whether parties should be dropped or added to an action presents problems of judicial administration over which the court, rather than the parties and their counsel, should maintain control at every stage of the action. In adding or eliminating parties, courts must consider judicial economy and their ability to manage each particular case, as well as how the amendment would affect the use of judicial resources, the impact the amendment would have on the judicial system, and the impact the amendment would have on each of the parties already named in the action.

Id. at *2 (internal citation omitted) (emphasis added).[8] Judge Cote's decision exposes WWE's position as legal hyperbole.

Of similar ilk is WWE's attempt to avoid application of Rule 15(d), which provides that leave of the Court was required for the separate and independent reason that WWE was filing a supplemental pleading. Based on nothing more than ipse dixit, WWE asserts that JAKKS' position is "frivol[ous]" because only "four paragraphs" of the Amended Complaint involve transactions or occurrences that occurred after the original Complaint was filed. (April 11 Letter at 6.) But WWE has not identified any authority to support its assertion that the application of Rule 15(d) depends on the quantity of the supplemental claims as a percentage of the whole pleading. On its face, Rule 15(d) provides that leave of the court must be sought and draws no such distinction.[9]

---

8. The cases cited by WWE are factually distinguishable from the circumstances present here. Indeed, three of the five cases relied on by WWE were decided after the plaintiffs had moved for leave to amend their complaint. For example, Washington dealt with the repeated denial by the trial court to grant the pro se plaintiff's explicit request to add two defendants. Washington, 709 F.2d at 795. The Court held that plaintiff's first request, which came prior to defendant's answer, "should have been granted." Id. The Court was not, however, faced with a situation in which a plaintiff had unilaterally disregarded a court ordered briefing scheduling by filing an unannounced amended complaint without first seeking leave of the Court. Likewise, Le Grand v. Evan, 702 F.2d 415, 416-417 (2d Cir. 1983), involved a pro se plaintiff who had made a motion for leave to amend his complaint. As in Washington, the Court held that the motion to amend should have been granted. Id. at 417. Similarly, in Singh v. Prudential Ins. Co. of America, Inc., 200 F. Supp. 2d 193, 197-98 (E.D.N.Y. 2002) the court granted a motion to join defendants in a separate state court action as defendants in the federal action and remanded the case to state court.

9. Rule 15(d) provides: "[u]pon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit the party to serve a supplemental pleading setting

(continued...)

## Conclusion

Based on the foregoing, we respectfully submit that WWE's repeated disregard for this Court's unambiguous orders, requiring, inter alia, that WWE respond to the numerous and dispositive grounds on which Defendants have moved to dismiss WWE's claims, mandates that Defendants' motions to dismiss be granted or, in the alternative, that WWE be denied leave to refile its Amended Complaint.

Respectfully submitted,

Jonathan J. Lerner

cc: All Counsel (by email)

---

[9](...continued)
forth transactions and occurrences or events which have happened since the date of the pleading sought to be supplemented." Fed. R. Civ. P. 15(d) (emphasis added). The cases on which WWE relies actually reinforce the need to seek leave when submitting supplemental pleadings because in two of those cases the plaintiff sought and the court granted leave to amend the original complaint before the amended complaint was filed. See United States v. IBM Corp., 66 F.R.D. 223, 225 (S.D.N.Y. 1975) (plaintiff moved for leave to amend its complaint); Westwood v. Cohen, 838 F. Supp. 126, 128 (S.D.N.Y. 1993) (court granted leave to file amended complaint in securities class action and defendant moved to dismiss the complaint as supplemental, or in the alternative for failure to state a claim pursuant to Rule 12(b)(6)). Fidenas AG v. Honeywell Inc., 501 F. Supp. 1029, 1032-33 (S.D.N.Y. 1981) also provides no support for WWE's position, since there the court specifically acknowledged that leave of the Court was required to file supplemental pleadings, but decided that "a formal application [of Rule 15(d)] . . . would not be a productive use of the time of the Court or the parties" in the circumstances of that case.



Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222-2312
412.355.6500
Fax 412.355.6501
www.klng.com

Jerry S. McDevitt
412.355.8608
Fax: 412.355.6501
jmcdevitt@klng.com

May 6, 2005

**VIA HAND DELIVERY**

Honorable Kenneth M. Karas
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street, Room 920
New York, NY 10007

**Re: World Wrestling Entertainment, Inc. v. JAKKS Pacific, Inc., et al.**
**1:04-CV-08223-KMK**

Dear Judge Karas:

We submit this letter in accordance with the Court's Order of April 27, 2005.[1] As a threshold matter, we wish to reiterate a few points made to the Court on April 27, 2005. First and foremost, we intended no disrespect to the Court or its authority over the litigants by filing the Amended Complaint. We sincerely regret if the Court took offense and believed - and continue to believe in good faith - that we followed the correct procedure for amending as of right and that the filing superceded the original Complaint. Int'l Controls Corp. v. Vesco, 556 F.2d 665, 668 (2d Cir. 1977). Had we realized that your Honor wanted us to advise the Court and counsel in advance by letter, we would have done so.

Secondly, the principal purpose of the Amended Complaint is to set forth even stronger claims on the basis of our continuing investigation. As a result, we added a claim under the Sherman Act and amended the RICO claim to assert a broader plan to defraud WWE of the honest services of its licensing agents which affected every grant of intellectual property rights after the execution of the

[1] A redlined version of the Amended Complaint and a compendium of unreported opinions cited herein are also enclosed.



Kirkpatrick & Lockhart Nicholson Graham LLP

original domestic toy license with Jakks in 1995. In the process of amending, we evaluated the numerous arguments alleging factual insufficiency set forth in the 104 collective pages of briefings filed by Defendants. Although we disagree with Defendants' insufficiency arguments, we believe that the Amended Complaint addresses some of their arguments in any event. We made no amendments aimed at addressing numerous arguments of Defendants either because we disagreed with their positions on the controlling law, their application of law to the facts, or because the issue involved is a legal issue. Our complete position on these matters, and the sufficiency of the Amended Complaint, can only be developed in a plenary brief with page limits approximating the pages afforded Defendants to develop their arguments if they again move to dismiss. Thus, this letter will primarily address Defendants' main arguments regarding factual sufficiency and how the Amended Complaint moots those arguments.[2]

1.) ALLEGED PATTERN DEFICIENCIES – Defendants argued that continuity had not been adequately plead because the original Complaint depicted a "unitary scheme which lasted less than one year" and which, according to Defendants, ended when the videogame license was secured in June of 1998. Defendants' arguments require the Court to ignore, rather than credit, well-pled facts, including that Defendant Stanley Shenker was acting as an undisclosed agent on behalf of Jakks when he promised to, and did, split his commissions on the videogame license with Bell, WWE's

---

[2] In the interest of brevity, citations to the original Complaint herein will be in the format of "O.C. ¶___" and to the Amended Complaint as "A.C. ¶___." We have identified herein certain paragraphs of the Amended Complaint which we believe are pertinent to the insufficiency arguments of Defendants. We emphasize, however, that the Amended Complaint must be read as a whole and that other paragraphs of the Amended Complaint may also be relevant to further arguments made by Defendants.



Senior Vice-President of Licensing. O.C. ¶ 78. On a proper read of the original Complaint, the racketeering activity associated with the bribes paid by Jakks and its agent Shenker to Bell in connection with the videogame license ran from January 2, 1998 to December 13, 2001, a period of nearly four years. O.C. ¶ 141a. The money laundering activities set forth in the original Complaint further operated to extend the pattern until December 13, 2001. O.C. ¶ 141b.[3]

The Amended Complaint more specifically alleges a broader pattern of racketeering activities, including a plan to deny WWE the honest services of its licensing agents which began in 1995. Less than a month after specific licensing rights were granted to Jakks by WWE for the first time on October 24, 1995 in the domestic market for essentially two years, Jakks secretly secured Shenker's agreement to also serve as its agent. A.C. ¶¶ 35-46. Thereafter, Jakks continuously sought and obtained expansions and amendments to its toy licensing rights via Shenker on its terms, often brazenly intermingling its desire to obtain additional rights from WWE in writings to Shenker discussing his work for Jakks. A.C. ¶¶ 44, 47, 54-56. As early as February of 1996, Jakks also told Shenker of its interest in the WWE videogame license, and its desire that he be its agent on it. A.C. ¶ 47-49. Beginning in or around June of 1996, Jakks also improperly utilized Shenker to orchestrate the elimination of a competitor of Jakks in the WWE toy market known as Playmates, which had been given a license by WWE to make toys which competed with Jakks. Specifically, Jakks promised to pay Shenker monies for favorable treatment on licensing matters involving Jakks,

[3] As a legal matter, the word "scheme" appears nowhere in the RICO statute, and there is no requirement that a plaintiff allege more than one scheme to establish a pattern. H.J. Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 236-237 (1989); United States v. Indelicato, 865 F.2d 1370, 1383 (2d Cir. 1989).

including the elimination of Playmates as a WWE licensee, and in connection with its longstanding desire to obtain the WWE videogame license. A.C. ¶¶ 57-62. In October of 1996, Jakks instructed Shenker to obtain additional rights for Jakks which would be in practical conflict with the rights being exercised by Playmates, which Shenker did in January and February of 1997. A.C. ¶¶ 62-71. After Playmates voiced its concern about the competing grant of rights to Jakks, Shenker, in turn, enlisted Bell into the scheme to defraud and promised Bell he would not only split bribes from Jakks with him but would also split Shenker's own commissions on the videogame license if Bell went along with the illegal plan to give Jakks favorable treatment. A.C. ¶¶ 79-82. After Bell was corrupted by such promises, that aspect of the plan to eliminate Playmates as a licensee of WWE and a competitor of Jakks in that market was carried out by machinations orchestrated by Shenker and Bell which culminated in the licensing rights once held by Playmates being transferred to Jakks, thereby removing Playmates as a competitor in the WWE toy market. A.C. ¶¶ 83-99. On the same day that the rights formerly held by Playmates were transferred to Jakks on the recommendation of Shenker and Bell, January 12, 1998, Jakks' highest ranking officers directed that $40,000 be placed in a secret bank account of Shenker's in Hong Kong.[4] A.C. ¶¶ 94-99. Shenker withdrew the money two days later, and obtained a demand draft for $20,000 from the proceeds to give to Bell upon his return to the states. A.C. ¶¶ 91-97. This payment, and all others made by Jakks to Shenker, was laundered through foreign subsidiaries to conceal the payments. After receiving this payment of

---

[4] WWE already has the documents to prove this payment and the other payments made by Jakks to Shenker, and the split of the money with Bell, despite massive efforts by all concerned to conceal the payments, including adjudicated perjury by Shenker to conceal the Jakks payments. Stanley Shenker and Associates, Inc. v. World Wrestling Fed. Ent., Inc., 48 Conn. Supp. 357, 366, 844 A.2d 964, 970 (2003).



$40,000, and as part of the illegal plan, Shenker and Bell abandoned their fiduciary duties to WWE in order to steer the videogame license to Jakks. A.C. ¶¶ 100-117. That aspect of the plan culminated on March 30, 1998 when Bell initialed a deal memo prepared by Shenker and recommended to management of WWE that the videogame license be given to Jakks without even ascertaining if other potential bidders would pay more for the rights. On March 31, 1998, the day after Bell committed to recommending the license be given to Jakks, Defendant Bennett, the CFO of Jakks, directed overseas agents of Jakks that it was "imperative" to once again deposit another $40,000 into Shenker's foreign bank account, which was again then split with Bell.[5] A.C. ¶¶ 110-111.

The original Complaint alleged the strange circumstances known to THQ when it first expressed an interest in the videogame license shortly after Shenker and Bell had secretly pocketed two payments from Jakks and recommended the license be given to Jakks. O.C. ¶¶ 69-76. The Amended Complaint adds dozens of very fact specific allegations showing THQ's motive and desperate condition at the time, the highly unusual events known to it at the time, and the opportunity provided to it by Jakks to participate in the illegal plan.[6] A.C. ¶¶ 118-164. Both the original and Amended Complaint allege yet another payment made to Shenker's overseas bank account by Jakks after the videogame license was secured by Jakks and THQ and the transfer of that money to Bell.

---

[5] Mr. Bell has entered a plea of guilty to being a dishonest servant in an ongoing federal investigation in Connecticut and has inculpated Shenker in the scheme. Bell's plea agreement listed a June 9, 2000 payment to Shenker's company from WWE as one of his culpable acts of mail fraud. That payment is set forth in A.C. ¶ 249(a)(lii) and included amounts paid to Shenker's company on the videogame license.

[6] In a nutshell, THQ had lost its license to produce wrestling videogames from a competitor of WWE, a license which accounted for 87% of its revenues in the first quarter of 1998 when the events in question were occurring. It desperately needed the WWE license to survive, and sold its corporate soul to Jakks to get a piece of it.



O.C. ¶¶ 87-90; A.C. ¶¶167-170. In addition, substantial allegations are added in the Amended Complaint regarding the agreements made by Jakks, THQ and Jakks/THQ regarding the distribution of the proceeds derived from the bribery induced videogame license, all of which constitute additional money laundering. A.C. ¶¶ 173-185; 249b. See United States v. McCarthy, 271 F.3d 387, 395 (2d Cir. 2001) (holding that a transaction conducted with the proceeds from specified unlawful activity is money laundering within meaning of 18 U.S.C. § 1957; is a separate offense; and is not part of one continuous offense); Welch Foods Inc. v. Gilchrist, No. 93-CV-0641E(F), 1996 WL 607059, at *5 (W.D.N.Y. Oct. 18, 1996) (commercial bribery is a specified unlawful activity under section 1957's money laundering prohibition). The money laundering associated with the proceeds of the videogame license began in January 1998, has continued through December 31, 2004 and will continue as long as proceeds of that videogame license are transferred by THQ/Jakks and THQ. A.C. ¶¶ 249b. In connection with the unlawful conduct, money has been laundered through at least five foreign or domestic banks known to date.[7]

In sum, the Amended Complaint establishes closed-ended continuity extending for a "substantial period of time" well beyond the two year period Defendants argued was required to establish closed-ended continuity. See Zito v. Leasecomm Corp., No. 02 Civ. 8074(GEL), 2003 WL 22251352, at *16-17 (S.D.N.Y. Sept. 30, 2003) (the statistic that the Second Circuit has never held a period of less than two years to establish closed-ended continuity does not create a pleading requirement or even merit empirical weight). A pattern of racketeering activity which began in

---

[7] The allegations regarding violations of New York's bribery statute, which are also predicate acts, were amended to include various payments made to Bell by Shenker in connection with the videogame license. See A.C. ¶ 249e.

November 1995, continues to date, and is certain to continue into the future is now alleged in the Amended Complaint. Additionally, open-ended continuity, which is viewed from the time of the occurrence of the initial acts in the unlawful pattern, is also established by the Amended Complaint. See, e.g., Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc., 879 F.2d 10, 18 (2d Cir. 1989) (a scheme that necessarily involves predicate acts over a decade is open-ended). Far from being the "inherently terminable" scheme suggested by Defendants, the pervasive, multifaceted and long term series of predicate acts demonstrate a way of doing business and the continual escalation of unlawful activities whenever a desired licensing opportunity presented itself, as well as money laundering for years thereafter.

2.) ALLEGED MAIL/WIRE FRAUD DEFICIENCIES – Several Defendants argued that the mail and wire fraud allegations were defective because the communications contained no false statements. RICO, however, does not require that the predicate mail or wire communications themselves contain fraudulent communications where such communications are incidental to an essential part of the scheme. Schmuck v. United States, 489 U.S. 705, 710-11 (1989); Jerome M. Sobel & Co. v. Fleck, No. 03 Civ.1041 RMB GWG, 2003 WL 22839799, at *5 (S.D.N.Y. Dec. 1, 2003) ("to survive a Motion to Dismiss in such a case, the Complaint need not identify false statements contained in the mailings or wire transmissions themselves."). In such cases, a detailed description of the underlying scheme and connection to the mails and wires satisfies fraud particularity standards. USA Certified Merchants, LLC v. Koebel, 262 F. Supp. 2d 319, 332 (S.D.N.Y. 2003); In re Sumitomo Copper Litig., 995 F.Supp. 451, 456 (S.D.N.Y. 1998) (Rule 9(b) only requires a description of "the overall fraudulent scheme"). It is also not necessary that a particular defendant actually undertake the



mailing, provided it was reasonably foreseeable that the mails would be used in the ordinary course of business as a result of defendant's acts. United States v. Bortnovsky, 879 F.2d 30, 36 (2d Cir. 1989). Finally, mail fraud includes not only affirmative misrepresentations, but also fraudulent omissions, such as when bribes have been paid to an agent or employee. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young, No. 91 Civ. 2923 (CSH), 1994 WL 88129, at *9 (S.D.N.Y. Mar. 15, 1994). The original Complaint more than complied with these requirements and clearly set forth the scheme to defraud WWE of honest services in connection with obtaining licensing rights, and the necessary use of mails to do so. The Amended Complaint provides an even more extensive description of the pervasive nature of the underlying scheme to defraud WWE of the honest services of its agents which included, but was not limited to, commercial bribery in connection with obtaining several different licensing rights, and includes additional mailings incidental to the mail fraud aspect of the racketeering activity. A.C. ¶¶ 37-185; 249a. WWE believes both Complaints are sufficient in this regard.

3.) Alleged Deficiency in Bribery and Money Laundering Allegations – Defendants argued that the commercial bribery predicate acts were deficient because the RICO injury was said to be speculative. That deficiency, in turn, was said to render the money laundering allegations insufficient.[8] WWE's burden of proof is to show injury caused by a pattern of racketeering activity or by individual predicate acts. Factual causation is a "but for" test, and proximate causation is shown if the RICO pattern or acts "are a substantial factor in the sequence of

[8] As a legal matter, the bribery allegations must comply only with notice pleading requirements. Merrill Lynch v. Young, 1994 WL 88129, at *8.

responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence." Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 23-24 (2d Cir. 1990). There was nothing speculative about the RICO injury alleged by WWE in the original Complaint – the underpayment of royalties and associated diversion of money to Jakks which should have, and would have, been paid to WWE but for the criminal conduct. Indeed, from Jakks' perspective, the whole point of the illegal conduct as it unfolded was to get a piece of the action of the videogame revenues by placing itself in the role of a broker whereby it, not WWE, dictated the terms on which THQ would obtain rights to exploit WWE's intellectual property. The Amended Complaint alleges the financial rewards paid to Jakks by THQ for orchestrating this fraud. Jakks, which neither owned the intellectual property nor was to have any role in brokering the rights on behalf of WWE, has been paid sixty-four million dollars by THQ through year end 2004 for its illicit role in obtaining control over the licensing decision by acts of racketeering. By comparison, fifty-four million dollars has been paid to WWE, the true owner of the intellectual property. A.C. ¶ 184. Additionally, by foreclosing competition and obtaining the license at well-below market value, Defendants injured WWE in excess of hundreds of millions of dollars. A.C. ¶¶ 161-164.

4.) DEFENDANTS' ENTERPRISE ARGUMENTS – Certain Defendants challenged whether the original Complaint established an enterprise, contending it had to be separate and apart from the pattern of racketeering activity. Enterprise allegations are subject only to notice pleading. In re Sumitomo Copper Litig., 104 F. Supp. 2d 314, 319 (S.D.N.Y. 2000). Liability under section 1962(c) depends on showing that the defendants "conducted or participated in the conduct of the 'enterprise's affairs', not just their own affairs." Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 163



(2001) (emphasis added). The Supreme Court has acknowledged that the proof used to establish an enterprise separate and apart from the predicate acts "may in particular cases coalesce." United States v. Turkette, 452 U.S. 576, 583 (1981). This is in fact the standard in the Second Circuit. See, e.g., United States v. Coonan, 938 F.2d 1553, 1560 (2d Cir. 1991) ("Common sense suggests that the existence of an association-in-fact is oftentimes more readily proven by 'what it *does*, rather than by abstract analysis of its structure.'") (emphasis in original); United States v. Ferguson, 758 F.2d 843, 853 (2d Cir. 1985) (RICO charges may be proven even when the enterprise and predicate acts are functionally equivalent). This line of controlling legal authority was not addressed in any of Defendants' briefs. The original Complaint more than satisfied the notice pleading standard and was consistent with controlling Second Circuit law. As the Court in Turkette indicated, an enterprise is nothing more than a "group of persons associated together for a common purpose of engaging in a course of conduct." Turkette, 452 U.S. at 583. The original Complaint alleged the common purpose of the members of the enterprise in great detail, and then separately pled the racketeering activities committed. No more is required. The Amended Complaint adds even greater factual detail going well beyond the relevant notice standard. See A.C. ¶¶ 35-185.

5.) ALLEGED OPERATION AND MANAGEMENT DEFICIENCIES – THQ and THQ/Jakks argued that the original Complaint failed to adequately allege their participation in the operation or management of the enterprise. WWE disagrees with that assessment, both factually and legally. See First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 176 (2d Cir. 2004) ("In this Circuit, the 'operation or management' test typically has proven to be a relatively low hurdle for plaintiffs to clear . . . especially at the pleading stage.") (internal citations omitted). The issue is essentially a

factual issue requiring proof only that a RICO defendant played "some part in directing [the enterprise's] affairs." Id. at 176 (emphasis in original). In any event, the Amended Complaint adds substantial allegations regarding THQ's and THQ/Jakks' role in the operation and management of the enterprise. A.C. ¶¶ 136-149; 154-164; 166; 173-185. Indeed, on the authority of THQ/Jakks and pursuant to an agreement with Jakks, THQ is responsible for the performance of the videogame license, including the collection of revenues and distribution of the proceeds of the contract obtained as a result of the racketeering activities, including the aforementioned sixty-four million dollars paid to date to Jakks. A.C. ¶¶ 173-185; 249b.

6.) ALLEGED SCIENTER AND VICARIOUS LIABILITY DEFICIENCIES – THQ and THQ/Jakks challenged the sufficiency of the scienter allegations against them, portraying themselves as innocent late-comers to the unlawful conduct. WWE believes the original Complaint was sufficient and that the Amended Complaint is unquestionably sufficient under the authorities cited by Defendants, plus other law not cited by them. As a matter of law, "When conduct is proscribed by a federal statute and civil liability for that conduct is explicitly or implicitly imposed, the normal rules of agency law apply in the absence of some indication that Congress had a contrary intent." USA Certified Merchants, LLC v. Koebel, 262 F. Supp. 2d 319, 329 (S.D.N.Y. 2003) (citation omitted). This Court has specifically found that there is "nothing in RICO or its legislative history which would suggest that the normal rules of agency law should not apply to the civil liability created by that statute." Connors v. Lexington Ins. Co., 666 F.Supp. 434, 453 (S.D.N.Y. 1987) (citations omitted); see also Amendolare v. Schenkers Int'l Forwarders, Inc., 747 F.Supp. 162, 171 (E.D.N.Y. 1990) (finding that application of agency doctrine "would not contravene the language or policy underlying RICO").

THQ and Jakks have held themselves out as partners or joint venturers with respect to the procurement of the videogame license, claiming it was "jointly obtained." A.C. ¶ 158. The law governing joint ventures is the same as partnership law. Gramercy Equities Corp. v. Dumont, 531 N.E.2d 629, 632 (N.Y. 1988). The liability of a partner and the partnership for a partner's conduct within the scope of the business requires neither actual participation in nor knowledge of the wrongful conduct before liability may be imposed. In re Wedtech Corp., 88 B.R. 619, 623 (Bankr. S.D.N.Y. 1988). Under well-established agency principles, THQ and THQ/Jakks are not free to receive the fruits of the bargain without adopting the instrumentalities employed by their partner and are bound by the fraud of Jakks, even if ignorant of the fraud and intending no fraud themselves. Young v. New York State Elec. & Gas Corp., 55 N.Y.S.2d 150, 153-54 (N.Y. Sup. Ct. 1945). Moreover, "It is a basic tenet of the law of agency that the knowledge of an agent, or for that matter a partner or joint venturer, is imputed to the principal." Mallis v. Bankers Trust Co., 717 F.2d 683, 689 (2d Cir. 1983).[9]

Independent of numerous agency principles which operate as a matter of law to make the actions of Jakks and the knowledge of Jakks' high ranking officers that of THQ and THQ/Jakks, the scienter of THQ and THQ/Jakks can be independently and circumstantially proven by demonstrating a motive for committing fraud and a clear opportunity to do so. Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc., 187 F.3d 229, 241 (2d Cir. 1999). Lastly, on THQ's own authorities,

[9] The same result is accomplished by ratification principles well-established in agency law which will be briefed if THQ and THQ/Jakks continue to challenge the legal basis for their liability. It is not an option for THQ and THQ/Jakks to deny liability for the acts of their partners under the law. Their remedy is to assert cross-claims against Jakks for violating fiduciary duties owed THQ and THQ/Jakks by Jakks.

such vicarious liability will be imposed on THQ if a corporate officer or director had knowledge of or was recklessly indifferent toward the unlawful activity. USA Certified Merchants, LLC, 262 F. Supp. 2d at 328.

As noted, the Amended Complaint adds to the substantial allegations of the original Complaint with respect to all of these issues. THQ's motivation for participating in the scheme, and its opportunity to do so, is set forth in great detail in the Amended Complaint. A.C. ¶¶ 118-164. THQ's actions were done at the highest level of the corporation. Although knowledge can be averred generally under Rule 9(b), the aforementioned allegations plainly support the conclusion that THQ "knew or was recklessly indifferent" to the unlawful activity. Thus, the Amended Complaint provides clearly sufficient allegations to hold both THQ and THQ/Jakks liable under numerous legal doctrines.

## COSTS AS A SANCTION

WWE respectfully submits that it has done nothing sanctionable. WWE is not aware of any Court ever awarding, or even considering an award of, sanctions because a plaintiff exercised the right under Rule 15(a) to amend as of right.[10] The Federal Rules of Civil Procedure certainly contain no such fee shifting provision. And, as the Court noted, it did not believe WWE's counsel acted in bad faith which is a required finding in order to award sanctions under 28 U.S.C. § 1927. See

---

[10] In Harrison v. NBD Inc., 990 F. Supp. 179, 185 (E.D.N.Y. 1998), the Court rejected a similar argument to that made here. Defendants attempted to claim they would be prejudiced if they had to incur the costs of analyzing a third Amended Complaint. Finding no law where leave to amend was denied due to the burden of costs of litigation, the Court rejected the assertion that such a burden was a reason to deny a motion to amend.

MacDraw, Inc. v. CIT Group Equip. Fin., Inc., 73 F.3d 1253, 1258 (2d Cir. 1996) (a finding of subjective bad faith is required to support award).

On a more fundamental note, WWE respectfully submits such sanctions are inconsistent with the deliberate architecture of the Federal Rules of Civil Procedure. WWE's intent in this case is to have the case resolved by a jury on the merits. The Defendants are given the right by the Rules to test the sufficiency of the Complaint in order to try to defeat that goal. This Court quite properly afforded the Defendants the right to move to dismiss. See Richardson Greenshields Sec., Inc. v. Lau, 825 F.2d 647, 652 (2d Cir. 1987). ("Absent extraordinary circumstances, such as a demonstrated history of frivolous and vexatious litigation ... or a failure to comply with sanctions imposed for such conduct ... a Court has no power to prevent a party from filing pleadings, motions or appeals authorized by the Federal Rules of Civil Procedure.").[11]

Having afforded the Defendants their right under the rules of procedure, we respectfully submit that no basis exists for denying WWE its right to amend once as of right or sanctioning the exercise of that right. The right to file an amended pleading once as a matter of right is also a pleading authorized by Rule 15(a), and is not cut off by a Motion to Dismiss. To punish that right by an award of sanctions is to destroy the right, and is inconsistent with the rules. Accordingly, WWE respectfully submits that no factual or legal basis exists to award sanctions.

---

[11] Accord, Milltex Indus. Corp. v. Jacquard Lace Co., 55 F.3d 34, 39 (2d Cir. 1995); Eisemann v. Greene, 204 F.3d 393, 397 (2d Cir. 2000); Fruit of the Loom, Inc. v. American Mktg. Enter., Inc., 192 F.3d 73, 75 (2d Cir. 1999) (District Court judges are bound by the Federal Rules of Civil Procedure and may not apply their individual practice rules in a manner that is inconsistent with the Federal Rules).



Kirkpatrick & Lockhart Nicholson Graham LLP

Honorable Kenneth M. Karas
May 6, 2005
Page 15

**CONCLUSION**

WWE respectfully requests that the Court now order Defendants to respond to the Amended Complaint on a schedule deemed fair by the Court. During the last conference, the Court urged counsel to view things through the eyes of their adversary. WWE respectfully requests that the Court consider our mindset with regard to amending. Our only guidance on exercising the right to amend - the Federal Rules and case law of this Circuit - indicates only that the right was unfettered, and no order precluded WWE from exercising the right when it did so.

In closing, we submit it is in the interest of all concerned to direct our collective energies now to the merits of the lawsuit, and we ask the Court to put the parties on a path to do so by ordering the Defendants to answer or otherwise move with respect to the Amended Complaint by a date deemed reasonable by the Court.

Very truly yours,

Jerry S. McDevitt

JSM:laf
cc: All Counsel of Record (via electronic mail and Federal Express)

**CERTIFICATE OF SERVICE**

The undersigned, an attorney duly admitted to practice law before this Court, hereby certifies under penalty of perjury, that on May 6, 2005, I caused a true copy of the foregoing: (i) WWE's May 6, 2005 letter to Judge Karas; (ii) Compendium of Unreported Cases Cited in WWE's May 6, 2005 letter; and (iii) Redline version of WWE's Amended Complaint, to be served upon the following parties via electronic mail service and Federal Express:

John R. Williams
Williams & Pattis, LLC
51 Elm Street, Suite 409
New Haven, CT 06510

Michael A. Cornman
Schweitzer Cornman Gross & Bondell, LLP
292 Madison Avenue
New York, NY 10017

Steven A. Marenberg
Irell & Manella, LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067-4276

Steven M. Bierman
Sidley Austin Brown & Wood
787 Seventh Avenue
New York, NY 10019

Michael A. Freeman
24 West 40th Street
17th Floor
New York, NY 10018

Jonathan J. Lerner
Skadden, Arps, Slate, Meagher & Flom, LLP
Four Times Square
New York, NY 10036-6522

Murray L. Skala, Esquire
Feder, Kaszovitz, Isaacson, Weber, Skala, Bass & Rhine, LLP
750 Lexington Avenue
New York, NY 10022-1200

Richard Schaeffer
Dornbush Schaeffer Strongin & Weinstein, LLP
747 Third Avenue
New York, NY 10017

Jerry S. McDevitt

Dated: May 6, 2005

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

FOUR TIMES SQUARE
NEW YORK 10036-6522

TEL: (212) 735-3000
FAX: (212) 735-2000
www.skadden.com

DIRECT DIAL
212-735-2550
DIRECT FAX
917-777-2550
EMAIL ADDRESS
JLERNER@SKADDEN.COM

FIRM/AFFILIATE OFFICES
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

May 9, 2005

BY FACSIMILE

Honorable Kenneth M. Karas
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street, Room 920
New York, New York 10007

Re: World Wrestling Entertainment, Inc. v. JAKKS Pacific, Inc., et al., 1:04-CV-08223-KMK

Dear Judge Karas:

We write on behalf of the JAKKS Defendants to request permission to submit a short response to the fifteen (15) page letter submitted on Friday May 6, 2005 by World Wrestling Entertainment, Inc. ("WWE"), which purports to respond to the Court's Order of April 27, 2005. Pursuant to the instruction from Your Honor's Law Clerk to indicate the proposed subjects in our letter, we seek to:

(1) address WWE's compliance with this Court's April 6, 2005 and April 27, 2005 directives that WWE "identify how the Amended Complaint responds to the dispositive motions raised by Defendants." See April 6 Order at 1-2; April 27, 2005 Transcript at 52;

(2) bring to the Court's attention legal authorities addressing the appropriate consequences where a plaintiff fails to file a responsive brief in opposition to a pending motion to dismiss, and instead files an amended complaint that fails to address defects that were raised in the dismissal motion; and

(3) address WWE's assertions that it has "done nothing sanctionable" and that the Federal Rules of Civil Procedure do not warrant fee shifting under the circumstances here.

Accordingly, we respectfully request leave to file, on or before Friday May 13, 2005, a letter of no more than ten (10) double-spaced pages.

Respectfully submitted,

Jonathan J. Lerner

cc: All Counsel

IRELL & MANELLA LLP
A REGISTERED LIMITED LIABILITY LAW PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

840 NEWPORT CENTER DRIVE, SUITE 400
NEWPORT BEACH, CA 92660-6324
TELEPHONE (949) 760-0991
FACSIMILE (949) 760-5200

1800 AVENUE OF THE STARS, SUITE 900
LOS ANGELES, CALIFORNIA 90067-4276

TELEPHONE (310) 277-1010
FACSIMILE (310) 203-7199
WEBSITE: www.irell.com

WRITER'S DIRECT
TELEPHONE (310) 203-7547
FACSIMILE (310) 203-7199
smarenberg@irell.com

May 13, 2005

**VIA MESSENGER**

The Hon. Kenneth M. Karas
United States District Court
Southern District of New York
500 Pearl Street, Room 920
New York, NY 10007

Re: World Wrestling Entertainment, Inc. v. JAKKS Pacific, Inc., et al., 1:04-CV-08223-KMK

Dear Judge Karas:

We write on behalf of our clients, Defendants THQ Inc., and Brian Farrell (collectively "THQ"), in response to WWE's letter to the Court of May 6, 2005. Consistent with past practice, our representations to the Court, and the Court's May 10, 2005 Order, in this letter we focus solely on why certain claims in WWE's amended complaint against THQ are insufficient to remedy the defects in the original complaint that we identified in our motion to dismiss that pleading.[1]

For the reasons summarized below, WWE's amended complaint does not remotely remedy the defective claims in its first pleading. Certain defects in the original complaint – such as the facial infirmity of both WWE's Robinson-Patman claims and WWE's claim based on New York's commercial bribery law – are so clear and incurable that this Court: (1) can and should dismiss them *sua sponte*, (see note 6, infra), and (2) deny leave to file the current (and any future) amended pleading that merely incorporates comparably inadequate variations of them. In its May 6th letter,

[1] Accordingly, in this letter we have only responded to WWE's arguments in its May 6 letter, and will not address WWE's new Sherman Act claims not previously alleged.

WWE has not even attempted to explain how these claims are not subject to dismissal as a matter of law in light of clear and controlling authority. We submit that permitting the filing of such a facially defective pleading would only ensure additional and wasteful rounds of pleading motions filed under Fed. R. Civ. P. 12(b), and ought not to be permitted.

The same is true as to the RICO claims WWE purports to state against THQ. Indeed, WWE's amended complaint not only fails to cure the defects in the original complaint, it further exacerbates them. Specifically, by adding new averments to the Amended Complaint relating to Jakks' and other Defendants' alleged efforts to fraudulently procure a toy license in 1996 (with which THQ had nothing to do), WWE's amended pleading only underscores further how far removed THQ – which did not become involved with Jakks or WWE until several years later – was from the alleged criminal scheme. Thus, as in its original complaint, the RICO claims in WWE's amended complaint fail against THQ because WWE cannot show: (1) that THQ engaged in a continuous pattern of racketeering activity; (2) that THQ was involved in the "operation or management" of the RICO enterprise, which started years before THQ's alleged "involvement" in it; and/or (3) that THQ can and should be held vicariously liable for actions of an alleged enterprise formed years before THQ was involved with the participants.[2]

---

[2] In its original motion, THQ also asserted that WWE's original complaint was defective against THQ because it failed to allege the requisite number of predicate acts of racketeering. By failing to allege that THQ had *any* knowledge of the alleged crimes of Jakks and others, WWE tacitly acknowledged that THQ simply could not have committed criminal acts of racketeering. WWE has attempted to cure this deficiency with boilerplate, conclusory allegations of THQ's *scienter*. These pro forma allegations cannot and do not rescue the pleading. First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 772 (2d Cir. 1994) ("Courts do not accept conclusory allegations on the legal effect of the events plaintiff has set out if these allegations do not reasonably follow from his description of what happened."). In the interests of brevity, however, THQ will not discuss this ground herein (nor will THQ discuss certain deficiencies identified in its original motion in certain

A. **WWE Failed to Cure the Defects in its RICO Claims Against THQ**

In its effort to resuscitate its defective RICO claims, WWE has been forced in its amended complaint to completely recast the alleged unlawful scheme. It now avers that Jakks and other defendants (but not THQ or THQ/Jakks Pacific LLC (the "LLC")) began their bribery scheme in late 1995 in connection with a toy license, with which THQ had nothing to do. (Amended Complaint ("AC"), ¶¶ 40-71.) As with its original complaint, the amended complaint does not allege that THQ's "involvement" in the matter began until at least April 1998 – *years* after the enterprise began operating. And, even at this time, WWE alleges that THQ was competing *against* Jakks. (AC ¶ 133.) According to the amended complaint itself, Jakks' allegedly corrupt "double-agents," Shenker and Bell, attempted to dissuade THQ from bidding on the Videogame License when THQ first showed interest in it in April 1998. (AC, ¶ 129.) Only when THQ would not relent in legitimately seeking the Videogame License and making a superior offer to that of Jakks, is it even alleged that Jakks and its double agents approached THQ about jointly bidding on the Videogame License "in order to deal with the threat of competition presented by the undesired emergence of THQ."[3] (AC, ¶¶ 131, 136.) Nowhere in WWE's hundred-plus page complaint does it allege that Jakks or anyone else told THQ about the alleged bribery.

Also like the original complaint, THQ's "involvement" in the corrupt acts necessarily ended a few months later when the Videogame License was procured by the LLC, the entity set up by THQ

state-law claims based on the lack of *scienter* allegations). Should the Court accept WWE's amended complaint, THQ would move to dismiss on this ground along with the other grounds discussed in depth herein.

[3] Obviously, for purposes of the inquiry before the Court, as required we assume that the allegations as to THQ's alleged involvement in the conduct alleged in the pleadings are true, though in fact there is not a shred of truth to these accusations against THQ.

and Jakks to hold the Videogame License. Although WWE strains to extend THQ's involvement beyond procurement of the Videogame License, the law is clear as explained below that whatever "scheme" THQ was involved in naturally terminated upon procurement of the Videogame License.

**1. WWE's Amended Complaint Does not Cure the Deficiencies in the "Continuity" Allegations Against THQ**

Unlike Jakks and other defendants who, according to the latest allegations, were involved in the alleged enterprise for years, THQ's alleged involvement was fleeting and at most lasted for a few months. Thus, WWE cannot satisfy the requirement of alleging that THQ engaged in a continuous "pattern of racketeering activity." 18 U.S.C. § 1962(c). When "analyzing the issue of continuity," courts must "evaluate the RICO allegations with respect to *each defendant individually*." First Capital Asset Mgmt. v. Satinwood, Inc., 385 F.3d 159, 181 (2d Cir. 2004) (emphasis added). "Continuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." H.J., Inc. v. Northwestern Bell Telephone Co., 492 U.S. 229, 241 (1988). WWE argues it has alleged both open- and closed-ended continuity as to THQ. WWE alleges neither, however.

WWE's amended complaint falls far short of making the requisite allegations as to open-ended continuity. When the enterprise is a legitimate business, "there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." Cofacredit, S.A. v. Windsor Pulmbing Supply Co., 187 F.3d 229, 243 (2d Cir. 1999). WWE never alleges, nor could it, that the alleged criminal activity here was "the regular way" THQ operates business. Indeed, the averments of the amended complaint do not even make clear that THQ knew about the alleged criminal activity (E.g., AC ¶ 143 ("Farrell and THQ either knew of, or were

recklessly indifferent toward, the unlawful activity set forth herein."). Moreover, the allegations of the complaint as to THQ do not support a finding that there was a threat of continued criminal activity by it. Courts in this Circuit routinely hold that a scheme to fraudulently obtain a single agreement, or a scheme with only one victim is insufficient for purposes of open-ended continuity. Schaeffler Nance & Co. v. Estate of Warhol, 119 F.3d 91, 98 (2d Cir. 1997) ("There was no open-ended continuity here. There was no threat that the alleged fraud involved in the execution of the [one] Agreement would continue in the future."); CPF Premium Funding, Inc. v.. Ferrarini, No. 95 Civ. 4621(CSH), 1997 WL 158361, at *9 (S.D.N.Y. 1997) (thirty-five alleged predicate acts are not threat of continued criminal activity where "the acts were all directed at the same corporation and took place within a relatively short time span").

WWE's allegations of "closed-ended" continuity are likewise insufficient as a matter of law. THQ's short alleged involvement in procuring the Videogame License – lasting only a few months – is well shy of the requisite "substantial period of time" for purposes of closed-ended continuity. First Capital, 385 F.3d at 181 ("this Court has never found a closed-ended pattern where the predicate acts spanned fewer than two years"); Cofacredit, 187 F.3d at 244 (same). WWE attempts to evade this fatal problem with new allegations that the use of all of the proceeds from the Videogame License constitute predicate acts of "money laundering," which, it avers, continue to this day. (AC, ¶¶ 249.b.xxviii-xxxviiii.) This argument is without merit. The acts which WWE characterizes as "money laundering" consist of no more than payments among the relevant parties pursuant to the terms of the Videogame License. Under the plain terms of the money laundering statutes, such acts are not laundering. The *proceeds* from the Videogame License are not "criminally derived property" or the "proceeds of some form of unlawful activity." See 18 U.S.C. §§ 1956(a)(1),