# EXHIBIT A

*195*

U.S. DISTRICT COURT
DEC 28 2007
W.P.
S.D. OF N.Y.

#_____

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------X
WORLD WRESTLING ENTERTAINMENT, INC.

              **Plaintiff,**

   -against-

JAKKS PACIFIC, INC., JAKKS PACIFIC (H.K.)
LIMITED, ROAD CHANMPS LIMITED, THQ, INC.,
THQ/JAKKS PACIFIC, L.L.C., THE JOINT VENTURE
OF THE THQ, INC., STANLEY SHENKER AND
ASSOCIATES, INC., STANLEY SHENKER, BELL
LICENSING, L.L.C., JAMES BELL, JACK FRIEDMAN,
STEPHEN BERMAN, JOEL BENNETT, BRIAN
FARRELL, QUANTUM EQUITIES, LLC, FRANK
WHITING,
            **Defendants.**
------------------------------X

**04 Civ. 8223 (KMK)**
**JUDGMENT**

     Whereas the above entitled action having been assigned to the Honorable Kenneth M.
Karas, U.S.D.J., and the Court thereafter on December 21, 2007 having handed down an Opinion
and Order (Docket # 194) granting Defendants' Motions to Dismiss, and denying Plaintiff's
Motion to Strike as moot, it is,

     **ORDERED, ADJUDGED AND DECREED:** that Defendants' Motions to Dismiss
are granted with prejudice and Plaintiff's Motion to Strike is Denied as Moot and the case is
hereby closed.

**Dated: White Plains, N.Y.**
       **December 28, 2007**

                     *J. Michael McMahon*

               **Clerk of Court  - J. Michael McMahon**

**ENTERED AS A JUDGMENT ON:** *1-3-08*

MICROFILM
DEC 2 6 2007
USDC SDNY W.P.

I:\JUDGMENT\WWE.223.wpd

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WORLD WRESTLING ENTERTAINMENT, INC.,

Plaintiff,

-v-

JAKKS PACIFIC, INC., JAKKS PACIFIC (H.K.)
LTD., ROAD CHAMPS LTD., THQ, INC.,
THQ/JAKKS PACIFIC L.L.C., STANLEY
SHENKER & ASSOCS., INC., BELL LICENSING,
L.L.C., JACK FRIEDMAN, STEPHEN BERMAN,
JOEL BENNETT, BRIAN FARRELL, STANLEY
SHENKER, JAMES BELL,

Defendants.

Case No. 04-CV-8223 (KMK)

OPINION AND ORDER
ECF Case

APPEARANCES:

Jerry McDevitt, Esq.
Amy Lyn Barrette, Esq.
William Purcell, Esq.
Kirkpatrick & Lockhart Nicholson Graham, LLP
Pittsburgh, PA
Counsel for Plaintiff

Jonathan Lerner, Esq.
Maura Barry Grinalds, Esq.
Michael Gruenglas, Esq.
Skadden, Arps, Slate, Meagher & Flom, LLP
New York, NY
Jonathan Honig, Esq.
Feder, Kaszovitz, Isaacson, Weber, Skala, Bass & Rhine LLP
New York, NY
Counsel for Defendants Jakks Pacific, Inc., Jack Friedman,
Stephen Berman, and Joel Bennett

Steven Marenberg, Esq.
Irell & Manella LLP
Los Angeles, CA
Counsel for Defendant THQ, Inc.
and Brian Farrell

Richard Schaeffer, Esq.
Bruce Handler, Esq.
Dornbush, Mensch, Mandelstam & Schaeffer, L.L.P.
New York, NY
*Counsel for THQ/Jakks Pacific L.L.C.*

Michael Alan Freeman, Esq.
Law Offices of Michael A. Freeman and McCallion & Associates
New York, NY
*Counsel for Defendants Stanley Shenker*
*and Stanley Shenker & Assocs., Inc.*

KENNETH M. KARAS, District Judge:

Plaintiff World Wrestling Entertainment, Inc. ("WWE") filed this action against

Defendants Jakks Pacific, Inc. ("Jakks"), Jakks Pacific H.K. Ltd. ("Jakks H.K."), Road Champs,

Ltd. ("Road Champs"), THQ, Inc. ("THQ"), THQ/Jakks Pacific LLC ("THQ/Jakks"), Stanley

Shenker & Associates, Inc. ("SSAI"), Bell Licensing, LLC ("Bell Licensing"), Stanley Shenker

("Shenker"), James Bell ("Bell"), Jack Friedman ("Friedman"), Stephen Berman ("Berman"),

Joel Bennett ("Bennett"), and Brian Farrell ("Farrell"). Plaintiff's original Complaint asserted

federal claims arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO"),

18 U.S.C. § 1962(c), (d), and the Robinson-Patman Act, 15 U.S.C. § 13(c). The Complaint also

alleged causes of action under New York State law for commercial bribery, fraudulent

inducement, unjust enrichment, breach of fiduciary duty, inducement of breach of fiduciary duty,

tortious interference with contractual relations, and conspiracy to engage in each of the above

acts.

As will be discussed more fully below, on March 31, 2005, Plaintiff filed an Amended

Complaint. The Amended Complaint contains more detailed factual allegations of wrongdoing

2

by Defendants and also adds a Sherman Act cause of action. Plaintiff seeks compensatory, statutory, and punitive damages, a declaration that the licensing agreements entered into or extended as a result of the alleged bribery are void, an accounting of all revenues and profits obtained by Defendants under the licenses, disgorgement and/or restitution for any improper revenues and/or profits obtained under the agreements, disgorgement and/or restitution of any amounts allegedly paid to Defendants as bribes, and attorney's fees and costs.

All Defendants have moved to dismiss the RICO causes of action on the ground that they fail to adequately plead a RICO enterprise. Certain Defendants have also moved to dismiss the Robinson-Patman and Sherman Act causes of action against them. Furthermore, Defendants Shenker and SSAI have moved to dismiss the RICO causes of action on res judicata and abstention grounds.[1] For the reasons discussed in detail herein, the Motions to Dismiss the RICO causes of action are denied and the Motions to Dismiss the Robinson-Patman and Sherman Act causes of action are granted.

## I. Background

### A. Parties

This action involves a large number of parties with various roles in the unlawful scheme alleged by Plaintiff. For clarity, the Court provides a summary of the Parties and their respective roles in the alleged scheme.

---

[1]The Defendants have also moved to dismiss the RICO causes of action on other grounds, as well as the state law causes of action. Those motions have not been fully briefed for reasons discussed below, and therefore, are not considered here. Also, Defendants moved for transfer of venue, but have since withdrawn those Motions. (*See* Letter from Michael A. Freeman to the Court, Jan. 24, 2006; Letter from Richard Schaeffer to the Court, Jan. 23, 2006; Letter from Jonathan J. Lerner to the Court, Jan. 20, 2006; Letter from Steven A. Marenberg to the Court, Jan. 19, 2006)

3

Plaintiff WWE is principally engaged in the development, promotion, and marketing of television and pay-per-view programming and live arena events related to professional wrestling. (Am. Compl. ¶ 9)  As part of its business, WWE also creates characters whose names and likenesses may be licensed to third parties.  (Am. Compl. ¶ 9)

Defendant Jakks principally sells action figures and toys.  (Am. Compl. ¶ 10)  Defendant Jack Friedman is the Chief Executive Officer and Chairman of Jakks.  (Am. Compl. ¶ 13)  He co-founded Jakks with Defendant Berman.  (Am. Compl. ¶ 13)  Prior to founding Jakks, Friedman was the CEO of Defendant THQ.  (Am. Compl. ¶ 14)

Jakks and Friedman also own Jakks H.K. and Road Champs, both Hong Kong Corporations.  (Am. Compl. ¶¶ 11-12)

During the times relevant to the Amended Complaint, Defendant Berman was the Executive Vice President of Jakks.  (Am. Compl. ¶ 15)  Berman also served at times as Jakks's President, Secretary, and Chief Operating Officer.  He currently serves on Jakks's Board of Directors.  (Am. Compl. ¶ 15)

Defendant Bennett was Jakks's Chief Financial Officer during the times relevant to the Complaint. (Am. Compl. ¶ 16)

Defendant THQ, Inc. markets and sells video games.  (Am. Compl. ¶ 17)  Defendant Farrell is the President, Chief Executive Officer, and a member of the Board of Directors of THQ.  (Am. Compl. ¶ 18)

THQ and Jakks formed THQ/Jakks Pacific LLC as a joint venture on June 10, 1998. (Am. Compl. ¶ 19)  THQ/Jakks was formed in order to be the official licensee for WWE's video game license.  (Am. Compl. ¶ 19)  Defendant Berman was authorized to act on behalf of the joint

4

venture. (Am. Compl. ¶ 19)

Defendant SSAI served as WWE's licensing agent from approximately April 1995 through June 13, 2000. (Am. Compl. ¶ 20) Defendant Shenker is the sole owner and President of SSAI. (Am. Compl. ¶ 21) He is also the sole owner and alleged alter ego of a Hong Kong corporation known as Stanfull Industrial, Ltd. (Am. Compl. ¶ 21) Shenker allegedly used Stanfull for a variety of criminal and fraudulent enterprises. (Am. Compl. ¶ 21)

Defendant Bell Licensing is a limited liability company and was allegedly formed to launder bribes paid to Bell while he was an executive at WWE. (Am. Compl. ¶ 22) Defendant Bell is a former WWE executive and is the President and sole owner of Bell Licensing. (Am. Compl. ¶ 23) On February 10, 2005, Bell pled guilty in the United States District Court for the District of Connecticut to one count of mail fraud in violation of 18 U.S.C. § 1342 in connection with his receipt of bribes relating to WWE's licensing program. (Am. Compl. ¶ 24)

### B. Facts

For purposes of this Motion, the Court accepts as true the allegations in the Amended Complaint, which are: In March 1995, WWE hired Bell to negotiate and procure licenses for its intellectual property. (Am. Compl. ¶ 29) From October 1996 to his termination on March 24, 2000, Bell served as WWE's Senior Vice President of Licensing and Merchandising. (Am. Compl. ¶ 29)

At Bell's urging, WWE entered into a nonexclusive agency agreement with SSAI in April 1995. (Am. Compl. ¶ 32) SSAI was to procure and negotiate licensing contracts on behalf of WWE. (Am. Compl. ¶ 32) The agreement between SSAI and WWE provided that SSAI would receive a commission of eleven percent of royalties on licenses negotiated by SSAI. (Am.

Compl. ¶ 77)

Shortly after SSAI and WWE entered into the agency agreement in 1995, Friedman approached Bell and Shenker at the annual New York Toy Fair. (Am. Compl. ¶ 35) Friedman inquired about obtaining a license on behalf of Jakks to make WWE toys. (Am. Compl. ¶ 35) On October 24, 1995, WWE and Jakks entered into a domestic toy license which was scheduled to terminate on December 31, 1997, with a one-year right to renew. (Am. Compl. ¶ 35)

At around the same time, Shenker and SSAI entered into undisclosed agreements with Jakks to represent Jakks's interests at the same time as Shenker and SSAI were serving as WWE's agents. (Am. Compl. ¶¶ 40-46) At first, Shenker's work for Jakks was on matters unrelated to WWE. But at the New York Toy Fair in 1996, Shenker and Jakks discussed hiring Shenker as Jakks's agent on WWE matters as well. (Am. Compl. ¶ 49) Jakks's outside legal counsel, however, advised that such an arrangement would present a conflict of interest for Shenker unless Shenker disclosed the arrangement to WWE and obtained WWE's full consent. (Am. Compl. ¶ 50) Nevertheless, without informing WWE, Shenker and Jakks entered into an arrangement whereby Shenker would secretly serve as Jakks's agent in negotiations with WWE. (Am. Compl. ¶¶ 53-56)

On February 12, 1996, Jakks paid SSAI $2,500 in connection with Shenker's work as its agent. (Am. Compl. ¶ 48) Shortly thereafter, on April 22, 1996, the domestic toy license between WWE and Jakks was amended to provide additional rights to Jakks. (Am. Compl. ¶ 56) According to WWE, in compensation for his services, Jakks and Shenker agreed that Shenker would accept bribes from Jakks, and split them with Bell if necessary, to obtain various toy and video game licenses from WWE. The monies used to pay the bribes would be laundered through

6

foreign shell corporations. (Am. Compl. ¶ 62)

Pursuant to SSAI's and Shenker's recommendation, on January 21, 1997, WWE amended the domestic toy license with Jakks a second time, further expanding Jakks's domestic licensing rights. (Am. Compl. ¶¶ 64-67) Subsequently, on February 10, 1997, again on the recommendation of SSAI and Shenker, WWE entered into an international toy licensing agreement with Jakks. (Am. Compl. ¶ 71) Shenker's dual role in these negotiations was never disclosed to WWE. On March 17 1997, WWE hired SSAI as its exclusive outside licensing agent. (Am. Compl. ¶ 72)

Plaintiff also alleges that Defendants conspired on behalf of Jakks to obtain the video game license from WWE, which had been previously licensed to video game-maker Acclaim. (Am. Compl. ¶¶ 100-03) WWE alleges that Shenker wanted Jakks to have the video game license because SSAI and Shenker would not receive royalties from the Acclaim license, which had been negotiated before SSAI was hired. (Am. Compl. ¶¶ 83, 102) In order to procure the video game license, on January 14, 1998, Jakks paid a bribe to Shenker in the form of payment for a false invoice, (Am. Compl. ¶¶ 85-86, 95) which Jakks laundered through offshore entities, including Shenker's alter ego, Stanfull. (Am. Compl. ¶¶ 86-87, 94-99) Shenker then paid Bell a portion of the monies received from Jakks in order to secure his assistance. (Am. Compl. ¶ 97) In turn, Bell agreed to prohibit Acclaim from submitting a proposal to renew its video game license with WWE and to instead have the license awarded to Jakks. (Am. Compl. ¶ 104)

WWE contends that Bell failed to forward superior offers and proposals from Jakks's competitors to WWE's management in order to protect the scheme to award the license to Jakks. (Am. Compl. ¶ 104) Specifically, according to the Amended Complaint, Bell tried to convince

7

WWE management not to renew the video game license with Acclaim, tried to convince Acclaim

not to bid, and submitted a deal memo recommending granting the license to Jakks without

seeking any other bidders. (Am. Compl. ¶¶ 107-08)  Upon Bell's recommendation, WWE

informed Acclaim in April 1998 that it would not be renewing its license. (Am. Compl. ¶ 115)

    In the meantime, one of WWE's licensees for action figures, Playmates, had begun

complaining in January 1997 that Jakks had been granted conflicting domestic rights by WWE.

(Am. Compl. ¶ 79)  At the direction of Shenker and Jakks, and in order to eliminate competition

against Jakks, Bell offered to absolve Playmates of the obligation of its guarantee to WWE if

Playmates would give up its rights to produce action figures. (Am. Compl. ¶¶ 80-83)  WWE

alleges that this agreement cost the company its guarantee and royalties above the guarantee.

(Am. Compl. ¶ 83)

    Jakks was also facing competition in bidding on the video game license from THQ, and a

new bidder, Activision. (Am. Compl. ¶¶ 127-29)  On March 30, 1998, Bell recommended that

WWE accept Jakks's offer for the video game license. (Am. Compl. ¶ 110)  Subsequently,

without solicitation from Bell or Shenker, Activision and THQ emerged as potential bidders in

early April 1998. (Am. Compl. ¶¶ 127-29)  In response, Bell and Shenker attempted to convince

THQ and Activision not to bid, going so far as to refuse to provide them with prospective terms

for a bid. (Am. Compl. ¶ 129)  Nevertheless, THQ and Activision submitted informal proposals

which were superior to Jakks's previously submitted proposal. (Am. Compl. ¶ 131-32)  In order

to protect the bribery scheme, Shenker and/or Bell concealed the informal proposals from WWE,

but advised Jakks of the terms of THQ's and Activision's proposals. (Am. Compl. ¶ 134-35,

145)

8

Notwithstanding their efforts to conceal the bribery scheme, Jakks became concerned that WWE would learn of the superior offers from THQ and Activision. (Am. Compl. ¶ 133) In order to save the scheme, Jakks approached THQ with an offer to act as joint venture partners in securing the video game license. With THQ as a partner, Jakks could make a more competitive offer to WWE, while continuing to make a generous profit on the license. THQ would be required to pay both Jakks and WWE for the license, while also funding and managing the licensed operations. (Am. Compl. ¶¶ 137, 178-79, 182-85)

According to WWE, THQ accepted the offer because it was in desperate financial straits after the cancellation of one of its most lucrative licenses. (Am. Compl. ¶¶ 119-25) The Amended Complaint further alleges that THQ knew Jakks had never been in the video game business, knew that it was improper for Jakks to discuss with THQ the terms by which THQ could gain access to WWE's intellectual property, and knew that what Jakks was telling THQ was different from what Bell and Shenker had shared earlier. (Am. Compl. ¶¶ 139-43, 164)

In early May 1998, Bell submitted a deal memo recommending granting the video game license to THQ and Jakks as a joint venture. (Am. Compl. ¶ 152) Shortly thereafter, Activision sent a more formalized version of its earlier informal proposal, which was also superior to the THQ/Jakks proposal. (Am. Compl. ¶ 153) However, Bell and Shenker did not forward the Activision proposal to WWE management. (Am. Compl. ¶ 153)

Jakks and THQ agreed to form a joint venture on June 10, 1998. (Am. Compl. ¶ 154) On that same day, WWE and THQ/Jakks executed a licensing agreement. (Am. Compl. ¶ 154) The agreement was for ten years with a five-year right to renew — an allegedly long amount of time for such an agreement. (Am. Compl. ¶¶ 148, 157) The terms of the domestic and

9

international toy licenses, which Jakks already had with WWE, were extended to coincide with the term of the video game license. (Am. Compl. ¶ 165)

WWE alleges that the royalties it received under the June 10, 1998 deal were below-market because Shenker and Bell had foreclosed competitive bidding and because some of the money that should have been paid to WWE was instead paid by THQ to Jakks. (Am. Compl. ¶¶ 150, 160-63)

The June 10, 1998 deal allegedly resulted in profits for Bell and Shenker, as well as for Jakks and THQ. In addition to payments from Jakks, Bell and Shenker received a portion of the revenue stream pursuant to SSAI's agency agreement with WWE. Shenker split the commission with Bell under their unlawful plan. (Am. Compl. ¶¶ 151, 166-70)

On March 24, 2000, WWE terminated Bell's employment for reasons unrelated to the bribery scheme (which, at the time, WWE did not know about). (Am. Compl. ¶ 187)  On June 13, 2000, WWE terminated its contract with SSAI based on a change of business direction. (Am. Compl. ¶ 189)  In October 2000, SSAI brought a breach of contract claim against WWE in Connecticut state court seeking to be paid commissions on licenses SSAI had allegedly procured for WWE (Am. Compl. ¶ 190)  WWE cross-claimed against SSAI, sent interrogatories to SSAI, Shenker, Bell, Jakks, and THQ, and deposed Shenker, Friedman, Berman, and Bennett during the course of discovery in the Connecticut state court action. (Am. Compl. ¶¶ 191-239)  WWE alleges that, during the Connecticut litigation, Defendants destroyed evidence of the bribery, provided perjured testimony, made false statements to auditors, and concealed documents. (Am. Compl. ¶¶ 191-239)  Eventually, WWE discovered the purportedly unlawful scheme, despite Defendants' alleged attempts to conceal it. (Am. Compl. ¶¶ 210-12)

10

On October 16, 2003, the Connecticut state court dismissed with prejudice SSAI's action against WWE and entered a default judgment in favor of WWE as a sanction for Shenker's concealment of critical documents and repeated perjured deposition testimony. (Am. Compl. ¶ 221) *See also Stanley Shenker and Assocs., Inc. v. World Wrestling Fed'n Entm't, Inc.*, 844 A.2d 964, 978 (Conn. Super. Ct. 2003). WWE alleges that Defendants continued concealing documents and giving perjured testimony even after Shenker was sanctioned. (Am. Compl. ¶¶ 228-30, 235, 239)

### C. Procedural History

On January 25, 2005, the Court held a pre-motion conference with the Parties to discuss Defendants' requests to file motions to dismiss. At that conference, the Court established a briefing schedule. In accordance with that schedule, each Defendant filed a Motion to Dismiss the certain causes of action alleged against them pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiff's response to each Motion to Dismiss was due on March 31, 2005. Instead of responding to the Motions to Dismiss, however, Plaintiff filed an Amended Complaint. In its Amended Complaint, Plaintiff reasserted its RICO, Robinson-Patman Act, and New York state law claims. Plaintiff also added a claim under the Sherman Act, 15 U.S.C. § 1.[2] Plaintiff did

---

[2] The Complaint alleges fifteen counts. Not all counts are alleged against each Defendant. The specific allegations are as follows:

- Count I (against all Defendants): Violation of RICO, 18 U.S.C. § 1962(c). (Am. Compl. ¶¶ 242-53);
- Count II (against all Defendants): Conspiracy to Violate RICO, 18 U.S.C. § 1962(d). (Am. Compl. ¶¶ 254-58);
- Count III (against all Defendants except Jakks H.K. and Road Champs): Violation of the Sherman Act, 15 U.S.C. § 1. (Am. Compl. ¶¶ 259-72);
- Count IV (against THQ, THQ/Jakks, and Jakks): Declaratory Judgment as to whether the video game license and the 1998 amendments to the toy license are void because they

11

not, however, accompany its Amended Complaint with a memorandum explaining how the

Amended Complaint addressed the arguments raised in Defendants' Motions to Dismiss.[3]

Defendants understandably had an adverse reaction to Plaintiff's lack of substantive response to

the comprehensively briefed motions, and made an application for sanctions against Plaintiff.

The Court declined to impose any sanctions even though it found Plaintiff's tactical choices to be

less than ideal.

---

were formed as a result of commercial bribery in violation of New York law. (Am. Compl. ¶¶ 273-80);

- Count V (against THQ, THQ/Jakks, and Jakks): Declaratory Judgment as to whether the video game license and the 1998 amendments to the toy license are void because of Shenker's and Bell's illegal acts and conflict of interest which was known to Jakks, in violation of New York law. (Am. Compl. ¶¶ 281-95);

- Count VI (against THQ/Jakks, Jakks, THQ, Friedman, Berman, and Bennett): Violation of the Robinson-Patman Act, 15 U.S.C. § 13(c). (Am. Compl. ¶¶ 296-302);

- Count VII (against THQ, THQ/Jakks, Jakks, Friedman, Berman, and Bennett): Violation of the New York commercial bribery law. (Am. Compl. ¶¶ 303-09);

- Count VIII (against THQ, THQ/Jakks, Jakks, Friedman, Berman, Bennett, and Farrell): Fraudulent inducement in violation of New York law. (Am. Compl. ¶¶ 310-17);

- Count IX (against THQ, THQ/Jakks, Jakks, Friedman, Berman, and Bennett): Unjust enrichment in violation of New York law. (Am. Compl. ¶¶ 318-21);

- Counts X and XI (against THQ, THQ/Jakks, Jakks, Friedman, Berman, and Bennett): Inducing breach of fiduciary duty in violation of New York law. (Am. Compl. ¶¶ 322-40);

- Count XII (against THQ, THQ/Jakks, Jakks, Friedman, Berman, and Bennett): Constructive trust under New York law. (Am. Compl. ¶¶ 343-47);

- Count XIII (against THQ, THQ/Jakks, Jakks, Friedman, Berman, and Bennett): Tortious interference with contractual relations in violation of New York law. (Am. Compl. ¶¶ 348-53);

- Count XIV (against THQ, THQ/Jakks, and Jakks): Piercing the corporate veil under New York law. (Am. Compl. ¶¶ 354-58);

- Count XV (against THQ, THQ/Jakks, Jakks, Friedman, Berman, and Bennett): Conspiracy to commit commercial bribery; fraudulent inducement; inducing breach of fiduciary duty; and tortious interference with contractual relations in violation of New York law. (Am. Compl. ¶¶ 359-63)

[3]On September 1, 2005, Defendants James Bell and Bell Licensing, L.L.C. withdrew their Motions to Dismiss.

12

However, rather than requiring Defendants to file new motions to dismiss the Amended Complaint, the Court ordered bifurcated briefing. First, the Court ordered the Plaintiff to respond to three threshold issues raised in the Defendants' original Motions to Dismiss which remained applicable to the Amended Complaint and were potentially dispositive. Those three issues are: (1) whether Plaintiff sufficiently alleged the existence of a RICO enterprise pursuant to 18 U.S.C. § 1962(c); (2) whether Plaintiff pleaded a cause of action under the Robinson-Patman Act, 15 U.S.C. § 13(c); and (3) whether Plaintiff is estopped from pursuing its RICO claim against Defendants Shenker and SSAI because it is duplicative of litigation commenced in Connecticut state court. Second, the Court set a schedule for briefing Plaintiff's Sherman Act claim, which was raised for the first time in the Amended Complaint.

The Court held oral argument on the threshold issues and the Sherman Act claim on January 11, 2006. This Opinion and Order addresses only those issues fully briefed and argued as of January 11, 2006.

## II. Discussion

### A. Standard of Review

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a party may seek to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In examining a motion to dismiss, the Court must "accept as true the factual allegations made in the complaint and draw all inferences in favor of the plaintiffs." *Grandon v. Merrill Lynch & Co., Inc.*, 147 F.3d 184, 188 (2d Cir. 1998). "The court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d

13

Cir. 1985). Dismissal is appropriate "only if there are no legal grounds upon which relief may be granted." *Virgilio v. City of New York*, 407 F.3d 105, 111 (2d Cir. 2005).

### B. RICO Enterprise Pleading Requirement

Defendants seek dismissal of the RICO claims in Counts I and II on several grounds. The only one fully briefed to this point is Defendants' claim that Plaintiff failed to properly plead a RICO enterprise distinct from the alleged racketeering acts.[4] In particular, Defendants contend that while Plaintiff may allege an enterprise that is an association-in-fact, a properly pled RICO enterprise must be comprised of more than just the predicate acts of racketeering. Rather, according to Defendants, a RICO enterprise must be an "ongoing enterprise" whose members "function as a continuing unit." (Jakks Mem. 27-28 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981))). This requires Plaintiff to allege the existence of an ongoing organization that has an identifiable hierarchy and organization, and involves conduct that demonstrates that the enterprise's members work together toward a common purpose.

Plaintiff, on the other hand, argues that an enterprise can merely be the sum of the alleged predicate acts, and that no separate, ascertainable structure is required. (WWE Mem. in Opp. to Defs.' Mot. to Dismiss 19, 22 ("WWE Resp.")) In its Amended Complaint, Plaintiff contends that there are sufficient allegations to satisfy this minimal burden. Thus, resolution of the dispute

---

[4]In addition to the enterprise argument, Defendants have also argued that Plaintiff's RICO claim should be dismissed for the following reasons: (1) failure to allege a threat of continued criminal activity (Jakks Mem. of Law in Supp. of Mot. to Dismiss Am. Compl., 18-24 ("Jakks Mem.")); (2) failure to establish a pattern of racketeering activity (Jakks Mem. 24-27); (3) failure to allege a pecuniary injury to its business or property (Jakks Mem 29-31); (4) failure to seek enjoinment of future conduct (Jakks Mem. 31-32); and (4) failure to properly plead the RICO predicate acts (Jakks Mem. 32-35). For the reasons stated earlier, the Court is only addressing the enterprise argument at this time. *See supra* Part I.C.

14

on the point of law is dispositive, for Plaintiff admits that its Complaint does not allege a RICO enterprise that has an ascertainable structure beyond the purported racketeering acts. (Hr'g Tr. 143-44, Jan. 11, 2006 ("Tr."))

RICO defines an "enterprise" to include any "individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). According to the Supreme Court, a RICO enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct," which must be proved "by evidence of an ongoing organization, formal or informal, and by evidence of the various associates functioning as a continuing unit." *Turkette*, 452 U.S. at 583. Moreover, a RICO enterprise "is an entity separate and apart from the pattern of activity in which it engages." *Id.* Thus, "[t]he existence of an enterprise at all times remains a separate element which must be proved." *Id.*

"Defendants interpret [*Turkette*], not without reason, to hold that the evidence necessary to establish an enterprise must be distinct from that which a plaintiff must adduce to show a pattern of racketeering activity." *Hansel 'N Gretel Brand, Inc. v. Savitsky*, No. 94 Civ. 4027, 1997 WL 543088, at *2 (S.D.N.Y. Sept. 3, 1997), *abrogated on other grounds by Blue Tree Hotels Inv. (Canada), LTD. v. Starwood Hotels & Resorts*, 369 F.3d 212, 218 (2d Cir. 2004). However, Defendants rely on much more than the passages quoted above from *Turkette* in support of their argument. For example, Defendants cite the Second Circuit's relatively recent decision in *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004), and numerous other district court decisions within this Circuit that provide express support for Defendants' position.

15

The panel in *First Capital* cited *Turkette* for support of the proposition that "the enterprise must be separate from the pattern of racketeering activity." 385 F.3d at 173. The panel further noted that legitimacy is "by no means a prerequisite to a RICO enterprise," and, in fact, commented that in its "least developed form, an enterprise may be found where there is simply a 'discrete economic association existing separately from the racketeering activity.'" *Id.* (quoting *United States v. Anderson*, 626 F.2d 1358, 1372 (8th Cir. 1980)). Thus, in describing the enterprises alleged in that case, the panel found that the complaint failed "to detail any course of fraudulent or illegal conduct separate and distinct from the alleged predicate racketeering acts themselves – a requirement in this circuit." *Id.* at 174 (citing *First Nationwide Bank v. Gelt Funding Corp.*, 820 F. Supp. 89, 98 (S.D.N.Y. 1993)). Moreover, the panel observed that the complaint "failed to provide us with any solid information regarding the 'hierarchy, organization, and activities' of the alleged association-in-fact enterprise, *United States v. Coonan*, 938 F.2d 1553, 1560-61 (2d Cir. 1991), from which we could conclude that its 'members functioned as a unit.'" *Id.* (quoting *Nasik Breeding & Research Farm Ltd. v. Merck & Co.*, 165 F. Supp. 2d 514, 539 (S.D.N.Y. 2001)).

There is little doubt that if *First Capital* was the only Second Circuit decision discussing the elements of a RICO enterprise, Defendants' Motion to Dismiss would be summarily granted. However, over two decades ago a panel of the Second Circuit confronted the same argument being made by Defendants here: "Mazzei claims that to establish a violation of RICO, there must be proof that the alleged enterprise was distinct from the alleged pattern of racketeering activity. . . . To support this contention, he relies principally on [*Turkette*] and *United States v. Bledsoe*, 674 F.2d 647 (8th Cir. 1982)." *United States v. Mazzei*, 700 F.2d 85, 88 (2d Cir. 1980)

16

(alteration added). In explicitly rejecting this claim, the *Mazzei* panel held:

> We agree that *Turkette* requires the government to prove both the existence of an "enterprise" and a "pattern of racketeering activity." We do not, however, read *Turkette* to hold that proof of these separate elements be distinct and independent, as long as the proof offered is sufficient to satisfy both elements. There is nothing in the language or legislative history of the Act to support the appellant's view. Moreover, it does not make sense to import a "distinctiveness" requirement in RICO cases. The appellant would have us rule that his actions are beyond the purview of RICO because he engaged only in point shaving and did not commit criminal acts other than those specifically contemplated in the conspiracy. Mazzei's interpretation would lead to the anomalous result that a large scale underworld operation which engaged solely in trafficking of heroin would not be subject to RICO's enhanced sanctions, whereas small-time criminals jointly engaged in infrequent sales of contraband drugs and illegal handguns arguably could be prosecuted under RICO. The Court will not place its *imprimatur* on such a counter-productive interpretation.

700 F.2d at 89.

Two other things are noteworthy about *Mazzei*. First, in rejecting the same claim made by Defendants in this case, the panel acknowledged that "the Eighth Circuit's position on the 'distinctness' issue is at odds with our analysis" (citing, *inter alia*, *Bledsoe*, 674 F.2d 647 and *Anderson*, 626 F.2d 1358), but reiterated that it was "not persuaded by that precedent," and noted that, in fact, it had been "implicitly rejected" by earlier Second Circuit decisions. *Mazzei*, 700 F.2d at 89-90 (citing *United States v. Errico*, 635 F.2d 152, 156 (2d Cir. 1980) and *United States v. Altese*, 542 F.2d 104, 106 (2d Cir. 1976)).[5] Second, the Court has never explicitly overruled

---

[5]In *Errico*, the panel upheld the RICO conviction of defendants whose enterprise was solely engaged in the fixing of horse races. *See* 635 F.2d at 156 ("A circle of jockeys – including Amy and others – who were joined through Errico with a circle of bettors . . . regularly attempted to profit and did profit from the illegal fixing of races. The two circles came together and continued to operate with that single, illegal purpose from at least August, 1974 through March 24, 1975. That community of interest and continuing core of personnel provides the 'group of

17

*Mazzei*, and, in fact, has reaffirmed its core holding on numerous occasions. *See Coonan*, 938 F.2d at 1560 ("[W]e have previously indicated that proof of various racketeering acts may be relied on to establish the existence of the charged enterprise."); *United States v. Ferguson*, 758 F.2d 843, 853 (2d Cir. 1985) ("RICO charges may be proven even when the enterprise and predicate acts are functionally equivalent, and the proof used to establish them coalesced." (citations omitted)); *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 22 (2d Cir. 1983) (*Mazzei* rejected "the Eighth Circuit's view that the evidence offered to prove the 'enterprise' and 'pattern of racketeering' must necessarily be distinct"); *United States v. Bagaric*, 706 F.2d 42, 55 (2d Cir. 1983) ("We have upheld application of RICO to situations where the enterprise was, in effect, no more than the sum of the predicate racketeering acts."), *abrogated on other grounds by Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 260 (1994). Indeed, other circuits have recognized that *Mazzei* places the Second Circuit in the minority on the question of ascertainable structure/distinctiveness of RICO enterprises. *See Chang v. Chen*, 80 F.3d 1293, 1297 (9th Cir. 1996) (noting that the Second Circuit is one of two [out of eight circuits to have confronted the issue] which "interpret[] *Turkette* to permit the organization constituting the enterprise to be no more than the sum of the predicate racketeering acts").

To blunt the force of *Mazzei*, in addition to *First Capital*, Defendants turn to the district courts within the Second Circuit to claim that their view of what Plaintiff must allege about a RICO enterprise is the correct one. On this score, there is no question that Defendants can cite to many more district court decisions that embrace Defendants' position than Plaintiff can to support its side. *See, e.g., Stein v. New York Stair Cushion Co., Inc.*, No. 04 Civ. 4741, 2006 WL

---

individuals associated in fact' that is required for a RICO conviction.").

18

319300, at *3 (E.D.N.Y. Feb. 10, 2006) ("The enterprise is not the pattern of racketeering activity; it is an entity separate and apart from the pattern of activity in which it engages."); *Dale v. Banque SCS Alliance, S.A.*, No. 02 Civ. 3592, 2005 WL 2347853, at *7 (S.D.N.Y. Sept. 22, 2005) ("The plaintiffs do not allege that the association-in-fact enterprise had any purpose or activities other than the execution of Frankel's scheme.  Consequently, the association-in-fact enterprise does not have any alleged existence apart from the pattern of racketeering activity alleged in the amended complaint, and it does not satisfy the requirement noted in *First Capital*."); *Singh v. Parnes*, 199 F. Supp. 2d 152, 163 (S.D.N.Y. 2002) ("There is no indication that in carrying out the activities Singh alleges, the defendants were carrying out the affairs of an unlawful enterprise as defined by the statute, rather than their own affairs or those of their institutional employers, principals or partners."); *Int'l Telecom, Inc. v. Generadora Electrica Del Oriente, S.A.*, No. 00 Civ. 8695, 2002 WL 465291, at *9 (S.D.N.Y. March 27, 2002) ("Nothing in the pleading suggests that the members of the enterprise, even those as yet unidentified, formed a unit with a structure, hierarchy, or a continuity."); *Nasik Breeding*, 165 F. Supp. 2d at 539 ("Nasik has failed to present specific details of any hierarchy, organization, or unity among the various alleged conspirators."); *Pavlov v. Bank of New York Co., Inc.*, 135 F. Supp. 2d 426, 430 (S.D.N.Y. 2001) ("[T]here must be more to an 'enterprise' than simply an aggregation of predicate acts of racketeering activity.  In other words, an 'enterprise' must exhibit more structure than is inherent simply in the alleged pattern or [sic] racketeering activity.") (citing *Stephens, Inc. v. Geldermann, Inc.*, 962 F.2d 808, 815 (8th Cir. 1992) and *Bledsoe*, 674 F.2d at 664), *rev'd*, 25 Fed.Appx. 70 (2d Cir. 2002) (unpublished opinion)); *Goldfine v. Sichenzia*, 118 F. Supp. 2d 392, 401 (S.D.N.Y. 2000) ("[I]n a fraud-based RICO claim, if the sole purpose of the

alleged enterprise is to perpetrate the alleged fraud, there can be no enterprise for RICO purposes."); *Amsterdam Tobacco Inc. v. Philip Morris Inc.*, 107 F. Supp. 2d 210, 215 (S.D.N.Y. 2000) ("Here, as in *Schmidt*, there is insufficient allegation of any enterprise involving Defendant . . . . There is no legally discernable and sufficient distinction between the alleged enterprise and the alleged pattern of racketeering activity."); *Black Radio Network, Inc. v. NYNEX Corp.*, 44 F. Supp. 2d 565, 580 (S.D.N.Y. 1999) ("The enterprise . . . must . . . be an entity separate from the pattern of racketeering activity in which it engages."); *Bank v. Brooklyn Law School*, No. 97 Civ. 7470, 2000 WL 1692844, at *4 (E.D.N.Y. Oct. 6, 2000) ("The second amended complaint fails to allege that any of the nineteen associations-in-fact existed as an entity separate and apart from the commission of the alleged acts of mail and wire fraud."); *Schmidt v. Fleet Bank*, 16 F. Supp. 2d 340, 349 (S.D.N.Y. 1998) ("The enterprise 'cannot simply be . . . the minimal association which surrounds the [pattern racketeering] acts.' In other words, the members of the group as a whole must have a common link other than the racketeering activity.'") (quoting, *inter alia*, *Bledsoe*, 674 F. 2d at 664 (alteration in original)).

The courts within the Second Circuit, however, are not unanimous, as some have adhered to *Mazzei* and its specific rejection of the Eighth Circuit's view expressed in *Stephens* and *Bledsoe*. *See Nat'l Group for Commc'ns and Computers Ltd. v. Lucent Techs. Inc.*, 03 Civ. 6001, 2006 WL 490057, at *14 n.30 (S.D.N.Y. Feb. 28, 2006) (noting that *Mazzei* and *Errico* suggest that "the enterprise element may be established merely by proof of defendants cooperation in a common pattern of racketeering acts," and that "[o]ther circuits have adopted more demanding pleading standards requiring plaintiffs to demonstrate that the association-in-fact enterprise has a structure independent of the underlying pattern of predicate acts.") (citing,

20

*inter alia, Bledsoe*, 674 F.2d 647); *Feinberg v. Katz*, No. 99 Civ. 45, 2002 WL 1751135, at *13 (S.D.N.Y. July 26, 2002) ("In light of the clear Second Circuit precedent which allows an enterprise to be comprised of a group for the sole purpose of engaging in fraudulent activity, I cannot accept the Katzes' argument that the plaintiff has failed to adequately allege an enterprise because the Katz Enterprise existed purely to commit the fraud plaintiff alleges."); *Hansel 'N Gretel*, 1997 WL 543088, at *2 (noting that the Second Circuit remains in the minority of the circuits to have decided the question of distinctiveness of a RICO enterprise).

Additionally, a deeper look at the cases lining up with Defendants reveals that they provide insufficient support for Defendants' motion. To begin, only two of the district court decisions noted above were appealed to the Second Circuit. In one, *First Nationwide*, the Second Circuit affirmed the district court's dismissal of the complaint solely on the grounds that plaintiff had not alleged an injury ripe for suit under RICO, and that plaintiff had not sufficiently pleaded proximate cause from any alleged RICO violation. 27 F.3d 763. In the other appealed decision, *Pavlov*, the Second Circuit reversed, in an unpublished opinion, the district court's dismissal of the RICO complaint.[6] Thus, none of the district court decisions ripened into Second Circuit authority that adopted Defendants' view of the enterprise element.

Moreover, very few of the district court decisions explicitly considered *Mazzei* and its

---

[6]The Court does not cite or rely on the Circuit's unpublished opinion reversing the district court, as the Second Circuit's rules prohibit citation to the opinion. 2d Cir. R. 0.23. However, it remains true that the district court's dismissal of the complaint was reversed, even if the grounds are not precedent in this Circuit. It bears noting that the district court dismissed the RICO counts in the complaint solely on the basis that they failed to adequately plead the elements of enterprise (relying on the Eighth Circuit's decisions in *Stephens* and *Bledsoe*). *See Pavlov*, 135 F. Supp. 2d at 429-31. Once the district court dismissed the RICO counts, it then declined to exercise supplemental jurisdiction over the state law claims and also dismissed them for lack of diversity jurisdiction and on *forum non conveniens* grounds. *Id.* at 431-38.

21

progeny. For example, in *Schmidt* the court explicitly relied on the very same Eighth Circuit decision (*Bledsoe*) that the *Mazzei* panel rejected, in holding that an enterprise "cannot simply be the minimal association which surrounds the [pattern racketeering] acts." 16 F. Supp. 2d at 349 (quoting *Stephens*, 962 F.2d at 815 which was quoting *Bledsoe* 674 F.2d at 664). While the *Schmidt* court attempted in a footnote to distinguish the Second Circuit's decision in *Moss*, there is no mention of *Mazzei* anywhere in the opinion (perhaps because *Mazzei* was not brought to the court's attention), or any discussion of the Second Circuit's rejection of *Bledsoe* in *Mazzei*.

The *Schmidt* decision proved to be significant in that it took on a life of its own, being cited by numerous courts in this Circuit (and elsewhere) for the proposition (earlier rejected in *Mazzei*) that there must be an ascertainable structure to a RICO enterprise beyond the mere accumulation of racketeering acts. *See, e.g., Nasik Breeding*, 165 F. Supp. 2d at 539; *Pavlov*, 135 F. Supp. 2d at 430 n.8; *Goldfine*, 118 F. Supp. 2d at 401; *Amsterdam Tobacco*, 107 F. Supp. 2d at 215-16; *Bank*, 2000 WL 1692844, at *4; *Black Radio*, 44 F. Supp. 2d at 580. Yet, in none of these decisions is there a reconciliation (again, perhaps because none was offered by the parties) between the *Schmidt* court's express reliance on the same Eighth Circuit authority rejected in *Mazzei*. Thus, this string of cases does not provide a satisfactory resolution of the apparent inconsistency between Defendants' position and binding precedent in this Circuit. *See Feinberg*, 2002 WL 1751135, at *13 ("The reasoning of the Eighth Circuit on which *Schmidt* stands was dismissed by the Second Circuit" long ago.). Moreover, while the show of hands among the district courts within the Second Circuit is impressive and supports Defendants' position, the weight of these decisions is insufficient for this Court to conclude that *Mazzei* sleeps with the fishes. *See Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484

22

(1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."); *Priester v. Senkowski*, No. 01 Civ. 3441, 2002 WL 1448303, at *7 (S.D.N.Y. July 3, 2002) ("Based on this principle of *stare decisis* [discussed in *Rodriguez*], this Court is constrained to follow the holding of [the Second Circuit]." (alterations added)); *United States v. Russotti*, 780 F. Supp. 128, 131 (S.D.N.Y. 1991) (noting that a district court is to follow Second Circuit precedent, even though intervening district court decision is inconsistent with circuit precedent, particularly where the district court decision does not cite or discuss circuit precedent); Steven G. Calabresi & Gary Lawson, *Equity and Hierarchy: Reflections on the Harris Execution*, 102 Yale L.J. 255, 276 n.106 (1992) ("The hierarchical structure of Article III dictates that inferior courts faithfully apply the precedents of superior courts, just as the hierarchical structure of Article II requires executive officials to follow presidential precedents.").[7]

But what about the Second Circuit's decision in *First Capital*? There is no question that Defendants' reliance on certain statements in that case is proper and persuasive. However, there also appears to be no doubt that these same statements are inconsistent with the holdings of *Mazzei* and its progeny. *Compare First Capital*, 385 F.3d at 174 ("The Amended Complaint

---

[7]The Court is bound to follow precedent even if it disagrees with it. *See State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) ("The Court of Appeals was correct in applying that principle [that lower courts are to follow binding precedent of the Supreme Court] despite disagreement with [that precedent] for it is this Court's prerogative alone to overrule one of its precedents."). Here, for example, there is much to be said for the view that RICO should not be used to bring a "civil conspiracy claim," and that the "criminal prohibition in § 1962(c) is not a mere super-conspiracy statute." *Bank*, 2000 WL 1692844, at *4. Until told otherwise by the Second Circuit, however, the Court can do little with this view in light of *Mazzei*.

fails . . . to detail any course of fraudulent or illegal conduct separate and distinct from the alleged predicate racketeering acts themselves – a requirement in this Circuit."), *with Bagaric,* 706 F.2d at 55 ("We have upheld application of RICO to situations where the enterprise was, in effect, no more than the sum of the predicate racketeering acts." (*citing Mazzei,* 700 F.2d at 88-89)). Furthermore, as noted, it is beyond dispute that neither the Second Circuit nor the Supreme Court has expressly overruled *Mazzei.* This is critical because this Court cannot ignore binding Second Circuit precedent, unless it is expressly or implicitly overruled. *See Anderson v. Recore,* 317 F.3d 194, 201 (2d Cir. 2003) ("We will follow a precedent from this circuit unless a Supreme Court decision or an en banc holding of this court implicitly or explicitly overrules the prior decision."); *Russotti,* 780 F. Supp. at 131 ("[I]t is axiomatic that a district court cannot simply take a position contrary to that of its circuit court . . . ."); *Danna v. Air France,* 334 F. Supp. 52, 62 (S.D.N.Y. 1971) ("[A] District Court is not empowered to reject Supreme Court precedent on the ground that it is moribund except in the clearest of cases.").

In the absence of an express decision overruling *Mazzei,* the remaining question is whether it has been implicitly overruled. The Court is unaware of any such decision, and Defendants have failed to identify the case that implicitly neutered *Mazzei.* Instead, at oral argument, counsel for Defendants suggested that the Second Circuit's decisions in *United States v. Porcelli,* 865 F.2d 1352 (2d Cir. 1989) and *United States v. Indelicato,* 865 F.2d 1370 (2d Cir. 1989) have reconciled *Mazzei* "as an evidence case." (Tr. 14, 19) According to Defendants, the Second Circuit has construed *Mazzei* to stand only for the proposition that the proof of the enterprise and the predicate acts may coalesce, (Tr. 19) but does not reject the notion that the "[e]nterprise minus racketeering acts must be greater than zero." (Tr. 23) However, in

24

describing *Mazzei*, the Second Circuit has explicitly held that RICO permits "situations where the enterprise was, in effect, no more than the sum of the predicate acts." *Bagaric*, 706 F.2d at 55. In other words, under *Mazzei*, enterprise minus racketeering acts can equal zero. *See Indelicato*, 865 F.2d at 1381 (noting that the "concepts of relatedness and continuity are attributes of [a pattern of] activity, not of a RICO enterprise."); *Nat'l Group*, 2006 WL 490057, at *14 ("The Second Circuit . . . does not require RICO plaintiffs to *plead* continuity beyond the performance of racketeering acts." (emphasis added) (citing *Indelicato*, 865 F.2d at 89)). Moreover, in neither *Porcelli* nor *Indelicato* is there any critical commentary directed at *Mazzei* or its reasoning. In fact, *Porcelli* mentions *Mazzei* only once to support the proposition that in "many cases . . . the enterprise itself is the vehicle for the racketeering activity." 865 F.2d at 1362 (citing *Mazzei* as one of two examples). And in *Indelicato*, the Circuit sitting en banc, merely described (without a hint of regret) the holding in *Mazzei* as rejecting the contention that the enterprise and the pattern of racketeering activity must be distinct. 865 F.2d at 1375 (citing, *inter alia, Moss*, 719 F.2d at 22). Thus, there is nothing about either decision that could support the suggestion that *Mazzei* was implicitly overruled.[8]

Defendants also believe *First Capital*, while not overruling *Mazzei*, should control as it is "the most extensive analysis in a civil context of any of the cases." (Tr. 25) The Court is unaware, however, of any Second Circuit decision limiting the reach of *Mazzei* to criminal cases, and does not believe there would be a logical way to distinguish a civil from a criminal RICO

---

[8]Nor is there anything in *Coonan* that suggests an implicit retreat from *Mazzei*. In fact, the panel in *Coonan* cited *Mazzei* and *Bagaric* for the notion that "[c]ommon sense suggests that the existence of an association-in-fact is oftentimes more readily proven by 'what it *does*, rather than by abstract analysis of its structure.'" 938 F.2d at 1560 (quoting *Bagaric*, 706 F.2d at 56 and citing *Mazzei*, 700 F.2d at 88-89).

enterprise. Moreover, to the extent Defendants are hinting that *First Capital* implicitly overruled *Mazzei*, the argument suffers from the fact that the validity of the plaintiffs' pleading regarding the RICO enterprises at issue in that case was not before the *First Capital* panel. In fact, none of the three district court decisions that were on appeal in *First Capital* dismissed the complaint on the ground that the plaintiffs failed to properly allege that the enterprise was distinct from the racketeering acts. Instead, the RICO causes of action in the district courts were dismissed for failure to properly plead a pattern of racketeering activity, and for lack of standing and personal jurisdiction. *See First Capital*, 385 F.3d at 165-72. Thus, the parties on appeal did not brief the adequacy of the allegations regarding the enterprises, and, therefore, did not discuss or even cite *Mazzei* in their briefs to the Second Circuit. *See* Br. for Plaintiffs-Appellants, No. 03 Civ. 7897, 2004 WL 3355134 (Feb. 17, 2004); Resp. Br. for Defendants-Appellees, No. 03 Civ. 7897, 2004 WL 3355135 (Mar. 22, 2004); Reply Br. for Plaintiffs-Appellants, No. 03 Civ. 7897, 2004 WL 3355131 (Apr. 6, 2004).

In the end, therefore, it is insufficiently clear to this Court that *First Capital* should be read to implicitly overrule *Mazzei*, thereby constraining this Court to follow *Mazzei*. *Cf. Russotti*, 780 F. Supp. at 131 (refusing to apply later district court opinion that contradicted earlier Second Circuit authority that was not even brought to the attention of the district court). Therefore, the Defendants' Motion to Dismiss the RICO counts for failure to properly plead an enterprise pursuant to § 1962(c) is denied.

### C. Robinson-Patman Act

In Count VI of the Amended Complaint, Plaintiff claims that Defendants' alleged bribery scheme violates § 2(c) of the Robinson-Patman Act ("RPA"). Specifically, Plaintiff alleges that

26

the RPA Defendants engaged in an illegal bribery scheme to obtain Plaintiff's toy and video game licenses. (Am. Compl. ¶¶ 296-302) The RPA Defendants seek dismissal of this count, arguing that it fails to state a cause of action because: (i) § 2(c) of the RPA only applies to the purchase or sale of "goods, wares, or merchandise"; and (ii) Plaintiff lacks standing to bring an RPA claim because it fails to allege an antitrust injury. (Jakks Mem. 10-16) For the reasons discussed below, the Court agrees with the first argument and, therefore, does not reach the second.

Section 2(c) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(c), states:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

15 U.S.C. § 13(c).

Plaintiff reads this provision as "straightforward" (WWE Resp. 28), yet Justice Frankfurter commented that "precision of expression is not an outstanding characteristic of the Robinson-Patman Act." *Automatic Canteen Co. of Am. v. FTC*, 346 U.S. 61, 65 (1953).[9]

---

[9]A practitioner has observed:

> Linguistically, Section 2(c) is a genuine piece of art. It has 115 words, all in one sentence. There are no semicolons, no clauses, just a few commas – and there has even been a debate about

27

Plaintiff also asserts that this provision is to be interpreted to include intangibles, such as licenses, yet, as discussed below, virtually every court to have considered the issue in the last seven decades has held otherwise. Indeed, one judge in this district has imposed Rule 11 sanctions on a party for even alleging that § 2(c) covers intangible services. *See Empire State Pharm. Soc'y, Inc. v. Empire Blue Cross and Blue Shield of Greater New York*, 778 F. Supp. 1253, 1258 (S.D.N.Y. 1991) (holding that in light of "abundance of authority" that the RPA "applies only to goods and commodities," it was "objectively unreasonable" for plaintiff to have brought RPA claim in case involving insurance services).

A little history is in order. "Section 2, 'when originally enacted as part of the Clayton Act in 1914 was born of a desire by Congress to curb the use by financially powerful corporations of localized price-cutting tactics which had gravely impaired the competitive position of other sellers.'" *Volvo Trucks North Am., Inc. v. Reeder-Simco GMC, Inc.*, – US –, – , 126 S. Ct. 860, 869 (2006) (quoting *FTC v. Anheuser-Busch, Inc.*, 363 U.S. 536, 543, 544 n.6 (1960)). However, "[a] lengthy investigation revealed that large chain buyers were obtaining competitive advantages in several ways other than direct price[] concessions and were thus avoiding the impact of the Clayton Act." *FTC v. Henry Broch & Co.*, 363 U.S. 166, 168-69 (1959). "One of the favorite means of obtaining an indirect price concession was by setting up 'dummy' brokers who were employed by the buyer and who, in many cases, rendered no services. The large

---

whether the commas are in the right places. As you might expect in such a situation, no one has ever come forward to take full responsibility for its drafting.

Mark L. Yeager, *Developments – 1984: Living with the Robinson-Patman Act*, 53 Antitrust L.J. 1029 (1985).

buyers demanded that the seller pay 'brokerage' to these fictitious brokers who then turned it over to their employer." *Id.* at 169. It was primarily in response to this harsh business practice that Congress enacted the Robinson-Patman Act. *See Volvo Trucks*, 126 S. Ct. at 869 ("Augmenting that provision in 1936 with the Robinson-Patman Act, Congress sought to target the perceived harm to competition occasioned by powerful buyers, rather than sellers; specifically, Congress responded to the advent of large chain stores, enterprises with the clout to obtain lower prices for goods than smaller buyers." ); *see also Philip Morris, Inc. v. Grinnell Lithographic Co.*, 67 F. Supp. 2d 126, 130 (E.D.N.Y. 1999) ("Section 2(c) was enacted primarily to prevent large buyers from obtaining indirect price discrimination by demanding that the suppliers pay fees to bogus brokers, which fees would then be returned to the buyers."). However, while motivated principally to eliminate the use of dummy brokers, "Congress in its wisdom phrased § 2(c) broadly, not only to cover the other methods then in existence but all other means by which brokerage could be used to effect price discrimination." *Broch*, 363 U.S. at 169. Or, as Chief Judge Walker recently noted, "[t]he *sine qua non* of a § 2(c) violation . . . is an improper payment, *i.e.*, a payment of a commission, brokerage, or discount other than for services actually rendered." *Blue Tree Hotels Inv. (Canada), Ltd.*, 369 F.3d at 223. Thus, as the Supreme Court and the Second Circuit have made clear, the RPA seeks to proscribe the payment of any kind to brokers or their equivalents for services not rendered.

Notwithstanding this history, Plaintiff claims that § 2(c) applies to "services" such as the licenses at issue in this action. First, Plaintiff cites to a "diagram" of § 2(c) in *Blue Tree*. (WWE

Mem. 28-29).[10] However, nothing about this diagram, or the holding in *Blue Tree*, supports

Plaintiff's claim. Indeed, the court in *Blue Tree* merely held that plaintiffs had failed to state an

RPA claim because they had not alleged that the payments to defendants were improper. 369

F.3d at 224. The court was not asked to decide, and obviously did not decide, the question

presented here.[11] In this context, then, the "diagram" does not shed any light on § 2(c).

Moreover, there is nothing in the structure of the "diagram" that requires this Court to adopt

Plaintiff's reading of the statute. Instead, the diagram begs the question of whether the "services

rendered" are an exception to the proscribed payment to brokers (or their equivalents), or if the

"services rendered" language is modified by the sale or purchase of goods. Thus, the diagram

can hardly be viewed as binding precedent from the Second Circuit on whether § 2(c) applies to

services or other intangible products.

---

[10]The diagram breaks down § 2(c) as follows:

> It is unlawful for any person to
> (1) pay (or receive) –
> a. anything of value as a commission, brokerage, or other compensation, *or*
> b. any allowance or discount in lieu of brokerage,
> *except* for services rendered in connection with a sale or purchase of goods,
> (2) when the payment is made to (or by)
> a. the other party to the transaction, or
> b. an agent, representative or other intermediary where the intermediary is
> (i) acting for or in behalf of, or
> (ii) subject to the direct or indirect control of
> any party to the transaction other than the person by whom compensation is paid.

*Blue Tree Hotels Inv. (Canada), Ltd.*, 369 F.3d at 218.

[11]In *Blue Tree*, the district court dismissed the complaint on the grounds that plaintiffs had failed to allege any competitive injury from defendants' alleged conduct. 369 F.3d at 214. Though affirming dismissal of the complaint on the ground identified above, the *Blue Tree* court noted that the district court had erred in this conclusion, noting that to prevail on a claim under § 2(c), a plaintiff need only plead an antitrust injury. *Id.* at 219.

30

Second, Plaintiff cites language (but not the holding) in a seventy-year-old Second Circuit

decision that is not on point.  Specifically, Plaintiff quotes from a portion of *Biddle Purchasing*

*Co. v. FTC*, 96 F.2d 687 (2d Cir. 1938), to claim that the phrase "in connection with the sale or

purchase of goods, wares, or merchandise" is only a part of the "services rendered" exception.

The quote is as follows:

> The report of the House and Senate Conference Committee,
> submitted in referring to the bill in its present form, interprets the
> section as having this meaning[:]
>
> 'This subsection permits the payment of compensation by a seller
> to his broker or agent for services actually rendered in his behalf;
> likewise by a buyer to his broker or agent for services in
> connection with the purchase of goods actually rendered in his
> behalf; but it prohibits direct or indirect payment of brokerage
> except for such services rendered . . . .' House Rep., 2951, 74th
> Congress, 2d Session.

(WWE Resp. 29) (quoting *Biddle*, 96 F.2d at 691 n.1).  Plaintiff's selective quotation from

*Biddle*, however, is far off the mark.

As with *Blue Tree*, the quote should be put into context.  Biddle Purchasing Co. supplied

market information, for a monthly fee, to subscribers who were in turn wholesalers and

distributors.  *Id.* at 689.  Biddle also acted as a broker, selling goods on behalf of "numerous

manufacturers, canners, and packers," to Biddle's subscribers.  *Id.*  For brokering these sales,

Biddle received commissions from the sellers.  *Id.*  The buyers (subscribers) would receive back

the commissions paid to Biddle by the sellers.  In the vast majority of these sales, the

commissions refunded to the buyers were no more than they had paid for the subscription

services they received from Biddle.  *Id.*  However, in some instances, the commissions paid to

Biddle exceeded the subscription fees and the excess was given to the buyers, thus in effect

31

giving these buyers a discount. *Id.* It was this practice that the FTC found objectionable, and which led to the appeal. *Id.*

In upholding the FTC's order, the Second Circuit noted that "the statute prohibits payment of brokerage by the seller to the buyer or his agent or representative or controlled intermediary, except for services rendered." *Id.* at 691. It was after this comment that the court then cited the House and Senate Report (as quoted above in Plaintiff's brief). The purpose of quoting this part of the legislative history was not, as Plaintiff suggests, to define the "services rendered" exception, but to make clear that the exception "prohibit[ed] payments which were made here to the buyers." *Id.* Indeed, the court went on to note that based on this legislative history, it was fair to conclude that "Congress must have intended that payments by sellers should not be made to buyers through any one acting as agent for the buyer." *Id.* at 691. This all led to the bottom line in *Biddle*: "[T]he brokerage fees by the sellers to the Biddle Company could not be made in good faith as compensation for services rendered, since the fees are intended for the buyers and are immediately transmitted to them." *Id.* at 691-92.

As should be clear from this description of the background and holding in *Biddle*, the question presented before the court in that case bore no resemblance to the question presented here. Therefore, the quotation from the legislative history, either standing alone or in the context in which it was quoted, does not support Plaintiff's cause.

Finally, Plaintiff points to a footnote in the Eight Circuit's decision in *Ideal Plumbing Co., v. Benco, Inc.*, 529 F.2d 972 (8th Cir. 1976). (WWE Resp. 29) In this footnote, the court observed that:

> It is also apparent that the terminology "goods, wares, or

32

merchandise" in the statute may merely modify the "services rendered" exception and therefore constitute only an element to be determined when a defendant contends that the concession was made in exchange for services rendered.

529 F.2d at 978 n.6. As with the other threads, Plaintiff is unable to weave this footnote into a

winning argument. First, Plaintiff's quotation leaves out the earlier part of the footnote, where

the court noted that "[s]ince the evidence was such that the District Court could hold as a matter

of law that the price reduction extracted from [defendant] . . . was not compensation in lieu of

brokerage, it is unnecessary to examine at length the District Court's alternative findings," which

included a finding that § 2(c) did not apply since the contract was for services. *Id.* In other

words, the court's comment on the "services rendered" exception was pure dicta. Second,

Plaintiff also left out the next portion of the footnote, where the court noted that there were

decisions in other circuits holding that § 2(c) applied only to "goods, wares, or merchandise," and

not to services. *Id.* It was after recognizing this line of authority, that the court offered, but did

not adopt, the counter-argument, quoted by Plaintiff, that the reference to goods, wares, or

merchandise "*may* merely modify the 'services rendered' exception . . . ." *Id.* (emphasis

added).[12] Thus, this footnote does not constitute the holding of the court and, therefore, is

insufficient to carry the day.

    In the end, Plaintiff is not able to cite a single holding that supports its reading of the

statute. Instead, in its quiver, Plaintiff only has a "diagram," one out-of-context quotation from

two Second Circuit decisions that do not remotely deal with the issue presented, and, at best,

---

[12] In support of this point, the court cited to the *Biddle* court's quote from the legislative history, which Plaintiff relies upon as well. As discussed above, relying on that quote is misguided. Also, it bears noting that no other court has adopted the *Ideal Plumbing* court's interpretation of the quote from *Biddle*.

33

equivocal dicta from another circuit.

Plaintiff's offering is paltry compared to the scores of cases that line up squarely with Defendants' view of the statute, which is that it simply does not, by its terms and consistent with its legislative history, cover services or other intangible items such as licenses. This authority spans each decade since enactment of the RPA, and includes jurisdictions covering virtually every time zone in the continental United States. *See Union City Barge Line, Inc. v. Union Carbide Corp.*, 823 F.2d 129, 141 (5th Cir. 1987) ("[T]he dominant nature of redelivery is a service, not a good. Thus, Gulf Coast's admittedly unlawful actions fall outside the statute's commercial bribery reach."); *May Dep't Store v. Graphic Process Co.*, 637 F.2d 1211, 1214 (9th Cir. 1980) ("It is necessary for an action under section 2(c) of the Robinson-Patman Act that the transactions between the parties constitute a sale of 'goods, wares, or merchandise. . . .'"); *Freeman v. Chicago Title and Trust Co.*, 505 F.2d 527, 529-30 (7th Cir. 1974) ("[W]e find no affirmative evidence that Congress intended section 2(c) to be the only Robinson-Patman provision applicable to intangibles. . . ."); *Webb-Crawford Co. v. FTC*, 109 F.2d 268, 270 (5th Cir. 1940) (noting that "services rendered" only modifies the preceding phrase relating to brokerage fees); *Yeager v. Waste Mgmt, Inc.*, 3:89 Civ. 7248, 1994 WL 761959, at *1 (N.D. Ohio Sept. 30, 1994) (granting defendant's summary judgment motion because complaint related only to landfill services); *Myano Mach. USA, Inc. v. Zonar*, No. 92 Civ. 2385, 1993 WL 23758, at *6 (N.D. Ill. Jan. 29, 1993) (granting motion to dismiss where payments related to "sale of a business opportunity, even the opportunity to sell goods"); *Empire State Pharm. Soc.*, 778 F. Supp. at 1258 (imposing Rule 11 sanctions on plaintiff for claiming in a complaint that § 2(c) applies to services); *Callahan v. Commonwealth Land Title Ins. Co.*, Civ. A. Nos. 88-7656, 88-

34